**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
CONSERVATION LAW              :    Civ. No. 3:21CV00933(SALM)
FOUNDATION, INC.              :
                              :
v.                            :
                              :
SHELL OIL COMPANY, et al.     :    September 16, 2022
                              :
------------------------------x
```

<u>**RULING ON MOTION TO DISMISS [Doc. #50]**</u>

Plaintiff Conservation Law Foundation, Inc. ("plaintiff" or "CLF") brings this citizen enforcement action pursuant to the Clean Water Act and the Resource Conservation and Recovery Act. <u>See</u> Doc. #47. Plaintiff proceeds pursuant to an Amended Complaint, asserting fourteen counts against defendants Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum Inc., Triton Terminaling LLC, and Motiva Enterprises LLC (collectively "defendants"). <u>See generally</u> Doc. #47.[1] Plaintiff seeks declaratory and injunctive relief, as well as the imposition of civil penalties to "remedy" defendants' alleged violations of federal law, including:

> (1) Shell's past and ongoing failures to comply with Connecticut Industrial Stormwater Permit ... and the Clean Water Act; (2) the Shell facility's location in a

---

[1] Throughout this Ruling, the Court cites to the page numbers reflected in each document's ECF header, rather than the pagination applied by the filing party.

floodplain and improperly managed susceptibility to
washout of solid waste, which poses a hazard to human
life, wildlife, and land and water resources; (3)
Shell's past and present contribution to handling,
storage, treatment, transportation, or disposal of solid
and hazardous wastes, which may present an imminent and
substantial endangerment to health or the environment in
violation of RCRA; and (4) Shell's failure to operate
and maintain its facility to minimize the possibility of
a fire, explosion, or any unplanned release of hazardous
waste or hazardous waste constituents to air, soil, or
surface water which could threaten human health or the
environment.

Doc. #47 at 1-2, ¶1. Plaintiff alleges that the above-described
"violations of federal law have occurred and are occurring at
Shell's New Haven Terminal, formerly the Motiva Enterprises LLC
New Haven Terminal, a bulk storage and fuel terminal[.]" Id. at
2, ¶2.

Defendants have filed a motion seeking to dismiss most of
the Amended Complaint, along with a supporting memorandum. See
Docs. #50, #50-1. Defendants seek dismissal of "all Causes of
Action in the Complaint[]" as to defendants Shell Oil Company,
Shell Petroleum, Inc., and Motiva Enterprises LLC. Doc. #50 at 1
(sic). Defendants also seek dismissal of "Causes of Action 1-9
and 12-14" as to defendants Equilon Enterprises LLC d/b/a Shell
Oil Products US and Triton Terminaling LLC. Id. Plaintiff has

filed an opposition to defendants' motion to dismiss, see Doc. #53, to which defendants have filed a reply. See Doc. #59.[2]

For the reasons stated below, defendants' Motion to Dismiss [**Doc. #50**] is **GRANTED, in part, and DENIED, in part.**

I.   **FACTUAL BACKGROUND**

For purposes of deciding the motion to dismiss, the Court presumes the following factual allegations made in the Amended Complaint [Doc. #47] to be true.

The allegations of the Amended Complaint focus on "a bulk storage and fuel terminal located at" the Port of New Haven, Connecticut (hereinafter the "Terminal"), id. at 2, ¶2, which "Defendants own and operate[.]" Id. at 14, ¶67; see also id. at 21, ¶106. The Port of New Haven sits on the banks of the New Haven Harbor and "is the highest volume commercial shipping port on the Long Island Sound[.]" Id. at 33, ¶¶170-71 (citation and quotation marks omitted). "[P]etroleum products arrive at the Terminal dock by tanker ship[,]" and are transferred to aboveground storage tanks. Id. at 21-22, ¶113. Due to the impacts of climate change, the Port of New Haven "is at

_____

[2] Defendants filed two reply briefs, which appear to be identical in form and substance. See Docs. #58, #59. For ease of reference, the Court cites only to the second filed brief, Doc. #59.

substantial risk of flooding from severe weather events." Id. at 34, ¶173.

The Terminal is operated "pursuant to the General Permit for Discharge of Stormwater Associated with Industrial Activity issued by" the Connecticut Department of Energy and Environmental Protection (the "Permit"). Doc. #47 at 35, ¶175. The Permit "applies to stormwater discharges from industrial activity at any facility that registers for coverage under the" Permit. Id. at 35, ¶178 (citation and quotation marks omitted). "The Permit requires Shell to implement 'Control Measures' to guard against the risks of pollutant discharges in the stormwater." Id. at 38, ¶192; see also id. at 38-41, ¶¶193-200 (describing the control measures required under the Permit). "The Permit requires the permittee to develop a Stormwater Pollution Prevention Plan, or SWPPP[.]" Id. at 41, ¶201; see also id. at 41-43, ¶¶202-07 (describing the elements required to be included in the SWPPP).

> The Permit requires that the SWPPP be amended within 120 days of certain events, including: (A) when there is a change at the site which has an effect on the potential to cause pollution of the surface waters of the state and (F) when necessary to address any significant sources or potential sources of pollution identified as a result of any inspection of visual monitoring.

Id. at 43, ¶208 (citation and quotation marks omitted).

4

The Terminal is also regulated under the Resource Conservation and Recovery Act as a "Small Quantity Generator" of hazardous waste. Id. at 28, ¶144; see also id. at 28, ¶143. "The soil and groundwater within the Terminal are contaminated[,]" because of "various chemical spills [that] have occurred on the site since at least the 1970s." Id. at 29, ¶¶148-49. Remediation activities continue to the present day. See id. at 29, ¶150.

"Plaintiff ... is a ... nonprofit, member-supported organization dedicated to the conservation and protection of New England's public health, environment, and natural resources." Doc. #47 at 3, ¶9. Plaintiff "has long worked to protect the health of New England's waterways, including addressing the significant water quality impacts of industrial and stormwater pollution." Id. Plaintiff's "members live near, recreate on, and regularly visit the area and waters near Shell's Terminal[.] ... [Plaintiff's] members use and enjoy these waters for recreational and aesthetic purposes, including, but not limited to boating, swimming, fishing, observing wildlife, and sightseeing; they intend to continue to engage in these activities in the future." Id. at 4, ¶10.

Plaintiff names five defendants and describes their corporate relationships at length in the Amended Complaint. See generally Doc. #47 at 5-14. Non-party Shell plc "is a holding

5

company and the ultimate parent company of a number of separate companies, engaged in the oil and gas business around the world, often referred to as the Shell group." Id. at 5, ¶17. Defendant Shell Petroleum, Inc., is a holding company with no employees and "is the ultimate United States parent of Shell group entities that conduct exploration and production, trading, refining, marketing, and retail operations in the United States." Id. at 6, ¶19; see also id. at 6, ¶21.

Defendant "Shell Oil Company is wholly owned by Shell Petroleum, Inc. and is an indirect subsidiary of Shell plc." Id. at 6, ¶23. "Shell Oil Company is Shell plc's primary operating subsidiary in the United States[]" and "has the power to direct or cause the direction of the management or policies of Defendant Equilon Enterprises LLC and Defendant Triton Terminaling, LLC." Id. at 6, ¶¶24-25.

Defendant Equilon Enterprises LLC ("Equilon") is an indirect subsidiary of Shell Oil Company and Shell plc doing business as "Shell Business Products US." Id. at 6, ¶¶26-27. Equilon holds the Permit and is an operator of the Terminal. See id. at 7, ¶¶28-29. Defendant Triton Terminaling LLC ("Triton") is also an indirect subsidiary of Shell Oil Company and Shell plc. See id. at 7, ¶30. Triton became an owner of the Terminal

in 2017, and is also an operator of the Terminal. See id. at 7, ¶¶31-32.

Defendant Motiva Enterprises LLC ("Motiva") owned the Terminal between 2000 and 2017. See id. at 7, ¶34. "Motiva was formed in 1988 as a joint venture between Shell Oil Company, Texaco Inc., and the Saudi Arabian Oil Company. In 2002, Shell Oil Company took over Texaco's interest in Motiva. In 2017, Motiva was dissolved and Shell maintained control over its assets in the Northeastern region of the United States, including ownership of the Terminal." Id. at 7, ¶¶35-36.

"Shell plc sets climate change policies and strategies for the entire Shell group of companies[,]" including "policies for managing and mitigating climate risks to facilities owned by companies in the Shell group." Doc. #47 at 8-9, ¶¶42-43. "Compliance with Shell's climate change policies and strategies is mandatory for each Defendant." Id. at 10, ¶51. "Shell plc holds Shell Oil Company accountable for ensuring Shell Oil Company's subsidiaries implement Shell's climate change policies and strategies. Shell Oil Company exercises control over Triton and Equilon to ensure implementation of Shell plc's climate change policies and strategies." Id. at 11, ¶¶55-56; see also id. at 12-13, ¶¶60-66 (describing the "Control Framework that specifies the standards for health, safety, security,

7

environment and social performance ... and the scope for
applying these standards for all entities in the Shell
group[]").

Plaintiff asserts the following causes of action against
all defendants: (1) Violation of the Clean Water Act – Failure
to Eliminate Non-Stormwater Discharges; (2) Violation of the
Clean Water Act – Activity Inconsistent with the Coastal
Management Act and Causing Adverse Impacts to Coastal Resources;
(3) Violation of the Clean Water Act – Unlawful Certification of
SWPPP; (4) Violation of the Clean Water Act – Failure to
Identify Potential Pollution Sources; (5) Violation of the Clean
Water Act – Failure to Describe and Implement Practices to
Reduce Pollutants and Ensure Permit Compliance; (6) Violation of
the Clean Water Act – Failure to Implement Measures to Manage
Runoff; (7) Violation of the Clean Water Act – Failure to
Minimize the Potential for Leaks and Spills; (8) Violation of
the Clean Water Act – Failure to Submit Required Facts or
Information to Connecticut Department of Energy and
Environmental Protection; (9) Violation of the Clean Water Act –
Failure to Amend or Update the SWPPP; (10) Violation of the
Clean Water Act – Failure to Identify Discharges to Impaired
Waters in SWPPP; (11) Violation of the Clean Water Act – Failure
to Conduct Monitoring for Discharges to Impaired Waters; (12)

8

Violation of the Resource Conservation and Recovery Act – Open Dumping; (13) Violation of the Resource Conservation and Recovery Act – Imminent and Substantial Endangerment to Human Health and the Environment; and (14) Violation of the Resource Conservation and Recovery Act – Failure to Comply with State and Federal RCRA Regulations Applicable to Generators of Hazardous Wastes. See Doc. #47 at 78-98.[3]

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v.

_____

[3] Counts 1-9 and 12-14 are hereinafter collectively referred to as the "Adaptation Claims."

NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively identical." Feldheim v. Fin. Recovery Servs., Inc., 257 F. Supp. 3d 361, 365 (S.D.N.Y. 2017) (citation and quotation mark omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); Fed. R. Civ. P. 12(b)(1). "However, on a Rule 12(b)(1) motion, the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction

exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6). This allocation of the burden of proof is the only substantive difference between the standards of review under these two rules." Feldheim, 257 F. Supp. 3d at 365-66 (citations and quotation marks omitted); see also Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) ("The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." (citation and quotation marks omitted)), aff'd, 561 U.S. 247 (2010). "[A] motion under Rule 12(b)(1) may ... rely on evidence beyond the pleadings. When a defendant makes such a fact-based motion, the plaintiff may respond with evidence of its own." SM Kids, LLC v. Google LLC, 963 F.3d 206, 210 (2d Cir. 2020) (citation omitted).

## III. **STATUTORY FRAMEWORK**

Before discussing the specific arguments raised in the Motion to Dismiss, the Court briefly summarizes the relevant statutory framework.

### A.   The Clean Water Act

The Clean Water Act ("CWA") "prohibits the discharge of any pollutant by any person unless done in compliance with some

provision of the Act." <u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency</u>, 846 F.3d 492, 502 (2d Cir. 2017) (citation and quotation marks omitted). The CWA "provides for the issuance, by the Administrator of the Environmental Protection Agency (EPA) or by authorized States, of National Pollutant Discharge Elimination System (NPDES) permits." <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 174 (2000). "With narrow exceptions not relevant here, a party must acquire an NPDES permit in order to discharge a specified amount of a specified pollutant[]" into navigable waters. <u>Trout Unlimited</u>, 846 F.3d at 502. "[E]very NPDES permit is statutorily required to set forth, at the very least, effluent limitations, that is, certain restrictions on the quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." <u>Waterkeeper All., Inc. v. U.S. E.P.A.</u>, 399 F.3d 486, 491 (2d Cir. 2005) (citation and quotation marks omitted). The "limitations on the discharge of pollutants," and the "related monitoring and reporting requirements[]" seek to "improve the cleanliness and safety of the Nation's waters." <u>Friends of the Earth</u>, 528 U.S. at 174. "Noncompliance with a permit constitutes a violation of the" CWA. <u>Id.</u>

12

Reflecting "cooperative federalism in the management of the nation's water sources[,] ... states typically control the NPDES permitting programs as they apply to waters within their borders, subject to EPA approval." Trout Unlimited, 846 F.3d at 502 (citations and quotation marks omitted). "In Connecticut, the department [of Energy and Environmental Protection] is responsible for issuing both federal and state discharge permits[,]" including NPDES permits. Burton v. Comm'r of Env't Prot., 970 A.2d 640, 645 n.4 (Conn. 2009); see also Conn. Gen. Stat. §§22a-416, et seq. (governing "Water Pollution Control").

The CWA "allows 'citizens' to bring civil enforcement actions seeking penalties or equitable relief 'against any person alleged to be in violation of the conditions of either a federal or state NPDES permit.'" Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. #1, 16 F. Supp. 3d 294, 301 (S.D.N.Y. 2014) (quoting 33 U.S.C. §1365(a)).

B.   The Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act ("RCRA") "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). The "primary purpose" of RCRA "is to reduce the generation of hazardous waste and to

13

ensure the proper treatment, storage, and disposal of that waste

... so as to minimize the present and future threat to human

health and the environment." Id. (citation and quotation marks

omitted). RCRA also "contains a citizen-suit provision which

permits private citizens to enforce its provisions." Brooklyn

Union Gas Co. v. Exxon Mobil Corp., 478 F. Supp. 3d 417, 426

(E.D.N.Y. 2020) (citation and quotation marks omitted).

## IV.   DISCUSSION

### A.   Failure to Comply with the Local Rules

At the outset of its brief, plaintiff asserts that the

Court should deny defendants' motion "because their Memorandum

violates the maximum page limit set by the Local Rules." Doc.

#53 at 12. "In the alternative[,]" plaintiff requests that the

Court "decline to consider Defendants' abstention argument,

which appears almost exclusively on the excess pages." Id. at

12-13.

Defendants have filed a Notice conceding that their

memorandum in support of the motion to dismiss inadvertently

fails to comply with Local Rule 10. See Doc. #54 at 1. To remedy

this, defendants have agreed, "[s]ubject to the Court's

approval[,]" to "strike their abstention argument from their

motion to dismiss, which comprises the over-length portion of

the brief." Id. at 2.

The Court will not deny defendants' motion for its failure to comply with the Local Rules. However, the Court **GRANTS, on consent**, the request to strike defendants' abstention argument. See Doc. #53 at 12-13; Doc. #54 at 2. The Court will not consider defendants' abstention argument,[4] and turns next to the threshold issue of standing.

B.    Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Silva v. Farrish, --- 4th ---, No. 21-0616, 2022 WL 3650689, at *5 (2d Cir. Aug. 25, 2022) (quoting U.S. Const. art. III, §2). "As a threshold inquiry, a federal court must determine that the plaintiff has constitutional Article III standing prior to determining ... the subsequent merits of the case." McCrory v. Adm'r of Fed. Emergency Mgmt. Agency of U.S. Dep't of Homeland Sec., 600 F. App'x 807, 808 (2d Cir. 2015).

Defendants contend that plaintiff lacks standing to bring the Adaptation Claims because "[t]hese claims are based only on CLF's members' fears of a future injury." Doc. #50-1 at 24. Defendants assert that: (1) plaintiff's alleged injury-in-fact

---

[4] Although the Court does not consider this argument, a review of the relevant case law reflects that other courts have largely rejected similar abstention arguments.

is not certainly impending; (2) the allegations of the Amended Complaint do not show a serious likelihood that harm will occur as required for standing to seek civil penalties; and (3) plaintiff's alleged injury-in-fact is not traceable to the actions of defendants. See id. at 26-30. Plaintiff contends that it has adequately alleged an injury-in-fact. See Doc. #53 at 13-18.[5] In reply, defendants reassert that plaintiff has not adequately alleged an injury-in-fact that is imminent or traceable. See Doc. #59 at 9-11.

     *1. Applicable Law*

    "Although we generally accept the truth of a plaintiff's allegations at the motion to dismiss stage, the plaintiff still bears the burden of alleging facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." Calcano v. Swarovski N. Am. Ltd., 36 F.4th 68, 75 (2d Cir. 2022) (citation and quotation marks omitted). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each of the elements that make up the irreducible constitutional minimum of standing." Fac. v. N.Y.

---

[5] Plaintiff has opted to address only "the injury-in-fact prong of the standing test ... because Defendants' challenge to CLF's standing is based exclusively on that prong[,]" and defendants' other standing arguments are "wholly derivative of their injury-in-fact argument." Doc. #53 at 13 n.4.

<u>Univ.</u>, 11 F.4th 68, 74 (2d Cir. 2021) (footnote and quotation marks omitted), <u>cert. denied sub nom.</u> <u>Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.</u>, No. 21-1046, 2022 WL 2111369 (U.S. June 13, 2022).

"[T]o establish standing, a plaintiff must show (i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2203 (2021).[6]

> An injury in fact must be particularized, and it must be concrete. Particularized injuries affect the plaintiff in a personal and individual way. Concrete injuries are "physical, monetary, or cognizable intangible harms traditionally recognized as providing a basis for a lawsuit in American courts.

<u>Harty v. W. Point Realty, Inc.</u>, 28 F.4th 435, 442-43 (2d Cir. 2022) (citations and quotation marks omitted).

---

[6] Defendants do not contest organizational standing. The Court therefore does not address that issue. <u>See</u> <u>Friends of the Earth</u>, 528 U.S. at 181 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

> 2.   *Analysis*
>
> a.   Imminence

Defendants assert that plaintiff's "claimed injury to aesthetic and recreational uses of waterways" does not describe an injury that is certainly impending. Doc. #50-1 at 26. Plaintiff responds that it "has sufficiently alleged that the risks of severe weather to – and the resultant pollutant discharges from – the Terminal are both 'substantial' and 'certainly impending.'" Doc. #53 at 14.

> [T]he Supreme Court has made clear that "allegations of possible future injury" or even an "objectively reasonable likelihood" of future injury are insufficient to confer standing. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409-10 (2013) (internal quotation marks, alterations, and emphasis omitted). Rather, a future injury constitutes an Article III injury in fact only "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

McMorris v. Carlos Lopez & Assocs., LLC, 995 F.3d 295, 300 (2d Cir. 2021); see also Calcano, 36 F.4th at 74 ("A plaintiff pursuing injunctive relief may not rely solely on past injury, but also must establish that she is likely to be harmed again in the future in a similar way. Such threatened injury must be certainly impending to constitute injury in fact, and

allegations of <u>possible</u> future injury are not sufficient." (citation and quotations marks omitted) (emphases in original)).[7]

The Supreme Court in <u>TransUnion v. Ramirez</u>, 141 S. Ct. 2190 (2021), recently "established that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm[.]" <u>Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.</u>, 19 F.4th 58, 64 (2d Cir. 2021); see also <u>Cons. L. Found., Inc. v. ExxonMobil Corp.</u>, 579 F. Supp. 3d 119, 121 (D. Mass. 2021) ("<u>CLF I</u>") ("The Supreme Court held that, with regard to a suit for damages, the mere risk of future harm is not enough to establish standing.").

<u>TransUnion</u>, however, does not seem to have materially altered standing jurisprudence for parties seeking <u>injunctive</u> relief. Rather, the Supreme Court again "recognized[]" that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." <u>TransUnion</u>, 141 S. Ct. at 2210. The <u>TransUnion</u> decision therefore appears to recognize the fundamental

---

[7] "It is well established that a plaintiff must demonstrate Article III standing for each type of relief she or he seeks." <u>Garthwait v. Eversource Energy Co.</u>, No. 3:20CV00902(JCH), 2022 WL 1657469, at *4 (D. Conn. May 25, 2022). Plaintiff seeks declaratory and injunctive relief, as well as the imposition of civil penalties. <u>See</u> Doc. #47 at 99.

differences between damages and injunctive or other deterrent relief. See id. ("[A] plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages.").

Defendants categorize the risks alleged in the Amended Complaint as those stemming from "possible future weather risks[,]" including: "(1) flooding due to storms and storm surge; (2) flooding due to sea level rise; (3) flooding due to increasing sea temperatures; and, (4) severe precipitation[.]" Doc. #50-1 at 26 (citations to Amended Complaint omitted). Defendants contend that none of these alleged risks are "certainly impending." Id. (citation and quotation marks omitted). The allegations of the Amended Complaint, however, plainly allege the near-term harms from foreseeable weather events.

Plaintiff alleges: "Climate change and its associated impacts are affecting New Haven now[,]" and New Haven "currently experiences frequent flooding due to heavy rainfall and increasingly severe hurricanes and winter storms." Doc. #47 at 14, ¶68 (citation and quotation marks omitted). Although the Amended Complaint cites to future projections of the impact of climate change on New Haven, it also alleges "that the acceleration of the negative impacts of climate change [such as

increased surface temperature in Long Island Sound and sea level
rise] is happening now and will only get more pronounced as each
year goes by." Id. at 15, ¶72; see also id. at 48-49, ¶¶228-29
("These changes, which exacerbate the risk of pollutant
discharges and/or releases from precipitation and/or flooding,
have already occurred, are continuing to occur, and are certain
to worsen over time."). Plaintiff further alleges: (1) storm
surge is increasing in Connecticut; (2) the severity and
frequency of coastal flooding is increasing in Connecticut; and
(3) "The storm surge threat associated with nor'easters in New
England is steadily increasing due to sea level rise." Id. at
51, ¶250; see also id. at 51 ¶¶245, 247, 249; id. at 52, ¶253
("New Haven experiences frequent flooding due to heavy rainfall
and increasingly severe hurricanes and winter storms. Weather-
related flooding is compounded by a high rate of sea level rise
of 2.5mm per year[.]" (citation and quotation marks omitted)).
Relatedly, plaintiff alleges that "[s]ea levels are rising in
Connecticut[,]" which has contributed to increased coastal
flooding as well as "pollutant discharges and/or releases from
the Terminal." Doc. #47 at 56-57, ¶¶267, 273-74. Plaintiff
alleges that sea surface temperatures in New England are rising,
which causes more intense and more frequent storm events, which
"cause and contribute to pollutant discharges and/or releases

from the Terminal due to ... inadequate infrastructure design and infrastructure failure." Id. at 63, ¶298; see also id. at 62, ¶¶294-96. Plaintiff also alleges that "[t]he average annual precipitation is increasing in Connecticut[,]" and that "[s]evere or intense precipitation events have caused, contributed to, and will continue to cause and contribute to pollutant discharges and/or releases from the Terminal due to ... inadequate infrastructure design and infrastructure failure." Id. at 64, ¶¶305, 307.

As alleged in the Amended Complaint, these threatened injuries are not purely theoretical. Plaintiff alleges that "the Terminal is immediately adjacent to the New Haven Harbor, houses multiple large petroleum storage tanks near sea-level, and has suffered spills before[.]" Doc. #47 at 16, ¶74; see also id. at 54, ¶¶259-60. The Amended Complaint further alleges that "[t]he Port is at substantial risk of flooding from severe weather events[]" because it sits "partly within the 100-year floodplain with a base level elevation equal to the costal inundation." Id. at 34, ¶173 (citation and quotation marks omitted); see also id.

at 37, ¶187 ("The Terminal is located within the delineated coastal boundary in New Haven.").[8]

These allegations "make[] clear that a major weather event, magnified by the effects of climate change, could happen at virtually any time, resulting in the catastrophic release of pollutants due to Defendants' alleged failure to adapt the Terminal to address those impending effects. While it might not occur for many years, the fact that it is certainly impending is enough to meet the standard." Cons. L. Found., Inc. v. Shell Oil Prod. US, No. 17CV00396(WES), 2020 WL 5775874, at *1 (D.R.I. Sept. 28, 2020) ("CLF II"). Accordingly, at this stage, the Amended Complaint sufficiently alleges that the alleged injuries to plaintiff's members are "certainly impending" and/or present a "substantial risk." See Garthwait, 2022 WL 1657469, at *4 ("To demonstrate standing to seek prospective relief, a plaintiff must show that they are likely to be subjected to future harm, i.e., that a real or immediate threat of injury exists." (citations and quotation marks omitted)).[9]

_____

[8] Plaintiff supports many of its allegations with citations to various publications detailing the measurable effects of climate change on the area of the Terminal.

[9] Plaintiff may pursue its claims for prospective relief where "the injury is certainly impending." Clapper, 568 U.S. at 409 (citation and quotation marks omitted). Plaintiff represents that it "is not alleging harm for risks in the far future – CLF

### b.   *Civil Penalties*

Defendants contend that <u>TransUnion</u> "is fatal to CLF's claims for civil penalties[,]" because "[l]ike in <u>TransUnion</u>, CLF's allegations regarding the current risk amount to only mere possibility." Doc. #50-1 at 28. In sum, defendants "question whether CLF's Adaptation Claims satisfy the requirement for a concrete and particularized injury in fact." <u>Id.</u> (citation and quotation marks omitted). Plaintiff responds that these "arguments are meritless[,]" because "<u>Transunion</u>'s holding is expressly limited to actions seeking <u>damages</u>, whereas CLF seeks <u>civil penalties</u>[.]" Doc. #53 at 17 (sic). Plaintiff further contends that its "members allege concrete injuries as a result of Defendants' conduct." <u>Id.</u> at 18. In reply, defendants assert: "Nowhere in <u>TransUnion</u> does the Court state that the holding is limited to claims for damages[,]" and the standard set forth in that decision "should apply to claims for civil penalties[.]" Doc. #59 at 11 (footnote omitted).

---

alleges that the risk to the Terminal is present now and is increasing over time. ... CLF cites certain future projections to support the inference that risks are increasing." Doc. #53 at 16. The allegations of the Amended Complaint, as discussed above, support this representation. Plaintiff may not pursue its claims to the extent those claims rely solely on <u>possible</u> future injury. <u>See</u> <u>id.</u>; <u>see also</u> <u>CLF II</u>, 2020 WL 5775874, at *1.

The TransUnion decision itself, and the decisions of other courts to have analyzed it, suggest that TransUnion is limited to actions seeking damages. As the Second Circuit recently stated: "TransUnion now makes clear that the 'material risk' standard applies only with respect to injunctive relief and that 'in a suit for damages[,] mere risk of future harm, standing alone, cannot qualify as a concrete harm.'" Harty, 28 F.4th at 443 (quoting TransUnion, 141 S. Ct. at 2210-11). An earlier Second Circuit case similarly noted: "In sum, TransUnion established that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm[.]" Maddox, 19 F.4th at 64 (emphasis added); see also CLF I, 578 F. Supp. 3d at 121 ("The Supreme Court held that, with regard to a suit for damages, the mere risk of future harm is not enough to establish standing.").

There is no clear Supreme Court or Second Circuit guidance on how TransUnion impacts the question of standing for claims seeking civil penalties. Defendants, relying on CLF I, assert that "[t]he same reasoning [set forth in TransUnion] applies to a claim for civil penalties instead of damages." Doc. #50-1 at 29 n.1. The Court does not agree. CLF I merely suggests that the reasoning of TransUnion "with regard to standing claims for

25

damages <u>may be</u> equally applicable to claims for civil penalties for future violations." <u>CLF I</u>, 578 F. Supp. 3d at 121 (emphases added). Regardless, defendants' arguments ignore the fundamental differences between damages and civil penalties, which are meaningful to the question of standing.

Civil penalties are "designed in some measure to punish culpable individuals, and not simply to extract compensation or restore the status quo." <u>City of New York v. Milhelm Attea & Bros.</u>, No. 06CV03620(CBA), 2012 WL 3579568, at *28 (E.D.N.Y. Aug. 17, 2012) (citation and quotation marks omitted). "Civil penalties also serve the purposes of encouraging defendants to discontinue current violations and deterring them from committing future ones." <u>Id.</u> (citations and quotation marks omitted). Accordingly, civil penalties are "[s]imilar to permanent injunctions," because they "are imposed to deter the wrongdoer from similar conduct in the future[.]" <u>Sec. & Exch. Comm'n v. Blockvest, LLC</u>, No. 18CV02287(GPB)(MSB), 2020 WL 7488067, at *5 (S.D. Cal. Dec. 15, 2020); <u>see also</u> <u>Sec. & Exch. Comm'n v. Vander Tuig</u>, No. 2:21CV05381(MCS), 2022 WL 1518254, at *4 (C.D. Cal. Apr. 19, 2022) ("Because civil penalties, like injunctions, are intended to deter future violations, courts often apply the same factors for determining whether an injunction should issue to decide whether a civil penalty

26

should issue."); Ctr. for Biological Diversity v. Univ. of N.C. at Chapel Hill, No. 1:19CV01179(CCE), 2021 WL 3861388, at *7 (M.D.N.C. Aug. 30, 2021) ("Civil penalties, if awarded, would redress injuries to the plaintiffs' members by deterring future violations."), appeal dismissed, No. 21-2089, 2021 WL 7908071 (4th Cir. Nov. 23, 2021).

Additionally, the CWA "does not authorize civil penalties separately from injunctive relief; rather, the two forms of relief are referred to in the same subsection, even in the same sentence." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 58 (1987). Thus, "[t]he citizen suit provision suggests a connection between injunctive relief and civil penalties that is noticeably absent from the provision authorizing agency enforcement." Id. Given the similar purpose served by civil penalties and prospective injunctive relief, the Court is persuaded that post-TransUnion, the standing analysis for claims seeking civil penalties should align with that applicable to prospective injunctive relief, rather than that applicable to damages.

Additionally, plaintiff has alleged that its members "use and enjoy" the waters near the Terminal "for recreational and aesthetic purposes," and "are affected by, and concerned with, pollutant discharges[.]" Doc. #47 at 4, ¶¶10, 13. "To establish

a concrete and particularized injury, harm that in fact affects the recreational or even the mere aesthetic interests of the plaintiff will suffice." <u>CLF II</u>, 2020 WL 5775874, at *2 (citation and quotation marks omitted); <u>see also</u> <u>Mancuso v. Consol. Edison Co. of N.Y.</u>, 25 F. App'x 12, 13 (2d Cir. 2002) ("The Supreme Court has held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." (citation and quotation marks omitted)); <u>Brooklyn Union Gas Co.</u>, 478 F. Supp. 3d at 429 ("Courts have also recognized aesthetic injuries as a basis for standing to assert RCRA citizen suits."). Accordingly, the Amended Complaint adequately alleges facts to establish standing for plaintiff "to seek penalties for violations that are ongoing at the time of the complaint and that could continue into the future if undeterred." <u>Friends of the Earth</u>, 528 U.S. at 188 (footnote omitted).

> c.  *Traceability*

Last, defendants assert that plaintiff's "Adaptation Claims fail to satisfy the injury-in-fact and fairly traceable prongs of standing because they rest on a speculative chain of

possibilities that largely lack any factual support." Doc. #50-1 at 29.

"The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (citation and quotation marks omitted). "The causal connection element of Article III standing[] ... does not create an onerous standard. ... [I]t is a standard lower than that of proximate causation. A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." Carter v. HealthPort Techs., LLC, 822 F.3d 47, 55-56 (2d Cir. 2016) (citation and quotation marks omitted).

The alleged injuries to plaintiff's members "flow[] from the conduct [plaintiff] challenges: Defendants' failure to prepare the Terminal for the coming impacts of climate change." CLF II, 2020 WL 5775874, at *2. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted).

29

Plaintiff has alleged that the injury to its members is attributable to the actions, or deliberate inaction, of defendants. Accordingly, plaintiff has adequately alleged, at this stage of the proceedings, that the injuries to its members are fairly traceable to defendants. See Carter, 822 F.3d at 59 ("[A] plaintiff's injury need not be 'directly' attributable to a defendant in order to show the causation element of standing to sue that defendant, so long as the injury is 'fairly traceable' to that defendant.").

Thus, for the reasons stated, plaintiff has adequately alleged standing for claims arising from certainly impending or near-term harms.

### C. __Subject Matter Jurisdiction as to Motiva__

Defendants assert that the Court lacks jurisdiction over Motiva, the Terminal's former owner and operator, because Motiva is not alleged to be in violation of the Permit. See Doc. #50-1 at 23-24. Plaintiff responds, in relevant part, that "Motiva should not be absolved from liability" because "there is a connection between the current and former Terminal operators[.]" Doc. #53 at 42. In reply, defendants assert that plaintiff "ignores bedrock principles of corporate law[.]" Doc. #59 at 8.

30

1.   *Claims Asserted Pursuant to the CWA*

The Court begins with plaintiff's claims asserted pursuant to the CWA. The citizen suit provision of the CWA provides that "any citizen may commence a civil action on his own behalf -- against any person ... who is <u>alleged to be in violation</u> of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation[.]" 33 U.S.C. §1365(a)(1) (emphases added).

> This requires a citizen-plaintiff to "allege a state of either continuous or intermittent violation — that is, a reasonable likelihood that a past polluter will continue to pollute in the future." <u>Gwaltney</u>, 484 U.S. at 57. To satisfy federal subject matter jurisdiction, plaintiff's allegations of continuing violation must be made in "good faith." <u>Id.</u> at 64.

<u>Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.</u>, 989 F.2d 1305, 1311 (2d Cir. 1993). "Good faith allegations [of a continuing violation] ... will defeat a motion to dismiss on the pleadings for lack of subject matter jurisdiction." <u>Id.</u> at 1312. "The critical time for determining whether there is an ongoing violation is when the complaint was filed." <u>Id.</u> at 1311.

Plaintiff alleges that Motiva "is a wholly owned subsidiary of Saudi Refining Inc. and Aramco Financial Services Co.," that "operated the Terminal between 2000 and 2017." Doc. #47 at 7, ¶¶33-34. "Motiva was formed in 1998 as a joint venture between

Shell Oil Company, Texaco Inc., and the Saudi Arabian Oil Company. ... In 2002, Shell Oil Company took over Texaco's interest in Motiva." Id. at 7, ¶35. "In 2017, Motiva was dissolved and Shell maintained control over its assets in the Northeastern region of the United States, including ownership of the Terminal." Id. at 7, ¶36. As part of the dissolution, Motiva assigned its permits to Triton and Equilon. See id. at 8, ¶37.

Plaintiff argues in briefing that the Permit violations that occurred under Motiva's operation of the Terminal have been occurring since 2016 and continued through 2020. See Doc. #53 at 41. Plaintiff cites to no allegations of the Amended Complaint in support of this claim. Rather, the allegations of the Amended Complaint explicitly state that Motiva ceased ownership and operation of the Terminal, and transferred its permits in 2017. See Doc. #47 at 7-8, ¶¶33-37. This supports the conclusion, or at least the inference, that Motiva's violations, for purposes of the CWA, are "wholly past" notwithstanding any vague argument that there remains a connection between Motiva and the current owner/operators of the Terminal.[10]

---

[10] With no analysis, the court in CLF II declined to dismiss Motiva from that action because "Motiva's continued control is a live issue." CLF II, 2020 WL 5775874, at *4. Based on the allegations of the Amended Complaint, and plaintiff's scant arguments on this point, Motiva's continued control is not a live issue here. See also Paolino v. JF Realty, No.

32

The decision in Friends of Sakonnet v. Dutra, 738 F. Supp. 623 (D.R.I. 1990), is persuasive on this question. There, the Court considered "whether a person who has violated the Clean Water Act may avoid liability by relinquishing ownership of the polluting source although the violation continues." Id. at 632. Applying "the plain language of the citizens' suit statute, 33 U.S.C. §1365(a)[,]" the Court found that prior owners of a property which continued to be in violation of the CWA could not be held liable under the CWA because they were "not presently violating the Act." Id. at 632-33 (footnote omitted); see also id. at 636. The Court reasoned: "The phrase 'any person ... who is alleged to be in violation' is clearly directed to a present violation by the person against whom the citizen suit is brought." Id. at 632-33. The Court further explained, persuasively, that "the notice requirement of §1365(b)(1)(A) would serve little purpose in a suit against past owners of a pollution source." Id. at 633 (footnote omitted).

Other courts to have considered this issue have reached similar conclusions. See, e.g., Brossman Sales, Inc. v. Broderick, 808 F. Supp. 1209, 1214 (E.D. Pa. 1992) ("Since

---

12CV00039(ML), 2013 WL 3867376, at *4 (D.R.I. July 24, 2013) (allowing suit to proceed against former owner where the former owner potentially maintained control).

33

defendants in this case have relinquished ownership of the source of the alleged violation and no longer have the control to abate it, the statute is likewise inapplicable to them."); Daigle v. Cimarex Energy Co., 333 F. Supp. 3d 604, 613-14 (W.D. La. 2018) ("[T]he CWA is inapplicable to impose liability upon" a defendant where "the Complaint expressly acknowledges that [defendant] ceased all operations at the Garth Well in 2009[;] ... has not done anything at the Garth Well at any time since[;]" and "sold all of its interest in the Garth Well effective May 2010."); Black Warrior Riverkeeper, Inc. v. Birmingham Airport Auth., No. 07CV00591(IPJ), 2008 WL 11377643, at *2 (N.D. Ala. Mar. 3, 2008) ("Several district courts have examined the issue of allowing past owners to be liable for current violations. Each of those courts [has] found that a wholly past owner or operator can have no liability for current violations."). Accordingly, because Motiva is not "alleged to be in violation" of the CWA, all claims asserted pursuant to the CWA against Motiva are **DISMISSED**.

>    2.   *Claims Asserted Pursuant to RCRA*

The analysis with respect to plaintiff's claims asserted pursuant to RCRA is somewhat different. The citizen suit provision for RCRA provides in relevant part:

34

> [A]ny person may commence a civil action on his own
> behalf -- (1)(A) against any person ... who is alleged
> to be in violation of any permit, standard, regulation,
> condition, requirement, prohibition, or order which has
> become effective pursuant to this chapter; or (B)
> against any person ... including any past or present
> generator, past or present transporter, or past or
> present owner or operator of a treatment, storage, or
> disposal facility, who has contributed or who is
> contributing to the past or present handling, storage,
> treatment, transportation, or disposal of any solid or
> hazardous waste which may present an imminent and
> substantial endangerment to health or the environment[.]

42 U.S.C. §6972(a)(1). "Citizen suits under RCRA can be brought

only against persons engaged in RCRA violations that are

ongoing." S. Rd. Assocs. v. Int'l Bus. Machines Corp., 216 F.3d

251, 252 (2d Cir. 2000). There is "no blanket requirement that

current action be alleged[]" as to each named defendant. Id. at

254. Rather, the Court is to "consider[] each allegation of

unlawful disposal and storage and test[] its sufficiency against

the wording of the statute[.]" Id.

> Thus a defendant's current activity at the site is not
> a prerequisite for finding a current violation under 42
> U.S.C. §6972(a)(1)(A). The inquiry required by Remington
> Arms — the same inquiry required by §6972(a)(1)(A) — is
> whether the defendant's actions — past or present — cause
> an ongoing violation of RCRA. That question turns on the
> wording of the prohibition alleged.

Id. at 254-55.

Plaintiff asserts claims pursuant to RCRA for "open dumping

of waste in violation of RCRA [Count 12]; ... creation of an

imminent and substantial endangerment to health or the

35

environment in violation of RCRA [Count 13]; and ... failure to comply with state and federal RCRA regulations applicable to generators of hazardous wastes [Count 14]." Doc. #47 at 5, ¶16; see also id. at 89-98 (capitalizations altered). Of the three RCRA claims asserted, only Count 13 asserts a claim for imminent and substantial endangerment to human health and the environment. See id. at 93-94. Because section 42 U.S.C. §6972(a)(1)(B) expressly contemplates that an action may be brought against past or present owners who have contributed to the ongoing violation, defendants' motion to dismiss Motiva as to Count 13 is **DENIED**. See Remington Arms, 989 F.2d at 1316 ("An imminent hazard citizen suit will lie against any past or present RCRA offender who has contributed or who is contributing to past or present solid waste handling practices that may present an imminent and substantial endangerment to health or the environment. Therefore, under an imminent hazard citizen suit, the endangerment must be ongoing, but the conduct that created the endangerment need not be." (citation and quotation marks omitted)).

Count 12 asserts "violation of [RCRA] – open dumping[.]" Doc. #47 at 89 (capitalizations altered). This claim appears to be asserted pursuant to 42 U.S.C. §6945(a). See Doc. #47 at 19, ¶93. "Section 6945 of RCRA prohibits 'any solid waste management

36

practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste.' That section is enforceable through Section 6972 against 'persons engaged in the act of open dumping.'" Chart v. Town of Parma, No. 10CV06179(MWP), 2012 WL 3839241, at *9 (W.D.N.Y. Aug. 28, 2012) (quoting 42 U.S.C. §6945). "A historical act cannot support a claim for violation of 42 U.S.C. §6945(a)." June v. Town of Westfield, N.Y., 370 F.3d 255, 259 (2d Cir. 2004) (citation and quotation marks omitted).

The Amended Complaint alleges that "the soil and ground water at the Terminal ... contains high volumes of hazardous waste." Doc. #47 at 90, ¶468 (sic). The Amended Complaint further alleges that "the Terminal has been subject to storm surge inundation in the past in the containment areas. Inundation by flood waters result in the washout and carrying away of discarded petroleum products and other contaminants." Id. at 92, ¶¶477-78 (sic). Specifically, plaintiff alleges "that the Terminal flooded during Tropical Storm Irene in 2011, causing the Terminal to discharge several pollutants well beyond Benchmark levels." Id. at 54, ¶260. The allegations of the Amended Complaint state that Motiva operated the Terminal at the time of this flooding.

Plaintiff has not alleged that Motiva "was engaged in the act of open dumping" at the time plaintiff filed the original Complaint. Accordingly, plaintiff has not stated a cause of action against Motiva as to Count 12. See June, 370 F.3d at 259 (dismissing RCRA open dumping claim where the "allegations were of a purely historical act[]"); Chart, 2012 WL 3839241, at *10 (dismissing RCRA open dumping claim where plaintiff failed to allege "that the [defendant] was engaged in the act of open dumping at the time [plaintiff] filed his complaint[]" (footnote and quotation marks omitted)); N. Cal. River Watch v. Fluor Corp., No. 10CV05105(MEJ), 2014 WL 3385287, at *10 (N.D. Cal. July 9, 2014) ("The fact that unremediated pollutants remain on the Site is not sufficient to allege an ongoing violation of the open dumping prohibition."). Thus, Count 12 as to Motiva is **DISMISSED**.[11]

Count 14 asserts "violation of [RCRA] – failure to comply with state and federal RCRA regulations applicable to generators of hazardous wastes[.]" Doc. #47 at 96 (capitalizations altered). Plaintiff asserts that defendants are in violation of 40 C.F.R. §262.16(b)(8)(i), which provides: "A small quantity generator must maintain and operate its facility to minimize the

---

[11] This Count is also dismissed against all defendants for reasons stated in Section IV.E.4.a., below.

possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment." 40 C.F.R. §262.16(b)(8)(i); see also Doc. #47 at 98, ¶512. According to the allegations of the Amended Complaint, Motiva ceased to exist and was not maintaining or operating the Terminal at the time plaintiff filed the Complaint. Accordingly, Motiva was not a small quantity generator within the meaning of RCRA, and was not required to comply with the regulations applicable to hazardous waste generators. Accordingly, Count 14 as to Motiva is **DISMISSED.**[12]

Thus, for the reasons stated, all claims asserted against Motiva are **DISMISSED, other than Count 13.**

D.   Claims Against the Non-Owner/Operator Defendants

Defendants assert that the Amended Complaint is defective because it groups "separate corporate entities under a single name – 'Shell' – without specifying the conduct allegedly attributable to each" named defendant. Doc. #50-1 at 20-21. Defendants contend that the Amended Complaint: (1) violates the pleading requirements of Rule 8 of the Federal Rules of Civil

---

[12] This Count is dismissed against all defendants for the reasons stated in Section IV.E.4.b., below.

Procedure; and (2) "does not allege any facts that would suffice to meet the high standard of holding a corporate entity liable for acts of an affiliate." Id. at 21. Plaintiff asserts that the allegations of the Amended Complaint "are sufficient to state a claim against the Parent Defendants because (i) CLF's use of 'Defendants' and 'Shell' makes clear that CLF is asserting all claims against all Defendants, and (ii) CLF sufficiently alleges that the Parent Defendants exercise control over environmental safety at the Terminal." Doc. #53 at 35-36. The Court addresses each argument in turn.

### 1. Rule 8

Rule 8 of the Federal Rules of Civil Procedure sets a "lenient standard" for pleading. Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004). Rule 8 "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged," but it does require, "at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (citation and quotation marks omitted); see also Bruce Kirby, Inc. v. Quarter Moon, Inc., No. 3:17CV01389(JAM), 2018 WL 3614120, at *1 (D. Conn. July 27, 2018) ("Rule 8 pleading is extremely permissive[.]" (citation and quotation marks omitted)). "Moreover, nothing in Rule 8

prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." Bruce Kirby, 2018 WL 3614120, at *1 (citation and quotation marks omitted).

The Amended Complaint refers to all five defendants collectively as "Shell" or "Defendants." See generally Doc. #47. Although defendants attack this group pleading, they do not claim to lack adequate notice of the claims asserted against them. "[M]otions to dismiss for improper group pleading fail when, even though the plaintiff refers to 'defendants' generally rather than a particular defendant individually, it is sufficiently clear that in the particular factual context of the case the complaint furnishes adequate notice for initial pleading purposes of plaintiff's claim of wrongdoing." Arias v. E. Hartford, No. 3:20CV00895(JCH), 2021 WL 3268846, at *4 (D. Conn. July 30, 2021) (citation and quotation marks omitted). Here, the Amended Complaint is adequately clear that identical claims are being asserted against each defendant. See Doc. #47 at 1, ¶1; id. at 21, ¶106; id. at 24, ¶121. Accordingly, the Amended Complaint provides adequate notice to defendants for initial pleading purposes.

2.   *Non-Owner/Operator Defendants*

Defendants assert: "To the extent CLF contends the Non-Owner/Operator Defendants are liable for the acts of other corporate entities, that is easily dismissed. The Complaint fails as a matter of law to provide any basis to hold these two Defendants liable under such a theory." Doc. #50-1 at 22 (sic).[13] Plaintiff asserts that it "plausibly alleges that the Parent Defendants had sufficient control over the Terminal to be considered 'operators' that are independently liable for the violations alleged in the" Amended Complaint. Doc. #53 at 37.

The parties each rely on the Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998), to support their respective positions. See Doc. #50-1 at 22-23; Doc. #53 at 38-39; Doc. #59 at 7-8. Although "Bestfoods interprets CERCLA," other courts have found that "its interpretation also applies to questions of RCRA and CWA liability." Cons. L. Found., Inc. v. Shell Oil Prod. US, No. 17CV00396(WES), 2022 WL 2353065, at *2 n.3 (D.R.I. June 30, 2022) ("CLF III").

The Bestfoods decision considered the question of "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may,

_____

[13] The "Non-Owner/Operator Defendants" are Shell Oil Company and Shell Petroleum, Inc.

without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." <u>Bestfoods</u>, 524 U.S. at 55.

> The Supreme Court answered that question "no, unless the corporate veil may be pierced." <u>Id.</u> However, the Court also held that a "corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." <u>Id.</u>

<u>Yankee Gas Servs. Co. v. UGI Utils., Inc.</u>, 616 F. Supp. 2d 228, 240 (D. Conn. 2009). Defendants largely focus on whether plaintiff has alleged sufficient facts to plausibly support piercing of the corporate veil. <u>See</u> Doc. #50-1 at 22-23. Plaintiff contends, however, that it "alleges that the Parent Defendants are individually directly liable for the violations in the AC; CLF is not seeking to hold the Parent Defendants vicariously liable for the violations of the other defendants." Doc. #53 at 37 n.11. Accordingly, the Court considers whether the facts alleged in the Amended Complaint state a plausible claim for direct liability against the non-owner/operator defendants.

In considering whether a parent company has direct liability, "courts should focus on the parent's interaction with the subsidiary's facility, and not on the relationship between the two corporations. ... [T]he question is not whether the

parent operates the subsidiary, but rather whether it operates
the facility, and that operation is evidenced by participation
in the activities of the facility, not the subsidiary." Yankee
Gas, 616 F. Supp. 2d at 241 (citation and quotation marks
omitted).

As previously noted, the Amended Complaint alleges that
"Shell [defined to encompass all defendants], acting through its
officers, managers, subsidiary companies, and instrumentalities,
owns and operates the Terminal." Doc. #47 at 21, ¶106; see also
id. at 35, ¶175. The Amended Complaint further alleges:
"Defendants are[] ... responsible for the operation and
maintenance of the Terminal, including compliance with the
Permit." Id. at 24, ¶121. The Amended Complaint alleges that the
parent companies maintain centralized climate change policies
and strategies, which "are binding on all companies in the Shell
group." Id. at 8, ¶41; see also id. at 8-9, ¶¶42-43; id. at 10,
¶51 ("Compliance with Shell's climate change policies and
strategies is mandatory for each Defendant."). Construing these
allegations in the light most favorable to plaintiff, it is
reasonable to infer that such mandatory policies result in the
parent companies' "manage[ment], direct[ion], or conduct [of]
operations [at the Terminal] specifically related to the leakage
or disposal of hazardous waste, or decisions about compliance

44

with environmental regulations." <u>Pateley Assocs. I, LLC v.</u>
<u>Pitney Bowes, Inc.</u>, 704 F. Supp. 2d 140, 146 (D. Conn. 2010)
(citation and quotation marks omitted).

Thus, at this early stage, these allegations "state a
plausible claim for direct liability under the standard
enunciated in <u>Bestfoods</u>. Since corporate control is a fact-
specific inquiry and may support a finding of direct liability
under both the CWA and RCRA, Plaintiff's group allegations ...
pass muster to state a plausible claim[.]" <u>CLF III</u>, 2022 WL
2353065, at *2 (citation and quotation marks omitted).
Accordingly, defendants' motion to dismiss on this ground is
**DENIED**.

E.   <u>RCRA Claims (Counts 12, 13, and 14)</u>

Plaintiff asserts two different categories of claims
pursuant to RCRA. Counts 12 and 14 assert claims for regulatory
violations, and Count 13 asserts an imminent and substantial
endangerment claim. <u>See</u> Doc. #47 at 89-98. The regulatory
violations, asserted pursuant to 42 U.S.C. §6972(a)(1)(A),
require plaintiff to allege that defendants are "in violation of
any permit, standard, regulation, condition, requirement,
prohibition or order[.]" 42 U.S.C. §6972(a)(1)(A). The imminent
and substantial endangerment claim, asserted pursuant to 42
U.S.C. §6972(a)(1)(B), requires plaintiff to allege that

> any past or present generator, ... or past or present
> owner or operator of a treatment, storage, or disposal
> facility, ... has contributed or ... is contributing to
> the past or present handling, storage, treatment,
> transportation, or disposal of any solid or hazardous
> waste which may present an imminent and substantial
> endangerment to health or the environment[.]

42 U.S.C. §6972(a)(1)(B); see also White Plains Hous. Auth. v.
BP Prod. N. Am. Inc., 482 F. Supp. 3d 95, 115 (S.D.N.Y. 2020).

Defendants assert that "multiple elements of CLF's RCRA
claims lack factual support[,]" and therefore, the Court "must
dismiss" these claims. Doc. #50-1 at 31. Plaintiff responds that
it has plausibly alleged that defendants have violated RCRA. See
Doc. #53 at 25. The Court addresses defendants' arguments in
turn.

### 1. Waste

Defendants first assert that plaintiff's "RCRA claims fail
because its allegations do not concern 'waste.'" Doc. #50-1 at
31. Defendants contend that "the Terminal stores and distributes
saleable fuel and other 'products[,]'" and "saleable products
cannot be waste[.]" Id. Defendants further assert that although
they are alleged to be "generators of hazardous waste[,]" the
allegations related to the types of hazardous wastes listed in
the Amended Complaint "have nothing to do with the hazardous
waste they allege Defendants generate. Instead, CLF premises its
RCRA claims on the release of oil (saleable product) from the

46

Terminal's storage tanks." Id. at 32 (sic). Plaintiff asserts that the allegations of the Amended Complaint "encompass all of the waste at the Terminal, not just waste related to the product storage tanks." Doc. #53 at 27.

RCRA defines solid waste as, inter alia, "any garbage ... and other discarded material ... resulting from industrial, commercial, mining, and agricultural operations, and from community activities[.]" 42 U.S.C. §6903(27). "In order for waste to be classified as hazardous under RCRA, it must first qualify as a solid waste pursuant to the statute." Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 205 (2d Cir. 2009) (citation and quotation marks omitted).[14]

Defendants cite to a slew of out of circuit case law to support their position that saleable product, by definition, cannot be waste. See Doc. #50-1 at 32-33.[15] However, courts in

---

[14] Plaintiff's regulatory and imminent endangerment claims both require a finding that the waste at the Terminal constitutes "solid waste" under RCRA. See Simsbury-Avon, 575 F.3d at 205-06; Remington Arms, 898 F.2d at 1313.

[15] Defendants cite to No Spray Coal., Inc. v. City of New York, 252 F.3d 148 (2d Cir. 2001), in further support of this argument. There, the Second Circuit noted that it had previously "indicated that material is not discarded until after it has served its intended purpose." Id. at 150. Presumably, after the gasoline or petroleum product leaks from the above ground storage tanks (as plaintiff alleges is the risk), it is no longer usable and would not be able to serve its intended purpose.

this Circuit have found: "Gasoline and petroleum are considered a hazardous and solid waste under RCRA." White Plains Hous., 482 F. Supp. 3d at 115–16 (citation and quotation marks omitted); see also Bologna v. Kerr-McGee Corp., 95 F. Supp. 2d 197, 201 (S.D.N.Y. 2000) ("Petroleum is considered a hazardous and solid waste under RCRA.").

Plaintiff alleges that defendants' failure to prepare the Terminal for the imminent risks associated with the effects of climate change will result in the release of petroleum and other substances into the environment surrounding the Terminal. See Doc. #47 at 90, ¶486. Plaintiff has also pled the presence of other waste at the Terminal that is not gasoline or petroleum. See Doc. #47 at 28-29, ¶¶143-45, 151; id. at 89-90, ¶¶465, 466; id. at 93-94, ¶489; id. at 96-97, ¶504. Defendants assert that these allegations do not relate to the harm claimed in the Amended Complaint. The Court disagrees. The allegations of the Amended Complaint encompass not just the materials held in the storage tanks, but all waste at the Terminal. See Doc. #47 at 93-94, ¶¶487-90; id. at 96-97, ¶¶504-07. Accordingly, plaintiff has adequately alleged the presence of waste at the Terminal. See CLF II, 2020 WL 5775874, at *2 (finding, on similar allegations, that "[f]oundationally, Plaintiff has pleaded the existence of solid and hazardous waste at the Terminal[]");

48

United States v. Hill, No. 95CV01716(RSP)(GJD), 1998 WL 278291,
at *3 (N.D.N.Y. May 20, 1998) ("[L]eakage of gasoline from an
underground storage tank into the surrounding soil constitutes
disposal of a solid waste under RCRA.").

　　　　　　2.　　Infrastructure Allegations

　　　　Defendants next contend that plaintiff's RCRA claims "fail
to meet Iqbal's basic pleading standard[,]" because "CLF
provides no specific factual support detailing how Defendants
have allegedly failed to address these risks." Doc. #50-1 at 34.
Plaintiff responds that it "is not required to identify every
way that Defendants could change their facility to become RCRA-
compliant in addition to considering and preparing for the
impacts of climate change, especially at this early stage of the
case." Doc. #53 at 33.

　　　　The Amended Complaint alleges sufficient facts to support
the assertion that defendants have violated RCRA by failing to
adapt the Terminal to account for imminent risks caused by the
impacts of climate change. For example, plaintiff alleges:
"Shell's containment structures, which are not designed to
protect against floodwaters or storm surge flowing onto the
Terminal, were not designed with sufficient freeboard to
accommodate extreme precipitation or coastal flooding, including
reasonably foreseeable impacts of climate change." Doc. #47 at

49

56, ¶265; see also id. at 56, ¶266 ("Shell's SWPPP does not
include any measures that Shell is taking to protect the [above-
ground storage tanks], including such commonsense measures as
filling the tanks with liquid before storms or anchoring the
[above-ground storage tanks] to their bases, let alone
consideration of other strategies."). Additionally, it is
reasonable to infer from the allegations of the Amended
Complaint that the infrastructure at the Terminal is at risk of
experiencing the same infirmities as those alleged to have
occurred at Shell's Houston and Deer Park Facilities, among
others. See, e.g., Doc. #47 at 68-69, ¶¶322-326.[16]

Accordingly, defendants' motion to dismiss on this ground
is **DENIED**.

> 3.   *Imminent and Substantial Endangerment Claim
>       (Count 13)*

Defendants assert that plaintiff's "claim under RCRA's
endangerment provision also fails because the Complaint
identifies no act by any Defendant that is contributing to the
endangerment from the highly speculative flooding and severe

---

[16] The Court has reviewed that portion of the SWPPP cited by
defendants and disagrees with defendants' contention that
plaintiff's "conclusory statements contradict the language in
the SWPPP, which shows Defendants have considered that
stormwater could be impacted by petroleum products from storage
tanks should the BMPs described in those documents not be
considered." Doc. #50-1 at 34.

precipitation risks and fails to show how any such endangerment

is imminent." Doc. #50-1 at 35 (citation and quotation marks

omitted). Plaintiff contends that it has alleged sufficient

facts to support its imminent and substantial endangerment

claim. See Doc. #53 at 28.

To state a claim pursuant to 42 U.S.C. §6972(a)(1)(B),

plaintiff must allege that

> (1) the defendant was or is a generator or transporter
> of solid or hazardous waste or owner or operator of a
> solid or hazardous waste treatment, storage or disposal
> facility, (2) the defendant has contributed or is
> contributing to the handling, storage, treatment,
> transportation, or disposal of solid or hazardous waste,
> as defined by RCRA, and (3) that the solid or hazardous
> waste in question may pose an imminent and substantial
> endangerment to health or the environment.

Prisco v. A & D Carting Corp., 168 F.3d 593, 608 (2d Cir. 1999).

The Second Circuit has "indicated that the 'imminent and

substantial endangerment' standard is broad one[.]" Simsbury-

Avon, 575 F.3d at 210. The allegations of the Amended Complaint

satisfy this element, as previously discussed. Accordingly, the

Court next considers whether plaintiff has adequately alleged

the second and third elements of its endangerment claim.

a.    "Contributing To"

Defendants contend "that RCRA's contributing to language

speaks in active terms about handling, storage, treatment,

transportation, or disposal of waste[,]" but here, plaintiff's

"claimed endangerment ... is premised on the Defendants' alleged inaction[,]" and thus, plaintiff's "claim based on acts the Defendants have not undertaken contradicts the plain meaning of contributed to and must be rejected." Doc. #50-1 at 35-36 (citations and quotation marks omitted). Plaintiff asserts that it "has adequately alleged that Defendants are contributing to the past and present handling, storage, transportation, and disposal of solid and hazardous waste[.]" Doc. #53 at 29 (quotation marks omitted).

"[T]he term 'contributed to' is not defined under RCRA, so courts have looked to its ordinary meaning. To this end, relevant legislative history supports a broad, rather than a narrow, construction of the term." White Plains Hous., 482 F. Supp. 3d at 116 (citation and quotation marks omitted). "This is in keeping with the liberal construction accorded to RCRA in general because it is a remedial statute." Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 112 (E.D.N.Y. 2001) (citation and quotation marks omitted); see also Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C., 405 F. Supp. 408, 439 (W.D.N.Y. 2019) ("In analyzing this element of a RCRA Endangerment Claim, consideration is due for RCRA's broad language and remedial purpose. This approach comports with the Second Circuit's expansive reading of RCRA and its remedies."

(citations omitted)). Thus, "the term ['contributed to'] for RCRA purposes means that a defendant must be actively involved in or have some degree of control over, have a share in any act or effect, or act as a determining factor." White Plains Hous., 482 F. Supp. 3d at 116 (citations, quotation marks, and footnote omitted).

In light of RCRA's broad language and remedial purpose, the Court finds that plaintiff has adequately alleged the second element of its RCRA endangerment claim. The Amended Complaint alleges that defendants are generators of hazardous waste who operate and/or exercise control over the Terminal and its waste disposal process. See Doc. #47 at 28-29, ¶¶143-45; id. at 35, ¶175; id. at 80, ¶¶398, 403; id. at 90, ¶467; id. at 92, ¶478-80. The Amended Complaint further alleges that there have been spills of hazardous waste at the Terminal during defendants' ownership and operation of the Terminal. See Doc. #47 at 29, ¶¶148-51; id. at 94, ¶490; id. at 96, ¶502. Accordingly, accepting the facts as true, and drawing all reasonable inferences in plaintiff's favor, plaintiff has adequately alleged that defendants contribute to the handling, storage, transportation, and/or disposal of solid and hazardous waste at the Terminal. See, e.g., CLF II, 2020 WL 5775874, at *3 (finding this element satisfied based on similar factual allegations).

b.   Imminence

Finally, defendants assert that plaintiff "has not alleged an endangerment that threatens to occur immediately or is present now[,]" but rather "alleges an injury that is premised on scenarios occurring at the mid-century or end of the century[.]" Doc. #50-1 at 37. Plaintiff contends that it "has adequately alleged that Defendants' failure to prepare the Terminal for the known risks of climate change creates a risk of imminent harm." Doc. #53 at 32.

> [A] plaintiff may bring a suit only upon a showing that the solid or hazardous waste at issue may present an imminent and substantial endangerment to health or the environment. Regarding the imminency of an endangerment, this language implies that there must be a threat which is present now, although the impact of the threat may not be felt until later. But liability under 42 U.S.C. §6972 is not limited to emergency-type situations. Nor does a finding of imminency require a showing that actual harm will occur immediately. Instead, an imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public.

White Plains Hous., 482 F. Supp. 3d at 116 (citation and quotation marks omitted); see also Fresh Air for the Eastside, 405 F. Supp. 3d at 438.

The allegations of the Amended Complaint, as outlined in Section IV.B.2.a. discussing imminence in the context of standing, supra, adequately plead that "a risk of threatened harm is present." Fresh Air for the Eastside, 405 F. Supp. 3d at

54

438 (citation and quotation marks omitted); see id. ("Harm is imminent if a risk of threatened harm is present." (citation and quotation marks omitted)).

Accordingly, accepting the allegations of the Amended Complaint as true, and drawing all reasonable inferences in plaintiff's favor, plaintiff has adequately alleged a present risk of harm. See, e.g., CLF II, 2020 WL 5775874, at *2 ("Plaintiff has pleaded facts satisfying this standard (even if the harm may be well in the future) where Plaintiff theorizes that Defendants' failure to prepare the Terminal for the threat of foreseeable weather events is an imminent endangerment.").

Thus, defendants' Motion to Dismiss as to the RCRA endangerment claim (Count 13) is **DENIED as to all defendants**.

  4.  *Regulatory Violation Claims (Count 12 and Count 14)*

Defendants next assert that "Counts 12 and 14 ... fail to state a claim under RCRA[.]" Doc. #50-1 at 38. Plaintiff contends that it "has adequately alleged its Open Dumping Claim (Count 12) and its Generator Claim (Count 14)." Doc. #53 at 33-34. The Court addresses each count separately.

  a.  Count 12

Count 12 asserts an "open dumping" violation of RCRA, under 40 C.F.R. §257.1(a). See generally Doc. #47 at 89-93. Defendants

55

contend that because "Connecticut has obtained approval to maintain its own waste management program regulating generators of hazardous waste, and has its own regulation pertaining to open dumps, ... CLF cannot allege a violation of the federal hazardous waste regulations at 40 C.F.R. §257.1(a)(2)." Doc. #50-1 at 38 (citations omitted). Plaintiff does not address the substance of this argument, instead arguing that defendants have waived this argument because they "cite no case law or statutory support for this proposition and do not otherwise develop this argument[.]" Doc. #53 at 34.

The parties' briefing on this point is terribly unhelpful. Defendants cite to one case in a footnote of their reply brief in support of this argument, see Doc. #59 at 13 n.19, and plaintiff does not even attempt to address the argument in a meaningful way. See Doc. #53 at 34. Regardless, a review of the scant case law in this Circuit indicates that plaintiff's RCRA claim based on federal law violations is prohibited. See Dague v. City of Burlington, 935 F.2d 1343, 1352–53 (2d Cir. 1991) ("Pursuant to §6926(b), an EPA-authorized state hazardous waste program[] ... can supersede the permit and notification requirements of subchapter III of RCRA. However, a state's own hazardous waste program affects only those actions brought pursuant to subsection A, i.e., those that depend upon the

specific permit and notification requirements in subchapter
III."), rev'd in part on other grounds, 505 U.S. 557 (1992);
accord Orange Env't, Inc. v. Cnty. of Orange, 860 F. Supp. 1003,
1020 (S.D.N.Y. 1994) ("The Second Circuit has held that an EPA
authorized state hazardous waste program can supersede RCRA's
permit and notification requirements, so that a citizen suit
pursuant to subsection (a)(1)(A) to enforce §6925 and §6930 is
unavailable."); Aiello, 136 F. Supp. 2d at 107 ("The Second
Circuit [in Dague] affirmed the district court's finding that
(a)(1)(A) was not implicated since state regulations superceded
the RCRA regulations that were the basis of the (a)(1)(A)
claims, and therefore a direct action to enforce the RCRA
regulations was not available to the plaintiffs." (sic)
(citation and quotation marks omitted)); Brod v. Omya, Inc., No.
2:05CV00182(JJN), 2006 WL 8426527, at *5 (D. Vt. June 22, 2006)
("[T]his Court's holding does not prohibit a citizen suit under
§6972(a)(1)(A) based on state law violations. Rather, it
prohibits a RCRA citizen suit in federal court based on federal
law violations when there is an EPA approved state hazardous
waste program that supersedes the federal law."). Accordingly,
defendants' motion to dismiss Count 12 is **GRANTED**.

b.   Count 14

Count 14 alleges violations of both federal and Connecticut regulations. See Doc. #47 at 96-98. Any claims asserted for violations of federal regulations are dismissed as superseded by the state regulations.

As to the Connecticut regulation asserted, section 22a-430-3(h), defendants contend that this regulation "has nothing to do with the management of solid or hazardous waste[,]" applying instead to water discharge permits, and even if it were relevant, "there are no facts anywhere in the Complaint to support this claim[.]" Doc. #50-1 at 38-39 (emphases removed). Plaintiff contends that "the RCRA generator rule places additional duties on Defendants to avoid discharges of hazardous waste." Doc. #53 at 35.

Section 22a-430-3 governs "General Conditions Applicable to Water Discharge Permits," and provides in relevant part: "The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of the permit or any discharge which has a reasonable likelihood of adversely affecting human health or the environment." Conn. Agencies Regs. §22a-430-3(h). Plaintiff does not attempt to reconcile how this regulation is applicable to a RCRA claim. Indeed, this regulation falls under DEEP's water pollution control regulations, not those applicable

58

to solid waste management. Compare Conn. Agencies Regs. §§22a-430-1, et seq. (Water Pollution Control), with Conn. Agencies Regs. §§22a-209-1, et seq. (Solid Waste Management). Because the Amended Complaint does not adequately allege how the state regulation relied on would support a RCRA claim, defendants' motion to dismiss Count 14 is **GRANTED.**

F.    Adaptation Claims Asserted Pursuant to the CWA

Last, defendants assert that plaintiffs have failed to state a claim under the CWA for three separate reasons. See Doc. #50-1 at 39-44. The Court addresses each in turn.

1.    Impacts Beyond Life of NPDES Permit

Defendants contend that plaintiff "seeks to hold the Defendants liable for" future risks that fall outside the five year life of the Permit. Doc. #50-1 at 39. However, as previously discussed, plaintiff has alleged "that a major weather event, magnified by the effects of climate change, could happen at virtually any time, resulting in the catastrophic release of pollutants due to Defendants' alleged failure to adapt the Terminal to address those impending effects." CLF II, 2020 WL 5775874, at *1. Accordingly, this argument is without merit.

59

2.   *Scope of Permitting Obligations*

Defendants next contend: "The CWA's permit shield expressly bars CLF's attempt to impose requirements beyond those in the permit." Doc. #50-1 at 40. Defendants assert that "Shell's SWPPP fully complies with the requirements of" the Permit, and plaintiff's "allegations otherwise are an improper attempt to expand Connecticut's permitting scheme." Id. at 41. Plaintiff responds that it "seeks to hold Defendants accountable to the terms of the Permit[,]" and that its "claims are entirely founded on the plain language of the Permit." Doc. #53 at 21. Plaintiff further contends that defendants are not "protected by the 'permit shield' doctrine[,]" because plaintiff "is not challenging the terms of Shell's permit[,]" but rather "enforcing those terms to remedy ongoing violations of the CWA and RCRA." Id. at 23.

The Amended Complaint alleges: "The Permit requires Shell to implement 'Control Measures' to guard against the risks of pollutant discharges in its stormwater." Doc. #47 at 38, ¶192. The Permit states:

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

60

Id. at 38, ¶193. There are thirteen categories of "Control Measures[,]" including the categories of: "Minimize Exposure[;]" "Management of Runoff[;]" "Preventative Maintenance[;]" "Spill Prevention and Response Procedures[;]" and "Non-Stormwater Discharges[.]" Id. at 39-40, ¶¶196-200.

The allegations of the Amended Complaint do not seek to hold defendants liable beyond what is required by the Permit. As was true in CLF II, plaintiff's claims here "entail interpreting the Permit – asking, for example, whether" Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change, including rising tides and catastrophic storms. CLF II, 2020 WL 5775874, at *3. Accordingly, as in CLF II, "because this suit does not challenge the Permit's terms[,] ... Defendants cannot invoke the permit shield to avoid it." Id. (citations omitted).

   3.   Lack of Factual Support

Last, defendants assert that plaintiff's "CWA Adaptation Claims also fail because they continue the conclusory refrain that Defendants have allegedly failed to address the potential for severe precipitation and flooding, but allege no facts to substantiate these claims." Doc. #50-1 at 41-42.

The Court has considered each of defendants' arguments and, largely for the reasons stated by plaintiff in its brief, finds that the Amended Complaint alleges fact sufficient to assert the CWA Adaptation claims at this stage of the proceedings. Accordingly, defendants' motion to dismiss the CWA Adaptation claims is **DENIED**.

G.   <u>CONCLUSION</u>

For the reasons stated, defendants' Motion to Dismiss [**Doc. #50**] is **GRANTED, in part, and DENIED, in part**.

The motion to dismiss is **GRANTED** as to all claims asserted against Motiva, other than Count 13.

The motion to dismiss is **GRANTED** as to Counts 12 and 14, against all defendants.

The motion to dismiss is otherwise **DENIED** in all other respects.

It is so ordered at Bridgeport, Connecticut, this 16th day of September 2022.

                        _____/s/_____
                        HON. SARAH A. L. MERRIAM
                        UNITED STATES DISTRICT JUDGE