**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

CONSERVATION LAW FOUNDATION, INC.,

    *Plaintiff*,

          v.

SHELL OIL COMPANY, EQUILON
ENTERPRISES LLC D/B/A SHELL OIL
PRODUCTS US, SHELL PETROLEUM, INC.,
TRITON TERMINALING LLC, and MOTIVA
ENTERPRISES LLC,

    *Defendants*.

Civil Action No. 3:21-cv-00933-JAM

---

**PLAINTIFF CONSERVATION LAW FOUNDATION'S RENEWED MOTION TO
<u>COMPEL AND ACCOMPANYING MEMORANDUM OF LAW</u>**

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

Table of Contents...................................................................................................... ii

Table of Authorities ................................................................................................ iv

Exhibit List............................................................................................................. vii

I.     Introduction ..................................................................................................... 1

II.    Background ...................................................................................................... 2

    A.  Plaintiff's Claims and Discovery Requests.............................................. 2

    B.  Defendants' Production and Objections ................................................... 4

    C.  Attempts to Resolve Discovery Disputes ................................................ 6

III.   Argument ......................................................................................................... 8

    A.  Standard for a Motion to Compel ............................................................ 9

    B.  Defendants' Relevance Objections Are Unfounded: All of Plaintiff's Requests Relate to the Claims and Defenses in this Case. ......................................... 10

        1.  Defendants' corporate structures, prescriptive policies, and mandatory procedures are relevant to determining operator liability. .......................... 11

        2.  Defendants' knowledge of the risks to infrastructure from climate change and severe weather and their operations at the Terminal are relevant to whether Defendants adapted the Terminal to prevent pollutant discharges. ........................... 17

        3.  Defendants' knowledge of the risks to infrastructure from climate change and severe weather is relevant to show whether such information was withheld from regulators.............................................................................................. 22

        4.  The temporal scope of CLF's requests are relevant to the allegations that Defendants have failed to comply with their obligations under the CWA and RCRA.......................................................................................................... 24

        5.  Defendants' knowledge of the risks to infrastructure from climate change and severe weather prior to the claims periods is relevant to the penalties under the CWA. .......................................................................................................... 27

    C.  Defendants' Productions Violate the Federal Rules in a Manner that Frustrates the Discovery Process and Obfuscates Improperly Withheld Information. ......................... 28

        1.  Defendants have not identified what responsive documents they have withheld.................................................................................................... 28

        2.  CLF cannot fully address Defendants' objections because Defendants have failed to specify what they have withheld and produced. ........................... 31

    D.  Defendants' Other Objections Are Without Merit........................................... 35

        1.  Defendants have not carried their burden to show that CLF's requests are disproportionate to the needs of this case. ................................................ 35

2.  Defendants' objections to the use of "climate change" as vague is unsupported by its own documents.................................................................................................. 37

IV.  Conclusion ................................................................................................................... 37

## TABLE OF AUTHORITIES

*Cases*

*Berney v. Apple Inc.*, No. 3:20-CV-1379 (JAM), 2021 WL 6334985 (D. Conn. May 27, 2021) ................................................................................................ 30

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142 (9th Cir. 2005) ............................................................................... 29

*California Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128 (E.D. Cal. 2016) ....................................................................... 18

*City of Wilmington v. United States*, 141 Fed. Cl. 558 (2019) ..................................... 18

*Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933(SALM), 2022 WL 4292183 (D. Conn. Sept. 16, 2022) ............................................................ passim

*Conservation L. Found., Inc. v. Shell Oil Prod. US*, No. CV 17-00396-WES, 2022 WL 2353065 (D.R.I. June 30, 2022) .................................................... 11

*Conservation L. Found., Inc. v. Shell Oil Prod. US*, No. CV 17-396 WES, 2020 WL 5775874 (D.R.I. Sept. 28, 2020) ............................................................ 18, 37

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083 (9th Cir. 2017) ....................... 20

*Fassett v. Sears Holdings Corp.*, 319 F.R.D. 143 (M.D. Pa. 2017) ........................................ 10, 13

*Ferring Pharms., Inc. v. Braintree Lab'ys, Inc.*, 215 F. Supp. 3d 114 (D. Mass. 2016) ................................................................................................................ 10

*Foley v. Town of Marlborough*, No. 3:19-CV-01481 (VAB), 2022 WL 3716505 (D. Conn. Aug. 29, 2022) ...................................................................... 9

*Gross v. Lunduski*, 304 F.R.D. 136 (W.D.N.Y. 2014) ................................................ 36

*Gunning v. N.Y. State Justice Ctr. for Prot. of People with Special Needs*, No. 1:19-CV-1446 (GLS/CFH), 2022 WL 783226 (N.D.N.Y. Mar. 15, 2022) ........................... 26

*Hall v. Marriott Int'l, Inc.*, No. 319CV01715JLSAHG, 2021 WL 1906464 (S.D. Cal. May 12, 2021) ................................................................................. 24

*Hannah v. Wal-Mart Stores, Inc.*, No. 3:12CV1361 JCH, 2014 WL 2515221 (D. Conn. June 4, 2014) ...................................................................... 32, 33, 35

*Hatamian v. Advanced Micro Devices, Inc.*, No. 14cv226-YGR-JSC, 2015 WL 7180662 (N.D. Cal. Nov. 16, 2015) ................................................... 25

*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 238 F.R.D. 536 (D. Conn. 2006) ............................................................................................................. 28

*In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76 (2d Cir. 2008) ............................................ 10

*In re Chevron Corp.*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010)................................... 29

*In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 2313201 (N.D. Ill. May 29, 2017)...................................... 28

*John Wiley & Sons. Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184 (S.D.N.Y. 2014) ............................................................................................................. 30

*Klein v. AIG Trading Grp. Inc.*, 228 F.R.D. 418 (D. Conn. 2005)................................................ 9

*Liguria Foods, Inc. v. Griffith Lab's, Inc.*, 320 F.R.D. 168 (N.D. Iowa 2017) ........................... 32

*Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1514918 (D. Conn. May 12, 2022) ............................................................................................................. 25

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)........................................................... 11

*Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649 (D. Kan. 2004) .......................................... 25

*Pass & Seymour, Inc. v. Hubbell Inc.*, 255 F.R.D. 331 (N.D.N.Y. 2008) ............................. 33, 34

*Passenti v. Veyo, LLC*, No. 21-CV-01350 (SRU), 2022 WL 17261411 (D. Conn. Nov. 29, 2022) ............................................................................................................. 36

*Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009) ..................................................................................................................... 18, 19

*Sec. & Exch. Comm'n v. McGinnis*, No. 5:14-CV-6, 2019 WL 13172367 (D. Vt. Feb. 1, 2019) ............................................................................................................. 9

*Sentis Group, Inc. v. Shell Oil Co.*, 763 F.3d 919 (8th Cir. 2014).............................................. 10

*Sullivan v. StratMar Systems, Inc.*, 276 F.R.D. 17 (D. Conn. 2011) .......................................... 36

*United States v. 216 Bottles, More or Less, Etc.*, 36 F.R.D. 695 (E.D.N.Y. 1965)..................... 23

*United States v. Bestfoods*, 524 U.S. 51 (1998) ......................................................................... 11

*United States v. Ray*, 585 F. Supp. 3d 445 (S.D.N.Y. 2022) ...................................................... 10

*Walls v. City of New York*, 502 F. Supp. 3d 686 (E.D.N.Y. 2020) ....................................... 35, 36

*Xchange Telecom Corp. v. Sprint Spectrum L.P.*, No. 14-CV-54 GLS/CFH, 2015
    WL 773752 (N.D.N.Y. Feb. 24, 2015) ........................................................ 10, 13

*Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228 (D. Conn. 2009) ...................... 11

**Statutes**

33 U.S.C. § 1319 ................................................................................................ 27

42 U.S.C. § 6972 ................................................................................................ 11

**Rules**

D. Conn. L.R. Civ. P. 26 .................................................................................... 28

D. Conn. L.R. Civ. P. 37 .................................................................................... 3, 6

Fed. R. Civ. P. 19 .............................................................................................. 15

Fed. R. Civ. P. 26 .......................................................................................... passim

Fed. R. Civ. P. 34 .............................................................................. 5, 31, 32, 36

Fed. R. Civ. P. 37 .............................................................................. 6, 8, 38

Fed. R. Civ. P. 8 ................................................................................................ 25

Fed. R. Evid. 1003 ............................................................................................ 34

Fed. R. Evid. 1004 ............................................................................................ 34

Fed. R. Evid. 401 .............................................................................................. 10

Fed. R. Evid. 404 .............................................................................................. 27

Fed. R. Evid. 803 .............................................................................................. 34

Fed. R. Evid. 804 .............................................................................................. 34

Fed. R. Evid. 901 .............................................................................................. 34

Fed. R. Evid. 902 .............................................................................................. 34

**Regulations**

40 C.F.R. § 122.41 ............................................................................................ 11

**EXHIBIT LIST**

Exhibit A.      Affidavit of Alexandra St. Pierre

Exhibit B.      Plaintiff's First Set of Requests for Production

Exhibit C.      Plaintiff's First Set of Interrogatories

Exhibit D.      Defendants' Responses to Plaintiff's First Set of Requests for Production

Exhibit E.      Defendants' Responses to Plaintiff's First Interrogatories

Exhibit F.      Table of Discovery Requests and Responses

Exhibit G.      Deposition of James Kent Yeates (December 22, 2022)*

Exhibit H.      Exhibit 1015 to the Deposition of James Kent Yeates
                (SOPUS_NHVN00049494)*

Exhibit I.      Exhibit 1016 to the Deposition of James Kent Yeates
                (SOPUS_NHVN00049574)*

Exhibit J.      Hazard Management Sheet (SOPUS_NHVN00038398)*

Exhibit K.      Project Development Request Form (SOPUS_NHVN0056587)*

Exhibit L.      2022 Internal Audit (SOPUS_NHVN00049778)*

Exhibit M.      Continuity Plan (SOPUS_NHVN00000663)*

Exhibit N.      Hazard Determination Worksheet (SOPUS_NHVN00159713)*

Exhibit O.      Tank Stripping Emails (SOPUS_NHVN00084393)*

Exhibit P.      Terminal Operations Manual (SOPUS_NHVN00015501)*

Exhibit Q.      Tank Stripping Presentation (SOPUS_NHVN00032014)*

Exhibit R.      Safety and Environmental Performance Presentation (SOPUS_NHVN00023705)*

* Denotes documents either redacted or filed under seal in compliance with D. Conn. L. R. Civ. P. 5(e) and this Court's Protective Order, ECF 7

## I.      INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") files this Motion to Compel discovery responses under Rule 37 of the Federal Rules of Civil Procedure from Defendants Shell Oil Company ("Shell USA"), Equilon Enterprises LLC d/b/a Shell Oil Products US ("Equilon"), Shell Petroleum, Inc., Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva"), collectively referred to in this Motion as "Defendants." Since April 2022, CLF has attempted to obtain written discovery in the possession and control of Defendants that directly relates to its allegations that Defendants have failed to prepare their New Haven bulk petroleum storage terminal ("the Terminal") for the impacts of climate change and severe weather, in violation of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA").[1] Though this Court issued a published opinion in September 2022 stating that the majority of CLF's claims may proceed against Defendants, *see* Order on Mtn. to Dismiss, ECF 111, Defendants have not revised their objections and continue to withhold relevant, responsive documents, *see* Affidavit of Alexandra St. Pierre ¶ 33 ("St. Pierre Aff."), attached hereto as Exhibit A. Defendants have also failed to comply with discovery rules that allow the propounding party a fair opportunity to dispute discovery objections.

This Motion seeks to address Defendants' failure to comply with the Rules in their production of certain documents and interrogatory responses, as well as Defendants' refusal to produce documents and information relevant to the claims and defenses in this case.

---

[1] CLF filed a similar suit against the same Defendants in the District of Rhode Island. *See CLF v. Shell Oil Products US, et al.*, 17-cv-00396 (D.R.I.) (the "Rhode Island matter"). CLF served Defendants in the Rhode Island matter with a similar set of discovery requests in May 2021 and has had similar, if not identical, issues with obtaining discovery from Defendants in that case, leading to briefing of a Motion to Compel and Cross-Motion for Protective Order that were denied without prejudice pending the deposition of an engineer put forward by Defendants to clarify certain issues. *See* St. Pierre Aff., Ex. A ¶¶ 2–9.

## II.     BACKGROUND

CLF propounded discovery requests on Defendants in April 2022 and received objections to all 11 interrogatories and 64 of the 65 requests for production in May 2022. The Parties conferred but came to an impasse, and CLF filed a motion to compel. *See* ECF 84. Defendants proposed to produce rolling productions and offered a witness, James Kent Yeates, as an alternative to resolving CLF's motion. *See* ECF 95-1 at 3–4 (order from the Rhode Island matter summarizing Defendants' proposal). This Court dismissed the motion without prejudice on August 15, 2022. *See* ECFs 96, 98. Since then, this Court issued a detailed order denying in large part Defendants' motion to dismiss, *see* ECF 111, and CLF deposed Mr. Yeates, whose testimony supports, rather than substitutes for, this Motion. Defendants have not revised their objections in light of this Court's order or the deposition. Thus, CLF is back before the Court with largely the same issues presented in its prior motion.

### A.  Plaintiff's Claims and Discovery Requests

CLF filed this action to halt Defendants' longstanding and ongoing violations of the CWA and RCRA at their bulk petroleum storage terminal in the Port of New Haven (the "Terminal"). In short, CLF alleges that Defendants have failed to evaluate and address the reasonably foreseeable risks to the Terminal posed by severe weather, including risks associated with climate change, which threaten to flood the Terminal and release millions of gallons of oil and other pollutants into nearby New Haven Harbor, Quinnipiac River, and Mill River.

Defendants are all directly liable as owners or operators of the Terminal for violating the terms of the CWA permit ("the Permit"), including the obligations to satisfy "best industry practice" (Counts I, V, VI, VII) and inform state regulators about risks to the Terminal from severe weather and climate change (Counts III, VIII, IX, and XIII), as well as for presenting an imminent and substantial endangerment to human health and the environment under RCRA (Count XIII).

2

The appropriate civil penalties for these violations depend in part on CLF's allegations that Defendants have knowingly failed to address these risks at the Terminal for decades.

CLF filed an Amended Complaint on February 11, 2022, and Defendants moved to dismiss certain of CLF's claims. ECFs 47, 50. This Court largely denied Defendants' motion, holding that CLF's CWA claims could proceed against Defendants Shell USA, Shell Petroleum, Equilon, and Triton, and that one of CLF's RCRA claims (Count XIII) could proceed against all Defendants. *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933(SALM), 2022 WL 4292183 (D. Conn. Sept. 16, 2022) ("*CLF III*"). Central to this Court's decisions were allegations regarding Defendants' participation in and control over the operations of the Terminal, *see id.* at *15–16, "whether Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change," *id.* at *21 (citation omitted), and "that the infrastructure at the Terminal is at risk of experiencing the same infirmities as those alleged to have occurred at Shell's Houston and Deer Park Facilities, among others," *id.* at *17.

CLF has requested written discovery from Defendants that seeks information relevant to proving its claims. On April 13, 2022, CLF sent Defendants its first Requests for Production of Documents ("RFPs")[2] and Interrogatories ("ROGs").[3] The requests seek information that can be categorized as follows for ease of discussion in this Motion, *see* D. Conn. L.R. Civ. P. 37(b)(1):

- The Terminal's infrastructure, policies and procedures, operations, and history and risk of discharges and contamination of water, *see* ROGs 1, 5, 7, 10; RFPs 7, 23, 31, 33–42, 45–50, 52, 54, 57–62;

---

[2] Attached hereto as Exhibit B.

[3] Attached hereto as Exhibit C.

- Defendants' knowledge of climate change and severe weather risks to the Terminal, actions taken at the Terminal in light of these risks, and policies concerning climate preparedness at the Terminal, *see* ROGs 2, 3, 4, 6; RFPs 8, 9, 10, 11, 63;

- Defendants' knowledge of climate change and severe weather risks, actions taken at other facilities in light of these risks, and corporate policies concerning climate preparedness, *see* ROG 9; RFPs 12–22, 24–28, 63, 64;

- Operator and owner liability and control, *see* ROG 11; RFPs 2–6, 42, 61, 62;

- Defendants' corporate policies and procedures concerning wastewater, *see* RFP 53;

- Permit and regulatory information specific to the Terminal, *see* ROG 8; RFPs 29–30, 32, 43–44, 51, 55–56; and

- Document retention and review: RFPs 1, 65.

All but two of CLF's 65 requests cover a period of 2011 to the present.[4] *See* RFPs, Ex. B at 4 ¶ 12.

CLF also served a second set of written discovery requests upon Defendants that is not at issue in this Motion.

## B. Defendants' Production and Objections

On May 13, 2022, Defendants responded to CLF's requests.[5] Defendants objected and refused to respond in any way to several document requests they characterized as "wholly unrelated to Plaintiff's claims" because they include requests for documents of Defendants' "ultimate corporate parent related to the vast topic of climate change," *see* RFP Resp., Ex. D at 17–18 (objecting to RFP 12); *id.* (objecting to RFPs 13, 14, 16, 22, 25, and 64 on similar grounds).

---

[4] RFP 1 seeks the document retention policies at the Terminal from 2000 to present, and RFP 7 seeks documents regarding environmental monitoring at the Terminal for the same period. *See* RFPs, Ex. B at 7–8. RFPs 12, 14, and 20 do not specify a timeframe separate from the default time period, but they do seek documents related to publications, speeches, interviews, and videos created prior to 2011. *Id.* at 10–14, 16.

[5] Defendants' objections to CLF's RFPs are attached hereto as Exhibit D.

Defendants objected to all of CLF's remaining discovery requests, except RFP 61, but nonetheless agreed to produce some documents.[6] These objections broadly fall into the following categories: (i) relevance and proportionality objections based on Defendants' narrow interpretation of CLF's claims; (ii) privilege objections; and (iii) objections to certain words or phrases used in the requests as ambiguous.[7] *See, e.g.*, RFP Resp., Ex. D at 8–14 (objecting to RFPs 6, 8, 10–11 on all of these grounds). None of Defendants' responses to the 64 objected-to RFPs state whether responsive documents are being withheld and, if so, on what ground(s). *See id.* Defendants have not withdrawn or otherwise revised any of their written objections.

Notwithstanding these objections, Defendants electronically produced 155 documents (6,457 pages) on May 13, 2022; an additional 6,886 documents (43,400 pages) over four productions between June 22 and December 14, 2022; and 30,395 documents (158,846 pages)—over 80% of all documents produced—after 10 p.m. on December 31, 2022. *See* St. Pierre Aff., Ex. A ¶¶ 12, 14, 21, 36, 40–42, 45. Contrary to CLF's instructions in the requests and CLF's explicit verbal request, Defendants did not identify which documents were responsive to which request(s). *See* RFPs, Ex. B at 2 ¶ 3; St. Pierre Aff., Ex. A ¶¶ 29, 52; Fed. R. Civ. P. 34(b)(2). Of the 37,436 documents produced, 47% (17,533 documents) are exact duplicates. *See* St. Pierre Aff., Ex. A ¶ 62. None of Defendants' productions include any information about where or how the documents were kept in the ordinary course of business (such as a file path and which Defendant is the custodian). *Id.* ¶¶ 59, 63–64.

---

[6] Defendants objected to RFPs 1–11, 15, 17–21, 23–24, 26–60, 62–63, and 65 but provided a response to each. Defendants objected to all of CLF's ROGs. Defendants' objections are attached hereto as Exhibit E.

[7] To aid the Court in resolution of this Motion, CLF has created a table of CLF's requests and Defendants' objections and responses, attached hereto as Exhibit F.

Defendants provided CLF with a list of search terms they used to respond to CLF's requests but stated the list did not include terms that correspond to the Requests for which Defendants maintain pending objections. *See* St. Pierre Aff., Ex. A ¶ 24. Defendants also listed individuals whose files were searched, but the list did not indicate by which Defendant(s) the individuals were employed. *Id.*

Defendants redacted 16,110 of the produced documents and designated 98.8% (37,000 documents) of all produced documents as either "Confidential" or "Confidential – Attorneys' Eyes Only" under this Court's Protective Order. *See* St. Pierre Aff., Ex. A ¶¶ 60–61; ECF 7 (protective order). CLF inquired about the nature of some of the redactions on September 2, 2022, by email because Defendants had previously stated that no information was being withheld on privilege grounds. *See* St. Pierre Aff., Ex. A ¶¶ 31, 38. On January 13, 2023, Defendants informed CLF that documents were redacted for relevance and confidential business information. *See* St. Pierre Aff., Ex. A ¶ 50. Defendants have yet to provide a privilege log. *See* St. Pierre Aff., Ex. A ¶ 45.

### C. Attempts to Resolve Discovery Disputes

To address Defendants' objections to every ROG and 64 of CLF's 65 RFPs, the Parties have exchanged numerous letters and emails and conferred at least twice to avoid Court intervention.[8] *See* St. Pierre Aff., Ex. A ¶¶ 10–59; *see also* Fed. R. Civ. P. 37(a); D. Conn. L.R. Civ. P. 37(a).

On July 1, 2022, the Parties held a meet and confer. The Parties noted the extensive discussions that had happened in the Rhode Island case, including two informal discovery conferences with the Rhode Island court, and determined that rehashing those issues again was not

---

[8] These numbers do not capture the extensive meet and confers that occurred on virtually identical issues in the Rhode Island matter. *See* St. Pierre Aff., Ex. A ¶¶ 2–9.

an efficient use of time. Instead, the Parties (i) somewhat clarified and compromised on the time period dispute; (ii) agreed on a way to proceed with the use of search terms; and (iii) planned forthcoming productions. The Parties agreed that they would each produce their next round of documents on July 22, 2022, with rolling productions to follow. The Parties confirmed that each would produce privilege logs within one week of any production in which privileged documents were withheld. St. Pierre Aff., Ex. A ¶ 16.

When the Parties were unable to resolve Defendants' objections, CLF filed a motion to compel. *See* ECF 84. Pursuant to negotiations between the Parties, this Court denied CLF's motion without prejudice, under the expectation that the deposition of Defendants' corporate witness, Mr. James Kent Yeates, could resolve or narrow outstanding disputes. *See* ECFs 95–98.

The Parties met and conferred on substantive and logistical issues surrounding the deposition, including the production of documents related to topics on which Mr. Yeates was ordered to testify. While Defendants stated that they anticipated that all Yeates-relevant documents would be produced by the week of October 10, 2022, all Yeates-relevant documents were not produced until November 22, 2022. St. Pierre Aff., Ex. A ¶¶ 32, 34. After the deposition, Defendants produced an additional 30,395 documents, approximately 4,000 of which included Yeates' by name. *See* St. Pierre Aff., Ex. A ¶¶ 45–46. Upon further review, CLF determined that around 2,080 of the 4,000 documents do not appear to have been provided to CLF prior to Yeates' deposition. *Id.* ¶ 46. By CLF's estimation, approximately 500 of those appear to be related to the topics of Yeates' deposition. *Id.*

Since CLF filed its original motion to compel, this Court has denied Defendants' Motion to Dismiss the Amended Complaint, *see* ECF 111; Defendants filed their Answer asserting affirmative defenses, *see* ECF 120; and CLF deposed Mr. Yeates.[9]

CLF files the instant Motion in accordance with Fed. R. Civ. P. 37 and this Court's scheduling orders, *see* ECFs 131, 147, because the Parties remain at an impasse with respect to the vast majority of CLF's requests for information, which were not obviated by Mr. Yeates' deposition testimony.

Mr. Yeates' testimony undermines Defendants' relevancy claims, as detailed in Part III.B. But, despite Defendants' insistence that the deposition of Mr. Yeates would resolve outstanding discovery issues (but using only the universe of records they deemed relevant to his deposition), his testimony demonstrates he lacks knowledge about many issues relevant to CLF's instant motion, such as which corporations were involved in the operation of the Terminal and whether Defendants' complied with their corporate policies regarding facility design for severe weather. *See, e.g.*, Yeates Tr., Ex. G at 102:6–17 (stating there is no need to consider FEMA flood maps because the terminal has existed for "many decades without any historical flooding events."). What Mr. Yeates' testimony ultimately demonstrates is a near certain plethora of relevant and responsive documents that Defendants are withholding.

## III.    ARGUMENT

Before the Court are the Parties' disputes about what discovery is relevant to the claims and defenses in this case, *see infra* Section III.B, and issues resulting from Defendants' noncompliance with the Rules governing discovery, *see infra* Part III.C. These two issues are related: Defendants have failed to identify what documents they have produced or withheld, and

---

[9] The Yeates deposition transcript are attached hereto as Exhibit G.

on what ground(s), and Mr. Yeates not only confirmed CLF's understanding that Defendants use corporate safety and engineering policies across their business units, but also revealed that he was an inadequate substitute for primary records. Consequently, CLF has insufficient information and no cause to narrow its requests for information directly relevant to the claims in this case.

Instead, CLF must come to this Court to force Defendants to comply with their basic obligations under the Federal Rules, which "seek to avoid the surprise and secrecy that are antithetical to the informed determination of cases of their merits," *Sec. & Exch. Comm'n v. McGinnis*, No. 5:14-CV-6, 2019 WL 13172367, at *5 (D. Vt. Feb. 1, 2019) (citation omitted). Because Defendants have violated their obligations and wrongfully withheld responsive, relevant discovery—and, in the process, squandered judicial resources and the discovery period in this case—CLF requests this Court compel Defendants to produce all documents responsive to its outstanding requests and extend CLF's discovery deadlines, as discussed in more detail below.

### A.  Standard for a Motion to Compel

CLF is entitled to any information that is relevant to its claims or Defendants' defenses. *See* Fed. R. Civ. P. 26(b)(1). "Even after the 2015 amendments [to the Federal Rules], relevance is still to be construed broadly to encompass any matter that bears on, or that 'reasonably could lead to other matter that could bear on any party's claim or defense.'" *Foley v. Town of Marlborough*, No. 3:19-CV-01481 (VAB), 2022 WL 3716505, at *15 (D. Conn. Aug. 29, 2022) (citation and brackets omitted). "The objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded by the federal discovery rules, each request is not relevant or how each question is overly broad, unduly burdensome or oppressive." *Id.* at *15 (quoting *Klein v. AIG Trading Grp. Inc.*, 228 F.R.D. 418, 422 (D. Conn. 2005)) (brackets omitted).

When adjudicating discovery disputes, courts are guided by the principle that "[a] party must be afforded a meaningful opportunity to establish the facts necessary to support his claim." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008). As in this case, where "Defendants are repeat players in this genre of litigation, and they consequently enjoy the benefits of sweeping protective orders," and where CLF "lack[s] nearly all avenues other than judicially-sanctioned ones to obtain the requisite records that rest in Defendants' possession," the equities weigh in favor of granting CLF's discovery requests. *See Fassett v. Sears Holdings Corp.*, 319 F.R.D. 143, 150 (M.D. Pa. 2017); *see also* Fed. R. Civ. P. 26(b)(1) (proportionality factors).

### B. Defendants' Relevance Objections Are Unfounded: All of Plaintiff's Requests Relate to the Claims and Defenses in this Case.

"Rule 401 imposes a 'relatively low bar' of relevance." *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (citation omitted); Fed. R. Evid. 401; *see also, e.g.*, *Ferring Pharms., Inc. v. Braintree Lab'ys, Inc.*, 215 F. Supp. 3d 114, 124 (D. Mass. 2016). Defendants have attempted to raise that bar by repleading CLF's claims in their discovery objections to fit their preferred narrative of this case, and then objecting to CLF's requests as "irrelevant." *See, e.g.*, RFP Resp., Ex. D at 10 ("RESPONSE: This is not a case about climate change."). However, Defendants cannot unilaterally determine relevance. "No party possess[es] the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case." *Xchange Telecom Corp. v. Sprint Spectrum L.P.*, No. 14-CV-54 GLS/CFH, 2015 WL 773752, at *3 (N.D.N.Y. Feb. 24, 2015) (quoting *Sentis Group, Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014)) (internal quotation marks omitted). For purposes of discovery, "[w]hat matters is that each side is entitled to pursue intelligible theories of the case," and neither party can, "by their sole insistence, declare evidence undiscoverable or irrelevant merely because it does not fit into their own theory of the case." *Id.* (quoting *Sentis Group*, 763 F.3d at 926).

As this Court has clearly recognized, this case is about CLF's allegations that "[D]efendants' failure to prepare the Terminal for the imminent risks associated with the effects of climate change will result in the release of petroleum and other substances into the environment surrounding the Terminal." *CLF III*, 2022 WL 4292183, at *17. And because this Court allowed CLF to proceed against all Defendants and on theories under both the CWA and RCRA, the scope of relevant discovery has not been narrowed. *Cf. Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) (noting "discovery of matter that is relevant only to claims or defenses that have been stricken" is not relevant). The material sought through the instant Motion lies at the heart of CLF's claims.

Because each of the objected-to requests seeks relevant documents as described below, *see* Fed. R. Civ. P. 26(b)(1), CLF requests that this Court compel Defendants to provide all responsive documents that have been withheld.

### 1. Defendants' corporate structures, prescriptive policies, and mandatory procedures are relevant to determining operator liability.

To hold any Defendant liable under each of CLF's CWA and RCRA claims, CLF must prove that the Defendant was either a permit-holder, owner, or operator of the Terminal. *See CLF III*, 2022 WL 4292183, at *15 (quoting *Conservation L. Found., Inc. v. Shell Oil Prod. US*, No. CV 17-00396-WES, 2022 WL 2353065, at *2 n.3 (D.R.I. June 30, 2022) ("*CLF II*")); 42 U.S.C. § 6972(a)(1) (RCRA citizen suit provision); 40 C.F.R. § 122.41(a)(2). As this Court noted in denying Defendants' Motion to Dismiss, where a defendant is not a permit-holder or owner of a polluting facility, CLF carries the burden of proving that the defendant "actively participated in, and exercised control over, the operations of the facility itself." *CLF III*, 2022 WL 4292183, at *15 (quoting *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 240 (D. Conn. 2009)); *see also United States v. Bestfoods*, 524 U.S. 51, 55 (1998). This is "a fact-specific inquiry"

"focus[ed] on the parent's interaction with the subsidiary's facility." *CLF III*, 2022 WL 4292183, at *15–16 (quoting *Yankee Gas*, 616 F. Supp. 2d at 241).

Most of CLF's discovery requests seek information relevant to proving operator liability for the Defendants, but two categories of disputed requests are particularly relevant in light of this Court's denial of Defendants' Motion to Dismiss: (i) questions about Defendants' "officers, managers, subsidiary companies, and instrumentalities" involvement with "the operation and maintenance of the Terminal," and (ii) questions regarding any "mandatory" and "centralized climate change policies and strategies" of Defendants' "parent companies." *CLF III*, 2022 WL 4292183, at *15 (alterations omitted) (quoting Am. Compl., ECF 47 ¶¶ 41–43, 51, 106, 121, 175).

*First*, CLF's requests regarding Defendants' corporate structures (ROG 11 and RFPs 2–6, 42, and 62), as well as those regarding actions Defendants have taken at the Terminal itself (ROGs 3, 5, and 6 and RFPs 7, 10, 31–52, and 54–60), fall squarely within the first category of information this Court found relevant to operator liability under the *Bestfoods* test. *See* RFPs, Ex. B; ROGs, Ex. C. But Defendants objected to each of these requests as overbroad and on relevance grounds (except for RFP 62). *See* Table, Ex. F. For example, CLF requested the identities of "employees whose work relates to engineering, design, emergency preparedness, and/or environmental compliance at the Terminal, including but not limited to consultants, advisors, and policy- and decision-makers." *See* ROGs, Ex. C at 8 (ROG 11). In response, Defendants Equilon and Triton objected on relevance grounds and listed only four people who they deemed as having "responsibility/ accountability for the issues relevant to this case," three of whom do not work for either Defendant. ROG Resp., Ex. E at 22–23. But where the request, as written, asks for information directly related to the claims and issues in this case, Defendants may not refuse to

respond based on their own conception of relevance. *See Xchange Telecom Corp.*, 2015 WL 773752, at *3.

CLF's requests on corporate structure, relationships, and operations remain both relevant and vital to the claims and defenses in this case because Defendants Shell USA, Shell Petroleum, and Triton[10] continue to deny operator liability for the Terminal, including those allegations relied upon by this Court in the ruling on the Motion to Dismiss. *See* Answer, ECF 120 ¶¶ 32, 35, 106, 121, 175; *cf.* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendments ("Information about organizational arrangements . . . of a party could be discoverable if likely to yield or lead to the discovery of admissible information."). Information sought in the disputed requests, for example, "corporate control of any activities at the terminal," *see* RFPs, Ex. B at 8 (RFP 6), "may also clarify any lingering issues as to the most appropriate defendants," *see Fassett*, 319 F.R.D. at 150.

*Second*, Defendants Shell USA, Shell Petroleum, Equilon, and Triton admit that they share an ultimate parent company, Shell plc (formerly Royal Dutch Shell plc), which they also admit sets "some policies that are binding on all companies in the Shell group."[11] *See* Answer, ECF 120 ¶¶ 17–18, 20, 23, 26, 30, 41–42. Those admissions—combined with this Court's endorsement that "mandatory policies" of Defendants' "parent companies" bear directly on operator liability, *see CLF III*, 2022 WL 4292183, at *15—are sufficient to show that CLF's requests for information about mandatory, centralized approaches and processes to define, evaluate, and address risks to the physical infrastructure of Shell companies' facilities are directly relevant to the claims in this

---

[10] Defendant Triton both denies and admits that it is an operator of the Terminal. *Compare* Answer, ECF 120 ¶ 32 (denying that "Triton is an operator of the Terminal"), *with id.* ¶ 121 ("Triton Terminaling LLC admits current responsibility for the operation and maintenance of the Terminal and denies all remaining allegations.").

[11] Shell plc refers to its "subsidiaries" "collectively . . . as Shell" and "Shell group." *See* Royal Dutch Shell plc, *Powering Progress: Annual Report and Accounts 2020* iii (2021), *available at* https://reports.shell.com/annual-report/2020/servicepages/downloads/files/shell-annual-report-2020.pdf.

case: whether Defendants or their parent corporations have policies regarding climate or severe weather adaption for infrastructure like the Terminal, and whether or not those policies were applied to the Terminal, goes directly to who controlled operations at the Terminal.

Moreover, Defendants Shell USA, Shell Petroleum, Equilon, and Triton deny that "Shell plc sets policies for managing and mitigating climate risks to facilities owned by companies in the Shell group," *see* Am. Compl., ECF 47 ¶ 43; Answer, ECF 120 ¶ 43, and all Defendants deny that "[c]ompliance with Shell's climate change policies and strategies is mandatory for each Defendant," Am. Compl. ECF 47 ¶ 51; Answer, ECF 120 ¶ 51. But Defendants' production to date undermines these denials. For example, Shell group uses "literally thousands" of reference engineering manuals ("Design and Engineering Practice Specifications" or "DEP Specification"), Yeates Tr., Ex. G at 142:13–143:7, which "████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████," Yeates Deposition Exhibit 1015 at 2 ("Yeates 1015"), attached hereto as Exhibit H. One such DEP Specification and its corresponding Informative,[12] which are responsive to RFP 17 but Defendants produced inadvertently, *see* St. Pierre Aff., Ex. A ¶ 55, governs meteorological and oceanographic ("metocean") data acquisition requirements for Shell projects. *See* Yeates 1015, Ex. H; *see also* Yeates 1016, Ex. I. The Metocean DEP Informative applies to the "████████████████████████████████████████████████" for both new structures and the "████████████████████," and includes specific plans to account for climate change in facility design. Yeates 1016, Ex. I at 5, 6–7; Yeates 1015, Ex. H at 17; *see also* Yeates Tr., Ex. G at 214:21–216:7.

---

[12] "DEP-Informatives provide the main rational for certain requirements and recommendations in the companion DEP-Specification with the same number." Yeates Deposition Exhibit 1016 at 2 ("Yeates 1016"), attached hereto as Exhibit I.

Defendants' production also shows that Shell's Hazard and Effects Management Process (HEMP) centralizes control within Shell plc's business line management structure, not specific corporations. As its name suggests, Shell's HEMP process applies Shell policies to managing hazards at Shell facilities, including the Terminal, and requires evaluation of, *inter alia*, whether "███████████████████████████████████████████████████." Hazard Management Sheet, Ex. J at 5 (cell B194).[13] Before that process is complete, a "handshake" from "approval parties" is required: for example, Mr. Yeates' "handshake," *i.e.*, approval, was required for the HEMP review of the Terminal even though he is not employed by an entity that Defendants acknowledge as a Terminal operator. Yeates Tr., Ex. G at 229:6–230:11.

The contradiction between Defendants' denials that they or their parent companies exercise control over the Terminal and their own records underscores the relevance of Shell plc's policies to CLF's claims and whether any necessary parties have not been joined to this action, *see* Fed. R. Civ. P. 19. Thus Defendants should be compelled to respond in full to ROG 9 and RFPs 8–11, 13, 15, 17–19, 21, and 24–25, which seek information regarding Defendants' broadly applicable climate change and severe weather policies and decision making.

*Finally*, Mr. Yeates' testimony only supports CLF's entitlement to discovery on CLF's operator liability: Mr. Yeates describes Shell plc's operations as organized around business lines rather than corporate boundaries, including operations and risk management at the Terminal. *See* Yeates Tr., Ex. G at 55:17–21. In terms of corporate structure (or lack thereof), the Terminal falls within Shell plc's Downstream business line and Trading & Supply "sub business." *Id.* at 67:7–12, 69:2–12. Indeed, Mr. Yeates, who Defendants produced as their key witness on disputed

---

[13] This PDF was produced to CLF in a multi-sheet, password-protected Excel spreadsheet, but CLF has saved the relevant sheet as a PDF to enable electronic filing with the Court. *See* St. Pierre Aff., Ex. A ¶ 65.

discovery issues, has responsibilities related to risks at the Terminal but is not employed by any of the Defendants in this case. *See id.* at 72:2–12. He is employed by Shell Pipeline Company. *Id.* at 72:5–6.

But Mr. Yeates was not so knowledgeable as to obviate the need for documentary evidence. For example, Mr. Yeates' superiors all work within the Trading & Supply line of business, but they are based outside the United States, and he does not know what corporation employs them. Yeates Tr., Ex. G at 72:13–74:6. According to Defendants, however, Shell's Downstream business line and the "Shell Trading & Supply" sub-business "are not corporate entities capable of being deposed," *see* St. Pierre Aff., Ex. A ¶ 48, but Defendants' own documents describe the Terminal's owner as "███████████ and the operator as "███████████████." *See* Project Development Request Form, Ex. K at 3 (cells S64:T64); *see also* 2022 Internal Audit, Ex. L at 2 ("████████ ████████████████████████████████████████████████████ ████████████████████████████"). [14] Relatedly, Mr. Yeates noted that Helen Theoret played an important role in a project conducted by Shell Trading & Supply to transition the Terminal from Motiva, but he could not identify for which company Ms. Theoret worked. *See* Yeates Tr., Ex. G at 134:20–135:10. The same was true for Philippe Casbas, who was also important to the transfer of the Terminal. *Id.* at 134:20–135:10.

CLF asked Mr. Yeates about a public disclosure from Shell plc to the Carbon Disclosure Project ("CDP")—referenced in RFP 15, to which Defendants objected and produced no documents, *see* RFP Resp., Ex. D at 22–23—that states, "A corporate team with global remit is responsible for evaluating climate change related risks to the Shell group, supports the business in

---

[14] This same document identifies the Terminal as part of the ████████████████████ ████████████.

developing CO2 management strategies and has oversight of the company's CO2 management implementation program." *See* Yeates Tr., Ex. G at 88:10–25. But Mr. Yeates was unable to confirm whether Defendants and their parent, Shell plc, exercised control over climate change risks at the Terminal, which is critical to ascertaining who operated the Terminal. *Id.*

Because the information sought through ROGs 3, 5, 6, 9, and 11 and RFPs 2–7, 8–11, 13, 15, 17–19, 21, 24–25, 31–52, 54–60, and 62 is relevant to proving operator liability and has not been resolved through Mr. Yeates' deposition, this Court should compel Defendants to fully respond to these requests.

> **2. Defendants' knowledge of the risks to infrastructure from climate change and severe weather and their operations at the Terminal are relevant to whether Defendants adapted the Terminal to prevent pollutant discharges.**

CLF has sought information from Defendants regarding (i) what actions, if any, they have taken to address the risks climate change and severe weather pose to the Terminal, *see* ROGs 2–4, 6; RFPs 8–9, 11, 26; (ii) any history or analysis of storm and flooding risk, environmental monitoring, infrastructure failure, or discharges at the Terminal and Defendants' corresponding policies and actions, *see* ROGs 1, 5, 7, 10; RFPs 7, 23, 31, 33–42, 45–50, 52, 54, 57–60; (iii) damage to other facilities owned or operated by Defendants caused by severe weather and storms and how Defendants' plan for and respond to such events, *see* ROG 9; RFPs 24, 27–28, 63–64; and (iv) Defendants' knowledge of the risks of climate change and severe weather to infrastructure—for example, regional increased precipitation reviews—and any work to adapt or mitigate such risks, *see* RFPs 10, 12–22, 24–26. Each of these categories of requests relate directly to CLF's claims that Defendants' failure to prepare the Terminal for climate change and severe weather impacts will result in discharge of toxic pollutants into the environment, *see* Am. Compl, ECF 47 ¶¶ 389–404 (Counts I, II), 415–436 (Counts IV, V, VI, VII), 486–502 (Count XIII).

*First*, CLF's CWA "claims here 'entail interpreting the Permit—asking, for example, whether' Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change, including rising tides and catastrophic storms." *CLF III*, 2022 WL 4292183, at *21 (quoting *Conservation L. Found., Inc. v. Shell Oil Prod. US*, No. CV 17-396 WES, 2020 WL 5775874, at *3 (D.R.I. Sept. 28, 2020) ("*CLF I*")). Best Management Practices (BMPs) are those that "reduce and/or eliminate" the discharge of pollutants "to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." *Id.* (quoting Am. Compl., ECF 47 ¶ 193). Whether BMPs or "best industry practice" were implemented at the Terminal is a question of fact. *See, e.g.*, *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 925 (C.D. Cal. 2009) (assessing whether BMPs were implemented is a fact inquiry).[15] Information about the Terminal itself, including prior pollutant discharges and Defendants' mitigation practices and policies, and non-Terminal information, including expert testimony, about best industry practices are relevant to this factual determination. *See City of Wilmington v. United States*, 141 Fed. Cl. 558, 563–64 (2019) ("The process Defendant follows to evaluate the reasonableness of stormwater charges is relevant for discovery purposes. . . . Defendant presumably marshalled facts that led it to determine the charges were unreasonable, and Plaintiff is entitled to discovery of those facts . . . ."); *Santa Monica Baykeeper*, 619 F. Supp. 2d at 925 (noting that compliance with the Clean Water Act and "best management practices" "requires assessments based both on industry-wide standards and on an individualized and flexible approach"); *id.* at 925–26 (reviewing expert testimony, the SWPPP, and defendant's practices to evaluate permit violation claim).

---

[15] Like the Connecticut General Permit, the California General Permit under the CWA defines BMPs in terms of "best industry practice considering technological availability and economic practicability and achievability," *see California Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1137 (E.D. Cal. 2016).

Despite the obvious relevance of CLF's requests related directly to the Terminal (categories (i) and (ii) above), Defendants have not withdrawn their objections. For example, Defendants objected to ROG 3 as "irrelevant" in part because it seeks information about "the costs of any actions taken" "in designing and operating the Terminal" to account for climate change. ROG Resp., Ex. E at 8; *see also id.* at 11–12 (objecting to ROGs 4 and 5). But "economic[] practicab[ility]" is part of the definition of BMPs. *See CLF II*, 2022 WL 4292183, at *21. This Court should overrule Defendants' relevance objections to the requests under (i) and (ii) and compel Defendants to produce responsive documents.

*Second*, Defendants' practices at other facilities, as well as their climate change projections, climate preparedness standards, and climate vulnerability analyses, are also relevant to BMPs and whether Defendants have created an imminent and substantial endangerment under RCRA. As a matter of logic, Defendants' practices at all of their terminals inform the industry standard because they are participants in their industry. *E.g.*, *Santa Monica Baykeeper*, 619 F. Supp. 2d at 925 ("[T]he General Permit appears to require a more comprehensive look at . . . *the industry* to determine whether a specific site's BMPs achieve" the "best available technology economically achievable.") (emphasis added). Furthermore, this Court held that any infrastructure damage or discharge of pollutants that occurred at "Shell's Houston and Deer Park Facilities, among others," is relevant to CLF's claim that Defendants have failed to engineer, manage, operate, and fortify the Terminal against flooding and sea level rise. *CLF III*, 2022 WL 4292183, at *17 (citing Am. Compl., ECF 47 ¶¶ 322–326) [16]; *see also* Fed. R. Civ. P. 26(b)(1) advisory committee notes to the 2000 amendments ("A variety of types of information not directly pertinent to the incident in suit

---

[16] While this Court's discussion of the relevance of Defendants' experiences and actions at other facilities in its Order on Defendants' motion to dismiss was in the context of CLF's RCRA claim, the same principle applies to CLF's CWA claims, as evidenced by the Court's citation to paragraphs of the Amended Complaint referring to the SWPPP. *See CLF III*, 2022 WL 4292183, at *17.

could be relevant to the claims or defenses raised in a given action," such as "other incidents of the same type.").

But Defendants continue to maintain, despite this clear language from the Court, that "information wholly unrelated to the New Haven Terminal" is irrelevant. *E.g.*, RFP Resp., Ex. D at 59 (objecting to RFP 64 request for "documents pertaining to Superstorm Sandy" and Defendants' "facility in Sewaren, New Jersey"). This objection is contradicted by Defendants' own documents. For example, the ████████████████████████████ ███████████████████████████████ ("Continuity Plan") dictates what happens when major events limit access or operations of the Terminal or other Shell group facilities in the US East division, including Sewaren. *See* Continuity Plan, Ex. M at 2, 7. The Continuity Plan includes step-by-step directives during a hurricane or severe weather, which are "████████████ ███████████████████████████████████████████████" *Id.* at 7 (emphasis added). Thus it stands to reason that the Continuity Plan was implemented at the Sewaren Terminal in New Jersey in 2012, when the terminal spilled more than 100,000 gallons of oil into the Arthur Kill during Superstorm Sandy. Am Compl., ECF 47 ¶ 316; *cf.* Yeates Tr., Ex. G at 223:14. Any investigation Defendants conducted into the cause and source of that spill (or spill at any other facility resulting from severe weather), any efforts Defendants engaged in to respond to and clean up the spill, as well as any subsequent efforts to address any needed improvements or modifications at the facility to minimize and/or eliminate the risk of a future spill, are relevant to best industry practice. *Cf. Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1101 (9th Cir. 2017) (summarizing expert testimony regarding processes "at other facilities" with similar waste and whether "company policy" was implemented in RCRA endangerment case).

As another example, the Metocean DEP Informative that sets standards for the "███████

███████████████████████████████████████████████" references an incident

at a liquified natural gas (LNG) plant where contractors failed to consider the possibility of severe

weather events due to their "█████" and therefore "███████████" the facility "████████

█████████████████████████████████." Yeates 1016, Ex. I at 6–

7. CLF is entitled to information about these lessons learned at Defendants' other facilities because

they are relevant to whether Defendants put those lessons into practice at the Terminal to avoid

"the same infirmities," *CLF II*, 2022 WL 4292183, at *17.

Other documents show the Shell group considers industry practices and experiences in the

United States and abroad when addressing risks at its own terminals. When the former Distribution

Operations Manager for Shell Trading & Supply discovered certain terminals were not complying

with the Terminal Operations Manual[17] during a process called tank stripping, he initiated a

process of evaluating the risks. *See* Tank Stripping Emails, Ex. O at 3–4. Shell group formed a

working group to evaluate whether the "████████████████████████████████

██████████████████,"[18] which investigated tank stripping practices at other

facilities, including "████████████████████████████████████████."

Tank Stripping Emails, Ex. O at 2.[19] Indeed, the working group identified "████████████

███████████████████████." Tank Stripping Presentation, Ex. Q at 13. Thus,

---

[17] Shell's Terminal Operation Manual (TOM) outlines specific operational requirements for all Shell group terminals. It is a "██████████████████████████████████." Tank Stripping Emails, Ex. O at 10. In addition to specifying standards for terminal operations, the TOM requires direct intervention from Trading & Supply managers for certain environmental and safety related actions at Shell group terminals. *See* Tank Stripping Emails, Ex. O at 18–19; Terminal Operations Manual, Ex. P at 21.

[18] Hazard Determination Worksheet, Ex. N at 4.

[19] This document includes numerous redactions that are unexplained, including a bullet point that appears to identify specific problems or "gaps" that were identified when comparing then-current practices with the Terminal Operation Manual.

Shell's own actions show other facilities, including its own, are relevant to CLF's best industry practice claims under the CWA (Count I, V, VI, VII).

> **3.    Defendants' knowledge of the risks to infrastructure from climate change and severe weather is relevant to show whether such information was withheld from regulators.**

CLF alleges that Defendants failed to disclose to the Connecticut Department of Energy and Environmental Protection ("CT DEEP") information known to them about "the reasonably foreseeable risks of pollutant discharges" from the Terminal associated with severe weather and climate change. Am. Compl., ECF 47 ¶¶ 405–14 (Count III), 437–48 (Counts VIII, IX). CLF further alleges that failure to disclose these risks "has contributed to the imminent and substantial endangerment to health and the environment." Am. Compl, ECF 47 ¶¶ 486–502 (Count XIII). To support these claims, CLF has sought information related to (i) Defendants' compliance with regulatory requirements (ROG 8; RFPs 29–30, 32, 43–44, 51, 55–56), as well as information about (ii) Defendants' knowledge of climate change and severe weather impacts and the risks of those impacts to infrastructure, including the Terminal (ROGs 2–4, 6, and 9; RFPs 8–22, 24–28, 63–64). Because these requests are, on their face, "relevant to any party's claim," CLF is entitled to complete responses. Fed. R. Civ. P. 26(b)(1).

*First*, Defendants objected, on overbreadth and relevance grounds, to producing Terminal-specific communications with regulatory authorities (ROG 8 and RFP 32), permit applications and filings (RFPs 29–30), and procedures for compliance with the CWA and RCRA (RFPs 43–44, 51, and 55–56). *See, e.g.*, RFP Resp., Ex. D at 54 (objecting to RFP 55 regarding Terminal's RCRA generator status); ROG Resp., Ex. E at 15 (objecting to ROG 8 regarding documents provided to CT DEEP). These objections are baseless, as the requests are tailored to Defendants' own conception of this case: "whether or not there are current or ongoing violations of certain

provisions of the Terminal's . . . Permit[] or whether waste at the Terminal is currently managed in violation of" RCRA, *see* RFP Resp., Ex. D at 3 ¶ 5 (general objections).

*Second*, the depth of Defendants' knowledge of climate change and severe weather impacts, such as sea level rise and increased frequency of severe storm events, and the risks of those impacts to infrastructure including the Terminal is probative of both what Defendants were required to do to prevent unauthorized discharges or releases, *see supra* Part III.B.2, and also what Defendants were required to disclose to regulatory authorities. For example, CT DEEP requires facilities operating under the Permit to "identify . . . all non-stormwater discharges," such as from inundation due to storm surge or sea level rise, and "describe management practices and/or inspection procedures to ensure that new non-stormwater discharges do not occur in the future." Am. Compl., ECF 47 ¶ 392. Flooding due to sea level rise or storm surge are non-stormwater discharges that Defendants have not accounted for in the SWPPP, *id.* ¶¶ 391, 393–94, and any information they have about the risk of these kinds of discharges is relevant to Count I.

Defendants' response in the face of the apparent connection between CLF's claims and requests is to deny that climate change is relevant to their obligations under the CWA and RCRA. *See, e.g.*, RFP Resp., Ex. D at 10 ("RESPONSE: This is not a case about climate change."). But Defendants lost that battle at the motion to dismiss stage and are therefore required to produce relevant discovery on the claims pending against them, for "[a] party may not refuse to answer an interrogatory upon the ground that it is phrased in such a manner that the answer given would be predicated upon a false hypothesis according to the interrogated party's theory of the case." *United States v. 216 Bottles, More or Less, Etc.*, 36 F.R.D. 695, 700–01 (E.D.N.Y. 1965); *id.* at 700 ("The Government's theory is that the article is a drug and as previously stated, the discovery proceeding

cannot proceed upon the basis that [whether the article is a drug] has been decided in claimant's

favor.").

### 4. The temporal scope of CLF's requests are relevant to the allegations that Defendants have failed to comply with their obligations under the CWA and RCRA.

For Requests where a time period applies, CLF requested information from two relevant

time periods: 2011 to the present (the default time period) for ROGs 1–11 and all RFPs except 1

and 7, *see* Ex. C at 2 ¶ 6; Ex. B, at 4 ¶ 12; and 2000 to the present for RFPs 1 and 7, *see* Ex. B, at

7–8.[20] Defendants asserted in their written responses that they would produce only documents

"during the time [period] related to Plaintiff's claims," which they state is "the date that Defendant

Equilon Enterprises LLC d/b/a Shell Oil Products US applied for the relevant Clean Water Act

permit," July 2017.[21] RFP Resp., Ex. D at 37. However, Defendants have since clarified that they

will produce documents slightly in advance of when they registered under the Permit: from January

2017 to present for the CWA claim. *See* St. Pierre Aff., Ex. A ¶ 56. Despite Defendants'

concession, this temporal limitation is unfounded and should be overruled.

As an initial matter, Defendants assert that the statute of limitations for CLF's CWA claims

is five years. RFP Resp., Ex. D at 3 ¶ 5. At minimum, then, CLF is entitled to documents from all

Defendants from at least July 2016. *See* ECF 1 (filed July 7, 2021). But even "[t]he statute of

limitations is not a rigid barrier separating discoverable information from information outside the

scope of discovery." *Hall v. Marriott Int'l, Inc.*, No. 319CV01715JLSAHG, 2021 WL 1906464,

at *8 (S.D. Cal. May 12, 2021) (citation omitted). Instead, the question is whether "information

---

[20] *See supra* note 4.

[21] For the RCRA claims, Defendants have agreed to produce documents throughout the default time period. *See* St. Pierre Aff., Ex. A ¶ 56. But because Defendants have not provided any information about which claims or requests their productions are responsive to, *see infra* Part III.C.2, CLF does not know which requests, if any, have been responded to in full.

before and after the liability period" is "relevant and/or reasonably calculated to lead to the discovery of admissible evidence." *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 655 (D. Kan. 2004); *accord Hatamian v. Advanced Micro Devices, Inc.*, No. 14cv226-YGR-JSC, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015) ("In general, courts allow discovery to extend to events before and after the period of actual liability so as to provide context.").

The default time period in CLF's requests is relevant to its claims because Defendant Motiva first registered under the Clean Water Act Permit for the Terminal in 2011 and the current permit is simply a renewal of the 2011 permit. *See* Am. Compl., ECF 47 ¶ 175;[22] CT DEEP, *Industrial Stormwater General Permit Page*, https://portal.ct.gov/DEEP/Water-Regulating-and-Discharges/Stormwater/Industrial-Stormwater-GP (last visited on January 20, 2023) (noting the Permit was extended without modification through September 20, 2024). Defendants' knowledge and actions throughout the course of the Permit, and their statements to CT DEEP during the Permit term, are relevant for evaluating the state of Defendants' knowledge and experience at the start of the current permit term and during their application for registration under the Permit. For example, CLF has alleged Defendants failed to disclose knowledge in their possession about the risks posed by climate change. *See supra* Part III.B.3. Documents, even those dating back to 2011, are likely to demonstrate the depth of Defendants' knowledge about climate change and are relevant to determine what Defendants were obligated, and failed, to disclose. *Cf. Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1514918, at *8 (D. Conn. May 12, 2022) (allowing plaintiff's request for information related to the treatment of employees he supervised for the duration of five years before plaintiff's demotion because such information had "importance . . .

---

[22] In their Answer, Defendants Equilon and Triton failed to admit, deny, or aver to the allegations in sentences two, three, and four of Paragraph 175, so the allegations are deemed as admitted as against these Defendants. *See* Answer, ECF 120 ¶ 175; Fed. R. Civ. P. 8(b)(6).

in resolving the issues" and shed light on whether the plaintiff was treated differently by the employer than others in similar situations); *Gunning v. N.Y. State Justice Ctr. for Prot. of People with Special Needs*, No. 1:19-CV-1446 (GLS/CFH), 2022 WL 783226, at *10 (N.D.N.Y. Mar. 15, 2022) (same).

In addition, CLF's claims are bolstered by information showing that the Terminal's infrastructure is at risk of discharging pollutants due to climate change and severe weather. *See supra* Part III.B.2. The default time period covers at least two events relevant to these adaptation claims: the impact of Tropical Storm Irene on the Terminal in 2011, Am. Compl., ECF 47 ¶¶ 259–62, and the impact of Superstorm Sandy on the Sewaren Terminal in 2012, *id.* ¶ 316.

CLF's limited requests for information about Terminal-specific document retention policies (RFP 1) and environmental monitoring (RFP 7) from 2000 to present are relevant because Motiva began operating the Terminal in 2000, *see* Answer, ECF 120 ¶ 34. The record retention policies inform what documents Defendants can be expected to have retained over that period, and documents concerning environmental monitoring and analysis by contractors at the Terminal are relevant to CLF's claims that (i) Defendants failed to disclose relevant information to CT DEEP, *see* Am. Compl., ECF 47 ¶¶ 405–14 (Count III), 437–48 (Counts VIII, IX), and (ii) Defendants' failure to prepare the Terminal for climate change and severe weather impacts will result in discharge of toxic pollutants into the environment, *see* Am. Compl, ECF 47 ¶¶ 389–404 (Counts I, II), 415–436 (Counts IV, V, VI, VII), 486–502 (Count XIII). Given the limited nature of the Requests, Defendants' objections regarding burden and overbreadth, as well as lack of relevance, should be overruled.

For these reasons, this Court should overrule Defendants' time-based relevance requests and compel Defendants to produce the information requested in ROGs 1–10 and to produce documents withheld in response to RFPs 1–7, 11, 18, 23, 29–32, 34–35, 39–60, 62, and 65.

> **5. Defendants' knowledge of the risks to infrastructure from climate change and severe weather prior to the claims periods is relevant to the penalties under the CWA.**

All of CLF's requests about risks to the Terminal posed by climate change and severe weather, or compliance with the Permit (ROGs 2–4, 6, and 8 and RFPs 8–11, 29–30, 32, 43–44, 51, 55–56, and 63), as well as requests seeking information about Defendants' general knowledge of the risks posed by climate change (ROG 9 and RFPs 10, 12–22, 24–28, and 63–64), are relevant to civil penalties. Civil penalties under the CWA are informed by, *inter alia*, "the seriousness of the violation," "any history of such violations," and "any good-faith efforts to comply with the applicable requirements." *See* 33 U.S.C. § 1319(d). Failing to prepare the Terminal for climate change or severe weather is particularly egregious if Defendants have extensive information about the likelihood and severity of risks and have a history of failing to take any measures to mitigate those risks. Defendants' long history of studying climate risks but ignoring them at the Terminal is relevant to the appropriate penalty calculation.

Furthermore, information about the impact of climate change or severe weather on other assets owned by Defendants and how Defendants have mitigated risks of discharges in those situations is also relevant to showing Defendants' knowledge, intent, absence of mistake, and/or lack of accident in violating the CWA and RCRA, *see* Fed. R. Evid. 404(b)(2), which in turn can be considered in evaluating Defendants' "good-faith efforts to comply" with the Permit, *see* 33 U.S.C. § 1319(d). Evidence of storm or flooding vulnerability at other facilities *prior* to the effective date of the Permit is highly probative to whether Defendants knowingly mislead regulators or had "a history of such violations" as of the effective date of the Permit. *Cf. In re*

27

*Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 2313201, at *2 (N.D. Ill. May 29, 2017) (holding that defendant's conduct prior to plaintiffs suffering damages "would be relevant to show that [defendant] had notice of the need to police its sales representatives and yet failed to live up to the standards to which it had agreed").

### C. Defendants' Productions Violate the Federal Rules in a Manner that Frustrates the Discovery Process and Obfuscates Improperly Withheld Information.

#### 1. Defendants have not identified what responsive documents they have withheld.

Defendants have objected to several written discovery requests on privilege grounds but have failed to produce a privilege log. Defendants' counsel represented to CLF in October 2022 that they had not withheld any documents on the basis of any privilege, but recently stated that was not true as to the production served on CLF on December 31, 2022. *See* St. Pierre Aff., Ex. A ¶¶ 38, 45. However, over the course of discovery Defendants have also produced thousands of documents with redactions, similarly without a log. *See* St. Pierre Aff., Ex. A ¶¶ 50–51, 61. These practices violate the Federal Rules of Civil Procedure, and this Court should compel Defendants to produce all responsive documents over these unsupported objections.

*First*, failure to timely describe in detail the nature of any claimed privilege through production of a privilege log, as required by the local rules, *see* D. Conn. L.R. Civ. P. 26(e), "is sufficient grounds to deem the privilege waived." *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 238 F.R.D. 536, 538 (D. Conn. 2006); *see also* Fed. R. Civ. P. 26(b)(5)(A). Defendants objected to ROGs 1–2 and RFPs 6–29, 31, 34, 36–37, 39–51, 53–54, 57–59, and 62–65[23] on privilege grounds on May 13, 2022, and issued five productions containing redacted documents

---

[23] Defendants additionally qualified their responses to other RFPs where they did not object on privilege grounds by stating, "Defendants will produce responsive, *non-privileged documents*," *see, e.g.*, RFP Resp., Ex. D at 6 (emphasis added).

through December 2022. *See* RFP Resp., Ex. D. CLF repeatedly reminded Defendants of their

obligation to provide a privilege log. *See, e.g.*, ECF 84-6 at 3 (June 6, 2022, letter from CLF to

Defendants); St. Pierre Aff., Ex. A ¶¶ 16, 31, 37, 45. No Defendant has produced a privilege log

to CLF in this matter. *See* St. Pierre Aff., Ex. A ¶ 45. CLF therefore requests that this Court hold

that Defendants have waived all claims of privilege in response to CLF's written discovery

requests for documents it has withheld and/or redacted pursuant to a privilege in its first five

productions.[24] Such a judicial remedy is justified in circumstances like this one, where Defendants

have had eight months to comply and an explanation as to broad claims of privilege are necessary

to ensure "that parties raise all objections at once, rather than in staggered batches, so that

discovery does not become a game." *In re Chevron Corp.*, 749 F. Supp. 2d 170, 181 (S.D.N.Y.

2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010)

(citation and quotation marks omitted); *see also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*

*for Dist. of Mont.*, 408 F.3d 1142, 1149–50 (9th Cir. 2005) (holding "sophisticated corporate

litigant and a repeat player in environmental lawsuits and regulatory action" waived assertions of

privilege "where the log not only was not filed during the Rule 34 time limit, but was filed *five*

*months* later").

 Relatedly, Defendants have improperly redacted information from over 16,000 responsive

documents based on improper claims of relevance, confidential business information, or both. St.

Pierre Aff., Ex. A ¶¶ 50, 61. For instance, many documents containing information about

infrastructure, maintenance, or permit violations at multiple terminals have been heavily redacted

so that only information directly pertaining to Defendants' Providence or New Haven facilities is

---

[24] Defendants stated at the January 13, 2023 meet and confer that they had withheld and/or redacted documents in the Sixth Production, produced two weeks prior, on privilege grounds and would be providing a privilege log. St. Pierre Aff., Ex. A ¶ 45. CLF has not received the log but will meet and confer with Defendants should it have any issues or concerns.

visible. *See, e.g.*, Project Dev. Request Form, Ex. L.[25] Defendants have not provided a log explaining the bases for these redactions, leaving CLF unable to evaluate or challenge those bases except categorically.[26] However, "[t]he weight of authority in the Second Circuit goes against allowing a party to redact information from admittedly responsive and relevant documents based on that party's unilateral determinations of relevancy." *Berney v. Apple Inc.*, No. 3:20-CV-1379 (JAM), 2021 WL 6334985, at *2 (D. Conn. May 27, 2021) (citing cases) (quotation marks omitted); *see also John Wiley & Sons. Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("[R]edactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege."). Additionally, redacting documents to protect confidential business information is inappropriate where this Court has entered a protective order for that very purpose.[27] *See* ECF 7.

Consequently, this Court should compel Defendants to produce in full all redacted documents and to produce any documents that have been improperly withheld pursuant to an unclaimed and unidentified privilege.

---

[25] Defendants' redactions, however, appear to be inconsistent, which Plaintiffs brought to Defendants attention in the meet and confer. St. Pierre Aff., Ex. A ¶ 50. For example, Defendants claim they are redacting information for relevance, but in a single document that included information about spills at the Terminal, Defendants heavily redacted some information while leaving information about an incident in Mexico City involving a hijacking and stolen truck unredacted. Safety and Environmental Performance Presentation, Ex. R at 6.

[26] Whether redactions for relevance are the basis for Defendants' ubiquitous undue burden and proportionality arguments, *see infra* Part III.D.1, is unclear from Defendants' lack of transparency on this issue. If these impermissible redactions are the cause for Defendants' constant delays in production, however, Defendants' conduct has undermined their arguments regarding undue burden. *See* St. Pierre Aff., Ex. A ¶ 34.

[27] For this same reason, Defendants' objections to CLF's written requests on the basis of "confidential and sensitive business information," *e.g.*, RFP Resp., Ex. D at 13 (objecting to RFP 10), or "security concerns," *e.g.*, *id.* at 39 (objecting to RFP 33), are unfounded and should be overruled. If Defendants have withheld any documents on these grounds—their responses do not specify—this Court should compel production of said documents, subject to the protective order.

### 2. CLF cannot fully address Defendants' objections because Defendants have failed to specify what they have withheld and produced.

Defendants have objected to all ROGs and RFPs (except RFP 61) on a variety of generalized non-privileged grounds, including relevance, undue burden, and proportionality.[28] For most of these requests, Defendants have also represented that they have produced some responsive documents subject to those objections.[29] But Defendants have not identified what responsive documents, if any, they are withholding under non-privilege objections, *see* Fed. R. Civ. P. 34(b)(2)(C) (requiring objecting party to "state whether any responsive materials are being withheld on the basis of that objection"), nor have they identified which request(s) the documents produced thus far are responsive to or which Defendant produced each document, *see* Fed. R. Civ. P. 34(b)(2).

*First*, Defendants provide boilerplate objections and responses to each of CLF's RFPs, reciting a litany of objections and then stating that subject to those objections, they will produce some responsive documents. For example, in response to RFP 11, Defendants objected on overbreadth, relevance, vagueness, and disproportionality grounds, and then responded that they will produce documents that are "relevant to Plaintiff's claims."[30] *See* RFP Resp., Ex. D at 14. That provides <u>no clarity</u> as to whether Defendants withheld responsive documents, particularly because CLF's request—"[a]ll documents concerning risks to the Terminal's physical infrastructure from climate change, flooding, sea level rise, and/or severe weather"—corresponds

---

[28] Defendants also objected to RFPs 10 and 12 on First Amendment grounds, but never identified the documents withheld and later stated that they did not withhold documents on this basis, *see* St. Pierre Aff. ¶ 16. CLF takes Defendants at their word and understands that this objection has been withdrawn. If Defendants later attempt to raise this objection again, CLF will request this Court find it waived pursuant to Fed. R. Civ. P. 34(b)(2)(C).

[29] Defendants objected to RFPs 1–11, 15, 18–21, 23–24, 26–60, 62–63, and 65 but agreed to produce some responsive documents.

[30] Defendants responded in the same fashion to RFPs 4, 7–6, 8–10, 23–24, 26–28, 31–33, 36–38, 40, 42, 53–54, 58, and 63.

directly to CLF's claims that Defendants have failed to plan for, mitigate, and acknowledge risks of pollutant release from Terminal due to climate change, flooding, sea level rise, and/or severe weather, *see* Am. Compl., ECF 47 ¶¶ 389–463, 486–501 (Counts I–XI, XIII); *see also supra* Part III.B (discussing the connection between CLF's claims and requests). "[S]imply stating that a response is 'subject to' one or more general objections does not satisfy the 'specificity' requirement," because Defendants don't state "which of the numerous general objections is purportedly applicable as well as whether the documents or answers provided are complete, or whether responsive documents are being withheld." *Liguria Foods, Inc. v. Griffith Lab's, Inc.*, 320 F.R.D. 168, 187 (N.D. Iowa 2017); *see also* 7 Moore's Federal Practice § 34.13[2][b] (3d ed. 2021) (specificity required "to avoid confusion").[31]

Conferring with Defendants has not alleviated the confusion of their productions: a list of discovery search terms provided to CLF by Defendants explicitly excluded "terms that correspond to the Requests for which Defendants maintain pending objections," without indication of what responsive (but objectionable) terms Defendants were withholding. *See* St. Pierre Aff., Ex. A ¶ 24.

*Second*, Defendants' productions have not specified which Defendant(s) produced each document or to which request each document is responsive, nor have the productions included information sufficient to show the documents were produced "as they are kept in the usual course of business." Fed. R. Civ. P. 34(b)(2)(E)(1). The purpose of this Rule is "to prevent parties from deliberately mixing critical documents with other in the hope of obscuring significance." *Hannah v. Wal-Mart Stores, Inc.*, No. 3:12CV1361 JCH, 2014 WL 2515221, at *2 (D. Conn. June 4, 2014)

---

[31] Confusion is precisely what Defendants' generalized responses have wrought in this case. For example, Defendants refused to produce metocean information in response to RFP 17, objecting that it was "not relevant" and that there are "no Metocean documents related" to the Terminal. RFP Resp., Ex. D at 24. But a metocean DEP and Informative were produced to CLF, *see* Exs. H and I. Defendants stated months later that the production was inadvertent, *see* St. Pierre Aff., Ex. A ¶ 55, but as detailed above, the documents are directly relevant to Claims V, VI, and VII, *see supra* Parts III.B.1–2.

(citation and internal alterations omitted). Regardless of Defendants' intent, their voluminous, unorganized productions have resulted in this exact obfuscation.

Though counsel for Defendants represented for the first time on January 13, 2023, that documents had been produced as they were kept in the ordinary course of business, *see* St. Pierre Aff., Ex. A ¶ 52,[32] the producing "party must do more than merely represent to the court and the requesting party that the documents have been produced as they are maintained." *Pass & Seymour, Inc. v. Hubbell Inc.*, 255 F.R.D. 331, 334 (N.D.N.Y. 2008) (citing cases). Instead, Defendants bear the burden to prove compliance by providing "additional information regarding its search for the documents, including where the documents produced were maintained, whether they came from a single source or file or from multiple points of origin, the identity of the record custodians, and the manner in which they were organized." *Id.* at 334–35; *see also id.* at 336 ("[T]he documents should be produced, organized and labeled and, if appropriate, indexed just as they are maintained by the producing party."); *Hannah*, 2014 WL 2515221, at *2 (citing *Pass & Seymour*, 255 F.R.D. at 334). Defendants' production has failed to identify which Defendant(s) had possession, custody, or control,[33] and "the manner in which they were organized." *See* St. Pierre Aff., Ex. A ¶¶ 63–64.

When CLF raised this issue with Defendants, they stated "documents produced should be construed as being produced on behalf of every Defendant" "unless otherwise noted in Defendants' responses." St. Pierre Aff., Ex. A ¶ 53. But if Defendants have not indicated to which request(s) each document is responsive, how can CLF determine which Defendant(s) produced any given

---

[32] CLF also specifically requested that Defendants identify which request(s) each document was responsive to. St. Pierre Aff., Ex. A ¶ 29.

[33] Defendants provided CLF with a list of custodians whose files were searched, *see* St. Pierre Aff., Ex. A ¶ 24, and the metadata for Defendants' production includes a Custodian field with names from this list. But Defendants have not indicated whether any of these custodians are (or were) employees or agents of any Defendant(s), and which Defendant(s) exercised possession, custody, or control of produced documents. *Cf. Pass & Seymour*, 255 F.R.D. at 334 (finding producing party's list of custodians insufficient to meet the requirement to produce documents as ordinarily kept, where "many of the individuals identified are not known" to the receiving party).

document? *See, e.g.*, RFP Resp., Ex. D at 25 (responding that Motiva has no responsive documents, but that the other Defendants will produce). Defendants' contradictory positions on their production obligations are especially problematic because without the identity of the producing party, CLF cannot know which documents may be used as evidence of liability against any particular Defendant. *See supra* Part III.B.1. More fundamentally, CLF needs this information to authenticate and admit the documents into evidence. *See, e.g.*, Fed. R. Evid. 803, 804, 901, 902, 1003, 1004.

A prime example of the confusion caused by Defendants' noncompliant responses relates to the time period of production. In light of Defendants' agreement to produce documents from 2011 to the present for requests related to the RCRA claim, it appears that all responsive documents should have been produced in response to requests where Defendants stated they would produce responsive, non-privileged documents "dated during the time related to Plaintiff's claims," including RFPs 1, 2, 6–7, 18, 23, 30–32, 35, 47–50, 53, 55–57, 59–60, 62, 65. *See* RFP Resp., Ex. D. But because Defendants have not complied with Rule 34, CLF cannot verify whether Defendants have produced all responsive documents.

Defendants' failure to comply with Rule 34 has frustrated discovery negotiations in this case, and Defendants should be compelled to respond to the requests in full as a result. Alternatively, to help the Parties and this Court determine whether any discovery disputes can be narrowed, CLF requests this Court compel Defendants to serve CLF with updated written discovery responses identifying, for each request, (a) whether any responsive documents have been withheld, and on what ground(s), and (b) what documents were produced responsive to the request, and which Defendant(s) produced the responsive documents. *See, e.g.*, *Pass & Seymour*, 255 F.R.D. at 337–38 (citing cases requiring producing party to create an index of production);

*Hannah*, 2014 WL 2515221, at *2 (requiring the party to "serve amended discovery responses identifying by bates number which documents are responsive to each request").

### D.  Defendants' Other Objections Are Without Merit.

#### 1.  Defendants have not carried their burden to show that CLF's requests are disproportionate to the needs of this case.

Defendants objected to every ROG and every RFP (except RFP 61) as either overbroad, unduly burdensome, and/or disproportionate to the needs of the case. *See* Table, Ex. F. To support any claim of proportionality, Defendants are required to affirmatively show that the production of relevant, responsive information is not warranted "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see, e.g.*, *Walls v. City of New York*, 502 F. Supp. 3d 686, 691 (E.D.N.Y. 2020) ("[P]arty seeking to avoid discovery on grounds of burden," must "address those proportionality factors pertinent to that case and provide specific evidence and argument . . . ."); *Hannah*, 2014 WL 2515221 at *4. As the proponent of the discovery requests, CLF need not affirmatively address proportionality, as the producing party has the responsibility to raise and articulate the burden it faces. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendments.

Defendants have failed to carry their burden because they have injected the same boilerplate responses to every one of CLF's requests—alleging lack of relevance due to the geographic, temporal, or climate change-focus of the request—without detailing how or why the "burden or expense of the proposed discovery outweighs its likely benefit."[34] *See Sullivan v.*

---

[34] Defendants filed a declaration in the Rhode Island matter discussing similar requests. But Defendants have not filed a similar declaration in this case, nor made the legal argument as to why the difficulty of production is disproportionate to the needs of this case.

*StratMar Systems, Inc.*, 276 F.R.D. 17, 19 (D. Conn. 2011) ("To assert a proper objection on this basis, however, one must do more than simply intone the familiar litany that the interrogatories are burdensome, oppressive or overly broad.") (brackets and quotation marks omitted). Nor have Defendants addressed why allowing CLF to inspect the relevant files, rather than producing them, is an insufficient alternative. *See Gross v. Lunduski*, 304 F.R.D. 136, 151–52 (W.D.N.Y. 2014); Fed. R. Civ. P. 34(b)(2)(B). Indeed, Defendants are hard pressed to show that CLF's claims are not proportional in light of the "information asymmetry" in this case, where Defendants "have vast amounts of information, including information that can be readily retrieved" through computer searches. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendments. "In practice these circumstances often mean that the burden of responding to discovery lies heavier on the party who has more information, and properly so." *Id.*

As a remedy for these deficiencies, CLF requests that this Court find Defendants have failed to show the requested discovery is disproportionate to the needs of the case and compel Defendants to produce all responsive documents withheld pursuant to their deficient overbreadth, relevance, or related objections. *See, e.g.*, *Walls*, 502 F. Supp. 3d at 691. In the alternative, CLF requests the Court compel Defendants to provide CLF with a detailed accounting of what responsive information has been withheld on the basis of proportionality, and state with specificity why the request is disproportionate in light of the Parties' relative access to information and resources. *See, e.g.*, *Passenti v. Veyo, LLC*, No. 21-CV-01350 (SRU), 2022 WL 17261411, at *7 (D. Conn. Nov. 29, 2022) (requiring objecting party to revise discovery responses that violate Rule 34(b)(2)(C)).

### 2. Defendants' objections to the use of "climate change" as vague is unsupported by its own documents.

Defendants assert that "climate change" is "not defined and is an extraordinarily broad term that may refer to myriad processes over significantly varying periods of time" and is not relevant to CLF's claims in its responses to ROGs 2–4, 6, 8, and 9 and RFPs 8, 10–13, 15, 19, 20, 21, 22, and 24–26. *See* RFP Resp., Ex. D. This objection is frivolous. *First*, CLF has clearly defined climate change in its complaint. *See* Am. Compl., ECF 47 ¶¶ 334–65. But if that definition is insufficient, Defendants' internal documents also contain their own definition of climate change. *See, e.g.*, Yeates 1015, Ex. H at 5. *Second*, any confusion Defendants have asserted about the relevance of climate change to claims in this case was dispelled by this Court's order on the motion to dismiss, which stated clearly that this case is about the risk of "catastrophic release of pollutants due to Defendants' alleged failure to adapt the Terminal to address" climate change." *CLF II*, 2022 WL 4292183, at *20 (quoting *CLF I*, 2020 WL 5775874, at *1); *see also id.* at *2, *8, *17. The relevance of climate change to the claims is indisputable, and Defendants' objections to the contrary should be overruled.

## IV.   CONCLUSION

For the foregoing reasons, CLF asks the Court to overrule Defendants' Objections to CLF's First Interrogatories and First Requests for Production of Documents and enter an Order compelling Defendants to:

(i)  respond to the requests as written;

(ii) produce unredacted copies of prior productions impermissibly redacted for relevance or on the basis of confidentiality; and

(iii)serve CLF with amended discovery responses identifying by bates number which documents are responsive to each request and which Defendant produced the responsive documents.

To allow CLF time to review Defendants' production and incorporate those documents into the remaining depositions in this case, CLF also respectfully requests this Court stay Plaintiff's deposition deadline, set for February 16, 2023, and enter a new deadline for 60 days after Defendants' compliance with the above requested order.[35]

Finally, CLF further requests this Court enter a briefing schedule on whether Defendants are required, under Rule 37, to pay CLF's reasonable expenses, including attorneys' fees, in litigating this and the prior motion to compel on the same topics, and what other sanctions may be appropriate. Fed. R. Civ. P. 37(c)(1).

Dated: January 20, 2023                      Respectfully submitted,

CONSERVATION LAW FOUNDATION,
Inc., by its attorneys

/s/ Alexandra St. Pierre
Alexandra St. Pierre (ct31210)
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
Tel: (617) 850-1732
E-mail: aestpierre@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
E-mail: jcrowley@clf.org

---

[35] Subsequent to the filing of this Motion, Plaintiffs intend to file a motion detailing the reasons to stay the deposition deadline until resolution of this Motion.

Christopher M. Kilian (ct31122)
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (803) 223-5992
E-mail: ckilian@clf.org

Allan Kanner (ct31051)
E-mail: a.kanner@kanner-law.com
Elizabeth B. Petersen (ct 31211)
E-mail: e.petersen@kanner-law.com
Allison S. Brouk (ct31204)
E-mail: a.brouk@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street New Orleans, Louisiana
70130 Tel: (504) 542-5777
Facsimile: (504) 524-5763