**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| *Plaintiff*, | Civil Action No. 3:21-cv-00933-JAM |
| v. | |
| SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | |
| *Defendants*. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION**
**<u>FOR PARTIAL SUMMARY JUDGMENT</u>**

**Oral Argument Requested**

## **TABLE OF CONTENTS**

Table of Contents.................................................................................................................. ii

Table of Authorities ............................................................................................................ iv

Exhibit List......................................................................................................................... vii

I.      Introduction.............................................................................................................. 1

II.     Brief Summary of CLF's Claims............................................................................. 2

III.    Legal Standard ......................................................................................................... 3

IV.     Argument .................................................................................................................. 4

    A.  Because the Permit's BMP Requirements Are Not Dispositive of Counts II,
        III, IV, VIII, and IX, Defendants' MPSJ Fails as to Those Claims. ........................... 5

        1.  Count II: Defendants do not mention or interpret the Connecticut Coastal
            Management Act ("CMA") (Permit § 3(b)(2)). ..................................................... 6

        2.  Count IV: Defendants do not mention or interpret the Permit's
            requirement to identify potential pollutant sources (Permit § 5(c)(2)(D)). ........... 9

        3.  Count III: Defendants do not contest CLF's interpretation of the Permit's
            SWPPP certification requirements (Permit §§ 5(c)(7), 6(d))................................. 10

        4.  Count VIII: Defendants argument regarding BMPs is not dispositive of
            whether Defendants failed to submit required information to CT DEEP
            (Permit § 6(g))..................................................................................................... 12

        5.  Count IX: Defendants argument regarding BMPs is not dispositive of
            whether Defendants failed to update the SWPPP (Permit § 5(c)(5))................... 13

    B.  Because the Plain Text of the Permit Directs Permittees to Design and Adopt
        Best Management Practices Tailored to the Specific Facts of the Permitted
        Facility, Defendants' MPSJ Fails as to Counts I, V, VI, and VII. .............................. 14

        1.  The Permit's plain language demonstrates that BMPs are site-specific and
            responsive to the potential sources of pollution identified in the SWPPP............ 16

            a.  Defendants' textual arguments produce unreasonable interpretations of
                the Permit. ...................................................................................................... 19

        2.  Best industry practice is determined by expert testimony and a review of
            industry practices. ................................................................................................ 23

    C.  Extrinsic Evidence of CT DEEP's Intent Supports CLF's Interpretation of the
        Permit as Requiring Site-Specific BMPs That Encompass Consideration of the
        Effects of Climate Change. ....................................................................................... 25

        1.  CT DEEP's guidance demonstrates CT DEEP's intent to require permitted
            facilities to tailor BMPs to the facility's risks and site-specific features.............. 26

2. Defendants' extrinsic evidence does not demonstrate that CT DEEP intended the BMPs in the Permit to "provide specific detail" on how to comply with Section 5(b) of the Permit. ........................................... 27

a. Defendants' use of extrinsic evidence in their "plain language" interpretation arguments is impermissible and should be disregarded by this Court unless the Permit is ambiguous. ................................. 28

b. EPA's MSGP and guidance also make clear that appropriate BMPs are not prescribed but must be tailored to the risks and features of each permitted facility. ........................................................................... 29

c. Defendants' extrinsic deposition evidence is inadmissible. .......................... 34

D. Defendants Do Not Challenge the Sufficiency of CLF's Evidence, and Such a Claim Is Premature. ...................................................................................... 38

V. Conclusion ........................................................................................................ 40

## **TABLE OF AUTHORITIES**

### *Cases*

*ABB Indus. Sys. v. Prime Tech*, 120 F.3d 351 (2d Cir. 1997)........................................ 34

*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) ............................................ 3

*Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012)............................................... 8

*Bryant v. Rudman*, 933 F. Supp. 270 (S.D.N.Y. 1996)........................................... 8, 40

*Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319 (D. Conn. 2018).................................. 8

*California Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128 (E.D. Cal. 2016)........................................................... 24

*Chapco, Inc. v. Woodway USA, Inc.*, No. 3:15-CV-1665 (JCH), 2018 WL 3581694 (D. Conn. July 24, 2018)........................................................... 8

*Chardavoyne v. Thames Water Holdings Inc.*, No. 03CV56, 2007 WL 735707 (D. Conn. Mar. 5, 2007)........................................................... 7

*City of New York v. Anglebrook Ltd. P'ship.*, 891 F. Supp. 908 (S.D.N.Y.), *aff'd*, 58 F.3d 35 (2d Cir. 1995) ........................................................... 17, 24

*City of New York v. Chavez*, 944 F. Supp. 2d 260 (S.D.N.Y. 2013)........................................... 8

*Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416 (D. Conn. 2022) ........................................................... 4

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011)................................................ 8, 40

*Ctr. for Biological Diversity v. Univ. of N. Carolina at Chapel Hill*, No. 1:19-CV-1179, 2021 WL 3861388 (M.D.N.C. Aug. 30, 2021), *appeal dismissed,* No. 21-2089, 2021 WL 7908071 (4th Cir. Nov. 23, 2021) ........................................ 37

*Douglas v. City of Waterbury*, 494 F. Supp. 2d 112 (D. Conn. 2007)........................................ 29

*Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117 (D. Conn. 2014) ........................................................... 7

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) ........................................ 4

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987).................... 36

*Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614 (2d Cir. 1996)........................................ 38

*Isham v. Isham*, 972 A.2d 228 (Conn. 2009)................................................... 12

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)........................................ 3

*Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595 (5th Cir. 2000).................................... 38

*LaCourse v. HallKeen Mgmt., Inc.*, No. 10-CV-420, 2011 WL 3857149 (D. Me. Aug. 31, 2011) ........................................................... 35

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 883 F. Supp. 2d 979 (D. Or. 2012), *rev'd on other grounds*, 585 Fed. App'x 613 (9th Cir. 2014) ............................................................................... 20

*Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022) ........................................ 8

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir. 1977) ............................... 38

*McNamara v. Associated Press*, 40 F. Supp. 3d 345 (S.D.N.Y. 2014) ................. 8, 10

*Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013) ............................................................................................................ passim

*Ohio Valley Env't Coal. v. Fola Coal Co.*, 845 F.3d 133 (4th Cir. 2017) .................. 27

*Ollman v. Special Bd. of Adjustment No. 1063*, 527 F.3d 239 (2d Cir. 2008) ............. 3

*Parisi v. Parisi*, 107 A.3d 920 (Conn. 2015) ......................................................... 12

*Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010) ................. 20

*Russ v. Int'l Paper Co.*, 943 F.2d 589 (5th Cir. 1991) .............................................. 9

*Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009) ................................................................................................................. 24

*Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870 (N.D. Ill. 2014) ......................... 8, 10

*Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270 (2d Cir. 1968) ............. 39

*Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015) ......................... 21, 29

*Stissi v. Interstate & Ocean Transp. Co. of Philadelphia*, 765 F.2d 370 (2d Cir. 1985) ................................................................................................................. 38

*Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990) ................................................... 39

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002), *as amended on denial of reh'g* (Jan. 23, 2003) ............................................................ 3

*TransAtlantic Lines LLC v. United States*, No. 06-CV-354, 2007 WL 735705 (D. Conn. Mar. 5, 2007) ........................................................................................... 12

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ....................................... 38

*United States v. Ruffin*, 575 F.2d 346 (2d Cir. 1978) ............................................. 35

*Yuhe Diamba Wembi v. Metro Air Serv.*, 195 F. Supp. 3d 957 (N.D. Ill. 2016) ...... 7, 10

*Ziegenfus v. John Veriha Trucking*, No. 10 CIV. 5946, 2012 WL 1075841 (S.D.N.Y. Mar. 28, 2012) .................................................................................... 37

**Statutes**

33 U.S.C. § 1251(a) ............................................................................................. 20

33 U.S.C. § 1342(o) ............................................................................................. 32

Conn. Gen. Stat. § 22a-430(b) ..................................................................... 20, 21, 24

Conn. Gen. Stat. § 22a-430b(a)(1)............................................................... 21

Conn. Gen. Stat. § 22a-92(a)(5)............................................................... 6, 7

## *Rules*

Fed. R. Civ. P. 12(g)(2)............................................................... 39

Fed. R. Civ. P. 12(h)(2)............................................................... 39

Fed. R. Civ. P. 37(c)(1)............................................................... 37

Fed. R. Civ. P. 56(a) ............................................................... 3

Fed. R. Civ. P. 56(c)(2)............................................................... 34

Fed. R. Civ. P. 56(d) ............................................................... 25, 34, 40

Fed. R. Evid. 402 ............................................................... 35

Fed. R. Evid. 701(c)............................................................... 37

Fed. R. Evid. 801(c)............................................................... 35, 38

Fed. R. Evid. 802 ............................................................... 35

## *Treatises*

5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1367 (3d ed.).................................... 39

## *Regulations*

Non-Transportation-Related Onshore and Offshore Facilities, 67 Fed. Reg. 47042,
47070 (Jul. 17, 2002) ............................................................... 27

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit A. | CLF's Rule 56(a)(2) Statement of Material Facts |
| Exhibit B. | Affidavit of Alexandra Jordan |
| Exhibit C. | Guidance on Developing SWPPPs, published by U.S. Environmental Protection Agency in March 2021 |
| Exhibit D. | Exhibit 5 to Deposition of Renee Bourdeau, Spreadsheet of Reviewed SWPPPs |
| Exhibit E. | Emails to CT DEEP Regarding SWPPPs (RBORD00007668–73) |

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Shell USA, Inc. f/k/a Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum, Inc., and Triton Terminaling LLC ("Defendants")[1] Motion for Partial Summary Judgment ("MPSJ") (ECF 248) on Counts I–IX of CLF's Amended Complaint (ECF 47).

## I.    INTRODUCTION

In this case, CLF asserts that Defendants are violating the Clean Water Act ("CWA") by failing to comply with the Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity ("Permit") at Defendants' bulk petroleum storage terminal in New Haven, Connecticut ("Terminal"). Defendants have not operated or prepared their facility for the effects of severe weather events, including climate change-induced risks, such as the increased frequency and severity of storms, sea level rise, and storm surge. The Permit regulates stormwater discharges from the Terminal and directs Defendants to minimize pollutant discharges into nearby waterbodies, such as the New Haven Harbor, the Quinnipiac River, and the Mill River. It follows that a permit that regulates stormwater necessarily requires a permittee to consider factors that *affect stormwater*, including things that might change the frequency, severity, and duration of precipitation events (which create stormwater) or otherwise affect stormwater treatment systems—including the increased frequency and severity of storms, sea level rise, and storm surge. Yet despite this commonsense conclusion, Defendants do not consider the effects of severe weather or climate change in their implementation of the Permit at the Terminal.

Instead, Defendants assert that the "plain language" of Section 5(b) of the Permit, which mandates permittees to adopt "Best Management Practices" ("BMPs") to minimize the release of

---

[1] Defendant Motiva Enterprises LLC ("Motiva") did not move for summary judgment.

1

pollutants from the facility, does not require consideration of climate change factors that change precipitation patterns or may cause flooding at the Terminal. *See* ECF 248-1 at 15.[2] Defendants come to this conclusion by construing open-ended categories of required BMPs, such as "Management of Runoff," as "specific" and "detailed" instructions "on what the permittee must do to comply with the CT General Permit." *Id.*; Defs.' SOF, ECF 248-2 ¶ 7.

Defendants' interpretation of the Permit's language is plainly at odds with the language in the Permit and should be rejected, and their MPSJ denied accordingly.

## II.    BRIEF SUMMARY OF CLF'S CLAIMS

As CLF's Amended Complaint ("Am. Compl.") describes, flooding and precipitation events are occurring at an increasing rate in the Northeast, including in the New Haven area. *See* Am. Compl., ECF 47 ¶ 68. These ongoing changes to severe weather from climate change, what Defendants' dub "Climate Factors," *see* ECF 248-1 at 7, increase the frequency and intensity of storms and storm surges and lead to sea level rise and increasing sea surface temperatures, all of which exacerbate flooding and precipitation. *See generally* Am. Compl., ECF 47 at Factual Background § IV.

CLF has alleged that the Permit places affirmative duties on Defendants to evaluate the risks posed to the Terminal by severe weather events, including climate change-induced risks, and to take action to address those risks, and that Defendants have failed to do so. In particular, Defendants must comply with the Connecticut Coastal Management Act by planning for the potential impacts of sea level rise and coastal flooding (Count II). Am. Compl., ECF 47 ¶ 188. Defendants are obligated to "minimize the discharge of pollutants" from the Terminal by, among other things, implementing control measures to (i) eliminate any non-stormwater discharges,

---

[2] Pin citations to documents on the docket refer to the ECF header number.

(Count I) (ii) manage stormwater runoff, (Count VI) and (iii) minimize the risk of spills (Count VII). *Id.* at ¶¶ 390, 422–23, 428, 433; Permit, ECF 248-5 at 19–23 (§§ 5(b)(11), 5(c)(2)(E), 5(b)(7), 5(b)(9)). Defendants must also develop and implement a stormwater pollution prevention plan ("SWPPP") that identifies the potential pollutant sources (Count IV) and describes the control measures Defendants have implemented to address the risk of discharges (Count V). Am. Compl., ECF 47 ¶¶ 201–03, 206; Permit, ECF 248-5 at 23 (§§ 5(c)(1)(A), 5(c)(2)). Defendants are further required to certify their SWPPP (Count III), update the SWPPP as conditions change (Count IX), and to disclose known risks to regulators (Count VIII). Am. Compl., ECF 47 ¶¶ 413, 444–47; Permit, ECF 248-5 at 29 (§ 5(c)(5)). By failing to take severe weather and climate change into account, Defendants are violating the above Permit requirements, and therefore the CWA.

## III.   LEGAL STANDARD

"Even when, as here, the moving party does not have the ultimate burden of persuasion at trial, it has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002), *as amended on denial of reh'g* (Jan. 23, 2003); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); Fed. R. Civ. P. 56(a). "A court reviewing a motion for summary judgment 'must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Ollman v. Special Bd. of Adjustment No. 1063*, 527 F.3d 239, 245 (2d Cir. 2008) (citation omitted). "[A] movant cannot support a motion for summary judgment with a conclusory assertion that the nonmovant has no evidence to support his *case*"; instead, the movant must show that the nonmovant has no evidence to support "a *specific element* of the nonmovant's claim." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 n.10 (5th Cir. 2017). "[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts

3

entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (cleaned up).

## IV.  ARGUMENT

CLF pled eleven claims under the CWA, each of which survived Defendants' motion to dismiss. *See Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416, 449 (D. Conn. 2022). Defendants move for summary judgment on Counts I–IX of those CWA claims,[3] without ever referencing the elements of any of the claims, the legal theories that underlie the claims, or the differences between them. As discussed below, there is no legal question common to CLF's claims to allow resolution of all nine claims together; rather, an examination of each claim shows that the way in which different provisions of the Permit apply to the Terminal is a factual question not subject to resolution on summary judgment.

Though Defendants style their MPSJ as an attack on Counts I–IX, Defendants do not address any of the elements of Counts II, III, IV, VIII, or IX. Defendants' brief asserts a singular legal theory: that the plain text of the BMPs section of the Permit (Section 5(b)), does not require consideration of "climate factors" because the BMPs "provide[] specific detail on what the permittee must do to comply with the CT General Permit." *See* ECF 248-1 at 15. But interpretation of the BMPs section is not dispositive of Counts II, III, IV, VIII, and IX, which premise Defendants' liability on *separate* Permit conditions. Because Defendants' argument does not address the elements of Counts II, III, IV, VIII, and IX, the Court should deny their MPSJ.

---

[3] Counts X and XI are brought against all Defendants except Motiva. Am. Compl., ECF 47 ¶¶ 449–63. Count XIII alleges a violation of the Resource Conservation and Recovery Act ("RCRA") against all Defendants, including Motiva. *Id.* ¶¶ 486–502.

Counts I, V, VI, and VII assert that Defendants must consider the impacts of severe weather and climate change on the Terminal because the BMPs require permittees to take into account site-specific information and best industry practices to minimize discharges of pollutants from the Terminal. Defendants' MPSJ fails because determining whether BMPs that ignore climate change are employing "best industry practice" is question of fact and expert opinion, not something that is pre-determined by Connecticut Department of Energy and Environmental Protection ("CT DEEP") and baked into the thirteen BMP categories listed in the Permit. Defendants further assert that because the words "climate change" do not appear in the Permit, they do not need to consider climate change or its effects when choosing BMPs for the Terminal. Defendants' interpretations are contrary to the language of the Permit, as well as all guidance issued by CT DEEP and the U.S. Environmental Protection Agency ("EPA") stating that BMPs must consider site-specific information impacting the frequency, severity, and duration of storms that generate stormwater 9and non-stormwater discharges.

### A. Because the Permit's BMP Requirements Are Not Dispositive of Counts II, III, IV, VIII, and IX, Defendants' MPSJ Fails as to Those Claims.

Defendants assert—without citation to the Amended Complaint—that "CLF's CWA permit claims rest entirely [sic] CLF's subjective perception of the meaning of best management practices." *Id.* Defendants then spend the entirety of their MPSJ arguing that the "meaning" of Section 5(b) of the Permit, which defines BMPs, "is plain, unambiguous, and CLF's attempts to manufacture an interpretation that requires the consideration of its Climate Factors is erroneous." *Id.*[4] Because Defendants fail to engage with the substance of Counts II, III, IV, VIII, and IX, which do not reference BMPs and rely on other Permit provisions, Defendants' MPSJ must be denied.

---

[4] A review of each substantive section of Defendants' brief shows that Defendants' sole argument in the MPSJ relates to the interpretation of the BMP requirement—not any other section of the Permit. *See* ECF 248-1 at 15–17 (arguing

    **1.** *Count II: Defendants do not mention or interpret the Connecticut Coastal Management Act ("CMA") (Permit § 3(b)(2)).*

In Count II, CLF alleges that Defendants are in violation of the Permit because they have failed to consider in their SWPPP "the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards," Conn. Gen. Stat. § 22a-92(a)(5), as required by the Permit, which incorporates the CMA. *See* Permit, ECF 248-5 at 10 (§ 3(b)(2)) (citing "section 22a-92 of the Connecticut General Statutes"); *see also* Am. Compl., ECF 47 ¶¶ 188, 397–400. CLF further alleges that Defendants are in violation of the Permit's directive that the activities at the Terminal "must not cause adverse impacts to coastal resources as defined in section 22a-93(15) of the Connecticut General Statutes." *See* Permit, ECF 248-5 at 10 (§ 3(b)(2)); Am. Compl., ECF 47 ¶¶ 401–03.

Nowhere in their briefing do Defendants cite, discuss, or argue as to the requirements of Permit Section 3(b)(2) or the CMA. *See generally* ECF 248-1. Even if Defendants prevail on their lone legal theory that "not one of the[] 13 BMPs requires the consideration of CLF's Climate Factors," *see id.* at 15, such a ruling will not resolve Count II, because the Permit imposes compliance with "all applicable goals and policies" of the CMA *in addition* to the BMP

---

solely about the BMP terms in the Permit in Section II.B.1), 17–18 (same for Section II.B.2), 18–19 (same for Section II.B.3), 20–21 (same for Section II.C.1), 21–23 (same for Section II.C.2), 23–24 (same for Section II.C.3), 24–25 (same for Section II.C.4), 25–27 (same for Section II.C.5), 28–33 (discussing extrinsic evidence regarding how CT DEEP "understands and interprets the BMPs requirement" in Section III.A), 33–37 (same for US EPA's interpretation, in Section III.B).

Defendants' three other brief sections assert that CWA permits are interpreted like contracts, *see* ECF 248-1 at 12 (Section I); that permittees who comply with the Permit are shielded from liability, *see id.* at 13–14 (Section II.A); and that new Permit terms should be added through the regulatory process, *id.* at 37–38 (Section III.C). The first two are settled principles of law and the third is relevant only if Defendants' show that consideration of climate factors is not required in the BMP section of the Permit.

requirements. *See* Permit, ECF 248-5 at 10 (§ 3(b)(2)). The CMA explicitly requires consideration of a "rise in sea level, coastal flooding and erosion patterns," Conn. Gen. Stat. § 22a-92(a)(5), *i.e.*, CLF's "climate factors." *See* Am. Compl., ECF 47 ¶¶ 398–99. Thus, summary judgment on Count II is inappropriate, because the question of whether the BMPs require consideration of climate factors is not dispositive of whether Defendants have violated Section 3(b)(2) of the Permit. *Cf. Chardavoyne v. Thames Water Holdings Inc.*, No. 03CV56, 2007 WL 735707, at *5 (D. Conn. Mar. 5, 2007) (holding summary judgment is inappropriate where "Defendant's characterization of plaintiff's allegations" did not comport with a "review of the complaint").

Defendants do not challenge the sufficiency of CLF's evidence as to Count II[5] or otherwise address *any* element of Count II. Defendants' "bare assertion" that "the current CT General Permit does not require consideration of CLF's Climate Factors," ECF 248-1 at 37, without any discussion of the elements of Count II or the record, is insufficient to show that CLF could not carry its burden on Count II at trial. *See Miro v. City of Bridgeport*, No. 20-CV-0346, 2023 WL 2563211, at *9 (D. Conn. Mar. 17, 2023) (determining "bare assertion" was "insufficient to support granting summary judgment"); *see also Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 127–28 (D. Conn. 2014) ("'[A] mere conclusory statement that the other side has no evidence' is insufficient to shift the burden 'to the plaintiffs to go beyond the pleadings to show specific facts creating a genuine issue for trial . . . .'" (citation omitted)). Where Defendants' "motion purports to seek 'summary judgment as to'" Counts I–IX but its "brief[] do[es] not mention the [CMA] claim[,] . . . [Defendants] ha[ve] forfeited the point." *Yuhe Diamba Wembi v. Metro Air Serv.*, 195 F. Supp. 3d 957, 968 (N.D. Ill. 2016) (citations omitted); *Schwab v. N. Ill.*

---

[5] Defendants do not argue, for example, that the CMA does not apply to the Terminal because it is not within a coastal boundary. Am. Compl., ECF 47 ¶¶ 185–87.

*Med. Ctr.*, 42 F. Supp. 3d 870, 885–86 (N.D. Ill. 2014) ("Centegra's opening brief does not address Schwab's retaliation claim. . . .' Accordingly, Centegra forfeited for summary judgment purposes any argument . . . on her retaliation claim." (citations omitted)); *Bryant v. Rudman*, 933 F. Supp. 270, 274 n.2 (S.D.N.Y. 1996) (holding no "proper basis on which to grant summary judgment because [the arguments] were not raised by the defendants on this motion").[6]

Because Defendants fail to address any elements of Count II, CLF is "not required to present evidence sufficient to demonstrate a genuine issue of material fact as to those claims." *McNamara v. Associated Press*, 40 F. Supp. 3d 345, 355 n.8 (S.D.N.Y. 2014) ("Because defendant's motion for summary judgment does not address plaintiff's claims under the ADEA and NYSHRL, plaintiff was not required to present evidence sufficient to demonstrate a genuine issue of material fact as to those claims."); *see City of New York v. Chavez*, 944 F. Supp. 2d 260, 278–79 (S.D.N.Y. 2013) (explaining that where "Defendants did not move for summary judgment on any of the City's claims against them," the question of whether summary judgment is appropriate "is not even . . . properly before the Court."). Stated more plainly, "[t]he nonmovant is not required to present evidence on an issue not raised by the movant." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011); *see also Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 914–15 (7th Cir. 2022) ("[A] party opposing a motion for summary judgment needs to respond only to

---

[6] Additional argument as to Count II in Defendants' reply should be disregarded as waived. Where CLF's complaint plainly alleges a failure to comply with the CMA's directive "to consider in the planning process the potential impact of a rise in sea level, coastal flooding, and erosion patterns in operating the Terminal," Am. Compl., ECF 47 ¶ 398, "[t]here is no apparent reason Defendant could not have made this argument in its Motion and thus it should be deemed waived." *Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 326 n.7 (D. Conn. 2018) (denying summary judgment); *see also Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("The responsive filings did not create a right in the [movant] to assert for the first time in reply new challenges to the [non-movants'] evidence as to other aspects of the Section 10(b) illegality defense."); *cf. Brown v. City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012) ("[S]uccessive motions for summary judgment may be procedurally improper if the arguments in the second motion could have been raised in the first motion.") (citation omitted); *Chapco, Inc. v. Woodway USA, Inc.*, No. 3:15-CV-1665 (JCH), 2018 WL 3581694, at *4 (D. Conn. July 24, 2018) ("The purpose of permitting the successive Motions was not to give the parties a second opportunity to raise arguments that could have been raised at the original summary judgment stage."). Waiver applies with equal force to Counts III, IV, VIII, and IX. *See infra* Parts IV.A.2–5.

arguments the moving party actually made, not others that the moving party might have made but did not."); *infra* Part IV.D; *cf. Russ v. Int'l Paper Co.*, 943 F.2d 589, 591 (5th Cir. 1991) ("Simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case."). The Court should deny Defendants motion as to Count II.

### 2. *Count IV: Defendants do not mention or interpret the Permit's requirement to identify potential pollutant sources (Permit § 5(c)(2)(D)).*

In Count IV, CLF alleges that Defendants have violated the Permit because they have failed to "map and describe" in the SWPPP "potential sources of pollutants" resulting from severe weather and climate change factors "that may reasonably be expected to affect stormwater quality at the site," including the "activities and materials that may be a source of stormwater pollution at the site," Permit, ECF 248-5 at 24–25 (§ 5(c)(2)(D)); *see also* Am. Compl., ECF 47 ¶¶ 416–17.

Count IV interprets a SWPPP requirement in Section 5(c) of the Permit and does not mention or rely upon interpretation of BMPs, control measures, or Section 5(b) of the Permit. *See* Am. Compl., ECF 47 ¶¶ 416–20. Nowhere in their briefing do Defendants cite, discuss, or argue as to the requirements of Permit Section 5(c)(2)(D) or identification of pollutant sources. *See generally* ECF 248-1.[7] As a result, even if this Court determines that the plain language of the Permit does not require Defendants to consider CLF's "climate factors" in creating BMPs for the Terminal as required by Section 5(b), such a determination has no relationship to CLF's assertion that Section 5(c)(2)(D) requires identification of potential pollutant sources resulting from severe

---

[7] The only SWPPP section of the Permit mentioned in Defendants' briefing, Section 5(c)(2)(E), addresses the requirement for permittees to describe in their SWPPP the BMPs "implemented at the site in accordance with 'Control Measures' (Section 5(b))." *Id.* at 17–18 (citing Defs.' SOF, ECF 248-2 ¶ 13; quoting Permit, ECF 248-5 at 26 (§ 5(c)(2)(E)). Furthermore, the Permit imposes SWPPP requirements in addition to the BMPs requirements: a section documenting and discussing BMPs is but one of several required components of the SWPPP. *See* Permit, ECF 248-5 at 23–27 (§ 5(c)(2)) ("The Plan shall be representative of current site conditions and shall address, at a minimum, all the elements below."); *id.* (§ 5(c)(2)(A)–(K)) (listing required elements (A) through (K)).

weather and climate factors. *See* Am. Compl., ECF 47 ¶¶ 417–18. Because Defendants fail to address any elements of CLF's claim as it was pled and do not analyze the Permit's text regarding pollutant sources, this Court should deny the MPSJ as to Count IV. *See, e.g.*, *Miro*, 2023 WL 2563211, at \*9; *Garden Catering-Hamilton Ave.*, 30 F. Supp. 3d at 127–28; *Yuhe Diamba Wembi*, 195 F. Supp. 3d at 968; *Schwab*, 42 F. Supp. 3d at 885–86; *McNamara*, 40 F. Supp. 3d at 355 n.8.

### 3. *Count III: Defendants do not contest CLF's interpretation of the Permit's SWPPP certification requirements (Permit §§ 5(c)(7), 6(d)).*

In Count III, CLF alleges Defendants violated one or both of the Permit's certification requirements by failing to disclose information known to them about the risks of reasonably foreseeable pollutant discharges associated with climate change. *See* Am. Compl., ECF 47 ¶¶ 405–14. The SWPPP requirements in the Permit dictate that a responsible corporate officer or duly authorized representative, as well as a licensed professional engineer, must certify the SWPPP. *See* Permit, ECF 248-5 at 28–30 (§§ 5(c)(4)(A)(i), 5(c)(7)).

The corporate certification is prescribed in the Permit and requires attestation that, "based on reasonable investigation, including my inquiry of those individuals responsible for obtaining the information, the submitted information is true, accurate and complete to the best of my knowledge and belief." *Id.* at 70 (§ 6(d)); *see also* Am. Compl., ECF 47 ¶ 407; Defs.' Answer, ECF 120 ¶ 407. CLF alleges that the corporate certification in the SWPPP was inaccurate: information Defendants submitted to CT DEEP with the SWPPP was not true, accurate and complete to the best of the responsible corporate officer's knowledge because Defendants knew of the risks of pollutant discharges from the Terminal from storm surge, sea level rise, and increased intensity and frequency of precipitation associated with climate change. *See* Am. Compl., ECF 47 ¶¶ 410–13.

10

CLF's claim regarding the engineering certification is similar. The certification of the licensed professional engineer must state as follows:

> I certify that I have thoroughly and completely reviewed the Stormwater Pollution Prevention Plan prepared for this site. I further certify, based on such review and site visit by myself or my agent, and on my professional judgment, that the Stormwater Pollution Prevention Plan meets the criteria set forth in the General Permit for the Discharge of Stormwater Associated with Industrial Activity effective on October 1, 2018.

Permit, ECF 248-5 at 30 (§ 5(c)(7)); *see also* Am. Compl., ECF 47 ¶ 408; Defs.' Answer, ECF 120 ¶ 408. CLF alleges that the engineer certification in Defendants' SWPPP is unlawful because the SWPPP does not meet the criteria set forth in the Permit and no reasonable engineer could have said it met the criteria, and/or the engineer certification was made without disclosing reasonably foreseeable substantial risks of pollutant discharges associated with severe weather and climate change risks. *See* Am. Compl., ECF 47 ¶¶ 411–12.

This Court should deny the MPSJ with respect to Count III because Defendants do not provide any arguments regarding the text of the certification requirements detailed in Permit Sections 5(c)(4)(A), 5(c)(7), or 6(d). *See generally* ECF 248-1. Instead, Defendants focus their entire textual interpretation argument on BMPs in Section 5(b) of the Permit. *See id.* at 13–27. Although Defendants tangentially mention the certification requirements in furtherance of their textual BMP argument, they do not engage with the text of Permit Sections 5(c)(4)(A), 5(c)(7), or 6(d).[8] *See id.* at 18–19. Because analysis of what the Permit requires must begin with the text, Defendants' failure to analyze the certification language in the Permit is fatal to their MPSJ as to

---

[8] Nor do Defendants' arguments relying on the testimony of non-parties Triton Environmental, Inc. and Witt O'Brien, LLC address the text of the certification requirements. Instead, Defendants functionally offer these non-parties as experts on interpretation of ambiguous terms in the Permit's BMP requirements. *See* ECF 248-1 at 31 (asserting that "Triton and Witt O'Brien are [the] certified professional engineers" required to certify SWPPPs). Because Defendants do not engage with the text of the certification requirements and because Defendants' reliance on these non-parties is inadmissible, *see infra* Part IV.C.2.c, this Court should deny the MPSJ with respect to Count III.

Count III. *See Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1205 (9th Cir. 2013) (explaining that only if "the permit's language is ambiguous" does the court "turn to extrinsic evidence to interpret its terms"); ECF 248-1 at 12, 17 (same); *accord TransAtlantic Lines LLC v. United States*, No. 06-CV-354, 2007 WL 735705, at *2 (D. Conn. Mar. 5, 2007) ("In interpreting a contract, the court begins by looking at the contract's plain language."); *Parisi v. Parisi*, 107 A.3d 920, 929 (Conn. 2015) (explaining that under Connecticut contract law, "[w]hen only one interpretation of a contract is possible, the court need not look outside the four corners of the contract" (quoting and citing *Isham v. Isham*, 972 A.2d 228, 235 (Conn. 2009))).

Furthermore, as is evident from the Amended Complaint, Count III does not allege that Defendants must consider climate factors in developing the BMPs. Instead, Defendants are liable under Count III if the SWPPP is deficient in *any* of the several ways CLF has alleged in Counts II, IV, or any of the BMP claims (Counts I, V, VI, VII). CLF can therefore prove its false certification claim without reference to the BMPs because Defendants' SWPPP violates the Permit if the SWPPP fails to comply with the CMA (Count II), or if the SWPPP does not identify pollutant sources from the effects of climate change (Count IV).

### 4. *Count VIII: Defendants argument regarding BMPs is not dispositive of whether Defendants failed to submit required information to CT DEEP (Permit § 6(g)).*

Similar to the certification claim, Count VIII alleges that Defendants failed to submit information to CT DEEP about known risks to the Terminal from severe weather and climate change. *See* Am. Compl., ECF 47 ¶¶ 437–42. The Permit requires Defendants to submit updated information to CT DEEP within fifteen days of the permittee "becom[ing] aware of a change in any of the information submitted pursuant to this general permit, becom[ing] aware that any such information is inaccurate or misleading, or that any relevant information has been omitted." Permit, ECF 248-5 at 70 (§ 6(g)). CLF alleges that Defendants' knowledge about the risks of

12

pollutant discharges from severe weather and climate change constitutes relevant information that was omitted from the SWPPP and withheld from CT DEEP, and/or constitutes inaccurate or misleading information. *See* Am. Compl., ECF 47 ¶¶ 438–39; *see also, e.g.*, CLF Renewed Mtn. to Compel, ECF 149 at 29–31 (arguing to compel information Defendants are withholding regarding their knowledge of climate risks to the Terminal); CLF Reply Br., ECF 191 at 9–10 & n.13 (same).

As with Counts II–IV, whether BMPs require consideration of climate risks is not dispositive of whether Defendants violated Section 6(g) of the Permit. If, for example, Defendants' failure to include climate factors in the section of the SWPPP identifying potential pollutant sources is a violation of the Permit (Count IV), then failure to "correct the inaccurate or misleading information or supply the omitted information in writing to the commissioner" is also a violation of the Permit. Permit, ECF 248-5 at 70 (§ 6(g)); Am. Compl., ECF 47 ¶ 439. The same is true with respect to CLF's allegations in Count II regarding Defendants' failure to comply with the Permit's CMA requirement in Section 3(b)(2). *See supra* Part IV.A.1.

Once again, Defendants' MPSJ does not mention, cite, or analyze Permit Section 6(g) or the "Correction of Inaccuracies" requirement. *See generally* ECF 248-1. Because Defendants fail to address the basis of Count VIII, and the BMP arguments advanced in the MPSJ are not dispositive of Count VIII, this Court should deny Defendants' motion with respect to Count VIII.

### 5.   *Count IX: Defendants argument regarding BMPs is not dispositive of whether Defendants failed to update the SWPPP (Permit § 5(c)(5)).*

Lastly, Count IX alleges that Defendants have not timely amended or updated their SWPPP, as required under the Permit, to account for the risks posed by severe weather and climate change. *See* Am. Compl., ECF 47 ¶¶ 443–48. The Permit requires that Defendants amend their SWPPP under certain circumstances, including whenever:

(A) there is a change at the site which has an effect on the potential to cause pollution of the surface waters of the state;

(B) the actions required by the Plan fail to ensure or adequately protect against pollution of the surface waters of the state; or . . . .

(F) necessary to address any significant sources or potential sources of pollution identified as a result of any inspection or visual monitoring;

Permit, ECF 248-5 at 29 (§ 5(c)(5)(A)–(B), (F)); *see also* Am. Compl., ECF 47 ¶ 444; Answer, ECF 120 ¶ 444.

If the Permit requires Defendants to account for potential risk of pollution discharges due to climate change factors, as alleged in Counts II and IV, then Defendants' failure to update their SWPPP to reflect that information is a violation of Section 5(c)(5). Defendants do not dispute this, as they do not mention or otherwise address the Permit requirements in Section 3(b)(2) (CMA) or 5(c)(2)(B) (potential pollutant sources). Nor do Defendants cite or otherwise discuss the requirement to update the SWPPP set forth in Permit Section 5(c)(5).

For these reasons (as with Counts III and VIII), the sole theory on which Defendants move for summary judgment—that Defendants are not required to consider climate change factors as part of the BMP requirements in Section 5(b)—is not dispositive of Count IX. Therefore, Defendants' MPSJ fails to assert an argument that could affect the outcome of Count IX, and their MPSJ should be denied.

**B. Because the Plain Text of the Permit Directs Permittees to Design and Adopt Best Management Practices Tailored to the Specific Facts of the Permitted Facility, Defendants' MPSJ Fails as to Counts I, V, VI, and VII.**

Unlike the claims addressed in the Part IV.A, Counts I, V, VI, and VII of CLF's Amended Complaint allege that Defendants are in violation of the Permit because they have failed to account for the impacts of severe weather and climate change in their BMPs in the SWPPP. Under Count I, CLF alleges that Defendants have not considered non-stormwater discharges from storm surge,

14

snowmelt not associated with rain events, and/or run-on flooding, in violation of Permit Sections 5(b)(11) and 5(c)(2)(E)–(F). *See* Am. Compl., ECF 47 ¶¶ 389–95. In Count V, CLF alleges that Defendants' SWPPP lacks BMPs to minimize the potential for pollutant discharges because it does not refer to the potential flooding from storm surge, increased rainfall and severe weather exacerbated by climate change, and/or sea level rise, despite the Terminal's location on the coast, in violation of Permit Sections 5(b) and 5(c)(2)(E). *Id.* ¶¶ 421–26. In Count VI, CLF alleges that Defendants, by not considering the potential impact of severe weather and climate change on increased pollutants in stormwater discharges, have failed to comply with the control measure that requires management of runoff, in violation of Permit Section 5(b)(7). *Id.* ¶¶ 427–31. And in Count VII, CLF alleges that Defendants have failed to comply with the control measure regarding spill prevention and response by not considering factors that increase the likelihood of leaks and spills such as sea level rise, increased intensity and frequency of precipitation, and the increased likelihood of storm surge flooding, in violation of Permit Section 5(b)(9). *Id.* ¶¶ 432–36.

Defendants' MPSJ fails as to Counts I, V, VI, and VII because Defendants' interpretation of the Permit's BMP requirements is incorrect in two respects. *First*, the plain language of the Permit does not "provide[] specific detail on what the permittee must do to comply with the CT General Permit." *See* ECF 248-1 at 15. Instead, the Permit includes categories of control measures prohibiting certain outcomes and directing the permittee to design BMPs by applying best industry practice to the unique features of the permitted facility, including the potential pollutant sources identified in the SWPPP. *Second*, the absence of the words "sea level rise, increased severity or frequency of storms, or any of the other Climate Factors claimed by CLF" from the Control Measures section of the Permit (Section 5(b)) does not mean that such factors need not be considered by the permittee. *Id.* at 15–16. Instead, the Permit's directive to employ "best industry

practice" requires expert and fact opinion to determine whether consideration of severe weather and climate change are necessary to minimize the risk of pollutant discharges.

Defendants attempt to paint the Permit language as detailing a specific and concrete set of BMPs and therefore a matter of law as to what permittees are required to do. *See id.* at 14–27. But these BMPs are not step-by-step instructions: they are narrative requirements that any permittee must meet through individualized practices that take into account the characteristics of the facility and best industry practice. This is plain from the language of the Permit itself, *see infra* Part IV.B.1, and confirmed by viewing evidence of CT DEEP's intent in the light most favorable to CLF, *see infra* Part IV.B.2. The Court should deny Defendants' MPSJ.

 **1. *The Permit's plain language demonstrates that BMPs are site-specific and responsive to the potential sources of pollution identified in the SWPPP.***

The Permit includes thirteen categories of control measures in Section 5(b) that a permittee must implement to achieve goals in the Permit. "Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility." Permit, ECF 248-5 at 18 (§ 5(b)). As used here, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." *Id.*

The control measure requirements are general and narrative rather than specific and numeric. Courts within the Second Circuit have found that the characteristics of a given facility are what drive implementation of the Permit standards: "It is apparent from the text of the General Permit that the design requirements at issue are Guidelines. They accommodate themselves to the sound professional judgement that is necessarily required in any complex project driven by the vagaries of weather, topology, soil condition and the unforeseen or unforeseeable construction contingencies." *City of New York v. Anglebrook Ltd. P'ship.*, 891 F. Supp. 908, 924 (S.D.N.Y.),

*aff'd*, 58 F.3d 35 (2d Cir. 1995). "[T]he regulations governing the contents of a SWPPP are 'intended to be flexible rules which contemplate—and indeed require—applicants to exercise good engineering practices, informed by professional judgment and common sense.'" *Id.* at 915.

As Defendants note, the Permit is a <u>*general*</u> permit and applies not only to varying types of industrial facilities,[9] but facilities in various locations—facilities located near waterbodies and facilities completely removed from any nearby waterbodies. *See* ECF 248-1 at 20; *cf.* CLF SOF, Ex. A ¶ 55. The language clearly and intentionally allows room for different types of facilities in various locations to comply with the same *categories* of control measures in a way that accounts for the specific characteristics and risks of that individual facility. For example, under the "Good Housekeeping" control measure (§ 5(b)(1)), the ultimate compliance goal is for the permittee to "maintain a clean, orderly facility" in a way that reduces and/or eliminates pollutant discharges "to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." Permit, ECF 248-5 at 18 (§ 5(b)). To help permittees achieve that goal the Permit includes examples, such as "sweeping at regular intervals, appropriate storage practices, proper garbage and waste management, dust control measures, etc." *Id.* (§ 5(b)(1)). As is clear from the use of a non-exhaustive list of examples, denoted by "*e.g.*" and "*etc.*", the Permit does not *require* a permittee to use any of these specific examples, nor does it specify *how* a permittee should implement any given example. For instance, the Permit does not state at what "regular interval" a permittee would sweep its facility, or what type of storage practices would be "appropriate," and such practices would likely differ based on whether the facility is paved, dirt, gravel, or a combination thereof. Some amount of discretion is plainly left to the permittee who has the factual knowledge of its facility to determine in which

---

[9] The Permit applies to "industrial activit[ies]" across fourteen categories. Permit, ECF 248-5 at 6-7 (§ 2).

way it plans to "maintain a clean, orderly facility," *id.*, to reduce and/or eliminate pollutant discharges "to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." *Id.* (§ 5(b)).[10]

> The Permit additionally states that each permitted facility must create a SWPPP that is
>
> representative of ***current site conditions*** and shall address, at a minimum . . . the location and type of control measures installed and implemented at the site in accordance with "Control Measures" (Section 5(*b*)). The permittee shall discuss the ***appropriateness and priorities*** of control measures in the Plan and how they address identified potential sources of pollutants at the site.

*Id.* at 26 (§ 5(c)(2)(E)) (emphasis added). The SWPPP must also contain the "procedures for implementation of control measures." *Id.* at 27 (§ 5(c)(2)(K)). Thus, the Permit itself does not contemplate a verbatim regurgitation of the required control measure categories in Section 5(b), but instead directs permittees to "discuss" how they will meet the directives in the control measures through implementation of practices specific to the potential sources of pollution that are unique to the permitted facility. This language clearly shows that the Permit contemplates a SWPPP that will "descri[be]" the control measures for the facility and "revise these measures" if they are found to be inadequate. Additionally, the Permit envisions control measures as evolving practices that will be amended whenever new potential sources of pollutants are identified or when it becomes apparent existing measures will no longer adequately protect against pollution. *Id.* at 29 (§ 5(c)(5)). Thus, the plain language of the Permit directly contradicts Defendants' assertion that the Permit states with "specific detail" "what a permittee must do to comply with the CT General Permit." Defs.' SOF, ECF 248-2 ¶ 7 (misrepresenting the contents of the Permit).

---

[10] Defendants' own SWPPP shows they do not truly believe the BMPs to be implemented at the Terminal are specified in "detail" in the Permit. If Defendants acted in accordance with their proposed interpretation, Defendants' SWPPP would contain control measures verbatim from the Permit; it does not. *Compare* SWPPP, ECF 248-16 at 26–27, *with* Permit, ECF 248-5 at 18–22 (§ 5(b)).

### a. Defendants' textual arguments produce unreasonable interpretations of the Permit.

In an effort to create ambiguity where there is none, Defendants point to an industry-specific control measure they purport shows CT DEEP "knows how to include precipitation-related requirements . . . when it wants to." ECF 248-1 at 23. Section 5(f)(10)(A)(i) requires small-scale composting facilities to "retain the runoff from the 25-year, 24-hour rainfall event" "[w]here composting operations are exposed to rainfall or runoff." Permit, ECF 248-5 at 65 (§ 5(f)(10)(A)(i)). Defendants' conclusion that this specific measure for small composting facilities relieves the Terminal from considering "rainfall events" is absurd. *See* ECF 248-1 at 24. First, small-scale composting facilities are less regulated than the Terminal and many other facility types under the Permit.[11] That the facility least regulated under the general *stormwater* Permit must manage rainfall necessarily means that *all* regulated facilities are required to take varying degrees of storms into account based on the facility's characteristics. Second, the thrust of this "additional" control measure for small composting facilities is not that the facility must consider *rainfall*, but that it "must retain the runoff" from this category of storm. Permit, 248-5 at 65 ((§ 5(f)(10)(A)(i)). The Permit does not direct Defendants to retain this kind of runoff, but it certainly does not direct them to *ignore rainfall events*.

Defendants' reading of Section 5(f)(10)(A)(i)—that no facility other than small-scale composting facilities is required to consider rainfall events—contradicts the entire purpose of the Permit, which is specifically designed to address stormwater discharges. *See, e.g.*, Permit, ECF 248-5 at 9–10 (§ 3(a)-(b)) (detailing stormwater discharges the Permit authorizes and does not

---

[11] Small-scale composting facilities are defined as facilities "conducting composting . . . on two acres or less, and that processes less than 5,000 cubic yards per year of one or more . . . organic materials . . . ." Permit, ECF 248-5 at 8 (§ 2). These facilities pay lower registration fees than the Terminal, *compare id.* at 13 (§ 4(c)(1)(A)(i)), *with id.* (§ 4(c)(1)(A)(ii)), and are subject to fewer monitoring requirements, *id.* at 66 (§ 5(f)(10)(C)) (exempting these facilities from the general monitoring required in *id.* at 31-32 (§ 5(e)(1)(A)(ii))).

authorize). The Permit is issued pursuant to the authority in "section 22a-430b of the Connecticut General Statutes," *id.* at 5 (§ 2), which directs CT DEEP to "establish procedures, criteria and standards as appropriate for determining if (I) a discharge would cause pollution to the waters of the state, and (II) a treatment system is adequate to protect the waters of the state from pollution," Conn. Gen. Stat. § 22a-430(b). This coincides with the purpose of the CWA. *See Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 185 (2d Cir. 2010) ("[T]he CWA's purpose is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" (quoting 33 U.S.C. § 1251(a))). Thus, the purpose of the Permit is to prevent "pollution to the waters of the state." Conn. Gen. Stat. § 22a-430(b)*. To adopt Defendants' interpretation that permittees may *ignore rainfall events* is contrary to that purpose and thus an impermissible reading. *Cf. County. of Los Angeles*, 725 F.3d at 1208; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 883 F. Supp. 2d 979, 991–92 (D. Or. 2012) (holding that interpretation of USFS Plan could not run contrary to purpose of enabling statute), *rev'd on other grounds*, 585 Fed. App'x 613 (9th Cir. 2014).

The control measure for the management of run-off (§ 5(b)(7)) is no different, despite Defendants' attempt to mischaracterize the plain language of the measure. ECF 248-1 at 16. While Defendants concede the permittee—not CT DEEP—"must determine whether there is a 'need for stormwater management or treatment practices . . . to divert, infiltrate, reuse, or treat stormwater runoff in a manner that minimizes pollutants in stormwater discharges" and "must implement such 'stormwater management or treatment measures determined to be reasonable and appropriate to minimize the discharge of pollutants from the site," *id.* (quoting Permit, ECF 248-5 at 19 (§ 5(b)(7)))), they attempt to cast this as a narrow limitation on what a permittee is allowed to do— only divert, infiltrate, reuse, or treat stormwater runoff. *Id.* Nevertheless, the Permit plainly does

not specify *how* a permittee should divert, infiltrate, reuse, or treat stormwater runoff—or which option a permittee must choose. Nor should it: the means to achieve compliance with the Permit's objective of minimizing or eliminating pollutant discharges *should* vary based on site-specific climatological analysis, the facility's physical characteristics, and the impact of those characteristics on different potential pollutant sources to align with the Permit's purpose, *see* Conn. Gen. Stat. § 22a-430(b).

Furthermore, the statute authorizing the creation of the Permit contemplates exactly the kind of flexibility CT DEEP has written into the BMP section. Section 22a-430(b) authorizes CT DEEP to adopt "procedures, criteria and standards [that] *may include* schedules of activities, prohibitions of practices, operating and maintenance procedures, management practices and other measures to prevent or reduce pollution of the waters of the state, provided the commissioner in adopting such procedures, criteria and standards *shall consider best management practices*." Conn. Gen. Stat. § 22a-430(b) (emphases added). Thus, the enabling statute authorizes the "standards" CT DEEP has identified in the Permit as thirteen categories of control measures, *i.e.*, BMPs, that are acceptable when they "reduce and/or eliminate" "the discharge of pollutants from the permitted facility . . . to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." Permit, ECF 248-5 at 18 (§ 5(b)). As Defendants note, the purpose of a <u>general</u> permit is so that a "permitting agency . . . can properly regulate a class of dischargers without detailed information about individual discharges . . . ." *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 290 (6th Cir. 2015) (citation omitted) (quoted in ECF 248-1 at 21); *see also* Conn. Gen. Stat. § 22a-430b(a)(1). This purpose would be thwarted if CT DEEP had to identify each and every BMP that a permittee must use in any given situation and/or approve every SWPPP; instead, CT DEEP decided to create the

21

structure of the Permit so that the Permit itself specifies the ultimate categories, purpose, and floor of BMPs a permittee must achieve, and the permittees must use their professional judgment, as evidenced by the required certifications, in designing and implementing their SWPPP. This interpretation is further supported by the fact that the Permit does not require permittees to submit their SWPPPs to CT DEEP for approval. *Compare* Permit, ECF 248-5 at 16 (§ 4(d)(2)) (leaving the decision whether to make SWPPP available up to permittee and providing for no review of SWPPP by CT DEEP), *with id.* at 15 (§ 4(c)(3)) (requiring certain small-scale composting facilities to submit their SWPPPs to CT DEEP for review and approval when registering under the Permit).

Defendants next argue that CLF's reading of the Permit to include consideration of the increased frequency and intensity of precipitation, sea level rise, and storm surge ignores a part the secondary containment requirement of the control measure for spill prevention and response procedures (§ 5(b)(9)). *See* ECF 248-1 at 22–23. Rather than engage with CLF's claim on Count VII, which references the first part of the control measure ("The permittee must minimize the potential for leaks and spills."), *see* Am. Compl., ECF 47 at ¶199, Defendants instead focus on the requirement that "any storage area, tank or container installed prior to the date of authorization of this general permit, [must have] an impermeable secondary containment area which will hold at least 100% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow from such secondary containment area." ECF 248-1 at 22 (quoting Permit, ECF 248-5 at 20 (§ 5(b)(9)(A)(i)(2))). According to Defendants, "if CLF's interpretation were correct, then this analysis of the Climate Factors would determine the necessary volume of secondary containment required for storage tanks, and the CT General Permit would not need to have a provision that secondary containment must hold 'at least 100% of the volume of the largest tank.'" *Id.* Yet it is Defendants' reading that violates the

statutory interpretation cannon that mandates giving weight to all the words in a sentence and provision and reading the Permit as a whole. *County of Los Angeles*, 725 F.3d at 1206 ("'[A] court must give effect to every word or term' in an NPDES permit 'and reject none as meaningless or surplusage . . . .'" (quoting *In re Crystal Props., Ltd.*, 268 F.3d 743, 748 (9th Cir. 2001))).

As an initial matter, Defendants read out the words "at least," which modifies and provides a floor for the amount of volume a containment area must have. Additionally, Defendants do not read the containment provision in conjunction with the whole control measure, including the part which states "[t]he permittee must minimize the potential for leaks and spills." Permit, ECF 248-5 at 20 (§ 5(b)(9)). But "minimize," as used in the definition of control measure and as used for emphasis throughout the control measures, means to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." *Id.* at 18 (§ 5(b)). Accordingly, Defendants are required to go above the minimum containment volume if that is best industry practice.

In sum, the Permit is clear and, to a degree, flexible: a permittee must develop and implement BMPs at a permitted facility based on the narrative standards set forth in the Permit.

## 2. *Best industry practice is determined by expert testimony and a review of industry practices.*

Defendants essentially argue that the phrase "best industry practice" as used in the definition of BMPs is descriptive of the control measures in the Permit and not a *directive* to the permittee as to which BMPs must be designed and implemented in the SWPPP. *See* ECF 248-1 at 18–19 (Section II.B.3). This interpretation must be rejected, because it renders terms of the Permit meaningless. *See County of Los Angeles*, 725 F.3d at 1206.

Reducing and eliminating pollutant discharges is the purpose of the BMPs. *See* Permit, ECF 248-5 at 18 (§ 5(b)). BMPs must comply with "best industry practice" in order to fulfill that

purpose. *Id.* If, as argued above, the control measure categories in the Permit are not detailed instructions of what a permittee must do—i.e., sweep every other hour—but instead general "standards," per the enabling statute (Conn. Gen. Stat. § 22a-430(b))—i.e., "sweeping at regular intervals," *see* Permit, ECF 248-5 at 18 (§ 5(b)(1))—then the guiding principle for the precise measure the permittee must implement is the practice that will "reduce and/or eliminate [pollutant discharges] to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." *Id.* at 18 (§ 5(b)). Under this understanding of the Permit, "best industry practice" is a fact determination based on expert testimony and a review of industry practice. *See, e.g., Anglebrook*, 891 F. Supp. at 915 ("[T]he regulations governing the contents of an SWPPP . . . are 'intended to be flexible rules which contemplate—and indeed require—applicants to exercise good engineering practices, informed by professional judgment and common sense.'"); *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 925 (C.D. Cal. 2009) (assessing whether BMPs were implemented is a factual inquiry and noting that compliance with CWA and BMPs "requires assessments based both on industry-wide standards and on an individualized and flexible approach").[12]

Defendants' hypothetical does not change the textual analysis. According to Defendants, whether "a particular stormwater diversion technique may only be able to achieve 99% diversion, rather than 100%," is a matter of best industry practice. ECF 248-1 at 19. However, how would one know whether that particular diversion technique is considered standard at 99% rather than 100% without consulting an expert or looking to what other similarly situated facilities have done? The Permit's requirement for the SWPPP to be certified by a licensed professional engineer

---

[12] Like the Connecticut General Permit, the California General Permit under the CWA defines BMPs in terms of "best industry practice considering technological availability and economic practicability and achievability," *see California Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1137 (E.D. Cal. 2016).

suggests such consultation is necessary. *See* Permit, ECF 248-5 at 29–30 (§ 5(c)(7)); *supra* Part IV.A.3. Moreover, the same diversion technique might be "technologically available and economically practicable and feasible" in light of best industry practice at 100% at a facility A, but only "technologically available and economically practicable and feasible" in light of best industry practice at 73% at facility B. Whether that difference between 73%, 99%, or 100% makes a difference in stormwater discharge at the Terminal depends on information about the Terminal and the risks it faces, including prior pollutant discharges, Defendants' mitigation practices and policies, and expert testimony, about best industry practices.[13]

### C. Extrinsic Evidence of CT DEEP's Intent Supports CLF's Interpretation of the Permit as Requiring Site-Specific BMPs That Encompass Consideration of the Effects of Climate Change.

As an initial matter, extrinsic evidence is irrelevant because the Permit terms are clear. *See County of Los Angeles*, 725 F.3d at 1205; ECF 248-1 at 12, 17 (same). Even if this Court were to find the Permit language ambiguous and look to extrinsic evidence to guide its interpretation, the extrinsic evidence available supports CLF's interpretation that the "control measures" required in Defendants' SWPPP must be site-specific and fact-dependent and could include, depending on best industry practice, the effects of climate change; the Permit does not, as Defendants claim, simply require a regurgitation of the thirteen control measure categories in the Permit. *E.g.*, ECF 248-1 at 15–16; Defs.' SOF, ECF 248-2 ¶ 7.

When interpreting an ambiguous permit under the Clean Water Act, a court looks "to determine the intent of the permitting authority" in promulgating the permit. *County of Los*

---

[13] CLF has a pending Motion to Compel, ECF 149, seeking discovery on Defendants' practices at other facilities. Additionally, because the discovery deadlines have been stayed, *see* Order on Motion to Stay, ECF 176, the Parties have not proceeded to expert discovery and therefore CLF is without the requisite testimony to expound on what would need to be considered at the Terminal to meet the best industry practice standard. A ruling on this issue at summary judgment is therefore premature. *See infra*, Part IV.D; Fed. R. Civ. P. 56(d).

*Angeles*, 725 F.3d at 1207 (quoting *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 270 (4th Cir. 2001)). In doing so, courts "give significant weight to any extrinsic evidence that evinces the permitting authority's interpretation of the relevant permit," *id.* (citing *Nw. Env't Advocates v. City of Portland*, 56 F.3d 679, 985 (9th Cir. 1995)), but "do not defer to the [permitting authority's] interpretation of the Permit," *id.* at 1208. Ambiguous permit terms should also be interpreted to give effect to the purposes of the Clean Water Act. *Id.*

### 1. *CT DEEP's guidance demonstrates CT DEEP's intent to require permitted facilities to tailor BMPs to the facility's risks and site-specific features.*

CT DEEP's intent was that permittees would select site-specific BMPs to address the pollutants and conditions at the permitted facility. The Court need look no further than CT DEEP's *Guidance Document For Preparing a Stormwater Pollution Prevention Plan March 2011* ("Guidance Document"), *see* ECF 248-13, issued around the time the first iteration of the current Permit was issued, *see* CLF SOF, Ex. A ¶¶ 17–18. The discussion of control measures themselves in the Guidance Document is illustrative of CT DEEP's intent for the Permit to detail requirements for permittees to meet, with the "how" left up to permittees within narrative standards. For example, the Good Housekeeping control measure requires permittees to describe "*any* practices that you are implementing to keep exposed areas of your site clean (e.g. sweeping at regular intervals, appropriate storage practices, proper garbage and waste management, dust control measures, etc.)," ECF 248-13 at 15 (emphasis added), clearly anticipating that some permittees may not be implementing "any" practices in this area. The Guidance Document goes on to explain, "Although good housekeeping measures will be specific to your site, the following are common examples," and then lists several examples. *Id.* The Guidance document patently does not assume that the "Good Housekeeping" BMPs will be identical from facility to facility.

This guidance is not remarkable; regulating agencies often use narrative requirements rather than specific standards because narrowly-drawn standards run the risk of "freezing" standards in place "which may swiftly become outdated or obsolete." Oil Pollution Prevention and Response; Non-Transportation-Related Onshore and Offshore Facilities, 67 Fed. Reg. 47042, 47070 (Jul. 17, 2002); *see, e.g.*, *Ohio Valley Env't Coal. v. Fola Coal Co.*, 845 F.3d 133, 142–44 (4th Cir. 2017) (discussing numeric effluent limits and narrative requirements in CWA permits).

### 2. *Defendants' extrinsic evidence does not demonstrate that CT DEEP intended the BMPs in the Permit to "provide specific detail" on how to comply with Section 5(b) of the Permit.*

Though Defendants claim that each of the thirteen BMPs in the Permit "provides specific detail on what a permittee must do to comply with the CT General Permit," Defs.' SOF, ECF 248-2 ¶ 7, the extrinsic evidence they cite to does not support that conclusion. Instead, the evidence clearly shows that CT DEEP, as the permitting authority, intended for facilities to adopt BMPs tailored to the specific industry, pollutants, risks (such as severe weather) and other relevant characteristics of the facility.

Defendants direct the Court to a variety of irrelevant and inadmissible evidence suggesting that permitted facilities and their private contractors do not consider climate change in crafting the BMPs included in their SWPPPs. But the appropriate inquiry in interpreting the Permit is not the intent of the regulated: it is the intent of the regulator. *E.g.*, *County of Los Angeles*, 725 F.3d at 1207–08 (noting that the relevant extrinsic evidence is the intent of the permitting authority and the purpose of the CWA). Because the undisputed facts do not show that the BMPs operate as specifically defined mandates for every permitted facility, Defendants' MPSJ must fail.

a. **Defendants' use of extrinsic evidence in their "plain language"
interpretation arguments is impermissible and should be
disregarded by this Court unless the Permit is ambiguous.**

In Defendants' argument section regarding the plain language of the Permit, Defendants
cite Connecticut's "Uniform Administrative Procedure Act" and a document published by CT
DEEP in 2005, appended to the MPSJ as Exhibit 11 (ECF 248-14). *See* ECF 248-1 at 23–25 (citing
to Defs.' SOF, ECF 248-2 at ¶ 18). Reliance on such extrinsic evidence is impermissible where,
as Defendants claim, the text of the Permit is "plain." *See, e.g.*, ECF 248-1 at 12, 27; *County of
Los Angeles*, 725 F.3d at 1205 (explaining that only if "the permit's language is ambiguous" does
the court "turn to extrinsic evidence to interpret its terms"). This Court should disregard Sections
II.C.3 and II.C.4 of Defendants' brief unless the Court finds the language of the Permit ambiguous.

Defendants argue that CLF's interpretation of the Permit conflicts with the Connecticut
Uniform Administrative Procedure Act. *See* ECF 248-1 at 24–25. Because Defendants fail to cite
or analyze any statutory language, *see id.*, this argument is unsupported and should be rejected.
Furthermore, Defendants mischaracterize CLF's position by claiming that CLF's interpretation
would violate the "basic tenet of administrative law that an entity subject to a new regulation must
be given fair notice of the content of that rule." *Id.* at 25. CLF has not argued that consideration of
the effects of climate change is a "new" Permit condition. CLF has in fact stated the opposite: the
BMP language of the Permit has included, since at least 2011, language that would generally
encompass the risk factors alleged in CLF's complaint. *See* Defs.' SOF, ECF 248-2 ¶¶ 3–5. This
is because a Permit mandating that Defendants "minimize" their discharge of pollutants in
stormwater necessarily requires a permittee to consider factors that change the frequency, severity,
and duration of water-depositing events, including changes to the climate. *See, e.g.*, Hr'g Tr. in
*Conservation L. Found., Inc. v. ExxonMobil Corp.*, No. 16-cv-11950 (Mar. 19, 2019), ECF 53-2
at 16 ("The appropriate inquiry is not whether the permit requires consideration of climate change

but whether the permit requires consideration of weather events that CLF alleges threaten the terminal, including but not limited to those that might be caused by alleged climate change. Under this framework, the provisions of the permit that underlie CLF's climate change counts require [Defendants] to consider the kinds of climate-induced weather events that CLF alleges threaten the terminal."). The Permit hasn't changed: CLF instead alleges that the likelihood of pollutant discharges from the Terminal has increased due to the risks of climate change and Defendants' failure to prepare for those risks.

Finally, Defendants' characterization of CT DEEP's "awareness" of climate change is inadmissible. *See* ECF 248-1 at 23. The allegation is not supported by Defendants' citation to either their SOF or Exhibit 11 and should be disregarded in its entirety. *See* CLF SOF, Ex. A ¶ 32; *Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 114 n.3 (D. Conn. 2007) ("[T]he district court may not rely solely on the statement of undisputed facts contained in the moving party's Local Rule 56 statement. It must be satisfied that the citation to evidence in the record supports the assertion." (brackets and citation omitted)). In any event, such "awareness" only supports CLF's position regarding interpretation of the Permit. If CT DEEP was aware of risks of climate change at the time the Permit was issued, it is reasonable to assume that CT DEEP contemplated and was prohibiting discharges as a result of these increased risks where applicable. *See Sierra Club*, 781 F.3d at 290 (finding defendant's discharge of selenium to be within regulating agency's "reasonable contemplation" because the agency "knew at the time it issued the general permit that the mines in the area could produce selenium").

### b. EPA's MSGP and guidance also make clear that appropriate BMPs are not prescribed but must be tailored to the risks and features of each permitted facility.

Defendants next point to EPA's final 2021 Multi-Sector General Permit ("MSGP") and its Response to Comments for its revision to the draft 2020 MSGP as evidence of EPA's, and

therefore CT DEEP's, intent as to the Permit requirements. *See* CLF Cmt., ECF 248-23 (commenting on the proposed MSGP). To the extent the 2021 MSGP and comments are informative as to CT DEEP's intent at the time it issued the 2011 Permit, the 2021 MSGP and the EPA's response to comments on the draft MSGP confirm CLF's interpretation that BMPs are not set in stone. The control measures[14] section of the MSGP is general and explicitly states that permittees "must *select, design*, install, and implement stormwater control measures (including best management practices) to minimize pollutant discharges that address" specified "selection and design considerations" and meet specified "non-numeric effluent limits" and numeric "effluent limitations." ECF 248-10 at 18 (emphasis added). The MSGP "does not require nor prescribe specific control measure to be implemented." *Id.* at 19 (emphasis added). Permittees "must document in your SWPPP . . . the considerations made to select and design control measures at your facility to minimize pollutants discharged via stormwater." *Id.* at 19–20.

In response to a comment that control measures in the 2021 MSGP should be a set list of acceptable BMPs for permittees to choose from, EPA stated that creating "a definitive list of best management practices . . . could inadvertently limit the controls which operators may use to fulfill the permit requirement." ECF 248-24 at 414. Furthermore, in EPA's guidance documents for permittees creating SWPPPs under the 2021 MSGP, EPA again emphasizes that the appropriate control measures require site-specific flexibility:

> In most industrial stormwater permits, including the 2021 MSGP, site operators are given the flexibility to select the type of SCMs, including specific technologies, which they believe are best suited to the facility and that will meet the permit's

---

[14] The Permit and MSGP do not define control measures in exactly the same way. In the Permit, control measures are essentially synonymous with BMPs, *see* Permit, ECF 248-5 at 18 (§ 5(b)), while in the MSGP the definition of control measures "*include[s]* best management practices," ECF 248-10 at 17–18. This is a distinction without a difference, as the control measures described in the MSGP are similar or the same as many of those listed in the Permit (Good Housekeeping, Maintenance, Spill Prevention and Response, Management of Runoff, and Non-Stormwater Discharges). *Compare id.* at 18–25 *with* Permit, ECF 248-5 at 18–22 (§ 5(b)). Defendants themselves refer to one of the MSGP control measure consideration criteria (Part 2.1.1.8) as a BMP. ECF 248-1 at 35 n.14, 37.

> requirements. This flexibility is necessary given the **variability of each industrial operation, the differences in the topography from site to site, and the dissimilarities in the activities and materials exposed to stormwater**.

*See* EPA's SWPPP Development Guide, Ex. C at 21 (Section 4: Selecting Stormwater Control Measures) (emphasis added); *accord* 2008 EPA Fact Sheet, ECF 248-8 at 9 ("[T]he discharger is free to change at any time the control measures used in order to meet the effluent limitations contained in the permit. This flexibility helps ensure that the permittee is able to adjust its practices as necessary to ensure continued compliance with the permit's effluent limitations.").

EPA's interpretation of the MSGP's directive to "minimize" discharge of pollutants additionally supports CLF's interpretation of BMPs. In its 2008 MSGP Fact Sheet, EPA explained that "[t]o meet the effluent limits that require the discharger to 'minimize" pollutants, . . . operators need to consider what control measures are *considered 'best' for their industry*, and then select and design control measures for their site that are viable in terms of cost and technology." ECF 248-8 at 38 (emphasis added). Thus, to the extent the plain language of the Permit is ambiguous, the extrinsic evidence shows that the permitting authority that first defined BMPs—the EPA— intended for each facility to adopt the best practices within their industry.

Defendants, however, point to Part 2.1.1.8 of the MSGP, which explicitly requires permittees to consider "[i]mplementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures [that] can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events." ECF 248-24 at 406. Defendants note that EPA stated this was a "new" effluent limitation over the previous permit. *See* ECF 248-1 at 34. But the fact that EPA referred to Section 2.1.1.8 as "new" and stated that "the 2015 MSGP did not include a similar provision" does not mean that permittees were not required to consider whether severe weather caused a flood risk at their facility as part of "good engineering practice." EPA's Response was

31

limited to whether anti-backsliding provisions were implicated;[15] EPA expressed no opinion on the merits of CLF's interpretation of the 2015 MSGP requirements. *See* ECF 248-24 at 402–07. Had EPA wished to reject CLF's interpretation of the 2015 MSGP's "good engineering practices" standard, it could have done so. EPA provided no opinion in this Response and, in fact, its Response to Excerpt 4[16] does not discuss the "good engineering practices" standard at all.

The Excerpts where EPA does address the "good engineering practices" standard confirms CLF's above interpretation of EPA's Excerpt 4 Response. In response to CLF's Excerpt 7, EPA states the following about the 2015 MSGP language: "EPA acknowledges that the use of 'good engineering practices' to develop control measures should consider flood risks." *Id.* at 410. EPA then confirmed that Section 2.1.1.8 does not limit this obligation in any way: "EPA considers the specific provision contained in Part 2.1.1.8 necessary to *confirm that operators have expressly considered control measures* to mitigate impacts from stormwater discharges from major storm events." *Id.* (emphasis added). Especially in light of EPA's Excerpt 7 Response, the Excerpt 4 Response cannot reasonably be construed as rejecting any prior obligation in the 2015 MSGP to consider whether extreme weather poses a risk to a permitted facility.

Defendants' statement that EPA declined "to make changes that CLF wanted and disagree[d] with CLF's arguments" is also incorrect. ECF 248-1 at 34. Defendants point to the statement that "EPA does not agree that permanent, structural control measures are necessary to mitigate risks of pollution from major storm events," *Id*. at 34–35 (quoting ECF 248-24 at 406), but neglect to include the following statement a few lines afterward:

---

[15] The CWA's anti-backsliding provision prohibits renewed, reissued, and modified permits from having less stringent effluent limitations than the previous permit. 33 U.S.C. § 1342(o).

[16] EPA's Response to Comment separated CLF's full-length comment into seven separate excerpts and then individually responded to each excerpt.

> However, EPA acknowledges that sometimes treatment devices or constructed/installed controls may be necessary, particularly where a facility might otherwise not meet water quality standards. *EPA has added to the 2021 MSGP the following language*, "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures will help to minimize impacts from stormwater discharges from major storm events, such as hurricanes, storm surge, extreme precipitation, and historic flood incidents."

ECF 248-24 at 406. Accordingly, EPA took CLF's comments seriously and added language that further clarified how EPA's intent matched CLF's interpretation.

Defendants finish by stating, "Since USEPA concluded the final permit was not backsliding, its rejection of these measures equates to a statement that they were not required by any prior MSGP." ECF 248-1 at 35. While it is unclear what Defendants mean by "these measures"—"permanent, structural control measures," "stronger control measures for facilities handing [sic] hazardous substances," *id*., or something else entirely—as noted briefly above, EPA's determination that the new MSGP did not constitute backsliding cannot be said to be an outright rejection of CLF's position. In fact, EPA's Response to Comment did just the opposite. EPA confirmed that "the use of 'good engineering practices' to develop control measures should consider flood risks." ECF 248-24 at 410. EPA also stated:

> To address the comment that EPA should strengthen the language in Part 2.1.1.8, EPA notes that the following language from Part 2.1 of the MSGP applies to the measures selected under Part 2.1.1.8, "The selection, design, installation, and implementation of control measures to comply with Part 2 must be in accordance with good engineering practices and manufacturer's specifications."

*Id*. at 400. The "good engineering practices" standard is not a new requirement of the 2021 MSGP; it was also in the prior version, as Defendants have recognized. ECF 248-1 at 34. Far from saying that consideration of severe weather risks was a new provision, EPA clarified that permittees should have been doing it all along, which is consistent with CLF's reading of the Permit.

The fact that EPA determined the new provision was not backsliding is a red herring, and does not signify, as Defendants state, that "USEPA was clear . . . that it [sic] prior versions of the

MSGP did not require permittees to consider a heightened future risk of severe weather impacts." ECF 248-1 at 34. In response to CLF's Excerpt 4, EPA responded that the requirements in Section 2.1.1.8 could not be backsliding because Section 2.1.1.8 was adding a new condition—not removing or changing pre-existing language—and "[a]nti-backsliding simply does not apply to a new condition." ECF 248-24 at 406. It was, rightly or wrongly, simply a determination about what can legally constitute backsliding.

As stated previously, the 2021 MSGP and Response to Comments confirms CLF's interpretation of the Permit that control measures and BMPs are outlined in the Permit to give permittees guidance as to what to consider to ensure that they minimize pollutant discharges in line with the Permit requirements. Nothing in Defendants' brief alters that conclusion.

### c. Defendants' extrinsic deposition evidence is inadmissible.

Defendants rely on deposition testimony from Renee Bourdeau,[17] Triton Environmental, Inc., and Witt O'Brien, LLC, as extrinsic evidence of the meaning of the Permit. *See* ECF 248-1 at 29–33. However, these non-party witnesses' testimony would not be admissible at trial for the purpose of proving CT DEEP's intent and therefore cannot support Defendants' MPSJ. *See* Fed. R. Civ. P. 56(c)(2); *ABB Indus. Sys. v. Prime Tech*, 120 F.3d 351, 357 (2d Cir. 1997) (inadmissible hearsay cannot create a triable issue of fact).

Defendants offer Ms. Bourdeau's testimony characterizing the contents of 152 SWPPPs and alleged statements from a CT DEEP employee as extrinsic evidence of the Permit's

---

[17] Defendants prejudiced CLF by their late disclosure of Ms. Bourdeau after the close of written fact discovery and after CLF had used up its depositions, leaving CLF with no opportunity to conduct follow-up discovery. *See* Jordan Aff., Ex. B ¶¶ 5–13. Should this Court find that Ms. Bourdeau's testimony is admissible, CLF requests the Court deny or delay resolution of the MPSJ and grant CLF leave to take additional discovery, such as subpoenaing CT DEEP for the complete SWPPPs and NOVs reviewed by Ms. Bourdeau but not produced to CLF. *See* CLF SOF, Ex. A ¶¶ 29–31; Fed. R. Civ. P. 56(d).

requirements. *See* ECF 248-1 at 29–30. However, her testimony on these issues is inadmissible hearsay and cannot support Defendants' MPSJ. Fed. R. Evid. 801(c).

*First*, Defendants offer Ms. Bourdeau's testimony regarding her review (and interpretation) of the contents of the SWPPPs and permittee files and what they evidence vis-à-vis the Permit's requirements. A witness's testimony about the contents of documents reviewed from a government office is "classic multiple hearsay." *United States v. Ruffin*, 575 F.2d 346, 357 (2d Cir. 1978) (quotations omitted). The documents themselves would also be hearsay if offered at trial to prove the truth of the matter asserted in them. *Id.*; *see also LaCourse v. HallKeen Mgmt., Inc.*, No. 10-CV-420, 2011 WL 3857149, at *10 n.82 (D. Me. Aug. 31, 2011) (sustaining hearsay objection to statement of additional facts describing the contents of submission where the party failed to put the document itself into evidence).

*Second*, Defendants offer Ms. Bourdeau's testimony regarding her conversation with a CT DEEP employee. ECF 248-1 at 30. But again, this is inadmissible hearsay. The alleged out-of-court statements of a CT DEEP employee about the Permit's requirements are offered as proof of the Permit's requirements. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802.

*Third*, even if Ms. Bourdeau's testimony were not hearsay, it is inadmissible because it is irrelevant. Fed. R. Evid. 402. The SWPPPs are written by private entities and do not evidence CT DEEP's intent. Because interpretation of a permit is akin to interpretation of a regulation, it is only the intent of the regulator that is relevant, not the parties subject to regulation. *Piney Run Pres. Ass'n*, 268 F.3d at 270; *see also County of Los Angeles*, 725 F.3d at 1207.

Moreover, while Ms. Bourdeau stated she reviewed 152 SWPPPs, she also testified that there are "approximately 1647 industrial permittees" under the Permit, meaning she reviewed less than one tenth of all SWPPPs. *See* CLF SOF, Ex. A ¶ 55. In addition, Ms. Bourdeau could not

verify that any of the SWPPPs were current, *see* Bourdeau Tr., ECF 248-20 at 71:14–18, and her record of the SWPPPs show that 77 (more than half) are dated from before the first issuance of the current Permit in 2011. *See* Bourdeau Reviewed SWPPPs, Ex. B. Nor have Defendants shown that CT DEEP reviewed all—or any—of these SWPPPs for compliance with the Permit. While Ms. Bourdeau stated she obtained some of the SWPPPs from CT DEEP, nowhere in her testimony does she state that she confirmed with CT DEEP whether any of the SWPPPs had been reviewed for compliance. And although she testified that in her file review she saw notices of violations, her testimony as to the *contents* of those NOVs—which she did not produce to CLF—is hearsay. For these reasons alone, CT DEEP's alleged lack of enforcement action against the entities who drafted the SWPPPs is not evidence of CT DEEP's interpretation of the Permit.

But even if the 75 SWPPPs Ms. Bourdeau reviewed that were issued after the date the Permit was first issued—which Defendants did not offer into evidence and did not reproduce to CLF in full, *see* CLF SOF, Ex. A ¶ 30—could be properly considered, there is no information to suggest they are a representative sample. Nor does a lack of enforcement mean that CT DEEP approves of the contents. Again, Defendants present no evidence that CT DEEP reviewed these SWPPPs for compliance. Even if it had, citizen suits under the CWA are for the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). If an agency's determination not to prosecute a violation were dispositive of a permit's requirements, it would turn the CWA's citizen suit provision on its head. Construed in the light

most favorable to CLF, Ms. Bourdeau's testimony is insufficient to show that CT DEEP's enforcement is evidence of CT DEEP's interpretation of what the Permit requires.[18]

Defendants also offer the testimony of two third-party corporations, Triton Environmental, Inc. and Witt O'Brien's, LLC, as experts on what CT DEEP meant in the Permit, and therefore on what the Permit does and does not require. This evidence is inadmissible because (i) the corporations' opinions of CT DEEP's intent is irrelevant, *see Piney Run Pres. Ass'n*, 268 F.3d at 270; *see also County of Los Angeles*, 725 F.3d at 1207; (ii) Defendants have failed to comply with the disclosures required for expert testimony; (iii) witnesses may not testify as to ultimate legal questions, including what the Permit requires; and (iv) the testimony is either hearsay or unreliable.

Defendants describe both corporations as "consultants" that are "certified professional engineers," not lay witnesses. ECF 248-1 at 31; Defs.' SOF, ECF 248-2 ¶¶ 33–34, 37. Defendants are functionally offer this testimony as based on "specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701(c), without stating so. A party that fails to identify a witness as required by Rule 26(a) regarding expert testimony is "not allowed to use that information or witness to supply evidence on a motion . . . or at trial . . . ." Fed. R. Civ. P. 37(c)(1); *Ziegenfus v. John Veriha Trucking*, No. 10 CIV. 5946, 2012 WL 1075841, at *5 (S.D.N.Y. Mar. 28, 2012). Defendants have not disclosed these witnesses as experts or provided expert reports. *See* CLF SOF, Ex. 1 ¶ 18. CLF has not had the ability to examine either of the witnesses *as experts* to test their qualifications. Furthermore, an expert's testimony on issues of law is generally inadmissible. *United States v.*

---

[18] Defendants cite an unpublished opinion for the proposition that an agency's lack of enforcement of an alleged violation dispositively demonstrated the agency's intent that such conduct was not a violation. ECF 248-1 at 24 (citing *Ctr. for Biological Diversity v. Univ. of N. Carolina at Chapel Hill*, No. 1:19-CV-1179, 2021 WL 3861388, at *9 (M.D.N.C. Aug. 30, 2021), *appeal dismissed,* No. 21-2089, 2021 WL 7908071 (4th Cir. Nov. 23, 2021)). However, the court there made no such proclamation. Instead, the court simply considered the fact that the agency was presented with the specifically alleged violation and did not proceed with an enforcement action as one indicator of the agency's intent, taken with many other pieces of evidence, such as the removal of the relevant permit provision from the updated permit. *Univ. of N. Carolina at Chapel Hill*, 2021 WL 3861388, at *9.

*Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). "When a decision turns on the meaning of words in a statute or regulation, the decision is one of law which must be made by the court." *Stissi v. Interstate & Ocean Transp. Co. of Philadelphia*, 765 F.2d 370, 374 (2d Cir. 1985). While a court may consider expert testimony to clarify or define terms of art or industry terminology, *e.g., Kona Tech. Corp. v. S. Pac. Transp. Co*., 225 F.3d 595, 611 (5th Cir. 2000), Defendants have not offered Witt O'Brien's or Triton's testimony for these reasons; they have offered them as experts on the ultimate question of what the Permit requires. Neither organization may offer opinions about the legal requirements of the Permit. *Cf. Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977) (holding district court erred in admitting expert testimony concerning legal requirements of a contract).

The testimony of these corporations is otherwise inadmissible and unreliable. Triton's "ongoing discussions with CT DEEP" about the Permit requirements, *see* Defs.' SOF, ECF 248-2 ¶ 35, are inadmissible hearsay. Fed. R. Evid. 801(c). The Witt O'Brien's representative testified erroneously that a professional engineer certification is not required by the Permit. *Compare* Witt O'Brien's Tr., ECF 248-22 at 41:10–17, *with* Permit, ECF 248-5 at 30 (§ 5(c)(7)). Where issues of credibility of testimony exist at summary judgment, "the court should not weigh evidence or assess the credibility of witnesses," for those "determinations are within the sole province of the jury." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (quotations omitted).

### D. Defendants Do Not Challenge the Sufficiency of CLF's Evidence, and Such a Claim Is Premature.

Defendants' MPSJ addresses only the legal question of whether the text of Section 5(b) of the Permit requires consideration of CLF's climate factors in developing BMPs for the Terminal. *See supra* note 4 and accompanying text. In this respect, Defendants' "motion was more akin to a 12(b)(6) motion in that it raised legal issues and challenged only the sufficiency of the plaintiffs'

complaint," *i.e.*, Defendants essentially argue that CLF cannot state a claim under the plain text of Section 5(b) of the Permit.[19] *See Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993). "As a result, the burden never shifted to the plaintiffs to go beyond the pleadings to show specific facts creating a genuine issue for trial." *Id.* Therefore, this Court's "sole task at this point of the case is to determine what Plaintiffs are required to show in order to establish *liability* under the terms of *this particular* NPDES permit." *County of Los Angeles*, 725 F.3d at 1204–05. If Defendants' legal argument as to the interpretation of the Permit fails, then their motion for *partial* summary judgment must necessarily fail.

Defendants' MPSJ does *not* raise an alternative argument that, even if the determination of required BMPs under the Permit is a fact- and site-specific determination, CLF has insufficient evidence to show that such fact-specific inquiries must account for the impacts of climate change. *See, e.g.*, Defs.' Mtn. to Stay, ECF 250 at 1 (characterizing the MPSJ as "rais[ing] a narrow issue regarding the requirements of the Connecticut' General Permit for the Discharge of Stormwater Associated with Industrial Activity"); ECF 250-1 at 1 ("The MPSJ raises a *threshold* question of interpretation regarding the terms of the Connecticut General Permit . . . ." (emphasis added)). CLF therefore has no burden, at this stage and on the present motion, to produce evidence showing that "best industry practice" requires consideration of climate factors to advance the claims challenged in the MPSJ. *See, e.g.*, *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on;

---

[19] Courts may convert summary judgment motions to Rule 12(b)(6) motions "[w]here appropriate." *See Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273–74 (2d Cir. 1968). Defendants have already filed a Rule 12 motion in this case and could have raised their legal argument regarding Section 5(b) of the Permit at that time, so any successive Rule 12(b) motion is not permitted. *See* Fed. R. Civ. P. 12(g)(2); Fed. R. Civ. P. 12(h)(2). If the MPSJ were converted to a Rule 12(c) motion, it should be denied: "The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." 5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1367 (3d ed.). Defendants have not admitted all material allegations in the complaint. *See generally* Answer, ECF 120.

the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised on pain of forfeiting their position."); *Bryant*, 933 F. Supp. at 274 n.2; *Costello*, 651 F.3d at 635.

Even if Defendants had attacked the sufficiency of CLF's evidence, such an argument is premature at this stage of the litigation. *See* Fed. R. Civ. P. 56(d). As noted in CLF's Opposition to Defendants' Motion to Limit Discovery (ECF 259 at 7–9), CLF has six discovery motions pending before this Court related to fact discovery on whether "best industry practice" would include consideration of severe weather and climate change. *See also* Jordan Aff., Ex. B ¶¶ 17. CLF has briefed why the discovery being withheld—including depositions of the Defendants—is necessary to prove the claims pending in this MPSJ. *Id*. Additionally, expert discovery in this case has not begun and is stayed pending resolution of CLF's Renewed Motion to Compel. *See id.* ¶¶ 16–18. CLF has argued throughout this case that expert discovery is essential to its ability to prove its claims at trial and identify appropriate injunctive relief. *E.g.*, ROG Resps., ECF 103-4 at 7, 14, 15, 17, 18, 33, 43, 50–51 (objecting to Interrogatories requiring expert testimony or opinions before the start of expert discovery); Jordan Aff., Ex. B ¶¶ 13–17.

Because Defendants have not challenged the sufficiency of CLF's evidence, and any argument to that effect would be premature while fact and expert discovery are not yet complete, considering the sufficiency of CLF's evidence on the present Motion is inappropriate.

## V.    CONCLUSION

For the foregoing reasons, CLF respectfully requests this Court deny Defendants' Motion for Partial Summary Judgment (ECF 248) as to Counts II, III, IV, VIII, and IX for failure to address any elements of those claims, and as to Counts I, V, VI, and VII because Defendants' legal theory regarding interpretation of the Permit is incorrect.

40

Dated: July 14, 2023

Respectfully submitted,

CONSERVATION LAW FOUNDATION, Inc., by its attorneys

*/s/ Alexandra St. Pierre*
Alexandra St. Pierre (ct31210)
Alexandra M. Jordan (ct31466)
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
Tel: (617) 850-1732
E-mail: aestpierre@clf.org
E-mail: ajordan@clf.org

Christopher M. Kilian (ct31122)
Kenneth J. Rumelt (phv207130)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3020
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
E-mail: jcrowley@clf.org

Allan Kanner (ct31051)
E-mail: a.kanner@kanner-law.com
Chancey E. Raymond (ct31311)
E-mail: c.raymond@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street New Orleans, LA 70130
Tel: (504) 542-5777
Facsimile: (504) 524-5763

*Admitted as Visiting Attorney*