**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Conservation Law Foundation, Inc., | |
| Plaintiff, | Civil No. 3:21-cv-00933 (JAM) |
| v. | |
| Shell Oil Co., *et al.*, | August 22, 2023 |
| Defendants. | |

**RULING AND ORDER ON MOTION TO COMPEL (ECF No. 149)**

**I.    INTRODUCTION**

This is a citizen suit under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq*. The plaintiff, Conservation Law Foundation, Inc. ("CLF"), is a nonprofit corporation "dedicated to the conservation and protection of New England's public health, environment, and natural resources." (Am. Compl., ECF No. 47, ¶ 9.) It claims that the bulk oil storage terminal next to the New Haven Harbor (the "Terminal") has not been adequately prepared for "the reasonably foreseeable risks . . . posed by severe weather, including risks associated with climate change." (Motion to Compel, ECF No. 149, at 2) ("Motion"). In this suit, it seeks to hold five companies accountable under the CWA and RCRA for those alleged failures – Shell Oil Co. n/k/a Shell USA, Inc. ("Shell Oil"), Equilon Enterprises LLC ("Equilon"), Shell Petroleum Inc. ("Shell Petroleum"), Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva") (together, "Defendants").

CLF served eleven interrogatories and sixty-five requests for production on the Defendants. (ECF Nos. 149-2, 149-3.) The Defendants objected to all eleven interrogatories and sixty-four of the sixty-five requests for production on a variety of grounds, but in most instances,

1

they agreed to produce some information "subject to" those objections.  (ECF Nos. 149-4, 149-5.)  The parties then attempted to resolve the objections (*see* Aff. of A. St. Pierre, ECF No. 149-1), but when those efforts failed, CLF moved to compel compliance with all seventy-five disputed requests.  The Defendants filed an opposition ("Opp'n," ECF No. 177); CLF filed a reply ("Reply," ECF No. 191); and the Court heard oral argument.   (Hrg. Tr., ECF No. 201.)

Presumably because of the number of discovery requests involved, the parties have presented the issues principally in general terms; their briefs do not contain detailed, request-by-request discussions of the seventy-five disputes.  *See* D. Conn. L. Civ. R. 37(b)1 (permitting parties to "group" disputed items "into categories" when a motion to compel implicates "several different items").  For example, CLF asks the Court to consider broadly whether the "Defendants' corporate structures, prescriptive practices, and mandatory procedures are relevant to" their potential responsibility under the "operator liability" provisions of the CWA and RCRA.  (Motion at 11.)  CLF also asks the Court to consider whether "Defendants' knowledge of the risks to infrastructure from climate change and severe weather" is relevant to several of its claims, including "whether Defendants adapted the Terminal to prevent pollutant discharges" and whether that knowledge was impermissibly "withheld from regulators."  (*Id.* at 17, 22.)

As discussed below, CLF generally has the stronger arguments on these broad propositions.  The Defendants' policies and procedures governing the Terminal, and their knowledge of certain climate change risks, are relevant in the Rule 26(b)(1) sense to claims asserted in CLF's Amended Complaint.  The Defendants' opposition is more of a merits challenge than a true challenge to the relevance of the requested information, but "a party may not typically object to relevant discovery on the ground that it believes its opponent's case to be meritless."  *Huseby, LLC v. Bailey*, No. 3:20-cv-167 (JBA) (TOF), 2021 WL 3206776, at *7 (D. Conn. July 29, 2021).

On a motion to compel, however, the Court's task is not to decide general questions or issue advisory opinions on the discoverability of broad categories of information. Rather, Rule 37 authorizes the Court to compel answers to *specific* interrogatories propounded under Rule 33, or to compel the production of documents in response to *specific* requests for production served under Rule 34. Fed. R. Civ. P. 37(a)(3)(B). Determining whether a specific request merits such an order requires consideration not only of its logical relevance, but also of (among other things) its burdensomeness and its proportionality to the needs of the case. Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 26(c)(1). In this case, many of CLF's interrogatories and requests for production are overly broad, unduly burdensome, and disproportionate.

The Court will therefore grant CLF's Motion in part and deny it in part. The Defendants will be ordered to provide further responses to those discovery requests that both (i) seek information that is relevant to a claim or defense and (ii) are not overly broad, unduly burdensome, or out of proportion to the needs of the case. The Court will deny the Motion as to all other interrogatories and requests for production, without prejudice to CLF's right to pursue discovery of relevant topics through narrower and less burdensome inquiries.

The parties raise other issues of compliance with the Federal and Local Rules of Civil Procedure, aside from relevance, burden, proportionality, and so forth. CLF contends that the Defendants over-redacted the documents that they have produced to date, and that they failed to comply with Fed. R. Civ. P. 34(b)(2)(C) and –(b)(2)(E). (Motion at 28-34.) The Defendants say that CLF did not comply with D. Conn. L. Civ. R. 37 (Opp'n at 14-17), but CLF disputes that claim. (Reply at 1-5.) The Court generally agrees with CLF on these points, and while it will not order the Defendants to un-redact their entire production, it will order them to comply with Rules 34(b)(2)(C) and –(b)(2)(E). The Court's order is set forth in Section V below.

## II.   BACKGROUND

This is one of several cases arising out of CLF's contention that the oil industry is not doing enough to harden its bulk oil terminals against severe weather events, including those caused by anthropogenic climate change.  In 2016 CLF sued ExxonMobil in the District of Massachusetts, alleging that the company "has not taken climate change impacts into account in" the CWA-required Stormwater Pollution Prevention Plan ("SWPPP") for a bulk terminal in Everett, Massachusetts.  (Compl., *Conservation L. Found. v. ExxonMobil Corp.*, No. 1:16-cv-11950 (MLW) (D. Mass.), ECF No. 1, ¶ 11.)  In 2017 it sued several members of the Shell family of oil companies in the District of Rhode Island, alleging that they violated the CWA by failing to account for "sea level rise, increased and/or more intense precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges . . . in [their] Clean Water Act-required and enforceable" SWPPP for their Providence facility.  (Compl., *Conservation L. Found., Inc. v. Shell Oil Prods. U.S.*, No. 1:17-cv-396 (WES) (LDA) (D.R.I.), ECF No. 1, ¶ 14) (hereinafter "Rhode Island Case").

CLF filed this action on July 7, 2021 (Compl., ECF No. 1), seeking "to halt Defendants' longstanding and ongoing violations of the CWA and RCRA" at the bulk fuel terminal located at 481 East Shore Parkway in New Haven.  (Motion at 2; Compl., ECF No. 1, ¶ 2.)  The Defendants moved to dismiss most claims (First Mot. to Dismiss, ECF No. 41), and in response, CLF amended its complaint.  (Am. Compl., ECF No. 47.)  The amended complaint contained fourteen counts, eleven of which alleged violations of the CWA, and three of which asserted violations of RCRA. (*Id.*)

CLF characterizes several of the CWA counts as being united by common themes.  (Motion at 2.)  Counts I, V, VI, and VII allege in various ways that the Defendants violated the terms of

their CWA Industrial Stormwater Permit ("Permit") by failing to employ "best industry practice" at the Terminal.  (Motion at 2.)  Counts III, VII, and IX substantially allege that the Defendants violated the Permit by "fail[ing] to inform state regulators about the risks to the Terminal from severe weather and climate change."  (*Id.*)

As they had done with the initial complaint, the Defendants moved to dismiss most of the claims in the amended complaint.  (Second Mot. to Dismiss, ECF No. 50.)  Among other arguments, the Defendants asserted that CLF was seeking not to enforce the Permit, but rather to "expand the scope" of their "permitting obligations" with "novel" claims about what the Permit allegedly required – a reference to CLF's claim that the Permit required the employment of "best industry practice."  (Memo. of L. in Supp. of Mot. to Dismiss, ECF No. 50-1, at 3, 31-32.)   The Defendants also urged dismissal of all claims against Shell Oil and Shell Petroleum on the ground that the CWA imposes its obligations on "owners" and "operators" of a facility, and those entities were neither owners nor operators of the New Haven Terminal.  (*Id.* at 11.)

United States District Judge (now Circuit Judge) Sarah A.L. Merriam largely denied the Defendants' motion.  *Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416 (D. Conn. 2022) ("*CLF IV*").  She construed CLF's CWA claims as "not seek[ing] to hold defendants liable *beyond* what is required by the Permit," but rather as seeking an "'interpret[ation of] the Permit' – asking, for example, whether Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change, including rising tides and catastrophic storms."  *Id.* at 449 (quoting *Conservation L. Found. v. Shell Oil Prods. U.S.*, No. 1:17-396 (WES) (LDA), 2020 WL 5775874, at *3 (D.R.I. Sept. 28, 2020)) ("*CLF II*") (emphasis in original).  With respect to Shell Oil and Shell Petroleum, she concluded that the amended complaint "state[d] a plausible claim for direct liability under the standards enunciated in" the Supreme Court's decision

in *United States v. Bestfoods*, 524 U.S. 51 (1998).  *Id.* at 442 (quoting *Conservation L. Found. v. Shell Oil Prods. U.S.*, No. 1:17-cv-396 (WES) (LDA), 2022 WL 2353065, at *2 (D.R.I. June 30, 2022) ("*CLF III*"), *report and recommendation adopted*, slip op. (D.R.I. July 15, 2022)).

While the motion to dismiss was pending, CLF served eleven interrogatories and sixty-five requests for production on the Defendants.  (ECF Nos. 149-2, 149-3.)  The Court will discuss these discovery requests in detail below, but a few examples will provide some idea of the breadth of some of them.  In Request for Production ("RFP") No. 10, CLF sought "[a]ll Documents related to Defendants addressing or adapting to climate change and/or the greenhouse effect, both at the Terminal and generally, including but not limited to documents concerning . . . engineering, design and management of facilities and infrastructure . . . interactions with industry trade groups . . . interactions with regulatory and other governmental agencies . . . investment and financial management . . . and corporate policy, management, or decision-making."  (ECF No. 149-4, at 12.)  In RFP 21, CLF requested production of "[a]ll Shell sustainability reports and associated Documents."  (*Id.* at 28.)  And in RFP No. 26, it sought production of "[a]ll Documents related to the study of climate change and/or weather-related risks created, used, or relied on by Defendants, including but not limited to any Documents relating to . . . the incidence, frequency, and magnitude of flooding or inundation from extreme weather events, sea level rise, or other events induced by climate change."  (*Id.* at 33.)

The Defendants served their responses and objections thirty days later (ECF Nos. 149-3, 149-4), and here too, an example will provide their general flavor.  The Defendants objected to RFP 10 "as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks information that is not relevant to the claims in this matter and/or the relief sought by Plaintiff."  (ECF No. 149-4, at 12.)  They also objected on the ground that a request for "'All

Documents related to'" a given subject "is on its face overbroad, unduly burdensome and not proportional to the needs of the case," adding that "[t]o respond, likely thousands of searches would need to be developed to identify all documents that might discuss the topic of addressing and adapting to climate change." (*Id.*) They closed out their objections with a statement that the universe of responsive documents might include "confidential and sensitive business information," and with an objection – since withdrawn – that the request for communications with government agencies and industry trade groups violated their First Amendment rights. (*Id.*)

The Defendants then provided a response "subject to" their various objections. (*Id.*) They began with an argument that "[t]his is not a case about climate change," but rather "a citizen suit to enforce a stormwater permit and waste management requirements at the New Haven Terminal." (*Id.* at 13.) In their view, "[t]here is no element of [CLF's] claims that requires an evaluation of all documents that may conceivably relate to the vast topic of climate change." (*Id.*) The Defendants then committed to produce "responsive, non-privileged documents in their possession, custody, and control related to 'Defendants addressing or adapting to climate change and/or the greenhouse effect' that are relevant to Plaintiff's claims regarding the New Haven Terminal using the document search terms to be negotiated and agreed upon by the parties." (*Id.*) They did not state whether they were withholding any documents pursuant to each of their objections. (*See id.*)

CLF had served similar discovery requests upon the Defendants in the Rhode Island Case, and the parties conferred over the requests and objections in both cases in 2022. (*See* discussion, Aff. of A. St. Pierre, ECF No. 149-1, ¶¶ 2-17.) When the conferences failed to resolve the disputed issues, CLF filed two motions to compel – one in Rhode Island on March 4, 2022, and another in this case on July 27, 2022. (*Id.* ¶¶ 6, 18.) The Defendants opposed the Rhode Island motion in part with a declaration from their East Coast Lead Facility Engineer, James Kent Yeates, and they

argued that "a deposition would be a far more efficient discovery mechanism" on the broad issues raised by CLF's requests.  *Conservation L. Found., Inc. v. Shell Oil Prods. U.S.*, No. 1:17-cv-396 (WES) (LDA), slip op. at 2 (D.R.I. July 21, 2022).  Noting that CLF was "seek[ing] far-reaching discovery which, if allowed, would likely be very time consuming and expensive," the Rhode Island court denied CLF's motion without prejudice, but ordered the Defendants to produce Mr. Yeates for a deposition.  The parties then reported to this Court that "ongoing discovery, both in this case and in their District of Rhode Island case, will likely change the character and scope of the" motion that CLF had filed here.  (Memo. of Status Conf., ECF No. 96, Aug. 15, 2022).  CLF therefore agreed that its motion "should be denied without prejudice to resubmission once the scope of the discovery dispute (if any) comes into clearer view."  (*Id.*)  The Court accordingly denied the motion without prejudice (*id.*), and CLF proceeded with Mr. Yeates' deposition on December 22, 2022.  (Aff. of A. St. Pierre, ECF No. 149-1, ¶ 44.)

Both before and after the Yeates deposition, the Defendants produced some documents to CLF.  They delivered 155 documents totaling 6,457 pages on May 13, 2022.  (Aff. of A. St. Pierre, ECF No. 149-1, ¶ 12.)  On June 22, 2022, they produced a second installment of fifty-two documents totaling 1,570 pages.  (*Id.* ¶ 14.)  A third production of 227 documents (1,489 pages) followed on July 28, 2022, and a fourth installment of 1,758 documents (14,109 pages) came on October 4, 2022.  (*Id.* ¶¶ 21, 36.)  The Defendants made other, smaller productions on October 28 and December 14, 2022, but they did not produce the largest installment – 30,395 documents totaling 158,846 pages – until December 31, 2022, over a week after the Yeates deposition.  (*Id.* ¶¶ 40, 42, 45.)  CLF says that the documents were neither produced as kept in the usual course of business nor organized and labeled to correspond to its requests.  (*Id.* ¶ 52.)

CLF considered Mr. Yeates' deposition testimony and concluded that it was not an adequate substitute for the documents and interrogatory answers to which it claimed to be entitled. (Motion at 2.)   It therefore filed the Motion that is currently before the Court. (*Id.*)  As noted above, the Defendants filed an opposition; CLF filed a reply; and the Court heard oral argument. Additional facts will be set forth as necessary below.

## III.   DISCUSSION: THRESHOLD ISSUES

The parties have raised four threshold issues of compliance with the Federal and Local Rules of Civil Procedure.  The first arises out of the fact that the documents in the Defendants' productions allegedly contain both responsive and non-responsive information.  The Defendants redacted the latter, even though they concede that it is not subject to a legal privilege, and CLF argues that the Court should not permit this.  (Motion at 29-30.)  Second, CLF says that the Defendants violated Fed. R. Civ. P. 34(b)(2)(C) when they objected to document production requests without specifying whether they were withholding documents pursuant to each objection. (*Id.* at 31-32.)  Third, CLF contends that the Defendants violated Fed. R. Civ. P. 34(b)(2)(E) when they failed to produce their documents "as they are kept in the usual course of business" or "organize[d] and label[ed] . . . to correspond to the categories in the request."  (*Id.*)  Fourth, the Defendants argue that CLF's Motion fails to comply with Rule 37 of the District of Connecticut's Local Rules of Civil Procedure.  (Opp'n at 14-17.)  The Court will resolve these issues first.[1]

### A.   Redactions

CLF asserts that the "Defendants have improperly redacted information from over 16,000 responsive documents based on improper claims of relevance, confidential business information,

---

[1]   CLF's Motion also raised an additional argument about the Defendants' attorney-client privilege and work product claims (Motion at 28-29), but the Court has ruled upon that separately. (*See* ECF Nos. 264, 275.)

or both." (Motion at 29.) It explains that "many documents containing information about infrastructure, maintenance, or permit violations at multiple terminals have been heavily redacted so that only information directly pertaining to Defendants' Providence or New Haven facilities is visible." (*Id.* at 29-30.) Citing *Berney v. Apple Inc.*, No. 3:20-cv-1379 (JAM) (RMS), 2021 WL 6334985, at *2 (D. Conn. May 27, 2021), CLF argues that a producing party should not redact material from responsive documents "based on that party's unilateral determination of relevancy." (*Id.* at 30.) It also argues that "redacting documents to protect confidential business information is inappropriate where this Court has entered a protective order for that very purpose." (*Id.*) CLF therefore seeks an order compelling the Defendants "to produce in full all redacted documents and to produce any documents that have been improperly withheld pursuant to an unclaimed and unidentified privilege." (*Id.*)

The Defendants do not dispute that they redacted over 16,000 documents for relevance and confidentiality, but they contend that they were entitled to do so under the circumstances. (Opp'n at 36-37.) They explain that many of the redacted documents "contained information about . . . facilities" other than the New Haven Terminal, including "large spreadsheets containing rows of information about" multiple sites. (*Id.* at 36.) They object to producing those documents on the ground that other facilities "ha[ve] no bearing" on CLF's CWA and RCRA claims, and they suggest that the documents could have been properly withheld in their entirety. (*Id.*) Instead, they produced redacted versions, "to provide documents to CLF without effectively conceding their position on the irrelevance of information about other facilities." (*Id.* at 36-37.) In other words, the Defendants suggest that in producing redacted versions of documents that they could have withheld entirely, they have overproduced rather than underproduced.

10

Although contrary cases exist, most authorities do not support the sort of redactions that the Defendants have made here.  As Judge Spector has explained, "[t]he weight of authority in the Second Circuit goes against allowing a party to redact information from admittedly responsive and relevant documents based on that party's unilateral determinations of relevancy." *Berney*, 2021 WL 6334985, at *2 (quoting *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS) (AKT), 2020 WL 2836787, at *14 (E.D.N.Y. May 29, 2020) (quotation marks omitted); *see also Christine Asia Co., Ltd. v. Alibaba Grp. Holding Co.*, 327 F.R.D. 52, 54 (S.D.N.Y. 2018) (same).  "[S]uch redactions are generally unwise," because they "breed suspicions, and they may deprive the reader of context."  *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, No. 08-cv-0333 (RJH) (DFE), 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009).  For these reasons, "redactions on grounds of non-responsiveness or irrelevance are generally impermissible, especially where . . . a confidentiality stipulation and order . . . is in place."  *Durling v. Papa John's Int'l, Inc.*, No. 16-cv-3592 (CS) (JCM), 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018); *see also John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("[R]edactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege."); *but see Schiller v. City of New York*, No. 04-cv-7922 (KMK) (JCF), 2006 WL 3592547, at *7 (S.D.N.Y. Dec. 7, 2006) (sustaining redactions where "[t]he redacted information . . . is not relevant to any claim or defense in the litigation").

In this case, however, there is an additional consideration.  The Defendants have been redacting documents for alleged irrelevance and business confidentiality ever since they produced the first installment of their production in May of 2022, but CLF evidently did not object then. (*See* Motion at 28, Opp'n at 35; *see also* Aff. of A. St. Pierre, ECF No. 149-1, at 3-6 (failing to identify redaction issue as one of the issues over which the parties met and conferred in the summer

of 2022).)  Moreover, CLF did not raise the issue in the initial motion to compel that it filed on July 27, 2022.  (*See generally* Mot. to Compel, ECF No. 84.)  So far as the record discloses, CLF did not question the Defendants' redactions until September 2, 2022, and even then, it only questioned individual documents; it did not challenge the redactions wholesale.  (Aff. of A. St. Pierre, ECF No. 149-1, at 6-7.)  The Defendants note that, under the initial scheduling order, motions to compel were due "within 30 days after the response was due under the Rules of Civil Procedure."  (Opp'n at 35-36) (citing Sched. Order, ECF No. 52, at 4).  For these reasons, they suggest that this issue should have been raised long ago, before they produced documents that they otherwise might have objected to producing, and before they invested significant time and effort into redacting the subsequent installments of their production.  (*See* Opp'n at 35.)

The *State Street Bank* court encountered a similar situation.  In that case, the parties apparently did not agree on a redaction protocol before the plaintiff produced a large body of documents, some of which it redacted "to remove non-responsive materials, as opposed to privileged information."  2009 WL 1026013, at *1.  As noted above, the court observed that "such redactions are generally unwise" and often "deprive the reader of context," and it therefore directed the parties not to make any such redactions going forward.  *Id.*  But with respect to the documents that had already been produced, the court declined to "compel [the plaintiff] to unredact all of its tedious busywork."  *Id.*  Instead, it adopted a protocol under which the defendant could challenge individual claims of non-responsiveness.  *Id.* at *2.

The Court concludes that a similar resolution is appropriate in this case.  Because CLF should have squarely raised this issue before the Defendants invested time and effort into redacting the later production installments, the Court will not order the Defendants to un-redact their entire production.  Nevertheless, CLF should not be prevented from understanding the unredacted

information in a key document just because the Defendants have elected to redact material that provides important context.  Expecting that such documents constitute only a small percentage of the whole, the Court will authorize CLF to identify to the Defendants up to fifty documents in which the redactions have rendered the unredacted information unintelligible or lacking in key context.  The Defendants will be ordered to produce those documents to CLF in unredacted form within fourteen days of their identification.

      **B.**      **Fed. R. Civ. P. 34(b)(2)(C)**

      CLF next challenges the Defendants' compliance with Fed. R. Civ. P. 34(b)(2)(C). (Motion at 31-32.)  The Defendants responded to almost all of CLF's Rule 34 requests by objecting, and then stating that they would produce documents "subject to" their objections.  In Request No. 11, for example, CLF sought "[a]ll documents concerning risks to the Terminal's physical infrastructure from climate change, flooding, sea level rise, and/or severe weather." (ECF No. 149-4, at 14.)  The Defendants objected "to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case;" on the ground that "the term 'climate change' is undefined," "vague," and "ambiguous;" and on the ground that "'All Documents' is on its face overbroad" and "unduly burdensome." (*Id.*)  They then stated that, "[s]ubject to the foregoing . . . objections," they would "produce responsive, non-privileged documents in their possession, custody, and control related to the particular risks that are relevant to Plaintiff's claims regarding the New Haven Terminal based upon the document search terms to be negotiated and agreed upon by the parties." (*Id.*)  Yet they did not say whether they were in fact withholding documents pursuant to each of their objections. (*E.g., id.*)  CLF asserts that this omission leaves it in the dark about what has and has not been produced, and that it violates Fed. R. Civ. P. 34(b)(2)(C). (Motion at 31-32.)  It seeks an order compelling the Defendants to "identify[], for

each request . . . . whether any responsive documents have been withheld, and on what ground(s)." (*Id.* at 34.)

Rule 34 requires that "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C). "This requirement is intended to avoid confusion when a producing party states objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld on the basis of the objections." *Passenti v. Veyo*, No. 21-cv-1350 (SRU) (MEG), 2022 WL 17261411, at *7 (D. Conn. Nov. 29, 2022) (quoting 7 James Wm. Moore *et al., Moore's Fed. Prac.* § 34.13[2][b] (3d ed. 2021)). Moreover, the practice of asserting an objection and then responding "subject to" or "without waiving" the objection "leaves the requesting party uncertain as to whether the opposing party has fully answered its request and, importantly, is not contemplated by the Federal Rules of Civil Procedure." *Hauser v. Gen. Cable Indus.*, No. 3:16-cv-1694 (RNC) (DFM), 2017 WL 2294286, at *1 n.2 (D. Conn. May 25, 2017).

The Defendants' responses do not comply with Rule 34(b)(2)(C), and in their Opposition, they do not seriously contend otherwise. (*See* Opp'n at 34-37) (addressing CLF's arguments about redactions and Rule 34(b)(2)(E) but failing to argue that the responses conformed to Rule 34(b)(2)(C)). The Court will therefore order the Defendants to re-serve responses to CLF's document production requests that state, for each objection, whether responsive materials are being withheld pursuant to that objection.[2]

---

[2] To the extent that CLF is asking the Court to go further and order the Defendants to *log* "what responsive documents, if any, they are withholding under their non-privilege objections" (Motion at 31), that request is denied because Rule 34 does not require "a detailed description or log of all documents withheld." *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-125, 2019 WL 12323321, at *4 (D. Vt. June 10, 2019). A producing party meets its obligation if it "alert[s] other parties to the fact that documents have been withheld and thereby facilitate[s] an informed discussion of the objection." *Id.*

14

### C. Fed. R. Civ. P. 34(b)(2)(E*)*

CLF next argues that the Defendants failed to comply with Fed. R. Civ. P. 34(b)(2)(E)(i). (Motion at 31-32.)  This rule provides that, "[u]nless otherwise stipulated or ordered by the court . . . [a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request[.]"  Fed. R. Civ. P. 34(b)(2)(E)(i).  CLF says that the Defendants have not met their burden to show that they produced their documents as kept in the usual course.  (Motion at 33) (citing *Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 334-35 (N.D.N.Y. 2008)).  It then concludes that, because the Defendants have not made this showing, they should be ordered to comply with the second of the two Rule 34(b)(2)(E)(i) alternatives by "identifying, for each request . . . what documents were produced responsive to the request[.]" (Motion at 34.)

The Defendants oppose this portion of CLF's Motion, claiming that they complied with the "usual course" option.  (Opp'n at 37.)  Their brief does not explain how, but an accompanying declaration from "an eDiscovery Analyst for Shell, USA" named Frank Contreras provides some details on portions of their process.  (ECF No. 177-7.)  In his declaration, Mr. Contreras states that "CLF and Defendants initially agreed to conduct searches to respond to a subset of CLF's First Set of Requests for Production that were not in dispute by using a list of search terms and custodians proposed by Defendants."  (*Id.* ¶ 16.)  The Defendants then ran search terms "across the Outlook Exchange email and OneDrive for Business accounts of all custodians as well as three SharePoint sites."  (*Id.* ¶ 17.)  This process "collected 1,747,411 documents," which the Defendants "narrowed . . . to approximately 228,654" using "Technology Assisted Review."  (*Id.* ¶ 19.)  The Defendants then used a "software-based intelligence tool" called RAL to cull this 228,654-document cohort down to "134,316 documents potentially responsive to CLF's requests."

(*Id.* ¶ 20.)  "Of those 134,316 documents, Defendants' team of approximately twelve contract attorneys reviewed 123,067 documents."  (*Id.*)  But Mr. Contreras's description of the process stops there, and while he says much about how the documents were *collected*, he says essentially nothing about how they were *produced*.  For example, CLF complains that the documents were produced without such basic information "as a file path and which Defendant is the custodian" (Motion at 5), and the Contreras declaration does not say otherwise.

In considering whether the Defendants' production complies with Rule 34(b)(2)(E)(i), the Court begins by noting that the rule does not expressly define what it means to produce materials as "kept in the usual course of business."  *See* Fed. R. Civ. P. 34(b)(2)(E)(i); *Cardenas v. Dorel Juvenile Grp., Inc.*, 230 F.R.D. 611, 618 (D. Kan. 2005) ("Rule 34 does not explain what it means to produce documents 'as they are kept in the usual course of business[.]'").  Some principles may nevertheless be extracted from the rule's purpose.  "The provision authorizing production in accordance with [the 'usual course'] option was born out of the disfavor shown by courts to the dumping of massive quantities of documents, with no indexing or readily apparent organization, in response to a document request from an adversary[.]"  *Pass & Seymour*, 255 F.R.D. at 334 (citing *In re: Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 363 (N.D. Ill. 2005)).  It was added to Rule 34 in 1980, before the advent of modern e-discovery, to address the practice of "mix[ing] critical documents with others in the hope of obscuring significance."  Fed. R. Civ. P. 34 advisory committee's notes to 1980 amendment.  Because a business "has an obvious incentive to keep needed documents in a way that maximizes their usefulness in [its] day-to-day operations," *In re: Sulfuric Acid Antitrust Litig.*, 231 F.R.D. at 363, and therefore would not ordinarily bury its key documents among irrelevant materials, the rule's drafters expected that a "usual course" production would have some "internal logic" that would make it useful to and usable by the

requesting party.  *See S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 409 (S.D.N.Y. 2009)

(quoting *Rpt. of the Spec. Comm. for the Study of Discovery Abuse*, 92 F.R.D. 137, 177 (1980)).

Thus, in deciding whether a document production qualifies as a "usual course" production, courts

have considered whether it has an organizational logic that is either plainly evident or has

otherwise been explained to the requesting party.  *See, e.g., Estate of Townes van Zandt v. Eggers*,

No. 05-cv-10661 (RJH) (RLE), 2007 WL 3145097, at *2 (S.D.N.Y. Oct. 26, 2007) (holding that

"usual course" nature of production was evident from file labeling system); *Pass & Seymour*, 255

F.R.D. at 336 (stating, in a case where the production's organizational logic was not evident, that

"the rule contemplates that a party selecting" the usual course option "disclose information to the

requesting party regarding how the documents are organized in the party's ordinary course of

business").

Courts have taken somewhat different approaches when applying these principles to

electronically stored information, or "ESI."[3]  One court held that, "[t]o satisfy the usual course of

business requirement" in the ESI context, "the mode of production should preserve the functional

utility of the electronic information produced."  *McKinney/Pearl Rest. Partners, L.P. v. Metro.*

*Life Ins. Co.*, 322 F.R.D. 235, 250 (N.D. Tex. 2016).  "[T]his normally requires (1) preserving the

format of the ESI and (2) providing sufficient information about the context in which it is kept and

used[.]"  *Id.*  Another court concluded that "in the usual course of business" requires that ESI be

---

[3]        Some courts have held that Rule 34(b)(2)(E)(i) does not apply to ESI.  *See, e.g., Anderson*
*Living Tr. v. WPX Energy Prod., LLC*, 298 F.R.D. 514, 520-26 (D.N.M. 2014); *but see Landry v.*
*Swire Oilfield Servs., LLC*, 323 F.R.D. 360, 388 (D.N.M. 2018) (noting conflict, but observing
that "[t]he vast majority of courts have treated (E)(i) and (E)(ii) as supplementary rather than
alternative, applying (E)(i)'s organized production requirement to ESI the same way they had
before the 2006 amendments, and adding the (E)(ii) form requirement on top of the requirements
of (E)(i)").  The Defendants have not made that argument here, however, and accordingly the Court
does not address it.  (*See* Opp'n at 37.)

"rationally organized to enable the parties to determine if responsive documents have been produced." *City of Colton v. Am. Promotional Events, Inc.*, 277 F.R.D. 578, 584-85 (C. D. Cal. 2011).

In this case, the Defendants have not shown that their production comports with these conceptions – or, indeed, with any recognized conception – of a "usual course" production of ESI. To begin with, neither their brief nor the Contreras declaration says anything about the format in which the ESI was produced.[4]  Moreover, the Defendants have provided no information about the organizational structure of the production, nor have they contradicted CLF's claim that the production was unaccompanied by basic custodian information.  And more broadly, they have not shown that the production retains the same organizational logic as the original materials, nor that it is "rationally organized to enable" CLF "to determine if responsive documents have been produced" with respect to each discovery request.  *Id.*

The law is clear that, if the producing party chooses the "usual course" option, it bears the burden to show that it produced its documents that way.  "A party selecting the [usual course] alternative method of production bears the burden of demonstrating that the documents made available were in fact produced consistent with that mandate."  *Pass & Seymour*, 255 F.R.D. at 334; *see also Collins & Aikman*, 256 F.R.D. at 409 (same).  Furthermore, "[t]o carry this burden, a party must do more than merely represent to the court and the requesting party that the documents

---

[4]     The Defendants have placed the parties' "Joint Agreement Concerning Discovery of Electronically Stored Information and Hard Copy Documents" before the Court in connection with a different discovery motion.  (ECF No. 211-1.)  In that document, the parties evidently agreed to produce most ESI as "TIFF images with . . . associated metadata," with "metadata" defined to include "the custodian or Non-Custodial data source from which it was collected."  (*Id.* at ¶¶ 6.2, 2.h.)  But neither their brief nor the Contreras affidavit says that the production was made in accordance with this agreement, and indeed, CLF says without contradiction that custodian information was not provided.  (Motion at 5; Reply at 10.)

have been produced as they are maintained." *Pass & Seymour*, 255 F.R.D. at 334 (citing cases).

And when producing parties fail to show that the documents were produced as kept in the usual

course, courts have ordered them to comply with the other Rule 34(b)(2)(E)(i) option by organizing

and labeling the materials to correspond to each production request. *See, e.g., Hannah v. Wal-*

*Mart Stores, Inc.*, No. 3:12-cv-1361 (JCH) (HBF), 2014 WL 2515221, at *2 (D. Conn. June 4,

2014) ("Plaintiffs have not argued, nor have they presented any evidence suggesting, that they

produced the documents as kept in the usual course of business. . . . Therefore, plaintiffs were

required to organize and label the documents to correspond to each request."). The Defendants

having failed to meet their burden in this case, the Court will follow the *Hannah* precedent and

order them to "serve amended discovery responses identifying by bates number which documents

are responsive to each request." *Id.*

### D.    Local Rule 37

In the District of Connecticut, motions to compel are governed by Rule 37 of the Local

Rules of Civil Procedure. Subsection (a) of Local Rule 37 contains what is commonly referred to

as the "meet and confer requirement;" it provides that "[n]o motion pursuant to Rules 26 through

37, Fed. R. Civ. P., shall be filed unless counsel making the motion has conferred, in person or by

telephone, with opposing counsel and discussed the discovery issues between them in detail in a

good faith effort to eliminate or reduce the area of controversy, and to arrive at a mutually

satisfactory resolution." D. Conn. L. Civ. R. 37(a). Subsection (a) also includes an "affidavit

requirement," stating that if the meet-and-confer process is unsuccessful and a motion to compel

becomes necessary, the moving attorney must "file . . . as part of the motion papers, an affidavit

certifying that he or she has conferred with counsel for the opposing party in an effort in good faith

to resolve by agreement the issues raised by the motion without the intervention of the Court, and

has been unable to reach such an agreement." *Id.* Subsection (b) addresses memoranda submitted in support of motions to compel; it ordinarily requires "a specific verbatim listing of each of the items of discovery sought or opposed," but it adds that, "[w]here several different items of discovery are in dispute, counsel shall, to the extent possible, group the items into categories in lieu of an individual listing of each item." D. Conn. L. Civ. R. 37(b).

The Defendants argue that CLF failed to comply with subsection (a) (Opp'n at 14-16), but the Court disagrees. The Defendants contend that thirteen out of the seventy-six contested requests were not conferred over (*id.* at 14), but CLF's reply brief points to correspondence documenting such discussions in either this case or the Rhode Island Case. (Reply at 2-3 & n.4); (*see also* ECF No. 177-2, at 7) (CLF letter discussing Defendants' objections to temporal scope of requests). They also claim that CLF's counsel's affidavit "does not clearly specify what issues are resolved and what remains in dispute" (Opp'n at 15), but this is not supported by the record. The affidavit explains that the parties were able to agree on such things as search terms and production formats, but it adds that they could not resolve their disputes over the temporal scope of the requests, compliance with Rule 34(b), and so forth. (ECF No. 149-1, ¶¶ 16, 52, 54, 56.)

Finally, the Defendants argue that CLF "only nominally attempt[ed] to comply with" subsection (b). (Opp'n at 16.) CLF exercised its option to "group" the contested discovery requests "into categories in lieu of an individual listing of each item," and the Defendants find CLF's grouping "extremely challenging" to respond to. (Opp'n at 16.) The Court, however, finds CLF's grouping not only to be reasonably understandable, but also sensible considering the number of discovery requests involved. "Plainly, the purpose of Rule 37(b) is to ensure that the movant is clear about what he wants and why he wants it," and where the moving party "has been reasonably clear" about these things, its motion should not be denied for failure to comply with

the rule.  *Huseby,* 2021 WL 3206776, at *5.  That is the case here, and accordingly the Court will

not deny CLF's Motion for failure to comply with Local Rule 37.

## IV.  DISCUSSION: THE DISPUTED DISCOVERY REQUESTS

With those threshold issues resolved, the Court will now address the more substantive

elements of CLF's Motion.  Because the parties principally dispute the relevance, burden, and

proportionality of the contested discovery requests, the Court will begin by setting forth the

applicable legal principles in Section IV.A.  In Section IV.B, it will address three issues that the

parties' briefs discuss on a blanket basis: (i) the temporal scope of CLF's discovery requests; (ii)

the relevance, burden, and proportionality of those requests directed to the Defendants' potential

liability as operators of the Terminal; and (iii) the relevance, burden, and proportionality of the

requests directed to the Defendants' knowledge of the risks created by climate change.  Finally,

the Court will address the individual requests for production and interrogatories in Section IV.C.

### A.    Applicable Legal Principles

#### 1.    *Relevance*

Subject to the proportionality requirement and other limitations set forth in Rule 26, a party

may discover relevant, nonprivileged information in the other party's possession.  "Parties may

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense[.]"  Fed. R. Civ P. 26(b)(1).  Moreover, information "within the scope of discovery need

not be admissible in evidence to be discoverable."  *Id.*

Information is "relevant" if it "(a) has any tendency to make a fact more or less probable

than it would be without the evidence, and (b) the fact is of consequence in determining the action."

Fed. R. Evid. 401; *see also Gaynor v. City of Meriden*, No. 3:17-cv-1103, 2019 WL 2537669, at

*2 (D. Conn. June 20, 2019) ("While the Federal Rules of Civil Procedure do not define 'relevant,'

the operative definition can be found in Rule 401 of the Federal Rules of Evidence[.]"); *In re PE Corp. Secs. Litig.*, 221 F.R.D. 20, 23 (D. Conn. 2003) (employing Rule 401's definition of relevance in addressing discovery dispute under Rule 26).  "[T]he determination of whether . . . information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action."  Fed. R. Civ. P. 26 advisory committee's notes to 2000 amendments.  In part because the concept of relevance is not limited by considerations of evidentiary admissibility at the discovery stage, *see* Fed. R. Civ. P. 26(b)(1), "[i]t is well established that relevance for purposes of discovery is broader in scope than relevance for the purpose of the trial itself."  *Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016); *accord Martino v. Nationstar Mortg. LLC*, No. 3:17-cv-1326 (KAD), 2019 WL 2238030, at *1 (D. Conn. May 23, 2019) (observing that, at the discovery stage, relevance is "an extremely broad concept").

The scope of discovery can also include "[a] variety of types of information not directly pertinent to the incident in suit."  Fed. R. Civ. P. 26 advisory committee's note to 2000 amendments.  For example, "[i]nformation about organizational arrangements or filing systems of a party" can also sometimes be discoverable "if likely to yield or lead to the discovery of admissible information."  *Id.*  And discovery has long encompassed information about "the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26 advisory committee's note to 2015 amendments (explaining that these words no longer appear in Rule 26(b)(1) only because "[d]iscovery of such matters is so deeply entrenched in practice that it is no longer necessary to clutter the long text of Rule 26 with these examples").  In short, the scope of discovery under Rule 26(b)(1) is "obviously broad" and "liberally construed."

*Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

When a discovery-seeking party moves to compel responses to its requests, it bears the burden to demonstrate that the requests are within the scope of Rule 26(b)(1).  As the Court has previously observed, "[t]he burden of demonstrating relevance initially rests with the party seeking discovery."  *Doe v. Wesleyan Univ.*, No. 3:19-cv-1519 (JBA) (TOF), 2021 WL 4704852, at *3 (D. Conn. Oct. 8, 2021) (citing *Bagley v. Yale Univ.*, 315 F.R.D. 131, 144 (D. Conn. 2016), *as amended* (June 15, 2016)).  "'Once the requesting party has made a *prima facie* showing of relevance,' however, 'it is up to the responding party to justify curtailing discovery.'"  *Id.* (quoting *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018)).  "Put differently, once the moving party shows that the requested information 'bears on, or reasonably could lead to other matter that could bear on, any issue' in the case, 'the party resisting discovery bears the burden of showing why discovery should be denied.'"  *Id.* (quoting *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009)) (brackets and ellipsis omitted).

### 2. *Undue burden and proportionality*

While the scope of discovery is broad, it is not unlimited.  As Judge Merriam has put it, "[t]he broad standard of relevance . . . is not a license for unrestricted discovery."  *DiPippa v. Edible Brands, LLC*, No. 3:20-cv-1434 (MPS) (SALM), 2021 WL 2201194, at *3 (D. Conn. June 1, 2021).  In particular, "[a] party may object to a relevant discovery request . . . if it is 'overly broad' or 'unduly burdensome.'"  *Sullivan v. StratMar Sys., Inc.*, 276 F.R.D. 17, 19 (D. Conn. 2011) (citing 7 James Wm. Moore *et al.*, *Moore's Fed. Prac.* ¶¶ 33.173[3]-[4] (3d ed. 2004)).  "To assert a proper objection on this basis, however, one must do more than 'simply intone the familiar litany that the interrogatories are burdensome, oppressive, or overly broad.'"  *Id.* (quoting

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petro. Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984)) (brackets omitted). Instead, the objecting party must "show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each . . . request or question is overly broad, unduly burdensome or oppressive." *Musante v. USI Ins. Servs., LLC*, No. 3:16-cv-799 (RNC) (DFM), 2017 WL 11446763, at *1 (D. Conn. May 11, 2017) (brackets and citation omitted). Of course, all discovery is burdensome in some degree, and the fact that compliance "may 'involve work, research and expense is not sufficient to render the request objectionable.'" *Mercer v. Rovella*, No. 3:16-cv-329 (CSH), 2022 WL 1514918, at *8 (D. Conn. May 12, 2022) (quoting *U.S. v. Nysco Labs., Inc.*, 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960)). The question under Rule 26 is not whether the discovery request is burdensome in some measure, but rather whether it is unduly so. Fed. R. Civ. P. 26(c)(1).

Discovery requests must be proportional to the needs of the case, *see* Fed R. Civ. P. 26(b)(1), and where the requests lack proportionality, the responding party may validly object. *E.g., Conservation L. Found. v. All-Star Transp., LLC*, No. 3:21-cv-201 (JBA) (TOF), 2022 WL 16901999, at *3 D. Conn. Nov. 11, 2022) (hereinafter "*All-Star*"). "Courts analyze the proportionality of a request by 'considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* (quoting Fed. R. Civ. P. 26(b)(1). "The proportionality analysis focuses on the marginal utility of the requested discovery." *Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co.*, No. 3:19-cv-839 (JCH) (RAR), 2020 WL 6074204, at *6 (D. Conn. Oct. 15, 2020); *see also Huseby*, 2021 WL 3206776, at *7. "[E]ven relevant information must be reasonably proportional to the value of the requested information,

the needs of the case, and the parties' resources." *Parimal v. Manitex Int'l, Inc.*, No. 3:19-cv-1910 (MPS) (SALM), 2021 WL 1978347, at *5 (D. Conn. May 18, 2021) (quoting *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS) (AKT), 2020 WL 2836787, at *2 (E.D.N.Y. May 29, 2020)).  Stated another way, "[t]he fact that particular information is relevant does not mean that its production will always be proportional to the needs of the case." *Elisa W. by Baricelli v. City of New York*, No. 15-cv-5273 (LTS) (HB), 2018 WL 6695278, at *2 (S.D.N.Y. Dec. 20, 2018).  "If relevance alone always rendered information discoverable, the proportionality limitation would be meaningless." *Id.*

Each party bears a burden with respect to proportionality.  "For example, 'a party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them.'" *All-Star*, 2022 WL 16901999, at *2 (quoting Fed. R. Civ. P. 26 advisory committee notes to 2015 amendments) (brackets omitted).  "Conversely, 'the responding party bears the burden on the 'burden and expense' element of the proportionality analysis.'" *Id.* (quoting *Huseby*, 2021 WL 3206776, at *8 n.3).  This burden is not met "simply by making a boilerplate objection that [the requested discovery] is not proportional." *Endurance Am. Spec. Ins. Co. v. Wm. Kramer & Assocs., LLC*, No. 3:18-cv-192 (MPS) (RAR), 2020 WL 6940761, at *7 (D. Conn. Mar. 30, 2020).  "To successfully resist discovery on grounds of undue burden or expense, the responding party ordinarily must 'submit affidavits or offer evidence revealing the nature of the burden.'" *All-Star*, 2022 WL 16901999, at *2 (quoting *Pegoraro v. Marrero*, 281 F.R.D. 122, 128-29 (S.D.N.Y. 2012)) (brackets omitted).

"District courts may, however, overlook the lack of an affidavit or other evidence when the requests are overly broad or unduly burdensome on their face." *Id.*  In *In re Kidd*, for example, a

litigant demanded production of "all Documents and Communications concerning or evidencing the official or unofficial control structure for each of" several related companies.  No. 3:20-cv-899 (KAD), 2020 WL 5594122, at *12 (D. Conn. Sept. 18, 2020).  The companies did not come forward with an affidavit explaining the burdens that compliance would entail, but Judge Dooley nevertheless agreed with them "that courts can limit discovery based upon a finding of facial overbreadth."  *Id.* at *11 (citing cases).  She therefore sustained their objection to the demand because compliance would "sweep in . . . all manner of organizational documents" and potentially "encompass an entirely unknowable universe of" materials.  *Id.* at *12.  Similarly, in *All-Star*, the plaintiff demanded that a school bus company produce "substantially all information and documents related to [its] vehicles, real estate, operations, employee job responsibilities, and environmental compliance efforts[.]"  2022 WL 16901999, at *3.  The Court held that it "[did] not need an affidavit to know that," in propounding such sweeping demands, "CLF has requested production of a significant percentage of all the documents the defendants created over the past seven years."  *Id.* at *3.  In summary, while an affidavit is ordinarily required to demonstrate undue burden or lack of proportionality, a court can sustain those objections without an affidavit when the request is plainly disproportionate and unduly burdensome on its face.  *In re Kidd*, 2020 WL 5594122, at *11; *All-Star*, 2022 WL 16901999, at *3.

### B.    Application to the Disputed Discovery Requests

Having set forth the applicable legal principles, the Court will now address the disputed discovery requests.  As noted above, both sides invite the Court to approach some issues on a blanket basis.  For example, CLF contends that the temporal scope of its discovery requests is proper in all instances (Motion at 24-27), while the Defendants argue that it "runs afoul of the relevance and proportionality requirements" of Rule 26.  (Opp'n at 31.)  CLF also gives blanket

treatment to those of its requests that are directed to the Defendants' potential liability as operators of the Terminal (Motion at 11-17), and the Defendants respond in kind. (Opp'n at 18-26.) Similarly, CLF takes a blanket approach to those of its requests that are directed to the Defendants' knowledge of climate change risks (Motion at 17-24), and the Defendants do too. (Opp'n at 26-31.) In this Section, the Court will discuss these broad claims. It will then address the individual interrogatories and requests for production in Section IV.C.

### 1.     *The temporal scope of CLF's requests*

In most of its interrogatories and requests for production, CLF sought information from "January 1, 2011 to present." (ECF Nos. 149-2 (requests for production); 149-3 (interrogatories).) In two of the sixty-five requests for production – RFP 1, which concerned document retention policies, and RFP 7, which concerned environmental monitoring at the Terminal – it sought documents going back to 2000. (ECF No. 149-2, at 5, 9.) Some requests did not state a time frame. (*E.g.*, RFP 12, ECF No. 149-2, at 14.)

The Defendants objected to the temporal scope of each request. (ECF No. 149-4, at 5.) During the Local Rule 37 meet-and-confer process, they evidently agreed to produce documents going back to January 1, 2011 in response to those requests directed to CLF's RCRA claims. (Aff. of A. St. Pierre, ECF No. 149-1, ¶ 56.) Yet with respect to those requests directed to the CWA claims, the Defendants agreed to go back no further than January 1, 2017. (*Id.*)

The parties' briefs revealed that they had been talking past each other on this issue. CLF initially interpreted the Defendants' opposition as being based on the five-year statute of limitation applicable to CWA claims, and since it filed this suit in July 2021, it argued that their position was untenable. (Motion at 24) ("At minimum, then, CLF is entitled to documents from all Defendants from at least July 2016."). CLF also argued that a statute of limitation does not bar discovery of

pre-limitation documents that are relevant to events within the limitation period. (*Id.* at 24-25) (citing, *inter alia, Hall v. Marriott Int'l, Inc.*, No. 3:19-cv-1715 (JLS) (AHG), 2021 WL 1906464, at *8 (S.D. Cal. May 12, 2021)). The Defendants' Opposition focused less on the statute of limitations than on the fact that the current Permit was issued in December of 2017. (Opp'n at 32.) They urge the Court to adopt their proposal as reasonable, because it encompasses not only the entire limitation period, but also nearly the entire year before. (*Id.* at 32.) In reply, CLF says (among other things) that "there is ample evidence that the Defendants Shell USA and Equilon directly participated in the operation of the Terminal prior to the transfer" of the Permit from Motiva. (Reply at 7.)

The Court agrees with CLF on the general proposition that information pre-dating a limitation period can sometimes be discoverable if relevant to the claims within the limitation period. While it can be "proper to deny discovery of matter . . . that occurred before an applicable limitations period," this is so only if "the information sought is [not] otherwise relevant to issues in the case." *Oppenheimer Fund*, 437 U.S. at 352. As Judge Haight has put it, "the statute of limitations of an underlying claim is not dispositive of the scope of admissible discovery related to that claim[.]" *Perez v. Lasership, Inc.*, No. 3:15-mc-31 (CSH), 2015 WL 11109330, at *5 (D. Conn. Sept. 18, 2015). But this general proposition only takes CLF so far, because it still bears the burden to show that pre-2017 portion of each request seeks relevant information. *Doe*, 2021 WL 4704852, at *3. The Court will address this issue in Section IV.C below.

### 2.    *Requests relating to operator liability*

CLF acknowledges that, to establish any Defendant's liability under the CWA or RCRA, it "must prove that the Defendant was either a permit-holder, owner, or operator of the Terminal." (Motion, at 11.) The Defendants say that Triton owns the Terminal, and Equilon holds the Permit.

(Opp'n, at 4.)  If so, the liability of Shell Oil and Shell Petroleum hinges on whether (among other things) they operated the facility at the relevant times.

In her decision on the Defendants' motion to dismiss, Judge Merriam explained some of the legal principles that will govern this inquiry.  She began with an analysis of *Bestfoods* – a case that, although it interpreted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), nevertheless has been held to "appl[y] to questions of RCRA and CWA liability."  *CLF III*, 628 F. Supp. 3d at 441 (quoting *CLF II*, 2022 WL 2353065, at *2 n.3).  In *Bestfoods*, the Supreme Court declined an invitation to hold that a parent corporation may be liable under CERCLA "as an operator of a polluting facility" merely because it "actively participated in, and exercised control over, the operations of a subsidiary[.]"  524 U.S. at 55.  The court then held, however, that "a corporate parent that actively participated in, and exercised control over, the operations *of the facility itself* may be held directly liable in its own right as an operator of the facility."  *Id.* (emphasis added).  Distilling these principles into a single sentence, the court stated that "the question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary."  *Id.* at 68; *see also CLF III*, 628 F. Supp. 3d at 442; *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 241 (D. Conn. 2009).

Judge Merriam then explained how the *Bestfoods* principle applied to the allegations of CLF's Amended Complaint.  She began by noting the allegation that "Shell [defined to encompass all defendants], acting through its officers, managers, subsidiary companies and instrumentalities, owns and operates the Terminal."  *CLF III*, 628 F. Supp. 3d at 442 (quoting Am. Compl., ECF No. 47, ¶ 106).  She also cited CLF's claim that the "Defendants are . . . responsible for the operation and maintenance of the Terminal, including compliance with the Permit."  *Id.* (quoting Am.

Compl., ECF No. 47, ¶ 121).  Moreover, CLF also "allege[d] that the parent companies maintain centralized climate change policies and strategies, which are 'binding on all companies in the Shell group.'"  *Id.* at 442 (quoting Am. Compl., ECF No. 47, ¶ 41).  "Construing these allegations in the light most favorable to plaintiff, it is reasonable to infer that such mandatory policies result in the parent companies' 'management, direction, or conduct of operations at the Terminal specifically related to the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'"  *Id.* (quoting *Pateley Assocs. I v. Pitney Bowes, Inc.*, 704 F. Supp. 2d 140, 146 (D. Conn. 2010)) (brackets omitted).  "Thus, at this early stage, these allegations 'state a plausible claim for direct liability under the standard enunciated in *Bestfoods.*'"  *Id.* (quoting *CLF II*, 2022 WL 2353065, at *2).

In its Motion, CLF says that it designed many of its discovery requests to explore the potential operator liability of Shell Oil and Shell Petroleum.  (Motion at 12) ("Most of CLF's discovery requests seek information relevant to proving operator liability for the Defendants[.]").  Some requests inquire about "Defendants' corporate structures," and others concern "actions Defendants have taken at the Terminal itself," and CLF says that these two classes of request "fall squarely within" the scope of what "this Court found relevant to operator liability under the *Bestfoods* test."  (*Id.*)  A third class of requests concerns "mandatory, centralized approaches and processes to define, evaluate, and address risks to the physical infrastructure of Shell companies' facilities[.]"  (*Id.* at 13.)  In CLF's view, this third class is likewise "relevant to the claims in this case" as they stand after the decision on the motion to dismiss.  (*Id.* at 13-14.)

The Defendants respond that "[t]he question of who operates the New Haven Terminal for purposes of CLF's CWA claims should be one of the simplest factual inquiries in this case."  (Opp'n at 18.)  In their view, the Permit imposes obligations on the permit-holder, and the permit-

holder is Equilon; they therefore suggest that an inquiry into the other Defendants should not have left the starting block. (*Id.*)  Furthermore, they contend that an inquiry into the Shell Group's overall corporate structure is irrelevant to the *Bestfoods* analysis. (*See* ECF No. 149-4, at 6; Opp'n at 21 n.77.)  Allowing, however, that CLF has "mount[ed] an argument that the other Defendants also operate the Terminal for purposes of the General Permit," they say that the "have already produced all the information that could be relevant to that question." (*Id.*)  They argue that "[a]ll that remains are Defendants' documents that are *not* about the New Haven Terminal's operations, and that information has no bearing on operator liability for the New Haven Terminal." (*Id.* at 21-22) (citing *Yankee Gas*, 616 F. Supp. 2d at 240).

If that were all there was to this dispute, it would be easily resolved in the Defendants' favor.  Corporate policies and procedures that do not govern operations at the Terminal are not relevant to the operator liability dispute in the Rule 401 sense, because CLF's claims will turn on the Defendants' "participation in the activities of the facility, not the subsidiary." *Bestfoods*, 524 U.S. at 68.  And the Court does not read Judge Merriam as having said otherwise; while she did cite CLF's allegations about "centralized" and "binding" "climate change policies and strategies," she specifically connected them to the question of "management, direction, or conduct of operations *at the Terminal.*" *CLF III*, 628 F. Supp. 3d at 442 (emphasis added) (brackets and quotation marks omitted).  Indeed, CLF concedes that it "carries the burden of proving that the defendant[s] 'actively participated in, and exercised control over, the operations of the facility itself.'" (Motion at 11) (quoting *CLF III*, 628 F. Supp. 3d at 442).  To the extent that it now contends that Judge Merriam authorized an inquiry into "centralized approaches and processes to define, evaluate, and address risks to the physical infrastructure" of *all* "of Shell companies' facilities" beyond the Terminal (*id.* at 13), the Court disagrees.  To be relevant to operator liability,

the policy or procedure must govern operations at the Terminal.  *See CLF III*, 628 F. Supp. 3d at 442.

This is not the only question raised by the parties' dispute, however.  They also evidently disagree on *whose* policies and procedures are discoverable.  CLF says that it should be permitted to discover not only the Defendants' policies and procedures, but also the policies and procedures of their ultimate corporate parent – the non-party Shell plc – because "whether Defendants or their parent corporations have policies regarding climate or severe weather adaptation for infrastructure like the Terminal, and whether or not those policies were applied to the Terminal, goes directly to who controlled operations at the Terminal."[5]  (Motion at 13-14.)  CLF also argues that Shell plc's policies will address the question of "whether any necessary parties have not been joined to this action."  (*Id.* at 15.)  For their part, the Defendants regard CLF's pursuit of this information not as part of a genuine effort to determine the liability of any current party, but rather as an "attempt[] to establish" Shell plc "as an operator."  (Opp'n at 22.)  They argue that "[t]his argument is baseless and it is yet another transparent fishing expedition targeting Shell plc."  (*Id.*)

To the extent that the Defendants are arguing that Shell plc's policies and procedures are entirely off limits, the Court disagrees.  It was the allegations about Shell plc's policies, not the

---

[5]     CLF's Motion concerns interrogatories served on the party Defendants under Rule 33 and requests for production served on the party Defendants under Rule 34 (*see* ECF Nos. 149-4, 149-5), not a subpoena served on the non-party Shell plc under Rule 45.  CLF therefore does not contend that Shell plc had any obligation to produce these materials directly.  (*See generally* Motion at 13-17.)  Yet Rule 34 encompasses not only those documents that a party legally owns or physically possesses, but also those documents that are within its "custody" or "control."  Fed. R. Civ. P. 34(a)(1).  And "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007).  Thus, the Court regards CLF as having demanded that the *Defendants* produce those of Shell plc's policies and procedures that are in the *Defendants'* possession, custody, or control, as those terms have been interpreted in the Second Circuit.

Defendants' policies, that caused Judge Merriam to conclude that CLF had pled a plausible claim of operator liability with respect to the current Defendants. *CLF III*, 628 F. Supp. 3d at 442. In particular, Judge Merriam cited paragraph 41 of the Amended Complaint, in which CLF alleged that "Shell plc sets policies that are binding on all companies in the Shell group." *Id.*; (*see also* Am. Compl., ECF No. 47, ¶ 41). She also cited paragraphs 42 and 43, which respectively alleged that "Shell plc sets policies that are binding on all companies in the Shell group," and "Shell plc sets climate change policies and strategies for the entire Shell group of companies." *Id.*; (*see also* Am. Compl., ECF No. 47, ¶¶ 42-43). Some inquiry into Shell plc's policies is therefore relevant to CLF's claims as framed by the decision on the motion to dismiss.

To say that the inquiry is relevant is not, however, to say that it possesses high marginal utility. Certainly, the Defendants' own policies, procedures, and interactions with the Terminal are more probative of their operator liability under the *Bestfoods* test than those of an ultimate corporate parent. And to the extent that the requests are premised on to Shell plc's potential operator liability, as opposed to the current Defendants' (*cf.* Motion at 15) (premising requests in part on the need to determine "whether any necessary parties have not been joined"), they are not relevant to the extant claims at all. It is well established that the "purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists." *Abrahams v. Young & Rubicam*, 979 F. Supp. 122, 129 (D. Conn. 1997) (quoting *Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991)).

The Court will therefore review those interrogatories and requests for production that are premised on the Defendants' alleged operator liability under the following principles. First, the requests will be deemed relevant to the extent that they inquire about the Defendants' participation in or control over the activities of the Terminal. A broader inquiry into "centralized approaches

and processes to define, evaluate, and address risks to the physical infrastructure of Shell companies' facilities" generally (Motion at 13) – that is, beyond those that govern the Terminal – is not supported by CLF's operator liability claims.  Second, some inquiry into those of Shell plc's policies and procedures that govern the Defendants' activities at the Terminal is relevant to CLF's operator liability claims considering Judge Merriam's disposition of the motion to dismiss.  Third, while that inquiry is relevant in the Rule 401 sense, its level of marginal utility will affect the proportionality analysis.  *Conn. Mun. Elec. Energy Coop.*, 2020 WL 6074204, at *6 ("The proportionality analysis focuses on the marginal utility of the requested discovery."); *All-Star*, 2022 WL 16901999, at *3 (denying motion to compel where movant had "not shown that the requested information would have much marginal utility").

### 3.    Requests directed to the Defendants' knowledge of climate change risks

CLF designed many of its discovery requests to explore the "Defendants' knowledge of the risks to infrastructure from climate change and severe weather."  (Motion at 17.)  It breaks these requests into four sub-classes.  (*Id.*)  First are those requests that concern "what actions, if any, [the Defendants] have taken to address the risks climate change and severe weather pose to the Terminal."  (*Id.*) (citing Interrogatories 2-4, 6 and Requests for Production 8, 9, 11, 16).  Second are those that explore "any history of analysis of storm and flooding risk, environmental monitoring, infrastructure failure, or discharges at the Terminal and Defendants' corresponding actions."  (*Id.*) (citing Interrogatories 1, 5, 7, 10 and Requests for Production 7, 23, 31, 33-42, 45-50, 52, 54, 57-60).  Third are the requests that inquire about "damage to other facilities owned or operated by Defendants caused by severe weather and storms and how Defendants' [*sic*] plan for and respond to such events."  (*Id.*) (citing Interrogatory 9 and Requests for Production 24, 27-28, 63-64).  Fourth and finally, some requests inquire after "Defendants' knowledge of the risks of

climate change and severe weather to infrastructure" generally.   (*Id.*) (citing Requests for Production 10, 12-22, 24-26).   CLF argues that "[e]ach of these categories of requests relate directly to [its] claims that Defendants' failure to prepare the Terminal for climate change and severe weather impacts will result in discharge of toxic pollutants into the environment."  (*Id.*)

In response, the Defendants argue that their knowledge of climate change is not relevant to any extant claim.  (Opp'n at 26.)  They point out that there are only two elements to liability under the CWA's citizen suit provision – first, the defendant must be a "person," and second, it must be "in violation of an effluent standard or limitation, or order from EPA or a state."  (*Id.*) (citing 33 U.S.C. § 1365(a)).  They add that RCRA's citizen suit provision has essentially the same two elements.  (*Id.*) (citing 42 U.S.C. § 6972(a)).   Conceiving of CLF's claims as "up-or-down questions of compliance" that ask only whether "the Terminal is in violation of the General Permit and RCRA or not," they reason that "[w]hat Defendants or their corporate parents or affiliates may have known about climate change and when does not affect the answer to these questions."  (*Id.*)

The parties' dispute over the relevance of the Defendants' knowledge of climate change risks manifests itself in their discussion of "best management practices" and "best industry practice" under the Permit – and to understand that discussion, it will be useful to set out some of the Permit's terms.  To begin with, the Permit requires most businesses seeking to discharge stormwater into surface waters or a sewer system to implement "control measures."  (ECF No. 248-5, § 5(b).)  It then describes "control measures" as "required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility," and it defines "minimize" as "[to] reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."  (*Id.*)  After setting forth these terms, the Permit

then lists thirteen specific activities that constitute "control measures," including "maintain[ing] a clean, orderly facility," "investigat[ing] the need for stormwater management or treatment practices that shall be used to divert, infiltrate, reuse, or treat stormwater runoff in a manner that minimizes stormwater discharges from the site," and "implement[ing] a preventive maintenance program." (*Id.*)

The parties have dramatically different views about the role of the terms "best management practices" and "best industry practice" in interpreting the Permit, and by extension they have dramatically different views of what discovery would be relevant to CLF's Permit-based CWA claims. CLF says that the term "best management practices" encompasses all practices that "'reduce and/or eliminate' the discharge of pollutants 'to the extent achievable using control measures that are technologically available and economically achievable in light of best industry practice." (Motion at 18.) Under this view, preparing the Terminal for the effects of climate change might qualify as a "best management practice" if doing so is technologically and economically practicable given "best industry practice" – and, by negative implication, *failing* to prepare the Terminal would constitute a violation of the Permit. (*See id.*) The Defendants, by contrast, argue that the thirteen listed "control measures" are exclusive. (Opp'n at 27.) They say that there is "no discovery required on this point" because the best management practices "required by the General Permit are listed in the permit itself."[6] (*Id.*)

As with the operator liability issue, CLF observes support for its position on the knowledge-of-climate-risks issue in Judge Merriam's decision on the motion to dismiss. (Motion

---

[6]     Indeed, this disagreement is a principal point of contention in a pending motion for partial summary judgment that the Defendants filed on June 13, 2023. (*Compare* Memo. of L. in Supp. of Defs.' Mot. for Partial Summ. J., ECF No. 248-1, *with* Pl's Opp'n to Defs.' Mot. for Partial Summ. J., ECF No. 260.)

at 18.)  The Defendants had moved for dismissal partly on the ground that, in seeking to hold them liable "for failing to consider and act upon information concerning sea level rise and changes in the risks posed by storm surge, flooding, and other inundation," CLF was not enforcing the Permit as it existed but was instead attempting to expand it beyond its scope.  (ECF No. 50-1, at 30-32.) But Judge Merriam rejected that claim, holding that "[t]he allegations of the Amended Complaint do not seek to hold defendants liable *beyond* what is required by the Permit."  *CLF III*, 628 F. Supp. 3d at 449.  Rather, "[a]s was true in *CLF II*, plaintiff's claims here 'entail interpreting the Permit – asking, for example, whether' Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change, including rising tides and catastrophic storms."  *Id.* (quoting *CLF II*, 2020 WL 5775874, at *3).  The Defendants disagree that this statement renders their knowledge of climate change relevant, because it "does not augment the nature of CLF's claims, which are still site-specific permit and RCRA claims."  (Opp'n at 29.)

The parties' dispute over the relevance of the Defendants' knowledge of climate change risks also manifests itself in their discussion of CLF's "disclosure claims."   In Count III of its Amended Complaint, CLF alleges that the Defendants violated the CWA by failing to disclose those risks, along with "the reasonably foreseeable substantial risks of pollutant discharges associated with" them, when it certified its SWPPP to its regulators.  (Am. Compl., ECF No. 47, ¶ 410.)  In Count VIII, it alleges that in withholding their developing "knowledge of the extreme conditions caused by climate change," the Defendants failed in their ongoing duty under the Permit to correct their SWPPP submission as new information becomes available.  (*Id.* ¶¶ 438-41.) Relatedly, in Count IX CLF asserts that the Defendants violated the CWA when they failed to amend or update their SWPPP "based on information known to [them] regarding" climate change risks.  (*Id.* ¶ 445.)  And in Count XIII, CLF says that the Defendants violated RCRA when their

"failure to adapt the Terminal" to account for those risks "put[] the facility, the public health, and the environment at substantial and imminent risk of pollutant discharges and/or releases[.]"  (*Id.* ¶ 498.)  Citing these counts, CLF argues (among other things) that "the depth of Defendants' knowledge of climate change and severe weather impacts, such as sea level rise and increased frequency of severe storm events, and the risks of those impacts to infrastructure including the Terminal is probative" not only of "what Defendants were required to do to prevent unauthorized discharges or releases," but also of "what Defendants were required to disclose to regulatory authorities." (Motion at 23.)

Here, too, the Defendants disagree.  They begin by claiming that "CLF has made no disclosure claims" (Opp'n at 29), but this is of course inaccurate; it did so in Counts III, VIII and IX at a minimum.  Evidently, what they really mean is that CLF has not made a *meritorious* disclosure claim.  (*Id.* at 30.)  Pointing out that "[c]limate change is no secret to anyone," they argue that none of the Permit provisions referenced in Counts III, VIII, IX or XIII "could possibly be interpreted to require disclosure of the information that CLF is claiming." (*Id.*)  They add that it would be "far-fetched for CLF to contend that" its regulators "would require every stormwater permittee to provide such a volume of information that is unrelated to [the] facility it is permitting." (*Id.*)

Having carefully considered the matter, the Court concludes that CLF has the better side of the argument on the general question of whether the Defendants' knowledge of certain climate change risks is relevant to CLF's claims.  The Defendants' counterarguments are essentially challenges to the merits of those claims, and as noted above, "a party may not typically object to relevant discovery on the ground that it believes its opponent's case to be meritless."  *Huseby*, 2021 WL 3206776, at *7; *see also Admiral Ins. Co. v. Versailles Med. Spa, LLC*, No. 3:20-cv-568

(JCH) (TOF), 2021 WL 106273, at *3 (D. Conn. Jan. 12, 2021) ("[I]t is well established that discovery ordinarily should not be denied because it relates to a claim or defense that is being challenged as insufficient.") (citation and quotation marks omitted); *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.*, No. 90-cv-7811 (KC) (JCF), 1993 WL 437767, at *3 (S.D.N.Y. Oct. 26, 1993) (observing that "a discovery motion is not the proper forum for deciding the merits of" the claim). CLF says that the Permit requires "best industry practice," which in turn requires hardening the Terminal against climate change risks (Motion at 18); and it says that the Defendants were obliged to disclose those risks both in the application process and during the pendency of the Permit. (*Id.* at 23.) The Defendants disagree with these claims, but if a responding party "desires to contest the legitimacy of its opponent's claim, it should do so with the appropriate motion." *Arkwright Mut. Ins. Co.*, 1993 WL 437767, at *3. "Unless and until such a motion is made and granted . . . the opponent is entitled to discover information relevant to its claim." *Huseby*, 2021 WL 3206776, at *7. Stated another way, "[n]o party possess[es] the unilateral ability to dictate the scope of discovery based on their own views of the parties' respective theories of the case." *Xchange Telecom Corp. v. Sprint Spectrum L.P.*, No. 14-cv-54 (GLS) (CFH), 2015 WL 773752, at *3 (N.D.N.Y. Feb. 24, 2015) (quoting *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014)) (quotation marks omitted).

As also noted above, however, the Court's task on a motion to compel is not to decide general questions or give advisory opinions on the discoverability of broad classes of information. Rather, Rule 37 authorizes CLF to "move for an order compelling an answer . . . [or] production" to specific interrogatories served under Rule 33 or specific requests for production served under Rule 34. Fed. R. Civ. P. 37(a)(3). Determining whether a specific request merits the strong medicine of a court order requires consideration not only of its logical relevance under Rule 401,

but also of its breadth, burdensomeness, and proportionality to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 26(c)(1).  In this case, many of CLF's requests are grossly overbroad, unduly burdensome, and disproportionate, as will be discussed next.

### C.     The Individual Discovery Requests

The Court has carefully reviewed each of the eleven contested interrogatories and sixty-four contested requests for production, along with the Defendants' responses and objections.  For those discovery requests to which the Defendants objected on grounds of overbreadth or undue burden, the Court has also carefully weighed what the Contreras declaration says about the burden – and, when the declaration is silent about a particular request, it has evaluated whether the overbreadth or burden is so facially obvious as to excuse the omission.  And for each request to which the Defendants objected on lack-of-proportionality grounds, the Court has considered "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).  Having weighed all these considerations, the Court rules on the requests as follows.

### *1.      Requests for production as to which relief will be granted*

CLF is entitled to relief on RFPs 1 through 5, 30, 35, 55, 56, 62, and 65.  In RFP 1, CLF sought production of "[a]ll document or record retention policies applicable to the operations and remediation efforts at the Terminal from 2000 through present."  (ECF No. 149-4, at 5.)  The Defendants objected to the temporal scope of the request (*id.*), but this is one instance in which pre-2017 documents could be relevant to the extant claims; if, say, a 2005 policy required the retention of a certain record for twenty years, it would "inform what documents Defendants can

be expected to have" during the period at issue, as CLF points out.  (Motion at 26.)  The Defendants also objected on the ground that "the effort to locate and produce policies regarding the Terminal's operations from 2000 is not proportional to the needs of the case" (ECF No. 149-4, at 5), but this claim is neither supported by the Contreras declaration nor obvious from the language of the request, particularly given that it is limited to document or record retention policies in effect at the Terminal.  The Defendants' objections to RFP 1 are overruled.

In RFP 2, CLF sought "[d]ocuments sufficient to show Defendants' corporate structure (including all parent companies and subsidiary companies) and relationships between the Defendants, including but not limited to organizational charts."  (ECF No. 149-4, at 6.)  The Defendants objected on lack-of-relevance grounds (*id.*), and to be sure, the question of whether one company in the Shell family controls another is not a directly relevant inquiry under the *Bestfoods* test.  524 U.S. at 55 ("[T]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility[.]").  But it may be a link in the chain of that inquiry, and as such, it is sufficiently relevant to support the minimal burden imposed by this request.  Importantly, CLF has not requested "all documents" relating to corporate structure in RFP 2, but rather only "documents sufficient to show" that structure.  *See Hedgeye Risk Mgmt., LLC v. Dale*, No. 21-cv-3687 (ALC) (RWL), 2023 WL 4353076, at *2 (S.D.N.Y. July 5, 2023) (distinguishing, for proportionality purposes, requests demanding "all documents" from requests seeking "documents sufficient to show" a particular fact).  Presumably this can be accomplished by the production of a few organizational charts.  And the burden is further reduced by the fact that CLF has not shown the relevance of corporate structure documents and organizational charts pre-dating 2017; thus, the Defendants need only produce documents "sufficient to show" corporate structure from 2017 onward.  CLF's Motion will therefore be granted in part and denied in part with respect

41

to RFP 2; the Defendants will be directed to respond to the request from 2017 forward if they have not done so already.

In RFP 3, CLF requested "[d]ocuments sufficient to show ownership (including but not limited to deeds and title) of the Terminal, including Documents concerning the transfer of ownership of the Terminal at all times during which Defendants or their subsidiaries had any ownership interest." (ECF No. 149-4, at 7.)  RFP 4 sought "[d]ocuments sufficient to show the management structure of the Terminal, including all individuals who hold supervisor and/or managerial roles."  (*Id.*)  And in RFP 5, CLF requested "[d]ocuments sufficient to show the operators of the Terminal."  (*Id.* at 8.)  These requests plainly seek relevant discovery, and any claim of burden or lack of proportionality is adequately addressed by the "sufficient to show" formulation.  But here too, CLF has not shown the relevance of pre-2017 documents.  The Defendants will therefore be ordered to respond to RFPs 3, 4, and 5 from 2017 onward, to the extent that they have not already done so.

RFPs 30, 35, 55, and 56 concern CLF's RCRA claims.  RFP 30 sought "[a]ll [RCRA] permits, permit applications, and technical filings for the Terminal."  (*Id.* at 30.)  RFP 35 sought "[d]ocuments sufficient to show all locations where hazardous waste is generated, transported, and/or stored at the Terminal."  (*Id.* at 40.)  RFP 55 requested production of "[d]ocuments sufficient to show the Terminal's RCRA generator status at all times since 2011" (*id.* at 53), and RFP 56 sought "[d]ocuments sufficient to show the types and amounts of RCRA wastes generated, stored, and transported from the Terminal."  (*Id.* at 54.)  The Defendants objected to the temporal scope of some of these requests (*e.g., id.* at 37, 41), but they now acknowledge that "CLF's default time period of 2011" is appropriate for those requests directed exclusively to the RCRA claim.  (Opp'n at 32.)  And they objected to some on grounds of overbreadth, undue burden, and lack of

42

proportionality (*e.g.,* ECF No. 149-4, at 41), but these objections are adequately addressed by the "sufficient to show" formulation.  The Defendants will be directed to comply with these four requests.

RFP 61 sought production of any insurance policy that "covers or may cover the claims asserted in this Matter."  (ECF No. 149-4, at 57.)  The Defendants did not object, but in their response, they stated that the had "not identified" any such policies.  (*Id.*)  Yet when CLF requested in RFP 62 that the Defendants produce "[a]ll Documents reflecting a claim against or a request for coverage under" an insurance policy, the Defendants objected on grounds of overbreadth, undue burden, lack of proportionality, attorney-client privilege, and attorney work product.  (*Id.*)  The Court is unable to make sense of these two responses, because if there is no insurance policy, there is no claim or request for coverage.  The Defendants' non-privilege objections to RFP 62 are therefore overruled.  If there are no responsive documents, the Defendants shall so state; and if there are responsive, privileged documents, the Defendants shall identify them on a privilege log.

Finally, RFP 65 sought "[a]ll Documents relied on in preparing, or referred to in, their answers to Plaintiff's Interrogatories."  (*Id.* at 59.)  The Defendants objected on the ground that "'All Documents Defendants relied on' is on its face overbroad, unduly burdensome and not proportional to the needs of the case," and on grounds of attorney-client privilege and work product.  But this sort of interrogatory is "unexceptional."  *Charter Practices Int'l, LLC v. Robb*, No. 3:12-cv-1768 (RNC) (DFM), 2014 WL 273855, at *4 (D. Conn. Jan. 23, 2014).  "Certainly, documents identified and relied upon in answering the interrogatories are relevant and not so overly broad as to preclude production."  *Ruran v. Beth El Temple of W. Hartford, Inc.*, 226 F.R.D. 165, 168 (D. Conn. 2005).  The Defendants' non-privilege objections to RFP 65 are overruled, and any responsive, privileged documents shall be identified on a privilege log.

### 2. *Requests for production as to which relief will be denied*

CLF is not entitled to relief on RPFs 7, 8, 9, 10, 12, 13, 18, 25, 26, and 54 because the Contreras declaration adequately supports the Defendants' overbreadth, undue burden, and proportionality objections. RFP 7, for example, sought "[a]ll contracts and related Documents, including relevant scope(s) of work, related to environmental monitoring, sampling, analysis, and/or assessment at the Terminal from 2000 to present." (ECF No. 149-4, at 9.) CLF says that this request is relevant to both its operator liability claims and its claim that the Defendants have not sufficiently hardened the Terminal against climate change (Motion at 12, 17), and the Court agrees on at least the first point; whether a particular Defendant contracted for, say, environmental monitoring work at the Terminal is relevant to the question of whether it operated the Terminal. But Mr. Contreras explains that when the Defendants ran preliminary search terms to respond to the same request in the Rhode Island Case, the search returned 1,213,742 items. (ECF No. 177-7, ¶ 23.c.) He adds that 1,213,742 electronic items, if printed, could be expected to fill 1,135 bankers' boxes with 3,003,325 documents. (*Id.*) Of course, the item and document counts might be different in this case than in the Rhode Island Case, and the number of items might be substantially reduced by the culling process described elsewhere in his declaration. (*See* discussion, Section III.C *supra*.) But the Court is nonetheless satisfied that this request is overbroad, unduly burdensome, and disproportionate, even considering the proportionality factors that favor disclosure.

To cite other examples, Mr. Contreras's declaration explains that a preliminary search for documents responsive to RFPs 8 and 9 in the Rhode Island Case returned 225,106 items that (if printed) would likely fill 351 bankers' boxes. (ECF No. 177-7, ¶ 23.b.) Searches for materials responsive to the Rhode Island analog to RFPs 25 and 26 yielded 237.87 gigabytes of data, the

equivalent of 233 boxes of documents.  (*Id.* ¶ 23.a.)  With the analog to RFP 54, the tally was 415.45 gigabytes, or 351 boxes.  (*Id.* ¶ 23.d.)  In coming forward with a declaration containing these figures, the Defendants have adequately supported their overbreadth, undue burden, and proportionality objections to these requests.

Tellingly, CLF has not confirmed that it would read all these documents even if the Defendants produced them.  It conceded at oral argument that if a complete production included as many documents as Mr. Contreras predicts, it would not read them all but would instead "apply[] search terms" and "use some predictive analytics" to "start culling them down."  (Hrg. Tr., ECF No. 201, at 8:17-11:15.  But litigants should not request more documents than they plan to read, *cf. Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 938 (2d Cir. 1989) (sanctioning attorney for requesting documents to support expert analysis despite knowing that the expert would not use them), and when they do, their requests are almost certainly overbroad.  The Defendants' overbreadth, undue burden, and proportionality objections to RFPs 7, 8, 9, 10, 12, 13, 25, 26, and 54 are sustained.

CLF is not entitled to relief on the remaining requests for production because they are facially overbroad, unduly burdensome, and disproportionate to the needs of the case.  Almost all these requests ask for "[a]ll documents" "related to" broad subject areas, with "relate[d]" defined as "concerning, constituting, defining, embodying, identifying, reflecting, referring to, stating, or dealing with in any way."  (ECF No. 149-2, at 5.)  Any production request that begins this way is immediately suspect, because starting a request "with 'All Documents' or 'All Communications' . . . often is a red flag for overbreadth and undue burden."  *Hedgeye Risk Mgmt.*, 2023 WL 4353076, at *2; *see also S.E.C. v. Ahmed*, No. 3:15-cv-675 (JBA), 2018 WL 1541902, at *2 (D. Conn. Mar. 29, 2018) ("A large portion of the document requests seek the production of 'all documents'

relating to various issues.  Courts have often found that such blanket requests are overbroad and impermissible.").  In *Gropper v. David Ellis Real Estate, L.P.*, for example, the plaintiff demanded production of "any and all documents concerning, or that otherwise describe, evidence, or refer to, the number of" people employed by the defendant.  No. 13-cv-2068 (ALC) (JCF), 2014 WL 518234, at 4 (S.D.N.Y. Feb. 10, 2014).  Although "the number of the defendants' employees" was clearly relevant to the plaintiff's Americans with Disabilities Act claim, "the request for 'any and all' documents concerning that subject [was] inherently overbroad."  *Id.*

Moreover, each of these requests is facially overbroad and disproportionate to the needs of the case – sometimes spectacularly so.  Take, for example, RFP 6, which sought production of "[a]ll Documents related to corporate control of any activities at the Terminal, including policies governing Defendants' corporate interactions with each other and any parents and subsidiaries." (ECF No. 149-4, at 8.)  When considered alongside the temporal scope of the request and CLF's broad definition of "relate," RFP 6 essentially asks for all documents constituting interactions between the Defendants, or between them and their parents, over the past twelve years.  Every e-mail between Shell Oil or Shell Petroleum on the one hand, and Shell plc on the other, would be included.  A broader request is hard to imagine.  In *In re Kidd*, Judge Dooley sustained a facial overbreadth objection to a request seeking "all Documents and Communications concerning or evidencing the official or unofficial control structure" from a small hedge fund.  2020 WL 5594122, at *11-12.  CLF's RFP 6 is even broader, and more objectionable.

Other examples abound.  RFP 17 sought "[a]ll Documents related to the work of Shell's Metocean Team and any Metocean Advisors," and RFP 18 sought "[a]ll documents related to the work of Shell's global Soil & Groundwater Team."  (ECF No. 149-4, at 24.)  Requests for "all documents" "related" to the work of two entire business units, anywhere in the world, are facially

overbroad and disproportionate to the needs of the case. RFP 21 sought "[a]ll Shell sustainability reports and associated Documents;" as written, this request would seem to encompass virtually all the Defendants' documents on the topic of sustainability, anywhere in the world, whether relevant to the Terminal or not. (*Id.* at 28.) RFP 32 sought "[a]ll communications with the State of Connecticut or the City of New Haven regarding the Terminal" without any limitation (*id.* at 39), thus encompassing such irrelevant communications as property tax bills, unemployment insurance claims for Terminal employees, and so forth. RFP 42 sought "[a]ll Documents related to Defendants' policies and practices regarding Terminal employee training, and employee supervision and monitoring" (*id.* at 45) – which would cover, among many other things, every employee performance appraisal irrespective of whether that employee was involved in managing flooding and storm surge risks.

Some requests present closer calls. RFP 23, for example, sought "[a]ll Documents related to changes in physical infrastructure at the Terminal." (*Id.* at 30.) Because it is limited to the Terminal, it is less obviously burdensome and less obviously disproportionate to the needs of the case. But in requesting "all documents" regarding *any* change to physical infrastructure, it nonetheless exceeds the scope of relevant inquiry in this matter. As written, it would encompass infrastructure changes having no potential effect on flooding or storm surge risk, such as painting a tank a different color, replacing an exterior ladder, and so forth. Similarly, RFP 29 sought "[a]ll Clean Water Act permits, permit applications, and technical filings for the Terminal," and it might have been unobjectionable had CLF not gone on to request all "related Documents." (*Id.* at 36.) That addition renders the request overbroad and disproportionate. CLF is entitled to relief only on RFPs 1 through 5, 30, 35, 55, 56, 62, and 65.

### 3. Interrogatories

In contrast to its requests for production, CLF's interrogatories are generally limited to the Terminal. Interrogatory 1, for example, asked the Defendants to "[d]escribe all analyses [they] have done of past and current conditions regarding, and changes or potential changes in, the frequency or severity of storms, the quantity of precipitation, and/or the risk of flooding at the Terminal." (ECF No. 149-5, at 5.) Interrogatory 2 asked for a description of "all analyses . . . of the impacts or potential impacts – including past, current, and future impacts – of climate change on the Terminal." (*Id.* at 6.) Interrogatory 9 is an exception; it asked the Defendants to "[d]escribe how [they] make decisions concerning preparation for severe weather and/or climate change and associated impacts, including rising sea levels, at all coastal facilities [they] own or operate." (*Id.* at 16.)

The Defendants generally responded to the interrogatories by objecting on grounds of overbreadth, undue burden, proportionality, and improper temporal scope, and then answering nevertheless. (*E.g., id.* at 5.) For example, in response to Interrogatory 1's request for a description of their analyses of conditions at the Terminal, Shell Oil and Shell Petroleum stated that they neither own nor operate the facility and, therefore, "have no information responsive to this Interrogatory." (*Id.*) Equilon, Triton and Motiva responded that they do not conduct such analyses, but instead "look to scientific and regulatory entities such [as] the Federal Emergency Management Agency" and others. (*Id.*) Similarly, in response to Interrogatory 3's request for a description of "all ways in which You have taken climate change, global warming, the greenhouse effect or greenhouse gases . . . into consideration in designing and operating the Terminal," Shell Oil and Shell Petroleum disclaimed having any responsive information, but Equilon, Triton, and Motiva provided a two-and-a-half-page answer. (*Id.* at 8-10.)

48

The Court declines to grant any relief to CLF on Interrogatories 1 through 10. Such broad questions are generally better suited for a deposition than an interrogatory. *See, e.g., Bokina v. Whitcraft LLC*, No. 3:08-cv-1223 (WWE) (HBF), 2010 WL 2584757, at *1 (D. Conn. June 21, 2010) (denying motion to compel additional answers to interrogatory seeking "each and every performance weakness" of a former employee on the ground that it was "better answered through [deposition] testimony").

CLF is, however, entitled to some relief on Interrogatory 11. That interrogatory asked the Defendants to "[i]dentify each of Your employees whose work relates to engineering, design, emergency preparedness, and/or environmental compliance at the Terminal, including but not limited to consultants, advisors, and policy- and decision-makers," with "relate" defined as broadly as it was defined in the requests for production, and with "You" defined to include the Defendants' "corporate parents, subsidiaries, or affiliates." (ECF No. 149-3, at 3, 5, 8.) The Defendants are correct that this is facially overbroad, since it would require identification of (say) a Shell plc engineer in far-off Brunei if her work somehow "related" to the Terminal under CLF's broad definition of that term. At the same time, CLF is entitled to know who works on engineering, design, emergency preparedness etc. *specifically at the Terminal*, and the Defendants' answer is unclear about whether all such people have been named. The Court will order them to do so.

## V. CONCLUSION AND ORDER

For the foregoing reasons, CLF's Motion is granted in part and denied in part, and the Court orders as follows:

A.    CLF shall identify to the Defendants up to fifty documents in which its ability to understand the unredacted information has been compromised by the redaction of information withheld under a claim of non-responsiveness or confidentiality – that is, not under a claim of

attorney-client privilege or work product protection. The Defendants shall produce the documents so identified in unredacted form within fourteen days of the identification. If the Defendants believe that any of the information so disclosed qualifies as confidential under the terms of the Standing Protective Order (ECF No. 7), they may designate it as such, provided that they follow the order's procedures for making such designations.

B.   The Defendants shall re-serve responses to CLF's document production requests that:

1.   state, for each objection, whether responsive materials are being withheld pursuant to that objection; and

2.   identify by Bates number or Bates range the documents that are responsive to each request.

C.   The Defendants shall comply with Requests for Production 1, 2, 3, 4, 5, 30, 35, 55, 56, 62, and 65. For Requests for Production 2, 3, 4, 5, 30, 35, 55, 56, 62, and 65, they may limit their compliance to documents from the period January 1, 2017 to the present. If the Defendants contend that any documents responsive to Requests for Production 62 or 65 are protected by the attorney-client privilege or work product doctrine, they shall log the documents on a privilege log meeting the requirements of D. Conn. L. Civ. R. 26(e).

D.   The Defendants shall serve a revised response to Interrogatory 11 that identifies all persons whose work, from January 1, 2017 to the present, specifically concerned engineering, design, emergency preparedness, and/or environmental compliance at the Terminal.

E.   CLF's Motion is denied with respect to all other interrogatories and requests for production. Where the Court has held that a particular interrogatory or request for production seeks relevant information, but denied relief on grounds of undue burden, overbreadth, or lack of

proportionality, the denial is without prejudice to more narrowly tailored and targeted discovery into the subject matter of that interrogatory or request for production.

F.      Unless otherwise stated, compliance with the foregoing shall be made by September 5, 2023.  D. Conn. L. Civ. R. 37(d) ("Unless a different time is set by the Court, compliance with discovery ordered by the Court shall be made within fourteen (14) days of the filing of the Court's order.").

This is not a recommended ruling.  It is a ruling by a Magistrate Judge on "nondispositive motions . . . relating to discovery," D. Conn. L. Civ. R. 72.1(C)(2), and as such it is reviewable pursuant to the "clearly erroneous" statutory standard of review.  *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Conn. L. Civ. R. 72.2(b).  It is an order of the Court unless reversed or modified upon timely objection under Local Rule 72.2(a).

*/s/ Thomas O. Farrish*

Hon. Thomas O. Farrish
United States Magistrate Judge