## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION, INC.,

      *Plaintiff*,

          v.

SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,

      *Defendants*.

Civil Action No. 3:21-cv-00933-JAM

December 8, 2023

## DEFENDANTS' OPPOSITION TO MOTION TO COMPEL BY CONSERVATION LAW FOUNDATION, INC. (ECF No. 309)

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................ 5

   I.     Concise statement of nature of the case. ................................................................ 5

   II.    The Court's Orders on CLF's Renewed Motion to Compel and motion for
reconsideration. ............................................................................................................ 6

   III.   CLF's September 5 Revised RFPs. ..................................................................... 8

   IV.   The parties' efforts to meet and confer AND CLF'S OCTOBER 3 REVISED RFPs. ... 8

   V.    The Court's order on Defendants' Motion for Partial Summary Judgment. ................ 11

   VI.   Summary of discovery received by CLF to date. ................................................. 11

LEGAL STANDARD ........................................................................................................ 13

ARGUMENT ..................................................................................................................... 15

   I.     Defendants' relevance objections are proper. ...................................................... 15

     A.     Defendants are not prohibited from making relevance objections. ........................... 15

     B.     The vast scope of CLF's Revised RFPs sweeps in irrelevant information. ............... 15

   II.    CLF's requests seeking production of documents regarding "coastal facilities" having a
yellow or red "RAM" rating are overbroad, not proportional, and unduly burdensome. ......... 19

   III.   CLF still has not shown the relevance of pre-2017 documents for its operator liability
THEORY and production of an additional five years of documents is unduly burdensome.... 28

   IV.   CLF's remaining arguments are untimely and relitigate the Court's mtc order. ........... 32

   V.    CLF received Defendants' document production and CLF contributed to the delay it
complains of. ................................................................................................................ 35

CONCLUSION ................................................................................................................. 36

## INTRODUCTION

The Federal Rules of Civil Procedure require discovery to be both relevant and proportional to the needs of the case. After failing to meet that standard with 53 of its 64 first Requests for Production ("First RFPs"), the Court allowed Conservation Law Foundation, Inc. ("CLF") a second bite at the apple.  ECF No. 277 ("MTC Order").  CLF was permitted to serve revised Requests for Production ("Revised RFPs") for those requests found unduly burdensome, overbroad, or not proportional to the needs of the case.  *Id*. at 51. These Revised RFPs were to be "more narrowly tailored and targeted."  *Id*.

They were not. Despite the denial of the majority of CLF's motion to compel, the denial of its subsequent motion for reconsideration, the denial of its motion to compel in the related Rhode Island litigation, *and*, having the extensive court guidance provided in those decisions — CLF continues to ignore that its discovery is restrained by the Federal Rules of Civil Procedure, and in particular the rules' proportionality considerations.

Rather than narrowing, some of the Revised RFPs are now *broader* then their First RFP counterparts.  *See e.g*., Revised RFPs 9 and 48, ECF No. 309-5 at 1, 10 (requests originally limited to the New Haven terminal now expanded to "coastal facilities that store or handle petroleum products in bulk" and having a certain "RAM" risk rating).  The Revised RFPs also continue to seek "all documents" concerning an overbroad range of subjects. *See e.g*., Revised RFP 17, *id*. at 4 (where original RFP (denied as facially overbroad) requested all documents of global Metocean team and its advisors, Revised RFP 17 seeks, "all documents concerning" assessments of climate change factors and future climate conditions by all direct or indirect subsidiaries of non-party parent Shell plc, globally).  Other Revised RFPs on their face seek documents going back to the 1980s, *e.g*., Revised RFP 12, *id*. at 4.  These requests are neither narrower nor more targeted and CLF is misguided in thinking that merely swapping the word

1

"concerning" for "related to" in the Revised RFPs sufficiently mitigates the grossly overbroad nature of these requests.

Contrary to what CLF may believe, the denial of Defendants' motion for partial summary judgment did not give CLF a pass to disregard proportionality.  CLF's Revised RFPs double-down on its demands for global discovery from the entire Shell group of companies when that far exceeds the relevant inquiry for its "best industry practice" related claims, and is not proportional.  These claims – Counts I, V, VI, VII – all only allege that the Terminal's Stormwater Pollution Prevention Plan ("SWPPP") lacks a discussion of climate change factors. The only question related to "best industry practice" is whether it is "best industry practice" to include such a discussion about climate change in a Connecticut SWPPP.  These claims do *not* allege anything about what design, engineering or other practices should be employed at facilities to address climate change risks.  The Court affirmed it shared this narrow understanding of the scope of these "best industry practice" claims as relating to SWPPPs during oral argument on Defendants' motion for partial summary judgment.

Since the parties' briefing and argument on CLF's January 2023 motion to compel, Defendants have produced to CLF approximately 175 excerpted Connecticut SWPPPs. CLF also has the Gulf SWPPP from its virtually identical lawsuit filed against Gulf, and the Providence, Rhode Island terminal SWPPP from that related case.  This set of more than 175 SWPPPs is a tailored and more than sufficient set of documents for CLF to study whether or not it is best industry practice to consider climate change risks in a Connecticut SWPPP.   This is in sharp contrast to the untailored and expansive discovery into other Shell group facilities demanded by CLF -- such as Port Fourchon in Louisiana -- that are nothing like the New Haven terminal, are located in entirely different geographies, certainly not reflective of industry practice relating to

2

SWPPP preparation, and have practically zero marginal utility in this case. Whether Shell entities follow a uniform practice or whether this Terminal does it differently than other assets in the Shell group of companies' portfolio is not a question in this case.

CLF rests much of its justification for this incredibly expansive fishing expedition on its "operator liability" theory of the case. The Court already decided in its August 2023 order that CLF's operator liability requests must be limited to activities at the New Haven terminal, and no broader. In addition, the Court ruled that operator liability discovery should be focused on Defendants or policies that govern Defendants' activities at the Terminal – not the entire Shell group of companies, and even then, that scope of the inquiry should be limited to "Defendants' participation in or control over the activities of the Terminal," and not reflect a "broader inquiry into centralized approaches and processes to define, evaluate, and address risks to the physical infrastructure of Shell companies' facilities generally." MTC Order, at 33-34.  CLF's unyielding demands for irrelevant and sensitive financial and investment information from the Shell group and Motiva (for which all CWA claims have been dismissed) are also beyond the scope of the Court's prior ruling on operator liability.

With respect to the appropriate timeframe for CLF's discovery, CLF again uses a default start date of 2011, but some requests seek documents going back to the 1980s.  A request for a 35 year old document is inexplicable in light of the Court's ruling, and reflects CLF's unwillingness to use a reasonable approach in discovery.  CLF makes the same timeframe arguments that were found lacking by the Court in its order on CLF's prior motion to compel, and its subsequent order on CLF's motion for reconsideration.  Those arguments should be rejected again here.

The costs and undue burden of these requests is real and substantial.  CLF seems to believe that collecting, searching, reviewing, and producing documents across numerous companies that operate in over 70 countries and hundreds of document custodians can be done with a few clicks.  As explained by declarant Kalisha Bennett, there are not centralized lists of which facilities are "coastal," "handle or store petroleum products in bulk," or have a "RAM" risk rating of yellow/red.  To determine this universe of facilities would requires a series of individual inquiries to people with knowledge of different businesses and assets within the Shell group. There are more than 100 terminals globally just within the Shell Trading and Supply business, and this is just one segment of what would need to be investigated.  Using an extremely conservative figure of just 20 other terminals, declarant Frank Contreras estimates the costs to do first level review for CLF's Revised RFPs directed to other facilities to be more than $5 million dollars.  This is excessively burdensome and not proportional, particularly given the extensive discovery CLF has already received about every relevant facet of the Terminal and how it is operates to manage storm and flooding risks, and the recent production of materials from 175 SWPPPs from other Connecticut facilities.

CLF's remaining arguments about Defendants' search terms and redactions re-raise long stale issues or ones the Court has already ruled on. These issues have nothing to do with the relevance and proportionality of CLF's discovery and it is neither necessary nor appropriate for CLF to attempt to relitigate these issues when the Court's prior orders are now the law of the case.

CLF has had enough bites at this apple.  If the parties are ever to reach the end of fact discovery, CLF must be prohibited from continuing its relentless pursuit of documents from Defendants and the entire Shell group that have nothing to do with this Terminal, and about

4

facilities around the world that will shed no light on the narrow SWPPP issues this case concerns.  CLF's motion to compel should be denied with prejudice and the parties should be permitted to complete the remainder of fact discovery and move towards a resolution of this case.[1]

## RELEVANT BACKGROUND

### I.    CONCISE STATEMENT OF NATURE OF THE CASE.

CLF's action is a citizen suit under the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA").  *See generally* ECF No. 47 (Am. Compl.).  CLF named five defendants: Motiva Enterprises LLC ("Motiva"); Shell USA, Inc. (f/k/a Shell Oil Company); Equilon Enterprises LLC d/b/a/ Shell Oil Products US ("Equilon"); Shell Petroleum, Inc; and Triton Terminaling LLC. CLF has twelve claims remaining after the Court's ruling on Defendants' motion to dismiss. *Id.* Eleven are CWA claims. *Id.* ¶¶ 389-463.  The CWA claims against Motiva have been dismissed.  All the CWA claims allege a current violation of the General Permit for industrial stormwater discharges ("General Permit") issued by the Connecticut Department for Energy and Environment ("CT DEEP"). *Id.*. The General Permit at issue in this case, permit No. GSI002800, applies to stormwater discharges at the bulk fuel terminal located at 481 East Shore Parkway in New Haven, Connecticut (the "New Haven Terminal" or "Terminal"). *Id.* ¶ 2.. The RCRA claim alleges that waste at the Terminal currently presents an imminent and substantial endangerment to human health or the environment. *Id.* ¶¶ 464-514.

---

[1] Per the parties' Joint Status Report and the subsequent entered scheduling order, Defendants understand that CLF does not intend to file a reply in order to expedite resolution of this motion, and accordingly briefing is now closed. *See* ECF No. 323 at 5; ECF No. 285-1, Email from A. Jordan to B. Reddy (Aug. 30, 2023) ("assum[ing] CLF will not file reply to expedite resolution"); ECF No. 286 (scheduling order reflecting no reply deadline).

II.    **THE COURT'S ORDERS ON CLF'S RENEWED MOTION TO COMPEL AND MOTION FOR RECONSIDERATION.**

On August 22, 2023, the Court granted in part and denied in part CLF's Renewed Motion to Compel. *Conservation L. Foundation, Inc. v. Shell Oil Products US, et al.,* Civil Action No. 3:21-cv-933-JAM (D. Conn.), ECF No. 277 ("MTC Order"). The Court stated that the majority of CLF's First RFPs were "facially overbroad, unduly burdensome, and disproportionate to the needs of the case" and "sometimes spectacularly so." *Id*. at 45-46. The Court noted that many requests began with "all documents" and that such language often signals facial overbreadth and burden concerns. *Id*. at 45. ("Any production request that begins this way is immediately suspect, because starting a request "with 'All Documents' or 'All Communications' . . . often is a red flag for overbreadth and undue burden.") (quoting *Hedgeye Risk Mgmt., LLC v. Dale*, No. 21-cv-3687 (ALC) (RWL), 2023 WL 4353076, at *2 (S.D.N.Y. July 5, 2023)).

For requests found overbroad, unduly burdensome, or disproportionate to the needs of the case, the motion was denied without prejudice to CLF serving more "narrowly tailored and targeted" revised requests. MTC Order at 51. CLF filed a motion for reconsideration on August 30, 2023 raising several issues to the Court. ECF No. 280. On October 2, 2023, the Court denied CLF's motion for reconsideration excepting the correction of a scrivener's error. ECF No. 293.

The Court's holdings and discussions in these orders addressed several issues that are pertinent to the present motion:

- **Requests concerning operator liability.**
  - CLF's requests concerning corporate policies and procedures that *do not govern the Terminal* are *not* relevant to the operator liability dispute. MTC Order at 31-34 ("Requests will be deemed relevant to the extent that they inquire about the

Defendants' participation in or control over the activities of the Terminal…a broader

inquiry…that is, beyond those that govern the Terminal – is not supported by CLF's

operator liability claims.")

- o Parent-level policies and procedures governing *Defendants'* activities *at the Terminal*

  are relevant (but the marginal utility of this information should be considered under

  the proportionality analysis.) *Id*. at 34.

- **Requests concerning Defendants' "knowledge of climate change" and "best industry practice."**

  - o "*Defendants*' policies and procedures governing the Terminal, and *their* knowledge

    of certain climate change risks, are relevant…." (and again, the marginal utility of this

    information should be considered under the proportionality analysis). *Id*. at 2

    (emphasis added).

- **Timeframe relevance.**

  - o CLF failed to show the relevance of pre-2017 documents for First RFPs 2-5, and 62.

    MTC Order at 41-42.  (Each of these requests related to operator liability only).  *See*

    ECF No. 149-6 (Ex. F to CLF Motion to Compel).

- **Proportionality.**

  - o Even where a request seeks relevant information, the marginal utility of the

    information sought should be considered under the proportionality analysis.  MTC

    Order at 24-25 ("[E]ven relevant information must be reasonably proportional to the

    value of the requested information, the needs of the case, and the parties' resources,")

    (quoting *Parimal v. Manitex Int'l, Inc.*, No. 3:19-cv-1910 (MPS) (SALM), 2021 WL

    1978347, at *5 (D. Conn. May 18, 2021)).

- **Redactions in Defendants' document productions.**

o   Redactions for relevance and confidentiality were not supported, but CLF did not
     timely raise the issue.  Defendants were *not* ordered to un-redact entire production.
     Instead Defendants ordered to un-redact a subset of up to 50 documents meeting
     certain requirements. MTC Order at 9-13.

## III.   CLF'S SEPTEMBER 5 REVISED RFPs.

Per the Court's MTC Order, CLF served its Revised RFPs on September 5, 2023 ("9/5
Revised RFPs").  CLF describes its own efforts at narrowing as "modify[ing] requests to seek
'documents sufficient to show,' 'all policies,' or 'all reports,' and replaced all instances of
'relating to' with more narrowly defined 'referring to' or 'concerning' articulations." ECF No.
309 at 4 (citing Ex. B at 6).

Many of the 9/5 Revised RFPs began with "All Documents concerning." *See* 9/5 Revised
RFPs 10, 11, 17, 18, 26, 36, 38, 41, 44, and 51, ECF 309-2 at 9-10, 13-15, 17-19.  The default
timeframe went back to 2011 for all requests. *Id.* at 4.  Other requests were broadened from the
First RFPs.  *See* ECF No. 309-2 at 9, 19 (9/5 Revised RFPs 9, 48) (expanding geographic scope
from terminal-specific to global coastal facilities).

The 9/5 Revised RFPs also sought a broad range of documents for all "coastal facilities
that store or handle petroleum products in bulk." ECF No. 309-2 at 9-10, 13-15, 19, 21 (9/5
Revised RFPs 9, 10, 11, 17, 23-28, 48, 64.)

## IV.   THE PARTIES' EFFORTS TO MEET AND CONFER AND CLF'S OCTOBER 3 REVISED RFPs.

Immediately upon receiving the September 5 Revised RFPs, Defendants had significant
concerns about proportionality and overbreadth, including facial overbreadth, and about certain
timeframes going beyond the relevant period for the claims.  Prather Decl. ¶ 22.  On September 7
the parties attended a status conference with the Court and Defendants expressed some of these

concerns. Ex. B. The Court encouraged the parties to confer with the goal of avoiding or minimizing further discovery motions. *Id*.

Five days after the conference, on September 12, Defendants sent CLF proposed changes to the 9/5 Revised RPFs intended to better align the requests with the MTC Order.  Prather Decl. ¶ 23; *see also* ECF No. 309-17 at 3. The proposed changes included comments for each change citing to the Court's MTC Order.  ECF No. 309-3. Defendants suggested several "sufficient to show" revisions to address burden, and proposed deleting the language regarding all "coastal facilities that store or handle petroleum products in bulk."  *See* ECF No. 309-3 at 9, 14-15, 18-21 In response CLF asked if Defendants would waive all objections (except privilege) to RFPs where CLF accepted the proposed changes.  ECF No. 309-17 at 2-3.  Defendants explained that they offered the revisions at an early point to address facial overbreadth and immediately obvious proportionality defects, but that they could not waive all objections upfront because they had not yet had a chance to attempt to search for and gather documents.  ECF No. 309-17 at 2. Defendants said if proportionality concerns remained with an RFP after the parties narrowed the language, they would work with CLF to try to eliminate the issues.  ECF No. 309-17 at 2.  At this time Defendants also raised the potential need to extend their 30-day window to serve responses to the 9/5 Revised RFPs because this window was passing while the parties were still engaged in negotiations over the final text that Defendants would be responding to.  ECF No. 309-17 at 2.

CLF declined to respond to Defendants' proposed revisions to the 9/5 Revised RFPs and stated it would not agree to an extension, in part because the new RFPs were "narrower than the original RFPs," and Defendants should have already completed its searches.  ECF No. 309-17 at 1.  CLF also reiterated an earlier offer to modify its requests concerning other facilities globally

to North, Central, and South America, *id*., that Defendants had already explained was still an unduly burdensome scope. ECF No. 309-17 at 2.

Defendants repeatedly raised concerns about their response deadline and specifically that CLF appeared to be waiting until the Court ruled on its motion for reconsideration before it would engage with Defendants' proposed revisions to the 9/5 Revised RFPs. ECF No. 309-19 at 2. Defendants explained that if Defendants responded to the 9/5 Revised RFPs as written, the parties would be headed towards motions practice and on issues nearly identical to the ones the Court just decided in its MTC Order. *Id.* Defendants asked CLF to join a call to chambers to seek guidance from the Court before that became an inevitability. CLF refused to join a call to chambers. *Id.* at 5. CLF also cited its then pending motion for reconsideration as the reason it would not narrow the 9/5 Revised RFPs:

> As an initial matter, CLF's Motion for Reconsideration and/or Clarification remains pending. As Judge Farrish said in the hearing nearly three weeks ago, "with respect to the motion for reconsideration, we will get a decision out to you shortly on that. And that decision will prevail over any contrary thing I might say here." Tr. 13:13–16. CLF will not limit its requests as if the issues raised in its motion have been conclusively resolved against CLF.

ECF No. 309-19 at 6 (A. Jordan 9/26/23 email).

The Court issued its ruling denying CLF's motion for reconsideration on October 2, 2023 (excepting correction of a scrivener's error). ECF No. 293.The next day, Defendants asked CLF if it would respond to Defendants' proposed changes to the 9/5 Revised RFPs in light of the Court's order. ECF No. 309-19 at 2. Later that day, on October 3, CLF accepted several, but not all, of Defendants' September 12 proposed revisions. ECF No. 309-19 at 1. This was two days before Defendants' October 5 deadline to respond to CLF's revised RFPs. CLF consented to a one-week extension of Defendants' deadline to respond.*Id.*

CLF's October 3 edits accepting a subset of Defendants' September 12 proposed revisions became the final text of CLF's Revised RFPs that Defendants served objections and responses to.

## V.       THE COURT'S ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

On October 19, 2023, the Court held oral argument on Defendants' motion for partial summary judgment ("MPSJ") and at the conclusion issued an oral ruling from the bench denying the motion. ECF No. 305 at 86: 23-25.  Defendants' MPSJ argued that, as a matter of law, the CT DEEP General Permit at issue did not require consideration of the climate change factors listed in CLF's Amended Complaint.  The Court ruled that it could not conclude, as a matter of law, that the term "best industry practice" incorporated into Section 5 of the permit (addressing required Best Management Practices) did not require the consideration of CLF's climate change factors. The Court further ruled that whether "best industry practice" as used in Section 5 required consideration of the climate change factors was a question of fact that could not be decided at that time.[2]

## VI.      SUMMARY OF DISCOVERY RECEIVED BY CLF TO DATE.

CLF has received a substantial amount of discovery in this case.  Defendants summarized their productions in their February 10, 2023 opposition to CLF's motion to compel on its First RFPs and in the latest Joint Status Report, and do not repeat that full discussion here.  *See* ECF 177 at 7-9, and Prather Decl. ¶¶ 4-6. ; *see also* ECF 323, at ___.  Core documents produced

---

[2] CLF's motion suggests that defense counsel made representations during the argument that Defendants would withdraw their discovery objections if the MPSJ was denied. ECF No. 309 at 21. This is not correct.  The Court asked about the extensive discovery disputes in the case and Defendants said that the resolution of whether "best industry practice" required consideration of CLF's climate change factors had the "potential" to eliminate many of the parties' discovery disputes. ECF No. 305 at 71.  This was true. *Id.* However, the Court did not answer that question and instead ruled that it was a factual issue that could not be decided. ECF No. 305 at 86: 14-16. This effectively left the parties in the status quo with regard to the scope of discovery.

include: the Terminal's Stormwater Pollution Prevention Plan ("SWPPP"), Facility Response

Plan, and Spill Prevention Control and Countermeasures Plan; records, policies, procedures,

manuals, presentations, spreadsheets, and other documents for the New Haven Terminal relating

to management of stormwater, waste/remediation, extreme weather, emergency preparedness and

response, permit compliance and general permitting, leaks/spills; groundwater monitoring,

employee training, tank inspections, processes for managing weather-related hazards; Terminal

infrastructure documents relating to these subjects; communications to/with Terminal personnel

regarding the foregoing subjects; all corporate/parent-level policies relating to these subjects that

apply to the New Haven Terminal, including the applicable manuals of the Shell group's Health,

Security, Safety, the Environment and Social Performance Control Framework; corporate

structure and organization documents, such as organizational charts and email correspondence

regrading delegations of authority; and, documents concerning other facilities that encompassed

the New Haven Terminal, such as emails regarding storm events that impacted regional terminals

and the U.S. East Hurricane Action Plan for terminals.  Prather Decl. ¶ 5.

    CLF has also received documents in response to subpoenas from four engineering firms

associated with stormwater management, related planning, and discharge monitoring at the

Terminal and CT DEEP files via the Connecticut Freedom of Information Act.  CLF also

conducted a site visit with experts and other attendees. Prather Decl. ¶ 6.

    Notably, since the briefing and argument on CLF's motion to compel on its First RFPs,

CLF has been produced substantial documentation regarding CT SWPPPs.  Specifically, CLF

has been provided excerpts of approximately 175 SWPPPs under the Connecticut General

Permit.  Prather Decl. ¶ 6.  Defendants hired a consultant, Renee Bourdeau, to conduct a factual

investigation into available SWPPPs in connection with its motion for partial summary

judgment. Prather Decl. ¶ 16.  Ms. Bourdeau reviewed CT DEEP files and searched for publicly available SWPPPs. *Id.*  She photographed excerpts from the SWPPPs, principally related to discussions of Best Management Practices. *Id.* These excerpts were produced to CLF and Ms. Bourdeau was deposed on May 25, 2023.  Prather Decl. ¶¶ 17-18.  CLF has also been produced the SWPPP for the Providence terminal in the related Rhode Island litigation, and the Gulf SWPPP in CLF's Connecticut suit against Gulf.  Prather Decl. ¶ 19.

## LEGAL STANDARD

Rule 26 requires that information sought in discovery be "relevant to any party's claim or defense" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Discovery may not be used as a 'fishing expedition to discover additional instances of wrongdoing beyond those already alleged.'" *Wells Fargo Bank, N.A. v. Konover*, 2009 WL 585430, at *5 (D. Conn. Mar. 4, 2009) (quoting *Tottenham v. Trans World Gaming Corp.*, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002)). Where the proposed discovery is outside the relevance and proportionality requirements of Rule 26(b)(1), courts "must limit the frequency or extent of discovery." Fed. R. Civ. P. 26(b)(2)(C)(iii).

"Courts analyze the proportionality of a request by 'considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Conservation L. Found. v. All-Star Transp.*, LLC, No. 3:21-cv-201 (JBA) (TOF), 2022 WL 16901999, at *3 D. Conn. Nov. 11, 2022) (hereinafter "*All-Star*") (quoting Fed. R. Civ. P. 26(b)(1)). "[E]ven relevant information must be reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." *Parimal v. Manitex*

*Int'l, Inc.*, No. 3:19-cv-1910 (MPS) (SALM), 2021 WL 1978347, at *5 (D. Conn. May 18, 2021)

(quoting *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS) (AKT), 2020 WL 2836787, at *2

(E.D.N.Y. May 29, 2020)).

Each party bears a burden with respect to proportionality. "[A] party claiming that a

request is important to resolve the issues should be able to explain the ways in which the

underlying information bears on the issues as that party understands them.'" *All-Star*, 2022 WL

16901999, at *2 (quoting Fed. R. Civ. P. 26 advisory committee notes to 2015 amendments)

(brackets omitted). "Conversely, 'the responding party bears the burden on the 'burden and

expense' element of the proportionality analysis.'" *Id*. (quoting *Huseby*, 2021 WL 3206776, at

*8 n.3). To support an objection on grounds of undue burden or expense the responding party

may "submitting affidavits or offering evidence revealing the nature of the burden." *Pegoraro v.*

*Marrero*, 281 F.R.D. 122, 128-29 (S.D.N.Y. 2012). However, a court "can sustain

[proportionality] objections without an affidavit when the request is plainly disproportionate and

unduly burdensome on its face." ECF 277-00 at 26 (citing *In re Kidd*, 2020 WL 5594122, at *11;

*All-Star*, 2022 WL 16901999, at *3).

Finally, because CLF's Revised RFPs were permitted by a previous order of the Court,

the law of the case doctrine applies. That doctrine "limits 'relitigation of an issue once it has

been decided.... [L]aw of the case is concerned with the extent to which law applied in a decision

at one stage of litigation becomes the governing principles in later stages of the same litigation.'"

*Kalra v. Adler Pollock & Sheehan, P.C.,* No. 3:18-CV-260 (KAD), 2023 WL 363043, at *3 (D.

Conn. Jan. 23, 2023) (quoting *Rezzonico v. H & R Block, Inc.,* 182 F.3d 144, 148 (2d Cir. 1999)).

**ARGUMENT**

I.      **DEFENDANTS' RELEVANCE OBJECTIONS ARE PROPER.**

A.      **Defendants are not prohibited from making relevance objections.**

CLF begins its argument by claiming (incorrectly) that "this Court previously told
Defendants that their relevance objections are not appropriate in discovery" and requesting
sanctions against Defendants for asserting relevance objections.  Mot. at 10.  This is baseless.
The Court has certainly not banned Defendants from raising relevance.  In fact, the Court *upheld*
Defendants' timeframe based relevance objections regarding pre-2017 documents for First RFPs
2, 3, 4, 5, 62, and 65, MTC Order at 41-42, 50, and found several categories of information
irrelevant related to CLF's expansive operator liability and knowledge of climate change focused
RFPs. *Id.* at 44-46.  It is nonsensical that Defendants would be prohibited from raising relevance
objections given many of those objections were ruled meritorious (much less be sanctioned for
doing so).

Where the Court ruled that a topic was relevant, such as Defendants' "knowledge of
certain climate risks," MTC Order at 2, 38, Defendants did not assert objections to the Revised
RFPs that this information is irrelevant.  However, the Court also found that several of CLF's
First RFPs were so overbroad as to sweep in plainly irrelevant information.  *Id.* at 47. As
discussed in the next section, in several instances that was the case again with CLF's Revised
RFPs and Defendants properly objected on relevance grounds.

B.      **The vast scope of CLF's Revised RFPs sweeps in irrelevant information.**

Defendants' relevance objections are appropriate because the scope of many of CLF's
Revised RFPs are so vast that, as written, they request irrelevant information.  This is a
fundamental — and persistent — failure by CLF to tailor its discovery to what it actually needs
to resolve the questions in this case.  The Court's MTC Order identified this problem in its

15

analysis of CLF's First RFPs. For example, the Court discussed First RFP 23, which sought "[a]ll Documents related to changes in physical infrastructure at the Terminal." MTC Order at 47. The Court found that this request "exceeds the scope of *relevant* inquiry" because "it would encompass infrastructure changes having no potential effect on flooding or storm surge risk, such as painting a tank a different color, replacing an exterior ladder, and so forth." *Id.* (emphasis added). First RFP 32, which concerned communications with the State of Connecticut and City of New Haven, was similarly flawed because its scope included "*irrelevant* communications as property tax bills, unemployment insurance claims for Terminal employees…." *Id.* (emphasis added).

CLF points specifically to Defendants' relevance objection to Revised RFP 12 as improper, Mot. at 9-10, but Revised RFP 12 is actually a prime example of CLF's inability to reign in the overbroad scope of its discovery. RFP 12 was identified by CLF relating to its best management practice claims only. *See* ECF 149-6 at 1 (CLF Ex. F to Jan. 2023 Motion to Compel).

Revised RFP 12 seeks:

- "all reports that Shell authored," with "Shell" defined as Shell plc and its direct or indirect subsidiaries," ECF 309-3;

- over a 12 year period;

- concerning "Climate Change" impacts on the frequency or intensity of a wide range of weather events, with "Climate Change" defined as "changes in the state of the climate that can be identified by changes in the means, extremes, and/or the variability of its properties and that persist for an extended period, typically decades or longer;"

16

- "generally," *i.e.*, with no geographic limitation;[3]

- "or" where four specified facilities are within the scope of the report, which include Gulf coast facilities;

- *and*, though omitted from its brief and its chart at Exhibit H, subparts (a) – (t) that request 20 reports that reach back to *1988* and are authored by a non-parties, including the U.S. Department of Energy and the University of Cambridge.

*Revised RFP 12 was supposed to be a narrowed and tailored request. It is not.* Its scope covers all companies in the Shell group, essentially any type of report relating to climate change impacts, facilities that are far outside New England or the Northeast, including potentially international facilities, and a set of 20 disparate and old in time reports that CLF requested originally.

This Revised RFP and others of CLF's appear to be based on a premise that every document related to climate change is *ipso facto* relevant to the claims in this case. But a 35-year old report by a non-party is not relevant to best industry practices/best management practices for SWPPPs in New Haven, Defendants' "knowledge of climate change," or any other issue in this case. Indeed, this request goes far beyond Defendants' knowledge of climate risks by seeking documents from other entities that must provide permission for access, *see* MTC Order at 2, 38 and Contreras Decl. ¶ 6, and accordingly seeks irrelevant information. As the Court's MTC Order stated, "starting a request with 'All Document' or 'All Communications'…often is a red flag for overbreadth and undue burden." MTC Order, at 45.

---

[3] CLF's brief argues that Revised RFP 12 is limited to reports where the scope covers the listed facilities, *see* Mot. at 16, but Defendants specifically objected to the term "generally" on the basis of a lack of geographic limitation, see ECF 309-7, and CLF never tried to correct Defendants if they were misreading the request. Prather Decl. ¶ 24.

Defendants' relevance objections here were justified. *See also id*. at 46 (discussing cases specifically finding "all documents *concerning*" language to be overbroad.)

      Other Revised RFPs that seek irrelevant information include No. 6, which seeks "all policies" that "establish, acknowledge, or limit" Defendants' authority to "participate in, exercise control over, manage, direct, or conduct" any "activities" at the Terminal. "Activities" is not limited in any way and would include issues that have nothing to do with this case, such as management of employee benefits, or marine activities like managing arriving ships and barges. In addition, the term "acknowledge" sweeps in documents that may merely reference another policy without the document itself relating to the actual operations of Terminal.  Revised RFP 9 seeks "all Documents referring to" the Terminal, or coastal bulk fuel storage or handling facilities having a "RAM" rating of yellow/red, that contain common terms, such as "flood." Responsive documents would include any document with these terms (*e.g*., containing the phrase a "flood of information") regardless of whether they had anything to do with the issues in this case. Similarly, Revised RFP 11 seeks "all documents concerning risks to the Terminal's physical infrastructure" posed by hurricanes or other severe weather. This would encompass documents concerning electrical equipment that is unrelated to the stormwater and waste issues in this case.

      In sum, the Court has not disallowed relevance objections from Defendants nor are Defendants' relevance objections "invalid".  Such objections were appropriate where CLF's Revised RFPs are so overbroad as to request information that is not relevant to CLF's claims.

Defendants' relevance objections to Revised RFPs 6, 9, 12, 17, 18, 20, 23, 25, and 33 are appropriate and should be sustained.[4]

## II.     CLF'S REQUESTS SEEKING PRODUCTION OF DOCUMENTS REGARDING "COASTAL FACILITIES" "STORING OR HANDLING PETROLEUM PRODUCTS IN BULK" HAVING A YELLOW OR RED "RAM" RATING ARE OVERBROAD, NOT PROPORTIONAL, AND UNDULY BURDENSOME.

CLF's requests seeking discovery into other facilities remain grossly overbroad, unduly burdensome, and not proportional to the needs of this case. CLF contends it needs this discovery for its "best management practices" claims, which entail a factual inquiry into "best industry practice." *See* Am. Comp. ¶¶83, 193-94, 362, 423.[5]  As a threshold issue, CLF framed these issues in its January 2023 motion to compel as related to "Defendants'" knowledge about risks to infrastructure from climate change, and "Defendants'" obligation to use "best industry practice." ECF 149 at 2 & 18. The Court went on to analyze it consistent with that framing and ruled that "*Defendants*' policies and procedures governing the Terminal, and *their* knowledge of certain climate change risks, are relevant…."  ECF 277 at 2 (emphasis added).  Most of CLF's Revised RFPs seeking discovery about other facilities go beyond "Defendants" and are directed to "Shell," or no entity at all.  [Revised Request Nos. 23-25, 27, 28, 48, 63, &, 64]  CLF has casually conflated Defendants with other Shell group entities throughout this litigation, but the distinction is significant from a burden and proportionality perspective.  As explained below, CLF had the opportunity to meaningfully narrow and tailor these requests (and follow the Courts' ruling based on its own arguments), but again, it has not.

---

[4] *See e.g.,* Revised RFP 17 (like No. 12, seeking broad range of Shell plc documents and requesting all design standards for the Terminal and other facilities that take into account climate change, which would include, for example, standards unrelated to storms or flooding, such as operating equipment under increased temperatures).
[5] As addressed above, the Court's MTC order ruled that CLF's discovery into facilities other than the Terminal for purposes of its operator liability theory is not permitted. MTC Order at 31 ("To the extent that [CLF] now contends that Judge Merriam authorized an inquiry into "centralized approaches and processes to define, evaluate, and address risks to the physical infrastructure" of *all* "of Shell companies' facilities" beyond the Terminal (id. at 13), the Court disagrees.")

Turning to the claims these requests are based on – the best management practice claims – they *only* concern whether Defendants should have considered climate change risks in the Terminal's Stormwater Pollution Prevention Plan ("SWPPP") as a matter of best management practice (and in turn, best industry practice).  The factual inquiry into what best industry practices are for SWPPPs prepared under CT DEEP's General Permit can be determined by reviewing CT SWPPPs (of which CLF has now received many in discovery).  What is not required, and certainly not proportional, is discovery into everything that has been considered or done relating to weather risks within a group of companies that operate in more than 70 countries over a 12 year period.[6]  CLF's purported "narrowing" to coastal facilities having a yellow/red "RAM" rating does not move the needle on the undue burden involved in attempting to respond to such a request or to even identify relevant custodians and perform searches.  Given the broad scope of information sought by CLF, responding to these requests for even one facility would in effect require Defendants to duplicate the entire production to date for the New Haven terminal for another location. Prather Decl. ¶.  Although Defendants may not agree with the ruling, Defendants do not dispute that the Court ruled that whether consideration of climate change risks is a "best industry practice" required by the CT permit is a factual question.[7]  ECF 305 at 84-86. Therefore, it is within the scope of discovery.  However, the discovery necessary to address that question is not nearly as broad as CLF wants it to be.

First, CLF's "best industry practice" claims alleging violations of § 5 of the General Permit are quite narrow.  They concern the information that is required to be included in a

---

[6] Shell.com, *Who we are*, https://www.shell.com/about-us/who-we-are.html (last visited Dec. 7, 2023).

[7] Defendants do dispute CLF's unfounded claim that Defendants were withholding discovery pending the outcome of the Court's ruling on Defendants' motion for partial summary judgment. Mot. at 2.  This is not true.  If documents were not searched or produced, it was because of the irrelevant, overbroad, and unduly burdensome nature of many of CLF's requests.  *See generally* ECF 309-7 (Defs. Responses to Revised RFPs).

SWPPP, and specifically whether the Terminal's SWPPP violates the permit because it allegedly does not address climate change risks.[8]  CLF's Counts I, V, VI, and IX[9] allege that it is best industry practice to include such information in a SWPPP and therefore the provisions at § 5 of the General Permit have been violated. The question at issue is whether it is, in fact, a best industry practice to consider future climate change risks in the way CLF has alleged in a Connecticut SWPPP.

At the argument on Defendants' motion for partial summary judgment, the Court indicated it likewise understood these claims to narrowly be about the content of the Connecticut SWPPP.  In a colloquy with defense counsel the Court expressed confusion about why the parties are fighting so many disputes in this litigation when the alleged violation just relates to the text of a SWPPP:

> THE COURT: But you could basically address the case and if you just took all your facilities, this one and presumably other facilities…*and simply add some sentences to your stormwater prevention plans, right, that show that you in fact have considered [climate change risks].* That's what's kind of mystifying me about this lawsuit. It seems you all are juggernauts, the courtroom is full of people, and everybody is fighting over something. …And why it's not basically fixable…why Shell hasn't just frankly adjusted its permit.

---

[8] *See* Am. Compl. at Count I ¶ 394 ("Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to ensure that non-stormwater pollutant discharges resulting from the factors discussed in Section IV.A *supra*…Shell is violating the Permit and the Clean Water Act."); Count III ¶ 411 ("Shell made these certifications without developing and implementing a SWPPP that included discussion or disclosure of information known to it about climate change and the reasonably foreseeable substantial risks of pollutant discharges associated with climate change, *see generally* Section IV *supra*."); Count IV ¶ 418 ("The SWPPP does not refer to the potential for flooding at the Terminal from storm surge and sea-level rise, despite the past incidences of storm surge flooding referred to *supra*."); Count V ¶ 425 ("Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to address pollutant discharges resulting from the factors discussed in Section IV.A *supra*, Shell is violating the Permit and the Clean Water Act"); Count VI ¶ 430 ("Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to address run-on to avoid areas that may contribute pollutants, despite previous flooding and the factors discussed in Section IV.A *supra*, including storm surge flooding, Shell is violating the Permit and the Clean Water Act"); Count VII ¶ 435 ("Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to minimize the potential for leaks and spills resulting from the factors discussed in Section IV.A *supra*, Shell is violating the Permit and the Clean Water Act"); Count IX ¶ 445 ("Shell has not amended or updated its SWPPP based on information known to it regarding the factors discussed in Section IV.A *supra*, and the substantial risks of pollutant discharges and/or releases associated with these factors, in violation of the Permit and the Clean Water Act.").
[9] CLF identifies these counts as its best industry practices claims.  *See* ECF No. 149 at 29.

MPSJ Oral Argument Tr. 70:23-71:14 (Oct. 19, 2023) (emphasis added).

The Court's view that these claims could be resolved by revising the Terminal's SWPPP is consistent with the reading of CLF's Counts I, V, VI, and VII as pleading nothing more than the Terminal's SWPPP violates the General Permit because it does not contain a discussion considering climate change risks.

The Court's conclusion that "whether best industry practice is to consider climate change factors is simply a question of fact," *id*. at 85:13-15, did not give CLF a license to pursue global discovery into all weather-related risk considerations at a number of other facilities regardless of burden or the utility to the case. <u>Indeed, the Court's ruling framed the scope of "best industry practice" to be about facilities "like" the New Haven terminal</u>. *Id*. at 84:19-22 ("the parties seem to dispute, as a factual matter, whether best industry practice requires consideration of climate change *for a facility like the Shell facility that sits adjacent to the New Haven Harbor*.") (emphasis added).

CLF's discovery into "coastal facilities that store or handle petroleum products in bulk"[10] covers a large range of assets that are not remotely "like" the New Haven terminal. As explained in the Declaration of Kent Yeates, Ex. D [11], the Lead Facility Engineer for the New Haven Terminal, within the Shell group there is a wide variety of asset types that all have different risk profiles.  Yeates Decl. ¶ 5.  Facilities that "handle or store petroleum products in bulk" would include assets that have few similarities to the New Haven terminal, such as refineries, manufacturing facilities, gas stations, blending plants, and pipelines.  Yeates Decl. ¶¶ 7-9.  As

---

[10] As explained below, CLF's attempt to limit this set of facilities to those also having a RAM rating of yellow/red does not mitigate the undue burden issues because Defendants have no way of readily identifying which facilities might have such a rating.  See discussion § __ and Contreras Declaration.

[11] CLF was provided a copy of Mr. Yeates' declaration on September 9, 2022.  *See* ECF 177-02 at 74 (Tab 15).

explained by Mr. Yeates, the engineering practices and considerations for a refinery are "enormously different" than that of a fuel terminal. Yeates Decl. ¶ 10.  The marginal utility of producing the large amount of information requested about these facilities is low given how little they are likely to tell CLF about best industry practices for SWPPP preparation for a bulk fuel storage terminal in New Haven.  After years of disputes on this question, CLF has never explained how it believes information about different types of facilities in far flung locations around the world can help it prove that SWPPPs for facilities like the New Haven terminal should include consideration of climate change risks. Even if it were limited to coastal facilities or even other bulk fuel storage facilities and there were some marginal relevance, the scope of what CLF is requesting is far out of proportion to the needs of its best industry practice claims. CLF's own Motion makes this point quite clear when it explains that it expects documents as varied (and irrelevant) as "investment approvals" and design and construction documents for all these locations.  Mot. at 20.

CLF's claims that it is seeking information regarding the "most relevant facilities", Mot. at 14, is nothing more than speculation and not supported by any facts or reference to its actual claims.  Indeed, the specific example CLF gives regarding Port Fourchon in Louisiana as a facility it believes it is entitled to broad discovery on (covering a period of twelve years)[12] only illustrates this point further. Port Fourchon couldn't be less "like" the New Haven terminal. The Port Fourchon study attached to CLF's Motion at Exhibit L explains it well:

> Port Fourchon is at the edge of the Mississippi delta facing the sea, *one of the world's most vulnerable low-elevation coastal zones*.  It is highly exposed to storm surge and wave-induced inundation under hurricanes which regularly visit the Gulf of Mexico.  In addition, it experiences one of *the largest rates of subsidence in the world*…

---

[12] It bears noting how broad a set of documents CLF believes it should be provided regarding Port Fourchon: hazard evaluation and risk assessment documents, "investment approval(s)" for construction, design and construction documents, and any adaption plans. For a span of twelve years. Mot. at 20.

ECF 309-12 at 1 (emphasis added).

CLF asks for a wide variety of documents regarding Port Fourchon, but Port Fourchon is a demonstrably poor fit for determining best industry practices applicable to SWPPPs and consideration of climate change risks in Connecticut.  Port Fourchon has unique climate risk considerations (*e.g.*, extreme subsidence) that do not apply to the Port of New Haven.  CLF's focus on Port Fourchon illustrates its inability (or unwillingness) to internalize the Court's ample guidance on marginal utility considerations when serving discovery.  MTC Order at 33-34.[13]

Finally, since briefing and argument on CLF's motion to compel on its First RFPs, CLF has been produced excerpts of 175 SWPPPs showing discussions of best management practices. Defendants hired a consultant, Ms. Bourdeau, to locate these CT SWPPPs and document them. If CLF wishes to look more closely at these documents, Defendants have made that easy by providing the necessary identifying information. In addition to these 175 SWPPPs, CLF has the SWPPP from the Providence Terminal operated by Defendant Equilon, and the SWPPP from the neighboring Gulf terminal in New Haven from discovery in that case.  Thus, CLF now has numerous data points on what industry practices are with respect to consideration of climate change risks in a CT SWPPP.  The Bourdeau SWPPP production is comprised of all Connecticut facilities, which due to their close proximity, are far more "like" the New Haven terminal in terms of climate risks than Port Fourchon or some other facility whether in the United States or in a more distant location.

---

[13] The SEC filing identified by CLF, Shell plc's Form 20-F, likewise does not have any utility in terms of informing best industry practices for SWPPP preparation. And while Shell plc's SEC filing says, unsurprisingly, that climate related risks are assessed, it in no way suggests assessments exist for every asset in the Shell group nor that documents relating to this subject for facilities around the world are readily ascertainable.  *See generally* Bennett Declaration.

Turning to the burden of these requests (Revised RFPs 9, 10, 12, 17, 23, 25, 26, 27, 28, 48, 63, and 64), as detailed in the Declaration of Frank Contreras, it is extraordinarily high in terms of costs and time. CLF's motion repeatedly chides Defendants for not "searching" for documents about other facilities as requested, but misleadingly omits that Defendants explained that searching would involve a series of steps that itself is unduly burdensome.  As defense counsel described in meet and confer correspondence:

> The language "coastal facilities that store or handle petroleum products in bulk and that have a Risk Assessment Matrix (RAM) rating of yellow or red for category H-09.01 (weather conditions)" still poses undue burden and proportionality problems.
>
> Responding to this language in the Revised RFPs' language poses logistical challenges.  Even just the work required to identify facilities that would fall within the scope of this language poses an undue burden. An initial issue is determining the universe of "coastal" facilities.  Defendants would have to look at numerous lists and/or compile information referencing facilities, and then manually determine which facilities should qualify as "coastal."  Then that would have to be culled to those that "store or handle petroleum products in bulk."  Similarly, there is no comprehensive list of all facilities that have RAM ratings of yellow or red for weather conditions.  Multiple steps would be required to attempt to determine that subset.  All of this – just to identify the universe of facilities within the scope of "coastal facilities that store or handle petroleum products in bulk and that have a Risk Assessment Matrix (RAM) rating of yellow or red for category H-09.01 (weather conditions)" -- would require enormous time, effort, and costs.
>
> Even after those facilities are identified, running keyword searches to identify potentially responsive documents would also be a logistical burden…
>
> ECF 309-16 at 1-2 (Papetti Email).

Mr. Contreras is an eDiscovery analyst and has supported the Shell US Legal function for 20 years.  Contreras Decl. ¶ __. He has previously submitted a declaration in this case.  He explains that searching for documents across the entire Shell group of companies is extremely logistically challenging because documents do not exist within a single platform. Contreras Decl. ¶ __.  To draw on documents across the entire group, searches would have to be completed

across a variety of systems and the results would then need to be loaded to review platforms for additional search and filtering functions.  Contreras Decl. ¶ __.

Ms. Kalisha Bennett is the Health, Safety, Security and Environment ("HSSE") Team Lead for the United States in Distribution Operations, which is within the Trading and Supply line of business. Bennett Decl. ¶ 1. As explained in Ms. Bennett's attached declaration, to respond to CLF's Revised RFPs, Defendants would have to conduct a series of exceedingly difficult and burdensome inquiries, some of which might not even be possible. *Id.* ¶ 13. There is no central database or location that contains the universe of facilities that are (i) "coastal," (ii) "store or handle petroleum products in bulk," and (iii) have RAM ratings for weather of yellow or red. *Id.* ¶ 13. Identifying facilities for each of those three criteria across all applicable lines of business implicated by CLF's Revised Requests would be a massive undertaking, if even possible.

First, CLF seeks documents applicable to "coastal facilities." The identification of which facilities are "coastal facilities" imposes a substantial burden. *Id.* ¶ 7. To answer that question requires many individualized inquiries that are time-consuming. *Id.* ¶ 8. Inquiries would have to be conducted with each line of business and entity implicated by CLF's Revised RFPs to see if it maintains a list of "coastal facilities." *Id.* ¶ 8. At Trading and Supply, for example, there is no one list of facilities that includes information about whether a facility is "coastal" or the distance a facility is from the "shore." *Id.* ¶ 7. The Trading and Supply line of business includes many different types of assets, with terminals alone numbering over 100 globally. *Id.* ¶ 7. Trading and Supply is just one example; given the global scale of CLF's Revised RFPs, such inquiries would be extremely time-consuming and would likely require additional burdensome analyses, such as determining if an interconnected waterway is considered to be "coastal." *Id.* ¶ 8.

In addition to determining whether a facility is "coastal," there is another burdensome inquiry in determining which facilities "store or handle petroleum products in bulk." *Id.* ¶ 9. At Trading and Supply, *all* organization terminals "store or handle petroleum products in bulk," and as previously noted, there are over 100 such terminals around the world. *Id.* ¶ 9. There is no single place to find out which other Shell Group facilities globally in any other organization or line of business may also "store of handle petroleum products in bulk." *Id.* ¶ 9. Such a determination would also require individual queries for different facilities and lines of business within the Shell Group. *Id.* ¶ 9.

Furthermore, there is a significant burden in identifying which facilities have a RAM rating of yellow or red for weather; in fact, such inquiry may not even be possible. *Id.* ¶ 10. The HSSE & SP Control Framework requires the establishment and maintenance of an effective Hazards and Effects Management Process ("HEMP"), but there is no prescribed process as to *how* a facility implements this requirement. *Id.* ¶ 10. The process can take many forms. *Id.* ¶ 10. And as HSSE & SP risks are *qualitatively* analyzed for each asset using a RAM, the risks will be different among facilities. *Id.* ¶ 10.

For example, with Trading and Supply in the Americas, there is no one list or database that captures what all the individual RAM ratings have been or are currently for all of the terminals. *Id.* ¶ 11. The RAM risk scores are stored locally in the HEMP for each asset and not in one central location. Thus, to conduct the review required to respond to CLF's Revised RFPs would involve reaching out to over 100 terminals worldwide and compiling such information. *Id.* ¶ 11. This process would be incredibly time-consuming and burdensome. *Id.* ¶ 11. Other types of assets in different lines of business may track weather-related risks in different ways, requiring inquiries at various lines of businesses and specific facilities to identify, collect, and review the

documents that track those weather-related risks. *Id.* ¶ 12. Not to mention too that each asset is exposed to different weather conditions, and the risks are evaluated based on the threats specific to that location. *Id.* ¶ 12. All of these factors would make the process in identifying facilities that have a RAM rating of yellow or red for weather exceedingly difficult, time-consuming, and burdensome, if not impossible. *Id.* ¶¶ 10, 12. In addition, custodians would need to be identified to collect documents from because documents are not organized on a facility-by-facility basis. Contreras Decl. ¶ ___.  The New Haven litigation itself has 25 custodians.  Contreras Decl. ¶ ___. That is for just one facility. The above is required just to determine the universe of documents to collect potentially responsive documents.

### III.   CLF STILL HAS NOT SHOWN THE RELEVANCE OF PRE-2017 DOCUMENTS FOR ITS OPERATOR LIABILITY THEORY AND PRODUCTION OF AN ADDITIONAL FIVE YEARS OF DOCUMENTS IS UNDULY BURDENSOME.

CLF's relevance arguments for pre-2017 discovery for its operator liability theory[14] are the same arguments that were raised and rejected in its motion for reconsideration.  CLF again argues that the Court cannot limit this discovery to post-2017 because that would resolve a "merits dispute" over whether the non-Motiva Defendants operated the Terminal prior to 2017. Mot at 24-29.

First, the Court has already heard and considered this argument (twice) and found that it did not establish the relevance for pre-2017 discovery for RFPs 2, 3, 4 , 5, and 63.  CLF identified RFPs 2, 3, 4 , 5, and 63 as only relevant to operator liability. CLF Ex. F to first MTC. CLF has not raised any new issues and the Court's reasoning for limiting discovery to post-2017 for RFPs 2, 3, 4, 5, and 63 applies equally to CLF's other operator liability focused RFPs.

---

[14] CLF does not argue in its motion that pre-2017 discovery is relevant to its best management practice claims. Regardless, pre

Second, this is not a "merits dispute." CLF has *not* alleged pre-2017 violations of the General Permit against the non-Motiva Defendants (and these claims have already been dismissed at to Motiva). CLF cites to paragraphs 34-37, 51, 55-56, 67, 108-109, 175, 334-61, and 389-502 of its Amended Complaint, Mot. at 25, but none of these paragraphs allege that the non-Motiva Defendants were operating the Terminal prior to 2017.  In fact, CLF's complaint plainly says that "Motiva operated the Terminal between 2000 and 2017."  Am. Compl. ¶ 37. There is not a single factual allegation in the Amended Complaint relating to any non-Motiva Defendant operating the Terminal pre-2017.[15]

CLF's operator liability argument about pre-2017 liability of the non-Motiva Defendants is a *post hoc* attempt to hold on to pre-2017 discovery after the dismissal of the CWA claims against Motiva.  As explained above, CLF's complaint never alleged that any party other than Motiva operated the Terminal prior to 2017.  The CWA claims against Motiva were dismissed by Judge Merriam on the basis of the pleading because the Court found Motiva ceased operating the Terminal by 2017.  CLF's argument that, notwithstanding the dismissal of Motiva for these claims the non-Motiva operators are liable for violations during Motiva's operation strains credulity.  There has never been any such allegation in this case, and there is not one now.

Third, an additional five years of discovery does not come cost-free. The burden does not end with the identification of "coastal facilities" that "store or handle petroleum products in bulk" and have RAM ratings for weather of yellow or red. After the time-consuming, laborious process of identifying those facilities, there are then substantial burdens in facilitating the collection and review of those documents. Mr. Contreras is an eDiscovery analyst and has

---

[15] Nor are there any allegations in CLF's complaint that any pre-2017 version of the General Permit has been violated by any Defendant.  CLF's complaint refers only to permit no. GSI002800.  It is a matter of public record that that permit was applied for on July 10, 2017, and issued on December 5, 2017.  CT DEEP, https://www.depdata.ct.gov/permit/Industrial_Stormwater_Reg_Report.pdf

supported the Shell US Legal function for 20 years.  Contreras Decl., Ex __, ¶ 2. He has previously submitted a declaration in this case. Decl. of Frank Contreras, Ex. G, ECF No. 177-07. Once the facilities are identified, there are significant logistical challenges to collect the documents. Ex. __, ¶¶ 11., 12 Those logistical challenges include how many searches can be run in a given day, how long it takes to execute a single request, how many search terms can be utilized at a time, the real availability of the data sources, and how much data can be exported without failing. *Id.* Many of CLF's Revised RFPs are phrased broadly and would likely require multiple searches to be run in order to capture all potentially responsive documents, such as Revised RFP 17 which requests "All Documents concerning Shell's assessments of Climate Change factors." *Id.* ¶ 12.

As described above, the universe of facilities from which potentially responsive documents would need to be searched and collected would be numerous. There are currently over 155,000 individual and shared Outlook Exchange mailboxes across the entire Shell Group of companies. *Id.* ¶ 14. There are over 13,000 SharePoint site collections holding more than 643 million documents across the entire Shell Group of companies. *Id.* ¶ 14. Based on his experience, Mr. Contreras estimates that the keyword searches required to fully respond to CLF's Revised RFPs would result in millions of search hits and unindexable items, and based on the search limitations (*i.e.*, only a certain number of characters can be one at one time), many of the searches required to respond to one Revised RFP would likely take multiple searches, an difficult and time-consuming process. *Id.* ¶¶ 15-16.

In addition to the time and challenging logistics required to conduct searches for documents potentially responsive to CLF's Revised RFPs, the costs associated with such searches and document collection and review would be exorbitant. Using the costs incurred thus

far in connection with Defendants' document productions in response to CLF's Fist FRPs that were not in dispute is illustrative. Using the agreed-upon search terms, Defendants collected 1,747,411 documents, which were then narrowed to approximately 228,654 documents by working with an e-discovery vendor to perform Technology Assisted Review. *Id.* ¶ 21. From the 228,654 documents, Defendants then used additional software tools and targeted searches to identify 134,316 documents potentially responsive. *Id.* ¶ 22. Of those 134,316 documents, Defendants' team of approximately twelve contract attorneys reviewed 123,067 documents. *Id.* ¶ 22. This process cost approximately $307,000, which does not include the attorney time required by outside counsel to perform quality control review and any additional follow-up. *Id.* ¶ 23. In other words, Defendants incurred a cost of $1.72 per document to complete just a first level review, which does not include quality control review and other significant costs associated with document review and production. *Id.* ¶ 24.

Based on this information, a conservative estimate of the costs associated with searching, collecting, and reviewing documents responsive to CLF's Revised RFPs are over a staggering $5 million for just a first level review that does not incorporate any costs associated with quality control review or additional document review and production. *Id.* ¶¶ 35-36. The specific calculations are further detailed in Mr. Contreras's Declaration, but to provide an overview, the average gigabyte (GB) of electronic data for Shell Group companies contains 2,235 documents (1,690 pages). *Id.* ¶ 25. For searches to CLF's Revised RFPs 25 and 26, there would be approximately 276 GB of data, which is equivalent to about 233 bankers boxes (617,128 documents). *Id.* ¶ 26. Mr. Contreras conducted searches for Revised RFPs 9, 23, and 48, which resulted in approximately 69.3 GB, 18 GB, and 71 GB of data, respectively. *Id.* ¶¶ 27-29  These numbers are based on the current documents collected for the *New Haven terminal*, a single

facility, not the potentially hundreds of facilities that would be implicated by 11 of CLF's Revised RFPs, as discussed above. *Id.* ¶ 31. Taking an average of just those three Revised RFP searches comes to 47 GB per search requested by CLF. *Id.* ¶ 30. Running just one search across 20 terminals of approximate size as New Haven would yield over 2 million documents, and assuming Defendants could use technology-assisted review as with the prior productions and reduce the total documents to around 270,000 documents, the total cost for a first level review would be over $469,000. *Id.* ¶¶ 31-32. This cost is for just one Revised RFP. *Id.* For the 11 Revised RFPs that are directed toward "coastal facilities," assuming 20 facilities are searched, over 23 million total documents would be swept within its scope, with approximately 3 million documents to review after technology-based review. *Id.* ¶¶ 34-36. This conservative estimate would come to a total cost of over $5 million for just a *first level review*. *Id.* ¶ 35. The costs are enormous and would impose an undue and disproportionate burden on Defendants.

## IV.   CLF'S REMAINING ARGUMENTS ARE UNTIMELY AND RELITIGATE THE COURT'S MTC ORDER.

CLF raises a number of other arguments that are untimely, including complaints about productions that CLF itself acknowledges go back to February 2023. Mot at 37.  In particular, CLF contends that Defendants' prior productions were not complete because they do not include specific documents CLF believes to be responsive.

Of particular note in this list are CLF's insistent demands for documents regarding Shell plc policies about investment and financial issues, and confidential agreements with non-parties regarding the formation and dissolution of Motiva as a joint venture (that contain financial and commercially sensitive information).  Prather Decl. ¶ __; Mot. at 35 (listing, e.g., "Business Assurance Letters for the Terminal and other Shell group terminals," "corporate guidance for the

32

Business Assurance Letters," "a list of eight financial and management decision-making policies, guides, tools, and checklists referenced in Defendants' Investment Management Guide," and corporate documents regarding Motiva).

With regard to the former, CLF has never established the relevance of these Shell plc investment and financial related documents to this citizen suit about compliance with a CWA permit and RCRA.  Likewise, the documents regarding Motiva's formation and dissolution as a joint venture are not relevant to any claim.  To the extent CLF claims it is entitled to these documents under its operator liability theory, that is not supported by the Court's MTC order. The Court authorized some discovery into parent-level policies and procedures "governing *Defendants'* activities *at the Terminal"* MTC Order at 32, but noted that such requests must have sufficient marginal utility.  CLF only offers hollow speculation that it "understands these documents would inform and constrain decisions around engineering, operations, spending, and risk assessment."  Mot. at 36.  CLF is wrong, and this speculation does not carry its burden to show relevance, and the marginal utility of producing these documents is extremely low. CLF has already been provided organizational charts showing the relationships between the parties (if any) for each year since 2017.  Prather Decl. ¶ __.  CLF's demands for this type of information have become harassing and Defendants ask the Court to deny CLF relief on these irrelevant and untimely requests.[16]

CLF's motion also complains repeatedly about Defendants' alleged failure to search for documents. However, CLF's presentation of this issue is misleadingly imprecise, creates a false impression of Defendants' discovery efforts, and is squarely contradicted by CLF's own declaration submitted in support of its Renewed Motion to Compel.

---

[16] CLF has served Rule 45 subpoenas in the Providence litigation to non-parties seeking these same documents. Those subpoenas are the subject of a pending motion to compel in that case.

First, an important distinction is necessary between the search terms that were used to *collect* potentially responsive documents and those that were used to *review and produce* documents. In response to CLF's First Set of RFPs, Defendants used a series of search terms to collect potentially responsive documents (over 1.7 million documents). Decl. of Frank Contreras, Ex. G, ¶ 19, ECF No. 177-07. These search terms were derived from (a) an agreed-upon set of climate-change-based terms and (b) search terms derived from CLF's discovery requests in the Providence litigation, an approach agreed upon by CLF. Prather Decl. ¶¶ ____. As sworn in CLF's Affidavit of Attorney Alexandra St. Pierre In Support of Plaintiff's Renewed Motion to Compel, the Parties "agreed on a way to proceed with the use of search terms[,]" which involved using the same search terms that were discussed in connection with Rhode Island litigation. St. Pierre Aff., Ex. A ¶ 16 ECF No. 149-01. The Parties agreed to use the same approach in the Rhode Island litigation "[d]ue to the nearly-identical documents requests and [in] the interest of efficiency." Ex. B, Tab 1, at 4, ECF No. 177-02.[17] Despite Defendants' production of over 41,000 documents, since the Parties' agreement to use the Rhode Island search terms, CLF has never raised an issue about the language of the agreed-upon search terms the Parties used. Prather Decl. ¶¶ ___.

For CLF's Revised RFPs, Defendants did not need to do another document *collection*, but instead used targeted search terms to *review* documents that were previously collected. Prather Decl. ¶¶ __. CLF does not distinguish between searching for *collection* versus searching for *review*, which is necessary to accurately reflect Defendants' document collection, review, and production. Thus, contrary to CLF's claims, Defendants actually did run targeted searches

---

[17] As represented to the Rhode Island court, CLF "conditionally agreed on search terms" and "reserved its right to propose new search terms based upon the hits from Defendants [sic] searches." CLF's Motion to Compel Production of Documents Responsive to Plaintiffs' First Set of Requests for Production to All Defendants, at 7, n.16, *Conservation Law Found. v. Shell Oil Prods. US*, No. 1:17-cv-00396-WES-LDA (D.R.I. filed Jan. 4, 2022).

derived from the language of CLF's Revised RFPs to *review* potentially responsive documents based on those documents that were already collected from the relevant document custodians by Defendants. Prather Decl. ¶¶ __. Defendants did not run additional searches to *collect* additional documents because, as ordered by the Court in its MTC Order and represented by CLF, CLF's Revised RFPs are supposed to be *narrower* in scope than the original First Set of RFPs. *See* Email from A. Jordan (Sept. 27, 2023) (CLF discussing its "attempt[] to narrow those requests after the September 7 hearing, in light of Judge Farrish's comment ('I'm not sure I love all documents related to any coastal facility.')"); *see also* Motion, at __; Prather Decl. ¶¶ __. Thus, the documents Defendants collected in connection with CLF's First Set of RFPs would necessarily encompass those documents responsive to CLF's allegedly more narrowly-tailored Revised RFPs. Based on Defendants' *review* searches, on November 28, 2023, Defendants produced 278 documents in response to those Revised RFPs. Prather Decl. ¶¶ __.

Finally, the Court should not consider CLF's attempt to relitigate the Court's decision regarding Defendants' earlier redactions. CLF raised this in its motion to compel, and its motion for reconsideration and the Court has now clearly ruled twice that CLF waited too long to raise the issue, and Defendants are not required to produce unredacted versions of documents in its previous productions.

This is now the law of the case. *Kalra,* 2023 WL 363043, at *3 (D. Conn. Jan. 23, 2023) (quoting *Rezzonico,* 182 F.3d at 148. Defendants produced CLF unredacted versions of 36 requested documents, per the MTC Order, and CLF's opportunity to challenge that production has long passed too.

## V.   CLF RECEIVED DEFENDANTS' DOCUMENT PRODUCTION AND CLF CONTRIBUTED TO THE DELAY IT COMPLAINS OF.

On November 28, 2023, Defendants provided its thirteenth production, which included the documents responsive to the Revised RFPs (unless indicated as withheld on the basis of an objection).  Prather Decl. ¶ __.  CLF complains that Defendants did not produce all responsive documents by October 12, 2023, which was one-week after CLF's revised its RFPs into their final form.  Mot. at 37.  As explained above, CLF did not make these revisions until after the Court's October 3 order denying CLF's motion for reconsideration.  Thus, to the extent the production was delayed, CLF bears substantial responsibility.

Further, it has been the practice of both CLF and Defendants to produce outside the default 30-day window, and CLF itself has made very liberal use of rolling productions.  CLF served its 21st production this week, on December 5, 2023, *429 days* after Defendants served their Second Requests for Production.  Prather Decl. ¶ __.  Defendants have not had the opportunity to review the entire production, but note that the production contains documents dating back to at least 2018.  Prather Decl. ¶ __.  In light of CLF's own practices, its complaint that Defendants did not produce documents within a one-week window rings hollow.  Finally, CLF received Defendants' thirteenth production prior to the next scheduled deposition (of Jennifer Bothwell, on December 6-7) and has suffered no prejudice.

## CONCLUSION

For the foregoing reasons, CLF's motion to compel should be denied.  Defendants' respectfully request the Court exercise its discretion to award fees to Defendants pursuant to Rule 37.


*/s/ Bina R. Reddy*_____

Bina R. Reddy (phv20420)
BEVERIDGE &DIAMOND, P.C.

36

400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
20 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: 1.410.230.1305
rprather@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that that the foregoing was served via the ECF system on all counsel of record.

/s/Bina Reddy