```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2
                                   )
 3   CONSERVATION LAW FOUNDATION,   )   No. 3:21-CV-00933-JAM
     INC.,                          )   450 Main Street
 4                                  )   Hartford, Connecticut
                         vs.        )
 5                                  )   January 12, 2024
     SHELL OIL COMPANY, ET AL.      )
 6   _____
```

```
 7                  TRANSCRIPT OF MOTION HEARING

 8            BEFORE THE HONORABLE THOMAS O. FARRISH

 9              UNITED STATES MAGISTRATE JUDGE

10   APPEARANCES:
     For the Plaintiff:       ALEXANDRA M. JORDAN, ESQ.
11                            Conservation Law Foundation
                              62 Summer Street
12                            Boston, MA 02110

13   For the Plaintiff:       CHRISTOPHER KILIAN, ESQ.
                              Conservation Law Foundation
14                            15 East State Street
                              Suite 4
15                            Montpelier, VT 05602

16   For the Defendants:      ROY D. PRATHER, III, ESQ.
                              Beveridge & Diamond, P.C.
17                            201 North Charles Street
                              Suite 2210
18                            Baltimore, MD 21201

19   For the Defendants:      BINA REDDY, ESQ.
                              Beveridge & Diamond, PC
20                            400 West 15th Street
                              Suite 1410
21                            Austin, TX 78701

22   For the Defendants:      JAMES O. CRAVEN, ESQ.
                              Wiggin & Dana, LLP
23                            265 Church Street
                              17th Floor
24                            New Haven, CT 06510

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    ECR Operator:              COURT SMART

22                    Kelly Borngen, CDLT-290
                      7227 N. 16th Street
23                         Suite 207
                      Phoenix, AZ 85020
24                      (800) 257-0885

25

1              (10:00 O'CLOCK, A.M.)

2         THE CLERK:  Oyez, oyez, oyez.  The Honorable United

3    States District Court for the District of Connecticut is now

4    open.  All persons having a cause of action pending, been

5    bound or summoned to appear herein, shall take due notice and

6    give attention according to law.

7         THE COURT:  Good morning everybody.  Please be

8    seated.  We are here in the matter of Conservation Law

9    Foundation Inc. v. Shell Oil Company.  It's case number 21-cv-

10   933.  It's assigned for trial to Judge Meyer.  My name is

11   Judge Farrish.

12        May I have the appearances, please, beginning with

13   the plaintiff?

14        MS. JORDAN:  Good morning, Your Honor.  Alexandra

15   Jordan from the Conservation Law Foundation.  And I'm joined

16   at counsel's table by Chris Kilian.

17        MR. KILIAN:  Good morning, Your Honor.

18        THE COURT:  Good morning to you both.  And Attorney

19   Jordan, will you be arguing today?

20        MS. JORDAN:  Yes, I will, Your Honor.

21        THE COURT:  Okay.  And for the defendant?

22        MR. PRATHER:  Good morning, Your Honor.  Roy Prather

23   her on behalf of defendants.  And I'm joined at counsel table

24   by Bina Reddy and Jim Craven.

25        THE COURT:  Okay.  And good morning.  And will you be

1    arguing today, Mr. Prather?

2         MR. PRATHER:  Yes, Your Honor.

3         THE COURT:  Okay.  So we are here for a hearing on

4    the motion to compel that was filed by Conservation Law on

5    November 22nd of 2023.  It's on the docket in public redacted

6    form at ECF number 309.  It's in unredacted form at ECF number

7    311.  Shell's opposition is at 325, and CLF's reply is at 328.

8         So Attorney Jordan, I will hear you in support of

9    your motion.  Before I start peppering -- I'm going to hear

10   your argument before I start peppering you with most of my

11   questions.  But I do have one threshold question.  So to be

12   clear, when you asked me on page one of your brief for an

13   order compelling production of documents responsive to the

14   revised request for production, you mean the final revisions

15   as updated on October 3rd of 2023; is that right?

16        MS. JORDAN:  Yes, Your Honor.

17        THE COURT:  Okay.  I just, I want to know what target

18   we're shooting at here.  So with that, I will hear you in

19   support of your motion.

20        MS. JORDAN:  Thank you, Your Honor.  So as we lay out

21   in our brief, throughout this litigation, defendants have

22   maintained a posture that information about climate change,

23   including their knowledge of climate change and any

24   information about how they address climate change risks at

25   facilities other than the New Haven terminal are completely

1    irrelevant.  But discovery is defined, first and foremost, by

2    the complaint and then by any subsequent orders narrowing that

3    complaint.  But the two orders that have been issued by this

4    Court, Judge Merriam's order on the motion to dismiss and

5    Judge Meyer's order on the motion for partial summary

6    judgment, both reject defendants very narrow view of what this

7    case is about.

8            This is a citizen suit enforcement action under both

9    the Clean Water Act and RCRA, in which we allege that this

10   terminal is at extreme risk of harm to the local community, to

11   the New Haven Harbor and the Long Island Sound, because

12   defendants have failed to take into account the risks to the

13   terminal from extreme weather events and climate change.

14           All of our discovery requests are geared towards

15   trying to understand both what defendants know about those

16   risks to this terminal, and what defendants understand to be

17   the risks of climate change to other similarly situated

18   facilities, and how, if at all, they have addressed those

19   risks elsewhere.

20           Now, through CLF's own investigation of information

21   that's publicly available, we have learned that defendants do,

22   in fact, speak publicly very often about how knowledgeable

23   their collection of companies, the Shell group, is about

24   climate change, how they are at the forefront of adapting to

25   climate change globally, that they are investing lots of money

1    in hardening their infrastructure to protect communities

2    around them.

3         One example we have given is a publicly available

4    study of a facility in Louisiana where, within the Shell

5    group, a team assessed the risks to that facility from climate

6    change.  And then on the basis of that assessment made,

7    according to Shell PLC's SEC filings, a very substantial

8    monetary improvements, structural improvements to that

9    facility.

10         But that is the only document that has been produced

11    by any party in this case, and it was produced by CLF, that

12    relates to these core issues of how defendants understand,

13    study, assess and then adapt to climate risks.

14         We have done our best to shape -- given our limited

15    understanding of how defendants address these risks, which is

16    again based on what we can glean from publicly available

17    records, we have done our best to shape these requests to

18    create a nexus between facilities that are like the terminal.

19    So facilities that store petroleum in bulk, that are on the

20    coast, and that defendants have determined are at a high risk

21    of a failure incident due to severe weather events.  We have

22    attempted to shape those requests to seek that universe of

23    facilities.

24         Defendants, in response, have refused to really

25    engage with us on further narrowing, given what they know.  So

1    we had a multi-month process over which we were conferring

2    about many of these requests that relate to defendants'

3    adaptation and study of climate events at these types of

4    facilities.  And we repeatedly asked, okay, if these four ways

5    in which we have tried to narrow the universe of other

6    facilities that are like the terminal are unhelpful to you,

7    what would be helpful?

8              And I think, as we noted in our briefing the day

9    before we had to file this motion, defendants finally came

10   back and said, there's nothing we can do.  There's no way that

11   you could narrow any of these requests that would make it not

12   burdensome.  Even one more facility would be unduly burdensome

13   to respond to these requests.

14             And I think what's important to highlight for the

15   Court is that that position, I think, while facially

16   unreasonable, also isn't supported by any work done by the

17   defendants.  They have not searched for documents for that one

18   facility.  So we note in our complaint in loss of containment

19   incidents due to severe weather at a Deer Park facility in

20   Texas and at the Sewaren facility in New Jersey.  Those are

21   two, I think, very easy examples of facilities that defendants

22   could run searches for.  And we've, in fact, got two RFPs

23   asking for information specific to the weather events that

24   caused the loss of containment events at those facilities.

25             But defendants, as far as we can tell from the meet

1    and confer, and from the declarations presented, have not

2    attempted to define how burdensome it would be to run those

3    searches for information at those facilities.

4         THE COURT:  Yeah.  So if I can interject, I'm going

5    to be talking with Mr. Prather about that in a minute.  But

6    just on the topic of how CLF has tried to narrow its requests

7    here.  So in at least some instances, for example, request for

8    production number 40, the only difference between your old

9    request and your new request is the substitution of the word

10   "concerning" for the term "related to".  Give me a

11   hypothetical example of a document that would be responsive to

12   the latter, but not to the former.

13        MS. JORDAN:  So "related to", I think, as you noted

14   in your order on our prior motion to compel, can encompass a

15   wide variety of things that could be theoretically related to

16   storm water monitoring.  So this could mean, well, maybe I'll

17   try to go with a narrower version.  I think communications

18   concerning --

19        THE COURT:  Right.  I get that you think that

20   "concerning" is narrower than "related to".  I'm just trying

21   to figure out how.

22        MS. JORDAN:  Right.  So we did define them

23   differently.  I think, for practical purposes, the defendants

24   would search for communications.  So my understanding is the

25   only communications defendants have searched are emails.  So

1    within the emails, they would search for communications that

2    are about the terminal and that are about stormwater

3    monitoring.  There are, I suppose, communications related to

4    stormwater monitoring policies that might not mention either

5    of those things.  So I guess there could be a communication

6    generally about our policy to use a certain reagent.

7            I'm having a hard time coming up with a hypothetical,

8    Your Honor, but our, sort of, position is stormwater

9    monitoring policies at the terminal are directly relevant to

10   the claims.  I don't think anybody actually disagrees with

11   that.  Eleven of our counts are about stormwater monitoring.

12           THE COURT:  Right.

13           MS. JORDAN:  And this RFP is also directed to the

14   policies that are applicable at the terminal.  And we're only

15   asking for communications about those policies.  So we did our

16   best to narrow using a word that addressed the concerns that

17   you have stated in your prior order, which is "related to" is

18   a very tenuous relationship.  And we tried to make it clearer

19   that we wanted communications that are about these policies

20   and their application to the terminal.  But I'm not sure how

21   we could have been more specific without carving out

22   information directly related to several of our claims.

23           THE COURT:  Okay.  Was any consideration given to

24   something like documents sufficient to show the stormwater

25   monitoring policies in place at the terminal?

1          MS. JORDAN:  So I think for this request, we wanted

2     to understand if defendants had talked about their policies

3     because that could -- so not just the content of the policies

4     themselves --

5          THE COURT:  I see.

6          MS. JORDAN:  -- but whether there was consideration

7     to changing them because many of our claims are underlied by

8     the fact that we think that the stormwater monitoring policies

9     at the terminal are insufficient.  So has there been

10     communication among defendants about improving those policies

11     or changing them over time?  And that is, kind of, the goal of

12     this request.

13          THE COURT:  Okay.  Well, I interrupted your flow.  I

14     think you were talking mostly about other facilities here, so

15     I'll let you resume that.

16          MS. JORDAN:  So I think I've made my point there,

17     both that we have done the best we can do with the information

18     available to us, because we have gotten so little about how

19     defendants assess risk at other facilities.  We've had to use

20     the internal risk rating system that defendants have devised

21     that has been applied to the terminal, and we have tried to

22     identify the single risk that we think is most relevant to the

23     claims, which is weather.  And again, we have tried to

24     restrict this to facilities that are like the terminal.  For

25     example, we offered to restrict it to facilities that are in

1    the Americas.  As we understand it, that is a geographic

2    demarcation that's significant within this group of companies.

3    But that was also rejected.

4         So with the information we have, we have done as much

5    as we can to seek information that we believe is directly

6    relevant to best industry practice, to minimizing the

7    discharge of pollutants, which includes what technology is

8    available to do that, and where the facilities are at least

9    similarly situated to the terminal, and where defendants have

10   studied the impacts of weather and have determined that the

11   weather risk to that facility is quite significant.

12        Now, I think that there are some other requests that

13   don't relate to other facilities that also present really

14   challenging issues for CLF, where we have narrowed the request

15   to be directly relevant to the terminal.  But we are still

16   receiving objections from defendants that they believe these

17   requests are unrelated to our claims.

18        So an example is request number 33.  And this is

19   seeking engineering diagrams, drawings, and or site plans for

20   infrastructure that's identified in the permit, the Stormwater

21   Pollution Prevention Plan or the Spill Prevention, Control and

22   Countermeasure Plan.  That is a plan that defendants'

23   reference in their SWPPP.  And it also relates to managing any

24   oil spills that are at the facility.  And then we give

25   examples of the kinds of infrastructure we're talking about,

1  the berms, the secondary containment areas at this facility.

2          That's a very narrow request.  It is directly

3  relevant to the physical control measures that are in place at

4  this facility to address the discharge of pollutants.  And

5  I'll note that even though we refer to the SWPPP and the

6  permit, I think that these diagrams, plans, and drawings are

7  also directly related to our RCRA claim, where there isn't a

8  planning document for RCRA that defendants are responsible for

9  producing.  But their obligations under RCRA as we've pled

10  them in the complaint, is to avoid imminent and substantial

11  endangerment to human health or the environment through a

12  catastrophic release of waste.

13          And so one of the ways that you can prevent a

14  catastrophic release of waste is to contain it, such as with

15  secondary containment area and berms.  But defendants object

16  to this request and say that this is seeking information

17  that's unrelated to waste management or unrelated to

18  stormwater.  And so they have restricted what they're

19  producing to us.

20          Now, I don't understand what infrastructure

21  defendants think are unrelated to waste or stormwater because

22  they don't say in their objections.  They just say our search

23  terms are what define what's relevant, and that's what we're

24  going to look for.  But I think, as we've pointed out to Your

25  Honor in the briefing, we don't know what the search terms

1    are.  We've asked for them repeatedly and have not received

2    them.

3            So even understanding the universe, even if we, CLF,

4    were to take on the burden of going through the search terms

5    and trying to line them up with each request and say, okay, I

6    think that this is fair, fairly encompasses what we have in

7    the request.  We actually can't do that here because we still

8    have not received them.  And I think that this RFP, there's

9    similar issues in request number 38 and in request number 18,

10   it's very similar objections there, again, to request for

11   similar kinds of information.

12           What's emblematic about that is defendants, I think,

13   are continuing to ignore that in discovery, they don't get to

14   decide what's relevant.  The complaint, the motion to dismiss

15   order, and the motion on partial summary judgment frame the

16   scope of relevance.  And these are very -- these requests are

17   very clearly within what CLF has pled are the violations at

18   the terminal.

19           And so I think part of the frustration, frankly, in

20   having to come before you again is it feels as if defendants'

21   position just has not changed from the first time we were

22   before you almost a year ago to now, despite the intervening

23   motion for partial summary judgment decision.  And so you

24   know, I fully concede that these requests are not perfect, but

25   they are what CLF was able to come up with, trying to maintain

1      our ability to get information relevant to the claims as we

2      have pled them, as they still exist before this Court in light

3      of the information that we have.

4              Since we appeared before you last and you decided our

5      prior motion to compel, we have received about 30 documents as

6      a result of your prior motion.  I'm sorry, as a result of your

7      order on our prior motion.  We have received a supplemental

8      production since then that included a few hundred documents,

9      but that's it.  There hasn't been an enormous divulging of

10     information that would have allowed us to do more in revising

11     these requests.

12             And we have since been able to take two more

13     depositions that the parties agreed to.  One of RPMS

14     Consulting, which is a consulting firm that defendants' hired

15     to work at the terminal.  And the other is for Jennifer

16     Bothwell, who is a former employee of defendants' who worked

17     on issues related to the terminal.  But I think as Your Honor

18     knows, we have not actually been able to talk to the

19     defendants yet.

20             So the three defendants for whom we issued notices of

21     deposition, and those notices were contested, we are awaiting

22     resolution of the dispute there.  And we had agreed that --

23     the parties had agreed that CLF could move forward with

24     deposing the other two defendants upon resolution of the

25     issues raised in those motions, essentially to avoid

1    duplicative motions practice before you.

2         So we haven't been able to ask defendants some of the

3    clarifying questions that might resolve some of these issues

4    in a formal deposition setting or obviate the need for

5    document production through a deposition.  And so I would just

6    like to, sort of, say that to underscore that this

7    information, we think it's relevant to our claims.  It is not

8    cumulative or duplicative, because we haven't received much

9    since the last time we were before you.

10        And in light of what we have, and I'll underscore

11   that according to defendants' own accounting, that's only

12   about 3000 unique documents responsive to the requests that

13   was in response to your order on our prior motion, these are

14   the requests that we could come up with.  We then expected to

15   have a more productive conversation in meet and confer, but we

16   were met with just firm opposition.  Anything prior to 2017 is

17   completely irrelevant; it doesn't matter.  Anything about any

18   other terminal, if it doesn't have a nexus to the terminal,

19   and I don't understand what that means.

20        THE COURT:  So I do want to talk to you about the

21   temporal limitation.  I don't know if you were going there.

22        MS. JORDAN:  I'm happy to talk with you about it now,

23   Your Honor.

24        THE COURT:  Okay.  So your opponent says that you

25   haven't provided me with anything supporting the relevance of

1    the pre-2017 documents beyond what you provided in your last

2    motion.  Walk me through your current motion and point out

3    what evidence or arguments relating to the pre-2017 documents

4    was not before me last time.

5         MS. JORDAN:  So in our opening brief and in our

6    reply, excuse me, we identify the allegations in the complaint

7    that support the assertion that all defendants, not just

8    defendant Motiva, are operators of the terminal prior to 2016.

9    I think it is a disputed issue of fact whether or not that is

10   true.  And as we note, I don't think we quite grasped, maybe,

11   defendants' argument on our prior motion.

12        But as we note in this motion, it appears to us that

13   defendants are saying, well, when you change the registration

14   under the Clean Water Act permit from Motiva to not Motiva,

15   then anything prior to that date change that's about any other

16   defendant isn't relevant because only Motiva was the

17   registrant under the permit.  But that's not what Best Foods

18   says.  So if Motiva is -- whoever is the registrant under the

19   permit is by definition an operator, but they are not the sole

20   operator.

21        And so we have alleged -- and Judge Merriam engaged

22   with those allegations in her order on the motion to

23   dismiss -- we have alleged that other defendants were

24   operating this terminal at that time.  And I think what is

25   very telling about defendants', sort of, the lack of coherence

1    in defendants' argument is they don't deny that they were

2    operating the terminal for purposes of RCRA prior to 2017.  So

3    they've agreed that everything dating back to 2011 on RCRA

4    claims is discoverable and relevant from all defendants.

5         But the factual bases underlying our claims on the

6    Clean Water Act and on RCRA are quite similar.  It's that

7    defendants are aware that there are climate risks to this

8    terminal.  They have failed to account for them in their

9    planning, adaptation, and mitigation.  And for, in terms of

10   RCRA, that failure means that defendants have an intent to

11   discard the products that are stored in their aboveground

12   storage tanks and so that makes those products solid waste

13   under RCRA.  And a severe storm, a severe weather event, could

14   result in the catastrophic release of those products into the

15   environment, which would cause harm.

16        That is not -- those sort of factual allegations are

17   very similar to what we are alleging under the Clean Water Act

18   claims, if not identical for some of them.  And so the, sort

19   of, temporal distinction on well, if you're talking about

20   storm water, then, it's only 2017 forward.  It's just not --

21   it doesn't make much sense, because what we're alleging under

22   RCRA is that there would be a storm, a catastrophic storm, and

23   that as part of that storm, you would have a release of

24   pollutants.  Those pollutants would, perhaps, be conveyed

25   through storm water.  It's hard to think of a severe enough

1    storm in which there would be no storm water that would cause

2    that kind of catastrophic release from an AST.

3          So I think we've tried to provide you with more, sort

4    of, argument regarding the real discrepancy between the time

5    positions.  And also, we have been unable to find, and

6    defendants have not provided, any evidence that change in the

7    registration under the permit somehow insulates a prior

8    operator, if that operator is continuing to operate, from

9    liability.

10         So for example, if defendant Equilon, who owned part

11   of Motiva during the time that Motiva owned the terminal and

12   was the registrant, then became the registrant under the

13   current permit, they were continuously operating the permit

14   and are today, they are the admitted operator.  And so under

15   the Best Foods analysis and under the Clean Water Act, that is

16   a continuous or intermittent violation from the time that

17   Motiva owned to present.

18         We have, again, as I've said, the only discovery that

19   we've received since our last motion that is relevant to this

20   claim are the proof, I'm sorry, are the organizational charts

21   that defendants produced in response to RFP 2?  We attached

22   those to our opening brief, and they show the direct ownership

23   relationship between defendant Equilon and Motiva, and then

24   the indirect ownership relationship for defendants Shell

25   Petroleum Incorporated and Shell USA or Shell Oil Company.

1            So I'm sorry that that was a somewhat long response.

2    But those are the additional arguments and evidence that we've

3    put before you today that we didn't quite crystallize or frame

4    in the same way under our prior motion.

5            THE COURT:  Okay.  Well, it's your motion.  You're

6    going to get the last word.  But is there anything else you'd

7    like me to know before I pass the mic to Mr. Prather?

8            MS. JORDAN:  I just think the last thing I'd like to

9    say, Your Honor, is much of -- we're having a fight about

10    relevance, but we're also having a fight about proportionality

11    and undue burden.  But I think it's important to note that

12    defendants aren't addressing many of the factors under the

13    proportionality analysis.  Their focus is there's a lot of

14    documents and it's hard to get them all, even though we

15    actually haven't searched, so we can't tell you how hard, but

16    we'll guesstimate at how hard.  But there are five other

17    factors under the proportionality analysis, I think, most of

18    which weigh in favor of CLF, and as is apparent from the

19    record.

20            THE COURT:  All right.  So tell me what you would

21    have me know about those five factors.

22            MS. JORDAN:  So the parties' relative access to the

23    material.  As I've stated before, what we know about how this

24    company assesses climate risk and addresses it is based on

25    publicly available information.  Obviously, defendants have

1    substantially more information available to them.  I think, as

2    has been relayed through the briefing before this Court, it

3    appears that defendants -- well, all discovery has been

4    produced on behalf of all defendants.  Defendants also have

5    argued that we are seeking discovery from them that is not

6    related to any of the defendants.  We dispute that.

7              Our requests are directed to documents in their

8    possession, custody, or control.  But what that suggests to me

9    is that there are documents in the possession, custody, and

10    control of the defendants that belong to other organizations

11    within Shell group.  So by implication, I think defendants

12    have substantially more access to this information than CLF

13    does.

14              THE COURT:  Okay.  I think I understand the picture

15    on the parties' relative access to information here.  But

16    what's at stake here?  How much is in controversy?

17              MS. JORDAN:  So we're alleging daily penalties for

18    the max under both the Clean Water Act and RCRA.  I do not

19    have the exact number in mind.  It's around 50,000 dollars a

20    day.  If our allegations that are true, if we are successful

21    in proving them, that defendants have been violating this

22    permit continuously since it went into effect in October of

23    2011, that is, at this point, 12 years of violations at

24    50,000, potentially 50,000 dollars a day.  So it's -- I can't

25    do that math in my head, Your Honor.

1          THE COURT:  Okay.  I understand it's a lot of money.

2          MS. JORDAN:  It's a very large amount of money.

3          THE COURT:  But leaving penalties aside for a moment,

4    I think the first time we all met, one of the big issues was

5    the defendants' complaint that the plaintiff really isn't

6    telling them what's wrong with the terminal.  In all of that

7    time, have you developed any views on this?  Is this a case

8    where they could fix whatever you complain is wrong -- say is

9    wrong with the terminal by adding another two inches to the

10   berm which they could have a backhoe guy do for 50,000 bucks,

11   or is this something where you say, no, they need to move the

12   terminal to the top of a mountain?  What's your understanding?

13         MS. JORDAN:  So we've provided some amended responses

14   in discovery to defendants relating to interrogatories, where

15   we've identified specific issues with their secondary

16   containment area.  So this is essentially the basin, I'm going

17   to use layperson's terms, in which all the storage tanks are

18   located.

19         THE COURT:  Um-hum.

20         MS. JORDAN:  We have identified that we don't believe

21   that basin is impermeable as is required under the permit.  So

22   you basically have infiltration of not only polluted storm

23   water through the polluted soil, but also potentially

24   petroleum products if there was a release.  I think we've also

25   indicated in that interrogatory response that the volume of

1    that containment area is insufficient.

2         I should note defendants have more than one

3    containment area, but they have connected them all with

4    passive pipes so that they are functionally the volume of the

5    three areas over time is available to any containment area.

6    We have identified that we think that that volume is

7    insufficient under the requirements of the permit, which I

8    discussed a little bit at the hearing on the motion for

9    partial summary judgment with Judge Meyer.

10        I think our complaint asserts that the ASTs are at

11    risk of failure in a severe weather event similar to what

12    happened at Sewaren during Hurricane Sandy and at Deer Park

13    during Hurricane Harvey.  My understanding, and we have tried

14    to get more discovery from defendants on both of these

15    incidents but have been unsuccessful so far, is that part of

16    the problem was those ASTs floated, they're not anchored to

17    the ground.  And then they either collide with other

18    infrastructure at the facility and catastrophically fail that

19    way, or, as I think was the case at one of these facilities,

20    pipes going into the tank basically are sheared off, and then

21    you have a release of petroleum products.  So that's just

22    stated on the face of the complaint.

23        My understanding from the discovery we have received

24    is that the ASTs at this facility are not anchored.  But in

25    order to comprehensively compare them to the types of failure

1    events that happened at these other facilities, we need some

2    more information about the failure.

3         THE COURT:  Okay.  No.  And I understand you're still

4    developing your understanding of all of this, but if I can try

5    and tie a bow around all of that in a couple of sentences.  So

6    to the plaintiff's understanding at this point, what needs to

7    happen to bring the terminal into compliance with the permit

8    is to anchor the tanks to make the basin impermeable, and to

9    add some capacity to the basin as well.  And has the plaintiff

10   put any dollar figures to that yet?

11        MS. JORDAN:  We have not, Your Honor.  So I will say

12   those are some of the things we think they need to do.  I also

13   think this is a kind of a question for expert testimony and

14   also is based in part on what is best industry practice, which

15   is what we're trying to get discovery on.  So there might

16   be -- so part of the definition of "minimize" is it says you

17   have to do whatever you can to eliminate or minimize to the

18   extent possible the risk of discharging pollutants in storm

19   water based on the technology that's available, what's

20   economically achievable, and in light of best industry

21   practice.

22        THE COURT:  Right.

23        MS. JORDAN:  So I think that there will be expert

24   testimony on what is best industry practice from people who

25   work in this industry, and that just hasn't come into the

1    record yet because we're not there.  But we're also hoping to

2    get some of that information from the defendants, in addition

3    to what technology is available, to address these kinds of

4    risks.  So I think that the examples that I gave you are ones

5    that have become quite apparent to us.  Either they were

6    apparent when we filed the complaint, or we've updated our

7    discovery responses to reflect them.

8        But I think the more fundamental issue is our

9    position is that the permit says it's defendants'

10   responsibility to assess and study these risks and make a

11   determination based on the technology available, what's

12   economically practicable, and the best industry practice of

13   what they should do.  And they haven't done that.

14       So defendants, I think, are continuously trying to

15   shift the burden under the permit from themselves to us, but

16   we're not the ones who are under a permit obligation.

17   Defendants are.  We are highlighting, I think, first and

18   foremost, that the risks of this terminal are real, that they

19   are currently happening today, and that they aren't

20   hypothetical and in the future.  And so if that's the case,

21   then defendants need to take the steps to assess those risks.

22       THE COURT:  So we started this discussion by talking

23   about our proportionality factors.  How does that last

24   observation work into the proportionality factor?  So what

25   you're saying to me here is hey judge, we're not actually

1    saying that we know to a certainty that they have to anchor

2    the tanks or dig up the basin, or the catch basin, and replace

3    it with Vibranium or whatever.  What we're saying is that they

4    need to study this.  Well, then doesn't that go into the

5    proportionality analysis of whether it will be just to order

6    them to spend half a million or a million dollars producing

7    documents, if that's what it involves.

8              MS. JORDAN:  So I guess if the amount in controversy

9    contemplates the injunctive relief, we're not sure what it

10   costs to study that at this terminal.  Part of defendants'

11   position in refusing to produce documents, for example, about

12   their analysis at Port Fourchon is how they don't want to tell

13   us how expensive it was to do that analysis.

14             So I'm not sure exactly what the injunctive relief

15   would cost.  The best anchor I have for the amount in

16   controversy is the penalties.  But I think it's fair to say

17   that it will cost some amount of money to study these risks to

18   the terminal and then to assess is the terminal adequately

19   prepared.  And obviously we have alleged it's not because it

20   can't possibly be if you aren't considering that these risks

21   are real.

22             So if you defendants have decided that, well, we

23   think Port Fourchon is definitely at risk of climate change,

24   but without studying it, we've just decided that New Haven

25   isn't.  That can't be, I think it's clear on its face that

1    that's not the best industry practice because they have chosen

2    to study it at Port Fourchon and understand.  So the study, I

3    think, is the first step.  And then implementation of that

4    study, I can't know what the costs will be to upgrade the

5    terminal, to harden the terminal, in the absence of that

6    analysis.

7           And then I think the final factor that we haven't

8    talked about, and that I, again, don't believe defendants have

9    addressed, is the importance of the issues at stake in the

10   case.  So as I mentioned before, CLF is in the capacity, as a

11   citizen attorney general under the Clean Water Act.  This is

12   not a private dispute between two companies trying to hash out

13   who owes what or under a contract.  This is a program of

14   national importance.  And Connecticut has decided that it is

15   incredibly important to Connecticut to protect its coastal

16   areas from this kind of pollution.

17          In the 70s, Connecticut passed the Coastal Management

18   Act, which I think was very progressive at the time and way

19   ahead of its time in terms of the national environmental

20   protections and emphasized that you need to consider coastal

21   flooding and erosion.  And within the Coastal Management Act

22   itself, there are several provisions that restrict location of

23   new facilities, like defendants', on the coast, and that

24   really show that there are policy concerns around the types of

25   failure of terminals that CLF has alleged in its complaint.

1    And one of our accounts relates to those policies in the

2    Coastal Management Act.

3              But I think that the issues at stake here are quite

4    important.  They're issues of public interest.  They're issues

5    of statewide importance to Connecticut, as defined by its own

6    statutes.  As we, I think, note in our complaint, Connecticut

7    has adopted a sea level rise scenario.  The legislature has.

8    So the legislature is also quite concerned about climate

9    change and how it's going to impact coastal facilities.

10             So and then as we've alleged in our complaint,

11   there's communities around this terminal.  There are people

12   who live there.  And the risks that this terminal presents to

13   them, I think are, for them, incalculable.  So we would say

14   that the issues in this case are quite important and that

15   despite defendants' attempts to, sort of, frame this as this

16   is about one tiny permit in one tiny facility.  Yes, it's

17   about this one facility, but it's not -- the impacts and the

18   policy implications for what happens at this facility are not

19   tiny.  They are of importance to the State of Connecticut and

20   to the federal government.

21             THE COURT:  Okay.  Well, thank you, Attorney Jordan.

22             MS. JORDAN:  Thank you, Your Honor.

23             THE COURT:  All right.  Well, let's turn to Attorney

24   Prather.  So Mr. Prather, as with Attorney Jordan, I will save

25   most of my -- peppering you with most of my questions for

1  during your argument.  But just at the outset, let me just

2  make sure I understand what I'm being told in the new Frank

3  Contreras declaration.  So is it true that the defendants have

4  not run any new searches since the first revised set of

5  requests for production were served on September 5th?

6          MR. PRATHER:  No, Your Honor.  Mr. Contreras ran

7  additional searches, but for the specific purpose of

8  identifying the burden for a particular request, not for the

9  entire set of requests for production.

10          THE COURT:  Okay.  All right.  Well, let me hear you

11  in opposition to the motion.

12          MR. PRATHER:  Thank you, Your Honor.  Attorney

13  Jordan, I think, crystallized the fundamental issue with the

14  approach that CLF is taking to discovery, and that defendants

15  have tried to address in opposing this latest motion, when she

16  focused entirely on this discussion of relevance and the

17  relevance objections that defendants have made but ignored

18  entirely the marginal utility arguments that defendants made

19  to inform why those relevance issues still inform and matter

20  for purposes of appropriate discovery.

21          For example, with respect to these other facilities

22  that Attorney Jordan has described that CLF needs discovery

23  about, if you look at the request themselves, which were told

24  to have been narrowed, but essentially seek the same

25  information as the previous request and in some instances,

1    greater information, they are looking for information from not

2    just any small set of facilities that the defendants operate,

3    but actually any entity within the Shell group, because they

4    just use the term "Shell" that they define broadly as Shell

5    PLC and its subsidiaries, direct or indirect, and with no

6    geographic limitation.  Now, she's --

7             THE COURT:  Well, the inquiry no, isn't it, is about

8    industry practice, not about these defendants' practice.  And

9    aren't the other Shell companies members of the industry?  And

10   isn't what they do inform industry practice?

11            MR. PRATHER:  It informs it, but very narrowly so,

12   Your Honor.  With respect to industry practice, I believe

13   Attorney Jordan herself acknowledged that that's a question

14   that an expert would probably be able to speak very well to,

15   having been exposed to not just what Shell is doing, but many

16   of the other companies that operate within that industry,

17   which we don't have information on, that is available to us,

18   CLF does not have, but that expert probably does.

19            But we can't get to that stage of the proceedings

20   because the extent of what is being sought in fact discovery

21   just grows broader and broader and pushes out farther and

22   farther the time that defendants are spending in fact

23   discovery.  Related to that issue, Your Honor, is this idea

24   that industry practice is somehow informed by what's being

25   done in a facility that has no relation at all to the New

1    Haven terminal.  Facility, and I believe Ms. Bennett's

2    declaration speaks to this, is not limited to a bulk fuel

3    storage facility like the terminal in New Haven.  It includes,

4    potentially, refineries and all other kinds of different types

5    of facilities that are operated for purposes of this industry.

6         THE COURT:  Well, I think your opponent is willing to

7    limit it to bulk fuel storage terminals, right, that are

8    coastal.  And they've given you a definition of coastal that

9    comes from your own documents, right?

10        MR. PRATHER:  Correct, Your Honor.  And with that

11   limitation, we still encounter the same proportionality

12   problems that were raised with respect to the original set of

13   requests for production, when, for example, the effort to

14   narrow essentially requires a level of analysis that the

15   defendants would need to do that they have not done prior to

16   speak to what the risk is at a particular facility.  And in

17   addition to that, conduct a collection and review and

18   production process that mirrors what it's already done for two

19   facilities.

20        The reason why adding even just a single facility for

21   the entire scope of every request for production that's been

22   served is unduly burdensome is because we've seen what that

23   effort requires, and there's additional litigation against

24   Gulf, where they've done a similar exercise, and we've seen

25   what the costs associated with that have been.  What we would

1  be doing is effectively duplicating that same process for one

2  additional facility even.  But presently the request is for

3  many more facilities than that.

4         And so the costs associated with it is not in any

5  means proportional to what would be required to address what

6  is the fundamental issue in the case, which is this permit

7  action, where the determination is that, or the argument is

8  that defendants failed to consider these climate change

9  factors that are described in the complaint -- consider.  They

10  have received testimony from the facilities manager, the

11  environmental manager, engineering companies.  Every single

12  witness that has testified has been unanimous in identifying

13  and acknowledging that those factors are not considered at the

14  New Haven terminal.

15         What we are doing now is embarking on a process where

16  they want to not determine whether or not those factors are

17  considered, but look at how those factors should be

18  considered, even though that's not the claim that was made in

19  the complaint.  So this discovery about what another facility

20  has considered, like Port Fourchon, for example --

21         THE COURT:  Well, I think the claim in the complaint

22  is that best industry practice requires consideration of those

23  factors, right?  And wouldn't what another Shell company does

24  with another facility within a similar distance from the water

25  and whatnot, be relevant to that analysis?

1          MR. PRATHER:  It could potentially be relevant, but

2    again, the marginal utility part of this analysis, I think, is

3    what is more appropriate, because certainly a facility

4    operating within the State of Connecticut would be much more

5    relevant than one that's in Louisiana or outside the country.

6          THE COURT:  Okay.  So let me ask you on the marginal

7    utility and proportionality point.  If this is just shouting

8    right at me in your papers and I've lost sight of it because

9    of the two motions we're arguing today, I apologize.  But

10   where in your papers is the best statement of the precise

11   burden that would accrue to you in searching for another

12   couple of facilities?

13         MR. PRATHER:  That would be the combination of the

14   declaration from Mr. Contreras and the declaration from Ms.

15   Bennett, where Ms. Bennett describes the steps that would need

16   to be taken to even identify what the universe of facilities

17   would be.  And then, once that's done, that process that Mr.

18   Contreras would have to go through for a single additional

19   facility to address as these certain requests for production

20   are written, what's being demanded here.  And that's just to

21   collect the information and do a first level review.  And

22   so --

23         THE COURT:  Yeah.  So again, if I've lost my grip on

24   something very basic, I apologize.  But my memory is that Mr.

25   Contreras gave me a declaration about Providence and told me

 1    that New Haven would likely be similar and so forth.  But

 2    remind me, walk me through, where in the record I would have

 3    something about these other four facilities that they've been

 4    talking about here.

 5            MR. PRATHER:  Well, that would also then relate to

 6    the process that defendants went through, specifically, for

 7    this litigation to respond to the requests that were received,

 8    and the costs associated with that.  Mr. Contreras'

 9    declaration referenced those costs in addition to the searches

10    that were done in Providence.

11            And it is, given the scope of what's being sought

12    here, it's not as though CLF has asked for, with respect to a

13    single request, oh, for four facilities, respond to us with

14    documents for that particular request.  There are eleven

15    requests, at least, that seek all documents related to those

16    particular areas, four other facilities, coastal facilities.

17    If they limited it to a single facility, because of the scale

18    of the requests that are currently pending, then that process

19    would be very similar to what the defendants have had to do

20    here, and also in Providence, in order to provide responsive

21    documents.  And the additional reason why that's not

22    appropriate is it's not connected to the actual claims that

23    are at issue.

24            THE COURT:  Well, so your opponents say that they

25    haven't asked for the same range of documents with respect to

 1    those other facilities as they have at New Haven.  And have we

 2    done any searches that are tailored to the specific requests

 3    they have related to those other facilities to reveal what the

 4    burden is?

 5          MR. PRATHER:  Not with respect to the particular -- a

 6    particular facility --

 7          THE COURT:  Okay.

 8          MR. PRATHER:  -- because those facilities have not

 9    yet been identified other than the requests that have been

10    made.  But I will point Your Honor to documents that

11    defendants have produced that do reference other facilities or

12    issues related to other facilities previously, which informed

13    the expansion of document requests that we did receive from

14    CLF.

15          So for example, the Sewaren event.  Defendants

16    produced information related to that, primarily because CLF

17    requested it after learning that it could be potentially

18    relevant as a way of resolving the disputes about the scope.

19    By giving that information, it just opened the door to saying,

20    now we want to know about the facility in Long Island, we want

21    to know about the facility in Deer Park, we want to know --

22          And so this problem that we're having now is to every

23    extent that defendants go to find information that is targeted

24    specifically at the issues, then what comes back is this

25    doesn't say what we thought it was going to say, so there must

1    be more information out there that says what we're looking

2    for.  Which is some idea that there has been coordination with

3    the defendants for this facility, among other facilities, to

4    do things a particular way, and they've just made a decision

5    not to do it, even though they do it everywhere else.  And

6    that's simply not the case.  And that's been the testimony

7    that they've received and the documents that they've received

8    say the same.

9            And it's interesting that for purposes of talking

10   about this marginal utility and the issues related to the

11   State of Connecticut, defendants went through the process of

12   obtaining a witness to review all of the publicly available

13   Stormwater Pollution Prevention Plans, which are the primary

14   documents that would indicate what the best management

15   practices are or what the best industry practice is for these

16   issues, and did not locate, within that set, any of the things

17   that CLF is referencing.

18           We produced those SWPPPs to CLF, which then would

19   point them to the other facilities, not just in Louisiana or

20   outside of the country, but in Connecticut that are under the

21   same general permit to show what they're doing.  And that

22   would give them an opportunity to look further at those SWPPPs

23   or get additional discovery from whatever third-party might be

24   relevant to those SWPPPs.

25           But again, seeing that information, the conclusion

1   was, that's not enough, because what we're concerned about

2   more broadly is everything that's being done by a Shell-

3   related company, really in any location, as long as they're

4   operating a facility that is on the coast.  And so ultimately,

5   there is no satisfying that need for more information.  At the

6   outset of when the parties first engaged in these disputes,

7   related to the first request for a production, CLFs position

8   was, we don't know what we don't know, but at this stage they

9   know a lot more than they did at that time.  But the request

10  that they've made hasn't narrowed a bit, or at least not in

11  any meaningful way with respect to the burden that we would

12  still find ourselves under, trying to even identify what could

13  potentially be responsive to those requests.

14         THE COURT:  Okay.  You wouldn't grant them that any

15  of these requests had been significantly narrowed?  There

16  aren't three where you would say, oh, yeah, that revised

17  request is meaningfully different than the one that Farrish

18  ruled upon in August?

19         MR. PRATHER:  Yes.  And I think those were the ones

20  where they agreed to adopt the proposed revisions that

21  defendants made or suggested to make them fit better with the

22  ruling that we received from Your Honor.  But that was a small

23  number of the requests.  Ultimately, I believe they were

24  attached as exhibits to CLFs motion.  Ultimately, for the

25  large majority of them, the proportionality concerns and

1    burden concerns that we raised before were simply just not

2    accepted, because relevance is the only thing, as far as we

3    can tell, that dictates, irrespective of marginal utility or

4    those things, dictates what should be available in discovery.

5    And that position, defendants simply disagree with.  And I

6    think that's also inconsistent with what we've been informed

7    by the Court previously in these discovery disputes.

8         THE COURT:  Okay.  Part of your answer to my question

9    was about Ms. Bennett's declaration.  So tell me why I should

10   credit her claim that it would be difficult to determine which

11   of the defendants' facilities are coastal facilities?  It

12   doesn't sound plausible to me.

13        MR. PRATHER:  When you say -- I may have misheard

14   part of the question.  You said what would --

15        THE COURT:  So at the very beginning, maybe five

16   minutes ago, when I was asking you to kind of survey the

17   current state of the lack of proportionality claim, you

18   referenced Mr. Contreras and also Ms. Bennett.  And one of the

19   things that Ms. Bennett tells me is, well, this will be really

20   hard because we don't know which facilities are coastal.  Why

21   should I credit that?

22        THE COURT:  I believe it was a bit more nuanced in

23   the sense that it's not that we're not able to ascertain which

24   facilities are coastal or not.  It's there's no list just

25   sitting in a database somewhere that you can pull up to say,

1  here are all of the coastal facilities.  That is something

2  that would need to be assembled and collected from a wide

3  range of different companies and individuals and then

4  compiled.  So she's more so speaking to the steps.

5         THE COURT:  Yeah.  There's a list of bulk petroleum

6  storage terminals in the United States, right?

7         MR. PRATHER:  I don't believe there's a specific list

8  for that, but there are -- not for bulk petroleum storage.  I

9  don't have an understanding, and I have not seen documents to

10  suggest that the way that the facilities are tracked is kept

11  that specifically in terms of refinery versus bulk or for

12  petroleum storage facility.  But in any event --

13         THE COURT:  Yeah, tell me why I should credit the

14  suggestion that it would take somebody more than a couple of

15  hours, tops, to identify all bulk petroleum storage facilities

16  in the United States that are coastal?

17         MR. PRATHER:  In the United States?  I don't believe

18  that Ms. Bennett's declaration spoke specifically to that

19  determination, because that's not what was being requested.

20  But that's a narrowing that's not been proposed.

21         THE COURT:  Okay.  In the Americas.

22         MR. PRATHER:  So I believe she went through the

23  process of trying to determine that.

24         THE COURT:  Okay.  In the Americas, why should I

25  think that would take more than a couple of hours?

1            MR. PRATHER:  I think the issue is not how much time

2    to identify the facilities, but rather the process that would

3    be entailed once they're identified what the information is

4    that needs to be collected in that process.

5            THE COURT:  Well, I understand.  That's a different

6    question though.

7            MR. PRATHER:  Right.

8            THE COURT:  What I understood her to be telling me in

9    the declaration was just that part of it was going to be very

10   hard to do, and I struggle to credit that.

11           MR. PRATHER:  I understand, and I, to the extent that

12   there was misunderstanding about what she was intending to

13   share there, though, I believe the focus was on the full scope

14   of what was currently being demanded or requested.  So it

15   didn't speak to the U.S.  And once you, particularly, once you

16   go beyond those geographic barriers and then go to other lines

17   of business, because there is no limitation to a specific

18   company or specific line of business, that expands

19   dramatically the number of facilities that would need to be

20   identified before you could determine what is and isn't a

21   coastal facility.

22           THE COURT:  Okay.

23           MR. PRATHER:  Oh, and just a clarification with

24   respect to the analysis and information that Mr. Contreras

25   provided, when we discussed what would be entailed in terms of

1    other facilities in the process for collecting documents, we

2    used what we did in New Haven, specifically, as the proxy to

3    kind of extrapolate from there so that it was connected to the

4    work that that he's done in this case.  In addition, just

5    speaking again to this idea --

6                THE COURT:  Right.  So, if I may.

7                MR. PRATHER:  Certainly.

8                THE COURT:  Just let me test my understanding of

9    this, because I've got two cases swimming around in my head

10   here, this one and the Gulf case at noon.

11               MR. PRATHER:  Sure.

12               THE COURT:  So the data points that we have on burden

13   are basically the Providence affidavit, and we have the New

14   Haven affidavit about what the searches run with respect to

15   those facilities are.  And I think what I hear you telling me

16   is that that's our proxy for what it would take to add even a

17   single other facility to the list here, right?

18               MR. PRATHER:  Correct, Your Honor.

19               THE COURT:  Okay.  But again, I think your opponent

20   says that we haven't asked for the same scope of documents

21   with respect to those other facilities as we did with respect

22   to New Haven or with respect to Providence.  And I suppose

23   they might say, gee, Judge Farrish, I don't know that you can

24   sustain a burdensomeness or lack of proportionality objection

25   when you're in the dark as to what the scope is.

1          MR. PRATHER:  Certainly.  But if you recall, Your

2    Honor, the search that Mr. Contreras ran, he targeted specific

3    RFPs.  It wasn't the entirety of the RFPs when he identified a

4    number in terms of the cost associated with the documents that

5    would be returned and what would be required to review those.

6    He looked at the revised RFPs specifically and identified

7    certain requests.  He did not do that analysis for every

8    single one, but the purpose was to identify as an example of

9    here are the costs associated with even one of these at least

10   eleven additional RFPs that are seeking the information

11   related to the other facilities --

12          THE COURT:  Okay.

13          MR. PRATHER:  -- and the cost associated with that.

14          THE COURT:  All right.  I get it.  I didn't sit down

15   and build out a list of the ones where he had given us a data

16   point in the New Haven declaration then compare it to the list

17   of ones that they say relate to the other terminals they've

18   asked for.

19          MR. PRATHER:  I would direct Your Honor specifically

20   to paragraphs 27 through 31 of his declaration and 33 through

21   37 that speak specifically to that.  With respect to CLFs

22   arguments regarding the public statements that have been made.

23   Again, this goes back to the same issue that we've encountered

24   throughout this litigation, where statements made by companies

25   that are not defendants in this litigation are then imputed to

1    the defendants, and that they must have information or should

2    be brought to account for those statements that have been

3    made.

4              And that's also reflected in the revised RFPs, which

5    essentially repeat the same requests that were served before

6    to seek speeches, videos, articles that were published by

7    other entities as far back as the 1990s and then receive

8    documents related to their creation.  This is an example of

9    not showing any real change, for purposes of proportionality

10   or marginal utility, with respect to requiring defendants to

11   search for or produce those documents.

12             With respect to the statement about the ownership of

13   the terminal or the operator of the terminal, CLFs position

14   seems to be now contrary to what they actually pled in the

15   complaint, which was that Motiva was the operator up until

16   2017, and then the operator changed after that point.

17             They point to no documentation, nothing that we've

18   produced, or otherwise, testimony that they've received to

19   suggest, or to imply, that they have a basis for expanding the

20   discovery of the Clean Water Act claims to the defendants to

21   go back to the period before that, to somehow hold them

22   accountable for the operation of the terminal at that time

23   when Motiva was the operator.  That's just not been

24   established, and there's really no basis for doing so.

25             In addition to that, it's factually incorrect to say

1    that defendants have taken the position that RCRA doesn't

2    apply, or that, excuse me, that they've conceded that they

3    were the operator for RCRA purposes prior to 2017.  What

4    defendants offered instead was to provide documents pre-2017,

5    because that could be informant of historic contamination at

6    the property.  It was not for purposes of accepting any

7    particular operator or suggesting that operator liability for

8    the defendants should extend beyond that period.  That was a

9    reasonable resolution, particularly given the nature of RCRA

10   claims versus the nature of Clean Water Act claims.

11           The 2017 issue, which was resolved by Judge Merriam

12   as to Motiva, part of the reason why those claims were

13   dismissed as to Motiva was that post-2017 activity did not

14   involve Motiva, and so you can't potentially hold those claims

15   against them as an operator of the terminal going forward.

16   The same logic applies in the opposite direction.  And we've

17   seen nothing, and they've received no testimony that says that

18   anything different should apply here.

19           And just to be clear, defendants have not taken a

20   hard line stance across the board of everything that's pre-

21   2017 is off limits.  If you look at the responses to the

22   revised RFPs, there are specific instances where defendants

23   have raised a time frame objection and specifically called out

24   withholding documents on that basis.  It is not across every

25   single request that has been made, and I believe 14 of the 41

1    revised RFPs don't even reference any time frame objection at

2    all.

3         And so this has been an ongoing effort to meet what

4    CLF has requested and identified as being important for

5    purposes of their claims, while at the same time not

6    undertaking something that has little to no marginal utility

7    and would require additional steps far beyond what is

8    appropriate for the type of claims that have been asserted

9    here.

10        Ultimately, defendants are in a position where they

11   have no ability to place any limitation on what CLF is further

12   pushing or pursuing, because any information they receive is

13   discounted if it doesn't say the things that they would prefer

14   that they say related to how climate change is considered at

15   the terminal.  They have testimony and documents that show

16   those factors, as they've been described by CLF, were not

17   considered.

18        And so the next question is what should be the result

19   of that?  And that's the best industry practice question.  And

20   I believe it's been conceded, or at least accepted, that the

21   answer to that question is probably best informed by what are

22   companies operating in this state doing that would inform the

23   best industry practice, and we have SWPPPs that show that

24   already, and we've produced them.  And they also have the

25   SWPPP for the Providence terminal in Rhode Island, as well as

1    the Gulf facility that's the subject of the other litigation.

2    And in addition to that, it would be an expert who could speak

3    to it.

4           Notably, back in December 2022, CLF did an inspection

5    of the terminal with its expert.  Yet here we are, over a year

6    later, and there's still no identification of the potential

7    costs associated with what CLF would claim is necessary to

8    address the claims that they've asserted.  And meanwhile, the

9    costs just continue to rack up in discovery when the cost

10   associated with any of those things, we've gotten no

11   information about what that would or should be.

12          And ultimately, it's simply unfair to defendants to

13   continue going down that road, incurring those costs, and now

14   potentially expanding them exponentially solely for the

15   purpose of collecting information, not to establishing a

16   particular claim.  So with respect to that, Your Honor, CLFs

17   motion should be denied, and the Court should hold them to the

18   same standard that was identified, articulated, and thoroughly

19   discussed with respect to the first set of requests for

20   production that CLF served.

21          THE COURT:  Okay.  Well, before I pass the microphone

22   back to Attorney Jordan, and there's an issue that she doesn't

23   seem to want to make much out of, but I want to know the

24   answer to.  So you may recall that I ordered the defendants to

25   produce fifty documents that were redacted, produce it to them

1   in unredacted form that they specified.  And my understanding

2   is that you produced only thirty-six of them.  Can you tell me

3   why the other fourteen were not produced?

4        MR. PRATHER:  Yes, Your Honor.  Within that order, it

5   required defendants to produce redacted documents that

6   effectively prevented the reader from understanding the

7   substance of the documents because of those redactions.  The

8   list of documents that we received from CLF, there were a

9   number of documents, honestly, the majority of them, where it

10  was still clear on the face of the document what the

11  information was about, and the type of information related to

12  the facility.

13       However, we agreed to produce thirty-six of those

14  documents in the interest of trying to resolve that issue,

15  even though we raised it with CLF and asked for an explanation

16  to show us how it was the case that those particular

17  documents, and we provided a chart explaining our

18  understanding and asking for a response, to say, what is it

19  about this document that you're not able to ascertain?

20  Because if you can't answer that question, that means it's

21  inconsistent with what was actually required of defendants.

22  We want to understand.

23       What we were told is, well, we don't have an

24  obligation to do that.  We gave you a list of fifty documents,

25  unredact all of them, and give them to us.  And that dispute

1    resulted in the production of thirty-six of the fifty that

2    were requested.

3          THE COURT:  All right.  Let me test my understanding

4    of that by trying to give it back to you in my own words.

5          MR. PRATHER:  Sure.

6          THE COURT:  So I think my words in the order were,

7    they should identify fifty documents where the redactions are

8    depriving them of context.  And your view of it is that

9    fourteen of their fifty identifications were documents where

10   you didn't think that was at work where they were asking for

11   the information behind the redactions for some other purpose

12   than to get context for the unredacted information.  Do I have

13   that right?

14         MR. PRATHER:  Correct, Your Honor.

15         THE COURT:  Okay.  Well, I don't know that it was in

16   my contemplation that you would kind of self-help -- resort to

17   self-help on that.  I'll consider whether I want to take that

18   up any further.  But with that, thank you, Mr. Prather.

19         Let me turn back to Attorney Jordan to hear the last

20   word.

21         MS. JORDAN:  Thank you, Your Honor.  I have some sort

22   of disjointed notes to try to respond to some of the points

23   that Attorney Prather made.  So I think where I'd like to

24   start is Attorney Prather was characterizing how defendants

25   respond to climate threats and risks at other facilities as

1    relevant solely to best industry practice.  I think it is

2    directly relevant to best industry practice, but it's also

3    relevant to two other issues in this case.

4          One is defendants' knowledge not only of climate

5    risks, but also how to adapt to them.  And that is at the

6    heart of counts 3, 8, and 9 in our complaint.  Because there

7    are provisions in this permit that essentially say it's a

8    violation of the permit, if you know things that are relevant,

9    and you don't disclose them.

10          THE COURT:  Right.  What we called the disclosure

11   claims last time.  Right.

12          MS. JORDAN:  Exactly, Your Honor.  And then

13   defendants' knowledge of both the risks and how to adapt to

14   them is also relevant to the penalties provisions of the Clean

15   Water Act.  Now, we don't have bifurcated discovery in this

16   case.  So we are simultaneously seeking discovery on liability

17   and penalties.  And one of the several factors for the Court

18   to consider in penalties is not only the history of the

19   violation, but defendants' -- I'm going to paraphrase because

20   I don't have it in front of me -- intentionality or knowledge

21   or lack of good faith.

22          And so again, I think that this information that we

23   are seeking is not marginally relevant.  It is directly on

24   point to what the permit requires, as Judge Meyer found in his

25   order.  But it is also directly relevant to two other aspects

1    of the claims that are before the Court.

2        I also would like to note that defendants have

3    offered several reasons why identifying facilities is really

4    hard, determining whether they even fall within our list is

5    really difficult.  But that's all information that's only

6    within defendants' possession and control, which is why we

7    engaged with them for months to say, well, what is your

8    counteroffer?  So if our definition, if our narrowing, for

9    these other facilities that we think are facially relevant to

10   the claims is too broad, then how can we make it more

11   manageable?  And we didn't get any engagement on that point.

12       I find it hard to believe.  Well, I know for a fact

13   from the discovery we have, for example, that all of the U.S.

14   East facilities are -- they have a list of them, because it's

15   the same set of people responsible for implementation of the

16   health, safety, and environmental compliance aspects.  So many

17   of the defendants we've talked to, I'm sorry, many of the

18   employees of the defendants we have talked to, they don't

19   actually work at the terminal.  They work for U.S. East.  So

20   they work across a number of terminals in the eastern part of

21   the United States.

22       So we have -- that list exists.  And I imagine that

23   U.S. West and other parts of other geographical areas are

24   similarly organized, though, because we haven't received

25   discovery on that, I don't know.  But defendants know.  And I

1    think it was within their obligation in negotiating with us in

2    good faith to try to figure that out and at least say, okay,

3    we don't have any list of, let's say, the facilities in Asia

4    or in Africa or in Europe, but we have them for North America

5    and here they are.

6          It would take three hours to figure out if they're

7    coastal or it would take a long time, let's say, to figure out

8    if they're coastal.  If that were the case, CLF would have

9    just looked at a map and said, well, based on our view, you

10   gave us the names of all these terminals.  We can see where

11   they are.  It looks like these ones are coastal.  How about

12   those?  But we didn't get into that level of back and forth

13   because defendants said we can't identify a narrowing concept

14   for you.  Even one more terminal is just too burdensome.

15         And I think it's -- there was an RFP at issue here,

16   RFP 12.  Let me make sure I have the number right for the

17   record.  I'm sorry, RFP 63, which seeks only information about

18   Hurricane Sandy's impact at one terminal, which is the Sewaren

19   facility in New Jersey.  That is an incredibly narrow,

20   directed request.

21         But in defendants' declaration, put forth by Mr.

22   Contreras, he asserts that responding to that request, in

23   conjunction with the others, would be the equivalent of having

24   to review, I think, something like a million documents because

25   he extrapolates each of the other facility requests across

1    them.  And I don't know how difficult it would be to respond

2    to that request, because, again, I don't think -- defendants

3    have said they've never searched to try to determine what the

4    universe of information is.

5           But another important point about that request is

6    that not only did we make allegations about Hurricane Sandy

7    and the Sewaren facility in our complaint.  So we've been

8    interested in that event because we think it's analogous to

9    what could happen at this terminal since the beginning of the

10   case.  But it became clear, when defendants partially complied

11   with your order to produce unredacted documents, that they had

12   gone through and purposefully taken out information about that

13   event at the Sewaren facility so that we would be deprived of

14   it.

15          So they spent I don't know how many hours and how

16   many dollars to explicitly remove information directly

17   relevant to what we pled in our complaint and to the request

18   that we had served on them.  So we didn't discuss this part of

19   our motion, but I think the idea that defendants' burden is

20   enormous sort of ignores that there are different levels of

21   burden for different universes of documents.

22          So there are the documents that they went through and

23   spent a bunch of time trying to deprive us of relevant

24   information.  My understanding, from how our discovery

25   software works and our limited conversations with them, is you

1    could just turn those redactions off and produce the documents

2    to us.  That seems like it would be not burdensome at all.

3           And then there are other documents within the

4    universe of documents that have already been collected or

5    reviewed, so there's no collection burden, where defendants

6    could run a search of Sandy plus Sewaren.  And I don't know

7    how many documents would result from that search, but if it's

8    a million, then we can talk about how to further narrow it.

9    But I somewhat doubt that it's a million since their search

10   terms -- it's unclear to me whether their search terms were

11   designed to even pull in that information.

12          So again, I think that the burden claims in Mr.

13   Contreras' declaration and in the briefing generally just

14   don't reflect how the requests were written.  Several of the

15   other facility requests are sufficient to show requests or

16   requests for a policy that, again, would presumably apply to

17   multiple facilities if it's a policy.  But also, CLF can only

18   do so much narrowing before we're just sitting at the table

19   arguing against ourselves if we get no counter proposal and no

20   engagement.

21          I'd also like to note that defendants have talked

22   about what other assets in the Shell group do.  That's just,

23   like, not relevant.  It's also, not, maybe, within our

24   control.  Again, we didn't ask --

25          THE COURT:  I don't think I heard them say it wasn't

1   relevant.  I think I heard them say it doesn't have a ton of

2   marginal utility when they've already produced 175 SWPPPs and

3   so on.

4           MS. JORDAN:   So again, on the SWPPP point, I think

5   we note this.  There's more discussion of it in our opposition

6   to their motion for partial summary judgment, but we do note

7   it in our reply.  They did not produce 175 SWPPPs.  They

8   produced 150-something partial SWPPPs.  I think the majority

9   of which predate the current permit.  So any provisions which

10  from the 2011 permit to the present permit.

11          And again, defendants have also taken the view that,

12  well, if we want information about another facility, it has to

13  be a terminal, because that's the only type of facility where

14  the stormwater practices could possibly be relevant, because

15  we have sued a terminal here.  I don't know how many of the

16  SWPPPs that defendants have produced are what they would

17  consider are for industries or facilities that are like the

18  terminal, and they have not provided that.  So I think that

19  would further narrow.

20          But I think, again, the broader point that we make in

21  our briefing is of the very, I think, five percent or fewer of

22  those facilities that they provided to us, I'm sorry, of those

23  partial SWPPPs that they provided to us, those SWPPPs are not

24  reviewed or approved by any regulatory authority.  They are

25  also, to the best of our knowledge, there's no evidence that

1   those SWPPPs represent the best industry practice.  I think

2   they are a data point.  I'm not saying they're not.

3          But if defendants know, because they have within

4   their possession, custody, and control how to address

5   hurricane risk at a coastal facility in South Carolina, let's

6   say, that seems much more relevant.  And they have documents

7   that talk about, yeah, this is how you assess the risk, this

8   is what you need to do to harden or mitigate.  That seems so

9   much more on point to this question, not only of what is the

10  best industry practice for addressing climate change, but what

11  do you know about how to address climate change?  And that

12  then informs the knowledge counts and the penalties.

13         Defendants also in their -- and I believe we

14  mentioned this in our opening brief -- defendants have a

15  practice of collecting information about what other members of

16  their industry have done and incidents, catastrophic

17  incidents, of other members in their industry.  So I think we

18  mention a facility maybe in, like, Oklahoma that is in their

19  metocean DEP where there's a list of facilities and they say

20  these are weather related catastrophic events that have

21  happened at a ConocoPhillips facility, for example.  How they

22  responded to that was bad practice.  We would respond

23  differently.  Let's learn from what they did.

24         That's apart from what we have, we can tell, that

25  that's apart of how defendants operate.  So it actually seems

1   like not only do they have relevant information about

2   facilities within the Shell group, but they also have relevant

3   information about other actors within their industry that they

4   rely on in making decisions.  But the defendants have taken

5   the position that that metocean DEP was produced inadvertently

6   and is totally irrelevant, and that they won't produce any

7   more information related to it.

8        So again, I think that from the discovery we do have,

9   defendants have a vast amount of knowledge about best industry

10  practice.  And we're entitled to receive at least some of that

11  knowledge, but their position has been but it's not about the

12  terminal, it doesn't matter.  And sort of shifting this to be

13  entirely a battle of the experts I think really deprives CLF

14  of the relevant facts in defendants' possession, what they

15  know and what they could have done or should have done.

16       I also wanted to note that in, sort of, defendants'

17  characterization that we didn't sufficiently revise the

18  requests.  There were fifty-three requests that CLF could have

19  reissued.  We ultimately only reissued forty-one.  So there is

20  some -- some of the requests represent an attempt to

21  consolidate information into a single request.  But also, we

22  did request less information than we could have.  We gave up

23  the opportunity to reissue more RFPs in an attempt to, without

24  sacrificing information relevant to our claims, in an attempt

25  to reduce the overall burden.

1          I'd also note that defendants' objected to all but

2     four of our requests on time grounds.  I just went through.

3     We provided the Court with a chart that's at --

4          THE COURT:  Right.  Exhibit --

5          MS. JORDAN:  -- yeah, ECF 309-8.  And at least my

6     plain reading of it is that they objected to all but four on

7     time grounds.  And so their objections were not constrained to

8     just a subset of these requests.  And we brief for the Court

9     why we think the -- even if the Court were to agree with

10    defendants' temporal sort of separation between RCRA and Clean

11    Water Act claims, there are a whole set of requests that we

12    think seek information that is relevant to the RCRA claims,

13    but defendants have decided it's only relevant to the Clean

14    Water Act, so they're not producing information from prior to

15    2017.

16         And I believe that's all I have for Your Honor, if

17    you don't have any questions for me.

18         THE COURT:  No.  I think I have asked them.

19         MS. JORDAN:  Thank you, Your Honor.

20         THE COURT:  All right.  Mr. Prather, some of what she

21    said in there was responsive to me, not to you.  So even

22    though it's ordinarily the rule that she gets the last word

23    here if there's something briefly.

24         MR. PRATHER:  I'll keep it brief, and hopefully she

25    won't need to respond to it.  But I did want to clarify two

1    things.  One, with respect to the documents related to how the

2    Shell group of companies manage risk, and particularly how

3    they manage risk at the terminal, those documents have been

4    produced.  The policies that govern that have been produced,

5    and they've obtained testimony about how that functions and

6    how that operates, particularly at the New Haven terminal as

7    well.

8            So it's a bit of a mischaracterization to say that

9    they're not getting access to how those risks are being

10   addressed as it relates to their claims.  The idea of

11   particular climate analyses or what that should entail, that's

12   a different discussion and a different issue that they are

13   also seeking discovery on.  But that's taken up in the

14   arguments that we've made about marginal utility as it relates

15   to other facilities and things of that nature.

16           The one other point that I wanted to clarify is that

17   we have not withheld documents relating to what we call

18   "learning from incidents", which is if there is a catastrophic

19   event at another facility that would inform how the New Haven

20   terminal operates, which I believe is the way that they

21   learned about the Sewaren, or received information about the

22   Sewaren incident in the first place, we have produced that

23   because it has a nexus to the terminal and how it deals with

24   precipitation events and things of that nature.

25           And so this is not an example of defendants simply

1    just stonewalling and saying, no, we're not giving you any

2    information at all that ever talks about or references another

3    facility.  It's an attempt to structure it in a way that

4    doesn't require massively expanding the scope of the discovery

5    for a benefit that doesn't seem to be connected to

6    specifically how you address risk at the terminal, but also

7    what the requirements are under the permit that's applicable

8    in the case.

9            THE COURT:  All right.  Well, let me make sure I

10   understand that last point.

11           MR. PRATHER:  Sure.

12           THE COURT:  So if you guys have a document that

13   analyzes what happened at some tank farm in New Mexico and

14   doesn't reference the New Haven terminal, are you telling me

15   that that's been produced in accordance with one of your

16   searches or --

17           MR. PRATHER:  If the analysis of the tank farm

18   informs how the New Haven terminal addresses its own tanks,

19   then yes.  Now just the fact that there was an incident --

20           THE COURT:  Even if it doesn't -- even if it were New

21   Haven or --

22           MR. PRATHER:  The word New Haven doesn't necessarily

23   have to -- doesn't have to appear.  That's not the basis for

24   withholding or otherwise not producing any of those particular

25   documents.  Now, it's worth noting, and I think this is part

1    of the issue that has created some disconnect.  But there has

2    not been, or at least at the time of the filing of the

3    complaint, there hadn't been an incident at the New Haven

4    terminal where a storm event resulted in a release.  And we

5    recently received documentation from a FOIA that CLF itself

6    served where the Connecticut DEP specifically identified that

7    in terms of what the activity was related to those terminals.

8         THE COURT:  Okay.  Yeah, I'm not sure I want to open

9    up a new front in the argument here.

10        MR. PRATHER:  Understood.

11        THE COURT:  But one thing I do want to understand is

12   that -- so I think what I hear you saying, Mr. Prather, is

13   that you really don't have a relevance objection to a document

14   in which one of your clients' discusses some catastrophe at

15   some other facility in New Mexico as long as it informs what

16   goes on in New Haven.  You don't have a relevance objection to

17   that.  And to the extent that any such documents haven't been

18   produced at this point, they're really just burdensomeness

19   objections.  We'd have to -- the search we'd have to run to

20   root them out is too burdensome.

21        MR. PRATHER:  Correct, Your Honor.

22        THE COURT:  Okay.  All right.  I think I get it.

23        Okay.  Well, I am going to take the matter under

24   advisement.  So I do have a couple of opinions that I have to

25   get out in other matters at the beginning of next week, but

1    then I'm going to turn right to this.  So you should get a

2    decision from me on this fairly shortly.

3            So I have kind of put off deciding the deposition

4    related motions, because I expected you guys probably wanted

5    to draw a circle around what the document universe was before

6    you went taking a whole bunch of depositions.  But does

7    anybody want to update me on what -- you did mention that two

8    depositions have been taken, but otherwise the issues over the

9    scope of the 30(b)(6) deposition notices are sitting in the

10   same place where we left them last time we talked about it?

11           MS. JORDAN:  Yes, Your Honor.  And I actually did --

12   I think we both wanted to address there's a deadline in the

13   case for Monday related to your order at docket number 287,

14   where the parties were directed to within 45 days of the close

15   of fact discovery submit simultaneous briefing about the need

16   for the deposition of the other four individuals that CLF had

17   previously asked for.  And we just wanted to seek your

18   guidance on that because we haven't taken the defendants'

19   depositions yet.

20           CLFs position is that the sort of state of play has

21   not really altered since we submitted our last status report

22   to you.  But as we understand the order, we need to, because

23   Monday is a federal holiday, file, basically, renew our motion

24   to depose those four individuals today.  And we are happy to

25   do that if the Court would like us to, but we don't want to --

1          MR. PRATHER:  Well, Mr. Prather, I'm not inclined to

2    hang them up on that when the root of it basically is that I

3    haven't gotten out decisions on this as quickly as I could

4    have.

5          MS. JORDAN:  So we just wanted to raise that for you.

6    I think our -- I think the parties' hope in suggesting this

7    solution to you was that we would cover some of the topics in

8    the defendants' depositions that we wanted to cover with these

9    individual people.

10          THE COURT:  Right.

11          MS. JORDAN:  So.

12          THE COURT:  Right.  So I do remember that.  So I'm

13    going to ask my law clerk here just to make a note that we'll

14    take a look at the schedule.  But if what we have here is an

15    oral motion for relief from that Monday deadline.

16          MS. JORDAN:  Yes, Your Honor.

17          THE COURT:  Mr. Prather, any objection?

18          MR. PRATHER:  No objection, Your Honor.

19          THE COURT:  Okay.  We'll go ahead and grant it.  And

20    we'll take up what the deadline should be later on.

21          MS. JORDAN:  Thank you.

22          THE COURT:  All right.  So all of this has been

23    helpful to me.  It would be great if you guys could talk

24    amongst yourselves about ordering the transcript and we should

25    probably note for our court reporter's convenience that

1    everybody's been using the term "SWPPP" here.  Perhaps we

2    could render that in the transcript as S-W-P-P-P.  And yeah,

3    if you guys would take care of ordering that and it can be

4    charged as a cost at the end of the case that would be great.

5              Let me see if there's anything else I wanted to touch

6    on before we adjourn.  No.  If there's nothing further from

7    either counsel, we will stand in recess until the next matter

8    at noon.

9              MS. JORDAN:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             THE CLERK:  All rise.  The Honorable United States

12   District Court is now in recess.

13             (Whereupon the above matter was concluded at 11:23

14   o'clock, a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T I O N

2

3          I, Kelly Borngen, Official Court Transcriber for the

4    United States District Court for the District of Connecticut,

5    do hereby certify that the foregoing pages are a true and

6    accurate transcription of the proceedings in the

7    aforementioned matter to the best of my skill and ability.

8

9

10   Date: January 20, 2024

11

12

13

14   _____

15              KELLY BORNGEN, CDLT-290

16              eScribers, LLC
                7227 N. 16th Street
17              Phoenix, AZ 85020
                (800) 257-0885
18

19

20

21

22

23

24

25