# Exhibit B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Conservation Law Foundation, Inc.,<br><br>                              Plaintiff,<br><br>      v.<br><br>Shell Oil Company,<br>Equilon Enterprises LLC d/b/a<br>Shell Oil Products US,<br>Shell Petroleum, Inc.,<br>Motiva Enterprises LLC, and<br>Triton Terminaling LLC,<br>                              Defendants. | No. 3:21-cv-00933-SALM |

## DEFENDANTS' RESPONSES TO PLAINTIFF CONSERVATION LAW FOUNDATION'S FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS

Defendants Shell Oil Company[1], Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum, Inc., Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") respond below to Plaintiff's First Set of Interrogatories ("Interrogatories").

## PRELIMINARY STATEMENT

Defendants' good-faith Responses are based on information presently known to Defendants. The Responses are made without prejudice to Defendants' right to supplement their responses if further responsive information and documents become known to Defendants hereafter.

Motiva Enterprises LLC ("Motiva") is the *prior* owner/operator of the bulk storage and fuel terminal located at 481 East Shore Parkway, New Haven, Connecticut 06512 ("Terminal" or "New Haven Terminal") that is the subject of this litigation. Since May 2017 it has had no interest

---

[1] As disclosed in Defendants' prior filing (ECF No. 56), Shell Oil Company changed its name to Shell USA, Inc.

of any kind in the Terminal and no involvement in the Terminal's operations. Motiva does not now and never has shared a parent company with any other defendant. Two of the defendants, Shell Oil Company and Shell Petroleum, Inc., have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal. Each defendant is a separate legal entity; the use of collective terms (e.g., "Defendants") and/or common objections and Responses herein is solely for the purpose of streamlining Defendants' Responses to Plaintiff's Interrogatories, and should not be construed to have any other effect.

## GENERAL OBJECTIONS AND LIMITATIONS

1.      Defendants object to the Interrogatories to the extent they seek privileged or confidential information, including but not limited to information encompassed by the attorney-client privilege, the attorney work-product doctrine, the deliberative process privilege, or any other applicable privilege or immunity. Defendants' responses are not intended to and cannot be construed as a waiver or relinquishment of any applicable privilege or immunity.

2.      Defendants object to Plaintiff's definition of "**Defendants**" as overbroad and unduly burdensome, including to the extent the definition groups together each of the named Defendants in this action, each of which is a separate legal entity, and because the term is defined to include numerous non-parties, including "corporate parents(s), subsidiaries, and affiliates." This definition could include foreign companies and defies the basic principles of corporate separateness. Plaintiff cannot seek discovery of information about or from non-parties to this litigation. While Plaintiff states that it "does not intend to impose a discovery obligation on any person who is not a party to this the litigation, this definition is internally inconsistent.

3.      Defendants object to the Interrogatories to the extent they seek information not in the possession, custody, or control of the Defendants.

4.      Defendants object to the Interrogatories as unduly burdensome to the extent they require more than a reasonable search of their records reasonably believed most likely to contain the responsive information, and to the extent they seek information or documents in a format other than as the information is kept in the usual course of business.

5.      Defendants object to the Interrogatories to the extent that they call for information beyond the scope of discovery permitted under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(b). Plaintiff's claims pertain to whether or not there are current or ongoing violations of certain provisions of the Terminal's Clean Water Act (CWA) General Permit for Discharge of Stormwater Associated with Industrial Activity or whether waste at the Terminal is currently managed in violation of the Resource Conservation and Recovery Act (RCRA). The injunctive relief sought by Plaintiff is by definition forward-looking, and to the extent Plaintiff seeks civil penalties, such relief is limited to violations not more than five years old. Numerous Interrogatories seek information that is not relevant to the claims in this matter (*e.g.*, entirely unrelated to the Terminal, issues beyond the CWA/RCRA claims, broad global warming/climate change issues, or the time period at issue), and/or the relief sought by Plaintiff. For these same reasons, Defendants also object to these Interrogatories as overbroad and unduly burdensome and not proportional to the reasonable needs of the case.

6.      Defendants object to the Interrogatories to the extent that they seek the production of information that is publicly available, and therefore equally available to Plaintiff.

7.      The information that Defendants produce in response to the Interrogatories, if any, is being produced solely for the purpose of this action. Should any party seek to admit the information contained in these Responses in motion or trial, such information is subject to all objections regarding relevance, authenticity, materiality, propriety, and admissibility and any other

3

objections that would require exclusion of such information from evidence. All such objections are expressly reserved and may be raised at the time of motion or trial.

8.      Defendants reserve the right to object to other discovery directed to the subject matter of the Interrogatories. Defendants' decision to provide information notwithstanding the objectionable nature of any Interrogatory should not be construed as a stipulation or admission that the information provided is relevant or admissible, a waiver of any objection, or an agreement that requests for similar discovery will be treated in a similar manner.

9.      To the extent Defendants reference documents as responsive or potentially responsive to any Interrogatory, those references do not constitute an admission that Defendants agree with any characterization, disputed facts or other information contained therein.

10.     Defendants object to Instruction 6, which establishes the applicable timeline for the Interrogatories from January 1, 2011 to present, as overbroad and unduly burdensome.

11.     Defendants object as overbroad to Plaintiff's definition of "**Defendant's General Permit**" for establishing the relevant period as starting October 1, 2011.

12.     Defendants object to Plaintiff's definition of "**Terminal Site**" as overbroad because the inclusion of "all locations to which hazardous waste has travelled" encompasses off-site disposal locations that are beyond the scope of this litigation.

These General Objections are incorporated by reference into each of the individual Responses below. The following Responses are made subject to the foregoing Preliminary Statement, these General Objections, and the specific objections provided for each respective Interrogatory. Defendants do not waive any General Objections in response to any specific Interrogatory propounded, and any specific objection made by Defendants in no respect limits or modifies the General Objections stated herein.

## INTERROGATORIES

**INTERROGATORY NO. 1**

Describe all analyses You have done of past and current conditions regarding, and changes or potential changes in, the frequency or severity of storms, the quantity of precipitation, and/or the risk of flooding at the Terminal.

**OBJECTION:** Defendants object to this Interrogatory as overbroad, unduly burdensome and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011, which is far beyond the period relevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA. Defendants also object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome to the extent it seeks information regarding all "past and current conditions" and "changes or potential changes" in the weather conditions identified. Defendants object on the basis that "changes or potential changes" in weather conditions are irrelevant to whether there is a current violation of any permit conditions. Defendants further object to this Interrogatory to the extent the term "all analyses" seeks information protected by the attorney-client privilege and the attorney work-product doctrine.

**RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Defendants Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton Terminaling LLC ("Triton"), and former owner/operator Motiva are or were principally engaged in the storage and distribution of petroleum and other fuel products at the Terminal; they do not undertake the complex meteorological predictions and analyses described in Interrogatory

5

No. 1.  Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva look to scientific and regulatory entities such the Federal Emergency Management Agency (FEMA), National Oceanic and Atmospheric Administration (NOAA), United States Geological Survey (USGS), and the Connecticut Department of Energy Environmental Protection (CT DEEP) for such analyses.  *See also* Response to Interrogatory No. 3.

## INTERROGATORY NO. 2

Describe all analyses You have done of the impacts or potential impacts—including past, current and future impacts—of climate change on the Terminal.

**OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period relevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants further object to this Interrogatory as overbroad, vague, ambiguous, and unduly burdensome, including the use of the term "climate change." "Climate change" is not defined and is an extraordinarily broad term that may refer to myriad processes over significantly varying periods of time and is not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms. Defendants also object to this Interrogatory to the extent the term "all analyses" seeks information protected by the attorney-client privilege and the attorney work-product doctrine.

**RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: with respect to the weather-related risks raised by CLF's claims, such as increased precipitation, flooding, and severe or extreme storms, such analyses are conducted in accordance with applicable regulatory requirements. The Terminal's containment areas meet the standards of (i) 110% of the capacity of the largest container within the containment area, and (ii) the capacity of the largest container within the containment area plus sufficient freeboard to contain precipitation, using a 25-year, 24-hour storm event for purposes of determining sufficient freeboard. Stormwater monitoring is conducted consistent with General Permit No. GSI002800, and the results of the monitoring are reviewed to evaluate trends in the performance of the Terminal's stormwater management system, including but not limited to during periods of severe precipitation. *See also* Response to Interrogatory No. 3.

## INTERROGATORY NO. 3

Describe all ways in which You have taken climate change, global warming, the greenhouse effect or greenhouse gases, flooding, sea level rise, severe or extreme storms, and/or severe or extreme weather into consideration in designing and operating the Terminal, including the costs of any actions taken.

**OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011, which is far beyond the period relevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants further object to this Interrogatory as overbroad, vague, ambiguous, irrelevant, not proportional to the reasonable needs of the case, and unduly burdensome, including the use of the terms "climate change" and "greenhouse effect," neither of which are defined and are extraordinarily broad terms that may refer to myriad processes and effects over significantly varying periods of time and are not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms. Defendants also object to the request of "costs of any actions taken" as irrelevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case.

**RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: The Terminal has been in existence and continuously operating at its current location adjacent to the New Haven Harbor, the Quinnipiac River, and the Mill River, Connecticut since 1951. This period of operation includes numerous significant weather events of the types identified in the Amended Complaint (*see* Section IV, describing risks

from severe precipitation and flooding events). The risks posed by severe precipitation and flooding are not new to the Terminal and have long been incorporated into its design and operation.

With regard to operations, as noted in the Response to Interrogatory No. 1, the Terminal is engaged in the business of receiving, storing, and distributing petroleum and other fuel products, and thus the prevention of fuel spills into the environment is built into its business purpose. Operational updates and maintenance driven by process safety, technology, and asset integrity address risks from severe precipitation and flooding. These updates and maintenance actions may overlap with actions taken for environmental compliance.

The Terminal is first focused on prevention of potential spills. For example: Tanks and equipment (including holding ponds, pumps, and loading racks) are inspected by operating personnel multiple times daily to ensure, among other things, that there are no visible leaks in the system, and/or sheens. Tanks are inventoried every weekday and after each weekend (representing a three-day folio of Friday, Saturday, and Sunday), which enables the Terminal to account for any product loss or possible water entry. Storage tanks are inspected monthly. Above-ground storage containers are professionally inspected and thickness testing is performed per industry standards. Tank inspections are completed per API 653 inspection and repair codes, and all tanks are inspected every ten years rather than on the twenty-year cycle prescribed by the API code. Pipelines undergo annual pressure testing, and regular inspections. Tank dike areas are drained as necessary to provide adequate secondary containment in the event of a release (only after first confirming that

drain water is free of product or sheen). The pumps at the Terminal utilize a seal monitoring device that monitors for leaks and provides a warning for potential leaks before they can be observed visually. Stormwater monitoring is conducted consistent with General Permit No. GSI002800, and the results of the monitoring are reviewed to evaluate trends in the performance of the Terminal's stormwater management system, including but not limited to during periods of severe precipitation. Emergency response and preparedness trainings and drills are conducted on a regular basis. These include, but are not limited to, annual Spill Prevention Control and Countermeasures (SPCC) training, annual Stormwater Pollution Prevention Plan (SWPPP) training, annual RCRA training, annual Hazardous Waste Operations Emergency Response tabletop exercises, and Oil Pollution Act of 1990 (OPA 90) preparation exercises on a triennial cycle.

In the event of a hurricane or other major storm event projected to potentially impact the Terminal, a number of steps are taken to prepare. For example, the dock is inspected for items that could be blown away by high winds, and any such items are removed. Tanks are then inventoried to ensure there is sufficient product in the tanks to prevent floating, and additional product (or water) is added to tanks as needed for ballast. Drums are moved as needed to covered storage. Settling ponds are evaluated for sufficient capacity and released as needed. Isolation valves at the land/water interface are closed. Emergency response procedures are engaged, including potential shutdown or moving of critical IT infrastructure.

**INTERROGATORY NO. 4**

Describe any changes to the Terminal made to address risks associated with the frequency or severity of storms, changes in the quantity of precipitation, sea level rise, and/or climate change, including the costs of each change.

> **OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants also object to this Interrogatory as overbroad, vague, ambiguous, and unduly burdensome, including the use of the terms "climate change" and "associated risks." "Climate change" is not defined and is an extraordinarily broad term that may refer to myriad processes and effects over varying periods of time and is not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms. Defendants also object to the request of "costs of each change" as irrelevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case.
>
> **RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.
>
> Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: *see* Response to Interrogatory No. 3; *see also* Response to Interrogatory No. 9.

**INTERROGATORY NO. 5**

Describe all actions taken at the Terminal to prevent flooding, including the dates when those actions were taken and the costs of each change.

> **OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants also object to this Interrogatory as ambiguous, because the term "flooding" is subject to various interpretations. Defendants also object to the request of "costs of each change" as irrelevant to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case.

> **RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

> Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: Defendants cannot "prevent" flooding. However, the risk of flooding can be and is mitigated through operational planning and maintenance measures. *See* Response to Interrogatory No. 3; *see also* Response to Interrogatory No. 9.

**INTERROGATORY NO. 6**

Describe how You considered climate change when developing Stormwater Pollution Prevention Plans for the Terminal.

> **OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants also object to this Interrogatory as overbroad, vague, ambiguous, and unduly burdensome, including as to the use of the term "climate change" which is not defined and is an extraordinarily broad term that may refer to myriad processes and effects over varying periods of time and is not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms.

> **RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

> Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: *see* Response to Interrogatory No. 2. Further, the purpose of the Terminal's Stormwater Pollution Prevention Plan (SWPPP) is to identify potential sources of pollution and outline specific management activities designed to minimize the introduction of

pollutants into stormwater, including stormwater resulting from the types of severe precipitation and flooding described in Section IV of the Amended Complaint.

## INTERROGATORY NO. 7

Describe all circumstances where water from the New Haven Harbor, the Quinnipiac River, or the Mill River entered the Terminal, including but not limited to, storm surge, tides, and any other flooding.

**OBJECTION:** Defendants object to this Interrogatory as overbroad and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants further object that the phrase "entered the Terminal" is vague and ambiguous and subject to various interpretations. Defendants also object to the language "all circumstances" as unduly burdensome.

**RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: The knowledge of Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva responsive to this Interrogatory is limited to their period(s) of ownership and/or operation. To the best of these Defendants' knowledge waters from the New Haven Harbor, the Quinnipiac River, or the Mill River have never entered the Terminal.

14

**INTERROGATORY NO. 8**

Identify all documents You have provided to the Connecticut Department of Environmental Protection regarding weather conditions, climate change, or risk of flooding at the Terminal.

> **OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants further object to this Interrogatory as vague, ambiguous, and overbroad, specifically regarding the use of the terms "climate change" and "weather conditions." "Climate change" is not defined and is an extraordinarily broad term that may refer to myriad processes over varying periods of time and is not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms. "Weather conditions" is also not defined and ambiguous.
>
> **RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.
>
> Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton, and Motiva respond as follows: with respect to the weather-related risks raised by CLF's claims, such as increased precipitation, flooding, and severe or extreme storms, NOAA daily precipitation data is and has been provided to the Connecticut Department of Energy and Environmental

Protection as part of monthly required discharge monitoring reporting. This Response will be supplemented if additional documents containing the requested information are identified

## INTERROGATORY NO. 9

Describe how You make decisions concerning preparation for severe weather and/or climate change and associated impacts, including rising sea levels, at all coastal facilities that You own or operate, including but not limited to:

a.  any applicable policies and procedures, and

b.  all entities consulted in making the decisions.

**OBJECTION:** Defendants object to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the CWA, or the relief sought in this case. Defendants further object to this Interrogatory as vague, ambiguous and overbroad, specifically to the use of the terms "climate change" and "associated impacts." "Climate change" is not defined and is an extraordinarily broad term that may refer to myriad processes over varying periods of time and is not tailored to the limited issues in this case concerning alleged CWA violations under the Terminal's current permit and alleged RCRA violations related to increased precipitation, flooding, and severe or extreme storms. Defendants also object to this Interrogatory as overbroad, unduly burdensome, irrelevant and not proportional to the reasonable needs of the case to the extent that it seeks any information beyond that specifically pertaining to the Terminal,

16

which is the subject of this litigation, not "all coastal facilities." Defendants will limit their Response to responsive information regarding the New Haven Terminal.

**RESPONSE**:  Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Motiva responds as follows: Motiva has not owned or operated the Terminal since 2017, and accordingly makes no such decisions regarding the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US and Triton respond as follows: *see* response to Interrogatory No. 3. Further, decision-making regarding planning for and preparedness for potential severe precipitation and flooding events is made based on policies, experience, and real-time developments unique to each site. With regard to policies, the Terminal follows the protocols required under its Facility Response Plan and SPCC.  Terminal personnel rely on their training, and to varying degrees, prior experience with significant storms, to inform decision-making regarding an advancing storm. Real-time developments also play a role in decision-making, and these are largely informed by weather tracking tools such as Impact Weather and StormGeo. The Terminal may communicate with entities such as the United States Coast Guard, Connecticut Department of Energy and Environmental Protection, Connecticut Division of Emergency Management, New Haven Local Emergency Planning Commission, and the U.S. Environmental Protection Agency, which has responsibility for reviewing and approving

the Facility Response Plan, regarding planning for and preparedness for significant weather events.

Additionally, severe weather and other risks are addressed through the Terminal's Asset Integrity Process. This process helps to both ensure compliance with permit requirements and evaluate and address physical risks to the Terminal. In doing so, the Terminal utilizes site-specific engineering practices in maintaining its preparation for severe weather effects. There are no universally applicable engineering practices and such practices are highly site-specific. Operational procedures also play a vital role in Asset Integrity, particularly with respect to weather-related events.

The Terminal's process for risk assessment begins with the Health, Security, Safety, Environment and Social Performance Control Framework (HSSE Control Framework). This is an overarching, general framework that provides a high level set of goals and objectives for all companies within the Shell group to identify risks. While applicable to all companies, the HSSE Control Framework is not a prescriptive set of standards and it is the responsibility of each company to determine how such risks must be managed. Each company is responsible for applying to HSSE Control Framework to its own unique circumstances.

The New Haven Terminal is part of the Trading & Supply business. In Trading & Supply, alignment with the goals and objectives of the HSSE Control Framework is carried out through an Asset Management System (AMS) process that is unique to Trading & Supply.

18

The AMS is intended to align with the goal for all Shell group entities of "No Harm, No Leaks" for assets. The AMS creates a general framework of policies and procedures to harmonize assets with the high-level goals of the HSSE Control Framework. In doing so, the AMS requires that asset integrity management procedures be in place and are followed. The implementation and operationalization of such procedures are handled at the site-level.

There are three teams at the site-level to develop and implement these policies and procedures based on local circumstances and conditions, including local regulatory requirements, which can vary substantially by site. These teams are Engineering, HSSE, and Operations. These teams conduct assessments and develop plans to ensure that all equipment in the Terminal, particularly Safety Critical Equipment (SCE), has a risk-based and fit-for-purpose inspection and maintenance regime. For example, when preparing for an oncoming storm, operations will consider several factors, including, but not limited to, the location of tanks (e.g., nearness to surface water), elevation, product levels in tanks, and height of dike walls – none of which is detailed in a set of broadly applicable processes or procedures. Additionally, each site is individually governed by the overlapping federal, state, and local regulations applicable, creating a minimum standard that must be applied and complied with by each individual site.

Hazards are identified through an operational Hazards and Effects Management Process (operational HEMP). Each facility is unique and therefore has its own unique operational HEMP. This process identifies hazards, top events and their consequences, threats that may release the hazards, and barriers (equipment or human) that can prevent threats from

releasing a hazard or limit consequences of events. Engineered barriers are be designed to prevent an unwanted event or mitigate harmful consequences.  Operational (control and recovery) barriers are also employed to address potential risks, including those arising before, during, and after weather-related events. At the New Haven Terminal, SCE includes product storage gasoline tanks (excluding distillate tanks), emergency shutdown devices, and tank high level alarms, among other equipment.

Within Trading & Supply, terminal operations are governed by the Terminal Operations Manual. In addition, each Terminal has its own unique Local Operating Procedures (LOP) for certain activities depending on local circumstances. For example, at the New Haven Terminal secondary containment mechanisms, such as is relevant here, stormwater discharge, and bund and dike walls, are informed by the LOP and applicable regulations and permit requirements.

**INTERROGATORY NO. 10**

Describe the process for conducting stormwater monitoring at the Terminal, starting from any steps that may precede a storm, including the beginning of a storm and duration of a storm, and ending with review of samples sent to a lab for analysis, including all steps taken and the time periods involved in each step.

**OBJECTION:** Defendants objects to this Interrogatory as overbroad, irrelevant, and not proportional to the reasonable needs of the case, including to the extent it requests information from January 1, 2011 onwards, which is far beyond the period applicable to Plaintiff's claims regarding alleged current and/or ongoing violations of RCRA and the

CWA, or the relief sought in this case. Defendants further object to this Interrogatory as unduly burdensome, including to the extent it asks for information on "all steps" and "time periods involved in each step."

**RESPONSE:** Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Motiva responds as follows: Motiva has not owned or operated the Terminal since 2017, and has no responsive information regarding how stormwater monitoring is conducted at the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US and Triton respond as follows: The Terminal has a comprehensive inspection program for asset integrity. Daily operator rounds inspect for leaks that could impact stormwater and visually inspect stormwater accumulation in the tank farm containments areas and retention ponds for sheen or other impacts to stormwater. Semi-annual sampling and laboratory analysis was last conducted on December 16, 2018. At that time, semi-annual stormwater laboratory analysis was discontinued, consistent with the terms of the permit, because the required sampling parameters were below benchmark levels for the four preceding sampling events. That sampling looked for evidence of pollutants entering the stormwater drainage system, any impact to storm water including inspecting the retention ponds and outfall, and the structural components of the stormwater system (*e.g.* OWS, product storage, and handling areas). Stormwater monitoring at Outfall 001 is conducted on a quarterly basis by a third

party on an ongoing basis. A sample representative of the discharge is collected and visually inspected for various water quality characteristics including color, odor, oil sheen, and other indications of stormwater impacts. If there are findings of impacted stormwater in these inspections, action would be taken to prevent discharge and correct the issue as appropriate.

Prior to initiating any discharge, the retention ponds are inspected for any visible oil sheen or other pollutants. Discharge is not initiated if there are any findings. When the pumps are activated to allow discharge, the operator will stand by during the discharge event to monitor.

**INTERROGATORY NO. 11**

Identify each of Your employees whose work relates to engineering, design, emergency preparedness, and/or environmental compliance at the Terminal, including but not limited to consultants, advisors, and policy- and decision-makers, specifying the entity that employs each employee and describing the activities each employee effects at the Terminal.

**OBJECTION**: Defendants object to this Interrogatory as overbroad and unduly burdensome to the extent that it seeks information beyond that specifically pertaining to the Terminal or Terminal employees. Defendants further object to this Interrogatory as vague, ambiguous, unduly burdensome, overbroad, and not proportional to the reasonable needs of the case specifically to the use of the terms "relates to," "consultants," "advisors," and "policy- and decision-makers." These terms are extraordinarily broad, undefined, and

22

can be understood to seek information regarding individuals beyond the scope of this litigation.

**RESPONSE**: Shell Oil Company and Shell Petroleum, Inc. have never owned or operated the Terminal, or otherwise controlled the operations of the Terminal, and have no information responsive to this Interrogatory regarding the Terminal.

Motiva responds as follows: Motiva has not owned or operated the Terminal since 2017, and has no responsive information regarding current employees at the Terminal.

Equilon Enterprises LLC d/b/a Shell Oil Products US and Triton respond as follows: Employees with responsibility/accountability for the issues relevant to this case on the topics listed are:

- Mike Sullivan, Facilities Manager, Shell Pipeline Company LP

- Theresa Geijer, Environmental Advisor, Shell Pipeline Company LP

- James Kent Yeates, Lead Facility Engineer, Shell Pipeline Company LP

- Ed Henke, Program Manager, Soil and Groundwater, Equilon Enterprises LLC

Dated: May 13, 2022

        /s/ Bina R. Reddy
James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

23

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)
BEVERIDGE & DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

*Counsel for Defendants*

## <u>VERIFICATION OF INTERROGATORY RESPONSES</u>

I, Michael Sullivan, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify under penalty of perjury that the foregoing is true and correct.

Executed on May _13_, 2022

Michael Sullivan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above-referenced date, I served a copy of the above and foregoing upon all counsel of record by email.


      /s/ Megan L. Morgan
Megan L. Morgan