

King & Spalding LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100
www.kslaw.com

March 20, 2025

**VIA ECF**

Hon. Judge Thomas O. Farrish
U.S. District Court
District of Connecticut
United States Courthouse
450 Main Street - Suite 262
Hartford, Connecticut 06103
Clerk's Office: (860) 240-3200

> **RE:** *Conservation Law Foundation v. Shell Oil Products U.S., et al.*,
> Civil Action No. 3.21-cv-00933-VDO

Dear Judge Farrish:

    We represent all Defendants in the above-referenced action. Pursuant to this Court's March 17, 2025 ruling at ECF 542, and in accordance with ECF 473(3.b), Defendants respectfully submit this letter brief on the Parties' dispute regarding corporate designee Brian Evans's preparation for a Rule 30(b)(6) deposition.

## BACKGROUND

    Defendants designated Brian Evans to testify as Defendants' corporate representative on 21 Topics within Plaintiff's Rule 30(b)(6) deposition notice. *See* Feb. 12, 2025 Deposition of Brian Evans ("Evans Depo.")[1] at 7-8. Mr. Evans is currently employed by non-party Shell Pipeline Company ("SPLC") as a Business Opportunity Manager, working within the Trading & Supply Line of Business. Prior to his current role, Mr. Evans spent many years employed as a Distribution Operations Manager, managing the allocation of resources at the New Haven Terminal, which is the subject of this lawsuit. His personal knowledge of the Terminal, stemming from years of experience in this managerial role, made him an ideal candidate to testify on Defendants' behalf regarding the facts at issue in this lawsuit, including as specified in Plaintiff's Rule 30(b)(6) deposition notice.[2]

    CLF completed Mr. Evans's deposition on February 12, 2025. Mr. Evans testified for approximately six hours on the record—and was in the deposition room at Plaintiff's counsel's

---

[1] The deposition testimony of Mr. Evans cited in this letter brief is not an exhaustive list of all testimony he provided in connection with the associated Topics, but rather is intended to provide examples of the depth and breadth of his testimony.

[2] Defendants note that Plaintiff has already taken full-length depositions of five current and former employees, including Mr. Evans, in their individual capacity, and another 30(b)(6) deposition. In many of these depositions—and in written discovery—Plaintiff explored these issues already.

office for over eight hours—regarding extremely broad deposition topics. *See generally id*. Throughout the deposition, Mr. Evans provided courteous, detailed answers in response to repetitive and often harassing questioning from Plaintiff's counsel, which frequently exceeded the scope of the notice served, and inquired into additional and irrelevant subject matters. There was no question he refused to answer[3]. Yet Plaintiff elected to terminate the deposition early,[4] while Mr. Evans remained present, willing and able to continue answering Plaintiff's questions. Plaintiff now claims Mr. Evans was insufficiently prepared to address Topics 1, 2, 3(g), 21, 23, 24, 30, and 31.

## ARGUMENT

Under Rule 30(b)(6), "an entity must make a good-faith effort to designate the person or persons with the knowledge sought and to prepare those individuals so that they may fully answer the questions posed on the relevant subject matters." *Expert Choice, Inc. v. Gartner, Inc.*, No. 303CV02234CFDTPS, 2006 WL 8447096, at *4 (D. Conn. June 21, 2006). Here, the record demonstrates that Mr. Evans was reasonably prepared to provide testimony on the designated topics, and in fact did so for over six hours of record time. Plaintiff's decision to terminate the deposition prematurely, while Mr. Evans remained present and willing to continue testifying, should not be rewarded with an additional deposition, let alone at the expense of Defendants. Simply put, Defendants have already satisfied their obligation to produce a witness with knowledge to testify on these extremely broad topics and no additional deposition is justified. However, if the Court allows Plaintiff to take an additional deposition of Mr. Evans on any topic, such deposition should be limited to the time that Plaintiff left on the table while Mr. Evans remained willing to continue.

It is well settled that Rule 30(b)(6) depositions are not a memory test, and no witness is expected to recall every minute fact or circumstance under the sun, just because it may fall under the broad umbrella of a noticed topic. *See Harger Da Silva v. New York City Transit Auth.*, No. 17CIV4550FBVMS, 2023 WL 8096925, at *4 (E.D.N.Y. Nov. 20, 2023) ("Rule 30(b)(6) is not designed to be a memory contest. Rule 30(b)(6) does not require the organization to be pressed into the role of a private investigator for the plaintiff.") (internal citation and quotations omitted). Therefore, even if Mr. Evans could not recall certain highly particularized details regarding specific deposition questions, this does not suggest he was insufficiently prepared. At most, such questions and answers may provide fodder for cross-examination, but do not render the corporate representative's deposition invalid. *Fashion Exch. LLC v. Hybrid Promotions, LLC,* No.

---

[3] Unable to demonstrate that Mr. Evans refused to answer a single question, Plaintiff now suggests that Mr. Evans provided non-responsive and/or repetitive answers. This argument is belied by the transcript. To the extent that Mr. Evans offered any repetitive answers, such answers were either responsive to the questions asked, or repeated in response to repetitive questions from Plaintiff's counsel. Plaintiff's apparent dissatisfaction with Mr. Evans's answers does not justify any additional deposition, or the imposition of costs for same upon Defendants.

[4] Prior to the deposition, the parties agreed that Plaintiff could depose Mr. Evans for up to a total of 8.5 hours of record time—90 minutes beyond the time limit contemplated by Fed. R. Civ. P. 30 (setting the maximum deposition time to "1 day of 7 hours"). Plaintiff nevertheless terminated the deposition after roughly 6 hours of record time and would go forward with questioning, despite Defendants' record objection to any later continuation of the deposition.

14CV1254SHSOTW, 2019 WL 1533212, at *1 (S.D.N.Y. Apr. 9, 2019) ("If the deponent answers on behalf of the organization that it cannot remember a certain fact, that inability to remember is imputed to the organization but does not invalidate the deposition."). Parties conducting depositions pursuant to Rule 30(b)(6) are required to "confine the examination to the matters stated with reasonable particularity" in the topics contained in the deposition notice. *Falchenberg v. N.Y. State Dept. of Educ.*, 642 F. Supp. 2d 156, 164 (S.D.N.Y.2008) (citation omitted). Plaintiff cannot demand answers to questions outside the scope of the noticed topics. "If the 30(b)(6) deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem." *Id*.

Regarding the standard for sanctions, "in order to impose sanctions for [inadequate testimony], the inadequacies of the testimony must be egregious." *Expert Choice, Inc. v. Gartner, Inc.*, No. 303CV02234CFDTPS, 2006 WL 8447096, at *4 (D. Conn. June 21, 2006) (internal citations omitted). As the record reflects, Mr. Evans's testimony was not inadequate, and certainly not egregious. *See Harger Da Silva,* 2023 WL 8096925, at *4 ("A party seeking sanctions for an unprepared Rule 30(b)(6) witness must show that the deponent's inability to testify was 'egregious and not merely lacking in desired specificity in discrete areas.' Even when there is deficient Rule 30(b)(6) testimony, courts are reluctant to award sanctions.").

In any event, the record clearly demonstrates that Mr. Evans was sufficiently prepared to testify on each of the noticed topics, as reflected in the following deposition testimony.

**Topic 1: Corporate Structure of Defendants.**
The record is clear that Mr. Evans was well prepared to address Topic 1 regarding the Defendants' corporate structure. In fact, Mr. Evans painstakingly testified, through Plaintiff's repetitive questions, that "Triton is the owner of the New Haven Terminal, and Equilon is the operator doing business as SOPUS, Shell Oil Products US." *See, e.g.,* Evans Depo., at 200:15-20. He also differentiated Triton and Equilon as legal entities that are distinct from Trading & Supply, which is a line of business—not a legal entity. *Id.* at 223:5-18; *see also id.* at 225:16-20 ("So Triton is the owner of the New Haven terminal. Equilon is the operator. The employees who manage the New Haven terminal are part of the trading and supply organization."). Mr. Evans explained that "there are operating agreements between Triton, Equilon and the fact that SPLC provides the employees that operate the facility on behalf of the operator Equilon." *Id.* at 250:9-16; *see also id.* at 264:6-13 (discussing the operating agreement that describes how "SPLC employees are involved to provide the service to operate the terminals on behalf of Equilon, the operator").

This testimony, and related testimony elsewhere in the deposition, establishes that Mr. Evans was adequately prepared to address Plaintiff's counsel's questions on this topic. To be sure, Topic No. 1 requested testimony on the corporate structure of each Defendant that provides some level of service or operations "at or for the New Haven Terminal." Mr. Evans confirmed that those entities are Triton (the owner) and Equilon (the operator). He testified as to the agreements between those companies as they pertain to managing the terminal, including with the personnel provided by SPLC. Plaintiff's suggestions to the contrary, including a cherry-picked question and answer regarding Mr. Evans's unfamiliarity with a particular organizational chart, do not affect this conclusion. In any event, Defendants have provided this information in response to written discovery, including production of this and many other organizational charts. This alone should

quell any purported concern over Plaintiff's ability to discover this information.[5]  No additional deposition is necessary on this topic.

**Topic 2: Lines of Business.**

Mr. Evans's testimony on the various lines of business within the Shell group of companies, and how they interact with individual assets like the New Haven Terminal, was similarly extensive. In fact, there is far too much testimony on this subject matter to include here.

However, even a cursory review of the deposition transcript reveals Mr. Evans's testimony explaining that, "Trading & Supply is a line of business" and "an organization of people that manages all the trading, supply and distribution activities that are carried out in Shell[,]" which includes individuals that work at the New Haven Terminal, is sufficiently detailed and nuanced. *Id.* at 234:4-235:24; 236:3-8; 236:21-237:6. Mr. Evans testified that the head of Trading & Supply is Andrew Smith, Executive Vice President of Trading & Supply. *Id.* at 242:17-243:18; *see also id.* at 255:4- (testifying that below Andrew Smith, "the Senior Vice President of Distributions Operations in midstream is Anthea Hampson.  The Senior Vice President of Commercial Operations is Yor Vinka.  Senior Vice President of Crude Trading is Stacy Pitts.  Senior Vice President of Products Training is Richard Jory.  Senior Vice President of Shipping and Maritime is Kerry Troth.").  He further explained that the Trading & Supply line of business includes "distribution operations in midstream, which includes the people that work at the New Haven terminal," as well as "commercial operations, [] Shell Energy, [] crude trading, products training . . . [and] shipping and maritime." *Id.* at 243:19-244:16. He further testified that Distribution Operations, which is a subgroup of Trading & Supply, includes the New Haven Terminal within its US team. *Id.* at 247:7-18; *see also id.* at 248:4-249:3. More specifically, Mr. Evans testified that "[w]ithin trading and supply, and then within distribution operations and midstream, there are guidance documents around terminal operations and asset management and those sort of things that are utilized by the team at New Haven to manage the terminal." *Id.* at 257:20-258:11.

Perhaps most tellingly, Mr. Evans provided a lengthy answer explaining the structure within Trading & Supply as follows:

> [W]ithin those groups of trading and supply that I told you on the other question, you know, crude products, distribution operations in midstream, within each of those groups, it's further divided—and let's just take distribution operations for example. It's divided into – there's an Americas organization, there's a US organization. The US organization is split between east and west. And in the east, distribution operations organization, there's a group for the terminals in the northeast, which includes Providence, New Haven, and Long Island. Mike Sullivan is part of that group. And then, for example, under Mike Sullivan, there are terminal managers for each terminal. And then under the terminal managers, terminal operators.

*Id.* at 248:10-249:3.

Mr. Evans further testified to various corporate functions within the Shell group of companies as applied to the New Haven Terminal. *See id.* at 287:6-288:2 ("[Y]ou can go into the directorates, like I mentioned, the downstream is a directorate, and within downstream you have

---

[5] In addition to written discovery and document productions, Plaintiff may also reference Defendants' Rule 7.1 Corporate Disclosure Statements, filed on December 6, 2021 (ECF 26-27).

the trading and supply line of business. There are also corporate functions, which includes finance, it includes contracting and procurement, it includes HR, it includes IT. Those sort of groups are called corporate functions, and they are centrally aligned from an administrative perspective[.]").

It is beyond clear that Mr. Evans, who is personally employed within the Trading & Supply line of business, was more than prepared to—and did—handle this Topic.

**Topics 3(g) and 21: Design & Engineering Practices ("DEPs") Related to Metocean; Services Provided by the Metocean Team at Port Fourchon and Other Facilities.**

The record reflects that Mr. Evans was well prepared to answer Plaintiff's questions regarding the Metocean Team, and indeed provided thoughtful, detailed answers to Plaintiff's questions on these topics. Mr. Evans confirmed that he is "aware of the Metocean team," which is a "technical group that provides support to Shell businesses and assets for advising on meteorological and oceanographic phenomenon and related data." *Id.* at 30:2-10. Mr. Evans explained that "Metocean is short for meteorological and oceanographic. And the Metocean team specializes in that technical discipline, evaluating meteorological and oceanographic patterns, effects and sometimes are called upon to help the business with various issues or risks that we may be dealing with in that space." *Id.* at 127:22-128:7; *see also id.* at 128:24-129:10 (further explaining that the Metocean group "provides technical input on design considerations for potential new projects . . . And they could conduct various other studies in the Metocean discipline if called upon to do so."); 129:12-24 ("[T]he Metocean team doesn't really deal with assets directly, they deal with the meteorological and oceanographic environment in which they're studying. And that could vary depending on what they're called upon to help with."); 130:23-131:16 ("Metocean focuses on providing information to make risk management decisions. So, we have to deal with a risk that a local business has identified and they've then determined that the Metocean team would be able to provide some expertise to help them make an informed decision."). He further described that the Shell group of companies "leverage[s] Metocean when there's a business need, when we have a risk or scenario that needs to be evaluated that requires a skill set. We looked at them for advice and recommendations." *Id.* at 32:5-16. And despite the lack of relevance of climate change considerations in complying with the requirements of the industrial stormwater permit in place at the New Haven Terminal, Mr. Evans testified that, "[I]f by climate change you mean severe weather and changing weather patterns, the Metocean team does evaluate things of that nature and provides information to the business. But typically, it's going to be for a specific risk that the business is aiming to manage." *Id.* at 131:6-16; *see also* 133:5-134:16 ("elaborating on [Plaintiff's] question" to explain how the Metocean team responds, when asked by a local business asset, "to identify and implement measures to manage that risk").

Mr. Evans confirmed that, in preparation for his deposition, he met with one of the "few" subject matter experts from the Metocean Team (Sergio Jaramillo) "to help me understand what types of work Metocean does, who that group is, and learning more about how they support Shell." *Id.* at 141:4-23; 188:21-189:5. He also testified that he reviewed various studies authored by the Metocean Team in preparation for the deposition. *Id.* at 31:9-18; 189:1-5. Plaintiff then introduced Exhibit 1243, a Metocean guidance document entitled, "Metocean Design and Operating Considerations – Guideline for the Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation." *Id.* at 145:16-146:8. Mr. Evans confirmed that he had reviewed this document in preparation for his deposition and proceeded to answer **35 transcript pages** of Plaintiff's questions regarding same, despite Defendants' objections that this document was outside the scope of the deposition notice. *Id.* at 145:16-180:7; *see also, e.g., id.* at 166:6-9

5

(explaining that this document "provides guidance to the design team if the team has identified that there is a climate-related risk that needs to be managed as part of the project design").

With regard to Topic 3(g), Mr. Evans testified about relevant DEPs used by the Metocean team, and how it "appl[ies] practices that Shell's developed in that discipline over the years." *Id.* at 343:2-5; 30:22-31:6; 157:8-158:1 (answering a question about the only Metocean DEP that Plaintiff actually discussed in the deposition). Mr. Evans proceeded to answer questions regarding the Metocean DEPs, and how they are considered and developed by the engineering team, including discussions with subject matter experts. *Id.* at 343:6-345:17 (explaining that "[t]hey have different disciplines, different roles with specialties, and they would get to the right person that speaks on that. If that person needed to reach out to, for example, the Metocean team, to get advice, they would do that."). Mr. Evans also explained how DEPs are implemented at individual facilities in collaboration with the reliability integrity engineer and facility engineer for the subject asset. *Id.* at 344:25-346:25.

Based on this record of Mr. Evans's extensive testimony regarding the Metocean team and associated design engineering practices, it is remarkable that Plaintiff believes Mr. Evans was not adequately prepared to provide testimony on these topics at his deposition. In any event, Plaintiff is scheduled to take the deposition of Paul Verlaan, a member of the Metocean Team, on March 20, 2025. Defendants have also offered to let Plaintiff take the deposition of Sergio Jaramillo, another member of the Metocean team, on a later date.[6] These individuals represent two of the "few" Metocean team members Mr. Evans testified about. Given Mr. Evans's extensive testimony on this subject, Plaintiff's request for even more duplicative testimony from Mr. Evans on this subject is unnecessary.

**Topic 23 and 24: Insurance Policies; Communications with Insurers.**

Though irrelevant to any claim or defense here,[7] Mr. Evans testified as to the existence of insurance policies at the New Haven Terminal which cover potential losses related to "wind damage and other weather-related damage." *Id.* at 269:23-270:12; 271:3-8. He further testified that he is "not aware of any claims" under those insurance policies for any damages at the Terminal (*id.* at 276:13-17), nor any requests from an insurer to "make modifications to its insurance policies" to protect against risks such as flooding, hurricanes or wind. *Id.* at 276:24-278:4.

Despite Plaintiff's claims to the contrary, no additional information regarding insurance policies or communications with insurers is relevant or proportional to the needs of this case. In

---

[6] On March 26, 2025, Plaintiff is also scheduled to take the deposition of Pusp Naidu, on the subject of DEPs. This further undercuts any claimed necessity for more deposition testimony from Mr. Evans on Topic 3(g).

[7] This case concerns claims for damages and injunctive relief regarding alleged noncompliance with an industrial stormwater permit at the Terminal. Defendants previously advised in the Initial Disclosures that "there are no insurance policies that are applicable to this matter." (*I.e.*, "insurance agreements under which an insurer may be liable to satisfy all or part of a possible judgment in the above-titled action"). *See* Defendants' Initial Disclosures (Feb. 11, 2022), at 2, 4. That remains true, and any additional information regarding what insurance Defendants may or may not have in place for the Terminal for other purposes bears no relation to any claim or defense in this action, nor is it proportional to the needs of the case. In addition, Plaintiff has served no written discovery request calling for the production of such insurance policies.

any event, during the meet and confer process in connection with this briefing, Defendants provided Plaintiff with the insurance policies that fully answer any factual questions Plaintiff may have about such coverage (*e.g.*, the identity of the named insureds, the scope of coverage, and the applicable policy limits). Yet Plaintiff still insists on pursuing a further deposition on this topic. There is no information that Plaintiff needs on the insurance topic that isn't answered by the materials Plaintiff already has. Rule 1 dictates that any further testimony on this topic in this particular case is unwarranted.

**Topics 30 and 31: Document Storage; Identification of Document Custodians.**

Prior to Mr. Evans's deposition, the parties agreed that Defendants would provide information regarding Topics 30 and 31 via written responses, to obviate the need for any deposition testimony on these subjects and save all of the parties some time and expense.[8] Plaintiff's counsel advised that it would accept written responses on these topics "provided that you can provide a written response by the end of week." Plaintiff's counsel further stated that Plaintiff reserved the right to ask follow-up questions "if the response is not sufficiently thorough."

In accordance with the parties' agreement, Defendants then provided six paragraphs of responsive information on February 7, 2025.[9] Plaintiff's counsel responded, "Thank you, Antonio. We will review and get back to you shortly." But Plaintiff never responded further, nor did Plaintiff indicate any concern about the sufficiency or thoroughness of Defendants' written responses until Mr. Evans's deposition on February 12, 2025. As a result, Defendants considered the matter resolved and did not prepare Mr. Evans to discuss the issues further.

Defendants maintain their objection to any further deposition testimony on these topics pursuant to the parties' agreement.

## CONCLUSION

For these reasons, Defendants respectfully request the Court deny Plaintiff's request for an additional deposition of Mr. Evans. Should the Court decide to allow further testimony, that it be limited to the time remaining, and deny Plaintiff's request that Defendants bear the cost of any associated fees or costs in doing so. Defendants thank the Court for its consideration and courtesies.

---

[8] Defendants respect the Court's instruction not to attach exhibits to this submission but can produce any referenced correspondence upon request.

[9] In response to Topic 30, Defendants' written responses provided detailed information regarding its document management system, records management policies, delegation of authorities, and information relating to personnel at the New Haven Terminal. Defendants' written responses further referenced prior document productions containing this information with both Bates Numbers and a reference to relevant responses to written discovery. In response to Topic 31, Defendants provided detailed information regarding its document search, collection and preservation practices, as well as the processes used to identify document custodians, including its conducting of witness interviews, in-person site visits, extensive document review efforts, and review of associated documents, databases, e-mails, and metadata.

Respectfully submitted,

Douglas A. Henderson

KING & SPALDING, LLP

cc: Counsel of Record