Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CONNECTICUT
 3
 4   CONSERVATION LAW              NO.
     FOUNDATION, INC.,             3:21-cv-00933-JAM
 5          Plaintiff,
 6   VERSUS
 7   SHELL OIL COMPANY,
     EQUILON ENTERPRISES LLC
 8   D/B/A SHELL OIL PRODUCTS
     US, SHELL PETROLEUM INC.,
 9   TRITON TERMINALING LLC,
     and MOTIVA ENTERPRISES
10   LLC,
            Defendants.
11
12
13          30(b)(6) videotaped deposition of BRIAN
14   EVANS, 36213 LaSalle Pointe Drive, Prairieville,
15   Louisiana, taken in the offices of Liskow & Lewis,
16   701 Poydras Street, Suite 5009, New Orleans,
17   Louisiana, on Wednesday, February 12, 2025,
18   commencing at 9:03 AM.
19
20
21
22
     REPORTED BY:
23          KRISTIE GARRISON
            CERTIFIED COURT REPORTER
24
25
```

```
                                               Page 10
 1      Q.    Do you know how many weeks ago?
 2      A.    Not exactly.  Three to four weeks.
 3      Q.    So somewhere between two to four weeks
 4  ago?
 5            MR. LEWIS:
 6                  Object to form.
 7  BY MR. GREENE:
 8      Q.    Would that be correct?
 9      A.    Yes.
10      Q.    Is it your understanding you're here to
11  testify as it relates to Topic Number 1?
12      A.    Yes.
13      Q.    As well as Topic Number 2?
14      A.    Yes.
15      Q.    As well as Topic Numbers 3b, 3c, and 3d,
16  3e, 3g, 3h, 3i, 3j.
17      A.    Can you repeat the letters again?
18      Q.    I knew you were going to ask me to do
19  that.  I'll do them one at a time.
20            Are you're here -- is it your
21  understanding you're here today to testify as to
22  Topic 3b?
23      A.    Yes.
24      Q.    As well as 3c?
25      A.    Yes.
```

Page 11

```
 1       Q.     As well as 3d?

 2       A.     Yes.

 3       Q.     As well as 3e?

 4       A.     Yes.

 5       Q.     As well as 3g?

 6       A.     Yes.

 7       Q.     3h?

 8       A.     Yes.

 9       Q.     3i?

10       A.     Yes.

11       Q.     And 3j?

12       A.     Yes.

13       Q.     And is it your understanding that you're

14   here today to testify as to Topic 21?

15       A.     Yes.

16       Q.     Is it you're understanding that you're

17   here today to testify as to Topic 23?

18       A.     Yes.

19       Q.     And is it your understanding you're here

20   today to testify as to Topic 24?

21       A.     Yes.

22       Q.     And is it your understanding that you're

23   here today to testify as to Topic 26?

24       A.     Yes.

25       Q.     And is it your understanding that you're
```

```
                                              Page 20
 1            MR. LEWIS:
 2                  Object to form.
 3    BY MR. GREENE:
 4       Q.    You can't answer that question without
 5    knowing what he testified to?
 6       A.    Correct.
 7       Q.    Well, you don't have any reason to
 8    believe that Mr. Sullivan is a liar, do you?
 9            MR. LEWIS:
10                  Object to form.
11            THE WITNESS:
12                  I can only speak to what I just
13        said.  I believe Mike is trustworthy, but I
14        don't know what he said last week, so I can't
15        really speak on his testimony from last week.
16    BY MR. GREENE:
17       Q.    So you can't, without reviewing his
18    testimony, as you sit here today, categorically say
19    that you believe that Mr. Sullivan would have been
20    truthful and accurate in his testimony; is that what
21    you're saying?
22            MR. LEWIS:
23                  Object to form.
24            THE WITNESS:
25                  I can't really speak on his
```

Page 21

```
 1        testimony from last week.
 2    BY MR. GREENE:
 3        Q.    I'm just going to ask you that again just
 4    to clarify.
 5              As you're sitting here today, you can't
 6    tell me categorically that Mr. Sullivan's testimony
 7    was truthful and accurate unless you review it; is
 8    that what you're saying?
 9              MR. LEWIS:
10                    Object to form.  Asked and answered.
11              THE WITNESS:
12                    I don't know what his testimony was
13          last week, so I can't really speak on it.
14    BY MR. GREENE:
15        Q.    Shell wouldn't lie to its investors,
16    would it?
17              MR. LEWIS:
18                    Object to form.
19              THE WITNESS:
20                    Shell strives to be open, and
21          honest, and transparent in all its business
22          dealings with any stakeholders involved.
23    BY MR. GREENE:
24        Q.    So if Shell says something in its annual
25    report to its investors, for example, you can rely
```

Page 22

1   on what it said to be the truth.  Would you agree

2   with that?

3                   MR. LEWIS:

4                        Object to form.

5                   THE WITNESS:

6                        I would have to see individual

7          statements to know what you're referring to.

8   BY MR. GREENE:

9       Q.    So again, you can't tell me that Shell

10  categorically tells the truth in its annual

11  statements without reviewing the annual statements;

12  is that what you're saying?

13                  MR. LEWIS:

14                       Object to form.  Mischaracterizes

15         testimony.

16                  THE WITNESS:

17                       No, I'm saying that Shell strives to

18         be truthful, honest, and transparent in all of

19         its business dealings with all stakeholders

20         and counter parties.  But I would need to see

21         specific statements from the annual reports to

22         speak on those.

23  BY MR. GREENE:

24      Q.    Well, Shell wouldn't intentionally lie in

25  its annual reports, would it?

Page 23

1              MR. LEWIS:

2                    Object to form.

3              THE WITNESS:

4                    Again, Shell strives to be truthful,

5        and transparent, and honest in all of its

6        communications.

7    BY MR. GREENE:

8        Q.    Yeah, you've said that before.  I'm

9    asking you a more direct question.

10             Shell wouldn't intentionally lie in its

11   annual reports, would it?  Yes or no?

12             MR. LEWIS:

13                   Objection.  Asked and answered.

14             THE WITNESS:

15                   I'll just restate.  Shell strives to

16       be truthful, honest, and transparent in all of

17       its communications and dealings.

18   BY MR. GREENE:

19       Q.    Can you answer the question I just asked

20   with a yes or no?  Are you able to do that?

21             MR. LEWIS:

22                   Objection; argumentative.

23         Objection; asked and answered.

24             MR. GREENE:

25                   It's not argumentative.  I just want

Page 24

```
 1      to know if he can do it or not.
 2   BY MR. GREENE:
 3      Q.    Can you do that?  Yes or no?
 4           MR. LEWIS:
 5                Objection.  Argumentative.
 6           THE WITNESS:
 7                I'll repeat.  Shell strives to be
 8      truthful, honest, and transparent in all
 9      communications and dealings.
10   BY MR. GREENE:
11      Q.    So you're not able to give me A yes or no
12   answer to whether or not Shell would intentionally
13   lie in its annual reports; is that correct?
14           MR. LEWIS:
15                Object to form.  Asked and answered.
16           THE WITNESS:
17                Shell strives to be truthful,
18      honest, and transparent, as I said, in all of
19      its communications and dealings.
20   BY MR. GREENE:
21      Q.    Would Shell intentionally lie on its
22   website?
23           MR. LEWIS:
24                Object to form.
25           THE WITNESS:
```

Page 25

```
 1                   Shell strives to be truthful,
 2        honest, and transparent in all of its
 3        communications.
 4   BY MR. GREENE:
 5        Q.    Are you able to answer that question?
 6   Yes or no?  Would Shell intentionally lie on its
 7   website?
 8                MR. LEWIS:
 9                     Objection; argumentative.
10                THE WITNESS:
11                     Shell strives to be truthful,
12        honest, and transparent in all of its
13        communications.
14   BY MR. GREENE:
15        Q.    If Shell publishes something on its
16   website, can you count on it to be true and
17   accurate?
18        A.    Shell strives to be truthful, honest, and
19   transparent in all of its communications.
20        Q.    And for you to feel comfortable that a
21   Shell communication in its annual report is
22   truthful, are you saying you need to look at it
23   first?
24                MR. LEWIS:
25                     Object to form.
```

Page 26

```
 1              THE WITNESS:
 2                   Well, I would want to see a specific
 3         example as one thing that I would need to
 4         know.  And then it depends on what the subject
 5         is.
 6    BY MR. GREENE:
 7         Q.   And so, without looking at it, it being a
 8    statement in an annual report by Shell, you're not
 9    able to tell me whether it's truthful or accurate;
10    is that correct?
11              MR. LEWIS:
12                   Object to form.  Objection; asked
13         and answered.
14              THE WITNESS:
15                   As I said, Shell strives to be
16         truthful, honest, and transparent in all
17         communications.
18              MR. GREENE:
19                   Yeah, you said that.
20              MR. LEWIS:
21                   Please don't interrupt the witness
22         while he's answering the question.
23    BY MR. GREENE:
24         Q.   My question was different.  You're
25    telling me, and you're telling the ladies and
```

Page 27

1    gentlemen in the jury, that before you can say that

2    a Shell communication in its annual report is

3    accurate and truthful, you need to look at it here

4    today; is that correct?

5                MR. LEWIS:

6                    Objection; asked and answered many,

7        many times.

8    BY MR. GREENE:

9        Q.    Is that correct?

10                MR. LEWIS:

11                    Same objection.

12                THE WITNESS:

13                    I'll just restate what I told you

14        already.  Shell strives to be truthful,

15        honest, and transparent in all of its

16        communications.

17    BY MR. GREENE:

18        Q.    And for you to say whether or not a

19    statement made by Shell on its website is truthful

20    and accurate, you would need to look at it first; is

21    that what you're saying to the jury?

22                MR. LEWIS:

23                    Again, objection; asked and

24        answered.

25                THE WITNESS:

Page 28

```
 1                    I would need to see a specific
 2          example, but Shell strives to be truthful, and
 3          honest, and transparent in all communications.
 4    BY MR. GREENE:
 5        Q.    And I want to zero in just on that piece.
 6    You can't say something is truthful and accurate
 7    with Shell without seeing a specific example; is
 8    that correct?
 9                    MR. LEWIS:
10                        Objection; asked and answered.
11                    THE WITNESS:
12                        Well, and then it depends on the
13          topic, whether I would have that knowledge.
14    BY MR. GREENE:
15        Q.    So you're not able to rely on Shell's
16    truthfulness and accuracy or your personal
17    knowledge; is that correct?
18                    MR. LEWIS:
19                        Objection; outside the scope.  And
20          object to the form.
21                    THE WITNESS:
22                        I'll just restate.  Shell strives to
23          be truthful, honest, and transparent in all of
24          its communications.
25    BY MR. GREENE:
```

Page 62

1    correctly?

2        A.    Yes, I believe you did.

3        Q.    Do you agree with that statement as the

4    representative of the defendants sitting here today?

5        A.    I have no reason to disagree with that

6    statement.

7        Q.    This document is the Shell 2019 Annual

8    Report; isn't that correct?

9        A.    That's what it says on the title page.

10       Q.    You don't have any reason to disagree

11   with the title page, do you?

12       A.    No.

13       Q.    This is a document that was generated and

14   maintained in the regular course of business at

15   Shell, correct?

16            MR. LEWIS:

17                 Object to form.

18            THE WITNESS:

19                 Shell issues an annual report every

20        year.

21   BY MR. GREENE:

22       Q.    And the annual report is generated and

23   maintained in the regular course of business,

24   correct?

25            MR. LEWIS:

Page 63

```
 1                    Object to form.
 2            THE WITNESS:
 3                    Well, I'm not involved in developing
 4        the report myself, but I know that it is
 5        published annually.
 6   BY MR. GREENE:
 7        Q.    Yeah, published annually by Shell, which
 8   creates a document and keeps it in its regular
 9   course of business, correct?
10            MR. LEWIS:
11                    Object to form.
12            THE WITNESS:
13                    I am aware that the report is
14        published annually.
15   BY MR. GREENE:
16        Q.    That really wasn't my question.  My
17   question is a little more specific.
18            Can you agree with me that this document
19   was created by Shell?
20            MR. LEWIS:
21                    Object to form.
22            THE WITNESS:
23                    I have no reason to think that it
24        wasn't created by Shell.
25   BY MR. GREENE:
```

Page 64

```
 1        Q.    And do you have any reason to believe
 2   that this document wasn't maintained in the regular
 3   course of business by Shell?
 4              MR. LEWIS:
 5                   Object to form.
 6              THE WITNESS:
 7                   Shell publishes an annual report.
 8        We have a report every year that comes out,
 9         just like this.
10   BY MR. GREENE:
11        Q.    And when it publishes them, it keeps them
12   as part of its business, correct?
13        A.    The reports are retained, yes.
14        Q.    And you don't have any reason to believe
15   that this is not a true and accurate copy of Shell's
16   2019 Annual Report, correct?
17              MR. LEWIS:
18                   Object to form.
19              THE WITNESS:
20                   I can't speak on whether it's true
21         and accurate, but it does appear to be the
22         2019 Annual Report.
23   BY MR. GREENE:
24        Q.    My question was a little different.
25              If you want to look at it, look at it.
```

Page 65

1    But you don't have any reason to believe this is not

2    a true and accurate copy of Shell's 2019 Annual

3    Report, correct?

4                MR. LEWIS:

5                      Object to form.

6                THE WITNESS:

7                      I don't know if it's marked as such.

8          I'm not sure I can answer that.

9    BY MR. GREENE:

10       Q.    When you say "marked as suck," what do

11   you mean?  I'm attempting to mark it as such.

12   You're the corporate representative here.  You're

13   here to testify on behalf of the defendants.

14                As the corporate representative, I'm

15   asking you if this is a true and accurate copy of

16   Shell's 2019 Annual Report.  Are you able to say

17   that?

18                MR. LEWIS:

19                      Objection; outside the scope.

20         Object to form.

21                THE WITNESS:

22                      Well, I would need to be able to

23         verify every page that's in front of me here

24         to do that.

25   BY MR. GREENE:

                                                    Page 66

1        Q.    Great.  We'll do that off the record.

2        A.    Then I can't answer that question.

3        Q.    No, we're going to take a break in a

4    minute.  You're going to look at every page, and

5    then I'm going to come back on the record and ask

6    you if this is a true or an accurate copy of the

7    report.

8              MR. LEWIS:

9                   Objection.  This witness is not

10        designated to authenticate documents.  So

11        outside the scope.

12             MR. GREENE:

13                  This witness is -- you can disagree

14        with that all you want, but that's what we're

15        going to do.  So we're going to take a break

16        in a minute, and that's what we're going to

17        do.

18             MR. LEWIS:

19                  We can stay on the record if that's

20        how you want to spend your time.

21             MR. GREENE:

22                  No, that's not how I'm going to

23        spend my time, because this witness is being

24        obstreperous, argumentative, and unresponsive

25        and to a simple question as to whether or not

Page 67

1       this is an authentic document.  If to get that
2       we have to take a break, we're going to do
3       that.  And I'm not going to waste my
4       deposition time to do that.
5            MR. LEWIS:
6                 The witness has already answered
7       your question adequately.  So if you want to
8       have him walk through the document, we can do
9       it.  Stay on the record.
10           MR. GREENE:
11                The witness has not answered my
12      question.
13                We've been going about an hour.  Why
14      don't we take five minutes.  You look at that
15      document, I'm going to come back and ask you
16      the same question.
17           MR. LEWIS:
18                Object to form.  Witness is going to
19      take a break.
20          THE VIDEOGRAPHER:
21                Off the record.  9:53 AM.
22                  (Recess taken.)
23          THE VIDEOGRAPHER:
24                On the record.  10:13 AM.
25   BY MR. GREENE:

Page 68

1      Q.    Welcome back, Mr. Evans.  Are you good to
2   continue?
3      A.    Yes.
4      Q.    Before the break, I asked you to review
5   the document we marked as an exhibit, which is the
6   2019 Annual Report, to see if you can tell me if
7   it's a true and accurate copy of Shell's annual
8   report from that year.  Did you review the document?
9      A.    No, I did not.
10      Q.    You didn't take the document with you
11   when you left the room, did you?
12      A.    No.
13      Q.    And so I'm going to ask you the question
14   again, are you able to tell me whether that's a true
15   and accurate copy of Shell's annual report for 2019?
16           MR. LEWIS:
17                Objection; outside the scope.
18           THE WITNESS:
19                No, I can't because there's no
20        document control on this, right?  So once it's
21        printed, this is a paper copy, it could have
22        been altered before it was given to me.  So
23        it's not the official copy and that's why I
24        can't authenticate it.
25   BY MR. GREENE:

Page 70

1    BY MR. GREENE:

2        Q.    You'd agree with me that Shell wouldn't

3    lie to its investors in it's 2019 Annual Report,

4    wouldn't you?

5              MR. LEWIS:

6                   Object to form.

7              THE WITNESS:

8                   Shell always strives to be

9         transparent, honest, and forthcoming with

10        information to all of our stakeholders and

11        counterparties.

12   BY MR. GREENE:

13       Q.    And striving to be transparent and honest

14   means that you wouldn't intentionally lie.  Can we

15   agree with that?

16             MR. LEWIS:

17                  Object to form.

18             THE WITNESS:

19                  Again, Shell strives to be honest,

20        transparent with all communications.

21   BY MR. GREENE:

22       Q.    Except that's not what I asked you.  I

23   asked you what it means to strive to be transparent

24   and honest.  And as you sit here today as the

25   representative of defendants, can you and I agree

Page 71

1    that striving to be transparent and honest means you
2    wouldn't intentionally lie?  Can we agree on that?
3                  MR. LEWIS:
4                        Object to form.
5                  THE WITNESS:
6                        As I stated, Shell strives to be
7           transparent and honest in all communications.
8    BY MR. GREENE:
9        Q.    Again, that wasn't my question.
10               Can I have my question read back?
11           (Court reporter reads back question.)
12   BY MR. GREENE:
13       Q.    Can you answer my question as it's
14   phrased as the court reporter has read it back?
15                  MR. LEWIS:
16                        Object to form.
17                  THE WITNESS:
18                        As I stated, Shell strives to be
19           transparent and honest in all communications.
20   BY MR. GREENE:
21       Q.    Are you able to give me any answer other
22   than what you just repeated?
23                  MR. LEWIS:
24                        Object to form.
25                  THE WITNESS:

Page 72

1              Like I stated, Shell strives to be

2         transparent and honest in all communications.

3  BY MR. GREENE:

4      Q.    Mr. Evans, I'm going to read you a

5  sentence from paragraph 53 of the complaint.

6  Paragraph 53 of the complaint states, "Each Shell

7  entity and each Shell operated venture is

8  responsible for implementing climate change policies

9  and strategies."

10             Are you able to agree with that statement

11  as I repeated it from paragraph 53 of the amended

12  complaint in this matter?

13             MR. LEWIS:

14                  Object to form.

15             THE WITNESS:

16                  I would need to see the context from

17         which that statement comes.

18  BY MR. GREENE:

19      Q.    As you sit here today, you can't agree

20  that each Shell entity and each Shell-operated

21  venture is responsible for implementing climate

22  change policies and procedures without looking at a

23  document; is that correct?

24             MR. LEWIS:

25                  Object to form.

Page 86

```
 1        Q.    Mr. Evans, if I represent to you that
 2   this was printed from Shell's website that has not
 3   been changed, are you able to tell me whether it's a
 4   true and authentic copy of Shell's document
 5   entitled, "Better Life with a Healthy Planet,
 6   Pathways to Net-Zero Emissions"?
 7              MR. LEWIS:
 8                   Object to form.  Outside the scope.
 9              THE WITNESS:
10                   It's a printed copy so it has no
11        document control at that point, so I can't
12        authenticate it.
13   BY MR. GREENE:
14        Q.    My question was a little different.  If I
15   represent to you as an officer of the court and
16   counsel of record in this case, that it was printed
17   from Shell's website and has not been changed in any
18   way, would you be able to agree with me that this is
19   an authentic copy of Shell's A Better Life with a
20   Healthy Planet?
21              MR. LEWIS:
22                   Same objection.
23              THE WITNESS:
24                   If it was printed from the Shell
25        website and not altered, then it would be an
```

Page 87

1          authentic copy.

2    BY MR. GREENE:

3          Q.    And if I tell you that the 2019 Annual

4    Report that we looked at earlier was printed from

5    the Shell website and not altered in any way, could

6    you agree with me that's an authentic copy of

7    Shell's 2019 Annual Report?

8                MR. LEWIS:

9                     Object to form.  Outside the scope.

10               THE WITNESS:

11                    If it was printed from the website

12          and not altered, then it would be an authentic

13          copy.

14   BY MR. GREENE:

15         Q.    And I'm representing to you as counsel of

16   record in this case, on the record in this

17   deposition, that it was indeed printed from Shell's

18   website and was not altered.  So therefore, can we

19   agree that it is a true and authentic copy of

20   Shell's 2019 Annual Report?

21               MR. LEWIS:

22                    Object to form.  Outside the scope.

23   BY MR. GREENE:

24         Q.    Can we agree on that?

25               MR. LEWIS:



Page 142



```
 9   BY MR. GREENE:
10        Q.    You're here to testify on Topic 3G,
11   correct?
12        A.    Yes.
13        Q.    You're here to testify on Topic 21,
14   correct?
15        A.    Yes.
16
```



Page 143

Golkow Technologies,
A Veritext Division



Golkow Technologies,
A Veritext Division

Page 152

```
 1            MR. LEWIS:
 2                  Objection; outside the scope.
 3            THE WITNESS:
 4                  No, I don't think so.  I'm not sure
 5       that that is a document control number for the
 6       report issued.  Because the letters that are
 7       used there seem to indicate that this is
 8       related to this case, but I could be wrong.
 9  BY MR. GREENE:
10       Q.   When you say document control number, are
11  you referring to an internal Shell number?  Is that
12  something Shell does?
13            MR. LEWIS:
14                  Objection; outside the scope.
15            THE WITNESS:
16                  So for an official report, yes,
17       there is a number over here under the word
18       "restricted."  That is the Shell report
19       numbering system.  I don't know what the
20       official term of it is, but that's what you'll
21       see on the report from Shell.
22  BY MR. GREENE:
23       Q.   And are you telling me that's the only
24  way you're able to testify sitting here today,
25  whether a document is an authentic Shell document?
```

Page 153

1          MR. LEWIS:

2               Objection; Outside the scope.

3      Object to form.

4          THE WITNESS:

5               No, that's not what I'm saying.

6      Even that is not enough, because again, this

7      is a printed copy and I don't know if it was

8      printed from the official report source and

9      whether it was altered after being printed.

10 BY MR. GREENE:

11     Q.    If I tell you this document was produced

12 by counsel in this litigation, would you have any

13 reason to dispute that it's a true and authentic

14 copy?

15          MR. LEWIS:

16               Objection.  Outside the scope.

17          THE WITNESS:

18               I would need to know the source and

19      whether it was altered.

20 BY MR. GREENE:

21     Q.    So if I represent to you that counsel for

22 the corporations -- sorry.  Strike that.

23          The counsel for the defendants, that

24 you're here to testify on behalf of, as

25 representative, provided this document in

Page 154

1    litigation, you are unable to tell me whether or not

2    it's a true and authentic copy.

3              MR. LEWIS:

4                    Objection; outside the scope.

5              THE WITNESS:

6                    I can't tell you whether this hard

7         copy is because it's a printed copy.

8    BY MR. GREENE:

9         Q.   Are you only able to say whether a

10   digital copy of a document is a true or authentic

11   Shell document?

12             MR. LEWIS:

13                   Objection; outside the scope.

14        Object to form.

15             THE WITNESS:

16                   It's not that simple.

17   BY MR. GREENE:

18        Q.   Enlighten me.

19             MR. LEWIS:

20                   Object to form.

21             THE WITNESS:

22                   Well, I don't know where these

23        reports, this particular report, where it's

24        actually stored, right.  There's got to be a

25        repository for this as an official report from

Page 155

1      Metocean.  And I would want to see where
2      that's stored and how the document control is
3      managed.
4  BY MR. GREENE:
5      Q.    As you sit here today, do you believe
6  that counsel for the defendants that you are here to
7  testify on behalf of provided documents that were
8  not Shell documents even though they represented
9  them to be so?
10             MR. LEWIS:
11                  Objection; outside the scope.
12       Object to form.
13             THE WITNESS:
14                  I have no reason to believe that.
15  BY MR. GREENE:
16      Q.    Does this document look any different
17  than the document you reviewed in preparation for
18  your deposition?
19      A.    From what I've seen of it today, no, it
20  doesn't look different.
21      Q.    Do you have any basis to disagree that
22  this is a true and authentic copy of the Metocean
23  design and operating considerations?
24             MR. LEWIS:
25                  Objection; outside the scope.

Page 156

1          THE WITNESS:

2                    I can only say that the report that

3          was provided to me that I reviewed, looks like

4          the report that I reviewed today.  I don't see

5          any difference between those two.

6     BY MR. GREENE:

7          Q.    So you don't have any reason to disagree

8     that it's a true and authentic copy; is that

9     correct?

10         MR. LEWIS:

11                   Objection; outside the scope.

12         THE WITNESS:

13                   It appears to be the same report

14         that I've reviewed, based on what I've seen.

15

Page 181

1    published by Shell?

2        A.    Yeah, I've heard of it.

3        Q.    You've heard of it.

4              Have you seen it?

5        A.    No, I haven't.

6        Q.    Is that anything that you've watched in

7    connection with your preparation for your deposition

8    here today?

9        A.    No, I didn't watch it.

10       Q.    In what context are you aware of it?

11       A.    My understanding is it's a video that

12   Shell made to highlight some of the potential

13   concerns about climate change.

14       Q.    Which is not something you've seen

15   previously?

16       A.    I have not seen it.

17       Q.    As I've asked you earlier, you'd agree

18   that Shell seeks to be truthful and accurate in its

19   communications, correct?

20       A.    Yes, Shell strives to be truthful and

21   honest in all communications.

22       Q.    And that would -- that goes for the

23   annual reports, correct?

24       A.    That would go for any communications that

25   Shell does.

Page 182

1    Q.    And within that context of any
2  communications that Shell does, that would include
3  the 1991 film entitled "Climate of Concern,"
4  correct?
5              MR. LEWIS:
6                    Object to form.
7              THE WITNESS:
8                    I would say that it applies to all
9        communications from Shell.  Shell strives to
10       be honest and transparent in our
11       communications.
12  BY MR. GREENE:
13    Q.    And by definition that would include an
14  educational film that Shell puts out, right?
15             MR. LEWIS:
16                    Object to form.
17             THE WITNESS:
18                    It would include any communications
19       from Shell.
20  BY MR. GREENE:
21    Q.    And I'm asking would you include an
22  educational short film produced by Shell within
23  that?
24             MR. LEWIS:
25                    Same objection.

1        experience in Shell, as well as my knowledge

2        and experience related to the New Haven

3        terminal, and the processes and activities

4        that we use to manage risk at our New Haven

5        terminal and at all of our terminals, really.

6    BY MR. GREENE:

7        Q.    Have you ever been a corporate

8    representative in a deposition other than this one

9    during your time at Shell?

10       A.    No, I have not.

11       Q.    Have you ever been a corporate

12   representative in a deposition at any point in your

13   working career?

14       A.    No, I have not.

15   ███    ████████████████████████████████

     ████████████

     ███    ███████████████████████████████ Triton

18   is the owner of the New Haven terminal, and Equilon

19   is the operator doing business as SOPUS, Shell

20   Products US.

21   ███    ██████████████████████████████████

     ███████████████████████████████

     ███    █████████████████

     ███    ████████████████████████████████

     ███████████████████████████████████████

1    A.    Yeah, because the legal entities are
2    not -- organization is organization of the people.
3    The legal entities, in this case, the Equilon being
4    the operator and Triton being the owner.
5    Q.    But you wouldn't agree with me that as a
6    line of business being called trading and supply,
7    that a company that manages an asset and the company
8    that owns that asset, where people are working in
9    that line of business, you wouldn't agree with me
10   that; therefore, Equilon and Triton are engaged in
11   trading and supply as a line of business?
12   A.    The word "engaged" doesn't make sense in
13   what you're saying.
14   Q.    How could it not make sense?  They own
15   the land -- excuse me.  They own the asset and
16   manage the asset.  The people at that asset --
17   A.    But Equilon and Triton don't have any
18   people, right?  The people are all part of Shell
19   Pipeline.  Are part of trading and supply.
20   Q.    But they own the asset and management,
21   right?
22   A.    The legal entity.
23   Q.    Yes.
24   A.    The legal entity -- so Equilon is the
25   legal entity that is listed as the operator, and

                                        Page 252

1    between Equilon, Triton, and SPLC?

2         A.    It's not for each facility.  It's for a

3    group of facilities.  It's basically for the

4    facilities that are owned by Triton.

5         Q.    Now, do you have an understanding that

6    Motiva Enterprises, LLC, owned and operated the New

7    Haven terminal from around 2000 until about 2017?

8         A.    Yes, I'm aware of that.

9         Q.    Do you have an understanding that Motiva

10   was a joint venture between Saudi Aramco and Shell

11   Oil?

12        A.    Yes, I'm aware of that.

13        Q.    Does Equilon have a board of directors?

14        A.    I don't believe there are a board of

15   directors, but there are officers.

16        Q.    Do you know what the title of those

17   officers are?

18        A.    I believe there's a president and there

19   are a few vice presidents, but I don't remember how

20   many.

21        Q.    Do you know who the president of Equilon

22   is?

23        A.    At the moment, no, I do not.

24        Q.    Do you know who any of the vice

25   presidents are of Equilon?

Page 253

1          A.    I haven't been involved in that in a

2     while, but at one point, the Distribution Operations

3     Americas general manager, that role, was designated

4     as one of the vice presidents.

5          Q.    Is Distributions Operations Americas

6     within trading and supply?

7          A.    Yes.

8          Q.    Any other vice presidential titles that

9     you are aware of?

10         A.    I don't recall the other ones, honestly.

11         Q.    Does Triton have a board of directors?

12         A.    No, I think that there are also officers

13    for that one.

14         Q.    Do you know the titles of the officers

15    for Triton?

16         A.    No, I don't.

17         Q.    Do you know whether any of the officers

18    for Triton are within the organization known as

19    trading and supply?

20         A.    I believe they are, but again, I don't

21    remember which roles have those titles.

22         Q.    And I apologize if I asked you this

23    earlier.  Can you give me the names of any corporate

24    officers for Equilon?

25         A.    Again, assuming that the Distribution

Page 267

1          MR. LEWIS:

2               Same objection.  And object to form.

3          THE WITNESS:

4               Ask that one more time?  Sorry.

5    BY MR. GREENE:

6      Q.    Sure.

7          Are accounting issues at Equilon managed

8    by a different Shell capitalist, meaning proper name

9    Shell, company?

10     A.    I don't know.

11     Q.    Would your answer be the same for Triton?

12     A.    Yes.

13         MR. LEWIS:

14              Same objection.

15   BY MR. GREENE:

16     Q.    Would your answer be the same for Motiva?

17         MR. LEWIS:

18              Same objection.

19         THE WITNESS:

20              Well, that's -- Motiva is a bit

21      different, right?  Because Motiva is not a

22      legal entity.  It was a joint venture company

23      between Shell and Saudi Aramco.  And I believe

24      Motiva did have an accounting department.

25   BY MR. GREENE:

Page 268

```
 1       Q.    Do you know how many officers at Equilon
 2   are also involved with other Shell, capital S,
 3   companies?
 4              MR. LEWIS:
 5                   Objection; outside the scope.
 6              THE WITNESS:
 7                   No, I don't.
 8   BY MR. GREENE:
 9       Q.    Would your answer be the same for Triton?
10              MR. LEWIS:
11                   Same objection.
12              THE WITNESS:
13                   Yes.
14   BY MR. GREENE:
15       Q.    Would your answer be the same for Motiva?
16              MR. LEWIS:
17                   Same objection.
18              THE WITNESS:
19                   Well, again, Motiva is not a legal
20       entity, so there were not officers in that
21       context if that makes sense.
22              MR. GREENE:
23                   We've being going over an hour.  Why
24       don't we take five.  Take ten.
25              THE VIDEOGRAPHER:
```

Page 269

1                    Off the record.  2:42 PM.
2                         (Recess taken.)
3               THE VIDEOGRAPHER:
4                    On the record.  2:59 PM.
5     BY MR. GREENE:
6         Q.    Welcome back, Mr. Evans.  Are you ready
7     to continue?
8         A.    Yes.
9

23                    Do you know whether Triton has any
24    insurance policies that cover for loss due to a
25    flooding?

Page 270

1      A.    I don't know if it specifically says

2   flooding.  Like I said, I haven't seen the policies.

3   But I know that we have coverage for things like

4   wind damage and other weather-related damage.



Page 271





877-370-3377          Golkow Technologies,          www.veritext.com
A Veritext Division



Golkow Technologies,
A Veritext Division





Page 275

Golkow Technologies,
A Veritext Division



Page 276

13    Q.    Would I be correct that you don't know
14 whether Shell has made any changes to any insurance
15 policies in connection with the New Haven terminal
16 based on projected sea level rise?
17    A.    Yeah, I'm not aware of any claims.

Page 277

███
███
███
███
███
███

```
 7              Do you know whether any insurer has ever
 8   suggested that Shell make modifications to its
 9   insurance policies for the New Haven terminal to
10   protect against flooding?
11              MR. LEWIS:
12                   Object to form.
13              THE WITNESS:
14                   I'm not aware of any suggestions
15      like that.
16   BY MR. GREENE:
17      Q.   Would your answer be the same if I asked
18   you with respect to damage from hurricanes?
19              MR. LEWIS:
20                   Same objection.
21              THE WITNESS:
22                   Yes, same answer.
23   BY MR. GREENE:
24      Q.   Would your answer be the same if I asked
25   you with regard to any damage with respect to wind?
```

Page 278

1          MR. LEWIS:

2               Object to form.

3          THE WITNESS:

4               Yes, that's correct.

5



Golkow Technologies,
A Veritext Division

www.veritext.com

Page 279



Page 318

1          THE WITNESS:

2                  Again, I would need to know if the

3      source was the master document that was

4      printed and whether it had been altered after

5      printing.

6  BY MR. GREENE:

7      Q.    So given both the confidentiality stamp,

8  the Bates number, and my representation to you that

9  this was produced by counsel in this matter, you're

10  not able to tell me whether or not this is a true

11  and accurate copy of the Asset Integrity - Process

12  Safety Management Application Manual; is that

13  correct?

14          MR. LEWIS:

15                  Same objection.

16          THE WITNESS:

17                  If it was printed from the master

18      source online and not altered, then it would

19      be an authentic copy.

20  BY MR. GREENE:

21      Q.    Well, you're not questioning whether or

22  not counsel for Shell altered the document, are you?

23          MR. LEWIS:

24                  Object to form.

25          THE WITNESS:

                                          Page 319

1                    No, I didn't say that.  I'm just
2         saying in order for it to be the authentic
3         copy, it has to be printed from the master
4         source and not altered.
5    BY MR. GREENE:
6         Q.    So, am I correct that you can assume and
7    agree that counsel for Shell didn't alter the
8    document, right?
9                    MR. LEWIS:
10                        Object to form.
11                   THE WITNESS:
12                        I mean, I'm not aware of any
13        altering, but I didn't print the document
14        myself, so I don't know.
15   BY MR. GREENE:
16        Q.    And I'm going to represent to you that
17   given the Bates stamp and the confidentiality
18   number, counsel for the plaintiff didn't alter the
19   document, so therefore, can we agree that it's a
20   true and accurate document?
21                   MR. LEWIS:
22                        Object to form.  Outside the scope.
23                   THE WITNESS:
24                        Again, if it was printed from the
25        master source and not altered after printing,

Page 328

1          So why don't we take ten.

2                THE VIDEOGRAPHER:

3                     Off the record.  4 o'clock PM.

4                     (Recess taken.)

5                THE VIDEOGRAPHER:

6                     On the record.  4:17 PM.

7     BY MR. GREENE:

8          Q.    Welcome back, Mr. Evans.  Are you ready

9     to continue?

10         A.    Yes.

11         Q.    Mr. Evans, I'm handing you what I've

12    marked as Exhibit 1247 to your deposition.  I want

13    you to take a moment to look at that, and then I

14    have just a couple of questions about it.

15         A.    (Witness reviews document.)

16         Q.    Let me know when you're ready.

17         A.    Almost.  Okay.

18         Q.    Mr. Evans, you've had a chance to review

19    what I marked as Exhibit 1247 to your deposition,

20    correct?

21         A.    Yes.

22         Q.    Have you seen that document before?

23         A.    No, I don't believe I've seen it.

24         Q.    That's not something that you reviewed in

25    preparation for your deposition; is it?

Page 329

 1      A.    No.

 2      Q.    That's not something you've seen at any

 3  other point in either the context of this case or

 4  otherwise; is that correct?

 5      A.    No, I don't recall seeing this document.

 6            MR. LEWIS:

 7                 Object to the form.

 8  BY MR. GREENE:

 9      Q.    Same thing, Mr. Evans.  I'm going to hand

10  you what we've marked as Exhibit 1248.

11      A.    (Witness reviews document.)  Okay.

12      Q.    Mr. Evans, have you previously seen the

13  document that we've marked to your deposition as

14  Exhibit 1248?

15      A.    I've seen a version of this.  It's been a

16  while.  I don't know if I've seen this particular

17  document that was produced here.

18      Q.    Okay.  You'll note that this has the

19  confidentiality stamp and a Bates number at the

20  bottom.  Do you see that?

21      A.    Yes, I do.

22      Q.    And I'll represent to you that this is a

23  document that was produced by counsel in connection

24  with this case.

25            Is this something that you reviewed in

Page 330

1    preparation for your deposition?

2        A.    No, I don't think I saw this one.

3        Q.    Have you seen this one in any context

4    other than the preparing for your deposition?

5        A.    Yeah, like I said, a version of it in the

6    past.  It's been quite a few years.  I don't

7    remember when the last time I saw it.

8        Q.    Did you see any version of this provided

9    by your counsel in connection with your deposition

10   here today?

11            MR. LEWIS:

12                 Object to the form.

13            THE WITNESS:

14                 No, I don't think I've seen a

15        version of this in preparation for this

16        deposition.

17   BY MR. GREENE:

18       Q.    You can add that to the stack.

19            With respect to the document we were just

20   looking at, 1248, you saw a version of it years ago,

21   was that -- that wasn't in connection with this case

22   in any way, shape or form, was it?

23            MR. LEWIS:

24                 Object to the form.

25            THE WITNESS:

Page 331

1                    No, it's not.  It's not in

2        connection with this case.

3    BY MR. GREENE:

4        Q.    Do you know whether it was before this

5    case was filed or after this case was filed?

6                MR. LEWIS:

7                    Object to the form.

8    BY MR. GREENE:

9        Q.    If you know.

10       A.    It was -- I'm not sure.  I believe it was

11   after the case was filed, but I'm not 100% confident

12   of that.

13       Q.    It was not something that you saw in

14   connection with the case; is that right?

15       A.    It was not in connection with the case.

16               MR. LEWIS:

17                   Object to the form.

18   BY MR. GREENE:

19       Q.    Mr. Evans, with respect to Topics 30 and

20   31, your counsel provided us with written responses,

21   which I'm marking as an exhibit to your deposition.

22   It will be Exhibit 1249.  So I have some questions

23   about that.  I understand counsel has an objection.

24   There you go.

25               MR. LEWIS:





Golkow Technologies,
A Veritext Division

Page 337

1          e-mails that were relevant, we had to make
2          those known.  I don't know if that answers
3          your question.
4    BY MR. GREENE:
5        Q.    It doesn't, specifically.  I'm going to
6    get to that sort of topic in a second.  But this
7    sort of overlaps between Topic 30 and 31.  So my
8    question is a little different.
9              Do you know in that process that you just
10   described, do you know whether there was any
11   specific effort to address any distinction in Motiva
12   e-mail addresses, Motiva SharePoint system, or any
13   Motiva document hosting system?
14             MR. LEWIS:
15                  Object to the form.
16             THE WITNESS:
17                  No, I'm not aware of that.
18   BY MR. GREENE:
19       Q.    So this flows into Topic 31.  Do you know
20   how in this matter initial custodians were
21   identified?
22       A.    I don't know anything beyond what I've
23   read here in this document.
24       Q.    Okay.
25       A.    That outlines it.

Page 338

1       Q.    That may actually be helpful.  I've got a

2   series of follow-up questions.

3             For example, do you know how custodians

4   and locations of documents were identified?  Am I

5   correct you wouldn't know that?

6       A.    No, I don't.

7       Q.    Okay.  Do you know who received

8   litigation holds?

9       A.    I did at one time.  There was a list,

10  because I think it was a lot of the same folks that

11  had to do those attestations on a regular basis.  I

12  don't remember all the names, but I know a few of

13  the names.

14      Q.    Would it be fair to say, if I ask you a

15  series of follow-up questions, the extent of your

16  knowledge is what's on that page?

17      A.    For the most part, yeah.

18      Q.    Just to confirm that, I'm going to ask

19  you a couple of additional questions.  I'm just

20  going to try and truncate this just to be efficient.

21            If I asked you with respect to any

22  particular discovery requests in this case, what

23  steps were taken to respond to those discovery

24  requests, am I correct you wouldn't be able to

25  answer that?

Page 339

1          MR. LEWIS:

2               Object to the form.

3          THE WITNESS:

4               Yeah, only the parts where I was

5       involved, in other words, where if I was asked

6       if I had any documents that are relevant.

7   BY MR. GREENE:

8       Q.    Sure.  You know what you did personally?

9       A.    I know what I did.

10      Q.    Okay.  And I'm talking about in a broader

11  context.

12      A.    Okay.

13      Q.    So if I asked you for any given requests

14  for documents in this case, do you know what was

15  done with respect to specific requests to find

16  responsive documents?  You wouldn't know that

17  globally, correct?

18      A.    That's correct, yeah.

19      Q.    And again, I'm just trying to be

20  efficient here.  I think that covers the waterfront.