# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | May 6, 2025 |
| SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | **Request for Expeditated Consideration Pursuant to Local Rules 7(a)(4) and 7(a)6** |
| Defendants. | **Oral Argument Requested** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY DISCOVERY AND PROCEEDINGS RELATED TO PLAINTIFF'S "CLIMATE CHANGE" ALLEGATIONS IN COUNTS I-IX OF COMPLAINT; REQUEST FOR EXPEDITED CONSIDERATION PURSUANT TO <u>LOCAL RULES 7(a)(4) AND 7(a)(6)</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY ............................................. 4

    A.    The Current Permit ......................................................................................... 4

    B.    The Draft Permit And Its New "Climate Change" Measures ................................. 5

    C.    The Draft Permit Renders Plaintiff's Requested Relief Moot. ............................. 8

    D.    It Is Undisputed That Neither CT DEEP Nor EPA Have Ever Required Defendants To Perform A "Climate Change" Assessment.................................... 11

II.    LEGAL STANDARD ....................................................................................... 12

III.    ARGUMENT .................................................................................................. 13

    A.    Defendants Will Succeed On The Merits Once CT DEEP Issues The Draft Permit In Final Form ...................................................................................... 16

        1.    Counts I-IX Fail Because CT DEEP Itself Has Advised the Current Permit Did Not Required "Climate Change" Considerations................... 18

        2.    The Incorporated Connecticut Stormwater Quality Manual Confirms The Current Permit Did Not Require "Climate Change" Considerations........................................................................................ 20

    B.    Defendants Will Suffer Irreparable Injury and Expense If Forced To Conduct Unnecessary Expert Discovery On Claims That Should Already be Extinguished. ................................................................................................ 21

    C.    A Stay Will Not Injure Plaintiff. ...................................................................... 22

    D.    The Public Interest Favors a Stay. ................................................................... 22

IV.    CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auer v. Robbins*,
  519 U.S. 452 (1997)....................................................................................................18, 19

*City Club of N.Y. v. U.S. Army Corps. of Eng'rs*,
  246 F. Supp. 3d 860 (S.D.N.Y. 2017)...................................................................................19

*Clark v. Mulcahy*,
  162 Conn. 332, 294 A.2d 504 (1972) ("A court may take judicial notice of
  state regulations." (citing *Pierce v. Lantz*, 965 A.2d 576, 580 (Conn. App. Ct.
  2009)))....................................................................................................................................17

*Conn. Fund for Env't., Inc. v. Upjohn Co.*,
  660 F. Supp. 1397 (D. Conn. 1987)......................................................................................16

*Cordiano v. Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009)...........................................................................................18, 19

*Gwaltney of Smithfield v. Chesapeake Bay Found.*,
  484 U.S. 49 (1987)................................................................................................................23

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)..............................................................................................................12

*Komondy v. Gioco*,
  253 F. Supp. 3d 430 (D. Conn. 2017)...................................................................................17

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)..............................................................................................................12

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002)...................................................................................................12

*Niken v. Holder*,
  556 U.S. 418 (2009)..............................................................................................................12

*Paulsen v. All Am. Sch. Bus Corp.*,
  No. 13-CV-3762 (KAM), 2013 WL 5744483 (E.D.N.Y. Oct. 23, 2013)..........................12, 13

*Read v. Corning Inc.*
  351 F.Supp.3d 342, 360 (W.D.N.Y. Dec. 21, 2018)............................................................13

*Sierra Club v. Chevron U.S.A., Inc.*,
  834 F.2d 1517 (9th Cir. 1987) .......................................................................................15, 23

*U.S. S.E.C. v. Daspin*,
  557 F. App'x 46 (2d Cir. 2014) ...........................................................................12

*Uniformed Fire Officers Ass'n v. De Blasio*,
  973 F.3d 41 (2d Cir. 2020)..................................................................................12

*United States v. Penn Foundry & Mfg. Co.*,
  337 U.S. 198 (1949) (Douglas, J., concurring).....................................................17

*Warm Springs Dam Task Force v. Gribble*
  417 U.S. 1301, 1301-4 and 1310 (1974)..............................................................13

Since this case was filed on July 7, 2021, the Court has devoted endless time refereeing disputes in this case concerning one central question in Counts I-IX in Plaintiff's Complaint: whether Defendants were required to consider "climate change" in developing and implementing their Stormwater Pollution Prevention Plan ("SWPPP") at the New Haven Terminal under the 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity (the "Current Permit").  Early in the case, the Court ruled that due to the lack of guidance from EPA and the Connecticut Department of Energy and Environmental Protection ("CT DEEP"), there was an open question of fact about whether the Permit's inclusion of the generic term "best industry practice" would require Defendants to consider "climate change" in the development of the SWPPP.  Oct. 19, 2023 Order Denying Motion for Partial Summary Judgment [ECF 302] ("If the best industry practice is to require consideration of "climate change" factors, then the permit includes this requirement **despite the absence of more explicit language in the permit** about 'climate change' factors." (emphasis added)).

At the hearing, the Court did recognize that "CT DEEP could have"—but did not—"more explicitly required consideration of particular climate change factors."  Oct. 19, 2023 Hearing Tr. at 81:19-21.  Based on that initial finding of a question of fact, the parties have conducted discovery in accordance with the Court's ruling.  For instance, the Court even granted CLF's Motion to Compel discovery from Defendants into 15 additional, "similar" coastal bulk petroleum storage facilities hat have a Risk Assessment Matrix (RAM) rating of yellow or red for category H-09.01 (weather conditions) finding that the "[t]he key inquiry in this case is about best *industry* practice, and because the Defendants are of course members of the industry, what they do at their other facilities **<u>may inform the meaning of that term</u>**."  *See* ECF 372 at 5-7

(emphasis added).   Although fact discovery is now ending, [3] expert discovery is ongoing and accelerating at great expense to the parties.

CT DEEP has now spoken directly on what the Current Permit did and did not require.  In fact, CT DEEP has explicitly advised that the Draft Permit will require permittees—for the first time—to consider climate change in the operation of their facilities.[4]

Of direct relevance to this case, CT DEEP expressly stated these permit provisions are "new" and "significant changes" from the prior, current Permit.  CT DEEP will soon be finalizing this draft and issuing a new permit that will become the operative permit applicable to the New Haven Terminal going forward.

The Draft Permit makes it clear that the permit at issue in this lawsuit never required consideration of "climate change."  As a result, CT DEEP is poised to answer the Court's question and conclusively instruct that the current Permit never required Defendants to consider "climate change" in their operation and management of the Terminal.

For example, CT DEEP has repeatedly referred to its provision regarding "climate change" considerations as a "**<u>new</u> component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes**."  Ex. A, November 2024 Fact Sheet at 12 (emphasis added); Ex. D, December 2024 Supplemental Fact at 3; Ex. E, March 2024 Fact Sheet at 10; Ex. F, April 2024 Supplemental Fact Sheet at 3.   The agency also recognized that these "**significant changes**" to the prior permitting regime call for a 120-day waiting period for permittees to come into compliance and submit a revised SWPPP.  *See* Ex. B, December 2024

---

[3] Written fact discovery is complete, and the fact discovery period is now limited to three remaining depositions.

[4] CT DEEP first published the Draft Permit in March 2024, and reissued it in December 2024. There is one remaining public hearing scheduled in May 2025, and the Draft Permit is anticipated to be finalized shortly thereafter.

Draft Permit at 51; Ex. E, March 2024 Fact Sheet at 7.

The Draft Permit will resolve the central legal question at the heart of Plaintiff's claims, which the Court—without the benefit of the Draft Permit and associated guidance from CT DEEP—initially viewed as a question of fact. This will no longer be an open issue subject to interpretation.

Given these developments, it would not serve the interests of judicial economy to press on with costly fact and expert discovery related to Plaintiff's "climate change" and "climate adaptation" allegations in this case. The parties and the Court have already expended far too many resources litigating these "climate change" allegations which are now mooted and legally invalid. Fact discovery is nearly complete, and expert discovery will make no difference in deciding the key **legal** question. CT DEEP's interpretation of its own permit is controlling and will dispose of the issue. Until that happens, there is no reason for the parties or the Court to waste further time and resources on claims that will, in all likelihood, be resolved in the very near future.

Accordingly, Defendants ask the Court to stay discovery in this case until CT DEEP has issued its Draft Permit in final form, after which the Court can consider and rule on how CT DEEP's guidance alters the viability of Plaintiff's claims.[5]

---

[5] Defendants contacted Plaintiff on April 25, 2025 to meet and confer regarding the filing of a **joint** motion to stay discovery and proceedings related to Plaintiff's "climate change" and "climate adaptation" allegations. *See* Ex. C, May 6, 2025 Declaration of Douglas Henderson, Esq. ("Henderson Decl."), at ¶ 4. The parties subsequently met and conferred on this issue over two teleconferences on April 28, 2025 and May 2, 2025. *Id*. Defendants maintain that a stay would benefit all parties, as well as the Court, to avoid significant and unnecessary litigation costs regarding this issue which will soon be decided as a matter of law. However, Plaintiff would not agree to the proposed stay, necessitating Court intervention. *Id*. at ¶ 6.

## I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

This case concerns stormwater permit compliance at a bulk fuel storage and distribution terminal located at 481 East Shore Parkway, New Haven, Connecticut 06512 (the "Terminal"). Amended Complaint ("Compl."), ¶ 2.  Since May 2017, the Terminal has been owned by Defendant Triton Terminaling LLC[6] and operated by Defendant Equilon Enterprises LLC d/b/a Shell Oil Products US.  *Id.*, ¶ 27.

### A.    <u>The Current Permit</u>

Since 2018, the Terminal has been subject to the Current Permit, under Permit No. GSI002800.  2018 Permit at 1.  The Current Permit, extended in 2021 without any relevant changes, regulates stormwater discharges from industrial facilities engaged in certain identified activities.  *See* Ex. G, Current Permit at 1.  It imposes various regulatory obligations on all facilities subject to it, including the Terminal.  *Id.* at 17-71.  Such requirements include certain specified control measures, the creation of a SWPPP, and monitoring and recordkeeping tasks, among others.  *Id.*

In general, the purpose of the SWPPP is to lay out the necessary control measures at the Terminal to reduce or eliminate the potential for the discharge of stormwater runoff pollutants into the environment.  *Id.* at 23-38.  The SWPPP currently in place for the Terminal further specifies 13 "Best Management Practices" required by the Current Permit.  None of these "Best Management Practices" required Defendants to consider the "climate change" factors alleged in Plaintiff's Complaint.  *Id.* at 18-22.[7]  Plaintiff's claims are completely novel and represent a

---

[6] Prior to an ownership transfer in 2017, the Terminal was previously owned by Defendant Motiva Enterprises LLC ("Motiva").  *See* ECF 47, Amended Compl., ¶ 34.

[7] Of course, SWPPPs are not comprehensive permits for facilities to address "climate change" generally.  Nor does a SWPPP include *everything* a facility does to prepare for weather related events.

naked attempt to re-write the regulations to reflect what CLF thinks they should be, not what they are.

Plaintiff nevertheless pursues fourteen causes of action,[8] twelve of which are based on Plaintiff's supposition that Defendants have violated the Current Permit by failing to take into account certain factors related to "climate change" and "climate adaptation"—factors that appear nowhere in the language of the Current Permit.  *See generally* Ex. G, Current Permit.  For example, Plaintiff alleges that Defendants failed to consider "climate change" risks such as flooding, storm surges and sea-level rise.  *See e.g.,* ECF 47, Amended Compl., ¶ 391, 393, 394, 398, 418, 424, *inter alia*.  The Current Permit is silent on these issues.  And no SWPPP on file with CT DEEP reflects *any* permittee that has ever included such considerations.  *See* ECF 248, Defendants' Memorandum of Law ISO Motion for Summary Judgment dated June 13, 2023 at 23-24 (referencing the deposition testimony of Ms. Bourdeau, an engineer that conducted factual research and investigation for Defendants, regarding her assessment that none of the 152 publicly available SWPPPs she reviewed in CT DEEP's office considered the litany of climate factors identified by CLF in this lawsuit.)

## B.  The Draft Permit And Its New "Climate Change" Measures

The Current Permit was set to expire on September 30, 2024, but the permit was administratively continued until the Draft Permit went into effect.[9]  This extension was expected,

---

[8] Plaintiff's original Complaint asserted sixteen causes of action.  However, two of Plaintiff's claims were dismissed by Order dated September 16, 2022 [ECF 111].  The Court further dismissed all but Count XIII against Defendant Motiva.  *Id.*

[9] Notice of Tentative Determination Intent to Reissue the General Permit for the Discharge of Stormwater Associated with Industrial Activities (Jan. 7, 2025), at 2, https://portal.ct.gov/-/media/deep/water_regulating_and_discharges/stormwater/industrial/2024-industrial-sw-gp-reissuance---public-notice-docs/december-2024-public-notice/2024-11-20_draft-stormwater-igp-

as CT DEEP previously published the Draft Permit on March 11, 2024, describing what it referred to as "**significant changes**" to the Current Permit and inviting public comment.  *See* Ex. A, November 2024 Fact Sheet at 5.  CT DEEP then reissued the Draft Permit on December 30, 2024, with minimal updates.  As predicted, when CT DEEP revealed the Draft Permit, its changes proved to be significant—particularly for this case.

Most importantly, the Draft Permit for the first time explicitly requires that permittees consider certain climate "resiliency measures" that CT DEEP has repeatedly characterizes as a "new component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes."  *See e.g.,* Ex. A, November 2024 Fact Sheet at 12; Ex. D, December 2024 Supplemental Fact at 3; Ex. E, March 2024 Fact Sheet at 10; Ex. F, April 2024 Supplemental Fact Sheet at 3.

The "Resiliency Measures" provide as follows:

---

notice-of-
determination_final_ahd_jp_tb.pdf?rev=e4715999602a460eb63e44a2231d6da4&hash=A7A952
2E21F4160CFE6D859D72E572F8

(v)  Resiliency Measures

Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events. If such SCMs are already in place due to existing requirements mandated by other state, local or federal agencies, the permittee should document in their SWPPP a brief description of the controls and a reference to the existing requirement(s). If the facility may be exposed to or has previously experienced such major storm events, additional SCMs that may be considered include, but are not limited to:

- Reinforce materials storage structures to withstand flooding and additional exertion of force.

- Prevent floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with non-corrosive device.

- When a delivery of exposed materials is expected, and a storm is anticipated within 48 hours, delay delivery until after the storm or store materials as appropriate (refer to emergency procedures).

- Temporarily store materials and waste above the BFE level.

- Temporarily reduce or eliminate outdoor storage.

- Temporarily relocate any mobile vehicles and equipment to higher ground.

- Develop scenario-based emergency procedures for major storms that are complementary to regular stormwater pollution prevention planning and identify emergency contacts for staff and contractors.

- Conduct staff training for implementing the permittee's emergency procedures at regular intervals.

Note: This subsection requires that the permittee must consider Section 7(b) when selecting and designing control measures to minimize pollutant discharges via stormwater. This subsection does not require nor prescribe specific SCMs to be implemented; however, the permittee must document in their SWPPP the considerations made to select and design control measures at their facility to minimize pollutants discharged via stormwater.

Ex. B, Draft Permit, at Section 7(c)(D)(v).

These "Resiliency Measures" (borrowed from the U.S. Environmental Protection

Agency's ("EPA") Multi-Sector General Permit ("MSGP")) now require permittees to **consider**

certain control measures to account for "hurricanes, storm surge, extreme/heavy precipitation, and flood events." *Id.*

Importantly, these new "climate change" provisions in the Draft Permit were added **outside** the scope of the definition of "Best Management Practices"—which is a defined term in both the Current Permit and Draft Permit that is used to incorporate the 13 specific control measures that are expressly spelled out in those documents (none of which mention "climate change" considerations).

In clear recognition that the Current Permit did **not** previously require such climate control measures, the Draft Permit suggests that if a particular facility already has such measures in place "due to existing requirements mandated by **other state, local or federal agencies**," then the permittees should document this in their updated SWPPP. *See* Ex. B, Draft Permit, at 43. (emphasis added). The Draft Permit's use of the word "other" makes clear that the Current Permit does not contain such a requirement. Nor would Plaintiff even be permitted to enforce any provision in an unrelated state statute via this citizen suit brought pursuant to the very specific and limited authority for citizen suits granted under the Clean Water Act. It is also worth noting that no other state, local or federal agency required Defendants to employ such control measures regarding "climate change" factors at the Terminal prior to the Draft Permit. Clearly, these regulations and requirements are entirely new.

## C. The Draft Permit Renders Plaintiff's Requested Relief Moot.

Defendants, of course, recognize their responsibility to comply with all applicable regulations and permitting requirements in their operation of the Terminal, which they have done and will continue to do when the Draft Permit is finalized and takes effect. The Draft Permit's

requirements now overlap and moot Plaintiff's wide-ranging requests for injunctive relief related

adaptation measures to address alleged "climate change" factors.

| **Plaintiff's Cause of Action** | **New Requirements Under Draft Permit** |
|---|---|
| **Count I** alleges that Defendants failed to consider storm surge flooding and sea-level rise to establish control measures to eliminate pollutant discharges from unpermitted non-stormwater discharges. | The Draft Permit and Stormwater Quality Manual have elected not to define "unpermitted non-stormwater discharges" to include water from these "climate change" factors. The Stormwater Quality Manual does acknowledge that the Connecticut Institute for Resilience & Climate Adaptation expects water levels in the Long Island Sound to increase by up to 20 inches—but does not obligate or describe if or how a facility should address predicted sea level rise. *See* Ex. H, Connecticut Stormwater Quality Manual ("SQM") at 555.<br><br>"The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
| **Count II** alleges that Defendants failed to consider the potential impact of a rise in sea level, coastal flooding, and erosion leading to inconsistency with Connecticut's Coastal Management Act. | The Draft Permit **specifically requires consideration and documentation** of Stormwater Control Measures. Ex. B, Draft Permit, at Section 7(c)(D)(v). |
| **Count III** alleges Defendants failed to consider "climate change" within the stormwater pollution prevention plan ("SWPPP") constituting unlawful certification of the SWPPP. | The Draft Permit specifically requires this: "**The permittee must document in their SWPPP the considerations made to select and design control measures [with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility to minimize pollutants discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v).<br><br>"The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
| **Count IV** alleges Defendants failed to identify potential pollution sources from flooding, storm surges, and sea-level rise. | The Draft Permit requires: "The permittee **must document in their SWPPP the considerations made** to select and design control measures **[with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility **to minimize pollutants** discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v). |

| | |
|---|---|
| **Count V** alleges Defendants failed to implement best management practices to address "climate change." | The Draft Permit requires: "The permittee must document in their SWPPP the considerations made to select and **design control measures [with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility to minimize pollutants discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v). "The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
| **Count VI** alleges Defendants failed to implement runoff measures to address flooding, storm surges, and increased rainfall. | The Draft Permit requires: "The permittee must document in their SWPPP the considerations made to select and design control measures **[with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility to minimize pollutants discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v). |
| **Count VII** alleges Defendants failed to minimize the potential for **leaks and spills** resulting from "climate change." | The Draft Permit requires: "The permittee must document in their SWPPP the considerations made to select and design control measures **[with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility **to minimize pollutants discharged via stormwater**." Ex. B, Draft Permit, Section 7(c)(D)(v). "The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
| **Count VIII** alleges Defendants failed to submit information to CT DEEP regarding "climate change." But CT DEEP does not even require this in the Draft Permit. | The Draft Permit merely requires Defendants to "document in their SWPPP the considerations made to select and design control measures [with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events] at their facility to minimize pollutants discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v). The Draft Permit also requires: "If the facility may be exposed to or has previously experienced such major storm events, additional SCMs that may be *considered* include, but are not limited to . . . [certain "climate change" considerations.]" Ex. B, Draft Permit, Section 7(c)(D)(v). "The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
| **Count IX** alleges Defendants failed to update | The Draft Permit requires Defendants to "document in their SWPPP the considerations made to select and design control |

| the SWPPP in light of "climate change." | measures **[with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events]** at their facility to minimize pollutants discharged via stormwater." Ex. B, Draft Permit, Section 7(c)(D)(v). "The Resilience Measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. |
|---|---|

### D. **It Is Undisputed That Neither CT DEEP Nor EPA Have Ever Required Defendants To Perform A "Climate Change" Assessment.**

Against this backdrop, it is unsurprising that neither CT DEEP nor EPA have ever required Defendants to consider "climate change" as part of their operation of the terminal, as part of "best management practices" or otherwise. Plaintiff cannot dispute that:

➤ CT DEEP has never asked Defendants to perform a "climate change" impact assessment under the Current Permit.

➤ There is no document from CT DEEP that has ever suggested "climate change" considerations were included in "best management practices."

➤ CT DEEP has never orally stated that the "best management practices" provision requires Defendants to complete an assessment of "climate change" impacts at the Terminal.

➤ EPA has never orally stated that "best management practices" requires Defendants to complete an assessment as requested by CLF in this case of "climate change" impacts at the Terminal.

➤ CT DEEP has never stated in writing that the "best management practices" provision requires Defendants to complete an assessment of "climate change" impacts at the Terminal.

➤ EPA has never stated in writing that "best management practices" requires Defendants to complete an assessment as requested by CLF of "climate change" impacts at the Terminal.

➤ CT DEEP has never required Defendants to consider climate resiliency under the Current Permit.

➤ EPA has never stated that "best management practices" require the "climate change" impact considerations request by CLF as injunctive relief in this case.

> ➤ There is no document from EPA that has ever suggested "climate change" considerations as requested by CLF as injunctive relief in this case were included in "best management practices."

> ➤ No SWPPP on file with CT DEEP reflects *any* permittee has ever included such considerations. *See* ECF 248, Defendants' Memorandum of Law ISO Motion for Summary Judgment dated June 13, 2023, at 23-24.

This highlights how the "climate change" requirements in the Draft Permit are **new** and **significant changes** to the current regulatory framework, and Plaintiff's claims cannot survive.

## II.    LEGAL STANDARD

The Court has wide discretion to stay proceedings in this case.  It is a longstanding principle that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  The determination of whether to stay proceedings depends on the case-specific facts before the Court.  *See Niken v. Holder*, 556 U.S. 418, 433-434 (2009).  The party requesting a stay bears the burden of showing the circumstances justify the stay.  *See id*.

To determine the appropriateness of a stay, the Court must apply a four-factor standard balancing (1) whether the stay applicant has shown they will likely succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies.  *See id*. (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020).  While the first two factors are usually the most important, the "degree to which a factor must be present varies with the strength of the others; more of one factor excuses less of the other."  *See U.S. S.E.C. v. Daspin*, 557 F. App'x 46, 48 (2d Cir. 2014) (internal quotations omitted).  "Simply stated, more of one excuses less of the other."  *Paulsen v. All Am. Sch. Bus Corp.*, No. 13-CV-3762 (KAM),

2013 WL 5744483, at *2 (E.D.N.Y. Oct. 23, 2013) (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)).

Further, courts have routinely granted stays of proceedings where a decision that will impact the facts and issues in a case is pending from an applicable regulatory or governmental agency. For example, the court in *Read v. Corning Inc.* granted the defendants' request for a stay of proceedings in deference to forthcoming decision by the New York State Department of Environmental Conservation ("DEC") on an appropriate remedy. 351 F.Supp.3d 342, 360 (W.D.N.Y. Dec. 21, 2018). That court held that it would "make[] eminent sense to stay the claims for response costs and other damages until after the DEC-ordered remediation has been implemented" because to allow the other claims to proceed would only result in "piecemeal litigation, with consequent delay and multiplicitous appeals, and attendant attorney's fees." *Id.* Likewise, the Supreme Court in the *Warm Springs Dam Task Force v. Gribble* case granted a stay to maintain the status quo pending appeal while the Council on Environmental Quality, which is ultimately responsible for administration of the NEPA and most familiar with its requirements for Environmental Impact Statements, considered whether the defendants' environmental impact statement was deficient. *See* 417 U.S. 1301, 1301-4 and 1310 (1974).

### III.    ARGUMENT

On March 11, 2024, CT DEEP published the Draft Permit describing what it referred to as "significant changes" to the Current Permit and inviting public comment.[10] Most importantly, the Draft Permit for the first time—and explicitly—requires that permittees consider certain climate "resiliency measures" that CT DEEP characterizes as a "new component . . . added in

---

[10] *See* https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/industrial-stormwater-gp.

response to Connecticut's commitment to prepare for ongoing climate changes." *See* Ex. A, November 2024 Fact Sheet at 12. CT DEEP then reissued the draft permit on December 30, 2024, and scheduled a second public hearing for May 13, 2025. *Id*. It is anticipated that CT DEEP will be issuing a final version of the Draft Permit in the coming weeks or months.

From the specific terms of the Draft Permit, there can be no doubt that the Current Permit does not require what Plaintiff claims. Accordingly, Defendants requested CLF to agree to stay discovery and proceedings related to its "climate change" and "climate adaptation" claims in this case until the Draft Permit has been finalized. *See* Ex. C, Henderson Decl., at ¶ 5. Yet Plaintiff refuses to do so.

Defendants intend to file a Motion for Summary Judgment based on CT DEEP's Draft Permit and related guidance. However, CLF has already indicated its intent to argue that such motion is premature because the Draft Permit has not yet been finalized. While Defendants vehemently disagree with that notion, in order to avoid that argument presenting any potential issue for Court, Defendants respectfully seek, at minimum, a stay of all discovery and proceedings related to Plaintiff's "climate change" and "climate adaptation" allegations in Counts I-IX, including any related injunctive relief requested by Plaintiff, to avoid unnecessary and costly expert discovery in this case.

Defendants acknowledge that the Court previously denied a prior motion to stay under disparate circumstances. Although Defendants respectfully disagree with the Court's ruling on the prior motion,[11] there is now clear justification to stay discovery and proceedings regarding

---

[11] On June 16, 2023, Defendants moved for an order essentially staying discovery pending an order on Defendants' Motion for Patial Summary Judgment (ECF 248). *See* ECF 250. This Court denied Defendants' motion finding that two of the four factors had not been met, including that (i) Defendants had not shown that they would have been subject to any undue discovery

claims that CT DEEP will soon be foreclosing with the finalization of its Draft Permit.   First, as explained below, Defendants would be substantially prejudiced if discovery was not stayed under this motion given the enormous expense of pressing forward with ongoing discovery and upcoming expert discovery deadlines.   Second, CLF will not be prejudiced by a stay of discovery at this point, in fact the opposite is now true.   Fact discovery is nearing completion and expert opinions cannot change the legal impact of CT DEEP's own statements interpreting the provisions of the Current Permit, upon which the Court previously found a question of fact (without the benefit of such guidance).   By contrast, both sides will benefit from a stay to the extent that each side will be alleviated from the time and expense to continue litigating fact issues on claims that should now be resolved as a matter of law.   Defendants' prior motion to stay was based on entirely different facts and circumstances, and is easily distinguishable from the issues now pending before the Court on this Motion.

Applying the four factors that the Court should consider on a motion to stay, such relief is clearly warranted here.   First, Defendants are likely to succeed on the merits.   Second, Defendants will suffer the irreparable injury of wasted time and resources if forced to proceed through cumbersome (and ultimately pointless) additional fact and expert discovery on claims that are likely to be dismissed.   Third, Plaintiff will not be injured at all by a stay, let alone substantially injured.   And finally, the public interest lies in allowing CT DEEP to interpret its own permit and not subjecting Defendants (and the broader regulated community) to the unpredictability of allowing Plaintiff and the trier of fact to decide what the permit means.

---

burdens because discovery was already essential stayed pending resolution of CLF's then filed motions to compel, and (ii) CLF would be unfairly prejudiced by any stay in discovery with the then upcoming dispositive motion deadline.   *See* ECF 263, Judge Farrish's Order on Motion to Limit Discovery (ECF 250) ("Farrish's Order to Limit") at 8-10.

because CLF, by filing a "citizen suit" under the Clean Water Act, only "stands in the shoes of the CT DEEP, the statements by CT DEEP are dispositive of all key issues in this never-before seen lawsuit.  *See, e.g., Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) ("Citizen enforcement actions greatly resemble government enforcement and qui tam actions . . . citizen plaintiffs . . . effectively stand in the shoes of the EPA."); *see also Conn. Fund for Env't, Inc. v. Upjohn Co.*, 660 F. Supp. 1397, 1411 n.22 (D. Conn. 1987) (recognizing that "Plaintiffs in this citizen suit stand in the shoes of the government with respect to this matter.").

There is no justification to continue expending significant time and resources litigating claims that are now defeated by the Draft Permit and associated guidance documents, and will be conclusively resolved by the finalization of the Draft Permit in a matter of weeks or months.

### A. <u>Defendants Will Succeed On The Merits Once CT DEEP Issues The Draft Permit In Final Form.</u>

The central premise of Plaintiff's Complaint is that the Current Permit and its "Best Management Practices" provision required Defendants to consider "climate change" in certain ways in the operation of the Terminal, despite the absence of any language to that effect, or any such previous requirement from US EPA or CT DEEP.  *See* ECF 47, Amended Compl. at 362, 394, 430, 435.  While Plaintiff argues that the "Best Management Practice" requirement of the Current Permit implied a "climate change" consideration, the Draft Permit makes it clear—as a pure legal matter—that the Current Permit never required Defendants to consider these measures.  Instead, CT DEEP has explained, in clear and unambiguous terms: these are "new" and "significant changes" to the Current Permit.

In CT DEEP's words, the Draft Permit's "resiliency measures" element "is **a new component** of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes" (*See* Ex. A, November 2024 Fact Sheet at 12) (emphasis added),

and **specific** resiliency measures are neither required nor prescribed under the Draft Permit.  Ex.

B, Draft Permit, Section 7(c)(D)(v).  Consistent with CT DEEP's recognition that these

requirements are brand new and will require permittees to make significant changes to come into

compliance, the Draft Permit grants facilities an interim period of 120 days to update their

SWPPPs, during which time those facilities will maintain coverage under the Current Permit.

*See* Ex. B, Draft Permit, at 51.  Because CT DEEP has already contradicted Plaintiff's theory of

the case with the issuance of its Draft Permit and will soon be adopting it in final form,

Defendants are extremely likely to succeed on the merits.

　　　　Given CT DEEP's clarification of its regulatory requirements, these claims do not present

any question of material fact.  When CT DEEP or any other state agency issues a new permit, the

agency is addressing all aspects covered by that permit.  The agency has stated what is required

and what is not required.  For Plaintiff or the trier of fact to interpret the Current Permit in any

way contrary or inconsistent with CT DEEP's own interpretation is to effectively rewrite the

Current Permit itself.  Plaintiff cannot be permitted to create new law via an environmental

citizen suit, nor is this a tort case with open-ended standards of care for a jury to decide.  Plaintiff

is only entitled to stand in the shoes of CT DEEP and enforce the law and regulations as written.

　　　　Nor do CT DEEP's statements require expert testimony to interpret.  CT DEEP has

spoken clearly, and the Court may take judicial notice of the public position of a state agency.

*See Komondy v. Gioco*, 253 F. Supp. 3d 430, 454 (D. Conn. 2017) (taking judicial notice of the

Town of Chester's stated purposes in enforcing zoning regulations); *Clark v. Mulcahy*, 162 Conn.

332, 336 n. 3, 294 A.2d 504 (1972) ("A court may take judicial notice of state regulations."

(citing *Pierce v. Lantz*, 965 A.2d 576, 580 (Conn. App. Ct. 2009))); *see also United States v.*

*Penn Foundry & Mfg. Co*., 337 U.S. 198, 215 (1949) (Douglas, J., concurring) (official

17

communications disclosing policy, such as reports, rules and regulations of an agency, are reliable and authoritative and need not be proven).

Courts are generally instructed to "defer to an agency's interpretation of its own regulations." *Cordiano*, 575 F.3d at 207-08; *see also Auer*, 519 U.S. at 462-63 (a regulatory body has the power to resolve ambiguities in its own regulations). Put simply, the best evidence of what CT DEEP intends for the Draft Permit to require is the words and actions of CT DEEP. Instead, Plaintiff's theory of the case is that it can read CT DEEP's mind about the "true," albeit entirely unstated, meaning of the Current Permit, especially the term "best management practices." But there is no longer any need to read these tea leaves, because CT DEEP has confirmed that the requirements for "climate change" considerations are in fact new. There is only one way that kind of statement can be interpreted: those provisions are **new, significant changes** to the prior regulatory framework, and they are simply not included in the prior, Current Permit. The Court must reject Plaintiff's effort to overwrite this clear statement from CT DEEP. The question of what CT DEEP requires in the Current Permit is therefore a question of legal interpretation for the Court alone, not one that requires expert discovery or scientific expertise, let alone any question of fact, that would require a trier of fact to decide.

As explained below, CT DEEP's impending actions will necessarily dispose of Plaintiff's "climate change" claims, and the first factor weighs heavily in favor of a stay.

### 1. Counts I-IX Fail Because CT DEEP Itself Has Advised the Current Permit Did Not Required "Climate Change" Considerations.

The Draft Permit has dispelled any mystery about whether Defendants were ever required to consider "climate change" factors under the Current Permit—they were not. CT DEEP knows what its permits do and, in this case, do not require. CT DEEP's "new" resiliency measures and reporting requirements regarding "climate change" explicitly recognize that they were not

previously included in prior permits like the Current Permit at issue in this case. This clarification will resolve any dispute about the meaning of the Current Permit. In fact, CT DEEP's answer is loud and clear: the Current Permit never included the requirements Plaintiff alleges, as part of the "best management practices" language or any other provision.

In its prior ruling on the 2023 Motion for Summary Judgment, the Court—without the benefit of CT DEEP's new Draft Permit—held there was a question of fact regarding what the permit required by imposing "best management practices" in operating the Terminal. While Defendants respectfully disagree with that finding, there should no longer be any lingering doubt that CT DEEP itself has answered the question in the negative. Indeed, the Court need look no further than EPA and CT DEEP's statements in order to resolve any perceived ambiguity in that language. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 207-08 (2d Cir. 2009) (Second Circuit deferring to EPA interpretation of ambiguous term, and stating that, "We will generally defer to an agency's interpretation of its own regulations . . . so long as the interpretation is not plainly erroneous or inconsistent with law."); *see also Auer v. Robbins*, 519 U.S. 452, 462-63 (1997) (holding that a regulatory body has the power to resolve ambiguities in its own regulations); *City Club of N.Y. v. U.S. Army Corps. of Eng'rs*, 246 F. Supp. 3d 860, 869 (S.D.N.Y. 2017) (endorsing "*Auer* deference" for a court to defer to an agency interpreting its own regulations).

Now, any ambiguity the Court saw[12] in what CT DEEP intended to be required by the Current Permit is explained by its own statements that the climate resiliency control measures represent "significant changes" and "new" requirements that did not exist under the Current Permit. Indeed, allowing Plaintiff's "climate change" claims to proceed after CT DEEP has so clearly spoken on this issue would leave the interpretation of the Current Permit up to the trier of fact, even though it is now crystal clear what the Current Permit did and did not require. This would put the regulated community in the impossible position of guessing whether CT DEEP's regulations mean what CT DEEP has already said they mean, or having to continuously be subject to attempts by expansionist plaintiffs that seek to use litigation to accomplish a policy goal. That cannot be the result here, as it would subject the regulated community to an unpredictable outcome of what a potential jury might think on a pure question of law.

The bottom line is that while CT DEEP's prior silence on whether the Current Permit created what the Court previously viewed as an information vacuum, CT DEEP has now explained the controlling interpretation of its old and new industrial stormwater permits with its own words and eliminated any possible question of fact.

### 2. The Incorporated Connecticut Stormwater Quality Manual Confirms The Current Permit Did Not Require "Climate Change" Considerations.

Likewise, the March 2024 revision to the Connecticut Stormwater Quality Manual ("SQM") (incorporated by reference into the Draft Permit), clarifies that its own provisions

---

[12] Defendants respectfully maintain the position set forth in their first Motion for Partial Summary Judgment that the language of the Current Permit was unambiguous, and—by its plain terms—did not require Defendants to consider the "climate change" factors that are the bases of Plaintiff's allegations in this case. *See* Motion for Partial Summary Judgment [ECF. 248-1]. But given the Court's prior ruling, Defendants assert that any perceived ambiguity is now resolved by this new and now conclusive extrinsic evidence from the EPA and CT DEEP, including the explanation provided by CT DEEP in its new Draft Permit that these are "new" requirements, compelling the same conclusion.

regarding "climate change" factors were new as of the time of its issuance. Indeed, the March 2024 SQM revision expressly states that "[c]limate change (*i.e.*, increasing precipitation and temperature and sea level rise) and its implications for stormwater management design and implementation were important considerations **during the revision of this Manual**[.]" *See* Ex. H, SQM at 546 (emphasis added). The SQM revisions further state that "[b]ased on the stated goals of the Manual update and the Workgroup's review, **it was clear that Connecticut's revision of this Manual needed to consider both observed and potential future changes in precipitation as a result of climate change**." *See* Ex. H, SQM at 547. (emphasis added).

In short, CT DEEP has made it abundantly clear that the inclusion of "climate change" measures in its revised, new Draft Permit and SQM constitute new considerations. There is no ambiguity. CT DEEP's statements all point in the same direction: the Current Permit never required Defendants to consider the "climate change" factors alleged by Plaintiff. Defendants will succeed on the merits, and a stay is warranted.

B.  **Defendants Will Suffer Irreparable Injury and Expense If Forced To Conduct Unnecessary Expert Discovery On Claims That Should Already be Extinguished.**

The technical and scientific issues underlying CLF's "climate change" claims, not to mention the expansive approach CLF has taken to discovery, are wide-ranging and complex. These claims implicate millions of pages of documents and will require significant expert witness testimony. In addition, Plaintiff continues to seek supplementation of written discovery as well as depositions of individuals on issues related to its "climate change" and "climate adaptation" allegations, even as fact discovery is coming to a close. For example, Plaintiff has noticed a deposition of Sergio Jaramillo, a Metocean engineer, to explore additional questioning on climate-related topics on May 28, 2025. Virtually all of this work and the significant associated expenses will not be necessary if, as there is no reason to doubt, CT DEEP's final

permit is published consistent with its prior drafts. Defendants have already spent millions of

dollars to defend these meritless claims, and the Court should not require Defendants to waste

additional resources on Plaintiff's "climate change" claims when CT DEEP has stricken them

down. This factor weighs in favor of a stay.

### C.  <u>A Stay Will Not Injure Plaintiff.</u>

By contrast, Plaintiff will not be harmed by a stay in any way. In fact, CLF has already

taken the position that the Draft Permit should not be considered until it is finalized. *See* Ex. C,

Henderson Decl., at ¶ 5. While Defendants disagree with that position, it would be difficult for

Plaintiff to argue that staying the case until the Draft Permit has been issued in final form would

cause Plaintiff to suffer any harm whatsoever. Instead, a stay would avoid the unnecessary

wasting of time, money and judicial resources on an argument that will be obviated once the

Draft Permit goes final. Nor would CLF be harmed by delaying the completion of outstanding

fact and expert discovery, which can easily be resumed at that time, if something surprisingly

does change with respect to the language in the final permit. At most, a stay will only cause a

delay of a few weeks or months, which will not materially harm CLF in any way. This factor

weighs in favor of a stay.

### D.  <u>The Public Interest Favors a Stay.</u>

Finally, a stay is also in the public interest. CT DEEP's Draft Permit, once finalized, will

apply not only to Defendants in this case, but indeed to the entire regulated community. CLF is

neither EPA nor CT DEEP, and it is not CLF's role to decide what CT DEEP's regulations and

permits require. Defendants respectfully submit that the Court should let CT DEEP do its job,

and avoid risking the issuance of an order that could send guidance to the industry that is

inconsistent with CT DEEP's own interpretation of what its permits do and do not mean. Indeed,

the imminent finalization of the Draft Permit by CT DEEP will provide the only guidance that

the industry needs to comply with the requirements of industrial stormwater permits that it issues. A stay of discovery and proceedings is necessary to let that process play out and avoid unnecessary guesswork that will impact the daily operations of an entire industry.

It is black letter law that a citizen suit is not a replacement for regulatory enforcement. *See Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 50 (1987) ("the citizen suit is meant to supplement, not supplant, governmental action"). Citizen suits exist to **enforce** existing law, not create new law. *Sierra Club,* 834 F.2d at 1522. Plaintiff simply cannot create new regulatory requirements that fly in the face of CT DEEP's interpretation of its own permit.

While Defendants respectfully maintain there was no question of fact to begin with, certainly now there is no ambiguity about CT DEEP's intentions regarding what was—and was not—required under the Current Permit. Allowing Plaintiff's "climate change" claims to proceed after CT DEEP has issued such clear statements leaves the interpretation of CT DEEP's permit up to a fact finder, even though CT DEEP has spoken unambiguously. The interpretation of the permit language is a pure question of law. By contrast, allowing Plaintiff's claim to proceed on an "implied" term through a "best management practices" theory (one that is entirely novel) puts the regulated community in the untenable position of guessing whether CT DEEP's regulations mean what CT DEEP says they mean, or whether they will be subjected to a continuous cycle of litigation like this. That kind of regulatory uncertainty is neither productive nor allowed under the law.

There is no reason to allow these claims to consume even more time and resources when the parties and the Court know CT DEEP's final issuance of the Draft Permit in final form is imminent. The finalization of the Draft Permit will not only inform the parties to this case but the entire regulated community. At that point, it will be known whether CT DEEP's permits

23

mean what CT DEEP says they mean, or whether they mean whatever CLF thinks they **should**

say.  There is no reason to doubt that common sense will prevail, but until that determination is

made, it is in the public's interest to stay further proceedings in this case.

## IV.    CONCLUSION

For all these reasons, Defendants respectfully request that the Court stay further

discovery in this case until CT DEEP has issued its Draft Permit in final form and the Court has

had time to consider the implications of that permit on CLF's claims.


Dated: May 6, 2025                                    Respectfully submitted,

                                                      /s/ *Douglas A. Henderson*
                                                      Douglas A. Henderson (phv05547)
                                                      Carmen R. Toledo (phv20194)
                                                      KING & SPALDING LLP
                                                      1180 Peachtree Street, NE Suite 1600
                                                      Atlanta, GA 30309
                                                      T: (404) 572-4600
                                                      dhenderson@kslaw.com
                                                      CToledo@KSLAW.com

                                                      Antonio E. Lewis (phv03069)
                                                      KING & SPALDING LLP
                                                      300 S Tryon Street Suite 1700
                                                      Charlotte, North Carolina 28202
                                                      T: (704) 503-2600
                                                      alewis@kslaw.com

                                                      James O. Craven (ct18790)
                                                      WIGGIN AND DANA LLP
                                                      One Century Tower 265 Church Street
                                                      P.O. Box 1832
                                                      New Haven, CT 06508-1832
                                                      T: (203) 498-4400
                                                      F: (203) 782-2889
                                                      jcraven@wiggin.com

                                                      Rose J. Jones (phv208026)
                                                      Hilgers Graben PLLC

1372 Peachtree Street, N.E. 19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

John S. Guttmann (ct25359)
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)
Beveridge & Diamond, P.C.
400 West 15th Street Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 6, 2025, the foregoing was served via email to all counsel of record.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com