## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION, INC.,

    *Plaintiff*,

           v.

SHELL OIL COMPANY, EQUILON
ENTERPRISES LLC D/B/A SHELL OIL
PRODUCTS US, SHELL PETROLEUM, INC.,
TRITON TERMINALING LLC, and MOTIVA
ENTERPRISES LLC,

    *Defendants*.

Civil Action No. 3:21-cv-00933-VDO

May 28, 2025

## PLAINTIFF CONSERVATION LAW FOUNDATION'S OPPOSITION TO DEFENDANTS' MOTION TO STAY DISCOVERY AND PROCEEDINGS RELATED TO PLAINTIFF'S "CLIMATE CHANGE" ALLEGATIONS IN COUNTS I-IX OF COMPLAINT

Oral Argument Requested

**TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................................................................ii

TABLE OF AUTHORITIES ................................................................................. iv

EXHIBIT LIST .................................................................................................... vii

I.    Introduction................................................................................................. 1

II.   Background ................................................................................................. 2

III.  Legal Standard ........................................................................................... 5

IV.   Argument .................................................................................................... 8

    A.  Defendants Attempt to Reargue Legal Issues They Previously Lost and Overturn Judge Meyer's Ruling that it is a Matter of Fact Whether the Current Permit Requires Consideration of Climate Change.......................................... 8

    B.  The Draft Permit and Related CT DEEP Statements Have No Legal Significance to this Case and The Requirement to Minimize Pollution in Light of Best Industry Practice is Unchanged............................................................... 10

        1.  CT DEEP Has Made No Statement, Much Less a Conclusive One, On The Interpretation of Past General Permits........................................ 11

        2.  CT DEEP's Proposed Draft Permit Does Not Alter the Requirement to Minimize Pollution to the Best Industry Practice ............................ 15

    C.  Defendants' Stay Pending Appeal Factors Do Not Control the Court, and the Stay Should Be Rejected Under the Primary Jurisdiction Doctrine And Stay Pending Separate Regulatory Proceeding Factors. ........................................ 19

        3.  Defendants Argue to the Primary Jurisdiction Doctrine Without Invoking it, And Courts Considering Stays of CLF's Similar Cases Pending Governmental Actions on Permits have Rejected Staying the Litigation .......................................... 20

        4.  The Consideration of a Stay Pending a Regulatory Proceeding Factors on Which the Court Should Focus are the Prejudice of a Stay to CLF, the Lack of any Harm to Defendants From Continued Litigation, and the Maturity of this Litigation.......................................... 23

    D.  Each of the Four Appellate Factors Also Weighs Against Defendants ............................ 26

        5.  Defendants Cannot Make a Strong Showing of Likely Success on the Merits .......... 27

1.  Defendants Cannot Show Irreparable Harm .................................................. 35

2.  CLF Will be Substantially Harmed ............................................................... 36

3.  The Public Interest Favors Prompt Enforcement and Disfavors Indefinite
    Delay ............................................................................................................ 37

E.  The Requested Stay is Indefinite, Impermissible, and Ignores CLF's Other Claims ....... 38

V.  Conclusion ............................................................................................................ 40

## TABLE OF AUTHORITIES

### *Cases*

*American Canoe Ass'n v. D.C. Water & Sewer Auth.*,
 306 F. Supp. 2d 30 (D.D.C. 2004) ....................................................................... 11

*Conn. Fund for the Env't v. Job Plating Co.*,
 623 F. Supp. 207 (D. Conn. 1985) ....................................................................... 22

*Conservation L. Found. v. Shell Oil Co.*,
 C.A. No. 17-396 WES, 2020 WL 5775874 (D.R.I. Sept. 28, 2020) ................................. 8, 20

*Conservation L. Found., Inc. v. Exxon Mobil Corp.*,
 3 F.4th 61 (1st Cir. 2021) ......................................................................... 7, 21, 40

*Eisenberg v. Permanent Mission of Equatorial Guinea to the United Nations*,
 No. 18-CV-02092, 2022 WL 1546673 (S.D.N.Y. Apr. 5, 2022) ................................... 10

*Ellis v. Tribune Television Co.*,
 443 F.3d 71 (2d Cir.2006) ................................................................................ 21

*Entangled Media, LLC v. Dropbox Inc.*,
 732 F. Supp. 3d 1120 (N.D. Cal. 2024) ................................................................ 25

*Farricielli v. Rocque*,
 158 F. Supp. 2d 207 (D. Conn. 2001) ................................................................. 35

*Friedman as Trustee of Ellett Brothers, LLC v. Nexien, Inc.*,
 No. 21-CV-03292 (DRH) (JMW) 2021 WL 5910763 (E.D.N.Y. Nov. 9, 2021) .................. 38

*GOJO Indus., Inc. v. Innovative Biodefense, Inc.*,
 407 F. Supp. 3d 356 (S.D.N.Y. 2019) ............................................................ 7, 21, 26

*Goldstein v. Time Warner New York City Cable Grp.*,
 3 F. Supp. 2d 423 (S.D.N.Y. 1998) ....................................................................... 5

*Harnage v. Dzurenda*,
 No. 3:14-cv-885, 2015 WL 1540658 (D. Conn. Apr. 7, 2015) ................................... 35

*Kappel v. Comfort*,
 914 F. Supp. 1056 (S.D.N.Y. 1996) ............................................................. 5, 6, 24

*King v. Time Warner Cable*,
 113 F. Supp. 3d 718 (S.D.N.Y. 2015),
 *vacated and remanded on other grounds to* 894 F.3d 473 (2d Cir. 2018) ...................... 22

*L.E.A.D. (Local Environmental Awareness Development) v. Exide Corp.*,
  No. CIV. 96-3030, 1999 WL 124473 (E.D.Pa. Feb. 19, 1999) ............................................ 38

*Landis v. North Am. Co.*,
  299 U.S. 248 (1936) .......................................................................................................... 6, 39

*Lithgow v. Edelmann*,
  247 F.R.D. 61 (D. Conn. 2007) ............................................................................................ 24

*Lucy v. Bay Area Credit Serv. LLC*,
  No. 3:10-cv-1024, 2011 WL 13344167 (D. Conn. July 28, 2011) ....................................... 35

*Lugo v. Alvarado*,
  819 F.2d 5 (1st Cir. 1987) ...................................................................................................... 37

*Maldonado-Padilla v. Holder*,
  651 F.3d 325 (2d Cir. 2011) .................................................................................................... 6

*McKnight v. Blanchard*,
  667 F.2d 477, 479 (5th Cir. 1982) ......................................................................................... 39

*Medina v. Angrignon*,
  No. 15-cv-0427RJA, 2022 WL 1555083 (W.D.N.Y. May 17, 2022) ................................... 38

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................................................... 5, 27

*Pennenvironment v. GenOn Ne. Mgmt. Co.*,
  No. 07–475, 2011 WL 1085885 (W.D. Pa. Mar. 21, 2011) ................................................. 22

*Perricone v. Unimed Nutritional Servs., Inc.*,
  No. CIV.A. 301CV512(CFD), 2002 WL 31075868 (D. Conn. July 18, 2002) ...................... 7

*Protegrity Corp. v. Epicor Softward Corp.*,
  67 F. Supp. 3d 555 (D. Conn. 2014) .................................................................................. 7, 25

*Pub. Emps. for Envtl. Responsibility v. Gipson Co.*,
  No. 3:15–0020, 2015 WL 4663173 (M.D. Tenn. Aug. 6, 2015) ........................................... 23

*Range v. 480-486 Broadway, LLC*,
  810 F.3d 108 (2d Cir. 2015) .................................................................................................... 6

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
  415 U.S. 1 (1974) .................................................................................................................... 35

*Seneca Nation of Indians v. New York,*
    988 F.3d 618 (2d Cir. 2021)............................................................................ 20, 21

*Sikhs for Justice v. Nath,*
    893 F. Supp. 2d 598 (S.D.N.Y. 2012)................................................................ 5

*South Camden Citizens in Action v. New Jersey Dept. of Env. Protection,*
    145 F. Supp. 2d 446  (D.N.J. 2001) ................................................................ 12

*Student Pub. Int. Res. Grp. of N.J., Inc. v. Fritzsche, Dodge & Olcott, Inc.,*
    579 F. Supp. 1528 (D.N.J. 1984) .................................................................... 23

*Unif. Fire Officers Ass. v. de Blasio,*
    973 F.3d 41 (2d Cir. 2020)............................................................................... 36

*VirtualAgility Inc. v. Salesforce.com, Inc.,*
    759 F.3d 1307 (Fed. Cir. 2014)........................................................................ 25

*White v. Am. Tobacco Co.,*
    125 F.R.D. 508 (D. Nev. 1989)........................................................................ 37

### Statutes

33 U.S.C. § 1365(a) ...................................................................................... 22

42 U.S.C. § 6972(a) ...................................................................................... 22

**EXHIBIT LIST**

Exhibit A.    Declaration of J. Meinert

Exhibit B.    Rule 11 Correspondence

Exhibit C.    M. Sullivan 30(b)(6) Deposition Transcript

Exhibit D.    Shell Global Solutions International B.V., DEP Informative Metocean Design and Operating Considerations (Endorsement of ISO 19901-1:2005) (Feb. 2011)*

Exhibit E.    P. Verlaan Deposition Transcript*

Exhibit F.    DEP Informative Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption to Climate Change (Feb. 2015)*

Exhibit G.    Shell Global Solutions International B.V., Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplement to ISO 19901-1:2015) (Feb. 2017)*

Exhibit H.    Met Office Climate Consultancy, Climate Risk Assessment: Pilot Project (2014)*

Exhibit I.    "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 1 Weather Risk Assessment and Mitigation" (2016)*

Exhibit J.    "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 2 Main Weather-Related Hazards & Considerations by Region" (2016)*

Exhibit K.    "Metocean Design and Operating Considerations – Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation" (2017)*

Exhibit L.    "Climate Change Impact and Adaptation" (June 2020)*

Exhibit M.    Wendi Goldsmith Expert Report*

* Documents denoted with an asterisk are being filed under seal pursuant to this Court's Protective Order (ECF 7)

## I.     INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") respectfully files this Opposition to Defendants' May 6, 2025, Motion to Stay Discovery and Proceedings Related to Plaintiff's "Climate Change" Allegations in Counts I-IX of Complaint, ECF 584, and its accompanying Memorandum of Law, ECF 585 ("Motion to Stay" or "Motion"). Defendants' Motion to Stay is a transparent attempt to delay this litigation at a pivotal moment—after receiving CLF's expert reports but before Defendants must disclose their own. Defendants' Motion to Stay has no basis in fact or law as it contains no substantiation of Defendants' stated injury of continued litigation costs, is based on speculative regulatory actions by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"), and mischaracterizes the legal significance of CT DEEP's 2024 Draft General Permit for the Discharge of Stormwater Associated with Industrial Activities ("Draft Permit") and its accompanying fact sheets. The Motion to Stay also impermissibly reargues legal theories that the Court has already rejected from Defendants' 2023 Motion for Partial Summary Judgment, ECF 248, ("MPSJ") which was denied in full from the bench at oral argument, ECF 305.

Defendants' Motion argues to four factors for a stay pending appeal, but this is the wrong legal test as there is no pending appeal. The Court should instead use the analysis and factors for a primary jurisdiction doctrine challenge or those for a stay pending the outcome of a separate proceeding. When a party requests a stay pending the outcome of a separate governmental proceeding, courts consider the interests of each party, the court, and the public interest, but they also specifically consider whether the movant's motion is timed for tactical advantage as well as the relationship between the maturity of the litigation and the applicability of the separate governmental proceeding's potential outcomes; Defendants' Motion is silent as to these additional considerations. But under any set of factors, Defendants' Motion should be denied because all

factors regardless of test disfavor a stay. Even under Defendants' four appellate stay factors, each factor weighs against them because: (1) Defendants are unlikely to succeed on the merits of a later motion because their legal theory has no basis in fact or law and is contrary to the law of this case; (2) Defendants only seek to alleviate unsubstantiated litigation costs, which are not cognizable as irreparable harm; (3) CLF would suffer significant prejudice given the timing of a stay; and (4) the public interest strongly disfavors delays of litigation under environmental statutes' citizen suit provisions where ongoing violations are alleged. Worse still, Defendants impermissibly seek a stay of indefinite duration based on uncertain future agency action. The Court should deny Defendants' Motion to Stay as contrary to law, precedent, and the fair administration of justice.

## II.    BACKGROUND

CLF's suit alleges violations of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA") at Defendants' bulk oil storage terminal ("Terminal") in the New Haven Harbor, which is separated by a fence from the backyards of New Haven residents including CLF's members. The Terminal is a set of building-size tanks that store tens of millions of gallons of hazardous and flammable oil products. CLF's suit alleges Defendants are in violation of their duties under the CWA and RCRA because they have not adapted their facility to the realities of increased precipitation levels, sea level rise, storm frequency, and increased storm severity due to climate change. This is in spite of the fact that Defendants' own facilities have been repeatedly affected by powerful storms, which have caused catastrophic spills, discharges of hazardous pollutants, and uncontrolled chemical fires. *See* Am. Complaint, ECF 47 ¶¶ 74, 259, 260, 307, 316.

CLF's Amended Complaint, ECF 47, articulates violations of the 2011 General Permit for the Discharge of Stormwater Associated with Industrial Activities ("2011 General Permit"), which was extended three times beyond its original five-year termination date on October 1, 2016, October 1, 2018, and October 1, 2019. Am. Compl., ECF 47 at ¶ 175. The Complaint alleges

ongoing violations that equally apply to the 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activities ("Current Permit"), which re-issued the 2011 General Permit without changes, Suppl. Fact Sheet, ECF 585-4 at 2, and is the permit currently in force at the Terminal. The Current Permit requires Defendants to demonstrate their compliance by creating a Stormwater Pollution Prevention Plan ("SWPPP"). *See* Current Permit, ECF 585-7 at 24–31.[1] The SWPPP must document a variety of factual aspects of the facility, explain the results of required analyses, and describe how the permit holder is complying with the Current Permit. *Id.* CLF has alleged that various deficiencies in Defendants' SWPPPs are violations of the Current Permit and that other conditions at the Terminal and failures to provide and amend information to CT DEEP constitute additional violations of the Current Permit.

On June 13, 2023, Defendants filed a Motion for Partial Summary Judgment ("MPSJ"), ECF 248, that argued the interpretation of the Current Permit is a question of law for the Court, ECF 248-1 at 12, that the "plain language of the CT General Permit is unambiguous and does not require consideration of CLF's claimed 'climate factors,'" *id.* at 13-27, and that, in the alternative, even if the Court held that the permit terms were ambiguous, extrinsic evidence demonstrates that CT DEEP does not require consideration of CLF's climate factors, *id.* at 27-38. On October 19, 2023, the Court ruled from the bench after oral argument and denied Defendants' motion in full. Order Denying Defs. Mot. for Partial Sum. J., ECF 302 at 1.

On March 11, 2024, CT DEEP noticed its intent to issue a new General Permit for the Discharge of Stormwater Associated with Industrial Activity, including a draft of that permit. On March 29, 2024, the Court ruled on CLF's motion to compel documents. Order Granting CLF's Mot. to Compel, ECF 372. Instead of filing the instant Motion to Stay at that logical point in time,

---

[1] Pin cites to docket entries refer to the ECF header page number.

Defendants worked from March 2024 to August 2024 to attempt to comply with the Court's ECF 372 Order. Defendants have reported they employed a document review team of 460 attorneys to review millions of documents. Joint Status Rpt. (Aug. 19, 2025), ECF 455 at 2.

In September 2024, when the Current Permit naturally would have expired, CT DEEP announced it would not be issuing a new permit that month as planned and extended the Current Permit indefinitely.[2] On December 30, 2024, CT DEEP issued an updated draft permit ("Draft Permit"); as of the date of this filing there is still no specific date when the Current Permit will expire. Defendants still did not seek a stay at the time CT DEEP publicized the Draft Permit.

Fact discovery in this case ended on March 31, 2025, although outstanding discovery issues and some depositions were mutually agreed would occur after the deadline. Scheduling Order (Jan. 13, 2025), ECF 507; Joint Status Rpt. (Mar. 31, 2025), ECF 558 at 2. Defendants still did not seek a stay at the conclusion of fact discovery. CLF alone timely made its Expert Disclosures on May 8, 2025. Aff. of J. Meinert, Ex. A. The remaining case deadlines are governed by the case scheduling order at ECF 507.[3]

In advance of this motion, Defendants sent CLF a Rule 11 letter on April 2, 2025, demanding CLF withdraw this suit and CLF's similar suit in Rhode Island ("Rhode Island Matter"). Rule 11 Correspondence, Ex. B at 2-4. CLF responded on April 23, 2025 noting the many ways Defendants' letter was itself frivolous. *Id.* at 5-13. The Parties met and conferred over

---

[2] CT DEEP, Industrial Stormwater General Permit, Notes 9/18/2024 – Reissuance Update, https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/industrial-stormwater-gp (last visited May 28, 2025).

[3] The deadline for reports for parties that do not have the burden of proof was originally set for June 9, 2025. *See* Scheduling Order, ECF 507. The Court granted Defendants an extension of that deadline to June 23, 2025 to accommodate the Parties' need to re-schedule CLF's 30(b)(6) deposition due to a medical emergency. Order (May 22, 2025), ECF 598. The deadline for rebuttal reports is July 7, 2025. Order (Jan. 13, 2025), ECF 507. The close of expert discovery and deadline to complete expert depositions is August 11, 2025. *Id.* Any motion related to preclusion of an expert must be filed on or before September 1, 2025. *Id.* Dispositive motions, if any, shall be filed by September 19, 2025. *Id.* If no party files dispositive motions, a joint trial memorandum is due October 1, 2025.

Defendants' Rule 11 Letter and request for a stay among other issues on April 28, 2025 and May 2, 2025. Aff. of J. Meinert, Ex. A. In the May 2 meet and confer, Defendants represented to CLF that they have no present intention to file a Rule 11 motion. *Id.* at 3.

## III.    LEGAL STANDARD

Defendants in their Motion recite the standard four factor test for a stay pending appeal. Defs. Mot. to Stay ("Mot."), ECF 585 at 16. That test derives from the "appellate court's power to hold an order in abeyance while it assesses the legality of the order" on appeal, which "has been described as [an] inherent" power from the Court's ability to conduct appellate review and manage cases. *Nken v. Holder*, 556 U.S. 418, 426 (2009). But because there is no pending appeal and this Court is not exercising an appellate power, the Court should not use Defendants' inapplicable test.

Defendants' request for a stay until CT DEEP finalizes an action should instead be analyzed using the factors for a stay pending the outcome of a separate proceeding. That test is often used in the context of separate litigation, but similar factors and analyses are used for a variety of types of separate proceedings. District courts in the Second Circuit often use a five-factor test, sometimes referred to as *Kappel* factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) (quoting *Volmar Distributors v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993)); *see, e.g.*, *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 621–22 (S.D.N.Y. 2012) (same); *but see, e.g.*, *Goldstein v. Time Warner New York City Cable Grp.*, 3 F. Supp. 2d 423, 437–39 (S.D.N.Y. 1998) (considering the fairest course without express factors but focusing on the extent of the current litigation's development, the closeness of alignment of legal issues between the matters, and the timing of a decision in the

separate matter). These are balancing factors for "a case-by-case determination, with the basic goal

being to avoid prejudice." *Kappel*, 914 F. Supp. at 1058 (quoting *Volmar Distributors*, 152 F.R.D.

at 39). When considering a stay pending a separate proceedings, courts note that a "stay is an

intrusion into the ordinary processes of administration and judicial review," *Maldonado-Padilla*

*v. Holder*, 651 F.3d 325, 328 (2d Cir. 2011) (quoting *Nken*, 556 U.S.at 427), to be granted only in

"rare circumstances," *Landis v. North Am. Co.*, 299 U.S. 248, 254–55 (1936).

The authority for a stay pending the outcome of a separate proceeding derives from courts'

inherent authority to manage their cases. *See id.* at 244 ("[T]he power to stay proceedings is

incidental to the power inherent in every court to control the disposition of the causes on its docket

with economy of time and effort for itself, for counsel, and for litigants."). The *Landis* case sets

the foundation for a stay pending separate proceedings, but it does not lay out a particular set of

factors, instead noting that "the processes of justice" require "adaptation to varying conditions."

*Id.* at 256. The Supreme Court noted, however, that its discretion was limited so that it could not

apply "a stay of indefinite duration in the absence of a pressing need." *Id.* at 255. "The decision

whether to stay an action calls on a district court's studied judgment, requiring the court to examine

the particular facts before it and determine the extent to which a stay would work a hardship,

inequity, or injustice to a party, the public or the court." *Range v. 480-486 Broadway, LLC*, 810

F.3d 108, 113 (2d Cir. 2015) (quotation marks and alterations omitted).

Defendants' Motion does not rest on a separate proceeding that is another federal litigation,

but rather the finalization of a governmental agency's regulatory proceeding, which courts address

with more specific considerations. One of the more regularly litigated contexts in this Circuit

whereby a stay is evaluated against a pending governmental action is a stay of patent infringement

litigation while there is a pending *Inter partes* review, which occurs when the U.S. Patent and

Trademark Office hears a petition to reconsider the validity of the patent at issue in the litigation. In such cases, the judicial test uses three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set," *see Perricone v. Unimed Nutritional Servs., Inc.*, No. CIV.A. 301CV512(CFD), 2002 WL 31075868, at *1 (D. Conn. July 18, 2002) (quoting *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)). Congress codified that test in the 2011 America Invents Act and added a fourth factor, "whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court." *See Protegrity Corp. v. Epicor Software Corp.*, 67 F. Supp. 3d 555, 560 (D. Conn. 2014). To consider the stay at issue, the Court should look to *Inter partes* cases and similar considerations of stays pending the outcome of a government regulatory action.

In addition to the above factors, the Court should consider whether Defendants' Motion is more appropriately considered using the doctrine of primary jurisdiction. While not explicitly invoked by Defendants' Motion, the Court may find some factors in that analysis useful as the doctrine fundamentally considers whether a regulatory agency's determination of an issue would improve judicial efficiency for issues a court may ultimately take up. *See, e.g.*, *GOJO Indus., Inc. v. Innovative Biodefense, Inc.*, 407 F. Supp. 3d 356, 360–62 (S.D.N.Y. 2019) (considering both the primary jurisdiction doctrine and the five factor *Kappel* test in evaluating a stay pending the outcome of a separate governmental proceeding). The primary jurisdiction doctrine has been considered in CLF's similar cases under the CWA and RCRA where a governmental action, including issuance of a new permit, was at issue. In those situations, courts have determined the litigation should proceed. *See Conservation L. Found., Inc. v. Exxon Mobil Corp.*, 3 F.4th 61, 70–75 (1st Cir. 2021) ("*Exxon Mobil*"); *Conservation L. Found. v. Shell Oil Co.*, C.A. No. 17-396

WES, 2020 WL 5775874, at *3 (D.R.I. Sept. 28, 2020).

## IV.    ARGUMENT

### A.  Defendants Attempt to Reargue Legal Issues They Previously Lost and Overturn Judge Meyer's Ruling that it is a Matter of Fact Whether the Current Permit Requires Consideration of Climate Change

This Court definitively interpreted the Current Permit to require consideration of climate change if, as a matter of fact, Defendants' and the industry's practices demonstrate, through documents and expert testimony, that doing so is "best industry practice." Order Denying Defs. MPSJ, ECF 302. Defendants' Motion attempts to reopen this holding and upend the existing case management order based on a not-yet-filed **second** motion for partial summary judgment that would apparently seek reconsideration of the denial of the first MPSJ. The Court should reject Defendants' last-ditch efforts to halt this case and require Defendants to complete expert discovery within the Court's existing deadlines.

Defendants' Motion asks the Court to find that the Current Permit's requirement to implement best management practices ("BMPs") to manage stormwater did not involve a consideration of climate change as a matter of law based on extrinsic CT DEEP statements about the separate Draft Permit. *See* Mot., ECF 585 at 24–25. The Court, however, already ruled on each of these issues when denying Defendants' MPSJ. Defendants' MPSJ argued that the Current Permit is "plain and unambiguous" in that it only required implementation of the "expressly enumerated" BMPs with the overriding requirement that each of those BMPs must be implemented to "minimize pollutants" to the "best industry practice" and did not impose any additional requirements to consider impacts from climate change. *See* Memo. of Law in Support of Defs.' MPSJ, ECF 248-1 at 13–19. The Court denied that motion and ruled that the Current Permit unambiguously imposes a duty to implement best industry practices to minimize pollutants. *See* Order Denying Defs. MPSJ, ECF 302; MPSJ Hearing Tr., ECF 305 at 77:5–8. The Court reasoned:

> So, in short, I conclude that the permit does not, at least as a matter of law, preclude CLF's position that Shell was required by the permit to consider climate change factors. Whether Shell was required to consider climate change factors -- and hence to carry out its minimization duties by reference to such factors -- depends in part on whether consideration of such climate change factors is an element of control factors that constitute best industry practice. The permit is unambiguous, in my view, in this respect.

MPSJ Hearing Tr., ECF 305 at 84:3–12. The Court also ruled that because the Current Permit defines the compliance standard as best industry practice, it does not matter that the Current Permit's BMPs do not expressly list climate change analyses because it would necessarily include such requirements if, as a matter of fact, performing such analyses is best industry practice:

> So I do conclude that the permit unambiguously imposes a minimization duty that, in turn, references and incorporates best industry practice. If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that I cannot resolve at this time.

MPSJ Hearing Tr., ECF 305 at 86:8–16. Defendants had also asked the Court to consider CT DEEP's statements and enforcement practices as to the meaning of the best industry practice standard in the Current Permit as an alternative argument that was also based on extrinsic evidence. The Court rejected that argument noting that the meaning would lie with the practices of the industry and not with statements made by CT DEEP:

> Third, Shell -- at least I was confused by the argument a bit -- it argues that it is CT DEEP that determines best management practices, not the Shell defendants. Yes, DEEP's permit imposes a BMP requirement but, as I've explained above, that requirement the BMP requires minimization which in turn requires reference to best industry practices. No one suggests that it is CT DEEP that conclusively decides as an initial matter what is best industry practice. . . . The very purpose of a best industry practice requirement, in my view, is to require industry to conform to best practices even if the content of such best practices are not spelled out word for word in the permit itself, in no small part because of the common sense reality that best practices may evolve over time. Nor, apart from CLF's apparent reliance in part on Shell's own statements and practices elsewhere, does CLF's argument mean that only Shell's practices rather than industry-wide practices establish what constitutes best industry practice.

MPSJ Hearing Tr., ECF 305 at 82:20-83:15. Defendants' present Motion is based on Defendants' claim that, in the future, they *may* file a *second* motion for partial summary judgment asking the Court to revisit these exact three rulings. Mot., ECF 584 at 6. Courts do not allow litigants to rehash previously rejected arguments. *See Eisenberg v. Permanent Mission of Equatorial Guinea to the United Nations*, No. 18-CV-02092, 2022 WL 1546673, at *2 (S.D.N.Y. Apr. 5, 2022) ("[C]ourts within the Second Circuit have imposed sanctions where a party persists in raising previously rejected claims or defenses.") (collecting cases).

Therefore, the Court should deny the Motion is contrary to the law of the case because this Court has already ruled that whether the Current Permit requires consideration of climate change is a matter of fact. MPSJ Hearing Tr., ECF 305 at 85:13–15 ("In my view, whether best industry practice is to consider climate change factors is simply a question of fact that's not suitable for resolution at this stage where the parties have yet to complete discovery.").

### B. The Draft Permit and Related CT DEEP Statements Have No Legal Significance to this Case and The Requirement to Minimize Pollution in Light of Best Industry Practice is Unchanged.

Defendants' Motion is based on the argument that the phrases "new component of the SWPPP" and "significant changes" in the fact sheets accompanying the Draft Permit are interpretations by CT DEEP of the Current Permit. Mot., ECF 585 at 20. This argument has no basis in the law used to interpret environmental permits and, in fact, CT DEEP has made no statement on the interpretation of the Current Permit currently in force. Further, Defendants' argument fails to engage with the incontrovertible fact that the Draft Permit has the same operative requirements as the Current Permit on which CLF's claims are based and on which this Court has already ruled are the source of Defendants' duty to minimize discharges of polluted stormwater using best industry practices.

### 1. CT DEEP Has Made No Statement, Much Less a Conclusive One, On The Interpretation of Past General Permits.

The Parties do not dispute that CWA permits are interpreted like any other contract. MPSJ Hearing Tr., ECF 305 at 76:24–77:4 ("[J. Meyer:] I also don't think that there's a dispute about the basic notions of permit interpretation, which is essentially like a contract, that the Court has to be guided by the language of the permit to the extent that it's not ambiguous, otherwise only if its ambiguous can the Court look to extrinsic evidence."). Accordingly, the interpretation of unambiguous terms in the Current Permit is a matter of law, while ambiguous terms may be interpreted using extrinsic evidence to determine "the circumstances surrounding the making of the contract," including the "circumstances before, during, and surrounding the making of the contract, [and] customary practices the parties had reason to know about." *American Canoe Ass'n v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 43 (D.D.C. 2004) (quotations and citations omitted). Inquiries into extrinsic evidence are bounded, however, by important principles, including the principle that statements by a contracting party not made before, during, or surrounding the making of the contract at issue are irrelevant to interpreting that contract's terms. *See id.* Because CT DEEP's statements in the Draft Permit fact sheets were made long after the issuance of the Current Permit and are, thus, irrelevant to any interpretation of the terms of the Current Permit, the Court should reject Defendants' appeal to language in said fact sheets and deny Defendants' Motion in its entirety.

As a matter of contract interpretation, Defendants' Motion is also grossly deficient because nowhere does it cite a case or principle of law that a party to a contract—in this case, CT DEEP to the Current Permit—may unilaterally alter the terms of that contract years after agreeing to it. Defendants assert that "[n]othing could be more relevant to this case than CT DEEP speaking directly on whether its own permits did or did not require consideration of 'climate change.'" Mot.,

11

ECF 584 at 3.  That CT DEEP had not made this purported exclusion part of the original contract is evidenced by this Court's consideration of the Current Permit when ruling on Defendants' MPSJ, where the Court concluded that CT DEEP had not explicitly excluded climate change analysis from the Current Permit's requirements:

> First, Shell argues that -- and I quote – "if CT DEEP wanted to include consideration of CLF's climate factors, it knows how to." I think that argument is true, but it's really beside the point. Yes, CT DEEP could have more explicitly required consideration of particular climate change factors. But the fact that CT DEEP could have been more explicit does not mean that the permit's minimization requirement and its corresponding reference to best industry practices means that the best industry practices does not include consideration of climate change factors.

MPSJ Hearing Tr., ECF 305 at 81:16–82:1. If the consideration of climate change factors was not barred from the Current Permit 18 months ago, it cannot be barred now as a matter of contract interpretation even if a party were to now express that view—which CT DEEP has not.

Nowhere does Defendants' Motion use the word "contract" or apply any principles of contract interpretation. This is likely because Defendants' entire legal argument rests on post hoc statements, which are irrelevant to contract interpretation. Rather than provide the Court with the controlling standard and then ask the Court to ignore that applicable law—which is what Defendants' Motion asks—Defendants insert cases setting out the deference owed to an agency's interpretation of its own regulations. *See* Mot., ECF 585 at 22–23 (citing *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 207–08 (2d Cir. 2009) and *Auer v. Robbins*, 519 U.S. 452, 462–63 (1997)). But these cases are inapposite—they do not involve the construction or interpretation of permits, nor do they support Defendants' argument that this Court should defer to ***draft*** agency statements that accompany ***draft*** permits when interpreting a different final permit. Under basic principles of administrative law, even a draft guidance would not carry the force of law. *See S. Camden Citizens in Action v. New Jersey Dept. of Env. Prot.*, 145 F. Supp. 2d 446, 476 (D.N.J. 2001) ("The Court recognizes, as do the parties, that neither of the Draft Guidances are final and,

therefore, neither is binding on this Court."). The statements Defendants cite to are not even in a draft guidance on the Current Permit but, rather, a mere fact sheet accompanying the Draft Permit in its issuance for public comment. Even if the Court were to adopt *Auer* deference in this case—which it has no basis to do—CT DEEP has made no definitive statements about the meaning of the term "best industry practice" in the Current Permit or any of the Draft Permit materials.

Even if the Court considers Defendants' irrelevant evidence as an aspect of contract interpretation or as agency guidance, Defendants' interpretation of the fact sheet is not a reasonable or the singular plain language reading. Defendants' Motion argues that when CT DEEP used the phrase "new component of the SWPPP" in fact sheets *about* the Draft Permit, the agency conclusively promulgated guidance on how to interpret the Current Permit. Mot., ECF 585 at 25. As an initial matter, the fact sheet does not say that it is interpreting the Current Permit. *See* Draft Permit Fact Sheet, ECF 585-1. And the phrase "significant changes" sits at the top of a 41-page fact sheet that generally describes changes without applying special force to any specific change. *See id.* Further, the phrase "new component of the SWPPP" is consistent with CLF's positions in this litigation as merely a statement that the Current Permit now has a universal requirement to document resiliency measures in all facilities' SWPPPs when previously this requirement applied to facilities based on their industry or location. The Current Permit's BMP requirement includes a standard to minimize pollution to the best industry practice, which is consistent with some industries having different practices. Thus, CT DEEP's use of the word "new" can reasonably mean a newly universal requirement. Defendants' Terminal stores tens of millions of gallons of hazardous pollutants at the New Haven Harbor, which may make its industry standards quite different from another facility that stores gravel and sits at the top of a hill miles from the shore, but the Draft Permit now requires the same documentation of resiliency measures at both facilities.

Another reasonable interpretation of the fact sheet's phrase "new component of the SWPPP" that is consistent with CLF's claims is that this language extends existing requirements to plan for sea level rise at facilities within the Connecticut coastal boundary to all facilities. Both the Current and Draft Permits expressly include requirements to implement BMPs consistent with the Connecticut Coastal Management Act. Current Permit, ECF 585-7 at 11; Draft Permit, ECF 585-2 at 16. Count 2 of CLF's Amended Complaint notes that Defendants' failure to evaluate climate change factors is a violation of Section 3(b)(2) of the Current Permit, which requires that all activity conducted under the Current Permit, such as implementing BMPs and discharging stormwater, must be in accordance with the goals and policies of the Connecticut Coastal Management Act. *See* Am. Compl., ECF 47 at ¶¶ 184–91, 396–404. Those goals and policies explicitly require planning to consider sea level rise, coastal flooding, and erosion control. *Id.* at ¶ 188. Notably, these requirements are only triggered for facilities that sit "within the coastal boundary," which Defendants' facility does. *Id.* ¶¶ 185–87. It is entirely consistent with CLF's claims to consider that the Draft Permit extend these climate change planning considerations from coastal boundary facilities to all facilities by universalizing the resiliency measures to all SWPPPs.

Even if the Court finds that Defendants' appeal to extrinsic evidence has any merit, the Court must consider that Defendants' argument is based on materials accompanying the issuance for public comment of a Draft Permit. While Defendants make the assertion that CT DEEP will finalize the Draft Permit soon, neither Defendants, CLF, nor this Court know when, if ever, that will occur or how the final permit and CT DEEPs statements may differ from the draft materials Defendants attached to their Motion. Defendants are asking this Court to go where no court has gone before–to stay a case based on speculation that a draft permit will be finalized as is, at some indefinite point in the future. Defendants speculate that the final permit is forthcoming shortly, but

in doing so they ignore the history of past iterations of the Current Permit at issue. CT DEEP finalized the first General Permit at issue in this case in 2011, but at the five-year end of its lifespan continued the Permit three times before re-issuing it without changes in 2021. Am. Compl., ECF 47 at ¶ 175; Suppl. Fact Sheet, ECF 585-4 at 2. There is no set time by which any new permit may be issued, and its finalization is a matter of agency policy, priorities, and resources.

For these reasons, the Court should not find that Defendants' extrinsic evidence supports the argument that any portion of the Draft Permit described as new or different in a fact sheet necessitates an interpretation of the requirements of the Current Permit. And the Court should not support Defendants' extension of that argument that CT DEEP has concluded the Current Permit does not include any requirements to consider climate change impacts.

## 2. CT DEEP's Proposed Draft Permit Does Not Alter the Requirement to Minimize Pollution to the Best Industry Practice

Defendants' Motion to Stay misreads the Draft Permit and runs with the idea that its insertion of a mandated section in all SWPPPs for "Resiliency Measures" somehow negates or alters the other requirements in the Current Permit. Defendants' alleged changes to requirements for the contents of SWPPPs ignore the fact that the Current and Draft Permits have the same, unchanged, basic requirements to implement control measures and BMPs with a duty to minimize pollution to the best industry practice, which is where CLF's claims and this Court have located the duty to consider climate change impacts.

The Current Permit lays out its requirements primarily in "Section 5. Conditions of this General Permit," Current Permit, ECF 585-7 at 4, 187-7069, while the Draft Permit lays out its general requirements in Section 7, Draft Permit, ECF 585-2 at 4-76, 292-10497. In the Current Permit, the requirements to analyze and implement structural controls and BMPs to minimize pollution from stormwater are in Section 5(b), Current Permit, ECF 585-7 at 4, 19-24, while in the

Draft Permit these same requirements are in Section 7(b) "stormwater control measures," Draft Permit, ECF 585-2 at 4-5, 30-41. "Minimize" in both the Current and Draft Permits means to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." Current Permit, ECF 585-7 at 19; Draft Permit, ECF 585-2 at 30. And "control measures" in the Current Permit means the "required [BMPs] that the permittee must implement to minimize the discharge of pollutants from the permitted facility," Current Permit, ECF 585-7 at 19, while the Draft Permit requires "stormwater control measures" that include BMPs to "minimize the discharge of pollutants." Draft Permit, ECF 585-2 at 30.

The Current Permit requires the outcomes of analyses and details of control measures and implemented BMPs to be memorialized and kept current in the SWPPP as described in Section 5(c), ECF 585-7 at 4, 24-31, while the Draft Permit places the description of the contents of the SWPPP in Section 7(c), see ECF 585-2 at 4, 41-59. As Defendants' Motion acknowledges, the resiliency measures requirement in the Draft Permit is in the description of what must be included in the SWPPP and not in the section describing the required stormwater control measures and BMPs. Mot., ECF 585 at 128 (noting the "'climate change' provisions" are "outside" the section on "the 13 specific control measures that are expressly spelled out"). Defendants argue that the location of the resiliency measures section informs the prior definition of BMPs in the Current Permit. *Id.* But it is equally plausible to read the resiliency measures section as a new requirement to *document* and, as warranted, enhance and keep current such analyses in the SWPPP, while that overall requirement to analyze and implement stormwater control measures that minimize pollution to the best industry practice was, and still is, the foundational requirement for what the permittee must do to comply with both the Current and the Draft Permits.

Even if CT DEEP were to adopt the Draft Permit in its current form—which is entirely speculative—it does not differ from the Current Permit's requirement to consider climate change factors if doing so is best industry practice. CT DEEP did not strike from the Current Permit the unambiguous minimization duty that in turn references and incorporates best industry practice when considering and adopting control measures and BMPs. *Compare* Current Permit, ECF 585-7 at 19 *with* Draft Permit, ECF 585-2 at 30; *see also* Order Denying Defs. MPSJ, ECF 302. The Draft Permit's "Resilience Measures" section itself states that permittees should still be evaluating and selecting control measures and BMPs based on the Draft Permit's section requiring those measures: "This [resiliency measures] subsection requires that the permittee must consider Section 7(b) [stormwater control measures and BMPs] when selecting and designing control measures to minimize pollutant discharges via stormwater." 2024 Draft Permit, ECF 585-2 at 50. Like the Current Permit, the Draft Permit's "resiliency measures" subsection "does not require nor prescribe specific [stormwater control measures] to be implemented." *Id.* The Draft Permit therefore continues to require Defendants as the permittee to select and design control measures consistent with best industry practice to minimize pollutant discharges via stormwater.

While the "resiliency measures" section of the Draft Permit states that additional measures may be required to minimize impacts from stormwater discharges from "major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events," Draft Permit, ECF 585-2 at 49–50, accounting for and minimizing pollution from those events has never been absent from the requirements of the Current Permit. Defendants admit through their 30(b)(6) designee that the Current Permit makes ***no exception*** for these kinds of storm events and that Defendants—not CT DEEP—are responsible for conducting the necessary analyses and selecting the control measures and BMPs required for their site that would comply with their minimization duty. Sullivan 30(b)(6)

Dep., Ex. C at 38:20-39:7; 53:2-14; 230:9-16. Defendants further admit that they are responsible for developing control measures that apply best industry practices whether or not a significant storm is occurring, *id.* at 53:2–14, including hurricanes. *Id.* at 38:20–39:7. Nor is there an exception in the Current Permit in the event weather-related impacts like flooding and storm surge cause a catastrophic tank failure resulting in a major release into the environment. *Id.* at 39:8-11; 39:21–40:6. If the Court were to adopt Defendants' argument that the requirements of the resiliency measures SWPPP section are all new and therefore the Current Permit cannot contain those requirements, it would have to hold that the Current Permit excludes consideration of severe weather events from Defendants' unambiguous duty to minimize using control measures that apply best industry practice, which is at odds with Judge Meyer's decision denying their MPSJ.

Defendants' argument about newness in Defendants' Motion to Stay does not attempt to grapple with the implications of a permitting regime where a requirement for a new headered section in SWPPPs under the Draft Permit could fully disallow, rebuke, or cancel out any and all overlap between the "new" section and existing obligations under the Current Permit. Defendants' argument would mean that the "new" requirements for "hurricanes, storm surge, extreme/heavy precipitation and flood events," *see* Mot., ECF 585 at 12, disallow any notion that the Current Permit regulates stormwater from those events. It would be a nonsensical result that Defendants could be let off the hook for past and ongoing violations of the continuing control measures BMP requirements as they apply to stormwater from flood events or heavy precipitation simply because CT DEEP has now contemplated explicitly requiring that SWPPPs across the state document their climate change resiliency measures analyses.

Defendants' Motion argues that the Draft Permit's explicit requirement for a resiliency measures section in SWPPPs means that all prior permits did not and could not require any

consideration of climate change. ECF 585 at 22-23. This argument is premised upon a foundational misunderstanding of the difference between the requirement to implement BMPs to the best industry practice and the requirement to document and maintain certain types of information in the SWPPP. CLF's Amended Complaint and the Court's rulings in this case have all noted that the requirement in the Current Permit to evaluate climate change hazards and make changes to the facility's stormwater pollution control measures stems from the BMP requirements and the incorporation of the Connecticut Coastal Management Act. *See* Am. Compl., ECF 47 at ¶¶ 184 & 192-193; Order Denying Defs. MPSJ, ECF 302.  Defendants now claim such a reading of the Current Permit has been fully invalidated by overlapping with the resiliency measures requirements in the Draft Permit. Mot., ECF 585 at 10–12. Yet Defendants do not attempt to grapple with the immediate implications of their argument, and how it would create immediate conflicts with the unchanged obligations between the Current and Draft Permits. The Court should find that CLF's claims about the Current Permit are fully compatible with the Draft Permit's requirement for SWPPPs to include a separate section for resiliency measures. The Court should not adopt Defendants' myopic view of the Current Permit and should reject their requested stay.

### C. Defendants' Stay Pending Appeal Factors Do Not Control the Court, and the Stay Should Be Rejected Under the Primary Jurisdiction Doctrine And Stay Pending Separate Regulatory Proceeding Factors.

Defendants' Motion claims that "the Court must apply" the four factors appellate courts use when evaluating a stay pending appeal. Mot., ECF 585 at 16. Defendants' Motion presents this as the correct legal test to use when it is not. This presentation, intentionally or not,[4] appears to be

---

[4] This does not appear to be an error as Defendants previously sought a stay pending the outcoming of their MPSJ, and in that stay motion, argued to the particularized factors for that procedural posture rather than defaulting to stay pending appeal factors. *See* Defs. Mem. in Support of Mot. to Stay Discovery (June 16, 2023), ECF 250-1, at 3-4 (citing *Country Club of Fairfield, Inc. v. New Hampshire Ins. Co.*, 2014 WL 3895923, at *3 (D. Conn. Aug. 8, 2014) for the three factors of a stay of discovery pending a dispositive motion).

a request for this Court to adopt appeal factors despite the lack of a pending appeal and despite this Court not exercising an appellate authority. Use of those factors would be an ill fit in this situation for a number of reasons and would be inconsistent with current law. Defendants' Motion attempts to avoid the primary jurisdiction doctrine, on which Defendants would lose, and similarly attempts to distract the Court from the traditional factors for a stay pending the outcome of a separate regulatory proceeding, on which Defendants would also lose.

### 3. Defendants Argue to the Primary Jurisdiction Doctrine Without Invoking it, And Courts Considering Stays of CLF's Similar Cases Pending Governmental Actions on Permits have Rejected Staying the Litigation

The primary jurisdiction doctrine "allows a court to stay litigation and refer issues to an administrative agency when a case involves issues that fall within the special competence of that agency." *Seneca Nation of Indians v. New York*, 988 F.3d 618, 629 (2d Cir. 2021) (citing *United States v W. Pac. R.R. Co.*, 352 U.S. 59, 62–65 (1956)). Its purpose is to maintain the regulatory uniformity of subjects entrusted to federal agencies coupled with the aspiration to capitalize on administrative acumen. In the Rhode Island Matter, the Court specifically invited amicus from the State of Rhode Island as to whether the litigation should be stayed or dismissed pending actions by the State. Brief of State of Rhode Island as Amici Curiae By Invitation Posed in the Court's June 30, 2020 Text Order (July 30, 2020) (ECF 49), *Conservation L. Found. v. Shell Oil Co.*, No. 1:17-cv-00396 (D.R.I). The State of Rhode Island argued against staying or dismissing CLF's litigation, *id.,* and the Court agreed. *Conservation L. Found. v. Shell Oil Co.*, C.A. No. 17-396 WES, 2020 WL 5775874, at *3 (D.R.I. Sept. 28, 2020) (declining to exercise *Burford* abstention or dismissal or stay under the primary jurisdiction doctrine, noting that courts consider stays of citizen suit environmental enforcement cases an "end run" around the statutes). In CLF's similar case against the ExxonMobil Corporation over a bulk oil storage terminal in Massachusetts, the First Circuit held that a stay of the case pending the issuance of a new permit would be improvident

and not warranted after extensive analysis of the primary jurisdiction doctrine. *Exxon Mobil Corp.*, 3 F.4th at 73–74 & n.4 (holding the future issuance of a new permit by EPA "seems to us largely irrelevant to whether ExxonMobil has violated the conditions of the permit currently in effect," and consolidating cases rejecting stays pending modifications or re-issuances of permits in environmental citizen suit cases). This case, and Defendants' Motion, is no different and the Court should not entertain deferring the Court's role in interpreting environmental permits and enforcing environmental laws to future actions by CT DEEP as Defendants have proposed.

A stay based on the doctrine of primary jurisdiction requires courts to consider if "the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82 (2d Cir.2006) (quoting *W. Pac. R.R. Co.,* 352 U.S. at 64). While "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," the Second Circuit considers four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Seneca Nation of Indians*, 988 F.3d at 629 (citing *Ellis*). On the first prong, courts regularly hold that interpretation of contracts and determinations of whether facts constitute violations of law are a basic competency of courts. *Id.* at 621 ("[C]ontract interpretation is a basic competency of courts."); *see GOJO Indus*, 407 F. Supp. 3d at 362 (collecting cases where determining if conduct violates statute or regulation is "routinely identified as properly within the realm of the judiciary"). A stay pending the issuance of a new permit for its potential bearing on interpretation of the existing permit would not be an appropriate outcome under these circumstances and under the application of this doctrine. When courts have weighed the primary jurisdiction doctrine factors,

they have not granted a stay where the legal issue is interpretation of "a generally applicable law" where the "text is clear and unambiguous on its face," and where the litigation is near its end such that "the benefit of waiting is slight" and "the disruption caused by a delay would be great." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 724 (S.D.N.Y. 2015), *vacated and remanded on other grounds to* 894 F.3d 473 (2d Cir. 2018).

Most damning, and perhaps why Defendants did not invoke this doctrine despite its closer similarity with Defendants' request than a stay pending appeal, is that the primary jurisdiction doctrine generally does not apply to citizen suit CWA enforcement actions. *Conn. Fund for the Env't v. Job Plating Co.*, 623 F. Supp. 207, 214–15 (D. Conn. 1985) (declining to apply the primary jurisdiction doctrine to a citizen enforcement action under the CWA noting the statute's committee reports explicitly noted such cases are within the competence of the courts). Indeed, Congress's enactment of the citizen suit provisions is considered an exclusive conferral to the district courts jurisdiction of CWA and RCRA citizen suit claims. *See* 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a); *see, e.g.*, *Pennenvironment v. GenOn Ne. Mgmt. Co.*, No. 07–475, 2011 WL 1085885, at *5 (W.D. Pa. Mar. 21, 2011) (the primary jurisdiction doctrine was deemed inapplicable partly because determining whether the defendant violated its NPDES permit did not necessitate the Court's involvement in technical or policy evaluations). Congress established these citizen suit provisions to achieve broad compliance with environmental laws, believing that having multiple enforcers would be more effective than relying on just one or two. *See generally*, H.R. Rep. No. 92-911, at 132 (1972), *reprinted in* A Legislative History of the Water Pollution Control Act Amendments of 1972, at 819 (1973). Indeed, "determining whether Defendants have violated the terms of their permits or are releasing pollutants into a body of water in violation of the CWA . . . are exactly the types of things that Congress have determined federal courts competent to decide." *Pub. Emps. for*

*Envtl. Responsibility v. Gipson Co.,* No. 3:15–0020, 2015 WL 4663173, at *3 (M.D. Tenn. Aug. 6, 2015). Thus, CWA citizen suit claims are "fully within the Court's competence and jurisdiction." *Student Pub. Int. Res. Grp. of N.J., Inc. v. Fritzsche, Dodge & Olcott, Inc.,* 579 F. Supp. 1528, 1537 (D.N.J. 1984) (ruling a citizen suit CWA enforcement case should not be stayed pending issuance of a new permit because determination of whether facts "reveal permit violations is fully within the Court's competence and jurisdiction").

Defendants' Motion asks the Court to stay this litigation in the event a draft permit that may or may not eventually be finalized by CT DEEP may be interpreted to retroactively reinterpret the meaning of a different permit, despite such requests' typically consideration under the primary jurisdiction doctrine. The doctrine, meanwhile, counsels this Court to decline any stay on questions of permit compliance and interpretation under the CWA's and RCRA's citizen suit provisions because the jurisdiction and acumen rests with the district court.

### 4. The Consideration of a Stay Pending a Regulatory Proceeding Factors on Which the Court Should Focus are the Prejudice of a Stay to CLF, the Lack of any Harm to Defendants From Continued Litigation, and the Maturity of this Litigation

When courts consider a stay of litigation pending the outcome of another proceeding, including a governmental regulatory proceeding, they focus on the interests, prejudice, and burden of continued litigation or a stay on the parties, the courts, and the public interest. Against these factors Defendants have only pointed to their own litigation costs as a potential harm and have made no attempt to explain how an indefinite stay would not severely prejudice to CLF given the current stage of litigation and expert disclosures. And Defendants have not grappled at all with the interests of the courts or public interest in concluding this years-long litigation.

The traditional analysis for a stay pending the outcome of a separate proceeding is a balancing of five factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Kappel*, 914 F. Supp. at 1058 (quoting *Volmar Distributors v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993)). This analysis generally accounts for three of the stay pending appeal factors but unlike those factors, the balancing test for a stay pending separate proceeding includes no consideration of whether there is a strong showing the movant will likely succeed on the merits. This Court should not focus on the likely success on the merits element that Defendants argue is a primary consideration, *see* Mot., ECF 585 at 16, as this is a logical factor for an appellate court that has already received the argument on the merits. For this Court, an evaluation of likely success on the merits is not a useful factor because the merits briefing is not before the Court, and in this case relates to Defendants' not-yet-presented future second MPSJ that would be based on a state regulatory action that has not occurred, and when it occurs could take any substantive form, or even never occur. And courts may reject stays pending a dispositive motion when the motion is not in front of the Court. *See Lithgow v. Edelmann*, 247 F.R.D. 61, 63 (D. Conn. 2007).

The other three appellate factors loosely map onto some of the considerations for a stay pending the outcome of a separate proceeding, as they are concerned with the harm to each party and the public interest. Notably, the appellate factors do not expressly include consideration of some factors that are core to the analysis of a stay pending the outcome of a separate proceeding. The appellate factors do not expressly consider the potential tactical advantage of the timing of the stay request, nor are they terribly concerned with the duration of the stay. These elements are considered separately by some courts but are both present in the five separate-proceeding factors where the interests of expeditious litigation and the interests of the courts are referenced.

The stay pending the outcome of a separate proceeding analysis focuses first on the interest

of the plaintiff proceeding expeditiously with the litigation and whether the moving party has timed their request to gain a tactical advantage. This type of analysis arises in this Circuit most often in stays of patent litigation pending government determinations on the underlying patents. In such cases, when one party moves for a stay of litigation pending the outcome of a review decision by the U.S. Patent and Trademark Office on that patent's validity, the Court considers whether the motion (or even the petition for patent review) was timed for tactical advantage. *See Protegrity Corp.*, 67 F. Supp. 3d at 564–67 (weighing the timing of the stay and government petition with the pending litigation and potential prejudice and tactical advantage to the parties). Even where a government ruling on patent validity would simplify litigation, courts may reject a stay of litigation because the movant could have sought the stay at an earlier time and seeks a tactical advantage. *See, e.g.*, *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1319 (Fed. Cir. 2014) (finding that failure to move for a preliminary injunction at beginning of case and waiting nearly a year "for some unexplained reason" to file weighed against granting a stay); *Entangled Media, LLC v. Dropbox Inc.*, 732 F. Supp. 3d 1120, 25 (N.D. Cal. 2024) (considering the timing of the request for stay and finding movant waiting a year to initiate government review and file motion for stay weighed against a stay). In this case, Defendants have clearly timed this Motion for a Stay in the middle of expert discovery to give their experts more time with CLF's expert reports than the scheduling order allows. The Draft Permit was published over a year ago on March 11, 2024, *see* Defs. Mot., ECF 585 at 10, and Defendants did not move for a stay at that point. CT DEEP reissued the Draft Permit on December 30, 2024 (which Defendants characterized as "with minimal updates"), *id.*, and again Defendants did not move for a stay. Defendants chose this moment to move for a stay, not based on their claimed injury of litigating while CT DEEP's regulatory proceeding plays out, but rather because Defendants wanted to pause this litigation after CLF had

shown its cards, but before Defendants have to show theirs. Such a tactic is clearly prejudicial to CLF and the Court should find such prejudice weighs heavily against Defendants' requested stay.

Another consideration relevant to a stay pending the outcome of a separate proceeding is the status of the progress of the current case in comparison to the separate proceeding because— unlike a stay pending appeal—the court has no control over the pace or timing of the other proceeding. *See GOJO Indus.*, 407 F. Supp. 3d at 364 (noting stay pending an FDA regulatory enforcement action constituted significant prejudice to the nonmovant given the case was in its fifth year of litigation and not in its infancy). This is a particularly relevant consideration in this case because the other proceeding is not another suit in federal court or administrative adjudication with somewhat determinable schedules, but is rather a policy decision, the timing of which could vary based on changing politics, policies, or even funding of state or federal agencies. Furthermore, an agency action itself could be subject to lengthy litigation. And in this matter, the Parties have engaged in litigation for years, have expended significant resources and the Court's time, and are mere months away from trial memoranda. When evaluating the progress of the current case, courts are more inclined to stay cases in their infancy where a short stay could significantly simplify the action. As Defendants note, they have already spent millions of dollars in fact discovery, ECF 585 at 26, and now seek a delay in the final steps of this litigation. The Court should find that the significant maturity of this litigation weighs heavily against Defendants' requested stay.

### D.  Each of the Four Appellate Factors Also Weighs Against Defendants

The Court should not rely on Defendants' stay pending appeal factors. *See* Defs. Mot., ECF 585 at 17. As discussed above, those factors are not controlling and are ill-suited to the factual situation here where there is no pending appeal. Even if the Court were to use those factors, however, Defendants' Motion must be denied as each factor weighs against the requested stay.

**5.  Defendants Cannot Make a Strong Showing of Likely Success on the Merits**

Defendants claim they are likely to succeed[5] on the merits of their ***second*** MPSJ, which has not been filed but will allegedly be based on a new CT DEEP General Permit that Defendants argue will requires the Court to conclude the Current Permit did not include climate change considerations in the BMP requirements. *Id.* at 19. As an initial matter, and as argued above, the Court does not have that merits motion before it to evaluate Defendants' likely success because neither it nor the materials it would purportedly be based on are in existence. Regardless, the Court should rule that Defendants are not likely to succeed on the merits because success would necessarily require the Court to overturn its own ruling that whether the "best industry practice" standard includes climate change considerations will be decided as a matter of fact. MPSJ Hearing Tr., ECF 305 at 85:13–15 ("In my view, whether best industry practice is to consider climate change factors is simply a question of fact that's not suitable for resolution at this stage . . . .").

If the Court entertains Defendants' invitation to reconsider Judge Meyer's ruling and decide the instant Motion as Defendants' unfiled future MPSJ on whether the Current Permit's BMPs requirement contains climate change considerations as a matter of law, the Court should reject those arguments for the reasons CLF laid out, *supra*, in Sections B.1 and B.2. As argued above, the Current and Draft Permits both require Defendants to evaluate and implement stormwater control measures and BMPs to minimize the discharge of pollutants to the best industry practice. The selection and implementation of those control measures and BMPs must be done pursuant to both the Current and Draft Permits consistent with the Connecticut Coastal Management Act's goals and policies, which explicitly requires facilities like Defendants', which

---

[5] The relevant standard is not "likely to succeed" but rather, "whether the stay applicant has made <u>a strong showing</u> that he is likely to succeed on the merits." *Nken*, 556 U.S. at 426 & 434 (emphasis added).

are in the coastal boundary, to select their BMPs based on the impact of sea level rise and coastal flooding. The inclusion in the Draft Permit of a new section of the SWPPP where all facilities must document the climate change resiliency measures they have considered does not mean the Current Permit now or at any time lacked these requirements. And furthermore, if a fact sheet associated with the finalization of the Draft Permit states the resiliency measures section is a new section, this can easily mean it is a newly universal section, and cannot be considered a binding agency interpretation of all prior permits.

The Court should not go along with Defendants' invitation to reconsider Judge Meyer's ruling, and the Court should instead find that the likely success on the merits factor is bound by the law of the case, which includes the determination that the consideration of climate change factors in the Current Permit is a matter of fact. On this factor Defendants put forth no argument, even in the alternative, that the Court could credit to find in their favor as a matter of fact. The Court should evaluate the likelihood of success factor by determining whether Defendants have made a strong showing that there are no genuine disputes as to any material fact over whether Defendants' own practices and those of others in the industry demonstrate that best industry practice is to consider climate change risks when minimizing pollutants from stormwater. On this question, the evidence is overwhelming that Defendants have conducted climate change assessments and have adapted the design, operation, and maintenance of some facilities based on those assessments for years if not decades.

The Current and Draft Permits both indisputably require a permitholder to implement BMPs that will minimize pollution from stormwater to the "best industry standard." The Parties have litigated for years the extent of Defendants' internal standards for climate change assessment practices and the extent of their knowledge about the practices of others in the industry. The record

is clear from document productions, depositions, and now CLF's expert reports that Defendants have long evaluated climate change risks at their assets, they have standard methodologies for making those evaluations, and they have mandatory corporate policies for incorporating those analyses in facility design, operation, and maintenance. Defendants have used these methods to analyze and adapt some of their other facilities to account for climate change hazards, but they have failed to do so at the New Haven Terminal.

CLF has spent significant resources reviewing hundreds of thousands of Shell documents and hiring expert witnesses who provided timely reports on the issues in the case consistent with Judge Meyer's ruling. Those reports, partly based on Defendants' documents, confirm that best industry practice requires considering climate change consistent with Judge Meyer's ruling.

Defendants have a centralized engineering and science team that evaluates hazards and creates engineering requirements for all entities and contractors across the Shell Group as to how facilities must be designed, constructed, operated, and maintained. These requirements are published in Shell Design and Engineering Practice ("DEP") documents, which are comprised of a "Specification" document that lays out requirements and an accompanying "Informative" document that explains the background and context requirements in the Specification. *See* Defs.' Penny Decl. (May 23, 2023), ECF 234-1, at 3–5 (explaining the Shell DEPs are requirements across the Shell Group and Contractors, consist of Specification and Informative companion documents, and are licensed for use to others in the industry). As early as 2011, Defendants' "DEP Informative Metocean[6] Design and Operating Considerations (Endorsement of ISO 19901-1:2005)" described █████████████████████████████████████████████████████ ███████████████████████. Shell Global Sols. Int'l B.V., *DEP Informative Metocean Design*

---

[6] Metocean is a compound term of meteorological and oceanographic.

*and Operating Considerations (Endorsement of ISO 19901-1:2005)* (Feb. 2011) ("2011 DEP Informative"), Ex. D. The 2011 DEP Informative ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Dr. Paul Verlaan, a Senior Metocean Engineer who has been with Shell since 2002, testified as follows in response to questions about the above conclusions ███████████

███████████████████

████████████████████████████████████████████████████

Verlaan Deposition (Mar. 20, 2025), Ex. F at 49:21–50:6. Thus, from the discovery and testimony in this case, it has been ██████████████████████████████████████

████████████████████████████████████████████████████████████████

30

████████████████████████████████████████ Defendants' own climate engineer testified

███████████████████████████████████████████████████████████

████████████████████

        The 2011 DEP Informative is not the sole instance of a ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ In fact, there are many such

examples. Additional working and final DEPs from 2015 and 2017 are a few examples, provided

below, that ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████ Regarding these DEPs, Dr. Verlaan confirmed that the DEPs ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at 152:7–22;

*see id.* at 48:1-51:20 (confirming ████████████████████████████████████████████).

        The 2015 DEP titled "Metocean Design and Operating Considerations for Offshore and

Onshore Structures – Adaption to Climate Change," ███████████████████████████████

███████████████████████████████████████████████████████████



Shell Global Sols. Int'l B.V., *DEP Informative Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption to Climate Change* (Feb. 2015), Ex. E at 15. Similar to the 2011 DEP Informative, this 2015 informative concludes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

The 2017 DEP titled "Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplement to ISO 19901-1:2015)"

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Shell Global Sols. Int'l B.V., *Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplement to ISO 19901-1:2015)* (Feb. 2017), Ex. G. This 2017 DEP Informative repeats the same statements above that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 5. And Dr. Verlaan

also ████████████████████████████████████ Verlaan Tr., Ex. F at

52:1–64:5 ████████████████████████████████████

    These DEPs are accompanied by and explicitly reference other ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *See id.* at 234:1–259:20

████████████████████████████████████████████████

████████████████████████████████████████████████

████████    These documents include:

- A 2014 "Climate Risk Assessment: Pilot Project," Ex. H, ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ Ex. H at 4.
- A 2016 document titled "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 1 Weather Risk Assessment and Mitigation," Ex. I which describes a ████████████████████████████████ Ex. I at 5.
- A 2016 document titled "Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 2 Main Weather-Related Hazards & Considerations by Region," Ex. J, which describes ████████████████████████████████████ Ex. J at 5.
- A 2017 document titled "Metocean Design and Operating Considerations – Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation," Ex. K, which is a companion document to ████████████████████████████████████████ such that ████████████████████████████ Ex. K at 4.
- A 2020 document titled "Climate Change Impact and Adaptation," Ex. L, ████████████████████████████████████████████



Ex. L at 41.

Further, Defendants have already applied these required Shell-wide practices when analyzing some of their other facilities in the United States, and they have concluded that some of their facilities will be under water due to sea level rise before the end of the facilities' lives. *See* CLF's Mot. to Compel, ECF 326-1 at 25–26. Based on that analysis, Defendants have moved some of their facilities to higher ground, including elevating facilities in order to protect them from sea level rise and increased precipitation and storm surge. *Id.* (describing Defendants' 2021 disclosures in SEC filings related to their Port Fourchon facility where climate risks were assessed and the facility's tanks and building were moved and elevated to adapt to sea level rise concerns).

CLF's expert witness, Dr. Wendi Goldsmith, submitted a report demonstrating that best industry practice has required consideration of climate change risks as far back as 2007. Goldsmith Report, Ex. M at 25–26. Dr. Goldsmith's opinions are supported by decades-old industry standards and internal Shell guidelines and DEPs, including those referenced above, that are too numerous to include in the body of this brief but are examined in detail in her timely report. *Id.* at 15–28.

Defendants assert that they are likely to succeed on the merits of a not-yet-filed second motion for partial summary judgment because the Court will decide that their extrinsic evidence about the Draft Permit conclusively interprets the Current Permit. Mot., ECF 585 at 20. It is already the law of the case, however, that whether the best industry practice requirement in the Current Permit includes consideration of climate change is a matter of fact determined by what the best industry practices entail, including Defendants' own practices. On that analysis, Defendants are not likely to succeed because their own documents, depositions in this case, and CLF's expert reports conclusively show that it is best industry practice, and Shell's own required practice, to

consider climate change risks. This factor weighs against Defendants' motion.

### 1. Defendants Cannot Show Irreparable Harm

Defendants claim that the irreparable harm necessitating their Motion is the expense of litigation. Mot., ECF 585 at 19. It is well established law that litigation expense is not an irreparable harm. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Lucy v. Bay Area Credit Serv. LLC*, No. 3:10-cv-1024, 2011 WL 13344167, at *2 (D. Conn. July 28, 2011) ("Many, if not most, litigants who seek a stay of proceedings pending interlocutory appeal face the cost of ongoing litigation in the district court. Although these costs are particularly nettlesome in the context of a dispute over whether to compel arbitration, the fact remains that 'litigation costs do not rise to the level of irreparable injury.'" (quoting *Daniels v. City of New York*, 138 F. Supp. 2d 562, 564 (S.D.N.Y. 2001)); *Harnage v. Dzurenda*, No. 3:14-cv-885, 2015 WL 1540658, at *2 (D. Conn. Apr. 7, 2015) ("Delay in prosecuting a case against [a] defendant [ ] or possibly increased litigation expenses do not constitute irreparable injury."). Defendants have provided no argument for why the Court should deviate from established law, nor have they provided any argument for extending, modifying, or reversing existing law or for establishing new law holding their litigation costs are uniquely irreparably harmful.

Further, Defendants have provided no factual basis on which the Court could find that litigation expense is irreparable or even a harm. To give the Court enough information to consider such an extraordinary finding, Defendants should have at least submitted an attorney affidavit with estimates of a month or two of expert discovery costs. *See Farricielli v. Rocque*, 158 F. Supp. 2d 207, 209 (D. Conn. 2001) (finding that where a party has not provided sufficient evidence that they will be irreparably harmed, a stay should not be granted). That Defendants did not offer even an unsupported estimate of this alleged harm should be interpreted to mean that they either did not

estimate their costs before filing this motion, or they know those estimate were not compelling.

Defendants' failure to provide any estimate of expert and continued litigation costs is surprising because Defendants have already made their fact discovery costs a matter of record. In response to CLF's most recent motion to compel discovery, Defendants estimated their costs to comply with just 11 of CLF's Revised RFPs at $5,167,373. Contreras Decl. (Dec. 8, 2023), ECF 324-3 at ¶¶ 35–36. While CLF heavily disputed Defendants' methodology, *see* CLF's Reply to Opp. of CLF's Mot. to Compel, (Dec. 22, 2023), ECF 328 at 9–10, Defendants were ordered to comply with 42 of CLF's Revised RFPs in full and Defendants subsequently reported they used a document review team of 460 attorneys to review millions of documents. Joint Status Rpt. (Aug 19, 2024), ECF 455 at 2. Defendants did not raise the instant motion to stay on the basis that those fact discovery costs despite the fact that CT DEEP issued the 2024 Draft Permit prior to the Court's order that Defendants comply with CLF's Revised RFPs. Even if the Court were to consider a novel proposition that mere litigation costs could substantiate irreparable injury, there is nothing in the record to suggest that Defendants are poised to outlay a particularly large expense in expert discovery. Defendants bear the burden to substantiate their allegedly irreparable injury and because they have not attempted to do so, the Court should find this factor weighs against Defendants' requested stay. Even if the Court were to find there was some irreparable harm, "a stay 'is not a matter of right, even if irreparable injury might otherwise result,' it is 'an exercise of judicial discretion,' and '[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.'" *Unif. Fire Officers Ass. v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (quoting *Nken*, 556 U.S. at 433-34 (alteration in original)).

## 2. CLF Will be Substantially Harmed

Defendants claim that CLF will not be substantially harmed. Mot., ECF 585 at 26. As CLF has argued, *supra* Section C.2., the timing of this request for a stay is designed to substantially

harm CLF by pausing the litigation after CLF has disclosed its expert reports but before Defendants must disclose theirs. Defendants' requested stay would result in one-sided discovery, which this Court should not entertain. *See, e.g.*, *Lugo v. Alvarado*, 819 F.2d 5, 7 (1st Cir. 1987) (holding "appellant's use of discovery against appellee estops him from raising any limited right that he may have had . . . to restrict the scope of appellee's discovery against him"); *White v. Am. Tobacco Co.*, 125 F.R.D. 508, 510 (D. Nev. 1989) (denying defendant's motion to stay discovery where defendant "aggressively pursued discovery against the Plaintiff," because the requested stay would give defendant "the benefit of unilateral discovery"). To avoid such harm, the Court would need to order that Defendants disclose their reports before any stay issues, which would be directly at odds with Defendants' claimed bases for the Motion. The more prudent and just decision would be to allow the Parties to complete litigation under the current schedule and consider any dispositive motions at the time the current schedule contemplates such motions (which is mere months away).

### 3. The Public Interest Favors Prompt Enforcement and Disfavors Indefinite Delay

Defendants claim that the public interest is supported by a stay, Mot., ECF 585 at 26–28, but their argument on this factor is nearly incomprehensible. Defendants appear to claim that denying their stay will cause inconsistency between CT DEEP and this Court on the interpretation of the Current Permit, and that such inconsistency will "impact the daily operations of an entire industry." *Id.* at 26–27. Defendants conflate the public interest in granting or denying a stay with a decision by this Court on their second partial summary judgment motion that has not been filed. Further, Defendants' argument seems to anticipate that this litigation will find Defendants have a duty to consider climate change impacts under the Current Permit, but that the Draft Permit will conflict with that finding by labeling climate change a new requirement in a fact sheet to that Draft

Permit. This argument provides useful insight into Defendants' true motive in filing this Motion, which is that on the current record and law of the case CLF wins, and their only hope is an indefinite stay until they can attempt to wield CT DEEP's unrelated statements on a different permit in a Hail Mary bid to reverses the law of the case. The Court's decision on that Hail Mary motion, if indeed it is ever filed, is not at issue now, and the actual consideration of the public interest under this factor is the public's interest in the prompt resolution of litigation.

The public interest favors prompt resolution of litigation and disfavors indefinite stays. *Medina v. Angrignon*, No. 15-cv-0427RJA, 2022 WL 1555083, at *2 (W.D.N.Y. May 17, 2022) ("[S]tays of indefinite duration are generally disfavored."). Not only is prompt litigation favored in general, but it is particularly favored in citizen suit environmental enforcement cases where the allegations necessarily involve ongoing violation of environmental laws. *See L.E.A.D. (Local Environmental Awareness Development) v. Exide Corp.*, No. CIV. 96-3030, 1999 WL 124473, at *33 (E.D. Pa. Feb. 19, 1999) (acknowledging Congress' intention "to keep [environmental] enforcement actions simple and speedy"); *see generally, Friedman as Trustee of Ellett Brothers, LLC v. Nexien, Inc.*, No. 21-CV-03292 (DRH) (JMW) 2021 WL 5910763, at *2 (E.D.N.Y. Nov. 9, 2021) (in ruling on motion to stay discovery, recognizing Rule 1 advises that Rules of Federal Civil Procedure should be construed, administered, and employed by court and parties "to secure the just, speedy, and inexpensive determination of every action and proceeding."). CLF's complaint alleges ongoing violations of environmental laws. The public interest is in favor of prompt resolution of ongoing violations of environmental laws and the Court should find this factor weighs against Defendants' stay.

### E. The Requested Stay is Indefinite, Impermissible, and Ignores CLF's Other Claims

Compounding the above arguments, is the fact that Defendants' requested relief is not crafted in a judicially practicable fashion. Defendants' Motion connects the end of their stay to a

hypothetical future action by CT DEEP. Defendants do not know when, or if, this action will occur, and thus this is a request for an indefinite stay. An indefinite stay is inconsistent with the Supreme Court's foundational *Landis* ruling that overturned an indefinite stay based on ongoing separate proceedings. *Landis*, 299 U.S. at 255 (holding a lower court could not apply "a stay of indefinite duration in the absence of a pressing need."); *see also McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982) ("[S]tay orders will be reversed when they are found to be immoderate or of an indefinite duration.").

If the Court were to grant such improvident relief, the Parties would need substantial additional guidance on what is actually stayed and what is not. Defendants' Motion states the requested stay is to "all discovery and proceedings related to Plaintiff's 'climate change' and 'climate adaptation' claims" "that underlies Counts I-IX" of the Complaint. Defs. Mot., ECF 584 at 4. The Motion, however, also requests in the alternative "that the Court, at a minimum, stay further discovery in this case until CT DEEP has issued its Draft Permit in final form." *Id.* at 6. In this litigation, there are ongoing discovery disputes over CLF's privilege logs, Defendants' confidentiality claims under the protective order, motions to seal documents, and sanctions issues that have not yet been adjudicated over Defendants' apparent violations of various parts of Rule 37. Defendants' Motion makes no particular presentation or request as to which of these discovery disputes, if any, would be stayed. Further, there are depositions that will occur in this matter and the related Rhode Island matter in the coming month. Joint Status Rpt. (May 27, 2025), ECF 602 at 2. Many of those depositions are expressly by agreement, or tacitly, and are both noticed and occurring in both cases, *see id.*, because the Parties have stipulated that discovery produced in one case is produced in the other as well, *see* Stip. of Dismissal (Feb. 11, 2025), ECF 527 at 2. It is unclear which events are within the primary request to stay "all discovery and proceedings" related

to specific issues, and which events are within the alternative request to stay "further discovery."

Further, Defendants' Motion explicitly does not cover CLF's RCRA claims, nor the non-climate change aspects of Counts I-IX. Thus it is unclear that a stay of only the CWA climate change claims would result in any pause of the litigation as the Parties would still continue expert discovery through trial as to the other aspects of the case. The First Circuit was faced with a similar decision in CLF's related litigation and that Court concluded that a stay was improvident given alleged resolution of CWA issues by a government action would have no effect on the RCRA claims. *Exxon Mobil*, 3 F.4th at 70–75 (1st Cir. 2021) ("Even if EPA issues ExxonMobil's permit . . . and even if the permit moots [CLF]'s request for injunctive relief, the parties would still have to begin discovery on the counts alleging past violations. Indeed, the district court held that [CLF]'s complaint adequately alleged that ExxonMobil was or is contributing to an 'imminent and substantial endangerment to health or the environment' in violation of RCRA. 42 U.S.C. § 6972(a)(1)(B). And that count does not even involve consideration of the permit's terms.").

Granting the improvidently defined stay in Defendants' Motion would invite significant confusion as to how the Parties would proceed on unstayed claims and discovery issues and which pending and anticipated motions and litigation events would move forward. For all these reasons, the Court should not entertain Defendants' requested stay as it is not a serious proposal at efficiently conducting this litigation and thus fails to convey any reason as to why this Court should invoke the serious remedy of staying mature litigation.

## V.    CONCLUSION

For the foregoing reasons, CLF asks the Court to deny Defendants' Motion to Stay in its entirety.

Dated: May 28, 2025

Respectfully submitted,

CONSERVATION LAW
FOUNDATION, Inc., by its attorneys

*/s/ James Y. Meinert*

James Y. Meinert (ct31637)
Zachary Manley (pvh207600)*
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110
Tel: (617) 850-1744
Tel: (617) 850-1707
E-mail: jmeinert@clf.org
E-mail: zmanley@clf.org

Ana McMonigle (ct31370)
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
E-mail: amcmonigle@clf.org

Christopher M. Kilian (ct31122)
Kenneth J. Rumelt (phv207130)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 622-3020
Tel: (802) 223-5992
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
E-mail: jcrowley@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street

Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: 832-671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Email: lsinger@motleyrice.com
Email: esmith@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
Email: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
Email: rmazingo@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903
Tel: (401) 457-7730
Email: vgreene@motleyrice.com


*Attorneys for Plaintiff Conservation Law
Foundation, Inc.*

*\*Admitted as Visiting Attorney*

42