# EXHIBIT C

```
                                                          Page 1
 1                    Volume I   Pages 1-348
 2                    Exhibits 1202-1233
 3        IN THE UNITED STATES DISTRICT COURT
 4           FOR THE DISTRICT OF CONNECTICUT
 5   _____
 6   CONSERVATION LAW FOUNDATION, INC.
 7        Plaintiff                         C.A. No.
 8   V.                              3:21-cv-00933-JAM
 9   SHELL OIL COMPANY, EQUILON ENTERPRISES
10   LLC D/B/A SHELL OIL PRODUCTS US, et al.
11        Defendants
12   _____
13   (Full caption on following page)
14
15            RULE 30(b)(6) VIDEOTAPED
16           VIDEOCONFERENCE DEPOSITION OF
17    TRITON TERMINALING LLC, EQUILON ENTERPRISES LLC,
18              and MOTIVA ENTERPRISES LLC
19             by and through its designee
20                MICHAEL SULLIVAN LLC
21        Thursday, February 6, 2025, 9:11 a.m.
22                    MOTLEY RICE
23         40 Westminster Street, 5th Floor
24            Providence, Rhode Island  02903
25        -----REPORTER:  Sonya Lopes, RPR, CSR-----
```

```
                                                        Page 2
 1         IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CONNECTICUT
 3   _____
 4   CONSERVATION LAW FOUNDATION, INC.
 5        Plaintiff                          C.A. No.
 6   V.                                 3:21-cv-00933-JAM
 7   SHELL OIL COMPANY, EQUILON
 8   ENTERPRISES LLC D/B/A SHELL
 9   OIL PRODUCTS US, SHELL
10   PETROLEUM INC., TRITON
11   TERMINALING LLC, and
12   MOTIVA ENTERPRISES LLC
13        Defendants
14   _____
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                          Page 3

 1   APPEARANCES:

 2

 3   Motley Rice LLC

 4        Michael J. Pendell, Esq.

 5        Ridge Mazingo, Esq.

 6        One Corporate Center

 7        20 Church Street, 17th Floor

 8        Hartford, Connecticut   06103

 9        860.218.2722

10        mpendell@motleyrice.com

11        rmazingo@motleyrice.com

12        for Plaintiff

13

14   King & Spalding

15        Antonio E. Lewis, Esq.

16        Ryan T. Kearney, Esq.

17        300 South Tyron Street

18        Charlotte, North Carolina   28202

19        704.503.2551

20        alewis@kslaw.com

21        rkearney@kslaw.com

22        for Defendants

23

24

25
```

Page 38

1    Q.   And with regard to control measures,
2    control measures aren't explained in the permit
3    either; correct?  You have to go somewhere else to
4    figure that out; correct?
5             MR. LEWIS:  Objection.  The permit
6    speaks for itself.
7    A.   It is, actually -- they're recommended but
8    not specific practices.  So spill prevention and
9    control, a control measure, in my line of business,
10   is the integrity of a tank; high-level alarms; tank
11   settings; monitoring systems like remote gauging.
12   We want to know that we are containing our products.
13   Q.   Does the permit itself specify how much
14   stormwaters the terminal will need to manage?
15             MR. LEWIS:  Objection.  Permit speaks
16   for itself.
17   A.   It does not.  It says that we will manage
18   it and comply with the conditions of the permit,
19   which we do.
20   Q.   Okay.  And you agree with me that there's
21   no exception in the Connecticut general permit for a
22   significant storm event like a hurricane; correct?
23             MR. LEWIS:  Object to form.
24   A.   I'm not sure the word "hurricane" is
25   actually mentioned in the permit.  What we focus on

Page 39

1  is complying with the conditions of the permit.
2      Q.  And -- sure.  And the conditions of the
3  permit apply all the time; correct?  There's no "You
4  can ignore the permit because there's a hurricane
5  coming."
6      A.  No.  We've never -- we don't think we can
7  seek relief, nor would we ever ask.
8      Q.  Sure.  And there's no exception in the
9  Connecticut general permit for a catastrophic tank
10 failure; correct?
11     A.  Right.  SPCC is meant to handle a
12 catastrophic tank failure.
13     Q.  Sure.  But the permit doesn't say "This
14 permit applies, unless and until there's a
15 catastrophic tank failure.  Then, you know, you
16 don't have to worry about the permit."
17     A.  What the SPCC plan does say is that you
18 must have secondary containment cal -- calculate a
19 secondary containment to contain the worst-case
20 scenario.
21     Q.  There were tank failures at the Sewaren.
22 Have you heard of Sewaren?
23     A.  Sewaren, yes.
24     Q.  Sewaren.  Thank you.  There was a tank
25 failure at that terminal during Superstorm Sandy,

Page 40

1   wasn't there?
2        A.  Yes, there was.
3        Q.  And there's no exception in the Connecticut
4   general permit for something like that; correct?
5             MR. LEWIS:  Object to form.
6        A.  Not to my knowledge.
7        Q.  Okay.  And there's no exception in the
8   Connecticut general permit for nonroutine operations
9   of the aboveground storage tanks, is there?
10            MR. LEWIS:  Objection.  Vague.
11       A.  Could you repeat that, please?
12       Q.  Sure.  To your knowledge, is there any
13  exception in the Connecticut general permit for
14  nonroutine operation of the aboveground storage
15  tanks?
16            MR. LEWIS:  Objection.  Vague.
17       A.  I'm not sure what nonroutine operation of a
18  storage tank actually is.  We store it, and the
19  intent is to contain it.
20       Q.  Okay.  Well, what's a routine operation of
21  a storage tank?
22       A.  Routine operation of a storage tank is to
23  fill it --
24       Q.  Okay.
25       A.  -- and dispense from it.

Page 52

```
 1  who are inspectors or people who would visit, you
 2  know, from the air bureau or the storage tank
 3  license people.
 4       Q.   The Connecticut general permit doesn't
 5  allow you to rely on Connecticut DEEP to design your
 6  SWPPP for you; is that correct?
 7            MR. LEWIS:  Object to form.
 8       A.   That's correct.
 9       Q.   And it doesn't allow you to rely on
10  Connecticut DEEP to select the best management
11  practices that will reduce or eliminate stormwater
12  pollution to the extent achievable using control
13  measures that are technologically available and
14  economically practicable and achievable in light of
15  best industry practices; right?
16            MR. LEWIS:  Object to form.
17       A.   That is correct.  They leave it to the
18  individual facilities because of individual
19  circumstances.
20       Q.   Okay.  And the Connecticut general permit
21  does not allow you to wait for Connecticut DEEP to
22  tell you exactly what you need to do to reduce and
23  eliminate stormwater pollution.  True?
24       A.   That is correct.  There are benchmarks that
25  we need to be under, and it is up to the facility to
```

Page 53

```
 1   achieve those objectives.
 2       Q.  Okay.  And the State of Connecticut relies
 3   on you, the defendants, to design control measures
 4   for significant storms; correct?
 5              MR. LEWIS:  Object to form.
 6       A.  They rely on us to comply with the permit
 7   they put upon us.
 8       Q.  Including during significant storms;
 9   correct?
10       A.  All stormwater management.
11       Q.  All the time.
12       A.  All the time.
13       Q.  24/7, 365; correct?
14       A.  That's right.
15       Q.  Okay.  No two-week vacations.
16       A.  I wish.  No.
17       Q.  Me too.
18           You agree with me that the Connecticut DEEP
19   is not a part of the oil and gas industry, is it?
20       A.  State agency.  No, they're not.
21       Q.  Okay.  They -- to your knowledge, they
22   don't own or operate any coastal petroleum
23   facilities.
24              MR. LEWIS:  Object to form.  Outside the
25   scope.
```

Page 230

1      Q.   Correct.  And you said it was better than
2   industry practice; correct?
3      A.   I believe so.
4      Q.   Well, how do you know that because it's not
5   listed in the permit.
6      A.   Again, these are practices.  They're not
7   codes.  They're not specific.  We saw an improvement
8   need, and we addressed it.
9      Q.   Does best industry practice require you to
10  consider an increased frequency in severe storms
11  like hurricanes as part of your minimization
12  efforts?
13     A.   We are focused on complying with the
14  permit, and we do.  And we manage our stormwater
15  accordingly.  If the permit condition changed, we
16  would comply with it.
17     Q.   So the answer to my question is, sitting
18  here today, "no"; correct?
19              MR. LEWIS:  Object to form.  Objection.
20  Mischaracterizes testimony.
21     Q.   Your answer is you're not required to do
22  that.
23              MR. LEWIS:  Objection.  Asked and
24  answered.
25     A.   I'm required to comply with the permit.