

For a thriving New England
**CLF Connecticut**
www.clf.org

May 30, 2025

The Honorable Vernon D. Oliver
United States District Court
450 Main Street
Hartford, CT 06103

**RE: *Conservation Law Foundation v. Shell Oil Co., et al.*, No. 3:21-cv-933 (D. Conn.)**

Dear Judge Oliver,

Plaintiff Conservation Law Foundation ("CLF") submits this letter brief in opposition to Defendants' May 23, 2025 Motion to Strike letter brief ("Motion").[1] Their Motion is untimely and raises issues Defendants could have moved on years ago.

Regardless, CLF's NOI is *more* than sufficient, its expert reports do not raise "new claims," Defendants' arguments about "other state and federal laws" are misguided and unsupported, and the so-called "prejudicial" opinions are entirely relevant to this case and are not unfairly prejudicial.

I. <u>CLF's NOIs provided more than sufficient information for Defendants to identify the specific standards they violated and the activities alleged to constitute a violation.</u>

The Clean Water Act ("CWA") requires a plaintiff to provide notice of an alleged violation at least sixty days before commencing a citizen suit "in such manner as the [EPA] Administrator shall prescribe by regulation." 33 U.S.C. §§ 1365(a), (b). Relevant here, EPA regulations only require that the notice includes: "***sufficient information to permit the <u>recipient</u> to identify the specific standard,*** limitation, or order alleged to have been violated [and] ***the activity alleged to constitute a violation***. 40 C.F.R. §¶ 135.3(a) (emphasis added). While sufficient notice is a prerequisite for filing citizen suits,[2] the Second Circuit "refuses to allow form to prevail over

---

[1] CLF attempts to respond as fully as possible in this letter brief, but CLF objects to Defendants' Motion in its entirety and does not waive the right to respond to any argument found therein.

[2] Circuit courts are split on whether the notice requirements are jurisdictional or procedural. *See, e.g.*, *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 72–73 (1st Cir. 2021) (holding the notice requirements are procedural, rather than jurisdiction, in line with sever other circuits). The Second

substance in considering the content required of a notice letter, and looks to what the particular notice given may be reasonably expected to accomplish." *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 147 (S.D.N.Y. 2010) (internal quotations omitted) (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481,487 (2d Cir. 2001)). No more than "reasonable specificity" is required. *Id.* at 488.

A citizen suit plaintiff need not "list every specific aspect or detail of every violation, or describe every ramification of a violation." *Paolino v. JF Realty, LLC*, 710 F.3d 31, 38 (1st Cir. 2013). 710 at 38 (internal quotations omitted). "This is so because, *in investigating one aspect of an alleged violation*, *the other aspects of that violation will of necessity come under scrutiny by the putative defendant*." *Id.* (internal quotations omitted). "If investigation . . . by the agency or the permit holder uncovers directly related . . . violations, 'complete compliance' should incorporate the correction of all such interconnected violations." *Id.* A citizen suit plaintiff can seek "'complete compliance,' eliminating all directly related violations, without the burden of further notice." *Id.*

A citizen suit plaintiff need not identify the specific standard or permit term in the notice. "The requirement is not that the standard be alleged in the Notice, but that the Notice provide sufficient information to permit **the recipient** to identify the specific standard, limitation, or order alleged to have been violated." *Midshore Riverkeeper Conservancy, Inc. v. Franzoni*, 429 F. Supp. 3d 67, 76 (D. Md. 2019) (emphasis in original) (notice that "fail[ed] to allege violation of a specific limitation or standard of the CWA" sufficient because the notice "sufficed to allow Defendants to identify the [relevant] CWA provisions . . . as those being violated by its conduct."). Defendants attempt to flip the notice requirements on their head to require the CLF to identify the specific standard violated. Mot. at 1 ("CLF's NOI was required to identify the specific standard . . . alleged to have been violated[.]"). Defendants are wrong about what the law requires.

Indeed, "[t]o require more than Plaintiffs are able to provide given their available data would be to require the 'impossible' upon citizens seeking to enforce the law." Sierr*a Club v. BNSF Ry. Co.*, No. C13-0967-JCC, 2014 WL 12029092, *4 (W.D. Wash. Mar. 12, 2014) "The point of the . . . notice requirement is not to prove violations, it is to inform the polluter about what it is doing wrong[.]" *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917–18 (9th Cir. 2004). "Congress did not intend to unduly burden citizens by requiring them to basically carry out the job of the agency." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002).

It is "particularly specious" to require more from CLF when a citizen suit plaintiff "does not have access" to the facility where violations are alleged to occur since "only defendants, who control and supervise [the facility], have the ability to identify [the offending structures]." *See New York Communities for Change v. New York City Dep't of Educ.*, No. 11 CV 3494 SJ, 2012

---

Circuit has not ruled on this issue. *See City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 152 (S.D.N.Y. Feb. 5, 2010).

WL 7807955, at *12 (E.D.N.Y. Aug. 29, 2012), *report and recommendation adopted*, No. 11CV3494 SJ CLP, 2013 WL 1232244 (E.D.N.Y. Mar. 26, 2013).

Upon receipt of an NOI, Defendants are responsible for investigating the allegations and correcting them and any interconnected violations. *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1252 (3d Cir. 1995). Where the citizen suit plaintiff alleges violations of a SWPPP, the NOI sufficiently addresses the issues Defendants raise in their Letter Brief when it identifies the "specific categories of standards required under the permit and allegedly violated" and "asserts that the SWPPPP violated the General Permit," which is an "adequate statement of the activity that constitutes the violation." *Anglebrook*, 891 F. Supp. at 907–08. Indeed it strains credulity and logic to contend that Defendants are surprised by any finding of the Plaintiffs' experts where the Defendants have been sole control of their facility since receiving the NOI, especially given their unceasing obligations under the SWPPP.

CLF easily met the notice requirements. The NOI at issue in this case notified Defendants that the Terminal is located in an area that is prone to weather-related risks, including flooding and storm surge and that there is ample evidence that these risks will significantly increase in the future due to climate change. ECF 47-2 at 4–7.[3] The NOI indicates that Federal Emergency Management Agency (FEMA) flood maps show the entire Terminal within a "Special Flood Hazard Area . . . subject to *inundation* by a 1% annual chance flood." *Id.* at 4 (emphasis added). CT DEEP's "Coastal Hazards Viewer" showed the Terminal was "inundated when Superstorm Sandy hit New Haven on October 29, 2012." *Id.* at 5.

The NOI also describes the physical characteristics of the facility that make it vulnerable to weather-related risks like flooding and storm surge. The Terminal's secondary containment areas, in which the Terminal's above ground storage tanks are situated, "lie below the surrounding ground level and have rammed earth berms . . . [that] do not surround the entirety of the [secondary containment area] and have openings in several places." ECF 47-2 at 3. The NOI explains that "the soils and groundwater at the Terminal are contaminated from Shell's past, present, and ongoing" activities and spills at the site leading to "contamination from benzene, lead, copper, arsenic, zinc, phenanthrene" and other chemicals associated with fuels stored at the Terminal. *Id.* at 3–4. Stormwater associated with industrial activity is a pollutant. *Puget Soundkeeper All. v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1057 (W.D. Wash. 2015).

Indeed, CLF notified Defendants of Shell's own words that "we are taking steps at our facilities around the world to ensure that they are resilient to climate change. ***This reduces the vulnerability of our facilities and infrastructure to potential extreme variability in weather conditions***." ECF 47-2. at 7 (emphasis added). Yet here, "Shell has not designed, maintained, modified, and/or operated its Terminal to account for the numerous impacts of climate change despite devoting years of study to the topic[.]" ECF 47-2 at 2.

The NOI informs Defendants they violated several conditions of the General Permit ("Permit") and contributing to an imminent and substantial endangerment to human health in the

---

[3] Pin cites to docket entries refer to the ECF header page numbers.

environment under RCRA. The NOI cites various relevant sections of the Permit being violated, including:

- "describe and ensure implementation of BMPs that will be used to ensure that non-stormwater pollutant discharges resulting from various weather-related risks do not occur in the future and are eliminated." *Id.* at 9 (citing Permit § 5(c)(2)(E)).
- "provide effective containment . . . for accidental spills . . . that have the potential to cause catastrophic oil spills in the Long Island Sound estuary." *Id.* at 10 (Permit § 3(b)(2)).
- "minimize the potential for leaks and spills." *Id.* at 12 (citing Permit § 5(b)(9)). "The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices." *Id.* (citing Permit § 5(c)(2)(E)).
- "submit required facts or information to CT DEEP" that are referenced in the NOI about weather-related risks and. *Id.* at 12–13 (citing Permit § 6(g)).
- "failure to amend or update the SWPPP based on information in its possession regarding the risks to the Terminal from climate-change discussed [in the NOI] and the substantial risks of pollutant discharges and/or releases associated with these factors." *Id.* (citing Permit § 5(c)(5)).

CLF notified Defendants that they were in violation of Permit § 5(b)(9), which requires them to "minimize the potential for leaks and spills." NOI at 12. That section, titled "Spill Prevention and Response Procedures," includes the secondary containment area capacity and permeability requirements. Permit § 5(b)(9)(A)(i)(2). CLF's description of the weather-related risks and groundwater contamination—which would not occur but for spills and leaks seeping into the soils and groundwater—supplied sufficient information for Defendants to identify the specific standards they were violating. They did not require not were they entitled to more. *See, e.g.*, *Midshore Riverkeeper*, 429 F. Supp. 3d 67, 76 (notice sufficient without referencing specific standard) and *Anglebrook*, 891 F. Supp. at 907–08.

Defendants also had sufficient notice of capacity and permeability issues ***because they were aware of it three years before receiving the NOI***. *See Paolino*, 710 F.3d at 37 (adequacy of pre-suit notice depends on, "inter alia, the nature of the purported violations, the prior regulatory history of the site, and the actions or inactions of the particular defendants."). CLF did not have this information, which was not in the public domain, but Defendants' environmental consultant Triton Environmental informed them that it could not certify the secondary containment areas met the permeability and volume requirements without implementing a corrective action plan. *See* ECF 183 at 10–12. Dr. Horner's opinion regarding Defendants' failure to implement the corrective action plan addresses this specific point. *See* Mot. at 3. After CLF filed its claim, Defendants attempted to address the secondary containment area volume issues by installing a gravity-fed 12-inch pipe between two containment areas as (a grossly insufficient) workaround. That grossly insufficient workaround does not exonerate Defendants from liability. CLF experts address this issue in their reports.

Defendants' pleadings also demonstrate CLF provided sufficient notice. Defendants' standing arguments above show they understood the nature of the violations. They recognized the impact

weather-related risks would have on the terminal and the threats, including that "secondary spill containment structures will be breached or otherwise fail."  MTD, ECF 50-1 at 20.  The risks of breach or failure implicate structural integrity of berms that Defendants acknowledge are not designed for flood control. *See id*. at ECF 14 ("The secondary containment areas are designed to contain[.]"). Their Motion to Dismiss states, "[a]s ***required by the General Permit*** . . . the containment area is impermeable: its floors and berms are constructed of compact earth and crushed stone. *Id.* (emphasis added).  The secondary containment areas are designed to contain the entire contents of the largest container 'plus sufficient freeboard to allow for precipitation.'" ECF 41-1 at 13. Although it is untrue that their containment area is impermeable, the fact remains Defendants had sufficient information to identify the exact activity and standards being violated.

Further, Defendants' argument about opinions describing "low points in secondary containment areas" is belied by the NOI's reference to "rammed earth berms . . . [that] do not surround the entirety of the [secondary containment area] and have openings in several places." ECF 47-2 at 3.  Secondary containment berms constructed from "rammed earth" materials are susceptible to breaching during storm surge flooding from "wave attacks." *See* Mot. at 3. Areas that have "bare soil," are particularly susceptible. *Id*.

## II.    *Defendants Wrongly Claim that CLF is Suing for Violations of "Other Federal and State Laws"*

Defendants wrongly contend that Dr. Nairn "allege[s] violations" of the National Traffic and Motor Vehicle Safety Act (MVSA) and NHTSA regulations and that CLF cannot "bring a claim to enforce this violation in this CWA citizen suit." Letter Br. at 5. CLF is ***not*** seeking to hold Defendants liable under the MVSA or NHTSA regulations. Defendants purposefully misconstrue the purpose of Dr. Nairn's reference to those regulations.  Those regulations are relevant to best industry practice and CLF's RCRA imminent and substantial endangerment claim. If emergency responders cannot get timely access to a leak during a flood event, it can result in a greater volume of hazardous waste being spilled and contaminating the surrounding environment.

CLF is also not reaching beyond the scope of the CWA by enforcing a permit condition that references state law.  Defendants' selective citations to *Atl. States Legal Found., Ind. v. Eastman Kodak Co.*, 12 F.3d 353 (2d Cir. 1993) oversimplifies the holding of that case.  Mot. at 6.  In *Atlantic States*, the Second Circuit concluded that "state regulations, including the provisions of [state pollutant elimination discharge system] permits, which mandate 'a greater scope of coverage than that required' by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365." 12 F.3d at 359 (citing 40 C.F.R. § 123.1(i)(2)). That is not the case here. CT DEEP has included this additional water quality-based effluent limitation best management practice ("BMP") in the Permit pursuant to 33 U.S.C. § 1311(b)(1)(C) requiring that Shell's activities must be "consistent with the applicable goals and policies [of the CMA], and must not cause adverse impacts to coastal resources [as defined in the statute]."  *Atl. States* is inapposite.

### III.    *CLF's Expert Opinions Are Relevant and Not Unfairly Prejudicial*

Each of the so-called "prejudicial" opinions are relevant to this case.  First, Defendants'
knowledge of climate risks is at issue.  *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-
CV-00933 (JAM), 2023 WL 5434760, \*1 (D. Conn. Aug. 22, 2023). Thus, Dr. Oreskes'
opinions are relevant. Second, Dr. Barlow's opinions about the science of climate change are
relevant to understanding the current and foreseeable weather-related risks at the Terminal and
standing (see below). Third, Professor Macey's opinion on Shell's healthy balance sheet
addresses the "the economic impact of the penalty on the violator" factor for civil penalty
calculations.  33 U.S.C. § 1319(d).  His opinions also address Defendant Equilon's operational
control over the Terminal during Defendant Motiva's period of ownership. He is an expert on
corporate structure and governance, reviewed Defendants' documents on these topics, and
rendered an opinion about how they operate based on those documents and certain deposition
testimony. These are not legal conclusions, but factual assertions he is able to make based on his
expertise and review of significant documents that would be difficult for a lay jury to understand
without those documents being distilled and put into context by an expert witness.

Defendants provide no case law or test to support their "unfair prejudice" claim.  Neither CLF
nor this Court should address or fix incomplete arguments.  Ruling on the admissibility of expert
testimony at this stage of the litigation is also premature. *See United States v. Roberts*, No. 01
CR 410 RWS, 2001 WL 1602123, at \*11 (S.D.N.Y. Dec. 14, 2001) (holding a *Daubert* motion
"is premature . . . [where] the parties have not even exchanged expert discovery.").

### IV.    *Defendants' Request for this Court to Dispose of CLF's Claims is Untimely Gamesmanship*

The issues raised in Defendants' motion should have been raised in Defendants' prior dispositive
motions but were not. For example, Defendants should have raised the CMA arguments in a
motion to dismiss or their 2023 MSPJ but did not. *See* NOI, ECF 47-1 at 9; Complaint (ECF 1 at
72); Amended Complaint (ECF 47 at 79), *compare*  Defs.' First MTD (ECF 41-1 at 35); Second
MTD (ECF 50-1 at 44); and Defs.' MPSJ (ECF 248-1). Years later, Defendants now claim an
emergency need to address the issue in a motion to strike expert reports and opinions.

### V.    *Expert Opinions Defendants Ask This Court to Strike Are Directly Related to Defendants' Standing Arguments*

Finally, at a minimum, the expert opinions Defendants seek to strike are appropriate to rebut
Defendants' assertions that CLF lacks standing to bring this suit. For example, in their Motion to
Dismiss, Defendants argued that CLF lacked standing to pursue this lawsuit unless it established:
(1) severe precipitation and flooding of a magnitude described in the Complaint must strike the
New Haven area; (2) the storm conditions will be such that the Terminal will be inundated; (3)
the product storage tanks and wastewater treatment systems at the Terminal will rupture or
otherwise fail; (4) secondary spill containment structures will be breached or otherwise fail; (5)
spill control and emergency responses will be absent or inadequate; and finally (6) pollutants will

be released and reach waterways in quantities or concentrations that will injure CLF's members. Defs.' MTD, ECF 41-1 at 28. All of the opinions Defendants seek to strike speak to one or more of these points.

- Dr. Barlow opines that "human-caused climate change has already caused an increase in precipitation, and more frequent and severe storms **at the Terminal location in New Haven, CT**, and these trends are continuing to increase along with increasing fossil fuel emissions." Barlow Report at 7. Dr. Barlow describes the underlying science of human-caused climate change. *Id.* at 10. Dr. Barlow's opinion is relevant to points 1 and 2.
- Opinions from Drs. Nairn, Goldsmith, and Horner on deficiencies in the secondary containment area berms' structural integrity, bare soils on berms, susceptibility to wave attack during storm surge flooding, and reporting failures are relevant to points 3 and 4.
- Dr. Horner's opinions on groundwater infiltration, the stormwater pond liner, the stormwater treatment basin, and failure to implement the corrective action plan address point 6.
- Drs. Nairn and Goldsmith's opinions on emergency vehicle access for ingress and egress address point 5.
- Dr. Goldsmith's opinions on tank spacing violations at the terminal in violation of National Fire Protection Association requirements address points 5 and 6.
- Dr. Goldsmith's opinion on Defendants' risk management program addresses points 3–5.
- Dr. Nairn's reference to NHTSA regulations addresses point 5.

It is clear that every opinion Defendants seek to strike in CLF's expert reports are relevant, appropriate, and probative of an issue in the case. As such, the Court should deny Defendants' motion in its entirety and should instruct Defendants to stop their unwarranted efforts to delay substantive adjudication of CLF's well described and appropriate claims.

***

For the foregoing reasons CLF respectfully requests that the Court deny Defendants' Motion.

*s/ Kenneth J. Rumelt*

Kenneth J. Rumelt (phv207130)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 622-3020
 E-mail: krumelt@clf.org

*Attorney for Plaintiff Conservation Law Foundation, Inc.*

cc:    Counsel of Record