# **EXHIBIT B**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


```
- - - - - - - - - - - - - - - - - x
                                  :
CONSERVATION LAW FOUNDATION,      : No. 3:21CV933(JAM)
INC.,                             :
                                  :
              Plaintiff           :
                                  :
         v.                       :
                                  :
SHELL OIL COMPANY, EQUILON        :
ENTERPRISES LLC D/B/A SHELL OIL   :
PRODUCTS US, SHELL PETROLEUM,     :
INC., SHELL TRADING (US) COMPANY, :
TRITON TERMINALING LLC, and       :
MOTIVA ENTERPRISES, LLC,          :
                                  :
                                  : New Haven, Connecticut
              Defendants          : October 19, 2023
                                  :
- - - - - - - - - - - - - - - - - x
```


MOTION HEARING


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

```
 1    A P P E A R A N C E S:

 2
           FOR THE PLAINTIFF:
 3

 4                  CONSERVATION LAW FOUNDATION
                        62 Summer Street
 5                      Boston, Massachusetts 02110
                    BY:  ALEXANDRA MARIE JORDAN, ESQ.
 6
                    CONSERVATION LAW FOUNDATION
 7                      15 E. State St., Suite 4
                        Montpelier, Vermont 05602
 8                  BY:  CHRISTOPHER KILIAN, ESQ.

 9                  CONSERVATION LAW FOUNDATION
                        28 High Street, Apt. 506
10                      Hartford, Connecticut 06103
                    BY:  ANA McMONIGLE, ESQ.
11

12         FOR THE DEFENDANTS:

13                  WIGGIN & DANA
                        One Century Tower
14                      265 Church Street
                        P.O. Box 1832
15                      New Haven, Connecticut 06510
                    BY:  JAMES O. CRAVEN, ESQ.
16
                    BEVERIDGE & DIAMOND PC
17                      400 W. 15th Street, Suite 1410
                        Austin, Texas 78701
18                  BY:  BINA REDDY, ESQ.

19                  BEVERIDGE & DIAMOND PC
                        1900 N. Street NW, Suite 100
20                      Washington, DC 20036
                    BY:  JOHN S. GUTTMAN, JR., ESQ.
21

22

23

24

25
```

1                              **3:01 P.M.**

2                THE COURT:  We're here today for argument on a

3     motion for partial summary judgment in Conservation Law

4     Foundation v. Shell Oil, et al.

5                Appearance of counsel, please, for the

6     plaintiff.

7                MS. JORDAN:  Yes, Your Honor.  Alexandra Jordan.

8     I'm joined at counsel table by Christopher Kilian.

9                THE COURT:  And for Shell defendants.

10               MS. REDDY:  Good afternoon, Your Honor.  Bina

11    Reddy with Beveridge & Diamond.  With me here today is Jim

12    Craven with Wiggin & Dana.  I'd also like to introduce my

13    colleague John Guttmann with Beveridge & Diamond and Joe'l

14    Mafrige, in-house counsel for the defendants.

15               THE COURT:  Welcome to all of you.

16               Who will be presenting today, principally?

17               MS. JORDAN:  I will, Your Honor, for

18    Conservation Law Foundation.

19               THE COURT:  And Ms. Reddy, you're on tap?

20               MS. REDDY:  I will speak for defendants.

21               THE COURT:  Great, great.

22               So you can see I'm wearing a mask right now.

23    Unfortunately, I'm undergoing chemotherapy treatment right

24    now which requires me, my doctor says I should wear a

25    mask.  My doctor would prefer I'm not in the presence of

1    other people at all.  I feel otherwise fine, I'm very

2    familiar with the briefing and the record in the case.

3    It's just that I need to wear the mask.  I'm sorry about

4    that.  If you're not able to understand something I ask or

5    something like that, just feel free to ask me to repeat

6    myself, I'm happy to do that.  Also, as you can see, my

7    chambers staff right next to me are also mostly wearing

8    masks.  I'm not asking or suggesting that other folks in

9    the room should need to wear a mask if they prefer not to.

10            All right.  So I guess, Ms. Reddy, since it's

11   your motion, would you like to proceed?

12            MS. REDDY:  Yes, Your Honor.

13            THE COURT:  If you don't mind, from counsel

14   table, that would be okay.

15            MS. REDDY:  Sure.  And please let me know if you

16   have any trouble hearing me.

17            THE COURT:  Of course.

18            MS. REDDY:  So, Your Honor, I do have a few

19   points that I'm prepared to deliver, but if you have

20   questions for me, I'm happy to start there, or we can take

21   questions as we go.

22            THE COURT:  Oh, I probably will think of a

23   question or two.

24            MS. REDDY:  Okay.  Thank you, Your Honor.

25            I'd like to start with an overarching point.

1    And it's one that the defendants believe is important to

2    keep in mind as we discuss the stormwater discharge permit

3    that's at issue in this case.  And that point, that

4    fundamental point, is that core to this permitting

5    program -- and this is the National Pollutant Discharge

6    Elimination System program but really any regulatory

7    program for that matter -- it is essential that the

8    requirements of the regulation or the permit in this case,

9    that they must be discernible to the permittee.  Put very

10   simply, a permittee has to be able to tell from the permit

11   what it must do to comply.

12           Defendants raise this principle at multiple

13   points in its briefing, that includes Supreme Court cases

14   and Second Circuit authorities.  And I'm highlighting this

15   at the outset because we think it's a central problem with

16   the claims that are at issue here today and with

17   plaintiff's position, and I will explain how as I move

18   through my argument.  But this basic idea that you have to

19   be able to tell from a permit what to do to comply, that

20   it shouldn't be guesswork, that principle is not really

21   under any dispute.  And, as I'll explain, the requirement

22   that the plaintiff here is saying arises out of this

23   permit, it's just not discernible from the permit.  It's

24   not written anywhere in the permit.  And that requirement

25   would create inconsistencies with the permit itself.  And

1    the law tells us that permits are not supposed to work

2    this way.  But I'm going to take a step back now and just

3    provide a brief sketch of the claims and issues.

4              So the plaintiff here is Conservation Law

5    Foundation, Inc. --

6              THE COURT:  Sure.  I think I know the

7    background.

8              MS. REDDY:  Okay.

9              THE COURT:  It struck me, looking at your

10   briefing, that you're basically making a single point:

11   this is a permit that nowhere, as much as you look through

12   all of the multiple pages of the permit, do you find any

13   reference or requirement for Shell -- I'll just call it

14   Shell, all the defendants collectively as Shell -- to take

15   into consideration climate change factors.  It's just not

16   in there.  And so for that reason, you believe the eleven

17   counts, Clean Water Act -- is it eleven counts?  Nine

18   counts?

19             MS. REDDY:  It's nine.

20             THE COURT:  -- Counts 1 through 9, should be

21   dismissed; is that right?  It doesn't seem to me you're

22   making a count-specific argument here.  I couldn't find it

23   in your briefing.

24             MS. REDDY:  That's correct.

25             THE COURT:  I know that the CLF comes back and

1    says, hey, look at this count, look at this count, look at

2    that count.  But your argument is basically you win at

3    one-stroke argument.

4                MS. REDDY:  That's correct.  If you at the

5    entire permit, whatever section you want to look at, you

6    just won't find it.  You won't find it expressly, you

7    won't find it implied either.

8                THE COURT:  Okay.

9                MS. REDDY:  So you're correct.  It's a very

10    simple argument.

11                THE COURT:  All right.

12                MS. REDDY:  So as the Court --

13                THE COURT:  And it's basically an argument as a

14    matter of law more than anything.

15                MS. REDDY:  That is correct.  It is an argument

16    as a matter of law.  This is a question of permit

17    interpretation.

18                THE COURT:  Sure.

19                MS. REDDY:  And CLF's own brief describes this

20    as an affirmative requirement of the permit.  So that

21    means it's got to be in there somewhere if it's an

22    affirmative requirement.

23                THE COURT:  Okay.

24                MS. REDDY:  So I'll skip the background and just

25    jump into the permit itself.

1          So the terminal at issue here, it operates under

2     a permit that allows it to discharge stormwater subject to

3     the terms and conditions of the permit.  That's the

4     general permit that Your Honor has read about extensively

5     in the briefing.  It's issued by the Department of Energy

6     & Environmental Protection, I'm going to call that DEEP or

7     CT DEEP, for short.  As the name implies, it is a general

8     permit.  This is also, we feel, a pretty significant point

9     because that means it's not specific to this terminal.

10     The thousands of entities in the state that have been

11     issued this permit to govern their stormwater discharges,

12     it's the same permit for all of them.  So there are pretty

13     far-reaching implications of the position CLF is taking in

14     terms of its interpretation of this permit.

15          The current permit was issued on October 1,

16     2021, and it's going to expire in less than a year on

17     September 30, 3024.  Prior to issuing the permit, the

18     agency followed the standard practice of issuing a notice

19     of the draft permit, and there is a public comment period.

20          And as Your Honor just pointed out, defendants'

21     motion raises really a threshold legal question, and

22     that's does the general permit require permittees to

23     consider and account for these current and future risks

24     that are related to climate change, and those are detailed

25     in their complaint in Section IV.A.  And the risks, I do

1    want to emphasize, are expansive.  It includes risk

2    related to hurricane, sea level rise, increasing ocean

3    temperatures, intense precipitation, storm surge.  And

4    it's not just as these risks exist today but it's also how

5    those risks may increase in the future.  As I mentioned a

6    moment ago, this current permit only has a three-year

7    term.  And as we understand CLF's argument, they are

8    asking permittees to account for risk well out beyond the

9    life span of the permit.

10            THE COURT:  That's normal, though, right?  In

11   other words, permits will often look at conditions and

12   say, hey, you need to make sure that you give adequate

13   protection against an event unless it's like a 100-year

14   storm, right?

15            MS. REDDY:  Well, not this permit.  This permit

16   actually says that you should take into account current

17   site conditions.  So there may be other permitting --

18            THE COURT:  Do you have a copy of the permit

19   with you?

20            MS. REDDY:  I do.

21            THE COURT:  Great.  Why don't you flip to

22   Section 3(b)(6) at page 10 of 80 of CM/ECF Doc. 248-5.

23            MS. REDDY:  If you'll give me a moment to

24   wrangle my binder.

25            THE COURT:  Sure, absolutely.

1          MR. CRAVEN:  Can you cite to that again?

2          THE COURT:  Section 3(b)(6).

3          MS. REDDY:  Thank you.

4          THE COURT:  Okay.

5          MS. REDDY:  So Section (6), that refers to -- I

6    assume you're referring to this 100-year, 24-hour rainfall

7    event?

8          THE COURT:  Absolutely.  So just to be clear,

9    right, this is a different part -- we're going to talk

10   about Section 5 and control measures and all that.  When

11   we talk about general authorization under the permit, it

12   has certain essentially blanket requirements here, right?

13   So, for instance, you can't discharge -- if you look at

14   number (5), you can't discharge stormwater to a POTW, into

15   the sewer system, right?

16         MS. REDDY:  Correct.

17         THE COURT:  And then it says -- and I'm quoting

18   it -- "[t]he stormwater is not discharged entirely to

19   groundwater, meaning that there will be no surface

20   discharge up to a 100-year, 24-hour rainfall event."

21         At least as I interpret that, it seems to me to

22   suggest unless there's a 100-year, 24-hour rainfall event,

23   you can't have a surface discharge like into a lake or a

24   pond, groundwater.  Would that sound right?

25         MS. REDDY:  That is correct.

```
 1              And just to make sure I'm understanding you
 2    correctly, the reference to a 100-year, 24-hour rainfall
 3    event is not a reference to an event that's going to
 4    happen way off in time.  That would be a present-day event
 5    that is defined essentially by the likelihood of the event
 6    happening.  So 100-year storm means there's 1 in 100
 7    chance of it happening in this year.
 8              THE COURT:  Maybe.  But basically, though, the
 9    idea is sometimes permits do this.  They look to the
10    future or the possibility of something, right,
11    happening --
12              MS. REDDY:  Certainly.
13              THE COURT:  -- in the future, right?
14              MS. REDDY:  Well, again --
15              THE COURT:  And that's outside the three-year
16    limitation, right?  This is 100 years, it's 100 years
17    outside of three years?
18              MS. REDDY:  Well, so that's not exactly what
19    this term means.
20              THE COURT:  Okay.
21              MS. REDDY:  So I believe there's a definition in
22    here of a 100-year, 24-hour rainfall event.  It's
23    essentially a description of a storm event that explains
24    the likelihood of the event occurring.
25              So I can direct you to the very first page,
```

1    Section 2, Definitions.  It's almost -- it's almost inured

2    to the concept of when you categorize a storm.  I mean,

3    it's different than a category hurricane or something, but

4    it is a descriptor of a particular event, an amount of

5    rainfall based on historical information about how much

6    rainfall has fallen.  It is not a forward-looking mandate

7    that tells you you have to do something to cover a certain

8    period of time.  It's simply defining a type of storm and

9    really the amount of rainfall.

10              THE COURT:  To follow up -- I'm glad you pointed

11    me to the definition; it sort of makes my point for me, I

12    think.  It says it means the maximum 24-hour precipitation

13    event with a probable recurrence interval of once in 100

14    years.  So it is looking temporally prospectively, would

15    you agree?

16              MS. REDDY:  Respectfully, I don't agree that

17    this is prospective-looking.

18              Similarly, if you look at the prior -- the prior

19    definition of the 25-year, 24-hour rainfall event, it's

20    really just a definition that explains the probability of

21    event happening using a span of years.  So, you know, you

22    can have the 500-year storm.  It's not necessarily that

23    it's describing something that could happen over a time

24    period of 500 years.  It's just explaining that there is a

25    1 in 500 chance of that much rain happening this year.

1   You can often have 500-year storms certainly more than

2   every 500 years.  I don't think CLF would disagree with me

3   on this point, that that particular definition is not

4   referring to a requirement that extends forward in time

5   100 years.

6           THE COURT:  All right.  I get the point that it

7   doesn't mean you're under a 100-year obligation, right.

8   It's a permit that's limited in time.  I'm not as sure

9   about the notion that it doesn't require the permittee to

10  be aware of events that may happen well into the future

11  and the probability that they could happen.

12          MS. REDDY:  I don't disagree with the general

13  premise that there is certainly planning involved.  It's

14  inherently a forward-looking process, you have to plan for

15  certain events.  But as this permit is written, and I'll

16  locate the reference for you, but it does refer to current

17  site conditions.  In fact, I believe that reference is in

18  CLF's brief.

19          THE COURT:  Okay.

20          MS. REDDY:  It doesn't say look ahead this

21  amount of time.  There's nothing like that in this

22  particular permit.

23          THE COURT:  CLF's argument here, though, is in

24  part, I take it, that there is a now-and-present-

25  within-the-permit-period risk of extraordinary storm

1    events, rising seas, right, that poses a risk to the

2    facility within the prescribed permit period.  So I know

3    you don't like the fact that they may be saying after the

4    permit period.  But part of their claim here, right, is

5    within the permit period.  Would that be right?

6         MS. REDDY:  That's correct.  And I don't think

7    anybody would dispute that these risks do exist now and

8    current.  The question is: Does the permit require the

9    permittee to account for those?  But I don't think that

10   there can really be any dispute that there's certainly

11   always risk from different types of weather events.

12         THE COURT:  I see.  Okay.

13         MS. REDDY:  So as we were saying a moment ago,

14   defendants' motion is really a kind of threshold legal

15   question: Does the general permit require permittees to

16   consider these climate change factors?  And the nine

17   claims that we're here on today, Counts 1 through 9,

18   that's really the heart of the claim is that you violated

19   this permit because you have not considered these climate

20   change factors.  And that is not really in dispute.

21         CLF does make various arguments, sort of

22   technical arguments that defendants did not properly raise

23   the issue as to each of the nine counts which we just

24   discussed.  And I can address those arguments, but there

25   is actually not a dispute that CLF's claims are premised

1   on this position that the permit imposes this affirmative

2   duty, right, on all permit holders to evaluate these

3   risks.  And, you know, if the permit has created an

4   affirmative requirement -- coming back to my main point --

5   it's got to be in the permit there somewhere.  And going

6   back to my very first point, it must be knowable or

7   discernible from the permit itself so that the permit

8   holder knows --

9           THE COURT:  I get your basic point there, but

10  maybe you can talk about Section 5(b) which is where CLF's

11  argument is.

12          MS. REDDY:  Okay.  So we discuss Section 5(b)

13  and it's in the context of Counts 1, 5, 6, and 7.  There's

14  no disagreement that that Section 5(b) is at issue in this

15  motion.

16          And so these terms, this requirement's not

17  express.  So it's got to be somehow implied by some other

18  term.  And for 5(b), CLF says that it's implied by the

19  term "best industry practice."  So you see that in

20  Section 5(b).  The parties devote a lot of time in their

21  briefs to arguing about this term "best industry

22  practice."  I won't repeat it all verbatim here, but

23  there's a few key issues I do want to point out on this.

24          The first goes to the structure of the permit.

25  So that term, "best industry practice," it is not an

1    independent requirement of the permit.  It's not one of

2    the 13 mandated prescribed I'll call them control measures

3    but they're also referred to as best management practices,

4    or BMPs, those terms are synonymous in the permit.  So

5    it's not one of those 13, that can't really be debated.

6    Instead, this term "best industry practice," it only

7    exists in a definition.  And specifically it's

8    incorporated into the definition of the term "minimize."

9            So, in effect, CLF is saying that this

10    affirmative requirement to conduct these climate change

11    analyses, that is borne out of a definition in the permit.

12    And that is what we point out in our brief and what is

13    called in the case law hiding an elephant in a mousehole.

14    It is a disfavored way of interpreting a permit or a

15    regulation.  We don't think that we should presume that if

16    DEEP wanted permittees to do this kind of analysis of

17    current and future climate change risk that it would tuck

18    that requirement away in the definition of "minimize."

19            Again, I want to just highlight, we talk about

20    this in our opening brief, but that is just not a natural

21    reading of the term "minimize" in this permit.  The

22    definition of "minimize" is merely saying that when you

23    implement these 13 control measures, your goal is to

24    minimize the discharge of pollutants.  And that means you

25    should be minimizing them to the extent achievable in

1    light of best industry practice.

2            THE COURT:  So the purpose, in other words, is

3    that, right?  So I think your argument is you've got 13

4    BMPs here.  The purpose of these is to minimize.  But I

5    think your argument is all the permit requires is that you

6    follow the BMPs and not that you necessarily maximize the

7    stated definitional purpose; is that your argument?

8            MS. REDDY:  Well, I actually would say that the

9    purpose of the BMPs is, correct, to minimize the discharge

10   of pollutants.  But then you've got to take one more step

11   to get to best industry practice and look at the

12   definition of "minimize."  And that is not the purpose of

13   the BMPs.  Best industry practice in that definition --

14   and I can read it to you if you like -- is essentially

15   telling you to what extent you must minimize.

16           So to use a very rudimentary hypothetical, let's

17   say you have a scale of 1 to 100.  And best industry

18   practice demonstrates that it's practicable to reduce a

19   pollutant down to 2.  What that means is DEEP is telling

20   us that they expect the permit holder to get it down, or

21   to minimize it, to 2.  It's simply telling you the extent

22   to which you need to minimize.  You must meet best

23   industry practice.  You can't use some out-of-date way of

24   minimizing.  You've got to be current in terms of how

25   you're going about this to minimize the pollutants.

```
 1              THE COURT:  So really what you're saying -- I
 2     was unclear, I have to say, a little bit in your argument
 3     here.  Your brief I think stated that the best industry
 4     practice requirement derives simply from -- or simply it's
 5     a purpose that's to be attained as opposed to a
 6     requirement, I think I read you to say that.  And then I
 7     think kind of your alternative argument is if it has
 8     independent content, the best industry practice reference
 9     in the permit, it's basically a quantitative measure to
10     say, as you spell out in I think page 13 of your brief,
11     you say if, for example, a particular stormwater diversion
12     technique may only be able to achieve 99 percent diversion
13     rather than 100 percent as a matter of industry practice.
14     So which is it?  Because above that, the paragraph above
15     that you say -- and I'm quoting -- "[t]his clause is
16     simply to provide the purpose of the BMPs."
17              So, you know, if we take a statutory context,
18     right, Congress passes statutes all the time, there are,
19     frankly, administrator agencies, they will have part of
20     the reg that says this is the purpose of the reg or the
21     statute, right?  And then they have actually words that go
22     in the statute that impose requirements.  So I understood
23     your argument here to say that the reference to industry
24     practice or minimization -- the minimization issue is
25     simply the purpose.  I understood that to be -- are you
```

 1    backing off that, changing that?  Or am I

 2    misunderstanding?

 3            MS. REDDY:  I apologize if it was unclear.  So I

 4    think when we were referring to the cause, we were

 5    referring to the concept of minimize, that the purpose of

 6    the BMPs is to minimize the pollutant discharges.  And

 7    that best industry practice is what you described as the

 8    alternative, that simply defines the extent to which you

 9    need to minimize.  And it may not be quantitative,

10    necessarily.

11            THE COURT:  All right.  But I'm trying to figure

12    out, does the minimization reference -- I'm not going to

13    say requirement because it's not clear to me you think

14    it's a requirement.  Is the reference to minimization, is

15    that simply the purpose to be served by the people

16    following the BMPs like good housekeeping, et cetera?

17            MS. REDDY:  Yes, that is the purpose of those 13

18    BMPs that follow.

19            THE COURT:  Okay.  All right.

20            And so if that's so, right, then your argument

21    is minimization actually has no role at all.  It's just

22    essentially -- it's like the legislative statement of

23    purpose.

24            MS. REDDY:  That's correct.

25            THE COURT:  And it might be helpful when we're

1    trying to figure out what ambiguous terms mean, if we're

2    going to get that far, you know, off into that area.  That

3    seems to me to be a very different argument than saying in

4    fact minimization does have an operational role in the

5    regulation in terms of specifying the quantity, like

6    99 percent versus 100 percent or the other hypo you just

7    gave me, you know, two different ways, which one is going

8    to be done.  So you can see why -- I hope I'm making clear

9    this is why I'm confused.  I'm reading one paragraph of

10    your brief and it's saying it's just hortatory, and then

11    I'm reading the next part where you're saying it has a

12    role, it's just a quantitive role and not a qualitative

13    role.

14              MS. REDDY:  Right.  I mean, it has a role.  The

15    term "best industry practice" and "minimize," we're not

16    suggesting that there are words in the permit that have no

17    role.  When you see that description of the control

18    measures and you go to the first one, the good

19    housekeeping one is number (1).  The concept is that you

20    do this good housekeeping, you sweep the floors, you keep

21    the place tidy.  And the reason you're doing that, the

22    purpose of doing that is to minimize pollutants from

23    getting into stormwater.  So you clean up the trash so it

24    doesn't blow into the water.  This is the purpose of doing

25    these 13 BMPs.

1          THE COURT:  It's a great example.  What you're

2     suggesting is it's minimizing the possibility -- there's

3     always a possibility, right, prospectively -- that these

4     pollutants unless swept up are going to end up in the

5     waters in New Haven Harbor, right?  As distinct from

6     making it only 99 percent versus 100 percent likely that

7     if you don't sweep up these things that are on the floor,

8     they're going to end up in the harbor.

9          MS. REDDY:  That's correct to a degree.  So you

10    do have to minimize -- the point is to minimize the

11    pollutants getting into the harbor, but it is within the

12    boundaries of these 13 defined BMPs.

13          So sticking with good housekeeping, the best

14    industry practice would tell you sweep twice a day, no,

15    sweep three times a day.  It tells me kind of what is the

16    industry standard in terms of how you go about this, what

17    can you achieve.

18          THE COURT:  And the idea there is, first,

19    sweeping twice a day versus three times a day is stop

20    pollutants from getting out at all, right?  It's not only

21    allow 1 percent of the pollutants versus 0 percent of

22    pollutants to get out, right?

23          MS. REDDY:  Well, I think getting out at all

24    is -- you know, that would be nice.  But there are

25    technological and other limits on being able to prevent

1    every last molecule from getting out.

2              And I think at this point it would be actually

3    useful to just repeat the definition of "minimize" here

4    because it -- I think it does describe what we're talking

5    about.  It says "'[m]inimize', for purposes of

6    implementing control measures in Section 5(b) of this

7    general permit, means reduce and/or eliminate to the

8    extent achievable using control measures that are

9    technologically available and economically practicable and

10   achievable in light of best entry practice."

11             So there's economic considerations, there's

12   technological considerations.  It's not all.  It's not

13   just get it eliminated.  It's actually saying you need to

14   balance these things and try to hit the mark of what we

15   consider best industry practice.  If everybody else is

16   vacuuming, get rid of your broom and buy a vacuum.  Don't

17   be using outdated technology, be current in how you go

18   about implementing these control measures.

19             THE COURT:  All right.

20             MS. REDDY:  So, again, I'm going to keep coming

21   back to the very first point I made about the really

22   fundamental need to be able to know what the permit

23   requires.  So when you're talking about this "best

24   industry practice" term which is really anchoring a lot of

25   these claims, there is a broader problem here.  And it's

1    really kind of a practical one.  And that's: How would any

2    permit holder know from reading the term "minimize" that

3    it's got to undertake these climate risk analyses?

4          I'm going to give you another illustration.  So

5    CLF says that risk from increasing ocean temperatures

6    should be considered by a permit in order to comply with

7    Section 5(b).  And so if you're a permit holder, how would

8    you know that from reading the definition of "minimize"?

9    You would have no more reason to think that the permit

10   requires you to look at ocean temperatures than, say,

11   consider the risk posed by earthquakes.  I don't raise

12   that example facetiously.  I mean it sincerely.

13   Connecticut's not immune to earthquakes.  It's a non-zero

14   risk, right?  As it is, we're talking about things like

15   500-year storms which is a 0.2 percent probability of

16   happening in a year.  An earthquake could certainly cause

17   spills, result in discharge of pollutants into stormwater.

18   So should a permittee do an analysis of earthquakes?

19          THE COURT:  Can I ask you, when you say how

20   would they know that, I'll go back to the hypothetical

21   that you gave me a few minutes ago.  I think you said for

22   the good housekeeping BMP -- which, by the way, isn't even

23   at issue in this claim -- but for the good housekeeping

24   BMP, maybe you sweep two times a day, maybe you sweep

25   three times a day, maybe you use a vacuum and not a broom.

1    Okay.  There's nothing in the good housekeeping

2    requirements that talk about vacuums, brooms, or number of

3    times, right?  How do you know that?  You know that

4    because you are members of this industry and you can

5    become familiar with what is best industry practice.  So

6    by the terms of your very hypothetical, I think you're

7    presupposing that you, as a member of the industry, can

8    become familiar with best industry practice.  And I don't

9    understand anything you're saying in your pleadings here

10   or your briefing to say that the term "best industry

11   practice" is hopelessly vague and we can't understand what

12   the heck that means.  I understand you really to be making

13   the argument, you're talking about earthquakes and

14   unlikely things to happen, that seems to me to be an

15   argument that best industry practice wouldn't be to spend

16   a million dollars on a facility because there's a 1 in 500

17   chance that there's going to be an earthquake over the

18   permit period.  So it seems to me to be an argument about

19   what best industry practices are as opposed to an argument

20   about there's no way to know what best industry practices

21   are.  Am I misunderstanding that?

22            MS. REDDY:  Well, I think the distinction in the

23   good housekeeping example is good housekeeping -- and it's

24   not at issue, but it's convenient because it's simple --

25   it says keep a clean and orderly facility.  Sweep.  You

1    know, appropriately store your containers.  And so the

2    question about how many times should you sweep a day, it

3    has some basis in the language of that BMP.  And my

4    earthquake example is sort of saying that, well, ocean

5    temperatures, you wouldn't have the slightest idea to

6    think about that.  But if you actually follow CLF's

7    argument through that minimize concept, it flows through

8    the entirety of Section 5(b).

9            And so, you know, I think --

10           THE COURT:  So let's suppose for a moment

11   that -- and I'm going to ask you to go along with me here.

12   Suppose we have a rash of earthquakes here in Connecticut,

13   several once-a-year serious earthquakes.  It's as if we

14   lived on the San Andreas Fault, worse.  And if best

15   industry practices were make sure that you design your

16   bulk oil storage facility so that it will survive an

17   earthquake and not crack open and spill millions of

18   gallons of oil into the New Haven Harbor, I would think

19   you would say, okay, well, it's best industry practice

20   now, now that there's been a rash of earthquakes, and if

21   the best industry practice is to harden the bulk oil

22   storage tanks against an earthquake, you'd say, okay,

23   that's enough, even though the permit doesn't say the word

24   "earthquake," right?

25           MS. REDDY:  I'm not sure I would agree with

1    that, based on the permit as it's written.  We have to

2    sort of live with Section 5(b) as it's written.  And your

3    example is actually a true one right now.  You don't even

4    have to use the pretend earthquake example.  All of these

5    facilities, they're all sitting on the coast, they all

6    have hurricane plans, they all have plans for weather

7    events.  They prepare for weather.  I'm sure you know

8    where these terminals are located.  There are all kinds of

9    overlapping requirements, but there's also just industry

10   practice.  And so these practices are done, but that

11   doesn't transform them or somehow make them spring from

12   the permit.

13         Now, DEEP may issue a notice and say emergency

14   notice, we want you to, you know, put on fasteners or

15   whatever they would say, because we've had these rash of

16   earthquakes.  Then we've got the agency --

17         THE COURT:  I guess I just don't understand how

18   you say it doesn't spring from the permit when the

19   permit's very definition of "minimization" requires

20   reference and consultation of best industry practices.  So

21   if your best industry practice is harden the facility for

22   earthquakes, well, you're obliged to harden your facility

23   for earthquakes notwithstanding the absence of the word

24   "earthquake" in the permit, right?  Isn't that obvious?

25         MS. REDDY:  Only if it's tied to one of the

1    BMPs.  It's an enumerated list, do these 13 things.  And

2    if you look at a lot of the BMPs, you know, we can move

3    away from good housekeeping, what they really talk about

4    is make sure that you're not -- there's not a risk of

5    having your stormwater come in contact with pollutants.

6    So this is really -- it doesn't matter if there's a big

7    rainstorm coming or a small rainstorm coming.  You use

8    these best practices.  You put a roof over your

9    containers.  You make sure they're sealed.  You make sure

10   they're labeled.  And these are all spelled out in the

11   permit itself.

12          But I think that, going back to my earthquake

13   example, I think CLF would say the same thing you are now.

14   If it is best industry practice to consider earthquakes,

15   then, yes, consider earthquakes.  But the problem with

16   that is that that then means that best industry practice

17   could mean pretty much anything.  We could be talking

18   about terrorist attacks.  And then it has swallowed the

19   express terms of the permit.

20          THE COURT:  Is best industry practices an

21   express term of a permit?  Is it?

22          MS. REDDY:  It is expressly in the permit.

23          THE COURT:  So you're saying an express term of

24   the permit has swallowed other express terms; is that your

25   argument really?

 1              MS. REDDY:  If you adopt CLF's interpretation.

 2              THE COURT:  How about if I read the permit?  It

 3    says "best industry practices."  It's written right into

 4    the permit, right?

 5              MS. REDDY:  It is written into the definition of

 6    "minimize."  It is not an independent requirement.

 7              THE COURT:  Is it in fact integral to at least

 8    some of the BMPs?

 9              MS. REDDY:  Certainly.  I mean, it tells you the

10    extent to which you should minimize.

11              THE COURT:  Sure.  Take a look at the Management

12    of Runoff section BMP, right?  This one is implicated in

13    the case, right?  You can see the language there, it says

14    "[t]he permittee shall investigate the need for stormwater

15    management or treatment practices that shall be used" --

16    I'm just reading from the beginning of it -- "to divert,

17    infiltrate, reuse, or treat stormwater runoff in a manner

18    that minimizes pollutants in stormwater discharges from

19    the site."

20              So the word "minimizes," as used there, is

21    adopting wholesale the very definition of "minimize" in

22    Section 5(b) and also in the Definition section, it has

23    another definition section on that.  So essentially what

24    it's doing, this particular BMP, is it's very much

25    operationalizing a minimization requirement.  Would you

1    agree?

2            MS. REDDY:  Correct.  That one does use --

3            THE COURT:  So when we look at the term

4    "minimizes" in Section 5(b)(7), we know that it

5    incorporates the best industry practice standard that's

6    inherent to the very definition of what is minimization,

7    right?

8            MS. REDDY:  Well, it doesn't just incorporate

9    this general concept of best industry practice.

10   There's -- it's -- it's attached to other language that

11   talks about you will minimize to the extent achievable.

12   And so "to the extent" suggests that we're talking about

13   some level or degree of minimization and not a, okay, what

14   possible analyses could we do that might relate to how

15   run-on is going to be effected.  Again, it's that all of

16   these terms have to be read in the context of the BMPs.

17           THE COURT:  And when you say "to the extent," if

18   we go back to the definition of "minimize," you do see it

19   says "means" -- and I'm quoting -- "reduce and/or

20   eliminate."  So it's not saying just reduce somewhat but

21   don't bother to eliminate if you don't want to, is it?

22           MS. REDDY:  Yes.  It says that.

23           THE COURT:  Sure.

24           MS. REDDY:  I mean, you could take that argument

25   and carry it out to sort of some fairly extreme outcomes

1    if you want to eliminate -- if you want to sort of

2    minimize and get to elimination, right, you could build

3    40 ft. walls.  You could say, you know --

4                THE COURT:  Totally with you on that, okay?  But

5    the regulation limits that, okay, by not saying

6    categorically you must eliminate altogether discharges.

7    It says and looks at the degree to which you can reduce

8    and/or eliminate to the extent it's achievable, right,

9    using best industry practices.

10                So my whole problem with your argument here is

11    if you have a permit that says and references and

12    incorporates best industry practices and then talks about

13    achievability in accordance with those best industry

14    practices, it seems to me it's basically a fact question

15    whether you look at -- whether accounting for climate

16    change factors is something that is, in fact, best

17    industry practices.  No different than the earthquake

18    example that we used before.  You come in here -- and I

19    asked you this right from the start today.  I said you're

20    making an argument of law at one stroke, not even

21    count-specific.  And if you're making that argument of

22    law, it seems to me you can't really argue now, well,

23    these various climate factors, they're not achievable,

24    they're not actually required by industry practice.

25    That's a fact-based argument.  So that's my concern with

1   what you're saying.

2          MS. REDDY:  Well, I think where I keep coming

3   back to is, again, we've got a list of BMPs and they are

4   fairly specific.  We don't disagree that they're narrative

5   requirements, there's some room for interpretation there,

6   but we think that there's not this much room for

7   interpretation that there would be this pretty significant

8   requirement that, again, would filter down through all of

9   these control measures at Section 5(b).

10         And I do want to come back to this idea about

11  best industry practices swallowing the express terms of

12  the permit because I think we see that when we get into

13  the arguments about some of the existing permit

14  requirements that are -- they're on the face of the

15  permit.  And if you accept that there's this affirmative

16  duty to look at these climate factors, you've got to do

17  it, it's there, mandatory, you know, looking at the

18  control measure in the brief that's at Section 5(b)(9)(A)

19  and that's the one that says that tanks, like the ones at

20  this terminal, that they should be surrounded by a

21  containment area that can hold a volume that's equal to

22  100 percent of the largest tank or 10 percent of the

23  volume of all of the tanks.  So that is just in plain

24  black and white in the permit in Section 5(b).

25         And that requirement, there's no accounting for

1    rainfall there.  And it just says have it meet this

2    number, 100 percent or 10 percent of the whole.  But CLF

3    says, well, no, you actually do need to account for

4    rainfall.  You need to account for rainfall and you have

5    to account for extreme rainfall.  CLF's answer to this

6    problem is to say, okay, well, that express requirement,

7    that's just a floor, and permittees need to do more than

8    that.  And so that is the example of best industry

9    practice sort of swallowing an express term of the permit.

10   Because what happens, if you accept that interpretation,

11   is that in effect it just writes out the express term and

12   it imposes this sort of invisible not-quite-clear

13   requirement in its place.

14           THE COURT:  So if you need a containment zone,

15   right, that presupposes that you've had a spill or leak in

16   the first place, right?

17           MS. REDDY:  Yes, if I'm following you.

18           THE COURT:  Sure.  Got industry with a big tank

19   of, you know, acid, okay.  And the goal, right, is don't

20   let the acid spill out, okay, because it might get to the

21   river or the harbor.  And if it does, build a containment

22   area, right?

23           MS. REDDY:  Well, the containment area has to

24   exist at all times regardless of --

25           THE COURT:  Sure.  But the goal, the first goal

1    is don't let the acid get out.

2              MS. REDDY:  Correct.

3              THE COURT:  Don't let the oil get out.

4              And in fact, if you look at the title of this

5    particular BMP, it's number (9), it's called Spill

6    Prevention and Response Procedures.  And you see the very

7    first sentence says "[t]he permittee must minimize the

8    potential for leaks and spills."  Do you see that?

9              MS. REDDY:  Yes.

10             THE COURT:  Sure.  So that imposes, I think --

11   maybe you'll disagree with me -- an obligation on the

12   permittee to not allow or to minimize, consistent with the

13   very definition of "minimize" that we've talked about, the

14   potential for leaks and spills.

15             And then it goes on, and I agree that there's a

16   lot of verbiage in that particular BMP about containment

17   areas, but it seems to me that your argument in part is

18   overlooking the primary obligation there, is don't let the

19   acid get out of the tank in the first place much less have

20   an effective containment system if it does.

21             MS. REDDY:  There is no dispute that containment

22   is a necessary and good thing to have.  I think the

23   issue -- so I think the real-life scenario here is that,

24   you know, you have a huge storm and there is -- you know,

25   the tank gets ruptured or something.  And then you have

1    your containment.  And there's water in that containment.

2    And your contents of your tank spill out.  And now you've

3    overflowed your containment.  That's the argument in terms

4    of how this requirement relates to rainfall.

5         And if you look at other permitting schemes,

6    like the federal spill prevention and control plan, they

7    do ask you to add a little bit to account for rainfall in

8    your containment volumes.  But this permit doesn't.  And I

9    want to find the language that you pointed to.

10        THE COURT:  It's the first sentence of sub-part

11   (9).

12        MS. REDDY:  Right.

13        And so, you know, there are these -- for I think

14   pretty much all of these BMPs, you have this overarching

15   language, but then you get into some specifics.  You do it

16   this way.  This is the volume we want you to have.  And,

17   you know, this is how permeable we want it to be.  And,

18   oh, if it was built this year, we want it to be this much

19   or that much.  And so it's not -- yes, there are these

20   overarching purposes, but they don't just eliminate the

21   more specific requirements.  There's very specific

22   requirements here.

23        THE COURT:  So the first sentence is just an

24   overarching purpose, it's not an actionable

25   obligation-imposing sentence?

1        MS. REDDY:  Well, it's an overarching purpose,

2   and then you follow all of these that follow and it tells

3   you how the agency wants you to do it.  Again, you may do

4   more stuff because that's just your company's practice or

5   there's some other regulation that requires you to do

6   other things.  But we're talking about this permit.  And

7   this permit is pretty specific about how it wants you to

8   go about effectuating these BMPs.  And this is one example

9   where if you take that expansive view of the word

10  "minimize," then do you build at 200 percent?  Or do you

11  build it to some other number?  I think that is the

12  problem.  And I think that the express terms should trump,

13  basically.  You're still minimizing.  You're minimizing in

14  the way and manner that the agency wants you to.

15       THE COURT:  So your argument really is because

16  the agency decided that specifically for containment

17  areas -- which is just one way, frankly, that you could

18  have a stormwater discharge, right, overflowing of

19  containment area -- that simply because they specified

20  particular numerical criteria there, that that means that

21  even if industry practice were different than that and

22  required more than that, that that industry practice

23  standard would not be effective?

24       MS. REDDY:  It wouldn't be enforceable via this

25  permit.  You can have all kinds of industry practices, but

1    not all of them are pulled into this permit.  Again, we

2    have these specific categories.

3            THE COURT:  Again, your argument is simply

4    because there's a regulation that quantifies in the

5    specific way as to containment zones, you're presupposing,

6    well, that means the permit already took into account

7    rainfall, a climate factor like increased rainfall so that

8    all manner of protection against rainfall events beyond

9    containment is not required by the permit; is that what

10   you're saying?

11           MS. REDDY:  So --

12           THE COURT:  I mean, talk about an elephant

13   hiding in a mousehole, right?  You're basically taking and

14   seizing upon one provision concerning containment and

15   saying, hey, just because it quantifies how big the

16   containment area must be, that must mean that this whole

17   darn permit can't possibly require the permittee to take

18   into account extraordinary rainfall events.  That's pretty

19   much your argument, I think.

20           MS. REDDY:  Well, I'm saying that as a matter of

21   construction, there is a problem, because you can't really

22   reconcile the two.  And so, yes, I'm saying that CLF's

23   argument is that this requirement pervades the whole

24   permit.  But if you accept that, it renders some of these

25   express requirements that are actually written

1    superfluous.  Now it's not 100 percent, it's something

2    else.  And we don't really know exactly what --

3            THE COURT:  Or maybe it makes the permittee

4    liable twice over.  Right?  Permits often do that.  They

5    impose requirements that are sometimes somewhat

6    duplicative, that overlap, there's limitations to the use

7    of English language.  I'm not sure that you can really

8    draw the inference that you want to draw here from the

9    fact that the containment criteria here is quantified in a

10   way that you think would be inconsistent with taking into

11   account extraordinary rainfall events.

12           MS. REDDY:  Well, I will say that this -- you

13   know, this is an articulation of CLF's position.  How do

14   these things work together?  And in their brief they said

15   treat that 100 percent as a floor and you would need to do

16   more than that.  And I think that's problematic because

17   then a permit holder cannot look at the requirement and

18   know whether they are in compliance or not.  And I

19   wouldn't disagree with you that many permits are not

20   perfectly written.  They can have these inconsistencies or

21   bad construction, but I don't think we should go ahead and

22   interpret the permit in a way that creates that.  And

23   that's why I keep coming back to this idea that it is very

24   hard to understand what you're supposed to do if you adopt

25   their interpretation that you have to do these broad

1    analyses.

2              THE COURT:  Is a permit required to take into

3    account the site, the specific site and characteristic of

4    the site such as the location?

5              MS. REDDY:  To a degree.

6              THE COURT:  So the answer is yes?

7              MS. REDDY:  Well, again, bounded by the terms of

8    the permit.

9              So taking your run-on example, the BMP on

10   run-on, if you've got a facility and you've got a big hill

11   next to you, you probably should take that into account

12   because you might have faster water coming down when you

13   decide how you want to divert or infiltrate the various

14   options that are presented.  That logically flows out of

15   the actual text of the permit.  But if you are reading

16   that run-on requirement and you're supposed to say, well,

17   what are the impacts of increasing ocean temperatures on a

18   storm surge that might come up out of the harbor and onto

19   my property and that run-on, that is a very different

20   analysis that's not even necessarily about the site.

21   You're looking more broadly at the climate.

22             THE COURT:  Maybe I'm a little confused here.

23   Because you say, hey -- I think you're saying, look, a

24   permit's got to take into account or should take into

25   account the site, for example, if you're on the steep hill

1    where there's this danger of runoff.  But in Connecticut,

2    at least -- I guess you're not from Connecticut, but if

3    you are looking at a facility that's perched on the very

4    edge of New Haven Harbor or very near there, I don't know

5    if it's exactly on the edge, but it seems to me it's close

6    from all the maps we've gotten here versus one in, who

7    knows, Meriden that's not near any kind of waters of the

8    United States, you'll probably say, well, the permit

9    obligations there take into account, just like they take

10   into account the hill, they take into account proximity to

11   waters of the United States.  And if so, okay, and if the

12   argument is you have to account for rising oceans, well,

13   those are waters of the United States, right?  So it seems

14   to me I don't really understand why you wouldn't --

15   somebody who is right next to the water of the

16   United States, wouldn't say, okay, well, rising oceans

17   make a difference to the dangers that we're going to have

18   of discharge of pollutants.

19        MS. REDDY:  So I think that it's -- the question

20   of why I think is really just a question for the agency.

21   These are questions of what has the agency mandated, what

22   are the requirements of the permit.  So the agency may,

23   right, this permit that's going to be expiring, say, you

24   guys who are within 1 mile of the coast, we want you to

25   factor in -- I'm sorry, I'm not an expert on these things,

1    but I'll just throw something out there -- a foot of water

2    coming on your property.  And there you've got a specific

3    thing to do.  You're being told this is what we want you

4    to account for.

5         The climate change factors are really, really

6    expansive.  It essentially -- you would need kind of an

7    army of experts to tell you, you know, how should you take

8    into account drought?  In your good housekeeping, maybe

9    you're in a windy spot and you have to sweep all the time

10   because it's dry and it's windy.  It is contrary to,

11   again, that principle that these NPDES permits are

12   supposed to have clear and identifiable requirements.  And

13   that's what's lacking with CLF's theory.  We don't have

14   anything clear and identifiable.

15        So when you put this into effect -- and again,

16   we're not disagreeing there could be some variability,

17   right, that you shouldn't just sort of put on your

18   blinders and just not even look around at your actual

19   site, but you can't suddenly have the term "best industry

20   practice" be infinitely elastic.  That could just mean

21   anything.  There should be some relationship to the actual

22   requirements of the permit.

23        THE COURT:  I'm surprised to hear you argue

24   that, I have to say.  Because it seems to me if you're

25   talking about best industry practices, that presupposes

1    its own limitation as to what is a practice, what is an

2    industry practice, what is the best industry practice.  So

3    it's not limitless, right?  It's constrained by what is

4    the best industry practice.  We haven't gotten into

5    exactly that.  Maybe we will later on in this litigation.

6    But to say it's limitless seems to be kind of unmoored

7    from the very terminology "best industry practice."

8         MS. REDDY:  Well, sure, there's the term "best,"

9    there's the term "industry," and there are these other

10   limitations.  But best industry practice as to what issue

11   is where I'm saying that you could -- you could pull in

12   all kinds of topics.  Like I said, you could say, well,

13   you've got to consider the risk of a terrorist attack,

14   consider that in 5(b).  And that is what I'm saying, sure,

15   there is a best for that, there is probably an industry

16   for that, there's probably practices for that.  So those

17   limitations are in place.  But the question is, what are

18   we talking about?  What are we supposed to be analyzing to

19   determine best industry practice?  And that is the part

20   that I'm saying their argument gets very broad.  We could

21   be talking about a lot of different things.  So there's a

22   lot of ways you could minimize pollutants or the risk of

23   the discharge of pollutants.

24         I'm going to take a sip of water.

25         THE COURT:  Sure.

1        MS. REDDY:  I think I kind of heard you moving

2  into the maybe at some other later point in this

3  litigation there will be some more facts or, you know,

4  expert testimony.  So I do want to address that in the

5  context of best industry practice.

6        And from defendants' perspective, that argument

7  is really kind of conflating two things where, as I said,

8  a couple different points.  If this is an affirmative

9  requirement in the permit, then there's no expert who

10  should be telling the Court that this exists or not.  Now,

11  if the Court decides it exists, then an expert can come in

12  and say you do it this way, you do it that way or the

13  other way.  I just want to make sure that we keep apart

14  those concepts.

15        We disagree that this is premature.  This is a

16  question that's ripe.  It is a question of permit

17  interpretation.  Either the permit does have this

18  affirmative requirement or it doesn't.  But, as I said,

19  we --

20        THE COURT:  I was trying to figure out, it's not

21  premature, necessarily, but overdue.  You had an argument

22  with Judge Merriam, right, which I thought you would have

23  raised all your objections that are as a matter of law.

24  Why is this one suddenly springing forth?

25        MS. REDDY:  Well, I mean, we raised 12(b)(6)

1    arguments about a failure to state a claim.  But in this

2    context, we did look at some extrinsic evidence in the

3    event --

4              THE COURT:  I know you're looking at extrinsic

5    evidence.  That's your fallback, right?  Your primary

6    argument is, hey, look at the permit, there ain't no

7    mention of climate factors in there as a matter of law,

8    and you keep saying that I think in your briefing.  I am

9    trying to figure out, why wasn't this before Judge

10   Merriam?  If this is so clear and jumping out, why did it

11   take so long to surface this?

12             MS. REDDY:  Your Honor, you know, there were a

13   number of arguments made in the motion to dismiss.  And we

14   only get one shot when you're making these kinds of

15   arguments.  So we did want to take a look at the extrinsic

16   evidence and kind of check our boxes.  I think it's

17   actually Judge Merriam's decision that kind of brings us

18   to this point.  She said that, you know, she -- she said

19   that these terms -- I'm sorry, these claims entail

20   interpreting the permit, asking for example whether best

21   management practices requires defendants to prepare the

22   terminal for the immediate effects of climate change

23   including rising tides and catastrophic storms.  And

24   that's what we're here doing.  We would -- if we could

25   have resolved this earlier, that would have been nice.

1           I'm sure Your Honor knows from looking at the

2     docket, there's been an incredible number of discovery

3     disputes.  And a lot of them actually do relate

4     fundamentally to this disagreement, this fundamental

5     disagreement about what the permit requires.  And so we

6     are in favor of a resolution.  And we agree that, you

7     know, overdue, and I'll take the blame for that.

8           But I would just say that CLF's articulation of

9     this as an affirmative duty I think means that both sides

10    kind of agree we don't need an expert to tell us whether

11    this is a requirement of the permit.  That really wouldn't

12    be appropriate.  It's properly a question for the Court.

13          And so would you like me to touch on the other

14    claims?  I think you got it correct in the beginning

15    that --

16          THE COURT:  I'm not sure what other arguments

17    you'd like to make.  You're welcome to make them.

18          MS. REDDY:  Well, we laid them out in the brief.

19    We do think that the other claims are fundamentally based

20    on the same factual allegation.  And our threshold

21    question does reach those claims.  But I think that

22    there's just one or two other points I want to make and

23    then I'll have a seat.

24          On the extrinsic evidence, both sides agree the

25    permit -- we have different interpretations of it.  Both

1    sides seem to agree the permit is plain and unambiguous.

2    So the takeaway I want to offer to the Court is that, you

3    know, we attempted to review as many permits and

4    permitting plans as we could find at DEEP and whatever was

5    publicly available and to look in the files and see other

6    notices of violation.  We didn't find any that are

7    addressing any of these things.

8              And so kind of just a general point here is that

9    if this is an affirmative requirement of the permit,

10   either no one knows about it or there's just mass

11   noncompliance because this is not incorporated into

12   anybody's current permits.

13             And then another practical point, which is that

14   if CLF's interpretation of the permit is accepted, what

15   that will mean is that, because we're talking about a

16   general permit, that all of the general permit holders

17   will have to undertake and implement these climate change

18   risk analyses.  And when you think about the implications

19   of that, that gets very complicated very fast.  Because,

20   again, it's such a broad category of things.  And think

21   about, you know, maybe less sophisticated permit holders,

22   how will they know what category hurricane to factor in

23   and base their analysis on?  One facility chooses

24   Category 3, a neighboring facility chooses Category 5.

25   Which one is in compliance?  It's coming back, again, to

1    that very basic point I started with, it's very difficult

2    to know.  And then when you start looking out at future

3    risk, how many years out are permittees supposed to be

4    looking at?  Is it five years?  Fifty years?  There's a

5    lot of different questions that start to crop up,

6    including will these efforts be in conflict with the

7    agency's plans.

8            And that's where we come back around to what we

9    see is the fundamental problem here is that this

10    requirement, which is pretty broad and pretty complex, is

11    just not discernible from the face of this permit.  Nobody

12    else seems to see it.  And so that's your quintessential

13    elephant in a mousehole, right?

14            THE COURT:  You know, it seems to me that what

15    CLF is asking for -- and maybe I misunderstood -- is

16    they're really saying, look, we want you to consider -- we

17    think the permit requires, I know they want you to, but we

18    think the permit requires you to consider.  And by

19    "consider" means when you're doing your storm weather

20    prevention plan, you have discussion of that, right, of

21    the risk from rising oceans, warmer waters, greater

22    rainfall events, and the like.  Basically climate factors.

23    I think that's what they're asking you to do, right?

24    They're not saying build a wall, right, right now?

25            MS. REDDY:  Well --

 1              THE COURT:  Are they?

 2          MS. REDDY:  It's consider.  And then if you have

 3    to consider it, the control measures say they should be

 4    implemented.

 5              So I do want --

 6              THE COURT:  Do they?  If you consider it, you

 7    might consider it and say, you know, we've considered the

 8    possibility that we're going to have a Category 2

 9    hurricane instead of Category 3 hurricane which we used to

10    think we'd get but, hey, our facility is just fine for

11    that, we don't need to change anything.  All we need to do

12    is we've considered it.  Right?

13              MS. REDDY:  That may be.  There may be a first

14    step that is just consideration and it stops right there.

15              THE COURT:  Sure.

16              MS. REDDY:  But that is not actually that light

17    a lift.  So to determine the potential for storm surge on

18    the coast and, you know, you have these different types of

19    storms.  I know you mention that you're familiar with this

20    terminal area.

21              THE COURT:  I live here, so I'm stuck with being

22    familiar with the immediate area where I live.

23              MS. REDDY:  But there are many terminals there.

24    Multiple, at least.  And this one actually sits furthest

25    away, it sits behind the others.  And so, you know, that's

1    a different -- you know, the terminal in front is doing a

2    different analysis than the terminal in the back.  And

3    that probably would involve pretty sophisticated modeling.

4            THE COURT:  Can I ask you this?  Even if we

5    didn't have this phenomena that we call climate change,

6    right, you'd still have to be thinking about what's the

7    risk from rainfall, what's the risk from flooding, what's

8    the risk from storm surges, right?  You'd still have to be

9    thinking about weather-related risk anyways.  And you

10   already do that, right?

11           MS. REDDY:  Yes.

12           THE COURT:  So this is just only different --

13   this is something that's not like some new thing being

14   introduced.  It's just a variation of that that takes into

15   account, and you hire an engineer for these sorts of

16   things, which is what industries do.  And that engineer

17   draws up the prevention plan that now takes into account

18   the data, right, on greater climate risk.  But you're

19   already considering risk in the first place.  I assume you

20   were, especially if you're right on the edge of New Haven

21   Harbor or very near it.

22           MS. REDDY:  Certainly.  Like I said earlier, you

23   know, the terminals do take into account weather.  It may

24   be this kind of goes without saying, but the whole point

25   of these places is to keep those products in the tanks.

 1    You're storing them.  You don't want to be willy-nilly and

 2    sort of cut corners because you don't want to loose your

 3    product.  That is actually the point.  So obviously you're

 4    taking into account risks that might threaten the

 5    integrity of the tanks because just as a business

 6    matter --

 7              THE COURT:  And weather-related risks, right?

 8              MS. REDDY:  Yes.

 9              THE COURT:  And rain and storm surges, you're

10    already looking at that, right?

11              MS. REDDY:  No.  There's a but.

12              THE COURT:  You're not?

13              MS. REDDY:  There's a but.  And that's that

14    there are many ways of managing these kinds of risks.  And

15    a lot of them are pretty simple and have been

16    well-established for decades.  So if you've got a storm

17    coming, what you do is you fill up your tanks so they're

18    nice and heavy so they don't float if there's a lot of

19    water.  There are simple operational steps that are taken

20    and have been taken for a long time, you know.  These

21    facilities have experienced storms.  They know what they

22    are like.  But they do not involve this.  They do not

23    involve doing modeling of storm surges.  Because there are

24    simpler more cost-effective ways of ensuring that you're

25    not going to have a spill that doesn't involve this level

1   of complication and expense.

2          Again, if the agency says do it, right, then

3   we'll do it.  But coming back to it, the question is:

4   Does the permit require it?  Not as it's written today.

5   That's our argument.

6          Now, it may one day.  As I said, you know,

7   there's going to be a new iteration of this permit pretty

8   soon.  And if CLF wants to see it written in the permit

9   consider A, B, C, D, E, they're going to have that

10  opportunity to ask the agency maybe as soon as this spring

11  when this next permit gets expired -- I'm sorry, when the

12  current permit expires, excuse me.

13         Again, coming back to what I think are the

14  big-picture points here is this is a simple question of

15  what does this permit require now.  We have argued that if

16  you adopt their interpretation, it does a lot of violence

17  to the permit and creates a tremendous amount of

18  uncertainty.  And if you suddenly impose this requirement,

19  it is really not clear what people are supposed to be

20  doing.  And that, as a general matter, that's not what

21  NPDES permits -- that's not how they're supposed to work.

22  Again, they're supposed to have clear and identifiable

23  requirements.  And again, if they want it in the permit,

24  they can ask for it, and the agency will make their

25  decision.

```
 1              THE COURT:  Thank you very much.
 2              MS. REDDY:  Thank you.
 3              THE COURT:  Hold on just a second.
 4                   (Pause.)
 5              THE COURT:  Folks, we're going to take a recess.
 6    As you may see, the hardest working person is sitting in
 7    front of me in the courtroom, our court reporter.  So
 8    we'll take a 10-minute recess and reconvene at 4:30, and
 9    I'll hear from CLF.  Thank you very much.
10                   (Whereupon, a recess followed.)
11              THE COURT:  Ms. Jordan, would you like to
12    proceed?
13              MS. JORDAN:  Yes, thank you, Your Honor.
14              So I have a few points I'd like to make in
15    response to the back-and-forth that you had with
16    defendants' counsel, but I also want to say I can just
17    pause here and answer any questions that you have.
18              THE COURT:  I think you can see I'm not shy
19    about asking questions.  If questions occur to me, I'm
20    happy to ask you.
21              MS. JORDAN:  Okay.  All right.
22              I think the first and overarching point I'd like
23    to make is CLF brought this complaint against a single
24    facility, and our claims are about what that facility in
25    light of its location, the pollutants at the facility, its
```

```
1   current practices, and the risks facing that facility must

2   do.  So defendants have --

3           THE COURT:  You have a whole bunch of other

4   lawsuits, don't you?

5           MS. JORDAN:  We do.  We have three others.

6           THE COURT:  Similar kinds of facility-specific

7   ones?

8           MS. JORDAN:  They are similar facilities in

9   different locations.  Two of those cases are under

10  different permits.  We have another lawsuit under the same

11  permit against a different facility.

12          And so the point I'm trying to make is that

13  CLF's allegations are not that every single facility

14  subject to this general stormwater permit has to conduct

15  to the exact same analysis.  Actually, our point would be

16  opposite, right, that the analysis is site specific.  I

17  think that's why this motion is premature because what

18  best industry practice requires of this facility is a

19  fact-specific question.  Whether this facility is

20  violating the directive in the permit to minimize the risk

21  of pollutant discharges is a fact-specific question.  And

22  so I just want to underscore that whatever this facility

23  may be required to do is not necessarily the same thing as

24  what another facility would be required to do.  And that's

25  why the permit requires the facility to hire a licensed
```

1    professional engineer to certify SWPPP, to help develop

2    the SWPPP, and to say in my professional judgment, based

3    on all of my experience, my training, and my

4    certification, you have actually met the directive in this

5    permit to minimize the risk.

6              THE COURT:  It won't stop you from suing, right,

7    though?

8              MS. JORDAN:  It wouldn't.

9              THE COURT:  No, because you can come along and

10   say, hey, they might have got an engineer to sign off on

11   this, but this particular facility is not complying with

12   best industry practice, best industry practice is

13   site-specific.  So essentially every single deep-pocket-

14   out-there facility gets sued by you, right, because you

15   have this kind of best industry practice standard that's

16   endlessly litigable, right?

17             MS. JORDAN:  Well, I think that that's how the

18   Clean Water Act sets up the scheme is that citizens can

19   sue to enforce the Act if they don't think that facilities

20   are complying.  And we don't think this facility is

21   complying.

22             Now, this isn't really the subject of this

23   motion, but our complaint sort of details extensively what

24   we believe defendants' knowledge should be of these exact

25   risks that we're talking about.  And we think that's very

1    important to understanding why it's so egregious that they

2    have not accounted for those risks at this facility.

3            Now, Counsel was asserting that they are, in

4    fact, accounting for those risks.  I think that is, again,

5    a fact question that really isn't before the Court on this

6    motion and another reason why the ultimate question of

7    what best industry practice is necessary for this facility

8    is premature at this point.  We're still in the middle of

9    fact discovery.  We haven't begun expert discovery.

10           And I would like to turn just to the overall

11   structure of the control measure section and how they

12   operate within this permit scheme.  I think the

13   fundamental point that CLF was hoping to make in our

14   briefing is that these control measures represent goals

15   and prohibitions.  It is not a how-to manual.  It does not

16   tell the permittee in what manner it must meet these goals

17   or prohibitions.  And I think that's very apparent from

18   the text of the control measures themselves.

19           For example, Control Measure (11) is

20   Non-Stormwater Discharges.  And it says the permittee must

21   eliminate non-stormwater discharges except as provided for

22   in the certification section.  This goes to Count 1 of our

23   complaint.  That language is a prohibition.  It is not a

24   how-to.  And the how is what the definition of control

25   measures is telling the permittee.  How you meet this

1    requirement is you consider best industry practice, you

2    consider what technology is available, you consider what's

3    economically achievable in order for you to minimize or,

4    at best, eliminate the risk of pollutant discharges.

5          And I believe that language is also very clearly

6    in the structure of Control Measure Number (9), the Spill

7    Prevention and Response Procedures.  I know that you and

8    Counsel spent a long time kind of discussing the

9    containment section of that control measure.  And I want

10   to emphasize that under Section (9)(A)(i), so the heading

11   for Stationary Storage or Storage Areas, it says that the

12   permittee -- and I'm reading the last part of that

13   section -- "shall, at a minimum, comply with one of the

14   following types of secondary requirements."

15         And then if you go to Part (2), it says, you

16   know, for any storage area, et cetera, your secondary

17   containment area "will hold at least 100% of the volume of

18   the largest tank or container or 10% of the volume of all

19   tanks or containers in the area, whichever is larger,

20   without overflow from such secondary containment area."

21   That is why CLF has asserted in its briefing that that is

22   a minimum requirement.  You must have at least that much

23   and it also cannot have overflow.

24         Now, I imagine that if your secondary

25   containment area were in a large building not subject to

1    any rainfall and there were no other ways that other items

2    could displace volume in your secondary containment area,

3    then maybe 100 percent would be perfectly reasonable.

4    Because what that means is if your tank fails, you just

5    have a bathtub that takes up all that volume.  If there's

6    something else that might fill that secondary containment

7    area, then you must ensure that there is no overflow from

8    that area.

9            THE COURT:  But you don't have to pay attention

10   to any of that if you choose option number one, right?

11           MS. JORDAN:  Right, if you have a double-walled

12   above-ground tank.  I'm not sure if defendants have those

13   types of tanks at their facility, but I know that there

14   are tanks here in New Haven that do use that kind of

15   secondary containment.

16           So, you know, I think that, based on what I was

17   hearing in the argument, it seems that defendants do agree

18   with CLF that the BMPs are not a how-to guide, that they

19   are I think the word used was "elastic," right?  What you

20   might need to do in order to meet best industry practice

21   is elastic.  And I think fundamentally that it's a fact

22   question.  And we don't have a fully developed record on

23   what best industry practice would require of this

24   facility.

25           I would like to say on the legal question,

1    there's actually agreement that there are site-specific

2    considerations that must be taken into account.  But we

3    can't answer the question of at this facility what

4    site-specific considerations are necessary and, I guess

5    the further question being, did defendants consider those

6    things or not.

7            I would also like to just note that defendants

8    don't discuss or mention Section 3(b)(2) of the permit in

9    their briefing.  That's the Coastal Management Act

10   section.  That's what Count 2 of our complaint is based

11   on.  And that part of the permit says that for all

12   activity that you are conducting under this permit, that

13   activity, which is stormwater discharges, must be in

14   accordance with the goals and policies of the Connecticut

15   Coastal Management Act.  That Coastal Management Act says

16   that in your planning you must consider sea level rise,

17   coastal flooding, and erosion control.

18           And so I also just think we fundamentally

19   disagree with the assertion by defendants that nowhere in

20   this permit is there any mention of the kinds of climate

21   control factors or climate change factors that CLF is

22   concerned with.  I think that they're actually explicitly

23   incorporated into the permit through the Coastal

24   Management Act.  But even if they weren't, the absence of

25   these, you know, magic words, again doesn't mean that you

1    don't have to consider that information.  And I think that

2    your colloquy on earthquakes was a good example.  The idea

3    being if your facility is facing particular heightened

4    unique risks, that would increase the likelihood of a

5    discharge of pollutants through stormwater, you need to

6    keep that into account when you are, for example,

7    minimizing the potential for leaks and spills which is the

8    requirement under Control Measure (9).

9            Now, defendants also stated sort of at the

10   beginning that this permit doesn't require consideration

11   of future or far-off risks and that that is what CLF is

12   alleging.  I think that's a re-litigation of the motion to

13   dismiss.  Judge Merriam clearly stated in her order "[t]he

14   allegations of the Amended Complaint, however, plainly

15   allege the near-term harms from foreseeable weather

16   events."  So CLF isn't asking for defendants to plan for

17   something 100 years from now.  We're asking them to take

18   into account the reasonably foreseeable risks of current

19   weather events.  And I think the permit really does expect

20   that of permittees.

21           So in Section 5(b)(9) of the permit, again, you

22   know, the permit uses the language "[t]he permittee must

23   minimize the potential for leaks and spills," right?

24   There's this idea it's forward-looking.  If there's a

25   potential for a leak and spill, you have to plan for that.

1          In Section 5(c)(2)(D) of the permit, I believe

2     that this relates to Count 6 of CLF's claims -- I'm sorry,

3     Count 4, permittees are required to consider all potential

4     sources of pollutants on their site.  So not just the

5     places that you know that there's a barrel of toxic

6     chemicals, but any potential pollutant source.  And then

7     there's a wide variety of requirements on how you document

8     that and how you account for that in your site planning

9     and through your SWPPP.

10          THE COURT:  So when -- I was curious about that

11     because it strikes me that that requirement to consider

12     potential sources is not necessarily the same as potential

13     causes of discharges of pollutants, right?  In other

14     words, if there's an overflow from a tank that's on some

15     site, the cause of that may be a storm surge.  But that's

16     not the source.  The source is that tank that overflowed,

17     right, or those other areas on the facility site that are

18     actually themselves the source of pollutants.  Is there

19     such a distinction between source and cause?

20          MS. JORDAN:  I think the tanks full of oil are

21     potential sources of pollutants regardless of how they

22     fail, whether it's because they were hit with storm surge

23     and it caused the tanks to come off their moorings and

24     then float into the New Haven Harbor or whether it was

25     some type of mechanical failure or rust or something.  I

1    think that where the pollutants exist, they are potential

2    sources of pollutants.

3              THE COURT:  Do you see the point?  It seems to

4    me it's too easy to equate the two.

5              MS. JORDAN:  I do see what you're saying.

6              I think that CLF also would argue that storm

7    surge flooding itself is a pollutant.  So -- or once it

8    comes into contact with the ground, then it certainly is

9    full of pollutants.  So the way that stormwater is defined

10   in this permit I believe is rainfall and snowmelt.  It

11   doesn't consider storm surge flooding.  And then,

12   additionally, the permit completely prohibits

13   non-stormwater discharges which we would allege, you know,

14   storm surge flooding is.  So I think that in this

15   particular example that you're giving, the idea that your

16   facility could become inundated through storm surge

17   flooding is something that you would need to account for

18   because it is entirely prohibited by the permit itself.

19   And the permit doesn't tell the permittee how to prevent

20   non-stormwater discharges; it just says that you must do

21   so.  We would argue that, in doing so, you must use best

22   industry practice.

23             So I also would just like to note that in their

24   reply brief and here today defendants set up a sort of

25   contradiction between CLF's arguments that we are, on the

1  one hand, saying that the permit language is clear but

2  then, on the other hand, saying this is a fact-specific

3  question and that there seems to be some tension there.  I

4  just want to clarify I don't think that's a correct

5  characterization.

6           Our position is that the text of this permit is

7  quite clear, it says best industry practice that's capable

8  of interpretation and understanding.  But whether

9  defendants have violated this permit, that's a fact

10  question.  So whether defendants have incorporated best

11  industry practice at their terminal is itself a fact

12  question.  And so that's just a point of clarification I

13  wanted to provide because I think, otherwise, this idea

14  that we're arguing for two different standards creates

15  confusion.

16           THE COURT:  So ultimately, I take it, your

17  argument is there's going to have to be factual resolution

18  of what's best industry practice, right?

19           MS. JORDAN:  Unless defendants will stipulate

20  that they do not in fact consider any of our climate

21  change factors at their facility, then, yes, I think it's

22  a fact-specific question.  As you heard today --

23           THE COURT:  You lost me on that one.

24           MS. JORDAN:  So --

25           THE COURT:  So suppose they say, hey, we're --

1    I'm not saying they would say this, but we're denying

2    climate change.  You'd still have to, I think, show what

3    the best industry practice is as shorthand for what's

4    actually technologically achievable, available, and

5    economically practicable consistent with what is best

6    industry practice, right?

7              MS. JORDAN:  Yes, Your Honor.  I think I more

8    meant to say we would not have to argue about whether

9    defendants' hurricane response plan is in and of itself

10   meeting that standard.

11             THE COURT:  But ultimately you're going to have

12   to get, I presume, probably expert testimony --

13             MS. JORDAN:  Yes, Your Honor.

14             THE COURT:  -- to say this is what best industry

15   practice is.

16             MS. JORDAN:  Yes, Your Honor.

17             THE COURT:  I see.  Okay.

18             MS. JORDAN:  And, as Ms. Reddy sort of

19   intimated, we have ongoing fact discovery disputes about

20   this question.  CLF's perspective is that best industry

21   practice means best industry practice.  So what defendants

22   do at their other similarly situated facilities is

23   representative or at least is a data point to assessing

24   best industry practice.  You know, this facility is not an

25   island.  It's not the only one of its kind.  So what

1    others do to address these kinds of potential sources of

2    spills and leaks and pollutants is relevant to this

3    question.

4         I think also the permit sort of makes clear that

5    professional engineering judgment is indeed a part of that

6    consideration, too, of what best industry practice is

7    through the requirement of a licensed professional

8    engineer certification.  There are multiple points in the

9    permit where I believe actually Control Measure Number (7)

10   also, you know, specifically directs the permittee to

11   develop their control measures or their BMPs to manage

12   runoff with the assistance of a licensed professional

13   engineer.

14         THE COURT:  So the permit, if you're looking at

15   Number (7), you'll see at the end of the first paragraph

16   of Number (7) it imposes an obligation on the permittee to

17   implement and maintain stormwater management or treatment

18   measures determined to be -- and then it says "reasonable

19   and appropriate to minimize the discharge of pollutants

20   from the site."  That additional terminology of

21   "reasonable and appropriate" is, of course, in addition to

22   what is best industry practice, at least just in terms of

23   verbiage.

24         MS. JORDAN:  Yes, Your Honor.

25         THE COURT:  Do you have a view of whether that

 1   is different from or essentially -- no pun intended --

 2   waters down the best industry practice requirement because

 3   there's an additional consideration of what is "reasonable

 4   and appropriate"?

 5        MS. JORDAN:  I think it is in addition to the

 6   best industry practice requirement.  As you pointed out

 7   earlier, the term "minimize" is defined, and that term is

 8   defined by actually three different factors and

 9   considerations: what's economically practicable,

10   technologically available, and best industry practice.  So

11   I do think that this section is saying, you know, with

12   those three considerations and whatever would be

13   reasonable and appropriate to essentially eliminate or, to

14   the extent achievable in light of those things, minimize

15   your pollutant discharges.

16        THE COURT:  So something might be best industry

17   practice, might be technologically feasible, economically

18   practicable, but still not be reasonable and appropriate?

19        MS. JORDAN:  It's difficult for me to imagine a

20   circumstance where if it were all those things it would

21   not be reasonable and appropriate.  But I think the plain

22   text of the permit suggests that that is possible.  So

23   perhaps your facility is so uniquely situated that, you

24   know, installing this would render your site useless.

25   Whatever control measure it is that you would need to

1    implement, even if it's economically available to you in

2    that the control measure itself is not expensive but

3    installing it would render much of your site unusable, I

4    think perhaps that would not be reasonable and

5    appropriate.

6            THE COURT:  I see.  All right.  What else?

7            MS. JORDAN:  And just the last point I wanted to

8    make is, you know, I do think that, to an extent,

9    defendants did raise the question that's being raised in

10   this motion before Judge Merriam.  It was through a

11   slightly different frame there.  In their briefing, it was

12   raised as a permit shield argument that nowhere in this

13   permit do these words appear, so it can't possibly be the

14   case that this is required by the permit.  And Judge

15   Merriam in her order on the motion to dismiss rejected

16   that argument.  And I believe Ms. Reddy read into the

17   record that portion of her opinion where she basically

18   says what best management practices requires is a

19   fact-specific question.  And I think that that really is

20   the primary point that CLF wants to drive home today is

21   this is -- just because these words may not appear in the

22   permit does not mean that you would never have to consider

23   them.  It's a fact-specific question.  And so I believe

24   defendants' motion can be just denied on that ground and

25   the Court doesn't need to reach today and on this record

1    can't reach today specifically which factors or

2    site-specific analysis defendants needed to have

3    considered in adopting their SWPPP and the control

4    measures in it.

5         THE COURT:  It looks like you want a good year

6    or more to develop all these facts, according to the

7    schedule that I guess was entered by Judge Farrish.

8         MS. JORDAN:  Yes, Your Honor.  So discovery has

9    been substantially delayed in this case through a variety

10   of disputes and motions that have been pending, at this

11   point I believe around seven or eight months.  The parties

12   agreed to the schedule that's currently been entered which

13   contemplates the close of fact discovery at the end of

14   February and then a period for expert discovery after

15   that.

16        THE COURT:  Well, almost through the next year,

17   right?

18        MS. JORDAN:  Yes, Your Honor.  I don't know it

19   off the top of my head, but I believe the dispositive

20   motion deadline in this case is about a year from today.

21        THE COURT:  Sure.  And Daubert motions and all

22   that, it looks like, folding in?

23        MS. JORDAN:  That's built into the expert

24   discovery schedule, Your Honor.

25        THE COURT:  And all over the issue of whether

1    Shell has to consider these factors.

2              MS. JORDAN:  I think that's a primary dispute in

3    this case.  But we do have several other claims.  We have

4    RCRA claims against actually a defendant that's not before

5    you on this motion today, defendant Motiva, as well as the

6    other defendants.  And then we have two more Clean Water

7    Act claims that aren't the subject of this motion.

8              THE COURT:  You need that much time?

9              MS. JORDAN:  Given the challenges that we've

10   faced in discovery and the very opposed positions of the

11   parties, it has taken a very substantial amount of time to

12   obtain records.  And the parties continue to have very

13   strong disagreements about what kind of records are

14   relevant to the questions presented in our claims.

15             THE COURT:  I see.  Okay.  What else?

16             MS. JORDAN:  I don't have anything more for you.

17             THE COURT:  Thank you very much.

18             MS. JORDAN:  Thank you.

19             THE COURT:  Ms. Reddy.

20             MS. REDDY:  I'll only respond to a few points,

21   Your Honor.

22             The first is I just want to clarify my

23   references to there being some elasticity.  As I think I

24   said a few times during my argument, that should always be

25   bounded by the requirements of the permit and those

1    specific control measures.

2            THE COURT:  But they're narrative terms of the

3    permit, right?

4            MS. REDDY:  Yes.  But they should be, again,

5    bounded by -- okay, using our favorite example, good

6    housekeeping, keeping an orderly and clean facility.  So I

7    disagree with the notion that, okay, there is so much

8    elasticity, that is still within the boundaries of just

9    sheer interpretation of the permit.  So I think it's still

10   a legal question.

11           And the next thing I wanted to respond to was

12   what I thought was an interesting comment about this

13   identification of potential sources of pollutants.  And

14   Ms. Jordan said that they would consider storm surge

15   itself to be a pollutant.  So if you look at that

16   requirement, you know, it's almost step by step.  It's

17   make a map, identify these sources.  It's pretty explicit.

18   And this kind of introduces that same problem of, okay, I

19   thought I was making a map of, okay, here's our tank, here

20   is where we store waste, here are all the potential

21   sources of pollutants, but now there's this other concept

22   of let's map the storm surge.  And this is getting into

23   that idea of there's a real lack of clarity about what

24   exactly you're supposed to be doing when you're accounting

25   for these kinds of factors.  And agencies -- we didn't

 1    discuss this and it's covered in the briefing, but EPA

 2    Region 1, they developed this pretty tight sort of

 3    requirement about how they want you to look at storm

 4    events.  You've got something you can hang onto in that

 5    permit, EPA's permit.  Here, you know, you're looking at

 6    that provision to identify potential sources of pollutants

 7    and, again, I'm sort of beating a dead horse at this

 8    point, but it's all a little vague if you're supposed to

 9    be looking at storm surge now as a pollutant.

10            And then the very last point was another thing

11    that Ms. Jordan said that I thought was interesting which

12    is this idea that the permit itself, you know, it

13    incorporates kind of an engineering standard because an

14    engineer has to put their stamp on this, right?  There's

15    no dispute that an engineer did put their stamp on the

16    defendants' plans.  And so if I'm following what was just

17    said, some engineer decided that this plan meets best

18    industry practice.  And that, you know, there's no claim

19    here that that was fraudulent or something, as far as I

20    know.  And so that would seem to settle it.  But clearly

21    it doesn't.  Because there is this idea -- and again, this

22    notion that this whole motion is based on that there's

23    some other requirement here that needs to be accounted

24    for.  And CLF knows that there are hurricane plans and

25    this plan and that plan, but they're saying this permit,

 1    you had to write it in your stormwater pollution

 2    prevention plan, it's not there.  And that is what they're

 3    saying is the violation.  So as far as I know, we could

 4    have ten hurricane plans and we'd still be in violation of

 5    the permit because it's not in the stormwater pollution

 6    prevention plan that's required here.  So, really, you

 7    know, those are the only --

 8            THE COURT:  But you could fix that pretty

 9    easily, right?  I looked at your stormwater prevention

10    plan.  It's a pretty basic document.  You could basically

11    just say we've taken that into account.

12            MS. REDDY:  Yes, it actually does incorporate by

13    reference other plans, some of the federal plans.  That's

14    not an issue that's really been surfaced yet.  But I think

15    that the problem remains -- and I think you touched on

16    this -- is that, well, what about ocean temperatures?  How

17    do we know what's reasonably foreseeable?  What about all

18    this other stuff that we didn't do because our hurricane

19    plan is what it is?  The kind of enforcement risk,

20    reliability risk is not yet resolved because at this point

21    all we know is you haven't described all of these things

22    in the plan.

23            THE COURT:  But you could basically address the

24    case and if you just took all your facilities, this one

25    and presumably other facilities that might be subject to a

1    lawsuit, and simply add some sentences to your stormwater

2    prevention plans, right, that show that you in fact have

3    considered.  That's what's kind of mystifying me about

4    this lawsuit.  It seems you all are juggernauts, the

5    courtroom is full of people, and everybody is fighting

6    over something.  You're not here -- I don't think Shell is

7    here to say, hey, we're climate deniers.  And I can't

8    figure out why you need a year, first of all.  I guess

9    it's what you want to do is you want to litigate and run

10   up tremendous lawyer bills, lawyers from all over the

11   country for a year.  And why it's not basically fixable

12   unless Shell wants to deny that there's any kind of

13   climate change that's relevant to its protection, why

14   Shell hasn't just frankly adjusted its permit.  Now, I

15   know your argument is, hey, the permit doesn't say that.

16   I get that.  I know that.  I'm just trying to look at the

17   common sense of what's happening in this case and the

18   resources that are being devoted to the case.

19            MS. REDDY:  We would agree there's been an

20   excessive amount of resources, and a lot of that really

21   does go to significant discovery disputes which, you know,

22   we don't need to get into here.  But I do think that

23   resolution of this requirement question is this required

24   or not will eliminate a lot of issues.  And it actually

25   could really narrow expert discovery, depending on which

1    way -- you know, the outcome of that question.  No matter

2    which way this is decided, it has a lot of potential to

3    streamline this case.  That, we wholeheartedly agree with.

4              But, you know, I see what you're saying.

5    There's sort of an easy fix, why not do it?  But if you

6    look at Section IV.A of the complaint, it's a little bit

7    more -- what's being asked is a little more than that.

8              THE COURT:  I appreciate -- and look, I'm newer

9    to the case than all of you, and I realize all of you are

10   closer to the ground in the case.  I just wanted to be

11   candid about at least what I seem to be seeing.

12             MS. REDDY:  It's a fair question.

13             THE COURT:  Thank you, Ms. Reddy.

14             MS. REDDY:  Thank you.

15             THE COURT:  I wonder, Ms. Jordan, maybe I could

16   clarify this because maybe I was struck a little bit by

17   Ms. Reddy's concern on the point.  Is your argument that

18   every single storm surge is a non-stormwater violation of

19   the permit?

20             MS. JORDAN:  So that is what Count 1 of the

21   complaint alleges.  It says that, you know, we allege that

22   storm surge flooding of the facility would -- and the

23   discharge of that storm surge flooding through a

24   conveyance, so all the ways in which stormwater is

25   captured at the facility, would be a non-stormwater

1    discharge.

2         THE COURT:  That's assuming -- it's not just

3    simply the fact that there has been a storm surge, but it

4    would depend upon, I think the Clean Water Act says there

5    must be an addition of a pollutant.  So there would be

6    some showing as a result of the water's flooding up, it

7    carried away something that qualifies as a pollutant.

8         MS. JORDAN:  So we have allegations in our

9    complaint that, yes, this facility has had numerous spills

10   and leaks and there's pollutants all over the ground, and

11   so necessarily if storm surge were to enter the facility,

12   it would pick up pollutants and convey them.  I do not

13   want to commit us to saying right now that we would say in

14   all cases even if there was no evidence of that at all,

15   storm surge would nonetheless be a pollutant.  But I do

16   think a discharge of non-stormwater is prohibited by the

17   permit.  The permit doesn't say non-stormwater discharges

18   with pollutants in them.  It just says non-stormwater

19   discharges.  That means you can't have a hose running at

20   your facility running on the ground and then the water

21   collects into whatever your conveyance is that then goes

22   into the waters of the United States.  It's actually

23   prohibited by this permit.  And the reason is because the

24   purpose of the permit recognizes that these industrial

25   facilities are in fact covered in potential pollutants.

1    Pollutants are more than just chemicals, right?  It could

2    be bits of scrap metal or other types of things that then

3    get carried into the waterways.  So the permit's

4    requirement of no non-stormwater discharges itself does

5    not actually require that those non-stormwater discharges

6    carry in them pollutants.  I think the permit, by

7    prohibiting that, is essentially saying we consider this

8    to fall within the definition of a pollutant under the

9    Clean Water Act.

10            THE COURT:  Okay.  I'm not sure I need to

11    resolve that at this time.

12            Ms. Reddy, since it's your motion, you get the

13    privilege of last word.  Anything else you would want me

14    to know?

15            MS. REDDY:  Nothing further in terms of

16    substantive argument.

17            I did want to say that Count 2 was raised in the

18    Coastal Management Act.  As we said in our brief, we

19    believe that there's some significant factual and legal

20    problems with that claim.  If Your Honor wants to kind of

21    wrap that into this and would like additional briefing on

22    that issue, we're happy to provide it.  If not, that's of

23    course fine too.

24            That's all I have for today.

25            THE COURT:  Thank you very much.

1              MS. REDDY:  Thank you very much, Your Honor.

2              THE COURT:  You know, I've looked at all of the

3    briefing and the materials, many materials that you've all

4    given me here.  What I'm going to do is I'm actually going

5    to rule on the motion right now and give you an oral

6    ruling that's available from the court reporter.  And the

7    oral ruling will be at some length.  Frankly, my view is

8    that it's better to give you the guidance now rather than

9    let this percolate for months and months more for me to

10   write a written ruling, and get you on your way in what

11   has clearly been a resource-intensive case to date.

12             So the plaintiff here, Conservation Law

13   Foundation, who I'll just call CLF, has filed a citizen

14   suit alleging in relevant part multiple violations of the

15   Clean Water Act with respect to the Shell Oil bulk oil

16   storage facility that's located near or along the harbor

17   in New Haven, Connecticut.

18             The facility at issue is subject to a general

19   Clean Water Act discharge permit that's been issued by the

20   Connecticut Department of Energy & Environment Protection,

21   everybody knows as CT DEEP.  Although the complaint

22   alleges violations of the many different provisions of the

23   permit, the common predicate for those alleged violations

24   is CLF's contention that the defendants -- whom I'll just

25   refer to as Shell collectively here -- have failed to

1    comply with the requirement of the permit that they

2    consider risk associated with climate change and

3    weather-related factors such as sea water level rises,

4    flooding from storm surges, and increased precipitation,

5    among other factors, all as a result of global climate

6    change that allegedly increases risk of water pollution

7    from the Shell facility.

8           Shell has filed a partial motion for summary

9    judgment that seeks dismissal of Counts 1 to 9 of the

10   complaint.  Shell, as I understand it from the briefing

11   and today, argues that all these counts should be

12   dismissed because as a matter of law the general permit

13   does not require Shell to consider climate change factors

14   as part of its duties not to discharge pollutants in

15   violation of the Clean Water Act.

16          I could rehearse at length the basic controlling

17   legal standards.  I don't think that the general

18   controlling legal standards are at dispute here in terms

19   of what Rule 56 requires.  It requires me to look at

20   whether there's a genuine issue of fact and, of course, to

21   view the record in the light most favorable to the

22   nonmoving party and decide if there's a genuine issue for

23   trial and, of course, as part of that, to resolve

24   well-presented issues of law.  I also don't think that

25   there's a dispute about the basic notions of permit

1    interpretation, which is essentially like a contract, that

2    the Court has to be guided by the language of the permit

3    to the extent that it's not ambiguous, otherwise only if

4    it's ambiguous can the Court look to extrinsic evidence.

5         So, on balance, I don't agree with Shell that as

6    a matter of law the permit does not require it to consider

7    climate change factors.  To be sure, there's no explicit

8    language in the permit that requires consideration of

9    climate change factors.  But, in my view, the inquiry is

10    not that simple.  In my view, there are ample grounds --

11    based on plausibly alleged facts yet to be established,

12    maybe never established but at least plausibly alleged --

13    for CLF's contention that the permit does indeed require

14    consideration of climate change factors.

15         So I'll start with the permit's requirement in

16    Section 5(b) that we spoke about at oral argument that

17    Shell use certain what are called control measures to

18    limit potential discharges of water pollution from its

19    facility.  The permit defines the term "control measures"

20    to mean -- and I'm quoting -- "Best Management Practices

21    (BMP) that the permittee must implement to minimize the

22    discharge of pollutants from the permit facility."  The

23    permit then states, the next sentence, that "[t]he term

24    'minimize' means reduce and/or eliminate to the extent

25    achievable using control measures that are technologically

1    available and economically practicable and achievable in

2    light of best industry practice."

3           Now, it's CLF's contention here that the

4    requirement "best industry practice" is indeed in the

5    requirement and that it requires consideration of climate

6    change factors, in particular.  So I'm first going to

7    focus on whether the permit requires a permittee to

8    consult best industry practices at all as distinct from

9    the separate question whether best industry practices

10   actually require consideration of climate change factors.

11          Now, according to Shell, as I understand the

12   argument, the definition of the term "minimize," with its

13   reference to what is achievable in light of best industry

14   practice -- and I'm quoting Shell's brief here at 248-1 at

15   19 ECF -- states "is simply to provide the purpose of the

16   Best Management Practices."  In my view, that's not so.

17   To the contrary, the permit goes on to make clear that for

18   at least two of the BMPs, or Best Management Practices,

19   that is for management of runoff, that's (7), and for

20   spill prevention, (9), that they must be implemented in a

21   manner that minimizes pollutants, and thus consistent with

22   best industry practices.

23          So if we start with Best Management Practice

24   (7), that's the one that's titled Management of Runoff,

25   the permit says that Shell must -- and I'm quoting --

1    "investigate the need for stormwater management or

2    treatment practices that shall be used to divert,

3    infiltrate, reuse, or treat stormwater runoff in a manner

4    that minimizes" -- there's that term again, "minimizes" --

5    "pollutants in stormwater discharges from the site."  It

6    goes on to state and the permittee "shall implement and

7    maintain stormwater management or treatment measures

8    determined to be reasonable and appropriate to

9    minimize" -- again the term "minimize" -- "the discharge

10    of pollutants from the site."  And similarly, Best

11    Management Practices (9), which is titled Spill Prevention

12    and Response Procedures, it states in the very first

13    sentence, as we discussed at argument, that "[t]he

14    permittee must minimize the potential for leaks and

15    spills."

16            And what these two best management practices do

17    is, in my view, they operationalize the minimization

18    requirement.  Minimization, with its accompanying

19    requirement built in, baked in to the very definition of

20    what is minimization, requires consideration of best

21    industry practice.  It is not, in my view, merely a

22    statement of hortatory or precatory purpose.  Instead, the

23    permittee must implement these two best management

24    practices in a manner that will minimize the discharge of

25    pollutants and to do so by reference to what is the best

1    industry practice.  In particular, the regulation says "in

2    light of best industry practice."

3        Now, the same holds true for the permit's

4    requirement in Section 5(c) for Stormwater Pollution

5    Prevention Plan.  It requires in Section 5(c)(1) that

6    Shell develop a plan -- and I'm quoting again from the

7    permit -- "including implementation of the Control

8    Measures in Section 5(b)" of the permit.  It then further

9    requires in Section 5(c)(2)(E) that -- and I quote -- "the

10   permittee shall discuss the appropriateness and priorities

11   of control measures in the Plan and how they address

12   identified potential pollutants at the site."

13       So, all in all, I really cannot agree with

14   Shell's argument that the permit's reference to

15   minimization is merely a statement of purpose rather than

16   a requirement that Shell shall implement control measures

17   in a manner that will minimize pollutants from the site

18   consistent with, of course, best industry practices, not a

19   limitless obligation.

20       Now, Shell further argues, as I understand the

21   briefing here, that the only relevance of "best industry

22   practice" is in a quantitative rather than a qualitative

23   sense -- and I'm quoting from Shell's brief -- to "inform

24   the extent or level to which a permittee must 'minimize'

25   pollutants," such as whether best industry practice allows

1    a particular stormwater diversion technique that may only

2    be able to achieve 99 percent diversion rather than

3    100 percent diversion.  This is, again, ECF 248-1 at 19.

4    I just don't find support in the language of the permit

5    for this quantitive-vs.-qualitative distinction.  The

6    correct reading of the permit, in my view, is to consult

7    "best industry practices" with respect to the full range

8    of activities that will minimize the discharge of

9    pollutants regardless whether a particular practice is

10   aimed at reducing the quantity of discharge by a certain

11   percentage rather than preventing a discharge at all.

12          Now, I've considered all of Shell's contrary

13   arguments.  They're well-stated.  I'm not criticizing

14   Shell for the briefing that it's making, but I'm just not

15   convinced by those arguments.

16          First, Shell argues that -- and I quote -- "if

17   CT DEEP wanted to include consideration of CLF's climate

18   factors, it knows how to."  I think that argument is true,

19   but it's really beside the point.  Yes, CT DEEP could have

20   more explicitly required consideration of particular

21   climate change factors.  But the fact that CT DEEP could

22   have been more explicit does not mean that the permit's

23   minimization requirement and its corresponding reference

24   to best industry practices means that the best industry

25   practices does not include consideration of climate change

1    factors.

2              Now, second, Shell relies on particular

3    quantitative restrictions of the permit that apply, for

4    example, to containment and, although we didn't talk about

5    it at argument, to small composting facilities.  I agree

6    with CLF that the fact that the permit imposes such

7    specific and specialized requirements does not perforce

8    mean that climate change factors should be ignored if in

9    fact the best industry practice is to consider such

10   factors.  So, for example, the fact that the permit in

11   Section 3(b)(6), which we spoke about at argument,

12   explicitly takes into consideration rainfall by barring a

13   permittee from a surface discharge to groundwater unless

14   there's been a very significant 100-year, 24-hour rainfall

15   event, that does not mean, in my view, that the permittee

16   is therefore free to ignore all other pollution risks

17   created by heavy rainfall events.  The permit imposes a

18   general duty of minimizations which need to be read in

19   light of best industry practices.

20             Third, Shell -- at least I was confused by the

21   argument a bit -- it argues that it is CT DEEP that

22   determines best management practices, not the Shell

23   defendants.  Yes, DEEP's permit imposes a BMP requirement

24   but, as I've explained above, that requirement the BMP

25   requires minimization which in turn requires reference to

1   best industry practices.  No one suggests that it is

2   CT DEEP that conclusively decides as an initial matter

3   what is best industry practice.  I haven't seen any sign

4   of some sort of handbook of what is exactly best industry

5   practice that's binding and conclusive on that.  The very

6   purpose of a best industry practice requirement, in my

7   view, is to require industry to conform to best practices

8   even if the content of such best practices are not spelled

9   out word for word in the permit itself, in no small part

10  because of the common sense reality that best practices

11  may evolve over time.  Nor, apart from CLF's apparent

12  reliance in part on Shell's own statements and practices

13  elsewhere, does CLF's argument mean that only Shell's

14  practices rather than industry-wide practices establish

15  what constitutes best industry practice.

16          And fourth, this is not, in my view, as Shell

17  argues, an elephant-in-a-mousehole case or a case where

18  CLF's position violates basic administrative law norms of

19  fair notice.  The permit imposes a minimization duty and

20  defines that duty by reference to best industry practice.

21  If best industry practice requires consideration of

22  climate change factors, there is no surprise or unfairness

23  in that.  Indeed, when a regulation chooses to incorporate

24  the norms of best industry practice, members of the

25  industry themselves are poorly positioned to argue a lack

1    of notice or knowledge what they and other members of the

2    industry are doing.

3              So, in short, I conclude that the permit does

4    not, at least as a matter of law, preclude CLF's position

5    that Shell was required by the permit to consider climate

6    change factors.  Whether Shell was required to consider

7    climate change factors -- and hence to carry out its

8    minimization duties by reference to such factors --

9    depends in part on whether consideration of such climate

10   change factors is an element of control factors that

11   constitute best industry practice.  The permit is

12   unambiguous, in my view, in this respect.

13             And that brings me really to the next issue, the

14   one I kind of bracketed earlier, whether it is indeed the

15   best industry practice to consider and control for climate

16   change factors.  It seems to me that as far as I know, at

17   least at this point, Shell is not arguing that the very

18   term "best industry practice" is itself ambiguous.

19   Instead, the parties seem to dispute, as a factual matter,

20   whether best industry practice requires consideration of

21   climate change for a facility like the Shell facility that

22   sits adjacent to the New Haven Harbor.

23             Shell points to evidence that none of the

24   publicly available stormwater pollution prevention plans

25   that it has reviewed includes consideration of climate

1    factors, that CT DEEP has yet to bring an enforcement

2    action for failure to consider climate factors, and

3    certain experienced third-party consultants who have been

4    deposed by Shell have never considered or understood the

5    permit, the general permit here, to require consideration

6    of climate factors.  Now, for its part, CLF responds in

7    part that Shell's data is only a portion of the total

8    number of management plans, and that CT DEEP's enforcement

9    practices as well as the opinions of those consultants

10   selected by Shell for deposition and introduction here are

11   not conclusive on the issue of what constitutes best

12   industry practice.

13          In my view, whether best industry practice is to

14   consider climate change factors is simply a question of

15   fact that's not suitable for resolution at this stage

16   where the parties have yet to complete discovery.  I'll

17   tell you I have some doubt that the issue will ever be so

18   clear that it would be appropriate for resolution at

19   summary judgment but that can wait and see if Shell

20   decides, I guess somewhere the end of next year, to file a

21   dispositive issue on that issue among any other

22   dispositive issues it might seek at the close of all

23   discovery and in accordance with the scheduling order.

24          Shell also argues that the US EPA has rejected

25   the argument that the terms of the general federal

1    Clean Water Act permit require consideration of climate

2    factors.  We didn't really get much into this in the

3    argument today, but I've looked at that argument.  And I'm

4    convinced, for the reasons pointed out by CLF, that the

5    record is not so clear that the EPA's alleged

6    interpretation is necessarily conclusive in this case

7    involving a state permit.

8            So I do conclude that the permit unambiguously

9    imposes a minimization duty that, in turn, references and

10   incorporates best industry practice.  If the best industry

11   practice is to require consideration of climate change

12   factors, then the permit includes this requirement despite

13   the absence of more explicit language in the permit about

14   climate change factors.  Whether best industry practice is

15   to consider climate change factors is a factual question

16   that I cannot resolve at this time.

17           Lastly, because Shell seeks across-the-board

18   dismissal of Counts 1 to 9 on the basis of a common

19   argument about what the permit means or does not mean, I

20   have no occasion at this time to address each challenged

21   count on a count-by-count basis in the absence of an

22   effort by Shell to do so in the first instance.

23           So for the reasons I've stated, the Court denies

24   the Shell defendants' motion for partial summary judgment.

25   That's the ruling of the Court.

```
 1              I will just talk to you a little bit about
 2     scheduling here.  I know you've agreed to your schedule.
 3     I'm not going to try to undo that.  It struck me that the
 4     case could frankly move quite a bit faster, but I'm not
 5     going to undo what the parties have done.  But in the
 6     event that the parties come back and they decide they want
 7     a sooner trial date, I could probably do it next May.  I
 8     hope you'll let me know.  And decide if you want to do
 9     that or if there's some other date that would make sense
10     that's different than what you've agreed to.  But again,
11     I'm not going to go in and upset the apple cart in light
12     of what it is you've agreed to and has been approved by
13     Judge Farrish in the case.
14              I'm hopeful -- as I think you all have been
15     candid there have been extraordinary amounts of discovery
16     motions, I just hope there's some way to try to move
17     through those and not have them kind of plague the case.
18     I look at just the docket, it seems to me there's a very
19     large number of discovery-related motions.  Perhaps my
20     ruling today will clear the way a bit for resolution of
21     some of those.
22              I also ask you to think about, you know, how far
23     this case goes.  I'm a trial judge, I like having trials.
24     I'd love to have a trial.  In this case our jury box is
25     empty here now.  I'd love to fill it up with jurors, as I
```

1    gather there's a jury claim in the case.  But I also

2    consider it my responsibility to try to help the parties

3    figure out resolution if it's feasible in one way or the

4    other.  Especially, we have magistrate judges in this

5    district who -- it wouldn't be Judge Farrish because he's

6    been working with you on discovery issues, unless you both

7    decided you wanted to meet with him for a settlement

8    conference.  But I could assign the case to a different

9    magistrate judge who would conduct a settlement

10   conference.  In the event that you decide -- and I always

11   say this to folks -- our magistrate judges in this

12   district are tremendously experienced.  They also conduct

13   jury trials.  When parties consent, magistrate judges are

14   happy to conduct a jury trial, basically conduct the case

15   exactly like it would be conducted by a district judge,

16   some people would say a heck of a lot better than what a

17   district judge would do.  So if you all decide at some

18   point down the road, hey, we'd like to work with a

19   magistrate judge, especially because magistrate judges'

20   schedules end up being quite a bit more flexible than

21   district judges who have an ongoing obligation to conduct

22   criminal trials and to give precedence to cases.  It just

23   happens that sometimes I set trial dates and the trial

24   dates get bumped and you all have lined up your witnesses

25   and all that but I've got somebody who has to have first

1    priority.  That's not true for magistrate judges.  If you

2    did decide to consent to a magistrate judge presiding over

3    the case for all purposes, the magistrate judge would

4    conduct jury selection, conduct the whole trial just as a

5    district judge would, but I think without any significant

6    likelihood of a schedule disruption of the type that could

7    happen for a district judge.  If you decide you want to

8    hang out with me and end up trying the case, I'll be

9    pleased to do it.  It looks like a very well-lawyered case

10   and very interesting issues as well.

11           So that's a lot to say.  It's late in the

12   afternoon.  I just wanted to hear from counsel if there's

13   anything else you want to put on record or raise with me.

14           MS. REDDY:  No, Your Honor.  Thank you very

15   much.

16           MS. JORDAN:  No, Your Honor.  Thank you.

17           THE COURT:  And thank you.  I wish you all safe

18   travels back to your places of destination.

19               (Proceedings adjourned at 5:30 p.m.)

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5      RE: CONSERVATION LAW FOUNDATION, INC. v. SHELL OIL
                COMPANY, ET AL., No. 3:21CV933(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8  Reporter for the United States District Court for the

9  District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 89 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                            _____/s/_____

18                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
19                    United States District Court
                      141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25