# **EXHIBIT E**

# EXHIBIT M

Conservation Law Foundation

v.

Shell New Haven Terminal

Case No. 3:21-CV-00933-VDO

**EXPERT REPORT OF WENDI GOLDSMITH**

May 8, 2025

# TABLE OF CONTENTS

**I. Introduction** ............................................................................................................................ 1

**II. Professional Background and Methodology** .................................................................... 3

   Professional Background .......................................................................................................... 3

   Expert Testimony ..................................................................................................................... 8

   Methodology ............................................................................................................................ 9

**III. Opinions** ............................................................................................................................. 15

   Opinion 1 – Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change. ............................. 15

      Best Industry Practice Required Shell to Consider Long-Term Risks for the Service Life of the New Haven Oil Terminal, not Only Risks During the Permit Period .......................... 27

   Opinion 2 – More Severe Weather, Precipitation, Storm Surge, and Sea Level Rise Have Created Reasonably Foreseeable and Significant Risks to the New Haven Oil Terminal that Shell has not Addressed. ......................................................................................................... 29

   Opinion 3 – Past Storms Put Shell on Notice of the Increased Risks to Coastal Facilities from Severe Weather, Storm Surges, Precipitation, and Sea Level Rise. ........................................ 32

   Opinion 4 – The New Haven Oil Terminal is Not Engineered or Operated Pursuant to Best Industry Practice. .................................................................................................................... 39

   Opinion 5 – The New Haven Terminal's Stormwater Management System is Not Sufficient to Mitigate the Risks of Potential Flood Hazards and Severe Storms. ................................... 42

   Opinion 6 – The New Haven Oil Terminal's Berms and Containment Areas are Insufficient to Contain the Petroleum in the Event of Oil Spill. .................................................................. 43

   Opinion 7 - The New Haven Oil Terminal is Not Engineered or Operated to Prevent the Discharge of Pollutants. .......................................................................................................... 46

   Opinion 8 – Adequate Decision Support Frameworks Currently Exist to Guide Engineering of Infrastructure Measures to Effectively Manage Flood Risk at the New Haven Oil Terminal. ....... 48

   Opinion 9 – Shell Fails to Apply Best Industry Practice in Its Risk Management Program. ........... 49

   Opinion 10 – A Severe Storm Poses a Threat of Potential Pollution in the Surrounding Community and Environment Given the Current Condition of the Shell New Haven Terminal. 52

      The Terminal is Not Prepared to Prevent a Catastrophic Failure by a Severe Storm. ................. 52

      The Terminal Poses a Threat to the Surrounding Community ....................................... 56

**Appendix A: Wendi Goldsmith *Curriculum Vitae*** ................................................................. i

**Appendix B: Additional Materials Considered** ................................................................... ix

**III.     Opinions**

**Opinion 1 – Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change.**

Shell is required to employ Best Industry Practice (BIP) under its Permit which states:

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.[7]

Best industry practice is continuously advancing and, for more than 35 years, has been to incorporate the physical impacts of climate change in evaluating risks to critical infrastructure like the Terminal. It is based on addressing foreseeable risks, evaluating those risks, and engineering solutions to mitigate those risks. Ignoring known and foreseeable risks has never been, and should never be, considered best industry practice.

Best industry practice is frequently described in publicly available references by relevant professional societies, industry associations, government policies, and published agency manuals, as well as internal documentation produced by Shell. The American Society of Civil Engineers (ASCE) is a leading non-governmental body in the U.S. which develops and disseminates evolving information, guidance, policy, and positions related to professional engineering practice. In this capacity, ASCE supports both "[g]overnment policies that encourage anticipation of and preparation for impacts of climate change on the built environment," "[r]evisions to engineering design standards, codes, regulations and associated laws that strengthen the sustainability and resiliency of infrastructure at high risk of being affected by climate change," and "[i]dentifying critical infrastructure that is most threatened by changing climate in a given region and informing decision makers and the public."[8] ASCE approved its first policy statement on climate change in 1990.

ASCE currently concludes:

> Civil engineers are responsible for the planning, design, construction, operations, and maintenance of infrastructure systems. Most infrastructure systems typically have long service lives (50 to 100 years) and are expected to remain functional, durable, and safe during that time. These systems are exposed to and often are vulnerable to the effects of extreme climate and weather events. Engineering practices and standards associated with these systems must be revised and enhanced to address climate change and resiliency to ensure they continue to

---

[7] Connecticut Department of Energy and Environmental Protection, General Permit for the Discharge of Stormwater Associated with Industrial Activity, October 1, 2021, 18.
[8] "Policy statement 360 – Climate Change," ASCE | American Society of Civil Engineers, https://www.asce.org/advocacy/policy-statements/ps360---climate-change.

provide low risks of failures and to reduce vulnerability to failure in functionality, durability, and safety over their service lives.[9]

Since 1987, industry publications and government reports have highlighted the growing risks to critical infrastructure, including accelerated sea level rise. These risks must be taken into account in coastal engineering, design, and maintenance projects across the entire service life of such designs.



In 1987, the National Research Council (NRC) published a report entitled "Responding to Changes in Sea Level: Engineering Implications."[15] The goal of the report was to "establish a basis for coastal planners, engineers, and government agencies to carry out their responsibilities in the presence of an anticipated increase in the rate of sea level rise over the next several decades."[16] The report discussed the need to plan for "accelerated sea level rise," stating that it would be "appropriate to allow for an acceleration of sea level rise in the initial design" and recommending that "sea level change during a structure's design service life should be considered."[17] The NRC report was widely discussed in the industry and readily available to Shell.

---

[9] Policy statement 360.

[15] National Research Council. 1987. Responding to Changes in Sea Level: Engineering Implications. Washington, DC: The National Academies Press. https://doi.org/10.17226/1006.
[16] Responding to Changes in Sea Level, 1987, v – vi.
[17] *Id.* at 4.

In 1990, the NRC published another report discussing sea level change.[18] While the purpose of the report was to discuss the process of sea level change and to forecast the global rise in sea level during the next 100 years, the report again noted that sea level change "can have significant implications for coastal engineering practices."[19] The USACE also issued guidance regarding the need to implement measures to address the risks of severe weather, storm surge, and sea level rise.

In 2000, the USACE incorporated the 1987 NRC recommendations into its guidance for coastal projects, stating: "Potential relative sea level change should be considered in every coastal . . . feasibility study that the Corps undertakes."[20] The guidance required designers to consider the "impact a higher relative sea level rise rate would have on the design based on the historical rate," and noted that "it may be appropriate to consider plans that . . . incorporate features to facilitate future [sea level] changes, or plans designed for future conditions."[21]

Between 2004 and 2005, Hurricanes Katrina, Rita, and Ivan devastated the fossil fuel industry, demonstrating the tremendous impacts of climate change. Following these storms, USACE released the IPET Force report in multiple early drafts and eight final volumes detailing forensic analysis findings of the flood infrastructure system components, the forces created by Katrina, the failure mechanisms, their effects, risk and reliability levels prior to Katrina that proved inadequate.[22]

In 2007, the USACE also released Hurricane and Storm Damage Risk Reduction System Design Guidelines INTERIM.[23] These were working draft design guidelines meant to "*provide a comprehensive collection of best practices for those engaged in this project.*"[24] The original draft Guidelines and those that followed marked the inflection point when best industry practice embraced accounting for future conditions, in particular climate-driven risks.

That same year, the Intergovernmental Panel on Climate Change ("IPCC") completed its Fourth Annual Report (AR4)report, "Climate Change 2007, the Physical Science Basis."[25] The report highlighted rising sea levels due to global warming and provided numerical estimates of sea level rise.[26] It noted that "physical impacts from climate changes are occurring now and future impacts are unavoidable even if we do succeed in reducing emissions."[27] The IPCC observed, "Increasingly reliable regional climate change projections are now available for many regions of the world due to

---

[18] National Research Council. 1990. *Sea-Level Change*. Washington, DC: The National Academies Press. https://doi.org/10.17226/1345.
[19] *Id.* at 5.
[20] U.S. Army Corps of Engineers. "Engineer Regulation 1105-2-100." 2000, E-142.
[21] *Id.*
[22] "IPET and HPDC Investigations." US Army Corps of Engineers | Institute for Water Resources Website. https://www.iwr.usace.army.mil/About/History/IPET-and-HPDC-Investigations/. U.S. Army Corps of Engineers, "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance Evaluation Task Force." New Orleans, Louisiana: Interagency Performance Evaluation Task Force, US Army Corp of Engineers, 2009.; *Performance Evaluation: Draft Final Report,* 2006.
[23] US Army Corps of Engineers, "Hurricane and Storm Damage Risk Reduction System Design Guidelines INTERIM". New Orleans, Louisiana. 2012.
[24] *Id.* at xi (emphasis added).
[25] Intergovernmental Panel on Climate Change, "Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change." Cambridge, United Kingdom: Cambridge University Press, 2007, 1.
[26] *Id.* at 5.
[27] *Id.* at 1.

17

advances in modeling and understanding of the physical process of the climate system."[28] At this point, industry was well aware of the risks and should have been taking action to forestall harms.

In 2010, Dell and Pasteris published a paper, "Adaptation in the Oil and Gas Industry to Projected Impacts of Climate Change," that was presented at the Society of Petroleum Engineers conference in Rio de Janeiro, Brazil in April of 2010.[29] The paper noted,

> In the 2007 IPCC Fourth Assessment Report, it was reported that some physical impacts from climate changes are occurring now and future impacts are unavoidable even if we do succeed in reducing emissions. Adaptation to climate change is now widely recognized as an equally and complementary response to greenhouse gas (GHG) mitigation in addressing climate change (OECD 2008). The global community recognizes that the most effective climate change strategy requires both mitigation efforts to reduce emissions to minimize the magnitude of climate change impacts and adaptation to minimize the effects from current and future impacts that are not avoided through emissions reductions."[30]

The paper presented a fossil fuel industry specific methodology for risk assessment,



---

[28] *Id.* at 2.
[29] J.J. Dell, et al., "Adaptation in the Oil and Gas Industry to Projected Impacts of Climate Change", 2010.
[30] *Id.* (Emphases in original)
[31] *Id.* at 1.



During this same time period, in 2011, the USACE reiterated that "the direct and indirect physical effects of projected future sea-level change" should be incorporated into "all phases" of "managing, planning, engineering, designing, constructing, operating and maintaining" civil works programs.[40] The guidance circular, "Sea-level Change Considerations for Civil Works Programs," noted that despite its age, the information and guidance in the 1987 NRC study regarding how projects may be affected by sea level change was still useful, and planners and engineers should continue to consider the study throughout the life-cycle of projects.[41] The circular states, "analysts shall consider what effect changing relative sea-level rates could have on design alternatives, economic and environmental evaluation, and risk."[42] The circular includes a step-by-step flow chart designers can use to account for changes in mean sea level and to select project designs that "best accommodate the range of sea-level change scenarios throughout the project life-cycle."[43]

In 2012, when Shell owned Motiva through a joint venture, Hurricane Sandy struck U.S. east coast and caused extensive damage. Motiva's Sewaren, New Jersey terminal (Sewaren Terminal) spilled

---

[40] US Army Corps of Engineers, "Sea-level Change Considerations for Civil Works Programs: Regulation No. 1165-2-212." Washington, DC: US Army Corps of Engineers, 2011, 1.
[41] Id. at B-10.
[42] Id.
[43] Id. at C-1 to C-4.

300,000 gallons of diesel fuel into the Arthur Kill waterway when the terminal became inundated with water and tanks failed during Hurricane Sandy.[44]

In 2012, Shell publicly acknowledged climate change risks and claimed in its Carbon Disclosure Project Submission that it was taking steps to address those risks.[45] It stated, "Rising sea levels could impact our coastal facilities (e.g. refineries ports, terminals etc.) as events such as floods, related to storm surges, could become more frequent"[46] and noted that "[b]asing decisions on historical climate information is no longer robust."[47]

Despite Shell's early knowledge of the risks from sea level rise and other climate change factors to its facilities and the need to both study and prepare for those impacts, Shell did not consistently act on these threats. After Hurricanes Katrina, Rita and Ivan devastated fossil fuel facilities and the IPCC completed its AR4 report, Shell did little while best industry practice required more. Indeed, the same year Shell's Carbon Disclosure Project Submission was released, the Sewaren terminal spilled 300,000 gallons of fuel into the Arthur Kill waterway during Hurricane Sandy.

One year later, in 2013, Shell hosted and participated in a meeting of the International Petroleum Industry Environmental Conservation Association (IPIEC). The meeting acknowledged climate change risks and the need to respond and apply tools to assess the risks.[48]



---

[44] 30(b)(6) Deposition of Shell Oil Co. (Michael Sullivan), February 6, 2025 ("30(b)(6) Sullivan Dep."), 143:4–144:16.
[45] PSCT018952: 2012 Shell Carbon Disclosure Project Submission.
[46] Id. at Section 5.1c.
[47] Id. at Section 5.1d.
[48] PSCT074593: "Addressing adaptation in the oil and gas industry," published by the International Petroleum Industry Environmental Conservation Association.
[50] Intergovernmental Panel on Climate Change, "Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change," Geneva, Switzerland, 2014, 151.
[52] Id.

20





22



Concurrently in 2017, Shell's Metocean Scientist Alison Brown published internally the "Metocean



In 2018, the International Association of Oil and Gas Producers, along with other stakeholders held a workshop in the United Kingdom, "Our Future Climate, Understanding the spread of physical risk for the oil and gas industry."[86] Representatives from across the oil and gas industry attended the conference, including several individuals from Shell.[87] There were numerous relevant and detailed presentations, and a stated purpose of sharing "best practices."[88] The program for the workshop noted that "changes in climate have the potential to create significant disruption and uncertainty in the oil and gas sector" including "environmental impacts from the overflow of drainage systems from increased participation" and stated that "understanding both the physical risks and vulnerabilities of the oil and gas sector will help IOGP Members develop and implement adaptation strategies to manage the physical impacts of climate change."[89]



---

[86] PSCT047246: "Our Future Climate: Understanding the spread of physical risk for the oil and gas industry"
[87] *Id.*
[88] *Id.*
[89] *Id.*

24



Based on my professional training and experience, including guidelines since as far back as 2007 ██ ██████████████████████ best industry practice requires Shell to consider past events, like the Sewaren spill, unequivocal upward trends in weather-related risks, and reasonably

---



[96] *See* "Munich RE Home Page," Munich RE, https://www.munichre.com/en.html.

foreseeable increases in the severity and frequency of storms and sea level rise for the Terminal. Shell must factor these parameters into the design and operation of the Shell New Haven Terminal to minimize the future risk of pollutant discharges triggered by these reasonably foreseeable risks.

Failure to consider both current and reasonably foreseeable weather-related risks leads to cascading impacts in terms of the Terminal's compliance with the permit, including requirements for the stormwater pollution prevention plan ("SWPPP"). Without considering these risks, it is my opinion that Shell cannot sufficiently describe potential sources of pollutants that may affect stormwater quality, discuss the appropriateness and priorities of control measures and how they address potential sources of pollutants, address the need to divert uncontaminated run-on, or minimize the potential for leaks and spill, evaluate conditions that could result in pollutant discharges and develop control measures to mitigate those risks, update the SWPPP as conditions change and to disclose known risks to regulators, or address aspects of the Connecticut Coastal Management Act which requires Shell to: "consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards."[104] I understand that these are all requirements in its current and previous permit.

Critical Infrastructure (CI) Policy and Best Practice Applicable to Petroleum Storage and Distribution

Best industry practice also requires a more conservative approach at the New Haven Terminal compared to other structures because it is considered "critical infrastructure." To properly understand the public policies and resulting best industry practice that apply to the Shell New Haven Terminal and other similar types of facilities, it is important to be aware of its critical infrastructure ("CI") status and associated implications. At its essence, critical infrastructure refers to a facility or wider network or system that is important not only to the private business or public entity that operates it but is indispensable to the security and prosperity of all others who rely on it. Hence, special attention is warranted to ensure reliable functionality through heightened coordination and application of more rigorous standards. Generally, the service life of critical infrastructure facilities is defined as far longer than other categories of construction, with 100 years commonly referenced. However, some facilities include components that have shorter effective service lives before being replaced or updated.

For critical infrastructure systems to be reliable when needed most (such as to furnish home heating oil during a winter blizzard, or tanks of gas fueling families evacuating before a hurricane) an array of private companies with infrastructure components of different classes, ages, and conditions must somehow deliver a well-orchestrated end result, even under dire circumstances. Unlike some nations where major infrastructure systems are government run, the U.S. relies on a complex mosaic of private and public infrastructure elements that are interdependent, and which have often evolved over the course of centuries without any central planning or direct oversight. Often in hindsight, and under wartime threat profiles or when faced with natural catastrophes, our nation has realized that the systems our society depends on are not necessarily as reliable as presumed, often with

---

[104] Permit §§ 5(b), 5(b)(7) (Shell must "investigate the need for stormwater management or treatment practices," "consider the potential of various sources at the facility to contribute pollutants to stormwater discharges," and "implement and maintain" those measures), (9); 5(c)(2)(D). Conn. Gen. Stat. § 22a–92 (cited in Permit § 3(b)).

debilitating consequences that could have been better mitigated. In 1996, the first dedicated federal policy initiative addressing critical infrastructure summarized the issues clearly:

> Certain national infrastructures are so vital that their incapacity or destruction would have a debilitating impact on the defense or economic security of the United States. These critical infrastructures include telecommunications, electrical power systems, *gas and oil storage and transportation,* banking and finance, transportation, water supply systems, emergency services (including medical, police, fire, and rescue), and continuity of government. Threats to these critical infrastructures fall into two categories: physical threats to tangible property ("physical threats"), and threats of electronic, radio-frequency, or computer-based attacks on the information or communications components that control critical infrastructures ("cyber threats"). *Because many of these critical infrastructures are owned and operated by the private sector, it is essential that the government and private sector work together to develop a strategy for protecting them and assuring their continued operation.*[105]

### Best Industry Practice Required Shell to Consider Long-Term Risks for the Service Life of the New Haven Oil Terminal, not Only Risks During the Permit Period

Best industry practice, particularly for critical infrastructure, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ requires that climate risks are evaluated for the facility's expected service life. In 2014, USACE published a technical letter discussing adaptation to changing sea levels and providing additional guidance for addressing impacts of projected sea level change on coastal projects.[106] The letter noted, "the longer the life of engineered systems . . . the more important it becomes to evaluate the sustainability and resiliency . . . in the face of climate change effects."[107] It included a tiered, risk-based framework for assessing the importance of sea level change to various projects and identifying measures to reduce their vulnerability.[108]

EPA Region 1 recommends procedures for adaptation plans for wastewater treatment and sewer systems in light of climate change impacts and experiences during severe weather events.[109] These recommendations, which I find applicable to the New Haven Terminal, make clear that a 5-year window for evaluating and addressing risks of major storm and flood events is not appropriate. EPA specifically states that one should assume a 20-year life expectancy for mechanical and electrical systems, a fifty-year life for "tankage and similar structures," and that new infrastructure should consider even longer life expectancies, "especially in coastal areas subject to sea level rise and coastal erosion."[110] A five-year horizon, even for existing facilities, is clearly not appropriate.

---

[105] "Executive Order 13010 of July 15, 1996, Improving Critical Infrastructure Cybersecurity," *Federal Register* : 61 FR 37347 (1996) (emphasis added).
[106] US Army Corps of Engineers, "Engineer Technical Letter (ETL) 1100-2-1." Washington, DC, 2014.
[107] *Id.* at 5-1.
[108] *Id.*
[109] "EPA Region 1 Recommended Procedures and Resources for the Developmnet of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems (2025)", Environmental Protection Agency, Feb. 18, 2025. https://www.epa.gov/system/files/documents/2025-02/adaptation-plan-recommended-procedures-case-studies-02182025.pdf.
[110] Id. at pg. 8.



While it could be improved, it is a serviceable representation of "best industry practice" for assessing severe weather and climate change hazards for the life of the Terminal.

Designing, operating, and maintaining durable structures and complex facilities, such as the Terminal, demands more than taking a short-sighted view of foreseeable conditions based on past data; it requires considering risks over the service-life of the Terminal while incorporating forward-looking data. To do otherwise results in designing a Terminal and committing to operating plans

