# Exhibit A

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 1

1                                    PAGES:    1-331

                                     EXHIBITS:  1-15

2              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF CONNECTICUT

3                  NO. 3:21-cv-00933-JAM

4         _____

5    CONSERVATION LAW FOUNDATION, INC.,  )

6                      Plaintiff,        )

7                  vs.                   )

8    SHELL OIL COMPANY, EQUILON          )

9    ENTERPRISES LLC D/B/A SHELL OIL     )

10   PRODUCTS US, SHELL PETROLEUM INC.,  )

11   TRITON TERMINALING LLC, and MOTIVA  )

12   ENTERPRISES, LLC,                   )

13                      Defendants.      )

14   _____)

15                  VIDEOTAPED DEPOSITION OF

16   CONSERVATION LAW FOUNDATION, INC. BY SEAN M.

17   MAHONEY, called as a witness by and on behalf of

18   the Defendants, pursuant to the applicable

19   provisions of the Federal Rules of Civil Procedure,

20   Rule 30(b)(6) before P. Jodi Ohnemus, RPR, RMR,

21   CRR, CA-CSR #13192, NH-LSR #91, MA-CSR #123193, and

22   Notary Public, within and for the Commonwealth of

23   Massachusetts, at Conservation Law Foundation, 62

24   Summer Street, Boston, Massachusetts, on Wednesday,

25   June 4, 2025, commencing at 8:06 a.m.

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 2

```
 1      APPEARANCES:

 2                      MOTLEY RICE LLC

 3                      BY:  Vincent L. Greene, IV, Esq.

 4                      (Via Videoconference)

 5                      Michael J. Pendell, Esq.

 6                      40 Westminster Street, 5th Floor

 7                      Providence, RI  02903

 8                      Vgreene@motleyrice.com

 9                      Mpendell@motleyrice.com

10                             -and-

11                      CONSERVATION LAW FOUNDATION

12                      BY:  Zachary Manley, Esq.

13                      (Via Videoconference)

14                      Ken Rumelt, Esq.

15                      (Via Videoconference)

16                      Anna Tadio, Esq.

17                      Ana McMonigle, Esq.

18                      62 Summer Street

19                      Boston, MA  02110-1016

20                      617 350-0990

21                      Zmanley@clf.org

22                      Krumelt@clf.org

23                      Atadio@clf.org

24                      Amcmonigle@clf.org

25                      For the Plaintiff
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

```
                                              Page 3

 1     APPEARANCES:   (CONT'D)

 2

 3

 4                      KING & SPALDING

 5                      By:  Douglas A. Henderson, Esq.

 6                      Ryan T. Kearney, Esq.

 7                      1180 Peachtree Street, N.E.

 8                      Atlanta, GA  30309

 9                      404 572-4656

10                      Dhenderson@kslaw.com

11                      Rkearney@kslaw.com

12                      For the Defendants

13

14     ALSO PRESENT:

15                      Geoffrey Bassett, Video Operator

16

17                      CONSERVATION LAW FOUNDATION

18                      SUMMER INTERNS:

19                      Joshua Marion

20                      James Hammond

21                      Abigail George

22

23

24

25
```

Sean M. Mahoney                           June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                                  Page 4

1                          I N D E X

2

3      TESTIMONY OF:                              PAGE

4

5      SEAN M. MAHONEY

6

7      (By Mr. Henderson)                          15

8      (By Mr. Greene)                            325

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sean M. Mahoney                              June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 5

1                        E X H I B I T S

2        EXHIBIT              DESCRIPTION                 PAGE

3

4        Exhibit 1      Defendants' Amended Notice         19

5                       of Deposition of F.R.C.P.

6                       30(B)(6) Witness for

7                       Plaintiff Conservation Law

8                       Foundation, Inc.

9        Exhibit 3      letter, 7/28/2020, Notice of       40

10                      Intent to File Suit, 15-page

11                      document

12       Exhibit 4      letter, 2/17/2021,                 47

13                      Supplemental Notice of

14                      Intent to File Suit, 15-page

15                      document

16       Exhibit 5      letter, 11/21/2024,                48

17                      Supplemental Notice of

18                      Intent to File Suit,

19                      100-page document

20       Exhibit 6      General Permit For the            109

21                      Discharge of Stormwater

22                      Associated With industrial

23                      Activity, 10/1/2018

24       Exhibit 7      General Permit For the            110

25                      Discharge of Stormwater

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 6

 1                    Associated With Industrial

 2                    Activity, 10/1/2021

 3         Exhibit 8     Guidance Document For          144

 4                    Preparing a Stormwater

 5                    Pollution Prevention Plan,

 6                    March 2011

 7         Exhibit 9     National Pollutant Discharge   152

 8                    Elimination System General

 9                    Permit For the Discharge of

10                    Stormwater Associated With

11                    Industrial Activities,

12                    Effective Date:  [to be

13                    determined]

14         Exhibit 10    Connecticut Department of      155

15                    Energy and Environment

16                    Protection National

17                    Pollutant Discharge

18                    Elimination System General

19                    Permit For the Discharge of

20                    Stormwater Associated With

21                    Industrial Activities,

22                    General Permit No.:

23                    CTR050000

24         Exhibit 11    National Pollutant Discharge   166

25                    Elimination System General

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

1                              Permit For the Discharge of

2                              Stormwater Associated With

3                              Industrial Activity, Fact

4                              Sheet, March 2024

5         Exhibit 12          Supplemental Fact Sheet          166

6                              Draft NPDES Permit For the

7                              Discharge of Stormwater

8                              Associated With Industrial

9                              Activities, March 2024

10        Exhibit 13          National Pollutant Discharge     166

11                             Elimination System General

12                             Permit For the Discharge of

13                             Stormwater Associated With

14                             Industrial Activity Fact

15                             Sheet, General Permit No:

16                             CTR 050000

17        Exhibit 14          Supplemental Fact Sheet          167

18                             (December 2024) Draft

19                             National Pollutant Discharge

20                             Elimination System (NPDES)

21                             General Permit For the

22                             Discharge of Stormwater

23                             Associated With Industrial

24                             Activities

25        Exhibit 15          Plaintiff Conservation Law       311

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 8

1                        Foundation's Response to

2                        Defendants' Second Set of

3                        Interrogatories

4        Exhibit 2A      Binder, Topics 1 & 2

5

6        Exhibit 2B      Binder, Topic 5

7

8        Exhibit 2C      Binder, Topics 6 & 8

9

10       Exhibit 2D      Binder, Topic 9

11

12       Exhibit 2E      Binder, Topic 10

13

14       Exhibit 2F      Binder, Topics 11 & 12

15

16       Exhibit 2G      Binder, Topic 13

17

18       Exhibit 2H      Binder, Topics 14-16, Part 1

19

20       Exhibit 2I      Binder, Topics 14-16, Part 2

21

22       Exhibit 2J      Binder, Topic 17

23

24       Exhibit 2K      Binder, Topic 18

25

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 9

```
 1      Exhibit 2L    Binder, Topic 19
 2
 3      Exhibit 2M    Binder, Topics 21-23
 4
 5      Exhibit 2N    Binder, Topics 24 & 28
 6
 7      Exhibit 2O    Binder, Topic 26
 8
 9      Exhibit 2P    Binder, Topics 27 & 29
10
11      Exhibit 2Q    Binder, Topics 30, 32 & 33
12
13      Exhibit 2R    Binder, Topics 7, 34-36, CA
14                    Regional WQCB NPDES
15      Exhibit 2S    Binder, Topic 7, 34-36, CT
16                    2011 General Industrial
17                    Permit
18      Exhibit 2T    Binder, Topic 7, 34-36, CT
19                    Draft MSGP
20      Exhibit 2U    Binder, Topic 7, 34-36, EPA
21                    2021 MSGP
22      Exhibit 2V    Binder, Topic 7, 34-36, EPA
23                    Consent Orders and Decrees
24      Exhibit 2W    Binder, Topics 7, 34-36, EPA
25                    Mass Permits Part 1
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 10

```
 1        Exhibit 2X      Binder, Topic 7, 34-36, EPA

 2                        Mass Permits Part 2

 3        Exhibit 2Y      Binder, Topic 7, 34-36,

 4                        Government Guidance & RIDEM

 5                        2024 MSGP

 6        Exhibit 2Z      Binder, Topic 37

 7

 8

 9

10

11

12

13

14

15

16        (Exhibits 2A through 2Z retained by Conservation

17        Law Foundation to be supplied to King & Spalding)

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
800.808.4958                                           770.343.9696

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 11

1            VIDEO OPERATOR:  Good morning, everyone.

2       We are now on the record.  Today's date is

3       Wednesday, June 4th, and the time is now 8:06 a.m.

4       Please note that microphones are sensitive and may

5       pick up whispering and private conversations.

6       Please mute your phones at this time.

7            Audio and video recording will continue to

8       take place unless all parties agree to go off the

9       record.

10            This is the media unit one of the

11       video-recorded deposition of Sean Mahoney in the

12       matter of the Conservation Law Foundation

13       Incorporated versus Shell Oil Company.  The

14       location of this deposition is Conservation Law

15       Foundation at 62 Summer Street, in Boston,

16       Massachusetts  02110.

17            My name is Jeffrey Bassett with Veritext,

18       and I am the videographer today.  Our court

19       reporter is Jodi Ohnemus, also with Veritext.  I am

20       not authorized to administer an oath.  I am not

21       relate to any party in this action, nor am I

22       financially interested in the outcome.

23            If there are any objections to proceeding,

24       please state them at the time of your appearance.

25       Counsel and all present, please state your

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 12

1          appearance now for the record.

2                    MR. GREENE:  Vincent Greene from Motley

3          Rice firm for the Conservation Law Foundation.

4                    MR. MANLEY:  Zack Manley for Conservation

5          Law Foundation.

6                    MR. HENDERSON:  Douglas Henderson for the

7          defendants in this action, of King & Spaulding.

8                    MR. KEARNEY:  Ryan Kearney also from King

9          & Spaulding for the defendants.

10                   VIDEO OPERATOR:  At this time I'll hand it

11         over to our court reporter to swear in the witness.

12                   SEAN M. MAHONEY, having

13                   satisfactorily been identified by

14                   the production of a driver's license,

15                   and being first duly sworn by the Notary

16                   Public, was examined and testified as

17                   follows to interrogatories

18                   MR. GREENE:  Good morning.  I just have a

19         brief statement I need to put on the record.

20                   CLF recognizes that this deposition has

21         only been noticed in the Connecticut matter, but as

22         the parties are aware, there is a companion case

23         filed in federal district court in Rhode Island

24         and, given recent discovery rulings in the federal

25         district court in Rhode Island, there are certain

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 13

1    discovery topics that that Court has ruled that are

2    not discoverable generally as they relate to

3    knowledge that CLF has and fundraising and client

4    staffing lists that CLF has.

5          Consistent with that Court's rulings, to

6    the extent that any testimony given here today on

7    the topics that the Court just recently ruled on in

8    Rhode Island and -- we would object to the use of

9    that testimony in the Rhode Island case.  So I just

10   want to make sure that objection is preserved.

11         MR. HENDERSON:  Mr. Greene, is it your

12   view that you will not answer any questions in this

13   case because of the Rhode Island order?

14         MR. GREENE:  No, nope.  The discovery

15   rulings in this case are applicable to this case.

16         MR. HENDERSON:  But not the Rhode Island?

17         MR. GREENE:  Yes.

18         MR. HENDERSON:  Okay.  So the purpose of

19   your note, for the record?

20         MR. GREENE:  Purpose of my note is to make

21   sure that all objections in the Rhode Island case

22   are preserved for the Rhode Island case because

23   we've discussed truncating the Rhode Island

24   deposition because this deposition is taking place

25   first, and I just want to make sure that it's clear

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 14

 1    that we are not waiving any objections to any of
 2    the topics that the Court in Rhode Island has ruled
 3    on.
 4            MR. HENDERSON:  Right.  And -- and we
 5    don't agree with the characterization of the order,
 6    but I understand you placed it on notice.  We view
 7    this as a deposition in the Connecticut case, and
 8    we'll address the topics in the Connecticut
 9    lawsuit.
10            MR. GREENE:  Yeah.
11            MR. HENDERSON:  We're not waiving the
12    right to ask any questions in the Rhode Island case
13    either.
14            MR. GREENE:  Yeah, and we're not waiving
15    our objection to any topics.
16            MR. HENDERSON:  Yeah.
17            MR. GREENE:  But, again, because we've
18    discussed truncating the Rhode Island deposition
19    because this deposition is going first, I want to
20    make sure it's clear that we're not waiving any
21    objections to any discovery in the Rhode Island
22    case.
23            MR. HENDERSON:  It's noted from our
24    perspective.
25            MR. GREENE:  Great.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 15

 1              MR. HENDERSON:  Thanks.

 2              I think -- are we ready to go?

 3              COURT REPORTER:  We're good.  He's sworn.

 4     BY MR. HENDERSON:

 5         Q.   Mr. Mahoney, good morning.  My name is

 6     Doug Henderson.  I met you earlier today, and along

 7     with me is Ryan Kearney.  We will probably take the

 8     full day here today, but if you need a break, just

 9     let me know.

10              Have you ever been deposed before?

11         A.   Yes.

12         Q.   Okay.  So you -- I think you're a lawyer.

13     So I won't spend all the time about what a

14     deposition is.

15              If you don't understand my question, just

16     let me know and I'll try to clarify it if I can.

17              So you are the 30(b)(6) representative for

18     CLF in this case?

19         A.   Yes.

20         Q.   Okay.  Have you ever been a 30(b)(6)

21     representative for CLF in any other cases?

22         A.   Yes.

23         Q.   And what are those other cases?

24         A.   One case involved a Clean Air Act suit

25     against New Hampshire Power, and another case

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 16

 1      involved litigation concerning a landfill in New
 2      Hampshire.
 3          Q.   Is that all you can remember?
 4          A.   Yes.
 5          Q.   And when were those -- when was the New
 6      Hampshire Power case deposition?
 7          A.   I want to say it's about ten years ago.
 8          Q.   And the landfill case?
 9          A.   Seven.
10          Q.   And why were you designated as the
11      30(b)(6) representative for CLF?
12               MR. GREENE:  Object to the extent that
13      that calls for testimony concerning any
14      communications he's had with counsel.
15               But if you can answer without reference to
16      that, you can proceed.
17          A.   At the time I was the executive vice
18      president at CLF, and to the extent that there
19      should be somebody designated to be the witness for
20      a 30(b)(6) deposition, it was determined that that
21      role was something that I would do.
22          Q.   Did you decide or who decided that you
23      would be the 30(b)(6)?
24          A.   That was in --
25               MR. GREENE:  I'll make the same objection.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 17

1              But go ahead.

2      A.    -- conversation among the senior team.

3      Q.    Okay.  Okay.  So here today do you -- who

4      are the defendants in this case?  I just want to

5      make it clear for the record.  We understand there

6      are only three defendants in this case at this

7      point.

8              Can you tell me who the defendants are.

9              MR. GREENE:  I'm just going to object to

10     the characterization.

11             But you can answer.

12     A.    I mean, they're in the documents that you

13     have.  Do you -- do you need me to tell you who the

14     defendants are in the case?  Who your clients are?

15     Q.    Many of the defendants have been

16     dismissed.

17             So as of today we understand there are

18     three defendants, Equilon Enterprises --

19     A.    Okay.

20     Q.    -- Triton Terminaling --

21     A.    Okay.

22     Q.    -- and Motiva Enterprises.

23     A.    Okay.

24     Q.    Do you understand that Shell Oil is no

25     longer a defendant in this case?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 18

1              MR. GREENE:  Just going to object that
2       calls for a legal conclusion.  And I'm really not
3       sure what topic this goes to.
4              But you can answer.
5              MR. HENDERSON:  No, just in terms of who
6       his -- his understanding of the case.  Or...
7              MR. GREENE:  I don't think that is covered
8       by any topic in the notice.
9              MR. HENDERSON:  So I'll ask him.
10       Q.   Do you understand that Shell Oil is not a
11       defendant in this case?
12              MR. GREENE:  Object that it calls for a
13       legal conclusion.
14              Go ahead.
15       A.   I understand that the three parties that
16       you named earlier are the three parties to the case
17       at present.
18       Q.   Okay.  Shell Petroleum is no longer a
19       defendant in this case?
20              MR. GREENE:  Objection.
21       A.   If you -- if you need me to confirm what
22       you know, I can do that, yes.
23       Q.   Yeah.  Just -- just making sure, 'cause if
24       we use certain names throughout the case as
25       defendants, I just wanted to be clear about that.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 19

1              -- Mr. Mahoney, I'm going to hand you

2     what's going to be our first of probably 20

3     exhibits today.

4         A.    Okay.

5              MR. HENDERSON:  Just for the record, it's

6     our amended notice of the 30(b)(6) deposition.

7              (Court reporter comment.)

8              (Exhibit Mahoney 1, Defendants' Amended

9              Notice of Deposition of F.R.C.P. 30(B)(6)

10             Witness for Plaintiff Conservation Law

11             Foundation, Inc.)

12             MR. HENDERSON:  Then we have one for you

13     if you don't have one.

14             MR. GREENE:  I've got one.

15             MR. HENDERSON:  Thank you.

16        Q.    Mr. Mahoney, this has been identified as

17     Mahoney Exhibit No. 1, the amended notice of the

18     30(b)(6) deposition.

19             Have you seen this notice?

20        A.    I have.

21        Q.    Okay.  And you agree that's the notice

22     that we'll be discussing here today?

23        A.    I do.

24        Q.    Okay.  And there are 3 -- 33 topics in the

25     notice.  Is that what you understand as well too?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 20

1          A.    I do.

2          Q.    Okay.  And you're the designated 30(b)(6)

3    respondent for all 33 of the topics; correct?

4          A.    I am.

5          Q.    Okay.  And you will answer the questions

6    on those topics?

7          A.    I will.

8          Q.    Okay.  Thanks.

9                And tell us about your background at CLF,

10   Mr. Mahoney, when you started, what your roles

11   were.

12         A.    I joined CLF in 2007.  I joined as the

13   vice president for Maine.  In 2011 or 2012 I also

14   took on the role of executive vice president, and I

15   served in that role until 2023, at which point I --

16   we had some internal organizational changes and I

17   stepped away from executive vice president.  We

18   don't have an executive vice president now.  And I

19   serve as senior counsel and still the vice

20   president for Maine.

21         Q.    Do you live in Maine?

22         A.    I do.

23         Q.    Now, what are your responsibilities in

24   those roles -- in your current job?

25         A.    As vice president of Maine, I'm in charge

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 21

1      of overseeing our advocacy in Maine, working with

2      my colleagues throughout CLF.  So that includes

3      advocacy before the legislature, before

4      administrative bodies, and before courts.

5              THE WITNESS:  Am I speaking loud enough?

6              COURT REPORTER:  Thanks.

7          A.   As senior counsel I have other

8      responsibilities concerning some special projects

9      and also serving as a 30(b)(6) deponent for -- for

10     occasions that call for that.

11         Q.   How many lawyers do you have working for

12     you or under your management?

13         A.   At present, I have four direct reports.

14         Q.   Are they all based in Maine?

15         A.   Yes.

16         Q.   Okay.  Do you have any man --

17     responsibility for the lawyers in the Boston

18     office?

19         A.   No.

20         Q.   Okay.  Who -- who do those lawyers report

21     to?

22         A.   It -- in some cases they report to program

23     directors, some cases -- most cases they're

24     reporting directly to program directors.  Program

25     directors report to a senior vice president for law

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 22

1        and policy.

2             Q.     And who is that?

3             A.     That is Kate Sinding Daly, S-i-n-d-i-n-g,

4        Daly.

5             Q.     So in advocacy, are you responsible for

6        deciding which lawsuits are filed in Maine?

7             A.     I have a role in that, yes.

8             Q.     Do you have any role in which lawsuits are

9        filed in other states like Connecticut or Rhode

10       Island?

11            A.     We have a -- a litigation committee that

12       reviews cases before they move forward, and I serve

13       on that.

14            Q.     Did you serve on the committee that

15       approved the litigation in Connecticut against the

16       defendants in this case?

17            A.     At that time the -- the litigation

18       committee was not extant.

19            Q.     Who made the decision at CLF to file this

20       case against the defendants in the Connecticut

21       case?

22                   MR. GREENE:  I'm going to object and

23       instruct him not to answer.

24                   You can ask about the organization, but

25       when you're getting into the decisionmaking with

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 23

1      regard to this case or the Rhode Island case, I'm

2      not going to let him answer.

3          Q.   Did -- are you a registered lobbyist?

4              MR. GREENE:  I'm sorry.  What was that

5      question?

6          Q.   Are you a registered lobbyist?

7          A.   I am not.

8          Q.   Do you lobby any of the legislature in the

9      state of Maine?

10         A.   I do some, but I don't do enough to cross

11     the threshold that requires registration as a

12     lobbyist.

13         Q.   Okay.  Are there lobbyists at CLF that

14     lobby in Maine for you?

15         A.   There is -- we -- this year for the first

16     time we had a contract lobbyist who worked for us

17     for all of three weeks on one particular bill.

18         Q.   What role have you had in the lawsuit in

19     this deposition?

20         A.   I am serving as the 30(b)(6) deponent.

21         Q.   Do you participate in any of the

22     litigation decisions?

23              MR. GREENE:  Object and instruct him not

24     to answer.

25         Q.   Have you made -- have you participated in

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 24

1     any role in identifying which facilities in
2     Connecticut are sued and which ones are not?
3             MR. GREENE:  Same objection.
4             (Counsel confer.)
5        Q.   Have -- is there a head of litigation at
6     CLF?
7        A.   There is not.
8        Q.   Okay.  Who is the most senior lawyer at
9     CLF?
10       A.   Our president, Brad Campbell.
11       Q.   Brad Campbell.
12            Who does Ken Rumelt report to?
13       A.   Ken Rumelt is on our strategic litigation
14    program, and the program director for strategic
15    litigation is Chris Kilian.
16       Q.   Okay.  Same for James Meinert?
17       A.   James Meinert works out of the Boston
18    office is on the strategic litigation team and
19    reports to Chris Kilian.
20       Q.   Okay.  Try to get a feel for that.
21            Do you ever appear as attorney of record
22    in any of the CLF cases?
23       A.   Yes.
24       Q.   Which cases are you currently attorney of
25    record?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 25

1          A.    Conservation Law Foundation versus Maine

2     Board of Environmental Protection, which is pending

3     in the Maine Superior Court.

4               I think that's all that's pending at the

5     moment.

6          Q.    Are you any attorney of record in any of

7     the cases outside of Maine?

8          A.    I am not.

9          Q.    Have you ever tried a jury trial --

10         A.    I have.

11         Q.    -- to verdict?

12              Have you ever tried a bench trial to

13    verdict?

14         A.    I have.

15         Q.    Trialed a permit -- tried a permit

16    challenge to a decision?

17         A.    I have.

18         Q.    How many jury trials have you tried?

19         A.    One to -- to --

20         Q.    What was --

21         A.    -- to a verdict.

22         Q.    What was the most recent?

23         A.    It was actually before I joined CLF.

24         Q.    Okay.  That's fine.  I'm just -- again, I

25    just met you.  This is the only time I get to ask

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 26

1        these questions.

2                So how about bench trials?  What's the

3        most recent one you've done?

4            A.    2008, I believe.

5            Q.    And that was before you joined CLF?

6            A.    No, it was just after joining CLF.

7            Q.    Okay.  And was that in Maine?

8            A.    It was.  And I was serving as local

9        counsel.

10           Q.    Okay.  Great.

11               Have you ever appeared in any Connecticut

12       court case?

13           A.    I have not.

14           Q.    Okay.  Do you have any family members that

15       live in Connecticut?

16               MR. GREENE:  Objection.

17           Q.    You can still ask -- answer.

18           A.    I --

19               MR. GREENE:  That is way beyond the scope

20       of anything in your deposition notice.

21               MR. HENDERSON:  So you're --

22               MR. GREENE:  What topic relates to the

23       witness's family members?

24               MR. HENDERSON:  I'm just asking if he has

25       family members in Maine.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 27

 1              MR. GREENE:  I'm aware of that.
 2              MR. HENDERSON:  You can instruct --
 3              MR. GREENE:  Your notice -- your
 4     deposition's limited to the scope of the notice,
 5     and I've given you some wide latitude already.
 6              What is the basis of asking the 30(b)(6)
 7     witness if he has family members in Maine
 8     [verbatim]?
 9              MR. HENDERSON:  Because you sought a jury
10     trial in this case in your complaint, and I'm
11     asking to see if he has any family members.
12              MR. GREENE:  That's great, but you have
13     a -- this is a deposition based on the scope of a
14     notice.
15              MR. HENDERSON:  Okay.  So are you
16     recommending that we depose him personally?
17              MR. GREENE:  No.  He's a 30(b)(6) witness.
18              MR. HENDERSON:  I'm just asking if you --
19              MR. GREENE:  You tell me what topic
20     relates to his family members.
21              MR. HENDERSON:  I'm just finding out who
22     the witness is.
23              MR. GREENE:  You don't get to just explore
24     whatever you want.  It's a 30(b)(6) deposition.
25              MR. HENDERSON:  Mr. Greene, I understand

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 28

```
 1      what a 30(b)(6) is.
 2                   MR. GREENE:  Apparently not.
 3                   MR. HENDERSON:  So just for the record,
 4      you're -- you're not -- you're refusing to answer
 5      that?
 6                   MR. GREENE:  I didn't instruct him not to
 7      answer, but I would like you to explain to me --
 8                   MR. HENDERSON:  And I gave you an
 9      explanation.
10                   MR. GREENE:  No, you didn't.
11                   MR. HENDERSON:  The explanation was he is
12      a representative from this company that has sought
13      a jury trial.
14                   MR. GREENE:  Yeah.
15                   MR. HENDERSON:  This is our only chance to
16      see if this witness for CLF has family members in
17      Connecticut.  That's my basis.  If you're
18      instructing him not to answer, that's fine.  We'll
19      go on, and we'll take it up later.
20                   MR. GREENE:  Your deposition is limited to
21      the scope of your notice.  You tell me what topic
22      relates to his family members.
23                   MR. HENDERSON:  Information about your
24      organization.  He's a representative.
25                   MR. GREENE:  Nope.  That's not information
```

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

                                                    Page 29

 1          about his organization.

 2                  MR. HENDERSON:  Okay.

 3          Q.   I'm going to ask you again, and if he

 4     instructs you not to answer, that's fine.  We'll go

 5     on.

 6                  But do you have any family members in

 7     Connecticut?

 8                  MR. GREENE:  I'm not going to instruct not

 9     to answer.

10          A.   I just want to be clear.  You said

11     Connecticut, and then you said Maine.  So which

12     one?

13          Q.   Connecticut.

14          A.   I don't have any family members in

15     Connecticut.

16          Q.   Okay.  That's all I was trying to do,

17     Mr. Mahoney.  It's my only chance to get to ask you

18     that.  Unless --

19                  MR. GREENE:  Let's just be clear --

20          Q.   Unless -- unless your lawyer is

21     instructing you to answer -- not to answer --

22                  MR. GREENE:  Your -- the fact that this is

23     your only chance to depose the witness does not

24     permit you to go beyond the scope of the notice.

25     So let's get that straight now at 8:20 in the

Page 30

```
 1    morning.
 2            MR. HENDERSON:  He's the representative of
 3    the organization.
 4            MR. GREENE:  Yeah, which is why you have
 5    to define the scope of what you're going to ask
 6    him, and you don't get to go beyond that scope.
 7            MR. HENDERSON:  It says information of the
 8    organization --
 9            MR. GREENE:  That's not information about
10    his organization.  You asked about his family
11    members.
12            MR. HENDERSON:  Okay.  Okay.
13            MR. GREENE:  So I just -- I want to make
14    sure at 8:30 in the morning, when we have 6 1/2
15    more hours of this, that you understand you're
16    going to stay within the boundaries of your notice.
17    He's not a fact witness.
18            MR. HENDERSON:  Mr. Greene, I don't need
19    you lecturing to me.  I'm trying to move through
20    the things.
21            MR. GREENE:  The fact that you're asking
22    questions about his family members 30 minutes into
23    the --
24            MR. HENDERSON:  All you've got to do is --
25            MR. GREENE:  -- deposition --
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 31

1              MR. HENDERSON:  -- object.

2              MR. GREENE:  -- tells me what you're going

3       to do today.

4              MR. HENDERSON:  If you object and you

5       lodge it for the record --

6              MR. GREENE:  So let's move on.

7              MR. HENDERSON:  -- you can do it.  That's

8       how it works.  If you disagree with me and you

9       instruct him not to answer, then we get to move on.

10             MR. GREENE:  I'm -- I'm just making sure

11      we're on the same page about how this is going to

12      proceed.

13             Keep going.

14             MR. HENDERSON:  That's fine.  Okay.

15        Q.   Just for the record, Mr. Greene did not

16      instruct you to not answer that question; is that

17      correct?

18        A.   Yes, that's --

19             MR. GREENE:  The record reflects what

20      happened.  Keep going.

21        Q.   Okay.  Thank you.

22             So, Mr. Mahoney, what did you do to

23      prepare for this deposition?

24        A.   I reviewed the deposition notice.  I

25      reviewed documents that were related to the topics

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 32

1      as identified in the deposition notice.  I met with

2      my colleagues to prepare for the deposition, and I

3      spent time on my own preparing for the deposition.

4           Q.   Who did you meet with specifically?

5                MR. GREENE:  And, again, I'm just going to

6      object.  Obviously other than counsel.

7           A.   Other than counsel, I haven't met with

8      anybody other than counsel about this deposition.

9           Q.   Okay.  Which counsel did you meet with?

10          A.   I met with Mr. Manley, Mr. Greene,

11     Mr. Ruggio, Mr. Rumelt, met briefly with another

12     colleague of Mr. Greene's whose name escapes me at

13     the moment, and Mr. Meinert.

14          Q.   Okay.  Thank you.

15               How long did you meet with all of your

16     lawyers?

17          A.   Some of them were just there for portions,

18     but I met with Mr. Manley and Mr. Greene several

19     times over Zoom for an hour or -- or two and then

20     over the course of a day in person.

21          Q.   So did you meet with any nonlawyers at CLF

22     or any third parties?

23          A.   Didn't meet with any nonlawyers at CLF to

24     prepare for this deposition, and I did not meet

25     with any third parties to prepare for this

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 33

1      deposition.

2          Q.    Did -- did you discuss the strengths and

3      weaknesses of the case with your lawyers?

4               MR. GREENE:  I'm going to object and

5      instruct him not to answer.

6               You know -- you know he's not going to

7      answer questions about what he talked about with

8      counsel.

9          Q.    Did you review any privileged memoranda in

10     preparing for this case?

11              MR. GREENE:  I'm just going to object.

12     Instruct him not to answer.

13         Q.    I'm just asking if you reviewed the -- any

14     legal memo to prepare for this case?

15              MR. GREENE:  And I'm going to object and

16     instruct him not to answer.

17         Q.    So in preparing for this case, did you

18     review any legal memoranda on the case?

19              MR. GREENE:  I'm just going to object and

20     instruct him not to answer as to anything that may

21     be privileged.  Obviously anything that's on the

22     public docket you can talk about.

23         Q.    My question's not about what you -- the

24     contents.  Did you review any internal legal

25     memoranda on the cases?  Just yes or no.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                              Page 34

 1            MR. GREENE:  Now that you changed your

 2      question as to external legal memoranda, I'm going

 3      to instruct him not to answer.

 4         Q.   So did you -- did you review any emails

 5      from any of your counsel to prepare for this

 6      deposition on the strengths and weaknesses of the

 7      case?

 8            MR. GREENE:  Well, emails from counsel

 9      would be considered communications, and I'm going

10      to instruct him not to answer.  So...

11         Q.   My question is did you do that.  That's

12      all I'm asking.

13            MR. GREENE:  I'm still going to

14      instruct -- instruct -- excuse me -- instruct him

15      not to answer.

16         Q.   And you're the 30(b)(6) representative of

17      CLF on these 33 topics?

18         A.   Yes, I am.

19         Q.   And you're refusing to answer whether or

20      not you reviewed internal legal memoranda to

21      prepare for this deposition?

22         A.   I'm following the advice of counsel.

23         Q.   So that's yes, you are refusing to answer?

24         A.   I've been instructed not to answer by

25      counsel.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 35

1          Q.    Okay.

2          A.    That's on the record.

3          Q.    That's okay.  I mean, Mr. Mahoney, I'm not

4     arguing.  This is just my only chance to ask these

5     questions.

6                What material did you review?

7          A.    So you --

8                MR. GREENE:  I'm just going to object.

9     Nonprivileged materials did you review.

10                THE WITNESS:  All right.

11          Q.    But you did review some privileged

12     material?

13                MR. GREENE:  He hasn't answered those

14     questions.  I'm just -- I'm just protecting any

15     potential privilege because your question's not

16     well phrased.

17                But go ahead.

18          A.    So what specific?

19          Q.    Yes.

20          A.    So I have reviewed the complaint.  I have

21     reviewed the expert reports --

22          Q.    Uh-huh.

23          A.    -- that CLF prepared.  I have reviewed

24     state and federal documents relating to stormwater.

25     I have reviewed discovery responses that I signed

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 36

1    on behalf of CLF.

2         Q.    How about depositions?  Did you review any

3    deposition transcripts?

4         A.    In this case?

5         Q.    Yes.

6         A.    I have not.

7         Q.    Okay.  Did you review any photographs?

8         A.    I think to the extent that there were

9    photographs included in documents I may have, I

10   didn't review any photographs as photographs.

11        Q.    Did you speak to your experts --

12        A.    I --

13        Q.    -- for CLF?

14        A.    I have not.

15        Q.    Did you look at any sampling data?  Water

16   quality data?  Anything like that?

17        A.    I don't recall.

18        Q.    Okay.  In the deposition room here today

19   there's a large table or tables that have binders

20   with topics identified.

21              Did you review those memos -- binders?

22        A.    I took a look through them as -- well, you

23   can't see on the camera.  You can see there are

24   many.  So I -- I would look at them, familiarize

25   myself --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 37

1          Q.    All right.

2          A.    -- with what they were.

3                MR. HENDERSON:  And, for the record, we

4     would ask the court reporter to note and the

5     videographer the binders that are in the room and

6     mark them as exhibits.

7                COURT REPORTER:  One exhibit?  Manley 2?

8                MR. HENDERSON:  Yeah, why don't we 2A, B,

9     C, D, E, just so we could have that.

10         Q.    So, Mr. Mahoney, you did review what's in

11    those binders?

12         A.    I looked at those binders, yes.

13         Q.    Yeah.  Okay.

14               MR. HENDERSON:  Vin, could we get a copy

15    of those?

16               MR. GREENE:  Yeah.  Sure.

17               MR. HENDERSON:  Okay.  Great.  Great.

18         Q.    What role do you play at all in this case

19    against the defendants besides being a 30(b)(6)

20    deponent?

21               MR. GREENE:  Just going to object to the

22    extent that it calls for privileged communications

23    or attorney work product.

24               But to the extent that you can answer

25    without regard to that, you can.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 38

1          A.    None.

2          Q.    Okay.  Do you receive emails on the status

3      of this case?

4          A.    No.

5          Q.    Do you ever have conference calls before

6      being a 30(b)(6) with anyone in this case --

7                MR. GREENE:  Just going to object to the

8      extent --

9          Q.    -- about issues in the case?

10               MR. GREENE:  -- extent that that calls for

11     privileged information.

12         A.    I'm sorry.  Could you -- could you clarify

13     the question?  Did --

14         Q.    Before you were a 30(b)(6) deponent --

15         A.    Ah.

16         Q.    -- in this case, did you ever have

17     conversations with anyone at CLF about this case?

18         A.    No.  My only conversations have been about

19     my role as a 30(b)(6) deponent.

20         Q.    Okay.  And when you were designated as a

21     30(b)(6) deponent, did you review of the -- review

22     any of the internal memoranda on these cases that

23     CLF has?

24               MR. GREENE:  I'm going to object.

25     Instruct him not to answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 39

1              Again, it's the same question you asked

2       before.

3              Q.    Who is the lead lawyer for CLF in these --

4       in this case?

5              MR. GREENE:   What topic is that related

6       to?

7              MR. HENDERSON:   The organization in this

8       case.

9              MR. GREENE:   Yeah, it's not about the

10      organization.   It's about the litigation of this

11      case; but, I mean...

12             (Counsel confer.)

13             Q.    Have you been asked to be the 30(b)(6)

14      representative for the Providence case?

15             MR. GREENE:   Going to object.

16             This deposition is not about the

17      Providence case.

18             Q.    You can still answer.

19             MR. GREENE:   Actually, no.  I'm going to

20      instruct not to answer on that.

21             MR. HENDERSON:   And the base --

22             (Counsel confer.)

23             Q.    Will you be the 30(b)(6)?

24             MR. GREENE:   No, I'm going to object.

25      Instruct not to answer.  If Providence deposition

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 40

1          happens, you can ask that witness questions that

2          are outlined in the notice for that deposition.

3                     MR. HENDERSON:   Okay.

4               Q.   So we're going to hand you another

5          exhibit, Mr. Mahoney.

6                     (Exhibit Mahoney 3, letter, 7/28/2020,

7                     Notice of Intent to File Suit,

8                     15-page document.)

9               Q.   Mr. Mahoney, you've been handed what's

10         going to be Mahoney No. 3.

11                    (Counsel confer.)

12              Q.   Mr. Mahoney, have you seen this document

13         before?

14              A.   I have.

15              Q.   And you reviewed it as part of your

16         preparation of this 30(b)(6) deposition today?

17              A.   I did.

18              Q.   Can you describe what this is for the

19         record.

20              A.   This is a July 28, 2020, Notice of Intent

21         to File Suit for Violations of the Resource

22         Conservation and Recovery Act and Clean Water Act

23         at the terminal and is addressed to Michael

24         Sullivan, Shell Petroleum Inc., Shell Oil Company,

25         Shell Trading US Co., Equilon Enterprises, and

Page 41

1      Motiva Enterprises.

2          Q.   Why did CLF send this Notice of Intent to

3      Sue?

4               MR. GREENE:  I'm going to object.

5      Instruct you not to answer.  Calls for privileged

6      information.  Thoughts and impressions of the

7      attorneys at CLF.

8               Although, given that this is entitled the

9      "Notice of Intent to Sue," I suspect you can divine

10     that from the document.

11         Q.   Mr. Mahoney, why did CLF send this letter

12     to the defendants in this case?

13              MR. GREENE:  Same objection.

14         Q.   So are you refusing to answer that

15     question?

16         A.   I'm going to follow the advice of our

17     attorney.

18         Q.   And so this is your notice -- this is

19     CLF's notice of intent to file suit and you are

20     refusing to answer questions about this document?

21              MR. GREENE:  No.  But you asked him a

22     question why CLF sent it, which impermissibly

23     treads on the thoughts and impressions of the

24     attorneys at CLF.  If you would ask -- if you'd

25     like to ask him about the document and what's in

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 42

1       the document, you're certainly free to do that.

2           Q.   Was there a legal reason that CLF sent

3       this Notice of Intent to Sue?

4               MR. GREENE:  That's a different question.

5               You can answer.

6           A.   Under the Clean Water Act and the Resource

7       Conservation and Recovery Act, before initiating a

8       citizen suit, a party is required to file a notice

9       of intent to -- to file such a suit to the

10      defendants, with copies to federal and state

11      agencies who are responsible for implementing those

12      laws.

13          Q.   Is this required by the Clean Water Act?

14              MR. GREENE:  Objection to the extent it

15      calls for a legal conclusion.

16              But you can answer.

17          A.   Yes, that's what I just said.

18          Q.   Okay.  So is there a code of federal

19      regulations section that defines what must be

20      included in a Notice of Intent to Sue letter?

21              MR. GREENE:  Objection.  Calls for a legal

22      conclusion.

23              You can answer.

24          A.   I suspect that there may be in light of

25      your question.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 43

1        Q.   Did you review that code of federal

2    regulations requirement to prepare for your

3    deposition today?

4        A.   Assuming there is a CFR for that, no, I

5    did not.

6        Q.   Okay.  So are you testifying that you did

7    not know there was a -- code of federal regulation

8    requirements for submitting a notice of intent?

9            MR. GREENE:  Objection to the form of the

10   question.

11           But you can answer.

12       A.   No, I'm just not, sitting here today,

13   aware of the specific --

14       Q.   Okay.

15       A.   -- code where such regulation might be set

16   forth.

17       Q.   And are all of CLF's alleged violations

18   against the defendants included in this notice of

19   intent letter marked as Mahoney No. 3?

20           MR. GREENE:  Objection to the form of the

21   question.

22           You can answer.

23       A.   The notice letter provides notice of

24   violations at the terminal under the Clean Water

25   Act.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 44

1      Q.   So is it your testimony that CLF included

2   all of its alleged violations in this Notice of

3   Intent to Sue?

4           MR. GREENE:  Objection to form of the

5   question.

6           You can answer.

7      A.   All of CLF's claims related to the

8   terminal are in CLF's amended complaint.  This --

9      Q.   No, I meant in the notice of intent

10  letter.

11     A.   This notice of intent letter was -- is to

12  provide notice to the defendants of the potential

13  violations.

14     Q.   Right.  And was this letter sent to the

15  United States Environmental Protection Agency?

16     A.   I believe that it was sent to US EPA and

17  to Connecticut Department of Energy and

18  Environmental Protection, yes.  And, in fact, page

19  15 of the document has the cc's of Andrew Wheeler,

20  then administrator of EPA; and Dennis Deziel, then

21  EPA region 1 acting administrator.

22     Q.   So are you familiar with the required

23  waiting period before a lawsuit can be filed under

24  the Clean Water Act?

25     A.   I believe it's 60 days.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 45

1          Q.   All right.  Are you an expert in the Clean
2     Water Act?
3               MR. GREENE:  Objection.  Form of the
4     question.
5               He's not here as an expert.  He's here as
6     a 30(b)(6) witness.
7               MR. HENDERSON:  I didn't ask that
8     question.
9          Q.   Are you an expert in the Clean Water Act?
10              MR. GREENE:  Same objection.
11              You can answer.
12         Q.   You can -- you can answer, Mr. Mahoney.
13    He's preaching --
14              MR. GREENE:  Don't instruct my witness.
15         Q.   I said you can answer.  He's objected and
16    noted for the record.
17              MR. GREENE:  Okay.  I'll tell him when he
18    can answer.
19         Q.   You can answer.
20              MR. GREENE:  You can answer.
21         Q.   So please answer.
22         A.   I will.  I've been practicing for 33
23    years.  I've done a number of cases and work under
24    the Clean Water Act, but I wouldn't claim to be an
25    expert.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 46

1      Q.    Okay.  Now -- and you have read through

2    this Notice of Intent to Sue identified as Mahoney

3    No. 3?

4      A.    I reviewed it, yes.

5      Q.    And this included all of its claims under

6    the RCRA, the R-C-R-A, the Resource Conversation

7    [sic] and Recovery Act?

8            MR. GREENE:  Objection.  Form of the

9    question.

10           You can answer.

11     A.    On page 7 and 8 it provides notice of

12    claims under the RCRA.

13     Q.    And this notice of intent includes all of

14    CLF's claims under the Clean Water Act as well?

15           MR. GREENE:  Objection to the form of the

16    question.

17           You can answer.

18     A.    On pages --

19     Q.    What pages are those?

20     A.    Pages -- pages -- pages 8 through 13

21    provide notice of Clean Water Act violations.

22     Q.    And that's included all of the ones that

23    CLF were bringing?

24           MR. GREENE:  Objection.  Form of the

25    question.

Page 47

1          A.    It provides notice as the basis for all of

2      the claims that CLF brought in the complaint.

3          Q.    Okay.  I'm going to hand you, Mr. Mahoney,

4      what will be marked Mahoney 4.

5                (Exhibit Mahoney 4, letter, 2/17/2021,

6                Supplemental Notice of Intent to

7                File Suit, 15-page document.)

8          Q.    Mr. Mahoney, just to move this along, for

9      the record, this is another notice of intent filed

10     in this case, dated February 17, 2021.

11               Have you seen this Notice of Intent to

12     Sue?

13         A.    I have.

14         Q.    And what's the difference between this

15     notice and the prior notice?

16         A.    My understanding is stated on page 2 of

17     the document.  (As read):

18               "This letter supplements and does not

19     supersede CLF's July 28, 2020, Notice of Intent to

20     File Suit for Violations of RCRA and the CWA."

21               That was sent to parties.  (As read):

22               "This letter puts additional parties on

23     notice of the RCRA and CWA violations alleged

24     herein."

25               And as I understand it, this notice added

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 48

 1      Triton Terminaling, LLC, as a -- as -- you know, as
 2      a party receiving notice of this.
 3          Q.   So did CLF do this amended notice because
 4      the notice requirements required that?  I mean, why
 5      did they submit this amended NOI?
 6               MR. GREENE:  First, I'm going to object to
 7      the extent that calls for privileged
 8      communications, attorney work product.
 9               If you can answer without regard to that,
10      you can answer.
11               I'm also going to object to the extent it
12      calls for a legal conclusion.
13          A.   The document speaks for itself.  It was
14      sent to provide notice to additional parties.
15          Q.   Right.  To your knowledge, has this notice
16      of intent been supplemented or amended in any way?
17          A.   Not to my knowledge.
18          Q.   Was there a subsequent notice of intent in
19      this case?
20          A.   Not to my knowledge.
21          Q.   Have you reviewed the -- a third notice of
22      intent that was issued in the Connecticut case?
23          A.   I'm not aware of a third notice of intent.
24               (Exhibit Mahoney 5, letter, 11/21/2024,
25               Supplemental Notice of Intent to File

Page 49

```
 1              Suit, 100-page document.)

 2              (Counsel confer.)

 3       Q.   Mr. Mahoney, I'm handing you what has been

 4    marked Mahoney Exhibit 5.

 5              For the record, Mr. Mahoney, have you

 6    reviewed this Notice of Intent to Sue?

 7       A.   (Witness reviews document.)  I may have.

 8    I may have.  And, you know, there's a number of --

 9    as I understand it, that this letter supplements

10    and doesn't supersede CLF's July 28, 2020, and

11    February 17, 2021, notices of intent to file suit.

12    It puts additional parties on notice for

13    violations, and the added party appears to be Shell

14    Pipeline Company LP.

15       Q.   All right.  So this is the third amended

16    Notice of Intent to Sue that CLF filed in this

17    case?

18       A.   It is.

19       Q.   Did -- why did CLF issue a third amended?

20    Was it simply to add another party?

21              MR. GREENE:  Just going to object to the

22    extent that it calls for privileged -- privileged

23    information.

24       A.   Yeah, the -- the document speaks for

25    itself.  It says that the letter puts additional
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 50

1     parties on notice of the RCRA and CWA violations

2     alleged herein, and it supplements and does not

3     supersede the prior notices of intent.

4          Q.   And, again, the -- this notice of intent

5     and the two prior ones included all of CLF's

6     alleged Clean Water Act violations and the RCRA

7     violations?

8               MR. GREENE:  Objection.  Form of the

9     question.

10              Go ahead.

11         Q.   Is that correct?

12         A.   It provided notice of the claims that CLF

13    would be bringing if they weren't remedied within

14    the 60-day period.

15         Q.   But all of those claims -- all of the

16    notices of those claims are in this letter and the

17    two prior notices of intent?

18              MR. GREENE:  Objection.  Form of the

19    question.

20              Go ahead.  You can answer if you are able.

21              THE WITNESS:  Yeah.

22         A.   The notice letters provide notice of the

23    areas and basis for violations that are set forth

24    in the complaint that was filed by CLF.

25         Q.   Are you -- are you testifying that these

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 51

```
 1       notice letters comply with the code of federal

 2       regulation requirements for a notice letter under

 3       the Clean Water Act?

 4               MR. GREENE:  Objection.  Calls for a legal

 5       conclusion.

 6               It's not his role as a 30(b)(6) witness.

 7       Q.    You can still answer.

 8       A.    I'm confident that these notices of intent

 9       comply with all applicable regulations.

10       Q.    But here today you did not check to see if

11       it were -- if they did meet the code of federal

12       regulations?

13               MR. GREENE:  Objection.  Calls for a legal

14       conclusion.

15               It's not his role as a 30(b)(6) witness.

16       Q.    You can still answer.

17       A.    I did not.

18       Q.    Okay.  So what is the purpose of a notice

19       of intent letter?

20               MR. GREENE:  Objection.  Calls for a legal

21       conclusion.

22               You can answer if you're able.

23       Q.    Do you know?

24       A.    It's to provide notice of an intent to

25       file suit under a statute, here the Clean Water Act
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 52

1        and the Resource Conservation Recovery Act, to

2        provide notice to the party alleged to be in

3        violation of those acts --

4            Q.    Is it --

5            A.    -- and to provide the parties with an

6        opportunity to cure the violations or to provide

7        the appropriate state or federal agencies charged

8        with enforcing the law to bring an action.

9            Q.    And what is the purpose of the 60-day

10       waiting notice?  Do you know?

11               MR. GREENE:  Objection.  Calls for a legal

12       conclusion.

13               You can answer if you're able.

14           A.    Yes, it is to provide that period of time

15       for those parties to correct the alleged

16       violations.

17           Q.    Doesn't it also give notice to the agency

18       of what specific violations are alleged?

19               MR. GREENE:  Objection.  Calls for a legal

20       conclusion.

21               You can answer.

22           A.    It gives notice to both the agencies and

23       the parties of the basis for the violations

24       alleged.

25           Q.    So that's -- the theory is -- so if the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 53

1       agency knows what the violation is, it may take an

2       enforcement action against the recipient of the

3       notice of intent letter?

4               MR. GREENE:  Objection.  Calls for a legal

5       conclusion.

6               You can answer.

7       A.    That's one of the purposes.

8       Q.    Okay.  What are the other purposes?

9               MR. GREENE:  Same objection.

10      A.    To give notice to the parties --

11      Q.    Right.

12      A.    -- to cure the violations.

13      Q.    Right.

14              What is the purpose of giving notice to

15      EPA?

16              MR. GREENE:  Same objection.

17      A.    You just -- you just asked that question.

18      Do you want me to answer it again?

19      Q.    Was going to ask -- okay.  So you answered

20      already.

21              What is the purpose of giving notice of

22      the Connecticut DEEP, D-E-E-P, all capitals?

23              MR. GREENE:  Objection.  Calls for a legal

24      conclusion.

25              You can answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 54

1          A.    It's the same answer that I gave earlier.

2     It gives state and federal agencies who are charged

3     with enforcing the -- the laws alleged to be

4     violated with an opportunity to bring an

5     enforcement action on their own.

6          Q.    So the agency should be able to read the

7     notice of intent and know what specific violations

8     are identified at the facility?

9               MR. GREENE:  Objection.  It's beyond the

10    scope of the deposition notice.  Beyond the purpose

11    of the deposition.  It calls for a legal

12    conclusion.  And it's not this witness's

13    responsibility to opine on what a regulatory agency

14    is able or should be able to divine.

15               But to that extent, you can answer.

16         A.    Could you repeat the question?

17         Q.    So what's the purpose of providing notice

18    of the specific violations in this letter for a

19    federal or state agency?

20               MR. GREENE:  Same objections.

21         A.    It's to meet the requirement of the law.

22         Q.    So if a violation is not identified in

23    here, in the notice of intent letters that CLF has

24    filed, the agency would not know what an alleged

25    violation is; correct?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 55

1              MR. GREENE:  Objection.  Calls for

2     speculation.  Calls for a legal conclusion.  Calls

3     for an expert opinion.  Beyond the scope of the

4     deposition notice.

5              With all of that, you can answer.

6        A.   The notice provides notice of conduct or

7     actions taken or not taken that's -- that are

8     alleged to be in violation of the statutes at

9     issue.

10             It may also provide notice of other areas

11    or cause an agency to look for additional issues

12    that might be present.  So it is to provide notice

13    that, in this case, an oil storage terminal

14    facility is allegedly violating the Clean Water Act

15    and RCRA and lays out the issues as identified --

16       Q.   If --

17       A.   -- by, in this case, Conservation Law

18    Foundation.

19       Q.   If Conservation Legal -- Law Foundation

20    later identified a violation but it was never

21    included in the notice of intent letter, how would

22    an agency ever know about that other alleged

23    violation?

24             MR. GREENE:  Objection.  Calls for

25    speculation.  Beyond the scope of the notice.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 56

1      A.    I'm sorry.  Could you repeat the question
2      again?
3      Q.    So if -- if CLF raised a violation, let's
4      just say last month, that there was not egress or
5      ingress at the facility and that violated the Clean
6      Water Act, but if it were not included in the
7      notice of intent, how would the Connecticut DEEP
8      ever learn about that violation?
9           MR. GREENE:  For the record, can I get
10     exactly what topic you believe that these questions
11     relate to?
12     Q.    You can go ahead and answer.
13          MR. GREENE:  No.  For the record, I would
14     like to know what topic this relates to before he
15     answers.
16          MR. HENDERSON:  It's topic No. 4.
17          MR. GREENE:  Topic No. 4.  Same objections
18     as before.
19          MR. HENDERSON:  Mr. Greene, if you just
20     instruct him not to answer, that's fine.  I'm just
21     trying to answer -- ask this question.
22          MR. GREENE:  So here's my issue --
23          MR. HENDERSON:  I don't -- I don't care
24     about your issue.
25          MR. GREENE:  I do.  Because topic No. 4 is

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 57

1      "the factual basis and regulatory basis of the

2      contention."

3             You're asking for legal conclusions and

4      speculations about what an agency might know and

5      when they might know it.  Those are not factual or

6      regulatory basis.

7             MR. HENDERSON:  We just have a

8      differing --

9             MR. GREENE:  You're way beyond the scope

10     of the top- --

11            MR. HENDERSON:  We just have a different

12     interpretation.

13            MR. GREENE:  No.  No.  No.  We don't have

14     a different interpretation.

15            MR. HENDERSON:  Mr. Greene, we dis --

16            MR. GREENE:  The words --

17            MR. HENDERSON:  -- I'm just asking the

18     witness.  I'm not asking you.

19            MR. GREENE:  Saying things like "This is

20     my only chance to ask questions" and "I'm just

21     asking the witness" do not permit you to go beyond

22     the scope of the deposition notice.

23            MR. HENDERSON:  I -- I've identified topic

24     No. 4.

25            MR. GREENE:  Your topic -- yeah.  Thank

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 58

 1        you.  I appreciate that.
 2                But your topic is a factual basis.
 3        There's nothing about your question that relates to
 4        a factual basis.  You're asking the witness
 5        repeatedly for legal conclusions --
 6                MR. HENDERSON:  So my --
 7                MR. GREENE:  -- because you're trying to
 8        pad a record for a motion that you're arguing.
 9        It's not within the scope of the deposition.
10           Q.   So I'm asking you about your Notice of
11        Intent to Sue --
12                MR. GREENE:  Yeah, you're asking about the
13        notice of the intent to sue --
14           Q.   If -- if in this --
15                MR. GREENE:  -- and legal conclusions
16        thereon.
17           Q.   If in this notice CLF has not identified
18        an alleged violation, then it would not have
19        provided notice to the agency of that violation.
20                MR. GREENE:  Calls for speculation.  Legal
21        conclusion.  Beyond the scope of the deposition
22        notice.  Document speaks for itself.
23                MR. HENDERSON:  Are you instructing him
24        not to answer?
25                MR. GREENE:  No, I'm not instructing not

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 59

1      to answer.
2                MR. HENDERSON:  Okay.
3           A.   I think that's a legal conclusion.  It's
4      not something that I've made.
5           Q.   So you're not -- you don't have a --
6      you're not able to answer it today?
7           A.   I think that's a legal -- it's a matter
8      for a Court to determine.
9           Q.   So does this notice of intent include all
10     of the Clean Water Act violations that CLF has
11     alleged against the defendants?
12          A.   It's the same --
13               MR. GREENE:  Objection.  Asked and
14     answered.
15          A.   Yeah, it's the same answer that I've given
16     before.
17          Q.   And I think your testimony was yes.
18               MR. GREENE:  No.  Mischaracterizes the
19     testimony.  He's testified multiple times on this
20     topic.
21          Q.   You can answer.
22          A.   I mean, I have.  We could read it back.
23          Q.   No.  I mean, I'm asking you again.  I did
24     not hear it that way.  If you need to read it back,
25     please go ahead.

Page 60

1          I'm just simply saying if the -- this

2     includes all of CLF's alleged violations of the

3     Clean Water Act against the defendants?

4          MR. GREENE:  Objection.  Asked and

5     answered.  Mischaracterizes the document.

6          But to the extent that you're able to

7     answer, you can go ahead.

8     A.    This notice provides notice of the conduct

9     and issues at the terminal that are -- that were

10    alleged to be in violation --

11    Q.    Okay.

12    A.    -- of the Clean Water Act and the Resource

13    Conservation Recovery Act and that were then set

14    forth in the complaint that CLF filed after the

15    60-day notice period ran.

16    Q.    But are there issues in the complaint that

17    do not appear in the notice of intent?  Are there

18    alleged violations of the Clean Water Act that

19    appear in the complaint that do not appear in the

20    Notice of Intent to Sue?

21         MR. GREENE:  Objection.  Form of the

22    question.

23         To the extent that you're able, you can

24    answer.

25    A.    My understanding is no, that the amended

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 61

1        complaint reflects the notice -- reflects or is

2        based on the issues that were noticed in the notice

3        of intent letters that were sent to your clients

4        and to the EPA and to Connecticut DEEP, D-E-E-P.

5              Q.    Thanks.

6                    MR. HENDERSON:  And for the record, Jodi,

7        we're just going to use DEEP or D-E-E-P just to say

8        that.  It's a mouthful to say Connecticut D-E-E-P.

9                    COURT REPORTER:  Okay.

10             Q.    Now, does -- so -- just so we're clear,

11       CLF is not making any claims that are not in the

12       complaint; correct?

13                   MR. GREENE:  Objection.  Document speaks

14       for itself.

15                   You can answer to the extent that you're

16       able.

17             A.    The complaint speaks for itself.  Those

18       are the claims that CLF has brought.

19             Q.    So if it's not in the complaint, they're

20       not bringing a claim for it?

21                   MR. GREENE:  Objection.

22             A.    Not as I sit here today.

23             Q.    Excuse me?

24             A.    Not as I sit here today.

25             Q.    So if it's not in the complaint, they are

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 62

1     not bringing a claim for it.

2              MR. GREENE:  Objection.  Document speaks

3     for itself.

4         Q.   Is that correct?

5         A.   As -- as I said, today -- as I said, the

6     claims that CLF are bringing are in the amended

7     complaint.

8         Q.   And so its claims are limited to the Clean

9     Water Act and RCRA counts that are identified in

10    the complaint?

11             MR. GREENE:  Objection.  Calls for a legal

12    conclusion.

13        A.   Yeah, the --

14             MR. GREENE:  This witness is not here to

15    talk about claims in the legal sense.  This is

16    supposed to be a deposition about facts.

17             MR. HENDERSON:  So e would object to

18    Mr. Greene's characterization of this case.  We

19    have a right to ask about facts and law under the

20    30(b)(6) notice.  So...

21             MR. GREENE:  Actually, I utterly disagree

22    with that conclusion.

23             MR. HENDERSON:  Well, that's --

24        Q.   So is CLF bringing any negligence claims

25    against any of the defendants?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 63

1              MR. GREENE:  Again object.  It calls for a

2      legal conclusion.  It's beyond the scope of the

3      deposition notice.

4              But you can answer.

5         A.   As I understand it, there are no

6      negligence claims in the --

7         Q.   Okay.

8         A.   -- in the complaint.

9         Q.   There are no -- there's no tort claims,

10     there's no -- at all against any of the defendants?

11             MR. GREENE:  Objection.  Calls for a legal

12     conclusion.  Beyond the scope of the notice.

13             You can answer.

14        A.   I -- the complaint speaks for itself.  And

15     it's my understanding that there are no tort claims

16     in the -- that have been alleged in the complaint.

17        Q.   So even though CLF lawyers have alleged

18     negligence in various correspondence, you're not

19     making any legal claims for negligence against --

20             MR. GREENE:  Objection.

21        Q.   -- any of the defendants?

22             MR. GREENE:  The witness is not here to

23     opine on what legal claims are being brought.  The

24     complaint speaks for itself.

25             To the extent that you can answer, you can

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 64

1       go ahead.

2            A.    Yeah, I can't answer that question.

3            Q.    So there's no nuisance claims that are

4       being brought in this case?

5                  MR. GREENE:  Same objection.

6            A.    I'm -- I'm not aware of any nuisance

7       claims that are set forth in the complaint --

8       amended complaint.

9            Q.    No fraud counts -- claims?

10           A.    I'm not --

11                 MR. GREENE:  Object -- hold on.  Object.

12      Calls for a legal conclusion.  The complaint speaks

13      for itself.

14                 To the extent that you can answer -- oh,

15      and beyond the scope of the notice.

16                 But you can answer.

17           A.    I'm not aware of any fraud claims.

18           Q.    No unfair business practices or deceit

19      claims or anything like that in this case?

20                 MR. GREENE:  Objection.  The complaint

21      speaks for itself.  Beyond the scope of the

22      deposition notice.  Calls for a legal conclusion.

23                 You can answer.

24           A.    I'm not aware of any unfair business

25      practice claims.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 65

1          Q.   Or deceit claims or anything like that?

2               MR. GREENE:  Objection.  The complaint

3     speaks for itself.  Beyond the scope of the

4     deposition.  Calls for a legal conclusion.

5               You can answer.

6          A.   I'm not aware of any deceit claims in the

7     complaint.

8          Q.   Okay.  And when we say "complaint," are we

9     agreeing that it also includes the amended

10    complaint?

11         A.   Yes, it -- it is the amended complaint

12    that I'm referring to.

13              MR. HENDERSON:  Yeah.  Can we take a

14    five-minute break at this point?

15              MR. GREENE:  Sure.

16              VIDEO OPERATOR:  The time is now 9:08

17    a.m., and we are off the record.

18              (Recess was taken.)

19              VIDEO OPERATOR:  The time is now 9:18.  We

20    are on the record.

21         Q.   Mr. Mahoney, we're going to go back to

22    Mahoney Exhibit No. 3, which is the notice of

23    intent, and I think, for the record, the -- this is

24    the first notice of intent, and I believe you

25    testified it's the same substantive allegations as

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 66

1      in the notice of intent 2 and the notice of intent

2      3.  It's just those added additional parties.

3                Is that your understanding?

4          A.   That's my understanding.

5          Q.   Okay.  Thanks.

6                So you mentioned that you had reviewed the

7      expert reports.  And are you familiar with the

8      report of Mr. Horner where he talks about

9      permeability as a concept?

10         A.   I did review the expert reports to be

11     familiar with them.  If you're going to ask me

12     questions about the report that you want specifics,

13     I should have that in front of me, but...

14         Q.   Okay.  My question's pretty simple.

15         A.   Understood.

16         Q.   The -- is -- does the notice of intent

17     identify any issue involving permeability?

18               MR. GREENE:  I'm just going to object.

19     The form of the question.  Document speaks for

20     itself.

21               And you haven't provided him a copy of the

22     expert's report.

23               But to the extent that you can answer, go

24     ahead.

25         Q.   For the record, I think you said you

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 67

1      reviewed the expert report.  So...

2              MR. GREENE:  Yeah, he did, but he also

3      said if you're going to ask him questions about it,

4      he would like to see it.  So...

5          Q.   My question's about the NOI, the notice of

6      intent.  Does the notice of intent include any

7      reference to permeability or impermeability of

8      anything?

9              MR. GREENE:  Just to be clear, your first

10     question was about the expert report and the NOI.

11     And the witness said if he was going to be asked

12     questions about the expert report, he'd like to

13     have it in front of him.

14             MR. HENDERSON:  The witness did not say

15     that, Mr. Greene.  Mr. Greene, the witness did not

16     say that.  You're the one testifying.  He can

17     answer.

18             MR. GREENE:  No.  No.  Actually, can we go

19     back and check the record.  He testified that if

20     he's [verbatim] going to ask questions about the

21     report, he'd like to have it in front of him.

22             MR. HENDERSON:  And I said I was not going

23     to ask questions about the report.

24             MR. GREENE:  Except your question did ask

25     questions --

 1              MR. HENDERSON:  I was going to ask

 2     questions about the notice of intent.

 3              MR. GREENE:  In reference to the expert's

 4     report.  That was your question.

 5              But I didn't get to finish my objection.

 6     My objection was that the document speaks for

 7     itself and he doesn't have the expert's report in

 8     front of him.

 9              With that, go ahead, if you're able to

10     answer the question.

11          A.   So I think you asked me initially if I was

12     familiar with Doctor Horner's report.

13          Q.   Correct.

14          A.   He mentioned permeability in his report.

15          Q.   Correct.  You said you generally reviewed

16     it?

17          A.   I generally reviewed it.

18          Q.   Right.

19          A.   And I hadn't answered your question about

20     does he mention permeability --

21          Q.   Yeah.

22          A.   -- in his report.

23              He does.

24          Q.   Okay.  Is permeability or impermeability

25     referenced on any page of the Notice of Intent to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 69

1      Sue?

2              MR. GREENE:  Objection.  The document

3      speaks for itself.

4              You can answer.

5      Q.    And to save us time, Mr. Mahoney, as the

6      witness for CLF, if -- when Mr. Greene says the

7      document -- document speaks for itself, if that's a

8      statement that we can rely on and if it does not

9      have the word permeability or impermeability in

10     here, please let me know.  We can save a lot of

11     time.

12             MR. GREENE:  Well, no, because if the

13     witness has a more fulsome answer, he'll provide a

14     more fulsome answer.  My objections are to preserve

15     the record.

16             But with that, go ahead.

17     A.    The document does speak for itself.  I

18     won't do a word search to see if permeability --

19     Q.    Okay.

20     A.     -- or impermeability is not in the

21     document.  The document provides notice of alleged

22     violations having to do with stormwater management

23     and stormwater control.  And Doctor Horner's

24     opinion, expert opinion, addresses specifics of

25     stormwater management, stormwater control, how to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 70

1      prevent releases of pollutants; and as part of

2      that, he discusses permeability and impermeability.

3              Q.    But are the words -- does the word

4      permeability or permeable appear anywhere in the

5      notice of intent letter?

6                    MR. GREENE:  Objection.  Document speaks

7      for itself.  Beyond the scope of the deposition.

8                    If you are able to answer, go ahead.

9              A.    The document speaks for itself, then.

10             Q.    So you don't know if it mentions the word

11     impermeable or permeability?

12             A.    I haven't --

13                   MR. GREENE:  Objection.  Mischaracterizes

14     testimony.

15                   Go ahead.

16             A.    Yeah, I -- I haven't done that close of a

17     read to determine whether or not permeable or

18     impermeable is not in there.  I could if you'd

19     like, or I could also just say the document speaks

20     for itself.

21             Q.    Yeah, I think I would like, yeah.  If you

22     can go ahead and -- and review it.

23             A.    Okay.

24             Q.    You can review it now on the record, or

25     you can review it at the break.  I just want to

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 71

```
 1      know --
 2              MR. GREENE:  Well, if he's going to review
 3      it, it's going to be on the record.
 4              Go ahead.
 5          Q.   -- if the notice of intent mentions the
 6      word permeability or impermeable.
 7              MR. GREENE:  Same objections.
 8          A.   Okay.  So my answer is the document speaks
 9      for itself.  If you'd like, I would review this and
10      see if I find that word in there.
11          Q.   Mr. Mahoney, I'm not trying to be
12      difficult.  I'm just trying to get in here and to
13      say this document does not include the word
14      permeability or impermeable or impervious.  Any of
15      those words and concepts are not mentioned in
16      here --
17              MR. GREENE:  Objection.
18          Q.   -- is that correct?
19              MR. GREENE:  Objection.  The document
20      speaks for itself.
21          Q.   Or --
22              MR. GREENE:  Mischaracterizes the
23      document.  Beyond the scope of the deposition.
24          Q.   -- if -- if the words are not in this
25      document, the words are not in this document.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 72

 1              Is that a fair statement?

 2         A.    That is -- that is -- that is a fair

 3    statement.

 4         Q.    Okay.

 5         A.    If the words aren't in a document, they

 6    are not in the document, yes.

 7         Q.    Okay.  Great.

 8              But you did not look today to review to

 9    see if the words permeability or impermeability

10    were in the notice of intent?

11         A.    I did not.

12              MR. GREENE:  Objection.  Beyond the scope

13    of the notice and beyond the role of the witness.

14              But go ahead.

15         Q.    Again, we're just here trying to ask

16    questions about what we're being sued over, and

17    this is the notice of intent, and you're the only

18    person that I have the right to ask these

19    questions.  So that's all I'm trying to do.

20              MR. GREENE:  And, again -- no.  So I just

21    want to be clear for the record, what you're trying

22    to do is go beyond the scope of the notice to pad a

23    record for a motion that you have pending.  That's

24    what you --

25              MR. HENDERSON:  It's topic No. 4,

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 73

1      Mr. Greene.

2              MR. GREENE:  -- that's what you're trying

3      to do.

4              And -- and, again, just to the record's

5      clear, just to say that this is the only chance you

6      have to ask questions and to say that you're trying

7      to ask questions about what you're being sued

8      about, your -- your questions have to be limited to

9      the scope of the notice.

10             MR. HENDERSON:  And I'm reading --

11             MR. GREENE:  This is beyond the scope of

12     the notice.

13             MR. HENDERSON:  -- topic No. 4.

14             MR. GREENE:  And its purpose is -- let me

15     finish -- the scope of the notice, and what you're

16     doing is to pad a record for a motion that's

17     pending.  That has nothing to do with the notice of

18     deposition which was negotiated and litigated.

19         Q.   Have you reviewed topic No. 4 in the

20     notice, which I think was Mahoney No. 1, (as read):

21             "Factual basis and regulatory basis for

22     your contention the terminal is deficient or

23     otherwise in violation."

24             MR. GREENE:  I'm sorry.

25         Q.   And I'm just asking about what is in your

Sean M. Mahoney                           June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 74

1      notice of violation.  So --

2              MR. GREENE:  I didn't hear the whole

3      question.  So I'm going to object to the form of

4      the question and document speaks for itself and

5      beyond the scope of the notice.

6          Q.   Mr. Mahoney, did -- did CLF provide notice

7      of any alleged violation that includes the word

8      permeability or impermeability in the notice of

9      intent?

10             MR. GREENE:  Objection.  The document

11     speak for itself.  Beyond the role of the witness

12     and beyond the scope of the deposition -- beyond

13     the notice, excuse me, beyond the scope of the

14     notice.

15         Q.   You can answer.

16             MR. GREENE:  You can answer.

17         A.   Yeah, the notice of intent states that (as

18     read):

19             "Shell's SWPPP fails to describe or ensure

20     implementation of BMPs that will be used to ensure

21     that nonstormwater pollutant discharges resulting

22     from sea level rise, increased precipitation,

23     increased magnitude and frequency of storm

24     events --"

25             THE WITNESS:  I'm sorry.

Page 75

1        A.    -- "and increased magnitude and frequency

2    of storm surges do not occur in the future and are

3    eliminated."

4            Doctor Horner's opinion talks about some

5    of the best management practices and best industry

6    practices associated with controlling stormwater.

7        Q.    Did --

8        A.    And in that context he talks about

9    permeable and impermeable.

10       Q.    But does he reference -- does CLF identify

11   of any specific violations related to permeability

12   or impermeability in the notice of intent letter?

13           MR. GREENE:  Objection.  Asked and

14   answered.  Document speaks for itself.  Beyond the

15   scope of the notice.

16       Q.    If -- do you agree the words permeability

17   or impermeability or porosity or any word like that

18   is ident- -- included in this notice of intent

19   letter?

20           MR. GREENE:  Objection.  The form of the

21   question.  The document speaks for itself.  Beyond

22   the scope of the notice.

23           If you can answer, you can go ahead.

24       A.    I -- I -- I -- we've asked and answered

25   this a number of times.  I --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 76

1          Q.    So you -- you --

2          A.    The -- the document speaks for itself.  As

3    you said earlier, if a document -- if a word is not

4    in a document, it's not in the document.

5          Q.    Okay.

6          A.    I would agree with that.

7          Q.    Okay.  That's helpful.

8                Is there any count, any sentence, any word

9    in the complaint or the amended complaint that

10   it -- includes permeability or impermeability?

11               MR. GREENE:  Objection.  The document

12   speaks for itself.  It's beyond the scope of the

13   notice.  Beyond the role of the witness.

14               If you are able to answer, you can answer.

15         A.    It would -- it would be the same answer as

16   I just gave.

17         Q.    Okay.  So the words -- if the words are

18   not there, then you did not include that in the

19   amended complaint?

20               MR. GREENE:  Hold -- mischaracterizes his

21   testimony.  Objection to the form of the question.

22               Simply because the complaint doesn't use a

23   specific word you are asking about does not mean

24   that the violations are not included.

25               So with that, you can answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 77

```
 1          Q.    Did --
 2                (Counsel confer.)
 3                MR. HENDERSON:  For the record, I think
 4     Mr. Greene's are crossing over -- becoming --
 5     statements are becoming just speaking objections,
 6     trying to instruct you.  So we noted that for the
 7     record.
 8          Q.    In terms of --
 9                MR. GREENE:  So just -- I want to be
10     clear.  They're not speaking objections, but I'm
11     not going to let you harass this witness and,
12     again, attempt to pad a record for a motion that
13     you have pending while you go beyond the scope of
14     the notice and ask misleading questions.
15                The questions are misleading and
16     mischaracterizing the documents.
17                MR. HENDERSON:  Well, if the witness
18     believes they are, he -- I think the witness can
19     explain.
20                MR. GREENE:  He's certainly capable of
21     testifying, but my job is to note the objections
22     for the record, which I've done.
23                So you can go ahead.
24          Q.    So there was no notice given by CLF of any
25     violation dealing with the permeability of
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 78

1     secondary containment or the impermeability of it?

2          MR. GREENE:  Objection.  Mischaracterizes

3     the NOIs.  Mischaracterizes the complaint.  Calls

4     for a legal conclusion.  Beyond the scope of the

5     notice.

6          But you can answer.

7     A.    No.

8     Q.    No what?

9     A.    No to your question.

10         MR. HENDERSON:  Can you read back my

11    question, Jodi.

12         (Question read back.)

13    Q.    So you're saying that there was notice

14    given of a permeability violation?

15    A.    The notice given was violations associated

16    with the lack of best industry practice, best

17    management practice, stormwater management, and

18    control measures.

19    Q.    So does the notice --

20    A.    That was the notice.

21    Q.    Does the notice give a specific

22    description of the violations of the best industry

23    practice provision?  Is that what you're saying?

24         MR. GREENE:  Objection.  Mischaracterizes

25    his testimony.  Document speaks for itself.  Beyond

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 79

1        the scope of the deposition notice.

2              A.    On page 9 of the -- of Exhibit 3 --

3              Q.    Right.

4              A.    -- first paragraph, the sentence that I

5        read (as read):

6                    "Shell's SWPPP --"

7              Q.    Page 9?

8              A.    Page 9.

9                    "Shell's --"

10             Q.    Of Mahoney Exhibit 3?

11             A.    Yes.

12                   MR. HENDERSON:  I'm not seeing it.

13             Q.    Well, the first sentence says "The permit

14       requires"?

15             A.    Yes.

16             Q.    Okay.

17             A.    Midway down, (as read):

18                   "Shell's SWPPP --"

19             Q.    Right.

20             A.    -- "fails to describe or ensure

21       implementation of BMPs that will be used to ensure

22       nonstormwater pollutant discharges."

23             Q.    And -- but nowhere does -- does this

24       paragraph mention permeability of secondary

25       containment?

Page 80

1              MR. GREENE:  Objection.

2              Go ahead.

3         A.   Best management practices include -- so

4    there's -- there's not a -- there's not in this

5    document.

6         Q.   So there's no citation.  The only -- the

7    only citation here is to "eliminate nonstormwater

8    discharges"?

9              MR. GREENE:  Objection.  The form of the

10   question.

11        Q.   Does that --

12        A.   And BMPs, yes.

13        Q.   That is --

14        A.   That's one section of this, yes.

15        Q.   Does the notice of intent deal with

16   secondary containment?  Does it provide any notice

17   of any violation of secondary containment?

18             MR. GREENE:  Objection.  The form of the

19   question.  Document speaks for itself.  Beyond the

20   scope of the notice.

21             You can answer.

22        Q.   Mr. Mahoney --

23        A.   The document speaks for itself.

24        Q.   Okay.  So -- and I'm -- I understand

25   your -- your testimony.  You're saying if it's not

Page 81

1      there, it's not there; if it is there, it is there;
2      is that correct?
3            A.    That's correct.
4            Q.    Okay.  Well, that should save us some time
5      here.
6                  So, to your knowledge, has EPA ever cited
7      any of the defendants for a violation of any
8      section of the Connecticut stormwater permit ever
9      at any time?
10           A.    For this terminal, for the New Haven
11     terminal?
12           Q.    Yes.
13           A.    I'm not aware of any.
14           Q.    Okay.  Has the US EPA ever cited the
15     defendants for this terminal for any violation of
16     any environmental law?
17                 MR. GREENE:  Objection.  The form of the
18     question.  Calls for a legal conclusion.
19                 You can answer.
20           A.    Not that I'm aware of.
21                 And what topic are we on?
22           Q.    Topic 4 and other topics.
23           A.    Okay.  Thank you.
24           Q.    So has the Connecticut DEEP ever inspected
25     this terminal and identified any problem with the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 82

1      permeability or impermeability of any of the
2      secondary containment?
3                 MR. GREENE:  Objection.  The form of the
4      question.
5                 You can answer.
6           A.    Yeah, I'm not aware.
7           Q.    Okay.  Do you know that even if the --
8      does the state of Connecticut even have a
9      regulation that requires liners for secondary
10     containment?
11                MR. GREENE:  Objection.  Calls for a legal
12     conclusion.
13          A.    My understanding is the requirements are
14     that best industry practices be used --
15          Q.    Okay.
16          A.    -- at -- at facilities.
17          Q.    So the -- your testimony is it's a
18     violation of the best industry practices language
19     in the permit?
20                MR. GREENE:  Objection.  Mischaracterizes
21     his testimony.
22          A.    What is the violation?
23          Q.    No.  You said you -- you believe that the
24     permeability issue was a violation of the best
25     industry practices provision or --

Page 83

1      A.    No, I don't think so.  I think you were

2      asking about liners.

3      Q.    Right.  I just asked you:  Are you aware

4      the state of Connecticut has any regulatory

5      requirements that liners should be placed in

6      secondary containment?

7            MR. GREENE:  To the extent that was a

8      question, it's been asked and answered and it calls

9      for a legal conclusion.

10      A.    Yeah, and my understanding is that the

11      Connecticut DEEP requires best industry practices

12      to be used to control -- as control measures for

13      stormwater, and that could include liners.

14      Q.    But you're not citing any specific section

15      of the permit?  It's just that language about best

16      industry practices?

17            MR. GREENE:  Objection.  Mischaracterizes

18      his testimony.

19      A.    I would say that the permit -- and I think

20      you're speaking about the -- the permit for the

21      terminal?

22      Q.    Yes.

23      A.    The Connecticut DEEP --

24      Q.    Yes.

25      A.    -- permit for the terminal?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 84

1          Q.    Yes.

2          A.    Would speak for itself; but, again, I

3     would agree -- and we can do this if you'd like --

4     if the word is not in there, it's not in there.

5          Q.    Okay.  Thank you.

6                Are you -- do you remember where Doctor

7     Horner talked about no liner in the stormwater

8     pond?  Does that sound familiar?

9                MR. GREENE:  I'm just going to object.

10               If you want to ask him specific questions

11    about the expert reports, he should have the expert

12    reports in front of him.

13         A.    I recall that there was discussion about

14    the base of the retention pond.

15         Q.    Is there any allegation in the notice of

16    intent that -- that it's a violation of the

17    stormwater permit that there's no liner in the

18    stormwater pond?  Is there anything that remotely

19    resembles that in the notice of intent?

20               MR. GREENE:  Just going to object to the

21    form of the question.  The document speaks for

22    itself.  Calls for a legal conclusion.  Beyond the

23    scope of the notice.

24               Go ahead.

25         A.    Yeah, I -- you know, the same answers that

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 85

1      we've had.

2          Q.   So just so we're -- there's no confusion

3      here, all of your claims against the defendants is

4      in the Notice of Intent to Sue?

5              MR. GREENE:  Objection.  Asked and

6      answered.  Repeatedly --

7              MR. HENDERSON:  No.  No.  No.

8              MR. GREENE:  -- repeatedly, repeatedly

9      he's testified to that.

10              MR. HENDERSON:  If we can agree that

11      that's it, then we can move on.

12              MR. GREENE:  No.  No.  No.  No.  Just

13      'cause you're not getting the answer that you want

14      doesn't mean you get to keep asking over and over.

15              MR. HENDERSON:  No, I'm -- I'm getting the

16      answers that I think he's being truthful about.

17              MR. GREENE:  No, no.  I said you're not

18      getting the answers that you want --

19              MR. HENDERSON:  No.  No.  You don't --

20              MR. GREENE:  -- so you keep asking that

21      question.

22              MR. HENDERSON:  Mr. Greene, why do you

23      think you know what's in my head.  I'm just

24      curious.

25              MR. GREENE:  'Cause I can tell from your

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 86

1          questions.  It's obvious.

2               Q.   So if it's not in the letter, it's not in

3          the letter?

4               MR. GREENE:  Objection.  Mischaracterizes

5          his testimony.

6               Q.   So are --

7               A.   If a word is not in the letter, it is not

8          in the letter.

9               Q.   Okay.

10              A.   That was not your question.

11              Q.   I just asked that question.

12              MR. GREENE:  No, it's not the same

13         question.

14              Q.   Okay.  Are you familiar with the

15         Connecticut -- are you familiar with the

16         Connecticut Stormwater Quality Manual?

17              A.   Yes.

18              Q.   Okay.  Are you alleging any violations of

19         the Connecticut Stormwater Quality Manual in this

20         case?

21              MR. GREENE:  Objection.  Calls for a legal

22         conclusion.  Beyond the scope of the notice.

23              Q.   You can answer.

24              A.   I'm aware of the -- the guidance manual

25         which provides guidance to permit holders.  I'm not

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 87

1    sure one could be in violation of the guidance

2    document.

3         Q.   Okay.  Did CLF ever notify Connecticut

4    DEEP or EPA about its -- about Doctor Horner's

5    alleged violation there was no liner in the

6    stormwater pond?

7              MR. GREENE:  I'm just going to object.

8              I -- well, that's -- that's, again, well

9    beyond the scope of this notice.

10        Q.   I'm just -- okay.  Subject to that, you

11   can answer.

12        A.   I don't know if Doctor Horner's expert

13   report has been shared with EPA or Connecticut DEEP

14   or, quite frankly, any other third party other than

15   your clients.

16        Q.   How would -- to the extent you know, how

17   would the Connecticut DEEP know that there was an

18   alleged violation of the liner -- of no liner in

19   the stormwater pond?

20             MR. GREENE:  Objection.  Calls for

21   speculation.  Beyond the scope of the notice.

22             Go ahead.

23        A.   They could read Doctor Horner's report.

24   They could -- they could go to the site themselves.

25        Q.   Okay.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 88

1          A.    They could -- they could take any measure
2     that any state or federal agency could take to
3     investigate.  They could call your clients --
4          Q.    Uh-huh.
5          A.    -- and ask.  And there's lots of things
6     that they could do.
7          Q.    But if they didn't know about the
8     allegation, why would they do any of that?
9               MR. GREENE:  Objection.  Calls for
10    speculation.
11         Q.    I mean, if DEEP didn't know about it, how
12    would it know to do that?
13              MR. GREENE:  Object to the form of the
14    question.  And it calls for speculation.
15         A.    If DEEP didn't know about the complaint?
16         Q.    The alleged violation of no liner in the
17    stormwater pond.
18              MR. GREENE:  Objection.  The form of the
19    question.  Beyond the scope of the notice.
20              Go ahead.
21         A.    It -- they would know -- they were on
22    notice that there was an alleged violation of the
23    permits governing regulating stormwater at the
24    site, and that's the -- that's the notice that they
25    would have had.  And then they would follow up on

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 89

1      that notice if they so chose to.

2           Q.   But the notice didn't include any

3      allegation about no liner in the stormwater pond,

4      did it?

5                MR. GREENE:  I'm just going to object to

6      the form of the question to the extent that you

7      have characterized the report as an allegation and

8      the NOI speaks for itself.

9                MR. HENDERSON:  Okay.

10               MR. GREENE:  And it calls for a legal

11     conclusion and beyond the scope of the notice.

12               But you can answer.

13          A.   The notice gives notice of the alleged

14     violations.

15          Q.   Okay.  I'm just asking about Doctor

16     Horner's report.  I mean, he makes some claims and

17     those claims do not appear to us to be in the

18     notice of intent.  I just wanted to see if you felt

19     otherwise.

20               MR. GREENE:  I'm just going to -- again,

21     I'm going to object to the form of the question

22     'cause the report is a report.  It doesn't allege

23     claims.

24               THE WITNESS:  Right.

25               MR. GREENE:  So...

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 90

 1          A.    Yeah.

 2          Q.    Are you saying Doctor Horner's report

 3     didn't allege any violations?

 4          A.    Doctor Horner's report is his expert

 5     opinion as to the appropriate stormwater control

 6     measures -- in part appropriate stormwater control

 7     measures that should be applied at the site.

 8          Q.    If you go back to Mahoney Exhibit No. 3,

 9     is there any allegation of inadequate stormwater

10     treatment in the Notice of Intent to Sue?

11             MR. GREENE:  Once again, I'm going to

12     object --

13             THE WITNESS:  Yeah.

14             MR. GREENE:  -- to the extent the document

15     speaks for itself.

16          A.    It would be the same answer as before.

17          Q.    So if it's -- if it doesn't mention

18     inadequate stormwater treatment in the NS -- NOI,

19     then that is not a claim that CLF is making?

20             MR. GREENE:  Objection.  Mischaracterizes

21     testimony and the document.

22             But you can go ahead.

23             THE WITNESS:  Yeah.

24          A.    If it -- if the words aren't in the

25     document, the words aren't in the document.  It

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 91

1          doesn't have to do with the relationship between

2          the notice and the claim.

3               Q.    Okay.

4               A.    And the complaint.

5               Q.    Does -- did CLF ever notify EPA or DEEP

6          about alleged violations of inadequate secondary

7          containment in the notice of intent?

8               A.    Again --

9                     MR. GREENE:  Just going to object again.

10         The document speaks for itself.  Beyond the scope

11         of the notice.

12                    You can answer.

13                    THE WITNESS:  Yeah.

14              Q.    I'm -- I'm just asking questions.

15              A.    These -- these are the documents --

16                    MR. GREENE:  Again, just because you keep

17         saying that now I have to say you're not just

18         asking questions.  You're asking -- for the fifth

19         time, you're asking questions beyond the scope of

20         the notice, mischaracterizing documents,

21         mischaracterizing testimony all to pad the record

22         of a motion that you have pending, which is well

23         beyond the scope of the notice which was negotiated

24         and litigated.

25                    MR. HENDERSON:  It's the -- topic No. 4,

Page 92

```
 1      (as read):

 2              "The factual basis for your contentions

 3      the terminal had violated or is deficient in the

 4      SWPPP."

 5              That's what I'm basing my question on.

 6              MR. GREENE:  Except you're not asking

 7      about a factual basis for anything.  You're asking

 8      him questions about words in a document that speaks

 9      for itself over and over and over again, and your

10      purpose in doing that is to pad the record --

11              MR. HENDERSON:  Mr. Greene --

12              MR. GREENE:  -- for a motion that you

13      have --

14              MR. HENDERSON:  -- we don't need to hear

15      your diatribe on stuff.

16              MR. GREENE:  It's not a diatribe.  You are

17      inappropriately using the notice --

18              MR. HENDERSON:  Just note it generally and

19      we'll have it subject to that.

20              MR. GREENE:  No, I'm going to -- every

21      time you abuse this process to pad your record, I'm

22      going to point it out.

23              MR. HENDERSON:  Mr. Greene, I've asked

24      very simple questions.  I'm not abusing any

25      process.  So if we just --
```

Page 93

1          MR. GREENE:  Simply saying that doesn't

2     make it true.

3          MR. HENDERSON:  If we can just keep --

4     Mr. Greene, you have a right to file whatever

5     notice on the record you want.  So...

6          MR. GREENE:  And I'm going to keep doing

7     that because you continue to mischaracterize the

8     documents, the testimony, the regulatory process,

9     and you're well off the notice.  You're well beyond

10    the scope of topic 4.  So I will continue to

11    object.

12         MR. HENDERSON:  So --

13         MR. GREENE:  You can go ahead.

14    Q.   Did CLF ever provide notice to EPA or DEEP

15    that there was inadequate secondary containment at

16    the terminal in New Haven?

17         MR. GREENE:  I'm going to object.  Form of

18    the question.  Calls for a legal conclusion.

19    Mischaracterizes the NOI.  Beyond the scope of the

20    notice.

21         You can answer, Mr. Mahoney.

22    A.   The only notices that CLF provided to EPA

23    and Connecticut DEEP are Exhibits 3, 4, and 5.

24    Q.   Okay.  And if they're not -- if the

25    alleged violations are not in Exhibit 3, 4, or 5,

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 94

1      then they're not in this case; right?

2          A.    No.

3                MR. GREENE:  Objection.  Mischaracterizes

4      the documents and the testimony.

5          Q.    So how would the agency know about these

6      inadequate secondary containment allegations that

7      CLF is making?

8                MR. GREENE:  Objection.  Calls for

9      speculation.  Beyond the scope of the notice.

10     Mischaracterizes the document.

11               You can go ahead, Mr. Mahoney.

12         A.    Again, the notices of intent provide your

13     clients and also the agencies with notice of the

14     basis for alleged violations.  What your clients or

15     EPA or Connecticut DEEP do with that notice is up

16     to them.

17         Q.    So --

18         A.    The Exhibits 3, 4, and 5 clearly provide

19     notice of alleged violations of the Clean Water Act

20     and the Resource Conservation Recovery Act to all

21     those parties.

22         Q.    And I think you previously testified you

23     don't know if they meet the requirements for the

24     code of federal regulations on notice?

25               MR. GREENE:  Objection.  Mischaracterizes

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 95

1    the testimony.

2             Go ahead.

3        A.    I said I'm not intimately familiar to

4    know, but I would presume that the notice letter

5    was appropriately prepared and meets all legal

6    requirements.

7        Q.    Did Doctor Horner raise any groundwater

8    allegations, or did he make any claims that there

9    were violation of groundwater laws and regulations

10   in the Notice of Intent to Sue letter?

11            MR. GREENE:  I'm just going to object that

12   it mischaracterizes the nature of the expert report

13   which does not address claims or allegations, but

14   also Mr. Mahoney repeatedly said if you're going to

15   ask him questions about Doctor Horner's report, he

16   would like to have it in front of him.

17            But with that objection, you can go ahead.

18       A.    The question's a little confusing.  Doctor

19   Horner's report is provided well after the notices

20   and -- and the complaint.  So it has -- it doesn't

21   relate back to those.

22       Q.    So that's our point.

23       A.    Yeah.

24       Q.    So Doctor Horner raised alleged violations

25   in his report that were not in the Notice of Intent

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 96

1      to Sue?

2            A.    No, you --

3                  MR. GREENE:  Objection.  Mischaracterizes

4      his testimony.  Mischaracterizes the report.

5      Mischaracterizes the NOI.

6                  You can answer.

7            A.    You -- you asked me if Mr. Horner's

8      claims -- they're not claims, but if his opinion

9      was -- was in the NOI.  I took that to mean did

10     Doctor Horner contribute to the NOIs when they were

11     drafted and sent in July of 2020 and -- sorry --

12     February of '21 and November of '24.

13                 And my answer to that is, no, he did not

14     because his expert report was prepared after those

15     documents.

16           Q.    Was -- does the Notice of Intent to Sue or

17     the complaint include any allegation that the

18     defendants violated the permit for a failure to

19     implement a corrective action plan?

20                 MR. GREENE:  Objection to the form of the

21     question.  And the documents speaks for themselves.

22     Beyond the scope of the notice.

23                 But you can answer if you're able.

24           A.    Again, same answer:  If the words

25     "corrective action plant -- plan" aren't in the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 97

1    notice, they're not in the notice.  I'd have to

2    take a look at the complaint.  But same thing:  The

3    document would speak for itself.

4        Q.   So no notice of a failure to implement a

5    corrective action plan was ever provided by CLF to

6    the EPA or the Connecticut DEEP?

7             MR. GREENE:  Objection.  Mischaracterizes

8    his testimony.  Mischaracterizes the document.

9    Beyond the scope of the deposition.

10       Q.   So no notice was provided to CL -- by CLF

11   to the Connecticut DEEP and the EPA about an

12   alleged violation of a failure to implement a

13   corrective action plan?

14            MR. GREENE:  Objection.  Mischaracterizes

15   the document.  Mischaracterizes -- documents.

16   Mischaracterizes his testimony.  Beyond the scope

17   of the deposition notice.

18       A.   Again, same thing.

19       Q.   Okay.

20       A.   Notice was provided for the basis of the

21   allegations of alleged violations, and if the words

22   aren't in the document, they're not in the

23   document.

24            (Counsel confer.)

25       Q.   So, Mr. Mahoney, just continuing to move

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 98

1      forward here about the notice of intent, which is
2      identified as Mahoney Exhibit 3.
3              Does -- I'm going to ask the same question
4      just so we have it on the transcript.
5              Does the notice of intent make any
6      allegation that the defendants violated any part of
7      the permit related to ingress and egress to the
8      terminal site?
9              MR. GREENE:  Objection.  The document
10     speaks for itself.  Beyond the scope of the
11     deposition.
12             You can answer.
13     A.    And I assume by "permit" you're talking
14     about the Connecticut DEEP permit?
15     Q.    The Connecticut DEEP permit.
16     A.    Connecticut permit?
17     Q.    Yes, sir.
18     A.    Same -- same answer.
19     Q.    Okay.
20     A.    If the words aren't in the document,
21     they're not in the document.
22     Q.    Mr. Mahoney, to your knowledge, has the
23     claim by CLF that the defendants violated the --
24     some law related to ingress/egress, has that been
25     made at any time before May 8th, 2025?

1          MR. GREENE:  Objection.

2     Mischaracterizes -- first of all, this is again

3     beyond the scope of the deposition.

4          MR. HENDERSON:  I'm referring to topic No.

5     4 about the (as read):

6               "...factual and regulatory basis of your

7     contention that the SWPPP was deficient or

8     otherwise in violation of."

9          MR. GREENE:  Well, yeah.  Again, you're

10    just so clear.

11         MR. HENDERSON:  Can you just --

12         MR. GREENE:  Again, since you -- since you

13    brought it up, you're supposed to be asking him

14    about the facts.  You are asking him about when and

15    how certain -- which you characterize as claims

16    have been made and when and how notice was

17    provided.  That's not within the scope of topic 4.

18    You are using this deposition to pad a record for a

19    motion argument that you have upcoming.

20         MR. HENDERSON:  So --

21         MR. GREENE:  You are well beyond the scope

22    of the notice.  If you continue to do this, I may

23    have to suspend the deposition because asking him

24    about when and how a notice was given has nothing

25    to do with the facts underlying the claims.  If

Page 100

1     you'd like to ask him about some facts, you're free

2     to do that.

3                 MR. HENDERSON:  I think it says "facts and

4     regulatory basis."

5                 MR. GREENE:  That's also not a regulatory

6     basis.

7          Q.   So, Mr. Mahoney, can you identify any fact

8     in this case before May 8th, 2025, that relates to

9     the ingress and egress to the terminal as a

10    violation of the permit in this case?

11                MR. GREENE:  Object to the form of the

12    question.

13                You can answer.

14         A.   I'm not aware of any.

15         Q.   Okay.  So is it your -- is it CFL's --

16    CLF's allegation that the Connecticut DEEP

17    industrial stormwater permit required -- includes a

18    requirement to comply with the National Highway

19    Traffic Safety Administration requirements?

20                MR. GREENE:  Objection.  Calls for a legal

21    conclusion.

22                THE WITNESS:  Yeah.

23         A.   I don't -- I don't have an opinion on

24    that.

25         Q.   I'm not asking for your opinion.  I'm

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 101

1     asking for what CLF's factual basis and regulatory

2     basis.

3              Do you believe that notice of intent

4     included an allegation that -- that defendants

5     somehow had violated the National Highway and

6     Traffic Safety Administration Act.

7              MR. GREENE:  Well, that's not the question

8     you asked previously.  So now we're back to asking

9     about what claims are in the notice of intent and

10    how it's worded to pad your motion.  So I'm going

11    to object.  The document speaks for itself.

12             MR. HENDERSON:  Again --

13             MR. GREENE:  That was not the first

14    question asked.

15             MR. HENDERSON:  -- we're noting that we

16    object to Mr. Greene's continuing objection on his

17    theory of why we ask certain questions.  We're

18    asking questions about the alleged violations that

19    CLF says the defendants have raised -- has made.

20             MR. GREENE:  Well, again, just -- I don't

21    really need to do this 'cause the record is

22    abundantly clear, but you're asking questions about

23    phrasing in the notice of intent to pad a motion

24    that you have pending.  You are not using this

25    deposition for the stated purpose in the notice of

Page 102

1      deposition and for which we negotiated and

2      litigated.

3                 So...

4           Q.   Does the 2000 and -- does the permit that

5      is the basis of this lawsuit, the Connecticut DEEP

6      permit that's the basis of this lawsuit, does it

7      include a requirement that a permittee must secure

8      ingress and egress to a facility?

9                 MR. GREENE:  I'm just going to object to

10     the form of the question and asking him about the

11     permit without actually putting a copy of the

12     permit in front of him.

13                But with that, you can answer.

14          A.   I don't know.

15          Q.   Okay.  That's fine.

16                So you don't know.  And do you believe

17     that CLF would have a right to bring a claim under

18     that permit for a violation of the National Highway

19     and Traffic Safety Administration Act?

20                MR. GREENE:  Just going to object to the

21     form of the question.  Beyond the scope of the

22     notice.  Asking him questions about the permit

23     without putting it in front of him.

24                With that, you can go ahead.

25          A.   I would believe that CLF would have the

Page 103

1    right to bring a claim under any law as long as it

2    was factually supported and legally sufficient.

3        Q.    Does -- does that act, National Highway

4    Traffic Safety Administration Act, does it have a

5    citizen suit provision in it?

6            MR. GREENE:  I object.  Calls for a legal

7    conclusion and beyond the scope of the notice.

8            You can answer.

9        A.    I don't know.

10       Q.    In the -- in the Notice of Intent to Sue,

11   factually is there any statement relating to a

12   violation related to the inadequacy of the Spill

13   Prevention Control and Countermeasures plan known

14   as the SPCC?

15           MR. GREENE:  Object to the form of the

16   question and the fact that the document speaks for

17   itself.

18           You can answer.

19       A.    Give the same answer as we've given

20   before.

21       Q.    And -- and that is the document speaks for

22   itself.  And if the words SPCC are not in the

23   notice, then there is no claim being raised about

24   that?

25           MR. GREENE:  Again, objection.  That

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 104

1      mischaracterizes his testimony --

2               MR. HENDERSON:  That's just a question --

3               MR. GREENE:  -- where he has said --

4               MR. HENDERSON:  It's just a question.

5               MR. GREENE:  -- whether or not words --

6      No.  No.  No.  No.  Because you're misconstruing

7      his testimony with the intent of getting testimony

8      to help your motion.  He said whether or not words

9      are in the document, they may or may not be in the

10     document.  That does not mean if words -- specific

11     words you've asked for are not in the document that

12     that claim is not brought, and he's said that over

13     and over again.  And you continue to

14     mischaracterize his testimony.

15         Q.   So has CLF ever provided notice to EPA or

16     the Connecticut DEEP of a compound flood condition

17     at the terminal in New Haven?

18              MR. GREENE:  Object.  Document speaks for

19     itself.  Beyond the scope of the notice.

20              Go ahead.

21         A.   It's the same answer.  The notice -- the

22     only notice of intent concerning this terminal

23     provided to EPA and Connecticut DEEP are Exhibits

24     3, 4, and 5.

25         Q.   Okay.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 105

1          A.    And they speak for themselves.

2          Q.    Okay.  Did -- did CLF ever provide notice

3     to EPA or the Connecticut DP -- DEEP of bare soil

4     on berms at the terminal?

5          A.    Same --

6                MR. GREENE:  Object to the form of the

7     question.

8                You can answer.

9          A.    Same answer.

10          Q.    Okay.  Did -- did it ever provide oral

11     notice to Connecticut DEEP of any violation at the

12     terminal?

13                MR. GREENE:  Just going to object.  Beyond

14     the scope of the notice.

15                Go ahead.

16          A.    I don't -- I don't know the answer to

17     that.  I don't know if there was any conversation

18     concerning receipt of the notices of intent.

19          Q.    Has CLF ever had any conversation with

20     Connecticut DEEP about any alleged violations at

21     the terminal in New Haven?

22          A.    Yes, in connection with FOIA requests that

23     were made.

24          Q.    What were those conversations?

25          A.    Following up on the status of the response

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 106

1        to those FOIA requests.

2            Q.    Has --

3                  (Environmental sounds.)

4                  VIDEO OPERATOR:  Just to be clear, that's

5        going to be in the video, if you want to pause for

6        just a second.

7                  MR. HENDERSON:  We can take a five-minute

8        break if you want.

9                  MR. GREENE:  Why don't we just pause for a

10       minute.  It's going to go by.

11                 THE WITNESS:  He gave the thumb's up.

12                 MR. HENDERSON:  Huh?  Okay.

13           Q.    Has CLF ever had -- has CLF ever notified

14       the Connecticut DEEP or EPA orally that there were

15       violations at the terminal in New Haven?

16                 MR. GREENE:  Object to the form of the

17       question.

18                 You can go ahead.

19           A.    I don't believe so.  They may have, but I

20       don't -- I don't believe so.

21           Q.    Okay.  Has CLF -- does it lobby in

22       Connecticut?

23                 MR. GREENE:  I'm just going to object as

24       beyond the scope of the notice.

25                 You can go ahead.

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 107

1          A.   I know that -- that the CLF advocates

2     based in Connecticut do some legislative work.  I

3     don't know if they are registered as lobbyists, and

4     I don't know what the requirements are for

5     registering as a lobbyist in Connecticut.

6          Q.   Has CLF ever texted or e-mailed with any

7     legislator in Connecticut about the terminal?

8               MR. GREENE:  Object.  Beyond the scope of

9     the notice.

10              You can answer.

11         A.   Do you mean a state legislator?

12         Q.   Yes.

13         A.   I'm not aware of any.

14         Q.   How about any federal legislator?

15         A.   I'm not --

16              MR. GREENE:  Objection.

17         A.   Not aware of any.

18         Q.   Do you know Mr. Dave Weinreb?

19         A.   Not personally.

20         Q.   How about Jacqueline Maison-Pierre?

21         A.   Not personally.

22         Q.   Do you know who they are?

23         A.   I know that Mr. Weinreb is a member of CLF

24     and a standing declarant in this case.

25         Q.   Anstress Farwell, do you know her?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 108

1        A.    I don't know her but know the same of her.

2        Q.    How were they identified to be members of

3    the CLF with standing to bring these claims?

4            MR. GREENE:  I'm just going to object to

5    the form of the question.  To the extent that calls

6    for privileged information, you don't have to

7    disclose that.

8        A.    How are they --

9        Q.    How were they identified?

10           MR. GREENE:  Same objections.

11       A.    I think that there was some work that was

12   done to identify people in the community who were

13   concerned about the operations of the terminal in

14   New Haven.

15       Q.    Did CLF pay someone to identify them?

16           MR. GREENE:  Objection.  I'm going to

17   object and instruct you not to answer.

18       Q.    How much did they pay them to -- to be the

19   witnesses this case?

20           MR. GREENE:  Objection to the form of the

21   question.  I'm going to instruct you not to answer.

22           Go ahead.

23       Q.    So you're not answering that?

24           MR. GREENE:  You're into the development

25   of this lawsuit.  It's privileged information.

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 109

1              MR. HENDERSON:  I'm just asking.  These

2        are the standing folks that y'all identified.

3              MR. GREENE:  I'm aware of that, but I

4        think you're into privileged information.  So...

5         A.   Are you asking how much the standing

6        declarants were paid to testify?

7         Q.   How much did CLF pay to identify the

8        standing declarants?

9              MR. GREENE:  I'm just going to object and

10       instruct him not to answer.

11             I don't see that that's -- any of this is

12       discoverable or within the scope of the notice, but

13       go ahead.

14        Q.   So just for the record, are you not

15       answering that question?

16        A.   I'm going to follow advice of counsel.

17        Q.   Okay.

18             MR. HENDERSON:  5?

19             COURT REPORTER:  6.

20             (Exhibit Mahoney 6, General Permit For the

21             Discharge of Stormwater Associated With

22             Industrial Activity, 10/1/2018.)

23        Q.   Mr. Mahoney, we're going to switch gears

24       here for a little bit.

25        A.   Okay.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 110

1      Q.   You've been -- you've identified -- you've
2    been handed an exhibit called Mahoney Exhibit 6.
3    And, Mr. Mahoney, this exhibit is dated October 1,
4    2018; is that correct?
5      A.   That is correct.
6      Q.   Is this the permit that the complaint by
7    CLF against the defendants was based on?
8      A.   I think this might be.  I know that the
9    permit was reissued without any changes in 2021 as
10   well, and that's the current --
11     Q.   Right.
12     A.   -- that's the current permit.
13     Q.   Mr. Mahoney, we'll be giving you another
14   one which is the 2021 permit.
15               (Exhibit Mahoney 7, General Permit For the
16               Discharge of Stormwater Associated With
17               Industrial Activity, 10/1/2021.)
18     Q.   So, Mr. Mahoney, just for the record, this
19   is the October 1, 2021, permit?
20     A.   Okay.  Yes.
21     Q.   And just -- with all the documents it can
22   get confusing after a while, but I believe
23   originally when you filed suit the 2018 permit was
24   in effect and then it was amended.  We were just
25   going to propose to use the 2021 permit to ask

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 111

1          questions.  Do you think they're -- substantively I

2          think they're identical, but...

3                    So have you reviewed this October 1, 2021,

4          permit?

5          A.    Yes, I have -- I have reviewed it.

6          Q.    And it's marked as Mahoney Exhibit 7.

7                    And so this permit was the basis for the

8          lawsuit or we've identified the amended complaint

9          was filed against the defendants; is that correct?

10                   MR. GREENE:  I'm just going to object.  I

11         don't want to be this nitpicky, but it

12         mischaracterizes his testimony.  He said the 2018

13         one was the basis and then -- was a new permit.

14         So -- which remains in effect.  But go ahead.

15                   I understand the efficiency of using the

16         2021, but because of the way you asked the

17         question, I just needed to clarify.

18                   (Counsel confer.)

19         Q.    So for the references in the amended

20         complaint, which permit did you rely on?

21         A.    For the amended complaint I believe we

22         relied on 20- -- I think the 2018 permit was still

23         in effect, but I'd have to take a look at the --

24         Q.    Okay.

25         A.    -- complaint.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 112

1              But that's my understanding.  It's -- my
2      understanding is what you just said, which was the
3      2018 was in effect at the time the complaint was
4      filed; the 2021 permit is the permit that is
5      governing today, and that there was little change
6      to that per Connecticut DEEP.
7          Q.   And that was our understanding as well,
8      just for the record.  I know Mr. Greene's probably
9      going to object to that, but that's our
10     understanding too.
11             MR. GREENE:  Well, again, I have no
12     objection to that.  I just -- the way the question
13     was asked, his testimony then became inaccurate.  I
14     just wanted to make sure it was clear.  That's all.
15     I'm happy to clarify the situation.
16         Q.   So what's -- this is our time to go
17     through the permit, and I just have some questions
18     about it.
19             Now, this is a general permit; correct?
20         A.   That's correct.  And --
21         Q.   What's the difference between a general
22     and an individual permit?
23         A.   Let me -- let me just say --
24         Q.   Oh, sure.
25         A.   -- before.  I have reviewed this.  I am

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                              Page 113

1      not an expert in this.

2           Q.   Okay.

3           A.   As we talked about earlier, I am not

4      working on this case.  I am not and have not played

5      any role in interpreting the provisions of the

6      permit and how they apply to that.  I'm happy to

7      talk about it, but I would, just as an initial

8      matter -- and maybe to save us some time --

9           Q.   And I appreciate --

10          A.   -- this is a document that speaks for

11     itself.

12          Q.   Okay.

13          A.   This is the Connecticut DEEP document,

14     and --

15          Q.   And I appreciate that --

16          A.   Okay.

17          Q.   -- and -- and maybe Mr. Greene may not

18     have the same objections, but if a document --

19     when -- when you say a document speaks for itself,

20     what do you mean?

21               MR. GREENE:  Objection.

22          Q.   No, I mean that, you know, just a very

23     basic way and -- I mean, if we can agree that if --

24     if the words are here and the words are not here

25     and if they're not there, then they're not there so

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 114

1    we don't need to worry about them.  That's what I'm

2    trying to get my hands on.

3              MR. GREENE:  Well, again, I'm going to

4    just object to that soliloquy because of the issues

5    we've had prior in this deposition.  To say words

6    are or are not in a document doesn't necessarily

7    explain what the document means.

8              And so with that, you can go ahead,

9    Mr. Mahoney.

10             THE WITNESS:  Yeah.

11        A.   When I say a document speaks for itself.

12   I mean the words are the words in the document.

13   There may be differences in interpretation of those

14   words, but the -- the plain language is the plain

15   language.

16        Q.   Yeah.  And we appreciate that.  That's --

17   I just want to make sure.

18        A.   So there may be words in here that there

19   may be disagreement about, but the words are clear.

20             So -- we'll leave it at that.

21        Q.   Okay.  We'll -- we'll just move through

22   it --

23        A.   Okay.

24        Q.   -- and if Mr. Greene has any objections,

25   he can note them for the record.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 115

1          But my question was really what's the
2    difference between a general and an individual
3    permit?
4          A.   So the general permit, under the National
5    Pollutant Discharge Elimination System, under the
6    Clean Water Act, you can have individual permits
7    for discharges that are specific to that discharge
8    or facility, and sometimes it can cover multiple
9    discharges from one facility.
10          A general permit applies, as the word
11    would imply, generally across, and it applies to
12    different sectors to regulate stormwater associated
13    with, as it says, industrial activity.
14          Q.   Okay.  But this permit is -- is really
15    what the dispute is -- is this permit what the
16    lawsuit is based on?  That the defendants did not
17    comply with this permit?
18          MR. GREENE:  Just going to object to the
19    form of the question and calls for a legal
20    conclusion.
21          But you can go ahead.
22          A.   Certainly the Clean Water Act claims --
23          Q.   All right.
24          A.   -- are associated with failure to meet
25    requirements of this permit.  The RCRA claims are

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 116

1          obviously based on the law associated with RCRA.

2              Q.   Right.

3              A.   R-C-R-A.

4              Q.   Did the defendants in this case actually

5          prepare and -- and implement a SWPPP -- an

6          S-W-P-P-P, all capitals -- for the terminal?

7              A.   I think it's my understanding they did.

8              Q.   Okay.  Do you know if EPA has inspected

9          the terminal within the last five years?

10             A.   I do not.

11             Q.   Okay.  Do you know if Connecticut DEEP has

12         inspected the facility in the last five years?

13             A.   I do not.

14             Q.   All right.  For this permit, does it use

15         the words "climate change" anywhere in the permit,

16         the 2021 permit, identified as Mahoney No. --

17         Exhibit No. 7?

18                  MR. GREENE:  Objection to the form of the

19         question.

20                  You can answer.

21                  THE WITNESS:  Yeah.

22             A.   Again, the document speaks for itself.

23             Q.   So look at page 5 of 70, which is 5 of 70

24         identified in the exhibit.

25                  MR. GREENE:  And I apologize.  We're on 7;

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 117

1          correct?

2                    MR. HENDERSON:  Yes.  Yes, sir.

3               Q.   The definitions -- this permit does not

4          include a definition for climate change, does it?

5                    MR. GREENE:  Object to the form of the

6          question.

7                    Go ahead.

8               A.   (Witness reviews document.)  It does not.

9               Q.   Okay.  Does it mention the word "climate

10         adaptation"?

11                   MR. GREENE:  Objection.  Document speaks

12         for itself.

13                   You can answer.

14              A.   There's no definition for climate

15         adaptation, if that's what you're asking.

16              Q.   Is there a definition of climate

17         resilience, r-e-s-i-l-i-e-n-s-c-e [verbatim]?

18                   MR. GREENE:  Objection.  Document speaks

19         for itself.

20                   You can answer.

21              A.   There's no definition of resilience in

22         this document.

23              Q.   Does it use the word "climate change,"

24         "climate adaptation," or "climate resilience"

25         anywhere in the permit?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 118

1          A.   You know, the document speaks for itself.
2      I haven't done that close of a review to say it
3      does or it doesn't.
4          Q.   Okay.  But if those words don't appear in
5      here, then the word -- the permit does not include
6      the words; correct?
7               MR. GREENE:  Object to the form of the
8      question.
9               You can answer.
10         A.   Right.  If the -- if the words aren't in
11     here, the words aren't in here.
12         Q.   Okay.  Did -- can you point out anywhere
13     in this permit where it requires the defendants to
14     complete a climate change risk assessment?
15              MR. GREENE:  Object.  First of all, if the
16     witness wants to take the time to review the
17     document, he should take whatever time he wants.
18              Secondly, the document speaks for itself.
19              But go ahead.
20         A.   You asked about climate risk assessment?
21         Q.   Yes.
22         A.   I don't see that defined in -- in the
23     definitions, section 2, of this document.  And as I
24     said earlier, I haven't reviewed the -- the permit
25     closely enough to give you an answer either way as

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 119

1         to whether it appears elsewhere in the document.

2              Q.    Is CLF alleging that the defendants failed

3         to consider climate change impacts on the terminal?

4                    MR. GREENE:  Object to the extent that the

5         NOI and complaint speak for themselves.

6                    But you can answer.

7              A.    CLF's allegations are that --

8                    (Counsel confer.)

9              A.    -- that the --

10             Q.    Go ahead.

11             A.    CLF's allegations are that your clients

12        have failed to meet the requirements of the permit

13        and that that failure is set forth in the complaint

14        and -- and in the opinions of the experts that CLF

15        has retained to support its claims.

16             Q.    Thank you.  I would -- I'm just trying to

17        identify where in the permit, what provision have

18        the defendants violated in -- when CLF claims they

19        did not complete a climate change assessment of the

20        terminal?

21                   MR. GREENE:  Object to the form of the

22        question.  And the document speaks for itself, as

23        do the NOI and the complaint -- complaints, excuse

24        me.

25                   But you can answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 120

```
 1          Q.   I'm looking for the section -- page number
 2     section -- the section that we violated when you
 3     allege we did not complete a climate change
 4     vulnerability analysis.
 5               MR. GREENE:  I'm just going to --
 6          Q.   So if you could point that out, that's
 7     what I -- my question.
 8               MR. GREENE:  I'm going to continue to
 9     object.
10          Q.   And it's topic 4 about where it
11     specifically mentions the general 2021 permit.
12               MR. GREENE:  Just for the record, this is
13     an issue that's been litigated.  The defendants are
14     on notice of what they violated.  They've been on
15     notice via the NOI, via the complaints, via the
16     expert reports now that have been served.  So to
17     ask this witness to go through --
18               MR. HENDERSON:  Object to Mr. Greene's
19     speaking objections.
20               MR. GREENE:  Well, let me finish my
21     objection before you object to my objection.
22               So to ask the witness to parse words in a
23     document I think is -- is unfair.
24               But with that, you can go ahead.
25          Q.   Go ahead, Mr. Mahoney.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 121

1          A.    Yeah.  I mean, again, this document speaks

2     for itself.  The allegations that CLF has made are

3     contained in the amended complaint and --

4          Q.    No, I'm just here today --

5          A.    I understand.

6          Q.    -- looking at the permit.

7                Could you point out which section of the

8     permit we allegedly violated by not completing a

9     climate change assessment of the terminal.

10               MR. GREENE:  Yeah, and once again, it

11     calls for a legal conclusion.  All the documents in

12     this case advise the defendants of what the claims

13     are and what the bases are, including the NOIs and

14     the amended complaints and the copious expert

15     reports that have been served.

16          A.    I don't have anything to add to that.

17          Q.    So are you unable to identify which --

18     here today in this deposition -- which section of

19     the permit we have violated when CLF alleges we did

20     not complete a climate change assessment of the

21     terminal?

22               MR. GREENE:  Objection.  Mischaracterizes

23     his testimony, and defendants are already on notice

24     in a variety of ways repeatedly --

25          Q.    Mr. --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 122

1          MR. GREENE:  -- of what they violated.

2          But you can answer.

3      Q.   Mr. Mahoney, I'm just -- we have the

4  document.  It's about 60 pages.  You've testified

5  you reviewed it.  I just -- if you could point out

6  which section of the permit that we allegedly

7  violated when CLF claims that we did not complete a

8  climate change assessment.

9          MR. GREENE:  Same objections.  Again, to

10  ask this witness to parse words in a document and

11  come to a legal conclusion is inappropriate,

12  particularly when the defendants have been

13  repeatedly put on notice via multiple pleadings in

14  this case and the expert reports of what they

15  violated.

16          You can go ahead.

17          MR. HENDERSON:  Vin, just -- just for the

18  record, and if --

19      Q.   I'm just asking you, Mr. Mahoney, you're

20  the 30(b)(6) for CLF and speaking on behalf of the

21  company, CLF has sued the defendants --

22      A.   Right.

23      Q.   -- and they claim that we have violated

24  this permit because we did not complete a climate

25  change assessment of the terminal.

Sean M. Mahoney                                June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 123

1            Where -- which section did we violate?
2            MR. GREENE:  Asked and answered
3       repeatedly.
4                THE WITNESS:  Yeah.
5            MR. GREENE:  I restate all my
6       objections --
7                MR. HENDERSON:  No.
8            MR. GREENE:  -- again and again.
9            MR. HENDERSON:  I haven't --
10           MR. GREENE:  -- that this witness is not
11      going to give you legal conclusions.  It's not his
12      role.
13           MR. HENDERSON:  It's not a legal
14      conclusion.
15           MR. GREENE:  Yeah, it is.
16           MR. HENDERSON:  Where -- where in the
17      permit --
18           MR. GREENE:  That is absolutely a legal
19      conclusion.
20           MR. HENDERSON:  Where --
21           MR. GREENE:  You're asking him what you
22      violated.
23           MR. HENDERSON:  Which permit?
24           MR. GREENE:  And by the way, and for the
25      record, you know what you violated.  It's been a

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 124

 1          topic of this entire litigation.

 2                  MR. HENDERSON:  Look, I'm asking --

 3                  MR. GREENE:  This is a disingenuous

 4          question.

 5              Q.   I'm asking here today.  You're on the

 6          video.  You have the document.  Just point out

 7          which section that we allegedly violated --

 8                  MR. GREENE:  He -- again --

 9              Q.   -- on this permit.

10                  MR. GREENE:  Asked and answered.

11          Repeatedly asking a witness for a legal conclusion.

12          Asking for an expert conclusion.  Beyond the scope

13          of the notice.  Document speaks for itself.  So

14          does the NOI.  So does the complaint.

15              Q.   So -- okay.  Subject to that, can you

16          point out --

17              A.   Section 5.

18              Q.   Okay.  Section 5.  What page is that?

19              A.   17.

20              Q.   72?

21              A.   17.

22              Q.   17.  Okay.  So which -- which section did

23          we violate of this permit when you say -- when CLF

24          alleges the defendants did not complete a climate

25          change assessment of the terminal?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 125

1              MR. GREENE:  Restating all my same

2        objections.

3              Q.   No, you said section 5.  I'm just trying

4        to -- which one of these provisions?

5              A.   Section 5 are the conditions of the

6        permit.

7              Q.   Right.

8              A.   So --

9              Q.   But which specific --

10             A.   I don't have --

11             Q.   -- section?

12             A.   I don't have -- I don't have an opinion on

13       which specific section of this that you -- that

14       your clients violated.  That's for the team that's

15       trying the case.

16             Q.   I'm -- I'm not asking for your opinion.

17             A.   You are.  You're asking me.  You are.

18             Q.   I'm just asking where in the permit is the

19       section that we violated?

20             MR. GREENE:  Objection.  Calls for a legal

21       conclusion.  It calls for an expert conclusion.

22       Beyond the scope of the notice.

23             A.   My -- my understanding is section 5 of the

24       general permit is where your clients have

25       violated -- have violations.  Beyond that, I'm not

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 126

1      into the details of the specifics of what those

2      are.

3          Q.   So you don't have any factual knowledge on

4      behalf of CLF about what section of the general

5      2021 permit that the defendants allegedly violated?

6              MR. GREENE:  Objection.  That's not the

7      question you asked previously.  If you are asking

8      about the factual knowledge that he has, he's

9      already testified to -- to some of that.  You've

10     asked for a legal conclusion.

11         Q.   The only -- if I used the word legal

12     conclusion, I apologize.  I don't think I did.

13             I'm asking you to point out in this permit

14     which section that we violated.  So your -- your

15     testimony is it was section 5; is that right?

16             MR. GREENE:  Hold on.  Hold on.  I have an

17     objection.  Just to say you didn't use the word

18     legal conclusion doesn't mean you didn't ask for a

19     legal conclusion, which seems to be the

20     communication problem we've been having all day.

21             But, again --

22         Q.   Again --

23             MR. GREENE:  This witness is a witness

24     here testifying about the facts of the case.

25     You're asking him about -- you're asking him to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 127

1      opine on specific portions of the permit that you

2      have violated.

3          Q.   I'm asking --

4               MR. GREENE:  Those -- let me finish.

5               Those violations have been well set out in

6      the notice of intent -- notices of intent, the

7      complaint, multiple pleadings in this case, and the

8      expert reports.  This witness is not here to make

9      legal conclusions.  He's not an expert.  If you

10     want to ask him about the facts, you can ask him

11     about the facts.

12              But with that, go ahead.

13         Q.   Okay.  Topic 4, "What is regulatory

14     basis?"

15              What is the basis in this permit that you

16     allege we -- or the section of the permit you

17     allege we have violated when CLF alleges that we,

18     the defendants, failed to complete a climate change

19     assessment?

20              MR. GREENE:  That --

21         Q.   And so, yeah, I believe you testified

22     section 5; right?

23         A.   I think it relates to section 5.

24         Q.   So you are unable to point to a section in

25     this permit that CLF alleges we violated when we

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 128

```
 1        did not do a climate change assessment of the

 2        terminal?

 3                  MR. GREENE:  Objection.  Absolutely

 4        mischaracterizes his testimony.

 5                  And, again, restating all of the

 6        objections I've made here about legal conclusions,

 7        expert conclusions, information already provided to

 8        the defendants in -- in reams and reams and forests

 9        of paper.

10                  CLF has made it clear what the theory of

11        the case is, what the claims are, what the legal

12        basis is.  And to ask this witness to parse out a

13        specific phrasing is inappropriate, and he's

14        already testified section 5.

15                  You can go ahead.

16        A.   I don't have anything add -- to add.

17        Q.   Okay.  So -- and just so I get the record:

18        You have not identified any section of the permit

19        that CLF alleges we violated when the defendants

20        did not complete a climate change assessment of the

21        terminal?

22                  MR. GREENE:  Objection.  Absolutely

23        mischaracterizes his testimony.

24        Q.   Factually did you -- you pointed to

25        section 5; correct?
```

Page 129

1          A.    You asked me for a section of the permit.

2          Q.    Okay.

3          A.    That's the section --

4          Q.    Which subsection?

5          A.    -- that I believe -- I don't know what the

6     subsection is.

7          Q.    Okay.  So you're the spokesperson for CLF

8     that has sued the defendants, and you are unable to

9     identify a section of the permit that we allegedly

10    violated?

11          MR. GREENE:  Objection.  Mischaracterizes

12    his testimony, both -- particularly in this series

13    of questioning and all morning where he's testified

14    that he's relying on the expert reports in this

15    matter as well as all of the -- the pleadings, the

16    NOI, and the complaint.

17          So mischaracterizes his testimony and

18    calls for a legal conclusion.

19          MR. HENDERSON:  Again, we object to your

20    speaking objection, Mr. Greene.  I've noted that

21    for the record.

22          Q.    But you --

23          A.    The facts, as I understand them, are set

24    forth in the notice of intent and the complaint.

25          Q.    No, I didn't --

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 130

```
 1          A.    That's just how I understand them.
 2          Q.    But I don't have a right to talk to the
 3     lawyers who wrote the complaint.  You're the person
 4     that has been designated to answer our questions
 5     for the defendants on what we have allegedly
 6     violated.
 7              And I'm here today to identify which
 8     section of the permits -- sections of the permits
 9     that CLF has identified us as violating.
10              MR. GREENE:  Because --
11          Q.    That's all I'm trying to do.
12              MR. GREENE:  I'm going to object 'cause
13     he's already answers that question.  He's answered
14     it repeatedly.  And your question erroneously
15     leaves the impression that you don't already know
16     that.
17              MR. HENDERSON:  I'm not asking if we knew
18     it, Mr. Greene.  This is a document that's been
19     provided to the witness.  I think the jury and the
20     judge can see this.  I'm asking you to point out
21     where in this document, which section we violated.
22              MR. GREENE:  And that --
23          Q.    And you're the only person that we can ask
24     this about.  You're the spokesperson for CLF.
25              MR. GREENE:  Well, those -- objection to
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 131

1      the form of the question, if that was a question.

2      He's not the only person you can ask [verbatim] him

3      about.  We've provided multiple expert reports.  So

4      that's actually just categorically untrue.

5          Q.   But you're speaking on behalf of CLF.

6      That's why I'm asking you.  And if you don't know,

7      all you've got to do is say I don't know.

8               MR. GREENE:  Objection.  Mischaracterizes

9      testimony.  He's already answered the question

10     multiple times.

11         Q.   Again, just so we have a clear record.

12              Mr. Mahoney, you're the 30(b)(6) deponent

13     for CLF in this case; correct?

14         A.   That's correct.

15         Q.   And CLF is alleging that we violated this

16     permit, the October 1, 2021, stormwater permit;

17     correct?

18         A.   That's correct.

19         Q.   And I'm asking you to please identify

20     which sections of the permit that the defendants

21     have allegedly violated when they have not

22     completed a climate change assessment of the

23     terminal?

24              MR. GREENE:  Objection.  Asked and

25     answered.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 132

1          Q.    You can still go ahead and answer.

2                MR. GREENE:  And all of my other

3        objections.  Apologies.

4                Go ahead.

5          Q.    You can you can answer the question.

6                MR. GREENE:  He's already answered the

7        question.

8          A.    I've answered, and I don't know how I can

9        answer it differently.

10               MR. HENDERSON:  Can we go back and look at

11       his answer?

12         Q.    Can you just repeat your answer?

13         A.    My answer is that my understanding is that

14       the general conditions of this permit, section 5,

15       are where -- are -- are where your -- your clients

16       have failed to properly meet the conditions of

17       the -- of the permit, and that's set forth in the

18       complaint and in the expert reports that have

19       already been shared with you.

20               To go into the detail of where that is is

21       beyond the scope of my review, which was to become

22       familiar with hundreds, if not thousands, of pages

23       of -- of documents and to provide you with

24       information about CLF and the other topics that are

25       set forth in your deposition notice.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 133

1          Q.   Is this the only permit that you allege

2     the defendants have violated?

3          A.   I'd have to look at the complaint again to

4     make sure that there wasn't another permit.

5          Q.   So you're not clear today?

6          A.   I --

7               MR. GREENE:  Objection.  Mischaracterizes

8     his testimony.

9          A.   I just said I'd want to look at the

10    complaint to make sure.

11         Q.   Okay.

12              MR. HENDERSON:  Can we take a five-minute

13    break?

14              MR. GREENE:  Sure.

15              VIDEO OPERATOR:  The time is now 10:34,

16    and we are off the record.

17              (Recess was taken.)

18              VIDEO OPERATOR:  The time is now 10:50

19    a.m.  We are on the record.

20         Q.   So, Mr. Mahoney, let's look at the permit

21    under -- on page 18 of 70, which is section 5(b.)

22    Do you see that at the top "Control Measures"?  And

23    you had mentioned control measures in your

24    testimony.

25              Do you see that on page 18 of 70?

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 134

1          A.    I do.

2          Q.    "Control measures are required --"

3          A.    Yes.

4          Q.    -- "best management practices."

5                Is this the paragraph that CLF alleges the

6     defendants violated when the defendants did not

7     complete a climate change vulnerability analysis

8     for the terminal?

9                MR. GREENE:  A couple of objections.

10    First, the witness should take whatever time he

11    needs to review it and familiarize himself with it.

12               Secondly, mischaracterizes the pleadings

13    in this case.

14               But go ahead.

15               MR. HENDERSON:  I don't believe I referred

16    to any pleadings, but...

17               MR. GREENE:  You did inherently so.

18         Q.    I'm just trying to see if this was the

19    provision that you think CLF pointed to or -- or

20    says that we violated when the defendants did not

21    complete a vulnerability risk assessment.

22               MR. GREENE:  Well, again, my objection was

23    mischaracterizes the pleadings 'cause it assumes

24    only one section, but you should take your time to

25    review it.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 135

1            MR. HENDERSON:  We'd just note for the

2       record Mr. Greene's continued coaching of the

3       witness.

4            MR. GREENE:  I'm not coaching the witness.

5       The questions are misleading and mischaracterizing

6       the record in the case.  So I'm trying to clarify

7       the record.  Thank you.

8            MR. HENDERSON:  I think the witness is

9       welcome to -- if the question's not clear enough.

10           MR. GREENE:  Yeah, but my job is to

11      actually preserve that for the record.  So...

12           MR. HENDERSON:  I think the witness can

13      note for the record if it's unclear.

14           MR. GREENE:  But I still have a role here.

15      So I'm performing my role; but, again, take your

16      time.

17       A.   So the control measures portion of the

18      permit are -- required best management practices

19      that permittees are to implement to minimize the

20      discharge of pollutants from the permitted facility

21      and -- and quoting, (as read):

22           "The term 'minimize' means reduce and/or

23      eliminate, to the extent achievable, control

24      measures that are technologically available and

25      economically practicable and achievable in light of

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 136

1          best industry practice."

2                  I mean, I --

3          Q.    Go ahead.

4          A.    So -- so those are the control measures --

5          Q.    Okay.

6          A.    -- of the permit.

7          Q.    And that's what CLF alleges we violated

8     when the defendants did not complete a climate

9     change assessment of the terminal?

10                 MR. GREENE:  Objection the form of the

11    question for the reasons I noted earlier.

12         A.    I would just note that a climate change

13    assessment of the terminal may be a best management

14    practice or a best industry practice.  I'm not an

15    expert on those -- on -- on what is or isn't a best

16    industry practice --

17         Q.    Okay.

18         A.    -- or a best management practice.  There

19    are expert reports that have been prepared and

20    provided to you and your clients that we talked

21    about earlier today that discuss those.

22         Q.    Did -- is this the only place in the

23    permit where best manage- -- best industry practice

24    is mentioned in the permit?  Do you know?

25         A.    I --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 137

1              MR. GREENE:  Objection.  The document

2       speaks for itself.

3              You can answer.

4              THE WITNESS:  Yeah.

5         A.   I don't know offhand.  I think this is the

6       same answer as before.  The document speaks for

7       itself.

8         Q.   Okay.

9         A.    If the words are in there, they're in

10      there; if they're not, they're not.

11        Q.   Which of the subsections of section 5(b)

12      have the defendants violated according to the CLF

13      when defendants did not complete a climate change

14      assessment of the facility?

15             MR. GREENE:  Objection.  Calls for a legal

16      conclusion.

17             You can answer.

18        A.   I -- I wouldn't be able to point you to

19      the specific sections of that.

20        Q.   Okay.  Now, I think you may have answered

21      earlier, but by its terms the permit does not state

22      a permittee is required to complete a climate

23      change assessment under this permit; is that

24      correct?

25             MR. GREENE:  Objection.  Mischaracterizes

Page 138

1        his testimony.

2                    You can answer.

3                    And the document speaks for itself.

4                    You can answer.

5            A.   I think it's the same answer.  If it's not

6        in the document, it's not in the document.

7            Q.   Okay.  Does it has -- does the permit have

8        any reference that a permittee should complete an

9        assessment using a 100-year flood return period?

10           A.   (Witness reviews document.)  To be honest,

11       I can't recall if it does or it doesn't.  If

12       there's a section you can point me to.

13           Q.   And do you -- does CLF have any -- does

14       CLF have a copy of any document that shows the EPA

15       has ever required a permittee for an industrial

16       stormwater permit to conduct a climate change

17       assessment of the permitted facility?

18           A.   I'm not aware of any.

19           Q.   Okay.  Do you know if the Connecticut --

20           A.   I do -- sorry.  Just to followup on your

21       other question.

22                    There is a definition for a 100-year,

23       24-hour rainfall event --

24           Q.   Right.

25           A.   -- in the document, and there might be

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 139

1      other reference to 100-year flood events elsewhere
2      in the document.
3          Q.   So based on your review, that's the only
4      one you identified in this permit in that quick
5      summary of the permit you just looked at --
6          A.   In the --
7              MR. GREENE:  Well, just -- object to the
8      extent he hasn't actually taken the time to do a
9      full review of the documents as he is sitting
10     there.
11             But go ahead.
12         Q.   And do you know of any document where the
13     Connecticut DEEP has ever required a permittee
14     under a -- an industrial stormwater permit to
15     conduct a climate change assessment of the
16     permitted facility?
17             MR. GREENE:  Object to the form of the
18     question.
19             You can answer.
20         A.   Sitting here today, I'm -- I'm not aware.
21         Q.   Okay.  As the CLF representative, is -- is
22     it CLF's position that CLF is the only entity that
23     has ever demanded that a permittee, under
24     industrial stormwater permit, complete a climate
25     change assessment of the permitted facility?

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 140

```
 1              MR. GREENE:  Objection the form of the
 2      question.
 3              Go ahead.
 4      A.    I don't have an understanding either way.
 5      Q.    Okay.  But you -- you have no information
 6      that EPA has ever requested that a permittee, under
 7      an industrial stormwater permit, is required to
 8      complete a climate change assessment of the
 9      permitted facility?
10      A.    As I said, I'm not aware of that.
11      Q.    Okay.  And not aware that CT --
12      Connecticut DEEP has ever required that?
13      A.    I'm not -- I'm not aware of that.
14      Q.    How -- how is a permittee supposed to know
15      that section 5 requires a climate change risk
16      assessment of the permitted facility?
17              MR. GREENE:  Objection.  Calls for
18      speculation and the document speaks for itself.
19              But you can answer.
20      Q.    I mean, the words of the permit don't
21      require it; correct?
22              MR. GREENE:  Objection.  Mischaracterizes
23      his testimony for the reasons --
24              MR. HENDERSON:  I mean, just --
25              MR. GREENE:  -- reasons we have -- we have
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 141

1      discussed repeatedly this morning.

2          A.   I've never been required or tasked with

3      developing the plan for following the -- the

4      requirements of a general permit for discharge.

5      There are people who are -- whose job that is, and

6      there are experts to -- who -- who do that type of

7      work.

8              So I think that the one thing I would note

9      is just that there is a -- you know, that there is

10     a requirement for use of best management practices

11     and best industry practices; and so I think that

12     those would be what would guide how -- would guide

13     how a permittee determines it complies with a

14     permit.

15         Q.   Did -- thank you.

16             Another question:  I think you testified

17     that CLF did a -- an Open Records Act request or a

18     FOIA request to the Connecticut DEEP?

19         A.   Yes.

20         Q.   Did -- has CLF ever identified any email,

21     letter sent to a permittee of an industrial

22     stormwater permit in Connecticut that it was

23     required to complete a climate change assessment of

24     the permitted facility?

25             MR. GREENE:  I'm just going to object as

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 142

1      beyond the scope of the deposition notice to the

2      extent that it's dealing with matters other than

3      this one.

4            But you can go ahead.

5       A.   I'm not aware of any such document from

6      Connecticut DEEP in response to FOIA requests.

7       Q.   Has Connecticut DEEP ever put any

8      statement or guidance on its website that a

9      permittee, under a Connecticut general permit for

10     industrial stormwater, is required to conduct a

11     climate change assessment of the permitted

12     facility?

13           MR. GREENE:  Same objection.

14      A.   I'm not aware of any such document going

15     on the Connecticut DEEP website.

16      Q.   Is CLF aware of any requirement by the US

17     EPA that a permittee, under an industrial

18     stormwater permit, is obligated to complete a

19     climate change assessment of the permitted

20     facility?

21           THE WITNESS:  Could you read that back?

22           (Question read back.)

23      A.   I'm not aware of any such directive from

24     EPA.

25      Q.   Has Connecticut DEEP ever offered its

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 143

1          interpretation that the general permit of 2021 for

2          industrial stormwater section 5, the best industry

3          practice, requires a climate change assessment?

4                    MR. GREENE:  Object to the form of the

5          question.

6                    You can answer.

7          A.    I'm not aware of any such guidance or

8          directive issued by Connecticut DEEP.

9          Q.    Does CLF have any information that any

10         other laws in the state of Connecticut require a

11         permittee, under industrial stormwater permit, to

12         complete a climate change assessment of the

13         permitted facility?

14                    MR. GREENE:  Object to the extent that it

15         calls for a legal conclusion and beyond the scope

16         of the notice.

17                    But you can answer.

18         A.    I'm not aware of any such laws.

19         Q.    Do you know of any state in the United

20         States that requires a permittee, under any general

21         permit, to complete a climate change assessment of

22         the permitted facility?

23                    MR. GREENE:  Objection to the extent it

24         calls for a legal conclusion.  Beyond the scope of

25         the notice.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 144

 1          A.    I haven't done an analysis --

 2          Q.    Okay.

 3          A.    -- of any states with respect to that

 4    question.

 5          Q.    Does -- has CLF ever asked the Connecticut

 6    DEEP does the term "best industry practice" include

 7    an obligation to complete a climate change

 8    assessment of a facility permitted under an

 9    industrial stormwater permit in Connecticut?

10          MR. GREENE:  Object to the form of the

11    question.

12          You can answer.

13          A.    I don't believe CLF has ever asked

14    Connecticut DEEP that question.

15          Q.    Okay.  Why not?

16          MR. GREENE:  Objection.  Beyond the scope

17    of the notice.  Calls for potentially privileged

18    information.

19          But you can answer.

20          A.    I -- I don't know.

21          (Counsel confer.)

22          (Exhibit Mahoney 8, Guidance Document For

23          Preparing a Stormwater Pollution

24          Prevention Plan, March 2011.)

25          Q.    Mr. Mahoney, you've been provided what's

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 145

1        been marked as Mahoney Exhibit No. 8.  This is a

2        2011 guidance document by Connecticut DEEP.  This

3        was also included in topic 5 of the 30(b)(6)

4        deposition.

5                 Have you reviewed this document?

6        A.    I did look through it, yes.

7        Q.    Does -- so this is the Connecticut DEEP's

8        guidance document for preparing a Stormwater

9        Pollution Prevention Plan; correct?

10       A.    That's correct.

11       Q.    Does this document require a permittee to

12       conduct a climate change assessment of a facility

13       permitted under the Connecticut industrial

14       stormwater permit?

15                 MR. GREENE:  Objection to the extent that

16       calls for an expert witness conclusion.

17                 But you can answer.

18       A.    You know, again, the document would speak

19       for itself.  If those words aren't in here, those

20       words aren't in here.  I did look at this amongst,

21       as I said earlier, you know, a plethora of

22       documents that -- trying to be familiar with and to

23       be able to give you good answers.

24                 So it -- they may be in there, but I --

25       I'm not aware of it.  And, as I said earlier, if

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 146

 1          it's -- if the words aren't in there, the words

 2          aren't in there.

 3                Q.    Does CLF know if this document is still an

 4          effective guidance for Connecticut DEP -- DEEP?

 5                A.    My understanding is that this guidance

 6          document is the most recent one and that there

 7          hasn't been a subsequent guidance document

 8          prepared.  So it's 14 years old, but...

 9                Q.    So this is what an industrial stormwater

10          permit -- permittee would have to follow in knowing

11          how to prepare a Stormwater Pollution Prevention

12          Plan in the state of Connecticut?

13                A.    This would be one document that they could

14          refer to for guidance.  As we talked about earlier,

15          the -- it's a general permit.  So there are

16          different requirements for different industrial

17          activity.  So, you know, guidance doesn't -- some

18          guidance is specific to some specific --

19                Q.    Right.

20                A.    -- or some terms of the permit are

21          specific to some specific sectors.

22                Q.    Right.  So if you look at pages 25 of

23          43 --

24                A.    Uh-huh.

25                Q.    -- in this document, there's a table

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 147

1      called "Additional Inspection Requirements by

2      Sector."  And the sector -- there is no sector for

3      a fuel oil storage facility, is there?

4              MR. GREENE:  Object to the form of the

5      question.

6              Go ahead.

7         A.   In this chart?

8         Q.   In this chart.

9         A.   (Witness reviews document.)  In this chart

10     there is not.

11        Q.   In fact, does this document require any

12     sector in the state of Connecticut to complete a

13     climate change assessment of the terminal permitted

14     under this permit?

15             MR. GREENE:  Going to object to the form

16     of the question.

17             To the extent that you want some time to

18     review it, you should.

19        A.   I don't believe so.

20        Q.   So look at page 15 of 43 of this guidance

21     document.  It has identified "Control Measure

22     Elements."

23        A.   Yes.

24        Q.   And "Good Housekeeping."

25             Is there any requirement to conduct a

Page 148

1     climate change assessment of any facility regulator

2     under the general permit in the state of

3     Connecticut?

4              MR. GREENE:  I'm just going to object to

5     the extent the document speaks for itself.  Calls

6     for a legal or expert conclusion.

7              You can answer.

8         A.   In that section on good housekeeping,

9     which is pages 15 to 16, there's not.

10        Q.   And I think you've previously testified

11    there is no requirement for permittees to complete

12    a climate change assessment of any facility

13    regulated under an industrial stormwater permit in

14    the state of Connecticut; is that correct?

15             MR. GREENE:  Objection.  Mischaracterizes

16    his testimony.

17             You can answer.

18        A.   What I stated earlier was that the

19    requirement is to apply best management practices

20    and best industry practice, and so --

21        Q.   No, I'm just looking at this document.  Do

22    you see anything in here that requires the

23    permittee to conduct an industrial -- that the

24    permittee, under the industrial stormwater permit,

25    to complete a climate change assessment of that

Page 149

1     facility?

2              MR. GREENE:  I'm just going to object to

3     the form of the question to the extent this is a

4     guidance document.  This is -- it's not a list of

5     requirements.  It's what -- the document speaks for

6     itself.

7         A.   It -- if your question is is there a

8     requirement for a climate change assessment in this

9     section of the guidance documents, stormwater

10    control measures, there is not a specific

11    requirement --

12        Q.   Is your --

13        A.   -- for that.

14        Q.   Go ahead.

15             Is there a specific requirement anywhere

16    in this document?

17             MR. GREENE:  Just going to object to the

18    form of the question.  Document speaks for itself.

19             Go ahead.

20        A.   Again, I'm not aware of -- if the specific

21    term "climate change assessment" is in here or not;

22    but, again --

23        Q.   And --

24        A.   -- as we've agreed, if it's -- the words

25    aren't in here, they're not in here.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 150

1          Q.   So -- and I think you previously testified

2     the Connecticut DEEP -- that CLF knows of no

3     statement by Connecticut DEEP that a permittee,

4     under industrial stormwater permit, is required to

5     complete a climate change assessment of the

6     permitted facility; correct?

7          A.   I think we've already had that

8     conversation, yes.  Correct.

9          Q.   And I also think that you said this is

10    currently effective guidance document for the state

11    of Connecticut; correct?

12         A.   That's my understanding.

13         Q.   Has CLF ever requested that Connecticut

14    DEEP change this guidance document?

15         A.   I don't believe so.

16         Q.   Has CLF provided comments on the new

17    industrial stormwater permit that it'd proposed for

18    the state of Connecticut?

19              MR. GREENE:  Just going to object to the

20    extent that that's beyond the scope of the notice

21    of deposition.

22         A.   If you're referring to the draft --

23         Q.   Yes.

24         A.   -- permit, CLF did provide comments on the

25    draft permit.

Page 151

1      Q.   Okay.  And before we go on this guidance

2   document, I think that it says on page 59 --

3           (Counsel confer.)

4      Q.   It's on page 15 of this document.

5      A.   Are you talking about the guidance

6   document?

7      Q.   This guidance document.  Sorry about that.

8      A.   Okay.

9      Q.   Where it's -- very top of page (as read):

10          "Control measures are the best management

11   practices that are used to prevent or minimize

12   discharge of pollutants in stormwater."

13          You agree it says that?

14     A.   I do agree it says that.

15     Q.   Yeah.  So did you participate in any way

16   in drafting the CLF comments on the proposed draft

17   industrial stormwater permit that Connecticut DEEP

18   released last year?

19          MR. GREENE:  I'm just going to object to

20   the extent it's beyond the scope of the deposition.

21     Q.   Again --

22     A.   I did not.

23     Q.   So on page 21 of this document -- it's the

24   table we just looked at, I believe --

25     A.   This is the guidance document again?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 152

1          Q.   The guidance document.  Sorry.  Yes.
2               The "additional control measures required
3     by sector."  And they refer to section F of the
4     industrial stormwater permit.
5               Do you see that at the top of the page?
6          A.   Yes.
7          Q.   And they identify various sectors,
8     industry -- industry sectors:  auto salvage yards,
9     scrap recycling facilities, steam electric power
10     generation facilities, marinas, yacht clubs, and
11     boat dealers, ship and boat building and -- and
12     repair."
13               And do you see on the right-hand side it
14     has "Additional Control Measures"?
15               For any of those industries, does the
16     Connecticut DEEP require a climate change
17     assessment of the permitted facility?
18               MR. GREENE:  Objection.  Document speaks
19     for itself.  Calls for a legal and expert
20     conclusion.  Mischaracterizes the document.
21          A.   It does not.
22          Q.   So we'll switch to another document here,
23     Mr...
24               (Exhibit Mahoney 9, National Pollutant
25               Discharge Elimination System General

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 153

1              Permit For the Discharge of Stormwater

2              Associated With Industrial Activities,

3              Effective Date:  [to be determined].)

4        Q.    Mr. Mahoney, you've been provided what's

5    been identified as Mahoney No. 9, which is the

6    draft of the proposed -- of the -- a draft of the

7    proposed new industrial stormwater permit for the

8    state of Connecticut.  This was published in early

9    2024.

10             Have you reviewed this document?

11       A.    I have -- yes, I've gone through it.

12       Q.    And CLF has provided comments on this?

13       A.    Yes.

14       Q.    Who was responsible for preparing the

15   comments on the draft industrial stormwater permit

16   for the state of Connecticut?

17       A.    I'd have to look at the comment letter

18   that was sent in to see who signed it.

19       Q.    Okay.  Previously for the 2021 general

20   permit that we've been looking at the last 45

21   minutes, did CLF challenge that permit in any way?

22             MR. GREENE:  Object to the form of the

23   question.

24             You can answer.

25       A.    Do you mean a legal challenge?

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 154

1          Q.    Yeah.  When it was finalized.

2          A.    Not that I'm aware of.

3          Q.    Did it provide comments on the '21 permit?

4          A.    Not that I'm aware of.

5          Q.    So in 2021 CLF did not provide comments to

6     the Connecticut DEEP that the permit should require

7     a climate change assessment of all permitted

8     facilities under that permit?

9                MR. GREENE:  Object to the form of the

10    question.

11               You can answer.

12         A.    CLF provided no comments on the --

13         Q.    Okay.

14         A.    -- 2021 permit.

15         Q.    So CLF didn't feel the need to point out

16    to Connecticut DEEP that it should require a

17    climate change assessment of facilities under the

18    stormwater permit in Connecticut?

19               MR. GREENE:  Object to the form of the

20    question.  Mischaracterizes the document.

21               You can answer.

22         A.    I -- I don't know what, if any, thought

23    was given as to whether or not to submit comments

24    and -- or whether or not to submit comments.

25         Q.    Let's look at the draft permit, which is

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 155

1     marked as Mahoney No. 9.

2              (Counsel confer.)

3         Q.   Sorry.  Mr. Mahoney, a little mistake

4     here.

5              So, Mr. Mahoney, if you turn to page 33 of

6     this permit, it -- when it says "Content

7     Requirements" and it mentions "Resiliency measures

8     that are now required in Connecticut" -- do you see

9     that?

10        A.   (Witness reviews document.)

11        Q.   It's page 33 of the --

12        A.   Yeah.

13        Q.   -- draft permit.  Sorry about that.

14        A.   Yeah.  I see that "resiliency measures" is

15    7(c)(2)(10) of this section of the permit.

16        Q.   Yup.  And, Mr. Mahoney, we're going to go

17    ahead and introduce another document.  We've been

18    looking at the December version --

19             MR. KEARNEY:  March.

20        Q.   -- I mean the March version.  I'm going to

21    identify another document which is the December

22    version.  We believe they're largely the same.

23    This will be Mahoney 10.

24             (Exhibit Mahoney 10, Connecticut

25             Department of Energy and Environment

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 156

1          Protection National Pollutant Discharge

2          Elimination System General Permit For the

3          Discharge of Stormwater Associated With

4          Industrial Activities, General Permit No.:

5          CTR050000.)

6      Q.    We'll just use this one, Mr. Mahoney, and

7    I represent for purposes that the provisions we're

8    talking about are the same whether it's for the

9    March permit or the December permit.  You are

10   welcome to confirm that for yourself, but I'll

11   represent it for the record.

12          And so on this one, if you turn -- this

13   one we're going to -- the page number here on this

14   one is -- refer to page 35 on this one.  Again, the

15   same topic you've already identified that the

16   permit now includes resilience measures of a

17   requirement for a SWPPP, a solid waste -- I mean a

18   Stormwater Pollution Prevention Plan.

19      A.    And this is the earlier version?

20      Q.    Either -- this is the later version.

21   The -- it's the December '24 version.

22      A.    And the other is March '24?

23      Q.    March '24; right.

24          (Counsel confer.)

25      Q.    And let's look at page 42 of the December

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 157

1          version.  Do you see at the bottom where it says
2          "Resilience Measures"?
3               A.    Yes.
4               Q.    What does this new provision require?  Can
5          you read the first sentence of the permit.
6                    MR. GREENE:  Objection to the form of the
7          question.
8                    You can answer.
9               A.    (As read):
10                   "Resilience Measures:  Implementing
11         structural improvements, enhanced resilient
12         pollution prevention measures and other mitigation
13         measures can help to minimize impacts from
14         stormwater discharges from major storm events such
15         as hurricanes, storm surge, extreme heavy
16         precipitation, and flood events."
17              Q.    Does it mention -- so it does mention
18         hurricanes?
19              A.    It does.
20              Q.    And it mentions flood events?
21              A.    It does.
22              Q.    And it mentions extreme precipitation?
23              A.    "Extreme/heavy precipitation."
24              Q.    Right.  If you look down on that on page
25         42 over to 43 where it says (as read):

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 158

1          "If the facility --" very last sentence in
2     that top paragraph (as read):
3          "If the facility may be exposed to or has
4     previously experienced such major storm events,
5     additional SCMs, stormwater control measures, that
6     may be considered include, but are not limited
7     to..."
8          Does it -- so it includes "reinforcing
9     material storage areas to withstand flooding and
10    additional force; correct?
11         MR. GREENE:  It does say additional
12    exertion of force, but yes.  Yeah.
13    Q.   "Prevent floating of semistationary
14    structures to the base flood elevation."
15         Do you know what the base flood elevation
16    is under this permit, Mr. Mahoney?
17    A.   No.
18    Q.   (As read):
19         "Temporarily store materials and waste
20    above the BFE."
21         Do you know what that means?
22         MR. GREENE:  Objection.  Object 'cause
23    you're leaving out words, but go ahead.
24    A.   BFE means base flood elevation.
25    Q.   Right.  It says for -- (as read):

Page 159

1              "Under this new permit permittees need to

2      develop scenario-based emergency procedures for

3      major storms."

4              Is that a new requirement under this

5      permit?

6              MR. GREENE:  I'm sorry.  I don't see where

7      you are.

8          A.   Yeah, I don't see where you are either.

9          Q.   I'm on page 43 of 254.

10             MR. GREENE:  Yeah, but...

11         Q.   Second-to-the-last bullet there.

12         A.   And the question was?

13         Q.   So (as read):

14             "Under this new permit, permittees are

15     required to develop scenario-based emergency

16     procedures for major storms."

17             Isn't that a new requirement of this

18     permit?

19             MR. GREENE:  Just going to object to the

20     form of the question, both to the extent of the

21     reading of the text and the characterization of it

22     as new.

23             But go ahead.

24         A.   I don't know whether it's -- I don't know

25     whether it's new or not, and I guess I'd also just

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 160

```
 1      note, I mean, it's -- it's still a draft permit.
 2      It's been a draft permit for quite some time.
 3           Q.   Understand.  But this is what the state of
 4      Connecticut has proposed as a new industrial
 5      stormwater permit for the state of Connecticut?
 6                MR. GREENE:  Object to the form of the
 7      question.
 8                Go ahead.
 9           A.   It is for -- yeah.  It is -- it is what --
10      it is the draft of what Connecticut DEEP is
11      proposing to govern discharges of stormwater from
12      industrial activity.
13                So I suspect that there are some
14      improvements and clarifications and new provisions
15      that are part of -- of that work.  They haven't had
16      a new permit since 2018.
17           Q.   I think the -- Mr. Mahoney, isn't it true
18      there's a 2021 permit?
19           A.   There is, but the 2021 was just an
20      extension of the 2018.  So there hadn't been a -- a
21      reevaluation of the whole permit --
22           Q.   Right.
23           A.   -- by Connecticut DEEP --
24           Q.   Right.
25           A.   -- since the 2018 permit.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 161

1          Q.    Right.

2          A.    It's my understanding.

3          Q.    If you could look at page -- at the bottom

4     of page 54 over to 55.  So these are new procedures

5     proposed by the Connecticut DEEP called

6     "Comprehensive Site Inspection Procedure."

7               Do you see that?

8               MR. GREENE:  I'm just going to object to

9     the form.

10              Go ahead.

11         Q.    And there's various numbered new

12    requirements --

13              MR. GREENE:  Again, same objection.

14         Q.    -- in this proposed draft permit?

15              And particularly section 5, which is on

16    page 55.

17              So, Mr. Mahoney, have you looked at this

18    new requirement that Connecticut DEEP has proposed

19    for permittees to (as read):

20              "...inspect and implement structural

21    improvements, enhanced resilient pollution

22    prevention measures or other mitigation measures

23    that are intended to minimize impacts from

24    stormwater discharges from major storm events such

25    as hurricanes, storm surge, extreme/heavy

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 162

1        precipitation."

2                Is that a -- a new requirement for

3        industrial permit?

4                MR. GREENE:  So I'm just going to object

5        'cause you -- first you stated categorically it was

6        new, and now you're asking if it's new.

7                So I'm just going to object to the form of

8        the question to the extent that it

9        mischaracterizes.

10           Q.   Just making sure CLF agrees these are new

11       proposed requirements under this permit.

12           A.   Yeah, but I --

13               MR. GREENE:  But again, just to be clear,

14       you stated it as a fact, and now you're asking a

15       question.  And so -- and you did it all as one long

16       run-on sentence.  So object to the form of the

17       question.  Object to the characterization of the

18       document.  The document speaks for itself.

19           Q.   Are these new provisions --

20               MR. GREENE:  Now you can answer.

21           Q.    -- being proposed by the Connecticut DEEP

22       to control industrial stormwater in the state of

23       Connecticut?

24               MR. GREENE:  Objection to the extent --

25       just objection to the form of the question.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 163

```
 1              Go ahead.
 2         A.    Well, these are -- these are resilience
 3     measures, not stormwater control measures; right?
 4              So there are -- there are other areas.  So
 5     just above there are structural control measures,
 6     nonstructural stormwater control measures,
 7     stormwater management systems.
 8              Whether they are new or clarifications,
 9     I -- I -- sitting here today, I couldn't -- I
10     haven't compared the 2021 permit with this draft
11     permit, but it would also just seem to me that some
12     of these are clarifying or emphasizing things that
13     I would assume are already part of procedures and
14     part of best management practices and best industry
15     practices.
16              So, for example, inspecting the integrity
17     and functionality of stormwater treatment systems,
18     e.g., oil/water separators, I don't think that's a
19     new requirement of -- of industrial sites like your
20     clients that have oil/water separators.  I think
21     that would be something that, as best management
22     practice, they would be inspecting the integrity of
23     those systems in order to make sure that they work
24     as -- as they are supposed to work.
25         Q.    Did the prior permit, 2021 permit, mention
```

Page 164

1      hurricanes at all?

2          A.   I -- I don't know.  Again, if it's in the

3      document, it's in the document.

4          Q.   Uh-huh.  Does CLF believe that hurricanes

5      are affected by climate change?

6              MR. GREENE:  Object as beyond the scope of

7      the deposition.

8              But you can answer.

9          A.   I think CLF shares the -- shares an

10     opinion with the vast majority of science and,

11     quite honestly, you know, your client's scientists,

12     that climate change has had an impact on the

13     increasing severity and frequency of severe storms,

14     including hurricanes.

15         Q.   Uh-huh.  Can you point to any scientist at

16     defendants that have said that?

17             MR. GREENE:  Just going to object to the

18     form of the question.  Beyond the scope of the

19     deposition.  Well beyond the scope of the

20     deposition.

21             MR. HENDERSON:  He raised it.  I'm just --

22     I'm just following up.

23         A.   I think that the --

24             MR. GREENE:  Just saying things like I'm

25     following up doesn't mean you get to go beyond the

Page 165

1      scope of -- of the deposition.

2           Q.   Can you identify any?

3           A.   I mean, I think that the -- the expert

4      report of Professor Oreskes lays out --

5      O-r-e-s-k-e-s, I believe.

6                MR. GREENE:  Yeah.

7           A.   -- documents a lot of the science that

8      was -- that has been conducted and would support

9      that, including science conducted and engaged in by

10     employees of Shell.

11          Q.   So does CLF agree this proposed permit,

12     this is the first time that Connecticut DEEP has

13     ever required any assessment of adverse weather

14     events, hurricanes, in preparing a solid waste

15     pollution prevent -- I mean a Stormwater Pollution

16     Prevention Plan?

17               MR. GREENE:  Objection.  Form of the

18     question and to the extent that it mischaracterizes

19     the documents that are marked here and are part of

20     the question.

21               But you can answer.

22               (Court Reporter comment.)

23               THE WITNESS:  Sorry.  Sorry.

24               (Question read back.)

25          A.   This may well be the first time that the

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                              Page 166

1        term -- the phrase hurricane is used in the -- in

2        the permit.  I'm -- again, I would say if it -- if

3        the word's not in the 2021 permit, it's -- it's not

4        in there.

5            Q.   Okay.  Mr. Mahoney, I'm going to hand you

6        what will be marked Mahoney 11, and we'll just go

7        ahead and enter them all.  Save us some time.

8                   (Exhibit Mahoney 11, National Pollutant

9                   Discharge Elimination System General

10                  Permit For the Discharge of Stormwater

11                  Associated With Industrial Activity, Fact

12                  Sheet, March 2024.)

13                  (Exhibit Mahoney 12, Supplemental Fact

14                  Sheet Draft NPDES Permit For the Discharge

15                  of Stormwater Associated With Industrial

16                  Activities, March 2024.)

17                  (Exhibit Mahoney 13, National Pollutant

18                  Discharge Elimination System General

19                  Permit For the Discharge of Stormwater

20                  Associated With Industrial Activity Fact

21                  Sheet, General Permit No:  CTR 050000.)

22                  MR. KEARNEY:  Off the record for a moment.

23                  VIDEO OPERATOR:  The time is now 11:40.

24       We are off the record.

25                  (Discussion off the record.)

Page 167

```
 1              (Exhibit Mahoney 14, Supplemental Fact
 2              Sheet (December 2024) Draft National
 3              Pollutant Discharge Elimination System
 4              (NPDES) General Permit For the Discharge
 5              of Stormwater Associated With Industrial
 6              Activities.)
 7              VIDEO OPERATOR:  The time is now 11:42.
 8      We are on the record.
 9          Q.  Mr. Mahoney, thank you for bearing with
10      us.  We've handed you four new exhibits, which is
11      Mahoney 11, which is a fact sheet from the
12      Connecticut DEEP.  It does not have it labeled on
13      the front, but this is for March of 2024.
14              We've also provided you Mahoney 12, which
15      is a fact sheet from the Connecticut DEEP called
16      "Supplemental Fact Sheet," again, Mahoney 12.  It's
17      identified as March -- for the record, I'll
18      represent it was actually released in April.
19              Mahoney 13 has been provided to you.  It
20      is also not labeled, but it -- I'll represent that
21      it was from November of 2024.
22              And the last one for this category was a
23      supplemental fact sheet from December of '24 from
24      the Connecticut DEEP, again, Mahoney 14.
25              Have you reviewed any of these documents?
```

Page 168

```
 1          A.    I have reviewed -- I don't know if I
 2    reviewed the Exhibit 11, which is the February 2024
 3    fact sheet.
 4          Q.    Okay.
 5          A.    But I have looked at or reviewed Exhibits
 6    12, 13, and -- and 14.
 7          Q.    Okay.  Let's --
 8          A.    I may well have looked at --
 9          Q.    Right.
10          A.    -- 11 as well.
11          Q.    So, Mr. Mahoney, do you understand these
12    are -- when the state of Connecticut, the
13    Connecticut DEEP issued these proposed permits for
14    industrial stormwater, the proposed industrial
15    general permit for stormwater, it also
16    issued/released various fact sheets about these
17    particular permits; is that correct?
18          A.    Yes.
19          Q.    All right.  And is this typical that an
20    agency will issue fax sheets about a new permit?
21                MR. GREENE:  Just going to object to the
22    extent it calls for speculation about what's
23    typical for an agency.
24                But you can answer.
25          A.    It's typical when a -- when an agency
```

Page 169

1      issues a new or a revised permit that it will

2      provide fact sheets to assist with public comment.

3            Q.    All right.  Let's look at the November

4      one, which is marked Mahoney 13.  And if you can

5      look -- turn to page 5 of 40 of the document; and,

6      again, this is the Connecticut DEEP explaining its

7      new proposed general permit for industrial

8      stormwater in the state of Connecticut.

9                  Near the bottom there's a paragraph that

10     says "Lastly."

11                 Do you see that paragraph?

12           A.    Yes.

13           Q.    And they're referencing the EPA's MSGP.

14     Do you know what the M -- EPA's MSGP is?

15           A.    Multi-sector general permit.

16           Q.    And would that have been issued -- what --

17     in 2021?

18           A.    2020 or '21, I believe.

19           Q.    '21, yeah.  I think it was draft in '20

20     but issued in '21, I believe.

21                 And this is the Connecticut DEEP talking

22     about some of the new features of this draft

23     proposed permit.  And the very last sentence it

24     says, (as read):

25                 "References to the SQM --" which is the

Sean M. Mahoney                        June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 170

1       stormwater quality manual -- "include structural

2       control measures and may help improve the

3       resiliency of industrial facilities to climate

4       stressors, including changing precipitation

5       patterns and extreme weather events."

6                 So the state of Connecticut is now

7       revising this industrial permit to address climate

8       stressors.  Do you agree with that, Mr. Mahoney?

9                 MR. GREENE:  Object to the form of the

10      question because reading that sentence out of

11      context with the rest of the paragraph is

12      misleading.

13                You can answer.

14                MR. HENDERSON:  You can read the rest of

15      the paragraph.

16          Q.   Does that sentence --

17                MR. GREENE:  I don't need to, but my

18      objection --

19          Q.   Does the sentence mention climate

20      stressors?  So now this permit is addressing

21      climate stressors; correct?

22                MR. GREENE:  Objection.  Mischaracterizes

23      the sentence, the paragraph, the document, and the

24      prior documents.

25          A.   To be fair, it -- the sentence that you --

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 171

1          you read isn't -- is the permit referencing

2          stormwater quality manual, which was a year before,

3          September '23, and it talks about helping improve

4          the resiliency of industrial facilities to climate

5          stressors.  So it's -- it is -- and as it says

6          beforehand, much of what it is doing is clarifying

7          the requirements for stormwater control.

8                    So on -- the paragraph just beforehand

9          talks about --

10              Q.   So before the date --

11              A.   -- clarifications on stormwater and

12          nonstormwater issues.

13              Q.   Connecticut's DEEP says this is a new

14          section of the permit?

15                    MR. GREENE:  Objection.  Mischaracterizes

16          the --

17                    MR. HENDERSON:  Second.

18                    MR. GREENE:  -- second paragraph --

19          statements of the paragraph.

20              Q.   Second sentence of that same paragraph.

21              A.   The new permit -- the new section, I

22          think, is a section on "Permit Condition and

23          Schedule for Corrective Actions."

24              Q.   Let's -- let's flip to page 12 and 13 of

25          this document.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 172

 1          A.    Okay.
 2          Q.    Has -- and this section talks about the
 3    new proposed section 7.6 of the Stormwater
 4    Pollution Prevention Plan and that this draft
 5    permit -- this proposed permit.
 6          A.    It doesn't --
 7                MR. GREENE:  Object to the form if that
 8    was a question.
 9                Go ahead.
10          A.    It -- it --
11                MR. GREENE:  I don't think there's a
12    question pending.  Was that a question?
13          Q.    I'm just asking if you agree that this
14    section, page 12 of 40 of the fact sheet, the
15    Connecticut DEEP is talking about new provisions of
16    the Stormwater Pollution Prevention Plan?
17                MR. GREENE:  Happy to object to the form
18    of the question.
19                You can go ahead, Mr. Mahoney.
20          A.    I think you said it was a new section and
21    so -- but just to be clear, the Stormwater
22    Pollution Prevention Plan is not a new section of
23    the permit and I think --
24          Q.    Have they added new features to the
25    Stormwater Pollution Prevention Plan requirements?

Page 173

1          A.    The resilient -- it states (as read):

2                "The resilience measures element is a new

3    component of the SWPPP and added in response to

4    Connecticut's commitment to prepare for ongoing

5    climate changes."

6          Q.    So is -- to your knowledge, is this the

7    first time the Connecticut DEEP has said that

8    they've included a new component in the S-W-P-P-P

9    or the SWPPP to prepare for ongoing climate

10   changes?

11               MR. GREENE:  Object to the form of the

12   question.

13               You can answer.

14         A.    Related to resilience of the -- the -- of

15   the industrial facilities that are regulated by the

16   permit.

17         Q.    Right.  And before this Connecticut DEEP

18   has never mentioned climate -- ongoing climate

19   changes; correct?

20               MR. GREENE:  Object to the form of the

21   question.

22               You can answer.

23         Q.    In the context of industrial stormwater

24   permit?

25         A.    I think in the context of industrial

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 174

 1        stormwater permit, as we've talked about, the --
 2        the 2021 permit speaks for itself, and if the terms
 3        "climate change" aren't in that permit, then
 4        they're not in that permit -- then the words aren't
 5        in that permit.
 6             Q.   Look at -- can you read the next sentence
 7        of this section.  "The increasing temperatures"?
 8             A.   (As read):
 9                  "The increasing temperatures, changes in
10        precipitation patterns, and drought frequency are
11        amid the climate impacts that currently and are
12        projected to affect water quality and quantity in
13        Connecticut."
14             Q.   Can you read the following sentence?
15             A.   (As read):
16                  "Implementing structural improvements,
17        enhanced/resilient pollution prevention measures,
18        and other mitigation measures can help to minimize
19        impacts from stormwater discharges from major storm
20        events such as hurricanes, storm surge,
21        extreme/heavy precipitation, and flood events."
22             Q.   So does CLF interpret this as a new
23        requirement under the industrial stormwater
24        pollution -- permit?
25                  MR. GREENE:  Objection.  Calls for expert

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 175

1      opinion.  Beyond the scope of the deposition

2      notice.

3                You can answer.

4          A.    Yeah, again, I have no opinion as to

5      whether or not we would -- CLF considers this to be

6      a new component of the SWPPP.

7          Q.    So you're offering no opinion on that?

8          A.    I'm --

9                MR. GREENE:  Objection.

10               You can answer.

11         A.    -- absolutely offering no opinion on that.

12         Q.    Do you think factually this is a new

13     addition to the industrial stormwater permit in the

14     state of Connecticut?

15               MR. GREENE:  Objection.  Asked and

16     answered.

17               But you -- you can answer.

18         A.    I think the specific resilience measures

19     term is new and Connecticut DEEP believes it's a

20     new component of the SWPPP.

21         Q.    And DEEP believes they're new?

22               MR. GREENE:  Objection.  Calls for

23     speculation.

24               You can answer.

25         A.    The DEEP fact sheet states "The resilience

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 176

1        measures element is a new component of the SWPPP."

2            Q.   Is it CLF's view that the prior permit

3        required considering clim- -- required

4        consideration of climate resilience in the

5        industrial stormwater permit?

6                MR. GREENE:  Objection.  Calls for a legal

7        conclusion.  Beyond the scope of the notice.

8                But you can answer.

9                THE WITNESS:  Could you read the question

10       again.

11               (Question read back.)

12           A.   Yes, to the extent that best management

13       practices and best industry practices called for

14       measures to safely and -- and properly manage

15       stormwater from those facilities.

16           Q.   And does CLF have in its possession any

17       statements by US EPA that the federal agency agrees

18       with CLF's interpretation of the prior permit?

19               MR. GREENE:  Objection.  Asked and

20       answered.

21               Go ahead.

22               VIDEO OPERATOR:  Can I ask the witness to

23       move your microphone up.

24               THE WITNESS:  Sorry.

25               VIDEO OPERATOR:  You keep crossing your

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                        Page 177

 1      arms.

 2                THE WITNESS:  Yeah, I know.  I just

 3      realized I was doing that.

 4                How's that?

 5                VIDEO OPERATOR:  It will be fine.  It's

 6      good.

 7           A.   No.

 8           Q.   And has Connecticut DEEP ever issued any

 9      document, made any public statement that the prior

10      permit required the completion of a climate change

11      assessment for any permitted facility?

12                MR. GREENE:  Objection.  Asked and

13      answered.

14                Go ahead.

15           A.   Not that I'm aware of.

16           Q.   So let's go to Mahoney Exhibit 14.

17                On the front page of Mahoney Exhibit 14,

18      DEEP has a paragraph begins with "Significant

19      changes," and it -- Connecticut DEEP is saying (as

20      read):

21                "Significant changes to the general permit

22      include the following."

23                Do you see that paragraph?

24           A.   I do.

25           Q.   And they say that it -- "they mirror the

Page 178

1      2021 EPA MSGP."

2              Do you see that?

3          A.   Yes.

4          Q.   Does that mean -- what all did the 2021

5      MSGP include?  Did -- do you -- did it include

6      climate and resilience provisions?

7          A.   I'd have to take a look at that -- at that

8      permit.

9          Q.   If you look at -- then going on down in

10     that paragraph where it talks about -- it has the

11     new permit -- or the new proposed permit will have

12     a corrective action section.

13             Do you see that?

14         A.   I do.

15         Q.   So is it CLF's position that that did not

16     exist in the prior permit?

17             MR. GREENE:  Object to the extent the

18     documents speak for themselves, don't require an

19     opinion, and to the extent that it calls for a

20     legal conclusion about the documents.

21             But you can go ahead.

22         A.   Yeah, I don't recall.  I could look back

23     on the 2021 permit if you'd like.

24         Q.   Okay.  Sure.

25         A.   (Witness reviews document.)  I'm just

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 179

```
 1        looking at the table of contents --
 2             Q.    Right.
 3             A.    -- in the sections, and I don't see a
 4        section titled "Corrective Action" --
 5             Q.    So --
 6             A.    -- here.
 7             Q.    -- Connecticut DEEP believes that's a new
 8        section; right?
 9                   MR. GREENE:  Objection to the extent that
10        it calls for speculation.
11                   But you can --
12             A.    Yes, they -- they use the adjective "new."
13             Q.    Right.  And if you could turn to page 3 of
14        this document, which is marked Mahoney 14, section
15        identified as 1.4; and, again, this is a fact sheet
16        for the proposed Connecticut DEEP industrial
17        stormwater permit for the state of Connecticut;
18        correct?  This fact sheet?
19             A.    This fact sheet.
20             Q.    In this section right here it points to
21        "New resiliency measure element in the SWPPP."
22                   Is this the new climate resiliency measure
23        that Connecticut DEEP is proposing to include in
24        the new permit?
25                   MR. GREENE:  Object to the form of the
```

Page 180

1      question.

2              You can answer.

3          A.   Well, it states (as read):

4              "It's added in response to Connecticut's

5      commitment to prepare for ongoing climate change."

6              It also states that (as read):

7              "This section does not require nor

8      prescribe specific control measures or BMPs to be

9      implemented."

10         Q.   Right.  And -- but this is a new section

11     of the Connecticut general permit for industrial

12     stormwater; correct?

13         A.   It is.  It's --

14         Q.   And the Connecticut DEEP says they

15     specifically are doing this to prepare for ongoing

16     climate change; correct?

17         A.   They -- it states -- to be fair, it was

18     added in response to Connecticut's commitment to

19     prepare for ongoing climate change.

20         Q.   And in December of 2024 -- so

21     approximately six months ago -- the state of

22     Connecticut said that it was changing its

23     industrial stormwater permit to "prepare for

24     ongoing climate change"; correct?

25             MR. GREENE:  Objection.  Mischaracterizes

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 181

1      this document and the related documents.
2            But you can answer.
3       A.   No, I -- I don't think that's -- that's
4      correct.
5            It said it -- it says "This measure --"
6      which is a new component -- "was added in response
7      to Connecticut's commitment to prepare for ongoing
8      climate change."
9            I don't think you or anyone else would say
10     that Connecticut had not been committed to
11     preparing for climate change for some time and that
12     both government and industry private sector knew of
13     the need to prepare for ongoing climate change and
14     the severe and more frequent storms that have
15     impacted industrial facilities like your own
16     facilities going back to 2005 and -- and Hurricane
17     Katrina and then proceeding to the storms that have
18     hit the East Coast.
19           So to suggest that only in December of
20     2024 that Connecticut -- and quite frankly, anybody
21     who holds a permit for stormwater management would
22     only now be thinking of climate change because the
23     words -- the two words "climate change" were in
24     that fact sheet or in that permit I don't think is
25     a fair reading of -- of the situation or the law.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 182

1      Q.   I'm just reading what is the fact sheet.
2  The Connecticut DEEP has stated (as read):
3           "This is a new component and was added,
4  this new climate resiliency measure was added in
5  response to Connecticut's commitment to prepare for
6  ongoing climate change."
7           Had the Connecticut DEEP ever said that
8  about any prior permit?
9           MR. GREENE:  Objection.  Misquotes and
10  mischaracterizes the document.
11           You can answer.
12      A.   I haven't reviewed the fact sheets for the
13  other general permit, and I'm not aware of what
14  they might have done with other permits that the
15  state of Connecticut issued across the board, but I
16  would think it would be hard to say with a straight
17  face that any state or federal agency with any
18  regulatory purview over the environment was not
19  addressing climate change before the actual wording
20  into a fact sheet.
21      Q.   Does your -- does CLF, in your role as a
22  spokesman for -- spokesperson in this deposition
23  for CLF, has Connecticut DEEP ever required an
24  industrial permittee under a stormwater industrial
25  permit to assess climate change in its permit?

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 183

1              MR. GREENE:  Object to the extent that

2      it's beyond the scope of the deposition.  Calls for

3      a legal conclusion.

4              But you can answer.

5         A.   I'm not aware.

6         Q.   Okay.

7              MR. HENDERSON:  Can we go ahead and take

8      our lunch break?

9              MR. GREENE:  Sure.

10             MR. HENDERSON:  And maybe in 45 minutes?

11     Is that long enough?

12             MR. GREENE:  Defer to the witness.  You

13     want to do a half an hour or --

14             THE WITNESS:  It's the day.  So...

15             VIDEO OPERATOR:  We're still on the

16     record.  Let me go off real quick.

17             The time is 12:04, and we're off the

18     record.

19             (Whereupon the deposition recessed at

20             12:05 p.m.)

21

22

23

24

25

Page 184

```
 1                 AFTERNOON SESSION (12:45 PM)
 2             VIDEO OPERATOR:  The time is now 12:47.
 3      We are on the record.
 4             MR. MANLEY:  So I'm just putting an
 5      agreement on the record regarding how we are
 6      intending to handle the binders that are present in
 7      the room today.  CLF is going to retain possession
 8      of the binders that are all marked Exhibit 2 with
 9      the series of letters.
10             CLF will mail the physical copies of those
11      binders to defendants at their offices in Houston
12      and they will --
13             MR. HENDERSON:  Atlanta.
14             MR. MANLEY:  -- Atlanta, excuse me, and
15      they will retain the copies there to preserve them
16      by whatever means they need to.
17             MR. HENDERSON:  Thank you.
18             MR. KEARNEY:  So stipulated.
19          Q.   Mr. Mahoney, good seeing you again after
20      lunch.  Just want to keep talking about various
21      things that we've been talking about.
22             Let's talk about -- we were talking about
23      topic 4 about various alleged violations and
24      permits and the -- the regulatory basis about our
25      permit was deficient.  In one of your testimonies
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 185

1    you had mentioned about various conditions at New

2    Haven Terminal.

3            Do you know if the -- if a category 5

4    hurricane has ever hit New Haven?

5        A.   I don't.

6            MR. GREENE:  Object.  It calls for an

7    expert opinion.

8            Go ahead.

9        A.   I don't know if a category 5 has hit New

10   Haven.

11       Q.   How about a category 4 or 3 or --

12           MR. GREENE:  Same objection.

13           You can --

14       Q.   -- 2?

15       A.   I don't know what level of hurricane has

16   hit New Haven in the past.

17       Q.   Okay.  Do you know if there's actually

18   been any releases of petroleum hydrocarbons from

19   our facility in the past five years?

20       A.   I believe that an investigation in 2022 at

21   your facility by -- by your clients identified

22   contaminants in the -- in the soils there.  And I

23   believe also that maybe it was Superstorm Sandy

24   that there was some flooding at the facility --

25   your facility.  But that would have been reported

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 186

1      by your clients.  I think I saw that in one of the

2      documents.

3           Q.   Is -- is flooding a violation of the

4      industrial stormwater permit in the state of

5      Connecticut?

6           A.   Is flooding --

7                MR. GREENE:  Just going to object to the

8      extent that calls for a legal conclusion.

9                You can answer.

10               Sorry.  I'll try and clear my throat

11     faster.  That was my fault.

12               THE WITNESS:  No.  No.

13          A.   Flooding caused by natural elements I

14     don't think is a -- is, in and of itself, a

15     violation.  Flooding is addressed and what impacts

16     the flooding has on the facility, I think, has a

17     bearing on compliance and/or potential violations.

18          Q.   But the mere act of flooding is not a

19     violation of the industrial stormwater permit?  In

20     other words, if there's a storm and there's

21     flooding, there's no duty to prevent any flooding;

22     correct?

23               MR. GREENE:  Same objection.

24               You can go ahead.

25          A.   Yeah, the duty is to minimize any

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 187

1     pollution and -- and -- under a stormwater permit.

2     So to the extent steps can be taken to -- to

3     minimize pollution from flooding events and they're

4     not taken, then that could be cause for violation

5     of a permit.

6          Q.   Okay.  Is that any flooding or only

7     flooding from a 100-year return period storm or...

8               MR. GREENE:  Same objection again.

9          A.   Yeah, I think it's very fact dependent

10    on -- on what -- what you're talking about, what

11    kind of flooding and what kind of impacts result

12    from the flooding.

13         Q.   So, Mr. Mahoney, turning to some other

14    topics here.  Does CLF know of any SWPPP --

15    S-W-P-P-P -- know of any SWPPP in the state of

16    Connecticut that includes requirements to conduct a

17    climate change vulnerability analysis under

18    industrial stormwater permit?

19              MR. GREENE:  Object to the extent it's

20    outside the scope of the notice.

21              But you can answer.

22         A.   I'm -- I'm not aware of any.

23         Q.   Okay.  Has CLF actually looked to see if

24    it could identify an existing SWPPP at a facility

25    in state of Connecticut that includes requirements,

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 188

1          procedures, to evaluate climate change and to make

2          changes at a facility?

3                    MR. GREENE:  Same objection.

4          A.    I don't know the -- the answer to that.

5          There aren't that many facilities such as your

6          client's in -- in the state.

7          Q.    But CLF does not -- does it have an

8          example of a SWPPP that CLF believes would comply

9          with its interpretation of climate change

10         assessment?

11         A.    I don't think there's one in Connecticut.

12         Q.    How about other states?

13         A.    Can't recollect right now if there are

14         other states that have such a condition in a SWPPP,

15         S-W-P-P-P.

16         Q.    Has CLF developed a model SWPPP that it

17         believes would meet all the requirements that CLF

18         believes are needed to address climate change in a

19         SWPPP under state of Connecticut law?

20                   MR. GREENE:  Just going to object to the

21         extent that that's beyond the scope of the notice.

22                   But you can answer.

23         A.    No.  CLF has provided comments in the

24         state of Connecticut on the draft 2024 permit.

25         Q.    Uh-huh.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 189

1          A.    But we have not developed a SWPPP -- we

2     don't have an industrial facility that requires

3     the --

4          Q.   I didn't know if you were trying to do it

5     for industry so they knew what CLF expected

6     industry to do.

7               MR. GREENE:  Object to the form of the

8     question.

9               You can answer to the extent that there's

10    a question there.

11         A.    We have not developed a SWPPP for Shell or

12    other industrial facilities.

13         Q.   Does the existing -- the 2021 industrial

14    stormwater permit -- or does it require a permit to

15    you to assess sea level rise?

16              MR. GREENE:  Object that it calls for an

17    expert opinion or legal conclusion.

18              But you can answer.

19         A.    I don't think that the 2021 permit has a

20    specific requirement concerning sea level rise.

21         Q.   How about storm surge?  Does the 2021

22    permit include any requirement to assess storm

23    surges for industrial permit in the state of

24    Connecticut?

25              MR. GREENE:  Same objection.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 190

 1            THE WITNESS:  Yeah.
 2       A.    I -- I don't believe that the permit has a
 3    specific provision concerning storm surges.  As
 4    I've said before, the permit does have provisions
 5    requiring best management practices and best
 6    industry practices, and so the -- the question or
 7    the issue there would be whether or not those
 8    practices -- what those practices required.
 9       Q.    How about does the 2021 general permit for
10    industrial stormwater in the state of Connecticut
11    include an obligation to -- for a permittee to
12    assess the effects of drought on industrial
13    stormwater at a facility?
14            MR. GREENE:  So I object to the extent it
15    calls for a legal conclusion or expert opinion.
16            But you can answer.
17       A.    It would -- it would be the same answer
18    that I -- that I just gave --
19       Q.    Okay.
20       A.    -- with respect to storm surge.
21       Q.    Does CLF -- has CLF identified any SWPPPs
22    that include provisions addressing climate change
23    impacts under an industrial stormwater permit?
24       A.    I think that there might have been such a
25    permit out of California, but I can't recall

Page 191

1          specifically.

2               Q.    Was that a Shell facility?

3               A.    I don't believe so.

4               Q.    Okay.  Is CLF aware of any Shell facility

5          where Shell has completed a climate change risk

6          assessment for a terminal?

7                     MR. GREENE:  Just going to object to the

8          extent that it's outside the scope of the notice.

9                     But you can answer.

10              A.    For a bulk storage terminal?

11              Q.    Yeah.

12              A.    I don't -- I don't know the answer to

13         that.

14              Q.    To your knowledge, has Connecticut DEEP

15         ever required a local government to conduct a

16         climate change assessment of its stormwater

17         practices for local government?

18              A.    I don't -- I'm not aware of that, and I'm

19         not sure if they even have the authority to do

20         that.

21                    Are you talking about MS4s?

22              Q.    Yes, I was.

23              A.    I -- I don't know what they've done with

24         respect to approval of MS4s.

25              Q.    Has CLF identified -- other than this, the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 192

1      2021 general permit, has CLF identified any other

2      state of Connecticut law that would require a

3      climate change assessment for any facility?

4            MR. GREENE:  Again, I'm just going to

5      object to the extent that it calls for a legal

6      conclusion and is outside the scope of the notice.

7            But you can answer.

8      A.    Sitting here today, I'm not aware of any.

9      Q.    Has CLF sent notices of intent to sue to

10     any other terminals in New Haven?

11           MR. GREENE:  Just going to object.  Well

12     outside the scope of the notice and to the extent

13     it may infringe upon any attorney work product.

14           You can answer.

15     A.    My understanding is that there has been a

16     notice sent to the Gulf terminal in New Haven

17     Harbor.

18     Q.    Is that now Pike Fuels?

19     A.    I think that's correct.

20     Q.    Does that sound familiar?

21           How about the Buckeye facility?

22           MR. GREENE:  Same objection.

23     A.    I don't know that answer right -- right

24     off.

25     Q.    How about any other terminals?

Page 193

1          A.    Unaware of any other terminals.

2          Q.    Are there terminals in New Haven that

3     actually -- all storage terminals that are actually

4     closer to the harbor than the Gulf facility?  I

5     mean, that are -- than the Shell facility?

6          A.    I don't know the answer.

7          Q.    Have you ever been by the Shell terminal

8     in New Haven?

9          A.    A long time ago.

10         Q.    Okay.  Are -- has CLF looked at all

11    industry around the New Haven Harbor?

12               MR. GREENE:  I'm going to object to the

13    form.

14               You can answer.

15         A.    I -- I don't know what you mean by "looked

16    around."

17         Q.    Have they investigated the --

18         A.    I see.

19         Q.    -- stormwater compliance status of other

20    facilities near New Haven Harbor?

21               MR. GREENE:  Same objection.

22         A.    Not that I'm aware of.

23         Q.    Okay.

24         A.    They may have.  We're oftentimes asked by

25    members of the community about specific issues.  So

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 194

1          we may have been asked, but I just don't know --

2               Q.    Uh-huh.

3               A.    -- whether that has happened or not.

4               THE WITNESS:  Sorry.

5               COURT REPORTER:  It's okay.

6               Q.    Are there any other contaminated sites

7          around the New Haven Harbor that CLF has

8          investigated?

9               MR. GREENE:  First of all, I'm going to

10         object to the extent that it may infringe upon

11         attorney work product or attorney-client privilege.

12         Also, the form of the question is overbroad, vague,

13         and beyond the scope of the notice.

14              But you can answer within those contexts.

15              A.    I'm not aware.

16              Q.    Okay.  Does CLF --

17              A.    Beyond -- beyond the Gulf facility.

18              Q.    Does CLF have in its possession any

19         written statement by EPA that its 2021 MSGP

20         requires a facility to conduct a climate change

21         assessment of any facility?

22              MR. GREENE:  Just going to object that's

23         been asked and answered.

24              You can go ahead.

25              A.    I don't believe so.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 195

 1              MR. HENDERSON:  Off the record.  Is it
 2      cold in here to y'all?
 3              MR. GREENE:  Yeah, it's been cold in here
 4      the whole time.
 5              VIDEO OPERATOR:  We're still on the
 6      record.  Do you want to go off?
 7              MR. HENDERSON:  Yeah.
 8              VIDEO OPERATOR:  The time is now 1:04, and
 9      we're off the record.
10              (Discussion off the record.)
11              VIDEO OPERATOR:  The time is now 1:05, and
12      we're on the record.
13          Q.  Mr. Mahoney, let's -- let's talk about
14      RCRA for a minute.  So what practices at the
15      terminal does CLF believe violate RCRA?
16              MR. GREENE:  Object to the extent that
17      calls for a legal conclusion.
18              You can answer.
19          A.  The -- as set out in the complaint, under
20      RCRA the complaint alleges that there is an
21      imminent substantial endangerment from the presence
22      of hazardous materials at the site, that there was
23      improper storage at the site and that there was
24      improper dumping -- open -- open dumping at the
25      site.  Those are the three RCRA claims.

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

                                                    Page 196

1          Q.    Is it your testimony on behalf of CLF that

2     the improper storage claims still exist in this

3     case?

4                MR. GREENE:  Object to the form of the

5     question.

6                You can answer.

7          A.    That's my understanding.

8          Q.    Okay.  So there's still three RCRA claims,

9     to your knowledge?

10               MR. GREENE:  Same objection.

11               You can answer.

12         A.    That's my understanding.

13         Q.    Okay.  And what specifically constitutes

14    imminent substantial endangerment?

15               MR. GREENE:  So object to the extent that

16    it calls for a legal or expert opinion.

17               But you can answer.

18         A.    Yeah, I mean, it's the -- there's a

19    definition of that under RCRA.  And otherwise, to

20    answer I'd want to look at the complaint and see

21    how that's alleged.

22         Q.    Has the Connecticut DEEP ever cited the

23    terminal for any violations of RCRA?

24         A.    Not that I'm aware of.

25         Q.    Has EPA ever cited the terminal for any

Sean M. Mahoney                              June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 197

```
 1        violations of RCRA?
 2             A.   Not that I'm aware of.  And I would just
 3        note that that's when a citizen suit is possible.
 4        When the agencies haven't taken action.
 5             Q.   Right.
 6                  So have you actually inspected the
 7        facility, the terminal?
 8             A.   I --
 9                  MR. GREENE:  Object to the form.
10                  Yeah, just -- are you asking him
11        personally or --
12                  MR. HENDERSON:  Yes, personally.
13             Q.   Have you been --
14             A.   Personally Sean Mahoney has not inspected
15        the site.
16             Q.   For this deposition did you review
17        information that describes the conditions at the
18        facility?
19             A.   Yes, I reviewed documents that described
20        the facility to prepare for the deposition.
21             Q.   And what were those documents?
22             A.   The complaint; the notice of -- notice of
23        intent, I believe; the expert reports that were
24        prepared and -- and provided you all.  Those --
25        those would be the principal ones.  And there's
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 198

1      some description of the facility in the SWPPP.

2          Q.   Have you spoken to anyone at CLF that

3      actually has conducted a site inspection?

4              MR. GREENE:  Just going to object to the

5      extent that it calls for attorney-client

6      communications.

7              With that caveat, you can answer.

8          A.   I -- I haven't spoken with anybody at CLF

9      about the site visit.  I may have spoken with some

10     of the people who went on the site visit but not

11     about the site visit -- if that makes sense.

12         Q.   Do you know who Renee Bourdeau is?

13     B-o-u-r-d-e-a-u.

14         A.   I don't.

15         Q.   So does -- I think I asked you this, but I

16     don't remember exactly, but has CLF identified any

17     SWPPP in the state of Connecticut that has

18     requirements related to any aspect of climate

19     change?

20             MR. GREENE:  Just going to object to the

21     extent that's been asked and answered, and it also

22     calls for a legal conclusion or an expert opinion.

23             But you can answer.

24         A.   Any -- any SWPPP that references climate

25     change?  Is that what you asked?

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 199

1          Q.    Right.   In the state of Connecticut.

2          A.    Yeah, not that I'm aware of where the

3    words "climate change" are in the SWPPP.

4          Q.    Okay.  Did CLF go to Connecticut DEEP and

5    actually look at SWPPPs?

6          A.    I don't know the answer to that.

7          Q.    Has anybody ever provided you copies of

8    other SWPPPs from Connecticut?

9          A.    Beyond the SWPPP for the Gulf terminal?

10         Q.    Yes.

11         A.    I don't know the answer to that.

12         Q.    Did -- has CLF ever submitted a FOIA to

13   get copies of our SWPPPs at other coastal

14   facilities in Connecticut?

15              MR. GREENE:  I'm just going to object to

16   the extent that's beyond the scope of the notice.

17              But you can answer.

18         A.    I know that we submitted FOIAs to

19   Connecticut DEEP.  I don't know if part of the FOIA

20   request was for copies of SWPPPs.

21         Q.    Is CLF alleging that the SPCC at the

22   terminal violates the Clean Water Act?

23              MR. GREENE:  Object to -- the complaint

24   and NOIs speak for themselves.

25              But you can answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 200

1          A.   Yeah, I think the SPCC is a condition of
2     the -- of the permit, and I think that is an issue
3     that CLF has identified.
4          Q.   What -- what is the problem with the
5     SWPPP?
6               MR. GREENE:  Object to form of the
7     question.
8          Q.   Or what is the violation of the SWPPP that
9     CLF alleges?
10         A.   You mean the SPCC or the --
11         Q.   The SPCC, yeah.
12         A.   I'd want to look at the complaint to -- to
13    do any --
14         Q.   But you don't remember anything --
15         A.   I don't.
16         Q.   -- off --
17         A.   Not off -- as I sit here today.  As you
18    know, there were a lot of things to look at.
19         Q.   Has CLF ever identified any notice of
20    violation or notice of potential violation that
21    CT DEEP has issued to any facility in Connecticut
22    that relates to climate change in any way?
23              MR. GREENE:  Object.  Asked and answered
24    and beyond the scope of the deposition.
25         A.   I -- I don't know.

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 201

1      Q.   Do you know how many inspections of

2    stormwater are conducted at the New Haven Terminal

3    every year?

4      A.   No, but I obviously expect your -- your

5    client does.

6      Q.   Uh-huh.  No, I'm asking if CLF knows.

7      A.   I think I answered.

8      Q.   Okay.

9      A.   No.

10     Q.   Okay.

11     A.   But I suspect your client does.

12     Q.   All right.  So does CLF have any campaigns

13   to shut down oil and gas facilities in Connecticut?

14          MR. GREENE:  I'm just going to object to

15   the extent that's beyond the scope of the notice.

16          You can answer.

17     A.   No.  No.

18     Q.   So in terms of the RCRA violations that

19   CLF allege, you talked about storage.  Can you

20   identify any permits, any requirements under RCRA

21   that specifically relate to storage that the

22   terminals have violated?

23          MR. GREENE:  I'm going to object to the

24   extent that it calls for a legal conclusion and

25   expert opinion.

Page 202

1          But you can answer.

2      A.    I think to answer that I'd want to look at

3    the complaint so I could answer it correctly as

4    it's set forth in the complaint.

5      Q.    And that's all you know is what's in the

6    complaint?

7          MR. GREENE:  Objection.  Mischaracterizes

8    testimony.

9      A.    The complaint and then -- I'm trying to

10   think.  I -- I don't -- I'm not aware -- can't

11   recall if the expert reports address those or not,

12   but the complaint is the primary basis for my

13   knowledge.

14     Q.    Do you have any -- does CLF have any

15   knowledge of what operational practices the

16   terminal in New Haven actually follow on a daily

17   basis?

18          MR. GREENE:  Object to the form of the

19   question.

20          You can answer.

21     A.    I mean, CLF's knowledge is -- is limited

22   based on the documents that Shell has produced,

23   based on its permit, and based on, as I understand

24   it, three site visits that were all accompanied by

25   Shell personnel.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 203

1          Q.    Has CLF conducted any monitoring from

2     substances, emissions, materials being released or

3     emitted from the terminal in New Haven?

4          A.    Not that I am aware of.

5          Q.    Has CLF measured air quality near the

6     terminal?

7          A.    Not that I'm aware of.

8          Q.    Has CLF actually measured stormwater being

9     released from the facility at -- in New Haven?

10         A.    I don't believe they've had -- I don't

11    believe so.

12         Q.    Okay.  Does CLF have any plans to monitor

13    stormwater from the terminal in New Haven?

14              MR. GREENE:  Just going to object to the

15    extent that it may call for privileged

16    communications or attorney work product.

17              But beyond that, you can answer.

18         A.    I don't -- I don't think so.

19         Q.    Has CLF conducted sampling of any sediment

20    in the New Haven Harbor?

21         A.    No, I don't believe so.

22         Q.    Has it conducted sampling of water quality

23    in the New Haven Harbor?

24         A.    Again, I don't believe CLF has conducted

25    that on its own.  I suspect that such data has been

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 204

1          compiled by other agencies.

2               Q.   Has CLF conducted any soil samples at the

3          terminal in New Haven?

4               A.   Any?

5               Q.   Soil samples at the New Haven Terminal

6          that's the subject of this lawsuit?

7               A.   No, CLF is aware of the completion of

8          investigation report filed in 2022, I think, by

9          Shell and the results of those -- of that

10         investigation.

11              Q.   Has CLF ever conducted soil samples of any

12         berm on the terminal in New Haven that's the

13         subject of this litigation?

14              A.   I don't believe so.  The -- the berms and

15         the soil were inspected by CLF and some of its

16         expert witnesses.  I don't know if they took soil

17         samples.

18              Q.   Did they take any measurements of porosity

19         of soil at the terminal in New Haven?

20              MR. GREENE:  I'm just going to object to

21         the extent that the defendants are in possession of

22         the plaintiff's expert reports.

23              But you -- you certainly can answer.

24              A.   Yeah.  I'm not aware of any measurements

25         of porosity that were taken.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 205

1        Q.    Has CLF conducted any testing that is not
2    identified in its expert reports at the terminal in
3    New Haven?
4        A.    Not that I'm aware of.
5        Q.    Okay.  Has -- has CLF -- is CLF alleging
6    that the terminal's emergency response plan as
7    drafted is violating the Clean Water Act?
8             MR. GREENE:  Just going to object to the
9    extent that it calls for a legal conclusion or
10    expert opinion.  All of the allegations are
11    contained in the NOIs, the complaint, and the
12    plaintiff's expert reports.
13             But you can answer.
14        A.    I -- I think there have been some issues
15    identified with the access to and from the site in
16    the event of severe storms or flooding or storm
17    surge.  What -- and that was in the expert reports.
18             What impact that has as far as compliance
19    with the permit, I'm not -- I haven't analyzed.
20        Q.    Mr. Mahoney, do you know of any CT DEEP
21    guidance document, regulation, statement, procedure
22    that requires a permittee under industrial
23    stormwater permit to ensure there's access to a
24    facility during a flood?
25             MR. GREENE:  Object to the form of the

Page 206

1        question.  It's vague.  Compound.  Calls for a

2        legal conclusion.  Expert testimony.

3                You can answer.

4        A.   I'm not aware of any specific provision.

5        I would hazard that access to a site during a storm

6        event or flooding event or storm surge would be

7        important to minimize damage to the facility and

8        minimize release of pollutants to the environment.

9                So I --

10       Q.   Can you --

11       A.   -- it wouldn't surprise me if there was

12       a -- a requirement that the -- a facility be

13       accessible.

14       Q.   But you -- can you identify any section of

15       the general permit for industrial stormwater in the

16       state of Connecticut that requires a permittee to

17       ensure there's access and egress --

18       A.   Yeah.

19       Q.   -- when a facility is flooded?

20               MR. GREENE:  Object to the extent that it

21       calls for a legal conclusion and expert testimony.

22       The document speaks for itself.

23               You can answer.

24               THE WITNESS:  Yeah.

25       A.   I don't think there's any specific

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 207

1    language, but I think that it would -- it could

2    very well fall, for the reasons I noted, under best

3    management practices or best -- best industry

4    practices.

5        Q.   Okay.  Has or is CLF alleging that the New

6    Haven terminal has failed to have a spill

7    prevention or a leak procedure implemented at the

8    terminal?

9            MR. GREENE:  I'm just going to object to

10   the extent that allegations are contained within

11   the NOIs, the complaint, and the plaintiff's expert

12   reports.

13           But you can answer.

14       A.   No, I believe that the contention isn't

15   that there's not an SPCC but the adequacy of that

16   SPCC.

17       Q.   Does the notice of intent make a specific

18   allegation that the terminals have violated the

19   stormwater permit by not having an adequate SPCC?

20       A.   I think we've kind of gone over before the

21   notice piece.  So the notice doesn't specifically

22   state the violation is the failure to have an

23   adequate SPCC.  Just provides notice that the

24   stormwater management control measures are -- are

25   not sufficient.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 208

1      Q.    Okay.   Has CLF submitted a FOIA request to
2    US Coast Guard?
3      A.    Yes.
4      Q.    And has that -- have the results of that
5    been produced in this lawsuit?
6            MR. GREENE:  Object to the form of the
7    question.
8            You can answer.
9      A.    I -- I believe so.  They weren't -- there
10   wasn't a response.
11     Q.    Does CLF have any letter, document, email
12   from the US Coast Guard that alleges the terminal
13   is in violation of any federal or state law or
14   regulation?
15           MR. GREENE:  Objection.  The form of the
16   question.
17           You can answer.
18     A.    Not that I'm aware of.
19     Q.    Does CLF have in its possession any
20   document, report, email, notice from the City of
21   New Haven that the terminal is in violation of any
22   state or local law or regulation?
23     A.    Not that I'm aware of.
24     Q.    Do you know if the fire department
25   inspects the terminal?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 209

1          A.    I don't.

2          Q.    Do you know if New Haven Fire Department

3    has found any violations at the terminal?

4          A.    I don't.

5          Q.    Is CLF alleging that the risk management

6    plan at the terminal violates the Clean Water Act?

7                MR. GREENE:  Just going to object to the

8    form of the question to the extent that it calls

9    for a legal conclusion or expert opinion and the

10   fact that it's vague as to which plan.  If you have

11   a plan, it should be in front of him.

12               But with that, if you can answer.

13         A.    I'm not aware of the -- whether the

14   adequacy of the risk management plan is at issue.

15         Q.    Doctor Goldsmith had a statement about the

16   risk management plan at the terminal, and I didn't

17   know if CLF had any position of whether or not that

18   risk management plan somehow violated the Clean

19   Water Act.

20         A.    Yeah, I just --

21               MR. GREENE:  Just going to object to the

22   extent that it calls for a legal conclusion.

23               You can answer.

24               THE WITNESS:  Right.

25         A.    And I recognize the fact that she has

Page 210

1     that.  What the -- the litigation team does with

2     that is -- I'm not aware of what their plan is.

3          Q.   What -- as a 30(b)(6) deponent for CLF, is

4     it CLF's view that the risk management plan

5     implemented by Shell at the terminal violates the

6     Clean Water Act?

7               MR. GREENE:  Just going to object to the

8     extent that CL -- the defendants already have the

9     complaint, the NOIs, and plaintiff's expert

10    reports.

11              But you can answer.

12              THE WITNESS:  Right.

13         A.   Yeah, I think we would rely on the reports

14    of our experts in making such a claim, and I don't

15    know if we've made -- if we've made a decision to

16    make such a claim or not.

17         Q.   Is it CLF's position that no flooding is

18    permitted at a facility that is permitted under the

19    Connecticut general permit for industrial

20    stormwater?

21              MR. GREENE:  Just going to object to the

22    extent I believe it's been asked and answered.  It

23    calls for an expert opinion and legal conclusion.

24              But you can answer.

25         A.   The position is that the facility needs to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 211

1    be managed and operated to minimize any pollution

2    from stormwater, including flooding, from the

3    facility and -- yeah, period.

4         Q.   But in terms of which section of the

5    permit are the defendants violating, can you point

6    me to that in terms of the flooding question we

7    discuss -- that I asked?

8              MR. GREENE:  Object to the extent that

9    calls for a legal conclusion and at least

10   repetitive of questions asked earlier.

11             But you can answer.

12        A.   Right.  I think we've talked about this

13   earlier this morning, but that would be -- that

14   would include, you know, the control measures set

15   forth under section 5, and we're talking about the

16   2021 permit -- or I'm talking about the 2021

17   permit.

18        Q.   Okay.  How about the tanks at the terminal

19   in New Haven?  Is CLF saying the tanks are

20   structurally unsound?

21        A.   I -- I -- I don't think CLF is taking a

22   position as to whether the tanks themselves are

23   structurally sound or not.

24        Q.   Do you know if any expert is offering any

25   opinions on that in this case for CLF?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 212

1              MR. GREENE:  To the extent -- to the
2      extent that it calls for an expert opinion and
3      defendants are already in possession of the
4      plaintiff's expert reports.
5              But you can answer.
6              Also, object as to vague as to the term
7      structurally unsound.
8              But you can answer.
9          A.   CLF has produced expert reports.  I don't
10     think any of them address the structural integrity
11     of the tanks as they sit.
12             There is some discussion in the reports, I
13     believe, about what can happen to tanks -- even if
14     structurally sound, what can happen to them in
15     storm surges or hurricanes --
16         Q.   Uh-huh.
17         A.   -- or the like based on observations of
18     what occurred in previous hurricanes or superstorms
19     or storm surges or the like.
20         Q.   Does CLF have any information, any
21     documents, correspondence, reports, that suggest
22     the tanks at New Haven Terminal are faulty or
23     deficient in any way?
24         A.   To the -- to the extent that storage tanks
25     can be subject to failure in storms, yes, there

Page 213

 1     is -- there is evidence of damage and destruction

 2     and subsequent release of pollutants from

 3     facilities up and down the East Coast, including

 4     the Motiva facility in Sewaren, New Jersey,

 5     including facilities in Houston during -- I think

 6     it was Hurricane Harvey, and the destruction

 7     previously seen with Hurricane Katrina and Irene.

 8            So even tanks that were nominally

 9     structurally sound suffered catastrophic failures

10     during those storms.

11        Q.   And what's the basis for that statement,

12     Mr. Mahoney?

13        A.   It's fairly common knowledge of the -- for

14     example, of the failure of the Motiva terminal in

15     Sewaren during Superstorm Sandy.

16        Q.   Is that the only evidence that CLF has of

17     that occurring on the East Coast of the United

18     States?

19            MR. GREENE:  Just going to object to the

20     form of the question as vague and overbroad.

21            But you can answer.

22        A.   I mean --

23            MR. GREENE:  And beyond the scope of the

24     notice.

25            But you can answer.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 214

1        A.    I mean, my longer answer with the -- with

2    the hurricanes -- Katrina, Irene, Harvey and

3    Superstorm Sandy?

4        Q.    Yes.

5        A.    Yeah, I mean, those are -- those are my

6    points of reference in terms of that.

7        Q.    But in terms of the tanks at the New Haven

8    terminal, CLF has no information to suggest they're

9    structurally unsound or leaking or would collapse

10   during a storm?

11            MR. GREENE:   Objection.   Vague.

12   Overbroad.   Mischaracterizes his testimony.

13       A.    I would say up until the last point you

14   had about failure during a storm, I would agree

15   with you, but -- but as we saw, failure of these

16   tanks happen during storms, and they happen because

17   of storm surges.   They happen because of other

18   material smashing into them.   They happen because

19   they are empty and get lifted from their moorings.

20            So there's a host of real-world things

21   that have happened that call into question the

22   ability of -- of tanks to withstand catastrophic

23   damage during increasingly severe and frequent

24   storms we get on the East Coast.

25       Q.    Is CLF familiar with the procedures that

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 215

1      the US EPA recommends to have tank storage

2      facilities secure the facility during hurricanes

3      and other adverse weather events?

4              MR. GREENE:  Object to the form.

5              Go ahead.

6         A.   I -- we may be.  They -- CLF staff may be.

7         Q.   Yeah.  Okay.

8              Does the US EPA have any specific

9      procedures or requirements for terminals to secure

10     their facilities to withstand hurricanes?

11             MR. GREENE:  Object to the extent that it

12     calls for a legal conclusion.

13             You can answer.

14        A.   I -- I don't know the answer to that.

15        Q.   Does Connecticut DEEP have any written

16     procedures, policies, or regulations that a fuel

17     storage terminal should implement in the event of

18     adverse weather events at the terminal?

19             MR. GREENE:  Same objection.

20        A.   Yeah, I'm -- I'm not aware of any

21     specifics.

22        Q.   Does CLF have any documents, reports,

23     other evidence that the tank -- I mean the valves

24     or other equipment at the terminal are faulty or

25     substandard?

Page 216

1              MR. GREENE:  Object to the form as vague

2        and overbroad.

3              But you can answer.

4        A.    I'm not aware of -- of that.

5        Q.    Does CLF even know how all of the tanks

6        are used at the New Haven Terminal?

7        A.    I think that knowledge is with -- is with

8        Shell, the owners and operators -- any owners and

9        operators of that -- of the terminal.

10       Q.    I understand.  I was -- what information

11       does CLF have on how -- or whether all of the tanks

12       are used at the New Haven facility?

13             MR. GREENE:  I'm just going to object to

14       the form of the question only because you -- your

15       first question was how and this question was

16       whether.  And so I'm -- I guess we'll go with

17       whether the --

18             MR. HENDERSON:  The first question is

19       whether -- does...

20             Can you read back my last question.

21             (Question read back.)

22       Q.    Let's just take the whether part first.

23       Does CLF have any information on whether the

24       tanks --

25       A.    Are used.

Page 217

1        Q.    -- are used.  I'm sorry.

2        A.    The information we have -- the information

3    that I have has to do with the number of tanks and

4    the total volume/capacity that the tanks can hold.

5    How often all of the tanks are used or some of the

6    tanks are used I suspect has -- is an operational

7    issue that --

8        Q.    Uh-huh.

9        A.    -- changes on a regular basis as to the

10   full tank used, half tank, is it empty?  Is it

11   being cleaned for maintenance?

12            So as to the specifics of that, I don't

13   have any information about that.

14       Q.    Does CLF have any information on how

15   defendants maintain the tanks at the New Haven

16   Terminal?

17            MR. GREENE:  Object to the form of the

18   question as vague, overbroad, and not defined as to

19   maintain.

20            But you can answer.

21       A.    If we had any of -- any information along

22   those lines, we would have received it from your

23   clients.

24       Q.    Okay.  But CLF is not alleging that our

25   maintenance is somehow violating the Clean Water

Sean M. Mahoney                           June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 218

 1      Act?

 2              MR. GREENE:  Object to the extent that the

 3      allegations are contained in the complaint, the

 4      NOIs, and the plaintiff's expert reports, and

 5      answers in discovery.

 6              But you can answer.

 7              And objection as to vague and overbroad.

 8              But you can answer.

 9      A.   If your question is the maintenance of the

10      physical tanks themselves and -- and not their

11      surroundings, I don't believe that there's any

12      allegation that the tanks are not being -- are

13      being improperly --

14      Q.   Is there --

15      A.   -- maintained.

16      Q.   You testified you reviewed the permit that

17      is the subject of this lawsuit.  Is there anything

18      in that permit, based on your review, that requires

19      the tanks to be spaced at any distance apart from

20      the other tanks?

21      A.   I don't recall any specific requirement

22      concerning distance; and I would say that the

23      only -- as I've said before, the only part of the

24      permit that might control that would be whether or

25      not how you space tanks impacts what constitutes

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 219

```
 1      best management practices or best industry
 2      practice.
 3            Q.   But you're unaware of anything in this
 4      permit specifically that addresses tank spacing?
 5                 MR. GREENE:  Objection.  Mischaracterizes
 6      testimony.  Mischaracterizes the permit.  Vague and
 7      overbroad.
 8                 You can answer.
 9            A.   Just wait...
10            Q.   Does -- is -- is CLF alleging that --
11                 COURT REPORTER:  We didn't get an answer
12      to the last question.
13                 MR. HENDERSON:  Oh, yeah.  Sorry about
14      that.
15                 (Question read back.)
16                 MR. GREENE:  Then the objection is
17      renewed.
18            A.   Yeah, I'm unaware of anything that
19      specifically addresses tank spacing --
20            Q.   Okay.
21            A.   -- in this -- in the 2021 permit.
22                 MR. HENDERSON:  I'm going to take a
23      five-minute break.  Can we go off the record?
24                 VIDEO OPERATOR:  The time is now 1:42.
25      We're off the record.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 220

 1              (Recess was taken.)
 2              VIDEO OPERATOR:  The time is now 1:58.  We
 3       are on the record.
 4         Q.    Mr. Mahoney, we're going to keep moving.
 5              VIDEO OPERATOR:  Your mic?
 6              MR. HENDERSON:  All right.
 7         Q.    I'm going to keep moving, Mr. Mahoney.
 8       Thank you.
 9              So have you had a chance to review any of
10       the -- have you had a chance to review the SPCC for
11       the terminal?
12         A.    I think I looked at -- I think I did look
13       at that --
14         Q.    Okay.
15         A.    -- document.
16         Q.    Did you identify any problems with the
17       SPCC at -- for the terminal?
18              MR. GREENE:  Object to the question --
19       form of the question as vague.
20              You can answer.
21         A.    I was just looking at it to familiarize
22       myself with the document.
23         Q.    Has -- you testified earlier that CLF had
24       submitted a FOIA -- Open Records Act request -- to
25       DEEP, Connecticut DEEP, about the terminal; is that

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 221

1      correct?

2          A.   Yes.

3          Q.   Has CLF submitted an Open Records Act -- a

4      FOIA -- to Connecticut DEEP to identify any other

5      facilities that have climate change provisions in

6      their SWPPPs?

7               MR. GREENE:  Object to the extent that

8      it's beyond the scope of the notice and may bear

9      upon privileged communications or attorney work

10     product.

11              So with those objections, you can answer.

12         A.   I think you also asked it before, but I'm

13     not aware of any such FOIA requests being made by

14     CLF.

15         Q.   Okay.  Have you ever seen a SWPPP that had

16     provisions that required the permittee to assess

17     climate change for any state, any facility in

18     America?

19         A.   Yeah.  Again, I --

20              MR. GREENE:  Object to the form of the

21     question.

22              You can answer.

23         A.   I think you asked that question earlier.

24     I thought I had seen one out of California

25     unrelated to this case.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 222

1      Q.    Is that all you can think of right now?

2      A.    At the moment, yes.

3      Q.    Do you know of any -- so you don't know of

4   any in Rhode Island that would have them or

5   Connecticut, anywhere in the Northeast?

6            MR. GREENE:  Objection to the extent that

7   it's beyond the scope of the notice.

8            You can answer.

9      A.    Not that I am aware of.

10           MR. GREENE:  Excuse me.

11     Q.    Okay.  Have you been involved in any

12   discussions at CLF that it intends to challenge

13   this new Connecticut DEEP industrial stormwater

14   permit?

15           MR. GREENE:  I'm going to object to the

16   extent that it calls for attorney -- privileged

17   communications or attorney work product.

18           You can answer.

19     A.    I have not.

20     Q.    Do you know if there are discussions going

21   on at CLF about challenging the new Connecticut

22   DEEP industrial stormwater permit?

23           MR. GREENE:  Same objections.

24     A.    I'm not aware of any such conversations at

25   the moment.

Sean M. Mahoney                                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 223

1          Q.   Has CLF ever challenged a -- a new permit
2     in any state in the Northeast?  A new final permit?
3               MR. GREENE:  Object to the extent that
4     it's beyond the scope of the notice.
5               You can answer.
6          A.   I think -- and you're talking about a
7     general stormwater permit?
8          Q.   Any permit.  So in other words,
9     Mr. Mahoney, I'm trying to get a feel for state
10    issues a new permit, has CLF ever challenged the
11    new permit when it becomes final?
12              MR. GREENE:  Same objection.
13         A.   Certainly when it comes to individual
14    facility permits.
15         Q.   I mean a general permit.
16         A.   I believe that we did -- that CLF did
17    challenge the Massachusetts general permit, but
18    I -- I don't know if that -- if that went to a full
19    judicial challenge or not.
20         Q.   Uh-huh.  You talked about the EPA
21    multi-sector general permit -- I think it was
22    2021 -- and in the topics -- there's topic No. 11.
23    Did you prepare to testify on topic 11?
24         A.   (Witness reviews document.)  Yes, I've
25    reviewed the multi-sector general permit from EPA.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 224

1      I reviewed the comments that CLF submitted.  I

2      think that's...

3          Q.   Did -- you mentioned CLF sent comments on

4      the EPA MSGP.  Did EPA accept all of CLF's

5      comments?

6              MR. GREENE:  Object to the form of the

7      question.

8              You can answer.

9          A.   I don't know, but I would suspect that

10     they did not.

11         Q.   Uh-huh.  Do you remember any of the

12     comments that CLF made on the EPA MSGP?

13         A.   You know, sitting here right now, I don't.

14     Six -- six hours in, I don't remember the

15     specifics.  I do have copies of the comment letters

16     if you want me to get you some specifics.

17         Q.   Are you aware that in the 2021 EPA MSGP

18     that EPA identified various climate resilience

19     measures that are -- that should be included --

20     that were included in EPA's MSGP?

21             MR. GREENE:  Object to the form of the

22     question.

23             But you can answer.

24         A.   Again --

25             MR. GREENE:  If you want to ask him about

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 225

1      specific items, we should put the actual document

2      in front of him.

3          A.    Yes.

4          Q.    Mr. Mahoney, did -- do you -- does CLF

5      recognize that the climate resilient factors in the

6      proposed CT DEEP industrial stormwater permit are

7      identical to the climate resilience provisions in

8      the EPA MSGP from 2021?

9              MR. GREENE:  Again I'm going to object.

10     This isn't supposed to be a memory test.

11             MR. HENDERSON:  No, I'm just asking does

12     he recognize --

13             MR. GREENE:  Whoa, hang on.  First of all,

14     let me finish my objection.

15             I'm just going to object to the form of

16     the question and to the extent that we haven't put

17     the document in -- in front of witness.  Just --

18     you know, just to note for the record, the witness

19     was prepared on over 30 topics.  We have more than

20     a dozen binders of thousands of pages.  If you want

21     to ask him about something specific, we should put

22     the document in front of him.

23         Q.    So, Mr. Mahoney, if you could look at

24     exhibit labeled Mahoney No. 10, page 42 and 43.

25         A.    Okay.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 226

1    Q.   Do you see where it says "Resilience
2    Measures" at the bottom of 42 and it goes over to
3    the middle of page 43?
4    A.   I do.
5    Q.   Does CLF recognize those are identical to
6    the resilience measures that EPA has included in
7    the 2021 MSGP?
8         MR. GREENE:  Just going to move to --
9    object to the form of the question to the extent
10   that we're not putting the actual EPA document in
11   front of the witness for a comparison sake.
12        But to that extent, if you're able to
13   answer, go ahead.
14   A.   I don't think that we've ever sat down and
15   compared the two.  As I said, I'd be happy to look
16   at the MSGP to confirm what you're suggesting.
17        The -- the Connecticut draft permit
18   overarching goal was to be more consistent with the
19   MSGP, as it's stated.  So both in its format as
20   well as in its structure.
21   Q.   Uh-huh.
22   A.   So it wouldn't surprise me that there
23   would be similarities between the MSGP, the EPA
24   MSGP and the Connecticut DEEP general permit.
25   Q.   And on Mahoney No. 14 on the supplemental

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 227

1       fact sheet of December of last year --

2          A.    Okay.

3          Q.    -- I think Connecticut DEEP actually

4       states that its format "mirrors the 2021 EPA MSGP."

5          A.    I think that's --

6               MR. GREENE:  I'm just going to again

7       object to the form that we don't have a specific

8       cite that we're looking at here.

9               If you're with -- Mr. Mahoney, you can

10      answer.

11         A.    Yeah, I do see that in the third paragraph

12      on page 1 --

13         Q.    Right.

14         A.    -- of Exhibit 14 says that the (as read):

15              "Significant changes to a general permit

16      include the following:  An updated format that

17      mirrors the 2021 US EPA multi-sector general

18      permit."

19         Q.    Are you aware that EPA did not require any

20      sort of climate assessment for facilities regulated

21      under the EPA multi-sector general permit for

22      industrial stormwater?

23              MR. GREENE:  Object to the form of the

24      question as vague and without reference to any

25      document.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 228

1          A.    Right.  And I think -- I go back to the
2     answer that we've -- you've had from me a couple of
3     times, which is, you know, the document speaks for
4     itself.
5          Q.    Okay.
6          A.    If there's no specific language requiring
7     climate --
8          Q.    Right.
9          A.    -- assessment, it's not in there.  Those
10    words aren't in there.
11         Q.    Do you believe that Connecticut DEEP
12    should have added additional provisions to the new
13    draft proposed permit?
14              MR. GREENE:  Just going to object to the
15    extent that it's outside the scope of the
16    deposition.  It calls for legal and expert
17    conclusion.
18              But you can answer.
19         A.    I know that -- that CLF has made
20    suggestions for additional measures or provisions
21    for the draft permit in the two comment letters
22    that we submitted and presume that those comments
23    are still under consideration by Connecticut DEEP,
24    as they have yet to issue a final permit.
25         Q.    Has CLF attempted to identify SWPPPs for

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 229

1          other facilities along the coast in the state of

2          Connecticut to evaluate whether they address

3          climate change in any way?

4                    MR. GREENE:  Just going to object to the

5          extent that I think that was asked and answered.

6          Beyond the scope of the deposition notice.

7                    But you can answer.

8               A.   What facilities do you -- are you

9          referencing?

10              Q.   Oh, just along the coast or on the coast.

11              A.    Industrial facilities?

12              Q.    Industrial facilities.  Facilities subject

13         to the industrial stormwater permit.

14              A.   Oh.  I don't know if -- if others at CLF

15         have inquired about that.  Have made those

16         inquiries.

17              Q.   If none of the SWPPPs for facilities along

18         the coast of Connecticut have any provisions that

19         require climate change assessment of those

20         facilities, does that indicate anything about what

21         industry is doing in the state of Connecticut?

22                    MR. GREENE:  I'm going to object.

23         Incomplete hypothetical.  Assumes facts not in

24         evidence.  Beyond the scope of the deposition.

25         Calls for a legal conclusion.  Calls for an expert

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 230

 1      conclusion.

 2              With all of those issues, if you can

 3      answer it, go ahead.

 4              And vague as to "industry" but...

 5      A.   I guess could you clarify what you mean by

 6      "climate assessment"?  You've used that a lot.

 7      What -- what --

 8      Q.   Right.  I'm -- I'm saying has --

 9              MR. HENDERSON:  Can you read back my

10      question, Jodi?

11              (Question read back.)

12              MR. GREENE:  I'll renew all those

13      objections and add vague as to facilities.

14              But go ahead.

15      A.   And by -- and by "climate change

16      assessment" you mean --

17      Q.   I mean looking for what you use in the

18      term here, in this case, "climate change effects,

19      rising sea level, increased storms, storm surge."

20              I think previously you testified that you

21      knew of no SWPPP in the state of Connecticut that

22      required any assessment of those features.

23              That's the first part.  I think you've

24      testified to that.  My question is --

25              MR. GREENE:  I'm going to just object to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 231

1          the extent that mischaracterizes his testimony.

2                    But you can go ahead.

3          Q.    And the second part is if there are none,

4          what does that say about industry practices

5          throughout the state of Connecticut?

6          A.    Well, you've been talking --

7                    MR. GREENE:   Same objections.

8          A.    You've been talking about climate

9          assessment, and it hasn't been clear to me that --

10         that by climate assessment you mean the effects of

11         climate change.

12         Q.    Correct.

13         A.    So -- so you do mean the effects of

14         climate change?

15         Q.    Correct.

16         A.    So an assessment of the effects of climate

17         change?

18         Q.    Correct.

19         A.    And that the -- and -- and your under --

20         by that you mean the effect -- the increased sea

21         level rise?

22         Q.    Yup.

23         A.    Increasing severity and frequency of

24         storms?

25         Q.    Yeah.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 232

1          VIDEO OPERATOR:  Counsel, pen.

2          MR. GREENE:  Oh, sorry.  Sorry.

3          THE WITNESS:  That's a five-yard penalty.

4     A.   So I think that what I have said is that

5     there -- the permit hasn't -- there's been no use

6     of the term "climate assessment."  There's been no

7     requirement of climate assessment.

8          But I hope I've made it clear that the

9     permit, in requiring the use of best management

10    practices and best industry practices where

11    technologically -- I think it says accessible and

12    economically practical -- I think those are the

13    lines -- that needs to be looked at.

14         To that end, of course you're going to be

15    looking at what type of precipitation you're going

16    to be getting to determine what kind of stormwater

17    you're going to get.  Of course you're going to be

18    looking at what the risks are of flooding.  Of

19    course you're going to be looking at what storm --

20    what risks are from storm surge.

21         All of that is embodied in the

22    requirements of the -- of the general permit to

23    properly manage stormwater, and that's both runon

24    and runoff from the facility.

25    Q.   All right.  But my question was about do

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 233

1     you know of any other facility in Connecticut that
2     is currently doing that as part of its requirements
3     under the state of Connecticut general permit for
4     industrial stormwater?
5             MR. GREENE:  Just going to object to the
6     question as overbroad.  Vague as to "facility."
7     Beyond the scope of the notice.  Calling for an
8     expert opinion, legal conclusion.
9        A.   Am I aware of any specific facility on the
10    coast of Connecticut that is doing that pursuant to
11    their SWPPP?
12       Q.   Correct.
13       A.   And there's -- and their permit?  I'm not
14    aware of any by name; but, as I said, it would be
15    our position that anybody with -- anybody subject
16    to that permit needs to take those factors into
17    account as part of determining the best management
18    practices and consistent with best industry
19    practice.
20       Q.   My -- my question is can you point to any
21    company that has an industrial stormwater permit
22    that is currently doing that in the state of
23    Connecticut?
24            MR. GREENE:  Objection.  Just going to
25    restate my objections from the last question.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 234

```
 1        A.   I can't -- I can point to two that aren't

 2   doing that.

 3        Q.   No, I just wanted to know the ones that

 4   are.

 5        A.   Well, I -- I just told you.  I can't point

 6   to ones that are.  I can point to two that aren't.

 7   Your client's facility and the Gulf Pike facility.

 8        Q.   Yeah, I'm -- I'm just -- so you don't --

 9   you can't identify anyone today that's doing that

10   pursuant to their --

11        A.   Right.  I mean, you've asked that --

12             MR. GREENE:  Same objections.

13        A.   -- a number of times.

14             COURT REPORTER:  What was your objection?

15             MR. GREENE:  Same ones.

16             COURT REPORTER:  You spoke over --

17             MR. GREENE:  Sorry.  It was all the ones

18   previously:  Beyond the scope of the notice.  Calls

19   for a legal conclusion, expert conclusion.  Vague

20   as to what facilities are being referred to and

21   type of industry.

22             But you can go ahead.

23        Q.   Do you know of any facilities in the state

24   of Connecticut that have a Clean Water Act NPDES --

25   all capitals -- permit other than industrial
```

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 235

1          stormwater that are evaluating the climate change

2          impacts of their facilities?

3                    MR. GREENE:  Object to the question as to

4          vague as to facilities.

5                    But you can go ahead.

6          A.    Yeah, as I sit here today, no.

7          Q.    Do you have -- have you, CLF, conducted a

8          survey of industry in Connecticut to evaluate their

9          internal practices for evaluating climate change in

10         the context of their industrial stormwater permit?

11                   MR. GREENE:  I'm just going to object to

12         the question to the extent that it assumes that CLF

13         would have the ability to conduct a survey of

14         private industries.  And vague as to facilities.

15                   But you can answer.

16                   THE WITNESS:  Yeah.

17                   COURT REPORTER:  Did you -- you've got it?

18                   THE WITNESS:  Yeah, I'm okay.  Thank you,

19         Jodi.  I'm counting to ten.

20         A.    And I think that the -- beyond the fact

21         that such -- doing something like that is not

22         consistent with our -- necessary with our mission,

23         is not something that we have the resources to do,

24         nor is it something that we'd likely be able to get

25         cooperation of industrial facilities to conduct.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 236

1      We have not undertaken such an activity.

2           Q.   How does CLF know what best industry

3      practices are for facilities in the state of

4      Connecticut under the industrial stormwater permit?

5           A.   We rely on --

6                THE WITNESS:  I'm sorry.

7                MR. GREENE:  No, that's...

8           A.   We rely on our staff and consultants,

9      including experts, to assist us in making those

10     determinations.

11          Q.   Has CLF conducted a survey of

12     environmental consultants that provide consulting

13     on industrial stormwater permits in the state of

14     Connecticut and whether or not they've identified

15     any facilities in Connecticut that are evaluating

16     climate change under their permit?

17          A.   What -- what topic are we on?

18          Q.   Topic 12.

19          A.   (Witness reviews document.)  We have not

20     conducted a survey of consultants as to what

21     constitutes best management practices, best

22     industry practices, or good engineering practices.

23     We have met with consultants and experts about that

24     topic.

25          Q.   Has CLF contacted any industry in

Page 237

1      Connecticut and inquired about how they are
2      handling climate change impacts in their industrial
3      stormwater permits?
4              MR. GREENE:  Object as to beyond the scope
5      of topic 12.  It's not specified as to what
6      industry.  It's overbroad.
7              But go ahead.
8          A.   I don't know.
9          Q.   Has anyone ever provided you any
10     information that they're -- that anyone at CLF had
11     ever contacted industry to see what the best
12     industry practice is in the state of Connecticut?
13             MR. GREENE:  Once again, I'm going to
14     object as to overbroad and beyond the scope of the
15     topic which is limited to the permit for industrial
16     stormwater permit compliance.
17             But you can go ahead.
18         A.   By industry do you just mean anybody
19     subject to the industrial stormwater permit?
20         Q.   Yes, sir.
21         A.   I think the only -- the only information
22     we've received has been from your clients as to
23     what they consider best management practice and
24     best industry practice.
25         Q.   So has CLF interviewed, spoken with any

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 238

1      other industry in the state of Connecticut located
2      along the coast that is subject to an industrial
3      stormwater permit of how it handles or whether it
4      handles climate change in compliance with that
5      industrial stormwater permit?
6          A.   No.  I think we would have been -- we
7      would have welcomed such a conversation with your
8      clients or the owners and operators of the Gulf
9      Pike facility after we issued our notice of intent
10     letter, but I don't believe any such conversations
11     took place.
12         Q.   Do you know how the electric generating
13     plant, which is near the New Haven Terminal in
14     the -- at issue in this case, how did they handle
15     climate change in their SWPPP?
16             MR. GREENE:  I'm just going to object to
17     the extent that it calls for an expert
18     opinion/legal conclusion as beyond the scope of the
19     notice.
20             But you can answer.
21         A.   I haven't reviewed their SWPPP.
22         Q.   Do you know if anyone at CLF has reviewed
23     their SWPPP?
24             MR. GREENE:  Just going to object to the
25     extent that it calls for attorney work product or

Sean M. Mahoney                              June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 239

1          attorney-client privilege, but with those caveats,

2          you can answer.

3                A.    I'm not aware of anybody at CLF who has.

4                Q.    Do you know if anyone at CLF has actually

5          looked at the SWPPP for any other facility that's

6          located on the New Haven Harbor?

7                      MR. GREENE:  Same objections as to work

8          product and privilege.

9                      But with those caveats, you can answer.

10               A.    I believe that somebody has -- somebody at

11         CLF has reviewed the SWPPP for the Gulf Pike

12         facility.

13               Q.    Other than the Gulf Pike facility?

14                     MR. GREENE:  Same objections.

15               A.    I'm not aware of -- of anybody having

16         reviewed any other facility that might be on New

17         Haven Harbor and subject to the industrial

18         stormwater permit.

19               Q.    Did CLF ever conduct a review of SWPPPs

20         for facilities along the entire coast of

21         Connecticut to see how those facilities were

22         handling climate change impact analysis at those

23         facilities?

24               A.    I think you already asked that question,

25         and the answer is I'm not aware of anything other

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 240

1    than your client's facility in New Haven and the

2    Gulf Pike facility.

3         Q.   How has CLF determined what the best

4    industry practices are for compliance with SWPPPs

5    in the state of Connecticut?

6              MR. GREENE:  Just going to object to the

7    extent that it calls for a legal conclusion,

8    attorney work product, attorney-client

9    communications.

10             But if you're able to answer with those

11   caveats, go ahead.

12        A.   Based on a reading of the general permit,

13   the facility SWPPP, and the reports prepared by our

14   expert witnesses.

15        Q.   So -- so did the -- how does CLF define

16   best industry practices?

17             MR. GREENE:  Just going to object to the

18   extent that it calls for a legal conclusion, expert

19   testimony, and particularly given that defendant is

20   in possession of the discovery in this matter as

21   well as the plaintiff's expert reports, is very

22   aware of the plaintiff's position in that.

23             With that, you can answer.

24        A.   I think it gives the plain meaning of best

25   industry practice as -- and it's defined by those

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 241

1      who are most familiar with the industry and

2      familiar through -- and -- and we rely on our

3      experts to help us identify what the best

4      management practices and what the best industry

5      practices and what the best engineering practices

6      are.

7              That comes through both professional

8      organizations.  It comes through the writings and

9      policies and procedures of industry itself that are

10     publicly available, including policy and procedures

11     of your clients; and it includes, you know, a site

12     visit to see actual features at the site.

13         Q.   But how did CLF collect data on what are

14     the industry practices regarding industrial

15     stormwater in the state of Connecticut?

16             MR. GREENE:  Well, for that one I think

17     I'm going to object and instruct you not to answer

18     'cause now we're getting into work product that

19     bears upon the litigation in this case.

20             You're talking about the collection of

21     evidence and attorney work product and

22     attorney-client privilege.

23             MR. HENDERSON:  Just for the record -- so

24     you're instructing not to answer.

25             My question was -- can you read back my

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 242

1      question, Jodi.

2             (Question read back.)

3             MR. GREENE:  Yeah, and I'm going to -- I

4      stand by my objection.  I mean, I think that's --

5      that's within the bounds of CLF's preparation of

6      its case here.

7         Q.   So, Mr. Maloney -- Mahoney -- sorry about

8      that --

9             MR. GREENE:  Again, just to clarify, it's

10     not a question of CLF's knowledge of best industry

11     practice.  That's -- that's really a question about

12     what CLF did to collect information and data in

13     preparation of this case.  So...

14        Q.   Mr. Mahoney, does CLF -- have you seen any

15     information where CLF has conducted -- collected

16     factual information on the industry practices of

17     complying with the state of Connecticut industrial

18     stormwater permit?

19            MR. GREENE:  So make the same objection.

20     Provide the same instruction:  Again, he's -- he's

21     testified about what CLF knows about industry

22     practices.  He's testified extensively about what

23     he understands to be best industry practices as it

24     relates to defendants in this case but collection

25     of information at least runs in parallel with CLF's

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 243

1        preparation of its case here.  So...

2               MR. HENDERSON:  I have no objection to

3        that if you're -- but if you intend to use the

4        data, you can't claim it's privileged.

5               MR. GREENE:  No.  We can use what we've

6        produced and we've produced --

7               MR. HENDERSON:  Oh.

8               MR. GREENE:  -- documents.  We've produced

9        our expert reports.  Your question -- your first

10       question was how CLF went about collecting data.

11       That's a question about what attorneys did.

12          Q.   Well, nonattorneys.  Has CLF, excluding

13       their attorneys, collected information on industry

14       practices in the state of Connecticut concerning

15       industrial stormwater?

16              MR. GREENE:  Still going to instruct him

17       not to answer.  That bears upon the preparation of

18       the case.  Again, you're not asking about what CLF

19       knows.  You're asking about CLF's procedures,

20       particularly procedures that bear upon the

21       preparation of this case.  So...

22          Q.   Okay.  So the record shows that you've

23       been instructed not to answer that.

24          A.   (Witness nods.)

25              COURT REPORTER:  Yes?  You nodded.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 244

1          A.   Yes, and I will follow that instruction.

2               MR. GREENE:  You haven't nodded your head

3     all day.  That was --

4               THE WITNESS:  I know.  That was the first

5     one.

6          Q.   So have you looked to see if anyone else

7     has established what the best industry practice was

8     in the state of Connecticut in terms of complying

9     with industrial stormwater and evaluation of

10    climate change impacts?

11         A.   You're -- you're going to have to clarify.

12    What -- have -- have we looked at what any other

13    industrial facility had identified as BMP or BIP --

14         Q.   Uh-huh.

15         A.   -- under the permit?

16         Q.   Uh-huh.

17         A.   Is that the question?

18         Q.   Yup.

19         A.   So you -- so we have -- okay.  So we've --

20    we're just asking it in a different form.  I've

21    answered it before.  I think -- I'm not aware of us

22    having looked at anything other than the facility

23    of your clients, Shell, et al., and the Gulf Pike

24    facility.

25         Q.   Is it CLF's position that all industry

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 245

1      subject to the CT DEEP industrial stormwater permit
2      should be completing a climate change assessment of
3      the effects of climate change on their facility?
4            A.   There again I -- I've -- I'm finding your
5      use of the term "climate change assessment" vague.
6      I -- do I -- do I think facilities should be
7      looking at how climate change is going to impact
8      the operations of their facility?  Absolutely.
9                 I think it would be malpractice if you
10     were running a business or operation and you didn't
11     consider the impacts that could be had on your
12     operations, particularly if you're located along
13     the coast.
14                So I -- so I'm not sure I understand what
15     your -- your question is that...
16           Q.   Mr. Mahoney, does CLF believe that
17     facilities along the coast are evaluating the
18     impacts of climate change on their facilities?
19                MR. GREENE:  I'm just going to object as
20     overbroad and beyond the scope of the notice.
21                But you can answer.
22           A.   Yeah, it's -- it's very broad.  I think
23     that there are some facilities that are
24     reviewing --
25           Q.   Can you identify one?

Page 246

1           A.    Sure.

2                 The City of Portland Wastewater Treatment

3     Facility.

4           Q.    And that's Portland, Connecticut?

5           A.    Portland, Maine.

6           Q.    Okay.  Do you know of any in Connecticut?

7           A.    Well, I would assume Shell is now

8     assessing their operations.

9           Q.    I'm just -- you're -- you're the one that

10    used best industry practices.  I'm just asking

11    questions on how CLF defines it and what evidence

12    they have for their best industry practice.

13          A.    But -- but you --

14                MR. GREENE:  Object to the form of the

15    question.

16          A.    But you were asking me if any facilities

17    along the coast are evaluating the impacts of

18    climate change on their facilities, and my answer

19    was I would hope so because it's malpractice if

20    you're not.  And I think that is in the private

21    sector.  It's in the public sector.  It's in the

22    municipal sector.

23                So I think it's all happening.  That's a

24    little far afield from -- from the industrial

25    general stormwater permit, but I think it's

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 247

1    responsive to the question you asked.

2         Q.    Do -- do you -- can you identify any

3    company subject to the state of Connecticut

4    Industrial Stormwater Permit that is at this point

5    evaluating the impacts of climate change on their

6    facility?

7              MR. GREENE:  Object as to vague,

8    overbroad, and beyond the scope of the notice.

9    Witness is not here to testify about any and every

10   facility and their practices on the coast of

11   Connecticut or the Eastern Seaboard.

12             But if you can answer, you can answer.

13        Q.    You can go ahead and answer.

14        A.    And, again, I think we've asked this a

15   couple of different ways now.

16             I'm not aware of any specific facility

17   that I could give you the name of, sitting here

18   today.

19        Q.    Okay.  Is --

20        A.    But I would imagine that there are plenty

21   who have or are in the process of doing so.

22        Q.    But you have not identified one by name?

23             MR. GREENE:  Same objections.

24        A.    That is correct.

25        Q.    Does -- what data does CLF have on the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 248

1      best industry practices to comply with the state of

2      Connecticut storm -- Industrial Stormwater Permit?

3              MR. GREENE:  Objection.  Asked and

4      answered.  Calls for an expert conclusion, legal

5      conclusion.

6              The defendants are in possession of the

7      plaintiff's expert reports.

8              You can answer.

9              MR. HENDERSON:  Again, we just note for

10     the record, for the Court, we object to

11     Mr. Greene's continual speaking objections

12     throughout.

13         Q.   Go ahead.

14             MR. GREENE:  I'm not speaking.  I'm

15     stating my objections and getting out of the way

16     and letting the witness answer.

17         A.   Again, we -- you've -- you've asked this

18     question.  So I answered it before.  So I --

19         Q.   And --

20         A.   -- and I'll answer it again, but we're --

21     we're repeating ourselves now, and it's not a great

22     use of time.

23         Q.   I'm just asking what data do you have that

24     establishes best industry practice in the state of

25     Connecticut when it comes to industrial stormwater

Page 249

1      compliance?

2              MR. GREENE:  All the same objections.

3          A.   So with respect to this case, in addition

4      to what's set forth in the complaint and in

5      reviewing the permit itself, the facilities, SWPPP,

6      and working with our experts, whose reports have

7      been produced to you and your clients and that go

8      into some detail about what constitutes best

9      management practices, best industry practices when

10     it comes to bulk fuel storage facilities like

11     yours; and that includes pointing to policies of

12     your own clients when it comes to what are best

13     practices for protecting their own infrastructure

14     and preventing the release of pollutants from that

15     infrastructure.

16         Q.   Right.  I'm asking about other industry in

17     the state of Connecticut.  What are they doing when

18     it comes to industrial stormwater?

19             MR. GREENE:  Well, what industry?

20             MR. HENDERSON:  The bulk fuel storage.

21             MR. GREENE:  Well, that's a facility.

22     When you say other industry, that's way overbroad

23     and too vague.

24             MR. HENDERSON:  Bulk other -- you're the

25     one that used the term, but okay.  We'll say --

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 250

```
 1              MR. GREENE:  But you're the one that has
 2      to comply with the notice and that -- these topics.
 3              MR. HENDERSON:  Let's look at all facility
 4      subject --
 5              THE WITNESS:  Wait.  Wait.
 6              Could you read the question back, the
 7      prior one that started before my last answer,
 8      'cause that wasn't the question you asked me.
 9              You asked me how did we -- how did CLF --
10      I'm sorry.
11              Could you read the question, Jodi.
12              (Question and answer back.)
13      A.    I think it's -- it's the same question
14      again.  So --
15      Q.    Now, you talked -- let me ask that
16      question.  Other than what occurs at defendants'
17      terminal, what evidence do you have for best
18      industry practice for those subject to a general
19      industrial stormwater permit in the state of
20      Connecticut?
21              MR. GREENE:  One second.  I'm just going
22      to -- same objections.  Asked and answered.  Calls
23      for an expert conclusion, a legal conclusion.
24              Defendant has all of the pleadings,
25      complaint, NOIs, and expert reports in this case.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 251

1              You can go ahead.

2        A.    So beyond the reports of our experts who

3     have looked at the bulk fuel storage terminal

4     industry broadly and -- and including defendants'

5     own policies and practices, there aren't any other

6     bulk fuel storage terminal facilities on New Haven

7     Harbor for us to look at that would model best

8     management practices.

9              So as to other facilities subject to the

10    industrial general permit --

11       Q.    Uh-huh.

12       A.    -- I'm not aware of other facilities that

13    we've looked at --

14       Q.    So --

15       A.    -- in order to inform what we think best

16    management or best industry practices are.

17       Q.    So did you look at any facilities in

18    Stamford, Connecticut, along the coast that are

19    subject to the industrial stormwater permit?

20       A.    I'm not aware --

21       Q.    Did they --

22       A.    -- if we've done that.

23       Q.    Did CLF look and see how they're handling

24    whether climate change impacts their facility?

25              MR. GREENE:  I'm just going to object to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 252

1    the extent that that is inherently included in the

2    same questions that you've asked repeatedly on this

3    topic.

4                But go ahead.

5                With all of my same objections.

6        A.    I'm not -- I'm not aware of whether we've

7    looked at any facilities in Stamford, Connecticut.

8        Q.    Did CLF look at fuel storage facilities in

9    other states to see how they're handling climate

10   change impacts?

11               MR. GREENE:  Same objections.  Beyond the

12   scope.

13               You can answer.

14       A.    I mean, CLF has been involved with other

15   facilities -- coastal bulk storage; bulk fuel

16   storage facilities; obviously your client's other

17   facility in Providence, Rhode Island; and then

18   there were several facilities here in Boston Harbor

19   that we were engaged with.

20       Q.    Did you survey any other industry besides

21   fuel storage terminals?  Did you look at any other

22   types of industry in Connecticut to see how they

23   are evaluating the climate change impacts under the

24   industrial stormwater permit in the state of

25   Connecticut?

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 253

1          A.    I believe that CLF has been engaged in
2     some enforcement actions concerning scrap metal
3     facilities in Connecticut, but they would not be a
4     model of what best management practice or best
5     industry practice would be.
6          Q.    So other than looking at the facility
7     in -- at issue in this case and the Gulf Pike
8     facility you looked at, has CF -- has CLF looked at
9     any other industrial facility along the coast of
10    Connecticut to see how they are evaluating the
11    climate change impacts under the industrial
12    stormwater permit in the state of Connecticut?
13              MR. GREENE:  I'm just going to object.
14    Asked and answered repeatedly.
15         Q.    If you haven't -- that's all I'm looking
16    for.  If you have, tell me.
17              MR. GREENE:  It's the same question --
18    it's a different version of the same question
19    you've asked, by my count, close to a dozen times
20    now.
21              So with all the same objections, you can
22    answer.
23         A.    I'm not sure where the scrap metal
24    facility was located, if it was coastal or not.
25    And other than that, I'm not aware of -- of whether

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 254

1       we have or have not -- shall I stop?

2           Q.   So I'm just -- I mean, I've used the term

3       best industry practices.  I'm just trying to find

4       out what industry you have looked at and what

5       industry you have not looked at.  So that's why I

6       asked about other facilities.

7               Do you know how any other industry in the

8       state of Connecticut subject to the industrial

9       stormwater permit is handling or evaluating the

10      climate change impacts to their facility?

11              MR. GREENE:  It's got to be close to 12

12      times you've asked essentially the same question.

13              MR. HENDERSON:  I know.  I'm just -- but I

14      haven't heard any answer.

15              MR. GREENE:  I don't know if you just

16      don't like the answer --

17              MR. HENDERSON:  No, I just --

18              MR. GREENE:  -- or what the problems is,

19      but I --

20          Q.   You know, you can answer.

21              MR. GREENE:  No, actually, if he -- I'm

22      getting to the point where I'm going to instruct

23      him not to answer because you've asked the same

24      question repeatedly over and over and over again.

25              MR. HENDERSON:  I understand.

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 255

1          So can you read it back, Jodi.  I don't
2     think that I've asked that question.  I asked about
3     other industry, not related to us.
4          (Question read back.)
5          MR. GREENE:  You have asked that
6     question -- that question repeatedly.
7          A.   Yeah.
8          Q.   And I've heard you have not looked at any
9     other industry.  I just want to make sure I heard
10    that correctly.
11          MR. GREENE:  But they --
12          MR. HENDERSON:  No.  I mean --
13          MR. GREENE:  There's a record.  She's
14    writing it down.
15          MR. HENDERSON:  Okay.  Fair.
16          MR. GREENE:  You asked the question six
17    times.
18          A.   I will say it one more time.  I am not
19    aware of us having looked at any other facility
20    subject to the Connecticut General Industrial
21    Stormwater Permit --
22          Q.   All right.  All right.
23          A.   -- and how they may be addressing their
24    own specific issues --
25          Q.   You mentioned --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 256

1          A.    -- related to climate change --

2          Q.    Oh, sorry.

3          A.    -- and the effects of climate change.

4          Q.    Okay.  Mr. Mahoney, you mentioned

5    associations.  Have you ever heard the American

6    Society of Civil Engineers?

7          A.    I have.

8          Q.    Do you know if they have a standard on how

9    industry should consider climate change if that

10   industry has an industrial stormwater permit?

11         A.    What -- what do you mean by policy?  Do

12   you mean a position?

13         Q.    Do they have a practice -- a recommended

14   practice?  Do they have a required practice?  Do

15   they have a standard on how to do it?

16         A.    Yeah.

17               MR. GREENE:  Object to the form of the

18   question.

19               You can answer.

20               THE WITNESS:  Yeah.

21         A.    I believe they do, and I believe that

22   Ms. Goldsmith's expert report goes into some detail

23   with respect to not just the American Society of

24   Civil Engineers but other professional

25   organizations and industry-led organizations and

Page 257

1      industry itself, including your client Shell and

2      its associated companies.

3           Q.   Do you know of any national consensus

4      standard on how a company should evaluate climate

5      change impacts to its facility regulated under an

6      industrial stormwater permit?

7           A.   I don't -- sitting here right now, I

8      couldn't tell you if there's a national standard.

9                I would think that there is -- because

10     every facility is different, there's going to have

11     to be individual site-specific approaches taken in

12     light of the nature of risk surrounding

13     environmental features, habitat features, size of

14     facility, type of activity going on.

15               As you know, the general permit covers a

16     variety of sectors.  So those sectors have

17     different issues.  Some have tanks storing

18     hazardous materials.  Some don't.  Some are -- are

19     producing materials.  Others are storing and

20     transferring them.  It's a -- you know.  So it

21     depends on -- on the -- on the industry.

22               But -- I'll stop there.

23           Q.   Would the EPA MSGP, would that provide

24     guidance to companies on how to consider climate

25     change impacts of their facilities under an

Page 258

1       industrial stormwater permit?

2               MR. GREENE:  I'm just going to object to

3       the extent it's repetitive of questions that were

4       asked earlier in the deposition.  Calls for a legal

5       conclusion and potentially an expert opinion.

6               But you can answer.

7       A.   The MSGP provides regulations for the

8       operation and maintenance of facilities subject to

9       the permit.  So I would not say they provide

10      guidance.  They provide the rules that must be

11      followed --

12      Q.   So --

13      A.   -- by those facilities.

14      Q.   -- if a company follows EPA's MSGP

15      requirements, would that be best industry practice?

16              MR. GREENE:  Object to the extent that it

17      calls for a legal conclusion and expert opinion.

18      A.   Not necessarily.

19      Q.   What else would an industry need to comply

20      with?

21      A.   The circle of --

22              MR. GREENE:  Just going to object to --

23      just going to object to -- vague as to --

24              THE WITNESS:  Yeah.

25              MR. GREENE:  -- industry.

Sean M. Mahoney                June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 259

1          A.    The universe of what constitutes best

2      industry practice or best management practice could

3      be larger than what just is pure -- what is set

4      forth in the MSGP.  And the MSGP, in and of itself,

5      references the need to implement best management

6      practices and best industrial practices without

7      laying out all of the specificities of what

8      constitutes best management practice or best

9      industry practice.

10              It provides some ability for --

11          Q.   How --

12          A.    -- industries to define -- to -- to work

13      to define what those are; and then it is a matter

14      of determining if those are sufficient to meet the

15      requirements to minimize -- in the case of

16      stormwater general permit -- to minimize pollution

17      resulting from stormwater discharges.

18          Q.    If -- if a new terminal moved to the state

19      of Connecticut, how would they determine what the

20      best industry practice is in the state of

21      Connecticut for compliance with industrial

22      stormwater permit?

23              MR. GREENE:  I'm just going to object to

24      the form of the question as it relates to -- vague

25      as to industry and the assumption that best

Page 260

```
 1      industry practice is limited to the state of
 2      Connecticut.
 3               But you can answer.
 4         Q.   You can still answer.
 5         A.   I mean, I -- a company should -- I mean,
 6      it's such a -- it's such a broad general question.
 7               How would a company determine that they
 8      are complying with best industry practice and best
 9      management practice?
10         Q.   How -- how would -- Mr. Mahoney, how would
11      they know what the best industry practice is?  How
12      would -- how would they know?
13               MR. GREENE:  I'm just -- objection as
14      to -- vague as to industry.  Overbroad.  And -- and
15      vague -- and the inaccurate presumption that best
16      industry practice is limited to a state
17      jurisdiction or border.
18               Go ahead.
19               MR. HENDERSON:  Again, for the record, we
20      note -- we object to Mr. Greene's continued
21      speaking objections.  Just putting that on the
22      record.
23               Go ahead.
24               MR. GREENE:  Again, and I will put on the
25      record:  I -- your questions are misleading.
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 261

 1        They're vague.  They're overbroad.  They're not
 2        tailored to the deposition notice.  So I'm just not
 3        going to let you mislead the witness.  It's not
 4        my -- they're not speaking objections.  There's no
 5        obligation for me to let you mislead my witness.
 6                So you can go ahead.
 7                MR. HENDERSON:  Yeah, call it whatever you
 8        want.
 9        Q.    Go ahead.
10        A.    How would a new company know...
11        Q.    How would a new company know what the best
12        industry practice is in the state of Connecticut to
13        comply with the industrial stormwater permit?
14                MR. GREENE:  Same objections.
15        A.    I would -- you're asking me to speculate
16        'cause it's not something that I would do in my
17        day-to-day role, but if I were a company, I would
18        be looking to hire people with experience in the
19        industry.  I would be looking to hire consultants
20        who could -- who are qualified, based on experience
21        and education.  I would likely -- if I had to seek
22        assistance from municipal or state or federal
23        agencies.
24                I mean, I would do -- I would do what I
25        think anybody would do in that situation, which is

Page 262

1      try and find the -- the information that allows me

2      to satisfy myself that I -- that I'm setting up a

3      business that's going to meet best industry

4      practice and best management practice.

5            Q.   Other than hiring consultants, how would

6      you determine what the best industry practice is in

7      the state of Connecticut for industrial permit

8      compliance?

9                 MR. GREENE:  I'm just going to object

10     because his answer was beyond just --

11     mischaracterizes his prior answer, number one.

12     Number two --

13                MR. HENDERSON:  All he said was

14     consultants.  I heard nothing else.

15                THE WITNESS:  Can --

16                MR. GREENE:  Can you read back the answer.

17                THE WITNESS:  Yeah, read -- please.

18                (Answer read back.)

19           Q.   Okay.  Would there be any website where

20     you could identify what best industry practice

21     would be?

22                MR. GREENE:  I'm just going to object for

23     all the reasons I've objected to this line of

24     questioning before and -- and the continuing use of

25     an incomplete and vague, overbroad hypothetical.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 263

1          Q.   I mean, is there any source of best

2     industry practices in the state of Connecticut for

3     industrial stormwater -- any website where that's

4     identified?

5          A.   I -- I don't know.

6          Q.   Okay.  Is there any government that keeps

7     up with best management practices for industrial

8     stormwater at fuel storage terminals?

9               MR. GREENE:  Object as vague.  Overbroad.

10    Beyond the scope of the deposition notice.

11               You can answer.

12         A.   I don't know.

13         Q.   Okay.  Do you know of any local

14    professional organization that has identified what

15    best industry practices are for managing stormwater

16    at a facility in the state of Connecticut?

17               MR. GREENE:  Local -- what do you mean by

18    local?

19               MR. HENDERSON:  Like the Connecticut

20    Association of the American Society of Civil

21    Engineers.

22               MR. GREENE:  And my -- my question was are

23    we defining local by state or by town?  That was my

24    question.

25               You can go ahead if you can answer.

Page 264

1        Q.   Do you know of any source -- any

2    repository of best industry practices in the state

3    of Connecticut for industrial stormwater

4    compliance?

5        A.   I'm not aware of any.

6              MR. HENDERSON:  Y'all want to go ahead and

7    take another break?  Go off the record.

8              VIDEO OPERATOR:  The time is now 2:58, and

9    we are off the record.

10             (Recess was taken.)

11             MR. MANLEY:  Jodi, before I forget, can we

12   order a rush transcript?

13             COURT REPORTER:  Two days?

14             MR. MANLEY:  Fine.

15             (Recess was taken.)

16             VIDEO OPERATOR:  The time is now 3:19, and

17   we are on the record.

18       Q.   So --

19             MR. MANLEY:  Just to note for the record,

20   CLF attorney Ana McMonigle has joined the Zoom,

21   A-n-a M-c-M-o-n-i-g-l-e.

22             And also I wanted to put on the record the

23   second piece of our agreement with defendants on

24   managing the binders that are present in the room

25   today:  After the defendants have scanned and

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 265

1          digitized these binders, they've agreed to share

2          the digital copies with CLF and Motley Rice.

3                    MR. HENDERSON:  Agreed.

4                    Are we ready?

5                    (Court Reporter comment.)

6          Q.    So, Mr. Mahoney, we were talking about

7          best industry practices and best management

8          practices, and previously we had talked about

9          control measures, but does CLF -- is it CLF's

10         position that best management practices are also

11         control measures?

12         A.    I think if I were to look at the

13         definition, I mean, the statement in the 2021

14         permit --

15         Q.    Just couldn't remember if I had asked that

16         question, but --

17         A.    Page 18 --

18         Q.    Yes.

19         A.    -- under "Control Measures" (as read):

20                    "Control measures are required best

21         management practices that the permittee must

22         implement to minimize the discharge of pollutants

23         from the facility.  The term 'minimize' means

24         reduce and/or eliminate to the extent achievable

25         using control measures that are technologically

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 266

1    available and economically practicable and

2    achievable in light of best industry practice."

3         Q.   And that was the section, Mr. Mahoney.

4              (Counsel confer.)

5              MR. HENDERSON:  Sorry about that.

6         Q.   So on the -- the permit you were reading

7    from, Mr. Mahoney, on pages 18 to -- on page 18 of

8    the 2021 permit, the section that you were just

9    reading at the top of the page, section 5(b), (as

10   read):

11             "Control measures are required best

12   management practices that the permittee must

13   implement."

14             And if you look on that page 17 of 70,

15   there's "Good Housekeeping," there's "Vehicle

16   Equipment Washing, Floor Drains, Roof Areas,

17   Minimize Exposure, Sediment and Erosion Control,

18   Management of Runoff and Preventative Maintenance,

19   Spill Prevention."

20             And then I think 9 -- 10 is "Employee

21   Training," 11 is "Nonstormwater Discharges," page

22   22 of 70 is "Solid Deicing Material Storage."  And

23   13 -- and I think this is the last control measure

24   is "Sector-based Control Measures."

25             For those sectors that are in section 5(f)

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 267

1          of the permit; and I think if you look over on

2          section 5(f) of this permit -- it's on page 32 --

3          sorry -- it's not on 32.  It's --

4               A.    39.

5               Q.    -- it is on 39.

6                     So "Additional Requirements For Certain

7          Sectors."  And I think you previously testified

8          there is no specific sector for fuel oil storage;

9          is that correct?

10                    MR. GREENE:  Object to the form to the

11         extent it mischaracterizes testimony.

12                    Go ahead.

13              Q.    On page 39 lists the additional sectors.

14              A.    No, I don't think I actually previously

15         testified to that, but I think that is correct.

16              Q.    Okay.  I just wanted to make sure there

17         was not any additional control factors for the

18         special sectors.

19                    You had mentioned scrap recycling

20         facilities, which, on page 46 of 70, it has a

21         separate additional control requirements for the --

22         under the industrial stormwater, but I just wanted

23         to confirm you identified none for oil storage

24         facilities?

25                    MR. GREENE:  Object to form.

Page 268

1          A.    Of the sectors, which go to sector J,

2     there are -- there is not a sector for a bulk --

3     bulk oil storage terminals.

4          Q.    Okay.  Okay.  So in terms of, like, the

5     allegations of CLF that the defendants did not

6     follow BMPs and BIPs, or best industry practices,

7     has EPA or Connecticut DEEP ever said that

8     defendants are not acting in accordance with best

9     management practices at the New Haven Terminal?

10              MR. GREENE:  Object to the form of the

11     question.

12              You can answer.

13          A.    I don't believe EPA or Connecticut DEEP

14     has communicated to CLF that the defendants are not

15     operating the facility in -- in compliance with the

16     permit.

17          Q.    Do you know -- does CLF know that EPA --

18     that neither EPA nor Connecticut DEEP has ever

19     indicated to defendants that defendants are not

20     acting in accordance with best management

21     practices?

22          A.    No.

23              MR. GREENE:  Object to the form of the

24     question.

25          A.    I have no knowledge as to what Connecticut

Page 269

1      DEEP or EPA may have said or not said to

2      defendants.

3              Q.   But CLF does not have any documents that

4      suggest that or indicate that?

5              MR. GREENE:  I believe it's been asked and

6      answered.

7              But go ahead, with that objection.

8              A.   CLF does not have any documents.

9              Q.   Same thing:  CLF does not have any

10     documents that indicate that EPA or CT DEEP that

11     defendants are not acting in accordance with best

12     industry practices either.

13             A.   CLF is not aware of any documents from EPA

14     or Connecticut DEEP saying that.

15             Q.   So the term "good engineering practices,"

16     is that used in the 2021 stormwater permit for the

17     state of Connecticut?

18             MR. GREENE:  What exhibit is that, Sean?

19             THE WITNESS:  I'm looking at Exhibit 7.

20             MR. HENDERSON:  It's Mahoney 7.

21             MR. GREENE:  Just wanted to make sure I

22     have the right one.

23             A.   It's not a defined term; and, as we've

24     talked about earlier, I don't know the permit well

25     enough to say whether or not the term is -- is in

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 270

1        the 70 pages that is the permit, but I would also

2        say that, as we've said before, that if the term is

3        not -- if the three words are not in the document,

4        the three words are not in the document.  The

5        document speaks for itself.

6              Q.   Are you aware of any documents from EPA

7        that say best industry practices requires

8        consideration of climate change factors in -- for

9        an industrial stormwater permit?

10             A.   I'm not aware of -- of such a document,

11       sitting here today.

12             Q.   Okay.  Is CLF aware of any document from

13       EPA or CT DEEP that best management practices

14       requires consideration of climate change factors in

15       operating facilities regulated by the industrial

16       stormwater permit?

17             A.   Well, I'm familiar that the draft

18       Connecticut permit talks about resilience measures

19       in climate change, and we've talked about that.

20             Q.   Right.

21             A.   I'm unaware of specific documents where

22       EPA or Connecticut DEEP may reference climate

23       change in connection with best management

24       practices.

25             Q.   Is CLF aware of any climate change risk

Sean M. Mahoney                                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 271

1        assessment completed for the New Haven Terminal?

2            A.   Is CLF aware of any climate risk

3        assessment performed by your clients with respect

4        to the terminal?

5            Q.   No.  No.  Performed or completed on the

6        New Haven Terminal.

7                 MR. GREENE:  Just going to object to the

8        form of the question.  Vague as to context who

9        would have performed the analysis.

10                But if you understand the question, you

11       can answer.

12           A.   Just trying to track -- track the

13       question.

14                I am unaware of any assessment by the

15       owner-operators of the terminal or any third

16       parties concerning the impacts of climate on the

17       terminal, with the exception of the reports of our

18       experts --

19           Q.   Okay.

20           A.   -- who have detailed the risks posed by

21       climate change in terms of flooding, storm surge,

22       increased severity and frequency of storms and

23       flooding and what those impacts might be if

24       appropriate measures aren't taken.

25           Q.   How does CLF evaluate whether a technology

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 272

1          or a control measure is economically practicable?

2                    MR. GREENE:  I'm just going to object to

3          the extent that that's within the scope of the

4          notice or this witness's expertise.  He's not an

5          expert.  This calls for an expert opinion and

6          potentially a legal conclusion.

7                    But with that, you can answer.

8                    THE WITNESS:  Yeah.

9          A.   We would rely on expert opinion with

10         respect to -- to that issue of economically -- what

11         was it -- practicable?

12         Q.   Correct.

13         A.   (Witness reviews document.)

14         Q.   Paragraph 193 in your complaint is how

15         it's framed.

16                    But -- but in terms of CLF, how is it

17         defining economically practical?

18                    MR. GREENE:  Same objection.  Calls for an

19         expert opinion.  Beyond the scope of the notice.

20                    You can answer.

21         A.    Yeah, it's -- in order to do that we would

22         want to -- or in order to do that we invested

23         resources to obtain the services of an expert who

24         could speak to the economic practicability, the

25         technological availability, and what's achievable

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 273

1      in light of best industry practice, and -- and

2      those are the expert reports that have been

3      produced.

4          Q.   Do any of your experts have any actual

5      experience with the Connecticut stormwater

6      program -- industrial stormwater program?

7              MR. GREENE:  I'm just going to object to

8      the extent that I don't think the notice

9      encompasses this witness's knowledge of the

10     experts' experience; and, as I've said before, the

11     defendants are in possession of extensive --

12             MR. HENDERSON:  Uh-huh.

13             MR. GREENE:  -- experts in compliance with

14     the federal rules.

15             But with that, if you're aware, you can

16     answer.

17         A.   They do now.

18         Q.   And before this project did they have any

19     experience with Connecticut stormwater --

20     industrial stormwater program?

21             MR. GREENE:  Same objections.

22         A.   I believe Ms. Goldsmith was involved in

23     helping CLF with its comments on the draft 2024

24     permit.

25         Q.   So --

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 274

1          A.    And -- and other than that, I don't -- I
2     don't know.
3          Q.    Does anyone at CLF have any direct
4     experience with the Connecticut industrial
5     stormwater permitting program?
6                MR. GREENE:  God bless you.
7                THE WITNESS:  Excuse me.
8          A.    Yes, I think a number of advocates do,
9     including those who have worked on this case, as
10    well as those who are involved in providing comment
11    on the proposed -- or the draft permit.
12         Q.    Does CLF know of any consensus statement
13    on what a facility in Connecticut should do to
14    evaluate climate change impacts to their facility?
15               MR. GREENE:  I'm going to object to the
16    extent that I think that's been asked and answered.
17    And vague as to consensus of whom or from where or
18    when.
19               But go ahead.
20         A.    I don't understand what you mean by
21    consensus statement.
22         Q.    Is there some -- does CLF know of any
23    group in Connecticut that has developed best
24    practices for addressing climate change at
25    facilities in the state of Connecticut?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 275

1              MR. GREENE:  Same objection.  And

2      objection.  Compound.  Form of the question.

3              You can answer.

4      A.    Other than CLF?

5      Q.    Other than CLF.

6      A.    Our first comment letter on the draft

7      permit was joined by a number of other

8      organizations.  So to that extent, I think those

9      organizations have some idea of -- of what's

10     required or what they think should be required

11     under a general stormwater permit, but the degree

12     to which that level of knowledge is, I -- I

13     couldn't speak to.

14              And other than that, I'm not aware of any

15     other.

16     Q.    Do you know of industry -- do you know of

17     any industry group in the state of Connecticut that

18     has issued a recommended standard or a required

19     standard on how companies should evaluate climate

20     change impacts to their facilities in the state of

21     Connecticut?

22              MR. GREENE:  I'm just going to object.

23     Vague and overbroad as to "industry" and

24     "facility."  And beyond the scope of the notice.

25              You can answer.

Sean M. Mahoney                              June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 276

1        A.    I think Ms. Goldsmith addressed some of

2    that in her expert report, but beyond what she

3    discusses in her report, I -- I couldn't add.

4        Q.    Are the industrial stormwater -- the

5    industrial stormwater permitting requirements in

6    Connecticut, do they differ from the industrial

7    stormwater permitting requirements in Rhode Island?

8            MR. GREENE:  I'm going to object to the

9    extent that it's beyond the scope of the notice and

10   calls for a legal conclusion.

11           You can answer.

12       A.    I don't know the answer to that.  I

13   haven't compared the two.

14       Q.    Do you know if the industrial stormwater

15   permitting requirements in the state of Connecticut

16   differ from the stormwater permitting requirements

17   in Maine?

18           MR. GREENE:  Same objections.

19       A.    Again, I haven't compared the two.  So I

20   wouldn't be able to answer that question.

21       Q.    Do the industrial stormwater permitting

22   requirements in Maine have any relevance to the

23   industrial stormwater permitting requirements in

24   the state of Connecticut?

25           MR. GREENE:  Object to the form of the

Page 277

1          question as vague as to the term "relevance."

2          Calls for an expert -- strike that.

3                    Calls for a legal conclusion.

4                    And you can answer.

5                    And beyond the scope of the notice.

6                    You can answer.

7          A.    You know, I suppose they could --

8          depending on level of detail and what it reflects,

9          it could be considered as a factor in determining

10         what constitutes best management practice.

11         Q.    Would the industrial stormwater permitting

12         requirements of Connecticut be different from those

13         in the state of New York for industrial stormwater?

14                    MR. GREENE:  Objection.  Beyond the scope

15         of the notice.  Calls for a legal conclusion.

16                    You can answer.

17         A.    Yeah, again, I -- I haven't reviewed the

18         industrial stormwater regulations in New York.

19         So -- and -- and nor have I compared them with

20         those in Connecticut.  So I couldn't speak to that.

21         Q.    Would those practices in other states be

22         relevant to the best industry practice?

23                    MR. GREENE:  Again, object to the form of

24         the question as to the term "relevant."  Calls for

25         an expert and legal conclusion.

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 278

1              You can answer.

2              THE WITNESS:  Yeah.

3              MR. GREENE:  Beyond the scope of the

4      notice.

5         A.   I think it's the same answer as I gave to

6      the question about whether or not the -- the Maine

7      provisions might be relevant.  I think it -- they

8      could potentially be relevant as one factor to

9      consider in determining what constitutes or what

10     represents best management practices and best

11     industry practices.

12        Q.   Does NOAA -- do you know what NOAA is?

13     N-O-A-A?  Does NOAA have any standard or guideline

14     for how an industry or facility should evaluate the

15     climate change impacts on that -- that facility?

16        A.   On -- on a bulk fuel storage facility or

17     any facility?

18        Q.   Any facility.

19        A.   Yeah, I don't have a -- I -- I don't know

20     if NOAA has specific requirements.  They -- I'm not

21     sure it falls within their purview with respect to

22     regulating facilities.  I suspect it used to be

23     their role to provide good data and science that

24     would allow people to gauge -- better gauge weather

25     events and sea level rise and the like, although

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 279

1      there are challenges to that today.
2          Q.   Would -- has NOAA released any guidance on
3      how industry should evaluate climate change
4      impacts?
5              MR. GREENE:  Just going to object to the
6      extent it's beyond the scope of the notice and may
7      require an expert opinion.
8              You can answer.
9          A.   And industry, you just mean any -- any
10     industry?
11         Q.   Any industry.
12         A.   I don't know.
13         Q.   Do you know if the American Petroleum
14     Institute has developed any best practices for
15     evaluating climate change impacts at its members'
16     facilities?
17         A.   I can't recall.  I can't recall if this
18     was something that was discussed in Ms. Goldsmith's
19     report or Ms. Oreskes's report.  I do know that API
20     had quite a bit of data presented to it -- or
21     developed by it at some point in time.
22              But I'm also aware that at a certain
23     juncture they stopped providing such information
24     and instead challenged the scientific fact of
25     climate change.

Sean M. Mahoney                          June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 280

1      Q.   Has CLF looked at any Superfund sites in
2   Connecticut and how they are evaluating the impacts
3   of climate change?
4           MR. GREENE:  I'm just going to object to
5   the extent it bears upon attorney work product or
6   attorney-client privilege.
7           Beyond that, if you know, you can answer.
8      A.   I think at some point in time there was
9   some discussion about evaluating Superfund sites,
10  both closed sites as well as sites where ongoing
11  remediation is, and how climate was being taken
12  into account there.
13          But I don't think there was -- I don't
14  think there was a lot of followup on that.
15     Q.   Uh-huh.
16     A.   It was an area of interest at one point in
17  time.
18     Q.   Is CLF alleging that defendants have
19  violated the Connecticut Coastal Management Act?
20          MR. GREENE:  Object to the extent that the
21  plaintiff's allegations are clearly contained in
22  the complaint, the NOIs, and the expert reports
23  provided to the defendant.
24          But you can answer.
25     A.   It's -- it's my understanding that the

Sean M. Mahoney                June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 281

1    permit requires compliance with the Coastal

2    Management Act and that there are issues with

3    compliance with that act at the facility.

4         Q.    Has CLF communicated with the American

5    Petroleum Institute on these lawsuits or on climate

6    change impacts at -- at fuel storage facilities?

7         A.    Have -- in terms of direct oral or written

8    conversation --

9         Q.    Yes.

10        A.    -- or email?

11        Q.    Yes.

12        A.    Not that I'm aware of.

13        Q.    Has CLF looked at how rising ocean

14   temperatures have affected any of the terminals in

15   the state of Connecticut?

16             MR. GREENE:  I'm just going to object to

17   the extent that it calls for an expert opinion and

18   defendants are in possession of plaintiff's expert

19   reports.

20             But you can answer.

21        A.    So rising ocean temperatures have an

22   impact on weather and particularly, as we enter

23   into hurricane season, has an impact on the

24   severity and frequency of hurricanes.

25             It also has an impact on sea level rise as

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 282

1      warming water expands.  So sea level rise comes

2      from the water warming as well as additional -- as

3      well as the addition of ice melt and -- and

4      increased runoff.

5           Q.   So when is the last time flooding has

6      occurred at the New Haven Terminal?

7                MR. GREENE:  Object to the question as

8      to -- vague as to "flooding."

9                But you can answer.

10          A.   Do you mean flooding as in flooding from

11     storm surge or -- or sea level rise or

12     precipitation?

13          Q.   Flooding from rain --

14          A.   Any flooding?

15          Q.   -- precipitation, anything.

16          A.   Yeah.

17               MR. GREENE:  Same objection.

18          Q.   Do you know whether the facility has had

19     any flooding?

20          A.   I know that the facility reported flooding

21     to Connecticut DEEP at one point in time.  I'm not

22     sure when that was.

23          Q.   Do you --

24          A.   I don't know if that was in -- in

25     connection with Superstorm Sandy --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 283

1          Q.    Do you know --
2          A.    -- or if it was subsequent to that.
3          Q.    Does CLF know of any other facility in the
4    state of Connecticut that is evaluating how sea
5    level rise may affect the facility's obligations
6    under the industrial stormwater permit in the state
7    of Connecticut?
8          A.    I'm not aware of another facility that is
9    doing so.
10         Q.    Does CLF know what the best industry
11   practice is in the state of Connecticut for
12   evaluating whether sea level rise is affecting a
13   facility regulated under an industrial stormwater
14   permit?
15               MR. GREENE:  I'm just going to object as
16   to vague and overbroad.
17               But you can answer.
18         A.    Were you asking for the best industry
19   practice on how to determine sea level rise or how
20   to address sea level rise?
21         Q.    How to address.
22         A.    Okay.  I'm not aware of -- of any other
23   facility -- I'm not aware of how any other facility
24   is attempting to address the impacts of sea level
25   rise in Connecticut.

Page 284

1      Q.   Are you aware of any other facility and

2   how they are evaluating the effects of storm surges

3   on their facility under the industrial stormwater

4   permit?

5      A.   Again, assuming that you don't -- that

6   you're excluding your client's facility and the

7   Gulf Pike facility, I'm not aware of any other

8   facility.

9      Q.   Just -- just so I can get this on the

10   record, has any of CLF's experts, members,

11   employees, consultants ever conducted testing of

12   outflows into the New Har -- Havor Harven -- New

13   Haven Harbor?

14          MR. GREENE:  I'm just going to -- hold on.

15   I'm just going to object as to vague, overbroad as

16   to location, time.  Question's compound.  Beyond

17   the scope of the notice.  Defendants are going to

18   have an opportunity to depose the plaintiff's

19   experts.

20          But with that, you can answer.

21      A.   I'm not aware of any --

22      Q.   Do you --

23      A.   -- testing -- sorry.  Just to be on the

24   record.

25      Q.   Sure.

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 285

1          A.    I'm not aware of any testing of effluent
2    that's been discharged into New Haven Harbor that's
3    been conducted by CLF employees, consultants,
4    experts, or members.
5          Q.    Great.  Thank you.
6                Are you aware of any sampling that shows
7    the New Haven Terminal has exceeded any limits in
8    its industrial stormwater permit?
9                MR. GREENE:  Object to the extent that it
10   calls for an expert conclusion and vague as to time
11   of any sampling.
12               But you -- you can answer.
13         Q.    At any time.
14         A.    I'm not aware of any testing that's been
15   done of the stormwater effluent or what infiltrates
16   into the groundwater from the facility.
17         Q.    Do you know of any exceedance of any
18   stormwater permit limit in the permit for the New
19   Haven facility that has been exceeded?
20               MR. GREENE:  Just going to object to the
21   extent that it calls for a legal conclusion.
22               You can answer.
23         A.    And -- and what -- what -- which limits
24   are you referring to?
25         Q.    Any of the limits in the industrial

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 286

1    stormwater permit for the New Haven facility.

2        A.    (Witness reviews document.)  Which -- so

3    you're not referring to -- so you're referring to

4    the 2021 --

5        Q.    Correct.

6        A.    -- permit?

7        Q.    2021 permit.

8        A.    Okay.

9        Q.    Do you know of any data that shows the New

10   Haven Terminal has exceeded any permit limit under

11   its stormwater permit?

12           MR. GREENE:  Object to the vagueness of

13   the question as to permit levels and time.

14           But you can answer.

15           And calls for an expert opinion and legal

16   conclusion.

17       A.    So I just want to be clear.  The only -- I

18   think the only permit limits that you're referring

19   to are the benchmarks monitoring; is that correct?

20       Q.    Correct.

21       A.    So on page 32 of the 2021 permit is -- is

22   what you're referring to; is that correct?

23       Q.    That's -- yup, that's one of them.

24       A.    Okay.  (Witness reviews document.)  So --

25   and those -- and, as I assume you know, those --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 287

1      that sampling is done by the permittee.  So we're

2      not aware of any benchmarks that the -- that have

3      been exceeded as -- pursuant to the testing

4      conducted by Shell at the facility.

5          Q.   Has CLF provided any information to

6      Connecticut DEEP that Connecticut DEEP's assumption

7      of rising sea level is low?

8          A.   I'm sorry.  Could you repeat that?

9          Q.   Has CLF ever provided any comments, made

10     statements, conversations with C -- Connecticut

11     DEEP that the rising sea level estimates that DEEP

12     have are incorrect?

13             MR. GREENE:  I'm just going to object to

14     the extent that it calls for an expert opinion.

15     It's beyond the scope of the notice.

16             But you can answer.

17         A.   I don't believe so.

18         Q.   So if CLF believes CT DEEP's estimates of

19     rising sea level are incorrect, why hasn't CLF

20     provided that information to the agency?

21             MR. GREENE:  Again, I'm going to object.

22     It's beyond the scope of the notice.  It calls for

23     an expert opinion.  It calls for speculation.

24         A.   Oh.

25             MR. HENDERSON:  You want to read the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 288

1        question back, Jodi.

2                    (Question read back.)

3                    MR. GREENE:  Same objections.

4            A.    Yeah, I don't know whether or not we have

5        provided that information to Connecticut DEEP in

6        any other venue outside this case.

7            Q.    Does CLF believe CT DEEP's estimates of

8        rising sea level are incorrect?

9                    MR. GREENE:  Object to the extent that's

10       beyond the scope of the notice.  Calls for an

11       expert opinion.

12                   THE WITNESS:  Yeah.

13                   MR. GREENE:  You can answer.

14           A.    I don't have an opinion on that.  And as a

15       matter of fact, I don't know if -- if that is a --

16       a correct statement.

17           Q.    When CLF submitted comments on EPA's 2021

18       MSGP, did EPA reject many of CLF's comments?

19           A.    I think you asked that question earlier in

20       a different way.

21                   MR. GREENE:  Just going to object.  Asked

22       and answered.

23           A.    I think you asked that and did they accept

24       all of CLF's comments.

25           Q.    Uh-huh.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 289

1          A.   As I said before, I would be surprised if
2     they accepted all our comments.  I don't know if
3     they rejected all of our comments or not.  We
4     submitted comments on our own behalf as well as
5     with several other groups in a separate comment
6     letter.
7               So I -- I couldn't answer that question
8     without doing a sit-down of line-by-line review of
9     the comment letter and the ultimate permit.
10         Q.   Does -- is CLF requesting that defendants
11    close the New Haven Terminal?
12              MR. GREENE:  Just going to object to the
13    extent that what CLF is seeking is clear in its
14    complaint and the remediation outlined by its
15    expert reports.
16         A.   But just to be clear, your question was is
17    CLF seeking to close the New Haven Terminal?
18         Q.   Correct.
19              MR. GREENE:  Same objections.
20         A.   CLF in this complaint is seeking to have
21    the New Haven Terminal comply with the terms and
22    conditions of its Clean Water Act permit and to
23    address the alleged violations under the Resource
24    Conservation and Recovery Act.
25         Q.   Is CLF seeking to have the terminal

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 290

1      closed?

2              MR. GREENE:  Asked and answered.  Same

3      objections.

4          A.   We have not asked as -- in our request for

5      relief in the complaint for the closure of the

6      terminal.

7          Q.   Does the 2021 permit require a permittee

8      to submit information on precipitation at a

9      regulated facility?

10             MR. GREENE:  Object to the extent that it

11     calls for a legal conclusion.

12             But you can answer.

13         A.   I don't believe that that's a -- that is

14     covered under the reporting requirements.

15             But I would have to do a -- a line-by-line

16     review or take a deeper look at this in order to be

17     certain of that answer.

18         Q.   In one of the expert reports they said

19     that there's a risk that there will be a

20     catastrophic spill in the neighborhoods near the

21     New Haven Terminal.

22             Has any of your experts or anyone

23     internally at CLF done any modeling to evaluate

24     that claim?

25             MR. GREENE:  I'm just going to object to

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 291

1      the extent it's beyond the scope of the notice.

2      Defendants have a copy of all of the plaintiff's

3      expert reports and will have an opportunity to

4      depose the expert witnesses.  That's not an

5      appropriate question for this witness.

6           Q.   Mr. Mahoney, I was just asking is there

7      anyone at CLF that's done it before these expert

8      reports --

9           MR. GREENE:  Well, that's a different

10     question.

11          Q.   -- outside of --

12          MR. GREENE:  Go ahead.

13          Q.   -- outside of this lawsuit, have they

14     looked at it?  Done any analysis?  But not the

15     experts in this case.

16          MR. GREENE:  Going to also object to the

17     extent that it bears upon any attorney work product

18     or attorney-client privilege.

19          But if you can answer without regard to

20     those restrictions, you can answer.

21          A.   So separate and apart from --

22          Q.   Yes.

23          A.   -- this litigation has there been any

24     evaluation of what the likelihood of a catastrophic

25     failure would be?

Page 292

1          Q.   Or any failure, yes.  Has there been any

2     independent analysis by CLF?

3               MR. GREENE:  Well, let me just object.  I

4     would consider the experts for CLF to be an

5     independent analysis.

6               MR. HENDERSON:  No.

7               MR. GREENE:  With that, you can answer.

8          Q.   Other than.

9          A.   But you're asking other than the

10    independent analysis of the experts in this case

11    and other than anybody else connected with this

12    case?

13         Q.   Correct.

14         A.   I -- I don't believe anybody has done that

15    separate and apart from this case.

16         Q.   So do you know how many oil storage

17    terminals there are around the New Haven Harbor?

18         A.   Do I know how many terminal storages --

19         Q.   Separate --

20         A.   How many bulk storage?

21         Q.   Separate fuel storage terminals that are

22    on the New Haven Harbor other than the New Haven

23    terminal owned by defendants.

24         A.   So I -- I believe there are two.  There is

25    the Gulf Pike facility and the -- and I believe

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 293

1      there is the Buckeye facility.

2          Q.   Of those three, which one is the closest

3      to New Haven Harbor?  Of the three being the Shell

4      terminal, the Buckeye terminal, and the Gulf, which

5      one's closest to the New Haven --

6               MR. GREENE:  I'm just going to object.

7      It's beyond the scope of the notice.

8               You can answer.

9          A.   Yeah, they all sit on the shores of New

10     Haven Harbor.  I'm not sure who's closest by metes

11     and bounds.

12         Q.   Okay.  So you've -- you -- it's your

13     understanding the Shell New Haven Terminal owned

14     and operated by Triton and Equilon is on the shores

15     of the New Haven Harbor?

16               MR. GREENE:  Just going to object to the

17     form of the question.  Vague.  Ambiguous as to what

18     "shores" means.

19               But you can answer.

20         A.   I would say that they're all, you know,

21     surrounding the harbor.  You know, whether they --

22     how far away they are, I couldn't tell you.

23         Q.   Has CLF ever provided any information to

24     newspapers or other media about this lawsuit?

25         A.   CLF has a communications department.  Part

Page 294

1      of our advocacy is communicating that work to our

2      members, to the general public, to stakeholders,

3      and decision-makers.

4              And so we use a number of means to do

5      that.  And some of that includes reaching out to

6      newspapers and the public press, and I believe that

7      there have been a number of instances where we have

8      offered to meet with reporters to discuss the

9      nature of the advocacy that we're engaged in.

10         Q.   When was -- who was it that met with

11     reporters to discuss this case?

12         A.   I didn't say --

13              MR. GREENE:  Object to the form of the

14     question.

15              You can answer.

16              THE WITNESS:  Okay.

17         A.   I didn't say that they've met with them.

18     I think there was some outreach by a former press

19     secretary or -- or -- yeah, press secretary had

20     reached out on several -- two or three maybe --

21     occasions offering to speak with reporters.

22              I'm not sure if that offer was taken up on

23     by those reporters and/or if that person ever met

24     with reporters to discuss the case.

25         Q.   Would CLF communication keep notes of

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 295

1         those meetings?

2              A.    Again, I don't --

3                    MR. GREENE:  Object to the form.

4                    You can answer.

5              A.    Again, I don't know if there were any

6         meetings, and I -- I don't know what his -- that

7         person's practice was with respect to -- to

8         meetings.

9                    I would suspect that the notes would be

10        kept by the reporter and not the -- and not the

11        press secretary if, in fact, they met, which,

12        again, I don't know if they did or didn't.

13             Q.    Is CLF alleging that Shell is deceiving

14        the residents of New Haven Harbor?

15                   MR. GREENE:  Just going to object to the

16        extent that plaintiff's allegations are clear from

17        the notices of intent in the complaint -- multiple

18        complaints and the plaintiff's expert reports.

19                   But with that, you can answer.

20             A.    I think that the -- the notice, the

21        complaints, and the expert testimony of Ms. Oreskes

22        details the behavior of your clients when it comes

23        to addressing the issue of climate change.

24                   I -- I don't -- to your specific question

25        as to whether or not your clients are deceiving the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 296

1          residents of New Haven, it's -- it's overly broad

2          to -- to answer when Shell or its membership

3          organizations take positions that climate change

4          isn't happening, it's not happening as fast as the

5          science says it's happening, it's -- or that other

6          forms of energy are inferior to the products that

7          they sell, then my opinion would be, yes, they're

8          deceiving people.

9                    But as far as this case goes, that's not

10         a -- that's not a -- a cause of action that we're

11         seeking to bring.  As you asked earlier, we're not

12         alleging fraud as a -- as a count or a claim.

13                   MR. HENDERSON:  If I may ask -- as one who

14         keeps up with the time, you --

15                   MR. GREENE:  Got about 40 minutes left.

16         So he'll have the real one.

17                   VIDEO OPERATOR:  Six hours and 20 minutes

18         so far.

19                   MR. HENDERSON:  40?

20                   VIDEO OPERATOR:  40 on the dot.

21                   MR. HENDERSON:  Okay.  Let's go ahead and

22         take a break.

23                   VIDEO OPERATOR:  The time is now 4:12, and

24         we are off the record.

25                   (Recess was taken.)

Sean M. Mahoney                June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 297

1              VIDEO OPERATOR:  The time is now 4:31.  We
2      are on the record.
3          Q.   Mr. Mahoney, thank you today for appearing
4      at the deposition.  Earlier we talked about the
5      members that had signed declarations in this case.
6      I forget their -- all of their names.  You had
7      mentioned one.  You spelled his last --
8              MR. KEARNEY:  Weinreb.
9              MR. HENDERSON:  Okay.
10             (Counsel confer.)
11         Q.   So, Mr. Mahoney, we had talked about
12     Mr. Weinreb?
13         A.   Yes.
14         Q.   Ms. Maison-Pierre?
15         A.   Yes.
16         Q.   Farwell?
17         A.   Yes.
18         Q.   Ozick, Lufkin as declarants for -- for
19     standing here.
20             Does CLF agree that none of its members
21     have suffered actual harm as of today's date?
22             MR. GREENE:  Just going to object to the
23     form of the question.
24         Q.   Have they suffered any physical harm as a
25     result of the activities at this terminal?

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 298

1          A.    I think the declarations that were

2     submitted speak for themselves and speak to the

3     harms that they experienced and the interests of

4     theirs that are impacted by the operations at the

5     terminal.

6          Q.    But they've expresses no additional harms

7     to CLF?

8               MR. GREENE:  Just going to object to the

9     form of the question.  Vague as to what additional

10    harms would be, but you can answer.

11         A.    I'm not aware of any other conversations

12    that those members have had in addition to what

13    they state in their declarations.

14         Q.    And none had identified any economic harm,

15    but you have not heard of any additional harms

16    other than what's the declarations?

17         A.    That's correct.

18         Q.    Okay.  So if you could turn to the

19    draft -- the proposed permit?

20         A.    Which version?

21         Q.    It's the --

22               MR. GREENE:  Or which exhibit number, I

23    guess is --

24         A.    9 or 10.

25         Q.    I think it's 10.  If you look at page 43,

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 299

1    and in the middle of the page there of page 43 of

2    Mahoney Exhibit 10 it says -- and this is the

3    resiliency -- resilience measures section of the

4    draft Connecticut DEEP New Industrial Stormwater

5    Permit.

6              Middle of the page, 43 it says (as read):

7              "This subsection requires that the

8    permittee must consider the bullet points section

9    7(b) when selecting and designing control measures

10   to minimize pollutant discharges via stormwater."

11             So under the draft permit the permittee

12   would only need to consider various factors in

13   section 7(b)?

14             MR. GREENE:  Object to the form of the

15   question.  Mischaracterizes the document.

16             You can answer.

17        A.   So you read the language correctly.  This

18   subsection requires that the permittee must

19   consider section 7(b) when selecting -- and (as

20   read):

21             "The permittee must consider section 7(b)

22   when selecting and designing control measures to

23   minimize pollutant discharges via stormwater."

24             Correct.

25        Q.   Right.  And so those are stormwater

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 300

1       control measures.  So it's not those defined by an

2       industry standard.  It's those that the permittee

3       must consider; correct?

4               MR. GREENE:  Object to the form of the

5       question.  Mischaracterizes the document.

6               You can answer.

7          A.   Your -- your question was confusing to me.

8          Q.   So --

9          A.   This section references that the permittee

10      must consider section 7(b) when selecting design

11      and control measures to minimize pollutant

12      discharges via stormwater.

13              Section 7(b) says (as read):

14              "Stormwater control measures, i.e. control

15      measures, help to minimize the discharge of

16      pollutants from a permitted facility and include

17      best management practices, which are schedules of

18      activities, prohibitions of practices, maintenance

19      procedures, and other management practices to

20      prevent or reduce the pollution of the waters of

21      the state.  BMPs also include treatment

22      requirements, operating procedures, and practices

23      to control plant site runoff, spillage or leaks,

24      sludge or waste disposal, or drainage from raw

25      material storage.  The term 'minimize' means reduce

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 301

1          and/or eliminate, to the extent achievable, using

2          control measures that are technologically

3          available, economically practicable, and achievable

4          in light of best industry practice."

5               Q.   Right.

6               A.   Right?

7               Q.   And if you look at "Resilience Measures"

8          section on 43 of 254, it requires that a permittee

9          must consider those when selecting its design --

10         design and control measures to minimize pollution

11         discharges from stormwater under this section.

12                  Is that how CLF understands this?

13              A.   Well, how I understand this is that in

14         meeting the draft -- this draft permit requires

15         that resilience measures be considered by

16         permittees, and in selecting -- and in -- and in

17         this subsection that they have to consider section

18         7(b) as well.  7(b) itself stands on its own as

19         a -- as the stormwater control measures.

20              Q.   No, I -- I understand that.

21              A.   Okay.

22              Q.   I'm just focused on page 43 where it says

23         (as read):

24                  "The permittee must consider section 7(c)

25         [verbatim] in looking at the resilience measures."

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 302

1          A.    Section 7(b), yes.

2          Q.    It does not require the permittee to

3     comply with.  It just says consider.  And it says

4     the permittee is required.

5               MR. GREENE:  Objection.  Mischaracterizes

6     the document.

7               You can answer.

8               THE WITNESS:  Yeah.

9          A.    So the -- the permittee, in selecting

10    resilience measures, must consider 7(b.)

11         Q.    Right.

12         A.    It doesn't have to include all of the

13    control measures that are set forth in 7(b) as part

14    of the resilience measures.

15         Q.    Correct.

16         A.    That's separate and apart from what the

17    permittee must do with respect to stormwater

18    control measures.

19               So there is compliance with 7(b) as --

20    under this draft permit, and in order to comply

21    with 7(c) 1(d) -- I'm sorry, no -- trying to get

22    the cite right.

23               In order to comply with the provisions

24    concerning resilience measures, they must consider

25    section 7(b.)

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 303

1          Q.    Right.

2          A.    So those are two different actions

3     required under the --

4          Q.    Just confirming --

5          A.    Okay.

6          Q.    -- okay --

7          A.    Right.

8          Q.    -- that understanding.

9          A.    Okay.

10          Q.    And that is CLF's understanding?

11          A.    That -- that is -- that is my

12     understanding of -- of this draft permit.  I

13     haven't discussed that understanding with others at

14     CLF.

15          Q.    Okay.

16                Is it CLF's view that section 7(b) that

17     you were just reading, page 23 of 54, that it

18     includes a requirement to complete a climate change

19     vulnerability analysis under that section 7(b)?

20          A.    I would say that if this draft permit were

21     to actually be finalized, that it is setting forth

22     a requirement that best management practices have

23     to be met to minimize pollution and that, as part

24     of that consideration, factoring in the risks posed

25     to a facility from what you call climate assessment

Page 304

```
 1      impacts; but, you know, the effects of climate
 2      change is absolutely something that should be done
 3      to comply, and I think that the expert reports we
 4      have submitted make that clear.
 5           Q.   I'm just looking at what you -- CLF, how
 6      it interprets the new permit.  Okay?
 7           A.   That's how we interpret it.  That's how I
 8      interpret this new permit.
 9           Q.   So under the new permit the climate
10      resilience measures are left up to the permittee?
11                MR. GREENE:  Objection.  Mischaracterizes
12      testimony.
13                THE WITNESS:  Yeah.
14           A.   I would disagree with that.  I think
15      the -- the permittee must consider section 7(b),
16      stormwater control measures, among other things, in
17      determining its resilience -- in determining
18      resilience measures.
19           Q.   So is it CLF's view that under this permit
20      every permittee would have to complete a climate
21      change vulnerability analysis to see how climate
22      change may be affecting their facility?
23           A.   Yeah.  Again, it's not clear to me what
24      you mean by a climate change vulnerability
25      analysis, but it would be that, in determining
```

Sean M. Mahoney                      June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 305

1    resilience measures -- which are being clarified

2    here by Connecticut DEEP in order to -- to meet

3    Connecticut's stated goal of addressing climate

4    change -- that one would want to be considering

5    what the impacts of climate change are.

6             And, again, as we've talked about a number

7    of times, those include storm surges, more frequent

8    and more severe weather events, flooding, and the

9    like, heavy precipitation.

10   Q.    Uh-huh.  So previously I think you

11   testified that your expert reports contained the

12   analysis of what should be -- what changes should

13   be made at the New Haven Terminal.

14             Is that my understanding of what your

15   testimony was?

16   A.    As I recall, the expert reports -- and we

17   can pull them out if you want specifics -- but

18   there were recommendations concerning what should

19   be done with respect to the heights of the berms at

20   the facility; with respect to the containment

21   areas, the retention areas; the viability of using

22   liners; and expanding containment areas.

23             I'm trying to think of some of the other

24   things, but --

25   Q.    Is --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 306

1        A.   -- as I said, I'd be happy to kind of pull

2    up the reports and give you more specifics.  You've

3    got the reports.  So you know what they've

4    recommended.

5        Q.   Mr. Mahoney, I was just trying to see are

6    there any other things that CLF is requesting

7    outside of the expert reports?

8             MR. GREENE:  So object to the form of the

9    question.  CLF's requests are clear in the

10    complaint and the expert reports.

11             But you can answer.

12             THE WITNESS:  Yeah.

13        A.   Yes, the -- the complaint and the prayer

14    for relief in the complaint is clear if -- if you'd

15    like me to -- I mean, there are -- there's requests

16    for civil penalties.  There's a request for

17    attorneys' fees and costs as part of the relief,

18    and all --

19        Q.   Well, it -- it also had a request for

20    doing a -- a climate change assessment was one of

21    the first things requested, and I'm -- I'm just

22    trying to --

23        A.   In the complaint?

24        Q.   I think in the discovery response.  That's

25    why I'm asking what else are you --

Sean M. Mahoney                                June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 307

1            MR. GREENE:  If you're going to ask him a

2     specific question from a specific document, let's

3     put the document in front of him.

4            THE WITNESS:  Yeah.

5       Q.    I'm asking --

6       A.    Yeah.

7       Q.    -- what other remedies or features of

8     remedies is CLF seeking other than the

9     recommendations in their expert reports?

10           MR. GREENE:  Well, again, just -- it's the

11    same objection I've made all day.  CLF's remedies

12    are clear in the complaint, its discovery

13    responses, and its expert reports.

14           But with that, you can answer.

15      Q.    Do you have any additional -- I mean, I'm

16    just trying to understand what CLF seeks.

17      A.    Well, sitting here today, there's no

18    relief requested beyond what is identified in the

19    complaint, in the discovery responses, and in the

20    expert reports.

21      Q.    Is CLF seeking any --

22      A.    Again, that's the amended complaint.

23    Sorry.

24      Q.    Uh-huh.  Is CLF seeking any injunctive

25    relief?

Page 308

1          A.    That relief is sought in the amended

2     complaint.

3          Q.    And do you remember what that was?

4                MR. GREENE:  If you want we can look at

5     the complaint.  Document speaks for itself, but...

6                This isn't supposed to be a memory test,

7     but...

8          Q.    Is CLF seeking any supplemental

9     environmental projects?

10                MR. GREENE:  Same objections.  What CLF is

11     requesting is in the complaint and discovery

12     responses, the expert reports.

13                But go ahead.

14          A.    I don't think supplemental environmental

15     projects are specifically requested.

16                MR. GREENE:  I just want to object to the

17     form of the question because I'm not sure what that

18     term means either.

19                But you can go ahead.  I'm sorry.  I'm

20     sorry.

21          A.    If by supplemental environmental projects

22     you're referring to projects that are typically

23     included in settlements where a settling party

24     agrees to perform or take certain action at its own

25     cost as part of a settlement of claims against

Page 309

1     it --

2          Q.    Uh-huh.

3          A.    -- if that's what you mean by supplemental

4     environmental projects, there's no -- to my

5     recollection, there's no specific request for a

6     supplemental environmental project in the

7     complaint.  There's -- there was nothing mentioned

8     in the expert reports, and I don't believe there

9     was anything in discovery.

10               As I said at the outset of the answer,

11    supplemental environmental projects are typically

12    included in settlement or consent decrees resolving

13    liability.

14          Q.    Uh-huh.  I'm just clarifying what it's

15    seeking.

16          A.    Okay.

17          Q.    The resiliency assessment that CLF seeks,

18    what are the specific requirements of that?  It's

19    just identified as a resiliency assessment.

20               MR. GREENE:  Once again, if you have

21    specific questions concerning terms of the

22    document, you should put the document in front of

23    him.

24               But, Mr. Mahoney, if you know, you can --

25          Q.    It -- this says "perform an assessment of

Page 310

1    terminal's vulnerabilities to increase the severity

2    and frequency of severe weather events."

3              MR. GREENE:  But we're not putting the

4    document in front of him.  You're just reading from

5    it.

6              With that --

7              MR. HENDERSON:  I'm just saying has CLF

8    discussed about the specifics of its resiliency

9    assessment.

10             MR. GREENE:  I don't want to revisit seven

11   hours ago, but you saying "I'm just saying" doesn't

12   resolve my objection.  You're just -- is you

13   repeating yourself without giving him the document.

14   So my objection stands.

15             MR. HENDERSON:  I'm just simply asking him

16   what is the specifics of his -- where he seeks

17   "performance of resiliency assessment."  That's all

18   we have.

19             MR. GREENE:  Now I have to say again.

20   Your saying "I'm simply asking" doesn't resolve the

21   issue.  You're reading from a document.  You're not

22   putting a document in front of him.  And -- and so,

23   again, I have an objection to the question.  If you

24   have a question -- specific question about the

25   terms from a specific document, put the document in

Page 311

1      front of him.  Don't just say "I'm just asking."

2           Q.   Okay.  Do you --

3           A.   If you have a -- if you have -- if you

4      have a document so that I can understand what --

5      what you're referring to --

6                (Counsel confer.)

7           A.   -- I'd be happy to try and answer your

8      question, but I don't -- I don't know what you're

9      referencing.

10               MR. HENDERSON:  Again, just reading what

11     you have.

12          A.   Well, I don't -- I don't have any.

13          Q.   We're pulling it.  Okay?

14          A.   I understand.  But if you identify it, you

15     know, I might know what you're talking about.

16          Q.   It's your response to interrogatory No.

17     22.  And you said "performance of a resiliency

18     assessment."

19          A.   Okay.

20          Q.   It's your term.

21               So --

22               (Exhibit Mahoney 15, Plaintiff.

23               Conservation Law Foundation's Response to

24               Defendants' Second Set of

25               Interrogatories.)

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 312

1         Q.    Mr. Mahoney, if you can look at your
2    response to interrogatory No. 22 --
3         A.    Okay.
4         Q.    -- which begins on basically the bottom of
5    10, top of 11.  I'm simply asking.  The bottom of
6    page 11 and it's an assessment "vulnerabilities can
7    increase severity and frequency of severe weather
8    events."
9              My question was pretty straightforward:
10   Do you have any more details or is this it?
11             MR. GREENE:  Just going to object that
12   obviously since this piece of discovery has been
13   served and defendants have been provided copious
14   expert reports that further detail this relief
15   sought.
16             But with that, Mr. Mahoney, you can answer
17   if you're able.
18        Q.    Okay.  If -- if -- my question is did your
19   expert reports include what CLF is seeking?
20        A.    (Witness reviews document.)
21             MR. GREENE:  Again, you can have an
22   opportunity to ask all the experts questions in
23   their depositions and you have their reports.
24             But, Mr. Mahoney, you can answer.
25             MR. GREENE:  By the way, that wasn't the

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 313

1      question that you asked before.  So why don't we

2      just be clear on what the question is.

3          Q.   My question is is this the current

4      description of what CLF is seeking, or is it the

5      recommendations in your expert report, as you

6      testified earlier?

7          A.   Well, I think that this is injunctive

8      relief and it's -- it would include, as it states,

9      response -- (as read):

10              "CL responds injunctive relief sought in

11     this manner might consist of at least the following

12     types of measures."

13              And then the performance of resiliency

14     assessment that you talked about, and then two

15     others:  corrective measures and routine updates to

16     resiliency assessment.

17              I don't think there's anything more to

18     add --

19          Q.   Okay.

20          A.   -- to the five characteristics that, at a

21     minimum, at a minimum, the assessment will

22     consider.

23              I don't have -- sitting here today, I

24     don't have anything to add to those

25     characteristics, A through F, on page 12.

Page 314

1          MR. GREENE:  Yeah, and with that answer, I
2     just want to make a clarification:  You were
3     reading one phrase of this answer to him without
4     providing him a document when the response details
5     that "what is sought may consist of at least the
6     following types of measures."
7          Which means -- which means these are not
8     inclusive, except the performance of resiliency
9     assessment goes on for another half a page and has
10    six subbullet points very specifically describing
11    the resiliency assessment and then goes on to seek
12    corrective measures and routine updates to
13    resiliency assessment.
14          So I would submit that simply reading a
15    phrase without providing a document, which is what
16    I requested, is misleading.
17          So with that, we can go on.
18    Q.    So my question was are all your opinions
19    of what you're seeking in your expert reports on
20    the technical issues you're seeking?
21          MR. GREENE:  I'm just going to object to
22    the form of the question.  I'm not even sure I
23    understand that question.
24          THE WITNESS:  Yeah.
25          MR. GREENE:  But, again, you have

Sean M. Mahoney                         June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 315

1      everything, including this discovery response, the

2      complaint, and the expert reports to know what's

3      being requested.

4                With that, you can answer.

5         A.    The relief we're requesting has been set

6      forth in the complaint, in the discovery requests,

7      and in -- and suggestions made by the experts in

8      the reports that were prepared and produced.

9         Q.    Okay.  I think that answers my question.

10        A.    Yeah, okay.

11                MR. HENDERSON:  How many more minutes do

12     we have?

13                MR. KEARNEY:  14.

14                MR. HENDERSON:  Okay.  If we could take a

15     two-minute break, I'll huddle up and try to wrap

16     this up.

17                VIDEO OPERATOR:  The time is now 4:56, and

18     we are off the record.

19                (Recess was taken.)

20                VIDEO OPERATOR:  The time is now 5:03.

21     We're on the record.

22        Q.    Let's see.  Let me go back to here.

23                Mr. Mahoney -- Mr. Mahoney, let's assume

24     that the current permit actually required

25     defendants to consider climate change.  Just --

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 316

1          let's just assume that, which we established we

2          don't think the permits require.  Let's just assume

3          it did.

4                    What evidence does CLF have the defendants

5          failed to meet such a requirement?

6                    MR. GREENE:  Just going to object to the

7          form of the question.

8                    And given that the plaintiffs have

9          provided the defendants with extensive and copious

10         expert reports on that, among other issues, the

11         defendants already know it's their last position on

12         that, but you already know --

13                   THE WITNESS:  Could you read the question

14         back.

15                   MR. GREENE:  Just one more thing.  The

16         question mischaracterizes the testimony throughout

17         the day here.

18                   But go ahead.

19                   THE WITNESS:  Okay.

20                   (Question read back.)

21                   MR. GREENE:  So that's -- I'm just

22         objecting as to overbroad too.

23                   But go ahead.

24         A.   So -- so my answer is -- my -- the first

25         part of my answer is that I disagree with your

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 317

1        assumption and your statement that we've agreed

2        that it doesn't apply.

3               What we've stated and what we -- what we

4        have agreed to --

5          Q.   I don't think I said agreed.  I think I

6        said established.

7          A.   Okay.  Well, we've established.

8               What we've agreed or established is that

9        the two words "climate change" may not be in the

10       2021 permit and that we have agreed and established

11       that the document speaks for itself and that if

12       words -- specific words are not in the document,

13       they are not in the document.

14              That does not mean that the document

15       doesn't require the impacts of climate change in

16       terms of storm surges, flooding, heavy

17       precipitation, increased severity and quantity or

18       frequency of storms.  That should be considered in

19       the permit as part of a permittee identifying and

20       implementing what are the best management practices

21       to control and manage stormwater at their facility.

22              So that's -- that's my answer.

23         Q.   Yeah, my question was what evidence does

24       CLF have that defendants failed to meet their

25       requirement, that they did not consider adverse

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 318

1        weather, for example?

2                    MR. GREENE:  Just going to -- again,

3        object.

4                    Defendants are in receipt of all of the

5        plaintiff's expert reports.

6                    THE WITNESS:  Right.

7                    MR. GREENE:  Particularly on that point.

8                    But you can answer.

9        Q.    I'm just -- what evidence do you have that

10       defendants failed to consider adverse weather?

11       A.    Well, actually, we have evidence that

12       defendants did consider and, quite frankly, are

13       well aware of the impacts of -- what you phrase

14       adverse weather -- but the impacts of climate

15       change.

16                    What they have not done is taken steps to

17       implement storm control measures that would address

18       those impacts and minimize the risk of pollution as

19       a result of those impacts on the operations and

20       maintenance of the facility.

21       Q.    Okay.  Does -- I think you've answered

22       that CLF does consider risk weather -- related to

23       weather events in their daily operations?

24       A.    I said defendants, didn't I?

25       Q.    You said CLF, yeah.

Page 319

1          A.    I meant to say defendants.

2                Could you repeat.  Yeah.

3          Q.    CLF agrees that defendants do consider

4     weather events and storms in their daily operation.

5     I think you just said that they did?

6          A.    I said that -- I said that defendants are

7     well aware of the impacts of climate change.

8          Q.    All right.

9          A.    Well aware of the impacts that climate

10    change could have on its own infrastructure --

11         Q.    Correct.

12         A.    -- as detailed in the complaint and the

13    expert testimony of Ms. Goldsmith and Ms. Oreskes,

14    but that the stormwater control measures currently

15    in place at the facility do not meet the best

16    management practices required by the permit

17    pursuant to the expert opinions of our witnesses

18    that we have produced to you and your clients.

19         Q.    Uh-huh.  If corrective measures that CLF

20    seeks would not be economically practicable, does

21    CLF agree that they would not need to be required

22    under the permit?

23                MR. GREENE:  Just going to object to the

24    form of the question.  It calls for a legal

25    conclusion.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 320

1              You can answer.

2         A.    And do you mean control measures?

3    Stormwater control measures?

4         Q.    Stormwater control or corrective measures.

5    Sometimes that's used.

6         A.    I think the standard of what is

7    economically practicable is used in the permit with

8    respect to stormwater control measures and best

9    management practices.

10             I think that as the -- as the document

11    says and speaks for itself, you know, if it's

12    technologically -- let me get the specific

13    language -- (witness reviews document) -- sorry.

14    I'm in the wrong section.

15             MR. KEARNEY:  18.

16             THE WITNESS:  Page 18?

17         A.    Right.  Sorry.  So if the control measures

18    that are technologically available and economically

19    practicable and achievable, in light of best

20    industry practice.

21             So it's got to meet all of those.  It's

22    got to be economically practicable and achievable.

23    And I think your question was if there is agreement

24    that something is not economically practicable and

25    achievable, does it need to be --

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 321

1          Q.    And they would not be required.

2                MR. GREENE:  So object to the extent that

3          it calls for a legal conclusion.

4                You can answer.

5                THE WITNESS:  Yeah, and a hypothetical.

6                MR. GREENE:  Yeah.

7          A.    But if it was not economically practicable

8          and achievable, then that would not be within the

9          definition of what the term minimize means for

10         purposes of the -- of the permit.

11         Q.    All right.  Does CLF expect defendants to

12         build a -- a fortress wall around the perimeter of

13         the New Haven Terminal?

14               MR. GREENE:  Object as to -- and vague as

15         to what a fortress wall is and what -- what CLF --

16               MR. HENDERSON:  A wall that --

17               MR. GREENE:  -- expects to be done has

18         been set out in the expert reports that you have.

19         But I'll object as to vague.

20               MR. HENDERSON:  You know, at this point

21         we're just going to note for the record --

22         Q.    I'm sorry.  Go ahead.

23         A.    Well, I can answer your question if you'd

24         like.

25         Q.    Yeah, please.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 322

1          A.    I -- CLF expects Shell and the other

2     defendants to comply with its legal obligations

3     under the Clean Water Act and -- and RCRA.

4               And with respect to how it complies with

5     those obligations, with those legal obligations, we

6     have presented expert testimony which we believe,

7     if implemented, would bring the facility into

8     compliance.

9          Q.    Okay.

10              MR. HENDERSON:  For the record, we are

11    going to make an objection and note for the record

12    that we believe plaintiff's counsel has asserted

13    improper objections which impeded this deposition

14    throughout.

15              We also believe the witnesses -- was not

16    prepared for many topics that were identified in

17    the notice of deposition.  And for these reasons,

18    defendants reserve the right to bring a motion to

19    address these courts -- issues with the Court.

20              MR. GREENE:  Plaintiffs will obviously

21    object to that motion.  This witness is

22    significantly more prepared than the defendants'

23    30(b)(6) witness was.  There are more than a dozen

24    binders in this room.  He has spent hours and hours

25    and hours preparing, and he's relying on all the

Page 323

1        material the defendants have.

2                And the defendants have created a fiction

3        in this deposition and asking questions of what is

4        essentially a lay witness when they have in receipt

5        extensive expert reports.

6                The Court, on the motions concerning the

7        deposition notice in this case, acknowledged that

8        the plaintiffs would have to probably repeatedly

9        object to the defendants' questions because they

10       are calling for expert testimony.

11               The Court also in the argument on this

12       notice acknowledged that he didn't understand how

13       any witness could possibly be prepared to testify

14       on the scope and number of topics here.

15               So Mr. Mahoney has done an admirable job

16       at testifying.  He's been well educated on these

17       topics, and my objections have been to address what

18       is really gamesmanship on the part of the

19       defendants to try and trap a witness in a limited

20       period of time with an overbroad notice when the

21       defendants are in receipt of the plaintiff's expert

22       reports and know their facility better than anyone

23       else and are the ones obligated under the permit.

24               So the allegations made by the defendants

25       are baseless, and I stand by this record.

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 324

1          MR. HENDERSON:  And we stand by our

2     objections noted for the record as well.

3          Speaking objections have been outrageous

4     throughout this whole deposition.  But we note it

5     for the record, and we can take it up with the

6     Court.

7          MR. GREENE:  And let me -- let me just

8     clarify:  There isn't a word of testimony that this

9     witness hasn't provided with -- on any topic that

10    the defendants have requested, any question that

11    they have asked as a result of any objection that

12    I've made.

13         The witness has done his best to provide

14    clear, complete answers to every question, but the

15    defendants have continued to be vague, overbroad,

16    and misleading to the point of not providing

17    documents when asked and misleading what they're

18    reading from the documents.

19         So the record will stand, and I'll note

20    the defendants have roughly one minute and 40

21    seconds left of their time.

22         MR. HENDERSON:  As noted.  And we noted

23    our objections, and we stand by them.  We can take

24    it up with the Court.

25         Thank you, Mr. Mahoney.

Sean M. Mahoney                     June 4, 2025
Conservation Law Foundation, Inc. Vs. Shell Oil Company

Page 325

1              MR. GREENE:  We may not be done yet.

2       We're going to take a five-minute break to see if I

3       have any followup questions.

4              VIDEO OPERATOR:  The time is 5:16, and

5       we're off the record.

6              MR. HENDERSON:  If you can send a rough

7       draft as soon as possible.

8              (Recess was taken.)

9              VIDEO OPERATOR:  The time is now 5:29, and

10      we're on the record.

11                      EXAMINATION

12      BY MR. GREENE:

13         Q.   Mr. Mahoney, I just have a couple of

14      followup questions for you.

15              In that last session of questions, do you

16      recall saying that you believe that Shell had

17      considered climate change?

18         A.   Yes.

19         Q.   Okay.  When you said that, were you

20      referring to just an awareness of climate change

21      generally?

22         A.   Yes.

23         Q.   Okay.

24         A.   Throughout the company, yes.

25         Q.   You -- you weren't saying that they had

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 326

1      considered climate change with respect specifically

2      to the New Haven Terminal at any point.  That

3      wasn't your testimony, was it?

4           A.   It was not.

5               MR. GREENE:  Okay.  Great.  Those are all

6      the questions I have.

7               MR. HENDERSON:  Thank you.

8               VIDEO OPERATOR:  All right.  The time is

9      now 5:29.  We are off the record.  Thank you,

10     everyone.

11              MR. GREENE:  Let me just go back on the

12     record for one second.  I just want to make one

13     thing clear.

14              VIDEO OPERATOR:  The time is now 5:29 --

15     sorry -- 5:30, and we are on the record.

16              MR. GREENE:  Pretty sure my objection made

17     this clear, but we consider this deposition

18     complete and that there should be no further

19     examination of this witness.  Thank you.

20              MR. PENDELL:  One more thing:  Just for

21     the record, this is Mike Pendell, we reserve the

22     right to read and sign.

23              MR. GREENE:  Yeah, got it.  Right.

24              MR. HENDERSON:  And our objections are

25     noted on the record.  So...

Page 327

1                VIDEO OPERATOR:  All right.  The time is

2       now 5:30, and we are off the record.

3                    (Exhibit Mahoney 2A, Binder,

4                    Topics 1 & 2.)

5                    (Exhibit Mahoney 2B, Binder, Topic 5.)

6                    (Exhibit Mahoney 2C, Binder,

7                    Topics 6 & 8.)

8                    (Exhibit Mahoney 2D, Binder, Topic 9.)

9                    (Exhibit Mahoney 2E, Binder, Topic 10.)

10                   (Exhibit Mahoney 2F, Binder,

11                   Topics 11 & 12.)

12                   (Exhibit Mahoney 2G, Binder, Topic 13.)

13                   (Exhibit Mahoney 2H, Binder,

14                   Topics 14-16, Part 1.)

15                   (Exhibit Mahoney 2I, Binder,

16                   Topics 14-16, Part 2.)

17                   (Exhibit Mahoney 2J, Binder, Topic 17.)

18                   (Exhibit Mahoney 2K, Binder, Topic 18.)

19                   (Exhibit Mahoney 2L, Binder, Topic 19.)

20                   (Exhibit Mahoney 2M, Binder,

21                   Topics 21-23.)

22                   (Exhibit Mahoney 2N, Binder,

23                   Topics 24 & 28.)

24                   (Exhibit Mahoney 2O, Binder, Topic 26.)

25                   (Exhibit Mahoney 2P, Binder,

Page 328

```
 1              Topics 27 & 29.)

 2              (Exhibit Mahoney 2Q, Binder,

 3              Topics 30, 32 & 33.)

 4              (Exhibit Mahoney 2R, Binder,

 5              Topics 7, 34-36, CA Regional WQCB NPDES.)

 6              (Exhibit Mahoney 2S, Binder, Topic 7,

 7              34-36, CT 2011 General Industrial Permit.)

 8              (Exhibit Mahoney 2T, Binder, Topic 7,

 9              34-36, CT Draft MSGP.)

10              (Exhibit Mahoney 2U, Binder,

11              Topic 7, 34-36, EPA 2021 MSGP.)

12              (Exhibit Mahoney 2V, Binder, Topic 7,

13              34-36, EPA Consent Orders and Decrees.)

14              (Exhibit Mahoney 2W, Binder, Topics 7,

15              34-36, EPA Mass Permits Part 1.)

16              (Exhibit Mahoney 2X, Binder, Topic 7,

17              34-36, EPA Mass Permits Part 2.)

18              (Exhibit Mahoney 2Y, Binder, Topic 7,

19              34-36, Government Guidance & RIDEM

20              2024 MSGP.)

21              (Exhibit Mahoney 2Z, Binder, Topic 37.)

22              (Whereupon the deposition ended at

23              5:30 p.m.)

24

25
```

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 329

1    Vincent L. Greene IV, Esquire

2    vgreene@motleyrice.com

3                          June 6, 2025

4    Conservation Law Foundation, Inc.  v. Shell Oil Company

5        6/4/2025, Sean M. Mahoney (#7401804)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 330

```
 1      Commonwealth of Massachusetts
 2      Middlesex, ss.
 3
 4
               I, P. Jodi Ohnemus, Notary Public
 5      in and for the Commonwealth of Massachusetts,
        do hereby certify that there came before me
 6      on the 4th day of June, 2025, the deponent herein,
        who was duly sworn by me; that the ensuing
 7      examination upon oath of the said deponent was
        reported stenographically by me and transcribed
 8      into typewriting under my direction and control;
        and that the within transcript is a true record of
 9      the questions asked and answers given at said
        deposition.
10
11             I FURTHER CERTIFY that I am neither
        attorney nor counsel for, nor related to or
12      employed by any of the parties to the action
        in which this deposition is taken; and, further,
13      that I am not a relative or employee of any
        attorney or financially interested in the outcome
14      of the action.
15
            IN WITNESS WHEREOF I have hereunto set my
16      hand and affixed my seal of office this
        6th day of June, 2025, at Waltham.
17
18
19
20      P. Jodi Ohnemus, RPR, RMR, CRR
        CSR, Notary Public,
21      Commonwealth of Massachusetts
        My Commission Expires:
22      3/3/2028
23
24
25
```

Sean M. Mahoney                                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 331

1      ATTACH TO DEPOSITION OF:  SEAN M. MAHONEY
       CASE:  CLF VS. SHELL OIL, ET AL.
2      Job No. ATL7401804
                         ERRATA SHEET
3
       INSTRUCTIONS:  After reading the transcript of your
4      deposition, note any change or correction to your
       testimony and the reason therefor on this sheet.
5      DO NOT make any marks or notations on the
       transcript volume itself.  Sign and date this
6      errata sheet (before a Notary Public, if required).
       Refer to page 329 of the transcript for errata
7      sheet distribution instructions.
8      PAGE LINE
       ____ ____     CHANGE: _____
9                    REASON: _____
       ____ ____     CHANGE: _____
10                   REASON: _____
       ____ ____     CHANGE: _____
11                   REASON: _____
       ____ ____     CHANGE: _____
12                   REASON: _____
       ____ ____     CHANGE: _____
13                   REASON: _____
       ____ ____     CHANGE: _____
14                   REASON: _____
       ____ ____     CHANGE: _____
15                   REASON: _____
       ____ ____     CHANGE: _____
16                   REASON: _____
       ____ ____     CHANGE: _____
17                   REASON: _____
18            I have read the foregoing transcript of
       my deposition and except for any corrections or
19     changes noted above, I hereby subscribe to the
       transcript as an accurate record of the statements
20     made by me.
21     _____

       SEAN M. MAHONEY
22
              Subscribed and sworn to before me
23     this _____ day of _____, 2025.
24     _____
       Notary Public
25     My Commission Expires: