

**Exhibit B**

For a thriving New England

**CLF Vermont**  15 East State Street, Suite 4
Montpelier, VT 05602
P: 802.223.5992
F: 802.223.0060
www.clf.org

February 17, 2021

*Via Registered Mail and Certified Mail, Return Receipt Requested*

| | |
|---|---|
| Michael Sullivan<br>Complex Manager, New Haven Terminal<br>481 East Short Parkway<br>New Haven, CT 06512 | Shell Petroleum, Inc.<br>910 Louisiana Street<br>Houston, TX 77002 |
| Shell Oil Company<br>150 N. Dairy Ashford<br>Houston, TX 77079 | Shell Trading (US) Co<br>1000 Main, 12th Floor<br>Houston, TX 77002 |
| Equilon Enterprises LLC d/b/a Shell Oil Products US<br>150 N. Dairy Ashford<br>Houston, TX 77079 | Motiva Enterprises LLC<br>One Allen Center<br>500 Dallas St, 9th Floor<br>Houston, TX 77002 |

*C/O Bina Reddy*
*Beveridge & Diamond PC*
*400 West 15th Street, Suite 1410*
*Austin, TX 78701*

Triton Terminaling LLC
150 N. Dairy Ashford
Houston, TX 77079

**RE:  Supplemental Notice of Intent to File Suit for Violations of the Resource Conservation and Recovery Act and Clean Water Act at the Terminal**

To Whom It May Concern:

  Conservation Law Foundation ("CLF")[1] hereby notifies Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum, Inc., Shell Trading (US) Company,

---

[1] CLF is a 501(c)(3) nonprofit, member-supported organization dedicated to the conservation and protection of New England's environment.

**Exhibit B**

Triton Terminaling LLC, and Motiva Enterprises LLC (hereinafter, "Shell"))[2] of its intent to commence a civil action under Section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365 and Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), for violations of the CWA, 33 U.S.C. § 1251 *et seq.*, and RCRA, 42 U.S.C. § 6901 *et seq.*, at Shell's bulk storage and fuel terminal located at 481 East Shore Parkway, New Haven, Connecticut (the "Terminal").[3] Unless Shell adequately resolves the violations of RCRA and the CWA described herein, CLF intends to file suit against Shell in the United States District Court for the District of Connecticut to secure appropriate relief under federal and state law for these violations.

**This Letter supplements, and does not supersede, CLF's July 28, 2020 Notice of Intent to File Suit** for violations of RCRA and the CWA that was sent to Michael Sullivan, Complex Manager, New Haven Terminal; Shell Petroleum, Inc.; Shell Trading (US) Company; Equilon Enterprises LLC d/b/a Shell Oil Products US; and Motiva Enterprises LLC. This Letter puts additional parties on notice of the RCRA and CWA violations alleged herein.

Shell has not designed, maintained, modified, and/or operated its Terminal to account for the numerous impacts of climate change despite devoting years of study to the topic and creating "scenarios" demonstrating the harmful effects of greenhouse gases and the necessity of mitigating the harm by both curbing emissions and simultaneously preparing infrastructure for those impacts that have already become inevitable. Shell's infrastructure and operational failures at the Terminal, which include failing to inform regulators of the Terminal's specific vulnerabilities to climate change, put CLF's members, the New Haven community, and their natural resources at great risk and violate RCRA and the CWA because they essentially guarantee flooding, unpermitted discharges, and widespread contamination.

---

[2] This Supplemental Notice of Intent to File Suit is being sent to Ms. Bina Reddy on behalf of Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum, Inc., Shell Trading (US) Company, and Motiva Enterprises LLC because Ms. Reddy has indicated to CLF that she represents these entities in relation to CLF's July 28, 2020 letter.

[3] The terminal was formerly owned and operated by Motiva Enterprises, LLC, between 2000 and 2017. Motiva was formed in 1998 as a joint venture between Shell Oil Company, Texaco Inc. and Saudi Arabian Oil Company. *See* Saudi-Texaco Joint Venture, THE NEW YORK TIMES (Jan. 3, 1989), https://www.nytimes.com/1989/01/03/business/saudi-texaco-joint-venture.html. In 2002, Shell Oil Company took over Texaco's interest in Motiva. *See* Letter Approving Application to Divest Texaco Refining and Marketing Inc. to Shell Oil Company and Saudi Refining, Inc., FTC (Feb. 5, 2002), https://www.ftc.gov/sites/default/files/documents/cases/2002/02/ftc.gov-chevronltr.htm. In 2017, Motiva was dissolved and Shell maintained control over the Northeastern region of the U.S., including ownership of the New Haven Terminal. *See* Shell Global, *Shell Announces the Completion of Transaction to Separate Motiva Assets* (May 1, 2017), https://www.shell.com/media/news-and-media-releases/2017/completion-transaction-to-separate-motiva-assets.html. Per the dissolution agreement, references to Shell herein include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of Shell, including Motiva Enterprises LLC.

**Exhibit B**

### I. The Terminal

Shell, acting through officers, managers, subsidiary companies, and instrumentalities, owns or has owned and/or operates or has operated the Terminal, which consists of "tank farms," a pipeline, a marine terminal, buildings, and infrastructure located at 481 East Shore Parkway in New Haven, Connecticut. The Terminal is located in the Port of New Haven, on New Haven Harbor, which opens into the Long Island Sound.

The Terminal is engaged in the receipt, storage, and distribution of petroleum products. The spectrum of fuels handled by this facility consists of motor gasoline, fuel grade ethanol, fuel oil, jet fuel, fuel additives, and diesel. The facility contains thirty-nine bulk storage tanks with a total bulk storage capacity of approximately 76,328,498 gallons. The Terminal receives, stores, blends, and distributes gasoline and petroleum distillate products. Fuel products are received at the marine terminal area of the Terminal via ships and shipped from the Terminal via trucks. Some products are also shipped by pipeline.

The Terminal's bulk storage tanks are located in three "Containment Areas," which lie below the surrounding ground level and have rammed earth berms at certain locations around the periphery of the Containment Areas. The containment berms do not surround the entirety of the Containment Areas and have openings in several places. Stormwater from the Terminal flows through a series of catch-basins and pumps into a set of two retention basins. The stormwater from the basins is then manually pumped into the New Haven Municipal Separate Storm Sewer System ("MS4"). The stormwater from the tank farm is not treated before it is pumped into the retention basins. Stormwater from the truck loading rack flows through an oil/water separator before it is pumped into the retention basins. The stormwater from the retention basins is not treated before it is pumped to the New Haven MS4. The stormwater flows from the New Haven MS4 directly into New Haven Harbor.

Shell is a generator of hazardous waste at the Terminal and is categorized as a Large Quantity Generator of hazardous waste. It has contributed to the past or present handling, storage, treatment, transportation, or disposal of hazardous waste, as that term is defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), and solid waste, as that term is defined in Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), at the Terminal, which may present an imminent and substantial endangerment to health or the environment.

Based on the information currently available to CLF, the toxic and hazardous wastes and pollutants listed below, many of which are highly carcinogenic, are present at the Terminal: petroleum hydrocarbons, 1,2,4-trimethylbenzene, anthracene, benzene, benzo(G,H,I)perylene, cumene, cyclohexane, ethylbenzene, lead compounds, n-Hexane, naphthalene, polycyclic aromatic compounds, styrene, toluene, and xylene (Mixed Isomers). In addition, the Terminal is subject to the risk management plan ("RMP") requirements of Clean Air Act Section 112(r) because it holds approximately 790,000 pounds of butane for use in a "butane blending system" where butane is blended with gasoline—well in excess of the 10,000 pound RMP threshold.

In addition to current activities and storage, the soils and groundwater at the Terminal are contaminated from Shell's past, present, and ongoing handling, storage, treatment, transportation,

**Exhibit B**

or disposal of hazardous and solid waste. Environmental remediation reports submitted by Shell to the Connecticut Department of Energy and Environmental Protection ("CT DEEP") indicate that various chemical spills have occurred on the site since at least the 1970s. The Terminal is subject to long-term remediation requirements for contamination from benzene, lead, copper, arsenic, zinc, phenanthrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, and benzo(k)fluoranthene.

The Federal Emergency Management Agency ("FEMA") flood map for the area where the Terminal is located, which was last revised in July 2013, shows that the entire Terminal is within a Special Flood Hazard Area (SFHA) subject to inundation by a 1% annual chance flood (i.e., a 100-year flood or "base flood").

## II. Climate Change and New Haven

The present flood risks at the Terminal demonstrated by the FEMA map are, and will continue to be, exacerbated by sea level rise, increased precipitation, increased magnitude and frequency of storm events, as well as increased magnitude and frequency of storm surges—all of which are, and will continue to become, worse as a result of climate change. According to the Fourth National Climate Assessment: "The frequency of dangerous coastal flooding in the Northeast would more than triple with 2 feet of sea level rise."[4] Since 1900, sea level has already risen approximately one foot in the Northeast, at a rate that is three to four times higher than the global average.[5] From 1895 to 2011, the Northeast sustained a temperature increase of 2°F and a 10% increase in precipitation (5 inches), and from 1958 to 2016, "the number of heaviest 1% precipitation events (that is, an event that has a 1% chance of occurring in any given year) in the Northeast has increased by 55%."[6] The location, elevation, and failure to operate, maintain, or design infrastructure at the Terminal to account for the impacts associated with climate change make it especially vulnerable.

The entirety of the Port of New Haven is situated on artificial fill layered over stratified drift.[7] Combined with being located nearly at sea level, the Terminal is at risk from coastal flooding caused by sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges—all of which will become, and are becoming, worse as a result of climate change.

"New Haven's southern facing coastline and the geomorphology of Long Island Sound cause it to be particularly vulnerable to all hurricanes forecasted to track to New England. This is due to the ability of Long Island Sound to amplify hurricane surges."[8] "As a coastal town, New

---

[4] Mecray, Ellen L., *et al.*, *Ch. 18: Northeast,* 713 FOURTH NATIONAL CLIMATE ASSESSMENT, VOLUME II: IMPACTS, RISKS, AND ADAPTATIONS IN THE UNITED STATES (2018), *available at* https://nca2018.globalchange.gov/downloads/NCA4_Ch18_Northeast_Full.pdf.

[5] *Id.*; Horton, Radley, *et al.*, *Ch. 16: Northeast, in* CLIMATE CHANGE IMPACTS IN THE UNITED STATES: THE THIRD NATIONAL CLIMATE ASSESSMENT (J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, eds., U.S. Global Change Research Program) (2014).

[6] Mecray, *supra* at n.3; Radley, *supra* at n.4.

[7] *City of New Haven Natural Hazard Mitigation Plan Update II*, Figure 2-5, 2-12 (Apr. 2017).

[8] *Id.* at 5-1.

4

**Exhibit B**

Haven experiences frequent flooding due to heavy rainfall and increasingly severe hurricanes and winter storms. Weather-related flooding is compounded by a high rate of sea level rise of 2.5mm per year (the global mean trend is 0.5mm per year)."[9] "Several extreme precipitation indices are projected to increase, including the number of days with more than 1 inch of precipitation [], number of heavy precipitation days[], fraction of total precipitation accounted for by heavy precipitation [], and the maximum 1-day and 5-day precipitation [], all indicating a substantial increase of flood risk by mid-century."[10]

Sea level trends along the Northeast Atlantic "have been higher than the global rate over the last several decades, capped by a recent multiyear jump in sea level beginning in 2009."[11] This trend is projected to continue.[12] A 2019 analysis by the Connecticut Institute for Resilience and Climate Adaptation ("CIRCA") concluded that communities in Connecticut should plan that "sea level will be 0.5 m (1ft 8 inches) higher than the [1992 level] in Long Island Sound by 2050."[13] Moreover, according to a report by CT DEEP, average surface temperatures in Long Island Sound have been rising—which has been connected to increased risk of frequency and magnitude of storms—with a change of almost 2 degrees between 1991 and 2015.[14]

The Port of New Haven, and specifically the Terminal, is directly at risk from these impacts. In fact, the Terminal has been inundated by storm surge in the past. According to the CT DEEP online mapping tool entitled Connecticut Coastal Hazards Viewer, all of the oil terminals in the Port of New Haven, including the Terminal, were inundated when Superstorm Sandy hit New Haven on October 29, 2012. The storm surge in New Haven during Sandy was measured to be 9.14 feet above normal tide levels.[15] Despite swamping the Terminal, the storm surge from Sandy was *less than initially anticipated* owing to a change in the storm's trajectory.[16] Post-Sandy,

---

[9] CONNECTICUT INSTITUTE FOR CLIMATE AND ADAPTATION, *City of New Haven Commercial Industrial Toolbox Final Report* 4 (Jul. 31, 2017), available at https://circa.uconn.edu/wp-content/uploads/sites/1618/2016/03/CIT-CIRCA-Final-Report-With-JPEG-Appendices-attached.pdf.

[10] Connecticut Institute for Resilience and Climate Adaptation, *Connecticut Physical Climate Science Assessment Report (PCSAR): Observed trends and projections of temperature and precipitation*, 4 (Aug. 2019), available at https://circa.uconn.edu/wp-content/uploads/sites/1618/2019/11/CTPCSAR-Aug2019.pdf.

[11] NOAA, *Global & Regional Sea Level Rise Scenarios for the U.S.*, at 9 (Jan. 2017), https://tidesandcurrents.noaa.gov/publications/techrpt83_Global_and_Regional_SLR_Scenarios_for_the_US_final.pdf.

[12] *See id.* at vii ("Along regions of the Northeast Atlantic (Virginia coast and northward) and the western Gulf of Mexico coasts, RSL [relative sea level] rise is projected to be greater than the global average for almost all future GMSL [global mean sea level] rise scenarios.").

[13] James O'Donnell, Connecticut Institute for Resilience & Climate Adaptation, Sea Level Rise in Connecticut, 1, 4 (Feb. 2019), available at https://circa.uconn.edu/wp-content/uploads/sites/1618/2019/02/SeaLevelRiseConnecticut-Final-Report.pdf.

[14] *2015 Long Island Sound Hypoxia Season Review*, CT DEEP (2015), available at https://portal.ct.gov/DEEP/Water/LIS-Monitoring/-/media/DEEP/water/lis_water_quality/monitoring/2015/2015SeasonReviewfinalpdf.pdf.

[15] *City of New Haven Natural Hazard Mitigation Plan Update II* at 3-12.

[16] Hernandez, Esteban L., *Connecticut officials talk resiliency to mark Superstorm Sandy anniversary*, New Haven Register (Oct. 31, 2017), available at https://www.nhregister.com/news/article/Connecticut-officials-talk-resliency-to-mark-12321276.php.

5

**Exhibit B**

the City of New Haven commissioned a study of the resiliency of the I-95 corridor through New Haven. The study's authors noted that "[u]nder different storm tracking scenario, Superstorm Sandy could have caused more damage if the flooding inundation was superposed with high tides."[17] In particular, the study concluded that a similar storm in the future could further increase the water level by almost three feet.[18]

As the world's fifth largest company by revenue and second largest oil and gas company,[19] Shell has played a major role in causing anthropogenic climate change that is resulting in a greater frequency of storm surges, extreme weather events, and rising sea levels. Shell has been aware of this since at least 1986, when it circulated an internal document acknowledging that with "fossil fuel combustion being the major source of $CO_2$ in the atmosphere, a forward looking approach by the energy industry is clearly desirable."[20] Just three years later, in 1989, Shell announced the company's decision to account for sea level rise in the construction of a natural-gas production platform in the North Sea.[21] In 1991, Shell published the educational film, "Climate of Concern," cautioning against the risks of climate change.[22]

For over 40 years, Shell has developed "scenarios" in order to "make crucial choices in uncertain times and tackle tough energy and environmental issues."[23] Since the 1990s, Shell has been contributing these "scenarios" to other organizations, including the Intergovernmental Panel on Climate Change.[24] Shell was also an early member of the Global Climate Coalition ("GCC"), but withdrew its membership in April 1998 when the GCC began lobbying against establishing legally binding targets and timetables in the Kyoto Protocol.[25] Shell has continued to publicly reiterate its support for international agreements, such as the Kyoto Protocol[26] and the Paris Climate Agreement.[27]

In August 2005, Shell's Mars Platform suffered damages during Hurricane Katrina, not coming back online until May 2006.[28] The storm forced Shell to begin "preparing for hurricanes

---

[17] Anagnostou, Emmanouil & Zhang, Wei, *Resiliency Analysis of Storm Surge for Interstate 95 Right-of-Way at Long Wharf / New Haven, CT*, 24 (Mar. 23, 2017).
[18] *Id.* at 25–28.
[19] *Global 500: Royal Dutch Shell*, FORTUNE (2016); Lauren Gensler, *The World's Largest Oil and Gas Companies 2017: Exxon Reigns Supreme, While Chevron Slips*, FORBES (May 24, 2017).
[20] Shell Internationale Petroleum, *The Greenhouse Effect* (1986).
[21] *Greenhouse Effect: Shell Anticipates A Sea Change*, THE N.Y. TIMES (1989).
[22] Damian Carrington and Jelmer Mommers, *'Shell knew': oil giant's 1991 film warned of climate change danger*, THE GUARDIAN (Feb. 28, 2017).
[23] *Shell Earlier Scenarios* (2017).
[24] Peter Knight, *The Shell Report: Profits and Principles – does there have to be a choice?* (1998).
[25] *Id.* According to Shell, "[t]he main disagreement centered on the Kyoto protocol which aims to cut overall greenhouse gas emissions by 5% by the year 2012. The GCC is actively campaigning against legally binding targets and timetables as well as ratification by the US government. The Shell view is that prudent precautionary measures are called for." *Id*.
[26] Chris Noon, *Shell CEO Targets Washington Over Kyoto*, FORBES (Dec. 5, 2006).
[27] Samantha Raphelson, *Energy Companies Urge Trump to Remain in Paris Climate Agreement*, NPR (May 18, 2017).
[28] Shell, *The Shell Sustainability Report: Meeting the Energy Challenge* (2006).

**Exhibit B**

in the Gulf of Mexico."[29] In the company's 2016 Sustainability Report, Shell stated that "[t]he effects of climate change mean that government, business and local communities are adapting their infrastructure to the changing environment. At Shell, we are taking steps at our facilities around the world to ensure that they are resilient to climate change. This reduces the vulnerability of our facilities and infrastructure to potential extreme variability in weather conditions."[30]

The Terminal stores toxic pollutants known to be harmful to humans and aquatic life in an area affected by sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges—all of which will become, and are becoming, worse as a result of climate change. The first significant storm surge that makes landfall at the Terminal is going to flush hazardous and solid waste from the Terminal into the Harbor and the Quinnipiac and Mill Rivers and through nearby communities and ecosystems; a significant rise in sea level will put the majority of the Terminal, including soils, groundwater, and treatment works, under water. Shell knows all this, and yet has failed to disclose required information in its possession and has not taken appropriate steps to protect the public and the environment from this certain risk.

### III.     Resource Conservation and Recovery Act ("RCRA") Violations

#### 1. Imminent and Substantial Endangerment

The hazardous and solid waste at the Terminal is generated, handled, stored, treated, transported and/or disposed of at or near sea level in close proximity to major human population centers, New Haven Harbor, and the Quinnipiac and Mill Rivers in New Haven. In the face of rising sea levels and increasing major storm events, the Terminal poses an imminent and substantial risk to surrounding communities and the environment.

Shell has not disclosed its creation of this imminent and substantial risk to the United States Environmental Protection Agency ("EPA"), state regulators, or the public as it relates to the Terminal. Shell failed to disclose required information in its possession to the federal and state regulators and the public regarding the effects of climate change on the Terminal. Shell's failure to disclose has contributed to the imminent and substantial endangerment to health and the environment.

#### 2. Open Dumping

In addition to the hazardous wastes discussed above, the petroleum products stored at the Terminal qualify as "solid waste" under RCRA because Shell's failure to address the known imminent risks associated with climate-change, discussed above, will result in release of these products when these foreseeable events occur. Shell's inaction in the face of its own knowledge regarding the risks of climate change represents an "intent to discard" useful products because the outcome of this inaction is certain to occur.

---

[29] *Id.*
[30] Royal Dutch Shell plc., *Sustainability Report* (2016).

7

**Exhibit B**

RCRA prohibits "open dumping" which includes "facilities or practices in floodplains" that "result in washout of solid waste, so as to pose a hazard to human life, wildlife, or land or water resources." 40 C.F.R. 257.3-1(a). The Terminal is in a 100-year floodplain as determined by the Federal Emergency Management Agency. Inundation by flood waters results in the washout and carrying away of discarded petroleum products and other contaminants. The perimeter trough and catch basis surrounding the truck loading area catch spilled oil products during loading and are fully open to inundation by flood waters. The Terminal has been subject to storm surge inundation in the past causing the discharge of pollutants from the site. For example, the Terminal reported that precipitation and flooding from Hurricane Irene had caused it to discharge substantial pollutant loads to New Haven Harbor.

Shell has taken no steps to prevent similar flooding and pollution discharges, despite the past flooding and the increasing severity of storms and storm surge caused by climate change, in violation of RCRA's open-dumping prohibition.

### 3. *Generator Violation*

Large Quantity Generators like the Terminal are required to maintain and operate their facilities is such a way as to "minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment." 40 C.F.R. § 262.251; *see also* Connecticut Reg. § 22a-430-3(h). Shell is violating these duties by (i) failing to disclose the known and ever-increasing risks to the Terminal from climate change discussed above, and (ii) failing to take any steps to prevent flooding at the Terminal from these risks.

\*      \*      \*      \*      \*

Shell's violations of RCRA are ongoing and continuous. CLF intends to seek a civil injunction, as provided under Section 7002 of RCRA, 42 U.S.C. § 6972, ordering Shell to make necessary disclosures, to address current and ever-increasing risks of flooding from climate-change-induced storms, and restraining Shell from further violating RCRA. CLF also intends to seek civil penalties and an award of litigation costs, including attorney and expert witness fees, under Section 7002 of RCRA, 42 U.S.C. § 6972.

### IV. <u>Clean Water Act</u>

Shell operates the Terminal pursuant to the General Permit for Discharge of Stormwater Associated with Industrial Activity issued by CT DEEP ("General Permit"). A version of the General Permit was first effective on October 1, 2011 and was reissued most recently on October 1, 2019. The current General Permit is set to expire on September 30, 2021. *See* https://www.ct.gov/deep/cwp/view.asp?A=2721&Q=558454.

The Permit requires Shell to develop a Stormwater Pollution Prevention Plan ("SWPPP") and sets forth the elements that are required to be included in the SWPPP, including: (i) a facility description, (ii) identification of "potential pollutant sources," (iii) a description of the "control measures" implemented by the Terminal, and (iv) an engineer's certification. *See* Permit § 5(c). In the section entitled "Potential Pollutant Sources," the Permit provides that "[t]he [SWPPP] shall

8

**Exhibit B**

map and describe the potential sources of pollutants that may reasonably be expected to affect stormwater quality at the site or that may result in the discharge of pollutants during dry weather from the site." Permit § 5(c)(2)(D).

>  Among other requirements the Permit states:
>
>  Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

Permit § 5(b).

Shell's SWPPP fails to include information documenting sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges—all of which will become, and are becoming, worse as a result of climate change—that would impact the Terminal and surrounding communities. By failing to address these foreseeable impacts of climate change, Shell is not maintaining and implementing a SWPPP and BMPs that will reduce or eliminate the pollutants in the Terminal's storm water discharges and assure compliance with the Permit, which is a violation of the Permit in itself.

### A. Clean Water Act Violations

#### 1. Failure to Eliminate Non-Stormwater Discharges

The Permit requires that Shell eliminate all non-stormwater discharges and that Shell's SWPPP document the control measures it will use to eliminate the non-stormwater discharges. Permit 5(c)(2)(E); Bureau of Materials Management and Compliance Assurance Water Permitting and Enforcement Division, *Guidance Document for Preparing a Stormwater Pollution Prevention Plan*, 19 CT DEEP (Mar. 2011), *available at* https://portal.ct.gov/-/media/DEEP/Permits_and_Licenses/Water_Discharge_General_Permits/swpppguidpdf.pdf. Shell's SWPPP fails to describe or ensure implementation of BMPs that will be used to ensure that non-stormwater pollutant discharges resulting from sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges, do not occur in the future and are eliminated. Therefore, Shell is violating the Permit and the Clean Water Act.

#### 2. Activity Inconsistent with the Coastal Management Act and Causing Adverse Impacts to Coastal Resources

Shell has failed to design its Terminal to minimize the risk of oil and chemical spills at the Terminal and therefore its activities at the Terminal are inconsistent with the applicable goals and policies in the Coastal Management Act. *See* Permit Sect. 3(b)(2). The referenced provisions state in part:

>  (a) The following general goals and policies are established by this chapter: . . .

**Exhibit B**

> (5) To consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards.

Conn. Gen. Stat. § 22a-92(a)(5). Connecticut has adopted a sea level change scenario of 20 inches by 2050. CT DEEP, *Notice*, (Dec. 26, 2018) *available at* https://portal.ct.gov/-/media/DEEP/coastal-resources/coastal_management/coastal_hazards/SeaLevelChangeDEEPStatement12262018pdf.pdf?la=en. Shell has failed to consider the potential impact of a rise in sea level, coastal flooding, and erosion patterns on coastal development in its planning and operating process at the Terminal. Shell has also failed to design the Terminal to minimize the risk of spillage of petroleum products and hazardous substances. Moreover, Shell has failed to provide effective containment and cleanup facilities for accidental spills or disallowed offshore oil receiving systems that have the potential to cause catastrophic oil spills in the Long Island Sound estuary. Accordingly, Shell's activities designing and operating the Terminal will cause adverse impacts to coastal resources as defined in section 22a-93(15) of the Connecticut General Statutes.

### 3. Unlawful Certification

Shell's Permit requires that the SWPPP be signed "by a responsible corporate officer or duly authorized representative thereof." Permit at 5(c)(4). The SWPPP must also include the following certification:

> "I have personally examined and am familiar with the information submitted in this document and all attachments thereto, and I certify that, based on reasonable investigation, including my inquiry of those individuals responsible for obtaining the information, the submitted information is true, accurate and complete to the best of my knowledge and belief. I understand that a false statement made in the submitted information may be punishable as a criminal offense, in accordance with section 22a-6 of the General Statutes, pursuant to section 53a-157b of the General Statutes, and in accordance with any other applicable statute."

Permit 6(d).

In addition, the Permit requires that each SWPPP contain a certification from a licensed professional engineer:

> "I certify that I have thoroughly and completely reviewed the Stormwater Pollution Prevention Plan prepared for this site. I further certify, based on such review and site visit by myself or my agent, and on my professional judgment, that the Stormwater Pollution Prevention Plan meets the criteria set forth in the General Permit for the Discharge of Stormwater Associated with Industrial Activity effective on October 1, 2018. I am aware that there are significant penalties for false

10

**Exhibit B**

    statements in this certification, including the possibility of fine and imprisonment for knowingly making false statements."

Permit 5(c)(7).

    Shell made the required certifications at the time of development and submission of its SWPPP but without discussing in the SWPPP or disclosing to regulators information in its possession regarding climate change driven impacts and the substantial risks of pollutant discharges associated with these impacts. Shell made these certifications without considering the spill prevention and control procedures that would be necessary to address the foreseeable effects of climate change—sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges—and the substantial risks of pollutant discharges and/or releases associated with these effects. Accordingly, Shell's SWPPP certification is untrue, inaccurate, and incomplete in violation of the Permit and the CWA.

        *4. Failure to Identify Sources of Pollution Reasonably Expected to Affect the Quality of Stormwater Discharges*

    The Permit requires that "[t]he [SWPPP] shall map and describe the potential sources of pollutants that may reasonably be expected to affect stormwater quality at the site or that may result in the discharge of pollutants during dry weather from the site. The [SWPPP] shall identify all activities and materials that may be a source of stormwater pollution at the site." Permit 5(c)(2)(D). Shell has failed to identify sources of pollutants resulting from the impacts of climate change as sources of pollution reasonably expected and anticipated by Shell to affect the quality of the stormwater discharges from the Terminal, including the potential for flooding at the Terminal from storm surge despite multiple past instances of storm surge. Shell has failed to identify sources of pollutants resulting from sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surge—all of which will become, and are becoming, worse as a result of climate change—and which are reasonably expected and anticipated to affect the quality of the stormwater discharges from the Terminal.

        *5. Failure to Describe and Implement Practices to Reduce Pollutants and Assure Permit Compliance*

    The Permit requires that:

    [t]he permittee must document the location and type of control measures installed and implemented at the site in accordance with "Control Measures" (Section 5(b)). The permittee shall discuss the appropriateness and priorities of control measures in the [SWPPP] and how they address identified potential sources of pollutants at the site. The [SWPPP] shall include a schedule for implementing such control measures if not already implemented.

Permit 5(c)(2)(E). According to the Permit:

11

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility. The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

Permit 5(b). The SWPPP does not refer to the potential for flooding at the Terminal from storm surge, despite the multiple past incidences of storm surge flooding referred to *supra*, and as a result does not include control measures or BMPs to minimize this potential unpermitted discharge. Shell's SWPPP for the Terminal does not describe or ensure implementation of BMPs that will be used to address pollutant discharges resulting from sea level rise, increased precipitation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surge—all of which will become, and are becoming, worse as a result of climate change—which are reasonably expected, and known to Shell.

### 6. *Failure to Implement Measures to Manage Runoff*

The Permit requires the Terminal it to "minimize the discharge of pollutants from the site" including to "divert uncontaminated run-on to avoid areas that may contribute pollutants." Permit § 5(b)(7). Shell's SWPPP for the Terminal does not refer to the potential for flooding at the Terminal from storm surge or heavy precipitation, despite the multiple past incidences of flooding. Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to address run-on to avoid areas that may contribute pollutants despite previous flooding and the current and growing risk of further flooding from the climate change impacts discussed above, Shell is violating the Permit and the Clean Water Act.

### 7. *Failure to Minimize the Potential for Leaks and Spills*

The Permit requires that "[t]he permittee must minimize the potential for leaks and spills." Permit 5(b)(9). The potential for leaks and spills is increased by previous instances of flooding and the current and growing risk of further flooding from the climate change impacts discussed above. Because the SWPPP for the Terminal fails to describe or ensure implementation of BMPs that will be used to minimize the potential for leaks and spills resulting from the climate-change impacts discussed above, Shell is violating the Permit and the Clean Water Act.

### 8. *Failure to Submit Required Facts or Information to Connecticut Department of Energy and Environmental Protection*

The Permit requires that:

> Within fifteen (15) days after the date a permittee becomes aware of a change in any of the information submitted pursuant to this general permit, becomes aware that any such information is inaccurate or misleading, or that any relevant information has been omitted, such permittee shall correct the inaccurate or misleading information or supply the omitted information in writing to the commissioner. Such information shall be certified in accordance with Section 6(d) of this general permit. The provisions of this subsection shall apply both while a

**Exhibit B**

request for registration is pending and after the commissioner has approved such request.

Permit 6(g).

Shell has failed to submit relevant facts and/or submitted incorrect and incomplete information regarding the risks of climate-change, discussed above, and the substantial risks of pollutant discharges and/or releases associated with these factors in its SWPPP and reports to CT DEEP. Shell has not promptly submitted such facts or information to CT DEEP, despite Shell's knowledge of the risks of climate-change discussed above, and the substantial risks of pollutant discharges and/or releases associated with these factors, dating back decades. By failing to submit relevant facts and/or submitting incorrect and incomplete information and failing to promptly submit such information upon becoming aware that it had not previously been submitted, Shell is violating the Permit and the Clean Water Act.

### 9. *Failure to Amend or Update the SWPPP*

The Permit requires that the permittee amend the SWPPP under certain circumstances, including whenever:

> (A) there is a change at the site which has an effect on the potential to cause pollution of the surface waters of the state;
>
> (B) the actions required by the Plan fail to ensure or adequately protect against pollution of the surface waters of the state; or
>
> . . . .
>
> (F) necessary to address any significant sources or potential sources of pollution identified as a result of any inspection or visual monitoring;

Permit 5(c)(5). Shell has not amended or updated its SWPPP based on information in its possession regarding the risks to the Terminal from climate-change discussed above, and the substantial risks of pollutant discharges and/or releases associated with these factors, in violation of the Permit and the Clean Water Act. By failing to properly amend or update its SWPPP, Shell is violating the Permit and the Clean Water Act.

### 10. *Failure to Identify Discharges to Impaired Waters in SWPPP*

The Permit requires Shell to identify in its SWPPP any impaired waters to which the Terminal discharges and whether or not a Total Maximum Daily Load allocation ("TMDL") has been established for them. Permit § 5(c)(2)(D)(i)(7). In addition, if the Terminal discharges to an impaired waterbody, the SWPPP must also document schedules and procedures for implementing impaired waters monitoring. Permit § 5(c)(2)(K). The Terminal discharges to New Haven Harbor via the City of New Haven's Municipal Separate Storm Sewer System ("MS4"). Shell's discharges enter the New Haven MS4 and discharge into New Haven Harbor south of the Terminal. The State of Connecticut has identified New Haven Harbor as impaired for dissolved oxygen, nutrients, oil

**Exhibit B**

and grease, polychlorinated biphenyls ("PCBs"), and bacteria. New Haven Harbor is included in the Connecticut State Bacteria TMDL.

Shell's SWPPP fails to disclose the discharge to the impaired New Haven Harbor. It states instead that because the Terminal discharges to the MS4, it is "not subject to additional monitoring requirements associated with monitoring of discharges to impaired waters." Shell's failure to identify its discharges to an impaired waterbody and failure to document procedures for monitoring those discharges are a violation of the Permit and the Clean Water Act.

*11. Failure to Conduct Monitoring for Discharges to Impaired Waters*

If the Terminal discharges to an impaired waterbody, the Permit imposes special monitoring requirements for indicator pollutants. Permit § 5(e)(1)(D). As explained above, Shell discharges to New Haven Harbor, which is impaired for the following pollutants for which no TMDL has been established: dissolved oxygen, nutrients, oil and grease, PCBs, and bacteria. Until 2015, the Terminal's stormwater monitoring reports to Connecticut DEEP identified it as discharging to an impaired waterbody (New Haven Harbor) and included the additional monitoring. Beginning in 2015, Shell stopped stating that it discharged to an impaired waterbody and stopped monitoring for indicator pollutants, stating in its SWPPP that "[a]s the site's discharges are to an MS4, the site is not subject to additional monitoring requirements associated with monitoring of discharges to impaired waters." Shell's failure to monitor for indicator pollutants for the impairments in New Haven Harbor is a violation of the Permit and the Clean Water Act.

**V.    OTHER CLAIMS**

The violations of federal law alleged herein also support pendant state law claims sounding in tort, including, but not necessarily limited to, negligence and public and private nuisance. Shell is specifically put on notice that CLF intends to pursue such claims as warranted.

**VI.    CONCLUSION**

During the notice period, CLF is willing to discuss effective remedies for the violations noticed in this letter that may avoid the necessity of litigation. If Shell wishes to pursue such discussions, please contact CLF within the next 20 days so that negotiations may be completed before the end of the notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing at the conclusion of the notice period.

Sincerely,

Christopher M. Kilian
Vice President and Director of Strategic Litigation

14

**Exhibit B**

Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992
ckilian@clf.org

Allan Kanner
Elizabeth B. Petersen
Allison S. Brouk
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, LA 70130
(504) 524-5777
a.kanner@kanner-law.com
e.petersen@kanner-law.com
a.brouk@kanner-law.com

| | | |
|---|---|---|
| cc: | Jane Nishida<br>Acting Administrator<br>Environmental Protection Agency<br>Ariel Rios Building 110A<br>1200 Pennsylvania Avenue NW<br>Washington, DC 20460 | Katherine Dykes<br>Commissioner<br>Connecticut Department of Energy and Environmental Protection<br>79 Elm Street<br>Hartford CT 06106 |
| | Deborah Szaro<br>EPA Region 1 Acting Administrator<br>Environmental Protection Agency<br>5 Post Office Square, Suite 100<br>Boston, MA 02109-3912 | CT Corporation System<br>*As registered agent for Triton Terminaling LLC*<br>67 Burnside Ave<br>East Hartford, CT 06108 |