# Exhibit B

# Filed Under Seal

Page 1

Volume I
Pages 1 to 291
Exhibits See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -x
                                 :
CONSERVATION LAW FOUNDATION,     :
INC.,                            :
            Plaintiff,           :
                                 : Civil Action
        vs.                      : No.
                                 : 3:21-cv-00933-
EQUILON ENTERPRISES LLC D/B/A    : VDO
SHELL OIL PRODUCTS US, TRITON    :
TERMINALING LLC, and MOTIVA      :
ENTERPRISES LLC,                 :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

        VIDEOTAPED DEPOSITION OF WENDI GOLDSMITH, Ph.D., PG, a witness called by counsel for the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Jane M. Werner, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing at the Offices of Conservation Law Foundation, Inc., 62 Summer Street, Boston, Massachusetts, on Wednesday, August 20, 2025, commencing at 10:02 a.m.

PRESENT:

    Conservation Law Foundation
        (by Christopher M. Kilian, Esq.)
        15 East State Street, Suite 4, Montpelier, VT 05602, for the Plaintiff.
        ckilian@clf.org
        802.223.5992

Page 2

PRESENT:   (Continued)
     Conservation Law Foundation
              (by Ana McMonigle, Esq.)
              195 Church Street, Mezzanine Level,
              Suite B, New Haven, CT 06510,
              for the Plaintiff.
              amcmonigle@clf.org
              203.298.7692
     King & Spalding
              (by Douglas A. Henderson, Esq.)
              1180 Peachtree Street, NE, Suite 1600,
              Atlanta, GA 30309, for the Defendants.
              404.572.4600
     Wiggin and Dana LLP
              (by James Craven, Esq.)
              One Century Tower, 265 Church Street,
              New Haven, CT 06510, for the Defendants.
              jcraven@wiggin.com
              203.4984361

  Also Present:  Oleg Bolotov, Videographer
                 Andrew Miller (Via Zoom)

                    *  *  *  *  *

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 3

I N D E X

WITNESS:                          DIRECT   CROSS

WENDI GOLDSMITH, Ph.D., PG
(By Mr. Henderson)               9
(By Mr. Kilian)                        259

                    *   *   *

                  E X H I B I T S

EX. NO.                                      PAGE

EXHIBIT G1   Expert Report of Wendi Goldsmith,
             dated 5/8/25                        71

EXHIBIT G2   Expert Rebuttal Report of Wendi
             Goldsmith, dated 8/1/25             71

EXHIBIT G3   Document entitled "General Permit
             for the Discharge of Stormwater
             Associated with Industrial
             Activity, Effective Date:
             10/1/18"                            71

EXHIBIT G4   Document entitled "General Permit
             for the Discharge of Stormwater
             Associated with Industrial
             Activity, Effective Date:
             10/1/21"                            71

EXHIBIT G5   Document entitled "Connecticut
             Department of Energy and
             Environmental Protection,
             National Pollutant Discharge
             Elimination System General
             Permit for the Discharge of
             Stormwater Associated with
             Industrial Activities, General
             Permit No.: CTR050000"              72

Page 4

E X H I B I T S, (Continued)

EX. NO.                                                    PAGE

EXHIBIT G6   Document entitled "National
             Pollutant Discharge
             Elimination System General
             Permit for the Discharge of
             Stormwater Associated with
             Industrial Activity Fact Sheet"    100

EXHIBIT G7   Document entitled "Supplemental
             Fact Sheet Draft General NPDES
             Permit for the Discharge of
             Stormwater Associated with
             Industrial Activities," dated
             March 2025                          103

EXHIBIT G8   (Not used)

EXHIBIT G9   Document entitled "National
             Pollutant Discharge Elimination
             System General Permit for the
             Discharge of Stormwater
             Associated with Industrial
             Activity Fact Sheet, General
             Permit No.: CTR050000              105

EXHIBIT G10  Document entitled "Supplemental
             Fact Sheet (December 2024)         108

EXHIBIT G11  Document entitled "Appendix G –
             Climate Change Considerations      199

EXHIBIT G12-16  (Not used)

EXHIBIT G17  Document entitled "Policy
             Statement 360 -Climate change"     163

EXHIBIT G18  Document entitled "Flood
             Resistant Design and
             Construction," Standard 24-24      128

EXHIBIT G19  Document entitled "Flood
             Resistant Design and
             Construction," Standard 24-14      127

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 5

E X H I B I T S, (Continued

EX. NO.                                               PAGE

EXHIBIT G20 Document entitled "A Guide
            for Higher Standards in
            Floodplain Management,"
            Revised March 2013                        206

EXHIBIT G21 Document entitled "Industrial
            Stormwater Fact Sheet Series"             200

EXHIBIT G22 Document entitled "U.S.
            Environmental Protection Agency
            SPCC Field Inspection and Plan
            Review Checklist"                         168

EXHIBIT G23 Document entitled "Flood
            Preparedness Recommended Best
            Practices"                                194

EXHIBIT G24 Document entitled "Developing
            Your Stormwater Pollution
            Prevention Plan, A Guide for
            Industrial Operators,
            March 2021"                               201

EXHIBIT G25 Document entitled "FEMA Policy
            Standards for Flood Risk,
            Analysis and Mapping, FEMA
            Policy #FP 204-078-1 (Rev 10)"            176

EXHIBIT G26 Document entitled "EPA Region 1
            Recommended Procedures and
            Resources for the Development
            of Adaptation Plans for
            Wastewater Treatment Systems
            and/or Sewer Systems"                     150

EXHIBIT G27 (Not used)

EXHIBIT G28 Document entitled "New York
            State Petroleum Terminal
            Resiliency Assessment NYSERDA
            Contract 30186, Final Report,
            March 2014"                               214

Veritext Legal Solutions
800.808.4958                                   770.343.9696

Page 6

E X H I B I T S, (Continued

EX. NO.                                         PAGE

EXHIBIT G29 Document entitled "Natural Hazard
            Risk Assessment Guidance for
            Marine Oil Terminals, December
            2024"                               224

EXHIBIT G30-33 (Not used)

EXHIBIT G34 Document entitled "Responding to
            Changes in Sea Level: Engineering
            Implications (1987"                 140

EXHIBIT G35 Document entitled "Risk
            Management Series, Design Guide
            for Improving Critical Facility
            Safety from Flooding and High
            Winds, FEMA 543/January 2007        202

                    *   *   *

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We're going on the record.  The time is 10:02 a.m. on August 20th.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.

Audio and video recording will continue to take place until all parties agree to go off record.

This is the beginning of Media No. 1 in the recorded deposition of Wendi Goldsmith taken by the counsel for the Defendants in the matter of Conservation Law Foundation versus Equilon Enterprises filed in the U.S. District Court for the District of Connecticut, Case No. 321-cv-00933-VDO. The location of this deposition is Conservation Law Foundation, 62 Summer Street, Boston, Massachusetts 02110.

My name is Oleg Bolotov, representing Veritext, and I'm the videographer.

The court reporter is Jane Werner, with the firm Veritext.  I am not authorized to administer the oath.  I am not related to any party in this action, nor am I financially interested in the

Page 8

outcome.  If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel or all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. HENDERSON:  Hello.  I am Douglas Henderson, counsel for Defendants in this matter.

MR. CRAVEN:  Hello.  This is Jim Craven, also counsel for the Defendants in this matter.

MR. KILIAN:  I'm Christopher Kilian, counsel for Conservation Law Foundation.

MS. McMONIGLE:  I'm Ana McMonigle, counsel for Conservation Law Foundation.

THE VIDEOGRAPHER:  Okay.  The court reporter will now swear in the witness, and we may again begin.

Page 9

WENDI GOLDSMITH, Ph.D., PG a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of her driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HENDERSON:

Q.   Good morning, Dr. Goldsmith.  I'm Doug Henderson.  I've met you before.  Welcome.  This is my chance to ask questions to you under oath.

From your CV, I'm assuming you've been deposed before.

A.   Yes.

Q.   So you understand the rules.  If I ask a question that you don't understand it, let me know.  Chris may object to certain of my questions.  We will handle that.  I don't expect too much problem.  Again, if I ask a question that you don't understand, let me know, and I'll try to reframe it.

Do you have legal counsel here today representing you?

A.   I have no individual legal counsel.

Q.   Now, before we jump into this case, how

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 10

many times have you been deposed?

A.    Fewer than ten.

Q.    And what were those depositions about?

A.    The depositions have been about business litigation matters and being a traffic accident witness; not in the expert realm.

Q.    Is this your first deposition as an expert witness?

A.    Yes.

Q.    Have you ever been a juror in a case?

A.    Yes.

Q.    What kind of case was that?

A.    A contract issue.

Q.    How long ago was that?

A.    20 years ago.

Q.    Have you ever testified at hearings for regulations or hearings of any kind?

A.    Yes.

Q.    And what were those?

A.    Clean Water Act-related things.

Q.    Can you give some examples of where you testified at hearings?

A.    So I've provided both written and oral testimony in different Clean Water Act matters.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 11

Q.    Are these permitting regulations?

A.    Yes, commenting on the regulatory process.

Q.    What other context have you testified at hearings?

A.    I don't think I can recall any.

Q.    What's the most recent time you testified in a hearing?

A.    So oral testimony?

Q.    Yes.

A.    It was probably 25 years ago.

Q.    Have you offered written testimony in hearings?

A.    Well, in regulatory review procedures.

Q.    And what was the most recent one of those?

A.    Why, that would be the Connecticut Industrial General Permit under the Clean Water Act.

Q.    And do you remember the general date of when you offered testimony in that proceeding?

A.    Generally, I believe 2023.

Q.    And did you submit a declaration in that?

A.    Yes, I did.

Q.    Is that the last declaration you've submitted in the Clean Water Act matter in Connecticut?

Page 12

A.   I believe so, yes.

Q.   Have you submitted any other declarations since that time in other cases?

A.   I don't believe so.

Q.   Have you ever testified at a bench trial?

A.   Um, I don't know if it would be categorized as a "bench trial."

Q.   Can you explain what you mean?

A.   Well, so one of the -- the matter that I mentioned was about 25 years ago.  It was -- it wasn't in a court.  It was an administrative hearing, so I gather that's not a bench trial.

Q.   And what did that concern?

A.   It had to do with the State of Vermont's adoption of the NPDES Phase II rules and programs for watershed protection.

Q.   And who you were testifying on behalf of?

A.   Conservation Law Foundation.

Q.   How long have you represented Conservation Law Foundation?

A.   I believe that was the first matter that put us in contact.

Q.   20 years ago?

A.   More like 25.  Closer to 30, even.  I'm not

Page 13

sure.

Q.   Who contacted you from CLF?

A.   I have talked with so many people at CLF over the years, I don't honestly recall.

Q.   Have you ever been a party in litigation?

A.   Yes.

Q.   And what was that?

A.   I have been named in many different business litigation matters.

Q.   What's the issue in those?

A.   Contract issues.  Sometimes being named just to throw another name on the list.  And if you ask me to say what it was about, I'm not sure I could answer.

Q.   Did it involve -- which business did it involve?

A.   I think all the business litigation I was involved in was for the Bioengineering Group, the Bioengineering Group, Inc.

Q.   And what year did that occur?

A.   There are several different things in the '90s and early to mid-2000s.

Q.   And what's the most recent lawsuit that you've been involved with personally?

Page 14

A.   Starting roughly ten years ago, I filed a lawsuit in a business matter.

Q.   And what was that about?

A.   It was a contract dispute.

Q.   And has that been resolved?

A.   Yes, it has.

Q.   Was that a settlement?

A.   Yes, it was.

Q.   How about the other business matters?  Have you ever been sued for negligence?

A.   No.

Q.   Have you been sued for fraud?

A.   No.

Q.   Have you ever been sued for unfair business or any unfair business activities?

A.   No.

Q.   Have you ever had a judgment entered against you?

A.   Individually?

Q.   Yes.

A.   I don't believe so.

Q.   Have you ever filed bankruptcy?

A.   Yes, I did.

Q.   In what year was that?

Page 15

A.    2018.

Q.    Has that case been closed?

A.    Yes.

Q.    Was that Chapter 11?  7?

A.    7.

Q.    Okay.  How long did that proceeding last?

A.    Um, very brief.

Q.    Were you sued individually, or was that part of your role as a corporate officer?  Was it individually that you filed Chapter 7?

A.    The bankruptcy filing included a statement that it was related to -- it was related to business issues.  And...

Q.    Were these breach of contract claims that you were sued on?

A.    This was a lawsuit I filed.

Q.    And what were the claims there?

A.    That the bank did not follow contract terms.

Q.    And that's been resolved?

A.    Yes.

Q.    Let's look at your background.  Is your undergrad degree in geology?

A.    Yes.

Page 16

Q.   Is that what shows up on the diploma?

A.   Yes.

Q.   Do you have a degree in engineering?

A.   No.

Q.   Have you ever been a licensed engineer in any state?

A.   No.

Q.   Are you a licensed geologist in Connecticut?

A.   No.

Q.   Do you have any hydrology specialty certificates?

A.   No.

Q.   Are you a meteorologist?

A.   No.

Q.   Are you an atmospheric scientist?

A.   No.

Q.   Are you an expert in financial analysis?

A.   No.

Q.   I noticed you had a degree from Conway. Are you a licensed landscape architect?

A.   No.

Q.   How about a soil scientist in Connecticut?

A.   Not licensed.

Page 17

Q.   How about a certified hazardous materials management --

A.   No.

Q.   Do you have that?

A.   No, I do not.

Q.   You're not a toxicologist?

A.   No.

Q.   And your doctorate, what is that degree in?

A.   It's from the Aarhus University in Denmark, the School of Business and Social Sciences.

Q.   What's the degree, actually; the title of the degree?  What field?

A.   It's a Ph.D. from the School of Business and Social Sciences.

Q.   But you don't have a doctorate in engineering?

A.   Correct.

Q.   When you were at Bioengineering, who were your main clients?

A.   A mixture of public agencies, federal, state and municipal, private entities, including corporate and academic and NGO clients.

Q.   How about the oil and gas industry?  Do you have any experience in oil and gas?

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 19 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 18

A.   Yes.

Q.   Can you describe that?

A.   I worked on different projects for pipeline companies, mostly involving river-crossing issues and other pipeline restoration mitigation and stabilization issues.

I also worked on -- I worked on a couple of different projects for decommissioned petroleum facilities.

Q.   Who are your clients?

A.   Um, so for the oil and gas, Tennessee Gas Pipeline Company, El Paso.  I'm trying to remember. Algonquin.  Um.  Another big pipeline company up in Canada.  I don't remember their name.

Q.   Have you ever represented Exxon?

A.   I don't think so, but I will say I worked on a couple of small decommissioned -- you know, some old places where there had been sites.  And I know that I could guess who I think was one, but I worked on several.  And I honestly don't remember -- because there was no branding and signs and the names were little, you know, single-entity -- single-purpose entity stuff.  So I think one was Chevron, but...  And this is all at least 20 years

Page 19

ago.

Q.    Who are you currently employed by?

A.    I just work as a consultant independently.

Q.    Do you have a company name that you consult under?

A.    Most of the work I do is under a company called, "Sustainability Visions, LLC."

Q.    Are you the only employee?

A.    Yes.  Technically, I'm not an employee.

Q.    What's the other entity that you consult under?

A.    It's called "EMP R&D LLC."

Q.    EMP?

A.    (Witness nods head)

Q.    And what does EMP do?

A.    I use that entity when I'm working on R&D-related issues that don't involve professional liability insurance.

Q.    And Sustainable Visions is what you have --

A.    Sustainability Visions.

Q.    And that's the one where you have errors and omissions insurance?

A.    Um, I don't know that I have exactly an errors and omissions policy, because the work I do

Page 20

is not, you know, like, engineering plan certification type work.  But there is some professional liability coverage, as well as other coverages.

Q.    So for oil and gas, have you ever been to an offshore facility?

A.    I've been pretty close.

Q.    Have you ever been to an offshore facility?

A.    I have never been on an offshore facility.

Q.    Have you ever been an operator of any oil and gas equipment?

A.    No.

Q.    Do you have operational experience in the oil and gas industry?

A.    No.

Q.    Outside of your experience for CLF, have you ever been to a petroleum bulk storage terminal, fuel storage tank facility?

A.    Yes.

Q.    And where was that?

A.    I toured, using multiple forms of transportation, facilities throughout Greater New Orleans and the Gulf Coast area impacted after Hurricane Katrina.

Page 21

Q.   And what names of those facilities did you inspect?

A.   I know one was Murphy Oil.  And there were a bunch of upstream and midstream facilities along the Mississippi River, primarily.  But I overflew a couple weeks after the hurricane.

Q.   How many petroleum bulk storage terminals have you been to personally, where you got out and walked around?

A.   I'd say a dozen.

Q.   And where are those?

A.   Louisiana, Massachusetts, Connecticut, Maine.

Q.   Can you list the ones in Maine you've been to?

A.   I don't recall.

Q.   How about the ones in Connecticut?

A.   Shell and Gulf.

Q.   Have you been to Buckeye?

A.   I've had a good gander at it, but I have not been in the facility.

Q.   For Shell and for Gulf, was that in your role for CLF for the litigation or potential litigation?

Page 22

A.    Yes.

Q.    For the ones in Maine, was that for litigation or potential litigation?

A.    There was a trip I made to Maine for reviewing coastal dynamics issues in the proximity of a couple of terminals after a major coastal storm probably two years ago.  But -- it may sound a little strange; but at this point, I have intense curiosity about these matters.  So I will take detours and have a look to see many coastally facing industrial sites.

Q.    Did you actually go onto the site of the terminal in Maine?

A.    No, I have never been on a site there.

Q.    So just to be clear, you haven't been to a petroleum bulk storage terminal in Maine?

MR. KILIAN:  Objection.

A.    I have not been --

Q.    You have not been onsite --

A.    Correct.

Q.    -- to a petroleum bulk storage facility in Maine.

How about in Connecticut?  Have you been onsite to what you refer to as the "Shell New Haven

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 24 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 23

terminal"?

A.   Yes.

Q.   And the Gulf?  Have you been onsite at the
Gulf?

A.   Yes.

Q.   Is that now known as "Pipe Fuels"?

A.   For some with more nimble minds than I,
yes.

Q.   Have you been onsite at any other petroleum
bulk storage facility in Connecticut?

A.   Not that I recall.

Q.   How about Mass.?  Have you been onsite at a
petroleum bulk storage terminal there?

A.   I've been on many former sites.

Q.   Have you been on any operating petroleum
bulk storage terminal facilities in Massachusetts?

A.   Not inside the fence line.

Q.   What other states have you been to for
petroleum bulk fuel storage terminals?

A.   I mentioned Louisiana.

Q.   And for Louisiana, what was the name of
that terminal that you were onsite?

A.   Well, I mentioned that I overflew the
coastal area impacted by Hurricane Katrina just a

Page 24

few weeks after the hurricane, and many of the roads were not passable.  And I was in the air, but at about 400-feet elevation, so I was able to get a close look at a lot of these facilities, but I was not boots on the ground.

Q.    So did you actually go onsite, walk after the flood at any petroleum bulk storage terminal?

A.    No.  But I have been on noncommercial petroleum bulk storage facilities at the major pumping stations throughout Greater New Orleans, which themselves include large storage tanks.

Q.    Have you ever worked for any party on environmental compliance for operating a petroleum bulk storage terminal?

A.    No.

Q.    Have you ever operated any equipment at a petroleum bulk storage facility?

A.    No.

Q.    Did you participate in any permitting activities when you were at Bioengineering that occurred at petroleum bulk storage terminals?

A.    Some having to do with clean-up, stabilization and closure of existing permits, but not related to the bulk oil storage function itself.

Page 25

Q.   Do you have any -- outside of your experience with CLF, do you have any experience with permitting under an Industrial Stormwater Permit for a petroleum bulk storage terminal?

A.   Yes.

Q.   Can you explain where that is?

A.   Well, through Bioengineering Group, we handled architectural and engineering contracts for the Army Corps that involved bulk petroleum storage. Not million-gallon tanks, but multi-thousand-gallon tanks of multiple fuels.

Q.   Did you fill out the application -- I mean you, Wendi Goldsmith -- fill out any applications for an Industrial Stormwater Permit at any of these facilities?

A.   I know I reviewed them.  I don't know that I filled them out.

Q.   What experience do you have in completing permit applications for an Industrial Stormwater Permit?

A.   Um, I have a fair bit of training in the area.  And although I have not -- it was not our business line at Bioengineering Group to be handling, you know, the petroleum industry clients'

Page 26

main operations, um, I did work on a handful of Industrial Stormwater Permits where I not only filled out the paperwork, but under New York State law, my certification enabled me to essentially certify compliance for the Industrial Stormwater Permit.

Q.   And who was that for?

A.   I don't remember the client's name.

Q.   Have you ever filled out any applications for an Industrial Stormwater Permit in the State of Connecticut?

A.   I contributed to those.

Q.   Have you ever filled it out yourself?

A.   Portions of.

Q.   And what was this for?

A.   The first one I worked on in that capacity was for the South Central Connecticut Drinking Water Purification Facility.

Q.   And which permits did you complete?  Which applications?

A.   I filled out narrative material and looked at form -- you know, which boxes to check and other data to furnish related to the stormwater management system on the site and also the use of a portion of

Case 3:21-cv-00933-VDO    Document 693    Filed 09/03/25    Page 28 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 27

the site for filter system backwash treatment.

Q.    Have you ever interacted with Connecticut DEEP, CT D-E-E-P, on any industrial stormwater permitting issue?

A.    Not on industrial stormwater.

Q.    So you have no experience in negotiating industrial stormwater permitting issues with Connecticut DEEP?

MR. KILIAN:  Objection.

Q.    You can answer.

A.    Correct.

Q.    Now, have you ever designed a stormwater groundwater infiltration system?

A.    Yes.

Q.    In the State of Connecticut?

A.    In Connecticut, I have been involved on an interdisciplinary team working on that multiple times.

Q.    But have you designed one?

A.    I have not.  It is often the case that there is science, landscape, architecture, and engineering involvement, and I would be contributing to the science and the water quality treatment plant planning phases of the work.

Page 28

Q.   I think you testified earlier you're not a licensed engineer in Connecticut, correct?

A.   I am not an engineer at all.

Q.   And are you offering any engineering opinions in this case?

A.   No.

Q.   Now, how about SPCC plans; Spill, Prevention, Control and Countermeasure plans?  Have you ever certified an SPCC plan?

A.   No.

Q.   Have you ever drafted an SPCC plan yourself?

A.   I have not drafted, but I have reviewed them.

Q.   Are you an engineer that can certify an SPCC plan?

A.   No.

Q.   How about preparing a stormwater pollution prevention plan, an S-W-P-P-P or a SWPPP?  Have you ever certified a SWPPP in the State of Connecticut?

A.   Not in Connecticut.

Q.   Are you capable of certifying a SWPPP in the State of Connecticut?

A.   Not in Connecticut.

Page 29

Q.   Have you certified a SWPPP in any other state?

A.   Yes.

Q.   Which state?

A.   New York State.

Q.   And what kind of facility was that for?

A.   That was a large multi-purpose, low-intensity large area facility.

Q.   What kind of facility?

A.   It was a facility that was sort of an agricultural product aggregation facility and a farm.

Q.   But it wasn't a petroleum bulk storage facility?

A.   No, it was not.

Q.   Have you ever worked at a petroleum storage -- petroleum bulk storage facility in New York State?

A.   I mentioned having worked on former sites, and that included in New York.

Q.   By "former," meaning they were no longer operating as a bulk storage terminal?

A.   That is correct.

Q.   Were they closed?

Page 30

A.   They were in the closure process.

Q.   Do you have any expertise in operating a petroleum bulk storage terminal?

MR. KILIAN:  Objection.

A.   No.

Q.   Have you ever negotiated a consent decree with any state agency over an Industrial Stormwater Permit?

A.   No.

Q.   Dr. Goldsmith, how about the EPA?  Have you had any experience working with EPA?  Let me ask this:  Have you ever represented EPA before directly as a contractor?

A.   I have held contracts with EPA.

Q.   Who is -- what does "held contracts" mean?

A.   Well, my signature was on a contract between -- multiple contracts between Bioengineering Group and various offices of U.S. EPA.

Q.   How about with the Corps of Engineers?  Have you worked for the Corps of Engineers?

A.   Yes.

Q.   Have you ever been terminated from a project by the Corps of Engineers?

A.   One project.  They sent us a letter to

Page 31

terminate for convenience because their funding was sent to Afghanistan.

Q.    Have you ever had any conversations with Connecticut DEEP about the New Haven terminal operated and owned by the defendants?

A.    No.

Q.    Have you ever submitted correspondence to the Connecticut DEEP about the New Haven terminal owned and operated by the defendants?

A.    No.

Q.    What areas of the Clean Water Act have you worked with besides industrial stormwater?

A.    The MS4 program.

Q.    And what is the MS4 program?

A.    Under NPDES Phase II, various sized municipalities were increasingly falling under the jurisdiction of the Clean Water Act.  And what does the "MS4" stand for?  It's "Municipal Storm Sewers Separation" something.  I don't know.

Q.    Have you ever dealt with the Corps of Engineers on wetlands permitting?

A.    Yes.

Q.    Have you ever worked on wetlands permitting in Connecticut?

Page 32

A.    Yes.

Q.    For who?

A.    Most recently, for the City of New Haven.

Q.    And what is that project?

A.    On the Mill River; the Mill River Greenway project.

Q.    And what did you do on that project?

A.    I contributed to revegetation and stabilization of the river banks in the Greenway corridor adjacent to the river where a new publicly accessible trail was being developed.

Q.    And is that project completed?

A.    To my knowledge, it's completed.

Q.    And when was it completed?

A.    The portions that I had direct visibility into were completed I think in 2019.

Q.    Have you ever designed secondary containment for an industrial stormwater SWPPP?

A.    Um, I'm pondering whether the parameters of a couple of my projects fit that, but I think the answer is "Maybe."

Q.    Have you ever designed secondary containment structures in the State of Connecticut?

A.    No.

Page 33

Q.   Do you have any experience with construction stormwater permitting?

A.   Yes.

Q.   What projects did you work on there?

A.   Many projects for state agencies, municipalities, federal agencies.

Q.   Have you ever been to a petroleum bulk storage terminal when it was raining?

A.   Not inside the terminals when it was raining there.

Q.   Not inside the boundaries of the facility?

A.   Correct.

Q.   How about your hazardous waste experience? Tell us about that.

A.   I have experience working on project sites that had legacy or recent contamination issues.  And I have worked on any projects in multiple states related to RCRA and CERCLA jurisdiction, many Superfund projects as well.

Q.   And what do you do on those projects, generally?

A.   My involvement in the projects usually has had to do with the final phases of clean-up and closure and stabilization, including many times

Page 34

final site stormwater management decisions and implementation.

Q.   Have you done a lot of restoration projects, Dr. Goldsmith?

A.   Yes, very many.

Q.   Would that be considered your main area that you focused on over the years?  Restoration?

A.   Many restoration projects, many proactive green infrastructure projects as well.

Q.   What would be an example of a proactive green project?

A.   A proactive green infrastructure project might be using a vegetative stormwater quality basin and other treatment train measures at the municipal scale to treat regional stormwater quality and quantity issues.

Q.   Are you offering any opinions on hazardous waste management in this case?

A.   Not related to hazardous waste management, per se.

Q.   Are you offering any opinions in this case that involve hazardous waste?

A.   Yes.

Q.   And what are those?

Page 35

A.    In particular, I think Opinion 10 speaks about some contaminant pathways and receptors at the terminal facility.

Q.    And what is your opinion?

A.    I speak to the availability of different coastal storm damage effects to contribute to release and dispersal of contaminants affecting known habitats and different aspects of community -- nearby communities.

Q.    Did you conduct any surface water flow studies to see how any dispersal might affect the ecological resources?

A.    I did not conduct modeling.  However, I did conduct preliminary visual observation of site conditions and surface water features and some desktop understanding of the terrain and drainage features and natural channel features in the area. And I reviewed other expert reports prepared in this matter on behalf of CLF.

Q.    I meant, what did you do.  So you said you did not do any modeling of potential contaminant movement to these ecological resources.

A.    Correct.  That was done by others.

Q.    Did you collect any data on stormwater for

Case 3:21-cv-00933-VDO  Document 693  Filed 09/03/25  Page 37 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 36

the New Haven terminal owned and operated by defendants?

A.   I did not collect any data, but I reviewed many different documents containing stormwater data that had been collected primarily by the defendants and their contractors.

Q.   Are you HAZWOPER certified?

A.   No.

Q.   Do you have any firsthand knowledge on how the New Haven terminal owned and operated by the defendants creates any hazardous waste?

A.   I have read a lot of documents that I identify different known -- different known contaminants onsite.

Q.   When you were at the site, did you actually observe any hazardous waste management activities?

A.   Well, there were many large tanks full of bulk petroleum products and ancillary chemical additives and what not.  And there were also, you know, stormwater -- an oil/water separator device. I definitely peered in and had a good whiff of that. And I read a number of reports about the legacy contaminants within different areas of the site, including some reportable incidents where spills and

Case 3:21-cv-00933-VDO    Document 693    Filed 09/03/25    Page 38 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37

general presence of contaminants had been identified and reported.

Q.   And that's in your report?

A.   I know I referred generally to the presence of contaminated sediment, soil and groundwater in different areas of the site.

Q.   Did you actually conduct any test of soil at the New Haven terminal?

A.   No.  I didn't have my trusty shovel with me.

Q.   Did you conduct any samples of stormwater at the New Haven terminal?

A.   No.

Q.   Did you take any samples of groundwater at the New Haven terminal?

A.   No.

Q.   Did you take any samples of soil sediment -- river sediment?

A.   No.

Q.   Did you conduct any samples of pool water?

A.   No.

Q.   Do you offer any opinions that the defendants violated any section of RCRA?

A.   I believe that my Opinion No. 10 speaks to

Page 38

the potential for a large spill to affect sensitive receptors.

Q.   So it's the potential spill.

A.   Well, I also just spoke about the fact that there have been different reportable incidents, records on which I have reviewed.

Q.   Are you offering any opinion that there is a current violation of RCRA at the New Haven terminal?

A.   I formed a process, source and dispersal mechanism-based opinion.

I think the question you asked me is a legal question.

Q.   Did you say that you are offering an opinion on a current violation of the RCRA?  Are you offering one in your report?

MR. KILIAN:  Objection.

A.   I believe that the opinion describes the nature of contaminants present onsite today and the recognized and foreseeable risk of a future major release.  And I described what might cause that and what receptors would be on the receiving end.

Q.   And what were those source locations that you identified in your report?

Page 39

A.    Well, inside and outside of the secondary containment areas a subsurface contamination has been identified at various times by the terminal owners and their consultants.  And of course, all of the bulk petroleum and ancillary additives and so forth themselves, when there is an incident, become a hazardous and toxic release.

Q.    Do you know of any current spills or releases that you allege are violations of RCRA?

MR. KILIAN:  Objection.

A.    I am aware that there is legacy contamination throughout the site, as is typical of industrial sites of its vintage.

Q.    Are you saying that those current conditions or the legacy conditions are violations of RCRA?

A.    I believe you're asking me a legal question that I'm not sure of the answer to.

Q.    So you're not offering any opinion that the legacy conditions are a violation of RCRA?

MR. KILIAN:  Objection.

A.    My view is that the exposure to coastal storm damage poses a foreseeable risk of such materials becoming released, resuspended, otherwise

Page 40

entering the dispersal processes that would be very active in that area during a major coastal storm event.

Q.   Did you do any modeling to understand how far they would migrate, those substances?

A.   I did not do modeling, as I mentioned earlier.

Q.   And you're not saying there are current conditions.  It would be the conditions from a failure of a tank?

MR. KILIAN:  Objection.

A.   I cited that there are mechanisms such as through the breach of a berm, where concentrated flow could easily suspend, infiltrate, and otherwise entrain different contaminants.  I do believe there is, um, ongoing infiltration with no pretreatment into known contaminated areas onsite, which I know is a violation of a stormwater permit in the State of Connecticut.

I don't know exactly how RCRA governs that particular issue.  That was not a main focus area of my scope.  But I am clarifying that it's not only in the event of a tank leak; that there is other contaminant -- there's other contaminated material

Page 41

onsite that could become -- get moved around in a major storm event.

Q.   Is the presence of contaminants at the site a violation of the Industrial Stormwater Permit for the New Haven terminal?

MR. KILIAN:  Objection.

A.   No.  I believe the Industrial General Permit contemplates the reality that many sites have legacy contamination, and that's, in itself, not a violation, as I understand it.

Q.   And what's the violation you're alleging for this issue?

MR. KILIAN:  Objection.

A.   I understand that the Industrial General Permit calls for the avoidance of infiltration into areas with known contaminants in order to prevent further migration of those contaminants, as well as any that are otherwise included in the stormwater itself.

And also, in general, the stormwater must be treated before it's infiltrated anywhere, although Connecticut is increasingly proactive about encouraging that when the stormwater has been treated sufficiently and the ground conditions can

Page 42

infiltrate materials without exposing stormwater --
infiltrated stormwater to contaminants, that
actually, infiltration is a favored practice.

Q.    Is it your opinion that all stormwater must
be treated before it can be discharged to a site?

A.    It is my opinion that the plain language of
the permit says that stormwater cannot be
infiltrated until it has received some pretreatment.

Q.    Do you have a regulatory site for the
permit for that?

A.    Not memorized, but I'd be glad to look at
the document.

Q.    Okay.

      Have you ever worked for any of the
defendants here, Triton Terminailing?

A.    No, I don't believe so.

Q.    Have you worked for Equilon Enterprises?

A.    No.

Q.    How about Motiva?

A.    No.

Q.    And Dr. Goldsmith, I think you understand
Shell is not a defendant in this case?

A.    I do.  I actually had meant to clarify with
you in my report and in my speech today, I prefer

Case 3:21-cv-00933-VDO Document 693 Filed 09/03/25 Page 44 of 292

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 43

just to refer to, you know, the defendant by the branded name that's all over the site of "Shell."

Q.   Have you ever worked for Chevron?

A.   Possibly, as I outlined earlier.

Q.   I mean you; not Bioengineering.

A.   No.

Q.   Have you ever worked for Exxon personally?

A.   No.

Q.   And I think you testified -- I'm sorry -- but you have not worked for Motiva?

A.   Correct.

Q.   What projects have you worked on in the State of Connecticut?

A.   The Southeast Regional Water Purification Facility at the New Haven/Hampton line.  The Stamford Mill River Restoration Plan.  Multiple projects for the Connecticut Department of Transportation.

Q.   In these projects, you're not offering any engineering analysis, correct?

A.   Not performed by me, as I am not an engineer.

Q.   As an expert witness, when I mean "you," I mean you, Wendi Goldsmith.

Page 44

Now, do you have any employees in any of your companies?

A.   Not since 2014/'15.

Q.   What's the last time you've interacted with Connecticut DEEP about any matter?

A.   Well, it's been at least a decade.

Q.   And never involving industrial stormwater?

A.   Well, the Connecticut Drinking Water Facility actually had an Industrial Stormwater Permit.

Q.   Were you involved with that permitting?

A.   Yes.  I mentioned that I provided some of the narrative and, you know, was involved in scoping the stormwater management and process water management for that facility.

Q.   Did you do a climate change vulnerability risk assessment for that project?

A.   There was a consideration of climate issues for that facility.  And there was an effort made to retain, infiltrate and basically steward all the precipitation that fell on the site and also to use the backflush water for filter cleaning beneficially onsite.

And the entire facility was chosen because

Page 45

of its disaster-resilient, low-carbon approach to being fed by gravity and having the multiple steps in the water treatment process powered essentially by gravity instead of by operating pumps.

Q.   Let's talk about your visits to the New Haven terminal owned and operated by defendants.

How many times have you been to that terminal?

A.   I believe I've been inside of the terminal on two occasions.

Q.   So on two occasions?

A.   Uh-hum.

Q.   So do you remember when your first time was there?

A.   No.

Q.   Who did you meet for the terminal?

A.   I believe Mike Sullivan led the tour both times.

Q.   Did he answer questions that you asked?

A.   He answered questions that the group of people had.  I probably had a question or two, but I don't recall what they were.

Q.   Did he ever refuse to answer any questions?

A.   I don't recall him refusing.  I do remember

Page 46

he pondered how to reply in many cases.  I was

trying to also recall which facility that that would

have occurred on.

Q.    How many times have you been to the

facility in New Haven?

A.    Two.

Q.    Two, okay.

A.    But I will only mention it's a little hard

to remember when a particular exchange may have

happened at New Haven versus another facility with

the same person.

Q.    Did you walk the New Haven facility both

times?

A.    Yes, I did.

Q.    Did you take any pictures?

A.    Yes, I did.

Q.    And have you produced those pictures?

A.    Yes, promptly upon request.

Q.    Did you take any notes of your site

inspection?

A.    No.

Q.    Why not?

A.    I am a very visual person.  And for me, the

visual observations are my best way to devote my

Page 47

attention on a site visit.

Q. And you're aware that the court gave CLF permission to sample at the terminal. Did you collect any water samples at the New Haven terminal?

A. No, I did not do that.

Q. Why didn't you do that?

A. On the occasions when I do some kind of sampling, it gets really expensive to try to do sampling, especially if it's first flush sampling and, you know...

Q. So it's because it costs a lot of money?

A. Proximity to the site, availability; things like that. I wasn't asked even about doing that.

Q. How about soil samples?

A. I did no sampling on the site, as I said earlier.

Q. Did you sample stormwater at all?

A. No.

Q. And I think you didn't test any groundwater either, correct?

A. Correct.

Q. Did you do any soil permeability test?

A. I did not test anything, but I reviewed test data that was part of the defendants' records

Page 48

and reports.

Q.   But just to be clear, you didn't sample any soil on any secondary containment?

A.   Correct.

Q.   Did you sample -- did you determine soil permeability on the base of any secondary containment?

A.   I made no formal determination about the permeability.

Q.   Did you measure the height of the secondary containments at any location?

A.   I did not perform a survey or stretch out a measuring tape.

Q.   Did you measure the slope of any secondary containment at the site, at the New Haven terminal?

A.   Not through any measuring device.

Q.   Did you actually sample the water in the oil/water separator?

A.   Nothing more than the aroma test.

Q.   Did you sample any solids in the oil/water separator?

A.   No.

Q.   Do you know if any other CLF experts while you were on that site visit conducted any samples?

Page 49

A.    Not that I recall.

Q.    Have you ever taken samples at any other terminal in the New Haven Harbor?

A.    Not at the terminal.

Q.    How about any other terminal other than the New Haven terminal owned by defendants?

A.    I have never conducted any sampling inside the fence at any terminal.

Q.    Have you ever sampled stormwater flowing off of a terminal in New Haven?

A.    Yes, I have.

Q.    And which one was that at?

A.    Um, I have taken samples flowing under Water Street, in front of the Gulf terminal and discharging into the -- essentially under the Quinnipiac Bridge, roughly in the alignment of Water Street, which contained multiple facilities, stormwater discharges.

Q.    And what were the results of those tests?

A.    They weren't great.  They were also done during dry weather; not during an optimal first flush condition, as is standard.

Q.    What do you mean by "not great"?

A.    Well, when you are able to capture the

Page 50

first flush of stormwater, which is considered the appropriate method for verifying the presence of significant contaminants that have accumulated over time in the period between rainfall events, where the rainfall will sweep them off and into the storm sewer system, I was able to be onsite roughly a day after an event and expected that there might be some sign -- like, in other words, if I found that the water quality was pure as the driven snow, I would not expect to find high contaminant levels in a first flush scenario.

So what I saw was not great.  It was not, perhaps unsurprisingly, as pure as the driven snow, but it was not enough to be a reportable exceedance.

Q.   So you didn't identify any reportable exceedance of the stormwater sample you took at the Gulf facility?

A.   Correct.

Q.   What lab did you send your results to?

A.   I forget which lab those went to.

Q.   Did you follow all EPA protocols in conducting that stormwater sample?

A.   I did in terms of chain of custody, but I did not follow the first flush protocol, as I

Page 51

outlined.

Q.   Is that a one-time event when you collected samples from an operating petroleum fuel storage terminal?

A.   Yeah.  I did a little series of samples on the course of one day.

Q.   At that location?

A.   Yes.

Q.   Have you ever collected samples of stormwater running off of the New Haven terminal owned and operated by defendants?

A.   No, I have not.

Q.   Why not, Dr. Goldsmith?

A.   Um, it's never been part of a scope I've been asked to initiate.

Q.   Okay.  Do you know what product is stored at the New Haven terminal?

A.   Petroleum.

Q.   Do you know what types of petroleum?

A.   Yes.  I know they have jet fuel gasoline and heating oil diesel.

Q.   Do you know any other substances they store at the facility?

A.   Various blending and additive components.

Page 52

Q.   Do you know how many tanks exist at the New Haven terminal?

A.   Off the top of my head, no.

Q.   Who is the permitee for the New Haven terminal?

A.   I think it's Motiva, but I tend to put all of the names under the Shell brand in my memory.

Q.   Do you know if any storms have affected the New Haven terminal?

A.   Yes.

Q.   Which storms?

A.   Well, Hurricane Sandy was a major storm, which fortunately hit New Haven at low tide, so it had certain components of precipitation and wind. And unlike Bridgeport, New York City and other points further to the west and south, it had less of -- you know, less of a direct hit combined with high tide.  I know that Hurricane Irene, there was flooding reported at the terminal.  And contaminants were a part of that report.

Q.   Do you know of any damage to the New Haven terminal -- damage to any of the tanks from any prior adverse weather events?

A.   Not at the New Haven terminal that I'm

Page 53

aware of from storm damage.

Q.   Do you know if the New Haven terminal has ever exceeded any of the water quality thresholds in its Industrial Stormwater Permit?

A.   I don't -- there have been a lot of permits over the years, and I look at a lot of different permits for a lot of different sites, so I don't think I'm going to be able to offer you an answer from memory.

Q.   You're not offering that opinion in your report, correct?

A.   I think that's correct.

Q.   Do you know if the terminal conducts training for stormwater management?

A.   I know that there is a line in their SWPPP that says they do.

Q.   Do you have any evidence they don't do training at the New Haven terminal on stormwater management?

A.   Well, I mentioned earlier that there's a lot of infiltration without treatment that is evident onsite.

Q.   Do you know if the terminal conducts training on stormwater management at the New Haven

Page 54

terminal?

MR. KILIAN:  Objection.

A.   I know that the training is discussed.  I have no knowledge of what the curriculum is.

Q.   Do you know if Connecticut DEEP has ever inspected the New Haven terminal?

A.   I know that there have been various occasions where personnel from DEEP have been at the facility.

Q.   Have they ever issued a notice of violation to defendants about stormwater?

MR. KILIAN:  Objection.

A.   Um, I don't believe they've done that in recent years.

Q.   Have you reviewed the Connecticut DEEP files on the New Haven terminal?

A.   I don't believe I've seen any files that were sourced from Connecticut DEEP directly.  I have read a number of files that include correspondence with Connecticut DEEP from the defendant.

Q.   Has EPA ever issued a notice of violation to the New Haven terminal for industrial stormwater?

MR. KILIAN:  Objection.

A.   I don't know.

Page 55

Q.   Has Connecticut DEEP ever cited the terminal for noncompliance?

MR. KILIAN:  Objection.

A.   I don't recall.

Q.   How about OSHA?  Has it ever cited the New Haven terminal for any violations of OSHA?

MR. KILIAN:  Objection.

A.   I don't recall seeing any OSHA-related correspondence.

Q.   How about the Coast Guard?  Have they ever issued a notice of noncompliance to the New Haven terminal?

MR. KILIAN:  Objection.

A.   I don't recall seeing any.

Q.   Has Connecticut DEEP ever asked the terminal to do a climate change vulnerability analysis?

MR. KILIAN:  Objection.

A.   I don't believe that Connecticut DEEP made mention of that in any emails or other correspondence I reviewed.

Q.   Has Connecticut DEEP ever asked the New Haven terminal to change any of its practices or procedures involving stormwater at the New Haven

Case 3:21-cv-00933-VDO    Document 693    Filed 09/03/25    Page 57 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 56

terminal?

          MR. KILIAN:  Objection.

     A.    Not that I'm aware of.

     Q.    Did you ever FOIA EPA to see if its files contained any request?

     A.    No, I have not FOIA'd any information about the terminal.

     Q.    When were you first contacted to work on the New Haven terminal owned and operated by defendants?

     A.    Without looking at my records, I don't know.  And I know I looked at my records relatively recently for my report, but I don't recall the number I typed in.

     Q.    Who called you?

     A.    I'm not sure.

     Q.    Do you have a list of all the documents that CLF has provided to you to review?

     A.    Um, I don't think I have a specific list.

     Q.    In your role in this case, have you actually collected any information on increased precipitation at the New Haven terminal?

     A.    I have not sought or received information on that topic related specifically to the terminal,

Page 57

but I am familiar with some of the regional

precipitation data and trends in that information.

Q.    Have you ever collected information on what

rising sea level is occurring at the New Haven

terminal site itself?

A.    Collecting data or being familiar with the

collected data?

Q.    Have you measured any sea level rise

increase at the New Haven terminal?

A.    I am not a buoy.

Q.    Did you ask anybody on your behalf to

collect any rising sea level information on the

terminal?

A.    No.

Q.    Do you have any information that confirms

rising sea level has affected the terminal at all as

of today?

A.    I am very familiar with how rising sea

levels in the highly permeable geologic formations

that exist around New Haven Harbor are well

recognized to be facing an increasing salinity wedge

of higher density saline water getting in under the

freshwater groundwater lens.  And given the

proximity of the facility to the harbor shoreline

Page 58

and the fact that there is a stream corridor
bisecting the site, yes, I think that there has
already been change in groundwater salinity
probable.  And it's exactly the kind -- I've been in
sites where the ecological and industrial impacts of
that kind of salinity in the subsoil conditions has
been a very real change that has occurred over the
last, in this case, 75 years since that site was
constructed for petroleum bulk storage use.

Q.   Do you know what increase in sea level rise
has actually been identified at the New Haven
terminal?

A.   Well, there are certainly many mapping
tools that are maintained by the State of
Connecticut and updated FEMA maps that speak to some
of those changes.

Q.   Do you generally believe that FEMA maps are
accurate?

A.   I think that they are fit for purpose; for
flood rate insurance decision support, which is what
they're intended for.  But I don't think they are
suitable for detailed engineering basis of design
purposes.

Q.   Did you collect any information on

Page 59

increased precipitation at the New Haven terminal?

MR. KILIAN:  Objection.

A.   I did not collect precipitation data, other than my garden rain gauge.

Q.   Did you collect any information on increased frequency of storms at the New Haven terminal?

A.   I have not collected that information.

Q.   Have you collected any aerial photos of the New Haven terminal?

A.   I have collected no photos of the terminal.

Q.   Have you actually measured groundwater elevations at the New Haven terminal?

A.   No.  But as I mentioned, I'm familiar with groundwater trends in the area.

Q.   And what are those trends?

A.   Well, the dominant sandstone materials that form the basis of the regional geology in most areas do allow salinity penetration through the granular material.

Q.   Are you offering any opinions on salinity infiltration at the New Haven terminal in your expert report?

A.   Certainly, it was not a main focus of my

Page 60

report.

Q.   Are you offering any opinions on salinity in your expert report?

A.   I might have mentioned it.

Q.   But if it's not in there, you're not offering an opinion on it?

A.   That is correct.

Q.   Who is CIRCA?  You mentioned "CIRCA."  Who is CIRCA?

A.   CIRCA is the Connecticut's state program that has developed maps, tools and other resources to assist the state in developing its resilience against -- especially climate impacts.  To become better adapted to future climate conditions.

Q.   Do you believe the CIRCA information is accurate?

A.   I believe the CIRCA information -- the information that CIRCA has developed and published has been rigorously developed and reviewed and is consistent with other available data, to the extent that it's made for comparable purposes, such as not being for flood insurance purposes.

Q.   Did you do any analysis yourself of the extent of potential flooding at the New Haven

Page 61

terminal?

A.   No, I did no modeling or anything like that.  I did consider, based on published studies and my own knowledge, of failure modes and effects that are common due to coastal storm damage and which are known to affect petroleum storage facilities, such as the terminal.

Q.   And, Dr. Goldsmith, I may have asked you this, but you haven't spoken to the EPA about the New Haven terminal, correct?

A.   Correct.

Q.   And you haven't spoken to DEEP about the terminal?

A.   Correct.

Q.   What is the role of Connecticut DEEP in regulating stormwater at the terminal?

MR. KILIAN:  Objection.

A.   Well, Connecticut DEEP is operating under delegated authority to administer the Industrial General Permit and other permits under the Clean Water Act.

Q.   So Connecticut DEEP drafted the existing Industrial Stormwater Permit for the New Haven terminal?

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 63 of 292

Wendi Goldsmith , Ph.D., PG                 August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 62

A.    Yes.  It's their permit.

Q.    Has Connecticut DEEP ever stated in writing that facilities along the coast of Connecticut should complete a climate change effects vulnerability analysis or any similar assessment of risk from climate change?

MR. KILIAN:  Objection.

A.    Well, CIRCA's reports and websites are filled with resources to make that easier.  And there's been outreach to help people understand how to deal with that.

The Connecticut Coastal Zone Management Act is an example of a very early state policy, basically requiring facilities to be on their toes about coastal hazards, including climate change as a consideration.

Q.    Has Connecticut DEEP ever stated in writing to any industrial stormwater permitee in the State of Connecticut that it required an assessment of the effects of climate change under the Industrial Stormwater Permit?

MR. KILIAN:  Objection.

A.    Well, the State of Connecticut, in their most recent version of the permit, has actually made

Page 63

that a minimum requirement.  And I don't know whether or not the State of Connecticut ever -- I don't recall seeing any record where they might have corresponded with the defendants on this matter here.  I assume they did not, but I'm not sure.

Q.   Did they make any other public statements that a climate change effects vulnerability risk assessment was required in any way?

MR. KILIAN:  Objection.

A.   Well, the Corps of Engineers --

Q.   I'm focused on Connecticut DEEP.

A.   The Corps of Engineers' study, which focused -- had a whole section focusing on Connecticut and which was carried out in consultation with Connecticut DEEP, as I understand it, definitely highlighted what risks there were and called out bulk petroleum storage facilities on New Haven Harbor, without naming this terminal specifically as a site that was one of the sites that was exposed.  But that category of critical infrastructure was called out in a 2015 NACCS study.

*Q.   My question was, has Connecticut DEEP ever stated in writing that all industrial stormwater permitees along the coast of Connecticut are

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 65 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 64

required to complete a risk assessment or effects study of climate change on their facilities?

MR. KILIAN:  Objection, overbroad, calls for hearsay, asked and answered.

Q.   I don't think you answered that question, Dr. Goldsmith.  But could you answer that question?

A.   I'm trying to even understand exactly what your question --

MR. HENDERSON:  Can you read it back, Jane?

*(Question read)

MR. KILIAN:  My objection still stands.

Q.   You can answer.

A.   So I believe that Connecticut DEEP has stated in their newly updated General Permit that those issues are required as a minimum bar.  And I also believe that the prior version of the Industrial General Permit, which is clearly a risk-based program, would require any and all risk-based factors to have been considered, which would include understanding climate-related risks and basic vulnerability assessment information pertaining to identifying sources of contaminants and other things that are clearly spelled out in the permit.

Page 65

Q.    Again, I'm just trying to get your views.

Has Connecticut DEEP ever stated in writing to any industrial permitee under the stormwater permit in Connecticut that they were required to complete an assessment of climate change effects for their facilities?

MR. KILIAN:  Objection.  Overbroad.

Q.    Go ahead.  You can answer.

A.    I believe the existence of the CIRCA program is there to help make that information available to everyone; residential, industrial, municipal alike.  Anybody who is in Connecticut operating anything has access to a set of informed tools to guide how they handle whatever needs are influenced by climate, which reaches out and touches almost everything.

Q.    Has Connecticut DEEP ever stated in writing that it wanted all industrial permitees under the stormwater permit to specifically conduct a climate change vulnerability risk assessment?

MR. KILIAN:  Objection, overbroad.

Q.    That's my question.

MR. KILIAN:  It calls for hearsay.

A.    I'm not aware of anything.

Case 3:21-cv-00933-VDO    Document 693    Filed 09/03/25    Page 67 of 292

Wendi Goldsmith , Ph.D., PG                      August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 66

Q.   Are you aware of EPA ever stating in writing that all permitees under an Industrial Stormwater Permit should complete a risk assessment or a vulnerability assessment, as you called it, of climate change on their facilities?

MR. KILIAN:  Objection.

A.   I am aware of many EPA publications that talk about coastally situated facilities with tanks and surface ponds enclosed by berms, etc., specifically in relation to wastewater treatment facilities, which are often situated and configured that way.  I don't recall seeing anything that EPA prepared about bulk petroleum storage facilities. But the tanks and open bermed areas are similar.

Q.   Are you offering any opinions that defendants should be raising the height of the terminal?

A.   I didn't really make any recommendations at all, although I attempted to synthesize some of the findings of the NACCS study and also -- which did make some recommendations for mitigation measures around New Haven Harbor, including for the petroleum storage facilities and other waterfront industrial facilities.  And I did offer my opinion that I felt

Page 67

that the nature of those recommendations was, you
know, at a planning level, appropriate for the
facility.

Q.   Are you offering any opinions in this case
that the terminal should not be permitted to have
floodwaters on it?

A.   I do believe that the provisions of the
permit about non-stormwater and run-on being
diverted and -- I forget -- without looking at the
permit, I'm not sure I remember which verbs apply to
which materials.  But I do think that there's innate
problems with having floodwaters entering any
industrial site and that the permit poses
restrictions and/or prohibitions on that.

Q.   Are you saying that it's a violation of the
Industrial Stormwater Permit if a facility floods?

A.   With any type of facility, there is always
some residual risk of something occurring that
exceeds whatever design standard has been applied.

       So the idea that the world will come to an
end if any facility floods for any purpose, from a
permitting standpoint, from a regulatory standpoint,
I don't think there's -- it all depends on what
mitigation resilience and operational measures are

Page 68

in place.

Q.   So if a facility floods, is that a violation of the Industrial Stormwater Permit in the State of Connecticut?

A.   I believe that if a facility is located in a floodplain and insufficient measures are taken to manage the way water enters and leaves the site to address the requirements of the permit, that that could pose a violation.

Q.   But the mere flooding is not a violation of the industrial stormwater permitting?

A.   I believe under certain circumstances, some flooding could occur that would potentially be considered an inevitable and reasonably managed circumstance.  I believe that having berms that are lower than the 100-year FEMA flood map are not an example of best industry practices.  And thus, they would be a violation under the permit.

Q.   So you're not offering any opinions about Shell plc, are you?

A.   Are we getting into the nomenclature issue? I don't know.  If you're parsing entities exactly, I'm not sure how to answer the question.

Q.   Are you offering any opinions on the

Page 69

corporate form of the owner/operator of the New

Haven terminal?  Like, what does Equilon mean in

terms of Shell?  Are you offering any opinions on

corporate form?

A.   No.  I think I know very little about that.

Q.   Okay, great.

I also noticed in your expert report you

did not mention the State of Connecticut stormwater

quality manual.

Are you offering any opinions on the

Connecticut stormwater quality manual?

A.   Um, I think I did get into the stormwater

quality manual a little bit in the rebuttal report.

However, I would say that the stormwater quality

manual is mostly structured to provide insight to

people who are handling less intensively industrial

sites than this one.  Sites, for example, wherein

filtrating stormwater would be favorably viewed and

not restricted by the presence of contaminants.

Q.   Is that an opinion you're offering in this

case?

A.   Um, to the extent that I believe in my

rebuttal report, I did -- if I didn't cite the

stormwater manual, I at least touched on some of the

Page 70

topics it covered.

Q.    And you didn't cite any of the reports that are called the "Shell Climate Adaptation reports"? You're not offering any opinions on those, are you?

MR. KILIAN:  Objection.

A.    I don't have direct experience with any of Shell's internal procedures or anything.

Q.    How about its reports produced in this case called, "Climate Adaptation"?

MR. KILIAN:  Objection.

A.    I don't remember which -- I may have read the reports you're referring to without knowing them by that title.

Q.    But they're not in your reports; your expert report or your rebuttal.  So you're not offering any opinions on the Shell Climate Adaptation reports, correct?

MR. KILIAN:  Objection.

A.    I don't think I had any material opinion on that.  But I may have read them and think of them with another name in mind.

MR. HENDERSON:  Dr. Goldsmith, just to make things move along faster here, I brought a copy of your reports.  Just for the record, this is going to

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 71

be marked G1, your expert report.  So that's going to be what we call G1, Dr. Goldsmith.

(Document marked as

Exhibit G1 for identification)

MR. HENDERSON:  And here is your rebuttal report that I think we'll be labeling "G2."

(Document marked as

Exhibit G2 for identification)

MR. HENDERSON:  I'm going to take some time here just to get these out, so we can go back and forth over them.

And Dr. Goldsmith, while we're labeling things, I'm going to hand you what's going to be marked G3, which is the 2018 permit.

(Document marked as

Exhibit G3 for identification)

MR. HENDERSON:  And I'm going to hand you the 2021 permit, which is going to be G4.

(Document marked as

Exhibit G4 for identification)

MR. HENDERSON:  And just to keep moving -- I think this will save us some time down the road -- G5 is going to be the -- I'll, for the record, call it the "2024 draft permit."

Page 72

(Document marked as

Exhibit G5 for identification)

MR. HENDERSON:  So for the record, Dr. Goldsmith, we have identified as Exhibit G1 your initial expert report.  We've also identified as G2 your rebuttal report.  We've identified as G3 the 2018 Industrial Stormwater Permit.  And G4 is going to be the 2021 Industrial Stormwater Permit.  And G5 is the draft Connecticut DEEP Stormwater Permit.

And, Dr. Goldsmith, if you disagree with me, let me know.  But I may refer to the 2018 permit or the '21 permit -- they're identical permits.  For the record, they're identical; the '18 and then Connecticut DEEP just reissued as '21.

So if that's acceptable, I'll call them the Industrial Stormwater Permit.  I'm pretty good about putting '18 and '21 together.  I don't want to have to go back through '21.

MR. KILIAN:  We'll stipulate that they're the same.

MR. HENDERSON:  It's the same agreement.

BY MR. HENDERSON:

Q.   If you could look at -- again, your expert reports are there if you need those.

Page 73

A.    I've got those.

Q.    On the 2018 permit, let's look at that, which is identified as Exhibit G3.

A.    So you want me to be looking at the permit?

Q.    Correct.  And you've reviewed this permit?

A.    Yes.

Q.    And you've reviewed the 2021 permit marked as G4 as well, correct?

A.    Yes.  And they looked pretty much identical to me.

Q.    They're the same sections.  Pretty much the same.

      If you could look at Section 2 of the -- we'll just stick to the 2018 permit, just to make it easy.

A.    Okay.

Q.    Section 2 in the "Definitions," it identifies a "25-year 24-hour rainfall event"; is that correct?

A.    Correct.

Q.    And it identifies a "100-year 24-hour rainfall event"?

A.    Yes, it does.

Q.    It does not mention a 500-year rainfall

Page 74

event, does it?

A.   No.   Usually the smaller scale events are important for precipitation and stormwater management themes.

Q.   But the permit doesn't mention a 500-year rainfall event, correct?

A.   No, it doesn't.

Q.   And it doesn't mention hurricanes either, does it?

A.   Does it?  I think there are some sections of the permit that do talk about -- there's some sections of the permit that are associated with other specified industries that do have some storm preparation.

Q.   Does it mention rising sea level in the 2018?

A.   Well, it talks about coastal areas and refers to a portion of the Connecticut statutes that I believe are related to the Connecticut Coastal Management Act, which does talk and has for a long time talked about rising sea levels and climate effects.

Q.   Does the permit specifically mention rising sea level in the text of the permit?

Page 75

A.    I don't think it does.

Q.    How about climate change?  Does it mention climate change anywhere in the 2018 permit?

A.    Not specifically.  But I think implicitly.

Q.    Does the 2018 permit mention specifically climate resilience?

A.    No, it doesn't.

Q.    If you could turn to the definitions of "minimize" in the 2018 permit.  Is this where you get the term "best industry practice"?

A.    Yes.

Q.    Is this the only place that it appears in the permit, 2018 permit?

A.    Well, I mean, a very big staple of the permit is implementation of control measures.  So the best industry practice that would be applied to achieve the definition of "minimize" covers a lot, even though the definition is where that through line is drawn.

Q.    So the word "minimize" means "to reduce and/or eliminate to the extent achievable."  Can you read that definition of "minimize."

A.    In quotes, "'Minimize,' for purposes of implementing control measures in Section 5(b) of

Page 76

this General Permit, means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."

Q.    So the "in light of best industry practice" applies to control measures?

A.    Uh-hum.

Q.    Does it apply to the design of the facility?

A.    Much of the facility consists of control measures for managing stormwater and containing petroleum products in a way that keeps them separate from the stormwater.

Q.    But does it specifically say that the best industry practice applies to the design of the New Haven terminal or any other terminal or other facility?

A.    Control measures categorically include things that are designed and other things that are practices.

Q.    So is it your opinion that all facilities regulated under the Industrial Stormwater Permit are required to be designed in accordance with practices

Page 77

that respond to climate change?

A.    I do believe the best industry practice has long taken into account climate change in exposed and vulnerable coastal sites, such as the terminal.

Q.    The permit does not prohibit the release of stormwater, does it?

A.    No.  It governs the conditions and requirements of stormwater releases.

Q.    And the other place it appears in the permit is in Section 5(b) of the permit?

A.    What page would that be on?

Q.    I think that's -- I have it as Section 5(b).  That is going to be Page 17 of 70.

A.    Okay, yes.

Q.    Do you know if the words "best industry practice" appear anywhere else in the permit?

A.    I'm not sure, but I know that they appear more than one place and that the control measures themselves are, you know, a substantial piece of the content.

Q.    Does the permit require all industrial permitees to conduct a climate change vulnerability risk assessment?

A.    It does not call out -- the permit itself

Page 78

is not terribly detailed about what it does include. It gives a series of examples and expects that the permitee will carry out a site-tailored plan of action memorialized in the SWPPP and executed in its daily operating efforts to -- and special conditions operational and preparedness efforts according to best industry practice.

Q.   So this permit came out in 2021 -- or the most recent version in 2021, correct?

A.   Yes.

Q.   So EPA had already issued its 2021 MSGP permit, which included climate resilience provisions, correct?

A.   Yeah, I believe that's the chronology, as I recall.

Q.   So is it your understanding that DEEP knew how to include climate resiliency provisions in this permit --

MR. KILIAN:  Objection.

Q.   -- when it was issued?

MR. KILIAN:  Objection.

A.   Well, looking at Page 18 of 70, it says under "Management of Runoff," "The permitee shall investigate the need for stormwater management or

Page 79

treatment practices that shall be used," etc., etc. And it talks about "Any evaluation, construction, or modification of the design of the stormwater drainage system requires certification by an engineer."

So they're talking about, first of all, understanding what factors shall be investigated and evaluated and constructed and modified.  So it's all about construction.  And anything including climate change would need to be -- you know, as the facility expands or contracts and changes and as the harbor is experiencing higher sea levels and more intensive frequent storms or other changing factors, these would all need to be considered.

Q.    So just to be clear, are you saying that all permitees under the Industrial Stormwater Permit of Connecticut are required to evaluate the facts of climate change on their facilities?

A.    I think it's a factor.  Now, there are different -- the Industrial General Permit covers many, many different highly distinct sectors with different challenges.  The petroleum bulk storage sector has obviously vast volumes of toxic and hazardous material onsite in liquid form that could

Page 80

be readily mobilized, among other things.

So they're going to have a different risk profile and a different set of issues to investigate and to take action, including evaluation, construction, or modification.  And, you know, somebody who's got a sawmill is going to have a different set of issues, you know, or...

Q.   I'm just trying to get a handle on, is it your opinion that all permitees under the Industrial Stormwater Permit for the State of Connecticut are required to complete a climate change vulnerability risk assessment of their facility?

A.   I believe that right here on Page 18, as it talks about -- includes the statement, "The permitee shall investigate the need for stormwater management or treatment practices that shall be used," and then it continues in that paragraph and the following two paragraphs -- that these -- yeah.  In this case, I think according to Shell's own internal practices, it recognizes that these things are, in fact, relevant and that they would be triggered for this site under the terms of this permit.

Q.   How about for other industrial stormwater permitees?  Are you saying it applies across the

Page 81

board to every industrial permitee under the stormwater permit in the State of Connecticut?

A.  Well, different industries have different best practices.  And there is a lot written on the bulk petroleum storage industry in terms of practices that are unique to that arena.

And then there are specific standards, such as the 500-year or 1000-year flood storm, as opposed to a precipitation storm.  And those are relevant for consideration for critical infrastructure facilities, of which the terminal and others like it qualify.

Q.  Still, maybe it's just me.  I did not hear an answer.

Are you saying it's required of all industrial stormwater permitees to --

A.  I haven't evaluated all types of permitees and all types of permits.  But I have for this terminal under this permit.

Q.  How would all the other industrial stormwater permitees know if it has to require -- if it's required to prepare a climate change vulnerability risk assessment for its facility?

MR. KILIAN:  Objection.

Page 82

A.   I think that many permitees listen to their consultants.  They consult with DEP and others from the regulatory standpoint to know that they're in the process of drafting something that makes it an outright requirement in the current version.  You know, that's essentially the nature of the updates to the current draft -- the 2024 draft permit.

I find that the language being added at that point as a permit requirement, as opposed to something that is perhaps more inclined to be picked up by industries that are operating at a more aware knowledge-rich leading-edge type -- you know, folks with higher risk profiles and more science and engineering personnel are going to know more.  So, you know...

Q.   So before 2024, had Connecticut DEEP ever recommended that permitees under the Industrial Stormwater Permit considered completing a climate change vulnerability risk assessment?

MR. KILIAN:  Objection.

A.   I was not privy to those conversations, but I have been at numerous meetings and conference-type events where Connecticut DEP has been aware of these issues for decades and --

Page 83

Q.   But have they -- sorry.  Go ahead.

Have they ever specifically recommended that permitees under the Industrial Stormwater Permit consider the effects of climate change under the permit?

MR. KILIAN:  Objection.

Q.   That's my question.

A.   Well, the Connecticut Coastal Management Act --

Q.   I asked for DEEP.  Has Connecticut DEEP ever stated in any document that you've reviewed before 2024 that it recommended that permitees consider completing a climate change vulnerability risk assessment?  That's my question.

A.   The permit does not contemplate all types of prescriptive requirements that are going to apply to all parties under a General Permit.  That's why it's a risk-based program.

Q.   I'm asking, have you seen any document where Connecticut DEEP has ever recommended that permitees under the Industrial Stormwater Permit in the State of Connecticut consider the climate change effects on their facility?

A.   I believe that DEEP would assume that

Page 84

others in the organization -- within the state and federal government are producing the information to fill that gap.

Q.   Again, Dr. Goldsmith, that wasn't my question.

*Do you know if DEEP has ever stated -- recommended to permitees in the State of Connecticut under the Industrial Stormwater Permit that they should consider the effect of climate change on their facilities --

*MR. KILIAN:  Objection.

*Q.   -- before 2004?

MR. KILIAN:  Sorry, objection.

A.   I know of no occasion where they've told permitees that that is not important to consider.

Q.   I didn't ask that, Dr. Goldsmith.

A.   I believe the permit references the Coastal Zone Management Act.

Q.   I didn't ask that, either.

MR. HENDERSON:  Jane, can you read the question back.

Q.   And if you can't answer it, you can't answer it.

A.   Well, I'm trying to give you the most

Page 85

specific answer.

MR. HENDERSON:  Jane, if you could just read it back.

*(Record read)

A.   I wouldn't know the answer to that.

Q.   You haven't seen any such document or email or guidance procedure --

MR. KILIAN:

Q.   -- that states that, correct?

A.   No, I haven't.

MR. KILIAN:  Doctor, I wanted to let you know -- let everybody know that -- minor importance -- go as long as you want, but lunch is here waiting for folks.  And I know we've only been going for two hours.

MR. HENDERSON:  Yeah, but we're making progress.  Why don't we do this, if it's okay.  If I could take a little break, then we come back for 30 minutes, and then we eat lunch.  How about that?

MR. KILIAN:  Sure.  Does that work for you, Wendi?

THE WITNESS:  Well, what did we get for lunch?  If it's going to get soggy --

THE VIDEOGRAPHER:  The time is 12:05.

Page 86

We're going off the record.

(Recess taken from 12:05 to 12:14)

THE VIDEOGRAPHER:  The time is 12:14.
We're back on the record.

BY MR. HENDERSON:

Q.  Good morning, Dr. Goldsmith.  We're back on
the record, as they just noted.

I asked you a question earlier, and I think
I actually used the wrong year.  I just want to make
sure I got it straight.

And the question I asked was this:  I used
"2004," and I meant "2024."  So I'll ask it again.

Do you know if DEEP has ever stated or
recommended to permitees in the State of
Connecticut, under the Industrial Stormwater Permit,
that they should consider the effect of climate
change on their facilities before 2024?  I had
mistakenly put "2004."

A.  I have no insight into the broad activities
of Connecticut DEEP.

Q.  And so you do not have any knowledge that
they've ever told permitees that they needed to
consider climate change impacts before 2024?

A.  I'm not sure how I would acquire such

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 87

knowledge.

Q.   Do you have a copy of any statement by DEEP to that effect?

A.   Not permitee-specific, no.

Q.   Do you have a copy of any emails that they've sent to permitees in the State of Connecticut requesting that they consider the effects of climate change?

A.   Not from Connecticut DEEP, but certainly from other programs in Connecticut that are very focused on that topic.

Q.   But Connecticut DEEP, who regulates industrial stormwater, has never made that request that its permitees consider climate change effects under the Industrial Stormwater Permit, correct --

MR. KILIAN:  Objection.

Q.   -- before 2024?

MR. KILIAN:  Objection.

A.   I am not aware of that, nor am I aware of them providing any statement that it is somehow separated and not a factor under the Industrial General Permit.

Q.   Do you know if Connecticut DEEP has ever requested permitees to evaluate the climate change

Page 88

effects under any version of the Industrial Stormwater Permit in the State of Connecticut?

A.   No.

Q.   So I think you have the 2018 permit in front of you.  I think it's marked Exhibit G3.

Does it ever mention the National Highway Transportation and Safety Act in the permit?

A.   Um, I have some familiarity with the Act. I honestly can't tell you if it's included in this comment or not.

Q.   Do you have any documents, copies of emails or any statements from Connecticut DEEP, that an Industrial Stormwater Permitee under the Industrial Stormwater Permit in Connecticut should consider the National Highway Traffic Safety Act in operating its facilities?

A.   Not that I recall.

Q.   Does the 2018 Industrial Stormwater Permit talk about flooding at dry docks?

A.   Um, the permit talks about very specific sectors in a lot of depth, which was not part of the scope of my assignment on this matter.

Q.   So it doesn't mention it?  Or it does mention flooding --

Page 89

A.    I am aware that probably the bulk of the Industrial General Permit goes into detail about specific subsectors, which does not include the subsector of bulk petroleum storage terminals, for some inexplicable reason.

Q.    Dr. Goldsmith, I'm going to refer you to Exhibit G5, which is the draft 2004 permit.  To your knowledge, has Connecticut DEEP ever referred to the concept of resilience or climate resilience before 2004 as part of the industrial stormwater permitting program?  Sorry, '24.

A.    I know that having discussed previously that I provided comments during the drafting of this General Permit, I am aware of the fact that this became front and center, a stated minimum requirement, to be addressed by permitees in 2024.

And I say, again, I wouldn't have visibility into each and every exchange that might have happened between Connecticut DEEP and permitees prior to that.

Q.    So this lawsuit has been going on since 2021, and there's been millions of pages of documents, and you have not seen any statement by Connecticut DEEP that permitees under the Industrial

Page 90

Stormwater should be completing a climate change vulnerability risk assessment, correct?

A.    The Industrial General Permit focuses on risks of pollutant releases and calls upon the permitees to evaluate this topic as necessary, as it pertains to their facility and industry.

Q.    I mean, has Connecticut DEEP ever used the words "climate change," and has Connecticut DEEP ever said or recommended that its permitees under the Industrial Stormwater Permit complete a climate change vulnerability risk assessment of their facilities?

MR. KILIAN:  Objection.

Q.    I just want to be clear on that point.

MR. KILIAN:  Objection.

Q.    Do you know of any statement -- have you seen any document in the millions of pages produced here where Connecticut DEEP has ever said that before 2024?

A.    I have no visibility into the broad set of communications that Connecticut DEEP has had on that topic.

Q.    And nobody's provided you with any copies of documents that Connecticut DEEP has said that,

Page 91

correct?

A.   Well, I mentioned earlier the NACCS study is one that was -- the Army Corps of Engineers worked jointly with all of the states that were within the NACCS study area.  And it is my understanding that Connecticut DEEP contributed a lot of information in the development of that, which did talk -- it actually provided a climate vulnerability assessment of the segment of New Haven Harbor and specifically named the petroleum bulk storage facilities.

Q.   And, Dr. Goldsmith, I'm just simply asking, have you seen any document from Connecticut DEEP -- an email, report, information, flyer -- where Connecticut DEEP had recommended to permitees to complete a climate change vulnerability risk assessment --

MR. KILIAN:  Objection.

Q.   -- before 2024?

MR. KILIAN:  Asked and answered.

Q.   And if you don't have a document, that's all you've got to say, is "I haven't seen a document."

A.   I have said that.

Page 92

Q.   If that's your testimony, that's acceptable.  I did not hear that.  If I didn't hear it, I just wanted to clarify it for the record.

So if you look at Exhibit G5, if you look at the Section 2, the "Definitions," the new permit -- by "new permit," I mean the draft 2024 permit -- it mentions under "Definitions" a 100-year flood, correct?

A.   Yes.

Q.   It mentions a 2-year rainfall event?

A.   Right.

Q.   It mentions a 10-year rainfall event.  And it mentions a 25-year rainfall event, correct?

A.   Yup.

Q.   It does not include a 500-year flood, does it?  In the "Definitions," it does not --

A.   That is correct, it does not do that.

Q.   Does it reference a 500-year flood anywhere in the new 2024 permit for Connecticut DEEP?

A.   It does not, but it still references "best industry practice," which in turn points to the circumstances where the 500- or 1000-year storm flooding event is relevant for certain industries and certain types of facilities.

Page 93

Q.   So Connecticut DEEP thought it was important to include the 100-year flood in the new definitions, but Connecticut DEEP did not think it was important to put the 500-year flood?

MR. KILIAN:  Objection.

A.   So the 100-year flood, as we've already discussed, is often publicly available through long-standing tradition of FEMA flood maps, which call that out.  And it's a familiar resource.  It's something that has handy-dandy online tools people can access.  It parallels the baseline of flood risk and is relevant, I would say, in every instance for people to be aware of as a general risk management perimeter.  But that doesn't resolve relevant risk considerations that are pursuant to best industry practice, which is why I've always understood through training, experience and dialogue with regulatory personnel and other professionals, that, you know, we all have to stay current.  We all have to take a lot of courses and continuing education credits and what not to remain abreast of best industry practices in our spheres of professional pursuits.

Q.   So should Connecticut DEEP have included a

Page 94

definition of a 500-year flood event?

A.   This is a General Permit that includes broad, triggering language about best industry practice and also requires certification of key documents by licensed professionals on behalf of the permitees.  And so I think it covers everything very nicely, without specifying every type of -- for instance, American Society of Civil Engineers just earlier this calendar year went from using the 500-year recurrence interval for flooding as a basis of design for critical infrastructure facilities. Now it's a 1000-year.  The beauty of the language that has long been in these Clean Water Act permits is that it allows updates and best practices to roll forward without rewriting the General Permit or attempting to do so for all of the broad industries that it is designed to cover.

Q.   If that were the case, why wouldn't they have just left it as "best industry practice" and not included the climate resilience section?

MR. KILIAN:  Objection.

A.   Well, I've noticed as a professional that there are often leaders and laggards.  And sometimes regulators get a little frustrated with the folks

Page 95

who aren't getting with the program, and they like to spell out things that are in everybody's interest.  But I'm speculating, because I don't know exactly what the DEEP folks were considering.

Q.   If you look at Section 7(C)2 in the new permit.

MR. KILIAN:  Do we have a page for that, Doug?

A.   Did you say "7(C)2"?

Q.   Yes.

A.   There's a lot of 7(C)s.

Q.   7(C)2; "Requirements for a SWPPP," S-W-P-P-P.

A.   35 I'm looking at.

Q.   I think it's Page 35.  It's the contents of a SWPPP under the new permit.

A.   Uh-hum.

Q.   Does it require now a section on "resiliency measures"?

A.   Yes, that's added there, uh-hum.

Q.   Is that a new feature of the new '24 permit?

A.   I think it's an explicit -- without comparing what the content requirements were

Wendi Goldsmith , Ph.D., PG                    August 20, 2025

Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 96

year-over-year, it's my best recollection that the resilience measures is an additional one and that it's also the only change.  But without looking side-by-side, I'm not sure.

Q.   So did the word "resiliency" appear in the 2018 permit anywhere?

A.   It may have.

Q.   But you're not sure?

A.   I'm not sure.  It was definitely not a focal point --

Q.   If you could move to Section 7(C), big D, Romanette (v).

MR. KILIAN:  Oh, boy.  Sorry, say it again, Doug?

MR. HENDERSON:  Section 7(C)(ii)(D) Romanette (v).  Resiliency measures.

A.   Are we on 41?  Where is this?  My binder clip is covering the title.

Q.   That's the right page.

A.   What is the title?

Q.   "Resiliency Measures"?

MR. KILIAN:  Romanette v?

MR. HENDERSON:  Yes.

A.   So Page 41.  It's up at the top under the

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 98 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 97

binder clip.

Q.   So is this the new section of the permit, Dr. Goldsmith, for resiliency?

A.   I'm going to take off the binder clip.

MR. KILIAN:  Can we just make sure that we're at the same page before we finally go forward?

MR. HENDERSON:  Section 7(C)(ii)(D) Romanette (v), resiliency measures.

A.   So it's at the bottom of Page 42.

MR. HENDERSON:  What is that page?

MR. KILIAN:  It's the bottom of 42 in Exhibit G5 is where it starts.

BY MR. HENDERSON:

Q.   Is this the new section that the Connecticut DEEP included in the new permit to deal with climate change?

MR. KILIAN:  Objection.

A.   Much of the Connecticut state policies and publications speak in terms of client resilience. The word "climate" doesn't even appear here in conjunction with the section on resilience measures, but it also talks about stormwater discharges from major storm events, such as hurricanes, storm surge, heavy precipitation, and flood events.

Page 98

So it doesn't necessarily in this case attribute resilience measures to anything having to do with climate change.  But it talks about climate-related events.

And certainly, the State of Connecticut acknowledges and has prepared reports and forecasted -- documented past climate change and ongoing trends in climate change.

And in their fact sheets and other documents, where they have a slightly more vernacular language use, I know that they refer to these as "climate resilience measures," although I don't see that word here.  They're just talking about "resilience measures," which are a prudent thing to attend to with or without climate change.

Q.   Is this the new section in the permit that Connecticut DEEP included to address climate change impacts under the Industrial Stormwater Permit?

MR. KILIAN:  Objection.  There's been no testimony that anything is new.

A.   What I read in the plain language on this page is that it's not even talking about climate. It's talking about resilience, which in and of itself is not directly connected to climate or

Page 99

climate change.

Q.   Okay.   Is it your opinion that this provision, Section 7(C)(ii)(2)(D)(v) was not included to address climate change in the State of Connecticut under the Industrial Stormwater Permits?

A.   I don't have an opinion.   I wasn't asked to form an opinion about it.   And I read the language, and it's noteworthy that the "climate change" phrasing is not used in conjunction with "resilience" in this.

Q.   But you're not offering an opinion about what this section means, correct?

A.   No, I'm not.

Q.   And in fact, Dr. Goldsmith, you're not offering any opinions about this new 2024 permit?

A.   That's correct, other than, as I acknowledged earlier, I was involved in commenting on it, and I was aware of some of the ongoing discussions about it.

Q.   Dr. Goldsmith, here is what will be marked Exhibit G6.   And for the record, this is a fact sheet that is labeled "3/11 draft," posted 3/27/24 up at the top.

Have you ever seen this fact sheet before?

Page 100

A.    Does this one have a date on it?

MR. HENDERSON:  So this is going to be marked as Exhibit G6.

(Document marked as Exhibit G6 for identification)

Q.   And, Dr. Goldsmith, have you seen this fact sheet before?

A.   I think so, yeah.  I haven't looked at it terribly recently.  I had not expected to be looking at it again today.

Is there any particular part we're going to look at?

Q.    Sure.  If you look on Page 10 of 34, in the middle of the page it has the requirements for the SWPPP, the Stormwater Pollution Prevention Plan.

A.    Uh-hum.

Q.    And at the very bottom, going on to Page 11, it says -- can you read that sentence, beginning with, "The resiliency measures..."

A.    Okay.  "The resiliency measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to preparing for ongoing climate changes.  The increasing temperatures, precipitation, and drought frequency

Page 101

are amid the climate impacts that currently and are projected to affect water quality and quantity in Connecticut.  Implementing structural improvements, enhanced resilient pollution prevention measures, and other mitigation measures can help minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation and flood events."

Q.   Thank you.  So the Connecticut DEEP said this provision is -- was added in response to Connecticut's commitment to prepare for ongoing climate change; is that correct?

A.   Well, it --

Q.   Is that what it says there in the fact sheet?

A.   Yes.  It's a new requirement under the program to spell out as a floor what is expected of permitees, whereas previously, there was some leeway I would observe about what was considered appropriate under best industry practice.

Q.   If you could look on Page 11 of 34.

A.   Uh-hum.

Q.   Could you read the paragraph beginning with, "This new element of the SWPPP..."

Page 102

A.   "This new element of the SWPPP is intended to identify resource gaps, promote emergency planning and identify additional processes and procedures that may need to be considered and, if necessary, employed when experiencing variable weather patterns."

Q.   Keep reading.

A.   "This section does not require nor prescribe specific SCMs or BMPs to be implemented. This section is also not intended to impede or conflict with local efforts to improve and bolster resiliency."

*Q.   So from this fact sheet, Dr. Goldsmith, is it clear that the Connecticut DEEP implemented this provision to address climate change in the Industrial Stormwater Permit?

A.   I would --

MR. KILIAN:  Objection.

THE WITNESS:  Can you read back that question?

MR. HENDERSON:  Jane, if you could.

*(Question read)

A.   Um, you had me read a sentence where they say it's the response to Connecticut's commitment to

Page 103

prepare for ongoing climate changes.

This is something that preceded this.  So this was just a more explicit step towards pointing people who may be the laggards, as I mentioned earlier, towards the resources that they may not have otherwise been...

Q.   And that's your interpretation, correct?

A.   That's my interpretation.

MR. HENDERSON:  I'm going to hand you what's going to be marked Exhibit G7, which for the record is a supplemental fact sheet from the Connecticut DEEP that was posted April 1, 2024.

(Document marked as

Exhibit G7 for identification)

Q.   Dr. Goldsmith, on this document, if you could look at Page 3 of 4.

A.   What are we looking at on 3 of 4?

Q.   Page 3 of 4, towards the middle of the section.  This is a second statement by the Connecticut DEEP.  And is this -- if you read the first sentence of Section 1.5, including the heading.

A.    "As adapted from the U.S. EPA MSGP permit, the draft IGP includes a new section, 'Corrective

Page 104

Actions,' providing consistent and concise compliance determinations (i.e., what constitutes a permit violation) and provides the permitee with a roadmap for the necessary steps to return to compliance.  This section includes built-in compliance deadlines to further specify DEEP's expectations for the type of actions that must be taken within a specific time frame and simplifies the reporting requirements for the permitee."

Q.   On Page 3 of 4 above that, is it the same language that you previously read in Exhibit G6 about -- can you read the first sentence of that paragraph, Section 1.4.

A.   "The Resiliency Measure section is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate change."

Q.   Thank you.

A.    It's pretty similar.  Is it exactly a match?  They're also saying "resiliency" in some places and "resilience" in others.  So I do see a little bit of a hash with their verbiage.

Q.   So they repeated their view that this was a new section to deal with climate change?

Page 105

A.    They say it's intended to identify resource gaps, promote emergency planning and preparedness, and identify additional processes and procedures that may need to be considered and, if necessary, employed when experiencing variable weather patterns."  So that states what their intention is. It, um...

MR. HENDERSON:  I'm going to hand you what will be marked as Exhibit G9, which is --

THE WITNESS:  We haven't gotten to G8 yet.

MR. HENDERSON:  We're going to skip G8. Here is G9.

(Document marked as

Exhibit G9 for identification)

Q.    And, Dr. Goldsmith, on Page 12 of 40, Connecticut DEEP, in the center of the page, I believe, states, yet again, that the resiliency measure is a new component.  Can you just refer to Page 12 of 40.

A.    I'm looking at it.

Q.    So this is a fact sheet that's a little more than a year later -- maybe 8, 10 months later -- by Connecticut DEEP.  And they're still describing it as a -- could you read the first

Page 106

sentence again.  I think it's the same sentence;
Page 12 of 40 in the very middle.

A.   "The Resilience Measures element is a new
component of the SWPPP and was added in response to
Connecticut's commitment to prepare for ongoing
climate changes.  The increasing temperatures,
changes in precipitation patterns, and drought
frequency are amid the climate impacts that
currently and are projected to affect water" --

Q.   Thank you.

A.   -- "currently and are projected to affect
water quality and quantity in Connecticut."

Q.   Thank you.  So it's the same statement.
Connecticut DEEP is sticking by its statement that
this is a new section to deal with climate change in
the Industrial Stormwater Permit?

MR. KILIAN:  Objection.

A.   It's a new explicit component of the SWPPP.

*Q.   At any time before this 2024 permit has
Connecticut DEEP ever stated that the prior permit
had a provision that addressed climate change?

MR. KILIAN:  Objection.

A.   Well, as we saw, the fact sheets talk about
climate change.  The language of the draft 2024

Page 107

permit that you instructed me to read doesn't

actually -- the resilience measures, they have good

practices with or without climate change.  And they

don't mention climate there.

          MR. HENDERSON:  Jane, can you just read

back my question.

              *(Question read)

          MR. KILIAN:  My objection is noted.

     A.    Um, the permit was silent on it one way or

another, other than referencing best industry

practice and requiring engineer certification of the

SWPPP, for instance.  With engineers, many of the

engineers I've worked closely with were involved

with and otherwise deeply aware of American Society

of Civil Engineers' climate change positions and

climate resilience focused standards.

     Q.    Are you a member of the American Society of

Civil Engineers?

     A.    I am not, although I have collaborated with

the organization.

     Q.    And you're not a civil engineer?

     A.    Correct.

     Q.    You have no degree in civil engineering?

     A.    Correct.

Page 108

Q.   And do you serve on any committees at the American Society of Civil Engineers?

A.   No.

MR. HENDERSON:  So we have the record, I'm going to hand you what will be marked Exhibit G10. It's the supplemental fact sheet from December of '24.  It was actually posted on 1/7/25.

(Document marked as

Exhibit G10 for identification)

Q.   And this is G10, correct?  And Dr. Goldsmith, just to be clear, this is the latest fact sheet on the 2024 permit from Connecticut DEEP.

A.   Okay.

Q.   And if you look on Page 3, where it says "New Resiliency Measures," Connecticut DEEP is standing by its statement this is a new provision intended to address climate change, correct?

MR. KILIAN:  Objection.

Q.   You can answer.

A.   Um, it's a new element in the SWPPP.  It doesn't speak to the fact that there was or wasn't any.

Q.   Does it use the words, "This was a new component of the SWPPP"?

Page 109

A.    "The Resiliency Measures section is a new component of the SWPPP," yes.

Q.    And your testimony is that it was just implied in the prior permit; the duty to complete a climate change vulnerability risk assessment?

MR. KILIAN:  Objection.

A.    Well, I think incorporating climate change considerations into any risk evaluation and general planning process, investigating and analyzing the site and its pollutant-related risks overall, yes, I think climate has been for decades a relevant factor to be considered there under the prior permit versions.

Q.    So it's your testimony that this obligation to complete a climate change vulnerability risk assessment has been implicit in the permit for how many years?

A.    Basically, I would say about 20 years.

Q.    So it's your testimony that Connecticut DEEP has had an implied obligation in its Industrial Stormwater Permit to conduct the climate change vulnerability risk assessment; is that correct?

MR. KILIAN:  Objection.

A.    Yes.  I would say that under best

Page 110

practices, that has been absolutely a factor.  I think, if anything, it's this word "resiliency" or "resilience" that is maybe one of the newer angles on this and something that is -- I'm familiar with how many trained professionals in the field find the term a little confusing or a little broad.  It's an interesting choice of words.  I don't think it's problematic, but it's novel to a lot of folks.

Q.   So your opinion is it's been an implied requirement of the permit for 25 years?  Is that what you said?

A.   I said "20."

MR. KILIAN:  Objection.

Q.   20.  But yet at no time has Connecticut DEEP ever stated it was an implied requirement of the Industrial Stormwater Permit in Connecticut, correct?

MR. KILIAN:  Objection.

A.   Um, they don't state what the best industry practice is in general.

Q.   So they reissued multiple permits in the past, and they've never mentioned climate change, even though you believe it's an implied requirement of the Connecticut Industrial Stormwater Permit,

Page 111

correct?

        MR. KILIAN:  Objection.

    Q.    So did Connecticut DEEP make a mistake and not explain that there was this implied obligation?

        MR. KILIAN:  Objection.

    A.    (No response)

    Q.    Did it ever tell its permitees that, "Hey, you might want to consider climate change?"

        MR. KILIAN:  Objection.

    Q.    Go ahead.

    A.    Industry evolved many best practices within the petroleum industry, within the critical infrastructure sector of multiple industries and also within the engineering sector, who are the folks that have to sign off and certify the SWPPP, for example.

        I think what's more notable here is that there's this reference to "resiliency measure" element in the SWPPP.  And Connecticut DEEP says here -- they say what their intent is.  Otherwise, I can't read their mind and interpret what -- I mean, I wouldn't know what they're intended.  But they're saying specifically -- and I read this earlier, both when I was requested and when I commented that they

Page 112

say right here, "This new element of the SWPPP is intended to identify resource gaps, promote emergency planning and preparedness, and identify additional processes and procedures that may need to be considered and, if necessary, employed when experiencing variable weather patterns."

So they're talking about all of these things being their intent.  They are not saying to take note that climate change is a new thing. They're not suggesting anything.  They're saying they want to identify resource gaps, promote emergency planning, and identify additional stuff.

Q.   Have you ever asked Connecticut DEEP if this best management practice includes an obligation to complete a climate change vulnerability risk assessment?

A.   No, I have not.

Q.   Why haven't you?

MR. KILIAN:  Objection.

A.   Well, first of all, Connecticut DEEP is an organization, not a person I could just send an email or have a chat with.  It's a broader organizational question.  And I mentioned earlier that I have over the years been in discussion with

Page 113

people from Connecticut DEEP and other state agencies in Connecticut and in other states and regions, and all of the issues about climate change have been on the table for decades.

Q. So if that were the case, why wouldn't DEEP include that in the definition of "minimize"? Why wouldn't it say, "You must include the duty to prepare a climate change vulnerability risk assessment under the definition of "best industry practice"?

MR. KILIAN: Objection.

A. Well, so --

Q. Why would DEEP not want to include that in there?

MR. KILIAN: Objection.

A. "This section does not require, nor prescribe specific control measures where BMP is to be implemented."

Q. I didn't ask that, Dr. Goldsmith.

A. This is a very clear watch word for what this permit, this Connecticut Industrial General Permit and other permits like it, past and current or future, you know, they aren't out there trying to contemplate and prescribe everything. They leave it

Page 114

to the judgment and some flexibility and responsibility of the permitee.

*Q.   So has DEEP ever taken an enforcement action against any company because they did not consider the effects of climate change under the Industrial Stormwater Permit?

MR. KILIAN:  Objection.

A.   I don't know the answer to that question. But I do know that there have been enforcement actions throughout the U.S. when major storms that have been associated with climate change trends have caused major releases.

The Sewaren incident would be one of them. I know there was a natural resource damage settlement in that matter, for example.

Q.   My question -- that wasn't my question.  My question is --

MR. HENDERSON:  Can you read back my question, Jane.  It's easier.

*(Question read)

MR. KILIAN:  Subject to my objection.

THE WITNESS:  And can you read back my answer?

MR. HENDERSON:  Actually, I'd rather have

Page 115

the question first, and then you can read back her answer, if she can respond.

THE WITNESS:  I believe I answered the question.

Q.   Can you answer it again, please?

MR. KILIAN:  Objection.

Q.   You can answer.

THE WITNESS:  Can you actually read back the question again?  Because I tried to answer the different elements of the question as I heard it.

MR. HENDERSON:  Sure.  Read it again.

*(Question read)

MR. KILIAN:  Subject to my objection.

A.   I'll rephrase my answer a little bit.

Q.   Do you know of any?  That was my question. Just yes or no; do you know of any?

A.   I know of many --

Q.   No.  Do you know of anything that Connecticut DEEP did to enforce the lack of a climate change?  I'm not asking about other agencies or other states or other -- I'm asking about Connecticut DEEP.

MR. KILIAN:  Objection.

A.   The enforcement actions are about --

Page 116

Q.   I'm asking about Connecticut DEEP.  The question is pretty simple.

Do you know if Connecticut DEEP has ever taken any enforcement action against any permitee under the Industrial Stormwater Permit in Connecticut for the failure to complete a climate change vulnerability risk assessment?

A.   And my answer is, in cases where such failure has, in fact, led to exposures that -- incidents that --

Q.   I'm asking about Connecticut DEEP.  I'm not asking about any other state.  Connecticut DEEP.  Do you know?  Yes or no.

A.   I'm not aware of any -- I don't know very much about Connecticut DEEP's enforcement actions from one cause or another.

Q.   Do you know if Connecticut DEEP has ever sent any document to anybody -- to any facility in the State of Connecticut saying, "We recommend you consider climate change vulnerability risk assessments"?

MR. KILIAN:  Objection, asked and answered, irrelevant, among other things.

Q.   You can respond.

Page 117

A.   I know that Connecticut DEEP has awareness of the NACCS study.

Q.   I just asked about enforcement, any document.  Have they ever said -- have they made a recommendation to any permitee in the State of Connecticut that DEEP recommended or believed one was required under the Industrial Stormwater Permit in the State of Connecticut?

MR. KILIAN:  Objection.

Q.   That's all I'm asking.

A.   I have never read through any type of tabulation of Connecticut DEEP's enforcement actions.

Q.   So in this lawsuit -- where there have been millions of pages of DEEP documents, there have been SWPPPs from other facilities -- there's not one piece of paper where DEEP has ever said that the best industry practice provision of Section 5(b) of the permit requires an assessment of climate change vulnerability risk?

MR. KILIAN:  Objection, beyond the scope.

Q.   If you know of any, please tell me.  If you don't know of any, just state that for the record.

A.   I wouldn't know.

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 119 of 292

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 118

Q.   I just asked, do you know.   That wasn't the question.   I didn't ask, "Would you know."

You can respond.

A.   Well, so the NACCS study actually talks about some spills.

Q.   I'm not asking about the NACCS study.   I'm asking about DEEP, Connecticut DEEP, the regulator in this case.   Have they made any statements to any permitee or any statements at all that the best industry practice provision of the permit requires a climate change vulnerability risk assessment, as you say it does?

A.   As I recall --

MR. KILIAN:   Objection.

A.   As I recall, the NACCS study talks about some petroleum spills.

Q.   I'm asking about Connecticut DEEP.   You keep switching --

A.   Can I please finish my answer?

Q.   You can.

A.   I can't imagine that the NACCS study would include a reference about a petroleum spill during Hurricane Sandy in Connecticut if Connecticut DEP had not filed an enforcement action.

Page 119

However, I do not know what those documents look like.  I have not seen them.

Q.   So you don't have any in your possession?

A.   No, I do not.

Q.   Okay, thanks.

So, Dr. Goldsmith, let's turn to what's been marked as Exhibit G1, your expert report.  And I'm not going to go through every page and every paragraph.

Have you reviewed your report prior to this deposition today?

A.   Not today.

Q.   I said, "prior to today."

A.   Oh, I mean, yes, I did look it over earlier this week.

Q.   You never used the word "Triton Terminailing" throughout your report.

A.   Right.

Q.   And you really only mention Equilon I think once.

So your report is not addressed at the actual permitee of the facility, is it?

MR. KILIAN:  Objection.

A.   Correct -- I think my first exposure to the

Page 120

site was a little windshield tour drive-by.  I see a "Shell" sign, and it's reflected in my photographs and in my memory as such.  And as I said early in our exchange today, I refer to, you know, the facility.  I refer to throughout my report and my testimony as the "Shell New Haven terminal" or the "terminal belonging to Shell."  And there's been other changes of ownership and other names on the permit documents.  But keeping track of the ownership structure was not my focus area.  So I've referred to it with the branded name "Shell."

Q.   On Page 1 of your report, you talk about "The terminal is unprepared for impending foreseeable hazards."  Do you see that?  It's sort of in the middle of the page.

A.   No, I'm not --

Q.   Page 1, almost directly in the middle of the page.

A.   Oh.  Right under the word "kill"?

Q.   No.  It's under "300,000 gallons of diesel fuel."

A.   Yeah, okay.

Q.   In your expert report, you never even mentioned the Business Continuity Plan for the

Page 121

facility, did you?

A.   I don't know that I referred to the Business Continuity Plan.  I think --

Q.   Did you refer to the Facility Response Plan?

A.   I think there's the FRP.  At one point it was referred to as an "ERAP."

Q.   But you didn't offer opinions on whether or not that plan was a good plan or a bad plan, did you?

MR. KILIAN:  Objection.

A.   I think I had some comments -- essentially my finding of that was that there were some components -- I've looked at many versions of those documents over the years.  Some of the more recent versions I found to be very broad brush, not a lot of detail, and I was not terribly persuaded in their -- of their quality.

The other documents, I thought that they had some -- they hit some of the high points in operational preparedness, but that's a necessary component; not sufficient to address all the risks that I observed to be present, as detailed in my report.

Page 122

Q.   In your initial report identified as "G1" and your rebuttal report, you don't offer any opinions on the tank stability or tank structural status at all, do you?

A.   No, I did not offer any engineering assessment of the tanks.

Q.   So you don't know if the tanks would withstand a hurricane or not, do you?  And you're not offering any opinions to that effect?

MR. KILIAN:  Objection, compound.

A.   I provided discussion in my -- in the formulation of my opinions about the different failure modes that are common and specific with water-borne debris carried during storm events on storm surge or overtopping waves.

And while not attempting to provide an engineering analysis of what impact that would have and what damage that could cause, I did highlight that it's been observed.

I cited published literature that caused that kind of water-borne debris as a cause of tank damage.  I think I mentioned that that was understood to be the source of damage at the Sewaren facility that caused that major spill during

Page 123

Hurricane Sandy.  But I didn't attempt to -- I haven't seen anybody perform an engineering calculation on that matter.

Q.   My question was, you're not offering any opinions on the structural stability of the tanks at the New Haven terminal owned and operated by the defendants in this case.  Yes or no.

A.   Yes, I am not.

Q.   Okay, so you are not offering opinions --

A.   Right.

Q.   -- on the tanks' structural stability, correct?

A.   Correct.  I did touch on the exposure to certain hazards, to which I have already stated that I have seen no other analysis to the contrary.

Q.   So if there is a hurricane at the New Haven terminal, you did not know and you do not have an opinion on whether it would damage the tanks at the New Haven terminal?

A.   I have written that --

Q.   I'm just asking about, are you offering that in your report?  I did not see it.  I'm just confirming you're not offering an opinion in your report.

Page 124

A.   I mentioned the kind of damage that could affect tanks, pipes, valves --

Q.   I'm not asking about theoretical.  I'm asking about these particular tanks.  You're not offering any opinion that the tanks that actually exist at the New Haven terminal are going to fail during a hurricane?

MR. KILIAN:  Objection.

A.   I performed no engineering analysis of the tanks, nor test, etc..

Q.   And you're not offering any opinion that they are going to fail at -- the specific tanks, that they will fail at the New Haven terminal during a hurricane?

A.   I don't even think that that's something that anybody does.  They don't look at a tank and say, "It's going to fail," right?  There's always some probability or some risk of failure.  And I did in my report provide some detail about the relative order of magnitude of different forces that might cause failure of tanks or other equipment.  And I discuss the fact that there were no measures in place that would mitigate such risks.  But I didn't provide a detailed analysis and certainly not of the

Page 125

tanks.  But I did discuss different failure modes and effects that are published in the literature and appeared evident --

Q.   But you don't know if they exist for the actual tanks at the New Haven terminal?

A.   There was no tank-specific analysis that I performed on that.  But I discussed qualitatively the existence of that potential risk.

Q.   Do you even know what caused the release at Sewaren?

A.   I've seen a couple of different things that characterize it as a "buckled tank."

Q.   Do you know why the tank buckled?

A.   I have not seen anything resembling a detailed forensic evaluation.  I know that there was water within the secondary containment area and that water and watery oil and oily water just all flowed out of the containment area as well.

Q.   You're not offering any opinions on what caused the tank failure at Sewaren, are you?

A.   No.  I was merely speaking to some of the things I've seen published, which are less than detailed or rigorous in their scope.

Q.   So you don't know what caused the tank

Page 126

failure at Sewaren?

A.    That is true.

Q.    So on Page 1, down towards the bottom, you use the word, "The opinions examine the terminal's lack of conformance with multiple published engineering standards."

What are those engineering standards?

A.    There is some API standards about tank spacing that I touch on.  There's some ASCE standards --

Q.    Can we just start with the API.

A.    Uh-hum.

Q.    Are you saying that the terminal has tanks that do not meet the API standards?  Yes or no. That was not included in your report.

A.    I only mentioned it because I didn't want to forget the API.

I certainly read that there was a consultant working for Shell that found that the tank spacing was inadequately separated.

Q.    But that was not an API standard.

A.    I believe it was.

Q.    As long as that's your opinion.

A.    That's my interpretation.  But mostly, I

Page 127

was focusing on the ASCE standard and the various other engineering protocols and procedures, such as the NACCS and other publications for the U.S. Army Corps of Engineers that has basically pioneered methodologies to address evaluating and mitigating coastal storm damage hazards.

Q.   You talk about your articles.  Have you ever written any article about a petroleum bulk storage facility?

A.   No.

Q.   Have you ever given any presentations on a petroleum bulk storage facility?

A.   Only about some facilities, such as major pump stations that have housed -- and border patrol stations that have housed large field volumes.

Q.   Have you ever been a tenured professor at any university?

A.   No.

MR. HENDERSON:  Dr. Goldsmith, I'm going to hand you what will be marked as Exhibit G19.  And, Jane, if you could mark this as G19.

(Document marked as

Exhibit G19 for identification)

MR. HENDERSON:  I'm going to also hand you

Page 128

what's going to be G18.

(Document marked as

Exhibit G18 for identification)

BY MR. HENDERSON:

Q.   For the record, Dr. Goldsmith, G19 is a copy of the American Society of Civil Engineers Standard 24-14.  And Exhibit 18 is a copy of the American Society of Civil Engineers 24-24.

For the record, you did not cite that one, but that is actually the current standard.

A.   Yes, they do have a tendency to change and receive updates.

Q.   And I'll just focus on the 24-14, because that's what you focused on.

If you could look at this standard, which is marked G20 -- sorry, 19.

So G19 -- first of all, I think you said you're not a member of the American Society of Civil Engineers?

A.   Correct.

Q.   You don't sit on any bodies that regulate or issue standards under the American Society of Civil Engineers.  And you're saying this is a best industry practice for operating petroleum bulk

Page 129

storage facilities?

A.   No.  It is --

Q.   What is it?

A.   So this is a consensus-derived standard. And it is -- it's a very large document that requires an understanding and site-specific analysis and consultative design inputs.  It touches, as I recall, on different aspects related to critical infrastructure, but it doesn't necessarily cover every aspect of what applies in every industry.

Q.   So if you could look at Page 19 and go to -- it's actually Page 1, but it's about 15 pages in, because the outline of the table of contents is so long.  It says, "Scope."

MR. KILIAN:  Wait.  Where are we?

MR. HENDERSON:  Page 1.

MR. KILIAN:  I was on 19.  You said 19, Page 19.

MR. HENDERSON:  No, no.  It's, like, 19 actual pages, but they start numbering at Page 1.

MR. KILIAN:  Okay.  Sorry.

BY MR. HENDERSON:

Q.   And this is the scope of the American Society of Civil Engineers Standard 24-14, which has

Page 130

now been replaced by ASCE Standard 24-24.  Look at the scope of the standard, Dr. Goldsmith.

A.    Uh-hum.

Q.    Can you read where it says, "This standard applies..."?

A.    Well, it's minimum requirements for --

Q.    No.  Can you read the sentence that begins, "This standard applies to the following:

A.    "New construction, including subsequent work to such structures and work classified as substantial improvement of an existing structure that is not a historic structure."

Q.    And beneath that paragraph, could you look at the next section, where it says, "In addition to the requirements of this section," can you keep reading that provision.

A.    It talks about, "Chapter 2 shall apply to all new construction and substantial improvements in Flood Hazard Areas and High Risk Flood Hazard Areas except those that are identified in Coastal High Hazard Areas and Coastal A Zones.

"Chapter 3 shall apply to all new construction and substantial improvements in high Risk Flood Hazard Areas.

Page 131

"Chapter 4 shall apply to all new construction and substantial improvements in High Hazard Areas and Coastal A Zones.

"And Chapters 5, 6, 7, 8 and 9 shall apply to all new construction and substantial improvements."

But I go back to the very first sentence that I began reading under "Scope," because it says it provides "...minimum requirements for flood resistant design and construction of structures that are subject to building code requirements that are located, in whole or part, in Flood Hazard Areas."

*Q.   It's your opinion that this standard applies to existing petroleum bulk storage facilities?

A.   Well, it's my position that any standard can apply to existing and new structures or features.  And that risk assessments and other evaluations, which are, in fact, called for in the permit, require a permitee to be aware of the actual risk -- not some grandfathered previous risk level -- to stay on top of it and to identify material changes and to identify corrective actions, many of which could, but they won't necessarily for

Page 132

sure, fall into a category of substantial improvements.

MR. HENDERSON:  Jane, can you read back my question.

*(Question read)

A.   Um --

Q.   First of all, is it your opinion that this applies to a facility that's 100 years old and containment is operating today?  Yes or no.

A.   Yes.  I don't have any basis for thinking that it somehow does not apply or would not apply.

Q.   Even though the standard says it applies to new construction?

A.   Yeah, new construction and substantial improvements in high-risk flood hazard areas.

Q.   Has there been any substantial improvements at the New Haven terminal?  Yes or no.

A.   From what I've seen over the years, yes, there have been substantial improvements.

Q.   Do you know what the definition of "substantial improvements" means?  Look it up. Let's flip to Page --

A.   And I know there was a corrective action prescribed that was then abandoned that definitely

Page 133

would have been --

Q.    Dr. Goldsmith, I didn't ask you about that.
Look at the definition on Page 5, "Substantial
Improvement."  This is the American Society of Civil
Engineers.  It's very precise on what they mean.

So it's your opinion, a nonmember of the
American Society of Civil Engineers, that this
applies to all facilities?  Is that what your
opinion is?

A.    "Any reconstruction, rehabilitation,
addition or other improvements to a structure, the
cost of which equals or exceeds 50 percent of its
pre-improvement market value or equals or exceeds a
smaller percentage established by the authority
having jurisdiction," which I know New Haven has a
community rating system, flood zone terms that
probably get triggered for that.

Q.    Did you determine if there had been
substantial improvement -- using this definition
under ASCE Standard 24-14, did you do an assessment
on the cost that it equals 50 percent of the
pre-improvement market value?  Yes or no.

A.    No, I didn't do that.  And also, I would
say --

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 134

Q.   So because of that, you don't know if this standard applies to the existing New Haven terminal owned and operating by the defendants in this action?

MR. KILIAN:  Objection, asked and answered.

A.   (No response)

Q.   So you don't know, do you?

A.   I mentioned that I have seen the corrective action that was prepared and abandoned by Shell. And the nature of that work did appear to trigger substantial improvement in the many jurisdictions where I have seen a detailed evaluation happen.

Q.   But there's nothing in your report that shows that you looked at the definition of "substantial" -- Page 5.  There's nothing in your report that says that you did an assessment to determine that there was a substantial improvement at the New Haven terminal that would trigger ASCE Standard 24-14, did you?

A.   I did not evaluate that.

MR. HENDERSON:  We're going to take a break for our lunch.

MR. KILIAN:  Sure.

MR. HENDERSON:  Okay, let's do that.

Page 135

THE VIDEOGRAPHER:  The time is 1:29.  We're off the record.

                    (Luncheon recess taken

                    from 1:29 to 1:57 p.m.)

Page 136

AFTERNOON SESSION

THE VIDEOGRAPHER:  The time is 1:57.  We're on the record.

BY MR. HENDERSON:

Q.  Dr. Goldsmith, I think our last exhibit was Exhibit 19, I believe, which was the American Society of Civil Engineers, 24-14.

Has this document -- well, actually, let me ask you a different question.

What industry has adopted this document as a best industry practice?

A.  Well, the civil engineering service sector supports almost every industry.

Q.  No.  My question was, What industry sector has adopted this as a best industry practice?  Is it restaurants?  Do they adopt this?

MR. KILIAN:  Objection.

A.  If they have structures, yes.

Q.  So if they're building new structures in floodplains, this is a standard they follow?

A.  That would be correct.

Q.  What companies have adopted this as a best industry practice?

A.  I don't have a lot of visibility into

Page 137

companies' adoption of anything.

Q.   Has the EPA ever cited this document as a best industry practice?

MR. KILIAN:  Objection.

A.   I would say probably, but I'm not sure.  It wouldn't be necessary either, in the sense that a lot of what EPA says in the water quality world speaks to applying relevant engineering or best industry practices.

Q.   Has CT DEEP adopted this as a best -- or cited this as a best industry practice?

MR. KILIAN:  Objection.

A.   No, other than their reference of best industry practice in the -- you know, they assume that these things speak for themselves.  That the definition of "best industry practice" speaks to standards and demonstrable utilization of certain materials, measures, principals and practices.

Q.   So, Dr. Goldsmith, we were talking about the 2018 permit.  I believe it was Exhibit G3.  It actually doesn't use the word "critical infrastructure" anywhere in that permit, does it?

A.   Um, I just want to make sure I'm thinking of the right -- no.  It doesn't describe a lot of

Page 138

things.

Q.   But does it describe "critical infrastructure"?

A.   No, not to my knowledge.  I wouldn't expect it to.

Q.   Does it impose any more stringent standards on critical infrastructure in the 2018 permit?

A.   My interpretation of the manner in which that permit invokes best industry practice for control measures would require that the subsector of critical infrastructure that includes bulk petroleum storage facilities would necessarily need to meet a higher standard than a bulk mayonnaise storage facility or a dairy processing plant, for that matter.

Q.   But the permit, itself, does not impose in any specific words a requirement that it applies to critical infrastructure?

A.   Correct.  But it would also follow, of course, that with a more rigorous risk profile for critical infrastructure facilities, that higher standards that are industry-specific would be expected.

Q.   The concept of risk profile does not

Page 139

exist -- it does not use those words.  "Risk profile" do not appear anywhere in the 2018 permit, do they?

A.   Maybe not the words "risk profile," but --

Q.   I'm asking, does it use the words "risk profile" in the 2018 permit, the words, "risk profile"?

A.   I just used the phrase "risk profile."

Q.   I didn't ask how you used it.  I asked, Does the permit use the word "risk profile"?

A.   I don't know.  It uses the word "risk" a lot.  And at its heart, it is a risk-based permit program.

Can I just point something out?  I think it's possible that these two have been reversed.

MR. KILIAN:  18 is 24-24, and 19 is 24-14.

THE WITNESS:  So it's a little counterintuitive chronologically.  That's why I just noticed it.  Sorry, I didn't mean to distract.  I thought I might have stuck it on the wrong one.

MR. HENDERSON:  I'm going to hand you what will be marked Exhibit G34.  This is in your expert report.

Page 140

(Document marked as

Exhibit G34 for identification)

BY MR. HENDERSON:

Q.    Just for the record, this is an introductory section of this report by the National Academy Press, by the National Academy of Sciences -- actually, the National Research council, called, "Responding to Changes in Sea Level."

And you've referred to this as a best industry practice, correct?

A.    I don't think I did, no.

Q.    The document identified as Exhibit G34, is this a best industry practice?

A.    I don't think so.

Q.    Why did you cite this?

A.    This was a very early formalized publication stating the linkage between changes in sea level and the engineering implications.

Q.    Does this set any best industry practice whatsoever?

A.    First of all, I believe the Corps of Engineers had a more sophisticated -- it might even be referenced in this; I forget.  But I'm familiar with the Corps of Engineers having had sea level

Page 141

rise -- sea level rise due to post-glacial rebound has been understood by geologists for, you know, at least a century, I'd say.  And the Corps of Engineers had been dealing with that on project sites, so I know that they had awareness, if not at the time of this report, possibly preceding it, I think, to my recollection.

Q.   So this is or is not a best industry practice?

A.   It certainly isn't a best industry practice today, because this is something that is rather stale and outdated.  And also, this particular document really was trying to catalogue what was the then current understanding of sea level -- what contributes to sea level rise, why is it different in different areas and so forth, what are some of the extremes of sea level rise experienced locally. But it didn't really get into factoring in future forecasts.  In 1987, it was -- people were using a calculator to do a lot of computations, but they didn't have multi-parameter modeling of future climate conditions and their effects on sea level rise.

Q.   But just to be clear, this does not include

Page 142

any best industry practices for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   Not under any of the permits we talked about under Exhibit G1 or G2 -- oh, no, those are the...  G3 and G4 I think are the 2018 and 2021 --

Q.   And you were not citing it for an example of a best industry practice, right?

A.   That is correct.  I did include several things, talking about the evolution of the science, the linkage between science and practice from a planning and engineering standpoint, and then also essentially further evolving into today's best practices.

Q.   So on Page 6 of this document, the National Research Council said, "There does not now appear to be a reason for emergency action regarding engineering structures to mitigate the effects of anticipated increases in future eustatic sea level rise."

Do you agree with that today?

A.   It's not the position today.

Q.   Did you introduce any documents to show that it was not the position today?

Page 143

A.   Um, I certainly referenced -- well, the NACCS, which I cited heavily and excerpted also quite heavily.  The NACCS absolutely developed sea level rise forecasts that included post-glacial rebound effects in the Connecticut coastal area, combined with climate change-driven sea level rise factors.  And it also addressed other issues above and beyond sea level rise, such as increasing intensity and frequency of major storms.

Q.   Again, just to make sure, this does not set a best industry practice?

A.   It did something akin to that at the time, mentioning the linkage, but it is not a reference to look to today for best industry practice.

Q.   So let's turn back to critical infrastructure.  I think you testified just previously that the 2018 permit does not use the word "critical infrastructure"?

A.   I am not aware that critical infrastructure" is a term that is in the 2018 or 2021 IGP.

Q.   And is it in the 2024 permit by Connecticut DEEP?

A.   I am not sure.

Page 144

Q.   And you're not offering any opinion that the 2024 DEEP permit covers clinical infrastructure?

A.   I offered testimony encouraging them to put it in there, because I thought it would be a useful tier to address through the IGP, rather than an industry-specific approach.

Q.   And CT DEEP rejected your proposal?

A.   "Rejected" is a strong term.

MR. KILIAN:  Objection.

Q.   They disagreed with your proposal?

MR. KILIAN:  Objection.

A.   I'm not even sure if it's in there or not. I don't believe I saw that got included when I reviewed the status.  But I haven't looked lately, such as the recent fact sheet that you brought to my attention.

Q.   Are there any provisions in the 2018 permit, 2021 permit, or the 2024 permit where CT DEEP states that this permit requires additional protection from stormwater discharges for critical infrastructure?

MR. KILIAN:  Objection.  CT DEEP has not stated anything, as there is no final permit. Everything is in draft.  And compound.

Page 145

Q.    Okay.   How about the 2018 and 2021 permit?
Have they stated anything in any words in the permit
that says that critical infrastructure requires an
additional level of precaution for stormwater
discharges?

A.    In the 2018 and 2021 Industrial General
Permits, which are largely, if not actually the
same, I'm not aware of, as I've said before, that
there's any mention of critical infrastructure.

However, there are plenty of other parallel
best industry practices that have been developed
about critical infrastructure and specifically the
bulk petroleum subsector.

Q.    And what standard is that you're referring
to?

A.    Well, there are a host of industry -- I
included a lot of the references in my report.  The
ASCE also gets into classifying certain types of
infrastructure.  I also cited some of the Army Corps
and FEMA-related practices for designing and also
inspecting and otherwise ensuring ongoing
maintenance of features such as levies or things
like the berms that, you know, function as a first
line of defense to floodwaters.

Page 146

Q.   And all of those interpretations come from your opinion on what the word "best industry practice" means?

A.   Yeah.  I think my report is pretty clear that even my gap analysis goes to understanding what is stated explicitly in the permit and then the additional analysis of what is brought to bear through the best industry practice reference.

Q.   Do you know of any consensus document by any scientific organization that states the Industrial Stormwater Permit should add additional precautions for stormwater discharges or climate change impacts to critical infrastructure?

A.   I am not aware of one, nor would there be an expectation that one would exist.

Q.   So explain the last point you made.  Why wouldn't you expect?

A.   There needs to be some analysis about the 24-hour rainstorm, for an example.  But it doesn't say whether it's acceptable to use a hand calculator or a packaged computer model.  You know, there's a lot of...  But I don't think anybody's punching in the numbers on a calculator nowadays.  And with the packaged software, there's a lot of work that gets

Page 147

done with detail and integration through that method.

Q.   So are you familiar with a 2003 -- not '23 -- but 2003 Connecticut DEEP stormwater quality manual?

A.   No.

Q.   And you're not offering any opinions about that?

A.   No.

Q.   And I think you're not offering any opinions about the updated 2023 stormwater quality manual either, correct?

A.   I've discussed that I made some contributions in 2023 to the update process.

Q.   Does the U.S. EPA's 2021 MSGP mention "critical infrastructure"?

A.   I don't recall.

Q.   Do any of the fact sheets by Connecticut DEEP about the 2024 permit mention "critical infrastructure"?

A.   I don't know.

Q.   Do you know if the Connecticut DEEP has ever issued any guidance or other documents that says critical infrastructure should implement more

Page 148

stringent measures to protect against the effects of climate change?

A.   Um, the Connecticut DEEP would not be the cognizant agency.

Q.   So it doesn't surprise you that they have not identified any special stormwater regulations that apply to critical infrastructure?

A.   Correct.

Q.   Can you identify any facility along the coast of Connecticut that has taken additional precautions for climate change that is a critical industry?

A.   Yes --

Q.   Infrastructure, sorry.

Who is it?

A.   So I know that the Bridgeport Sewage Treatment Plant has suffered damage and that various efforts were made to embark upon upgrades to that. There were a number of small tributaries along Long Island Sound on the Connecticut shore that had poorly maintained, more or less abandoned early industrial dams for water power, some of which failed, others of which met risk of failures that would have both exacerbated river corridor flooding

Page 149

and also disbursed accumulated contaminated sediments that had developed behind the dam.  So there was a lot of work to take some corrective action on those.  That was a fairly -- that was a common small project, but a lot of them in coastal Connecticut.

I know that the project to provide the storm damage protection at Long Wharf, directly across the harbor from the Shell terminal's waterfront features, that was developed initially as part of the whole process of -- that got some of the post-Sandy funding to look at improving flood measures along the harbor front there.

Q.   Were any of these projects completed because they were acquired by the State of Connecticut Industrial Stormwater Permit?

A.   I don't believe anything that I have just mentioned would fall under the Connecticut DEEP IGP. They are all non-industrial sites, to my knowledge and awareness.

Q.   Has Connecticut DEEP ever issued any guidance for critical infrastructure in the State of Connecticut?

A.   I don't know.

Page 150

Q.   And you're not relying on any in your expert report or your rebuttal report?

A.   Correct.

Q.   In fact, Connecticut DEEP does not even define the term "critical infrastructure," does it, in any of the stormwater permits?

A.   I don't believe they do.

MR. HENDERSON:  Dr. Goldsmith, this is an exhibit we're going to mark as Exhibit G26.

(Document marked as

Exhibit G26 for identification)

Q.   So, Dr. Goldsmith, have you seen this document before?

A.   Yes, I have.

Q.   And you cite this, I believe, as an example of a best industry practice in your report?

A.   Yes, I did.

Q.   And for the record, this is an EPA Region 1 recommended procedures for adaptation plans for wastewater treatment systems and sewer systems, correct?

A.   Yes.

Q.   And EPA Region 1, does that include Connecticut?

Page 151

A.   Yes.   EPA Region 1 includes Connecticut. But as we touched on earlier, under the Clean Water Act, Connecticut DEEP exercises delegated authority from a regulated standpoint.

Q.   And I think this document came out earlier this year, didn't it?

A.   I don't know when it came out.  I know it has a date, but that might be when it was accessed.

Q.   So on Page 7 of this document -- and that was how it was numbered.  I did not make that error. In fact, all the pages are numbered 7, but --

A.   Oh, no.

Q.   This all came from the internet.

A.   The internet at it again.

Q.   So if you look at this document, first of all, there's no mention of Industrial Stormwater Permitting here, correct?

A.   If you say so.

Q.   And in fact, if you look on the second page, which has the first Page 7, could you read the paragraph beginning with, "the purpose of this document..."

A.   "The purpose of this document is to assist owners and operators of wastewater treatment systems

Page 152

and/or sewer systems to develop adaptation plans as required in Region 1 NPDES permits.  The document provides recommendations and procedures for use of a free EPA tool developed specifically for water utilities.  However, as described in the permit itself, other approaches providing equivalent analysis may also be used."

Q.   So this applies to a wastewater treatment system, right?

A.   Wastewater treatment and sewer systems.

Q.   So is the New Haven terminal considered a wastewater treatment system under this document?

A.   My answer to that is, Not exactly.  Wastewater treatment plants are also considered a critical infrastructure.  They also include tankage and open impoundments holding, for instance, stormwater or secondary containment volumes, as well as wastewater treatment volumes.

Q.   Isn't this memo focused on local government wastewater treatment systems?

A.   I wouldn't say that.  It's true that in New England, the majority of wastewater treatment systems are owned and/or operated by government entities, but many are actually privately owned and

Page 153

operated.  And especially, you know, on an increasing number.

Q.   Is the New Haven terminal a sewer system?

A.   No, it's not.

Q.   This document nowhere says it's a best industry practice for Industrial Stormwater Permitting, does it?

A.   It doesn't say that, but it is --

Q.   So it doesn't say that.  You agree to that, correct?

A.   Correct.

Q.   Now, if you look on Page -- just counting pages, one, two, three, four -- sorry, it's Page 5. And it talks about steps permitees can take.  And that means permitees under wastewater treatment systems and permitees under sewer systems, correct?

A.   Yes.

Q.   Now, if you look at the examples towards the end here, Attachment A, which unfortunately is labeled "Page 12," all of the examples are local government wastewater treatment plants:  Manchester by the Sea.  And it says it's a wastewater treatment plant, Manchester Harbor.

Second example is Western Mass. - South

Page 154

Hadley Water Pollution Control System in -- is it Montague?

A.    Yeah, Montague.

Q.    So another local government.

A.    Uh-hum.

Q.    And it has resilience standards, strategies.  The Greater Augusta Utility District. That's another example.

A.    Uh-hum.

Q.    Another example is Portsmouth, New Hampshire.  And these are all in EPA Region 1.

It doesn't provide any examples of Industrial Stormwater Permitting, does it?  And it never even says that it's a best practice --

MR. KILIAN:  Objection.

Q.    -- for industrial stormwater permitting?

A.    I agree the document doesn't somehow state that it is a best practice, but it is -- it certainly states that it is offered to assist owners and operators with developing adaptation plans as required under their NPDES permits.  It also says that other approaches providing equivalent analysis may be used, but it breaks down a very stepwise procedure.  And the stepwise procedure is very

Page 155

closely assigned with other stepwise procedures that are considered best practices, which are equally relevant for a facility like the terminal or for other critical infrastructure facilities with on-ground, open containment areas and hard structures, such as large tanks storing liquids.

Q.   And that's all your interpretation, correct?  It's not written in the document anywhere?

MR. KILIAN:  Objection.

Q.   What you just said appears nowhere in this document, correct?

A.   What I said is I referred to this.  And I note that these same stepwise procedures are what is used to evaluate really any asset for its climate resilience.

Q.   So do you think the EPA knows the difference between industrial stormwater and a sewer?

A.   Well, I think that the EPA is intimately familiar that many folks with stormwater permits discharge directly into public sewers that do or do not go through wastewater treatment plants, such as the terminal in New Haven.

Q.   But do you think that the EPA knows the

Page 156

difference between a sewer and a stormwater --

industrial stormwater discharge?

        MR. KILIAN:  Objection.

   A.   I think the EPA is extremely informed on

the subject, and they're well aware of the

circumstances that greatly blur the distinction

between the two.

   Q.   So if they meant for this to apply to

Industrial Stormwater Permitees, they could have

stated that, correct?  They could have stated -- if

they wanted to apply to industrial stormwater

permitees -- like, this is addressed to permitees of

wastewater treatment plants and permitees of sewer

systems.  EPA could have said, "This applies to

industrial stormwater permitees," couldn't they, Dr.

Goldsmith?

   A.   Um --

   Q.   Just, couldn't they?  Couldn't the EPA have

said that?

        MR. KILIAN:  Objection.

   A.   Well, as a point of fact, EPA normally

spends time helping to subsidize public entities'

responses to different permit obligations.  They

tend to leave some of the private sector to their

Page 157

own devices for doing the same.

Q.   I'm talking purely about this document.

If EPA meant for it to apply to industrial stormwater permitees, it could have added that requirement to this guidance document.

MR. KILIAN:  Objection.

Q.   Isn't that correct?

A.   I'm not going to speculate about what they could or couldn't have done or would or wouldn't have done.

I was not putting this out as a tailored-to-oil-terminals document.  I was saying it's a very current example of the stepwise planning procedure for a -- New England wastewater treatment facilities, like oil terminals, are more often than not located in coastal settings, and they have various types of enclosed tankage and other open volume storage measures that are sharing common physical features.

With that in mind and knowing the similarities in the procedure, I made a reference to this, but I did not say this is somehow the required standard, nor did I attempt to suggest that it was something that EPA would view as a requirement.  In

Page 158

fact, the document, even so much as it does apply to wastewater treatment facilities and sewer systems, it even says folks could use other methods to get to the same end.

Q.   And that means folks in the wastewater treatment plant industry or the sewer industry could use other methods.  That's perfectly fine.

But it doesn't say, "And this should also be used in other industrial sectors."  And it doesn't say, "This should be a model for industrial stormwater permitees."

MR. KILIAN:  Objection, argumentative.

Q.   It doesn't say that, does it?

A.   Um --

Q.   Simple question.  Does this document --

A.   Well, I think you asked, like, three questions in that last --

Q.   The first question I asked was, If EPA meant for it to apply to industrial permitees, it could have added that in this document, correct?

MR. KILIAN:  Objection, asked and answered.

Q.   I think you testified, Yes, it could have?

MR. KILIAN:  Objection.

A.   I agree that this is -- the stated intent

Page 159

here is for wastewater treatment systems and/or
sewer systems.  And as you heard me explain, there
are some physical and geographic similarities
between the two, as well as both being classified as
"critical infrastructure" important to the community
continuity.

Q.   But again, nowhere in the 2018 stormwater
permit or the 2021 permit do they regulate petroleum
bulk storage facilities as "critical
infrastructure"?

MR. KILIAN:  Objection.

A.   I disagree with your assertion.

Q.   Can you point out in Exhibit G3 where it
uses the word "critical infrastructure" anywhere?
Can you do that right now?

A.   You worded your statement -- I do not
recall seeing "critical infrastructure" included in
that permit.  That much, I think we agree on.

What you just asserted sounded like some
kind of exclusion of critical infrastructure or as
if the permit does not, in fact, regulate any
critical infrastructure.  And that is where I would
differ.

Q.   So can you point out in the permit -- in

Page 160

the 2018 and 2021 Industrial Stormwater Permit for the State of Connecticut, can you point out here today where it states it regulates critical infrastructure?

A.   I'm not sure where the confusion is arising.  I just said I don't believe it's in there.

Q.   Are you saying that the 2018 and 2021 Industrial Stormwater Permit, by implication, regulates critical infrastructure or by inference? Are you saying that somehow the 2018 and 2021 Industrial Stormwater Permit regulates critical infrastructure in the State of Connecticut?

A.   I am saying that any industry that has -- that would fall under an Industrial General Permit -- and that could include bulk petroleum storage, a power generation plant, a waste incineration facility -- does that have its own category?  Even a hospital facility.  There are many types of equipment-rich, process-rich contaminated material handling facilities that are considered critical infrastructure facilities and which have Industrial General Permits.  I am saying that there is no exclusion.  And just like the -- I have never seen in the national critical infrastructure program

Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 161

documents any mention of Industrial General Permits

or multi-sector General Permits.  These are not

something -- these programs have never attempted to

cross-reference each other in the past, to my

knowledge.

Q.    So there's different programs that regulate

critical infrastructure that are different from the

Industrial Stormwater Permitting program?

A.    Not that regulates stormwater, no.

Q.    So let's go back to Exhibit 26, which was

the Region 1 waste treatment system and sewer system

memo.

What industry has adopted that Region 1

guidance as a best industry practice?

A.    I don't know.

Q.    What company has adopted that as a best

industry practice?

A.    I don't know.

Q.    Has EPA adopted its Region 1 guidance

document as a best industry practice for Industrial

Stormwater Permitees?

A.    I believe given that the title is "Region 1

Recommended Procedures and Resources for the

Development of Adaptation Plans for Wastewater

800.808.4958                                    770.343.9696

Page 162

Treatment Systems and/or Sewer Systems," I believe that that implies they consider it a best practice at EPA, the source and author of this.

Q. Again, EPA has never written that in this document at all. That's your interpretation, correct?

A. That is my interpretation.

Q. Okay, thank you.

And Connecticut DEEP has never incorporated this document or said it was a best practice in any way for Industrial Stormwater Permitees, correct?

A. I am not aware of Connecticut DEEP having opined on this one way or the other.

THE VIDEOGRAPHER: I'm sorry, I'm going to go off the record for ten seconds. The time is 2:37. We're off the record.

(Off the record)

THE VIDEOGRAPHER: The time is 12:38. We're back on the record.

BY MR. HENDERSON:

Q. So, Dr. Goldsmith, in your expert report you have referenced the American Society of Civil Engineers' Policy Statement 360?

A. Yes.

Page 163

MR. HENDERSON:  And unfortunately, I only see one copy here.  It looks like there's some extra pages here.  To make things easy, I'm going to remove these.  I don't have a stapler here.  I'm going to hand it to you.  It won't take long, Chris.

MR. KILIAN:  Are we marking that?

MR. HENDERSON:  Yes.  We will mark this as Exhibit G17.

MR. KILIAN:  And we only just have the one copy?

MR. HENDERSON:  That's all we've got, is the one copy.  It's only a paragraph.

MR. KILIAN:  Yeah.

(Document marked as Exhibit G17 for identification)

BY MR. HENDERSON:

Q.   So Dr. Goldsmith, are you saying this is a best industry practice?

A.   I am saying that this is actually a policy statement, and it speaks about practices, such as revising engineering design standards, codes, regulations and associated laws, conducting cooperative research and research development and demonstration to advance all this stuff, informing

Page 164

practicing engineers, project stakeholders,

policy-makers, and decision-makers --

Q.   But this is not -- sorry, go ahead.

A.   -- informing practicing engineers, project

stakeholders --

THE COURT REPORTER:  Hold on.  That's

really loud.

MR. HENDERSON:  Sorry.

Q.   Okay, go ahead.

A.   -- identifying critical infrastructure that

is most threatened by changing climate and so on.

Anyway, this statement is a policy

statement, but it frames how the science, the

policy, the role of engineers, and the significance

of critical infrastructure are reflected.

Q.   So is this a best industry practice for

petroleum bulk storage facilities?

A.   It's not a best industry practice.  It's a

policy statement that references some practices.

Q.   Just making sure it's not a best industry

practice.

A.   It speaks to what is and what's involved in

a best industry practice.  And it also definitely

speaks about critical infrastructure as well.

Page 165

Q.   But it doesn't say anywhere in this document that it is intended to be a best practice for industry, does it?

A.   So as a policy statement, one of the issues it says on Page 2 is that there's an immediate need for engineers to incorporate resilience to future climate changes into project design criteria.

It also goes on to say, "Unfortunately, current practices and rules governing such design criteria do not adequately address concerns associated with climate change, such as building codes that may have been written before and without awareness of climate change."

Q.   Does it make any recommendation that Industrial Stormwater Permits should be changed in any way?

A.   No.  But it's direct reference to changing current engineering design standards, codes and regulations, these become best practices.

So when this policy -- my first recollection of Policy Statement 360 on climate change goes back at least 20 years.

Q.   Again, just so there's no confusion at trial, you're not saying ASCE Policy Statement 360

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 166

is a best industry practice for industrial permitees under the Connecticut Industrial Stormwater Permit?

A.   I am saying that --

Q.   Can you just answer that, and then you can explain it.

A.   It is a policy statement that describes what is involved in some best practices getting established.

Q.   But it, itself, is not a best industry practice as that term is used under the 2018 or 2021 Industrial Stormwater Permit --

A.   Correct.

Q.   -- in the State of Connecticut.  Okay, great.  Thank you.

Have any companies adopted that ASCE Policy Statement 360 as a best industry practice?

A.   I have --

MR. KILIAN:  Objection.

A.   Not as a best industry practice.  We just established that it's not a best industry -- it's a policy.  So there are a number of companies and allied engineering organizations and associations that have expressed in various ways that they subscribe to this policy.

Page 167

Q.    Did you identify any of those in your expert report?

A.    No.

Q.    Now, do you know if EPA has adopted this ASCE Policy 360 as an example of a best industry practice --

A.    No.

Q.    -- for Industrial Stormwater Permitees?

A.    I am not aware that the EPA has done that. And as we just saw when we read the EPA's own document, they have disclaimers that they are not -- they say you can also do an equivalent to handle this; not just follow this particular stepwise procedure.

So I would not expect EPA to endorse any other parties' report or procedure.  At least not to single it out as the only one that is the best one.

Q.    And Connecticut DEEP has never referenced the ASCE Policy Statement 360 as relevant to any activity under the Industrial Stormwater Permitting program in the State of Connecticut, have they?

A.    I don't know of any.

MR. KILIAN:  Can we go off the record for a moment?

Page 168

MR. HENDERSON:  Sure.

THE VIDEOGRAPHER:  The time is 2:45.  We're off the record.

(Recess taken from 2:45 to 2:47)

THE VIDEOGRAPHER:  The time is 2:47.  We are back on the record.

(Document marked as Exhibit G22 for identification)

BY MR. HENDERSON:

Q.   I'm going to hand you, Dr. Goldsmith, what we will identify as Exhibit G22.  And you do not cite this in your report.  Have you seen this document before?  It's a Field Inspection and Plan Review for the New Haven terminal owned by the defendants in this case.

A.   No, I haven't seen this.

Q.   Do you know when this lawsuit was filed?

A.   Not off the top of my head.

Q.   It was filed in -- I don't remember the date -- but July 2021.

And again, just for the record, you're not offering any opinion about this document in this case, correct?

A.   I believe this was the document which was

Page 169

referenced in I believe the Kovich report and maybe others. I'm not sure of the details. And I think I made some comments about it. I don't know if it had been provided to me at the time, but I know I had not read it until seeing it right now.

Q. Do you intend to offer any opinions on this document in this case?

A. I certainly provided some comments in my rebuttal report, which I am prepared to speak to. And I'm not retracting them.

Q. So this inspection was -- there were actually two inspectors -- actually three inspectors from the EPA came and inspected the New Haven terminal. Did you know that?

A. I did not know how many.

Q. On Page 2, you can see they were inspected on December 21, 2022?

A. Uh-hum.

Q. Okay. And 3, John McKeown, McKeown, depending on how he pronounces it, Lina Takahashi, and Cayla Baughn.

A. Uh-hum.

Q. So EPA was actually at the New Haven facility and inspected the facility, including the

Page 170

SPCC plan.

A.    Uh-hum.

Q.    You are not offering any opinions that the SPCC plan is defective in any way, are you, in this case?

MR. KILIAN:  Objection.

Q.    There is none contained in your expert report?

A.    My report really focuses on the question of the stormwater permit compliance; not the spill containment aspect, although I did touch incidentally on major release of pollutants related to a spill incident.

Q.    But -- and again, this is my time to ask questions -- you are not offering any opinion that the SPCC plan is defective or does not comply with the regulations --

MR. KILIAN:  Objection.

Q.    -- in this case?

A.    I --

Q.    Do you have that opinion in your initial expert report?

A.    I believe that my expert opinions related to --

Page 171

Q.   No.  Do you mention this document in your expert report at all?

A.   No.

Q.   So in that document, you're not offering any opinions that the SPCC plan for the New Haven terminal do not comply with any requirements of the Industrial Stormwater Permitting program in the State of Connecticut?

A.   I am not suggesting -- I did not form an opinion finding anything deficient from an SPCC point of view.

Q.   Also, the EPA inspected the FRP, the Federal Response Plan.  Do you know what that is regulated under?

        MR. KILIAN:  Objection.

Q.   Do you know what an FRP is, Doctor?

A.   I think it's Facility Response Plan.

Q.   Dr. Goldsmith, do you know what an FRP is?

A.   I believe it is a Facility Response Plan.

Q.   Have you ever prepared a Facility Response Plan before?

A.   No.

Q.   So the EPA was there to inspect the facility, correct?

Page 172

A.    I believe that's --

MR. KILIAN:  Objection.

Q.    I mean, they said there were three inspectors there.  Do you have any doubt that they were inspecting the New Haven terminal, as it states on the first line?

MR. KILIAN:  Objection, irrelevant.  She's testified that she hasn't formed any opinions about this at all and has never seen it before.

MR. HENDERSON:  Well, no.  She mentioned it in her report, her rebuttal report.

A.    Because it was mentioned in the Kovich report.

Q.    As long as you're not offering opinions on this, we can move on.

A.    Well, I want to stand by what I wrote in my rebuttal report.

Q.    Okay.  And what is that opinion?

A.    Can we find that?

Q.    G2?

A.    Yeah.  I hate it when you can't do a word search on a piece of paper.  (Witness reviews document)  Okay.  So on Page 8, Kovich speaks to --

Q.    Page 8 of your rebuttal report?

Page 173

A.   Of my rebuttal report, which is G2.  That's when -- you know, I spoke to the fact that folks do some inspection to do field confirmation of things that have been represented by the permitee.  And then -- also, now that I see this particular form, it's clear that it has to do with the SPCC program -- the spill prevention control and countermeasure rule, instead of the stormwater functions.

And these are really overlapping in the case of the terminal, because basically, the majority of the site is enclosed within the secondary containment berm system.  And any precipitation that lands there is part -- for all intents and purposes, that is the stormwater basin, but it's also the spill prevention and countermeasure that's most dominant in the facility.

Q.   Again, the only opinions you have about this document are identified in your rebuttal report, correct?

A.   Well, that was what I was looking at before anyone showed me a document.  I was merely saying, as I did, that Kovich depicts the affirmative report by an EPA inspector, which I now understand is an

Page 174

inspector team of three as proof -- it's basically saying how it's proof that the terminal is in compliance with the permit.  And from this form, I can see that the -- that the -- so this is specifically just the SPCC component.  It's not -- in fact, it doesn't have anything to do with stormwater management or stormwater treatment.  So this is not something that somehow can be represented as documentation of permit compliance.

Q.   So on Page 4 of 14, the EPA concludes, "The plan is prepared in accordance with good engineering practice, including consideration of applicable industry standards and the requirements of 40 CFR, Part 112."

Do you disagree with the EPA?

A.    I think that their --

MR. KILIAN:  Sorry, what page was that?

MR. HENDERSON:  Page 4 of 14.

Q.   Again, I'm just asking you, Do you agree with the EPA when they conclude, "The plan is prepared in accordance with good engineering practice, including consideration of applicable industry standards and the requirements of 40 CFR, Part 112."  Do you agree with the EPA?  Yes or no.

Page 175

MR. KILIAN:  Objection.

A.   So as they say in the cell up above it --

Q.   No, I'm just looking at this point here, where it says "Yes" to the right-hand side.

Do you agree with that statement by EPA or do you disagree?

A.   Since I was not there at the inspection and I didn't know what they were looking at, I'm not agreeing or disagreeing with what they viewed or how they interpreted it.  But in terms of what's checked here, yes, I agree that they said that.

But just to be clear, it says it's for the date -- this is for the SPCC plan.  They're speaking about that.  They're not talking about the SWPPP, that's for sure.  So that is a different plan, designed for a different purpose.

Q.   I never said that it was.  I was just saying the SPCC.

So you don't have any basis to disagree with the EPA's statement that the plan was in accordance with good engineering practice, including consideration of applicable industry standards?

MR. KILIAN:  Objection.  That misrepresents the statement.

Page 176

Q.   You can read the statement in the record.

MR. KILIAN:  There's prefatory language to this statement that isn't about EPA making any statement.  It's a misrepresentation of the document.

A.   I would also point out that I'm less conversant with the exact programmatic language of the SPCC aspect that is operational at the terminal. But I know that this is not the same language that Connecticut DEEP uses in the IGP.  So that's another difference.

MR. HENDERSON:  So, Dr. Goldsmith, this is what's going to be identified as G25, another document that you cited in your expert reports.

(Document marked as

Exhibit G25 for identification)

Q.   Dr. Goldsmith, have you seen this document before?

A.   Yes, I have.

Q.   And did you cite this as a best industry practice for permitees under the Industrial Stormwater Permit for the State of Connecticut?

A.   Yes and no.

I was differentiating -- see, on the front

Page 177

page here, it talks about how this is related to the National Flood Insurance Program and the Flood Insurance Rate Map process, right?

Q.   Is this document a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   No.

Q.   So it's "No."  Why is it not?

A.   The FEMA firm development process is intended for setting insurance rates.  It's an excellent screening tool.  A lot of people rely on it as the only tool that exists covering their certain area.

I have presented -- and I attempted to be clear about it -- that the NACCS study provided much more detailed analysis at a much higher resolution and degree of accuracy that included future climate change effects related to flooding and storm intensity.

And so I wish to differentiate that use of FEMA maps for screening purposes is a good starting point.  But for the -- the publicly available resource that far exceeded that in terms of quality would be the NACCS study.  And last but not least,

Page 178

reports such as the Nairn modeling results closely followed the procedures outlined in the NACCS, which I expanded upon the studies carried out in the NACCS.

Q.    Are you saying the Nairn modeling report is a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.    No.  I said that it was an example of a work product that was developed based on some best management practices.

Q.    So the NACCS study --

A.    Best industry practices.

Q.    The NACCS; that's what you're referring to, correct?

A.    Uh-hum.

Q.    Has any industry adopted the NACCS study as a best industry practice?

A.    Yes.

Q.    What industry?

A.    The critical infrastructure industry as a whole.

Q.    How about the restaurant business, the restaurant industry?  Has it adopted it?

Page 179

A.   I don't imagine flooding is on the minds of most restaurant people.  I've never heard it as a topic of conversation.  And my ears perk up at the words.

Q.   How about the transportation industry?  Is it a best industry practice?

A.   The transportation industry is, especially for key nodes, absolutely part of the critical infrastructure sector.

Q.   What transportation association has said the NACCS study is a best industry practice for Industrial Stormwater Permit compliance?

A.   I'm not saying for the industrial stormwater.  You know, there's no such thing as a best industry practice for the 2018 Connecticut IGP.  You're parsing this to a level of precision that I find nonsensical.

So if your questions are that narrow, I'm not sure how we're going to clarify anything about what my opinions do or don't.

There are some material differences here.  A FEMA flood map is a common practice.  It is to be contrasted with flood modeling that accounts for climate change, sea level rise, and degrees of rigor

Page 180

and known factors of uncertainty and so forth.

Q.   I'm just trying to find out what the requirements of the permit is.  So that's why I'm asking is it a best industry practice for the petroleum bulk storage industry.  And I think you've said the FEMA policy is not a best industry practice for the petroleum bulk storage --

A.   It is --

MR. KILIAN:  Objection.

A.   I said it is a good -- it is an acceptable practice for screening level initial -- and there are references -- now I get a little confused about which versions have this in there.  But there is -- certainly Connecticut DEEP nowadays is looking at flooding -- I'm pretty sure that we're talking about flooding, including 100-year flooding, in some of the earlier permit language, all of which is inadequate for critical infrastructure protection, especially, but actually for any site-specific engineering purpose.

Q.   Does Connecticut DEEP ever say what you just said?

A.   They don't have to.  It's written all over FEMA's own program document.  There's

Page 181

correspondence --

Q.   I understand.  But as a matter for the Industrial Stormwater Permit, where in that permit does it say what you just said?

A.   Well, it requires that a qualified engineer certify --

Q.   Right.  And you've already admitted you're not one of those.  But where in the permit does it say what you just said?  That's what we're trying to figure out.

A.   Oh, I disagree.

Q.   I have -- if you could point out where what you just said is in the Industrial Stormwater Permit, that would be very helpful.

MR. KILIAN:  I'm sorry, Doug, just for clarification, where it says that best industry practice is a requirement of the control measures section of the permit?

MR. HENDERSON:  No --

MR. KILIAN:  I thought we covered that this morning.

MR. HENDERSON:  -- that this document right here that Dr. Goldsmith referenced is a best industry practice.

Page 182

MR. KILIAN:  Oh, sorry.  I was confused.

BY MR. HENDERSON:

Q.   And I'm just trying to say, What company has ever cited this in any of its SWPPPs or anything else as a best industry practice?  Where has the CT DEEP ever said this was a best industry practice?

A.   I'm not saying that -- for flood risk analysis, for the purpose of the highly political, not-very-rigorous flood insurance program, the national flood insurance program, it is the method that is approved and promulgated, although it's getting updated.

In terms of doing site-specific risk-based engineering design, it is not considered a best practice.  It is contrasted with best practices.

Q.   So let's go back to the NACCS.

A.   Uh-hum.

Q.   Have you cited any consensus policy, consensus practice by any industry group that says the best industry practice is to follow the NACCS?

A.   Well, the NACCS follows a procedure.  The NACCS is a study that performs a risk assessment of basically --

Q.   I get that.  I'm sorry to butt in, but I'm

Page 183

asking a very simple question.

You have not identified any industry association that has adopted the NACCS as a best industry practice.  If you have one in your report, if you could point it out, but I have not heard you identify any consensus industry practice, policy that adopts the NACCS as a best industry practice.

A.    Well, the U.S. Department of Defense has made use of it extensively.

Q.    I didn't say, "made use of."

I'm saying, have they identified it as a best industry practice?  That's the word from the permit.  It's not "made use of."  It's "best industry practice."

So I have not seen anything in your report that identifies any industry association that has adopted NACCS and said, "This is the best industry practice for addressing climate change for permitees."

MR. KILIAN:  I know we're only objecting to form, but I'm going to object on relevance grounds.

MR. HENDERSON:  Okay, fine.

Q.    You can go ahead and answer.  But go ahead.

A.    Um --

Page 184

Q.   If you haven't identified any, that's fine. I'm just trying to get an answer to that.

A.   I have been at numerous working meetings --

Q.   A written document.  I'm looking for a written document from any industry association that shows there's a consensus that the NACCS report is best industry practice for evaluating climate change risk.  If you can identify one of those -- you haven't identified any in your report; is that correct?

A.   No.

Q.   Can you point out in your report an industry consensus document where that industry says, "This is the best industry practice for evaluating climate change impacts"?  And if you can identify that in your report, it would be helpful.

*A.   So the NACCS is a study that employed best industry practice.

*Q.   I understand that.

*A.   It is not a best industry practice.

Q.   Okay.  I think that answers my question.

So the NACCS is not a best industry practice.

A.   It represents best industry practice.

Page 185

Q.   You just previously said it wasn't.

MR. HENDERSON:  Could you read that back, Jane.

*(Record read)

Q.   That's what you said.

A.   I said it is a study that employs --

Q.   She just read what you said.

A.   Yeah.

Q.   That's not what it said.  You're changing it from what it said.

MR. KILIAN:  No.  She said the same exact thing.

MR. HENDERSON:  Read it.  It says, It is not --

A.   There's a recipe for a soufflet, and there's a soufflet.  A recipe and a soufflet do not make equally tasty lunches.

MR. HENDERSON:  Just read it back, Jane.

I'm reading it right here.  It says, "It is not a best industry practice," is what you said.

A.   It is a study completed using the best industry practice.  It is an example of putting into practice the best industry practice.  That's why I think it's relevant, and I'm just --

Page 186

*Q.   So just to be clear, is the NACCS a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   The beauty of the NACCS is a detailed --

Q.   If you answer that, then you can explain whatever you want.

MR. HENDERSON:  If you could read the question back, Jane.

*(Question read)

A.   I feel I need to explain something.  And I sounded perhaps a little comical about --

Q.   Can you just answer that question, and then you can explain --

A.   Your question doesn't really make sense, Doug.

MR. HENDERSON:  Can you read it back one more time.  And if you think this question doesn't make sense, you can note it for the record so the jury can hear it.  Go ahead.  This is the question I asked.

*(Question read)

*A.   Yes, the results of the NACCS represent best industry practice useful to permitees throughout the State of Connecticut.

Page 187

MR. HENDERSON:  Can you read that back, Jane?

*(Answer read)

Q.   So it says, "the results of the NACCS."

A.   Uh-hum.

Q.   My question was, Was the NACCS a best industry practice.  Not the results of --

A.   So here's where I start talking about a soufflet.  There's the wonderful Julia Child's recipe for the soufflet.  There's the James Beard chef at your favorite restaurant who's baked a soufflet.  Which one do you want to eat for lunch? Which one do you want to practice and get ready to make your sweetie an amazing meal for a special event?

There is a difference.  One is a recipe; the other is the result by following the recipe. The recipe, especially if it's Julia Child's recipe, is best practice.  The soufflet is what you actually want to eat.

Q.   So are you saying -- I understand your question [sic] to be, the NACCS, itself, is not a best industry practice for permitees under the industrial Stormwater Permit of the State of

Page 188

Connecticut.

MR. KILIAN:  Objection, asked and answered.

MR. HENDERSON:  For the record, she said the results of the NACCS.

MR. KILIAN:  The transcript says what it is.  You've asked this question ten times.  Objection, asked and answered.

BY MR. HENDERSON:

Q.   So how is a permitee supposed to know this is a best industry practice under the State of Connecticut Industrial Stormwater Permit?

A.   At the time the NACCS was released, there were many organizations.  I certainly have attended dozens, if not 100, different events or meetings where people talked about the finding of the NACCS.  Frankly, it was quite eye-opening for a lot of folks to realize that flood control projects throughout the eastern seaboard had been designed based on what people at the time understood were the best available practices, but which, in hindsight, turn out to be far less effective than they've been purported to be and to be far less compatible with land use development and other expectations that had evolved over the years.

Page 189

So by going back and reassessing and saying these facilities that everybody thought were protected up to, say, 100-year storm occurrence level, that, in fact, they were in some cases less than half or less than 10 percent of that level of -- the actual risk reduction was sometimes 90 percent less than what had been presumed.  And then plans were immediately made to take corrective actions.

Q.   Do you know of any state that has said the NACCS is a best industry practice for permitees under the Industrial Stormwater -- under any Industrial Stormwater Permit?

A.   I know that for wastewater treatment facilities, the NACCS was -- the results of the NACCS were taken as best industry practice to feed into hardening and upgrades that were planned and in many cases implemented.

Q.   But you don't know of any document by the EPA or any other state that says NACCS is a best industry practice for permitees under any Industrial Stormwater Permitting program?

A.   What I know is that --

Q.   Can you answer that question, please?

Page 190

A.   If we had a copy of the NACCS, I think I could find the --

Q.   Can I just ask, do you know of any document where any state said, "We are adopting the NACCS as a best industry practice for permitees under the Industrial Stormwater Permitting program"?

A.   So it's not a best industry practice.  It is a study that implemented best industry practice and publicly made available a very well-integrated and costly set of risk assessment results and design criteria from an engineering standpoint.  Not on a site-specific basis, but getting close to that level of granularity.

EPA and most of the state agencies that are involved with regulatory oversight and emergency management were at the table as the NACCS study was getting completed.  They were at the table for a lot of the NACCS outreach events that occurred throughout 2015/'16.  And the NACCS gets discussed routinely at Engineering Society and other events.

Q.   I didn't ask that.

A.   Well, you said, How would people know it was out there.  And I would say anybody who wasn't living under a rock would be aware of it and of its

Page 191

incredible value.

Q.   So if it's that, why didn't EPA state that that is a best industry practice if everybody knew about it?

MR. KILIAN:  Objection.

Q.   No, I'm just curious.  Why wouldn't EPA say that this is a best industry practice?

MR. KILIAN:  Objection.

A.   Because it isn't.  It's a study -- it's a really detailed study that revealed some inadequacies of prior studies and set up people with detailed maps, some of which I excerpted and spliced into my report to illustrate exactly how these areas were affected right in the area of New Haven Harbor, right where the NACCS mentioned both petroleum terminals, among other types of critical infrastructure, that were exposed to coastal storm hazards.

Q.   Do you know of any industry association that has made a written statement, issued a press release that says its members should treat NACCS as a best industry practice?

MR. KILIAN:  Objection.  Asked and answered and irrelevant.

Page 192

A.    I have been at many meetings and events --

Q.    I didn't ask that.  I didn't ask if you had been at events.

I simply asked, Do you know of any industry organization, API, anyone, that has ever said complying with the NACCS is a best industry practice under an Industrial Stormwater Permit?  And if you can point to something, please do.  I'd like to see it.  But if you can't point to anything, all you have to do is say, "I can't point to anything." That's all I'm asking.

Do you know of any industry group, trade association, even scientific organization that has said the NACCS is a best industry practice for permitees under a stormwater program?  That's it.

MR. KILIAN:  Objection.

A.    I have been at many meetings, specifically --

Q.    Again, I didn't ask that.  I'm just asking, do you know of any written statement by an industry group that says this is a best industry practice? Something I could read; not listening to you saying, I've been at organizations.

I just would like to know, is there some

Page 193

document that you say the industry has adopted this as a best industry practice?

MR. KILIAN: Objection, relevance. What is the relevance of whether an industry wrote about it? It has nothing to do with what the permit says. It's irrelevant. Objection. Asked and answered.

Q. You can answer my question.

A. Shell's own consultants basically followed the protocol used in the NACCS --

Q. I didn't ask that. Dr. Goldsmith, I'm asking --

A. Ask them what industry guidance they followed as they selected just that information --

Q. So that's your response to my question?

MR. KILIAN: Dr. Goldsmith, I do want to remind you that you are obligated to just ask [sic] the questions Attorney Henderson is asking of you and to -- if you can't answer the question, just let him know.

A. I have tried to clarify.

Q. Just go ahead and respond as your lawyer is instructing.

A. The NACCS is not a best industry practice. It employs best industry practice with a resulting

Page 194

study.

Q.   So these practices in the NACCS, have they been written down anywhere --

A.   Yes.

Q.   -- on what the standard is?  Where at?

A.   Well, the NACCS study itself documents all of that.  And then there are a whole series of engineering standards and data source recommendations that typically get updated every three years.

MR. HENDERSON:  I think we have a response on the record.  Let's keep moving.

Here's another document that's going to marked as Exhibit G23.

(Document marked as
Exhibit G23 for identification)

Q.   Dr. Goldsmith, have you seen this document before?

A.   I have.

Q.   Now, you did not cite this document in your expert report, did you?

A.   No.

Q.   Did you even know about this document before your expert report?

Page 195

A.    I did, actually.

Q.    But you chose not to cite it?

A.    Correct.

Q.    So you don't believe -- first of all, can you describe what this document is, Dr. Goldsmith?

A.    Yeah.  So this is basically the regional response team out of the Gulf Coast area.  And I am familiar with a host of different documents that this group has used over the years, sharing lessons learned.  There were a lot of PowerPoint presentations.  There's this recommended best practices, which I've also seen.  But a lot of the images I recognize probably from some other presentation materials over the years.

Yeah, so this particular document is mostly, um, looking at things like tank ballasting, um, anchoring tanks having other structural measures, and routine maintenance like clearing storm drains.  You know, there's a bunch of things that they list as best practice.

Q.    Dr. Goldsmith, who developed this document? Is that -- Region 6 RRT; does that include the State of Arkansas, Louisiana, EPA, Coast Guard, Department of Defense, Department of Energy?  Is that who

Page 196

developed this --

A.    Yeah --

Q.    For the record, this is called, "Flood Preparedness, Recommended Best Practices."

Why was this prepared, Dr. Goldsmith; do you know?

A.    So let's see, the date of this particular document is 2016.  And at that point, there had already -- this was even predating Hurricanes Harvey and -- they had just finished digesting Katrina, Rita, Isaac, Ivan.  All these different storms to date had kept these responders quite busy, and they had some lessons learned.  And they talked about the preparedness actions, which are typically the things that are done; the battening down of the hatches upon the announced approach of a major storm.

Q.    Is this a best industry practice under the Industrial Stormwater Permit for the State of Connecticut?

A.    Well, it certainly isn't mentioned by the Connecticut IGP.

Q.    I didn't ask you that, Dr. Goldsmith.  I just asked you -- you're the one that interprets the

Page 197

best industry practice -- is this considered a best industry practice?

A.   For what it's known as "preparedness," yes.

Q.   And does it recommend ballasting?

A.   Yes, it does.  But that is not necessarily a control measure.

Q.   I just asked, "Does it recommend ballasting?"

A.   Yes, it does.  I'm not sure I've seen the word "ballasting," but --

Q.   Go to Page 2.  It says, "Prior to the storm, if removing the product is not possible, add more to the tank so the product's height is 3 to 6 feet higher than the expected storm surge or predicted reach of floodwater."  Is that --

MR. KILIAN:  Objection.  That's not what the document says.

A.   I only said I didn't see the word "ballasting," but I saw that it was referring to filling tanks with water or removing the contents altogether.

Q.   Right.  I'm just reading straight from the document.

MR. KILIAN:  You weren't, actually.  And I

Page 198

would move to strike all of the prior colloquy since the last question, because you merged two bullets together in what you read.  It's an inaccurate representation of the document.

Q.   I'm going to hand you this printed document as the document.

A.   Well, I have this.

Q.   I know you do.

My question was, is this a best industry practice under the Industrial Stormwater Permitting program in the State of Connecticut?

A.   This is for one aspect; for flood preparedness, which is separate from other control measures, such as things that exclude runon --

Q.   So it is a best industry practice under the Industrial Stormwater Permitting program?

A.   It reflects a small subset among best industry practices.

MR. HENDERSON:  Can we take a five-minute break?

THE VIDEOGRAPHER:  The time is 3:30.  We're off the record.

(Recess taken from 3:30 to 3:36)

THE VIDEOGRAPHER:  The time is 3:36.  We're

Page 199

back on the record.

MR. HENDERSON:  Dr. Goldsmith, I'm going to hand you what's going to be marked Exhibit G11.  And this is a copy of a document -- copy of a chapter from the 2023 Connecticut stormwater quality manual.

(Document marked as

Exhibit G11 for identification)

BY MR. HENDERSON:

Q.   Dr. Goldsmith, I'm just confirming, you did not cite this in any of your reports, and you're not offering any opinions on this document, are you?

A.   No.

Q.   And just to be super clear, you're not saying that this is a best industry practice.  You didn't cite it for any reason, so you don't have an opinion in this case about this document, correct?

A.   The handbook covers some of the more rudimentary configuration -- it's like a Stormwater Management 101 primer that tends not to be as relevant on complex, intensively used industrial sites or sites subject to coastal storm damage and flooding.

Q.   But you're not offering any opinions in this case about the Connecticut stormwater quality

Page 200

manual, are you?

A.   No.

MR. HENDERSON:  Dr. Goldsmith, I'm going to hand you what will be marked Exhibit G21.

(Document marked as Exhibit G21 for identification)

Q.   Have you seen this document before?

A.   Not that I -- I've probably reviewed something similar on the website.

Q.   Are you offering any opinions for this document identified as "Exhibit G21?  And for the record, it's called, "Industrial Stormwater Fact Sheet Series."

A.   I don't think this came into play in my opinions.

Q.   And you're not offering any opinions in this case about this document, are you?

A.   No.

Q.   You are or not?

A.   I am not.

MR. HENDERSON:  Just to be clear, then you're not offering any opinions.

Dr. Goldsmith, I'm going to hand you what will be marked Exhibit G24.

Page 201

(Document marked as

Exhibit 24 for identification)

Q.   Dr. Goldsmith, I don't believe this is in your expert reports.  This is a document from EPA which says, "Developing Your Stormwater Pollution Prevention Plan, March 2021, A Guide for Industrial Operators."

You're not offering any opinion about this document, are you?

A.   (Witness shakes head)  Not about the document.  But I am familiar with the general content and practice.

Q.   But you're not offering any opinions about the contents of this document?

A.   Not about the document itself.

Q.   So you're not offering any opinions on interpreting this document?

A.   Well, I did offer some opinions related to the SWPPP that the terminal holds.

Q.   But you're not referring to this, and you're not offering an opinion on what EPA believes should be included in the SWPPP plan?

MR. KILIAN:  Objection.

A.   I focused on the wording of the permit and

Page 202

my general knowledge of stormwater management and water quality management.

Q.   And so you don't have an opinion whether this is a best industry practice document or not?

A.   No, I do not.

Q.   You're not offering an opinion this is or is not a best industry practice?

A.   I'm not offering that opinion.

Q.   That it's not --

A.   I'm not offering an opinion on this document.

MR. HENDERSON:  Okay.  Dr. Goldsmith, I'm going to hand you what's going to be marked as Exhibit G35.

(Document marked as Exhibit G35 for identification)

Q.   I'll give you the good copy.

Dr. Goldsmith, you refer to this document in your expert report.  Is this evidence of best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

MR. KILIAN:  Before we proceed, I just want to clarify that this is basically just the Table of Contents?

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 204 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 203

MR. HENDERSON:  It's the Table of Contents.

MR. KILIAN:  And one introduction page?

MR. HENDERSON:  That's all it is.

MR. KILIAN:  Okay.

MR. HENDERSON:  So we have a picture of it to see if Dr. Goldsmith believes this is evidence of best industry practice for permitees under the Industrial Stormwater Permitting program in the State of Connecticut.

A.    So I think just from the date on it, I don't believe it's actually what would currently be a best practice, because it's nearly 20 years old. But it would have been in the evolutionary sequence of best practices.

Q.    So you're not offering an opinion that this is a current best industry practice?

A.    It's -- let's see.  Can you point me to where in my report I actually --

Q.    It's in a footnote.  I don't have that.

A.    I think it is this -- it's related to the debris impact loads.  That probably is a best industry practice to this date, because I don't believe in that respect that I cited it for, I don't believe there's been any new material advancement.

Page 204

And it's not really a best practice.  It's just relevant information that should be used within best practices.

Q.   If you look at Page Romanette i of this document, which is identified as Exhibit G34.

MR. KILIAN:  35, I think.

MR. HENDERSON:  It is 35, sorry.

A.   I'm looking at that, yeah.

Q.   G35.  It says, "This manual recommends incorporating hazard mitigation measures at all stages for all levels for new construction and the reconstruction rehabilitation of existing facilities."

A.   Uh-hum.

Q.   So New Haven terminal is not new, correct, and it's not being reconstructed or rehabilitated?

MR. KILIAN:  Objection.

A.   I have seen corrective actions prepared -- I've seen a corrective action plan prepared by Shell at the terminal.  So to say that it is -- it's definitely been in existence since on or around 1950, but it's also subject to various upgrades and modifications over the years.  And it has had at least one set of modifications proposed relatively

Page 205

recently, though, to my knowledge, not implemented.

Q.   And this FEMA document, do you believe it has the definition of reconstruction and rehabilitation that exists in the American Society of Civil Engineers?  Do you know or not?

A.   No, I don't know.  I want to also point out that there are two major categories of permit that I have worked with in my career.  There are permits for construction.  They're triggered specifically by construction.  And then there are operating permits, where ongoing operations are themselves a recognized source of pollution risk.

And so any change to a facility, including things to mitigate risk, are going to trigger new standards as part of best practices, even if there's not necessarily a threshold -- there's apples and oranges for operating permit versus construction permit triggers.

MR. HENDERSON:  So, Dr. Goldsmith, here's another exhibit.

THE WITNESS:  We should probably want to mark this one first.

MR. HENDERSON:  This is Exhibit 20.

MR. KILIAN:  G20?

Page 206

MR. HENDERSON:  G20, sorry.

MR. KILIAN:  Do you have one for me?

MR. HENDERSON:  Oh, sorry.

(Document marked as

Exhibit G20 for identification)

BY MR. HENDERSON:

Q.   So, Dr. Goldsmith, I've handed you what's been marked G20.

A.   Uh-hum.

Q.   And you cite this document in your report -- or actually, I think Dr. Nairn cites it, and you cite Dr. Nairn.

A.   Uh-hum.

Q.   But is this a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   I think it's one of the older versions, but ASFPM is a cutting-edge organization that tends to be pretty nimble in developing its plans -- it's practices.  It's all right up there in the best practices, although best strictly -- someone's got to be at the head of that horse race.

Q.   So is this a best industry practice, in your opinion, for permitees under the Industrial

Page 207

Stormwater Permit in the State of Connecticut?

A.   Yes.

Q.   And this document is dated, "Revised March 2013," which I believe is the current standard.

A.   That's probably true.

Q.   So if you could turn to Page 2 of 29.

A.   Uh-hum.

Q.   Can you read the first paragraph under "Introduction."

A.   "The purpose of the Guide for Higher Regulatory Standards in Floodplain Management is to provide options for communities that want to implement floodplain regulations which reduce flood damage and the overall impacts of floods.  These impacts include human risk, environmental damage, property damage, flood insurance claims, displacement of residents, and burden on community infrastructure and services."

Q.   So does it state anywhere here that it's a best industry practice for permitees under stormwater permits across the United States?

MR. KILIAN:  Objection.

A.   While the paragraph that I just read does not mention any specific permit or any specific

Page 208

permitee, it talks about human risk and environmental damage and burden on community infrastructure and services, all of which are factors that come into play under the terminals' Clean Water Act permit and are complicated in the SPCC and the SWPPP at the terminal.

Q.   Dr. Goldsmith, the 2018/2021 Industrial Stormwater Permit for the State of Connecticut does not mention this document by the ASFPM, "A Guide for Higher Standards in Floodplain Management," does it?

A.   No, it doesn't.

Q.   And the document, itself, doesn't say that it's a best industry practice for anyone, does it?

A.   Not in the paragraph you had me read --

Q.   Does it anywhere in this document say it is a best practice for anything?

A.   On the very bottom of this Page 2 of 29, it says, "The higher standards options in this guide are described in detail because they are recommended for safer development and use the natural protection provided by the natural functions and resources of the floodplain.  Please note that the model language presented in this document was developed to promote effective floodplain management and mesh with the

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 210 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 209

FEMA minimum flood damage reduction standards described in Federal Code...  Each community can tailor the model language to meet its own specific needs and should consider local legal issues when drafting specific language."

And New Haven, Connecticut, has adopted community rating system standards under FEMA that actually put into practice something that seems to have been developed.  I don't know the history and timing, but it seems to have been developed compatible with ASFPM recommendations here.

Q.   My question is, This document does not use the word "best practices" anywhere here?

A.   They say, "recommended practice coming from" --

Q.   I didn't ask about that.  I said, This document is not intended to be a best industry practice?  Does it state --

MR. KILIAN:  Objection.

Q.   -- that it was meant to be a best industry practice?

A.   Well --

Q.   Are the words "best industry practice" -- do they exist in this document?  Just answer that

Page 210

question to start with.

A.   Professionals don't usually look for exact quotes.

Q.   You can have your opinion.  I'm just asking you, This document does not state that it is a best industry practice for anyone, does it?

A.   It talks about higher standards --

Q.   I'm just asking you, the words "best industry practice," do they exist in this document? Yes or no.

A.   The words "best industry practice" I think are in here throughout.  Does it say something as literal as, "This is considered best industry practice by Connecticut DEEP in the Industrial General Permit" --

Q.   Does it say it's a best industry practice for anything in industrial stormwater?

A.   It talks about exceeding baseline standards for flood risk reduction.

Q.   So I don't think you've answered my question.  Does this document say that it's a best practice for anybody in any industry?  Just answer that question, Dr. Goldsmith, if you can.

A.   Well, I can take a moment to read it,

Page 211

because at no point did I ever read it screening for that particular constellation of language.

Q.   Okay.  If you look at this document, is it offering model language for local community ordinances?

A.   Yes --

Q.   Look at Page 20 of 29.  It has a model ordinance that says, Because of the damage from wave energy and high velocity flows, it has model language for an ordinance for residential and non-residential development, for new and substantially improved structures.  And it's proposing language for ordinances.

Do you agree with that?

A.   Yes, because under FEMA's community rating system, which allows different communities to achieve deeply discounted insurance rates for all of those federal insurance policyholders that are in a community rating system community, one of the requirements -- one of the cornerstones of that community rating system program is for the communities to develop floodplain management language.

And on Page 7 of this document it talks

Page 212

about "critical development protection."  It does not use the words "critical infrastructure."  But it describes the rationale as being "Facilities which provide critical services or services that are depended upon during flooding or other hazardous events should be protected to an even higher standard than other development.  Failure to provide flood protection to these types of critical facilities creates severe and unacceptable public safety risk.  The objective is to provide critical facilities and development against damage and to minimize the potential loss of life in flooding.  Model language is then provided."

Q.   Can you name one industry that has adopted this as a best industry practice?

A.    This is written for communities to adopt into their community rating system ordinance development.

Q.   Right.  So it's not an industry practice?

MR. KILIAN:  Objection.

A.    It becomes an industry practice when industries that are seeking municipal permits in community rating system communities, they must adhere to it.

Page 213

Q.    Right.  But this is not a requirement in the Industrial Stormwater Permit for the State of Connecticut?

MR. KILIAN:  Objection.

A.    Well, it reflects best industry practice related to flood risk reduction.

Q.    Where does it state that it is a practice that industries should follow?

A.    Well, going back to Page 7, I think, under the "Rationale," it describes that "Facilities which provide critical services or services that are depended on during flooding and other hazardous events should be protected to an even higher standard than other development."

Q.    But does it say it applies to industry? This guide developed new model ordinances for communities.

A.    Right.

MR. KILIAN:  Objection.

A.    But this is the particular model ordinance that would cover what is known as "critical development," "critical facilities" or "critical infrastructure."

Q.    And New Haven has not adopted this model?

Page 214

MR. KILIAN:  Objection.  There's no question.

A.   They have adopted something akin to --

MR. HENDERSON:  So, Dr. Goldsmith, I'm going to hand you what will be marked Exhibit G28.

(Document marked as

Exhibit G28 for identification)

Q.   So, Dr. Goldsmith, have you seen this document --

A.   Yes, I have.

Q.   -- identified as Exhibit G28.  Can you describe what this document is?

A.   This document was prepared soon after the impact of Hurricane Sandy and was published in March 2014; roughly a year and a half after Hurricane Sandy hit.

MR. KILIAN:  Can we just take a moment, Doug.  What are we numbering this one?

MR. HENDERSON:  G28.

BY MR. HENDERSON:

Q.   So this document, you did not cite this document in your expert report, did you?

A.   I did not cite it in my expert report, but I did in my rebuttal report.

Page 215

Q.    So did you even know it existed when you did your expert report?

A.    I was aware of a number of studies, but I didn't cite something based in New York, because I felt that the NACCS study, which provided more detailed and comprehensive information right in New Haven Harbor, was more relevant.

Q.    Did you know about this particular report before you issued your expert report?

A.    I had definitely not read it cover-to-cover.

Q.    Did you know it existed?

A.    Yes, I had some knowledge that it existed.

Q.    And do you think it has any relevance to what is best industry practice in the petroleum bulk storage industry?

A.    Not really.

Q.    So just to be clear, you're not offering an opinion that this document has any relevance to what is best industry practice in the petroleum bulk storage industry?

A.    I think this report goes into some evaluation of the nature of the impact of Hurricane Sandy.  It has some brief qualitative description of

Page 216

some actions taken afterwards, but it doesn't define standards or procedures or basis of decision that was useful in that.  So it falls short of describing best practice.

Q.   Is it a survey of the petroleum bulk storage industry in the State of New York?

A.   Yeah.  Basically the consultant was hired to go in and speak to the operators and hear written and oral responses.

Q.   Do you know of any other survey of the petroleum bulk storage industry that exists?

A.   I don't know any other one from Hurricane Sandy.

Q.   I didn't ask that.  I asked, do you know of any other survey of industrial stormwater practices at petroleum bulk storage facilities that exist anywhere in the United States?

A.   Well, there is -- in Shell's records there are lists of many incidents.

Q.   I'm just asking you a question.  And the question is this:  Do you know of any other survey of the petroleum bulk storage industry that addresses best industry practices for stormwater management?  Do you know of any other survey of the

Page 217

bulk storage industry?  Yes or no.

A.    So, first of all, I would not say that this report covers stormwater management at all.

Q.    Okay.  Do you know of any other survey of the petroleum bulk storage industry that talks about how they respond to climate change?

A.    I do not believe that this talks about the climate change question.  This talks about the impacts of Hurricane Sandy with a portion of the surveyed entities responding.  And one of the things that limits the meaningfulness of this study is the fact that it was a voluntary survey that had a fairly low rate of response and a fairly qualitative response level.  Nevertheless, there's some good things in it.

Q.    But do you know of any other survey of the petroleum bulk storage industry on what their practices are?

A.    I think many of the API documents are effectively survey-based, but they aren't incident-based, like this is.  Everybody was asked about their Hurricane Sandy...

Q.    Are you offering any opinions about this document in this case?

Page 218

A.   My rebuttal report contains a lot of opinions about this -- a lot of opinions relating to this report.

*Q.   So after Hurricane Sandy, how many tanks failed because of Hurricane Sandy, based on this survey of the industry, in the State of New York?

A.   That was one of the details that was rather opaque in this.

Q.   Do you have an answer?  Was it 20?  50?  How many --

A.   I think it was around the order of a dozen, but I know that from other sources.

Q.   Can you point that out -- No.  I didn't ask about your other sources.  I asked about this document.

MR. KILIAN:  Objection.  Can we actually have the question read back, because I think it was a broader question; not about this document, per se.

*(Question read)

MR. KILIAN:  Sorry about that.  I misheard you.

MR. HENDERSON:  Oh, that's okay.

BY MR. HENDERSON:

Q.   So did this survey indicate that ballasting

Page 219

was one of the most important practices that was identified in this report for managing floods and damages from adverse weather events?

A.    From memory, I believe that this report spoke about that being one of the most widely practiced preparedness measures.

Q.    Can you look at Page 33, Figure 23, where it says, The No. 1 response that petroleum bulk storage facilities had to Hurricane Sandy before was they confirmed their emergency plans.  And the second thing was, Filled tanks with product or water.

Does that suggest ballasting as a best industry practice?

A.    It suggests it is a common industry practice.

Q.    Now, if you look at Page 35, at the very top, it says, based on this survey -- and in fact, 55 petroleum bulk storage facilities in New York responded to this survey -- none of the 55 reported experiencing any tank movement during Super Storm Sandy and Hurricane Irene.

A.    I am aware that's what it says, but --

Q.    Do you agree with that or disagree?

Page 220

A.   Oh, I am very familiar with statistical methods and survey interpretation.  And the issue with voluntary surveys and issues with disclosing information or disclosing information before something like a natural resource damage assessment procedure is closed out, there are implications which make it less likely that candid or complete information either exists or that it is disclosed.

Q.   So I'm not sure what you're saying.  But are you saying that you disagree with that or you think that's incorrect?  Is that what you're saying?  Page 35 at the top of the page.

A.   A little more than half --

Q.   I'm reading -- I'm looking at the top of Page 35.

A.   Okay.

Q.   "No New York State terminals reported experiencing any tank movement during Super Storm Sandy or Hurricane Irene."

A.   But that doesn't mean that none happened.

Q.   I didn't ask that.  Just, do you agree or disagree that none of them had tank movement?

A.   That's what I just said.  The fact that this voluntary survey did not say, "Our tanks moved"

Case 3:21-cv-00933-VDO  Document 693  Filed 09/03/25  Page 222 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 221

does not mean that the tanks did not move.

Q.   Okay.  "Of the 28 terminals that were near water bodies, only two installed enhanced berms, levies or flood walls."

A.   Uh-hum.

Q.   Is that relevant to you in terms of knowing what is a best industry practice?

A.   Yes, especially since this survey was fulfilled by people less than a year -- closer to half a year, if I remember the calendar of events they described.

So November 1st is when Sandy made landfall.  And these surveys went out I think, you know, early, mid-2013.  And what people were saying is between the end of November and spring/summer 2013, that's when enhanced berms, levies and flood walls had already been added.  And to me --

Q.   How do you know that?  You're just totally speculating on that?

MR. KILIAN:  Objection.

A.   I'm not speculating.

Q.   No.  I mean, is it in the report?

A.   Yes.  So first of all, this report was released in March 2014.  So that's less than a year

Page 222

and a half after Sandy struck in November 2012.
Okay?  And the timing of this -- I did look at --
well, let's just imagine that we give them the whole
18 months, not counting for review and approval and
the return mail on the questionnaire and what have
you, right?  For terminals to have implemented
hardening and improvement to their flood defenses in
that short a time meant the industry was extremely
rapid in deploying those measures.

Q.   Did you do a survey to confirm that?

A.   No, I didn't.  But I have spoken with many
facility managers about realistic time frames for
implementation measures.

Q.   Can you identify facility managers you
spoke with?

A.   Well, one of the facility -- well, not in
the petroleum industry.  But the Metropolitan
Transit Authority in New York City I worked with
closely after Sandy.  And they had multiple-year
planning horizons to get engineering studies done,
permitting accomplished --

Q.   But you did not do a survey to know that
that's true, what you're suggesting?

A.   I'm just looking at the fact that they said

Page 223

some upgrades were implemented within the 18 months -- less than 18 months between when Sandy struck and when this report was released.

Q.   Is this a best industry practice -- does this report say anything about what is a best industry practice?

A.   In my rebuttal report, I took exception, especially to some things that Kovich has written.

Q.   I'm just asking, is this document a best -- does it document best industry practices at the petroleum bulk storage terminals?  Yes or no.

A.   It documents various practices.  It's an incomplete depiction of that.  And I took exception with some of the assertions -- some of the conclusions drawn by Kovich in his expert report. He looked at the fact that in 18 months or less since Sandy struck, that a handful of terminals had hardened their structures.  He took that to indicate that there was no interest in doing so, and that was not a practice that was adopted.

Q.   And there were no documented releases from these terminals either, was there?

A.   Not that people bragged about in their survey results.  But we know that New York State had

Page 224

releases.  And this is an example of the types of factors that go into voluntary surveys failing to capture some known truths.

MR. HENDERSON:  Okay, that's your opinion.

So we're going to mark this as Exhibit 29.

(Document marked as

Exhibit G29 for identification)

Q.  And, Dr. Goldsmith, you did not cite this document in either your report or your expert rebuttal report, correct?

A.  No, I don't think I've seen this one.

Q.  Just to be clear, you have not seen this document, which for the record is identified as a December 24th report from the Maine Department of Environmental Protection called, "Natural Hazard Risk Assessment, Guidance for Marine Oil Terminals." And so you're not offering opinions on this document, correct?

A.  Um --

Q.  It's not in either of your reports, correct?  Dr. Kovich cited it.  And you're not offering any rebuttal on this?  I just want to make sure that's clear on the record.

A.  Yes, I had not reviewed this.

Page 225

Q.   Okay.  If you go to Page 12 of this document, which was completed less than a year ago, this is a survey of the marine oil terminals, petroleum bulk storage facilities in all of Maine.

If you look at Page 12, it states -- and this is another survey -- I know you have problems with your surveys in terms of this, but let's look at what it says on Page 12.  "They are requiring their terminals to have a 100-year" --

A.   I'm looking at something that says "Page 12," and I don't --

Q.   I'm reading at the very top of it.

A.   Okay.

Q.   And it says -- the Maine Department of Environmental Protection says, "Adding a multiplier to the 24-hour, 100-year precipitation event is becoming an adopted practice across the New England States to account for projected increases in total rainfall in the future due to climate change."

A.   Uh-hum.

Q.   Do you agree with that statement or disagree with that statement?

A.   I'm not familiar with that multiplier.  I am familiar with various national weather service

Page 226

analytics and a review process, leading up -- which would be resulting in imminent release of a new dataset.

Q.   So, Dr. Goldsmith, you're not offering opinions on this document, so we can stop right there.

A.   Well --

Q.   No, I mean --

A.   -- you mentioned something about storms. And this is talking about precipitation; not about coastal storm damage.  So this is a rainfall volume related --

Q.   I didn't ask you that.  I asked you only if you agreed or disagreed with that statement on Page 12.  It's an adopted practice for projected increases in total rainfall.

I simply asked you, do you agree or disagree with that?

A.   I agree that's what the page says.

Q.   As a concept, do you agree that it's an adopted practice for the Northeastern states?

A.   I am not familiar with that multiplier.  I am familiar with the National Weather Service actually releasing an updated database.

Page 227

Q.   I'm asking about this.  Do you agree that it's an adopted practice in the New England states to use this 100-year precipitation event?

A.   With a multiplier.

Q.   Do you agree or disagree?  That's all I'm asking.

A.   The data that I'm familiar with --

Q.   I'm just asking, do you agree or disagree with that statement?  That's all I'm asking.

A.   It's not my statement.

Q.   I didn't say it was.  This is a document by the Maine Department of Environmental Protection that says this is an adopted practice for the New England states.

I'm just asking you, Do you agree or disagree with that statement by the Maine Department of Environmental Protection?

A.   I have never met a New England state.

MR. HENDERSON:  Okay, thank you.

Q.   Let's go back to the practice that you keep repeating about; best industry practice.

Have you ever offered an opinion before on what is best industry practice?

A.   I have.

Page 228

Q.   In what setting?

A.   I have offered that in multiple declarations.

Q.   How do you even define "industry" in the concept of best industry practice?

A.   Well, it's complicated, because there are -- you know, any given industry is going to probably include multiple industries, in the sense that let's say this terminal is dealing with the best practices of the engineering industry that has to certify the SWPPP and perform design work that's needed.

The coastal-facing features of the site would be subject specifically to a coastal engineering subspecialty within the engineering industry.  And then there's the actual operations, having to do with the petroleum industry standards.

Q.   So this permit is for a petroleum bulk storage terminal in New Haven?

A.   Uh-hum.

Q.   What industry is it in?

A.   Well, in this case, it's also qualified as a critical infrastructure facility, which is another --

Page 229

Q.    That's your opinion.  And you can identify it as an opinion.  But in terms of the permit, what is the industry that is regulated by the permit?

MR. KILIAN:  Asked and answered. Objection.

Q.    So does the permit regulate certain SIC codes?

A.    It does.  And then it also has the "everything else" category, which is what this terminal falls under.

Q.    So it's your opinion that this terminal is in the "everything else" and not because it's in the SIC code?  I just want to be clear.

A.    I deal with permits in different jurisdictions, so --

Q.    No.  Does this facility have to get an Industrial Stormwater Permit because of its SIC code?  That's the question.

A.    I'm not sure how to answer your question.

Q.    So why does this facility require an Industrial Stormwater Permit from the State of Connecticut?

MR. KILIAN:  Objection.

Q.    You can answer.

Page 230

A.   Well, it's classified -- any facility of a certain scale certainly has --

Q.   Do you know why this facility has to have an Industrial Stormwater Permit from the State of Connecticut?

A.   Well, other than it is handling vast quantities -- it has volume criteria --

Q.   I'm asking, do you know why it is required to have an Industrial Stormwater Permit in the State of Connecticut?

MR. KILIAN:   Objection.

A.   Because the program requires it to.

Q.   Okay.  You don't know why the program requires it to?

A.   To be honest, my involvement in industrial permitting generally does not include the screening level.  And I'm not sure what kind of a loophole there would be for bulk oil storage that might not trigger a permit requirement through the NPDES program.

Q.   What do you mean by "practice"?  What does the word mean "practice" to you?

A.   The EPA has written extensively about all kinds of practices, including best management

Page 231

practices, which is not best industry practice.  But practice can be something that you do, something that you buy and put into use, something that you engineer or construct.

So "practice" -- because people have to take actions in order to make it so, "practice" is a very broad term by intention.

*Q.   So to know what is occurring in an industry -- to know what's occurring in an industry, don't you need to know what is occurring at the companies in the industry?

MR. KILIAN:  Objection.

A.   Um, well in the case of Shell, for example --

Q.   I'm just --

A.   I'm familiar with a lot of information. And what I was going to say is, In that company, there's a very high level of science and engineering know-how within the organization on the Metocean subject matter.

So in that case, I would say the Metocean skill set and set of practices is extremely well detailed right inside the company.  And I've seen document of that.  And I would say my insight

Page 232

viewing it, but not working elbow-to-elbow with the folks on that team, suggests that the expertise and the developed practices are I would say solidly in alignment with the nature of practices that the Army Corps of Engineers, the world's leading engineering organization by many people's opinion, has adopted.

MR. HENDERSON:  Jane, could you read back the question that I actually asked.

*(Question read)

Q.   Can you answer that question?

MR. KILIAN:  Objection.  Asked and answered.

A.   Some industries don't involve companies.

Q.   What do they involve?

A.   Individuals.  There are -- you're acting as though it's all some kind of a corporate entity or all an asset owner, right?  And what I was getting at is trying to make a bridge between the industry based on maybe who owns the asset and sells a product versus the industry who may be actively engaged in defining what gets done at that facility, what gets built, or how things are maintained or even who files the permit applications.

So what I was trying to say in this case is

Page 233

there's at least one solid example within this case with Shell where you could look at -- you could talk about what their best practices -- well, you could talk about what practices Shell has about Metocean science and engineering.

And my statement was going to be, What they have going on inside of that company actually tracks well with the things that are considered best practices within government and within an organization such as the American Society of Civil Engineers.

Q.   So to know what is occurring in an industry -- let's take the restaurant industry.  To know what the restaurant industry is doing, wouldn't you need to know what individual restaurants are doing?

A.   You could probably exclude 95 percent of restaurants if you're talking about best industry practices, because if you look --

Q.   I didn't ask about that.  I'm talking about practices.  Good ones; the bad ones.

To know what an industry is doing, you need to know what is occurring at the actual companies in the industry, correct?

Page 234

A.    Not necessarily.  How about AI?  This is something that's evolving very quickly.  People are very concerned nowadays with developing guardrails and roadmaps for how to address that before letting a lot dominate day-to-day life, only to identify problems and be highly reactive.

Plus, what I was getting at, when the best practices were developed within the Army Corps of Engineers in the aftermath of Hurricane Katrina, many companies picked those up.  So the best practices started outside of the petroleum industry and the mining industry and the marine transport industry.  But they were quickly adopted by those other industries.

So I would say best practices have a way of industry-hopping.  And is it a practice within the industry if nobody has done it?  Maybe not.  But is it a best practice that is in the process of getting adopted by the industry?  I've watched it happen.

Q.    So to know what's going on in an industry, don't you have to look at what the members of the industry are doing?  That was my question.

A.    And I'm saying "No."  Sometimes folks with a lot of expertise in an area are filling a gap in

Case 3:21-cv-00933-VDO Document 693 Filed 09/03/25 Page 236 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 235

an industry by transferring information.  Other times, it's already grown up inside, imbedded in an industry.

Q.   I think we have your answer now, and that's what I was trying to get you to answer on that.

How do you identify other terminals like the New Haven terminal to see what they were doing?

A.   One of the things that I looked at was the NACCS study, which had identified various critical facilities.

Q.   What other terminals did you identify that are like the New Haven terminal and that you looked at their practices at their facility?

MR. KILIAN:  Objection.

Q.   You can answer.

A.   I have knowledge of many different terminals.  But that's not how I define what best practices are.

Q.   I'm not asking about best.  I'm asking about industry practices.  I didn't ask for best or worst or greatest.

How do you identify industry practices at a restaurant or in the petroleum bulk storage?  How do you identify what the industry practices are?

Page 236

A.    I have not conducted a survey of industry practices in the bulk petroleum storage or any industry.

Q.    Anywhere in the United States did you look at any?

A.    I started a conversation this morning by explaining especially forensic reconnaissance observations that included petroleum terminals.

Q.    Did you come up with a list of all the petroleum bulk storage facilities in Connecticut?

A.    No, I did not.

Q.    Would they be part of the industry that would have industry practices?  I don't mean best. I mean any.

How did you establish what industry practices were in the petroleum bulk storage industry?

MR. KILIAN:  Objection.

Q.    You didn't do a survey, right?

A.    No, I didn't.

Q.    Did you email a list of other petroleum bulk storage facilities and say, "I'm doing a survey, an analysis of practices"?

A.    I finished saying that I haven't and am not

Page 237

in the business of doing surveys of bulk petroleum operators or any type of industry.

Q.   Did you interview any of the, like, ten other petroleum bulk storage terminals?

A.   No other.

Q.   Did you look at their permits to see if they were required to do climate change vulnerability risk assessments?

A.   I have reviewed a number of --

Q.   Are they identified in your expert report?

A.   No.

Q.   Did you attempt to contact any other industries along the Connecticut coast outside of petroleum bulk storage --

MR. KILIAN:  Objection, relevance.

Q.   -- where they were conducting climate change vulnerability risk assessments?

A.   As I mentioned, the NACCS provided up and down the entirety --

Q.   I just asked if you contacted any other industries.

A.   Why would I?  The NACCS assembled and integrated all of that information for me and anyone else who wants access to it.

Page 238

Q.   I didn't ask that.  I asked, did you contact any of those industries to see if they were doing a climate change vulnerability risk assessment.

A.   The NACCS performed that.

Q.   I just want to know, did you contact any other industries outside of the petroleum bulk storage and ask them, "Are you guys doing a climate change vulnerability risk assessment?"  Yes or no.

A.   No.  I didn't even call my relatives to ask them if they had reconsidered their home site.

Q.   Did you call up API, American Petroleum Institute, and say, "Can I ask you about what are best practices at petroleum bulk storage facilities"?

A.   I read a number of their reports.

Q.   But did you attempt to contact anybody to get firsthand information?

A.   No, but I attend many engineering-related meetings and events, working meetings, as well as industry events.  And I'm fairly abreast of developments in the field.

Q.   Did you review Renee Boudreau's expert report?

Page 239

A.   No.

Q.   And you're not offering any rebuttal of her report?

A.   No.

Q.   Do you know Ms. Boudreau?

A.   No.

Q.   Did you ever ask any other petroleum bulk storage facilities how -- to what extent they were relying on ballasting as a best practice?

A.   No.

Q.   Did you ask any other petroleum bulk storage facilities if they were doing 100-year flood analysis to see how that would affect their facility?

MR. KILIAN:  Objection.

A.   No.

Q.   In fact, can you name one company along the coast of Connecticut that has done a 100-year flood analysis of its facility to evaluate climate change impacts?

A.   Just to clarify, the way you worded that question implies a 100-year flood event analysis --

Q.   I just simply said 100-year --

A.   You said "to evaluate climate," and those

Page 240

are two different points.

Q.   I said, Are they using it to evaluate climate.  You interpreted it that way.

I just simply asked, Have you talked to any other companies --

MR. KILIAN:  Objection, argumentative.

Q.   -- along the coast of Connecticut --

MR. KILIAN:  Objection.

Q.   -- whether they were using 100-year return period flood as a way to evaluate the climate change impacts of their property.  That's all I was asking.

A.   I have not called anybody who operates an oil terminal in Connecticut.

Q.   Do you know of any -- I think you said you haven't done a survey of any petroleum bulk storage facilities; is that correct?

A.   I've said that several times.

Q.   Did you look to see if fuel oil storage tanks at a petroleum bulk storage facility, if they had leaked during a hurricane if they were ballasted?

A.   What I've been able to find on this subject is not clear --

Q.   Did you call anybody?  Or did you conduct

Case 3:21-cv-00933-VDO    Document 693    Filed 09/03/25    Page 242 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 241

any firsthand knowledge --

A.    I've read Mike Sullivan's deposition on this matter.  And it's remarkably null on that point.

Q.    My question was, did you do a survey of the industry or any study of quantitative data to see if ballasted tanks were leaking during hurricanes?

A.    As I mentioned earlier, the available information on this subject is quite opaque.  And I do understand all of the motives and intents that prevent people from sharing with great candor issues that -- especially when they're in some type of active natural resource damage settlement process or other issues that arise from these types of incidents.

Q.    Now, does Connecticut DEEP change their regulations when they learn more information about certain issues, like climate change?

MR. KILIAN:  Objection.

A.    I can't really vouch for what really does or doesn't enter their thought process.

Q.    Do you know if Connecticut DEEP has changed its regulations to encourage more evaluation of climate change risk at industrial facilities in the

Page 242

State of Connecticut?

A.   We reviewed the language of the 2024 draft Industrial General Permit.  And we see that climate change and resilience are actually -- well.  Climate change barely gets into the permit language, but the fact sheets do tie climate change and resilience together.

Q.   So did anybody assist you with identifying what is a best industry practice?

A.   No.  I am quite confident speaking to that issue independently, because I've been in the room when a lot of these best industry practices have been developed and applied for their earliest case study examples.

Q.   Have you been in the room when best industry practices have been developed in the oil and gas industry?

MR. KILIAN:  Objection, irrelevant.

A.   I mentioned earlier being involved in some major field storage facilities, both preceding and in the immediate aftermath of Hurricane Katrina. So, yes, I have been involved when bulk petroleum storage facilities --

Q.   I didn't ask that.

Page 243

A.   I'm answering exactly the question that you asked.

Q.   No, you didn't.

So my question said "industry."

Were you in the room when industry developed best practices?

MR. KILIAN:  Objection.  It's asked and answered.  And "industry" is not limited -- she testified that "industry" is not limited to one industry; that it's a general term that refers to risk assessment across multiple sectors.  She testified to that 20 minutes ago.

Q.   So do you have a basis for why the word "industry" means -- what does the word "industry" mean to you?

A.   Are you familiar with Venn diagrams?

Q.   No.  Why don't you explain.

A.   Okay.  So I'll pretend I have a pen.  So if you can say this is the bulk petroleum industry.  This is the Metocean science and engineering industry.  This is the professional civil engineering industry.  In the middle, there could be something that intersects, where the bulk petroleum folks, the Metocean scientists who might work for a

Page 244

government agency or within let's say Shell.  And

then different civil engineers that are hired to

solve a problem.  They're all operating within the

overlapping area of those multiple, let's call them,

circles.

   *Q.   So if I hear you correctly, you didn't

actually collect any data on what practices the

industry was actually employing to evaluate climate

change, correct?

   A.   That is not correct.

        MR. HENDERSON:  Could you read the

question.

           *(Question read)

   A.   So I sketched out my imaginary Venn

diagram, and I suggested that there's a section in

the center where those three circles overlap.  That

can be described as being part of the petroleum bulk

storage industry, the Metocean science and

engineering industry, and the world of professional

civil engineers who put the stuff into practice, and

the planners, like myself, who tee up, scope, and

otherwise initiate -- help to initiate those

processes.

           So do I know what's going on outside of

Page 245

that shaded area?  It's not something I interface with.  But is it relevant to what's happening in the overlapping section of those different spheres of operation?

So I would say what happens in the practice of addressing coastal risk management at a marine terminal, that's going to involve multiple industries in a way that interfaces with each of them.  That's my point.

So when I've said it's complex what industries are there -- you know, how do you define which industry, because you can't get an engineering job done at a petroleum terminal just by talking to a bunch of operators who are not also duly licensed and duly informed.

Q.   So just to be clear, you didn't actually look at the practices -- let's just take ballasting. You didn't look at what terminals in Florida were doing when it came to ballasting, did you?

A.   I'm very familiar with ballasting to --

Q.   I didn't ask you that question.

Did you interview/survey any of the terminals in Florida to see what they were doing about ballasting?

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 247 of 292

Wendi Goldsmith , Ph.D., PG                         August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 246

A.   I've not interviewed or surveyed anyone in the petroleum industry or any other industry.

Q.   Okay.  Did you look at how petroleum bulk storage facilities in the Gulf of Mexico, how they were evaluating climate change impacts?  Did you talk to anybody to look at what those folks in the industry down there were doing?

A.   I have gone almost every year since 2005 --

Q.   I'm just asking --

MR. KILIAN:  You have to give her a chance to answer, Doug.  Objection.

A.   I speak with Coast Guard personnel all the time, and I speak with FEMA incident response personnel --

Q.   I didn't ask that.

A.   -- all the --

Q.   I didn't ask if you spoke to agencies.  I asked, Did you actually speak to the actual terminal operators on what practices they were employing.  That's what I asked.

A.   No.  I have had many conversations with the personnel who clean up after the failures.

Q.   I didn't ask that.  I didn't ask that.  I asked, Did you speak to all of the terminals -- the

Page 247

petroleum bulk storage terminals in the Gulf of Mexico to see, What practice are you all following for climate change evaluations?

I think the answer is you didn't.

A.    I've said at least a dozen times that I have not conducted any such survey.

Q.    Okay.  So do you know what is a good practice or a bad practice in petroleum bulk storage industries that are actually operating in the United States?

A.    Well, one of the studies I cited heavily in my initial and subsequent report was the Necci report, which includes many American incidents, but is a European-published -- European-based research team.  So it also included global incidents.

And it was very clear that tank ballasting was one measure, but that it was by no means a superior or sufficient measure to cover any and all risks.

And in fact, in my report, I inserted a key table out of that international study.  And ballasting was, in fact, on that list.  And I know I have it right here, Page 14.

Q.    So, Dr. Goldsmith, are you saying that

Page 248

Necci surveyed petroleum bulk storage terminals in the Gulf of Mexico?

A.   Yes.   Right here on Page 14, it's talking about notable examples of Hurricane Katrina in 2005, "Flooded tanks floated off foundations, spilling oil over vast areas.  Super Storm Sandy" --

Q.   But did you see if that was a ballasted tank?

A.   Given that the storm surge that struck --

Q.   Did you determine if the tank was ballasted?  Yes or no.

A.   I know that the ballasting did not matter, because --

Q.   Do you have any facts in front of you that the tanks they're referring to were ballasted or not?

A.   You pointed to a document earlier that spoke -- it was this one.  It was the Response Team 6.

Q.   Right.

A.   And it says right down there in the Gulf, "going to have 3 to 6 feet higher than the expected storm surge or predicted reach of the flood."  Okay? Katrina gave a 24-foot storm surge, so --

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 250 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 249

Q.   I didn't ask that, Dr. Goldsmith.

I just asked, Do you know if those tanks that you're talking about were ballasted or not? That's my only question.

A.   The Necci report widely cites the lack of detailed forensic information to document and explain single, let alone, multiple parameters that lead to failure.

So the short -- the reality of it is a lot of this information is hard to come by and inconsistent and challenging to compare.  But I can also say especially in Hurricane Katrina, which was cited as we looked here on Page 14 of my report, that storm surge was so high, that no measure was going to correct for it.

Q.   But you don't know if the tank was ballasted or not.  That was my only question.

A.   Are you suggesting that the terminal operators failed to follow any best practices, including ballasting?

Q.   This is my chance to ask you questions.

A.   Well, I wasn't implying that that was the case.  I was willing to give them the benefit of the doubt.

Page 250

Q.   I'm just simply asking, Do you know if those tanks were ballasted?

A.   I would be speculating.

Q.   Thank you.

A.   But the answer wouldn't change; because with or without ballasting, I would expect them to fail.

Q.   Again, you don't know what best practices -- put it this way:  You don't know what practices are being implemented at terminals in the Northwest United States, do you?

MR. KILIAN:  Objection.

A.   I am actually aware of a bunch of API standards.  I am aware of documents, including this one you surfaced earlier --

Q.   Do you know what the best practices -- do you know what the practices are of terminals in the Northwest United States when it comes to evaluating climate change risk?

MR. KILIAN:  Can I just clarify?  You've said "Northwest" twice.  I don't know if you mean --

MR. HENDERSON:  Northwest United States.

MR. KILIAN:  The Pacific Northwest?  How is that relevant?

Page 251

MR. HENDERSON:  I'm just asking --

MR. KILIAN:  Oh, you're asking about the West Coast right now?

MR. HENDERSON:  Yes.

MR. KILIAN:  Okay.  Sorry.

BY MR. HENDERSON:

Q.   I think you've testified you haven't evaluated what practices are actually being implemented at actual petroleum bulk storage facilities, correct?

A.   No, I'm fairly well informed.

Q.   Okay.  Who did you speak to in the Northwest at a bulk storage tank facility?

A.   I have actually spoken extensively with Coast Guard respondents, including incidents --

Q.   I didn't ask that question, Dr. Goldsmith. If I wanted to know did you speak to the Coast Guard, I would say that.

I'm just simply saying, You're making these allegations about what is a best industry practice. I'm trying to determine how you figured out what the practices were at actual bulk storage terminals.

MR. KILIAN:  Objection.  That's a mischaracterization of the questioning.  You're

Page 252

asking questions that really don't give her any chance to answer that.  You're asking a different set of questions she's trying to answer.

Q.    What data did you collect on the actual practices at petroleum bulk storage facilities in the Western United States?  What data did you collect that's in your report?

A.    The Western United States --

Q.    That's in your report.

A.    -- was not a focus of my study.  So I looked at worldwide literature on the subject, and I found the Necci --

Q.    I didn't ask literature.  I asked what data did you collect.

A.    Published literature is a widely accepted source of --

Q.    I get it.

A.    -- factual information.

Q.    I get it.

In terms of, did you do a survey of petroleum bulk storage facilities in California, for example, to see what practices they were implementing?  I don't need you to read that.

A.    Well, I have spoken to representatives --

Page 253

Q.   I'm asking about California.

A.   -- from the State of Louisiana, from the U.S. Environmental Protection Agency, U.S. Coast Guard --

Q.   But you provided no data in your report, so we don't have any information from you that you collected any data.

A.   I did not collect data.  I spoke to people about practices --

Q.   But you didn't identify who you spoke to.

THE COURT REPORTER:  I'm sorry.  I can't take both of you.

Q.   Okay, let's go back.

Have you conducted a survey of any petroleum bulk storage terminals about what practices they follow in California?  I think the answer is "No," right?

A.   Since I said I have done none, I think the answer to the question in California is also "None."

Q.   How do you know what's a bad practice and what's a good practice?

A.   One of the ways I know is having conversations with the incident responders, who have very strong opinions in most cases and are often the

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 255 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 254

ones who are first on the scene after a spill event.

MR. KILIAN:  Let's take another break here.

THE VIDEOGRAPHER:  The time is 4:54.  We're off the record.

(Recess taken from 4:54 to 5:05)

THE VIDEOGRAPHER:  The time is 5:05.  We're back on the record.

BY MR. HENDERSON:

Q.   Dr. Goldsmith, did you review any of the -- and if I've asked this, I apologize.

Did you read any of the climate adaptation reports from Shell?

A.   I certainly read a lot of climate adaptation content from Shell.  I'm not sure which report or reports you're referring to.

Q.   How many projects have you done for CLF in your professional career?

A.   For CLF?  Um, probably a dozen.

Q.   And I think you provided your invoices for your work in this project.  Is that the total amount that you've billed?

A.   I don't believe I furnished them directly to you, so I'm not sure what you've seen.

MR. HENDERSON:  I thought we got these from

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 256 of 292

Wendi Goldsmith , Ph.D., PG                     August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 255

CLF.

MR. KILIAN:  Based on the requests submitted by defendants and subject to our objections, we forwarded everything that we obtained related to the request.  So we didn't withhold anything.

MR. HENDERSON:  Okay, cool.

Q.    The other experts in the case for CLF, Like professor O'Donnell and Professor Barlow, do you know any of those?

A.    I have been in the room with Dr. O'Donnell in the past.  I was familiar with his role with CIRCA.  But we had never -- I can't recall a conversation we had.

Q.    How about Dr. Barlow?

A.    I've seen his name in publications, but I still wouldn't know what he looks like if I passed him.

Q.    How about Joshua Macey?

A.    I don't even think I know who that is.

Q.    Rob Nairn?

A.    Yes, I do know who Rob Nairn is and have known him and others in the firm for many years.

Q.    How about Professor -- I think it's

Page 256

Oreskes?

MR. KILIAN:  That's how it's pronounced.

MR. HENDERSON:  Oreskes.

MR. KILIAN:  O-R-E-S-K-E-S.

Q.  Do you know her?

A.  No, I don't.  What's her first name?

Q.  Naomi.

A.  I recognize the name, but I honestly don't know.

Q.  Have you ever met Allison Brown?

A.  No, but I find her work very interesting.

Q.  How about Brian Evans?

A.  No.

Q.  Ken Yeates?

A.  I've read a lot of his.

Q.  Do you know Jan Dell?

A.  I've read some of her stuff.

Q.  Do you know her?

A.  No.

Q.  Are you a member of Conservation Law Foundation?

A.  No.

Q.  How about any other environmental organizations are you a member of?

Page 257

A.   What do you mean "environmental organizations"?

Q.   Sierra Club.

A.   I'm not a member of the Sierra Club.

Q.   How about Restoration Society?  I mean, what other organizations, professional, are you a member of?

A.   So I am a member and have served on the Board of Directors of the Soil and Water Conservation Society.  I have been a chapter officer and long-time member of the International Erosion Control Association.  I am a member and a fellow of the Society of American Military Engineers and have also been a chapter officer.  I am a member of the Trustees of Reservations, which you wouldn't know if you're from Massachusetts, but it's a land conservation organization.  It's been around a long time in this state, and I serve in a governance capacity and I'm on a couple of committees.

Q.   Are you a member of any stormwater association?

A.   Well, the International Erosion Control Association has been very involved in erosion and sediment and water quality management and training

Case 3:21-cv-00933-VDO  Document 693  Filed 09/03/25  Page 259 of 292

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 258

and certification programs, as has the Soil and Water Conservation Society.

Q.   Are you a member of any climate change organizations?

A.   Well, all of the organizations I've mentioned are actively involved in updating best practices related to climate change.  I'm also a member of the Society of Risk Analysis.

Q.   How about Motley Rice?  Did you know any of the folks there before this lawsuit?

A.   No.

Q.   Are you currently working on any other cases that deal with, like, PFAS, PCBs, any other substances?

A.   No.

MR. HENDERSON:  Dr. Goldsmith, that's all we have for right now.

Chris, are you going to be asking any questions?

MR. KILIAN:  I do have some redirect. Shall I dive in with that?

MR. HENDERSON:  Sure.

Page 259

CROSS EXAMINATION

BY MR. KILIAN:

Q.   Dr. Goldsmith, can you turn to Exhibit G4, which is the -- this is just the October 1st, 2021 version of the General Permit.

A.   What page of that?

Q.   If you could turn to Page 6.

MR. HENDERSON:  That's for the '21 permit?

MR. KILIAN:  This is the '21 permit.

Q.   Although my questioning will be more general, we can go through the other permit, if needed.

But do you see the definition of "industrial activity"?

A.   Uh-hum.

Q.   And the title of this permit is "General Permit for the Discharge of Stormwater Associated with Industrial Activity," correct?

A.   Uh-hum.

Q.   So "industrial activity" is a defined term in the permit, correct?

A.   It is a broadly defined term in the permit.

Q.   And just to clarify, if you turn to Page 7 and look at numbered Paragraph 11 under that

Page 260

definition of "industrial activity," do you see that there's a parenthetical that includes petroleum bulk stations and terminals, right?

A.    Uh-hum.

Q.    And then there are numerous other numbered paragraphs as well, right?

A.    Yes.

Q.    This is my read, but you can correct me.  I read those other paragraphs as just describing other sectors of industrial activity.  Is that your understanding of that?

A.    Yeah.  And frankly, the SIC codes have been replaced a decade or so with a MAICS code.  So this is a bit of an anachronism.

MR. KILIAN:  MAICS is M-A-I-C-S, just for the record.

Q.    So looking at these definitions, my conclusion is that they're in alphabetical order. Is that what you're seeing as well?  I'm just looking at the list of definitions here.

A.    Um, I'm not sure where I see the --

Q.    I'm not looking at the "industrial activity" section now.  But looking at all the definitions, the italicized terms --

Page 261

A.    Oh, yes, it is.

Q.    -- they appear to be in alphabetical order?

A.    Yes, um-hum.

Q.    So is there a definition of the word "industry" in here?

A.    No, I don't see one.  And they also don't describe any industry.  It's specifically the industrial activity.  So what's actually happening at a given facility under a given permit I would observe is what's relevant.

Q.    But the permit uses the term "best industry practice"?

A.    Right.

Q.    Is "best industry practice" a defined term that you see in this --

A.    I don't see "industry."  I'm going to look to see if it says anything about "best."  (Witness reviews document)

Q.    And you had described --

A.    I don't see it.

Q.    -- in testimony a little bit earlier what you described as an imaginary Venn diagram.  And I believe you described Metocean and Metocean engineering, civil and civil engineering, and bulk

Page 262

petroleum terminals as parts of the Venn diagram.

In looking at the term "industry," are those the only three industries that you would look at?

A.   No.  I just thought that they were very applicable to the focus of my expert report.  And in my expert report, I cited things from the bulk petroleum industry and the Metocean specialty inside and outside of the petroleum industry, and also ditto for engineering.

Q.   Attorney Henderson asked you some questions earlier today referring to restaurants or the restaurant industry.

If a practice was occurring in the restaurant industry that was -- let's just use the word "relevant" to stormwater practices, could that be considered in the Venn diagram, even with bulk petroleum terminals, potentially?

A.   London has solved fatberg problems in storm sewers from mostly fish and chips oil clogging up the pipe.  And I could imagine there could be parallel circumstances even in the bulk petroleum industry, especially as they process more biofuels.

Q.   So I take it that when looking at best

Page 263

industry practice, that could include a broad array of industrial activities?

A.    Yeah.  I think it's very true that different industries -- I spoke to it -- they can cross-pollinate.  So it could be, like, the engineers who are working for different industries would bring some practice into an industry that might not have encountered it before.

Q.    Could there be pitfalls to an approach that just looked at one industry sector?

A.    Well, I was attempting to lighten the tenor of our dialogue when I mentioned that probably 95 percent of restaurants -- as an industry that I have a consumer's level of familiarity with, they're known for kind of cutting corners.  The food might be great; but what it takes to get the food on the table, not known for great practices, right?

Not every industry is used to getting scrutiny and striving to have regulatory compliance over all high quality operations.

So I think it's fair to say that without that kind of cross-pollination by people like civil engineers and regulators or maybe even legal professionals or insurance underwriting

Page 264

professionals, you know, there are certain factors that keep people improving in how they operate, especially related to risk factors like pollution prevention in the face of changing climate conditions.

Q.   So I take it that if we just looked at one industry and that industry was doing badly, it would actually potentially lower the regulatory bar?  Is that what you're saying?

A.   Well, yes and no.  On the one hand, if every industry was only classified by its exact peer group, then there would almost be a race to never implement anything, right; to, you know, keep yourself in the dark corners of low practice, instead of reaching out to try something perhaps novel in your exact sphere of industrial activity. You know, I mean, that's why there are also international standards organizations that speak to generalizable practices and standards.

Q.   Sorry.  I'm just trying to find this one...

So you were asked a number of questions about a draft 2024 version of the multi-sector Industrial Stormwater Permit in Connecticut.  And that was handed to you.  And you looked at a number

Page 265

of exhibits that were given various numbers.  I believe G6 was the 2024 permit.  Do you recollect that, the draft?  Sorry, G5.

A.   G5, yeah.  I'm looking at it, yeah.  I was just checking the number.

Q.   To your knowledge, is that permit final?

A.   The last time I looked online, it was not. But I can't tell you if that's up-to-the-moment accurate.

Q.   Are you aware of the requirements of a draft permit being enforceable in any context?

A.   No.  I think the reason a draft permit is published is for purposes of comment and, to some extent, giving folks a little heads-up for the leaders, instead of the laggards, to know what's coming up in the future.  But, no, it's not enforceable until it is -- until a permitee has a specific permit under the new terms, which in this case my understanding is still in draft form, and it is not a permit that has been applied to any permitee.

Q.   I want to refer you to Exhibit G6, which is the fact sheet from the 3/11/2023 draft.

A.   Uh-hum.

Page 266

Q.   If you could turn to Page 10.  I believe we were looking at Page 10.

A.   Uh-hum.

Q.   And there's language there that says, "The resiliency measures element is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate changes."

Do you see that?

A.   Yes.

Q.   So what do you take the word "ongoing" to mean there?

A.   That they've been around for a while.  That they are in effect now and that they are furthermore anticipated to continue, which is largely what that paragraph goes on to elaborate.

Q.   So when you say, "for a while," in Connecticut, what would you say "for a while" means in terms of ongoing climate change?

A.   As a Connecticut-born person who went to college in Connecticut at a time when climate change science was very much a lively discussion in the mid to late 1980s, I would say that being aware of these issues and how they were playing out in Connecticut's climate has been, at least in academic

Case 3:21-cv-00933-VDO   Document 693   Filed 09/03/25   Page 268 of 292

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 267

and applicable professional circles, been around for solidly 40 years.

Q.   And has that shown up in technical assessments, for example, subsequent to, like, Hurricane Sandy?

A.   Oh, I think since Hurricane Sandy, it's been universal.  What a lot of people in Connecticut thought was going to affect other parts -- in some of these academic circles, nobody really thought these chickens were coming home to roost as abruptly as Hurricane Sandy proved they could in New England.

Q.   And the next sentence says, "The increasing temperatures, precipitation and drought frequency are amid the climate impacts that currently and are projected to affect water quality and quantity in Connecticut."  Do you see that?

A.   Yes.

Q.   So what does the word "currently" mean to you?

A.   Well, currently; so at the present time and ongoing.  Not just instantaneously and are projected to continue to do that over time.

Q.   So would you say the use of the term "currently" there is consistent with the use of the

Page 268

term "ongoing"?

A.   I think "ongoing" implies a broader sense of a time period.  "Current" is more the brackets around the present moment.  And I mentioned the word "instantaneous" would be that little blip that represents the present instant.

Q.   If you could refer to -- if you can refer to Exhibit G10 and turn to the third page, under 1.4.

A.   Yup.

Q.   The second sentence says, "This new element of the SWPPP is intended to identify resource gaps, promote emergency planning and preparedness, and identify additional processes and procedures that may need to be considered and, if necessary, employed when experiencing variable weather patterns," correct?

A.   Yup.

Q.   And you, in your expert reports, referred to -- at least in your rebuttal report -- we can get more specific if need be -- the Shell's Business Continuity Plan, correct?

A.   I think I referred to a variety of operational plans.

Page 269

Q.    I'm asking you specifically about the Business Continuity Plan.  And I can point you to your citation to it if you'd like.

A.    No -- yes.  I looked at multiple operational plans.

Q.    But the Business Continuity Plan specifically and the Facility Response Plan, right?

A.    Yeah.

Q.    And the Business Continuity Plan and the Facility Response Plan are components of emergency planning and preparedness, right?

A.    Right.

Q.    And those concepts are appropriately -- are integrated into the SWPPP currently, correct?

A.    I believe that's how the program is structured.  I am not sure I have seen how those documents currently achieve that.

Q.    But they're not new --

A.    Correct.

Q.    -- emergency planning and preparedness, right?

A.    Correct.

Q.    In a SWPPP, would you typically see identification of resource gaps in the ongoing

Page 270

compliance activities?

A.    In principle or in practice?

Q.    In principle.

A.    I have not seen very -- I have not seen SWPPPs surface missing links as a rule.  They looked like very manageable, but it didn't have very succinct summaries; almost checklist approaches to doing different things.  And they tend to gloss over certain gaps.

Q.    Would you consider it to be a new concept to identify resource gaps in a SWPPP?

A.    Well, in principle, no, because I think that has been the intent.  It's just the way these things are put into practice and the way they tend to become copy/pasted from one case to another and lose some of their individual tailoring.

Q.    I'd like to refer you to what was marked as Exhibit G19, which is the AFCE Standard 2014.

A.    Okay.

Q.    And if you could turn to Page 39.

A.    Okay.

Q.    You were asked a number of questions about the scope of this document.  Do you remember that?

A.    Yes.

Page 271

Q.   If you look at Page 39 under numbered Paragraph C1.4.3 and just the text there says, "Table 1-1 of the standard defines Flood Design Classes 1 through 4."  Do you see that?

A.   Yes.

Q.   "Each building and structure is to be assigned a Flood Design Class.  The classes recognize the importance of occupancies, potential for damage, and threats to human life."

A.   Yes.

Q.   And then the next paragraphs list -- narratively describe some of those classes.  Do you see that?

A.   Yes.

Q.   So if you can turn back to Page 7 -- I'm sorry, back to Page 34.  If you could look at Page 34 --

A.   Yup.

Q.   -- there's a definition of "Essential Facility."  Do you see that?

A.   Yes.

Q.   And it says, "Table 1-1, Flood Design Class 4.  Building codes also define 'essential facility,' which is used by the codes for occupancy category IV

Page 272

or risk category IV structures."  Do you see that?

A.   Yes.

Q.   And if you go back to Page 7, Table 1-1 is at the top.  Do you see that?

A.   Yes.

Q.   And if you look at "Flood Design Class 4," it's "Buildings and structures that contain essential facilities and services necessary for emergency response and recovery or that pose a substantial risk to the community at large in the event of failure, disruption of function, or damage by flooding."  Do you see that?

A.   Yes.

Q.   And then if you scroll down, No. 8 is "Buildings and other structures, including but not limited to, facilities that manufacture, process, handle, store, use or dispose of such substances as hazardous fuels, hazardous chemicals, or hazardous waste containing sufficient quantities of highly toxic substances where the quantity of the material exceeds a threshold quantity established by the authority having jurisdiction."

Do you see that?

A.   Yes.

Page 273

Q.    I think -- I just want to make sure.  I think that was the one I was -- sorry, wrong one.  Strike that reference to "8."

7, "Ancillary structures such as communication towers, electrical substations, fuel or water storage tanks, or other structures necessary to allow continued functioning of a Flood Design Class 4 facility during and after an emergency."

I guess my question is, Would it be your opinion that the terminal would fall in this Category 4?

A.    Yes.  That essentially is also critical infrastructure or critical facility definition.

Q.    Okay.

A.    A strongly overlapping Venn diagram or otherwise.

Q.    If you could refer to Page 33 now --

A.    Uh-hum.

Q.    -- there is a numbered Paragraph C1.1.  Do you see that, and it says, "Scope"?

A.    Yes.

Q.    This section, "Scope," has the same title as the section that Attorney Henderson had you read

Page 274

from, correct?

A.   Yes.

Q.   Could you just read that first paragraph.

A.   "The requirements of this standard are developed through a rigorous consensus process of the American Society of Civil Engineers and are intended to protect public safety and property. This standard is, in part, based on examination of damage after floods and is intended to meet or exceed the requirements of the National Flood Insurance Program (NFIP).  Any conflicts or differences between this standard and other applicable regulations should be resolved such that compliance with NFIP requirements is equaled or exceeded.  This standard is intended for use by registered design professionals, and designs based on this standard should be signed and sealed by the professional who is responsible for the design."

Q.   And if you can go over to the next column, there's a paragraph that says, "Even if."  Could you read that?

A.   "Even if compliance with this standard is not required, designers and owners of buildings located in flood hazard areas are encouraged to use

Page 275

the standard to evaluate measures that may reduce vulnerability to future floods.  For example, upon examination and evaluation of flood loads, any building (even residential occupancies) may be retrofit with dry floodproofed measures, even if the resulting building is not in full compliance. Consideration of such measures should account for the same factors that are covered in the standard."

Q.    Okay, that's enough.

If we can refer now back to Page 39.

A.    Uh-hum.

Q.    And under C1.4.3, if you could just scroll down -- or look down to the third paragraph that starts, "Flood Design Class 4" and read that.

A.    "Flood Design Class 4 includes buildings that are essential facilities (see definitions) and buildings that provide services necessary for emergency response and recovery.  This standard now requires Flood Design Class 4 buildings to be elevated or protected to at least the 500-year flood level."

Q.    Okay, thank you.

So you were pointed to provisions in this document that talked about its scope only

Page 276

covering -- or covering new structures?

A.   Right.

Q.   This document is from 2014, correct?

A.   Uh-hum.

Q.   So 11 years, roughly, ago.

Would you say the information related to the technical aspects of this document have improved since 2014?

A.   Yes.  In the very next exhibit, which is in effect today, is an example of that.

Q.   From your perspective, would it be best industry practice to know about this standard and not apply it to an essential facility when looking at best industry practice?

A.   I would not consider that to be best industry practice.

Q.   Would that be good industry practice?

A.   It would be skimpy and scant practice.

Q.   If we can look now at Exhibit G23, which is "Flood Preparedness Recommended Best Practices." This one, the RRT6 document.

A.   Uh-hum.

Q.   And if we could turn to Page 2.

A.   Uh-hum.

Page 277

Q.    There's a list.  I don't know where the highlighting came from.  But there's a highlighted term "best practices."  Do you see that?

A.    Yes.

Q.    Could you look at the last bullet and read that aloud.

A.    Yeah.  "Conduct a detailed risk assessment of the facility and evaluate the impact of mitigation strategies; include these assessments in the Facility Response Plan and Spill Prevention Control and Countermeasures.  Develop a detailed timeline for preparing tanks in advance of an event."

Q.    From your perspective, what would a detailed risk assessment of the facility look like?

A.    It usually starts with a full inventory of what's there and then some type of condition assessment of the facility, review of some maintenance plan, but also a verification that some elements of that maintenance plan have been kept up to date or otherwise explained.  Typically, you know, identifying gaps accordingly; like, some maintenance is tardy or some condition is not keeping up with changes in the risk profile.  And

Page 278

those points would be noticed.

Was it in this document --

Q.   Hold on a second.  So this document is entitled "Flood Preparedness," right?

A.   Right.

Q.   And then if you look at Page 1, under "Aboveground Storage Tanks," for example, there are a couple of numbered paragraphs.  The first one is "1.  Storm surge"?

A.   Uh-hum.

Q.   And 2 is "Flooding"?

A.   Uh-hum.

Q.   The document says what it says, but --

A.   And 3 is "Debris."

Q.   3 is "Debris."  Those are core topics --

A.   Right.

Q.   -- that are being addressed in this document.

Have you been provided with a detailed risk assessment of the New Haven terminal at issue in this case, looking at those topics?

A.   No, I have not.  The --

Q.   Have you been provided with a detailed risk assessment of the facility conducted by anyone

Page 279

looking at the New Haven terminal, the subject of

this litigation, addressing any other aspect of

flooding?

     A.    The only thing that is responsive to that

would be some of -- specifically the Jones Report

looked -- I did not see any documentation that Shell

had on hand, least of all a detailed timeline for

preparing tanks in advance of an event.  Something

like that -- I had commented earlier that there was

scant information that could be put into an

actionable preparation plan.  Um --

     Q.    You can stop there.

           This document is dated January 2016.  In

your opinion, would it have been possible as of 2016

to do a detailed risk assessment of the facility in

New Haven, the terminal at issue in the case,

looking at these topics?

     A.    By 2015, the NACCS study had provided

detailed risk mapping and recommendations affecting

the New Haven Harbor and naming the bulk petroleum

terminals there.

     Q.    What about in 2017?  Would it have been

possible in 2017?

     A.    All that information and more interactive

Page 280

mapping tools published by Connecticut existed by then.

Q.   What about 2018?

A.   There's just more information available.

Q.   2019?

A.   By that time, everyone was reeling after Hurricane Harvey, and they knew that this was --

Q.   2020?  Could it have been completed in 2020?

A.   Absolutely.

Q.   Could it have been completed in 2021?

A.   The longer -- the later in the game we're getting, the more surprising, I find it, that it hasn't been completed.

Q.   Could it have been completed in 2022?

A.   Yes.

Q.   Could it have been completed in 2023?

A.   Yes.

Q.   What about 2024?

A.   Absolutely.

Q.   And I'm assuming --

A.   It's still possible and advisable.

And I will say the Jones report I think is not a comprehensive risk assessment.  It does not

Page 281

disclose its methodology.  It doesn't look at
multiple scenarios.  It does some calculations, but
it does not do so in what -- for instance, it talks
about buoyancy.  It doesn't talk about debris.  This
document talks about the different mechanisms of
failure.  That does not.  That looks at still
weather flooding and buoyancy --

Q.   So if you could just look at the first
bullet; "Prior to the storm, empty tank of product
and fill entirely with water."

A.   Right.

Q.   Would you consider that to be a best
practice in certain circumstances?

A.    There are two aspects of that that are
viewed as very positive.  One is removing from a
potentially exposed and vulnerable tank the
hazardous and toxic material, presumably to some
place out of harm's way, although it does not say
that.

And then filling the tank entirely with
water is typically a slightly higher density fluid
and more resistant to buoyancy-driven failure
mechanisms.  So I understand that.  Those are good
practices.  But there's a lot of time to empty a

Page 282

tank and then fill the tank.  And you need to have places to put what you empty from the tank.  And you need to have a source of -- probably you don't want saltwater going into a tank and introducing future years of corrosion hazard.  You want to look at something resembling freshwater, which is usually -- if anyone's ever filled up a swimming pool, you know that pumping large volumes, millions of gallons, is not something that comes out of your average municipal tap.

Q.   And if you look at the third bullet, "Anchor tanks and all piping to prevent uplift or flotation," do you see that one?

A.   Yes.

Q.   Can that be a best practice?

A.   Yes.  It can be additive and complementary to the buoyancy.

Q.   Are you aware whether any of the tanks at the New Haven terminal are anchored?

A.   This was not a major focus area.  And I know I've looked at different terminal sites.  So I know I've seen plenty of them that did not exhibit uniform or any anchoring.

Q.   If you look at this list of bulleted

Page 283

practices, one of them -- the second-to-the-last one is "Ensure all storm drains and de-watering intakes are clear and free of debris."

Do you see that?

A.   Yes.

Q.   Are these primarily focused on stormwater protection?

A.   These are all focused on the kinds of things you can rush around doing as a storm is approaching.  So I would say when you're clearing storm drains and de-watering -- you know, any intake pipes for de-watering efforts are free of debris, when you're doing that, it's probably stormwater-related.

Q.   Any others on the list?

A.   It's probably primarily a spill prevention and countermeasure approach, which can incidentally cross into the stormwater pollution realm.

Q.   So if you turn to Page 3, it says, "General Flood Loss Prevention:" And it says, "Best Practices:  Before the event."  Do you see that?

A.   Yes.

Q.   If you turn to Page 4 --

A.   Uh-hum.

Page 284

Q.   -- the second-to-the-last bullet says, "Consider constructing a reinforced concrete flood wall or earthen levy to protect the facility."  Do you see that?

A.   Where are you?

Q.   Page 4.

A.   Hum.

Q.   At the top, second-to-the-last bullet.

A.   Yes, yes.

Q.   In the context of this document -- I know you're kind of interpreting it on the fly here -- but when it says, "Consider constructing a reinforced concrete flood wall and earthen levy to protect the facility," that's in the context of storm surge and flooding risks and debris, correct?

A.   Well, yes, that would go a long way towards protecting all of those failure mechanisms.

Q.   This language, this bullet, is not focused on loss of containment and holding back spilled material primarily, correct?

A.   It's talking about protecting the facility. Just allowing the fill as designed to have integrity in the face of a storm.

Q.   And so when looking at the risk assessment,

Page 285

the detailed risk assessment of the facility, and an evaluation of the impact of mitigation strategy we were talking about earlier, those issues would sort of define the sizing and the structural approach to concrete flood walls and earthen levies, right?

A.   That's correct.  For instance, if in the face of a risk assessment you identify the magnitude of storm surge your site can be facing, putting sandbags in the door openings is not, like, "Well that was a bullet on the list, so I'm cool now." There needs to be parity between the risk exposure and the mitigation level of any control measures.

Q.   You were asked a number of questions about what surveys of specifically bulk petroleum terminal operators you had done.  Do you remember that?

A.   I remember that well.

Q.   In your expert report, you referred to a document produced by Shell that I'll just call the "Water Risks Report."  Do you recollect that?

A.   Yes.

Q.   Would you consider that to be a survey of industry practices, looking at climate-driven risks?

A.   It's a partial and oddly selective review of what different players in different industries

Page 286

are using.  And I kept flipping the pages when I had initially read that months ago, waiting to see different published studies; you know, many of the different engineering circulars published by the Army Corps, looking at what ASCE put out there, looking at the NACCS study that covered areas where Shell had itself experienced flood losses during Sandy at multiple facilities.

And I was surprised that folks were exploring subscription-based risk services and then complaining that the fees were so expensive; that they had not availed themselves of the free and publicly tailored resources that were more or less purpose-built for this type of end use.

MR. KILIAN:  I see.  Okay.  That's all I have for redirect.

MR. HENDERSON:  Give us one minute.

MR. KILIAN:  Sure.

(Off the record)

MR. HENDERSON:  Chris, I think we're through for the day.

THE VIDEOGRAPHER:  This concludes the deposition of Dr. Goldsmith.  The time is 5:54. We're off the record.

Page 287

(Whereupon, the deposition was

concluded at 5:54 p.m.)

Page 288

C E R T I F I C A T E

I, WENDI GOLDSMITH, Ph.D., PG, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2025.

_____

Page 289

SUGGESTED CORRECTIONS

RE: CONSERVATION LAW FOUNDATION, INC. vs. EQUILON

ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON

TERMINALING LLC, and MOTIVA ENTERPRISES LLC

WITNESS: WENDI GOLDSMITH, Ph.D., PG, Vol. I

The above-named witness wishes to make the following

changes to the testimony as originally given:


PAGE    LINE       SHOULD READ              REASON

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____

Page 290

\_\_\_\_   \_\_\_\_   _____   _____

Page 291

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                    )

I, Jane M. Werner, RMR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 20th day of August, 2025, at 10:02 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 31st day of August, 2025.

Jane M. Werner

Notary Public

Commission expires 1/27/2028