# Exhibit E

Filed Under Seal



**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

June 21, 2025

Carmen R. Toledo
King & Spalding LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309

**RE: STORMWATER REPORT REGARDING SHELL OIL PRODUCTS, US, 481 EAST SHORE PARKWAY, NEW HAVEN, CONNECTICUT (HRP# KIN2500.CE)**

Dear Ms. Toledo:

At your request, I have performed a review of the stormwater obligations for the New Haven Terminal owned by Triton Terminaling LLC and operated by Equilon Enterprises LLC (the "Defendants") under the current National Pollutant Discharge Elimination System (NPDES) General Permit for the Discharge of Stormwater Associated with Industrial Activities (Draft IGP). This review was done specifically in regard to claims mentioned in a lawsuit called CLF vs Shell Oil Company, et al.

**Qualifications, Experience, and Compensation**

I am the Engineering Practice Leader and a Principal at HRP Associates, Inc. (HRP), headquartered in Farmington, Connecticut. HRP is an environmental consulting firm that has been operating in Connecticut since its inception in 1982. HRP currently has approximately 125 employees in seven states throughout the U.S. HRP provides environmental and engineering services to private and government sector clients, with projects across the Americas, Europe, and Asia. For over 40 years, HRP has assisted clients understand and comply with environmental laws and regulations.

I am a Professional Engineer licensed in nineteen states, including Connecticut. I graduated from the University of New Haven with a degree in Civil/Structural Engineering. I have more than 40 years of experience in engineering, which includes many years in stormwater management and am intimately familiar with the requirements of permits adopted and drafted by the Connecticut Department of Environmental Protection (CT DEEP). I have worked on, prepared, and certified hundreds of Stormwater Pollution Prevention Plans (SWPPPs) for numerous facilities in Connecticut and elsewhere. I have reviewed hundreds of SWPPPs when consulting for various companies to advise them on regulatory compliance issues. More information about my qualifications is listed in my curriculum vitae (CV), which is attached as **Exhibit 1**.

I have not testified in any cases in the last four years. HRP is being compensated at my customary rate of $287.50 per hour. The opinions I express in this report are based on my review of the permits and documents, laws, and regulations discussed in this report and my education and my years of experience working in stormwater management, coastal industrial facilities, oil and gas

community and environmental organizations. As of the date of this letter, the 2025 IGP has not yet been issued, however drafts have been made available to the public for review and comment.

The 2025 IGP has significant changes from its predecessor. HRP prepared an article outlining the new provisions in the draft permit entitled, *2024 Stormwater Permit – What's New*, when the draft permit was first made public. A copy of the article is attached as **Exhibit 3**. The most notable change is the use of sectors to detail permit obligations based on industry, using SIC Codes. The Site will fall under Sector P, Land Transportation. The 2025 IGP will also require facilities such as the Site to consider potential resilience measures to enhance emergency preparedness and response to changing weather patterns but does not mandate specific best management practices (BMPs).

The discussion below is based off the most recent draft of the 2025 IGP, issued on January 7, 2025. A public hearing on the 2025 IGP was held on May 13, 2025.

## Coastal Management Issues Under the Permit

The Site is located within both the Coastal Boundary and Coastal Area. The Coastal Area is defined in the Connecticut General Statutes (CGS) Section 22a-94a as including the land and water within the area delineated by the following: The westerly, southerly and easterly limits of the state's jurisdiction in Long Island Sound; the towns of Greenwich, Stamford, Darien, Norwalk, Westport, Fairfield, Bridgeport, Stratford, Shelton, Milford, Orange, West Haven, New Haven, Hamden, North Haven, East Haven, Branford, Guilford, Madison, Clinton, Westbrook, Deep River, Chester, Essex, Old Saybrook, Lyme, Old Lyme, East Lyme, Waterford, New London, Montville, Norwich, Preston, Ledyard, Groton and Stonington.

Within this area is the Coastal Boundary, which is further defined in CGS 22a-94(b) as a continuous line delineated on the landward side by the interior contour elevation of the one hundred year frequency coastal flood zone, as defined and determined by the National Flood Insurance Act, as amended (USC 42 Section 4101, P.L. 93-234), or a one thousand foot linear setback measured from the mean high water mark in coastal waters, or a one thousand foot linear setback measured from the inland boundary of tidal wetlands mapped under section 22a-20, whichever is farthest inland; and shall be delineated on the seaward side by the seaward extent of the jurisdiction of the state.

The current CT Stormwater GP requires that activities within the Coastal area be consistent with the applicable goals and policies in CGS Section 22a-92. They may also not cause adverse impact to coastal resources as defined in CGS Section 22a-93(15).

The 2025 IGP includes the same language as the current CT Stormwater GP in Section 3(b)(2), however additional language is included for activities located wholly or in part waterward of the Coastal Jurisdiction Line (CJL) in tidal, coastal or navigable waters of the state, or in tidal wetlands. These activities are authorized pursuant to CGS Sections 22a-359 through 22a-363f, inclusive, or 22a-28 through 35, inclusive.



The CJL in New Haven is 4.6 feet above sea level (CT DEEP; *Coastal Jurisdiction Line Fact Sheet,* State of Connecticut, https://portal.ct.gov/deep/coastal-resources/coastal-permitting/coastal-jurisdiction-line-fact-sheet). Based on a survey of the Site dated January 12, 2021, and prepared by Godfrey Hoffman Hodge, LLC, for Triton Environmental, LLC, the Site is above the CJL (Godfrey, Hoffman Hodge, LLC. *Topography Survey,* prepared for Triton Environmental, 478 East Shore Parkway, New Haven, Connecticut; 1" = 60', 1 of 1; dated November 2, 2020; revised January 12, 2021).

CGS Section 22a-92 lays out the legislative goals and policies for the Coastal Management Act. Although Section 22a-92(5) notes that one of those goals and policies is "[t]o consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards," it does not demand specific actions be taken by permit holders. Further, it applies only to new developments, since it refers to the "planning process," so it does not apply to established facilities like the Terminal.

Both the current and proposed permits reference CGS 22a-93(15), which defines "adverse impacts of coastal resources" as including but not limited to: (A) Degrading water quality through the significant introduction into either coastal waters or groundwater supplies of suspended solids, nutrients, toxics, heavy metals or pathogens, or through the significant alteration of temperature, pH, dissolved oxygen or salinity; (B) degrading existing circulation patterns of coastal waters through the significant alteration of patterns of tidal exchange or flushing rates, freshwater input, or existing basin characteristics and channel contours; (C) degrading natural erosion patterns through the significant alteration of littoral transport of sediments in terms of deposition or source reduction; (D) degrading natural or existing drainage patterns through the significant alteration of groundwater flow and recharge and volume of runoff; (E) increasing the hazard of coastal flooding through significant alteration of shoreline configurations or bathymetry, particularly within high velocity flood zones; (F) degrading visual quality through significant alteration of the natural features of vistas and viewpoints; (G) degrading or destroying essential wildlife, finfish or shellfish habitat through significant alteration of the composition, migration patterns, distribution, breeding or other population characteristics of the natural species or significant alteration of the natural components of the habitat; and (H) degrading tidal wetlands, beaches and dunes, rocky shorefronts, and bluffs and escarpments through significant alteration of their natural characteristics or function.

Compliance with the proposed requirements of the 2025 IGP prevents the above-mentioned adverse effects through limiting contact with potential contaminants, stormwater control measures (SCMs), BMPs, regular inspections, chemical monitoring and operational controls.

Based on my experience, my visit and inspection of the site and discussion with the Terminal Manager, and my review of the Site's regulatory documentation, it is my opinion that the Site meets the requirements of its current permit as well as the requirements of the 2025 IGP discussed above. At the Site, the relevant controls include spill prevention equipment located throughout the Site, areas where ASTs are located are bermed to prevent spills and leaks from



reaching New Haven Harbor, automatic shut offs for loading operations, and the use of a 15,000 gallon oil/water separator to treat runoff from the truck loading area. Regular inspections, including looking for signs of spills and sheens throughout the site are conducted in accordance with the current CT Stormwater GP requirements. The Site also has a Facility Response Plan (FRP) that complies with the requirements of federal regulations, so the Terminal is well prepared to respond to any possible spills.

## Resilience Measures

As mentioned above, an addition to the 2025 IGP is that all sites must consider resilience measures into their Stormwater Pollution Prevention Plan (SWPPP). Potential resilience measures include, but are not limited to, structural improvements, enhanced pollution prevention methods and other mitigation measures to minimize the impacts of major storm events, such as hurricanes, storm surges, extreme precipitation and flood events. If these SCMs are already in place, they should be documented in the SWPPP, per Section 7(c)(2)(D)(v) of the 2025 IGP.

Section 7(d)(3)(A) of the 2025 IGP notes that the resilience measures be included in the semi-annual comprehensive inspections. This inspection also includes stormwater control measures, non-structural control measures, stormwater management systems and storage areas.

The Site has an existing series of procedures to account for extreme weather conditions, detailed in its emergency planning documents, including its Business Continuity Plan (BCP). This plan documents the steps to account for a series of events, including extended power outages, flooding, hurricanes and blizzards. The primary method of preparing for a potential weather event is inventory management. Incoming and outgoing shipments of product will be limited or stopped to avoid dangerous conditions. The volume of each AST will be distributed to prevent tanks from becoming dislodged by flood waters. These measures are consistent with Best Management Practices and Best Industry Practices that I am familiar with based upon my experience with facilities such as the Site.

Neither the current Permit nor the 2025 IGP requires facilities under Sector P to address a specific weather condition or flood volume. Based on my experience working with numerous Connecticut facilities on stormwater compliance issues, consideration of resilience measures has not to date been included in any current SWPPP. To my knowledge, no other entity in the State has incorporated consideration of "climate change" factors in its SWPPP. Based on my experience and review of hundreds of SWPPPs, this is not an existing Best Industry Practice for terminals such as the Site.

## Conclusion

As explained above and in the attached article, the 2025 IGP adds new requirements that permittees consider the use of Stormwater Control Measures which are intended to minimize the discharge of pollutants from permitted facilities. These SCMs include the use of Best Management Practices and site-specific controls. Defendants use a mix of controls including equipment designed to prevent overfilling while trucks are loading and an oil-water separator in the event of a spill or leak in the loading area. Tank areas are bermed and have been re-surveyed to ensure

