FILED UNDER SEAL

# EXHIBIT A

FILED UNDER SEAL

## EXPERT REPORT OF SUSAN PARKER BODINE

1.  I am Susan Parker Bodine. I am a partner in the law firm Earth & Water Law in Washington, D.C. I have expertise in the scope of the regulatory authority of the Clean Water Act, 33 U.S.C. 1251 *et seq.* and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.* My business address is 1455 Pennsylvania Ave., N.W., Suite 400, Washington, D.C. 20004.

### Assignment

2.  I have been retained by King & Spalding LLP to provide an expert opinion regarding whether the facts alleged by Conservation Law Foundation in *Conservation Law Foundation v. Shell Oil Company, et al,* No. 3:21-cv-00933 (D. Ct.) are relevant to the technical requirements of the Clean Water Act (CWA) or the Resource Conservation and Recovery Act (RCRA). My role as an expert is to provide background and technical context regarding the regulatory frameworks, statutory authority, and practical implementation of the CWA and RCRA, based on my extensive experience and expertise in the technical requirements of these statutes. I do not offer legal conclusions or opinions as to the ultimate legal issues in this case, nor do I intend to instruct the Court or jury on the law. My opinions are limited to the technical requirements and regulatory practices under these statutes as they are generally understood and applied by regulatory agencies. I am being compensated at my hourly rate of $750/hr. My compensation is not dependent on the outcome of the litigation.

### Summary of Opinions

3.  The following reflects my technical and regulatory opinions, based on my extensive experience in the enforcement and administration of the CWA and RCRA. My opinions are intended to assist the Court and the parties in understanding the regulatory context and technical requirements of these statutes and are not offered as legal conclusions or as instructions on the law.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

FILED UNDER SEAL

4. Based on my decades of technical experience with the CWA, it is my opinion that the duties that Conservation Law Foundation (CLF) seeks to find in the CWA and the Connecticut Department of Energy & Environmental Protection's (DEEP's) 2018 and 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity are not related to meeting CWA obligations. Specifically, a "climate assessment" and proposed measures to adapt to increased flood risks that may result from climate change do not meet the CWA definition of effluent limits or standards and are not limitations on a discharge, which are central to establishing the practical scope of CWA authority. Further, even if climate assessment and adaptation measures fell within the scope of CWA authority, they do not represent best industry practices so the applicable DEEP permit includes no requirement to implement them.

5. Based on my decades of experience with RCRA technical requirements, it also is my opinion that the petroleum product stored in aboveground storage tanks at the Terminal is not a solid or hazardous waste regulated under RCRA. Specifically, the petroleum product inside of the tanks at Defendants' New Haven Terminal, located at 481 East Shore Parkway, New Haven, Connecticut ("the Terminal") has not been discarded. Therefore, there is no authority under RCRA to regulate the storage of petroleum product at the Terminal.

6. These opinions are based on my extensive experience with the technical requirements of the CWA and RCRA and my understanding of how the CWA and RCRA are interpreted by EPA and implemented in practice and by applying my knowledge of these statutes to the facts presented in this matter. I gained this understanding as a regulator tasked with enforcing these statutes and related regulations, as a regulator tasked with implementing these statutes and revising related regulations, as a congressional staffer tasked with overseeing agency implementation of these statutes and drafting legislation to amend these statutes, and as an attorney in private practice tasked with advising clients on compliance with these statutes.

7. I explain the bases for these opinions below.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**            2

FILED UNDER SEAL

16. In the course of my 37 years working on environmental law and policy, I have gained a deep understanding of the scope of authority granted by Congress to EPA under the CWA.

17. The regulatory authority of the CWA over stormwater discharges is based on section 301, which prohibits the discharge of a pollutant unless the discharge is in compliance with effluent limits and standards as prescribed in a permit issued under the Act. 33 U.S.C. 1311.

   a. "Discharge of a pollutant" is a defined term.  It means the addition of any pollutant to navigable waters from any point source. 33 U.S.C. 1362(12).
   b. "Point source" is a defined term. It means any discernible, confined and discrete conveyance.  33 U.S.C. 1362(14).
   c. "Pollutant" is a defined term. It means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. 1362(6).
   d. "Effluent limitation" is a defined term. It means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters. 33 U.S.C. 1362(11).

18. In accordance with the statute, regulatory authority under the CWA applies only to the discharge. Section 301 of the CWA does not give EPA authority to regulate the source of a discharge.

   *"EPA can properly take only those actions authorized by the CWA -- allowing, prohibiting, or conditioning the pollutant discharge.  And, contrary to EPA's assumption, the CWA does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants.  Thus, just as EPA lacks authority to ban construction of new sources pending permit issuance, so the agency is powerless*

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER          9

*to impose permit conditions unrelated to the discharge itself." NRDC v. EPA, 859 F.2d 156, 169-70 (D.C. Cir. 1988).*

19. Further, a CWA permit standard or limitation must set forth specific rules applicable to the discharge.

   a. *"As used in the relevant context, a limitation is a 'restriction or restraint imposed from without (as by law[]).* [Citation omitted] *A provision that tells a permittee that it must do certain specific things plainly qualifies as a limitation. Such a provision imposes a restriction 'from without.' But when a provision simply tells a permittee that a particular end result must be achieved and that it is up to the permittee to figure out what it should do, the direct source of restriction or restraint is the plan that the permittee imposes on itself for the purpose of avoiding future liability. In other words, the direct source of the restriction comes from within, not 'from without.'" City and County of San Francisco v. EPA, 145 S. Ct. 704, 715 (U.S. 2025).*

   b. *"In sum we hold that [section 301 of the CWA] does not authorize EPA to include 'end-result' provisions in NPDES permits." 145 S. Ct. at 720.*

   c. *"This narrative standard is insufficient to give a shipowner guidance as to what is expected or to allow any permitting authority to determine whether a shipowner is violating water quality standards. By requiring shipowners to control discharges 'as necessary to meet applicable water quality standards' without giving specific guidance on the discharge limits, EPA fails to fulfill its duty to 'regulat[e] in fact, not only in principle.'" NRDC v. EPA, 808 F.3d 556, 578 (2ⁿᵈ Cir. 2015)* (citing *Waterkeeper Alliance v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005)).

20. As a technical matter, the Supreme Court's ruling in *City and County of San Francisco* does not preclude the adoption of technology-based effluent limitations that are set forth as descriptive narrative requirements, such as best management practices. 145 S. Ct. at 710, 720. However, those narrative requirements must be specific so that they are imposed from without, not from within. And those requirements must be a limitation on or a standard applicable to a discharge, not to the facility itself.

21. In my experience overseeing enforcement and implementation of the CWA, the technical requirements have never been used, and have never been contemplated to be used, as a flood control statute. The only references to flood or flooding in the CWA are found in non-regulatory provisions (studies in collaboration with other federal agencies under section 104(n), eligible uses of funds in the Oil Spill Liability Trust Fund for Gulf Coast

FILED UNDER SEAL

extent achievable using control measures that are technologically available and economically practicable in light of best industry practice."

d. Consistent with the scope of authority under the CWA, the Permit's definition of control measures is limited to controls on a discharge. None of the control measures identified in the Permit are measures that relate in any way to the prevention of the possibility of a discharge that is not yet occurring.

e. The term "best industry practice" as used in the Permit's definition of control measures can only refer to an industry practice related to controlling the discharge of pollutants.

f. Accordingly, it is my opinion as a CWA regulatory and compliance expert that nothing in the Permit requires a climate assessment or modification of a facility to address potential sea level rise.

26. The requirement in the DEEP permit for consistency with the applicable goals and policies in section 22a-92 of the Connecticut General Statutes does not expand the scope of regulatory authority being implemented by the Permit. That requirement applies to "such activity." The activity referred to is stormwater discharge associated with industrial activity, which the permit defines at "the discharge from any conveyance which is used for collecting and conveying stormwater and which is directly related to manufacturing, processing, or material storage areas at an industrial activity." Notwithstanding any reference to the state's Coastal Management Act, the Permit only regulates discharges of pollutants to navigable waters. Thus, a stormwater discharge into a coastal resource, such as an oyster bed, may be prohibited by the Permit. However, the reference to the Coastal Management Act does not expand regulation under the Permit to include facility siting or flood control.

27. Even if climate change assessment and adaptation measures did fall within the scope of the Permit's definition of control measure none of the information I have reviewed indicates that any such "best industry practice" exists at this time, as EPA uses that term in the regulatory context.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER          13

relevant industry codes, practices or consensus standards." The General Duty Clause, Office of Land and Emergency Management, EPA 550-F-20-002 (Apr. 2020).

34. I am not aware of any EPA survey of industry climate change practices relevant to CWA compliance. I also am not aware of any consensus technical guidelines for complying with a CWA stormwater permit created by experts in a particular industry for use throughout that industry that includes assessment of climate change or modification of structures to protect against flooding that may result from climate change.

35. As a result, it is my opinion as an expert in CWA regulatory compliance, that control measures in the Connecticut 2018 and 2021 Multi-Sector General Permit for Industrial Facilities do not include climate change and adaptation measures.

**Bases for my opinion that the petroleum product stored at the Terminal is not a waste under RCRA.**

36. RCRA and its implementing regulations set forth detailed requirements for the treatment, storage, and disposal of hazardous waste. However, RCRA does not regulate material that is not a waste, whether hazardous or not, and does not give EPA any authority to prevent a product from becoming a waste.

37. The Complaint alleges a RCRA violation based on a perceived "intent to discard" petroleum products stored at the Terminal. However, "intent to discard" is not an activity that is regulated under RCRA. RCRA applies only after a material has been discarded. *American Mining Congress v. EPA*, 824 F.2d 1177, 1190 (D.C. Cir. 1987) ("Congress clearly and unambiguously expressed its intent that 'solid waste' (and therefore EPA's regulatory authority) be limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away.").

38. RCRA regulations require a fact-based determination of whether or not a material is discarded.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER          15

39. Under RCRA, a material is considered discarded if it is abandoned by being disposed of, burned or incinerated, accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated. 40 CFR 261.2(b).

40. EPA's 2008 Definition of Solid Waste rulemaking, in which I was extensively involved as Assistant Administrator for OSWER, establishes criteria for identifying when a hazardous secondary material is discarded. 73 Fed. Reg. 64,668, 64,673 (Oct. 30, 2008).

41. EPA's 2008 regulations require a generator or a recycler of a hazardous secondary material to manage the secondary material in the same manner as an analogous raw material.  If there is no analogous raw material, the regulations required the hazardous secondary material to be contained.  In 2015, EPA added a definition of the term "contained" to its regulations to provide guidance to generators and recyclers of hazardous secondary materials. This definition comes into play only if there is no analogous raw material. The 2015 amendments did not change the fact that if there is an analogous raw material, a hazardous secondary material is not discarded if it is managed in a manner that is consistent with the management of the raw material. 40 CFR 260.43(a)(3).

42. Based on this understanding of EPA's RCRA authority, petroleum product stored at the Terminal cannot be considered discarded. Further, an "intent to discard" does not establish RCRA authority. Accordingly, the owners and operators of the Terminal cannot be considered to be in violation of RCRA based on the storage of petroleum product even if located in a flood plain and even if there is a possibility of a release.

**Evaluation of Plaintiff's Expert Reports**

43. Nothing in the expert reports served by the plaintiff in this litigation changes the opinions expressed above.

44. Dr. James O'Donnell provides his opinion that sea level rise will occur in the New Haven Harbor and that Defendants are aware of the potential for sea level rise.  As discussed

provided no examples of practices related to climate assessment and adaptation measures that are technical guidelines created by experts in a particular industry for use throughout that industry using a consensus process.

48. Dr. Robert Nairn provides his opinion on the adequacy of flood protection at the Terminal and cites to guidelines issued by the American Society of Civil Engineers and the Association of Floodplain Managers. As discussed above, neither the CWA nor RCRA give an agency the authority to require flood protection.

49. Mr. Joshua Macey, Esq. provides his opinion that "Shell" and Motiva exerted control over the Terminal and that "Shell" can afford to pay a large fine. Based on my experience as head of enforcement at EPA, I am aware of the factors considered in setting penalties for violations of the CWA and RCRA. EPA will consider inability to pay to justify lowering a penalty. However, deep pockets are not a consideration.

50. Dr. Wendi Goldsmith references the other expert reports and provides her opinion that best industry practice requires the Terminal to apply recommendations applicable to critical infrastructure as a matter of compliance with the CWA and RCRA. As discussed above, CWA authority does not attach until a discharge occurs and RCRA authority does not attach until a material is discarded. Thus, compliance with facility hardening recommendations do not fall within the scope of CWA and RCRA authority over the Terminal.

**Conclusion**

51. Based on my understanding of how the CWA and RCRA are authorized and implemented in practice and by applying my knowledge of these statutes to the facts presented in this matter it is my opinion that the regulatory frameworks of these two statutes do not provide the authority to compel the climate related adaptation measures being sought by CLF in this case.

FILED UNDER SEAL

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Dated: June 23, 2025

_____

Susan Parker Bodine

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER    19