# Exhibit A

Page 1

```
 1                              Volume I
                           Pages 1 to 291
 2                           Exhibits See Index
 3              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
 4
      - - - - - - - - - - - - - - - -x
 5                                    :
      CONSERVATION LAW FOUNDATION,    :
 6    INC.,                           :
                  Plaintiff,          :
 7                                    :  Civil Action
            vs.                       :  No.
 8                                    :  3:21-cv-00933-
      EQUILON ENTERPRISES LLC D/B/A   :  VDO
 9    SHELL OIL PRODUCTS US, TRITON   :
      TERMINALING LLC, and MOTIVA     :
10    ENTERPRISES LLC,                :
                  Defendants.         :
11                                    :
      - - - - - - - - - - - - - - - -x
12
              VIDEOTAPED DEPOSITION OF WENDI GOLDSMITH,
13    Ph.D., PG, a witness called by counsel for the
      Defendants, taken pursuant to the Federal Rules of
14    Civil Procedure, before Jane M. Werner, Registered
      Merit Reporter and Notary Public in and for the
15    Commonwealth of Massachusetts, appearing at the
      Offices of Conservation Law Foundation, Inc., 62
16    Summer Street, Boston, Massachusetts, on Wednesday,
      August 20, 2025, commencing at 10:02 a.m.
17
      PRESENT:
18
          Conservation Law Foundation
19              (by Christopher M. Kilian, Esq.)
                15 East State Street, Suite 4, Montpelier,
20              VT 05602, for the Plaintiff.
                ckilian@clf.org
21              802.223.5992
22
23
24
```

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

```
 1   PRESENT:  (Continued)
 2       Conservation Law Foundation
             (by Ana McMonigle, Esq.)
 3           195 Church Street, Mezzanine Level,
             Suite B, New Haven, CT 06510,
 4           for the Plaintiff.
             amcmonigle@clf.org
 5           203.298.7692
 6       King & Spalding
             (by Douglas A. Henderson, Esq.)
 7           1180 Peachtree Street, NE, Suite 1600,
             Atlanta, GA 30309, for the Defendants.
 8           404.572.4600
 9       Wiggin and Dana LLP
             (by James Craven, Esq.)
10           One Century Tower, 265 Church Street,
             New Haven, CT 06510, for the Defendants.
11           jcraven@wiggin.com
             203.4984361
12
     Also Present:  Oleg Bolotov, Videographer
13                  Andrew Miller (Via Zoom)
14
                      *  *  *  *  *
15
16
17
18
19
20
21
22
23
24
```

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 3

1                          I N D E X
2
    WITNESS:                        DIRECT   CROSS
3
    WENDI GOLDSMITH, Ph.D., PG
4   (By Mr. Henderson)               9
    (By Mr. Kilian)                        259
5
                            *   *   *
6
                        E X H I B I T S
7
    EX. NO.                                    PAGE
8
9   EXHIBIT G1   Expert Report of Wendi Goldsmith,
                 dated 5/8/25                     71
10
    EXHIBIT G2   Expert Rebuttal Report of Wendi
11               Goldsmith, dated 8/1/25          71
12  EXHIBIT G3   Document entitled "General Permit
                 for the Discharge of Stormwater
13               Associated with Industrial
                 Activity, Effective Date:
14               10/1/18"                         71
15  EXHIBIT G4   Document entitled "General Permit
                 for the Discharge of Stormwater
16               Associated with Industrial
                 Activity, Effective Date:
17               10/1/21"                         71
18  EXHIBIT G5   Document entitled "Connecticut
                 Department of Energy and
19               Environmental Protection,
                 National Pollutant Discharge
20               Elimination System General
                 Permit for the Discharge of
21               Stormwater Associated with
                 Industrial Activities, General
22               Permit No.: CTR050000"          72
23
24

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 4

```
 1               E X H I B I T S, (Continued)
 2    EX. NO.                                        PAGE
 3    EXHIBIT G6   Document entitled "National
                   Pollutant Discharge
 4                 Elimination System General
                   Permit for the Discharge of
 5                 Stormwater Associated with
                   Industrial Activity Fact Sheet"    100
 6
      EXHIBIT G7   Document entitled "Supplemental
 7                 Fact Sheet Draft General NPDES
                   Permit for the Discharge of
 8                 Stormwater Associated with
                   Industrial Activities," dated
 9                 March 2025                          103
10    EXHIBIT G8   (Not used)
11    EXHIBIT G9   Document entitled "National
                   Pollutant Discharge Elimination
12                 System General Permit for the
                   Discharge of Stormwater
13                 Associated with Industrial
                   Activity Fact Sheet, General
14                 Permit No.: CTR050000              105
15    EXHIBIT G10  Document entitled "Supplemental
                   Fact Sheet (December 2024)         108
16
      EXHIBIT G11  Document entitled "Appendix G -
17                 Climate Change Considerations      199
18    EXHIBIT G12-16  (Not used)
19    EXHIBIT G17  Document entitled "Policy
                   Statement 360 -Climate change"     163
20
      EXHIBIT G18  Document entitled "Flood
21                 Resistant Design and
                   Construction," Standard 24-24      128
22
      EXHIBIT G19  Document entitled "Flood
23                 Resistant Design and
                   Construction," Standard 24-14      127
24
```

Page 5

1              E X H I B I T S, (Continued
2    EX. NO.                                    PAGE
3    EXHIBIT G20 Document entitled "A Guide
                 for Higher Standards in
4                Floodplain Management,"
                 Revised March 2013              206
5
     EXHIBIT G21 Document entitled "Industrial
6                Stormwater Fact Sheet Series"   200
7    EXHIBIT G22 Document entitled "U.S.
                 Environmental Protection Agency
8                SPCC Field Inspection and Plan
                 Review Checklist"               168
9
     EXHIBIT G23 Document entitled "Flood
10               Preparedness Recommended Best
                 Practices"                      194
11
     EXHIBIT G24 Document entitled "Developing
12               Your Stormwater Pollution
                 Prevention Plan, A Guide for
13               Industrial Operators,
                 March 2021"                     201
14
     EXHIBIT G25 Document entitled "FEMA Policy
15               Standards for Flood Risk,
                 Analysis and Mapping, FEMA
16               Policy #FP 204-078-1 (Rev 10)"  176
17   EXHIBIT G26 Document entitled "EPA Region 1
                 Recommended Procedures and
18               Resources for the Development
                 of Adaptation Plans for
19               Wastewater Treatment Systems
                 and/or Sewer Systems"           150
20
     EXHIBIT G27 (Not used)
21
     EXHIBIT G28 Document entitled "New York
22               State Petroleum Terminal
                 Resiliency Assessment NYSERDA
23               Contract 30186, Final Report,
                 March 2014"                     214
24

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 6

1              E X H I B I T S, (Continued

2   EX. NO.                                        PAGE

3   EXHIBIT G29 Document entitled "Natural Hazard
                Risk Assessment Guidance for

4               Marine Oil Terminals, December
                2024"                              224

5

    EXHIBIT G30-33 (Not used)

6

    EXHIBIT G34 Document entitled "Responding to

7               Changes in Sea Level: Engineering
                Implications (1987"                140

8

    EXHIBIT G35 Document entitled "Risk

9               Management Series, Design Guide
                for Improving Critical Facility

10              Safety from Flooding and High
                Winds, FEMA 543/January 2007       202

11                      *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 16

```
1       Q.   Is that what shows up on the diploma?

2       A.   Yes.

3       Q.   Do you have a degree in engineering?

4       A.   No.

5       Q.   Have you ever been a licensed engineer in

6  any state?

7       A.   No.

8       Q.   Are you a licensed geologist in

9  Connecticut?

10      A.   No.

11      Q.   Do you have any hydrology specialty

12 certificates?

13      A.   No.

14      Q.   Are you a meteorologist?

15      A.   No.

16      Q.   Are you an atmospheric scientist?

17      A.   No.

18      Q.   Are you an expert in financial analysis?

19      A.   No.

20      Q.   I noticed you had a degree from Conway.

21 Are you a licensed landscape architect?

22      A.   No.

23      Q.   How about a soil scientist in Connecticut?

24      A.   Not licensed.
```

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 20

1    is not, you know, like, engineering plan

2    certification type work.  But there is some

3    professional liability coverage, as well as other

4    coverages.

5         Q.    So for oil and gas, have you ever been to

6    an offshore facility?

7         A.    I've been pretty close.

8         Q.    Have you ever been to an offshore facility?

9         A.    I have never been on an offshore facility.

10        Q.    Have you ever been an operator of any oil

11   and gas equipment?

12        A.    No.

13        Q.    Do you have operational experience in the

14   oil and gas industry?

15        A.    No.

16        Q.    Outside of your experience for CLF, have

17   you ever been to a petroleum bulk storage terminal,

18   fuel storage tank facility?

19        A.    Yes.

20        Q.    And where was that?

21        A.    I toured, using multiple forms of

22   transportation, facilities throughout Greater New

23   Orleans and the Gulf Coast area impacted after

24   Hurricane Katrina.

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 21

1    Q.    And what names of those facilities did you

2    inspect?

3    A.    I know one was Murphy Oil.  And there were

4    a bunch of upstream and midstream facilities along

5    the Mississippi River, primarily.  But I overflew a

6    couple weeks after the hurricane.

7    Q.    How many petroleum bulk storage terminals

8    have you been to personally, where you got out and

9    walked around?

10    A.    I'd say a dozen.

11    Q.    And where are those?

12    A.    Louisiana, Massachusetts, Connecticut,

13    Maine.

14    Q.    Can you list the ones in Maine you've been

15    to?

16    A.    I don't recall.

17    Q.    How about the ones in Connecticut?

18    A.    Shell and Gulf.

19    Q.    Have you been to Buckeye?

20    A.    I've had a good gander at it, but I have

21    not been in the facility.

22    Q.    For Shell and for Gulf, was that in your

23    role for CLF for the litigation or potential

24    litigation?

Wendi Goldsmith , Ph.D., PG                 August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 22

1      A.    Yes.

2      Q.    For the ones in Maine, was that for

3  litigation or potential litigation?

4      A.    There was a trip I made to Maine for

5  reviewing coastal dynamics issues in the proximity

6  of a couple of terminals after a major coastal storm

7  probably two years ago.  But -- it may sound a

8  little strange; but at this point, I have intense

9  curiosity about these matters.  So I will take

10 detours and have a look to see many coastally facing

11 industrial sites.

12     Q.    Did you actually go onto the site of the

13 terminal in Maine?

14     A.    No, I have never been on a site there.

15     Q.    So just to be clear, you haven't been to a

16 petroleum bulk storage terminal in Maine?

17           MR. KILIAN:  Objection.

18     A.    I have not been --

19     Q.    You have not been onsite --

20     A.    Correct.

21     Q.    -- to a petroleum bulk storage facility in

22 Maine.

23           How about in Connecticut?  Have you been

24 onsite to what you refer to as the "Shell New Haven

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

                                              Page 23

 1    terminal"?
 2         A.    Yes.
 3         Q.    And the Gulf?  Have you been onsite at the
 4    Gulf?
 5         A.    Yes.
 6         Q.    Is that now known as "Pipe Fuels"?
 7         A.    For some with more nimble minds than I,
 8    yes.
 9         Q.    Have you been onsite at any other petroleum
10    bulk storage facility in Connecticut?
11         A.    Not that I recall.
12         Q.    How about Mass.?  Have you been onsite at a
13    petroleum bulk storage terminal there?
14         A.    I've been on many former sites.
15         Q.    Have you been on any operating petroleum
16    bulk storage terminal facilities in Massachusetts?
17         A.    Not inside the fence line.
18         Q.    What other states have you been to for
19    petroleum bulk fuel storage terminals?
20         A.    I mentioned Louisiana.
21         Q.    And for Louisiana, what was the name of
22    that terminal that you were onsite?
23         A.    Well, I mentioned that I overflew the
24    coastal area impacted by Hurricane Katrina just a

Wendi Goldsmith , Ph.D., PG                      August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 24

1  few weeks after the hurricane, and many of the roads

2  were not passable.  And I was in the air, but at

3  about 400-feet elevation, so I was able to get a

4  close look at a lot of these facilities, but I was

5  not boots on the ground.

6      Q.   So did you actually go onsite, walk after

7  the flood at any petroleum bulk storage terminal?

8      A.   No.  But I have been on noncommercial

9  petroleum bulk storage facilities at the major

10  pumping stations throughout Greater New Orleans,

11  which themselves include large storage tanks.

12      Q.   Have you ever worked for any party on

13  environmental compliance for operating a petroleum

14  bulk storage terminal?

15      A.   No.

16      Q.   Have you ever operated any equipment at a

17  petroleum bulk storage facility?

18      A.   No.

19      Q.   Did you participate in any permitting

20  activities when you were at Bioengineering that

21  occurred at petroleum bulk storage terminals?

22      A.   Some having to do with clean-up,

23  stabilization and closure of existing permits, but

24  not related to the bulk oil storage function itself.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 27

1    the site for filter system backwash treatment.

2         Q.    Have you ever interacted with Connecticut

3    DEEP, CT D-E-E-P, on any industrial stormwater

4    permitting issue?

5         A.    Not on industrial stormwater.

6         Q.    So you have no experience in negotiating

7    industrial stormwater permitting issues with

8    Connecticut DEEP?

9              MR. KILIAN:   Objection.

10        Q.    You can answer.

11        A.    Correct.

12        Q.    Now, have you ever designed a stormwater

13   groundwater infiltration system?

14        A.    Yes.

15        Q.    In the State of Connecticut?

16        A.    In Connecticut, I have been involved on an

17   interdisciplinary team working on that multiple

18   times.

19        Q.    But have you designed one?

20        A.    I have not.  It is often the case that

21   there is science, landscape, architecture, and

22   engineering involvement, and I would be contributing

23   to the science and the water quality treatment plant

24   planning phases of the work.

Wendi Goldsmith , Ph.D., PG              August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 28

1      Q.   I think you testified earlier you're not a

2   licensed engineer in Connecticut, correct?

3      A.   I am not an engineer at all.

4      Q.   And are you offering any engineering

5   opinions in this case?

6      A.   No.

7      Q.   Now, how about SPCC plans; Spill,

8   Prevention, Control and Countermeasure plans?  Have

9   you ever certified an SPCC plan?

10     A.   No.

11     Q.   Have you ever drafted an SPCC plan

12  yourself?

13     A.   I have not drafted, but I have reviewed

14  them.

15     Q.   Are you an engineer that can certify an

16  SPCC plan?

17     A.   No.

18     Q.   How about preparing a stormwater pollution

19  prevention plan, an S-W-P-P-P or a SWPPP?  Have you

20  ever certified a SWPPP in the State of Connecticut?

21     A.   Not in Connecticut.

22     Q.   Are you capable of certifying a SWPPP in

23  the State of Connecticut?

24     A.   Not in Connecticut.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 30

1        A.    They were in the closure process.

2        Q.    Do you have any expertise in operating a

3    petroleum bulk storage terminal?

4              MR. KILIAN:   Objection.

5        A.    No.

6        Q.    Have you ever negotiated a consent decree

7    with any state agency over an Industrial Stormwater

8    Permit?

9        A.    No.

10       Q.    Dr. Goldsmith, how about the EPA?  Have you

11   had any experience working with EPA?  Let me ask

12   this:  Have you ever represented EPA before directly

13   as a contractor?

14       A.    I have held contracts with EPA.

15       Q.    Who is -- what does "held contracts" mean?

16       A.    Well, my signature was on a contract

17   between -- multiple contracts between Bioengineering

18   Group and various offices of U.S. EPA.

19       Q.    How about with the Corps of Engineers?

20   Have you worked for the Corps of Engineers?

21       A.    Yes.

22       Q.    Have you ever been terminated from a

23   project by the Corps of Engineers?

24       A.    One project.  They sent us a letter to

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 35

1      A.    In particular, I think Opinion 10 speaks

2   about some contaminant pathways and receptors at the

3   terminal facility.

4      Q.    And what is your opinion?

5      A.    I speak to the availability of different

6   coastal storm damage effects to contribute to

7   release and dispersal of contaminants affecting

8   known habitats and different aspects of community --

9   nearby communities.

10     Q.    Did you conduct any surface water flow

11  studies to see how any dispersal might affect the

12  ecological resources?

13     A.    I did not conduct modeling.  However, I did

14  conduct preliminary visual observation of site

15  conditions and surface water features and some

16  desktop understanding of the terrain and drainage

17  features and natural channel features in the area.

18  And I reviewed other expert reports prepared in this

19  matter on behalf of CLF.

20     Q.    I meant, what did you do.  So you said you

21  did not do any modeling of potential contaminant

22  movement to these ecological resources.

23     A.    Correct.  That was done by others.

24     Q.    Did you collect any data on stormwater for

Page 36

1    the New Haven terminal owned and operated by

2    defendants?

3         A.    I did not collect any data, but I reviewed

4    many different documents containing stormwater data

5    that had been collected primarily by the defendants

6    and their contractors.

7         Q.    Are you HAZWOPER certified?

8         A.    No.

9         Q.    Do you have any firsthand knowledge on how

10   the New Haven terminal owned and operated by the

11   defendants creates any hazardous waste?

12        A.    I have read a lot of documents that I

13   identify different known -- different known

14   contaminants onsite.

15        Q.    When you were at the site, did you actually

16   observe any hazardous waste management activities?

17        A.    Well, there were many large tanks full of

18   bulk petroleum products and ancillary chemical

19   additives and what not.  And there were also, you

20   know, stormwater -- an oil/water separator device.

21   I definitely peered in and had a good whiff of that.

22   And I read a number of reports about the legacy

23   contaminants within different areas of the site,

24   including some reportable incidents where spills and

Wendi Goldsmith , Ph.D., PG                      August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37

1    general presence of contaminants had been identified

2    and reported.

3         Q.   And that's in your report?

4    ███      ██    ████████████████████████████████

5    ██  █████████████████████████████████████████

6    ██  ███████████████████████████

7         Q.   Did you actually conduct any test of soil

8    at the New Haven terminal?

9         A.   No.  I didn't have my trusty shovel with

10   me.

11        Q.   Did you conduct any samples of stormwater

12   at the New Haven terminal?

13        A.   No.

14        Q.   Did you take any samples of groundwater at

15   the New Haven terminal?

16        A.   No.

17        Q.   Did you take any samples of soil

18   sediment -- river sediment?

19        A.   No.

20        Q.   Did you conduct any samples of pool water?

21        A.   No.

22   ██      ██    ██████████████████████████████

23   ██  ███████████████████████████████████

24   ██      ██    ██████████████████████████████████

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.



Page 40

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 49

1      A.    Not that I recall.

2      Q.    Have you ever taken samples at any other

3   terminal in the New Haven Harbor?

4      A.    Not at the terminal.

5      Q.    How about any other terminal other than the

6   New Haven terminal owned by defendants?

7      A.    I have never conducted any sampling inside

8   the fence at any terminal.

9      Q.    Have you ever sampled stormwater flowing

10  off of a terminal in New Haven?

11     A.    Yes, I have.

12     Q.    And which one was that at?

13     A.    Um, I have taken samples flowing under

14  Water Street, in front of the Gulf terminal and

15  discharging into the -- essentially under the

16  Quinnipiac Bridge, roughly in the alignment of Water

17  Street, which contained multiple facilities,

18  stormwater discharges.

19     Q.    And what were the results of those tests?

20     A.    They weren't great.  They were also done

21  during dry weather; not during an optimal first

22  flush condition, as is standard.

23     Q.    What do you mean by "not great"?

24     A.    Well, when you are able to capture the

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 54

1    terminal?

2              MR. KILIAN:  Objection.

3         A.   I know that the training is discussed.  I

4    have no knowledge of what the curriculum is.

5         Q.   Do you know if Connecticut DEEP has ever

6    inspected the New Haven terminal?

7         A.   I know that there have been various

8    occasions where personnel from DEEP have been at the

9    facility.

10        Q.   Have they ever issued a notice of violation

11   to defendants about stormwater?

12             MR. KILIAN:  Objection.

13        A.   Um, I don't believe they've done that in

14   recent years.

15        Q.   Have you reviewed the Connecticut DEEP

16   files on the New Haven terminal?

17        A.   I don't believe I've seen any files that

18   were sourced from Connecticut DEEP directly.  I have

19   read a number of files that include correspondence

20   with Connecticut DEEP from the defendant.

21        Q.   Has EPA ever issued a notice of violation

22   to the New Haven terminal for industrial stormwater?

23             MR. KILIAN:  Objection.

24        A.   I don't know.

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 55

1      Q.   Has Connecticut DEEP ever cited the
2   terminal for noncompliance?
3           MR. KILIAN:  Objection.
4      A.   I don't recall.
5      Q.   How about OSHA?  Has it ever cited the New
6   Haven terminal for any violations of OSHA?
7           MR. KILIAN:  Objection.
8      A.   I don't recall seeing any OSHA-related
9   correspondence.
10     Q.   How about the Coast Guard?  Have they ever
11  issued a notice of noncompliance to the New Haven
12  terminal?
13          MR. KILIAN:  Objection.
14     A.   I don't recall seeing any.
15     Q.   Has Connecticut DEEP ever asked the
16  terminal to do a climate change vulnerability
17  analysis?
18          MR. KILIAN:  Objection.
19     A.   I don't believe that Connecticut DEEP made
20  mention of that in any emails or other
21  correspondence I reviewed.
22     Q.   Has Connecticut DEEP ever asked the New
23  Haven terminal to change any of its practices or
24  procedures involving stormwater at the New Haven

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 65

1     Q.    Again, I'm just trying to get your views.

2           Has Connecticut DEEP ever stated in writing

3     to any industrial permitee under the stormwater

4     permit in Connecticut that they were required to

5     complete an assessment of climate change effects for

6     their facilities?

7           MR. KILIAN:  Objection.  Overbroad.

8     Q.    Go ahead.  You can answer.

9     A.    I believe the existence of the CIRCA

10    program is there to help make that information

11    available to everyone; residential, industrial,

12    municipal alike.  Anybody who is in Connecticut

13    operating anything has access to a set of informed

14    tools to guide how they handle whatever needs are

15    influenced by climate, which reaches out and touches

16    almost everything.

17    Q.    Has Connecticut DEEP ever stated in writing

18    that it wanted all industrial permitees under the

19    stormwater permit to specifically conduct a climate

20    change vulnerability risk assessment?

21          MR. KILIAN:  Objection, overbroad.

22    Q.    That's my question.

23          MR. KILIAN:  It calls for hearsay.

24    A.    I'm not aware of anything.

Wendi Goldsmith , Ph.D., PG                      August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 66

1      Q.   Are you aware of EPA ever stating in

2   writing that all permitees under an Industrial

3   Stormwater Permit should complete a risk assessment

4   or a vulnerability assessment, as you called it, of

5   climate change on their facilities?

6            MR. KILIAN:   Objection.

7      A.   I am aware of many EPA publications that

8   talk about coastally situated facilities with tanks

9   and surface ponds enclosed by berms, etc.,

10   specifically in relation to wastewater treatment

11   facilities, which are often situated and configured

12   that way.  I don't recall seeing anything that EPA

13   prepared about bulk petroleum storage facilities.

14   But the tanks and open bermed areas are similar.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 75

1        A.    I don't think it does.

2        Q.    How about climate change?  Does it mention

3   climate change anywhere in the 2018 permit?

4        A.    Not specifically.  But I think implicitly.

5        Q.    Does the 2018 permit mention specifically

6   climate resilience?

7        A.    No, it doesn't.

8        Q.    If you could turn to the definitions of

9   "minimize" in the 2018 permit.  Is this where you

10  get the term "best industry practice"?

11       A.    Yes.

12       Q.    Is this the only place that it appears in

13  the permit, 2018 permit?

14       A.    Well, I mean, a very big staple of the

15  permit is implementation of control measures.  So

16  the best industry practice that would be applied to

17  achieve the definition of "minimize" covers a lot,

18  even though the definition is where that through

19  line is drawn.

20       Q.    So the word "minimize" means "to reduce

21  and/or eliminate to the extent achievable."  Can you

22  read that definition of "minimize."

23       A.    In quotes, "'Minimize,' for purposes of

24  implementing control measures in Section 5(b) of

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 87

1  knowledge.

2      Q.    Do you have a copy of any statement by DEEP

3  to that effect?

4      A.    Not permitee-specific, no.

5      Q.    Do you have a copy of any emails that

6  they've sent to permitees in the State of

7  Connecticut requesting that they consider the

8  effects of climate change?

9      A.    Not from Connecticut DEEP, but certainly

10  from other programs in Connecticut that are very

11  focused on that topic.

12      Q.    But Connecticut DEEP, who regulates

13  industrial stormwater, has never made that request

14  that its permitees consider climate change effects

15  under the Industrial Stormwater Permit, correct --

16          MR. KILIAN:  Objection.

17      Q.    -- before 2024?

18          MR. KILIAN:  Objection.

19      A.    I am not aware of that, nor am I aware of

20  them providing any statement that it is somehow

21  separated and not a factor under the Industrial

22  General Permit.

23      Q.    Do you know if Connecticut DEEP has ever

24  requested permitees to evaluate the climate change

Page 88

1    effects under any version of the Industrial

2    Stormwater Permit in the State of Connecticut?

3         A.    No.

4         Q.    So I think you have the 2018 permit in

5    front of you.  I think it's marked Exhibit G3.

6              Does it ever mention the National Highway

7    Transportation and Safety Act in the permit?

8         A.    Um, I have some familiarity with the Act.

9    I honestly can't tell you if it's included in this

10   comment or not.

11        Q.    Do you have any documents, copies of emails

12   or any statements from Connecticut DEEP, that an

13   Industrial Stormwater Permitee under the Industrial

14   Stormwater Permit in Connecticut should consider the

15   National Highway Traffic Safety Act in operating its

16   facilities?

17        A.    Not that I recall.

18        Q.    Does the 2018 Industrial Stormwater Permit

19   talk about flooding at dry docks?

20        A.    Um, the permit talks about very specific

21   sectors in a lot of depth, which was not part of the

22   scope of my assignment on this matter.

23        Q.    So it doesn't mention it?  Or it does

24   mention flooding --

Page 103

1    prepare for ongoing climate changes.

2            This is something that preceded this.  So

3    this was just a more explicit step towards pointing

4    people who may be the laggards, as I mentioned

5    earlier, towards the resources that they may not

6    have otherwise been...

7        Q.   And that's your interpretation, correct?

8        A.   That's my interpretation.

9            MR. HENDERSON:  I'm going to hand you

10   what's going to be marked Exhibit G7, which for the

11   record is a supplemental fact sheet from the

12   Connecticut DEEP that was posted April 1, 2024.

13                    (Document marked as

14                    Exhibit G7 for identification)

15       Q.   Dr. Goldsmith, on this document, if you

16   could look at Page 3 of 4.

17       A.   What are we looking at on 3 of 4?

18       Q.   Page 3 of 4, towards the middle of the

19   section.  This is a second statement by the

20   Connecticut DEEP.  And is this -- if you read the

21   first sentence of Section 1.5, including the

22   heading.

23       A.   "As adapted from the U.S. EPA MSGP permit,

24   the draft IGP includes a new section, 'Corrective

Page 104

1    Actions,' providing consistent and concise

2    compliance determinations (i.e., what constitutes a

3    permit violation) and provides the permitee with a

4    roadmap for the necessary steps to return to

5    compliance.  This section includes built-in

6    compliance deadlines to further specify DEEP's

7    expectations for the type of actions that must be

8    taken within a specific time frame and simplifies

9    the reporting requirements for the permitee."

10       Q.   On Page 3 of 4 above that, is it the same

11   language that you previously read in Exhibit G6

12   about -- can you read the first sentence of that

13   paragraph, Section 1.4.

14       A.   "The Resiliency Measure section is a new

15   component of the SWPPP and was added in response to

16   Connecticut's commitment to prepare for ongoing

17   climate change."

18       Q.   Thank you.

19       A.   It's pretty similar.  Is it exactly a

20   match?  They're also saying "resiliency" in some

21   places and "resilience" in others.  So I do see a

22   little bit of a hash with their verbiage.

23       Q.   So they repeated their view that this was a

24   new section to deal with climate change?

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 107

1   permit that you instructed me to read doesn't

2   actually -- the resilience measures, they have good

3   practices with or without climate change.  And they

4   don't mention climate there.

5            MR. HENDERSON:  Jane, can you just read

6   back my question.

7            *(Question read)

8            MR. KILIAN:  My objection is noted.

9       A.   Um, the permit was silent on it one way or

10  another, other than referencing best industry

11  practice and requiring engineer certification of the

12  SWPPP, for instance.  With engineers, many of the

13  engineers I've worked closely with were involved

14  with and otherwise deeply aware of American Society

15  of Civil Engineers' climate change positions and

16  climate resilience focused standards.

17      Q.   Are you a member of the American Society of

18  Civil Engineers?

19      A.   I am not, although I have collaborated with

20  the organization.

21      Q.   And you're not a civil engineer?

22      A.   Correct.

23      Q.   You have no degree in civil engineering?

24      A.   Correct.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 109

1      A.    "The Resiliency Measures section is a new

2   component of the SWPPP," yes.

3      Q.    And your testimony is that it was just

4   implied in the prior permit; the duty to complete a

5   climate change vulnerability risk assessment?

6          MR. KILIAN:   Objection.

7      A.    Well, I think incorporating climate change

8   considerations into any risk evaluation and general

9   planning process, investigating and analyzing the

10   site and its pollutant-related risks overall, yes, I

11   think climate has been for decades a relevant factor

12   to be considered there under the prior permit

13   versions.

14     Q.    So it's your testimony that this obligation

15   to complete a climate change vulnerability risk

16   assessment has been implicit in the permit for how

17   many years?

18     A.    Basically, I would say about 20 years.

19     Q.    So it's your testimony that Connecticut

20   DEEP has had an implied obligation in its Industrial

21   Stormwater Permit to conduct the climate change

22   vulnerability risk assessment; is that correct?

23          MR. KILIAN:   Objection.

24     A.    Yes.  I would say that under best

Page 110

1    practices, that has been absolutely a factor.  I

2    think, if anything, it's this word "resiliency" or

3    "resilience" that is maybe one of the newer angles

4    on this and something that is -- I'm familiar with

5    how many trained professionals in the field find the

6    term a little confusing or a little broad.  It's an

7    interesting choice of words.  I don't think it's

8    problematic, but it's novel to a lot of folks.

9        Q.   So your opinion is it's been an implied

10   requirement of the permit for 25 years?  Is that

11   what you said?

12       A.   I said "20."

13            MR. KILIAN:  Objection.

14       Q.   20.  But yet at no time has Connecticut

15   DEEP ever stated it was an implied requirement of

16   the Industrial Stormwater Permit in Connecticut,

17   correct?

18            MR. KILIAN:  Objection.

19       A.   Um, they don't state what the best industry

20   practice is in general.

21       Q.   So they reissued multiple permits in the

22   past, and they've never mentioned climate change,

23   even though you believe it's an implied requirement

24   of the Connecticut Industrial Stormwater Permit,

Wendi Goldsmith , Ph.D., PG         August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 112

1    say right here, "This new element of the SWPPP is

2    intended to identify resource gaps, promote

3    emergency planning and preparedness, and identify

4    additional processes and procedures that may need to

5    be considered and, if necessary, employed when

6    experiencing variable weather patterns."

7         So they're talking about all of these

8    things being their intent.  They are not saying to

9    take note that climate change is a new thing.

10   They're not suggesting anything.  They're saying

11   they want to identify resource gaps, promote

12   emergency planning, and identify additional stuff.

13        Q.    Have you ever asked Connecticut DEEP if

14   this best management practice includes an obligation

15   to complete a climate change vulnerability risk

16   assessment?

17        A.    No, I have not.

18        Q.    Why haven't you?

19            MR. KILIAN:   Objection.

20        A.    Well, first of all, Connecticut DEEP is an

21   organization, not a person I could just send an

22   email or have a chat with.  It's a broader

23   organizational question.  And I mentioned earlier

24   that I have over the years been in discussion with

Page 116

1      Q.   I'm asking about Connecticut DEEP.  The

2    question is pretty simple.

3           Do you know if Connecticut DEEP has ever

4    taken any enforcement action against any permitee

5    under the Industrial Stormwater Permit in

6    Connecticut for the failure to complete a climate

7    change vulnerability risk assessment?

8      A.   And my answer is, in cases where such

9    failure has, in fact, led to exposures that --

10   incidents that --

11     Q.   I'm asking about Connecticut DEEP.  I'm not

12   asking about any other state.  Connecticut DEEP.  Do

13   you know?  Yes or no.

14     A.   I'm not aware of any -- I don't know very

15   much about Connecticut DEEP's enforcement actions

16   from one cause or another.

17     Q.   Do you know if Connecticut DEEP has ever

18   sent any document to anybody -- to any facility in

19   the State of Connecticut saying, "We recommend you

20   consider climate change vulnerability risk

21   assessments"?

22          MR. KILIAN:  Objection, asked and answered,

23   irrelevant, among other things.

24     Q.   You can respond.

Page 117

1      A.    I know that Connecticut DEEP has awareness

2    of the NACCS study.

3      Q.    I just asked about enforcement, any

4    document.  Have they ever said -- have they made a

5    recommendation to any permitee in the State of

6    Connecticut that DEEP recommended or believed one

7    was required under the Industrial Stormwater Permit

8    in the State of Connecticut?

9          MR. KILIAN:  Objection.

10     Q.    That's all I'm asking.

11     A.    I have never read through any type of

12   tabulation of Connecticut DEEP's enforcement

13   actions.

14     Q.    So in this lawsuit -- where there have been

15   millions of pages of DEEP documents, there have been

16   SWPPPs from other facilities -- there's not one

17   piece of paper where DEEP has ever said that the

18   best industry practice provision of Section 5(b) of

19   the permit requires an assessment of climate change

20   vulnerability risk?

21          MR. KILIAN:  Objection, beyond the scope.

22     Q.    If you know of any, please tell me.  If you

23   don't know of any, just state that for the record.

24     A.    I wouldn't know.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 120

1   site was a little windshield tour drive-by.  I see a

2   "Shell" sign, and it's reflected in my photographs

3   and in my memory as such.  And as I said early in

4   our exchange today, I refer to, you know, the

5   facility. ███████████████████████████

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 132



■    ██████████████████████████████████████

■    ██████████████.

3           MR. HENDERSON:  Jane, can you read back my

4    question.

5           *(Question read)

6    A.    Um --

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 134



```
21              MR. HENDERSON:  We're going to take a break

22    for our lunch.

23              MR. KILIAN:  Sure.

24              MR. HENDERSON:  Okay, let's do that.
```

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 137

1   companies' adoption of anything.

2        Q.   Has the EPA ever cited this document as a

3   best industry practice?

4        MR. KILIAN:   Objection.

5        A.   I would say probably, but I'm not sure.  It

6   wouldn't be necessary either, in the sense that a

7   lot of what EPA says in the water quality world

8   speaks to applying relevant engineering or best

9   industry practices.

10       Q.   Has CT DEEP adopted this as a best -- or

11  cited this as a best industry practice?

12       MR. KILIAN:   Objection.

13       A.   No, other than their reference of best

14  industry practice in the -- you know, they assume

15  that these things speak for themselves.  That the

16  definition of "best industry practice" speaks to

17  standards and demonstrable utilization of certain

18  materials, measures, principals and practices.

19       Q.   So, Dr. Goldsmith, we were talking about

20  the 2018 permit.  I believe it was Exhibit G3.  It

21  actually doesn't use the word "critical

22  infrastructure" anywhere in that permit, does it?

23       A.   Um, I just want to make sure I'm thinking

24  of the right -- no.  It doesn't describe a lot of

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 138

1    things.

2        Q.    But does it describe "critical

3    infrastructure"?

4        A.    No, not to my knowledge.  I wouldn't expect

5    it to.

6        Q.    Does it impose any more stringent standards

7    on critical infrastructure in the 2018 permit?

8        A.    My interpretation of the manner in which

9    that permit invokes best industry practice for

10   control measures would require that the subsector of

11   critical infrastructure that includes bulk petroleum

12   storage facilities would necessarily need to meet a

13   higher standard than a bulk mayonnaise storage

14   facility or a dairy processing plant, for that

15   matter.

16       Q.    But the permit, itself, does not impose in

17   any specific words a requirement that it applies to

18   critical infrastructure?

19       A.    Correct.  But it would also follow, of

20   course, that with a more rigorous risk profile for

21   critical infrastructure facilities, that higher

22   standards that are industry-specific would be

23   expected.

24       Q.    The concept of risk profile does not

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

                                                    Page 146

1      Q.   And all of those interpretations come from

2    your opinion on what the word "best industry

3    practice" means?

4      A.   Yeah.  I think my report is pretty clear

5    that even my gap analysis goes to understanding what

6    is stated explicitly in the permit and then the

7    additional analysis of what is brought to bear

8    through the best industry practice reference.

9      Q.   Do you know of any consensus document by

10   any scientific organization that states the

11   Industrial Stormwater Permit should add additional

12   precautions for stormwater discharges or climate

13   change impacts to critical infrastructure?

14     A.   I am not aware of one, nor would there be

15   an expectation that one would exist.

16     Q.   So explain the last point you made.  Why

17   wouldn't you expect?

18     A.   There needs to be some analysis about the

19   24-hour rainstorm, for an example.  But it doesn't

20   say whether it's acceptable to use a hand calculator

21   or a packaged computer model.  You know, there's a

22   lot of...  But I don't think anybody's punching in

23   the numbers on a calculator nowadays.  And with the

24   packaged software, there's a lot of work that gets

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 150

1        Q.    And you're not relying on any in your

2    expert report or your rebuttal report?

3        A.    Correct.

4        Q.    In fact, Connecticut DEEP does not even

5    define the term "critical infrastructure," does it,

6    in any of the stormwater permits?

7        A.    I don't believe they do.

8              MR. HENDERSON:  Dr. Goldsmith, this is an

9    exhibit we're going to mark as Exhibit G26.

10                  (Document marked as

11                  Exhibit G26 for identification)

12       Q.    So, Dr. Goldsmith, have you seen this

13   document before?

14       A.    Yes, I have.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 152



Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 153

3        Q.    Is the New Haven terminal a sewer system?

4        A.    No, it's not.

5        Q.    This document nowhere says it's a best

6    industry practice for Industrial Stormwater

7    Permitting, does it?

8        A.    It doesn't say that, but it is --

9        Q.    So it doesn't say that.  You agree to that,

10   correct?

11       A.    Correct.

12       Q.    Now, if you look on Page -- just counting

13   pages, one, two, three, four -- sorry, it's Page 5.

14   And it talks about steps permitees can take.  And

15   that means permitees under wastewater treatment

16   systems and permitees under sewer systems, correct?

17       A.    Yes.

18       Q.    Now, if you look at the examples towards

19   the end here, Attachment A, which unfortunately is

20   labeled "Page 12," all of the examples are local

21   government wastewater treatment plants:  Manchester

22   by the Sea.  And it says it's a wastewater treatment

23   plant, Manchester Harbor.

24             Second example is Western Mass. - South

Page 161

1    documents any mention of Industrial General Permits

2    or multi-sector General Permits.  These are not

3    something -- these programs have never attempted to

4    cross-reference each other in the past, to my

5    knowledge.

6         Q.   So there's different programs that regulate

7    critical infrastructure that are different from the

8    Industrial Stormwater Permitting program?

9         A.   Not that regulates stormwater, no.

10        Q.   So let's go back to Exhibit 26, which was

11   the Region 1 waste treatment system and sewer system

12   memo.

13             What industry has adopted that Region 1

14   guidance as a best industry practice?

15        A.   I don't know.

16        Q.   What company has adopted that as a best

17   industry practice?

18        A.   I don't know.

19        Q.   Has EPA adopted its Region 1 guidance

20   document as a best industry practice for Industrial

21   Stormwater Permitees?

22        A.    I believe given that the title is "Region 1

23   Recommended Procedures and Resources for the

24   Development of Adaptation Plans for Wastewater

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 162

1  Treatment Systems and/or Sewer Systems," I believe

2  that that implies they consider it a best practice

3  at EPA, the source and author of this.

4      Q.   Again, EPA has never written that in this

5  document at all.  That's your interpretation,

6  correct?

7      A.   That is my interpretation.

8      Q.   Okay, thank you.

9           And Connecticut DEEP has never incorporated

10  this document or said it was a best practice in any

11  way for Industrial Stormwater Permitees, correct?

12      A.   I am not aware of Connecticut DEEP having

13  opined on this one way or the other.

14           THE VIDEOGRAPHER:  I'm sorry, I'm going to

15  go off the record for ten seconds.  The time is

16  2:37.  We're off the record.

17           (Off the record)

18           THE VIDEOGRAPHER:  The time is 12:38.

19  We're back on the record.

20      BY MR. HENDERSON:

21      Q.   So, Dr. Goldsmith, in your expert report

22  you have referenced the American Society of Civil

23  Engineers' Policy Statement 360?

24      A.   Yes.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 194

1    study.

2         Q.    So these practices in the NACCS, have they

3    been written down anywhere --

4         A.    Yes.

5         Q.    -- on what the standard is?  Where at?

6         A.    Well, the NACCS study itself documents all

7    of that.  And then there are a whole series of

8    engineering standards and data source

9    recommendations that typically get updated every

10   three years.

11              MR. HENDERSON:  I think we have a response

12   on the record.  Let's keep moving.

13              Here's another document that's going to

14   marked as Exhibit G23.

15                    (Document marked as

16                     Exhibit G23 for identification)

17        Q.    Dr. Goldsmith, have you seen this document

18   before?

19        A.    I have.

20        Q.    Now, you did not cite this document in your

21   expert report, did you?

22        A.    No.

23        Q.    Did you even know about this document

24   before your expert report?

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 199

1   back on the record.

2         MR. HENDERSON:  Dr. Goldsmith, I'm going to

3   hand you what's going to be marked Exhibit G11.  And

4   this is a copy of a document -- copy of a chapter

5   from the 2023 Connecticut stormwater quality manual.

6                 (Document marked as

7                 Exhibit G11 for identification)

8   BY MR. HENDERSON:

9         Q.   Dr. Goldsmith, I'm just confirming, you did

10  not cite this in any of your reports, and you're not

11  offering any opinions on this document, are you?

12        A.   No.

13        Q.   And just to be super clear, you're not

14  saying that this is a best industry practice.  You

15  didn't cite it for any reason, so you don't have an

16  opinion in this case about this document, correct?

17        A.   The handbook covers some of the more

18  rudimentary configuration -- it's like a Stormwater

19  Management 101 primer that tends not to be as

20  relevant on complex, intensively used industrial

21  sites or sites subject to coastal storm damage and

22  flooding.

23        Q.   But you're not offering any opinions in

24  this case about the Connecticut stormwater quality

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 200

1    manual, are you?

2        A.    No.

3            MR. HENDERSON:  Dr. Goldsmith, I'm going to

4    hand you what will be marked Exhibit G21.

5                    (Document marked as

6                    Exhibit G21 for identification)

7        Q.    Have you seen this document before?

8        A.    Not that I -- I've probably reviewed

9    something similar on the website.

10       Q.    Are you offering any opinions for this

11   document identified as "Exhibit G21?  And for the

12   record, it's called, "Industrial Stormwater Fact

13   Sheet Series."

14       A.    I don't think this came into play in my

15   opinions.

16       Q.    And you're not offering any opinions in

17   this case about this document, are you?

18       A.    No.

19       Q.    You are or not?

20       A.    I am not.

21           MR. HENDERSON:  Just to be clear, then

22   you're not offering any opinions.

23           Dr. Goldsmith, I'm going to hand you what

24   will be marked Exhibit G24.

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 202

1    my general knowledge of stormwater management and

2    water quality management.

3         Q.    And so you don't have an opinion whether

4    this is a best industry practice document or not?

5         A.    No, I do not.

6         Q.    You're not offering an opinion this is or

7    is not a best industry practice?

8         A.    I'm not offering that opinion.

9         Q.    That it's not --

10        A.    I'm not offering an opinion on this

11   document.

12             MR. HENDERSON:  Okay.  Dr. Goldsmith, I'm

13   going to hand you what's going to be marked as

14   Exhibit G35.

15                  (Document marked as

16                  Exhibit G35 for identification)

17        Q.    I'll give you the good copy.

18             Dr. Goldsmith, you refer to this document

19   in your expert report.  Is this evidence of best

20   industry practice for permitees under the Industrial

21   Stormwater Permit in the State of Connecticut?

22             MR. KILIAN:  Before we proceed, I just want

23   to clarify that this is basically just the Table of

24   Contents?

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 206

1              MR. HENDERSON:  G20, sorry.

2              MR. KILIAN:  Do you have one for me?

3              MR. HENDERSON:  Oh, sorry.

4                   (Document marked as

5                   Exhibit G20 for identification)

6       BY MR. HENDERSON:

7       Q.   So, Dr. Goldsmith, I've handed you what's

8  been marked G20.

9       A.   Uh-hum.

10      Q.   And you cite this document in your

11 report -- or actually, I think Dr. Nairn cites it,

12 and you cite Dr. Nairn.

13      A.   Uh-hum.

14      Q.   But is this a best industry practice for

15 permitees under the Industrial Stormwater Permit in

16 the State of Connecticut?

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 207

██  ████████████████████████████████████

██   ███    ██████

██   ███    ███████████████████████████████████

██  ██████████████████████████████████████

██   ███    ██████████████████████

6      Q.    So if you could turn to Page 2 of 29.

7      A.    Uh-hum.

8      Q.    Can you read the first paragraph under

9    "Introduction."

10     A.    "The purpose of the Guide for Higher

11   Regulatory Standards in Floodplain Management is to

12   provide options for communities that want to

13   implement floodplain regulations which reduce flood

14   damage and the overall impacts of floods.  These

15   impacts include human risk, environmental damage,

16   property damage, flood insurance claims,

17   displacement of residents, and burden on community

18   infrastructure and services."

19     Q.    So does it state anywhere here that it's a

20   best industry practice for permitees under

21   stormwater permits across the United States?

22            MR. KILIAN:  Objection.

23     A.    While the paragraph that I just read does

24   not mention any specific permit or any specific

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 208

1    permitee, it talks about human risk and

2    environmental damage and burden on community

3    infrastructure and services, all of which are

4    factors that come into play under the terminals'

5    Clean Water Act permit and are complicated in the

6    SPCC and the SWPPP at the terminal.

7         Q.    Dr. Goldsmith, the 2018/2021 Industrial

8    Stormwater Permit for the State of Connecticut does

9    not mention this document by the ASFPM, "A Guide for

10   Higher Standards in Floodplain Management," does it?

11        A.    No, it doesn't.

12        Q.    And the document, itself, doesn't say that

13   it's a best industry practice for anyone, does it?

14        A.    Not in the paragraph you had me read --

15        Q.    Does it anywhere in this document say it is

16   a best practice for anything?

17        A.    On the very bottom of this Page 2 of 29, it

18   says, "The higher standards options in this guide

19   are described in detail because they are recommended

20   for safer development and use the natural protection

21   provided by the natural functions and resources of

22   the floodplain.  Please note that the model language

23   presented in this document was developed to promote

24   effective floodplain management and mesh with the

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 212

1     about "critical development protection."  It does

2     not use the words "critical infrastructure."  But it

3     describes the rationale as being "Facilities which

4     provide critical services or services that are

5     depended upon during flooding or other hazardous

6     events should be protected to an even higher

7     standard than other development.  Failure to provide

8     flood protection to these types of critical

9     facilities creates severe and unacceptable public

10    safety risk.  The objective is to provide critical

11    facilities and development against damage and to

12    minimize the potential loss of life in flooding.

13    Model language is then provided."

14        Q.   Can you name one industry that has adopted

15    this as a best industry practice?

16        A.    This is written for communities to adopt

17    into their community rating system ordinance

18    development.

19        Q.   Right.  So it's not an industry practice?

20            MR. KILIAN:  Objection.

21        A.   It becomes an industry practice when

22    industries that are seeking municipal permits in

23    community rating system communities, they must

24    adhere to it.

Wendi Goldsmith , Ph.D., PG                      August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 213

1    Q.   Right.  But this is not a requirement in

2    the Industrial Stormwater Permit for the State of

3    Connecticut?

4         MR. KILIAN:  Objection.

5    A.   Well, it reflects best industry practice

6    related to flood risk reduction.

7    Q.   Where does it state that it is a practice

8    that industries should follow?

9    A.   Well, going back to Page 7, I think, under

10   the "Rationale," it describes that "Facilities which

11   provide critical services or services that are

12   depended on during flooding and other hazardous

13   events should be protected to an even higher

14   standard than other development."

15   Q.   But does it say it applies to industry?

16   This guide developed new model ordinances for

17   communities.

18   A.   Right.

19        MR. KILIAN:  Objection.

20   A.   But this is the particular model ordinance

21   that would cover what is known as "critical

22   development," "critical facilities" or "critical

23   infrastructure."

24   Q.   And New Haven has not adopted this model?

Wendi Goldsmith , Ph.D., PG          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 229

1       Q.    That's your opinion.  And you can identify

2    it as an opinion.  But in terms of the permit, what

3    is the industry that is regulated by the permit?

4          MR. KILIAN:  Asked and answered.

5    Objection.

6       Q.    So does the permit regulate certain SIC

7    codes?

8       A.    It does.  And then it also has the

9    "everything else" category, which is what this

10   terminal falls under.

19       A.    I'm not sure how to answer your question.

20       Q.    So why does this facility require an

21   Industrial Stormwater Permit from the State of

22   Connecticut?

23          MR. KILIAN:  Objection.

24       Q.    You can answer.

Page 235

1    an industry by transferring information.  Other

2    times, it's already grown up inside, imbedded in an

3    industry.

4        Q.   I think we have your answer now, and that's

5    what I was trying to get you to answer on that.

6            How do you identify other terminals like

7    the New Haven terminal to see what they were doing?

8        A.   One of the things that I looked at was the

9    NACCS study, which had identified various critical

10   facilities.

11       Q.   What other terminals did you identify that

12   are like the New Haven terminal and that you looked

13   at their practices at their facility?

14           MR. KILIAN:  Objection.

15       Q.   You can answer.

16       A.   I have knowledge of many different

17   terminals.  But that's not how I define what best

18   practices are.

19       Q.   I'm not asking about best.  I'm asking

20   about industry practices.  I didn't ask for best or

21   worst or greatest.

22           How do you identify industry practices at a

23   restaurant or in the petroleum bulk storage?  How do

24   you identify what the industry practices are?

Page 236

1        A.    I have not conducted a survey of industry

2   practices in the bulk petroleum storage or any

3   industry.

4        Q.    Anywhere in the United States did you look

5   at any?

6        A.    I started a conversation this morning by

7   explaining especially forensic reconnaissance

8   observations that included petroleum terminals.

9        Q.    Did you come up with a list of all the

10  petroleum bulk storage facilities in Connecticut?

11       A.    No, I did not.

12       Q.    Would they be part of the industry that

13  would have industry practices?  I don't mean best.

14  I mean any.

15            How did you establish what industry

16  practices were in the petroleum bulk storage

17  industry?

18            MR. KILIAN:  Objection.

19       Q.    You didn't do a survey, right?

20       A.    No, I didn't.

21       Q.    Did you email a list of other petroleum

22  bulk storage facilities and say, "I'm doing a

23  survey, an analysis of practices"?

24       A.    I finished saying that I haven't and am not

Page 237

1    in the business of doing surveys of bulk petroleum

2    operators or any type of industry.

3        Q.    Did you interview any of the, like, ten

4    other petroleum bulk storage terminals?

5        A.    No other.

6        Q.    Did you look at their permits to see if

7    they were required to do climate change

8    vulnerability risk assessments?

9        A.    I have reviewed a number of --

10       Q.    Are they identified in your expert report?

11       A.    No.

12       Q.    Did you attempt to contact any other

13   industries along the Connecticut coast outside of

14   petroleum bulk storage --

15           MR. KILIAN:  Objection, relevance.

16       Q.    -- where they were conducting climate

17   change vulnerability risk assessments?

18       A.    As I mentioned, the NACCS provided up and

19   down the entirety --

20       Q.    I just asked if you contacted any other

21   industries.

22       A.    Why would I?  The NACCS assembled and

23   integrated all of that information for me and anyone

24   else who wants access to it.

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 238

1       Q.   I didn't ask that.  I asked, did you

2   contact any of those industries to see if they were

3   doing a climate change vulnerability risk

4   assessment.

5       A.   The NACCS performed that.

6       Q.   I just want to know, did you contact any

7   other industries outside of the petroleum bulk

8   storage and ask them, "Are you guys doing a climate

9   change vulnerability risk assessment?"  Yes or no.

10      A.   No.  I didn't even call my relatives to ask

11  them if they had reconsidered their home site.

12      Q.   Did you call up API, American Petroleum

13  Institute, and say, "Can I ask you about what are

14  best practices at petroleum bulk storage

15  facilities"?

16      A.   I read a number of their reports.

17      Q.   But did you attempt to contact anybody to

18  get firsthand information?

19      A.   No, but I attend many engineering-related

20  meetings and events, working meetings, as well as

21  industry events.  And I'm fairly abreast of

22  developments in the field.

23      Q.   Did you review Renee Boudreau's expert

24  report?

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 243

1     A.    I'm answering exactly the question that you

2     asked.

3     Q.    No, you didn't.

4           So my question said "industry."

5           Were you in the room when industry

6     developed best practices?

7           MR. KILIAN:   Objection.   It's asked and

8     answered.   And "industry" is not limited -- she

9     testified that "industry" is not limited to one

10    industry; that it's a general term that refers to

11    risk assessment across multiple sectors.   She

12    testified to that 20 minutes ago.

13    Q.    So do you have a basis for why the word

14    "industry" means -- what does the word "industry"

15    mean to you?

16    A.    Are you familiar with Venn diagrams?

17    Q.    No.   Why don't you explain.

18    A.    Okay.   So I'll pretend I have a pen.   So if

19    you can say this is the bulk petroleum industry.

20    This is the Metocean science and engineering

21    industry.   This is the professional civil

22    engineering industry.   In the middle, there could be

23    something that intersects, where the bulk petroleum

24    folks, the Metocean scientists who might work for a

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 244

1    government agency or within let's say Shell.  And

2    then different civil engineers that are hired to

3    solve a problem.  They're all operating within the

4    overlapping area of those multiple, let's call them,

5    circles.

6        *Q.   So if I hear you correctly, you didn't

7    actually collect any data on what practices the

8    industry was actually employing to evaluate climate

9    change, correct?

10       A.   That is not correct.

11            MR. HENDERSON:  Could you read the

12   question.

13            *(Question read)

14       A.   So I sketched out my imaginary Venn

15   diagram, and I suggested that there's a section in

16   the center where those three circles overlap.  That

17   can be described as being part of the petroleum bulk

18   storage industry, the Metocean science and

19   engineering industry, and the world of professional

20   civil engineers who put the stuff into practice, and

21   the planners, like myself, who tee up, scope, and

22   otherwise initiate -- help to initiate those

23   processes.

24            So do I know what's going on outside of