## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION, INC.,

                  Plaintiff,

    v.

EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,

                  Defendants.

Case No: 3:21-cv-00933-VDO

October 3, 2025

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S REBUTTAL EXPERT EDWIN LEVINE

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") move to exclude two categories of opinions offered by Plaintiff's expert Mr. Edwin Levine under Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 401–403, and 702.

# TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................ 2

   A.  Mr. Levine Admitted That Oil Spills Are "Highly Unlikely." ............................ 4

   B.  Mr. Levine's Opinions Describe Oil Spill Incident Responses Solely Based on His Coast
       Guard Experience, Responding to Unrelated Sites and Spills. ......................... 6

   C.  Mr. Levine Opines About a 2008 Spill Simulation Drill at the Magellan Oil Storage
       Facility. ............................................................................................. 6

   D.  Mr. Levine Did Not Evaluate the Effects of Any Weather Event at the Terminal or
       2018/2021 Permit Compliance. .............................................................. 7

II.   LEGAL STANDARD ...................................................................................... 8

III.  ARGUMENT ................................................................................................ 10

   A.  Mr. Levine's Opinions Should Be Excluded as Improper Rebuttal Under Rule 26
       Because They Do Not "Contradict or Rebut" Defendants' Expert Reports. ................. 10

   B.  Mr. Levine's Opinions Should Be Excluded as Irrelevant Under Rule 702 Because They
       Do Not Concern the Terminal or its Compliance with the 2018/2021 Permit. ............... 14

   C.  Mr. Levine's Opinions Are Unfairly Prejudicial to Defendants and Would Confuse the
       Issues and Mislead the Jury Because They Are Untethered to the Facts of this Case and
       Unnecessarily Expand the Scope of This Case. ............................................. 20

IV.   CONCLUSION ............................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
   707 F. Supp. 3d 309 (S.D.N.Y. 2023)..........................................................................11, 13, 14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)........................................................................................15, 17, 20

*Andrews v. Brethren Mut. Ins. Co.*,
   No. 4-19-CV-02107, 2023 WL 6690710 (M.D. Pa. Oct. 12, 2023)..........................................9

*Barack v. Am. Honda Motor Co.*,
   No. 09-CV-565, 2013 WL 12291437 (D. Conn. Apr. 10, 2013)......................................11, 14

*Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*,
   No. 22-cv-6653, 2024 WL 4227760 (S.D.N.Y. Sept. 18, 2024) ...........................................11

*Connecticut Fair Hous. Ctr v. CoreLogic Rental Prop. Sols., LLC*,
   No. 18-CV-705, 2021 WL 1186604 (D. Conn. Mar. 30, 2021) (J. Bryant) ...........................13

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................................................... *passim*

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)........................................................................................10, 20, 22

*Precision Trenchless, LLC v. Saertex multiCom LP*
   No. 3:19-CV-0054 (JCH), 2022 WL 594096 (D. Conn. Feb. 28, 2022)....................15, 17, 19

*Pugliano v. United States*,
   315 F. Supp. 2d 197 (D. Conn 2004)....................................................................................15

*Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ...................................................................................................9

*United States v. Cruz*,
   363 F.3d 187 (2d Cir. 2004)....................................................................................................19

*Wang v. Omni Hotels Management Corporation*,
   3:18-cv-2000, 2025 WL 1782264 (D. Conn. June 27, 2025) (Oliver, J.)..................................9

**Other Authorities**

Fed. R. Civ. P. 26 ................................................................................................... *passim*

Fed. R. Evid. 401 ................................................................................................................15

Fed. R. Evid. 403 ....................................................................................... *passim*

Fed. R. Evid. 702 ....................................................................................... *passim*

Plaintiff Conservation Law Foundation ("CLF") identified Edwin Levine, a retired scientific advisor to the U.S. Coast Guard with a Master's Degree in Marine Sciences, as a purported "rebuttal expert."  Mr. Levine claims to evaluate the potential effects of an oil spill at the petroleum bulk storage terminal (the "Terminal") in New Haven, Connecticut, owned or formerly owned by Defendants.  However, Mr. Levine's qualitative assessment about the impacts of oil spills, based on his personal experience, is not responsive to any defense expert report or testimony and has nothing to do with the Terminal.  He did not even review the testimony of the experts he is purporting to rebut.  His opinions are also unrelated to the claims in this case, i.e., compliance under the industrial stormwater permit ("2018/2021 Permit"[1]) issued by the Connecticut Department of Energy & Environmental Protection ("CT DEEP").  This Court should exclude all of Mr. Levine's rebuttal opinions under Federal Rule of Civil Procedure 26 and Federal Rules of Evidence 702 and Rule 403.

*First*, Mr. Levine's opinions are improper rebuttal under Rule 26 because they do not rebut any of Defendants' expert opinions.  Although Mr. Levine claims to respond to ██ ███████████████████████████████████████████████████████████ ████████████████████████████, Mr. Levine merely provides a commentary on his experience with the Coast Guard responding to unrelated oil spill incidents and hurricanes outside of Connecticut, which is outside the permissible bounds of a rebuttal report.

*Second*, all of Mr. Levine's opinions are irrelevant to this case and are not helpful to the jury under Rule 702.  Mr. Levine's opinions broadly reference random oil spills, oil spill simulations, and hurricane responses without any connection to the Terminal or the Terminal's

---

[1] The permit in effect at the time this lawsuit was filed was the 2018 Industrial Stormwater General Permit; it was renewed without substantive changes in 2021.  Both will be referred to collectively as the 2018/2021 Permit.

obligations under the 2018/2021 Permit and are therefore irrelevant. Mr. Levine's air dispersion model—his only assessment related to the Terminal—is not helpful to the jury because he admits it produces effects that are permitted under government standards and uses data that is not probable or even likely in this case. And his opinion that facilities should make assessments for climate change is similarly not connected to any requirement under the 2018/2021 Permit or likely effects at the Terminal.

*Third*, Mr. Levine's opinions only serve to unfairly prejudice Defendants, confuse the issues, and mislead the jury by referring to unrelated incidents and expanding the scope of this case beyond the obligations of the 2018/2021 Permit or even oil spill preparedness at the Terminal, in violation of Rule 403.

Accordingly, and for all the reasons explained below, Rules 26, 702, and 403 require that the Court exclude Mr. Levine's opinions.

## I.    BACKGROUND

This is a case against three defendants related to the operation of a bulk fuel storage terminal located at 481 East Shore Parkway in New Haven, CT. The current owner of the Terminal is Defendant Triton Terminaling, LLC and the current operator of the Terminal is Defendant Equilon Enterprises LLC. Defendant Motiva Enterprises LLC is a prior operator of the Terminal that Plaintiff alleges operated the facility from 2000-2017. [ECF 47], Am. Complaint, ¶¶ 31, 29, 34 (hereafter "Complaint"). Plaintiff brings this case as a citizen suit alleging violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"). The Clean Water Act allegations all relate to Plaintiff's claim that Defendants allegedly violated the 2018 General Permit for Discharge of Stormwater Associated

with Industrial Activity issued by CT DEEP.  Complaint at ¶ 175.[2]

Plaintiff argues that the 2018/2021 Permit required Defendants to consider climate change in preparing the Terminal's Stormwater Pollution Prevention Plan ("SWPPP").  *Id.* at 201.  CT DEEP has denied that there is any such requirement under the 2018/2021 Permit, not a single Connecticut licensed engineer (who must certify the SWPPP) supports such a claim, and every available CT SWPPP prepared by other permittees undermines such a claim.  Plaintiff's RCRA claim relates to an allegation that alleged legacy contamination at the Terminal poses a "substantial and imminent" risk of release due to climate change factors.  *Id.* at 493.  Defendants deny all of these claims.

In support of its claims, CLF disclosed seven expert witnesses in May 2025.  One month later, Defendants disclosed their experts, including



Mr. Levine agreed that Dr. Etkin and Dr. French-McCay "are some of the top experts in their field" in the United States, and he testified that he has frequently worked with both experts during the course of his career.  Ex. C, Levine Dep. at 53:22–54:1, 51:9–17, 52:14–19.

In July, CLF produced nine rebuttal expert reports, including reports from four entirely

---

[2] As noted above, the permit in effect at the time this lawsuit was filed was the 2018 Industrial Stormwater General Permit; it was renewed without substantive changes in 2021.

new "rebuttal" experts.  One such new rebuttal expert is Mr. Levine, a retired Coast Guard

member who worked as an advisor responding to oil spill incidents.  Ex. D, Levine Rpt. at 1.

Notably, Mr. Levine admits that during these spill incident responses, there were other experts

with different backgrounds as part of multidisciplinary teams that performed the scientific work

he relied upon in his position.  Ex. C, Levine Dep. at 54:14–23.  Mr. Levine has no expertise in

bulk storage fuel tank engineering.  *Id.* at 120:1–4.  Nonetheless, Mr. Levine claims to have

reviewed the expert reports of Dr. Etkin and Dr. French-McCay and purports to "evaluate the

effects of an oil spill from Defendants' facility" in rebuttal.  Ex. D, Levine Rpt. at 1.  He did not

review either of the experts' testimony in this case.  Ex. C, Levine Dep. at 15:10–24.

### A.    Mr. Levine Admitted That Oil Spills Are "Highly Unlikely."

Mr. Levine concedes that any potential oil spill is "highly unlikely."

> Q.  Do you agree that oil facility spills are highly unlikely events for any
>      particular facility or storage tank?
>
> A. Yes.

*Id.* at 167:24–168:3 (objection omitted).  His opinion is merely that the probability of an oil spill

is "not zero."  Ex. D, Levine Rpt. at 4.  Even if a spill occurred, Mr. Levine agreed that spills at

"storage tanks at coastal terminals will usually be contained within required secondary

containment."  Ex. C, Levine Dep. at 174:8–13.

Specific to the Terminal, Mr. Levine was shown modeling from the Connecticut Institute

for Resilience and Climate Adaptation ("CIRCA") for hypothetical storm events.  Ex. E, Levine

Dep. Ex. 7.[3]  Mr. Levine acknowledged that Connecticut has adopted a sea level rise projection

---

[3] The Connecticut Institute for Resilience and Climate Adaptation (CIRCA) is a multi-disciplinary center at the
University of Connecticut created to assist state communities prepare for and respond to climate change challenges.
*See* https://circa.uconn.edu/. Among other things, CIRCA has an online model for hypothetical storm events
(available at https://lisicos.uconn.edu/SLR/).

of 20 inches by 2050, which CIRCA research supported.  Ex. C, Levine Dep. at 82:12–16,

83:17–84:8.  Based on multiple possible flooding inputs—a 100-year flood event; a 100-year

flood event plus 20 inches sea level rise, a 500-year flood event, and a 500-year flood event plus

20 inches sea level rise—Mr. Levine agreed that the model showed no impact on the Terminal.

> Q.  Would you agree that based on the modeling that you have seen on Exhibit 7
> that the projections from a hundred-year flood event, a hundred-year flood
> event plus 20 inches SLR, a 500-year flood event, and a 500-year flood event
> plus 20 inches SLR would not impact the area where the bulk storage terminal
> facilities are located at the Equilon facility?
>
> A.  According to the inputs used in the model, it shows no impact to the Equilon
> facility.

*Id.* at 90:2–15 (objection omitted).

Further, Mr. Levine agreed that in a 2022 EPA inspection of the Terminal, inspectors

found proper training of all oil-handling personnel and operations and maintenance of equipment

to prevent oil discharges.  *Id.* at 101:1–14.  He also agreed that the three EPA inspectors found

that all rules and procedures were properly followed, that containment was sufficient, and █

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Mr.

Levine did not review any of the facility's operational documents, such as the Terminal's

hurricane action plan, it's emergency response plan, or it's SPCC plan, and he did not review any

testimony from anyone about the Terminal.  *Id.* at 94:9–95:24, 15:10–24.

**B.** **Mr. Levine's Opinions Describe Oil Spill Incident Responses Solely Based on His Coast Guard Experience, Responding to Unrelated Sites and Spills.**

Mr. Levine provides four opinions in this case: (1) oil spills are unique; (2) oil spills may cause imminent and substantial impacts to the environment, flora and fauna, and people; (3) hurricanes and other weather-related events may cause oil spills; and (4) to prevent or minimize future oil spills, facilities need to address climate change impacts. Ex. D, Levine Rpt. at 1–5.

Mr. Levine's report focuses on his personal experiences with response teams for oil spills. *See, e.g., id.* at 5 ("I have been a witness to unforeseen impacts of oil spills that have occurred due to natural disasters and human causal factors."); *id.* at 4 ("I can state that there were still societal and individual impacts 35 years after the EVOS [Exxon Valdez oil spill] and 15 years after the DWHOS [Deepwater Horizon oil spill]."). He lists his participation on response teams for oil spills or damage after multiple hurricanes and qualitatively describes the impact of oil spills. *See id.* at 11. For example, Mr. Levine describes a 1988 oil spill at Ashland Florette storage yard in Pennsylvania due to tank failure. *Id.* at 20. Unlike conditions at the Terminal, the storage tank at Ashland was moved from one state to another and was filled to capacity at the time of the spill. *Id.* Mr. Levine admitted that the Ashland spill did not occur to a tank that had been in use and inspected for years (as they are at the Terminal), nor did it occur as the result of any weather event. Ex. C, Levine Dep. at 122:4–10.

**C.** **Mr. Levine Opines About a 2008 Spill Simulation Drill at the Magellan Oil Storage Facility.**

Mr. Levine's report discusses one oil spill simulation drill that the Coast Guard conducted in 2008 at the Magellan oil storage facility, not the Terminal. ████████████████ ███████████████████████████████████████████████████ He contends that the 2008 drill showed a 50,000-gallon oil spill at the Magellan facility could impact the water, shoreline resources, and biological resources in and around New Haven. Ex. D, Levine

Rpt. at 8–10.  Mr. Levine agreed that, unlike the Magellan petroleum bulk storage tanks, the

tanks at the Terminal are not located on the water.  Ex. C, Levine Dep. at 163:12–16; 76:20–23.

Mr. Levine also agreed that the type of fuel stored in tanks can impact the effects of a spill from

that tank, *id.* at 163:22–164:1, and unlike the fuel stored in the Magellan tanks, ██████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

### D.     Mr. Levine Did Not Evaluate the Effects of Any Weather Event at the Terminal or 2018/2021 Permit Compliance.

Mr. Levine conceded at his deposition that he is not offering "any opinions about the

structural aspects" of the Terminal or the "engineering and structural integrity" of the petroleum

bulk storage tanks at the Terminal.  *Id.* at 122:24–123:20.  He has no opinions "related to the

actual operation of the facility in this case."  *Id.* at 108:2–8.  He is also not offering any opinions

about "what various permit requirements are in Connecticut or … under the Clean Water Act."

*Id.* at 105:12–16; *see also id.* at 123:21–124:11.  He did not know what a Stormwater Pollution

Prevention Plan was in the context of the 2018/2021 Permit.  *Id.* at 105:2–3.  He also could not

say what a SPCC plan is and did not comment on the Terminal's SPCC in his report.  *Id.* at 94:1–

3 ("Q. And do you know what "SPCC" stands for?  A. Yes.  But I can't tell you."); *id.* at 94:9–23

(Mr. Levine did not comment on the Terminal's SPCC in this case).

████████████████, Mr. Levine does not provide any opinions ████████████

██████████████████ beyond asserting that "the probability of a spill is not zero."  Ex. D,

Levine Rpt. at 4.  In fact, Mr. Levine admitted that he did not know whether there has been any

flooding at the Terminal because of any storms.  Ex. C, Levine Dep. at 122:19–23.  And ████

███████████████ Mr. Levine did not █████████████████████████████████

████████████████████████████████. *Id.* at 79:12–16.

Mr. Levine only performed one air dispersion model in Appendix 2 of his report, in which he plugged in a "1-million-gallon oil spill" to examine the air dispersion from the Terminal. *Id.* at A-10. To be clear, air dispersion is not an issue in this case (i.e., air dispersion is never referenced in CLF's Notice of Intent to Sue or complaint), nor is it relevant to the CWA or RCRA. Even so, he admitted that the "odor threshold" from his air dispersion model "is below any governmental action level criteria for any direct health effects" but could increase "the volume of 911 calls from concerned citizens." *Id.* at 4. That model is not related to any possible weather event or probability data. *Id.* at A-10. At bottom, Dr. Levine agreed that he did not analyze the effects of any weather event at the Terminal.

> Q. Did you take any pictures or do any research on what the effects of any storms have been on the terminal at issue in this case?

> A. I have no photographs of the terminal, and **I have not looked at the effects of any weather specific on that terminal**.

Ex. C, Levine Dep. 122:11–18 (emphasis added).

## II.    LEGAL STANDARD

As a threshold matter, under Rule 26, expert rebuttal reports are "intended solely to rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Then, as with all expert testimony, Rule 702 governs admissibility. Under Rule 702, expert testimony is not permitted unless it "help[s] the trier of fact to understand the evidence or determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court has emphasized that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)

(internal quotations omitted); *see also Wang v. Omni Hotels Management Corporation*, 3:18-cv-2000 (VDO), 2025 WL 1782264, at *2 (D. Conn. June 27, 2025) (Oliver, J.) (district courts play a crucial "'gatekeeping function' under Rule 702 and are charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). The importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (internal quotations omitted).

Congress amended Rule 702 in late 2023 to emphasize that courts must fulfill their gatekeeper role by strictly enforcing the requirements of the Rule. As the Advisory Committee noted in an accompanying comment, a prior trend of cases that held flaws in expert analysis went to "questions of weight and not admissibility" reflected "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 Advisory Comm. Note to 2023 Amend. 6. The amended Rule makes abundantly clear that "the proponent [of an expert must] demonstrate[] to the court that it is more likely than not" that the four Rule 702 factors are met—in particular that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Courts have relied on the amendment to draw stricter boundaries around the admissibility of expert opinions. *See, e.g.*, *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) (reversing admission of expert opinions where district court had not fully analyzed relevance and reliability); *Andrews v. Brethren Mut. Ins. Co.*, No. 4-19-CV-02107, 2023 WL 6690710, at *6, n.69 (M.D. Pa. Oct. 12, 2023) (citing *Sardis* and excluding speculative conclusions and the unsupported rejection of alternative causes of the relevant conduct).

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 403). The Supreme Court and Second Circuit have emphasized "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Id.* (citing *Daubert*, 509 U.S. at 595). In fact, because expert testimony has a greater chance of misleading the jury, a court evaluating potential prejudice under Rule 403 "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

### III.    ARGUMENT

The Court should exercise its gatekeeping duty to exclude Mr. Levine's rebuttal opinions for three independent reasons: (A.) Mr. Levine's report is not proper rebuttal at all, instead injecting into this case new and unrelated commentary on general oil spill clean-up not responsive to Defendants' experts; (B.) Mr. Levine's opinions are irrelevant and unhelpful to the jury under Rule 702 because they do not relate to the Terminal or the Terminal's compliance under the 2018/2021 Permit and are not properly the subject of a reliable methodology that relies upon actual terminal data or is based upon probabilities; and (C.) Mr. Levine's opinions are unfairly prejudicial and are likely to mislead the jury under Rule 403 by misrepresenting the likelihood of an oil spill, by showing pictures of tanks and/or spills that are not tethered to the facts of the case or even the structural specifics of the tanks being used at the Terminal and unnecessarily expanding the scope of this case.

### A.    Mr. Levine's Opinions Should Be Excluded as Improper Rebuttal Under Rule 26 Because They Do Not "Contradict or Rebut" Defendants' Expert Reports.

Under Rule 26, rebuttal expert testimony is permitted "solely to contradict or rebut evidence on the same subject identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii).

"An expert rebuttal report does exactly what it says: it rebuts, in the form of a complete statement of all the opinions expressed by the author, the report of the opposing party's expert." *Barack v. Am. Honda Motor Co*., No. 09-CV-565, 2013 WL 12291437, at *1 n. 1 (D. Conn. Apr. 10, 2013) (excluding untimely rebuttal reports that did not "conform to the definition of rebuttal reports, which are supposed to contradict, challenge and rebut the opposing party's expert's reports."). In other words, a party may not "introduce entirely new analyses or opinions" through a rebuttal report. *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 363 (S.D.N.Y. 2023); *see also Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*, No. 22-cv-6653, 2024 WL 4227760, at *8 (S.D.N.Y. Sept. 18, 2024) (striking expert rebuttal reports that did not directly respond to opposing expert opinions).

All of Mr. Levine's opinions are improper rebuttal under the above standards. Defendants' experts, Dr. Etkin and Dr. French-McCay, are not coast guard retirees. They are highly credentialed and experienced scientists who have performed spill analyses and modeling for state, federal, and international governments for four decades ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████. Mr. Levine purports to rebut ███████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████."). But Mr. Levine's opinions are not about the Terminal at all; he admitted that he did not evaluate "the structural aspects" of the Terminal or the "engineering and structural integrity" of the petroleum bulk storage tanks at the Terminal. Ex. C, Levine Dep. at 122:24–123:20. He frankly admitted

that, unlike Dr. Etkin and Dr. French-McCay, "I have not looked at the effects of any weather specific on that terminal." *Id.* at 122:11–18 (emphasis added). Tellingly, he did not even read the deposition testimony of the experts that he purports to rebut.

Q. And did you review any of the testimony of any of the other witnesses?

A. No.

Q. Why not?

A. It was never presented to me.

Q. Did you ask to see it?

A. No.

Q. So you knew the testimony of other witnesses had been taken, but you never asked to see that testimony?

A. Correct.

*Id.* at 15:10–24.

Instead, all four of Mr. Levine's *ipse dixit* opinions are his own generalized qualitative assessments about oil spills based on his experience on clean-up teams with the Coast Guard at other unrelated sites: (1) oil spills are unique; (2) oil spills may cause imminent and substantial impacts to the environment, flora and fauna, and people; (3) hurricanes and other weather-related events may cause oil spills; (4) to prevent or minimize future oil spills, facilities need to address climate change impacts. Ex. D, Levine Rpt. 1–5. In Mr. Levine's first three opinions, he describes his own experiences with oil spills or hurricane relief, unrelated to the Terminal and responsive to nothing in Dr. Etkin's or Dr. French-McCay's reports. *See, e.g., id.* at 5 ("I have been a witness to unforeseen impacts of oil spills that have occurred due to natural disasters and human causal factors."); *id.* at 4 ("I can state that there were still societal and individual impacts 35 years after the EVOS [Exxon Valdez oil spill] and 15 years after the DWOS [Deepwater Horizon oil spill]."). In his fourth opinion, Mr. Levine baldly asserts that "facilities need to address climate change impacts," which is again not responsive to anything in Dr. Etkin's or Dr.

French-McCay's reports. ████████████████████████████████████
██████████████████████████████████████████. Therefore, Mr.

Levine's climate change opinion seeks to "introduce entirely new analyses or opinions." *In re*

*Acetaminophen - ASD-ADHD Prods. Liab. Litig.,* 707 F. Supp. 3d at 363.

Mr. Levine also did not conduct any calculations or probability analysis to "contradict or

rebut" ████████████████████████████████████████ Fed. R. Civ. P.

26(a)(2)(D)(ii). Quite the opposite, Mr. Levine ████████████████████████████

████████████████████████████████ Ex. C, Levine Dep. at

167:24–168:3 (emphasis added). The closest Mr. Levine comes to responding to ████████

██████████████████████████████████████████████." Ex. D,

Levine Rpt. at 4; *see Connecticut Fair Hous. Ctr v. CoreLogic Rental Prop. Sols., LLC*, No. 18-

CV-705, 2021 WL 1186604, at *17 (D. Conn. Mar. 30, 2021) (J. Bryant) (excluding expert

rebuttal opinion that was "merely pointing out that [the opposing experts'] assumption is wrong"

without any independent analysis; such an opinion "is not helpful" and could be established

through cross-examination). He does not provide any citation for this unhelpful assertion, and it

is not specific to the risk of a spill at the Terminal. *Id.* This sole response is couched under Mr.

Levine's other unreliable opinion that "oil spills *may* cause imminent and substantial impacts to

the environment, flora and fauna, and people," which is not responsive to any of Dr. Etkins's

analysis. *Id.* (italics added).

Mr. Levine also did not perform any modelling about the effects of a potential oils spill at

the Terminal based on possible weather events ████████████████████████████

██████████████████████████████████████. Fed. R. Civ. P.

26(a)(2)(D)(ii). The only modeling he performed was an air dispersion model, in which he

plugged in a hypothetical million-gallon oil spill at the Terminal to assess the likely air

dispersion, unrelated to any possible weather event. Ex. D Levine Rpt. at A-10; Ex. C, Levine

Dep. at 79:12–16 ("Q. Mr. Levine, did you do any modeling of potential pathways for releases in

this case other than the model that you have in the appendix? A. No."). Aside from the fact that

Mr. Levine's air dispersion model is unhelpful to the jury, *see infra* Section B, ███████

█████████████████████████████. In fact, air dispersion has nothing to do with

the CWA or RCRA and is not at issue in this case. In other words, rather than respond to or rebut

any of Dr. French-McCay's analyses, Mr. Levine seeks to "introduce entirely new analyses or

opinions," which are not proper in a rebuttal report. *In re Acetaminophen - ASD-ADHD Prods.*

*Liab. Litig.,* 707 F. Supp. 3d at 363.

In sum, nothing in Mr. Levine's report "conform[s] to the definition of rebuttal reports,

which are supposed to contradict, challenge and rebut the opposing party's expert's reports,"

here, Dr. Etkin and Dr. French-McCay. *Barack*, No. 09-CV-565, at *1 (striking expert

disclosures of rebuttal experts that were not responsive to Defendants' experts). Mr. Levine's

report is essentially his own qualitative thoughts about unrelated and irrelevant oil spills and oil

spill clean-up based on his Coast Guard experience without any linkage to the defense experts'

opinions, and the Court should exclude his opinions as improper rebuttal under Rule

26(a)(2)(D)(ii).

**B.    Mr. Levine's Opinions Should Be Excluded as Irrelevant Under Rule 702 Because They Do Not Concern the Terminal or its Compliance with the 2018/2021 Permit.**

Even if Mr. Levine's opinions were considered proper rebuttal, his opinions are still

irrelevant to the claims in this case under Rule 702 because they are not a reliable application of

a methodology to the facts of this case; his opinions do not concern the Terminal, the Terminal's obligations under the 2018/2021 Permit, or claims under the CWA or RCRA.

Rule 702 requires that "an expert's opinion reflects a reliable application of the principles and methods to the facts of the case," i.e., the so-called 'fit' requirement." *Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn 2004). Similarly, the proponent of the expert testimony—here, CLF—must "demonstrate[] to the court that it is more likely than not that… the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. There is no question that the recent amendments to Rule 702 were passed to reiterate the importance of the application of these standards.

"This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. Thus, "in fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation omitted) (affirming the exclusion of expert testimony that relied on scientific literature that did not "fit" his opinions). For example, in *Precision Trenchless, LLC v. Saertex multiCom LP*, this Court excluded a damages expert's testimony about homeowners' insurance policies because it was irrelevant to the issue of damages in the case and invited an "apples to oranges" comparison. No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *31 (D. Conn. Feb. 28, 2022) (J. Hall).

In this case, CLF asserts claims under the CWA and RCRA and specifically alleges that

15

the Terminal did not comply with the 2018/2021 Permit, which it alleges included an obligation to consider climate change and adoption of resiliency measures. None of Mr. Levine's opinions relates to the Terminal or the 2018/2021 Permit. In fact, Mr. Levine admitted that he did not assess "the effects of any weather specific [to] that terminal," Ex. C, Levine Dep. at 122:11–18, and he is not offering any opinions on "what various permit requirements are in Connecticut or … under the Clean Water Act." *Id.* at 105:12–16; *see also* 123:21–124:11. Even though Mr. Levine's report discusses his experiences with oil spill incidents, he could not say what a SPCC plan was under the 2018/2021 Permit and did not comment on the Terminal's SPCC in his report. *Id.* at 94:1– 3 ("Q. And do you know what "SPCC" stands for?  A. Yes.  But I can't tell you."); *id.* at 94:9–23 (Mr. Levine did not comment on the Terminal's SPCC in this case).  He also had no knowledge of any of the other aspects of the Terminal operations or data that someone performing a reliable evaluation would need.

None of Mr. Levine's four general opinions relate specifically or reliably to any issue in the case and are therefore not helpful to the jury. *Daubert*, 509 U.S. at 591. Stating that the possibility of a spill is "not zero" is no more helpful than stating that the likelihood of getting struck by lightning twice is also "not zero."

**Opinion 1** is that "oil spills are unique." Ex. D, Levine Rpt. at 3. His opinion that "many of the impacts and outcomes [of oil spills] vary from incident to incident," *id.*, is a general statement with no relation to the Terminal. *Id.*

Mr. Levine refers to "Section 1" of his Report to support his opinion that oil spills are unique, which includes an "example of a Resources at Risk Report" based on the Coast Guard's oil spill simulation drill at a Magellan oil storage facility (not the Terminal) in 2008. *Id*. at 8. He does not discuss how that drill relates to the Terminal or the Terminal's compliance with the

16

2018/2021 Permit. *Id.* That drill tells us little to nothing about a possible oil spill at the Terminal because, as Mr. Levine conceded, the petroleum bulk storage tanks at Magellan are located on the water, unlike at the Terminal, and store a different type of fuel. Ex. C, Levine Dep. at 163:12–16; 76:20–23. The fact that Mr. Levine included this 2008 Magellan oil simulation drill for support that "oil spills are unique" seems to undercut any relationship to the Terminal. Ex. D, Levine Rpt. at 3. And whether "oil spills are unique" does not make the Terminal's compliance with the 2018/2021 Permit or even the likelihood of an oil spill at the Terminal "more or less probable." *Amorgianos*, 303 F.3d at 265.

**Opinion 2** is that "oil spills *may* cause imminent and substantial impacts to the environment, flora and fauna, and people." Ex. D, Levine Rpt. at 4 (emphasis added). Here, he discusses the impact of the Deepwater Horizon oil spill and Exxon Valdez oil spill. *Id.* Mr. Levine does not provide any opinion linking those oil spills (not involving a terminal on land away from the shore) to the likelihood of an oil spill at the actual Terminal or the "likely" effects that an oil spill would have at the Terminal. *Id.* This is exactly the type of "apples to oranges" comparison that is both speculative and unhelpful to the jury and, therefore, in admissible. *Precision Trenchless, LLC*, 2022 WL 594096, at *31.

The only modeling Mr. Levine performed specific to the Terminal (and indeed, only analysis specific to the Terminal at all) was an air dispersion model in the Appendix of his report. Ex. D, Levine Rpt. at A-10. CLF did not claim any violations related to air dispersion in either their Notice of Intent to Sue or Complaint, and air dispersion has nothing to do with Defendants' obligations under the CWA or RCRA. In that model, he input a hypothetical "1-million-gallon oil spill" to examine the air dispersion from the Terminal. *Id.* at A-10. Mr. Levine did not explain why he selected 1-million or whether that size of spill is likely. *Id.* Mr. Levine's model

17

is certainly not linked to any possible weather event. Ex. C, Levine Dep. at 122:11–18

(emphasis added) ("I have not looked at the effects of any whether specific [to] that terminal.").

It also uses a volume that vastly exceeds the Coast Guard's own estimate of a maximum probable

spill scenario from a terminal in the Port by more than 884,000 gallons, even though that is the

document he relies upon.  *See* Ex. D, Levine Rpt. at 22 (citing the "worst case discharge" as

116,000 gallons).  Similarly, Mr. Levine's million-gallon discharge volume is **twenty times** the

hypothetical volume used in the Magellan oil spill simulation he references.  *Id.* at 8 (testing a

scenario using a 50,000 gallon spill).

       More importantly, the results of Mr. Levine's air dispersion model are not consequential.

Plaintiff's complaint does not include any claim that is related in any way to air dispersion.

Rather, the claims are based on the CWA and RCRA, and neither statute regulates or relates to air

or odor dispersion.  Moreover, Mr. Levine admits in his report that the "odor threshold" from the

air dispersion in a hypothetical 1-million-gallon spill "is below any government action level

criteria for direct health effects" and would, at most, increase "the volume of 911 calls from

concerned citizens."  Ex. C, Levine Rpt. at 4.  Mr. Levine's conclusion that an oil spill at the

Terminal would result in air dispersion that is in any event **permissible** under government

standards does not "help the trier of fact to understand the evidence or to determine a fact in

issue."  Fed. R. Evid. 702.

       **Opinion 3** is that "hurricanes and other weather-related factors may cause oil spills."  Ex.

D, Levine Rpt. at 5.  Mr. Levine lists his hurricane response experience after several hurricane

impacts from outside of Connecticut and Long Island Sound that included oil spills, including

Hurricane Katrina and Super Storm Sandy.  *Id*. at 5, 11–12.  Mr. Levine does not—and cannot—

explain why this list of hurricanes (outside of Connecticut) is relevant to possible storm events in

Connecticut, or how any far away oil spill relates to this specific Terminal, because they do not. He also failed to conduct any study of how Hurricane Sandy actually impacted the Terminal. And, once again he uses the word "may"—a tell-tale sign of that his opinions are speculative and irrelevant.

Also under Opinion 3, Mr. Levine cites his "first large oil spill response activation" at the 1988 "Ashland Oil spill" in Pennsylvania. *Id.* at 5. Even though the Ashland oil spill reference is under Mr. Levine's "hurricane" opinion, he admitted at his deposition that the Ashland spill was **not** occur the result of any weather event. Ex. C, Levine Dep. at 122:4–10; *see also* Ex. D, Levine Rpt. at 20–21. He does not link the Ashland oil spill to any conditions at the Terminal, and instead admitted that, unlike the conditions at the Terminal, the used storage tank at Ashland was being filled for the first time after it had been transported on a truck across country at the time of the spill. Ex. C, Levine Dep. at 120:17–20; Ex. D, Levine Rpt. at 20. Again, these "apples to oranges" comparisons between unrelated oil spills or hurricanes and the Terminal are not helpful to the jury under Rule 702 and should be excluded as irrelevant. *Precision Trenchless, LLC*, 2022 WL 594096, at *31.

**Opinion 4**, Mr. Levine's final opinion, is that "to prevent or minimize future oil spills, facilities need to address climate change impacts."[4] Ex. D, Levine Rpt. at 5. Mr. Levine broadly discusses possible sea level rise and changes in precipitation patterns, and the resources potentially at risk by both, without any reference to the specific facility or without any basis to tie such a claim to permit requirements. *Id.* at 5, 9–10. He also acknowledged that he did not review any of the facility's operational documents, such as its hurricane action plan, its

---

[4] As an initial matter, Rule 702 requires that an expert witness is qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Mr. Levine is not a climate scientist. His climate change opinion does not match his expertise. *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (holding that the district court "failed to satisfy its obligations as a gatekeeper" by allowing an expert to "stray from the scope of his expertise.").

emergency response plan, or its spill prevention plan.  Ex. C, Levine Dep. at *Id.* at 94:9–95:24.

He also did not review any of the Terminal's deposition testimony.  *Id.* at 15:10–24.  Notably, Mr.

Levine admitted that he is not offering any opinion about requirements under the 2018/2021

Permit.  Ex. C, Levine Dep. at *Id.* at 105:12–16, 123:21–124:11.  In other words, Mr. Levine

does not connect his opinions about his views on the effects of climate change with the Terminal

or the Terminal's obligations under the 2018/2021 Permit, as relevant to this Plaintiff's claims.

Without establishing any connection, this opinion fails the "fit requirement," and should also be

excluded as irrelevant under Rule 702.  *Amorgianos*, 137 F. Supp. 2d at 163 (excluding expert

testimony relying on data that did not "fit" the facts of the case), *aff'd*, 303 F.3d 256 (2d Cir.

2002).

Therefore, even setting aside that Mr. Levine's report is improper rebuttal, all of Mr.

Levine's opinions should be excluded because they are not relevant and do not "help the trier of

fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

> **C.    Mr. Levine's Opinions Are Unfairly Prejudicial to Defendants and Would Confuse the Issues and Mislead the Jury Because They Are Untethered to the Facts of this Case and Unnecessarily Expand the Scope of This Case.**

Mr. Levine's opinions must also be excluded under Rule 403.  Under Rule 403, the Court

must exclude evidence or testimony where "its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Fed. R. Evid.

403.  The danger of unfair prejudice, confusing the issues, and misleading the jury is even more

pronounced from expert testimony given the "unique weight such evidence may have in a jury's

deliberations."  *Nimely*, 414 F.3d at 397. (citing *Daubert*, 509 U.S. at 595) (reversing the trial

court and granting a new trial based on the admission of unfairly prejudicial expert testimony

about the witnesses' credibility).  For that reason, trial courts "exercise[] more control over

experts than over lay witnesses" in policing for prejudice under Rule 403. *Daubert*, 509 U.S. at 595.

Here, and as discussed above, none of Mr. Levine's opinions are tied to the Terminal, the Terminal's compliance with the 2018/2021 Permit, or Plaintiff's claims. *See* Section B. Mr. Levine's opinions about his experience with oil spills and hurricane response efforts are likely to mislead the jury about the likelihood of an oil spill at the Terminal or an oil spill's "possible" consequences at the Terminal. This is especially true where Mr. Levine admitted that oil spills from any terminal are "highly unlikely," Ex. C, Levine Dep at 167:24–168:3, and oil spills are usually contained "within required secondary containment," *id.* at 174:8–13. For the Terminal, Mr. Levine also agreed that CIRCA modeling of storm events up to a 500-year rainfall event and 20-inch sea level rise "shows **no impact** to the [Terminal]," *id.* at 90:2–15 (emphasis added), ███

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████  Therefore, Mr. Levine's testimony about the impacts of other oil spills and hurricanes, without any connection to the Terminal, is unfairly prejudicial to Defendants. Fed. R. Evid. 403.

Similarly, Mr. Levine's recommendation to "address climate change impacts" without any connection to the 2018/2021 Permit would also mislead the jury and confuse the issues about Defendants' obligations in this case. Mr. Levine is not offering any opinions about the Defendants' compliance with the 2018/2021 Permit requirements, including the Terminal's SPCC plan for oil spill prevention. *Id.* at 105:12–16, 123:21–124:11, 94:9–23. Therefore, his opinion that "facilities need to address climate change impacts" is only based on his own say-so and unfairly prejudices Defendants by drastically expanding the scope of this case beyond the

obligations of the 2018/2021 Permit or even probable storm preparedness at the Terminal. *Cf.*

*Nimely*, 414 F.3d at 398 (2d Cir. 2005) (the trial court erred by allowing an expert to "state his

belief" about witnesses' credibility under Rule 403).

Therefore, this Court should exclude Mr. Levine's opinions for the additional reason that

they are likely to unfairly prejudice Defendants, confuse the issues, and mislead the jury under

Rule 403.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude Mr.

Levine's rebuttal opinions pursuant to Rule 26, Rule 702, and Rule 403.

Dated: October 3, 2025                               Respectfully submitted,

/s Douglas A. Henderson
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19ᵗʰ Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com
