# Exhibit C

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF CONNECTICUT
2    NO. 3:21-cv-00933-JAM
     ——————————————————————————————————

3

     CONSERVATION LAW FOUNDATION, INC.,
4                     Plaintiff,
5    vs.
6    SHELL OIL COMPANY, EQUILON
7    ENTERPRISES LLC D/B/A SHELL OIL
8    PRODUCTS US, SHELL PETROLEUM INC.,
9    TRITON TERMINALING LLC, and MOTIVA
10   ENTERPRISES, LLC,
11                    Defendants.
     ——————————————————————————————————

12
13           VIDEOTAPED DEPOSITION OF
14        CONSERVATION LAW FOUNDATION, INC.
15               BY EDWIN LEVINE
16   called as a witness by and on behalf of
17   the Defendants, pursuant to the applicable
18   provisions of the Federal Rules of Civil
19   Procedure, before Danielle Grant,
20   Notary Public, within and for the State of New
21   York on Thursday, September 11, 2025 commencing
22   at 9:47 a.m.
23
24
25

Page 2

1      A P P E A R A N C E S:

2      FOR THE PLAINTIFF:

3      TARRANT GILLIES SHEMS LLP

4           44 East State Street

5           Montpelier, Vermont 05602

6      BY:  DAVID K. MEARS, ESQ.

7           david@tarrantgillies.com

8

9      FOR THE DEFENDANTS:

10     WIGGIN & DANA, LLP

11          265 Church Street

12          One Century Tower

13          New Haven, Connecticut

14     By:  JAMES O. CRAVEN, ESQ.

15          jcraven@wiggin.com

16

17     ALSO PRESENT:

18     DANIEL ACOSTA, Video Operator

19

20

21

22

23

24

25

Page 15

1          Q     Does that cover everything
2     that you have done on this case from
3     July 22, 2025 until today?
4          A     It covers everything I can
5     recollect, yes.
6          Q     Other than speaking to counsel
7     for CLF, have you spoken to anyone else
8     about your opinions in this case?
9          A     No.
10          Q     Are you aware that other
11     witnesses have provided testimony in this
12     case?
13          A     Yes.
14          Q     And did you review any of the
15     testimony of any of the other witnesses?
16          A     No.
17          Q     Why not?
18          A     It was never presented to me.
19          Q     Did you ask to see it?
20          A     No.
21          Q     So you knew the testimony of
22     other witnesses had been taken, but you
23     never asked to see that testimony?
24          A     Correct.
25          Q     Were you aware that the

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 51

1      would you be able to tell me what their

2      expertise is and what their background and

3      training is?

4              A    I don't know their background

5      and training.  I know what they were

6      covering in their reports.

7              Q    Do you know Dr. French-McCay?

8              A    Yes.

9              Q    Have you worked with

10     Dr. French-McCay?

11             A    Yes.

12             Q    Have you worked with

13     Dr. French-McCay prior to this litigation?

14             A    Yes.

15             Q    On what types of things have

16     you worked Dr. French-McCay on?

17             A    Oil spills.

18             Q    Have you, in fact, engaged

19     Dr. French-McCay to assist you on various

20     matters?

21             A    I have not; NOAA has.

22             Q    And have you recommended to

23     NOAA that they engage her on certain

24     matters, too?

25             A    No.

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 52

```
 1              Q    Do you believe that
 2       Dr. French-McCay is well-qualified?
 3              A    Yes.
 4              Q    Do you rely upon her expertise
 5       or have you relied upon her expertise in
 6       other matters?
 7              A    Yes.
 8              Q    Okay.  Do you believe that the
 9       methodology that she employs in doing what
10       she does is generally reliable?
11              A    Yes.
12              Q    Do you know Dr. Etkin?
13              A    Yes.
14              Q    Have you worked with Dr. Etkin
15       before today?
16              A    Yes.
17              Q    Is Dr. Etkin someone that you
18       respect?
19              A    Yes.
20              Q    Do you believe that the
21       methodology that Dr. Etkin employed in her
22       reports in this case is a reliable
23       methodology?
24              A    Yes.
25              Q    Would you say that
```

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 53

```
 1      Dr. French-McCay and Dr. Etkin are experts
 2      in their field?
 3            A     Yes.
 4            Q     Would it be fair to say that
 5      they're actually some of the top experts
 6      in the world in what they do?
 7                  MR. MEARS:  Objection.  Form.
 8            A     Probably.
 9            Q     Would you say that the
10      United States has some of the top experts
11      in oil and gas and spill?
12            A     There's people all around the
13      world that -- I -- yes, but not -- we
14      don't have a -- kind of what's the word I
15      want?  It -- there are other people around
16      the world as well, you know, we don't have
17      a --
18            Q     Yeah, there are other top
19      experts around the world in this field
20      too, true?
21            A     Yes, thank you.
22            Q     But you would agree, at least
23      within the United States, Dr. French-McCay
24      and Dr. Etkin are some of the top experts
25      in their field?
```

Edwin Levine                     September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 54

1          A     Yes.

2          Q     They're experts that NOAA

3     retains when they need expertise in the

4     fields that they're in?

5                MR. MEARS:  Objection.  Form.

6          A     I don't know if NOAA has ever

7     hired Dr. Etkin Schmidt.  I know they have

8     hired Dr. French-McCay.

9          Q     In your experience with both

10    Dr. French-McCay and Dr. Etkin, have you

11    relied upon their expertise in the areas

12    that they're experts in?

13         A     Yes.

14         Q     My understanding in your -- as

15    your role doing what you did before you

16    retired was often to work with

17    multidisciplinary teams of experts when

18    you responded to oil spill incidents?

19               MR. MEARS:  Objection.

20          Mr. Levine hasn't testified to

21           that.

22         Q     You can answer.

23         A     Yes.

24         Q     Okay.  If you look at the CFR

25    definition of the position that you held,

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 63

1      performed or that you were part of in New

2      Haven Harbor?

3              A      Some of them.

4              Q      Have you relied upon any of

5      the simulations that you were a part of in

6      forming your opinions in this case?

7              A      Yes.

8              Q      Which ones specifically are

9      you relying upon?

10             A      Can I refer to the report?

11             Q      Sure.

12                    And just so the record is

13     clear, you're referring to Exhibit 3?

Edwin Levine                                September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Page 79



Page 82



24        Q    If you look at Exhibit 6 --

25             (Whereupon, the court reporter

Page 83

```
 1                   requested clarification.)
 2                   THE WITNESS:  The exhibit --
 3            I'm not -- without checking my
 4            report, I don't know if this was
 5            the one that the reference was in
 6            my report.
 7            Q    Sir, if you look at Exhibit 6,
 8      which was the --
 9            A    Yeah.
10            Q    -- the text printout?
11            A    Yeah.
12            Q    And you see that very first
13      paragraph?
14            A    Yep.
15            Q    The second sentence?
16            A    Yes.
17            Q    It says:  CIRCA research
18      recommends that planning anticipates sea
19      level be 20 inches higher than the
20      national tidal datum in Long Island
21      Sound --
22            A    Yeah.
23            Q    -- by 2050.
24                 Do you see that?
25            A    Yes.
```

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 84

1              Q    And then the very next

2    sentence says:  CIRCA's report on sea

3    level rise provided the basis for

4    projections in Bill S.B. 7, which was

5    introduced in the 2018 legislative session

6    and was enacted into law.

7                   Do you see that?

8              A    I see that.

9              Q    Okay.  So when we go back to

10   Exhibit 7 and you see the references to,

11   in the potential layers --

12             A    Yes.

13             Q    -- in this document to "20

14   inches SLR" --

15             A    Yes.

16             Q    -- that may correspond to the

17   projections that CIRCA is doing for sea

18   level rise as to 2050.

19                  MR. MEARS:  Objection.  Form.

20             Q    True?

21             A    If you say so.

22             Q    Okay.  Looking at page 1 of

23   Exhibit 7, do you see that, by using the

24   ten-year flood event plus 20 inches SLR,

25   it shows some effects on various coastal

Edwin Levine                September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 90

1           A     No.

2           Q     Would you agree that based on

3     the modeling that you have seen on

4     Exhibit 7 that the projections from a

5     hundred-year flood event, a hundred-year

6     flood event plus 20 inches SLR, a 500-year

7     flood event, and a 500-year flood event

8     plus 20 inches SLR would not impact the

9     area where the bulk storage terminal

10    facilities are located at the Equilon

11    facility?

12              MR. MEARS:  Objection.  Form.

13          A     According to the inputs used

14    in the model, it shows no impact to the

15    Equilon facility.

16          Q     Okay.

17              MR. CRAVEN:  Is that 8?

18              COURT REPORTER:  Eight.

19              MR. CRAVEN:  Thanks.

20              (Whereupon, an Aerial photo

21              was marked as Levine Exhibit

22              No. 8 for identification, as

23              of this date.)

24              MR. CRAVEN:  Mr. Levine, I'm

25              showing you what's been marked as

Page 94

```
 1            Q    And do you know what "SPCC"
 2      stands for?
 3            A    Yes.  But I can't tell you.
 4            Q    Sir, if you turn to the very
 5      first page of this document, and the very
 6      first paragraph.
 7            A    Spill prevention control and
 8      countermeasures.
 9            Q    Okay.  In connection with your
10      evaluation and opinions in this case, did
11      you review the Equilon terminal SPCC?
12            A    Yes.
13            Q    You did review it?
14            A    Yes.
15            Q    Did you review the Equilon
16      facility's FRP in connection with your
17      review in this case?
18            A    Yes.
19            Q    Sir, I don't believe either of
20      those documents are referenced in your
21      report.
22            A    I reviewed them.  I didn't
23      comment on them.
24            Q    Okay.  Did you review the
25      Equilon facility's BCP?
```

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 95

1              A    BCP.  I don't -- I don't --
2       what is BCP?
3              Q    Do you know what "BCP" is?
4              A    I just -- no.
5              Q    Okay.  Are you familiar with a
6       "business continuity plan"?
7              A    I know the term, yes.
8              Q    Okay.  Did you due review the
9       Equilon facility's business continuity
10      plan?
11             A    No, I don't believe so.
12             Q    Okay.  You're not going to
13      offer any opinions in this case about the
14      facility's business continuity plan?
15             A    No.
16             Q    Okay.  Did you review
17      Equilon's HAP?
18             A    What is an HHP [sic]?
19             Q    A hurricane action plan.
20             A    No.
21             Q    You're not going to offer any
22      opinions as to the Equilon facility's
23      hurricane action plan?
24             A    No.
25             Q    Can you turn to page 4 of 14.

Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 96

1                    A        Got it.

Edwin Levine                              September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 97



Edwin Levine                          September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 98



Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Page 99

Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 100



Page 101



Edwin Levine                        September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 102



Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 105

1          A    I don't know.

2          Q    Do you know what a SWPPP is?

3          A    No.

4          Q    Have you had experience ever

5     preparing a SWPPP?

6          A    I don't know what a SWPPP is,

7     so I don't know if I prepared one or not.

8          Q    Okay.  Well, if you prepared

9     one, you probably know what it is, right?

10         A    I would hope so.

11         Q    Yeah.

12              Do you intend to offer any

13    opinions in this case as to what various

14    permit requirements are in Connecticut or

15    the -- under the Clean Water Act?

16         A    No.

17         Q    Were you aware that Motiva no

18    longer had a ownership interest in the

19    facility after May of 2017?

20         A    No.

21         Q    Do you have any understanding

22    as to what Triton Terminaling's role is

23    with regard to the facility?

24         A    No.

25         Q    Have you worked, to your

Page 120

1          Q    Okay.  Do you have any

2    expertise in bulk storage tank

3    engineering?

4          A    No.

5          Q    There is expert reports by

6    Bayles & Pace that at some point are

7    referenced in your materials as having

8    been considered or reviewed or provided to

9    you in some sense.

10              You're not rebutting any of

11   their opinions in this case?

Page 122

1    failed during the first time it was being

2    filled?

3          A    Yes, it does.

4          Q    That failure didn't occur to a

5    tank that had been in use for years and

6    inspected for years and was -- failed as a

7    result of some sort of weather event,

8    true?

9              MR. MEARS:  Objection.  Form.

10         A    True.

11         Q    Did you take any pictures or

12   do any research on what the effects of any

13   storms have been on the terminal at issue

14   in this case?

15         A    I have no photographs of the

16   terminal, and I have not looked at the

17   effects of any weather specific on that

18   terminal.

19         Q    As you sit here today, you

20   don't know whether there has been any

21   flooding at the Equilon terminal as a

22   result of any storms, true?

23         A    True.

24         Q    And you're not going to offer

25   any opinions that pertain to the

Edwin Levine                                   September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 123

1     structural aspects of the Equilon

2     facility, true?

3             A      True.

4             Q      So to the extent there have

5     been experts that have talked about the

6     engineering and structural integrity of

7     the storage tanks currently at the Equilon

8     facility, you don't intend to rebut any of

9     their opinions on those issues?

10            A      I guess my only comment on

11    that would be I don't know if they've

12    taken into account all the potential

13    impacts to the tanks.

14            Q      Okay.  You don't know if they

15    have or they haven't?

16            A      Yes.

17            Q      And so, therefore, because you

18    don't know that, you're not going to offer

19    any opinions about that?

20            A      Correct.

21            Q      I want to make sure it's clear

22    that you're not going to offer any

23    opinions in this case one way or another

24    what the permit that at least is partially

25    at issue in this case requires or doesn't

Page 124

```
 1      require?
 2              A     Correct.
 3              Q     So to the extent that your
 4      report has language about certain things
 5      that you believe Defendants should
 6      consider or shouldn't consider, to the
 7      extent the permit requires that or doesn't
 8      require that, you're not going to offer an
 9      opinion about that?
10              MR. MEARS:  Objection.  Form.
11              A     Correct.
12              Q     Okay.  Are you familiar with
13      what RCRA is?
14              A     Yes.
15              Q     I didn't see any opinions in
16      your report related to anything related to
17      RCRA; is that true?
18              A     Yes.
19              MR. MEARS:  Objection.  Form.
20              Q     You're not offering any
21      opinions in this case related to RCRA?
22              A     Correct.
23              Q     Have you reviewed the
24      Connecticut Stormwater Quality Manuals?
25              A     No.
```

Page 163

1     a little while ago, "simulation," what I

2     should have said was "spill drill"?

3          A     Yes.

4          Q     Okay.  Would you agree that

5     for the USCG spill drill in 2008, they

6     re-used the Magellan oil storage facility?

7          A     Yes.

8          Q     And would you agree that, for

9     that spill drill, they used a scenario of

10    50,000 gallons of fuel oil?

11         A     Yes.

12         Q     And were -- would you agree

13    that the Magellan tank farm is closer to

14    the water than the bulk storage tanks at

15    the Equilon facility?

16         A     Yes.

17               MR. MEARS:  Objection.  Form.

18         Q     And would you agree, for this

19    spill drill, they used a model that had

20    fuel oil Number 4?

21         A     Yes.

22         Q     And would you agree that the

23    types of fuel stored in the tanks can

24    impact the effects of a spill from that

25    tank?

Page 164



Page 167



Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 168





Page 174