## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 3, 2025 |
| Defendants. | |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE JACQUELINE MICHEL, Ph.D.

Defendants Equilon Enterprises LLC (d/b/a Shell Oil Products US), Triton Terminaling LLC, and Motiva Enterprises LLC ("Defendants") respectfully submit the following Memorandum of Law and Facts in support of their Motion to Exclude the Expert Testimony of Jacqueline Michel, Ph.D., under Fed. R. Civ. P. 26 and Fed. R. Evid. 702 and 403.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 2

III.  LEGAL STANDARD ........................................................................................ 5

    A.  Admissibility of Expert Rebuttal Reports Under Rule 26 ...................................... 5

    B.  Admissibility of Expert Opinion Testimony Under Rules 702 & 403 ................... 6

IV.  ARGUMENT ...................................................................................................... 8

    A.  CLF Did Not Properly or Timely Disclose Dr. Michel's Opinions ....................... 8

    B.  Dr. Michel's Opinions Are Irrelevant and Do Not "Fit" the Claims in This Case 12

    C.  Dr. Michel Is Not Qualified to Offer Opinions Regarding Risk, Response, or Modeling ............................................................................................................... 14

    D.  Dr. Michel's Subjective Experiences Do Not Constitute Reliable Methodology . 16

        1.  Dr. Michel's WCD critique is anecdote-driven and omits the hallmarks of a reliable methodology ................................................................................ 17

        2.  Dr. Michel's emergency-response infeasibility opinion is premised on generalized assumptions ........................................................................... 19

        3.  Dr. Michel's critique of SIMAP modeling substitutes opinion for empirical validation ................................................................................................... 20

        4.  Dr. Michel's North Cape analogy is an experience-based assertion, not a testable method .......................................................................................... 22

    E.  Dr. Michel's Opinions Are Unreliable Because She Cherry-Picks and Ignores Contradictory Evidence ....................................................................................... 23

    F.  Dr. Michel's Opinions Are Improper, Unqualified, and Prejudicial ..................... 26

V.  CONCLUSION ................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*,
    473 F.3d 450 (2d Cir. 2007) .................................................................................20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .................................................................................16

*Arista Recs. LLC v. Lime Grp. LLC*,
    No. 06 CV5936KMW, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) .......................6

*Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*,
    No. 22-cv-6653, 2024 WL 4227760 (S.D.N.Y. Sept. 18, 2024) .......................6, 11

*Bustamante v. KIND, LLC*,
    100 F.4th 419 (2d Cir. 2024) .................................................................................8

*Capri Sun GmbH v. American Beverage Corp.*,
    595 F. Supp. 3d 83 (S.D.N.Y 2022) ..............................................................6, 7, 11

*Charter Pracs. Nternational, LLC v. Robb*,
    No. 3:12-CV-1768(RNC), 2015 WL 13000251 (D. Conn. Mar. 31, 2015) ............7

*Chery v. Town of Enfield*,
    No. 3:19-CV-1952 (VDO), 2024 WL 4372386 (D. Conn. Oct. 2, 2024) ..............11

*Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    No. 3:19CV839 (JBA), 2021 WL 4170757 (D. Conn. Sept. 14, 2021),
    reconsideration denied, 2021 WL 5039035 (D. Conn. Oct. 29, 2021) ..................18

*Daubert. Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) .............................................................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .................................................................................... *passim*

*Engler v. MTD Prods., Inc.*,
    No. 13-CV-575 CFH, 2015 WL 900126 (N.D.N.Y. Mar. 2, 2015) .......................15

*Gonyea v. Irick Excavating, LLC*,
    No. 2:08-CV-242, 2010 WL 11606973 (D. Vt. Nov. 30, 2010) .............................7

*Grajeda v. Vail Resorts Inc.*,
No. 2:20-CV-00165, 2023 WL 2613543 (D. Vt. Mar. 23, 2023) ............................................16

*Hart v. BHH, LLC*,
No. 15CV4804, 2018 WL 3471813 (S.D.N.Y. July 19, 2018) ...................................................9

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023) .........................................................................................9

*In re Mirena Ius Levonorgestrel-Related Products Liability Litigation*
(No. II) ....................................................................................................................................24

*In re Rezulin Products Liability Litigation*,
369 F.Supp.2d 398 (S.D.N.Y.,2005) ................................................................................23, 26

*In re Zyprexa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ......................................................................................26

*K.E. v. GlaxoSmithKline LLC*,
No. 3:14-CV-1294(VAB), 2017 WL 440242 (D. Conn. Feb. 1, 2017) ....................................24

*Learning Care Grp., Inc. v. Armetta*,
No. 3:13-CV-1540 (VAB), 2016 WL 3248178 (D. Conn. June 12, 2016) ................................6

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) ...................................26

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ....................................................................................................23

*Max Zach Corp. v. Marker 17 Marine*,
No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024) .............................17

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) .....................................................................................6, 7, 23, 26

*Perkins v. Origin Medsystems, Inc.*,
299 F. Supp. 2d 45 (D. Conn. 2004) ........................................................................................18

*Post University, Inc. v. Learneo, Inc.*,
No. 3:21-CV-01242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025) .............................7

*Pugliano v. United States*,
315 F. Supp. 2d 197 (D. Conn. 2004) .......................................................................................12

*Redd v. DePuy Orthopaedics, Inc.*,
700 F. App'x 551 (8th Cir. 2017) .............................................................................................23

*Reynolds v. Arnone,*
    645 F.Supp.3d 17 (D.Conn., 2022) ........................................................................12

*Scism v. Ferris,*
    No. 1:18-CV-672 (TWD), 2022 WL 2915745 (N.D.N.Y. July 25, 2022) ......................13, 14

*Smith v. Herman Miller, Inc.,*
    No. CV-03-5358 (CPS), 2005 WL 2076570 (E.D.N.Y. Aug. 26, 2005)..............................17

*United States v. Hamlett,*
    No. 19-3069, 2021 WL 5105861 (2d Cir. Nov. 3, 2021) ........................................................27

*United States v. Jones,*
    965 F.3d 149 (2d Cir. 2020).........................................................................................6

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007)........................................................................................16

*Wang v. Omni Hotels Mgmt. Corp.,*
    No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ...............................6

*Washington v. Kellwood Co.,*
    105 F. Supp. 3d 293 (S.D.N.Y. 2015).....................................................................14

*Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.,*
    No. 3:14-CV-00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018),
    aff'd, 782 F. App'x 9 (2d Cir. 2019)...............................................................19, 20

*Wells Fargo Bank, N.A. v. United States Life Ins. Co. in City of New York,*
    No. 22 CIV. 8606 (JPC), 2025 WL 2220948 (S.D.N.Y. Aug. 4, 2025)...................................7

## Statutes

Clean Water Act....................................................................................................1, 2, 3

Coastal Management Act.........................................................................................12

Resource Conservation and Recovery Act ...........................................................1, 2, 3

## Other Authorities

40 C.F.R. § 112.20 ...............................................................................................4, 17

Fed. R. Civ. P. 26 ...........................................................................................*passim*

Fed. R. Evid. 403 .........................................................................................7, 26, 7

Fed. R. Evid. 702 .........................................................................................2, 5, 28

## I.    INTRODUCTION

Plaintiff Conservation Law Foundation ("CLF") filed this citizen suit against Defendants Equilon Enterprises LLC, Triton Terminaling, LLC, and Motiva Enterprises LLC (collectively, "Defendants"),[1] alleging that Defendants' New Haven petroleum bulk storage terminal (the "Terminal") has violated the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"). Specifically, Plaintiff alleges that Defendants' alleged failure to consider climate change factors in the Terminal's Stormwater Pollution Prevention Plan ("SWPPP") violate Connecticut Department of Energy and Environmental Protection's ("CT DEEP") 2018/2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity (the "2018/2021 Permit").[2] *See* Complaint ¶¶ 175, 201. The RCRA claim alleges that legacy soil and groundwater impacts at the Terminal pose a "substantial and imminent" risk of release due to climate-related factors. *Id*. ¶ 493. Defendants deny all claims.

In support of its claims, CLF offers the testimony of **Jacqueline Michel, Ph.D.**, a geochemist, to address worst-case discharge scenarios, emergency response feasibility, and ecological risk modeling. Although CLF labels her as a rebuttal expert, Dr. Michel's report does not meaningfully respond to the opinions of Defendants' experts—Drs. Dagmar Etkin, Deborah French-McCay, and Ann Michelle Morrison. Instead, her report introduces new, affirmative opinions that were not previously disclosed and fall outside the permissible scope of rebuttal. Notably, Dr. Michel also failed to conduct any independent analysis, review any Terminal-specific data, or reach any conclusions regarding the Terminal or the likelihood of any release

---

[1] Equilon is the owner of the Terminal, Triton the current operator, and Motiva a former operator.

[2] The 2018 Permit was the operative permit when this lawsuit was filed. In 2021, CT DEEP renewed that permit with no substantive changes.

from it. As a result, her submission not only runs afoul of Fed. R. Civ. P. 26 but fails to satisfy the requirements of Fed. R. Evid. 702, 403, and *Daubert*[3] as well.

This in mind, her testimony does not help the trier of fact understand the evidence or "fit" the claims at issue, and should therefore be excluded for at least five independent reasons: **(1)** it exceeds the proper scope of rebuttal by introducing new theories and opinions not previously disclosed; **(2)** she lacks the specific qualifications necessary to offer the opinions presented in her report; **(3)** she does not apply any reliable methodology to reach her conclusions; **(4)** she selectively cites evidence that supports her position while disregarding facts and data that contradict her opinions; and **(5)** the prejudicial effect of her testimony substantially outweighs any potential probative value, risking confusion of the issues and unfair prejudice.

## II.    BACKGROUND

This citizen suit claims that Defendants' New Haven Terminal violates the CWA and RCRA because it allegedly does not have adequate safeguards in place to protect the facility from extreme weather. Plaintiff's theory is that the Terminal poses "an imminent and substantial endangerment to health or the environment" because hurricane-related storm surge and flooding could cause releases from aboveground storage tanks. *See* Amended Complaint ¶ 1 [ECF 47]. To support that narrative, CLF retained Dr. Michel "about a year and a half ago… to look at the potential environmental effects of a release from the terminal under extreme weather events" and to determine whether environmental endangerment would occur. Ex. A, Michel Dep. at 7:18–20; 9:3–9.

A "geologist by education" and a "geochemist by practice," Dr. Michel was likely recruited for this role due to her career in post-spill response and experience with post-spill

---

[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

Natural Resource Damage Assessment ("NRDA"). *Id*. at 26:16–27:7. Given her background, it is important to note that Dr. Michel's expertise is limited so, she does not proffer any opinions about:

- Storm frequency, intensity, site flooding, or storm surge at New Haven. Michel Dep. at 56:8–17.

- Whether a spill is likely to occur at the New Haven Terminal or whether any tank will fail in any particular storm. *Id*. at 54:23–55:7.

- Whether Defendants are violating any permit under the CWA or RCRA. *Id*. at 54:10–21.[4]

- The meaning of best management practices, best industry practices, or good engineering for terminals. *Id*. at 53:18–54:5.

Simply put, Dr. Michel is not prepared to opine on matters concerning risk, design, or regulations, either generally or specifically relating to the Terminal. This indicates that her testimony does not address the core issues in this case. The Complaint and Plaintiff's Notice of Intent focus on whether Defendants failed to implement "best management practices" or account for climate-related risks in accordance with the 2018/2021 Permit. *See* Compl. ¶¶ 7, 14, 295; NOI at 12. But Dr. Michel does not offer opinions on those topics. As a result, her testimony does not align with the legal and factual questions presented and does not bear on the specific claims at issue.

Instead, Dr, Michel's 17-page "Rebuttal" report merely advances the following critiques of Defendants' experts:

1) **Of Dr. Etkin (WCD)**: Dr. Etkin, a Harvard-trained Ph.D. with over 50 years in environmental risk analysis, developed a probability distribution function ("PDF") methodology in collaboration with EPA and NOAA to estimate worst-case discharge

---

[4] Dr. Michel's 07/22/25 rebuttal report does not even mention either the CWA or RCRA.

volumes based on tank design, contents, and historical spill data. Her analysis incorporates storm surge dynamics and tank failure probabilities, concluding that a spill from the Terminal is highly unlikely.[5] Dr. Michel argues Dr. Etkin's ███████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. B, Michel 07/22/25 Rpt. at 2–11. She relies on her spill-response project experience and cites incidents from Hurricanes Katrina, Rita, and Harvey. *Id.* She acknowledges, however, that under 40 C.F.R. Part 112 Appendix D, worst-case discharge calculations for Spill Prevention, Control, and Countermeasure ("SPCC") planning use the largest single tank and ████████████████████████████████████████████████ ██████████████████████████████████." Ex. A, Michel Dep. at 72:22–73:10; 74:19–25.

2) **Of Dr. ████-McCay (modeling)**: Dr. French-McCay, an internationally recognized expert in oil spill fate and effects modeling, developed the SIMAP model used by U.S. and international agencies for NRDA. ████████████████████



Ex. B, Michel 07/22/25 Rpt. at 11–16. She, however, is not a modeler, did not perform any modeling, did not propose

---

[5] *See generally* Ex. C, Etkin 06/23/2025 Report.

[6] *See generally* Ex. D, French-McCay 06/23/2025 Report.

an alternative model, and did not validate an alternative threshold for the Terminal. Ex. A, Michel Dep. at 16:20–23; 56:18–24; 131:13–16.

3) **Of Dr. Morrison (ecology)**: Dr. Morrison, a Harvard-trained Doctor of Science in Environmental Health, has over 28 years of experience evaluating ecological risks from chemical releases.



Ex. B, Michel 07/22/25 Rpt. at 17.

Dr. Michel then concludes that "potential spills" from the Terminal pose an "imminent and substantial endangerment to ecological resources in the area," even if only one tank were to release, based on her experience with large-volume fuel spills in coastal environments. Ex. __, Michel 07/22/25 Rpt. at 17; Ex. A, Michel Dep. at 130:13–131:12. But Dr. Michel's opinions, including each of these critiques, are contrary to Fed. R. Civ. P. 26 and Fed. R. Evid. 702 and 403.

## III.    LEGAL STANDARD

### A.    Admissibility of Expert Rebuttal Reports Under Rule 26

A party may offer a rebuttal expert's opinions only "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified" by another party under Rule 26. Fed. R. Civ. P. 26(a)(2)(D)(ii). "The scope of a rebuttal is limited to the same subject matter

---

[7] *See generally* Ex. E, Morrison 06/23/2025 Report.

encompassed in the opposing party's expert report." *Capri Sun GmbH v. American Beverage Corp.*, 595 F. Supp. 3d 83 (S.D.N.Y 2022) (citation modified). While a "rebuttal expert is permitted some leeway in how he or she explains, counteract, repels, or disproves the opinion being rebutted," "a party may not use its rebuttal opportunity to 'correct oversights in [that] party's case in chief,' . . . or to offer new opinions that could and should have been included in its initial report." *Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*, No. 22-cv-6653, 2024 WL 4227760, at *6 (S.D.N.Y. Sept. 18, 2024) (citation omitted). Even a timely and properly disclosed rebuttal opinion must satisfy the prerequisites to admissibility under Rule 702 and *Daubert. Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016).

### B.    Admissibility of Expert Opinion Testimony Under Rules 702 & 403

Federal Rule of Evidence 702 governs the admissibility of expert testimony, guiding the Court, as the gatekeeper, to ensure that expert testimony is both methodologically sound and directly relevant to the matters at issue. *Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *2 (D. Conn. June 27, 2025) (citation omitted). And as clarified by the recent amendments to Rule 702, as the proponent of Dr. Michel's opinions, Plaintiff has the burden of showing, by a preponderance of the evidence, that those opinions satisfy all of the prerequisites to admissibility under Rule 702. *See United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).

As part of the inquiry into an expert's qualifications, courts require that an expert's credentials be directly relevant to the subject matter of the opinions offered. *See Arista Recs. LLC v. Lime Grp. LLC*, No. 06 CV5936KMW, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) ("Testimony is routinely excluded where the expert lacks pertinent expertise or opines on issues outside of their area of specialization."); *see also Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); *Learning Care Grp., Inc. v. Armetta*, No. 3:13-CV-1540 (VAB), 2016 WL

3248178, at *7 (D. Conn. June 12, 2016). Methodological reliability, however, requires more than experience. To pass muster under Rule 702, experts must utilize a replicable, testable approach. Opinions that rely too heavily on anecdotal evidence and/or subjective judgment will be excluded. *See Charter Pracs. Nternational, LLC v. Robb*, No. 3:12-CV-1768(RNC), 2015 WL 13000251, at *5 (D. Conn. Mar. 31, 2015) (excluding expert testimony that is "largely anecdotal"); *Gonyea v. Irick Excavating, LLC,* No. 2:08-CV-242, 2010 WL 11606973, at *4 (D. Vt. Nov. 30, 2010) ("Relying on experience and subjectivity has been identified as a 'red flag' indicating an expert may not be qualified to testify on a particular subject under *Daubert*.")

Even if an expert uses a recognized methodology, that effort must "reflect[] a reliable application of the principles and methods to the facts of the case." *Post University, Inc. v. Learneo, Inc.*, No. 3:21-CV-01242 (VDO), 2025 WL 2709370, at *2 (D. Conn. Sept. 23, 2025); *Wells Fargo Bank, N.A. v. United States Life Ins. Co. in City of New York*, No. 22 CIV. 8606 (JPC), 2025 WL 2220948, at *20 (S.D.N.Y. Aug. 4, 2025). So, it follows that opinions that ignore case-specific facts or rely on speculative hypotheticals are inadmissible.

But even when rebuttal opinions are correctly tailored to the facts of the case, their admissibility remains constrained by their narrow purpose, which is to directly counter the opposing expert's assertions without introducing new theories or speculative analysis. Thus, courts exclude rebuttal reports that introduce new theories or opinions not directly responsive to the other side's disclosures. *See Capri Sun GmbH*, 595 F. Supp. 3d at 140 ("the charge of a rebuttal expert" is "to criticize the analysis presented by another party").

Finally, expert testimony must satisfy Rule 403. Even relevant expert testimony must be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion, or misleading the jury. *Nimely*, 414 F.3d at 397. Because expert testimony carries

unique weight, courts "exercise more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595; *see also Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (stating same).

## IV. ARGUMENT

The Court should exclude Dr. Michel's opinions because they are procedurally improper given Plaintiff's failure to comply with the disclosure requirements of Rule 26 and the disclosure schedule imposed by the Court. Procedural objections aside, the Court should also exclude Dr. Michel's opinions because Plaintiff cannot establish that those opinions satisfy the reliability, relevance, and admissibility requirements under Rule 702.[8]

As articulated in greater detail below, Dr. Michel's testimony suffers from five independent defects. ***First***, she introduces new opinions that exceed the permissible scope of rebuttal. ***Second***, as a geologist, Dr. Michel is not qualified to offer the opinions—on the design, operations, or regulatory compliance of the Terminal—that she presented in her report. ***Third***, in reaching her opinions, she does not apply a reliable methodology—in fact, she provides no methodology at all. ***Fourth***, she selectively cites supporting material while disregarding contrary evidence, resulting in opinions that are irrelevant and unhelpful. ***Lastly***, if allowed to be presented to the jury, her testimony would be unfairly prejudicial and risk confusing the issues. Each of these flaws, standing alone, warrants exclusion.

### A.    CLF Did Not Properly or Timely Disclose Dr. Michel's Opinions

Dr. Michel's report is styled as "rebuttal," but it does more than (attempt to) rebut the opinions offered by Defendants' experts. It also introduces new, affirmative opinions that were

---

[8] Dr. Michel's opinions are inadmissible under Rule 702. As the recent amendments to Rule 702 emphasize, the court must rigorously exercise its gatekeeping responsibility and make sure the proffered opinions meet all four requirements of the Rule.

not disclosed in Plaintiff's initial expert reports and are not responsive to any specific defense opinion. Specifically, her report offers independent conclusions about the magnitude of potential oil discharge, the ecological significance of specific toxicity thresholds, and the likelihood of spill-related harm based on external case studies—none of which are similarly addressed or analyzed by Defendants' experts, and all of which constitute improper, affirmative opinions rather than rebuttal. *See Hart v. BHH, LLC*, No. 15CV4804, 2018 WL 3471813, at *9 (S.D.N.Y. July 19, 2018) ("[] a rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice.") (internal quotations omitted); *see also In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 363 (S.D.N.Y. 2023) ("A rebuttal report is not the proper avenue to introduce entirely new analyses or opinions."). Federal Rule of Civil Procedure 26(a)(2)(D)(ii) allows rebuttal reports "intended ***solely*** to contradict or rebut evidence on the same subject matter identified by another party." (emphasis added). Dr. Michel's report does not meet that standard. Her opinions regarding the following topics are simply new theories of liability:

**1)** ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████ In contrast, Dr. Michel does not merely critique Dr. Etkin's assumptions—she constructs an entirely new scenario involving ***multiple simultaneous tank failures*** and ***100% outflow*** from each tank. *See* Michel 07/22/25 Rpt. at 10. This scenario is not derived from any defense expert's methodology and is not offered as a correction or contradiction of Dr. Etkin's analysis. Instead, it represents a new affirmative opinion about the magnitude of potential

discharge, which could and should have been disclosed in Plaintiff's initial expert reports. It is not rebuttal under Rule 26.

2) ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

████████ Dr. Michel, however, introduces thresholds of 0.5 μg/L and 0.1 μg/L for polycyclic aromatic hydrocarbons (PAHs), arguing that these should be the applicable standards for evaluating ecological harm. *See* Michel 07/22/25 Rpt. at 11–15. These thresholds are not referenced or challenged by any defense expert, and Dr. Michel's application of them constitutes a new scientific opinion—not a rebuttal. Her threshold selection reflects a normative judgment about what standards ***should*** apply, not a response to what Defendants' experts ***actually*** used.

3) **Historical Spill Data:** Dr. Michel's report includes case studies and historical spill data from unrelated facilities and events, which were not cited or relied upon in any meaningful way by any of Defendants' experts. For example, she references incidents involving different infrastructure, geographic conditions, and regulatory contexts to support her conclusions about the likelihood and consequences of a spill at the New Haven terminal. *See e.g.*, Michel 07/22/25 Rpt. at 11 (discussing Katrina, Rita, and Harvey). ██████████████████████████████████████████

███████████████████████████████████████████

████████████ Dr. Michel's use of external case studies is not a rebuttal to any specific

claim; it is an attempt to introduce affirmative evidence of risk that expands the scope of the litigation beyond what Defendants' experts addressed.

Courts routinely exclude opinions such as these for being untimely. *See, e.g., Capri Sun GmbH*, 595 F. Supp. 3d at 140 ("The charge of a rebuttal expert is to criticize the analysis presented by another party."); *Brink's Glob. Servs. USA,* 2024 WL 4227760, at *6 (excluding rebuttal expert who "offered new opinions that could and should have been included in its initial report"). The scheduling order in this case set firm deadlines for expert disclosures. Plaintiff's decision to introduce new opinions after those deadlines—under the guise of rebuttal—violates both Rule 26 and the Court's scheduling order. As this Court has recognized, failure to comply with the disclosure requirements set forth in the Federal Rules of Civil Procedure is grounds for excluding that testimony. *See Chery v. Town of Enfield*, No. 3:19-CV-1952 (VDO), 2024 WL 4372386, at *1 (D. Conn. Oct. 2, 2024) (applying FRCP 37(c)(1) and precluding testimony from witnesses based on untimely disclosure).

Plaintiff first reached out to Dr. Michel regarding a potential role in this litigation nearly 18 months ago. Ex. A, Michel Dep. at 7:18–20. This was well before the deadline for affirmative expert disclosures, which means she could have been disclosed and offered her opinions then. Instead, Plaintiff kept her in reserve and strategically served her report only after Defendants served their expert reports, taking away Defendants' right to respond to her affirmative opinions since the scheduling order does not allow Defendants to submit surrebuttal reports. Plaintiff has offered no justification for the delay.

And this is not a case of inadvertent omission or harmless error: Plaintiff is a sophisticated litigant, represented by experienced counsel, with a track record of similar suits. Plaintiff knew the rules, knew the deadlines, and chose to disregard them to sandbag Defendants

with new opinions they cannot respond to. CLF cannot circumvent the Court's scheduling order by characterizing new, affirmative opinions as "rebuttal" in an effort to avoid the consequences of noncompliance.

**B.**     Dr. Michel's Opinions Are Irrelevant and Do Not "Fit" the Claims in This **Case**

Even if Dr. Michel's opinions were timely and proper rebuttal (they are not), they are inadmissible under Rule 702 because they do not "fit" the claims at issue and will not assist the jury in resolving any disputed fact. Rule 702 requires that expert testimony be both reliable and relevant. The threshold inquiry is a matter of "fit"—whether the expert's opinion is sufficiently tied to the facts to aid the trier of fact in resolving a dispute. *Daubert*, 509 U.S. at 591; *Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn. 2004) ("The final requirement of Rule 702 is that the expert witness must be able to assist the trier of fact to reach accurate results. This is the so-called 'fit' requirement.").

This case turns on whether Defendants violated specific permit obligations. Namely, the critical inquiry is whether the term "best industry practice" in the 2018/2021 Permit impliedly requires permittees to consider climate change factors and whether Defendants failed to implement best management practices ("BMPs") to minimize the potential for leaks and spills resulting from climate change impacts. *See* Compl. ¶¶ 7, 14, 295; NOI at 12. Dr. Michel's opinions *are not* about best industry practices, BMPs, climate change, or the SWPPP. They *are not* about the 2018/2021 Permit or the Coastal Management Act. Her testimony concerns hypothetical post-spill environmental effects and the likelihood of tank failures, which shed no light on Defendants' regulatory compliance. *See generally* Ex. B, Michel 07/22/25 Rpt. at 2–17.

This disconnect is fatal under Rule 702. Expert testimony must be relevant to the claims and defenses in the case, and must help the trier of fact understand the evidence or determine a fact in issue. *See Reynolds v. Arnone*, 645 F.Supp.3d 17, 22 (D.Conn., 2022) ("This requirement

means that [e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (internal quotations omitted); *Scism v. Ferris*, No. 1:18-CV-672 (TWD), 2022 WL 2915745, at *3 (N.D.N.Y. July 25, 2022) (explaining the Court's inquiry entails a consideration of "whether the proposed testimony would be helpful to the trier of fact") (internal quotations and citations omitted). Dr. Michel's opinions do not meet that standard.

Here, Dr. Michel's opinions are untethered from the regulatory framework and do not address the permitting questions at the heart of this litigation. Critically, Dr. Michel did not even review the very documents that define the terminal's regulatory obligations:

> Q.  So I take it from reviewing these lists that *you have not reviewed any of the permits* or permit documents for the Equilon New Haven terminal; is that fair?
>
> A.  Yes.
>
> Q.  The *EPA Multi-Sector General Permit*.
>
> A.  I have not seen those.
>
> Q.  Have you reviewed the *2024 or 2025 draft permits* from the State of Connecticut that would apply to the terminal if they are finalized?
>
> A.  No.
>
> Q.  I take it you've also not reviewed the terminal's *SWPPP*.
>
> A.  I have not.
>
> Q.  Or the terminal's *SPCC*.
>
> A.  I have not.

Ex. A, Michel Dep. at 47:3–24 (emphasis added).

She only reviewed older versions of the Business Continuity Plan (2020 and 2023)—not the current 2024 plan—and cites only a single point from the Emergency Response Plan while conceding she offers no opinion that any of those plans are deficient. *Id*. at 48:15–24; 49:7–50:16

In short, Dr. Michel's testimony omits the very materials that would be necessary to assess compliance with the 2018/2021 Permit. Because her testimony does not "fit" the claims at

issue, it cannot assist the jury in resolving any disputed fact. Moreover, as the proponent of Dr. Michel's testimony, Plaintiff bears the burden of proving *by a preponderance of the evidence* that her opinions satisfy Rule 702. *Scism*, 2022 WL 2915745, at *3 ("[]the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied"). Plaintiff has not done so. Her opinions then are not relevant, not helpful, and, ultimately, not admissible.

## C.    Dr. Michel Is Not Qualified to Offer Opinions Regarding Risk, Response, or Modeling

Dr. Michel lacks the qualifications necessary to offer expert opinions on worst-case discharge scenarios, emergency preparedness, and ecological risk modeling at the New Haven Terminal. Her professional background is rooted in *post*-spill response, not in the disciplines required to assess *future* risk. She has spent her career managing projects to respond to spills after they occur—not predicting whether a spill might happen, modeling its potential impacts, or evaluating the adequacy of facility preparedness measures. *Cf. Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) ("[a]n expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.") (internal quotations and citations omitted). These forward-looking assessments require expertise in engineering, facility operations, and predictive modeling, which are fields in which Dr. Michel concedes she has no experience or qualifications:

> Q.  You're not a structural engineer, for example.
>
> A.  *No*.
>
> Q.  You're not an industrial engineer?
>
> A.  *No*.
>
> Q.  Or a chemical engineer.

A. *No*.

Q. You're not a mechanical engineer?

A. *No*.

Q. And you're not a tank engineer either; correct?

A. *No*.

Q. You're not a meteorologist?

A. *No*.

Q. You're not a metocean engineer?

A. *No*.

Q. You're not a toxicologist?

A. *Not by training*.

Q. You're not a climate scientist; correct?

A. *Correct*.

Q. And you're not an expert on climate change attribution.

A. *No*.

Ex. A, Michel Dep. at 36:17–37:9; 37:21–38:3 (emphasis added; objection omitted).

It is unsurprising then that she has never prepared or certified a Stormwater Pollution

Prevention Plan or a Spill Prevention, Control, and Countermeasure ("SPCC") plan; has never

designed a bulk storage facility, a tank, or secondary containment; and has never worked for CT

DEEP or EPA, or even at any Connecticut industrial facilities. *Id*. at 38:4–22; 39:11–40:8; *see*

*Compare Engler v. MTD Prods., Inc.*, No. 13-CV-575 CFH, 2015 WL 900126, at *10 (N.D.N.Y.

Mar. 2, 2015) (excluding expert testimony where expert lacked sufficient experience and relied

instead on "an opinion" rather than demonstrated expertise in the relevant field). █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ *Id*. at 41:6-23; 42:18-43:15. Her testimony, therefore,

exceeds the bounds of her expertise and must be excluded.

### D.    Dr. Michel's Subjective Experiences Do Not Constitute Reliable Methodology

Expert testimony must rest on a reliable, recognized methodology properly applied to the case-specific facts. Courts routinely exclude opinions that overemphasize anecdotal evidence, subjective judgment, and/or assumptions disconnected from the record. *See Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 2613543, at *5 (D. Vt. Mar. 23, 2023) (excluding expert opinion, in part, because "[r]eliance on anecdotal knowledge… will not suffice.") (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005)); *see also, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266–67 (2d Cir. 2002). Dr. Michel's opinions suffer from precisely these flaws. Her report relies almost entirely on generalized personal experiences with unrelated hurricane events from very different geographical areas with unique weather patterns, without any analytical framework to assess their relevance to conditions at the New Haven Terminal.

This methodological gap is especially concerning given the subject matter at issue. Despite the technical complexity of assessing spill risk during extreme weather events, Dr. Michel employs no specialized tools, replicable procedures, or accepted scientific principles to support her opinions. Indeed, across all topics, Dr. Michel fails to articulate or apply any methodology, let alone a reliable methodology, beyond her own say-so. She does not: (i) define a governing framework; (ii) identify accepted procedures for worst-case discharge estimation or ecological risk modeling; (iii) disclose criteria for selecting case studies; (iv) test alternative scenarios; (v) quantify uncertainty; or (vi) demonstrate peer review or general acceptance. *See* Fed. R. Evid. 702(c–d); *Daubert*, 509 U.S. at 593–94 (outlining factors affecting reliability); *see also United States v. Williams*, 506 F.3d 151, 160–61 (2d Cir. 2007) (explaining that a court must perform its gatekeeping function by examining the reliability of an expert's methods and may lean on the factors articulated in 702 and *Daubert* but that many other factors can be applicable).

Without more, Dr. Michel's opinions cannot be offered to the jury because they were not derived from any discernable methodology. *See Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024) (excluding expert opinion "because the Court [could not] discern the exact methodology [the expert] used"); *Smith v. Herman Miller, Inc.*, No. CV-03-5358 (CPS), 2005 WL 2076570, at *4–5 (E.D.N.Y. Aug. 26, 2005) (holding that "lack of calculations, alternative design, testing, or supporting research material renders it nearly impossible to discern precisely what [the expert's] methodology in coming to his conclusion was... leav[ing] the Court with mere *ipse dixit*, or say so of the witness.") (internal quotations and citations omitted).

### 1.    Dr. Michel's WCD critique is anecdote-driven and omits the hallmarks of a reliable methodology

Dr. Michel's critique of ███████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████    *See* Ex. B, Michel 07/22/25 Rpt. at 2, 12. But her conclusion—that New Haven's WCD would likely involve multiple tanks and larger volumes—is not grounded in any recognized methodology or regulatory standard. Instead, it rests solely on unsupported anecdotal inference.

This is particularly problematic given that WCD calculations are governed by specific federal regulations, including 40 C.F.R. § 112.20 and related EPA guidance. Yet Dr. Michel admitted in her deposition that she was unfamiliar with these requirements:

Q.  Are you familiar with the federal regulations regarding oil pollution prevention at bulk fuel storage facilities?

A.  Do you mean like SPCC?

Q.  I mean like the CFR, Code of Federal Regulations.

A.  *No*.

*See* Ex. A, Michel Dep. at 58:19–25 (emphasis added; objection omitted). ███████

████████████████████████████████████████████████████████████ ,

Dr. Michel again offered nothing in rebuttal other than her own experience:

Q.  But in terms of just looking at a one single tank --

A.  Yeah.

Q.  -- she did it correctly as far as the regulation says you're supposed to do it; right?

[A.] Again, I only can say that *my personal experience* is that that's not a sufficient worst case scenario.

Q.  I understand your opinion.

A.  Yeah, yeah.

Q.  ████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████

A.  *She did that in her report*.

*Id*. at 74:6–25 (emphasis added; objection omitted).

This exchange shows that Dr. Michel's attempt to challenge Dr. Etkin's WCD calculation

is fundamentally misguided. ████████████████████████████████

███████████████████████ In contrast, Dr. Michel's critique of Dr. Ekin is

unsupported by any regulatory understanding or analytical method, resting solely on her own

"understanding." But that is not enough. Where, as here, an expert's "opinion is connected to the

existing data only by the *ipse dixit* of the expert," it must be excluded. *Perkins v. Origin*

*Medsystems, Inc.*, 299 F. Supp. 2d 45, 54 (D. Conn. 2004). Because her testimony rests

exclusively on her personal experiences managing spill response projects—with nothing

connecting those experiences to the unique conditions at the Terminal other than her word—it

should be excluded under Rule 702. *See Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins.*

*Co. of Pittsburgh, PA*, No. 3:19CV839 (JBA), 2021 WL 4170757, at \*19 (D. Conn. Sept. 14, 2021), reconsideration denied, 2021 WL 5039035 (D. Conn. Oct. 29, 2021) (noting that when expert testimony is based primarily on experience, the expert must explain how that experience supports and applies to the case-specific opinion).

## 2.    Dr. Michel's emergency-response infeasibility opinion is premised on generalized assumptions

Dr. Michel offers the affirmative opinion that, if a release were to occur, "a quick response effort … will likely not occur," citing a single line from the Terminal's Emergency Response Plan ("[i]f time permits, all personnel should leave Facility") and a separate Plaintiff's expert's estimate that the access road may be inundated for nine hours during a 100-year storm event. *See* Ex. B, Michel 07/22/25 Rpt. at 10–11. But she admitted in her deposition that she did not review the Terminal's SPCC or SWPPP plans, nor did she examine the facility's business continuity plan beyond outdated versions from 2020 and 2023. *See* Ex. A, Michel Dep. at 47:3–49:23. *See Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 3:14-CV-00549 (VLB), 2018 WL 1525709, at \*16 (D. Conn. Mar. 28, 2018), aff'd sub nom. *Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9 (2d Cir. 2019) (excluding expert opinion because expert "failed to review" pertinent evidence, noting that "[w]ithout such information, [the expert] [could not] render a reliable opinion.").

Dr. Michel also conceded she has never worked at an industrial facility in Connecticut, never spoken with CT DEEP or EPA about stormwater regulations, and has no experience certifying or preparing emergency response plans more generally. *Id*. at 38:10–39:1; 39:20–40:23. Neither her deposition nor her report contains any reference to a site visit or conversation with any facility personnel familiar with the Terminal. Her opinions therefore are not informed by any firsthand knowledge of the Terminal's tank integrity, containment systems, pre-storm

19

planning and procedures, or post-storm operational procedures, and are instead based entirely on general assumptions and isolated quotations. In short, her testimony is completely devoid of any site-specific operational analysis.

Indeed, when asked directly whether she thought the Terminal's emergency response plan is lacking, she raised no concerns:

> Q. You're not offering any opinion in this case that defendants' emergency response plan is deficient in any way, are you?
>
> A. *No*.

*Id*. at 49:7–10 (emphasis added). This admission underscores the speculative nature of her emergency-response critique. She neither challenges the adequacy of the Terminal's plans and procedures nor analyzes their implementation yet still speculates that a timely response is unlikely. Again, Rule 26 and Rule 702 prohibit injecting a new expert on rebuttal who offers a list of new opinions.

This is not expert methodology; it is personal conjecture from someone who admits she is not an engineer or expert in stormwater permitting. Dr. Michel's failure to consider the Terminal's actual emergency protocols, staffing contingencies, and mitigation infrastructure renders her opinion unreliable. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir. 2007) ("expert opinions may properly be excluded when based on conjecture rather than evidence in the record"). Dr. Michel is not following a scientific method when she ignores fundamentally relevant information on the very subject of her opinion.

### 3. Dr. Michel's critique of SIMAP modeling substitutes opinion for empirical validation

Dr. Michel opines that Dr. French-McCay's SIMAP modeling is "wrong" because it did not predict sheens or shoreline oiling observed in other unrelated spills. *See* Ex. B, Michel 07/22/25 Rpt. at 11–16. Yet in her deposition, Dr. Michel acknowledged that she has worked

with Dr. French-McCay on numerous projects and considers her a "reliable authority in the field of spill modeling." *See* Ex. A, Michel Dep. at 43:4–44:10. In fact, she has repeatedly retained Dr. French-McCay and her company to perform modeling work, which is unsurprising given that Dr. Michel is not a modeler herself and has never validated SIMAP or any other modeling program for hurricane-induced spill scenarios. *Id*. at 36:10–38:3; 120:22–121:22; 131:13–16.

Worse still, despite "disagreeing" with Dr. French-McCay's opinions here, Dr. Michel offers no alternative modeling approach, no explanation of how her preferred method would be tested or validated, and no analysis of how the substances at issue would behave at the New Haven Terminal. Dr. Michel's critique relies solely on swapping inputs based on personal preference and comparing results to unrelated spill events. *See* Ex. B, Michel 07/22/25 Rpt. at 12–14 (discussing Hurricane Sandy). She also fails to justify the lower toxicity thresholds she prefers (0.5 or 0.1 µg/L) for the specific location or product types involved. *Id.* at 11–12, 15. At no point does she engage in empirical validation or site-specific modeling.

This internal conflict casts doubt on the reliability of her rebuttal. In fact, when asked whether she would hesitate to hire Dr. French-McCay for future spill modeling work, Dr. Michel responded unequivocally:

> Q. Is there any reason why you would not hire Dr. French-McCay to perform spill modeling work for you on a future project?
> A. ***No***.

Ex. A, Michel Dep. at 44:6–8*.* Here, just as with her unsupported opinions on spill project response, Dr. Michel seeks to have it both ways—discrediting Dr. French-McCay's work in this litigation while simultaneously affirming her professional reliability and expressing no reservations about hiring her again. This contradiction underscores the lack of genuine

methodological critique and reveals that Dr. Michel's "rebuttal" is based not on scientific

disagreement, but on subjective preference. Dr. Michel's unsupported opinions are inadmissible.

###    4.    Dr. Michel's North Cape analogy is an experience-based assertion, not a testable method

Dr. Michel claims to rely on her experience remediating the North Cape spill to assert, "I

know" the losses resulted from high concentrations of total polyaromatic hydrocarbons (TPAH)

in nearshore waters, and she speculates that similar impacts would occur at the New Haven

Terminal—particularly to shellfish beds and aquaculture sites. *See* Ex. B, Michel 07/22/25 Rpt.

at 17. But she makes no effort to connect the two sites and ignores the fact that the North Cape

spill is distinguishable because it occurred offshore, when a barge grounded off the coast of

Rhode Island.[9]

In this case, in contrast, the Terminal is located approximately half a mile from New

Haven Harbor, and ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Dr. Michel's report contains no analysis of how oil would reach, move, or persist in New

Haven Harbor; no discussion of the chemical behavior of the specific petroleum products stored

at the Terminal; and no structured framework for assessing ecological risk. *See generally*, Michel

07/22/25 Rpt.

When asked to support her conclusions, Dr. Michel retreated behind her résumé, stating

only that "we know from experience" how an oil spill at the Terminal might affect the

surrounding area. *See* Ex. A, Michel Dep. at 130:25–131:12. But she is not a toxicologist or

modeler, and she admitted she has never validated any ecological risk model for hurricane-

---

[9] *See* https://darrp.noaa.gov/oil-spills/north-cape.

induced spills. *See* Ex. A, Michel Dep. at 36:10–38:3; 131:13–16. Again, Dr. Michel, without any empirical analysis or site-specific modeling, cannot cite "[her] experience" as a substitute for scientific rigor. Indeed, her conclusory assertions—which she is unqualified to even offer—are "the essence of unverified subjectivity" that Rule 702 and *Daubert* are designed to exclude. *See Nimely*, 414 F.3d at 399; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's conclusory opinions are [] inappropriate.").

Ultimately, Dr. Michel's comparison to the North Cape oil spill is not an expert application of scientific principles; it is a personal assertion based on a ***different spill***, in a ***different location***, under ***different conditions***. She fails to account for the obvious differences between Block Island Sound and New Haven Harbor, including geography, product type, containment infrastructure, and hydrodynamics. This failure to consider site-specific variables renders her opinion incomplete and unreliable. And without a reliable method or application to the facts of this case, her North Cape analogy cannot assist the trier of fact and must be excluded.[10]

### E.   Dr. Michel's Opinions Are Unreliable Because She Cherry-Picks and Ignores Contradictory Evidence

An expert's failure to address contrary evidence or obvious alternative explanations renders the opinion unreliable. *See In re Rezulin Products Liability Litigation*, 369 F.Supp.2d 398, 425 (S.D.N.Y.,2005) ("[C]ourts have excluded expert testimony where the expert selectively chose his support from the scientific landscape."); *Redd v. DePuy Orthopaedics, Inc.*, 700 F. App'x 551, 555 (8th Cir. 2017) (affirming exclusion where expert failed to address "obvious

---

[10] Of note, Dr. French-McCay worked on the North Cape spill and published her findings in the peer reviewed literature. *See e.g.*, French-McCay Resume at 3, 8. Contrary to Dr. Michel, Dr. French-McCay considered the circumstances of the North Cape spill in her analysis and modeling. *See, e.g.*, Ex. D, French-McCay 06/23/2025 Report at 5, 13–14, 37.

alternative explanation[s]"); *K.E. v. GlaxoSmithKline LLC*, No. 3:14-CV-1294(VAB), 2017 WL

440242, at *10 (D. Conn. Feb. 1, 2017) (excluding expert whose presentation was "incomplete…

[and] therefore unreliable").

Dr. Michel's challenge to ████████████████████████████████████████

████████████████████████████ Her report relies heavily on a narrow set of Gulf Coast

hurricanes (Katrina, Rita, and Harvey) and accompanying photographs to support her claim that

multiple-tank failures and large-volume releases are to be expected during extreme weather

events. *See* Ex. B, Michel 07/22/25 Rpt. at 2–11. By comparison, her discussion of Hurricane

Sandy fails to account for how the Terminal responded to that event or how the Terminal adapted

its processes and procedures in the roughly 13 years since. To that point, Dr. Michel offers no

analysis of post-Sandy upgrades, no evaluation of current containment systems, and no

consideration of how lessons learned from Sandy have shaped modern engineering and

emergency planning.

Worse still, Dr. Michel ignores other relevant Northeast storms altogether—including

Hurricane Hanna (2008), Hurricane Gloria (1985), and the Great New England Hurricane of

1938—all of which impacted Connecticut and would have provided meaningful context for

assessing regional storm risk. *See In re Mirena Ius Levonorgestrel-Related Products Liability

Litigation* (No. II), 341 F.Supp.3d 213, 252–253 (S.D.N.Y., 2018) (excluding expert opinions, in

part, because the expert ignored evidence that undercut their opinions by focusing on tenuous

analogies while ignoring more obvious comparisons). During her deposition, she admitted as

such:

Q.  Have you conducted any studies regarding Tropical Storm Hanna in 2008?
A.  *No*.

\*      \*      \*

24

Q. Have you done any research into Hurricane Gloria in 1985?

A. ***No***.

           \*       \*       \*

Q. Have you done any research into the Great New England Hurricane of 1938?

A. ***I have not***.

Ex. A, Michel Dep. at 83:5–85:4 (emphasis added) (also exploring how these hurricanes became less violent after making landfall). She also acknowledged that she did not review historical storm data specific to New Haven or evaluate how regional storm characteristics differ from Gulf Coast hurricanes. When asked directly whether the Gulf of Mexico and the Northeastern U.S. are different, Dr. Michel half-heartedly agreed they differ "in some ways." *Id*. at 75:14–19.

Dr. Michel provides no inclusion or exclusion criteria for the case studies she selected, nor does she attempt to explain why the Gulf Coast examples are more relevant than Northeast case studies. She fails to account for differences in geography, facility location and design, and storm frequency and intensity. Instead, she conveniently elevates the most catastrophic examples from unrelated regions to support her conclusions, while disregarding contrary evidence and site-specific realities. Her own testimony underscores the unreliability of this approach:

Q. And if storms experienced in the Gulf of Mexico versus, for example, New Haven, Connecticut would be different, would you expect that the associated oil spill would be different as well?

[A.]You know, one of my favorite sayings is ***I've never been to the same spill twice***. So ***every one is a unique combination of events***.

           \*       \*       \*

Q. Do you have any reason to dispute that the wind speeds experienced in Hurricane Katrina were much stronger than have ever been recorded in the Northeastern Seaboard in the United States?

A. I haven't looked at the data for that, but, you know, that -- those are past. You know, in the future, you know, every -- every storm --you know, I've never been the same -- you know, ***I've never seen the same hurricane twice either***. So, you know, ***they're all different as well***, and the future ones seem to be more different.

*Id.* at 85:17–86:2; 101:17–102:2 (emphasis added; objection omitted). These admissions confirm that she cannot reliably extrapolate between hurricanes or oil spills. *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Unfounded extrapolations not supported by, or sufficiently related to, scientific data or expertise should be rejected"). Yet her opinions are based on precisely that type of unreliable extrapolation, drawing conclusions about New Haven based on Gulf Coast spills without accounting for the vastly different regional conditions.

Even if such extrapolation were appropriate (it is not), Dr. Michel conveniently elevated the most catastrophic Gulf Coast examples while ignoring more relevant Northeast storms, including Hurricane Hanna, Hurricane Gloria, and the Great New England Hurricane of 1938. *Compare In re Rezulin*, 369 F. Supp. 2d at 437–438. (excluding expert testimony, in part, because experts ignored contrary evidence). This biased, selective, and unsupported approach is not a reliable methodology. It is environmental advocacy, not expertise, and fails to meet the standards established by Rule 702. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) ("An expert's role is to assist the trier of fact by providing information and explanations; ***the expert's role is not to be an advocate*… *they do not serve as advocates, but as sources of information*.") (internal quotations and citations omitted; emphasis added).

### F.    Dr. Michel's Opinions Are Improper, Unqualified, and Prejudicial

Even if Plaintiff could overcome the procedural and evidentiary flaws inherent in Dr. Michel's opinions, the Court should exclude them under Rule 403. *See Nimely*, 414 F.3d at 397 ("In addition to the requirements of Rule 702, expert testimony is subject to Rule 403 . . . given the unique weight such evidence may have in a jury's deliberations.") (citation omitted). For starters, Dr. Michel's testimony has minimal, if any, relevance. Her report relies heavily on anecdotal accounts from unrelated hurricane events, including facilities in Louisiana and Texas,

without establishing any factual or geographic similarity to the New Haven Terminal. These narratives are not tied to the claims at issue in this case and greatly risk misleading the jury into believing the case concerns broader environmental policy or climate change impacts, which are topics that are not presently before the Court. *Id*. (emphasizing "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations.") (citing *Daubert*, 509 U.S. at 595). Dr. Michel's opinions have nothing at all to do with the central claim truly at issue, namely, Plaintiff's argument that the 2018/2021 Permit impliedly required Defendants to consider climate change factors, and that Defendants' alleged failure to do so violated the 2018/2021 Permit.

To illustrate the methodological problems, Dr. Michel hypothesizes about tank failures and ecological harm without any site-specific analysis or engineering basis. She testified that she is not an engineer with any tank experience. Ex. A, Michel Dep. at 36:17–37:9; 37:21–38:3. Her speculative scenarios would improperly invite the jury to impose liability for risks that are not supported by the record or relevant to the claims at issue in this case. Allowing such testimony would confuse the issues and force Defendants to defend against hypothetical failures untethered to the facts of this case. *See United States v. Hamlett*, No. 19-3069, 2021 WL 5105861, at *1 (2d Cir. Nov. 3, 2021) ("Under Federal Rule of Evidence 403, a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.") (internal quotations omitted) (citing Fed. R. Evid. 403.).

Accordingly, Dr. Michel's testimony should be excluded under Rule 403.

## V.    CONCLUSION

The Court should exclude Dr. Michel's opinions because they are improper rebuttal, and because Plaintiff cannot satisfy its burden of showing that, "more likely than not," they satisfy the prerequisites for admissibility under Rules 702 and 403 and *Daubert*.


Dated: October 3, 2025                         Respectfully submitted,

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*

Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com
