Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 1

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF CONNECTICUT

3     CONSERVATION LAW FOUNDATION,

4     INC.,

5              Plaintiff,          Case No.

6              vs.                 3:21-cv-00933-VDO

7     EQUILON ENTERPRISES LLC d/b/a

8     SHELL OIL PRODUCTS US, TRITON

9     TERMINALING LLC, and MOTIVA

10    ENTERPRISES LLC,

11             Defendants.

12    VIDEOTAPED

13    DEPOSITION OF:  JACQUELINE MICHEL, PhD

14    DATE:          August 22, 2025

15    TIME:          9:11 AM

16    LOCATION:      Nelson Mullins Riley &

17                   Scarborough, LLP

18                   1320 Main Street, 17th Floor

19                   Columbia, SC

20    REPORTED BY:   Sandra K. Bjerke, RDR, CRR, CBC

21

22

23

24

25

Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

```
 1      APPEARANCES OF COUNSEL:
 2          ATTORNEYS FOR THE PLAINTIFF:
 3              MOTLEY RICE, LLC
                BY:  SHALOM D. JACKS
 4              28 Bridgeside Boulevard
                Mt. Pleasant, SC  29464
 5              843-216-9000
                sjacks@motleyrice.com
 6
 7
            ATTORNEYS FOR THE DEFENDANTS:
 8
                KING & SPALDING, LLP
 9              BY:  RYAN T. KEARNEY
                1180 Peachtree Street NE
10              Atlanta, GA  30309
                (404) 572-4600
11              rkearney@kslaw.com
12
13          ALSO PRESENT:
14              Bob Kiel, Videographer
15
16
17
18
19
20
21
22
23
24              (INDEX AT REAR OF TRANSCRIPT)
25
```

Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 7

1    take a break about once every hour, but if you need

2    a break at any other time, just let me know and

3    that's fine.  The only thing I'll ask is if there's

4    a question pending, that we just go ahead and

5    answer that question and then we take the break.

6              Does that make sense?

7        A.   Yes.

8        Q.   Okay.  Dr. Michel, is there anything

9    that would prevent you from giving complete and

10   accurate testimony today?

11       A.   No.

12       Q.   And you've sworn to tell the truth in

13   response to all of my questions; correct?

14       A.   Yes.

15       Q.   Did you bring any documents or

16   materials with you to your deposition today?

17       A.   No.

18       Q.   Okay.  When were you first contacted to

19   serve as an expert witness in this case?

20       A.   About a year and a half ago.

21       Q.   Did you have any prior relationship

22   with CLF before you were asked to be an expert in

23   this case?

24       A.   No.

25       Q.   Have you been disclosed by CLF as an

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.



Page 9

1      in that case?

2                A.    I do not.

23                Q.    Do you understand that this case is

24      about the Equilon New Haven Terminal?

25                A.    Yes.

Page 16

 1                    (EXHIBIT 3, Additional Materials

 2          Considered, marked for identification.)

 3                    MR. KEARNEY:  I'll state for the record

 4          this is an additional document we received from

 5          plaintiff's counsel on August 20th with the title

 6          Additional Materials Considered.

 7          BY MR. KEARNEY:

 8                    Q.   Dr. Michel, have you seen this document

 9          before?

10                    A.   Yes.

11                    Q.   And what do you understand this to be?

12                    A.   The materials that I reviewed following

13          the additional materials in connection with my

14          report.

15                    Q.   Thank you.

16                    We're going to come back to this in a

17          few minutes as well.  I just wanted to ask you a

18          couple of other questions about documents you may

19          or may not have.

20                    Do you have any set of data and

21          calculations that you relied on in forming your

22          opinions in the case?

23                    A.   No.

24                    Q.   Do you have any exhibits or

25          demonstratives that you've already prepared that

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 26

```
 1              A.   It's listed there.
 2              Q.   I assume that refers to responding to
 3       oil spills after they've occurred; is that fair?
 4              A.   Yes.
 5              Q.   And the next item under that is
 6       HAZWOPER, H-A-Z-W-O-P-E-R.  And does that stand for
 7       hazardous waste operations and emergency response?
 8              A.   Yes.
 9              Q.   So is that also a field that deals with
10       responding to oil spills after they've occurred?
11              A.   Yes.
12              Q.   So on the top now to the right of that
13       on this page under Summary, do you see that
14       section?
15              A.   Yes.
16              Q.   And this section discusses that much of
17       your experience is based on emergency response to
18       oil and chemical spills.
19              A.   Yes.
20              Q.   You also specifically list response
21       strategies and shoreline cleanup in that expertise;
22       correct?
23              A.   Correct.
24              Q.   And in the next section marked
25       Specialties, you state that you specialize in spill
```

Page 27

1      planning, response, and damage assessment; correct?

2              A.    Yes.

3              Q.    Is it still correct here that with all

4      these references, you're still generally referring

5      to the planning and responding to an oil spill

6      after it's occurred?

7              A.    Yes.  And hazardous materials.

8              Q.    Yes.  Your LinkedIn profile provides

9      that you're currently employed as the president of

10     Research Planning, Incorporated.

11             A.    Yes.

12             Q.    And you've worked at Research Planning,

13     Incorporated since 1977.

14             A.    Yes.

15             Q.    This -- your CV, which we'll talk about

16     in a minute, states that you've served as the

17     president of -- can I call it RPI?

18             A.    RPI, yes.

19             Q.    Of RPI since 2000; is that right?

20             A.    Yes.

21             Q.    And you were actually one of the

22     founders of that company?

23             A.    Yes.

24             Q.    It's actually a company that you helped

25     found while you were still studying for your PhD.

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 36

1    know, not a specific spill, but spills in general.

2         Q.    Is that generally just the kind of

3    research you do to be ready to work on a project if

4    you were hired for an oil spill kind of thing?

5         A.    It's more that we get hired to do

6    research to inform the spill response community.

7    Not just my company, but responders in general and

8    planners and agencies and industry folks who are

9    involved in oil spill planning and response.

10         Q.    We just discussed this, but you're not

11    an engineer of any kind; right?

12         A.    No.

13         Q.    So this may seem a little silly, but I

14    just have to ask you some follow-up questions I

15    assume I know the answers to, but let me just get

16    through this list, and bear with me, please.

17              You're not a structural engineer, for

18    example.

19         A.    No.

20         Q.    You're not an industrial engineer?

21         A.    No.

22         Q.    Or a chemical engineer.

23         A.    No.

24         Q.    You're not a mechanical engineer?

25         A.    No.

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37

1          Q.   And you're not a tank engineer either;

2     correct?

3          A.   No.

4          Q.   You're not a meteorologist?

5          A.   No.

6          Q.   You're not a metocean engineer?

7          A.   No.

8          Q.   You're not a toxicologist?

9          A.   Not by training.

10         Q.   Would you defer to a toxicologist to

11    evaluate the toxicity of potential contaminants?

12         A.   I work with toxicologists to make that

13    assessment.

14         Q.   So if you're on a project that requires

15    a toxicological assessment, you would retain a

16    toxicologist to help you with that; fair?

17              MS. JACKS:  Objection; speculation.

18              THE WITNESS:  Under certain conditions,

19    yes.

20    BY MR. KEARNEY:

21         Q.   You're not a climate scientist;

22    correct?

23         A.   Correct.

24         Q.   And you're not an expert on climate

25    change attribution.

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 38

1              A.    No.

2              Q.    No, you're not an expert.

3              A.    I'm not an expert, yes.

4              Q.    Have you ever prepared a stormwater

5       pollution and prevention plan?

6              A.    No.

7              Q.    Do you understand that if I refer to

8       that as a SWPPP, that's what I'm talking about?

9              A.    Yes.

10             Q.    Have you ever certified a SWPPP?

11             A.    No.

12             Q.    Are you familiar with the regulatory

13      requirements relating to the preparation of a

14      SWPPP?

15             A.    No.

16             Q.    Have you ever prepared for a spill

17      prevention and countermeasures -- spill prevention,

18      control, and countermeasures plan?

19             A.    No.

20             Q.    Do you understand if I refer to that as

21      SPCC, that that's what I'm talking about?

22             A.    Yes.

23             Q.    Are you familiar with the regulatory

24      requirements relating to the preparation of an

25      SPCC?

Jacqueline Michel , PhD                 August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 39

1            A.    Only generally.

2            Q.    What's your understanding of generally?

3            A.    There's a certain worst case discharge

4       number that they have to be able to show that they

5       have sufficient containment.

6            Q.    Generally speaking, it would be

7       someone -- up to someone other than you to look at

8       those regulations and then to prepare the SPCC,

9       though; correct?

10           A.    Correct.

11           Q.    Have you ever been directly employed by

12      a bulk fuel storage facility?

13           A.    No.

14           Q.    Have you ever designed a bulk fuel

15      storage facility?

16           A.    No.

17           Q.    Have you ever designed secondary

18      containment berms for a bulk fuel storage facility?

19           A.    No.

20           Q.    Prior to this case, have you ever

21      worked on any projects regarding industrial

22      facilities in the state of Connecticut?

23           A.    No.

24           Q.    Have you ever worked directly with the

25      Connecticut Department of Energy and Environmental

Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 40

1      Protection?

2              A.    No.

3              Q.    If I refer to that as CT DEEP, would

4      you understand what I mean by that?

5              A.    Yes.

6              Q.    Have you ever worked directly with the

7      Environmental Protection Agency?

8              A.    I have not personally.

9              Q.    And same thing.  I may refer to that as

10     EPA.  I assume --

11             A.    Yes.

12             Q.    -- you understand what I'm talking

13     about.

14             A.    Yes.

15             Q.    You've never worked as an inspector for

16     a government agency, have you?

17             A.    No, I have not.

18             Q.    Have you ever even spoken with anyone

19     from CT DEEP regarding its stormwater regulations?

20             A.    No.

21             Q.    Have you ever spoken with EPA regarding

22     stormwater regulations?

23             A.    No.

24             Q.    Are you a member of the American

25     Petroleum Institute?

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 41

```
 1              A.    No.
 2              Q.    Okay.  So we talked earlier a bit about
 3      how you often lead multidisciplinary teams on
 4      projects; right?
 5              A.    Yes.
 6              Q.    In the multidisciplinary projects that
 7      you work on where you bring in other people to help
 8      with you, you're not typically personally
 9      responsible for the calculation of spill volumes;
10      correct?
11              A.    Correct.
12              Q.    That's someone that -- that's something
13      that you would bring in someone else to help you
14      with.
15              A.    Yes.
16              Q.    If a project required calculating spill
17      volume calculations, you -- strike that.
18                    On the projects that you -- that
19      involve calculating spill volume calculations where
20      you've brought in someone else to help you with
21      that, someone that you brought in on several
22      occasions is Dr. Dagmar Etkin; correct?
23              A.    Yes.
24              Q.    Do you agree that Dr. Etkin is a
25      reliable authority in the field of spill volume
```

Page 42

1    calculations?

2         A.   Yes.

3         Q.   Do you agree that Dr. Etkin has a high

4    degree of competence in the field of spill volume

5    calculation?

6         A.   Yes.

7         Q.   Do you believe that Dr. Etkin has

8    provided accurate spill volume calculations in the

9    projects that you have worked together on?

10        A.   Yes.

11             MS. JACKS:  Objection; vague.

12             THE WITNESS:  I'm sorry.  Yes.

13   BY MR. KEARNEY:

14        Q.   Is there any reason why you would not

15   hire Dr. Etkin to perform spill volume calculations

16   for you on a future project?

17        A.   No.

18        Q.   Okay.  And in the projects you work on,

19   these multidisciplinary teams, when you hire other

20   people to help you with aspects of them, you're not

21   typically personally responsible for creating a

22   spill model either; correct?

23        A.   Correct.

24        Q.   If a project required work like that,

25   that is something that you would typically retain

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 43

1      an expert in spill modeling to help you on that
2      team; right?
3              A.   Yes.
4              Q.   And one of the spill modeling experts
5      that you have asked to serve on multidisciplinary
6      teams to help you with spill modeling is
7      Dr. Deborah McCay; correct?
8              A.   Deborah French-McCay.
9              Q.   It's Deborah French-McCay now, and at
10     one point it was Deborah French; right?
11             A.   Right.
12             Q.   And you've hired Dr. French-McCay to
13     perform spill modeling for you on several
14     occasions; correct?
15             A.   Yes.  Her company, yes.
16             Q.   Do you agree that Dr. McCay --
17     Dr. French-McCay is a reliable authority in the
18     field of spill modeling?
19             A.   Yes.
20             Q.   Do you agree that Dr. French-McCay has
21     a high degree of competence in the field of spill
22     modeling?
23             A.   Yes.
24             Q.   Do you believe that Dr. French-McCay
25     has provided accurate spill modeling work in the

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 44

1      projects that you have worked together on?

2            A.   Yes.

3            Q.   Is there any reason why you would not

4      hire Dr. French-McCay to perform spill modeling

5      work for you on a future project?

6            A.   No.

7            Q.   In fact, your CV also lists several

8      publications that you have co-authored with

9      Dr. Etkin and/or Dr. McCay; fair?

10           A.   Yes.

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 47

1    on it in preparing your opinions; right?

2         A.    Yes.

3         Q.    So I take it from reviewing these lists

4    that you have not reviewed any of the permits or

5    permit documents for the Equilon New Haven

6    terminal; is that fair?

7         A.    Yes.

8         Q.    Or the EPA MSGP.  Do you know what the

9    MSGP is?

10        A.    No.

11        Q.    The EPA Multi-Sector General Permit.

12        A.    I have not seen those.

13        Q.    Not something that you relied on in

14   this case.

15        A.    No.

16        Q.    Have you reviewed the 2024 or 2025

17   draft permits from the State of Connecticut that

18   would apply to the terminal if they are finalized?

19        A.    No.

20        Q.    I take it you've also not reviewed the

21   terminal's SWPPP.

22        A.    I have not.

23        Q.    Or the terminal's SPCC.

24        A.    I have not.

25        Q.    And you're not offering opinions

Page 48

1    regarding those permit documents in your role in

2    this case; is that fair?

3            A.    Yes.

4            Q.    You're not offering opinions regarding

5    the provisions of the SWPPP or the SPCC in this

6    case either; correct?

7            A.    Correct.

8            Q.    You have not reviewed any deposition

9    testimony in this case, have you?

10           A.    No.

11           Q.    Were there any documents or additional

12   information that you would have liked to see but

13   were not provided to you?

14           A.    No.

15           Q.    So in your list of materials considered

16   you list the defendants' emergency response plan;

17   correct?

18           A.    Yes.

25           Q.    Is there any other portion of the

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 49

1      emergency response plan that you intend to offer

2      testimony regarding?

3             A.   No.

4             Q.   And is that true for both the 2021 and

5      the 2024 versions of that plan?

6             A.   Yes.

7             Q.   You're not offering any opinion in this

8      case that defendants' emergency response plan is

9      deficient in any way, are you?

10            A.   No.

11            Q.   You also list in your additional

12     materials considered list that you reviewed

13     defendants' business continuity plan for the New

14     Haven Terminal; correct?

15            A.   Yes.

16            Q.   And the versions of the business

17     continuity plan that you reference in that list are

18     from March 2020 and January 2023; correct?

19            A.   Yes.

20            Q.   So have you not reviewed the most

21     recent version of that business continuity plan,

22     which is from April 2024?

23            A.   I have not.

24            Q.   So you don't know what, if anything,

25     may have changed from the versions that you

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 50

1    reviewed and to the most recent version in 2024;

2    correct?

3              A.   I do not, yes.

4              Q.   I'll just note that your actual written

5    report does not contain any opinions regarding the

6    business continuity plan.

7                   Is there any opinion that you are

8    intending to offer regarding that plan?  Just

9    please let me know if that's the case.

10             A.   No.

11             Q.   So you're not going to offer an opinion

12   in this case that defendants' business continuity

13   plan is deficient in any way; right?

14                  MS. JACKS:  Objection; calls for

15   speculation.

16                  THE WITNESS:  No.

17   BY MR. KEARNEY:

18             Q.   I just want to make sure we're on the

19   same page about that.

20             A.   Yeah.

21             Q.   So your rebuttal expert report provides

22   a summary of the topics you were asked to opine on

23   in the case; right?

24             A.   Yes; the three reports.

25             Q.   And as we discussed, those three

Jacqueline Michel , PhD          August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 53

1          THE WITNESS:  No.

2    BY MR. KEARNEY:

3          Q.   You haven't reviewed the permits, so

4    you're not offering an opinion that one of those

5    provisions would violate it, essentially.

6          A.   Yes.  Correct.

7          Q.   Do you understand that this is a

8    citizens' suit seeking to enforce alleged

9    violations of the Clean Water Act and the Resource

10   Conservation and Recovery Act?

11         A.   Yes.

12         Q.   Do you understand that this case

13   asserts allegations that defendants violated the

14   terms of the Connecticut General Permit for the

15   Discharge of Stormwater Associated with Industrial

16   Activity?

17         A.   Not the details.

18         Q.   Okay.  You're not offering any opinions

19   regarding, quote, best management practices, end

20   quote, for the operation of a bulk fuel storage

21   facility like this one, are you?

22         A.   No.

23         Q.   You're not offering any opinions

24   regarding best industry practices for the operation

25   of a terminal like this either.

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 54

```
 1          A.    No.
 2          Q.    And you're not offering any opinions
 3    regarding good engineering practices for the
 4    operation of a bulk fuel storage facility either.
 5          A.    No.
 6          Q.    And just so we're on the same page for
 7    the record, for those questions "no" means you're
 8    not offering those opinions; right?
 9          A.    That's correct.
10          Q.    And you're not offering any opinion
11    that defendants are currently in violation of the
12    Clean Water Act, are you?
13          MS. JACKS:  Objection; calls for a
14    legal conclusion, beyond the scope.
15          THE WITNESS:  No.
16    BY MR. KEARNEY:
17          Q.    You're also not offering any opinions
18    that defendants are currently in violation of RCRA.
19          MS. JACKS:  Objection; calls for a
20    legal conclusion, beyond the scope.
21          THE WITNESS:  No.
22    BY MR. KEARNEY:
23          Q.    So you're not offering any opinion that
24    the tanks at the terminal would actually fail
25    during any particular storm event in this case, are
```

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 55

```
 1    you?

 2              MS. JACKS:  Objection; scope.

 3              THE WITNESS:  No.

 4    BY MR. KEARNEY:

 5        Q.    That's not part of your expert role in

 6    the case; fair?

 7        A.    Correct.

 8        Q.    Would you defer to a tank engineer to

 9    offer that kind of opinion?

10              MS. JACKS:  Objection.

11              THE WITNESS:  Possibly.

12    BY MR. KEARNEY:

13        Q.    What do you mean by "possibly"?

14        A.    I guess it would depend on what the --

15    that person was using as their input and, you know,

16    factors they were considering.

17        Q.    Okay.  Regardless of the actual

18    individual person that's offering those opinions,

19    is it fair that, generally speaking, you would

20    defer to someone who is a tank engineer to make

21    that kind of determination?

22              MS. JACKS:  Objection; calls for

23    speculation, vague.

24              THE WITNESS:  I guess so.

25    BY MR. KEARNEY:
```

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 56

1          Q.   So, in essence, you're really just --
2     you're rebutting the three experts we've talked
3     about that you note in your report.  That's your
4     role in the case; correct?
5          A.   Correct.  And to make the
6     endangerment -- you know, my final statement in my
7     expert report.
8          Q.   You're not offering any opinions
9     regarding the frequency or extent of storms that
10    may occur at the New Haven Terminal in the future,
11    are you?
12         A.   No.
13         Q.   You're not offering any opinion
14    regarding the extent of flooding or storm surge
15    that may occur at the terminal in the future;
16    correct?
17         A.   I am not.
18         Q.   And you're not offering any opinion in
19    support of a specific spill model that would occur
20    in the event of a tank failure, are you?
21         A.   No.
22         Q.   Your report does not propose a
23    particular spill model, for example; correct?
24         A.   That's correct.
25         Q.   You're not offering any opinion in this

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 58



1        specific opinions in your rebuttal report.

19              Q.    Are you familiar with the federal

20       regulations regarding oil pollution prevention at

21       bulk fuel storage facilities?

22              A.    Do you mean like SPCC?

23              Q.    I mean like the CFR, Code of Federal

24       Regulations.

25              A.    No.

Page 72

1    experience at actual spills and at facilities, you

2    know, during extreme storm events, that more than

3    one tank is -- the oil from more than one tank is

4    released.  So it's the state of the practice.  The

5    regulations are for SPCC plans.

6            Q.    So this regulation directs a

7    calculation of worst case discharges to equal that

8    of the capacity of the largest single aboveground

9    storage tank at the facility, and that is what

10   Dr. Etkin did in her report; correct?

11           MS. JACKS:  Objection to the extent

12   that this calls for a legal conclusion and is

13   speculative.

14           THE WITNESS:  That is one way to do a

15   worst case discharge.

16   BY MR. KEARNEY:

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 73



Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page  74





Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 75

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 83

1    speculation, vague.

2              THE WITNESS:  That's my general

3    understanding.

4    BY MR. KEARNEY:

5         Q.   And, in fact, there is a historical

6    record of hurricane wind strength decreasing once

7    storms have made landfall in the Long Island area;

8    correct?

9              MS. JACKS:  Objection; calls for

10   speculation.

11             THE WITNESS:  I have no knowledge of

12   that analysis.

13   BY MR. KEARNEY:

14        Q.   Have you conducted any studies

15   regarding Tropical Storm Hanna in 2008?

16        A.   No.

17        Q.   Do you have any reason to dispute that

18   Tropical Storm Hanna decreased in severity once it

19   made landfall in the Long Island peninsula?

20             MS. JACKS:  Objection; calls for

21   speculation.

22             THE WITNESS:  Yeah.  I have no

23   knowledge of that, so I have no opinion.

24   BY MR. KEARNEY:

25        Q.   Have you done any research into

Jacqueline Michel , PhD              August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 84

1    Hurricane Gloria in 1985?

2            A.    No.

3            Q.    Do you have any reason to dispute that

4    Hurricane Gloria in 1985 decreased in severity once

5    it made landfall on the Long Island peninsula?

6                 MS. JACKS:  Objection; calls for

7    speculation, outside the scope.

8                 THE WITNESS:  Yeah.  I have no

9    knowledge of that.

10   BY MR. KEARNEY:

11           Q.    Have you done any research into the

12   Great New England Hurricane of 1938?

13           A.    I have not.

14           Q.    Okay.  Do you have any reason to

15   dispute that the Great New England Hurricane of

16   1938 also decreased in severity upon making

17   landfall on the Long Island peninsula?

18                MS. JACKS:  Objection; calls for

19   speculation, vague, outside the scope.

20                THE WITNESS:  I have no -- I'm not

21   familiar with any of that information.

22   BY MR. KEARNEY:

23           Q.    Is it fair to say, generally speaking,

24   that hurricanes that may be experienced in one

25   region may be substantially different than

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 85

```
 1    hurricanes experienced in a different region?
 2                 MS. JACKS:  Objection; calls for
 3    speculation.
 4                 THE WITNESS:  Yes.
 5    BY MR. KEARNEY:
 6         Q.   For example, we talked about hurricanes
 7    in the Gulf of Mexico historically have been of a
 8    higher frequency and a higher intensity than
 9    elsewhere.
10                 MS. JACKS:  Objection; calls for
11    speculation.
12    BY MR. KEARNEY:
13         Q.   At least within the United States.
14         A.   Yeah, I'm trying to think.  A lot of
15    them come across and hit, you know, the lower
16    Mid-Atlantic, so -- but yes, generally.
17         Q.   And if storms experienced in the Gulf
18    of Mexico versus, for example, New Haven,
19    Connecticut would be different, would you expect
20    that the associated oil spill would be different as
21    well?
22                 MS. JACKS:  Objection; calls for
23    speculation, vague.
24                 THE WITNESS:  You know, one of my
25    favorite sayings is I've never been to the same
```

Jacqueline Michel , PhD                August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 86

1      spill twice.  So every one is a unique combination

2      of events.

3      BY MR. KEARNEY:

4          Q.    I was certainly going to ask you about

5      that.

6          A.    Yeah.

7          Q.    Okay.  That you've never been to the

8      same spill twice is a quote that you are sort of

9      attributed to; correct?

10         A.    That's correct.

11         Q.    It's one of your favorite quotes in

12     this area of study; correct?

13         A.    Yes.

14         Q.    Do you agree that the Gulf of Mexico

15     experiences the highest rate of hurricanes in the

16     Western Hemisphere?

17             MS. JACKS:  Objection; calls for

18     speculation, vague.

19             THE WITNESS:  I have -- I haven't

20     researched that, but...

21     BY MR. KEARNEY:

22         Q.    Do you have any reason to dispute that?

23         A.    No.

24         Q.    Relatedly, the Gulf of Mexico is also

25     the region within the United States that

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 101

1    experienced in the Northeastern Seaboard of the
2    United States?
3            A.    Which one?
4            Q.    Hurricane Katrina.
5                  MS. JACKS:  Objection; calls for
6    speculation and vague.
7                  THE WITNESS:  You know, it was a
8    category 3 when it came ashore and there's been
9    larger ones.  So, you know, it depends on what your
10   definition is.
11   BY MR. KEARNEY:
12           Q.    Do you agree that Hurricane Katrina was
13   classified as it -- in the upper echelons of what
14   would be considered category 3 when it made
15   landfall?
16           A.    Yes.
17           Q.    Do you have any reason to dispute that
18   the wind speeds experienced in Hurricane Katrina
19   were much stronger than have ever been recorded in
20   the Northeastern Seaboard in the United States?
21           A.    I haven't looked at the data for that,
22   but, you know, that -- those are past.  You know,
23   in the future, you know, every -- every storm --
24   you know, I've never been the same -- you know,
25   I've never seen the same hurricane twice either.

Page 102

1    So, you know, they're all different as well, and
2    the future ones seem to be more different.
3           Q.   I just want to get -- make sure we get
4    it for the record.  You said you haven't looked at
5    the data.
6           A.   Yeah.
7           Q.   But do you have any reason to dispute
8    that that's accurate, what I said, that Hurricane
9    Katrina had stronger wind speeds than -- in a -- in
10   that hurricane than have ever been recorded in a
11   hurricane that happened in the Northeastern
12   Seaboard of the United States?
13          MS. JACKS:  Objection; calls for
14   speculation.
15          THE WITNESS:  Yeah.  I have no
16   knowledge to make that -- you know, to object to
17   that.
18   BY MR. KEARNEY:

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 120



Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.



Page 121

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 130



Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 131



```
13        Q.   Okay.  You've established through your
14   testimony today that you are not a oil modeler like
15   Dr. French-McCay, for example; is that right?
16        A.   Yes.
17        Q.   In the course of your work, do you have
18   experience evaluating and interpreting spill
19   models?
20        A.   Yes.  On almost every spill that I get
21   notified about I work closely with the modelers,
22   most of the time with the National Oceanic and
23   Atmospheric Administration.  And we work together
24   to, you know, look at the model results, understand
25   how -- what might be, you know -- how they could be
```