# Exhibit B

James O'Donnell , Ph.D.                September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 1

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF CONNECTICUT
2

3    CONSERVATION LAW FOUNDATION,        )
     INC.,                               )
4                                        )
          Plaintiff,                     )Case No:
5                                        )3:21-cv-
                                         )00933-VDO
6    vs.                                 )
                                         )
7    EQUILON ENTERPRISES LLC D/B/A       )
     SHELL OIL PRODUCTS US,              )
8    TRITON TERMINALING LLC, and         )
     MOTIVA ENTERPRISES LLC,             )
9                                        )
          Defendants.                    )
10   _____

11

12            VIDEOTAPED DEPOSITION OF

13             JAMES O'DONNELL, Ph.D.

14

15   DATE:            September 12, 2025

16   TIME:            8:52 a.m.

17   HELD AT:         Wiggin and Dana LLP
                      20 Church Street
18                    16th Floor
                      Hartford, Connecticut
19

20      By:           Sarah J. Miner, RPR, LSR #238

21

22

23

24

25

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 2

```
 1   A  P  P  E  A  R  A  N  C  E  S:
 2   For the Plaintiff:
 3   Vincent L. Greene, IV, Esq.
     MotleyRice, LLC
 4   40 Westminster Street
     5th Floor
 5   Providence, Rhode Island  02903
     vgreene@motleyrice.com
 6
 7   For the Defendants:
 8   James O. Craven, Esq.
     Wiggin and Dana LLP
 9   One Century Towr
     265 Church Street
10   New Haven, Connecticut  06510
     jcraven@wiggin.com
11
     -and-
12
     Marissa Grabowski, Esq.
13   King & Spalding LLC
     1100 Louisiana Street
14   Suite 4100
     Houston, Texas  77002
15   mgrabowski@kslaw.com
16
     Also Present:
17
     Joe'l Marfrige
18   Rocco Mercurio, Videographer
19
20
21
22
23
24
25
```

James O'Donnell , Ph.D.                September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 3

1                     I N D E X
2      WITNESS:
3      JAMES O'DONNELL, Ph.D.
4      Direct Examination by Mr. Craven              6
       Cross-Examination by Mr. Greene            189
5      Redirect Examination by Mr. Craven         201
       Recross-Examination by Mr. Greene          206
6      Further Redirect Examination by Mr. Craven 209
7                     E X H I B I T
       O'Donnell
8      Deposition
       Exhibits        Description                Marked
9      Exhibit 1       Defendant's Notice of        9
                       Deposition of James O'Donnell,
10                     Ph.D. and Request for
                       Production of Documents
11     Exhibit 2       Letter to Devin William      9
                       from James O'Donnell, Ph.D.
12                     6/5/25 JODONNELL_000001-2
       Exhibit 3       Curriculum Vitae             9
13     Exhibit 4       Standing Protective Order    36
       Exhibit 5       Aerial photograph            37
14     Exhibit 6       "New Haven continues flood   52
                       mitigation efforts despite
15                     FEMA cuts"
       Exhibit 7       U.S. Environmental Protection 64
16                     Agency SPCC Field Inspection
                       and Plan Review Checklist
17                     SOPUS_NHVN00527912-24
       Exhibit 8       Resilient Fair Haven         79
18                     Final Report 12/23
       Exhibit 9       Connecticut Sea Level Rise   89
19                     and Storm Surge Viewer
       Exhibit 10      Connecticut Sea Level Rise  108
20                     and Storm Surge Viewer
       Exhibit 11      Connecticut Shoreline 100   112
21                     Year Event
       Exhibit 12      City of Groton Community    126
22                     Resilience Plan May 2022
       Exhibit 13      Modeling nearshore dynamics 134
23                     of extreme storms in complex
                       environments of Connecticut
24     Exhibit 14      Aerial photograph           151
25

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

                                                        Page 4

1    O'Donnell
     Deposition
2    Exhibits           Description                      Marked
     Exhibit 15    Guidance Document for              166
3                  Preparing a Stormwater
                   Pollution Prevention
4                  Plan March 2011
     Exhibit 16    General Permit for the             168
5                  Discharge of Stormwater
                   Associated with Industrial
6                  Activity 10/1/18
     Exhibit 17    General Permit for the             169
7                  Discharge of Stormwater
                   Associated with Industrial
8                  Activity 10/1/21
     Exhibit 18    General Permit No.:CTR050000       169
9    Exhibit 19    General Permit Registration        173
                   for the Discharge of
10                 Stormwater Associated with
                   Industrial Activity 10/1/11
11   Exhibit 20    2004 Connecticut Stormwater        175
                   Quality Manual
12   Exhibit 21    Connecticut Stormwater             178
                   Quality Manual 3/10/24
13   Exhibit 22    Curriculum Vitae                   188
14                 (Exhibits 15 - 18 cover pages only)
15
                   (The exhibits were included with the
16                 original transcript.)
17
18
19
20
21
22
23
24
25

James O'Donnell , Ph.D.          September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 33

1    listed on your materials considered portion of your

2    report?

3         A    No, not that I am aware.

4         Q    Do you have an awareness that there were a

5    lot of reports prepared by a number of experts in

6    this case?

7         A    I am not sure if they were all reports.

8    The materials that I received and reported on

9    January 28th line were numerous and detailed and I

10   didn't absorb them all.  So I was more -- I triaged

11   those to see if there was anything that was

12   relevant to the question that I was asked to

13   provide an opinion on and decided that there

14   weren't and it wasn't worth me charging them for

15   time required to absorb them all.

16          And I think the Barlow report and the

17   Nairn report were things that were the most

18   relevant and so I spent some time on those, but

19   they were not relevant to the opinions that I

20   focused on in my report.

21        Q    Do you have an awareness that after you

22   prepared your report in this case that the

23   defendants disclosed a number of experts with

24   reports?

25        A    No.

James O'Donnell , Ph.D.         September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 34

1      Q    You are not aware of that?

2      A    No.

3      Q    You haven't reviewed any of the expert

4   reports prepared by experts retained by the

5   defendants in this case?

6      A    Not that I recall, no.

7      Q    Did you review any testimony in connection

8   with your assignment in this case?

9      A    I am sure I didn't do that.

10     Q    Do you have an awareness that other

11  experts have provided testimony in this case prior

12  to today?

13     A    I am aware that that is the process, but

14  only one specific one, I think.

15     Q    So you have a general awareness in the

16  litigation process based on your prior case and

17  talking to colleagues and other people about how

18  the process worked, that other people may have

19  given testimony in this case but the only specific

20  awareness relates to one individual providing

21  testimony?

22     A    Correct.

23     Q    And with regards to the one person that

24  provided testimony that you are specifically aware

25  of, you didn't ask to review that person's

James O'Donnell , Ph.D.                 September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 35

1   testimony?

2         A    No.   Sorry.   That was inconsistent.   You

3   asked me if I asked to review and I said no when I

4   should have said yes.   I did not ask to review that

5   so it was a double negative.   I don't want to be

6   misinterpreted.

7                   MR. GREENE:   Good catch.

8   BY MR. CRAVEN:

9         Q    Thank you, Dr. O'Donnell, for clarifying.

10  Just to be clear, you did not review any testimony

11  in case and you did not ask to review any testimony

12  in this case?

13        A    That is correct.

14        Q    Did you conduct any sort of site

15  inspection of the facility that is at issue in this

16  case?

17        A    No.

18        Q    Did you conduct any site inspection of the

19  Gulf facility that you prepared an expert report

20  for?

21        A    No.   Pardon me.   My report is not about a

22  particular site.   It is about the case.   There is a

23  Gulf case.   So it is not -- I want to be clear that

24  I didn't -- I don't address the details of any site

25  in my report.

James O'Donnell , Ph.D.          September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 36

1          Q    To be clear, in connection with the work

2     you conducted in this case, you did not go and do

3     any sort of site inspection of the Equilon

4     facility?

5          A    Correct.

6          Q    Similarly in connection with the work that

7     you were doing for CLF in the other litigation

8     involving a different terminal, you also did not go

9     and do a site inspection?

10         A    That is correct.

11         Q    Outside of the litigation process, have

12    you actually gone to any of the New Haven Port

13    terminal bulk storage facilities?

14         A    I have driven past them.  I played soccer

15    down there one time in a field nearby and I have

16    seen them from the highway many times.

17         Q    Would it be fair to say that prior to

18    today you haven't been on-site --

19         A    Yes.

20         Q    -- of any of the terminal facilities in

21    the Port of New Haven?

22         A    That is correct.

23              (Exhibit No. 4 marked for

24         identification.)

25    BY MR. CRAVEN:

James O'Donnell , Ph.D.                September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 48

12        Q    You can see on exhibit -- is that

13   Exhibit --

14        A    Five.

15        Q    -- 5.   That in addition to bulk storage

16   terminal facilities on the east side of the New

17   Haven Harbor there are some facilities that are on

18   the west side.   True?

19        A    Correct.

20        Q    To be clear when I asked you earlier to

21   identify specific terminal facilities, you circled

22   an area on the east side of the New Haven Harbor.

23   True?

24        A    Correct.

25        Q    Are you able to identify which terminal

James O'Donnell , Ph.D.                September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 49

1    facility is on the west side of New Haven Harbor?

2         A    I don't know the name.

3         Q    Okay.  To the extent that I asked you

4    questions whether or not you visited any terminal

5    facilities in the Port of New Haven given that we

6    have now defined the word Port of New Haven, would

7    it be fair to say that you haven't been on-site on

8    any terminal facility near the harbor of New Haven?

9         A    That is correct.

10        Q    And does New Haven have seawalls on the

11   edge of the New Haven Harbor?

12        A    Yes.

13        Q    How many seawalls does it have?

14        A    New Haven Harbor has a lot of seawalls,

15   but I am precisely sure of what fraction, but that

16   is true of all of the Connecticut shoreline.

17        Q    Does New Haven Harbor have breakwaters?

18        A    Yes.

19        Q    How many breakwaters does it have?

20        A    I think probably three.  At least two.

21        Q    And what is the purpose of breakwaters, as

22   you understand it?

23        A    To reduce the amplitude of waves, high

24   frequency waves that propagate from Long Island

25   Sound into New Haven Harbor.

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 61

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 64



8          (Exhibit No. 7 marked for

9       identification.)

10          MR. GREENE:  This is 7?

11          THE COURT REPORTER:  Correct.

12          MR. GREENE:  Thank you.

13   BY MR. CRAVEN:

14      Q   Dr. O'Donnell, I am showing you what has

15   been marked as Exhibit 7, which at the top says it

16   is a

Page 65



James O'Donnell , Ph.D.                 September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Page 67



James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 68



Page 110

1    question and I will first make a statement about

2    Exhibit 10.

3             Dr. O'Donnell, there is a section on your

4    website that has a sea level rise storm surge

5    viewer.  True?

6        A    That is correct.

7        Q    And if you looking on the link related to

8    that, it brings you to what is contained on Exhibit

9    10.  So the way it is printed out here is four

10   pages.

11       A    Yes.

12       Q    But on the website it would be a single

13   sort of page.  It has a little background.  It has

14   an interactive map, and then it also has a

15   description of the data.  True?

16       A    Yes.

17       Q    And on the page of Exhibit 10 it describes

18   data and description usage.  Can you read what the

19   third paragraph says starting with the words, It is

20   important to note?

21       A    It is important to note that the 100-year

22   flood event layer in this tool is different from

23   FEMA's 100-year flood map boundary for a few

24   reasons, and then there are three bullets.

25       Q    And what is the first bullet?

James O'Donnell , Ph.D.          September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 111

1      A    The model data is calculated for Long

2    Island Sound to capture the complexity of

3    Connecticut geology and landscapes and improve

4    accuracy for effective flood risk design.

5      Q    And the second bullet says what?

6      A    The FVCOM model has high accuracy in

7    predicting storm surge levels.  The FVCOM level --

8    do you want the third one?

9      Q    Can you read the third bullet.

10     A    The FVCOM model data only displays storm

11   surge while FEMA maps incorporate both storm surge

12   and waves.

13     Q    And the next paragraph, can you read that.

14     A    Sure.  Wave-related splashover along

15   Connecticut shoreline requires smaller scale

16   resolution modeling.  CIRCA continues to work in

17   developing total water flood maps to include wave

18   data for the Connecticut coast and will update

19   tools as new information becomes available.

20     Q    So would it be fair to say that at least

21   with the sea level rise and storm surge viewer,

22   CIRCA views their viewer more reliable in some

23   aspects but it doesn't include in the viewer wave

24   action?

25     A    The -- it doesn't include wave action.

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 112

1   And it is more reliable than some other tools that

2   are available.  And it does allow consideration of

3   sea level rise.  Those are the motivations.

4        Q    And would you agree that it is model data

5   calibrated for Long Island Sound?

6                    MR. GREENE:  Object to the form.

7                    You can answer.

8                    THE WITNESS:  Yeah, this term model

9           data I hate, but it is model results that

10          are calibrated using data from areas of

11          Long Island Sound.

12  BY MR. CRAVEN:

13       Q    And the -- well, you agree, first of all,

14  that the language here says model data?

15       A    Yeah, yeah, that is what it says.

16       Q    This is on CIRCA's website.  True?

17       A    That is correct.

18       Q    It has been on CIRCA's website for years.

19  True?

20       A    Yes.

21                  (Exhibit No. 11 marked for

22          identification.)

23  BY MR. CRAVEN:

24       Q    Dr. O'Donnell, I will show you what is

25  marked as Exhibit 11, a series of printouts for sea

Page 113

1    level rise and storm surge viewer.  And do you see

2    that the printouts cover the area that we have been

3    referring to as the Port of New Haven?

4         A    Yes.

5         Q    And do you see that there are various

6    layer lists that you can activate for the storm

7    surge viewer?

8         A    Yes.

9         Q    And do you see that the first page of

10   Exhibit 11 has activated a mean higher high water

11   in the 10-year flood event?

12        A    Yes.

13        Q    Would you agree that based on using those

14   layers, there are some areas of the New Haven port

15   that show the effects of storm surge and sea level

16   rise but other areas of the port do not?

17        A    That is correct.

18        Q    And if you turn to the second page of

19   Exhibit 11.  Do you see that using the CIRCA sea

20   level rise storm surge viewer and activating the

21   layers for mean higher high water 10-year flood

22   event and the 10-year flood event plus 20 inches

23   SLR image shows results?

24        A    Yes.

25        Q    Can you see that the results of using

Page 114

1    those layers shows sea level rise and storm surge

2    impacting portions of the New Haven port area but

3    not all of the terminals?

4         A    That is correct.

5         Q    Page 3 of Exhibit 11 has the mean higher

6    high water layer and the 100-year flood event

7    indicated.  Yes?

8         A    Yes.

9         Q    And does that show the effects of sea

10   level rise and storm surge from the CIRCA viewer

11   impacting portions of the New Haven port but not

12   all of the terminals located in New Haven?

13        A    Yes.

14        Q    Can you turn to the next page of Exhibit

15   11, Dr. O'Donnell.

16        A    Yes.

17        Q    And you see that the next page is a

18   printout showing layer lists where the mean high or

19   high water is indicated in a 100-year flood event

20   plus 20 inches SLR is indicated?

21             Do you see that?

22        A    Yes.

23        Q    And does that show the effects of storm

24   surge and sea level rise from the CIRCA viewer on

25   certain areas of the New Haven port?

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 115

1         A    Yes.

2         Q    And does it show that certain areas of the

3    New Haven port are not affected by the 100-year

4    flood event plus 20 inches sea level are?

5         A    Yes, that is what it shows.

6         Q    Can you turn to the next page,

7    Dr. O'Donnell.  And do you see that this shows a

8    layer for mean high or high water in a 500-year

9    flood event?

10        A    Yes.

11        Q    Do you see that that shows the impact from

12   a 500-year flood event on the terminals located in

13   the Port of New Haven?

14        A    Yes.

15        Q    And do you see that the -- there are areas

16   in the Port of New Haven that are not impacted by

17   the 500-year flood event layer for the Connecticut

18   sea level rise and storm surge viewer?

19        A    Yes.

20        Q    Can you turn to the next page,

21   Dr. O'Donnell.

22        A    Yes.

23        Q    Do you see that this shows the impact

24   under the Connecticut sea level rise storm surge

25   viewer for the sea level rise for mean high or high

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 116

1  water in a 500-year flood event plus 20 inches of

2  sea level rise?

3        A    Yes.

4        Q    And does this show areas in the Port of

5  New Haven that are not impacted by storm surge or

6  sea level rise?

7        A    Yes.

8        Q    Have you looked at images from the sea

9  level rise storm surge viewer showing the Port of

10 New Haven in connection with this case?

11       A    Yes.

12       Q    Was that something that you did to prepare

13 for your deposition today?

James O'Donnell , Ph.D.    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 119

1    argue are valuable.

2        Q    I guess I don't quite understand that

3    question [sic] so I am going to follow up.

4            Have you reviewed the defendants' business

5    continuity plan otherwise known as a BCP?

6        A    No.

7        Q    Have you reviewed the defendants' HAP?

8        A    What is that?

9        Q    Do you know what HAP is?

10       A    No.

11       Q    Have you reviewed defendants' hurricane

12   action plan?

13       A    No.

14       Q    Have you reviewed defendants' FRP?

15       A    No.

16       Q    Do you intend to offer any opinions about

17   the -- any of those documents I just mentioned?

18       A    No.

19       Q    Have you spoken with any of the

20   individuals that are responsible for the facility

21   operations?

22       A    No.

23       Q    Have you reviewed the testimony of the

24   facility manager?

25       A    No.

James O'Donnell , Ph.D.                 September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 120

1      Q    Have you reviewed any of the operational

2   policies and procedures applicable to the Equilon

3   terminal?

4      A    No.

5      Q    Dr. O'Donnell, have you reviewed any of

6   the operational documents related to any of the

7   other bulk oil storage terminal facilities in the

8   New Haven port or near the New Haven harbor?

9      A    No.

10      Q    Have you reviewed any operational

11   documents for any bulk oil terminal facility ever?

12      A    No.

13      Q    So do you intend to offer any opinions in

14   this case whether or not any of the defendants'

15   policies and procedures regarding the operation of

16   the facility are deficient?

17      A    No.

18      Q    Do you intend to offer any opinions in

19   this case that the structure of the defendants'

20   facility is any way deficient?

21      A    No.

22      Q    You haven't reviewed, for example, the

23   structural aspects of the storage tanks located at

24   the defendants' facility.  True?

25      A    I think I saw a drawing of the berm

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 122

1        A    No.

2        Q    Are you familiar with the abbreviation

3    RCRA?

4        A    No.

5        Q    Some people refer to R-C-R-A as the RCRA?

6        A    No.

7        Q    You don't intend to offer any opinions

8    about RCRA in this case?

9        A    I am not sure what RCRA is, but if it was

10   explained to me I might be able to answer more

11   clearly.

12       Q    I think I asked you earlier if your spouse

13   was a registered engineer, and you told me she was

14   not.  True?

15       A    That is correct.

16       Q    Would this be also true that you are not a

17   registered engineer?

18       A    That is correct.

19       Q    And you do not intend to offer any

20   opinions in regards to the practice of engineering

21   in this case?

22       A    That is correct.

23       Q    Similarly, you may be aware that

24   Connecticut has some certifications for people that

25   handle hazardous materials.

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 123

1    A    I am aware that there are regulations.    I

2    didn't know Connecticut was separate from federal

3    ones.

4    Q    In any event, you don't have any of those

5    certifications or licenses.    Correct?

6    A    No, I do not.

7    Q    Are you aware of who the defendants are in

8    this case?

9    A    I think so.

10    Q    Are you aware that the defendants are

11    Equilon Enterprises, Triton Terminaling and Motiva?

12    A    No.

13    Q    Are you aware that Motiva sold its

14    interest in the facility in 2017?

15    A    No.

16    Q    Do you have any opinions in any sense that

17    Motiva did anything wrong prior to its selling of

18    the terminal in 2017?

19              MR. GREENE:    Object to the form.

20              You can answer.

21              THE WITNESS:    No.

22    BY MR. CRAVEN:

23    Q    It seems like from reading your report

24    that the majority or maybe all of the opinions that

25    you are offering have to do with considering future

James O'Donnell , Ph.D.          September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 131

1    glad that it jogged your memory.

2        A    Yeah.

3        Q    So to be clear, you see that Exhibit 12

4    contains information showing that as part of the

5    City of Groton's resilience plan, at least the

6    individuals performing their resiliency work, they

7    were relying upon CIRCA's viewer?

8                    MR. GREENE:  Object to the form.

9                    You can answer.

10                   THE WITNESS:  Yeah, I agree they used

11               it.  To the extent they relied it, I don't

12               know.  I wasn't part of it.

13   BY MR. CRAVEN:

14       Q    Well, part of the reason CIRCA has a

15   viewer on its website is so that people can go to

16   it and look at it and rely upon it.  True?

17                   MR. GREENE:  Objection to form.

18                   You can answer.

19                   THE WITNESS:  Yeah, that is -- the

20               motivation is to be useful to provide

21               guidance on the effects of sea level rise

22               on the patterns of flooding.  But, you

23               know, it does say these low-lying areas

24               need further evaluation due to the

25               hydrologic complexity created by flood

James O'Donnell , Ph.D.          September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 132

```
 1        control structures, bridges and culverts.
 2        That is part of the caveat associated with
 3        the map viewer that is on the website.
 4             So the Town uses, you know --
 5        typically, I don't really know what the
 6        City of Groton did in this case.  I might
 7        have seen this.  I think I did know about
 8        it.  But the -- there are FEMA maps people
 9        use.  They use our maps.  And there are
10        requirements, for example, for projects
11        that FEMA would fund that their
12        federally-certified stuff is used as part
13        of the planning documents.  So however,
14        they are not adequate for everything.
15        They don't include sea level rise effects.
16             And so towns and private companies,
17        and individuals I am sure too, use our
18        information and then as well as other
19        sources.  And then their plans that they
20        develop I am sure are based on a balance
21        of all of that information.
22             So I only am extending my comments on
23        this because I wasn't -- I don't want to
24        leave the impression that the reliance is
25        solely on what we provide.  We provide
```

Page 133

1            stuff and it is used, but other things are

2            used as well.

3    BY MR. CRAVEN:

4        Q    You are also not trying to suggest that it

5    is not something that should be relied upon, too.

6    Right?  It is a reliable useful piece of

7    information that CIRCA puts out?

8                    MR. GREENE:  Objection.

9                    THE WITNESS:  Absolutely.  Sorry.

10   BY MR. CRAVEN:

11       Q    Dr. O'Donnell, back to page 5 of your

12   resume.  You referenced an article, Number 8.

13            Do you recall that?

14       A    Yes.

15       Q    And is that a peer-review publication?

16       A    Yes.

17       Q    What does that mean when you say peer

18   review?

19       A    In the case of that paper, it means that

20   we submit a manuscript to an editor.  The editor

21   seeks out two or at least reviewers who are

22   anonymous who comment on the value and accuracy of

23   the material in the manuscript and provide advice

24   on whether or not it should be published.

25            And sometimes there is a cycle of revision

James O'Donnell , Ph.D.                September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

                                                    Page 167

1        Q    Dr. O'Donnell, showing you Exhibit 15.

2             Have you seen this document before?

3        A    No.

4        Q    You are not going to offer opinions about

5    this document in this case?

6        A    Not without knowing what it is, no.

7        Q    Well, reading the exhibit it says,

8    Guidance document for preparing a stormwater

9    pollution prevention plan March 2011.

10            Do you see that?

11       A    Yes, that is the title.  Go ahead.

12       Q    And this document isn't something that is

13   referenced in your report as something you

14   considered for your opinions.  True?

15       A    That is correct.

16       Q    Okay.  And have you ever been involved in

17   preparing a stormwater pollution prevention plan?

18       A    No.

19       Q    So would it be fair to say that you are

20   not going to offer any opinions in this case on how

21   to prepare a stormwater pollution prevention plan.

22   True?

23       A    No, I would not specifically make

24   recommendations on this in this case.

25                      (Exhibit No. 16 marked for

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

                                                    Page 168

1            identification.)

2    BY MR. CRAVEN:

3        Q    Dr. O'Donnell, I am showing you what has

4    been marked as Exhibit 16, which is entitled,

5    General Permit for the Discharge of Stormwater

6    Associated with Industrial Activity, effective

7    October 1st, 2018.

8            Do you see that document?

9        A    Yes.

10       Q    Have you reviewed this document prior to

11   today?

12       A    No.

13       Q    Have you cited this document as something

14   you considered in connection with your opinions in

15   this case?

16       A    No.

17       Q    Would it be fair to say you are not going

18   to offer any opinions about the contents of the

19   General Permit for the Discharge of Stormwater

20   Associated with Industrial Activity, dated October

21   1st, 2018?

22       A    No.  Well --

23       Q    That is fair to say?

24       A    It is fair to say that I am not going to

25   offer any opinions on this document in this case.

Page 169

1              (Exhibit No. 17 marked for

2              identification.)

3    BY MR. CRAVEN:

4        Q    Dr. O'Donnell, showing you what has been

5    marked as Exhibit 17, which is the General Permit

6    for the Discharge of Stormwater Associated with

7    Industrial Activity dated, October 1st, 2021.

8              Do you see that?

9        A    Yes.

10       Q    Have you seen this document before today?

11       A    No.

12       Q    Is this document cited as something you

13   considered as part of your opinions in this case?

14       A    No.

15       Q    Would it be fair to say you are not going

16   to offer any opinions about the contents of this

17   document?

18       A    No.  It is fair to say that I will not.

19              (Exhibit No. 18 marked for

20              identification.)

21              MR. CRAVEN:  What I would like to do

22              with counsel's permission, you can

23              consider it, Attorney Greene, but perhaps

24              at the end of the deposition we can for

25              purposes of copies, just use the cover

Page 172

1     Q    Okay.  Dr. O'Donnell, in connection with

2  the permitting process and the draft permit,

3  Connecticut DEEP provides a number of fact sheets

4  related to proposed changes in the permit.

5           Have you seen any of those fact sheets?

6     A    No.

7     Q    Would it be fair to say that you are not

8  going to offer any opinions about the contents of

9  any fact sheets prepared by Connecticut DEEP

10 related to the General Permit for the Discharge of

11 Stormwater Associated with Industrial Activity?

12    A    In this case, I don't anticipate that, but

13 I could foresee the possibility that DEEP will ask

14 my opinion about what they should include in their,

15 you know, permit modifications associated with

16 climate change and, in particular, sea level rise.

17 They might ask for that.

18    Q    At least as of today, you have not been

19 involved in the drafting of the permit that we are

20 talking about.  True?

21    A    That is correct.

22    Q    And you don't intend to offer any opinions

23 about the contents of the draft permit or the other

24 permits I showed you in this case.  True?

25    A    That is correct.

James O'Donnell , Ph.D.            September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 174

1          Do you see that?

2     A    Yes.

3     Q    Do you see below that it says, Pollution

4   prevention plan column notes are defined as, colon,

5   open for plan request, colon, within 15 days of the

6   initial registration posting date members of the

7   public can request a copy of a nonelectronic plan.

8          Did I read that correctly?

9     A    Yes.

10    Q    And then the very next sentence says,

11  Requesters have 30 days from receipt of a plan to

12  submit comments to DEEP.

13         Do you see that?

14    A    Yes.

15    Q    In connection with your opinions in this

16  case, have you reviewed any pollution prevention

17  plans prepared by the defendants in this case?

18    A    No.

19    Q    Have you submitted any comments on any

20  pollution prevention plan prepared by the

21  defendants in this case?

22    A    No.

23    Q    Have you seen any comments prepared for  a

24  pollution prevention plan prepared by CLF in this

25  case?

Page 185

1  going to offer opinions related to this issue.

2  True?

3      A   If this case is continued for another

4  year, there may be papers published in which our

5  results we are working on now are made public.

6      Q   Understanding that in the future there may

7  be studies that come out that you will review or

8  you will be part of, but it is not a study that you

9  have relied upon for purposes of your report or

10 that you are disclosed in this case to testify

11 about.  True?

12     A   That is correct.

13     Q   Okay.  Dr. O'Donnell, I want to make sure

14 it is clear.  You have done no evaluation of the

15 specific Equilon terminal in this case.  True?

16     A   That is correct.

17     Q   And you are not going to offer any

18 opinions about the potential effects any sea level

19 rise may or may not have on the Equilon terminal in

20 this case?

21     A   That is correct.

22     Q   As you sit here today, you are not aware

23 whether the Equilon facility has ever experienced

24 any damage or any damage related to any storm in

25 the past.  True?

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 186

1        A    I don't know of any.

2        Q    You haven't done any sort of assessment of

3   the Port of New Haven in connection with potential

4   flooding or past flooding related to storms?

5        A    I have not studied that site.

6        Q    And so to the extent that your report

7   refers to risk of flooding, you are not offering

8   any opinions that any specific site at the port

9   will flood under any given scenario.  True?

10       A    That is correct.

11       Q    You are intending to offer opinions that

12  sea level rise will occur in the future in

13  accordance with the charts that you have provided

14  in your report, but you are not intended to offer

15  the opinion that given those sea level rises it

16  will have any impact on a specific facility in the

17  Port of New Haven?

18       A    That is correct.  The details of what

19  happens at a site are very sensitive to the

20  geometry, the elevations and that we do require

21  much more intensive look at the geometry of the

22  site for me to do that, so no, I am not.

23       Q    You haven't done any analysis of the

24  specific site?

25       A    No.