# EXHIBIT 5

**to Plaintiff Conservation Law Foundation's *Daubert* Motion to Exclude the Expert Testimony of Deborah French-McCay, Ph.D.**

1           UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3

4   CONSERVATION LAW FOUNDATION,
    INC.,
5
                  Plaintiff,
6
        vs.                    Civil Action No. 3:21-cv-
7                                        00933-VDO

8   SHELL OIL COMPANY, EQUILON
    ENTERPRISES LLC D/B/A SHELL OIL
9   PRODUCTS US, SHELL PETROLEUM,
    INC., TRITON TERMINALING LLC,
10  and MOTIVA ENTERPRISES LLC,

11                Defendants.

12  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

13

14            VIDEOTAPED DEPOSITION OF

15          CRAIG ALEXANDER JONES, Ph.D.

16       CONDUCTED REMOTELY VIA ELITIGATE

17

18              September 4, 2025

19                 8:33 A.M.

20

21            Santa Cruz, California

22

23

24

25     Vanessa Harskamp, RPR, CRR, CRC, CSR No. 5679



```
 1              APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4   ANNA M. TADIO, ESQ.
     CONSERVATION LAW FOUNDATION, INC.
 5   15 East State Street
     Suite 4
 6   Montpelier, Vermont 05602
     (802) 779-4621
 7   (802) 223-5992
     (802) 622-3020
 8   atadio@clf.org

 9

10   For the Defendants:

11   DOUGLAS HENDERSON, ESQ.
     KING & SPALDING LLP
     1180 Peachtree Street, NE
12   Suite 1600
     Atlanta, Georgia 30309
13   (404) 572-2769
     dhenderson@kslaw.com

14

15   Also present:

16   ANGELA LYONS, Remote Videographer

17

18

19

20

21

22

23

24

25
```



```
 1                         I N D E X

 2

 3  WITNESS:  CRAIG ALEXANDER JONES, Ph.D.

 4                                                   PAGE

 5                  INDEX OF EXAMINATIONS

 6      BY MS. TADIO:                                  5

 7

 8                   INDEX OF EXHIBITS

 9   EXHIBITS                                      MARKED

10  Exhibit 1  Notice of Deposition                  7

11   Exhibit 2 The original Dr. Craig Jones Expert   9
              Report
12
     Exhibit 3 Supplemental Materials Considered     9
13
     Exhibit 4 Amended Materials Considered          9
14
     Exhibit 6 Amended Jones Report 2025             9
15
     Exhibit 7 Integral Consulting Inc. invoices    30
16              dated September 12, 2022

17   Exhibit 5 Failure Mechanism Modeling          119

18

19

20

21

22

23

24

25
```



```
 1              SANTA CRUZ, CALIFORNIA

 2         THURSDAY, SEPTEMBER 4, 2025; 8:33 A.M.

 3

 4

 5         THE VIDEOGRAPHER:  Good morning.  We are now

 6  on the record.

 7         The time is 8:33 a.m. Pacific on September

 8  4th, 2025.  This begins the videoconference deposition

 9  of Craig Jones, taken in the matter of Conservation Law

10  Foundation, Incorporated, versus Equilon Enterprises,

11  LLC, filed in the United States District Court for the

12  District of Connecticut, Civil Action number 3:21-cv-

13  00933-VDO.

14         My name is Angela Lyons.  I'm your remote

15  videographer today.

16         The court reporter is Vanessa Harskamp.

17         Will all counsel please introduce themselves

18  and state who you represent, after which our reporter

19  will swear in the witness.

20         MS. TADIO:  My name is Anna Tadio.  I am the

21  counsel for Conservation Law Foundation, who I will

22  refer to as CLF throughout this deposition.

23         MR. HENDERSON:  And I'm Douglas Henderson,

24  counsel for the Defendants in this case.

25                          -oOo-
```



```
 1              CRAIG ALEXANDER JONES, Ph.D.

 2     having been first duly sworn, testified as follows:

 3                       EXAMINATION

 4   BY MS. TADIO:

 5        Q.    Okay.  So, Dr. Jones, thank you for being here

 6   with us today.  Again, my name is Anna Tadio.  I'm

 7   counsel for Conservation Law Foundation in the matter of

 8   Shell Oil Company, Equilon Enterprises versus -- CLF

 9   versus Shell Oil Company; Equilon Enterprises, doing

10   business as Shell Oil Products U.S.; Shell Petroleum,

11   Inc.; Triton Terminaling, LLC; and Motiva Enterprises.

12             I will refer to CLF Conservation Law

13   Foundation as CLF throughout this deposition.  Will that

14   be acceptable with you?

15        A.    Yes, ma'am.

16        Q.    What is your full name and address for the

17   record?

18        A.    Craig Alexander Jones, 250 33rd Avenue, Santa

19   Cruz, California 95062.

20        Q.    Thank you.  Here are some basic groundrules

21   for the deposition today.  So that the court reporter

22   can record all of your answers, you should answer every

23   question audibly and not by nodding or saying "uh-huh";

24   do you understand that?

25        A.    Yes, I do.
```



```
 1        Q.    Thank you.  Sometimes your lawyer may object
 2   to my questions, but unless he instructs you not to
 3   answer, you will still need to answer my question.
 4             Are you clear on that?
 5        A.    Yes.
 6        Q.    Thank you.  The court reporter cannot take
 7   down what is being said if more than one person is
 8   talking at the same time.  Please wait to begin your
 9   answer until I have finished asking my question and
10   until your lawyer has finished objecting.
11        A.    I understand.
12        Q.    Thank you.  We will take breaks thoughout the
13   deposition.  If there is any reason you need an
14   additional break, please let me know; okay?
15        A.    Sounds perfect.  Thanks.
16        Q.    And I did do some math, and I see about 3:30
17   my time will be about 1:30 your time, so depending on
18   how we are going, we can take a longer break at that
19   time, too, if time accommodates.
20        A.    Thank you.
21        Q.    Do you understand that you are under oath
22   today?
23        A.    Yes, I do.
24        Q.    What does being under oath mean to you?
25        A.    To tell the truth.
```



```
 1      Q.   Is there anything preventing you from giving
 2  truthful testimony today?
 3      A.   No.  There isn't, excepting confidential work
 4  from my past resume of work.
 5      Q.   Are you prepared to testify fully and
 6  truthfully, regardless of whether or not your testimony
 7  hurts the position taken by the Defendants in this case?
 8      A.   Yes, I am.
 9      Q.   Were you provided with a copy of the Notice of
10  Deposition for today?
11      A.   Yes, I was, via e-mail.
12      Q.   Okay.  And did you review that?
13      A.   Yes, I did.
14           MS. TADIO:  Okay.  I am now going to introduce
15  a series of exhibits, beginning with the Notice of
16  Deposition.
17           And I will ask my paralegal to stamp this and
18  mark this as Jones Exhibit 1.  I'll wait and make sure
19  that we are able to do that.
20           MS. YU:  Sorry, Anna, I don't think I have
21  permission to stamp it.
22           MS. TADIO:  Yeah, I can stamp it.  Okay.
23           I am marking this exhibit.
24           (Plaintiff's Exhibit 1 marked for
25           identification)
```



```
 1            MS. TADIO:  Can everyone see that?
 2            THE WITNESS:  Yes.
 3            MR. TADIO:  Okay.  Perfect.  Okay.
 4            Next I'm going to introduce the original
 5  Dr. Craig Jones Expert Report, and I will do this just
 6  because that's where your CV is contained.  So we will
 7  use that strictly for your CV.
 8            MR. HENDERSON:  And Anna, what is the date of
 9  the report?
10            MS. TADIO:  Oh, sorry.  Was the other one --
11  was this actually introduced, the Notice of Deposition?
12  Is everyone able to see that?
13            THE COURT REPORTER:  Yes.
14            MS. TADIO:  Great.  So now I'll get us out of
15  that.  So the original report I want to introduce, and
16  only because it contains the CV, is 2025-06-23.  So
17  here, can everyone see that?
18            And I will stamp this.  Again, we are using
19  this just for the resume.  I will use the full, actual
20  expert report, all of the newly-provided materials for
21  today.
22            Is that acceptable, Counsel, to use the report
23  just for the CV?
24            MR. HENDERSON:  Absolutely.
25            MS. TADIO:  Okay.  So I'm marking this as
```



```
 1   Jones Exhibit 2.
 2              (Plaintiff's Exhibit 2 marked for
 3              identification)
 4              MS. TADIO:  Okay.  Next I will introduce the
 5   Supplemental Materials Considered, and I will mark this
 6   as Jones Exhibit 3.
 7              (Plaintiff's Exhibit 3 marked for
 8              identification)
 9              MS. TADIO:  Okay.  Next I will introduce the
10   Amended Materials Considered.  And I will stamp this as
11   Jones Exhibit 4.
12              (Plaintiff's Exhibit 4 marked for
13              identification)
14              MS. TADIO:  Okay.  Next I will introduce the
15   Amended Pages from the Jones Report, and this
16   is 09-04-2025.  And those were provided to us from
17   today, and that's what we will actually use to discuss
18   the expert reports.
19              Okay.  And then next I will introduce Exhibit
20   6, it will be the Amended Jones Report 2025, 09-04-2025
21   and I will stamp it now as Jones Exhibit 6.  Okay.
22              (Plaintiff's Exhibit 6 marked for
23              identification)
24   BY MS. TADIO:
25       Q.   All right.  Dr. Jones, back to you.  What is
```



```
 1   your understanding of who the Defendants are in this
 2   case?
 3        A.   My understanding is the defendants are the
 4   operators of the New Haven facility, petroleum storage
 5   facility.
 6        Q.   Okay.  So as a shorthand throughout, I'm going
 7   to refer to the Defendants who are here on behalf of as
 8   the defendants.  The Defendants will refer to Shell Oil
 9   Company, Equilon Enterprises LLC, who is the operator
10   doing business as Shell Oil Products, U.S.; Shell
11   Petroleum Inc. LLC; Triton Terminaling LLC; and then
12   Motiva Enterprises LLC.  Do you agree to me referring to
13   them as Defendants throughout?
14             MR. HENDERSON:  We are going to be objecting
15   for the form of that and the foundation.  Shell Oil is
16   not a defendant in this case, so we object to them being
17   referred to as a defendant.  You can refer to the
18   Defendants in the case, which are Triton, Equilon and
19   Motiva.
20             MS. TADIO:  Okay.  Objection is noted for the
21   record.
22   BY MS. TADIO:
23        Q.   I will refer to the New Haven Terminal as the
24   Terminal; do you agree?
25        A.   Yes, I do.
```



```
 1      Q.    For the purposes of this deposition.
 2            Do you have an understanding of who the
 3  Plaintiffs are in this case?
 4      A.    My understanding is that the Plaintiffs are
 5  CLF.
 6      Q.    Very good.  Conservation Law Foundation is the
 7  Plaintiff and brings a civil suit under the Citizens
 8  Suit Enforcement Provision of the Clean Water Act and
 9  Research Conservation Recovery Act.
10            Did you meet with any of the Defendants'
11  lawyers to prepare for today?
12      A.    I did.
13      Q.    Which lawyers?
14      A.    Doug Henderson, who is on the phone, and
15  Carmen Toledo, who is working with them.
16      Q.    Okay.  Anyone aside from those lawyers present
17  during those meetings?
18      A.    Sydney Weiss, who may also be an attorney with
19  the firm, I am not sure what her designation is, and she
20  is a junior attorney with the firm.
21      Q.    Anyone else?
22      A.    No, just the three of them.
23      Q.    Thank you.  And were there lawyers there who
24  represent other defendants in the case at those
25  meetings?
```



```
 1        A.    Not to my knowledge, no.
 2        Q.    Okay.  How many times did you meet with the
 3   Defendants' lawyers to prepare for this deposition?
 4        A.    Two, three -- five times.
 5        Q.    And on what dates did you meet with the
 6   Defendants' lawyers to prepare for the deposition today?
 7        A.    I am going to be approximate with you,
 8   yesterday, I think approximately two times last week,
 9   and then two times the week before.
10        Q.    And those would be reflected in your invoices;
11   correct?
12        A.    Yes, they should be.
13        Q.    And where did these meetings occur?
14        A.    They were online meetings via Microsoft Teams.
15        Q.    And approximately how long did you meet on
16   each occasion?
17        A.    Approximately one hour.
18        Q.    Were there any company employees present?
19        A.    Which company?
20              It was just the folks that I mentioned.
21        Q.    Okay.  So no Integral Company employees or
22   anyone else?
23        A.    No.
24        Q.    And was anyone on the telephone?
25        A.    Not to my knowledge.
```



 1       Q.    Did you take notes during any of these
 2   meetings?
 3       A.    General notes, yes.
 4       Q.    Did you retain a copy of your notes?
 5       A.    I do have a copy of my notes, yes.
 6       Q.    And were you videotaped during your prep?
 7       A.    Not to my knowledge.
 8       Q.    Okay.  Did you bring any documents with you
 9   today?
10       A.    I did.  I have one binder with a clean copy of
11   my expert report (indicating) and CV.
12       Q.    Okay.  What is that?
13       A.    And denoting the major sections just to
14   facilitate.
15       Q.    Okay.  And is that all that you have with you
16   today?
17       A.    Yes, it is.
18       Q.    And those are the materials that have been
19   fully provided to us this morning; correct?
20       A.    Correct.
21       Q.    Okay.  Excellent.  Dr. Jones, in your expert
22   report you include a section called "Materials
23   Considered" in the full report.  Are those materials the
24   full set of materials that you considered in developing
25   your opinions?



1      A.   They would be the primary materials I

2  considered.  But, of course, just general knowledge and

3  other books and papers I know from the general content

4  that may not be explicitly listed in there, but those

5  would be my primary reliance, certainly.

6      Q.   Are there any supplemental materials other

7  than the ones provided with Defendants' objections or

8  the ones provided to us this morning that you relied on?

9      A.   No, not as primary reliance.  Again, my

10  general background of 25 years, there may be other

11  material, but I generally rely on the note primary

12  source that strictly are all there.

13      Q.   So can you confirm that all of your opinions

14  related to this case are contained in your updated

15  expert report?

16      A.   My opinions to date are in there.  Of course,

17  I reserve the right to offer or refine any opinions

18  based on new information.

19      Q.   Okay.  And so between the references listed in

20  your report, the materials considered, and then the

21  supplemental materials titled Additional Materials

22  Considered sent by the Defendant's counsel on December

23  2nd, 2025 and then the two documents sent this morning,

24  is that everything you relied on to write this expert

25  report, and your background knowledge?



1      A.    Yes.    Those would be the primary sources.

2      Q.    Okay.    When you keep saying "primary sources,"

3  can you explain what you mean by that other than your

4  background knowledge?    Did you bring any other

5  materials?

6      A.    I would refer to primary sources as everything

7  I listed.    Secondary sources would be background

8  knowledge.

9      Q.    Okay.    Am I correct that you did some things

10  to prepare for this deposition?

11      A.    Yes.

12      Q.    Can you tell me what you did to prepare for

13  this deposition?

14      A.    The five meetings with the attorneys that we

15  just discussed, and then reading my expert report

16  thoroughly, reading reports of other experts, as well as

17  rebuttals and depositions of other experts involved in

18  the case.

19      Q.    Can you name all of the individuals that you

20  spoke to, whether it be in person, on the phone or by

21  some other means to prepare for this deposition?

22      A.    I think I generally could, yes.

23      Q.    Okay.    And who are those people?

24      A.    That would be Doug Henderson, Carmen Toledo

25  and Sydney Weiss are the primary people that I met with



1    in direct preparation for the deposition.

2          I spoke with my colleague here at Integral

3    that I have worked with just to validate and cue any

4    information.  I believe there was another attorney at

5    King & Spalding who had some questions for me regarding

6    another deposition he was given -- giving.  And I don't

7    recall anyone else that I spoke to.

8          Q.    Okay.

9          A.    For this deposition.

10         Q.    Okay.  Is there anyone that you feel that you

11   should have spoken to in order to prepare for this

12   deposition but that maybe you didn't have access to?

13         A.    Not to my knowledge, no.

14         Q.    Did you ask to speak with anyone but couldn't

15   get ahold of them?

16         A.    No, I did not.

17         Q.    Did you review any documents in preparation

18   for your testimony here today?

19         A.    My expert report and documents associated with

20   my expert report would be the main documents that I

21   reviewed, as well as I mentioned depositions and expert

22   reports of other experts.

23         Q.    And who selected the documents that you

24   reviewed to prepare for this deposition?

25         A.    I did.



1       Q.    Okay.  Did defense counsel also select
2   documents for you to review?
3       A.    No, they did not.  I selected all the
4   documents that I reviewed.
5       Q.    Okay.  Did you read the complaint in this
6   case?
7       A.    I read numerous complaints, so if we are
8   referring to a complaint, we may need to like
9   specifically refer, but I did review numerous complaints
10  in this case.
11      Q.    So the original complaint filed and then the
12  amended complaint you read?
13      A.    Yes, I did, and I believe I referenced that in
14  my expert report.  I know there has been some other
15  documentation sent to them but I'm not going to pretend
16  that I maintained the trail of it all.
17      Q.    So what is your understanding as to what the
18  plaintiffs CLF is alleging that the Defendants did
19  wrong?
20      A.    My basic understanding, as we can review at
21  the beginning of my expert report, is that CLF is
22  alleging that Defendant is not in compliance with
23  stormwater and clean water act standards.
24      Q.    And how did you come to that understanding of
25  what this case is about?



1    A.   By reading that original Notice of Intent and

2 complaint.

3    Q.   Was there anything in the complaint that you

4 do agree with?

5    A.   It's a big complaint.  I don't recall.  Yeah,

6 we would need to go through.  I don't recall right

7 offhand.  I don't agree with the general premise of the

8 complaint.

9    Q.   Okay.  So there is multiple counts under the

10 Clean Water Act, multiple counts under RCRA.  Any of

11 that do you agree with?

12    A.   Not that I can recall.

13    Q.   Okay.  All right.  How are you doing?

14         Do you need a break at this time or are you

15 all set still?

16    A.   No, we are doing great.  Thank you.

17    Q.   Perfect.  We will next turn to retention by

18 Defendants.

19         So you have been retained by King & Spalding

20 on behalf of Defendants in this case.  Is that correct?

21    A.   Yes, I have.

22    Q.   And when were you first contacted about

23 serving as an expert witness in this case?

24    A.   I believe it was September of 2022 when I

25 looked back in my records, and that was by an attorney



1  at Beveridge & Diamond.

2     Q.   Okay.  Prior to this case, had you ever

3  provided professional services to King & Spalding or any

4  of its clients?

5     A.   No, I have not.

6          MR. HENDERSON:  Object.  For the record, we

7  object to the extent that requires you to disclose

8  privileged and confidential information by the attorney.

9  BY MS. TADIO:

10    Q.   Sure.  Outside of confidential clients prior

11 to this case, have you ever provided any professional

12 services to King & Spalding?

13    A.   No, I have not.

14    Q.   Okay.  For Beveridge & Diamond, prior to this

15 case have you ever provided any professional services to

16 Beveridge & Diamond or any of its clients, other than

17 confidential clients?

18         MR. HENDERSON:  Same objections.

19         THE WITNESS:  Yes, I have, indirectly.

20 BY MS. TADIO:

21    Q.   Okay.  And how many times?

22    A.   One, one time.

23    Q.   And what type of case?

24         MR. HENDERSON:  Again, we object to the extent

25 it requires Dr. Jones to disclose privileged and

1  confidential work-product information.

2  BY MS. TADIO:

3      Q.   Dr. Jones, does this require you to disclose

4  confidential information, and if not, could you please

5  tell me what type of case this was?

6      A.   It wasn't a case.  It was a site where

7  Beveridge & Diamond was representing some of the

8  potential responsible parties at a Superfund clean up,

9  essentially.

10          MS. TADIO:  What generally were you asked to

11  do?

12          MR. HENDERSON:  Again, the same objection.

13          Dr. Jones, to the extent it requires you to

14  disclose attorney-client communications or work product,

15  I would instruct you not to discuss those topics.

16  BY MS. TADIO:

17      Q.   Sure.  And for the record, I am not inquiring

18  into confidential communications.  I'm just wondering,

19  generally, what were you required to do?

20      A.   This case is all on public record.  So it was

21  evaluation of contaminant fate and transport due to

22  historic pollutant releases in a coastal wetland and

23  subsequent clean-up of that.

24      Q.   And then did you provide a written report in

25  that case?



 1      A.   I was author of many on a very large RI/FS as

 2   part of a Superfund site and then additional design

 3   documents.

 4      Q.   Did you have to testify at trial for that

 5   case?

 6      A.   No, I did not.

 7      Q.   When did you first write a draft of your

 8   expert report?

 9           MR. HENDERSON:  Object to that requires

10   disclosure of attorney-client communication or work

11   product.

12           For the record, that does address attorney-

13   client communication.

14           MS. TADIO:  Okay.  Are you instructing your

15   client not to answer, Mr. Henderson?

16           MR. HENDERSON:  Yes.  If it involves the draft

17   report, yes.

18   BY MS. TADIO:

19      Q.   Well, I'm looking for a general timeline of

20   approximately when you began.  I understand that you

21   started working for Shell in 2022, and my question is

22   was that to begin work on your expert report?

23      A.   Well, I began working on the expert report

24   this winter-spring of 2025.

25      Q.   Okay.  So what work did you complete for Shell



1   in 2016?

2          MR. HENDERSON:  Object to the form of the

3   question.  Object to the extent the question requires

4   disclosure of attorney-client communications or work

5   product.

6          And I would instruct you not to answer if you

7   would have to reveal those attorney-client

8   communications or work product.

9   BY MS. TADIO:

10     Q.   Okay.  So what work did you complete for Shell

11  in 2022?

12         MR. HENDERSON:  Same objection to the extent

13  it requires you to reveal discussions with clients or

14  attorneys in your representation.

15  BY MS. TADIO:

16     Q.   And I won't ask you about communications.

17         Just generally what work did you complete for

18  Shell in 2022?  When you were working at the site; so

19  what was going on?

20     A.   Site review work, so reviewing the site and

21  reviewing public documents about the site.

22         And, Ms. Tadio, I apologize for using your

23  first name earlier.  I don't mean to be informal.

24     Q.   I did not even catch that, Mr. Jones.  You are

25  so fine.



```
 1              Okay.  What work did you complete for Shell in
 2  2023, again, not containing any confidential
 3  communications?
 4       A.   Similar general site review, review of public
 5  data around the site, review of permits, permitting
 6  requirements and, yeah, reviewing information about the
 7  site.
 8       Q.   Okay.  And what work did you complete for
 9  Shell in 2024?
10       A.   Similar content of work.  Reviewing
11  information about the site, site documents and flood
12  hazards as are outlined in my report.
13       Q.   And then in 2025, what was the work you were
14  completing for Shell?
15       A.   That was specifically starting to work and
16  document the work as outlined in my expert report.
17       Q.   Okay.  So you began --
18              MR. HENDERSON:  Ms. Tadio, for the record we
19  are objecting to the extent we are using Shell instead
20  of Defendants in this particular case.
21              MS. TADIO:  Sure, sure.
22  BY MS. TADIO:
23       Q.   What work did you complete for Defendants in
24  2024, just to make sure we have them for the record?
25       A.   Yes, and apologies, I was assuming Defendants.
```



1          The same work, site characterization work, and

2    general order reviewing, site permitting documents and

3    flood hazards.

4        Q.   And so you began completing your expert report

5    for Defendants in 2025; is that correct?

6        A.   Correct.

7        Q.   Okay.  Prior to your engagement in this case,

8    have you ever done any work for Shell Oil Company?

9        A.   Not directly for Shell Oil Company, that, as

10   you mention, there are many entities within Shell.  I

11   have done work for Shell Energies, I believe is the

12   entity.

13       Q.   Okay.  Prior to your engagement in this case,

14   have you ever done work for Equilon Enterprises LLC,

15   doing business as Shell Oil Products U.S.?

16       A.   No, I have not.

17       Q.   Prior to your engagement in this case, have

18   you ever done work for Shell Petroleum?

19       A.   Not to my knowledge as a business entity, no.

20       Q.   Okay.  And prior to your engagement in this

21   case, have you ever done work for Triton Terminal Inc.,

22   LLC?

23       A.   Not to my knowledge, no.

24       Q.   Okay.  And prior to your engagement in this

25   case, have you ever done any work for Shell Petroleum



1  Inc.?

2      A.   Again, with the caveat that I have done work

3  for Shell Energies, and I don't pretend to know all the

4  ownership structures there, so not directly to my

5  knowledge.

6      Q.   And prior to your engagement in this case,

7  have you ever done any work for Motiva Enterprises LLC?

8      A.   And, again, not to my knowledge.

9      Q.   Thank you.  When were you first contacted

10  about serving as an expert witness in this case?

11      A.   That would have been during my engagement with

12  King & Spalding where they had asked if I would be

13  willing to perform as an expert witness.  I believe that

14  was last year.

15      Q.   Okay.  And when were you actually retained?

16      A.   Ms. Tadio, you'd have to review the retention

17  letter.  To my recollection it was about a year ago, or

18  last year at some point.

19      Q.   And so how long after you were first contacted

20  about serving as an expert witness in this case was it

21  before you signed the retainer agreement?

22      A.   I would say within a month or two.

23      Q.   Okay.  And were you provided with any material

24  to review before you agreed to be retained?

25      A.   I believe I was provided with a complaint.  I



1  can't recall any other information besides the complaint

2  I was provided with, besides, as I mentioned, I had been

3  reviewing public documentation prior to that.

4      Q.   So did you do any independent research about

5  this case prior to agreeing to serve as an expert

6  witness in this case?

7      A.   What do you mean by independent research?

8      Q.   Going on Google, researching the case, just,

9  you know, looking into it yourself outside of what you

10  were asked to do by Defendant and its counsel?

11      A.   Yes, I did, yeah.

12      Q.   Okay.  And what type of independent research

13  did you do?

14      A.   Looking up the complaint, looking up the site,

15  looking up the characteristics of the site relative to

16  the complaint.

17      Q.   And who was the person who first contacted you

18  about being an expert witness in this case?

19      A.   I believe it was Doug Henderson that contacted

20  me.  I do want to acknowledge this was after a prior

21  engagement with Beveridge & Diamond, so that wasn't my

22  first contact regarding the case.

23      Q.   Sure.  Thank you for clarifying.

24          Did you previously know Doug?

25      A.   No.  I did not.



```
 1        Q.    Okay.  So you had never had any dealings with
 2   Mr. Henderson before your engagement in this case?
 3        A.    No, I had not.
 4        Q.    Okay.  Did you know anyone, attorneys,
 5   paralegals, just anyone at King & Spalding prior to your
 6   engagement in this case?
 7        A.    They are quite a large firm, so I don't want
 8   to say that firm-wide.  There could be attorneys there
 9   now that I have known from the past or interacted with
10   at, you know, some of the contaminated sites that I
11   worked at over my 25-year career, so I don't want to say
12   no.
13             But regarding this case, no, I did not know
14   Doug or any of the attorneys of that regarding this
15   case.
16        Q.    Okay.  And did you know anyone at Beveridge &
17   Diamond prior to your engagement in this case?
18        A.    Yes, I did.
19        Q.    And who was that?
20        A.    John Guttmann, who was the attorney I was
21   working with.  I had met him as part of previous sites I
22   had worked on, as well as Steve -- oh, my gosh, I'm
23   blanking on the last name right now.
24             Another attorney there who was not involved
25   with this case, but he was with the firm and he was one
```



1  I worked with, Steve Jawetz at Beveridge & Diamond who I

2  had worked with or who I knew from working on Berrys

3  Creek site in New Jersey that I had mentioned earlier.

4      Q.   Did you know anyone at Shell Oil Company prior

5  to your engagement in this case?

6      A.   Again, given that I don't understand all of

7  the entities within Shell, yes, I do know people at

8  Shell.

9      Q.   Approximately how many people?

10     A.   I would say over the past 25 years I have

11  maybe known ten different people that have worked at

12  Shell.

13     Q.   And can you tell me all the names that you do

14  remember?

15     A.   Yes.  Ray Myers, who was the lead engineer out

16  at Atlantic Shores Offshore Wind, which was owned by

17  Shell.

18           Deanne Hargrave, who was the head of

19  geotechnical geophysical who did environmental work as

20  part of Atlantic Shores Offshore Wind.

21           There were two other gentleman who worked at

22  Atlantic Shores Offshore Wind who I worked closely with.

23           And I also have a few colleagues in Houston

24  that I know professionally that I have never worked

25  with, Sergio Jaramillo, the Metocean engineer who has



 1    been deposed in this case.

 2            I did not talk to regarding this case, but I

 3    did know him previously through ocean sciences circles.

 4            Luz Zarate, who heads up renewable energy

 5    programs at Shell.

 6            And, again, I have had a few colleagues, Chris

 7    Hadley, who is an ocean engineer at Shell.  Again,

 8    people I don't work with, but I know numerous people

 9    just through technical engineering conferences over the

10    years.

11        Q.    Anyone else?

12        A.    I'm sure there are, Ms. Tadio, over my career,

13    so I don't want to say no, but those are the first ones

14    that come to mind that I have had the interaction with

15    in the past few years.

16        Q.    Thank you for providing me that list.

17            Did you know anyone at Equilon Enterprises,

18    LLC, doing business as Shell Oil Products U.S., prior to

19    your engagement in this case?

20        A.    No, I did not.

21        Q.    Okay.  Did you know anyone at Shell Petroleum,

22    Inc., prior to your engagement in this case?

23        A.    Once again, not to my knowledge.  I don't know

24    all the crossovers there, so...

25        Q.    Did you know anyone at Triton Terminal, Inc.,



1  LLC, prior to your engagement in this case?

2      A.   No.

3      Q.   Did you know anyone at Motiva Enterprises,

4  LLC, prior to your engagement in this case?

5      A.   No.

6      Q.   Did you know anything about this case before

7  you were contacted about being an expert witness for

8  defendants?

9      A.   No, not directly.  I know there were general

10  cases at CLF was raising against some energy firms

11  regarding climate change.  That was the extent of my

12  knowledge of any of these cases -- of this case.

13      Q.   So had you heard anything more specific about

14  this case prior to being retained as an expert?

15      A.   No, I had not.

16         MR. TADIO:  All right.  I will now introduce

17  as Exhibit 5 the Dr. Jones' invoices and I will mark

18  this exhibit now -- as Exhibit 7.

19         (Plaintiff's Exhibit 7 marked for

20         identification)

21  BY MS. TADIO:

22      Q.   Are you able to see those invoices?

23      A.   I'm sorry, I closed down the exhibit panel so

24  I could see you.

25         Yes, I see them.



1    Q.    Well, I will submit to you that these are the

2  invoices provided by the Defendants for your work

3  related to this litigation and they have not been

4  altered.  Do these look familiar to you?

5    A.    They do.

6    Q.    Okay.  How much per hour are you being

7  compensated for your work in this case?

8    A.    My rate is 347 an hour.  I'm sorry, that's

9  what Integral is being compensated.  My hourly

10  compensation is -- I don't know, I would have to

11  calculate what my compensation is, my personal hour

12  compensation.

13    Q.    And the 347 that you list, what is that for?

14    A.    That's Integral's standard consulting rate for

15  the work that I do as a senior principal in the company.

16    Q.    How did you come up with that hourly rate?

17    A.    Well, Integral's CFO comes up with this hourly

18  rate, but it is based on Integral's overhead, indirect

19  expenditures or expenditures, fringe benefits, and we

20  have fully audited government rates that comprise our

21  standard rates.

22    Q.    For how long has this been your hourly rate?

23    A.    We typically have incremental increases every

24  year.  That rate is my present 25 percent rate.

25    Q.    Do you charge the same hourly rate for your



1  deposition testimony and your trial testimony?

2      A.   No, we have a higher rate for my deposition

3  testimony and trial testimony.

4      Q.   Let me rephrase.  Do you make the same for

5  your deposition testimony and your trial testimony?

6          Are those -- is that the same rate?

7      A.   My pay rate is the same.

8      Q.   Okay.  And what is the rate for the deposition

9  testimony and trial testimony?

10     A.   Integral's standard rate, yes, is -- I am

11  going from memory here.  I want to say it is 347, but we

12  can correct that.  I do have a standard rate sheet -- or

13  447.  I do have a standard rate sheet that is in my

14  expert report if we want to look that up.

15     Q.   I have noted here that says you made $347 per

16  hour for consulting analysis and report preparation for

17  the Integral's charges filed, excuse me, and that

18  Integral would charge $458 for deposition testimony and

19  trial testimony.  Does that sound correct?

20     A.   Yes, that sounds correct.

21     Q.   That is what is contained in your report, so,

22  okay.

23          Does Integral charge $347 per hour for things

24  like reviewing documents?

25     A.   Yes, if I'm the primary person reviewing the



 1  documents.
 2       Q.   And how many hours did you put into this case
 3  to date?
 4       A.   I don't recall, Ms. Tadio, I have not
 5  calculated that.
 6            It would be here in the invoices, but I don't
 7  recall.
 8       Q.   And how much time do you expect to spend on
 9  this case after today?
10       A.   I would expect maybe a few more meetings with
11  attorneys after this, and then trial and preparation for
12  trial testimony, any exhibits with that, and then the
13  trial testimony.
14       Q.   Could you provide me a ballpark of how many
15  hours that could approximately be?
16            MR. HENDERSON:  We object to the form of the
17  question and foundation of the question.
18            MS. TADIO:  Okay.  I'll reword.
19            But just approximately how many more hours do
20  you expect to spend on this case after today?
21            MR. HENDERSON:  Same objection.
22            THE WITNESS:  I would guess about 40 hours on
23  the prep work and potentially 40 hours on the trial.
24  I -- that's a -- or 20 -- I don't know, honestly.
25            I would be speculating until the attorneys let



1  me know what they are expecting of me.

2  BY MS. TADIO:

3      Q.   Thank you for the answer.  Am I correct that

4  you are the only one who worked on this report?

5      A.   I am the primary author of the report and I

6  did write the report.  I did have people assisting me on

7  the report.

8      Q.   And can you tell me the people that you had

9  assisted you on this report, please?

10      A.   Yes.  Chris Flanary was the key person

11  assisting me on this report.

12      Q.   Only Chris?  He is the only other one that

13  worked on this report?

14      A.   I did have a technical editor that went

15  through, and did have two other engineers in the company

16  that provided some review and helped QA.

17      Q.   Who keeps track of how much time you expend?

18      A.   The -- our accounting system, primarily.

19      Q.   And who prepares your invoices?

20      A.   Our accounting team, and then for every

21  project we have a project coordinator that then reviews

22  that with our project managers to ensure they are

23  correct, before sending them to their clients.

24      Q.   Has all your time up to today been billed?

25      A.   No, it has not.  We invoice on a monthly



 1  basis, so our latest invoice, to my knowledge would have

 2  gone in, yes, last week, and been closed out on Friday.

 3         I don't know if that invoice will come --

 4  yeah, I'm not -- I know we close out at the end of the

 5  month.  I'm not sure exactly when those invoices are

 6  sent, since we are only on the 4th of the month after a

 7  holiday.

 8         MS. TADIO:  And, Counsel, you will be

 9  providing us with those invoices; is that correct?

10         MR. HENDERSON:  Which specific invoices?

11         MS. TADIO:  The ones that are being billed for

12  today and have been billed for this month that we do not

13  have?

14         MR. HENDERSON:  To the extent we receive them,

15  we will.

16  BY MS. TADIO:

17     Q.   And Dr. Jones, have you been paid?

18     A.   Have I been paid?

19     Q.   For your work that you have done for

20  Defendants in this case?

21     A.   I believe Integral's invoices are up to date

22  within the billing terms.  To my knowledge, Integral has

23  been paid for our work to date within the billing terms

24  of that retention.

25     Q.   And other than invoices starting from



1  September that you just mentioned, have all of your

2  other invoices been paid?

3       A.   To my knowledge, yes.

4       Q.   And to your knowledge, are there any invoices

5  that have been sent, but not yet paid?

6       A.   Not to my knowledge.  I would assume the

7  latest ones, because it is typically a 30-day lag

8  between payment, so I would assume the latest one has

9  not been paid.

10      Q.   Okay.  And when do you or Integral on your

11  behalf, when do you generally send out your billing

12  invoices?

13      A.   Typically the invoices go out the first week

14  of the month of a new month from the previous month.

15      Q.   Okay.  And the invoices that we have just

16  marked as Jones Exhibit 7, did those invoices accurately

17  reflect the time spent on this case up to the date of

18  your last invoice, so up to September 2025?

19      A.   Yes, they should.

20      Q.   And you are charging for your time today;

21  correct?

22      A.   Yes, we will be billing for the time to date.

23      Q.   And you are also charging for any time you

24  spent preparing for this deposition today; correct?

25      A.   Correct.



 1      Q.   And how much time do you expect to bill for
 2   today and for any prep time you have not already billed
 3   for?
 4            MR. HENDERSON:  Object to the form of the
 5   question, foundation question, and to the extent of
 6   disclosure of attorney-client communication or work
 7   product.
 8            THE WITNESS:  I would expect eight hours
 9   today, however long we are going through depositions.
10   BY MS. TADIO:
11      Q.   Do you charge for your travel time?
12      A.   Typically no.
13      Q.   Do you charge for overnight expense at a
14   deposition or at trial?
15      A.   No.
16      Q.   Do you expect to be called to testify at trial
17   in this case?
18            MR. HENDERSON:  Object to the form of the
19   question.  I instruct you not to answer to the -- to the
20   degree it requires you to disclose attorney-client
21   communications or discussions or work product.
22            THE WITNESS:  I think my best answer is I
23   don't know.
24   BY MS. TADIO:
25      Q.   Okay.  If you are asked to testify at trial in

1  this case, will you charge for your travel time to

2  Connecticut?

3      A.   I would ask the expectation of the client.

4  Typically we have a discussion with the client.  I try

5  to work on the plane, so the only times I would charge

6  for travel would be if I'm working on the airplane and

7  during that travel.

8      Q.   If you are asked to testify at trial in this

9  case, will you charge for your time preparing to

10  testify?

11      A.   As I did for the deposition, yes.

12      Q.   And if you are called to testify at trial, is

13  there any other time that you would charge for in that

14  instance?

15          MR. HENDERSON: Object to the form of the

16  question, foundation of the question.  Object to the

17  extent it requires disclosure of attorney-client

18  communications or work product.  So if it involves those

19  I would instruct you not to answer, otherwise, you can

20  respond.

21          THE WITNESS:  If I were called to trial, I

22  would expect to charge for the time I was working and

23  prepping for that trial and testifying during that

24  trial.

25  BY MS. TADIO:



1      Q.   Thank you.  And we do request that any

2  additional invoices be provided to us prior to trial.

3           Did anyone help writing and researching and

4  pulling  documents for editing your work for this

5  report?

6      A.   That's a broad question.  Maybe we can break

7  that down.  Which would you like to start with?

8      Q.   Well, I would like you to tell me everyone

9  that you worked with on this report at all.  If you just

10  list the names, that would be sufficient for now.

11      A.   Yes.  On this report the primary person was

12  Chris Flanary.  He helped me to pull weather data, water

13  level data, so that I could compile that data.  Helped

14  me with figure preparation, and QA and figures and

15  calculations that I was developed.  Helped with QA of my

16  modeling work.  Helped to rerun, to validate that work.

17  And helped with general review of the work that I was

18  doing.

19      Q.   Okay.  Who else worked on this report?

20      A.   We would have had a technical editor that went

21  through, and that would have been an editorial capacity

22  that work on the report.

23           Kerry Scheu did some review work on the

24  report.  I believe Tim Nelson did some, helped with some

25  review work on the report and helped compiling



 1 references to ensure that the reference list in the

 2 report agreed with what we provided as far as

 3 references, as well as data sources, so did an

 4 independent review of data sources.

 5      Babak Tehranirad did additional review of the

 6 report.  And those were reviews on the report, but no --

 7 I won't say they contributed in any way beyond reviewing

 8 and providing comments on things that could be explained

 9 better.

10      Q.   Who is Cheryl Hapke?

11      A.   Cheryl Hapke worked additionally with us on

12 the site when we were working in a consulting capacity,

13 initially with Beveridge & Diamond, and again helped

14 pull data, pulled some aerial photograph data and helped

15 compile some storm data.

16      Q.   And who is Daniel Kern?

17      A.   Daniel Kern is the project coordinate that I

18 mentioned earlier who helps with invoice preparation and

19 billing.

20      Q.   Okay.  For Christopher Flanary, what is his

21 current employment status?

22      A.   He is employed full-time with Integral

23 Consulting.

24      Q.   And what is his job title?

25      A.   His job is consultant, tide consultant.



1    Q.   And I understand that he did some like weather
2  and water level data monitoring.
3         What else did he do?
4    A.   Helped me with QA, quality assurance on
5  modeling work, model review, and data analysis, helped
6  with conducting some data analysis under my direction
7  and reviewing that with me.  I think that's -- that's
8  the main sum of it.  Oh, GIS analysis as well, but I
9  pull that under data analysis.
10   Q.   And he was the person that contributed sort of
11 the most to this report outside of you?
12   A.   Contributed most to the analysis that under my
13 direction that supported this report.
14   Q.   Okay.  Thank you for clarifying.  And do you
15 know if he is salaried or has an hourly rate?
16   A.   He is a salaried employee.
17   Q.   Okay.  And do you know approximately what he
18 is paid for this work?
19   A.   I, as we see here in this exhibit, I see his
20 billable rate is about 190 on the first.  I would assume
21 that is escalated to maybe $200 an hour by 2025, maybe
22 210 an hour.  I don't know his hourly rate that we are
23 billing him at.  I'd have to look at our rate sheet.
24   Q.   And do you know approximately the amount and
25 time that he spent working on this case?



```
 1      A.   Ms. Tadio, I'd have to guess.  If you'd like
 2 me to make a guess, I can.
 3      Q.   I see in -- well, we did some calculations on
 4 my team, and it looks like it was over 430 hours that
 5 Christopher Flanary worked, so quite a significant
 6 amount.
 7           So my next question is:  Has all of the time
 8 for the individuals that we have just named been
 9 invoiced, including Cheryl Hapke , Kerry Scheu,
10 Christopher Flanary, Daniel Kern, has all of their time
11 been invoiced?
12      A.   To my knowledge, with the exception of the
13 latest invoice.
14      Q.   Thank you.  Do you expect any of those
15 individuals to bill any more time in this case between
16 now and trial?
17      A.   If I'm guessing, I would say --
18           MR. HENDERSON:  Excuse me.  Same objection.
19 To the extent it requires you to disclose attorney-
20 client communications or work product, I instruct you
21 not to answer.  If it does not, then you can respond.
22           THE WITNESS:  Do you want to repeat the
23 question, then?
24 BY MS. TADIO:
25      Q.   Yeah, yeah, definitely.  I'm just wondering if
```



1  you expect any of those individuals, most specifically
2  Christopher Flanary, to bill more time in this case
3  between now and trial?
4      A.   I would be speculating, but I would guess it's
5  minimal to negligible.
6      Q.   Can you give me a ballpark figure as to how
7  much money you've made total on this case?
8      A.   Ballpark, I would guess Integral has billed on
9  the over of $250,000 total.
10     Q.   And how much do you expect to make?
11     A.   Again, without knowing anything about the
12 trial, if it goes to trial or if it settles, you know, I
13 don't look at the trial as being a significant
14 contributor, maybe 10 percent more.
15     Q.   Oh, okay.
16     A.   5 to 10 percent.  Again, that's a guess, given
17 the uncertainty of what that involves.
18     Q.   So, Mr. Jones, approximately you have made
19 $250,000 total for being an expert witness in the case
20 of CLF versus Shell Oil.
21          In the case of Shell Oil versus Defendant
22 you've approximately made $250,000 total?
23          MR. HENDERSON:  Objection to the form and
24 foundation of the question as asked.
25 BY MS. TADIO:



 1      Q.   I'm just making sure I heard it correctly.

 2           Mr. Jones, how much money have you made total

 3    from being an expert in this case?

 4           MR. HENDERSON:  Same objection.  Do you mean

 5    Integral or Dr. Jones?

 6    BY MS. TADIO:

 7      Q.   No.  I'm wondering about Dr. Jones

 8    specifically.

 9           I mean, Integral approximately has made

10    $250,000 total.  So what, Mr. Jones, have you made

11    specifically?

12           MR. HENDERSON:  We are going to object to that

13    question to the extent it goes into Dr. Jones' personal

14    information.

15           MS. TADIO:  Are you instructing the witness

16    not to answer?

17           MR. HENDERSON:  Yeah, to the extent it

18    requires him to disclose personal information, yes.

19           He has testified how much the company was

20    charged.

21           THE WITNESS:  Ms. Tadio, I'm a salaried

22    employee and I have no -- my salary does not change

23    based on Integral's income on this case or not.

24    BY MS. TADIO:

25      Q.   Okay.  My team did some calculations and,

```
 1  yeah, it appears that you have spent approximately --
 2             (Technical difficulty)
 3             MR. HENDERSON:  Ms. Tadio, we had a hard time
 4  hearing you.
 5             (Reporter asked for clarification)
 6  BY MS. TADIO:
 7      Q.   Yes, you have spent approximately 462 hours in
 8  this case; is that correct?
 9      A.   I'm going to rely on your math with that.
10  Assuming your math is correct, from the invoices we have
11  provided, that that sounds reasonable.
12             MS. TADIO:  Can you all hear me okay at this
13  time?
14             THE WITNESS:  You are clear now.
15             MR. HENDERSON:  Yeah.  I think it was an
16  Internet issue.
17             MS. TADIO:  Thank you.  Please let me know if
18  you can't hear me.  I'm always happy to repeat.
19  BY MS. TADIO:
20             Okay.  Next question, Dr. Jones.
21             Separate and apart from the expert witness
22  work in litigation, have you ever received any payments
23  from a fossil fuel company?
24             MR. HENDERSON:  We object to the extent it
25  requires you to disclose attorney-client communication
```



1  or work-product information, or by any other
2  confidentiality agreements or protective orders.
3        THE WITNESS:  I'm sorry, could you repeat the
4  question?
5        MS. TADIO:  Yep.
6  BY MS. TADIO:
7    Q.   Separate and apart from expert witness work in
8  litigation, have you ever received any payments from a
9  fossil fuel company?
10   A.   No, I have personally never received a payment
11 from a fossil fuel company.
12   Q.   Have you received any grants from a fossil
13 fuel company?
14   A.   No, I personally have never received grants,
15 to my knowledge.  So Ms. Tadio, I'm going to take this
16 opportunity to clarify, if you are talking about
17 Integral or myself personally?
18   Q.   You personally.
19   A.   No.  Me personally, I never have.
20   Q.   Has Integral received any grants from a fossil
21 fuel company?
22   A.   We have been a part of public-private
23 partnership grants into renewable energy by companies
24 such as Orsted, Equinor, regarding offshore wind, those
25 companies I know also have been involved in oil and gas



1  production, so it depends on how you are clarifying

2  "companies."  Those energy companies also have oil and

3  gas production.  We are working with them under grants

4  for renewable energy programs, offshore wind, and green

5  energy as well.

6      Q.   Have you ever received any stipends from a

7  fossil fuel company?

8      A.   No, I have not.

9      Q.   Aside from your 401(k), do you own any stock

10  in any fossil fuel company?

11      A.   Not -- yeah, you did say 401(k)?

12          I apologize, I'm clarifying in my head.

13  Mutual funds are a part of my 401(k,) are the only

14  things that may have an interest in a fossil fuel

15  company that I'm aware of.  Besides that, no, I do not.

16      Q.   Do you own any stock in any company involved

17  in the fossil fuel industry?

18      A.   Not directly.  To my knowledge, as I mentioned

19  earlier, could be part of a retirement portfolio.

20      Q.   Okay.  So you have not personally purchased

21  stocks in a fossil fuel company?

22      A.   Not -- right now I have no stocks in a fossil

23  fuel company.  In the past I have had stocks in fossil

24  fuel companies.

25      Q.   Okay.  And when were those divested?



1      A.    I would say during COVID.

2      Q.    So well before the beginning of this trial?

3      A.    Correct.

4      Q.    Do any of your immediate family members own

5  stock in a company involved in the fossil fuel industry?

6      A.    Not that I'm aware of.  I don't know my full

7  family portfolio, so I can't say.

8      Q.    Aside from the expert work you are doing in

9  this case or other litigation, does any company involved

10  in the fossil fuel industry have any financial

11  obligation to you?

12      A.    No.

13      Q.    Does any company involved in the fossil fuel

14  industry have any financial obligation to any of your

15  immediate family members?

16      A.    Not to my immediate family members, no, and

17  again, extended family I'm unaware of.

18      Q.    And have you been disclosed as an expert

19  witness in any other case involving fossil fuel

20  companies?

21      A.    No.

22      Q.    All right.  We've been going for about an hour

23  now.  I'm thinking maybe now would be a good time to

24  take a five-minute break before we turn to your resume.

25            Would that work for you, Dr. Jones?



```
 1      A.    Sure, that would be great.

 2            MS. TADIO: Five-minute stretch break?

 3            THE WITNESS:  Yeah.

 4            MR. HENDERSON:   That works fine.  So we will

 5   go off the record.

 6            And can we make it a ten-minute break?

 7            MS. TADIO:  Sure, yes.  Whatever, Counsel,

 8   whatever you both need is fine with me.

 9            MR. HENDERSON:  Okay.  How about, local time,

10   how about 9:50?

11            MS. TADIO:  Perfect.

12            MR. HENDERSON:  Does that work?

13            MS. TADIO:  That works, yes.

14            MR. HENDERSON:  Okay.  Thank you.

15            MS. TADIO:  Thank you.

16            THE WITNESS:  Thanks.

17            THE VIDEOGRAPHER:  Going off the record at

18   9:35 a.m. Pacific time.

19        (Recess)

20            THE VIDEOGRAPHER:  We are back on video record

21   at 9:48 a.m. Pacific time.

22   BY MS. TADIO:

23      Q.    So I am showing right now Exhibit 2, which is

24   the original Expert Report prepared for this deposition.

25            We will only be using this for the purposes of
```



```
 1   your CV and your resume, since we were not provided an
 2   updated copy.  Is that clear and acceptable?
 3        A.   Yes.
 4        Q.   Okay.  On the first page of this report are
 5   you able to see ma I'm looking at, it's got your
 6   signature there?  Is that correct, is that your
 7   signature?
 8        A.   That is.
 9        Q.   All right.  Give me one moment and I will
10   direct us to the beginning of your actual CV.  It's a
11   lengthy document.  Okay.  So appendix A, I will direct
12   to the page, can everybody see what we are looking at
13   Appendix A, CV of Dr. Craig Jones here.
14             Dr. Jones, is this a CV that accompanied your
15   report?
16        A.   Yes, it is.
17        Q.   Is it accurate?
18        A.   It is.
19        Q.   And is this CV up to date?
20        A.   Yes, it is.
21        Q.   Okay.  Is there anything that you would need
22   to add to this CV?
23        A.   Typically in the CV I have completed projects
24   updated approximately yearly.  There are ongoing
25   projects and background projects I have worked on that,
```



 1  you know, I may refer to that aren't explicitly listed

 2  in here, but this is complete and accurate.

 3      Q.   Okay.  Who prepared this CV?

 4      A.   I prepared the content.  Our grammar technical

 5  editing department formats it all.

 6      Q.   Okay.  Is there any updates to your CV between

 7  now and the time of trial will you promise that you will

 8  let the attorneys for King & Spalding, Beveridge &

 9  Diamond know so we can update any evidence at the trial?

10      A.   Yes, ma'am.

11      Q.   Thank you.  Do you have a different CV for

12  nontestifying work?

13      A.   My CV is extensive with many different

14  projects across the fields of work I do, work that I

15  felt was not relevant to this particular case is not

16  included in there.  So in that sense, I may have a

17  different CV that would be for project-related work or

18  qualifications for a particular project.

19      Q.   Okay.  You received a Ph.D. in mechanical and

20  environmental engineering from the University of

21  California Santa Barbara in 2000; is this correct?

22      A.   Correct.

23      Q.   And you received your Master of Science in

24  fluid mechanics, with minors in ocean engineering and

25  environmental engineering in 1996; is this correct?



```
 1        A.   Correct.
 2        Q.   And you received your Bachelor of Science in
 3   coastal engineering in 1994; is this correct?
 4        A.   Correct.
 5        Q.   And have you been a coastal engineer this
 6   whole time?
 7        A.   Yes.  I have been a coastal and environmental
 8   engineer this whole time.
 9        Q.   And during your doctorate, master's, or
10   undergrad, did you take any classes in climate change
11   risk assessment?
12        A.   As part of my Ph.D., yes, I did.
13        Q.   What classes?
14        A.   It was a class on coastal hazards and risk
15   assessment.
16        Q.   Okay.  What else?
17        A.   As part of my undergraduate, coastal hazards
18   are a fundamental part of coastal engineering, so there
19   were multiple classes on coastal processes and
20   estimating coastal hazards and coastal flooding.
21        Q.   So specifically during your Ph.D. you took one
22   class on climate change; did I hear that correctly.
23        A.   Yes, with climate change specifically.
24   Coastal engineering and coastal sciences in general is
25   inherently linked to climate and the latest data on
```



 1  climate.  So, and I'm paraphrasing a bit, but any
 2  coastal class inherently is related to the global
 3  climate.  Climate change assessments specifically would
 4  have been in graduate school.
 5      Q.   Okay.  So during graduate school, what classes
 6  did you take in climate change risk assessment?
 7      A.   There was one coastal risk assessment class
 8  specifically focused on climate change.
 9      Q.   And for undergrad, what classes did you take
10  in climate change risk assessment?
11      A.   There was a general climate change
12  environmental and climate change class looking at
13  overall climate change.
14      Q.   Okay.  Thank you.  And why did you get your
15  doctorate?
16      A.   I have a passion for coastal and ocean
17  sciences and engineering.
18      Q.   Were you part of any seeding groups during
19  undergrad, grad, or your Ph.D.?
20      A.   Yes, I was part of the American Society of
21  Civil Engineers, the Coastal Ocean Ports and Rivers
22  Institute, as part of an undergrad and graduate.
23      Q.   Anything else?
24      A.   Generally in undergrad I was part of the Surf
25  Club, Environmental Club, part of the Surfrider



1  Foundation.  Yeah, I don't recall.  There may have been

2  others.

3      Q.    Okay.  Are you aware generally of the work of

4  Dr. James Hanson?

5      A.    Dr. James Hanson, I apologize, I know a few

6  Dr. Hansons.  Could you be more specific?

7      Q.    The climate scientist?

8      A.    Yes, yes.

9      Q.    What is your knowledge of the IPCC?

10     A.    It is an International Panel on Climate

11  Change, which is the global group of scientists that

12  meet on a regular basis to look at climate change

13  impacts globally.

14     Q.    Are you aware of the IPCC assessment reports

15  such as the AR4 reports?

16     A.    Yes, I am.

17     Q.    Can you tell me what is your knowledge of

18  those reports?

19     A.    Those reports are generally a summary of the

20  science.  Some of them are quite long documents, so we

21  would have to talk about specific parts, but, yes,

22  generally comprehensive reports on this data climate

23  science.

24     Q.    Are you aware of the IPCC AR5 report from 2014

25  specifically?



1    A.    I believe I might have the designation

2  improper, but if you could pull up -- pull up the

3  document, I would be happy to say yes if I am.  If it's

4  the latest climate assessment, or one of the latest

5  climate assessment reports, I have reviewed most of

6  those.

7    Q.    Okay.  Can you tell me what you know of the

8  latest climate assessment reports generally?

9    A.    Yes, I may have involved global consensus on

10  climate change, climate change projections; have

11  involved global modeling of climate change under

12  different carbon emission scenarios, also looking at

13  impacts of those different scenarios, carbon release

14  scenarios or IPCC, I forget the name, what the actual

15  acronym stands for.

16        But looking at everything from inland

17  conditions to offshore conditions, of particular

18  interest to me in things I looked at, of course, are the

19  sea level rise assessments under those different

20  scenarios.

21    Q.    Are you aware of Hurricane Katrina?

22    A.    Yes, I am.

23    Q.    Are you aware of Hurricane Rita?

24    A.    Yes, ma'am.

25    Q.    Do you agree that these hurricanes are



 1  exacerbated by climate change?

 2      A.   I agree that they were intense storms.  To the

 3  extent they are exacerbated by climate change, I think

 4  the general consensus is that those are potentially

 5  exacerbated by climate change.

 6           I think also the general consensus in science

 7  is it is very difficult to say definitively; however, I

 8  think the consensus is that they were generally

 9  exacerbated by climate change.

10      Q.   What is the first instance where you can

11  recollect considering severe weather on sediment

12  transport?

13      A.   At the outset of my career and education.

14      Q.   Because you are a sediment expert; correct?

15      A.   Correct.

16      Q.   Have you ever considered climate change driven

17  by their risk on marine mammals?

18      A.   Generally, I'm not a marine mammal expert.

19  However, I have been involved in studies looking at

20  potential changes and projections to habitat changes as

21  a result of climate change, and those potential effects

22  on marine mammals working with marine mammal experts.

23      Q.   Are you aware of the ISO standards related to

24  climate change?

25      A.   More of the ISO standards and guidance.  We'd



1  have to read specific documents.  They have released a
2  lot of documents.
3       Q.    So specifically, are you aware of ISO 14090,
4  which provides a robust framework that supports
5  organizations in grasping the impacts and uncertainty
6  associated with climate change and facilitates informed
7  decision-making?
8       A.    Yes, I believe that's the one I reference in
9  my expert report.
10      Q.    And are you aware of ISO 14091, which guides
11 organizations in assessing climate-related risks for
12 presenting effective adaptation strategies?
13      A.    Yes, I am.  And, again, without -- I'm a
14 better visual person, if I see the numbers.  But if
15 those are the ones I referenced yes, I am aware of those
16 documents.
17      Q.    And are you aware of ISO/TS 14092, which helps
18 local governments and communities in preparing for
19 climate disruptions and fostering resilience by
20 identifying climate vulnerabilities and adaptive
21 capacities?
22      A.    That one I may not be as familiar with, but,
23 yes, I think I'm aware of that one.
24      Q.    And tell me just generally what is your
25 awareness of these ISO standards?



1    A.    ISO has set forth guidance and -- to be

2  considered by organizations and communities and

3  governments on how to incorporate potential climate

4  change effects into whatever operations may be

5  occurring.

6    Q.    Okay.  And are you aware of ISO standards

7  generally related to clean water?

8    A.    Yes, I am.

9    Q.    We will now turn to your employment.  What is

10  Integral Consulting?

11    A.    Integral Consulting is a firm of approximately

12  260 technical staff that provide environmental science

13  and engineering services to a wide range of clients

14  throughout the United States and globally.

15    Q.    What services does Integral provide to its

16  clients?

17    A.    Everything from environmental investigation,

18  environmental compliance to remediation, design, looking

19  at even climate adaptation and, you know, a wide range

20  of services.

21    Q.    Okay.  And who generally are Integral

22  Consulting's clients?

23    A.    We have a broad mix of public, private and NGO

24  clients.

25    Q.    How long have you worked for Integral



1  Consulting, Inc.?

2      A.   About actually going on 12 years this month.

3      Q.   And setting aside the expert witness work that

4  you do in litigation for Integral, what other work do

5  you generally do for Integral Consulting?

6      A.   My primary work is in helping put together

7  teams to solve client problems in its simplest form, but

8  I lead a marine coastal climate and technology services

9  group, which includes everything from pretty much

10  anything that touches the water, from stormwater,

11  stormwater compliance, to looking at estuarine,

12  estuarine issues, working at ports and harbors

13  environmental issues, coastal issues, communities and

14  entities on the coast out to offshore, working with

15  offshore challenges.

16      Q.   How much of your time at Integral Consulting,

17  Inc. is spent on litigation, as opposed to the

18  nonlitigation work you do?

19      A.   I would say 20 percent of my time is spent on

20  litigation, 10 to 20 percent.  And, Ms. Tadio, that's

21  highly variable.  There are years I do no litigation

22  work.

23      Q.   Understood.  Do you manage any staff at

24  Integral Consulting?

25      A.   I do.



1      Q.    How many internal staff do you manage?

2      A.    The group I'm responsible for is approximately

3   60 staff, but my direct line management is five, five to

4   six staff.

5      Q.    Okay.  And what are like their general job

6   titles or responsibilities?

7            Like who are the types of people you are

8   managing?

9      A.    From, for the full group of 60 people or the

10  people that I'm directly.

11     Q.    Direct?

12     A.    Five.

13     Q.    Okay.

14     A.    Are, it's our practice directors and data

15  sciences, who would be a senior science advisor, senior

16  engineering advisor, coastal engineering, principal in

17  coastal engineering, another principal in coastal

18  sciences.  Another senior advisor in offshore sciences.

19  Principal in offshore renewable energy.  Those are the

20  key people that I manage.

21     Q.    How much of your time would you say is spent

22  managing staff?

23     A.    I would say more of my time is spent in

24  leadership activities, helping those staff get project

25  teams together, help them with pursuing projects and



1    getting projects completed, helping with review of

2    projects.  So that's what most of my -- I would say

3    duties are, which would comprise management and

4    technical work.

5         Q.   Do you also manage external professionals?

6         A.   We do have on-call personnel that work with us

7    that I do work with managing, in a loose term.

8         Q.   And which external professionals do you

9    manage?

10        A.   Daniel Orange, who is here in this office who

11   is a marine geologist who supports our offshore energy

12   and subsea-cable portfolio.

13             There is Danny Rival, who is a professor at

14   Texas Tech in environmental engineering who supports on

15   sediment sites and contaminated sites, contaminated site

16   clean-up.

17             We do have some various other on-call site

18   personnel, that haven't really been involved in

19   anything, but those are probably the two that I have the

20   most interaction with.

21        Q.   How many total external professionals do you

22   manage?

23        A.   Oh, gosh, I think in our group and, Ms. Tadio,

24   I'm being broad here, I think we have five to six

25   external technical advisors.



1      Q.   What is Sea Engineering, Inc.?

2      A.   Sea Engineering is a Honolulu-based coastal

3  engineering and construction firm that I worked for for

4  approximately 12 years.

5      Q.   What did you do while employed at Sea

6  Engineering, Inc.?

7      A.   Worked in support of coastal and environmental

8  engineering projects and was one of the leaders at our

9  Santa Cruz office.

10      Q.   Who generally were your clients at Sea

11  Engineering, Inc.?

12      A.   A mix of public and private clients.

13      Q.   Did you do any litigation work while employed

14  at Sea Engineering, Inc.?

15      A.   Some litigation work, uh-huh.

16      Q.   How much of your work was litigation-related

17  as opposed to nonlitigation-related?

18      A.   Less than 10 percent.

19      Q.   Was litigation?

20      A.   Yes.

21      Q.   Okay.  Thank you.  What is Woods Hole Group,

22  Inc.?

23      A.   It's a company that was started by a professor

24  from Woods Hole, a small consultancy in coastal and

25  environmental science that I worked for, for



1  approximately six months.

2      Q.   And what did you do while employed at Woods

3  Hole Group, Inc.?

4      A.   I was a coastal and environmental engineer.

5      Q.   And who generally were your clients at Woods

6  Hole Group, Inc.?

7      A.   At the time, with the six months that I worked

8  on one project, that was for the U.S. Navy and

9  environmental climate clean-up.

10      Q.   Okay.  And this was in 2001 and 2002; correct?

11      A.   Correct.

12      Q.   Did you do any litigation work while employed

13  at Woods Hole Group, Inc.?

14      A.   No, I did not.

15      Q.   Do you currently teach?

16      A.   I teach some short courses periodically, so,

17  but no, at no institution do I formally teach.

18      Q.   What courses have you taught?

19      A.   Sediment transport, coastal and estuary

20  sediment transport.

21      Q.   And when was the last time you taught one of

22  those classes?

23      A.   This winter.

24      Q.   And for what institution?

25      A.   That was for Battelle Memorial Institute.



1    Q.   Do you currently do any consulting outside of

2   your work for Integral Consulting, Inc.?

3    A.   I did some outside work for the San Francisco

4   Bay Conservation District as part of a member of an

5   independent science panel.

6    Q.   Any other current employment?

7    A.   No.

8    Q.   Have you done any other consulting work aside

9   from the work that we've already talked about?

10   A.   I have, I did another outside review for

11  Orange County coast keeper approximately five years ago.

12   Q.   Are you the creator of any patents?

13   A.   Yes, I am.

14   Q.   Can you tell me about your 2014 patent?

15   A.   Yes, apologies.  I'm going to consult my own

16  notes here.

17       I devised a method for measuring wave motion.

18  It was part of a project that I developed for the ARPA-E

19  program, Advanced Research Projects Agency Energy that

20  the DOE has for energy renovations.

21       One thing for wave energy is they need up-to-

22  date wave measurements, realtime wave measurements so

23  that the wave energy devices can tune themselves.

24       I developed, and with a team, developed a

25  project that won an award from the Department of Energy,



 1  developed a patent around that wave energy device.

 2          It was a low-cost method that dropped the cost

 3  of wave measurements by about an order of magnitude, and

 4  that idea has since spin off into another company.

 5      Q.   Have you ever provided professional services

 6  to a fossil fuel company?

 7      A.   Through Integral, yes.  As I had mentioned,

 8  some of the previous Shell work and Equinor and Orsted.

 9  Personally, no.

10      Q.   Thank you, Dr. Jones.  Any types of companies

11  that you would not be willing to provide your

12  professional services to?

13      A.   Any company that are -- or any client that

14  asked me to do anything that is not objective science

15  and engineering work.

16      Q.   Are there any specific companies that you

17  would not be willing to provide your professional

18  services to?

19      A.   I can't say right now.  I mean, it's on a

20  basis by basis; however, we have refused work in the

21  past.

22      Q.   To your knowledge, has Integral ever been

23  investigated by any federal, state, or local agency or

24  authority?

25      A.   No.



 1    Q.   All right.  Dr. Jones, I would like to turn to
 2  your Relevant Experience section on your resume,
 3  Appendix A, which I believe we are both looking at right
 4  now.  Are you with me?
 5    A.   Yes.  I'm just going to put on glasses so I
 6  can read the paper copy, because it will be easier than
 7  reading the computer copy.
 8    Q.   Sure.  So the first relevant experience that
 9  you list is that you were the vice-president for COPRI.
10  COPRI being Coasts, Oceans, Ports and Rivers Institute,
11  I'm wondering what years were you the vice-president?
12    A.   I'm currently the vice-president this year.
13    Q.   Okay.  And when did you begin being the vice-
14  president?
15    A.   September of last year.
16    Q.   Okay.  So 2024 to present, you would say?
17    A.   Correct.  It's a one-year appointment.
18    Q.   Okay.  And who is your client as the vice-
19  president of COPRI?
20    A.   Well, the membership of the American Society
21  of Civil Engineers.
22    Q.   Would you consider publications from COPRI
23  that are still publicly available to be credible
24  sources?
25    A.   Yes.  Credible in the context of what they are



1    produced for, yes.

2        Q.   Yep.  Next you list that you were a U.S.

3    technical advisory group member to the International

4    Electrotechnical Commission, IEC.

5             Doctor, am I reading this correctly?

6        A.   Correct.

7        Q.   What years were you in this role?

8        A.   Still currently in this role.  I began, oh,

9    gosh, six to eight years ago.

10       Q.   And who is your client for this project?

11       A.   The marine energy community that would be

12   using those standards.

13       Q.   On page 2 of your CV, and I will, just so that

14   everybody on the screen can see, hit the direct to the

15   page.  On page 2 of your CV, you list the San Mateo

16   Vulnerability Assessment and Adaptation Plan, San Mateo

17   County, California; correct?

18       A.   Correct.

19       Q.   And what years were you in that role?

20       A.   That was approximately 2019 to 2023.

21       Q.   Okay.  And who was your client?

22       A.   The County of San Mateo.

23       Q.   And what were the results of this

24   Vulnerability Assessment and Adaptation Plan?

25       A.   A report for the county that outlined their

1  vulnerability and adaptation plan for the outer coast of

2  Southern San Mateo County.

3      Q.   Next you list that you developed a guide for

4  assessing sediment transport at Navy facilities for the

5  U.S. Navy and U.S. Department of Defense; correct?

6      A.   Yes.

7      Q.   And what years were you in this role?

8      A.   2005 to 2008.

9      Q.   Okay.  Next you list that you led technical

10 investigations for the Arctic Coastal Erosion and

11 Climate Risk Assessment in Alaska; correct?

12     A.   Yes.

13     Q.   And what years were you in this role?

14     A.   That started in probably 2018 and it is still

15 ongoing with various research efforts.

16     Q.   Okay.  Next you list that you were the

17 technical lead for Integral's contribution to Coastal

18 Protect Africa, climate resilient shoreline management

19 concept in West Africa; correct?

20     A.   Correct.

21     Q.   And what years were you in that role?

22     A.   That was 2018 to 2019.

23     Q.   Okay.  You were also the technical lead for

24 the Matilija Dam removal project in Ventura, California;

25 correct?



1    A.    Yes.  The Matilija Dam.

2    Q.    Thank you.  And what years were you in that

3    role?

4    A.    That project began in 2018 and is still

5    ongoing in various aspects.

6    Q.    Okay.  Next you list that you supported the

7    development of a realtime wave assessment tool for the

8    U.S. Department of Energy; correct?

9    A.    Correct.

10    Q.    And what years were you in that role?

11    A.    That was a patent we were discussing, so that

12    began in 2013-2014 and went until 2018-2019.

13    Q.    Okay.  Next you list that you were a project

14    manager for a contaminated sediment site evaluation at

15    Berrys Creek study area in New Jersey; correct?

16    A.    Correct.

17    Q.    And what years were you in that role?

18    A.    That began in 2006 or '7 and is still ongoing,

19    unfortunately, like many of our contaminated sites in

20    the United States.

21    Q.    Sure.  Thank you.  Next you list that you were

22    a project manager for a U.S. Army Corps of Engineers for

23    the Hamilton Well and Restoration in San Pablo Bay,

24    California; correct?

25    A.    Correct.



1      Q.   And what years were you in that role?

2      A.   2010 to 2015.

3      Q.   Okay.  Next you list that you supported the

4   remedial investigation and feasibility study at Hunters

5   Point Naval Shipyard in California; correct?

6      A.   Correct.

7      Q.   What years were you in that role?

8      A.   Again, that's one of those that wind up again

9   in 2003, and I think the last work I did on it was

10  probably 2022 to 2023.

11     Q.   Okay.  Next you many list that you co-managed

12  the design and implementation of the long-term dredge

13  disposal evaluation in Santa Cruz, California; correct?

14     A.   Correct.

15     Q.   And what years were you in this role?

16     A.   The initial study was in 2008 and continued

17  with permitting evaluation through 2015-2016.

18     Q.   Okay.  Next you list that you managed the

19  Department of Defense project on Mare Island,

20  California, and conducted a ship sediment stability

21  analysis; is this correct?

22     A.   Yes.

23     Q.   And what years were you in this role?

24     A.   That commenced in 2005 and went until 2015-16

25  as well.



1  Q.  Next you list that you were a technical

2  advisor for the San Francisco Estuary Institute;

3  correct?

4  A.  Correct.

5  Q.  And what years were you in this role?

6  A.  That began in 2005-2006, and I'm still

7  actively involved with the San Francisco Estuary

8  Institute on the PCB work group, the Sediment work

9  group, the Sources/Pathways/Loadings work group, and

10 actually back on the mercury work group now.

11 Q.  Okay.  Next you list that you served as a

12 project manager for a DDT fate and transport study at

13 the United Heckathorn Superfund site in Richmond,

14 California; correct?

15 A.  Correct.

16 Q.  And what years were you in this role?

17 A.  That began in 2010 or '11, and I believe most

18 recently I did some work for the EPA in 2022 on that

19 one.

20 Q.  Next you list that you were a project manager

21 for an Alpine Lake long-term sediment transportation

22 investigation in Lago Maggiore, Italy; correct?

23 A.  Correct.

24 Q.  And what years were you in this role?

25 A.  That was 2010 through 2019.



 1      Q.   Next you list that you developed and
 2  implemented a study on Sediment and Contaminant
 3  Transport Investigation in Augusta Bay, Sicily, Italy;
 4  correct?
 5      A.   Correct.
 6      Q.   And what years were you in this role?
 7      A.   That was 2010 through 2015-16.
 8      Q.   Next you list that you managed a Remedy
 9  Effectiveness Monitoring Analysis in Anacostia River,
10  Washington, DC; is this correct?
11      A.   Correct.
12      Q.   Okay.  And what years were you in this role?
13      A.   That began in 2006-2007 and some aspects still
14  ongoing today.  I think the most recent work on it has
15  been two to three years ago.
16      Q.   Next you list that you served as a technical
17  lead for a Contaminant Sediment River Dredging in
18  Ashtabula River, Ohio; correct?
19      A.   Correct.
20      Q.   And what years were you in this role?
21      A.   That commenced in approximately 2010 to 2012,
22  and went until approximately 2020.  I believe we were
23  still working on publications on it.
24      Q.   Okay.  Next you list that you were part of an
25  Evaluation of Sediment Transport for Chalk River



```
 1   Laboratories, Atomic Energy of Canada Limited, is this
 2   correct?
 3        A.   Correct.
 4        Q.   And what years were you in this role?
 5        A.   2012 to 2015-16.
 6        Q.   Okay.  Next you list that you managed a
 7   project, Evaluation of Dredge Material Transport into
 8   Delong Mountain Terminal, Alaska; correct?
 9        A.   Correct.
10        Q.   What years were you in this role?
11        A.   That was 2018-19.
12        Q.   Okay.  Next you list that you were part of
13   Prediction of Optical Variability in Dynamic Nearshore
14   Environments in Santa Cruz, California; is this correct?
15        A.   Correct.
16        Q.   What years were you in this role?
17        A.   That was the same, I think 2012 to 2017.
18        Q.   Next you list that you managed the study to
19   develop a hydrodynamic analysis of the Lower Fox River
20   in Green Bay, Wisconsin; correct?
21        A.   Correct.
22        Q.   And what years were you in this role?
23        A.   2001 to 2016-'17.
24        Q.   Next you list that you provided technical
25   oversight for Offshore Wind Benthic Baseline Studies on
```



1  the East Coast of the USA; correct?

2      A.   Correct.

3      Q.   And what years were you in this role?

4      A.   2020 -- 2019 through 2025, January 11th.

5      Q.   Next you list that you served as a technical

6  lead on an environmental case study for Acoustic Noise

7  Modeling from an Offshore Energy Array and its impact on

8  Marine Mammals in Oregon; correct?

9      A.   Correct.

10      Q.   And what years were you in this role?

11      A.   2018 to present.

12      Q.   Okay.  And next you list that you served as

13  the principal in charge of field studies for

14  Environmental Baseline Studies in Mexico; correct?

15      A.   Correct.

16      Q.   And what years were you in that role?

17      A.   2016 through 2020.

18      Q.   Next you list that you served as a lead for

19  the development of an Assessment Framework for Deepwater

20  Pipelines in the Gulf of Mexico USA; correct?

21      A.   Correct.

22      Q.   What years were you in this role?

23      A.   2010 to 2012.

24      Q.   Next you list that you served as a technical

25  lead for Improving the Efficiency and Effectiveness For



 1  Marine Hydrokinetic Permitting; correct?

 2       A.   Correct.

 3       Q.   And what years were you in this role?

 4       A.   2015 to 2022-23.

 5       Q.   Next you list that you served as a technical

 6  lead for modeling of the effects of nearshore wave

 7  propagation of Marine and Hydrokinetic Acceleration and

 8  Deployment; correct?

 9       A.   Correct.

10       Q.   What years were you in this role?

11       A.   2015 through '23, '24.

12       Q.   Next you list that you were the co-principal

13  investigator in developing a Realtime Wave Assessment

14  Tool; correct?

15       A.   Correct.

16       Q.   And what years were you in this role?

17       A.   That is 2019 through present.

18       Q.   Okay.  Next you list that you served as a

19  program manager for Marine Renewable Energy Support for

20  Sandia National Laboratories; correct?

21       A.   Correct.

22       Q.   And what years were you in this role?

23       A.   2010 through present.

24       Q.   Why didn't you add dates to your section of

25  the CV that includes relevant experience?



 1     A.   No particular reason.  I, you know, we
 2  typically don't add dates just as a process at Integral,
 3  and our tech writers might have a specific reason for
 4  that, I don't know.
 5     Q.   Okay.  That wasn't a decision you personally
 6  made?
 7     A.   No, ma'am.
 8     Q.   So now we will move to prior testimony that
 9  you have given, and we are still looking at in your
10  appendix page 9 of your CV.
11          So how many times have you been retained as an
12  expert witness prior to this case?
13     A.   I'm going to say approximately seven or eight.
14  I say approximately, as there's been times where I was
15  retained and the case has settled even before I prepared
16  an expert report, so...
17     Q.   When was the last time that you've been
18  retained as an expert witness other than this case?
19     A.   That was -- oh, I think it is listed in my
20  expert report.  It's not on my CV.  But that was, I
21  testified in court in Los Angeles on June, I believe it
22  was June 30th, actually, is the date that sticks in my
23  head, this year.
24     Q.   Okay.  For what case?
25     A.   It was LA.



```
1            Doug is raising his hand.

2            Get off mute, maybe.

3            THE VIDEOGRAPHER:  Do you want to go off the

4   record?  Okay.  Going off the video record at 10:28 a.m.

5   Pacific time.

6            (Discussion off the record).

7            THE VIDEOGRAPHER:  We are back on video record

8   at 10:32 a.m. Pacific time.

9   BY MS. TADIO:

10       Q.   So Dr. Jones, how did you first become a

11  testifying witness?

12       A.   The work that I mentioned or that we covered

13  on the Fox River, I was asked to testify in an

14  apportionment case on the Fox River against different

15  discharges in the river.

16       Q.   What years did you first start testifying as a

17  witness in litigation?

18       A.   I believe that Fox River case was

19  approximately 2010.

20       Q.   What types of matters, generally, have you

21  been retained as an expert in?

22       A.   Just within the, generally within the fields

23  of coastal and environmental engineering and realms of

24  my expertise, which is contaminant discharges,

25  stormwater discharges, their fate in the environment and
```



 1  looking at how things move in the environment and
 2  hazards of the environment.
 3      Q.   Okay.  So aside from this case, have you ever
 4  been retained as an expert witness in a case related to
 5  fossil fuels?
 6      A.   No, not to my knowledge, not directly.  I'm
 7  not saying that fossil fuels haven't been involved in
 8  some of the cases I have been involved with, but not
 9  directly.
10      Q.   Have you ever been retained as an expert
11  witness in a case involving a coal, oil or natural gas
12  company?
13      A.   Not, no, not to my knowledge, not directly.
14      Q.   And you've testified at trial as an expert
15  witness only once; is that correct?
16      A.   No, I have testified in trial three times.
17      Q.   Three times.  In what kinds of cases were you
18  testifying in trial?
19      A.   Environmental matters, the most recent being a
20  water quality matter.
21      Q.   Okay.  Have you ever been precluded by a Court
22  as an expert witness?
23      A.   No, I have not.
24      Q.   Have any of your pro-offered opinions been
25  precluded by a court?



```
 1        A.    No.
 2        Q.    Have you heard of something called a Daubert
 3   motion?
 4        A.    I have heard of it, yes.
 5        Q.    Have you ever been subject to a Daubert
 6   motion?
 7        A.    No.
 8        Q.    Have your expert opinions ever been
 9   challenged?
10        A.    I have had rebuttals on my expert opinions and
11   been cross-examined on them, so in that sense I would
12   view that as a challenge, so, yes.
13        Q.    I want to ask you about your work as an
14   expert.
15            MS. TADIO:  Go ahead, Doug.
16            MR. HENDERSON:  I didn't do anything.
17            MS. TADIO:  Sorry.  Your little screen went up
18   in green.  I wanted to make sure you didn't try to say
19   something.
20            MR. HENDERSON:  I didn't even do that.  I was
21   breathing.  Sorry.
22   BY MS. TADIO:
23        Q.    I'm sorry, okay.  Okay.
24            So I want to ask you about your work as an
25   expert in specific cases, and I am looking at your CV,
```



1  page 9, Expert Testimony.  I have directed everyone on

2  the screen to your page.  I understand you have your

3  paper copy, if you need to look at that.  So are you

4  looking at your expert testimony, page 9, Appendix A of

5  your report?

6       A.   Yes.

7       Q.   So you identified in support of the litigation

8  report that you evaluated contaminant runoff using the

9  Revised Universal Soil Loss Equation For Contaminant

10 Runoff and Dilution at a confidential site?

11      A.   Correct.

12      Q.   Did you use the revised universal soil loss

13 equation methods of soil runoff at the New Haven

14 Terminal?

15      A.   No, I did not.

16      Q.   Could you have used those methods at the New

17 Haven Terminal?

18      A.   They could be used, but not for the requests

19 that were made of me to opine on.

20      Q.   Okay.  So you identified a case called

21 Appleton Papers, Inc. and NCR Corps versus the United

22 States, case number 10-C-910 2013 on the U.S. District

23 Court for the Eastern district of Wisconsin; correct?

24      A.   That's correct.

25      Q.   And what kind of case was this?



1    A.    That was the case that I mentioned earlier.

2    Q.    Related to the Lower Fox River?

3    A.    Correct.

4    Q.    And for which party were you retained as an

5    expert?

6    A.    I was working on behalf of NCR and Appleton

7    Papers.

8    Q.    So are those the defendants or the plaintiffs?

9    A.    You know, it's an unusual case that I don't

10    fully understand, to be honest.  There were multiple

11    parties that had discharged to the river that were, I'm

12    going to be informal here, were essentially fighting

13    amongst themselves and with the United States

14    government.  So there were many parties involved, but

15    I'm not sure -- yeah.  All those parties collectively

16    were the defendants, as I understand it.

17    Q.    Okay.  And what law firms were involved in

18    that case?

19    A.    Oh, my gosh.  I don't recall.  I would have to

20    look it up.

21    Q.    Well, more specifically, which law firm

22    retained you?

23    A.    At one point it was Sidley & Austin, but, oh,

24    the final firm was Cravath, Swaine and Moore.

25    Q.    What opinions did you provide in that case?



1      A.   I provided opinions on the apportionment of

2   different discharges to the river, different contaminant

3   discharges and specifically what happened to those

4   discharges, that they moved through the river and where

5   they end up.

6      Q.   And this case didn't settle; correct, it went

7   to trial?

8      A.   It did go to trial.

9      Q.   And you testified at trial; correct?

10      A.   Correct.

11      Q.   And were there any motions to preclude your

12   testimony in whole or in part made during that trial?

13      A.   Not to my knowledge.

14      Q.   Do you have copies of the declarations that

15   you submitted in that case?

16      A.   Possibly somewhere in my archives.  That was

17   approximately 15 years ago, but, yeah, possibly.

18      Q.   Do you have your deposition transcript from

19   that case?

20      A.   The same, possibly.  I don't, it's -- yeah, I

21   don't recall.

22      Q.   If you were able to find them, would you agree

23   to produce them?

24      A.   Yes, I believe they are all on the public

25   record.



 1              MR. HENDERSON:  Yeah, to the extent that they

 2    are not, we would object to the extent that any required

 3    the disclosure of attorney-client information or other

 4    information subject to protective orders or other

 5    confidentiality agreements.

 6              MS. TADIO:  Okay.  Yep.

 7    BY MS. TADIO:

 8         Q.   So next you identified a report that was

 9    submitted to the San Francisco Public Utilities

10    Commission on behalf of Surfrider Foundation; is that

11    correct?

12         A.   Correct.

13         Q.   And what kind of report was this?

14         A.   I believe it was classified as an affidavit.

15    And apologies where I mix up legal terminology on what

16    it might be.  But it was a review of the application for

17    the Monterey -- and I'm reading it here -- the Monterey

18    Peninsula Water Supply Project which is a desalination

19    facility that would have a discharge out into Monterey

20    Bay.

21              And it was an affidavit reviewing that

22    discharge, and the information around that, that was

23    being submitted for a permit to the San Francisco Public

24    Utilities Commission.

25         Q.   Okay.  And for which party were you retained



1    as an expert?

2         A.    It was the Surfrider Foundation.

3         Q.    Were there law firms involved in that case or

4    you were primarily just working for the foundation?

5         A.    There was a law firm representing the Surf

6    Rider, and I don't recall the name of the law firm.

7         Q.    Were you retained by the law firm or you were

8    retained by Surfrider?

9         A.    By the law firm.

10        Q.    But you don't remember which law firm it was?

11        A.    I don't.  I'd have to look at my records.

12        Q.    Sure.  Sure.  And what opinions did you

13   provide in that report?

14        A.    I provided opinions onto the potential impacts

15   of the outfall in the Monterey Bay National Marine

16   Sanctuary and monitoring recommendations around that

17   outfall so that they could monitor any potential impacts

18   of the outfall.

19        Q.    Do you have copies of that report?

20        A.    Possibly.  Once again, this was over a decade

21   ago, so I'd have to -- or about a decade ago, so I'd

22   have to go through my records to pull it up.

23        Q.    Okay.  And did you do any depositions in that

24   instance?

25        A.    There was no deposition.  I did testify to the



```
 1  Public Utilities Commission in person, though.

 2       Q.    And do you have a testimony transcript from

 3  that?

 4       A.    I never received a transcript for that.

 5       Q.    Would you agree to produce your report if you

 6  were able to find it?

 7       A.    Yes, I would.

 8       Q.    Okay.

 9             MR. HENDERSON:  Same objection.  On the

10  report.

11             MS. TADIO:  Sure.

12  BY MS. TADIO:

13       Q.    Next we are on page 10 of your CV.  You

14  identified a case called Natural Resources Defense

15  Counsel and Maine People's Alliance versus HoltraChem

16  Manufacturing Company, LLC, in 2019 U.S. District Court

17  of Maine; is that correct?

18       A.    Yes.

19       Q.    And what kind of case was that?

20       A.    It was a case involving mercury contamination

21  in the Lower Penobscot River in Maine.

22       Q.    And for which party were you retained as an

23  expert?

24       A.    The Holtra Chem Manufacturing.

25       Q.    So the defendant; is that correct?
```



```
 1        A.    Correct.
 2        Q.    And what were the law firms involved in that
 3   case?
 4        A.    I don't recall.  It's right on the tip of my
 5   tongue.  A law firm in Maine that I can find the name
 6   for, though.
 7        Q.    Okay.  And that would be the one that retained
 8   you?
 9        A.    Correct.
10        Q.    And what opinions did you provide in this
11   case?
12        A.    Opinions on the design of remedial activities
13   in the river and the feasibility of designs on the
14   remedial activities in the river.
15        Q.    And did this case settle?
16        A.    It did.
17        Q.    Okay.  Did you ever do a deposition for this
18   case?
19        A.    I did.
20        Q.    Okay.  And do you have copies of the
21   declaration that you submitted in that case?
22        A.    Very likely, yes.
23        Q.    And do you have copies of the deposition
24   transcript from that case?
25        A.    Possibly.
```



1      Q.    Would you agree to produce those?

2      A.    Yes.

3      Q.    Okay.

4            MR. HENDERSON:  Again, for the record, we will

5      lodge the same objections for any document that was

6      prepared during the prior representation of the client

7      by Dr. Jones which may involve attorney-client

8      communications or other privileged or confidential

9      information.

10     BY MS. TADIO:

11     Q.    Next, Dr. Jones you identified a case called

12     Monsanto Company versus Spirer, et al. in the Superior

13     Court of the State of California for the County of

14     St. Louis, State of Missouri.  What kind of case was

15     this?

16     A.    It was involving PCB exposure, individual PCB

17     exposure in the environment.

18     Q.    And which party retained you as an expert?

19     A.    I was retained by Monsanto.

20     Q.    Were they the plaintiff or the defendant in

21     this lawsuit?

22     A.    Defendant.

23     Q.    Okay.  And what were the law firms involved in

24     that case?

25     A.    Yeah, I apologize.  You are testing my memory



 1  here.  I will have to consult.  I don't recall.

 2      Q.   Sure.  Do you recall which law firm retained

 3  you personally?

 4      A.   No, I don't.  I would have to look at my

 5  records.

 6      Q.   Okay.  Are those records readily available

 7  that you could look right now or is it something that it

 8  would take quite a while?

 9      A.   It would take some time, yeah.

10      Q.   Oh, okay.  What opinions did you provide in

11  that case?

12      A.   Opinions on global production of PCB use and

13  global environmental fate of PCB use in the environment.

14      Q.   Did this case settle?

15      A.   I believe so.  And I believe that's yes.

16      Q.   So it did not go to trial; correct?

17      A.   That one did not, no.

18      Q.   Do you have copies of the declaration that you

19  submitted in that case?

20      A.   Possibly.

21      Q.   Okay.  Did you provide a deposition for that

22  case?

23      A.   I did.

24      Q.   And do you have copies of your deposition

25  transcript from that case?



```
 1        A.    Possibly.
 2        Q.    Okay.  And would you agree to produce those?
 3        A.    Yes.
 4        Q.    Next you identified a case called Monsanto
 5   Company versus Steele, et al. in 2016, in the Superior
 6   Court of the State of California for the County of Los
 7   Angeles.  Is this correct?
 8        A.    Correct.
 9        Q.    And what kind of case was this?
10        A.    The same as the previous one.
11        Q.    Okay.  And for which party were you retained
12   as an expert?
13        A.    Monsanto.
14        Q.    And Monsanto was the defendant; correct?
15        A.    Correct.
16        Q.    And which law firms were involved in that
17   case?
18        A.    Same.  And it was the same law firm for the
19   previous case and this one and the next one, and I don't
20   recall.  If it comes to me, I'll let you know those.
21        Q.    Okay.  What opinions did you provide in that
22   case?
23        A.    Same opinions on global PCB production and
24   fate in transport.
25        Q.    Can you tell me a little more about that?
```



1    A.   Looking at global production of PCBs over the

2   time of PCB production.  How PCBs got into the

3   environment.  And then with Monsanto Clean Water Act how

4   that changed exposure to PCBs over time, or potential

5   exposure to PCBs over time.

6    Q.   And what did you find about potential exposure

7   to PCBs over time?

8    A.   PCBs were -- the peak of production was in the

9   late '60s, early '70s.  That's when they were primarily

10  released into the environment.

11       The Clean Water Act did a great job of

12  reducing the reducing the release of all contaminants

13  into the waters of the U.S.; however, people are still

14  exposed to PCBs in a broad range of contaminants and

15  it's been has been reducing substantially over time due

16  to environmental regulation.

17    Q.   And that's --

18    A.   Sorry.

19    Q.   Go on.

20    A.   Primary exposure route to dioxins and PCB-like

21  contaminants are primarily through food and seafood at

22  that.

23    Q.   Did this case settle?

24    A.   Yes, I believe so.

25    Q.   Okay.  And do you have copies of the



1  declarations you submitted in that case?

2     A.   I do.  After your last question I did not

3  submit expert reports on these cases.  So there are no

4  formal expert reports, there was just depositions.

5     Q.   Okay.  And do you have your deposition

6  transcript from that case?

7     A.   Possibly.

8     Q.   Okay.  Was there any motion to preclude any of

9  your testimony?

10     A.   No.

11     Q.   Okay.  Would you agree to produce your

12  deposition transcript in that case?

13        MR. HENDERSON:  Objection for all the same

14  objections as I lodged on making requests for documents

15  which may include attorney-client communications or work

16  product or be subject to any confidentiality or

17  protective orders.

18        THE WITNESS:  Yes, to the extent that they are

19  all possible.

20  BY MS. TADIO:

21     Q.   Okay.  Next you identified a case called

22  Monsanto Company versus Walker, et al. in 2016, in the

23  22nd Judicial Court for the District of St. Louis; is

24  this correct?

25     A.   Yes.



1      Q.    And what kind of case was this?

2      A.    The case was the same as the previous three.

3      Q.    Okay.  And for this --

4      A.    To same law firm.

5      Q.    Sure.  You were retained by the defendant in

6    this case as well; correct?

7      A.    Correct.

8      Q.    Okay.  And do you recall the law firm that

9    retained you for this case?

10      A.    Not yet.

11      Q.    Okay.  And what opinions did you provide in

12    this case?

13      A.    The same as the previous opinions.

14      Q.    Okay.  And did this case settle or go to

15    trial?

16      A.    This one went fully to court, so I did testify

17    at trial in St. Louis, looks like May of 2016.  So that

18    was the original.  I was deposed for the next two.  And

19    I believe there was a settlement for all of them.

20            I don't have any details after that.

21            (Reporter asked for clarification)

22            MR. HENDERSON:  No, I said nothing, thank you.

23    BY MS. TADIO:

24      Q.    Were there any motions to preclude your

25    testimony in whole or in part made?

```
 1       A.   No, not to my knowledge.

 2       Q.   And do you have copies of the declarations

 3  that you submitted in that case?

 4       A.   Possibly.

 5       Q.   How about your deposition transcript from that

 6  case?

 7       A.   Possibly.

 8       Q.   Would you agree to produce those?

 9       A.   Yes, to the extent they are public.

10       Q.   What other cases have you testified in at any

11  time, either at trial or deposition?

12       A.   The most recent one, if we go to the beginning

13  of my expert report, page 2 of the expert report, and

14  that is the same in both versions of my expert report.

15       Q.   So that's the sum total on page 2, your prior

16  testimony in the past four years?

17       A.   Yes.  That's the only one in the past four

18  years.

19       Q.   People of the State of California, that one?

20       A.   Correct.

21       Q.   Okay.  And what kind of case was that?

22       A.   Essentially a water quality case.

23       Q.   Okay.  And which jurisdiction?  This was in

24  the County of Los Angeles, the Superior Court of

25  California; correct?
```



```
 1        A.    Correct.
 2        Q.    Okay.  And for which party were you retained
 3   as an expert?
 4        A.    Prologis.
 5        Q.    Okay.  Is that the plaintiff or defendant?
 6        A.    Defendant.
 7        Q.    And which law firm retained you in this case?
 8        A.    Oh, my gosh.  And I should know this because
 9   it was just a few months ago.  I can find that one out
10   fairly quickly for you.
11        Q.    Okay.  If you want to take a minute, since
12   this was recent, it would be great to know that
13   information.
14        A.    Yes, give me one moment.
15              Apologies.  Almost there.
16              I just had to open an e-mail.
17        Q.    Take your time.  Take your time.
18        A.    Paul Hastings.
19        Q.    And what opinions did you provide in this
20   case?
21        A.    Provided opinions on the causes of hydrogen
22   sulfide release in the Dominguez Channel in Los Angeles.
23        Q.    And this case went to trial?
24        A.    It did.
25        Q.    Okay.  And did you testify at trial?
```



```
 1        A.    I did.
 2        Q.    And were there any motions to preclude your
 3   testimony in whole or in part?
 4        A.    No.
 5        Q.    And do you have copies of your deposition
 6   testimony from that case?
 7        A.    Very likely.
 8        Q.    Okay.  Would you agree to produce those?
 9        A.    Yes, I believe they are public.
10              MR. HENDERSON:  And same objection.
11   BY MS. TADIO:
12        Q.    Yes.  Okay.  Do you keep track of all the
13   cases you have provided testimony in, even further back
14   than four years?
15        A.    Yes, generally.  I mean, I qualify that simply
16   in the sense that there have been cases that I have
17   worked on that I have been in the midst of expert
18   reports and there has been a stop work to stop, or
19   worked on an expert report that settled at that point
20   before depositions are made.
21              But I believe with this case and the other
22   ones that we walked through, those are the depositions I
23   have given directly, and testimony I have given directly
24   in court.
25        Q.    Okay.  You understand that you are required in
```



 1  federal court to provide a list of testimony going back

 2  four years; right?

 3      A.    Correct.  This is correct for the past four

 4  years, yes.

 5      Q.    Okay.  Excellent.  So -- so am I correct that

 6  this is the complete list of all of your expert

 7  testimony from the last four years is contained within

 8  your report?

 9      A.    Yes.

10      Q.    How many cases have you ever provided a

11  written expert report in, but did not testify either at

12  trial or in a deposition?

13          MR. HENDERSON: We are going to make the same

14  objection, Dr. Jones.  To the extent it requires you to

15  discuss attorney-client information or attorney-client

16  communications, work product, or covered by

17  confidentiality agreement or protective order, we

18  instruct you not to answer.

19          THE WITNESS:  Yes, Ms. Tadio, I'm going to

20  say, just so I don't get myself in trouble, I can't

21  divulge without knowing the confidentiality details of

22  all of those cases.

23  BY MS. TADIO:

24      Q.    Okay.  So I just asked for a number, like a

25  ballpark, how many cases have you provided a written



 1  expert report in?

 2          MR. HENDERSON:  Again, I would -- I would

 3  believe that it is covered by attorney-client privileged

 4  communication or work product, and to the extent that it

 5  is not public, I would instruct you not to answer how

 6  many cases you've been involved where you've identified

 7  attorney-client communication or work product or had to

 8  develop some materials, subject to a protective order or

 9  a confidentiality agreement.

10          THE WITNESS:  Yeah, Ms. Tadio, as you can

11  understand, I don't want to get myself in any kind of

12  trouble on the record here, yeah, so I can't without

13  reviewing.

14  BY MS. TADIO:

15      Q.   Okay.  Can you tell me every case you remember

16  submitting an expert report in, but did not testify at

17  trial or deposition?

18          MR. HENDERSON:  Same objection for those.

19  BY MS. TADIO:

20      Q.   Okay.  Do you keep a list of all the cases

21  that you issued a report in, even if you didn't testify

22  in the case?

23      A.   I do have a record of all the reports I have

24  produced, yes.

25      Q.   Would you be able to produce a copy of that to



1  us?

2       A.    To the extent that it doesn't involve any

3  client confidentiality, yeah.

4       Q.    And have you ever testified before a grand

5  jury?

6       A.    No, not to my knowledge.

7       Q.    And have you ever faced any disciplinary

8  hearings in your professional capacity?

9       A.    No.

10      Q.    Do you advertise that for a price you are

11 available to testify as an expert witness?

12      A.    No.

13      Q.    Does Integral advertise that you and others at

14 the firm are available as experts for a price?

15      A.    As a consulting firm, offered to retain us for

16 our expertise, I don't -- I don't know that we advertise

17 for a price, no.

18      Q.    How do you promote your expert witness

19 services?

20      A.    We generally don't promote them.  We have law

21 firms approach us, based on our project expertise.  Many

22 of our practitioners are subject matter experts in their

23 areas and they are approached by law firms to provide

24 expertise on various cases.

25      Q.    Okay.  So, thank you.



1          Now we'll move from testimony and prior

2    testimony to publications.  So this starts on page 10 of

3    your report, excuse me, page 10 of the Appendix of your

4    report, most of it is more on page 11.  Page 10,

5    technically the first publication.  So are you with me

6    in your report looking at publications?

7          A.    Yes, I am.

8          Q.    Okay.  In your 25 years of experience since

9    you earned your Ph.D., it appears you completed several

10   publications; is that correct?

11         A.    Correct.

12         Q.    And you have listed approximately 51

13   publications here; is that correct?

14         A.    Correct.

15         Q.    And it appears that there are over 15

16   publications on tides and waves; is that correct?

17         A.    Approximately, I mean, I'm going to assume

18   that your math is correct.

19         Q.    So you would consider yourself an expert on

20   waves and tides; correct?

21         A.    Correct.

22         Q.    And it appears that there are over 13

23   publications on sediments; correct?

24         A.    Correct.

25         Q.    So you would consider yourself an expert on



1  sediments; correct?

2      A.   Correct.

3      Q.   Okay.  And I also saw that you completed

4  around ten publications on marine energy; is that

5  correct?

6      A.   Correct.

7      Q.   And so you probably consider yourself an

8  expert on marine energy also, then; is that correct?

9      A.   Correct.

10     Q.   Now, I only see one publication specifically

11 related to climate change; is this correct?

12     A.   Correct.  Although climate change, assessing

13 climates is inherently a factor, as I mention, in the

14 waves and tides and all of those publications, including

15 a lot of marine publications specifically are related to

16 environmental assessment and environmental permitting.

17     Q.   So the publication that I did see that you

18 listed was titled "Sea level rise and climate change

19 hazards:  An integrated and multidisciplinary NBS

20 approach to the hydrologic impacts of erosion and land

21 degradation"; is that correct?

22     A.   Correct.

23     Q.   And what was the subject matter of that

24 publication?

25     A.   Looking at climate change effects on changes in



1  water sheds and receiving waters.

2      Q.    Why did you decide to write about this subject

3  matter?

4      A.    I completed a project on looking at changes of

5  watershed loadings into receiving waters and how that

6  can change future projections of in particular

7  sedimentation, but also hydrodynamics.

8      Q.    So what was your conclusion in the paper?

9      A.    Overall that we can -- we do have the tools to

10 assess that and that overall climate change can help --

11 in this particular system -- can help enhance

12 sedimentation in the receiving waters.

13     Q.    So I noticed there are eight authors on this

14 publication.  What was specifically your part of the

15 report?

16     A.    Can you remind me which one you are referring

17 to?  Because there are two key ones I'm thinking of that

18 have to do with climate change.

19     Q.    Yeah.  "Sea Level Rise and Climate Change

20 Hazards:  An Integrated and Multidisciplinary NBS

21 Approach to the Hydrologic Impacts of Erosion and Lands

22 Degradation."

23          The description is --

24     A.    Yeah.

25     Q.    -- about like soil erosion, sediment loss and



1  attachment degradation.

2     A.   Yes.  Okay.  Yes.  Apologies.  There is

3  another project I was thinking of that was very similar

4  in content, so...

5     Q.   So there are eight authors on this paper, so

6  which was your part?

7     A.   I apologize.  Can you repeat the question?

8     Q.   Yeah.  There are eight authors on the paper

9  the publication that is titled "Sea Level Rise and

10  Climate Change Hazard:  an Integrated and

11  Multidisciplinary NBS Approach to the Hydrologic Impacts

12  of Erosion and Land Degradation."

13        So which part of this paper did you

14  specifically write?

15     A.   The parts regarding sediment -- transport

16  sediment loadings and responses in the land form

17  essentially to the hydrology.

18     Q.   So your focus was on sediments because you are

19  the sediment expert?

20     A.   Correct.

21     Q.   So for over 25 years you've written over 50

22  publications, and the majority of them are on the

23  sediments and marine energy; correct?

24     A.   They cover a wide range of topics, so I don't

25  know if I would bucket them that -- that narrowly,



 1  but...

 2      Q.   Okay.  So for over 25 years you've written

 3  over 50 publications, but only one paper is on climate

 4  change; is that correct?

 5           MR. HENDERSON:  Object to the form of the

 6  question and foundation.

 7           THE WITNESS:  So, as I mentioned, all of the

 8  ones dealing with ocean sciences have climate

 9  incorporated into them and very much look at climate and

10  climate projections.  You are correct in that there is

11  only one with climate change in the title.

12  BY MS. TADIO:

13      Q.   But specifically referring to climate change,

14  global warming, you've only been part of one paper

15  focused on climate change?

16           MR. HENDERSON:  Object to the form of that

17  question.

18           THE WITNESS:  Yes.  There is only one paper

19  with climate change in the title.

20  BY MS. TADIO:

21      Q.   Okay.  Other than the one paper where you were

22  one of eight authors, when else have you written about

23  climate change?

24      A.   There have been multiple projects that I have

25  dealt with over my career that assess climate change as



 1  part of the effects on the systems that we are looking

 2  at.

 3      Q.   In the last 25 years, have you done any

 4  publications on stormwater management?

 5           MR. HENDERSON:  Objection to the form of the

 6  question.

 7           THE WITNESS:  I apologize, Doug, I don't think

 8  we heard you.  I was talking over you.

 9           MR. HENDERSON:  I was saying I'm objecting to

10  the form of the question that she asked.

11           MS. TADIO:  I will reword.  I will reword.

12  BY MS. TADIO:

13      Q.   Have you ever authored any publications on

14  stormwater management?

15           MR. HENDERSON:  Object to the form of the

16  question.

17           THE WITNESS:  So stormwater is an integral

18  part of many of the publications that I have written on

19  sediment transport and sediment behavior.

20           So those specific titles and focus of the

21  paper was not on stormwater management, but it was an

22  integral component in much of the work that I have done

23  for the last 25 years.

24  BY MS. TADIO:

25      Q.   Please tell me when you have done stormwater



 1  monitoring.

 2          MR. HENDERSON:  Could you repeat the question?

 3          I didn't hear that one, Ms. Tadio.

 4  BY MS. TADIO:

 5      Q.   Please tell me when you have completed any

 6  stormwater monitoring.

 7      A.   We, in the last month we've been wrapping up a

 8  project that we are monitoring a dry season as part of a

 9  stormwater monitoring project ongoing now in San

10  Francisco Bay.

11      Q.   Can you please show me where in your CV you've

12  completed stormwater monitoring?

13      A.   It's part of the San Francisco Estuary

14  Institute work.

15      Q.   Anything else?

16          Any other time?

17      A.   Yes.  The -- one of the groups I manage is

18  responsible for stormwater compliance for many entities,

19  both MS4 compliant and NDS compliant.  So I do manage

20  groups that are regularly doing stormwater compliance

21  work.

22          MR. HENDERSON:  Can we take a ten-minute break

23  here?

24          MS. TADIO:  I have one more question on this

25  and then, yeah, that would be great before I move to the



 1   next section, if that's okay, Counsel?

 2           MR. HENDERSON:  Sure.

 3           MS. TADIO:  Sure.  Okay.

 4   BY MS. TADIO:

 5       Q.    And my final question until we take a break,

 6   again, please, can you show me where in your CV it

 7   references you've completed stormwater monitoring?

 8       A.    I mean, I could go back to the Berry's Creek

 9   project we did stormwater monitoring, designed and

10   implemented a stormwater monitoring program as part of

11   that project.

12           Lower Passaic River, we implemented,

13   recommended, melt implemented stormwater monitoring

14   programs.

15           The Fox River, Hunter's Point Naval Shipyard,

16   the Mare Island Shipyard, and essentially every

17   contaminated site I have worked on, an integral part of

18   Superfund contaminated sediment management is

19   understanding loadings to the system which are

20   stormwater.

21           So that involves looking up all the NPDES

22   permits in the area, the MS4 permits in the area,

23   evaluating those permitted discharges and then providing

24   additional monitoring of those discharges where they can

25   provide additional contaminants to the system.



1              And then beyond that there's, yeah, multiple

2     sites.  It's an integral part of what I do with sediment

3     transport and monitoring those systems.

4              MS. TADIO: Okay.  Thank you very much.  How

5     long would you like to break for?

6              MR. HENDERSON: Just ten minutes, about that.

7              MS. TADIO:  Okay.

8              THE VIDEOGRAPHER:  Going off the record at

9     11:11 a.m. Pacific time.

10              (Recess)

11              THE VIDEOGRAPHER:  We are back on video record

12    at 11:24 a.m. Pacific time.

13    BY MS. TADIO:

14        Q.   Dr. Jones, I would like to turn to page 15 of

15    Appendix A, that begins the Presentations and Posters.

16    I will direct you to the screen electronically, but I

17    will wait until you get to your paper copy.

18        A.   I'm there.

19        Q.   Okay.  Can you please now actually turn to

20    page 16, the next page and on page 16.  Are we there?

21        A.   Correct, yes.

22        Q.   Perfect.  Thank you.  You mentioned a

23    presentation in 2018 titled, "Evaluation of climate

24    change effects on natural recovery in an alpine lake."

25              Do you see that?



1      A.    Yes, I do.

2      Q.    And what was the subject matter of this

3  presentation?

4      A.    That was looking up recovery of contaminated

5  sediment, particularly by DDT at Lago Maggiore, Italy, a

6  site that we reviewed earlier, looking at projected

7  climate changes in this lake and watershed effects on

8  sediment delivery to that lake and how that may change

9  patterns of sediment and circulation over time due to

10 climate change.

11     Q.    Okay.  And why did you decide to present on

12 that subject matter?

13     A.    Because it was interesting.

14     Q.    And what was your conclusion?

15     A.    The conclusion was that climate change and

16 increased, potentially increased rainfall and snow melt

17 in the Alps could increase sediment delivery and

18 sedimentation to the lake, and one consequence of that

19 would be faster recovery of contaminants in the lake.

20     Q.    Did you use a PowerPoint or other

21 demonstratives during your presentation?

22     A.    Yes.  Actually, I believe my co-author in

23 that, Kerry Scheu, actually did the presentation.

24     Q.    Do you still have a copy of that presentation?

25     A.    Very likely it's in the record somewhere with



```
 1   that conference, or just in our company records.  I

 2   think we typically keep past presentations.

 3        Q.   Would you be opposed to providing a copy of

 4   it?

 5        A.   No.

 6        Q.   Okay.  Was your presentation recorded?

 7        A.   No.

 8        Q.   Who had invited you to be a presenter?

 9        A.   The conference chair of that group, which was

10   at the Battelle Conference on Remediation of Management

11   of Sediment.  And I'm forgetting who the conference

12   chair was.  But a colleague of ours in the field had

13   invited us to give the presentation.

14        Q.   And why do you think you were asked to

15   present?

16        A.   Our team is considered experts in sediment

17   contaminant transport processes or remediation of

18   sediment and looking at future projections of those

19   processes.

20        Q.   And you were paid for giving a presentation?

21        A.   No.

22        Q.   No?  Okay.  You did this presentation for free

23   of charge?

24        A.   Yes.  All of the presentations listed in this

25   section in our resume are done free of charge.
```



1    Q.    Okay.  And who attended the SETAC North
2  America 39th annual meeting in Sacramento, California?
3    A.    SETAC, Society For Environmental Toxicology
4  And Chemistry.  That's generally practitioners in the
5  field, everything from academics to professional experts
6  in the field of society or that are members of the
7  Society of Environmental Toxicology and Chemistry.
8    Q.    So were there lawyers there?
9    A.    Possibly.  I don't want to say no.  I don't --
10  it's not a law conference.  But I think sometimes
11  environmental attorneys with interest in those topics do
12  attend.
13    Q.    And can you tell me any of the other speakers
14  that you remember?
15    A.    No, but we could look it up.  I'm generally
16  familiar with most of the experts in the field.
17    Q.    And just generally from your recollection what
18  organizations were they from?
19    A.    Everything from academic organizations to
20  government institutions, I mean, high participation from
21  EPA, Army Corps of Engineers and professional experts
22  like myself, or professional consultants, yes.
23    Q.    Were there any representatives from the fossil
24  fuel industry that spoke?
25    A.    At which particular conference?



1    Q.    At the SETAC North America 39th Annual Meeting

2    in Sacramento, California where you gave this

3    presentation?

4    A.    Yes.  I would anticipate so, because I think

5    many people would have, the oil and gas industry have

6    remedial sites that they are cleaning up and probably

7    have an interest in the topic.  But, again, like

8    attorneys, I don't know specifically.

9    Q.    Okay.  So you are not sure which fossil fuel

10   companies they were from?

11   A.    No.

12   Q.    Okay.  Also on page 16 of your expert report

13   you mention a presentation in 2019 in New Orleans

14   titled, "Evaluating climate change effects on natural

15   recovery of a contaminated sediment site."

16         Do you remember this?

17         Is this correct?

18   A.    Yes.

19   Q.    And what was the subject matter of this

20   presentation?

21   A.    Similar to the last one we were discussing.

22   It was a more detailed treatment of what happens, what

23   the ultimate effect is on the contamination of the

24   sediment bed.

25   Q.    And why did you decide to present on that



1  subject matter?

2      A.    Because we felt it would be interesting to the

3  community.

4      Q.    And what was your conclusion?

5      A.    The same as the first one in that climate

6  change, one of the consequences of climate change is

7  increased sediment delivery to the sediment bed of clean

8  sediment, which actually helps the sediment bed recover

9  faster from the contamination present in the sediment

10  bed.

11      Q.    Did you use a PowerPoint or other

12  demonstratives during your presentation?

13      A.    Yes.

14      Q.    And do you still have that?

15      A.    It probably is in our records, yes.

16      Q.    Would you be opposed to providing us a copy?

17      A.    No.  Apologies, Ms. Tadio, I do have to

18  caveat, some of these conferences require signatures

19  that we, you know, I'm more than happy to, as far as I'm

20  concerned, they are public.  But we just have to -- I'll

21  have to double check because some conferences are very

22  strict about distributing materials presented.

23      Q.    Understood.

24      A.    I don't think we would be in violation of any

25  copyright laws, though.



```
 1        Q.    Understood.  Thank you, Dr. Jones.
 2              And was your presentation recorded?
 3        A.    Not to my knowledge.
 4        Q.    And who had invited you to be a presenter?
 5        A.    I believe we submitted to that one and had a
 6   colleague that was chairing a session on hydrodynamics
 7   and sediment transports.
 8        Q.    And you were not paid for giving this
 9   presentation?
10        A.    No.
11        Q.    Okay.  And can you tell me any of the other
12   speakers that you remember?
13        A.    Any of the -- it would be the same answer as
14   to the SETAC conference.  I don't recall.  However, I
15   think it is a fairly small community.  I can look at the
16   list and we could share that with you if we can find it.
17        Q.    Okay.  Do you remember any of the
18   organizations that were there?
19        A.    Generally the same as SETAC.  Everyone from
20   public agencies, private companies, academics, and to
21   some extent possibly some attorneys.  As far as the oil
22   and gas, fossil fuel industry, I don't know.
23        Q.    Were there any lawyers there?
24        A.    Yes, there were lawyers at that one.
25        Q.    Okay.  And were there any representatives from
```



1  the fossil fuel industry at this conference?

2      A.    Possibly, but to my knowledge I don't know

3  anyone specifically.

4      Q.    Okay.  So back to your expert CV, on page 1 of

5  your CV.

6          On page 1 of Appendix A you state that your

7  "experience spans riverine, estuarine, and coastal

8  environments with specialization in hydrodynamics, wave

9  action, sediment transport and containment fate."

10          Did I read that correctly?

11      A.    I believe you missed lacustrine, and it's

12  contaminant fate.  Yeah.

13      Q.    Oh, sorry, contaminant fate.  Okay.

14          So you are not a tank expert; correct?

15          MR. HENDERSON:  Object to the form of the

16  question, foundation.

17          THE WITNESS:  I'm a coastal and environmental

18  engineer that has evaluated structures like tanks as

19  part of my work, and in this case I'm providing opinions

20  on loadings on tanks.

21  BY MS. TADIO:

22      Q.    You don't have any experience in above-ground

23  storage tanks; correct?

24          MR. HENDERSON:  Same objection.

25          THE WITNESS:  I do have experience in coastal



1  and environmental engineering and evaluating coastal

2  structures such as above-ground storage tanks.

3  BY MS. TADIO:

4      Q.   You are not a climate scientist; correct?

5           MR. HENDERSON:  Object to the form of the

6  question.

7           THE WITNESS:  I do study the climate as part

8  of all of my work, as we've covered over the past 25

9  years, which includes waves, tides, sea level, and

10 winds, storms.

11 BY MS. TADIO:

12     Q.   You are not a meteorologist; correct?

13     A.   Meteorology is an inherent part of the work I

14 do and the training that I have had, including classes

15 in meteorology and oceanography.

16     Q.   You are not a geologist; correct?

17     A.   Again, sediment is part of geology, and the

18 geophysical work that I do is an inherent part of much

19 of the work that I do, so geology is an inherent part of

20 my work for the past 25 years.

21     Q.   And you are not a stormwater expert; correct?

22          MR. HENDERSON:  Object to the form of the

23 question.

24          THE WITNESS:  Stormwater, again, is an

25 inherent part of the majority, many of the projects that



1  I worked on over my career evaluating stormwater,

2  stormwater permits and monitoring stormwater.

3  BY MS. TADIO:

4      Q.   Can you please show me where in your CV you

5  use the word "stormwater"?

6      A.   I can't probably speak to a specific incident

7  in my CV, but I can assure you that all of the

8  projects -- many of the projects on here, we can walk

9  through the ones listed, as well as a broader sense,

10  have significant stormwater components.

11      Q.   You have not prepared a Stormwater management

12  Pollution Prevention Plan, or SWPPP; is this correct?

13      A.   I have reviewed numerous  SWPPPs for sites and

14  have provided background information that has gone into

15  SWPPPs.

16      Q.   But you personally have not prepared a SWPPP;

17  is that correct?

18          MR. HENDERSON:  Object to the form of the

19  question.

20          THE WITNESS:  I have prepared components of

21  work that goes into a SWPPP.

22  BY MS. TADIO:

23      Q.   Which components?

24      A.   Components around monitoring requirements that

25  go into a SWPPP, locations of monitoring, frequency of



1  monitoring so that they are in compliance with local

2  permitting requirements.

3       Q.    You are not a flood expert, correct?

4            MR. HENDERSON:  Object to the form of the

5  question.

6            THE WITNESS:  Flooding per the coastal work

7  that I have done, flooding is an inherent part of that

8  work, so I have evaluated flooding at multiple sites

9  throughout my career.

10 BY MS. TADIO:

11      Q.    You've never operated a bulk petroleum

12 terminal; correct?

13            MR. HENDERSON: Object to the form of the

14 question.

15            THE WITNESS:  I'm sorry, could you repeat the

16 question?  I didn't catch the first part of it.

17 BY MS. TADIO:

18      Q.    Sure.  Sure.  You've never operated a bulk

19 petroleum terminal; correct?

20      A.    No.  I have evaluated the operation plans of

21 bulk petroleum terminals, but...

22      Q.    And you are not a toxicologist; correct?

23            MR. HENDERSON:  Object to the form of the

24 question.

25            THE WITNESS:  For the evaluation of many of my



1  projects I've provided exposure data for contaminant

2  fate and transport that goes into toxicological

3  assessments.

4  BY MS. TADIO:

5      Q.    Okay.  So now we will turn to your expert

6  report with the amended report that was submitted today

7  and if we -- I'm bringing that back up.  This was

8  stamped as Exhibit 6.

9          So is everyone on the same page?  I have just

10  directed everyone to the page on the screen, and you

11  have your copy of your newest report in front of you,

12  Dr. Jones.  Is this what we are looking on the screen, a

13  copy of your report, your updated report on this case?

14      A.    I'm sorry, I need to zoom in.  For some

15  reason, it is showing up tiny on my screen, which is

16  another reason I have a paper copy.  Yes, and I realize

17  the updated report still has a June -- okay, we did a

18  revised -- okay, apologies.  My cover page is incorrect

19  on this one, but, yes, this is the correct version.

20      Q.    And is this your signature on the cover page?

21      A.    Yes, it is.

22      Q.    Is this report a complete statement of all the

23  opinions that you intend to express in this case?

24          MR. HENDERSON:  Object to the form of the

25  question.



1          THE WITNESS:  As I mentioned earlier, these
2    are the opinions I'm providing now.
3          As new information becomes evolved or other
4    questions arise, I reserve the right to change or offer
5    new opinions.
6    BY MS. TADIO:
7     Q.    Sitting here today, are there any changes or
8    supplementations that you intend to make to this report?
9     A.    Not to my knowledge, based on the knowledge
10   that I have onhand.
11    Q.    Any mistake made in this report is your
12   mistake; correct?
13    A.    Correct.  As far as typos, grammatical errors,
14   et cetera, but yes, any mistake, yes.
15    Q.    Do you take full responsibility for any
16   mistakes contained in this report?
17    A.    I do.
18    Q.    Okay.  Can you please explain to me any
19   changes that you made to the report from the original
20   that you submitted to the one provided today?
21    A.    Yes.  If we could go to page 74 of the report,
22   I'm not sure which page it is of the pdf.
23          (Plaintiff's Exhibit 5 marked for
24           identification)
25   BY MS. TADIO:



 1      Q.    Yes.   I'm going there now, and I'll direct
 2   everyone to that.   So 74, the Failure Mechanism
 3   Modeling, direct to the page so we are all looking at
 4   the same page.
 5      A.    Correct.
 6      Q.    And so you can you please explain to me the
 7   changes that you made to this report?
 8      A.    Yes.   In these equations, if we look at the
 9   first one as an example, LSE flotation equals F sub B
10   minus WT plus WL over FS.   That FS is a factor of
11   safety.
12          And my own fumbling with Microsoft Equation
13   Editor, I have FS incorrectly dividing under everything.
14          So the change is that only the WT plus WL is
15   now divided by the factor of safety, which is the
16   correct form of the equation.
17          And all of the equations have the same typo in
18   it because I was doing copying and pasting.   Anyway, no
19   excuses, I just made a mistake in those equations.
20      Q.    Okay.   And the only changes you made are on
21   pages 74 and 75; correct?
22      A.    Correct.
23      Q.    Did you draft this report yourself or did you
24   have any assistance?
25      A.    I drafted it myself.



 1      Q.    Okay.  Were you asked to make any assumptions
 2  in rendering your opinions?
 3      A.    No, not to my knowledge and understanding of
 4  what you mean by that question.
 5      Q.    So Exhibit A to your report contains a section
 6  called "Materials Considered."
 7            Am I correct that between this and your
 8  supplemental materials considered, and then the two
 9  additional amended reports and the amended pages and the
10  amended materials, that that would be a complete list of
11  the materials that you considered in rendering your
12  opinions in this case?
13      A.    Yes.  And I believe by my answer earlier, the
14  primary material, secondary materials being I'm going to
15  generally wave my hands at the library behind me, but
16  just like all the general knowledge for the past 25
17  years are not explicitly carried.
18      Q.    Are there any corrections or supplementations
19  that you need to make to those lists?
20      A.    No.  I did find out that there was a new
21  abbreviated list considered.  The original list had, I
22  think, over a thousand documents in it, some of which I
23  didn't review.  So to be more accurate, that was
24  whittled down to approximately 200 something documents.
25      Q.    Is it fair to say that if something is not set



1    forth on this list of materials or cited in the

2    footnotes of your report that you did not consider it?

3        A.    To the best of my knowledge, yes.  I'm not --

4    I don't want a blanket statement that there was

5    something I saw that might have informed something, but

6    again, that is my primary reliance.

7        Q.    Did you select the materials considered

8    yourself?

9        A.    To the large extent a lot of them were

10   requested documents by myself.  Some were documents

11   provided by the attorneys that they knew that I should

12   be considering.  I think the list of a thousand or

13   larger documents, I know there is some inspection

14   documents in there that I didn't look at that helped

15   inform my opinion, but, again, I didn't cite those

16   documents explicitly.

17       Q.    Were any of these documents provided by

18   defendant's lawyers?

19       A.    Yes.

20       Q.    Which ones?

21       A.    Some of the internal facility documents that

22   I, of course, didn't have access to publicly, tank

23   inspection documents, other internal documentation I

24   know that was produced as part of CLF expert reports.

25   Documentation that I believe CLF had requested from the



1 defendants, so I think there were a broad range of

2 documents that are in that larger list that I was

3 provided.

4      Q.   So there are millions of pages of documents in

5 this case.  How do we know which ones to use?

6      A.   Generally by, I was asked to evaluate coastal

7 hazards at the site and how that factored in

8 particularly with multi-sector general permit.

9           So I filtered initially the documentation and

10 data related to coastal hazards at the site and the

11 configuration of the site, information about specifics

12 of the site to evaluate those coastal hazards and their

13 effects on the tanks, as well as permitting

14 documentation.

15           So by those questions I was asked and rendered

16 opinions on, those were the documentation, the general

17 content I focused on.  So as I went through documents,

18 you know, read summaries and titles of many of these

19 documents to assess whether they were relevant in having

20 important data to helping me formulate my analysis and

21 eventual opinions.

22      Q.   Are there any documents that you requested

23 from the defendants' lawyers you did not receive?

24      A.   No.

25      Q.   There are certain reports that you have listed



 1  here.  So, for example, Wendy Goldsmith, Richard Horner,
 2  Mathew Barlow and Robert Nairn.  My question is:  How
 3  did you receive those reports?
 4       A.   From the Defendant's attorneys.
 5       Q.   Did you take any notes, outlines about these
 6  expert reports?
 7       A.   Yes, I did.
 8       Q.   And where do you store those notes and
 9  outlines?
10       A.   Generally in like a steno book.  I'm trying to
11  think of the name.  But, yeah, I can't remember the name
12  of the notebook.
13       Q.   Did you read all of CLF's experts in this
14  case?
15       A.   Yes, I generally reviewed their expert
16  reports.  I'm not going to say I have read every single
17  line and every single statement and would be able to
18  recall those, though.
19       Q.   So you did not read them in their entirety?
20       A.   Generally I skimmed them in their entirety and
21  read the ones that were relevant to -- relevant to my
22  work.
23       Q.   Okay.  How did you decide what to review?
24       A.   As I mentioned, I did read through all of the
25  reports and then focused on a few that were more



1  relevant to the work that I was doing.

2      Q.   Okay.  So specifically Robert Nairn's report

3  in this case, did you review it in its entirety?

4      A.   I did.

5      Q.   Did you review all of the material that he

6  considered in rendering his opinion?

7      A.   The majority of the material.  I don't want to

8  say all of it because there might be material that he

9  considered that I was not aware of or not directly

10 considered.

11     Q.   And what did you review?

12     A.   If we want to pull up Dr. Nairn's list of

13 references, I can tell you specifically.  I would say

14 generally the ones that I relied on most heavily are

15 listed in my references as well.

16     Q.   And how did you decide which to review?

17     A.   Based on my expertise in the field and my

18 knowledge of their relevance to the work that I was

19 doing.

20     Q.   Did you read the expert reports of any other

21 disclosed experts in this case?

22     A.   Yes, I did.  As I mentioned, I believe I

23 read -- read through all of the expert reports in the

24 case.

25     Q.   Can you tell me which ones?



1      A.    If -- I'm going to flip to my references

2    section here so that I can be complete.  So certainly

3    Mr. Nairn's, Ms. Goldsmith, Mr. Horner, Mr. O'Donnell,

4    Mr. Barlow.

5            Those are the primary ones that I see

6    referenced.  I'm not going to say that I got all of

7    those, but, yeah, I believe those were all the CLF

8    expert reports that were provided to me and that I was

9    aware of.

10     Q.    What was your purpose in reading those

11   reports?

12     A.    I apologize.  A motorcycle just went by

13   outside.  What was the question?

14     Q.    What was your purpose in reading those

15   reports?

16     A.    To understand CLF expert opinions on the case.

17     Q.    Did you read any deposition transcripts from

18   this case?

19     A.    Yes, I did.

20     Q.    Which ones?

21     A.    I read Sergio Jaramillo's deposition.  I read

22   Dr. Nairn's deposition yesterday, or, I apologize, I

23   don't know.  Ms. Goldsmith's deposition.  I believe

24   Mr. O'Donnell's deposition.  Also Ms. French McCay's

25   deposition.



1          And, yeah, I would have to look at the

2    depositions.  I'm going from memory here.  But there

3    were other -- was it -- gosh, I apologize.

4          There was another engineer I believe from

5    Shell whose deposition I reviewed.

6       Q.   Feel free to use the documents to help if you

7    have to.

8       A.   Ms. Tadio. these have been in the past two

9    weeks and obviously the depositions have been coming

10   fast and furious, so there is many I read through.

11   Obviously, not in their entirety, but --

12      Q.   Thank you.  Any deposition transcripts from

13   any other cases that you read to specifically prepare

14   your report in this case?

15      A.   No other cases besides this one.

16          To my knowledge, the Jaramillo and the other

17   engineer that I reviewed were as part of this case, as I

18   understand it.

19      Q.   And did you review the exhibits to the

20   deposition transcripts that you looked at?

21      A.   Yes, where I felt that they were relevant.

22   Again, I'm not going to say I comprehensively reviewed

23   all the exhibits.

24      Q.   And the documents that you did receive, were

25   those in hard copy or electronic?



```
 1      A.    Everything was electronic.

 2      Q.    And do you have a file for this case?

 3      A.    I do.

 4      Q.    And where do you keep that file?

 5      A.    I have a Sharepoint file maintained by

 6  Integral Consulting Withholders.

 7      Q.    And is anything kept in hard copy or it's all

 8  kept electronically?

 9      A.    We try to keep everything electronically just

10  to avoid paper waste.

11      Q.    What is in your case file?

12            MR. HENDERSON:  I'm going to object to that

13  question for form and foundational.  So object to the

14  extent it reveals any attorney-client communications,

15  work product, or other documents or materials subject to

16  protective orders or confidentiality agreements in this

17  case.

18            THE WITNESS:  Seeing as how I don't know

19  what's protected under that, I do have a general library

20  of the literature that we've mentioned and that I

21  referenced here.  Many, if not all, well, certainly all

22  of the documents I said that I ever relied on are in

23  those files, as well as the depositions I mentioned and

24  expert reports that I mentioned that I was provided.

25  BY MS. TADIO:
```


ESQUIRE
DEPOSITION SOLUTIONS

 1      Q.   Have you told me everything other than
 2  attorney confidentiality, attorney-client
 3  confidentiality and attorney-client communication, have
 4  you told me everything that is in the file that you can
 5  remember?
 6      A.   Yes.  Data, of course, and I have those data
 7  sources cited, so I don't -- I can't think of anything
 8  that is not cited that I would have in there.  Yeah, and
 9  supporting files and models I believe have been
10  produced.
11      Q.   And do you know personally or by reputation
12  any of the other experts disclosed by any of the
13  defendants in this case?
14      A.   Personally I have met Dr. French McCay in the
15  past, another water quality -- actually, it wasn't water
16  quality.  It was an assessment of Long Island sound.
17           As I mentioned, Sergio Jaramillo, I know him
18  as the Metocean engineer at Shell, yeah.
19           And Mr. Nairn, we've met before in the past.
20  We do know each other.
21      Q.   How do you know French McCay?
22      A.   The company that she worked for that was
23  acquired by Tetra Tech does a lot of modelling,
24  circulation modelling, and they had done a circulation
25  model for Long Island Sound.  And I believe we were



1  collaborating with their company, smaller organization,

2  on looking at cable crossings in Long Island Sound and

3  currants and sediment transport associated with that.

4  So I think our company and her company did team an

5  investigated project supporting each other.

6      Q.   And how do you know Sergio Jaramillo?

7      A.   Professionally through the offshore technology

8  conference in Houston where one of my colleagues runs

9  the Metocean Group, meteorology and oceanography group,

10 and Sergio is part of that group.  And I have gotten to

11 know him just through professional society.

12     Q.   And how do you know Dr. Nairn?

13     A.   He and I have worked on a project in the

14 Mississippi River on the Barataria Bay Diversion

15 Project.  His company and our company were both working

16 on hydrodynamic and sediment transport issues there.

17     Q.   Do you know personally or by reputation any of

18 the other experts disclosed by the plaintiffs in this

19 case?

20     A.   I have heard the name -- I mean, I'm familiar

21 with O'Donnell and Horner and their work generally, but

22 I don't -- I don't know them.

23     Q.   Do you plan to use any demonstratives at

24 trial?

25          MR. HENDERSON:  Object to the form of the



1  questions and foundation of the questions, and to the

2  extent it discloses attorney-client communications, work

3  product, or other materials subject to protective

4  orders.

5          THE WITNESS:  Again, I mention I don't know if

6  I'll be testifying at trial, and I would assume if I

7  testified at trial that there would be demonstratives

8  produced or provided -- developed.

9  BY MS. TADIO:

10     Q.  Okay.  And have you met with or spoken to any

11 other expert witnesses in this case?

12     A.  Yes.  I met with Dr. French McCay.

13         I also met with Dagmar Atkins about flood

14 levels and possible tank failure.  And then the tank

15 engineering firm HEI, the gentleman from there.

16         So met with them to discuss their data needs

17 from our analysis and provided them that data.

18     Q.  When were those meetings?

19     A.  Generally in the late winter to spring, I

20 would say.

21     Q.  And where were those meetings?

22     A.  They were all online.

23     Q.  And how long were those meetings?

24     A.  None more than an hour.

25     Q.  And what did you discuss?

1       A.    Discussed data needs for their analysis, and
2   also to provide them the background of where those data
3   came from.
4       Q.    Have you met with or spoken with any experts
5   from other fossil fuel cases?
6       A.    No, I have not.
7       Q.    Did you meet with or speak to any lawyers
8   representing other defendants in this case?
9       A.    No.
10      Q.    Did you meet with or speak to any residents of
11  the New Haven Harbor area?
12      A.    No, I did not.
13      Q.    Did you speak to any --
14      A.    I apologize, your -- Could you repeat?
15            (Reporter asked for clarification)
16  BY MS. TADIO:
17      Q.    Yes.  Yes.  Did you speak to any engineers
18  located in New Haven, Connecticut?
19      A.    No, I did not.
20      Q.    Okay.  Is there anybody else that you spoke to
21  or met with about this case that we have not already
22  talked about?
23      A.    Not that I recall at this time.
24      Q.    Did you meet with or speak to any fact
25  witnesses in this case?

1      A.   I believe the Terminal manager for New Haven,

2   yes, I have met with him.  And I believe he was a -- I

3   don't know if he was a fact witness or what kind of

4   witness he was.

5      Q.   What, if anything, do you plan on doing on

6   this case between now and trial?

7           MR. HENDERSON: Object to the form of the

8   question to the extent it requires a disclosure of

9   attorney-client communications, work product, or the

10  production of information or documents that are covered

11  by the protective order or confidentiality agreement.

12          THE WITNESS:  At this time I don't know if I'm

13  going to be testifying at trial, so I would reserve the

14  right of any new data that comes to light or any reports

15  that come to light.  But besides that, I don't know if

16  I'm testifying, so I don't know.

17  BY MS. TADIO:

18     Q.   Is there any information that you are aware of

19  sitting here today that you did not have that you would

20  need to give your opinions at trial?

21     A.   No.  Not to my knowledge.

22     Q.   Is there any information that you do not have

23  sitting here today that you feel would strengthen or

24  weaken your opinions?

25     A.   Not that I can think of today, no.



```
 1      Q.    Did you complete modelling to inform your
 2  report?
 3      A.    I did.
 4      Q.    Can you tell me about that modelling?
 5      A.    Yes.   Completed hydrodynamic modelling to look
 6  at flood extents in the vicinity of the New Haven
 7  facility.
 8            Also conducted tank risk modelling to look at
 9  potential risk of failure of tanks during different
10  flood events.   Those were the two primary types of
11  modelling.
12      Q.    Anything else?
13            (Dog barking)
14            THE COURT REPORTER:   I don't know how to write
15  that.
16            THE WITNESS:   Could you repeat the question?
17            MR. HENDERSON:   I thought that was a good
18  comment, too.   Thank you.
19            MS. TADIO:   I'm sorry, that's my dog.   One
20  moment.   I apologize.
21  BY MS. TADIO:
22      Q.    So you did two types of modelling to inform
23  your report, hydrodynamic modeling and risk modeling?
24      A.    Correct.
25      Q.    I apologize.   Who else completed the modelling
```

ESQUIRE
DEPOSITION SOLUTIONS

1  that informs your report?

2      A.    Chris Flanary assisted me with those models.

3      Q.    Do you have any opinions on storm surge

4  modelling?

5            MR. HENDERSON:   Object to the form of the

6  question.

7            THE WITNESS:  Yeah.  Do you mean in general or

8  specifically referring to my report?

9  BY MS. TADIO:

10     Q.    Specifically in your expert report, are there

11  any opinions on the storm surge modelling?

12     A.    I don't believe I have.  I have opinions

13  informed by storm surge modelling.  I don't believe I

14  have a direct opinion in the report on storm surge

15  modelling.  Storm surge assessment and general

16  understanding of storm surge is certainly an integral

17  part of my work here, though.

18     Q.    What is the name of the model that you are

19  relying on?

20     A.    The key models are relying on FEMA flood plain

21  maps that are informed by models that FEMA commissions;

22  the NACCS model, which I reference in the report; the

23  Delft Flexible Mesh model which I use.  And then the

24  Tank Failure Probability model, which is even, I

25  apologize, and I'm going to mispronounce the author's



1  names, is based on a peer-reviewed literature model from

2  Khakzad, and I apologize, I don't want to butcher their

3  names, but that I reference in the report.

4      Q.   Is there a written report of these various

5  models?

6      A.   Yes.  The FEMA work would be documented on the

7  FEMA website with background materials.

8           The NACCS model is documented online, and I

9  have a link to it in my report.

10           The Delft FM model has documentation

11  associated with it, and, again, the Khakzad and Gelder

12  model is documented in their report, as well as other

13  follow-on documents that discuss these models.

14      Q.   So of the FEMA model, the NACCS model, the

15  Delft3D FM model, which of those are the hydrodynamic

16  modelling?

17      A.   All of those have hydrodynamic components to

18  them.

19      Q.   And who specifically completed that modelling?

20      A.   No, the FEMA modelling was conducted under the

21  direction of FEMA.  The NACCS modelling was conducted

22  under the umbrella of the Army Corps of Engineers, but

23  in conjunction with NOAA and others, and the Delft FM

24  model was conducted by myself and Chris Leonard.

25      Q.   And the modelling that you did use to inform



1   your report, so, for example, FEMA and the NACCS

2   modelling, did you speak to the people that completed

3   that modelling?

4       A.   No, I did not.

5       Q.   Are you offering any opinions on Integral

6   modelling?

7           MR. HENDERSON:  Object to the form of the

8   question.

9           THE WITNESS:  Yeah, I -- am I offering

10  opinions informed by the Integral modelling?  Was that

11  your question?

12  BY MS. TADIO:

13      Q.   Yes, correct.  Are you offering any opinions

14  on Integral modelling?

15      A.   My opinions are informed by the Integral

16  modelling, yes.

17      Q.   Okay.  So you are not offering any opinions on

18  the Integral modelling then; correct?

19          MR. HENDERSON:  Object to the form of that

20  question.  Could you repeat that?

21          THE WITNESS:  Yeah.

22  BY MS. TADIO:

23      Q.   Yeah, I'm just trying to make sure that we

24  have clear for the record, you are not offering any

25  opinions on the Integral modelling; is that correct?



1    A.    My opinions are informed by the Integral
2 modelling.
3    Q.    Thank you for that clarification.
4          And you are not a flood modeler; correct?
5          MR. HENDERSON:  Object to the form of the
6 question and the foundation of the question.
7          THE WITNESS:  My graduate work was in
8 hydrodynamic modelling of surface water flows.  And I
9 have spent my entire career directing and conducting
10 modelling efforts that include flooding components, so I
11 consider myself a flood modelling expert, yes.
12 BY MS. TADIO:
13    Q.    Okay.  Great.  Could you please show me where
14 in your report you completed the flood modelling?
15    A.    The flood modelling for our work, I relied on
16 NACCS water level data to look at loadings on the tanks.
17 Work that Dr. French McCay relied on, I believe, was
18 informed by additional modelling that we had done that I
19 did not report on in my expert report.
20    Q.    Dr. Jones, have you completed modelling for
21 the New Haven Terminal?
22    A.    Yes.
23    Q.    Which modelling?
24    A.    The Delft FM model that is included as an
25 appendix in the French McCay report and the tank



 1  modelling -- the tank risk modelling that is included in

 2  my report.

 3      Q.   Have you ever certified a SWPPP in New Haven

 4  Connecticut?

 5          MR. HENDERSON:  Object to the form of the

 6  question.

 7          Actually, I couldn't understand the question.

 8          Could you repeat that, Anna?  Anna, I'm sorry.

 9          MS. TADIO:  Sure.  Yep.

10  BY MS. TADIO:

11      Q.   Have you ever certified a SWPPP in New Haven

12  Connecticut?

13      A.   No, I have never performed in a regulatory

14  capacity to certify a SWPPP.

15      Q.   Have you ever performed a Climate Risk

16  Assessment for the New Haven Terminal?

17          MR. HENDERSON:  Excuse me.  Again, I'm not

18  being dense.  What is the last part of your question?

19  I'm just -- it's tailing off for me.  I apologize.

20  BY MS. TADIO:

21      Q.   I'll repeat:  Have you ever performed a

22  Climate Risk Assessment for the New Haven Terminal?

23      A.   The work that I present here has climate risk,

24  coastal hazard in particular, assessment in it.  This is

25  the first time I have performed this work for the New



 1  Haven Terminal.

 2      Q.   To be in compliance under the Clean Water Act

 3  a facility must have a certified SWPPP.  Is this

 4  correct?

 5      A.   Correct.

 6           MR. HENDERSON:  Object to the form of the

 7  question and foundation of the question.

 8           THE WITNESS:  Via the Connecticut DEEP Multi-

 9  Sector General Permit, the facility must have a SWPPP,

10  and that is enacted in a chain, as I understand it, up

11  to the Clean Water Act.

12  BY MS. TADIO:

13      Q.   Was there a certified SWPPP during Motiva

14  ownership?

15      A.   I don't know the chain of ownership or

16  operation of the facility in detail.  I have reviewed

17  the SWPPPs since 2017, which was in effect, as I

18  understand it, was the first CLF Notice of Intent of

19  file.  I have seen the SWPPPs since then, so to my

20  knowledge there have been certified SWPPPs in effect for

21  that entire period are.

22      Q.   The SWPPP was certified in 2021; correct?

23      A.   I believe so, yes.

24      Q.   There was not a certified SWPPP prior to 2021

25  during the Motiva ownership; correct?



1         MR. HENDERSON: Object to the form of the
2    question, also to the foundation of the question for
3    Dr. Jones.
4         THE WITNESS:  To my understanding, there was a
5    SWPPP in effect.  I have seen a 2017 SWPPP that to the
6    best of my knowledge was in effect at that time.
7    BY MS. TADIO:
8         Q.   Dr. Jones, you have done Climate Risk
9    Assessments before; correct?
10        A.   Correct.
11        Q.   So I'm specifically thinking of the San Mateo
12   Climate Risk Assessment.  When did you complete your
13   Climate Risk Assessment at the New Haven Terminal?
14        A.   With the completion of this report, it was an
15   aspect of the Climate Risk Assessment.  The Climate Risk
16   Assessment includes -- could include something well
17   beyond.  It's specific in which aspect you mean of the
18   Climate Risk Assessment.
19        Q.   Well, what methodology did you use to do a
20   Climate Risk Assessment at the New Haven Terminal?
21        A.   Looked at the key climate risks to the
22   facility as certainly alleged by CLF as well, that was
23   the sea level rise, waves and storm flood surges, and
24   those particular risks to the facility.  So those are
25   the risks that I investigated, as I laid out in my



 1  report.

 2          (Reporter asked for clarification)

 3  BY MS. TADIO:

 4      Q.   When you did complete your Climate Risk

 5  Assessment, how many people were involved?

 6      A.   My, the ones that are I have listed.  Myself,

 7  Chris Flanary, Kerry Scheu assisted, Tim Nelson

 8  assisted.

 9      Q.   On page 2 of your CV, for experience, under

10  Estuarian and Coastal Risk Assessment and Long-Term

11  Management, you state that you were the technical lead

12  on the San Mateo Vulnerability Assessment and Adaptation

13  Plan in San Mateo, California.  And I'm just going to

14  read the description to you.

15          So you were "The technical lead on a

16  comprehensive coastal hazards and sea level rise

17  vulnerability assessment and adaptation planning effort

18  for Southern San Mateo County.  The project evaluated

19  risks to public land trust and critical infrastructure,

20  climate-driven coastal flooding, and erosion."

21          Did I read that correctly?

22      A.   Yes.

23      Q.   Okay.  And "The study informed long-term

24  resilience planning and regulatory compliance for

25  state-managed coastal lands."



1          Did I read that correctly?

2      A.    Correct.

3      Q.    So when did you complete a risk analysis for

4  the Port of New Haven using the specific methodology

5  from the San Mateo assessment?

6      A.    Of course, these assessments are site

7  specific, depending on the questions required.  The San

8  Mateo was a long-term, looking at adaptation out to 2050

9  and 2100 so that the County could develop comprehensive

10  plans.  So I was looking at 50 to 100 years of processes

11  on the coasts and what hazards those may pose.

12          At the New Haven facility, we are looking

13  at current climate risks and risks out over the

14  foreseeable permitted periods, looking at sea level rise

15  over the next, I believe Nairn's estimate had out to

16  2050, but looking at the potential for storms during

17  that time period.

18          Specifically under the permit, we looked at

19  risks that are covered under those permits and listed

20  under those permits, which are primarily, as alleged by

21  CLF, due to storm-driven surge, storm-driven effects,

22  essentially the 100-year and 500-year storm, as outlined

23  by CLF.  So looked at the specific hazards of CLF and

24  called out in their complaint.

25      Q.    So you haven't done a -- so you haven't done a



1  risk assessment for New Haven like you did for San

2  Mateo?

3           MR. HENDERSON:  Object to the form of the

4  question.

5           THE WITNESS:  So risk assessments are

6  addressing specific risk questions.  For this

7  site-specific risk assessment we conducted a risk

8  assessment addressing those specific risk questions that

9  arose.

10          San Mateo County had specific risk questions

11 they had to address for the State of California and we

12 addressed those specific risk questions.

13 BY MS. TADIO:

14    Q.   Can you describe the differences in the

15 methodology used for the San Mateo vulnerability

16 assessment and the methodology that you did use at New

17 Haven?

18          MR. HENDERSON:  Anna, sorry, I'm having a hard

19 time hearing you, and maybe other people might be have

20 the same problem.

21          (Reporter asked for clarification)

22 BY MS. TADIO:

23    Q.   No, please let me know.  If you can't hear me.

24 I would want to know that.

25          Please describe the differences in the



1   methodology used for the San Mateo vulnerability

2   assessment and the methodology used at New Haven.

3       A.   Essentially the methodology is the same.  It

4   is assessing what the primary hazards are, what the

5   probability of those hazards are, and what the

6   consequences of occurrence are based on the particular

7   infrastructure that you are looking at.  So the overall

8   scientific methodology is the same.  As I mentioned, the

9   goals of what you are assessing are where the

10  differences are.

11      Q.   Was any of your assessment integrated into the

12  SWPPP for the Terminal?

13          MR. HENDERSON:  Object to the form and

14  foundation of the question.

15          THE WITNESS:  The assessment is not required

16  as part of the SWPPP.

17  BY MS. TADIO:

18      Q.   Do you know when the certified SWPPP was

19  provided to Connecticut DEEP?

20      A.   I would have to look at my records.  I don't

21  recall offhand.

22          MS. TADIO:  I would be comfortable to wait if

23  you could refresh your memory and look at your records.

24          MR. HENDERSON:  And so we are going to -- I

25  mean, that could take a while.  Do we just want to stay



 1  on the record and let him -- I mean, it could take him,

 2  you know, an hour.

 3  BY MS. TADIO:

 4      Q.   Dr. Jones, are you anticipating it is going to

 5  take a while for you to answer when the certified SWPPP

 6  was provided to Connecticut DEEP?

 7      A.   I can look up the 2021 SWPPP.  2019.

 8           Let's see.  The current 2017.

 9           Yeah, this may take a little longer than --

10  and the New Haven General Permit.

11           The 2019 letter that was provided to CT DEEP.

12           MR. HENDERSON:  So can we take a break and let

13  Dr. Jones review his material?

14           MS. TADIO:  Sure.

15           MR. HENDERSON:  How about what we'll -- if we

16  could break, we'll let Dr. Jones figure it out and he

17  can tell us if it is going to be ten minutes or five

18  minutes or 20 minutes.

19           MS. TADIO:  Okay

20           MR. HENDERSON:  I have 3:26 Eastern time.  How

21  about we check back with you in ten minutes?

22           MS. TADIO:  That works for me.

23           Does that work, Dr. Jones?

24           THE WITNESS:  Yeah.  Would now be a logical

25  time to do a lunch break and just do that break now?



1      THE VIDEOGRAPHER:  Do you want to discuss this

2 off the record?

3      MR. TADIO:  Yes.

4      THE VIDEOGRAPHER:  Going off the record at

5 12:27 p.m. Pacific time.

6      (Luncheon break)

7      THE VIDEOGRAPHER:  We are back on the record

8 at 1:16 p.m. Pacific time.

9      MR. HENDERSON:  And, Angela, how long have we

10 been going?

11      THE VIDEOGRAPHER:  There is a running count at

12 the top of your screen.  It is three hours, 20 minutes.

13      MR. HENDERSON:  Okay.  Great.  Thank you.

14      THE VIDEOGRAPHER:  You're welcome.

15 BY MS. TADIO:

16      Q.   All right.  How was your break, Dr. Jones?

17      A.   Good, thank you.

18      Q.   So the question that we left off on was:  When

19 was the certified SWPPP provided to Connecticut DEEP?

20      A.   I -- what I have in my records is that I have

21 a complete 2017 SWPPP.  That was also sent to the state,

22 a Karen Abbott, and the Water Permitting and Enforcement

23 Division, Bureau of Materials Management, Compliance

24 Assurance, CT Deep and Hartford on June 11, 2019.

25      So that is the last update.  And from what it



1  says in this letter and everything I have reviewed,

2  there has been no updates since then to the SWPPP, and

3  that's what I have in my records.

4      Q.   Were you involved in any aspect of Clean Water

5  Act Compliance cases in 2016?

6          MR. HENDERSON:  Object to the form of the

7  question.

8          THE WITNESS:  I don't believe that I was

9  involved in any cases in 2016.

10          There may have been cases that I was involved

11  in that had Clean Water Act components to them, because

12  inherently, as I mentioned, all of my work is generally

13  governed by things that have cascaded out of the Clean

14  Water Act, regulations and laws that have cascaded out

15  of the Clean Water Act.

16  BY MS. TADIO:

17      Q.   Were you involved in any aspects of Clean

18  Water Act cases in 2017?

19          MR. HENDERSON:  Object to the form of the

20  question and the foundation of the question.

21          THE WITNESS:  Now, once again, the same

22  answer, is that most of my work has to do with Clean

23  Water Act compliance or issues associated with the Clean

24  Water Act in some way, shape or form.  So I'm not sure

25  if I know how to answer that.



```
 1  BY MS. TADIO:
 2      Q.   Okay.  Were you involved in any aspects of
 3  Clean Water Act compliance cases in 2018?
 4      A.   Once again, the same answer that --
 5           MR. HENDERSON:  I'm going to object.
 6           THE WITNESS:  Apologies, Doug, I think I spoke
 7  over you.
 8           MR. HENDERSON:  I was just preserving our
 9  objection to the form of the question and foundation.
10  BY MS. TADIO:
11      Q.   Were you involved in any aspects of Clean
12  Water Act compliance cases in 2019?
13      A.   Again, most of the work I do on contaminated
14  sites is due to some cascading regulations or laws
15  resulting from the Clean Water Act.
16  BY MS. TADIO:
17      Q.   Same question in 2020?
18           MR. HENDERSON:  Same objections.
19           THE WITNESS:  If you are okay with me saying
20  same answer, I will say the same answer.
21  BY MS. TADIO:
22      Q.   Were you involved in any aspects of the Clean
23  Water Act in 2021?
24           MR. HENDERSON:  The same objections.
25           THE WITNESS:  And if you are okay with me
```



 1  saying same answer, it's the same answer.

 2  BY MS. TADIO:

 3      Q.   And were you involved in any aspects of Clean

 4  Water Act compliance cases in 2022?

 5           MR. HENDERSON:  Same objections.

 6           THE WITNESS:  Once again, same answer.

 7  BY MS. TADIO:

 8      Q.   And were you involved in any aspects of Clean

 9  Water Act compliance cases in 2023?

10           MR. HENDERSON:  Same objection.

11           THE WITNESS:  Same answer.

12  BY MS. TADIO:

13      Q.   And were you involved in any aspects of Clean

14  Water Act compliance cases in 2024?

15           MR. HENDERSON:  Same objection.

16           THE WITNESS:  Same answer.

17  BY MS. TADIO:

18      Q.   Were you involved in any aspects of Clean

19  Water Act compliance cases in 2025?

20           MR. HENDERSON:  Same objection to form and

21  foundation questions.

22           THE WITNESS:  And same answer, as much of my

23  work results from the Clean Water Act.

24  BY MS. TADIO:

25      Q.   Okay.  Did you review any part of the SWPPP at



 1  New Haven Terminal that was in effect of 2016?

 2          MR. HENDERSON:  Objection to the form of

 3  the -- objection to the foundation of the question.

 4          THE WITNESS:  I do believe that I reviewed

 5  earlier versions of the SWPPP from prior to 2017.

 6  BY MS. TADIO:

 7      Q.   Did you review any part of the SWPPP at the

 8  New Haven Terminal that was in effect in 2017?

 9          MR. HENDERSON:  Object to the form of the

10  question, and I'm having a hard time hearing you.

11          MS. TADIO:  Okay.

12          THE WITNESS:  As I heard you say, did I review

13  any part of the SWPPP that was in effect in 2017?  And

14  yes.

15  BY MS. TADIO:

16      Q.   Okay.  Did you review any part of the SWPPP at

17  the New Haven Terminal that was in effect in 2018?

18      A.   Yes.

19      Q.   Are you aware that there was a certified SWPPP

20  at the New Haven Terminal in effect in 2016?

21      A.   I am aware that, yes, there was a SWPPP in

22  effect in 2016.

23      Q.   What versions of the certified SWPPP did you

24  review for your expert report?

25      A.   The 2017 would have been the current version



 1  at the time that I believe the CLF complaint was filed,
 2  and that is a version that I have and I was reviewing
 3  it.
 4      Q.    Can you walk me through the timeline of SWPPPs
 5  and certifications?
 6      A.    From what I understand, the 2017 would be the
 7  active SWPPP at the time the case was filed.  That was
 8  submitted to the state again in 2019.  To my
 9  understanding under the Multi-Sector General Permit in
10  2021 and currently in effect, there is a requirement to
11  certify a SWPPP, but to have an active SWPPP meeting all
12  the MSGP requirements on file at the site.
13      Q.    Did any of the SWPPPs have an Integrated
14  Climate Change Risk Assessment?
15          MR. HENDERSON:  Object to the form of the
16  question and foundation of the question for Dr. Jones.
17          Go ahead.
18          THE WITNESS:  As the Multi-Sector General
19  Permit did not require those integrated Climate Risk
20  Assessment, I believe was the term you used, the SWPPPs
21  did not have those components as they are not required
22  under the Multi-Sector General Permit that outlines the
23  SWPPP.
24  BY MS. TADIO:
25      Q.    And if there is no SWPPP, would that be a



1  violation of the permit?

2      A.   If there is no SWPPP on file --

3           MR. HENDERSON:  Object to the form of the

4  question and foundation of the question.

5           THE WITNESS:  To my understanding if there is

6  no SWPPP on file at the -- no current SWPPP on file at

7  the facility, that would be a violation.

8  BY MS. TADIO:

9      Q.   Earlier you testified that you were retained

10  for this case in or around 2022.  Did you ask Defendants

11  to review material related to any SWPPP for the Terminal

12  that was in effect prior to 2021?

13          MR. HENDERSON:  Objection.  To the extent it

14  requires the disclosure of an attorney-client

15  communication, work product, or the discussion of any

16  documents subject to a protective order or a

17  confidentiality agreement, I instruct you not to answer;

18  otherwise, you can answer.

19          THE WITNESS:  I reviewed the current SWPPP

20  that was on file for the facility.

21  BY MS. TADIO:

22      Q.   You have never certified a SWPPP in

23  Connecticut, have you?

24          MR. HENDERSON:  Object to the form of the

25  question.  It's been asked and answered.  I would object



 1  to the form and foundation of the question.

 2          THE WITNESS:  I believe, as I answered

 3  earlier, I am not a regulator and I never have been a

 4  regulator, so I have not performed certifications.

 5  BY MS. TADIO:

 6      Q.  So my understanding is that you have never

 7  certified a SWPPP; is that correct?

 8      A.  I have reviewed SWPPPs throughout much of my

 9  career, but I am not a regulator and do not certify

10  SWPPPs.

11      Q.  Have you ever reported violations of a

12  facility to the EPA?

13      A.  I have reviewed violations of facilities and

14  recommended corrective actions and monitoring actions

15  based on those violations.  I have never directly

16  reported one myself.

17          No, early in any career I was involved in

18  water quality monitoring as part of a construction

19  project and did have to report water quality exceedances

20  as part of a permit requirement.

21      Q.  Have you ever reported violations of a

22  facility to the Connecticut DEEP?

23      A.  No, I have never reported violations to CT

24  DEEP.

25      Q.  Are you familiar with Shell's managing risk



 1  manual?

 2          MR. HENDERSON:  Object to the form of the

 3  question and the foundation of the question and the

 4  definition of the term "Shell."

 5          THE WITNESS:  I am not familiar with the

 6  document.  If you could pull up the document and show it

 7  to me, I might be able to refresh my memory.

 8  BY MS. TADIO:

 9      Q.   Are you familiar with Shell's asset management

10  system?

11      A.   I am familiar that they likely have asset

12  management systems.  Again, I don't know specifically

13  without specific reference to a specific document, I

14  don't know.

15      Q.   On your Materials Considered list, number 838

16  is listed a "2024 Shell Climate Adaptation Project

17  Guide."  We have not received a copy of this document.

18          Counsel, would you be able to provide this to

19  us?

20          MR. HENDERSON:  If you could show it to me,

21  I'm pretty sure it was produced less than two months

22  ago.

23          MS. TADIO:  Okay.  We will confirm that.

24          MR. HENDERSON:  If you can send me a snippet

25  of the -- what was it called?



```
 1            MS. TADIO:  It is the "2024 Shell Climate
 2   Adaptation Project Guide" of the Materials Considered as
 3   number 838.
 4            MR. HENDERSON:  838.
 5            MS. TADIO:  838, yeah.
 6            Counsel, we can follow-up about this after the
 7   deposition.
 8            MR. HENDERSON:  Okay.
 9            MS. TADIO:  Okay.
10   BY MS. TADIO:
11       Q.  Dr. Jones, are you aware that this lawsuit is
12   governed by a statute of limitations?
13       A.  No, I'm not.
14       Q.  Okay.  So the statute of limitations states
15   that the allegation includes any violations up to five
16   years prior to the time of the filing of the lawsuit.
17            So knowing that the lawsuit includes the five
18   years prior to the filing in 2021, is there any
19   information that you should have asked the Defendants
20   for?
21            MR. HENDERSON:  Object to the form of the
22   question.  Object to the foundation of the question.
23            So I'll stop with those two.
24            And it also requires legal testimony from
25   Dr. Jones.
```



```
 1              THE WITNESS:  So I was asked to look at the
 2    requirements for climate change assessment at the
 3    facility and risk assessment for the facility in
 4    compliance with the CT DEEP and EPA requirements.
 5              So, no, there is nothing I can think of at
 6    this time that I would have asked for to inform that
 7    that I haven't seen, but that's as I sit here today on
 8    the spot.
 9    BY MS. TADIO:
10        Q.   Okay.  Did you review the Triton 30(b)(6)
11    deposition transcript?
12        A.   Not to my knowledge.
13        Q.   Okay.
14        A.   Or not as I recall.
15        Q.   So now I would like to turn to page 11 of your
16    report itself, and I have just directed everyone on the
17    screen to that page.
18              Let me know when you are looking at your
19    physical copy, Dr. Jones.  It is 2.3, the Stormwater
20    Management.
21        A.   Okay.
22        Q.   Okay.  I'm going to read the last sentence
23    into the record.
24              It says, "These drainage areas are
25    hydraulically isolated from one another and from offsite
```



 1  areas to minimize the risk of offsite migration in the
 2  event of a release."
 3          Did I read that correctly?
 4      A.   Yes, you did.
 5      Q.   Can you explain what this means to me, please?
 6      A.   Yeah, they have hydraulically separated the
 7  areas, as the EPA SPCC requires that they have
 8  containment areas to contain the volume of self
 9  synergous tanks, so they isolated those areas to contain
10  any spill from those tanks to make it easier to deal
11  with instead of having one large area that would hurt a
12  larger --
13          (Reporter asked for clarification)
14      A.   -- a larger surface area to manage in the
15  event of a release.
16      Q.   Physically how are they isolated?
17      A.   Via containment berms.
18      Q.   Okay.  Next I'd like to turn to page 36, and I
19  will direct everyone on screen to that page.  And
20  Dr. Jones, please let me know when you go to your
21  physical copy on page 36.
22      A.   Okay.
23      Q.   So in the middle there is a section in bold,
24  "Structural Integrity and Stability."
25          The last sentence there reads "The Terminal



```
 1  ensures physical resilience against foreseeable

 2  threats."

 3          Did I read that correctly?

 4      A.   Correct.

 5      Q.   Okay.  And which foreseeable threats are you

 6  referring to?

 7      A.   That would be threats.  That would be storm

 8  events.  That would be lightning strikes.  That would be

 9  the API 650 standard and 653.  But API 650 actually

10  lists a number of hazards that could be hazards to these

11  tanks, including degradation, lightning strikes, storm

12  events, winds.

13      Q.   Okay.  Anything else?

14      A.   I wouldn't -- I'd have to go back and review,

15  yes.  I mean, it's anything that could cause a release

16  under those API 650 standards and are listed in the

17  Multi-Sectored General Permits.

18      Q.   Okay.  Let's please turn to page 63 of your

19  report.

20      A.   I'm sorry, what page?

21      Q.   63.

22      A.   Okay.

23      Q.   In the second-to-last paragraph on the page,

24  it says, "Under typical hydrodynamic conditions, the

25  duration of peak inundation at the site would be 6 to 12
```



```
 1  hours, with full drainage occurring within 24 hours."
 2          Did I read that correctly?
 3      A.   Yes.
 4      Q.   Okay.  Where does the drainage go?
 5      A.   After storm waters have receded, they are in
 6  the facility response plan, the business continuity
 7  plan, the waters are -- any waters inside the
 8  containment area are inspected for release and they
 9  would be released to receiving waters if they are --
10  upon inspection, have no spill in them.
11      Q.   And if they did have a spill, what happens
12  then?
13      A.   That would activate the facilities response
14  plan and spill control plans that then would activate
15  methods to remove that material.
16      Q.   Next let's turn to page 85.
17      A.   Okay.
18      Q.   Okay.  In the first paragraph you mentioned
19  fragility modeling.
20      A.   Correct.
21      Q.   Okay.  Did you test this modeling?
22      A.   Actually, I apologize.  I'm familiar that I
23  wrote the term.  I don't -- I jumped ahead a little bit.
24  I said I -- Oh, I see it, yes.
25          MR. HENDERSON:  Could you switch it to page
```



1  85?  I'm still showing 63.

2            MS. TADIO:  Oh, sorry.  I forgot to hit direct

3  to page.  Yes, here we are.  Okay.

4            And in the first paragraph it mentions the

5  fragility modeling.

6            THE WITNESS:  Yes, using the term from

7  Kameshwar and Padgett's paper, who referred to their

8  modeling as fragility modeling.

9  BY MS. TADIO:

10       Q.   So did you test this modeling?

11       A.   I apologize, you cut out in the question.

12            Can you repeat the question?

13       Q.   Did you test this fragility modeling?

14       A.   Yes.  I conducted -- referring to it as more a

15  tank stability modeling.  But, yes, I tested the model

16  similar to the model they used and the one by Khakzad

17  and Gelder.  And my apologies again for not being able

18  to pronounce those names.  But yes, I used that model to

19  evaluate the tanks.

20       Q.   Have you ever been to New Haven, Connecticut?

21       A.   Yes, I have.

22       Q.   When was the last time that you were there?

23       A.   I think I conducted a site visit in 2022 or

24  2023, maybe.

25       Q.   Okay.  And how many times have you done a site



1  visit to the Terminal?

2      A.   One time.

3      Q.   And how long were you on site?

4      A.   Approximately half a day.

5      Q.   Did you walk the entire site?

6      A.   Yes, I did, with -- I believe it is in the

7  record with CLF experts as well.

8      Q.   Did you walk the fence line?

9      A.   Yes.

10     Q.   Did you check the fence line for gaps?

11     A.   For what?

12     Q.   Gaps.  Gaps in the fence line?

13     A.   No, I wasn't specifically looking for gaps in

14 the fence line.  But I don't recall one way or the other

15 if there were significant gaps or not.

16     Q.   And where did you walk at the Terminal?

17     A.   Walked the entire perimeter of the Terminal,

18 as well as walked the berms that are around those

19 containment areas that we were referring to earlier, as

20 well as reviewed site plans and documents at the office

21 of the facility.

22     Q.   Okay.  Could you tell approximately how close

23 were the residential homes to the Terminal fence?

24     A.   At the back side.  I'm sorry, I'm referring to

25 a front and a back side.  To the eastern end,



```
 1  northeastern side of the property there is a steep hill
 2  slope going up.  I would estimate approximately 200
 3  meters from the fence line are residences.
 4       Q.   Did you see people's homes?
 5       A.   I did.
 6       Q.   And what kind of barrier was blocking the
 7  residential areas from the Terminal?
 8       A.   There was a containment berm, a ditch, and
 9  then a hill slope upwards towards the residential
10  facilities, which were above the facility.
11            I'd have to look at the ditch elevation model
12  to make an estimation of the actual height, but...
13       Q.   If there is an oil spill at the New Haven
14  Terminal, what would prevent the oil from spreading into
15  the neighborhood?
16       A.   The measures in place to prevent an oil spill
17  are primarily the tanks and the resilience of the tanks,
18  and then the containment berms if the tank did, in fact,
19  fail.  The containment berms are built to withstand 110
20  percent of any spill and contain the spill contents, if
21  the tank were to fully breach, which has yet not
22  happened to my knowledge.
23       Q.   If a storm hit the Terminal, would it hurt
24  anything?
25            MR. HENDERSON:  Object to the form of that
```



 1  question, foundation of that question.

 2          THE WITNESS:  Again, the facility is

 3  constructed to standards to withstand storm events and

 4  to not have anything hurt during the storm.

 5  BY MS. TADIO:

 6      Q.   In the contents of your expert report, can you

 7  please show me where you completed storm surge modeling

 8  for the New Haven Terminal?

 9      A.   We looked at storm surge effects, relying on

10  the NACCS findings that Dr. Nairn relied on, because I

11  wanted to use the same information that the CLF experts

12  were using and that we see as a credible estimate of

13  storm surge water levels.

14          Starting on page 8.4.2 those flood level are

15  then applied to the site and we can see the effects of

16  those flood levels at the site with the knowledge that,

17  again, none of this is required under any of the

18  permitting requirements.

19          (Reporter asked for clarification)

20      Q.   Have you ever been a plaintiff or a defendant

21  in a lawsuit?

22          MR. HENDERSON:  Personally?

23  BY MS. TADIO:

24      Q.   Correct.

25      A.   No, I have not.



1    Q.   Do you believe in the civil justice system?

2    A.   I do believe in the justice system we have in

3  the United States, yes.

4    Q.   Is it true that this is the first case where

5  you've been retained to opine on stormwater permits?

6    A.   I am a coastal and --

7         MR. HENDERSON:  Object to the form of the

8  question.  Object to the foundation of the question.

9  You can go ahead.

10         THE WITNESS:  I'm a coastal and stormwater

11  engineer with decades of experience dealing with

12  stormwater issues, and this is the first time I have

13  provided an expert testimony in court on those issues.

14  BY MS. TADIO:

15    Q.   Is it true that this is the first case where

16  you've been retained to opine on best industry practice?

17    A.   Once again, I have been evaluating best

18  industry practices throughout most of my career, and

19  this is the first time I have testified in court as to

20  that experience.

21    Q.   Is it true that this is the first case where

22  you've been retained to provide opinions on best

23  management practices?

24         MR. HENDERSON:  Object to the form of the

25  question and the foundation of the question.



```
 1              THE WITNESS:  Again, as a practicing engineer
 2   I have been applying and working on best management
 3   practices throughout most of my career.  This is the
 4   first time I have testified about those in court.
 5              That's not true.  Some of the contaminant
 6   cases, the Fox River and Penobscot River did involve
 7   best management practices for contaminated material.
 8   BY MS. TADIO:
 9      Q.   Is it true that this is the first case you've
10   been retained to provide opinions on climate change?
11              MR. HENDERSON:  Object to the form of the
12   question.  Object to the foundation of the question.
13              THE WITNESS:  Since most of my work involves,
14   with contaminated sites and remediation involves
15   incorporation of potential climate change forecasts, I
16   don't recall if I specifically have testified on that in
17   some of the contaminant sediment cases.  It could be.
18   BY MR. TADIO:
19      Q.   Is it true that this is the first case where
20   you've been retained to provide opinions on Connecticut
21   DEEP regulations?
22      A.   It is the first time I have opined directly on
23   Connecticut DEEP regulations; however, I have opined on
24   federal regulations that govern the Connecticut DEEP
25   regulations.
```



1      Q.   Is it true that this is the first case where

2  you've been retained to provide an opinion on an oil

3  terminal?

4      A.   I apologize.  Can you --

5           MR. HENDERSON:  Yeah.  I'm struggling hearing

6  as well.

7  BY MS. TADIO:

8      Q.   I will repeat my question.

9           Is it true that this is the first case where

10  you've been retained to provide opinions on an oil

11  terminal?

12          MR. HENDERSON:  Object to the form of the

13  question and foundation of the question.

14          THE WITNESS:  I can generally say that I have

15  been retained to evaluate oil terminals on a

16  confidential case in the Gulf of Mexico, but that's

17  about all I can say regarding that.

18  BY MS. TADIO:

19      Q.   Dr. Jones, if after this deposition is over

20  you change your mind about any of your opinions or you

21  look at or consider any other documents or information

22  that you have not already looked at and considered,

23  regardless of whether or not it changes any of your

24  opinions, I ask that you please let the lawyers who

25  hired you know so that they can take the necessary steps



 1  to let us know.  Do you agree?

 2      A.    I agree.

 3           MS. TADIO:  Okay.  And that concludes my line

 4  of questioning for the day.

 5           MR. HENDERSON:  Okay.  Can we take a break?

 6           MS. TADIO:  Yes.

 7           MR. HENDERSON:  Ten minutes?  It is 4:47.  How

 8  about at 5:00 o'clock we come back?

 9           MS. TADIO:  Okay.

10           THE VIDEOGRAPHER:  Going off the record at

11  1:47 p.m. Pacific time.

12           MR. HENDERSON:  Thank you.

13           (Recess)

14           THE VIDEOGRAPHER:  We are back on video record

15  at 2:00 p.m. Pacific time.

16           MR. HENDERSON:  Thank you, everyone.  We have

17  no further questions for Dr. Jones.

18           Thank you.

19           THE VIDEOGRAPHER:  May I please get transcript

20  and video orders on the record from Counsel?

21           MR. HENDERSON:  Sure.  We have a standing

22  order, okay, so...

23           THE VIDEOGRAPHER:  Okay.

24           MR. HENDERSON:  You should have that

25  information, but it's, you know, a rough ASAP, then the,



1  you know, whenever you can, video synched, the whole

2  package.

3          THE VIDEOGRAPHER:  Okay.  Thank you.

4          MS. TADIO:  Thank you, Dr. Jones, for your

5  time today.

6          THE WITNESS:  Thanks everybody.

7          THE VIDEOGRAPHER:  Going off the video record

8  at 2:01 Pacific time.

9                      -oOo-

10      (The deposition was concluded at 2:01 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1      DECLARATION UNDER PENALTY OF PERJURY

2

3          I, CRAIG ALEXANDER JONES, Ph.D., do hereby

4   certify under penalty of perjury, that I have read the

5   foregoing transcript of my deposition taken on September

6   4, 2025; that I have made such corrections as appear

7   noted herein; that my testimony as contained herein, as

8   corrected, is true and correct.

9

10    DATED this _____ day of _____, 2025, at

11              _____, California.

12

13

14          _____

15                CRAIG ALEXANDER JONES, Ph.D.

16

17

18

19

20

21

22

23

24

25



1          REPORTER'S CERTIFICATION

2

3          I, Vanessa Harskamp, Certified Shorthand

4   Reporter in and for the State of California, do hereby

5   certify:

6          That the foregoing witness was by me duly

7   sworn; that the deposition was then taken before me at

8   the time and place herein set forth; that the testimony

9   and proceedings were reported stenographically by me and

10  later transcribed into typewritten form under my

11  direction; that the foregoing is a true record of the

12  testimony and proceedings taken at that time.

13          I further certify that I am not related to any

14  of the parties to this action by blood or marriage, and

15  that I am in no way interested in the outcome of this

16  matter.

17          IN WITNESS WHEREOF, I have subscribed my name

18  this 9th day of September, 2025.

19

20

21

22          *Vanessa Harskamp*

23  _____

24          VANESSA HARSKAMP, RPR, CRR, CCP, CSR NO. 5679

25



```
1                    DEPOSITION ERRATA SHEET

2

3

4   Our Assignment No.   J13396869

5   Case Caption:   CONSERVATION LAW FOUNDATION, INC. V

6   EQUILON ENTERPRISES LLC

7

8              DECLARATION UNDER PENALTY OF PERJURY

9

10            I declare under penalty of perjury that I have

11  read the entire transcript of my Deposition taken in the

12  captioned matter or the same has been read to me, and

13  the same is true and accurate, save and except for

14  changes and/or corrections, if any, as indicated by me

15  on the DEPOSITION ERRATA SHEET hereof, with the

16  understanding that I offer these changes as if still

17  under oath.

18

19  Signed on the _____ day of _____, 2025.

20

21       _____

22                  CRAIG ALEXANDER JONES, Ph.D.

23

24

25
```



```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            CRAIG ALEXANDER JONES, Ph.D.
```



```
 1            DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25          CRAIG ALEXANDER JONES, Ph.D.
```

