# EXHIBIT C

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CONNECTICUT
 3
 4  CONSERVATION LAW FOUNDATION,
    INC.,
 5
            Plaintiff,
 6
        vs.              Civil Action No. 3:21-cv-
 7                                          00933-VDO
 8  SHELL OIL COMPANY, EQUILON
    ENTERPRISES LLC D/B/A SHELL OIL
 9  PRODUCTS US, SHELL PETROLEUM,
    INC., TRITON TERMINALING LLC,
10  and MOTIVA ENTERPRISES LLC,
11            Defendants.
12  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
13
14          VIDEOTAPED DEPOSITION OF
15          CRAIG ALEXANDER JONES, Ph.D.
16       CONDUCTED REMOTELY VIA ELITIGATE
17
18             September 4, 2025
19                  8:33 A.M.
20
21             Santa Cruz, California
22
23
24
25     Vanessa Harskamp, RPR, CRR, CRC, CSR No. 5679
```

**Page 2**

```
 1            APPEARANCES OF COUNSEL
 2
 3  For the Plaintiff:
 4  ANNA M. TADIO, ESQ.
    CONSERVATION LAW FOUNDATION, INC.
 5  15 East State Street
    Suite 4
 6  Montpelier, Vermont 05602
    (802) 779-4621
 7  (802) 223-5992
    (802) 622-3020
 8  atadio@clf.org
 9
    For the Defendants:
10
    DOUGLAS HENDERSON, ESQ.
11  KING & SPALDING LLP
    1180 Peachtree Street, NE
12  Suite 1600
    Atlanta, Georgia 30309
13  (404) 572-2769
    dhenderson@kslaw.com
14
15  Also present:
16  ANGELA LYONS, Remote Videographer
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  I N D E X
 2
 3  WITNESS:  CRAIG ALEXANDER JONES, Ph.D.
 4                                          PAGE
 5             INDEX OF EXAMINATIONS
 6    BY MS. TADIO:                           5
 7
 8              INDEX OF EXHIBITS
 9  EXHIBITS                               MARKED
10  Exhibit 1 Notice of Deposition           7
11  Exhibit 2 The original Dr. Craig Jones Expert   9
              Report
12
    Exhibit 3 Supplemental Materials Considered    9
13
    Exhibit 4 Amended Materials Considered    9
14
    Exhibit 6 Amended Jones Report 2025       9
15
    Exhibit 7 Integral Consulting Inc. invoices   30
16        dated September 12, 2022
17  Exhibit 5 Failure Mechanism Modeling     119
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          SANTA CRUZ, CALIFORNIA
 2     THURSDAY, SEPTEMBER 4, 2025; 8:33 A.M.
 3
 4
 5        THE VIDEOGRAPHER:  Good morning.  We are now
 6  on the record.
 7        The time is 8:33 a.m. Pacific on September
 8  4th, 2025.  This begins the videoconference deposition
 9  of Craig Jones, taken in the matter of Conservation Law
10  Foundation, Incorporated, versus Equilon Enterprises,
11  LLC, filed in the United States District Court for the
12  District of Connecticut, Civil Action number 3:21-cv-
13  00933-VDO.
14        My name is Angela Lyons.  I'm your remote
15  videographer today.
16        The court reporter is Vanessa Harskamp.
17        Will all counsel please introduce themselves
18  and state who you represent, after which our reporter
19  will swear in the witness.
20        MS. TADIO:  My name is Anna Tadio.  I am the
21  counsel for Conservation Law Foundation, who I will
22  refer to as CLF throughout this deposition.
23        MR. HENDERSON:  And I'm Douglas Henderson,
24  counsel for the Defendants in this case.
25                  -oOo-
```



CRAIG ALEXANDER JONES PH.D.                          September 04, 2025
Conservation Law vs Shell Oil Co.                                    5–8

Page 5

1         CRAIG ALEXANDER JONES, Ph.D.
2  having been first duly sworn, testified as follows:
3            EXAMINATION
4  BY MS. TADIO:
5      Q.   Okay.  So, Dr. Jones, thank you for being here
6  with us today.  Again, my name is Anna Tadio.  I'm
7  counsel for Conservation Law Foundation in the matter of
8  Shell Oil Company, Equilon Enterprises versus -- CLF
9  versus Shell Oil Company; Equilon Enterprises, doing
10  business as Shell Oil Products U.S.; Shell Petroleum,
11  Inc.; Triton Terminaling, LLC; and Motiva Enterprises.
12        I will refer to CLF Conservation Law
13  Foundation as CLF throughout this deposition.  Will that
14  be acceptable with you?
15      A.   Yes, ma'am.
16      Q.   What is your full name and address for the
17  record?
18      A.   Craig Alexander Jones, 250 33rd Avenue, Santa
19  Cruz, California 95062.
20      Q.   Thank you.  Here are some basic groundrules
21  for the deposition today.  So that the court reporter
22  can record all of your answers, you should answer every
23  question audibly and not by nodding or saying "uh-huh";
24  do you understand that?
25      A.   Yes, I do.

Page 6

1      Q.   Thank you.  Sometimes your lawyer may object
2  to my questions, but unless he instructs you not to
3  answer, you will still need to answer my question.
4        Are you clear on that?
5      A.   Yes.
6      Q.   Thank you.  The court reporter cannot take
7  down what is being said if more than one person is
8  talking at the same time.  Please wait to begin your
9  answer until I have finished asking my question and
10  until your lawyer has finished objecting.
11      A.   I understand.
12      Q.   Thank you.  We will take breaks theout the
13  deposition.  If there is any reason you need an
14  additional break, please let me know; okay?
15      A.   Sounds perfect.  Thanks.
16      Q.   And I did do some math, and I see about 3:30
17  my time will be about 1:30 your time, so depending on
18  how we are going, we can take a longer break at that
19  time, too, if time accommodates.
20      A.   Thank you.
21      Q.   Do you understand that you are under oath
22  today?
23      A.   Yes, I do.
24      Q.   What does being under oath mean to you?
25      A.   To tell the truth.

Page 7

1      Q.   Is there anything preventing you from giving
2  truthful testimony today?
3      A.   No.  There isn't, excepting confidential work
4  from my past resume of work.
5      Q.   Are you prepared to testify fully and
6  truthfully, regardless of whether or not your testimony
7  hurts the position taken by the Defendants in this case?
8      A.   Yes, I am.
9      Q.   Were you provided with a copy of the Notice of
10  Deposition for today?
11      A.   Yes, I was, via e-mail.
12      Q.   Okay.  And did you review that?
13      A.   Yes, I did.
14        MS. TADIO:  Okay.  I am now going to introduce
15  a series of exhibits, beginning with the Notice of
16  Deposition.
17        And I will ask my paralegal to stamp this and
18  mark this as Jones Exhibit 1.  I'll wait and make sure
19  that we are able to do that.
20        MS. YU:  Sorry, Anna, I don't think I have
21  permission to stamp it.
22        MS. TADIO:  Yeah, I can stamp it.  Okay.
23  I am marking this exhibit.
24        (Plaintiff's Exhibit 1 marked for
25        identification)

Page 8

1        MS. TADIO:  Can everyone see that?
2        THE WITNESS:  Yes.
3        MR. TADIO:  Okay.  Perfect.  Okay.
4        Next I'm going to introduce the original
5  Dr. Craig Jones Expert Report, and I will do this just
6  because that's where your CV is contained.  So we will
7  use that strictly for your CV.
8        MR. HENDERSON:  And Anna, what is the date of
9  the report?
10        MS. TADIO:  Oh, sorry.  Was the other one --
11  was this actually introduced, the Notice of Deposition?
12  Is everyone able to see that?
13        THE COURT REPORTER:  Yes.
14        MS. TADIO:  Great.  So now I'll get us out of
15  that.  So the original report I want to introduce, and
16  only because it contains the CV, is 2025-06-23.  So
17  here, can everyone see that?
18        And I will stamp this.  Again, we are using
19  this just for the resume.  I will use the full, actual
20  expert report, all of the newly-provided materials for
21  today.
22        Is that acceptable, Counsel, to use the report
23  just for the CV?
24        MR. HENDERSON:  Absolutely.
25        MS. TADIO:  Okay.  So I'm marking this as



Page 13

1    Q.  Did you take notes during any of these
2 meetings?
3    A.  General notes, yes.
4    Q.  Did you retain a copy of your notes?
5    A.  I do have a copy of my notes, yes.
6    Q.  And were you videotaped during your prep?
7    A.  Not to my knowledge.
8    Q.  Okay.  Did you bring any documents with you
9 today?
10    A.  I did.  I have one binder with a clean copy of
11 my expert report (indicating) and CV.
12    Q.  Okay.  What is that?
13    A.  And denoting the major sections just to
14 facilitate.
15    Q.  Okay.  And is that all that you have with you
16 today?
17    A.  Yes, it is.
18    Q.  And those are the materials that have been
19 fully provided to us this morning; correct?
20    A.  Correct.
21    Q.  Okay.  Excellent.  Dr. Jones, in your expert
22 report you include a section called "Materials
23 Considered" in the full report.  Are those materials the
24 full set of materials that you considered in developing
25 your opinions?

Page 14

1    A.  They would be the primary materials I
2 considered.  But, of course, just general knowledge and
3 other books and papers I know from the general content
4 that may not be explicitly listed in there, but those
5 would be my primary reliance, certainly.
6    Q.  Are there any supplemental materials other
7 than the ones provided with Defendants' objections or
8 the ones provided to us this morning that you relied on?
9    A.  No, not as primary reliance.  Again, my
10 general background of 25 years, there may be other
11 material, but I generally rely on the note primary
12 source that strictly are all there.
13    Q.  So can you confirm that all of your opinions
14 related to this case are contained in your updated
15 expert report?
16    A.  My opinions to date are in there.  Of course,
17 I reserve the right to offer or refine any opinions
18 based on new information.
19    Q.  Okay.  And so between the references listed in
20 your report, the materials considered, and then the
21 supplemental materials titled Additional Materials
22 Considered sent by the Defendant's counsel on December
23 2nd, 2025 and then the two documents sent this morning,
24 is that everything you relied on to write this expert
25 report, and your background knowledge?

Page 15

1    A.  Yes.  Those would be the primary sources.
2    Q.  Okay.  When you keep saying "primary sources,"
3 can you explain what you mean by that other than your
4 background knowledge?  Did you bring any other
5 materials?
6    A.  I would refer to primary sources as everything
7 I listed.  Secondary sources would be background
8 knowledge.
9    Q.  Okay.  Am I correct that you did some things
10 to prepare for this deposition?
11    A.  Yes.
12    Q.  Can you tell me what you did to prepare for
13 this deposition?
14    A.  The five meetings with the attorneys that we
15 just discussed, and then reading my expert report
16 thoroughly, reading reports of other experts, as well as
17 rebuttals and depositions of other experts involved in
18 the case.
19    Q.  Can you name all of the individuals that you
20 spoke to, whether it be in person, on the phone or by
21 some other means to prepare for this deposition?
22    A.  I think I generally could, yes.
23    Q.  Okay.  And who are those people?
24    A.  That would be Doug Henderson, Carmen Toledo
25 and Sydney Weiss are the primary people that I met with

Page 16

1 in direct preparation for the deposition.
2        I spoke with my colleague here at Integral
3 that I have worked with just to validate and cue any
4 information.  I believe there was another attorney at
5 King & Spalding who had some questions for me regarding
6 another deposition he was given -- giving.  And I don't
7 recall anyone else that I spoke to.
8    Q.  Okay.
9    A.  For this deposition.
10    Q.  Okay.  Is there anyone that you feel that you
11 should have spoken to in order to prepare for this
12 deposition but that maybe you didn't have access to?
13    A.  Not to my knowledge, no.
14    Q.  Did you ask to speak with anyone but couldn't
15 get ahold of them?
16    A.  No, I did not.
17    Q.  Did you review any documents in preparation
18 for your testimony here today?
19    A.  My expert report and documents associated with
20 my expert report would be the main documents that I
21 reviewed, as well as I mentioned depositions and expert
22 reports of other experts.
23    Q.  And who selected the documents that you
24 reviewed to prepare for this deposition?
25    A.  I did.



CRAIG ALEXANDER JONES PH.D.                           September 04, 2025
Conservation Law vs Shell Oil Co.                              133–136

Page 133

1    A.  I believe the Terminal manager for New Haven,
2  yes, I have met with him.  And I believe he was a -- I
3  don't know if he was a fact witness or what kind of
4  witness he was.
5    Q.  What, if anything, do you plan on doing on
6  this case between now and trial?
7        MR. HENDERSON: Object to the form of the
8  question to the extent it requires a disclosure of
9  attorney-client communications, work product, or the
10  production of information or documents that are covered
11  by the protective order or confidentiality agreement.
12        THE WITNESS:  At this time I don't know if I'm
13  going to be testifying at trial, so I would reserve the
14  right of any new data that comes to light or any reports
15  that come to light.  But besides that, I don't know if
16  I'm testifying, so I don't know.
17  BY MS. TADIO:
18    Q.  Is there any information that you are aware of
19  sitting here today that you did not have that you would
20  need to give your opinions at trial?
21    A.  No.  Not to my knowledge.
22    Q.  Is there any information that you do not have
23  sitting here today that you feel would strengthen or
24  weaken your opinions?
25    A.  Not that I can think of today, no.

Page 134

1    Q.  Did you complete modelling to inform your
2  report?
3    A.  I did.
4    Q.  Can you tell me about that modelling?
5    A.  Yes.  Completed hydrodynamic modelling to look
6  at flood extents in the vicinity of the New Haven
7  facility.
8        Also conducted tank risk modelling to look at
9  potential risk of failure of tanks during different
10  flood events.  Those were the two primary types of
11  modelling.
12    Q.  Anything else?
13        (Dog barking)
14        THE COURT REPORTER:  I don't know how to write
15  that.
16        THE WITNESS:  Could you repeat the question?
17        MR. HENDERSON:  I thought that was a good
18  comment, too.  Thank you.
19        MS. TADIO:  I'm sorry, that's my dog.  One
20  moment. I apologize.
21  BY MS. TADIO:
22    Q.  So you did two types of modelling to inform
23  your report, hydrodynamic modeling and risk modeling?
24    A.  Correct.
25    Q.  I apologize.  Who else completed the modelling

Page 135

1  that informs your report?
2    A.  Chris Flanary assisted me with those models.
3    Q.  Do you have any opinions on storm surge
4  modelling?
5        MR. HENDERSON:  Object to the form of the
6  question.
7        THE WITNESS:  Yeah.  Do you mean in general or
8  specifically referring to my report?
9  BY MS. TADIO:
10    Q.  Specifically in your expert report, are there
11  any opinions on the storm surge modelling?
12    A.  I don't believe I have.  I have opinions
13  informed by storm surge modelling.  I don't believe I
14  have a direct opinion in the report on storm surge
15  modelling.  Storm surge assessment and general
16  understanding of storm surge is certainly an integral
17  part of my work here, though.
18    Q.  What is the name of the model that you are
19  relying on?
20    A.  The key models are relying on FEMA flood plain
21  maps that are informed by models that FEMA commissions;
22  the NACCS model, which I reference in the report; the
23  Delft Flexible Mesh model which I use.  And then the
24  Tank Failure Probability model, which is even, I
25  apologize, and I'm going to mispronounce the author's

Page 136

1  names, is based on a peer-reviewed literature model from
2  Khakzad, and I apologize, I don't want to butcher their
3  names, but that I reference in the report.
4    Q.  Is there a written report of these various
5  models?
6    A.  Yes.  The FEMA work would be documented on the
7  FEMA website with background materials.
8        The NACCS model is documented online, and I
9  have a link to it in my report.
10        The Delft FM model has documentation
11  associated with it, and, again, the Khakzad and Gelder
12  model is documented in their report, as well as other
13  follow-on documents that discuss these models.
14    Q.  So of the FEMA model, the NACCS model, the
15  Delft3D FM model, which of those are the hydrodynamic
16  modelling?
17    A.  All of those have hydrodynamic components to
18  them.
19    Q.  And who specifically completed that modelling?
20    A.  No, the FEMA modelling was conducted under the
21  direction of FEMA.  The NACCS modelling was conducted
22  under the umbrella of the Army Corps of Engineers, but
23  in conjunction with NOAA and others, and the Delft FM
24  model was conducted by myself and Chris Leonard.
25    Q.  And the modelling that you did use to inform



CRAIG ALEXANDER JONES PH.D.                    September 04, 2025
Conservation Law vs Shell Oil Co.                              137–140

Page 137
1  your report, so, for example, FEMA and the NACCS
2  modelling, did you speak to the people that completed
3  that modelling?
4      A.  No, I did not.
5      Q.  Are you offering any opinions on Integral
6  modelling?
7          MR. HENDERSON:  Object to the form of the
8  question.
9          THE WITNESS:  Yeah, I -- am I offering
10 opinions informed by the Integral modelling?  Was that
11 your question?
12 BY MS. TADIO:
13     Q.  Yes, correct.  Are you offering any opinions
14 on Integral modelling?
15     A.  My opinions are informed by the Integral
16 modelling, yes.
17     Q.  Okay.  So you are not offering any opinions on
18 the Integral modelling then; correct?
19         MR. HENDERSON:  Object to the form of that
20 question.  Could you repeat that?
21         THE WITNESS:  Yeah.
22 BY MS. TADIO:
23     Q.  Yeah, I'm just trying to make sure that we
24 have clear for the record, you are not offering any
25 opinions on the Integral modelling; is that correct?

Page 138
1      A.  My opinions are informed by the Integral
2  modelling.
3      Q.  Thank you for that clarification.
4          And you are not a flood modeler; correct?
5          MR. HENDERSON:  Object to the form of the
6  question and the foundation of the question.
7          THE WITNESS:  My graduate work was in
8  hydrodynamic modelling of surface water flows.  And I
9  have spent my entire career directing and conducting
10 modelling efforts that include flooding components, so I
11 consider myself a flood modelling expert, yes.
12 BY MS. TADIO:
13     Q.  Okay.  Great.  Could you please show me where
14 in your report you completed the flood modelling?
15     A.  The flood modelling for our work, I relied on
16 NACCS water level data to look at loadings on the tanks.
17 Work that Dr. French McCay relied on, I believe, was
18 informed by additional modelling that we had done that I
19 did not perform in my expert report.
20     Q.  Dr. Jones, have you completed modelling for
21 the New Haven Terminal?
22     A.  Yes.
23     Q.  Which modelling?
24     A.  The Delft FM model that is included as an
25 appendix in the French McCay report and the tank

Page 139
1  modelling -- the tank risk modelling that is included in
2  my report.
3      Q.  Have you ever certified a SWPPP in New Haven
4  Connecticut?
5          MR. HENDERSON:  Object to the form of the
6  question.
7          Actually, I couldn't understand the question.
8          Could you repeat that, Anna?  Anna, I'm sorry.
9          MS. TADIO:  Sure.  Yep.
10 BY MS. TADIO:
11     Q.  Have you ever certified a SWPPP in New Haven
12 Connecticut?
13     A.  No, I have never performed in a regulatory
14 capacity to certify a SWPPP.
15     Q.  Have you ever performed a Climate Risk
16 Assessment for the New Haven Terminal?
17         MR. HENDERSON:  Excuse me.  Again, I'm not
18 being dense.  What is the last part of your question?
19 I'm just -- it's tailing off for me.  I apologize.
20 BY MS. TADIO:
21     Q.  I'll repeat:  Have you ever performed a
22 Climate Risk Assessment for the New Haven Terminal?
23     A.  The work that I present here has climate risk,
24 coastal hazard in particular, assessment in it.  This is
25 the first time I have performed this work for the New

Page 140
1  Haven Terminal.
2      Q.  To be in compliance under the Clean Water Act
3  a facility must have a certified SWPPP.  Is this
4  correct?
5      A.  Correct.
6          MR. HENDERSON:  Object to the form of the
7  question and foundation of the question.
8          THE WITNESS:  Via the Connecticut DEEP Multi-
9  Sector General Permit, the facility must have a SWPPP,
10 and that is enacted in a chain, as I understand it, up
11 to the Clean Water Act.
12 BY MS. TADIO:
13     Q.  Was there a certified SWPPP during Motiva
14 ownership?
15     A.  I don't know the chain of ownership or
16 operation of the facility in detail.  I have reviewed
17 the SWPPPs since 2017, which was in effect, as I
18 understand it, was the first CLF Notice of Intent of
19 file.  I have seen the SWPPPs since then, so to my
20 knowledge there have been certified SWPPPs in effect for
21 that entire period are.
22     Q.  The SWPPP was certified in 2021; correct?
23     A.  I believe so, yes.
24     Q.  There was not a certified SWPPP prior to 2021
25 during the Motiva ownership; correct?

