## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION, INC.,

                Plaintiff,

    v.

EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,

                Defendants.

Case No: 3:21-cv-00933-VDO

October 3, 2025

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE PLAINTIFF'S EXPERT BRUNO PIGOTT

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") respectfully move to exclude Plaintiff Conservation Law Foundation Inc.'s ("CLF's") rebuttal expert, Bruno Pigott, under Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 401–403, and 702.

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................. 1

II.  MR. PIGOTT'S OPINIONS AND QUALIFICATIONS ...................... 5

III.  LEGAL STANDARD ............................................................ 6

    A.  Under Federal Rule of Civil Procedure 26, Rebuttal Reports Must Actually *Rebut* the Opposing Party's Expert ............................................ 6

    B.  Plaintiff Bears the Burden to Show its Experts Meet the Requirements Federal Rule of Evidence 702 ................................................. 7

IV.  ARGUMENT .................................................................... 8

    A.  Mr. Pigott's Opinions Should Be Excluded as Improper and Untimely Rebuttal Under Federal Rules of Civil Procedure 26 and 37 .................. 8

    B.  Mr. Pigott's Opinions Should Be Excluded as Irrelevant Because He Relies on Another Permit Instead of the 2018/2021 Permit at Issue .............. 12

        1.  Mr. Pigott's Opinions Are Irrelevant and Cannot Assist the Jury Because He Relies on Other 2018/2021 Permits ..................... 12

        2.  Mr. Pigott's Opinions Do "Not" Fit the Claims in this Case, Because He Relies on Irrelevant Facts ................................. 14

    C.  Mr. Pigott's Methodology Is Unreliable and Inadmissible Under Rule 702 Because It Is Not Based on the Operative 2018/2021 Permit or any Relevant Statutory, Regulatory, or Legal Authority ............................... 17

        1.  Mr. Pigott's Methodology Is Flawed Because He *Only* Considers Irrelevant *Cherry-Picked* Information to Support His Position ....... 17

        2.  Mr. Pigott's Methodology Is Flawed Because He Did Not Consider the Terminal's Applicable 2018/2021 Permit ........................ 20

        3.  Mr. Pigott's Methodology Is Flawed Because He Relies on Irrelevant, Indiana-Based Experience ......................................... 21

        4.  Mr. Pigott's Methodology Is Flawed Because He Improperly Interprets the CWA .............................................. 25

    D.  Mr. Pigott's Opinions Should Be Excluded Because They Waste Time, Are Cumulative, and Are Prejudicial Under Rule 403 ....................... 27

V.     CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
    707 F. Supp. 3d 309 (S.D.N.Y. 2023).........................................................................9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002)....................*passim*

*Barack v. Am. Honda Motor Co.*,
    No. 09-CV-565, 2013 WL 12291437 (D. Conn. Apr. 10, 2013)................................8

*Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*,
    No. 22-cv-6653, 2024 WL 4227760 (S.D.N.Y. Sept. 18, 2024) ...............................9

*Chery v. Town of Enfield*,
    No. 3:19-CV-1952 (VDO), 2024 WL 4372386 (D. Conn. Oct. 2, 2024)...........................6, 12

*City & Cnty. of San Francisco, Cal. v. EPA*,
    604 U.S. 334 (2025)........................................................................................4, 13, 26

*Connecticut Fair Hous. Ctr v. CoreLogic Rental Prop. Sols., LLC*,
    No. 18-CV-705, 2021 WL 1186604 (D. Conn. Mar. 30, 2021) (J. Bryant) ...........................11

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................*passim*

*Densberger v. United Technologies Corp.*,
    297 F.3d 66 (2d Cir. 2002)..............................................................................28, 29

*Donaldson v. Grous*,
    No. 3:22-cv-810 (VDO), 2025 WL 1373741 (D. Conn. May 12, 2025)................................7

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)........................................................................................22

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)........................................................................14, 27, 29

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)........................................................................21

*Marx & Co., Inc. v. Diners' Club Inc.*,
    550 F.2d 505 (2d Cir. 1977)........................................................................27

*Max Zach Corp. v. Marker 17 Marine*,
No. 3:23-CV-01088 (VDO), 2024 WL 4614487 ................................................................. 7

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
982 F.3d at 123 ........................................................................................................... 20, 21

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ......................................................................................... 8, 27

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ............................................................................................................ 17

*Precision Trenchless, LLC v. Saertex multiCom LP*,
2022 WL 594096 (D. Conn. Feb. 28, 2022) .............................................. 12, 13, 14, 16

*Pugliano v. United States*,
315 F. Supp. 2d 197 (D. Conn 2004) ........................................................................ 14, 27

*In re Rezulin Prod. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005) ............................................................................. 19

*Ruggiero v. Warner–Lambert Co.*,
424 F.3d 249 (2d Cir. 2005) ............................................................................................. 14

*TMI Tr. Co. v. WMC Mortg., LLC*,
No. 3:12-CV-1538 (CSH), 2017 WL 6617050 (D. Conn. Dec. 28, 2017) ................ 8, 28

*United States v. Articles of Banned Hazardous Substances Consisting of an
Undetermined No. of Cans of Rainbow Foam Paint*,
34 F.3d 91 (2d Cir. 1994) ................................................................................................. 28

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ........................................................................................ 28

*Wang v. Omni Hotels Management Corporation*,
No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ........................ 7

**Statutes**

33 U.S.C. § 1342(b) ................................................................................................... 4, 16

Clean Water Act, 33 U.S.C. § 1251 et seq. ................................................................ *passim*

33 U.S.C. § 1311(b)(1)(C) ......................................................................................... 4, 26

**Other Authorities**

40 C.F.R. Part 123 ............................................................................................................ 16

Fed. R. Civ. P. 26 ................................................................................................ *passim*

Fed. R. Civ. P. 37(c)(1) .................................................................................. 7, 12

Fed. R. Evid. 401 ................................................................................................ *passim*

Fed. R. Evid. 402 .......................................................................................... 3, 6, 29

Fed. R. Evid. 403 ................................................................................................ *passim*

Fed. R. Evid. 701 ................................................................................................ 14

Fed. R. Evid. 702 ................................................................................................ *passim*

## I.      INTRODUCTION

In this citizen suit, CLF alleges that Defendants were required to assess for and address the risks of climate change at the New Haven Terminal (the "Terminal") under the terms of the General Permit for Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") in 2018 and was extended without substantive changes in 2021 (collectively, "the 2018/2021 Permit").  There is no dispute, however, that the 2018/2021 Permit itself does not expressly require permittees to consider climate change risks.  Instead, CLF and its affirmative experts, particularly Bruno Pigott, assert that the obligation to consider climate change was "implied" in the 2018/2021 Permit, despite the lack of any CT DEEP guidance to support that interpretation and despite CT DEEP's statement that its 2024/2025 draft permit requires permittees to consider climate resilience as a "new consideration."[1][2]

In response to Plaintiff's strained (and incorrect) interpretation of the 2018/2021 Permit, Defendants produced reports by two former U.S. Environmental Protection Agency ("EPA") regulators who were charged with the enforcement of the Clean Water Act ("CWA"), Susan Bodine and David Uhlmann.[3] ███████████████████████████████████

████████████████████████████████████████████████████

---

[1] There is also no dispute that in this citizen suit Plaintiff bears the burden of proving that Defendants violated the Permit.  Under the Scheduling Order, any expert opinion to support Plaintiff's claim that the Permit terms required consideration of climate change factors had to be served by the initial expert disclosure date of May 1, 2025 [ECF 507].

[2] On October 1, 2025, CT DEEP issued a final permit, herein, the "New Permit."

[3] Ms. Bodine was EPA Assistant Administrator for Enforcement and Compliance Assurance during the first Trump Administration, from December 2017 to January 2021.  Bodine Rept. at ¶ 9(k) (Ex. A).  Mr. Uhlmann served in that same position during the Biden Administration, from July 2023 to December 2024.  June 23, 2025 Uhlmann Rept. ¶ 9 (Ex. B).

██████████████████████████████████████████████████████

████████████████████████████████████████

CLF filed this lawsuit on July 7, 2021 [ECF 1].  More than four years later—on July 27, 2025, CLF identified Bruno Pigott, the former Acting Assistant Administrator for Water at EPA, as a purported "rebuttal expert."  *See generally* July 27, 2025 Pigott Rebuttal Rpt. (Ex. C). While Mr. Pigott purports to rebut Ms. Bodine's and Mr. Uhlmann's opinions, *id.* at 12, he actually offers **affirmative** opinions that the 2018/2021 Permit required that the Defendants consider climate change, and that the CWA is an appropriate tool to address climate change – all issues for which CLF bears the burden of proof.  In other words, all of Mr. Pigott's opinions are improper bolstering of CLF's claims and are not responsive to any Defendants' expert opinions. The Court should exclude Mr. Pigott's "rebuttal" opinions for at least four reasons.

*First*, Mr. Pigott's opinions are improper rebuttal under Rule 26 because they affirmatively bolster CLF's claims in this case instead of rebutting any of Defendants' expert opinions.  Specifically, he opines that the "operative permit" requires permittees to consider climate change, and that a CWA citizen suit is the proper enforcement tool (again, despite the lack of any express requirement in the 2018/2021 Permit or other indication from CT DEEP). That is the central issue in this case, known to CLF from the beginning of this lawsuit and extensively discussed by CLF's other affirmative experts.

Given CLF's knowledge of its claims and the scope of Mr. Pigott's opinions, it should have produced any report from Mr. Pigott by no later than its May 1, 2025 deadline for initial expert reports, as requested in the *Joint* Motion for Extension of Discovery Deadlines [ECF 506]. Instead, CLF disclosed Mr. Pigott's opinions for the first time nearly two months later.  *See* Ex. C.  CLF cannot circumvent this Court's order [ECF 507]—or the Federal Rules of Civil

Procedure—by producing untimely affirmative opinions (*i.e.*, opinions that should have been produced by the original expert disclosure deadline) under the guise of "rebuttal" testimony.

*Second*, even if Mr. Pigott's opinions were not improper rebuttal, CLF cannot establish an evidentiary foundation for introducing Mr. Pigott's opinions because they are irrelevant and do not satisfy the other prerequisites for admitting expert testimony. *See* Fed. R. Evid. 401-402, 702. As he conceded in his deposition, Mr. Pigott **never reviewed the 2018/2021 Permit** at issue here. Ex. D, Pigott Dep. at 92:20–24. Instead, Mr. Pigott relies on the EPA and its MSGP[4]—which does not apply to the Terminal, and thus has no bearing on the questions before the jury—to provide conclusions about "the operative permit" (that he never reviewed), including that the Permit "requires consideration of climate change" by analogizing to the MSGP. Ex. C, Pigott Rpt. at 16–17. Mr. Pigott even opined that the term "good engineering practice" requires permittees in Connecticut to consider climate change, even though that term from the MSGP is not included in the Connecticut General Permit—effectively imposing non-existent obligations that he prefers over the ones that govern the Terminal. An admissible expert opinion must be based on **sufficient facts** and data **and** a reliable application of the expert's methodology **to the facts of this case**. *See* Fed. R. Evid. 702(b)(d). His creative interpretation of a document he never read, under regulatory standards that do not apply, cannot satisfy those requirements.

Similarly, Mr. Pigott's opinion that the CWA is a "performance-based statute" is also contrary to a recent decision from the U.S. Supreme Court, which clarified that EPA cannot

---

[4] EPA's MSGP is the federal version of the general stormwater industrial permit that applies to a handful of states (Massachusetts, New Hampshire, New Mexico, and Idaho), federal facilities, and federal territories. EPA has delegated authority to regulate point sources through the National Pollutant Discharge Elimination System ("NPDES") permitting scheme to all other states, including Connecticut. Thus, the MSGP and the CT DEEP Permit are two distinct and separate permits that can—and do—have different terms and requirements.

attempt to enforce a general goal (like preventing pollution) as a permit term without providing permittees with adequate guidance or clearly identifiable permit terms and requirements. *City & Cnty. of San Francisco, Cal. v. EPA*, 604 U.S. 334, 355 (2025). In the *City & Cnty. of San Francisco, Cal.* case, the Court held that "§ 1311(b)(1)(C) [of the CWA] does not authorize the EPA to include 'end-result' provisions in NPDES permits. Determining what steps a permittee must take to ensure that water quality standards are met is the EPA's responsibility." Ex. C, Pigott Rpt. at 18; 604 U.S. at 355. Mr. Pigott should not be allowed to offer legal argument disguised as expert opinion—especially an incorrect and self-serving interpretation of legal precedent that is inconsistent with the actual case law.

*Third*, Mr. Pigott's methodology is also unreliable under Rule 702 because he relies on cherry-picked sources that are not relevant to the 2018/2021 Permit, while ignoring guidance that is directly on point. Mr. Pigott's methodology is based on his own say-so, his review of EPA's MSGP (the general federal permit not at issue here), and his review of other irrelevant sources. To help the fact-finder understand the requirements of any given permit, the expert's opinions must be based on the regulations, guidance, and documents *relating to that permit*, not other permits. Mr. Pigott could not cite a single statute, regulation, or even the operative permit to support his opinions. He also could not identify a date *when* he believes CT DEEP started requiring permittees to consider climate change under the 2018/2021 Permit. Additionally, Mr. Pigott's methodology is unreliable because, instead of performing a literature review or methodical search of evidence relevant to his opinions, he referenced a handful of cases that he claimed to be "generally aware" of before he formed his opinions. In other words, he did not perform a methodical search of relevant sources to reach his opinions, instead working backwards from his preconceived opinions.

*Fourth*, even if Mr. Pigott's opinions were otherwise admissible (they are not), Mr. Pigott's opinions should be excluded under Fed. R. Evid. 403 because (1) his references to **other permits** are unfairly prejudicial to Defendants, and would certainly mislead the jury about Defendants' obligations under the 2018/2021 Permit; and (2) his opinion is needlessly cumulative—as Mr. Pigott notes in his *own* report, Dr. Goldsmith already rebuts Defendants' expert, Ms. Bodine.

To be clear, this case is not a referendum on climate change. The sole issue in this citizen suit is whether Defendants complied with the 2018/2021 Permit. CLF's novel interpretation of the 2018/2021 Permit's terms—supported by its affirmative experts and by Mr. Pigott's testimony—is not based on or supported by any agency guidance or any relevant industry standards. Should the Court—over Defendants' objections—allow Mr. Pigott to provide opinions at trial that the 2018/2021 Permit required that the Terminal consider climate change (again, without even having reviewed the actual 2018/2021 Permit), citizen suits would become a vehicle for rewriting permits to an expert's liking with no notice to Defendants or even the agency that is charged with enforcement of the 2018/2021 Permit. Mr. Pigott's opinions are especially unfair under the guise of a "rebuttal" report.

## II.    MR. PIGOTT'S OPINIONS AND QUALIFICATIONS

In support of its CWA claims, CLF produced nine rebuttal expert reports, including proposed opinions from four entirely new "rebuttal" experts. One such new rebuttal expert is Mr. Bruno Pigott. Mr. Pigott is currently the executive director of the WateReuse Association, a Virginia-based organization that advocates for water reuse policies. Ex. D, Pigott Dep. at 14:5–15:15. He was formerly the Assistant Administrator for Water at the EPA, and before that he worked for many years at the Indiana Department of Environmental Management ("IDEM"), ultimately serving as Commissioner of the agency. Ex. C, Pigott Rpt. at 3. Mr. Pigott is *not* an

5

engineer, toxicologist, risk assessor, climate scientist, or lawyer.  Ex. D, Pigott Dep. at 64:25–65:7; 67:9–10.  He has *never* been employed at a chemical facility, nor has he been employed at a bulk petroleum storage terminal.  *Id.* at 65:20–66:1.

In his report, Mr. Pigott lists 10 opinions "regarding NPDES permit terms and conditions and climate change."  Ex. C, Pigott Rpt. at 1.  At a high level, he offers opinions that (1) EPA has long held the terms "Best Industry Practice" or "Good Engineering Practice" "place an affirmative burden on permittees to identify and address risks,", including those related to climate change; (2) EPA has a history of considering climate change impacts in enforcement cases and when interpreting permit requirements under the CWA; (3) the "'Operative Permit' requires consideration of climate change," (4) "the lack of express requirements relating to climate change" does not change Defendants' obligation to consider climate change under the 2018/2021 Permit; and (5) the CWA and enforcement mechanisms are "appropriate tools to address climate change."  *Id.* at 2.

As set forth more fully below, Mr. Pigott's opinions should be excluded under Federal Rule of Civil Procedure 26, and Federal Rules of Evidence 401, 403, and 702 because his opinions are improper rebuttal, irrelevant, impermissible methodologically, and prejudicial.

## III.    LEGAL STANDARD

### A.    Under Federal Rule of Civil Procedure 26, Rebuttal Reports Must Actually *Rebut* the Opposing Party's Expert

As a threshold matter, under Rule 26, expert rebuttal reports are "intended solely to rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  As this Court has recognized, it has the discretion to preclude introduction of evidence based on the proponent's failure to comply with the disclosure requirements in Rule 26. *See, e.g.*, *Chery v. Town of Enfield*, No. 3:19-CV-1952 (VDO), 2024 WL 4372386 at *1 (D. Conn. Oct. 2, 2024)

(applying FRCP 37(c)(1) to preclude testimony from witnesses based on untimely disclosure); *Donaldson v. Grous*, No. 3:22-cv-810 (VDO), 2025 WL 1373741, at \*12 (D. Conn. May 12, 2025) (same; "This action has remained unresolved for many years, and the machinery of trial is far along.  To extend the trial date further still would unnecessarily delay the resolution of this action and thus would not serve the ends of justice.").

**B.      Plaintiff Bears the Burden to Show its Experts Meet the Requirements Federal Rule of Evidence 702**

As clarified by the recent amendments to Rule 702, as the proponent of the testimony, CLF bears the burden of proving that it is admissible by a preponderance of the evidence.  *See Wang v. Omni Hotels Management Corporation*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at \*2 (D. Conn. June 27, 2025) (citation modified).  Federal Rule of Evidence 702 prohibits a witness who is qualified as an expert from testifying unless: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at \*1 (summarizing Fed. R. Evid. 702); *see also, e.g.*, Advisory Committee Note to 2023 Amendments to Rule 702 (explaining that "Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology.").

The importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal

quotations omitted); *see also TMI Tr. Co. v. WMC Mortg., LLC,* No. 3:12-CV-1538 (CSH), 2017

WL 6617050, at *4 (D. Conn. Dec. 28, 2017) ("The principal target of *Daubert* and Rule 702 is

the professional expert witness—well educated, impeccably dressed, highly articulate—who

dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors.").  It

follows that the proponent of the expert's opinions must also establish that they are admissible

under Rule 403.  *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

## IV.    ARGUMENT

The Court should exercise its gatekeeping duty to exclude Mr. Pigott's expert opinions

for four independent reasons: (A) Mr. Pigott's opinions are not proper rebuttal and are untimely

because they are affirmative opinions that do not contradict or rebut any defense expert; (B) Mr.

Pigott's opinions are irrelevant, do not "fit" the facts in this case, and are not helpful to the fact-

finder because they relate to his Indiana-based experience and permits not at issue, instead of the

applicable CT DEEP 2018/2021 Permit; (C) Mr. Pigott's methodology is unreliable because he

did not cite any statutory authority, regulatory authority, or the operative 2018/2021 Permit to

support his claim that permittees must consider climate change; and (4) Mr. Pigott's opinions are

unduly prejudicial—and would certainly mislead the jury, and are needlessly cumulative.

### A.    Mr. Pigott's Opinions Should Be Excluded as Improper and Untimely Rebuttal Under Federal Rules of Civil Procedure 26 and 37

Under Rule 26, rebuttal expert testimony is permitted "solely to contradict or rebut

evidence on the same subject identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  An

expert rebuttal report does exactly what it says: it rebuts, in the form of a complete statement of

all the opinions expressed by the author, the report of the opposing party's expert."  *Barack v.*

*Am. Honda Motor Co.*, No. 09-CV-565, 2013 WL 12291437, at *1, n. 1 (D. Conn. Apr. 10, 2013)

(excluding untimely rebuttal reports that did not "conform to the definition of rebuttal reports,

which are supposed to contradict, challenge and rebut the opposing party's expert's reports.").  In other words, a party may not "introduce entirely new analyses or opinions" through a rebuttal report.  *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 363 (S.D.N.Y. 2023); *see also Brink's Global Servs. USA, Inc. v. Bonita Pearl Inc., et al.*, No. 22-cv-6653, 2024 WL 4227760, at *8 (S.D.N.Y. Sept. 18, 2024) (striking expert rebuttal reports that did not directly respond to opposing expert opinions).

All of Mr. Pigott's opinions are improper "rebuttal."  Every one of Mr. Pigott's opinions revolves around one central issue—*i.e.*, whether climate change must be considered by permittees regulated by CT DEEP under its 2018/2021 Permit.  As a so-called "rebuttal" expert, Mr. Pigott claimed to respond to Mr. Uhlmann's and Ms. Bodine's opinions, but he instead offered affirmative opinions that bolster CLF's other disclosed experts' opinions, two months after the initial expert disclosure deadline.

Mr. Pigott does not substantively "contradict or rebut" Mr. Uhlmann's or Ms. Bodine's opinions.  Fed. R. Civ. P. 26(a)(2)(D)(ii). ████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████    Mr. Pigott does not respond to Mr. Uhlmann's opinion, nor could he, since Mr. Pigott admittedly never looked at any Terminal-specific documents, information, or data.

If Mr. Pigott had truly meant to rebut Mr. Uhlmann's opinions relating to Defendants' compliance with the 2018/2021 Permit, one would expect Mr. Pigott to address Mr. Uhlmann's assertion that Defendants' "hurricane action plan" or "other emergency response measures" are

sufficient to consider "climate change-driven risks such as extreme precipitation, storm surge, flooding, and sea level rise." Ex. C, Pigott Rpt. at 10–12. But Mr. Pigott does not provide rebuttal opinions about Defendants' hurricane action plan or **any** Terminal-related documents. He instead broadly asserts, without citation or support, that an "affirmative duty to assess and manage risks is consistent with the statutory objectives of the CWA,[5] which emphasize not only the control of existing discharges but also the prevention of foreseeable pollution." Ex. C, Pigott Rpt. at 10–11. Mr. Pigott never even reviewed any of the Terminal documents that were prepared to address emergency preparedness procedures and documents prepared to comply with the 2018/2021 Permit, such as the hurricane action plan or the Storm Water Pollution Prevention Plan ("SWPPP") to determine whether Defendants satisfied their supposed "affirmative duty" or sufficiently considered "climate change-driven risks."

> Q. And again, you haven't looked at any of the documents from the facility that talk about what analyses the facility … has done?
>
> A. I did not.

Ex. D, Pigott Dep. at 178:23–179:3.

> Q. Did you ask to review the SWPPP or any of the terminal documents?
>
> A. I did not.
>
>                         \* \* \*
>
> Q. You have no opinion on whether defendant[s'] existing plans and procedures to prepare for severe weather events are sufficiently protective, correct?
>
> A. I have no opinion.

*Id.* at 261:21–23, 76:13–17. Consequently, Mr. Pigott cannot express any opinion on whether Defendants' existing plans are sufficient.

---

[5] Notably, Mr. Pigott cites no statutory objectives of the CWA to support this assertion.

As another example showing that Mr. Pigott is not rebutting Defendants' experts, he conceded that he has no opinions regarding Defendants' compliance with RCRA, Ex. D, Pigott Dep. at 77:23–25, which both Mr. Uhlmann and Ms. Bodine offer opinions about. *See* Ex. B, Uhlmann Rpt. at 2–4; Ex. A, Bodine Rpt. at 1–2. The only time RCRA is mentioned in Mr. Pigott's report is once: in the test of his Opinion 9, as follows: "The lack of express requirements relating to climate change in the CWA and *RCRA* does not change that Shell should consider climate change under the Permit." Ex. C, Pigott Rpt. at 2 (emphasis added). But the discussion of Opinion 9 makes no mention of RCRA. And in his deposition, Mr. Pigott denied having an opinion about RCRA:

> Q. So you're not expressing any opinions regarding RCRA, correct?
> A. I'm not.
>
> * * *
>
> Q. Your report does not address any issues relating to hazardous waste management at the Terminal, correct?
> A. My report does not deal with hazardous waste [ ] material, no.

Ex. D, Pigott Dep. at 77:23-25, 78:11-15.

Proper rebuttal is **not** "merely pointing out that [the opposing experts'] assumption is wrong." *See Connecticut Fair Hous. Ctr v. CoreLogic Rental Prop. Sols., LLC*, No. 18-CV-705, 2021 WL 1186604, at *17 (D. Conn. Mar. 30, 2021) (J. Bryant) (excluding expert rebuttal opinion that was "merely pointing out that [the opposing experts'] assumption is wrong" without any independent analysis, which "is not helpful" and could be established through cross-examination). Indeed, regardless of Mr. Pigott's assertions that he disagrees with Mr. Uhlmann's or Ms. Bodine's opinions, Mr. Pigott did not perform any independent analysis to challenge those opinions. Accordingly, Mr. Pigott's opinions are not proper rebuttal and are not helpful to the fact-finder under Rule 702. *Id.*

Because Mr. Pigott's report offers affirmative opinions disguised as "rebuttal," CLF should have disclosed those opinions by the initial expert deadline. Fed. R. Civ. P. 37(c)(1); *see Chery* 2024 WL 4372386 at *1 (applying Fed. R. Civ. P. 37(c)(1) and precluding expert testimony based on untimely disclosure). All his opinions are inadmissible on this basis.

**B.    Mr. Pigott's Opinions Should Be Excluded as Irrelevant Because He Relies on Another Permit Instead of the 2018/2021 Permit at Issue**

The Court should exclude Mr. Pigott's opinions because his opinions relate to and rely on his Indiana agency experience and permits, on the EPA's MSGP, and the NPDES program "writ large" (Ex. D, Pigott Dep. at 165:18-22); the opinions do not "fit" the facts of this case and are therefore irrelevant. Mr. Pigott's testimony is nothing but inadmissible *ipse dixit*, because he cannot point to any objective standard or evidence to support his assertion that the operative 2018/2021 Permit required consideration of climate change.

**1.    Mr. Pigott's Opinions Are Irrelevant and Cannot Assist the Jury Because He Relies on Other 2018/2021 Permits**

Mr. Pigott's testimony is irrelevant because he grounds his opinions relate to the EPA's stormwater industrial permit and guidance, rather than the operative CT DEEP stormwater industrial permit, i.e., the 2018/2021 Permit. "[T]he trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002) (internal quotation omitted) (affirming the exclusion of expert testimony that relied on scientific literature that did not "fit" his opinions). For example, in *Precision Trenchless, LLC v. Saertex multiCom LP*, this Court excluded a damages expert's testimony about homeowners' insurance policies because it was irrelevant to the issue of damages in the case and invited an

"apples to oranges" comparison.  No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *31 (D. Conn. Feb. 28, 2022) (J. Hall).

Mr. Pigott grounds his opinions on *EPA* guidance and *EPA's* 2021 stormwater industrial permit, not the 2018/2021 Permit issued by CT DEEP, the regulatory agency in this case.

> Q.  So in, in your opinions that you express in your report, when you're talking about permit requirements you generally are talking about the EPA 2021 MSGP, correct?
>
> A.  I am talking about the MSGP . . . .

Ex. D, Pigott Dep. at 94:1–6

> Q.    And here again you rely on EPA and the MSGP, right?
>
> A.  I relied on the [EPA's] Office of Enforcement Compliance Assurance framework for protecting public and private investment and clean water enforcement remedies, as well as the climate change adaptation plan  . . .
>
> Q.  But you do not rely on any permit from Connecticut, correct?
>
> A.  No.  This statement is indicative of EPA's long consideration of climate.

*Id.* at 184:1–186:5.

> Q.  And again, in this opinion, you discuss the MSGP and not the Connecticut DEEP permit, correct?
>
> A.  I talk about the Clean Water Act Industrial Stormwater permitting program writ large, generally.
>
> Q.  But to the extent that you talk about any permit, you talk about the --
>
> A.  The MSGP later in the second paragraph, you're correct.  Thank you.

*Id*. at 195:14–21.  But the requirements of EPA's MSGP are not relevant to the 2018/2021 Permit at issue here.  In fact, CT DEEP's 2018/2021 Permit lacks any language that remotely resembles the language in the "climate section" of the EPA MSGP.[6]  Mr. Pigott asserting that EPA's permit

---

[6] In 2024, CT DEEP released a draft permit that for the first time incorporates the requirement that permittees consider resiliency measures to address climate change risks.  CT DEEP formally issued this permit on October 1, 2025, which will be effective November 1, 2205.  *See* https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/industrial-stormwater-gp.  Just like with the 2018/2021 Permit, Mr. Pigott had never seen and was not aware of the draft permit.  Ex. D, Pigott Dep. at 110:23-24 ("Q. Have you ever seen this document [the CT DEEP 2024/2025 draft permit] before?  A. I have not.  I do not believe I have.").

requirements somehow apply to CT DEEP's Permit is the kind of unfounded and irrelevant "apples to oranges" comparison that requires exclusion. *Precision Trenchless,* 2022 WL 594096, at *31.

### 2. Mr. Pigott's Opinions Do "Not" Fit the Claims in this Case, Because He Relies on Irrelevant Facts

In addition to the many deficiencies of Mr. Pigott's opinion under Rule 401—i.e., Mr. Pigott's opinion is based on other permits not at issue—the Court should also exclude Mr. Pigott's opinions under Rule 702. Mr. Pigott's testimony fails the relevance or "fit" requirements of Rule 702 because his opinions are not based on any documents, facts, information, or data that have any connection to the applicable 2018/2021 Permit. *See Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn 2004). Expert testimony "may fail to meet the fit requirement if it relates to facts or data that have not been adequately established in the case." *Amorgianos*, 137 F. Supp. at 163. Further, an expert must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) ("Under Rules 701 and 702, opinions must be helpful to the trier of fact"). "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 255 (2d Cir. 2005); *Pugliano*, 315 F. Supp. 2d at 202. However, Mr. Pigott cannot assist the jury in understanding the meaning of the 2018/2021 Permit, when he has never even read the relevant 2018/2021 Permit:

> Q. I'll represent to you that this is the permit that was in effect at the time CLF filed its lawsuit in this case; okay? Have you reviewed this permit?
>
> A. I have not reviewed this permit.

Ex. D, Pigott Dep. at 92:20–24.  Mr. Pigott asserts the CT DEEP 2018/2021 Permit required

climate change considerations even though he had no knowledge about the actual language in the

Permit:

> Q. Are you aware that the Connecticut general permit does not include the term 'good engineering practice'?
>
> A. I am not precisely aware of the language of the Connecticut general permit.

Ex. D, Pigott Dep. at 160:11–15.  Mr. Pigott was also unsure whether the Terminal was subject to

a general or an individual permit—which often have different requirements, even if issued by the

same permitting authority.  In his report, he stated that "the specific Operative permit must also

comply with the Connecticut General Permit."  Ex. C, Pigott Rpt. at 16.  The only reasonable

reading of that statement is that, at the time he wrote his report, Mr. Pigott did not perform any

research to even identify the "Operative permit" and was under the mistaken impression that the

Terminal had an individual permit – which it does not.  When asked about this in his deposition,

Mr. Pigott hedged, having by then realized his mistake from the deposition questioning:

> Q. Is it your understanding that the facility has an individual permit?
>
> A. It -- I understand that it has the Connecticut general permit, it's got coverage under the general permit. I do not know whether it has an additional individual permit.

 Ex. D, Pigott Dep. at 205:9–14.

A failure to read, skim, or have even a basic understanding of the 2018/2021 Permit,

renders Mr. Pigott's testimony irrelevant, as the crux of this case is whether Defendants complied

with the 2018/2021 Permit.  Mr. Pigott cannot provide an opinion on this, given he is unaware of

the 2018/2021 Permit's terms.  Instead, Mr. Pigott is applying his understanding of the EPA 2021

MSGP to the applicable 2018/2021 Permit here.  Mr. Pigott essentially conflates the EPA permit

(which is not relevant in this analysis) and the CT DEEP 2018/2021 Permit, asserting that the

obligations of the "climate section" in EPA's 2021 MSGP is binding on the CT DEEP 2018/2021

Permit, despite no language to that effect in the 2018/2021 Permit and even though such an

interpretation is contrary to the NPDES permit scheme, in which EPA delegates authority to

individual states—including Connecticut—to issue their own stormwater permits.  33 U.S.C. §

1342(b); 40 C.F.R. Part 123.  Mr. Pigott's interpretation is comparable to saying that the terms of

a contract signed by two parties apply to an entirely separate contract signed by two different

parties—an opinion that is untenable and unhelpful to the jury.  "[T]he trial court should look to

the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e.,

whether it "has any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence."  *Amorgianos*, 303 F.3d at 265 (internal quotation omitted) (affirming the exclusion of

expert testimony that relied on scientific literature that did not "fit" his opinions).  For example,

in *Precision Trenchless, LLC*, this Court excluded a damages expert's testimony about

homeowners' insurance policies because it was irrelevant to the issue of damages in the case and

invited an "apples to oranges" comparison.  2022 WL 594096, at *31.

The Court should exclude Mr. Pigott's testimony because his opinions are irrelevant

under Rule 401—his reliance on EPA guidance and federal permits, which are not the Permit at

issue in this case, results in "apples to oranges" comparisons that do not make any fact more or

less probable and therefore lack relevance.  Mr. Pigott's testimony continuously fails to bridge

the analytical gap between EPA's MSGP permit and the 2018/2021 Permit and site-specific

conditions, offering only his *ipse dixit* untethered to the controlling regulatory language.

Accordingly, the Court should exclude Mr. Pigott's opinions under Rule 702's "fit" requirement

as his opinions will not assist the trier of fact because he relies on facts that are irrelevant to this case.

### C. Mr. Pigott's Methodology Is Unreliable and Inadmissible Under Rule 702 Because It Is Not Based on the Operative 2018/2021 Permit or any Relevant Statutory, Regulatory, or Legal Authority

Rule 702 requires that an expert witness's opinions must be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Courts assess a number of factors to determine reliability, such as "whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." *Daubert*, 509 U.S. at 580. Here, Mr. Pigott fails to identify reliable methodologies to support his opinions that the 2018/2021 Permit required permittees to consider climate change.

### 1. Mr. Pigott's Methodology Is Flawed Because He *Only* Considers Irrelevant *Cherry-Picked* Information to Support His Position

First, Mr. Pigott's methodology relies on cherry-picked guidance, websites, and memoranda from EPA that in no way relate to the 2018/2021 Permit or the Terminal. Ex. C, Pigott Rpt. at 4. Mr. Pigott's methodology is flawed because his randomly selected guidance, documents, and memoranda are not only not binding on Defendants with respect to compliance with the applicable 2018/2021 Permit, but are—as explained above—totally irrelevant. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 92 (2015) (holding "[i]nterpretive rules" "do not require notice-and-comment rulemaking, and do not have the force and effect of law"); *Agency Use of Guidance Documents*, Congressional Research Service (Apr. 19, 2021), https://www.congress.gov/crs-product/LSB10591 (stating "Agencies often issue statements that,

unlike legislative rules, do not carry the force of law").  Tellingly, Mr. Pigott could not cite a

single statute or regulation to support his opinion that the 2018/2021 Permit required permittees

to consider climate change, nor could he cite a date or document supporting *when* these

purported climate change obligations began.

> Q.  What do you mean in that first sentence of Opinion 6 where you say *that EPA has long considered* climate change in the context of permit interpretation?
>
> A.  Well, what I mean is that permits that use terminology such as 'best industry practice' or 'best engineering practices' include the evaluation of, of climate in the consideration of being in compliance with the permit, as part of the conditions of a permit.
>
> Q.  In your opinion, what is the date when that became an implied term of the permit?
>
> A.  *I do not have a date . . . .*

Ex. D, Pigott Dep. at 187:13–188:1 (emphasis added).  He simply could not cite to any support

for his assertion that this obligation has existed for "25 years."  *Id.* at 188:18-189:22 (testifying

that general permits required "climate change analyses" the entire time he worked as a regulator,

or 25 years).

> Q.  Can you cite to any document, regulation, permit that supports your statement that, that that has been an implicit requirement of the permit for the permit for 25 years?
>
> A.  I do not have a specific citation for that . . . .

*Id.* at 236:6–10.  Nor could he cite any document or guidance from Connecticut or that related to

the 2018/2021 Permit.  As stated above, Mr. Pigott did not even review the operative 2018/2021

Permit, and based his opinions on EPA's permit, not CT DEEP's:

> Q.  So in, in your opinions that you express in your report, when you're talking about permit requirements you generally are talking about the EPA 2021 MSGP, correct?
>
> A.  I am talking about the MSGP . . . .

Ex. D, Pigott Dep. at 94:1–6.

Further, Mr. Pigott even conceded that EPA's 2021 industrial stormwater permit included a "climate section" for the first time in 2021 and that this was "an addition, a new provision," *Id.* at 101:1–6. Yet, he still asserts the same obligation existed in prior versions of the EPA MSGP and all NPDES permits as an "implied" term—but could not identify any supporting citation, date, enforcement example, or source predating 2021. *Id.* at 168:17–170:25; 235:20–236:3.

Because Mr. Pigott's opinions rest *only* on guidance and documents that are irrelevant, not binding, and not related to the 2018/2021 Permit, Mr. Pigott's methodology is unreliable. "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. Mr. Pigott's opinions are aspirational, pushing an interpretation of 2018/2021 Permit terms that he would like to see as part of the regulatory requirements, not what the law already establishes.

Further, Mr. Pigott cited some legal cases to support the opinions he expressed in his report. *See, e.g.,* Ex. C, Pigott Rpt. at 8, 9, 11. When asked to explain his methodology for identifying those cases, he admitted he did not conduct any research or investigation. Instead, Mr. Pigott testified that he was "generally aware" of case law that he cited, "looked them up, and then found the citations . . . ." Ex. D, Pigott Dep. at 88:12–25. Again, Mr. Pigott cherry-picked the information he looked at for his analysis to support a conclusion he already had made before even analyzing the question at hand. Courts in the Second Circuit exclude expert testimony when it is clear the expert cherry-picked their evidence to support their opinion. *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) ("[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable"; "Courts have

excluded expert testimony where the expert selectively chose his support from the scientific landscape"). As a result, this Court should exclude Mr. Pigott because he did exactly that in developing his opinions.

### 2. Mr. Pigott's Methodology Is Flawed Because He Did Not Consider the Terminal's Applicable 2018/2021 Permit

Second, Mr. Pigott's methodology is unreliable because he seeks to provide opinions about a permit he has never read. To be admissible, "an expert's methodology must be reliable at every step of the way." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d at 123. Thus, trial courts "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* (emphasis in original) (quoting *Amorgianos*, 303 F.3d at 267).

All of Mr. Pigott's opinions rest on his mistaken assumption that "[t]he Operative Permit requires consideration of climate change." *See* Ex. C, Pigott Rpt. at 16. Yet, shockingly, Mr. Pigott admitted in his deposition that he had "not reviewed" nor was he aware that the term "good engineering practice," which he claims requires "evaluation of climate conditions," does not even appear in the CT DEEP industrial stormwater 2018/2021 Permit. Ex. D, Pigott Dep. at 92:20–24; 160:11–15. Still, Mr. Pigott attempts to provide his opinion about the Permit's obligations by analogizing to different permits and permitting authorities, none of which are applicable here.

> Q. So this morning you have been talking repeatedly about good engineering practice. Are you now saying that, that that is not the term you intended to use in your earlier testimony today?
>
> A. I -- no, I think that different, different NPDES permits -- and this paragraph specifically talks about NPDES permits, therefore there are different terms that are used. Good engineering practice may not be used in one permit, but certainly best industry practices are and where they are. The point is that

those practices should include the evaluation of climate conditions before coming up with their stormwater pollution prevention plans.

Q. So in your opinion you are really focusing again on the [EPA] permit terms rather than Connecticut's; is that true?

A. I'm focusing on NPDES permits overall, but certainly [EPA's] as well."

Ex. D, Pigott Dep. at 161:9–162:3.

A "rigorous examination of the facts on which the expert relies" reveals that Mr. Pigott's opinions are baseless. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d at 123. He does not even rely on **the 2018/2021 Permit** to justify his position that the 2018/2021 Permit implicitly requires "evaluation of climate conditions." Therefore, the Court should exclude Mr. Pigott's opinions under Rule 702 because his opinions are not "based on sufficient facts or data," nor does his methodology reflect "a reliable application" to the facts of this case. Fed. R. Evid. 702(b)-(d).

### 3. Mr. Pigott's Methodology Is Flawed Because He Relies on Irrelevant, Indiana-Based Experience

Third, Mr. Pigott leans heavily on his Indiana-based agency experience to inform his opinion that CT DEEP's permits require the evaluation of climate conditions" without ever tying the two together. Ex. D, Pigott Dep. at 82:24–83:9. "Although the Federal Rules of Evidence espouse a liberal standard for the admissibility of expert testimony, courts will not admit expert opinions that are without factual basis." *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (interpreting the pre-2023 version of Rule 702). Similarly, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos*, 303 F.3d at 266 (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Mr. Pigott's opinions heavily rely on his experience "as the Assistant Commissioner of the IDEM" where he was involved in issuing *Indiana-based* permits.

During my more than two decades as the Assistant Commissioner of the IDEM, I was involved in the issuance and reissuance of over hundreds of permits. It has been my experience, and is my professional judgment, that the terms and conditions of NPDES permits are enforceable and have been enforced.

\* \* \*

During my time as Assistant Commissioner and Commissioner of the IDEM, I authorized enforcement actions for a host of municipal and industrial permit holders based not only on the exceedances of numeric NPDES limits, but also on other violations, from the failure to implement best management practices to schedule violations, and violations of other specific permit requirements.

Ex. C, Pigott Rpt. at 5, 8 (emphasis added). Yet, Mr. Pigott fails to explain how his experience with a completely different permitting agency and permits provides a sufficient factual basis for his opinions about the Connecticut 2018/2021 Permit, relying only on his own *ipse dixit*.

Because Mr. Pigott's experience is based in Indiana, Mr. Pigott's opinions are not applicable to Connecticut or the relevant agency, CT DEEP. For example, Mr. Pigott conceded at his deposition that he did not have "a great understanding" of enforcement actions in Connecticut.

> Q. My question is: Are you aware of any enforcement actions in the state of Connecticut that involved climate-change-related considerations?

> A. I am not aware of specific enforcement activities in Connecticut regarding SSO overflows or CSOs or climate considerations. I don't have a great understanding of any of the specific enforcement activities in Connecticut.

> Q. And that would include consent decrees; you're not aware of any?

> A. I'm not aware of the consent decrees, which may or may not contain specific requirements to conduct climate analysis or even imply them.

> Q. Are you aware of any enforcement proceedings that involved climate-change-related considerations that occurred before 2023? . . .

> A. *I do not have a list and cannot cite specific enforcement actions in Connecticut period.*

Ex. D, Pigott Dep. at 134:23–136:5 (emphasis added).

But even his purported reliance on his Indiana or EPA experience is suspect, since Mr. Pigott could not even provide a single example of an enforcement action for *any*

permittee's failure to consider climate change during his time at the IDEM or EPA to support his opinion.

> Q.  During the course of your experience at IDEM, either at the Office of Water Quality or as commissioner, [did you] commence enforcement proceedings asserting that a facility had failed to consider climate change in its SWPPP?
>
> A.  Enforcement was -- whether or not we took enforcement action on the incorporation of climate in the SWPPP is something I don't know that I can answer, as usually enforcement actions involved a variety of specific violations. *So I can't answer specifically whether a particular enforcement action included* a provision saying that they didn't consider climate.
>
> Q.  Do you remember any such enforcement action while you were at the Office of Water Quality?
>
> A.  I can remember generally enforcement actions, but I don't have a specific recollection of an enforcement action in this regard. …

*Id*. at 119:15–120:11 (emphasis added) (objections omitted).

> Q.  Did [IDEM] ever commence enforcement proceedings against any industrial facility based on its failure to consider adverse weather events made worse by climate change?
>
> A.  I believe that the agency took enforcement actions when facilities failed to put in place stormwater pollution prevention plans and other plans that did not include both an analysis of the changing climate, specifically regarding intensity and frequency of rain events, and that those were the ways in which the agency incorporated the issue of climate into enforcement actions.
>
> Q.  Can you give me any examples?
>
> A.  *I don't off the top of my head have a memory of a specific [action]* . . . .

*Id*. at 53:14–54:14 (emphasis added) (objections, colloquy omitted).

In the same vein, Mr. Pigott could not name an enforcement action related to climate change in **any jurisdiction**, Connecticut or anywhere else.

> Q.  My question is whether you can name for me any enforcement proceedings, like the three you cite here in your rebuttal report at pages 6 to 7, that involved climate-change-related considerations before 2023?
>
> A.  I do not have a list and cannot cite specific enforcement actions in Connecticut, period.
>
> Q.  No, not my question. Before 2023 anywhere. The [consent decrees] you cite are 2023, 2024, 2024.

A. Yes.  In Connecticut, I just don't know.

Q. In, in any state or jurisdiction?

A. I, again, believe that the use of the term's general, except in engineering practices, includes climate considerations, so any enforcement action before 2023 that includes that would require an entity that signs a consent decree to consider the effects of storm events and climate change in their plans to resolve their enforcement cases.

Q. Can you name for me any enforcement proceeding before 2023 that was filed based on an alleged violation of good engineering practice?

A. *I cannot name a, an enforcement proceeding that was alleged based on a failure to put in place good engineering practices.*

Ex. D, Pigott Dep. at 135:24–136:23 (emphasis added).

Q. As we sit here today, can you identify for me a single enforcement case that the EPA has brought against a permittee under the industrial stormwater permit based on a violation of a best industry practice?  Can you name for me any enforcement proceeding before 2023 that was filed based on an alleged violation of good engineering practice?

A. *I, I'm not aware of the different enforcement actions that have been taken across the board at EPA for a variety of areas, but including the industrial stormwater area, you know.*

*Id.* at 148:8–18 (emphasis added).

Mr. Pigott also references three consent decrees—from Illinois, Guam, and

Massachusetts—but they have nothing to do with the Permit in this case and do not

support his opinions.  Two of the consent decrees (Guam and Massachusetts) relate to

violations of a different permit altogether.  He asserts these consent decrees support this

notion that "[p]ermit enforcement also has specifically involved climate change-related

considerations."  Ex. C, Pigott Rep, at 6.   However, when Mr. Pigott was questioned

about the reason these consent decrees came to fruition, and if that reason was due to a

lack of consideration for climate change.  The answer, of course, was a resounding "no":

Q. Did any of the three consent decrees you cited involve a Clean Water Act enforcement action brought for failure to implement a climate-change-related measure?

A.  The three -- two of the three were regarding sanitary sewer overflows, and the third was a [combined sewer overflow].[7]"

Ex. D, Pigott Dep. at 129:10–15.

Further, those two consent decrees only discussed climate when requiring the consenting party to consider EPA's Climate Resilience Evaluation and Awareness Tool, along with a myriad of other methods as one of "five potential practices to be considered when performing construction, management, and maintenance."  Ex. D, Pigott Dep. at 132:2–8.  When questioned about the complaints that led to the three consent decrees he relied on, and if any involved "claims based on the failure to implement climate resilience measures," Mr. Pigott could not answer, admitting that he was "not aware of whether the complaint points out failure to abide by climate resilience measures." *Id.* at 129:23–130:3.  Mr. Pigott even admitted that he did "not have a list and cannot cite specific enforcement actions in Connecticut" involving climate-change-related considerations at any time, let alone before 2023. *Id.* at 136:4–5.  He also could not name "an enforcement proceeding that was alleged based on a failure to put in place good engineering practices." *Id.* at 136:21–23.  In other words, Mr. Pigott failed to tie his experience and random examples to the 2018/2021 Permit in this case beyond his own *ipse dixit*. *Amorgianos*, 303 F.3d at 266.

### 4.    Mr. Pigott's Methodology Is Flawed Because He Improperly Interprets the CWA

Last, Mr. Pigott's interpretation of the CWA and 2018/2021 Permit does not reliably apply to the facts of this case because it is directly contrary to recent Supreme Court precedent. Mr. Pigott claims that the "CWA is a performance-based statute."  Ex. C, Pigott Rpt. at 18.  But

---

[7] Notably, combined sewer overflow and sanitary sewer overflow programs are entirely different permitting programs than the one at issue in this case, which is an industrial stormwater permit.  These consent decrees say nothing about enforcement of industrial stormwater permits.

the Supreme Court does not agree with this interpretation—the Supreme Court recently held that "§ 1311(b)(1)(C) [of the CWA] does not authorize the EPA to include 'end-result' provisions in NPDES permits. *Determining what steps a permittee must take to ensure that water quality standards are met is the EPA's responsibility*." *City & Cnty. of San Francisco, Cal.*, 604 U.S. at 355 (emphasis added). Still, Mr. Pigott emphasizes that the NPDES program, especially for industrial stormwater, is performance-based and places the burden on the permittee to analyze its own site and determine what measures are necessary to comply with the permit's objectives, even if the permit does not list specific required actions:

> A. The *burden is literally on the permittee here*, not on me to tell them exactly what to do, and, and that's the way the program was constructed, as it is for much of the NPDES program, really, especially industrial. We don't tell people what specific technologies to put in place on a whole raft of numerics, much less others. We say 'here are your conditions, here are your permit requirements, go meet them,' and it's *based on whether they do—whether or not they are in compliance with their permit*." (emphasis added)

Ex. D, Pigott Dep. at 70:1–12. However, the Terminal *does* comply with the 2018/2021 Permit, and Mr. Pigott could not state otherwise. *Id*. at 165:24–167:3 (testifying that he "made no position about whether they are in compliance"). And more importantly, the EPA must specify permit terms that unambiguously show the permittee what it must do to comply, meaning the CWA is not "performance based," as Mr. Pigott baselessly asserts. *City & Cnty. of San Francisco, Cal.*, 604 U.S. at 355. His testimony lacks a reliable application of the principles and methods to the facts of the case—which is a failure to meet the "fit requirement." *Pugliano*, 315 F. Supp. 2d at 202.

Mr. Pigott's testimony consistently fails to bridge the analytical gap between EPA's permit and the 2018/2021 Permit and site-specific conditions, offering only his *ipse dixit* untethered to the controlling regulatory language or Supreme Court precedent.

### D.    Mr. Pigott's Opinions Should Be Excluded Because They Waste Time, Are Cumulative, and Are Prejudicial Under Rule 403

"Rule 403 provides for exclusion of evidence which wastes time." *Hygh*, 961 F.2d at 363-64. "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what results to reach." *Id.*

Even if Mr. Pigott's opinions were relevant or proper under Rules 401 and 702, Mr. Pigott's opinions should be excluded under Rule 403 because they would undoubtedly confuse the jury, waste time, and unduly prejudice Defendants. "Rule 403 provides for exclusion of evidence which wastes time." *Hygh*, 961 F.2d at 363-64. "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what results to reach." *Id.* Mr. Pigott's reliance on other inapplicable permits and irrelevant, non-Connecticut experience would only mislead the fact-finder and unduly prejudice Defendants. The Court should exclude his testimony given the substantial risk that the fact-finder might base its verdict on Mr. Pigott's unfounded "expert" opinion. *See Nimely*, 414 F.3d at 397.

Mr. Pigott's testimony poses a significant risk of unfair prejudice, juror confusion, and misleading the jury due to his prior senior government roles and policy-driven legal conclusions. This risk is further compounded here because the jury would likely ascribe undue weight to Mr. Pigott's baseless opinions as an expert witness and based on his agency experience. *See, e.g.*, *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("We cannot ignore the tendency of juries on occasion "to decide simply according to the preponderance of numbers and of influential names."); *TMI Tr. Co.*, 2017 WL 6617050, at *4 ("The principal target of *Daubert* and Rule 702 is the professional expert witness—well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors."); *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Simply put, expert testimony

may be assigned talismanic significance in the eyes of lay jurors.").  Indeed, Mr. Pigott's former roles include IDEM Commissioner and EPA high-ranking official.  It would not be surprising if the jury were to ascribe "talismanic significance" to his policy-driven and unsupported conclusions and extrapolations from non-operative federal permits and non-binding federal guidance, risking substitution of his views for the Court's instructions and the actual Permit text.  Allowing the jury to hear his testimony would be unfairly prejudicial because Mr. Pigott has no authority to support his opinions, yet may come off as convincing based on his previous agency roles.

Finally, Mr. Pigott's opinions are prejudicial and inadmissible because he repeatedly invades the province of the Court by offering improper (and incorrect) legal opinions.  There is a fine line between properly assisting the jury to understand a complex regulatory framework and improperly telling "the jury what result to reach" by offering legal conclusions.  *See Densberger v. United Technologies Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) (holding that expert testimony concerning applicable law and asserting legal conclusions is inadmissible because "by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's."); *see also, e.g.*, *U.S. v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is [also] a well-established rule in [the Second] Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Hygh*, 961 F.2d at 363 (expert testimony that even implicitly communicates a legal standard is objectionable).

Mr. Pigott crosses that line.  Instead of explaining complicated regulatory text, Mr. Pigott seeks to tell the jury what the Court's role is in this case and how citizen suits can be used to

"enforce permit limits even when government agencies do not act." Ex. C, Pigott Rpt. at 8. For example, Mr. Pigott states in his report, "courts regularly interpret NPDES permit language" and the "enforceability of NPDES permits—considered the central mechanism of the CWA—depends on judicial interpretation to resolve disputes about compliance." *Id.* at 9. He cites to case law that is not binding on this Court and again offers opinions about general NPDES permitting instead of the 2018/2021 Permit here. *Id.* Thus, Mr. Pigott reaches inappropriate legal conclusions about the role of the Court and citizen plaintiffs that are likely to prejudice Defendants and mislead the jury. *See Densberger.*, 297 F.3d at 74.

Last, Federal Rule of Evidence 403, provides the Court may exclude relevant evidence if it is "needlessly presenting cumulative evidence." Mr. Pigott's own report admits, "Wendi Goldsmith's Expert Report ("Goldsmith Report") rebuts Susan Bodine's false distinction between flooding and flooding caused by sea level rise." Ex. C, Pigott Rpt. at 10. Propounding expert after expert that testifies to the same issue at hand inherently leads to prejudice, and presents a case to the jury, that what the experts say must be true, simply because so many are willing to testify to the same issue.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and exclude in full Mr. Pigott's opinions pursuant to Fed. R. Civ. P. 26 and Fed. R. Evid. 401–403, and 702. Defendants request all further relief the Court deems just and appropriate and stand ready for hearing at the Court's convenience.

Dated: October 3, 2025                  Respectfully submitted,

<u>/s Douglas A. Henderson</u>
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.

Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com
