# Exhibit D

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CONNECTICUT
 3    - - - - - - - - - - - - - - +
                                  |
 4    CONSERVATION LAW            |
      FOUNDATION, INC.,           |
 5                                |
              Plaintiff,          |    Case Number:
 6                                |
        vs.                       |    3:21-cv-00933-VDO
 7                                |
      EQUILON ENTERPRISES, LLC,   |
 8    d/b/a SHELL OIL PRODUCTS    |
      US, TRITON TERMINALING, LLC,|
 9    and MOTIVA ENTERPRISES, LLC,|
                                  |
10            Defendants.         |
                                  |
11    - - - - - - - - - - - - - - +
12
13
14              Video Deposition of
15                 BRUNO PIGOTT
16            Monday, August 25, 2025
17                  9:15 a.m.
18
19
20
21
22
23    Veritext 7553347
24    Reported by:  Laurie Donovan, RPR, CRR, CLR
25
```

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 2

1

2

3

4

5

6                          August 25, 2025

7                          9:15 a.m.

8

9            Video deposition of BRUNO PIGOTT, held in

10   person, with the witness and all parties participating

11   in person, pursuant to the Rules of the United States

12   District Court for the District of Connecticut,

13   subject to such stipulations as may be recited herein

14   or attached hereto, before Laurie Donovan, a

15   Registered Professional Reporter and notary public of

16   the District of Columbia, who officiated in

17   administering the oath to the witness.

18

19

20

21

22

23

24

25

Page 3

1                   A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3              Conservation Law Foundation, Inc.

4              15 East State Street

5              Suite 4

6              Montpelier, Vermont 05602

7              (802)223-5992

8              By:  Christopher M. Kilian, Esq.

9                   ckilian@clf.org

10                  Katrina Myers, Esq.

11   ON BEHALF OF THE DEFENDANTS:

12             King & Spalding, LLP

13             1180 Peachtree Street, NE

14             Suite 1600

15             Atlanta, Georgia 30309

16             (404)572-4600

17             By:  Carmen R. Toledo, Esq.

18                  ctoledo@kslaw.com

19   ALSO PRESENT:

20             Robert Leonard, videographer

21

22

23

24

25

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 4

1                    EXAMINATION INDEX

2                                                   PAGE

3    EXAMINATION BY MS. TOLEDO . . . . . . . . . .    7

4    EXAMINATION BY MR. KILIAN . . . . . . . . .    238

5    FURTHER EXAM BY MS. TOLEDO  . . . . . . . .    259

6

7

8

9

10                     E X H I B I T S

11    EXHIBIT    DESCRIPTION                        PAGE

12    Exhibit 1   Notice of Deposition  . . . . . .    13

13    Exhibit 2   Invoice from Bruno Pigott,

14                Bates PIGOTT000001  . . . . . . .    27

15    Exhibit 3   Expert Rebuttal Report of

16                Bruno L. Pigott . . . . . . . . .    30

17    Exhibit 4   Connecticut General Permit for

18                the Discharge of Stormwater

19                Associated with Industrial

20                Activity, October 1, 2018 . . . .    92

21    Exhibit 5   US EPA's NPDES Multi-Sector

22                General Permit for Stormwater

23                Discharges Associated with

24                Industrial Activity . . . . . . .    94

25

Bruno Pigott                     August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

                                        Page 5

1    (Exhibits continued)

2    EXHIBIT        DESCRIPTION                      PAGE

3    Exhibit 6    Industrial Stormwater Fact

4                 Sheet Series  . . . . . . . . .  97

5    Exhibit 7    Another copy of the

6                 Connecticut General Permit for

7                 the Discharge of Stormwater

8                 Associated with Industrial

9                 Activity, October 1, 2021 . . . . 107

10   Exhibit 8    Connecticut DEEP National

11                Pollutant Discharge Elimination

12                System General Permit for the

13                Discharge of Stormwater Associated

14                with Industrial Activities  . . . 109

15   Exhibit 9    Expert Witness Report of

16                David M. Uhlmann, June 23, 2025 . 137

17   Exhibit 10   Developing Your Stormwater

18                Pollution Prevention Plan, A

19                Guide for Industrial Operators  . 179

20

21

22

23

24

25

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 14

1    have in this case to your counsel for production to

2    defendants?

3        A    I have provided all my documents for this

4    case, yes.

5        Q    Is your most recent CV the one that is

6    attached to your report?

7        A    It has recently changed, as I started a new

8    job on August 11 of this year.  So it's not on my CV,

9    but I'm now the executive director of the WateReuse

10   Association, and that's not in my CV.

11       Q    I'm sorry.  The Water --

12       A    -- Reuse Association.

13            THE REPORTER:  So it's "water reuse"?

14            THE WITNESS:  Correct, and it's actually one

15       word.  It's capital W-a-t-e, capital R-e-u-s-e,

16       which is the way that they -- anyway, that's the

17       association that I'm the executive director of

18       today.

19   BY MS. TOLEDO:

20       Q    And what is the WateReuse Association?

21       A    The WateReuse Association is an

22   association -- it's a membership association comprised

23   of a number of utilities, businesses, and individuals

24   who are interested in promoting, educating and

25   advocating for water reuse policies around the

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 15

 1   country.

 2          And so that work involves explaining to

 3   people what WateReuse is comprised of.  It involves

 4   advocating before Congress and other organizations,

 5   state legislators, for rules and laws that would

 6   promote water reuse activity.

 7          And when I say what's a water reuse

 8   activity, it might include putting together a

 9   wastewater treatment plant and a drinking water

10   treatment plant that converts the waste water and

11   then -- and super-cleans it, using membranes, to

12   provide for potable drinking water.  For example, San

13   Diego, California is building such a facility today,

14   and there are a number of others.  So that's a potable

15   reuse.

16          There's non-potable reuse, which means --

17   and that's done in Florida, for example, in Tampa,

18   Florida, where the City of Tampa takes wastewater,

19   treats it, and it may not be at drinking water

20   standards, but they use it for the purposes of

21   watering lawns and other things.

22          It's a, it's a conservation effort to ensure

23   that drinking water is supplied to residents.  You see

24   it in the western U.S., in the southern U.S., and

25   increasingly, as we see data centers built around the

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 53

1          to protect against climate.

2                So I believe the agreed orders that would

3          have been put in place would call for submission

4          of a SWPPP or other things, not specifically

5          indicating climate inclusions, but since it was a

6          part of best engineering practices, it would have

7          been something that would have been required

8          under the permit.

9    BY MS. TOLEDO:

10         Q    But the violation was the failure to submit

11   a SWPPP, right?

12         A    There, there was definitely a violation

13   to -- that I can clearly recall -- submit a SWPPP.

14         Q    Did the agency ever commence enforcement

15   proceedings against any industrial facility based on

16   its failure to consider adverse weather events made

17   worse by climate change?

18                MR. KILIAN:  Objection.

19                THE WITNESS:  I believe -- oh, can you

20         repeat the question again.  I'm just a little bit

21         behind.

22                THE REPORTER:  Sure.

23                     (Whereupon, reporter reads requested

24                     material.)

25                THE WITNESS:  I believe that the agency took

Page 54

1          enforcement actions when facilities failed to put

2          in place stormwater pollution prevention plans

3          and other plans that did not include both an

4          analysis of the changing climate, specifically

5          regarding intensity and frequency of rain events,

6          and that those were the ways in which the agency

7          incorporated the issue of climate into

8          enforcement actions.

9    BY MS. TOLEDO:

10         Q    Can you give me any examples?

11         A    I don't off the top of my head have a memory

12   of a specific, but we took several enforcement

13   actions, and so I don't have them off the top of my

14   head.

15         Q    Would that have been after the EPA's 2021

16   MSGP went into effect?

17         A    It was probably not just after, but before

18   as well, because we were aware and believed that best

19   engineering practices were inclusive of considerations

20   of rain events and climate changes, even before the

21   MSGP was out.  I felt like the MSGP, the 2021 MSGP

22   only reinforced the notion that long existed that, you

23   know, you ought to look at the changing nature of rain

24   events in the climate as the cause of that to

25   determine what the best engineering practices are, and

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 64

1    meetings that occurred twice a year.  Another

2    occurring coming up, too.

3         Q    Have you worked on any projects for

4    companies in Connecticut?

5         A    Not that I'm aware of, no, ma'am.

6         Q    Have you worked for the State of Connecticut

7    or for any Connecticut municipality or other

8    governmental entity in the state?

9         A    No.

10        Q    Other than your work for CLF in this case,

11   have you done any work for any environmental groups in

12   the state of Connecticut?

13        A    No.

14        Q    You do not list any publications in your CV.

15   Have you published any articles in the peer-reviewed

16   literature?

17        A    No.

18        Q    Have you published any articles in the

19   popular press?

20        A    I have published articles in Indiana

21   publications, general environmental articles, yes.

22        Q    Have you submitted any papers for

23   publication?

24        A    I have not.

25        Q    Now, you're not an engineer, right?

Page 65

1      A     That's correct.  I'm not an engineer.

2      Q     And you're not a toxicologist?

3      A     I'm not a toxicologist.

4      Q     Or a risk assessor?

5      A     I'm not a risk assessor.

6      Q     You're not a lawyer?

7      A     I'm not a lawyer.

8      Q     You have never worked at a manufacturing

9   facility?

10     A     I have not.  Well --

11     Q     Oh, there's a story there.

12     A     Well, you know, in high school or college, I

13  worked at a plastics factory for a summer, but I don't

14  think that's what you're asking.

15     Q     Where was that?

16     A     In Rochester, Michigan.

17     Q     Did you work the manufacturing line?

18     A     Oh, yeah, I did.  I put plastic pellets into

19  an enormous machine that produced accelerator pedals.

20     Q     You've never been employed at a chemical

21  facility?

22     A     I have not.

23     Q     You've never been employed at a bulk

24  petroleum storage terminal?

25     A     I have not been employed at a bulk petroleum

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 66

storage terminal, no.

2    Q    Do you have any experience in environmental

3    compliance management at a petroleum bulk storage

4    terminal?

5    A    I have plenty of experience about

6    environmental compliance management, not at a -- and

7    from a state perspective, but not at a bulk petroleum

8    storage facility, no.

9    Q    At what type of facilities?

10    A    At the State of Indiana, I was in charge of

11    compliance activities, for all NPDES permits, both the

12    evaluation of data and in charge of the inspections

13    that took place around the state.

14    Q    Is that referring to state-owned facilities

15    or industrial facilities that you regulated?

16    A    State-owned facilities and industrial

17    facilities that we regulated, as well as

18    municipalities, MS4s.  I was in charge of the

19    inspection units for those activities.

20         THE REPORTER:  You said MS4s?

21         THE WITNESS:  Correct.

22    BY MS. TOLEDO:

23    Q    Have you ever advised the owners or

24    operators of petroleum bulk storage terminals about

25    design or compliance issues?

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 67

1      A    I signed inspection reports that went to

2   bulk storage facilities, but I did not personally

3   have -- either did not inspect, nor did I talk to the

4   managers of those facilities or the environmental crew

5   about, about environmental requirements.

6      Q    And that was in your capacity as a regulator

7   for the State of Indiana?

8      A    That's correct.

9      Q    You're not a climate scientist, are you?

10     A    I'm not a climate scientist.

11     Q    You're not a tank engineer?

12     A    I'm not a tank engineer.

13     Q    Are you familiar with best industry

14  practices relating to above-ground storage tanks?

15     A    As the head of the Indiana Department of

16  Environmental Management, we were involved in

17  discussions regarding above-ground storage tanks when

18  flooding occurred in Indiana and when the Charleston

19  River had a spill in West Virginia that caused our

20  agency to propose regulations imposing secondary

21  containment requirements for bulk storage facilities

22  around the state of Indiana, in response to the big

23  spill that happened in Charleston that closed the

24  drinking water treatment plant, and so that was my

25  role in, in advocating for secondary containment in

Page 70

```
 1            The burden is literally on the permittee
 2       here, not on me to tell them exactly what to do,
 3       and, and that's the way the program was
 4       constructed, as it is for much of the NPDES
 5       program, really, especially industrial.
 6            We don't tell people what specific
 7       technologies to put in place on a whole raft of
 8       numerics, much less others.  We say "here are
 9       your conditions, here are your permit
10       requirements, go meet them," and it's based on
11       whether they do -- whether or not they are in
12       compliance with their permit.
13  BY MS. TOLEDO:
14       Q    So it's a site-specific inquiry?
15       A    And certainly, especially for stormwater
16  issues, site-specific inquiries are vitally important.
17                 (Discussion was held off the record
18                  regarding a possible short break.)
19  BY MS. TOLEDO:
20       Q    It also depends on the specific industry and
21  type of facility, correct, not just location?
22                 MR. KILIAN:  Objection.
23                 THE WITNESS:  A variety of factors go into
24       determining the appropriate control measures,
25       including the location, including the rain event,
```

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 76

```
 1    BY MS. TOLEDO:
 2        Q    BMPs include nonstructural or management
 3    practices; do you agree?
 4              MR. KILIAN:  Objection:
 5              THE WITNESS:  BMPs include a variety of
 6         structural and nonstructural practices.
 7    BY MS. TOLEDO:
 8        Q    And in fact, the MSGP lists some control
 9    measures that are management practices, correct?
10        A    Yes.
11              (Reporter clarification.)
12    BY MS. TOLEDO:
13        Q    You have no opinion on whether defendant's
14    existing plans and procedures to prepare for severe
15    weather events are sufficiently protective, correct?
16              MR. KILIAN:  Objection.
17              THE WITNESS:  I have no opinion.
18    BY MS. TOLEDO:
19        Q    I'm sorry.  Can you say that again?
20        A    I don't have an opinion about whether or not
21    the plans are sufficient.  I have not reviewed them.
22        Q    You do state, like we talked before, that
23    you did review the Barlow and Goldsmith reports,
24    right?
25        A    I do -- in fact, I quote from them on one of
```

Bruno Pigott                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 77

1    the pages here.



Page 78

1        Q     Okay, and you don't specialize in solid and
2     hazard waste management, do you?
3        A     I -- well, I was the head of the Department
4     of Environmental Management.  I oversaw the solid
5     waste program, but I do not specialize in solid waste
6     issues.  I was in charge of all of it.
7        Q     And as we discussed earlier, at EPA, you
8     were at the Office of Water, and that was the focus of
9     your work, right?
10       A     Yes, that's correct.
11       Q     Your report does not address any issues
12    relating to hazardous waste management at the
13    terminal, correct?
14       A     My report does not deal with hazardous waste
15    as material, no.
16       Q     You are not offering any opinions as to
17    whether the terminal is or is not complying with SPCC
18    regulations, are you?
19       A     I did not --
20             MR. KILIAN:  Objection.
21             THE WITNESS:  I did not offer an opinion
22        about that.
23    BY MS. TOLEDO:
24       Q     Are you offering an opinion as to whether
25    the terminal is complying with the applicable

Bruno Pigott                               August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 82

1    BY MS. TOLEDO:

2        Q    Are you stating any opinions relating to any

3    violations of defendants specifically relating to this

4    case?

5        A    I am not citing any opinions about any

6    violations in this case.

7        Q    You have reviewed the complaint in the case,

8    right?

9        A    Yes.

10       Q    And so you're aware that the claims that are

11   being asserted are based on alleged violations of the

12   Clean Water Act and RCRA, right?

13       A    Yes.

14       Q    There are no claims alleging deceit,

15   correct?

16       A    Not that I'm aware of.

17            MR. KILIAN:  Objection.

18   BY MS. TOLEDO:

19       Q    And there are no claims based on fraud, as

20   best you're aware, correct?

21            MR. KILIAN:  Objection.

22            THE WITNESS:  I'm not aware.

23   BY MS. TOLEDO:

Bruno Pigott                                                  August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Bruno Pigott                                        August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 88



Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 92

1    issues at the same time that you're supposed to put

2    together a permit that reduces or prevents discharges

3    of pollutants to waters that this permit is supposed

4    to get at.

5         Q    Move to strike as nonresponsive.

6              Mr. Pigott, we have a lot of ground to

7    cover --

8         A    Okay.

9         Q    -- so I'm going to ask you please to answer

10   my questions, and, you know, your counsel will have

11   the opportunity to follow up; okay?

12        A    Okay.  Yep.

13             MS. TOLEDO:  Now, the general permit -- I'm

14             going to go ahead and mark the October 1, 2018

15             Connecticut general permit, and that will be

16             Exhibit 4, I think.

17                  (Exhibit 4 was marked for

18                  identification.)

19   BY MS. TOLEDO:

20        Q    I'll represent to you that this is the

21   permit that was in effect at the time CLF filed its

22   lawsuit in this case; okay?

23             Have you reviewed this permit?

24        A    I have not reviewed this permit.

25        Q    Is it your understanding that this 2018

11   BY MS. TOLEDO:

12        Q     EPA, as we talked about before, classifies

13   different industries by sector, correct?

14        A     That's correct.

15        Q     And what sector does the terminal fall

16   under?  Do you know off the top of your head?

17        A     I do not know.  I'm looking through the

18   permit now to see if there's a sector specific to bulk

19   petroleum loading facilities.

20             MS. TOLEDO:  Well, let me do something that

21        might help us move this along.

22             I'm going to mark as Exhibit 5 and 6 the --

23        actually, let's just do 5.

24                  (Exhibit 5 was marked for

25                  identification.)

Bruno Pigott                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 101

1          prevention plans.
2     BY MS. TOLEDO:
3          Q    Mr. Pigott, if the permit does not have the
4     express requirement and there is no EPA guidance
5     setting out the express requirements, how are
6     permittees supposed to know that they have to do that?
7               MR. KILIAN:  Objection.
8               THE WITNESS:  NPDES permits do not lay out
9          what technologies must be used or what best
10         management practices need to be used.  They
11         depend on -- and the program, the whole NPDES
12         program for industrial individual permits as well
13         as general permits, relies on the engineer's
14         evaluation of a situation and coming up with
15         here's what we're going to do to meet the terms
16         of the permit.
17              And so I think it's inherent in the, in the
18         process whether or not the language of, of
19         climate change considerations is listed
20         specifically in the permit.
21    BY MS. TOLEDO:
22         Q    Do you agree that the section in the 2021
23    MSGP -- strike that.
24              Do you agree that Section 2.1.1.8 on page 19
25    of the 2021 MSGP is a new section that was

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 110

1    permit, to the definitions.

2              Are you there?

3         A    I am there.  Thank you.

4         Q    And we can see that the draft permit now

5    references a 100-year flood.

6              Do you see that?

7         A    I do see that.

8         Q    It does not reference a 500-year flood; do

9    you agree?

10        A    I do not see "500-year flood" defined here.

11        Q    To your knowledge, is the 100-year flood

12   definition something new that was added to this permit

13   when compared to the 2018 permit?

14             MR. KILIAN:  Objection.

15             THE WITNESS:  I -- my experience is

16        "100-year flood" was a common definition in

17        permits, including stormwater permits.  I am not

18        aware whether or not this was included in the

19        definitions in the other past permits.

20   BY MS. TOLEDO:

21        Q    If we turn to Section 7(c)(2).

22             MR. KILIAN:  Do we have a page for that?

23   BY MS. TOLEDO:

24        Q    I'm looking.  Sorry.  I neglected to write

25   it down.

Page 119

1    BY MS. TOLEDO:

2        Q    And I understand that's your opinion and

3    that's what you've testified to, but my question was a

4    little different.

5             My question was whether the IDEM NPDES

6    general permit for industrial stormwater incorporated

7    the resilience measure section from the 2021 MSGP at

8    the time that you left the agency.

9        A    I don't recall, to be quite honest.  As the

10   head of the agency, I didn't always review each of the

11   permits that we issued, even though it was a general

12   permit, and I had responsibilities over air, land and

13   water enforcement, and so I can't answer that

14   honestly, because I, I don't know.

15       Q    During the course of your experience at

16   IDEM, either at the Office of Water Quality or as

17   commissioner, [did you] commence enforcement

18   proceedings asserting that a facility had failed to

19   consider climate change in its SWPPP?

20           MR. KILIAN:  Objection.

21           THE WITNESS:  Enforcement was -- whether or

22       not we took enforcement action on the

23       incorporation of climate in the SWPPP is

24       something I don't know that I can answer, as

25       usually enforcement actions involved a variety of

Bruno Pigott                           August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 120

1        specific violations.

2             So I can't answer specifically whether a

3        particular enforcement action included a

4        provision saying that they didn't consider

5        climate.

6    BY MS. TOLEDO:

7        Q    Do you remember any such enforcement action

8    while you were at the Office of Water Quality?

9        A    I can remember generally enforcement

10   actions, but don't have a specific recollection of an

11   enforcement action in this regard.  I saw the failure

12   to submit SWPPPs, the failure to put together the

13   climate plans, but I, I cannot, in all honesty, tell

14   you whether or not that was something that I saw as

15   the head of the Office of Water Quality.

24   BY MS. TOLEDO:

25       Q    Do you know what the due process clause is?

Bruno Pigott                           August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 129

1    process.

2         Q    Have you ever been involved in the drafting

3    of a complaint that resulted in a consent decree?

4         A    Not, not involved in a drafting, but in

5    negotiations on consent decrees, yes.

6         Q    Were you involved in negotiations relating

7    to any of the three consent decrees that you cited in

8    your report?

9         A    No.

18        Q    I appreciate that.

19             Did you review the Cohokia Heights

20   complaint?

21        A    I reviewed the agreed -- I mean consent

22   decree.

23        Q    Do you know whether the complaint involved

24   any claims based on the failure to implement climate

25   resilience measures?

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 130

1    A    I am not aware of whether the complaint
2    points out failure to abide by climate resilience
3    measures.
4    Q    Did Cohokia Heights hold a discharge permit
5    for its sanitary sewer system --
6    A    It had a --
7    Q    -- when it, when it -- when the complaint
8    was filed?
9    A    I believe it did.
10   Q    And the permit at issue in the Cohokia
11   Heights consent decree; was, was that the 2021 MSGP?
12   A    No.  This was about the NPDES individual
13   permit for Cohokia Heights.
14   Q    Has the Cohokia Heights consent decree, to
15   your knowledge, been approved and finalized, to your
16   knowledge?
17   A    I -- to my knowledge, I actually don't know
18   the answer to that.  I think it has been, but I, I
19   can't precisely answer or accurately answer.
20   Q    Guam water works consent decree -- strike
21   that.
22        For the Guam waterworks matter, did you
23   review that complaint?
24   A    I reviewed the consent decree itself.
25   Q    So do you have any knowledge about whether

Page 132

1        A    I'm unaware of that.

2        Q    Isn't it true that the Holyoke consent

3    decree does not require climate resilience measures to

4    be implemented, but rather it cites EPS -- strike that

5    -- EPA's climate resilience evaluation and awareness

6    tool as one of five potential practices to be

7    considered when performing construction, management

8    and maintenance?

9        A    The Holyoke consent decree required the city

10   to use the generally accepted engineering practices,

11   and then explicitly mentioned the climate resilience

12   evaluation tool, the point of which is to say that the

13   generally accepted engineering practices include an

14   evaluation of climate conditions.

15       Q    Would it be fair to say that none of these

16   cases involved climate-change-related claims?

17       A    I don't -- so I think that the cases involve

18   sanitary sewer overflows as well as combined sewer

19   overflows.  Some of those overflows may be related to

20   changing climate conditions and overloading of a sewer

21   system.

22            As a result, one of the -- in two of the

23   consent decrees, the SSO issues required the community

24   to analyze what was the cause of these SSO events, and

25   then to put together a plan including these

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 134

1    facilities.

2         Q    Were this -- was that not mentioned in the

3    consent decrees?

4         A    My reading of the consent decrees did not

5    mention -- I don't recall reading any mention of bulk

6    storage facilities in the consent decrees, merely that

7    there were SSO events and, and Holyoke CSO events.

8         Q    Are you aware of any such enforcement

9    actions in the state of Connecticut?

10             MR. KILIAN:  Objection.

11             THE WITNESS:  Can you be -- can I ask you to

12        be more specific in terms of the awareness of --

13        do you mean consent decrees like SSO event

14        consent decrees or specific enforcement matters,

15        or --

16   BY MS. TOLEDO:

17        Q    I'll clarify.

18        A    Okay.  Thank you.

Bruno Pigott                        August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 135



Bruno Pigott                           August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 136



24        Q    Now, these -- like we were talking about

25   before -- were consent orders that resulted from

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 148

1    whether -- and design a system that will help mitigate

2    the, the potential discharges from a facility, and

3    that's based on the fact that they're engineers and

4    they have an awareness of this, and they conduct an

5    evaluation of what's happening in industry generally

6    and then in their area specifically, and in their

7    geographic location.

8         Q    As we sit here today, can you identify for

9    me a single enforcement case that the EPA has brought

10   against a permittee under the industrial stormwater

11   permit based on a violation of a best industry

12   practice?

13              MR. KILIAN:  Objection.

14              THE WITNESS:  I, I'm not aware of the

15         different enforcement actions that have been

16         taken across the board at EPA for a variety of

17         areas, but including the industrial stormwater

18         area, you know.

19   BY MS. TOLEDO:

20         Q    Same question for Connecticut DEEP.  You --

21         A    I'm not aware of the --

22              MR. KILIAN:  Objection.

23              THE REPORTER:  You guys were all three

24         talking at the same time.

25              THE WITNESS:  Sorry.

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 160

1          A    I may be mixing it up with an NRDC vs. LA.

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Page 161

Bruno Pigott                                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 162

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 165

1    the permit?

2              MR. KILIAN:  Objection.

3              THE WITNESS:  I think that permittees know

4         about the outcomes and purposes of the permit

5         itself.  You're to minimize discharges to waters,

6         and what it does, just like the individual NPDES

7         permit program, is allow them to determine what

8         technologies work the best.

9              In the NPDES permit program, I do not tell

10        an industrial steelmaker what -- I do tell them

11        what numeric limits they need to meet, but I

12        don't tell them what technologies to use to do

13        that.  Here, it's the same kind of thing.

14        It's -- I'm not telling you exactly how you have

15        to build your treatment capacity.  What I'm

16        telling you is here is the outcome I want.

17        That's a standard for the NPDES program.

18             So I feel like it, it is clear, and that in

19        the NPDES program writ large, there is clarity

20        that there needs to be an analysis to determine

21        how best to meet the outcome requirements of the,

22        of the permits.

23   BY MS. TOLEDO:

24        Q    Are you aware that the terminal is in

25   compliance with its limits?

Bruno Pigott                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 166

```
 1          A    I --
 2               MR. KILIAN:  Objection.
 3               THE WITNESS:  I made no position about
 4          whether they are in compliance.  I don't know
 5          them -- I don't know whether that refers to
 6          numeric limits or standard conditions, so I can't
 7          really say that I am aware of that, no.
 8     BY MS. TOLEDO:
 9          Q    Well, you just said that your focus is on
10     the outcome --
11          A    That's correct.
12          Q    -- and meeting the limitations, right?
13          A    It is meeting limits and the standard
14     conditions in the permit.
15          Q    If the objective is to meet the limitations,
16     and a terminal is meeting the limitations, then how is
17     a permittee to determine that practices or procedures
18     or other circumstances at the terminal are violations?
19          A    The stormwater program, and perhaps all of
20     the NPDES programs are interesting, because water is
21     not a static thing.  It's not just whether you're
22     meeting them today, the permit terms, but what are you
23     going to do in the future, and how can you meet them.
24               And therefore, an analysis needs to be made
25     by the facility at the point in time when they have
```

Bruno Pigott                                        August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 167

1    the permit to determine what are the challenges today

2    and what are the likely future challenges, and then

3    design a system that meets those terms.

4         Q    And permits have five-year terms, right?

5         A    That's correct.

6         Q    Now, every five years, the agency can change

7    the permit requirements, correct?

8         A    That's correct.

9         Q    So for this planning for, for future

10   challenges that you were talking about, what time

11   period are you considering?

12        A    Well, again, the burden to determine the

13   timeframe for the stormwater activities and what

14   should -- is something that is determined by the

15   facility.  They have the requirement to conduct that

16   analysis, and therefore, they need to explain in the

17   stormwater pollution prevention plan what timeframes

18   did they use to consider what future challenges.  Is

19   it a 100-year storm event?  Is it a 500-year storm

20   event?

21            That analysis is required, and therefore, I

22   don't think that the permits dictate the timeframes

23   that people look for; rather -- and the reason that a

24   five-year term is there is because things change over

25   time, and when they do, it requires both the agency

Bruno Pigott                               August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 168

1    and a facility to reevaluate things.

2          So certainly they should look within that

3    time, that five-year timeframe, but beyond that, to

4    determine what are the likely impacts to our facility,

5    and it's really hard to, given storm events, predict

6    whether a 100-year storm event, a 500-year, how

7    frequently they will happen, but what they can do is

8    evaluate, well, okay, how many times are we seeing

9    these different storm events, and what can we expect

10   in the future.

11         So it's an analysis.  It certainly is, and

12   the agency does not say that you must do a minimum of

13   X, Y and Z, but requires that facility -- and frankly,

14   the folks that are under these permits advocated to

15   have these kinds of flexibilities in their permits to

16   say, look, let us design this.  We know what's going

17   on at our facility, and we know the stormwater issues

18   there.  I mean who better?  Because we're right there.

19   We know whether XYZ will work.  I think there is a

20   trust element in that to determine what should be put

21   in place.

22         Q    Well, the Connecticut general permit does

23   set out what is required to be included in the SWPPPs?

24         A    Correct.

25         Q    And the 2018 general permit had no

Bruno Pigott                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 169

1    requirement that the SWPPP discuss these plans or

2    analyses; do you agree with that?

3              MR. KILIAN:   Objection.



Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 170



Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 178



Bruno Pigott                              August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 179



Bruno Pigott                              August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 184

1        MR. KILIAN:   Objection.



Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 185

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 186

Bruno Pigott                                      August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 187



Page 188



Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 189



Bruno Pigott                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 195

1          five.  Back on the record at 4:20 p.m. Eastern
2          Time.  You may begin.
3     BY MS. TOLEDO:
4          Q    Are you ready to go forward, Mr. Pigott?
5          A    Yes, ma'am.



Page 205

1    that section is "Consideration of climate change is

2    critical for several reasons.  First, the specific

3    operative permit must also comply with the Connecticut

4    General Permit."

5              Now, what is your understanding of what the

6    specific operative permit is?

7         A    It's the permit that is in regard to this

8    specific facility.

9         Q    Is it your understanding that the facility

10   has an individual permit?

11        A    It -- I understand that it has the

12   Connecticut general permit, it's got coverage under

13   the general permit.  I do not know whether it has an

14   additional individual permit.

15        Q    Well, I'll represent to you that the

16   facility is governed by the Connecticut general

17   permit, okay?  So in that sense, that sentence would

18   not be entirely accurate, would you agree, if I'm

19   telling you the truth that it's governed by the

20   general permit?

21        A    If it's governed by the Connecticut general

22   permit, then it must comply with the general permit,

23   yes.  I see your point.

24        Q    You cite then to Section 22a-92 of the

25   general statutes, which you have mentioned previously

Bruno Pigott                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 235

1          A     Yes.

2          Q     Can you point to me anywhere in this guide

3     where it instructs industrial operators to conduct an

4     analysis of climate change or resilience factors in

5     developing their SWPPP?

6          A     I do not see a mention of, of that in my

7     short glance at it currently.

8          Q     Okay.

Bruno Pigott                           August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 236



Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 261



BY MS. TOLEDO:

    Q    Okay.  All right.  I just want to confirm a
couple of things.

         Counsel asked you about whether -- if the
terminal didn't have a SWPPP, that would be a
violation.

         Remember that?

    A    I do remember that, yes.

    Q    Did you ask to review the SWPPP or any of
the terminal documents?

    A    I did not.

    Q    And, and you didn't do so?

    A    That's correct.