FILED UNDER SEAL

# EXHIBIT B

FILED UNDER SEAL

# EXPERT REPORT

Opinions in the Matter of *Conservation Law Foundation v. Shell Oil Company, et al,* No. 3:21-cv-00933

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

*Prepared for:*
**King & Spalding LLP**
1180 Peachtree Street
Atlanta, CA 30309

*Prepared by:*
**Craig Jones, Ph.D.**
Managing Principal
Integral Consulting Inc.
200 Washington Street, Suite 201
Santa Cruz, CA 95060

Craig Jones, Ph.D.

June 23, 2025
Revised September 4, 2025

# CONTENTS

List of Figures ................................................................................................. v

List of Tables ................................................................................................ vii

Acronyms ..................................................................................................... viii

1    Introduction ............................................................................................ 1

    1.1    Qualifications and Experience ................................................................ 1

        1.1.1    Awards and Recognition ................................................................ 2

        1.1.2    Publications ................................................................................. 2

        1.1.3    Prior Testimony in the Past 4 Years ............................................... 2

        1.1.4    Compensation ............................................................................. 2

    1.2    Scope of Review .................................................................................. 3

    1.3    Summary of Opinions ........................................................................... 4

2    Site Background ........................................................................................ 8

    2.1    New Haven Harbor ............................................................................... 9

    2.2    Site Topography ................................................................................. 10

    2.3    Stormwater Management ..................................................................... 11

3    New Haven Terminal Permiting Framework ............................................... 14

    3.1    How SWPPPs and MSGPs Interact in Practice ......................................... 15

    3.2    New Haven Terminal 2018 and 2021 General Permits ............................. 16

    3.3    Mischaracterization of Permit Obligations by CLF .................................. 17

    3.4    Regional MSGP Comparison ................................................................ 19

4    Standards of Practice, Best Practices, and Regulatory Framework ............. 21

    4.1    Best Management Practices and Best Industry Practices .......................... 23

    4.2    Role of Technical Standards and Guidance Documents ............................ 23

    4.3    Authoritative Role of MSGPs in Compliance .......................................... 24

    4.4    Misalignment Between CLF and Applicable Compliance Standards ............ 24

5    Climate Risk Guidance ............................................................................ 28

    5.1    EPA Climate Resilience Guidance ......................................................... 28

    5.2    ASCE and ISO Climate Guidance .......................................................... 30

    5.3    USACE Climate And Flood Risk Guidance .............................................. 32

6    Industry Standards and Practice .............................................................. 33

    6.1    IOGP Guidance .................................................................................. 33

    6.2    API Standards for Tank Design and Inspection ....................................... 34

6.3    Application of Best Industry Practices ........................................................ 34

**7    New Haven Terminal's Existing Risk Management Plans ............................... 36**

7.1    Risk and Resilience ........................................................................................ 36

7.2    Environmental Protection and Spill Response Measures ........................... 37

7.3    Emergency Response Framework ................................................................. 37

7.4    Containment Berm Stability and Erosion Resistance ................................. 39

7.5    Summary ......................................................................................................... 41

**8    CLF's Experts' Analysis of Coastal Extreme Weather Hazards ................... 42**

8.1    Water Levels ................................................................................................... 42

8.1.1    Regulatory Foundations for the 100-Year Flood Design Standard ............... 43

8.1.2    FEMA Base Flood Elevations ............................................................. 45

8.1.3    New Haven Storm Frequency ............................................................ 45

8.1.4    Hurricane Sandy .............................................................................. 49

8.1.5    Long Wharf CSRM Study .................................................................. 50

8.2    CLF's Experts' Compound Flooding Allegations ........................................ 52

8.3    Sea Level Rise ................................................................................................ 53

8.4    Modeling Coastal Hazards ............................................................................ 54

8.4.1    Modeling Methodology and Approach ............................................. 54

8.4.2    NACCS Findings .............................................................................. 57

8.5    Duration of Flooding ...................................................................................... 62

**9    Evaluating Aboveground Storage Tank Resilience To Climate Hazards ....... 65**

9.1    Ballasting ........................................................................................................ 66

9.2    New Haven Terminal Summary ..................................................................... 69

**10   Storage Tank Resilience Under Extreme Events ....................................... 71**

10.1   Aboveground Storage Tank Evaluation Model ............................................ 73

10.1.1   Failure Mechanism Modeling ........................................................... 74

10.1.2   Simulation Framework ..................................................................... 75

10.2   Rare Flood Events .......................................................................................... 76

10.3   Tank Failure Risk Model ................................................................................ 78

10.3.1   Application for New Haven Terminal ................................................. 80

10.4   Tanks at the new haven terminal Are Secure Under Flood Conditions ..... 85

10.5   Comparative Risk to Regional Infrastructure ............................................. 86

10.6   Benchmark Comparison with Mormon Island California Terminal
        Assessment .................................................................................................... 89

**11  Additional Responses to CLF Experts** ........................................................ **90**

  11.1    Expert Report of Wendi Goldsmith .................................................................. 92

       11.1.1  Mischaracterization of "Best Industry Practice" and Regulatory
               Obligations ........................................................................................... 92

       11.1.2  Unsupported Claims of Vulnerability and Catastrophic Risk ......................... 93

       11.1.3  Invalid Use of Critical Infrastructure Designation and Planning
               Horizons ............................................................................................... 94

       11.1.4  Disregard for Established Site-Specific Risk Management Measures ........... 94

       11.1.5  Federal and Regulatory Findings Contradict CLF's Claims ............................ 95

       11.1.6  Unsupported Use of Internal and Nonbinding Planning Documents ............ 96

  11.2    Expert Report of Robert Nairn ...................................................................... 97

  11.3    Expert Report of James O'Donnell .................................................................. 99

  11.4    Expert Report of Mathew Barlow .................................................................. 100

  11.5    Expert Report of Richard Horner .................................................................. 101

  11.6    Summary of Rebuttals to CLF Claims .............................................................. 102

**12  References** ................................................................................................... **104**

Appendix A: Curriculum Vitae of Craig Jones, Ph.D.

FILED UNDER SEAL

# LIST OF FIGURES

Figure 1.        Overview of New Haven Terminal in New Haven, Connecticut

Figure 2.        New Haven Terminal Site Elevations

Figure 3.        New Haven Terminal Stormwater Drainage Areas

Figure 4.        MSGP, SWPPP, and BMPs Interaction for a Regulated Industrial Facility

Figure 5.        Figure 4.20 from Nairn (2025) Used as a Basis for Nairn's Evaluation of Berm Erosion

Figure 6.        Maximum Water Levels for Recorded Extreme Storm Events – New Haven, Connecticut

Figure 7.        Base Flood Elevations – New Haven Terminal (AE flood zone, designated flood elevation of 12 ft NAVD88)

Figure 8.        Storm Occurrences within 150 Miles of New Haven, Connecticut, since 1858 (NOAA 2024)

Figure 9.        New Haven Terminal Storm Occurrence – 150-Mile Radius

Figure 10.       Wind Speed, Atmospheric Pressure, and Water Level during Hurricane Sandy's Approach and Impact – New Haven, Connecticut

Figure 11.       Sea Level Rise Rates for Connecticut Coastline (NOAA 2025; CT DEEP 2024)

Figure 12.       Maximum Water Levels for Recorded Extreme Storm Events, FEMA Base Flood Elevation, and NACCS Mean Storm Surge Water Levels – New Haven, Connecticut (Save Point 271)

Figure 13.       Maximum Water Levels per NACCS Mean and 95th Percentile Confidence Interval Storm Surge Water Levels for New Haven, Connecticut, and Connecticut's Sea Level Rise for Save Point 271

Figure 14.       Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean 100-Year Flood Event

Figure 15.       Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean 500-Year Flood Event

Figure 16.       Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Upper 95th Confidence Limit, 500-Year Flood Event Combined with 1.64 ft of Sea Level Rise by 2050

Figure 17.       Highest Wind Speeds, Atmospheric Pressure, and Water Levels during Hurricane Sandy's Impact – New Haven, Connecticut (NOAA 2025)

Figure 18.       Representative Aboveground Storage Tank Failure Modes under Coastal Flooding Conditions

FILED UNDER SEAL

Figure 19.    Conceptual Graphic – New Haven Terminal Tank 3 Properly Ballasted during a 500-Year Flood Event

Figure 20.    Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean 500-Year Flood Event

Figure 21.    3-D Visualization of NACCS Mean 500-Year Flood Event at the New Haven Terminal

Figure 22.    New Haven Terminal's Tank 24, Properly Ballasted, under 500-Year Flood Conditions

Figure 23.    Conceptual Graphic – New Haven Terminal's Tank 24, Properly Ballasted, during a 500-Year Flood Event (with a 6-ft person for scale)

Figure 24.    Probability Distribution of Failure Modes for New Haven Terminal's Tank 24

Figure 25.    FEMA-Designated Flood Zones around the New Haven Terminal

Figure 26.    Yale-New Haven Health Hospital (marked by a red pin) and Nearby Infrastructure on the West Side of New Haven Harbor

FILED UNDER SEAL

# LIST OF TABLES

Table 1.        Applicable New Haven Terminal MSGPs and Climate Resilience Provisions

Table 2.        Comparison of BMPs, Best Industry Practices, and Technical Standards and Their Applicability to the New Haven Terminal

Table 3.        Inapplicable Planning and Engineering References Cited by CLF Experts

Table 4.        Regulatory and Planning Programs Using the 100-Year Flood Standard as the Design Benchmark for Industrial and Stormwater Infrastructure

Table 5.        NACCS Calculated Water Levels – New Haven, Connecticut (Save Point 271)

Table 6.        NACCS Water Levels Applied for Tank Failure Risk Model — New Haven, Connecticut

Table 7.        Model Parameters for Monte Carlo Simulation of Tank 24

Table 8.        New Haven Terminal Tank Parameters

Table 9.        Probabilities of Ballasted Tank Failures – 100- and 500-Year Flood Events

Table 10.        Probabilities of Ballasted Tank Failures – 95th Percentile, 500-Year Flood Event with 1.64-ft Sea Level Rise for 2050

Table 11.        Comparison of CLF Demands with Current and Future Connecticut SWPPP Requirements

FILED UNDER SEAL

# ACRONYMS

| | |
|---|---|
| API | American Petroleum Institute |
| ASCE | American Society of Civil Engineers |
| BCP | business continuity plan |
| BFE | base flood elevation |
| BMP | best management practice |
| CIRCA | Connecticut Institute for Resilience & Climate Adaptation |
| CLF | Conservation Law Foundation |
| CSRM | coastal storm risk management |
| CT DEEP | Connecticut Department of Energy and Environmental Protection |
| CWA | Clean Water Act |
| Defendants | Shell Oil Company; Equilon Enterprises LLC d/b/a Shell Oil Products US; Shell Petroleum, Inc.; Triton Terminaling, LLC; and Motiva Enterprises LLC |
| DEP | design and engineering practice |
| EPA | U.S. Environmental Protection Agency |
| FEMA | Federal Emergency Management Agency |
| FRP | facility response plan |
| ft NAVD88 | feet per North American Vertical Datum of 1988 |
| HAP | hurricane action plan |
| IOGP | International Association of Oil and Gas Producers |
| IPCC | Intergovernmental Panel on Climate Change |
| ISO | International Organization for Standardization |
| LSE | limit state equation |
| MSGP | Multi-Sector General Permit |
| NACCS | North Atlantic Coast Comprehensive Study |
| NFIP | National Flood Insurance Program |
| NOAA | National Oceanic and Atmospheric Administration |
| NOI | notice of intent |
| NPDES | National Pollutant Discharge Elimination System |
| RCRA | Resource Conservation and Recovery Act |



FILED UNDER SEAL

| | |
|---|---|
| RRT | EPA's Region 6 Regional Response Team |
| SPCC | spill prevention, control, and countermeasure |
| SWPPP | stormwater pollution prevention plan |
| USACE | U.S. Army Corps of Engineers |

FILED UNDER SEAL

# 1  INTRODUCTION

I was retained by King & Spalding LLP on behalf of Equilon Enterprises LLC d/b/a Shell Oil Products US; Triton Terminaling, LLC; and Motiva Enterprises LLC (Defendants).  I was asked to review and provide analysis and opinions on various claims, conclusions and opinions offered by Plaintiff's experts in the citizen suit filed by the Conservation Law Foundation (CLF) under the Clean Water Act (CWA) and the Resource Conservation and Recovery Act (RCRA) titled *Conservation Law Foundation v. Shell Oil Company, et al.*, Case No. No. 3:21-cv-00933, in the District Court of Connecticut.

For the citizen suit, I was engaged to evaluate Defendants' preparedness for extreme weather, flood- and climate-related risks as it concerns Defendants' New Haven Terminal in the Port of New Haven, Connecticut.  My assessment and opinions on the matter, refute key aspects of the claims alleged by CLF that Defendants have not taken sufficient steps to mitigate these risks at the terminal.

I hold the opinions expressed herein to a reasonable degree of scientific certainty. Additionally, the state of knowledge as of the date of this report may differ from the state of knowledge months in the future.  Given this qualification, I reserve the right to supplement my opinions and conclusions should additional information be made available to me.

For my work in connection with this matter, Integral Consulting Inc. is being compensated at the rate of $347 per hour. This compensation does not depend on me rendering particular opinions.

## 1.1  QUALIFICATIONS AND EXPERIENCE

I am a principal ocean and environmental engineer and serve as the Managing Principal of the Marine, Coastal, Climate, and Technology Services science area at Integral Consulting Inc. With more than 25 years of experience, I lead multidisciplinary teams in the development and execution of engineering and science-based projects focused on characterizing and managing complex coastal, estuarine, and riverine environments. My work integrates hydrodynamics, waves, sediment transport, and contaminant behavior with the evaluation of coastal and estuarine hazards and the projected impacts of climate change—including sea level rise, coastal hazards assessment, and shoreline evolution.

I specialize in applying advanced field measurement techniques and numerical modeling to support long-term risk assessment, infrastructure planning, and habitat restoration in dynamic aquatic systems.  My projects often inform the development of resilient design strategies, adaptive management frameworks, and regulatory compliance plans for government and private-sector clients. I also provide national and international leadership in the development of technical guidance and environmental standards, including through my service on the U.S.

FILED UNDER SEAL

Technical Advisory Group to the International Electrotechnical Commission's TC 114 for marine energy, and as Vice President on the Board of Governors for ASCE's Coasts, Oceans, Ports, and Rivers Institute, where I contribute to the development of Manuals of Practice and climate-informed guidance for coastal systems.

I earned a Bachelor of Science in Maritime Systems Engineering from Texas A&M University at Galveston in 1994, followed by an M.S. in Fluid Mechanics and a Ph.D. in Mechanical and Environmental Engineering (with minors in Environmental Ocean and Environmental Engineering) from the University of California, Santa Barbara in 1996 and 2000, respectively.

My curriculum vitae describes my technical experience in greater detail. It is included as Appendix A.

### 1.1.1 Awards and Recognition

I received the J.C. Stevens Award from ASCE in recognition of excellence in technical writing for a peer-reviewed paper on hydrodynamics and sediment transport.

I currently serve as vice president of ASCE's Coastal, Ocean, Ports, and Rivers Institute. In this role, I help guide the development of national standards and support coordination with other agencies, such as the National Oceanic and Atmospheric Administration (NOAA), to promote alignment in coastal and marine infrastructure guidance.

### 1.1.2 Publications

I have been a lead author or coauthor on over 30 peer-reviewed publications. A full list of my publications is provided in my curriculum vitae (Appendix A).

### 1.1.3 Prior Testimony in the Past 4 Years

In the matter of *People of the State of California ex rel. California Regional Water Quality Control Board, Los Angeles Region v. Prologis, Inc. et al.* Case No. 24STCV07273, Superior Court of California, County of Los Angeles, Dr. Craig Jones served as an expert witness on behalf of the defendants. He submitted an expert report on April 23, 2025, and provided deposition testimony on April 28, 2025, followed by trial testimony on June 30, 2025. His testimony addressed the mechanisms of hydrogen sulfide production and release in the Dominguez Channel, focusing on environmental, geologic, and hydrologic factors contributing to the October 2021 odor event.

### 1.1.4 Compensation

Integral Consulting Inc. is compensated for my time in this matter at the following hourly rates:

FILED UNDER SEAL

- $347 per hour for consulting, analysis, and report preparation

- $468 per hour for deposition testimony and trial testimony

Compensation is based solely on time expended and is not contingent upon the outcome of the litigation, the substance of the opinions rendered, or the findings favorable to any party. Payment is not dependent on the results of this case, or any specific conclusion reached.

## 1.2  SCOPE OF REVIEW

Through multiple opinions offered by its experts, CLF alleges that the New Haven Terminal is vulnerable to flooding and climate-related risks, which could result in hazardous waste releases that threaten human health, local waterbodies, and surrounding communities. Specifically, CLF contends that the terminal's location in a floodplain makes it highly susceptible to storm surge, sea level rise, and extreme weather events, and CLF claims that Defendants have not taken sufficient steps to mitigate these risks.

Regarding the complaint, I conducted an analysis to determine whether Defendants' current practices for the terminal align with industry expectations and regulatory requirements. Additionally, I assessed the validity of CLF's claims regarding the need for additional climate resilience measures. My analysis considered Defendants' existing regulatory compliance, infrastructure, and operational measures to assess whether the New Haven Terminal meets regulatory compliance and is sufficiently resilient against flooding and extreme weather events. I also considered historical climate data, flood risk assessments, and the effectiveness of existing mitigation strategies in addressing potential storm surge and extreme precipitation events.

This report details how current regulations and guidance apply to operations and evaluates the resilience of the New Haven Terminal under various flood scenarios. By doing so, this report provides a technical assessment of the terminal's ability to withstand foreseeable adverse weather and other climate-related risks while maintaining compliance with applicable environmental and engineering frameworks.

FILED UNDER SEAL

## 1.3  Summary of Opinions

My opinions on the matter are as follows:

**Opinion 1:** From my perspective as an ocean and environmental engineer, the New Haven Terminal was in full compliance with all applicable requirements of the 2018 Connecticut Multi-Sector General Permit (MSGP) for industrial stormwater at the time CLF submitted its notice of intent (NOI). The 2018, or 2021, Connecticut MGSPs for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events.

**Opinion 2:** The allegations raised in CLF's NOI are based on aspirational standards, future climate modeling, and nonbinding guidance documents that were not incorporated into the 2018 or 2021 Connecticut MSGP and do not establish enforceable compliance obligations.

**Opinion 3:** The best management practices (BMPs) implemented at the New Haven Terminal were fully compliant with all regulatory requirements at the time CLF submitted its NOI.  The terminal's stormwater pollution prevention plan (SWPPP) was current, complete, and properly executed in accordance with the 2018 Connecticut MSGP—including all monitoring, inspection, and documentation obligations—and does not require the terminal to incorporate climate scenario modeling or long-term oceanographic projections.

**Opinion 4:** The assertion that "best industry practices" impose a higher compliance standard for many water-based standard than the MSGP is unfounded and unsupported by any authority.  This term has no formal definition within Connecticut's MSGP or the U.S. Environmental Protection Agency's (EPA's) MSGPs from 2015 or 2021, and the term has not been adopted as a binding compliance benchmark.

**Opinion 5:** The 2018 and 2021 Connecticut MSGP serves as the authoritative standard for determining compliance.

**Opinion 6:** EPA's climate resilience guidance provides nonbinding recommendations and does not create enforceable design or permitting obligations. The New Haven Terminal remains fully compliant with EPA's (2024a) core goal: "Facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment."

**Opinion 7:** ASCE guidance documents, including ASCE 7 and ASCE 24-14, offer design criteria for new construction and substantial modification. These standards are not retroactive and do not require modifications to existing facilities, such as the New Haven Terminal.

**Opinion 8:** Standards from the International Organization for Standardization (ISO), such as ISO 14090, are voluntary guidance documents intended to support long-term planning. They do not impose binding regulatory obligations on petroleum terminals or alter existing

FILED UNDER SEAL

permitting requirements under the MSGP or spill prevention, control, and countermeasure (SPCC) frameworks.

**Opinion 9:** Flood risk guidance from the U.S. Army Corps of Engineers (USACE), including ER 1105-2-101 and its supporting manuals, provides planning frameworks for future federal infrastructure projects and does not impose design or retrofit requirements for existing private storage facilities like the New Haven Terminal.

**Opinion 10**: The American Petroleum Institute (API) and International Association of Oil and Gas Producers (IOGP) provide technical recommendations to support operational resilience, but they do not impose mandatory climate adaptation standards or retrofits for existing aboveground storage tanks.

**Opinion 11**: IOGP does not impose binding design or operational standards for addressing climate change risks at existing industrial facilities.

**Opinion 12**: API Standards 650 and 653 do not require retroactive climate-specific upgrades. The New Haven Terminal is fully aligned with these core industry expectations.

**Opinion 13**: The New Haven Terminal employs best industry practices not required under the MSGP or other enforceable regulatory standards—such as tank ballasting during storm events—to enhance the structural resilience of its aboveground storage tanks.

**Opinion 14**: The New Haven Terminal meets or exceeds both the enforceable BMP requirements of the MSGP and the discretionary best practices recognized by the petroleum industry.

**Opinion 15:** The New Haven Terminal's containment berms are constructed, maintained, and inspected in full compliance with EPA's SPCC and the 2018 and 2021 MSGP. Assertions that these earthen berms are noncompliant or structurally deficient are factually unsupported.

**Opinion 16:** The 2018 Connecticut MSGP does not require containment berms to be designed for "wave attack," whatever the definition.  CLF provides no credible basis for its claims of berm instability, as Nairn's analysis lacks site-specific data on berm composition, cover, and structural design.

**Opinion 17:** The New Haven Terminal's business continuity plan (BCP), facility response plan (FRP), and hazard assessment protocol (HAP) collectively demonstrate compliance with applicable EPA regulations and API standards for inspection and containment.  They also incorporate BMPs and best industry practices that address adverse weather risks. These plans reflect a proactive, standards-based approach to environmental and operational resilience.

**Opinion 18:** The 100-year event is the accepted regulatory benchmark for flood protection under Federal Emergency Management Agency (FEMA) standards, EPA's SPCC and MSGP

FILED UNDER SEAL

programs, and Connecticut's industrial stormwater permitting framework. It provides a risk-informed basis for infrastructure resilience that protects human health and the environment without requiring speculative or nonbinding design thresholds like the 500-year event.

**Opinion 19:** Design criteria for newly constructed and substantial modifications for storage tank terminals are appropriately based on the 100-year flood event. Higher thresholds, like the 500-year event, are not required for existing terminals under current law or standards or for best industry practice.

**Opinion 20:** Contrary to the suggestion of CLF, Category 3 hurricanes are rare near New Haven, and no Category 4 or 5 hurricanes have been recorded within 150 miles. The New Haven Terminal's infrastructure and preparedness measures—including tank ballasting and emergency planning—appropriately reflect the region's storm history.

**Opinion 21:** The sea level rise assumptions proposed by O'Donnell (2025) are not incorporated into any regulatory standard governing the New Haven Terminal.

**Opinion 22:** The use of mean water levels from the North Atlantic Coast Comprehensive Study (NACCS) in the New Haven Terminal's flood risk assessment is consistent with FEMA and EPA guidance. It also provides a scientifically valid basis for risk evaluation. The 95th percentile NACCS water levels represent an upper-bound uncertainty estimate and are not appropriate for use as flood protection benchmarks.

**Opinion 23:** The New Haven Terminal's application of tank ballasting, consistent with EPA (2016) guidance and operational standards, effectively mitigates failure risk during coastal flood events and supports compliance with accepted engineering practice and environmental protection objectives.

**Opinion 24:** Probabilistic modeling confirms the New Haven Terminal's aboveground storage tanks are not at structural risk during 100- and 500-year flood and storm events when adequately ballasted. The berms are not required to protect the tanks against floods.

**Opinion 25:** Projected sea level rise over the next 5 years does not pose a structural risk to the terminal's aboveground storage tanks. The 2024 *Connecticut Stormwater Quality Manual*, for the first time, mentions that sea level will rise 20 inches by 2050, but it still does not prescribe that permittees take action to address any specific impacts.

**Opinion 26:** Historical storms—including Hurricane Sandy—did not result in flooding of the New Haven Terminal.

**Opinion 27:** Modeling results—including those under the most conservative and extreme conditions—demonstrate that the adequately ballasted tanks exhibit negligible probabilities of failure across all modeled hazards, confirming the robustness of the terminal's design, maintenance, and operational protocols under extreme but plausible conditions.

FILED UNDER SEAL

**Opinion 28:** Critical infrastructure in the region—including Union Station, power substations, and hospital access corridors—are more exposed to disruption or structural failure risk during a 100-year flood event than the New Haven Terminal, underscoring the terminal's relative resilience.

**Opinion 29:** NOAA Atlas 14 is the prevailing standard for hydrologic design in the United States. NOAA Atlas 15 has not been adopted by EPA or the Connecticut Department of Energy and Environmental Protection (CT DEEP).

FILED UNDER SEAL

## 2  SITE BACKGROUND

The New Haven Terminal is a bulk petroleum storage and distribution facility within the Port of New Haven in Connecticut (Figure 1). It is near New Haven Harbor and the confluence of the Quinnipiac and Mill rivers. The Port of New Haven is the largest commercial port in the Long Island Sound and plays a significant role in fuel distribution across the region (Witt O'Brien's 2023).

The terminal occupies 38 acres and has been in operation since at least 1954. It serves as a key hub for the receipt, storage, and transfer of petroleum products—primarily gasoline, diesel, ethanol, jet fuel, and fuel oil. Petroleum products arrive at the terminal via tanker ships, where they are transferred through product pipelines to aboveground storage tanks. The terminal contains 21 primary aboveground storage tanks (39 total tanks) with a total storage capacity of 76.3 million gal. Products are then distributed primarily by truck through a loading rack system, with some shipments also occurring via pipeline (Witt O'Brien's 2023).

FILED UNDER SEAL



Figure 1.    Overview of New Haven Terminal in New Haven, Connecticut

## 2.1  NEW HAVEN HARBOR

The hydrodynamics of New Haven Harbor are influenced by its coastal location, the confluence of the Quinnipiac and Mill rivers, and its interaction with the Long Island Sound. The primary hydrodynamic forces at play are tidal forces, riverine inputs, and meteorological conditions, which collectively contribute to the harbor's dynamic environment. The harbor experiences semidiurnal tides, with two high and two low tides each day and a tidal range of approximately 6 ft.

FILED UNDER SEAL

Historical data on water surface elevations—provided by NOAA's tidal station on the harbor's east bank—provide insight regarding the surface water elevations from past storms. The highest astronomical tide, or the highest predicted astronomical tide over a 40-year period, is 4.52 feet per North American Vertical Datum of 1988 (ft NAVD88). In October 2012, Hurricane Sandy, a Category 3 hurricane, resulted in the highest recorded tide in the station's history, with a reported water surface elevation of 8.62 ft NAVD88.

Saline water from the Long Island Sound, interacting by way of tides with fresh water from the Quinnipiac and Mill rivers, creates distinct circulation patterns in the harbor. Tidal exchange generates a salinity gradient across the harbor, which influences the water's density and circulation patterns, thereby playing a crucial role in the overall hydrodynamics of the area.

Local winds primarily generate small-amplitude, short-period waves that affect New Haven Harbor on a daily and seasonal basis. These waves are the most common within the harbor. The local winds generally move from the southwest to the northeast. Storm events with strong winds form the northeast (commonly referred to as nor'easters) typically occur between December and March. Nor'easters can lead to storm surges, potentially affecting the shore infrastructure due to the harbor's orientation. During spring and fall, there is a mixture of weather patterns and varying wind intensities.

## 2.2  SITE TOPOGRAPHY

The topography of the New Haven Terminal and surrounding area is a primary factor in understanding potential surface water flooding risks. The terminal is approximately 1,300 ft east of the bank of New Haven Harbor, with the aboveground storage tanks an average of 1,800 ft from the harbor. The western edge of the terminal boundary is at an elevation of 8–9 ft NAVD88 (Figure 2). The area within the terminal slopes westward, directing drainage toward designated low points, where a series of lift stations pump water into the terminal's retention basin. The elevation slopes upward immediately to the east of the terminal into a neighborhood in East Haven, Connecticut.

FILED UNDER SEAL



Figure 2.    New Haven Terminal Site Elevations

## 2.3  STORMWATER MANAGEMENT

The terminal is divided into four stormwater drainage areas. Three of these areas—referred to as Drainage Areas 1, 2, and 3—serve as designated containment areas for the aboveground storage tanks and associated transfer infrastructure (Figure 3). Each drainage area is equipped with berms and graded surfaces that direct flow into a central collection point. These drainage areas are hydraulically isolated from one another and from offsite areas to minimize the risk of offsite migration in the event of a release.

FILED UNDER SEAL



Figure 3.    New Haven Terminal Stormwater Drainage Areas

The aboveground storage tanks are situated within large, interconnected containment basins that incorporate engineered berms, containment walls, and gravity-fed drainage to a closed-loop system. Containment elevations at the berms surrounding the tank fields range from approximately 12 to 14 ft NAVD88, which exceeds both normal tidal elevations and the FEMA base flood elevation (BFE) of 12 ft NAVD88 for this zone.

The containment system is designed to provide secondary containment as required by the terminal's stormwater permit. In the event of a spill, stormwater valves in each basin remain closed until visual inspections confirm that no contamination is present. Once verified, the stormwater is either discharged under Connecticut's MSGP or handled appropriately in accordance with the terminal's SWPPP.

FILED UNDER SEAL

The MSGP is a regulatory tool designed to oversee industrial stormwater discharges across a variety of sectors. The MSGP establishes specific standards and practices to ensure effective stormwater management and environmental protection. In addition, the stormwater system is documented and maintained as part of the New Haven Terminal's SWPPP, which includes site maps, flow diagrams, inspection records, and employee training procedures (Triton 2017). The system is designed to manage existing site runoff and is not required. In addition, the state had not provided guidance to accommodate projected future flood levels or intensified precipitation scenarios under climate change models prior to 2024, which is 3 years after this case was filed.

The design, topography, and stormwater management systems at the New Haven Terminal reflect decades of industrial operation and engineering practice in a coastal environment. Understanding this physical context is essential for evaluating the terminal's compliance with stormwater regulations and its approach to environmental protection. Section 3 examines how stormwater discharges from industrial facilities like the New Haven Terminal are governed under state and federal law, including the specific requirements of the 2018 Connecticut MSGP as well as the role of site-specific BMPs and SWPPPs in regulatory compliance.

FILED UNDER SEAL

# 3 NEW HAVEN TERMINAL PERMITING FRAMEWORK

To understand Defendant's permitting compliance obligations at the New Haven Terminal, it is first necessary to understand the legal and regulatory structure that governs how industrial stormwater is managed in the United States. Industrial facilities that discharge stormwater—particularly those involved in oil storage and handling—are regulated under the federal CWA, which aims to prevent harmful pollutants from entering U.S. waters. A key mechanism for enforcement is the National Pollutant Discharge Elimination System (NPDES), a nationwide permitting system that establishes allowable conditions under which facilities can discharge stormwater into surface waters (EPA 2024c).

To streamline administration and account for the range of industries involved, EPA developed the MSGP. This is a standardized permit that applies to a broad array of industrial sectors, each with sector-specific requirements. States with delegated authority from the EPA are authorized to implement their own NPDES programs. One such state is Connecticut, which issues its own version of the MSGP through CT DEEP. These permits are legally binding and carry reporting, inspection, and performance obligations.

At the heart of the MSGP is the requirement for each facility to develop and maintain a SWPPP. The SWPPP is not a generic document—it is a highly customized plan that reflects a site's physical layout, stored materials, operational procedures, and stormwater infrastructure. Its purpose is to identify potential sources of stormwater pollution and describe the control measures used to reduce the risk of contamination. These control measures are referred to as BMPs and span both structural features—like containment berms, oil/water separators, and storm drain systems—and procedural elements, such as routine inspections, spill response planning, employee training, and recordkeeping.

The MSGP itself imposes a layered set of responsibilities. It includes general requirements that apply to all facilities as well as sector-specific standards—the New Haven Terminal, as a petroleum bulk storage facility, is regulated under Sector P of the MSGP. This sector classification comes with specific monitoring obligations for parameters—like oil and grease, pH, and total suspended solids—that serve as indicators of stormwater contamination. Facilities must conduct regular visual assessments, perform benchmark monitoring during qualifying storm events, and take corrective action if monitoring results exceed predefined thresholds. Moreover, the SWPPP must be periodically updated to reflect any operational changes or regulatory developments. Figure 4 presents a simplified conceptual diagram of how the MSGP, SWPPP, and BMPs interact at a regulated industrial facility.



Figure 4.    MSGP, SWPPP, and BMPs Interaction for a Regulated Industrial Facility

This regulatory framework ensures that facilities such as the New Haven Terminal are not only permitted but also actively engage in minimizing pollutant discharge risks. When properly implemented and enforced, the MSGP and SWPPP structure creates a comprehensive, adaptive system for managing stormwater pollution risks in industrial environments—particularly in sectors handling potentially hazardous materials.

## 3.1  HOW SWPPPS AND MSGPS INTERACT IN PRACTICE

The relationship between the MSGP and the SWPPP is central to how stormwater permitting functions. The MSGP sets the enforceable legal framework that industrial facilities must follow to manage stormwater discharges, while the SWPPP is the site-specific implementation plan

FILED UNDER SEAL

that translates those general requirements into concrete actions at the facility level. The SWPPP documents the physical layout, drainage patterns, potential pollutant sources, and specific BMPs that a facility uses to control stormwater contamination. BMPs are implemented with respect to what is technologically available and economically practicable and achievable in light of best industry practices, as required by CT DEEP in the 2018 and 2021 versions of the Connecticut MSGP. In doing so, the SWPPP becomes the operational backbone of compliance under the MSGP.

For coverage under the MSGP, owners of a facility must submit a NOI certifying that the facility will meet the permit's requirements. They must then develop and maintain a compliant SWPPP, conduct regular inspections and benchmark monitoring, and ensure employees are trained in stormwater procedures. If pollutant benchmarks are exceeded or BMPs fail, the facility is obligated to undergo timely corrective action. These core obligations—filing a NOI, implementing the SWPPP, and responding to monitoring results—are the standard against which regulatory compliance is measured.

## 3.2   NEW HAVEN TERMINAL 2018 AND 2021 GENERAL PERMITS

At the time CLF submitted its NOI to sue in August 2020, the New Haven Terminal was operating in full accordance with the 2018 Connecticut MSGP, which had taken effect on October 1, 2018. The terminal had filed the required NOI to obtain permit coverage and had developed a comprehensive, site-specific SWPPP consistent with all applicable MSGP requirements. The SWPPP included detailed site drainage maps, an inventory of materials exposed to stormwater, and clearly documented structural and procedural BMPs designed to prevent the discharge of pollutants into surrounding waters.

In practice, the New Haven Terminal implemented a full suite of stormwater controls and monitoring activities as mandated by Sector P of the MSGP, which governs petroleum storage terminals. Defendants maintained complete records of these inspections and submitted annual reports to CT DEEP, including documentation of employee training in stormwater procedures. The terminal also operated a fully engineered containment system with berm elevations between 12 and 14 ft NAVD88, designed to retain the volume of the largest tank in each containment area. The SWPPP in effect at the time was originally prepared by qualified environmental consultants at Triton Environmental in 2017 and remained current and compliant with all regulatory requirements through the present. Notably, there were no outstanding enforcement actions or benchmark exceedances associated with the terminal at the time CLF filed its allegations.

To illustrate the disconnect between CLF's allegations and the New Haven Terminal's actual compliance obligations, it is helpful to compare the relevant stormwater permits that governed the facility over time. Table 1 summarizes the content, status, and evolution of the applicable MSGPs in Connecticut and at the federal level. As shown, the 2018 Connecticut MSGP—the only legally enforceable permit in effect when CLF filed its NOI—did not reference climate

change, sea level rise, or long-range flood modeling in any form. Later iterations of permits, including EPA's 2021 permit and the proposed 2024 Connecticut MSGP, introduced "consideration" language encouraging climate awareness, but none imposed mandatory climate adaptation requirements. The structure and content of these permits make clear that the terminal's obligations at the time of the CLF NOI were limited to managing present-day stormwater risks through the implementation of BMPs, not speculative future scenarios.

Table 1.    Applicable New Haven Terminal MSGPs and Climate Resilience Provisions

| Permit Type | Coverage Period | Status in 2021 | Climate Resilience Content |
|---|---|---|---|
| 2018 CT MSGP | Oct 1, 2018–Sept 30, 2021 | In effect when CLF served NOI or filed complaint | Does not refer to climate change, sea level rise, or extreme weather; focuses on present-day stormwater BMPs, routine inspections, visual monitoring, and recordkeeping |
| 2021 EPA MSGP | Mar 1, 2021–Present | Not in effect in CT in 2021 | Acknowledges climate change as a potential factor in stormwater pollution; encourages consideration of extreme weather and flooding but imposes no mandatory actions (EPA 2021b) |
| 2021 CT MSGP | Oct 1, 2021–Present | Not in effect when CLF served NOI or filed complaint | Introduces optional exposure risk discussion but continues to rely on benchmark-based BMP compliance; does not contain a requirement for modeling sea level rise or adopting adaptive BMPs |
| 2024 Proposed CT MSGP | Draft as of March 2024 | Not adopted to date | Is the first permit to mention climate resilience explicitly; recommends, but does not require, that facilities consider sea level rise and implement rainfall or flood-resilient BMPs |
| 2026 Proposed EPA MSGP | Draft as of June 2025 | Not adopted to date | Is similar to the 2021 EPA MSGP; does not have any mandatory actions regarding climate change (EPA 2025c) |

Note:

CT= Connecticut

## 3.3  MISCHARACTERIZATION OF PERMIT OBLIGATIONS BY CLF

In addition to its core allegations, CLF submitted expert reports from Wendi Goldsmith (2025), Richard Horner (2025), Mathew Barlow (2025), and Robert Nairn (2025) that misrepresent the regulatory obligations applicable to the New Haven Terminal under the 2018 Connecticut MSGP and 2021 Connecticut MSGP. While these experts raise concerns rooted in climate

FILED UNDER SEAL

change adaptation and resilience science, none of their critiques are grounded in permitting frameworks that govern the terminal.

Goldsmith (2025) criticizes the terminal's SWPPP for not incorporating what she refers to as "best industry practices." As described in Section 4, this term is not defined in the Connecticut MSGP and does not impose any binding requirements. Instead, the MSGP mandates the implementation of BMPs that target pollutant-specific risks, not speculative design guidance or voluntary frameworks.

Goldsmith relies on guidance developed for public wastewater and critical infrastructure systems—such as EPA Region 1 climate tools for municipal water systems—but she misapplies those materials to an industrial petroleum terminal with different regulatory obligations. The Region 1 tools were created to support long-term capital planning and vulnerability assessments for municipally owned water and sewer infrastructure, which is often subject to different funding mechanisms, public service mandates, and regulatory frameworks (e.g., the Safe Drinking Water Act, the CWA NPDES for publicly owned treatment works). In contrast, petroleum terminals like the New Haven Terminal operate under the EPA's SPCC, FRP, and MSGP programs, which do not require the type of climate scenario planning envisioned by municipal climate resilience guidance.

Horner (2025) asserts that the New Haven Terminal's stormwater infrastructure is inadequate because it does not account for projected sea level rise, long-term flood modeling, or groundwater interaction. His evaluation presumes that the terminal was obligated to adapt its containment systems to potential future climate scenarios; however, the 2018 Connecticut MSGP imposed no such requirements. Specifically, it did not call for facilities to conduct flood modeling, apply sea level rise projections, or incorporate groundwater behavior into stormwater planning. Rather, the permit's scope was focused on present-day stormwater discharge management and pollutant control—not on speculative climate adaptation.

Barlow (2025) similarly contends that the New Haven Terminal's SWPPP is deficient for not incorporating projected increases in rainfall intensity due to climate change. This claim relies on climate model outputs, not on the standards defined by the MSGP. In reality, the permit required the terminal to implement BMPs and conduct stormwater monitoring based on historical rainfall and runoff conditions. There was no obligation or "best industry practice" to include future precipitation scenarios derived from climate projections or modeling tools from the Intergovernmental Panel on Climate Change (IPCC). The terminal's permit compliance was appropriately benchmarked against existing pollutant thresholds—not speculative 2050 rainfall projections that Barlow introduced for the first time in his expert report without prior disclosure or consultation with Defendants.

Nairn (2025) cites FEMA (2007) and USACE (1996) planning guidance to support his assertion that the New Haven Terminal should have undertaken probabilistic flood modeling and structural retrofits. However, both the FEMA and USACE flood risk management documents are designed primarily for the planning and design of new construction or substantial modification

FILED UNDER SEAL

for federally funded or critical public infrastructure—such as hospitals, emergency facilities, and public utilities—and are not intended for private industrial stormwater facilities regulated under the Connecticut MSGP. These documents are not incorporated into the MSGP, nor do they carry regulatory force in this context. As such, Nairn's analysis imposes an inappropriate standard by applying federal infrastructure planning frameworks to a private-sector facility governed by a distinct regulatory regime.

Taken together, these expert opinions reflect a forward-looking orientation grounded in evolving resilience thinking, but they do not align with the regulatory standards that were actually in place at the New Haven Terminal when CLF served its NOI or filed its complaint in 2021. None of the expert analyses demonstrate a failure to meet the binding requirements of the 2018 Connecticut MSGP or the CWA. While CLF's experts' perspectives may contribute to long-term planning conversations, they do not establish a valid foundation for a claim of noncompliance, and they do not establish "best industry practices" that have been adopted by the industry (e.g., bulk fuel storage terminals).

The final section in this report provides further evaluation of these and other CLF expert reports.

**Opinion 1:** From my perspective as an ocean and environmental engineer, the New Haven Terminal was in full compliance with all applicable requirements of the 2018 Connecticut Multi-Sector General Permit (MSGP) for industrial stormwater at the time CLF submitted its notice of intent (NOI). The 2018, or 2021, Connecticut MGSPs for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events.

**Opinion 2:** The allegations raised in CLF's NOI are based on aspirational standards, future climate modeling, and nonbinding guidance documents that were not incorporated into the 2018 or 2021 Connecticut MSGP and do not establish enforceable compliance obligations.

## 3.4  REGIONAL MSGP COMPARISON

To further place the New Haven Terminal's climate risk evaluation in regulatory context, it is useful to compare Connecticut's MSGP requirements with those of neighboring states. Neither the Rhode Island nor New York MSGP impose climate adaptation or resilience mandates comparable to the probabilistic tank failure modeling that is conducted later in this report.

Rhode Island's 2024 Industrial Stormwater General Permit includes routine requirements such as quarterly inspections, benchmark monitoring, and spill prevention protocols. While it references general climate adaptation goals from the state's resiliency plan, the permit contains no enforceable provisions requiring sea level rise modeling, surge assessment, or structural tank vulnerability evaluations (RIDEM 2024). New York's 2021 MSGP likewise contains no obligation to assess aboveground storage tank performance under future flood scenarios or to evaluate tank ballasting practices, storm surge exposure, or hydrodynamic

FILED UNDER SEAL

failure modes (NYSDEC 2021). No available permit in the Northeast (including Rhode Island, New York, and Connecticut) requires facilities to conduct a formal modeling assessment of climate stressors.

FILED UNDER SEAL

# 4   STANDARDS OF PRACTICE, BEST PRACTICES, AND REGULATORY FRAMEWORK

The allegations presented by CLF—and the opinions of CLF's experts—rely heavily on concepts such as "best industry practices," aspirational resilience standards, and guidance documents developed by professional associations. However, these concepts are often undefined or nonbinding unless explicitly adopted into a facility's governing permit. Further, CLF's characterization of "best industry practices" is not reflective of what the industry—namely, the industry of bulk petroleum storage terminals—has adopted as "best industry practices." Understanding how these terms differ from enforceable regulatory requirements is essential to evaluating Defendants' compliance.

This section provides a structured framework for distinguishing the following:

- **Best Management Practices (BMPs),** which are defined and required by stormwater permits, such as the MSGP

- **Best Industry Practices**, which constitute an informal and evolving concept that reflects widely adopted practices by a particular industry with no formally enforceable standard

- **Technical Standards and Guidance**, which may inform BMP development and "best industry practices" but are not binding unless formally incorporated into permit requirements or design codes.

These distinctions are critical to understanding why the claims raised in CLF's NOI, CLF's complaint, and the critiques in CLF's expert reports do not demonstrate regulatory noncompliance. Defendant's actions can only be evaluated against the formal requirements of the 2018 Connecticut MSGP—the only standard applicable at the time of CLF's filing. Table 2 defines each of these categories, illustrates how they differ, and provides examples. It also clarifies which standards were applicable to the New Haven Terminal's operations in 2021.

FILED UNDER SEAL

Table 2.    Comparison of BMPs, Best Industry Practices, and Technical Standards and Their Applicability to the New Haven Terminal

| Term | Definition | Distinguishing Features | Examples | Applicability to New Haven Terminal |
|---|---|---|---|---|
| Best Management Practices (BMPs) | Site-specific physical, procedural, or structural controls implemented to reduce pollutants in stormwater discharges | Defined and required by permits (e.g., MSGPs); enforceable; facility specific; included in SWPPPs | Oil-water separators, secondary containment, covered loading areas, good housekeeping, quarterly inspections | Required under the 2018 CT MSGP; the terminal implemented and documented BMPs, consistent with permit expectations |
| Best Industry Practices | Informal term referring to widely accepted operational approaches, technologies, or procedures considered effective across the industry | Nonbinding unless adopted by contract or regulation | Risk-based asset management, the use of resilience procedures, resilient designs exceeding code minimums, ballasting, compliance with EPA Region 6 Regional Response Team (RRT) | Not defined under the MSGP, other than to be implemented in a technologically and economically feasible way; Goldsmith's use of this term refers to standards not adopted by CT DEEP regulations |
| Technical Standards and Guidance | Voluntary technical standards or guidance developed by professional organizations | Often referenced, but not enforceable unless incorporated into permits or codes; used for benchmarking or design basis development | API 650 (tank design), ASCE 7 and 24 (flood loads), ISO 14001 (environmental management) | May inform BMP development but were not incorporated into the 2018 or 2021 CT MSGP; the terminal is not obligated to follow them |

The remainder of this section describes each of these categories, illustrates their relevance to the New Haven Terminal, and concludes with expert opinions affirming Defendants' compliance with the applicable permit.

FILED UNDER SEAL

## 4.1  BEST MANAGEMENT PRACTICES AND BEST INDUSTRY PRACTICES

Understanding compliance under the MSGP requires clarity on the distinction between enforceable requirements and informal or aspirational standards. At the core of stormwater permitting are BMPs—concrete, facility-specific measures designed to prevent or reduce the discharge of pollutants into stormwater. These include both physical infrastructure and operational procedures. Examples typically include secondary containment systems that capture spills, impervious paving to reduce infiltration of contaminants, dedicated spill prevention plans, regular inspections of storm drains, and employee training protocols. These practices are not optional; they are prescribed by the MSGP and must be documented in the terminal's SWPPP. Their implementation forms the backbone of permit compliance.

The 2018 and 2021 Connecticut MSGPs reinforces this regulatory framework through its definition of the term "minimize," a foundational concept in the MSGP. The agency defines "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available, economically practicable, and achievable in light of best industry practice." In this context, "best industry practices" are not aspirational ideals but serve as a boundary condition—limiting the extent to which controls must be implemented based on what is broadly accepted and feasible within the industry.

This use of the term clarifies that Connecticut does not treat "best industry practices" as a separate compliance standard. Instead, it frames them as a reference point for determining what is achievable in practice.  Best industry practice requires a consensus or established "practice" that is used by industry.  Best industry practice is not a collection of documents selected by individuals.  By contrast, when CLF's experts invoke the term "best industry practices," they do so to suggest a standard that exceeds what is required by the MSGP or codified in the SWPPP.  These expert opinions reflect policy preferences or emerging concepts rather than enforceable permit obligations. Under the current regulatory framework, permit compliance is grounded in site-specific BMPs—not in forward-looking ideals or evolving methodologies that have not been formally adopted.

## 4.2  ROLE OF TECHNICAL STANDARDS AND GUIDANCE DOCUMENTS

Closely related to the discussion over "best industry practices" is the role of technical standards and guidance documents published by national and international organizations. These documents—produced by bodies such as IOGP, API, ISO, and ASCE—are the result of consensus among industry experts and are often used to inform engineering design, risk assessments, and management systems. Specific examples will be included in the following sections of this report.

While these documents are well respected within their fields and can be valuable for benchmarking or informing internal policy, they are not, by themselves, enforceable. Their authority derives only from being formally incorporated into permits or referenced by

FILED UNDER SEAL

regulation. In the case of the New Haven Terminal, none of the guidance documents cited in CLF's expert reports—including those on flood design or climate resilience—were adopted into the 2018, or the 2021, Connecticut MSGP. Consequently, while these standards may reflect good engineering judgment or planning, they cannot be retroactively imposed as if they were legal obligations. It is unworkable to retroactively impose standards in a permit that a permittee was never notified of. Unless and until such documents are explicitly adopted by CT DEEP or incorporated into the MSGP, they serve as reference material—not compliance criteria.

## 4.3  AUTHORITATIVE ROLE OF MSGPS IN COMPLIANCE

Ultimately, it is the MSGP itself—not expert opinion or third-party guidance—that establishes the enforceable framework for stormwater management at regulated industrial sites. The Connecticut MSGP defines which BMPs are required, establishes the content and structure of a compliant SWPPP, and sets the standards against which implementation is measured. Importantly, the permit is grounded in present-day conditions and pollutant risks; it does not mandate that facilities anticipate or mitigate for future climate projections unless such requirements are specifically written into the permit language.

For example, neither the 2018 version (or the 2021 version) of the Connecticut MSGP nor the EPA MSGP required facilities to model sea level rise, prepare for 500-year flood events, or integrate climate change scenarios into stormwater design. While subsequent permit drafts have begun to acknowledge climate resilience as a consideration, those elements remain nonbinding recommendations rather than enforceable requirements. Therefore, the New Haven Terminal's compliance must be evaluated based on the obligations explicitly laid out in the MSGP in effect at the time of CLF's NOI—not against continuously evolving guidance or long-range planning concepts that had not been formally adopted by the regulatory authority or industry as a "best industry practice."

## 4.4  MISALIGNMENT BETWEEN CLF AND APPLICABLE COMPLIANCE STANDARDS

CLF's experts—in particular Goldsmith, Nairn, O'Donnell, Horner, and Barlow—base their opinions on speculative or nonbinding standards and guidance that extend beyond the scope of the Connecticut MSGP.  Taken together, these expert reports attempt to redefine compliance through the lens of *post hoc*, forward-looking risk standards that are not embedded in the legal framework.  The MSGP does not require facilities to anticipate future climate scenarios, adopt third-party guidance, or meet evolving ideals unless explicitly stated.  Rather, compliance is determined through present-day pollutant control, documented BMP implementation, and benchmark-based monitoring. The experts' opinions do not establish that the New Haven Terminal was in violation of the MSGP or the CWA at the time of CLF's filing.

FILED UNDER SEAL

In their reports, Goldsmith (2025) and Nairn (2025) cite numerous federal engineering manuals, technical bulletins, and consensus standards that are either not applicable to private sector stormwater management under Connecticut's MSGP or intended for use exclusively by federal agencies or in the design of critical or coastal defense infrastructure. These citations reflect a fundamental mischaracterization of the regulatory and technical standards governing the New Haven Terminal.

For example, the EPA's MSGP and the 2018 and 2021 versions of Connecticut's MSGP do not require terminals to evaluate or design for 500-year (or even 100-year) flood conditions. The MSGP framework, including Sector P for petroleum bulk stations and terminals, focuses on controlling pollutant discharge through the implementation of BMPs such as containment, inspections, employee training, and runoff control (EPA 2021). The permit does not require evaluation of structural tank stability, and it does not reference hydrodynamic modeling or coastal impact assessments as compliance criteria.

Specifically, experts rely on the following documents:

- **FEMA Risk MAP Program:** This is a planning initiative that provides communities with updated flood hazard mapping, risk assessment tools, and planning support to inform local mitigation efforts. While it encourages broad stakeholder participation, it is not a regulatory program and does not impose facility-specific obligations on private terminals (FEMA 2025).

- **USACE ER 1105-2-101:** This regulation provides guidance for USACE civil works projects, outlining a methodology for probabilistic flood risk assessments. While this methodology is technically robust, it is intended for federal planning and is not incorporated into industrial stormwater permitting under the CWA (USACE 2019).

- **USACE Engineer Manual EM 1110-2-1619 (Hydrologic Engineering):** This manual is a design and planning resource developed for federal agencies undertaking coastal engineering projects. It is not incorporated by reference into the MSGP or Connecticut's permitting regime for private facilities (USACE 1996).

- **EPA Region 1 Climate Resilience Evaluation and Awareness Tool (CREAT):** This EPA resource is a decision-support tool for drinking water and wastewater utilities. It helps municipal utility operators evaluate future climate threats to service delivery. However, it is not intended for petroleum terminals and is not referenced in EPA's industrial stormwater permitting (EPA 2025a).

- **EPA Region 1 Recommendations for Wastewater Resilience:** This guidance addresses climate resilience planning for municipal wastewater treatment plants. It contains no binding or relevant provisions for petroleum handling facilities regulated under the MSGP or SPCC frameworks (EPA 2025b).

By citing these and other materials, CLF's experts present an inflated standard of care that does not reflect the benchmarks for industrial stormwater compliance. Table 3 lists example

FILED UNDER SEAL

documents that the CLF experts rely on and their applicability to the New Haven Terminal. These documents are useful for long-range planning or use by federal agencies and municipalities, but they do not override the clear and specific compliance obligations imposed by the 2018 and 2021 versions of the Connecticut MSGP, which are based on stormwater BMP implementation.

This pattern of misapplying government-issued guidance has led to claims that the New Haven Terminal is out of compliance with standards that do not, in fact, apply to the facility. The expert opinions fail to distinguish between advisory planning resources and legally binding permitting requirements.

**Opinion 3:** The BMPs implemented at the New Haven Terminal were fully compliant with all regulatory requirements at the time CLF submitted its NOI. The terminal's SWPPP was current, complete, and properly executed in accordance with the 2018 Connecticut MSGP—including all monitoring, inspection, and documentation obligations—and does not require the terminal to incorporate climate scenario modeling or long-term oceanographic projections.

**Opinion 4:** The assertion that "best industry practices" impose a higher compliance standard than the MSGP is unfounded and unsupported by any authority. This term has no formal definition within Connecticut's MSGP or EPA's MSGPs from 2015 or 2021, and the term has not been adopted as a binding compliance benchmark.

**Opinion 5:** The 2018 Connecticut MSGP serves as the authoritative standard for determining compliance.

Table 3.    Inapplicable Planning and Engineering References Cited by CLF Experts

| Document Cited | Type | Primary Purpose | Applicability to New Haven Terminal |
|---|---|---|---|
| FEMA Risk MAP Program (FEMA 2025) | Guidance | Supports flood risk assessment and mitigation planning using updated mapping tools | Nonbinding; informational support for local planners; not incorporated into MSGP or SPCC programs |
| USACE ER 1105-2-101 (USACE 2019) | Technical Standard/ Guidance | Establishes a framework for risk-based planning and future flood scenario modeling for federal projects | Not enforceable for private facilities; applies to federally funded infrastructure assessments |
| USACE Engineer Manual EM 1110-2-1619 (USACE 1996) | Technical Standard | Provides coastal flood design criteria for federal infrastructure | Not applicable; targets U.S. Army Corps projects and federally designed structures |

FILED UNDER SEAL

Table 3.          Inapplicable Planning and Engineering References Cited by CLF Experts

| Document Cited | Type | Primary Purpose | Applicability to New Haven Terminal |
|---|---|---|---|
| EPA Climate Resilience Evaluation and Awareness Tool (EPA 2025a) | Guidance | Serves as a climate risk tool for public drinking water and wastewater utilities | Not applicable; not intended for petroleum terminals or stormwater compliance |
| EPA Region 1 Recommendations for Wastewater Resilience (EPA 2025b) | Best Industry Practice | Provides voluntary climate adaptation guidance for wastewater treatment plants | Not applicable; designed for municipal wastewater facilities |
| ASCE MOP 140: Climate-Resilient Infrastructure (ASCE 2018) | Guidance | Outlines conceptual approaches for climate-resilient infrastructure planning | Advisory only; not included in EPA or CT stormwater permitting schemes |
| ASCE 7-22 §6.6: Minimum Design Loads for Buildings and Other Structures (ASCE 2022) | Technical Standard | Specifies minimum loads for new construction, including flood and debris loads | Not applicable; applies to new building design, not existing terminal infrastructure |
| Technical Bulletin No. 5: Free-of-Obstruction Requirements (FEMA 2008) | Guidance | Provides guidance for managing flood debris impacts in flood zones | Not applicable; targets NFIP compliance for residential and light commercial structures |

Note:

NFIP = National Flood Insurance Program

FILED UNDER SEAL

# 5  CLIMATE RISK GUIDANCE

Over the past decade, government agencies and professional organizations have introduced a growing body of climate risk guidance aimed at supporting long-term planning and encouraging adaptive strategies. These documents—developed by EPA, USACE, ASCE, ISO, and others—offer voluntary frameworks for evaluating environmental stressors such as flooding, sea level rise, and extreme weather events. However, as outlined in the preceding sections, these forward-looking publications do not constitute legally binding requirements, and they do not necessarily establish "best industry practice." Most importantly, they do not override enforceable permitting obligations such as those found in the 2018, or 2021, Connecticut MSGP.

In the context of industrial stormwater management, the New Haven Terminal is regulated by formal permit instruments—i.e., the MSGP as authorized under the CWA. These instruments establish present-day, measurable obligations for pollutant control through BMP implementation, monitoring, and documentation. While EPA and other agencies have published information regarding climate resilience planning, their recommendations are discretionary and not incorporated by reference into regulations like the MSGP. Additionally, whatever materials these agencies published do not contemplate the extent of climate resilience that CLF contemplates—for example, the consideration of a 500-year flood condition.

CLF has cited various technical standards—such as ASCE's flood load criteria, FEMA's risk projections, and USACE's modeling frameworks—to support the argument that the New Haven Terminal should have adopted additional climate-based controls. However, as described in Sections 3 and 4, these materials are not codified standards, and they are not part of the legal framework governing facility compliance. Rather, they reflect evolving policy preferences and future-looking planning tools that may inform future regulatory updates or inform the design of new development, but they cannot be retroactively applied to assert permit violations.

Compliance at the New Haven Terminal is based on adherence to BMPs, proper SWPPP implementation, and risk controls that align with current regulatory and engineering requirements—not with projected climate scenarios or voluntary adaptation frameworks. The following sections review the content and legal status of recent climate-related guidance to clarify what these documents do, and do not, require.

## 5.1  EPA CLIMATE RESILIENCE GUIDANCE

EPA's climate resilience materials have consistently been presented as discretionary guidance, not as enforceable requirements. This distinction is fundamental to understanding the scope of the New Haven Terminal's regulatory obligations under the CWA and related programs such as the MSGP, SPCC, and FRP frameworks.

FILED UNDER SEAL

Goldsmith (2025) misrepresents the role of EPA guidance by citing aspirational planning tools and adaptation frameworks as though they carry the force of law. For example, she references EPA Region 1's Climate Resilience Evaluation and Awareness Tool (CREAT) and wastewater sector adaptation documents, which are tailored to public utilities and critical infrastructure—not private-sector petroleum terminals subject to MSGP requirements. These tools are explicitly designed to assist voluntary planning and do not modify existing regulatory standards. Goldsmith's implication that such documents create or inform binding permit obligations is incorrect and misleading.

EPA has clearly stated that its climate guidance is not legally binding. In *Climate Resilience in RCRA Permitting*, for example, EPA (2024b) states that "this document does not substitute for the statute or regulations, nor is it a regulation itself." This disclaimer appears throughout EPA's climate adaptation publications. While the agency encourages voluntary consideration of site-specific vulnerabilities, it does not require design retrofits, flood modeling, or forward-looking climate risk assessments for existing infrastructure under its stormwater, SPCC, or FRP regulatory programs.

EPA's position is consistent across its major climate-related guidance documents:

- **EPA (2013, 2014)**: These early adaptation strategies established general principles for resilience planning, but they are nonprescriptive and aimed at informing federal agency operations.

- **EPA (2021a)**: The *Climate Adaptation Action Plan* reiterates that adaptation is advisory and focused on supporting long-term planning, not compliance enforcement.

- **2021 EPA MSGP (EPA 2021b)**: EPA's 2021 MSGP encourages facilities to "consider" extreme weather and climate change, but it imposes no requirement to evaluate or design for future climate scenarios. Climate projections are not required inputs for the SWPPP.

- **EPA (2024a,b)**: In its RCRA climate resilience memorandum and final updates to the FRP Rule, EPA explicitly confirms that adaptation guidance does not alter existing requirements and that flood considerations apply only to new or expanding facilities—not existing sites like the New Haven Terminal.

- **2024 FRP Rule (EPA 2024c)**: This rule reaffirms that the 100-year flood event remains the governing standard, which is consistent with FEMA and longstanding EPA practice. There is no shift toward requiring 500-year flood event modeling under any EPA permit or design program.

Goldsmith's attempt to elevate nonbinding EPA planning guidance to the level of regulatory obligation fails to recognize these clear distinctions. Contrary to the suggestion of CLF's experts, EPA does not require facilities like the New Haven Terminal to incorporate climate

FILED UNDER SEAL

modeling, future sea level rise, or worst-case storm surge projections into their SWPPP or secondary containment designs.

The terminal is, in fact, compliant with all binding EPA frameworks—namely, the 2018 Connecticut MSGP, SPCC regulations under 40 CFR Part 112, and the FRP program. It incorporates secondary containment, visual inspection protocols, site-specific BMPs, and spill prevention infrastructure, all consistent with EPA's (2024a) statement that "facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment."

By relying on guidance intended for other sectors and mischaracterizing EPA's intent, Goldsmith (2025) does not establish any regulatory failure. Her critique reflects a policy preference, not a legal standard.

**Opinion 6:** EPA's climate resilience guidance provides nonbinding recommendations and does not create enforceable design or permitting obligations. The New Haven Terminal remains fully compliant with EPA's (2024a) core goal: "Facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment."

## 5.2  ASCE AND ISO CLIMATE GUIDANCE

In addition to EPA's discretionary climate planning tools, CLF experts—including Wendi Goldsmith (2025) and Robert Nairn (2025)—rely heavily on technical standards published by ASCE and ISO. These standards include ASCE 7, ASCE 24, and ISO 14090, which are frequently cited in support of more extensive structural evaluations or infrastructure retrofits. However, these documents are not regulatory in nature and do not impose enforceable obligations on existing industrial facilities—particularly those regulated under the 2018 Connecticut MSGP.

ASCE 7-16 and 7-22 provide engineering criteria for structural design under environmental loading conditions such as wind, snow, seismic events, and flooding. These standards are most relevant to new construction and substantial modifications, not existing facilities such as the New Haven Terminal. Further, facilities such as the New Haven Terminal are typically classified as Risk Category II, for which ASCE 7 designates the 100-year flood (with a 1 percent annual chance event) as the applicable protection threshold. The 500-year flood standard is reserved for Risk Category III and IV structures (e.g., hospitals, emergency operations centers), which are functionally distinct from storage terminals. Thus, the suggestion—advanced by Goldsmith and implied in Nairn—that storage tanks at the New Haven Terminal must conform to higher flood thresholds under ASCE 7 misrepresents its applicability.

FILED UNDER SEAL

ASCE 24-14, *Flood Resistant Design and Construction*, is a companion to ASCE 7 and applies only to facilities subject to building code floodplain regulations—again, new structures or substantially modifications to structures. ASCE 24 offers design guidance based on FEMA flood zones, foundation types, and material resistance standards.  It is not retroactive.  It does not mandate upgrades to existing facilities unless triggered by major reconstruction. Goldsmith's (2025) reliance on ASCE 24 as though it applies retroactively to the New Haven Terminal lacks basis.

Similarly, ISO 14090:2019, *Adaptation to Climate Change – Principles, Requirements and Guidelines*, is a global standard for high-level risk assessment and resilience planning. It encourages a systems-based approach to managing long-term climate exposure but offers no binding technical specifications, engineering requirements, or enforcement mechanisms. ISO 14090 is meant to support decision-making in sectors voluntarily adopting adaptation strategies. It is not incorporated into U.S. environmental permitting frameworks, and it is not cited in the MSGP, SPCC, or FRP regulations as a required reference. Therefore, the ISO standards cited by CLF experts are outside the regulatory framework governing the terminal.

By relying on ASCE and ISO guidance documents that are explicitly nonbinding, Goldsmith (2025) and Nairn (2025) blur and redraw the line between best industry practice and enforceable permit compliance (i.e., BMPs). As established in Section 4, the MSGP does not incorporate these design standards, and Connecticut's implementation of the MSGP for petroleum terminals imposes no obligation to predict extreme climate scenarios or retrofit facilities to meet evolving resilience frameworks.

The New Haven Terminal remains compliant with all applicable regulatory frameworks, including the 2018 MSGP, SPCC, and FRP requirements.  Its SWPPP is based on historical precipitation risks, pollutant discharge controls, and physical containment features—not on speculative climate modeling or advisory engineering concepts.  While ASCE and ISO standards may inform future design practices, they have no bearing on the current or past compliance status of this facility.

**Opinion 7:** ASCE guidance documents, including ASCE 7 and ASCE 24-14, offer design criteria for new construction and substantial modification. These standards are not retroactive and do not require modifications to existing facilities, such as the New Haven Terminal.

**Opinion 8:** Standards from the ISO, such as ISO 14090, are voluntary guidance documents intended to support long-term planning. They do not impose binding regulatory obligations on petroleum terminals or alter existing permitting requirements under the MSGP or SPCC frameworks.

FILED UNDER SEAL

## 5.3  USACE CLIMATE AND FLOOD RISK GUIDANCE

USACE provides some of the most technically detailed frameworks for flood risk management and coastal engineering, but these frameworks are misrepresented by CLF's experts—particularly Nairn (2025).

For example, Nairn references several USACE documents, including ER 1105-2-101 and EM 1110-2-1619, to argue that the New Haven Terminal should have undertaken detailed coastal wave modeling, debris impact analysis, and flood resilience retrofits. However, each of these documents is intended for federal agencies conducting planning-level analyses of new public infrastructure projects—not for enforcement against private-sector industrial facilities under the CWA or MSGP frameworks:

- ER 1105-2-101 (USACE 2019) provides a structured approach for evaluating future flood risks using probabilistic modeling. It is aimed at informing USACE project feasibility and investment decisions. The document explicitly does not impose design standards or retrofit obligations, and it is not incorporated into any environmental permit or regulation applicable to the New Haven Terminal.
- EM 1110-2-1619 (USACE 1996) provides methodologies for coastal structure design, including breakwaters, levees, and revetments. These are primarily for engineers working on federal navigation and shore protection projects, not bulk petroleum storage terminals governed by stormwater discharge permits.

By invoking these planning and research tools, Nairn implies the New Haven Terminal had a duty to design and retrofit its aboveground storage tank systems using standards never adopted into EPA's MSGP, SPCC, or FRP rules. This implication is a fundamental mischaracterization.  Neither EPA nor CT DEEP has incorporated USACE's technical planning documents into its permitting regimes, and these documents do not apply retroactively to facilities developed under earlier regulatory codes.

Despite the lack of requirement from these documents, this report demonstrates that many of the technical principles advocated by USACE—particularly scenario-based modeling and risk-informed evaluation—were voluntarily adopted in the probabilistic assessment of tank stability at the New Haven Terminal (Section 10). These analyses include consideration of flood height, velocity, wind loading, and structural performance. The fact that these methods align with USACE's best-practice methodologies reinforces the rigor of the analysis, but critically, no obligation to use them exists.

**Opinion 9:** USACE's flood risk guidance, including ER 1105-2-101 and its supporting manuals, provides planning frameworks for future federal infrastructure projects and does not impose design or retrofit requirements for existing private storage facilities like the New Haven Terminal.

FILED UNDER SEAL

# 6  INDUSTRY STANDARDS AND PRACTICE

CLF's experts—including Goldsmith (2025), Horner (2025), and Nairn (2025) in particular—suggest that the New Haven Terminal fails to meet what they describe as "best industry practices" and assert that the facility should have adopted climate-specific retrofits based on emerging engineering guidance.  Again, these claims fundamentally mischaracterize both the role of industry standards and the obligations imposed by existing regulatory frameworks.

While regulatory compliance defines the enforceable standards, industry standards provide voluntary guidance for engineering quality, resilience planning, and risk reduction. These standards include technical publications from groups such as IOGP and API. These industry-developed frameworks are not equivalent to BMPs under the MSGP. In contrast to the mandatory pollution prevention practices required under the 2018 Connecticut MSGP, API and IOGP guidelines are advisory in nature. They promote flexible, site-specific approaches to facility design and maintenance but do not require existing infrastructure to be retrofitted or redesigned solely based on projections of future climate risks.

Goldsmith (2025) relies on nonbinding guidance from IOGP to argue that the New Haven Terminal's SWPPP was deficient, but the guidance does not impose enforceable requirements, and it does not override the terminal's successful implementation of required BMPs. Horner (2025) and Nairn (2025) make similar errors in treating discretionary industry guidance as mandatory standards of care.

**Opinion 10**: API and IOGP provide technical recommendations to support operational resilience, but they do not impose mandatory climate adaptation standards or retrofits for existing aboveground storage tanks.

## 6.1  IOGP GUIDANCE

IOGP's climate and risk guidance encourages risk-based planning and the voluntary integration of resilience measures during new construction or major modifications. It does not apply retroactively, and it does not require facilities like the New Haven Terminal to undertake design changes in response to evolving flood or sea level projections.

The New Haven Terminal already meets IOGP's intent by conducting risk-based assessments, maintaining robust containment and inspection systems, and incorporating resilience strategies such as tank ballasting and elevated controls. As such, the facility reflects best industry practice without any formal obligation to comply with IOGP climate frameworks.

**Opinion 11**: IOGP does not impose binding design or operational standards for addressing climate change risks at existing industrial facilities.

FILED UNDER SEAL

## 6.2  API STANDARDS FOR TANK DESIGN AND INSPECTION

API remains the recognized authority on aboveground storage tank design and maintenance. However, its key publications—API Standard 650 and API Standard 653—focus on structural integrity and inspection. They do not mandate climate resilience retrofits for existing tanks.

- **API Standard 650** governs tank design and construction, addressing hydrostatic loads, seismic forces, and wind—not sea level rise or storm surge modeling.
- **API Standard 653** governs routine inspection, maintenance, and repair to ensure continued mechanical soundness.

Nairn (2025) improperly applies USACE design guidance—such as ER 1105-2-101—to argue that the New Haven Terminal should undergo structural retrofits. Such guidance is intended for new federal infrastructure, public safety facilities, or critical infrastructure planning, not for existing petroleum terminals governed by the MSGP or API standards. API Standards 650 and 653 remain the appropriate governing standards for design and inspection of aboveground storage tanks in this context. As other experts for Defendants in this case have explained, the New Haven Terminal applies these standards in full accordance with their intended purpose, ensuring mechanical integrity and regulatory compliance without deviation from prevailing engineering expectations.

**Opinion 12**: API Standards 650 and 653 do not require retroactive climate-specific upgrades. The New Haven Terminal is fully aligned with these core industry expectations.

## 6.3  APPLICATION OF BEST INDUSTRY PRACTICES

Intentionally or mistakenly, CLF's experts repeatedly conflate "best industry practices" with enforceable design mandates.  In fact, best industry practices are voluntary measures that enhance safety and resilience beyond minimum requirements.  At aboveground storage tank terminals like the New Haven Terminal, these practices include the following:

- Tank ballasting to prevent flotation or displacement during floods, which is recognized by EPA's Region 6 RRT and EPA (2016) as a best practice and is supported broadly by peer-reviewed work including Khakzad and Gelder (2018), Katopodis and Sfetsos (2019), Mia and Kameshwar (2024), and Ghimire and Kameshwar (2024)
- The use of elevated controls and stormwater controls beyond regulatory minimums
- Emergency preparedness actions that are triggered by forecasted flood events.

Each of these best industry practices have been implemented at the Terminal, and, as I explain later, they protect the Terminal from any sort of "catastrophic" releases claimed by CLF's

FILED UNDER SEAL

experts.  Each of these practices is consistent with industry norms and reflect the facility's commitment to resilience. However, none of them are required under the MSGP, SPCC, or FRP frameworks, and their absence cannot be construed as noncompliance.

**Opinion 13**: The New Haven Terminal employs best industry practices not required under the MSGP or other enforceable regulatory standards—such as tank ballasting during storm events—to enhance the structural resilience of its aboveground storage tanks.

To summarize, CLF's experts incorrectly treat voluntary guidance documents not keyed to a petroleum bulk storage facility as mandatory benchmarks for a petroleum bulk storage terminal. Their claims rely on discretionary standards that were never adopted into regulatory frameworks and were not applicable to the New Haven Terminal under the 2018, or 2021, Connecticut MSGP. The terminal's performance reflects full compliance with regulatory obligations and the responsible application of relevant industry best practices.

**Opinion 14**: The New Haven Terminal meets or exceeds both the enforceable BMP requirements of the MSGP and the discretionary best practices recognized by the petroleum industry.

FILED UNDER SEAL

# 7   NEW HAVEN TERMINAL'S EXISTING RISK MANAGEMENT PLANS

Contrary to claims by CLF experts—including Wendi Goldsmith (2025) and Robert Nairn (2025)—the New Haven Terminal actively addresses storm, flood, and operational risks through a suite of established risk management plans.  The Terminal's risk management program include the facility's business continuity plan (BCP), EPA-mandated facility response plan (FRP), and internal hazard assessment protocol (HAP), all of which support EPA's SPCC Rule and FRP Rule. These plans incorporate technical standards from the API, as well as facility-specific resilience strategies, such as tank ballasting and elevated control systems.

Goldsmith (2025) alleges that the terminal fails to consider best industry practices for climate resilience. However, the existing plans integrate both required and discretionary measures that exceed the minimum obligations under the 2018 and 2021 Connecticut MSGPs. Similarly, Nairn (2025) advocates for retrofits based on federal planning documents that do not apply to private terminals regulated under EPA's industrial stormwater framework. These critiques ignore the structured and proactive measures already in place to manage site-specific risk, ensure containment, and maintain operational readiness during extreme weather events.

The terminal's approach is centered around three key pillars:

- **Structural Integrity and Stability:** Through API Standard 653-compliant inspection and maintenance, tank ballasting during flood events, and implementation of containment berms, the terminal ensures physical resilience against foreseeable threats.

- **Environmental Protection:** The terminal complies with the SPCC Rule through redundant secondary containment systems, sealed stormwater basins, and pollution prevention controls consistent with EPA expectations.

- **Emergency Response and Preparedness:** A structured incident response plan, employee training, regular drills, and communication protocols with emergency agencies ensure rapid, coordinated action during major events.

These layers of protection show that the New Haven Terminal is not only compliant but actively engaged in prudent risk management practices based on current science, engineering standards, and regulatory guidance.

## 7.1   RISK AND RESILIENCE

CLF expert reports claim the terminal has not adequately addressed risks from flooding and sea level rise.  In reality, the facility implements multiple measures aligned with federal and industry expectations.  Measures to reduce risk include the following:

FILED UNDER SEAL

- **Tank Ballasting:** As recommended in EPA's (2016) flood preparedness guidance, the terminal undergoes tank ballasting before storms to prevent flotation or displacement during high-water conditions. This is a recognized best practice that enhances mechanical stability.

- **Secondary Containment:** Each tank is surrounded by engineered containment berms with capacities exceeding SPCC minimums, thereby preventing spills, even during compound flooding.

- **Elevated Infrastructure:** Electrical controls and fuel transfer systems are placed above base flood elevations to reduce exposure to flood damage and ensure the continuity of operations. The terminal also has backup generators that will allow pumps to function to provide drainage, if necessary, during an adverse weather event, even if the terminal loses power.

- **Graded Site Drainage and Retention:** Surface grading and stormwater pump stations control runoff and prevent accumulation, thereby ensuring compliance with the MSGP and avoiding flood-induced overflows.

These measures directly rebut CLF's assertion that the terminal is failing to manage flood and climate risks. They demonstrate that the facility considers physical threats and implements technically sound solutions, including voluntary safeguards, to reduce the likelihood of failure under extreme conditions.

## 7.2  ENVIRONMENTAL PROTECTION AND SPILL RESPONSE MEASURES

Goldsmith (2025) criticizes the terminal's lack of integration between stormwater and spill management. However, the New Haven Terminal's FRP serves as a critical component of its environmental protection and spill prevention strategy. This comprehensive plan outlines detailed spill containment procedures, emergency response protocols, and environmental impact mitigation strategies to ensure the terminal's operations remain in compliance with EPA's oil pollution prevention requirements. By maintaining a robust FRP and spill prevention strategy, the New Haven Terminal aligns with EPA guidelines and IOGP's best practices for environmental risk management, ensuring that its aboveground storage tank facilities remain environmentally secure under foreseeable conditions.

## 7.3  EMERGENCY RESPONSE FRAMEWORK

CLF's experts—including Nairn (2025), Goldsmith (2025), and Barlow (2025)— allege that the New Haven Terminal is unprepared for major weather events, citing concerns over infrastructure vulnerability, emergency response limitations, and access restrictions during flooding. However, these critiques fail to account for the robust emergency response plan

FILED UNDER SEAL

currently in place at the facility, which reflects both regulatory requirements and widely recognized industry practices.

The New Haven Terminal's emergency response framework is structured around a proactive, preemptive strategy that integrates coordination with federal, state, and local responders. The plan ensures that terminal personnel and emergency teams execute a unified incident command structure and activate pre-storm response protocols based on reliable forecasts and hazard scenarios.

In response to Nairn's (2025) specific concern about site access during storm events, it is important to recognize that the terminal's emergency response plan is based on established lead times for coastal storms. For example, according to the National Hurricane Center (2023), "A hurricane watch is issued 48 hours in advance of the anticipated onset of tropical-storm-force winds" and "a hurricane warning is issued 36 hours in advance." As the Terminal plans for extreme weather events, these forecast windows provide ample time for Defendants to implement safety procedures, secure infrastructure, ballast tanks, and deploy containment resources prior to storm arrival. Real-time ingress and egress during peak storm conditions are not required under EPA regulations and are not necessary for effective risk mitigation.

The emergency response framework includes the following key components:

- **Incident Command System:** Response actions are directed under a tiered, site-specific command structure consistent with industry norms and federal guidance.

- **Rapid Notification Protocols:** The terminal maintains communication links with the National Response Center, the Coast Guard, local emergency management, and state environmental agencies.

- **Hazardous Waste Operations and Emergency Response (HAZWOPER) and Spill Response Training:** All personnel undergo rigorous training in hazardous materials response and the Oil Pollution Act's emergency protocols.

- **Geographic Response Plans:** Emergency plans are tailored to regional flood, wind, and infrastructure risk conditions.

- **Routine Drills and Storm Simulations:** Regular simulations and pre-storm shutdown drills ensure that response teams remain fully prepared to act under adverse conditions. The terminal manager, Mike Sullivan, has regularly hosted the local fire department at the terminal to aid in proper preparation and response to any potential hazard.

Contrary to the claims by CLF's experts, the New Haven Terminal's emergency response capabilities are not reactive or deficient. They are anticipatory, risk-informed, and consistent with EPA spill response regulations and best practices recognized in both industry and government guidance.

FILED UNDER SEAL

## 7.4  CONTAINMENT BERM STABILITY AND EROSION RESISTANCE

Nairn (2025) asserts that the New Haven Terminal's containment berms, described as "bare soil," are structurally vulnerable and prone to erosion during flood events, particularly under scenarios involving wave attack.  Based on my site inspection, and my knowledge of site inspections completed by several very experienced environmental and tank engineers, this characterization is inaccurate and inconsistent with the facility's actual design and maintenance practices. As detailed in the 2017 SWPPP, the berms are constructed from compacted engineered fill and are surfaced with crushed stone or stabilized vegetation, which significantly increases erosion resistance under storm conditions.

The berms comply fully with EPA's SPCC (40 CFR §112.7(c)) which permits earthen secondary containment structures so long as they are sufficiently impervious to contain discharged oil and adequately maintained. There is no federal or state requirement mandating the use of impermeable liners or concrete armoring for containment berms at existing petroleum terminals. Horner's (2025) critique of the absence of liners misstates the governing regulatory framework. EPA explicitly allows unlined berms unless there is site-specific evidence of failure or groundwater risk, neither of which applies at the New Haven Terminal.

More importantly from a scientific and engineering perspective, neither Nairn nor Horner presents site-specific geotechnical analysis, hydrologic modeling, or post-storm inspection data to support their claims of berm vulnerability.  Nairn (2025) relies primarily on photographic evidence (Figure 5, originally Figure 4.20 in the Nairn report) as the basis for his assessment.  Yet this image lacks spatial context, soil classification, slope grading, or any quantitative analysis that would be necessary to support a geotechnical design critique. A standalone image without accompanying field data, subsurface characterization, or engineering assessment is wholly inadequate for evaluating berm stability under flood conditions.

Additionally, while Nairn (2025) presents an analysis of potential "wave attack" on the containment berms, his evaluation lacks the necessary site-specific inputs required to support his conclusions.  Nairn's analysis does not account for the actual construction of the berms, including the composition of the core, type and thickness of surface armoring (e.g., crushed stone), vegetation cover, or compaction characteristics—all of which critically affect erosion resistance.

Nairn applies generalized assumptions about berm geometry and material properties without access to as-built drawings, subsurface investigations, or maintenance records for the terminal; as such, his conclusions regarding erosion susceptibility are not grounded in verifiable geotechnical data or actual site conditions. While Nairn calculates wave energy based on assumed fetch distances, he does not calibrate these estimates against historical storm surge behavior within New Haven Harbor or wave attenuation effects from surrounding infrastructure and bathymetry.

FILED UNDER SEAL

In contrast, peer-reviewed research on hurricane impacts at petroleum terminals consistently finds that failure modes, such as tank flotation, sliding, or shell buckling—not berm erosion— are the dominant mechanisms of concern (Godoy 2007; Khakzad and Gelder 2018). More recent probabilistic modeling (Mia and Kameshwar 2024) reinforces this conclusion, showing that the erosion of containment berms does not represent a credible or controlling risk under even extreme flood scenarios.



Figure 5.    Figure 4.20 from Nairn (2025) Used as a Basis for Nairn's Evaluation of Berm Erosion

Accordingly, there is no substantiated evidence the berms are "bare soil" or structurally inadequate.  The claims of erosion vulnerability advanced by Nairn are unsupported by site-specific evidence, inconsistent with federal regulation, and not grounded in accepted engineering judgment.

**Opinion 15:** The New Haven Terminal's containment berms are constructed, maintained, and inspected in full compliance with EPA's SPCC and the 2018 and 2021 MSGP. Assertions that these earthen berms are noncompliant or structurally deficient are factually unsupported.

FILED UNDER SEAL

**Opinion 16:** The 2018 Connecticut MSGP does not require containment berms to be designed for "wave attack," whatever the definition.  CLF provides no credible basis for its claims of berm instability, as Nairn's analysis lacks site-specific data on berm composition, cover, and structural design.

## 7.5  SUMMARY

Contrary to assertions by CLF experts—including Nairn (2025), Goldsmith (2025), Barlow (2025), and Horner (2025)—the New Haven Terminal is not unprepared for extreme weather events.  Its risk management framework integrates EPA's SPCC, FRP, and MSGP requirements with best industry practices, including tank ballasting, elevated systems, engineered containment berms, and site-specific emergency planning.  These measures go beyond regulatory minimums and address foreseeable risks using sound engineering.

Nairn's claim that the terminal's berms are "bare soil" and prone to erosion is incorrect.  As described in the 2017 SWPPP, the berms are built from compacted fill and protected with stone or stabilized vegetation. EPA and CT DEEP do not require liners or hard armoring unless warranted by site-specific risks, but these risks are not present in the case of the terminal. Horner's assertion that unlined berms are noncompliant is likewise unsupported; EPA regulations allow earthen containment if properly maintained, which the terminal demonstrates through regular inspection and documentation. Literature confirms that tank flotation or shell buckling—not berm erosion—are the dominant flood failure modes (Godoy 2007; Khakzad and Gelder 2018; Mia and Kameshwar 2024). The terminal's flood response plans, supported by NOAA lead times, ensure proactive measures are implemented before storm impacts occur.

**Opinion 17:** The New Haven Terminal's BCP, FRP, and HAP collectively demonstrate compliance with applicable EPA regulations and API standards for inspection and containment. They also incorporate BMPs and best industry practices that address adverse weather risks. These plans reflect a proactive, standards-based approach to environmental and operational resilience.

FILED UNDER SEAL

# 8  CLF'S EXPERTS' ANALYSIS OF COASTAL EXTREME WEATHER HAZARDS

The New Haven Terminal is located within a dynamic coastal zone that may be exposed to a range of natural hazards, including storm surge, precipitation, and long-term sea level rise. These hazards are influenced by a combination of regional climate patterns, tidal and storm-driven hydrodynamics, and broader climatological trends affecting water levels and coastal processes within New Haven Harbor.  While projections from NOAA and other federal agencies suggest that the intensity—and, for certain event types, the frequency—of extreme weather may increase over time, current regulatory frameworks, such as the MSGP and SPCC frameworks, do not impose climate adaptation requirements based on these long-term projections.

CLF and its experts—including Barlow (2025), Goldsmith (2025), and Nairn (2025)—assert the New Haven Terminal is vulnerable to future climate hazards such as storm surge, extreme rainfall, and sea level rise. They also assert that Defendants have not adequately accounted for these risks in the terminal's planning or infrastructure.  Specifically, CLF alleges the terminal lacks sufficient elevation, flood protection, and climate resilience measures to withstand increasingly severe weather events.  Unfortunately, these claims are largely based on long-term climate projections rather than applicable regulatory requirements or site-specific engineering evaluations that are relevant over the time frame of permits (i.e., 5 years).

Nevertheless, to support a complete and transparent evaluation, this section assesses the terminal's exposure and resilience to projected coastal climate hazards using publicly available science (Wuebbles et al. 2017; Sweet et al. 2022).  This analysis confirms that the terminal remains robust and operationally secure, even when assessed against potential future scenarios beyond existing regulatory benchmarks.

## 8.1  WATER LEVELS

Flooding at the New Haven Terminal can result from tidal influences, storm surge, and sea level rise. Given the elevation of the terminal and its containment berms, the risk of flooding at the terminal due to tidal influences is low. In addition, the historic storms documented in New Haven Harbor's water level data record (1999–present) have not been a significant risk to flooding at the terminal (Figure 6).

While precipitation-driven flooding during major storm events is a recognized potential risk at coastal facilities, the New Haven Terminal's stormwater management systems—including bermed secondary containment, graded surfaces, and drainage infrastructure—are designed to capture and manage stormwater runoff effectively. Site-specific drainage features minimize the risk of rainfall accumulation that could lead to flooding within the terminal. As part of the terminal's SPCC and stormwater compliance programs, inspections and maintenance activities

also ensure that stormwater control measures remain functional during extreme precipitation events.



Figure 6.    Maximum Water Levels for Recorded Extreme Storm Events – New Haven, Connecticut

Need a sentence on what this really shows.  Based on Figure 6, the containment berms at the Terminal all lie below water levels from the last hurricanes and major storms in the area.

## 8.1.1 Regulatory Foundations for the 100-Year Flood Design Standard

CLF's experts, including Nairn (2025), Goldsmith (2025), and Barlow (2025), argue that the New Haven Terminal should be evaluated against extreme events exceeding the 100-year flood event, including scenarios for the 500-year flood event.  While these claims reflect evolving policy preferences, but they lack regulatory basis.  Unfortunately, they also misrepresent the current engineering and permitting frameworks governing stormwater management and aboveground storage tank facilities.

In practice, the 100-year event (with a 1 percent annual chance of occurrence) serves as the widely accepted design benchmark for environmental infrastructure under both federal and state programs.  It defines floodplain boundaries under FEMA's National Flood Insurance Program (NFIP), sets containment thresholds under EPA's SPCC rule, and anchors precipitation-based design criteria under the EPA's and Connecticut's MSGP. The recently proposed 2024 Connecticut MSGP and the 2024 Connecticut *Stormwater Quality Manual* reaffirm this standard for stormwater-related design and compliance evaluations.

FILED UNDER SEAL

Contrary to the assertions made by CLF's experts, protections against a 500-year flood (with a 0.2 percent annual chance of occurrence) are not required for existing terminals. This approach is reflected consistently across multiple regulatory programs, as shown in Table 4:

Table 4.    Regulatory and Planning Programs Using the 100-Year Flood Standard as the Design Benchmark for Industrial and Stormwater Infrastructure

| Organization or Protocol | Facility or Regulatory Context | Design Flood Standard | Source |
|---|---|---|---|
| CT DEEP | Industrial stormwater permitting | 100-year flood | Connecticut *Stormwater Quality Manual* §3.1.3, Table 3.4.1 (CT DEEP 2024) |
| RIDEM | Industrial SWPPP design | 100-year flood | Industrial Stormwater Permit, Appendix E (RIDEM 2024) |
| EPA, Hazardous Waste | Facility siting in floodplains | 100-year flood | 40 CFR §264.18(b) |
| NYSERDA | Inland flood planning | 100-year flood with freeboard of 2–3 ft | NYSERDA 2019 Inland Flood Risk Tools, p. 16 |
| NYC SWPPP Guidance | Stormwater design thresholds | 100-year flood | NYC SWPPP Applicant Guide, p. 22 |
| EPA Region 1 | Industrial terminal SWPPP approval | 100-year flood | Irving Oil SWPPP, Revere, Massachusetts (Irving Oil Terminals Inc. 2025) |

Notes:

RIDEM = Rhode Island Department of Environmental Management

NYC = New York City

NYSERDA = New York State Energy Research and Development Authority

These examples show that the 100-year return period is consistently adopted by regulators as the technical and legal standard for infrastructure and stormwater resilience. CLF's suggestion that anything short of a 500-year design benchmark constitutes a failure to meet best industry practice is not supported by any federal or state program applicable to the New Haven Terminal.

**Opinion 18:** The 100-year event is the accepted regulatory benchmark for flood protection under FEMA standards, EPA's SPCC and MSGP programs, and Connecticut's industrial stormwater permitting framework. It provides a risk-informed basis for infrastructure resilience that protects human health and the environment without requiring speculative or nonbinding design thresholds like the 500-year event.

**Opinion 19:** Design criteria for newly constructed and substantial modifications for storage tank terminals are appropriately based on the 100-year flood event. Higher thresholds, like the 500-year event, are not required for existing terminals under current law or standards.

FILED UNDER SEAL

## 8.1.2 FEMA Base Flood Elevations

Figure 7 presents the FEMA base flood elevations (BFEs) for Defendants' New Haven Terminal, which is situated in an AE flood zone with a BFE of 12 ft NAVD88. The FEMA AE zones indicate areas subject to a 1 percent annual chance of flooding, which is equivalent to the 100-year flood event, with BFEs established through detailed hydraulic and hydrologic analyses. The FEMA BFEs are applied for defining insurance rates rather than guiding industrial facility design, as they do not offer site-specific risk assessments. The BFE signifies the expected water level during such an event; however, the topography used for its evaluation is a bare-earth digital elevation model that has all structures removed, thereby giving the impression of the flood depth overtopping all the structures within the AE flood zone (Figure 7).



Figure 7.    Base Flood Elevations – New Haven Terminal (AE flood zone, designated flood elevation of 12 ft NAVD88)

## 8.1.3 New Haven Storm Frequency

Nairn (2025) asserts that the New Haven Terminal may experience risk from extreme storm events, including high-category hurricanes and associated storm surge. His analysis relies on worst-case scenario assumptions—such as Category 4 or 5 hurricanes and associated flood

FILED UNDER SEAL

depths—but these claims are inconsistent with both regional storm history and accepted flood planning methodologies.

Although the New Haven area is exposed to extratropical storms, hurricanes, and strong wind events—all of which can impose stress on coastal infrastructure—Category 3 or higher hurricanes are exceedingly rare. Since 1858, storm data compiled by the NOAA Office for Coastal Management (2024) show that tropical storms and nor'easters are the most common severe weather events to affect the region. Major hurricanes, particularly Category 4 or 5 hurricanes, have never been recorded within a 150-mile radius of New Haven.

This historical frequency provides an essential context for realistic risk assessment. Nairn's modeling, which treats such extreme events as likely design conditions, is not supported by the climatological record. Regulatory agencies, including EPA, FEMA, and CT DEEP, continue to define the 100-year flood event—not the 500-year event—as the standard for permitting and planning at industrial facilities. Unfortunately, the reliance on historically improbable storms in Nairn's analysis leads to artificially inflated projections that are not aligned with accepted floodplain management practice.

Further, the geographic positioning of Long Island to the south of New Haven provides a natural storm barrier, moderating storm surge and dampening wave energy in the northern Long Island Sound. This protective topography significantly reduces the terminal's exposure to the type of direct surge impacts typically associated with open-coast hurricanes.

Storm data within a 150-mile radius of the terminal (Figure 8 and Figure 9) confirm the following:

- Tropical storms are the most frequent severe weather events in the region.
- Extratropical storms (e.g., nor'easters) occur regularly but differ from hurricanes in terms of surge and wave dynamics.
- Category 1 and 2 hurricanes have only occurred infrequently.
- Category 3 hurricanes are rare, and Category 4 or 5 hurricanes have no historical record of affecting the area.

FILED UNDER SEAL



Figure 8.    Storm Occurrences within 150 Miles of New Haven, Connecticut, since 1858 (NOAA 2024)

FILED UNDER SEAL



Figure 9.    New Haven Terminal Storm Occurrence – 150-Mile Radius

This storm frequency analysis provides essential context for understanding the realistic likelihood of storm surge events affecting the New Haven Terminal. Given the predominance of weaker storm systems and the absence of any historical Category 4 or 5 hurricane within a 150-mile radius, the probability of a surge-induced flood at the terminal is statistically low. Most storms in the region do not generate the high-energy coastal impacts associated with major hurricanes, and the geographic positioning of Long Island serves as a natural barrier that moderates storm surge and wave energy, particularly along the northern coast of Long Island Sound (USACE 2015). This topographical buffer significantly reduces the intensity of flooding events in New Haven Harbor, contributing to the lower observed surge risk at the terminal.

The New Haven climate adaptation plan (USACE and CT DEEP 2020) also recognizes the 100-year event as the benchmark for planning purposes, which underscores that this standard remains appropriate, even for public infrastructure adaptation efforts in the same coastal setting. Flood risk analyses that disregard these historical, geographic, and engineering factors—as Nairn's (2025) analysis appears to do—result in exaggerated and implausible risk projections. By assuming extreme, low-probability hurricane scenarios without regard for regional storm climatology or realistic recurrence intervals, such analyses undermine the value of risk-based infrastructure planning.

The New Haven Terminal's risk management approach, including robust pre-storm protocols and flood preparedness measures, offers a statistically grounded and technically sound

FILED UNDER SEAL

resilience strategy—one that addresses foreseeable risks without resorting to inflated, speculative planning thresholds.

**Opinion 20:** Category 3 hurricanes are rare near New Haven, and no Category 4 or 5 hurricanes have been recorded within 150 miles. The New Haven Terminal's infrastructure and preparedness measures—including tank ballasting and emergency planning—appropriately reflect the region's storm history.

## 8.1.4 Hurricane Sandy

New Haven, Connecticut, experiences various storm events that have been as severe as Category 3 hurricanes, but the path and timing of storms, especially hurricanes and extratropical storms, offer ample warning periods for industrial facilities to activate their response plans effectively. Historical data of storm occurrences further support the notion that the New Haven Terminal would have sufficient time to prepare for and respond to storm threats, thereby enhancing resilience and reducing the impact of such events. One such example is Hurricane Sandy, which formed in the central Caribbean on October 22, 2012, though the highest storm surge within New Haven Harbor wasn't recorded until October 29, 2012 (Figure 10). Hurricane Sandy's progression was tracked days in advance, with critical information on its path, intensity, and potential landfall. The storm's approach was characterized by a gradual intensification and shift to a post-tropical cyclone at landfall. The storm was monitored continually, thereby allowing for strategic preparatory measures to be taken.

Contrary to the suggestion of CLF's experts, no flooding was observed in the New Haven Terminal or its aboveground storage tanks as a result of Hurricane Sandy. The predictive capacity of storm tracking enabled the terminal operators to adhere to established protocols, ensuring operational safety and minimizing risks. Additionally, the advanced forecasting and monitoring capabilities of NOAA allowed for the timely dissemination of warnings and updates to the public and infrastructure operators.

As demonstrated during Hurricane Sandy, real-time monitoring and forecasting ensure storms do not strike suddenly or without warning. Industrial facilities, such as the New Haven Terminal, benefit from this predictive capacity, enabling them to adhere to their established protocols and ensure operational safety.  In particular, tropical storms and hurricanes typically form near the tropics and take several days to travel northward to higher latitudes such as New Haven, providing additional lead time for preparation and response.

FILED UNDER SEAL



Figure 10.  Wind Speed, Atmospheric Pressure, and Water Level during Hurricane Sandy's Approach and Impact – New Haven, Connecticut

## 8.1.5 Long Wharf CSRM Study

One coastal storm risk management (CSRM) feasibility study for Fairfield and New Haven counties (USACE and CT DEEP 2020) evaluated regional coastal flood risks and mitigation strategies focused on New Haven's Long Wharf District. While the study incorporated hydrodynamic flood elevations from the USACE (2015) North Atlantic Coast Comprehensive Study (NACCS)—which are also used in this report—the CSRM's objectives, planning assumptions, and infrastructure solutions are fundamentally inapplicable to the New Haven Terminal's operations and permitting framework.

CLF expert Nairn (2025) cites the CSRM study to claim the New Haven Terminal is under-protected from storm surge and extreme flood events. This citation, however, reflects a categorical error. The CSRM study was designed to evaluate community-scale flood control for mixed-use urban districts—not site-specific risk management for petroleum terminals. Its preferred alternative—which includes 5,800 ft of floodwall, 475 ft of deployable gates, and a pump station (with a pumping rate of 900 cubic feet per second) at +15 ft NAVD88—was developed based on public infrastructure needs, land use constraints, and a community-wide cost-benefit analysis.

The alternative was not designed for, and does not establish, technical standards for aboveground storage tank facilities. Notably, the CSRM acknowledged that, even with this

FILED UNDER SEAL

infrastructure, residual flood risk would remain (with annual exceedance probabilities between 0.8 and 3.5 percent by 2074), meaning it would not meet the protection thresholds for a 500-year flood event that are typically applied to FEMA-designated critical facilities.

In contrast, the New Haven Terminal is governed by a different set of legal and technical standards—namely, the EPA's SPCC Rule, the 2018 Connecticut MSGP, and relevant industry standards such as API Standards 650 and 653. These standards focus on facility-specific containment and emergency response; they do not require the construction of regional flood infrastructure like the Long Wharf floodwall system.  Applying regional urban flood protection planning criteria to a petroleum terminal—as Nairn (2025) does—misrepresents both the applicable regulatory framework and the physical responsibilities of the facility operator.

CLF's expert Goldsmith (2025) similarly mischaracterizes the relevance of the Long Wharf CSRM study.  On page 49 of her report, Goldsmith implies that the flood protection elements proposed for a new, mixed-use residential and commercial development at Long Wharf should serve as a benchmark for "best industry practice" at the New Haven Terminal.

Again, this conflation is flawed. Goldsmith draws planning-level comparisons between the Long Wharf development—which will require permits from USACE, EPA, and various state and local agencies—and an existing petroleum terminal operating under the CT DEEP industrial stormwater permit. The two projects differ in regulatory oversight, land use, risk profile, and operational objectives.

Even more inaccurate, Goldsmith incorrectly suggests that the CT DEEP industrial stormwater permit requires permittees to construct floodwalls, implement road closures, or install pumping stations—none of these actions are mandated under the 2018 and 2021 MSGP or the proposed 2024 MSGP.  While the Long Wharf study evaluated 500-year flood conditions, the USACE design basis for the proposed floodwall remains the *100-year flood event*, which is consistent with the current and proposed requirements for industrial stormwater permitting in Connecticut.  From an engineering perspective, and contrary to the suggest of Nairn and Goldsmith, the CSRM study's proposed infrastructure is more closely aligned with protecting homes and personal property from water damage, whereas the steel aboveground storage tanks at the terminal are not susceptible to such harm.

In summary, CLF's reliance on the Long Wharf CSRM study (USACE and CT DEEP 2020)—whether through Nairn (2025) or Goldsmith (2025)—misrepresents the study's relevance to the New Haven Terminal. The study's planning context, design standards, and infrastructure objectives are incompatible with the regulatory and operational framework governing bulk fuel storage terminals.  Goldsmith wrongly equates one project report for the Long Wharf study to a "best industry practice" for an operating petroleum bulk storage facility.  Nowhere in the Long Wharf report does it set any standard, procedure or "practice" for operating industrial operations.

## 8.2  CLF'S EXPERTS' COMPOUND FLOODING ALLEGATIONS

While compound flooding—the interaction of storm surge, extreme rainfall, and riverine inflow—is an important framework in coastal hazard science, its applicability to the New Haven Terminal is limited, and CLF's experts, including Barlow (2025), misrepresent the physical and hydrologic setting of the terminal by invoking this concept without regard for local conditions. The terminal is constructed on a positively graded, elevated industrial platform along the Port of New Haven waterfront (Figure 2). It is not in a low-lying basin or behind levees, where rainfall and backwater can accumulate. Stormwater at the terminal flows away from storage tanks via engineered grading and vegetated swales, ultimately discharging into the harbor. Unlike Gulf Coast locations (e.g., Houston or New Orleans), the Quinnipiac River near the terminal is tidal and relatively small, and it has no upstream reservoirs or tributaries capable of generating significant riverine backwater surges during storm events. Consequently, the physical conditions for compound flooding—simultaneous surge and river inflow—are absent.

Additionally, the historical storm record undermines claims that compound flooding is a credible design basis for this facility. For example, Hurricane Sandy (in 2012) produced record storm surge in New Haven but very little rain, while Hurricane Irene (in 2011) brought heavy inland precipitation without corresponding coastal surge at the terminal. This historical decoupling of surge and rainfall in southern Connecticut storms highlights the fact that compound flooding is not the dominant risk for the terminal. Furthermore, FEMA flood insurance rate maps place the terminal in a coastal AE flood zone, but they do not classify it as subject to dual flood hazards, such as fluvial-coastal compound risk. The terminal is not within a Zone AO, A99, or other combined-hazard categorization, which would be expected if compound flooding were a relevant hazard.

In addition, and again contrary to Goldsmith's (2024) and Nairn's (2025) suggestion, flooding does not equate to damage.  That false premises drives their main recommendations.  While an area may flood, damage does not necessarily transpire from flooding.  This fact is why stormwater industrial permits exist—they allow for permittees to plan to avoid discharging pollutants in the event of flooding.

Nowhere does the 2018 Connecticut MSGP contemplate that flooding may not occur on site, as it would be impossible to protect every permittee from flooding in all scenarios. It would also be untenable if, whenever a flood occurred on a permittee's property, there would be a violation of an uncontrollable scenario.  Industrial stormwater permits are designed for just this reason—permitting discharge during storms and the conditions that follow—in an environmentally protective way that considers technological and economic factors. Again, flooding does not equate damage—facilities have been flooded across the country over hundreds of adverse weather events while not sustaining damage.

In summary, CLF's references to compound flooding overstate the New Haven Terminal's vulnerability and misapply regional flood science without accounting for the terminal's actual setting, infrastructure, and drainage characteristics.

FILED UNDER SEAL

## 8.3  SEA LEVEL RISE

Long-term sea level rise is a gradual phenomenon influenced by global oceanic and atmospheric dynamics, glacial melt, and localized factors like subsidence. Along the Connecticut coastline, the best available observational record—NOAA's Bridgeport tide gauge from Station 8467150—shows a sea level rise trend of approximately 0.1 in. per year, or 0.5 in. over the next 5 years (NOAA 2025). NOAA's station provides more than 60 years of continuous data and is the primary basis for state and federal infrastructure planning in southern Connecticut, including planning by NOAA, USACE, and CT DEEP. T

o account for future uncertainty, USACE (2013) established three sea level rise planning curves—low (0.1 in./yr), intermediate (0.2 in./yr), and high (0.6 in./yr)—none of which would result in more than 3.0 in. of rise by 2030. Even CT DEEP's conservative scenario, which projects 1.64 ft of sea level rise by 2050 (approximately 0.66 in./yr) (Figure 11), does not justify infrastructure modifications within the current 5-year permit cycle under the MSGP, SPCC, or FRP frameworks.



Figure 11.  Sea Level Rise Rates for Connecticut Coastline (NOAA 2025; CT DEEP 2024)

Despite this, CLF expert O'Donnell (2025) recommends that the New Haven Terminal be evaluated using non-consensus, forward-looking sea level rise assumptions that go beyond any adopted federal or state planning standard. His position relies on hypothetical 2050 or 2100 projections as though they were current regulatory requirements, a position not supported by EPA, FEMA, NOAA, or CT DEEP's stormwater or industrial permitting divisions.

In addition, it does not appear that O'Donnell's work has been provided to CT DEEP, EPA or any other federal, state or local agency. Accordingly, it would not be good engineering practice for a terminal to rely on key regulatory data until the CT DEEP or EPA has reviewed the data.

FILED UNDER SEAL

Critically, the regulatory standard for aboveground storage tank infrastructure is based on existing, statistically derived 100-year flood benchmarks—not on modeling of sea level rise beyond the current planning horizon. Even under the most aggressive scenario, the total increase over the 5-year MSGP cycle amounts to less than the height of a standard golf tee, a negligible change with no practical impact on tank stability, containment, or site grading.

While agencies like NOAA and USACE continue to refine long-term projections, they have not adopted these projections as enforceable standards for retrofitting or redesigning petroleum terminals. No regulatory or engineering framework applicable to the New Haven Terminal requires structural modification based on O'Donnell's proposed projections.

Perhaps more relevant, EPA also did not identify any "rising sea level" risk at the New Haven Terminal in its 2022 review of facilities with "risk management plans" (GAO 2022). In other words, EPA concludes sea level rise is not an immediate or urgent threat at the New Haven Terminal.

**Opinion 21:** The sea level rise assumptions proposed by O'Donnell (2025) are not incorporated into any regulatory standard governing the New Haven Terminal.

## 8.4   MODELING COASTAL HAZARDS

For management purposes, the NACCS evaluated coastal storm risks for the North Atlantic region of the United States. The study is a comprehensive assessment of coastal vulnerabilities, including extreme weather events, tidal influences, and climate change impacts, with a particular focus on storm surge and flooding hazards (USACE 2015). It integrates state-of-the-art hydrodynamic and atmospheric modeling techniques to generate high-resolution flood risk assessments and inform risk mitigation strategies. However, NACCS was not designed to evaluate compliance with federal regulations, such as the EPA's SPCC Rule, or the design criteria for individual industrial facilities.

### 8.4.1 Modeling Methodology and Approach

The NACCS modeling framework incorporated advanced numerical models to simulate the interactions of coastal storms with local topography, bathymetry, and hydrodynamic forces. The study used the Coastal Storm Modeling System (CSTORM-MS), a suite of high-fidelity numerical models that include the following:

- **ADCIRC (Advanced Circulation Model):** a hydrodynamic model used to simulate storm surge and coastal water levels under various storm conditions
- **WAM (Wave Prediction Model):** a spectral wave model used to simulate ocean wave interactions

FILED UNDER SEAL

- **STWAVE (Steady State Spectral Wave Model):** A nearshore wave transformation model that helps assess the impact of waves on coastal structures and flood risk.

These three models were validated using historical storm data to ensure accuracy in predicting storm surge and coastal flood hazards. The data set included over 1,100 modeled storm events, integrating both synthetic and historical storm data to create a comprehensive representation of potential coastal flooding risks. Among these storms, 1,050 synthetic tropical storms were generated to capture a broad spectrum of possible hurricane behaviors, while 100 historical extratropical storms were included to account for the significant impact of nor'easters and other regional storm systems. This approach ensured that both common and extreme storm conditions were statistically well represented, allowing for a more robust understanding of flood hazards along the North Atlantic coast. This balance ensures representation of both fast-moving tropical cyclones and slower, broader extratropical systems common to the northeastern United States.

To further refine the risk assessment, NACCS (USACE 2015) employed a joint probability analysis technique known as the Joint Probability Method with Optimum Sampling by Bayesian Quadrature. This method allowed the study to establish probabilistic estimates of extreme storm surge levels by integrating the statistical properties of multiple storm parameters and optimizing the sampling process for efficiency and accuracy. For storm surge water levels, the NACCS established averages and upper 95th percentile confidence limits for an array of locations, called save points, along the North Atlantic coast (Table 5). These levels included 100- and 500-year flood events for a location within New Haven Harbor, just west of the New Haven Terminal (Figure 12).

Table 5.　　　　NACCS Calculated Water Levels – New Haven, Connecticut (Save Point 271)

| Return Period (Years) | Mean Water Level (ft NAVD88) | Upper 95th Percentile Confidence Limit Water Level (ft NAVD88) |
|---|---|---|
| 100 | 11.6 | 14.7 |
| 500 | 15.1 | 18.2 |

Note:

The mean water level per FEMA's BFE is 12.0 ft NAVD88.

FILED UNDER SEAL



Figure 12.   Maximum Water Levels for Recorded Extreme Storm Events, FEMA Base Flood Elevation, and NACCS Mean Storm Surge Water Levels – New Haven, Connecticut (Save Point 271)

The NACCS modeling outputs include both mean water levels and upper 95th percentile confidence limits for each return-period scenario. The mean water level, also referred to as the expected value, represents the central estimate that is most consistent with FEMA's BFE approach, which is widely used across federal, state, and local floodplain management and permitting frameworks. This value serves as the appropriate standard for design and compliance assessments, including for stormwater permitting under the MSGP.

By contrast, the upper 95th percentile water levels represent conservative bounds used to characterize statistical uncertainty, not to define baseline or required flood protection levels. These values reflect the outer edge of confidence intervals—rare, upper-end estimates—rather than expected conditions.  As such, they are used for sensitivity analysis or risk communication in large-scale coastal planning, not as a regulatory standard for industrial facility design. Facilities are not required to be designed to withstand 95th percentile storm surge scenarios, and doing so would impose disproportionate costs with minimal additional risk reduction in most cases.

CLF expert Nairn (2025) cites the 95th percentile NACCS surge levels while arguing that the New Haven Terminal's infrastructure is improperly designed for coastal hazards. Again, this citation misrepresents the intended use of NACCS outputs. Selecting only the most extreme

FILED UNDER SEAL

upper-bound estimates, without accounting for the statistical distribution or the mean design standard, results in an inflated and unrepresentative view of site-specific flood risk. Federal agencies, including FEMA, EPA, and USACE, consistently use mean return-period water levels—such as the 100-year flood elevation—to establish compliance thresholds and design expectations. Even the Long Wharf CSRM study (USACE and CT DEEP 2020) uses the 100-year mean water level as its design reference.  In short, while the 95th percentile values are important for understanding the range of uncertainty, they are not appropriate for use as regulatory benchmarks or minimum design criteria.

**Opinion 22:** The use of mean water levels from the NACCS in the New Haven Terminal's flood risk assessment is consistent with FEMA and EPA guidance. It also provides a scientifically valid basis for risk evaluation. The 95th percentile NACCS water levels represent an upper-bound uncertainty estimate and are not appropriate for use as flood protection benchmarks.

## 8.4.2 NACCS Findings

By utilizing NACCS predictions, flood hazard maps were generated based on a range of modeled storm conditions (Figure 13). Of these, the 100-year flood event's mean water level represents the accepted regulatory benchmark used by EPA, FEMA, and CT DEEP for stormwater permitting, floodplain management, and tank infrastructure design. This value reflects the most probable severe event and is the standard applied in the Connecticut MSGP and related federal programs. Contrary to Nairn's use, the proper use of NACCS predictions is consistent with national engineering and regulatory practice, where mean return-period flood elevations are employed as the basis for design—not upper-bound or compounded extremes.

The 500-year flood scenario—along with a scenario that combines the upper 95th percentile confidence limit of the 500-year flood event's water level with CT DEEP's 1.64-ft sea level rise projection for 2050—are included here solely for illustrative comparison. These scenarios reflect future-focused planning assumptions similar to those promoted by CLF's experts, including Goldsmith (2025), Nairn (2025), and O'Donnell (2025), but they are not required by any EPA, FEMA, USACE, or ASCE design standard. In particular, the upper 95th percentile estimate represents a statistical outlier, not a regulatory benchmark, and has no associated recurrence interval. It shows how extreme, hypothetical combinations compare with established design thresholds—it does not suggest that the combinations should guide infrastructure requirements.

FILED UNDER SEAL



Figure 13.  Maximum Water Levels per NACCS Mean and 95th Percentile Confidence Interval Storm Surge Water Levels for New Haven, Connecticut, and Connecticut's Sea Level Rise for Save Point 271

Note: The elevation range of the terminal's containment berms is shown as the shaded horizontal bar.

The probabilistic flood hazard mapping developed from NACCS predictions demonstrates that, under the 100-year flood event—namely, the regulatory benchmark for stormwater permitting and aboveground storage tank resilience—the containment berms and key infrastructure at the New Haven Terminal are not expected to experience inundation (Figure 14). This scenario reflects the established design and compliance threshold applied by federal and state agencies, including EPA, FEMA, and CT DEEP.

More extreme scenarios—none of which are ever referenced or suggested by CT DEEP, EPA, NOAA or other relevant agencies—such as a 500-year flood event with a mean water level, were also modeled for illustrative purposes (Figure 15). These return periods are not required by the Connecticut MSGP or any EPA regulation but are included to evaluate the terminal's resilience under rare, high-impact events similar to those proposed by CLF experts, including Nairn (2025) and O'Donnell (2025). In such cases, some localized shallow inundation of containment areas could occur.

Based on Connecticut Institute for Resilience & Climate Adaptation (CIRCA) sea level rise and storm surge viewer, the New Haven Terminal is not inundated under any existing category up to a 500-year flood plus 20 in of sea level rise[1]. Overall, the terminal's aboveground storage tanks are designed and maintained in accordance with API Standards 650 and 653 and managed

---

[1] https://circa.uconn.edu/sea-level-rise-and-storm-surge-viewer/

FILED UNDER SEAL

under SPCC and FRP requirements. These standards focus on tank stability and containment integrity to support tank resiliency against flooding.

An additional worst-case scenario was modeled to incorporate the upper 95th percentile confidence limit of the 500-year flood event's water level and CT DEEP's 1.64-ft sea level rise projection for 2050 (Figure 16). This hypothetical extreme, which resembles the assumptions promoted by CLF experts, does not have an associated recurrence interval and exceeds all regulatory design standards.  Contrary to the suggestion by CLF's experts, there is no federal or state mandate requiring industrial facilities to design for the 95th percentile of a 500-year flood event, and there is no such mandate for compounded flood scenarios extending to 2050. Its inclusion here is illustrative, not prescriptive.

FILED UNDER SEAL



Figure 14.  Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean
        100-Year Flood Event

Note: The callout boxes show local terminal water depths.

FILED UNDER SEAL



Figure 15.  Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean
500-Year Flood Event

Note: The callout boxes show local terminal water depths.



Figure 16.  Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Upper 95th Confidence Limit, 500-Year Flood Event Combined with 1.64 ft of Sea Level Rise by 2050

Note: The callout boxes show local terminal water depths.

## 8.5  DURATION OF FLOODING

While the NACCS-based coastal hazards assessment employs a static, or "bathtub," approach—assuming instantaneous equilibrium of water levels across New Haven Harbor and the terminal—it is important to recognize that real-world flooding during rare storm events is dynamic and time limited. CLF's experts, including Nairn (2025) and O'Donnell (2025), imply that extreme water levels result in persistent flooding that threatens tank stability and

FILED UNDER SEAL

environmental safety.  However, this interpretation fails to consider the transient nature of storm surge and the limited duration of inundation, even during extreme events.

For example, Hurricane Sandy—a benchmark storm used by CLF experts—formed on October 22, 2012, but it did not produce peak water levels in New Haven Harbor until October 29, 2012, providing nearly a full week of lead time for pre-storm preparedness measures (see Figure 10 and Section 7.3). The storm's total water level impact in the region lasted approximately 24–36 hours, with peak surge levels persisting for less than 6 hours (Figure 17). This short-duration flooding profile is consistent with other extratropical and tropical systems that affect the Long Island Sound.

In this case, the terminal's inland position—approximately 1,800 ft from the harbor—and the intervening built environment reduce both the magnitude and duration of potential inundation. As storm surge moves inland, it loses energy due to surface friction, vegetation, and topography, resulting in attenuated and delayed flood arrival compared to direct shoreline exposure. This moderating effect is not considered in CLF's generalized risk framing but is essential to understanding localized flooding behavior.  None of these facts are mentioned by Goldsmith, Nairn or other CLF experts.

Following the storm's peak, floodwater at the terminal would drain rapidly. The site is positively graded, equipped with engineered drainage systems, and adjacent to open tidal waters, all of which support the rapid recession of surface water as surge subsides. Under typical hydrodynamic conditions, the duration of peak inundation at the site would be 6–12 hours, with full drainage occurring within 24 hours. These durations do not pose a sustained threat to tank stability.

In contrast to the long-term, catastrophic risks cited by CLF's experts, the realistic hydrodynamic profile at the New Haven Terminal is short-term and manageable.  The terminal's established ballasting protocols and emergency response plans are all specifically designed to accommodate these short-duration flooding conditions, consistent with EPA's SPCC Rule and API's inspection and structural integrity frameworks.

FILED UNDER SEAL



Figure 17.  Highest Wind Speeds, Atmospheric Pressure, and Water Levels during Hurricane Sandy's Impact – New Haven, Connecticut (NOAA 2025)

FILED UNDER SEAL

# 9 EVALUATING ABOVEGROUND STORAGE TANK RESILIENCE TO CLIMATE HAZARDS

Despite the claims made by CLF experts—especially Nairn (2025), who suggests that any flooding in proximity to aboveground storage tanks is inherently unacceptable and implies a failure of compliance—the presence of floodwaters near tanks does not equate to structural failure, engineering deficiency, or environmental hazard.  As available scientific and engineering research shows clear, aboveground storage tanks can be readily operated to withstand temporary inundation, particularly when site-specific mitigation strategies such as tank ballasting are implemented. Ballasting is a widely recognized best practice, one that is endorsed by EPA and reflected throughout the engineering literature, for improving tank stability and preventing flotation during severe weather events.

EPA (2016) guidance explicitly recommends ballasting when tanks cannot be physically anchored and anticipates its use during storm events to prevent structural displacement and potential releases. This recommendation is further supported by Khakzad and Gelder (2018), who identify ballasting as a core element of industrial flood risk management, and by Mia and Kameshwar (2024), who model its effectiveness in hurricane-prone regions and in probabilistic failure analyses. These sources—along with many others, including Katopodis and Sfetsos (2019) and Ghimire and Kameshwar (2024)—affirm that ballasting is a technically sound measure for maintaining tank stability during flood scenarios.  Neither Goldsmith nor Nairn—or any of CLF's experts—ever even mention ballasting as a best industry practice.

Consistent with risk-informed methodologies outlined by API, ASCE, ISO, USACE, and EPA, this section evaluates aboveground storage tank performance at the New Haven Terminal under projected coastal hazard scenarios. Key risks from coastal flooding include flotation, shell buckling, lateral displacement, and debris impact—failure modes that have been documented in past storm events and are illustrated in Figure 18.

As shown, flotation results when buoyant forces exceed the combined weight of a tank and its contents. Additionally, sliding occurs from lateral hydrodynamic pressures. Finally, shell buckling results from differential flood loading on partially filled tanks. The New Haven Terminal's resilience measures—including tank ballasting—directly mitigate each of these hazards. The safeguards were established prior to CLF's NOI and are consistent with EPA guidance and prevailing engineering standards. Assertions that the terminal is noncompliant or unprepared disregard these longstanding practices and misrepresent what is widely accepted in both regulatory and professional domains as sound flood resilience planning.

FILED UNDER SEAL



Figure 18.   Representative Aboveground Storage Tank Failure Modes under Coastal Flooding
          Conditions

Note: From left to right, 1) flotation occurs when buoyant forces exceed the combined weight of the tank and its contents; 2) sliding results from hydrodynamic forces; and 3) shell buckling is driven by differential hydrostatic and hydrodynamic pressures exerted on partially filled tanks, leading to structural instability.

## 9.1  BALLASTING

Ballasting has long been recognized as a critical risk mitigation strategy for aboveground storage tanks in flood-prone environments. It is an established best practice recommended by regulatory bodies, including the EPA (2016), which highlights product height and anchoring as key factors in preventing tank flotation and buckling. Specifically, EPA advises that tank product levels should exceed the expected floodwater elevation to resist buoyancy, noting that tanks with adequate internal product or water ballasting were significantly less likely to fail during events like Hurricanes Katrina and Rita.

Engineering guidance in API (2020) Standard 650 discusses hydrostatic considerations for shell design and tank stability. The concept of internal liquid loading to resist flotation is consistent with the buoyancy-resistance principles embedded in tank foundation design provisions. These principles are widely applied in coastal and floodplain installations as a means of anchoring tanks against uplift forces during extreme flooding.

Recent research by Ghimire and Kameshwar (2024) further supports the importance of ballast management in preventing failure. The authors' simulations demonstrate that aboveground storage tanks with lower product volumes are more susceptible to shell buckling and hydrodynamic failure under hurricane-induced flooding. As illustrated in Figure 19, a 49-ft-high aboveground storage tank exposed to even an extreme 500-year surge event is capable of increasing ballast well above flood water levels to reduce risk of displacement and structural instability.

FILED UNDER SEAL



Figure 19.  Conceptual Graphic – New Haven Terminal Tank 3 Properly Ballasted during a 500-Year Flood Event

Support for ballasting as a foundational best practice appears in several recent peer-reviewed studies. Dehghanisanij et al. (2024) applied Natech risk modeling and demonstrated that internal product levels were a dominant factor in fragility reduction under flood conditions. The study illustrated that tank ballast management should be a core component of Natech preparedness plans. Similarly, Kameshwar (2022) identified ballast level as the most influential parameter in probabilistic tank failure modeling at the Port of Rotterdam, while Godoy (2007) documented that tank failures during Hurricanes Katrina and Rita were primarily due to insufficient product height, not containment wall failures or erosion.

These findings confirm that the New Haven Terminal's practice of maintaining stable product heights aligns with current best practices and serves as a technically justified means of resilience. Ballasting is not only a common-sense operational safeguard but also an evidence-supported, peer-reviewed engineering approach that provides real protection against tank failure during extreme events.

The key advantages of ballasting are as follows:

- **Prevention of Flotation and Displacement:** By increasing the weight of the aboveground storage tank with additional product or water, ballasting counteracts

FILED UNDER SEAL

buoyant forces, preventing tanks from floating or shifting during flood events. This practice is particularly critical for aboveground storage tanks in areas with a high risk of storm surge (EPA 2016; Godoy 2007).

- **Improved Structural Integrity:** A properly ballasted tank is less susceptible to structural deformation caused by hydrodynamic forces. The internal pressure exerted by the stored liquid helps maintain the shape of the tank shell, thereby reducing the risk of buckling or collapse (Kameshwar 2022; Khakzad and Gelder 2018; Mia and Kameshwar 2024).

- **Minimization of Spill Risks:** Keeping aboveground storage tanks filled to a designated ballast level reduces the likelihood of tipping or toppling, thereby preventing the spill of hazardous materials (EPA 2016).

- **Compliance with Best Practices and Regulations:** Industry standards, such as API Standard 650, outline the importance of designing aboveground storage tanks with resilience measures. While regulatory requirements may vary by jurisdiction, operators who implement ballasting as part of their risk management strategies demonstrate adherence to best industry practices and environmental protection measures (EPA 2016; NFPA 2024).

- **Integration with Emergency Preparedness Plans:** The New Haven Terminal has integrated ballasting into its hurricane preparedness and flood resilience plans. Action items for the preparation of storm events often include ensuring tanks are filled to safe levels before the arrival of extreme weather, thereby reducing the likelihood of catastrophic failure (Shell 2024a).

Wind loading standards, such as those defined in ASCE 7, apply primarily to new construction and substantial renovations. However, API Standard 650 establishes specific wind resistance requirements for aboveground storage tanks, ensuring existing tanks at a facility are structurally sound and resistant to expected wind loads. In past extreme wind events, properly ballasted and anchored tanks have demonstrated high resistance to uplift, sliding, and overturning forces, further mitigating other non-flood-related risks associated with hurricanes and severe storms.

Ballasting remains one of the most effective and widely recognized methods for protecting aboveground storage tanks against flotation, displacement, and structural failure, even in light of potential extreme weather events. By ensuring tanks are adequately ballasted before storm events, facility operators can significantly reduce risks to infrastructure, the environment, and human health. As part of a comprehensive risk management approach, ballasting enhances the overall safety and reliability of aboveground storage tank operations in an area with a risk of flooding due to various coastal hazards.

CLF's experts—namely, Nairn (2025), Horner (2025), and Goldsmith (2025)—fail to account for the protective value of ballasting. Their assertions of imminent tank failure ignore the technical literature and operational safeguards in place. Their analyses do not refute the efficacy of

ballasting or provide an alternative failure pathway supported by quantitative data. As affirmed in the literature (Kameshwar and Padgett 2018a; Dehghanisanij et al. 2024), tanks that are properly ballasted do not face substantial risks of buckling, flotation, or sliding under modeled flood conditions.

**Opinion 23:** The New Haven Terminal's application of tank ballasting, consistent with EPA (2016) guidance and operational standards, effectively mitigates failure risk during coastal flood events and supports compliance with accepted engineering practice and environmental protection objectives.

## 9.2   NEW HAVEN TERMINAL SUMMARY

The New Haven Terminal is engineered and managed in accordance with federal regulations and widely accepted engineering practices that address these risks using a risk-informed, site-specific approach. Contrary to the assertions of CLF experts—including Goldsmith (2025), who recommends that the facility should be evaluated against 500-year flood events and worst-case projections, and Nairn (2025), who suggests that any proximity of floodwaters to tanks constitutes a design failure—the relevant regulatory and engineering standards governing the facility do not support or require actions for such speculative upper-bound scenarios.

While not even required by the current 2018 or 2021 Connecticut MSGP, the 100-year flood event remains the established regulatory benchmark under the EPA's MSGP for industrial stormwater management (notably, however, this benchmark does not apply to the terminal). It is also the governing standard in FEMA floodplain mapping and EPA's SPCC guidance. Such an event has a 1 percent annual chance of occurrence and is used consistently across federal and state permitting frameworks to define baseline infrastructure resilience and ensure regulatory compliance. Ballasting used for the aboveground storage tanks at the terminal ensure that they are not expected to experience structural instability or environmental hazard (as will be detailed in the next section).

While extreme events like the 500-year flood event (with a 0.2 percent annual probability of occurrence) began to appear in academic literature following Hurricane Katrina, their application has been limited to critical infrastructure—specifically, Risk Category III and IV structures under ASCE 7 and ASCE 24-14 (e.g., hospitals, emergency command centers, nuclear plants). Fuel storage terminals do not fall into these categories. No standard from API, ASCE, EPA, FEMA, or USACE requires existing storage tanks to be retrofitted for a 500-year event. Assertions by CLF experts that the New Haven Terminal must meet such standards mischaracterize both the state of practice and the permit requirements.

While long-term sea level rise projections may inform future planning, the anticipated increase over the current 5-year permit term is minimal—generally ranging from approximately 0.5 to 3 in., depending on the scenario. Such incremental change does not justify infrastructure retrofits. The terminal's existing protective measures—such as tank ballasting, impermeable

FILED UNDER SEAL

secondary containment, and emergency response protocols—already provide a level of resilience that exceeds current regulatory requirements.

In summary, the New Haven Terminal is designed and operated to meet or exceed the standard of a 100-year flood event as it governs industrial facility resilience. CLF experts' reliance on speculative, non-consensus scenarios—such as the 500-year flood event or compound worst-case events—does not align with federal permitting requirements or established engineering standards. No credible regulatory or technical justification supports the conclusion that additional modifications are necessary based on these extreme hypotheticals.

FILED UNDER SEAL

# 10 STORAGE TANK RESILIENCE UNDER EXTREME EVENTS

CLF experts, including Nairn (2025) and Goldsmith (2025), claim the New Haven Terminal is vulnerable to failure during extreme flood events beyond the 100-year return period.  These assertions rely on speculative scenarios and nonbinding guidance that exceed applicable regulations. But they provide zero evidence for their analysis.

In reality, the 100-year event remains the accepted benchmark per EPA's MSGP and its SPCC Rule as well as FEMA's NFIP standards. Flooding alone does not imply a failure; risks such as flotation or buckling are mitigated through established practices like tank ballasting and structural inspection (EPA 2016). The analysis in this section details the quantitative evaluation of tank ballasting.

Figure 14 shows that, during a modeled 100-year flood event, limited inundation may occur within the containment berms.  To provide a comprehensive evaluation—well beyond what is required by any federal or state permitting standard—the analysis in the following sections also includes a 500-year event to assess potential risks under increasingly extreme and unlikely flood conditions. These events are not required design thresholds under MSGP, SPCC, or ASCE standards; they are included solely for illustrative purposes.

As shown in Figure 20, the 500-year flood event, modeled using the NACCS mean water levels, projects inundation depths between 6.0 and 10.9 ft at low-lying terminal areas. Figure 21 illustrates these results in a 3D spatial context. Even under these extreme conditions, tank resilience is preserved due to proper fill levels, anchoring through ballast, and robust containment structures. These engineering controls are designed to prevent flotation, maintain stability, and ensure environmental protection. The analyses that follow demonstrate that, even under modeled conditions exceeding the standard of a 100-year flood event, the terminal continues to meet its design intent and regulatory obligations.

FILED UNDER SEAL



Figure 20.  Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean
500-Year Flood Event

Note: The callout boxes show local terminal water depths.

FILED UNDER SEAL



Figure 21.   3-D Visualization of NACCS Mean 500-Year Flood Event at the New Haven Terminal

## 10.1 ABOVEGROUND STORAGE TANK EVALUATION MODEL

An aboveground storage tank evaluation model was applied to systematically assess the structural resilience of aboveground storage tanks under multiple hazard scenarios. Implementation follows established engineering and regulatory guidance, including API Standard 650 for tank design, ASCE 7-16 for wind and flood loading, and other literature recommendations for aboveground storage tank assessment.  The probabilistic framework and structural performance metrics used in this model are also consistent with the USACE (2019). Specifically, the model integrates the key USACE-required components of flood risk assessment: hazard characterization (e.g., flood height, velocity), structural performance (via limit state equations), exposure and vulnerability (through scenario-based loads), and consequence evaluation (via failure probabilities).

The approach aligns with the USACE (2019) directive that risk assessments be quantitative and support the decision-making framework through computation of residual risk, structural fragility, and event consequence likelihood. By modeling each failure mode separately and aggregating system performance outcomes, the aboveground storage tank evaluation model supports the core USACE risk framework—risk assessment, risk communication, and risk management—thereby enabling transparency in quantifying aboveground storage tank vulnerability and informing appropriate mitigation strategies (e.g., ballasting).

FILED UNDER SEAL

### 10.1.1  Failure Mechanism Modeling

This model evaluates the structural integrity of aboveground storage tanks through a probabilistic approach, simulating a variety of environmental conditions, including flood height, water velocity, wind speed, oil level, wave characteristics, and debris impact energy. The model estimates the likelihood of different failure modes occurring and identifies key risk factors that influence tank stability. Seven failure mechanisms are assessed using the following limit state equations (LSEs) based on the original work by Khakzad and Gelder (2018):

- **Flotation Failure**: Flotation failure occurs when the buoyant force from floodwaters exceeds the combined weight of the tank and its stored contents, leading to tank displacement. The governing equation is as follows:

$$LSE_{floatation} = F_b - \frac{W_t + W_l}{FS}$$

  In this equation, $F_b$ is the buoyant force, $W_t$ is the tank steel weight, $W_l$ is the liquid content weight, and $FS$ is the factor of safety (1.5 for these cases).

- **Buckling Failure:** Buckling failure arises when external hydrostatic and hydrodynamic pressures exceed the critical buckling resistance of the tank shell, potentially leading to catastrophic collapse. The governing equation is as follows:

$$LSE_{buckling} = P_s + P_d - \frac{P_l + P_{cr}}{FS}$$

  In this equation, $P_s$ is the static water pressure, $P_d$ is dynamic pressure due to flood velocity, $P_l$ is internal pressure from tank contents, and $P_{cr}$ is critical buckling pressure.

- **Sliding Failure:** Sliding failure takes place when lateral hydrodynamic drag forces overcome frictional resistance at the base of the tank, causing displacement. The governing equation is as follows:

$$LSE_{sliding} = F_D - \frac{F_{fr}}{FS}$$

  In this equation, $F_D$ is the hydrodynamic drag force, and $F_{fr}$ is the frictional resistance due to tank weight and flood buoyancy.

- **Wind-Induced Sliding Failure**: This failure occurs when wind forces on the tank surpass the available frictional resistance, leading to lateral movement. The governing equation is as follows:

$$LSE_{wind-slide} = F_{wind} - \frac{F_{fr}}{FS}$$

FILED UNDER SEAL

In this equation, $F_{wind}$ is the force from wind pressure, calculated using exposed area and wind velocity, and $F_{fr}$ is the frictional resistance.

- **Wind-Induced Tipping Failure**: This failure results from overturning moments due to strong wind forces exceeding the stabilizing moment provided by the tank's weight and anchoring system. The governing equation is as follows:

$$LSE_{tipping} = M_{wind} - \frac{M_{resist}}{FS}$$

In this equation, $M_{wind}$ is the moment from wind force, and $M_{resist}$ is the resisting moment due to gravity.

- **Wave Loading Failure:** This failure happens when wave impact forces exceed the lateral resistance of the tank, leading to structural damage or potential overturning. The governing equation is as follows:

$$LSE_{wave} = F_{wave} - \frac{F_{fr}}{FS}$$

In this equation, $F_{wave}$ is the wave slam force, and $F_{fr}$ is the frictional resistance.

- **Debris Impact Failure:** Finally, debris impact failure develops when kinetic energy from floating debris surpasses the impact resistance of the tank shell, causing structural breaches. The governing equation is as follows:

$$LSE_{debris} = 0.5 \cdot m \cdot v^2 - \frac{E_{thr}}{FS}$$

In this equation, $m$ and $v$ are the debris mass and velocity, and $E_{thr}$ is a conservative energy threshold for structural breach. This equation expresses the limit state for debris impact failure, where failure occurs if the kinetic energy of the debris ($0.5 \cdot m \cdot v^2$) exceeds the structural energy threshold of the tank wall, adjusted by a safety factor FS.

## 10.1.2  Simulation Framework

The model employs a Monte Carlo simulation approach with 10,000 iterations, varying key environmental and structural parameters within realistic probability distributions. The variables considered include flood height, flood velocity, oil height, wind velocity, wave characteristics, and debris impact properties. This probabilistic framework enables the quantification of failure probabilities for each failure mode as well as the total probability of failure while considering all potential failure mechanisms.

The model provides comprehensive visualizations, including histograms of LSEs for each failure mode and probability curves for failure likelihood at varying oil height levels. These

FILED UNDER SEAL

outputs support engineering decision-making by identifying critical vulnerabilities and prioritizing mitigation measures (i.e., ballasting) to enhance aboveground storage tank resilience under extreme environmental conditions.

## 10.2 RARE FLOOD EVENTS

CLF's experts, including Goldsmith, Nairn, and O'Donnell, suggest that the New Haven Terminal's infrastructure should be evaluated or potentially modified based on a 500-year flood event. However, such an event is not used as a regulatory design threshold for aboveground storage tanks. The 100-year flood event remains the established benchmark under the EPA's MSGP, the SPCC Rule, and other standards, and it is the appropriate basis for evaluating compliance, structural stability, and risk mitigation at the terminal.

The 500-year flood event is included here solely to demonstrate conservatism and resilience well beyond what is required. These rare-event scenarios serve planning purposes in limited contexts, such as new construction of critical infrastructure (ASCE Risk Category III or IV), but do not apply to existing petroleum terminals like the New Haven Terminal. Neither EPA nor Connecticut DEEP mandates a design or retrofit based on these extreme events. Nonetheless, the following assessments show that, even under these scenarios, the New Haven Terminal's tanks remain structurally sound and environmentally secure. Table 6 summarizes the NACCS-modeled mean and 95th percentile confidence limit flood elevations for 100- and 500-year return periods. The 95th percentile represents the upper bound of model uncertainty, not a regulatory or design standard.

Table 6.          NACCS Water Levels Applied for Tank Failure Risk Model — New Haven, Connecticut

| Return Period (years) | Mean Water Level (ft NAVD88) | Upper 95th Confidence Limit Water Level (ft NAVD88) |
|---|---|---|
| 100 | 11.6 | 14.7 |
| 500 | 15.1 | 18.2 |

The presence of floodwater does not inherently mean that aboveground storage tanks are at risk of flotation, displacement, or rupture.  Instead, engineered design features—including ballasting—mitigate these risks, ensuring continued operational security even if water levels rise significantly. Proper stormwater drainage infrastructure prevents excessive rainwater accumulation within containment areas, further reducing the potential for tank instability during extreme weather events.

Figure 22 provides a detailed view of the 48-ft-tall Tank 24 at the New Haven Terminal, illustrating the modeled 500-year floodwater depth of 8.8 ft. Figure 23 is a schematic of Tank 24—when it is halfway full of liquid and properly ballasted—during the 500-year mean flood event. These graphics help visualize the scale of the potential flooding that would occur

FILED UNDER SEAL

during rare flood events in comparison to the size of the aboveground storage tanks and their internal product height.



Figure 22.  New Haven Terminal's Tank 24, Properly Ballasted, under 500-Year Flood Conditions



Figure 23.  Conceptual Graphic – New Haven Terminal's Tank 24, Properly Ballasted, during a 500-Year Flood Event (with a 6-ft person for scale)

## 10.3 TANK FAILURE RISK MODEL

An example of the model Monte Carlo simulations has been developed for Tank 24 at the New Haven Terminal to assess the structural vulnerability of a 180-ft-diameter, 48-ft-high aboveground storage tank under extreme environmental conditions. This tank is used for gasoline storage and is assumed to be ballasted up to approximately half its height. For modeling purposes, I investigated multiple failure mechanisms, including flotation, buckling, sliding, wind-induced failure, wave loading, and debris impact. To accurately capture the probabilistic risk of failure, a range of environmental and structural parameters have been incorporated into the model.

The Monte Carlo simulation varies key parameters within defined ranges that reflect potential environmental hazards. These ranges have been selected based on the historical storm events, NACCS-modeled events, engineering design limits, and established literature on flood and wind loading on aboveground storage tanks (Khakzad and Gelder 2018; Kameshwar and Padgett 2018b). The parameters considered include flood height, flood velocity, oil height, wind velocity, debris characteristics, and wave conditions, as summarized in Table 7.

FILED UNDER SEAL

Table 7.          Model Parameters for Monte Carlo Simulation of Tank 24

| Model Parameter | Range (International System of Units) | Range (U.S. customary units) |
|---|---|---|
| Flood Height | 2.7–3.1m | 8.8–10.3 ft |
| Flood Velocity | 0.5–4.0 m/s | 1.6–13.1 ft/s |
| Oil Height | 7.0–10.0 m | 22.9–32.8 ft |
| Wind Velocity | 10–70 m/s | 22.4–156.6 mph |
| Debris Mass | 200–3000 kg | 440–6614 lb |
| Debris Velocity | 0.5–4.0 m/s | 1.6–13.1 ft/s |
| Wave Height | 0.5–1.0 m | 1.6–6.6 ft |
| Wave Period | 4.0–14.0 s | 4.0–14.0 s |
| Tank Diameter | 54.9 m | 180 ft |
| Tank Height | 14.6 m | 48 ft |
| Shell Thickness | 0.008 m | 0.728 in |

By systematically varying these input parameters, the Monte Carlo simulation provides insights into the likelihood of failure for various state conditions, supporting risk-based decision-making and mitigation strategies for Tank 24 at the New Haven Terminal.

The results of the Monte Carlo simulation for Tank 24 are presented in Figure 24, which illustrates the probability distributions of the LSEs for each failure mode. These distributions indicate the range of potential structural responses under varying environmental conditions. The red, dashed lines in each histogram represent the LSE threshold for failure, where values greater than zero indicate a loss of stability or structural integrity. As seen, all LSEs remain below zero with a tank ballasted to less than half its height with a low-density fluid like gasoline. These results provide quantitative insights into the relative importance of different failure mechanisms for Tank 24, guiding targeted mitigation strategies such as ballast adjustments.

FILED UNDER SEAL



Figure 24. Probability Distribution of Failure Modes for New Haven Terminal's Tank 24

## 10.3.1  Application for New Haven Terminal

To conservatively evaluate the structural resilience of the New Haven Terminal's aboveground storage tanks, a probabilistic risk model was applied across the full tank inventory. Although the 100-year flood event remains the governing regulatory benchmark under the EPA's MSGP and SPCC rules, this analysis also includes simulation of rare, non-regulatory scenarios—specifically the 500-year flood event—solely to assess performance beyond what is required. Consideration of a 500-year flood event, which has a 0.2 percent annual probability of occurrence, is not mandated for existing industrial facilities, but such an event is included here to demonstrate robustness.

Additionally, the extreme scenario proposed by Nairn (2025)—combining the 95th percentile confidence level for the 500-year storm surge with 1.64 ft of sea level rise projected for 2050—was included to illustrate the continued effectiveness of ballasting in preventing flotation, even under unrealistic conditions in the context of a 5-year permit. The Monte Carlo model varied environmental and operational parameters—such as flood elevation, velocity, wind loading, debris impact, oil height, and ballasting—to assess potential failure modes. Table 8 summarizes the physical characteristics of each tank used as input to the simulations, including dimensions, stored product, specific gravity, and shell thickness.

FILED UNDER SEAL

Table 8.        New Haven Terminal Tank Parameters

| Tank ID | Diameter (ft) | Height (ft) | Product | Product Specific Gravity | Average Wall Thickness (in.) |
|---|---|---|---|---|---|
| 1 | 120 | 48 | Gasoline | 0.728 | 0.301 |
| 2 | 120 | 48 | Gasoline | 0.728 | 0.301 |
| 3 | 120 | 48 | Gasoline | 0.728 | 0.301 |
| 21 | 180 | 48 | Gasoline | 0.728 | 0.301 |
| 22 | 180 | 49 | Gasoline | 0.728 | 0.301 |
| 23 | 180 | 49 | Jet A | 0.840 | 0.301 |
| 24 | 180 | 48 | Gasoline | 0.728 | 0.301 |
| 25 | 110 | 56 | Ethanol | 0.789 | 0.500 |
| 26 | 110 | 55 | Gasoline | 0.728 | 0.301 |
| 27 | 88 | 55 | Jet A | 0.840 | 0.415 |
| 28 | 80 | 55 | Ethanol | 0.789 | 0.301 |
| 29 | 80 | 54 | Gasoline | 0.760 | 0.359 |
| 30 | 95 | 56 | Jet fuel | 0.840 | 0.436 |
| 31 | 72 | 55 | Gasoline | 0.728 | 0.327 |
| 32 | 72 | 55 | Gasoline | 0.759 | 0.341 |
| 33 | 61 | 55 | Gasoline – Jet A | 0.800 | 0.301 |
| 34 | 40 | 48 | Diesel | 0.850 | 0.301 |
| 35 | 40 | 48 | Diesel | 0.850 | 0.301 |
| 36 | 40 | 48 | Diesel | 0.850 | 0.205 |
| 36 | 110 | 55 | Diesel | 0.850 | 0.301 |
| 37 | 120 | 48 | Jet A | 0.840 | 0.301 |
| 38 | 120 | 48 | Diesel | 0.850 | 0.301 |

## 10.3.1.1  Model Results

Each tank's structural performance was evaluated using Monte Carlo simulation under a suite of conservative flooding scenarios ranging from the 100-year event's regulatory benchmark to rare, non-regulatory events with 500-year return periods. In all scenarios, tanks are ballasted according to site protocols and account for hydrodynamic forces, wind loads, wave pressure, and debris impacts. Table 9 summarizes the results, showing the modeled probability of failure across critical mechanisms, including flotation, buckling, sliding, wind-induced displacement, and debris impact. The final column for each event provides the minimum product height

FILED UNDER SEAL

required to maintain stability under the most extreme modeled conditions, incorporating a conservative safety factor of 1.5.

Table 9.            Probabilities of Ballasted Tank Failures – 100- and 500-Year Flood Events

| Tank ID | 100-Year Event Water Level (ft) | 100-Year Event Failure Probability (%) | 100-Year Minimum Stable Product Height (ft) | 500-Year Event Water Level (ft) | 500-Year Event Failure Probability (%) | 500-Year Minimum Stable Product Height (ft) |
|---|---|---|---|---|---|---|
| 1 | 3.1 | 0 | 4.9 | 6.2 | 0 | 12.1 |
| 2 | 4.0 | 0 | 6.9 | 7.1 | 0 | 14.1 |
| 3 | 5.1 | 0 | 9.2 | 8.2 | 0 | 16.4 |
| 21 | 2.5 | 0 | 3.6 | 5.6 | 0 | 11.2 |
| 22 | 3.1 | 0 | 5.2 | 6.2 | 0 | 12.5 |
| 23 | 3.6 | 0 | 5.2 | 6.7 | 0 | 11.8 |
| 24 | 5.7 | 0 | 10.5 | 8.8 | 0 | 18.0 |
| 25 | 4.9 | 0 | 6.9 | 8.0 | 0 | 14.1 |
| 26 | 4.2 | 0 | 7.2 | 7.3 | 0 | 14.4 |
| 27 | 3.6 | 0 | 5.2 | 6.6 | 0 | 10.8 |
| 28 | 5.6 | 0 | 9.2 | 8.7 | 0 | 15.7 |
| 29 | 4.7 | 0 | 7.5 | 7.8 | 0 | 14.4 |
| 30 | 3.9 | 0 | 5.6 | 7.0 | 0 | 11.5 |
| 31 | 5.1 | 0 | 9.2 | 8.2 | 0 | 16.1 |
| 32 | 5.0 | 0 | 8.5 | 8.1 | 0 | 15.1 |
| 33 | 4.8 | 0 | 8.5 | 7.9 | 0 | 13.8 |
| 34 | 3.6 | 0 | 7.5 | 6.7 | 0 | 11.2 |
| 35 | 4.2 | 0 | 8.2 | 7.3 | 0 | 11.8 |
| 36 | 4.0 | 0 | 8.5 | 7.0 | 0 | 12.1 |
| 37 | 3.9 | 0 | 7.9 | 7.0 | 0 | 11.8 |
| 38 | 2.6 | 0 | 3.6 | 5.7 | 0 | 9.5 |

Notes:

Probabilities consider mean event water level.

The stable product height level is based on the minimum product level required to ballast a tank with a 1.5 factor of safety.

To further demonstrate resilience, the outlier case proposed by Nairn (2025)—namely, the 95th percentile water level from the 500-year storm surge scenario combined with 1.64 ft of sea

FILED UNDER SEAL

level rise projected for 2050—was also modeled. Although this scenario lacks any regulatory basis and reflects an unlikely upper-bound condition, it was included to assess tank performance well beyond required standards. Table 10 summarizes the results, showing the modeled probability of failure across critical mechanisms.

Table 10.    Probabilities of Ballasted Tank Failures – 95th Percentile, 500-Year Flood Event with 1.64-ft Sea Level Rise for 2050

| Tank ID | Water Level, 500-Year Event (95th percentile) and Sea Level Rise (ft) | Probability of Ballasted Tank Failure (%) | Minimum Stable Product Height (ft) |
|---|---|---|---|
| 1 | 11.0 | 0 | 22.3 |
| 2 | 11.9 | 0 | 24.3 |
| 3 | 13.0 | 0 | 26.6 |
| 21 | 10.4 | 0 | 21.3 |
| 22 | 11.0 | 0 | 22.6 |
| 23 | 11.5 | 0 | 20.3 |
| 24 | 13.6 | 0 | 27.9 |
| 25 | 12.8 | 0 | 23.3 |
| 26 | 12.1 | 0 | 24.6 |
| 27 | 11.5 | 0 | 19.7 |
| 28 | 13.5 | 0 | 25.3 |
| 29 | 12.6 | 0 | 24.3 |
| 30 | 11.8 | 0 | 20.3 |
| 31 | 13.0 | 0 | 26.2 |
| 32 | 12.9 | 0 | 24.6 |
| 33 | 12.7 | 0 | 23.3 |
| 34 | 11.5 | 0 | 19.4 |
| 35 | 12.1 | 0 | 20.3 |
| 36 | 11.9 | 0 | 20.7 |
| 37 | 11.8 | 0 | 20 |
| 38 | 10.5 | 0 | 18.4 |

Note:

The stable product height level is based on the minimum product level required to ballast tank with a 1.5 factor of safety.

The simulation results confirm that all aboveground storage tanks at the New Haven Terminal exhibit a 0 percent probability of failure across the full suite of modeled flood scenarios,

FILED UNDER SEAL

including the most extreme case proposed by CLF expert Nairn (2025).  While Nairn's scenario has no regulatory basis and represents a highly speculative compound risk condition, it was modeled to test the outer bounds of structural performance. The results demonstrate that the terminal's infrastructure is robust, even under conditions far exceeding any mandated standard.

The terminal's resilience is due to multiple overlapping safeguards: rigorous adherence to API Standards 650 and 653, site-specific tank ballasting procedures, conservative structural design margins, and graded containment systems. The modeled probability of failure was 0 percent for all tanks under all return periods assessed—including 100- and 500-year events—with or without sea level rise adjustments. These results directly contradict assertions by CLF experts, including Nairn, Goldsmith, and O'Donnell, that the terminal infrastructure is vulnerable or inadequately protected.

In addition, I evaluated each primary failure mode:

- **Flotation Risk:** Ballasting proved highly effective. The ratio of buoyant force to tank weight stayed below failure thresholds in all cases, ensuring tanks remained grounded and stable—even under the deepest modeled floodwaters.

- **Buckling and Structural Collapse:** Circumferential stress from external water pressure and wind loading did not approach buckling thresholds. The tanks, designed in accordance with API Standard 650, retained full structural integrity throughout all simulations.

- **Sliding and Wind-Induced Displacement:** Wind speeds equivalent to a Category 5 hurricane (~157 mph) and lateral hydrodynamic forces were modeled. Anchoring, base friction, and containment berms collectively prevented any modeled lateral displacement. Ballasting further minimized uplift forces, leaving displacement risk effectively negligible.

- **Debris Impact:** The risk of critical tank failure from floating debris is extremely low due to the terminal's inland location, its shielding from direct wave action, and the robust design of tanks and surrounding infrastructure. Minor cosmetic damage is possible but does not threaten containment integrity.

In conclusion, the New Haven Terminal's tank infrastructure remains structurally sound, environmentally secure, and fully compliant with regulatory standards—even under flood scenarios well beyond what is required by EPA, CT DEEP, FEMA, or any prevailing industry design criteria. These findings affirm the technical and regulatory defensibility of the terminal's current risk management approach.

FILED UNDER SEAL

## 10.4 TANKS AT THE NEW HAVEN TERMINAL ARE SECURE UNDER FLOOD CONDITIONS

Contrary to the claims made in CLF's NOI and the assertions of its experts—including Goldsmith (2025), Nairn (2025), and O'Donnell (2025)—the presence of floodwaters near aboveground storage tanks does not constitute a failure of design, compliance, or environmental stewardship. Aboveground storage tanks engineered and operated in accordance with API Standards 650 and 653, when properly maintained and ballasted, are structurally resilient—even under rare and extreme flood conditions. This conclusion is not only supported by regulatory guidance (EPA 2016) but also by peer-reviewed engineering literature, including Kameshwar and Padgett (2018b), who demonstrated through fragility modeling that modern API-compliant tanks perform robustly under hurricane-induced surge conditions.

The probabilistic analysis presented in this report confirms that the New Haven Terminal's tanks remain structurally stable under all modeled flood scenarios, including those that CLF experts improperly assert should serve as a design basis—namely, the 500-year flood event and Nairn's speculative 500-year event with a water level at the 95th percentile along with 1.64 ft of sea level rise.  None of these probabilities are used in regulatory frameworks for tank infrastructure, and there is no mandate under EPA's MSGP, EPA's SPCC Rule, the CT DEEP permitting framework, or other standards requiring compliance with such extreme, low-probability conditions.

The tank ballasting protocols already in place, coupled with structural design factors, containment systems, and topographic elevation of the terminal, ensure that the probability of failure remains negligible—even during short-duration inundation from rare coastal storm surge. These measures directly rebut CLF's claim that the terminal is unprepared or vulnerable to catastrophic failure in future climate conditions.

The following list summarizes my points on the matter:

- CLF's experts misrepresent the regulatory design basis for aboveground storage tanks by invoking a 500-year flood event, which is not required by EPA, CT DEEP, or API design standards.

- The New Haven Terminal's existing infrastructure and operational procedures—especially tank ballasting—are effective and in line with accepted engineering practice.

- There is no requirement to retrofit existing infrastructure based solely on climate projections that have not been incorporated into enforceable regulatory requirements or design standards.

- Peer-reviewed literature and EPA guidance support the conclusion that flooding in proximity to tanks is not inherently hazardous and that ballasting provides a reliable and proven means of ensuring tank stability.

FILED UNDER SEAL

**Opinion 24:** Probabilistic modeling confirms the New Haven Terminal's aboveground storage tanks are not at structural risk during 100- and 500-year flood and storm events when adequately ballasted. The berms are not required to protect the tanks against floods.

**Opinion 25:** Projected sea level rise over the next 5 years does not pose a structural risk to the terminal's aboveground storage tanks. The 2024 *Connecticut Stormwater Quality Manual,* for the first time, mentions that sea level will rise 20 inches by 2050, but it still does not prescribe that permittees take action.

**Opinion 26:** Historical storms—including Hurricane Sandy—did not result in flooding of the New Haven Terminal.

**Opinion 27:** Modeling results—including those under the most conservative and extreme conditions—demonstrate that the adequately ballasted tanks exhibit negligible probabilities of failure across all modeled hazards, confirming the robustness of the terminal's design, maintenance, and operational protocols under extreme but plausible conditions.

## 10.5 COMPARATIVE RISK TO REGIONAL INFRASTRUCTURE

The New Haven Terminal is less vulnerable to extreme flood scenarios than other critical infrastructure assets in the region, many of which face significantly greater exposure and potential disruption during rare coastal storm events. The USACE identified Union Station, a key regional transportation hub, as highly susceptible to flooding in its CSRM feasibility study, citing overtopping risks even under moderate storm surge scenarios (USACE and CT DEEP 2020). The Long Wharf District as a whole—including roads, municipal services, and low-elevation commercial infrastructure—was shown to require substantial structural protection to meet basic flood resilience targets, with residual annual exceedance probabilities of 0.8–3.5 percent projected by 2074, even after floodwall installation.

In addition, energy infrastructure located along the harbor and Quinnipiac River corridor, including substations such as the East Shore facility (Figure 25), are sited in FEMA-designated AE flood zones and lack the physical protections afforded to the New Haven Terminal. Similarly, the Yale-New Haven Health Hospital, access roads, and utility lines are sited in FEMA-designated AE flood zones; they are vulnerable to coastal inundation during high-return-period events (Figure 26).

FILED UNDER SEAL



Figure 25.  FEMA-Designated Flood Zones around the New Haven Terminal

Notes: The East Shore electrical substation is marked by a red pin. The terminal is partially located within Zone AE, which is subject to inundation by a 100-year flood event with a base flood elevation of 12 ft.

FILED UNDER SEAL



Figure 26.   Yale-New Haven Health Hospital (marked by a red pin) and Nearby Infrastructure on the West Side of New Haven Harbor

Notes: The map shows that portions of the hospital complex and that adjacent facilities are located within Zone AE, indicating areas subject to inundation by a 100-year flood event, with base flood elevations of 11–12 ft NAVD88.

These examples underscore that other critical infrastructure—ranging from transportation to healthcare and power systems—is more likely to face significant functional or structural risk during 100-year flood events than the New Haven Terminal. The terminal's combination of elevated siting, structural ballasting, and regulatory compliance positions it as comparatively resilient under these rare but modeled scenarios.

**Opinion 28:** Critical infrastructure in the region—including Union Station, power substations, and hospital access corridors—are more exposed to disruption or structural failure risk during a 100-year flood event than the New Haven Terminal, underscoring the terminal's relative resilience.

## 10.6 BENCHMARK COMPARISON WITH MORMON ISLAND CALIFORNIA TERMINAL ASSESSMENT

To further contextualize the rigor of the assessment presented in this report, it is instructive to compare the New Haven Terminal evaluation with recent regulatory requirements for similar terminal facilities in more stringent climate policy environments. One relevant example is the Mormon Island Tank Farm in Sacramento County, California (Shell 2024b).

In 2023, the California Regional Water Quality Control Board (Central Valley Region) adopted Waste Discharge Requirements Order R5-2023-0293, which required the owner by law to develop a climate change effects vulnerability assessment and management plan for the Mormon Island Tank Farm. This plan—submitted in 2024—was structured around a high-level, scenario-based vulnerability screening. It included a qualitative evaluation of future climate risks—such as sea level rise, extreme precipitation, and wildfire exposure—and required the identification of adaptive management strategies for long-term resilience. However, it did not mandate a probabilistic engineering analysis, tank-by-tank structural modeling, or quantified risk thresholds under extreme event simulations.

By contrast, the evaluation presented in this report for the New Haven Terminal goes well beyond what was required under the Mormon Island order. The analysis here of the New Haven Terminal incorporates detailed, Monte Carlo-based probabilistic modeling applied to each tank using site-specific topography, flood depths, velocities, and structural parameters. It accounts for compound climate drivers—including sea level rise, wind, surge, debris, and tank geometry—and quantifies the likelihood of failure across multiple critical modes, including flotation, sliding, and buckling.

This comparison highlights two key points:

- Even in California—a state with one of the most advanced climate adaptation regulatory frameworks—permitting authorities only required qualitative screening-level assessments at comparable facilities, which did not lead to structural changes.

- The New Haven Terminal's resilience evaluation in this report exceeds the analytical depth and site-specific rigor of what has been required by law of California regulators at facilities like Mormon Island.

It is also important to note that the Mormon Island analysis was developed in 2024, years after CLF served its NOI and filed its complaint. Additionally, Mormon Island only performed such an analysis once the applicable regulatory agency required it to do so. Mormon Island did not take on a qualitative assessment because it was "best industry practice"; rather, it did so because it was required by law.

FILED UNDER SEAL

# 11 Additional Responses to CLF Experts

In addition to the claims discussed above, CLF's experts advocate for climate analysis and adaptation measures that go far beyond what is required—or even contemplated—by the 2018 Connecticut MSGP or the SWPPP framework in effect during the relevant period, or even at this point in time:

- EPA recently released a draft of its 2026 MGSP, which still uses the 100-year event as the applicable standard for permittee consideration.
- CT DEEP's 2024 MSGP, yet to be issued, also uses the 100-year flood event as the applicable standard for permittee consideration.

CLF's demands conflate nonbinding climate resilience guidance with enforceable regulatory obligations, seeking to impose retroactive design standards that are not supported by any current state or federal permitting framework. While climate risk considerations may inform future policy development, they do not override the clear and limited scope of current MSGP requirements, which are focused on controlling stormwater runoff resulting from precipitation—not structural performance under hurricane surge or long-term sea level rise.

As illustrated in Table 11, the recommendations made by CLF's experts introduce a range of demands that fall outside the regulatory structure and technical purpose of a SWPPP. These include the use of advanced coastal modeling tools, structural engineering evaluations, and speculative projections about future climate conditions—none of which are required for permit compliance under current or proposed MSGP revisions. The table provides a point-by-point comparison of CLF's demands with the applicable MSGP and SWPPP framework, making clear that the asserted deficiencies reflect CLF's misunderstanding of both the purpose and requirements of stormwater regulation.

FILED UNDER SEAL

Table 11.    Comparison of CLF Demands with Current and Future Connecticut SWPPP Requirements

| CLF Demand | Supporting Information | Required in Current or Future SWPPP |
|---|---|---|
| Conduct storm surge and wave modeling, including for 500-year storm scenarios | Neither the 2018 nor the proposed 2024 CT MSGP includes any requirement for modeling storm surge or wave loading. The focus remains on precipitation-driven runoff. | No |
| Analyze the combined effects of precipitation and surge on containment berms | There is no SWPPP requirement to simulate or model compound flood scenarios; such evaluations fall under new facility design or risk-informed planning, not MSGP compliance. | No |
| Evaluate structural systems (tanks, piping, electrical) for flood resilience | Structural resilience evaluations are outside the scope of the MSGP. These evaluations are engineering decisions, not permit mandates. | No |
| Assess community and environmental harm from flooding | The MSGP regulates facility-level discharges to stormwater—not offsite flood impact assessments. | No |
| Update the SWPPP to reflect climate risk analyses | Neither the current nor proposed CT MSGP requires SWPPPs to incorporate sea level rise, climate models, or projected changes. | No |
| Create a recurring process to update the SWPPP based on climate data | No requirement exists for iterative or climate-triggered SWPPP updates beyond standard 5-year permit renewal cycles. | No |
| Modify infrastructure to withstand a 500-year storm and sea level rise through 2050 and beyond | Infrastructure upgrades for climate resilience are not within MSGP authority or scope; there is no current requirement to meet this threshold. | No |

FILED UNDER SEAL

## 11.1 EXPERT REPORT OF WENDI GOLDSMITH

Goldsmith (2025) presents a forward-looking critique of the New Haven Terminal, alleging regulatory noncompliance and engineering inadequacy based on evolving climate guidance and internal planning documents. Her opinions are not supported by enforceable regulatory standards or established engineering methodologies, and they are inconsistent with the legal and technical framework applicable to the terminal.

Goldsmith's primary opinions are as follows:

- Defendants fail to design and operate the terminal in accordance with "best industry practice."

- The terminal is vulnerable to climate-related hazards, including sea level rise and storm surge, and is a potential source of "catastrophic" risk.

- Defendants did not consider the complete service life of the terminal or adapt to foreseeable future risks.

### 11.1.1  Mischaracterization of "Best Industry Practice" and Regulatory Obligations

Goldsmith repeatedly references "best industry practice" without offering a clear or technically grounded definition. Goldsmith's definition of "best industry practice" is entirely subjective, unsupported by any known regulatory guidance intended for industry, and unsupported by an agency, law, statute, regulation, or industry association. In contrast, best-industry practice is guided by codified standards and operational frameworks established by recognized entities such as API and EPA. These practices include structural design under API Standards 650 and API 653 and site-specific mitigation strategies consistent with SPCC and FRP protocols such as the EPA's (2016) guidance for ballasting. This definition is consistent with how best practice is applied in regulatory and engineering evaluations across the petroleum and chemical industries (see Sections 4 and 7).

Goldsmith suggests that certain USACE publications constitute "best industry practices" for fuel storage terminals. However, none of the cited USACE documents impose or even recommend specific actions, data inputs, or procedural frameworks applicable to climate risk assessments for facilities governed by the CT DEEP industrial stormwater permit. As defined in Section 4, for a standard or guidance to qualify as a "best industry practice," it must reflect the actual, widespread practices of the relevant industry—not an isolated agency publication taken out of context. The regulatory framework governing the New Haven Terminal is based on enforceable standards issued by CT DEEP, not discretionary planning materials developed for unrelated infrastructure classes. Selectively citing nonbinding agency documents does not transform them into applicable regulatory obligations or establish a "best industry practice."

FILED UNDER SEAL

Goldsmith's interpretation of the phrase "best industry practice" mischaracterizes its role within the 2018 and 2021 Connecticut MSGP. As clarified in Section 4 of this report, best industry practices are referenced in the permit only in the context of evaluating appropriate BMPs for stormwater control. Contrary to CLF's assertions, there is no obligation under the MSGP to retrofit existing infrastructure based on evolving climate projections or to interpret best industry practice as encompassing evolving standards advocated by third parties.

From my perspective as an experienced environmental engineer, the determination of what constitutes a best industry practice must be grounded in the prevailing norms of the regulated sector, as reflected in broadly accepted guidance from entities such as the EPA and API—not in isolated interpretations or agency planning documents. As discussed in Sections 5 and 6, neither EPA nor CT DEEP has required permittees to evaluate or design their facilities based on hypothetical climate conditions decades into the future. Goldsmith's effort to redefine "best industry practice" to include unadopted site retrofits and subjective performance expectations conflicts with the core principle of regulatory certainty. A permittee cannot be held to compliance standards that are neither stated in the permit nor supported by industry consensus.

It is important to clarify that while Goldsmith references internal documents from Defendants and industry guidance materials—such as Defendants' design engineering practices, the NACCS framework, and ISO 31000 risk management standards—these materials are nonbinding regulatory requirements. The New Haven Terminal's compliance must be evaluated against the enforceable standards in place at the time, namely the 2018 Connecticut MSGP and applicable EPA SPCC and FRP rules. While internal documents may reflect aspirational planning or evolving standards, they do not override the legal framework governing facility operations.

## 11.1.2   Unsupported Claims of Vulnerability and Catastrophic Risk

Goldsmith (2025) repeatedly characterizes the New Haven Terminal as a facility on the brink of failure, using terms such as "catastrophic petrochemical releases" (p. 1), "credible risk of catastrophic release" (p. 1), and "grossly unprepared for the impending, foreseeable hazards presented by severe weather" (p. 1). Goldsmith further asserts there is an "unacceptable risk of inundation" (p. 14) and a "severe risk of flooding resulting in pollutant discharges, including catastrophic discharges" (p. 43). These statements are speculative and not grounded in quantitative risk analysis or permit requirements. As detailed in Section 10, probabilistic modeling of tank failure during 100- and 500-year flood events demonstrates that the terminal's risk of structural failure is negligible due to existing mitigation measures—including tank ballasting, elevated heights, and robust emergency response protocols.

Goldsmith also claims that the terminal's infrastructure is outdated and deteriorated (p. 40) and suggests that the terminal lacks appropriate preparedness measures in its SWPPP and emergency response action plan. She concludes that these alleged deficiencies render the

FILED UNDER SEAL

facility noncompliant and unprepared (pp. 40–41). However, as discussed in Sections 4, 6, and 7, the terminal's implementation of BMPs—including secondary containment, impervious surfaces, spill prevention measures, and stormwater monitoring—fully complies with the 2018 Connecticut MSGP. Goldsmith provides no site-specific evidence to rebut these facts, instead relying on generalized assertions about "best industry practices" that are not defined in any applicable statute, regulation, or permit condition.

Furthermore, Goldsmith's assertion that Defendants failed to incorporate lessons from the Sewaren spill overlooks the site-specific differences between the two terminals. The New Haven Terminal did not flood during Hurricane Sandy, and its inland location, containment berms, and ballasting protocols provide a different risk profile. The probabilistic modeling presented in this report demonstrates that, even under 500-year flood scenarios, adequately ballasted tanks remain structurally stable, and the risk of failure is negligible.

### 11.1.3  Invalid Use of Critical Infrastructure Designation and Planning Horizons

Similarly, Goldsmith (2025, pp. 26–27, 41) suggests that the New Haven Terminal should be regulated as "critical infrastructure" and that this designation imposes additional permitting or engineering obligations under the MSGP. The 2018 Connecticut MSGP contains no reference to "critical infrastructure," and it does not mandate any form of classification or risk assessment based on that designation. As discussed in Sections 3 and 4, no provision in the MSGP or its implementing regulations requires a permittee to develop different plans, engineering controls, or BMPs based on whether a facility may be deemed "critical."

Goldsmith also argues that permittees should conduct long-range infrastructure planning based on speculation that the terminal will be operating for 20–50 years, despite the fact that the MSGP is issued on a 5-year cycle and is designed to reflect current science, regulatory development, and agency priorities over that time horizon.

As discussed in Section 2, the general permit framework used by CT DEEP and EPA provides certainty to regulated parties while allowing for regular, science-based updates through established rulemaking procedures. This flexibility is shown in the EPA proposed 2026 MSGP, which specifically states, "EPA uses the reissuance process to evaluate the effectiveness of the permit, incorporate any updates in regulations, improve clarity, and reflect current science and best practices." Nothing in the MSGP requires permittees to retrofit facilities based on speculative 50-year operational timeframe.

### 11.1.4  Disregard for Established Site-Specific Risk Management Measures

Goldsmith also overlooks the comprehensive suite of site-specific risk mitigation measures already in place, including the SPCC Plan, FRP, emergency response and action plan, and BCP. These plans incorporate BMPs in accordance with EPA guidance and API standards and are

FILED UNDER SEAL

further detailed in Sections 4, 5, and 6 of this report. Rather than engaging with these documents or the terminal's documented compliance, Goldsmith asserts—without quantitative basis—that the terminal is unprepared for future severe weather events.

Goldsmith's treatment of FEMA-related engineering requirements is similarly flawed. On page 45 of the report, Goldsmith states that engineering certifications under the 2018 Connecticut MSGP must comply with FEMA floodplain management standards, yet no such requirement exists in the MSGP or implementing regulations. FEMA 543 applies to mapping partners producing Flood Insurance Rate Maps and does not govern industrial stormwater permits. CT DEEP does not incorporate FEMA certification standards into the MSGP, and Goldsmith offers no basis to conclude otherwise.

Goldsmith also incorrectly attributes a flood-control function to the terminal's secondary containment berms, which are required under the EPA's SPCC Rule for oil spill prevention—not for flood protection. As noted in Section 7.4, neither EPA nor CT DEEP requires berms to be designed for storm surge mitigation in the context of stormwater permitting, and Goldsmith points to no language in the MSGP to support her contrary claim.

Further misinterpretation arises in her reliance on EPA Region 1 guidance, which applies to municipal wastewater treatment plants and combined sewer systems. These facilities, unlike the New Haven Terminal, often contain open tanks vulnerable to floodwater intrusion. The Region 1 climate guidance cited by Goldsmith is not referenced in the 2018 MSGP or its supporting fact sheets and has no applicability to enclosed fuel storage terminals authorized under Connecticut's industrial stormwater program. By its own terms, the guidance pertains to treatment systems and sewer infrastructure regulated under distinct sections of the Connecticut water quality regulatory framework.

Goldsmith's critique of the terminal's risk management program is similarly unfounded. She contends that the risk matrix does not conform to ISO 31000:2018 and that the risk management program "undermines the integrity" of terminal operations, but the 2018 MSGP contains no reference to ISO or any mandate for facilities to conform to international standards for enterprise risk management. The permit regulates stormwater discharges, not internal corporate risk frameworks. As shown in Section 4, the terminal's actual preparedness measures, including ballasting and emergency response, exceed permit requirements and reflect established best practices.

### 11.1.5  Federal and Regulatory Findings Contradict CLF's Claims

Goldsmith (2025) presents several assertions regarding the risk preparedness of the New Haven Terminal that are inconsistent with both the applicable regulatory framework and federal evaluations of climate risk. For example, she claims that climate change poses a serious hazard to hazardous waste operations at the terminal.

FILED UNDER SEAL

However, a 2024 analysis of EPA oversight found no such risk. The report—reviewing hazardous waste management across thousands of facilities—did not identify the New Haven Terminal as warranting additional action based on climate factors, including sea level rise (GAO 2024a,b). Similarly, in a 2022 evaluation, EPA did not designate the New Haven Terminal as vulnerable due to sea level rise, and while Category 4 or 5 hurricane exposure was noted, EPA did not identify any gaps in Defendants' compliance or infrastructure requiring correction (GAO 2022).

Lastly, Goldsmith points to internal communications and employee comments regarding the perceived threat of sea level rise as evidence of noncompliance. However, EPA concluded in its hazardous waste oversight that sea level rise within a 5-year timeframe did not constitute a relevant risk factor at the New Haven Terminal (GAO 2022). Disagreement with that assessment does not constitute regulatory failure or industry deviation.

## 11.1.6   Unsupported Use of Internal and Nonbinding Planning Documents

In addition, Goldsmith (2025, pp. 20–24) suggests that the design and engineering practices (DEPs) developed by the Defendants somehow apply to the New Haven Terminal. For example, Goldsmith states, "It is clear that the DEP applies to coastal facilities like the Terminal," and on page 28, she argues that the DEPs require the terminal to conduct 20- to 40-year planning.

This interpretation is factually incorrect. As clarified in deposition (2025) by experts Dr. Paul Verlaan and Dr. Sergio Jaramillo, the DEPs do not apply to existing terminals. Rather, they are intended for new project development—particularly offshore facilities not subject to local regulatory frameworks. The DEPs themselves specify their applicability to facilities involved in production, oil refining, gas handling, gasification, or chemical processing, which does not include the New Haven Terminal. Goldsmith also cites a "draft" version of DEP 10.14 that has never been finalized or adopted. Her reliance on these materials reflects a misunderstanding of their purpose and scope and does not establish any binding design obligation relevant to the terminal's operations.

In her expert report, Goldsmith (2025, p. 33) also asserts that the NACCS framework developed by the USACE should have been adopted into the New Haven Terminal's stormwater permitting obligations under the CT DEEP MSGP. As discussed in Section 4 of this report, there is no basis in the 2018, or 2021, Connecticut MSGP, its supporting fact sheets, or any applicable regulation requiring permittees to adopt the NACCS framework.

While it is probable that CT DEEP was aware of the NACCS study (CT DEEP 2020a), the agency chose not to incorporate its assessment into the regulatory requirements of the MSGP. Moreover, no national professional association, regulatory body, or petroleum industry consortium has required the adoption of the NACCS framework for stormwater compliance. Goldsmith's interpretation imposes a forward-looking planning standard that has not been codified, endorsed, or required under the permit regime governing the New Haven Terminal.

FILED UNDER SEAL

## 11.2 EXPERT REPORT OF ROBERT NAIRN

Robert Nairn (2025) examines the causes and extents of flooding at the New Haven Terminal, including storm surge from the Atlantic Ocean, river floods, and heavy rainfall. His analysis covers flood protection adequacy for critical areas such as fuel storage tanks and ingress/egress routes during storms. Containment berm stability was evaluated by estimating the vulnerability of bare soil to erosion. Nairn's evaluation includes assumed design events for flood protection, such as the 100- and 500-year floods, and compound flooding scenarios. The findings rely on a conservative used of published data from U.S. government agencies to conduct an analysis of potential flood risks.

Nairn's primary opinions are as follows:

- The terminal is exposed to significant flood hazard under current and future conditions.

- Containment berms are likely to fail or be overtopped during design storm events.

- Ingress/egress routes are submerged during surges, thereby affecting emergency access.

- The terminal's containment and access systems are structurally inadequate and pose a high risk of pollutant release.

The flood assessment relies on the assumption that storm surge will reach the upper bound of its statistical distribution—specifically, the 95th percentile confidence level for water elevation. This approach effectively treats a low-probability, high-impact scenario as the default design condition rather than accounting for the full range of possible outcomes. Statistically, a 95th percentile value is expected to be exceeded in only 1 out of 20 modeled events for that recurrence interval (e.g., a 100-year storm event). The best industry practice for evaluation of flood risk uses the mean or median water level for the 100-year event (Table 4). Furthermore, the Nairn (2025) evaluation omits consideration of existing facility flood protections, such as tank ballasting and adaptive measures guided by site-specific risk assessments. Ignoring these factors overstates residual risk and diverges from recommended practice for federal facilities outlined by USACE (2019). While not even applicable to the New Haven Terminal, the USACE guidance promotes balanced, risk-informed design rather than reliance on extreme case scenarios alone.

The water level modeling and tank failure risk analysis in Section 10.3 shows that, while overtopping of the containment berms may occur in low-probability scenarios, the resulting water levels are insufficient to float or fail ballasted aboveground storage tanks, even in the most extreme cases. Additionally, the Defendants use robust spill containment and response protocols as discussed in Section 7. In evaluation of Nairn's opinions on berms, despite potential overtopping during the flood scenarios, the risk of failure for adequately ballasted aboveground storage tank remains negligible.

FILED UNDER SEAL

In response to Nairn's comments on ingress and egress during storm events, the Defendants' emergency response plan accounts for the fact that major coastal storms are typically forecast with several days of advance notice, as documented in Section 7.3. This lead time allows for proactive, staged implementation of onsite safety measures. Emergency protocols prioritize pre-storm containment, personnel safety, and spill prevention using onsite resources, consistent with API and EPA guidance for risk-based planning.

Nairn's assertion regarding potential berm failure is speculative and not based on any quantitative evaluation of the containment berms at the terminal. There is no evidence that the berms are "bare soil" or structurally inadequate (see Section 7.4). The terminal was inspected for its SPCC compliance in 2022, and the terminal was found to comply the applicable SPCC regulations. The claims of erosion vulnerability advanced by Nairn and Horner are unsupported by site-specific evidence, inconsistent with federal regulation, and not grounded in accepted engineering judgment. The berms and containment systems are designed per EPA requirements and have not shown any indication of structural inadequacy.

Nairn also bases his opinions on documents that are not "best industry practice" of existing bulk fuel storage terminals (Section 5). Nairn cites the ASCE 24-14 standard, which is specifically for new construction or major improvements to existing structures. Nairn also cites the Association of Floodplain Managers standards, which state that they apply to local governments to redefine flood ordinances; they are not for industries to adopt. Nairn further cites the FEMA design standards, which are also for new construction standards (and reconstruction). None of these standards are related to existing bulk fuel storage terminals, as summarized in Table 3.

By applying the standards for new structures, Nairn is rewriting the permit's requirements. The standard for BMPs specifically addresses cost and "best industry practice." It is not "best industry practice" for bulk fuel storage terminals (or any industry) to tear down existing structures and rebuild them to meet the new standards, yet this premise is a central assumption in Nairn's analysis.

Overall, Nairn presents an incomplete and overstated view of flood risk at the New Haven Terminal by focusing on statistically extreme water levels—such as 95th percentile storm surge scenarios—and berm overtopping without considering the actual risk to the aboveground storage tanks. This approach neglects key components of a risk-based assessment, including the terminal's compliance with EPA and API standards, existing containment and ballasting measures, and the multiple days of advance notice typically available for major storm events. Nairn's reliance on nonstandard water level projections and federal infrastructure benchmarks—while informative—exceeds the scope of applicable regulatory requirements. The terminal is designed and operated in compliance with the 2018 MSGP, SPCC, and FRP standards, which do not mandate the 500-year flood protection thresholds or wave overtopping criteria cited by Nairn. As detailed in this report, a technically sound climate resilience evaluation must consider not only consistent definitions of hazards, but also site-specific infrastructure, adaptive management protocols, and regulatory context. A balanced

FILED UNDER SEAL

assessment integrates these real-world factors to provide a more accurate, scientifically defensible understanding of flood risk and resilience.

## 11.3 EXPERT REPORT OF JAMES O'DONNELL

James O'Donnell (2025) provides a detailed assessment of sea level rise in the Long Island Sound region; the assessment is grounded in NOAA tide gauge data, IPCC projections, and state planning thresholds. His analysis underscores long-term trends of rising sea level due to global thermal expansion and regional land subsidence—trends that are well documented and acknowledged in the climate science literature. However, while the scientific basis for sea level rise is not in dispute, O'Donnell's conclusions about the implications for the New Haven Terminal do not fully account for the site-specific conditions, engineering controls, operational measures, and regulatory compliance measures in place.

O'Donnell's primary opinions are as follows:

- Defendants underestimated storm surge and flood risks at the New Haven Terminal by relying on outdated models and tide levels.

- The increased frequency and magnitude of compound flooding make the terminal more vulnerable than Defendants acknowledge.

In response to his first opinion, Defendants' modeling includes NOAA sea level rise projections and 500-year storm surge water levels for the region. While climate extremes are evolving, the approach here uses FEMA, NACCS, and NOAA intermediate scenarios to simulate compound storm surge and rainfall—and it also evaluates conditions that significantly exceed the most up-to-date, defensible technical standards.

In response to O'Donnell's second opinion—regarding the increased frequency and magnitude of compound flooding—Defendants have detailed response plans for various scenarios, as outlined in Section 7. While compound flooding is an increasingly recognized concern for coastal communities, it is technically improbable at the New Haven Terminal, given its characteristics. The terminal is on elevated industrial fill with direct drainage to open water, and it is not affected by significant riverine inflow (Figure 2). The modeling in this report already includes conservative assumptions for storm surge and sea level rise, and additional rainfall would not materially increase flood depth or tank failure risk due to the terminal's topographic slope.

While O'Donnell provides a detailed historical and scientific overview of sea level rise in Long Island Sound, his conclusions do not demonstrate that Defendants' New Haven Terminal is out of compliance with any applicable regulatory standard. Defendants' obligations are governed by the 2018 Connecticut MSGP, EPA's SPCC and FRP rules, and relevant API standards—not by evolving academic consensus or state-level planning thresholds. O'Donnell's assertion that Defendants "should have known" about sea level rise as early as 1987 is speculative and not

grounded in any legal or regulatory requirement in effect at that time. Moreover, while he references the 2019 planning threshold of 1.64 ft by 2050, that guidance applies to new municipal and state projects—not to existing industrial facilities operating under federal permits.

In summary, O'Donnell's report offers a comprehensive academic perspective on sea level rise trends and projections, but it does not identify any failure by Defendants to meet enforceable regulatory obligations. The terminal is designed and operated in accordance with applicable federal and state requirements, and its risk management practices are consistent with industry norms. As outlined in Sections 7 and 10 of this report, the terminal's design, maintenance, and risk management protocols are fully compliant with applicable industry and regulatory standards and demonstrate sufficient resilience to address projected sea level rise and compound storm surge events over the relevant planning horizon.

## 11.4 EXPERT REPORT OF MATHEW BARLOW

Mathew Barlow (2025) presents a regional climate analysis highlighting the increased likelihood of compound flooding from precipitation and sea level rise in southern New England. While the broader climate science is well established, his conclusions are not tailored to the physical conditions, regulatory design basis, or risk management measures specific to the New Haven Terminal. The facility is built on elevated industrial fill, features well-drained topography, and is protected by robust secondary containment systems, stormwater controls, and emergency response plans in compliance with SPCC, FRP, and MSGP requirements.

While Barlow presents a comprehensive overview of climate science and its implications for extreme precipitation and storm intensity, his conclusions are largely theoretical and do not establish that the New Haven Terminal is in violation of any applicable regulatory standard. The terminal is designed and operated in accordance with the 2018 MSGP, SPCC, and FRP requirements, which do not mandate design modifications based on speculative future climate scenarios or evolving academic assessments. Barlow's reliance on IPCC and National Climate Assessment projections—while scientifically rigorous—does not translate into enforceable obligations under current federal or state environmental regulations. Moreover, his critique of NOAA Atlas 14 as underestimating precipitation risk fails to acknowledge that it remains the prevailing standard for hydrologic design in the United States. Defendants cannot be faulted for relying on the most current regulatory guidance available at the time of or since design and operation.

While the 2026 EPA MSGP remains in proposed form and is not yet enforceable, its provisions reflect EPA's (2025c) current regulatory direction and scientific understanding. Notably, the proposed MSGP explicitly acknowledges the increasing risks posed by extreme precipitation events and directs permittees to incorporate the best available data—such as updated intensity-duration-frequency curves and NOAA's forthcoming Atlas 15 estimates—into the design of stormwater control measures. Importantly, the MSGP does not mandate Atlas 15 as

FILED UNDER SEAL

a regulatory standard but identifies it as an informational resource to support future climate-resilient infrastructure planning. This forward-looking approach directly contradicts Barlow's assertion that regulatory frameworks fail to account for evolving precipitation risks and instead demonstrates EPA's intent to align industrial stormwater management with contemporary climate science and resilience planning.

Ultimately, Barlow's critique reflects a broader climate policy perspective but does not establish a basis for noncompliance or necessary retrofits under existing permits. The terminal's site-specific infrastructure and planning measures sufficiently address foreseeable climate-driven hazards within the scope of current environmental standards.

**Opinion 29:** NOAA Atlas 14 is the prevailing standard for hydrologic design in the United States. NOAA Atlas 15 has not been adopted by EPA or CT DEEP.

## 11.5 EXPERT REPORT OF RICHARD HORNER

Richard Horner (2025) evaluated the New Haven Terminal's stormwater and containment systems, and he concludes that the facility is noncompliant with CWA requirements due to unlined containment areas, alleged groundwater impacts, and perceived deficiencies in the SWPPP. However, these conclusions are not supported by regulatory findings or site-specific engineering data. As discussed in Section 7, the terminal's secondary containment systems are constructed and maintained in accordance with EPA SPCC regulations and API standards. While the containment areas are not lined, EPA guidance does not require retroactive lining of existing containment structures, provided they minimize the potential for discharge, which the terminal's configuration achieves through inspection, maintenance, and operational controls.

Regarding Horner's critique of the terminal's SWPPP, Section 3.2 confirms that the plan was developed in accordance with the CT DEEP General Permit, includes all required elements, and is supported by ongoing compliance actions. Horner's assertion that the plan is invalid due to the age or format of its documentation is inconsistent with permit requirements and regulatory practice.

Lastly, while Horner questions the capacity of stormwater basins and bypass structures under extreme rainfall, the terminal's stormwater infrastructure—including retention basins, oil/water separators, and lift stations—meets the MSGP requirements. No data are presented to show system failure or violation of discharge standards. Moreover, as described in Sections 7.1 and 10.3.1, the broader risk management framework—supported by probabilistic modeling—demonstrates that the facility remains structurally secure and environmentally protective even under rare flood scenarios.

In summary, Horner's report critiques the terminal's stormwater infrastructure and SWPPP based on standards that are not required under the applicable Connecticut MSGP. While his recommendations—such as installing impermeable liners, upgrading treatment systems, and

FILED UNDER SEAL

incorporating climate change projections—exceed the specific obligations imposed by the MSGP and the SWPPP in effect at the time of or since CLFs NOI. The permit does not mandate impermeable containment liners, and it does not require advanced treatment technologies or climate adaptation measures. The terminal's SWPPP, including its certification and containment design, was developed in accordance with the regulatory framework in force at the time of development. Horner's conclusions do not establish that the terminal failed to meet any enforceable requirement under the MSGP or that the SWPPP was invalid under the permit's terms.

## 11.6 SUMMARY OF REBUTTALS TO CLF CLAIMS

CLF's experts propose a set of loosely defined, evolving, and subjective criteria for evaluating industrial facility resilience that depart substantially from established regulatory frameworks and best industry practice. These criteria include imposing design standards—such as 500-year flood protection and full facility hardening—that are not codified in EPA or CT DEEP regulations and are unsupported by quantitative analysis of the New Haven Terminal.

In contrast, the New Haven Terminal operates in compliance with the regulatory standards set by EPA and CT DEEP, both of which rely on the 100-year flood as the governing design threshold. These agencies have access to the same climate data cited by CLF and have chosen not to codify the 500-year flood or sea level rise adjustments in enforceable stormwater or spill prevention regulations. Both O'Donnell and Barlow affirm that the 100-year standard remains the operative threshold.

CLF is presenting a "best available practice" based on the best state-of-the-art analysis available. The distinction between "best industry practice" and the "best available practice" is critical. Best industry practice refers to widely adopted, achievable, and consistently implemented standards within the regulated sector—namely, those that regulated entities are expected to know and follow. These are not speculative or aspirational concepts derived from isolated documents or academic suggestions. State-of-the-art ideas or non-operational recommendations from non-industry actors, such as those put forward by CLF's experts, do not define best industry practice.

Importantly, there is no evidence that CLF's experts conducted any facility-specific quantitative assessment of tank vulnerability, structural integrity, or containment performance at the New Haven Terminal. Their assertions regarding catastrophic flood damage and necessary rebuilds are speculative and not grounded in fragility modeling or structural reliability analysis. In contrast, the probabilistic modeling and review presented here confirms that the terminal's tanks are resilient across all modeled scenarios and that flood conditions—even with added sea level rise—do not lead to structural failures or product release.

Attempts to redefine regulatory expectations around uncertain future sea level rise, long-range infrastructure planning, or asset design lifespans are inconsistent with the 5-year horizon of

FILED UNDER SEAL

the MSGP and stormwater permitting frameworks. EPA's 2026 draft MSGP and CT DEEP's proposed updates continue to use the term "best practice" without adopting the speculative thresholds proposed by CLF. As a result, it would be infeasible for industry to comply with CLF's moving-target standards—let alone incorporate them into enforceable permit obligations.

Finally, CLF's experts' attempt to hold the New Haven Terminal to a higher standard than other adjacent critical infrastructure—such as substations and public roads—reveals the inconsistency and impracticality of their recommendations. These expert opinions, largely divorced from operational experience and regulatory precedent, do not reflect industry consensus or enforceable standards, and they should not be used as a basis for evaluating facility compliance or liability.

FILED UNDER SEAL

# 12 REFERENCES

API. 2020. *Welded Tanks for Oil Storage*. Thirteenth edition. API Standard 650. American Petroleum Institute, Washington, DC.

API. 2021. *Tank Inspection, Repair, Alteration, and Reconstruction*. Fifth edition. API Standard 653. American Petroleum Institute, Washington, DC.

ASCE. 2014. *Flood Resistant Design and Construction.* Standard ASCE 24-14. American Society of Civil Engineers, Reston, VA. https://doi.org/10.1061/9780784413791.

ASCE. 2017. *Minimum Design Loads and Associated Criteria for Buildings and Other Structures*. Standard ASCE/SEI 7-16. American Society of Civil Engineers, Reston, VA.

ASCE. 2018. *Climate-Resilient Infrastructure: Adaptive Design and Risk Management.* MOP 140. B.M. Ayyub (ed). American Society of Civil Engineers, Committee on Adaptation to a Changing Climate, Reston, VA. https://sp360.asce.org/PersonifyEbusiness/Merchandise/Product-Details/productId/244232276.

ASCE. 2022. *Minimum Design Loads and Associated Criteria for Buildings and Other Structures*. Standard ASCE/SEI 7-22. American Society of Civil Engineers, Reston, VA.

Barlow, M. 2025. The Impact of Climate Change on Storms and Extreme Precipitation Relevant to the Shell Terminal in New Haven, Connecticut. Expert Report Prepared for the Conservation Law Foundation. May 1, 2025. CONFIDENTIAL – Produced Pursuant to Protective Order.

Bernier, C., and J.E. Padgett. 2019. Fragility and risk assessment of aboveground storage tanks subjected to concurrent surge, wave, and wind loads. *Reliability Engineering & System Safety* 191:106571. https://doi.org/10.1016/j.ress.2019.106571.

CT DEEP. 2018. General Permit for the Discharge of Stormwater Associated with Industrial Activity. Connecticut Department of Energy and Environmental Protection, Hartford, CT.

CT DEEP. 2020a. Assessment and Strategies of the Connecticut Coastal Management Program, 2021 to 205 Enhancement Cycle. Final. Connecticut Department of Energy and Environmental Protection, Land and Water Resources Division, Hartford, CT. https://portal.ct.gov/-/media/DEEP/coastal-resources/coastal_management/final-ct-section-309-coastal-management-assessment-2021-to-2025.

CT DEEP. 2020b. Sea Level Rise in Connecticut. Updated on September 25, 2020. Connecticut Department of Energy and Environmental Protection, Hartford, CT. https://portal.ct.gov/deep/coastal-resources/coastal-hazards/sea-level-rise.

FILED UNDER SEAL

CT DEEP. 2021. General Permit for the Discharge of Stormwater Associated with Industrial Activity. Document DEEP-WPED-GP-014. Connecticut Department of Energy and Environmental Protection, Bureau of Materials Management and Compliance Assurance, Water Permitting and Enforcement Division, Hartford, CT. https://portal.ct.gov/-/media/deep/permits_and_licenses/water_discharge_general_permits/stormindustgppdf.pdf.

CT DEEP. 2024. *Connecticut Stormwater Quality Manual*. Connecticut Department of Energy and Environmental Protection, Hartford, CT. September 30. https://portal.ct.gov/-/media/deep/water/water_quality_management/guidance/swm_mar_2024.pdf?rev=1dafea8e03ca4ec98f5ec011d803f4dc&hash=A49802ED8F721C491C85776C3E77CF51.

Dehghanisanij, A., N. Khakzad, E. Salzano, and P. Amyotte. 2024. Protecting oil storage tanks against floods: Natech risk assessment with imprecise probabilities. *Canadian Journal of Chemical Engineering* 102:3333-3344. https://doi.org/10.1002/cjce.25349.

Del Vasto Urueña, J.A., and C. López Pérez. 2024. NATECH Scenario Analysis: Oil Spills Triggered by the Impact of Extreme Hydrological Phenomena on Storage Tanks. Presented at the American Institute of Chemical Engineers (AIChE) 2024 Spring Meeting and 20th Global Congress on Process Safety, New Orleans, LA. https://proceedings.aiche.org/conferences/aiche-spring-meeting-and-global-congress-on-process-safety/2024/proceeding/paper/55b-analisis-de-escenario-natech-derrame-de-hidrocarburo-desencadenado-por-el-impacto-de-fenomeno.

EPA. 2013. Climate Change Adaptation Plan. U.S. Environmental Protection Agency, Washington, DC. June. https://www.epa.gov/sites/default/files/2015-08/documents/sspp2013appendices_508.pdf.

EPA. 2014. Policy Statement on Climate Change Adaptation. U.S. Environmental Protection Agency, Washington, DC. June 26. https://www.epa.gov/sites/production/files/2016-08/documents/adaptation-statement-2014.pdf.

EPA. 2016. Flood Preparedness, Recommended Best Practices. RRT6 Fact Sheet #103a. U.S. Environmental Protection Agency, Region 6 Regional Response Team, Dallas, TX. https://www.cclepc.org/docs/Flood-Prepare-fact_sheet.pdf.

EPA. 2021a. Climate Adaptation Action Plan. U.S. Environmental Protection Agency, Washington, DC. October. https://www.epa.gov/system/files/documents/2024-08/epa-climate-adaptation-plan-2021.pdf.

EPA. 2021b. National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit (MSGP) For Stormwater Discharges Associated with Industrial Activity. U.S. Environmental Protection Agency, Washington, DC. https://www.epa.gov/npdes/stormwater-discharges-industrial-activities-epas-2021-msgp.

FILED UNDER SEAL

EPA. 2024a. Facility Response Plans (FRPs) for Oil Storage and Handling Facilities. U.S. Environmental Protection Agency, Washington, DC. https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/facility-response-plan-frp-overview.

EPA. 2024b. Implementing Climate Resilience in Hazardous Waste Permitting Under the Resource Conservation and Recovery Act (RCRA). U.S. Environmental Protection Agency, Office of Resource Conservation and Recovery, Washington, DC. Retrieved from https://rcrapublic.epa.gov/files/14964.pdf.

EPA. 2024c. National Pollutant Discharge Elimination System (NPDES) Program Permitting. U.S. Environmental Protection Agency, Washington, DC. https://www.epa.gov/npdes.

EPA. 2025a. Climate Resilience Evaluation and Awareness Tool (CREAT). U.S. Environmental Protection Agency, Office of Water, Washington, DC. https://www.epa.gov/crwu/climate-resilience-evaluation-and-awareness-tool.

EPA. 2025b. EPA Region 1 Recommended Procedures and Resources for the Development of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems. U.S. Environmental Protection Agency, Region 1, Boston, MA. https://www.epa.gov/system/files/documents/2025-02/adaptation-plan-recommended-procedures-case-studies-02182025.pdf

EPA. 2025c. National Pollutant Discharge Elimination System (NPDES) Proposed 2026 Multi-Sector General Permit (MSGP) For Stormwater Discharges Associated with Industrial Activity. U.S. Environmental Protection Agency, Washington, DC. https://www.epa.gov/npdes/stormwater-discharges-industrial-activities-epas-proposed-2026-msgp.

FEMA. 2007. Design Guide for Improving Critical Facility Safety from Flooding and High Winds: Providing Protection to People and Buildings. Document FEMA 543. U.S. Department of Homeland Security, Federal Emergency Management Agency, Washington, DC. January.

FEMA. 2008. Free-of-Obstruction Requirements for Buildings Located in Coastal High Hazard Areas in Accordance with the National Flood Insurance Program. Technical Bulletin 5. U.S. Department of Homeland Security, Federal Emergency Management Agency, Washington, DC. March. https://www.fema.gov/sites/default/files/2020-07/fema_tb5_free_obstruction_requirements.pdf.

FEMA. 2011. Coastal Construction Manual, Principles and Practices of Planning, Siting, Designing, Constructing, and Maintaining Residential Buildings in Coastal Areas. Fourth edition. Document FEMA P-55. U.S. Department of Homeland Security, Federal Emergency Management Agency, Washington, DC. August. https://www.fema.gov/sites/default/files/2020-08/fema55_voli_combined.pdf.

FILED UNDER SEAL

FEMA. 2025. Risk Mapping, Assessment and Planning (Risk MAP). Updated on March 28, 2025. U.S. Department of Homeland Security, Federal Emergency Management Agency, Washington, DC. https://www.fema.gov/flood-maps/tools-resources/risk-map.

GAO. 2022. Chemical Accident Prevention, EPA Should Ensure Regulated Facilities Consider Risks from Climate Change. Document GAO-22-104494. U.S. Government Accountability Office, Washington, DC. February. https://www.gao.gov/assets/gao-22-104494.pdf.

GAO. 2024a. Hazardous Waste, EPA Should Take Additional Actions to Encourage Treatment, Storage, and Disposal Facilities to Manage Climate Risks. Document GAO-25-106253. U.S. Government Accountability Office, Washington, DC. November. https://www.gao.gov/assets/gao-25-106253.pdf.

GAO. 2024b. Hazardous Waste, EPA Should Take Additional Actions to Encourage Treatment, Storage, and Disposal Facilities to Manage Climate Risks. Data file. Document GAO-25-106253. U.S. Government Accountability Office, Washington, DC. https://www.gao.gov/products/gao-25-106253.

Ghimire, S., and S. Kameshwar. 2024. Assessing the effectiveness of regional storm surge reduction strategies and tank level structural mitigation measures for aboveground storage tanks. *Journal of Marine Science and Engineering* 12:401. https://doi.org/10.3390/jmse12030401.

Godoy, L.A. 2007. Performance of Storage Tanks in Oil Facilities Damaged by Hurricanes Katrina and Rita. *Journal of Performance of Constructed Facilities* 21(6):441–449. https://doi.org/10.1061/(ASCE)0887-3828(2007)21:6(441).

Goldsmith, W. (2025). Expert Report of Wendi Goldsmith. In Conservation Law Foundation v. Shell New Haven Terminal, Case No. 3:21-CV-00933-VDO. May 8, 2025. CONFIDENTIAL – Produced Pursuant to Protective Order.

Horner, R.R. 2025. Expert Report of Richard R. Horner, Ph.D. In Conservation Law Foundation v. Shell New Haven Terminal, Case No. 3:21-CV-00933-VDO. May 1, 2025. CONFIDENTIAL – Produced Pursuant to Protective Order.

IOGP. 2022. Guidelines for Risk-Based Decision Making in Oil and Gas Facilities. International Association of Oil and Gas Producers, London, United Kingdom.

Irving Oil Terminals Inc. (2025). Stormwater Pollution Prevention Plan – New Haven Terminal. January 2025. Prepared by Woodard & Curran, Inc. for Irving Oil Terminals Inc., New Haven, Connecticut.

FILED UNDER SEAL

ISO. 2019. *Adaptation to climate change — Principles, requirements and guidelines*. First edition. ISO 14090:2019. International Organization for Standardization, Geneva, Switzerland. https://www.iso.org/standard/68507.html.

ISO. 2021. *Adaptation to climate change — Guidelines on vulnerability, impacts and risk assessment*. First edition. Standard ISO 14091:2021. International Organization for Standardization, Geneva Switzerland. https://www.iso.org/standard/68508.html.

Jaramillo, S. (2025). Deposition of Dr. Sergio Jaramillo, May 28, 2025. United States District Court, District of Connecticut, in the matter of Conservation Law Foundation v. Shell Oil Company et al.

Kameshwar, S. 2022. Chapter 29: Flood risk assessment of storage tanks in the Port of Rotterdam. In: D. V. Rosati, C. N. Patiño and J. E. Padgett (eds.), Coastal Flood Risk Reduction. 1st ed. Elsevier, pp. 397–409. https://doi.org/10.1016/B978-0-323-85251-7.00029-9.

Kameshwar, S., and J.E. Padgett. 2018a. Fragility and Resilience Indicators for Portfolio of Oil Storage Tanks Subjected to Hurricanes. *Journal of Infrastructure Systems* 24(3):04018025. https://doi.org/10.1061/(ASCE)IS.1943-555X.0000418.

Kameshwar, S., and J.E. Padgett. 2018b. Storm surge fragility assessment of above ground storage tanks. *Structural Safety* 70:48-58. https://doi.org/10.1016/j.strusafe.2017.10.002.

Kameshwar, S., J.E. Padgett, and S. Li. 2022. Hurricane vulnerability of aboveground storage tanks in coastal Louisiana. *Coastal Structures and Port Engineering Proceedings* 2022(1):1–12. https://www.laseagrant.org/wp-content/uploads/CSAP-2022-Kameshwar.pdf.

Katopodis, T., and A. Sfetsos. 2019. A Review of Climate Change Impacts to Oil Sector Critical Services and Suggested Recommendations for Industry Uptake. *Infrastructures* 4(4):74. https://doi.org/10.3390/infrastructures4040074.

Khakzad, N., and P.V. Gelder. 2018. Vulnerability of industrial plants to flood-induced natechs: A Bayesian network approach. *Reliability Engineering and System Safety* 169:403–411. https://doi.org/10.1016/j.ress.2017.09.016.

Mia, M.M., and S. Kameshwar. 2024. Probabilistic assessment of material failure in anchored above ground storage tanks during flood events. *Engineering Structures* 301:117244. https://doi.org/10.1016/j.engstruct.2023.117244.

Nairn, R.B. 2025. Expert Report on the Shell Oil Terminal Flood Risk, Shell Oil Terminal – New Haven, Connecticut. W.F. Baird & Associates Ltd. Prepared for Conservation Law Foundation. April 30, 2025. CONFIDENTIAL – Produced Pursuant to Protective Order.

National Hurricane Center. 2023. National Hurricane Center Product Description Document: A User's Guide to Hurricane Products. Document NWS NHC PDD 01-23. U.S. Department of

FILED UNDER SEAL

Commerce, National Oceanic and Atmospheric Administration, National Weather Service, National Centers for Environmental Prediction, National Hurricane Center, University Park, FL. https://www.nhc.noaa.gov/pdf/NHC_Product_Description.pdf.

NFPA. 2024. *NFPA 30: Flammable and Combustible Liquids Code*. National Fire Protection Association, Quincy, MA. https://www.nfpa.org/codes-and-standards/nfpa-30-standard-development/30.

NOAA. 2025. Tides & Currents. Tide Station 8467150 – Bridgeport, CT. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Silver Springs, MD. https://tidesandcurrents.noaa.gov/stationhome.html?id=8467150.

NOAA Office for Coastal Management. 2024. Historical Hurricane Tracks. National Oceanic and Atmospheric Administration. Available at: https://coast.noaa.gov/hurricanes

NYSDEC. 2021. New York Multi-Sector General Permit. Permit No. GP-0-17-004. New York State Department of Environmental Conservation, Albany, NY. https://dec.ny.gov/environmental-protection/water/water-quality/stormwater/msgp.

O'Donnell, J. 2025. Expert Report of James O'Donnell, Ph.D. In Conservation Law Foundation v. Shell New Haven Terminal, Case No. 3:21-CV-00933-VDO. May 1, 2025. CONFIDENTIAL – Produced Pursuant to Protective Order.

RIDEM. 2024. Rhode Island 2024 Draft Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity. Rhode Island Department of Environmental Management, Providence, RI. https://dem.ri.gov.

Shell. 2024a. Shell Trading & Supply Distribution Operations US East Business Continuity and Storm Action Plan. Internal document. Shell Oil Company, Houston, TX.

Shell. 2024b. Climate Change Effects Vulnerability Assessment and Mitigation Plan. Internal document. Shell Oil Products US Mormon Island Terminal, Wilmington, CA.

Sweet, W.V., B.D. Hamlington, R.E. Kopp, C.P. Weaver, P.L. Barnard, D. Bekaert, et al. 2022. Global and Regional Sea Level Rise Scenarios for the United States. NOAA Technical Report NOS 01. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Silver Springs, MD. 111 pp. https://earth.gov/sealevel/us/internal_resources/756/noaa-nos-techrpt01-global-regional-SLR-scenarios-US.pdf.

Triton. 2017. Shell Oil Products US-New Haven, Connecticut Stormwater Pollution Prevention Plan. Triton Environmental, Inc., Guilford, CT.

USACE. 1996. Risk-Based Analysis for Flood Damage Reduction Studies. Manual No. 1110-2-1619. U.S. Army Corps of Engineers, Washington, DC. August 1.

FILED UNDER SEAL

https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-1619.pdf.

USACE. 2013. Incorporating Sea Level Change in Civil Works Programs. Regulation No. 1100-2-8162. United States Army Corps of Engineers, Washington, DC. December 31. https://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1100-2-8162.pdf.

USACE. 2015. North Atlantic Coast Comprehensive Study: Resilient Adaptation to Increasing Risk. Record No. 735-17c. U.S. Army Corps of Engineers, Washington, DC. https://usace.contentdm.oclc.org/digital/collection/p266001coll1/id/2793/.

USACE. 2019. Risk-Based Analysis for Flood Risk Management Studies. Regulation No. 1105-2-101. United States Army Corps of Engineers, Washington, DC. July 15. https://www.publications.usace.army.mil/Portals/76/Users/182/86/2486/ER%201105-2-101_Clean.pdf.

USACE and CT DEEP. 2020. Fairfield & New Haven Counties, Connecticut Coastal Storm Risk Management Feasibility Study: Integrated Feasibility Report & Environmental Assessment. Final. U.S. Army Corps of Engineers, North Atlantic Division, New England District Concord, MA, and Connecticut Department of Energy and Environmental Protection, Hartford, CT. October. https://erdc-library.erdc.dren.mil/items/36ca14fd-78d3-40fb-bb22-39b5428e2ab7/full?obo.page=1#p-obo.

Verlaan, P. 2025. Deposition of Paul Verlaan, March 20, 2025. United States District Court, District of Connecticut, in the matter of Conservation Law Foundation v. Shell Oil Company et al.

Witt O'Brien's. 2023. Emergency Response Action Plan: New Haven Terminal. Prepared for Triton Terminaling LLC. Witt O'Brien's, Houston, TX.

Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds). 2017. Climate Science Special Report: Fourth National Climate Assessment, Volume I. U.S. Global Change Research Program, Washington, DC. 470 pp. https://doi.org/10.7930/J0J964J6.