# Exhibit C

Page 1

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF CONNECTICUT

3

4

     --------------------------x

5    CONSERVATION LAW              :

     FOUNDATION, INC.,             :

6                                  :

              Plaintiff            :

7                                  :CASE NO.

        -versus-                   :3:21-CV-00933-VDO

8                                  :

     EQUILON ENTERPRISES LLC       :

9    d/b/a SHELL OIL PRODUCTS      :

     US, TRITON TERMINALING LLC :

10   and MOTIVE ENTERPRISES LLC,:

                                   :

11            Defendants           :

     --------------------------x

12

13

14

15   Videotaped Deposition of JOSHUA MACEY, taken

16   pursuant to Rule 30 of the Federal Rules of Civil

17   Procedure, held at the law offices of WIGGIN AND

18   DANA, LLP, One Century Tower, 265 Church Street,

19   New Haven, Connecticut, before Julia Flynn

20   Cashman, RPR, CSR and Notary Public in and for the

21   State of Connecticut, on Tuesday, September 2,

22   2025, at 9:00 a.m.

23

24

25

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

                                              Page 2

1   A P P E A R A N C E S:
2
3              ATTORNEY FOR PLAINTIFF:
4              MOTLEY RICE LLC
               One Corporate Center
5              20 Church Street, 17th Floor
               Hartford, Connecticut  06103
6              BY:  MICHAEL J. PENDELL,    ESQUIRE
                    Mpendell@motleyrice.com
7
8
               ATTORNEY FOR DEFENDANTS:
9
               KING & SPALDING
10             1180 Peachtree Street, N.E.
               Atlanta, Georgia  30309-3521
11             BY:  RYAN T. KEARNEY, ESQUIRE
                    Rkearney@kslaw.com
12
13
14        ALSO PRESENT:   Joe'l Mafrige, Esquire
                              Senior Legal Counsel
15                            Global Litigation
                              Shell USA
16                            Houston, Texas
                              (Remotely)
17
18
                          Daniel Lohaus,
19                            Videographer
                              (In person)
20
21
22
23
24
25

Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 3

1            S T I P U L A T I O N S

2

3    IT IS HEREBY STIPULATED AND AGREED by and between

4    counsel for the respective parties hereto that all

5    technicalities as to proof of the official

6    character before whom the deposition is to be

7    taken are waived.

8    IT IS FURTHER STIPULATED AND AGREED by and between

9    counsel for the respective parties hereto that the

10   reading and signing of the deposition by the

11   deponent are not waived.

12   IT IS FURTHER STIPULATED AND AGREED by and between

13   counsel for the respective parties hereto that all

14   objections, except as to form, are reserved to the

15   time of trial.

16

17                    *   *   *   *   *

18

19

20

21

22

23

24

25

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 6

1   understand what I mean when I say "CLF"?

2       A. Yes, I do.

3       Q. That case was brought in 2021 regarding

4   allegations related to defendants at the New Haven

5   fuel storage terminal.  Do you understand that

6   you've been disclosed as an expert witness to

7   testify on behalf of the plaintiff in this case?

8       A. Yes, I do.

9       Q. And do you also understand that -- strike

10  that.

11         Are you an attorney of record for CLF in

12  this case?

13      A. I am not.

14      Q. Do you understand the difference between

15  attorney of record and expert witness?

16      A. I do.

17      Q. And an expert witness may not be able

18  advocate in the same way that attorney of record

19  would be?

20      A. Correct.

21      Q. Have you appeared for a deposition before

22  today?

23      A. I have not.

24      Q. So I'll go over some brief rules for how

25  this will go.

Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 11

1    Liscow, who is a law professor at Yale Law School.

2        Q. Can you spell those last names for the

3    record, please?

4        A. L-I --

5        Q. I think you said Klass?

6        A. K-L-A-S-S.

7        Q. And Liscow?

8        A. L-I-S-C-O-W.  I actually don't remember the

9    name of the CLF person.

10       Q. You also said -- let me ask you first,

11   actually.  Do you recall the name of that lecture

12   or seminar, title?

13       A. It was something generic like Future or New

14   Directions of Environmental Law.  The Yale

15   Environmental Law Society or student group puts on

16   a conference once a year, and it was in that

17   capacity.

18       Q. Were you contacted to speak at that seminar

19   by CLF, by Yale, or by someone else?

20       A. The Yale student group.

21       Q. You also mentioned that you've sent some of

22   your students to intern at CLF over the years,

23   correct?

24       A. So I'm actually not certain about that.  It

25   is possible.  I teach Energy and Environmental Law

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 13

1      Q. Have you been disclosed as an expert witness

2   for CLF in any other case?

3      A. No.

4      Q. Have you been disclosed as an expert witness

5   in any other case with outside counsel Motley

6   Rice?

7      A. No.

Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 14

Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 15



19    Q. Is there any other purpose why you've

20    completed an expert report in this case, other

21    than to provide trial testimony?

22    A. Not that I can think of.

23    Q. So you understand that this case is about

24    the Equilon New Haven Terminal, correct?

25    A. Yes.

Joshua Macey                                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 18

1    the case, past the statute of limitations.

2        Q. Let me ask you, then, as of 2021, who was

3    the owner of the New Haven Terminal?

4        A. As of 2021, I believe Shell was the owner of

5    the New Haven Terminal.  Well, as of the 2021,

6    Triton was the owner of the New Haven Terminal.

7        Q. Let me try to clean that up.  Do you have

8    any reason to dispute that Triton Terminal Inc.

9    LLC was the owner of the New Haven Terminal as of

10   2021?

11       A. No, I do not have reason to dispute that

12   Triton was the owner as of 2021.

13       Q. And do you have any reason to dispute that

14   Triton is still the owner of the New Haven

15   Terminal --

16       A. No.

17       Q. -- as we sit here today?

18       A. No.

19       Q. Who -- and I'll start this with the 2021

20   timeframe, as you identified.  Who was the

21   operator of the New Haven Terminal as of 2021?

22       A. So I want to sort of -- I don't mean to be

23   overly academic with that question, but

24   "operator," there can be one or many operators.

25   And, you know, under the definition of an operator

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 21

1      A. So, again, I have -- I have no reason to

2   dispute that, but the documents I reviewed stopped

3   in 2021.

4      Q. Do you understand that the defendant Motiva

5   is no longer engaged in the ownership or operation

6   of the terminal?

7      A. I do.

8      Q. Do you know when defendant Motiva ceased any

9   ownership or operational role of the New Haven

10  Terminal?

11     A. I do.

12     Q. And when was that?

13     A. 2017.

14     Q. May 1st, 2017, to be precise?

15     A. I would need to, once again, review the

16  various documents, but that is my understanding.

17     Q. So do you understand that other than the

18  three companies that we just discussed, which were

19  Triton, Equilon, and Motiva, that there are no

20  additional defendants in this case?

21     A. I believe so.

22     Q. So do you understand, for example, that

23  Shell USA Incorporated is not a defendant in the

24  case?

25     A. I do.

Joshua Macey                           September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 25

1    wanted to mark it for the record.

2         I just wanted to ask you about some of the

3    other items in the Requests For Production to find

4    out if you have any of that material or not.

5         Was there any data or calculations that you

6    relied on in forming your expert report and

7    opinions in this case?

8       A. No.

9       Q. Are there any exhibits or perhaps

10   demonstratives that you already prepared that you

11   would intend to use at trial if you were to

12   testify?

13      A. No.

14      Q. Have you given all documents that you

15   believe are responsive to this Notice to

16   plaintiff's attorneys in this case?

17      A. So you asked for all of my published

18   articles, all of which are in the public domain.

19   I brought many today.  Some are in storage.  So I

20   had intended -- I had intended to go yesterday and

21   print them out, but I didn't remember it was a

22   holiday so I didn't have enough paper to print

23   them out.  So if you had like I can print them out

24   and find a way to get those to you.

25         But there were about 17 Bar Review articles

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 29

1      A. No, I did not.

2      Q. -- in preparation for today?

3      A. No.  I'll let you finish.

4      Q. We're doing okay.  You'll get in more

5   trouble with the court reporter than you will with

6   me.

7          So you are a law professor, correct?

8      A. Correct.

9      Q. At Yale University School of Law?

10     A. Correct.

11     Q. Are you actually a practicing attorney as

12   well?

13     A. I am not.

14     Q. Are you admitted to the bar in any state?

15     A. I am not.

16     Q. Have you ever sought admission to the bar in

17   any state?

18     A. I have not.

19     Q. It probably goes without saying, but you're

20   not a professional engineer, correct?

21     A. I'm not a professional engineer.

22     Q. And you're not an engineer of any kind?

23     A. No.

24     Q. Other than a law license, or a JD, we'll

25   say, do you have any other professional degrees or

Joshua Macey                        September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 30

1    certifications or licenses of any kind?

2        A. I have a Master's from the London School of

3    Economics in Political Theory.  I do not have

4    other professional certifications.

5        Q. To put it cleaner, other than educational

6    degrees, you don't have any professional

7    certifications or licenses?

8        A. Correct.

9        Q. You're not a economist?

10       A. Depends on your definition of economist.  I

11   do not have a PhD in economics.  I don't identify

12   as a economist.  I have papers in economics

13   journals, or submitted to economics journals,

14   coauthored with economists.

15       Q. You've never held yourself out as a

16   economist, fair?

17       A. You know, it's a matter of degree.  I don't

18   think of myself as an economist.  I have been

19   introduced as an economist.

20       Q. You don't have any degree in Economics?

21       A. I do not.

22       Q. You don't have any degree in Accounting at

23   any level, do you?

24       A. Nope.

25       Q. And you don't have any degree in Finance at

Joshua Macey                           September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 31

1   any level?

2      A. No degree.

3      Q. You're not a certified public accountant?

4      A. No.

5      Q. You're not a meteorologist?

6      A. No.

7      Q. This may sound silly.

8      A. I'm happy to answer.

9      Q. Just for the record.  You're not a

10  toxicologist, correct?

11     A. Correct.

12     Q. And you're not a climate scientist?

13     A. Correct.

14     Q. You're not an expert on climate change

15  attribution, correct?

16     A. Correct.

17     Q. You're not an expert on adaptation to

18  climate change?

19     A. I mean, I'm not an expert on climate change

20  adaptation, to go back to your previous question.

21  Much of my writing and research is about how legal

22  systems are relevant to climate adaptation and

23  mitigation.  So I -- again, I think it would

24  depend a little bit on what you mean by that.  But

25  there are people who would think of me as an

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 32

1    expert about that.

2        Q. Let me ask you a little more specifically.

3    You don't have any expertise from a technical

4    perspective on climate change adaptation efforts?

5        A. Can you --

6            MR. PENDELL:  Objection to form.  Go

7    ahead.

8        A. Can you explain what you mean by "technical

9    perspective"?

10       Q. An engineering, perhaps, perspective?

11       A. I do not have an engineering perspective

12   about that.

13       Q. Actions that one would take to adapt to

14   climate change.

15       A. From an engineering perspective?

16       Q. From an engineering perspective.

17       A. No.

18       Q. How about any technical perspective?

19       A. I have to understand what you mean by

20   "technical."

21       Q. It seems like you have a hang-up there.  Is

22   there anything that you believe you do have that

23   expertise in, as far as technical perspective for

24   climate adaptation?

25       A. Sure, I don't need to get us hung up too

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 33

1    much on this question.  But I have written about

2    insurance for climate change; about financial

3    products relevant to basically underwriting things

4    like counterparty credit risk for extreme events,

5    all of which are relevant to climate adaptation

6    and mitigation.  But if the focus is on

7    engineering, then no.

8       Q. Is it fair to say that any background you

9    may have on climate change adaptation would be

10   either insurance or legal perspective?

11      A. It would legal corporate governance,

12   corporate structure insurance.

13      Q. Have you ever prepared or certified a SWPPP?

14      A. No.

15      Q. Do you know what SWPPP is?

16      A. It is extremely familiar, but would you mind

17   reminding me.

18      Q. I'll state for the record that is a SWPPP is

19   a Stormwater --

20      A. Oh, yeah, yeah, yeah.

21      Q. -- Pollution Prevention Plan.

22      A. Yes, yeah, yeah, yeah.

23      Q. When you say "yeah," I want to make sure

24   you're not saying something I don't think you're

25   saying.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

1        You have never prepared or certified --

2     A. I have never prepared or certified one.

3     Q. Have you ever prepared or certified an SPCC?

4     A. No.

5     Q. Do you know what a SPCC is?

6     A. Would you remind me.

7     Q. SPCC is a Spill Prevention and

8  Countermeasures --

9     A. I have never.

10     Q. -- Control Plan.

11        Have you ever been directly employed by a

12  bulk storage facility?

13     A. No, I have not.

14     Q. Have you ever been directly employed by a

15  manufacturing facility of any kind?

16     A. No.

17     Q. Have you ever been directly employed by a

18  chemical facility of any kind?

19     A. No.

20     Q. Prior to this case, have you ever worked on

21  any projects or studies regarding bulk fuel

22  storage facilities?

23     A. No, I have not.

24     Q. Have you ever worked directly with the

25  Connecticut Department of Energy and Environmental

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 36

1    Dykes about industrial stormwater permits in the

2    state of Connecticut?

3        A.  I have not.

4        Q.  Let's talk about the other individual you

5    referenced, Josh, whose last name you're

6    unfamiliar with.  What did you speak with Josh at

7    CT DEEP about?

8        A.  Again, nothing to do with this case, nothing

9    to do with stormwater permits, nothing to do with

10   Shell.  Again, matters I would prefer not to talk

11   about.

12       Q.  Personal relationship?

13       A.  It's a personal relationship.  We have

14   spoken about electricity and the grid.  Nothing to

15   do with Shell.

16       Q.  Have you ever worked directly with the

17   Environmental Protection Agency?

18       A.  I have not.

19       Q.  If I say "EPA," I assume you understand what

20   I mean by that?

21       A.  I will.

22       Q.  Have you ever spoke when I anyone -- with

23   EPA about industrial stormwater permits?

24       A.  I have not.

25       Q.  Have you ever spoken with anyone at EPA

Joshua Macey                        September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 37

1   regarding anything to do with this case?

2       A. I have not.

3       Q. You have never worked as an inspector for

4   any government agency, correct?

5       A. I have not.

6       Q. You don't have any background in regulatory

7   enforcement with a government agency?

8       A. Nope.

9       Q. Safe to say you're not a member of the

10  American Petroleum Institute?

11      A. I am not.

12              MR. KEARNEY:  Next exhibit will be

13  Macey Exhibit 4.

14              (DEFENDANT'S EXHIBIT 4 FOR

15              IDENTIFICATION Received and Marked.)

16      Q. I'll ask you, Professor Macey, have you ever

17  seen this document before?

18      A. This all looks familiar.  Oh, is this my

19  LinkedIn page?

20      Q. I'll say for the record it's a printout of

21  your LinkedIn profile.  I'll respond this way

22  because when you print them out, they don't look

23  perhaps like they might if you access the page on

24  your phone or computer.  But do you recognize this

25  document to be an essentially a copy of the

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 38

```
 1   information that's on your LinkedIn profile?
 2      A. It looks like it.  I have not gone on my
 3   LinkedIn recently, but this -- I would expect this
 4   to be my LinkedIn, given that I never printed it
 5   out or...
 6            MR. PENDELL:  Actually, it's much nicer
 7   printed out.
 8            MR. KEARNEY:  No pictures, right?
 9      Q. You're LinkedIn profile states you attended
10   Yale University for your Bachelor's degree,
11   correct?
12      A. Correct.
13      Q. And you earned a Bachelor's degree in
14   English Language and Literature in 2012?
15      A. Correct.
16      Q. You then obtained a Master's degree in
17   Political Theory from London School of Economics
18   and Political Science in 2013?
19      A. Correct.
20      Q. And finally, you obtained a law degree from
21   Yale Law School in 2017, correct?
22      A. Correct.
23      Q. So it's just eight years ago, right?
24      A. Yeah.
25      Q. And you have never held any position as a
```

Joshua Macey                        September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 39

1    practicing attorney?

2        A. I have not.

3        Q. After law school, you worked as a law clerk

4    for Judge Harvie Wilkinson in Virginia?

5        A. Correct.

6        Q. While you clerked for Judge Wilkinson, did

7    you work on any Clean Water Act or Resource

8    Conservation Recovery Act cases?

9        A. I don't believe so, but I don't think I'm

10   supposed to talk about what I worked on while

11   clerking.  I mean, I did not, like -- I can say I

12   did not work on any Clean Water Act or any EPA

13   act.  But I am supposed to not talk about what I

14   worked on while clerking.

15       Q. Is there some rule of confidentiality that

16   protects a clerk working for a judge?

17       A. I don't -- I mean, I actually don't know if

18   there is.  But he's pretty emphatic that he wants

19   us to be discreet about that.

20       Q. I'll just state, I may ask you some

21   questions about it today, but we can mark it at

22   confidential at your request.

23           So we talked, you did not work on any CWA or

24   RCRA cases with Judge Wilkinson?

25       A. Not that I can remember.  Again, I'm not

Joshua Macey                        September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 45

1   your bio page on the Yale Law School website;
2   correct?
3       A. Correct.
4       Q. Your bio states that you're currently on
5   leave from Yale Law School for the fall of 2025,
6   correct?
7       A. Correct.
8       Q. Why are you currently on leave?
9       A. I have a six-week-old girl.
10      Q. Congratulations.
11      A. Thank you.
12      Q. Your bio also states that while you've been
13  at Yale, you've taught courses, and a list of few
14  of them, I'll just ask you to confirm.  Advanced
15  State and Federal Electricity Law, --
16      A. Yes.
17      Q. -- correct?  Energy Law and Electricity?
18      A. Yes.
19      Q. Just so we're on the same page, was that a
20  course focused on electrical utility companies?
21      A. It's a course on public utilities, the
22  regulation of the grid, the natural gas system,
23  pipeline companies; how we regulate oil, gas and
24  electricity.
25      Q. So was part of that course regarding the

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 46

1    regulation of bulk fuel storage facilities?

2        A. No.

3        Q. Is it fair to say that no aspect of your

4    Energy Law and Electricity course at Yale covered

5    a bulk fuel storage facility like the New Haven

6    Terminal?

7        A. My course at Yale Law School did not cover

8    bulk fuel storage facilities.  The reason I

9    clarify that is I taught energy four times at

10   Chicago, and there was in their -- under the -- I

11   think under the Trump's first administration,

12   there was an interesting FERC case involving an

13   export facility for liquified natural gas, which I

14   taught one year at the University of Chicago.

15       Q. For the record when you say "FERC," can you

16   explain what that is?

17       A. The federal Energy Regulatory Commission.

18       Q. I think you said that that regarded

19   liquified natural gas storage?

20       A. It regarded -- the interesting question is

21   whether FERC has jurisdiction to regulate

22   liquified natural gas export facilities.  Because

23   there's an interesting question in the Federal

24   Natural Gas Act about does it have to be coming

25   into the US or in the US.

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 47

1    Q. So other than the jurisdictional ability to

2    regulate a liquified natural gas facility, under

3    the case you mentioned, was there any other aspect

4    of that course that discussed bulk fuel storage

5    facilities?

6    A. No.  The course -- the gas portion of the

7    class is focused on FERC's major restructuring --

8    (inaudible).

9                (The reporter asked for clarification)

10   A. FERC's major restructuring order.  So FERC's

11   authority to regulate the transportation of gas in

12   domestic markets.

13   Q. Have you ever taught any course regarding

14   industrial stormwater permits of any kind?

15   A. No.

16   Q. You also taught a course at Yale Law School

17   called Public Utility Law (Energy), correct?

18   A. So I'm interested -- I will be teaching --

19   oh, I did so, okay.  It's interesting.  I have

20   taught Public Utility Law.  Advanced State and

21   Federal Electricity Law, I'm scheduled to teach in

22   the spring.  But --

23   Q. What was that?

24   A. Advanced State and Federal Electricity Law,

25   I will be teaching in the spring of 2026.  So the

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 49

1   Yale.

2       Q. You have not taught any courses as a

3   professor at any law school on the subject of

4   Ethics, correct?

5       A. I have not taught any courses on Ethics.

6       Q. You have not taught any courses on Civil

7   Procedure?

8       A. Oh, no.

9       Q. You have not taught any course, then, on

10  Evidence?

11      A. No.

12              MR. KEARNEY:  This will be Macey

13  Exhibit 6.

14              (DEFENDANT'S EXHIBIT 6 FOR

15              IDENTIFICATION Received and Marked.)

16      Q. Professor Macey, have you ever seen this

17  document before?

18      A. Yes, I have.

19      Q. What do you recognize it to be?

20      A. This is my CV.

21      Q. This is, for the record, a copy of your

22  curriculum vitae that was provided with your

23  initial expert report in this case.  And I'll ask

24  you, does this CV, is it current, is it up to

25  date?

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 61

1    in preparing your expert opinions?

2        A. Correct.

3        Q. So looking at these lists, it appears you

4    have not reviewed any of the permits or permit

5    documents for the New Haven Terminal.

6        A. Correct.

7        Q. You have not reviewed the EPA Multisector

8    General Permit.

9        A. Correct.

10       Q. Do you know what that is?

11       A. No, I do not.

12       Q. You agree that your list of materials

13   considered for this case, this case, does not

14   contain the 2018 permit that was in effect for the

15   New Haven Terminal at that time, correct?

16       A. Correct.

17       Q. Or the 2021 permit, which is the current

18   permit in place for the terminal, correct?

19       A. Correct.

20       Q. You have not reviewed the draft permit that

21   CT DEEP has published in 2024 and 2025, correct?

22       A. Correct.

23       Q. You have not reviewed the SWPPP in place for

24   the New Haven Terminal?

25       A. Correct.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 62

1              MR. KEARNEY:  For the record, SWPPP is

2     S-W-P-P-P.

3        Q. You have not reviewed the SPCC that is in

4     place for the New Haven Terminal, correct?

5        A. What does "SPCC" stand for?

6        Q. We talked about that earlier, Spill

7     Prevention Control Countermeasures.

8        A. Correct.

9        Q. You have not reviewed that?

10       A. I have not.

11       Q. And you're not offering any opinion about

12    those documents we discussed in this case,

13    correct?

14       A. I would -- I assume it depends what you mean

15    by "opinion about those documents."  I don't --

16    but if you could clarify, I think I understand.

17       Q. So with the premise that you have not

18    reviewed those documents, you're not offering any

19    opinion in this case about what those documents

20    say or don't say, correct?

21       A. So I did review documents in which

22    individuals -- and I'd want to go back and look at

23    them -- mentioned in emails, for example, about

24    who was listed as the owner or operator on the

25    permit.  And so I, based on my review of those

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 63

1   documents, do have an opinion about that specific

2   question.

3       Q. Having not reviewed the permits themselves,

4   you're not going to offer an opinion in this case

5   that defendants are currently in violation of any

6   of the provisions of those permits, correct?

7       A. My -- that seems like, again, a legal

8   conclusion.  And so my -- the way that I

9   understand my role here is not to provide a legal

10  conclusion about whether the defendants are in

11  fact in violation of the permits.

12      Q. Whether or not it's a legal conclusion, it's

13  not an opinion that you're offering, correct?

14      A. I do not have an opinion about that.

15      Q. So you're not offering an opinion that

16  defendants are currently in violation of the Clean

17  Water Act?

18      A. I am not offering an opinion about that.

19  Sorry.

20      Q. Sure.

Page 64

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████

5      Q. Pretty sure we're talking about the same

6   thing here.  Let's just put it very generally,

7   right?  There's a side of the case that might be

8   considered liability and side of the case that

9   might be considered damages, right?

10     A. Yep.

11     Q. If anything, --

12     A. Yep.

13     Q. -- your opinion would be about penalties

14   under the damages phase of the case.

15     A. Correct.

16     Q. You're not offering any opinion about the

17   liability phase of the case.

18     A. Correct.

19     Q. The only deposition that you've considered

20   in forming your opinions in this case is the

21   February 6, 2025 rule 30(b)(6) deposition of Brian

22   Evans, correct?

23     A. I'd have to review what I cited in my

24   report, which I'm happy to do now.  But I take

25   your word for that.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 66

```
 1              MR. KEARNEY:  For the record, that's
 2   J-A-R-A-M-I-L-L-O.
 3      Q. And you have not reviewed any of the
 4   deposition testimony, Professor Macey, of Paul
 5   Verlaan?
 6      A. I -- no.
 7              MR. KEARNEY:  And for the record,
 8   that's V-E-R-L-A-A-N.
 9      Q. Professor Macey, you've also not reviewed
10   the deposition testimony of James Kent Yeates?
11      A. No.
12              MR. KEARNEY:  And for the record,
13   that's Y-E-A-T-E-S.
14      Q. And Professor Macey, you've not reviewed the
15   rule 30(b)(6) deposition testimony of the
16   plaintiff in this case, Conservation Law
17   Foundation, correct?
18      A. Correct.
19      Q. You have not reviewed any Declaration of an
20   employee within the Shell group of companies that
21   was submitted in this case either, correct?
22      A. Correct.
23      Q. Did you ask for any additional information
24   or materials that were not provided to you in your
25   review of the materials for this case?
```

Joshua Macey                                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 67

1      A. I did.

2      Q. What documents, if any, did you ask for that

3   you were not able to obtain?

4      A. I was -- well, I asked -- I did not ask for

5   specific documents.  I told the attorneys from

6   Motley Rice that these are the kinds of documents

7   that would be useful for my report.  They then

8   sent me a list of a bunch of documents.  After

9   reviewing those documents, I sent description of

10  other types of documents that would be useful.

11  They sent me those documents.  I reviewed those.

12  I think that happened one more time.  And on the

13  basis of the documents they furnished in response

14  to my description of the kinds of documents that

15  would be useful, I prepared my report.

16     Q. So what I'm getting at, is there any

17  document that you believe is out there that you

18  haven't seen that you think would impact your

19  ultimate opinions in this case?

20            MR. PENDELL:  Objection to form.  Go

21  ahead.

22     A. I submitted a request for all of the kinds

23  of documents that would be useful to me in

24  understanding the types of relationships between

25  various Shell subsidiaries and affiliates.  On the

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 72

1   express an opinion in the report I authored about

2   that question.

3       Q. So maybe a more straightforward question on

4   this.  You're not offering an opinion in this case

5   that any party, other than the defendants that are

6   in the case, owned, operated, participated -- or

7   participated in or controlled the New Haven

8   Terminal?

9       A. That is correct.

10      Q. And you agree that Motiva no longer owns or

11  operates the New Haven Terminal, correct?

12      A. Correct.

13      Q. And they have not done so since May 1st of

14  2017?

15      A. Again, I am pretty sure I trust you on the

16  May 1st question.  When I reviewed the documents

17  that were -- the transition took a few months,

18  but, correct, --

19      Q. Certainly --

20      A. -- preceding that.

21      Q. Certainly you agree that at least 2017 would

22  be the correct date?

23      A. 2017 would be the correct year.  I'm sorry,

24  slow down, don't interrupt.

25      Q. I'll slow down as well.  I'm sure that will

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 73

1    make the court reporter very happy with both of

2    us.

3         This may go without saying, but you're not

4    offering any opinion that Motiva still

5    participates in any way in the operation of the

6    New Haven Terminal today, are you?

7         A. I don't -- I do not -- did not express an

8    opinion that Motiva continues to participate in

9    the operation of the terminal today.

10        Q. And are you not offering that opinion in

11   this case?

12        A. Correct.

13        Q. You're not offering an opinion in this case

14   that Motiva still controls the New Haven Terminal

15   today, correct?

16        A. Correct.

17        Q. You're not offering any opinion that Shell

18   USA Incorporated owned or operated the New Haven

19   terminal at any time, correct?

20        A. Given who the named defendants are in this

21   case, I'm not offering that opinion.

22        Q. You're not offering any opinion that Shell

23   PLC owned or operated the New Haven Terminal at

24   any time either?

25        A. Again, same answer as previously.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 87

1   inherently wrong with those benefits of a

2   vertically integrated company?

3       A. Well-managed vertical integration is

4   something we should celebrate.

5       Q. In fact, those benefits are generally good

6   things that are provided to a company and its

7   shareholders?

8       A. Good for the company, shareholders and the

9   world economy.

10      Q. Is it also common for a parent company to

11  install a board of directors to manage its

12  subsidiaries?

13      A. Yes.

14      Q. Nothing inherently wrong with that, right?

15      A. Nothing inherently wrong about that.

16      Q. In fact, do you recognize the parent

17  company's management of subsidiaries in this

18  fashion is often a good thing?

19      A. Absolutely.

20      Q. This type of corporate structure allows the

21  parent company to ensure that its companywide

22  policies are adhered to?

23      A. So adhere --

24      Q. Still talking about in general.

25      A. Talking about in general, this is how

Joshua Macey                                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 93

1     Q. Motive no longer shares any parent or
2   subsidiary with any company within the Shell group
3   of companies, does it?
4     A. No.  I trust that after the period I
5   reviewed, nothing happened; but yeah.

Page 95



21          MR. KEARNEY:  I think this is a good

22     time to take a break, if that's okay.

23          THE VIDEOGRAPHER:  We are now going off

24     the record.  The time is 10:53 a.m.

25          (R E C E S S)

Joshua Macey                                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 98

1    veil, correct?

2        A. Correct.

3        Q. You agree that holding a parent liable for

4    the actions or losses of its subsidiary is the

5    exception, not the rule, correct?

6        A. As a default rule, parents are not held

7    liable for the actions of subsidiary.  Absolutely.

8        Q. That is because the limited liability role

9    for this type of corporate structure is an

10   important protection that's provided to

11   shareholders of a parent company.

12       A. It's because limited liability is one of the

13   greatest inventions of western civilization; and

14   absolutely, yeah.

15       Q. And it's an important protection that

16   shareholders have?

17       A. Yes, there are many economic arguments

18   suggesting that growth, huge economic growth,

19   beginning in the 19th Century, is tied to the

20   invention of limited liability.

21       Q. And it takes a court to find that the

22   typical role of limited liability should not be

23   applied in a particular case, correct?

24       A. That, in a particular case, that question is

25   a legal question.  That is, yes, absolutely.

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 99

1     Q. And it would take the court to decide that

2   legal question, right?

3     A. Yes.

4     Q. And that is something that a judge would

5   have to decide, fair?

6     A. Fair.

7     Q. You're not advocating to the court to

8   actually toss aside the limited liability

9   protections of Shell's holders in this case, are

10   you?

23     Q. I just want to make sure we're on the same

24   page.  You're not offering an opinion that Shell

25   USA Incorporated or Shell PLC, for that matter,

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 100

1   should be held liability as a direct operator of

2   the New Haven Terminal, are you?

3       A. In my report, I do not express an opinion --

4   you said Shell PLC and what was the other entity?

5       Q. Or Shell USA Incorporated.

6       A. Correct.

7       Q. Correct, you are not offering that opinion?

8       A. I am not offering that opinion.

9       Q. That would be an example of what we've been

10  referring to previously as advocacy, wouldn't it?

11      A. That would.

12      Q. And you're aware that plaintiff has already

13  voluntarily dismissed its claims against all

14  defendants except Triton, Equilon and Motiva?

15      A. Correct.

16      Q. So plaintiff has already voluntarily

17  dismissed its claims against Shell USA

18  Incorporated with prejudice in this case, correct?

19      A. Correct.

20      Q. And plaintiff has already dismissed its

21  claims against Shell Petroleum Incorporated with

22  prejudice in this case.

23      A. Correct.

24      Q. Now, each of the remaining defendants,

25  Triton, Equilon, and Motiva, have actually served

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 120



Joshua Macey                                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com



Page 121

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 140

1      Q. I just want to direct -- before I do that,

2   let me ask you, this document does not make a

3   single reference to the New Haven Terminal either,

4   does it?

5      A. I believe you.

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 146

1    possible someone at Shell has also reviewed it.

2    But I reviewed a significant number of documents

3    with that particular question in mind, such that a

4    comparative assessment would involve -- we'd have

5    to have a test or something.

6        Q. Okay, I want to look at some documents that

7    discuss this.  And this will be Macey Exhibit 14.

8                (DEFENDANT'S EXHIBIT 14 FOR

9                IDENTIFICATION, Received and Marked.)

10       Q. We discussed earlier in the deposition that

11   you did not review any Declaration submitted by

12   the defendants in this case, right?

13       A. Correct.

14       Q. I'll represent for the record that this is a

15   Declaration of James Kent Yeates submitted in this

16   action pending in the District of Connecticut,

17   signed September 9, 2022.

18       And I'll just ask you, you haven't seen this

19   document before, correct?

20       A. No, I have not.

21       Q. Do you see, on the very first page, the

22   first paragraph -- actually, let me back up for a

23   moment before I do this.

24       You're an attorney.  Do you understand what

25   a Declaration is in this context?

Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 147

1      A. I do.  I'm not an attorney, but I --

2      Q. That's correct, you have a JD.

3      A. I have a JD.

4      Q. Do you understand what a Declaration is in

5    this context?

6      A. Yes.

7      Q. In another context, perhaps it might be

8    referred to as an affidavit.

9      A. Yep.

10      Q. It's something someone submits under penalty

11    of perjury, testifying everything they include is

12    accurate to the best of their knowledge; correct?

13      A. Correct.

14      Q. Similar to what you're doing here today in

15    the deposition.

16      A. Correct.

17      Q. So let's turn back to what this document

18    says in the very first page.

19        It says "My name is James Kent Yeates.  I am

20    the lead facility engineer for the east coast

21    Equilon terminals, which includes the bulk

22    petroleum distribution and storage terminal

23    located in New Haven, Connecticut that is owned by

24    Triton Terminaling LLC and operated by Equilon

25    Enterprises LLC."

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 151

1    Equilon entities or operational control may be --
2    in which I would quibble with that.
3        Q. Do you agree that defendants have multiple
4    facilities located in different areas of the
5    country that do different business activities,
6    generally speaking?
7        A. I agree with that.
8        Q. And do those facilities have unique
9    operational risks, for example, based on the
10   location at which they operate?
11       A. I haven't reviewed the other ones.  It would
12   not be surprising to me if, for example, hurricane
13   risk is different.
14       Q. For example, there may be site specific
15   factors to operating a facility that operates with
16   one business purpose versus a different facility
17   that has a different business purpose; fair
18   enough?
19       A. So that's a little outside my area of
20   expertise.  And I don't really have a view.  I
21   mean, speaking in the abstract, I can imagine that
22   that is true.  But I haven't reviewed the other
23   terminals, nor am I an expert on things like
24   hurricane mitigation risk.
25       Q. Do you agree that regulations may be

Joshua Macey                                                      September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 168

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 169



Joshua Macey                              September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 194

1      A.  I have not.

2      Q.  Would that have been relevant to your points

3    in this case?

4           MR. PENDELL:   Objection to form.

5      A.  Again, I would need to look at the

6    deposition.

23     Q.  And you haven't reviewed the SEAM standards

24   either?

25     A.  I have not.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 195

1      Q. So your expert reports obviously do not

2   offer any opinions regarding SEAM standards,

3   Hurricane Action Plan or the Business Continuity

4   Plan, right?  Because you haven't reviewed them?

5      A. I don't think I reviewed this Hurricane

6   Action Plan.  I reviewed some hurricane stuff, but

7   I don't think this is the one.  But we'd have to

8   look back.

9      Q. In any event, my question still stands:

10  You're not offering any opinions about those

11  documents in this case?

12     A. Correct.

25     Q. Put this document aside.

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 213

1    the terminals he worked on, whether DEPs applied

2    or not.  And he absolutely mentioned the New Haven

3    terminal.

4         Given what I take to be the possibility of

5    an inconsistency here, it just seems know that I

6    would want to understand what he is testifying

7    about, what his responsibility was for Shell, and

8    how it compares to the second testimony that we

9    just looked at.  But I don't think we're

10   disagreeing, really, here.

11       Q. And to be sure, you are and never been

12   employed by any company within the Shell group of

13   companies; correct?

14       A. Correct.

15       Q. And these DEPs are internal documents

16   created within the Shell group of companies;

17   correct?

18       A. Correct.

19       Q. In other words, they're not external

20   regulations created by any government agency like

21   the EPA or CT DEEP?

22       A. Correct.

23       Q. Or Congress, --

24       A. Correct.

25       Q. -- right?  So we agree that employees within

Joshua Macey                    September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 232

1            MR. PENDELL:  I'm sorry, can you -- I
2      didn't hear that question.
3            MR. KEARNEY:  Sure.  For the record,
4      we're just going to get the door.
5         Q. So my question is, do you agree that Shell
6      PLC's balance sheet has nothing to do with whether
7      the defendants are in compliance with the permit
8      requirements that are in place at the New Haven
9      Terminal?
10        A. You're asking about liability, not damages,
11     right?
12        Q. That's right.
13        A. Then correct.
14        Q. Same questions for, for example, Shell PLC's
15     income before taxation.  Does that have anything
16     to would with whether or not defendants are in
17     compliance with the permit requirements?
18        A. No, I don't think so.
19        Q. How about Shell PLC's profitability in
20     general?
21        A. The question of is Shell complying with the
22     Clean Water Act and RCRA -- not is Shell.  Is
23     Motiva or Equilon or Triton complying with the
24     Clean Water Act or RCRA.  Shell's balance sheet is
25     not relevant to the question of liability.

Joshua Macey                           September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 242

1    that.  I don't mean that.

2         Did you endeavor to take, after looking at

3    the corporate documents in this case to understand

4    the corporate structure, did you then endeavor to

5    take that analysis and apply the Bestfoods

6    standard to make a determination as to whether or

7    not it met the Bestfoods standard?

8              MR. KEARNEY:  Objection to form.

9      A. I did not make -- I described the facts as I

10   would think that someone would find them to be

11   relevant or useful, but I did not apply the

12   Bestfoods standard to these facts.

25        Q. Do you have any other case as we sit here

Page 256

1    about operation control?

2        A. So that's consistent with the documents I

3    read, which formally outline the fact that

4    decision -- compliance above certain dollar

5    amounts had to be approved by different entities,

6    including Shell T&S. It, again, suggests to me

7    other entities are heavily involved in the

8    operational decisions of the terminal.

9                MR. PENDELL:  I have nothing further.

10               MR. KEARNEY:  A little bit of a

11   ping-pong going back and forth here.

12               MR. PENDELL:  I'm going to have to have

13   the last word, so --

14               MR. KEARNEY:  You may, you may.

15   FURTHER REDIRECT EXAMINATION

16   BY MR. KEARNEY:

17       Q. The rule that was referenced about certain

18   individuals having certain spending authority at

19   the terminal that was just referenced, do you

20   agree that it is common among all kinds of

21   companies that certain individuals have a certain

22   spending authority that is assigned to them to

23   make improvements at any facility?

24       A. Again, it is common to exercise supervision.

25   It is common to be able to oversee and possibly

Page 257

1    approve or veto certain spending decisions.  And

2    so the question of whether those other entities

3    exercise operational control gets to does this get

4    at the day-to-day things, is it the major issues.

5    So again, it's a case specific inquiry that we've

6    been getting at.

7        Q. So what I'm getting at, I guess, is it would

8    not be unusual for a certain individual, a certain

9    individual at any company, to have spending

10   authority of let's say a million dollars, and then

11   if you want to spend between a million and some

12   other number, you got to go to somebody else.

13   That's not unusual, is it?

14       A. That fact is not unusual and for the

15   question of operator, is someone and operator,

16   it's going to depend on the specifics of the case,

17   yes.

18              MR. KEARNEY:  Those are all the

19   questions I have.  If Mr. Pendell would like the

20   last word, it may be his.

21   FURTHER RECROSS-EXAMINATION

22   BY MR. PENDELL:

23       Q. Let me just ask you this question to

24   summarize.  Is it fair to say no one data point is

25   determinative as to the analysis of who had