# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CONNECTICUT
 3   ------------------------------
 4   CONSERVATION LAW FOUNDATION,
 5   INC.,
 6              Plaintiff,
 7   V.                              Civil Action No.
 8   SHELL OIL COMPANY, EQUILON      3:21-cv-00933-VDO
 9   ENTERPRISES LLC D/B/A SHELL
10   OIL PRODUCTS US, SHELL
11   PETROLEUM, INC., TRITON
12   TERMINALING LLC, and MOTIVA
13   ENTERPRISES LLC,
14              Defendants.
15   ---------------------------
16
17
18      REMOTE VIDEO-RECORDED EXPERT DEPOSITION OF
19                  DAVID M. UHLMANN
20            Friday, September 12, 2025
21                  9:15 PM EST
22
23   Job No. MDLG7585638
24   Reported by:  Denise Dobner Vickery, CRR, RMR
```

Friday, September 12, 2025

9:15 PM EST

Remote Video-Recorded Expert Deposition of DAVID M. UHLMANN, held in the location of the witness in Washington, DC.

Pursuant to notice, before Denise Dobner Vickery, Certified Realtime Reporter, Registered Merit Reporter, and Notary Public in and for the District of Columbia.

Page 27

1  you brought with you today, the only document?
2        A.    That's the only document I have with
3  me.  Yes, sir.
4        Q.    Yeah.  And can you confirm that all
5  of the opinions that you are offering in this
6  matter are contained in your expert report?
7        A.    I can confirm that all the opinions
8  that I offered in the expert witness report are in
9  my expert report, but I may offer opinions today
10 that -- that go beyond what's in the report,
11 depending on what you ask me and what
12 Mr. Henderson asks me.
13       Q.    Are you here testifying on behalf of
14 the Environmental Protection Agency today?
15       A.    I am not.
16       Q.    Are you here today testifying on
17 behalf of the United States Department of Justice?
18       A.    I am not.
19       Q.    In providing the opinions in your
20 expert report, did you utilize information
21 obtained or developed in the course of your work
22 at the Environmental Protection Agency?
23       A.    Sir, I worked at the Environmental
24 Protection Agency for -- for 25 months.  So, you

Page 56

1  For some reason, Tennessee or the Western District
2  of Tennessee jumps out.  I just remember that, and
3  I -- and, of course, I know because I'm currently
4  practicing there that I'm admitted in the Western
5  District of Michigan.
6       Q.    Are you admitted to any -- to
7  practice before any appellate -- federal appellate
8  courts?
9       A.    Yes.
10      Q.    Which ones?
11      A.    I don't know whether these are --
12 you know, I don't know what happens to these.  I
13 mean, again, this dates to when I was at the
14 Justice Department.  So I don't know if they are
15 forever.
16            But I was during my Justice
17 Department tenure admitted to practice in the
18 Sixth Circuit, in the Eighth Circuit, in the Ninth
19 Circuit, may have been others, but those are the
20 three that I remember arguing -- where I remember
21 arguing appeals.
22      Q.    Okay.  Thank you.
23      A.    You're welcome.
24      Q.    Do you have any advanced degrees

Page 57

```
 1   other than your law degree?
 2          A.      I do not.
 3          Q.      Are you an engineer?
 4          A.      I am not.
 5          Q.      So you're not a licensed
 6   Professional Engineer in the State of Connecticut?
 7          A.      I am not.
 8          Q.      Are you a hydrologist?
 9          A.      I am not.
10          Q.      Are you an environmental modeling
11   professional?
12          A.      I mean, you know, it's interesting
13   that you're asking about.  These are all people I
14   worked with at EPA, but I'm not a modeling
15   professional, no.
16          Q.      Are you an expert in assessing the
17   fate and transport of pollutants?
18          A.      That's a strange question.
19                  Can you define what you mean by
20   expert in the fate of -- of storage --
21          Q.      I take it from your question that
22   you don't understand the use of that terminology;
23   is that correct?
24          A.      Oh, I understand those terms,
```

Page 58

1  Mr. Kilian.  I just don't understand what you mean
2  by your question.  I'm sorry.
3       Q.     Okay.  Have you ever hired an expert
4  to address the fate and transport of pollutants in
5  the environment?
6       A.     I mean, my goodness, we've had in
7  our cases had expert witnesses about that question
8  a lot.  I just, you know, I -- I think any of us
9  who work on environmental cases have to have a
10 fair amount of expertise on the -- on the question
11 that you're asking about, what happens to
12 pollutants in the environment.
13            I assume you have expertise on that.
14 I assume Mr. Henderson does.  I would say I do as
15 well, but -- but I've never been an expert witness
16 on that question, if that helps.
17      Q.     Do you feel that you're qualified to
18 be an expert witness on that question?
19      A.     You know, it's a topic I know a lot
20 about.  I don't know that I would.
21            I would -- I would want to have
22 scientific background to testify as an expert
23 about it, but, again, expert is a term, you know,
24 is a term with different meanings.

Page 59

1    It's certainly within my area of
2    expertise, the question, but it's not -- I don't
3    know that it's something I would want to -- I
4    wouldn't do -- I wouldn't do an expert witness
5    report about that question unless it was at a very
6    high 30,000-foot level.
7        Q.    And I take it you never have to date
8    provided an expert report on that question,
9    correct?
10       A.    That's correct.
11       Q.    Have you ever provided an export
12   -- expert opinion addressing flooding?
13       A.    No, I have not.
14       Q.    Have you -- are you a
15   hydrogeologist?
16       A.    I am not.
17       Q.    Are you a toxicologist?
18       A.    I am not.
19       Q.    Are you a stormwater professional?
20       A.    I am not.
21       Q.    Are you a risk assessment --
22   environmental risk assessment professional?
23       A.    I'm just going to interrupt and say,
24   I mean, I'm a lawyer.  In the course of my legal

Page 60

1  career, I have worked with all the types of people
2  that you're talking about and part of what I've
3  had to do is assimilate the information that they
4  provide me and figure out what to do, particularly
5  in enforcement matters -- actually specifically in
6  enforcement matters -- with that information.
7           But I am not -- I am not an expert
8  in the expert witness sense of the term in any
9  scientific field or other area that requires
10 advanced training, which I don't have.
11      Q.      Thank you.
12              So back to my question.
13              You're not an environmental risk
14 assessment professional, correct?
15                   MR. HENDERSON:  Object to the
16         form of the question.
17                   THE WITNESS:  Yeah, I just --
18         I mean, I'm under oath, sir, you're not,
19         and -- and I'm trying to be very careful
20         about my answers because of that.
21                   My work and your work involves
22         environmental risk assessment quite
23         often.  So in that sense of the term,
24         absolutely.  But I think you mean

1                MR. KILIAN:  I'm not taking a
2         break right now.
3                MR. HENDERSON:  We're going
4         for an hour, more than an hour.  So I
5         would like --
6                MR. KILIAN:  I'm not taking a
7         break right now, Doug.  I want to get
8         back to my questions.
9    BY MR. KILIAN:
10        Q.     Are you a Certified Environmental
11   Risk Assessment Manager?
12               MR. HENDERSON:  I have --
13         okay.  The way the rules work, you've
14         asked the question.  After he responds to
15         that question, we can take a break.
16               Go ahead.
17               MR. KILIAN:  I'm almost done
18         with this section of my questioning, so I
19         want to keep going for another couple
20         minutes.
21   BY MR. KILIAN:
22        Q.     Are you a Certified Environmental
23   Risk Assessment Manager?
24               MR. HENDERSON:  Object to the

Page 65

```
 1            form of the question.
 2                      THE WITNESS:  I am not a
 3       certified -- not certified in whatever
 4       you said.  I'm sorry.  There's a lot of
 5       back-and-forth here.
 6  BY MR. KILIAN:
 7       Q.      Are you aware that there is a
 8  certification for environmental risk assessment
 9  managers available?
10                      MR. HENDERSON:  Object to the
11       form of the question.
12                      THE WITNESS:  I mean, I'm
13       aware generally that certifications are
14       available in any number of environmental,
15       yes.
16  BY MR. KILIAN:
17       Q.      Are you an economist?
18       A.      I am not an economist.
19       Q.      Are you a hazardous waste manager?
20                      MR. HENDERSON:  Object to the
21       form of the question.
22                      THE WITNESS:  I'm not a
23       hazardous waste manager.
24  BY MR. KILIAN:
```

Page 205

1  rate that was paid to an expert in a case that you
2  tried in the past?
3         A.      I'm sorry, Mr. Kilian, I don't -- I
4  don't remember how much the experts in our cases
5  charged.
6                 I do remember one fabulous
7  toxicologist who charged us nothing because it was
8  the Justice Department and he believed in our
9  case, and he told me that he was -- he would make
10 up for it in the private party litigation he
11 handled where he'd be charging a whole lot more.
12                So, you know, I know that people --
13 people's rates are all over the place.  There's a
14 wide -- wide range of rates, but I'm confident
15 saying that the experts we retained when I was at
16 the Justice Department weren't making $2,250 per
17 hour.  We just -- we didn't have that kind of
18 budget.



Page 214

1    A.    So one was an attorney named Daniel
2  Mulvihill -- and for the court reporter, that's
3  M-u-l-v-i-h-i-l-l -- who Dan is a partner in our
4  New York office and he is a former Assistant
5  Attorney General in the State of New York, and I
6  believe also may have worked at one point as an
7  attorney for New York City.
8              And then the second attorney is an
9  attorney named Michael Smith.  Michael is an
10 associate in our Seattle office, and he's
11 relatively new to private practice, year or two,
12 after clerking for federal judge.
13    Q.    Can you describe what
14 Mr. Mulvihill's substantive role was in assisting
15 you in preparing the report that -- the expert
16 report that you've provided in this matter?
17    A.    Just sort of in the interest of time
18 because I know you were concerned about that, it
19 might -- I mean, I might describe the work that
20 Dan and Michael did together and just say that Dan
21 was the more senior of the two.
22              So if there was, you know, there
23 were times when Dan did review of work that
24 Michael had done, but maybe I could just describe

Page 215

1  to you what they together did for me.
2      Q.    Sure.
3      A.    I mean, I'll do -- I'll do this
4  however you want.  I just thought that might --
5  just because that's the reality of how it worked,
6  that might be easier.
7      Q.    Go ahead.
8      A.    Okay.  So I thought it made sense
9  just in terms of managing the costs of this
10 project and also just in terms of balancing the
11 demands on my time, I thought it made sense to
12 have other lawyers with -- with far lower rates do
13 the initial document review and identify for me
14 which documents and ideally which sections of
15 documents I needed to also review.
16           I also -- so that's one of the
17 things that they did, and both of them did.
18 Although Michael did the largest percentage of
19 that because his rate is the lowest, but Dan
20 reviewed a lot of material as well.  They did
21 subdividing and conquering.  There's a lot of
22 material in this case, as you're aware.
23           But the two of them did the initial
24 cut on -- on the documents, and then the two of

Page 216

1   them were my sounding boards for sort of thinking
2   through and talking through the issues I thought
3   were raised by the case and helping me arrive at
4   my opinions.
5              I did ask them to do follow-up
6   research on questions that arose for me and then I
7   -- then they assisted me in the drafting and
8   editing of the report.
9       Q.    What is Mr. Mulvihill's hourly rate
10  for work on this matter?
11      A.    Could I look at my phone?  Maybe
12  could I look at it?
13             I mean, I'd want to look at an
14  actual document rather than -- I mean, I can -- I
15  can find one, but I just -- I don't have his --
16  his different rates all memorized.  I know
17  ballpark, but I don't know the exact number.
18             MR. KILIAN:  Yeah, I guess
19        consistent with that, I'm wondering,
20        Doug, if we can ask for an itemized
21        invoice that just actually indicates the
22        hourly rates and time spent from all
23        billers instead of this.
24             I mean, we thought we had