# Exhibit D

Page 1

1                UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF CONNECTICUT
3
4

     ---------------------------x
5    CONSERVATION LAW                :
     FOUNDATION, INC.,               :
6                                    :
              Plaintiff              :
7                                    :CASE NO.
        -versus-                     :3:21-CV-00933-VDO
8                                    :
     EQUILON ENTERPRISES LLC         :
9    d/b/a SHELL OIL PRODUCTS        :
     US, TRITON TERMINALING LLC :
10   and MOTIVE ENTERPRISES LLC,:
                                     :
11            Defendants             :
     ---------------------------x
12
13
14
15   Videotaped Deposition of MATTHEW BARLOW, taken
16   pursuant to Rule 30 of the Federal Rules of Civil
17   Procedure, held at the law offices of WIGGIN AND
18   DANA, LLP 20 Church Street, 16th Floor, Hartford,
19   Connecticut, before Julia Flynn Cashman, RPR, CSR
20   and Notary Public in and for the State of
21   Connecticut, on Wednesday, September 10, 2025, at
22   9:00 a.m.
23
24
25

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 2

```
 1    A P P E A R A N C E S:
 2
 3              ATTORNEY FOR PLAINTIFF:
 4              MOTLEY RICE LLC
                401 9th Street NW, Suite 630
 5              Washington, DC  20004
                BY:  DEVIN X. WILLIAMS, ESQUIRE
 6                   Dwilliams@motleyrice.com
 7
 8              ATTORNEY FOR DEFENDANTS:
 9              WIGGIN AND DANA LLP
                One Century Tower
10              265 Church Street
                New Haven, Connecticut  06510
11              BY:   JAMES O. CRAVEN, ESQUIRE
                     Jcraven@wiggin.com
12
13
14        ALSO PRESENT:   Joe'l Mafrige, Esquire
                             Senior Legal Counsel
15                           Global Litigation
                             Shell USA
16                           Houston, Texas
                             (Remotely)
17
18                        Ameya Gehi, Esquire
                             Conservation Law
19                           Foundation
                             (Remotely)
20
21                        Kevin Aspinwall,
                             Videographer
22                           (In person)
23
24
25
```

Page 3

1                    S T I P U L A T I O N S

2

3    IT IS HEREBY STIPULATED AND AGREED by and between

4    counsel for the respective parties hereto that all

5    technicalities as to proof of the official

6    character before whom the deposition is to be

7    taken are waived.

8    IT IS FURTHER STIPULATED AND AGREED by and between

9    counsel for the respective parties hereto that the

10   reading and signing of the deposition by the

11   deponent are not waived.

12   IT IS FURTHER STIPULATED AND AGREED by and between

13   counsel for the respective parties hereto that all

14   objections, except as to form, are reserved to the

15   time of trial.

16

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 35

1      A. I don't know.

2      Q. So my question is are you aware of whether

3   or not Dr. Jones or Dr. Zeeb provided testimony in

4   this case?

5      A. I certainly don't recall being aware of

6   that.

7      Q. Did you ask to see the testimony of either

8   Dr. Jones or Dr. Zeeb?

9      A. I don't recall.

10     Q. You don't recall whether you asked to see

11  it?

12     A. Yeah, I don't recall.

13     Q. Do you recall whether you asked to see the

14  testimony of any other experts that have provided

15  testimony in this case?

16     A. I don't recall.

17     Q. Do you recall whether or not you asked to

18  see the testimony of any other experts related to

19  issues covered in your report?

20     A. I don't recall.

21     Q. Have you been to the port in New Haven?

22     A. Not that I recall, I don't think so.

23     Q. Were you aware that there were site visits

24  in connection with this case where experts were

25  allowed to go on site and actually look around the

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 36

1    terminal at issue in this case?

2        A. That some site visits were made sounds

3    familiar, but I don't recall anything about the

4    specifics.

5        Q. You did not attend any site visits in this

6    case, true?

7        A. True.

8        Q. Did you review any documents that any of the

9    defendants produced in this case, other than the

10   two expert reports that are referenced on Exhibit

11   Number 5?

12       A. It's possible, but I don't recall.

13       Q. Are you relying upon any documents that were

14   produced by the defendants in this case?

15                 MR. WILLIAMS:  Object to form.

16       A. Not to my knowledge.

17       Q. And as you sit here today, you're not aware

18   of whether or not you possess any documents that

19   the defendants produced in this case?

20       A. Not to my knowledge.

21       Q. Have you reviewed something referred to as a

22   BCP?

23       A. Could you explain what a BCP is?

24       Q. As you sit here today, do you know what a

25   BCP is?

Page 41

1    in this case, you didn't go to the port area to

2    evaluate the site conditions, true?

3        A. That's correct.

4        Q. And you didn't do that in connection with

5    your opinions for Gulf either, true?

6                    MR. WILLIAMS:  Object to form.

7        A. That's correct.

8        Q. You didn't do any environmental sampling of

9    soil conditions or anything like that in this

10   case, true?

11       A. That's correct.

12       Q. You haven't looked at any such sampling if

13   it exists, true?

14       A. That's correct.

15       Q. You haven't done any sort of study of the

16   bulk storage terminal tanks at the terminal?

17       A. That's correct.

18       Q. You don't consider yourself an expert as to

19   sort of the structural components of bulk storage

20   terminal tanks, do you?

21                   MR. WILLIAMS:  Object to form.

22       A. I don't consider myself an expert in bulk

23   terminals.

24       Q. Okay.  You don't -- well, do you have a

25   recollection of reviewing the defendants HAP?

Matthew Barlow , PhD                September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 60

1    defendant's facility, or even the Gulf facility,

2    is resilient?

3        A. That's correct.

4        Q. Have you reviewed the Connecticut General

5    Permit from 2018?

6        A. Not that I recall.

7        Q. Did you review the Connecticut General

8    Permit from 2021?

9        A. Not that I recall.

10       Q. Did you review the Complaint that sets forth

11   the allegations that CLF is making in this case?

12       A. I think so.

13       Q. Dr. Barlow, can you look in your report and

14   see if you see any reference to the Complaint in

15   this case as either a reference or something that

16   you reviewed as additional material?

17       A. I don't see any reference to the Complaint.

18       Q. Does that suggest to you that you didn't

19   review the Complaint in this case?

20       A. No, it suggests to me that I didn't find it

21   relevant to the opinion.

22       Q. Were you aware that the picture of where the

23   terminal is is in the Complaint?

24       A. That sounds likely.

25       Q. But as you sit here today, you don't have a

Page 61

1    recollection of reviewing that, or you have a

2    recollection of seeing it?

3        A. Of seeing the image?

4        Q. Yeah.

5        A. I have a vague recollection of seeing an

6    image of the site, yes.

7        Q. And notwithstanding having a vague

8    recollection of seeing the image in a Complaint

9    that's not referenced in your reliance materials,

10   you're not able to say on Exhibit 7 where you

11   believe the Shell terminal is located?

12               MR. WILLIAMS:  Object to form.

13       A. Not more specifically than I have indicated.

14       Q. Would it be important to you to know where

15   the facility is located?

16       A. Not at spatial scales smaller than what I

17   have indicated.

18       Q. So other than it being somewhere within the

19   circle that you have indicated on Exhibit 7, it's

20   not important for you to know where it's located?

21       A. For the purposes of the opinion in the

22   report, yes, that's sufficient.

23       Q. For purposes of the opinions in your report,

24   you didn't need to know specifically where the

25   Equilon terminal is located other than what you've

Matthew Barlow , PhD                September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 63

```
 1    no.
 2        Q. Are you aware that Gulf sold their facility?
 3            MR. WILLIAMS:  Object to form.
 4        A. I'm not aware of the details of the
 5    ownership.
 6        Q. Are you aware of where the Buckeye facility
 7    is?
 8            MR. WILLIAMS:  Object to form.
 9        A. I don't know what the Buckeye facility is.
10        Q. Are you aware how many different terminals
11    there are in the harbor of New Haven?
12        A. No.
13        Q. Are you -- have you looked at any of the
14    permitting materials related to any of the
15    terminals in the Port of New Haven?
16        A. Not that I recall.
17        Q. Have you reviewed any of the permitting
18    materials for any terminal located in the state of
19    Connecticut?
20        A. Not that I recall.
21        Q. Do you have any opinions in this case as to
22    what's required under any Connecticut permit?
23        A. I do not have opinions on permitting.
24        Q. Or what is required under any permit?
25        A. Or what is required.
```

Page 64

1      Q. Do you have a recollection of reviewing the

2    2024 draft industrial permit?

3      A. No.

4      Q. Do you have a recollection of reviewing any

5    of the fact sheets related to the Connecticut

6    General Industrial Permit for Stormwater Purposes?

7      A. No.

8      Q. Are you familiar with CIRCA?

9      A. Not off the top of my head, although I hear

10   a lot of acronyms.

11     Q. Are you familiar with the Connecticut

12   Institute For Resilience and Climate Adaptation?

13     A. Yes.

14     Q. Abbreviated as CIRCA?

15     A. Yes.

16     Q. And how are you familiar with them?

17     A. I'm familiar with their work.  I don't

18   recall off the top of my head who is employed

19   there, but I imagine I know them professionally.

20     Q. Are you aware that -- let's mark this.

21             (DEFENDANT'S EXHIBIT 8 FOR

22             IDENTIFICATION, Received and Marked.)

23     Q. Are you aware that the Connecticut Institute

24   For Resilience and Climate Adaptation is

25   affiliated with the University of Connecticut?

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 119

9        Q. Prior to today, did you have any

10   communications with anyone at Connecticut DEEP

11   with regards to any of the terminal or facilities

12   in the New Haven Harbor?

13        A. Not to my knowledge.

14        Q. Did you have any communications prior to

15   today with anyone from US EPA with regards to any

16   of the facilities at New Haven Harbor?

17        A. Not to my knowledge.

18        Q. Have you seen any inspection documents

19   related to the Gulf facility that you prepared a

20   report on?

21             MR. WILLIAMS:  Object to form.

22        A. Not to my knowledge.

23        Q. And, again, you're not offering any opinions

24   in this case as to whether or not the facilities

25   in New Haven Harbor are able to withstand any

Matthew Barlow , PhD                September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 120

1   increase in precipitation or particular storm, or

2   storm surge, true?

3                  MR. WILLIAMS:  Object to form.

4       Q. You're not saying whether they can or can't;

5   you have no opinions about that, right?

6       A. That's correct.

7       Q. Did you review -- sorry.  That's okay, take

8   a break if you need a drink.  I don't want to ask

9   you when your mouth's full.

10         Did you review any documents related to

11  after action analysis or after action reports from

12  any particular storm or extreme precipitation

13  event that was prepared by officials investigating

14  those events, or something like that?

15      A. Not related to the facility.  I did look at

16  some National Weather Service storm reports, which

17  are broader.

18      Q. So you looked at some National Weather storm

19  reports about particular storms in the past?

20      A. Yes.

21      Q. And what I'm trying to get at is sometimes

22  after a storm, there is damage in particular areas

23  that stems from a storm.  You understand that,

24  true?

25      A. Yes.

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 121

1      Q. Did you look, for part of your opinions in

2    this case, as to whether or not there were any

3    after action reports with regards to damage that

4    was caused or happened during those storms?

5      A. I'm not fully sure exactly what kind of

6    after storm reports we're looking at.  I did cite

7    the Weather Service, I know, ones that I looked

8    at, so those are in the report.

9      Q. So let me do this.  Have you looked at any

10   reports from EPA at all in this case?

11     A. I don't think so.

12     Q. Did you look at any reports from Connecticut

13   DEEP in this case?

14     A. I don't think so.

15     Q. Did you look at any reports from the US

16   Coast Guard in this case?

17     A. I don't think so.

18     Q. Did you look at any documents from any bulk

19   storage fuel terminal facility related to the

20   impacts of storms?

21     A. No.

22     Q. So to the extent that you looked at official

23   weather service reports, it was related to the

24   weather from a particular storm?

25     A. Yes.  I mean, sometimes they track number of

Page 123

1      A. I focused on storm information from the

2    northeast from a physical understanding point of

3    view.  There are similarities in precipitation

4    that cover all extra tropical land masses.  So I

5    did refer in some of the physical understanding

6    pieces to those more broad considerations.

7      Q. Are you aware or did you look at documents

8    related to flood preparation for various types of

9    facilities?

10     A. No, I don't think so.

11     Q. Again, that wasn't part of your opinion in

12   this case.  You don't have any opinions as to

13   types of preparations or what preparations should

14   be done by various facilities, true?

15     A. That's correct.

16          (DEFENDANT'S EXHIBIT 14 FOR

17          IDENTIFICATION Received and Marked.)

18     Q. Dr. Barlow, I'm going to show you Exhibit

19   14, which is a document that, at the top of the

20   documents, it says "General Permit Registration

21   For the Discharge of Stormwater Associated With

22   Industrial Activity, Effective October 1st, 2011."

23   Do you see that?

24     A. Yes.

25     Q. And you see that the next section talks

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 126

1    comment period closed."  Do you see that?

2        A. Yes.

3        Q. Are you familiar with any of those sentences

4    or descriptions that I just read to you on Exhibit

5    14?

6        A. Not in any substantial way.

7        Q. Okay.  Did you review a Pollution Prevention

8    Plan in this case?

9        A. Not that I recall.

10       Q. Okay.  Some people call it a Stormwater

11   Pollution Prevention Plan.  If I refer to it as a

12   Stormwater Pollution Prevention Plan, is it the

13   same answer, that you haven't reviewed anything

14   like that in connection with this case?

15       A. Not that I recall, yes.

16       Q. You're not going to offer any opinions in

17   this case as to whether or not, one way or

18   another, the Stormwater Pollution Plan in

19   connection with the facility in this case is

20   compliant or not compliant?

21       A. I will not be offering opinions on that,

22   yes.

23               (DEFENDANT'S EXHIBIT 15 FOR

24               IDENTIFICATION Received and Marked.)

25       Q. Dr. Barlow, I'm showing you what's been

Page 158

1    A. It does.

2    Q. And paragraph number 5, what does that say?

3    A. "I have evaluated the new permit."

4    Q. And so when I just went through the permits

5    that you said you didn't think you had reviewed,

6    you submitted a Declaration to the Connecticut

7    Department of Energy and Environmental Protection

8    saying that you had evaluated the new permit?

9    A. That is correct, which -- that is correct.

10   Q. So which is it?  Did you evaluate the new

11   permit or didn't you evaluate the new permit?

12          MR. WILLIAMS:  Object to form.

13   A. Yes, I evaluated the new permit.

14   Q. In your Declaration to Connecticut DEEP on

15   the 6th of May, 2024, did you advocate for

16   Connecticut DEEP to do something other than rely

17   upon the NOAA Atlas 14?

18   A. Yes.

19   Q. And I have just gone through the Stormwater

20   Quality Management Manual with you, sir.  You have

21   seen that Connecticut DEEP has in fact adopted the

22   NOAA Atlas 14.  True?

23   A. Yes.

24   Q. You're aware that after it received your

25   submission, Declaration, it came out with a

Matthew Barlow , PhD                September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 159

1    revised draft permit that did not include what you

2    were asking them to include?

3                   MR. WILLIAMS:   Object to form.

4        Q. True?

5        A. Is that one of the -- I'm not sure which of

6    these permits that is.

7        Q. Well, certainly after you -- did you review

8    the permit that came out after you submitted your

9    comments?

10       A. The permit that came after I submitted my

11   comments?

12       Q. Yes.

13       A. I'm not sure.

14       Q. Well, you remember I went through documents

15   and dates from November of 2024, December of 2024,

16   and January of 2025?

17       A. Yes.

18       Q. And I think you testified earlier, you

19   didn't review any of those documents.  True?

20       A. I certainly didn't remember reviewing any of

21   those documents, yes.

22       Q. As you sit here today, is it your

23   understanding that Connecticut DEEP has adopted

24   the NOAA Atlas 14?

25       A. That's my understanding today, yes.

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 160

1       Q. So to the extent that you were advocating

2    for them to adopt something other than NOAA Atlas

3    14, they decided not to do that; isn't that true?

4       A. That appears to be the case, yes.

9                    MR. WILLIAMS:  Object to form.

17                   MR. WILLIAMS:  Object to form.

18      A. I did not say that.

19      Q. And now that I have gone through the

20   documents with you, wouldn't you agree that you

21   should have at least acknowledged that Connecticut

22   DEEP, as the regulator under the permit that this

23   lawsuit is being brought, doesn't require anything

24   other than NOAA Atlas 14?

25                   MR. WILLIAMS:  Object to form.

Page 161

1      A. My expert witness focuses on the scientific

2      piece, not the regulatory and the permit piece.

3      Q. So to the extent that Connecticut DEEP has

4      reviewed and assessed a NOAA Atlas 14+, or the

5      NOAA Atlas 14++, or some other mechanism other

6      than NOAA Atlas 14, you would agree a permittee

7      isn't required to do anything other than NOAA

8      Atlas 14?

9             MR. WILLIAMS:  Object to form.

10     A. I don't have -- sorry.  I don't have the

11     expertise to discuss permitting.

12     Q. Okay.  Do you think you should have put in

13     your report that Connecticut DEEP doesn't require

14     anything other than NOAA Atlas 14, --

15            MR. WILLIAMS:  Object to form.

16     Q. -- but that you believe and advocated for

17     DEEP to change that standard, but they didn't?

18            MR. WILLIAMS:  Object to form.

19     A. I focused my report on the scientific piece,

20     not the permitting piece.

21     Q. In your submission to Connecticut DEEP,

22     where you talk about NOAA Atlas 14, did you talk

23     about what Connecticut DEEP had just done in their

24     Stormwater Quality Manual?

25     A. I'm not sure I understand what you're

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 176

1          A. Yes.

2          Q. And so looking at that report, someone could

3     project annually, if that data was accurate, what

4     the increase in precipitation days would be over

5     the next five years?

6          A. I think so.

7          Q. And sitting here today, that's not something

8     that you have done for purposes of your report.

9     Your report focuses a little bit farther out,

10    mid-century and end-of-century projections, true?

11         A. Right.

12         Q. And has the projections for the end of

13    century -- strike that.

14             Have the -- strike that.  I'm going to ask a

15    different question.

Page 178

1          MR. WILLIAMS:  Object to form.

2     A. It would have some limited relevance.

3     Q. In any event, as you sit here today, you

4  don't know whether or not the defendant's terminal

5  ever flooded, true?

6     A. That's correct, I don't know.

7     Q. And you don't know whether or not the Gulf

8  terminal ever flooded, true?

9     A. True.

10     Q. You made no effort to find out whether or

11  not the defendant's terminal, the Gulf terminal,

12  ever flooded, true?

13          MR. WILLIAMS:  Object to form.

14     A. That's correct.

15     Q. You made no effort to determine whether or

16  not any of the terminals in the Port of New Haven

17  have ever flooded, true?

18          MR. WILLIAMS:  Object to form.

19     A. That's correct.

20     Q. Did you make any effort to determine whether

21  or not there's ever been any river flooding on the

22  rivers connected to the Port of New Haven?

23     A. I don't recall.

24     Q. I didn't see anything in your report.  I'm

25  just -- would you have put it in your report if

Page 193

1    report.

2        Q. Do you recall publishing an article in

3    October of 2022 where you said that "How the

4    number of hurricanes that form each year may

5    change is another major question that is not well

6    understood"?

7        A. It sounds familiar, yes.

8        Q. And is that -- was that your belief at the

9    time that you wrote that?

10       A. Yes, the overall number.

11       Q. You also went on to say that there's no

12   definitive theory explaining the number of storms

13   in the current climate, or how it will change in

14   the future.  Was that your opinion at that time?

15       A. Yes.

16       Q. And is that still your opinion today?

17       A. Yes.

18       Q. Are you familiar with the Connecticut

19   Coastal Management Act?

20       A. I don't think so.

21       Q. Are you familiar with the Resource

22   Conservation and Recovery Act, some people refer

23   to as RCRA?

24       A. That sounds vaguely familiar.

25       Q. Do you consider yourself an expert in RCRA?

Page 194

1        A. No.

2        Q. Do you intend to offer any opinions in this

3    case with regards to RCRA?

4            MR. WILLIAMS:  Object to form.

5        A. No.

6        Q. Do you intend to offer any opinions in this

7    case related to the Clean Water Act?

8            MR. WILLIAMS:  Object to form.

9        A. Not from a policy perspective.

10        Q. Do you have any understanding as to the

11    regulatory structure of Clean Water Act?

12        A. I'm not an expert in regulatory matters.

13        Q. So you're not going to offer any opinions

14    that the Clean Water Act requires something or

15    doesn't require something in this case?

16        A. That's correct.

17        Q. Did you review any of the testimony of any

18    of the fact witnesses in this case?

19        A. I'm not sure I know what a fact witness is.

20        Q. Are you aware that some of the defendants'

21    employees have been provided testimony about the

22    facility and how the facility is run and operates?

23        A. Not to my knowledge.

24        Q. You didn't review any of that testimony?

25        A. I don't think so.

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 197

1      Q. You don't socialize with people from CLF

2    that you're aware of?

3      A. Not that I know of.  Not that I wouldn't.

4      Q. Have you performed any work for any energy

5    companies?

6      A. Not that I'm aware of.

7      Q. Are you a member of the American Chemistry

8    Council?

9      A. No.

10     Q. ASTM?

11     A. No.

12     Q. ISO?

13     A. No.

14     Q. Would it be fair to say to the extent that

15   you're a member of an organization, that's covered

16   on your CV?

17     A. As far as I'm aware.

18     Q. Do you have LinkedIn?

19     A. I do.

20     Q. And is that up to date?

21     A. I'm going to say not really.

22     Q. Do you have any knowledge whatsoever as to

23   how the facility at issue in this case handles

24   precipitation or stormwater?

25     A. Not really, no.

Matthew Barlow , PhD                    September 10, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 202

3      Q. Okay.  Do you know who the defendants are?

4    I think I asked you that already, but I just want

5    to be clear.

6              MR. WILLIAMS:  Objection, asked --

7      Q. You said in that paragraph, you used the

8    word "defendants," right?

9              MR. WILLIAMS:  Counsel, asked and

10   answered.

11     A. Yes, I used that word.

12     Q. Okay.  But as you sit here today, you don't

13   know who the defendants actually are in this case,

14   true?

15             MR. WILLIAMS:  Objection; asked and

16   answered.

17     A. Off the top of my head, no.

18     Q. Do you have any current plans to do

19   additional work in connection with this case?

20     A. Beyond being at trial, potentially, I don't

21   know what else, what additional work would look

22   like.

23     Q. Do you have any specific opinions as to how

24   many days increase in rain there will be in New

25   Haven for the year 2026?

Page 203

1              MR. WILLIAMS:  Object to form.

2         A. I don't have a specific opinion as to 2026.

3    I could calculate an estimate considering 2026 to

4    be similar to the current five-year period and

5    make an estimate of how that's differed from

6    preindustrial or some other baseline.  That would

7    be possible to do.

8         Q. As you sit here today, you haven't done that

9    calculation?

10        A. No.

11        Q. Is that no, you haven't done that?

12        A. No, I have not done that calculation.

13        Q. If I asked the same question for 2027, 2028,

14   2029, 2030, is it the same answer?

15        A. I think it's the same answer.  2030 is also

16   a period I have looked at a little bit.  But it

17   would be a similar answer, yes.

18        Q. Do you have an understanding as to what the

19   duration of the permits are in this case?

20              MR. WILLIAMS:  Object to form.

21        A. No.

22        Q. Do you have an understanding -- strike that.

23        Other than your belief that there will be an

24   increase in the frequency and/or severity of

25   storms, do you have an opinion as to what that