# Exhibit C

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CONNECTICUT
   _____
 3
   CONSERVATION LAW FOUNDATION,        )
 4 INC.,                               )
                    Plaintiff,         )
 5                                     )
          vs.                          )
 6                                     ) Case No.
   EQUILON ENTERPRISES LLC D/B/A       ) 3:21-cv-00933-VDO
 7 SHELL OIL PRODUCTS US, TRITON       )
   TERMINALING LLC, and MOTIVA         )
 8 ENTERPRISES LLC,                    )
                                       )
 9              Defendants.            )
   _____
10
     VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF
11
              RICHARD R. HORNER, Ph.D.
12 _____
13
14            MONDAY, AUGUST 11, 2025
15                 9:05 A.M. PST
16
17            Veritext - Seattle, WA
18         1200 Sixth Avenue, Suite 610
19             Seattle, WA 98101
20
21
22
23
24 JOB No. ATL 7530788
25 REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

1                    A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3         MOTLEY RICE LLC
          Elizabeth Smith
4         401 9th St. NW
          Suite 1001
5         Washington, DC 20004
          (401) 457-7700
6          Esmith@motleyrice.com
7         MOTLEY RICE LLC
          Shalom D. Jacks
8         28 Bridgeside Boulevard
          Mount Pleasant, SC 29464
9         (866) 604-2715
          Sjacks@motleyrice.com
10
11   FOR THE DEFENDANTS:
12        KING & SPALDING LLP
          Carmen R. Toledo
13        1180 Peachtree Street NE
          Suite 1600
14        Atlanta, GA 30309
          (404) 572-3438
15        Ctoledo@kslaw.com
16
17
18
     ALSO PRESENT:  ADAM SWEETS, VIDEOGRAPHER
19
20
21
22
23
24
25

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 3

```
1                        I N D E X
2    EXAMINATION BY:                          PAGE(S)
     MR. TOLEDO                               5,229
3    MS. SMITH                                  208
4
5
6    EXHIBITS FOR IDENTIFICATION                 PAGE
     Exhibit 1     Notice of Deposition Richard    10
7                  Horner
     Exhibit 2     Richard Horner Original Report   15
8    Exhibit 3     Richard Horner Rebuttal Report   15
     Exhibit 4     Robert Horner Invoices           20
9    Exhibit 5     NOI                              33
     Exhibit 6     NOI                              33
10   Exhibit 7     Connecticut DEEP guidance document  40
                   for preparing a SWPPP
11   Exhibit 8     2009 Report Urban Stormwater      54
                   Management in the United States
12   Exhibit 9     Aerial photograph of New Haven    70
                   Terminal and nearby facilities
13   Exhibit 10    Flood Preparedness Fact Sheet by  106
                   Region 6 Regional Response Team
14                 Executive Committee
     Exhibit 11    EPA Inspection Document           115
15   Exhibit 12    Connecticut Stormwater Quality    119
                   Manual
16   Exhibit 13    RPMS Document                     127
     Exhibit 14    Survey Drawings Bates page ending 132
17                 56
     Exhibit 15    2018 Connecticut General Permit   138
18   Exhibit 16    Table 4.2 from Stormwater Manual  171
     Exhibit 17    Notes of Connecticut DEEP meeting 180
19   Exhibit 18    Richard Horner Calculations       185
     Exhibit 19    Letter Report from Sovereign      189
20                 Consulting to Jennifer Bothwell
     Exhibit 20    Meteorological and Oceanographic  199
21                 Design and Operating
                   Considerations Offshore, Coastal,
22                 and Onshore from February2017
     Exhibit 21    Excerpts from the 2004 Connecticut 213
23                 Stormwater Quality Manual
     Exhibit 22    Excerpts from 2004 Stormwater     229
24                 Quality Manual
25
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 30

1    report.  In some cases, expert report, plus deposition.

2        Q.  Okay.  I guess I was -- I understood you to

3    say that every matter listed here was a case in which

4    you testified either at a hearing, deposition, or

5    trial.

6            Are you saying that some of these actually

7    were just expert reports?

8        A.  Yes.  I think -- I think we didn't quite -- or

9    I didn't quite communicate correctly there, yes.  If it

10   involved the filing of an expert report, I included it.

11       Q.  I see.

12           In each of these cases where you served as an

13   expert in a citizen suit case, was it your opinion that

14   the facility at issue was in violation of its permit?

15       A.  Yes.

16       Q.  Have you ever testified in litigation in favor

17   of an owner or -- owner or operator of an industrial

18   facility?

19       A.  I have not testified in litigation for an

20   owner or operator under a permit.

21       Q.  Have you ever testified in litigation in favor

22   of a municipality?

23       A.  I have not testified in litigation for a

24   municipality, but I've worked for a number of them in

25   other contexts.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 33

1    Have you heard that?

2         A.  Yes, I have.

3         Q.  Okay.  Have you reviewed NOIs in the citizen

4    suits that you have worked -- worked on before?

5         A.  In some cases, yes, and in some, no.

6         Q.  Okay.  Do you usually review the NOIs before

7    you prepare your report?

8         A.  I would say roughly, very roughly, half the

9    time.

10        Q.  Are you aware that to be able to assert a

11   claim in a citizen suit it must have been expressly

12   listed in the NOI?

13        A.  I am aware as a lay person in that respect.

14        Q.  Did you review the NOIs that CLF served in the

15   case relating to the terminal?

16        A.  No.

17        Q.  Why not?

18        A.  I wasn't asked to.

19        Q.  Let's go ahead and get those marked.  And I

20   believe that will be Exhibits 5 and 6.

21                  MS. TOLEDO:  This will be 5.

22                  (Exhibit 5 marked for identification.)

23                  MS. TOLEDO:  And 6.

24                  (Exhibit 6 marked for identification.)

25     BY MS. TOLEDO:

Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 34

1      Q.  Okay.  Have you had a chance to just look at

2   those?

3      A.  Just the cover pages.

4      Q.  And just to confirm, you have not seen these

5   before; is that right?

6      A.  That's correct.

7      Q.  Okay.  And you didn't ask to review them

8   before you started working on your report, correct?

9      A.  I did not.

10      Q.  What percentage of your income is derived from

11   your litigation-consulting work?

12      A.  Well, I do several things, and litigation such

13   as we're doing today is probably about 40 percent.

14      Q.  Okay.  The remaining 60 percent would be

15   consulting work?

16      A.  Yes, it would be consulting work of some form.

17      Q.  To your knowledge, has your testimony been

18   excluded or limited in any case?

19      A.  No.

20      Q.  If we could turn to your CV.  That was

21   Attachment B in your report, which is Exhibit 2.  And I

22   believe it's, like I said, Attachment B.  Got it?

23      A.  Yeah.

24      Q.  And I believe you stated earlier that this is

25   the most current version of your CV; is that right?

Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 35

1         A.   That's right.

2         Q.   And you have your education listed first.  And

3    it says here you got your Ph.D. in civil engineering

4    from the University of Washington; is that right?

5         A.   Yes.

6         Q.   And before that, you had degrees -- you

7    obtained degrees in mechanical engineering from the

8    University of Pennsylvania, right?

9         A.   Correct.

10        Q.   Do you have any other certifications or

11   degrees?

12        A.   No.

13        Q.   You're not a licensed professional engineer,

14   correct?

15        A.   Correct.

16        Q.   Have you ever been a PE?

17        A.   No.

18        Q.   You've never prepared a SWPPP before, have

19   you?

20        A.   I have not prepared one, no.

21        Q.   And generally, regulations require that a

22   SWPPP be certified by a PE.  Do you agree?

23        A.   Yes.

24        Q.   Have you reviewed the Connecticut DEEP's

25   guidance document for preparing a SWPPP?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 36

1              (Reporter clarification.)

2         MS. TOLEDO:  You're doing awesome.

3    BY MS. TOLEDO:



Case 3:21-cv-00933-VDO    Document 734-4    Filed 10/03/25    Page 10 of 62

Richard R. Horner , Ph.D.        August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 41

1          A.   Correct.

2          Q.   Have you ever advised a client on preparation

3     of a SWPPP?

4          A.   Well, my clients have not prepared SWPPPs.

5          Q.   Okay.

6          A.   I've advised them on the qualities of SWPPPs.

7     I've certainly spoken to industry representatives

8     and/or consultants about my opinions about SWPPPs.

9          Q.   About SWPPPs that were in existence?

10         A.   Yes.

11         Q.   You were never involved in writing or

12    preparing a SWPPP, right?

13         A.   I was not.

14         Q.   Okay.  And as we discussed before, if you go

15    to Page 5 of this document, under Existing Registrants,

16    halfway through the paragraph it says that, "Existing

17    registrants must update their current plan and have the

18    plan recertified at the time of registration for this

19    general permit by a professional engineer, PE, licensed

20    to practice in the state of Connecticut, or a certified

21    hazardous materials manager, CHMM."

22              Did I read that correctly?

23         A.   Yes.

24         Q.   And that's as we discussed before, that it

25    must be prepared and certified by a registered

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 42

 1    professional engineer, correct?

 2         A.   Correct.

 3         Q.   And if you'll turn to Page 17, the last

 4    paragraph of that page it provides that -- under

 5    Management of Runoff it says, "Be aware that any

 6    evaluation, construction, or modification of the design

 7    of a stormwater drainage system requires certification

 8    by a professional engineer licensed to practice in the

 9    state of Connecticut and must be discussed in your

10    plan."

11              Did I read that correctly?

12         A.   Yes.

13         Q.   So you would agree with me that, based on the

14    clear language of this guidance, for anyone to evaluate

15    the design of a stormwater drainage system of a

16    permitted facility in Connecticut, such as a terminal,

17    that person must be a professional engineer licensed in

18    the state of Connecticut, wouldn't you?

19              MS. SMITH:   Objection to form.  Calls

20    for legal conclusion as well.

21              You can go ahead and answer.

22              THE WITNESS:   The formal certification

23    must be done by such a person, but there is nothing

24    that says that somebody else cannot evaluate the plan

25    and contribute to it during the preparation, for that

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 43

1    matter.
2     BY MS. TOLEDO:
3         Q.   So you are drawing a distinction between the
4    language as stated here and what you have done in this
5    case, correct?
6                     MS. SMITH:   Objection to form.
7                You can answer.
8                     THE WITNESS:   I think it's very literal
9    here that the certification requires the stamp of a
10   professional engineer.   But there's nothing that says
11   that contributors to or evaluators of have to be a
12   licensed professional engineer in Connecticut.
13    BY MS. TOLEDO:
14        Q.   Well, it expressly says that any evaluation
15   must be certified by a professional engineer, doesn't
16   it?
17                     MS. SMITH:   Objection.   Calls for a
18   legal conclusion.
19                     THE WITNESS:   I would interpret that to
20   mean that an evaluation that affects the content of the
21   plan has to be certified.
22                In other words, if an evaluator contributes
23   something to the plan, that action must be certified by
24   a professional engineer, but not that an evaluation
25   can't be conducted by somebody else.   That's my

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 44

1    interpretation.

2     BY MS. TOLEDO:

3         Q.   Let's go back to your CV, Attachment B of the

4    report.  And we talked earlier about your education,

5    and I wanted to ask you about your work experience.

6              And it looks like your first listed job was as

7    a research assistant at the University of Pennsylvania;

8    is that right?

9         A.   Yes.

10        Q.   Was that for a specific professor?

11        A.   Yes.

12        Q.   Who was that?

13        A.   His name was TK Chu.

14        Q.   What was your research area?

15        A.   I was -- excuse me -- in mechanical

16   engineering, and it was plasma flow work.

17        Q.   Explain to me what that means.

18        A.   Plasma is a gas that transmits material.  And

19   specifically, the application of that, the intended

20   application, I don't recall.

21        Q.   And after you graduated with your master's,

22   looks like you went to work for Exxon Research and

23   Engineering in New Jersey, correct?

24        A.   Yes.

25        Q.   And you worked there for about three years?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 45

1        A.   About two and a half.

2        Q.   Two and a half years.

3             This was a research facility, correct?

4        A.   That's in the name, but the work that I did

5    was not research.

6        Q.   What work did you do there?

7        A.   I did design basis setting for the support

8    facilities and refineries in chemical plants; that is,

9    facilities that are not part of refining, the chemical

10   process, but rather the mechanical and civil works that

11   support the -- those processes.

12       Q.   Did you do any work at bulk petroleum storage

13   facilities?

14       A.   No.

15       Q.   It looks like after that you worked at North

16   Hampton Community College in the engineering

17   department; is that correct?

18       A.   Correct.

19       Q.   And there you were an instructor or professor?

20       A.   Yes.

21       Q.   Which one?   What was your title?

22       A.   Professor, working my way up from assistant to

23   professor.

24       Q.   What courses did you teach there?

25       A.   I once took a count, I taught more than 30

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 46

1     courses in engineering and environmental studies.

2          Q.   That was before you got your Ph.D.; isn't that

3     true?

4          A.   Before and after.

5          Q.   Okay.  So nowadays we can do that with Zoom,

6     right, and remote work.

7               How did you manage that in the late '60s?

8          A.   How did I manage?

9          Q.   Getting your Ph.D. and working as a professor

10    at the same time?

11         A.   Oh, I was on leave of absence.

12         Q.   I see.

13         A.   I returned -- I had a sabbatical.  I was

14    obligated to return for a year.  I, in fact, worked

15    three more years after my Ph.D. at the community

16    college.  So my Ph.D. studies were separate.  They were

17    3,000 miles apart.

18         Q.   So then you returned to the University of

19    Washington after getting your Ph.D. three years later;

20    is that right?

21         A.   That's right.

22         Q.   And that was in 1981; is that right, according

23    to your CV?

24         A.   Correct.

25         Q.   And you began working as a research associate

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 50

1        Q.   Were these courses, these continuing education

2   short courses, how long would they go for?

3        A.   From one to five days.

4        Q.   And you took emeritus status in 2011 at the

5   University of Washington; is that correct?

6        A.   Correct.

7        Q.   Are you still affiliated with the University?

8        A.   In that status since taking the emeritus, I

9   have done some research.  It's not been in the last

10  several years.  And I have guest spoken in classes.

11       Q.   Okay.  Do you still teach any courses?

12       A.   No.

13       Q.   When did you stop teaching on a regular basis?

14       A.   I believe 2008.

15       Q.   About how many hours do you devote to your

16  research work for the University?

17       A.   Did I, when I was an active researcher?

18       Q.   No, after you took emeritus status.

19       A.   Oh, how many hours a week?   Probably as a

20  broad average, trying to think, I would say about 12 to

21  15.

22       Q.   Hours a week?

23       A.   Yes.

24       Q.   To this day?

25       A.   Oh, no, no, no.  I said I have not done

Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 51

1    research in recent years.

2         Q.   Have you taught courses in recent years?

3         A.   No.  The last course that I taught that I was

4    responsible for was 2008.  I have spoken in classes

5    since, but I have not been the assigned professor for a

6    course since 2008.

7         Q.   Those times where you do a guest professor

8    class, are those classes mostly in the landscape

9    architecture department?

10        A.   They have been, yes.

11        Q.   Do you continue to occasionally teach or --

12   strike that.

13        Do you continue to go to some of these classes

14   as a guest speaker to this day?

15        A.   I have not in several years.  I believe

16   because, as time passes, my associates move on and do

17   different things.  And so what I had been doing

18   regularly, that professor is no longer active in that

19   area.

20        Q.   When did he become no longer active in that

21   area?

22        A.   Well, she, and it was --

23        Q.   Oh, she, sorry.

24        A.   Let's see.  I recall doing one by Zoom during

25   COVID.  That would have made that -- or in 2021, I

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 52

1    believe.  I did it one more time, I think, for somebody
2    else.  So it's been about three years.
3         Q.  Now, your CV also states that you began
4    offering services in environmental engineering and
5    science in 1986; is that right?
6         A.  Yes.
7         Q.  Is that when you began your consulting
8    business?
9         A.  Yes.  There was not a lot of consulting at
10   that time, but I had some.
11        Q.  Since your retirement in 2011, is your
12   consulting business your primary source of income?
13        A.  Yes.
14        Q.  What percentage of your income is from your
15   consulting business?
16        A.  Well, other than my retirement, which I'm
17   drawing, and Social Security, let's see.  What would it
18   be?  It's a half to two-thirds.
19        Q.  Okay.  From 1986 to 1990, you also list a
20   part-time position with King County, and I believe you
21   referenced that earlier; is that right?
22        A.  Yes.
23        Q.  It says you were coordinator of Puget Sound
24   Wetland and Stormwater Management Research Program; is
25   that right?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 61

1      A.   Right.   That is a term that is not probably

2   alone used by Connecticut, but is used in the

3   Connecticut permit.   Terms that mean the same thing or

4   much the same thing are used in other permits in

5   Washington and in California.

6      Q.   And best industry practice must take into

7   account the specific industry.   Would you agree?

8      A.   Yes.

9      Q.   And BIPs are generally accepted practices in a

10   given industry and it may not be applicable to others,

11   right?

12                  MS. SMITH:   Objection to form.

13              You can answer.

14                  THE WITNESS:   I interpret it more

15   broadly.   It is not industry-by-industry, but industry

16   that discharged stormwater, in my field.   And this is

17   the way it is definitely used in Washington and

18   California.   And I believe the intention is the same in

19   Connecticut.   It is not specific to

20   industry-by-industry, but those under the industrial

21   general stormwater permit have a obligation to use the

22   best practices that the market provides.

23   BY MS. TOLEDO:

24      Q.   What is the basis for that opinion?

25      A.   The basis is that I've seen the best

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 64

 1   permit --
 2         Q.   Okay.
 3         A.   -- what your reference is.
 4         Q.   We will get to that.
 5              I believe earlier you testified that you have
 6   not worked on projects in Connecticut before; is that
 7   right?
 8         A.   That's right.
 9         Q.   Have you ever consulted with Connecticut DEEP
10   in any capacity?
11         A.   No.
12         Q.   Have you ever spoken with anyone from
13   Connecticut DEEP in connection with this case?
14         A.   No.
15         Q.   Have you made your opinions about alleged
16   violations at the terminal available to the Connecticut
17   DEEP?
18         A.   My opinions are in my two reports.  That's the
19   expression of them.  Otherwise, I did not distribute
20   them in any way.
21         Q.   And you've not discussed them with anyone at
22   EPA either?
23         A.   No.
24         Q.   Going back to your report and your CV to your
25   publications, starting on page Roman numeral 18, you

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 66

1    stormwater management.  And if you'll allow me to go

2    down the list, I could tell you which ones do.

3         Q.  Well, let's -- let's move on because we have a

4    lot to cover.

5         Do you recall off the top of your head any

6    articles that you published regarding industrial

7    stormwater management?

8         A.  As I said, some of these pertain to industrial

9    stormwater management.  For example, how to monitor.

10   Monitoring is a function of industrial stormwater

11   management, so it pertains to it.  You know, that's one

12   example that comes to mind.  I would have to go down

13   the list point by point.

14        Q.  So when you say "pertain," it means that you

15   discussed issues that apply to industrial stormwater

16   management?

17        A.  Yes.  We did a research project for the

18   Electric Power Research Institute, and it was how to

19   monitor electric power plants, you know, how to improve

20   monitoring electric power plants.  That would be

21   monitoring for stormwater and other, you know,

22   functions, monitoring functions that they had to

23   perform.  So there are several papers that have to do

24   with that.

25        Q.  Have you published any papers discussing

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 67

1    stormwater pollution prevention plans?

2        A.  No papers on SWPPPs specifically, no.

3        Q.  You have written about the positive impact of

4    nonstructural BMPs, correct?

5        A.  Yes.

6        Q.  So you do agree that nonstructural BMPs can be

7    effective to protect water quality, correct?

8        A.  They're one of the categories that is widely

9    recognized to be part of the strategy, yes.

10        Q.  The majority of your papers and reports have

11    to do with urban runoff.  Is that fair?

12        A.  Yes.  Although, as I said, there are aspects

13    of them that pertain quite directly to industries, too.

14        Q.  But generally, urban stormwater management

15    strategies differ from the strategies employed in

16    industrial stormwater management.  Would you agree?

17                    MS. SMITH:  Objection to form.

18            Go ahead.

19                    THE WITNESS:  Not entirely.

20     BY MS. TOLEDO:

21        Q.  Why not?

22        A.  Well, Shell uses a wet pond.  Municipalities

23    use wet ponds.  Just one example.

24        Q.  So you're considering municipalities to fall

25    under the urban stormwater umbrella?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 69

1    industrial runoff.  It may not be detected above a
2    specific limit, but it's detected.
3            Then there are total petroleum hydrocarbons,
4    which are a group.  There are gasoline fractions,
5    diesel fractions, and heavy oil fractions.  They are
6    usually detected, again, not above specific limits a
7    lot of times.
8            And then there are all kinds of individual
9    petroleum hydrocarbons.  Many.  Dozens.  Hundreds.
10    BY MS. TOLEDO:
11       Q.  And petroleum hydrocarbons that are on
12    roadways can make their way to waterways through
13    runoff, correct?
14       A.  Yes.
15       Q.  And in New Haven Harbor we have the interstate
16    that crosses the harbor, correct?
17       A.  I -- I know it's close.  I don't know
18    specifically how close.  I didn't get around that area.
19       Q.  Did you see it when you visited?
20       A.  I don't believe I saw the interstate.
21       Q.  Did you consider other sources of contaminants
22    to New Haven Harbor in connection with your work
23    evaluating the terminal?
24       A.  Well, I didn't say anything about any
25    contaminants in New Haven Harbor itself.  I had no data

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 70

1    from New Haven Harbor.  I didn't discuss it.

2         Q.  Is that not significant for your opinions in

3    this case?

4              MS. SMITH:  Objection to form.

5              THE WITNESS:  It would be impossible to

6    distinguish the sources if it's measured in the

7    waterbody that is receiving runoff from an industrial

8    area and a relatively large city and transportation

9    facilities, et cetera.  My scope was the conditions and

10   practices at the terminal itself.

11             MS. TOLEDO:  Let's mark the next

12   exhibit.  It will be No. 9.

13             (Exhibit 9 marked for identification.)

14    BY MS. TOLEDO:

15        Q.  And I'll represent to you that this is an

16   aerial photograph of the terminal and nearby facilities

17   and New Haven Harbor.

18            Do you see that?

19        A.  Yes.

20        Q.  Okay.  Do you see I-95?

21        A.  Yes.

22        Q.  Okay.  And that crosses just to the north of

23   the terminal and crosses over -- I don't know if by

24   then it's the river or the harbor, but it crosses a

25   waterway, correct?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 71

1        A.   Yes.

2        Q.   Okay.  And there's also other facilities with

3    ASTs, right?

4        A.   With what?

5        Q.   ASTs, above-ground storage tanks?

6        A.   Yes.

7        Q.   Okay.  Did you conduct any research relating

8    to those facilities?

9                    MS. SMITH:  Objection.  Beyond the

10    scope.

11              You can answer.

12                    THE WITNESS:  No.

13    BY MS. TOLEDO:

14        Q.   And I-95 and the other facilities can and

15    likely do contribute pollutants to the harbor.  Would

16    you agree?

17                    MS. SMITH:  Objection to form,

18    speculation, and beyond the scope.

19              You can answer.

20                    THE WITNESS:  I agree.

21    BY MS. TOLEDO:

22        Q.   But I believe you said you did not look at

23    those because you focused on the facility itself, the

24    terminal?

25        A.   That's right.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page  72



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 73



Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 78

1    mean, I have enough background to judge the qualities

2    of substances that I might see reference to in

3    documents.

4     BY MS. TOLEDO:

5        Q.  You are not a risk assessor, correct?

6              MS. SMITH:  Objection to form.

7              THE WITNESS:  No, I don't consider

8    myself a risk assessor.  But I -- again, I have -- I

9    set out to structure my education to lead into a broad

10   practice in this field.

11            That's why I went to the University of

12   Washington.  It allowed me and encouraged me and

13   demanded, in fact, that I take courses farther afield

14   than the civil -- later, civil and environmental

15   engineering department.

16    BY MS. TOLEDO:

17       Q.  You -- I'm sorry.  Were you done?

18       A.  So I -- I encounter and, in many cases, work

19   with other practitioners.  And, yeah, today, you know,

20   right now, I work with somebody who considers himself

21   to be a risk assessor.  I don't consider myself to be a

22   risk assessor, but I have an appreciation for risk and

23   how it's assessed.

24       Q.  Who is that risk assessor you work with?

25       A.  You mean his name?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 80

1      A.  I did design basis work in that industry.  I

2  think, as I recall, it was really production, not bulk

3  storage.

4      Q.  Have you ever designed above-ground storage

5  tanks?

6      A.  No.

7      Q.  You're not a member of API, correct?

8      A.  Correct.

9      Q.  And you do know what API is?

10     A.  Yes, I do.

11     Q.  Do you have any experience in environmental

12  compliance management at a bulk petroleum storage

13  terminal?

14     A.  No.

15     Q.  Have you ever worked for EPA?

16     A.  I've never been employed by EPA.

17     Q.  Have you done projects for EPA?

18     A.  I've had some funding from EPA, research

19  funding.

20     Q.  Have you been retained by EPA to do any

21  projects aside from research?

22     A.  No.

23     Q.  Have you worked for the State of Washington

24  Department of Ecology?

25     A.  I have had research funding from the

Richard R. Horner , Ph.D.          August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 81

1   Department of Ecology.

2        Q.   And are those projects described or listed in

3   your CV?

4        A.   Yes, the major -- well, yeah, it's represented

5   in -- in the material in general.  As a matter of fact,

6   in the body of the report, I discuss the wetland

7   project and another project on streams that were

8   heavily funded by the Department of Ecology.

9        Q.   And you identified King County and the City of

10  Seattle and work you've done for them, right?

11       A.   Yes.

12       Q.   But you've never done any work for Connecticut

13  DEEP?

14       A.   No.

15       Q.   Have you ever worked as an inspector for any

16  government regulatory agency?

17       A.   No.

18       Q.   Have you over spoken with anyone from EPA

19  regarding stormwater regulations?

20       A.   Certainly I've spoken with personnel from EPA

21  about various aspects of the stormwater field.

22       Q.   Was that in connection with the panel that you

23  participated in?

24       A.   No.  EPA was the commissioner of that panel

25  but did not sit on it.  There have been EPA

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 87

1    that are as stringent as the federal requirements,

2    correct?

3          A.   That's my impression.

4          Q.   Are you aware that Connecticut DEEP has

5    published a draft permit in 2024 although it's not yet

6    effective?

7          A.   I have a really elementary awareness of that.

8    I certainly have not seen it.

9          Q.   You may -- you did not go to review the draft

10   permit?

11         A.   No.

12         Q.   Do you have an understanding of what the draft

13   permit includes as new requirements were different from

14   the 2021 permit?

15         A.   No, I have not been asked to review it and

16   have not reviewed it.

17         Q.   So I would assume that if you've not reviewed

18   it, you didn't provide comments; is that right?

19         A.   That's right.

20         Q.   Are you aware that CLF did provide comments?

21         A.   I am not aware.

22         Q.   Are you aware that Connecticut DEEP did not

23   adopt the majority of the comments that CLF proposed?

24         A.   I am not aware of that either.

25         Q.   You're not a climate scientist, correct?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 88

1          MS. SMITH:  Objection to form.

2          THE WITNESS:  Correct.

3   BY MS. TOLEDO:

4      Q.  And you're not a meteorologist, right?

5      A.  No, but I use meteorological data frequently.

6      Q.  You're not a tank engineer, would you agree?

7      A.  I would agree with that.

8      Q.  You've not designed above-ground storage

9   tanks?

10     A.  I have not.

11     Q.  And you've never published an article

12  regarding the potential for failure of above-ground

13  storage tanks, correct?

14     A.  Correct.

15     Q.  Are you familiar with best industry -- best

16  industry -- excuse me.  Strike that.

17          Are you familiar with best industry practices

18  relating to above-ground storage tanks?

19     A.  The SPCC and the provisions of the permit

20  define those quite well.

21     Q.  The SPCC defines best industry practices for

22  above-ground storage tanks?

23     A.  With respect to its scope, which is spill

24  prevention, containment, and countermeasures.

25     Q.  Can you identify best industry practices for

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 92

1      Q.  Is it your testimony that those best industry

2  practices apply based on your experience and knowledge

3  of stormwater management, rather than specific industry

4  practice?

5                  MS. SMITH:  Object to the form.

6                  THE WITNESS:  The SPCC and the permit

7  have very clear language.  It's unexceptional.  That is

8  what it's based on.

9             I understand what impermeable means.  I

10  understand what sufficient volume of containment means,

11  to be cleaned up before it has a chance to escape.

12  That's what it is based on.

13   BY MS. TOLEDO:

14      Q.  What does "impermeable" mean?  What's your

15  definition?

16      A.  "Impermeable" means that it does not transmit.

17      Q.  And where is that definition found?

18      A.  I would say in Merriam-Webster.  It's a term

19  that is kind of an absolute, you know, general term in

20  the English language.

21      Q.  Does the EPA define the term "impermeable"?

22      A.  I don't know.

23      Q.  Does Connecticut DEEP define the term

24  "impermeable" in their -- in the Connecticut

25  regulations?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 93

1           A.   Bringing up a passage in my mind here.  The

2      DEEP, of course, refers to the stormwater manual.  And

3      the stormwater manual specifies what can produce a

4      condition of impermeability.  So if you consider that

5      to be a definition.

6           Q.   Well, Connecticut regulations do define

7      certain terms relating to stormwater.  Would you agree

8      with that?

9           A.   You would have to point out to me what you're

10     referring to, "certain terms."

11          Q.   Did you make any effort to determine whether

12     Connecticut defines the term "impermeable"?

13          A.   I did not look for the definition, as I very

14     well understand what impermeable means.

15          Q.   Are you saying that impermeable means zero

16     percent can go through?

17          A.   Not necessarily zero percent.

18          Q.   So what is your definition?  Do you have a

19     quantitative definition of impermeable?

20          A.   Well, impermeable literally does mean zero

21     percent.  But in this context, if it prevents -- if,

22     for example, it is a natural soil condition which is

23     adequate to retain spilled material and not let it

24     escape before it can be cleaned up, it is sufficiently

25     impermeable according to the prevailing regulations.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 95

1    SPCC to identify either a natural soil condition or

2    some sort of modification of that condition that would

3    be allowable.

4         Q.  But none of those documents provides a

5    definition or rate that would be acceptable, correct?

6         A.  They definitely don't have a rate, no.

7         Q.  Okay.  Are you aware whether there is a rate

8    that is adopted as part of the definition in any state?

9         A.  I am not aware that such a rate exists.  It

10   may, but I don't know of it.

11        Q.  Did you conduct a review of any relevant

12   industry literature to try to identify what best

13   industry practices are for bulk petroleum storage

14   terminals?

15        A.  The permit in the SPCC told me what those

16   practices are in the scope in which I was working.

17        Q.  Well, the permits don't talk about issues that

18   are specific to these types of sites, correct?

19                MS. SMITH:  Objection to form.

20           Go ahead.

21                THE WITNESS:  It applies to any site

22   with a -- the potential to have a situation in which

23   it's not impermeable in its -- its terms.

24   BY MS. TOLEDO:

25        Q.  Well, permeability is not the only best

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 101

```
1   either of these technologies being used at any bulk
2   petroleum storage terminal, correct?
3        A.  I don't have a specific example of one, no.
4   But the abilities, their abilities, lend themselves to
5   use at such a location.
6        Q.  Well, contaminants are common across different
7   permitting scenarios, right?
8        A.  That's my point.
9        Q.  But the requirements imposed by the different
10  permits for different industries and different
11  activities are different, aren't they?
12       A.  Well, generally the effluent limits, however
13  they're phrased, are common across -- I mean, there are
14  not different benchmarks for different industrial
15  categories.
16       Q.  But we agreed earlier that the terminal is
17  meeting all of its effluent limits, right?
18       A.  It met them for a period of time as specified
19  by the permit to allow it to stop monitoring for some
20  period.  It's not monitored now for several years as --
21  as a result of being compliant with the benchmarks for
22  a period of time.
23       Q.  If it is in compliance with its effluent
24  limits, there is no requirement to change the
25  technology.
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 102

1              MS. SMITH:  Objection to form.

2     BY MS. TOLEDO:

3        Q.  Wouldn't you agree?

4              MS. SMITH:  Objection to form.

5           Go ahead.

6              THE WITNESS:  There is no requirement

7     for it to change that at this time.  My recommendation

8     was that this be considered because it has flexibility

9     that would have some benefits in the future.  It's easy

10    to change out if circumstances change, whether they be

11    the magnitudes of the effluent limits, whether it be

12    more water to handle, you know.

13           So I didn't say that it's required now.  I

14    said it is best industry practice, in my opinion, and

15    it would have some benefits.

16    BY MS. TOLEDO:

17       Q.  Well, is it best industry practice if no other

18    bulk storage -- bulk petroleum storage terminal is

19    using it?  Is it a best industry practice for that

20    industry?

21              MS. SMITH:  Objection to form.

22           So go ahead.

23              THE WITNESS:  Well, we were through this

24    before and I said I define the term "industry" a little

25    bit differently than your suggestion, and that is that

Richard R. Horner , Ph.D.                 August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 104

1      Q.   Okay.  But, again, you're not familiar with
2  any terminal, whatever the industry, any facility in
3  Connecticut that has adopted either of these treatment
4  technologies, correct?
5      A.   I don't know of an industry in Connecticut.  I
6  don't know whether they have or have not.
7      Q.   And if a facility is meeting its effluent
8  limits and is in compliance, isn't that facility
9  meeting best industry practice?
10            MS. SMITH:  Objection to the form.
11  Asked and answered, I believe.
12            Go ahead.
13            THE WITNESS:  I -- I never said that
14  they should tear out their ponds and put these in now.
15  I put them forward as best industry practice that
16  should be at least strongly considered should these
17  circumstances of redevelopment come up.
18            And they would do themselves a favor if they
19  were aware of the existence of these options because it
20  could lend some advantages to their continued
21  operation.
22   BY MS. TOLEDO:
23      Q.   Did you make any effort to contact anyone from
24  oil and gas companies to try to determine what best
25  industry practices are for that industry, using my

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

                                                    Page 106

 1    manual are accepted.

 2     BY MS. TOLEDO:

 3         Q.   Did you look to see whether any EPA region has

 4    issued guidance on recommended best practices?

 5                    MS. SMITH:   Objection to form and scope.

 6             Go ahead.

 7                    THE WITNESS:   I did not check the EPA

 8    regions, no.

 9                    MS. TOLEDO:   I'm going to mark the next

10    exhibit, Exhibit 10.

11                    (Exhibit 10 marked for identification.)

12     BY MS. TOLEDO:

13         Q.   Have you seen this document before --

14         A.   No.

15         Q.   -- Dr. Horner?

16             I'll represent to you that it is a Fact Sheet

17    prepared by the Region 6 Regional Response Team

18    Executive Committee looking at flood preparedness.

19             Do you see that?

20         A.   Yes.

21         Q.   Okay.   The -- if you look at the first

22    paragraph of this document, it indicates that they were

23    looking at the large number of spills generated by

24    Hurricanes Katrina and Rita.

25             Do you see that?

Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 112

1   part of CLF's claim here is that -- is the allegation

2   that the terminal is not protected from severe weather

3   events caused by climate change.

4            Do you agree with that?

5                    MS. SMITH:  Objection to the form.

6                    THE WITNESS:  The --

7                    MS. SMITH:  Scope.

8                    THE WITNESS:  It doesn't matter whether

9   it is protected or not, according to the regulations.

10  It doesn't matter.  Yes, it should take into account

11  the effects of meteorological conditions on its

12  operations as a whole.  But irrespective of that,

13  whether it does or doesn't, it needs to provide that

14  level of containment.

15   BY MS. TOLEDO:

16       Q.  Do you have any indication that a regulatory

17  agency has found the terminal not to be meeting the

18  SPCC regulations?

19       A.  I do not have any rulings in that regard, but

20  I myself determined that they aren't.

21       Q.  Going back to the best practices recommended

22  by Region 6, did you review any of the practices or

23  protocols in effect at the terminal to address the

24  issues that this document raises?

25                    MS. SMITH:  Objection to the form and

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 113

1   outside the scope.



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 114



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 115

5        Q.  And I believe that you did review an EPA

6    document that shows an inspection relating to SPCC

7    compliance.  Is that true?

8        A.  That is true.

9        Q.  Let me see if I can find that.

10            MS. TOLEDO:  Let's go ahead and mark

11    that.  It's -- apologies.  I'm just trying to find the

12    EPA document.

13            Okay.  So I believe this is 11.

14            (Exhibit 11 marked for identification.)

15    BY MS. TOLEDO:

16        Q.  Is this the inspection document that you

17    reviewed?

18        A.  Yes.

19        Q.  And this is a document that was cited by Eric

20    Kovich, right?

21        A.  Yes.

22        Q.  And EPA does inspect facilities for compliance

23    with SPCC, correct?

24        A.  Correct.

25        Q.  And this document is an inspection report for

Page 116

1    one such inspection of the terminal, correct?

2         A.  Yes.

3         Q.  Did EPA find any violation to the SPCC

4    regulations in its inspection?

5         A.  No.  But I disagree.

6         Q.  Are you a qualified EPA inspector?

7         A.  A practitioner and a citizen has a right to

8    disagree with the EPA.

9         Q.  Did you communicate with EPA that you disagree

10   with its findings?

11        A.  No.

12        Q.  To your knowledge, has Connecticut DEEP ever

13   issued a notice of violation to the terminal?

14        A.  I have not seen a notice of violation.  I

15   can't say whether one has ever been issued.

16        Q.  Did you do any research or contact anyone to

17   try to determine whether the facility had been cited

18   for any violation relating to stormwater?

19        A.  I didn't put that specific question to

20   anybody, no.

21        Q.  And to your knowledge, DEEP has never required

22   the terminal to change any of its processes.  Would you

23   agree?

24        A.  To my knowledge, I have not -- I would agree.

25        Q.  And nor has DEEP ever indicated that the

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 117

1    terminal SWPPP is in violation of the permit.

2            Is that your understanding?

3        A.   Yes.  But, again, a practitioner and a citizen

4    has a right to make their own evaluation and disagree,

5    if they find reason to.

6        Q.   Going back to the issue of ballasting and the

7    safety of the tanks, from your testimony my

8    understanding is that you're not offering an opinion

9    about the likelihood or not of failure of any of the

10   tanks; is that right?

11       A.   That is right.

12       Q.   Or opinions about tank stability, right?

13       A.   No.

14       Q.   Did you ever speak with a Dr. Kameshwar about

15   the likelihood of failure of tanks at the terminal?

16       A.   I don't know that name.

17       Q.   Have you ever reviewed any of his articles

18   relating to tank failures?

19       A.   No.

20       Q.   You did review the deposition of Mike

21   Sullivan, right?

22       A.   Yes.

23       Q.   And Mr. Sullivan testified that the terminal

24   does fill the tanks when a storm is anticipated.

25           Do you remember that testimony?

Page 119

1    Q.  Okay.  We are going to mark the next exhibit.

2  It's the Connecticut Stormwater Manual.  And that will

3  be Exhibit 12.

4              (Exhibit 12 marked for identification.)

5   BY MS. TOLEDO:

6    Q.  And for the record, this is Connecticut

7  Stormwater Quality Manual and it's the latest revision

8  dated March 26, 2024.

9            Do you see that?

10   A.  Yes.

11   Q.  Is this a document that you reviewed?

12   A.  Yes.

13   Q.  Okay.  Now, just to be clear, this document

14  dated 2024, obviously, was not in effect at the time

15  this lawsuit was filed in 2021, right?

16   A.  It was not revised in 20 years.  No, it was

17  not in effect.

18   Q.  Okay.  Well, the original publication date is

19  September 30th, 2023, with an effective date of

20  March 30, 2024.

21            Do you see that on the cover?

22   A.  Yes.

23   Q.  And if we go to Page 147, which is

24  Chapter 9 -- again, this is excerpts.  I'll just make

25  that clear for the record.  It's not the entire

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 121

1    could have been done at that time to provide for the

2    full volume of secondary containment required.



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 122



Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 144

1    permeability and capacity, correct?

2        A.   Correct.

3        Q.   And as far as the others, employee training,

4    non-stormwater discharges, is it your opinion that the

5    terminal is in violation on either of those?

6        A.   Not -- no, not of those, that I know of.

7        Q.   And the last one, No. 13, sector-based control

8    measures, those do not apply to the terminal, correct?

9        A.   Well, I'd have to review Section 5-J to answer

10   it authoritatively.

11       Q.   I believe it's F.

12       A.   I'm sorry, 5-F.

13       Q.   And that's on Page 38.  And it there lists the

14   various sectors.  Sector A is Asphalt Plans, Page 38.

15       A.   Yeah, I've got it.

16            Yeah.  Scrap recycling.  Steam electric power.

17   Transportation and public works.  Marinas, et cetera.

18   Small scale composting.  I think that's probably it.

19       Q.   So nothing that applies to the terminal,

20   correct?

21       A.   Well, I could make a case about No. 5,

22   minimize exposure.

23       Q.   You don't really know what sector the terminal

24   is classified under?

25       A.   I don't.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 146

1    that you were referring to?

2         A.   The stormwater manual --

3         Q.   Oh.

4         A.   -- which is, you know, associated -- provides

5    more of the specifics of implementation under the

6    permit.  It allows -- it -- it requires a liner, a

7    synthetic liner.  It names it.  But it lets open the

8    possibility for another method with permission.

9         Q.   But, again, that's from 2024, right?

10        A.   Yes.  I -- yes, that is the language in the

11   2024 manual.

12        Q.   Okay.  And it provides expressly that it

13   applies to new development, redevelopment, and upgrades

14   to existing development, as we discussed before, right?

15        A.   Well, yes, but long predating that is the

16   conditions of effectively impervious -- sufficiently

17   impervious and impermeable.  They do not depend on the

18   vintage of the stormwater manual.  They're absolute.

19   They've existed for some time before the 2024

20   stormwater manual.

21        Q.   Is there anywhere in the SPCC regulations that

22   has an express requirement for a synthetic liner?

23        A.   No.  But there is requirement for sufficiently

24   impervious.

25        Q.   Okay.  And as we have discussed before,

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 147

1  there's no quantitative standard regarding the

2  percolation rate.

3       A.  There is no quantitative standard.  The eye of

4  the beholder is that this is a case in which it's over

5  in the opposite extreme.  It is the kind of soil that

6  is known to be very permeable.

7       Q.  And the eye of the beholder is your,

8  Dr. Horner's, eye, right?

9              MS. SMITH:  Objection to form.

10          Go ahead.

11              THE WITNESS:  It is mine.  I believe it

12  would be widely agreed upon.

13   BY MS. TOLEDO:

14       Q.  Based on what?

15       A.  By the years of association with practitioners

16  in my field.

17       Q.  Is there any literature or any article or

18  guidance that you can cite to me as we sit today, as we

19  sit here today, that supports your argument that

20  just -- that a synthetic liner would be required in

21  these conditions?

22              MS. SMITH:  Objection to form.  Asked

23  and answered.

24          Go ahead.

25              THE WITNESS:  One needs to achieve

Page 165

1    BY MS. TOLEDO:

2        Q.  I'm so sorry.  I gave you -- I marked the

3    wrong thing.  So I will give you new ones, and we will

4    mark it in a minute.  I'll give you this one.  It has

5    the 5 up on top.

6            Did you see any reference to inadequate

7    capacity of secondary containment?

8                    MS. SMITH:  Same objection.

9                    THE WITNESS:  I haven't had a chance to

10   read it.  So I guess you represented to me it's not

11   there, but I can't affirm that.

12   BY MS. TOLEDO:

13       Q.  Well, take your time and read it.

14       A.  It's going to take a while.

15       Q.  Just those sections, the violations listed.

16   It's three pages.

17       A.  Now, if you're asking me if I see the word

18   "bypass."  At the bottom of Page 10 I've not seen the

19   word "bypass."  However, I do see that the

20   requirement -- the permit requires that the SWPPP shall

21   map and describe potential sources of pollutants that

22   may reasonably be expected to affect stormwater quality

23   at the site or that may result in the discharge of

24   pollutants during dry weather from the site.  That

25   could include the bypass.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 166

1       Q.  My question was whether there's any reference
2   to inadequate capacity of secondary containment?
3                   MS. SMITH:  Same objection.
4                   THE WITNESS:  I did not see the words
5   "inadequacy of secondary containment."  However, I
6   still maintain the general statement that I read to you
7   earlier is a requirement to consider all specific
8   sources of contamination, and that would be one.
9   BY MS. TOLEDO:
10      Q.  Did you see any reference to permeability?
11      A.  No.
12      Q.  Did you see any reference to a requirement
13  that the secondary containment area should have a
14  liner?
15                  MS. SMITH:  Same objection.  Requires
16  legal interpretation and conclusion.
17          Go ahead.
18                  THE WITNESS:  It's not in this document,
19  but it's in the regulations.
20  BY MS. TOLEDO:
21      Q.  Is there any mention in that document about
22  the bypass being inadequate?
23                  MS. SMITH:  Same objection.
24                  THE WITNESS:  It's not there, but I was
25  asked to analyze it.  It's on the list.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 167

1    BY MS. TOLEDO:

2        Q.  I understand.  Yeah.  We need to get the

3    sticker on this one.

4            Are you offering any opinions in this case

5    about violations of RCRA?

6        A.  No.

7                MS. SMITH:  I'm going to object, I'm

8    sorry, to that last question for the same reason, to

9    the extent it calls for a legal analysis or conclusion.

10   BY MS. TOLEDO:

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 168



20    BY MS. TOLEDO:

21         Q.  Well -- okay.  Well, let's go to -- back to

22    the stormwater manual.  And if you go -- it says that

23    the 2023 -- the second paragraph highlights -- starts

24    highlighting --

25         A.  Which page?

Page 169

1      Q.  Oh, I'm so sorry, Page 3.  I thought I had

2  said.

3      A.  Okay.

4      Q.  And it's -- it expressly says that Chapter 10

5  is a new chapter, the third bullet down.

6          Do you see that?

7      A.  Yes.

8      Q.  And do you agree that Chapter 10 is the

9  chapter that describes the LUHPPL requirements?

10     A.  Yes, Table 10-4.

11     Q.  Okay.  So starting on Page 191, it talks -- it

12  defines the LUHPPLs, right, what constitutes a LUHPPL,

13  and then has them listed on Table 10-4, as you said?

14     A.  Yes.

15     Q.  Now -- and Chapter 10 for LUHPPLs says, when

16  it describes going back to the description, at the

17  beginning of Chapter 10, it says that this chapter --

18  in the box, it says, "This chapter is a new addition to

19  the Connecticut Stormwater Quality Manual."

20          Do you see that?  Page 176.

21     A.  All right.  I'm at 176.

22     Q.  And I'm just saying, the box on the right-hand

23  side expressly states that this is a new addition, this

24  chapter?

25     A.  I see that.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 171

1    terminal is not in an aquifer protection area, correct?

2         A.   Yeah, this specific appendix by its title does

3    not apply.  However, the stormwater manual does not

4    refer to only areas of protected or supply.

5         Q.   Right.  But the stormwater manual postdates

6    the filing of this lawsuit and does not apply to

7    established facilities, right?

8                   MS. SMITH:  Objection to the form.

9                   THE WITNESS:  It postdates the filing of

10   the lawsuit.  I don't agree that it has no bearing on

11   the operation of the facility.

12    BY MS. TOLEDO:

13        Q.   Okay.  Well, let's go ahead and mark this next

14   exhibit, which I believe is 15.

15                   THE REPORTER:  I have 16.

16                   (Exhibit 16 marked for identification.)

17    BY MS. TOLEDO:

18        Q.   And I'll represent to you this is Table 4.2

19   from the stormwater manual that we mentioned before but

20   I had not copied in the excerpts that I provided

21   earlier.

22        Do you remember seeing this table when you

23   reviewed the stormwater manual before?

24        A.   I don't remember this table, no.

25        Q.   I can't recall if it's in your original report

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 193

1  of the following soil types?   If you have a soil that

2  is 100 percent sand, a soil that is 70 percent sand and

3  30 percent silt, soil that is 50 percent sand and

4  50 percent silt, or a soil that is 30 percent sand and

5  70 percent silt, which -- how do they rank?

6       A.  Well, the way you --

7            MS. SMITH:  Objection to form.

8         Go ahead.

9            THE WITNESS:  Well, the way you've laid

10  it out is permeability is decreasing down your list.

11  BY MS. TOLEDO:

12      Q.  So 100 percent sand is the most permeable out

13  of those combinations, correct?

14      A.  Correct.

15      Q.  Are you -- so you reviewed the 67 soil borings

16  from 2003, right?   That are from the Sovereign report,

17  right?

18      A.  Right.

19      Q.  Were you aware that there were additional

20  boring logs available from 2020 and 2024?

21      A.  No.  I didn't get that information.

22      Q.  So you didn't have an opportunity to review

23  those reports, correct?

24      A.  I did not.

25      Q.  Did you see a discussion about those

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 194

1    additional soil borings in Dr. Zeeb's report?

2          A.  I don't recall seeing that.  I don't recall

3    it.

4          Q.  And are you aware that those Sovereign reports

5    are publicly available through CT DEEP's online portal?

6          A.  I'm not aware of that.

7          Q.  Did you look?

8          A.  No.  I had no idea that they existed.

9          Q.  Did you do any independent research to

10   determine what information was available about the soil

11   at the terminal?

12         A.  Well, I accessed the soil survey for New Haven

13   County, and I looked at the soil in the vicinity of the

14   terminal.

15         Q.  Are you aware that soil at the terminal also

16   contains fill that was brought in?

17                    MS. SMITH:  Objection to form.

18                    THE WITNESS:  I'm not -- I'm not aware

19   of it, no.

20    BY MS. TOLEDO:

21         Q.  Would you agree that your analysis would be

22   more accurate if you had all of the available data?

23                    MS. SMITH:  Objection to form.

24                    THE WITNESS:  I would certainly liked to

25   have had all the available data.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 202

1    this is one document that should have been provided to

2    them.  That's how I cited it.

3     BY MS. TOLEDO:

4        Q.  Are you proffering an opinion that the

5    defendants have engaged in fraud or deceit relating to

6    anything relevant to this lawsuit?

7        A.  No, I would not frame anything as fraud or

8    deceit.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 203

1        Q.   Is it your opinion that defendants give no

