FILED UNDER SEAL

# EXHIBIT A

FILED UNDER SEAL

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Equilon Enterprises LLC et al.

Case No. 3:21-cv-00933

## EXPERT WITNESS REPORT OF DAVID M. UHLMANN

### June 23, 2025

### Introduction

1.      I was retained by King & Spalding to evaluate claims against their clients, Equilon Enterprises LLC ("Equilon), Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva") (collectively, "Defendants"), brought by the Conservation Law Foundation under the Clean Water Act and the Resource Conservation and Recovery Act ("RCRA") and, if requested to do so, to provide expert testimony on behalf of Defendants. Before agreeing to provide an expert opinion in this matter, I advised King & Spalding that I would make no promises about what my opinions would be regarding the merits and the enforceability of Plaintiff's claims against Defendants. King & Spalding and its clients agreed to retain me with that understanding at the rate of $2,250 per hour.

2.      This expert witness report summarizes my opinions related to several issues raised by the Amended Complaint filed in this case, as well as expert reports submitted by Plaintiff. My review has focused on Plaintiff's claims regarding the General Permit for the Discharge of Stormwater Associated with Industrial Activity issued in 2018 by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") and reissued in 2021 without any relevant substantive changes (the "2018/2021 General Permit"). The 2018/2021General

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 10**

express requirements relating to climate change on regulated industries. As a result, in my opinion, EPA would not have a basis to allege violations of the Clean Water Act or RCRA based on the failure to plan for climate change, absent regulations that did not exist when the Amended Complaint was filed in 2021 or applicable permits that include specific climate resiliency requirements.

21.     Since Plaintiff filed its Amended Complaint, EPA has taken steps to enhance climate enforcement, including imposition of climate resiliency measures as part of settlement agreements. On September 28, 2023, when I served as the EPA Assistant Administrator for Enforcement and Compliance Assurance, I issued EPA's Climate Enforcement Strategy.[12] In that document, I directed "all EPA enforcement and compliance offices to address climate change, whenever appropriate, in every matter within their jurisdiction." Pursuant to the Climate Enforcement Strategy, EPA's enforcement and compliance programs were required to prioritize enforcement and compliance actions to mitigate climate change; include climate adaptation and resilience in "case conclusions" (*e.g.*, settlement agreements) whenever appropriate; and provide technical assistance to state and local partners to achieve climate-related solutions.

22.     Significantly, however, EPA's Climate Enforcement Strategy recognized the relative lack of statutory and regulatory requirements relating to climate resiliency, noting that EPA's enforcement and compliance should work to incorporate climate resiliency measures into "agreed upon case resolutions," such as settlement agreements, with regulated entities. EPA did not direct its enforcement and compliance divisions to identify violations of environmental

---

[12] Climate Enforcement Strategy, *supra* note 2.

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 11**

statutes and regulations, including the Clean Water Act and RCRA, that were related to entities' failures to adapt to or plan for climate change-related impacts to their operations.

23.     In furtherance of the Climate Enforcement Strategy, EPA issued a June 12, 2024, memorandum titled *Addressing Climate Vulnerabilities in Water Enforcement Remedies* ("EPA Water Enforcement Memo")[13] that directed EPA's water enforcement staff to ensure that entities in violation of the Clean Water Act "consider climate change in taking the steps needed to return to, and maintain, compliance" with the Clean Water Act. The EPA Water Enforcement Memo notes that "[s]ettlements resolving CWA … enforcement actions should incorporate the remedial measures necessary to address vulnerabilities to climate change that will ensure long-term compliance" with the Clean Water Act. The EPA Water Enforcement Memo recommends specific resilience and adaptation measures, including several measures related to stormwater, that entities that are in violation of other aspects of the Clean Water Act can implement to address climate change vulnerabilities moving forward.

24.     The EPA Climate Enforcement Strategy and the EPA Water Enforcement Memo demonstrate that, through the end of the Biden Administration, EPA's enforcement program only addressed climate resiliency in the context of the Clean Water Act as a settlement term. Despite the fact that climate enforcement was one of my top priorities, EPA did not pursue enforcement

---

[13] Joseph Theis, Acting Director, Water Enforcement Division, Office of Civil Enforcement, Memorandum Re: Addressing Climate Vulnerabilities in Water Enforcement Remedies (June 12, 2024), https://www.epa.gov/system/files/documents/2024-06/addressingclimatevulnerabilitiesinwaterenfremedies.pdf. The EPA Water Enforcement Memo recognizes that "[t]he design of compliance remedies has traditionally been based on historic climate and hydrologic patterns, but historic weather patterns and data are no longer adequate to accurately characterize current or future conditions in light of a changing climate." *Id.* at 3.

FILED UNDER SEAL
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 12**

actions during my tenure against facilities that did not perform climate assessments or build climate-adaption measures into their long-term planning. To the best of my knowledge, EPA has never taken enforcement action under the Clean Water Act or RCRA based on the failure to pursue climate resiliency measures at a particular facility, as sought by Plaintiff in this case.

**Opinion 2: Clean Water Act general permits requiring best industry practices will be implemented differently across various sectors and will evolve as technology, science, and industries develop and new practices are adopted, which makes them a poor fit for enforcement except in cases where specific practices are well-established in a sector.**

25.      The Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[14] The Act prohibits the discharge of a pollutant from any point source into a "water of the United States" except in compliance with a Clean Water Act permit.[15]

26.      Clean Water Act permits can impose a variety of requirements. Generally, a permit allows a facility to discharge a specified amount of a pollutant, or combination of pollutants, into a receiving water under certain conditions. Permits must include "effluent limitations," which are restrictions on the quantities, rates, and concentrations of discharged

---

[14] 33 U.S.C. § 1251(a).

[15] *See* 33 U.S.C. § 1311(a) ("Except in compliance with this section and [other sections detailing permitting requirements] of this title, the discharge of any pollutant by any person shall be unlawful."); *id.* § 1362(12) (defining "discharge of a pollutant" to mean "any addition of any pollutant to [a jurisdictional water] from any point source").

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 13**

pollutants.[16] In addition to effluent limitations, a permit may also impose other requirements, including best management practices to reduce pollution.[17]

27.　　There are two types of Clean Water Act permits: individual permits and general permits. An individual permit only covers a single facility and is issued to address site-specific conditions at that facility. An individual permit is issued directly to the discharger based on that entity's application for such a permit. A general permit, on the other hand, is developed by the permitting authority to cover an entire class of hypothetical dischargers, often including multiple industrial sectors, and in some cases with nationwide coverage.[18] General permits are developed when the covered dischargers have similar operations and types of discharges.[19]

28.　　Under the Clean Water Act, EPA can authorize state, tribal, and territorial governments to operate permit programs within their jurisdictions.[20] That authorization enables State, tribal, or territorial governments to perform many of the permitting, administrative, and enforcement aspects of the Clean Water Act—all with EPA oversight. Currently, however, EPA implements the Clean Water Act in New Mexico, New Hampshire, Massachusetts, the District of Columbia, and all U.S. territories other than the U.S. Virgin Islands.[21]

---

[16] 33 U.S.C. § 1362(11)

[17] *See* 40 C.F.R. § 122.44(k)(3).

[18] *See* 40 C.F.R. § 122.28.

[19] *See id.*; *see also Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1183 (9th Cir. 2002) (discussing issuance of general permits).

[20] *Id.* §§ 1342(b), 1362(3), 1377.

[21] *NPDES Permits Around the Nation*, EPA.GOV, https://www.epa.gov/npdes-permits (last updated Feb. 5, 2025).

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 14**

29.     General permits typically contain broad requirements because they apply to numerous facilities across various industries. Because it would be impossible for EPA or authorized States to address in each general permit every category and type of facility, a general permit must rely to some extent on broader requirements, such as "best management practices," and/or "best industry practices." Best industry practices are not static. They evolve over time as industry develops new technologies, new control measures become economically feasible, and new practices are more widely adopted within a given sector—and recognized by regulators.

30.     EPA and the States can enforce the requirements of Clean Water Act general permits, including language regarding best management practices and best industry practices. But best industry practices only are enforceable in limited circumstances. Unlike enforcement of a permit condition that imposes, for example, a numeric limit on the discharge of a pollutant, enforcement of a permit condition that requires adoption of a best industry practice requires a broader analysis that considers whether a specific practice is economically practicable and achievable and the extent to which the practice has been adopted by comparable facilities within the relevant sector. The need for that analysis poses challenges from an enforcement standpoint, since regulated entities only may face penalties for violating the Clean Water Act—or any other statute—when the relevant legal standard can be determined in advance. As a result, best practices typically only are enforceable when there is evidence that they are technologically and economically practicable, and the practices are widely adopted within the relevant industry

FILED UNDER SEAL
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 15**

sector. To proceed otherwise would violate Constitutional due process requirements regarding fair notice.[22]

**Opinion 3: Plaintiff's expert has provided recommendations about how to increase climate resiliency at the New Haven Terminal, but those climate resiliency recommendations do not rise to the level of enforceable best industry practices, absent evidence that the measures were technologically and economically feasible and the extent to which comparable facilities implemented the measures at the time of the Amended Complaint.**

31.    I have reviewed the Expert Report of Dr. Wendi Goldsmith, dated May 8, 2025 (the "Goldsmith Report"), which identifies several measures that Dr. Goldsmith believes would be appropriate to address and mitigate climate risk and/or enhance climate resilience at bulk fuel storage terminals. These include, among other things, to proactively plan for upward trends in weather-related risks and to consider, based on accurate risk modeling, projected climate change impacts over the life of a facility.[23] Even if such measures were optimal, however, they would only rise to the level of enforceable best industry practices when they are adopted widely enough in the relevant sector so that a failure to take such measures would be out of step with what responsible companies in the relevant sector are doing. Moreover, practices that could be deemed

---

[22] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also id.* (explaining that "clarity in regulation is essential to the protections provided by the Due Process Clause"). To ensure due process, "regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary way." *Id.*

[23] *See, e.g.*, Goldsmith Report at 25-26, 31.

FILED UNDER SEAL
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 16**

"optimal" might not be "best" industry practices because they are not "technologically and economically practicable and achievable" under the 2018/2021 General Permit.

32.    To my knowledge, neither EPA nor any other federal or state agency has brought an enforcement action against any entity for failing to implement a best industry practice involving climate resiliency measures. Indeed, as discussed in Opinion 1, neither the EPA nor States with delegated Clean Water Act enforcement authority, including Connecticut, have brought an enforcement action based on a regulated entity's failure to perform a climate assessment or to incorporate climate resiliency measures into a compliance program. Although not dispositive, the absence of such enforcement actions—under any statute, against any entity, in any sector—strongly suggests that there was no enforceable requirement to perform the climate resiliency measures identified in the Goldsmith Report when Plaintiff filed the Amended Complaint.

33.    The Goldsmith Report identifies only a handful of instances where other facilities have proposed or engaged in the type of analysis that Dr. Goldsmith believes should have occurred at the New Haven Terminal. It merits emphasis that those facilities either were responding to specific permit requirements absent from Connecticut's 2018/2021 General

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 17**

Permit[24] or to extreme weather events that caused major operational disruptions.[25] From an enforcement perspective, identifying a few facilities at which a certain measure has been adopted—particularly when those facilities adopted that measure in response to express permit requirements or extreme weather-related incidents not present here[26]—is not enough to show that those measures are best industry practices for purposes of creating an enforceable requirement under the Clean Water Act.

34.    In my opinion, before enforcing a permit condition that involves best industry practices, EPA or authorized States would need to identify a group of comparable facilities. Only after doing so could EPA or the State determine whether a particular practice was technically and economically feasible and adopted widely enough to have ripened into an enforceable requirement. In determining a set of comparable facilities, relevant considerations would include the purpose and function of the facility, its size, and its location (including, in the present case, whether it is in a coastal area).

---

[24] Dr. Goldsmith references the "Chelsea Terminal SWPPP which addresses climate change." Goldsmith Report at 34, n.135. The NPDES Permit that required development of that SWPPP, unlike the General Permit that covers the New Haven Terminal, specifically requires that the SWPPP "take future conditions into consideration." *See* NPDES Permit No. MA0001091, at 18. The Chelsea Terminal SWPPP also postdates the 2018/2021 General Permit.

[25] *See, e.g.*, Goldsmith Report at 34 (discussing an investigation of failure mechanisms at Motiva Port Arthur Refinery and Shell's Deer Park, Texas facility and proposals to implement various improvements).

[26] The Amended Complaint in this case discusses only one incident of past storm-related flooding at the New Haven Terminal, which resulted in exceedances at two outfalls. *See* Am. Compl. at 54-55 (discussing storm surge caused by Hurricane Irene in 2011). The Goldsmith Report does not specifically identify any such events.

FILED UNDER SEAL
**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 18**

35.     During Plaintiff's Rule 30(b)(6) deposition, Sean Mahoney from the Conservation Law Foundation was asked whether Plaintiff was aware of other facilities in Connecticut that had implemented specific measures related to climate change resiliency. Mr. Mahoney stated that he was not aware of any such facilities.[27] Although not dispositive, the absence of such comparable facilities would be a relevant consideration in determining whether climate resiliency measures were enforceable best industry practices under the Clean Water Act at the time of the Amended Complaint.

36.     The climate resiliency measures described by Dr. Goldsmith and Mr. Mahoney are the kind of steps that EPA sought to require as part of settlements under the Climate Enforcement Strategy in 2023 and the Water Enforcement Memo in 2024.[28] But the fact that EPA in 2023 and 2024 sought to require climate resiliency efforts as part of settlement agreements is categorically different from the conclusion that climate resiliency measures were enforceable requirements of the 2018/2021 General Permit, as the Amended Complaint alleges.

37.     Despite my belief that federal and state agencies should promote climate resiliency, it is my opinion that the specific steps recommended by Dr. Goldsmith were not enforceable best industry practices when Plaintiff filed the Amended Complaint. My opinion that

---

[27] *See* Mahoney Dep. Tr. (rough transcript), at 279:6-11 ("I'm not aware of—of any other facility—I'm not aware of how any other facility is attempting to address the impacts of sea level rise in Connecticut.")

[28] EPA also encouraged permittees to consider rising sea levels and increased rainfall in the 2021 Multi-Sector General Permit ("2021 MSGP"). Significantly, however, Connecticut did not utilize the 2021 MSGP and even the 2021 MSGP did not require implementation of the climate resiliency measures described by Dr. Goldsmith and Mr. Mahoney.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 19**

the climate resiliency measures recommended by Dr. Goldsmith were not enforceable requirements of the 2018/2021 General Permit is reinforced by the fact that EPA and the States have never brought an enforcement action alleging similar violations. Indeed, there is no evidence that comparable facilities implemented climate resiliency measures except when required to do so by specific permit language or in response to extreme weather events that caused major operational disruptions at an individual facility. Those occurrences did not amend the 2018/2021 General Permit or otherwise establish a new enforceable best industry practice.

**Opinion 4: By implementing a hurricane action plan and adopting other emergency response measures at the New Haven Terminal, Defendants addressed climate risks to the extent that they would have been enforceable best industry practices under the 2018/2021 General Permit; the additional climate resiliency steps specified in the Amended Complaint and in the Goldsmith Report were not enforceable terms of the 2018/2021 General Permit.**

38.    Based on the materials that I have reviewed relating to operations at the New Haven Terminal, Defendants took a number of steps to address the possibility of extreme weather events at the New Haven Terminal. Defendants instituted a "business continuity plan" and previously implemented a "hurricane action plan" to ensure that the New Haven Terminal was prepared for extreme weather events, including training to prepare for such events. For example, Defendants' Business Continuity and Storm Action Plan ("Business Continuity Plan")[29] directs the facility manager to "work with the Supply Team to evaluate options for tanks that could be impacted by a storm surge event due to low product levels."[30] The Business

---

[29] Shell Trading & Supply Distributions US East Business Continuity and Storm Action Plan (Apr. 2024).

[30] *Id.* at 9.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 20**

Continuity Plan outlines several steps that the facility manager can take to protect storage tanks from storm damage, such as increasing the height of product or adding a water bottom to the tank for ballast. The Business Continuity Plan also directs the terminal manager to confirm that the seals between the concrete foundation and the tanks have been inspected on a monthly basis and that the seals are not "compromised or showing signs of deterioration, holes or otherwise areas that water could penetrate between the tank chime and concrete foundation."[31]

39.     It is my understanding that the measures implemented by Defendants to prepare for the potential of extreme weather events were similar to those recommended by the EPA Region 6 Regional Response Team.[32] In addition, based on an expert report submitted by Defendants, operators of bulk petroleum storage facilities located in coastal areas appear to have implemented ballasting procedures and other storm preparedness measures that are similar to those in Defendants' Business Continuity Plan described above.[33] From an enforcement perspective, the ballasting procedures and storm preparedness measures that Defendants and other operators of coastal fuel terminals implemented to prepare for the possibility of extreme weather events may have been enforceable best industry practices at the time of the Amended Complaint. But the additional measures identified by Dr. Goldsmith, which are focused on designing and hardening facilities for long-term impacts of climate change, do not appear to have

---

[31] *Id.*

[32] *See* Region 6 Regional Response Team, Flood Preparedness: Recommended Best Practices (Jan. 2016).

[33] Expert Report of Eric Kovich P.E. (June 23, 2023).

FILED UNDER SEAL

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 21**

been generally accepted or implemented widely enough to be considered enforceable best industry practices.

40.     The State of Connecticut has conducted regular inspections at the New Haven Terminal. The State determined that the New Haven Terminal was in compliance with the 2018/2021 General Permit for nearly a decade.[34] Although also not dispositive, these findings by state regulators militate strongly in favor of the view that specific climate resiliency measures were not required best industry practices prior to the filing of the Amended Complaint.

41.     On that basis, it is my opinion that Plaintiff has not demonstrated that Defendants failed to conduct their operations in accordance with the enforceable best industry practices for minimizing stormwater discharges caused by storm events. From an enforcement perspective, I do not believe that EPA and the State of Connecticut could have proven that Defendants violated the requirements of the 2018/2021 General Permit, including the best industry practices provision, by not including the long-term design and hardening measures promoted by Dr. Goldsmith, as those measures were not generally implemented by industry at that time. My opinion is reinforced by the other opinions expressed in this report: (a) the Clean Water Act does not contain statutory language addressing climate change; EPA has never alleged that the failure

---

[34] *See* Expert Report of Russ Parkman (June 23, 2025). *See also* Equilon Enterprises LLC (Shell Oil Products US) FRS ID 110070687145 Detailed Facility Report (showing, as of June 11, 2025, no informal or formal enforcement actions within the past five years), *and* Motiva Enterprises LLC FRS ID 110000491977 Detailed Facility Report (showing, as of June 11, 2025, one Clean Air Act compliance violation in 2023, one presumably related informal enforcement action that same year, and no other informal or formal enforcement actions within the past five years) (both reports retrieved from EPA's Enforcement And Compliance History Online (ECHO) database, https://echo.epa.gov/).

FILED UNDER SEAL
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 22**

to implement climate resiliency measures is a violation of the Clean Water Act; and climate resiliency only has been required by EPA as part of settlement agreements; (b) best industry practices—the only term in the 2018/2021 General Permit that Plaintiff cites to support its claims—are not well-suited to enforcement absent far more compelling evidence than what has been presented by Plaintiff; and (c) Plaintiff's expert report fails to identify climate resiliency measures widely adopted by other coastal fuel storage terminals.

42.      It merits emphasis that, while citizen suits can be brought in situations where EPA and the State fail to act, citizen suits cannot be premised on violations that the government cannot enforce. Stated differently, if EPA and the State of Connecticut cannot bring an enforcement action alleging that the failure to perform climate resiliency measures constitutes a violation of the 2018/2021 General Permit, a citizen suit cannot be brought on that basis either. Citizen suits cannot create new obligations or enforce new requirements that do not appear in the Clean Water Act, regulations under the Clean Water Act, or permits issued by EPA or a State under the Clean Water Act.

**Opinion 5: Defendants have not created "an imminent and substantial endangerment" at the New Haven Terminal, as that term is defined under RCRA, because the storage of petroleum products is not regulated under RCRA, and any quantities of petroleum products released during regular operations at the site are too small to present an imminent and substantial endangerment.**

43.      The storage of petroleum products is not regulated under RCRA because the petroleum products are not "discarded" and therefore not "solid waste" or "hazardous wastes"

FILED UNDER SEAL

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 23**

under RCRA.[35] For a RCRA violation to occur at a fuel storage terminal, there would need to be a disposal of petroleum products or other hazardous wastes at the site. While disposal of hazardous waste could occur if a storage tank ruptured, EPA has never taken the position in an enforcement action that the mere storage of petroleum products requires a RCRA storage permit or that a potential fuel tank rupture is somehow prospectively a disposal of hazardous waste under RCRA.

44.     Plaintiff seeks to salvage its RCRA claim by alleging that the petroleum stored at the New Haven Terminal constitutes a solid waste "because [Defendants'] failure to address the known imminent risks associated with severe precipitation, extreme weather, storm surge, and sea level rise … will result in release of these products when these foreseeable events inevitably occur." Amended Complaint at 491. Plaintiff also argues that Defendants' "inaction" demonstrates an "intent to discard" wastes. *Id.* In my opinion, Plaintiff's theories are not enforceable violations of RCRA and are inconsistent with RCRA's regulatory scheme. RCRA requires that material must be "discarded" to qualify as a solid waste, not material that may be discarded in the future.

45.     Because other materials present at the New Haven Terminal constitute hazardous waste, the New Haven Terminal is categorized as a "small quantity generator" under RCRA. Small quantity generators generate more than 100 kilograms, but less than 1,000 kilograms of hazardous waste per month. For the reasons explained above, Plaintiff's RCRA claim only exists

---

[35] *See* 42 U.S.C. § 6903(27); *id.* at § 6903(5) (a "hazardous waste" is a solid waste with certain characteristics).

FILED UNDER SEAL
CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 24**

to the extent that the New Haven Terminal is a small quantity generator and that past discharges of solid waste have occurred at the New Haven Terminal. Because the New Haven Terminal is a small quantity generator, the amount of waste discarded is unlikely to be of a sufficient amount that would pose a substantial threat to the surrounding community or environment.

46.    Enforcement based on imminent and substantial endangerment is reserved for the most serious RCRA violations, where substantial harm is already being caused by the unlawful treatment, storage, and disposal of hazardous waste—or those unlawful activities create a substantial risk of harm that meets the legal definition of imminent (*i.e.*, the exposure is taking place, even if the harm may not be immediate). In this case, Plaintiff cannot establish that Defendants are unlawfully treating, storing, or disposing of hazardous waste. The most they allege is that Defendants *may* unlawfully dispose of hazardous waste in the future *if* one of their fuel storage tanks ruptures—and that the public would therefore be endangered. I cannot recall EPA or any State bringing a RCRA enforcement action for imminent and substantial endangerment where there is no present violation of RCRA—and where the imminent and substantial endangerment is so contingent on future events that may or may not occur.

47.    Plaintiff's interpretation of imminent and substantial endangerment would expand RCRA to reach conduct that never has been thought to be covered by the statute. Every fuel storage terminal in the United States arguably would be in violation, as would chemical storage facilities in every city and town in the country. Throughout my career, I have advocated for robust enforcement of the environmental laws, including RCRA. But the imminent and substantial endangerment provisions of RCRA do not reach every petroleum facility and every chemical storage facility in the United States without dramatically expanding the statute.

FILED UNDER SEAL

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 25**

48.    Nor is there any basis for arguing that small quantity generators present an imminent and substantial endangerment because they could be impacted by severe weather events. There are thousands of small quantity generators in the United States. To construe imminent and substantial endangerment under RCRA to extend to every small quantity generator in the United States would produce absurd results. RCRA was not intended to have such a broad swathe, and EPA and the States never have interpreted RCRA to apply so broadly.

**Opinion 6: There is no evidence that non-party parent corporations exercised the level of pervasive control over the New Haven Terminal that would impose parent company liability nor that the assets of the parent companies here are relevant to any penalties.**

49.    I also have reviewed the Expert Report of Professor Joshua C. Macey, dated May 8, 2025 ("Macey Report"). In his report, Professor Macey concludes that "Shell"[36] "carefully monitored and controlled" operations at the New Haven Terminal and exerted control over environmental protocols that go "beyond oversight and supervisory activities common of parent companies whose subsidiaries operate potential environmental hazards." Macey Report, ¶ 48. Professor Macey appears to be trying to establish Shell's corporate liability under the *United States v. Bestfoods* standard, although he does not explicitly state that conclusion.

50.    Shell plc was not named as a defendant in this lawsuit, and it is my understanding from the Court's docket that the claims against Shell Petroleum, Inc. and Shell Oil Company in this lawsuit have been dismissed. Thus, it is not clear why Professor Macey's opinions regarding

---

[36] Professor Macey does not define which company "Shell" is, or whether it is a single entity or a conglomerate of related entities. In forming my opinions, I have assumed that Professor Macey is referring collectively to "Shell plc," identified as a non-party in the Amended Complaint, Shell Petroleum, Inc. and Shell Oil Company.

FILED UNDER SEAL
**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 26**

"Shell" are relevant to this matter. Regardless, it is my opinion that, were these entities included as defendants in this lawsuit, they did not exercise the level of control over Defendants' operations that would cause EPA to initiate an enforcement action against them under the Clean Water Act or RCRA.

51.      Professor Macey discusses at length policies and guidelines established by "Shell" that were followed at the New Haven Terminal. *Id.* ¶¶ 40-45. In the context of Clean Water Act and RCRA enforcement, however, the existence of, and adherence to, these manuals and policies would not support a conclusion that "Shell" should be held liable as an entity that exercised control over the facility under the standard articulated in *United States v. Bestfoods*. Operators in every industry follow a variety of corporate manuals and guidance, some of which are established by related corporations; others are established by government entities or independent industry organizations (*e.g.*, ASTM standards).[37] In my opinion, from an enforcement perspective, Shell's promulgation of policies and guidelines does not equate to "control over processes" at the facility itself such that Shell was operating the facility and not Defendants.[38] To conclude otherwise, would violate basic notions of corporate separateness and discourage the kind of proactive environmental and climate policies implemented by Shell.

---

[37] *See, e.g.*, Declaration of James Kent Yeates, dated Sept. 9, 2022 ("Yeats Declaration") at ¶ 17 (Shell's "Asset Integrity" process ensured that operators follow "API tank standards").

[38] In his declaration, Mr. Yeates explained that Shell's corporate policies provided a "general framework" for its subsidiaries follow, but did not "set engineering standards for New Haven Terminal or any other asset." *Id.* ¶ 21. *See also id.* ¶ 24 (Shell's HSSE Control Framework "provides a high level framework to the companies in the Shell group as to the identification of risks and the level to which such risks should be managed … but does not prescribe *how* such risks should be managed." (emphasis in original)).

FILED UNDER SEAL
**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 27**

52.    Further, the Macey Report repeatedly states that Equilon, not Shell plc, determined how compliance occurred at the New Haven Terminal after Motiva transferred the terminal to Triton:

- "*Equilon* ... required third-party contractors [to] comply with Shell" protocols and contractor safety manuals;

- "*Equilon* made sure vendors and contractors were selected from a list of vendors" maintained by Shell;

- "*Equilon* maintained spreadsheets documenting how Motiva … complied with DEP design standards";

- "*Equilon* … followed Shell's Distribution Global Asset Management Excellence" design manuals.

(Macey Report, ¶¶ 44-45) (emphasis added). Based on the information I reviewed, it appears that Equilon has been the operator (*i.e.*, the permittee) and Triton has been the owner of the New Haven Terminal from May 2017 to the present.[39]

53.    In my opinion, the existence of and adherence to Shell corporate policies and guidelines would only be relevant to EPA in developing the civil penalty assessed to a subsidiary that did not possess the financial resources to pay a penalty and would not affect EPA's decision making as to what entity violated a particular statute. It is my understanding that Equilon and Triton possess the financial resources to pay a penalty, if any penalty were warranted. When

---

[39] *See, e.g.*, Declaration of James Kent Yeates, ¶¶ 1, 3 (Sept. 9, 2022) (stating that since 2017, the New Haven Terminal has been owned by Triton and operated by Equilon, and that since 2017 Motiva has had no interest or involvement in, or control over, the New Haven Terminal); Transcript of Deposition of Brian Evans at 226:15-17 ((30)(b)(6) representative for Triton and Equilon stating: "Equilon is the operator from a legal entity p[er]spective. Triton is the owner.").

FILED UNDER SEAL

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 28**

assessing civil penalties, EPA will include an amount, known as the "gravity component," that reflects the seriousness of the violation. Often, EPA will consider a history or "culture" of noncompliance at a facility when analyzing the gravity component and adjust a penalty upward. If EPA had found Clean Water Act violations at the New Haven Terminal, the fact that the operators followed corporate guidelines established by Shell could preclude such a finding and upward adjustment. The existence of Shell's corporate guidelines, however, would not rise to the level of corporate "active" control of a subsidiary that would lead EPA to enforce the statute against the corporate parent as well as a subsidiary.

54.     Similarly, in my opinion, Shell plc's corporate revenues and balance sheets are not relevant to this lawsuit. EPA's penalty policy, to the extent it is applicable here, allows EPA and courts to consider a parent entity's assets and revenues in an enforcement action as part of an "ability to pay" assessment for the permittee. A parent entity's financial position may be relevant when the subsidiary is not sufficiently liquid to pay a potential penalty. In this case, in the absence of evidence that Defendants committed an enforceable violation of the Clean Water Act or RCRA, Shell plc's financial position would not be relevant.

David M. Uhlmann

**Exhibit 1: Curriculum Vitae**

**Exhibit 2: Materials Considered**