# EXHIBIT 3

**to Plaintiff Conservation Law Foundation's *Daubert* Motion to Exclude the Expert Testimony of Renee Bourdeau**

1

2

3          UNITED STATES DISTRICT COURT

4          FOR THE DISTRICT OF CONNECTICUT

5  - - - - - - - - - - - - - - - - - - - - - - - - x

6  CONSERVATION LAW

7  FOUNDATION, INC.,

8                        Plaintiff,

9    v.                        Civil Action

10                       No. 3:21-cv-00933-JAM

11  SHELL OIL COMPANY, EQUILON

12  ENTERPRISES, LLC d/b/a SHELL OIL

13  PRODUCTS US, SHELL PETROLEUM,

14  INC., TRITON TERMINALING, LLC,

15  and MOTIVA ENTERPRISES, LLC.

16                       Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - x

18          VIDEOCONFERENCE DEPOSITION

19              OF RENEE BOURDEAU

20                May 25, 2023

21                10:01 a.m.

22            Boston, Massachusetts

23          Reporter:  Nancy L. LaCivita

24



```
 1   APPEARANCES VIA ZOOM:

 2

 3       CONSERVATION LAW FOUNDATION

 4       By Alexandra St. Pierre, Esquire

 5       62 Summer Street

 6       Boston, MA 02110-1016

 7       (617) 350-0990

 8       Counsel for the Plaintiff

 9

10       KANNER & WHITELEY, LLC

11       By Chance Raymond, Esquire

12       701 Camp Street

13       New Orleans, LA 70130

14       (504) 524-5777

15       Co-Counsel for the Plaintiff

16

17       BEVERIDGE & DIAMOND, P.C.

18       By John S. Guttman, Esquire

19       By Anthony Papetti, Esquire

20       1900 N Street, NW

21       Suite 100

22       Washington, DC 20036

23       (202) 789-6020

24       Counsel for the Defendants
```



```
 1   APPEARANCES CONTINUED:

 2

 3       WIGGIN AND DANA, LLP

 4       By James O. Craven, Esquire

 5       One Century Tower

 6       265 Church Street

 7       P.O. Box 1832

 8       New Haven, CT 06508-1832

 9       (203) 498-4400

10       Co-Counsel for the Defendants

11

12   ALSO PRESENT:

13       Michaela Morris

14       Claire Song

15       Krystal Crowell

16       Andrew Womack

17

18

19

20

21

22

23

24
```



```
 1                 I N D E X

 2   EXAMINATION OF:                        PAGE

 3   RENEE BOURDEAU

 4

 5     Direct Examination by Mr. Guttman        6

 6     Cross-Examination by Ms. St. Pierre     44

 7

 8

 9

10                 E X H I B I T S

11   NO.                                    PAGE

12

13   Exhibit No. 1     Resume                   11

14   Exhibit No. 2     Retainer Letter          17

15   Exhibit No. 3     B&B Petroleum SWPPP       26

16   Exhibit No. 4     Hornblower Shipyard SWPPP 31

17   Exhibit No. 5     Spreadsheet              36

18

19

20

21

22

23

24   *Original exhibits returned to John S. Guttman.
```



```
 1               P R O C E E D I N G S

 2                      * * *

 3               RENEE BOURDEAU, having been

 4     satisfactorily identified and duly sworn by the

 5     Notary Public, was examined and testified as

 6     follows:

 7                      * * *

 8               It is hereby stipulated and agreed by and

 9     among counsel for the respective parties that all

10     formalities in connection with the taking of this

11     deposition, including time, place, sufficiency of

12     notice, and the authority of the officer before

13     whom it is being taken, may be and are hereby

14     waived.

15               It is further stipulated and agreed that

16     objections other than as to form are reserved to

17     the time of trial.

18               It is further stipulated and agreed that

19     the reading and signing of said deposition by the

20     deponent is hereby not waived.

21               It is further stipulated that the proof

22     of the qualifications of the Notary Public before

23     whom the deposition is being taken is hereby

24     waived.
```



```
 1               * * *
 2            DIRECT EXAMINATION
 3  BY MR. GUTTMAN:
 4      Q.  Ms. Bourdeau, would you identify
 5  yourself, please, for the record.  Your name and
 6  your business address is what we would like.
 7      A.  Yes.  Renee Bourdeau.  My office at is
 8  277 Willow Street in South Hamilton,
 9  Massachusetts.
10      Q.  I would like to cover just some
11  preliminary items before we get into the substance
12  of things.
13            First of all, have you ever had your
14  deposition taken before today?
15      A.  No.
16      Q.  Well, then we definitely need to cover
17  the preliminaries.  So let's just start with this:
18  You're in Beveridge & Diamond's Boston office; is
19  that correct?
20      A.  That is correct.
21      Q.  Is anyone in the room with you?
22      A.  No one is in the room with me.
23      Q.  Okay.  How are you logged on?  Do you
24  have a computer in front of you, or is it through
```



```
 1   some --
 2        A.   There is a tablet platform and then a
 3   video screen and then there is a monitor on the
 4   wall.  So I do not have a laptop present with me.
 5        Q.   Do you have your cell phone with you?
 6        A.   My cell phone is in the room, but it is
 7   in my personal bag over there on the chair.
 8        Q.   So just keep it over there as we proceed
 9   because you should not be communicating with
10   anyone outside your room during the course of the
11   deposition.  Do you understand that?
12        A.   Yes.
13        Q.   All right.  Am I right that you are in
14   the room without counsel today?
15        A.   This is correct.
16        Q.   Am I right that you understand that the
17   lawyers who will be asking you questions today are
18   acting as counsel to parties in the case, not as
19   your counsel?
20        A.   Yes, that is correct.
21        Q.   So I'm going to ask you questions for a
22   bit and then one of the plaintiff's counsel, one
23   of Conservation Law Foundation's counsel, either
24   Ms. St. Pierre or Mr. Raymond, I'm not sure which,
```



1  will be asking you questions.  Let us know if at

2  any point you can't hear us clearly.  Okay?

3       A.  Yes.

4       Q.  Do you understand that you need to speak

5  clearly, annunciate and be loud enough so that the

6  reporter can hear you?

7       A.  Yes.

8       Q.  We obviously all need to hear you, but

9  the two most important people here today are you

10 and the reporter.  So she will let you know if she

11 has trouble hearing you.

12            And let me say also if we do have

13 any technological issues over the course of the

14 deposition, just let us know if you can't hear one

15 of us or there is a volume depth or anything that

16 is troublesome and we can take a quick break and

17 deal with it; is that okay?

18       A.  Yes.

19            MR. GUTTMAN:  And, Alex, I think I

20 indicated this to you, but just for purposes of

21 the record, no one from our firm is present

22 physically with the witness as she just indicated.

23            We do have a tech. person for our

24 firm who is going about her normal day in our



1  Boston office on standby to come in and deal with

2  any issues that arise.  So I just wanted to note

3  that for the record.

4      Q.  Let's talk about how the questioning will

5  proceed.  First of all, there may be points where

6  an attorney objects to a question posed by another

7  attorney.

8          You're still obligated to answer the

9  question, okay?  In other words, lawyers make

10  objections to preserve a record for later, but

11  they don't affect your obligation to truthfully

12  answer.

13          If you don't understand a question

14  that one of us asks you, would you please let us

15  know?

16      A.  Yes.

17      Q.  We'll do our best to rephrase it, all the

18  lawyers here.  If you answer a question and then

19  later on as we are proceeding remember some

20  additional relevant information that you had

21  omitted in your answer, would you let us know?

22      A.  Yes.

23      Q.  And then we will give you an opportunity

24  to supplement your answer.  So you understand that



 1  we want your full and complete testimony to the
 2  best of your ability?
 3      A.  Yes.
 4      Q.  We will take a break at some point, but
 5  if you need a break at any point to stretch your
 6  legs, use the rest room, for whatever reason,
 7  would you let us know and we will take a break?
 8      A.  Yes.
 9      Q.  If there is a question pending when you
10  ask for a break, we will want you to answer the
11  question and then we'll take the break; is that
12  okay?
13      A.  Yes.
14      Q.  And let us know -- I think I said this,
15  but just in case -- if anyone walks in the room,
16  we're going to stop and just let us know that
17  someone has come in and who it is.
18      A.  Okay.
19      Q.  Is there anything that affects your
20  ability to give truthful and complete testimony
21  today?
22      A.  No.
23      Q.  For example, are you feeling ill?
24      A.  No.



1    Q.  Are you on any medication that might

2    affect your ability to answer?

3    A.  No.

4    Q.  So let's move into the substance of

5    things and Andrew Womack is going to share the

6    exhibits.

7              MR. GUTTMAN:  And for the reporter's

8    benefit, we have -- I don't know about CLF -- but

9    we have only five exhibits today.  So it's going

10   to be pretty straight forward.

11   Q.  So let's take a look -- let me ask you

12   this:  Do you have copies of the exhibit with you?

13   A.  Yes.  So on the table in front of me, I

14   have printed copies of the five exhibits that will

15   be shown today.

16             MR. GUTTMAN:  Just so the record is

17   clear, Alex, we informed her in advance as to what

18   the five exhibits would be, and they are the

19   exhibits that were provided to you earlier.

20   Q.  So let's take a look at Exhibit No. 1.

21   If you can see it while on the screen, that is

22   great.  If you can't, it all depends on the

23   quality of the video hookup and how far you are.

24   Tell us what this is, please.

ESQUIRE
DEPOSITION SOLUTIONS

1     A.   This is a copy of my most recent resume.

2     Q.   Okay.  You said most recent.

3   Approximately when it was prepared, if you can

4   recall?

5     A.   It was updated in the fall of 2022.

6     Q.   Now, let's start with a quick summary of

7   your background and hit the highlights.  Your

8   education?

9     A.   I attended the Plattsburg State

10  University of New York from 2000 to 2004 and

11  received a Bachelor of Science degree in

12  Environmental Science.

13            Following that, I attended the

14  University of New Hampshire from 2004 to 2006

15  pursuing a degree in water resources in civil

16  engineering and master's of science degree.  It

17  took me a couple of years to finish my thesis, and

18  I finally graduated and received my degree in

19  2010.

20    Q.   Can you give us a brief summary, again,

21  just the highlights, high level, of your

22  employment history.

23    A.   Yes.  I was employed from 2004 to about

24  2006 with Geosyntec Consultants approximately nine



1  and a half years at which time I left the firm and

2  worked for Wright-Pierce for nine months.

3           Following that, I worked for the

4  Horsley Witten Group for approximately three and a

5  half years before rejoining Geosyntec Consultants

6  where I'm currently employed in 2020.

7       Q.  Are you a licensed professional engineer?

8       A.  Yes, in the state of New Hampshire.

9       Q.  What type of engineer are you licensed

10  as?

11       A.  Civil engineer.

12       Q.  Can you tell us whether or not you are an

13  environmental engineer?

14       A.  I believe my degree from the University

15  of New Hampshire is for Civil and Environmental

16  Engineering.

17       Q.  But you're licensed as a civil engineer,

18  to be clear?

19       A.  That is correct.

20       Q.  Let's move off your resume then.  Are you

21  familiar with what is called a National Pollution

22  Discharge Elimination System Permit under the

23  Clean Water Act?

24       A.  Yes.



1     Q.  And, in very general terms, what is such

2  a permit?

3     A.  A permit is issued by either EPA or a

4  delegated state to regulate the stormwater

5  discharges from either construction sites,

6  industrial sites or municipal facilities.

7     Q.  In this litigation we're focused, in

8  particular, on the state of Connecticut.  Are you

9  aware of that?

10    A.  Yes.

11    Q.  What did you mean when you used the

12  phrase "delegated authority" a moment ago?

13    A.  So there is a few states where EPA still

14  issues the NPDES permits and Massachusetts and New

15  Hampshire are two, in particular, that are local.

16  Other states are delegated down.  So EPA delegates

17  the right for the state to issue the NPDES

18  permits.  And Connecticut is a delegated state,

19  and they issue the NPDES permits.

20    Q.  Are you familiar with the term

21  Multi-Sector General Permit?

22    A.  Yes.

23    Q.  What does that term refer to?

24    A.  The Multi-Sector General Permit or MSGP

 1  covers industrial users under the NPDES program.

 2       Q.  In your career, have you worked on

 3  projects related to NPDES?

 4            MR. GUTTMAN:  And for the reporter,

 5  that is N-P-D-E-S permits.

 6       A.  Yes.

 7       Q.  What kind of -- again, just high level

 8  general -- what kind of work have you done related

 9  to NPDES permits?

10       A.  A lot.  I've worked under all three

11  programs that I previously referenced.  So I've

12  worked under the Multi-Sector General Permit, you

13  know, ensuring that clients are in compliance with

14  the permits.

15            I have also done work under the

16  construction general permit preparing Stormwater

17  Pollution Prevention Plans which I will refer to

18  SWPPP, S-W-P-P-P, as well as the municipal

19  separate storm sewer permit or the MS-4 permit

20  working with municipal clients to ensure that they

21  are meeting all the minimum control measures under

22  that permit including preparation of SWPPP, i.e.,

23  plans, et cetera.

24       Q.  Have you, in your career, worked on



1  projects that involved Mult-Sector General Permits
2  specifically?
3      A.  Yes.
4      Q.  Now, you already used the phrase, but I
5  want to touch on it for a minute.  SWPPP, what do
6  those initials stand for?
7      A.  Stormwater Pollution Prevention Plan.
8      Q.  What is a SWPPP?  What does that mean?
9      A.  So a Pollution Prevention Plan is a
10  document that must be prepared by the permittees
11  that basically outlines the control measures they
12  are going to implement on site to reduce the
13  potential for pollutants of concern to be
14  discharged from their site.
15          And it is typically prepared in
16  accordance with the general permit that they are
17  covered under.  And typically there is a SWPPP
18  guidance that is either prepared by the state
19  entity or is referred to the EPA National
20  Guidance.
21      Q.  Can you tell us whether or not you have
22  been retained by my law firm to perform any work
23  related to this case?
24      A.  I have been asked by your law firm to



1  review SWPPP's as a fact witness, I believe, for

2  this case.

3      Q.  We will get into a little more detail on

4  that momentarily.

5          MR. GUTTMAN:  Andrew, if you could

6  put up Exhibit 2.

7      Q.  Ms. Bourdeau, what is Exhibit 2?

8      A.  Exhibit 2 is the retainer letter that was

9  issued to our firm to enter into an agreement to

10  provide consulting services to Beveridge &

11  Diamond.

12      Q.  Let me just direct your attention to this

13  very first sentence.  It reads, "The purpose of

14  this letter is to set forth the terms of an

15  agreement between Geosyntec Consultants, Inc.,

16  paren, quote, Geosyntec, close quote, paren, you,

17  close quote, your, close quote, close paren and

18  Beveridge & Diamond, P.C. counsel on behalf of the

19  companies listed in Attachment A for your expert

20  consulting services in connection with the case."

21  Do you see that language?

22      A.  Yes.

23      Q.  Now, are you offering expert opinions

24  today?



1        A.   No.

2        Q.   So --

3        A.   I can elaborate.  When the retainer was

4   prepared, we left it a little open-ended with

5   flexibility in the event that we wanted -- the

6   attorneys wanted to use me for expert consulting.

7              However, when we began to talk about

8   the scope of work, we decided that the scope of

9   work best fit for me is to be a fact witness for

10  an investigator.

11       Q.   When you talk about the attorneys, let's

12  just be clear, who are you talking about?

13       A.   Yourself, Mr. John Guttman.

14       Q.   Now, you just said that you were asked to

15  do a factual investigation.  Please describe what

16  you did.

17       A.   Yes.  So I was asked by Mr. Guttman to

18  review all publically available Stormwater

19  Pollution Prevention Plans in the state of

20  Connecticut for entities that are covered under

21  the industrial Multi-Sector General Permit.

22              And my role was when I reviewed

23  those SWPPP's was to determine if the permittees

24  who prepared the SWPPP's took climate change into



1  consideration when preparing those SWPPP

2  documents.  And when I refer to climate change,

3  I'm referring to sea level rise, storm surge and

4  extreme precipitation event.

5      Q.  How many Connecticut -- how many SWPPP's

6  prepared pursuant to the Multi-Sector General

7  Permit in Connecticut did you review?

8      A.  I reviewed -- I believe it was 152

9  SWPPP's that were publically available.

10     Q.  Where did you review them?  How did you

11 find them?

12     A.  So I first started out by searching the

13 Connecticut E documents portal.  And so it's a

14 portal that is the Connecticut Department of

15 Energy and Environmental Protection which I may

16 refer to as DEEP.

17          They have an E-portal on line where

18 you can look for permittees to upload Pollution

19 Prevention Plans.  We started there.  Then I

20 submitted a request to Connecticut DEEP to their

21 records review department and asked if we could

22 review all publically available documents for

23 industrial facilities that contained SWPPP's.

24 When that records request was made, the records


ESQUIRE
DEPOSITION SOLUTIONS

1   room referred my request to the supervisor or the

2   superintendent of the water division -- the

3   Stormwater Division and Enforcement, Karen Allen.

4            I spoke with Karen because she had

5   indicated that there is approximately 1647

6   industrial permittees.  And, as you can imagine,

7   that's a lot of files.  So she was asking

8   specifically what I would like to view.

9            I indicated that I was interested in

10  basically reviewing any publically available

11  SWPPP's that Connecticut DEEP had in their

12  possession.  At that time, she suggested that I

13  schedule an appointment to come into the records

14  room which you can do on line through the

15  Connecticut DEEP portal.

16           At that point, I scheduled an

17  appointment.  She indicated that one of her

18  supervisors -- one of the women she supervises

19  would be present to talk to me when I got there.

20  I went to the Connecticut DEEP office in Hartford

21  and basically went to the records room and was

22  able to basically pull all the industries'

23  folders/files that existed within the records

24  room.  I opened each of those files to determine



 1   if a SWPPP was present in those files.  Not all

 2   the files contained SWPPP's.  For the files that

 3   did contain SWPPP's, I reviewed each of those

 4   SWPPP's and took photographs.

 5              Primarily I took photographs of the

 6   cover page and the engineer's certification page.

 7   If they were newer SWPPP's or more relevant, I

 8   took several pictures, but at no time did I take

 9   more than four or five pictures.

10        Q.   Let me just stop you there, and we will

11   have you continue explaining in just a minute.  So

12   you went to the records room in Hartford; is that

13   right?

14        A.   Yes.

15        Q.   Okay.  And you mentioned there are

16   approximately 1647 facilities covered by the

17   Multi-Sector General Permit, correct?

18        A.   Yes.

19        Q.   And is it your testimony that you

20   reviewed the files on all those facilities?

21        A.   No.  I don't believe I did.

22        Q.   How many files did you review?

23        A.   I didn't count the number of folders that

24   I pulled.  Folders typically only exist if the --



1  if Connecticut DEEP has asked the permittee to

2  submit paperwork that could be following an

3  inspection or a violation.

4          There were many more.  I believe the

5  number of SWPPP's I reviewed on that day was

6  approximately 90, give or take one or two.  And I

7  probably pulled double or triple the amount of

8  folders that day.

9      Q.  How many times did you visit DEEP's

10  offices?

11      A.  Just one day.

12      Q.  If you didn't review all the files that

13  were there, how do you know whether or not you

14  examined all the SWPPP's that were there?

15      A.  I pulled all the files that were

16  identified as industrial facilities.  I opened

17  every single folder, but every folder did not

18  contain a SWPPP.

19          So the ones that did not contain a

20  SWPPP, I did not review any additional

21  documentation that was present in that folder.

22      Q.  Okay.  Just so the record is clear, are

23  you saying you did look at all the folders at DEEP

24  for facilities covered by the Multi-Sector General



 1  Permit?

 2       A.  Yes.  That were available at the

 3  department.

 4       Q.  Okay.  What kinds of documents were you

 5  findings in these folders?

 6       A.  Obviously there were SWPPP's in those

 7  documents -- in those folders.  There was also

 8  Notice of Intent.  There was Notice of Violations.

 9  There was Daily Monitoring Reports present,

10  documents like that.

11       Q.  Who did you talk to from the agency while

12  you were there?

13       A.  I spoke with Karen Abbott, A-B-B-O-T-T.

14       Q.  What did you talk about?

15       A.  I asked Karen -- I explained to Karen

16  what my scope of work was, what exactly I was

17  looking for.  I asked her if all of the documents

18  that they had would be available in the records

19  room.

20            And she indicated that she believed

21  that they were.  I also asked Karen if she had any

22  other SWPPP's available in electronic format.  She

23  indicated that she did and she would forward them

24  to me via e-mail, which she did.  I also asked



 1  Karen if she was aware if any of the SWPPP's that

 2  she has ever reviewed or inspected over the tenure

 3  of her career at Connecticut DEP, which I believe

 4  is around 15 years, if she had seen language or if

 5  permittees considered the impacts of climate

 6  change in those Stormwater Pollution Prevention

 7  Plans.

 8              She indicated to me that she had

 9  not.  I also asked her if she had prepared Notice

10  of Violations to any permittees or sites for their

11  Stormwater Pollution Prevention Plan not

12  containing language with respect to climate change

13  and she indicated she had not.

14      Q.  What kinds of -- again, high level.  What

15  kinds of -- tell us about the substance of the

16  SWPPP's.

17              In other words, what types of things

18  were contained in the SWPPP's that you reviewed?

19      A.  The SWPPP's generally contained a site

20  description, a description of the pollution

21  control measures on site to prevent stormwater

22  discharge for commingling with industrial

23  facilities or activities on the site.  It

24  typically referenced a sampling plan, a schedule,



1  reporting requirements, the typical things you

2  would expect to see in a SWPPP.

3      Q.  Now, you testified that not all of the

4  files contained SWPPP's, correct?

5      A.  Yes.

6      Q.  Do you have an understanding as to why

7  some files didn't contain them?

8      A.  I believe so.  For the files that didn't

9  contain a SWPPP, as I indicated, the permittee is

10 not required to submit their SWPPP to the state.

11 They are required to make it publically available

12 once they submit their Notice of Intent.

13          So most of the SWPPP's that were

14 there were because Connecticut DEEP did an

15 inspection or requested that the applicant submit

16 the SWPPP.  So for the files that did not contain

17 a SWPPP, primarily there were Notice of Violations

18 for not submitting daily monitoring reports.

19          And then the file contained that

20 Notice of Violation as well as the daily

21 monitoring reports that were missing.  And so

22 those kinds of things were generally what was in

23 the file.  And I don't remember everything, but

24 that was primarily it.  The daily monitoring



 1  report seems to be the thing that was most often

 2  in the files that did not contain a SWPPP.

 3      Q.  Just, to be clear, if the file did not

 4  contain a SWPPP, does that mean the facility did

 5  not have a SWPPP?

 6      A.  No, I do not believe that.

 7      Q.  Let's move on to Exhibit 3.

 8          MR. GUTTMAN:  Alex, let me just note

 9  what we asked Ms. Bourdeau was to select some

10  SWPPP's to turn them into an exhibit rather than

11  have a mega exhibit that was 150 or so SWPPP's

12  which would be extraordinarily voluminous.  We

13  felt it was unnecessary.  In other words, we

14  wanted to keep the record manageable for today.

15      Q.  So, Ms. Bourdeau, what is Exhibit 3?

16      A.  Exhibit 3 is a SWPPP prepared for the B&B

17  Petroleum site in Portland, Connecticut.

18      Q.  Let's scroll through it and see if there

19  is anything in addition to the B&B that is in

20  there.  We are now on page five of Exhibit 3.

21  What does this page indicate?

22      A.  This is the Stormwater Pollution

23  Prevention Plan for Connecticut Diggers, LLC out

24  of Colebrook, Connecticut.



1      Q.   Going down to page 13, what is page 13?

2      A.   Page 13 is a Stormwater Pollution

3   Prevention Plan for Cromwell Concrete Products out

4   of Cromwell, Connecticut.

5      Q.   Is this SWPPP from Cromwell the final

6   SWPPP that is included within Exhibit 3?

7      A.   Yes.

8      Q.   So since we have it up on the screen --

9   first of all, are these SWPPP's that you copied at

10   the agency?

11      A.   Yes.  I took photographs of the ones that

12   we are looking at right now in Exhibit 3.

13      Q.   Okay.  So is it fair to say these are

14   examples of what you -- how you documented your

15   search?

16      A.   Yes.

17      Q.   So you testified earlier that you

18   photographed pages in the front and then pages in

19   the back of each SWPPP you looked at there,

20   correct?

21      A.   Yes.

22      Q.   Let's take this Cromwell Concrete

23   Products SWPPP as an example.  So scroll through

24   it and it tell us what is here.



1    A.   So this is the Table of Contents for what

2  is outlined in the SWPPP.  This goes through the

3  facility description and general location map.  So

4  it just describes the general conditions on the

5  site.

6              Next is the measures and controls on

7  site, treatment practices.  It says, "Stormwater

8  measures and controls" as well as it outlines the

9  monitoring programs on site.  This is the

10 professional engineer's certification page.

11   Q.   That's the last page?

12   A.   That is correct.

13   Q.   So the pages you have just gone through

14 were not -- are not the complete SWPPP, are they?

15   A.   That is correct.  It is not the complete

16 SWPPP.

17   Q.   Okay.  And what was your purpose in

18 copying part, but not the entirety, of this

19 particular SWPPP?

20   A.   So I wanted to take a picture of the

21 cover obviously so I knew which SWPPP I was

22 reviewing.  Also, for the majority of them, I took

23 a picture of the professional engineer's

24 certification to indicate that it was prepared in



1  accordance with the general permit and certified

2  by a professional engineer.

3            And then for some facilities that

4  had SWPPP's that were more recent, I took pictures

5  of the introduction or description of the

6  facility.  And I also took pictures of locations

7  where they described the pollution potential

8  measures on site and the monitoring program.

9            And I took it of those because those

10 would be the places where I felt would be most

11 likely to have languages that pertain to climate

12 change if a permittee were to have it in their

13 plan.

14      Q.  So we just talked about six pages of this

15 particular SWPPP that is the final one in

16 Exhibit 3.  Just so we're clear, can you tell us

17 whether or not you reviewed the entirety of this

18 SWPPP or just the six pages?

19      A.  I reviewed the entirety of the SWPPP.

20      Q.  Exhibit 3, as you just explained for us,

21 contains excerpts from three SWPPP's.  B&B

22 Petroleum, Inc., Connecticut Diggers, LLC and

23 Cromwell Concrete Products, Inc.  Again, just to

24 make sure we are clear, are the three SWPPP's in



1  Exhibit 3 the only ones you reviewed at the

2  agency?

3       A.  No.

4            MR. GUTTMAN:  Again, I will note for

5  the record, Alex, that, as I said earlier, these

6  were selected to make a shorter exhibit and they

7  were pulled out of the documents that we produced

8  on May 5th which were provided to us by

9  Ms. Bourdeau.

10      Q.  Now, did any of the SWPPP's that you

11  found in the agency's files include discussions of

12  climate change?

13      A.  No.  None of the approximately 90 files I

14  reviewed at the agency contained any language as

15  it pertains to climate change.

16      Q.  Did any of the SWPPP's that you found in

17  the agency's files include discussions of storm

18  surge?

19      A.  No.

20      Q.  Did any of the SWPPP's that you found in

21  the agency's files include discussion of severe

22  storm risk?

23      A.  No.

24      Q.  Did any of the SWPPP's that you found in



1  the agency's files include discussion of rising

2  sea levels?

3        A.  No.

4        Q.  Did any of the SWPPP's that you found in

5  the agency's files include discussion of melting

6  sea ice?

7        A.  No.

8        Q.  Did any of the SWPPP's that you found in

9  the agency's files include discussion of climate

10 effects?

11       A.  No.

12       Q.  Did any of the SWPPP's that you found in

13 the agency's files include discussion of

14 increasing precipitation due to climate change?

15       A.  No.

16       Q.  Did any of the SWPPP's that you found in

17 the agency's files include discussion of

18 increasing winds due to climate change?

19       A.  No.

20       Q.  Did any of the SWPPP's that you found in

21 the agency's files include discussion of

22 hurricanes?

23       A.  No.

24       Q.  Let's move on to Exhibit 4.  What is



1  Exhibit 4?

2      A.   Exhibit 4 is a Stormwater Pollution

3  Prevention Plan for Hornblower Shipyard, LLC in

4  Bridgeport, Connecticut.

5          MR. GUTTMAN:   Andrew, could you go

6  ahead to page 62?

7      Q.   What is page 62?

8      A.   62 is the Stormwater Pollution Prevention

9  Plan for the Norwalk Wastewater Treatment Plant

10 located in Norwalk, Connecticut.

11     Q.   Page 188, what is this?

12     A.   The Stormwater Pollution Prevention Plan

13 for Trelleborg Coating Systems USA in New Haven,

14 Connecticut.

15          MR. GUTTMAN:   Page 319, Andrew.

16     A.   This is the Stormwater Pollution

17 Prevention Plan for the Norwalk Yacht Club in

18 Norwalk, Connecticut.

19     Q.   That is the last one in Exhibit 4.   Now,

20 this exhibit, as you can see, is 380 pages and it

21 is for Stormwater Pollution Prevention Plans.   Why

22 are they so much longer?

23     A.   These were complete Stormwater Prevention

24 Plans I received -- I either downloaded these from



 1  Connecticut DEEP's website or they were provided

 2  to me via e-mail from Connecticut DEEP.

 3       Q.  By e-mail from who?

 4       A.  Connecticut DEEP, from Karen Abbott.

 5       Q.  Just so we're clear, in Exhibit 4, are

 6  these the complete SWPPP's or excerpts like those

 7  contained in Exhibit 3?

 8       A.  These are complete SWPPP's.

 9       Q.  Why did you, in these instances, provide

10  us with the entire SWPPP's as opposed to excerpts

11  of pages?

12       A.  Well, when I was in the records room

13  reviewing them in person with paper, to save time,

14  I just took photographs of pertinent pages because

15  there were so many of them whereas the ones that

16  we're looking at right now were provided

17  electronically as a PDF file.  So I could provide

18  the whole document very easily.

19            MR. GUTTMAN:  Again, Alex, I will

20  note for the record we selected some examples, but

21  there is a larger universe of complete SWPPP's

22  that Ms. Bourdeau obtained in their entirety all

23  of which were included in the documents we

24  produced on May 5th.  It was 380 pages.  So we



1  didn't want to complicate the record with a lot of

2  them.

3      Q.  Now, is this all the SWPPP's that you

4  obtained in electronic form, Ms. Bourdeau?

5      A.  No.

6      Q.  So would it be fair to say these are

7  examples?

8      A.  Yes.  These are just example SWPPP's from

9  the records that I prepared.

10     Q.  And in the case of the SWPPP's that --

11 these and the others that you obtained in

12 electronic form, can you tell us whether or not

13 you reviewed them?

14     A.  Yes.  I reviewed all of them.

15     Q.  Did you review them in their entirety?

16     A.  Yes.

17     Q.  Now, we're -- I'm going to ask you the

18 same series of questions.  This is with respect

19 only to the SWPPP's you obtained in electronic

20 form which have been produced.

21          Did any of the SWPPP's you obtained

22 in electronic form include discussions of climate

23 change?

24     A.  No.



```
 1        Q.  Did any of the SWPPP's that you obtained
 2   in electronic form include discussions of storm
 3   surge?
 4        A.  No.
 5        Q.  Did any of the SWPPP's that you obtained
 6   in electronic form include discussion of severe
 7   storm risk?
 8        A.  No.
 9        Q.  Did any of the SWPPP's you obtained in
10   electronic form include discussion of rising sea
11   levels?
12        A.  No.
13        Q.  Did any of the SWPPP's you obtained in
14   electronic form include discussion of melting sea
15   ice?
16        A.  No.
17        Q.  Did any of the SWPPP's you obtained in
18   electronic form contain discussion of climate
19   effects?
20        A.  No.
21        Q.  Did any of the SWPPP's that you obtained
22   in electronic form include discussion of
23   increasing precipitation due to climate change?
24        A.  No.
```



1    Q.  Did any of the SWPPP's that you found in

2  the agency's files include discussion of

3  increasing winds due to climate change?

4    A.  No.

5    Q.  Did any of the SWPPP's that you obtained

6  in electronic form include discussion of

7  hurricanes?

8    A.  No.

9    Q.  Let's turn to Exhibit 5, Ms. Bourdeau.

10  What is Exhibit 5?

11    A.  Exhibit 5 is a spreadsheet that I

12  prepared to keep track of the sites and SWPPP's

13  that I was able to obtain and review.

14    Q.  Would you please walk us through the

15  common headers.  In other words, tell us what the

16  column represents.

17    A.  On the far left, the column name is site

18  town.  It represents the town, if it was

19  available, that the site was located in.  The next

20  column indicates the site name and the street

21  address where the site was located.

22           The next one is just a repeated

23  address.  The next is the client name.  The next

24  column is if a Pollution Prevention Plan existed



1  with a yes or no, Y indicating yes.  The next

2  column was how I received the file.

3           So whether I received it via e-mail,

4  and that would have been directly from Connecticut

5  DEEP, whether I downloaded that directly from the

6  Connecticut DEEP website, whether I retrieved and

7  reviewed a paper copy, that would have been when I

8  was present in the records room, or whether it was

9  obtained via an on-line search.

10           I did do some Google searching and

11  found a few additional SWPPP's that I added to the

12  list.  The next column is the plan year.  That is

13  the date it was present on the cover of the SWPPP.

14  And then there is nothing in the notes column.

15           I will indicate that I initially

16  started off with a full list of all industrial

17  facilities in the state of Connecticut, which was

18  approximately 1647, and basically was able to fill

19  out that Pollution Prevention Plan with a yes or

20  no.

21           And today I only provided the list

22  of the ones that were available or that had a yes

23  indicated in that column.

24       Q.  So, in other words, are you -- is it your



1  testimony that -- well, let me ask it differently.

2           Can you tell us whether or not

3  Exhibit 5 includes all of the facilities for which

4  you located SWPPP's?

5       A.  Yes, it does.

6       Q.  Do I understand your testimony to be that

7  this is a list of those facilities, and it does

8  not include the facilities for which you were not

9  able to obtain SWPPP's; is that correct?

10      A.  That is correct.

11      Q.  Now, the fourth column is headed "Client

12  name."  Just so we're clear, what does that mean?

13      A.  So this was a field that was within the

14  Connecticut DEEP spreadsheet.  So you were able to

15  download a list of all the industrial facilities,

16  and the first four columns are columns that came

17  directly from that spreadsheet and one of them was

18  the client name.

19           And most often it represents the

20  owner of the property.  So, for instance, in the

21  first one, it is the City of Ansonia DPW and the

22  client is the City of Ansonia.

23      Q.  Just so we are clear, it does not

24  indicate they are clients of your firm, correct?


ESQUIRE
DEPOSITION SOLUTIONS

```
 1        A.   That is correct.
 2        Q.   But the client name is the nomenclature
 3   that DEEP uses?
 4        A.   That is correct, yes.
 5        Q.   Did I understand your earlier testimony
 6   to be that Exhibit 5 includes all of the
 7   facilities for which you were able to obtain and
 8   review SWPPP's?
 9        A.   Yes, that is correct.
10        Q.   Looking at this entire list, how many is
11   it?
12        A.   It is approximately 152 or it's exactly
13   152.
14        Q.   Did any of those SWPPP's include
15   discussions of climate change?
16        A.   No.
17        Q.   Did any of those SWPPP's include
18   discussions of storm surge?
19        A.   No.
20        Q.   Did any of those SWPPP's include
21   discussions of severe storm risk?
22        A.   No.
23        Q.   Did any of those SWPPP's include
24   discussions of rising sea levels?
```



```
 1        A.  No.
 2        Q.  Did any of those SWPPP's include
 3   discussions of melting sea ice?
 4        A.  No.
 5        Q.  Did any of those SWPPP's include
 6   discussions of climate effects?
 7        A.  No.
 8        Q.  Did any of those SWPPP's include
 9   discussion of increased precipitation due to
10   climate change?
11        A.  No.
12        Q.  Did any of the SWPPP's in Exhibit 5
13   include discussion of increasing winds due to
14   climate change?
15        A.  No.
16        Q.  Did any of the SWPPP's in Exhibit 5
17   include discussion of hurricanes?
18        A.  No.
19             MR. GUTTMAN:  Andrew, we are done
20   with five.
21        Q.  Let's go back briefly to your earlier
22   explanation of the files that you reviewed at
23   DEEP.
24             Do I recall your testimony correctly
```



1  that some of the files contained Notices of

2  Violation?

3       A.  Yes.

4       Q.  Did you look at the Notices of Violation?

5       A.  Yes.

6       Q.  Just give us a general description of

7  what a Notice of Violation looks like.

8       A.  So the Notice of Violation is generally a

9  checklist of what the DEEP inspector would be on

10  site looking for.  And it generally details all of

11  the sections that are required under the

12  Multi-Sector General Permit.

13            The SWPPP is one of them.  There is

14  also daily monitoring reports, site facility

15  observation, site walk, et cetera.

16       Q.  Did any of the Notices of Violation you

17  found reflect alleged violations not including

18  discussions of climate change in the SWPPP?

19       A.  No.  There were no Notice of Violation

20  for that.

21       Q.  Did any of the Notices of Violation

22  reflect alleged violations for failure to include

23  discussions of storm surges?

24       A.  No.



```
 1       Q.  Did any of the Notices of Violation
 2  include alleged violations for failure to include
 3  discussion of severe storm risk in the SWPPP?
 4       A.  No.
 5       Q.  Did any of the Notices of Violation that
 6  you reviewed include alleged violations for
 7  failure to discuss rising sea levels?
 8       A.  No.
 9       Q.  Did any of the Notices of Violation that
10  you reviewed include alleged violations for
11  failure to discuss melting sea ice?
12       A.  No.
13       Q.  Did any of the Notices of Violation that
14  you reviewed include alleged violations for
15  failure to discuss climate effects?
16       A.  No.
17       Q.  Did any of the Notices of Violation that
18  you reviewed include alleged violations for
19  failure to discuss increasing precipitation due to
20  climate change?
21       A.  No.
22       Q.  Did any of the Notices of Violation that
23  you reviewed include discussion of alleged
24  violations -- let me start over.
```



1          Did any of the Notices of Violation

2    that you reviewed include alleged violations for

3    failure to discuss increased precipitation due to

4    climate change?

5          A.  No.

6          Q.  Did any of the Notices of Violation that

7    you reviewed include alleged violations for

8    failure to discuss increasing winds due to climate

9    change?

10         A.  No.

11         Q.  Did any of the Notices of Violation that

12    you reviewed include alleged violations for

13    failure to discuss hurricanes?

14         A.  No.

15         Q.  Can you tell us whether or not you

16    reviewed all the Notices of Violation that were in

17    the files?

18         A.  I can't state whether I reviewed all of

19    them.  I did review the ones that were present in

20    the folders that I did pull.

21              MR. GUTTMAN:  Can we go off the

22    record for five minutes?  I think I'm done, but I

23    would like to consult with my colleague.

24              MS. ST. PIERRE:  Sure.



1              MR. GUTTMAN:  At some point after we

2    started, Abigail Dodd of Shell's legal department

3    joined the deposition, and we indicated at the

4    outset we would note that.

5              CROSS-EXAMINATION

6    BY MS. ST. PIERRE:

7        Q.  Hi, Ms. Bourdeau.  I'm going to ask you

8    some questions, and it might be a little

9    disjointed because John covered some of the

10   material I was going to ask, but if at any point

11   you have questions or not following what I'm

12   asking, let me know.

13             When were you hired in this matter?

14       A.  I was retained in the fall of 2022.  I'm

15   just going to refer to the letter for the exact

16   date.  November 7th, 2022.

17       Q.  Who hired you?

18       A.  Beveridge & Diamond retained me for this

19   position.

20       Q.  How did they hire you, or how did they

21   reach out to you?

22       A.  I believe that Mr. Guttman reached out to

23   one of my senior colleagues at Geosyntec

24   Consultants and asked who would be a good person



 1   to conduct this scope of work.  And that senior

 2   colleague identified myself and that is how John

 3   and I were connected with each other.

 4        Q.  I'm going to show you Exhibit 2 again.

 5   Do you see that?

 6        A.  Yes.

 7        Q.  Go to page seven, the last page.  What do

 8   you know about each of the entities listed in this

 9   attachment?

10        A.  I don't really know much about the

11   entities on the attachment other than the general

12   name.

13        Q.  Are you aware that Shell Trading US

14   Company is not a defendant in this case?

15        A.  I'm not aware of that.

16        Q.  Do you know if you were hired on behalf

17   of any of these defendants?

18        A.  No.

19        Q.  Is the retainer agreement, is that

20   between you and defendants and counsel, or is it

21   between Geosyntec and defendants and counsel?

22        A.  It is between Geosyntec and Beveridge &

23   Diamond.

24        Q.  What is your understanding of why you



1  were hired in this action?

2      A.  I was hired to review all publically

3  available Stormwater Pollution Prevention Plans

4  prepared under the Connecticut Multi-Sector

5  General Permit and to review those Stormwater

6  Pollution Prevention Plans to determine if they

7  contain provisions related to climate change.

8      Q.  And that is the reason you were hired in

9  November of 2022?

10      A.  That is correct, yes.

11      Q.  I believe that you testified earlier that

12  you were hired -- the letter says you were hired

13  for expert services, but then you determined that

14  the services you were going to perform were more

15  fact witness services; is that correct?

16      A.  Yes.  The retainer was prepared with

17  flexibility that would allow me to be an expert

18  witness if we decided that were to be the case.

19  However, when we initially discussed the scope of

20  work, we determined that it was best for me to be

21  a fact witness or investigator.

22      Q.  Okay.  And that was determined at the

23  time you signed the letter?

24      A.  It was just after.  I signed the letter



1    prior to having a discussion with Mr. Guttman.

2    And upon the first discussion I had with

3    Mr. Guttman, we determined that I would be a fact

4    witness or investigator in the case.

5        Q.  Do you remember when that discussion

6    happened?

7        A.  It happened days after the retainer

8    letter was signed in early November.

9        Q.  Were you ever asked to do anything else

10   other than collect and review Connecticut SWPPP's?

11       A.  No.

12       Q.  Have you done any other work for any

13   defendant and/or Beveridge & Diamond in this

14   matter?

15       A.  No.

16       Q.  Have you done any work for defendants

17   and/or Beveridge & Diamond in any other matters?

18       A.  I am working with Beveridge & Diamond on

19   one other matter.

20       Q.  What matter is that?

21       A.  That is Conservation Law Foundation

22   versus Shell for the Providence terminal.

23       Q.  What is the type of work you're doing

24   there?



```
 1       A.   The type of work is exactly the same as
 2  this scope of work.  I would be a fact witness and
 3  investigator.
 4       Q.   Reviewing Rhode Island SWPPP's?
 5       A.   Yes.
 6       Q.   What communications have you had with
 7  defendants or their employees?
 8       A.   None.
 9       Q.   What communications have you had with
10  defendants' counsel?
11       A.   None.
12       Q.   And by defendants' counsel, I mean
13  Beveridge & Diamond.
14       A.   The only attorney at Beveridge & Diamond
15  I have spoken with is Mr. Guttman.  With the
16  exception of when I was preparing for deposition,
17  I received Zoom links and communication from other
18  attorneys or associates with Beveridge & Diamond.
19       Q.   And approximately how often have you
20  communicated with Mr. Guttman?
21       A.   Maybe ten times since November.
22       Q.   Is that primary via e-mail or phone?
23       A.   Primarily via phone, and it was primarily
24  just to provide updates on my progress with the
```



 1  scope of work at hand.

 2       Q.  Just quickly going back to the work or

 3  the work you said you were doing in the Rhode

 4  Island matter, is that covered by the same

 5  retention letter?

 6       A.  It is not.

 7       Q.  When was the other letter signed?

 8       A.  I don't know the exact date, but probably

 9  a month or two ago perhaps.  In 2023 at some

10  point, spring of 2023.

11       Q.  What, if any, information or documents

12  have defendants' counsel -- has Beveridge &

13  Diamond provided to you?

14       A.  They provided me no documents.

15       Q.  So what is the timeline of your work in

16  this matter?

17       A.  So I was retained in November of 2022.  I

18  believe we did some initial on-line searching with

19  the Connecticut DEEP's website in late November.

20  At that time, we also submitted the request to the

21  records room in November of 2022.

22            I visited the records room of the

23  Connecticut DEEP in early December 2022 at which

24  point I reviewed all of the paper records.  After



1  that, I received additional SWPPP's via e-mail

2  from the Connecticut Department of Environment.

3  And then I continued to review any SWPPP's

4  beginning of 2023, mostly the electronic SWPPP's I

5  received.

6      Q.  And you said initially, I think, that we

7  began doing on-line searches.  Who is we?

8      A.  So I did ask a few of my junior staff who

9  are identified in the retainer letter.  I scoped

10  them with kind of searching on the Connecticut

11  DEEP website to find Pollution Prevention Plans

12  and downloaded them to our site server.

13     Q.  And those individuals are Ganesh Krishnan

14  and Emma Williamson?

15     A.  That is correct.

16     Q.  Has anyone else from -- are they with

17  Geosyntec?

18     A.  Yes.  They are all employed with

19  Geosyntec.

20     Q.  Has anyone else with Geosyntec done any

21  work with you in this matter?

22     A.  Yes.  There are two other individuals,

23  Isabella D'Ascoli and Andrew Colcord who are both

24  employees of mine, junior staff, who were tasked



1  with downloading SWPPP's.  And one of them was

2  tasked with converting my JPG images to PDF files

3  and then compressing them into one giant document.

4      Q.  Have you created any written work product

5  in this matter?

6      A.  No.

7      Q.  Did you take any notes while reviewing

8  any of the SWPPP's?

9      A.  I didn't take notes while reviewing the

10  SWPPP's.  I did take notes during one phone

11  conversation I had with Connecticut DEEP, Karen

12  Abbott.

13      Q.  And approximately when was that?

14      A.  It had to have been probably

15  December 2022.  It was after I went to the records

16  room to review the records.  And then I maybe had

17  another follow-up conversation with her in

18  January of 2023.

19      Q.  And just to clarify, I think -- and it's

20  possible I misheard you.  I think initially you

21  mentioned Karen Allen with Connecticut DEEP.  Is

22  she the same person as Karen Abbott or are there

23  two Karen's?

24      A.  There is two Karen's.  Karen Allen is the



1  supervisor or the superintendent of the water --

2  Stormwater Enforcement Division and then Karen

3  Abbott reports to Karen Allen.

4      Q.  So what was the conversation -- what was

5  the substance of the conversation that you had

6  where took notes with Karen Abbott?

7      A.  So when I talked to Karen Abbott, I did

8  ask her if we had received all the SWPPP's that

9  were in Connecticut DEEP's possession.  She

10  indicated yes.  I asked also her follow-up

11  questions.

12          I think I stated earlier in my

13  deposition that when I met her in person, I had

14  asked her if she had ever seen language in a SWPPP

15  as it pertains to climate change including storm

16  surge, extreme precipitation, sea level rise.

17          I re-asked her those questions and

18  she, again, confirmed that, no, she had never seen

19  that language in a SWPPP.  I also asked her if she

20  produced any Notice of Violations for SWPPP's that

21  contained language or not containing language with

22  regard to climate change and she indicated no.

23      Q.  You said you told Karen I think -- Karen

24  Allen, what your scope of work was.  You told her



1  you were a fact witness?

2      A.  Yes.

3      Q.  Have you ever done work like this before?

4      A.  No.

5      Q.  Have you ever been retained as an expert

6  witness before?

7      A.  I have written expert reports before.  I

8  co-authored two expert reports.  So I would say

9  yes.  I have not given a deposition, though.  This

10 is my first time.

11     Q.  For those two expert reports, starting

12 with the first one, I guess, when did you write

13 that?

14     A.  I believe the first one was in, I would

15 say, the 2021 time frame.  It was recent.

16     Q.  Okay.  And what was the purpose of that

17 report?

18     A.  So the purpose of that report was

19 litigation over the construction of a water supply

20 reservoir.  And then during construction, there

21 were off-site discharges of sediment that impacted

22 a downstream water body.

23          And our client was suing both the

24 engineer of record and the construction operator



 1  to recoup costs for cleaning up the damage of the

 2  downstream water body.

 3       Q.  Who did you work for?

 4            MR. GUTTMAN:  Can I interject before

 5  you go any further?  It's probably a good idea to

 6  clarify on the record whether her work in these

 7  other cases is now a matter of public record or

 8  whether -- you know what I mean?

 9            If the reports have not been

10  produced -- she is working with other lawyers.

11  Not with us.  Either she shouldn't talk about

12  it -- it's her call or maybe we should seal this

13  part of the deposition.  I just think we need to

14  be cautious is all I am saying.

15            MS. ST. PIERRE:  Okay.

16       Q.  If that is the case, Ms. Bourdeau, I'm

17  fine with a general description of the work -- a

18  general description of the person you were hired

19  assuming that is not -- if it's the case that it

20  is not public yet.

21       A.  I think I did provide a pretty general

22  description of that, and I would indicate that we

23  were hired by a law firm on behalf of a government

24  entity.



```
 1        Q.  Were they the plaintiff or defendant in a
 2   matter?
 3        A.  I believe they were the plaintiff.
 4        Q.  So that was the first one.  And the
 5   second expert report that you did --
 6        A.  Yes.  So this one had not been settled
 7   yet.  It's still under litigation.  We prepared a
 8   list of opinions and are currently working on
 9   preparing an expert report for a matter.  It's a
10   highway transportation matter with regards to
11   flooding of neighboring properties.
12        Q.  Are either of these reflected on your
13   resume?
14        A.  Yes.  They should both be on my resume.
15   Yes, they are.
16        Q.  If we can pull up the resume, maybe you
17   can just point out which ones they are or if you
18   know what page.
19        A.  On page one, the one at the bottom is the
20   first one I referred to.  And on the second page,
21   it is -- I believe it's the -- it is either the
22   first or second one on the top of the page.  I
23   believe it's the second one.
24        Q.  And the second one you said, that is the
```



```
 1  one that is currently ongoing?
 2       A.   That is correct.
 3       Q.   And those are the only times you have
 4  been hired as an expert in a litigation matter?
 5       A.   That is correct.
 6       Q.   Have you ever worked for any or on behalf
 7  of any oil companies before?
 8       A.   I don't believe so.
 9       Q.   Have you ever worked for or on behalf of
10  any bulk petroleum storage terminals before?
11       A.   I mean, Geosyntec works with a lot of
12  these clients, and I can't remember every single
13  project I've worked on in the past 17 years.  So I
14  don't feel confident saying yes or no.  It's
15  possible.
16       Q.   That is perfectly acceptable.  So I'm
17  going to come back to your resume in a moment, but
18  I will ask you more general questions.  What does
19  your work at Geosyntec entail?
20       A.   So I'm a Principal Water Resources
21  Engineer.  I do a lot of various tasks, as I
22  indicated earlier.  I do a lot of NPDES Clean
23  Water Acts for clients for both private clients,
24  municipal clients as well as construction
```



1  developer clients.  I also do stormwater civil

2  infrastructure design work.  I do watershed based

3  planning work.  I do water quality work.  I do

4  sampling work.

5      Q.  I believe you testified that you work

6  sort of in three categories of NPDES permits, the

7  MSGP, a construction permit and the M-4; is that

8  correct?

9      A.  That is correct.

10      Q.  And when you say MSGP, are you referring

11  specifically to the EPA MSGP?

12      A.  No.  I'm referring to the Multi-Sector

13  General Permit that either the EPA issues for the

14  non-delegated states or the Multi-Sector General

15  Permit that is issued by the delegated states.

16      Q.  So have you -- throughout the course of

17  your work, have you worked with the Connecticut

18  General Permit for industrial stormwater?

19      A.  I have worked in the state of Connecticut

20  on various projects, and I know I have done

21  permitting compliance work.  I can't state

22  factually if it was under the Multi-Sector General

23  Permit in Connecticut or not.  I don't remember.

24      Q.  In the course of your work, do you review



1  SWPPP's?

2       A.  Yes.

3       Q.  How often?

4       A.  I think it depends on the types of

5  projects we're doing on any given basis.  I would

6  say over the course of my career, I've probably

7  either reviewed or prepared hundreds of SWPPP's

8  over the course of my career.

9       Q.  Okay.  And when you say prepared, were

10 you the certifying engineer or were you -- were

11 you the certifying engineer?

12      A.  No.  I did not certify the plan.  At

13 Geosyntec, how we typically do it is the most

14 senior person on the project would stamp the plan.

15 However, I was the lead engineer in preparation of

16 the plan under the direction of the professional

17 engineer.

18      Q.  How many SWPPP's would you say

19 approximately that you worked on the preparation?

20      A.  25 to 30.

21      Q.  Do you ever conduct site specific flood

22 modeling and resiliency audits?

23      A.  I have not.

24      Q.  I'm going to go back to your resume for a



1  moment.

2      A.  Yes.

3      Q.  If we go up to the top, you have climate

4  adaptation, planning and mitigation as a general

5  topic that you work on.  What does that mean?

6      A.  So we work with some municipal clients --

7  I have worked some municipal clients preparing

8  climate adaptation plans.  One example is for the

9  town of Exeter, New Hampshire where we did a model

10  of their storm drain network and then simulated

11  potential sea level rise in a downstream water

12  body to understand the impacts of flooding within

13  their infrastructure as well as at the surface of

14  their infrastructure.

15      Q.  Is that reflected -- I think it's page

16  seven.

17      A.  It's at the bottom of page six.

18      Q.  How did you come to do that work for the

19  Town of Exeter?

20      A.  Geosyntec Consultants had the contract,

21  and I was part of the Water Resources Group.  And

22  I do stormwater modeling, and I was asked to

23  assist with working on that project and preparing

24  the report.



1     Q.  Do you know why the Town of Exeter was

2  asking Geosyntec to do that work?

3     A.  This was some time ago.  I think this was

4  in -- I don't know -- the early 2010ish time

5  frame.  So I'm going to be recalling back here a

6  little bit.  I believe it was a grant opportunity

7  through the University of New Hampshire who

8  brought Geosyntec on as a subcontractor.

9          I think that is how it was.  So the

10  university had the contract and Geosyntec was

11  brought on as a subcontractor.

12     Q.  You answered this a little, but,

13  generally, your work at Geosyntec, what type of

14  clients do you have?

15     A.  It's a mix of public and private clients.

16     Q.  What type of public clients would you

17  have?

18     A.  Mostly municipal clients.  So town and

19  city government.  I also work with state

20  government as well.

21     Q.  What type of private clients do you

22  typically have?

23     A.  We can work with developers, attorneys,

24  really any private group that needs environmental



1  consulting services.

2      Q.  What professional licenses or

3  certifications do you have?

4      A.  I'm a professional engineer in the state

5  of New Hampshire.

6      Q.  How do you maintain that license?

7      A.  I'm required to do educational

8  training -- I think they are called EDU's -- every

9  two years, 30 hours, to maintain that license

10  which could be presenting at conferences, writing

11  technical papers, et cetera.

12      Q.  Do you have experience in regulatory

13  compliance for industrial operations?

14      A.  Yes.  I'm familiar with that.

15      Q.  Is that in the stormwater context?

16      A.  That is correct.

17      Q.  Do you have any experience in

18  environmental health and safety?

19      A.  Yes.

20      Q.  What type of experience?

21      A.  Geosyntec does a lot of environmental

22  health and safety auditing of facilities, and I

23  have done some audits accompanying some of my

24  colleagues on those audits.



```
 1        Q.  Do you have experience in stormwater
 2   reporting?
 3        A.  Yes.
 4        Q.  What type of experience do you have?
 5        A.  We do all the stormwater reporting
 6   compliance under the Multi-Sector General Permit
 7   for clients that we have.  So we would submit like
 8   daily monitoring reports.
 9             We also do it for the MS-4 clients,
10   all of the wet weather, dry weather, annual
11   reporting that is required under the NPDES permit.
12        Q.  Do you have experience evaluating,
13   preparing and updating hazardous waste contingency
14   plans?
15        A.  I have not done that before.
16        Q.  Do you have experience evaluating,
17   preparing and/or updating waste minimization
18   program?
19        A.  I have not done that before.
20        Q.  Do you have experience evaluating,
21   preparing and/or updating spill pollution control
22   and counter measure plans?
23        A.  Yes.  I have done that before.
24        Q.  Is that -- the amount of work you have
```



1  done on those, is it that equivalent to the amount

2  of work you have done on SWPPP's or is it more or

3  less --

4      A.  I would say I do less work on SPCC's than

5  I do on SWPPP's.

6      Q.  Have you ever certified or participated

7  in preparing an MS-4 permit?

8      A.  Yes.

9      Q.  About how many?

10     A.  I currently work with approximately six

11  or seven communities on their MS-4 program.

12     Q.  The most recent one, would you say it's

13  ongoing or --

14     A.  Yes.  Those are all active clients

15  currently at the moment.

16     Q.  And then to go back to your work on the

17  SWPPP's, when was the most recent SWPPP that you

18  certified?  Not that you certified.  That you

19  helped prepare.

20     A.  We just recently revised one for one of

21  our municipal clients under the MS-4 permit.  And

22  I prepared one last fall for a construction

23  general permit.

24     Q.  Were either of those in the state of



 1  Connecticut?

 2        A.   They were not.

 3        Q.   Were either of those in the state of

 4  Rhode Island?

 5        A.   They were not.  But I will state just to

 6  add on to that they were both prepared in

 7  accordance with EPA guidance which is similar

 8  guidance that Connecticut uses for preparation of

 9  SWPPP's.

10        Q.   Have you submitted any invoices to

11  defendants or defendants' counsel in this matter?

12        A.   Yes.

13        Q.   How many?

14        A.   Six.

15        Q.   Was it pursuant to the retention letter

16  that was Exhibit 2, I believe?

17        A.   That is correct, yes.  We submit monthly

18  invoices to Mr. Guttman on this matter.

19        Q.   Have there been any disputes over the

20  invoices?

21        A.   No.

22        Q.   Have you been paid pursuant to the

23  invoices?

24        A.   I believe they are in the process of



 1  being paid.

 2       Q.  How much -- I'm not sure which one is

 3  easier.  Like, in total, how much have the

 4  invoices amounted to?

 5       A.  I don't know the exact number, but I

 6  believe somewhere around 25,000 to $30,000.

 7       Q.  Have you sent any invoices to Beveridge &

 8  Diamond related to your work in the Rhode Island

 9  case?

10       A.  I may have submitted one.

11       Q.  So that would probably have been within

12  the last few months after you --

13       A.  I believe it would have been an April

14  2023 invoice.

15       Q.  Do you know approximately how much that

16  was for?

17       A.  I don't.  I believe maybe a couple of

18  hundred dollars or a thousand dollars.  It was a

19  very small amount.

20       Q.  Okay.  So the spreadsheet, I believe, is

21  Exhibit 5.  You testified earlier that you created

22  that exhibit?

23       A.  That is correct.

24       Q.  You said initially you started -- and



1   correct me if I'm misstating what you testified.

2   What I remember is that you said you started with

3   a list of all the permittees under the Connecticut

4   industrial permit; is that correct?

5        A.  Yes.  I downloaded a spreadsheet that was

6   available on the Connecticut DEEP's website that

7   contained a list of all the industrial facilities

8   covered under the Mult-Sector General Permit and I

9   modified that list to make it specific to my

10  needs.

11       Q.  So is there another version of this

12  spreadsheet that kind of has both the Y's in the

13  pollution prevention column that they do have a

14  SWPPP versus the ones that -- the two SWPPP's you

15  did not review?

16       A.  Yes.

17       Q.  Are these in any particular order?

18       A.  They may be sorted by site town, but that

19  is not intentional.  It has no meaning.

20       Q.  You stated, I think, that there were

21  about 1647 permittees total?

22       A.  Correct.  That is what Karen Allen

23  indicated to me after we made our records request.

24       Q.  And that you reviewed in total 152



1    SWPPP's?

2        A.   Correct.

3        Q.   And those were just SWPPP's that you

4    either saw at Connecticut DEEP, found on line or

5    received from them via e-mail?

6        A.   Yes.  I think that is correct.

7        Q.   There are probably additional SWPPP's?

8        A.   There is one SWPPP on this list for Gulf

9    Oil Limited Partnership that I did receive from

10   Mr. Guttman.

11            Other than that, all of the other

12   SWPPP's in this table I received via e-mail from

13   Connecticut DEEP, I reviewed in the records room

14   at Connecticut DEEP or I downloaded them from

15   Connecticut DEEP's on-line portal.

16       Q.   So there is approximately -- the

17   difference between the 152 you reviewed and the

18   1647 is approximately 1500.

19            Does that mean there is

20   approximately 1500 SWPPP's that exist that you

21   have not reviewed?

22       A.   Those 1500 SWPPP's are not publically

23   available, to my knowledge.  So I would not be

24   able to review them.



1    Q.  But those permittees would be required to
2  have a SWPPP?
3    A.  That is correct.  In accordance with the
4  Multi-Sector General Permit, yes, they would be
5  required to have a SWPPP on site.
6    Q.  About how long did it take you to review
7  all of the SWPPP's?
8    A.  I did it a little at a time.  So it was
9  probably over the course of two to three and a
10  half months to review all the SWPPP's.
11    Q.  Approximately how much time did you spend
12  reviewing each SWPPP?
13    A.  I took as much time as it needed for me
14  to read through the documents.  Some varied in
15  length.  Some were short and some were long.  So
16  it varied based on the text of the SWPPP.
17    Q.  So you did read through the entirety of
18  all 152 SWPPP's?
19    A.  Yes.  With the exception of some of the
20  attachments which were like the general permit or
21  other state guidance that was consistent with all
22  of the SWPPP's.
23    Q.  When you went to the town of Connecticut
24  DEEP's office, for approximately how long were you



1  there?

2      A.  I was there for a full day.

3      Q.  Would you say eight hours?

4      A.  I believe my appointment was at 9 a.m.

5  and I believe we left around 4 p.m.

6      Q.  My understanding is that you created a

7  large PDF of all 152 SWPPP's; is that correct?

8      A.  That is correct.  I had a staff do that

9  on my behalf.  And then I scrolled through it to

10 ensure that they were all present.

11     Q.  And then so for, Exhibit 3, I believe,

12 that has the excerpts, how did you select which

13 excerpts to pull for Exhibit 3?

14     A.  I believe it was pretty random.

15     Q.  Okay.  So Exhibit 3 just represents

16 SWPPP's that you saw while you were in Connecticut

17 DEEP's office?

18     A.  That is correct in the records room.

19     Q.  Who was with you when you were in the

20 records room?

21     A.  An attorney from Wiggan and Dana.

22 Mr. Jim Craven accompanied me to the records room

23 appointment.

24     Q.  Anyone else from Geosyntec?



1      A.   No.

2      Q.   Was anyone from Connecticut DEEP there

3  with you?

4      A.   Yes.   Karen Abbott came down to greet us

5  before we entered into the actual records and was

6  there to answer any preliminary questions we had.

7  And she did come down one or two times while we

8  were there just to check in.

9      Q.   What questions did you have for her while

10  you were there?

11      A.   I just asked her if the files that were

12  on the shelves that we were going to review were

13  all of the industrial files that were within the

14  department and would the SWPPP's in the records

15  room in the files be all the SWPPP's that

16  Connecticut DEEP had.

17           And she indicated that they would be

18  all the paper files and the electronic ones she

19  would be able to provide me after my meeting

20  there.

21      Q.   So then for Exhibit 4, which are the, I

22  believe, three complete SWPPP's, how did you

23  select those?

24      A.   So actually for the four complete SWPPP's



1   that were contained in that exhibit, I chose ones

2   that were in cities or towns that are identified

3   as coastal in the state of Connecticut.

4        Q.  Okay.  And then of the SWPPP's that you

5   reviewed, approximately how many of them were for

6   coastal facilities?

7        A.  I don't know off the top of my head.  I

8   would have to look and sort those by city.

9        Q.  Okay.  Would it be fair to say not all of

10  them?

11       A.  That is correct.  Not all of them are.

12       Q.  Do these SWPPP's represent the most

13  recent SWPPP's for each facility?

14       A.  I can't state that.  It's just a file

15  that was available.  I know that permittees are

16  required to review and update their SWPPP's as

17  needed on site.  So I would assume that the most

18  recent SWPPP is available on site.

19       Q.  Do you know how many of the SWPPP's

20  represent bulk petroleum storage terminal?

21       A.  I believe only one of them does.

22  However, all of these SWPPP's were prepared under

23  the guidance of the Connecticut Multi-Sector

24  General Permit and under the EPA guidance which



1  does not include or does not require applicants to

2  include language as it regards to climate change.

3      Q.  Which is the facility that is the bulk

4  petroleum storage terminal?

5      A.  That would be the Gulf terminal.

6      Q.  How many of the facilities in their

7  SWPPP's had loss of containment issues?

8      A.  I wasn't looking specifically for that.

9  So I don't remember off the top of my head.

10      Q.  Do you remember if any of the SWPPP's

11  contained corrective action plans?

12      A.  I do not remember.  I wasn't looking for

13  those.

14      Q.  Okay.  Do you know if any of the

15  facilities are generators of solid or hazardous

16  waste?

17      A.  I don't know that off the top of my head.

18      Q.  You have a notes column on your

19  spreadsheet.  Why are there no notes in there?

20      A.  I believe when I was initially reviewing

21  the SWPPP's, I may have put some notes in there.

22  I don't even recall what notes I would have

23  written in there, or it could have been notes from

24  one of my staff.  I did have one of my staff



 1  members inventory all of the folders to ensure

 2  this list matched the PDF's that we created.

 3           So, at that point, they may have

 4  made notes saying whether a SWPPP was not present

 5  or present or something to that fashion.

 6      Q.  For you to be able to add it to the --

 7      A.  That is correct.

 8      Q.  Would you still have copies of any of

 9  those -- either the notes you took that you can't

10  recall or the notes of your colleagues?

11      A.  I don't know offhand.

12      Q.  You said you didn't create any work

13  product, but you did create the spreadsheet.

14           Are there any other documents or

15  spreadsheets comparing the SWPPP's with any sort

16  of your thoughts about the SWPPP's?

17      A.  No.

18           MS. ST. PIERRE:  I think those are

19  most of my questions.  I may have a few more.  Do

20  you mind taking five minutes?

21           MR. GUTTMAN:  Let's take ten and I

22  will see if I have follow-up.  I don't plan to,

23  but let's take ten minutes.

24           (Recess taken.)



1              MS. ST. PIERRE:  I just have a few

2    more questions for you, Ms. Bourdeau.

3         Q.  Do you still have your correspondence

4    with Connecticut DEEP?

5         A.  Yes.

6         Q.  And then earlier I think you had

7    testified that you did not receive any documents

8    from Beveridge & Diamond, but then you remembered

9    that you received the SWPPP from the Gulf oil

10   terminal.

11              Can you remember if there were any

12   other documents you received from Beveridge &

13   Diamond?

14         A.  I believe that was the only one.  And I

15   do want to say I'm not sure if it came from

16   Mr. Guttman or Mr. Craven with Wiggan and Dana,

17   but it came from one of them.

18         Q.  I think you testified earlier that the

19   permittees are not required to consider climate

20   change in their SWPPP's.

21              Did you use your professional

22   experience to come to that conclusion?

23         A.  There is just no language within the

24   Multi-Sector General Permit or the SWPPP guidance



 1  that says that needs to be done.

 2      Q.  Okay.  And you're familiar with that

 3  based on your work as an engineer?

 4      A.  I reviewed the Multi-Sector General

 5  Permits and the Connecticut SWPPP guidance that is

 6  part of the scope of work.

 7      Q.  For the Rhode Island case, are you doing

 8  any -- you're doing similar work as you have done

 9  here, correct?

10      A.  Yes.

11      Q.  Are you doing any expert work in that

12  case?

13      A.  No.

14      Q.  Just to clarify that.  The determination

15  for you to do fact witness type work was made a

16  few days after signing the agreement in this case?

17      A.  That is correct.  During my first

18  discussions with Mr. Guttman, we talked about the

19  scope of work and it was determined at that time

20  that I would be a fact witness.

21      Q.  Is there anything in writing documenting

22  that scope of work?

23      A.  I don't believe so.

24      Q.  So, according to your resume, it looks



1  like you did some expert support work in other

2  cases that included review of documents; is that

3  correct?

4      A.  Yes.

5      Q.  Were you paid at different rates in those

6  matters?

7      A.  We are paid based on the level that we

8  are at our employer, what professional level we

9  are.  So, yes, at different points in my career, I

10  have been promoted.  So I have been paid at

11  different rates on different projects.

12      Q.  So it wasn't based necessarily on the

13  substance of the work you were doing.  It was

14  based on your years of experience?

15      A.  Yes.  If you look at the back of the

16  retainer letter, we have a rate sheet which is

17  solely based on position level and that's how I am

18  -- well, I'm not compensated that way, but that is

19  how we bill our hours.

20      Q.  Understood.  Have you ever been a fact

21  witness in a case before?

22      A.  I have not.

23      Q.  I believe that I asked you earlier.  Do

24  you ever conduct site specific flood modeling and



1  resiliency audits and you said no.  Does that

2  sound right?

3      A.  Yes.

4      Q.  Have you ever given a presentation

5  entitled Tools for Flood Risk Management and

6  Increased Resiliency in New York City?

7      A.  Yes.

8      Q.  Can you tell me about the work you did?

9      A.  Yes.  So that project started in 2016.

10  Just shortly after that project started, I left

11  Geosyntec to work for two other employers.  When I

12  rejoined Geosyntec in 2020, I became the project

13  manager of that project.

14           It was on a long hiatus for

15  approximately one year and we restarted the

16  project in February of 2022.  For the last year --

17  I guess 15 months, I have been managing the

18  permitting for the implementation of one of the

19  flood control barriers at a site located in New

20  York City.

21           And I will also be managing our

22  subcontractors who will be doing construction

23  oversight of installation of that technology.

24      Q.  So what type of study was done to



```
 1  determine the flood areas that were necessary?
 2      A.   Staff from Geosyntec, as well as from our
 3  subcontractors who did conduct the site flood
 4  audits to determine elevation which were flooded
 5  by Super Storm Sandy.
 6           And based on those elevations, our
 7  company has designed flood panels to potentially
 8  prevent future flooding up to those elevations if
 9  an event were to occur like that in the future.
10      Q.   So Geosyntec actually does some of the
11  physical work aside from just -- or did I
12  misunderstand that?
13      A.   Some of Geosyntec's employees conducted
14  the physical flood resiliency audit.  I was just
15  not one of them.  I was not employed with
16  Geosyntec at that time.
17      Q.   Okay.  What type of -- you said you were
18  helping with the permitting, I think.  What kind
19  of permitting would that be?
20      A.   The permitting with the department of
21  -- the building department to basically be able to
22  install the flood panels to the building.  We also
23  have permitting with Department of Transportation
24  because the flood panels will be deployed and
```



1  installed within sidewalks which is DOT's right of

2  way.

3      Q.  What kind of modeling was done on this

4  project?

5      A.  I wasn't employed at Geosyntec at that

6  time.  So I can't speak to the specifics of the

7  actual modeling that was done.

8      Q.  Do you know broadly what things were

9  modeled?

10     A.  I know we modeled -- I believe that -- I

11  can't say -- I don't want to misstate it.  So I'm

12  not going to answer the question because I wasn't

13  employed there.  So I don't want to speculate.

14     Q.  Okay.

15          MS. ST. PIERRE:  I think those are

16  all of my questions.

17          MR. GUTTMAN:  And I have no further

18  questions.

19          We didn't talk about stipulations

20  before we started.  I assume the same stipulations

21  we have had in all the other fact depositions?

22          MS. ST. PIERRE:  Yes.  I'm glad you

23  brought that up.  I meant to bring that up as

24  well.



```
1                MR. GUTTMAN:  Madam Reporter,

2   standard stips, objections as to form are waived.

3   Otherwise, preserved.  We can send you the page

4   from one of the earlier transcripts so you can see

5   exactly what it is.

6                (Whereupon the deposition was

7   concluded at 12:12 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



```
 1              C E R T I F I C A T E
 2              I, RENEE BOURDEAU, do hereby certify
 3   that I have read the foregoing transcript of my
 4   testimony, and further certify that said
 5   transcript is a true and accurate record of said
 6   testimony (with the exception of the following
 7   corrections listed below:)
 8   Page    Line         Correction
 9
10
11
12
13
14
15
16
17
18
19   Signed under the pains and penalties of perjury
20   this       day of                    , 2023.
21
22
23
24                       RENEE BOURDEAU
```



1   COMMONWEALTH OF MASSACHUSETTS   )

2                                   )

3   SUFFOLK, SS.                    )

4

5           I, Nancy L. LaCivita, Professional

6   Shorthand Reporter and Notary Public in and for

7   the Commonwealth of Massachusetts, do hereby

8   certify that RENEE BOURDEAU, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me, and that such deposition is a true

11  record of the testimony given by such witness.

12          I further certify that I am neither

13  related to or employed by any of the parties in or

14  counsel to this action, nor am I financially

15  interested in the outcome of this action.

16          IN WITNESS WHEREOF, I have hereunto

17  set my hand and Notarial Seal this 31st day of

18  May, 2023.

19

20                      _Nancy L. LaCivita_

21                      Nancy L. LaCivita

22                      Notary Public

23  My Commission Expires:

24  January 2, 2026



















































































