# Exhibit E

Filed
D.C. Superior Court
07/26/2021 17:20PM
Clerk of the Court

# IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| MICHAEL E. MANN, PH.D., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL REVIEW, INC., *et al.*, <br><br> Defendants. | 2012 CA 008263 B <br><br><br> Judge Alfred S. Irving, Jr. |

## <u>ORDER</u>

Before the Court are:  (1) *Plaintiff's Motion in Limine to Strike the Expert Testimony of Dr. Judith Curry* ("MIL Curry"), filed on January 22, 2021 and (2) *Plaintiff's Motion in Limine to Strike the Expert Testimony of Dr. Abraham Wyner* ("MIL Wyner"), filed on January 22, 2021.  Defendants, too, have filed motions to exclude Plaintiff's proffered expert witnesses, as follows:  (1) *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Naomi Oreskes* ("MIL Oreskes"), filed on March 3, 2021; (2) *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Peter Frumhoff* ("MIL Frumhoff"), filed on March 3, 2021; (3) *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. John Holdren* ("MIL Holdren"), filed on March 3, 2021; (4) *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of John Mashey* ("MIL Mashey"), filed on March 3, 2021; (5) *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Gerald North* ("MIL North"), filed on March 3, 2021; (6) *Defendant Mark Steyn's Motion in Limine to Strike the Expert Testimony of John Abraham* ("MIL Abraham"), filed on March 3, 2021; and (7) *Defendant Mark Steyn's Motion in Limine to*

*Strike the Expert Testimony of Raymond Bradley* ("MIL Bradley"), filed on March 3, 2021.

Oppositions and replies were filed concerning each of the aforementioned motions.

## BACKGROUND

A more extensive recitation of the facts of this case are set forth in the Court's Orders dated July 22, 2021. The Court, here, only references the facts pertinent to resolution of the instant motions.

Importantly, this is a defamation action arising out of two blog posts written individually by Defendants Steyn and Simberg. The litigation does not intend to answer any questions about the existence of climate change or global warming. The subject statements concerned and criticized Dr. Mann ("Plaintiff") personally for his work in producing a model of rising global temperatures, which model is known publicly as the Hockey Stick graph. The statements accused Plaintiff, *inter alia*, of "molest[ing] and tortur[ing] data in the service of politicized science[,]" "engaging in data manipulation[,]" and creating the "fraudulent climate-change 'hockey-stick' graph[.]" *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1262-64 (D.C. 2016), *as amended* (Dec. 13, 2018), *cert denied* 140 S. Ct. 344 (2019). Plaintiff claims that the statements are defamatory and false. Defendants, on the other hand, contend the statements are not defamatory and are, indeed, true. Defendants seek to offer the testimony of two experts in the field of climate science and statistics, to lend to the credence and the legitimacy of the allegedly defamatory statements. For his part, Plaintiff proffers seven experts to support his claim that the statements are defamatory. The question for the Court is whether it may, as gatekeeper, admit into evidence the witnesses' opinion testimony and, if so, whether the subject matter of the testimony should be limited in any fashion.

## DISCUSSION

As to the admissibility of the proffered expert opinions, this Court takes its guidance

from the District of Columbia Court of Appeals' decision in *Motorola Inc. v. Murray*, 147 A.3d

751 (2016).  Therein, the Court of Appeals adopted Federal Rule of Evidence 702 and the

evidentiary standards for apprehending expert testimony that the United States Supreme Court

established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).  The court focused on

the following articulation of Rule 702:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> **and**
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

*Motorola*, 147 A.3d at 756 (emphasis added); *see also Parker v. United States*, 249 A.3d 388,

401-02 (D.C. 2021).  The *Motorola* decision provides that trial judges, as gatekeepers of the

admission of opinion testimony, are required to determine whether the proposed expert

testimony is sufficiently reliable before allowing the testimony to be heard by a jury.  *Motorola*,

147 A.3d at 757.  In determining whether an expert opinion is based on specialized knowledge

and has used reliable methodologies, the Court will look to such factors as:  (1) "whether the

theory or technique … can be (and has been) tested;" (2) "whether it has been subjected to peer

review and publication;" (3) "the known or potential rate of error;" (4) "the existence and

maintenance of standards controlling the technique's operation;" and (5) "whether the technique

has been accepted by the scientific community." *Daubert*, 509 U.S. at 593-94.  Determining

reliability is a flexible inquiry that focuses "solely on principles and methodology, not on the

conclusions that they generate." *Id.* at 594-95.

It is important to note that Rule 702 "does not operate in isolation." *Motorola*, 147 A.3d

at 754.  Indeed, the court recognized that Rule 702 is meant to operate in concert with Federal

Rules of Evidence 703 and 403.  *Id.* at 754 n.7.  Rule 703 provides that the facts or data relied

upon by an expert may be "of a type reasonably relied upon by experts in the particular field in

forming opinions or inferences upon the subject[.]"  *In re Melton*, 597 A.2d 892, 901-02 (D.C.

1991) (en banc).  Rule 403 permits the exclusion of relevant evidence where "the danger of

unfair or undue prejudice substantially outweighs the probative value [of the evidence.]"

*Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc).

As the Parties appreciate, trials are expected to feature competing expert testimony, so

long as the testimony is reliable.  Indeed, as the Court of Appeals observed in *Motorola*:

> The goal is to deny admission to expert testimony that is not reliable,
> but to admit competing theories if they are derived from reliable
> principles that have been reliably applied . . . .  Indeed, we expect
> that many cases will feature expert witnesses espousing different
> views of the evidence. Their testimony will be tested by the
> adversary process and evaluated by the jury.

*Motorola*, 147 A.3d at 757.

The court further acknowledged that, "[a]lthough we have not formally adopted [Federal]

Rule [of Evidence] 104, 'it accurately states the rule of evidence we generally follow.'"  *Id.* at

754 n.7 (citing *Jenkins v. United States*, 80 A.3d 978, 991 (D.C. 2013)).  The court instructed

that, "[t]o perform the gatekeeping function, the trial court normally will apply Rule 104(a)."  *Id.*

at 754.  Rule 104(a) requires the court to decide preliminary questions about whether a witness is

qualified or evidence is admissible.  And, Rule 104(b) requires that, where the relevance of

evidence depends on the existence of a fact, sufficient proof to support a finding of that fact must be offered. The court may admit such evidence "on the condition that the proof be introduced later." Fed. R. Evid. 104(b).

Finally, "[t]he burden is on the proponent of the testimony to establish its admissibility by a preponderance of proof." *United States v. Libby*, 461 F. Supp. 2d 3, 6 (D.D.C. 2006) (internal quotations omitted); *see also United States v. Tibbs*, Case No. 2016 CF1 19431, 2019 D.C. Super. LEXIS 9, at *14 (D.C. Super. Ct. Sept. 5, 2019) (citing *Daubert*, 509 U.S. at 592 n.10).

Plaintiff asks the Court to strike the expert opinions of two of Defendants' expert witnesses, Dr. Judith Curry and Dr. Abraham Wyner. Defendants ask the Court to strike the testimony of seven of Plaintiff's experts: Dr. Naomi Oreskes; Dr. Peter Frumhoff; Dr. John Holdren; Dr. John Mashey; Dr. Gerald North; Dr. Raymond Bradley; and Dr. John Abraham. The Court will first address a shortcoming that is common in all but one of the expert reports, and then will address each report individually.

## A. An Expert Opinion Must Be Predicated on a Methodology Derived from the Scientific Method; Summarizing Publicly Available Information Without Conducting a Scientific Analysis is not a Reliable Methodology

First, none of Plaintiff's proffered experts explain the methodologies that they used to formulate the opinions contained in their reports. This error, in and of itself, is fatal because the Court is rendered unable to determine whether the Parties' experts used reliable methodologies. *See Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 250-51 (D.D.C. 2018); *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 300 (D.D.C 2018). Second, as gatekeeper, the Court cannot allow an expert to testify concerning documents and articles that they have reviewed, unless the expert can establish that they have used some technique or methodology that

systematically gathers, organizes and catalogs the documents such that another expert with similar training could follow the same procedure and arrive at the same result. *See Danley v. Bayer*, 169 F. Supp. 3d 396, 478 (S.D.N.Y. 2016) (finding that an expert may rely on documentary evidence in rendering her opinion, but may not "present these documents to the jury with no analysis or merely read, selectively quote from, or regurgitate the evidence.") (Internal citations omitted); *S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

The methodologies of the expert must be grounded in the scientific method, such that another person with similar expertise could replicate them. *See Daubert* 509 U.S. at 591. Reviewing a selection of documents, summarizing them, and giving an opinion about their conclusions is not a proper methodology grounded in the scientific method, but, unfortunately, it is precisely the methodology used by most of the proffered experts, here. For that reason, the Court is constrained to grant all of the subject motions and exclude all of the proffered expert testimony, with the exception of Dr. Wyner's expert testimony.

Despite this common shortcoming, and with the expectation that the Parties will likely attempt to elaborate on the methodologies that their experts used in subsequent pleadings, the Court herein provides a *Daubert* evaluation of each expert's opinion.

## B. Plaintiff's Motion in Limine to Strike the Expert Testimony of Judith Curry

Dr. Curry is Professor Emerita and a former Chair of the School of Earth and Atmospheric Sciences at the Georgia Institute of Technology. Williams Decl., Ex. 7, at 2 ("Curry Rep."). She holds a Ph.D. in atmospheric science, has worked for a number of

universities and has published extensive research on a variety of climate-related topics.  Curry Rep. 2.

Dr. Curry explains that her "observations and opinions" include a discussion of:  "(I) the nature of the scientific and public controversy concerning the Hockey Stick graph; (II) whether the Hockey Stick graph can be regarded as 'fraudulent[;'] and (III) [Plaintiff's] role in the downward spiral of climate science discourse."  Curry Rep. 1.  Dr. Curry notes that she "present[s] sections (I) and (III) mostly in [her] capacity as a fact/lay opinion witness and section (II) in [her] capacity as an expert witness."  Curry Rep. 1.

Plaintiff has no quarrel with Dr. Curry's credentials.  Rather, he challenges the admissibility of several of Dr. Curry's conclusions.  He argues the following:  (i) Dr. Curry has been proffered to provide "state of mind" expert testimony; (ii) Dr. Curry's opinions are not rooted in sufficient facts and data, and are indeed contradicted by facts; (iii) Dr. Curry's opinions are not based on reliable principles or methods, as the overwhelming consensus of the scientific community has reached a contrary conclusion; (iv) Dr. Curry's opinions are not relevant to the facts of this case; and (v) Dr. Curry offers impermissible opinions that should be excluded. MIL Curry Mem. 14-19.

### 1. Dr. Curry's Expert Testimony Regarding State of Mind and the "Reasonableness" of Defendants' Statements

In her report, Dr. Curry opines that "it is reasonable to have referred to the Hockey Stick in 2012 as 'fraudulent,' in the sense that aspects of it are deceptive and misleading[.]"  Curry Rep. 1.  Dr. Curry offers various definitions of "fraud" and "scientific misconduct," and cites to the Climategate emails and public accusations of fraud levied at Plaintiff that would generally support an observer's view that the Hockey Stick was fraudulent.  Curry Rep. 15-18.

Plaintiff contends that, if Dr. Curry intends to testify in such areas, this Court must find that she is legally precluded from submitting such opinions to a jury. As support, Plaintiff notes that courts have "rejected attempts to have experts testify on issues relating to someone else's state of mind" because to do so "would invade the province of the jury and address an ultimate issue in the case." MIL Curry Mem. 14.

In opposition, Defendant Steyn asserts that "[Dr.] Curry's use of the word 'reasonable' in her testimony is not about anyone's *subjective* mindset, but rather explains why it is *objectively* reasonable to refer to [Plaintiff's] work as fraudulent." Steyn Opp'n MIL Curry 8 (emphasis in original).

Plaintiff relies upon several cases that do not unequivocally support his position. For example, in *OAO Alfa Bank v. Center for Public Integrity*, the United States District Court for the District of Columbia rejected a plaintiff's attempt to show actual malice through the testimony of an expert in journalism, and granted summary judgment in favor of the defendants. 387 F. Supp. 2d 20, 55-56 (D.D.C. 2005). The court concluded that the "plaintiffs cannot survive summary judgment on the shoulders of their journalism expert's opinion that defendants violated journalism ethics and the article does not hold up to normal standards of investigative reporting." *Id.* (internal quotations omitted). The court's finding was rooted in the well-settled principle that actual malice does not necessarily result from a failure of adhering to certain journalistic standards of investigation. *Id.* at 56; *see also Harris v. Quadracci*, 856 F. Supp. 513, 518-19 (E.D. Wis. 1994) (granting summary judgment where plaintiff relied on an "expert journalist" to show actual malice). There, the plaintiff seemed to suggest a bright-line rule barring any expert opinion in the determination of actual malice. *Id.* The court, however, further elaborated: "The Court cannot say that the views of an expert in the field could never be helpful

in illuminating the options available to a publisher in investigating a piece." *OAO Alfa Bank*,
387 F. Supp. 2d at 56.

Similarly, in *Lohrenz v. Donnely*, the court concluded that "plaintiffs may not establish
malice, a subjective state of mind, solely through expert testimony[.]" 223 F. Supp. 2d. 25
(D.D.C. 2002), *aff'd* 350 F.3d 1272 (D.C. Cir. 2003). There, a plaintiff, pursuing a defamation
claim for defendant's accusations that she was underqualified for her position as a navy pilot and
the beneficiary of preferential treatment, sought to offer expert testimony regarding F-14 piloting
and pilot training. *Id.* at 35-36. The court rejected the expert's testimony as it related to actual
malice, explaining that "an expert in piloting F-14s and training F-14 pilots may not render legal
opinions concerning defendants' alleged malicious or deceptive motives." *Id.* at 36. At the same
time, however, the court found that the expert's opinion was appropriate in other aspects of the
case because the expert was likely "intimately familiar with the method and practice of
evaluating F-14 pilots," which is "an area of fact where technical expertise dominates and where
the Court and jurors would likely be inexperienced; [the expert] would likely be able to 'assist
the trier of fact.'" *Id.* (citing Fed. R. Evid. 702). As such, the court allowed the expert's
Declaration to remain part of the record solely because it spoke directly and appropriately to his
technical expertise. *Id.*

In *Iacangelo v. Georgetown University*, another case that Plaintiff cites, a plaintiff
brought claims of medical malpractice, breach of fiduciary duty, and failure to warn adequately.
560 F. Supp. 2d 53, 54 (D.D.C. 2009). There, the plaintiffs hoped to offer expert testimony to
show that defendants violated a national standard of care in the employment of certain medical
treatments. *Id.* at 59-61. The court did not allow certain of the experts' opinions, reasoning that
they "state impermissible opinions on Defendants' state of mind," by opining that "[Defendant]

knowingly participated in the illegal importation of a Class III medical device" and conclusively opining that Defendant's "willful and wanton misbehavior [was] not permitted." *Id.* at 60 n.10.

The instant case is somewhat comparable to the latter case because determining actual malice turns on Defendants' state of mind at the time that they made the allegedly defamatory statements. *See Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 659 (1989). Dr. Curry, concisely and conclusively, writes in her report that "[r]eferring to the Hockey Stick as 'fraudulent' is supported by the public understanding of fraud and how the issues surrounding the Hockey Stick have been portrayed in the media." Curry Report 28.

Defendant Steyn does not shrink from his position that Dr. Curry's testimony should be deemed admissible because she provides the necessary evidence of the Defendant's lack of actual malice. Steyn Opp'n 8. He argues that "[a]n expert's opinion about whether there is a 'reasonable basis' for an allegedly defamatory statement 'could be considered by the fact finder' not only on the statement's truth but also on whether it was published with actual malice." *Id.* (citing *Houlahan v. World Wide Ass'n of Specialty Programs & Schs.*, Case No. 04-01161 (HHK)(AK), 2007 U.S. Dist. LEXIS 95970, at *11 (D.D.C. Mar. 30, 2007)).

In *Houlahan*, a plaintiff-journalist sued for defamation after the target of one of his writings accused him of lying. 2007 U.S. Dist. LEXIS 95970, at *10-11. The court permitted the plaintiff to offer expert testimony supporting his allegedly defamatory statements. The court concluded that such evidence may be used to support a showing of actual malice, by way of "show[ing] the truth of [plaintiff's] findings by presenting evidence that there existed a reasonable basis for his statements[.]" *Id.* at *10.

Despite Plaintiff's attempt to portray a bright-line rule barring any expert from opining on "issues relating to someone else's state of mind[,]" a review of his offered authority betrays that conclusion.[1]  MIL Curry Mem. 14.

Still, many aspects of Dr. Curry's proposed testimony improperly invade the province of the jury.  Federal Rule of Evidence 702(a) provides that an expert may testify in the form of an opinion if the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  *See also Motorola*, 147 A.3d at 756.  In *United States v. Libby*, the United States District Court for the District of Columbia offered an extensive review of the blurry line that courts must sometimes straddle when applying *Daubert* and Federal Rule 702.  461 F. Supp. 2d 3, 5-18 (D.D.C. 2006).  Factors a court must consider include whether expert testimony is within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness's credibility.  *Id.* at 7; *see also Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*, 14 F. Supp. 391, 399 (S.D.N.Y. 1998).  The court in *Kidder* noted, "[w]hether a party acted with objective reasonableness is a quintessential common law jury question."  *Kidder,* 14 F. Supp. at 399.  It further acknowledged that, "[b]y the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind."  *Id.*

---

[1] Plaintiff further cites to a short line of cases from federal courts in Texas that are similarly unavailing.  In *Charalambopoulos v. Grammer*, the court determined that an expert may not offer opinion on the state of mind of the members of a grand jury in declining to issue an indictment, as such testimony would amount to speculation.  Case No. 3:14-cv-2424-D, 2017 U.S. Dist. LEXIS 33488, at *28 (N.D. Tex. Mar. 8, 2017).  In *Fisher v. Halliburton*, the court disallowed expert testimony describing "specific intent" as it related to the plaintiff's claims, as that legal conclusion would clearly usurp the role of the judge and the jury.  Case Nos. H-05-1731, H-06-1971, H-06-1168, 2009 U.S. Dist. LEXIS 118486, at *2 (S.D. Tex. Dec. 21, 2009).  The decisions in these cases were highly fact-specific, and the Court finds them unhelpful with the instant analysis.

Dr. Curry is careful to explain that she does not conclude, as an expert, that the Hockey

Stick was fraudulent. Her deposition provides, as follows:

> My arguments regard[] and my written testimony relates to whether
> it's reasonable for the general public or a journalist . . . to regard
> [Plaintiff's work] as fraud. That's what I was asked to do, not to
> pas[s] judgment on research misconduct, but whether it's reasonable
> for the public, somebody, a member of the public to infer that this
> was somehow fraudulent.

Williams Decl., Ex. 1, at 52:6-21 ("Curry Dep."). When questioned as to why a section of her

report specifically addresses whether it is "reasonable to regard the hockey stick as fraudulent,"

she explained that "it was hopefully to forestall people from asking me whether I think the

hockey stick is fraudulent, because . . . it's a very complex issue and I'm not personally making a

judgment here on that." Curry Dep. 138:17-139:5. Rather, referencing the analysis in her report,

she explains that "these are things that contribute to a perception, public perception of fraudulent.

That was the gist of the points that I made in my report." Curry Dep. 83:22-25.

Dr. Curry's report goes well beyond providing expert testimony as to scientific

deficiencies in the Hockey Stick. She proffers testimony as a historian of the climate change

debate and as an authority on the use of the word "fraud." Curry Rep. 16-17. Dr. Curry surveys

scientific publications, blogs, articles, books, congressional hearings and investigations,

dictionary definitions of "fraud," and Plaintiff's behavior in engaging in debate over the Hockey

Stick, all to support her general opinion that there is a reasonable basis for public criticism of the

Hockey Stick. Curry Rep. 3-14; 16-17; 28-38. The Court must ask whether such testimony is

pertinent to the question of defamation and whether a jury is helped by Dr. Curry's opinions.

The Court concludes that Dr. Curry's testimony is inadmissible; it speaks directly to the

question of actual malice, which is a question that the jury is singularly suited and mandated to

answer. It is the jury's role to determine whether Defendants recklessly disregarded truth in

making their statements.  *See Harte-Hanks*, 491 U.S. at 667.  Should Dr. Curry so conclusively

state, as a purported expert, that Defendants' statements were justified by a public perception of

Plaintiff's work, her opinion would irreparably supplant the jury's determination of that very

question.   Moreover, Dr. Curry is not an expert in the etymology of the word "fraud," and has

not been proffered as such.  The Court will not permit her to testify directly that Defendants, as

members of the public, did not recklessly disregard the truth.  Dr. Curry's conclusion that there

was a rational basis for Defendants' statements is not "beyond the ken of the average juror."

*Libby*, 461 F. Supp. 2d at 18.

But, there may be value in aspects of Dr. Curry's proposed testimony.  "[A]n expert may

offer [her] opinion as to facts that, if found, would support a conclusion that the legal standard at

issue was satisfied, but [she] may not testify as to whether the legal standard has been satisfied."

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

This distinction is slight, and worth illuminating through example.  Dr. Curry spends

considerable space in her report reviewing criticisms of Plaintiff's work.  Curry Rep. 3-14.

Dr. Curry concludes that "[t]he scientific and public controversy surrounding the Hockey Stick

provides ample rationale for public statements that criticize the Hockey Stick."  Curry Rep. 14.

The Court, as well, cannot permit testimony of this nature.  As explained in greater detail below,

Dr. Curry has merely summarized the conclusions of other experts and presented them as her

own.  Such methodology is not derived from the scientific method.  "Even a supremely qualified

expert cannot waltz into the courtroom and render opinions unless those opinions are based on

some recognized scientific method."  *Smith*, 215 F.3d at 718.  A jury is sufficiently qualified to

review criticisms of Plaintiff's work and determine whether there was "ample rationale" for

Defendant's statements.  Therefore, Dr. Curry may, as a fact witness, speak to the extent to

which others in the public sphere criticized Plaintiff's work during the relevant period.  Of course, such testimony must first be established as relevant, i.e., that Defendants were aware of such public criticisms and relied upon them in making the statements at issue.

Section three of Dr. Curry's report opines, as follows:  "[Plaintiff] has been instrumental in the downward spiral of discourse surrounding climate change" and "[h]is loose use of the word 'fraudulent' with regard to research that is critical of his own . . . contributes to an 'anything goes' environment for discourse surrounding this controversial and contentious topic." Curry Rep. 38.  This is not scientific opinion and is inadmissible as expert testimony.  If Defendants wish to offer evidence of Plaintiff's conduct in public discussions of climate change, if relevant, they may do so through fact witnesses.  A jury is sufficiently qualified to come to that conclusion without the assistance of an expert.

At bottom, Dr. Curry's report is not that of an expert.  If permitted by the evidentiary standards of this jurisdiction, it may be possible for Dr. Curry to offer testimony of her knowledge.  But, Defendants have not shown her to have applied principles and methods suitable for a relevant expert opinion in this case.  The Court will not permit her to testify as an expert.

## 2. Sufficiency of Dr. Curry's Facts and Data

Plaintiff argues that "Dr. Curry's opinions are not only unsupported, they are contradicted by the facts."  MIL Curry Mem. 15.  As such, they fail "[t]he second *Daubert* test," which asks "whether the expert's testimony is based on sufficient facts and data."  MIL Curry Mem. 15; *see Motorola Inc.*, 147 A.3d at 756 (citing Fed. R. Evid. 702(b)).

The Court does not find fault in the facts and data upon which Dr. Curry relies.  She reviewed Plaintiff's work, which is the subject of Defendants' statements and which is enough for her to form an opinion in this case.  As explained above, Defendants have simply failed to

show that Dr. Curry offered any scientific opinion of her own, and her testimony must be foreclosed for that reason. The Court takes the opportunity, here, to elucidate the deficiencies in the Parties' offered expert testimony and arguments in opposition, in anticipation of further briefing in subsequent pleadings.

Scientific expert testimony is used for a variety of ends. It is used to prove causation, i.e., that exposure to harmful materials resulted in disease. *See Motorola*, 147 A.3d at 752; *see also General Electric Co. v. Joiner*, 522 U.S. 136, 139-40 (1997). It is used to challenge the veracity of certain kinds of evidence. *See United States v. Libby*, 461 F. Supp. 2d 3, 5 (D.D.C. 2006); *Burgess v. United States*, 953 A.2d 1055, 1057 (D.C. 2008). And, it is used to explain a standard of care in negligence cases, where liability may lie upon a finding that a defendant violated that standard of care. *See Kordas v. Sugarbaker*, 990 A.2d 496, 498 (D.C. 2010). Expert opinion that Plaintiff's Hockey Stick does not rise to adequate levels of scientific muster is most akin to the last category.

Dr. Curry offers critiques of choices that Plaintiff made in his studies and analyses. Dr. Curry explains that observers have commented that the use, misuse, or exclusion of data in creating the Hockey Stick casts doubt on its reliability. To render sound opinions on the matter, experts must rely solely upon Plaintiff's work.

In *Govan v. Brown*, the Court of Appeals considered an opposition to expert testimony that "primarily challenge[d] the evidentiary basis" underlying the expert's opinion, explaining that "the trial court properly understood these concerns as relevant to the weight to afford the opinion, rather than its admissibility." 228 A.3d 142, 155 (D.C. 2020). The Court must come to a similar conclusion with regard to Plaintiff's argument on the issue, here. Plaintiff cannot

genuinely dispute the factual basis for an expert opinion predicated on a review of Plaintiff's work.

### 3. Reliability of Dr. Curry's Principles and Methods

Plaintiff argues that "it is the overwhelming consensus of the scientific community that [Plaintiff] and his colleagues have published diligently and with integrity." MIL Curry Mem. 16. As such, he asserts that Dr. Curry's testimony is not "the product of reliable principles and methods" as required by Federal Rule of Evidence 702(c).

The Court of Appeals has plainly established the principle that "minority status is not a proxy for unreliability." *Motorola*, 147 A.3d at 758. However, where "experts on one side are in a distinct minority[,] [t]hat may well raise a red flag[.]" *Id.* at 757-58. Plaintiff highlights the numerous investigations that the Court of Appeals considered on appeal in this case. MIL Curry Mem. 16. Plaintiff's reliance is misplaced. Certainly, the Court of Appeals was "struck by the number, extent, and specificity of the investigations, and by the composition of the investigatory bodies." *CEI*, 150 A.3d at 1253. The Court of Appeals did not, however, consider the weight of the investigations as evidence, as that task is for a jury. Rather, the court acknowledged that a jury could find the existence and conclusions of the investigations to be probative of actual malice. *Id.* at 1253-54.

Plaintiff does not explicitly attack the principles and methods that Dr. Curry employs, only her conclusions. This tactic is specifically rebuffed by *Daubert*, where the Supreme Court instructed that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. Plaintiff identifies groups that came to opposite conclusions, and reasons that Dr. Curry's conclusions are therefore unsupported. In one example, Plaintiff cites to a 2006 report of the National Research Council ("NRC") that

commented on Plaintiff's work, claiming that "[the NRC] found no flaws in the data selection process, and even the critics did not allege any pre-determined bias." MIL Curry Mem. 16-17 (citing Williams Decl., Ex. 8, at 114-15 ("NRC Report")). Plaintiff contends that the NRC cited to "other scientific peer-review studies published in the wake of the MBH papers—all replicating and validating the MBH methods and conclusions." MIL Curry Mem. 17. To be clear, the NRC Report does not definitively refute any of the conclusions that Dr. Curry recites. The cited selection of the NRC Report simply surveys criticisms of temperature reconstruction techniques. NRC Report 112-15. The NRC Report's conclusions tend to corroborate Plaintiff's own, but even the NRC disclaimed that at least one method employed by Plaintiff was "not recommended[.]" NRC Report 113.

While Plaintiff's attacks on Dr. Curry's methodology are not well-founded, the Court must, regardless, find that Defendants have not met their burden of establishing that Dr. Curry used reliable methodologies. To wit, her expert report does not contain any explanations of her methodologies, making it impossible for the Court to find her testimony reliable. *See Sacchetti*, 344 F. Supp. 3d at 250-51; *Campbell v. Nat'l R.R. Passenger Corp.,* 311 F. Supp. 3d 281, 300 (D.D.C 2018). Based on the Court's own assessment, her "methodologies" appear to be that she reviewed several articles and documents, and then opined that the conclusions of those documents are correct. Such methodologies are not derived from the scientific method and, thus, render Dr. Curry's opinion unreliable as expert testimony. *See Danley v. Bayer*, 169 F. Supp. 3d 396, 478 (S.D.N.Y. 2016) (finding that an expert may rely on documentary evidence in rendering her opinion, but may not "present these documents to the jury with no analysis or merely read, selectively quote from, or regurgitate the evidence.") (internal citations omitted); *S.E.C. v.*

*Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

### 4. Relevance of Dr. Curry's Testimony

Plaintiff argues that, "[e]ven were it appropriate for Dr. Curry to express the opinion that it was reasonable for the defendants to regard the hockey stick as fraudulent, this testimony would be relevant only if the defendants had actually known about these issues *before* they made the defamatory statements." MIL Curry Mem. 18 (quotations omitted) (emphasis in original). Plaintiff argues that Dr. Curry's testimony, therefore, fails the fourth *Daubert* test: Whether the expert has "reliably applied the principles and methods to the facts of the case." *Motorola*, 147 A.3d at 756.

The Court broadly agrees that an expert's opinion has no bearing on actual malice if the Defendants were entirely unaware of the issues the experts raised in their opinions and instead wrote the subject statements in a vacuum. *See CEI*, 150 A.3d at 1252. Plaintiff argues that there is no evidence that Defendants knew of the issues that Dr. Curry raises in her report. Defendant Steyn, in opposition, provides that the Defendants were aware of the issues that Dr. Curry raises, to varying degrees, although during deposition they were unable to describe the issues with the specificity offered by Dr. Curry. Defendants may offer proof of the relevancy of an expert's opinion.

### 5. Relevancy of Other Aspects of Dr. Curry's Report

Plaintiff challenges sections of Dr. Curry's report explaining the breadth of the public climate change debate and Plaintiff's participation in it. MIL Curry Mem. 19. Plaintiff argues that "[n]one of these issues are relevant to the issues in this case." MIL Curry Mem. 19.

Defendant Steyn argues that Dr. Curry's opinion on these topics is relevant to show the broader social context of the disputed statements.

Defendant Steyn relies upon the ruling in *Farah v. Esquire Magazine*, where the United States Court of Appeals for the District of Columbia Circuit affirmed dismissal of a defamation claim on the grounds that the statements at issue were properly understood as satire. 736 F.3d 528, 533-39 (D.C. Cir. 2013). The court explained that the "broader social context . . . is vital to a proper understanding of the disputed statements." *Id.* at 535 (quotations omitted).

The Court, here, makes no comment on Defendant Steyn's theory. The instant dispute is whether Dr. Curry may offer testimony reviewing the social context of the climate change debate. Dr. Curry claims to present such evidence "mostly in [her] capacity as a fact/lay opinion witness." Curry Rep. 1. The limits of the term "mostly" are not clear. Nevertheless, Dr. Curry makes the following conclusions: "The scientific and public controversy surrounding the Hockey Stick provides ample rationale for public statements that criticize the Hockey Stick[;]" and "[Plaintiff] has been instrumental in the downward spiral of discourse surrounding climate change." Curry Rep 14, 38.

As discussed above, conclusions such as these must be reserved for the jury. Dr. Curry may have experience in the contentious world of climate science, but her opinions on the effect of the polemic on a member of the public and on Plaintiff's effect on that polemic are no different than that of a layperson. "[W]here the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016). Defendants may present evidence detailing the social context in which their statements were made, but the jury

19

determines whether such evidence supports or defeats the elements of a defamation claim, not an expert.

### C. Plaintiff's Motion in Limine to Strike the Expert Testimony of Abraham Wyner

Dr. Wyner is a Professor of Statistics at Pennsylvania's Wharton School. Williams Decl., Ex. 1, at ¶ 1 ("Wyner Rep."). He offers opinions on "matters relating to statistical methods for reconstructing the earth's temperature over the past millennium." Wyner Rep. ¶ 3. He was "retained to offer [his] opinions on specific statements made by the defendants that have been alleged to be defamatory." Wyner Rep. ¶ 9.

Plaintiff argues that Dr. Wyner's opinions "violate the standards set forth in two of the *Daubert* standards." MIL Wyner Mem. 4. He contends that Dr. Wyner's opinion relates solely to the Defendants' state of mind and that his opinions are not relevant as they assume Defendants were aware of his work when making the statements at issue.

In sharp contrast with the reports of the other experts that the Parties have proffered, Dr. Wyner's report offers substantial analysis and explanation of the scientific principles and methods he employed in forming his opinion. Dr. Wyner, a trained and recognized statistician, explains there are "aspects of Dr. Mann's work that can reasonably be construed as manipulative, if not in intent than in effect, as the word is used in common parlance." Wyner Rep. ¶ 9. Plaintiff argues that Dr. Wyner's opinion is "little different than the Curry opinion expressed in her report." MIL Curry Mem. 9. A comparison of the two reports controverts this theory. Dr. Curry seeks to offer a review of criticisms of the Hockey Stick and excerpts of the polemic surrounding the graph, all to support her expert opinion that it would be reasonable to call it fraudulent. Dr. Wyner, in contrast, offers detailed analysis of the statistical methods used to

construct the Hockey Stick graph, and why the methods may be reliable and, thus, tending to support a basis for Defendants' statements.

For example, Dr. Wyner states that "constructed random sequences, simulated like playing cards drawn from a deck, are no less skillful for reconstructing temperatures than naturally occurring proxies." Wyner Rep. ¶ 33. He explains in detail how he applied "cross-validation," which is "an effective method of exploring and countering overfitting and measuring model reliability accurately." Wyner Rep. ¶ 38 n.13. Plaintiff does not, and likely cannot, assail the principles and methods that Dr. Wyner applies. His opinion is plainly beyond the ken of the average juror, and his testimony regarding the reliability of the Hockey Stick graph will be useful in aiding the jury's determination of actual malice and falsity.

### 1. Dr. Wyner's Expert Testimony Regarding State of Mind and the "Reasonableness of Defendants' Statements

The Court has already addressed Plaintiff's theory regarding expert state of mind testimony. As the Court has discussed, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997). Dr. Wyner was asked the following at his deposition: "And you're not an expert in how the public would perceive a word that may have been used in an article, correct?" He answered: "I'm not an expert in that[.]" Wyner Dep. 43:19-22. Dr. Wyner explained that his testimony will explain "what was done statistically that would connect or relate in some way to a statement that says kept the blade or engaged in data manipulation to keep the blade on the famous hockey stick graph." Wyner Dep. 47:3-48:6.

The Court appreciates that Dr. Wyner walks a fine line between permissibly offering facts that would support a jury determination on the issue of actual malice and impermissibly

opining directly on actual malice. For example, he provides: "There are three specific conclusions in [his analysis] in particular that would support a political commentator using language like 'manipulated' when describing Dr. Mann's work." Wyner Rep. ¶ 32. But, Dr. Wyner's opinion on this issue is not that Defendants' statements were reasonable. His opinion is targeted at the Hockey Stick graph itself. As explained above, the Court will allow him to present expert testimony in that regard.

### 2. Relevance of Dr. Wyner's Expert Testimony

In similar fashion to his arguments regarding Dr. Curry's testimony, Plaintiff argues that neither Defendant had read or reviewed Dr. Wyner's analysis, prior to writing the alleged defamatory statements. MIL Wyner Mem. 14. As such, Plaintiff contends that Defendants are unable to satisfy the fourth *Daubert* standard, "whether the expert has reliably applied the principles and methods to the facts of the case." MIL Wyner Mem. 14.

This argument again misses the point. No matter, the Court's analysis and conclusion relative to Dr. Curry's testimony are apt, here. Dr. Wyner's opinions may only bear on the question of actual malice if it can be shown that Defendants were aware of the points that Dr. Wyner raises. Defendants are free to make that offering of proof. And, Dr. Wyner's opinions regarding the veracity or reliability of Plaintiff's work bears directly on Plaintiff's required showing of falsity, and should be admitted for that purpose.

### D. CEI's Motion in Limine to Strike the Expert Testimony of Dr. Naomi Oreskes

Dr. Naomi Oreskes is a "professor of the History of Science at Harvard University" where she "teach[es] on the history of science and scientific thought." DeLaquil Decl. Supp. Dr. Oreskes, Ex. 1, ("Oreskes Rep.") at 1. She is a coauthor of *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming*,

which she claims addresses the "agenda, policies and practices of industry and think tanks, including the Competitive Enterprise Institute, in regards [sic] to many of the issues in this case." *Id.*

Dr. Oreskes intends to offer her opinion that scientific research is made reliable by "the collective vetting and critical interrogation of claims through scientific workshop, meetings, conferences, and above all, publication in peer-reviewed journals, formal scientific assessments and reports of government scientific agencies and laboratories." *Id.* at 2. She will also opine that "think-tanks (including CEI) … ignore, misrepresent, or reject principled scientific thought on environmental and climate issues." *Id.* at 3.

### a.  Dr. Oreskes' Discussion of General Principles of Scientific Reliability

As an initial matter, the Court is skeptical that Dr. Oreskes' opinion would be helpful to the jury. The bulk of her opinion focuses generally on what makes scientific research reliable and not on the specific inquiry at bar, whether Plaintiff's research was reliable. Plaintiff avers that such information "will be necessary to assist the jury in understanding the credibility and validity of the sources of information that [Plaintiff's] experts relied upon, as well as the quality of the sources that the defendants relied upon in making their allegations against [Plaintiff]." Opp'n Mem. 55. The Court is not convinced that a separate expert is needed to define terms which other witnesses will inevitably discuss, witnesses who have first-hand knowledge of Plaintiff's work.

The Court appreciates that Dr. Oreskes' testimony may provide a framework from which the jury could more easily assess and determine whether Plaintiff's work was fraudulent. As such, the Court does not exclude her testimony on that basis. Rather, the Court's decision to exclude the testimony is based upon Dr. Oreskes' failure to use a scientific technique which

applies reliable methodologies.  The Court must exclude an expert opinion that fails to explain the methodology underlying the expert's opinion.  *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 250-51.  As is the case with several of Plaintiff's proffered experts, Dr. Oreskes' report is devoid of any discussion of her methodologies.

In his opposition, Plaintiff attempts to persuade the Court that Dr. Oreskes described her methodologies during her deposition, as follows:

> Defendants' assertion that Dr. Oreskes applied an improper methodology to analyze CEI's public statements also disregards her testimony, in which she testified at length about the content analysis methodology applied in her research and in this case:
>
> "So we read the documents.  And as I said before, we applied a well-established method in social science, which is broadly accepted as being, you know, a reputable method of analyzing something, content analysis, in order to show that there was this fairly substantial disparity between what the company scientists were saying in their private reports and publishing in peer-reviewed scientific literature which was essentially consistent with what other scientists were saying versus what the company was saying in public in advertisements that were aimed at the general public."

Opp'n Mem. 56 (quoting DeLaquil Decl. Supp. Dr. Oreskes, Ex. 4, ("Oreskes Dep. Vol. 2") at 55:18-56:5).  The complete text of her deposition testimony on this subject is much more helpful to the court and it reads, as follows:

> In the case of ExxonMobil, we had the opportunity to do this analysis because the company itself had made public these documents.  And they claimed in public that if you read these documents, you would see that everything was fine and that ExxonMobil had done nothing wrong.
>
> We applied a well-established method in social science, which is broadly accepted as being, you know, a reputable method of analyzing something, content analysis, in order to show that there was this fairly substantial disparity between what the company scientists were saying in their private reports and publishing in peer-reviewed scientific literature which was essentially consistent with what other scientists were saying versus what the company was

> saying in public in advertisements that were aimed at the general public.

Oreskes Dep. Vol. 2. At 55:12-56:5.  Notwithstanding Plaintiff's contentions to the contrary, Dr. Oreskes did not perform Content Analysis for her report in this case.  She was directly asked whether she performed Content Analysis for this case and she replied "no."  *See Id.* at 33:5-15.

When asked about the methodologies that she used in *this* case, Dr. Oreskes responded: "If you want me to tell you what my method is, it's reading and thinking.  We read.  We read documents.  And we think about them."  *Id.* at 34:13-15.

That is the problem, here.  Reading and thinking about documents are not the types of "reliable methodologies" typical of an expert witness, which leaves the Court unable to distinguish why Dr. Oreskes is more capable than the average juror, who can also read and think about documents.  *See Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (rejecting an expert opinion based solely on the experts "reading and viewing" and finding that reading, alone, does not constitute an acceptable methodology).  Dr. Oreskes "reading and thinking" have not been peer-reviewed, have no known success rate, and cannot be replicated by other experts in her field.  *See Daubert*, 509 U.S. at 593-94; *see also Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001).  Dr. Oreskes opinion is not derived from the scientific method and is more aptly described as a historical narrative or research compilation than scientific testimony.  *See Daubert*, 509 U.S. at 590; *Meister*, 267 F. 3d at 1127 (finding that to identify scientific testimony, "forces the court to focus on principles and methodology, not on the conclusions they generate, and thus demands a grounding in the methods and procedures of science, rather than subjective belief or unsupported speculation.") (internal citations omitted.)

The Court acknowledges that there are instances where an expert's opinion can be based substantially on her experience, but in those instances the expert must explain "how that

experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." *Arias v. DynCorp.*, 928 F. Supp. 2d 10, 15-16 (D.D.C 2013). Dr. Oreskes' opinion is not derived from her personal experience, but rather, it is derived from her review of documents and reports created by third-parties.

### b. Dr. Oreskes' Opinion Concerning CEI's Agenda

In her report, Dr. Oreskes offers an expansive history of CEI's actions opposing progressive policy goals by advocating against scientists in an attempt to show that CEI routinely rejects valid and widely-accepted scientific research. The Court finds, as it did above, that her opinion is not based on reliable methodologies. The Court further finds that expert testimony is unnecessary to present the types of information that Dr. Oreskes' offers concerning CEI's agenda. Her opinion amounts to a historical summary of CEI's actions, basically a recounting of articles published and actions taken by CEI in its opposition to a wide array of progressive policies including tobacco abatement, the limitation of greenhouse gasses, and climate change. The Court agrees with Defendants' assertion that "Dr. Oreskes made no effort to compile or catalogue CEI's publications according to an objectively defined set of metrics." MIL Oreskes Mem. 9. Accordingly, the Court shall exclude Dr. Oreskes expert testimony.

### E. CEI's Motion in Limine to Strike the Expert Testimony of Dr. Peter Frumhoff

Dr. Frumhoff is the Director of Science and Policy and Chief Climate Scientists at the Union of Concerned Scientists, a nonprofit organization composed of "nearly 250 scientists, analysts, policy and communication experts" who "engage in advocacy on public policy issues." Union of Concerned Scientists, *About*, https://www.ucsusa.org/about, Last Accessed July 15, 2021; Bailen Decl. Supp. Dr. Frumhoff, Ex. 1, at 1 ("Frumhoff Rep."). Dr. Frumhoff has a Ph.D.

in Ecology and an extensive career working at prestigious universities across the country.  He has authored several influential reports and is a leading member of several organizations working in the climate change field.

Dr. Frumhoff will offer his opinion concerning "how unfounded attacks – such as attacks on the Climate Research Unit scientists and their colleagues in the wake of the incident known as 'climategate,' as well as the attacks on Dr. Mann that are the subject of this litigation – can have detrimental effects on scientists, on the scientific enterprise, and on the public understanding of information and its societal implications."  Frumhoff Rep. 2-3.

### a. Dr. Frumhoff's Methodologies

Dr. Frumhoff's report fails to include an explanation of his methodologies.  Accordingly, the Court must exclude his expert testimony.  *See Sacchetti*, 344 F. Supp. 3d at 250-51; *Campbell*, 311 F. Supp. 3d at 300.  Plaintiff's explanation that "Dr. Frumhoff will rely upon a public opinion study which shows a significant drop in the public trust of scientists as sources of information on global warming in the wake of the climategate disclosures" is unavailing.  It is not enough that an expert's opinion contains citations to reliable authority to support his conclusions; the expert himself must employ a methodology based in the scientific method. Here, Dr. Frumhoff's testimony would merely serve as a conduit for the admission of the public opinion study upon which his opinion is based.  *See United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (explaining that an expert witness's reliance on hearsay evidence "only becomes a problem where the witness is used as little more than a conduit or transmitter … rather than as a true expert whose considered opinion sheds some light on some specialized factual situation[.]").  The Court is not persuaded that a jury would be unable to understand that public opinion study without the aid of an expert.

### b. Dr. Frumhoff's Testimony Regarding Reputational Harm

Dr. Frumhoff will testify that "false allegations like those that followed the release of stolen emails from the CRU and the subsequent statements made by National Review and the Competitive Enterprise Institute … caused damage" by:  (1) inflicting harm to the reputation of the individual scientists; (2) requiring the scientists to redirect time away from their professional and personal lives to respond to the unfounded accusations; (3) limiting a scientist's ability to attract research funding;  (4) stifling climate science research and the public understanding of climate science; and (5) disrupting "efforts to address important public policy concerns." Frumhoff Rep. 3-5.

It is important here to remind the Parties that the case Dr. Mann filed concerns the question of defamation, not whether climate change is real.  While certain criticisms generally and historically, including those of Defendants, may have stifled climate science research and disrupted efforts to address important policy considerations, those concerns are not the subject of this litigation and to deal with them in this case will only serve to obfuscate the actual issues and confuse and waste the jury's time.  Those concerns cannot be reasonably tied to any specific harm that Plaintiff allegedly suffered.  The Court will not equate Plaintiff with all climate change scientists or with the field of climate change and allow him to assign harm caused to those scientists or the field to himself.  Dr. Frumhoff's testimony that "[t]he timing of the release of the stolen emails derailed discussions at the Copenhagen Summit" and "made it less likely that governments would adopt a climate deal at that conference" has no bearing on Plaintiff's defamation claim.  *See* Frumhoff Rep. 7.  Testimony seeking to establish that "there was a significant drop in the public trust of scientists as sources of information about global warming" is similarly not relevant.  Frumhoff Rep. 13; *see Daubert,* 509 U.S. at 592 (finding that the first

determination that the Court must make concerning the admissibility of expert testimony is whether it would be helpful to the jury).

Concerning Dr. Frumhoff's testimony about the effect of spurious attacks on individual scientists other than Plaintiff, the Court again finds that such testimony is irrelevant to the inquiry at hand. Dr. Frumhoff explains that other scientists with whom he has worked have received death threats, "faced intimidation such as receiving a dead rat," and having their "names dragged through the mud." Frumhoff Rep. 13. Dr. Frumhoff further testifies concerning several types of harm that scientists in general could face such as losing funding and having their time and resources directed away from their work. As Dr. Frumhoff does not have personal knowledge that Plaintiff experienced such harm, his testimony would be entirely speculative. Plaintiff proffers that "Dr. Frumhoff's testimony will provide a framework for the jury to consider the more specific testimony it will hear regarding the effect of the defamations in this case against [Plaintiff]." Opp'n 68. The Court is not persuaded that such framework is necessary. Given the nature of this case, the Court cannot find that the jury requires the proposed background information to guide them in determining whether the facts support the claimed defamation. Certainly, without the aid of an expert, a jury can understand that defamatory attacks may have an untoward effect on one's reputation or professional career. As an example, the concept that "grant funders base their funding decisions, in part, on the reputations of the applicants" is a matter within the ken of the average juror. Opp'n Mem. 69.

Plaintiff is free to submit evidence and elicit witness testimony which shows how he, personally, has been harmed, but allowing Dr. Frumhoff to testify to specific instances of harm, such as receiving a dead rat, when Dr. Frumhoff has no factual basis to believe that Dr. Mann has experienced such harm, would be unnecessarily prejudicial. Dr. Frumhoff's deposition

testimony reveals that he does not have any factual basis to discuss harm that Plaintiff suffered. *See* Bailen Decl. Supp. Dr. Frumhoff, Ex. 2, ("Frumhoff Dep.") at 112:4-10, 111:23-112:3, 131:14-18, 116:2-5, 149:2-4 (showing that Dr. Frumhoff was unaware of, and unable to quantify: (1) the amount of time Plaintiff spent responding to criticisms; (2) the number of academic opportunities Plaintiff was unable to pursue; (3) how Plaintiff's research output was diminished; (4) whether Plaintiff had received any threats; and (5) whether Plaintiff's ability to obtain research grants diminished). The Court finds that Dr. Frumhoff is unable to provide reliable testimony regarding any harm that Dr. Mann may have suffered because he lacks the facts and the data to support any such testimony. *See Motorola*, 147 A.3d at 756.

The concepts of being threatened, losing money, and having your reputation damaged are well within the ken of the average juror. *See Steele*, 854 A.2d at 181 (quoting *Payne v. Soft Sheen Prds., Inc.,* 486 A.2d 712, 727 (D.C. 1985)) (holding that expert testimony is improper when "the jurors are as capable of understanding and drawing correct conclusions from the facts as an expert witness."); *see also King v. United States*, 74 A.3d 678, 683 (D.C. 2013) (distinguishing the difference between lay and expert testimony and holding that observations that are common and can be formed through "simple, personal observations of human conduct" are not expert opinions.). For these reasons, the Court must exclude Dr. Frumhoff from testifying about the putative harm that Plaintiff may have suffered. *Motorola*, 147 A.3d at 756.

### c. Dr. Frumhoff's Testimony Regarding Emails Stolen from the Climate Research Unit at East Anglia University and Subsequent Investigation Reports Concerning Stolen Emails

Dr. Frumhoff also devotes a substantial portion of his expert report summarizing investigations into whether the emails stolen from the CRU at East Anglia University established that Plaintiff had manipulated data in reaching his scientific conclusions. This testimony

concerns the "falsity" element of the defamation claim and, thus, could be said to be helpful to the jury in resolving a fact at issue. *See Motorola*, 147 A.3d at 756. In particular, his testimony could assist the jury in understanding whether the phrases from the emails such as "Mike's Nature trick" and "hide the decline" refer to legitimate scientific techniques.

In describing the methodology that he used to determine that the stolen emails were not incriminating, however, Dr. Frumhoff indicates only that he has reviewed a number of the emails that were released, "particularly those that were alleged to suggest misconduct on the part of the climate scientists." Frumhoff Rep. 7. The Court finds that reading the emails alone and particularly, reading only a subset of the emails, would not constitute a reliable methodology. To allow Dr. Frumhoff to give his opinion without his having utilized a reliable methodology would be to allow Plaintiff to supplant Dr. Frumhoff's testimony on the issue of falsity for that of the jury.

Dr. Frumhoff's report summarizes findings made by other organizations that investigated the emails including the Associated Press, Media Matters, Politifact.com, The Penn State Inquiry Committee, the Oxburgh Panel, the Independent Climate Change E-mails Review, the UK House of Commons Science and Technology Committee, and the Department of Commerce Office of Inspector General. Critical here, is that Dr. Frumhoff did not participate in the investigations; his summary of those reports amounts to a superficial recitation of their findings. Dr. Frumhoff has no special knowledge concerning how the investigations were conducted or the legitimacy of their conclusions. Any testimony that he would offer concerning those reports would not be beyond the ken of the average juror.

**F.  CEI's Motion in Limine to Exclude the Expert Testimony of Dr. John Holdren**

Dr. Holdren is a professor of Environmental Science and Policy at Harvard University and Director Emeritus and Senior Advisor to the Director of the Woodwell Climate Research Center, a nonprofit organization that "advances scientific discovery and solutions to address the world's climate challenges."  Woodwell Climate Research Center, *About*, https://www.woodwellclimate.org/about/, Last Accessed July 16, 2021; Bailen Decl. Supp. Dr. Holdren, Ex. 1 ("Holdren Rep.").  Between 2009 and 2017, Dr. Holdren served as the Science and Technology Advisor to President Barrack Obama and held several other high-ranking positions in the federal government.  Dr. Holdren holds a master's degree in Aeronautics and Astronautics and a Ph.D. in theoretical plasma physics.

Dr. Holdren will give opinions "regarding human-caused global climate change, including the meaning of terminology used in this domain, key milestones in the history of climate research, and the scientific standing of Plaintiff."  Holdren Rep. 2.  In particular, he intends to opine on "the use of proxy data to estimate global-average temperatures prior to the advent of thermometer measurements."  *Id.*  Dr. Holdren will also discuss "the wider scope of [Plaintiff's] contributions to climate science."  *Id.*

**a.  Dr. Holdren's Opinion Concerning General Concepts Related to Global Warming**

Dr. Holdren begins his report with an all-encompassing history of climate change that starts with the definition of "weather," discusses reasons for the Earth's changing temperatures "over the millennia" and attempts to define terms such as "greenhouse gases," "anthropologic climate change," "paleoclimatology" and "climate-change mitigation."  Plaintiff posits that an understanding of general concepts relating to climate change is necessary "in order to explain

how [Plaintiff's] research became so important in the field of climate change...."  Opp'n Mem. 62.

In considering how much climate change background information is necessary, the Court must tread a thin line.  "The only thing that is relevant here is Defendant's knowledge and/or serious doubts about the truth of the [purportedly defamatory] statements."  Order Denying Motion to Compel Re: Steyn 6.  Accordingly, any testimony that is intended to show that Plaintiff's work was important in the field of climate change is not relevant.  To establish the "falsity" element of a defamation claim, Plaintiff must show that his work was not fraudulent.  Plaintiff's research is highly technical and, as such, for a jury to determine whether Plaintiff acted fraudulently, the jury will likely need expert testimony defining certain terms and concepts.

The problem with Dr. Holdren's discussion of general climate change concepts is that many of the concepts that he explains are not directly related to whether Plaintiff manipulated data and acted fraudulently.  The Court agrees that "[i]t would be difficult to assess the defendants' reliance on such terms as 'Mike's Nature trick' and 'hide the decline' without knowing what they [are] related to," but the Court does not yet appreciate how the history of climate change is necessary to assist with defining such terms.  Opp'n Mem. 63.

### b.  Dr. Holdren's Opinion Concerning the Use of Proxy Data

Plaintiff's use of proxy data to determine historic temperature levels, his exclusion of particular types of proxy data, and his use of principle component analysis are at the heart of whether Plaintiff acted fraudulently.  Such concepts are indeed beyond the ken of the average juror and will necessarily require scientific and technical explanation.  Accordingly, the Court finds that expert testimony is necessary for the jury to understand Plaintiff's use of proxy data, and principle component analysis.  The next issue the parties dispute is whether Dr. Holdren

possesses the requisite experience, education, or training to testify knowledgeably about such matters.

Defendants note that, by Dr. Holdren's own admission, he is not an expert. *See* Bailen Decl. Supp. Dr. Holdren, Ex. 2 ("Holdren Dep.") at 29:15-30:6, 141:16-142:3 (showing that Dr. Holdren has indicated that he is not an expert in tree rings, proxy analysis in general, or Principal Component Analysis and that he has never participated in a paleoclimate reconstruction or published a peer-reviewed article on statistics). Defendants also highlight that Dr. Holdren cites extensively to a report from the National Academy of Sciences but concedes that he has not read the report in over fifteen years. *See* MIL Holdren Mem. 10; Holdren Dep. 69:11-14.

Plaintiff counters that "Dr. Holdren does not need to be conversant with all aspects of highly specialized fields to be able to offer an opinion on global warming research in general and the basic research tools that are used in that field." Opp'n Mem. 64. The Court has already concluded that opinions on global warming research in general would not be helpful. Regardless, whether Dr. Holdren's qualifications make him the best expert is not a determination for the Court. The extent of an expert's knowledge and the reliability of the facts on which he bases his opinion go to the weight of the expert's opinion, not its admissibility. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2000) (overturning a trial court's holding that experts were not qualified "in a relevant field solely because their expertise related to an area other than the one concerning the ultimate issue to be decided by the trier of fact."). The Court finds that Dr. Holdren's extensive career in climate-related fields and scientific background are sufficient for a jury to find him credible.

Rather than disqualifying Dr. Holdren because he is unqualified to render his opinion, the Court must disqualify him because his opinion is not based on reliable methods. "Even a

supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method."  *Smith*, 215 F.3d at 718 (internal citations omitted).  Dr. Holdren's report contains zero explanation for how he arrived at his conclusions, leaving the Court to conclude that he has not conducted any scientific analysis beyond reciting the findings and conclusions of other experts in the field.

### c.  Dr. Holdren's Opinion Concerning Other Reports Which Confirmed Plaintiff's Research and Investigation into Plaintiff's Research

Dr. Holdren's report also contains a history of research and investigations conducted by other scientists that he claims, "definitively validated" Plaintiff's research.  Defendants aver that Dr. Holdren "cannot offer any scientific or specialized knowledge on this topic" and that "[a]ll he did was read a Wikipedia entry about the reports; glance at them many years ago … and then relay their conclusions to the Court."  Holdren MIL Mem. 10.  Plaintiff responds that "the 45-page Wikipedia entry is considered 'the most extensive and authoritative account of the hockey-stick controversy in all of its long-running complexity.'"  Opp'n Mem. 65-66 (quoting Holdren Rep. 12).

The Court must exclude such testimony.  A review of Dr. Holdren's deposition testimony reveals that he likely has not read all of the reports and investigations in their entirety, and, at the very least, that he has not read them for several years.  *See* Holdren Dep. 75:1-5. Because Dr. Holdren's expert opinion concerning the investigation reports is based primarily on his having read a publicly editable Wikipedia page, and not the reports, themselves, the Court finds that any testimony that he would offer would not be based on adequate facts.  Further, regurgitation of secondary sources of information is not a reliable methodology.  *See Danley*, 169 F. Supp. at 478 (finding that an expert may rely on documentary evidence in rendering her opinion, but may not "present these documents to the jury with no analysis or merely read,

selectively quote from, or regurgitate the evidence.") (Internal citations omitted); *S.E.C*, 46 F.

Supp. 2d at 763 ("expert testimony may not be used merely to repeat or summarize what the jury

independently has the ability to understand.").

### d. Dr. Holdren's Discussion of Plaintiff's Subsequent Research and Career Achievements

Dr. Holdren's report also contains a section titled, "The Stature of Professor Mann as a

Climate Scientist." Therein he summarizes several of Plaintiff's career achievements and the

impact that they had on other scientists and the field of climate change research. This

information will not help the trier of fact to understand the evidence or to determine a fact in

issue. *See Motorola*, 147 A.3d at 756. A recitation of Plaintiff's curriculum vitae has no bearing

on whether Defendants' statements were defamatory or whether Plaintiff conducted his research

fraudulently.

Plaintiff avers that Dr. Holdren will testify that Plaintiff's admittance to the U.S. National

Academy of Sciences is evidence that his research was sound because "[t]he election procedures

of the NAS are not made public, but they are famously rigorous" and that "[a]ny significant flaw

in one's research record or in one's conduct in public debate about scientific issues is likely to

prove fatal to the prospects for election." Holdren Rep. 20-21. Dr. Holdren was not a member

of any selection committee at the NAS and does not possess any special knowledge or

experience that would help the jury to understand why the NAS elected Plaintiff. His testimony

concerning the reasons for Plaintiff's election is entirely speculative and must be excluded.

### G. CEI's Motion in Limine to Exclude the Expert Testimony of Dr. John Mashey

Dr. Mashey holds a Bachelor of Science in Mathematics and a Ph.D. in Computer

Science. Dr. Mashey does not rely upon his education to form the basis of his expertise,

however. Rather, after retiring in 2001, he began studying "climate science denial and the

attacks against scientists, especially analyzing tactics of online amplification and disinformation." DeLaquil Decl. Supp. John Mashey, Ex. 3, at 1 ("Mashey Rep."). Dr. Mashey has presented at several universities on topics concerning climate and tobacco industry disinformation and "was profiled in the AAAS journal, *Science*, for [his] efforts in defending climate scientists." Mashey Rep. 2.

The Court's initial reaction to Dr. Mashey's curriculum vitae is that he lacks the training in the relevant field to render an opinion on the dispositive issues in this case. Further, the Court is skeptical of Dr. Mashey's role as an expert in "disinformation" because the Court has not previously been made aware of a field of study dedicated solely to tracking misinformation. Rather, Dr. Mashey's CV suggests that he is a passionate advocate whose expertise was developed specifically to testify on behalf of climate scientists. *See In re Welding Fume Prod. Liab. Litig.,* No. 1:03-CV-17000 (MDL Docket No. 1535), 2005 U.S. Dist. LEXIS 46164 at *60 (N.D. Ohio Aug. 8, 2005) ("a person does not become an expert in an area outside of his regular field merely by reading up for the specific purpose of testifying."). Dr. Mashey does appear to be well-read on such matters, however, as his report indicates that he has extensively reviewed the scientific communities and public's reaction to Plaintiff's article.

Regardless, the extent of Dr. Mashey's knowledge and his expertise in the field of disinformation go to the credibility of his opinion, not its admissibility. *See Smith,* 215 F.3d at 719. Accordingly, while the Court questions Dr. Mashey's qualifications, it finds that he has a very limited, specific expertise which could be helpful to a jury.

The Court cannot, however, so easily assuage its concerns about the methodologies that Dr. Mashey uses to formulate his opinion. Plaintiff explains that "Dr. Mashey was not attempting to provide an encyclopedic collection of all of the internet information on [Plaintiff],

but only to show a number of examples of articles that were within the defendants' easy reach." Opp'n Mem. 81 (internal quotations omitted).  Defendants' aver that "Mr. Mashey could not point to any literature that supports the methodology he utilized to compile this information." Mashey MIL mem. 7.  In describing his process, Dr. Mashey explained that "[i]t's just what people do with using the Internet to find things."  Mashey Dep. 68:9-19.  Defendants then identify several articles that Dr. Mashey omitted from his report, "from publications he conceded are credible that were critical of Plaintiff…."  Mashey MIL mem. 7.

The Court must conclude that Dr. Mashey's report is not based upon reliable principles and methods.  A review of his deposition testimony reveals that his opinion is derived from reviewing articles, websites, and blogposts that were submitted to him by Plaintiff's counsel and from his own, non-scientific, scouring of the internet.  Mashey Dep. 129:6-131:17 (admitting that he "did not do the detailed analysis," of his sources, did not have a list of the publications that he had reviewed, and that his opinion was primarily based on his "rummaging around and looking at things," seeing what some of the widely known denier blogs were saying, but not writing down his findings until he was provided with a list of sources by Plaintiff's attorneys, years after having done his "analysis.").  Dr. Mashey even admits that the sources upon which his opinion is based are not a good statistical sampling of articles, but are rather, in his opinion, "a pretty reasonable sample of what is going on."  *Id.* at 131:20-132:7.  Performing internet searches and selecting articles without an explanation or methodology for how particular articles were chosen is not a methodology based in the scientific method.  *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,* 254 F. Supp. 2d 1239, 1245 (finding that an expert having read articles compiled by others without knowing what searches produced those articles is not a reliable

methodology).  Dr. Mashey's methodology is particularly unreliable given that he did not write

down his sources at the time he reviewed them.  *See Id.* at 130:12-16.

### H.  CEI's Motion in Limine to Exclude the Expert Testimony of Dr. Gerald North

Dr. North is the University Distinguished Professor Emeritus at Texas A&M and holds a

Ph.D. in Physics with specialties in climate modeling and energy balance climate models.

DeLaquil Decl. Supp. Dr. North, ("North Rep.") Ex. 3, at 1-2; DeLaquil Decl. Supp. Dr. North,

Ex. 2 (North Dep.) at 41:15-22.  In 2006, the National Research Council of the National

Academy of Sciences created the Committee on Surface Temperature Reconstructions for the

Last 2,000 Years in order to "review the attacks on MBH research by a number of climate

change skeptics."  *Id.* at 2.  Dr. North served as the chair of that committee during its

investigation of Plaintiff's work.  *Id.*

Dr. North will offer his opinion that, "the research [was] valid and was performed in an

honest and scientifically appropriate manner" and that methodologies used by Plaintiff have been

replicated "by a large number of similar reconstructions since the MBH research was

conducted."  *Id.* at 3.  Dr. North also intends to opine that "any improprieties on Dr. Mann's part

would have been addressed – and dismissed – by the National Academy of Sciences in

connection with Dr. Mann's recent election to that organization."  *Id.*

#### a.  Dr. North's Testimony Concerning the Validity of Plaintiff's Work

Dr. North presided over an investigation of Plaintiff's work "conducted by credentialed

academics and professionals."  *CEI*, 150 A.3d at 1253.  The Committee's investigation directly

addressed whether Plaintiff manipulated data or acted fraudulently.  The findings of the

Committee are technical in nature, certainly beyond the ken of the average juror.  As such the

Court finds that Dr. North's opinion concerning whether Plaintiff conducted his work

fraudulently would be helpful to the jury and that Dr. North is qualified to give that opinion by both his education and his involvement on the committee.

Defendants take issue with Dr. North's methodologies, explaining that:

> "[h]is opinion is mostly the historical recounting of work by a committee he chaired in 2006 and his (inaccurate, in many cases) spin on the work of nearly a dozen scientists composing that committee. Reciting what that committee did and the contents of its report is not the exercise of a reliable methodology…."

MIL North Mem. 1. In response, Plaintiff explains that Dr. North will discuss the Committee Report "both as a fact and an expert witness. … describe the work of the committee, which he chaired, and provide his opinion that its findings and conclusions were well researched by a number of eminent climatologists and that he agrees with the committee's findings and conclusions." Opp'n Mem. 41.

In strong opposition, Defendants cite to *SEC v. Mudd* to support their assertion that describing the work, and summarizing the conclusions of a committee is not applying a reliable methodology under *Daubert*. *See SEC v. Mudd*, No. 11 CIV, 9202 (PAC), 2016 WL 2593980 at *14 (S.D.N.Y. May 4, 2016) (acknowledging that an expert cannot "merely closely summarize documentary evidence without applying any analysis"). In determining whether an expert has used reliable methodologies, the Court must look to such factors as (1) "whether the theory or technique … can be (and has been) tested;" (2) "whether it has been subjected to peer review and publication;" (3) "the known or potential rate of error;" (4) "the existence and maintenance of standards controlling the technique's operation;" and (5) whether the technique has been accepted by the scientific community. *Daubert* at 593-94. The Court need not perform an exhaustive analysis of these factors to find that Dr. North's opinion does not constitute an expert opinion which has used and applied reliable methods. Dr. North's "technique" has not been

tested, it has not been peer reviewed, there is no known error rate or standards controlling the techniques operation. Such is the case because Dr. North has not implemented any scientific analysis or technique; he has merely summarized the findings of the Committee Report.

While Dr. North is, without doubt, qualified to discuss the findings of the Committee Report as a fact witness, because he has not conducted his own scientific analysis using methodologies which can be replicated or analyzed, the Court must preclude him from testifying as an expert.

### b. Dr. North's Testimony Concerning Plaintiff's Election to the National Academy of Sciences

Dr. North will opine that Plaintiff's election to the National Academy of Sciences "demonstrates the high quality of his work as a scientist." North Rep. 20. During his deposition, however, Dr. North conceded that he has no knowledge of the criteria that the National Academy of Sciences considers when determining whether it will accept a scientist into its ranks. North. Dep. 189:2-12. Dr. North's opinion regarding Plaintiff's admission to NAS is not based on any reliable methodology and amounts to mere speculation. He cannot state, with any certainty or inside knowledge, the reasons for which Plaintiff was admitted to the National Academy of Sciences. Plaintiff, for his part, concedes that, "of course, Dr. North does not know the specific consideration of [Plaintiff's] candidacy, but he is certainly familiar with the Academy's stringent standards for admission." Opp'n. Mem 54. The Court finds that Dr. North's general knowledge of the Academy's stringent admission standards would not aid the jury in deciding the discrete question of whether Plaintiff manipulated data to further his personal political agenda. He has demonstrated no specialized knowledge concerning Plaintiff's induction into the Academy.

I. **Defendant Steyn's Motion in Limine to Strike the Testimony of Dr. Raymond Bradley**

Dr. Bradley is a professor in the Department of Geosciences and the Director of the Climate System Research Center at the University of Massachusetts, Amherst. *See* MIL Bradley, Ex. A, Expert Report of Raymond S. Bradley, D.Sc., ¶¶ 2-4 ("Bradley Rep."). Dr. Bradley, along with Dr. Mann and Dr. Hughes, co-authored the *Global-Scale Temperature Patterns and Climate Forcing Over the Past Six Centuries* ("MBH98"), and *Northern Hemisphere Temperatures During the Past Millennium: Inferences, Uncertainties, and Limitations* ("MBH99"). *Id.* at ¶¶ 1, 7-10.

Plaintiff proffers Dr. Bradley as an expert to provide testimony on the MBH research, the scientific standards used in the study, and the methodology and data that were used to create the graph. Opp'n Mem. at 47. Dr. Bradley's testimony will also include a discussion of the peer review of the MBH study, its validation by the International Panel of Climate Change ("IPCC"), and an acknowledgement that the MBH scientists recognized the uncertainties and limitations of their research. *Id.* Dr. Bradley will address Stephen McIntyre and Ross McKitrick's criticisms of the MBH research, as well as Mr. Steyn's personal criticisms of Plaintiff and the hockey stick research. *Id.*

Mr. Steyn argues that Dr. Bradley must be disqualified to provide testimony as an expert witness because of his co-authorship of the Hockey Stick graph and his likely biases stemming therefrom. Mr. Steyn contends that Dr. Bradley's testimony would be biased because of his personal interest in redeeming Dr. Mann personally and professionally and because of his personal interest in ensuring the legitimacy of the Hockey Stick graph. *See* MIL Bradley 1, 4-6; Def.'s Reply 1-2; s*ee also Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp., Inc.*, No. 18 Civ 2121, 2020 U.S. Dist. Lexis 22434, 2020 WL 622152, at *4 (D.D.C. Feb. 10, 2020).

Critically, Mr. Steyn asserts that Dr. Bradley's analysis fails to provide the foundation necessary to satisfy Rule 702's reliability requirements because the analysis does not detail his understanding of whether and how the research data was properly incorporated into the MBH98 and MBH99 studies. *Id.* at 7; Def.'s Reply at 4-7. Further, Mr. Steyn argues that Dr. Bradley's opinions on the falsity of Mr. Steyn's statements are unreliable because Dr. Bradley had no hand in the eleven investigatory reports upon which he relies for his opinion. *Id.* at 7-9. Quite pointedly, Mr. Steyn argues that Dr. Bradley is unqualified to testify about the investigations, as he lacks the knowledge, skill, experience, training, or education in "the methods of academic, institutional, or congressional investigations to testify on their veracity." *Id.* at 9.

Finally, Mr. Steyn asserts that Dr. Bradley's testimony on general global warming research and the methodology of IPCC assessment reports are simply not relevant to address the question of defamation. *Id.* at 2, 10-12.

Plaintiff, on the other hand, argues that hybrid witnesses are routinely permitted to testify, and that the issue of whether Dr. Bradley's testimony is self-serving because he was a co-author of the MBH research is an issue that is subject to cross-examination and a matter for the jury to decide. Opp'n Mem. 48. In short, it is a question of weight and credibility rather than a question of admissibility.

Plaintiff explains that Dr. Bradley's support for his conclusions stems from consideration of scientific literature generally, his personal climate change research, his MBH research, and the formal institutional investigations into the MBH research. *Id.* at 48-49. Plaintiff asserts that Dr. Bradley is indeed qualified to provide opinion testimony on the results of the Climategate investigations because the investigations concerned scientific research about climate change. *Id.* at 50.

Plaintiff contends that Dr. Bradley's opinions on global warming are relevant because his testimony on global temperatures is rooted within the context of the MBH research's conclusions. *Id.* at 50. Finally, Plaintiff notes that he has withdrawn the portion of Dr. Bradley's testimony about the credibility of the IPCC reports. *Id.*

In his Reply, Mr. Steyn argues that Dr. Bradley did not, and is unable to, verify the veracity of the investigatory reports; he does not have any knowledge of the standards or process employed by the authors of the investigatory reports; and, ultimately, his testimony amounts to reading comprehension because he only provides the conclusions of the reports, which interpretation does not require specialized knowledge. Def.'s Reply at 7-8.

The Court will first discuss whether Dr. Bradley can testify as a fact and expert witness and whether his relationship with Dr. Mann disqualifies him based on bias. To support his position, Mr. Steyn cites to *Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp. Inc.*, 2020 U.S. Dist. Lexis 22434 at *3. In that case, plaintiffs Phoenix Restoration Group, Inc. ("Phoenix") and AVSmoot, LLC purchased commercial insurance through defendant Liberty Mutual Group Inc., with the policies underwritten by defendant Ohio Security Insurance Company. *See Phoenix Restoration Grp., Inc.*, 2020 U.S. Dist. Lexis 22434 at *3. After a fire in July 2016, the defendants assigned plaintiffs' claims to a claims adjustor, resulting in the hiring of David R. Elmore and Elmore's firm, MDD Forensic Accountants ("MDD"). *Id.* The defendants intended to call Mr. Elmore, who was identified as a certified public accountant, valuation analyst and a master analyst in financial forensics, to testify both as a fact witness and defendants' sole expert witness. *Id.* at 2. The plaintiffs objected, asserting that Mr. Elmore made "critical misrepresentations about how plaintiffs' claims would be treated, upon which misrepresentations the plaintiffs relied to their detriment." *Id.* The plaintiffs filed a motion in limine to exclude or

limit Mr. Elmore's testimony under Federal Rule of Evidence 403. The plaintiffs objected to

Mr. Elmore providing both factual testimony and independent expert testimony to rebut

plaintiffs' proffered experts on general industry standards for processing insurance claims and

forensic accounting because of the danger of prejudice and jury confusion. *Id.* at *7.

The court recognized that "having a witness testify as both a fact and expert witness is

permissible under Federal Rules of Evidence 701 and 702." *Id.* at *8-*9. The court, however,

cautioned that, "[a] 'two-hatted' witness providing closely related lay and expert opinion

testimony" presents special risks because of the "'aura of special reliability and trustworthiness

surrounding expert testimony.'" *Id.* at *10 (quoting *United States v. Williams*, 827 F.3d 1134,

1160-61 (D.C. Cir. 2016). It opined that, when hybrid testimony is not presented properly, "the

manner in which [the] expert and lay opinions [are] interspersed during the trial" can "require[]

mental gymnastics of the jurors in determining when [the witness] was testifying as an expert

and when he was not, risking confusion." *Id.* (quoting *Williams*, 827 F. 3d at 1160). Concerns

over juror confusion could warrant the exclusion of such expert testimony or imposition of strict

limits on the scope of the expert portion of a hybrid witness's testimony or employment of

procedural safeguards against jury confusion. *Id.* at *10-*11.

Further, the court noted that "expert testimony from a hybrid witness may be excluded

based upon a finding of insufficiency under Rule 702." *Id.* at *11. Rule 702 "requires that 'the

[expert] testimony [be] the product of reliable principles and methods' and that 'the expert has

reliably applied the principles and methods to the facts of the case.'" *Id.* (quoting Fed. R. Evid.

702(c), (d)). The District Court explained that the reliability of expert testimony may be

undermined if the expert witness has a clear interest in the outcome of the proceeding or if the

expert witness has become an advocate for a cause. *Id.* at *11-*12.

The court found that Mr. Elmore's total and sole involvement in the claims adjustment process gave rise to the plaintiffs' pending legal claims. Because of his role, that court concluded that, allowing Mr. Elmore to provide expert testimony about the consistency of his conduct with industry standards on claims processing and accounting would bolster his factual testimony by "imbuing it with undue weight under Rule 403." *Id.* at \*13-\*14. In addition, the court found that, because Mr. Elmore is purported to have engaged in the alleged misrepresentations to the plaintiffs, "he has a clear incentive to determine, in his expert capacity, that the defendants' conduct (which, at bottom, rests in significant part on his conduct) was appropriate and proper, for a number of reasons." *Id.* at \*14. On these facts, the court was constrained to grant plaintiffs' motion in limine, but allowed Mr. Elmore to provide expert opinion testimony about opinions he formed while working on plaintiffs' claim, so long as his testimony satisfied Rule 702. *Id.* at \*17-\*18.

Here, Dr. Bradley's involvement in the Hockey Stick research does not figure prominently in the factual allegations underlying Plaintiff's claim of defamation. Dr. Bradley testified:

> [Plaintiff] was responsible for developing the statistical approach, writing the computer code, and calculating the uncertainties. Prof. Hughes and I selected the different records that would be used in the analysis and collaborated with [Plaintiff] on interpreting the reconstructed temperature record.

Bradley Rep. ¶ 11. Dr. Bradley, however, provides: "Some of [defendants'] statements impugn my integrity as well as that of my co-author, Malcom Hughes, as well as [Plaintiff's]." *Id.* at ¶ 56. In addition, Dr. Bradley indicates that, "[w]hile these statements were principally directed at [Plaintiff], by implication, they also accuse his co-authors, including me, of wrongdoing[.]" *Id.* Dr. Bradley's testimony does not show sufficient bias to justify exclusion of his testimony in

its entirety.  Indeed, to the extent necessary, the Court could restrict the scope of Dr. Bradley's testimony to counter any potential risk of bias.  *See Phoenix Restoration Grp., Inc.*, 2020 U.S. Dist. Lexis 22434 at *11, *13.

Dr. Bradley provides expert testimony about the findings from the MBH research, how global temperatures were calculated, and the use of proxy data in the hockey stick research. Bradley Rep. ¶¶ 12-39.  The Court will, however, exclude this testimony because Dr. Bradley fails to put forth the scientific technique or methodology underlying his expert opinion.  *See Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 250-51.

The type of proxy data used and whether it was properly incorporated into the hockey stick research is a fact at issue in this case.  Dr. Bradley, as a co-author of the MBH98 and MBH99 studies, has first-hand knowledge of the data used in the hockey stick research.  In arriving at his conclusion that the "technique was properly incorporated into, and used appropriately in, the MBH98 and MBH99 studies," Dr. Bradley's testimony skips a significant step that is required of all expert testimony.  *See* Bradley Rep. ¶¶ 36-39.  Dr. Bradley only speaks to how the proxy data was chosen but fails to establish the principles and methodologies he used to arrive at his conclusion that the data and technique in the MBH98 and MBH99 studies were properly incorporated and used appropriately.  *See Arias v. DynCorp.*, 928 F. Supp. 2d 10, 15-16 (D.D.C 2013) (indicating that an expert's opinion can be based on their experience, but in those instances the expert must explain "how the experience leads to the conclusions reached, why the experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts.").  The Court must, therefore, exclude Dr. Bradley's testimony.

Further, the Court will exclude Dr. Bradley's expert testimony as to the peer review process and the investigative reports.  Although Dr. Bradley has impressive credentials and is a

co-author of the MBH studies, he fails to explain the principles and methods by which he draws conclusions from the investigatory reports that ostensibly exonerate Plaintiff and support his conclusion that the research was not fraudulent. *See* Fed. R. Evid. 702 (c)-(d).

What is more, because he is a co-author of the MBH studies, to allow Dr. Bradley to make conclusory statements as an expert witness concerning the findings of the various investigations runs the risk of improperly bolstering his factual testimony by imbuing it with undue weight, in violation of Rule 403 of the Federal Rules of Evidence. The Court must strike the testimony for this reason, as well.

Finally, the Court must also exclude Dr. Bradley's expert testimony on global warming. Although Plaintiff explains that Dr. Bradley's testimony will be presented solely within the context of the MBH research findings, Dr. Bradley's expert report contains testimony concerning occurrences of global warming outside the context of the MBH98 or MBH99 studies. *See* Bradley Rep. ¶¶ 12-27. That testimony, instead, provides information about global warming and evidence that it is occurring. *Id.* As the Hon. Jennifer M. Anderson concluded in her October 22, 2019 order addressing a motion to compel discovery, "[t]he broader question of global warming is [not] before the Court." *See* Order Denying Pl.'s Mot. Compel Disc. at 6. Indeed, the policy debate over global warming is not before this Court. Although Plaintiff must prove that Defendants' purportedly defamatory statements are false by showing that Plaintiff's research was not conducted fraudulently, that assessment does not require an understanding of the totality of scientific research underlying or buttressing the debate over global warming.

### J. Defendant Steyn's Motion in Limine to Exclude the Expert Report of John Abraham

John P. Abraham, Ph.D., is a professor of thermal sciences at the University of St. Thomas, Minnesota. *See* MIL Abraham, Ex. A, Report of Dr. John P. Abraham ("Abraham

Rep."). Dr. Abraham received a Ph.D. in Mechanical Engineering. Professionally, his specialty is Thermal Science, which is a sub-division of Mechanical Engineering dealing with heat and energy transfer. *Id.* Dr. Abraham indicates that his research includes "work on climate change, renewable energy, and access to drinking water in the developing world." *Id.*

Plaintiff offers Dr. Abraham's testimony to provide opinions on the science of climate change, the centrality of Plaintiff's research to the climate change conversation, and the investigations into Plaintiff's conduct. Opp'n Mem. at 72-73. Plaintiff has also designated Dr. Abraham as an expert to opine upon the damage to Plaintiff's reputation within the scientific community and how Defendants' statements stymied Plaintiff's ability to collaborate with other researchers and receive funding for his research. *Id.* at 73, 76.

More specifically, Plaintiff proffers Dr. Abraham's expert testimony to assist the jury in answering the following eight questions.

> Issue 1: Is there evidence that the Earth is warming and that the warming is caused by humans?
>
> Issue 2: If there is warming, is it unnatural, or at a rate that cannot be explained by natural phenomena?
>
> Issue 3: How central is [Plaintiff]'s research in the above two items?
>
> Issue 4: Is [Plaintiff]'s research correct? That is, are his findings related to climate change confirmed?
>
> Issue 5: Did [Plaintiff] participate in any fraudulent activities that misrepresented his research or otherwise exaggerated the impact of humans on the climate?
>
> Issue 6: Did colleagues of [Plaintiff] contribute to any activities that misrepresented their research or otherwise exaggerated the impact of humans on the climate?
>
> Issue 7: Did [Plaintiff] engage in unprofessional activities that interfered with others' ability to reproduce their work or interfere with scholarly process?

> Issue 8: Did [Plaintiff]'s colleagues engage in unprofessional activities that interfered with others' ability to reproduce their work or interfere with the scholarly process?

Abraham Rep. 2-4.

Mr. Steyn argues that most of Dr. Abraham's testimony is neither relevant nor reliable because he focuses much of his discussion upon the broader question of global warming. MIL Abraham at 1, 3-4, 6-7, 13-14. Mr. Steyn contends that Dr. Abraham lacks the expertise to provide expert testimony about global warming and the validity of Plaintiff's research in dendroclimatology because his specialty is in thermal science, not climate science. *Id.* at 1-2, 4-5, 8-9; Def.'s Reply 4-5, 10. Mr. Steyn asserts that, "offering generalized opinions based on a summary of documents that can be read and understood by the Court does not qualify a person's testimony as expert." Def.'s Reply 3, 6-7; *see also Arias v. Dyn Corp.*, 928 F. Supp. 2d 10, 18 (D.D.C. 2013).

What is more, Mr. Steyn contends that Dr. Abraham has no expertise investigating professional research misconduct and should not be permitted to testify as an expert about any financial or reputational damages that Dr. Mann may have suffered as a result of Defendants' statements. Def.'s Reply 1, 3, 7-8.

Mr. Steyn asserts that Dr. Abraham's opinions are not reliable because he only provides conclusions, relies on his own personal summaries of the investigation reports, and cannot independently confirm the veracity of the reports. MIL Abraham 2, 10, 13, 15-17; Def.'s Reply 8. Further, Mr. Steyn argues that Dr. Abraham's testimony is biased because he is closely aligned with Plaintiff on climate change, has co-authored with Plaintiff multiple articles on ocean temperatures, has personally supported Plaintiff, and has called Plaintiff a "hero" among his

colleagues. *Id.* at 17- 20; *see also Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp., Inc.*, No. 18 Civ 2121, 2020 U.S. Dist. Lexis 22434, 2020 WL 622152, at *4 (D.D.C. Feb. 10, 2020).

In his opposition, Plaintiff argues that thermal science has bearing on climate change and that Dr. Abraham is qualified to testify about the investigation reports and climate issues because he is an active climate researcher and has published a number of peer-reviewed studies on "global warming, impacts of warming to society, recent temperature trends, and methods to determine paleoclimate temperatures." Opp'n Mem. at 72-75. Plaintiff asserts that the methodology underlying Dr. Abraham's opinions on global warming is reliable because an "expert's review of the published literature in light of the expert's education, training, and experience is a clearly appropriate 'methodology.'" *Id.* at 73-75. In addition, Plaintiff argues that Mr. Steyn's objection about the relevance of global warming to the issues at bar "disregards the Court of Appeals' observation that issues relating [to] the defendants' positions on this issue may be considered by the jury." *Id.*

Having considered the arguments, the Court must conclude that the eight aforementioned questions are simply not relevant to the questions before this Court. *See* Dr. Abraham Rep. 2-4. Issues 1, 2, and 3 concern how Plaintiff's research is central to the conversation about global warming. *Id.* Contrary to Plaintiff's arguments, a discussion about global warming is not necessary to counter Defendants' "zeal in advancing their cause against the hockey stick graph's depiction of a warming global climate[.]" *CEI*, 150 A.3d at 1259. The Court will not permit this defamation case to expand into litigation over whether the Earth is warming. *See* Fed. R. Evid. 702(a); *see also Daubert,* 509 U.S. at 592.

Plaintiff has correctly withdrawn issues 6, 7 and 8, as those issues are not relevant.

Concerning Issues 4 and 5, Mr. Steyn argues that Dr. Abraham is not qualified to testify as an expert about Plaintiff's research and the investigation reports. "To be qualified as an expert, a witness must have 'sufficient skill, knowledge, or experience' in the relevant area that [their] opinion testimony will 'probably aid' the trier of fact to arrive at the truth. The determination that a proposed expert has the necessary qualifications is committed to the trial court's sound discretion." *See In re A.B.*, 999 A.2d 36, 41 (D.C. 2010). "The training and specialization of the [expert] witness goes to the weight rather than the admissibility of the evidence generally speaking." *Kling v. Peters*, 564 A.2d 708, 716 (D.C. 1989) (quoting *Baerman v. Reisinger*, 363 F.2d 309, 310 (D.C. Cir. 1966)); *see also Coleman v. Parkline Corp.* 844 F.2d 863, 865-866 (D.C. Cir. 1988).

In his deposition, Dr. Abraham explains that, "thermal sciences, which include climate change[,] and the editorial and publication process, which includes peer review, are two areas that I claim expertise in." *See* MIL Abraham; Ex. B, Abraham Dep. 68:18-25. Dr. Abraham indicates that the thermal sciences field includes climate change and that he is an active publisher in the peer review literature of climate science. *Id.* at 69:1-15. Although Dr. Abraham concedes his doctoral studies did not include a focus in climate change, he explains that, "radiative heat transfer is one of my expertise. Something called connective flow, and the flow of heat and fluid. So those topics form the basis of our understanding of climate change and that's what I have my Ph.D. in." *Id.* at 70:1-10. Dr. Abraham concedes that he has never participated in an institution's investigation of faculty research misconduct. *Id.* at 71:7-10.

Even though Dr. Abraham has impressive credentials, Dr. Mann has failed to explain satisfactorily how Dr. Abraham's academic and professional experience qualify him to testify about whether Plaintiff manipulated data or conducted his research fraudulently. See *Arias v.*

*DynCorp.*, 928 F. Supp. 2d 10, 15-16 (D.D.C 2013).  Dr. Abraham represents that he read eleven

reports and passages from the investigation reports to inform his conclusion, as follows:

> [The] investigation[s] found no evidence of data manipulation or scientific misconduct on the part of [Plaintiff] or his colleagues.  I agree.  The underlying science is sound, is reproducible, and is evidence of rapid warming caused by human emission of heat trapping gases.

*See* Abraham Rep. 7-8, 10, 30, 33-34, 37, 43, 50.

Dr. Abraham fails to provide the principles and methodologies underlying his

conclusions beyond his citation to findings in the investigative reports.  His opinions are not the

result of a scientific method.  *See* Fed. R. Evid. 702 (c)-(d); *see also Parsi v. Daioleslam*, 852 F.

Supp. 2d 82, 89 (D.D.C. 2012) (rejecting an expert opinion based solely on the experts "reading

and viewing" and finding that reading, alone, does not constitute an acceptable methodology);

*Daubert*, 509 U.S. at 593-94; *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir.

2001) (finding that to identify scientific testimony, "forces the court to focus on principles and

methodology, not on the conclusions they generate, and thus demands a grounding in the

methods and procedures of science, rather than subjective belief or unsupported speculation.").

What is more, it appears Dr. Abraham lacks the specialized knowledge to explain how the

investigations were conducted or the legitimacy of their conclusions.  The Court will exclude

Dr. Abraham's expert testimony as it relates to the investigation reports.

Finally, as to Dr. Abraham's proffer concerning Dr. Mann's reputation, expert testimony

is not necessary and the basis for Dr. Abraham's expertise on the subject is unclear.  *See*

Abraham Dep. 202:7-24; Fed. R. Evid. 701(c), 702(a); *see also Steele*, 854 A.2d at 181; *Payne v.*

*Soft Sheen Prds., Inc.,* 486 A.2d 712, 727 (D.C. 1985)) (holding that expert testimony is

improper when "the jurors are as capable of understanding and drawing correct conclusions from

the facts as an expert witness."); *King v. United States*, 74 A.3d 678, 683 (D.C. 2013) (distinguishing the difference between lay and expert testimony and holding that observations that are common and can be formed through "simple, personal observations of human conduct" are not expert opinions). Expert testimony is not necessary to aid the jury as to Dr. Mann's reputation in the scientific community. *Motorola*, 147 A.3d at 756.

ACCORDINGLY, it is by the Court this 26th day of July 2021, hereby

**ORDERED** that *Plaintiff's Motion in Limine to Strike the Expert Testimony of Dr. Judith Curry* is **GRANTED**; and it is further

**ORDERED** that *Plaintiff's Motion in Limine to Strike the Expert Testimony of Dr. Abraham Wyner* is **DENIED**; and it is further

**ORDERED** that *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Naomi Oreskes* is **GRANTED**; and it is further

**ORDERED** that *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Peter Frumhoff* is **GRANTED**; and it is further

**ORDERED** that *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. John Holdren* is **GRANTED**; and it is further

**ORDERED** that *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of John Mashey* is **GRANTED**; and it is further

**ORDERED** that *Defendants Competitive Enterprise Institute and Rand Simberg's Motion in Limine to Exclude the Expert Testimony of Dr. Gerald North* is **GRANTED**; and it is further

**ORDERED** that *Defendant Mark Steyn's Motion in Limine to Strike the Expert Testimony of John Abraham* is **GRANTED**; and it is further

**ORDERED** that *Defendant Mark Steyn's Motion in Limine to Strike the Expert Testimony of Raymond Bradley* is **GRANTED**.

**Judge Alfred S. Irving, Jr.**

**Copies to:**

John B. Williams, Esq. (e-Served)
Ty Cobb, Esq. (e-Served)
Peter J. Fontaine, Esq. (e-Served)
Patrick J. Coyne, Esq. (e-Served)
**Counsel for Plaintiff**

Andrew Grossman, Esq. (e-Served)
Mark I. Bailen, Esq. (e-Served)
Kristen Rasmussen, Esq. (e-Served)
Mark W. Delaquil, Esq. (e-Served)
David B. Rivkin, Jr., Esq. (e-Served)
**Counsel for Defendants Competitive Enterprise Institute ("CEI") and Rand Simberg**

Anthony J. Dick, Esq. (e-Served)
Michael A. Carvin, Esq. (e-Served)
**Counsel for Defendant National Review, Inc. ("NRI")**

Daniel J. Kornstein, Esq. (e-Served)
Scott Abeles, Esq. (e-Served)
**Counsel for Defendant Mark Steyn**