# Exhibit F

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

MICHAEL E. MANN, PH.D.,

             Plaintiff,

v.

NATIONAL REVIEW, INC., *et al.*,

             Defendants.

2012 CA 008263 B

Judge Alfred S. Irving, Jr.

## ORDER

Before the Court is *Plaintiff's Motion for Reconsideration of July 26, 2021 Order*

*Granting Defendants' Motions in Limine to Exclude or Strike All Reports of Plaintiff's Expert*

*Witnesses*, filed on September 20, 2021. On October 27, 2021, Defendants Competitive

Enterprise Institute ("CEI") and Rand Simberg filed an opposition. Defendant Mark Steyn

joined in that opposition and, on the same day, filed his own. On November 16, 2021, the Court

held a hearing on the motion.

## DISCUSSION

### I.    Motion for Reconsideration

The Superior Court's Civil Rules do not provide for a "motion for reconsideration," by

that name. *Nichols v. First Union Nat'l Bank*, 905 A.2d 268, 272 n.5 (D.C. 2006) (citing

*Fleming v. District of Columbia*, 533 A.2d 846, 848 (D.C. 1993)); *Williams v. Vel Rey Props.*,

699 A.2d 416, 419 (D.C. 1997) ("the trial court rules do not expressly provide for motions to

reconsider interlocutory orders[.]"). The Court applies the principles of Superior Court Civil

Rules 59(e) and 60(b)(1) in considering motions for reconsideration of interlocutory orders. *See*

*Wallace v. Warehouse Employees Union #730*, 482 A.2d 801, 803 (D.C. 1984). Rule 59(e)

provides for a "motion to alter or amend judgment," and Rule 60(b) provides for a motion for

"relief from judgment or order." *Nichols*, 905 A.2d at 272 n.5 (citing Super. Ct. Civ. R. 59(e), 60(b)).

Where a movant seeks relief "from the adverse consequences of the original order on the basis of error of law, the motion is properly considered under Rule 59(e)." *Farrow v. J. Crew Group Inc.*, 12 A.3d 28, 37 (D.C. 2011) (citing *Wallace*, 481 A.2d at 804) (quotations omitted). A court need not grant a Rule 59(e) motion unless it "finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). "The decision whether to grant or deny a motion to alter or amend a judgment under Rule 59(e) lies within the broad discretion of the trial court." *Wallace*, 482 A.2d at 810.

"A motion which requests consideration for the first time of additional circumstances is one which may be designated more properly as filed under Rule 60(b)." *Vincent v. Anderson*, 621 A.2d 367, 371 (D.C. 1993). The purpose of Rule 60(b) is to provide an avenue for relief from judgments "under exceptional circumstances," "in unusual and extraordinary situations justifying an exception to the overriding policy of finality," "or where the judgment may work an extreme and undue hardship[.]" *Clement v. District of Columbia Dep't of Human Servs.*, 629 A.2d 1215, 1219 (D.C. 1993) (citations omitted). Motions for reconsideration are not a vehicle to present theories or arguments that could have been advanced earlier. *See District of Columbia v. Precision Contr. Sols., LP*, Case No. 2019 CA 005047 B, 2020 D.C. Super. LEXIS 30, at *23 (D.C. Super. Ct. Nov. 17, 2020) (Park, J.) (citing *Stati v. Republic of Kaz.*, 302 F. Supp. 3d 187, 198 (D.D.C. 2018)).

Dr. Mann offers that "the principal basis of this motion for reconsideration is the 'new evidence' prong—by which Dr. Mann's experts have submitted declarations elaborating on the

methodologies they employed in reaching their opinions in this case." Pl.'s Mot. Recons. 3. The

Court will consider the supplemental declarations, but the evidence should not be considered

"newly discovered" as Rule 60(b)(2) contemplates because presumably the proffered experts had

already employed the methodologies, but had not satisfactorily explained them for the Court. To

be sure, the Court, in its July 26, 2021 Order, requested that Dr. Mann provide a more expansive

discussion of his experts' methodologies. The Court's denial was without prejudice. If the

strictures of Rule 59 or 60 are applicable, the Court considers the filing as an unusual "situation[]

justifying an exception to the overriding policy of finality" of the July 26, 2021 Order. *See*

*Clement,* 629 A.2d at 1219.

## II.    *Daubert* Standard for Expert Testimony

As decided in *Motorola, Inc. v. Murray,* 147 A.3d 751 (D.C. 2016), this jurisdiction

applies the evidentiary standards for expert testimony set by the United States Supreme Court in

*Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993). The *Murray* court focused on the

following articulation of Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

*Murray* 147 A.3d at 756. Trial judges are the gatekeepers of expert testimony. *Id.* at 757. The

Supreme Court offered factors for consideration, including whether an expert's theory or

technique has been tested, whether it has been subject to peer review or publication, the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation. *Id.* at 754 (citing *Daubert*, 509 U.S. at 593-94).

"[T]o qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 589. A trial court's evaluation of expert testimony offered not for "scientific knowledge" but for "technical" or "other specialized knowledge" is similarly rigorous; the court must "determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quotations and alterations omitted).

Rule 702 "does not operate in isolation." *Motorola*, 147 A.3d at 754. This jurisdiction further recognizes Federal Rules of Evidence 703 and 403. *Id.* at 754 n.7. Rule 703 provides that facts or data relied upon by an expert may be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" *In re Melton*, 597 A.2d 892, 901-02 (D.C. 1991) (*en banc*). Rule 403 permits the exclusion of relevant evidence where "the danger of unfair or undue prejudice substantially outweighs probative value[.]" *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (*en banc*). The court further instructed that, "[t]o perform the gatekeeping function, the trial court normally will apply Rule 104(a)." *Motorola*, 147 A.3d at 754. Rule 104(a) requires the court to decide preliminary questions about whether a witness is qualified or evidence is admissible.

Finally, "[t]he burden is on the proponent of the testimony to establish its admissibility by a preponderance of proof." *United States v. Libby*, 461 F. Supp. 2d 3, 6 (D.D.C. 2006) (internal quotations omitted); *see also United States v. Tibbs*, Case No. 2016 CF1 19431, 2019

D.C. Super. LEXIS 9, at *14 (D.C. Super. Ct. Sept. 5, 2019) (citing *Daubert*, 509 U.S. at 592 n.10).

### III.    Late Supplementation of Expert Reports

Defendants argue that Dr. Mann's supplemental declarations improperly introduce new expert opinions and testimony after the close of discovery.  Defendants characterize the supplemental declarations as "Sham Affidavits."  *See Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 929 (D.C. 2003).  "Under the [sham affidavit] doctrine, courts will disregard an offsetting affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation and creates only a sham issue of material fact."  *Id.*  Here, Defendants argue that Dr. Mann has offered tailored, dishonest, and previously undisclosed "sham" declarations for the purpose of surviving the exclusion of his experts.[1]

Defendants offer the decision in *Abell v. Wang* to support excluding Plaintiff's supplemental declarations.  *See* 697 A.2d 796, 801 (D.C. 1997).  *Abell* considered when it is appropriate for a court to exclude expert testimony that is not presented in accordance with discovery rules and a scheduling order.  *Id.*; *see also Lowrey v. Glassman*, 908 A.2d 30, 34 (D.C. 2006); *Forti v. Ashcraft & Gerel*, 864 A.2d 133, 138-39 (D.C. 2004).  The Court considers requests for submissions of additional expert testimony in light of the "totality of the circumstances" presented in each case, and upon applying the factors in *Weiner v. Kneller*, 557 A.2d 1306, 1311-12 (D.C. 1989).  Ordinarily, reconsideration is not an opportunity to raise

---

[1] In its Order dated October 7, 2021, the Court considered a similar argument in the Defendant's September 20, 2021 Motion to Strike Plaintiff's Motion for Reconsideration.  At that time, the Court was presented with insufficient briefing on the question, which limitations may have been owing to the swiftness with which Defendants made their filing.  The Court reconsiders the argument more fully, here.

arguments or present evidence previously available to the requester and that could have been raised earlier. *See United States v. All Assets Held at Bank Julius*, 502 F. Supp. 3d 91, 98 (D.D.C. 2020); *Precision Contr. Sols.*, 2020 D.C. Super. LEXIS 30, at *23; *McNeil v. Brown*, No. 17-cv-2602 (RC), 2019 U.S. Dist. LEXIS 31928 at *5 (D.D.C. Feb 28, 2019).

Again, here, the Court explicitly requested and anticipated additional briefing. Still, the rigidity of scheduling orders issued under Rule 16(c) and the philosophy supporting Rule 26(a)(2)'s requirement that expert reports be disclosed and supplemented in a timely fashion demand that there be a limit to how far Plaintiff may expand his experts' reports to gain compliance with *Daubert*. Ultimately, consideration of the supplemental declarations is within the Court's discretion. *See Russell v. Call/D, LLC*, 122 A.3d 860, 864-65 (D.C. 2015).

The reason for the supplementation was to provide Dr. Mann an opportunity to elaborate on the principles and methods that his experts used to support the opinions in their original expert reports. Insofar as these supplemental declarations offer new opinions, or offer a principle or method with no obvious link to previous expert disclosures, the Court will decline to consider them.

## IV.    Analysis of Experts

The Court excluded Dr. Mann's experts for various reasons, but an overarching theme was the absence of disclosed principles or methods underlying their opinions. Dr. Mann seeks reconsideration of five of the originally proffered experts and, in many instances, concedes that their proposed opinions should be limited.

As a broad argument, Dr. Mann writes that "[a]ll the testimony addressed above is reliable and all have been generally accepted in the scientific community—which is the principal consideration articulated in the *Daubert* analysis." Pl.'s Mot. Recons. 3. Dr. Mann is partially

correct. While "general acceptance" may have a bearing on the Court's evaluation of a proffered expert's applied methodology, the "principal consideration[s]" for the Court's analysis are reliability and relevance. *Daubert*, 509 U.S. at 594, 597.

With these principles in mind, the Court reconsiders requests for admission of the testimony of five experts.

### A.    John P. Abraham, Ph. D.

Dr. Abraham's relevant biography is contained in the Abraham Report at pages 55-58, the Abraham Supplemental Declaration at ¶¶ 10-16, and the Court made findings regarding his biography in its July 26, 2021 Order at pages 48-53. According to Dr. Mann, Dr. Abraham will testify "that the MBH work was valid[,] that it was not misrepresented or exaggerated[,] and that Dr. Mann's findings and conclusions have been confirmed in multiple subsequent investigations." Pl.'s Mot. Recons. 2. Addressing the Court's July 26, 2021 Order, Dr. Mann provides his interpretation of the Court's Order by expressing that "the Court appears concerned about Dr. Abraham's qualifications to evaluate the prior investigations into Dr. Mann and his methodology for the same." *Id.* at 7. Dr. Mann has misconstrued the Court's rationale for its decision to exclude Dr. Abraham. While the Court did find significant shortcomings in the methodologies that Dr. Abraham used to develop his expert report, the Court's ultimate finding was that "Dr. Abraham fail[ed] to provide the principles and methodologies underlying his conclusions beyond his citation to findings in the investigative reports." July 26, 2021 Order at 53. This shortcoming derived largely from the fact that "Dr. Abraham lack[ed] the specialized knowledge to explain how the investigations were conducted or the legitimacy of their conclusions." *Id.*

Dr. Mann submits a supplemental declaration wherein Dr. Abraham elaborates on the methodologies he used to formulate his expert opinion. *See* Pl.'s Mot. Recons. Ex. 1, Declaration of John P. Abraham, Ph. D. ("Abraham Supp. Decl."). Dr. Abraham explains that his review of the investigation reports was, in itself, a scientific process because "[h]e reviewed each investigative panel and/or final report and considered several factors to determine if the conclusion could be trusted." Pl.'s Mot. Recons. 8. The investigations and reports that Dr. Abraham reviewed are, with the following abbreviated titles: "(1) Penn State 1 Report; (2) Penn State 2 Report; (3) UEA Oxburgh Report; (4) UEA Russel Panel; (5) UK House of Commons 1 Report; (6) UK House of Commons 2 Report …; (7) US Dept. Commerce Report; (8) NSF Report; (9) EPA Report 1; (10) EPA Report 2; and (11) NRC Report." Abraham Supp. Decl. ¶ 8. Dr. Abraham explains that he considered the following factors to conclude that the investigations and reports could be trusted:

> (a)  Who created the report or investigated the issue(s)?
>
> (b)  How was the report commissioned and what issues were the report intended to address?
>
> (c)  How were the investigators or reviewers selected and what were their credentials?
>
> (d)  Did the report faithfully adhere to its commission?
>
> (e)  How complete and thorough was the report?
>
> (f)  Did the investigation or review attempt to address adversarial views or remain neutral in some stated and obvious way?
>
> (g)  Viewing all of the reports, was there coherence, consensus, and consistency among the report findings? Were they mutually reinforcing of each other, or did they reinforce the Hockey Stick Graph generally, if addressing that issue?

*Id.* at ¶ 20. In the remainder of his supplemental declaration, Dr. Abraham described how he applied the factors to each of the aforementioned investigations and reports.

Preliminarily, the Court notes that this is the type of methodology that would, in fact, be deemed sound under *Daubert*. However, having considered further clarification as to Dr. Abraham's methodology, the Court must exclude opinion testimony from Dr. Abraham. Succinctly stated, because Dr. Abraham did not participate in the investigations of MBH research, his expert opinion amounts, at most, to an opinion assessing the validity of those investigations. The validity of the investigations is not the issue before the Court. Rather, the question before this Court is whether Defendants' statements are true or false, and whether Defendants had actual malice in making the statements. Dr. Abraham has conducted no independent analysis as to the validity of the MBH research. His expert opinion amounts to a recitation of opinions which are not his own. *See Louis Vuitton Malletier v. Dooney & Burke*, 525 F. Supp. 2d 558, 665 (S.D. N.Y. 2007); *see also Owens v. Republic of Sudan*, 864 F. 3d 751, 790 (D.C. Cir. 2017); *Sherrod v. McHugh,* 334 F. Supp. 3d 219, 260 (D.D.C. 2018).

Dr. Mann's submission of Dr. Abraham's expert report reveals a recurring fatal flaw in his litigation approach. To be sure, Dr. Mann's research has been widely discussed in both professional circles and in the broader public arena. A simple internet search reveals many articles, analyses, and blog posts concerning the MBH research. Dr. Mann attempts to use Dr. Abraham, and as explained below, as Dr. John R. Mashey, as conduits for evidence that would otherwise be considered hearsay. Such is an inappropriate use of expert testimony. *See In re Melton,* 597 A.2d at 901 (hearsay is admissible for the limited non-hearsay purpose of "evaluating the reasonableness and correctness of [the expert's] conclusions, and not to establish the truth of the matters asserted…"). Dr. Abraham does not rely on the investigation reports to

bolster his own independent conclusions. Rather, he summarizes those investigation reports to establish the facts and conclusions that they contain. *See Davis v. Carroll*, 329 F.R.D. 435, 442 (M.D. Fla. 2018) (finding that experts are precluded from "merely regurgitat[ing] another expert's opinion."); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 880 (E.D. Ark. 2008); *Louis Vuitton Malletier*, 525 F. Supp. 2d at 666.

The Court appreciates the relevance of the investigations and reports that Dr. Abraham has analyzed. If Dr. Mann intends to use those investigations to support his contention that his work was not the product of fraud or misconduct, he must introduce the investigation reports into evidence or call the authors to testify about their findings, with due consideration of the laws of evidence. Without the reports entered into evidence, the Court sees very little probative value in having Dr. Abraham assess the validity of their conclusions. Allowing Dr. Abraham to provide such expert testimony would unfairly lead the jury to conclude that the investigations and reports validated Dr. Mann's work, while denying the jury the benefit of being able to assess their reliability. *See Johnson*, 683 A.2d at 1099 (formally adopting Federal Rule of Evidence 403).

Moreover, several of the investigation reports do not directly address the MBH research and, at best, only tangentially implicate Dr. Mann. Allowing Dr. Abraham to summarize such reports would be to allow unreliable testimony concerning the adequacy of evidence that is not relevant.

In the event that the investigation reports are admitted into evidence and their validity becomes an issue, Dr. Abraham may offer his expert opinion concerning the validity of the investigation reports. While his methodology of applying the above-listed factors to different investigation reports is not a method that has been peer-reviewed or generally accepted in the scientific community, Dr. Abraham's experience as an editor on several scientific journals where

he regularly considers or assesses "accusations of inaccuracies, fraud, and misconduct" and his

pragmatic, replicable approach to analyzing the investigations would pass muster under *Daubert*

as particularized "technical knowledge."  *See* Abraham Decl. ¶¶ 11-14; *Kumho Tire*, 526 U.S. at

149-50.  Still, his testimony would be limited to the validity of the investigations; he would be

precluded from testifying about their substance because he did not participate in the

investigations.

### B.    John R. Mashey, Ph. D.

Dr. Mashey's relevant biography is found in the Mashey Report at pages 1-2, the Mashey

Supplemental Declaration at ¶¶ 4-5, and the Court's findings in the July 26, 2021 Order

regarding the biography, at pages 36-37.  The Court excluded Dr. Mashey's expert opinions

because Dr. Mann failed to show that Dr. Mashey adhered to reliable principles or methods in

formulating his opinions.  Specifically, the Court explained that Dr. Mashey merely scoured the

internet, in a non-scientific fashion, to reach his conclusions.  July 26, 2021 Order at 38.

Dr. Mann seeks reconsideration for the following three opinions from Dr. Mashey:

> (1) No peer reviewed research has concluded or alleged that
>     Dr. Mann engaged in fraud or falsification;
>
> (2) The research critical of the MBH research is flawed; and
>
> (3) Dr. Mann's reduction in funding and the opinion polling in the
>     wake of the articles reveal that he suffered reputational harm.

Pl.'s Mot. Recons. 9.  Dr. Mashey and Dr. Mann have explained, step-by-step, the methodology

that Dr. Mashey employed, as follows:  First, Dr. Mashey "stud[ied] mainstream scientific

literature" by reading reports, "assess[ing] credibility," then followed the references in that report

to other reports.  Mashey Supp. Decl. ¶ 7.  Second, he "accumulated credibility assessments of

papers, media and organizations" and "attended lectures and conferences and made contacts with

credible experts."  *Id.* at ¶ 8.  Third, he "familiarized or refamiliarized [him]self with relevant

statistics." *Id.* at ¶ 9.  Fourth, for a peer-reviewed report, he "compared research results, text, and conclusions." *Id.* at ¶ 10.

Dr. Mann provides page citations to Dr. Mashey's initial report at pages 3, 6-14, and 40-42.  The Court will confine its analysis to the opinions expressed on those pages.

1.    No Peer Reviewed Research Found that Plaintiff Engaged in Fraud or Falsification.[2]

Dr. Mashey's "method" for reaching this opinion is rather simple.  In his supplemental declaration, Dr. Mashey explains that "[he] reviewed the scientific peer-reviewed studies of the MBH research.  [He] analyzed their findings, and their conclusions.  [He] also studied the published reviews of these reports, including those in the IPCC reports."  Mashey Supp. Decl. ¶ 15.  Defendants highlight that, in his deposition, Dr. Mashey described his method as "read[ing]" a lot . . . do[ing] a lot of searching to see what there is," and that this method is "just what people do with using the Internet to find things."  CEI & Simberg Opp'n 18 n.4 (quoting Mashey Dep. at 65:19-22; 68:9-19).

Dr. Mashey spent an undisclosed amount of time researching the field of paleoclimatology and reviews of Dr. Mann's work and was apparently unable to find a peer reviewed article that concluded or alleged that Dr. Mann engaged in fraud or falsification.  Specifically, he looked for allegations of "fraud" and "misconduct" as those terms are "used by the National Science Foundation, universities and good scientists."  Mashey Supp. Decl. ¶ 10.

---

[2] Defendants object that, in Dr. Mashey's supplemental declaration and Plaintiff's Motion for Reconsideration, a new qualifier, "no *peer reviewed* research," appears for the first time.  Further, Defendants argue that the supplemental declaration adds new bases for Dr. Mashey's opinions.  The Court invited Dr. Mann to elaborate on his experts' methodologies, not to change the scope of those opinions.  The change of scope is slight and unlikely to cause great prejudice.  Because the Court will exclude the opinion for reasons explained below, the Court will not address this objection further.

The term "good scientist" is undefined, and appears to be a matter of Dr. Mashey's personal opinion. *See id.*

The United States District Court for the District of Columbia faced a similar proffer of expert testimony in *Parsi v. Daioslam*, 852 F. Supp. 2d 82, 86-90 (D.D.C. 2012). There, an expert was offered in the field of journalism in a defamation case. *Id.* at 86. The expert read a selection of the defendant's writings, upwards of 60 but not all, and did not review discovery produced in the litigation. *Id.* The expert cited to a "code of ethics" in the field of journalism, and opined that the defendant had failed the standard. *Id.* at 86-87. His "method" for so concluding consisted of reading the defendant's publicly available articles and adjudging whether they were up to muster. *Id.* at 89. The court, viewing the testimony as akin to standard of care expert testimony, found that the expert offered no suitable basis for his standard of care opinion. *Id.* at 89-90. The court found that the expert's application of that standard to the defendants' writings was wanting, in that he articulated no systematic review or method that he applied in reaching his conclusion. *Id.* In other words, the expert's methodology was to read a number of writings on the internet.

Dr. Mashey likely conducted more research than the expert in *Parsi*, but the difference is in quantity, not in kind. Dr. Mann seeks to admit an overly-broad and conclusory statement that "no peer-reviewed study report has ever concluded, or even suggested, that the MBH research was falsified or fabricated or the product of fraud[,]" as the opinion of an expert, where that expert's methodology was a mere reading of articles and papers on the internet. *See* Mashey Supp. Decl. ¶ 15. Dr. Mashey conducted no study to formulate this "opinion." Perhaps if Dr. Mashey had conducted a polling analysis of the available peer-reviewed literature on the

topic to reach some level of statistical certainty, the Court might be inclined to permit limited opinion testimony.

### 2.    The Research Critical of the MBH Research is Flawed.

In his expert report, Dr. Mashey identifies several critiques of Dr. Mann's work, opining that they are baseless or otherwise unreliable. These critiques are by Ross McKitrick, Steven McIntyre, Edward Wegman, Blakely McShane, Abraham Wyner, Richard Lindzen, John Christy, Judith Curry, and Andrew Montford.

As to McKitrick and McIntyre, Dr. Mashey writes that "[t]he inaccuracy of [their criticism of Dr. Mann's MBH work] was revealed shortly after the paper was released, and shown to include a number of errors, such as the failure to 'standardize' data and the use of only a single PC, when more was needed." Mashey Rep. 6. He further writes that "[a] more serious issue was discovered in 2010 when it was shown that their 2005 paper was even more flawed[,]" and explains the problem was found in their code and the choices they made in interpreting data. Mashey Rep. 6-7. Ambiguously, Dr. Mashey offers that "[m]y review of other publications by McIntyre and McKitrick has also led me to conclude that they lacked a firm grasp on the other underlying science." Mashey Rep. 7.

Dr. Mashey writes about the complicated topic of statistics and use of data, yet this does not appear to be the focus of his report. His opinion is entirely founded upon the work of others. At the November 16, 2021 hearing, Dr. Mann invoked a September 26, 2010 Report by Dr. Mashey that totals 250 pages to show the purported reliability and thoroughness of Dr. Mashey's opinion, although indicated that the report would not be moved into evidence nor offered to the Court in full for the instant analysis. The Court has reviewed the sections of the 250-page report to which Dr. Mashey cites. The report does not reveal that Dr. Mashey undertook any personal statistical analysis of the work of McIntyre and McKitrick. The cited

section largely discusses a report by Edward Wegman, and how other researchers have interpreted that report.

Dr. Mashey cites to a website, captioned *Deep Climate: Exploring climate science disinformation in Canada.* The website appears to be a blog, whose author remains anonymous. Dr. Mashey's observations as to the alleged errors of McKitrick and McIntyre are largely regurgitations of the cited blog post. Again, Dr. Mashey's "method" of developing his opinion was from reading an article online. He did not personally perform an analysis of the McKitrick and McIntyre work. He does not appear to offer an analysis of the blog post, other than to say he agrees with it. His "method" can hardly be called "scientific." Federal courts often recognize that, "[w]hile it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make informed findings and not merely regurgitate another expert's opinion." *Davis*, 329 F.R.D. at 442; *see also In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d at 880 (excluding expert testimony because it "was simply a regurgitation of an exhibit, absent any expert analysis or opinion."); *Louis Vuitton Malletier*, 525 F. Supp. 2d at 666 (excluding expert testimony "because it is nothing but conduit testimony from an expert on a matter outside his field of expertise."). The Court is impressed that Dr. Mann seeks to introduce a complicated statistical analysis from an anonymous blogpost through Dr. Mashey.

With regard to Edward Wegman, Dr. Mashey again regurgitates technical analysis from the *Deep Climate* blog. He explains that Wegman's work was plagiarized, and that "[t]his plagiarism was verified by independent experts[,]" citing to a *USA TODAY* article and statement from *ScienceDirect*. Mashey Rep. 8. Dr. Mashey's criticisms of Blakely McShane and Abraham Wyner are not his own, but are block text quotes from other authors and researchers.

For Richard Lindzen, Dr. Mashey provides no expert analysis, and cites to other writers to opine that "Dr. Lindzen has ties to the fossil fuels industry which may explain his views." Mashey Rep. 12. For John Christy, Dr. Mashey offers that "[h]is research into the climate change area has been questionable—and criticized" and that his "conclusions were shown to be inaccurate[,]" again citing to a blog post. Mashey Rep. 12. Dr. Mashey offers no expert analysis of the work of Judith Curry or Andrew Montford, again basing his criticisms on the work of others and making general attacks on their reputation.

Dr. Mashey's 250-page report, and his other extensive reports available online, indicate an extensive awareness of the characters and goings-on of the climate change debate. However, his opinions on the critics of Dr. Mann's work are founded upon second-hand knowledge, *ad hominem* attacks, and speculation. This foundation fails *Daubert*. *See Louis Vuitton Malletier*, 525 F. Supp. 2d at 665; *see also Owens v. Republic of Sudan*, 864 F. 3d 751, 790 (D.C. Cir. 2017) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the expert used the hearsay as the basis of his testimony."), *vacated on other grounds sub nom*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 260 (D.D.C. 2018) ("an expert is not permitted to be the mere mouthpiece of an expert in a different specialty.") (quotations and alterations omitted).

Dr. Mann offers Dr. Mashey to opine that, based upon what he's seen online, some researchers are good and others are bad. He did not personally conduct any learned analysis, statistical or otherwise, of the subject matter on which he seeks to opine. His opinions are regurgitations of the work of others, including some anonymous authors. His technique has not been tested, subjected to peer review, there is no known rate of error, and there is no discernable set of standards controlling the technique's operation. *See Kumho Tire*, 526, U.S. at 149-50;

*Daubert*, 509 U.S. at 593-94. There is some "technical knowledge" expressed in his report in the field of statistics; however, as explained above, his analysis amounts to a regurgitation of an anonymous author. The Court cannot allow Dr. Mashey to offer his opinions on this point, as they would be largely unhelpful, unreliable, and likely irrelevant.

3.    <u>Plaintiff's Reduction in Funding and the Opinion Polling in the Wake of the Articles Revealed that he Suffered Reputational Harm.</u>

Dr. Mashey opines that the Defendants' statements caused reputational harm to Dr. Mann "and to climate scientists in general." Mashey Rep. 40. He bases this opinion upon experience, reviewing estimates of Dr. Mann's grant funding before and after Defendants' statements, and a conversation with David Verardo, a director at the National Science Foundation overseeing funding of the Paleoclimatology Group.

Dr. Mann is the only climate scientist whose damages are at issue in this case. Therefore, any testimony related to "climate scientists in general" or "public opinion" of climate science is wholly irrelevant and cannot be presented to a jury. *Id.* As to Dr. Mashey's opinion of Dr. Mann's damages, it is irrelevant. He is not an expert on this subject.

As the Court has found elsewhere in this litigation, the question of Dr. Mann's damages is one that can be answered by the jury, without the influence of an expert. Part of the *Daubert* test asks whether an expert's specialized knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue." *Motorola*, 147 A.3d at 757 n.8. Where the jury is as competent as an expert to weigh evidence and draw conclusions therefrom, it is improper to offer opinion evidence on that issue. *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016). Dr. Mashey's opinion, here, is largely a hunch based on his experience as well as hearsay, and will not add anything other than the potential for an improper reliance on his opinion. The Court must exclude Dr. Mashey's testimony.

### C.    Peter C. Frumhoff, Ph. D.

Dr. Frumhoff's relevant biography is found in the Frumhoff Report at pages 1-2, and the Court made findings regarding his biography in its July 26, 2021 Order at pages 26-27. Dr. Mann indicates that Dr. Frumhoff will testify about the climategate emails and opine that use of the terms "Mike's nature trick" and "hide the decline" do not evidence that Dr. Mann acted fraudulently.  Pl.'s Mot. Recons. 2.

Dr. Mann now explains that, when the emails were stolen from the Climate Research Unit, Dr. Frumhoff and his colleagues at the Union of Concerned Scientists "undertook an analysis of the emails that were alleged to show that the climate scientists involved, including Dr. Mann, had engaged in research misconduct and/or fraud."  Pl.'s Mot. Recons. 11.  Notably, unlike the other experts now on reconsideration, Dr. Mann did not submit a supplemental declaration allowing Dr. Frumhoff to elaborate on the methodologies that he used to analyze the climategate emails.  Rather, Dr. Mann indicates that Dr. Frumhoff's methodologies are explained in his previously submitted expert report and in the report that he conducted on behalf of the Union of Concerned Scientists, titled "Debunking Misinformation About Stolen Climate Emails in the 'Climategate' Manufactured Controversy."  Pl.'s Mot. Recons. 2.  The Court found the declaration inadequate, and its ruling must stand.  Dr. Frumhoff's report is lacking in the rigor required by *Daubert*.  The Court cannot find that defining the phrases "Mike's nature trick" and "hide the decline," are beyond the ken of the trier of fact.  *See Jones v. United States*, Case No. 18-CO-899, 2021 D.C. App. LEXIS 310, at *21 (D.C. Nov. 4, 2021).

Dr. Mann's proffer indicates that Dr. Frumhoff will testify that "trick" refers to a "trick of the trade" and "hide the decline" refers to omitting certain unreliable data.  *See* Pl.'s Mot. Recons. 11-12.  Dr. Frumhoff's expert report notes that the Associated Press investigation, upon

which he relies heavily to formulate his opinion, was conducted by five reporters, not individuals with extensive scientific backgrounds. *See* Mar. 3, 2021 Decl. of Mark Bailen, Ex. 1, Expert Statement by Peter C. Frumhoff ("Frumhoff Rep."), at 8.

Ultimately, Dr. Frumhoff has not identified any sound basis by which his expertise allowed him to determine the meaning of the terms. The Court is satisfied that the average juror is more than capable of performing the analysis that Dr. Frumhoff performed. *See Motorola*, 147 A.3d at 757 n.8; *see also Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1992) (explaining that "helpfulness to the trier of fact" is the touchstone of Rule 702 and that testimony is unhelpful if it "concerns matters within the everyday knowledge and experience of a lay juror").

### D.    Naomi Oreskes, Ph. D.

Dr. Oreskes' relevant biography is found in the Oreskes Report at pages 1-2, the Oreskes Supplemental Declaration at ¶¶ 1-2, 6-11 and the Court made findings regarding her biography in its July 26, 2021 Order at pages 22-23.

In its July 26, 2021 Order, the Court noted its skepticism that Dr. Oreskes' opinion would be helpful to the jury because it focused so heavily on what generally makes scientific research reliable and not "the inquiry at bar, whether [Dr. Mann's] research was reliable." July 26, 2021 Order at 23. Ultimately, however, the basis for the Court's exclusion of Dr. Oreskes' opinion was that it was not based on sound methodologies. The Court specifically discounted Dr. Mann's proffer that Dr. Oreskes had used the "content analysis" technique to formulate her opinion, explaining that her deposition transcript revealed that Dr. Oreskes had performed content analysis in the past, for different cases, but not in formulating her expert opinion for this case. *See* July 26, 2021 Order at 24-25.

The Court noted that, during her deposition, Dr. Oreskes was asked directly to explain the methodologies used to formulate her opinion. In response, Dr. Oreskes testified, "If you want

me to tell you what my method is, it's reading and thinking. We read. We read documents. And we think about them." DeLaquil Decl. Supp. Dr. Oreskes, Ex. 4 (Oreskes Dep. Vol. 2) at 34:13-15. The Court rejected such methods, finding that "reading and thinking about documents are not the types of 'reliable methodologies' typical of an expert witness" and equating Dr. Oreskes' opinion to a research compilation as opposed to proper expert testimony. July 26, 2021 Order at 25.

On reconsideration, Dr. Mann limits the scope of Dr. Oreskes' proffered testimony to address only the "importance of scientific expertise and the significance of the scientific method and peer review process in scientific debate." Pl.'s Mot. Recons. 2. Specifically, Dr. Oreskes will provide a "contextual exposition…of the character and nature of scientific research" that Dr. Mann avers is "crucial to enable the jury to reach its conclusions concerning the truth or falsehood of Defendants' objectively verifiable statements of fact about Dr. Mann and his scientific research which produced the Hockey Stick Graph." *Id.* at 15.

Dr. Oreskes provides a supplemental declaration elaborating on the methodologies she used to formulate her expert opinions, or, as Dr. Mann now describes her testimony, her "contextual exposition." *See* Oreskes Supp. Decl. Dr. Mann avers that the Court erred in its original determination because "experts are permitted to testify regarding scientific principles to permit the jury to understand those principles and to apply them to facts without running afoul of the general rules relating to opinion testimony." Pl.'s Mot. Recons. 4.

As explained previously, "the trial judge's general 'gatekeeping' obligation applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141. In other words, in some cases, expert "testimony rests upon scientific foundations…[while] in other cases, the relevant

reliability concerns may focus upon personal knowledge or experience." *Id.* at 150. Ultimately, Rule 702's inquiry is "a flexible one," meaning that there will be instances where the factors identified in *Daubert* are not pertinent in assessing reliability. *Id.*; *Daubert*, 509 U.S. at 594.

Dr. Mann highlights the following passage from the 1972 Advisory Committee's Note to Federal Rule of Evidence 702:

> Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.

Pl.'s Mot. Recons. 4 (quoting Fed R. Evid. 702 Advisory Comments). Indeed, expert testimony may be offered to give the jury background and context, if the testimony will aid the jury in comprehending arcane subject matter. *United States v. Mulder*, 273 F.3d 91, 102 (2nd Cir. 2001) (expert offered for contextual background of alleged extortion); *Kopf*, 993 F.2d at 377 (expert offered context for the use of force); *United States v. Reed*, No. 18-4610, 2019 U.S. App. LEXIS 34131, at *3-4 (4th Cir. 2019) (expert offered insight into quantities of narcotics typically involved in distribution and context of items found at a crime scene).

Allowing an expert to provide an opinion without having applied her methodology to the facts of the case may appear at first glance to go against *Daubert*. Yet, case law suggests otherwise.

In *United States v. Reed*, the United States Court of Appeals for the Fourth Circuit allowed a narcotics officer to testify over a defendant's objection that the officer's "testimony was overly broad and had no link to his case." 2019 U.S. App. LEXIS 34131, at *3-4. The court held that the officer's testimony "was relevant to give the jury an understanding of the quantities of cocaine and heroin typically involved in distribution, the link between the drug trade and firearms, and to provide context to some of the items found during the search of [the

defendant's] residence." *Id.* at *4.  The court explicitly acknowledged that Rule 702 does not require a link between an expert's testimony and the specific facts of a case.  *Id.*

In *Kopf v. Skyrm*, the Fourth Circuit underscored the liberal admission standards of Rule 702, explaining that "[t]he subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend" so long as it employs "scientific, technical, or other specialized knowledge."  *Kopf*, 993 F.2d at 377.  The court was deciding whether an expert's testimony could aid a jury in understanding the excessive force standard – "objective reasonableness."  The Court finds the following discussion illustrative:

> The facts of every case will determine whether expert testimony would assist the jury.  Where force is reduced to its most primitive form – the bare hands – expert testimony might not be helpful.  Add handcuffs, a gun, a slapjack, mace, or some other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do?  Answering these questions may often be assisted by expert testimony.

*Id.* at 379.

Such is the case with the testimony which Dr. Oreskes now plans to give.  To be clear, the majority of Dr. Oreskes' originally offered expert testimony remains unreliable and irrelevant.  Dr. Oreskes' report discusses the history of "the debate over anthropogenic climate change," to include her opinion as to CEI's character, history, and agenda.  Such opinions are not demonstrably the product of any scientific principle or method, and are largely irrelevant.

The Court is swayed, however, that Dr. Oreskes should be permitted to provide contextual information about what makes scientific research reliable.  Specifically, Dr. Oreskes is permitted to testify concerning the methods that produce reliable scientific knowledge, the critical role of the peer review process in establishing valid scientific claims, and who is qualified to perform scientific peer review.  Dr. Oreskes' context will be helpful to the jury

because the MBH research was subjected to peer review and the jury will need help understanding how peer review could have identified data manipulation and fraudulent research.

Consistent with this ruling, the Court will not permit Dr. Oreskes to discuss Dr. Mann's work, whether his methods were reliable, or whether peer review of the MBH research revealed data manipulation or fraudulent behavior. Dr. Oreskes' opinion in that regard would be entirely speculative given that she has not demonstrated any particular expertise or experience regarding Dr. Mann's research. Neither her original expert report nor her supplemental declaration indicates any intimate knowledge of Dr. Mann's work. Further, Dr. Oreskes' expert report identifies her as an expert in the history of science and in geology, not as an expert in climate reconstruction. Dr. Oreskes has not demonstrated any specialized knowledge or experience concerning the substantive or factual aspects of the MBH research.

Further, in her supplemental declaration, Dr. Oreskes indicates that her expertise in the history of science qualifies her to testify concerning the "consensus view" in a particular field. *See* Oreskes Supp. Decl. ¶ 33. She elaborates that she "undertook an analysis to determine whether there was a scientific-consensus that man-made climate change was underway." *Id.* at ¶ 40. And, she explains that "leading 'skeptics' of climate change had not found problems in climate science but were reacting negatively to climate science for political and ideological reasons." *Id.* at ¶ 42. Her opinion, here, is not relevant. Whether Dr. Mann's conclusions were correct, later-verified, part of a consensus, or otherwise validated bears minimally on the question of whether his conclusions were the product of fraud.

Wide discussion on the consensus view of climate change would mislead the jury into likening the MBH research to all of climate change science. Climate change science, and the extensive body of work by countless researchers in the years since the MBH98 and MBH99

papers, are not the subject of this litigation. Dr. Oreskes will be precluded from discussing the scientific consensus concerning climate change.

### E.    Raymond Bradley, Ph. D.

Dr. Bradley's relevant biography is found at paragraphs two through five of his report, paragraphs six through nine of his supplemental declaration, and the Court made findings regarding his background at page 42 of its July 26, 2021 Order. The Court excluded Dr. Bradley's opinions because he failed to articulate a methodology to support his opinion. July 26, 2021 Order at 47.

Dr. Mann seeks reconsideration of the following opinions to be offered by Dr. Bradley: (1) The MBH research was properly conducted, (2) the MBH research was confirmed and validated by the peer review process.[3] Dr. Mann identifies these opinions at pages 2-16 of Dr. Bradley's initial report, and the Court confines its analysis to those pages and the supplemental declaration.

### 1.    The MBH Research was Properly Conducted.

Dr. Mann argues that "Dr. Bradley's opinion that the MBH research was conducted in an appropriate fashion is now well accepted in the scientific community, and the MBH research has been validated and replicated in dozens of subsequent studies." Pl.'s Mot. Recons. 4-5. *Daubert* cautions that "[Rule 702's] subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, *not on the conclusions that they generate*." 509 U.S. at 594-95 (emphasis added). The "general acceptance" consideration enunciated in *Daubert*

---

[3] Dr. Bradley "propose[s] to offer expert testimony regarding: (1) the findings from the MBH research; (2) methodologies about how global temperatures were calculated; (3) methodologies for the use of proxy data in the hockey stick research; and (4) the peer-review process[.]" Bradley Supp. Decl. ¶ 5.

speaks to the acceptance of a technique or methodology, not to the acceptance of a conclusion. *Motorola, Inc.*, 147 A.3d at 752-56.

Dr. Mann points to pages eight through eleven of Dr. Bradley's Report as a general description of his techniques. These pages contain a description of various data used in the MBH research, including temperature records, tree ring data, ice core oxygen isotopes, coral cores, and lake sediments. Dr. Bradley, repeatedly and in conclusory fashion, states that these techniques were "properly incorporated into, and used appropriately in, the MBH98 and MBH99 studies." Bradley Rep. ¶¶ 36-39. In his supplemental declaration, Dr. Bradley repeats his explanation of temperature data, further explaining how instrument data was used to calibrate proxy data. He also includes some explanation of how the data was used. He provides a seemingly rudimentary explanation of the scientific method. Finally, he explains that "[t]he principles and methodologies used and applied in the MBH98 and MBH99 studies are detailed and memorialized in the MBH98 and MBH99 papers" and summarizes the methodologies used in that research. Bradley Supp. Decl. ¶¶ 60, 61-94.

Proffering Dr. Bradley as a fact witness and an expert witness is fraught, as Defendants argue most vociferously. The Parties seemingly concede that Dr. Bradley conducted no subsequent analysis of the MBH research to support his opinion that it was valid and remains valid. Dr. Bradley expresses plainly that his opinion is derived from the principles and methods undertaken in the MBH research.[4] Consequently, the methodology he offers is the subject of the allegedly defamatory statements at the center of this case. No matter, *Daubert* requires the Court

---

[4] Defendants' argument over the lateness of disclosures in the supplemental declaration is not persuasive as related to Dr. Bradley. Dr. Bradley's supplement contains no new information. He points only to the MBH research itself, which has long been a focal point of this case. Accordingly, Defendants will suffer no surprise or undue prejudice should the Court consider it.

to assess the scientific validity of an expert's methodology. *Motorola, Inc.*, 147 A.3d at 754 (citing *Daubert*, 509 U.S. at 592-93). Thus, for its assessment of Dr. Bradley, the Court must comment upon the merits of the case, but proceeds with caution so as not to leave the impression it has prejudged the case, answering the question whether the evidence shows that Dr. Mann's work was the product of fraud or academic misconduct.

In assessing the proffered testimony, the Court must start with the proper scope of Dr. Bradley's factual testimony. Dr. Bradley participated in the MBH research and may offer, as a fact witness, testimony of his work while working with Dr. Mann. Further, Defendants' allegedly defamatory statements claim that the MBH research was the product of data manipulation. Accordingly, Dr. Bradley may offer, not as an expert, but as a fact witness, the basis for decisions that he made, *i.e.*, an explanation for his use of certain data, pursuant to some established principle of science, and not in furtherance of fraud.

What remains is Dr. Bradley's testimony as an expert. Despite Dr. Mann's failure to produce the MBH98 and MBH99 papers along with Dr. Bradley's supplemental declaration, they were among the hundreds of previously submitted exhibits and the Court has reviewed them. The papers reconstruct temperature data over the past several centuries, employing a variety of methods including dendroclimatology, calibration of data using instrumental records, and principal component analysis. Michael E. Mann, Raymond S. Bradley, Malcolm K. Hughes, *Northern Hemisphere Temperatures During the Past Millennium: Inferences, Uncertainties, and Limitations*, 26 GEOPHYSICAL RESEARCH LETTERS 759 (1999) ("MBH99"); Michael E. Mann, Raymond S. Bradley, Malcolm K. Hughes, *Global-scale temperature patterns and climate forcing over the past six centuries*, 392 NATURE 779 (1998) ("MBH98").

*Daubert*'s suggested criteria for whether a technique should be accepted tend to support admission of Dr. Bradley's expert opinion. *Daubert* asks whether there is a known or potential rate of error of a technique. 509 U.S. at 594. The MBH papers acknowledge the "skill" or "statistical validity" of their models. MBH99 at 760; MBH98 at 781. The papers rely upon techniques seemingly widely employed in the field, as evidenced by extensive citations to many other peer reviewed papers, factors which *Daubert* weighs in favor of admission. 509 U.S. at 594.

One *Daubert* factor that gives the Court pause is whether a technique can be and has been "tested." 509 U.S. at 593. The United States District Court for the District of Columbia recently asked whether the principles underlying expert testimony on firearm and toolmark identification have been tested, finding in the affirmative. *See United States v. Harris*, 502 F. Supp. 3d 28, 36-38 (D.D.C. 2020). It is not difficult to imagine how to test such a technique—task forensic firearm examiners with identifications where the answer is known, and see how they fare. *See id.* at 38 (noting that "of 1,512 possible identifications tested, firearms examiners correctly identified 1508 casings to the firearm from which the casing was fired.").

Testing the techniques applied in historical temperature reconstruction is not as simple. Instrumental temperature records are used to hone the accuracy of proxy data and large-scale multiproxy reconstructions. National Research Council, Surface Temperature Reconstructions for the Last 2,000 Years 1-3, 9-12 (2006) (hereinafter "2006 NRC Report").[5] Instrument records are limited to more recent history, meaning reconstructions for earlier periods have less confidence. 2006 NRC Report 92.

---

[5] Dr. Bradley cites to this same report in his supplemental declaration, and borrows some language for his discussion on proxy data.

Yet, the validation process appears to be a form of testing, and was employed in the MBH research. MBH99 at 760 ("MBH98 performed extensive cross-validation experiments to verify the reliability of the reconstruction using global temperature data from 1854-1901 withheld from 1902-1980 calibration, and, further back, by the small number of instrumental temperature series available back through the mid-18th century."). Further, the results of climate reconstruction studies are present alongside their inherent statistical uncertainties. The 2006 NRC Report explains that, "[i]n a complete statistical analysis, the validation step should also include the calculation of measures of uncertainty, which gives an idea of the confidence one should place in the reconstructed record." 2006 NRC Report at 84.

The Supreme Court, in *Kumho Tire*, clarified that the *Daubert* factors are not a "definitive checklist or test." 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). The gatekeeping inquiry must be "tied to the facts of a particular case." *Id.* (quotation omitted). The Supreme Court explained that, depending on the nature of an issue, the *Daubert* factors may or may not be pertinent in assessing reliability. *Id.*

Of importance is the specific opinion offered by Dr. Bradley, that "the MBH research was properly conducted and conducted in accordance with generally accepted scientific standards." Pl.'s Mot. Recons. 17. Dr. Bradley is more akin to a standard of care expert than an expert on causation or damages. The Court is satisfied that Dr. Bradley is an appropriate expert to render this opinion. He has demonstrated the basis for his knowledge. His explanation of the choices underlying the MBH research will help the jury to comprehend difficult scientific concepts.

Defendant Steyn raises, again, the issue of Dr. Bradley's bias. It is true that Dr. Bradley's basis for his opinion, his principles and methods, are indeed at issue in this case,

and his potential for bias looms prominently.  The United States District Court for the District of Columbia has observed that "any attempt by the Court to evaluate the 'credibility of opposing experts and persuasiveness of competing scientific studies' conflates 'the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.'"  *In re Rail Freight Fuel Surcharge Antitrist Litig.*, 292 F. Supp. 3d 14, 47 (D.D.C. 2017) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996)).  As the Court previously observed, a witness is permitted to provide both lay and expert testimony in a single case, so long as those portions of the testimony based upon scientific knowledge are within the scope of Rule 702.  *See Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp. Inc.*, No. 18-2121 (BAH), 2020 U.S. Dist. LEXIS 22434, at *8-9 (D.D.C. Feb. 10, 2020).  However, the "aura of special reliability and trustworthiness surrounding expert testimony" may conflict with Federal Rule of Evidence 403's prejudice concerns and Rule 702's reliability concerns.  *Id.* at *10-12 (quotations omitted).  Courts occasionally prevent expert witnesses from testifying where the expert is an "advocate for a cause[.]"  *Id.* at *12 (citing *Viterbo v. Dow Chemical Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986)).

The reliability concerns of Dr. Bradley's testimony are notable because he worked with Dr. Mann on the MBH research.  He is being called to testify on research bearing his name and that work has been the subject of public debate.  The Court remains confident that any potential bias will not run afoul of Rule 403 or Rule 702.  His testimony will be limited to explaining the choices made in the MBH research.  The scientific conclusion of the research is not at issue, though it is clearly implicated.  Still, his personal interest in the litigation may be addressed through cross-examination.  At bottom, his potential bias goes to credibility, not admissibility.

    2.    <u>The Peer Review Process Confirmed and Validated the MBH Research.</u>

Dr. Bradley generally explains the peer review process and what it means for scientific work. Dr. Bradley appears to have significant experience working within the peer review process. He explains how the MBH research was subject to the peer review process, and that "[t]he MBH98 and MBH99 findings and conclusions were confirmed and validated through this peer-review process." Bradley Supp. Decl. ¶ 97. He explains that one criticism of MBH98 and MBH99, by McIntyre and McKitrick, was not subject to a proper peer review process, and, in his opinion, is less reliable.

The Court, above, discussed the basis for which Dr. Mann may offer Dr. Oreskes' opinion as to scientific processes and the reliability of those processes. Similarly, Dr. Bradley's opinion relating to peer review is not scientific in nature, but based upon his technical and specialized knowledge. Dr. Bradley, who publishes in academic journals often, does have expertise that may assist the jury in determining what it means for a paper to be peer reviewed or not. The Court notes that opinion testimony must nevertheless be relevant. Thus, any testimony regarding the McKitrick and McIntyre papers must be preceded by a foundation of relevancy.

**ACCORDINGLY**, it is by the Court this 25th day of January 2022, hereby

**ORDERED** that Plaintiff's Motion for Reconsideration is **GRANTED, IN PART,** as explained herein.

_____
**Judge Alfred S. Irving, Jr.**

**Copies to:**

John B. Williams, Esq. (e-Served)
Ty Cobb, Esq. (e-Served)
Peter J. Fontaine, Esq. (e-Served)
Brian Kint, Esq. (e-Served)
Patrick J. Coyne, Esq. (e-Served)
**Counsel for Plaintiff**

Andrew Grossman, Esq. (e-Served)
Mark I. Bailen, Esq. (e-Served)
Kristen Rasmussen, Esq. (e-Served)
Mark W. Delaquil, Esq. (e-Served)
David B. Rivkin, Jr., Esq. (e-Served)
**Counsel for Defendants Competitive Enterprise Institute ("CEI") and Rand Simberg**

Anthony J. Dick, Esq. (e-Served)
Michael A. Carvin, Esq. (e-Served)
John G. Heintz, Esq. (e-Served)
**Counsel for Defendant National Review, Inc. ("NRI")**

Clifton S. Elgarten, Esq. (e-Served)
Mark Thomson, Esq. (e-Served)
Daniel J. Kornstein, Esq. (e-Served)
Scott Abeles, Esq. (e-Served)
**Counsel for Defendant Mark Steyn**