# Exhibit E

# Response to Public Comments
# EPA NPDES 2021 Multi-Sector General Permit (MSGP)

January 15, 2021

Docket ID #: EPA-HQ-OW-2019-0372

# Table of Contents

Comment Response Essay 1 Legal Issues ........................................................................................ 1

The Regulatory Flexibility Act................................................................................................... 1

Executive Orders ........................................................................................................................ 3

Tribal Consultation .................................................................................................................... 4

Authorization Under the CWA................................................................................................... 4

NRC Study Data Not Made Available ....................................................................................... 5

Comment Response Essay 2 Monitoring ....................................................................................... 6

"Inspection Only" Option .......................................................................................................... 6

Support for Including an Inspection-Only Option.................................................................. 6

General Critiques of an Inspection-Only Option ................................................................... 7

Identifying "Low-Risk" Facilities ........................................................................................ 7

Frequency of Inspections ....................................................................................................... 9

Contents of the Inspection..................................................................................................... 9

Professional Inspector Credentials ........................................................................................ 9

Cost of the Inspection-Only Option ..................................................................................... 11

Alternative Approaches to Benchmark Monitoring.................................................................. 11

General Support and Critiques of Benchmark Monitoring .................................................. 11

Suggested Alternatives......................................................................................................... 12

Chemical-Specific Benchmark Monitoring for Sectors I, P, And R......................................... 13

Quarterly Universal Benchmark Monitoring ........................................................................... 15

General Support and Critiques of Universal Benchmark Monitoring ................................. 15

Modifying Monitoring Requirements if Benchmarks Are Not Exceeded............................ 17

Cost of Quarterly Monitoring............................................................................................... 17

Benchmark Thresholds ............................................................................................................ 18

Wet Weather Water Quality Standards................................................................................. 18

Benchmark Thresholds for Dissolved Metals ...................................................................... 18

Allowing Dilution for Benchmark Thresholds ..................................................................... 19

Selenium ............................................................................................................................... 19

Arsenic .................................................................................................................................. 21

Cadmium............................................................................................................................... 21

Magnesium............................................................................................................................ 22

Iron........................................................................................................................................ 22

Copper................................................................................................................................... 23

Aluminum ............................................................................................................................. 25

PAHs..................................................................................................................................... 26

Impaired Waters Monitoring................................................................................................29
Facilities in Climates with Irregular Stormwater Discharges.............................................30
Comment Response Essay 3 Additional Implementation Measures ........................................32
General Critiques of AIM ...................................................................................................32
Applicability of AIM Requirements ...................................................................................34
AIM Framework ..................................................................................................................35
AIM Level Triggers.........................................................................................................36
Facility Changes Triggering AIM ...................................................................................38
Moving Between Tiers .....................................................................................................38
AIM Responses ...................................................................................................................38
Tier 2................................................................................................................................38
Tier 3................................................................................................................................39
Groundwater Infiltration .................................................................................................40
AIM Compliance Timeframes ............................................................................................40
AIM Exceptions ..................................................................................................................41
Natural Background Exception ........................................................................................42
Run-On from A Neighboring Source Exception .............................................................46
Abnormal Event Exception .............................................................................................46
No Exceedance of Water Quality Standards Exception...................................................48
AIM Documentation ...........................................................................................................49
Comment Response Essay 4 Proposals Not Finalized............................................................51
Eligibility Conditions – Discharges to a CERCLA Site (Request for Comment 1) .............51
Support for the Proposed Permit Provision .....................................................................51
Opposition to the Proposed Permit Provision .................................................................51
Comments Related to EPA's Authority to Impose this Requirement...............................51
Timeframe for Advance Notice Prior to NOI Submission ..............................................52
Groundwater Concerns ....................................................................................................52
General Comments ...........................................................................................................52
Eligibility Conditions – Facilities Using Coal-Tar Sealcoat (Request for Comment 2)........54
Support for the Proposed Permit Provision .....................................................................54
Opposition to the Proposed Permit Provision .................................................................54
General Comments ...........................................................................................................56
Alternative Solutions .......................................................................................................56
Eligibility Conditions – Extended NOI Review for Facilities with a Pending Enforcement Action
(Request for Comment 4)........................................................................................................58
Support for the Proposed Permit Provision .....................................................................58
Opposition to the Proposed Permit Provision .................................................................58

Alternatives to the Proposed Permit Provision ................................................................. 58

General Comments ............................................................................................................. 59

Appendix Q – Stormwater Control Measures ........................................................................ 60

Individual Comments and Responses ...................................................................................... 61

G.1. General ......................................................................................................................... 61

G.2. General - Support .......................................................................................................... 70

G.3. General - Do Not Support .............................................................................................. 73

G.4. General - Reference to Other Letters ............................................................................ 99

G.5. General - Overall Cost Issues ..................................................................................... 109

G.6. General - Legal Issues ................................................................................................ 120

G.7. General - Regulatory Issues ........................................................................................ 125

G.8. General - 2015 MSGP Litigation ................................................................................. 144

G.9. General - NRC NAS Industrial Stormwater Study ....................................................... 145

1.1. Eligibility Conditions ................................................................................................... 156

1.1.2. Eligibility Conditions - Your Discharges Are Associated with Industrial Activity.................. 158

1.1.3. Eligibility Conditions - Limitations on Coverage ..................................................... 159

1.1.4. Eligibility Conditions - Eligibility related to Endangered and Threatened Species and Critical Habitat Protection ......................................................................................................... 160

1.1.5. Eligibility Conditions - Eligibility related to Historic Properties Preservation ......................... 160

1.1.6. Eligibility Conditions - Eligibility for "New Dischargers" and "New Sources" (as defined in Appendix A) ONLY ............................................................................................................. 161

1.1.7. Eligibility Conditions - Eligibility for Discharges to a Federal CERCLA Site ......................... 164

1.1.7.RFC1. Eligibility Conditions - RFC1 Discharges to a CERCLA site.................................... 165

1.1.8. Eligibility Conditions - Eligibility for Facilities using Coal-Tar Sealcoat ............................... 179

1.1.8.RFC2. Eligibility Conditions - RFC2 Coal-tar sealcoat .......................................... 182

1.1.8.RFC3. Eligibility Conditions - RFC3 Cationic treatment chemicals ......................................... 240

1.2. Types of Discharges Authorized Under the MSGP .................................................... 266

1.2.1. Types of Discharges Authorized Under the MSGP - Authorized Stormwater Discharges ........ 270

1.2.2. Types of Discharges Authorized Under the MSGP - Authorized Non-Stormwater Discharges 270

1.3. Obtaining Authorization to Discharge ........................................................................ 275

1.3.2. Obtaining Authorization to Discharge - How to Submit Your Notice of Intent (NOI) to Get Permit Coverage ................................................................................................................ 276

1.3.3. Obtaining Authorization to Discharge - Deadlines for Submitting Your NOI and Your Official Date of Permit Coverage................................................................................................... 278

1.3.3.RFC4. Obtaining Authorization to Discharge - RFC4 Extended NOI review time for facilities with a pending enforcement action ................................................................................. 278

1.3.4. Obtaining Authorization to Discharge - Modifying your NOI ................................................. 292

1.3.4.RFC5. Obtaining Authorization to Discharge - RFC 5 Change NOI paper form ...................... 293

1.3.6. Obtaining Authorization to Discharge - Requirement to Post a Sign of your Permit Coverage. 301

1.3.6.RFC6. Obtaining Authorization to Discharge - RFC 6 Post a sign of permit coverage.............. 302

1.3.7. Obtaining Authorization to Discharge - Coverage Under Alternative Permits ....................... 350

1.5. Conditional Exclusion for No Exposure ................................................................................. 351

1.5.RFC7. Conditional Exclusion for No Exposure - RFC 7 New acronym for the no exposure certification acronym (NOE to NEC) .................................................................................................. 356

1.6. Permit Compliance ................................................................................................................ 364

2. Control Measures and Effluent Limits ...................................................................................... 365

2.1. Control Measures ................................................................................................................... 367

2.1.1. Control Measures - Control Measure Selection and Design Considerations.......................... 372

2.1.1.RFC8. Control Measures - RFC 8 Enhanced measures for major storms ................................. 372

2.1.2. Control Measures - Non-Numeric Technology-Based Effluent Limits (BPT/BAT/BCT).......... 430

2.1.2.RFC3. Control Measures - See RFC 3 ................................................................................... 458

2.2. Water Quality-Based Effluent Limitations............................................................................. 459

2.2.1. Water Quality-Based Effluent Limitations - Water Quality Standards.................................... 470

2.2.2. Water Quality-Based Effluent Limitations - Discharges to Water Quality-Impaired Waters .... 474

3. Inspections ................................................................................................................................ 474

3.1. Routine Facility Inspections ................................................................................................... 475

3.1.1. Routine Facility Inspections - Inspection Personnel .............................................................. 476

3.1.2. Routine Facility Inspections - Areas that You Must Inspect ................................................... 480

3.1.3. Routine Facility Inspections - What You Must Look for During an Inspection........................ 480

3.1.4. Routine Facility Inspections - Inspection Frequency ............................................................. 481

3.1.5. Routine Facility Inspections - Exceptions to Routine Facility Inspections for Inactive and Unstaffed Sites ................................................................................................................................ 483

3.2. Quarterly Visual Assessment of Stormwater Discharges.......................................................... 485

3.2.2. Quarterly Visual Assessment of Stormwater Discharges - Visual Assessment Procedures....... 486

3.2.4. Quarterly Visual Assessment of Stormwater Discharges - Exceptions to Quarterly Visual Assessments .................................................................................................................................... 490

4.1. Monitoring Procedures........................................................................................................... 492

4.1.1. Monitoring Procedures - Monitored Discharge Points........................................................... 495

4.1.2. Monitoring Procedures - Commingled Discharges................................................................. 498

4.1.3. Monitoring Procedures - Measurable Storm Events ............................................................... 499

4.1.4. Monitoring Procedures - Sample Type .................................................................................. 499

4.1.5. Monitoring Procedures - Adverse Weather Conditions .......................................................... 510

4.1.6. Monitoring Procedures - Climates Where Limited Rainfall Occurs During Parts of the Year or Freezing Conditions Exist that Prevent Discharges....................................................................... 510

4.2. Required Monitoring............................................................................................................... 512

4.2.1. Required Monitoring - Benchmark Monitoring...................................................................... 515

4.2.1.RFC9. Required Monitoring - RFC 9 Alternative approaches to benchmark monitoring .......... 584

4.2.1.RFC10. Required Monitoring - RFC 10 Universal benchmark monitoring ............................ 619

4.2.1.RFC11. Required Monitoring - RFC 11 Inspection-only option in lieu of benchmark monitoring ...................................................................................................................................... 720

4.2.1.RFC12. Required Monitoring - RFC 12 Chemical-specific benchmark monitoring ................ 810

4.2.1.RFC13. Required Monitoring - RFC 13 Quarterly benchmark monitoring for entire permit term ...................................................................................................................................... 833

4.2.1.RFC14. Required Monitoring - RFC 14 Selenium benchmark .................................................. 867

4.2.1.RFC15. Required Monitoring - RFC 15 Arsenic benchmark .................................................... 874

4.2.1.RFC16. Required Monitoring - RFC 16 Cadmium benchmark .................................................. 880

4.2.1.RFC17. Required Monitoring - RFC 17 Magnesium benchmark ............................................... 886

4.2.1.RFC18. Required Monitoring - RFC 18 Iron benchmark ........................................................... 894

4.2.1.RFC19. Required Monitoring - RFC 19 Copper benchmark ...................................................... 908

4.2.1.RFC20. Required Monitoring - RFC 20 PAHs ........................................................................... 922

4.2.2. Required Monitoring - Effluent Limitations Monitoring .......................................................... 937

4.2.3. Required Monitoring - State or Tribal Required Monitoring .................................................... 940

4.2.4. Required Monitoring - Impaired Waters Monitoring ................................................................. 940

4.2.5. Required Monitoring - Additional Monitoring Required by EPA .............................................. 952

5. Corrective Actions and Additional Implementation Measures (AIM) .............................................. 953

5.1. Corrective Action .......................................................................................................................... 954

5.1.2. Deadlines for Corrective Actions .............................................................................................. 954

5.2. Additional Implementation Measures (AIM) ................................................................................ 958

5.2.1. AIM Tier 1 ................................................................................................................................. 1035

5.2.1.RFC21. Additional Implementation Measures (AIM) - RFC 21 Tier 1 triggering event .......... 1044

5.2.2. AIM Tier 2 ................................................................................................................................. 1061

5.2.2.RFC22. Additional Implementation Measures (AIM) - RFC 22 Aberrant event exception ..... 1084

5.2.3. AIM Tier 3 ................................................................................................................................. 1100

5.2.3.RFC23. Additional Implementation Measures (AIM) - RFC 23 Exception for discharges not resulting in any exceedance of water quality standards .................................................................... 1133

5.2.4. AIM Exemptions ....................................................................................................................... 1150

5.2.4.RFC24. Additional Implementation Measures (AIM) - RFC 24 Changing the natural background pollutant exception threshold ........................................................................................... 1156

5.2.4.RFC25. Additional Implementation Measures (AIM) - RFC 25 Methods for characterizing natural background pollutant concentrations ..................................................................................... 1181

5.3. Corrective Action and AIM Documentation .................................................................................. 1196

5.3.1. Documentation within 24 Hours ............................................................................................... 1199

5.3.3. Documentation within 14 Days ................................................................................................. 1199

5.3.3.RFC26. Corrective Action and AIM Documentation - RFC 26 Method for tracking triggered AIM Tiers .................................................................................................................. 1199

6.1. Person(s) Responsible for Preparing the SWPPP ............................................... 1212

6.2. Required Contents of Your SWPPP ....................................................................... 1214

6.4. SWPPP Availability ................................................................................................ 1222

6.5. Additional Documentation Requirements .............................................................. 1229

7. Reporting and Recordkeeping ................................................................................... 1230

7.1. Electronic Reporting Requirement .......................................................................... 1231

7.2. Submitting Information to EPA ............................................................................... 1232

7.4. Reporting Monitoring Data to EPA ......................................................................... 1233

7.5. Annual Report ........................................................................................................ 1236

7.7. Additional Standard Recordkeeping and Reporting Requirements ........................ 1237

8. Sector Requirements for Industrial Activity ................................................................ 1237

8.A. Sector A - Timber Products .................................................................................... 1254

8.C. Sector C - Chemical and Allied Products Manufacturing and Refining.................. 1258

8.E. Sector E - Glass, Clay, Cement, Concrete, and Gypsum Products........................ 1259

8.F. Sector F - Primary Metals ...................................................................................... 1260

8.G. Sector G - Metal Mining ........................................................................................ 1263

8.G.RFC27. Sector G - Metal Mining - RFC 27 Sector G monitoring requirements for discharges from waste rock and overburden piles at active metal mining facilities .................................. 1264

8.H. Sector H - Coal Mines and Coal Mining-Related Facilities .................................... 1267

8.J. Sector J - Non-Metallic Mineral Mining and Dressing ........................................... 1270

8.L. Sector L - Landfills, Land Application Sites, and Open Dumps............................... 1274

8.M. Sector M - Automobile Salvage Yards ................................................................... 1275

8.N. Sector N - Scrap Recycling and Waste Recycling Facilities .................................. 1278

8.O. Sector O - Steam Electric Generating Facilities .................................................... 1281

8.P. Sector P - Land Transportation and Warehousing.................................................. 1286

8.Q. Sector Q - Water Transportation............................................................................ 1287

8.R. Sector R - Ship and Boat Building and Repair Yards ............................................. 1290

8.S. Sector S - Air Transportation .................................................................................. 1292

8.U. Sector U - Food and Kindred Products .................................................................. 1309

8.X. Sector X - Printing and Publishing ......................................................................... 1311

Appendix A. Definitions, Abbreviations, and Acronyms ................................................. 1315

Appendix C. Areas Eligible for Permit Coverage .......................................................... 1316

Appendix D. Facilities and Activities Covered................................................................ 1317

Appendix E. Procedures Relating to Endangered Species Protection ........................... 1320

Appendix I. Annual Report Form.................................................................................... 1323

Appendix K. No Exposure Certification Form ................................................................ 1324

Appendix M. Discharge Monitoring Report (DMR) Form ............................................. 1324

Appendix O. Summary of Reports Permit Submittals .................................................... 1327

Appendix Q. Stormwater Control Measures ................................................................... 1328

CIA.General. Cost Impact Analysis - General ............................................................... 1408

CIA.V. Cost Impact Analysis - Cost Implications of Key Proposed Permit Changes....................... 1418

CIA.V.A. Cost Impact Analysis - Streamlining of Permit.............................................. 1429

CIA.V.B.1. Cost Impact Analysis - Eligibility Coal Tar Sealcoat ................................. 1429

CIA.V.C.1. Cost Impact Analysis - Getting MSGP Authorization Relating to Enforcement............ 1436

CIA.V.C.2. Cost Impact Analysis - Public Signage of Permit Coverage ......................... 1437

CIA.V.D. Cost Impact Analysis - Control Measures for Major Storm Planning............................. 1438

CIA.V.E.1. Cost Impact Analysis - Monitoring: Discharges to Impaired Waters ........................... 1439

CIA.V.E.2. Cost Impact Analysis - Monitoring: Additional Implementation Measures.................... 1440

CIA.V.E.3. Cost Impact Analysis - Monitoring: New Sector Specific Benchmarks ........................ 1444

CIA.V.E.4. Cost Impact Analysis - Monitoring: Universal Benchmark Monitoring for All Sectors. 1445

CIA.V.E.5. Cost Impact Analysis - Monitoring: Inspection-only Option in Lieu of Benchmark
Monitoring .................................................................................................................... 1455

FS.General. Fact Sheet - General ................................................................................... 1459

FS.IV. Fact Sheet - Summary of Proposed Changes from the 2015 MSGP ................................... 1461

# Comment Response Essay 1 Legal Issues

The following are responses to comments on EPA's legal obligations under the MSGP and legal requirements, organized by topic.

## The Regulatory Flexibility Act

EPA received comments regarding the proposed 2020 MSGP and EPA's compliance with the requirements set forth in the Regulatory Flexibility Act (RFA). Many of these comments assert that CWA section 402 general permits, such as the MSGP, are rules under the Administrative Procedure Act (APA) and thus subject to certain procedures, such as the RFA. As a result, the comments state that EPA must evaluate the economic impacts of the proposed revisions to the MSGP on small entities, and it should reconsider the elements of the proposed 2020 MSGP.

With respect to the several comments regarding the RFA and whether the MSGP is a rule, the RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the APA or any other statute unless the Agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions. 5 U.S.C. § 601(6).

It is EPA's longstanding position that CWA section 402 general permits are adjudications, rather than rules, under the APA and CWA. First, the CWA specifies in which instances Congress expected EPA to conduct a rulemaking. See, e.g., CWA section 312(f), 33 U.S.C. § 1322. Notably, the CWA does not state that permits for stormwater discharges associated with industrial stormwater be issued via rulemaking. See CWA section 402(p), 33 U.S.C. §1342(p). Second, the APA defines two broad, mutually exclusive categories of agency action "rules" and "orders."  See Attorney General's Manual on the APA at 14 ("[T]he entire Act is based on a dichotomy between rule making and adjudication."). Pursuant to the APA, a permit is an adjudication. See 5 U.S.C. §§ 551(6)-(8) (defining an adjudication as "the process for formulation of an order[,]" an order as "including licensing[,]" and a license as "an agency permit"). The APA thus categorizes a permit as an order, which by the APA's definition is not a rule.

In the Agency's view, the fact that a National Pollutant Discharge Elimination System (NPDES) general permit may apply to a large number of different dischargers does not convert it from a permit into a rule. Moreover, the 2021 MSGP retains unique characteristics that distinguish a permit from a rule.  First, the 2021 MSGP is effective only with respect to those dischargers that choose to be bound by the permit and so notify EPA. Thus, unlike the typical rule, the 2021 MSGP does not impose immediately effective obligations of general applicability. A discharger always retains the option of obtaining its own individual permit. If a source discharges without authorization of a general or an individual permit, the discharger violates CWA section 301 for discharging without a permit, not for violating the terms of the 2021 MSGP.

Commenters cite the D.C. Circuit Court's decision in *National Association of Homebuilders v. U.S. Army Corps of Engineers,* 417 F.3d 1272, 1284 (D.C. Cir. 2005), to support the claim that the 2021 MSGP "is a legal prescription of EPA's ability to implement its permitting authority granted by Congress in Section 402(p) of the Clean Water Act." In *Nat'l Association of Homebuilders*, the Court held that the Corps' actions in issuing a 404 nationwide permit were APA rules because they were "legal prescription[s] of general and prospective applicability." 417 F.3d at 1284. EPA respectfully disagrees with the commenters' characterization and application of that decision to this action.

First, EPA respectively views the case as wrongly decided. As discussed above, the Court's reasoning is inconsistent with caselaw deferring to an agency's choice or procedures, as well as applicable APA definitions. Caselaw states that unless the statute expressly requires a particular procedure to be used, the Agency is free to use the process that they see fit. The Supreme Court has held that agencies are generally free to decide whether to formulate policies through rulemaking or through adjudication. *See SEC v.*

*Chenery Corp.*, 332 U.S. 194, 203 (1947); *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974) (citing *SEC v. Chenery Corp.*). Similarly, the U.S. Courts of Appeals have repeatedly held that agencies have "very broad discretion to decide whether to proceed by adjudication or rulemaking." *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017) (citing *Conference Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013)); *see City of Arlington, Texas v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012) (citations omitted). Courts have generally deferred to an agency's choice between adjudication and rulemaking except in cases where the statute requires the agency to use one or the other, *see Michigan v. EPA*, 268 F.3d 1075, 1087 (D.C. Cir. 2001), or where the agency is attempting to revise an existing legislative rule, *see POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir. 2015). Neither of these two exceptions applies here. The statute does not require that Section 404 actions with nationwide applicability must be accomplished through rulemaking, and in fact, Congress expressly authorized the Corps to issue "general permits" and specified procedures for doing so. 33 U.S.C. § 1344(e)(1). The legislative history is also clear that CWA Section 404 provisions for permits were meant to promote administrative efficiency, which rulemaking would not achieve.

Second, subsequent decisions made by the Court provide support for the EPA's position that the MSGP is an adjudication not a rule. *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir. 2015) ("'The fact that an order rendered in an adjudication may affect agency policy and have general prospective application, does not make it rulemaking subject to APA section 553 notice and comment.'") (quoting *Conference Grp., LLC v. FCC*, 720 F.3d at 966); *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007) (holding that "[t]here is no such general principle" that a "broadly applicable order" must be a rule); *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) ("the fact that an agency action applies to a large number of licensees carries little weight in our analysis") (quotations and citations omitted). The D.C. Circuit also subsequently provided useful context to *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), a case upon which the Court relied on in *National Association of Homebuilders*. *POM Wonderful, LLC*, 777 F.3d at 497 ("*Appalachian Power*, however, involved a guidance document that 'in effect amended' a regulation, which the agency could not 'legally do without complying with the rulemaking procedures.' Here, the Commission did not effectively amend a notice-and-comment regulation. It instead validly proceeded by adjudication.") (citation omitted).

If, as suggested by commenters, the MSGP and NPDES general permits broadly were treated as rules, it would call into question the applicability of the Clean Water Act section 401's and APA section 558(c) administrative continuance provisions, subject NPDES permits to statutory and Executive Order requirements, and result in significant and wide-ranging impacts on other EPA and federal agency permit programs.

Other comments stated that the agency's determination of no significant economic impact on small entities, and thus no RFA analysis, was incorrect and that the proposed 2020 MSGP could have a significant economic impact on a substantial number of small entities. Such impacts, commenters claim, require EPA to convene a Small Business Regulatory Enforcement Fairness Act (SBREFA) panel and conduct a regulatory flexibility analysis.

EPA disagrees. First, as explained above, EPA maintains that the 2021 MSGP is an adjudication, thus not subject to the requirements of the RFA. Nevertheless, EPA agreed to submit general permits for OMB review and conduct a SBREFA analysis "voluntarily." Second, during the course of this MSGP permitting proceeding, the Agency voluntarily conducted the analysis and made the appropriate determinations that are called for by the RFA.

EPA estimated the cost of certain proposed 2020 MSGP requirements as unit cost instead of total cost, which are not included in the overall incremental cost of $2,423 per operator over the 5-year permit term. EPA conducted generic assessments of economic impacts for some requirements predominantly due to data unavailability and the site-specific nature of the proposed changes. The 2021 MSGP is a national general permit and covers a wide variety of discharges from different types of industrial activities across

2

the 29 different sectors in a range of climates and geographic regions across the United States. The nature of the general permit also presents challenges for an accurate cost estimate since EPA issues the permit first then receives Notices of Intent (NOIs) from facilities seeking coverage under the permit. This permitting structure precludes EPA from knowing exactly where and what type of facilities will be covered under the general permit ahead of permit issuance, although the Agency is aware that many facilities are existing facilities that have been covered under previous MSGPs. Although some industrial facilities under the MSGP have similar operations and discharge properties, variables such as industrial activity and sector, facility and operations size, precipitation pattern, climate, existing stormwater control measures, and variable labor and material costs across the country may impact the overall compliance cost significantly. These factors make many of the proposed requirements highly location-specific making it difficult to make a unique global assumption for all facilities that may be covered under this permit while conducting a cost analysis. In addition, EPA does not currently collect data on number of employees or annual receipts of entities that may seek coverage under the MSGP, and therefore estimating impacts on small entities is not possible.

Regarding EPA's difficulty in estimating impacts on small entities, some comments state that EPA must account for all direct costs to small entities, such as producing "realistic per entity cost ranges" that are representative of small entities in each industry group or sector. These cost ranges are further expected to clearly articulate assumptions about what small entities would do to comply with the rule, and those assumptions be subject to public comment to ensure they are reasonable. As discussed above, in evaluating costs EPA acknowledged that estimating the total costs to operators is challenging due to wide variation across industries, site-specific conditions and limitations that may apply, and lack of information regarding permit registrants due to the procedures used in general permits (i.e., NOIs are submitted after finalizing the permit). Further, general permits are often structured to be less prescriptive than individual permits, allowing operators significant flexibility in the implementation of stormwater control measures to comply with permit conditions. EPA's practice is to avoid unnecessarily specifying stormwater control measure implementation that should be used to comply with permit requirements. EPA notes that historically, operators have typically been supportive of this flexibility. Given the limitations, EPA used reasonable global assumptions to generate costs. EPA believes this approach is appropriate and necessary in order to generate a cost analysis for a general permit, which covers a variety of sectors, activities, and different sized facilities located in various parts of the country that all have varying site-specific conditions.

One comment suggests that EPA conduct industry-specific profiles and cost analyses using North American Industrial Classification System (NAICS) codes. Such a suggestion is unreasonable and beyond the scope of the 2021 MSGP and the scope of the permit's cost analysis. EPA notes that there are approximately 570 different NAICS codes covered under the MSGP. An effort of that magnitude would take years to complete and would still not address the site-specific considerations and limitations for each facility, nor EPA's commitment to provide operator flexibility for selecting appropriate BMPs or other controls to comply with permit conditions.

One proposal provided by a comment was for EPA to only finalize those provisions of the general permit that were the same as the 2015 MSGP or exempt all or most small entities from the costliest requirements. EPA disagrees with this comment and believes that the 2021 MSGP improves upon the 2015 MSGP in several ways, including enhanced provisions to meet the CWA requirement that industrial stormwater discharges be controlled such that the discharges will result in the receiving waters meeting applicable water quality standards.

## Executive Orders

Comments raised concerns with EPA's compliance with Executive Orders. One comment states that EPA should have sought more information from potentially impacted permittees and attempted to reduce burden where possible. The comment asserts that by not including such information in the proposed

rulemaking package EPA has not complied with Executive Order 13563. Additionally, the comment states that the increase in burden and costs associated with the 2021 MSGP violate both Executive Order 13924 and 13771.

EPA disagrees that the Agency was not in "compliance" with, acted "inconsistent with Administration priorities[,]" or acted in a manner "insufficient to comply with the spirit" of Executive Orders 13563, 13771, and 13924. The 2021 MSGP is not a regulatory action, it is a permit and not a rule. See discussion under "Regulatory Flexibility Act" above for further discussion. Even so, EPA conducted a E.O. 12866 review and included documentation of the changes made in the docket for this permit. Additionally, as discussed in the 2021 MSGP Fact Sheet and Cost Impact Analysis, EPA's cost analysis is based on an average incremental compliance cost. EPA estimates the incremental costs of the 2021 MSGP, as compared to the 2015 MSGP requirements. EPA determined that these increased costs are economically achievable and thus will not inhibit any economic recovery associated with COVID-19.

## Tribal Consultation

A comment asserts that EPA has not fulfilled its trust obligations with the Seminole Tribe of Florida by not seeking consult prior to proposing the 2020 MSGP. The comment claims that EPA has acknowledged that public comment periods are not considered formal government-to-government consultation. The Seminole Tribe also requests the following:

- EPA require the State of Florida's NPDES permitting parallel EPA's proposed revisions to ensure consistent and fair implementation of the Clean Water Act.
- EPA ensure states, like Florida, adequately communicate NPDES permitting decisions that may impact Tribal waters/interests with the Seminole Tribe.

The commenter's request "that EPA utilize its oversight and delegation authority to require the State of Florida's NPDES permitting parallel EPA's proposed revisions to ensure consistent and fair implementation of the Clean Water Act" is outside the scope of this permit.

Facilities on the Seminole Tribe lands are not authorized under the 2021 MSGP. Although the EPA sought comments and consultations from the Seminole Tribe during tribal consultation, EPA did not request certification from the Seminole Tribe. As such, facilities on the Seminole Tribe lands should work with EPA Region 4 as to available permit coverage for the industrial stormwater discharges.

## Authorization Under the CWA

Two comments claim that EPA is exceeding its authorization under the Clean Water Act with portions of the MSGP. Comments claim the following:

- Section 5.2 – Corrective Actions and Additional Implementation Measures ("AIM") as applied to the Air Transportation Sector is legally untenable.
- EPA is exceeding its authority to regulate the point source discharge of pollutants to waters of the United States by attempting to mandate how operations and materials should be managed, and data collected, upstream from the discharge.

Both EPA's jurisdiction under the CWA, including the definition of the waters of the United States, and what discharges require permit coverage are outside the scope of this permit. This permit concerns the substantive obligations of dischargers who choose to obtain permit coverage for their permits under this general permit. The permit contains pollution prevention measures, and these measures are tied to limiting and controlling stormwater discharges. The Act expressly contemplates that "management practices" can be required to control stormwater discharges. See CWA section 402(p)(6).

## NRC Study Data Not Made Available

A comment raised concerns about data used in the NRC study and asserts that "EPA did not make available for public comment the underlying and limited data the NRC used to support its conclusions and recommendations, thus violating administrative procedures and the agency's own policy guidance."

EPA fully explained the basis for the proposed permit provisions that were based on NRC study recommendations in the proposed permit (See Proposed 2020 Fact Sheet). In general, the NRC study provided recommendations related to the following for the MSGP: pollutant monitoring requirements and benchmark thresholds; stormwater sampling and data collection; and consideration of retention standards in the MSGP. Further, the NRC study was part of the record. The NRC study and proposed permit and fact sheet provided information and analyses descriptions to provide sufficient basis for the public to comment.

# Comment Response Essay 2 Monitoring

## "Inspection Only" Option

The NRC Study recommended that EPA provide low-risk facilities with an option to have a certified inspector perform a comprehensive site inspection in lieu of benchmark monitoring requirements. In the proposed 2020 MSGP, EPA requested comment on a possible "inspection-only" option available to low-risk facilities in-lieu of benchmark monitoring to reduce the burden on low-risk facilities and eliminate potentially unreliable monitoring data, while improving stormwater management. EPA specifically requested comment on whether the permit should include an inspection-only option, ways to identify eligible low-risk facilities, what frequency would be appropriate for such an inspection, what the inspection should entail (including what follow up should be required), and what qualifications or certifications an inspector should have. A summary of the comments received is provided below.

After consideration of public comments, EPA is not finalizing an inspection-only option in the 2021 MSGP. EPA acknowledges the validity of the NRC Study recommendation to provide an alternative compliance option for low-risk facilities; however, the Agency does not currently have sufficient information or a fully-vetted approach to identify which facilities should be considered low-risk. Further, EPA did not receive enough data or information to enable EPA to determine an effective inspection scheme, including frequency, content, follow-up actions, and qualifications of inspectors. Finally, as noted in the proposed 2020 Fact Sheet and discussed by commenters, the potential costs related to an inspection-only option appropriate for the MSGP may not make it a viable alternative or more cost-effective. EPA will continue to collect information, including the indicator monitoring data required in the 2021 MSGP, to support future consideration of an inspection-only option for low-risk facilities that is sufficient to protect water quality. EPA finalized exceptions to benchmark monitoring and AIM that provide flexibilities for benchmark monitoring where appropriate and allow operators to identify substantially identical discharge points to reduce burden (See Parts 4.2.2 and 5.2).

## Support for Including an Inspection-Only Option

EPA received several comments expressing general support for an inspection-only option in lieu of benchmark monitoring for low-risk facilities, citing benefits including decreased cost for operators, enabling operators to focus resources on risk management, eliminating potentially unreliable monitoring data, and freeing up resources for regulators to focus on higher-risk facilities. Some comments stated that including an inspection-only option would encourage small operations to apply for permit coverage and would encourage facilities of all sizes to limit industrial activities to areas with minimal impact to stormwater runoff. One comment supported an inspection-only option with regular re-evaluation of facility risk. Several comments supported an inspection-only option if the proposed universal benchmark monitoring was included in the 2021 MSGP. Other comments expressed conditional support for an inspection-only option provided the option was designed to reduce burden, or if the option was only available to facilities whose industrial activity is limited to processes that produce waste requiring hazardous material disposal. One comment suggested that an inspection-only option be made available only after 3 years of benchmark monitoring to provide data that operators can use to identify potential pollutant sources. Another comment suggested that the inspection-only option should also be available to inactive or unstaffed facilities.

A few comments requested clarification on the applicability of an inspection-only option to the proposed universal benchmark monitoring. One comment suggested requiring enhanced maintenance of stormwater control measures for low-risk facilities as an alternative to an inspection-only option. Two comments requested that EPA extend the inspection-only option to individual outfalls at facilities that do not qualify in their entirety as low-risk.

## General Critiques of an Inspection-Only Option

EPA received a few comments that did not support including an inspection-only option. Some of those comments stated the inspections would be burdensome for small facilities, with one suggesting that low-risk facilities should not be subject to benchmark monitoring or inspections. Others indicated it would be difficult for regulators to identify low-risk facilities without monitoring data. One of those noted that certain low-risk facilities can reduce their compliance burden through the existing No Exposure Certification. A few comments suggested that continued quarterly visual monitoring and wet weather inspections in lieu of benchmark monitoring would be appropriate for low-risk facilities.

## Identifying "Low-Risk" Facilities

EPA received many comments on identifying low-risk facilities. Some of those suggested certain sectors, SIC/NAICS codes, or industries should qualify for a categorical low-risk designation. Several comments stated that mining operations are low-risk because the facilities are well-managed and already heavily regulated; some of those comments suggested mining operations where the MSGP applies to a small percentage of the total facility footprint should be considered low-risk. For similar reasons, some comments stated that airports (Sector S), aggregate facilities (Sector J), steam electric facilities (Sector O), railroads (Sector P), or certain types of Sector A facilities should be considered low risk. One comment suggested ready-mixed concrete facilities that produce less than a specified volume should be considered low risk and another specified that food and beverage facilities (Sector U) should be considered low risk. Other comments suggested categorical low-risk designation wastewater treatment facilities (Sector T) that have a robust stormwater pollution prevention program; others suggested low-risk designation for metal casting facilities, surface finishing facilities, or generating stations. Several comments agreed with the suggestion in the proposed 2020 MSGP fact sheet that "light manufacturing" facilities under the SICs listed in 40 CFR 122.26(b)(14)(xi) should be considered low-risk; one comment stated that those facilities are exempt from NPDES permitting under Clean Water Act section 402(p)(1). One comment more generally stated that a facility's SIC/NAICS code should be a significant factor in determining risk, while a few others stated that individual facilities in any sector should be able to qualify for an inspection only option. One comment specifically stated that ELG applicability should not preclude a facility from being considered low-risk.

Many comments suggested specific criteria that should be considered when determining whether a facility is low-risk. A few comments stated facility size should be considered along with other factors, including type and intensity of industrial activities, receiving water impairments, and use of stormwater treatment BMPs, noting that area alone is not a true indicator of risk. Two comments suggested the number of employees is an indicator of a facility's level of industrial activity and should be considered along with facility type of the number of storm drains.

Many comments stated that a facility's type and intensity of industrial activity and potential for specific pollutants to be present in discharges are important indicators of risk. Some of those suggested that the discharge potential should be reviewed and certified by a PE or regulatory agency. One comment suggested that facility size and type should be considered in conjunction with the types of pollutants that might be discharged. Several comments similarly suggested consideration of potential to discharge from exposed activities.

A few comments identified the existence of other (non-MSGP) regulatory requirements that prevent surface water impacts as a criterion for identifying low-risk facilities; one of those stated that the existing regulatory framework should be considered along with the likelihood of discharging toxic substances in toxic amounts. Other comments suggested additional indicators of low risk including discharges to intermittent drainages, low potential for discharges to reach waters of the United States.

A few comments supported use of the activity-related criteria in Table 3-3 of the NRC Study for identifying low-risk facilities. Several comments identified specific site conditions or characteristics that should exist at low-risk facilities. Some of the suggested "low-risk" characteristics included:

- No discharge to impaired waters, sensitive areas, or MS4s.
- No reportable spills or violations over a specified time frame.
- No fueling activities on site or fueling only on a covered pad.
- No outdoor exposed storage or industrial activities.
- Total area of industrial activity less than one acre.
- Comprehensive spill prevention and control and emergency response programs.
- Employee training programs.
- Corporate inspection/audit program.
- Adequate secondary containment.
- Low annual rainfall or low runoff volume.

Several comments stated that facilities in sectors that have not historically been subject to benchmark monitoring should be considered low-risk facilities.

A few comments suggested a preliminary inspection to identify risk could be similar to evaluations for the existing No Exposure Certification; one of those comments suggested that an existing checklist used for No Exposure Certifications could be modified into a rating system to score a facility's risk potential.

Many comments suggested that a facility's compliance history should be considered in determining whether it is low risk. The majority of those comments stated that facilities that have not exceeded benchmark targets under prior MSGPs should qualify as low risk. Some added that facilities that corrected prior benchmark exceedances should also be considered low risk and one suggested that benchmark exceedances that occurred because of natural background concentrations should not disqualify a facility. A few others referred more generally to a facility's compliance history without specifying consistent achievement of benchmarks. One comment suggested that facilities in sectors with low pollutant concentrations in discharge monitoring report databases should qualify for an inspection-only option.

A few comments commented more broadly on establishing criteria for identifying low-risk facilities. One requested clear and reasonable criteria and another suggested establishing objective and measurable metrics that address water quality. One comment similarly stated that a definition of "low risk" should be specified in the permit and should be distinct from the definition of "no exposure." One comment suggested that sectors or SICs considered to be low risk should be clearly identified in the MSGP. Some comments suggested that the criteria should be selected and structured so that the low-risk designation would be broadly available to many facilities under the MSGP. One comment stated that EPA should propose and accept public comment on a definition of a low-risk facility before including an inspection-only option in the permit.

One comment suggested that EPA should entertain requests for sector-specific criteria. A few comments suggested that EPA establish a process, similar to the 1993 group application process, for sectors subject to benchmark monitoring to use new data to demonstrate that the sector could now be considered low risk and qualify for an inspection-only option. A few comments suggested allowing facilities to self-certify that there is negligible risk of pollutant releases in excess of benchmarks.

A few comments stated that facilities qualifying for the inspection-only option should be periodically re-evaluated to ensure they remain low-risk facilities. One comment reiterated the recommendations of the NAS study that address public availability of facility determinations and demonstration of low likelihood of discharging toxics, small area of exposed industrial activity, and proper facility management.

One comment stated that facility size and intensity of industrial activity are not appropriate indicators of risk. Several comments stated that conducting the majority of industrial activities indoors should not qualify a facility for the inspection-only option because those facilities can already obtain a no-exposure exclusion. One comment disagreed with designating low-risk facilities by SIC code and suggested the determination should be facility-specific because of the potential for varying levels of risk at different facilities in the same industry.

## Frequency of Inspections

EPA received several comments on the appropriate frequency of inspections for low-risk facilities. Most stated that twice per permit term is sufficient; with several of those specifying the inspections should occur in the first and third years of permit coverage and one suggesting that the inspections should occur after a qualifying storm event. One comment recommended quarterly inspections during the first year of permit coverage only. Several other comments suggested that the inspections should be done in conjunction with, or should be satisfied by, the quarterly visual inspections already required under the MSGP. A few comments stated one inspection per permit term would be sufficient; several also stated that significant changes in practices or potential pollutants at the facility would warrant a reinspection. One comment suggested that monthly inspections might be appropriate. One comment suggested that inspections and associated reporting should be integrated with similar requirements under other regulatory programs.

## Contents of the Inspection

EPA received several comments on the contents of the inspection and appropriate follow-up activities for facilities that qualify for an inspection-only option. A few of these concurred with the list of inspection items in the proposed 2020 MSGP fact sheet; specific inspection items suggested by some comments were consistent with the list in the proposed fact sheet. A few other comments suggested that inspections should be consistent with existing inspection and reporting requirements in the permit or be based on each industry's sector-specific requirements. One comment recommended that the inspections be limited to visual inspections of active discharges at permitted outfalls.

One comment specified a complete report should be developed that documents observations and actions taken as a result of the inspection and other comments supported a requirement that the professional inspector's original support be submitted to the permitting authority. One comment requested that EPA clarify operators would be able to review inspection reports before they are submitted to the permitting authority and another similarly stated that a requirement to submit the original, unmodified inspector's report would be inconsistent with other environmental regulatory programs that allow for inspectors to make adjustments to reports based on follow-up with facility personnel. Another comment suggested that the inspection report should be kept on file at the facility. One comment requested that EPA design an inspection form or checklist that in-house personnel could use to complete the inspections.

One comment suggested that facilities qualifying for an inspection only option be required to annually self-certify that the continue to meet the qualification criteria.

## Professional Inspector Credentials

EPA received many comments on appropriate credentials or qualifications to conduct inspections of low-risk facilities. A few suggested that the permit include a broad range of options so facilities can select the most appropriate type of inspector and control costs.

Many comments suggested that the MSGP should not require the use of third-party inspectors, stating that on-site or in-house staff should be allowed to conduct the inspections. Those comments stated in-house staff are more familiar with facility operations and SWPPPs and can respond more quickly to needs and follow-up activities identified through inspections. Some of these comments expressed support for use of on-site staff with a professional certification while others stated that certifications should not be required. One comment cautioned against requiring the use of third-party inspectors whose knowledge and

understanding of the stormwater program requirements is not consistent with that of the regulatory agency. A few comments referred to EPA's Risk Management Plan rule, in which EPA proposed to require use of independent auditors but ultimately audits to be conducted by facility staff. Others suggested the inspection could be conducted by in-house or parent company staff who are not involved with the day-to-day operations and oversight of the facility. Alternatively, some comments supported the use of third-party inspectors, citing the ability to coordinate the inspections with existing quarterly inspections conducted by third parties as well objectivity of third-party inspectors.

A few comments supported a requirement for a Professional Engineer (PE) or Professional Geologist (PG) to conduct or certify inspections while many others did not. Those in favor of requiring a PE to conduct or certify inspections specified that the PE should be experienced in stormwater management or otherwise be properly trained and qualified. Those that did not support a requirement for a PE or PG to conduct the inspections cited cost, access to appropriately qualified engineers in rural areas, and other issues associated with use of third-party inspectors.

Several comments generally supported a requirement for a professional certification or license and identified specific certifications that might be appropriate; those include Certified Professional in Industrial Stormwater Management (CPISM), Certified Professional in Stormwater Quality (CPSWQ), Certified Stormwater Inspectors trained by the National Stormwater Center, Certified Inspector of Soil and Erosion Control, Certified Professional in Erosion and Sediment Control or any stormwater management certification in the National Registry of Environmental Professionals. A few comments identify state-specific environmental certifications as appropriate qualifications for stormwater inspectors for low-risk facilities, including Certified Stormwater Inspector and Responsible Land Disturber (Virginia) and Licensed Site Professional, Certified Hazardous Materials Manager, and Toxics Use Reduction Planner (Massachusetts). One comment suggested that qualified inspectors for ready-mixed concrete facilities should complete the industry association's Environmental Course. Another referred more generally to certification in stormwater control measures and inspection techniques with a course curriculum and duration deemed appropriate by EPA.

Other comments did not support a requirement that the inspector hold a specific license or certification; one specifically stated that EPA should not spend the necessary time and resources to develop a new industrial stormwater training or professional certificate program. Several comments described alternative education, experience, and qualifications for inspectors, including familiarity with the facility and the SWPPP, a specified number of years of experience, a degree in environmental or earth science, training in a wide range of environmental sciences, on-the-job training, supplemental stormwater training, knowledge of stormwater control measures, understanding of the MSGP, use of existing EPA guidance on industrial stormwater monitoring and sampling, and the ability to be fair and objective.

Several comments stated that the definition of "qualified personnel" for SWPPP preparation should be applied to describe individuals qualified to perform inspections at low-risk facilities. Another suggested that the qualifications should be the same as those that apply to personnel performing routine inspections under the MSGP.

One comment suggested that EPA establish criteria for inspectors based on review of requirements established by state permitting authorities for individuals capable of conducting stormwater permit inspections. Another comment stated that requiring a certified inspector would be overly burdensome for small businesses; instead, businesses should document inspector qualifications in their SWPPP.

One comment agreed with the NRC Study recommendation that the certified inspector be an employee of a municipal separate storm sewer system (MS4) and another stated that only state and local agency inspectors should be allowed to perform the inspections unless a certification program is created to address this option. Another comment did not support the use of MS4 program staff to conduct the

inspections based on the additional workload and the potential to transfer the cost of the inspections to public rate payers.

## Cost of the Inspection-Only Option

Several comments stated that the inspection-only option would be cost-prohibitive if a PE or other type of third-party, licensed professional were required to perform the inspections. Some cited burden specifically to small businesses and others noted increased costs for facilities in rural areas that would have to pay for third party inspectors to travel long distances. One comment suggested that EPA's analysis underestimates the cost of the inspection-only option because it does not account for administrative costs to regulatory agencies. Other comments stated more generally that the inspection-only option must be evaluated carefully to minimize the associated compliance cost and suggested the compliance burden for the inspection should be similar to inspections required under other environmental regulatory programs.

## Alternative Approaches to Benchmark Monitoring

Since the first issuance of the MSGP in 1995, benchmark monitoring has been employed to measure the concentration of a pollutant in a facility's industrial stormwater discharges. The NRC study noted that some stakeholders have described benchmark monitoring as overly burdensome to industries and producing data that go unutilized. On the other hand, other stakeholders have expressed concern that if stormwater problems are observed through benchmark monitoring, the mechanisms to ensure issues are effectively addressed are lacking.

In the proposed 2020 MSGP, EPA requested comment on viable alternative approaches to benchmark monitoring for characterizing industrial sites' stormwater discharges, quantifying pollutant concentrations, and assessing stormwater control measure effectiveness.

As discussed further below, EPA received numerous comments on the utility of benchmark monitoring requirements and suggested alternatives. In addition to the suggested alternatives, EPA also received comments recommending updates to the benchmark thresholds themselves, including recommendations for development of wet weather water quality standards, benchmark thresholds for metals based on dissolved values, and allowing the use of bioavailable criteria (see discussion under Benchmark Thresholds below for discussion of these topics). Other comments expressed concern regarding monitoring in arid climates and where elevated natural background conditions are present (see Comment Response Essay 3 Additional Implementation Measures for discussion of the natural background exception).

After consideration of public comments, EPA is maintaining benchmark monitoring requirements in the 2021 MSGP, with an updated monitoring schedule from the 2015 MSGP that extends the minimum benchmark monitoring from four quarters to at least eight quarters. While EPA appreciates the many comments and suggestions for replacing or improving benchmark monitoring, EPA maintains that viable alternative approaches to benchmark monitoring for characterizing industrial sites' stormwater discharges, quantifying pollutant concentrations, and assessing stormwater control measure effectiveness are not available.

## General Support and Critiques of Benchmark Monitoring

EPA received several comments supporting the current benchmark monitoring framework. Some comments noted that, while imperfect, benchmark monitoring is a reasonable and reliable approach to ascertain the quality of stormwater discharges. One comment stated that, based on their oversight experience, visual observations and routine inspections do not provide an appropriate substitute for benchmark monitoring.

EPA also received numerous comments opposing benchmark monitoring, with some stating that it is costly, unnecessary, and difficult to implement. Some comments stated that the use of benchmark thresholds combined with the AIM requirements constitute "de facto" or "pseudo" effluent limitations

and noted that benchmark monitoring requirements were not intended to be used to trigger mandatory compliance. Some comments questioned the benefits of benchmark monitoring for water quality and identification of systematic issues.

For clarity, EPA emphasizes that the benchmark thresholds in the 2021 MSGP are not, and have never been, effluent limits themselves. Therefore, an exceedance of the benchmark threshold is not a violation of the permit. As specified in Part 1.6 of the 2021 MSGP, where exceedance of an applicable benchmark occurs, there is no permit violation provided the operator takes the required responses within the deadlines specified in Part 5. EPA also acknowledges that benchmark exceedances are not necessarily indicative of a water quality issue, but are meant to act as a screen to identify potential water quality issues and ultimately avoid stormwater discharges from industrial activity not being controlled as necessary to meet water quality standards, which is not permissible under CWA section 301(b)(1)(C) and EPA's implementing regulations. See Comment Response Essay 3 Additional Implementation Measures for additional discussion.

## Suggested Alternatives

EPA received several suggestions for alternatives to benchmark monitoring, including:

- Visual inspections in place of analytical sampling where an operator demonstrates consistent compliance with benchmark thresholds.
- A combination of annual reporting and visual assessments.
- Rewarding operators with less frequent monitoring frequencies if sampling results are consistently below benchmark thresholds.
- Allowing operators to provide all monitoring data collected to date to qualify for an exception to benchmark monitoring.
- Monitoring using alternative technologies (e.g., drones, artificial intelligence, or Interference Synthetic Aperture Radar).
- Requiring corrective actions only for significant changes in baseline over time.
- Enhanced maintenance requirements (e.g., specific maintenance and cleaning schedules).

While EPA acknowledges the merits of these suggestions, EPA continues to find that benchmark monitoring, in concert with the MSGP's requirements for routine inspections, visual assessments, and AIM requirements, is an important component of the MSGP and is a necessary indicator of the performance of facilities' stormwater control measures. EPA also notes that benchmark monitoring applies to only approximately half of the covered facilities, many of which are expected to completely fulfill the benchmark monitoring requirements in the permit after the first and fourth year of permit coverage or likely qualify for one of the exceptions to reduce or discontinue monitoring (e.g., because exceedances are due to pollutants in the natural background).

Analytical results from benchmark monitoring are quantitative and therefore can be used to compare results from discharge to discharge and quantify any improvement in stormwater quality attributable to the stormwater control measures, or to identify a pollutant that is not being adequately controlled. The benchmark thresholds provide an appropriate level to determine whether a facility's stormwater control measures are successfully implemented.

As discussed in the 2021 MSGP fact sheet, compiling and evaluating information from either annual reports or visual assessments in a systemic, meaningful way is more challenging than quantitative benchmark data. Annual reports tell an overall story of what happened with stormwater discharges at the facility for a given year, and visual assessments give a general, observed indication of discharge quality for a given quarter. Benchmark monitoring data, however, provides numerical indicators of stormwater control effectiveness, what pollutants are being discharged, and at what magnitude, which can be addressed in real-time and compared over time.

With respect to recommendations to discontinue benchmark monitoring based on compliance history, EPA declines to make this change. It is important for all operators subject to benchmark monitoring to perform the monitoring in the first year of permit coverage so that operators are made aware of potential problems expeditiously. For existing dischargers, it is important that benchmark monitoring be restarted during the first year of coverage under the 2021 MSGP in case there have been changes, whether known or planned or not, that affect the quality of the discharges. If there are no changes and the average of the four quarterly samples are below the benchmarks for all required parameters, then benchmark monitoring may be discontinued until the fourth year of the permit term. Requiring monitoring twice during the permit term at the beginning and again towards the end of the permit allows operators to better characterize their industrial stormwater discharges and describe industrial stormwater control measure performance with additional sampling data throughout their permit coverage.

## Chemical-Specific Benchmark Monitoring for Sectors I, P, And R

The NRC Study included several recommendations for additional data collection on industrial stormwater quality and stormwater control measure performance and identified a "need for updated evaluations of pollutant potential and opportunities for pollutant reduction through implementation of additional SCMs." Based on EPA's initial reading of the NRC Study discussion of sectors currently not subject to benchmark monitoring, EPA explained in the proposed 2020 MSGP that the study specifically identified facilities in Sectors I, P, and R as including industrial activities with the potential to contribute pollutants to stormwater and suggested that chemical-specific benchmark monitoring would be appropriate. In the proposed 2020 MSGP, EPA proposed to require benchmark monitoring for these three sectors. Specifically, EPA proposed that facilities in Sector I (Oil and Gas Extraction) have benchmark monitoring for ammonia, total recoverable lead, total recoverable nickel, nitrate plus nitrite nitrogen, and total recoverable zinc. For Sector P (Land Transportation and Warehousing), EPA proposed benchmark monitoring for total recoverable lead and total recoverable mercury. For Sector R (Ship and Boat Building and Repair Yards), EPA proposed benchmark monitoring for chromium (III), chromium (VI), total recoverable copper, total recoverable lead, total recoverable nickel, and total recoverable zinc. Except for chromium (III) and chromium (VI), the benchmark thresholds in the proposed 2020 MSGP were based on existing benchmark thresholds for the parameters proposed for each sector. The proposed benchmarks for chromium (III) and chromium (VI) for Sector R were based on EPA's national recommend acute aquatic life criteria.

EPA received several comments expressing general support for the proposed benchmark monitoring for Sectors I, P, and R, with some comments supporting the proposed benchmarks for one or two of the sectors. One comment suggested that additional benchmarks should be added, specifically: polycyclic aromatic hydrocarbons (PAHs) for Sectors I, P, and R; radium and other radionuclides for Sector I; and nutrients, total suspended solids (TSS), and runoff volume for Sector P.

Several comments opposed the proposed benchmarks for one or more sectors. Several comments stated that existing monitoring requirements or other regulatory requirements for these sectors are adequate. Another specifically opposed adding benchmarks without conducting industry-specific analyses, citing the process used to develop sector-specific benchmark monitoring for the 1995 MSGP. Two comments expressed concern that the proposed benchmarks for Sector P would also be required for Sector A and B facilities with co-located trucking and warehouse operations.

Many comments suggested revisions to the proposed parameters for specific sectors. Of those, most did not support including lead and mercury benchmarks for Sector P. Some of those comments stated that the Toxics Release Inventory (TRI) data used in the NRC Study generally reflect air emissions for mercury and did not show that lead in stormwater is prevalent for Sector P facilities. Several comments stated that existing data do not indicate that lead and mercury pollutants are present in stormwater discharges from Sector P facilities; one of those comments stated that EPA is not authorized under the Clean Water Act to establish lead and mercury benchmarks for certain Sector P facilities because those pollutants are not a

13

component of the regulated activity. Several comments suggested that lead and mercury benchmarks are not appropriate for Sector P facilities where fueling, vehicle maintenance, and related activities are not exposed or not conducted at the site and one generally stated lead benchmarks are not appropriate for any facility if lead is not associated with the operation. One comment stated that mercury benchmarks are not appropriate for specific Sector P subsectors and another stated that oil and grease benchmarks would be more appropriate than mercury and lead benchmarks for Sector P facilities. One comment suggested that Sector P should qualify for the proposed inspection-only option in lieu of benchmark monitoring requirements.

Two comments suggested revisions to the proposed benchmarks for Sector R. One suggested that the copper benchmarks be revised because the proposed hardness-dependent benchmark thresholds result in benchmark thresholds below drinking water action levels and reportable concentrations. Another suggested removing the benchmarks for chromium III and chromium VI, stating they add unnecessary complexity to SWPPP implementation.

After considering public comments and reexamining the NRC study, EPA notes that the NRC did not recommend the Agency require benchmarks for these sectors, but rather provided them as examples of "Sectors Not Subject to Benchmark Monitoring" and for highlighting the "Need for Periodic Monitoring Reviews." The NRC notes that these examples "highlight the need for updated evaluations of pollutant potential and opportunities for pollutant reduction through implementation of additional SCMs." In the NRC study, the NRC actually recommended "the following specific steps be taken to periodically review the MSGP monitoring requirements and update them as appropriate based on new information:

- Prior to each permit renewal, EPA should conduct a literature review and update its industry fact sheets, which describe potential pollutants from common industry activities, pollutant sources, and practices that could reduce pollutant discharge on site. Changes in industry practice over time may introduce new contaminants and render other contaminant monitoring of limited value.
- EPA should continue the process conducted by Tetra Tech in advance of the 2008 MSGP (O'Donnell, 2005) where sector-specific data from the previous MSGP as well as Toxic Release Inventory and Toxic Substances Control Act data are assessed to determine whether the chemical monitoring requirements are adequate to detect stormwater management concerns.
- State industrial stormwater permits should be reviewed for advancements in sector-specific monitoring that would be appropriate for the national permit (e.g., Bulkley et al., 2009).
- New understanding of pollutant effects in the environment and advances in monitoring technology should be evaluated. For example, PAHs were not previously monitored as part of the MSGP process, but aquatic impacts of PAHs are now better understood and analytical technologies have advanced significantly since the 1992 group application. Scientific advances that identify cost-effective monitoring surrogates should also be considered."

After consideration of public comments on establishing benchmark monitoring for sectors I, P, and R, EPA is not finalizing benchmark monitoring requirements for those sectors. EPA acknowledges the NRC Study's recommendation for additional sector-specific data-gathering efforts. At this time, EPA is requiring indicator monitoring for pH, TSS, and COD for facilities in subsectors that do not have sector-specific benchmark monitoring requirements in the 2021 MSGP, which includes subsectors I1, P1, and R1. The indicator monitoring will provide operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control effectiveness at these facilities, as recommended by NRC. EPA will use the results of the indicator monitoring to re-assess the need for additional chemical-specific benchmark monitoring for the next reissuance of the MSGP.

## Quarterly Universal Benchmark Monitoring

The proposed 2020 MSGP included proposed quarterly "universal benchmark" monitoring requirements for pH, TSS, and chemical oxygen demand (COD) that would apply to all operators. After review of comments and further consideration, EPA is not finalizing universal benchmark monitoring as proposed. Instead, the 2021 MSGP includes a new provision that requires certain operators to conduct indicator analytical monitoring for pH, TSS, and COD quarterly for the duration of the permit. This "indicator monitoring" requirement applies to all operators in subsectors that do not have sector-specific benchmark monitoring requirements in the 2021 MSGP. For this permit, indicator monitoring does not have a threshold or baseline value for comparison nor does it require follow-up actions, unless the operator becomes aware, or EPA determines, that a discharge does not meet applicable water quality standards. In that case, corrective action(s) is required. Indicator monitoring for these three parameters will provide operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control effectiveness at these facilities.

## General Support and Critiques of Universal Benchmark Monitoring

EPA received several comments in support of quarterly universal benchmark monitoring for the entire permit term. One comment suggested more frequent than quarterly monitoring for facilities with a high coefficient of variation in monitoring data. A few comments supported universal benchmark monitoring for the full permit term but stated that monitoring results should not trigger corrective actions.

EPA also received several comments that did not support universal benchmark monitoring. Many comments recommended that universal benchmark monitoring be limited to certain sectors. Some comments supported universal benchmark monitoring only for sectors without sector-specific benchmark monitoring requirements, while others stated that monitoring should not be imposed on such sectors since they have a low risk for contributing to stormwater pollution. Other comments supported universal benchmark monitoring only for high-risk sectors or subsectors. Some comments recommended that specific sectors and activities be excluded from the universal benchmark monitoring requirement, including iron and steel mills in Sector F (Primary Metals), Sector G (Metal Mining), Sector H (Coal Mines and Coal Mining-Related Facilities), Sector J (Mineral Mining and Dressing), Sector N1 (Scrap Recycling and Waste Recycling Facilities), Sector O (Steam Electric Generating Facilities), Sector P (Land Transportation and Warehousing), Sector S (Air Transportation Facilities), Sector T (Treatment Works), Sector U (Food and Kindred Products), paint and coatings (SIC Code 2851), adhesive and sealants manufacturing industry (SIC Code 2891), and aggregate operations.

One comment agreed that the characterization data collected under the universal benchmark monitoring would be valuable but suggested that such data collection should be undertaken by EPA and not added as a permit requirement. Another comment suggested that EPA commission independent studies to identify sectors that should be required to perform monitoring and require relevant sectors to monitor those parameters for the next permit term.

Some comments did not support universal benchmark monitoring at the proposed frequency. A few of those suggested reducing the monitoring frequency to annually, with two suggesting quarterly monitoring be required if an annual sample exceeds the benchmark threshold. One comment suggested that semi-annual universal benchmark monitoring is an appropriate schedule along with quarterly inspections and quarterly visual assessments. Another recommended quarterly sampling over 3 years to determine the annual average or quarterly sampling followed by an annual sampling event.

Many comments did not support the use of COD, pH, and TSS as parameters for universal benchmark monitoring, indicating that they are not good indicators of impacts to stormwater from industrial activity. Some comments expressed concerns that universal benchmark monitoring results in arid environments could result in potentially unreliable monitoring data, particularly for COD and TSS, with one comment requesting an exception from universal benchmark monitoring for facilities in the arid southwest. Another

comment suggested that COD monitoring only be required for certain sectors. One comment stated that COD monitoring should not be required for operators that do not use, process, or produce residual food and agricultural organic wastes. Some comments expressed concerns that benchmark exceedances for pH could be the result of natural background conditions in areas where rainfall contains low pH levels that are typically below 6.0, such as the Northeast. One comment indicated that TSS can be a surrogate for control of stormwater associated with industrial activities and suggested that EPA limit universal benchmark monitoring to TSS only.

EPA also received some comments suggesting other parameters for universal benchmark monitoring. Two comments recommended allowing substitution of $BOD_5$ or total petroleum hydrocarbons for COD. One comment suggested that zinc and *E. coli* be added to the list of universal benchmark parameters. One comment suggested that EPA add nitrogen and phosphorus, given that many surface waters are impaired for these parameters. One comment suggested limiting universal benchmark monitoring to only using parameters measurable with field instruments (e.g., turbidity instead of TSS) and that COD testing not be required for facilities with limited vegetation and no organic processing or chemicals. One comment recommended universal benchmark monitoring for flow.

EPA is requiring quarterly indicator monitoring for the permit term in the 2021 MSGP for those sectors without sector-specific benchmark monitoring. Although there are no benchmark thresholds for pH, TSS, and COD, indicator quarterly monitoring will allow operators to evaluate and compare data over time to identify conditions that cause values to fluctuate and review and revise SWPPPs and stormwater control measures accordingly. EPA declines to include provisions for more frequent monitoring or to reduce the frequency of indicator monitoring. EPA arrived at the quarterly sample frequency by weighing numerous factors, including the need for an adequate sampling regime to characterize control measure performance and to avoid imposing undue cost on facilities. While EPA encourages operators to conduct more frequent monitoring than specified in the MSGP, at this time, EPA has determined that that frequency of indicator monitoring in the 2021 MSGP is adequate.

These three parameters are appropriate as broad, low-cost indicators of stormwater pollution, as recommended in the 2019 National Research Council (NRC) study:

- "pH detects excess acidic or alkaline substances in the water, and pH excursions indicate corrosive (acidic or basic) and/or toxic concerns. Stormwater discharges that are excessively polluted may not exhibit problems with respect to pH. However, pH excursions that are highly acidic or highly alkaline and do not fall into the benchmark range (6.0–9.0) can be indicative of a major polluting event or process failure and can be impactful to receiving waters. Unexpected pH values also can indicate that a stormwater treatment system is not operating properly" (NRC, 27-28).
- "Total Suspended Solids (TSS) is a measure of suspended particulate matter in a water sample. Particulate matter can result from erosion of industrial soils, deposited particulate matter on the drainage area, erosion/corrosion of materials present on the site, and general overall site cleanliness. TSS also provides information about possible high concentrations of numerous other pollutants that will partition onto particulate matter, including phosphorus, many heavy metals, and many hydrophobic organic chemicals" (NRC, 28)
- "Chemical Oxygen Demand (COD) is a surrogate measure of organic pollutants in water (through measurement of oxygen demand). It is a conventional water quality parameter with established industrial stormwater benchmarks. In addition to the measure of oxygen demand, high COD can also be indicative of oils and hydrocarbon pollution and, as with TSS, can be an indicator of overall site cleanliness. Increases in COD could also indicate problems with the treatment SCM effectiveness, including the need for maintenance" (NRC, 27).

For the 2021 MSGP, EPA is requiring indicator monitoring for pH, TSS, and COD as "report-only" for operators in the 22 subsectors without sector-specific benchmarks. Indicator monitoring for these subsectors is appropriate, given that the 2015 MSGP only required sector-specific benchmark monitoring for around 55 percent of MSGP subsectors; the other 45 percent of subsectors did not have any chemical-specific analytical benchmark monitoring. The 2021 MSGP suspended benchmark monitoring for iron resulting in the elimination of benchmark monitoring requirements for subsectors L2 and O1. With these changes, 22 subsectors under the 2021 MSGP without sector-specific benchmark monitoring are now required to conduct indicator monitoring for pH, TSS, and COD.

## Modifying Monitoring Requirements if Benchmarks Are Not Exceeded

Many comments suggested that, if universal benchmark monitoring is included in the MSGP, EPA should also provide a mechanism for monitoring to be reduced or discontinued if a facility's results do not exceed the benchmarks for those parameters. Several of those comments requested a provision similar to that for required sector-specific benchmark monitoring which allows a facility to discontinue monitoring if the four-quarter annual average for a parameter does not exceed the benchmark threshold. A few of those comments included the provision that benchmark monitoring requirements may resume if there are changes at the site that might affect that parameter. One comment limited this request to facilities covered under Sector U, and several others added that ongoing visual inspections are effective to evaluate controls where benchmark monitoring has been discontinued. One comment suggested that the monitoring be waived or reduced to annual monitoring, and the facility should be designated as "low-risk" after 2 years of quarterly results below the benchmark threshold or where the facility can demonstrate it was not the substantial source of the exceedance. Another suggested that sampling also could be discontinued based on results of monitoring conducted under the 2015 MSGP or based on sampling results that do not exceed benchmark levels for four quarters after correction of an exceedance that triggered AIM Tier 1.

Some comments suggested a reduction in the required frequency of universal benchmark monitoring after a facility demonstrates consistent results below the benchmark thresholds. Several of those comments suggested a reduction to semi-annual or annual monitoring based on a 2-year average that is below benchmarks. One of those noted that quarterly monitoring should resume if there is a subsequent change at the facility or a benchmark exceedance. One comment suggested that universal benchmark monitoring frequency could be reduced as a reward program for excellence.

As described above, EPA is not finalizing the proposed universal benchmark monitoring. Instead, the 2021 MSGP requires quarterly "report-only" indicator monitoring without benchmarks for pH, TSS, and COD. As such, the 2021 MSGP also does not include a mechanism for discontinuing or reducing universal benchmark monitoring requirements based on a demonstration that discharges do not exceed benchmark thresholds. In addition, reducing the frequency or discontinuing indicator monitoring negates the potential benefit to operators without benchmark monitoring requirements for providing operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control measure effectiveness at these facilities. Indicator monitoring provides operators and EPA with an understanding of industrial stormwater discharge quality, potential water quality problems, and stormwater control effectiveness at regulated facilities. The resulting data set will allow operators to evaluate and compare data over time to identify conditions that cause values to fluctuate and review and revise SWPPPs and stormwater control measures accordingly.

## Cost of Quarterly Monitoring

Several comments did not support the proposed quarterly universal benchmark monitoring, citing excessive cost and sampling burden to operators. One comment expressed further concerns about costs associated with remedial actions associated with benchmark exceedances and another. Some of these questioned the necessity of the data collection given existing monitoring, visual assessment, and inspection requirements. EPA notes that the indicator monitoring requirements included in the 2021 MSGP add monitoring costs of approximately $407 to $463 per year for approximately 40 percent of

operators covered under the MSGP (see Cost Impact Analysis for the 2021 MSGP). The indicator monitoring frequency coincides with sample collection for visual monitoring that is already being conducted at those facilities. Therefore, EPA disagrees that the quarterly sampling requirement for the proposed universal benchmark monitoring or the indicator monitoring included in the 2021 MSGP imposes excessive cost or burden on operators.

## Benchmark Thresholds

### Wet Weather Water Quality Standards

Some comments suggested that EPA replace the current benchmark thresholds with wet weather water quality standards that reflect the differences between stormwater and wastewater (e.g., stormwater discharges are episodic, whereas wastewater discharges tend to have continuous flow). The comments note that the current benchmark thresholds, which are based on acute aquatic life criteria with no allowance for dilution, reflect conditions for low-flow and constant exposure in the receiving stream, which is different than the conditions that occur during a wet weather discharge event subject to benchmark monitoring. While EPA is developing the wet weather standards, the comments suggest that EPA rely on annual reporting and visual assessments to assess stormwater effectiveness. One comment supported a more focused expansion of monitoring to support development of the wet weather standards than the proposed universal benchmark monitoring requirement, stating that EPA has alternative mechanisms to collect new data. Another comment suggested that a facility could qualify for wet weather benchmark monitoring by demonstrating that the receiving water experiences additional volumetric flow substantially greater than the stormwater discharge flow during the same storm event.

At this time, EPA does not plan to develop wet-weather criteria, as aquatic life water quality criteria are appropriate protective values for ambient waters and for use as the MSGP's benchmark thresholds. If EPA were presented with alternative evidence, the Agency may consider the validity of exploring a wet weather criteria approach in the future. Multiple chemical exposures (e.g., PAHs, metals) are very likely after wet weather events and the current state of scientific information that indicates that effects of individual chemicals in the same class are often found to be additive. As such, the current one-by-one chemical consideration for benchmarks in the MSGP does not address this issue. Although numerous laboratory studies document the potential impacts of pulsed exposure to contaminants, impacts from wet weather events can be complicated logistically to document in the field.

### Benchmark Thresholds for Dissolved Metals

EPA received several comments requesting the ability to perform benchmark monitoring for dissolved metals rather than total recoverable. These comments stated that the metal benchmarks are overly stringent and noted that many operators have difficulty meeting the metal benchmarks. The comments stated that monitoring for dissolved metals would be protective of aquatic life and consistent with EPA's National Recommended Water Quality Criteria, which are expressed in dissolved form. Two comments suggested that the MSGP provide the option to sample for dissolved metals for operators with repeated benchmark exceedances, as recommended by the NRC study.

In the 2021 MSGP, EPA is retaining the requirement for operators subject to benchmark monitoring requirements for metals to measure for "total" metals. Monitoring for total metals to characterize effluent discharges is consistent with NPDES regulations, which specify that, when a permit contains a limitation for a metal, the limit be expressed in terms of total recoverable metals (40 C.F.R. 122.45(c)). The partitioning between dissolved and adsorbed forms of metal in a discharge and after the effluent is in the receiving water changes as a result of the chemical differences between the discharge and the receiving water, and there is no assurance that particulate metal in the stormwater discharge would dissolve after discharge. Keeping benchmark thresholds in terms of total recoverable metals also avoids increasing the monitoring burden (and risking the economic achievability of the permit's requirements) because otherwise samples would have to be filtered in the field for a dissolved metals analysis and/or the receiving water characteristics will have to be known. Moreover, monitoring for total recoverable metals

is adequate to protect water quality because it is a conservative practice that takes into account all possible concentrations of the metal, and not a value that may not be representative of receiving water conditions.

## Allowing Dilution for Benchmark Thresholds

A few comments suggested that EPA revise the benchmark thresholds to account for a reasonably conservative estimate of in-stream concentrations (i.e., dilution). The comments suggested that in-stream concentrations associated with stormwater discharges would be low due to the high flow in the receiving stream. The comments recommended using a dilution and attenuation factor of 100 to adjust the benchmark thresholds.

EPA has generally established benchmark thresholds based on acute aquatic life criteria, with no allowance for mixing zones or dilution during storm events. EPA notes that listed species may be located in the waterbody at or near the point of discharge, thus obviating any benefit from dilution of the stormwater in the receiving waterbody. In addition, stormwater in headwater streams may make up all or most of the instream flow, and thus there may be little to no instream water available for dilution.

For the purposes of determining compliance with water quality standards, i.e., with regard to the requirement for discharges to be controlled as necessary to meet water quality standards, unless a discharge is assigned a mixing zone (sometimes with an associated dilution factor), compliance is measured at the point of discharge, i.e., at "end-of-pipe." Many state agencies do not allow mixing zones, or do not allow them for shallow shoreline discharges, such as those from stormwater runoff. Consequently, pollutant concentrations in discharges are often compared directly with the water quality standards themselves. To consider mixing zones, if the mixing zone was allowed, operators would need to perform in-stream monitoring, not just at the discharge point the permit requires. In addition, mixing zones would generally not be available where a waterbody is impaired (i.e., the assimilative capacity of the receiving water for the pollutant in question has already been exceeded). EPA may consider several factors, including applicable mixing zones, as appropriate and applicable under state law when determining whether a discharge is being controlled sufficiently to meet water quality standards. However, because of the various factors that may affect such a determination, such a determination would be made on a case-by-case basis and would be more appropriate for an individual permit.

## Selenium

As in the 2015 MSGP, the 2021 MSGP requires operators in subsectors G2 and K1 to conduct benchmark monitoring for selenium. The 2015 MSGP included a benchmark threshold of 0.005 mg/L (5 µg/L) for discharges to freshwater based on EPA's 1999 national recommended chronic criterion for the protection of aquatic life (EPA-822-F-04-010). EPA used the chronic criterion for the benchmark threshold since, at the time issuance of the 2015 MSGP, no acute freshwater criterion had been published.

In 2016, EPA updated the recommended aquatic life criteria for selenium, which updated the chronic aquatic life criterion from 5 µg/L to 3.1 µg/L for still (lentic) waters and 1.5 µg/L for flowing (lotic) waters. The 2016 recommended criteria accounts for the bioaccumulation properties of selenium and reproductive effects on fish species. It also includes a translation of the chronic criteria for short-term or intermittent exposure in lieu of acute criteria. The translation of the chronic criteria to an appropriate benchmark must be calculated based on site-specific considerations (i.e., background base-flow concentrations of selenium and length of exposure) in the receiving waterbody.

In the proposed 2020 MSGP, EPA included a benchmark threshold of 5 µg/L, but requested comment on whether to allow operators that repeatedly exceed the selenium benchmark threshold to use the recommended 2016 aquatic life criteria to evaluate water quality risk on a site-specific basis and discontinue comparisons to national benchmarks.

Some comments suggested that EPA should update the selenium benchmark threshold to be consistent with the 2016 recommended chronic criteria of 3.1 μg/L for still (lentic) waters and 1.5 μg/L for flowing (lotic) waters. Several comments expressed support for allowing development of site-specific benchmarks for selenium. One comment suggested that water quality risk be evaluated on a site-specific basis using standards developed by each state. One comment suggested that this flexibility be limited to only facilities with repeated exceedances. However, another comment requested that the MSGP allow all operators, not just those exceeding the benchmark, to be able to use fish tissue data to derive a site-specific benchmark for selenium or use the formula in the 2016 criteria to develop a short-term criterion that can be used to set a benchmark.

Some comments were opposed to EPA allowing site-specific benchmarks for selenium for facilities that routinely exceed the benchmark. One comment expressed concern that few operators would perform site-specific assessments given the associated time, cost, and complexity, and indicated that such assessments are akin to the analysis completed in developing an individual permit. Two comments were opposed to development of a site-specific benchmark, which they found to be overly burdensome to operators and inappropriate for implementation in the MSGP; instead, the comments suggested that EPA adopt a benchmark of 20 μg/L, based on previous acute criteria.

In the 2021 MSGP, EPA is updating the selenium benchmark for discharges to freshwater to the 2016 recommended chronic criteria but is not allowing for development of site-specific benchmarks for operators that routinely exceed the applicable benchmark.

The 2016 chronic criteria for selenium reflects the latest science and consists of four elements, all of which are protective against chronic selenium effects. Two elements are based on the concentration of selenium in fish tissue and two elements are based on the concentration of selenium in the water column, which are the elements of the criteria most relevant in determining a revised benchmark threshold. The recommended water-related elements of the update criteria are: (1) a monthly average exposure water column element and (2) an intermittent exposure water column element to account for potential chronic effects from short-term exposures. Both water column elements include two values: one for lentic waters (e.g., lakes and impoundments) and one for lotic waters (e.g., rivers and streams). The criteria for the monthly average exposure water column element are 1.5 μg/L for still/standing (lentic) waters and 3.1 μg for flowing (lotic) waters, which EPA recommended states use when implementing the criteria under the NPDES program. Based on this recommendation, the 2021 MSGP includes the benchmark threshold of 1.5 μg/L for stormwater discharges to still/standing (lentic) waters and 3.1 μg/L for stormwater discharges to flowing (lotic) waters.

EPA has not developed specific concentration-based acute criteria in the 2016 national recommended aquatic life criteria for selenium; however, the chronic criterion is expected to be protective of acute effects on aquatic communities. To account for acute effects, EPA derived an intermittent exposure equation to address short-term exposures (such as stormwater) that contribute to the bioaccumulation of selenium and reproductive effects on fish species. The equation includes a translation of the chronic criteria, which must be calculated based on the background base-flow concentration of selenium in the receiving water and the length of exposure. See Table 1 on page XV of the final criterion document for selenium https://www.epa.gov/sites/production/files/2016-07/documents/aquatic_life_awqc_for_selenium_-_freshwater_2016.pdf.

EPA acknowledges that allowing operators who have repeatedly exceeded benchmarks to perform facility-specific analyses could provide additional information on any potential adverse effects that could occur based on specific facility conditions. However, optional use of the selenium intermittent exposure equation for such operators requires gathering additional data, including average background base-flow concentration of selenium in the receiving water and the length of exposure based on the fraction of any 30-day period during which elevated selenium concentrations occur. Given that reported benchmark data under the 2015 MSGP does not indicate a high incidence of exceedance of the 2015 MSGP selenium

benchmark and the extra data collection associated with implementing the intermittent exposure water column criteria, the 2021 MSGP does not include the option to use the intermittent exposure water column aquatic life criterion.

## Arsenic

As in the 2015 MSGP, the 2021 MSGP requires operators in subsectors A2, G2, and K1 to conduct benchmark monitoring for arsenic. The 2015 MSGP included a benchmark threshold for arsenic of 150 µg/L (0.15 mg/L) for freshwater and 69 µg/L (0.069 mg/L) for saltwater. These values are based on the 1995 national recommended chronic criterion for freshwater and acute criterion for saltwater, respectively. EPA selected the more conservative chronic freshwater value based on concerns about near-coastal freshwater discharges flowing quickly into sensitive saline waters, which have a saltwater acute aquatic criterion of 69 µg/L, five times lower than the acute freshwater criterion.

In the proposed 2020 MSGP, EPA requested comment and information related to updating the arsenic freshwater benchmark threshold based on the recommended acute criterion of 340 µg/L rather than the chronic criterion of 150 µg/L and specifically any concerns related to near-coastal freshwater discharges flowing into sensitive saline waters.

Several comments supported updating the arsenic freshwater benchmark threshold based on the recommended acute criterion of 340 µg/L. One comment expressing support for a benchmark based on the acute criterion stated that their data do not indicate significant arsenic exceedances under the existing benchmark. A couple of comments pointed to the NRC study, which recommended that EPA implement a benchmark based on the acute criterion unless EPA can justify this unique concern for arsenic discharges or it develops a criterion based on intermediate exposure (instead of acute exposure). One comment supported modification but suggested that EPA should not impose a benchmark in near-coastal discharges flowing into saline waters because EPA has not developed appropriate levels for that situation. Another comment suggested that EPA include a permit provision explicitly designating when the 150 µg/L criterion should be applied.

A few comments opposed updating the arsenic freshwater benchmark and recommended retaining the current freshwater benchmark of 150 µg/L. One comment agreed with EPA's stated preference in Part 4.2.1.2 of the proposed 2020 MSGP Fact Sheet not to weaken a discharge requirement unless good scientific evidence exists that a pollutant is less toxic than previously believed and pointed to the Clean Water Act goal to achieve progressively tighter pollution limits.

For the 2021 MSGP, and as stated in previous MSGPs, EPA will continue using the chronic freshwater criteria of 150 µg/L as the basis of the freshwater arsenic benchmark given that the Agency prefers not to weaken a discharge requirement unless good scientific evidence exists that a pollutant is less toxic than previously believed. This is not the case with arsenic. Furthermore, arsenic toxicity increases substantially in saline waters. Since many permitted facilities under EPA's MSGP are located in coastal states, and their discharge may reach saline waters quickly, EPA will continue to use the chronic criteria for arsenic to protect these estuarine environments.

## Cadmium

As with the 2015 MSGP, the 2021 MSGP requires operators in subsectors G2 and K1 to conduct benchmark monitoring for cadmium. EPA based the 2015 MSGP benchmark threshold on the 2001 national recommended acute aquatic life criterion that was hardness-dependent for freshwater (2.1 µg/L based on a hardness of 100 mg/L) and 40 µg/L (0.04 mg/L) for saltwater.

In 2016, EPA updated the freshwater criterion to continue to be hardness-dependent (1.8 µg/L based on a hardness of 100 mg/L) and the saltwater criterion to 33 µg/L (see 81 FR 19176). The revised criteria represent the best science available by accounting for new laboratory aquatic toxicity tests, including the

effects of total hardness on cadmium toxicity and included 75 new species and 40 new genera in the testing process.

In the proposed 2020 MSGP, EPA requested comment on updating the benchmark thresholds for cadmium for freshwater and saltwater based on the updated recommended 2016 acute aquatic life criteria. Most comments supported updating the benchmark thresholds for cadmium to reflect the 2015 acute aquatic life criteria. Only one comment suggested that the freshwater benchmark (1.8 μg/L based on a hardness of 100 mg/L) is unreasonably low and did not support updating the benchmark.

Based on the revised criteria, the 2021 MSGP includes a new freshwater benchmark for cadmium that continues to be hardness-dependent (at a hardness of 100 mg/L the benchmark is 1.8 μg/L) and a new saltwater benchmark of 33 μg/L.

## Magnesium

The 2015 MSGP required operators in subsector K1 to monitor for magnesium and included a benchmark threshold of 0.064 mg/L. The benchmark for magnesium was based on the minimum level, derived from the highest method detection limit, times a factor of 3.18.

In the proposed 2020 MSGP, EPA requested comments or information related to the acute effects of magnesium on aquatic organisms that would warrant retaining the magnesium benchmark. All but one comment supported EPA's discontinuation of the benchmark for magnesium. The opposing comment did not provide any information on the acute effects of magnesium on aquatic organisms.

The 2021 MSGP discontinues the benchmark for magnesium. The NRC study recommended that EPA remove the magnesium benchmark from the 2021 MSGP since it is a "natural component of surface and groundwater and does not appear to be toxic to a majority of aquatic organisms at concentrations likely to be encountered in most waters" (NRC, 41). Significant evidence does not exist to indicate adverse impacts of aquatic organisms. Magnesium concentrations present in stormwater are not anticipated to be toxic to most aquatic organisms.[1] EPA agrees with the NRC's analysis and does not have a historical record to support continuing to require this benchmark parameter. If EPA develops an aquatic life criterion for magnesium in the future, the Agency may consider including it in future proposed permits.

## Iron

In the 2015 MSGP, EPA required operators in subsectors C1, C2, E2, F2, G2, H1, L2, M1, N1, O1, Q1, and AA1 to monitor for iron. The 2015 MSGP benchmark of 1,000 μg/L was based on the freshwater chronic aquatic life criterion developed in 1986 and was established in the absence of an applicable acute criterion.

In the proposed 2020 MSGP, EPA requested comments or information related to the acute effects of iron on aquatic organisms that would warrant retaining the iron benchmark. Most comments supported EPA's discontinuation of the benchmark for iron.

A few comments opposed discontinuation of the benchmark for iron. One comment supported derivation of new water quality criteria for iron but suggested that EPA should continue to require iron monitoring using the current iron benchmark until a new criterion could be developed. Another comment indicated that their state does not have acute aquatic life criteria for iron and did not support removal of the iron benchmark until EPA develops an acute aquatic life criterion.

The 2021 MSGP discontinues the benchmark for iron. EPA has not developed national recommended acute aquatic life criteria for iron since the MSGP was originally issued. The NRC study found few

---

[1] van Dam, R. A., A. C. Hogan, C. D. McCullough, M. A. Houston, C. L. Humphrey, and A. J. Harford. 2010. Aquatic toxicity of magnesium sulfate, and the influence of calcium, in very low ionic concentration water. Environmental Toxicology and Chemistry 29(2):410 – 421.

studies on the acute effects of iron on aquatic organisms and the studies that were referenced suggest lethal effects occur well above the 2015 MSGP benchmark over longer time periods. Another study cited by the NRC also suggested that iron has relatively low toxicity and bioaccumulation of iron does not pose a substantial hazard to higher trophic levels; therefore, it is unlikely that a criterion based on intermittent exposure would be necessary. The NRC recommended that EPA no longer require an iron benchmark. EPA agrees with the NRC's analysis. If EPA revises the aquatic life criterion for iron in the future, the Agency may consider including it in future proposed permits.

## Copper

Like the 2015 MSGP, the 2021 MSGP requires operators in subsectors A2, F2, F3, F4, G2, and N1 to conduct benchmark monitoring for copper and includes both freshwater and saltwater benchmark threshold.

The 2015 MSGP copper benchmark threshold for freshwater was hardness-dependent based on the 1984 national recommended acute freshwater aquatic life criteria, ranging from 3.8 µg/L to 33.2 µg/L. In 2007, EPA revised the copper criteria using new data on copper toxicity and its effects on aquatic life. The new criteria are based on the Biotic Ligand Model (BLM), a metal bioavailability model that uses receiving water body characteristics to develop site-specific water quality criteria. The BLM requires 10 input parameters to calculate the freshwater copper criterion: temperature, pH, dissolved organic carbon (DOC), calcium, magnesium, sodium, potassium, sulfate, chloride, and alkalinity. Although the revised criteria were updated in 2007, EPA decided to not update the copper benchmark in the 2015 MSGP due to the extra sampling burden that would be placed on operators to acquire the site-specific water quality data needed by the BLM.

In the proposed 2020 MSGP, EPA requested comments on whether the copper benchmark should be updated and facilities that repeatedly exceed the copper benchmark should be able to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis. The proposal specified that site-specific analysis would discontinue comparison to national benchmarks and use the latest recommended criteria equations for calculating toxicity criteria based on short-term exposure using additional water chemistry and/or flow data.

Many comments expressed support for the proposal to use the latest recommended criteria equations for calculating toxicity criteria based on site-specific data for facilities that repeatedly exceed the copper benchmark. Several comments noted that compliance with the current freshwater benchmark is challenging and indicated that the flexibility to derive site-specific benchmark thresholds would reduce non-compliance and legal liability. Some comments recommended that comparison to site-specific benchmark thresholds should not be limited to operators with numerous benchmark exceedances, suggesting that the site-specific equation should be used during the first instance of benchmark exceedance as a follow-up tool and/or confirmation using site-specific information. A few comments recommended that EPA implement an approach similar to Oregon, which allows for streamlined water quality characterization for development of watershed-based copper benchmarks. Other comments requested that EPA provide guidance and examples for performing these site-specific calculations.

Some comments recommended that EPA retain the 2015 MSGP freshwater benchmark for copper and not allow comparison to site-specific benchmarks based on the latest recommended criteria equations for calculating toxicity criteria. One comment indicated that the proposed approach would introduce considerable complexity into the compliance framework and posed several questions regarding implementation, including what it means to "repeatedly exceed" the benchmark, requirements for EPA approval and public comment, and procedures when an operator implemented the site-specific benchmark incorrectly. As with selenium, one comment expressed concern that few operators would perform site-specific assessments given the associated time, cost, and complexity, and indicated that such assessments are akin to the analysis completed in developing an individual permit. Another comment suggested the

only reasonable relief from the copper benchmark was the proposed subtraction method under the natural background exception.

For the 2021 MSGP, EPA has incorporated the revised copper criteria in two ways, 1) using a single nationally-representative value informed by the BLM as the benchmark threshold, and 2) providing operators who may exceed this benchmark the opportunity to conduct an individual analysis using the BLM and demonstrate to EPA that their discharges would not otherwise exceed their site-specific value.

The new benchmark threshold of 5.19 µg/L for copper aligns with the updated acute aquatic life criteria and accounts for the required water quality parameter inputs to reflect the latest methods and toxicity data available. To generate this threshold, EPA calculated nationally-representative acute water quality criteria values for copper using water quality data reported in the USGS National Water Information System (NWIS) database and collected from surface waters across the conterminous US between 1984 and 2018, analyzed using the Copper Biotic Ligand Model (BLM) V2.2.1 for criteria derivation. Based on this analysis, EPA derived values used for the benchmark monitoring thresholds for copper that represent a level of protection that is protective 90% of the time for 95% of the genera.

Using the BLM-based water quality criteria improves the accuracy of the level of protection from the hardness-based benchmark threshold in the 2015 MSGP, which ranged from 3.8 µg/L to 33.2 µg/L. The revised benchmark threshold will in some cases be higher and in other cases be lower than the hardness-based benchmark threshold in the 2015 MSGP. Although there is not a single water quality criteria value to use for comparison purposes, the BLM-based water quality criteria for copper provides an improved framework for evaluating a level of protection that is consistent with the level of protection that was intended by the 1985 Guidelines (i.e., a 1-in-3 year exceedance frequency that will be protective of 95% of the genera) (see Aquatic Life Ambient Freshwater Quality Criteria - Copper 2007 Revision (EPA-822-R-07-001)). As EPA moves toward developing more bioavailability-based water quality criteria, the NPDES program will continue to seek the input of EPA's criteria experts in considering future revised criteria as benchmarks in the MSGP.

The NRC study recommended that EPA allow facilities that repeatedly exceed certain benchmark thresholds to be able to use the latest aquatic life criteria to evaluate water quality risk on a site-specific basis and discontinue comparisons to national benchmarks. Although the current 2007 recommended criteria for copper in freshwater provide the flexibility to develop site-specific criteria based on local water chemistry, the extra data collection associated with implementing these new aquatic life criteria makes them challenging to finalize as benchmark thresholds in the MSGP at the individual facility level, given there are an estimated 94 facilities that monitor for copper. Collection and reporting of several in-stream water chemistry parameters would be required of each operator ahead of or concurrent with NOI submission so that EPA could derive a facility-specific benchmark threshold in time for the reporting deadline for the first quarter of benchmark monitoring. At this time, EPA finds this approach to be unduly burdensome to both the operator and to EPA as the permitting authority for this general permit. One of the main benefits of a general permit is that it streamlines permit coverage for a large number of operators with similar discharges that are subject to the same or similar monitoring requirements. A general permit can allow the permitting authority to allocate resources efficiently and provide timelier permit coverage rather than issuing an individual permit and individually-tailored monitoring requirements to each facility.

However, the current water quality criteria represent the latest scientific understanding of toxicity and bioavailability for copper for protecting aquatic ecosystems from adverse impacts from short-term or intermittent exposure, such as that from stormwater. EPA recognizes the benefit of facility-specific criteria in identifying when stormwater discharges of these constituents at certain facilities may pose less of a concern than the nationally-representative benchmarks would otherwise indicate. Therefore, for the 2021 MSGP, EPA is allowing an exception from AIM and continued benchmark monitoring requirements in Part 5 for facilities that exceed the MSGP benchmark thresholds for copper (for discharges to freshwater).

EPA clarifies in the 2021 MSGP that to be considered for the exception, the operator must demonstrate to EPA that their discharge(s) that exceeded the applicable nationally-representative benchmark threshold would not result in an exceedance of a derived facility-specific value. The demonstration to EPA, which will be made publicly available, must meet minimum elements in order to be considered for and approved by the EPA Regional Office. Operators that exceed the MSGP benchmark for copper must still comply with any AIM requirements and additional benchmark monitoring until the demonstration is made to and approved by the EPA Regional Office. In this case, EPA suggests that samples collected for any continued benchmark monitoring also be analyzed for the required input parameters for each model for efficiency. For existing operators that anticipate an exceedance of the MSGP benchmark(s) based on previous monitoring data and expect to utilize this exception, EPA recommends those operators begin the required data collection in their first year of permit coverage.

Consistent with the 2015 MSGP, the 2021 MSGP includes a copper benchmark threshold of 4.8 µg/L (0.0048 mg/L) based on the national recommended acute aquatic life criterion for discharges to saltwater. Some comments stated that compliance with the saltwater benchmark is difficult, despite implementation of stormwater control measures to reduce copper. The comments recommended that EPA consider updating the saltwater benchmarks in addition to the freshwater benchmarks. Some comments suggested that EPA update the benchmark based to 1,300 µg/L (1.3 mg/L) based on EPA's national recommended criteria for protection of human health for consumption of water and organisms.

EPA is retaining the copper benchmark threshold of 4.8 µg/L (0.0048 mg/L) for discharges to saltwater. This benchmark is consistent with the applicable acute criterion for protection of aquatic life. A benchmark threshold based on the human health criterion would not be adequately protective of the aquatic life uses in receiving waters.

## Aluminum

Consistent with the 2015 MSGP, the 2021 MSGP requires operators in subsectors C2, E1, F1, F2, H1, M1, N1, Q1, and AA1 to conduct benchmark monitoring for aluminum. The 2015 MSGP benchmark threshold for aluminum was 750 µg/L (0.75 mg/L) based on the 1988 national recommended acute freshwater aquatic life criteria. In 2018, EPA updated the aluminum criteria to reflect the latest scientific understanding of how water chemistry parameters can alter the bioavailability of aluminum and affect toxicity to aquatic species. The updated criteria use a multiple linear regression method to derive values resulting from the interaction of total hardness, pH, and DOC. Therefore, rather than setting a single fixed value, the new criteria values vary depending on the water chemistry conditions in the waterbody.

In the proposed 2020 MSGP, EPA proposed to retain the aluminum benchmark from the 2015 MSGP. EPA received several comments suggesting that the aluminum benchmark be updated to reflect the 2018 criteria and, similar to copper, allow facilities that repeatedly exceed the aluminum benchmark to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis.

As a standard practice, EPA considers whether to update the MSGP's benchmark thresholds to reflect the latest water quality criteria with each reissuance. The NRC study also recommended that the 2021 MSGP benchmark threshold for aluminum should reflect the updated criteria. However, given the site-specific nature of the new criteria, EPA explored the best way to update the MSGP's benchmark using the revised aluminum criteria, as discussed in detail farther below. The 2021 MSGP incorporates the revised criteria in two ways, 1) using a single nationally-representative value informed by the criteria model as the MSGP benchmark threshold, and 2) providing operators who may exceed this benchmark the opportunity to conduct an individual analysis using the criteria model and demonstrate to EPA that their discharges would not otherwise exceed their site-specific value.

The new benchmark threshold of 1,100 µg/L for aluminum aligns with the updated acute aquatic life criteria and accounts for the required water quality parameter inputs to reflect the latest methods and toxicity data available. To generate this threshold, EPA calculated nationally-representative acute water

quality criteria values for aluminum using water quality data reported in the USGS NWIS database and collected from surface waters across the conterminous US between 1984 and 2018, analyzed using the Aluminum Criteria Calculator R Code V2.0 for criteria derivation. Based on this analysis, EPA derived values used for the benchmark monitoring threshold for aluminum that represent a level of protection that is protective 90% of the time for 95% of the genera.

The updated freshwater acute criterion, on which the new benchmark threshold is based, considers the variable effects of water chemistry on aluminum toxicity and additional species data. The data in the 1988 water quality criteria were not normalized to any water chemistry conditions making it difficult to compare the magnitude of the two criteria. The revised criterion represents the concentration of aluminum at which approximately 95% of genera in a freshwater aquatic ecosystem should be protected if the 1-hour average (duration) concentration of total aluminum is not exceeded more than once in 3 years (frequency) (see Final Aquatic Life Ambient Water Quality Criteria for Aluminum – 2018 (EPA-822-R-18-001)).

The NRC study recommended that EPA allow facilities that repeatedly exceed certain benchmark thresholds to be able to use the latest aquatic life criteria to evaluate water quality risk on a site-specific basis and discontinue comparisons to national benchmarks. Although the current 2018 recommended criteria for aluminum in freshwater provide the flexibility to develop site-specific criteria based on local water chemistry, the extra data collection associated with implementing these new aquatic life criteria makes them challenging to finalize as benchmark thresholds in the MSGP at the individual facility level, given there are an estimated 355 facilities that monitor for aluminum. Collection and reporting of several in-stream water chemistry parameters would be required of each operator ahead of or concurrent with NOI submission so that EPA could derive a facility-specific benchmark threshold in time for the reporting deadline for the first quarter of benchmark monitoring. At this time, EPA finds this approach to be unduly burdensome to both the operator and to EPA as the permitting authority for this general permit. One of the main benefits of a general permit is that it streamlines permit coverage for a large number of operators with similar discharges that are subject to the same or similar monitoring requirements. A general permit can allow the permitting authority to allocate resources efficiently and provide timelier permit coverage rather than issuing an individual permit and individually-tailored monitoring requirements to each facility.

However, the current water quality criteria represent the latest scientific understanding of toxicity and bioavailability for aluminum for protecting aquatic ecosystems from adverse impacts from short-term or intermittent exposure, such as that from stormwater. EPA recognizes the benefit of a facility-specific criteria in identifying when stormwater discharges of these constituents at certain facilities may pose less of a concern than the nationally-representative benchmarks would otherwise indicate.

To be considered for an exception, the operator must demonstrate to EPA that their discharge(s) that exceeded the applicable nationally-representative benchmark threshold would not result in an exceedance of a derived facility-specific value. The demonstration to EPA, which will be made publicly available, must meet minimum elements in order to be considered for and approved by the EPA Regional Office. Operators that exceed the MSGP benchmark for aluminum must still comply with any AIM requirements and additional benchmark monitoring until the demonstration is made to and approved by the EPA Regional Office. In this case, EPA suggests that samples collected for any continued benchmark monitoring also be analyzed for the required input parameters for each model for efficiency. For existing operators that anticipate an exceedance of the MSGP benchmark(s) based on previous monitoring data and expect to utilize this exception, EPA recommends those operators begin the required data collection in their first year of permit coverage.

## PAHs
Several PAHs have been shown to be extremely toxic to and bioaccumulate in fish and aquatic invertebrates and are known or probable human carcinogens. Although EPA does not have national

recommended aquatic life criteria for individual or total PAHs, some states have developed criteria for certain individual PAHs (for example, Illinois, Kansas, Colorado, and Arizona). In addition, the 2015 MSGP does not include benchmark monitoring requirements for PAHs. The NRC study recommended that EPA collect data or require monitoring related to PAHs in the MSGP to determine an adequate surrogate or if additional PAH monitoring is warranted.

In the proposed 2020 MSGP, EPA requested comment on information and data related to pollutant sources under all industrial sectors with petroleum hydrocarbon exposure that can release PAHs via stormwater discharges, any concentrations of individual PAHs and/or total PAHs at industrial sites, the correlation of PAHs and COD, and appropriate pollution prevention/source control methods and stormwater control measures that could be used to address PAHs. EPA stated that it may consider additional monitoring for PAHs in the final permit if it received sufficient information to develop an appropriate benchmark threshold.

Many comments on the proposed 2020 MSGP did not support establishment of benchmark monitoring requirements for PAHs. One comment suggested that PAH monitoring only apply to certain high-risk sectors or SIC codes. Another comment suggested that impaired water monitoring requirements for PAHs are more appropriate for addressing discharges to PAH-limited waters. One comment suggested that EPA should be responsible for collecting data and developing aquatic life criteria.

One comment suggested that PAH monitoring should be required for Sectors C (Chemicals and Allied Products), F (Primary Metals), I (Oil and Gas Extraction), P (Land Transportation and Warehousing), Q (Water Transportation), and R (Ship and Boat Building and Repairing Yards). As discussed further in the 2021 MSGP Fact Sheet, EPA agrees that these industrial activities have the potential to contribute to PAH contamination in stormwater and indicator monitoring is warranted for these sectors.

One comment suggested that PAH monitoring would not be appropriate for Sector A1 (General Sawmills and Planing Mills) and A2 (Wood Preserving), while another stated that discharges of PAHs in stormwater from lumber mills is unlikely. Conversely, one comment stated that Sector A facilities typically have multiple sources which could discharge PAHs in stormwater (e.g., oil storage, leaky vehicles and equipment, creosote from treated wood products, coal tar sealed roadways, etc.). The 2021 MSGP requires indicator monitoring for PAHs for Sector A facilities but is limited to those facilities that manufacture, use, or store creosote or creosote-treated wood in areas that are exposed to precipitation. As discussed in the 2021 MSGP Fact Sheet, coal-tar creosote, a commonly used wood preservative derived from coal tar, is known to contain high levels of PAHs, and studies have shown that facilities that use or previously used creosote to treat wood and the storage of creosote-treated wood have the potential to contribute to PAH contamination of soils and stormwater runoff.

Two comments suggested that PAH monitoring should not be required for iron and steel mills, with one recommending that monitoring be limited to by-product coke plants if monitoring is required. The 2021 MSGP requires indicator monitoring for PAHs for Sector F (Primary Metals) facilities, which includes iron and steel facilities. The industrial stormwater fact sheet for Sector F identifies several industrial activities with potential for petroleum hydrocarbon exposure. Coke production at iron and steel facilities has also been identified as sources of PAH pollution, and EPA's industry analysis indicated that Subsector F1 (Steel Works, Blast Furnaces, and Rolling and Finishing Mills) had the third highest PAH pollutant loading of the MSGP subsectors evaluated. Based on the potential for spills and leaks of petroleum products used at primary metals facilities, and sources identifying iron and steel facilities as sources of PAHs in surface waters, EPA has determined that indicator monitoring for PAHs is warranted for iron and steel facilities in Sector F.

In the 2021 MSGP, EPA is establishing a new provision that requires certain operators to conduct indicator analytical monitoring for PAHs bi-annually (twice/year) during their first and fourth years of permit coverage. PAH monitoring data is necessary to provide operators and EPA with a baseline and

comparable understanding of industrial stormwater discharge quality with respect to discharges of PAHs at these facilities. EPA plans to use the indicator monitoring data collected to conduct an initial quantitative assessment of the levels of PAHs in industrial stormwater, further identify industrial activities with the potential to discharge PAHs in stormwater, and inform future consideration of PAH benchmark monitoring for sectors with the potential to discharge PAHs in stormwater.

To determine the sectors subject to the PAH indicator monitoring requirement, EPA considered information provided in the public comments, including industrial stormwater data for 119 facilities, and reviewed EPA's industrial stormwater fact sheet series, performed a literature review of industrial activities that have the potential to contribute PAHs in stormwater, and conducted an industry analysis of industrial process wastewater discharges. Based on this information, EPA has determined that the PAH indicator monitoring requirement applies to the following operators given the types of activities they may conduct: operators in all sectors with stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located during coverage under this permit; operators in sectors A (facilities that manufacture, use, or store creosote or creosote-treated wood in areas that are exposed to precipitation), C (SIC Code 2911), D, F, H, I, M, O, P (SIC Codes 4011, 4013, and 5171), Q (SIC Code 4491), R, and S. Indicator monitoring is "report-only" and does not have a threshold or baseline value for comparison nor does it require follow-up actions under this part. The requirement in Part 2.2.1 to meet applicable water quality standards still applies.

As discussed in Comment Response Essay 4 Proposals Not Finalized, EPA requested comment on whether the MSGP should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. As discussed further in the 2021 MSGP fact sheet, surfaces treated with coal-tar sealcoat could release PAHs into the environment when exposed to precipitation resulting in stormwater discharges. Following consideration of the comments, EPA is not finalizing the proposed eligibility criterion, but is instead requiring PAH indicator monitoring for operators in all sectors with stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located during coverage under this permit.

EPA also requested comment in the proposed 2020 MSGP on the correlation of PAHs and COD. One comment suggested that COD would be a cost-effective surrogate for PAH monitoring. However, another comment suggested that COD would not be an appropriate surrogate for PAHs, pointing to the NRC study, which noted that PAHs can be toxic at concentrations orders of magnitude lower than the COD benchmark. A few comments suggested further study of the correlation of PAHs and COD.

Three comments suggested that oil and grease may be a better surrogate than COD, with two comments recommending continued visual inspections of stormwater samples for the presence of sheen in lieu of monitoring. Another comment indicated that existing controls to address oil and grease would be address PAHs as well.

In the 2021 MSGP, EPA is requiring monitoring for the 16 individual PAHs identified at 40 CFR Part 423, Appendix A: naphthalene, acenaphthylene, acenaphthene, fluorene, phenanthrene, anthracene, fluoranthene, pyrene, benzo[a]anthracene, chrysene, benzo[b]fluoranthene, benzo[k]fluoranthene, benzo[a]pyrene, benzo[g,h,i]perylene, indeno[1,2,3-c,d]pyrene, and dibenz[a,h]anthracene. Although COD, oil and grease, and total petroleum hydrocarbon analysis may be more cost effective than analysis for PAHs, EPA has determined that these parameters are not appropriate surrogates for PAHs given the lack of data correlating PAH concentrations in stormwater with concentrations of COD, oil and grease, or total petroleum hydrocarbons. Additionally, the toxicity of the individual PAHs varies; therefore, monitoring data for the individual PAHs will allow EPA and operators to better understand the specific PAHs that may be present in contaminated stormwater at levels that have the potential to impact the designated uses of receiving waters.

## Impaired Waters Monitoring

The 2015 MSGP required operators discharging to impaired waters without an EPA-approved or established total maximum daily load (TMDL) to monitor all pollutants for which the waterbody is impaired once per year. If the pollutant of concern was not detected and not expected to be present in the discharge, the 2015 MSGP allowed operators to discontinue monitoring for that pollutant.

In the proposed 2020 MSGP, EPA proposed allowing operators to narrow the list of required impaired waters monitoring pollutants to those associated with the industrial activity. EPA proposed that operators could discontinue impaired waters monitoring following three consecutive years of monitoring if the pollutant of concern is not detected and is not expected to be present in the discharge. EPA intended for this proposal to balance the potential narrowing of the pollutant list with an extended timeframe for monitoring, with two additional samples collected over 2 additional years.

Some comments requested that the MSGP allow sampling to be discontinued after 2 years instead of 3 years, as proposed. One comment did not agree with the proposal to measure non-detects for three consecutive years given their facility's historic monitoring results and the added costs for analytical monitoring to collect two additional samples.

Many comments supported EPA's proposal to discontinue monitoring for pollutants that are not detected or not expected in the discharge. However, one comment suggested that operators should be required to monitor at least one time for all pollutants for which the waterbody is impaired to ensure their stormwater discharge is not contributing to the impairment. Another comment was opposed to EPA's proposal to narrow the list of pollutants to those associated with the industrial activity and recommended that EPA increase the monitoring frequency to quarterly, consistent with the benchmark monitoring frequency.

In the 2021 MSGP, operators discharging to impaired waters without an EPA-approved or established TMDL must complete annual monitoring for discharges of certain pollutants to impaired waters. Monitoring is required for 1 year for all pollutants for which the waterbody is impaired, just as in the 2015 MSGP, after which the operator can discontinue monitoring for the next 2 years for any pollutant that is not detected. Annual monitoring must continue for any pollutant that is detected in the discharge. Required annual monitoring then resumes in the fourth year of permit coverage for 1 year for those pollutants that are both causing impairments and are associated with the industrial activity and/or are a required benchmark parameter for the operator's subsector(s), including any pollutant(s) for which the operator previously discontinued monitoring. After monitoring in the fourth year of permit coverage is completed, the operator can discontinue monitoring for the duration of their permit coverage for any pollutant that is not detected.

The extended impaired waters monitoring schedule under the 2021 MSGP will ensure that operators affirmatively determine in their first year of permit coverage that a parameter causing an impairment is not present at the facility before narrowing the list of monitored parameters in the fourth year. The updated schedule ensures operators periodically check on their potential contributions to impairments in their industrial stormwater discharges throughout their permit coverage.

One comment suggested that EPA discontinue using non-detect as the standard for cessation of monitoring and instead establish benchmarks based on TMDL wasteload allocations or what a TMDL waste load allocation would be given the water quality criteria for the specific pollutant. EPA does not agree with this suggestion. EPA notes that these requirements apply only to impaired waterbodies for which a TMDL wasteload allocation has not yet been developed; therefore, it is not possible to establish benchmarks based on a yet-to-be-developed wasteload allocation. Where a waterbody is impaired for a particular pollutant, any additional loading of that pollutant has the potential to contribute to exceedance of the applicable water quality criterion in the waterbody. For these waters, the impaired water monitoring requirements can be used to inform future development of a TMDL.

Two comments requested that mercury be excluded from the impaired water monitoring requirement since atmospheric deposition can be a pollutant source and the difficulties of sampling for mercury. EPA does not agree that mercury should be excluded from the impaired water monitoring requirement. As discussed in Comment Response Essay 3 Additional Implementation Measures, operators are responsible for the quality of their discharges, regardless of what may be added as a result of legacy or anthropomorphic sources of pollutants. Where a waterbody is impaired for mercury, any additional loading of mercury, a persistent and bioaccumulative pollutant, has the potential to contribute to an exceedance of the applicable water quality criterion in the waterbody.

One comment requested that EPA clarify EPA requirements for impaired waters monitoring when temperature is a pollutant of concern and the facility is a source and when a water is listed as impaired because of toxics (e.g., PCBs) in fish tissue. For temperature, EPA has added clarifying language in Part 4.2.5 of the 2021 MSGP that operators may discontinue monitoring if monitoring results indicate the monitored pollutant is within the acceptable range for a given parameter for the waterbody to meet its designated use (e.g., pH or temperature). Operators should refer to the state water quality standards or contact the EPA Regional Office for assistance. EPA also clarifies that where a water is listed as impaired because of toxics in fish tissue, impaired water monitoring is required for that pollutant.

A couple of comments requested the EPA clarify the natural background exception for impaired waters monitoring. One comment inquired whether 3 years of data is required to satisfy the exception. EPA clarifies that operators may qualify for the exception after the first year of monitoring and need not continue monitoring in the second and third years if they document their supporting information, as required in Part 4.2.5.1.a. One comment recommended that EPA require EPA Regional concurrence before an operator could discontinue monitoring where the operator determined that the presence of a pollutant was caused solely by natural background sources. The comment also requested that EPA require notification to the state, tribes, and public for review and comment prior to EPA Regional concurrence decisions. Consistent with the 2015 MSGP, the 2021 MSGP does not require concurrence by the EPA Regional Office or state or tribal notification and public review.

For stormwater discharges to waters for which there is an EPA-approved or established TMDL, operators are not required to monitor for the pollutant(s) for which the TMDL was written unless EPA informs them, upon examination of the applicable TMDL and its wasteload allocation, that the operator is subject to such a requirement consistent with the assumptions and findings of the applicable TMDL and its wasteload allocation. One comment recommended that all operators within a TMDL watershed perform impaired waters monitoring. If a discharge is not subject to a TMDL, EPA disagrees that the discharge should have to conduct additional monitoring on that basis. For this reason, EPA maintains that it is appropriate for EPA to determine if additional monitoring is necessary based on a TMDL and its WLA on a case-by-case basis.

## Facilities in Climates with Irregular Stormwater Discharges

Several comments identified potential challenges with performing monitoring in areas that do not receive rainfall year-round. Some comments requested exceptions to the universal benchmark monitoring requirement for facilities in arid areas with infrequent rainfall or discharge events, with one specifically requesting monitoring frequency be tied to storm events. Others requested that EPA clarify quarterly monitoring and reporting expectations for facilities that do not receive rainfall in every quarter. Several other comments cited similar challenges based on drought conditions, snowfall, or where monitoring would be required for events that occur during non-working hours.

Some comments indicated that operators in arid and semi-arid areas have difficulty meeting certain benchmark thresholds due to background concentrations. One comment stated that for certain regions such as the arid west, the benchmark thresholds are well below those in ambient waters and suggested that the benchmark thresholds do not account for variability in storm events and resulting runoff conditions.

Another comment stated that, in the arid southwest where storm events are infrequent, pollutant concentrations are often more a function of the length of time between rain events than of the volume of discharge, and suggested that implementation of control measures to mitigate spills would be more useful than the expensive and ineffective attempts to time stormwater discharges and collect samples from remote locations.

The 2021 MSGP provides considerable flexibility to account for the unique conditions in climates with irregular stormwater discharges. EPA notes that the 2021 MSGP provides for the implementation of alternative monitoring schedules for facilities located in arid and semi-arid climates, or in areas subject to snow or prolonged freezing. Alternate monitoring schedules allow operators the flexibility to allocate their resources effectively to capture the required number of stormwater discharge events during the permit term. EPA expects that this flexibility yields more accurate characterization of pollutant concentrations in facility stormwater discharges during times of the year when precipitation is actually occurring, and during snowmelt discharges in areas subject to extended winter seasons and prolonged freezing. This special exception should reduce the number of times operators report that there was no discharge due to lack of precipitation during a particular quarter, which in turn will provide EPA with more data that can be used to evaluate a facility discharge's pollutant levels. In concert with this flexibility is operators' responsibility to identify those periods during which discharges are most likely to occur and establish a schedule distributing the required monitoring events during those periods.

As discussed in Comment Response Essay 3 Additional Implementation Measures, the 2021 MSGP includes a natural background exception to performing additional benchmark monitoring in response to a benchmark exceedance if the operator demonstrates that the exceedance is attributable solely to the presence of that pollutant in the natural background.

Additionally, in Part 4.1.4 of the 2021 MSGP, EPA has also added an explicit clarification that composite sampling is allowed for indicator monitoring and benchmark monitoring in lieu of grab samples. The composite sampling may be performed manually or with the use of automated sampling. Use of automated samplers may address concerns raised in the comments for collecting samples at remote locations in arid and semi-arid areas. Using automated samplers can eliminate the need for a person to physically collect samples, which can be helpful if a storm happens outside of normal business hours. These samplers can lower labor costs and mitigate any safety concerns but require maintenance which would not otherwise be required if done manually.

# Comment Response Essay 3 Additional Implementation Measures

As agreed upon in the 2016 Settlement Agreement, EPA proposed new "Additional Implementation Measures" (AIM) requirements for operators for responding to benchmark exceedances in the proposed 2020 MSGP. The proposed AIM requirements replaced corresponding sections regarding benchmark exceedances in the 2015 MSGP. Under the proposal, operators would be required to respond to three different AIM "tiers" or levels with increasingly robust control measures depending on the nature and magnitude of the benchmark threshold exceedance. EPA proposed to retain exceptions to AIM triggers based on natural background sources or run-on for all AIM levels. EPA also proposed an exception in AIM Tier 2 for a one-time aberrant event, and an exception in AIM Tier 3 for operators who are able to demonstrate that the benchmark exceedance does not result in any exceedance of applicable water quality standards.

EPA received numerous comments on the proposed AIM requirements. As discussed further below, EPA has revised the AIM requirements in the 2021 MSGP to address concerns raised in the public comments. The following are responses to comments on the new AIM requirements, organized by topic.

## General Critiques of AIM

EPA received many comments that generally opposed some or all aspects of the AIM requirements in the proposed 2020 MSGP. The following is a summary:

- The AIM requirements are counter to legal and regulatory precedent.
- The AIM requirements are a significant escalation of the 2015 MSGP requirements and essentially turn benchmarks into "de facto" or "pseudo" numeric effluent limitations.
- The AIM requirements will result in criminal and civil penalties based on benchmark thresholds that are arbitrary and not based on science.
- The AIM requirements are not consistent with the monitoring framework recommended by the NRC study.
- EPA has not provided justification for imposing the AIM requirements.

EPA disagrees with the comment that the AIM requirements are counter to legal and regulatory precedent. The AIM requirements in the 2021 MSGP are an extension and enhancement of the benchmark monitoring and corrective action requirements in previous versions of the MSGP. Industrial stormwater discharges are explicitly required to meet all provisions of Clean Water Act section 301, including applicable water quality standards (Clean Water Act §402(p)(3)(A)). In the 2016 Settlement Agreement, EPA agreed to propose the AIM requirements because concerns were raised that the prior MSGP's corrective actions were not sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality , as is required by the Clean Water Act. The AIM requirements are an enhancement of the previous benchmark exceedance corrective action requirements in the 2015 MSGP. In the 2015 MSGP, in response to benchmark exceedances, operators were required to review their control measures, make modifications if necessary, and continue quarterly monitoring until the four-quarter average did not exceed the benchmark. Operators were also allowed to determine and document that no further pollutant reductions are technologically available or economically practicable. In the event that an operator continued to have benchmark exceedances, the 2015 MSGP required operators to repeat the process of reviewing controls, modifying controls, and continuing quarterly monitoring, or documenting why they cannot implement controls. The primary difference between the 2015 MSGP benchmark exceedance requirements and the new AIM requirements in the 2021 MSGP is that AIM provides a three-level structure of advancement and responses triggered by benchmark exceedances and keep follow-up actions clear, timely, and proportional to exceedance frequency and duration.

EPA disagrees with comments that the AIM requirements essentially turn benchmarks into "de facto" or "pseudo" numeric effluent limitations. EPA has always and continues to hold that benchmark thresholds

by themselves are not numeric water quality-based effluent limits (or any effluent limit); a benchmark exceedance is not definitive proof that a water quality standard has been exceeded. Exceedance of a benchmark threshold is not in and of itself a violation, but rather is a signal for the operator to investigate and take the appropriate AIM response. EPA expects the operator to make a good faith effort to correct benchmark exceedances using pollution prevention or good housekeeping techniques and structural controls, if needed. EPA gives operators the flexibility to claim exceptions to the AIM requirements, as well as a longer implementation timeframes if needed. Where AIM requirements are triggered by an event that itself does not constitute a permit violation, such as an exceedance of an applicable benchmark, there is no permit violation so long as the operator complies with the required responses within the relevant deadlines. However, not taking steps to comply AIM requirements may be considered by EPA to be permit noncompliance. Regular and/or frequent exceedances of the benchmark thresholds support the need for investigation and response by the operator, as appropriate, in addition to continued monitoring of these parameters to evaluate whether the issue has been abated. Ongoing exceedances may be indicative of minimal investment in investigating and bolstering stormwater control measures, operators not looking in the right places for potential sources, and/or a poorly implemented stormwater monitoring program, to name a few. Ongoing exceedances may also, on the other hand, be indicative of a condition for which there is an available exception from benchmark monitoring. Finally, unmitigated benchmark exceedances may result in stormwater discharges from industrial activity not being controlled as necessary to meet applicable water quality standards, which would be a permit violation.

EPA also disagrees that the AIM requirements will result in severe criminal and civil penalties. As specified in Part 1.6 of the 2021 MSGP, where AIM is triggered by an event that does not itself constitute permit noncompliance (i.e., an exceedance of an applicable benchmark), there is no permit violation provided the operator complies with the required responses within the relevant deadlines established in Part 5. EPA also disagrees that the benchmark thresholds have been established arbitrarily and are not based on science. See Part 4.2.2 of the 2021 MSGP Fact Sheet and Comment Response Essay 2 Monitoring for a discussion of the basis of the applicable benchmark thresholds.

EPA disagrees that the AIM requirements do not follow the NRC study recommendations. The AIM framework in the proposed 2020 MSGP closely followed the framework outlined in the 2016 settlement agreement and discussed in the NRC study. In the 2021 MSGP, EPA has made revisions to the AIM framework to streamline the requirements and reduce costs and complexity from the proposal by creating stepwise sequential advancement through the AIM levels with clear "resetting" to baseline status if benchmark thresholds and responses are met within the required deadlines.

EPA received many comments stating that the required AIM Level 2 and 3 responses will be very costly. Some comments state that management controls under the permit have been expensive to maintain and AIM would add an extra layer that would be infeasible and burdensome. EPA maintains that although AIM is a change to the MSGP, it does not result in excessive new burden to operators. As noted in the 2021 MSGP Fact Sheet, EPA does not anticipate that AIM responses undertaken in response to benchmark exceedances under the MSGP will necessitate complex or costly actions for most operators; rather, modifications to the stormwater controls in response to benchmark exceedances will in most cases be commonsense and pollution prevention oriented. EPA expects the great majority of operators performing AIM responses will determine there are modifications that can be made to the control measures that are technologically available, and economically practicable and achievable. The costs to implement AIM Level 2 responses will vary by facility. Compliance with AIM Level 2 does not require the operator to implement all feasible SCMs from an appropriate sector-specific fact sheet, as contemplated in the proposal (previously, all fact sheets were compiled and named Appendix Q in the proposed permit). In light of the volume of comments, EPA retained the existing 2015 sector-specific fact sheet guidance for the 2021 MSGP to provide recommended controls and, over the course of the 2021 MSGP permit term, will work with external stakeholders to thoroughly review and revise, as needed, the checklists for future use. EPA recognizes that the control measures needed to adequately minimize

pollutants will vary considerably for each operator. EPA regards treatment and structural controls, which are required under AIM Level 3, as a last resort due to the complexity and cost to the operator and are required only after continued benchmark exceedances and prevention/good housekeeping and other procedural changes in AIM Levels 1 and 2. EPA expects that few operators will advance to Level 3 after Levels 1 and 2. For more details on the estimated costs associated with the AIM requirements in the 2021 MSGP, see the Cost Impact Analysis for the 2021 MSGP.

Some comments stated that EPA has not provided adequate justification for the AIM requirements, and one comment recommended that EPA not finalize the AIM requirements to allow for further stakeholder involvement. EPA does not agree that the AIM requirements in the 2021 MSGP lack justification or that the AIM requirements should be delayed to allow for additional stakeholder involvement. The initial AIM framework that was proposed in the proposed 2020 MSGP was originally discussed and agreed upon by EPA and several parties representing environmental groups and industry representatives in the 2016 Settlement Agreement. The NRC study, which was a consensus report drafted by a committee and peer-reviewed by several individuals chosen for their diverse perspectives and technical expertise, supported implementation of the AIM framework. Further, EPA provided an opportunity for public comment on the AIM framework as part of the proposed 2020 MSGP and received public comments on the proposal from numerous stakeholders representing operators, industry representatives, environmental groups, and others. Upon consideration of the public comments, EPA has made revisions to the AIM framework in the 2021 MSGP. EPA finds that the AIM requirements are justified and necessary to provide more regulatory certainty, facilitate identification of issues and implementation of follow-up responses in a timely manner, and addresses previous stakeholder concerns that the prior MSGPs' corrective actions were not sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality. For the next proposed MSGP, EPA will evaluate the benchmark monitoring data submitted under the 2021 MSGP along with data on the AIM levels triggered by any benchmark exceedances to analyze the effectiveness of the AIM response requirements on reducing benchmark exceedances and protecting water quality.

**Applicability of AIM Requirements**

The AIM requirements in the proposed 2020 MSGP were proposed to be applied to exceedances of sector-specific benchmarks, as well as the proposed "universal benchmarks" for pH, COD, and TSS. The proposed universal benchmarks applied to all operators, including approximately 45 percent of subsectors that were not previously subject to benchmark monitoring requirements. EPA received many comments regarding the applicability of AIM requirements to certain operators. The following is a summary of these comments:

- AIM requirements should only apply to certain types of operators, such as those who operate at higher risk levels or have a history of poor performance in meeting the water quality standards.
- AIM requirements should only apply to operators with sector-specific benchmarks and should not apply to operators with only universal benchmarks.
- Operators in sectors who previously were not subject to benchmark monitoring requirements should be allowed to conduct report-only monitoring (without triggering AIM).
- EPA needs to develop a much more inclusive category of low-risk facilities.

Upon consideration of the public comments, EPA is not finalizing the proposed universal benchmark requirements and is instead requiring indicator monitoring for pH, TSS, and COD as "report-only" for operators in the 22 subsectors without sector-specific benchmarks. Indicator monitoring does not have a threshold or baseline value to compare to; therefore, under the 2021 MSGP, no follow-up action under the AIM requirements is triggered or required based on the indicator monitoring results. As a result of this change, the AIM requirements in the 2021 MSGP apply only to those operators subject to sector-specific benchmarks. The 2015 MSGP benchmark data are not necessarily comparable to how EPA expects the new AIM requirements to affect the incidence of benchmark exceedances in the 2021 MSGP. It is reasonable to assume that for compliance with AIM Level 1 responses, operators will not incur substantial

additional cost that was not already accounted for in the 2015 MSGP requirements given requirements are substantially similar to those for corrective action for benchmark exceedances in the 2015 MSGP. The permit provides facilities that trigger AIM a clear path to take necessary responses to return to baseline status.

EPA notes that it did consider the potential for an inspection-only option but declined to implement this option in the 2021 MSGP. For additional discussion of EPA's responses to comments pertaining to the inspection-only option and universal benchmark monitoring requirements, see Comment Response Essay 2 Monitoring.

## AIM Framework

EPA received many comments stating that the AIM framework was generally confusing. Some comments expressed confusion with the "Tier" naming convention since the terminology is similar to the three tiers of antidegradation protection. EPA agrees and has revised the naming convention from AIM "tiers" to AIM "levels" in the 2021 MSGP to alleviate this confusion. In addition, several comments found the placement of the AIM trigger examples in Parts 5.2.3, 5.2.4, and 5.2.5 of the proposed 2020 MSGP made it harder to understand the AIM requirements. As such, EPA has removed the AIM trigger examples from the 2021 MSGP and moved them into the fact sheet.

EPA received many comments stating that the AIM requirements are too complicated. The following is a summary of the comments received:

- The AIM requirements are overly complex, hard to understand, and burdensome.
- Many operators cannot comply with AIM without consultants because they do not have implementation experience or resources to implement additional control measures.
- Operators should not be allowed to skip AIM levels and should move through them sequentially.
- The proposed 2020 MSGP does not clearly distinguish whether the AIM responses are requirements or recommendations.
- EPA needs to make the AIM process easier to understand and should revise the triggers for AIM responses.

In response to the comments received, EPA has simplified the trigger conditions and established a stepwise sequential advancement through the AIM levels with clear "resetting" to baseline status if benchmark thresholds and responses are met within the required deadlines. EPA revisions to the AIM requirements in the 2021 MSGP streamlines the requirements and addresses the concerns raised in the comments while maintaining the effectiveness of the AIM framework.

In the 2021 MSGP, AIM is triggered by an exceedance of a benchmark monitoring parameter, which can occur from two "triggering events:" either an exceedance of the four-quarterly annual average for a parameter, or from fewer than four quarterly samples if a single sample or the sum of any sample results within the sampling year exceeds the benchmark threshold by more than four times for a parameter (this result indicates that an exceedance of the annual average is mathematically certain).

There are three AIM levels: AIM Level 1, Level 2, and Level 3. All operators subject to benchmark monitoring requirements begin in baseline status at the start of their permit coverage. An operator would progress linearly through the three AIM levels if an exceedance triggering event occurs and continues. If an exceedance triggering event occurs while in baseline status, an operator would enter AIM Level 1. If a triggering event occurs while in Level 1, an operator proceeds to AIM Level 2. If a triggering event occurs while in Level 2, an operator proceeds to AIM Level 3. The operator is required to respond with increasingly robust control measures and continued benchmark monitoring with each subsequent AIM level.

After an exceedance triggering event occurs, an operator must continue quarterly monitoring for the parameter(s) that caused the AIM triggering event at all affected discharge points, until four additional quarters of monitoring do not result in an exceedance triggering event. The deadlines for implementing AIM responses remains the same as in the proposed 2020 MSGP for AIM Levels 1 and 2 (within 14 days of receipt of lab results, unless infeasible, then within 45 days). The deadline for AIM Level 3 has been extended to allow time for scheduling and completing installation of stormwater controls (identify the schedule for installing controls within 14 days; install controls within 60 days, unless infeasible, then within 90 days). EPA may grant an extension beyond 90 days based on an appropriate demonstration by the operator which is outlined in detail in Part 5.2.

### AIM Level Triggers

The proposed 2020 MSGP included different triggering events for the three AIM levels. The proposed triggers for AIM Level 1 were based on an annual average over the benchmark threshold or a single sampling event over four times the benchmark threshold. The proposed triggers for AIM Level 2 were based on either continued or repeat benchmark exceedances after AIM Level 1 or by significant benchmark exceedances that are greater than Tier 1 (both annual average and single-sample). For AIM Level 3, the proposed triggers were based on either continued or repeat benchmark exceedances after Tier 2 or by significant benchmark exceedances that are greater than Tier 1 and Tier 2 (both annual average and single-sample).

EPA received many comments regarding the AIM trigger conditions. The following is a summary of the comments:

- EPA should only use annual averages for AIM triggers and should not use single-sample exceedance triggers.
- The "annual average" needs to be better defined or described for situations where there are less than four discharge events during a year.
- EPA should establish AIM Level 1 triggers based on an annual rolling average or a sample result two times over the benchmark.
- EPA should only use one type of trigger for AIM Levels 2 and 3 (either an annual average or a single event).
- The one-time "mathematically certain" trigger should not be used to enter AIM Levels 2 and 3.
- Given the natural variability associated with grab samples, operators could end up having to implement unnecessary costly controls.
- EPA should not limit the AIM Level 2 trigger to only consecutive annual exceedances (e.g., to account for an operator that experienced below-average rainfall during an intervening year).

Upon consideration of the public comments, EPA has simplified the AIM triggering events. The 2021 MSGP includes two AIM triggering events for all AIM levels and the triggering events do not change from level to level. The triggering events are based on quarterly samples that result in an exceedance of the annual average, including a one-sample exceedance, two-, or three-sample average exceedance that result in a mathematically certain exceedance of the annual average. The AIM two triggering events are: (a) The four-quarter annual average for a parameter exceeds the benchmark threshold, and (b) fewer than four quarterly samples have been collected, but a single sample or the sum of any sample results within the sampling year exceeds the benchmark threshold by more than four times for a parameter. This result indicates an exceedance is mathematically certain (i.e., the sum of quarterly sample results to date is already more than four times the benchmark threshold). EPA is also developing a simple spreadsheet to assist operators with determining if their samples trigger AIM.

Requiring AIM for a one-sample exceedance, or two-, or three-sample average exceedance that indicates an annual average exceedance, is consistent with the equivalent triggering conditions in the 2015 MSGP and appropriate to ensure that facilities respond in a timely manner as soon as any potential issues are

identified. Any quarterly sample collected that results in a benchmark exceedance based on mathematical certainty will trigger a timely response in accordance with the responses and deadlines specified in the permit.

EPA has determined that the single sample triggering event is relevant and appropriate to include in the 2021 MSGP. EPA maintains that both triggers are essentially based on an annual average exceeding the benchmark threshold. Some comments appeared to have misunderstood the mechanics behind the single-sample trigger. Both the proposed 2020 MSGP and the 2021 MSGP specify that a benchmark exceedance can be triggered if a single sample exceeds the benchmark threshold by four times, which effectively guarantees that the annual average will exceed the benchmark threshold, even if the results of the other three samples collected that year are below the benchmark or non-detects. For example, if the benchmark threshold for Pollutant A is 100 mg/L and the operator collects a single sample that is 450 mg/L, then even if the other three samples collected that year show 0 mg/L for Pollutant A, the final annual average will be 450 divided by 4, which is 112.5 mg/L (a benchmark exceedance).

In addition, the same theory applies if fewer than four quarterly samples are collected. If the sum of all results collected within a sampling year exceeds the benchmark threshold by four times, then this is effectively the same as having four samples that exceed the benchmark threshold. For example, if the benchmark threshold for Pollutant A is 100 mg/L and the operator is only able to collect two samples, which result in 225 mg/L and 230 mg/L for Pollutant A, then even if the operator were to hypothetically collect two more samples that had no Pollutant A detected, the annual average would still exceed the benchmark threshold of 100 mg/L, because 225+230 = 455 (which is four times greater than the benchmark threshold), and 455 divided by 4 is 113.75.

EPA received some comments stating that one-time exceedance triggers for certain pollutants like TSS are not appropriate for areas like the arid west, where storms can be infrequent and intense. These comments explain that in this situation, the one-time exceedance is not representative of most discharges from the facility and should not be used to judge the effectiveness of the stormwater control measures being used. However, EPA maintains that the primary goal of the benchmark thresholds is to function as a signal that the operator's stormwater controls may not be functioning in a way that is protective of water quality. If the established controls are unable to mitigate pollutant discharges from routine, if infrequent, storms, then it is justified that the operator should conduct a review their controls. Furthermore, EPA provides operators the flexibility to demonstrate and document that their existing controls are sufficient, that modifications to or additional control is infeasible, or that they qualify for one of the AIM exceptions. EPA also notes that the 2021 MSGP includes an exception to the AIM responses and continued benchmark monitoring requirements that allows the operator to demonstrate that the benchmark exceedance is solely attributable to the presence of that pollutant in natural background sources (see Natural Background Exception discussion below).

Regarding the variability of grab samples, EPA points out that AIM is only triggered by the annual average exceeding benchmark thresholds, or a single sample exceeding four times the benchmark threshold. Even with the variability of grab samples, if the annual average exceeds the benchmark or any sample exceeds four times the benchmark, then triggering AIM levels is justified.

One comment asked how the one-time exceedance threshold trigger would work for pH, which is on a logarithmic scale. EPA notes that because pH is on a logarithmic scale, an annual average exceedance for pH can only occur if the four-quarter annual average exceeds the benchmark threshold. EPA notes that in the 2021 MSGP fact sheet, Part 4.2.2.3, a note on pH was added in response to this comment.

Some comments noted that the AIM triggers ignore the ability of operators to collect additional sampling to bring the annual average below the applicable benchmark threshold. EPA notes that Part 4.2.2 allows operators, at their discretion, to take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges. While this would enable the

operator to avoid an AIM triggering event based on the four-quarterly annual average, EPA acknowledges that it would not provide relief where a single sample or the sum of any sample results within the sampling year exceeds the benchmark threshold by more than four times for a parameter. Nevertheless, EPA is including this AIM trigger because EPA is not requiring operators to collect more than four samples, collection of additional samples would not guarantee that the annual average concentration would be below the threshold, and because concentrations that exceed a level of four times the benchmark threshold indicate the need to promptly review and address any inadequacies in the operator's stormwater control measures.

## Facility Changes Triggering AIM

EPA received a few comments that supported and many comments that opposed an AIM Level 1 trigger based on facility changes. Based on the comments received, EPA decided to retain the requirement from the 2015 MSGP that if construction or a change in design, operation, or maintenance at the facility occurs that significantly changes the nature of pollutants discharged in stormwater from the facility, or significantly increases the quantity of pollutants discharged, the operator must review the SWPPP (e.g., sources of pollution, spill and leak procedures, non-stormwater discharges, selection, design, installation and implementation of control measures) to determine if modifications are necessary to meet the effluent limits in the permit. EPA had contemplated under the proposed 2020 MSGP moving this condition to Part 5.2 to be included in AIM, but based on public comments, this condition remains with the corrective action requirements in Part 5.1.2 of the 2021 MSGP.

## Moving Between Tiers

EPA received many comments seeking clarification on how operators move between and reset from AIM levels. Many comments observed that in the proposed 2020 MSGP, operators were able to trigger any of the AIM levels (e.g., skip to AIM Level 3 without having gone through AIM Levels 1 or 2). Many comments recommended that operators move through AIM levels sequentially. In addition, many comments requested clarification on how or when operators would reset back to baseline conditions.

The revised AIM requirements provide a sequential, stepwise follow-up process. This process provides more regulatory certainty of the required responses and timeframes for implementing responses once a benchmark triggering event occurs. The AIM requirements also facilitate the identification of any issues and implementation of any follow-up responses in a timely manner and address previous stakeholder concerns that the prior MSGPs' corrective actions were not sufficient to ensure that the under the permit are sufficiently controlled to protect water quality. The 2015 MSGP's corrective actions for benchmark exceedances may have allowed operators to only make minimal changes, or no changes, in their SWPPP or to their stormwater control measures, which may have led to poor stormwater control effectiveness. Under the 2015 MSGP's requirements, operators' benchmark exceedances as well as their attempts to reduce pollutant levels below the benchmark thresholds could potentially continue in an endless loop, without clear expectations in the permit for how to improve the necessary response, if warranted, nor for how to comply with certainty.

In the 2021 MSGP, the AIM levels are sequential, and levels cannot be skipped. In other words, an operator would need to progress from baseline status to Level 1 before progressing to Level 2, and Level 2 before Level 3. The operator is in the best position to evaluate the initial cause of their benchmark exceedance and should have the opportunity to self-correct in AIM Level 1, before advancing to Levels 2 and 3, in which additional stormwater control measures are no longer optional but required.

## AIM Responses

### Tier 2

EPA received many comments stating that it is too burdensome to require operators that trigger AIM Level 2 to implement all feasible controls from Appendix Q. In the 2021 MSGP, EPA is not including the checklists in Appendix Q. See Comment Response Essay 4 Proposals Not Finalized for more details.

Tier 3

EPA received many comments that the AIM Level 3 requirements are overly burdensome. EPA received comments stating that AIM Level 3 would require installation of very expensive structural stormwater control measures for continued minor exceedances with no regard for economic feasibility. EPA disagrees that operators are forced to install very expensive controls, and also disagrees that there is no regard for economic feasibility. EPA allows operators the flexibility to select control measures that work best for them; however, operators must ensure that discharges are controlled such that receiving waters of the United States meet water quality standards. Further, the 2021 MSGP does not include an exception for feasibility, such as one found in the 2015 MSGP (i.e., no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice). As part of the 2016 Settlement Agreement, the corrective action protocol for benchmark exceedances and all associated exceptions were revised and consolidated under AIM. In the Settlement Agreement, some previous exceptions were retained (e.g., exceedance was due to background sources or due to run-on sources) and some were added (e.g., if a facility can demonstrate their benchmark exceedances do not result in an exceedance of a water quality standard; the exceedance is due to a one-time abnormal event). However, the exception in questions (.e., no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice) was not included in the revised AIM protocol. For the final permit, EPA retained all of the proposed exceptions to AIM (and added another for aluminum and copper exceedances), but did not add this other exception back in.

The AIM requirements are an improved structure for the MSGP that require the appropriate and timely progression of control measure implementation as exceedances continue, while providing several exceptions which are more appropriate for this permit, because discharges need to meet water quality standards. Additionally, feasibility considerations are not relevant at AIM Level 1 because the operator can self-determine that no additional measures are warranted, as well as AIM Level 2 where the operator can select pollution prevention/house-keeping measures they deem appropriate. The AIM Level 3 permanent control measures are warranted because repeated benchmark exceedances raise additional concerns, especially following implementing AIM Levels 1 and 2 requirements. As mentioned previously, EPA anticipates few facilities trigger AIM Level 3. Additionally, industrial stormwater discharges are explicitly required to meet all provisions of Clean Water Act section 301, including applicable water quality standards.

EPA received comments that stated that the AIM Level 3 requirement to install permanent controls is overly burdensome for small facilities and would especially be an issue if the operator is leasing the property. Some comments stated that EPA should allow non-permanent treatment controls such as filtration socks and berms, filter inserts in storm drains, tracking grates, barriers to direct traffic away from erodible areas, etc. under AIM Level 3. EPA expects that these types of non-permanent controls would be implemented in AIM Levels 1 or 2, since these are the types of controls recommended by the sector-specific fact sheets (which are recommended as guidance for implementing AIM level 2). The Level 3 response requires an operator to implement one or more permanent, structural or treatment train technologies appropriate for the exceeded pollutants. Treatment technologies could be applied to remove pollutants from stormwater. Structural controls could include installing structures to prevent stormwater from being discharged.

EPA received comments that stated EPA should remove the requirement for professional engineers or professional geologists to be involved with the AIM Level 3 response or broaden the scope of qualifications to avoid excluding other qualified individuals. In the 2021 MSGP, EPA has removed the requirement for operators to use a professional engineer or professional geologist to assist with the implementation of a control in response to AIM Level 3 given the potential costs to hire a professional engineer or professional geologist.

EPA received a comment that stated EPA should not require EPA Regional Office concurrence for AIM Level 3 to avoid delays or compliance deadline issues. EPA notes that the 2021 MSGP does not require EPA Regional Office concurrence for the selection of an AIM Level 3 response. If requesting an extension from the AIM Level 3 deadlines, Part 5.3.3 of the 2021 MSGP does not require operators to notify EPA unless specifically required or requested to do so. Where an operator notifies EPA regarding an allowed extension of the specified timeframe, the operator must document the rationale for an extension, including any additional information and/or rationale that is required and/or applicable to the specified AIM response in Part 5.

EPA received a comment that stated that EPA should not require an individual permit if an operator continues to exceed the benchmark threshold for the same parameter even after compliance with AIM Level 3, because this is an enforcement response and doesn't fit within the benchmark concept. EPA points out that EPA does not automatically require an operator to obtain an individual permit if they continue to have benchmark exceedances after implementing AIM Level 3. However, EPA may require the operator to apply for an individual permit based on the site-specific circumstances. At this stage, circumstances at the facility could indicate that the discharge is no longer appropriately controlled under the general permit (40 CFR 122.28(b)(3)(E)). More site-specific requirements tailored to address the operator's stormwater discharges under an individual permit may be appropriate if benchmark exceedances continue to occur despite implementation of the stormwater control measures required to comply with this general permit. In addition, per Part 2.2.1, any time EPA determines that the discharge is not meeting the water quality-based effluent limit (WQBEL) (i.e., the discharge is not controlled as necessary such that the receiving water of the United States will not meet applicable water quality standards), the Agency may inform the operator that additional measures are needed, or require that the operator instead apply for an individual permit.

## Groundwater Infiltration

EPA received many comments that opposed or voiced concerns about the AIM Level 3 option to install infiltration or retention controls as a substitute or adjunct to permanent treatment controls, primarily due to concerns for the potential for groundwater contamination. Given there are numerous obstacles to using of this option, such as potential aquifer impacts, hydrologic connectivity to water bodies, groundwater impacts and the type of pollutants of concern, EPA has decided to not finalize this specific option. EPA intends to continue researching this topic to assess the feasibility of a future infiltration/retention approach and how to implement it for industrial stormwater discharges.

## AIM Compliance Timeframes

EPA received many comments stating that EPA did not provide enough time for operators to complete AIM responses. One comment stated that the AIM framework sets time periods by which the exceedance must be remedied, and that failure to remedy the exceedance within those timeframes would be a permit violation. Per Part 1.6, where AIM is triggered by an event that does not itself constitute permit noncompliance (i.e., an exceedance of an applicable benchmark), there is no permit violation provided the operator complies with the required responses within the relevant deadlines established in Part 5. The AIM deadlines set in the 2021 MSGP Part 5.2 for AIM Level 1 and Level 2 are the same as the corrective action deadlines for benchmark exceedances set in the 2015 MSGP Part 4.3. The deadlines provided in the 2021 MSGP are those that EPA considers reasonable for making the necessary repairs or modifications. The timeframes are included in the permit to ensure that inadequacies are not allowed to persist indefinitely. EPA recognizes that there may be circumstances where it is not feasible to complete needed AIM responses within 14 days, and therefore provides operators with the flexibility to modify the schedule for completing the AIM response so that the response is taken as soon as practicable after the 14-day timeframe, and is completed no later than 45 days after discovery of the triggering condition.

EPA received one comment that recommended EPA allow 7 days to complete the AIM Level 1 SWPPP review, because requiring the operator to review their SWPPP immediately is overly stringent.

Furthermore, this comment recommends that EPA allow 30 days for implementation of SWPPP modifications, and up to 60 days with an extension. EPA declines to make this change. The time limits set in the permit are those that EPA considers reasonable for identifying issues and making the necessary modifications so that inadequacies are not allowed to persist indefinitely.

EPA received many comments stating that EPA did not provide enough time for operators to complete AIM responses for AIM Levels 2 and 3. For AIM Level 2, comments regarding timeframes were addressed because EPA is not moving forward with requiring operators to implement all feasible controls listed in Appendix Q. The 2021 MSGP requires operators to review their SWPPP and implement additional pollution prevention/good housekeeping SCMs, considering good engineering practices, beyond what they did in their AIM Level 1 responses that would reasonably be expected to bring their exceedances below the parameter's benchmark threshold. EPA is providing additional flexibility in the selection of an appropriate control measure, and the 14-day timeframe is reasonable. Furthermore, if the operator determines that it is not feasible to implement their selected measure within 14 days, EPA is allowing operators to take up to 45 days. The operator must document per Part 5.3 why it was infeasible to implement such measure in 14 days. EPA may also grant you an extension beyond 45 days, based on an appropriate demonstration.

For AIM Level 3, EPA received many comments suggesting longer timeframes to implement structural control measures, ranging from 60 days to 6 months. One comment suggested a 1-year deadline for complying with the AIM Level 3 responses because it would require project planning, engineering designs, budget allocation, and construction. Another comment suggested that 6 months is a more realistic timeline for the installation of structural controls and 12 months for the installation of treatment controls. Some comments recommended that EPA generally allow more flexible implementation timeframes for stormwater control measures that are capital intensive. One comment stated that it would be difficult or impossible for public entities to install source controls or treatment controls due to the government budgeting process. This comment suggested a deadline of 18 months for public agencies. In response to these comments, EPA has revised the AIM Level 3 deadlines in the 2021 MSGP to allow additional time to identify the schedule for installing structural source and/or treatment controls and extending the timeframes for installation. EPA is requiring the operator to identify the schedule for installing the appropriate structural source and/or treatment control measures within 14 days and install such measures within 60 days. If is not feasible within 60 days, the operator may take up to 90 days to install such measures, documenting in your SWPPP why it is infeasible to install the measure within 60 days. EPA may also grant an extension beyond 90 days, based on an appropriate demonstration by the operator. In general, EPA maintains that the timeframes set by the permit are what EPA considers reasonable for making the necessary repairs or modifications and are included specifically so that inadequacies are not allowed to persist indefinitely.

## AIM Exceptions

The 2021 MSGP includes five exceptions that could allow an operator to be relieved of compliance with AIM requirements and continued benchmark monitoring at any AIM level. These exceptions are available to operators that can demonstrate that the benchmark exceedances is 1) solely attributable to natural background pollutant levels, 2) due to run-on from a neighboring source, 3) due to an abnormal event, 4) will not result in an exceedance of facility-specific criteria for aluminum or copper, or 5) will not result in any exceedance of water quality standards. For additional discussion of the exception for aluminum and copper, see Comment Response Essay 2 Monitoring.

In the proposed 2020 MSGP, EPA proposed that the exceptions for natural background levels of pollutants and run-on from a neighboring source would apply to all AIM levels, the exception for abnormal events (which was called the "aberrant event" exception in the proposed 2020 MSGP) would apply to AIM Level 2, and the exception for exceedances that do not result in any exceedance of water quality standards would apply to AIM Level 3. In the proposed 2020 MSGP, EPA requested comment on

whether it would be appropriate to make the exceptions for "aberrant events" and "discharges not resulting in any exceedance of water quality standards" available to other AIM levels. EPA received many comments in support of making all exceptions available to all three levels. EPA also received some comments opposed to making all exceptions available to all three levels. After further consideration, EPA has made all exceptions applicable to all AIM levels, because all five exceptions are reasonable explanations for why an operator may experience a benchmark exceedance.

EPA received some comments suggesting additional or alternative AIM exceptions. One comment suggested that EPA make an exception for pollutants from aerial deposition. EPA declines to make an exception for aerial deposition given EPA did not contemplate it in the proposal and no data was submitted. One comment recommended that EPA recognize the potential for sampling and analytical errors and allow operators to retest. The comment goes further to recommend that the section on AIM exceptions should be renamed "Exceptions and Retesting." EPA appreciates the suggestions but declines to make the suggested revisions given there is already an AIM exception for an abnormal event and the section title of "AIM Exceptions" accurately describes what that section contains.

Another comment recommended that EPA should add an exception that allows operators to demonstrate that the source of the benchmark parameter (e.g., zinc), is not from the industrial activities at the site (e.g., not in raw materials), but from ubiquitous items (e.g., building envelope, fencing) found in every industrial, non-industrial, and residential site. EPA disagrees that pollutants in stormwater discharged from structures themselves within areas of industrial activity cannot be considered to be "associated with industrial activity." In the Conditional No Exposure Exclusion from Industrial Activity fact sheet, revised in 2005, EPA states, "Particulate matter or visible deposits of residuals from roof stacks and/or vents not otherwise regulated (i.e., under an air quality control program) and evident in stormwater outflow are considered exposed. Consistent with the 2015 MSGP, Part 6.2.3 of the 2021 MSGP states, "For structures located in areas of industrial activity, you must be aware that the structures themselves are potential sources of pollutants. This could occur, for example, when metals such as aluminum or copper are leached from the structures as a result of acid rain." The language in Part 6.2.3 alerts operators to the potential for other sources of pollutants to contribute pollutants to stormwater discharges associated with industrial activity, and thus the need to ensure that the discharge of any pollutants from those sources is minimized or controlled appropriately.

## Natural Background Exception

The 2015 MSGP (as well as the preceding 2008 MSGP) provided operators with an exception to performing corrective actions or additional benchmark monitoring in response to a benchmark exceedance if the operator could demonstrate that the exceedance is attributable solely to the presence of that pollutant in the natural background. To make such a demonstration, the 2015 MSGP requires the average concentration of the benchmark monitoring result in the stormwater discharge to be less than or equal to the concentration of that pollutant in natural background (i.e., no net contribution of the pollutant from the facility).

In the proposed 2020 MSGP, EPA requested comment on changing the threshold for the natural background exception from the 2015 MSGP to a method whereby operators could subtract natural background concentrations from the total benchmark exceedance to determine if natural background levels are solely responsible for the exceedance (i.e., the subtraction method). EPA contemplated the subtraction method based on previous stakeholder feedback that the 2015 MSGP exception was burdensome. To demonstrate no net contributions, the 2015 MSGP requires the operator to use a four-quarter average concentration from all monitored discharge points, minus the average natural concentration of the parameter. The result of this analysis must not be greater than zero.

EPA received many comments expressing support for the proposed subtraction method. The comments noted that the subtraction method is more practical, would provide increased flexibility, is consistent with

other NPDES programs, and would help operators better understand and address pollutant loading from their operations. Other comments stated that the 2015 no net contribution method is unrealistic and unusable in practice. One comment suggested that requiring no net contribution imposes disproportionate burdens on operators discharging into receiving waters with high background concentrations and incentivizes operators to discharge into waters with lower background concentrations.

EPA also received several comments opposed to the proposed subtraction method. One comment stated that the subtraction method does not account for the proportion of flow due to natural background sources in the discharge and assumes that the natural background flows are equal to the stormwater discharge flows. Another comment suggested that the proposed subtraction method was arbitrary and capricious, mathematically flawed, and contrary to the Clean Water Act. One comment expressed concern that the proposed subtraction method would allow operators to contribute pollutants in amounts greater than the benchmark and could cause or contribute to water quality impairments. Another comment stated that allowing the subtraction method would not be consistent with the Clean Water Act's anti-backsliding requirements.

After further consideration of the rationale behind the 2015 MSGP's (and 2008 MSGP's) method and review of public comments, EPA is retaining the 2015 MSGP no net contribution method to applying the natural background exception for AIM responses for several reasons.

First, the 2015 MSGP method is consistent with existing EPA policy concerning the establishment of site-specific water quality criteria based on natural background conditions. See EPA's Office of Science and Technology memorandum, Establishing Site Specific Aquatic Life Criteria Equal to Natural Background (November 5, 1997). The policy states that aquatic life criteria should be equal to natural background, defined as background concentration due only to non-anthropogenic sources (i.e., non-manmade sources). Upon reconsideration of the proposed 2020 MSGP method, which would have enabled the operator to subtract the amount of the pollutant attributable to natural background from the pollutant levels found in the benchmark sample, EPA found that it would be inconsistent with the "solely attributable" standard EPA intends to maintain in the MSGP and the longstanding EPA policy referenced above. Since many of EPA's benchmark thresholds are based on aquatic life criteria (see 60 Fed. Reg. 50,804, 50,825 (Sept. 29, 1995)), the principles discussed in this policy are appropriate to uphold when establishing a natural background exception for benchmark exceedances.

Additionally, as stated in EPA's response to comment document for the 2015 MSGP, "EPA's long-standing position, consistent with the Clean Water Act and EPA's permitting regulations, is that operators are responsible for the quality of their discharges, regardless of what may be added as a result of run-on from other sources or legacy/anthropomorphic sources of pollutants." Additionally, the 2015 MSGP response to comments stated that "the CWA does not allow EPA or states to set a site-specific criteria equal to the natural background plus an otherwise protective level … since doing so could raise the level of the pollutant in the water body that might [be] above the natural background, which would not be protective of aquatic life, at a minimum." See Natural Background Exception to Benchmark Monitoring (p. 5-6) in Response to Public Comments – EPA NPDES 2015 Multi-Sector General Permit (MSGP), June 4, 2015. EPA maintains that this principle applies to benchmark monitoring and additional implementation measures.

Public comments also raised a variety of concerns to EPA that the proposed subtraction method is counter to the "solely attributable" standard and is not appropriate for the MSGP. The comments pointed out that the proposed subtraction method does not limit the exception to situations where benchmark exceedances are "solely attributable" to natural background sources, but rather it flipped the standard to excuse an exceedance if it was solely attributable to the operator's discharges, substantially weakening the effectiveness of the benchmark monitoring requirements. The comments also noted that subtraction method does not account for the proportion of flow due to natural background sources in the discharge and assumes that the natural background flows are equal to the stormwater discharge flows, meaning the

proposed exception would allow operators to contribute pollutants in amounts greater than the benchmark and could cause or contribute to water quality impairments. The proposed subtraction method essentially would allow operators to contribute higher concentrations to receiving waters than previously allowed without triggering AIM and is inconsistent with EPA's intention with the exception.

Additionally, as EPA expects that more operators would have qualified for the exception under the proposed subtraction method and been excused from controlling their pollutant contributions, the Agency must prioritize reducing the cumulative and compounding effect on water quality in its decision to not revise the exception and maintain the 2015 MSGP standard in the 2021 MSGP.

EPA also received several comments requesting guidance and clarification related to natural background demonstrations. Some comments requested that the exception make allowances for contributions other than natural background. One comment suggested that EPA revise the guidance for substantiating the natural background condition since they have been unable to identify non-human impacted references sites within their watersheds. Another comment requested clarification of whether the natural background exception or other exceptions could be used where air deposition from another source affects an operator's results and, if not, suggested that EPA provide another exception for such situations. One comment requested clarification that legacy pollutants entering the same receiving water upstream are a part of the background concentration, even if they are not naturally occurring. As discussed above, operators are responsible for the quality of their discharges, regardless of what may be added as a result of run-on from other sources or legacy/anthropomorphic sources of pollutants. EPA declines to expand the natural background exception to include anthropomorphic sources of pollutants because such sources are not part of the natural background.

A few comments expressed concern with the difficulty in demonstrating natural background concentrations for pollutants such as aluminum, pH, TSS, particularly in certain environments (e.g., arid and semi-arid environments, high clay content, low vegetation). EPA notes that the natural background exception is designed to address benchmark exceedances due to naturally occurring pollutants (e.g., concerns about high levels of TSS, aluminum, and other pollutants that could exist in the natural background). EPA acknowledges these concerns and notes that the operator can demonstrate the AIM exceedance is due to natural background pollutant levels by evaluating ambient monitoring data or by using information from a peer-reviewed publication or a local, state, or federal government publication specific to stormwater in the immediate region. Ambient monitoring is not the only demonstration needed to seek the AIM exception due to natural background pollutant levels.

Some comments identified challenges to EPA's requirements to implementing the natural background method, including identifying appropriate reference reaches, accounting for increased sample collection and lab costs, considering the geographic variability of isolated storm events, other physical constraints associated with sample collection, and safety concerns. One comment suggested that EPA allow the use of alternative statistical methods for determining natural backgrounds other than the annual average (e.g., median, geometric mean, interquartile range, or confidence intervals around the mean). EPA notes that Part 5.2.6.1 of the 2021 MSGP does not specify a particular method for determining natural background concentrations, nor does it require the use of an annual average concentration. As discussed in Part 5.2.6.1 of the 2021 MSGP Fact Sheet, the background concentration of a pollutant in discharges from a non-human impacted reference site in the same watershed should be determined by evaluating ambient monitoring data or by using information from a peer-reviewed publication or a local, state, or federal government publication specific to runoff or stormwater in the immediate region. Thus, the 2021 MSGP provides considerable flexibility for operators to analyze and determine natural background concentrations.

Part 5.2.4.1 of the proposed 2020 MSGP required submission of the operator's analysis and documentation to the EPA Regional Office to satisfy the natural background exception, which was not a requirement of the 2015 MSGP. Some comments opposed this change and recommended that EPA only

require documentation be maintained with the SWPPP, as in the 2015 MSGP, to reduce the paperwork burden for operators and EPA. EPA agrees and has revised the natural background exception in Part 5.2.6.1 of the 2021 MSGP to clarify that submission to the EPA Regional Office is only required upon request.

In the proposed 2020 MSGP, EPA also requested comment on other appropriate methods to characterize natural background pollutant concentrations. Specifically, EPA requested comment on the advantages and limitations of the National Stormwater Quality Database (NSQD), whether it can be adjusted for use in the MSGP for calculating natural background concentrations, and how that could be accomplished. The NSQD is a collection of urban stormwater runoff data from municipal separate storm sewer systems (MS4s) and contains concentration data from urban open spaces, among other land use categories.

Many comments supported the use of NSQD data to determine natural background. One comment noted that this dataset would reduce the labor and costs associated with performing and documenting an individual study. One comment supported use of NSQD data but suggested that it should not be the only source and should used in conjunction with additional sampling upstream. Another comment expressed support but stated that it should not supersede a site-specific dataset.

Some comments opposed use of the NSQD data or noted its inadequacies. Some comments noted that the NSQD does not contain data for New Mexico and thus would not be appropriate for use for operators in that state. NSQD data may not be appropriate for use in showing background levels of pollutants. Some comments noted that it would not be accurate for facilities outside MS4s or urban areas. One comment expressed concerns similar to those cited by EPA in request for comment and stated that use of the NSQD could be misused to justify inappropriate natural background values. One comment specified that the permit should require a site-specific analysis because of the wide variety of types of facilities, the varied locations, and ecoregions, resulting in different contributions to stormwater from geology and other natural conditions. Another comment stated that the NSQD does not reflect "natural" stormwater, but instead reflects stormwater with municipal and industrial contributions. The comment further stated that the NSQD is not a reliable proxy for site-specific background water quality data.

As alternatives to the NSQD, some comments suggested allowing the use of other state or local databases or studies, analytical results from an upstream location or historical MS4 data, data from USDA and/or soil and water conservation district, methods prescribed in other EPA programs (e.g., Superfund), sampling from representative non-industrial areas, and other alternative reference sources in the region or watershed. Two comments suggested that EPA provide guidance establishing natural background pollutant concentrations at remote locations. Another comment stated that use of regional or site-specific data would be preferable to the NSQD, but placing that burden on operators would potentially be cost prohibitive.

Based on the comments submitted, EPA remains concerned that the NSQD does not accurately represent pollutant concentrations that are attributable only to natural background sources and concludes that utilizing NSQD data to calculate an exception for industrial stormwater dischargers is inappropriate. Consistent with the 2015 MSGP, the 2021 MSGP specifies that supporting rationale for the natural background exception should include supporting rationale any data previously collected by the operator or others (including literature studies) that describe the levels of natural background pollutants in your stormwater discharge. As described in the Fact Sheet, the background concentration of a pollutant in discharges from a non-human impacted reference site in the same watershed should be determined by evaluating ambient monitoring data or by using information from a peer-reviewed publication or a local, state, or federal government publication specific to runoff or stormwater in the immediate region. Studies that are in other geographic areas, or are based on clearly different topographies or soils, are not appropriate.

## Run-On from A Neighboring Source Exception

Similar to the 2015 MSGP, the proposed 2020 MSGP and the 2021 MSGP provides operators with an exception to performing AIM requirements in response to a benchmark exceedance if the operator could demonstrate that the exceedance is attributable solely to run-on from a neighboring source. To make such a demonstration, the 2021 MSGP requires operators to demonstrate and obtain EPA agreement that run-on from a neighboring source is the cause of the exceedance. There are no significant changes to the requirements for this exception between the 2015 MSGP and 2021 MSGP.

EPA received several comments opposed to the run-on exception. One comment stated that operators should only be exempt if the exceedance is 100% attributable to run-on. The same comment states that the claim of "pollutants are from run-on" should not exempt an operator from AIM because if the operator can determine that the pollutant source is coming from a neighboring property, then they should be able to avoid commingling with the run-on. EPA agrees that it can be complicated to distinguish pollutant loads from run-on and from an operator's own facility. This is the reason why EPA requires operators to make a demonstration to the EPA Region and obtain the Region's determination of whether there is a basis for discontinuing benchmark monitoring due to run-on sources.

EPA received many comments that suggested modifications to the run-on exception requirements. One comment asked EPA to remove the requirement to notify the upstream party and the EPA Regional Office because it places the policing burden on the "innocent" party. EPA's long-standing position, consistent with the Clean Water Act and EPA's permitting regulations, is that operators are responsible for the quality of their discharges, regardless of what may be added as a result of run-on from other sources or legacy/anthropomorphic sources of pollutants. In the Phase I stormwater rule, EPA clarified that "operators of facilities are generally responsible for [their] discharge in its entirety regardless of the initial source of discharge. However, where an upstream source can be identified and permitted, the liability of a downstream facility for other stormwater entering that facility may be minimized. Facilities in such circumstances may be required to develop management practices or other run-on/run-off controls, which segregates or otherwise prevents outside runoff from commingling with its stormwater discharge." 55 Fed. Reg. 48010, November 16, 1990. Therefore, EPA requires that the operator take all necessary actions to ensure the discharge from their facility does not violate the terms of their permit. As such, it is the operator's responsibility to notify their upstream neighbors.

Several comments recommended that the operator should subtract the run-on pollutant load from their discharge to assess how much pollutant load the operator is contributing and measure against the benchmark. EPA maintains that it would be irresponsible to allow an operator to subtract the pollutant load from run-on because that effectively allows the operator to potentially discharge a higher quantity of pollutants into the receiving water.

EPA received a comment stating that if an operator needs EPA concurrence then the operator will probably not be able to meet the 14-day or 45-day response deadline for AIM levels 1 and 2. EPA notes that to claim a run-on exception, one of the requirements is to review and revise the SWPPP as appropriate. Therefore, for AIM Level 1, EPA expects that the operator would comply with the required response (i.e., review existing control measures, SWPPP, and other on-site activities to see if any actions or SWPPP revisions are necessary) before or at the same time as contacting EPA. For AIM Level 2, the 2021 MSGP states EPA may grant an extension for the compliance deadline beyond 45 days based on an appropriate demonstration by the operator.

## Abnormal Event Exception

The proposed 2020 MSGP and the 2021 MSGP provide operators with an exception to performing AIM requirements in response to a benchmark exceedance if the operator could demonstrate that the single event causing the exceedance was an abnormal event. In the proposed 2020 MSGP, this was referred to as an "aberrant event" exception. To make such a demonstration, the 2021 MSGP requires operators to

immediately document a description explaining what caused the abnormal event and how any control measures taken within 14 days of such event will prevent a reoccurrence. The operator is required to take a sample during the next qualifying rain event to demonstrate that the result is less than the benchmark threshold, in which case the operator does not trigger any AIM requirements based on the abnormal event. The operator would report this new sample in NetDMR in lieu of the result from the abnormal event.

EPA received one comment requesting clarification of the allowed frequency of claiming an aberrant event. EPA received another comment that supports allowing multiple aberrant events if well explained. In the proposed 2020 MSGP and the 2021 MSGP, EPA states that the operator can only claim an "abnormal" exception one time per parameter, per discharge point, which shall include substantially similar discharge points, for the duration of their permit coverage. EPA expects that the operator will ensure the abnormal event for the parameter does not occur repeatedly given that the nature of the event is atypical of the discharge quality.

EPA received many comments that support the abnormal event exception, but suggested modifications to the exception. One comment stated that the aberrant event exception should not allow an operator to trigger AIM Level 1. EPA acknowledges that the proposed 2020 MSGP included such a mechanism, and upon further consideration, EPA has removed this mechanism from the 2021 MSGP. In the 2021 MSGP, if the follow-up sample result is less than the benchmark threshold, then the operator does not trigger any AIM requirements based on the abnormal event. If the follow-up sample result is more than the benchmark threshold, then the operator stays in the AIM level that they triggered with the event that they are claiming to be abnormal.

Several comments did not think the operator should be required to provide additional analysis or documentation for the exception because these additional requirements would be "redundant and excessive." EPA does not agree with this comment. EPA is only requiring the operator to document what caused the abnormal event, which EPA does not consider to be an excessive burden. EPA is not requiring the operator to report this information to EPA. Without requiring adequate documentation to support the claim of an exception, it would be easy for an operator to falsely dismiss a benchmark exceedance as an abnormal event. Several comments stated that the operator should not have to explain why the cause of the aberrant event was not contemplated in the SWPPP. EPA agrees that the operator should not have to do this, since the nature of an aberrant event is that it is unexpected. EPA points out that neither the proposed 2020 MSGP nor the final 2021 MSGP require documentation in the SWPPP of why the aberrant event was not accounted for.

EPA received several comments that do not support the abnormal event exception. One comment stated that "aberration" or "aberrant event" are not terms found anywhere in the federal Clean Water Act or elsewhere in other federal regulations or guidance. The comment states that these terms require a clear definition or better, a substitution (together with a definition). They recommend the term "upset" as an appropriate substitution, since it is found throughout Clean Water Act (and other environmental) permitting. Another comment stated that they did not support making the "aberrant event" exception available to all AIM levels because the term is too vague, open to interpretation among both regulators and operators, and would make tracking and enforcement too challenging. In the 2021 MSGP, EPA is referring to this exception as the "abnormal event" exception. EPA chose this term because it is plainer language and more obviously refers to an event that is unexpected and uncommon. EPA declines to classify these events as "upsets." The term upset has a specific meaning in the context of NPDES permitting. The federal regulations at 40 CFR 122.41(n) define an upset as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." An operator may only claim an upset as an affirmative defense to an action brought for noncompliance with

technology-based effluent limitations. Since benchmarks are not effluent limitations, EPA has determined that the term upset is inappropriate for this exception.

## No Exceedance of Water Quality Standards Exception

The proposed 2020 MSGP and the 2021 MSGP provides operators with an exception to performing AIM requirements in response to a benchmark exceedance if the operator can demonstrate for any parameters that their discharges do not and will not result in any exceedance of a water quality standard. To make such a demonstration, EPA requires operators to perform a robust analysis which will be made publicly available. The 2021 MSGP outlines the minimum elements that operator must include in their analysis to be considered for approval by EPA.

EPA received many comments that opposed the water quality standards exception. One comment noted that collecting and analyzing a sample of the discharge is necessary to determine if the discharge did not result in an exceedance of water quality standards. As such, the comment suggested that this exception poses an equity issue across operators because small operators may not have the same available resources to show that their discharge did not result in an exceedance of water quality standards as larger operators. EPA does not agree that requiring sample collection and analysis to satisfy the conditions for the exception is inequitable. EPA's intent for including the exception is to provide flexibility and cost-savings for operators. EPA expects that operators will weigh the costs of making such a demonstration with the costs of implementing the AIM level responses that would otherwise be required in determining whether to pursue such an exception.

EPA received another comment opposed the exception because although the discharge might not cause an exceedance of a water quality standard at the discharge point, it may cause a problem downstream when combined with discharges from other sources. The comment recommended that the operator be required to take into account all downstream discharges and uses before EPA grants an exception. EPA appreciates the suggestion but declines to make this revision.

EPA received a comment that suggesting that the operator should not be required to obtain EPA approval to claim a water quality standards exception but should only be required to document in their SWPPP. Another comment suggested that the minimum elements specified to make a demonstration should be "suggested components" and should be not be required for all demonstrations. EPA does not agree with these comments. Industrial stormwater discharges are explicitly required to meet all provisions of Clean Water Act section 301, including applicable water quality standards (Clean Water Act §402(p)(3)(A)). A demonstration to meet this exception would require a robust analysis and is likely to rely on the use of computer models to make such a case, such as SWMM, DR3M, and HSGF. The 2021 MSGP requires the minimum elements for a demonstration, as well as EPA review, to ensure that allowing such an exception would not result in discharges that cause or contribute to an exceedance of a water quality standard. Without requiring adequate documentation to support the claim of an exception, it would be easy for an operator to falsely dismiss a benchmark exceedance as not exceeding water quality standards.

EPA received several comments stating that the 30-day timeframe in which operators must submit a water quality demonstration is not enough time to evaluate, sample, and submit a water quality demonstration. Several comments recommended that EPA provide at least 60 or 90 days to make the demonstration. One comment noted that the permit requires "full-storm composite sampling," which will take time to coordinate and will require an appropriate storm event to occur in order to perform sampling. The same comment noted that doesn't define "full-storm" in the permit. A few comments specifically noted that for airports, water quality studies that characterize deicing impacts must be conducted during the season when deicing activities occur and may be required over more than one season due to variability in weather. These comments recommended that airports should be required to initiate the study within a specified timeframe rather than complying with the proposed 30-day deadline. In response to these comments, EPA has extended the timeframe to complete the demonstration under this exception. The

permit now states that "If it is not feasible to complete this demonstration within 30 days, you may take up to 90 days, documenting in your SWPPP why it is infeasible to complete the demonstration within 30 days. EPA may also grant you an extension beyond 90 days, based on an appropriate demonstration by you, the operator."

One comment asked EPA to provide clarification about the operator's compliance status while waiting for EPA's approval on their submitted water quality standards exception demonstration. EPA notes that exceeding a benchmark threshold is not a violation, and that by preparing and submitting a demonstration for a water quality standards exception within the timeframe set by the permit, the operator is abiding by the AIM requirements and thus in compliance with the permit. If EPA does not approve the exception, then the operator must follow through with the requirements of the specific AIM level that they triggered.

## AIM Documentation

In the proposed 2020 MSGP, EPA requested comment on methods for tracking AIM levels that may have been triggered by an operator. EPA suggested requiring the operator to self-select any AIM levels that have been triggered in the past quarter when submitting quarterly monitoring results. In the 2021 MSGP, EPA is not requiring operators to self-select AIM levels in their DMR. The 2021 MSGP does require operators to document the existence of an AIM trigger within 24 hours. This initial documentation must include a description of the event triggering the AIM response, the date the event was identified, and a description of the immediate actions taken to minimize or prevent the discharge of pollutants. This documentation does not need to be submitted to EPA unless by request, and the operator needs to include a summary of this information in their annual response. The operator must also include a statement, signed and certified in accordance with Appendix B, Subsection 11. After this initial documentation, EPA requires the operator to document the AIM responses taken (or will take) within 14 days from the date the event was identified. This documentation must include the dates the operator initiated or completed (or expect to complete) each AIM response, or rationale for why it is infeasible to complete the necessary response within the specified timeframe. If applicable, the documentation must include if the operator notified EPA regarding an extension or exception, and any additional information that is required for the exception. Similar to the 24-hour documentation, this documentation is not required to be submitted to EPA, other than a summary in the annual report. In addition, the operator must keep this documentation with their SWPPP.

EPA received comments that support operators self-selecting AIM levels in their DMR reports. One comment stated that they would support self-selecting AIM levels if EPA reviews and approves the selections. EPA received a comment that suggested that operators should submit AIM documentation to EPA quarterly, instead of with annual report. EPA appreciates these comments but will not be moving forward with any quarterly AIM documentation requirements, as explained above.

EPA received comments that stated that NetDMR should notify operators when a benchmark is exceeded and if an AIM Level has been triggered. One comment stated further that that due to the complexity and multi-year nature of AIM, without a "smart" database that notifies users of exceedances, there will be significant non-compliance with AIM requirements. This same comment added that EPA should include an option in NetDMR to handle exceptions. Some comments expressed concern that operators may find it challenging to track their AIM requirements since they could theoretically be simultaneously subject to multiple AIM levels for different pollutants at different discharge points. EPA is updating NetDMR to automatically calculate and identify exceedances of AIM triggering events and AIM level. However, EPA notes that the deadlines for AIM responses (i.e., within 14 days of receipt of laboratory results) are shorter than the deadlines for submitting monitoring data in NetDMR specified at Part 7.3.1 (i.e., within 30 days of receiving the complete laboratory results for all monitoring discharge points for the reporting period). Therefore, operators will need to self-identify when an AIM triggering event has occurred and should not delay implementation of the required AIM responses while waiting for notification from NetDMR. EPA is also developing a simple spreadsheet to assist operators with determining if their samples trigger AIM.

EPA received comments that opposed operators reporting any AIM-related information in their DMR reports. One comment stated that self-selecting AIM levels in the quarterly DMRs is unnecessary because the same information will be included in the annual report and the operator will likely have already begun to implement the AIM requirements by the due date of the quarterly DMR. EPA received comments that support operators submitting AIM documentation annually and but not with quarterly reports. EPA received several comments that said operators should only be required to communicate what correction actions they took in the annual report, and not in the DMRs. EPA agrees with these comments, and as explained above, will not be requiring AIM-related reporting in the DMR.

Another comment stated that stand-alone reporting of changes in an operator's AIM status should not be required. EPA is not requiring stand-alone reporting of changes in an operator's AIM status. The permit only requires operators to document AIM triggers and responses within the timeframes described above and keep the documentation with their SWPPP. EPA is updating NetDMR to automatically calculate and identify exceedances of AIM triggering events and AIM levels. Operators are also required to include a summary of AIM response documentation in the operator's annual report, which is submitted through the NPDES eReporting Tool (NeT) and will be available to the public through EPA's Enforcement and Compliance History Online (ECHO) tool.

EPA received another comment asking how EPA will track operators' compliance with AIM. EPA is relying on operators to summarize AIM related documentation in their annual report. EPA will have an opportunity to review this information and assess compliance through the annual reports. As discussed above, EPA is also adding functionality to NetDMR to automatically calculate and identify exceedances of AIM triggering events and AIM level.

In addition, EPA received the comments about general corrective action documentation requirements. EPA received a comment asking for clarification on what documentation is required to support the determination that AIM implementation is not economically practicable or reasonably achievable. As discussed above, the 2021 MSGP does not include an exception for feasibility, such as one found in the 2015 MSGP (i.e., no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice).

EPA received several comments regarding the timeline to document AIM triggers and corrective actions. One comment suggested EPA allow operators 72 hours to document AIM triggers because it would be difficult for some operators, especially smaller ones, to comply with 24-hours if an event were to occur over a weekend or during a holiday. Other comments suggested that EPA allow 5 or 7 days to document AIM trigger and 30 days to document corrective action. EPA declines to make these changes to the documentation timeline. The permit requires minimal information in the initial corrective action report, including a description of the issue, the date the issue was identified, and a description of any immediate actions taken to address the issue. This requirement is substantially similar to documentation requirements in the 2015 MSGP.

# Comment Response Essay 4 Proposals Not Finalized

## Eligibility Conditions – Discharges to a CERCLA Site (Request for Comment 1)

As part of the Settlement Agreement reached in 2016, EPA agreed to solicit comment on whether the eligibility criterion contained in the 2015 MSGP at Part 1.1.4.10 (Part 1.1.7 in the Proposed 2020 MSGP), which only applies to facilities in EPA Region 10, should apply to all EPA Regions for facilities that discharge to Federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) sites that may be of concern for recontamination from industrial stormwater discharges. In addition, EPA requested comment on information that would assist the Agency in identifying such sites. EPA also requested comment on requiring such facilities to notify the EPA Regional Office a minimum of 30 days in advance of submitting the Notice of Intent (NOI) form.

The following is a summary of the comments that EPA received on this proposed permit provision.

### Support for the Proposed Permit Provision

Overall, supporting comments agreed with EPA's fact sheet assessment that this provision will protect water quality and not undermine previous efforts to remediate CERCLA sites and should be applied to all discharges to all CERCLA sites across the country.

One comment expressed support for including the eligibility criterion in all EPA Regions and included recommendations for additional requirements, such as requiring applicants to collect and submit data on the magnitude of stormwater discharged from facilities and the concentration of sediment in discharges as a component of the proposed advanced notice to EPA before an NOI application for coverage is submitted. In addition, the comment suggested that EPA provide the public an opportunity to review and comment on advanced notifications by applicants.

### Opposition to the Proposed Permit Provision

In general, opposing comments noted the provision is not necessary and creates burden for businesses by including additional requirements, when CERCLA sites must already adhere to existing specific control requirements. In addition, a comment opposing the permit provision suggested that EPA has not yet identified the specific CERCLA sites to which it would apply, lacking sufficient data to identify specific CERCLA sites in other Regions and further, that EPA Regions do not support the expansion of applicability to all EPA Regions.

One comment expressed concern that an unequitable application of this requirement will discourage businesses from locating near CERCLA sites. Another comment suggested that the permit requirement will complicate development for low-risk facilities, including those included in Sector P (Land Transportation and Warehousing) and recommended that EPA exclude this group of facilities from the requirement.

A comment suggested limiting the eligibility provision to new dischargers and new sources only since existing discharges would have previously been evaluated during EPA's process for identifying CERCLA sites. Another comment suggested that discharges to federal CERCLA sites should be subject to similar requirements as discharges to impaired waters.

### Comments Related to EPA's Authority to Impose this Requirement

Multiple comments indicated that EPA lacks authority to implement the eligibility provision in EPA Region 10 or any other EPA Region.

## Timeframe for Advance Notice Prior to NOI Submission

Comments expressed both support and opposition to the proposal to require such facilities to notify the EPA Regional Office a minimum of 30 days in advance of submitting the NOI form.

## Groundwater Concerns

One comment recommended clarification on whether the permit requires EPA to review of the facility's Stormwater Pollution Prevention Plan (SWPPP) if the facility is located above a groundwater CERCLA site. Additionally, the same comment asked if SWPPP review is required for sites located above a groundwater CERCLA site that is retaining and/or infiltrating stormwater as a best management practice.

Another comment questioned whether there is benefit to the CERCLA sites with deep groundwater contamination and noted that the permit suggests that the eligibility requirement only be applied where stormwater is likely to cause recontamination of the CERCLA site such that discharges may reach aquatic media.

One comment expressed concern that contaminated stormwater should not be discharged to CERCLA sites that have already experienced severe contamination and degradation; the action could endanger more groundwater that could otherwise be used in the future. In addition, the comment noted that the management of this discharge could also overload or overwhelm the approved remedies at the site, possibly making the operator a potential responsible party for remediation cost.

## General Comments

One comment noted that if the discharge is out of compliance, cost recovery should only be pursued if the CERCLA site is impacted. The comment also suggested that EPA clarify the eligibility criteria for determining whether a discharge is to a Federal CERCLA site. The comment expressed concern regarding stakeholders' lack of opportunity to comment on the final criteria selected for determination if EPA is requesting the public's suggestions during the public comment period, as opposed to including them in the proposed 2020 MSGP for which stakeholders are reviewing and providing comment.

EPA appreciates and acknowledges the comments received on this specific request. Following consideration of numerous comments, EPA is not finalizing the proposal for expanding the permit eligibility requirement for discharges to a federal CERCLA site beyond EPA Region 10. However, EPA has added in the 2021 MSGP that such facilities notify the EPA Regional Office in the NOI via NeT-MSGP. If the operator's NOI contains information regarding their eligibility with respect to discharges to a CERCLA site, the NOI will be held for review for 30 days, prior to the standard 30-day review period for all NOIs. EPA made this change so that operators do not need to submit this information to the EPA Regional Office ahead of NOI submission and can send all necessary information to EPA at one time.

EPA is limiting this eligibility criterion to MSGP facilities in EPA Region 10 states and Indian Country. EPA has extensive information that stormwater discharges are a source of CERCLA site recontamination in Region 10. EPA Region 10 has seen both the actual recontamination of Superfund Sites from stormwater discharge points and the potential for recontamination from source control information gathered at Superfund Sites not yet cleaned up. EPA evaluated 2015 MSGP NOI data and found that only 12 facilities in Region 10 have been subject to this requirement in the 2015 MSGP. Further, all facilities were able to get coverage under the MSGP, and only one facility was required to do additional monitoring. Therefore, EPA does not expect that this provision will result in significant burden or delays for the majority of operators covered by the 2021 MSGP.

Just as in the 2015 MSGP, in the 2021 MSGP a facility is considered to discharge to a federal CERCLA Site if the discharge flows directly into the site through its own conveyance, or a through a conveyance owned by others, such as a municipal separate storm sewer system. This does not include discharges to a tributary that flows into a CERCLA Site. "CERCLA Site" means a facility as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), that is undergoing a remedial investigation and feasibility study, or for

which a Record of Decision for remedial action has been issued in accordance with the National Contingency Plan at 40 CFR 300. This definition includes sites that have been listed on the National Priorities List in accordance with Section 105 of CERCLA, 42 U.S.C. §9605, or that are being addressed using CERCLA authority, including use of an agreement consistent with the Superfund Alternative Approach Guidance. The federal CERCLA sites to which this provision currently applies are listed in Appendix P to the 2021 MSGP.

To determine eligibility for coverage, the EPA Regional Office may evaluate whether the discharger has in place sufficient controls and implementation procedures (e.g., enhanced controls, corrective actions, monitoring requirements, and/or numeric benchmarks or effluent limits) designed to ensure that the discharge will not interfere with achieving the cleanup goals or lead to recontamination of sediments or aquatic media being remediated under CERCLA, such that it causes or contributes to an exceedance of a water quality standard. Such releases can undo accomplished cleanups and can result in new or continuing impairments of designated uses of the receiving waters.

EPA does not agree with comments suggesting that EPA lacks authority to implement this eligibility provision. It is within EPA's authority to determine whether a discharge is eligible for coverage under a general permit issued under Section 402 of the Clean Water Act, and implementing regulations found at 40 CFR Part 122, and in particular the implementing regulations related to general permits, 40 CFR 122.28. Regarding discharges to a CERCLA Site, it is within EPA's authority to seek a demonstration, prior to authorization, that a discharge will not cause, or have the reasonable potential to cause, or contribute to an excursion above any applicable water quality standard, either numeric or narrative, or impair a designated use or violate antidegradation requirements. Water quality standards can include narrative standards such as "no toxics in toxics amounts" or "no deleterious substances or deposits that impact designated uses" that may be exceeded at CERCLA Sites and may be violated by a discharge that contributes to the exceedance. See Clean Water Act section 301(b)(1)(C) and EPA's permitting regulations at 40 CFR sections 122.4(d), 122.4(i), and 122.44(d).

The 2021 MSGP Fact Sheet indicates that for those NOIs that contain information regarding their eligibility with respect to discharges to a CERCLA site, the NOI will be held for review, ahead of the standard 30-day review period for all NOIs. This change in permit provision relieves operators of having to submit information ahead of the NOI submission and allows them to provide all relevant and necessary information to EPA at the same time.

## Eligibility Conditions – Facilities Using Coal-Tar Sealcoat (Request for Comment 2)

As part of the Settlement Agreement reached in 2016, EPA agreed to solicit comment on an eligibility criterion for operators who, during MSGP coverage, will use coal-tar sealant to initially seal or to re-seal pavement and thereby discharge polycyclic aromatic hydrocarbons (PAHs) in stormwater are not eligible for coverage under the MSGP and must eliminate such discharge or apply for an individual NPDES permit. EPA requested comment on whether the MSGP should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. EPA also requested comments on any studies that provide data on the level of PAHs from coal-tar sealed pavements, the sources of measured PAHs in the aquatic environment, the levels of PAHs in fish and seafood, and associated chemical and biological impacts that may occur via stormwater discharges. EPA further requested comment on whether or to what extent requiring facilities to implement specific stormwater control measures under the MSGP to control and treat PAH-laden discharges from surfaces paved with coal-tar sealcoat is an appropriate alternative to the proposed eligibility criterion, and if so, what those control measures should be.

In general, comments mostly opposed the PAH-related coal-tar sealcoat provision. Industry groups noted that PAHs in stormwater is a multi-source problem and cannot be solely attributed to coal-tar materials. EPA received numerous form letters containing unsupported statements that the proposal was not based on science and that coal-tar sealcoat poses no health risks. Comments generally supporting the proposal noted the available information about health risks associated with coal-tar sealcoat, comparable cost of alternatives, and cited many technical studies. Supporting comments noted the prevalence and toxicity of PAHs and suggested that at a minimum, EPA should require monitoring for PAHs to collect the data necessary to characterize the pollution problem and evaluate stormwater treatment capabilities.

The following is a summary of the comments received on this permit provision.

### Support for the Proposed Permit Provision

EPA received some comments in support of the eligibility criterion, indicating concern with the reported health risks and toxicity associated with PAHs in coal-tar sealcoat, given the amount of information available in studies on the effects of PAHs present in coal-tar sealcoat materials. Other comments in support of the eligibility criterion indicated there are alternative cost-effective sealing and resealing materials that are not coal tar-based, contain lower concentrations of PAHs, and a number of states already impose restrictions on coal-tar sealcoat materials without causing economic hardship to paving companies; therefore, the comments concluded that it is reasonable to include the eligibility criterion.

### Opposition to the Proposed Permit Provision

*Alternatives to Coal-tar Sealcoat*

Many comments received opposed the criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. Many comments indicated coal-tar sealcoat is the most preferred sealant and alternatives are limited and more expensive and suggested that the toxicity of alternative sealants is unknown.

One comment indicated that including the coal-tar sealcoat eligibility criterion would lead to elevated levels of stormwater pollution by total suspended solids (TSS) due to diminished housekeeping practices if gravel or stone is used as an alternative surface. The comment noted that the use of gravel and stone surfaces contributes TSS and prohibits certain stormwater control measures, such as floor sweeping and other mechanical housekeeping practices to remove dirt and debris from high traffic areas, from being used. The same comment also indicated that concrete, another alternative surface, is more expensive and has greater susceptibility to detrimental effects resulting from temperature changes. In addition, the comments noted that spill containment and cleanup activities would also be inhibited by use of coal-tar sealcoat alternatives.

Several comments stated that coal-tar sealcoat lasts longer than other sealants; therefore, maintenance and re-sealing is required on a less frequent basis than if other surface sealants are used. One comment suggested the inclusion of the coal-tar sealcoat eligibility criterion would discourage appropriate routine maintenance and repair of asphalt surfaces and subsequent degradation from improper maintenance would lead to lower water quality in stormwater discharges. Two comments addressed the difficulty associated with identifying coal-tar sealcoat from other sealants; citing it is challenging for facilities to determine the type of sealcoat a paving contractor is using.

*Environmental Benefits*

Comments addressing environmental concerns generally indicated that applicators refer to American Society for Testing and Materials (ASTM) standards to identify appropriate and correct application procedures, and in doing so, understand that coal-tar sealcoat should not be applied immediately before rain events. The comments similarly stated that correct application of coal-tar sealcoat products does not result in a violation of water quality standards, that they are safe when applied correctly, and extend the life of asphalt; thereby reducing costs and facilities' carbon footprint. Comments noted that coal-tar sealcoat wears off over a period of 2 to 5 years, and if it does wear off, the particles are comprised of the top aggregate layer and the particles are too small to reach waters of the United States. Several comments proposed that coal-tar sealcoat is not a significant source of PAHs and that the particles are not readily bioavailable. In addition, some comments claimed that coal-tar sealcoat are not a significant contributor to aquatic or human toxicity.

Further, some comments noted that coal-tar sealcoat products are safe for use in health and beauty products (e.g., shampoos and skin creams) and that companies that apply coal-tar sealcoat have not received claims from clients claiming illness from coal-tar sealcoat, or that the applicators themselves have not become ill following years of daily exposure to coal-tar sealcoat products.

One comment noted that limiting the restriction of coal-tar sealcoat use to areas where industrial activity occurs does not address most sources of PAHs associated with coal-tar sealcoat. The same comment further suggests that the limitation results in minor environmental benefits versus burden of getting an individual permit, which may not result in substantially different permit requirements than those included in the MSGP. Several comments indicated that coal-tar sealcoat protect asphalt surfaces from oil, fuel, and other petroleum material spills as compared to asphalt-based sealcoats and reported that they are significantly cheaper than acrylic sealants.

*Economic Effects*

EPA received many comments citing concerns with the negative economic impact that would result from inclusion of an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. Comments describe how industries related to coal-tar sealcoat will negatively impact their businesses through a loss of profits, customers, and jobs. Comments suggested the alternatives to coal-tar sealcoat products are more costly and have inferior results in the marketplace, as well as their customers' preference for coal-tar sealcoat over other sealer types when offered other sealer options. In addition, property owners will have to pay more over time for increased repaving asphalt that is not sealed, as the comment claims that untreated asphalt deteriorates twice as fast as sealed asphalt. One comment proposed that companies that use coal-tar sealcoat will incur higher initial costs to change processes to accommodate alternative products.

*Questions Related to EPA's Legal Authority to Impose Eligibility Criterion*

More than one-third of the comments that EPA received on this specific permit provision asserted the proposed eligibility criterion is effectively a ban on coal-tar sealcoat products and that EPA lacks the authority to enact a ban on specific products in addition to prescribing the means by which facilities must comply with effluent limitations and permit conditions. Comments noted that while laws such as the Toxic Substances Control Act, allow for EPA to restrict or ban the use of chemicals, the Clean Water Act and the MSGP are inappropriate avenues for EPA to use to control the use of coal-tar sealcoat at

industrial facilities. Comments indicated that including the eligibility criterion for coal-tar sealcoat potentially establishes a consequential precedent for EPA to restrict or ban the use of other products. Comments suggested that EPA's implementation of the eligibility criterion will "cripple" the pavement products industry.

*Scientific Basis*

Certain comments remarked that EPA's proposed eligibility criterion requirement lacks scientific basis and that the MSGP lacks justification for the prohibition on the use of coal-tar sealcoat products. Multiple comments expounded the U.S. Geological Survey (USGS) study that EPA cited in the Proposed 2020 MSGP Fact Sheet (*Coal-Tar-Based Pavement Sealant, PAHs, and Environmental Health*, 2019) reflects flawed science in that scientists have been unable to replicate USGS's claims that refined tar-based sealants are the dominant source of PAHs in stream and lake sediments. Another comment stated that the USGS studies employ models that overestimate PAH volatilization from sealed parking lots and associated cancer risks. The comments noted that, based on the aforementioned deficiencies, it would be irresponsible for EPA to regulate coal-tar sealcoat, especially since EPA declined to include coal-tar sealcoat provisions in the 2015 MSGP due to a lack of scientifically sound data.

## General Comments

Some of the general comments EPA received on the coal-tar sealcoat eligibility criterion addressed concern with applicability of the 2021 MSGP to the general public and small businesses, given the accessibility of coal-tar sealcoat products in small containers (i.e., not industrial volumes) absent of a minimum square footage criterion. Another comment indicated opposition to the eligibility requirement citing that the use of coal-tar sealcoat is not an activity that is unique to industry or that is directly related to industrial activity. Further, the same comment noted that the subsequent need for facilities to obtain coverage under an individual NPDES permit would contribute to already extensive NPDES permit backlog in certain areas. Comments indicated that EPA has not implemented the appropriate regulatory process to establish technology-based effluent limitations for PAHs. In addition, comments suggested that the studies of PAHs that are cited in the Proposed 2020 MSGP Fact Sheet do not rely on EPA's own guidance and studies. One comment expressed concern for the proposed eligibility criterion because the proposal is based on a 2016 settlement agreement between EPA and outside organizations, while EPA failed to address and justify the rejection of the eligibility exclusion in the 2015 MSGP.

## Alternative Solutions

Certain comments EPA received proposed alternatives to the coal-tar sealcoat eligibility criterion. Multiple comments proposed the MSGP specify that repaving activities that use coal-tar sealcoat may only be conducted during dry periods to minimize stormwater impacts or facilities must institute good engineering practices such as installment of grassed buffer zones where possible, or carbon-absorbent booms downstream of runoff to minimize impacts to receiving streams. One comment recommended that EPA develop a provision in the MSGP requiring that surfaces proposed for resealing shall not be resealed with coal-tar sealant, but instead asphalt sealant; thereby resulting in a phase out of coal-tar sealcoat and ensuring coverage of facilities under the MSGP. Another comment proposed that EPA include additional statements in the eligibility requirement in Part 1.1.8 of the proposed 2020 permit to indicate there are viable alternative products that can be used instead of coal-tar sealcoat, such as "Substitutes for CTS are available, such as asphalt emulsion sealants and acrylic sealants." Another comment suggested that EPA include a *de minimis* exception based on the ratio of surface area where coal-tar sealcoat is applied to the overall drainage area of the permitted facility. In addition, one comment requested that EPA provide a specific definition for coal-tar sealcoat, perhaps using PAH content as the basis for the definition.

Following consideration of the comments, EPA is not finalizing the changes that were proposed in the proposed 2020 MSGP. EPA is instead implementing a holistic activity-based approach for addressing discharges of PAHs in stormwater associated with industrial activity. EPA will require industrial facilities to complete analytical indicator "report-only" monitoring bi-annually (i.e., sample twice per year) during

the first and fourth year of permit coverage for PAHs if the facilities use or plan to use coal-tar sealcoat on paved surfaces where industrial activities are located, as well other specific sectors with potential petroleum hydrocarbon exposure to stormwater. The indicator monitoring, specified in Part 4.2.1 of the 2021 MSGP, is "report-only" and does not have a threshold or baseline value for comparison nor does it trigger follow-up actions. Indicator monitoring is neither benchmark monitoring nor an effluent limitation. EPA plans to use the indicator monitoring data collected to conduct an initial quantitative assessment of the levels of PAHs in industrial stormwater, further identify industrial activities with the potential to discharge PAHs in stormwater, and inform future consideration of PAH benchmark monitoring for sectors with the potential to discharge PAHs in stormwater. See Comment Response Essay 2 Monitoring for additional information on the indicator monitoring for PAHs.

## Eligibility Conditions – Extended NOI Review for Facilities with a Pending Enforcement Action (Request for Comment 4)

As part of the Settlement Agreement reached in 2016, EPA agreed to solicit comment on a provision on the situation where a facility not covered under the 2015 MSGP submits a Notice of Intent (NOI) for permit coverage while there is a related pending stormwater-related enforcement action by EPA, a state, or a citizen (to include both notices of violations ("NOVs") by EPA or the State and notices of intent to bring a citizen suit). In this situation, EPA agreed to solicit comment on holding the operator's NOI for 30 days, in addition to the standard 30 calendar days required for all new NOIs, to allow EPA an opportunity to (a) review the operator's control measures expressed in its SWPPP, (b) identify any additional control measures that EPA deems necessary to control site discharges in order to ensure that discharges meet technology-based and water quality-based effluent limitations, and/or (c) to conduct further inquiry regarding the site's eligibility for general permit coverage. See Part 1.3.3 and Table 1-2 of the proposed permit.

The following is a summary of the comments received on this permit provision. In general, most of the comments in opposition to the permit provision indicate the current 30-day review period is sufficient, thus the additional 30 days review time is unnecessary. Comments suggested that EPA could, as an alternative to the extended review period, include a new question on the NOI that asks operators if there is a pending enforcement action against the facility. Prompt identification of the scenario enables EPA and the Office of Enforcement and Compliance Assurance (OECA) to focus their review during the standard 30-day review period rather than lengthening the NOI review process.

### Support for the Proposed Permit Provision

Multiple comments supported the proposed extension of the NOI review period for new NOIs for permit coverage while there are pending enforcement actions. One of the comments added to their support that the additional review time should not delay implementation of stormwater controls and associated monitoring. One comment indicated support for the proposed provision stating that the extended process may prevent operators from obtaining coverage as a shield from enforcement of prior and/or continuing Clean Water Act violations. The same comment cited that the lengthened review period will enable EPA and other stakeholders to conduct a sufficient evaluation of NOI information.

### Opposition to the Proposed Permit Provision

EPA received numerous comments that opposed the proposed extension of the NOI review period in these specific cases. Several comments indicated that the permit lacked adequate justification for extending the waiting period. Multiple comments indicated that the current standard length of review period, 30 days, is sufficient for review of NOIs and required information. Two comments indicated that the proposed 2020 MSGP did not present any additional criteria for EPA to follow or describe the process of review to occur during the extended review, only that the review period was extended. One of these comments stated that the extended timeframe may lead to an additional violation if there is an unpermitted discharge and will delay business operations. Another comment suggested an extended NOI review period would needlessly expand NOI processing times, reduce EPA's permit processing efficiency, and add to permit backlog. The same comment also noted that the Proposed 2020 MSGP (Table 1-2) provides EPA the ability to deny or delay discharge authorization for existing facilities without MSGP coverage; therefore, the comment asserts that the extended wait period is already built into the MSGP. A comment suggested that an additional wait period does not provide any additional environmental benefit.

### Alternatives to the Proposed Permit Provision

One comment suggested an alternative waiting period of 45 days, barring permit deficiencies. Further, the comment indicated that discharge authorization should be automatic if EPA hasn't notified the operator that authorization has been denied or delayed. Another comment suggested EPA provide an exemption for facilities that have changed ownership.

## General Comments

One comment indicated uncertainty in the benefit to their program by instituting a review period of 60 days because a permit registration statement is required to be submitted 60 days prior to commencement of industrial activity. In addition, the comment noted that the new tasks related to this specific review (e.g., determining when an enforcement action is pending, reviewing Stormwater Pollution Prevention Plans (SWPPPs), and tracking the extended processing period) would create additional workload for their staff. Further, the same comment indicated their program prefers to authorize facilities under their industrial stormwater general permit and ensure facilities are complying with the permit requirement. Additionally, their regulations provide flexibility to deny coverage under a general permit when a discharger is not in compliance with a general permit or when discharges are not appropriately controlled by a general permit, and to address SWPPPs or stormwater control measures as part of the compliance and enforcement process.

Another comment indicated the additional wait time could be biased against companies that operate multiple facilities within a state or across the country, where there may be subject to an enforcement action. The comment suggested that scenarios proposed in EPA's justification for the proposed permit provision, facilities will submit an NOI without adequately developing a SWPPP in an effort to avoid further enforcement action, would be rare and can be dealt with on an individual basis rather than instituting a broad policy. The comment also expressed concern with EPA's inclusion of citizen lawsuits in the types of enforcement actions against the facility, suggesting the potential for misuse by citizens who oppose the specific facility or its industrial activities in general. The comment suggested that if the proposal is finalized, that EPA limit its application to federal or state enforcement actions only.

EPA acknowledges the comments received on this specific solicitation. Following consideration of numerous comments, EPA is not finalizing the proposal for the provision requiring an extended NOI review period for the new NOIs for facilities that have a pending enforcement action. However, EPA has updated the NOI form in the 2021 MSGP from the 2015 MSGP, to include the following new questions specifically targeted at this issue:

- Were you previously covered under the 2015 MSGP? *(yes/no)*
    - If no, do you have a pending enforcement action related to stormwater by EPA, a state, or a citizen (to include both notices of violation (NOVs) by EPA or a state and notices of intent to bring a citizen suit)? *(yes/no)*

## Appendix Q – Stormwater Control Measures

In the proposed 2020 MSGP, EPA proposed to include new sector-specific stormwater control checklists in Appendix Q – Stormwater Control Measures (SCMs). The proposed 2020 MSGP required implementation of the controls in the checklists as part of the proposed AIM Level 2 responses. EPA developed the checklists based on the tables containing potential sources and corresponding stormwater control measures (Table 2) in EPA's sector-specific industrial stormwater fact sheet series. EPA agreed in the 2016 Settlement Agreement to update the fact sheets to incorporate emerging stormwater control measures that reflect best available technology economically achievable (BAT) and best conventional pollutant control technology (BCT), as revealed by current industry practice and as recommended by the NRC Study. EPA provided these proposed updates in the proposed Appendix Q (Stormwater Control Measures) in the form of checklists.

EPA received many comments opposed to the inclusion of Appendix Q in the permit. The comments stated that the requirements were overly prescriptive, burdensome and costly, vague, redundant or duplicative, and inconsistent with other federal and state requirements. EPA also received numerous comments requesting revisions to the stormwater control measures for specific sectors and concerns that the proposed requirements were developed without industry input. Specifically, some comments indicated that many of the requirements outlined were not fully applicable, relevant, or able to be implemented in the manner suggested by the checklists. For example, one commenter indicated that the control measure "determine whether excessive application of deicing chemicals occurs and adjust as necessary" may potentially conflict with Federal Aviation Administration requirements and that other identified practices for Sector S (Air Transportation Facilities) were outdated and ineffective at airports. Many comments also stated that the stormwater control measures appeared to be heavily biased toward vehicle use, storage, fueling, maintenance, and parking. Other comments indicated that some of the control measures could not be implemented within the AIM timeframes and that many would be cost-prohibitive to implement.

EPA also received numerous comments expressing concerns with the general layout, language, and format (i.e., checklist) of the proposed Appendix Q. Many comments suggested that the checklist be "indexed" or be provided as a "list or menu" rather than a checklist. Some commenters also suggested that Appendix Q be converted to recommendations or guidance rather than contained in the permit itself. Comments also suggested that operators should not have to document the "Reason Why Inappropriate / Not Done", indicating that such a process is contrary to proper engineering analysis and that the additional documentation would be extremely burdensome.

In light of the comments, EPA is not finalizing Appendix Q in the 2021 MSGP. Instead, EPA is maintaining the existing industrial stormwater fact sheet series as guidance. In the 2021 MSGP, after AIM Level 2 is triggered, the Level 2 response requires the operator to generally implement additional pollution prevention/good housekeeping measures. EPA encourages facilities to consult the existing MSGP industrial stormwater fact sheet series for guidance on recommended stormwater control measures appropriate to comply with AIM Level 2. EPA plans to work with external stakeholders to thoroughly revise the sector-specific fact sheets. For additional information on AIM Level 2 responses, see Comment Response Essay 3 Additional Implementation Measures.

# Individual Comments and Responses
## G.1. General

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI would like to note its appreciation of EPA's extension of the deadline to submit comments on the Proposed 2020 MSGP. To the extent that the extension reflected to some degree the impact of the current COVID-19 pandemic on the entire economy, ISRI hopes that EPA will carefully consider the timing of the effective date for any significant new activities, measures, or requirements in the 2020 MSGP. It does not stretch the imagination to believe that necessary equipment and services might not be available within the timeframes specified in the 2020 MSGP (even with EPA-approved extensions), or at all, for a period of time during the term of the 2020 MSGP. On a general basis, EPA should consider including a time delay in the 2020 MSGP for implementing any new significant equipment- or service-intensive activities, measures, or requirements to account for the possibility, if not likelihood, of significant practical impediments arising from the COVID-19 pandemic to compliance with the 2020 MSGP.

**Comment Response:**

EPA acknowledges the commenter's support for the extension of the comment period for the Proposed 2020 MSGP. Regarding timing of the requirements of the 2021 MSGP see page 1 of the final permit or the Federal Register Notice. Regarding the impacts of COVID on enforcement of the 2021 MSGP requirements, see response to EPA-HQ-OW-2019-0372-0183-A1, excerpt 1.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Our first concern is the timing of the new permit. The COVID-19 pandemic is still impacting Massachusetts and the nation. In fact, of all the states for which EPA has primary authority, Massachusetts is the worst hit and our governor has only recently established the first phase of four phases that will allow Massachusetts to reopen. Over 6000 residents have died from

COVID-19 and unemployment is increasing. Unlike other states, Massachusetts is not likely to have an all-clear for many weeks.

This make it difficult for the nearly 800 industries in Massachusetts impacted by this proposed regulation to spend time reviewing it and even more difficult to begin compliance with it. Many are shut down and their future is uncertain. Some are relying on federal loans to stay afloat, and many have switched their production to PPE or other essential items, running operations they would not normally engage in to help reduce the spread of the coronavirus.

As a result, we believe EPA should extend the current permit requirements indefinitely until people have more certainty regarding their prospects for reopening.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0184-A1, excerpt 1.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0140
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I strongly oppose pushing back the deadline for National Pollution Discharge system reporting and compliance. Discharging polluting waste into the environment is undeniably associated with dangers to public health. Presently mandated deadlines should be enforced, and the problems dealt with and not kicked down the road another five years. We do not have five years to waste. The problems need to be identified and dealt with before further damage is incurred.

**Comment Response:**

EPA acknowledges the commenter's concern regarding delaying requirements. EPA received comments both in favor and opposed to a delay in MSGP requirements for various reasons, including impacts resulting from the pandemic. Regarding timing of the requirements see response to EPA-HQ-OW-2019-0372-0184-A1, excerpt 1.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0247
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Please do NOT further delay the time the industries have to report and diminish their stormwater discharges. Industries should be accurately reporting this now and taking steps to diminish stormwater discharges now. The EPA is charged with protecting the nation's water from pollution...do so NOW!

**Comment Response:**

EPA acknowledges the commenter's concern regarding delaying requirements. EPA received comments both in favor and opposed to a delay in MSGP requirements for various reasons, including impacts resulting from the pandemic. Regarding timing of the requirements see response to EPA-HQ-OW-2019-0372-0184-A1, excerpt 1.

---

**Commenter Name:**  Jeffrey A. Cox
**Commenter Affiliation:**  Division of Sewerage and Drainage, Department of Public Utilities, Columbus, OH
**Document Control Number:**  EPA-HQ-OW-2019-0372-0131-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Although US EPA has delegated to Ohio EPA authority under the Clean Water Act to issue NPDES permits, USEPA's MSGP will have a significant influence on the terms of the Ohio EPA MSGP. Consequently, Columbus submits the following brief comments on USEPA's proposed MSGP.

1. Columbus requests that USEPA consider the adoption of the NAICS (https:/lwww.census.gov/eos/www/naics/) system in lieu of SIC codes to increase industry specificity.

**Comment Response:**

EPA disagrees and does not use NAICS codes in-lieu of SIC codes in the final 2021 MSGP. Similar to the 2015 MSGP, the Final 2021 MSGP continues to rely on SIC codes, or in some cases narrative descriptions, to maintain consistency with the industrial stormwater regulations in 40 CFR 122.26(b)(14)(i-ix, xi). The 2015 MSGP included an appendix matching SIC codes to NAICS codes, this appendix is retained in the 2021 MSGP. States can refer to Appendix N or the updated Sector-Specific fact sheets for correlation between SIC codes regulated under the MSGP. States and industrial facilities can also contact EPA Region Offices for more information.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

General comment about Permit Section 9 not being available during comment period. Section 9 of 2015 MSGP affects previous permit sections as well as the NOI for 2020 MSGP, especially in the impaired waters sampling requirements.

**Comment Response:**

EPA acknowledges the comment on Part 9 of the MSGP. EPA notes that 401 certifications were only requested after the permit was proposed. As such, these certifications were not available to the Agency at the time the MSGP was proposed. The proposed MSGP 2020, noted that EPA would update Part 9 with any CWA Section 401 certification conditions received as part of finalizing the MSGP and EPA has done so. EPA incorporated the 401 certifications submitted to EPA by authorized states and tribes in Part 9 of the final 2021 MSGP. Further, state 401 certifications often go through notice and comment at the state-level. Finally, EPA has no discretion regarding whether to include such state 401 certifications in its final permits.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

Throughout the MSGP and Fact Sheet, EPA has removed the language "(i.e., that pollutants of concern will not be discharged at levels that will cause or contribute to an exceedance of a water quality standard)" after the text "meet applicable water quality standards". (newly numbered parts 1.1.6.1, 1.1.6.2, 1.1.7, and part 2.2.1). However, this text has been retained in other sections.

1. The City suggests this language be retained to emphasize the exceedance is in the receiving water.

**Comment Response:**

EPA states in the final 2021 MSGP that the "stormwater discharge must be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards."

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We have coordinated with various industry groups, environmental professionals, and trade associations to generate a comprehensive and considerate look at the proposed changes, as these changes have the potential to impact many types of operations and will likely affect state-level NPDES permits in the future. We look forward to EPA's responses.

In our opinion, the proposed 2020 NPDES MSGP has many prescriptive requirements that will not "fit" across all sectors.

**Comment Response:**

EPA acknowledges the comment that not all requirements included in the Proposed 2020 MSGP "fit" all sectors. EPA has made changes to the permit based on public comments. For the 2021 MSGP requirements please see the final permit.

---

**Commenter Name:** Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:** Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The Steel Associations welcome and appreciate EPA's efforts to simplify the MSGP, streamline permitting, and eliminate certain unnecessary monitoring requirements.[2]

[2] 42 U.S.C. 7412(r)(6)(C)(i).

**Comment Response:**

EPA acknowledges the commenter's support for simplifying the MSGP.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

*In order to further promote public transparency, EPA should maintain a publicly available website where the public can access MSGP permit documents (NOIs, annual reports, and SWPPPs) as well as report any observations of stormwater pollution.*

Commenters acknowledge that EPA already provides public access to NOIs submitted for the 2015 MSGP (through ECHO for NOIs submitted prior to April 1, 2018, and through https://e-enterprise.gov/eenterprise-new for NOIs submitted on or after April 1, 2018). We urge EPA to also make annual reports (pursuant to section 7.5 of the proposed MSGP) and updated SWPPPs available on a central, publicly available website, where the public can also report any observations of stormwater pollution. Commenters recognize that the 2020 MSGP encourages operators to publish updated SWPPPs on publicly accessible URLs. However, this is not a requirement. If an operator does not follow this suggestion, the Proposed 2020 MSGP merely states, "EPA may provide access to portions of your SWPPP to a member of the public upon request…."[20] Proposed 2020 MSGP § 6.4.1. This language is insufficient to allow the public timely access to these records. Not only is it unclear what steps the public must take to request a facility's updated SWPPP, but also there are no mandatory timeframes by which EPA (and subsequently, the operator) must respond to such requests.[21]

*i. EPA already has both a foundation and experience to make these documents available to the public.*

Given that EPA already established an online system to electronically submit NOIs and annual inspection reports through EPA's Central Data Exchange,[22] the Agency already has a foundation to create a platform for the public to view these compliance documents. Further, EPA has had prior experience with – and is fully capable of – establishing or requiring electronic databases for the public to access and review compliance documents. For example, under EPA's solid waste regulations for coal ash disposal facilities, owners and operators are required to maintain publicly accessible websites where most of the documentation required by the regulations, including dozens of individual documents, must be posted.[23]

*ii. States with equivalent permits have set up similar databases.*

Other states have established public databases for equivalent general permits and require operators to post compliance documents. For example, California's General Permit for Storm

2021 EPA MSGP Response to Comments
January 15, 2021

Water Discharges Associated with Industrial Activities requires permittees to upload NOIs, SWPPPs, and annual inspection reports to its Stormwater Multiple Application and Report Tracking System (SMARTS) database.[24] These updated SWPPPs must be posted to the publicly accessible SMARTS database within 30 days of significant revisions to the SWPPP.[25] In addition, Rhode Island similarly requires permittees to upload Stormwater Management Plans (Rhode Island's version of the SWPPP) to its online NeT system once per year or else publish current plans on a publicly assessable URL.[26]

[20] *Id.* at section 6.4.1.

[21] Compare Draft Permit with Washington State Industrial Stormwater General Permit at 42 (effective Jan. 1, 2020), *available at https://fortress.wa.gov/ecy/ezshare/wq/permits/ISGP_PermitFINAL.pdf* (which requires a permittee to provide a copy or to provide access to the SWPPP within 14 days of receiving a written request from the public); and New York State, SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004, at 26 (effective Mar. 1, 2018) *available at* https://www.dec.ny.gov/docs/water_pdf/msgppermit.pdf (which requires permittees to make a copy of the SWPPP available to the public within 14 days of a request).

[22] https://npdes-ereporting.epa.gov/msgp

[23] 40 C.F.R. §257.107 ("Publicly accessible internet site requirements").

[24] California, *General Permit for Storm Water Discharges Associated with Industrial Activities,* at 3, 59 (effective July 1, 2015) *available at* https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/industrial/2014indgenpermit/wq o2014_0057_dwq_revmar2015.pdf.

[25] *Id.* at 24.

[26] Rhode Island, *Multi-Sector General Permit: Rhode Island Pollutant Discharge Elimination System: Storm Water Discharge Associated with Industrial Activity,* at 32 (effective May 3, 2019), *available at* http://www.dem.ri.gov/programs/benviron/water/pn/ripdes/msgp.pdf.

**Comment Response:**

EPA acknowledges the commenter's request for public access to all MSGP documents. Similar to the 2015 MSGP, the final 2021 MSGP lays out the option of having a SWPPP available online at a URL or including aspects of the SWPPP in the NOI. The final 2021 MSGP also includes an option to attach the SWPPP to the NOI. Therefore, the SWPPP or the most relevant requirements will be available to EPA when the NOI is submitted to EPA. Once active in EPA's ECHO tool the public will also have access to this information.

Data is also made available through annual reports. Additionally, the public can also request additional information not publicly available through the Freedom of Information Act (FOIA), see FOIA.gov for more information on this process.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 54
**Excerpt Status:** Final

**Comment Excerpt:**

VI.B. MSGP Permits in Idaho

EPA has authorized Idaho Department of Environmental Quality (IDEQ) to implement a NPDES permit program and IDEQ will obtain permitting authority for general industrial NPDES permits on July 1, 2021. Under EPA's current schedule, NOIs would be due 12 February 2021. With potential delays to finalizing the proposed 2020 MSGP, the timeframe to submit an NOI will likely be close to the date when Idaho becomes the permitting authority. Requiring facilities to submit two separate NOIs and comply with two different stormwater general permits within a short timeframe would be unnecessarily burdensome. Thus, Simplot requests that EPA administratively extend 2015 MSGP coverage to facilities in Idaho until IDEQ issues the Idaho NPDES General Permit for Industrial Activity.

**Comment Response:**

As noted by the commenter, the expected date for the transfer of National Pollutant Discharge Elimination System (NPDES) Permitting Authority to Idaho for general stormwater permits, including the EPA's MSGP, is July 1, 2021. EPA will work closely with operators in Idaho to transfer coverage at that time.

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, MassDEP wants to ensure that EPA is referencing the most recent 303d list in the MSGP: https://www.epa.gov/sites/production/files/2020-01/documents/2016-ma-303d-list-report.pdf

**Comment Response:**

Comment noted.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Given the significant financial hardship posed by the current Covid-19 situation on many industries, including the lumber industry, any additional regulatory burden posed upon these facilities should not be taken lightly.

**Comment Response:**

EPA acknowledges the commenter's concern regarding burden imposed on the lumber industry and all industries. EPA fully evaluates the burden associated with all regulatory actions.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, NRMCA supports and is committed to smart practices and common-sense methods for keeping our nation's waterways and their tributaries clean and healthy. It is the position of NRMCA that more regulation of our nation's waterways is not necessary to achieve the goals of the Clean Water Act. NRMCA believes that incentivizing and promoting environmentally conscientious practices will go much further to achieving these goals than tougher, more expansive, and more complex enforcement of laws and regulations.

**Comment Response:**

The conditions of the 2021 MSGP are consistent with the requirements of the Clean Water Act (CWA). The CWA § 402(p) requires EPA to regulate the discharge of pollutants from stormwater associated with industrial activity into waters of the U.S. under the NPDES program.

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

WEF recognizes that management of industrial stormwater benefits our municipal stormwater MS4 members as well. WEF would like to state at the outset that EPA should not lose sight of the pollution prevention benefits of this MSGP for stormwater discharges associated with industrial activity. Many small and medium facilities that embraced the pollution prevention approach had a less difficult time to comply with the complexities of the regulations, and although not painless, it was a more acceptable approach and a better outcome for the water quality.

Larger and more sophisticated facilities that looked at their operations and processes from the perspective of prevention first, adapted and invested in changes, including product substitution (as for example potential approaches in coal tar aspect of this proposed permit), making compliance more aligned for the desired outcome, protection of water quality without major disruption to the business activities.

Finally, EPA should remain attentive to the fact that imposing new or added responsibilities on industrial permittees under this general permit might lead to added burden on MS4 permits for Phase I communities, those who manage industrial stormwater programs as well as states who already have resource constraints in managing their stormwater and permitting programs.

**Comment Response:**

EPA acknowledges that some facilities were early adopters of pollution prevention approaches that can be an effective way to reduce pollutants in stormwater discharges. EPA evaluated the burden associated with this permitting action and notes that the 2021 MSGP does not directly impose requirements on Phase I Municipal Separate Storm Sewer Systems (MS4s).

## G.2. General - Support

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

James Environmental Management would like to express thanks for the language in the permit that is designed to give attention to low risk designations as an alternative for facilities that pose minimal impacts on stormwater quality... As well as accommodation for permittees seeking to stay in compliance through additional forms for facilities to provide explanation to the agency, as well as updating parts of the permit that have been found to have minimal impact on the overall stormwater quality

**Comment Response:**

EPA acknowledges the commenter's support for the proposed revisions to the MSGP.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI supports or accepts the following proposed provisions of, changes to, or additions for the 2020 MSGP—notwithstanding areas of opposition or disagreement by ISRI that might render them moot:

- Elimination of the iron benchmark;
- Increasing the benchmark for aluminum to 1,500 µg/L based on its 2018 final updated aquatic life criteria;
- Optional use at any time of updated aquatic life criteria for copper to develop an alternative facility-specific copper benchmark based on risk to the facility's receiving water;
- Adoption of wet-weather benchmark monitoring and also the option of using dissolved-metals benchmarks; Exceptions for aberrant events for any AIM trigger based on an exceedance greater than a specific multiple of the benchmark;
- An exception available in any AIM tier for demonstration of no actual exceedance of a WQS in the receiving water, with appropriate revision of the DMR Form;
- An exception that may be used at any time or in any AIM tier for natural background, as well as the impact of uncontrollable air emissions from off-site, that cause a benchmark exceedance and without which there would be no benchmark exceedance, with appropriate revisions of the DMR Form; and
- Changing "No Exposure Certification" from "NOE" to "NEC".

**Comment Response:**

EPA acknowledges the commenter's support for the proposed revisions to the MSGP.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The Port of Seattle (Port) supports the efforts to improve stormwater quality put forth in the draft MSGP. Managing stormwater discharges and protecting Washington's receiving waters is a critical goal for the Port. In today's competitive economic climate, the MSGP may have a major economic impact on Washington ports, port customers and related businesses. These comments are submitted with the aim of achieving environmental protection and regulatory predictability while balancing the economic needs of local and regional businesses.

**Comment Response:**

EPA acknowledges the commenter's support for the proposed revisions to the MSGP.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

The Port appreciates that the draft MSGP maintains important water quality benchmarks and supports the incorporation of new language addressing:

- Changing the acronym reference for a No Exposure Certification from NOE to NEC (Part 1.5)
- Including an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring (Part 4.2.1.1)
- Changing the copper benchmark in the 2020 MSGP to allow facilities that repeatedly exceed it to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis (Part 4.2.1.2.b)
- Updating the equation for evaluating sampling results against background pollutant levels and comparing this result to the benchmark threshold (Part 5.2.4.1)

The Port's suggestions for improving the draft MSGP language are in Attachments A and B. We believe the EPA can continue a strong, consistent, science-based stormwater regulatory framework to improve water quality without negatively impacting the state and local economies.

**Comment Response:**

EPA acknowledges the commenter's support for the proposed revisions to the MSGP.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

MWRA applauds the stated goals of revising the MSGP to better characterize industrial stormwater risk, related water quality problems, and stormwater control effectiveness, and EPA's efforts to streamline the permit, providing greater clarity, predictability and enforceability to permit compliance.

**Comment Response:**

EPA acknowledges the commenter's support for the proposed revisions to the MSGP.

## G.3. General - Do Not Support

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

CCIG appreciates EPA's effort to improve the MSGP and believes that many of the proposed changes would produce positive outcomes for water quality. Nevertheless, based on CCIG members' experience complying with MSGP requirements, the Group offers the following comments to recommend several important changes to EPA's proposal. CCIG believes that, if adopted, these changes would further improve the MSGP by, *inter alia*, providing industrial sources with the flexibility necessary to implement stormwater controls that are based on site-specific assessments.

**Comment Response:**

Comments noted. Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

**Commenter Name:** Meghan Morel
**Commenter Affiliation:** South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The South Carolina Water Quality Association (SCWQA) has concerns regarding several of the changes in the proposed 2020 MSGP. Many of SCWQA's Members own and/or operate publicly-owned treatment works (POTWs) that must either seek coverage for stormwater discharges from their facilities or submit no exposure certifications to the State to verify that coverage is not needed. Although EPA does not issue NPDES permits in South Carolina, state regulators often look to EPA's national permits, including the MSGP, for guidance in issuing state discharge permits.

**Comment Response:**

Comments noted. EPA notes that states with NPDES authority are not required to use the MSGP requirements included in the 2021 MSGP. Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

---

**Commenter Name:** Howard Marks
**Commenter Affiliation:** National Asphalt Pavement Association (NAPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

We commend EPA for continuing to ensure industrial stormwater discharge is protective of U.S. waters; however, we recommend the draft MSGP be revised substantially. NAPA, representing SIC 2951, would welcome the opportunity to further assist EPA in its endeavor to set realistic, applicable, and appropriate industry-specific industrial stormwater discharge benchmark values.

**Comment Response:**

EPA acknowledges the commenter's support for continued revisions to the MSGP. EPA appreciates assistance in refining the MSGP requirements via submitted comments and welcomes other opportunities to help further the reduction of pollutants in stormwater discharges.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

AAAE's recommendations in response to the proposed 2020 MSGP are intended to achieve two key goals: (1) improve the amount of flexibility that airports have to attain the desired outcomes outlined in the MSGP, and (2) ensure that the permit's terms and conditions reflect a risk-based approach when imposing obligations on airports covered under the MSGP.

**Comment Response:**

Comments noted.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

While supporting or accepting some aspects of the Proposed 2020 MSGP and some related topics, ISRI has significant concerns about major aspects of the Proposed 2020 MSGP.

**Comment Response:**

Comments noted. Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should adopt a 2020 MSGP that incorporates the proposed provisions, changes, and additions supported by ISRI and that excludes the proposed provisions and suggestions opposed by ISRI in an internally consistent manner and consistent with NASEM's recommendations in its Report.

**Comment Response:**

Comments noted. Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Although we recognize and appreciate the many ways in which EPA has endeavored to simplify and streamline permitting through the MSGP, we believe there are important additional opportunities to decrease compliance burdens associated with the MSGP while continuing to fully protect water resources.

**Comment Response:**

EPA acknowledges the support for simplifying and streamlining the MSGP.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

NAIMA and its members have significant concerns with a number of the new and modified requirements that are incorporated into the EPA's Proposal for 2020 Multi-Sector General Permits ("MSGP").  NAIMA respectfully requests EPA to consider the comments and concerns identified in these comments and make necessary revisions to the draft to accommodate these concerns.  EPA will note that the general tone and tenor of these comments is to afford the regulated community with greater flexibility to ensure financially feasible and technically

reasonable requirements that are based on a common-sense assessment of site-specific conditions.  NAIMA recognizes that this is intended to be a broad-based general permitting approach, but even given that objective, there needs to be room for accommodating and addressing unique feature of certain industries.

**Comment Response:**

Comments noted. Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

**The MSGP's Reach Extends Far Beyond Four States**

While the MSGP is used only in a handful of states and territories, the other states delegated with NPDES authority use it as a model, so changes in requirements can have a ripple effect across the country. According to EPA's webinar, 37% of the delegated states have adopted the EPA MSGP. EPA notes that state-issued permits do not have to "mimic" federal MSGP. Indeed, the CWA's basic policy "to recognize and preserve and protect the primary responsibility and rights of the states is the very foundation of the permit program. Congress made clear its intent that the CWA be administered in such a manner that the abilities of the states to control their own permit program will be developed and strengthened." *NRDC v. EPA*, 859 F.2d. 156 (DC Cir. 1988). However, NSSGA fears that even more states will feel compelled to adopt the EPA issued MSGP with the proposed permit's onerous provisions that may not be appropriate to ensure that a state's water quality standards will not be violated.

**Comment Response:**

As noted by the commenter, states with NPDES authority are not required to use the requirements in the 2021 MSGP. See response to EPA-HQ-OW-2019-0372-0228-A1, excerpt 1.

---

**Commenter Name:**  M. Jamerson
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0197
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

There are many confusing and perplexing items within the overall MSGP program. Having been involved with stormwater program since its inception in 1992, my comments are given from the practical perspective of working directly with industry onsite throughout the United States.

It strikes me that EPA's objectives are to prohibit storm water pollution from all sectors/polluters, not just those in specific designations. Compliance with the Stormwater Program should be applied in a two-fold manner.

**Comment Response:**

The Clean Water Act (CWA) prohibits the discharge of pollutants through a point source into a water of the United States without a permit. The MSGP enables eligible industrial operators to discharge stormwater from their facility.. See responses in comment code 1.1.2 and 1.5 for additional details.

---

**Commenter Name:** M. Jamerson
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0197
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

I would just like to see that EPA's objectives of stormwater pollution prevention are being met in a more significant way in the next five years than the laxed and lenient methods we've seen for the past five years under the 2015 MSGP.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0197, excerpt 1.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 88
**Excerpt Status:** Final

**Comment Excerpt:**

Commenters recognize that the EPA's proposed renewal permit includes reforms that will result in improved protections for water quality, wildlife, and human health. However, there are proposals in the draft permit, which are not supported by the law or science, that will undo or significantly weaken public safeguards. ... Lastly, there are a number of omissions or other areas where EPA has failed to adopt or modify aspects of the permit that are necessary to address ongoing harm to waterways, the environment, and human health.

**Comment Response:**

Without further details on the omissions or what specific areas the commenter felt "are not supported by the law or science" EPA cannot comment fully, but disagrees the proposed 2020 MSGP and the final 2021 MSGP contain components that are not supported by law, science, or otherwise necessary to carry out the requirements of the Clean Water Act.  and .

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  90
**Excerpt Status:** Final

**Comment Excerpt:**

In its current form, EPA's proposed Multi-Sector General Permit makes some progress since the development and issuance of the 2015 MSGP. However, still many issues that concern legal and technical compliance with the requirements of the Clean Water Act and other federal law are not adequately addressed or resolved in the Draft Permit. As explained above, EPA must adopt and revise a number of provisions in the final draft of the 2020 MSGP.

**Comment Response:**

Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

---

**Commenter Name:**  M. Patrick McGuire
**Commenter Affiliation:**  Edison Electric Institute (EEI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**III. The Proposed MSGP Must Retain Flexibilities For Facilities.**

The Proposed MSGP must retain regulatory flexibilities on which EEI members rely to allow facilities to continue to mitigate stormwater discharges in an efficient and effective manner.

**Comment Response:**

EPA has retained and added flexibilities in the 2021 MSGP. See Comment Response Essay 1 Legal Issues regarding the Regulatory Flexibility Act.

---

**Commenter Name:** Emily Remmel
**Commenter Affiliation:** National Association of Clean Water Agencies (NACWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0230-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

NACWA is concerned that the proposed 2020 MSGP will have considerable impacts on the clean water community by adding monitoring requirements and control measures that will not likely result in tangible water quality improvements.

**Comment Response:**

Comments noted. See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Benjamin J. Davenport
**Commenter Affiliation:** Idaho Mining Association (IMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Some of the provisions in the proposed 2020 MSGP will have direct implications for IMA members. IMA members own and operate metal and non-metal mines and related facilities (primarily sectors G and F) and would be affected negatively by some of the proposed changes.

**Comment Response:**

Please see more specific sections of the comment response document for more detailed responses to the issues raised by the commenter.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Our members believe that the proposed 2020 permit is vastly more expansive than EPA MSGP permits issued over the last 25 years, imposing monitoring and potential corrective measures for minor exceedances that are inappropriate for our industries.

**Comment Response:**

Comments noted. EPA considers the permit conditions established in the 2021 MSGP reasonable. See Essay 2 Monitoring and Essay 3 Additional Implementation Measures (AIM) related to additional monitoring and corrective measures.

**Commenter Name:** Christopher M. Kilian
**Commenter Affiliation:** Conservation Law Foundation (CLF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

For the reasons described above, the proposed Section 2.1.1.8 improperly narrows the duties imposed on permittees by the "good engineering practice" standard and needs to be revised to avoid impermissible backsliding.

**Comment Response:**

Comments noted. Please see comment code 2.1.1 of the comment response document for a detailed responses to the issues raised by the commenter.

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

In closing, CRH feels that certain portions of the proposed MSGP add significant complexity without clear benefits to, or assurances of, environmental quality. The potential for confusion and non-compliance is counterproductive to the purpose of the permit and the Clean Water Act. Additionally, CRH is concerned that for those issues which the EPA has not provided clear criteria (e.g., run-on to CERCLA site applicability, flood zone applicability, coal-based tars, signage, and the definition of a "low-risk" facility, among others), there will not be an opportunity for the regulated community to comment on decisions or amendments made by the EPA before finalization of the permit.

**Comment Response:**

EPA disagrees with the commenter's claims that "there will not be an opportunity for the regulated community to comment on decisions or amendments made by EPA." The public comment period is the public's opportunity, regulated community and others, to comment on EPA's proposed 2020 MSGP. As part of finalizing the MSGP, EPA has made changes to what was proposed considering public comments. For any new data, or topics outside of those raised in public comments, EPA would issue a Notice of Data Availability (NODA) to notify the public of new information.

---

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**A table of contents should be added before Section 1 of the permit**. A table of contents should be added before Section 1 of the permit. The table should include links to jump to the selected section of the permit.

**Comment Response:**

EPA agrees with the commenter's suggestion of incorporating a table of contents in the 2021 MSGP and included a table of contents for easier navigation within the document.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

CRH is providing comment regarding the proposed MSGP. Generally, we find the changes are unnecessarily onerous and confusing. The added complexity may lead to misinterpretation and misunderstanding of compliance responsibilities and status. This, in turn, could facilitate non-compliance for small operators without strong environmental management resources or compliance tools, without significant improvements to protections of water quality. Without some adjustments to the language and certain sections of the permit requirements, we believe the proposed MSGP could lead to additional costs and unwarranted enforcement and lawsuits. Our efforts to improve the environment are constrained when we must spend resources on burdensome regulation that does not result in significant added benefit to the environment.

**Comment Response:**

EPA disagrees with the comment that the proposed 2020 MSGP is onerous, confusing, and burdensome. In the proposed 2020 MSGP, EPA simplified language and streamlined the requirements and has made further similar refinements in the final 2021 MSGP. This included incorporating information in a more readable manner and additional clarity, where appropriate. EPA's goal was to reduce stormwater pollutants ultimately reaching waters of the United States while still keeping burden manageable.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

NSSGA finds the proposed permit needs changes to prevent it from being unnecessarily onerous and confusing for businesses to comply with, particularly small businesses. The intent of the litigation settlement and subsequent study was to both ease and streamline requirements for many facilities and to impose more requirements on those with the highest risk and long-term compliance problems.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0228-A1, excerpt 1.

**Commenter Name:** Daniel Curtin
**Commenter Affiliation:** Crystal Cove Marina
**Document Control Number:** EPA-HQ-OW-2019-0372-0106-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, the proposed MSGP continues to mask its requirements in a Labyrinthine fashion, which forces our industry to have to hire outside environmental professionals in both legal and scientific capacities, just so that we can ensure compliance.

The fact that the 2020 MSGP is a 193-page document with accompanying Appendices total nearly 900 pages is RIDUCULOUS! Why can't EPA use the recurring modification process to simplify the Permit rather than simply regurgitating the same bulk and making minor tweaks?

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0228-A1, excerpt 1. Without more specific suggestions for how the permit and process can be simplified EPA is unable to respond to concerns raised by the commenter.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Wyoming mining operations are large operations, often tens of thousands of acres in size, subject to comprehensive state and/or federal mining requirements. Only a small portion of these areas is covered by the MSGP stormwater program. Wyoming coal mining operations are also regulated under the Surface Mining Control and Reclamation Act[1] (SMCRA) program, which contains comprehensive requirements for protection of the hydrologic balance and implementation of erosion control measures onsite. Under the Wyoming MSGP permit program, runoff from the vast majority of the disturbed areas, along with all pit dewatering, and maintenance and coal handling facilities are required to be directed to ponds or discharge points regulated under NPDES permits. These NPDES permit sources are subject to Technology Based Effluent Limits and Water Quality Based Effluent Limits. Small areas, typically on the outer boundaries of a facility, can be exempted from these NPDES permit requirements upon an environmental performance demonstration by the operator and approval by the NPDES as well as the SMCRA regulatory agency. In Wyoming, the Wyoming Land Quality Division (LQD) is the approved SMCRA regulatory authority. For these small areas construction of a sediment basin is often

impracticable or would cause more environmental harm through its construction than the use of alternative sediment control measures. Instead of impacting additional lands, the agencies and our members agree that the use of best management stormwater practices are a better approach than installing more large NPDES sized containment ponds. The small areas that are not directed to sediment basins are typically where the stormwater provisions of the MSGP apply for coal mines. On both the watershed and mine site scale, these small MSGP structures present a minimal risk of environmental impact.

Wyoming's non-coal mining facilities also operate under a comprehensive regulatory framework that is designed to prevent the release of hazardous substances and risks to public health and the environment. Wyoming noncoal mining operations, primarily uranium, trona and bentonite, are also world-class operations, heavily regulated at both the state and federal levels. They too must comply with all federal environmental laws and undertake extensive permit processes to obtain approvals from the numerous federal and state agencies. To obtain permit approval, applicants must demonstrate compliance with numerous design and operational requirements applicable specifically to non-coal mining facilities. These operational and design requirements are in place to minimize the risk of significant spills or other releases that could adversely impact the environment, while other existing regulations require the mining company to take appropriate corrective action if such accidents occur. These regulations also require post-mining reclamation activities.

Coal mining operations are inspected monthly by the LQD staff and approximately annually by Wyoming WQD staff. Non-coal operations are also regularly inspected by LQD and WQD. Sediment control measures and stormwater management practices are often a focus of these inspections. When considering the comprehensive SMCRA, NPDES, SPCC and MSGP regulations on erosion control and stormwater management at mines, plus the minimal areas that are regulated under the MSGP, the imposition of the proposed 2020 changes to the MSGP program at these facilities is overly duplicative and costly.

[1] 30 C.F.R. 816.42-816.57 and 817.42-817.57

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0228-A1, excerpt 1. Regarding the commenter's concerns of regulations on erosion control and stormwater management being duplicative among programs (Surface Mining Control and Reclamation Act (SMCRA), NPDES, MSGP, and others), in general EPA recommends operators plan to comply with the most stringent requirements. Where possible, operators can coordinate with regulators regarding overlapping requirements and where requirements may be duplicative or more stringent elsewhere, operators can and should reference those other requirements. In some cases, this may require working with regulators who may not be familiar with all applicable requirements for a particular facility.

---

**Commenter Name:**  Steve Whitt
**Commenter Affiliation:**  Martin Marietta, Inc.

**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The changes made in this permit will have an impact across much of the country. While this permit is directly used by only a small number of states, there are many states that incorporate a substantial amount of the EPA permit into their state permit. The April 9, 2020 EPA presentation by Emily Halter (EPA's Proposed 2020 Multi Sector General Permit) detailed what the EPA found when the general permits were reviewed for 41 states. Only 8 states had a permit that was viewed as substantially different. Of these 41 states there were 11 with a permit that was identical/substantially similar, and there were 17 states with a permit that was somewhat similar. While some of the changes to this draft permit may be subtle, other changes are substantial and because of the scope of the impact, it is our view that several items should be reconsidered and others should wait to be implemented in the next generation of permit.

A review of all of the reference information utilized to develop this proposed 2020 MSGP also shows a disturbing trend. This information, generated as a tool to guide the regulators drafting this permit, should be factual, thorough and based on a solid understanding of the industry sectors involved. Unfortunately, the Cost Impact Analysis does not include a majority of the costs that most facilities will face. The National Academies of Sciences report generated to recommend improvements to the MSGP is overflowing with a misunderstanding of many of the industry sectors involved. And last but not least, the newly introduced Appendix Q in the proposed permit is redundant with many of the regulations and permits already required for Sector J facilities. All of this leads to a cumbersome set of permit documents that only the largest of companies with seasoned professionals will be able to comprehend.

**Comment Response:**

Regarding comments specific to the cost impact analysis, see responses to code CIA. General.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

Also see responses to code General – NRC NAS Industrial Stormwater Study.

---

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

The Industrial Minerals Association – North America supports the Environmental Protection Agency's ongoing work to update the National Pollutant Discharge Elimination System Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity in a comprehensive manner. Understanding the additional considerations born from the National Academies of Science study of the 2015 MSGP, the Association believes the 2020 proposal has multiple areas that can be improved to provide greater clarity. In particular, the Association does not believe the proposal is as well-balanced as it could be in relation to the altered application of universal benchmarking, the inclusion of COD testing, and the adoption of AIM. Other aspects of the proposal can be further improved or clarified, such as the necessity of signage, the approach to coal tar sealants, and aspects of Appendix Q. IMA NA is interested in exploring the opportunities presented by developing the low-risk facility category and believes industrial mineral producers could reasonably fit into that designation.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Of note, this proposed draft MSGP continues a recent trend towards a more top-down, command-and-control approach to stormwater regulation, with a highly prescriptive stormwater sampling/corrective action regime as its cornerstone. Prime examples of this trend in the draft MSGP include the Additional Implementation Measures (AIM), the Universal Benchmarks, and the new, voluminous Appendix Q of Stormwater Control Measures (SCMs). This is a most unfortunate trend that increases the regulatory burden on industry with no tie to a corresponding, quantifiable benefit to receiving waters. The new requirements in the proposed MSGP go well beyond what is required by the 2016 MSGP settlement and beyond what Congress intended in the Clean Water Act.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

We see significant issues with this proposed 2020 MSGP and have pushed forward suggestions to improve on implementation. We see this as helpful to the permittee while having no detrimental impact on the environmental. Our major suggestions are to include Sector J facilities as low risk, reconsideration of universal COD sampling for Sector J, and withdrawal of Appendix Q.

**Comment Response:**

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

Regarding comments specific to Sector J – Non-metallic mineral mining and dressing, see responses to code 8.J.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Based on its review the Proposed 2020 MSGP, ISRI opposes major aspects of the Proposed 2020 MSGP, including the Additional Implementation Measures (AIM) and Universal Benchmark Monitoring, while supporting some aspects of the Proposed 2020 MSGP and related topics,

including elimination of the iron benchmark, increasing the aluminum benchmark to reflect its final updated aquatic life criteria, and optional use of a facility-specific, risk-based benchmark for copper.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA added definition and specificity to sections in the MSGP, but the practical implementation would require undue burden on permittees and EPA staff to document compliance with the various new permit conditions, and the associated review, approval and tracking by EPA staff. For example:

- Part 5.2.2 on request for "aberrant event" exceptions
- Part 5.2.2.3 on request for Additional Implementation Measure (AIM) Tier 2 extensions
- Part 5.2.3.3 on request for Additional Implementation Measure (AIM) Tier 3 extensions
- Other applications and exception and extension requests in the MSGP

Should the EPA retain short timeframes for permittees to apply for various exceptions and implement AIM responses, the EPA should establish/define the process for each specific exception or extension within the MSGP, and commit to responding to any application, exception, or extension request by a permittee within a specific timeframe to provide permittees with regulatory certainty and allow permittees to meet required permit deadlines should the request be denied. For example, Section 5.2.2.3 allows up to 45 days to implement AIM Tier 2 response. To implement this effectively would require:

- Permittee request for extension (within a minimum of 15 days)
- EPA response within 7 days or auto approval
- If EPA denies request, permittee now only has 23 days left to implement AIM Tier 2 response
- If EPA denies a request, the deadline should be automatically extended by the time it took for EPA to respond to the request

The complexity of the proposed MSGP requirements and associated applications, exceptions and extensions will require EPA review and approval in a specific and short timeframe that will likely place an undue burden on EPA staff and may not be implemented effectively, especially considering that the majority of these applications, exception, and extension requests will occur at the beginning of each year after certain MSGP conditions are triggered. This will create regulatory uncertainty for permittees and make it more difficult to achieve compliance with the MSGP.

**Suggested Revision:**

EPA should define the process for submittal, review and approval of applications and exception/extension requests and commit to completing reviews in a specific timeframe to provide permittees with regulatory certainty and allow permittees to meet required permit deadlines should an extension or exception request be denied. The EPA should consider resetting the permit deadline from the time that the permittee receives a denial to their extension request (e.g., permittees would have the full amount of time to complete an AIM Tier 2 or Tier 3 response as allowed by the MSGP from the date of receipt of denial of the extension request).

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

Notwithstanding the above areas of support or acceptance, ISRI opposes for inclusion or adoption in the 2020 MSGP the following provisions of and suggestions in the Proposed 2020 MSGP—some of which may be overlapping:

- The AIM Framework and Appendix Q;
- Specific reporting of a permittee's change in AIM tier status;
- Universal Benchmark Monitoring and its associated schedule;
- The MSGP eligibility criterion for stormwater discharges to a Federal CERCLA site;
- The MSGP eligibility criterion for stormwater discharges from areas of industrial activity at a facility where coal-tar sealants will be used during the permit term;
- An MSGP eligibility criterion for use of cationic treatment chemicals;
- The requirement to post and maintain certain permit information in a highly publicly visible manner outside the facility;
- Required consideration of enhanced control measures for extreme flooding; and

- Making facility changes a trigger for AIM Tier 1;

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

As set out below, AISI is offering comments in opposition to many aspects included in EPA's proposed MSGP and the accompanying proposed sector-specific stormwater control measures (SCMs), many of which are clearly impractical and unreasonable for iron and steel facilities.

...

AISI and its member companies have serious concerns about the following points below. We hope the detailed significant costs projected for our sector as a result of Appendix Q will provide significant reason for EPA to take these concerns seriously, even though these costs may not be directly attributable to this proposed MSGP.

The proposed Universal Benchmark concentration for Chemical Oxygen Demand (COD) set out in Part 8, Table 8.1.1

- The proposed Sector-Specific Benchmark concentration for aluminum set out in Part 8.F.5 for Subsector F1 (Steel Works, Blast Furnaces, and Rolling and Finishing Mills (SIC 3312-3317);
- Consideration of benchmark monitoring for PAHs (EPA request for Comment 20);
- Proposed Stormwater Control Measures (SCMs) for Sector F (Primary Facilities);
- EPA's assessment of costs associated with the proposed MSGP; and,
- A number of implementation issues associated with the proposed MSGP.

In many respects, the proposed MSGP and proposed stormwater control measures (SCMs) are duplicative of, but go well beyond, existing programs that are already being implemented at AISI member facilities (i.e., facility-specific NPDES permits, SWPPPs, SPCC Plans, Title V and other

air permits, RCRA contingency plans). This is particularly true of the prescriptive Sector F SCMs set out in Appendix Q. Given the expansive scope and the prescriptive nature of the proposed MSGP and proposed SCMs, this will create considerable confusion among state regulators and AISI member facility environmental program personnel who implement stormwater control programs. We believe this will result in significant waste of scarce resources for the state agencies and for the AISI member facilities with no commensurate environmental benefit.

**Comment Response:**

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

Regarding comments specific to the cost impact analysis, see responses to code CIA. General.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  55
**Excerpt Status:** Final

**Comment Excerpt:**

## VII. SUMMARY & CONCLUSIONS

The new, expansive requirements in the proposed MSGP are diminishing the regulatory effectiveness of a "general" permit. The concept of a general permit is that it provides a structure that can easily be adapted to a variety of industrial sectors, thus minimizing resources spent in creating individual permits. The 2020 proposed MSGP, due to new eligibility requirements, expanded benchmark monitoring, inappropriate benchmark values and the Additional Implementation Measure(s), has added considerable complexity and cost with uncertain environmental benefits. This proposed MSGP is not consistent with the prior framework for the management of stormwater, which depended upon benchmark monitoring and associated thresholds for evaluating the effectiveness of stormwater controls. In particular, problematic aspects include requiring or inferring that stormwater discharges meet water quality standards, and the use of benchmark values (which may not be appropriate) to require new, extensive controls when such values (thresholds) are exceeded.

As described in these comments, Simplot recommends that TSS remain the sole parameter for "universal" monitoring and that the AIM process not be incorporated into the MSGP. Furthermore, a number of new eligibility and other requirements proposed for the 2020 MSGP

needs to be removed or modified. These changes are needed so that the 2020 MSGP remains aligned with the prior regulatory and legal approach from the Clean Water Act to managing stormwater.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

In general, this draft NPDES 2020 MSGP significantly departs from the 2015 MSGP. Key changes are: (1) additional monitoring requirements for universal benchmark monitoring for all sectors (2) a new system [Additional Implementation Measures (AIMs)] for benchmark exceedances that is extremely complex and costly and finally (3) requirements that either require or infer that stormwater discharges must meet appropriate water quality standards. These new requirements are overly burdensome in they have a high cost of compliance, will be time-consuming to implement and will likely provide little to no improvement in water quality. For example, AIMs triggering events are very complex. This complexity will make the requirements difficult to implement and especially problematic for industrial sites with many outfalls and/or limited environmental staff. We recommend that EPA reconsider the level of monitoring (especially "universal" monitoring) and AIMs requirements. Furthermore, the agency needs to reevaluate the economic effect this permit will have on the regulated community in regards to environmental benefits.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0166-A1

**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

If finalized as proposed, the 2020 MSGP would require additional complex, costly, and burdensome regulatory requirements. In addition, EPA's proposed Alternative Implementation Measures (AIM) would, for the first time in the history of the MSGP, consider exceedances of benchmark limits a violation of the permit. Subjecting the mining sector to these additional confusing and expensive requirements is especially problematic.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM).

---

**Commenter Name:** Beth Goodnough
**Commenter Affiliation:** Western Fuels Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Western Fuels supports the use of general permits under the NPDES program as an effective and efficient means to address classes of similar discharges. However, the proposed 2020 MSGP includes changes that would impose overly costly and burdensome requirements. We understand that EPA was required to propose many of these changes as the result of a settlement agreement but we believe the proposed changes are inadequately justified and overly impactful. The AIM proposal, in particular, has the potential to be a high liability issue for western mining operations. The agency should address these concerns before finalizing the MSGP.

**Comment Response:**

Regarding comments specific to AIM, see responses to code 5 (and all subsections) and Comment Response Essay 3 Additional Implementation Measures (AIM). Regarding costs, see the final 2021 MSGP Cost Analysis for anticipated impacts on the regulated industry and responses to code CIA.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Incentivizing and promoting environmentally conscientious practices will go much further to achieving these goals than tougher, more expansive, and more complex enforcement of laws and regulations. Unfortunately, these traits are exactly what portions of the proposed MSGP embodies. This proposal is unnecessarily more complex than its predecessor, and with the numerous changes and updates will mandate, needlessly, greater resources, testing, monitoring and personnel in order to be compliant with, and with likely little to no environmental benefit. As well, the proposal contains items NRMCA believes are already covered under different regulatory statute and agency jurisdiction, and bring into question some safety aspects of the various proposed requirements.

Further, the MSGP is and will continue to be a complicated compliance requirement concrete producers will need to comply with. Maintaining compliance with these permits is vital for producers to continue to manufacture ready mixed concrete. With the onset of the COVID-19 pandemic gripping the nation and the ready mixed concrete industry, the ability of the industry to respond to such requests for comments as this, and maintain subsequent compliance, have been dramatically interrupted and hindered. NRMCA and its membership are currently in the throes of addressing the COVID-19 situation which bring new developments and challenges daily. These struggles include juggling diminished material shipments, reduced orders for concrete, employee layoffs and most importantly managing a sickened workforce, to name a few.

For these reasons and those highlighted below, NRMCA is opposed to the proposed 2020 MSGP in its current form. The NRMCA membership, for purposes of comments to the proposal, are identified by North American Industry Classification System (NAICS) Code 327320. NRMCA's below comments address the changes and questions as outlined in the proposed MSGP, requirements listed in Appendix Q, and the Cost Impact Analysis.

**Comment Response:**

Regarding comments specific to the cost impact analysis, see the final 2021 MSGP Cost Analysis for anticipated impacts on the regulated industry and responses to code CIA. General.

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt:**

## II. GENERAL COMMENTS

In 2012, ACI-NA, in collaboration with Airlines for America, the Regional Airline Association, and the American Association of Airport Executives, announced the launch of an aviation industry Voluntary Pollution Reduction Program (VPRP or Program) to build on the aviation industry's long-standing work to reduce the environmental impacts associated with the use of specialized deicing and anti-icing fluids, collectively referred to as aircraft deicing fluid (ADF), which is necessary to ensure safe aircraft operations in winter conditions. EPA supported the VPRP plan and approach in its final Deicing Effluent Limitations Guidelines Federal Register notice. 77 Fed. Reg. 29,168, 29,175 (May 16, 2012).

The VPRP was a five-year effort undertaken by the Program Partners, running from September 2012 to September 2017. The Program documented and tracked the industry's progress towards reducing pollution associated with the use of ADF at 42 airports (the Defined Set) over a Defined Period of January 1, 2005 to September 30, 2017. The Defined Set of airports represents approximately 83 percent of total national ADF usage.

The Program Partners developed the concept of "Biological Oxygen Demand (BOD) Management Capacity" and a corresponding metric, the "BOD Management Capacity Index" to accurately and fully reflect the aviation industry's deployment of pollution reduction technologies related to aircraft deicing activities. The Program Partners then set the following goal for the Program:

*For any given deicing season, Pollution Reduction Technologies (PRTs) deployed between January 1, 2005 and September 30, 2017 will increase the BOD Management Capacity of the National PRT Complex relative to the BOD Management Capacity in the absence of those PRTs.*

*The BOD Management Capacity of the National PRT Complex will be evaluated using the BOD Management Capacity Index developed for this Program. The Program Partners target a 20 percent improvement in the BOD Management Capacity Index value at the end of the [Defined[1]] Period (2017) as compared to the 2005 BOD Management Capacity Index value.*

With the conclusion of our Program in September 2017, we issued our final report on the Program on November 17, 2017[2], which provides the final documentation of Program Partner activities under the VPRP. Most centrally, the report provides a final assessment of our industry's progress in reducing pollution associated with aircraft deicing activities as reflected by the BOD Management Capacity Index. The Program Partners are particularly pleased to report that the industry improved its BOD Management Capacity Index value by 36% over the 2005-2017 Program Period, exceeding our 20% improvement goal.

The Phase II Report also provides updates on Program Partners' efforts to facilitate the exchange of information about pollution reduction technologies and practices through outreach, industry events, and Airport Cooperative Research Program participation, as well as provides additional context for interpreting the BOD Management Capacity Index. Although the Program is now concluded, the Program Partners remain committed to refining the suite of PRTs as they evolve,

building on the industry's record of reducing environmental impacts related to aircraft deicing operations and encouraging meaningful and substantial progress into the future.

The VPRP is a tangible demonstration of the airport industry's commitment to proactive implementation of practical and effective stormwater controls to achieve meaningful reductions in pollutants from deicing operations. At the core of this program is the philosophy of applying deicing pollution reduction technologies that are best suited to the unique combination of operational, meteorological, and environmental conditions that exist at each airport.

The VPRP is a testament to the appropriate considerations that must be given to the unique nature of airport facilities, aircraft operations, and the heavily-regulated safety environment in which they exist. In fact, the VPRP approach is more sophisticated and measures on a national scale the various benefits of pollution control options implemented and uniquely tailored to individual airports. The VPRP cannot be "implemented" on an airport-specific basis, but rather helps to educate airport and airline staff about various pollution control options that then are measured on a national basis.

ACI-NA cannot overstate how extremely important it is to the industry that the success of this voluntary program not be undermined by some of the more draconian requirements in the MSGP that constrain an airport's flexibility in implementing the best stormwater management controls for its unique situation. Many of the comments provided below are related to this concern. Many of the specific comments provided below reflect an overarching concern that the EPA is exceeding its authority to regulate the point source discharge of pollutants to waters of the United States by attempting to mandate how operations and materials should be managed, and data collected, upstream from the discharge. This overextension of regulatory authority is at odds with the foundation of the VPRP and threatens airports' ability to efficiently and effectively reduce pollutants in stormwater discharges while balancing unique facility characteristics, aircraft operations, separate and distinct Federal Aviation Authority (FAA) regulatory mandates, and safety requirements generally.

For example, EPA's proposed tiered corrective action approach coupled with its proposed Appendix Q list of stormwater control measures undermines efficient and effective MSGP implementation at airports and the benefits that can be achieved through a more flexible, airport-specific set of considerations that are the core of the VPRP. In fact, EPA's failure to recognize the types of considerations illustrated by the VPRP suggests that additional meetings and information exchanges are vital during EPA's consideration of these comments so that industry experts can help to explain how the Proposed MSGP is a step backwards, not forwards, for the industry.

There are additional government resources that EPA may find useful that we can walk you through to assist in revising the proposal into a final permit that works for airports, including for example various studies put out by the Airport Cooperative Research Program, part of the National Academy of Sciences.

[1] This was articulated as "the end BOD Management Capacity Index value at the end of the Defined Period [emphasis added] as compared to the 2005 BOD Management Capacity Index

value" in the Supplemental Phase I Report. Because the goal pertains to the Defined Period (the 12-year period over which industry progress is to be measured), not the Program Period (the five-year term of the Program), for clarity we have changed this terminology. This makes no material difference because the Defined Period and the Program Period both ended on September 30, 2017. It should also be noted that the 2005 index value reflects PRTs deployed as of the end of the 2004-2005 deicing season (May 2005) and the index value as of the end of the Defined Period reflects the PRTs deployed as of the end of the 2016-2017 deicing season (May 2017).
[2] The final report, as well as the other major program milestone documents can be found on ACI-NA's website at this link: https://airportscouncil.org/committee_news/industry-deicing-voluntary-pollution-reduction-program/

**Comment Response:**

Regarding regulatory authority, see Comment Response Essay 1 Legal Issues.

Regarding comments specific to tiered corrective approaches, see Essay 3 Additional Implementation Measures (AIM).

Regarding comments specific to Appendix Q of the proposed 2020 MSGP, see responses to code Appendix Q.

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

WMA appreciates the opportunity to provide comments on the proposed 2020 MSGP. As explained, we have serious concerns about many of the new provisions contained in this permit. We believe the EPA would do well to withdraw the proposal in its entirety and instead reimplement the 2015 MSGP renewal regulations. If the EPA desires more data, the EPA should fund specific studies and gather the data itself rather than this effort to arbitrarily impose universal benchmark monitoring data collection nationwide.

**Comment Response:**

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

EPA has explained that numerous elements in this proposal reflect recommendations in the National Academies/ National Research Council 2019 study (NRC study), which was undertaken as part of a settlement agreement. DEQ supports updating the MSGP based on current data and demonstrated best practices. However, we believe that some portions of the proposed MSGP, such as the proposed universal benchmark monitoring and the Additional Implementation Measures may prove to be unduly burdensome or too complicated to be effectively implemented in the field. We have provided comments on these and several additional issue below.

**Comment Response:**

Regarding comments specific to the universal benchmarks and monitoring, see responses to code 4 (and all subsections) and Comment Response Essay 2 Monitoring. Regarding comments on additional implementation measures, see Essay 3 Additional Implementation Measures (AIM).

## G.4. General - Reference to Other Letters

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

AF&PA also supports the joint comments of the Federal Water Quality Coalition (FWQC) and the Federal StormWater Association (FSWA).

**Comment Response:**

Comment noted. EPA has responded to comments from Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0245-A1.

---

**Commenter Name:** Howard Marks
**Commenter Affiliation:** National Asphalt Pavement Association (NAPA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We are also submitting comments as a member of the Low Risk Coalition...

**Comment Response:**

Comment noted. EPA has responded to comments from Small Business Low-Risk coalition (SBLRC), see responses to all excerpts from EPA-HQ-OW-2019-0372-0203-A1.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

As documented in the NMA comments to EPA on this proposal (supported, referenced and adopted herein), there is no meaningful relationship between the benchmark levels and the ability to control the quality of stormwater discharges.

**Comment Response:**

Comment noted. EPA has responded to comments from National Mining Association (NMA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0201-A1.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Please reference the extensive NMA comments on this proposed MSGP renewal for additional details regarding concerns with setting the benchmark TSS at 100 mg/L. The NMA comments document that the 100 mg/L standard proposed by the EPA is often lower than what naturally

exists in the west, including in Wyoming, and hence is grossly inappropriate. Any such benchmark standard should be tailored to the State or region.

**Comment Response:**

EPA has responded to comments from National Mining Association (NMA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0201-A1.

---

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

ACA supports the comments submitted by the Small Business Low-Risk Coalition and the Multi-Association Coalition Comments Opposing Refined Coal Tar Sealcoat Provisions.

**Comment Response:**

Comment noted. EPA has responded to comments from Small Business Low-Risk coalition (SBLRC), see responses to all excerpts from EPA-HQ-OW-2019-0372-0203-A1. EPA is not aware of any comments from a "Multi-Association Coalition" and is not able to respond to these comments as a result.

---

**Commenter Name:** Harry Childress
**Commenter Affiliation:** Virginia Coal and Energy Alliance (VCEA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0175-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

VCEA also joins in and incorporates herein by reference the separately filed comments of the National Mining Association.

**Comment Response:**

Comment noted. EPA has responded to comments from National Mining Association (NMA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0201-A1.

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, IMA-NA joins the National Mining Association ("NMA") and the National Stone, Sand, & Gravel Association ("NSSGA") in discomfort over the exclusion of the NAS Study in materials available for public review. As our fellow associations properly note these materials should have been in the docket from the beginning and IMA-NA urges EPA to continue striving for greater transparency in the rulemaking process, particularly when providing substantive updates to programs like the MSGP.

**Comment Response:**

Comment noted. EPA has responded to comments from National Mining Association (NMA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0201-A1. EPA has also responded to comments from National Stone, Sand, and Gravel Association (NSSGA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0196-A1.

---

**Commenter Name:** Patrick A. Jacomet
**Commenter Affiliation:** Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

We incorporate by reference NSSGA's comments on this proposal.

**Comment Response:**

Comment noted. EPA has responded to comments from National Stone, Sand, and Gravel Association (NSSGA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0196-A1.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI is also a member of the Federal StormWater Association (FSWA) and supports the comments as applicable that FSWA is submitting separately on behalf of its diverse membership.

...

These comments refer to NASEM's Committee on Improving the Next-Generation EPA Multi-Sector General Permit for Industrial Stormwater Discharges (henceforth, "the Committee") and its Report.

**Comment Response:**

Comment noted. EPA has responded to comments from Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0245-A1.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

NSSGA is a member of the Small Business Low-Risk Coalition (SBLRC) and incorporates their comments by reference and recommends that EPA reconsider the efficacy of analytical monitoring per the SBLRC comments.

**Comment Response:**

Comment noted. EPA has responded to comments from Small Business Low-Risk coalition (SBLRC), see responses to all excerpts from EPA-HQ-OW-2019-0372-0203-A1.

---

**Commenter Name:** Gary A. Jones
**Commenter Affiliation:** Printing United Alliance
**Document Control Number:** EPA-HQ-OW-2019-0372-0198-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Printing United Alliance is part of and supports the comments submitted by the Small Business Low-Risk Coalition and is providing these additional industry specific comments.

**Comment Response:**

Comment noted. EPA has responded to comments from Small Business Low-Risk coalition (SBLRC), see responses to all excerpts from EPA-HQ-OW-2019-0372-0203-A1.

---

**Commenter Name:** Philip G. Rahrig
**Commenter Affiliation:** American Galvanizers Association (AGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0207-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

On behalf of the American Galvanizers Association (AGA) we are writing in support of the comments on the proposed 2020 Multi-Sector General Permit (MSGP) provided by the International Zinc Association and the Copper Development Association.

**Comment Response:**

Comment noted. EPA has responded to comments from the Copper Development Association (CDA) and International Zinc Association (IZA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0116-A1.

---

**Commenter Name:** Mark D. Williams
**Commenter Affiliation:** Luck Companies, Luck Stone
**Document Control Number:** EPA-HQ-OW-2019-0372-0223-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

We incorporate by reference NSSGA's comments on this proposal.

**Comment Response:**

Comment noted. EPA has responded to comments from National Stone, Sand, and Gravel Association (NSSGA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0196-A1.

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

We incorporate, by reference, the National Stone Sand and Gravel Association's (NSSGA) comments on this proposal.

**Comment Response:**

Comment noted. EPA has responded to comments from National Stone, Sand, and Gravel Association (NSSGA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0196-A1.

---

**Commenter Name:**  Benjamin J. Davenport
**Commenter Affiliation:**  Idaho Mining Association (IMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

IMA also expresses its support and concurrence for comments provided to EPA on the proposed 2020 MSGP submitted by the American Exploration and Mining Association.

**Comment Response:**

Comment noted. EPA has responded to comments from American Exploration and Mining Association, see responses to all excerpts from EPA-HQ-OW-0372-0260-A1.

---

**Commenter Name:**  Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:**  Utility Water Act Group (UWAG)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

UWAG is a member of the Federal Water Quality Coalition (FWQC) and generally supports the joint comments filed by FWQC and the Federal Stormwater Association (FSWA).

**Comment Response:**

Comment noted. EPA has responded to comments from Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0245-A1.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

ACI-NA is a member of the Federal StormWater Association (FSWA). FSWA is submitting extensive comments on issues related to EPA's specific requests for comments, including in particular benchmark monitoring, corrective actions, and proposed improvements. ACI-NA supports the FSWA comments and incorporates them here as an attachment.

**Comment Response:**

Comment noted. EPA has responded to comments from Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0245-A1.

---

**Commenter Name:**  Curt Wells
**Commenter Affiliation:**  The Aluminum Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

The Association is also a member of the *Federal Water Quality Coalition* and the *North American Metals Council* and as such endorses their comments submitted under separate cover.

**Comment Response:**

Comment noted. EPA has responded to comments from Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA), see responses to all excerpts from EPA-HQ-OW-2019-0372-0245-A1. EPA has also responded to comments from North American Metals Council (NAMC), see responses to all excerpts from EPA-HQ-OW-2019-0372-0161-A1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  37
**Excerpt Status:** Final

**Comment Excerpt:**

Utilizing the current inspection regime for a new inspection-only option corresponds to the recent recommendation of the U.S. Department of Energy (DOE) National Nuclear Security Agency.[91] In its MSGP comments, the DOE suggested that no additional inspection or certification requirements were needed and that the existing inspection and certification programs should be maintained. Such a program, DOE stated, was the best in terms of identifying pollutants in discharges and in terms of cost-effectiveness.[92]

[91] MSGP comments dated, April 17, 2020.

[92] DOE Comment at 3.

**Comment Response:**

Comment noted. EPA has responded to comments from the National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE), see responses to all excerpts from EPA-HQ-OW-2019-0372-0099-A1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  39
**Excerpt Status:** Final

**Comment Excerpt:**

In its comments, DOE agreed, commenting that third-party contractors were not familiar with the local environment, and that monitoring by the onsite stormwater team results in greater continuity between the visual and other monitoring programs. DOE also opposed the requirement for a PE, suggesting that storm water professionals have better credentials in

hydrogeology and biology, as well as green infrastructure, which is more beneficial for stormwater analyses.[93]

[93] DOE Comment at 4.

**Comment Response:**

See response to EPA-HW-OW-2019-0372-0252-A1, excerpt 37.

---

**Commenter Name:**  John S. Quarterman
**Commenter Affiliation:**  Suwannee Riverkeeper for WWALS Watershed Coalition (WWALS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0266-A2
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Please read into the comment record for EPA-HQ-OW-2019-0372 the WWALS comment letter of April 15, 2019, on Docket ID No. EPA-HQ-OW-2018-0149, Revised Definition of Waters of United States; a copy is appended to this present letter.

**Comment Response:**

Comment noted. Comments submitted in response to other rules, including the Navigable Waters Protection Rule, are outside of the scope of the MSGP. Further, the scope of EPA's authority under the CWA, including the definition of Waters of the United States, is outside the scope of this permit.

---

**Commenter Name:**  John S. Quarterman
**Commenter Affiliation:**  Suwannee Riverkeeper for WWALS Watershed Coalition (WWALS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0266-A2
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Please read into the comment record for EPA-HQ-OW-2019-0372 the WWALS comment letter of June 7, 2019, on Docket ID No. EPA-HQ-OW-2019-0166-0001, "Interpretive Statement on Application of the Clean Water Act National Pollutant Discharge Elimination System Program to Releases of Pollutants from a Point Source to Groundwater"; a copy is appended to this letter.

**Comment Response:**

Comment noted. Comments submitted in response to other EPA actions, including the Interpretative Statement on Releases of Pollutants from Point Sources to Ground Water, are outside of the scope of the MSGP.

---

**Commenter Name:** John S. Quarterman
**Commenter Affiliation:** Suwannee Riverkeeper for WWALS Watershed Coalition (WWALS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0266-A2
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

WWALS supports and is a co-signatory on the comments submitted today by Waterkeeper Alliance.

**Comment Response:**

Comment noted. EPA has responded to comments from Center for Progressive Reform, et al., which includes Waterkeeper Alliance and over 95 additional public interest groups. See responses to all excerpts from EPA-HQ-OW-2019-0372-0220-A1.

## G.5. General - Overall Cost Issues

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

**B. To comply with the RFA, EPA must identify affected small entities and their industries, account for all direct costs to small entities, including costs of site-specific controls, and must tailor its analysis of significant impacts to individual industries.**

**1. EPA must identify affected small entities and their industries**

The RFA requires EPA to consider the impacts of its rules on small entities. As part of that consideration, EPA must identify the affected industries and the number of small entities in those industries. The permit already identifies affected sectors, and Appendix D of the proposed 2020 MSGP summarizes the affected industries, but there is no estimate of the number of affected small entities in the proposed rule. If EPA lacks administrative data on these industries, EPA should use data published by the U.S. Census Bureau as part of the Statistics of U.S. Businesses (SUSB) to identify the number of affected small entities and their sizes. EPA can then identify

the number of small entities in each industry by applying the Small Business Administration's Table of Size Standards.

As the permit has direct effects on small entities in select states, EPA may narrow the analysis to affected entities in those states. SUSB has data on business size, states, and six-digit North American Industrial Classification System (NAICS) codes but does not publish a single table that breaks down firms by all these variables. EPA could approach the Census Bureau for access to more granular data. Another option would be for EPA to estimate the number of affected small entities by assuming the national distribution of firm sizes applies to the affected states if EPA can identify data with the number of entities by state and industry.

Without data on the number of affected entities, EPA cannot properly certify that the rule would not have a significant economic impact on a substantial number of small entities and must prepare an IRFA.

**Comment Response:**

EPA disagrees that an RFA must be prepared. Regarding more details specific to the Regulatory Flexibilities Act (RFA) and how EPA accounted for the RFA in assessing the MSGP see Comment Response Essay 1 Legal Issues.

EPA has, however, voluntarily conducted the analysis and made the appropriate determinations that are called for by the RFA. As indicated by the commenter, the U.S. Census Bureau does not publish data linking business size, state, and NAICS codes. As such, EPA is unable to assess which facilities in each industrial sector are classified as a small business. As described in the MSGP Cost Impact Analysis, EPA conducted a generic assessment of economic impacts because of limitations on the data availability, as cited by the commenter, and the site-specific nature of the changes in the MSGP. EPA's assumption is appropriate and necessary in order to generate some cost analysis for a general permit, which covers varied sectors, activities, and sizes of facilities located in various parts of the U.S. Using this approach, EPA determined that the 2021 MSGP is economically achievable.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0132
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I don't see why for smaller companies that have less then 10 people can't just keep the permit the way it is. It is very costly and timely to make these changes. They way it has been going for small businesses that need to report storm water testing has worked just fine the way it is going.

It would be greatly appreciated if it was taken into consideration the time it takes us smaller businesses to change and adapt to these new rules/regulations.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 19.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**The Proposed MSGP Will Harm Small Businesses**

Many Sector J operations are small businesses. The additional requirements included in the proposed 2020 MSGP along with the financial burden created by numerous items noted in this review, will strike a major blow to facilities that may already be struggling to remain open. Many of these operations already may be in business only part of the year due to a lack of sales. Add to this the incredible volume of information that now makes up this General Permit. The Fact Sheet, Parts 1- 9 of the Permit, Appendices A-P, and Appendix Q, add up to 1,151 pages. Small businesses may be overwhelmed with attempting to understand what applies to them and how to implement any changes. In order to assist these businesses with remaining viable, we suggest that the low-risk option be expanded to include Sector J and a withdrawal from the procedures outlined in Appendix Q.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 19 regarding small businesses.

Also see responses in section 4.2.1.RFC11 regarding the inspection-only option for "low-risk" facilities.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**Aggregates are Crucial for All Infrastructure & Economic Recovery**

NSSGA is the leading advocate for the aggregates industry, which produces the stone, sand and gravel (known as aggregates) needed for infrastructure and environmental improvements such as safe drinking water. Our members take the natural materials from the ground, and size them to go into roads and important public works such as water delivery systems, flood control, wastewater treatment and drinking water purification systems. Quarries that have exhausted usable material become useful as reservoirs for community drinking water storage and flood control. The timely availability of aggregates is essential for critical watershed restoration, such as the construction of $2.3 billion Lake Okeechobee Reservoir under Florida's Comprehensive Everglades Restoration Plan.[1] Therefore, an overly expansive MSGP, causing high costs and permitting issues, could have the paradoxical effect of harming water quality by causing material shortages that result in halting or delaying these important projects and uses.

Regulatory compliance costs can impact operational costs, particularly small businesses. These, in turn, impact the costs of infrastructure projects, which are largely borne by the taxpayer. NSSGA members work diligently to comply with regulations, and often go beyond what is required to improve their communities and the environment, such as creating wildlife habitats, wetlands for banking, parks and other public areas. When NSSGA members must spend more to comply with cumbersome regulations and red tape, it impacts the resources our members have available to perform these voluntary and environmentally beneficial projects.

Construction is the lifeblood of the economy, and with the economic hardships due to massive shutdowns and layoffs from the COVID-19 epidemic, will also be the engine driving the economic recovery. Aggregates are literally the building block of construction and impacts to aggregate operators' ability to supply material for vital construction and infrastructure projects can have a devastating ripple effect across the economy.

[1] Florida's Water Resources law of 2017 (Laws of Florida Chapter 2017-10) directs the expedited design and construction of a water storage reservoir in the Everglades Agricultural Area to provide for a significant increase in the southern storage to reduce high volume discharges from Lake Okeechobee.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 19 regarding small businesses.

For general costs associated with compliance with the 2021 MSGP, see codes CIA.General and EPA's Cost Impact Analysis for the 2021 MSGP.

Also see responses in section 4.2.1.RFC11 regarding the inspection-only option for "low-risk" facilities.

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Unfortunately, the coronavirus pandemic has inflicted unprecedented impacts on airports, and AAAE urges EPA to evaluate these comments and the proposed MSGP in the context of these unique circumstances, which are expected to affect airports for the foreseeable future. Since the beginning of the crisis, airports have seen significant reductions in passenger traffic, routinely in the 90–95% range. Collectively, airport revenue losses are estimated to top more than $20 billion. Airports remain focused on achieving their environmental objectives during this time, but EPA must recognize that airports are operating with fewer resources and need even greater flexibility to overcome these challenges.

**Comment Response:**

EPA acknowledges the commenter's concern regarding the impacts of COVID. EPA's analysis found the 2021 MSGP requirements to be economically achievable. EPA expects the incremental cost impact on entities that will be covered under the 2021 MSGP to be small. EPA anticipates the incremental administrative and compliance cost for new or modified permit requirements will be $338 - $632 per operator per year; or $1,690 - $3,157 per operator over the 5-year permit term. A copy of EPA's incremental cost analysis for the final permit, titled "Cost Impact Analysis for the Final 2021 Multi-Sector General Permit (MSGP)," is available in the docket (Docket ID No. EPA-HQ-OW-2019-0372).

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, the new costs associated with the expanded 2020 MSGP will hit the food and beverage sector hard at a time when our members are struggling to recover from the COVID-19 pandemic, in direct contravention to the policy goals of EO 13924.[1]

[1]Executive Order on "Regulatory Relief to Support Economic Recovery" issued on May 19, 2020. https://www.govinfo.gov/content/pkg/FR-2020-05-22/pdf/2020-11301.pdf.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0183-A1, excerpt 1.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

While the new MSGP will eventually impact everyone, this pandemic has impacted
Massachusetts extremely hard. We urge EPA to consider further delay to this program and if not
to work closely with impacted industries to minimize the cost of the new permit.

The COVID-19 pandemic has forced everyone to make changes in their economic outlook.
Many companies have had to lay off or furlough workers and companies that had been
considering expansions had to turn their attention to more immediate concerns. While some
businesses may begin operating soon, it will likely be months if not years before business returns
to some version of normal. Given economic uncertainty, many companies are simply not going
to have the capital to make investments until their business model is assured – even if a project is
required by regulations.

Therefore, EPA needs to be flexible in *every* aspect of the NPDES program. If EPA will not
delay this program, EPA must continually work with industry to develop regulations that are
practical and easy to comply with as well as cost-effective

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0183-A1, excerpt 1.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, EPA must recognize that the aviation industry has been particularly hard hit in the
COVID-19 pandemic and resulting economic crisis, and nobody knows or can predict when the
industry will return to pre-pandemic levels and economic stability. Operational funds will be
limited without further federal, state, and local financial support for years to come, and we stress

that EPA must consider that, when considering our comments on the Proposed MSGP. The industry's environmental record stands for itself – including international sustainability standards and often exceeding U.S. environmental regulatory mandates – and we are not advocating for ignoring environmental risk. At the same time, EPA is proposing significant expansions of the MSGP mandates that will impact airports and that we do not believe will provide any additional environmental benefits. At this time, the industry cannot afford investing in regulatory compliance that is not directly tied to or focused on specific environmental risk.

**Comment Response:**

Comments noted. EPA's MSGP requirements will provide additional environmental benefits. EPA has made a concerted effort to simplify the permit requirements and align schedules when possible to continue to reduce stormwater pollutants and minimize the impact on industrial sectors.

---

**Commenter Name:** John Butler
**Commenter Affiliation:** Pavement Solutions LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0101
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Please refrain from passing this bill. This proposal will negatively affect our business and 50+ employees will lose their job.

**Comment Response:**

Comment noted about the permit issuance. Without additional information on what aspects of the proposed 2020 MSGP are negatively impacting the commenter's business or why the cited job losses are likely to occur, EPA is unable to provide additional comment or consider making any relevant changes to the 2021 MSGP.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

WMA supports the use of general permits under the NPDES program as an effective and efficient means to address classes of similar discharges. However, the proposed 2020 MSGP includes changes that would impose overly costly and burdensome requirements on our members operations. We understand that EPA was required to propose many of these changes as the result of a settlement agreement but we believe the proposed changes are inadequately justified and overly impactful. The agency should address these concerns before finalizing the MSGP.

...

Our overall concern is that the draft rules are punitive and costly to the point that the use of the MSGP program at mines will be unworkable. If implemented as proposed, it is likely the program will be discontinued at most mining operations, resulting in a return to the old method of installing additional NPDES regulated impoundments instead of the practical MSGP measures now in place in a few small areas at our regulated mines. That will unnecessarily disturb more lands, a situation unbeneficial to everyone and the environment. We offer the following comments in the hopes that the EPA will withdraw the rules, and instead make the renewal more realistic.

**Comment Response:**

The final 2021 MSGP does not impose overly costly and burdensome requirements. EPA made a concerted effort to streamline and simplify the 2021 MSGP and has aligned schedules when possible to continue to reduce stormwater pollutants and minimize the impact on industrial sectors. EPA recognizes that compliance costs will vary among industrial sectors, and may even vary considerably among a sector given facility specific characteristics. EPA's cost analysis is based on an average incremental compliance cost, as described in the 2021 MSGP Fact Sheet and Cost Impact Analysis. EPA estimates that the additional requirements of the 2021 MSGP, as compared to the 2015 MSGP requirements, are economically achievable.

Additionally, without specific examples of how the revised MSGP requirements would impact costs at individual facilities or details on how cost could be more specifically estimated for a specific industrial sector, EPA is unable to take these impacts into account or modify requirements to mitigate these impacts.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

While the Association is supportive of the work to update this MSGP, we have some concerns related to the adoption of aspects that create additional costs and burdens without corresponding environmental benefits.

...

While the economy begins the process of re-opening, the Association feels it is important not to add additional burdens to our industry in the form of costly new requirements for the MSGP.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:**  Patrick A. Jacomet
**Commenter Affiliation:**  Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

In closing, the members of OAIMA feel this proposal without the suggested changes above, creates an unreasonable economic burden to industry without improving environmental quality.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

We are concerned, however, that the proposed 2020 MSGP may actually increase compliance burdens and permit complexity without creating meaningful environmental benefits.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

**The Proposed MSGP Will Harm Small Businesses**
EPA's proposal fails to address the very real need to demonstrate regulatory flexibility. All businesses, but particularly small businesses, face a very difficult time merely navigating payroll and other issues during this time of economic and health crises. Small businesses do not have the inhouse resources that larger industries do and hiring outside consultants is very costly. The proposed MSGP includes both burdensome new requirements that are difficult to understand and implement, as well as additional vagueness that puts small businesses at risk of CWA violations. The high level of penalties under the CWA are beyond most small business' resources.

In order to minimize harm to small businesses, it is imperative that EPA adopt a more inclusive and robust method of facilities to be considered low-risk and withdraw Appendix Q and work with industries for a workable version in 2025.

**Comment Response:**

EPA appreciates the background specific to the aggregate industry. See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

As a general matter, NMA supports the use of general permits under the NPDES program as an effective and efficient means to address classes of similar dischargers. However, the proposed 2020 MSGP includes changes that would impose unnecessary, costly, and burdensome requirements on our members. We understand that EPA was required to propose many of these changes as the result of a settlement agreement, but we believe the agency should further consult with industry to address these concerns before finalizing the 2020 MSGP.

**Comment Response:**

EPA appreciates the support for the 2021 MSGP. EPA proposed revisions to the MSGP to seek public input and finalized the 2021 MSGP considering the public comments received. The proposed 2020 MSGP was published in the Federal Register on March 2, 2020. The public comment period, which was extended from 60 days to 90 days, provided an opportunity for industry and other members of the public to review and comment on the proposed requirements. EPA will continue to work with stakeholders on implementation of the final 2021 MSGP.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 51
**Excerpt Status:** Final

**Comment Excerpt:**

The 2020 MSGP is not a mere permit renewal; if finalized as proposed, it would impose additional complex, costly, and burdensome regulatory requirements. ... Subjecting the mining sector to these additional confusing and expensive requirements, which lack both legal and scientific bases, is especially problematic as our industry works to rebuild the economy.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

In this time of severe economic hardship, as the economy still suffers and will suffer from the COVID-19 pandemic, the Agency must undertake a serious examination of the true benefits of these new questionable and costly requirements.

Unlike the current MSGP permit, the proposed permit represents a significant escalation in complexity and cost for our members.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

Requiring the numerous changes and updates as listed in the proposal will mandate cost increases, and greater personnel and resource allocation for each company and location in order to remain compliant. To this end, NRMCA is opposed to burdening businesses of all sizes with unnecessary changes to the MSGP.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-166-A1, excerpt 1.

## G.6. General - Legal Issues

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

**III. Advocacy's Recommendations**

**A. EPA must comply with the requirements of the Regulatory Flexibility Act.**

As discussed above, general permits are rules under the Administrative Procedure Act and the Regulatory Flexibility Act. As also discussed above, EPA does not have the factual basis to certify that the proposed MSGP will not have a significant economic impact on a substantial number of small entities. Therefore, prior to issuance of the final permit must do one of the following:

- Initiate a Small Business Advocacy Review panel under 5 U.S.C. 609(b), (2) issue an Initial Regulatory Flexibility Analysis for public comment, and (3) prepare a Final Regulatory Flexibility Analysis; or
- Finalize only those provisions of the general permit that were the same as the 2015 MSGP or exempt all or most small entities from the most costly requirements.

**Comment Response:**

EPA disagrees with the commenter's suggestion of finalizing a 2021 MSGP that is the same as the 2015 MSGP or exempt all or most small entities. Additionally, EPA disagrees that a small business advocacy review panel is required. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

**This MSGP Could Impact State Authority Over Impaired Waters**

Under the Clean Water Act, states have authority to improve impaired waters by methodologies that make the most technical and environmental sense for them, based on their full understanding of local ecosystems. This permit could impact a delegated state's right to determine the best methods in their states. The D.C. Circuit has clearly held that in administering the delegated Section 402 NPDES program "the federal overview of the states is meant to be limited." *NRDC v. EPA*, 859 F. 2d. 156, 169 (D.C. Cir. 1985). Under that principle, a delegated state should have the flexibility to tailor its permit to address water quality concerns specific to that state, including addressing impaired waters concerns.

**Comment Response:**

States with NPDES authority are not required to use the requirements in the 2021 MSGP. Authorized states have flexibility to develop permit requirements that meet the requirements of the Clean Water Act and the stormwater regulations. Without further discussion regarding how the stated MSGP requirements impact state's rights, EPA is unable to respond in greater detail.

---

**Commenter Name:**  John S. Quarterman
**Commenter Affiliation:**  Suwannee Riverkeeper for WWALS Watershed Coalition (WWALS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0266-A2
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

4. In addition to the comments noted in 3. above, WWA:S wishes to add that none of the NAS recommendations cited on page 64 say anything about groundwater contaminants leaching back up into springs and rivers. Such leaching is a huge problem in Florida. In 2016 the Florida legislature required Basin Management Action Plans (BMAPs) to reduce fertilizer nitrates and other contaminants leaching through soils and underlying limestone and causing algae blooms and other problems in springs and rivers. The Final Suwannee River BMAP was released May 22, 2018; see http://wwals.net/?p=44612 and https://floridadep.gov/sites/default/files/Suwannee%20Final%202018.pdf That BMAP says fertilizer nitrates leaching into springs and rivers must be reduced 83 to 92% in the Suwannee River Basin. Yet the BMAPs have no teeth to make that happen. 5.

5. The U.S. Supreme Court decided April 23, 2020, in County of Maui v. Hawaii Wildlife Fund , No. 18-260, saying injecting partially-treated wastewater into the ground where it travels half a mile underground into the Pacific Ocean, harming underwater flora and fauna, is "the functional equivalent of a direct discharge from the point source into navigable waters." See: https://www.supremecourt.gov/opinions/19pdf/18-260_jifl.pdf That precedent would also seem to apply to leaky septic tanks or to a municipal wastewater system leaking wastewater onto the ground (see items 1 and 2 above). Further, it is not clear why it should matter whether the source is a point source or a non-point source such as agriculture: contaminants still leak through the ground into waterways. Concentrated Animal Feeding Operations (CAFOs) are industrial operations, as are plant farming operations that use large amounts of fertilizer (see 4 above).

Therefore WWALS asks EPA to address the issue of contaminants leaching through groundwater. WWALS further asks EPA to require the Florida Department of Environmental Protection (FDEP) to amend its BMAPs to contain enough measures and timelines to actually stop such leaching.

**Comment Response:**

EPA acknowledges the importance of protecting groundwater during the use of stormwater infiltration systems. The MSGP's benchmark monitoring requirements are based on surface water quality criteria and benchmark monitoring was developed with respect to stormwater discharges to surface waters. However, the MSGP does, in fact, include provisions that will ensure the protection of groundwater from stormwater that is infiltrated. For example, Part 2.1.1 states that "care must be taken to avoid ground water contamination" when infiltrating runoff onsite. EPA also suggests that permittees should pay special attention Part 2.1.2.6 of the Fact Sheet that includes a discussion at the end related to Underground Injection Control (UIC) Regulations when infiltration occurs . The Fact Sheet includes cautions about stormwater infiltration impacting groundwater and the need to potentially obtain a UIC permit for a Class V infiltration well.

Additionally, EPA has not finalized the proposed provision that would have allowed infiltration as an alternative to permanent stormwater controls required in AIM Level 3. As noted in the Fact Sheet, if EPA does develop guidance for retention and infiltration for industrial stormwater, it will work closely with stakeholders and representatives of state water quality and underground

injection control (UIC) agencies to ensure guidance is consistent with groundwater protection regulations, standards, and practices.

---

**Commenter Name:** Paul N. Backhouse
**Commenter Affiliation:** Seminole Tribe of Florida
**Document Control Number:** EPA-HQ-OW-2019-0372-0268-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's coverage area for the 2020 MSGP is almost exclusively Indian Country making the scope of this general permit essentially a permit for Indian Country. However, the scope of EPA's government-to-government consultation with affected Indian Tribes, including the Seminole Tribe, has not been commensurate to the scope of the impact to Indian Country. The Tribe primarily views formal government-to-government consultation as a Trust Obligation. The hallmark of EPA's relationship with the Seminole Tribe is based on EPA's Trust Responsibility requiring the agency to consider and act in the best interests of federally recognized Tribes like the Seminole Tribe. The cornerstone of that Trust Responsibility to the Tribe is the duty to formally consult, early and often, on actions that could affect the interests of the Tribe. Further, EPA has long acknowledged general public commenting is not considered formal government-to-government consultation because tribes like the Seminole Tribe are sovereign nations not be treated as the general public. **Therefore, the Seminole Tribe respectfully requests EPA adequately consider Tribal consultation for future actions including general permitting. Considering formal consultation has not been initiated with the Seminole Tribe, the following comments are initial, and the Seminole Tribe reserves the right to submit more detail comments at a later date and after formal consultation has been initiated**.

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding tribal consultation.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We appreciate the Agency's effort to develop this update to the MSGP. However, we are extremely concerned that many of the elements EPA has proposed are not authorized by the Act

and respectfully submit that they cannot be finalized in their current form. In particular, Proposed Section 5.2 – Corrective Actions and Additional Implementation Measures ("AIM") as applied to the Air Transportation Sector is legally untenable.

Many of the flaws in the Draft 2020 MSGP are very similar to the flaws A4A noted with regard to the Draft 2015 MSGP as proposed by EPA. To its credit, the Agency listened to our concerns regarding the Draft 2015 MSGP and made changes addressing those concerns before finalizing the 2015 MSGP. Unfortunately – and disappointingly – EPA has reverted to a similarly flawed approach in this proposal. This approach would not survive legal scrutiny. Accordingly, we urge the Agency to revise its proposal. To that end, we will contact EPA in the near future to – consistent with the requirements and spirit of the Administrative Procedures Act – arrange a meeting with the appropriate EPA staff to further discuss the issues raised here.[3]

[3] We plan to coordinate such a meeting with representatives of the nation's airports, specifically with colleagues from Airports Council International – North America ("ACI-NA") and Association of American Airport Executives ("AAAE").

**Comment Response:**

Comment noted.  See Comment Response Essay 1 Legal Issues regarding EPA's authority for the 2021 MSGP. Regarding general comments on the legality of additional implementation measures, see Essay 3 Additional Implementation Measures (AIM), General Critiques of AIM.

---

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

As discussed in greater detail below, many elements currently proposed in the Draft 2020 MSGP are not authorized by the CWA and cannot be finalized in their current form. We recognize that many of elements of the Draft 2020 MSGP emanate from settlement of litigation brought by several parties challenging the sufficiency of the 2015 MSGP. For example, EPA agreed "to include in the benchmark monitoring section of the proposed permit 'Additional Implementation Measures' ('AIM') requirements."[8] An agreement to include a measure in a proposed rule, of course, does not and cannot provide a legal basis for adopting the proposed measure as an enforceable regulatory measure in any final regulation absent separate underlying authority and support for the particular measure (or measures) in question. It is one thing to propose a regulation – it is quite another to provide sufficient basis in the Administrative Record to support adoption of a proposal as a final regulation. Simply put, not only is the Administrative Record in this proceeding lacking a factual basis supporting finalization of these elements as enforceable federal regulations, adoption of these elements – at least as applied to the Air Transportation

Sector – would flatly contradict the Agency's own factual findings and policy determinations in prior administrative proceedings.

As we have stressed in other contexts, commercial aviation is a very heavily regulated industry and as such depends on the integrity of the regulatory process.[9] In this context, we again underscore the need for Agency to establish a record that provides a legally defensible, rational basis for taking such action.

[8] Settlement Agreement (EPA-HQ-OW-2019-0372-0015) at 9.

[9] See, e.g., Airlines for America Comments on Revised Definition of "Waters of the United States, EPA Docket ID. No. EPA-HQ-OW-2018-0149-4593 ("A4A and its members have been very supportive of the Agencies' efforts to reevaluate the definition of . . . WOTUS. Those comments also have emphasized that, as a heavily regulated industry, the commercial aviation industry depends on the integrity of the regulatory process to ensure that federal agencies act in strict accordance with the law and, in particular protections codified in the Administrative Procedures Act. Accordingly, we commend the Agencies for providing a comprehensive explanation of its proposed WOTUS definition and the reasoning supporting it in the present proceeding."); Airlines for America Comments on Clean Water Act Coverage of "Discharges of Pollutants" via a Direct Hydrologic Connection to Surface Waters; Request for Comment, EPA Docket ID No. EPA–HQ– OW–2018–0063-0249 (May 21, 2018) ("We have previously emphasized to the Agency that, as a trade association representing the interests of an intensely regulated industry, we greatly appreciate the need to ensure that all regulatory processes fully comply with constitutional requirements and basic principles of administrative law. While we would strongly support an effort to clarify the Agency's position on this critical issue, we emphasize that any such clarification can and will have legal effect if and only if the Agency strictly adheres to these requirements. It is not clear whether the present proceeding provides sufficient notice and opportunity for public comment to support Agency adoption of legally effective revisions to previously adopted statements regarding whether the CWA applies to indirect-but-hydrologically connected discharges. We would urge the Agency to consider formally proposing such revisions so that the public is afforded the opportunity to fully understand and comment on any position the Agency may take. We also urge the Agency to explain its views regarding the force and effect that such a position statement or rulemaking would have.")

**Comment Response:**

Comment noted. See Comment Response Essay 1 Legal Issues regarding EPA's authority for the 2021 MSGP. Regarding general comments on the legality of additional implementation measures, see Essay 3 Additional Implementation Measures (AIM), General Critiques of AIM.

## G.7. General - Regulatory Issues

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Advocacy believes that EPA must fully comply with the Regulatory Flexibility Act when promulgating the MSGP. It must evaluate the economic impacts of the proposed revisions to the MSGP on small entities, and it should reconsider the elements of the proposed 2020 MSGP that impose an unreasonable burden without a clear scientific justification.

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

In the *Federal Register* notices announcing issuance of the 1998 General Permit for Stormwater Discharges from Construction Activities in Region 6[9] and the 2009 MSGP,[10] EPA claimed that, in their analysis, general permits are not rules under the Administrative Procedure Act (APA) and thus also not subject to the RFA. Advocacy has disagreed with this interpretation of the APA and RFA.[11]

Nonetheless, EPA stated the following in the *Federal Register* notice for the 2009 MSGP:

. . . EPA hereby commits that the Agency will operate in accordance with the RFA's framework and requirements during the Agency's issuance of CWA general permits (in other words, the Agency commits that it will apply the RFA in its issuance of general permits as if those permits do qualify as "rules" that are subject to the RFA). In satisfaction of this commitment, during the course of this MSGP permitting proceeding, the Agency conducted the analysis and made the appropriate determinations that are called for by the RFA. In addition, and in satisfaction of the Agency's commitment, EPA will apply the RFA's framework and requirements in any future MSGP proceeding as well as in the Agency's issuance of other NPDES general permits. EPA anticipates that for most general permits the Agency will be able to conclude that there is not a significant economic impact on a substantial number of small entities. In such cases, the

requirements of the RFA framework are fulfilled by including a statement to this effect in the permit fact sheet, along with a statement providing the factual basis for the conclusion. A quantitative analysis of impacts would only be required for permits that may affect a substantial number of small entities, consistent with EPA guidance regarding RFA certification.[12]

In the 2015 MSGP, EPA made passing reference to small businesses in the fact sheet,[13] but did not conduct a screening analysis elsewhere.[14]

...

EPA has not "applied the RFA framework and requirements" as contemplated in the 2009 MSGP nor directly addressed the question of whether the MSGP is a rule under the APA. EPA has not provided an initial regulatory flexibility analysis for this proposal, as required under 5 U.S.C. 603.

[9] 63 Fed. Reg. 36490, 36497 (July 6, 1998).

[10] 74 Fed. Reg. 8789 (Feb. 26, 2009).

[11] *See* Letter from Thomas Sullivan, Chief Counsel for Advocacy, U.S. Small Business Administration to Benjamin Grumbles, Assistant Administrator for Water, U.S. Environmental Protection Agency (March 14, 2006) (*available at* https://webarchive.loc.gov/all/20160921203014/https://www.sba.gov/sites/default/files/files/epa06_0314. pdf).

[12] 74 Fed. Reg. at 8791.

[13] "Because most permittees covered under the permit are existing dischargers and control measures are already being implemented to meet the effluent limits in the permit, and considering the relatively modest cost of compliance with the 2015 MSGP, EPA concludes that the technology-based effluent limitations in the MSGP are unlikely to result in a substantial economic impact to the permitted universe, including small businesses." *2015 Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) – Fact Sheet*, pp. 21 (available at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_fs.pdf).

[14] *See, e.g., Cost Impact Analysis for the Multi-Sector General Permit (MSGP)*, regulations.gov Document ID EPA-HQ-OW-2012-0803-0167.

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**A. The Proposed 2020 MSGP is a rule under the Administrative Procedure Act and EPA must comply with the Regulatory Flexibility Act, either by convening a SBREFA panel and publishing an Initial Regulatory Flexibility Analysis for notice and comment, or by reducing the impacts on small entities so that EPA may certify that the rule will not have a significant economic impact on a substantial number of small entities.**

The Regulatory Flexibility Act applies to any rule which is required to be published for notice and comment by the Administrative Procedure Act (APA) or any other act. The proposed MSGP is a rule within the meaning of that term in the APA, and thus is subject to the requirements of the RFA. As proposed, the 2020 MSGP could have a significant economic impact on a substantial number of small entities. Unless those impacts are reduced, EPA is required to convene a SBREFA panel and publish an Initial Regulatory Flexibility Analysis for notice and comment.

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**1. The proposed 2020 MSGP is a rule under the Administrative Procedure Act**

The Administrative Procedure Act (APA) governs the procedural rule making process for federal agencies. The Act defines a rule as a "an agency statement of general . . . applicability and future

effect designed to implement, interpret, or prescribe law or policy. . ." and a rulemaking as the agency's process for "formulating, amending, or repealing a rule". Section 553 of the APA requires that general notice of proposed rulemaking be published in the Federal Register. This notice must include a statement of the time, place and nature of rulemaking proceedings, reference to the legal authority under which the rule is proposed, and either the terms or substance of the proposed rule or a description of the subjects and issues involved.

EPA's proposed 2020 MSGP fits squarely into the definition of a rule under the APA. First, the 2020 MSGP is an agency statement of general applicability and future effect. A statement of "general applicability," in contrast to a statement of "particular applicability," applies to all that meet the stated criteria. The proposed 2020 MSGP covers stormwater discharges from industrial facilities in 30 sectors across EPA's Regions 1 through 10. It is not limited to named parties nor parties that are already members of the class, so it is a policy of "general applicability." It is also of "future effect," since it will replace the existing MSGP upon its expiration on June 4, 2020 and remain in effect for five years. The proposed 2020 MSGP is designed to implement and prescribe law. Under Section 402(p) of the Clean Water Act, EPA is required to develop a phased approach to regulate stormwater discharges under the National Pollution Discharge Elimination System (NPDES). EPA lists Section 402(p) as the statutory authority under which it proposes this MSGP.

For good policy reasons, EPA adheres to both the nature and function of the rulemaking process in its efforts to improve upon the proposed permit. Rulemaking is characterized by its distinct function in administrative law: its purpose is to develop policies that apply to more than the limited parties known and present at the time. For example, a statute that requires EPA to consider issues of general policy with respect to a pollutant (i.e. the significance of its toxicity and degradability on affected organisms as opposed to issues of fact concerning a particular entity's discharges) is appropriately adhered to through the rulemaking process. In this case, the proposed 2020 MSGP relies on Section 402(p) of the Clean Water Act. Section 402(p) calls for EPA to issue regulations to set forth the permit application requirements for municipal and industrial stormwater discharges. This authority is a matter of general policy as EPA is directed to formulate permit application requirements for dischargers across the nation. Furthermore, the content of the notice itself shows that EPA intends to engage the public in an APA rulemaking function: formulation. EPA seeks public comments on the permit, noting that the final permit will not be issued until EPA considers all significant comments and makes appropriate changes to the proposed permit. This notice has both the character and function of a rule under the APA.

Nonetheless, EPA's legal position has been that a general permit is issued as an adjudication, not a rulemaking. In EPA's view, "the fact that an NPDES general permit may apply to a large number of different dischargers does not convert it from a permit into a rule."[32] EPA also argued that a general permit is not a policy of general applicability: "NPDES general permit for storm water discharges associated with construction activity is effective only with respect to those dischargers that choose to be bound by the permit. Thus, unlike the typical rule, this NPDES general permit does not impose immediately effective obligations of general applicability."[33]

The U.S. Court of Appeals for the D.C. Circuit has explicitly disagreed with EPA's interpretation of the issue. In *National Association of Home Builders v. Corps of Engineers*,[34] the court held

that nationwide permits (NWPs) issued by the Army Corps of Engineers under section 404 of the Clean Water Act "fit easily" into the APA's definition of a "rule". Like EPA, the Army Corps of Engineers contended that NWPs should instead be classified as "adjudications" under the APA because they were formulations of an "order", which includes "licensing", and a permit is a form of a "license". However, the court rejected the Army Corps' "elaborate statutory construction for the more straightforward one." Because the NWPs authorized permittees to discharge dredged and fill material, while prohibiting those without an individual permit from doing so, NWPs constituted a legal prescription of the Corps' ability to implement the permitting authority granted by Congress in Section 404 of the Clean Water Act.

Similarly, this proposed 2020 MSGP is a legal prescription of EPA's ability to implement its permitting authority granted by Congress in Section 402(p) of the Clean Water Act. The MSGP authorizes permittees to discharge pollutants into the waters of the United States and prohibits those without an individual NPDES permit or other NPDES general permit from doing so.

Despite the D.C. Circuit's opinion, EPA only recognizes that "this legal question remains 'a difficult one'."[35]

[32] 63 Fed. Reg. at 36497.

[33] *Id.*

[34] *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1284-85 (DC Cir. 2005)

[35] 74 Fed. Reg. at 8791.

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**2. The proposed 2020 MSGP must comply with the Regulatory Flexibility Act.**

The RFA was adopted to ensure that federal agencies formally assess and minimize regulatory burdens on small entities. In crafting the RFA, Congress recognized that alternative regulatory

approaches that maintain alignment with the objectives of the authorizing statues may be available to minimize the significant economic impact of rules on small entities.

Under the RFA, when an agency must publish general notice of proposed rulemaking under the APA, the agency must prepare and make publicly available an initial regulatory flexibility analysis (IRFA) describing the impact of the rule on small entities. In addition, prior to publishing an IRFA, EPA is required to convene a panel under Sec. 609(b) of the RFA, a requirement added to the RFA by the Small Business Enforcement Fairness Act (SBREFA).[36] The purpose of the IRFA and the SBREFA panel are similar in nature: both provide opportunities for the agency to minimize a rule's significant economic impacts on small entities. EPA can avoid the requirement for a panel and an IRFA only if it can certify as a matter of fact that the proposed rule will not have a significant economic impact on a substantial number of small entities.

EPA is required to comply with the requirements of the RFA, because a general permit is a rule under the APA, and EPA is required to publish the MSGP in the *Federal Register* for notice and comment. As described above, although EPA has previously committed to following the "RFA's framework and requirements," it has not provided either an initial regulatory flexibility analysis or a certification supported by a factual basis (see below). The minimal consideration of small entity impacts in the *Federal Register* notice and the cost analysis are not consistent with the Congressional purposes of the RFA.

[36] Public Law 104-121, March 29, 1996.

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposed 2020 MSGP has the potential to have significant economic impact on a substantial number of small entities. Despite EPA's past commitments to the "RFA's framework and requirements," Advocacy believes that EPA has missed the mark and must now recognize that the MSGP is a rule, subject to the RFA, and engage in full RFA compliance. If moving forward with the 2020 MSGP without conducting a SBREFA panel, IRFA and FRFA, EPA will need to narrowly tailor the 2020 MSGP to minimize the impact on small entities to the extent

that the agency can certify the 2020 MSGP will not have a significant economic impact on a substantial number of small entities.

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

**3. EPA must convene a SBREFA panel and publish an Initial Regulatory Flexibility Analysis for notice and comment, or reduce the impacts on small entities so that EPA may certify that the rule will not have a significant economic impact on a substantial number of small entities.**

EPA has two options for moving forward in promulgation of the general permit. EPA's first option would be to initiate the processes for a SBREFA panel under section 609(b), in preparation for an IRFA. EPA may not develop a FRFA in support of the final 2020 MSGP without issuing an IRFA for public comment,[37] and EPA must complete a SBREFA panel before issuing an IRFA. After public comment on the IRFA, EPA could move forward with development of a FRFA supporting promulgation of the final 2020 MSGP.

EPA's second option would be to issue as final only those elements of the 2020 MSGP that it can certify will not have a significant economic impact on a substantial number of small entities. As discussed below, EPA asserts significant gaps in its knowledge of small entities that are or are likely to become permittees, and EPA has made what Advocacy believes are unreasonable assumptions about the likely costs of the stormwater control measures (SCMs) that would be required under universal benchmark monitoring and AIM. EPA could consider the following alternatives that would reduce the impacts on small entities to a level that would satisfy the requirements.

- EPA could adopt the 2015 MSGP with no changes.
- EPA could adapt the NRC Study recommendation to adopt a tiered approach to benchmark monitoring and allow small entities that are not currently subject to benchmark monitoring to continue visual monitoring only.

- EPA could require benchmark monitoring in phases over the full period of the 2020 MSGP to minimize the impact on small entities.

Advocacy does not believe EPA could certify a final rule that included the second and third tiers of AIM as proposed.

[37] Southern Offshore Fishing Association v. Daley, 995 F. Supp. 1411, 1434 (M.D. Fla. 1998) ("the agency could not possibly have complied with § 604 by summarizing and considering comments on an IRFA that NMFS never prepared").

## Comment Response:

See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

## Comment Excerpt:

### A. The Office of Advocacy

Congress established Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA). As such the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For any rule that is expected to have a significant economic impact on a substantial number of small entities, the RFA requires the federal agency to assess the impact of the proposed rule on small entities and to consider less burdensome alternatives.[4] In addition, when EPA cannot certify that a proposed rule would not have a significant economic effect on a substantial number of small entities, EPA must conduct a SBREFA panel to consult directly with potentially affected small entities.[5]

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[6] The agency must include, in any explanation or discussion accompanying the final rule's publication in the Federal Register, their response to these written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[7] Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory

goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[8]

[2] 5 U.S.C. §601 et seq.

[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. §601 et seq.).

[4] Under the RFA, small entities are defined as (1) a "small business" under section 3 of the Small Business Act and under size standards issued by the SBA in 13 C.F.C. § 121.201, or (2) a "small organization" that is a not-for-profit enterprise which is independently owned and operated and is not dominant in its field, or (3) a "small governmental jurisdiction" that is the government of a city, county, town, township, village, school district or special district with a population of less than 50,000 persons. 5 U.S.C. § 601.

[5] *See* 5 U.S.C. § 609(a), (b).

[6] Small Business Jobs Act of 2010 (PL. 111-240) §1601.

[7] *Id.*

[8] 5 U.S.C. § 601 note

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  39
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Has Violated the Regulatory Flexibility Act (RFA) by Certifying the Rule Has No Significant Economic Impact on Small Firms; EPA Should Remove All Provisions That Carry Costs and No Benefits**

Previously, EPA has asserted that NPDES permits are not "rules" subject to the Regulatory Flexibility Analysis (RFA) requirements. However, in promulgating the 2008 Construction Stormwater General Permit, EPA committed to applying the RFA framework and requirements to all NPDES general permits whether the Agency considered them "rules" or not under the APA. See 73 Fed. Reg. 40,342 (July 14, 2008). We agree with the March 2006 U.S. SBA Office of Advocacy MSGP comment letter that all general permits, including the MSGP, are rules subject to the RFA.[117] In this case, the result of such a comprehensive RFA analysis would lead to the elimination or modification of many of the requirements, as suggested in the above text.

The Agency determined, however, that this proposed permit would not have a significant economic impact on a substantial number of small entities, and therefore no RFA analysis would be needed.[118] Yet, this letter seriously undermines that determination. This comment discusses the large adverse economic impacts placed on Coalition's small member companies, for which there are little to no water quality benefits.[119] Small businesses cannot afford the outside consultants that large businesses have to comply with these rules nor implement costly and unnecessary monitoring and SCMs. The proposed rules will be hard to understand, difficult to implement, costly, without significant benefit, and not in compliance with either EO 13771 or the new EO 13924. Finally, to comply with the RFA, at least in part, the Agency needs to promulgate a final permit which significantly reduces the economic impact of this proposed permit to justify "certification" of the final permit.[120]

[117] The RFA applies to notices of proposed rulemaking where notice and comment is required. SBA Advocacy Comment Letter, March 14, 2006, at 2-4. https://www.sba.gov/sites/default/files/files/epa06_0314.pdf. If permits are considered rules, then the MSGP would be subject to the RFA. EPA has failed since 2008 to definitively decide whether permits are rules, as has been clear at least since the definitive 2005 DC Circuit decision. See Letter at 2-4.

[118] 85. Fed. Reg. 12288, 12294 (March 2, 2020). See also MSGP Cost Analysis 5 U.S.C. Section 605(b) permits agencies to omit the required Initial Regulatory Flexibility Analysis if the agency certifies that there will be no "significant economic impact on a substantial number of small entities," often referred to the "SISNOSE" determination.

[119] This comment letter does not include consideration of the separate adverse impact on Refined Tar Sealant applicators and manufacturers and processors, which include thousands of small firms. Such an impact could independently negate EPA's "SISNOSE" finding and provide the basis for the application of the RFA analysis requirement.

[120] See footnote 122 above for the RFA certification test.

**Comment Response:**

EPA regularly looks for ways to reduce reporting burdens on businesses of all sizes. That is why EPA developed general permit procedures to reduce burdens associated with the application

process and information submittals for industrial stormwater facilities. See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 20.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

EPA has asked for comment on 27 specific aspects of the Proposed 2020 MSGP. Our detailed comments on each of these issues are provided below. However, before moving to those detailed concerns, it is important to recognize an overarching issue as to EPA's proposal: the Agency has filed to comply with important regulatory review requirements that are provided in statute and executive orders.

In its Federal Register notice for the Proposed 2020 MSGP, EPA stated that the proposal is a "significant regulatory action" pursuant to Executive Order 12866 as amended by Executive Order 13563.[1] As a result, EPA sent the proposal to the White House Office of Management and Budget (OMB) for review. However, merely sending the proposal to OMB is insufficient to comply with the spirit of those Executive Orders. Pursuant thereto, EPA should have sought information from potentially impacted permittees and attempted to identify and consider approaches that reduce the burden of the regulation and enhance flexibility. Such information should then have been included in the proposed rulemaking package. EPA's proposal and related supporting documents demonstrate that EPA did not comply with itsits rulemaking obligations under these Executive Orders. For example, EPA failed to properly assess the impacts on the industries subject to the MSGP related to universal benchmark monitoring and AIM corrective actions. Detailed discussions of these and other economic impacts are being submitted by FWQC and FSWA members in their individual comments.

EPA also failed to comply with the Regulatory Flexibility Act (RFA).[2] As provided above, EPA found that the proposal was a "significant regulatory action" with impacts on the economy of greater than $100 million. Much of that impact falls on small businesses. EPA must comply with the RFA when its action would have "significant economic impact on a substantial number of small entities" unless it certifies to the contrary, which EPA has not done, and which the record does not support. Evidence in the record and in comments being submitted demonstrate that EPA should have proceeded with full RFA compliance, including assembling a Small Business Regulatory Enforcement Fairness Act review panel.

Previously, EPA has asserted that NPDES permits are not "rules" subject to RFA requirements. However, in promulgating the 2008 Construction Stormwater General Permit, EPA committed to

applying the RFA framework and requirements to all NPDES general permits whether or not the Agency considered them "rules" or not under the Administrative Procedures Act.[3] EPA must conduct an appropriate and complete RFA analysis for the Final 2020 MSGP.

Since EPA's proposal was issued, President Trump has signed Executive Order 13,924, which focuses on regulatory relief to support economic recovery related to the COVID-19 pandemic. The current crisis is impacting many small businesses and others that are subject to MSGP permitting. In the Executive Order, the President directs all agencies, including EPA, to "identify regulatory standards that may inhibit economic recovery and shall consider taking appropriate action, consistent with applicable law, including by issuing proposed rules as necessary, to temporarily or permanently rescind, modify, waive, or exempt persons or entities from those requirements."[4] Many of the new regulatory mandates in the MSGP have little if any environmental benefit but pose significant economic impact. This is precisely the type of action that the President wants agencies to modify or take other appropriate action. EPA must comply with this this recent Executive Order when finalizing its MSGP.

[1] 85 Fed. Reg. at 12,294 (Mar. 2, 2020).

[2] 5 USC §§ 601 et seq.

[3] See 73 Fed. Reg. at 40,342 (July 14, 2008).

[4] See Executive Order 13924 at Section 1; 85 Fed. Reg. 31,353 (May 22, 2020).

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Regulatory Flexibilities Act and Executive Orders.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, these burdensome proposed regulations are inconsistent with Administration priorities as set out in Executive Order 13771 and the most recent Executive Order 13924.[4]

[4] Executive Order on "Regulatory Relief to Support Economic Recovery" issued on May 19, 2020; https://www.govinfo.gov/content/pkg/FR-2020-05-22/pdf/2020-11301.pdf.

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding EPA's compliance with the Executive Orders.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

***6. EPA Must Either Adopt Revisions to the MSGP or Separately Undertake a Regulatory Action to Address Discharges from Nonindustrial Facilities with Activities Similar to Those Currently Covered by the MSGP, in Accordance with the Recommendations of the National Academies of Sciences.***

The NAS recommended that EPA extend MSGP classification to "nonindustrial facilities with activities similar to those currently covered."[10] EPA does not disagree with the substance of the NAS recommendation. Indeed, "EPA recognizes the benefits of the recommendation."[11] Instead, EPA's main reason for declining to adopt the NAS recommendation is that doing so would require a separate regulatory action.[12] If this is true, then EPA should initiate a formal rulemaking to modify the definition of industrial stormwater.

EPA also refers to Sector AD of the MSGP, implying that sector AD is adequate to deal with the issues raised by the NAS. Sector AD – "Stormwater Discharges Designated by the Director as Requiring Permits" – plays an important role in the industrial stormwater permitting scheme, and indeed EPA has previously determined that there is a huge universe of facilities and activities that fall outside of the regular MSGP sectors, many of which could be subject Sector AD.[13]

However, the examples cited by the NAS – "school bus transportation facilities and fuel storage and fueling facilities" – are not necessarily the kinds of facilities to which section 122.26(a)(9)(i) applies. Section 122.26(a)(9)(i) applies to small MS4s, small construction activity, dischargers subject to a TMDL, dischargers that are known to be contributing to water quality standard violations, or otherwise "significant" dischargers.[14] It is not hard to imagine a school bus depot that fits none of those descriptions, and would therefore not fall within Sector AD. Yet, as the NAS points out, some states do include these activities in their general permits, precisely because they do warrant coverage.[15]

In 1999, when EPA identified over 1,000,000 facilities that should be regulated under the MSGP, the Agency claimed that it lacked sufficient data to designate any new sources.[16] That was 20 years ago. The NAS report therefore raises a concern that the EPA has shared for decades. Over the past 20 years, EPA should have been collecting sufficient data to designate new sources. The inability to identify new sources now is a problem that falls squarely on EPA's shoulders.

EPA has no reasoned basis for continuing to ignore "nonindustrial facilities with activities similar to those currently covered."[17] Regardless of how EPA chooses to go about addressing the concerns raised by the NAS, the Agency must somehow address those concerns, if not in the MSGP itself, then through a separate regulatory action.

[10] National Academies of Sciences, Engineering, and Medicine 2019. Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges at 3, 42 (2019) (hereinafter "NAS") (attached). Washington, DC: The National Academies Press. https://doi.org/10.17226/25355. 31-34.

[11] Fact Sheet at 5.

[12] *Id.* at 5.

[13] *See, e.g.*, U.S. EPA, National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges (Dec. 8, 1999), 63 Fed. Reg. 68722, 68779 (describing roughly 100,000 facilities that are "very similar, or identical, to regulated stormwater discharges associated with industrial activity," but are omitted from the regular MSGP sectors due to EPA's use of SIC codes in defining the universe of regulated activity, and another roughly 1,000,000 facilities that have the "potential for discharging pollutants to waters of the United States through storm water point sources").

[14] 40 C.F.R. § 122.26(a)(9)(i).

[15] NAS at 3, 42.

[16] *Id.*

[17] NAS at 3, 42.

**Comment Response:**

The 2021 MSGP does not cover any new industrial sources beyond those named in 40 CFR 122.26(b)(14). As the commenter noted, while EPA recognizes the benefits of the recommendation to cover facilities with activities similar to those already covered by the MSGP, such an expansion would require a separate regulatory action to modify the definition of "stormwater discharges associated with industrial activity" in 40 CFR 122.26(b)(14) and is outside of the scope of this permit.

Additionally, in Sector AD, the MSGP covers other stormwater discharges designated by the Director as needing a permit (see 40 CFR 122.26(a)(9)(i)(C) & (D)) or any facility discharging stormwater associated with industrial activity not described by any of Sectors A-AC.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 85
**Excerpt Status:** Final

**Comment Excerpt:**

***26. EPA Should Prepare a Full Environmental Impact Statement for the Issuance of the MSGP and Re-evaluate its Unsupportable Environmental Justice Conclusions.***

Section VII of EPA's March 2, 2020 Notice contends that "reissuance of the MSGP is eligible for a categorical exclusion requiring documentation under 40 CFR 6.204(a)(1)(iv)." 85 Fed. Reg. at 12294. This subsection applies to actions involving the "re-issuance of a NPDES permit for a new source providing the conclusions of the original NEPA document are still valid, there will be no degradation of the receiving waters, and the permit conditions do not change or are more environmentally protective." 40 CFR § 6.204(a)(1)(iv). EPA notes that it completed an Environmental Assessment/Finding of No Significant Impact (EA/FONSI) for the 2015 MSGP and contends that the "analysis and conclusions regarding the potential environmental impacts, reasonable alternatives, and potential mitigation included in the EA/ FONSI are still valid for the reissuance of the MSGP because the proposed permit conditions are either the same or in some cases are more environmentally protective." 85 Fed. Reg. at 12294.

EPA must reconsider its invocation of this categorical exclusion and to instead at a bare minimum prepare an EA to determine whether a full Environmental Impact Statement (EIS) is required. 40 C.F.R. § 1501.4. As an initial matter, this categorical exclusion on its face does not squarely apply to the issuance of this MSGP. It references "a NPDES permit" and "a new source" not thousands of permits and sources. The sheer number of industries and facilities covered by the 2020 MSGP counsel for a full environmental review under NEPA. In addition, in the intervening five years since issuance of the 2015 MSGP, much has changed both in terms of the society, regional, and local context of the sources and intensity of the proposed action.

There are changes that EPA must evaluate, including in the type and number of facilities covered, the nature of the pollutants covered (including but not limited to plastic), the receiving environment (including direct, indirect, and cumulative impacts to and uncertain or unknown risks), and the best available technical and scientific information. *See, e.g.,* 40 C.F.R. § 1508.27; *see also* 40 C.F.R. § 1502.24 (agencies must use high quality, accurate scientific information and ensure the scientific integrity of this analysis). In its cumulative impacts analysis, EPA may not brush aside "individually minor but collectively significant actions taking place over a period of time" regardless of what agency or person undertakes such other actions." *Id.* § 1508.7. This is especially important when considering cumulative industrial discharges that can harm water quality, biological resources, functioning ecosystems, historic and cultural resources, and public health.

EPA should also consider the likelihood and environmental impacts of unpermitted discharges, spills, and other accidents from sources covered by the MSGP. 40 C.F.R. § 15022.22(b)(4). EPA

has a duty to evaluate the impacts of this vast MSGP with fresh eyes and fresh science. To do otherwise would violate the tenets of NEPA and fail to be the "hard look" required. Agencies must also consider the environmental justice implications of a proposed project. Under Section VIII of its March 2, 2020 Notice, EPA includes just one cursory paragraph on environmental justice:

*The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The EPA has determined that the proposed permit will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because the requirements in the permit apply equally to industrial facilities in areas where the EPA is the permitting authority, and the proposed provisions increase the level of environmental protection for all affected populations.*

85 Fed. Reg. at 12294. It is unclear how EPA can conclude that in applying the same standards to every facility, there can be no disproportionate impact. The issue is the density of industrial facilities in these communities. A recent EPA report concluded that African-Americans and individuals living below the poverty level are more likely than others to live near pollution-emitting facilities, and that the racial correlation was stronger than the poverty-based one.[273] Studies dating back to the 1970s have documented a consistent pattern of siting facilities disproportionately where poor people and people of color live.[274] In the fence-line zones around industrial facilities that use or store hazardous chemicals, the percentage of Latinos is 60 percent greater and percentage of blacks 75 percent greater than for the United States as a whole.[275]

Furthermore, the 2019 NAS report noted that an individual permit can better regulate facilities by requiring more extensive monitoring and coverage of a greater number of pollutants relative to a General Permit, where benchmark monitoring is determined by standard industrial classification (SIC) code.[276] Individual permits can also be structured with enforceable discharge criteria expressed as numerical effluent limits, which then trigger a permit violation when exceeded. As the report concluded, "[t]his stricter enforcement of pollutant exceedances can be helpful for sites that represent a high public concern or that raise environmental justice issues."[277] Many of the facilities that would be covered by the MSGP are of high public concern, and their proliferation in low-income communities of color raises environmental justice concerns.

These concerns are not addressed or alleviated by EPA's statement that the MSGP provides an increase in protection. The MSGP is still permitting pollution that has direct, indirect, and cumulative impacts on these communities – impacts that are harmful. It is not acceptable for EPA to dismiss this with one paragraph that contains EPA's "belief" but is devoid of analysis.

[273] Mikati, I. et al., Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status, 108 Am. J. Pub. Health 480 (2018), https://doi.org/10.2105/AJPH.2017.304297.

[274] Brown, P. Race, class, and environmental health: a review and systematization of the literature. 69 Envtl. Res. 15 (1995).

[275] Environmental Justice and Health Alliance for Chemical Policy Reform, Who's in Danger? Race, Poverty, and Chemical Disasters (2014), https://comingcleaninc.org/assets/media/images/Reports/Who's%20in%20Danger%20Report%20FINAL.pdf.

[276] NAS at 76.

[277] *Id.*

**Comment Response:**

EPA disagrees with the commenter's assertion that compliance with the National Environmental Policy Act (NEPA) requires a new environmental assessment or environmental impact analysis. As stated in the Federal Register Notice, because the 2021 MSGP is no less stringent than the 2015 MSGP, and in some cases more environmentally protective, EPA is relying on the Environmental Assessment/Finding of No Significant Impact (EA/FONSI) from the 2015 MSGP.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  92
**Excerpt Status:** Final

**Comment Excerpt:**

*ii. EPA must define microplastics as a "pollutant," not a "significant material."*

The proposed regulations define microplastics as a "significant material."

*Significant Materials – includes, but is not limited to: raw materials; fuels; materials such as solvents, detergents, and plastic pellets; finished materials such as metallic products; raw materials used in food processing or production; hazardous substances designated under section 101(14) of CERCLA; any chemical the facility is required to report pursuant to section 313 of Title III of SARA; fertilizers; pesticides; and waste products such as ashes, slag and sludge that have the potential to be released with stormwater discharges. See 40 CFR 122.26(b)(12).[252]*

"Significant materials" are less regulated than pollutants. Current regulations merely require the facility to "estimate" and give a "narrative description" of "Significant materials that in the three years prior to the submittal of this application have been treated, stored or disposed in a manner to allow exposure to storm water; method of treatment, storage or disposal of such materials;

materials management practices employed, in the three years prior to the submittal of this application, to minimize contact by these materials with storm water runoff; materials loading and access areas…."[253]

Plastic nurdles, powders and flakes are pollutants and should be regulated as such. 40 C.F.R. §122.2 should be amended to state:

*Pollutant means dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials (except those regulated under the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.)), heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, ~~and~~ agricultural waste,* **and plastics (*including plastic nurdles, powder and flakes*)** *discharged into water.*

The vast expansion of the plastics industry will add billions of plastic pellets and other materials into stormwater runoff unless EPA takes action now. The health of our birds, fish, and mammals, as well as our own human health, depends on clean waterways free of hazardous plastic pollution. In accordance with its authority under the Clean Water Act, EPA must therefore promulgate regulations ensuring that the plastics industry does not discharge any more plastic waste through stormwater and wastewater runoff.[254]

[252] Draft Permit - Appendix A, definitions A-7 of 10 (emphasis added).

[253] 40 C.F.R. § 122.26(c)(1)(i)(B).

[254] 40 C.F.R. § 122.26(a)(4).

**Comment Response:**

The definition of "significant materials" is based on CFR text, see 40 CFR 122.26(b)(12). A change to these definitions is outside the scope of this action. This action is specific to the requirements of the MSGP, not CFR text itself. See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 93.

---

**Commenter Name:**  Paul N. Backhouse
**Commenter Affiliation:**  Seminole Tribe of Florida
**Document Control Number:**  EPA-HQ-OW-2019-0372-0268-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The Seminole Tribe has eight Reservations in Trust within the State of Florida. This necessary means all Tribal waters are downstream from waterbodies that are regulated by the State of

Florida's EPA delegated NPDES program. Consequently, requiring more robust monitoring and control measures on the Seminole Tribe's Reservations would be futile unless the State's multi-sector NPDES permit is also revised to parallel EPA's 2020 MSGP. As EPA acknowledges, the proposed changes are intended to increase accountability and effectiveness. **That accountability and effectiveness should be applied throughout Florida and not just on Tribal reservations (or the Seminole Tribe will have the disproportionate burden of monitoring and "cleaning" upstream discharges).**

The Seminole Tribe is concerned that EPA is viewing the proposed 2020 MSGP in a vacuum and not adequately considering the impact the State of Florida's implementation of their NPDES program impacts Tribal waters and Tribal implementation of the Clean Water Act (it is not enough to assume states will simply incorporate verbatim EPA's revisions into their respective permitting). **Therefore, the Seminole Tribe respectfully requests that EPA utilize its oversight and delegation authority to require the State of Florida's NPDES permitting parallel EPA's proposed revisions to ensure consistent and fair implementation of the Clean Water Act.**

Finally, while the Clean Water Act allows EPA to delegate programs like NPDES to states, EPA cannot delegate its Trust Responsibility. Historically, the State of Florida has not coordinated or communicated with the Seminole Tribe of Florida with regard to its implementation of the delegated NPDES program. This has essentially ended government-to-government consultation unless the Tribe requests EPA involvement, which EPA does not have adequate resources to do on every NPDES permit that may affect the Tribe. **Therefore, the Seminole Tribe requests EPA use its oversight and delegation authority to ensure states, like Florida, adequately communicate NPDES permitting decisions that may impact Tribal waters/interests with the Seminole Tribe.**

**Comment Response:**

See Comment Response Essay 1 Legal Issues regarding EPA's authority.

## G.8. General - 2015 MSGP Litigation

**Commenter Name:** Chuck Baltzer, Environmental Support Services (ESS)
**Commenter Affiliation:** Rio Algom Mining L.L.C, subsidiary of BHP Copper Inc. (BHP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0160-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

RAML is cognizant of the fact that many of the permit changes result from a Settlement Agreement between EPA, several NGO's, and two industry groups that required EPA to fund a National Research Council (NRC) study – with findings of that study incorporated into the permit. EPA notes that "*The NRC study's overarching recommendation is that the MSGP is too static and should continuously improve based on best available science, new data, and*

*technological advances*." [1] RAML recognizes that EPA must address the NRC findings; thus we have attempted to tailor our comments with this requirement in mind.

[1] p. 1, EPA Summary of Changes.

**Comment Response:**

Comment noted. See the 2021 MSGP Fact Sheet for specific details about how EPA incorporated details of the 2016 Settlement Agreement.

## G.9. General - NRC NAS Industrial Stormwater Study

**Commenter Name:** Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:** Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**Incorporate NAS (2019) recommendations.** USEPA's Request for Comment 19 and 23 are consistent with the NAS (2019) recommendations for enhanced monitoring, which include "additional tools and monitoring strategies" that "could be used to assess the water quality impact to receiving waters from stormwater discharge, including wet-weather mixing zones, dissolved metal sampling, and site-specific interpretation of water quality criteria, with additional guidance from EPA". Facilitating use of these additional tools is consistent with our previous suggestions/position calling for improved consideration of existing USEPA tools (including nationally recommended bioavailability-based WQC for copper) to translate stormwater benchmarks to receiving water conditions. Consistency with WQC and state-of-the science tools would allow for improved understanding of potential risks to aquatic environments. In the absence of a single set of revised benchmarks that include bioavailability based WQC (e.g., for copper and aluminum), additional options for more sophisticated approaches would be beneficial from the perspective of providing flexibility, balancing resource allocation, and demonstrating responsibility for adequately protecting the environment.

**Comment Response:**

Comment noted. See EPA's responses to the NRC recommendations in Part III of the 2021 MSGP Fact Sheet. And also see EPA's responses to public comments on Request for Comment 19 in comment code 4.2.1 RFC19.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration

**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**B. EPA should establish a reasonable and long-term data collection effort to fill in the gaps identified by the NRC.**

EPA should develop and issue for public comment a monitoring plan that commits EPA to gathering the data necessary to support future permits. The results of this monitoring would not trigger any regulatory obligations or permit noncompliance but would be a cooperative scientific effort between EPA and permittees. Advocacy recommends EPA consider the following in such a plan.

- Gather and analyze data by industrial activity rather than NAICS code or sectors. The current MSGP sectors are too broad, encompassing many disparate activities that do not share characteristics of regulatory interest. EPA should use data to associate issues with specific pollutants with particular industrial activities.
- Exempt low risk facilities and other facilities to the extent that the marginal value of the data that would be gathered is low.
- Exempt small entities to the maximum extent possible.
- Phase in monitoring for small entities over 3 to 4 years. Small entities need time to develop monitoring and testing capacity. EPA should offer technical assistance and training to small entities and publish data quality guidelines for monitoring and testing
- Phase-out of monitoring for industrial sectors if the data do not support a need for future action.
- Establish a clear timeline for the use of monitoring data to support the 2030 MSGP. Short of significant exigent circumstances, EPA should not plan to use this data for the 2025 MSGP.

**Comment Response:**

EPA acknowledges the commenter's suggestion and appreciates the level of detail associated with the suggestion for a monitoring plan. However, because of the high variability of industrial stormwater and the wide range of sectors covered by the MSGP, such a monitoring plan would require many samples. The MSGP, as a general permit, is not the appropriate vehicle for collecting such rigorous data. Monitoring requirements, such as those suggested by the commenter, are developed and administered through effluent limitations guidelines. The indicator monitoring requirements for pH, Total Suspended Solids (TSS), and Chemical Oxygen Demand (COD) will provide operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control measure effectiveness at these facilities. EPA also plans to use the indicator monitoring data collected for Polycyclic Aromatic Hydrocarbons (PAHs) to conduct an initial quantitative assessment of the levels PAHs in industrial stormwater, further identify industrial activities with the potential to discharge PAHs in stormwater, and inform future consideration of potential PAH benchmark monitoring for sectors with the potential to discharge PAHs in stormwater.

2021 EPA MSGP Response to Comments
January 15, 2021

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  84
**Excerpt Status:** Final

**Comment Excerpt:**

*5. EPA Should Require Additional Monitoring of Source Control Methods in Accordance with the Recommendations of the National Academies of Sciences.*

The NAS recommended that EPA require additional monitoring specifically focused on the capacity of Source Control Methods (SCMs) to reduce stormwater pollution.[269] EPA declines to adopt this recommendation yet fails to provide a legitimate rationale for its decision.

EPA's stated rationale for not requiring SCM performance data is that it "would be very complicated to do in context of a permit and possibly expensive for operators in balance with other proposed requirements."[270] It is painfully obvious that EPA never took the NAS recommendation seriously. Among other things, EPA failed to estimate the cost of collecting SCM performance data, and merely speculates that it is "possibly expensive."[271] The Agency also responds to the recommendation as if the only purpose of SCM performance data is to inform new numeric effluent limitations, when the NAS clearly recommended SCM performance data for two reasons – to identify sectors for which new national effluent limits are necessary, and to inform periodic reviews of benchmarks.[272] Finally, while EPA speculates about cost to permittees, it arbitrarily ignores the corresponding benefit to public health and the environment of learning more about SCM performance.

EPA has a statutory obligation to ensure that industrial stormwater permittees are minimizing their pollution loads using the best available technology. It should go without saying that the Agency cannot fulfill its obligation without learning more about the pollutant removal capabilities of various SCMs. EPA's stated rationale for ignoring the NAS recommendation is wholly unsupported by reasoned analysis. The Agency must require SCM performance data to address the concerns raised by the NAS and to fulfill its statutory obligations under the CWA.

[269] NAS at 4, 43.

[270] Fact Sheet at 6.

[271] *Id.*

[272] NAS at 4.

**Comment Response:**

As stated in the proposed 2020 MSGP Factsheet, EPA acknowledges that a more complete and robust dataset would be needed to establish numeric limitations for industrial stormwater. EPA maintains that such a requirement is outside of the scope of the MSGP, which is a general permit. See response to EPA-HQ-OW-2019-0372-0167-A1, excerpt 14.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**Important Aspects of the Settlement Agreement & National Academy of Sciences Study were Excluded Resulting in a Problematic MSGP**

The Settlement Agreement that was signed included a NAS committee convened to study certain aspects of the industrial stormwater program. That study had an emphasis on retention standards and monitoring requirements. The NAS study recommended a risk-based approach to improve data quality from the higher risk facilities and suggested moderating the burden on lower risk facilities. As we see it, the proposed MSGP increases the requirements for all facilities with limited opportunity to drop to a reduction in requirements. It appears that many of the proposed changes go past what is necessary to improve the MSGP, while other suggestions were not fully considered. This results in a problematic permit.

The NAS appears to have developed many of their suggestions without a full understanding of many of the industries involved and how these suggestions would be implemented in the real world. Many of the industry sectors, including Sector J that covers the aggregates industry, already must deal with numerous other permit programs that protect the environment. There was no need for the NAS to spend time on these areas of concern as they often do not impact discharges, or are redundant with other requirements. A prime example of this is how the proposed MSGP handles chemical oxygen demand (COD). Aggregates operations do not have any activities that would affect COD, but as proposed we will now be required to test for it at every outfall.

**Comment Response:**

Comment noted. See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40.  Regarding EPA's considerations of the NRC recommendations, see Part III of the 2021 MSGP Fact Sheet.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Important Aspects of the Settlement Agreement & National Academy of Sciences Study</u>**
**<u>were Excluded Resulting in a Problematic MSGP</u>**

As part of the settlement agreement signed by parties on August 16, 2016 NAS convened "a committee to study certain aspects of the industrial stormwater program, with an emphasis on monitoring requirements and retention standards." to identify the highest priority industries. In the settlement agreement it was noted that EPA would *consider* all recommendations of the NAS study, and the NAS study recommended a risk-based approach to improve data quality from the "largest, highest risk facilities, *while moderating the burden on the lowest risk facilities*." (emphasis added) However, as it stands, the proposed MSGP imposes increased requirements for all facilities and NSSGA finds that many of the suggestions go beyond the tasks and goals of improving the MSGP, while others were not fully considered, both of which result in a problematic MSGP.

NAS seems to have developed a number of suggestions in a vacuum without a full understanding of how the program works in the field, or the myriad of other programs protecting the environment. As a result, many of the proposed changes are overly prescriptive and not related to discharges, and/or are redundant with other requirements. For example, aggregates operations have no activities that would affect chemical oxygen demand (COD) yet will now be required to test for it on a quarterly basis from each outfall.

EPA has decades of experience in regulating water quality that the NAS does not. While EPA exercised some discretion in adopting NAS recommendations, they did not give enough consideration as to how these recommendations affect businesses, particularly small businesses. All of this increases the burden to low risk facilities, many of which are small businesses, not decreases it. According to the NAS, the problem is not a lack of data for all industries, it is a lack of data for <u>certain parameters for certain industries</u>: in particular, facilities with a potential for, and history of, impacts to surface waters. Additionally, EPA failed to provide data for public review in a timely manner as identified by a reviewer[4] early in the comment period.

[4] Kevin Bromberg, March 26, 2020, Proposed Multi-Sector General Permit (MSGP); Docket EPA-HQ-OW-2019-0372; 85 Fed. Reg. 12288, March 2, 2020

**Comment Response:**

Comments regarding the NAS NRC study are noted. See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40.

EPA disagrees that it failed to provide data for public review. The comment referenced by commenters, EPA-HQ-OW-2019-0372-0076-A2, submits data used in the NAS NRC study for review. See the response to EPA-HQ-OW-2019-0372-0076-A2, excerpt 1.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Flaws in the 2019 NRC Study: The 2019 NRC Study was based on limited data that is not representative of entire industry sectors. Further, EPA did not make available for public comment the underlying and limited data the NRC used to support its conclusions and recommendations, thus violating administrative procedures and the agency's own policy guidance.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40. And also see the Comment Response Essay 1 Legal Issues for EPA's response regarding administrative procedures and publicly available data.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  40
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Must Acknowledge Flaws in the 2019 NRC Study.**

As several proposed provisions in the proposed 2020 MSGP are based on conclusions from the NRC Study, EPA should recognize several critical flaws of the study before adopting its recommendations. As a general matter, the NRC Study was based on limited data that should not be used to impose costly and unnecessary new regulatory requirements on an entire industrial sector. The NRC Study concluded that several sectors appeared to exceed benchmarks repeatedly, whether it was due to "a large percentage of samples with concentrations above the benchmark threshold for more than one pollutant" or, "a large percentage of samples with concentrations above eight times the benchmarks."[62] Specifically, the NRC Study pointed to

Sector H, explaining that, in its analysis, more than half of the samples exceeded eight times the benchmark for TSS and 95% of the samples exceeded eight times the benchmarks for aluminum and iron.[63] The NRC Study seems to use the mere existence of repeated benchmark exceedances to justify recommended enhanced monitoring requirements.

This conclusion is incomplete and flawed for several reasons. First, the NRC Study was based on just 22 reported results for three facilities. This limited data should not be applied to Sector H broadly or be used to impose overly stringent and burdensome regulatory requirements.[64] Second, the NRC Study did not account for high levels of aluminum in the natural background concentration of these sites, which would have lowered the levels significantly. Third, the NRC did not analyze its monitoring results in the same way that EPA determines benchmark exceedances, making this an inappropriate comparison. Benchmark exceedances are determined based on the average of four quarterly samples, but the NRC Study simply looked at the limited samples it had, and determined Indeed, the NRC Study admitted that the tables presenting the data "do not indicate MSGP benchmark exceedances"[65] but claimed they "provide insight into the sectors and pollutants with frequent elevated discharge concentrations."[66] We do not believe that a completely new regulatory framework should be informed by "insight" into a particular sector from a limited dataset that has not been appropriately analyzed. If EPA makes significant changes to the MSGP, its changes must be scientifically justified and not based on generalizations from a very limited study.

Another critical shortcoming of the NRC Study and EPA's public process is that the data underlying the study were not made available for public comment. Agencies have long been required by the Office of Management and Budget (OMB) to make data and other information related to the rulemaking process publicly available. For example, under OMB M-19-15, agencies are required to make information, including information relied upon to support a rulemaking, publicly available in a way that is sufficient to allow the public to reproduce the agencies' conclusions. Similarly, OMB Memo M-10-06 requires agencies generally to publish government information online.[67] A 2010 OMB memo also requires agencies to make supporting materials that are part of rulemakings on the electric docket during the notice-and-comment period.[68] In addition, under OMB Circular A-4, agencies are encouraged to post their analysis and all supporting documents, including the data underlying the analysis, online for the express purpose of allowing the public to review the findings.[69] Fortunately, a commenter submitted the data to the docket,[70] but EPA should have made this data readily available for public review and comment. It is clear from these OMB memos that this data should have been included in the rulemaking docket at the beginning of the public comment period. NMA would not have learned about the flawed analysis applied to Sector H had we not been able to review that underlying data. In the future, EPA and the NRC must be more transparent about data informing significant rulemakings, especially when, as in the case of the 2020 MSGP, the NRC's recommendations directly inform the agency's proposal.

---

[62] 2019 NRC Study at 23, 24.

[63] Id.

[64] 2019 NRC Study at 3.

[65] 2019 NRC Study at 22.

[66] Id.

[67] Memorandum for the Heads of Executive Departments and Agencies, Open Government Directive, M- 10-06 (Dec. 8, 2009), *available at* https://www.treasury.gov/open/Documents/m10-06.pdf.

[68] Memorandum for the President's Management Council, Increasing Openness in the Rulemaking Process – Improving Electronic Dockets (May 28, 2010), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/assets/inforeg/IncreasingOpenness_04072010.pdf.

[69] OMB Circular A-4 , Regulatory Analysis, (Sept. 17, 2003), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.

[70] Kevin Bromberg, March 26, 2020, Proposed Multi-Sector General Permit (MSGP); Docket EPA-HQOW- 2019-0372; 85 Fed. Reg. 12288, March 2, 2020.

**Comment Response:**

Comments noted. EPA removed the sector-specific benchmark for iron for Sector H. The aluminum requirements remain the same, with the only change being to the units used to express the value (changing from mg/L to ug/L). The 2021 MSGP does include new additional implementation measures (AIM). However, these provisions are only triggered by a four-quarter annual average exceedance of a benchmark or by fewer than four quarterly samples, but where a single sample or the sum of any sample results within the sampling year exceeds the benchmark threshold by more than four times for a parameter, indicating an exceedance is mathematically certain (see Part 5 of the MSGP). The procedures for benchmark exceedances, now called Additional Implementation Measures (AIM), are further described in the MSGP and Fact Sheet. See Essay 3 Additional Implementation Measures (AIM) for further discussion on the intent and implementation of AIM.

Regarding the commenter's concerns about data availability, see Essay 1 Legal Analysis for further discussion. The NRC Study was conducted by a group outside of EPA. While EPA did fund the study and provide data for the NRC to evaluate, the results of the analysis are not owned by EPA. The NRC study evaluates data provided by EPA in conjunction with other information to suggest improvements to the MSGP. Commenters are encouraged to engage directly with NRC regarding the data used in their study. The NRC study is publicly available at the following link: https://www.nap.edu/catalog/25355/improving-the-epa-multi-sector-general-permit-for-industrial-stormwater-discharges

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Understanding the settlement agreement born out of the suit brought against the EPA's 2015 NPDES MSGP for Stormwater Discharges, IMA-NA echoes concerns raised by other industry stakeholders about the application of the National Academies of Science ("NAS") study. The NAS study convened to review the 2015 MSGP, offer suggestions for areas of improvement and identify the high priority industries. IMA-NA finds many of the NAS recommendations to be a wide sweeping when the MSGP would be better served by surgically focused improvements. The result of the NAS proposals would apply to all facilities without differentiating clearly between high and low risk facilities and therefore would increase burdens on operators across the board. Without a more tailored approach, low risk and small businesses will face operational and financial burdens that do not necessarily add environmental benefits. Furthermore, while the NAS was not under an obligation to cross examine their recommendations against other regulations across not only the EPA but other agencies, IMA-NA is alarmed by the EPA's seeming adoption of suggestions that are impractical and based on limited data.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40. Regarding EPA's considerations of the NRC recommendations, see Part III of the 2021 MSGP Fact Sheet.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  89
**Excerpt Status:** Final

**Comment Excerpt:**

In some instances, EPA rejects the recommendations of the National Academies of Sciences, Engineering, and Medicine without providing sufficient technical and legal justification.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40. Regarding EPA's considerations of the NRC recommendations, EPA generally discussed the considerations the NRC recommendations in Part III of the proposed 2020 MSGP Fact Sheet.

**Commenter Name:**  Rebecca McGrew
**Commenter Affiliation:**  North American Coal Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**Shortcomings in NRC Study**

It is important for EPA to recognize several shortcomings in the NRC Study that gave an inaccurate portrayal of mining operations. The NRC Study concluded that "several sectors emerge[d] that have a large percentage of samples with concentrations above the benchmark threshold for more than one pollutant, and even some with a large percentage of samples with concentrations above eight times the benchmarks." As an example, the NRC Study pointed to Sector H, noting that, in its analysis, more than half of the samples exceeded eight times the benchmark for TSS and 95% of the samples exceeded eight times the benchmarks for aluminum and iron. The problem with this conclusion is that the NRC Study did not account for high levels of aluminum in the natural background concentration of these sites. Moreover, this conclusion should not apply to Sector H broadly (hundreds of coal mines across the United States), as the NRC Study based its conclusion on just 22 reported results for three facilities.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA has used the NAS report as the basis for a number of the proposed changes in the MSGP or has used the report to poise questions for consideration in regards to the MSGP. It is very important for EPA to recognize the very critical shortcomings in the NAS Report.

First, since this report is focused on industrial stormwater, the committee generating the report should have included individuals from the industrial community who have considerable expertise and experience with industrial wastewater. Instead, the report was created by a number of academics and individuals from the public sector. As described below in these comments, a

number of the recommendations from the report and some of the "findings" show the lack of knowledge of industrial stormwater. Also, the failure of the report to look at the financial implications of the recommendations is a shortcoming.[1]

A significant "process" issue that limits the usefulness of this report is that the report (and underlying data) was not available for public review and comment. This is especially important because, though limited, the report discusses several very specific examples that really could have used external review. As an example, the NAS Report concluded that "several sectors emerge[d] that have a large percentage of samples with concentrations above the benchmark threshold for more than one pollutant, and even some with a large percentage of samples with concentrations above eight times the benchmarks." As an example, the NAS Study pointed to Sector H, noting that, in its analysis, more than half of the samples exceeded eight times the benchmark for TSS and 95% of the samples exceeded eight times the benchmarks for aluminum and iron.[2] The problem with this conclusion is that the NAS Study did not account for high levels of aluminum in the natural background concentration of these sites. Moreover, this conclusion should not apply to Sector H broadly, as the NAS Study based its conclusion on just 22 reported results for three facilities.[3] Regarding its review of MSGP monitoring results, the NAS Study admitted that the tables presenting the data "do not indicate MSGP benchmark exceedances, which are determined based on the average of four quarterly samples, and trigger review of the [SWPPP] and 1 year of additional monitoring."[4] Rather, "they provide insight into the sectors and pollutants with frequent elevated discharge concentrations."[5] We do not believe that "insight" into a particular sector or frequent elevated discharge concentrations from a small sample size that have not been appropriately analyzed should form the basis of a completely new regulatory framework.

[1] Page 1 of the NAS report states: "The committee was not asked to analyze the financial costs of its recommendations; instead EPA will assess the costs of possible changes in its proposed revision of the MSGP"

[2] 2019 NAS Study at 23, 24.

[3] Id. at 3.

[4] Id. at 22.

[5] Id.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1

**Comment Excerpt Number:** 56
**Excerpt Status:** Final

**Comment Excerpt:**

A number of the new proposed requirements in the 2020 MSGP came from the NAS report that was prepared for EPA as part of settlement agreement from litigation over the 2015 MSGP. A review of regulatory programs does provide an opportunity to determine if the requirements are producing the improvements in the environment that were anticipated. As discussed in these comments, the NAS report has a number of shortcomings. Simplot recommends that EPA undertake a new review, this time with formal participation from the industrial sector along with a public review process, to provide the review that was intended with the NAS study. Such an effort, could provide useful information to address a number of the questions that were originally proposed to the NAS panel and raised in these comments.

**Comment Response:**

EPA acknowledges the request to undertake a new review. See response to EPA-HQ-OW-2019-0372-0201-A1, excerpt 40.

## 1.1. Eligibility Conditions

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 93
**Excerpt Status:** Final

**Comment Excerpt:**

*iii. EPA must in the alternative require individual stormwater permits for facilities that produce or handle pre-production plastic*

If the above-noted measures are not included in this MSGP, EPA should exclude these facilities from coverage and instead require individual stormwater permits that incorporate the recommendations noted above at (e)(i)-(vii). Individual permits can be tailored specifically towards the plastic materials these facilities are producing, handling, transporting, and releasing in order to achieve the zero-discharge standard. Clean Water Act regulations recognize that the MSGP benchmark monitoring requirements, Stormwater Pollution Prevention Plans, and Stormwater Control Measures may be inadequate to address pollution from industrial stormwater. Given the scope of the plastic pollution problem from facilities that produce and handle preproduction plastic, EPA (as well as State Directors) can and should exclude facilities from industrial General Permits and require individual NPDES permits if they cannot be held to the zero discharge standard via an MSGP.[255] An individual stormwater permit can be required for any number of reasons, including a change in demonstrated technology or practices that better control pollutants, Effluent Limitation Guidelines promulgated for point sources, and the nature

156

of the discharge.[256] Here, as demonstrated above, the nature of the discharge and inadequacy of the MSGP to address the pollution problem supports the requirement of individual NPDES permits.

Individual permits could better regulate these facilities by requiring an enforceable zero discharge criterion for plastic and more effective monitoring that can detect permit violations when the zero-discharge standard is exceeded. As the NAS concluded in its 2019 review of EPA's stormwater regulations, "[t]his stricter enforcement of pollutant exceedances can be helpful for sites that represent a high public concern or that raise environmental justice issues."[257] Plastics facilities are of high public concern, and their proliferation in low-income communities of color raises environmental justice concerns. Each facility should be required to receive an individual NPDES permit if the MSGP is not strengthened in the ways suggested above.

The only way EPA can mitigate the dangers posed by microplastics conveyed far and wide from their original presence in industrial stormwater is to ensure they are not discharged in the first place. We request that the EPA remedy the ongoing failure of "best management practices" to meaningfully reduce plastic in stormwater discharge by adopting these measures.

[255] 40 C.F.R. § 122.28(b)(3) (General permits (applicable to State NPDES programs) subsection on requiring an individual permit).

[256] *Id.*

[257] NAS at 76.

**Comment Response:**

EPA does not agree and declines to require facilities that produce or handle pre-production plastic to obtain coverage under an individual NPDES permit. The CWA section 402 permit regulations for stormwater discharges associated with industrial activities require permits for stormwater discharges from facilities in Industry Group 28, which includes the Plastics Materials, Synthetic Resins, and Nonvulcanizable Elastomers industry (Standard Industrial Classification (SIC) code 2821). See 40 CFR 122.26(b)(14)(ii).

EPA agrees that discharges of plastic materials in stormwater discharges is a concern. The stormwater permitting regulations also specifically mention "plastic pellets" as one of the "significant materials" (see 40 CFR 122.26(b)(12)) that, if exposed to stormwater, require regulation. Part 2.1.2.2.e of the 2021 MSGP requires good housekeeping practices specifically for facilities that handle pre-production plastic. Further, EPA revised the 2021 MSGP to include additional language in Part 2.1.2.2.e to provide additional examples of appropriate control measures to address discharges of plastic in stormwater, which reads as follows:

> Facilities that handle pre-production plastic must implement control measures to eliminate discharges of plastic in stormwater.[9] Examples of plastic material

required to be addressed as stormwater pollutants include plastic resin pellets, powders, flakes, additives, regrind, scrap, waste and recycling.

[9] Examples of appropriate control measures include but are not limited to: installing a containment system, or other control, at each on-site storm drain discharge point down gradient of areas containing plastic material, designed to trap all particles retained by a 1mm mesh screen; using a durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage; using capture devices as a form of secondary containment during transfers, loading, or unloading plastic materials, such as catch pans, tarps, berms or any other device that collects errant material; having a vacuum or vacuum-type system for quick cleanup of fugitive plastic material available for employees; for facilities that maintain outdoor storage of plastic materials, do so in a durable, permanent structure that prevents exposure to precipitation that could cause the material to migrate or be discharged in stormwater.)

In addition, Part 8.Y.2.2 of the 2021 MSGP requires operators of Sector Y facilities to implement stormwater control measures to minimize discharges of plastics in stormwater. EPA and states also conduct compliance inspections at facilities that manufacture, handle, and transport pre-production plastic and work with operators to identify and develop appropriate stormwater control measures to minimize discharges of plastic in stormwater.

EPA expects that implementation of the stormwater control measures required by Parts 2.1.2.2.e and 8.Y.2.2 will be adequate to control discharges of plastic in stormwater.

## 1.1.2. Eligibility Conditions - Your Discharges Are Associated with Industrial Activity

**Commenter Name:** M. Jamerson
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0197
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

I. EPA's Current Regulation Falls Short of Significant Stormwater Pollution by Limiting Much of Industry from Coverage.

Here is a list of many qualifying factors stemming from the original SWR program in 1992, which seem to have fallen by the wayside from the regulations. Are these to be ignored when much of industry is polluting America's water resources?

1. If a facility engages in any one of 15 qualifying factors below, they should be required to comply.

- Is this facility reporting one or more toxic chemicals under Toxic Release Inventory (TRI), EPCRA, 313?
- Are any materials stored outside the facility?
- Are any active railroad spurs onsite?
- Is vehicle repair being performed onsite?

- Is trucking/shipping coming onsite and dropping oils/greases, diesel and radiator antifreeze spills?
- Is onsite shipping activity occurring without the protection of awnings?
- are any uncovered dumpsters onsite?
- Does leakage occur from covered dumpsters? [Airtight dumpsters are extremely rare.]
- Are activities involving machinery or industrial vehicles operating external to the facility?
- Are bodies of water (ponds, lakes, rivers, wetlands, or coastal waters within 1/8 mile of the facility? See
- Florida's ERP
- Are gasoline, oil, propane or diesel refueling activities occurring onsite?
- Is rock salt used onsite in winter?
- Is salt water used onsite for any other purpose? See Michigan's PIPP

2. If a Facility is Specifically Designated by Industry Sector or SIC Code, Compliance Should Be Required, as Such Facilities Are Most Likely to Pollute Stormwater Runoff.

**Comment Response:**

Modifications to EPA's industrial stormwater regulations and what discharges require permit coverage are outside the scope of this permit. The 2021 MSGP is available for stormwater discharges from 29 sectors of industrial activity (Sector A – Sector AC), as well as any discharge not covered under the 29 sectors (Sector AD) that has been identified by EPA as appropriate for coverage. The sector descriptions are based on Standard Industrial Classification (SIC) codes and Industrial Activity Codes consistent with the definition of stormwater discharge associated with industrial activity at 40 CFR 122.26(b)(14)(i-ix, xi). Prior to the issuance of the 1995 MSGP an analysis of industrial sources not covered under the stormwater Phase I rule was performed to determine whether any such industries should be covered under the 1999 stormwater Phase II rule (Report to Congress, March 1995, EPA 833-K-94-002). Ultimately, no new industrial sources were included in the stormwater Phase II rulemaking. The 2021 MSGP does not cover any new industrial sources beyond those named in 40 CFR 122.26(b)(14). As the commenter noted, while EPA recognizes the benefits of the recommendation to cover facilities with activities similar to those already covered by the MSGP, such an expansion would require a separate regulatory action to modify the definition of "stormwater discharges associated with industrial activity" in 40 CFR 122.26(b)(14) and is outside of the scope of this permit.

## 1.1.3. Eligibility Conditions - Limitations on Coverage

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

1.1.3.3
WEF recommends that there be an exception for changes to the facility operations that might warrant coverage under a general permit rather than an individual permit. For example, storage

outside that is exposed to rainfall might have a permit with numeric limits. The facility expands and encloses all storage. An individual permit should not be required, and GP coverage should be considered.

**Comment Response:**

EPA declines to revise Part 1.1.3.3 as suggested by the commenter as this part is referring to discharges already covered by another NPDES permit that do not warrant separate coverage under the 2021 MSGP. EPA clarifies that operators are eligible for one NPDES permit at a time for the same discharges and made corresponding edits in the permit and fact sheet.

## 1.1.4. Eligibility Conditions - Eligibility related to Endangered and Threatened Species and Critical Habitat Protection

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

***4. Biological Opinions Pursuant to Section 7 of the Endangered Species Act Must Also Address the Issues Raised Above in Section 3 of this Comment.***

The concerns raised in this letter must also be addressed in the U.S. Fish and Wildlife Service and the National Marine Fisheries Service's forthcoming Biological Opinions pursuant to Section 7 of the Endangered Species Act.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Excerpt Number 4.

## 1.1.5. Eligibility Conditions - Eligibility related to Historic Properties Preservation

**Commenter Name:**  Paul N. Backhouse
**Commenter Affiliation:**  Seminole Tribe of Florida
**Document Control Number:**  EPA-HQ-OW-2019-0372-0268-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

III. Acknowledgement of Seminole Tribe's Assumption of the National Historic Preservation Act
The Seminole Tribe of Florida has developed a comprehensive Cultural Resources Ordinance.

Further, the Tribe entered into an agreement with the Advisory Council on Historic Preservation (ACHP) whereby the Seminole Tribe assumed all National Historic Preservation Act ("NHPA") Section 106 authority. The ACHP specifically sent out a letter to federal agencies affirming that the Tribe's Cultural Resource Ordinance represented full compliance with Section 106, NHPA for all federal agencies (see attach the ACHP Letter). The ACHP further stated that the Seminole Tribe's Tribal Historic Preservation Officer makes all final Section 106 determinations (similar to "lead agency" role). The Seminole Tribe appreciates that EPA is considering impacts the proposed 2020 MSGP could have on historic properties under the NHPA. However, EPA's proposed screening process should not supplant the Seminole Tribe's Cultural Resource Ordinance screening process because that would be undermining the Tribe's sovereignty/self governance. EPA has long been a champion of Tribal sovereignty/self-governance. EPA's own Consultation Policy acknowledges Indian Tribes have the "primary authority and responsibility for each [T]ribe's land and membership," which is echoed in EPA's 1984 Native American Policy. **Therefore, it is respectfully requested that EPA acknowledge the Seminole Tribe's federally approved NHPA, Section 106 screening process and not supplant the Tribe's authority/autonomy on Seminole Trust lands.**

**Comment Response:**

Facilities on the Seminole Tribe lands are not authorized under the 2021 MSGP. See Comment Response 1, Legal for further discussion. Nevertheless, Appendix F to the 2021 MSGP does not supplant specific screening processes in place for Tribes that have assumed all National Historic Preservation Act Section 106 Authority. EPA receives any submitted additional screening requirements necessary to satisfy their Cultural Resource Ordinance screening process as part of the Clean Water Act Section 401 certification process. In addition, Step Four of Appendix F requires operators to consult with the appropriate historic preservation authorities, including the Tribal Historic Preservation Officer (THPO). Further, the THPO can request a hold if there are concerns with the Notice of Intent (NOI).

## 1.1.6. Eligibility Conditions - Eligibility for "New Dischargers" and "New Sources" (as defined in Appendix A) ONLY

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

III.A. Eligibility Based on Water Quality Standards (Part 1.1.6.1)

This requirement states that:

- "You must meet applicable water quality standards"

- "You are ineligible for coverage under this permit if EPA determines prior to your authorization to discharge that your discharge will not meet an applicable water quality standard."

Clarification is needed on this eligibility. Is this eligibility based on the discharge itself meeting water quality standards? If so, requiring the discharge itself to meet water quality standards is a significant departure from the regulation of stormwater. This requirement would require that a "new discharger" or a "new source" would need to predict the quality of their stormwater discharge. Stormwater, due to the nature of storm events and potentially of site conditions, can be highly variable. Due to this variability, it is very unclear how this eligibility requirement will be implemented. How EPA would determine (be able to determine) that "your discharge will not meet an applicable water quality standard?"

In previous MSGP, the stormwater program was focused on a certain level of monitoring that was used to determine the effectiveness of best management practices and other measures put in place to reduce the discharge of or minimize the potential of pollutants. Based on the monitoring data, adjustments were then made to these BMPs and measures to improve their effectiveness.

In regards to determining whether the receiving water would meet water quality standards, making such a determination is also difficult to do. Such a process is very similar to what a potential NPDES permit discharger would go through to obtain a discharge permit.

A proper analysis would require:

- Advance characterization of the stormwater discharge (volume and pollutant concentration(s)), which would likely change based on the size of the stormwater event.
- Knowledge of receiving water flow; which will vary based on seasonality factors and the size of the storm event.
- Knowing (predicting) the receiving water quality (contaminant concentration) upstream of the discharge, which will also be influenced the size of the storm event.

Thus, the eligibility requirement found in Part 1.1.6.1, besides the major change in the stormwater program (i.e., a discharge has to meet water quality standards), does raise the question whether or not there is any "regulatory efficiency" in having a "general" permit.[7] Simplot recommends the deletion of Part 1.1.6.1.

Simplot recommends the deletion of Part 1.1.6.1.

[7] Note: in regards to the importance of meeting water quality standards and impacts from stormwater, Part 1.1.6.2 in the draft MSGP covers that issue. Clearly, if a water segment is not meeting a water quality standard, then the TMDL developed needs to look at sources of the pollutant of concern (including stormwater) and make appropriate decisions on changes needed so that water quality standards can be met.

**Comment Response:**

EPA clarifies this eligibility provision is for new dischargers or new sources. Operators must control their stormwater discharges as necessary such that the receiving water of the United

States will meet applicable water quality standards. This language is consistent with the first sentence in 40 CFR 122.4(i), which states that EPA may not issue a permit to a new source or new discharger that will cause or contribute to a violation of water quality standards.

Under the 2021 MSGP, this permit condition only excludes new dischargers or new sources for whom it has been determined by EPA, prior to authorization, that their stormwater discharges will not be controlled as necessary such that the receiving water of the United States will not meet an applicable water quality standard. Even in this case, eligibility for MSGP coverage may be still be established if the new discharger or new source, prior to authorization, has implemented additional control measures so that the stormwater control measures will be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards. If the applicant has not been notified by EPA, or otherwise has no reason to believe that its discharge will not be controlled as necessary such that the receiving water of the United States will not meet an applicable water quality standard, it can assume eligibility under Part 1.1.6.1. If the information on the NOI or from other sources available to EPA suggests that more stringent controls are necessary, EPA will either direct the applicant to submit an application for an individual permit, or authorize coverage under the MSGP if the operator implements additional control measures such that the stormwater discharges will be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards.

---

**Commenter Name:** Benjamin J. Davenport
**Commenter Affiliation:** Idaho Mining Association (IMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility. Language in the proposed 2020 MSGP results in concern for eligibility of coverage based only on whether the stormwater discharge would meet water quality standards. This change would result in a facility's stormwater being assessed solely on meeting in-stream water quality standards without consideration of conditions in the receiving waters. In areas where naturally high concentrations of regulated constituents are common, like Idaho, this could limit the use of the MSGP for stormwater discharge coverage.

*IMA requests EPA retain the existing 2015 MSGP Language in Sections 1.1.6.1 and 1.1.6.2.*

**Comment Response:**

See response to DCN: EPA-HQ-OW-2019-0372-0231-A1, Comment Excerpt Number 4.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)

**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

1.1.6.2.d i.
i. This section says if no TMDL but impaired water, discharge must meet WQS at the point of discharge – end of pipe requirements typically only apply to metals, or toxic substances.
ii. This section requires assimilative capacity and available wasteload to be allocated to the industrial stormwater discharge. Typically, TMDLs do not make wasteload allocations for industrial stormwater – This could be state/region specific.

**Comment Response:**

NPDES permits establish end-of-pipe requirements for a variety of pollutants, where consideration of a dilution allowance or mixing zone is either not permitted by the water quality standards or is not appropriate. End-of-pipe effluent limitations are not restricted to metals or toxic pollutants. For the purposes of determining compliance with water quality standards, i.e., with regard to the requirement for discharges to be controlled as necessary to meet water quality standards, unless a discharge is assigned a mixing zone (sometimes with an associated dilution factor), compliance is measured at the point of discharge (i.e., at "end-of-pipe"). Many state agencies do not allow mixing zones, or do not allow them for shallow shoreline discharges, such as those from stormwater runoff. Consequently, pollutant concentrations in discharges are often compared directly with the water quality standards themselves. To consider mixing zones, if the mixing zone was allowed, permittees would have to do in-stream monitoring, not just at the discharge point the permit requires. In addition, mixing zones would generally not be available where a waterbody is impaired, because the assimilative capacity of the receiving water for the pollutant in question has already been maxed out and exceeded.

Part 1.1.6.2.d.ii refers to the availability of sufficient wasteload allocations in the TMDL to allow the discharge; i.e., that a reserve allocation for future growth is included in the TMDL applicable to the receiving water body. TMDLs are designed to ensure that a waterbody will meet and continue to meet water quality standards for a particular pollutant. If sufficient reserve allocations are not available, the new discharge could contribute to an exceedance of the applicable water quality standard. The purpose of this requirement is to ensure attainment of water quality standards, consistent with the assumptions of any applicable TMDL.

## 1.1.7. Eligibility Conditions - Eligibility for Discharges to a Federal CERCLA Site

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

1.1.7
If a permittee is above a groundwater CERCLA site is EPA SWPPP review required? If a permittee above a groundwater CECRLA site is retaining and/or infiltrating stormwater as a BMP, is EPA SWPPP review required? WEF recommends that EPA clarify.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

### 1.1.7.RFC1. Eligibility Conditions - RFC1 Discharges to a CERCLA site

**Commenter Name:** Charles Job
**Commenter Affiliation:** National Ground Water Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

NGWA Comment: Contaminated stormwater should not be discharged to CERCLA sites that have already experienced severe contamination and degradation. This action is the antithesis of environmental protection and could endanger more groundwater that could otherwise be used in the future. The management of this discharge could also overload/or overwhelm the approved remedies at the site, possibly making the discharge a potential responsible party for remediation cost.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

BES believes that this requirement as it currently exists results in inequity across EPA regions and may lead to businesses moving out of areas discharging to Federal CERCLA sites and result in adverse economic (e.g., loss of revenue), social (e.g., loss of jobs), and environmental (e.g., movement of businesses to cleaner less impacted areas) impacts to the community, local, and

state government. If EPA is concerned about protecting water, sediment, and fish tissue quality, then all MSGPs should ensure discharges will not lead to contamination of aquatic media within CERCLA sites or any other water body. If EPA, retains this requirement, BES supports a universal application of this strategy across the U.S. and all EPA Regions to maintain equity.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

We do not support an eligibility requirement for facilities that discharge to Federal CERCLA / superfund sites for all EPA regions. The eligibility criterion in this proposal is extremely complex, very unclear and will put further burdens on our business. We should not be subject to further classifications due to our location in a CERCLA/ superfund area. Known superfund sites involve their own ongoing corrective actions involving totally different industries with different pollutant issues. We are already subject to MSGP requirements and control measures.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Chuck Baltzer, Environmental Support Services (ESS)
**Commenter Affiliation:**  Rio Algom Mining L.L.C, subsidiary of BHP Copper Inc. (BHP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0160-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**COMMENT 3 – EPA's Request for Comment #1; Federal CERCLA Site NOI Requirements**: MSGP-2015 contained a provision that dischargers to a Federal CERCLA site in EPA Region 10 must seek approval from the Regional Administrator prior to filing a Notice of Intent (NOI) to discharge. Part 1.1.7 of Draft MSGP-2020 ("Eligibility for Discharges to a Federal CERCLA Site") has been drafted to expand the requirement to dischargers in all EPA

Regions, pursuant to the terms of the previously discussed Settlement Agreement. RAML believes this requirement should be limited to **NEW DISCHARGERS only.**

**Discussion**: Effluent contributions from existing dischargers would have previously been evaluated during the extensive studies EPA performs prior to listing a site under CERCLA, including Preliminary Assessments, Site Investigations, and Hazard Ranking. Part IV.2 of the Draft Fact Sheet provides the following rationale for dischargers to contact EPA Regional Administrators prior to filing NOIs:

*In determining eligibility for coverage, the EPA Regional Office may evaluate whether the facility has included appropriate controls and implementation procedures designed to ensure that the discharge will not interfere with achieving the cleanup goals or lead to recontamination of aquatic media at the CERCLA Site. Such releases can undo cleanups accomplished and can result in new or continuing impairments of designated uses of the receiving waters.[8]*

This same argument applies equally in the case of discharges to impaired waters. And yet Part 1.1.6.2 of Draft MSGP-2020 provides three options for pre-notification to the Regional Administrator, and most importantly applies only to NEW dischargers and NEW sources of discharges to impaired waters. Reasons for not applying this requirement to existing dischargers or sources include the fact that they would have already been evaluated in the 303(d) impairment listing and TMDL development processes. Certainly the same holds true for stormwater discharges that are related to or located adjacent to or within CERCLA sites.

Note also that EPA does not provide clear geographic boundaries on CERCLA sites as a matter of policy. Therefore, it is never possible to know where one's facility is located relative to a CERCLA site unless the facility is specifically listed as the CERCLA Site or is otherwise identified as a feature located within the CERCLA Site. It may be that Part 1.1.7 of Draft MSGP-2020 is an attempt to addresses this problem with the following language:

*If it is determined that your facility discharges to a CERCLA Site listed in Appendix P after you have obtained coverage under this permit, you must contact the EPA Regional Office...*

This is acceptable language provided that EPA clarifies that such an occurrence would not result in enforcement action. Importantly there is not a time-frame applied to this notification requirement. However, the Draft Fact Sheet indicates that EPA is requesting comment on whether there should be a 30-day notification requirement.[9] RAML suggests that there should not be a time-frame for notification. If a facility is discharging in proximity to a CERCLA site there will be substantial opportunity for personnel associated with the CERCLA site and the stormwater discharger to communicate their respective goals, objectives, and procedures designed to meet these ends so that the two parties have mutually acceptable solutions.

**Comment Summary:**

1. CERCLA pre-NOI notification should apply only to new dischargers and new sources. It should not be applicable to existing dischargers.
2. A time-frame restriction for notification to the EPA Regional Administrator of 30-days or any other time-frame is not helpful or appropriate and should not be added to the requirement.

[8] p. 9 of 103, Draft Fact Sheet.

[9] Ibid.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The Fact Sheet discussion focuses on scenarios where contaminants are transported from sediment, surface soils, or shallow subsurface soils to surface waters. The benefit of this requirement to CERCLA sites with deep groundwater contamination is unclear. Clarification is needed particularly if EPA extends this requirement to additional NPDES permits. The City suggests that this requirement only be applied under circumstances where stormwater discharge is likely to cause recontamination of the CERCLA site such that discharge may reach aquatic media.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The information available in the draft Appendix P is only relevant to Region 10, making it difficult to fully evaluate the impact of this proposed change in other EPA regions. EPA should consider including all CERCLA sites, not just those located in Region 10 for public review prior to implementation.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI does not support the proposed expansion of the eligibility criterion for 2020 MSGP coverage to industrial stormwater discharges to any Federal CERCLA site. More basically, ISRI does not support this eligibility criterion at all. With respect to a permittee's or permit applicant's receiving water for stormwater discharges, a Federal CERCLA site that comprises one or more water bodies shares much in common with an impaired receiving water. Both tend to have applicable limitations on the quality of industrial discharges into them. That a permittee's or applicant's receiving water happens to be such a Federal CERCLA site should not be an eligibility criterion for coverage under the 2020 MSGP. Instead, a facility's discharge to a Federal CERCLA site should be addressed in the same manner as a discharge to an impaired receiving water. In both cases, stormwater discharges have the potential to negatively impact the receiving water that requires protection from constituents of the discharge.

This is exactly how Washington State's new Industrial Stormwater General Permit (ISGP) works. The ISGP's Special Condition S6, Additional Sampling Requirements and Effluent Limits for Discharges to Certain Impaired Waters and Puget Sound Sediment Cleanup Sites, contains certain monitoring requirements applicable to discharges to the Puget Sound Sediment Cleanup Sites.

Discharges to a Federal CERCLA site should likewise have the same or similar requirements as discharges to impaired receiving waters. The existence of an industrial stormwater discharge to a Federal CERCLA site should not be a 2020 MSGP eligibility criterion per se.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Not necessary beyond Region 10; CERCLA sites have already established set parameters for each Region, location, and will continue to monitor each discharge. Submitting an NOI should be efficient as with any changes to an NOI.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility – CERCLA: NAIMA does not support applying eligibility requirements to all EPA regions for facilities that discharge to federal CERCLA sites. CERCLA is governed by its own detailed process and any such issues should be governed through that scheme.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 1:**

**Eligibility for Discharges to a Federal CERCLA Site (Part 1.1.7)**

The 2020 MSGP proposes to expand the Comprehensive Environmental Response, Contamination, and Liability Act (CERCLA) eligibility criterion from the 2015 MSGP to all Regions. Under the 2015 MSGP, operators that discharged to listed CERCLA sites in Region 10 were ineligible for coverage unless the Region reviewed their SWPPP and confirmed that

controls were sufficient to ensure that discharges met water quality standards and did not re-contaminate the site. In the 2020 MSGP, EPA has proposed to expand this CERCLA eligibility criterion to all regions and has requested comment on whether they should do that.

NMA objected to this eligibility criterion in the 2015 MSGP and still believes that the agency does not have the authority under the CWA to impose this requirement in Region 10 or in any other EPA Region. Under Part 1.1.7, in determining eligibility for coverage under this part, the EPA Regional Office "may evaluate whether you are implementing or plan to implement adequate controls and/or procedures to ensure that your discharge will not lead to recontamination of aquatic media at the CERCLA site such that your discharge will cause or contribute to an exceedance of a water quality standard."[6] This provision reflects an unnecessary and unprecedented expansion of EPA's regulatory authority. As proposed, it would seem to give EPA authority to prohibit stormwater discharges to virtually any receiving water that may have been included in a CERCLA site at some point. There is no basis for such authority in the CWA, nor does this provision reflect sound science or policy judgments. In short, because this proposal inexplicably departs from the approaches adopted by EPA in 1995 in implementing the stormwater discharge program while CERCLA was fully in effect, EPA should abandon it now.

In addition, EPA has not provided any justification for expanding this eligibility criterion to all Regions. The proposed 2020 Fact Sheet notes that "EPA has extensive information that stormwater discharges are a source of CERCLA Site recontamination in Region 10," but the agency has not provided any justification that stormwater discharges are a source of recontamination on CERCLA sites in other Regions. Accordingly, NMA recommends that EPA not apply this eligibility criterion in all Regions.

[6] Proposed 2020 MSGP at 4.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

**[No, the discharges of concern may seek coverage under individual permit.]**

**[30 days advance notification is reasonable.]**

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

NMED supports expanding the requirement to monitor stormwater discharges to CERCLA sites to all EPA Regions. Instead of a static list of sites in Appendix P of the MSGP, a link to an updatable database would be useful.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

*1. EPA Should Adopt its Proposal to Expand the Eligibility Criterion for Applicants that Discharge Stormwater to CERCLA Sites to All EPA Regions, with Certain Revisions.*

EPA rightfully acknowledges that by expanding the eligibility criterion for dischargers to CERCLA sites, the 2020 MSGP will be significantly more protective of water quality, of the efforts to remediate CERCLA sites, and of environmental quality and human health nationwide. In its Fact Sheet, EPA clearly illustrates the need for and benefit of expanding the eligibility criterion to all EPA Regions.[1] For example, EPA states that 12 facilities in Region 10 are currently subject to the CERCLA eligibility criterion under the 2015 permit, and the Agency estimates that there may be 103 total facilities subject to the eligibility criterion, should it be expanded to all EPA Regions as proposed. EPA also cites known examples of discharges of industrial stormwater that have contributed to downstream recontamination of CERCLA sites and water quality.

Run-on from industrial stormwater dischargers to CERCLA sites has the potential to cause downstream impairments and is particularly concerning given the type of hazardous substances

regulated under CERCLA that have the potential for serious harm to the environment and human health.[2] The eligibility criterion also fairly serves the interests of CERCLA responsible parties and other stakeholders. This includes taxpayers who support CERCLA remediation and members of the public, especially those populations and communities that live or work near affected CERCLA sites or use impacted aquatic resources.

As proposed by EPA, the operators of facilities that discharge to CERCLA sites should be required to provide advanced notice to the Agency of a minimum of 30 days before submission of NOI applications for permit coverage.[3] EPA should also provide public notice and comment on advanced notifications by prospective applicants during this time period. Advanced notice to EPA and public notice and comment will serve the interests of all parties - permit applicants, EPA, and the public. Advanced notice will allow EPA to undertake an investigation and evaluation of the impact of the discharger on downstream CERCLA sites and provide a determination for the controls that must be implemented before permit coverage will be granted. This will potentially shorten the time between when an application is submitted and coverage is granted.

Comments from the public and other stakeholders such as local governments, especially those with, local and/or specialized knowledge about CERCLA sites, stormwater, and downstream water quality and public use, for example, will also support the Agency's evaluation and determination on eligibility. The advanced notice requirement also provides an incentive to operators who know or suspect the possibility of downstream impacts to CERCLA sites to evaluate the necessary controls and measures and then determine whether general permit or individual permit coverage is appropriate given their particular circumstances, well in advance of developing a permit application.

EPA rightly acknowledges that stormwater general permits, as designed, may not be sufficient instruments for regulating the potential impact of discharges on downstream sediment recontamination at CERCLA sites.[4] EPA and applicants should absolutely have the flexibility to select individual NPDES permits where the design of the general permit cannot ensure downstream recontamination of CERCLA sites and compliance with applicable water quality standards.[5]

EPA should also revise Part 1.1.7 of the Draft Permit to require prospective applicants to collect and submit data on the magnitude of stormwater discharged from facilities and the concentration of sediment in discharges as a component of the proposed advanced notice to the Agency before an NOI application for coverage is submitted. EPA should also exercise its discretion to request additional data from applicants during the preapplication phase for other contaminants specific to the CERCLA site and those associated with dischargers' applicable sector(s). This data will support the Agency's evaluation and determination of whether the discharge has the potential to contribute to mobilization of contaminated sediments in CERCLA sites (i.e. the magnitude of stormwater discharged) and whether the discharged sediment have the potential to contribute to additional mobilization and transport of CERCLA site contaminants as well.

Lastly, EPA should require all applicants that do not provide advanced notice for the CERCLA eligibility criterion to include both an affirmative statement that their discharges comply with the

eligibility criterion and the information and analysis they relied upon to make that determination in their NOI applications for permit coverage. The information and analysis relied upon by applicants will allow EPA to identify any potential gaps in the applicants' self-evaluation, including relevant data and analysis, and to address those gaps before permit coverage is granted. The certification requirement will also incentivize applicants to conduct thorough and rigorous reviews of the potential downstream impacts of their discharges on CERCLA sites before developing an application for permit coverage.

[1] U.S. Envtl. Prot. Agency. United States Environmental Protection Agency National Pollutant Discharge Elimination System Proposed Multi-Sector General Permit Fact Sheet for Stormwater Discharges Associated with Industrial Activity (2020) at 17-20 (hereinafter "Fact Sheet").

[2] *Id.* at 19.

[3] U.S. Envtl. Prot. Agency. United States Environmental Protection Agency National Pollutant Discharge Elimination System Proposed Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (2020) at 4, Part 1.1.7 (hereinafter "Draft Permit").

[4] Fact Sheet at 18.

[5] *Id.* at 19.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

There are three problems with this concept. First, the Fact Sheet language (Section IV.2) indicates that the EPA and/or PRPs of CERCLA sites "…cannot obtain cost recovery for responding to releases of hazardous substances resulting from federally-permitted releases that are in compliance with the permit, so the permitting of industrial stormwater to CERCLA sites creates a barrier to cost recovery." If a facility's storm water quality is compliant with the MSGP, then there should be no need, or legal avenue, to pursue cost recovery, as there would be no water quality impacts above applicable standards. If the discharges are out of compliance, this cost recovery should only be pursued if the CERCLA site was found to be impacted. If the water quality standards for the CERCLA site are stricter than the MSGP requirements, then the facility

subject to MSGP standards, should not be subject to the same standard unless it is also a responsible party to the CERCLA site.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Second, the EPA has not provided clear criteria for a facility to determine if their discharge is "to a Federal CERCLA site." Some CERCLA sites include sediment, wetland, or other shoreline impacts in a water way. Would all storm water discharges upstream be required to notify the EPA? Would a discharge 5 miles upstream need to notify? Without more specific criteria, this provision should be left out of the 2020 MSGP. Generally, we are concerned that including this provision runs counter to the purpose of the permit and without better criteria to determine applicability, facilities could be found to be non-compliant with the permit. Additionally, this could lead to significant time and effort to investigate and potentially defend against unwarranted claims from PRP groups.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Third, we are concerned that by requesting applicability criteria from respondents, rather than offering criteria for comment, the regulated community will not have an opportunity to review and comment on the final criteria the EPA selects for this determination before finalization of the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 1. Currently, the above eligibility criterion in the 2015 MSGP only applies to facilities in EPA Region 10. Simplot believes that the agency does not have the authority under the CWA to impose this requirement in Region 10 or in any other EPA Region. Under Part 1.1.7, in determining eligibility for coverage under this part, the EPA Regional Office "may evaluate whether you are implementing or plan to implement adequate controls and/or procedures to ensure that your discharge will not lead to recontamination of aquatic media at the CERCLA site such that your discharge will cause or contribute to an exceedance of a water quality standard." This provision reflects an unnecessary and unprecedented expansion of EPA's regulatory authority. As proposed, it would seem to give EPA authority to prohibit stormwater discharges to virtually any receiving water that may have been included in a CERCLA site at some point. There is no basis for such authority in the Clean Water Act, nor does this provision reflect sound science or policy judgments. In short, because this proposal inexplicably departs from the approaches adopted by EPA in 1995 in implementing the stormwater discharge program while CERCLA was fully in effect, EPA should abandon it now.

In addition, EPA has not provided any justification for expanding this eligibility criterion to all Regions. The proposed 2020 Fact Sheet notes that "EPA has extensive information that stormwater discharges are a source of CERCLA Site recontamination in Region 10," but has not provided any justification that stormwater discharges are a source of recontamination on CERCLA sites in other Regions. Accordingly, Simplot recommends that EPA not apply this eligibility criterion in all Regions.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Benjamin J. Davenport
**Commenter Affiliation:**  Idaho Mining Association (IMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0233-A1

**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility of Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) Sites. The exclusion of all CERCLA sites from coverage under the 2020 MSGP is an unnecessary limit to the use of the MSGP for stormwater discharges. Mining sites in Idaho often include previously impacted areas, some of which have CERCLA designations. Precluding the use of site-wide stormwater practices on portions of land within a larger site is an unnecessary exclusion and potential excessive permitting burden on the permittee. This change could also result in additional administrative burden for both EPA and the permittee to have separate stormwater programs on intermingled properties subject to CERCLA administrative orders and oversight.

*IMA requests EPA not limit the eligibility of the 2020 MSGP for lands managed via CERCLA decisions in Region 10 nor apply the current Region 10 procedures to other region.*

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

As this requirement will complicate development of properties near or on Brownfields, this requirement should be a sector-specific requirement and be eliminated for low-risk facilities including those facilities within Sector P.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1

**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 1**

The FWQC and FSWA oppose expanding this eligibility criterion to all EPA Regions. Beyond Regional consistency, EPA offers no specific reason why this restriction on coverage is needed, when it was not necessary under previous versions of the MSGP. Issues concerning discharges from CERCLA sites should appropriately be dealt with through the CERCLA process, and prohibiting these discharges from being covered under the MSGP is an additional restriction that is not justified. We would not oppose requiring notification of EPA at least 30 days in advance of submitting an NOI form.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

We understand the Agency's concern regarding the potential for discharges authorized under the MSGP that "flow[] directly into" sites that "have undergone or are undergoing remedial cleanup actions pursuant to the Comprehensive Environmental Response, Compensation and Liability Act [CERCLA]" through its own conveyance, or a through a conveyance owned by others, such as a municipal separate storm sewer system" to compromise such remediation efforts.

However, several issues need clarification before the proposal could be deemed sufficiently explained to support meaningful comments. First, the proposed provision indicates that it will only apply where a discharge flows directly into a CERCLA site that is "listed in Appendix P." While we understand that any CERCLA site could potentially be so listed, the Fact Sheet indicates that it would apply to a subset of CERCLA sites "that may be of concern for recontamination from industrial stormwater discharges." The Agency, however, provides no guidance on the criteria that will be applied to determine where a site "may be of concern for recontamination from industrial stormwater discharges" or the process that it (or a Region) will follow in making that determination. Given that the consequence of a site being so designated (and listed in Appendix P) is that dischargers could be required to meet additional conditions to obtain coverage, there should be some articulation of the criteria that will be applied in

determining that a site will be listed and of the procedure that will be used to ensure interested parties will be notified that the Agency (or Region) intends to list a site in Appendix P and provided the opportunity to comment. A second related issue is that it is unclear what precisely the Agency means by "concern for recontamination." The proposed provision seems to indicate that "recontamination" would be deemed to occur where a discharge could lead to the exceedance of any water quality standard, regardless of the whether the standard pertains to a pollutant that had been a "pollutant of concern" at the site and a target of the remediation. Further, the proposed Fact Sheet seems to indicate that the provision will be primarily focused on sites where "recontamination" of sediment at a CERCLA site is the concern.

In any event, the Agency needs to clarify what precisely it means by "recontamination" and the types of discharges that could lead to such recontamination. For example, will discharges of "y" be deemed potentially subject to this provision even if "y" was not a "pollutant of concern" at the CERCLA site and the remediation did not target "y"? Further, the Agency will need to explain the source of its legal authority under the Clean Water Act where discharges do not add directly to levels of contamination but merely mobilize sediments. Finally, we ask that the Agency provide at least some indication of the criteria it would apply (or require Regions to apply) to determine whether "controls and/or procedures" are adequate to prevent "recontamination."

Until the Agency clarifies these issues, we believe the proposed provision is too ambiguous to support meaningful comments and respectfully suggest that once the Agency resolves these issues it provide additional opportunity for public comment on the revised provision.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

## 1.1.8. Eligibility Conditions - Eligibility for Facilities using Coal-Tar Sealcoat

**Commenter Name:**  John Hartz
**Commenter Affiliation:**  Hartz Sealcoating
**Document Control Number:**  EPA-HQ-OW-2019-0372-0105
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

I don't believe the MSGP should include an eligibility criteria for the application of sealcoat because additional red tape would impact our costs and increase costs to consumers.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Best practice in the auto recycling and scrap metal industries does not utilize materials such as coal tar-containing sealants in the industrial areas of the operation. The typical recycler uses asphalt, concrete, or other all-weather hard surfaces in the customer and employee parking areas only. The availability of alternative cost-effective sealing and resealing materials that are not coal tar-based, indicates that this requirement would have little to no impact on the auto or scrap metal industries.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA opposes making a facility that uses such materials ineligible for the general stormwater permit, although it does not believe that many, if any, of its members use coal-tar sealed pavements.** While we are certainly aware that a number of seal-coats, including non-coal tar asphalt sealcoats, may have been associated in the literature with potential cancer concerns, we think that this criterium, by itself, is an arbitrary basis for requiring a facility to obtain an individual NPDES permit. Perhaps the agency should consider collecting relevant information from MSGP permit applicants, and continue to weigh whether and when the MSGP should burden industry and regulatory authorities with additional NPDES permitting burdens. For instance, collecting such information could provide information if a facility, or group of facilities, are proximately located to impaired or fragile waters and/or ecosystems. It also may be possible to narrow down the kinds of facilities that pose potential threats to water systems because of asphalt or tar-based paving, based on local zoning ordinances. Finally, collection of this information would give permittees time to re-pave roads into and out of a facility, and also, if necessary. parking lots.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

- EPA's proposal raises unprecedented Constitutional and policy concerns.
  - EPA cannot overcome Commerce Clause limitations. The CWA provides no indication that Congress ever intended for EPA to use its authority to ban products and includes many signs that it did not. Interpreting the CWA to authorize such a radical measure would violate well-established principles of federalism that limit federal power and preserve state power.
  - EPA can only pursue a product ban under TSCA and only if it meets all of the TSCA requirements. The CWA does not authorize EPA to ban a product. In fact, EPA only has authority to ban products under the Toxic Substances Control Act ("TSCA"). Moreover, EPA can only implement a ban under TSCA if the ban meets the high legal burden set forth in the statute and regulations thereunder. Here, EPA has not even attempted to meet that burden.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

- RTS is not a significant source of PAHs in the aquatic environment. The proposed eligibility criterion fails to acknowledge and address the weight of current scientific evidence and current best practices in sediment risk assessment.
  - EPA's own CWA guidance acknowledges that, in natural aquatic environments, PAHs strongly adsorb to organic materials and are not bioavailable—and, thus, require specialized risk assessment techniques. None of the literature cited in the Fact Sheet to support the proposed RTS eligibility restriction reflects any of EPA's Toxicity

Identification Evaluation (TIE) guidance, guidance on developing Equilibrium Partitioning Sediment Benchmarks (ESBs) for PAHs, or any other method of identifying toxicity or the causes of measured toxicity in sediments in the real world.

o   <u>PAHs in coal-tar sealcoat particles bond particularly strongly and are not bioavailable.</u> EPA's guidance on ESBs and TIEs is grounded in EPA's recognition that, outside the laboratory, exposure to individual PAH compounds is limited by the physical-chemical characteristics of PAHs.

o   <u>Surfaces sealed with RTS do not contribute significant amounts of PAHs to aquatic environments.</u> Many studies show very low levels of PAHs from RTS-sealed surfaces even under unrealistic experimental conditions. Rather, the scientific consensus is that the great majority of PAHs in the environment come from atmospheric deposition from combustion sources. Additionally, scientists acknowledge that it is difficult to distinguish PAHs from widely diverse combustion sources, because PAH chemical profiles from those sources are so similar. Further, modeling efforts to apportion PAHs among sources are unreliable, as they rely on a PAH "signature" for RTS that was not generated for that purpose and has never been validated.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

## 1.1.8.RFC2. Eligibility Conditions - RFC2 Coal-tar sealcoat

**Commenter Name:**  Chelsea Herrick
**Commenter Affiliation:**  Daniel B. Krieg, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0077-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The vast majority of our sealcoating customers <u>prefer</u> Coal Tar sealer over other sealer types, because it lasts the longest, and has been proven to provide the BEST results when it comes to preserving their pavement. We have given our customers other sealer options throughout the years, and time and time again, they continue to ask specifically for Coal Tar.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Chelsea Herrick
**Commenter Affiliation:**  Daniel B. Krieg, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0077-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Unsupported research leads to bad science, and the USGS research that the EPA is using to support this proposal is flawed. Independent scientists have not been able to replicate USGS claims that RTS is the "dominant" source of PAHs in stream and lake sediments. **To make policies that financially damages businesses based on flawed science is irresponsible.**

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Craig Smith
**Commenter Affiliation:** CSR Construction, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0100
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We do not wish to have this ban put in place. We use coal tar sealer in our company's work, and putting this ban will cause us to lose jobs and money. As no one will want to seal their asphalt with anything other than coal tar, as it does not provide coverage as well as coal tar. Please reconsider this from happening.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** John Hartz
**Commenter Affiliation:** Hartz Sealcoating
**Document Control Number:** EPA-HQ-OW-2019-0372-0105
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I have personally looked at the research in years past and do not believe that RTS has been proven to negatively affect the environment in any greater capacity than typical water run-off.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Ted Lovell
**Commenter Affiliation:** Jet-Seal, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0107
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Volatilization of PAHs from Coal-Tar-Sealed Parking Lots

ENVIRON reviewed studies of PAH volatilization from sealcoated parking lots published the
USGS in two papers. As has been found in other work by the same USGS authors, effects have
been exaggerated and uncertainties have been minimized to make it falsely appear that lots
sealed with refined tar-based sealant are the dominant source of PAHs released to the
atmosphere. ENVIRON concludes Based on our analysis, we find that the two papers recently
published by Van Metre and coworkers (2012) overstate the volatilization of PAHs from coal tar
sealers. These papers employ a set of modeling assumptions and experimental study design
approaches that consistently bias their findings to overestimate PAH volatilization from sealed
parking lots.

Citation: Environ (2013). Volatilization of PAHs from Coal-Tar-Sealed Parking Lots. Report
prepared for the Pavement Coatings Technology Council. 46 p.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ted Lovell
**Commenter Affiliation:** Jet-Seal, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0107
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Peer Review of Coal-Tar-Sealed Pavement Risk Assessment

ARCADIS peer review of RTS risk assessment that appeared in 2013. The paper authored by
Williams and others asserts that the presence of refined tar-based pavement sealants is associated
with significant increases in estimated cancer risks for residents living adjacent to sealed paved
surfaces. ARCADIS evaluation finds that no such association has been established between
residents living adjacent to sealed paved surfaces, and no increases in estimated cancer risks

above regulatory levels of concern have been established. ARCADIS peer review critically evaluates the data and risk assessment methods described in the Williams and others paper, and also provides context missing in the Williams and others paper by presenting information about how much PAHs people are typically exposed to from multiple sources of exposure to PAHs in the environment.

Citation: ARCADIS (2013). Peer Review of Coal-Tar-Sealed Pavement Risk Assessment. Report prepared for the Pavement Coatings Technology Council. 17 p. Available at http://www.pavementcouncil.org/wp-content/uploads/2015/08/Peer-Review-CTSReport_Revised2.pdf

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ted Lovell
**Commenter Affiliation:** Jet-Seal, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0107
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Polycyclic Aromatic Hydrocarbon (PAH) Characteristics for Sediments Collected from Creeks and Streams in Austin, Texas

Environ report on study of sediments collected in Austin, TX in 2005 before the Citys ban on refined tar-based sealant went into effect. Sediments were sampled from many of the same locations were collected again in 2008. Results of the before and after study were subsequently published in DeMott et al. (2010).

Citation: Environ (2006). Polycyclic Aromatic Hydrocarbon(PAH)Characteristics for Sediments Collected from Creeks and Streams in Austin, Texas. Report prepared for the Pavement Coatings Technology Center. 63 p. Available at http://www.pavementcouncil.org/wp-content/uploads/2015/09/PCTC-sedimentreport_ optimize.pdf, plus Appendices available at http://www.pavementcouncil.org/wpcontent/ uploads/2015/09/PCTC-sediment-report-Appendices.pdf

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ted Lovell
**Commenter Affiliation:** Jet-Seal, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0107
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Review of Coal-Tar-Based Parking Lot Sealcoat: An Unrecognized Source of PAH to Settled House Dust by Mahler et al., published in Environmental Science and Technology, January 2010

Environ review of the settled house dust study. This review served as the core of a Freedom of Information Act Request (FOIA). The review remains incomplete because, as of July 2013, only a part of the requested data has been delivered.

Citation: Environ (2010). Review of Coal-Tar-Based Parking Lot Sealcoat: An Unrecognized Source of PAH to Settled House Dust by Mahler et al., published in Environmental Science and Technology, January 2010. Report prepared for the Pavement Coatings Technology Council. 18 p. - Pavement Coatings Technology Counsil

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ted Lovell
**Commenter Affiliation:** Jet-Seal, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0108
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I, Ted Lovell and Jet-Seal, LLC opposes the EPAs proposed use of the 2020 MSGP to make facilities using RTS to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This would effectively banrefined coal tar-based pavement sealcoat, which should not be allowed because:

Products that are used in my business are safe, effective and applied to standards that assure the safety of the public. The proposed change will have a negative impact on my business and employees. The use of alternative products would cause our season to be shortened due to refined tar sealers ability to dry without direct sun as well as at cooler temperatures. As is, our season in central Ohio is seven months. When you subtract the days where rain prohibits the application the season is reduced to approximatel six months. Due to the seasonal aspect of the

business it is difficult to hire and retain employees. Further acts that shorten the season could be fatal to our operation.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jim Sandlin
**Commenter Affiliation:**  Reece Seal Coating Inc
**Document Control Number:**  EPA-HQ-OW-2019-0372-0109-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

For several years, environmental activists have been advocating that coal tar sealers be banned on **alleged** health and environmental effects. One glance at the ingredients on many household products such as skin creams, dandruff shampoos, lotions and even makeup, you may find coal tar listed. Even the **FDA has classified coal tar as safe and effective for use for skin disorders such as Psoriasis.**

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jim Sandlin
**Commenter Affiliation:**  Reece Seal Coating Inc
**Document Control Number:**  EPA-HQ-OW-2019-0372-0109-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Reece Seal Coating Inc. is an applicator and retailer of Refined Tar Sealer. Since 1969 Reece Seal Coating Inc. has been an industry leader in pavement coatings. Since then, we have tested and applied other coatings but all fall short of the performance and protection that Refined Tar Sealers offer. There is no other pavement sealer on the market that is close to the superior performance of RTS.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:**  Steve Venable
**Commenter Affiliation:**  Straight Line Striping, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0110
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

We have used coal tar emulsion for 23 years. It is a safe product and a long term solution for asphalt maintenance. All of our customers are very happy with the product.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  John Garcia
**Commenter Affiliation:**  Rooters Asphalt, Rooters American Maintenance, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0111-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Rooters American Maintenance, Inc. opposes the EPA's proposed use of the 2020 MSGP to make facilities using RTS to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This would effectively ban refined coal tar-based pavement sealcoat, which should not be allowed because…

- Products that are used in my business are safe, effective and applied to standards that assure the safety of the public.
- Rooters American Maintenance has been in the sealcoating business since 1987and has safely used RTS throughout. I have never had a claim filed or made by an employee stating that he or she became ill or was diagnosed with a disease attributed to exposure to RTS. I have never had a customer make or file any similar type of claim against my company. In this era of hyper-litigation, the absence of claims made against RTS speaks volumes.

...

- I can buy coal tar shampoo and skin creams in the grocery store. This is because the Food and Drug Administration has found that coal tar is safe when rubbed on human skin. Why then should EPA be given the authority to regulate RTS under the Clean Water Act?
- In my experience, proper use of RTS does not cause ongoing discharges of pollutants that could negatively affect water quality standards. Therefore, EPA should not be allowed to

regulate RTS under the Clean Water Act when it does not result in violations of water quality standards.

- When used according to ASTM standards, RTS does not cause water quality violations. EPA has failed to show that an RTS ban is a reasonable solution to any water quality problem. Instead of regulating RTS, EPA should require industry standard best management practices, like the ones used by my business, to guarantee safe use of coal tar.
- EPA has never before used the Clean Water Act as a tool for banning products and should not set the precedent of doing so now. This is a bad policy that will negatively impact my business, and EPA's legal authority on this action is questionable. EPA shouldn't be able to accomplish through the back door what other agencies have failed to accomplish through the front.
- The MSGP should not include an eligibility criteria for the application of sealcoat.
- U.S. Geological Survey (USGS) research that EPA used to support this proposal is flawed science. Independent scientists have not been able to replicate USGS claims that RTS is the "dominant" source of PAHs in stream and lake sediments. It would be irresponsible to use unsupported research to regulate RTS.
- EPA declined to regulate RTS in the 2015 MSGP because of lack of data to support the regulation. The agency now cites very little post-2015 information to justify regulating RTS in the 2020 MSGP. What changed? The public has been told that EPA bases its regulation on science, but this change looks to be driven by the uninformed agendas of activists rather than science. Establishing new regulation of RTS under the Clean Water Act without understanding the science makes EPA appear unreasonable and irresponsible.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Tom Decker, Jr.
**Commenter Affiliation:**  Decker Enterprises, Inc., DBA SealMaster - DelMarVa
**Document Control Number:**  EPA-HQ-OW-2019-0372-0112-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Decker Enterprises, Inc. DBA SealMaster — DelMarVa, opposes the EPA's proposed use of the 2020 MSGP to make facilities using Refined coal tar pavement sealer (RTS) to sealcoat asphalt pavements ineligible for coverage under the MSGP, thereby requiring them to apply for an individual permit. This will effectively ban refined coal-tar based pavement sealer (RTS) which accounts for 35% of our pavement sealer revenue in the states of Delaware, Maryland, and Virginia, our franchise sales territory. This new regulation will be the first nail in the coffin of the asphalt pavement sealcoating industry. The proposed 2020 MSGP, by effectively banning all

RTS in the United States, will without question, send a message to owners of asphalt driveways and parking lots throughout the country, that all pavement sealers are bad for the environment.

Asphalt Pavement Maintenance and Sealcoating Contractors are considered "low hanging fruit" who can easily be sacrificed for the purpose of appearing to save the environment by banning RTS. The people behind the proposed ban of RTS know the cost of eliminating these smaller sealcoating businesses will not create a public uproar because they do not have the deep pockets required to defend their industry.

There is so much unproven evidence associated with the drive to ban RTS as a prime contributor of the levels of PAH's contained within the sediment of ponds, lakes and stream beds. In order for their claim to be true, the people behind the movement to ban RTS assume that contractors who apply RTS on asphalt, wait until there is going to be a thunderstorm, spray, brush or squeegee apply the RTS onto their customer's driveways or parking lots; then watch the down pour of rain wash their RTS down the storm drain or gully into the closest body of water.

Every contractor we supply with RTS has one or more websites they may access on their phones telling them precisely when they should and should not apply pavement sealer in order to avoid any washout due to rain. Why are they so careful not to seal before a rain event and risk a washout? Because they only have enough money estimated in their projects to apply the RTS one time. When they have to re-sealcoat a parking lot or driveway with coal tar pavement sealer, they are losing money.

The claim that RTS, once dried and cured becomes dust that wears off the surface of the asphalt and washes into the streams, lakes and ponds becoming the main source of unacceptable high levels of PAH's is absurd as well. This is totally an untrue claim with no data to substantiate it. RTS takes 2 to 5 years to wear off an asphalt surface depending upon the traffic driving upon the sealcoated surface.

When the pavement sealer film does partially wear off the asphalt surface over a long period time, it typically only wears off the top of the aggregate. There is a significant amount of RTS film still present and visible protecting the asphalt. No person with common sense would believe that those extremely miniscule particles (of RTS dust), can make it all the way to a nearby body of water from a driveway or parking lot, especially those surrounded by grass or landscaping. That such fine particles, coal tar dust released over years, could possibly be the main source of PAH's in the sediment makes no sense either.

Since April of 1996, I have worked inside our coal tar pavement sealer manufacturing plant breathing in the air and getting the coal tar pavement sealer on my skin directly every year. According to my Primary Care Physician, I am in excellent health. What is the problem they seek to eliminate by effectively banning RTS through the Clean Water Act? Can they provide me the name of a single person who has died from being exposed to high levels of PAH's?

To date, I have never seen evidence of a single person, plant, animal, or fish proven to have been harmed by the exposure to coal tar pavement sealer or high levels of PAH's. RTS has been safely

applied on asphalt surfaces in the U.S. for 60 years without any class action or individual lawsuits being filed because of physical harm caused to anyone or anything.

Asbestos, Lead paint, Leaded gasoline, PCB's and Dioxin are examples of things that have been banned by the EPA because of their proven toxicity to humans, animals, and the environment. RTS does not belong on that list because nobody can provide evidence of how RTS applied properly by contractors on asphalt driveways, parking lots, and low traffic roads, is the main source of high levels of PAH's in the soil, or sediment in ponds, lakes and streams.... or that high levels of PAH's has ever caused anything to die.

In the counties within Maryland where RTS has already been banned; Anne Arundel, Howard, Prince Georges, and Montgomery, as well as in the District of Columbia, the number of commercial sealcoating projects and driveway sealcoating jobs has decreased noticeably. Sealcoating in the District of Columbia has become almost non-existent since RTS was been banned. The EPA, if they effectively ban RTS in the U.S. via the Clean Water Act, will begin the end of the currently thriving asphalt maintenance industry, eliminating the many jobs within and dependent upon it. The much higher cost of having to repave un-sealcoated asphalt much more often as it deteriorates twice as fast, is a burden that property owners will unnecessarily have to absorb.

Banning RTS under the Clean Water Act is not what the EPA was created for. The large number of small businesses who depend upon the income generated from applying coal tar sealer on asphalt driveways and parking lots in the U.S. is very significant. Taking away their means of earning a living without proven justification through an underhanded backdoor move via the EPA and the Clean Water Act is unacceptable.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility related to application of coal-tar sealcoat

I agree that permit operators, who will use coal-tar sealcoat to initially seal or to re-seal their paved surfaces should be required to apply for an individual permit unless they re-seal with asphalt-based sealant or an acrylic sealant.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Renee Gilbert
**Commenter Affiliation:**  GemSeal
**Document Control Number:**  EPA-HQ-OW-2019-0372-0123
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

I, Renee Gilbert, oppose the EPAs proposed use of the 2020 MSGP to make facilities using RTS to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This would effectively ban refined coal tar-based pavement sealcoat, which should not be allowed because:

Products that are used in my business are safe, effective and applied to standards that assure the safety of the public. The proposed change will have a negative impact on my business and employees. The company I work for manufactures seal coating, so this "ban" will directly affect every employee. Sealer made with asphalt emulsion or other base materials are more inferior and more expensive to coal tar based products. When it gets to the point that it's not worth property management having maintenance of seal coating performed our jobs will be endangered.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Carolina Striping Solutions
**Document Control Number:**  EPA-HQ-OW-2019-0372-0125
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Carolina Striping Solutions opposes the EPAs proposed use of the 2020 MSGP to make facilities using RTS to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This would effectively ban refined coal tar-based pavement sealcoat, which should not be allowed because it is bad for the environment if spilled into sewres or washed off jobs. For me personally it dries up and burns my skin like a really escalated sun

burn. Products that are used in my business are safe, effective and applied to standards that assure the safety of the public.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports the requirement that facilities must remove discharges from surfaces that are sealed with coal-tar sealcoat in order to be eligible for coverage under this permit. A 2016 study published by researchers from Oregon State University showed that the polyaromatic hydrocarbons (PAH) found in coal-tar seal coatings were 30 times more toxic than the most common PAH compounds that were studied previously by the U.S. Geological Survey[1]. Seventeen states (Texas, Wisconsin, New York, Massachusetts, District of Columbia, Michigan, North Carolina, South Carolina, Washington, California, Kansas, Illinois, Maryland, Minnesota, Maine, Connecticut and Missouri)[2] have coal-tar restrictions within their boundaries due to impacts to the environment.

[1] https://pubs.acs.org/doi/abs/10.1021 /acs.estlett.6b00116

[2] https://coaltarfreeusa.com/bans-2/

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0138
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

I recommend we not use asphalt it is a known toxin and can affect the health of people working with it. In addition there is too much asphalt, concrete and other surfaces that is affecting runoff.

Plus we won't need it in a few years with aerial drone delivery.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

DEQ recognizes that PAHs can pose environmental concerns when discharged to surface water. However, we are not certain that the proposed restriction is an effective means to address that concern. Under the Multisector General Permit (MSGP), the proposed requirements would only apply to stormwater runoff from industrial areas. As a result, this proposed restriction would fail to address the majority of PAHs associated with the use of coal tar sealant. Virginia does not have a good method of determining how many industrial stormwater facilities would be impacted by this proposed restriction. Experience administering our VPDES program suggests that restricting eligibility based on coal tar seal coat use could impose a significant permitting burden on permittees and DEQ (i. e., the increased burden associated with administering individual permits, as well as the increased cost of an individual permit to permittees) in exchange for achieving relatively minor environmental benefits. In addition, it is not clear that an individual permit would result in substantially different stormwater permit conditions for these facilities. For these reasons, we do not support this proposed restriction.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jeffrey T. Miller
**Commenter Affiliation:**  Treated Wood Council
**Document Control Number:**  EPA-HQ-OW-2019-0372-0155-A1

**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Section 1.1.8 of the proposed 2020 MSGP indicates to be eligible for coverage under this permit, a facility must not have any stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located.

In many wood treating locations, facilities utilize stone for drives and pathways which, in some instances, leads to a crushed powdery material that tends to increase a facility's TSS concentration in sampled discharges. In turn, to eliminate the TSS from the discharges, a facility may look into applying asphalt at high traffic areas. Most asphalt is maintained with a coal-tar sealant as there are limited alternatives. In a document prepared by USEPA titled Assessment of Water Quality Runoff from Sealed Asphalt Surfaces [5] *"There are acrylic co-polymers available on the market but they are more expensive; although they claim to be less toxic, the actual toxicity of these alternatives is unknown. Some organic concrete sealants include acrylic sealers, epoxy coatings, urethane sealants, polyureas, and polyaspartics but these may not be relevant to sealing asphalt. The ability of these concrete sealants to be effective on unsealed asphalt surfaces is unknown. Future research needs include finding an inexpensive alternative to either asphalt- or coal tar-based products (i.e., new soy-based sealants)."* Based on this summary provided by USEPA, TWC feels it's prudent to request the removal of the eligibility criterion for facilities using coal-tar sealcoat and adjust to best management practices only.

[5] USEPA. 2011. Assessment of Water Quality Runoff from Sealed Asphalt Surfaces. EPA/600/R-10/178 September 2011

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Allan Heydorn
**Commenter Affiliation:** Pavement Maintenance & Reconstruction
**Document Control Number:** EPA-HQ-OW-2019-0372-0156
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

As the editor of Pavement Maintenance & Reconstruction, the industry's trade publication for contractors, I oppose the EPA's proposed use of the 2020 MSGP to make facilities using Refined Tar Sealer (RTS) to seal pavement ineligible for coverage under the MSGP.

...

This requirement damages contractors and the sealcoating industry via "guilt by association" with a product that requires a special permit. And whether the facilities are locally owned small businesses or large regional or national businesses, requiring them to seek a permit before hiring a sealcoating contractor is a step they are unlikely to take. Instead, they will seek a different product to use, so passage of 2020 MSGP would also result in a defacto ban on RTS as contractors would be forced to switch to other, less-effective, products.

The basis of including RTS in the 2020 MSGP is based on science that is dodgy, at best. In my more than 30 years as editor of Pavement Maintenance & Reconstruction and conference manager for National Pavement Expo, the industry's trade show, I have not learned of a single instance of a contractor being harmed by RTS. Nor have I heard of any complaints from properties that have relied on RTS to seal and extend the life of their asphalt pavement. I urge rejection of this proposal.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Bill Kerchusky
**Commenter Affiliation:**  Sure Seal Asphalt Paving & Maintenance Company Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0157
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

I have been in the seal coating business since 1983 and we have never had a workmans compensation case by using the coal tar products. Nor have I had any issues with the product. ...

Please consider all this in your decision to regulate the seal coating industry

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Many facilities currently have asphalt and chip sealing to allow sweepers to remove dirt and debris from high traffic areas and apply housekeeping BMPs. Banning the use of these materials forces facilities to choose between gravel/stone or concrete. The gravel/stone mixture does not allow floor sweeping and would contribute to stormwater pollution in terms of TSS and prohibit certain BMPs that enhance stormwater discharge. The other option is concrete which will be expensive and does not hold up to temperature changes as well as asphalt does. This requirement forces facilities to go backwards in their stormwater programs.

*Recommendation*

Howmet believes that EPA should remove the coal-tar sealant ban from the general permit as it will lead to elevated levels of stormwater pollution through TSS and diminished housekeeping practices. However, a requirement may be added that newly added sealant must be applied in dry season(s) to minimize stormwater impacts or institute good engineering practices such as grassed buffer zones where possible or carbon absorbent booms in run-off direction for this operation to minimize impacts to the receiving stream.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee does not support an exclusion criterion for Multi-Sector General Permit (MSGP) permits for facilities that use coal-tar sealant.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**Exclusion of Refined Coal Tar-based Sealcoat (RTS) from 2020 MSGP Eligibility**

ACA opposes EPA's proposal to exclude facilities that seal pavement with refined coal tar-based sealcoat (RTS) from being eligible for the 2020 Multi-Sector General Permit for Industrial Stormwater (MSGP). In effect and intent, the proposed condition is a product ban, however the Clean Water Act (CWA) does not give the EPA the legal authority to ban products. EPA does have some authority to restrict or ban use of chemicals under other laws, such as the Toxic Substances Control Act (TSCA). But TSCA imposes a range of procedural and substantive obligations upon EPA before it can take such drastic action. EPA must first determine that a chemical contained in the mixture is a high priority for risk evaluation. Then, it must conduct a risk evaluation of that chemical, including scientific peer review. EPA must then determine, based on the risk evaluation, that the chemical poses an unreasonable risk of injury to health or the environment under a condition of use. EPA must also consider the benefits of the product and the economic consequences of potential restrictions, including the availability of effective alternative products. The CWA does not provide EPA with any authority to bypass its substantive obligations under TSCA or any other statute focused on chemical safety. ACA is concerned that if EPA is successful in using the CWA to, in effect, prohibit the beneficial use of RTS at industrial sites, what other products or materials might EPA target in future CWA permits?

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, excluding Refined Coal Tar-based Sealcoat (RTS) from the MSGP is essentially a product ban, however the Clean Water Act (CWA) does not give the EPA the legal authority to ban products.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

In response to the EPA's request for comment on the proposal to include an eligibility criterion to the use of coal-tar sealants to paved areas in industrial facilities, the IMA-NA opposes the proposal. As proposed this change to the MSGP would effectively require sites to obtain an NPDES to maintain asphalt roads and parking lots. Requiring an NPDES for sites simply to maintain their roads and parking lots is an unrealistic burden for operators. To carry this eligibility criteria to its logical conclusion, this proposal would act as a sort of ban on the use of coal-tar sealants. IMA-NA feels this is an improper outcome from the updated MSGP. The Association recommends the Agency remove this proposal from the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**1. Request for Comment 2: Coal-Tar Sealcoat Prohibition**

There appears to be some confusion that all sealcoat products are "coal-tar sealcoats", although this is not the case. In fact, USEPA has indicated in its MSGP fact sheet that there are viable alternatives that include "asphalt emulsion sealants and acrylic sealants". Therefore, we suggest that a sentence be added to Section 1.1.8 to indicate alternatives that can be used instead of coal-tar sealcoats, such as "Substitutes for coal-tar sealcoats are available, such as asphalt emulsion sealants and acrylic sealants."

Additionally, there may be regulated facilities who use coal-tar sealcoats in only limited areas of their facilities. If the agency keeps Section 1.1.8, it should include a de minimis exception based on the ratio of the area with coal-tar sealcoats to the overall drainage area of the permitted facility.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

EPA has requested comment on multiple issues related to permit eligibility. As to whether the permit should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located, VMA believes banning the use of a specific product, rather than controlling its discharge, is beyond the scope of EPA's authority under the Clean Water Act ("CWA"). If a permittee utilizes coal-tar sealcoat, which is as effective as and often cheaper than using asphalt for certain repairs, the permittee can utilize best management practices ("BMPs") to control any polycyclic aromatic hydrocarbon ("PAH") discharges. EPA can encourage the use of the alternatives it identifies but cannot exceed its CWA authority within the scope of this rulemaking by attempting to ban the use of a specific product.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI does not support the proposed 2020 MSGP eligibility criterion for stormwater discharges from areas of industrial activity at a facility where coal-tar sealants will be used during the permit term. Coal-tar sealant is a useful product that achieves both operational and stormwater management objectives. Coal-tar sealant helps to maintain the integrity of pavement in areas of industrial activity that supports year-round heavy use of large equipment and the massive weight of operational materials, especially scrap metal. This allows equipment and materials to move or be moved safely and efficiently across a facility. Once cured after application, coal-tar sealant is able to withstand to a high degree the effects of thermal and mechanical cycling. Coal-tar sealant fills in or plugs cracks or fissures in pavement and helps to impede their growth. This helps to extend the operational life of pavement and also prevents raw stormwater from infiltrating

directly into the surficial soils beneath and possibly into the underlying groundwater, depending on its depth below surface. Its prevention of infiltration supports the goals of stormwater management and stormwater permitting. In some locations, especially with temperature extremes, there is no good alternative to coal-tar sealant with the same operational and sealant effectiveness and longevity. For these reasons, a facility's future use of coal-tar sealant in areas of industrial activity should not be a 2020 MSGP eligibility criterion for a discharge(s) of stormwater that had contacted coal-tar sealant in an area of industrial activity.

To have this proposed coal-tar sealant eligibility criterion in the 2020 MSGP would be extremely problematic both practically and legally. Practically, given normal sealant use, a facility would more likely become ineligible for 2020 MSGP coverage than be required to get an additional individual permit for only one or two discharge points, or much less feasibly to retain all stormwater without discharge. Legally, to have this criterion would create the problematic precedent of banning the use of materials as a condition of coverage under a stormwater permit.

The CWA (33 U.S.C. 1251 et seq.) does not authorize the banning of products or materials that might contribute to a "discharge of pollutants". The CWA applies to the "discharge of pollutants" and authorizes permits for them (33 U.S.C. 1342; CWA Sec. 402). The CWA defines "discharge of pollutants" to mean "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft" (33 U.S.C. 1362; CWA Sec. 502). "Point source" is defined to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged" (33 U.S.C. 1362; CWA Sec. 502). This proposed coal-tar sealant eligibility criterion is not permissible under the CWA. It also would remove a useful product for upholding the goals of and maintaining compliance with stormwater permits.

The proposed coal-tar sealant eligibility criterion should not and cannot be included in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Paul Bredwell
**Commenter Affiliation:**  U.S. Poultry & Egg Association et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

**4. Imposing ineligibility for facilities that use coal-tar sealcoat to initially or reseal asphalt surfaces is unreasonable.**

<u>Maintenance and Repair of Asphalt Surfaces</u>: Developing the standard that would deem the operator ineligible for MSGP Coverage if the facility used coal-tar sealcoat at an industrial facility would likely discourage the appropriate, routine maintenance and repair of asphalt surfaces from being performed. Adequate maintenance of these surfaces is critical, as it allows for efficient and effective dry clean-up methods to be utilized in the event of a spill and as general good housekeeping and pollution prevention practices. Many facilities use first flush and complete containment zones to capture and/or divert storm water runoff and incidental spillage in "high impact" areas to treatment systems. The effectiveness of these physical storm water pollution prevention systems would also likely be degraded if the new USEPA MSGP excludes coverage for facilities that use coal-tar sealcoat and results in permittees reducing maintenance and repair of asphalt surfaces.

<u>Stormwater Management Practices</u>: We believe there is a significant potential for this proposed provision to result in changes in asphalt surface maintenance and repair practices at regulated facilities. Changes in asphalt pavement maintenance and repair activities would likely result in significant cracking in paved surfaces as well as voids in and under paved surfaces, therefore degrading storm water pollution prevention practices related to storm water collection and/or diversion of storm water runoff to treatment systems or away from "high impact" areas, accumulation of sediment, dusts, debris and liquids that can contain pollutants and degrade the overall effectiveness of dry cleanup, general housekeeping and/or spill cleanup. In other words, the focus of the proposed 2020 MSGP on polycyclic aromatic hydrocarbons (PAHs) may result in significant adverse impacts and degradation of storm water runoff quality related to other more significant and common constituents of concern. These other constituents of concern likely pose a much greater risk to storm water runoff and/or receiving water quality than those posed by coal-tar sealcoat.

<u>Agreement with Association</u>: Our industries agree with the statements made by the associations representing the refined coal-tar based sealcoat (RTS) industry. Their remarks are as follows:

*But most important, this permit proceeding is based on the CWA, not TSCA. The CWA directs EPA to reduce the discharge of pollutants via effluent limitations or other requirements. While EPA can establish technology-based limitations on discharges of pollutants, it must leave facilities free to choose the means by which they meet such limitations.[2] The courts have recognized that EPA's CWA authority extends only to regulating discharges, not to controlling how plants operate:*

*"The CWA does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants. [T]he agency is powerless to impose permit conditions unrelated to the discharge itself...EPA may not...under the guise of carrying out its responsibilities under NEPA transmogrify its obligation to regulate discharges into a mandate to regulate the plants or facilities themselves. To do so would unjustifiably expand the agency's authority beyond its proper perimeters.[3]"*

*This Administration's overall regulatory policy emphasizes the need "to alleviate unnecessary regulatory burdens."[4] Banning a class of products without authority, and without any determination that this drastic step is actually necessary to protect water quality, runs directly contrary to this policy.*

FDA Product Safety Characteristics: We believe it is important to note coal tar has been designated by the U.S. Food and Drug Administration (FDA) as generally recognized as safe (GRAS), and coal tar is used for various over the counter medicinal products for control of dandruff, seborrheic dermatitis, or psoriasis for human use (See 21 CFR 358.701, 358.703, 358.710, 358.720, 358.750 and 358.760).

Permeable Pavement Challenges: One of the recommended alternatives in the proposed MSGP is the use of permeable pavements. Permeable pavements would not be appropriate for many industrial sites due to the cost associated with the amount of permeable pavement that would be needed, and the degree of difficulty and ineffectiveness associated with cleaning any potential spills. Spilled material would be able to seep through the pavement to the ground below, potentially causing other environmental concerns. Furthermore, in certain regions of the country such as the southeast where clay is very prominent in the soil profile, permeable pavements are not a viable option as the shallow clay is an impermeable layer and could cause drainage issues.

Environmental Benefits of Coal-Tar Sealcoat: Application of sealcoats to asphalt surfaces occur at a relatively infrequent basis and are part of normal repairs and maintenance of asphalt surfaces. Many factors, including but not limited to costs (initial and ongoing costs); accessibility; application methods and time requirements for alternate sealant curing, etc.; durability (e.g., performance over time); quality of seal provided; anticipated life of alternate sealants in various applications; and other factors must be fully considered to make an informed decision on this issue. There are also various benefits provided by coal-tar sealcoats as compared to alternatives. Coal-tar sealcoats protect asphalt surfaces from oil, fuel, and other petroleum material spills as compared to asphalt based sealcoats, and they are reportedly significantly cheaper than acrylic sealants (see PAHs in Coal Tar Sealants: Policy Analyses and Design Thesis by Abigail R. Ames, University of Vermont 2018, page 22 available at: https://scholarworks.uvm.edu/cgi/viewcontent.cgi?article=1050&context=envstheses). It is also important to note that USEPA's MSGP Fact Sheet indicates:

*West of the continental divide, the Washington State Department of Ecology conducted a watershed-wide analysis in the Puget Sound to estimate toxic pollutant loadings through major pathways such as surface water runoff and to provide data on pollutant concentrations in surface runoff from different land cover types, including commercial/industrial. This analysis found that combustion emissions and releases from creosote-treated wood account for most of the PAH release in the Puget Sound basin. Coal-tar sealant accounted for less than 1 percent of PAH releases as compared to other sources, ranging from 0.9 to 1.7 tons per year, or approximately 816 to 1,542 kg/year (Ecology and King County, 2011).*

Presented Case Against Coal-Tar Sealcoat: The information presented by the USEPA in the draft 2020 MSGP documents is not overwhelmingly supportive of USEPA's proposed exclusion of eligibility of facilities that use coal-tar sealcoat to protect and maintain asphalt surfaces. The

supportive information is not significantly compelling and some of the information provided on coal-tar sealcoats is anecdotal in scope and/or in some instances conflict with other information provided on this issue. **The one main point that is abundantly clear is properly maintained asphalt surfaces provide significant benefits for storm water pollution prevention associated with dry cleanup, good housekeeping and spill containment and clean-up.** Based on various information available, we believe the benefits of coal-tar sealcoats for asphalt surfaces outweigh the disadvantages when all aspects of storm water pollution prevention and costs are considered.

[2] EPA, NPDES PERMIT WRITERS' MANUAL at 49, available at https://www3.epa.gov/npdes/pubs/chapt_05.pdf.

[3] See Nat. Res. Def. Council, Inc. v. U.S. EPA, 859 F.2d 156, 170 (D.C. Cir. 1988).

[4] E.O. 13777, § 1 (82 Fed. Reg. 12285, Mar. 1, 2017).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that EPA not ban use of coal-tar sealcoats on paved surfaces.*

EPA Request for Comment 2 solicits comments about an effective ban on using coal-tar sealcoats on paved surfaces where industrial activities are located. Coal-tar sealcoats are manufactured using refined crude coal tar which is a by-product of cokemaking. This effective ban would shrink the market for coal-tar sealcoats, which would reduce the outlet for crude coal tar and possibly reduce the amount of coal tar beneficially reused. It could lead to disposal of crude coal tar as a waste material. The Clean Water Act does not authorize EPA to condition eligibility under the MSGP on the use of coal-tar sealants (or any product for that matter), because such a condition effectively prohibits the use of a particular product. In addition, the mere use of a product, such as coal-tar sealants, is not, without proof of actual discharge, an activity that is related to the discharge of pollutants "associated with industrial activity" as that term is defined by EPA's regulations.

EPA did not consider or account for the potential cost impacts of a ban on the use of coal-tar sealants in its cost assessment for the proposed MSGP. Such impacts would include potential incremental costs associated with substitute materials for coal-tar sealants, loss of market shar for the by-product cokemaking segment of the Primary Metals sector, and costs associated with offsite disposal of coal tar as a waste material.

Some AISI member companies belong to the Coke Oven Environmental Task Force which partnered with the Pavement Coatings Technology Coalition to submit comprehensive comments to EPA on this issue. Reference is made to those comments which have been provided under separate cover.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Brian J. Anthony
**Commenter Affiliation:** The Brewer Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0191-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The Brewer Company **opposes** the EPA's proposed use of the 2020 MSGP to make facilities using coal tar sealcoat to protect their pavement, ineligible for coverage under the General Permit, forcing them instead, to apply for an individual permit. This proposed language would result in a "de facto" ban on refined coal tar based pavement sealer, which is not only unprecedented, but beyond the scope of the CWA authority.

Refined coal tar sealants used in our industry are safe, effective and, when applied in accordance with industry standards, assure the safety of the public. They extend the service life of asphalt pavement, reducing costly repairs and replacement, minimizing the carbon footprint and the impact on landfills. We urge you to take a deeper consideration into your "cost impact analysis" to gain a clearer perspective on the true cost this ban would cause.

...

Further, as a member of the PCTC, we know that the EPA is relying on flawed USGS research to support this proposal; research that independent scientists have been unable to replicate. We believe it would be irresponsible for EPA, whom in their 2015 MSGP, declined to regulate refined coal tar sealants, due to a lack of scientifically sound data, to use this unsupported research to regulate the products, now. What has changed, since then?

For years, the public has been told that the EPA bases its regulation on science and cost impact studies. However, this proposal looks like it is driven by uniformed activists with an agenda, rather than driven by sound science and economic impact. Establishing this new regulation, a de facto ban on refined coal tar sealants, under the CWA, without understanding and substantiating the science and true economic impact, is unwarranted, unjust and makes EPA appear unreasonable and irresponsible. We urge you to be responsible and delete the proposed language, a de facto ban on refined coal tar sealants, from your Proposed 2020 MSGP.

We urge you to be responsible and delete the proposed language, a de facto ban on refined coal tar sealants, from your proposed MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

PAH's have not been proven to contribute problematic runoff in the short term or long term. EPA declined regulation in the 2015 MSGP due to lack of data to support. In addition, coal tar and asphalt products are available for purchase in 5, 20, and 55 gal containers to the public and small business sectors; therefore, if regulating one certain industry, regulations would presumably apply to the public sector as well which may make every sealed driveway nationwide subject to MSGP or separate permitting unless there is a limited square footage that would be exempt.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility – Coal-Tar Sealants:  Fiber glass and mineral wool do not use coal-tar-sealants in the manufacturing process.  Coal-tar-based sealant is a black, shiny substance sprayed or painted on top of asphalt pavement – including parking lots, driveways, and some playgrounds – to protect the underlying asphalt.  The sealant improves the appearance of the asphalt and helps with maintenance.  An estimated 85 million gallons (320 million liters) of coal-tar-based sealant are applied to pavement nationwide each year.  Coal-tar-based sealant is a potent source of polycyclic aromatic hydrocarbons ("PAHs").  There are alternatives, but these alternatives are more expensive.  EPA seeks to offer an incentive to use these alternatives.  The problem with the alternatives is that they are not fully vetted and there is no guarantee that they do not pose other undesirable risks.  NAIMA opposes EPA's proposals because they are creating a scenario where there is an anti-competitive impact on others in the marketplace.  This is not EPA's job.  EPA should avoid, at all costs, product specification, whether direct or indirect.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jeff Hannapel
**Commenter Affiliation:**  American Foundry Society (AFS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0199-A2
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposal to make facilities that use coal-tar sealant for asphalt preparation, maintenance, and repair ineligible for coverage under the 2020 MSGP is unreasonable. Adequate maintenance and repair of asphalt surfaces is critical for efficient and effective cleanup of spills and other materials on asphalt surfaces. In addition, EPA has not adequately justified the scientific need to prohibit the use of coal-tar sealant in the draft 2020 MSGP and the potential harm resulting from stormwater discharges.

The prohibition on the use of coal-tar sealant would provide a significant disincentive to the effective maintenance and repair of asphalt surfaces. Properly maintained asphalt surfaces with the use of coal-tar sealant provide significant environmental benefits for stormwater management, including dry cleanup, good housekeeping, and spill containment and cleanup. Accordingly, AFS urges EPA to remove the proposed restriction on the use of coal-tar sealant for asphalt surfaces.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 2:**

**Eligibility Criterion for Use of Coal-Tar Sealcoat (Part 1.1.8)**

EPA has requested comment on whether the MSGP should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. Specifically, this provision requires that operators "must not have any stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located during your coverage under this permit." NMA does not support the proposed eligibility criterion related to the application of coal-tar sealcoat. This eligibility criterion is overly stringent. Further, banning of the use of this material should not be done through the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**[The existing Eligibility for Facilities using Coal-Tar Sealcoat is effective in terms of pollution prevention.  No changes should be made.]**

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Chris Mariani
**Commenter Affiliation:** Gem Seal Pavement Products

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0206-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

In the proposed revisions, EPA will disallow businesses that use or have used refined tar sealants (a product commonly used and preferred in our industry) on their parking lots from access to stormwater Multi-Sector Group Permits. This will effectively ban the use of this product across the country which has had a 60 year history of safe and effective use. I am deeply concerned about the negative impact this will have on our business, which was founded in 1957 and is a major supplier to the paving construction and pavement preservation industry. We presently operate 9 plants and 6 distribution warehouses across the US.

Secondly, EPA has never used the stormwater MSGP program to regulate or ban a specific product as it is about to do now. This revision potentially sets a consequential precedent for NGO's and activist to ban many other products in any industry by this "backdoor" method.

I respectfully ask that you strongly consider removing the language that **requires properties to file for an individual stormwater permit (versus and multi-sector group permit) specifically and only because they use or used refined tar sealer on their parking lots.** This revision, as presently written, sets a dangerous precedent that potentially puts us and other businesses out of business. Unfortunately, we recently had to closed our Baltimore facility in February of this year due to similar regulatory pressure at the local level there. One of my competitors had to do the same in Minnesota four years ago. **This is a serious matter confronting our industry.** I realize that corona-virus is the current focus of attention. However, the corona-virus is temporary whereas the proposed revision language, if adopted, will be **permanent.**

I find ironic, if not tragic, that Washington is spending vast sums of time and money to keep businesses stable through the corona-virus crisis and yet, at the same time, is about to severely cripple our industry with this over-reaching and targeted revision. **I am proud that our company is one of few that has remained open during the pandemic without laying off a single employee or taking a single dime in Federal assistance.** This revision, however, will bring a decline that will shut down additional plants and layoff salaried and wage earning employees. Furthermore, the President is rightfully concerned about the economic sustainability of businesses large and small, particularly in this time, and has directed the multitude of Federal regulatory departments "**…to do no harm**" with regulatory policy making moving forward.

Again, I respectfully ask that you consider my request and do no harm. My contact information is listed below my signature. I'm available anytime to discuss this matter with you or your staff and answer any questions about my company, our industry, and the multitude of products we manufacture and distribute to the paving construction industry.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Michael Goeller
**Commenter Affiliation:** Stella Jones Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0213
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I, Michael Goeller, Director of Chemical Product Sales for Stella Jones Corporation, oppose the EPA's proposed use of the 2020 MSGP to require facilities using refined coal tar sealer to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This proposed rule creates a de facto ban on refined coal tar sealer and will destroy an entire segment of the industry.

Without the revenue generated by the sale of the refined tar base used in refined coal tar sealer, our Memphis, TN operation -- and the workforce sustaining that operation -- will be severely impacted.

Our workforce at the Memphis, TN plant is primarily comprised of non-college educated employees making a competitive "blue collar" wage with a full company benefits plan. These are good jobs. Moreover, our operation supports local business and transportation companies. Every dollar in final sales of our manufactured refined coal tar supports much more than a dollar in other businesses. This multiplier effect is greatest in manufacturing companies. Manufacturing companies and the jobs that come with them are vital to our US economy.

Consequently, I urge EPA not to use the Clean Water Act to ban this product, and ask that it rejects the 2020 Multi-Sector MSGP proposed rule.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

More instruction in the permit is needed to help a Facility operator determine "coal tar sealcoat" from other pavement sealant brand names or synonyms. EPA should add additional information

(e.g., chemical or product synonyms; Chemical Abstracts Service (CAS) 8007-45-2, if applicable). NMED supports additional monitoring to determine the effects of coal tar use.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

### 2. EPA Should Adopt its Proposal to Include an Eligibility Criterion Related to Application of Coal-tar Sealcoats to Paved Areas Where Industrial Activities are Located.

Commenters strongly support EPA's proposal to include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. EPA's fact sheet supporting the draft permit clearly summarizes the toxicological information on Polycyclic Aromatic Hydrocarbons (hereinafter "PAH"), lab-based research on the biological impacts of PAH contaminated sediment on aquatic organisms, and field research and modeling that show that coal tar sealcoat is a significant source of PAHs into the nearby environment, and that stormwater runoff is a pathway through which organisms and habitats are exposed to PAH contamination from coal tar sealcoat. All of EPA's conclusions about coal tar sealcoat are well supported in the scientific literature.

In addition to the many studies cited by EPA in its references section, additional support for EPA's conclusion that coal tar sealcoat is a significant contributor of PAHs to waterbodies in the United States is found in the two studies attached to this comment letter, one based on sampling conducted in Minnesota and one based on sampling conducted in Springfield, Missouri.[6]

EPA has also requested comment about alternative control measures that would allow continued application of coal tar sealcoat instead of an eligibility restriction. Commenters believe that alternative controls are unlikely to be feasible. Commenters agree with EPA's conclusion that data from studies conducted in Austin, Texas and other locations show that substituting similarly priced, low-PAH alternatives in place of coal tar sealcoats is effective at reducing PAH loadings from paved surfaces.

Substitution away from coal tar sealant is both simple and extremely cost-effective because there are widely available and similarly priced substitute sealants that contain orders of magnitude fewer PAHs. Also, as EPA notes, there are alternative paving methods that don't require a sealant at all. In light of the effectiveness, simplicity, and low cost of just not using coal tar-

based products, Commenters believe EPA is unlikely to find alternative stormwater control measures it can include under the MSGP that are equally attractive – i.e., equally effective, simple for permittees to implement, and cost-beneficial.

Commenters also reiterate that EPA's suggestion to restrict use of coal tar sealants is cost-beneficial and economically sensible because the costs of restricting use of coal tar sealants is marginal to society. Although some companies and organizations in the sealant industry protest all restrictions on coal tar sealants, experience with bans in different parts of the country has shown that restrictions on coal tar sealant use are practical and not economically harmful to paving companies. For example, after Minnesota banned coal tar sealants in 2015, dozens of companies in Minnesota abandoned use of these sealants with relatively little expense. Paving and sealing contractors have no capital costs associated with the change - their existing equipment works as well with asphalt based or other kinds of sealants as it does with coal tar. Suppliers/wholesalers typically stock both coal tar sealants and alternatives - switching from one to the other is not a problem, just a matter of running down inventory and not reordering. Almost all pavement sealant manufacturers make both coal tar sealants and alternatives - companies such as SealMaster, JetBlack, Neyra, GemSeal, Vance, Brewer, STAR and other smaller manufacturers of sealants all make both coal tar and asphalt-based product lines. In short, the costs side of the cost-benefit balancing is very small. A ban on coal tar sealants does not deprive the economy of pavement sealants and does not impose high costs (or almost any costs) on the sealant industry.

[6] Pavlowsky RT, Baseline Study of PAH Sources and Concentrations in Pond and Stream Sediments, Springfield, Missouri (Oct. 30, 2012), The Ozarks Environmental and Water Resources Institute (OEWRI) Missouri State University (MSU) (attached); Crane JL, Grosenheider K, and CB Wilson, Contamination of Stormwater Pond Sediments by Polycyclic Aromatic Hydrocarbons (PAHs) in Minnesota: The Role of Coal Tar-based Sealcoat Products as a Source of PAHs (March, 2010), Minnesota Pollution Control Agency (attached).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Commenters make two suggestions that we believe would enhance the MSGP's handling of PAHs from sealed surfaces:

1. Expand the eligibility criterion to apply to all high-PAH sealcoats, in recognition of the recent emergence of a new class of high-PAH sealcoats made with substances such as ethylene cracker residue or "ECR" (also referred to as steam-cracked asphalt).
2. Provide a definition of the affected sealcoats that enables permittees to more easily identify products that cannot be used during the permit term.

First, Commenters suggest that EPA transition from focusing exclusively on coal tar sealcoats to cover all high PAH sealcoats. Information to support this transition is readily obtainable from Washington D.C.'s Department of Energy and Environment (the comparison is relevant since EPA's MSGP is issued in and applies to dischargers located within D.C.). The District banned the use of coal tar sealcoat in 2009. In 2018, in light of new information, chiefly the results of field tests that showed parking lots coated with an ECR-based sealcoat product contained high levels of PAHs, the District extended its ban to all high PAH sealcoats, including those made with ethylene cracker residue. Washington D.C. revised its rules to set a content restriction – only sealants containing less than 0.1% PAHs by weight can be used. A presentation prepared by Washington DOEE staff on this topic is attached, and further information is available from DOEE and from sources listed in that presentation.[7]

The District of Columbia has provided convenient definitions of banned sealcoat products. See, e.g. https://doee.dc.gov/coaltar. A copy of DEC's 2019 amendments to its coal tar regulation are attached to this Comment.[8] Under that city's laws, the term "high PAH sealant product" means a material that:

1. Contains:
    1. Coal tar;
    2. Coal tar pitch, coal tar pitch volatiles, RT-12, refined tar, or a variation of those substances assigned the chemical abstracts services ("CAS") number 65996-92-1, 65996-89-6, or 8007-45-2;
    3. A surface-applied product containing steam-cracked petroleum residues, steam-cracked asphalt, pyrolysis fuel oil, heavy fuel oil, ethylene tar, ethylene cracker residue, or a variation of those substances assigned the CAS number 64742-90-1 or 69013-21-4; or
    4. Substances containing more than 0.1% (1000ppm) polycyclic aromatic hydrocarbons, by weight; and
2. Is used, or is intended for use, on an impermeable surface, including bricks, block, metal, roofing material, asphalt, or concrete.

The definitions used by D.C. could enhance EPA's permit, providing more clarity to permittees.

---

[7] Lillian Power and Zachary Rybarczyk, Challenges and Proposed Solutions to the District's Coal Tar Pavement Sealant Ban, Department of Energy and Environment, Washington, District of Columbia (attached).

[8] Limitations on Products Containing Polycyclic Aromatic Hydrocarbons Amendment Act of 2018, D.C. Act 22-628, Council of the District of Columbia (2019) (attached).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

ARA opposes the criteria and clean water act doesn't have the ability to ban specific products such as coal-tar. EPA's proposal to establish that facilities using CTS or refined tar sealant (RTS) are not eligible to use the MSGP amounts to a de facto ban on RTS usage. This effective ban violates the limits of EPA's regulatory authority. Although industrial dischargers are not required to apply for permits under the MSGP, EPA cannot rely on the fact that theoretical alternatives exist to save this proposed product ban. Courts commonly find that facially permissive regulations or incentives are coercive in practice.[1] When an incentive amounts to a requirement, it will invoke statutory and constitutional limits on regulatory authority.

[1] 567 U.S. 519, 581; see also S. Dakota v. Dole, 483 U.S. 203, 211 (1987) ("in some circumstances the financial inducement [] might be so coercive as to pass the point at which 'pressure turns into compulsion.'").

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

It is unreasonable for the EPA to expect facilities to understand the difference between coal tar-based sealcoats and other options. Typically, sealcoating is performed by a paving contractor that

may not provide this information or may change the product they apply based on costs and availability of product. In addition, it is our understanding that availability of coal-tar- and asphalt emulsion-based products varies by region and a facility in may not be able to select one over the other. Because of the unreasonable burden required to ascertain what seal-coat blend contractors are using and the potential added costs for alternatives, this provision should be left out of the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 2. This proposed exclusion raises a number of practical and regulatory issues. First, not allowing coverage under the 2020 MSGP from use of this product seems overly stringent since coal-tar products are commercially available. Second, it is not clear in this proposed permit condition if permit ineligibility includes previously coated surfaces or only surfaces coated during the permit period duration. Furthermore, how does this "ban" apply to parking lots *adjacent to* industrial activity? Finally, the 2020 MSPG is not the appropriate regulatory mechanism to regulate this product. It is not clear under the MSGP that EPA can ban certain chemicals/products from use that might come into contact with stormwater.[8] Sealing of asphalt is necessary for this material to continue to perform its functions, one of which is minimizing potential impacts to the subsurface from contaminants that may be on the surface. The focus of the MSGP needs to be on the management of industrial materials and associated control measures to minimize such materials being in a stormwater discharge.

Simplot strongly recommends permit condition Part 1.1.8 be removed from the 2020 MSGP.

[8] A more appropriate regulatory mechanism to look at the use of coal-tar sealcoat would be under TSCA.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

MassDEP agrees that polycyclic aromatic hydrocarbons pose a threat to the environment, however, denying coverage to facilities that have stormwater discharges generated from surfaces sealed with coal-tar is unrealistic as it is not feasible to have each facility covered under an individual permit. Instead MassDEP recommends that EPA should create a provision that surfaces that are proposed for resealing shall not be re-sealed with coal-tar sealant, but instead asphalt sealant. This results in phasing out coal-tar based sealants and ensures coverage of facilities under the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Gem Seal Pavement Products
**Document Control Number:** EPA-HQ-OW-2019-0372-0234-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

These comments focus on one issue: EPA's proposal, in the 2020 Proposed MSGP, to establish eligibility criteria related to the application of refined coal-tar sealcoat ("RTS"). **I oppose the revision that restricts industrial operators that use or have used refined tar sealers from multi-sector group permit eligibility.**

I am the second generation of three generations of family that produces pavement sealants of all types which include refined tar, asphalt, and LP based sealers. I began working in the industry at age 14 and still today, 40 years later, continue to work in this industry. Most of what we produce is refined tar sealers because that is still predominantly what is preferred by the majority of contractors and property owners within our industry. Why? Because it is still the most effective and best performing pavement sealer available despite the advocacy efforts of USGS NAWQA program which forms the flawed basis of this proposal.

 

Above Left: Asphalt based sealer (left) and refined tar sealer. ASTM D5727 type (right).  Photo taken June 13, 2012, six months after application

Above Right:  Photo taken April 1, 2016 of the same test strips.

The practice of science that employs the use of research models that have programmable outcomes is not science.  It is a perversion of science and unfortunately what forms the basis of the proposed MSGP eligibility criteria.  Regardless of the programmable outcomes devised by USGS which brings us to this proposal, the ultimate laboratory is in the field, and 60 years of field history tells us this:

- There is no recorded history of injury or adverse health effects from refined tar sealers applied by contractors or manufactured by sealer producers OSHA.
- There is no recorded history of injury or adverse health effects from refined tar (the raw material used to make refined tar sealers) producers.

If refined tar sealers truly contribute the level of PAHs that USGS NAWQA claims by their programmable research, and was as prone to causing adverse health as their programmable and non-reproduceable research results indicate, then history would have recorded a different outcome with regard to adverse health effects by the use of this product.

The use of refined tar sealers, properly used as designed, are effective and safe and preferred by the marketplace because they outperform the alternatives based on 60 years of field history.  I have been employed in every operational position in the production of refined tar pavement sealers in my 40 year career, all conducted without adverse health effects to me or my coworkers or raw material suppliers, and all with a safe plant operating record.

Furthermore, adoption of this proposal as written, will effectively establish a de facto ban of this safe and effective product, and harm businesses within this industry.  Ban pressure that exists in localized regions of the country has seen the closure of at least two production facilities and diminishing revenues over the past five years, even while "alternative" (and less effective) pavement sealers are currently being produced.

Again, I oppose the revision as proposed because it will ban a safe and effective product that the marketplace demands, it will further harm businesses that make up the pavement sealer industry, and it will not reduce PAHs in the environment.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jamie Conrad
**Commenter Affiliation:**  The Adhesive and Sealant Council, et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0237-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The undersigned associations strongly oppose EPA's proposal to exclude facilities that seal pavement with refined coal tar-based sealcoat (RTS) from being eligible for the 2020 Multi-Sector General Permit for Industrial Stormwater (MSGP).[1]

In effect and intent, the proposed condition is a product ban. But the Clean Water Act (CWA) does ***not*** give the EPA the legal authority to ban products. We have serious concerns about the dangerous precedential implications of this proposal for other industries and products. EPA should abandon it.[2]

**Discussion**

The principal purpose of the CWA is to restore and maintain the quality of the nation's navigable waters through the use of permits that eliminate or limit the discharge of pollutants to these waters from point sources. In the case of industrial stormwater, those limitations have historically taken the form of management practices and effluent limitations applicable to discharges. But EPA has never previously gone 'upstream' and attempted to effectively ban the use of a class of products at a facility.

EPA does have some authority to restrict or ban use of chemicals under other laws, such as the Toxic Substances Control Act (TSCA). But TSCA imposes a range of procedural and substantive obligations upon EPA before it can take such drastic action. EPA must first determine that a chemical contained in the mixture is a high priority for risk evaluation. Then, it must conduct a risk evaluation of that chemical, including scientific peer review. EPA must then determine, based on the risk evaluation, that the chemical poses an unreasonable risk of injury to health or the environment under a condition of use. EPA must also consider the benefits of the product and the economic consequences of potential restrictions, including the availability of effective alternative products. The CWA does not provide EPA with any authority to bypass its substantive obligations under TSCA or any other statute focused on chemical safety.

Further, EPA has gone through none of the steps required by TSCA in the current MSGP rulemaking. Instead, EPA began with its conclusion—already embodied in a judicial settlement agreement—that use of RTS should be excluded from the MSGP. EPA then pulled together a collection of literature citations and speculations regarding the effect of RTS use at facilities. In doing so, EPA ignored literature that seriously undermines EPA's speculation, as well as EPA's own determination, from the 2015 MSGP, that data were inadequate to support a ban. Moreover, EPA has not shown that a ban is necessary to address those alleged effects and it has not explained why less-disruptive alternatives, such as use of industry standard best management practices, are insufficient to address any concerns. It has not considered whether there are any alternative products available at reasonable cost that perform as well and as long as RTS. So EPA's proposal does not meet any of the TSCA requirements for banning a product.

But most important, this permit proceeding is based on the CWA, not TSCA. The CWA directs EPA to reduce the discharge of pollutants via effluent limitations or other requirements. While EPA can establish technology-based limitations on discharges of pollutants, it must leave facilities free to choose the means by which they meet such limitations. The courts have recognized that EPA's CWA authority extends only to regulating discharges, not to controlling how plants operate:

*The CWA does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants. [T]he agency is powerless to impose permit conditions unrelated to the discharge itself. . . . EPA may not . . . under the guise of carrying out its responsibilities under NEPA transmogrify its obligation to regulate discharges into a mandate to regulate the plants or facilities themselves. To do so would unjustifiably expand the agency's authority beyond its proper perimeters.[3]*

This Administration's overall regulatory policy emphasizes the need "to alleviate unnecessary regulatory burdens." [4] Banning a class of products without authority, and without any determination that this drastic step is actually necessary to protect water quality, runs directly contrary to this policy.

If EPA is successful in using the CWA to, in effect, prohibit the beneficial use of RTS at industrial sites, what other products or materials might EPA target in future CWA permits? The undersigned associations do not want to find out. Rather, we urge EPA to limit its CWA actions to those that are authorized by the statute. EPA should abandon this proposal.

[1] 85 Fed. Reg. 12288 (Mar. 2, 2020).

[2] All of the legal and factual claims made in this letter are supported at length by comments filed yesterday in this docket by the Pavement Coatings Technology Council and the Coke Oven Environmental Task Force.

[3] See Nat. Res. Def. Council, Inc. v. U.S. EPA, 859 F.2d 156, 170 (D.C. Cir. 1988).

[4] E.O. 13777, § 1 (82 Fed. Reg. 12285, Mar. 1, 2017).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**Coal Tar Pitch Sealant (EPA Request for Comment #2)**

Background and Current Status

The draft MSGP proposes a de-facto ban on the use of coal tar pitch sealant – requiring that any facility utilizing it apply for an individual stormwater permit. This has the impact of forcing thousands of facilities that have asphalt parking lots, storage areas, and driveways toward individual permit status simply for desiring to maintain those areas in good operating condition through normal resealing activities. The MSGP derives its legal basis from the Clean Water Act (CWA) and the CWA directs EPA to reduce the discharge of pollutants via effluent limitations or other requirements. While EPA can and does establish technology-based limitations on discharges of pollutants under the CWA, it leaves facilities free to choose the means by which they meet such limitations and the CWA legal authority to implement a product ban at a permitted facility such as is proposed is questionable at best.

In addition, it is likely that this de-facto ban would actually create other stormwater problems. Many covered facilities currently have asphalted areas to allow mechanized or manual sweepers to remove dirt and debris from high traffic areas as part of their housekeeping BMPs. Banning the use of coal tar sealant materials on asphaltic surfaces forces facilities to choose between gravel/stone or concrete as options. A gravel/stone mixture does not allow floor sweeping and would contribute to stormwater pollution in terms of TSS and prohibit BMPs that enhance stormwater discharge quality. The other option is concrete which can be expensive and may not hold up to temperature changes as well as asphalt.

Requested Action

Remove the de-facto coal-tar sealant ban from the MSGP and consider enhanced BMP implementation for its continued use, such as requiring sealant addition only during dry periods, cycles, or seasons to allow full curing before rainwater contact or the installation of grass buffer zones or carbon absorbent booms downstream of applied sealant.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 2 – NRMCA does not believe this is an appropriate addition to the MSGP. Disallowing covered discharges because the discharges originated from paved surfaces that were initially or re-sealed with coal-tar sealcoat is an unnecessary restriction, especially when so many currently paved surfaces use coal-tar sealcoat.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Coal-tar sealant eligibility. The CWA does not authorize EPA to condition eligibility under the MSGP on the use of coal-tar sealants (or any product for that matter), because such a condition effectively prohibits the use of a particular product. In addition, the mere use of a product, such as coal-tar sealants, is not, without proof of actual discharge, an activity that is related to the discharge of pollutants "associated with industrial activity" as that term is defined by EPA's regulations.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 2**

EPA's proposal to establish that facilities using CTS or refined tar sealant (RTS) are not eligible to use the MSGP violates the limits of EPA's regulatory authority under the CWA. Although industrial dischargers are not required to apply for permits under the MSGP, EPA cannot rely on the fact that theoretical alternative products exist to save this proposed product ban. Courts commonly find that facially permissive regulations or incentives are coercive in practice.[6] When an incentive amounts to a requirement, it will invoke statutory and constitutional limits on regulatory authority.

Section 301 of the CWA provides in relevant part, "Except in compliance with [the CWA], the discharge of any pollutant is unlawful."[7] The D.C. Circuit interpreted this language as a limit on EPA's regulatory authority and rejected measures that went beyond the regulation of pollutants in two cases brought by the Natural Resources Defense Counsel.[8] In 1987 the court struck down an "outright ban" on pre-permit construction of new sources.[9] Notably, the court refused to find any implicit Congressional intent to empower EPA to act beyond the narrow confines of its statutory mandate:

[A]lthough Congress full well knows how to confer the power to restrict construction pending issuance of a permit, it chose not to do so here. For example, the [Clean Water] Act includes no requirement that permit issuance or permit review proceedings precede construction, as is the case with the Clean Air Act. Neither does the Clean Water Act confer upon EPA permitting authority over the construction of facilities, as do the Atomic Energy Act and the Federal Power Act. Consequently, this is not a case in which a construction ban is clearly within the agency's jurisdiction under its organic statute. The fact that Congress has vested some agencies with such power demonstrates that when Congress wanted to extend that power, "it knew how to do so and did so expressly."[10]

The CWA authorizes EPA to require certain other actions relating to the regulation of pollution discharges, such as promulgation of effluent limitations guidelines.[11] The CWA also authorizes EPA to require control measures to comply with such non-numeric measures.[12] The MSGP directs permittees subject to technology-based effluent limits (TBELs) to establish and implement best management practices (BMPs).[13] To develop TBELs for industrial facilities, EPA can use national effluent limitations guidelines (ELGs) or, in the absence of ELGs, Best Professional Judgment (BPJ).[14]

If EPA seeks to regulate industrial stormwater discharges that come into contact with coal tar sealant, it must set TBELs at the appropriate level of control based on the pollutant that it seeks to reduce or eliminate in the stormwater discharge. EPA must base the TBELs on the level of control attainable based on currently available technology.[15] To establish effluent limitations, EPA must specify the factors to be considered in evaluating available technologies; utilize them to identify the best control technologies, measures, and practices available; and determine the degree of effluent reduction attainable using the best technology.[16]

Here, if EPA seeks to control the industrial stormwater that comes into contact with coal tar sealant, EPA must first identify the pollutant that it seeks to regulate and then set the appropriate level of control based on that pollutant. The 2016 Settlement suggests that in targeting coal tar sealants, EPA seeks to eliminate the discharge of PAHs. However, even if EPA did fully develop TBELs to control or eliminate PAHs, it cannot require the use of a specific type of control technology.[17] In other words, even if EPA sets TBELs for PAHs in the new MSGP, it cannot ban the use of coal tar sealants. The CWA would still allow the permittee to implement its own control measures to meet any TBEL for PAHs. Given the fact that certain best management practices—such as not applying coal tar sealants within twenty-four hours before a wet weather event—could reduce or eliminate of PAHs in an industrial permittee's stormwater discharges, conditioning eligibility for the MSGP on the use of coal tar sealants would be unnecessary to achieve TBELs, if promulgated. Finally, the science underlying the PAH impacts from stormwater discharges is controversial and not well-settled, and EPA has not provided sufficient data showing that such BMPs are inadequate to protect water quality.

The FWQC and FSWA oppose EPA's Part 1.1.8 proposal for its many legal, policy, cost, scientific, and product-related flaws. Some members of the FWQC and FSWA have submitted separate comprehensive comments detailing the legal, policy, cost, scientific, and product-related concerns relating to this provision specifically.

---

[6] 567 U.S. 519, 581; see also S. Dakota v. Dole, 483 U.S. 203, 211 (1987) ("in some circumstances the financial inducement [] might be so coercive as to pass the point at which 'pressure turns into compulsion.'").

[7] 33 U.S.C. § 1311(a).

[8] See Nat. Res. Def. Council, Inc. v. U.S. EPA, 859 F.2d 156, 169–170 (D.C. Cir. 1988) (citing Nat. Res. Def. Council, Inc. v. U.S. EPA, 822 F.2d 104, 129 (D.C. Cir. 1987). ("EPA's jurisdiction [under the CWA] is limited to regulating the discharge of pollutants. . . .") (emphasis added)).

[9] NRDC, 822 F.2d at 129.

[10] Id. (citations omitted).

[11] See, e.g., 33 U.S.C. § 1314(b).

[12] Id.

[13] 2015 MSGP, at p. 14.

[14] See NPDES Permit Writers' Manual, at p. 49, available at https://www3.epa.gov/npdes/pubs/chapt_05.pdf.

[15] Id.

[16] 33 U.S.C. § 1314(b).

[17] See NPDES Permit Writers' Manual, at p. 49 (explaining, "The intent of a technology-based effluent limitation is to require a minimum level of treatment for industrial/municipal point sources based on currently available treatment technologies while allowing the discharger to use any available control technique to meet the limitations.")

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposal to bar facilities using RTS from eligibility under the MSGP amounts to a de facto ban on RTS usage. This proposal is flawed for numerous legal, policy, cost, scientific, and product-related reasons. Those flaws in the EPA RTS proposal are described in detail in the appendices to these comments.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1

**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

- EPA lacks legal authority to condition permit eligibility on RTS use. The net impact of EPA's action, if finalized, would result in a de facto ban on RTS usage. EPA lacks legal authority to ban any product under the Clean Water Act (CWA)
    o EPA lacks legal authority to ban products through the CWA. While the CWA authorizes EPA to establish effluent limitations designed to meet water quality standards within a receiving body, it does not authorize the agency to impose past, present or future product-usage permit conditions, especially when it cannot quantify any water quality benefits.
    o EPA's proposal is inconsistent with its CWA authority. The CWA, through the NPDES permit program, limits the discharge of pollutants from "point sources" into waters of the United States, based upon the capabilities of the practices or technologies available to control such discharges. EPA cannot regulate an activity or "meddle in the facility." It can regulate only an existing pollutant discharge from a point source.
    o EPA's proposal is inconsistent with its own industrial stormwater permitting program. In regulating industrial stormwater through permits, EPA has followed an orderly, structured process that is guided by the structure of the CWA and EPA's own regulations. EPA's proposal to focus here on runoff of RTS from parking lots is inconsistent with that structure and with the information that EPA has collected over the course of implementing the MSGP.
    o EPA has not gone through the regulatory steps required to establish Technology-Based Effluent Limitations (TBELs) for PAHs. For technology-based controls, the CWA authorizes EPA to promulgate effluent limitations guidelines or other technology-based controls, including non-numeric measures. Historically, EPA has implemented technology-based controls through imposing "best management practices" (BMPs) in the MSGP. While EPA can establish technology-based limitations on discharges of pollutants, it must leave facilities free to choose the means by which they meet such limitations.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

- EPA must operate within its CWA authority to impose water quality-based controls. Rather than adopting the eligibility provision to address potential pollutants associated with RTS being used

at regulated industrial sites, in areas of industrial activities, EPA should rely upon its authorized powers to control pollutant discharges. Here, EPA has not attempted to promulgate WQBELs for PAHs.

- o   <u>The 2020 Proposed MSGP is inconsistent with the 2016 Settlement.</u> The 2020 Proposed MSGP language is inconsistent with the language of the 2016 Settlement, which conditions eligibility for operators who use RTS and thereby discharge PAHs. The 2020 Proposed MSGP simply conditions eligibility on the use of RTS without regard to whether or not PAHs are discharged.

- o   <u>EPA has declined to impose water quality-based controls for PAHs.</u> There is no evidence in the history of the MSGP demonstrating that EPA previously believed PAHs warranted monitoring, let alone a ban on a specific industrial practice that could involve the release of PAHs. In fact, the lack of monitoring for PAHs over the history of the MSGP is consistent with the fact that the CWA 303(d) state water quality reports rarely identify PAHs as a cause of impairment. The lack of evidence that PAHs cause widespread water quality impacts undermines EPA's basis for seeking to eliminate PAH discharges through a ban on RTS.

- o   <u>The MSGP already imposes requirements on discharges to PAH-limited waters.</u> Section 4.2.4.1 of the 2020 Proposed MSGP provides for monitoring of discharges to impaired waters without an EPA-approved or -established TMDL, as well as for discharges to impaired waters with an EPA-approved or -established TMDL. This approach represents a more nuanced and appropriate process for monitoring and addressing discharges to PAH-limited waters than the proposed eligibility requirements.

- o   <u>EPA has not established a need for water quality-based controls.</u> EPA's only possible legal basis for water quality-based controls for PAHs is establishing requirements based on a "reasonable potential" analysis with respect to attainment of state water quality standards. However, EPA has provided no such explanation, nor any supporting analysis. EPA simply assumes that regulation of RTS is necessary to reduce PAH releases, without any quantitative analysis.

- o   <u>The proposed PAH requirements are inconsistent with other NPDES actions.</u> EPA has not taken action to prohibit the use of RTS in any other permit in the NPDES program, which calls into question EPA's claim that use of RTS must be banned in the 2020 Proposed MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

- <u>RTS is not a significant source of aquatic or human toxicity.</u> PAHs in the aquatic environment are not particularly toxic to either aquatic life or humans.
  - o <u>The studies cited in the Fact Sheet do not rely on EPA's own guidance for assessing the aquatic toxicity of PAHs.</u> Because PAH-containing solids are not very bioavailable or bioaccessible, PAH concentrations have not been found to correlate with observed aquatic toxicity. In recognition of these facts, EPA developed both its ESB and TIE guidance documents so that evaluation of risks for exposures to PAHs in the aquatic environment would more closely reflect their actual toxicity. Environmental field studies of PAHs that employ EPA's recent guidance have not observed them to be toxic. Moreover, the Fact Sheet exclusively cites literature that reflects none of the scientific advances embodied in the ESB and TIE guidance. Rather, the Fact Sheet cites literature that relies on probable effect level values, without any citation to the bioavailability literature.
  - o <u>PAHs' toxicity to humans was widely overestimated until recently- a fact not recognized by the Fact Sheet.</u> The limited bioavailability of PAHs in the environment also complicates the process of assessing potential human health risks from PAH exposures. This complication is exacerbated by the tendency of human health risk assessments of PAHs to rely on outdated EPA guidance documents that were issued more than 25 years ago. The practice of estimating human health risks that could be associated with exposure to PAH-containing substances based on bioassays of animals exposed to substances in forms that do not occur outside the laboratory has been found to be unrepresentative of exposures to PAHs in the environment and to lead to unreliable predictions of toxicity.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

- <u>The proposed rule has no rational basis</u>. The weight of the best available science and evidence indicates that PAHs from RTS are not a cause of aquatic toxicity and do not pose risks to humans. Accordingly, the proposed eligibility restriction lacks any rational basis, as it would not reduce risks to human health and the environment—EPA's stated purpose for proposing the restriction.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

- Alternative products with equivalent performance and cost to RTS are not available. In its 2020 Proposed MSGP Fact Sheet, EPA contends, without supporting facts, that it has identified alternatives that are similar in product performance and cost to RTS. While there are certainly alternatives to RTS, none of them come close to RTS in terms of performance and cost. As documented below, the alternatives do not perform as well as RTS and their lifetime costs are higher.
    o RTS performs better than the alternatives. RTS lasts longer and requires less maintenance than RTS alternatives.
        ▪ Asphalt Sealants. Asphalt-based emulsions generally have life cycles of two to three years, whereas RTS will generally last four to six years.
        ▪ Acrylic Sealants. Acrylic coatings (which are often used on tennis courts) are brittle, resulting in the need to resurface courts every few years even though they are not subject to vehicle traffic.
        ▪ Permeable Pavement Products. Particulates infiltrate the pore space of permeable pavement products, leading to declining effectiveness over time and eventual complete clogging. Accordingly, permeable products are usually inappropriate for application on surfaces with vehicle traffic. Additionally, the costs of alternative permeable products at the point of application are often greater than those for RTS products, and the cost of maintenance can be much greater than maintenance of traditional pavements.
    o No alternative is cost-competitive. Sealcoating is an integral part of a preventive maintenance program that extends the useful service life of a pavement asset, and it costs considerably less than repaving or other measures that may be needed later to correct chronic or acute pavement problems. A comprehensive assessment of the costs associated with any sealcoating must include the costs incurred over the life cycle of a paved surface, which is where RTS clearly outperforms competitors.
    o Independent sources confirm that RTS is the preferred product. The cost and performance qualities discussed above are confirmed by independent sources. Those sources indicate that asphalt life-cycle is two to three years, while that for RTS is four to six years even though the cost of installation is roughly the same.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We are opposed to this eligibility requirement. Use of coal-tar sealcoat is not an activity that is unique to industry or that is directly related to industrial activity. It is not appropriate to make this a condition for eligibility under the MSGP since it is not related to industrial activity. In addition, this would result in some industrial facilities becoming ineligible for MSGP coverage, therefore requiring Individual NPDES permit coverage. For Massachusetts facilities, this would contribute to the already extensive NPDES permit backlog at EPA Region I. We suggest that this eligibility requirement be removed from the MSGP and, if appropriate, that the issue be addressed in a separate rulemaking that is not aimed solely at industry.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  44
**Excerpt Status:** Final

**Comment Excerpt:**

Section 1.1.8 would make facilities ineligible for coverage if it has stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat during coverage under the permit. We oppose this section for the following reasons:

We do not believe the MSGP is the appropriate or lawful regulatory vehicle for EPA to seek to remove an otherwise lawful product from the market. Facilities that would otherwise be able to seek permit coverage, and indeed did seek permit coverage under the 2015 MSGP, would be forced to seek individual permits.

We also question EPA's legal authority to use a stormwater permit to ban this product. EPA did not ban coal tar sealants in the 2015 MSGP and the agency does not provide sufficient explanation for the ban. This is particularly important now because use of the product would categorically deny a facility the opportunity to seek coverage under the general permit. It does not appear that EPA has seriously considered whether there are any alternative products available at reasonable cost that perform as well and lasts as long as coal-tar sealants.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Darren Bakst
**Commenter Affiliation:**  The Heritage Foundation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0254-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

**The Proposal Violates the Clean Water Act**

"[T]he Clean Water Act gives the EPA jurisdiction to regulate and control only actual discharges — not potential discharges, and certainly not point sources themselves."[10] This language from the Eight Circuit Court of Appeals decisions in *Service Oil v. EPA* nicely captures coverage of the CWA.[11]

The EPA, as it explains in the MSGP, is concerned with the discharge of polycyclic aromatic hydrocarbons (PAHs). Yet, the EPA is proposing to regulate point sources. In the proposed 2020 MSGP, the EPA explains:

*To be eligible for coverage under this permit, you must not have any stormwater discharges from paved surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located during your coverage under this permit.[12]*

This is not a regulation of the discharge of PAHs; this is the EPA trying to tell industrial facilities how to pave their surfaces.[13] The EPA would be regulating the point source, contrary to law, and trying to pick the best way for facilities to seal their pavements.

The National Pollutant Discharge Elimination System (NPDES) program utilizes two types of controls: technology-based effluent limitations and water quality-based effluent limitations.[14] This framework does not require the use of any given technology but instead expects the regulated entity to identify solutions to achieve the regulatory objectives. As explained on EPA's web site:

*EPA identifies the best available technology that is economically achievable for that industry and sets regulatory requirements based on the performance of that technology. The Effluent Guidelines do not require facilities to install the particular technology identified by EPA; however, the regulations do require facilities to achieve the regulatory standards which were developed based on a particular model technology.[15]*

The proposed MSGP would ignore this framework and allow EPA to choose how facilities comply as opposed to focusing on whether facilities comply.

[10] Service Oil, Inc. v. EPA, 590 F.3d 545 (8th Cir 2009) https://casetext.com/case/service-oil-v-us-epa (accessed June 1, 2020).

[11] Id. See also N.R.D.C. v. EPA., 859 F.2d 156, 170 (D.C. Cir. 1988) https://law.justia.com/cases/federal/appellate-courts/F2/859/156/126064/ (accessed June 1, 2020):"'EPA's jurisdiction [under the CWA] is limited to regulating the discharge of pollutants....' And, contrary to EPA's assumption, the CWA does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants." [Internal citations omitted].

[12] Proposed 2020 MSGP, 1.1.8 at p. 5, https://www.epa.gov/sites/production/files/2020-02/documents/final_proposed_2020_msgp_-_permit_parts_1-9.pdf (accessed June 1, 2020).

[13] The EPA would be regulating RTS but not regulating or claiming to be regulating the "discharge of RTS." Instead the agency is trying to regulate the discharge of PAHs through indirect means: the de facto ban on RTS.

[14] U.S. Environmental Protection Agency, "NPDES Permit Writers' Manual," September, 2010 at 1-3, https://www.epa.gov/sites/production/files/2015-09/documents/pwm_2010.pdf (accessed June 1, 2020).

[15] EPA web page entitled "Learn About Effluent Guidelines," https://www.epa.gov/eg/learn-about-effluent-guidelines#development (accessed June 1, 2020).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Darren Bakst
**Commenter Affiliation:**  The Heritage Foundation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0254-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

This proposal is extremely concerning because the agency is using a 2016 settlement agreement[3] with outside organizations as justification for the proposed exclusion while failing to properly justify the exclusion and failing to address the agency's own rejection of such an exclusion in the 2015 MSGP. Further, the agency would be using the Clean Water Act (CWA)—a water law not a product safety law—as a way to impose a de facto ban on RTS, and thereby establish a terrible precedent that could lead to banning other products. The EPA would be taking such action while

ignoring possible authority it does have to address any concerns regarding chemicals: the Toxic Substances Control Act. This proposed action is not only an extreme example of federal overreach, but it also ignores the CWA and the rule of law.

[3] MSGP 2016 Settlement Agreement, https://www.epa.gov/sites/production/files/2020-01/documents/multi-sector_general_permit_msgp_2016_settlement_agreement.pdf (accessed June 1, 2020).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Darren Bakst
**Commenter Affiliation:**  The Heritage Foundation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0254-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**The Misguided Process of Getting to the Current Proposed De Facto Ban**

The Misguided Process of Getting to the Current Proposed De Facto Ban The EPA expressly rejected a RTS exclusion for the 2015 MSGP.[4] Yet, the next year the EPA entered into a settlement agreement[5] regarding the 2015 MSGP with numerous environmental groups and intervenors that completely ignored the EPA's conclusions made the previous year. This was not a deadline suit and it did not just set a timeline for the agency to meet a mandatory duty.[6] Instead, the EPA used the settlement as a way to mandate that the agency make substantive policy decisions desired by the outside organizations.

One of these desired substantive choices was proposing to exclude RTS in the 2020 MSGP. The settlement itself was the start of this current effort to impose a de facto ban on RTS. The environmental organizations were well aware of what such an exclusion would mean. After the settlement, petitioners issued a press release boasting that the proposed sealcoat provisions "will effectively outlaw the use of dangerous coal tar sealants at thousands of covered sites."[7] This characterization is apt, unfortunately – few if any facilities would be likely to incur the costs and delays associated with obtaining an individualized NPDES permit just to be able to seal their pavement surfaces with a superior sealant.

Now, the EPA is literally required to work backwards to justify its current proposal because it is mandated to be included in the proposed 2020 MSGP. In 2015, the EPA in declining to exclude industrial facilities using RTS explained, "EPA does not have any data on the prevalence of coal tar sealcoat use at facilities covered under the MSGP, nor any data about potential water quality standards exceedances attributable to its use."[8] The 2020 MSGP does not indicate whether EPA

has such data now. If the agency still does not have this data, then it would be overlooking this critical fact that was so important to the agency in 2015. Such an about-face is arbitrary and capricious under State Farm and its progeny.[9]

[4] 2015 EPA MSGP Response to Comments, June 4, 2015 (EPA-HQ-OW-2012-0803-0135) at p. 75, https://www.regulations.gov/document?D=EPA-HQ-OW-2012-0803-0135 (accessed June 1, 2020).

[5] MSGP 2016 Settlement Agreement, https://www.epa.gov/sites/production/files/2020-01/documents/multi sector_general_permit_msgp_2016_settlement_agreement.pdf (accessed June 1, 2020).

[6] For a discussion of some of the reasons why the practice of sue-and-settle is unlawful, unwise, and unreasonable, see e.g. Hans A. von Spakovsky and Robert Gordon, "Scott Pruitt Ends an Obama Administration Abuse of Power," The Heritage Foundation Commentary, October 24, 2017, https://www.heritage.org/environment/commentary/scott-pruitt-ends-obama-administration-abuse-power (accessed June 1, 2020); Daren Bakst, "EPA Pushes Back on Practice That Environmentalist Groups Used to Dictate Agenda," The Heritage Foundation Commentary, October 18, 2017, https://www.heritage.org/government-regulation/commentary/epa-pushes-back-practice-environmentalist-groups-used-dictate (accessed June 1, 2020); and Andrew Grossman, "Regulation Through Sham Litigation: The Sue and Settle Phenomenon," The Heritage Foundation Legal Memorandum, February 25, 2014, https://www.heritage.org/crime-and-justice/report/regulation-through-sham-litigation-the-sue-and-settle-phenomenon (accessed June 1, 2020).

[7] Statement of Tiffany Schauer, Our Children's Earth Foundation, available at https://waterkeeper.org/news/u-s-epa-proposes-first-time-measures-to-restrict-the-use-of-coal-tar-sealants/ (accessed June 1, 2020).

[8] 2015 EPA MSGP Response to Comments, June 4, 2015 (EPA-HQ-OW-2012-0803-0135) at p. 75, https://www.regulations.gov/document?D=EPA-HQ-OW-2012-0803-0135 (accessed June 1, 2020).

[9] Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983), https://supreme.justia.com/cases/federal/us/463/29/ (accessed June 1, 2020).

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Darren Bakst
**Commenter Affiliation:**  The Heritage Foundation

**Document Control Number:** EPA-HQ-OW-2019-0372-0254-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Unfortunately, the past administration decided to inappropriately bind the current administration with a requirement to propose the RTS exclusion. However, the settlement agreement was limited to the proposal, and the EPA should go no further down this misguided, unprecedented, and unsupported path. I strongly urge the EPA to drop the proposed exclusion in any final rule.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

*EPA Request: Whether the permit should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located.*

Colorado supports EPA's eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located. Colorado supports this criterion because the available information on health risks and the existence of an affordable substitute (for instance, a HomeAdvisor website comparison of the costs of asphalt sealant versus coal tar sealant indicate that costs are comparable, https://www.homeadvisor.com/cost/landscape/seal-asphalt-paving/ ) mean that the public health and water quality benefits resulting from this change would significantly outweigh any costs.

*EPA Request: Any studies that provide data on the level of PAHs from coal-tar sealed pavements, the sources of measured PAHs in the aquatic environment, the levels of PAHs in fish and seafood, and associated chemical and biological impacts that may occur via stormwater discharges.*

Please see USGS Fact Sheet Coal-Tar-Based Pavement Sealcoat, Polycyclic Aromatic Hydrocarbons (PAHs), and Environmental Health, available at https://pubs.usgs.gov/fs/2011/3010/pdf/fs2011-3010.pdf .

Highlights from the fact sheet include the following:

- "Dust from pavement with coal-tar-based sealcoat has greatly elevated PAH concentrations compared to dust from unsealed pavement.
- Coal-tar-based sealcoat is the largest source of PAH contamination to 40 urban lakes studied, accounting for one-half of all PAH inputs.
- Coal-tar-based sealcoat use is the primary cause of upward trends in PAHs, since the 1960s, in urban lake sediment.
- Residences adjacent to parking lots with coal-tar-based sealcoat have PAH concentrations in house dust that are 25 times higher than those in house dust in residences adjacent to parking lots without coal-tar based sealcoat.
- PAHs move from a sealcoated surface into our environment by many mechanisms: storm runoff, adhesion to tires, wind, foot traffic, and volatilization."

*EPA Request: Whether or to what extent requiring facilities to implement specific stormwater control measures under the MSGP to control and treat PAH-laden discharges from surfaces paved with coal-tar sealcoat is an appropriate alternative to the proposed eligibility criterion, and if so, what those control measures should be.*

Colorado does not support an alternative of allowing new or resealed coal tar sealcoat with control measures. Product substitution is an affordable practice that is more protective of water quality.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

WEF suggests that EPA needs to further elaborate on this part of the proposed permit, for example, what is the maximum allowable percentage of coal-derived polycyclic aromatic hydrocarbons (PAHs) that can be in a sealant or admixture to not be defined as "coal-tar" for the purpose of this provision?

Generally, WEF supports the permit language with respect to coal-tar sealants. This may relate mostly to parking lots for industrial facilities. The data tying PAHs found in sediment that adversely affect aquatic life and are carcinogenic to coal tar sealants are compelling, not just from USGS studies but others as well. And there are equally effective sealants without the PAH content for equal cost.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

*Whether the permit should include an eligibility criterion related to the application of coal-tar sealcoat to paved areas where industrial activities are located.*

WEF supports requiring specific permitting for use of coal tar sealants that contribute PAHs to the water environment. Numerous studies summarized by USGS[1] have documented the potential impacts to human health and the environment. We request that EPA provide a specific definition for coal tar sealants – perhaps using PAH content. Industrial stormwater permits typically exclude employee/office parking since they are not an industrial activity. These are the portions of an industrial facility that typically require periodic pavement maintenance. Based on this precedent will EPA be then extending this requirement to other stormwater permits such as MS4 permits? WEF's understanding is that most pavements that may use coal tar sealants are associated with commercial land use/facilities and residential driveways.

[1] https://www.usgs.gov/centers/tx-water/science/usgs-research-pahs-and-coal-tar-based-pavement-sealcoat?qt-science_center_objects=1#qt-science_center_objects and https://pubs.usgs.gov/fs/2016/3017/fs20163017.pdf

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

*Any studies that provide data on the level of PAHs from coal-tar sealed pavements, the sources of measured PAHs in the aquatic environment, the levels of PAHs in fish and seafood, and associated chemical and biological impacts that may occur via stormwater discharges.*

Studies referenced by USGS noted above and others:

1. Correlated PAHs in sediments and aquatic organisms with coal tar sealants used in the watershed. A study conducted in by University of Wisconsin Milwaukee also found this correlation.

2. Note that the air pathway is also an identified risk for human health. As a result, several communities in southeastern Wisconsin and in other locations in the United States have banned use of coal tar sealants.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

*Whether or to what extent requiring facilities to implement specific stormwater control measures under the MSGP to control and treat PAH-laden discharges from surfaces paved with coal-tar sealcoat is an appropriate alternative to the proposed eligibility criterion, and if so, what those control measures should be. Proposed 2020 MSGP Fact Sheet*

If a separate operator permit is required for application of coal tar sealants, the operator should be required to include a control measure to prevent migration of PAHs from the site.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** National Association for Surface Finishing
**Document Control Number:** EPA-HQ-OW-2019-0372-0262-A1

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposal to make facilities that use coal-tar sealant for asphalt preparation, maintenance, and repair ineligible for coverage under the 2020 MSGP is unreasonable. Adequate maintenance and repair of asphalt surfaces is critical for efficient and effective cleanup of spills and other materials on asphalt surfaces. In addition, EPA has not adequately justified the scientific need to prohibit the use of coal-tar sealant in the draft 2020 MSGP and the potential harm resulting from stormwater discharges.

The prohibition on the use of coal-tar sealant would provide a significant disincentive to the effective maintenance and repair of asphalt surfaces. Properly maintained asphalt surfaces with the use of coal-tar sealant provide significant environmental benefits for stormwater management, including dry cleanup, good housekeeping, and spill containment and cleanup. Accordingly, NASF urges EPA to remove the proposed restriction on the use of coal-tar sealant for asphalt surfaces.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The permit should not include an eligibility criterion related to the application of coal tar. The MSGP eligibility is based on SIC code, which is adequately protective of water quality as it includes inspection, sampling, and corrective action required as part of permit compliance, as well as benchmark sampling for COD.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)

**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

As emphasized at the outset of these comments, A4A and its members take environmental protection seriously and are proud of our record of advancing environmental goals. This includes generally supporting the use of more environmentally friendly products where they can be used consistent with other imperatives, most importantly, maintaining safety of operations both in the air and on the ground. As such, we understand there is general concern regarding the use of coal-tar sealcoats ("CTS") and the Agency's desire to address that concern. We are, however, very concerned that the Agency has opted to propose using the "eligibility" mechanism to control the use of CTS, most particularly because it effectively functions to ban the use of a particular product by any person seeking a general permit. We do not believe it is within the Agency's authority under the Act to impose such a condition on MSGP eligibility[39] and – even if such authority exists – it cannot be exercised unless supported by sufficient evidence as required by the Administrative Procedures Act. Thus, as initial matters, before finalizing Proposed Part 1.1.8, the Agency must establish its legal authority under the Act to impose such a requirement and the factual basis supporting its policy choice. This is particularly important as, although this proposed provision is trained on CTS in this instance, it could be used as a model for effectively banning the use of any product the Agency targets in the future. It is therefore critically important that the Agency establish that it has unambiguous authority to establish this eligibility criterion based solely on the use of CTS.

In any event, even if the Agency is able to clear these legal hurdles, we would respectfully urge the Agency to consider using an alternative, less draconian method for controlling the use of CTS. In this context, we emphasize that, if this eligibility requirement is put in place, the ability of permittees to avail themselves of the MSGP – and for the permittees and the relevant permitting authorities to avoid the burdens of developing and administering individual permits – will hinge on whether CTS is used at a facility. We believe the burdens to permittees and permitting authorities may not be justified by the benefit of using permit eligibility as the mechanism for regulating the use of CTS. As an alternative, the Agency could require specific BMPs designed to control impacts associated with the use CTS – this would allow a permittee to opt to use CTS if necessary and deploy protective BMPs while avoiding the burdens of developing and administering an individual permit.

Most crucially, if the Agency intends to finalize this eligibility requirement, it must least include amendments to accommodate the realities many permittees face. As presently formulated, the proposed Part 1.1.8 is fundamentally flawed because it assumes an operator has control over how the paved areas are initially sealed or resealed. However, the definition of "Operator" provided in proposed MSGP Appendix A requires certain operational controls over industrial activities but not physical control over the premises at which those industrial activities occur.[40] In the airport context, it is not uncommon for tenants (such as airlines) to conduct operations that trigger the requirement to obtain a NPDES permit on premises that are physically controlled by parties that do not require such a permit. For example, an airline may sublease premises from a party that has

itself subleased those premises from an airport pursuant to a ground lease. Such ground lease sublessors can have physical control over the premises and be legally responsible for its maintenance, but do not conduct "industrial activities" triggering a requirement to seek coverage under the MSGP. Thus, although the holder of the ground lease may control (among other things) whether CTS is used to seal surfaces on the premises, because it is not required to obtain coverage under the MSGP, it will not be constrained by any eligibility requirement seeking to restrict the use of CTS.

Accordingly, we respectfully request, should the Agency seek to finalize Proposed Part 1.1.8, that – at a minimum – the language is amended to read (proposed added language underlined): "To be eligible for coverage under this permit, you must not have any discharges from paved surfaces over which you have physical control and the legal right to control the use of coal-tar sealcoat on those surfaces that will be initially sealed or re-sealed with coal-tar sealcoat where industrial activities are located during your coverage under this permit."

[39] We understand as proposed, Part 1.1.8 the Agency "may" allow a permittee to obtain a general permit even where the permittee uses CTS if the permittee "eliminate[s]" "discharges associated from paved surfaces that will be initially sealed or re-sealed with [CTS] where industrial activities are located." First, this is an unreasonable formulation as it contemplates that even if all such discharges were eliminated, EPA may still require the permittee to obtain an individual permit. There is certainly no justification for requiring an individual permit where any potential discharge (and thus any potential environmental concern) has been eliminated. Denying coverage under these circumstances seems the very definition of arbitrary and capricious. In addition, it is unreasonable to require the elimination of any discharge as the condition for (potentially) obtaining coverage. This (as the Agency likely understands) is a practical impossibility in many instances.

[40] The Definition reads: "Operator – any entity with a stormwater discharge associated with industrial activity that meets either of the following two criteria:

1. The entity has operational control over industrial activities, including the ability to make modifications to those activities; or
2. The entity has day-to-day operational control of activities at a facility necessary to ensure compliance with the permit (e.g., the entity is authorized to direct workers at a facility to carry out activities required by the permit)."

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

### 1.1.8.RFC3. Eligibility Conditions - RFC3 Cationic treatment chemicals

**Commenter Name:**  Joel Van Ornum
**Commenter Affiliation:**  Dungeness Environmental Solutions, Inc. (DESI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0093-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA's Construction General Permit (CGP) defines cationic treatment chemicals as follows:

*"Cationic Treatment Chemical" are defined as polymers, flocculants, or other chemicals that contain an overall positive charge. Among other things, they are used to reduce turbidity in stormwater discharges by chemically bonding to the overall negative charge of suspended silts and other soil materials and causing them to bind together and settle out. Common examples of cationic treatment chemicals are chitosan and cationic PAM.*

The EPA, under the CPG and under the Proposed MSGP, restricts the use of all cationic polymers, and requires or proposes to require special authorization and to restrictive eligibility requirements for operators implementing treatment protocols using cationic polymers. **We recommend that this definition be narrowed to include only those cationic polymers that are known to present a risk to water quality or that contain constituents that are known to be toxic as documented and confirmed by peer-reviewed studies.**

Section 8.H.4.1.8 of the Proposed 2020 MSGP Draft restricts the use of all cationic treatment chemistries:

*If you plan to use cationic treatment chemicals (as defined in Appendix A), you are ineligible for coverage under this permit, unless you notify your applicable EPA Regional Office in advance and the EPA Regional Office authorizes coverage under this permit after you have included appropriate controls and implementation procedures designed to ensure that your use of cationic treatment chemicals will not lead to a violation of water quality standards.*

We acknowledge that certain cationic polymers can be toxic to aquatic life, and that their (improper) use may result in exceedances of water quality standards. In those cases, restricting their application and establishing eligibility requirements for operators is both necessary and appropriate. That said, not all cationic polymers are alike, and not all are toxic to aquatic resources, either inherently, or when applied in the environment in the presence of whole effluent.

Universally imposing such restrictions on a wide-ranging class of chemicals, the only common characteristic of which is their cationic charge, impedes the beneficial use of select cationic chemicals that present no greater danger than similar, anionic chemical additives. For example, as the test reports described below show, the aquatic toxicity of ChitoVan® (chitosan acetate) to be 5 to 10 times lower than the toxicity of anionic polyacrylamide (PAM).

In a study to determine the toxicity of an oil-based anionic PAM emulsion to five species commonly used for freshwater toxicity testing[1], acute toxicity was observed in four of the five species at concentrations less than the 10 mg/L dose rate that is typically specified as a standard BMP for erosion control using PAM. Toxicity only partially decreased after passage of the treated runoff water across an adjacent field, which suggests that potentially toxic chemicals are released to the environment downstream when this BMP is employed.

A 2009 study using chitosan acetate and conducted by an independent 3rd party accredited laboratory determined the toxicity levels for a 1% solution of the cationic polymer, chitosan acetate, to be as follows:

| Toxicity Testing to Determine the Most Sensitive Response to 1% Chitosan Acetate[1] | | | | | |
|---|---|---|---|---|---|
| **Test** | **Endpoint** | **mg/L of 1% Chitosan Acetate Solution** | | **mg/L of Active Chitosan Acetate Polymer in 1% Solution** | |
| | | $EC_{50}$ | $EC_{25}$ | $EC_{50}$ | $EC_{25}$ |
| *Daphnia pulex* (acute) | 48-hr survival | >10,000 | > 10,000 | >100 | >100 |
| Rainbow Trout (acute) | 96-hr survival | 177 | 156 | 1.77 | 1.56 |
| Fathead Minnow (acute) | 96-hr survival | 909 | 723 | 9.09 | 7.23 |
| Rainbow Trout (7-day survival & growth) | survival | 287 | 228 | 2.87 | 2.28 |
| | weight | > 250 | 249 | > 2.5 | 2.49 |
| Fathead Minnow (7-day survival & growth) | survival | 797.5 | 596.8 | 7.98 | 5.97 |
| | weight | > 1000 | > 1000 | > 10 | > 10 |
| Rainbow Trout (embryo) | viability | > 1000 | > 1000 | > 10 | > 10 |
| Fathead Minnow (embryo-larval) | survival | 633.4 | 519.7 | 6.33 | 5.20 |
| | development | 639.3 | 526.4 | 6.39 | 5.26 |
| Topsmelt (7-day) | survival | > 1000 | > 1000 | > 10 | > 10 |
| | weight | > 1000 | > 1000 | > 10 | > 10 |
| Mysid (7-day) | survival | > 1000 | 300 | > 10 | 3 |
| | weight | 366 | 85 | 3.66 | 0.85 |
| Bivalve (embryo) | survival | > 1000 | > 1000 | > 10 | > 10 |
| | development | > 1000 | > 1000 | > 10 | > 10 |

[1] Tests performed by Nautilus Environmental Washington Laboratory, August 6, 2009.

The typical dose rate for chitosan acetate treatment is 1 mg/L based on the solid chitosan polymer content. This is lower than both the LC-50 and the NOEC for these species, and provides a larger factor of safety than does the application of anionic polyacrylamide. Nevertheless, the proposed changes to the draft MSGP restrict the application of cationic chitosan polymers, but allow the use of more toxic anion polymers, such as PAM. (See also, CHITOSAN – A UNIQUE TREATMENT POLYMER UNLIKE THE SYNTHETICS, below, for additional information.

A 2008 study conducted by an independent third party accredited laboratory determined the toxicity levels for the cationic polymer, chitosan lactate, to be as follows:

| Chitosan Lactate Toxicity Results[1] | | | | |
|---|---|---|---|---|
| Sample Type | Species | Test Type | EC50 *mg/L* | EC25 *mg/L* |
| ChitoVan Lactate | Fathead Minnow[2] | 7-day chronic | 23.4 (survival) | 17.4 (biomass) |
| ChitoVan Lactate | Rainbow Trout | 7 -day chronic | >30 (survival) | 24.2 (biomass) |
| ChitoVan Lactate | Daphnia Pulex | Acute | 353 (survival) | 138 (survival) |

1 - Tests performed by: AMEC Earth and Environmental Laboratory. Results are shown in mg/L of Active Chitosan Lactate polymer.

**Again, we recommend that the definition of cationic treatment chemicals as applied to the proposed MSGP be narrowed to include only those cationic polymers that are known to present a risk to water quality or that contain constituents that are known to be toxic as documented and confirmed by peer-reviewed studies.**

1 (Hyalella azteca (Saussure), Chironomus dilutus (Shobanov et al.), Ceriodaphnia dubia (Richard), Pimephales promelas (Rafrnesque), and Selenastrum capricornutum (Printz)

**Comment Response:**

EPA is not finalizing the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. Among other things, cationic treatment chemicals are used to reduce turbidity in stormwater discharges by chemically bonding to the overall negative charge of suspended solids and other soil materials and causing them to bind together and settle out. As noted in the Proposed MSGP Fact Sheet, the EPA's Construction General Permit includes an eligibility criterion for operators who plan to add "cationic treatment chemicals" to stormwater and/or authorized non-stormwater prior to discharge. Most stormwater discharges from industrial activities covered under the 2021 MSGP are unlikely to have the same soil erosion potential as could be associated with construction activities. The prevalence of use of cationic treatment chemicals in the industrial stormwater context is less clear and so without further data, EPA is unable to determine the potential benefits and costs of such a requirement.

EPA notes that Part 2.1.2.5 of the 2021 MSGP requires that if operators use polymers and/or other chemical treatments as part of their controls, they must identify the polymers and/or chemicals used and the purpose in their SWPPP. Also, if it is determined that the stormwater discharges are not controlled as necessary such that the receiving water of the United States will not meet water quality standards, then EPA may require the operator to apply for an individual permit.

In addition, consistent with the 2015 MSGP, the 2021 MSGP will retain requirements for cationic treatment chemical use in Parts 8.G.4.1.8, 8.H.4.1.8, and 8.J.4.1.8 for earth-disturbing activities conducting prior to active mining activities.

EPA declines to narrow the definition of cationic treatment chemicals in the 2021 MSGP at this time. There is an ample record from the 2012 CGP supporting cationic chemical requirements

and EPA has determined that it is appropriate to include the same requirements for pre-active mining earth disturbances. The 2012 EPA CGP Fact Sheet, Part VI.2.4 Use of Cationic Treatment Chemicals, describes the basis for this restriction. The carefully controlled use of cationic treatment chemicals can provide a useful tool for reducing turbidity. EPA has found multiple cases of operators using these chemicals in a haphazard, uncontrolled manner that has resulted in fish kills.

The requirements in Parts 8.G.4.1.8, 8.H.4.1.8, and 8.J.4.1.8 requiring operators to prepare a plan for use of these chemicals has been retained. EPA expects that any mine that uses cationic chemicals will either already have a plan in place or be able to write up their proposed use quickly. EPA's experience since 2012 with this provision in the CGP and under the 2015 MSGP has been that all operators have been able to obtain permit coverage and continue their operations without delay.

---

**Commenter Name:** Joel Van Ornum
**Commenter Affiliation:** Dungeness Environmental Solutions, Inc. (DESI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0093-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

## CHITOSAN – A UNIQUE TREATMENT POLYMER UNLIKE THE SYNTHETICS

Chitosan is a polysaccharide polymer with unique properties. Unlike synthetic polymers, it has no electronic charge and is non-toxic to aquatic species, humans, or the environment in general. Chitosan behaves as a cationic flocculent only when it is dissolved in dilute organic acids, such as acetic acid or lactic acid at pH concentrations below 6.5. When the pH is above 6.5, or when cationic chitosan is mixed with whole effluent (dirty water), the cationic charge is neutralized and the chitosan is again rendered insoluble. Insoluble chitosan does not exhibit an ionic charge, and is therefore non-toxic to even the most sensitive aquatic species. It is important to understand that chitosan itself is non-toxic to aquatic species, and that it is only at pH concentrations below 6.5 that chitosan exists in a cationic state. Further, it exists in a cationic state only transiently; as soon as cationic chitosan reacts with suspended particles or dissolved metals, it loses its cationic charge and once again becomes inert.

To summarize**, chitosan is unlike all other cationic polymers, in that the chitosan polymer is insoluble and without ionic charge at pH values above 6.5** (that is, higher than the lower pH limit for discharges made directly to the aquatic environment). **Without ionic charge, the polymer is non-toxic to aquatic organisms**. Even at pH's below 6.5, when the chitosan polymer has a positive charge; **the charge is quickly neutralized in the presence of suspended particles or dissolved metals in the process of forming flocked solids – thus rendering the polymer harmless once again**.

2021 EPA MSGP Response to Comments
January 15, 2021

Testing using Chitosan Lactate to determine its potential toxicity to Rainbow Trout showed an LC-50 of 30 mg/L in clean water (turbidity = 0 NTU); however, the LC-50 in water with a turbidity of 500 NTU was 110 mg/L (see Figure 1, below). The typical dose rate of chitosan required to remediate wastewater with a turbidity of 500 NTU is approximately 1 mg/L – yielding a safety factor of two orders of magnitude. Further, once a chitosan molecule uncoils and reacts with a suspended solid in the water column, it loses its charge and is, again, rendered harmless.



Figure 1

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Joel Van Ornum
**Commenter Affiliation:**  Dungeness Environmental Solutions, Inc. (DESI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0093-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**CONCLUSION**

 We object to the terms in the proposed MSGP to restrict the general use of all cationic water treatment chemicals, without discriminating between those cationic chemicals that are not toxic to the environment and those that are toxic. There is no such distinction offered for the general use of anionic water treatment chemicals, many of which are more toxic to the environment than

are certain cationic polymers. Chitosan does not have a cationic charge until it is dissolved in dilute organic acid at pH levels 6.5 and lower. For the reasons delineated above, the various forms of natural chitosan polymers should not be included within the same class as synthetic cationic polymers, which exhibit significantly different characteristics.

**We recommend that the definition of cationic chemicals that require more restrictive controls under the proposed MSGP be narrowed to include only those cationic polymers that are known to present a risk to water quality, or that contain constituents that are known to be toxic as documented and confirmed by peer-reviewed studies. Chitosan should not be included in that class.**

We recommend that consistent standards be included in the MSGP that clearly define required toxicity standards, regardless of the ionic characteristics of a given treatment chemical, and that clearly define the testing require to demonstrate that such treatment chemicals meet the standards established.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Joshua Wheatley
**Commenter Affiliation:**  James Environmental Management (JEM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

The eligibility criterion is a logical step in the process with the one caveat that the EPA must maintain an approved list where the chemicals have been scientifically evaluated. As long as the cationic treatment chemicals do not contribute deteriorating water quality parameters, adding additional eligibility is unnecessary and burdensome upon facilities seeking to comply with the permit.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Add eligibility criteria for operators who use or add "Cationic treatment chemicals" to stormwater prior to discharge.

Discussion/Recommendations

Treatment chemicals may be used for stormwater in the form of cationic chemicals or anionic materials with the target pollutants ranging from turbidity to metals. These types of Best Management Practices (BMPs) have been available and marketed for years. EPA should allow treatment chemical usage as an accepted BMP without notification. The language in Section 2.1.2.5 is sufficient and doesn't introduce "cationic". However, it is only for "Erosion and Sediment Controls". Suggest repeating the below sentence in Section 2.1.1.8 to allow its use as a BMP:

*If you use polymers and/or other chemical treatments as part of your controls, you must identify the polymers and/or chemicals used and the purpose in your SWPPP.*

If EPA still believes a notification is necessary to protect impaired waters, then an operator should only be required to notify for approval when a treatment chemical contains a substance that is impaired in the receiving water.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet does not agree with the proposed requirement to seek approval for the use of cationic polymers. In very rare circumstances, facilities may need to enhance stormwater treatment with

the use of a cationic polymer. In those instances, EPA should not require approval or design approval for applications as this may inhibit or stop this potential treatment option and asking facilities to comply with certain benchmarks and then creating barriers to that compliance is self-defeating. Howmet feels this is not necessary because the polymer is expensive, and it is beneficial to the facility doing the treatment to optimize the polymer use to reduce cost and still reduce meet benchmarks. EPA has not demonstrated that the use of polymer is excessive nor is it impacting the environment to the point that it needs review and approval prior to use.

*Recommendation*

Howmet requests that the review and authorization by EPA of cationic polymers be removed to allow facilities the full complement of treatment options that are efficient and cost effective.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

DWQ believes it is appropriate for permitted industrial sites to follow the same requirements as permitted construction sites when adding cationic treatment chemicals to stormwater.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI does not support EPA's suggestion to include in the 2020 MSGP an eligibility criterion for use of cationic treatment chemicals (CTCs). This 2020 MSGP eligibility criterion would require a permittee or applicant to provide prior notification to and to receive approval from the applicable EPA Regional Office for use of CTCs for stormwater management purposes. As with other provisions in the Proposed 2020 MSGP, this provision is predicated an assumed equivalency between the Construction General Permit[3] (CGP) and the MSGP.

Equivalency between the CGP and MSGP does not exist. One reason is that the CGP is temporary while the MSGP effectively applies indefinitely. In the case of stormwater management under the CGP, CTCs are used to control the level of total suspended solids (TSS) and/or turbidity in stormwater discharges. These are the main, if not only, parameters that require analytical monitoring under the CGP. The CGP's definition of CTC includes chitosan and cationic polyacrylamide (PAM) as examples of "polymers, flocculants, or other chemicals that contain an overall positive charge".

Certain chitosan formulations have been approved for treatment of turbidity at permitted construction sites. Chitosan has also been reportedly used at some industrial facilities in enhanced sand-filtration systems. To the extent that use of chitosan and other CTCs under the 2020 MSGP would only become necessary for facilities that reach AIM Tier 2 or Tier 3, there is no reason to require prior notification and approval of CTC use as a condition of 2020 MSGP eligibility. Any oversight or approval of use of CTCs could be engaged as part of the AIM process.

The proposed CTC eligibility criterion should not be adopted as part of the 2020 MSGP.

[3] National Pollutant Discharge Elimination System General Permit for Discharges from Construction Activities (as modified). Available at https://www.epa.gov/npdes/epas-2017-construction-general-permit-cgp-and-related-documents. Viewed April 24, 2020.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Eligibility – Construction General Permit:  Stormwater discharges for certain construction activities are covered by Construction General Permits ("CGP").  EPA seeks to add the CGP eligibility requirement to the MSGP for operators who use cationic treatment.  NAIMA opposes combination of the two permits largely because EPA has not given any justification why such a combination would be useful or beneficial.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP.  See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Moustafa Aboushabana
**Commenter Affiliation:**  Dober Chemical Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0218-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Before comments and recommendations are made it is important to address some of the facts that surround the chemical, Chitosan which is considered to be Cationic Chemical and would be subjected to notification to the applicable EPA Regional Office prior to use. Yet however, water treated with chitosan has never exhibited toxicity. Chitosan is seen as an effective coagulation/flocculation agent with low dosage rates, typically 0.3 to 3 mg/L. In addition, chitosan itself is removed with sediment in the treatment process. Regarding the most sensitive species, chitosan acetate, the residual chitosan concentration is < 0.10 mg/L. The toxicity threshold is 1.21 mg/L. The safety factor for chitosan is >12.1; EPA considers safety factors >3 to be adequate.

Regarding chitosan lactate, residual chitosan concentration is 4.8 mg/L with a safety factor of 48. Biodegradation rate is 5% per day. This indicates that in 20 days' time, the chitosan will have completely biodegraded into carbon dioxide and water. A simple field test can be used to measure and detect down to 100 ug/L in treated water.

Additional benefit to using chitosan is that it is manufactured from seafood waste. It provides a pathway for efficient recycling of a huge amount of waste. Every year there is approximately 4.7 billion pounds of seafood in the US from domestic and international sources. About 40% - 47% of this amount ends up as waste.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

**Commenter Name:** Moustafa Aboushabana
**Commenter Affiliation:** Dober Chemical Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0218-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

1. **Cationic Treatment Chemicals Should Be Afforded the Same Treatment As Other Treatment Chemicals Used Within the Requirements of s. 2.2.13, subsections a-f, or, in the Alternative, All Chemical Additives Should Be Required to Make the Demonstrations Required of Cationic Chemicals in s. 1.1.9.**

Under the proposed MSGP, sites utilizing cationic chemical additives are not eligible for coverage under the MSGP unless and until they notify the applicable EPA Regional Office in advance, and the EPA Regional Office authorizes coverage under the permit. In addition, the operator must ensure that the use of cationic treatment chemicals will not lead to discharges that cause an exceedance of water quality standards. In the 2012 Construction General Permit Fact Sheet (2012 Fact Sheet), the EPA discusses its concerns with the use of cationic chemicals and cites several instances in which cationic chemicals demonstrated increased toxicity when compared to anionic chemicals.

By imposing this on an entire category of chemicals which displays only a cationic charge in common, this imposes a burden on a number of cationic chemicals which, when used properly in accordance with the procedures outlined in 2.2.13, pose no greater toxicity threat to aquatic resources than anionic chemical additives. As a category, cationic chemicals can contain a variety of chemical species with different chemical functionalities that results in different levels of aquatic toxicity. For example, chitosan acetate is a cationic chemical whose cationic charge is attributed to protonated primary amines, and not to quaternary ammonium salts. When compared to numerous anionic polyacrylamide (aPAM) emulsions currently used for dust, erosion and sediment control, the cationic chitosan solution can be 5 to 10x lower in aquatic toxicity.

In a recent study, for example, an anionic PAM emulsion was "…evaluated for acute and/or chronic toxicity to five species commonly used for freshwater toxicity testing (*Hyalella azteca* (Saussure), *Chironomus dilutus* (Shobanov et al.), *Ceriodaphnia dubia* (Richard), *Pimephales promelas* (Rafinesque), and *Selenastrum capricornutum* (Printz)). **When applied as an oil-based product, acute toxicity was seen to four of the five species at concentrations less than the 10 mg/L that is often used for erosion control**. Toxicity was diminished, but still remained, after passage of the irrigation water across an agricultural field, indicating a potential impact to nearby surface waters." (emphasis added)[1]

In comparison, a recent study by Nautilus Environmental, LLC (performed in 2004, and revised in 2008) quantified the toxicities for a cationic chitosan solution (HaloKlear LiquiFloc 1%) as:

LC50                NOEC

| | | |
|---|---|---|
| Rainbow Trout | 173 mg/L | 125 mg/L |
| Fathead Minnow | 642 mg/L | 500 mg/L |
| Daphnia Pulex | 1369 mg/L | 1000 mg/L |

These data show that the toxicity of the cationic chitosan solution is orders of magnitude less toxic than the anionic PAM, and yet under the language of the CGP the PAM need not be evaluated for its toxicity prior to use.

Similarly, by allowing coverage under the CGP for use of PAM without additional evaluation, the CGP fails to address the potential for harmful acrylamide monomer (ACR) as a residual of PAM use. For example, using the assumption that aPAMs are following the acrylamide monomer maximum concentration in PAM products of 0.05%, total aPAM doses of 4,166 and 8,333 mg/L could potentially contain 2.08 to 4.17 mg/L respectively of acrylamide monomer (AMD). The drinking water maximum of 1 mg/L equates to ACR dose of 0.5 µg/L (0.5 parts per billion).

The Department of Health and Human Services has closely examined the role that AMD may play pose to human health:

"As required by the 1974 Safe Drinking Water Act, EPA developed a maximum contaminant level (MCL) for acrylamide, which specifies the concentration at which it is not expected to cause health problems. **The MCL for acrylamide is zero** (EPA 2006c). EPA requires water suppliers to control the amount of acrylamide added to water during the treatment process. This can be accomplished by limiting the amount of acrylamide in the polyacrylamide flocculants or by limiting the dose of flocculants (WHO 2003). **Uncoagulated acrylamide in drinking water must be <0.5 µg/L (ppb)** (Cavalli et al. 2004; EPA 2006c). This concentration corresponds to a maximum authorized dose of polymer of 1 mg/L (for a monomer content of 0.05%), as this corresponds to 0.5 µg/L of monomer in the water (Cavalli et al. 2004; WHO 2003)." (*emphasis added*).[2]

Since AMD does not bind to soil when released to land, and moves rapidly through the soil column, this residual from PAM use should be examined closely.[3]

This bias toward anionic chemicals and against cationic chemicals should be corrected. By categorically subjecting cationic chemicals to additional approvals when used under the CGP, the EPA is dis-incentivizing its use. This not only discourages the use of innovative technologies, but also potentially promotes the use of compounds (e.g., PAM solutions) that could produce even higher aquatic toxicity. This bias should be addressed by:

- Removing the additional requirements for approvals of "cationic treatment chemicals" and allow them to be treated the same as any other "treatment chemicals" included under the general provisions or
- If toxicity is the concern, requiring that all treatment chemicals undergo the same approval process that applies to cationic chemicals

[1] Weston, D.P., Lentz, D.R., Cahn, M.D., Ogle, R.S., Rothert, A.K., and M.J. Lydy, 2009. *Toxicity of Anionic Polyacrylamide Formulations when used for Erosion Control in Agriculture.* J Environ Qual 38:238–247.

[2] "Toxicological Profile for Acrylamide", U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, December 2012 at page 196. See https://www.atsdr.cdc.gov/toxprofiles/tp203.pdf

[3] Id. at 197.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Moustafa Aboushabana
**Commenter Affiliation:**  Dober Chemical Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0218-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**II. Streamline and Standardize the Approval Process for Cationic Treatment Chemicals.**

In the event the bias against using cationic treatment chemicals remains in the final 2020 MSGP, the EPA should streamline this process so that prior approvals of cationic chemical use can be applied to other sites.

This approach would not only promote the use of innovative new approaches to sedimentation, but would also reduce EPA workload in reviewing requests that had already been reviewed by qualified EPA staff. The approval for subsequent sites could be conditioned upon the operator offering the same level of control at each site, and upon certain crucial assumptions remaining consistent for each site. Operators could submit the approval, along with a certification that the assumptions and controls remain the same, along with the NOI. For example, flocculants dosed under a documented NOEC level should be automatically allowed without additional approvals by EPA regional staff.

To ensure the controls are sufficient, the approval could also be conditioned upon demonstrating that residual levels remain low enough to pose no toxicity threat. For example, chitosan is readily detected in effluent from treated systems using a residual chitosan test. The detection limits in currently-available kits range from 0.1 to 0.2 mg/L, well below the levels which would pose a concern for aquatic toxicity.[4] Pairing an approved dose level under the NOEC with an acceptable

test to confirm the controls and assumptions were appropriate should provide sufficient assurance that use of a cationic water treatment chemical such as chitosan does not pose a threat to aquatic toxicity. This would help to streamline the approval process, and promote the use of an effective water treatment additive that can be proven to be non-toxic. Site-specific approvals should only be required if dose exceeds an NOEC.

[4] Note: The states of California and Washington currently require the use of 3rd party validated kits when utilizing chitosan. Anionic polyacrylamides are not allowed for sediment control in either state because of the absence of field residual test methods. If EPA allows the use of PAM, it should also require operators to send treated water to a third party certified lab capable of measuring for residual PAM. In the absence of this testing, coverage under the CGP should be revoked for sites using polyacrylamides.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1. However, consistent with the 2015 MSGP, Parts 8.G.4.1.8, 8.H.4.1.8, and 8.J.4.1.8 of the 2021 MSGP include the requirement for operators in Sectors G, H, and J that plan to use cationic treatment chemicals are ineligible for coverage under the 2021 MSGP unless the operator notifies the applicable EPA Regional Office in advance and the EPA Regional Office authorizes coverage under the permit after the operator has included appropriate controls and implementation procedures designed to ensure that the use of cationic treatment chemicals will not lead to a violation of water quality standards. The notification and approval is required with each MSGP cycle. EPA's experience since 2012 with this provision in the CGP and under the 2015 MSGP has been that all operators have been able to obtain permit coverage and continue their operations without delay.

**Commenter Name:**  Moustafa Aboushabana
**Commenter Affiliation:**  Dober Chemical Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0218-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**III. The Definition of "Cationic Treatment Chemicals" Should Be More Narrowly Tailored to Reflect Only Those Chemicals That Pose a Concern About Toxicity**

Currently, the MSGP treats all cationic treatment chemicals with the same brush, based on a single, shared characteristic: a cationic charge. However, the specific chemical species that contributes to this cationic charge may or may not be responsible for aquatic toxicity. Since the

purpose of the MSGP is to protect water quality, only chemicals which present a risk to water quality should be singled out for additional approvals. To accomplish this, the definition of cationic treatment chemicals in 1.1.9 should be limited only to those cationic chemicals with known toxicity, or which contain chemical species with known toxicity impacts, as documented and supported by peer-reviewed research.

The goal of the NPDES permitting program is to restore and maintain the health of the nation's waters. As the NPDES program matures, there is an increased understanding about the harmful impacts that soil – and the nutrients that adhere to those particles – can have on waterbodies. When used properly, cationic chemical treatment additives are a powerful weapon in the arsenal of operators seeking to treat discharges from industrial sites and can offer a less toxic alternative to anionic chemicals. The MSGP should be modified to remove the bias against these less toxic chemicals and provide a streamlined path toward allowing the use of these innovative new treatment practices.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Excerpt Number 1.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

It makes sense to have similar requirements for specific pollutants notifications for all types of stormwater discharge permits. It should be simple to submit a Change NOI for these types of notifications, if usage of these chemicals was unforeseen at the time of permit application.

**Comment Response:**

Modifications to or finalization of other permits and their conditions is outside the scope of this permit. EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Tidal Vision (TV) USA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0221-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Facilities covered under the Multi Sector Industrial General Permit (MSGP) require a broader array of treatment solutions because of the broader array of various types of pollutants. Particulate sediment pollution is commonly associated with Construction General Permits (CGP) sites. However, facilities under the MSGP can also have particulate sediment or other Total Suspended Sediment (TSS) pollutants. Soluble pollutants or pollutants require a higher degree of treatment to included, but not limited to **separation technologies** (sand, cartridge, bag or membrane filtration), **adsorptive technologies** (Activated carbon, peat, green sand, etc.), **ion exchange technologies** (anionic or cationic exchange resins, etc.), **oxidation technologies** (permanganates, Ozone, Peroxides, etc.), **biological pretreatment** (bacteria & enzymes) even **disinfection technologies** (UV, Ozone, chlorine, etc..). These more advanced treatments require coagulation & flocculation to reduce system loading/fouling. Anionic polyacrylamides typical of the construction approved variety will "blind or foul" most advanced treatment systems. Limiting the flocculant technology allowed is counter intuitive to the use of more advanced treatment technologies. Chitosan Enhanced Sand Filtration (CESF) and Active Treatment Systems (ATS) used routinely in WA, OR, CA in the construction industry has easily transitioned into the MSGP site stormwater treatment and often times provides much higher water quality than from advanced treatment that does not utilize flocculants. CESF/ATS systems are proven technologies, treating average 25-75 billion gal of stormwater annually in North America alone. Typical turbidity from flocculant aided filtration is <10 NTUs.

Flocculant aided filtration can remove insoluble metals such as iron. Secondary & tertiary treatments can have significantly longer run cycles or bed volume throughput with low influent turbidity. Compliance with the Clean Water Act and Federal, State and watershed water quality objectives is the core purpose of the permit. Restrictive rules that discourage the use of advanced technologies, including coagulants and flocculants should not be included in this or any other permit.

A significant portion of municipal wastewater facilities use cationic metal-based coagulants (ex. Ferric chloride, aluminum sulfate, Polyaluminum chloride, etc..) in conjunction with flocculants (both cationic: polyDADMAC, polyamines, cationic PAMs as well as non-ionic and anionic PAMs). Globally, chitosan is also used because of its superior filterability comparative to synthetic flocculants. Without these precious "tools-of-the-trade", regulatory compliance would be near to impossible and drastically more expensive to operate. Multi-sector facilities require similar tools in order to meet their compliance objectives.

Chitosan acetate solutions typically have No Observed Effect Concentration (NOEC) of 100 mg/L or greater and most chitosan manufacturers/suppliers sell field Residual Test Kits which can detect residual polymer at 0.2 mg active chitosan (20mg) of 1% solution. Users of chitosan treatment systems can know for sure, real time, that they are not discharging any level of polymer that would approach aquatic toxicity concerns, a greater than 5x safety factor. Compare that with some anionic PAM applications as documented in the FL Designers and Reviewers

manual {page AIII-11, Florida Designers & Reviewers Manual, July 2013 version}, of aPAM being used at calculated 217.6 mg/L dose with IC25 for ceriodaphnia dubia of those products Product A at 99.8 mg/L (survival), 58.2 mg/L reproduction & Product B 257.3 mg/L (survival), 91.6 mg/L (reproduction). No field residual test exists for aPAM treatment. It is counter intuitive to only want to restrict or heavily regulate certain manufacturers/distributors/users that have multi-phase safety measures built into their use protocols, yet allow other manufacturers/distributors/users to have no restriction on use and no guarantees on performance.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Tidal Vision (TV) USA
**Document Control Number:** EPA-HQ-OW-2019-0372-0221-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Section 2.1.3 identifies specific effluent limits by industry. "Runoff from phosphate fertilizer manufacturing facilities that comes into contact with any raw materials, finished product, by-products or waste products (SIC 2874)" 40 CFR, Part 418, Subpart A requires Total phosphorous (as P) maximum 1 day discharge of 105 mg/L with 30 day average not to exceed 35 mg/L. Additionally, TSS daily maximum is 150 mg/L with 30 day average not to exceed 50 mg/L.

Industry BMP is use of vegetative buffers and wetland Total P uptake, but numerous facilities struggle with compliance due to seasonal variations in uptake capabilities. At times, cationic mineral precipitation of orthophosphates and flocculation (either cationic, anionic or combinations thereof) of particulate bound or polyphosphates is economically viable option with treated water filtered for particulate removal prior to discharge. This proactive approach by facilities would be discouraged under proposed rule. Any similar treatment application already has site specific designs, submittals & approval process. Adding additional forms is unnecessary and detrimental in effort of facility regulatory compliance.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

**Commenter Name:** No Name
**Commenter Affiliation:** Tidal Vision (TV) USA
**Document Control Number:** EPA-HQ-OW-2019-0372-0221-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

"Runoff from material storage piles at cement manufacturing facilities" 40 CFR, Part 411, Subpart C, 411.32 **Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available**

TSS        Not to exceed 50 mg/L

pH         Within the range 6.0 to 9.0

Stormwater runoff of stock piles can often exceed 9.0 threshold. Storage and pH adjustment prior to discharge is established norm, however, excess alkali material suspended in runoff can cause extreme limitations to pH & TSS reduction. Numerous cement and ready mix concrete facilities in state permitted territories have found flocculation and separation of suspended alkali material prior to acid injection reduced required acid content > 10x some as much as 40x. Low cationic charged polymers performed the best at settling suspended alkali material and still allowed for site water to also be used in production plant if necessary. Individual site polymer or pH adjuster usage is already reviewed and approved as part of SWPPP program. Additional paperwork only adds to submittal and review documents and delays reviewer's approval process.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

It is NACoal's experience that cationic polymers outperform other polymers in the regions we operate. If the goal is to reduce benchmark pollutants, including TSS, cationic polymers may be the best available flocculant available. Not all cationic polymers are toxic to aquatic resources

and some type of product specific evidence should be provided before a wholesale restriction of a proven product is banned.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

For certain industrial sectors, such as Sectors D, E, and J, this is not a commonly used control measure except in treatment of certain process waters, which are not permitted for discharge as storm water. This treatment technology is more feasible for short-term construction projects that can bear the added cost of purchasing these chemicals. For permanent operations, the feasibility of this treatment method is very low. Our companies utilize other methods of storm water treatment, such as flow, sedimentation, and erosion control, along with infiltration. It is not clear what benefit the notification provides or what potential additional actions the EPA would require a facility to take. Additional investigation and reporting could lead to a significant increase in cost. The EPA could apply this criterion to specific industry sectors known to utilize this treatment method, or, if there is little information available, the EPA could investigate the prevalence of the method by sector and then apply the applicability criterion in future revisions of the MSGP.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1. Regarding the comment that cationic treatment chemical use is not common at Sector J facilities, EPA notes that the 2021 MSGP retains the requirement in Part 8.J.4.1.8 as in the 2015 MSGP for operators of Sector J facilities for earth-disturbing activities conducted prior to active mining activities.

---

**Commenter Name:** Benjamin J. Davenport
**Commenter Affiliation:** Idaho Mining Association (IMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0233-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

IMA supports including cationic treatment chemicals as a potential tool for improving stormwater runoff quality where appropriate.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

Part 8.H.4.1.8 of the 2021 MSGP also provides the conditions under which use of cationic treatment chemicals can be authorized under the 2021 MSGP." For reference, Part 8 currently says "If you plan to use cationic treatment chemicals (as defined in Appendix A), you are ineligible for coverage under this permit, unless you notify your applicable EPA Regional Office in advance and the EPA Regional Office authorizes coverage under this permit after you have included appropriate controls and implementation procedures designed to ensure that your use of cationic treatment chemicals will not lead to a violation of water quality standards."

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

We request clarification from the EPA on the use of anionic treatment chemicals as well in the proposed MSGP.

**Comment Response:**

The 2021 MSGP does not include specific requirements for anionic treatment chemicals.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 3 – NRMCA does not believe eligibility criterion for use of cationic treatment chemicals should be added to the MSGP.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Under this section EPA requested comment on whether it is appropriate to add the corresponding Construction General Permit (CGP) eligibility requirement or a similar eligibility requirement to the MSGP for operators who may elect to use cationic treatment chemicals to comply with the MSGP, specifically Part 2.1.2.5 Erosion and Sediment Controls. Roughly 80 percent of permit exceedances involve TSS which are normally part of construction activities. Housekeeping practices alone won't typically work to avoid exceedances. The presence of heavier clays tend to keep TSS in circulation longer while heavier particles settle out. High clay contents typically require the addition of a binding agent with discharges going into the sanitary sewer system. ATA recommends not to add the corresponding CGP eligibility requirement or a similar eligibility requirement to the MSGP for operators who may elect to use cationic treatment chemicals to comply with the MSGP but include such requirements in individual construction permits instead.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Cationic treatment. The MSGP should not incorporate the Construction General Permit eligibility requirement for operators using cationic treatment chemicals. The industrial operations covered by the MSGP generally do not cause or generate turbidity to the extent that construction activities do. The entire focus of the CGP is to limit the discharge of pollutants from grading and disturbing land; that generally is not an "industrial" activity that the MSGP focuses upon.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 3**

The FWQC and FSWA oppose adding the CGP eligibility requirement for operators using cationic treatment chemicals. While the provision may be relevant for construction activities, where turbidity from intentionally disturbed land of at least one acre is a focus for each permittee covered by the CGP, it is not an ongoing issue or concern for most industrial operations covered by the MSGP.

EPA has not identified any reason to duplicate the CGP eligibility requirements in the MSGP. If an industrial site is engaged in construction that creates turbidity for which cationic treatment is necessary, that level of construction activity likely would obligate the operator to obtain separate CGP coverage. Had turbidity been a problem across the industrial sectors subject to the MSGP, it

would have been addressed over the past 30 years based on sector-wide or site-specific data. Accordingly, there is no basis for including the CGP eligibility requirements regarding cationic treatment chemicals in the MSGP merely as an attempt to promote consistency between the CGP and MSGP. Those two permits serve entirely different purposes and regulate very different groups of dischargers.

Further, operators often use treatment chemicals for stormwater in the form of cationic chemicals or anionic materials with the target pollutants ranging from turbidity to metals. These types of BMPs have been available and marketed for years. EPA should continue to allow treatment chemical usage as an accepted BMP without notification. Further, because Part 2.1.2.5 relates only to "Erosion and Sediment Control," the FWQC and FSWA recommend including the following sentence from Part 2.1.2.5 in Part 2.1.1.8 to expressly allow for the use of chemical treatment as a BMP:

If you use polymers and/or other chemical treatments as part of your controls, you must identify the polymers and/or chemicals used and the purpose in your SWPPP.

If EPA still believes a notification is necessary to protect impaired waters, then an operator should only be required to notify for approval when a treatment chemical contains a substance for which the receiving water is impaired.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

This should not be added as an eligibility criterion. The language in the current 2015 MSGP and the proposed 2020 MSGP requires facilities to identify polymers and/or other chemical treatments as part of the controls in the facility's site-specific SWPPP. We suggest retaining this language and not including any additional eligibility criterion. This approach allows more flexibility for facilities to modify treatment methods after they have obtained coverage under the MSGP and throughout the permit term as needed.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Should Not Include Notification or Eligibility Requirements for the Use of "Cationic Treatment Chemicals"**

EPA should only require identification of the use of cationic treatment chemicals in the facility's SWPPP, as is currently required in the 2015 MSGP.[6] Further requirements for pre-notification, approval, or eligibility would not be appropriate or necessary given the nature of the types of stormwater discharges under the Proposed 2020 MSGP and use of cationic treatment for industrial discharges.

Because the nature of construction stormwater discharges is inherently different from stormwater discharges associated with industrial activity, no alignment between the two general permit programs should be needed for purposes of the use of cationic treatment chemicals. Under the Construction Stormwater General Permit ("CGP") program, cationic treatment chemicals and systems are common, particularly as the nature of a stormwater discharge under a CGP is one that is often associated with disturbances of large ground areas which are prone to increases in turbidity. However, facilities regulated under the MSGP typically only use cationic treatment chemicals or systems as part of a corrective action triggered by benchmark exceedances or after implementing other types of erosion and sediment control measures. Moreover, stormwater discharges from industrial activities are often indirect, thereby reducing potential impacts to surface waters from the addition of cationic treatment chemicals.

Because the current MSGP already requires identification and evaluation of cationic treatment chemicals in the SWPPP and NOI, in certain circumstances,[7] additional requirements to receive EPA pre-approval seem redundant and unnecessary.

If pre-authorization of cationic treatment is to be included in the final MSGP, AAR respectfully requests that pre-authorization be limited to direct discharges or consideration made to include only chemicals that have been shown through research and analysis to present a risk to water quality or contain constituents that are known to be toxic. Otherwise, to require pre-authorization of chemicals that are known to be non-toxic with no appreciable risk to water quality standards would be unduly burdensome and unnecessary. AAR also requests that EPA provide clear

guidance on how approval would be obtained should any pre-authorization of cationic treatment be required in the final permit.

[6] 2015 MSGP, §§ 2.1.2.5 and 5.2.5.1. Note that under the 2015 MSGP, the use of polymers and other chemical treatments are required to be disclosed in the NOI if a URL to the SWPPP is not provided in the NOI.

[7] See footnote 5.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. Regarding the comment to include requirements only for chemicals that present a risk to water quality or contain constituents that are known to be toxic, see response to DCN EPA-HQ-OW-2019-0372-0093-A1, Excerpt Number 1.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

Use of cationic treatment chemicals. (Proposed MSGP 2.1.2.5, request for comment 3). EPA continues to indicate that the use of cationic treatment chemicals precludes coverage under the MSGP. Assuming that provision only relates to pre-active mining, it is still misguided. There is no information to support that use of those chemicals will result in negative implications for any receiving waters. Consistent with EPA's Construction General Permit (CGP), AEMA suggests that use of those chemicals be allowed for all sectors. However, the CGP provisions in the MSGP could be simplified by adding a requirement to identify such chemicals and appropriate controls in the NOI rather than requiring pre-NOI approval.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Excerpt Number 1.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

The permit is acceptable as written and should not include an eligibility requirement for cationic treatment chemicals. The MSGP already requires each site to conduct other monitoring as required by EPA, which can occur on a site-specific basis.

**Comment Response:**

EPA did not finalize the proposed eligibility requirement regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

## 1.2. Types of Discharges Authorized Under the MSGP

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Permit Shield Provision: EPA should remove language in the proposed permit that improperly narrows the scope of the permit shield provision under section 402(k).

**Comment Response:**

EPA declines to make this suggested change. The 2021 MSGP includes language that is identical to that in the 2015 MSGP. Part 1.1.3 of the 2021 MSGP describes the limitations on the types of discharges covered under the MSGP. Any discharges not expressly authorized under the Part 1.2 of the 2021 MSGP cannot become authorized or shielded from liability under CWA Section 402(k) by disclosure to EPA and/or state after issuance of the MSGP via any means, including the Notice of Intent (NOI) to be covered by the permit, the Stormwater Pollution Prevention Plan (SWPPP), or during an inspection. This is because any such discharges would not have been within the reasonable contemplation of EPA when it issued the MSGP. This is consistent with EPA's longstanding interpretation of the scope of the MSGP and of how the CWA permit shield works with respect to general permits. The permit shield for legitimate discharges of stormwater from industrial activity and the authorized non-stormwater discharges at Part 1.2.2 is not affected by the language regarding the scope of the permit shield in the MSGP, and this has not changed from previous permits.

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

## Part 1.2: Types of Discharges Authorized Under the MSGP/Permit Shield Provision

The proposed 2020 MSGP contains problematic language from the 2015 MSGP that improperly narrows the scope of the CWA's permit shield provision.[46] NMA previously objected to the inclusion of this language in the 2015 MSGP and again recommends that EPA remove this provision. Specifically, the provision states: "Any discharges not expressly authorized in this permit cannot become authorized or shielded from liability under the Clean Water Act (CWA) section 402(k) by disclosure to EPA, state, or local authorities after issuance of this permit via any means, including the Notice of Intent (NOI) to be covered by the permit, the Stormwater Pollution Prevention Plan (SWPPP), or during an inspection."[47]

EPA's narrowing of this language violates the agency's practice and court precedent, and accordingly, should be removed from the final MSGP. EPA intended the permit shield doctrine to be interpreted broadly.[48] When the agency first proposed the regulations in 1978, it initially considered limiting the permit shield to the discharge of pollutants specifically listed in the permit application. However, EPA eventually abandoned this approach and recognized that agencies should focus on "significant discharges" rather than "non-limited pollutants."[49] EPA further explained that the permit shield was a "central feature" of the permitting system:

This "shield" provision is one of the central features of EPA's attempt to provide permittees with maximum certainty during the fixed terms of their permits … This new provision gives a permittee the security of knowing that, if it complies with its permit, it will not be enforced against for violating some requirement of the appropriate Act which was not a requirement of the permit.[50]

This position was further affirmed in EPA's Revised Policy Statement on the scope of the permit shield, in which EPA clearly stated that section 402(k) "shields discharges of pollutants authorized under a general permit,"[51] such as the MSGP. It is clear from the agency's previous practice and existing guidance that the permit shield was intended to be applied broadly, and EPA should not narrow it through the MSGP.

In addition, several courts in recent years have affirmed the applicability of Section 402(k) to general permits.[52] More importantly, a number of courts that have interpreted the scope of Section 402(k) have rejected the view that any discharges not specifically authorized by an NPDES permit are necessarily prohibited. For instance, the U.S. Court of Appeals for the Fourth Circuit held that "all discharges adequately disclosed to the permitting authority are within the scope of the permit's protection."[53] According to that court, it is "clear that the permit holder is in compliance with the CWA even if it discharges pollutants that are not listed in its permit, as

long as it only discharges pollutants that have been adequately disclosed to the permitting authority."[54] Similarly, the U.S. District Court for the Eastern District of Kentucky adopted the holding from an Environmental Appeals Board decision that "polluters may discharge pollutants not specifically listed in their permits so long as they comply with the appropriate reporting requirements and abide by any new limitations when imposed on such pollutants."[55]

The rationale underlying the aforementioned holdings is straightforward. As the Second Circuit explained, "it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants."[56] Indeed, "compliance with such a permit would be impossible and anybody seeking to harass a permittee need only analyze that permittee's discharge until determining the presence of a substance not identified in the permit."[57] The Environmental Appeals Board expanded on the Second Circuit's rationale, as follows:

Although in theory the Agency could structure permits to prohibit the discharge of all pollutants except those listed in the permit, such an approach would require the Agency to include in the permit a list of every pollutant or combination of pollutants that conceivably might be contained in the applicant's wastestreams, and to determine which of those pollutants the Agency considered appropriate for discharge. Since any given wastestream may contain hundreds of pollutants, such a permit-writing approach would be unduly burdensome and costly, and ultimately, impractical. As the Agency has acknowledged: it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants. Consequently, the Agency has determined that the goals of the CWA may be more effectively achieved by focusing on the chief pollutants and wastestreams established in effluent guidelines and disclosed by permittees in their permit applications, rather than by attempting to identify the hundreds or thousands of pollutants potentially present in permittees' wastestreams.[58]

These legal holdings, and their underlying policy rationales, make it clear that the language in the proposed MSGP would unduly narrow the scope of the permit shield under 402(k). EPA has not articulated an explanation for departing from these precedents, and should remove this language from the final 2020 MSPG.

[46] The CWA's permit shield provision in Section 402(k) provides that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of section 1319 [government enforcement actions] and 1365 [citizen suits] of this title, with sections 1311 [effluent limitations], 1312 [water quality related effluent limitations], 1316, 1317, and 1343 of this title[.]" 33 U.S.C. § 1342(k).

[47] Proposed 2020 MSGP at 6, 51.

[48] Brief for the American Farm Bureau Federation et. al, p. 13, *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*. (2014).

[49] Id.

[50] Id. at 13-14.

[51] U.S. Environmental Protection Agency, Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES (April 11, 1995).

[52] *Sierra Club v. ICG Hazard, LLC*, No. 11-148-GFVT, 2012 U.S. Dist. LEXIS 146140 (E.D. Ky. Sep. 28, 2012)

[53] *Piney Run Pres. v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 269 (4th Cir. 2001).

[54] Id. at 268.

[55] *See ICG Hazard* at *9 (quoting In re Ketchikan Pulp Co., 7 E.A.D. 605, 1998 EPA App. LEXIS 85 (E.P.A. May 15, 1998)).

[56] *Atl. States Legal Found., Inc. v. Eastman Kodak Comp.*, 12 F.3d 353, 357 (2d Cir. 1994).

[57] Id.

[58] *In re Ketchikan Pulp Co.,* 7 E.A.D. 605, 1998 EPA App. LEXIS 85 (E.P.A. May 15, 1998)

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 7.

The permit shield for legitimate discharges of stormwater from industrial activity and the authorized non-stormwater discharges at Part 1.2.2 is not affected by the language regarding the scope of the permit shield in the MSGP, and this has not changed from previous permits (e.g., 2015 and 2008 MSGPs). The purpose of this language, which EPA has modified somewhat in response to comments received, is to clarify a misconception of some operators covered under the permit that the permit covers or "shields" other types of discharges that are not expressly authorized (i.e., wastewaters other than those associated with stormwater or with the exclusive list of authorized non-stormwater discharges at Part 1.2.2).

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

Permit Shield Language (Proposed MSGP, 1.2 (fn3), 6). EPA includes statements indicating that information included in the Notice of Intent ("NOI") does not shield the discharger from liability under section 402(k) of the CWA (the permit shield provisions). AEMA objects to that sweeping statement. If a discharger complies with its complete application obligations under the terms of

the permit and incorporates information regarding its discharges consistent with the requirements of the NOI, the discharger is in compliance with the CWA and those discharges should be subject to the permit shield protections that have been upheld by courts as applicable to general permits. AEMA asks that EPA narrow this language to reflect that the permit shield provisions are fully applicable to sites that have submitted a complete permit application.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 7.

## 1.2.1. Types of Discharges Authorized Under the MSGP - Authorized Stormwater Discharges

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  47
**Excerpt Status:** Final

**Comment Excerpt:**

The wording in 1.2.1.2 requires clarification. As written, this statement means that effluent limits requirements marked with an asterisk are required to be included in the SWPPP.

**Comment Response:**

This comment appears to include an erroneous reference, as the statement included in Part 1.2.1.2 of the MSGP does not contain an asterisk. EPA interprets this comment to refer to Part 2.1.2 [Non-Numeric Technology-Based Effluent Limits (BPT/BAT/BCT)]. Part 6.2.4 of the 2021 MSGP requires operators to document the location and type of control measures specifically chosen and/or designed to comply with the non-numeric technology-based effluent limits in Part 2.1.2. For the purposes of this requirement, Part 2.1.2 indicates that for those effluent limitations that are marked with an asterisk (*), the SWPPP could include extra information regarding control measures or may just "copy and paste" these effluent limits word-for-word in to the SWPPP without providing additional documentation.

## 1.2.2. Types of Discharges Authorized Under the MSGP - Authorized Non-Stormwater Discharges

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit section 1.2.2.1.a and b – Potable water flushes still not needing to be dechlorinated?  Shouldn't the EPA get consistent with what they are putting in MS4 permits?

**Comment Response:**

Part 1.2.2.1.a and b of the 2021 MSGP address discharges from emergency/unplanned fire-fighting activities and fire hydrant flushings, respectively. It should be noted that Part1.2.2.1.c of the 2021 MSGP identifies "potable water, including uncontaminated water line flushings" as an authorized non-stormwater discharge authorized under the MSGP. The MS4 requirements at 40 CFR 122.26(d)(2)(iv)(B)(*1*) and 122.34(b)(3)(ii) identify allowable non-stormwater discharges, which include water line flushing and discharges from potable water sources. The Phase I regulations state that these non-stormwater discharges "shall be addressed where such discharges are identified by the municipality as sources of pollutants to waters of the United States" (40 CFR 122.26(d)(2)(iv)(B)(*1*) while the Phase II regulations state that the MS4 permit must also require the MS4 permittee to address these non-stormwater discharges "only if the permittee identifies them as a significant contributor of pollutants to the small MS4." Although the 2021 MSGP does not specify that potable water flushes be dechlorinated, EPA notes that Part 1.2.2.1 requires that all non-stormwater discharges comply with the effluent limits set forth in Parts 2 and 8.

---

**Commenter Name:**  Timothy R. Henderson
**Commenter Affiliation:**  RICH & HENDERSON, P.C
**Document Control Number:**  EPA-HQ-OW-2019-0372-0169-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The Proposed Permit is too limited, generally, and particularly for ready-mix concrete facilities, which fall within Sector E of both the 2015 MSGP and Proposed Permit. Section 1.2.2.1 of the Proposed Permit lists eleven types of non-stormwater discharge authorized from all sectors covered by the permit. Sections 1.2.2.2 and .3 provide sector-specific approval for specified non-stormwater discharges. These sections are identical to Sections 1.1.3.1 – 1.1.3.3 in the 2015 MSGP and should be expanded to match the permit to the reality of ready-mix operations and the purpose of the multisector general permit. Such an expansion would be consistent with the authority granted to states with delegated National Pollutant Discharge Elimination System ("NPDES") programs under the federal Clean Water act, (e.g. Section 1342), which, in many cases, have adopted general stormwater discharge permits for industrial facilities which allow additional non-stormwater discharges for different industry sectors. These are general permits that have been reviewed by EPA without opposition. For example, these non-stormwater discharges are included as eligible discharges under Maryland's General Permit for Discharges from Mineral Mines, Quarries, Borrow Pits and Concrete and Asphalt Plants, No. 15-MM and NPDES Permit No. MDG49, Parts I.E.m & n.

Specifically, we propose the following additional language in Section 1.2.2.1, or alternatively, a specific approval for Sector E, in Section 8.E.3 of the Proposed Permit:

- *waste wash water at concrete plant operations from hosing down vehicles, including washing concrete mixer trucks, mixing equipment, and moulds or forms, to surface or ground waters; and*
- *miscellaneous wastewater from spillage at ready-mix plants and concrete manufacturing plants to surface or ground waters.*

The Maryland permit referenced above acknowledges that the stormwater management systems designed and operated at ready-mix concrete facilities are more than adequate and capable of managing the truck wash water and miscellaneous spillage of concrete product and raw materials. The constituents in such discharges are identical to those picked up by stormwater that falls on and flows through the typical concrete ready-mix concrete facility, e.g. sand, stone, aggregate and cement. These are the raw materials that are combined with water in the ready-mix plant to create the concrete mixture pumped into the trucks that are sent to construction sites, and are the materials that coat the interior of the cement trucks and other equipment, which are washed at the ready-mix plants at the end of a shift. The typical stormwater management system at ready-mix concrete facilities relies on a series of settling lagoons to remove, through settlement, the particles that stormwater picks up from the stone, sand, gravel, aggregate and cement stored and used on site. The last step of treatment prior to discharge lowers the pH of the water, which cement can cause.

Requiring the ready-mix concrete industry to obtain individual permits for rinse water from washing trucks and equipment is a tail-wagging-the-dog situation. It unnecessarily requires the administratively complex and paperwork-heavy individual permit for the ancillary activity of equipment washing, which generates less volume of water than from stormwater. Rather than make the permitting process less burdensome and tailoring it to an industry sector, the requirement to obtain an individual permit effectively requires the typical ready-mix concrete facility to obtain two permit approvals. This defeats the purpose of general discharge permits to reduce the administrative burden on both the permit reviewing and issuing agency, which in the case of the Proposed Permit is EPA, and the permit applicant. The requested addition to the Proposed Permit would further that purpose without sacrificing any protection of the Waters of the U.S., saving both the federal taxpayers and the industry a significant amount of time and expense.

**Comment Response:**

EPA declines to make the suggested edits. The MSGP authorizes non-stormwater discharges that are not a significant contributor of pollutants; generally waste streams that are not considered process wastewaters. EPA does not consider discharges resulting from washing ready-mix concrete trucks and equipment to be an appropriate non-stormwater waste stream for coverage under the MSGP.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Part 1.2.2.1 includes a revision to the provision regarding authorized non-stormwater discharges which adds a requirement that non-stormwater discharges from routine external building washdown/power wash water must be treated with appropriate control measures to minimize discharges of mobilized solids and other pollutants. This requirement is somewhat vague and could be easily misinterpreted. For example, does routine mean weekly or less frequently? For instance, if building washdown only occurs annually or bi-annually, such cleaning should not be subject to control measures.

**Comment Response:**

EPA agrees that the requirement in Part 1.2.2.1 of the proposed 2020 MSGP was unclear. EPA has removed "routine" from the permit language in the 2021 MSGP. The act of washing (especially power washing) mobilizes particulates and other substances present on buildings, irrespective of the frequency of the activity; therefore, discharges from external building washdown/power wash water must be treated with appropriate control measures to minimize discharges of mobilized solids and other pollutants. In addition, the revised wording of this permit provision now aligns with EPA's permit provision in the Construction General Permit.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Information and data, if available, on how the permittee knows the groundwater or spring water is uncontaminated should be documented in the facility SWPPP.

**Comment Response:**

EPA declines to make this change for all operators in the 2021 MSGP. Part 1.2.2.1.h states that uncontaminated groundwater or spring water are authorized non-stormwater discharges for all sectors. Part 6.2.3 (Summary of Potential Pollutant Sources) of the 2021 MSGP requires operators to describe areas at the facility where industrial materials or activities are exposed to stormwater or from which authorized non-stormwater discharges originate in the SWPPP. For each area identified, the description must include the activities in the area, pollutants, spills and leaks, salt storage, and sampling data. These requirements should ensure that the operator has

considered and documented potential contamination of non-stormwater discharges, including groundwater, in the SWPPP.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 77
**Excerpt Status:** Final

**Comment Excerpt:**

***23. EPA Should Adopt its Proposed Revision for Authorized Non-Stormwater Discharges of Wash Water.***

EPA should require control measures to minimize discharges of pollutants from wash water related to routine external wash-downs and power washing, because, as the Agency acknowledges, it is important to minimize particulates and other industrial residues that accumulate during dry-weather conditions from discharging to receiving waterways. However, the proposed revision to Part 1.2.2.1.g. should be worded to include the exterior of structures other than buildings, such as storage tanks, for example, that also have the potential to accumulate pollutants associated with industrial activity on their surfaces.

**Comment Response:**

EPA agrees that the exterior of structures, such as storage tanks, is appropriate to include in Part 1.2.2.1.g. Therefore, EPA has revised Part 1.2.2.1.g of the 2021 MSGP to read as follows: "External building/structure washdown…"

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Stormwater runoff from buildings during a storm event is similar to routine external building washdown without detergents or other chemicals. The requirement to install control measures for runoff from this practice is excessive and very costly to implement. Therefore, Simplot requests that it be removed from Part 1.2.2.1(g) as follows: "g. Routine external building washdown / power wash water that does not use detergents or hazardous cleaning products (e.g., those containing bleach, hydrofluoric acid, muriatic acid, sodium hydroxide, nonylphenols)."

**Comment Response:**

EPA disagrees that this requirement to implement appropriate control measures is excessive or very costly. Typically, exterior building washing involves power washing which by its nature, removes particles and materials that are not removed through rainfall. This is similar to an existing requirement applicable to non-stormwater discharges of pavement wash waters. Because the act of washing (especially power washing) mobilizes particulates and other substances present on pavement and buildings, discharges from external building washdown/power wash water must be treated with appropriate control measures to minimize discharges of mobilized solids and other pollutants. Examples of lower cost stormwater control measures that could be considered when doing such cleaning include using the least amount of water in pressure washing to reduce the quantity of discharge and running the wash water through a filter to remove pollutants prior to discharge. Other options include directing the wash water flow through treatment control or to capture and infiltrate the flow so there is no discharge.

## 1.3. Obtaining Authorization to Discharge

**Commenter Name:** Randall M. Lyons
**Commenter Affiliation:** Massachusetts Marine Trades Association (MMTA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that the 2020 MSGP, and all MSGP's going forward, implement an "automatic renewal" process for existing permit holders. In particular, we recommend that the 2020 MSGP include a provision that a permitee's failure to re-apply does not invalidate their permit unless and until EPA has sent an individualized Certified Mail notice of requirement to reapply. In our industry, there have been HUGE problems in the past because facilities rightfully assumed their same business didn't need to send a new permit application to carry on. There is no reason why existing permitees cannot be given a grace period or waiver for this application oversight instead of the strict cutoff process currently in place.

**Comment Response:**

National Pollutant Discharge Elimination System (NPDES) regulations at 40 CFR 122.41(b), incorporated in Appendix B.2 of the 2021 MSGP, provide eligible operators covered by the existing 2015 MSGP the opportunity to seek coverage under the 2021 MSGP. Further, the regulations at 40 CFR 122.28(b)(2)(i) state that except as provided under 40 CFR 122.28(b)(2)(v) and (vi), dischargers seeking coverage under a general permit shall submit a Notice of Intent (NOI) to be covered by a general permit. The information required in the NOI is necessary for EPA to confirm the operator's eligibility under the permit. The 2021 MSGP requires operators of existing industrial facilities that are authorized for coverage under the 2015 MSGP to submit a complete and accurate NOI no later than 90 days after the effective date of the

2021 MSGP. Previous versions of the MSGP required timely submittal of a complete and accurate NOI in order to obtain authorization to discharge under the MSGP.

### 1.3.2. Obtaining Authorization to Discharge - How to Submit Your Notice of Intent (NOI) to Get Permit Coverage

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 1.3.2 – Request for Comment 5 - Are paper waivers for the NOI going to be granted for federal facilities.  With all the outfall information regarding impaired water sampling, applicable sectors for each outfall, and the fact that NetDMR information for the 2015 MSGP was based on the NOI, does the electronic NOI allow all this extra needed information to be entered to support an accurate supporting NetDMR?  Also, section 9 of permit substantially changes the NOI for impaired waters sampling.

**Comment Response:**

Part 7.1 of the 2021 MSGP does not specifically exclude federal facilities from being eligible for a waiver from electronic reporting requirements; however, the EPA Regional Office may only grant a waiver if the operator meets one of the specified conditions.

NeT-MSGP requires operators to identify information about the discharge point location and receiving waters necessary to determine impaired waters monitoring requirements. Based on this information, NeT-MSGP has the capability to identify whether the receiving water is an impaired waterbody in EPA's Assessment, Total Maximum Daily Load (TMDL) Tracking and Information System (ATTAINS). If the receiving water is listed as impaired, NeT-MSGP requires the operator to identify the pollutants causing the impairment. Based on information provided in NeT-MSGP, NetDMR will populate the specific impaired water monitoring requirements in the DMRs, without any further action by the operator.

Part 9 of the MSGP includes additional standard reporting requirements applicable to certain states or tribes necessary in order for the permit to include conditions to achieve their respective water quality standards. NeT-MSGP does not currently require the operator to provide additional information to determine the applicable monitoring requirements under Part 9. EPA manually enters these requirements in ICIS which will populate the DMR in NetDMR for the facility based on information provided in the NOI.

**Commenter Name:** Jennie F. Formier
**Commenter Affiliation:** John W. Furrh Associations Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0151
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The electronic system still is quite challenging to the average business person trying to utilize it. One area is when there are facility changes and it is necessary to go in and totally redo the NOI, there should be a better way to update, change or correct the NOI information than having to totally redo it. (like you are proposing in a paper format, same idea would be good electronically.)

**Comment Response:**

EPA notes that NeT-MSGP already includes a feature to modify the NOI. In addition, for operators eligible for a waiver from the electronic NOI submission, EPA has developed a paper change NOI form. No changes were made in response to this comment.

---

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

***Table 1-2. NOI Submittal Deadlines and Discharge Authorization dates:***

Footnote 2 to this table indicates "Discharges are not authorized if your NOI is incomplete or inaccurate or if you are ineligible for permit coverage." If the Net-MSGP does not include the parameters required to be monitored relative to specific state certification requirements contained in Part 9, the NOI, as originally submitted by a facility, may be incomplete or incorrect due to system limitations.

*Recommendation:*

During the last permit cycle, NeT-MSGP interface issues resulted in the inability to submit complete NOIs. Accordingly, please provide clarification that an incomplete NOI resulting from NeT-MSGP system limitations will not result in an unauthorized discharge if the permittee is communicating with their respective Region in a timely manner to address necessary submissions.

**Comment Response:**

NeT-MSGP does not currently require operators to provide additional information to determine applicable Part 9 requirements. EPA manually enters these requirements in NetDMR based on information provided in the NOI. The NOI is complete if the operator provides timely, accurate, and complete information. Operators should contact their applicable EPA Regional Office as soon as possible if they receive notification that their NOI is incomplete, to ensure that deficiencies or system notifications are addressed in a timely manner. No changes were made in response to this comment.

### 1.3.3. Obtaining Authorization to Discharge - Deadlines for Submitting Your NOI and Your Official Date of Permit Coverage

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

1.3.3

When a facility is transferred to a new operator, the new operator may not have adequate access to the facility or control over the facility to feasibly prepare and submit an NOI with SWPPP 30 days prior to transfer.

**Comment Response:**

Part 1.3.4.2 of the 2021 MSGP states, "At a facility where there is a transfer in operator or a new operator takes over operational control at an existing facility, the new operator must submit a new NOI no later than thirty (30) calendar days after a change in operators." The permit requirement is submittal within 30 days after a change in operators, not prior.

### 1.3.3.RFC4. Obtaining Authorization to Discharge - RFC4 Extended NOI review time for facilities with a pending enforcement action

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Discharge authorization related to enforcement action

I agree with a waiting period of 60 calendar days after NOI submission for any operators whose discharges were not previously covered under the 2015 MSGP and who have a pending stormwater-related enforcement action.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Under our 2019 VPDES Industrial Stormwater (ISW) general permit, new facilities must submit a registration statement 60 days prior to commencement of industrial activity. Facilities subject to an individual permit must submit a registration statement 240 days prior to expiration. Thus, it is not clear that this proposed change would provide any benefit in Virginia. In addition, determining when an enforcement action is pending, reviewing SWPPP documents, and tracking the 60-day period would be new tasks imposed upon existing DEQ staff. Normally, acceptance of a registration statement by the Board and general permit coverage is indicated in a transmittal letter provided to the permittee. In general, we believe that it is preferable to get facilities covered under the ISW general permit and have them start complying with the permit requirements. Our regulations give us flexibility to utilize or deny general permits where appropriate (e. g., Virginia DEQ can require an individual permit when a discharger is not in compliance with a general permit, or when discharges are not appropriately controlled by a general permit) and to address deficient stormwater pollution prevention plans (SWPPPs) or controls as part of the compliance/enforcement process.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

This additional wait period will not provide any improvement in the water quality of the US. It serves only the purpose of further delaying the ability of viable recycling businesses in the US to obtain a permit. The current system provides adequate review for the Agency. Further, it is important that the Agency recognize that this burden will only apply to entities that already actively pursue a positive compliance assurance posture. Due to the lack of enforcement on those entities that do not or never intend to seek a permit, this language will have no positive impact on the water quality of the US. It is far more likely that the more burdensome the permitting process becomes, the Waters of the US may experience degradation. A subtle result of this increased permitting burden will be the appearance that only those entities attempting to do things right will be punished. In light of the fact that the CWA already allows for Citizen Suit actions, it is imperative that the Agency recognize the deleterious impact on those that are already attempting to comply. It is highly recommended that the Citizen Suit provision be removed.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

For dischargers whose discharge was not previously covered under the 2015 MSGP and who have a pending enforcement action, establish an additional 30 days wait period for discharge authorization.

Discussion/Recommendations

It is important to point out in the MSGP that this added 30 days before discharge authorization does not apply to new dischargers with no other history of enforcement, no pending enforcement actions, and no current enforcement actions. The language in the RFC is a little unclear but Table 1-2 seems to document that this is only a 30-day requirement for new dischargers. However, the language in Table 1-2 essentially does not allow new facilities without prior MSGP coverage to obtain permit coverage in the first 90 days after the permit effective date. This requirement should be eliminated.

**Comment Response:**

The language in Table 1-2 of the 2021 MSGP for new and existing facilities without MSGP coverage has been updated to include the Notice of Intent (NOI) submission deadline of "at least 30 calendar days prior to commencing discharge."

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The current discharge authorization wait period of 30 days should be sufficient to determine if permit coverage will be approved or denied. The extended time frame is unnecessary, may lead to an additional violation if there is an unpermitted discharge, and will delay business operations. It is also unclear how EPA would collect the additional information required.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that a 30-day wait period should be sufficient for EPA-review and approval/denial of a Notice of Intent. The EPA can deny or request additional information during the 30-day wait period. An additional 30-day wait period as outlined in the proposed draft does not appear to add any additional criteria for review and consideration by EPA. It only provides a longer hold where no action is being taken. What additional actions does EPA propose during the extended wait period that cannot be accomplished in the initial 30-day wait period?

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

## 2. Request for Comment 4: 60-day Discharge Authorization Wait Period

We oppose this new 60-day wait period for discharge authorization. It is a needless expansion of the NOI processing times, and would allow USEPA to relax on permit processing efficiency by extending the permit backlog processing times with impunity. The regulated community needs efficient permit processing, which includes timely feedback on their permit applications, including application deficiencies.

There is an existing category in Table 1-2 of the MSGP for "[e]xisting facility without permit coverage" that specifies discharge authorization in "30 calendar days after EPA notifies you that it has received a complete NOI, unless EPA notifies you that your authorization has been denied or delayed." Therefore, USEPA already has the ability to deny or delay authorization for unpermitted sites with pending stormwater enforcement action without the need of the proposed new category. USEPA just needs to continue to improve their permit processing efficiency to make these denial or delay determinations in a timely manner under the current category, without the need for this proposed category.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is also seeking feedback (EPA request for comment 4) regarding whether the permit should establish a discharge authorization wait period of 60 calendar days after notice of intent submission for any operators whose discharges were not previously covered under the 2015 MSGP and who have a pending enforcement action related to stormwater by EPA, a state, or a citizen. VMA believes that such a wait period could be biased against companies with multiple

operations. For example, a corporation with many sites across the country or even within a state may face stormwater enforcement far afield from a new site for which they are seeking MSGP coverage which is under different regional environmental management and is wholly unrelated to issues that might be present at the company's other facility. The company should not face any additional waiting period before receiving permit coverage. EPA states in the fact sheet that this is needed to prevent a facility with a pending enforcement action from quickly submitting a notice of intent in order to avoid further enforcement action. VMA believes that such instances are likely rare and can be dealt with on an individual basis rather than imposing this blanket requirement. VMA also has concerns with the language in request for comment 4 regarding pending enforcement actions by a "citizen." If a citizen merely has to file a notice of intent to sue and can further delay or prevent a facility from being eligible for coverage under the MSGP, such a provision would likely be susceptible to misuse by citizens who oppose the specific industrial operations more generally. If EPA proceeds with any wait period, it should be limited to federal or state enforcement actions only.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Discharge Authorization Waiting Period:  EPA proposed an increase in the authorization waiting period from 30 days to 60 days.  This extension of time would unnecessarily delay operations and manufacturing schedules.  Given that most, if not all, permits are obtained pursuant to existing electronic processes, EPA should have sufficient time to review all relevant information and make timely determinations without adding an additional 30 days to a process that would already be completed in a more expeditious manner.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether the permit should establish a discharge authorization wait period of 60 calendar days (30 calendar days standard for all new NOIs plus 30 additional days) after NOI submission for any operators whose discharges were not previously covered under the 2015 MSGP and who have a pending enforcement action related to stormwater by EPA, a state, or a citizen (to include both notices of violation (NOVs) by EPA or a state and notices of intent to bring a citizen suit). **[Yes.]**

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Asciatu Whiteside
**Commenter Affiliation:** Dallas Fort Worth International Airport (DFW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0208-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed language attempts to increase the waiting period from 30 to 60 days for specific facilities. While waiting 30 days to obtain authorization may be realistic for new facilities that have not yet initiated general operations, this waiting period is already unreasonable for existing facilities already engaging in ongoing and permitted facility operations. It is requested that the EPA revise Table 1-2 and grant discharge authorization or interim authorization upon receipt of electronic Notice of Intents.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Resource Management Associates (RMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 4 – We disagree with the establishment of a 60-day wait period for permit authorization in the case of a "pending enforcement action related to stormwater by EPA, a state, or a citizen (to include both notices of violation (NOVs) by EPA or a state and notices of intent to bring a citizen suit)". In many instances, NOVs can be issued for relatively small or routine situations, or citizen notices of intent may be issued for non-substantial reasons (which may be unrelated directly to stormwater). Without further clarification on the degree of non-compliance, or confirmation of some level of severity of non-compliance, there seems to be no justification to extend the waiting period from 30 days to 60 days. It would seem that moving more quickly to get potential "non-compliant" facilities under permit coverage, where the EPA and states would then have greater enforcement capability, would be advantageous (and provide greater environmental benefit), not extending this timeframe. Furthermore, the proposal to extend the waiting period does not come with an explanation of what will occur within this additional time, or why it's required.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, the additional 30 days for new coverage with pending enforcement action sites should apply, however it should not delay implementation of controls and monitoring.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

***5. EPA Should Adopt its Proposal to Establish a 60-Day Authorization Wait Period for Operators Not Previously Covered by the MSGP and are the Subject of a Pending Enforcement Action Related to Stormwater.***

EPA should adopt the proposal to establish a discharge authorization wait period of 60 days for operators that have not previously obtained coverage under the MSGP and are the subject of a pending enforcement action, because the extended authorization wait period will protect water quality while serving the interests of other permittees, EPA and the public. The lengthened wait period before authorization will contribute to efforts that prevent dischargers from obtaining coverage as a shield from enforcement of prior and/or continuing Clean Water Act violations. EPA will benefit from the 60-day authorization period because the comparatively longer period will support the Agency's efforts to conduct a sufficient evaluation of the application for permit coverage while also investigating and resolving violations of the Clean Water Act, and coordinating, as appropriate, between these two activities. Eliminating the opportunity for what amounts to, in part, an unfair business advantage will also benefit the far greater proportion of dischargers who seek to obtain coverage on a timely basis and comply with the requirements of the MSGP and Clean Water Act. Lastly, the extended 60-day period will provide other agencies and citizens with sufficient time to review and comment on the NOI submitted under the circumstances.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that the EPA consider an exemption for facilities that may meet the criteria stated but have submitted an NOI due to a change in ownership. The new owner, depending on the transaction structure (asset or stock), should not be subject to the extended wait period because of non-compliance it had no control over.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Benjamin J. Davenport
**Commenter Affiliation:** Idaho Mining Association (IMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed rule contains language that pertains to Pending Enforcement Actions that entail authorizing EPA to be able to add an additional 30-days for EPA to solicit comments before processing the NOI where the site associated with the NOI has a pending stormwater-related enforcement action.

*IMA understands the concern, but this seems to be an unnecessary action since any pending enforcement action will already be reviewed as part of the compliance action and can result in unnecessary and costly delays for permittees should the enforcement action not be found to be warranted. In addition, if the enforcement action reviews indicates violations, then there are already other portions of the regulations that deal with management and review of the stormwater site management where site specific criteria and additional permits are applicable and already required and this is unnecessary and duplicative requirement.*

The proposed rule would establish a discharge authorization wait period of 60 calendar days (in addition to the 30-days to solicit comments noted above) after an NOI submission for any operators whose discharges were not previously covered under the 2015 MSGP and who have a pending enforcement action related to stormwater.

*This new requirement assumes the EPA cannot effectively respond to an NOI in the current time frames and places an excessive and unnecessary burden on operators and should not be implemented.*

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed language attempts to increase the waiting period from 30 to 60 days for specific facilities. While waiting 30 days to obtain authorization may be realistic for new facilities that

have not yet initiated general operations, this waiting period is already unreasonable for existing facilities already engaging in ongoing and permitted facility operations. It is requested that the EPA revise Table 1-2 and grant discharge authorization or interim authorization upon receipt of electronic Notice of Intents.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 4 – NRMCA believes a 60 calendar-day wait period is far too long of a time span to restrict discharges. Such facilities potentially may not physically be able to withhold discharges for 60 calendar days due to infrastructure challenges. A standard 30 calendar-day wait period is sufficient.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requested comment on whether the permit should establish a discharge authorization wait period of 60 calendar days. Barring permit deficiencies, ATA supports a maximum 45 calendar day wait period for purposes of regulatory streamlining and burden reduction on businesses. If no official notice is received by an applicant within the 45-day waiting period, the permit and discharge authorization should be considered automatically approved.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Discharge authorization waiting period. The authorization waiting period should not be increased from 30 to 60 days. In today's electronic age, the existing electronic NOI process should provide EPA with sufficient information to make timely determinations regarding coverage within the normal 30-day window, if not significantly shorter time periods.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 4**

The FWQC and FSWA oppose a discharge authorization waiting period of 60 days. EPA has not provided any justification for why thirty days is an insufficient amount of time to allow EPA to (a) review the facility's Stormwater Control Measures (SCMs) detailed in the NOI and Stormwater Pollution Prevention Plan (SWPPP) to make sure they are appropriate for the facility, (b) identify any additional SCMs that EPA deems necessary to control site discharges in order to ensure that discharges meet technology-based and water quality-based effluent limitations, and/or (c) conduct further inquiry regarding the site's eligibility for permit coverage.

The FWQC and FSWA believe that the thirty-day time period is a sufficient amount of time for EPA to authorize a discharge. Specifically, EPA's NOI should collect sufficient information to make timely determinations, in addition to the Agency's other databases of NOVs or other

facility issues. As such, EPA should be able to review and make a timely determination on authorization within thirty days. Unwarranted and unnecessary delays in obtaining permit coverage are likely to unreasonably keep the facility in limbo without confirmed permit coverage, when in fact the Agency should be expediting the return to full compliance for such sites. While EPA had agreed to propose this provision as a result of the MSGP 2016 Settlement, the Agency has not provided sufficient justification or support for finalizing this proposed change.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

Permit authorization with a pending enforcement action (including NOVs and notices of intent to bring citizen suits) (Proposed MSGP 1.3.3, Table 1-2, request for comment 4). Consistent with the settlement agreement relative to the 2015 MSGP, EPA's proposal requests comment on including an additional 30-day waiting period prior to obtaining coverage under the MSGP for facilities not permitted under the prior MSGP and for which there is there is "a pending enforcement action" related to stormwater. AEMA suggest that the additional waiting period is unnecessary and potentially onerous for at least two reasons. First, the definition of a "pending enforcement action" is overbroad; it presumes that even a citizen suit notice constitutes a pending enforcement action that could delay MSGP coverage. In fact, if a permittee implements the MSGP application requirements and it resolves issues raised by a citizen suit notice letter, there is no pending enforcement action. The additional proposed permit coverage delay period undermines the reason for notice letters, i.e., giving the recipients an opportunity to address any alleged violations in a timely manner to avoid a citizen enforcement action. If the applicant does not resolve the issues identified in the notice letter, the citizen suit can, of course, still be filed. Second, even if EPA or a state has issued a Notice of Violation (NOV) for a site seeking coverage, that action should not further delay coverage under the MSGP. By its own terms, the MSGP does not cover discharges if the site is ineligible for that coverage. By delaying coverage for an additional thirty days, the proposal would preclude sites that are eligible for coverage from minimizing the risks associated with potential unauthorized discharges through compliance with the MSGP. The additional waiting period for a "pending enforcement action" should be eliminated from the proposed MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

1.3.3

Citizen suits may be unsuccessful due to there being insufficient evidence to support the claims of the plaintiff(s). Applying the filing of a citizen suit prior to a judgment as a standard for determining if a facility has unpermitted stormwater discharges, does not make use of EPA expertise to determine if a facility requires coverage.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

It appears that this proposal is intended to extend the waiting period to 60 days for permit authorization for discharges from <u>existing</u> facilities that were not covered under the 2015 MSGP if the facility is subject to a pending enforcement action. We ask that the Agency clarify that this proposal would not apply to new facilities seeking permit authorization for the first time, or to replacement facilities that may entail reconfigurations that create previously unpermitted outfalls associated with industrial activities. We believe it would be very difficult (if not impossible) to establish a legitimate enforcement action against such new or replacement facilities before they have even begun to operate (and so, to discharge). However, we are concerned that parties seeking to delay construction and/or operation of such facilities may file a notice of intent to bring suit simply to delay authorization of discharges under the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

### 1.3.4. Obtaining Authorization to Discharge - Modifying your NOI

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

Wording from Part 1.3.4 Modifying your NOI. "If after submitting your NOI, you need to correct or update any fields, you may do so by submitting a "Change NOI" form using NeT-MSGP." There seems to be a glitch in the Change NOI form as this document is modified for different reasons throughout the permit and when making a change often it will trigger NeTDMR to re-generate previously completed DMRs. The permittee only finds this out when receiving an email from EPA stating that soon the permittee will be in non-compliance for not submitting a DMR when this obligation had been met and the NOI had been previously modified with that change. This document needs to be more user friendly.

**Comment Response:**

*EPA is making updates to NeT-MSGP so that this error does not continue to occur. The operator can contact the NeT-MSGP helpdesk at* [NPDESereporting@epa.gov](mailto:NPDESereporting@epa.gov) *if they experience continued issues.*

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The language in Part 1.3.4.2 is inconsistent with the language in Part 1.4.2 regarding requirements when there is a transfer in facility operators.

Part 1.3.4.2 states that if there is a change in operator and a new operator takes over operational control at an existing facility, after the new operator submits an NOI the previous operator must submit an NOT *no later than 30 days after MSGP coverage becomes active for the new operator*. However, Part 1.4.2 states that the previous operator must submit a NOT *within 30 days after a new owner or operator has taken over responsibility for the facility*. We suggest clarifying the above-referenced parts of the proposed permit since the date a new operator's

coverage becomes active could be several months after taking over operational responsibility for a facility.

**Comment Response:**

EPA's intent in Part 1.4.2.1 is that the previous operator would submit a Notice of Termination (NOT) within 30 days after MSGP coverage becomes active for the new operator, as stated in Part 1.3.4.2. Therefore, EPA has reworded Part 1.4.2.1 to be consistent with the language in Part 1.3.4.2 of the 2021 MSGP.

### 1.3.4. RFC5. Obtaining Authorization to Discharge - RFC 5 Change NOI paper form

**Commenter Name:** Victoria R. Branson
**Commenter Affiliation:** National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Sandia National Laboratories, New Mexico (SNL/NM) agrees that a separate paper Change NOI form designed to document modifications throughout a permit term would be a beneficial change from retrofitting additional information into a single NOI format. Currently, SNL/NM is granted a waiver for a paper NOI form when changes are required through the permit term due to state specific requirements (Part 9 of the 2015 MSGP) that affect changes on the NeTDMR reporting tool. The following suggestions are proposed as improvements on the NOI and Change NOI forms:

- On the Change NOI form, include a section to record outfalls that have met requirements for the permit term (e.g., when the annual average for all parameters at that outfall does not exceed benchmark values and that outfall is approved for no further monitoring).
- Because changes in the NeTDMR reporting tool are based on information from the NOI, the NOI and Change NOI forms should allow for entry of any details that would need to be changed in the NeTDMR for that permittee. For example, when there are state-specific benchmark values required in Part 9 of the MSGP, that information would be documented on both the NOI and the Change NOI forms. The ability to include more specific information may eliminate the need for a paper NOI.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision. Regarding the first suggestion to add to the Change NOI form fields to record discharge point that have met requirements for the permit term, EPA agrees to add these fields to the paper Change NOI form. EPA adds the reminder that if operators' circumstances are such that their headquarters is physically located in a geographic area (i.e., zip code or census tract) that is identified as under-served for broadband internet access in the most recent report from the Federal Communications

Commission or if they have limitations regarding computer access or computer capability, they may submit a request to the applicable EPA Regional Office in Part 7.9 to obtain a waiver from submitting a report electronically; otherwise, they must submit the NOI electronically. MSGP-NeT currently has the ability in the Change NOI form to change requirements if benchmarks have been met.

Regarding the concern that the NOI and Change NOI forms should allow for state-specific benchmarks, EPA acknowledges that currently the NOI forms do not include fields for state-specific requirements; however, EPA Regions will add this information manually and operators will receive their applicable benchmarks.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I believe a "Change NOI" form would be very helpful for a permittee who needs to modify their NOI and has been granted a waiver from electronic reporting. When using a paper form and there is a need for additional space the use of the words " See Attachment" is appropriate.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision. EPA agrees that it is appropriate for operators to refer to an attachment(s) when sufficient space is not provided on the paper Change NOI form.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

This is much needed and would allow for assistance with compliance for those facing technological barriers. Any effort to make a clear and simple process for permit applications, updates, and termination for those that do not have the ability to do so online is a key part of promoting compliance.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Provide a separate paper NOI change form for submitting modifications to a paper NOI form.

Discussion/Recommendations

Provide a paper Change NOI form. The ability to update all information on the original NOI should be equivalently available electronically and by paper.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, we agree that a Change NOI Form would be useful.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

*Part 1.3.4 Modifying your NOI (Request for Comment 5):*

Yes. Providing a Change NOI form (proposed as Appendix G-2) that includes all the types of changes that require submittal of a Change NOI would be useful. Large complex facilities may need to change their NOI several times during a permit term. For example, the following types of changes were made during the last permit term (under the 2015 MSGP): adding or removing an outfall, adding or removing impaired water parameters, changing acreage, adding or removing sector designations, etc. In the past, changes to the NOI were submitted on the NOI form with yellow highlights provided to indicate requested change(s) along with attached tables and lists to identify changes not captured within the 2015 MSGP NOI format (such as providing a list of parameters for a specific outfall along with the permit limit and report due date). Some of the reasons the supplemental information had to be provided was because the most current State of New Mexico Clean Water Act §303(dy305(b) Integrated Report impaired waters pollutants were not available for selection in Net-MSGP. In addition, facilities operating in New Mexico, must adhere to water quality standards for certain benchmark constituents per Part 9.6.2 of the 2015 MSGP. 20.6.4.900 New Mexico Administrative Code (NMAC) requires monitoring of certain modified benchmark and impaired waters metals pollutants as dissolved species, which were not available for selection in NeT-MSGP. Facilities operating under several industrial sectors and discharging to different receiving waters, also complicates the use of the NOI form.

*Recommendation:*

Consider allowing a waiver from using the electronic NOI form in NeT-MSGP if information contained therein would result in inaccurate information such as monitored pollutants.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision. Regarding the request to allow a waiver in cases where information on monitored pollutants may be interpreted as inaccurate, Part 7.1 of the 2021 MSGP indicates that a waiver from the electronic NOI form is only available under specific conditions (e.g., their headquarters is physically located in a geographic area (i.e., zip code or census tract) that is identified as under-served for broadband internet access in the most recent report from the Federal Communications Commission or if they have limitations regarding computer access or computer capability). This requirement is consistent with EPA's Electronic Reporting Rule (80 FR 64064). Operators should contact the applicable EPA Regional Office if there are inaccuracies in the DMR.

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, we agree this would be useful.

**Comment Response:**

Thank you for your comment and support of this proposed permit provision.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

Paper Notice of Intent Form:  NAIMA supports EPA's proposed separate paper change for NOI forms.  NAIMA also requests the option of filing the NOI electronically.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Currently EPA accepts changes or edits to the NOI on the actual NOI paper form (Appendix G), if the facility is granted a waiver from electronic reporting. EPA is aware that the actual NOI paper form is not currently formatted for the facility to indicate all of the types of changes it might need to make on the form and does not allow for sufficient space to include the rationale/documentation for requesting the changes, if such changes need Regional approval.

EPA requests comment on whether a separate paper Change NOI form (proposed Appendix G-2) would be useful for facilities for submitting modifications to a paper NOI form. **[Yes.]**

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Resource Management Associates (RMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 5 – We agree that a separate paper Change NOI form would be useful.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, paper Change NOI forms should be available.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

MWRA is pleased to see that EPA plans to add a "Change NOI" form to NeT-MSGP. During the 2015 permit term, MWRA had to modify its NOI to indicate that impaired waters monitoring was no longer required, and it was confusing to figure out how to do this. In Request for Comment 5, EPA asked whether a separate paper Change NOI form (proposed Appendix G-2) would be useful for facilities for submitting modifications to a paper NOI form. **MWRA's comment is that it would be useful, and it makes sense to keep the paper and electronic systems as similar as possible.**

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The old form was easier to read and less bulky. If we need to submit more information, we can always attach a separate word document.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

A separate form for Notice of Intent (NOI) changes would make it easier for operators to request changes to their NOIs and should be implemented.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 5 – NRMCA does not believe an additional form is necessary for requesting changes on the NOI paper form if the current space allotment is not sufficient. NRMCA rather suggests amending the paper form to allow covered facilities to add their own additional documentation in the format that best suits their needs. Adding another form requirement will merely add more confusion and time to an already confusing, cumbersome and timely process.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 5**

The FWQC and FSWA support a separate paper Change NOI form, as the ability to update all information in the original NOI should be equivalently available electronically and by paper.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA Request for Comment #5, it is reasonable to provide a correctly formatted paper version of the NOI for facilities that need to use the paper form.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

With all the outfall information regarding impaired water sampling and applicable sectors for each outfall, does the electronic NOI allow all this extra needed information to be entered? A separate paper Change NOI form would be useful when sufficient space is not available through electronic reporting.

**Comment Response:**

EPA notes the commenter's support of this proposed permit provision.

## 1.3.6. Obtaining Authorization to Discharge - Requirement to Post a Sign of your Permit Coverage

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Signage Change:  Please see NAIMA's comments above on new signage requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0193-A1, Comment Excerpt Number 3.

### 1.3.6.RFC6. Obtaining Authorization to Discharge - RFC 6 Post a sign of permit coverage

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Signage Requirement is Unnecessarily Burdensome and Not Useful for the Public</u>**

The very specific requirements for signage with contact information is unduly burdensome and unnecessary in 2020 where information on the internet is readily available and up to date. This appears to have been adopted from the Construction General Permit (CGP) with little consideration for impacts. While this makes sense for the CGP and construction projects which are typically located in more urban and residential areas for a short period of time, they make little sense for the MSGP. Industrial and mining sites are more permanent in nature and therefore information is readily available through public sources like mapping programs and business directories. Furthermore, aggregates operations are not located in urban neighborhoods where interested parties are walking by. They are often located in rural areas that are not widely visible from major roads nor accessible by the general public. Furthermore, aggregates operations, like many industrial sites, contain physical hazards and access is carefully controlled. Heavy trucks are regularly arriving and leaving aggregates operations, further exacerbating the danger for members of the public stopping to write down information that is more logically obtained remotely. This requirement should be waived for facilities that are in areas not readily accessed by the general public or where it could be provided equally well on a website. Personnel and phone numbers can change frequently and making this a requirement on a sign creates additional costs for producers, particularly small businesses. Additionally, some local governments may require a permit or have specific conditions for signs that could conflict with this requirement, in addition to adding costs and delays. Given the fact that industrial sites are in business for decades vs. shorter term construction projects, signs of that size are a significant expense and, in most climates, will require maintenance and upkeep if not full replacement often due to sun, natural sand blasting and high winds. At a minimum, an option should be allowed for this information to be available on company websites in a specified format instead of a physical sign.

**Comment Response:**

EPA does not agree that this requirement is unnecessary. Some operators' headquarters may be physically located in a geographic area that is identified as under-served for broadband internet access or they have limitations regarding computer access or computer capability. The same limited access to broadband internet access and computer access or computer availability can occur for some members of the public. The purpose of the requirement in Part 1.3.5 is to provide notice to the public, and any other interested parties, that the industrial facility's stormwater discharges are authorized by EPA. Part 1.3.5 of the 2021 MSGP has been updated to require that the sign include a brief statement that the facility is permitted for industrial stormwater discharges under the EPA's MSGP along with the permit number, facility contact phone number for obtaining additional facility information, availability information related to the Stormwater Pollution Prevention Plan (SWPPP), and a statement related to reporting observed indicators of stormwater pollution (facility point of contact is optional). By providing notice of permit coverage and other information about the facility, interested parties are better informed and educated on how to obtain the SWPPP and how to contact the facility and EPA if indicators of stormwater pollution are observed in the discharge. Signage at facilities will increase public awareness of those facilities that have coverage under the MSGP, especially for any member of the public who may not be familiar with the MSGP, navigating the EPA website, or the individual facility they are interested in, or who may not have internet/computer access readily available.

In addition, the Proposed 2020 MSGP proposed to require operators to post a sign "…at potentially impacted public access areas." EPA has removed this language in the 2021 MSGP.

To address concerns for potential safety issues with posting a sign, EPA notes that the requirement is that the sign be posted at a "safe, publicly accessible location in close proximity" to the facility, so operators must choose an area that is safe for the public to access. As such, in some cases this could end up being some distance from the actual site, which is acceptable under the permit. To address the comment that certain sites are not widely visible from certain roads, the operator should consider posting the sign in a location that is visible from the nearest public road and as close as possible to the site.

To address concerns for limitations imposed by local governments, EPA is finalizing the following language in the 2021 MSGP: "Public signage is not required where other laws or local ordinances prohibit such signage, in which case you must document in your SWPPP a brief explanation for why you cannot post a sign and a reference to the law or ordinance."

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 6:**

**Sign of Permit Coverage (Part 1.3.6)** EPA should eliminate the proposed requirement to post a public sign of permit coverage. While it may appear to be a relatively simple requirement, posting a sign of permit coverage in accordance with EPA's proposal simply would not be possible at many mine sites and is duplicative of Stormwater Pollution Prevention Plan (SWPPP) requirements that already make this information publicly available.

EPA has proposed a requirement to post a sign or other notice of permit coverage at a "safe, publicly accessible location in close proximity to a facility and at potentially impacted public access areas." Facilities must also use a font large enough to be readily viewed from a public right-of-way and conduct periodic maintenance of the sign to ensure that it is legible, viable, and factually accurate. The sign must include four specific parts:

1. the NPDES ID;
2. a contact name and phone number for obtaining additional facility information;
3. the website where the SWPPP can be accessed or the statement: "If you would like to obtain a copy of the SWPPP for this facility, contact the EPA Regional Office at [include the appropriate MSGP Regional Office contact information found at http://www.epa.gov/npdes/contact-us-stormwater#regional];" and
4. the statement: "If you observe indicators of stormwater pollutants in the discharge or in the receiving waterbody, contact the EPA through the following website: https://echo.epa.gov/report-environmental-violations."

NMA members are committed to transparency and providing the public and the communities in which they operate accurate information about their operations. However, EPA's proposed requirements simply are not practical or necessary for mine sites. A sign of permit coverage might make sense on construction sites, which are usually located in populated areas for a limited period of time and which may be left unmanned during certain parts of the day. In those circumstances, a sign informing the public could be appropriate in directing the public to more information about a temporary operation.

Mining operations are completely different. Mine sites are very large, expansive sites that can cover thousands of acres. Given the nature of mining activities, many of these sites are located in very remote areas that are not publicly accessible. Mine sites also have very strict security procedures and access protocols to ensure the health and safety of employees, visitors, and the public. This means that it may not be feasible for operators to post a sign at a "safe, publicly accessible location in close proximity to [the] facility" simply because that location may not exist. Further, even if such a location could be determined for remote mining sites, the sign would be subject to significant vandalism and deterioration from weather conditions.

Furthermore, we oppose the proposed requirement of signage that suggests the public contact EPA if someone observes "indicators of stormwater pollutants in the discharge or the receiving waterbody." General members of the public do not have the expertise to determine whether a discharge actually originated from an area of the site that is covered by the MSGP. Inaccurate reports could cause confusion for both the site and EPA, and result in additional burdens for the agency. From a safety perspective, our members also do not want to endanger the public by

"inviting" them to investigate potential discharge from various outfalls on their site, which constitutes an unlawful trespass. It is important that any signage on the site does not encourage people to put themselves in danger.

Again, our members are committed to transparency and providing accurate information to the public. However, the proposed requirement to post a public sign in accordance with the requirements EPA has suggested here simply is not practical at a mine site. We believe it is important for the public to have access to information already provided through the SWPPP as described in Part 6.4 of the proposed MSGP, but recommend that EPA eliminate this provision completely.

**Comment Response:**

Regarding the purpose of the signage requirement in Part 1.3.5 and posting at potentially impacted public access areas, see response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11. Regarding the comment concerning the public monitoring and reporting discharges, EPA notes that, currently, there are existing avenues by which the public can report what appears to be a possible violation of environmental laws and regulations (e.g., ECHO website). Therefore, reporting potential environmental violations through EPA's ECHO website is not a novel approach. In addition, the sign must contain EPA's contact information, as EPA is the NPDES permitting authority for operators covered under the MSGP.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA decides to include signage requirements, then the MSGP should include an exemption or waiver process if there are local zoning law or codes preventing or limiting proposed permanent sign requirements or providing options such as posting information on a board inside the building at the public entrance.

**Comment Response:**

To address potential conflicts with local zoning law or codes, EPA finalized the following language in the 2021 MSGP: "Public signage is not required where other laws or local ordinances prohibit such signage, in which case you must document in your SWPPP a brief explanation for why you cannot post a sign and a reference to the law or ordinance."

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

On the proposal to place signage at every stormwater outfall:

"Sign, sign
Everywhere a sign
Blockin' out the scenery
Breakin' my mind
Do this, don't do that
Can't you read the sign?"

Anyone with a little bit of sense knows they will clutter up urban areas more than they already are and provide great targets for vandalism. In rural areas they are yet another eyesore to behold in what well may be an otherwise pleasant viewshed. All to be read and judged by people unqualified to make determinations on what they may see. Not to mention the burden of permittees to maintain and replace signs lost to vandalism or other causes. Or else placed on a facility far from the location of an outfall and utterly useless for the targeted audience.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Daniel Mumm
**Commenter Affiliation:** Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: Many facilities hold both an MSGP and NPDES discharge permit. The general public may not know if the observed pollution is originating from the area covered by the MSGP or by the NPDES permit, so this may result in confusion and misreporting to the EPA. Employees are trained in spill response and reporting procedures, as required in Section 2.1.2.8. Our employees are trained to contact the site environmental personnel on the stormwater pollution prevention team, which triggers an investigation and then contacting the proper

regulatory personnel. WSJM agrees with posting a sign for permit coverage but is concerned that adding information on contacting the EPA would result in confusion and misreporting.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10 and response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Allow the sign be posted at the stormwater outfall? No exposure facility not be required to post a sign.

**Comment Response:**

Operators may post the sign near stormwater outfall(s) if located in a safe, publicly accessible location. EPA clarifies that the requirement to post a sign of permit coverage is not applicable to facilities eligible for the no exposure exclusion under 40 CFR 122.26(g) (see Part 1.5 of the 2021 MSGP) and such facilities may file a No Exposure Certification (NEC).

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

Public sign of permit coverage

I agree that MSGP operators must be required to post a sign of permit coverage at a safe, publicly accessible location in close proximity to the facility.

**Comment Response:**

EPA notes the commenter's support for including a requirement that MSGP operators must post a sign of permit coverage.

---

**Commenter Name:** Jason F. Nall, Sr.
**Commenter Affiliation:** Kohler Co.
**Document Control Number:** EPA-HQ-OW-2019-0372-0124-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Sign postage of permit coverage should not be necessary because of concern for public safety, particularly if the intent of this provision of the permit is to have exterior signage. Industrial operations tend to be fenced and gated with frequent heavy truck traffic near these ingress/egress points. Additionally, discharge points may not be accessible for observation without trespass on a property, as frequently they are installed in remote locations away from industrial operations. Regarding impacts to receiving waterbodies, multiple industrial entities may be contributing to a waterbody in the same watershed making attribution to a single entity difficult for public identification.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports the inclusion of the permit requirement that MSGP operators must post a sign of permit coverage at a safe, publicly accessible location in close proximity to the facility. Signage will improve the accountability of MSGP operators and increases public awareness of those facilities that hold permits and may serve as a useful public education tool as well.

BES recommends that the permit identify specific sign requirements to maintain consistency such as text sizing, the name of the permit including the word " stormwater," the name and site address of the MSGP operator, a statement such as "Report any stormwater pollution concerns to" and the contact name and phone number of the regulatory contact person.

**Comment Response:**

EPA notes the commenter's support for including a requirement that MSGP operators must post a sign of permit coverage. EPA declines to specify the specific text size, but instead requires operators to use a font large enough to be readily viewed from a public right-of-way. The sign/notice does not need to be very large and take up significant space on the site. Part 1.3.5 identifies specific sign requirements, including a statement that the facility is permitted for industrial stormwater discharges, contact information for obtaining facility information, and information for reporting observations to EPA, as recommended by the comment.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests the removal of this requirement from the permit. Unlike construction sites, the majority of industrial facilities are staffed and have the means to provide permit coverage information in person or on a website. There is no need to make this a requirement for industrial facilities.

**Comment Response:**

EPA does not agree that this requirement is unnecessary. Signage at facilities will increase public awareness of those facilities that have coverage under the MSGP, especially for any member of the public that does not have access to a computer or broadband internet access or is not proficient with finding facility information on the internet. Also see response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding the requirement to Post a Sign of permit coverage.

The SIGN may be interpreted to say that there is an environmental issue at the property. This permit is required for established businesses and the need to post a sign should not be required even if other NPDES permits require it. In 2020, should any passer-by notice a situation that  called for immediate response regardless of type of property or ownership or if anyone is present or not, the passer-by knows at a minimum to contact town services. Anyone looking into environmental issues knows that they can contact the business and ask about their stormwater compliance. Stormwater documents are to be made available to the public and are also available through the Freedom of Information Act.

**Comment Response:**

EPA does not agree with the commenter's assumption that all members of the public would know the appropriate contact and points out that observations of potential permit violations should be reported to EPA. The purpose of the requirement in Part 1.3.5 is to provide notice to the public, and any other interested parties, that the industrial facility's stormwater discharges are authorized by EPA. By providing notice of permit coverage and other information about the facility, interested parties are able to obtain publicly available information about the facility and can identify the facility when reporting potential permit violations.

---

**Commenter Name:**  Meghan Morel
**Commenter Affiliation:**  South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**II. Signage Requirements Should Not Be Mandatory for All Sectors**

EPA is proposing in Section 1.3.6 to require a permittee to post a sign "or other notice of your permit coverage" at a "safe, publicly accessible location in close proximity to your facility and at potentially impacted public access areas." The sign must be large enough to be viewed from the public right-of-way and must be maintained. It must include: the NPDES ID; a contact name and phone number for further information; the Uniform Resource Locator (URL) for the SWPPP or a statement that the SWPPP is available by contacting the EPA Regional Office; and the following statement: "If you observe indicators of stormwater pollutants in the discharge or in the receiving waterbody, contact the EPA Regional Office at …"

SCWQA sees no reason to require a sign for all sectors. Unlike a small privately-owned scrap metal yard, the public can easily see most POTW facilities from the road and can contact the locality operating the plant with any concerns. Moreover, requiring a sign that must be maintained means the locality would have to ensure frequent monitoring of the sign and would have to pay to replace the sign if it is stolen or vandalized (this could be quite expensive). Lastly,

citizens would not be permitted to enter a POTW to view the discharge from a stormwater outfall, making it unnecessary to include a statement that the public should contact the regulator if it observes potential compliance issues. We also question whether members of the public would have the training to identify "indicators of stormwater pollutants in the discharge or in the receiving waterbody…" that are related to the POTW.

For these reasons, SCWQA recommends that EPA eliminate the signage requirement for Sector T permittees and consider whether it is an appropriate for other permittees given the issues listed in the paragraph above.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Frederick J. McNeill
**Commenter Affiliation:**  City of Manchester, New Hampshire
**Document Control Number:**  EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests that EPA consider signage that indicates permit coverage and informs the public on how to contact the permittee for more information and/or concerns rather than providing contact information for EPA. The City would appreciate the opportunity to address any public concerns before involving EPA, particularly when the concern is due to a misunderstanding, rather than an actual issue.

**Comment Response:**

Part 1.3.5 identifies specific sign requirements, which includes providing a contact phone number for obtaining additional facility information. Additionally, Part 1.3.5 of the 2021 MSGP has been updated to require that the sign include a statement that the facility is permitted for industrial stormwater discharges under the MSGP, as recommended by the comment.

Regarding the concern for providing EPA's contact information, see response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Virginia's 2019 ISW general permit does not require permittees to post a publicly available sign indicating permit coverage. At present, the public can identify sites that hold VPDES permits through our online Virginia Environmental Geographic Information System (VEGIS) data system as well as on a list posted on the DEQ website. Under our VPDES Construction General Permit, a notice of permit coverage is required to be posted, consistent with the federal construction general permit requirements. This requirement has proven to be very unpopular with permittees and resulted in litigation against DEQ challenging the requirement. We believe this is because a sign indicating VPDES permit coverage without any further information can cause a negative public perception without conveying a reasonable degree of understanding regarding the permitted activity. Certain facilities such as military installations and power plants also may have security concerns regarding posting too much information about the facility within close proximity. Most of the permittees under our ISW general permit are good actors that work to fulfil permit requirements. DEQ also has concern that this proposed requirement could set a precedent for the entire VPDES program. Overall, we see this proposed requirement as potentially burdensome with limited environmental benefit.

**Comment Response:**

EPA does not agree that the requirement to post a public sign is burdensome or has limited environmental benefit. As described in the Cost Impact Analysis for the 2021 MSGP, EPA estimates that the average cost per operator of this requirement over the 5-year permit term is $236.

The purpose of the requirement in Part 1.3.5 is to provide notice to the public, and any other interested parties, that the industrial facility's stormwater discharges are authorized by EPA. By providing notice of permit coverage and other information about the facility, interested parties are able to obtain publicly available information about the facility and can identify the facility when reporting potential permit violations. Further, except for Indian country within the state of Virginia, the 2021 MSGP is not eligible to industrial stormwater discharges in Virginia and, as an authorized state, Virginia DEQ is not obligated to incorporate this requirement in the VPDES permits.

Regarding the concerns about posting too much information for certain facilities, such as military installations and power plants, EPA has clarified in Part 1.3.5 of the 2021 MSGP that public signage is not required where other laws or local ordinances prohibit such signage. In such cases, the operator must document in the Stormwater Pollution Prevention Plan (SWPPP) a brief explanation for why the operator cannot post a sign and a reference to the law or ordinance.

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

(Pg#11) Request for Comment 6:..

The greatness of the recycling industry in general is that, when properly constructed and managed, it provides a sustainable solution for materials that would ordinarily end up in a municipal landfill or worse, on the side of the road. Increasing the regulatory oversight for those entities already working at considerable cost to be good neighbors and provide services to their local communities only impacts the good performers. These are visible and well-known establishments. Having a permit and following the requirements of the facility SWPPP provide benefit to the community. There is no benefit to adding additional oversight on the permitted facilities. Improvements in water quality will be gained with existing oversight using the current permit structure for those facilities that are currently unlicensed and unpermitted.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 1.3.6 – Request for Comment 6 - I think the sign is a bad idea. Where would we post a single sign on a large facility? Also, I do not want someone calling the EPA office directly and bypassing the internal process for reporting a stormwater issue.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**

**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

We believe this requirement to post signage is excessive and should not be required. Concerned community members have more than sufficient access to stormwater plans and contact information. Under current laws, anyone can make a claim about what they suspect may be a violation. This potentially leads to further exhausting work on the part of the accused to prove the burden of truth in such claims. The public is well protected under current laws without the need to post further signage and instructions.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11 and DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, we include in our detailed comments a number of other steps the agency can take to reduce administrative burden without sacrificing environmental benefit, such as removing the requirement for signs.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11 and DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Dischargers must post a sign of permit coverage at a covered facility as is required of other NPDES permittees, and whether the sign should provide information on how to contact EPA or what other information should be provided on the sign.

Discussion/Recommendations

This information is duplicative of information that can already be easily located on the internet or from state agencies and should not be an added requirement. Regarding location of sign: If on the street, the storm outlets would not be viewable here from all facilities, so could prompt false calls. If from shorelines, this sign would have to be oversized to include all required information creating a form of public nuisance. These concerns are exacerbated if new signs are required upon reapplication.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11 and DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Sign requirements

Discussion/Recommendations

Posting the name and contact phone number of an individual could lead to harassment and privacy issues.

**Comment Response:**

National Pollutant Discharge Elimination System (NPDES) permits such as the MSGP already require identification of the contact phone number for facility in the Notice of Intent, which is publicly available information; the sign requirements in Part 1.3.5 of the 2021 MSGP are not offering unique contact information that is not already publicly available.

---

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet does not agree with proposal for posting a sign designating permit coverage. The stormwater program is a self-implementing program based on BMPs and inspections.  It was never intended to be exactly like other NPDES programs nor should it.  The variable nature of stormwater, changes in facilities, and other concerns negate the need for a sign.  Some concerns include the next MSGP iteration which may require a sign at every outfall including those that may only have vegetation and wildlife, where should the sign be posted, does a turbid discharge of stormwater now necessitate a call to an agency about a facility, etc.  The fact that the facility information is available electronically and interested parties can look at this information negate the need for additional signage and the natural extension of signs all over a facility campus for stormwater drainage.

*Recommendation*

Howmet does not agree with the additional requirement of posting a sign for information on stormwater discharge for the public as it adds no value and the natural extension of this is problematic.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

While the EPA may be listed as a secondary contact, it would be useful to include contact information for the local Municipal Separate Storm Sewer System (MS4) operator on the sign as a primary contact so that the issue may be dealt with on a local level. Contact information for the local MS4 operator could be listed in Part 9 under the appropriate state. The contact information for the City of Albuquerque is MS4Compliance@cabq.gov .

**Comment Response:**

EPA declines to list the contact information of local Municipal Separate Storm Sewer System (MS4) operators in Part 9 of the 2021 MSGP. This information would likely become outdated during the 5-year permit term. In addition, the sign must contain EPA's contact information, as EPA is the National Pollutant Discharge Elimination System (NPDES) permitting authority for operators covered under the MSGP.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

This signage requirement seems like an unnecessary burden on the permittee. Signage makes sense in the CGP since construction sites are less permanent, the appropriate contact person and address can be difficult to identify, and ownership can change quickly. Industrial sites generally include company signage, maintain the same ownership for longer periods of time, have employees working at predictable times, and have a facility address and website with contact information. An onsite sign does not seem to be best way to identify required environmental permits and/or contact information for reporting violations. Information can be made available online to the public (e.g., through ECHO). If EPA implements a signage requirement, DWQ recommends keeping the required information to a minimum, as the visual appeal of the site is important to the company since it may also be used for customer interactions.

**Comment Response:**

EPA identifies specific sign requirements, which would likely include information separate from signage used for general customer interactions. See responses to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11 and DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should eliminate the proposed requirement to post a public sign of permit coverage. While it may appear to be a relatively simple requirement, posting a sign of permit coverage in accordance with EPA's proposal simply would not be possible at many mine sites and is duplicative of Stormwater Pollution Prevention Plan (SWPPP) requirements that already make this information publicly available.

EPA has proposed a requirement to post a sign or other notice of permit coverage at a "safe, publicly accessible location in close proximity to a facility and at potentially impacted public access areas." Proposed MSGP at Facilities must also use a font large enough to be readily viewed from a public right-of-way and conduct periodic maintenance of the sign to ensure that it is legible, viable, and factually accurate. The sign must include four specific parts:

1) the NPDES ID;

2) a contact name and phone number for obtaining additional facility information;

3) the website where the SWPPP can be accessed or the statement: "If you would like to obtain a copy of the SWPPP for this facility, contact the EPA Regional Office at [include the appropriate MSGP Regional Office contact information found at http://www.epa.gov/npdes/contact-us-stormwater#regional];" and

4) the statement: "If you observe indicators of stormwater pollutants in the discharge or in the receiving waterbody, contact the EPA through the following website: https://echo.epa.gov/report-environmentalviolations."

LQD SMCRA and non-coal regulations require WMA members to post site specific informational signs at their entrance roads. Hence, our WMA members have extensive experience with the cost to install and maintain signs, in particular the large sign required to satisfy the above list of requirements. Our members sign's already include the general contact site information on an entrance road sign. In our experience, that amount of posted information is sufficient and manageable.

The remaining items on the above desired list of information are duplicative and generally not necessary for mine sites. In our experience, more signs equate to more vandalism and sign maintenance from environmental degradation. Our members regularly must maintain or replace entrance road signs due to the prevalence of Wyoming's high winds, as well as wildlife and livestock rubbing on signs. In our windy climate, small signs are best.

We are also concerned with the proposed language on the sign that directs the public to contact EPA if someone observes "indicators of stormwater pollutants in the discharge or the receiving

waterbody." The proposed language as written could be construed by some individuals as a request from the EPA to become the EPA's enforcement arm. However general members of the public do not have the expertise to determine whether a discharge is stormwater, NPDES or natural runoff. Inaccurate complaints could cause confusion for both the site and Wyoming LQD and WQD regulators, imposing additional burdens on the agencies and our members.

In summary, the proposed requirement to post a public sign in accordance with the laundry list of requirements EPA has suggested here simply is not necessary and would be a maintenance issue due to the Wyoming winds. We believe it is sufficient to post the permit number and general facility contact information on an entrance road sign. The need for the additional information as proposed has not been justified in the MSGP nor in the support documents submitted with the 2020 MSGP renewal proposal.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

No permit information for the general public is required under the MSGP, and the sign is an added cost in creation and upkeep. The public will be able to access pertinent information from the facility's NOi issued with the regulatory agency (for example the ADEQ website eMaps lists permittee information). Should a sign be required, then EPA should consider only requiring signage at those locations where the public has a reasonable likelihood of coming in contact with the discharge.

**Comment Response:**

The Proposed 2020 MSGP proposed to require operators to post a sign "…at potentially impacted public access areas." EPA has removed this language in the 2021 MSGP.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

We do not agree that a sign should be posted at MSGP-permitted facilities. Industrial facilities are fixed facilities with generally static boundaries, pollutant sources, and typically have dedicated environmental personnel onsite. Site security and safety considerations may be significant. Concerned public can access information about the industrial facility operator through the internet, EPA website, etc. The addition of a sign posting for fixed industrial facilities does not add significant information to the concerned public and puts the industrial site operator at risk of private citizens parking and walking around the facility boundaries.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

## The Signage Requirement is Costly and Places the Public in a Dangerous Situation

The proposed MSGP introduces the idea of a sign at the facility that informs the public about stormwater related activities. While this may appear to be a minimal request, the specifics tell another story. Our assumption is that this idea is pulled from the General Permit that is currently used for Construction. In that situation, a project can reveal itself almost overnight and based on the fast pace of many construction projects, the disturbance can be a shock to the public, many of which may live in close proximity. In those situations, a sign may make sense due to the all the questions that will occur by those that have no advance knowledge of the project.

Typical construction projects are also situated in and amongst mixed use areas. In an urban setting they are more likely to have foot traffic passing along the road frontage or are adjacent to existing developments that allow for easier access to view a sign. Aggregate operations are not usually located in an urban area and are more permanent in nature with most operations having a planned life of many decades. Our large facilities are usually served by one main entrance and based on the fact that we are a heavy industry, that ingress/egress point is very busy with most of the traffic consisting of the many haul trucks that deliver our product to job sites. These are not safe places for foot traffic and are certainly not designed with any sort of parking area to allow viewing a sign.

...

The required language for this sign is clearly referenced in the draft permit and a mock-up of that sign would appear as shown below.



A proper sign is going to include the site name as well as the company logo. Scaling the above version to include 3-inch letters in the body of the sign brings the total dimension of the sign to 6.5-feet wide X 5.25-feet tall. This is 27 times the area of the smaller sign noted by the EPA and almost 5 times the larger dimension. A sign this large will also need to be properly installed to withstand wind loading. The $127.65 quoted in the cost analysis may not even cover the cost for the posts. A sign to meet the requirement is projected to cost over $1500 to $2000 including installation.

All of these factors contribute to our request that you remove the signage requirement. Most of the industries covered by this MSGP are managed by established companies with informative websites. We encourage the EPA to allow, as an option, placement of the requested information on the company website for public access.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

IMA-NA recommends EPA eliminate the requirement to post a public sign of the permit. As noted by other stakeholders, this requirement seems to be modeled after the Construction General Permit (CGP) and does not make sense when applied to mine sites. Unlike sites that are more temporary in nature, industrial mineral sites are operational for years and in many cases decades. As longstanding permit holders, any pertinent information about a mine can be found online without necessitating the posting and maintenance of an onsite sign for the public. Not only is there no real reason to model signage requirements for more permanent operations off of temporary site requirements, but in the case of mining operations there are reasons to deter the public from accessing the sites. Mines are by nature dangerous and operate under a series of safety regulations that necessitate on-site training and supervision for visitors. The sites also tend to be isolated and cut across acres of land. The size and location of the sites leave logistic as well as safety questions for the Agency to consider. Where could signs at mines be posted that would not potentially expose uninformed private citizens to potential dangers while attempting to review a permit. This is doubly true in the proposal's suggestion that the public can monitor, and report discharges themselves. Any language or regulatory requirement that ignores the safety considerations of mine sites should be re-evaluated and either removed or altered. IMA-NA feels this aspect of the proposal is impractical for our industry and believes there are other ways for the public to attain information related to permits if necessary.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

### 3. Request for Comment 6: Public Posting of Permit Coverage

We oppose this new proposal for public posting of permit coverage. It is another capricious expansion of the existing MSGP "process" without any stormwater benefit. There are already USEPA and state EPA websites that list stormwater permittees. The enforcement risk for "non-

compliance of process" is real, such as inadvertent non-posting, or not posting in the "right" location. This requirement would also add the burden of maintenance of the sign, often in natural bank environment that would disturb surrounding vegetation and create a visual obstruction to the natural water system. This proposal also raises precedential concerns on public postings of other non-stormwater operating permit programs.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's request for comment 6 seeks comment on whether there should be a requirement to post a sign of permit coverage at a safe, publicly accessible location in close proximity to the facility, as is required of other NPDES permittees. VMA believes this requirement is unnecessary and would be challenging to implement at some sites with limited benefit to the public. All relevant information is publicly available electronically through the Notice of Intent.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 1.3.6 Requirement to Post a Sign of your Permit Coverage (Request for Comment 6):***

Security requirements within a facility may limit the location where a publically accessible sign could be posted. While a sign may be placed in a publically accessible location, permitted MSGP facilities and associated discharges may not be publically accessible. Therefore, potential observed stormwater pollution may not be associated with MSGP discharges. Under these

conditions, the signage offers limited information to the public and EPA relative to notification of observed pollution in discharge. The ability for the public to report an observation to the website provided in Part 1.3.6.4 of the proposed 2020 MSGP appears to be sufficient. Further, detailed information relating to facility MSGP coverage is available to the public in online systems.

This requirement currently applies only to Construction General Permit sites. Construction projects may involve site disturbance, are time-limited in nature, and generally cover construction-related activities that are not representative of routine activities at industrial facilities. Compliance with this proposed permit language would require installation of a permanent sign for a facility requiring longterm to perpetual MSGP coverage. Each permit cycle, the sign would need to be modified to update the permit tracking number and SWPPP URL.

*Recommendation:*

It is recommended that no signage be required, or that an exclusion be allowed for industrial facilities that operate under restricted access to meet security requirements and do not allow public access.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA does not support the proposed posting requirement generally, and we also oppose the separate requirement for the sign to include contact information for EPA (or a State/Local authority).** Some of FPA's members operate in residential neighborhoods and others operate in industrial parks that are generally zoned for "light industry." In the first instance, buildings and appurtenances are low profile and conform with housekeeping practices not to interfere with these neighborhoods. Placarding of any kind is generally limited to identification of the business and the address. (It also is not unusual for local jurisdictions to limit what can be posted on property, to specify where signage can be posted, and to limit the "size" of information that is posted). Similarly, deliveries and pickups, including product and trash shipments out of such a facility are scheduled not to interfere with neighborhood traffic. Thus, additional signage of any kind would not be welcomed by these communities. In the second instance of "light industry"-zoned facility locations, while signage is less of a problem, activities including signage also are limited, especially in flood plains. In both instances, FPA's members also wish to underscore

their concern that signage regarding NPDES permit information, with or without EPA contact information, may signal "hazardous operations" to the community and thereby could convey "an invitation" for trespassers to dump oil or other household waste in facilities' storm sewers with resulting harm to the facility and the community. We believe that these concerns outweigh any value that would be added by posting MSGP coverage.

Importantly, FPA members conduct regular outreach with their communities, and all environmental permits are available to the public at the respective regulatory authority's place of business. Many of these authorities—and probably the vast majority of the —post permits online for the public. Thus, FPA submits that additional posting requirements are not needed, and may expose its members to potential harm.

**Comment Response:**

Regarding the purpose of the requirement in Part 1.3.5, see response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11. Regarding the concern for limitations imposed by local jurisdictions, EPA included the following language in the Final 2021 MSGP: "Public signage is not required where other laws or local ordinances prohibit such signage, in which case you must document in your SWPPP a brief explanation for why you cannot post a sign and a reference to the law or ordinance."

---

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

**10. AAAE believes EPA's proposed requirement to post a sign or other notice of coverage at a safe, publicly accessible location is impractical in the airport context.**

Under proposed Part 1.3.6, EPA would require permitted airports to post a sign or other notice of MSGP coverage "at a safe, publicly accessible location in close proximity to your facility and at potentially impacted public access areas." The sign would have to include the NPDES identification, contact name and phone number for the facility, and information on how to access the airport's SWPPP. AAAE understands that this requirement may be practical at many facilities with well-defined entry points or one primary building. However, this requirement would not achieve its intended objective in the airport context because of the multiple buildings and operators that are spread out across a large area. In addition, many airport areas and facilities are not accessible to the public, such as airfields, for safety and security reasons. Thus, AAAE believes EPA should remove this proposed requirement.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI does not support including in the 2020 MSGP EPA's suggested requirement for permittees to post and maintain certain information about the facility's permit, SWPPP, facility contacts, and filing complaints in a highly publicly visible manner outside the facility. As with other provisions in the Proposed 2020 MSGP, this suggested requirement is predicated an assumed equivalency between the CGP and MSGP.

Such equivalency does not exist. One reason is that the CGP is temporary while the MSGP effectively applies indefinitely. This is particularly relevant for this suggested requirement. A construction site is a temporary operation whereas an industrial facility is a permanent operation. Posting of stormwater permit information for a construction site may serve the public interest **precisely because of the site's lack of permanency**. This is not the case for an industrial site.

This provision should not be included in the 2020 MSGP because it is not necessary. The permittee's facility is permanent, and the facility's owner or operator can be found via its permanent street address. Anyone who wants more information about the facility and its stormwater management program (e.g., SWPPP) should be able to obtain it without too much effort, especially considering that certain stormwater information is submitted and posted electronically (e.g., the SWPPP) under the 2020 MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11. Also, to clarify, Part 6.4 of the 2021 MSGP requires that operators has three options to make Stormwater Pollution Prevention Plan (SWPPP) publicly available: attach the SWPPP to the NOI, provide a URL of the SWPPP in the NOI, or provide SWPPP information in the NOI.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that EPA remove the proposed requirement for signage at iron and steel facilities.*

All relevant NOI information is already available publicly and online. Requiring permit holders to create a website and install a sign is duplicative and a waste of resources that would provide no environmental benefit. Additionally, specific to the iron and steel sector, member facilities have significant perimeter and safety setbacks. For many facilities, finding locations for signs that serve any useful purpose would be difficult. Furthermore, this could potentially create a safety hazard for the public when trying to observe such signs.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11, and response DCN EPA-HQ-OW-2019-0372-0217-A1, Comment Excerpt Number: 3.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA remove the proposed requirement for signage at iron and steel facilities.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposed requirement to post notice of permit coverage is an unnecessary documentation exercise that would do little more than increase the risk that facilities will be subject to enforcement over petty paperwork violations. It does not meaningfully aid public awareness, and may in fact post a public safety hazard. Steel manufacturing facilities contain heavy industrial operations that tend to be fenced and gated with frequent heavy truck traffic through a limited number of ingress/egress points. To post notices of any kind near these areas would unnecessarily attract people into the path of this heavy truck traffic, and is particularly unnecessary because the information proposed to be posted is already available online and/or on request.

Additionally, discharge points at many facilities may not be accessible without trespassing on the facility property or neighboring properties. At other facilities, discharge points may be located in more remote locations away from industrial operations or areas that may not be safely accessed by an untrained or unfamiliar member of the public.

While the Steel Associations fully support the dissemination of important environmental compliance information – including stormwater outfall locations – to the public, we believe that access to information must be balanced against legitimate concerns about public safety. Where, as here, the information can be safely and effectively disseminated through the internet and other means, EPA should refrain from broadly imposing signage requirements that could create safety risks at some facilities.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  DG Whitefield, LLC and Springfield Power, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0188
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Part 1.3.6: Requirement to Post a Sign indicating Permit Coverage; Request for Comment 6 We disagree with the proposed requirement to post a sign to indicate permit coverage and provide EPA contact information as this seems highly unnecessary in an age of online search browsers where this information is easily accessible online

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Notification to EPA should be only through the assigned permitted facility contact. Public sector should never determine compliance on observation alone, due to lack of knowledge. A sign, if required should only list the assigned permitted facility contact, who has the knowledge to determine noncompliance based on the permit.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA proposes to require placing signs on the property of the entity applying for a stormwater permit. EPA seems to want to expand public notice. All relevant information about the permitting process is already available online. The public is not being kept in the dark. In fact, a plethora of information is available to members of the public who are interested in the process. Posting a sign on the property is like an open invitation to engage in a dialogue about the matter on-site. Manufacturing plants all have strict policies about visitors and tightly control access to manufacturing facilities for both safety and trade-secret reasons. The posting of such signs as proposed by EPA seems to invite access to the property. NAIMA and its members can see no benefit from this posting of signs on the property of manufacturing plants and a host of potential problems that would serve as an incentive for entrance onto the property.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether the 2020 MSGP should include a requirement that MSGP operators must post a sign of permit coverage at a safe, publicly accessible location in close proximity to the facility, as is required of other NPDES permittees. **[Yes.]** EPA requests comment on whether this notice should also include information that informs the public on how to contact EPA if stormwater pollution is observed in the discharge. **[Yes.]** EPA also requests comment on what other information could be included on any sign or other notice. **[The list of stormwater pollutants generated and monitored for MSGP compliant.]**

**Comment Response:**

EPA notes the commenter's support for including a requirement that MSGP operators must post a sign of permit coverage. EPA declines to add the list of stormwater pollutants generated and monitoring for MSGP compliance; however, the 2021 MSGP does require the sign to include a statement about how to obtain a copy of the SWPPP. The SWPPP would contain the list of stormwater pollutants generated at the site.

---

**Commenter Name:** Asciatu Whiteside
**Commenter Affiliation:** Dallas Fort Worth International Airport (DFW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0208-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed permit requires permitted facilities to post signage in publicly accessible areas of the facility displaying facility contact information, permit information, and EPA contact information. While this requirement may be practical in the majority of facilities with well-defined entry points or one primary building, this requirement may not be effective in the case of large facilities with multiple buildings/operators. Facilities, such as airport and seaports, may have multiple entry points with permitted facilities located in areas with limited public access (i.e. airfields). It is recommended that the EPA incorporate language to provide an option for large facilities to provide contact information, permit information, and EPA contact information on the permitted facilities company website instead of posting signage on property grounds in order to make messaging more visible and accessible.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

**Commenter Name:**  No Name
**Commenter Affiliation:**  Resource Management Associates (RMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 6 – It is recommended that the sign requirement be elaborated on, and a "standard sign" be made part of the MSGP with the specific information on it that the MSGP would require. However, it is also noted that the placement of sign where it may be viewable to the public will likely lead to many spurious calls to EPA or delegated state agencies due to the public's lack of understanding of the whole concept of industrial stormwater discharges, and/or what constitutes "stormwater pollution in the discharge". For example, if a TSS benchmark is 100 mg/L, discharges with concentrations of TSS below this, while still below the benchmark, may show signs of cloudiness. Should the EPA be notified? Some form of elaboration on when EPA or a state should be notified, or what will happen when a notification is made, is justified should this requirement be made part of the MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Industrial facilities can be large and dynamic places of business and typically have established signage that identifies the company name and contact information. Even if contact information is not posted on a sign at the site, it is not difficult to look up a company's contact information for an established business location. All information contained on the MSGP proposed sign is already available to the public through the regulatory agency or public website. Incorporating specific facility signage requirements into the MSGP would create an unnecessary burden on permittees to initially post and continually maintain the sign. Since the information that would be contained on the proposed sign is already publicly available, this new requirement would yield little to no benefit.

Unlike construction projects, which are temporary in nature, industrial facilities are more permanent and should not be required to post and maintain MSGP specific signage at the site. It is understandable to require signage at construction sites as it is often difficult to determine who is operating the site because of limited signage. This is not the case at industrial facilities.

**Suggested Revision:**

Delete Part 1.3.6 from the final version of the MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

This requirement is redundant in that the General Public can notify Local and Federal Authorities in the event they discover environmental contamination. The phone numbers and websites for these entities are readily available. In addition, the permitted facility already has their SWPPP easily available to the General Public.

This requirement could also create the appearance that each licensed facility is de facto guilty of being a polluter. I think it is inappropriate for a permit bolder to have to provide a sign instructing people to contact the EPA if contamination is found in a receiving water body. Finding contamination in a receiving body of water does not mean the pollution came from the permitted facility which had to put up the sign. Also, with all of the proposed wording for this sign, it will have to be very large for some businesses due to the requirement it must be readily viewable from a public right of way. I request the removal of this provision from the Proposed Rule as it can cause inaccurate accusations and innuendos.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1

**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement to post a sign is redundant/excessive. The public has adequate access to industry Storm Water Pollution Prevention Plans (SWPPP). The public's right to access industry SWPPP are protected under current law. This proposed requirement places an extra burden on companies and is unnecessary.

The proposed requirement to post a sign for public viewing is overkill and invites unecessary nuisance claims of suspected violation, perhaps even harassment calls. Having the information on line in the public domain is sufficient.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11 and DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Under the proposal operators must post a sign of permit coverage at a safe, publicly accessible location near the facility and include information that informs the public on how to contact the EPA if stormwater pollution is observed in the discharge.

While this is a seemingly minor issue, its value seems questionable. Many facilities subject to these regulations are not open to the public and the average member of the public could not distinguish stormwater pollution from normal runoff. As a result, this type of reporting could be used as a form of harassment, forcing operators to respond to things that are not a violation. There are very few members of the public that would be interested in requesting or reading an SWPPP and things like font size, size of sign and other minor details would result in a severe overregulation. We urge EPA to eliminate this requirement.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Matthew Paxton
**Commenter Affiliation:** Shipbuilders Council of America (SCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0217-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is also proposing to require that MSGP operators post a sign of permit coverage at a safe, publicly accessible location in close proximity to the facility. The proposal requires that the sign includes information about how the public can contact EPA if stormwater pollution is observed in stormwater runoff. Additionally, the sign must include a Uniform Resource Locator (URL) for the facility's Stormwater Protection Plan (SWPP). The requirement of posting a sign of permit coverage places an arbitrary and burdensome standard on MSGP operators that does not hold any utility for preventing polluted stormwater runoff. Rather than posting a sign, MSGP operators should be allocating their time and resources to functionally preventing polluted stormwater runoff.

**Comment Response:**

Regarding the purpose of the requirement in Part 1.3.5, see response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11. Regarding the statement that the sign must include a URL for the facility's SWPPP, this is applicable in cases where the operator has posted the SWPPP online. If the operator has not posted the SWPPP online, Part 1.3.5 requires a statement about how to obtain a copy of the SWPPP from the EPA Regional Office and facilities have the option to also include a facility point of contact.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

***7. EPA Should Require Operators to Post Public Signage of Permit Coverage to Promote Public Transparency and Compliance.***

Commenters support EPA's decision to require that operators post signage of permit coverage at a safe, publicly accessible location in close proximity to the facility.[18] Commenters also agree with the Agency that operators should be required to include information on how to contact EPA if a member of the public observes stormwater pollution.[19] To facilitate public reporting of stormwater pollution, the signage should include the name of the operator and facility as listed on the permittee's NOI. Moreover, as further discussed below, Commenters believe the signage

should include one straightforward URL to an EPA website where members of the public can (1) report observations of stormwater pollution, and (2) access permit compliance materials such as NOIs, annual inspection reports, and updated SWPPPs. This will allow the public to gain a better understanding of a specific facility's compliance with the MSGP. In turn, the public will be able to provide a more informed report of stormwater pollution to EPA.

[18] *See* Draft Permit at 10, Part 1.3.6.

[19] *Id.*

**Comment Response:**

EPA notes your support for including a requirement that MSGP operators must post a sign of permit coverage.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

ARA opposes the signage requirement for MSGP as it adds no value and has no practical application.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

In Request for Comment 6, EPA asks whether the proposed MSGP should include a requirement to post a sign of permit coverage "at a safe, publicly accessible location in close proximity to your facility and at potentially impacted public access areas". The sign(s) would have to include contact information for EPA for the public to report stormwater pollution. Except for combined

sewer overflows, MWRA is not aware of any similar requirements for signage near NPDES discharges.

Deer Island Treatment Plant is within the Boston Harbor Islands National Park, and a heavily used walking/biking path encompasses the entire perimeter of the facility. In our experience, the general public is not necessarily able to distinguish pollution from natural conditions, in particular seafoam and algal blooms. Also, since permittees are conducting routine inspections under the MSGP (and probably other permits and regulations), any stormwater pollution problem should not go undiscovered for long. Finally, many industries may not have suitably safe, publically accessible locations anywhere near their facilities.

If NPDES permit requirements are met, there should be no impact to human health or the environment, and no reason for the public to be concerned. In the draft permit, the proposed reporting method is a web form1 on the EPA Enforcement and Compliance History Online ("ECHO") web site. The ECHO website form allows anonymous reports, and will likely generate false alarms but provide no opportunity for public education. It may also result in a report or complaint that the Permittee is not informed about and therefore cannot address. **For the above described reasons, MWRA does not agree that the permit should include the proposed signage.**

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

No. Seems tacky, and costly.

**Comment Response:**

Comment noted. Commenter asserted that signage seems costly but did not provide supporting data or information regarding this assertion.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1

**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

This is not a reasonable requirement for some remote sites. It may require additional permitting by municipalities, which could incur unreasonable costs with minimal benefit to the environment. EPA needs to clarify criteria of the required signage (size, location, required content) and allow for subsequent comment by the regulated community. Further, the public already has access to storm water pollution prevention plans (SWPPP) online or by accessing the facility's NOI and they have access to state and federal agency contacts. Therefore, the EPA has not made clear what need is satisfied nor what benefit the public will gain by such a requirement. The action could lead to unwarranted claims that would burden the EPA enforcement division and the facility's resources.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Posting a sign should be required. Posting a sign to indicate permit coverage is not an onerous request and would make it easier to recognize permitted sites and for the public to provide reliable information if reporting a complaint or issue with a permitted site.

**Comment Response:**

EPA notes your support for including a requirement that MSGP operators must post a sign of permit coverage.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 6. The intent and benefit of the requirement for signage should be clarified by EPA. There are increased costs to installing and maintaining a sign for notice of 2020 MSGP permit coverage. For inactive mine sites, this would serve little value since these sites are generally remote and have no activity. In addition, it would be costly and difficult to implement and maintain a sign at a remote location. In areas where the nearest public road is not on or adjacent to the permitted site (such as a mine), unrelated stormwater issues (i.e. from a highway department in the right-of-way) could be mistaken as being the responsibility of the permittee listed on the signage. It is likely this would lead to additional time and effort for both the permit holder and EPA to deal with unsupported claims from NGOs or the public. Furthermore, the statement found in 1.3.6.4 (that EPA is proposing to be on this sign) is flawed. It is likely that most stormwater contains some type of pollutant, such as solids. Does the presence of any pollutant justify a phone call to an EPA hotline? The purpose of the MSGP is not to prohibit discharges of pollutants in stormwater. Rather it is to regulate such discharges so that water quality standards and associated beneficial uses are protected. Finally, the public always has the ability to call EPA over a water quality concern. Especially through resources and information available through the EPA's website, contacting EPA with such concerns is easy to do.

The proposed requirement in 1.3.6 is not needed and provides no environmental benefit. <u>Simplot strongly recommends that permit condition Part 1.3.6 be removed from the 2020 MSGP.</u>

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Lealdon Langley
**Commenter Affiliation:**  Massuchusetts Department of Environmental Protection (MassDEP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

MassDEP agrees that this is a worthwhile and reasonable amendment to the MSGP.

**Comment Response:**

EPA notes your support for including a requirement that MSGP operators must post a sign of permit coverage.

---

**Commenter Name:**  Benjamin J. Davenport
**Commenter Affiliation:**  Idaho Mining Association (IMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

IMA is not generally opposed to signage indicating coverage of a facility under the MSGP. However, we are concerned over the potential ramifications of directing the public to contact EPA if they "observe indicators of stormwater pollutants in the discharge or in the receiving waterbody" since such a determination likely requires methods or information not generally available to the public. Such direction could lead to inaccurate or unfounded reporting by the public, which would likely require unnecessary action on the part of EPA and the permittee.

*IMA requests that EPA remove the requirement to direct the public to report observations of stormwater concerns. The preceding language in the draft permit is sufficient to allow the public to find a facility's Storm Water Pollution Prevention Plan online and/or to contact EPA with questions or concerns.*

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

This requirement seems very unnecessary, given that permit coverage for regulated MSGP operators is readily available on the EPA's website. Liability issues with a "publicly accessible location in close proximity to the facility" are also a concern due to the nature of activities associated with Sector A facilities. If this requirement is to be included, we also request a better definition of "in close proximity", as this is vague. We would also propose that the sign needs to be posted in a visible location in or outside of the facility office or directly adjacent to the facility entrance if no office building is present.

**Comment Response:**

The term "in close proximity" means near, or a short distance away. EPA notes that the requirement is that the notice be posted at a "safe, publicly accessible" location, so operators must choose an area that is safe for the public to access. As such, in some cases this could end up being some distance from the actual site, which is acceptable under the permit.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)
**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**VI. UWAG Does Not Support the Proposed Requirement for Facilities to Post Public Signs of Permit Coverage**

EPA's Construction General Permit (CGP) includes a similar signage provision, but the rationale for this requirement does not apply to the MSGP. Unlike construction sites, industrial sites are established and not transient. Most facilities have existed at their current locations for decades, and all of the relevant notice of intent (NOI) information is available online. Requiring operators to post public signs of permit coverage would not provide any benefit to the public.

Moreover, this requirement poses safety risks and implementation problems for facilities. Public signs could draw the public to essential critical infrastructure or other sensitive facilities, which could potentially put the public and facility personnel at risk. From a practical standpoint, the public signs would not be useful for those facilities that are not publicly accessible. One UWAG member notes, for instance, that its facilities are completely surrounded by fencing or monitored by security guards. Additionally, some facilities that rely on the MSGP are also subject to the Chemical Facility Anti-Terrorism Standards (CFATS), which require facilities to adhere to risk-based performance standards that include the use of security personnel, detection systems, and barriers and barricades. 6 C.F.R. § 27.230. Requiring facilities to provide a sign of permit coverage would be burdensome, ineffective, and in some cases, dangerous.

Instead of a physical sign, UWAG recommends that the MSGP include an option for operators to make permit coverage publicly available through their websites, similar to public notice provision for SWPPPs. See Proposed Fact Sheet, Part 6.4.1, at 94. As noted above, NOI materials are already available online. In the event that EPA moves forward with this requirement, the Agency should include an exception that would exempt facilities that are located a certain distance from a public right-of-way. UWAG also recommends reducing the information that must be included on the public posting, as most of the information that EPA would require is readily available online in publicly available NOIs. Additionally, EPA should not require public signs include EPA contact information to report on alleged stormwater pollution. Inclusion of this information directs individuals of the public to render determinations that they may not be qualified to render.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed permit requires permitted facilities to post signage in publicly accessible areas of the facility displaying facility contact information, permit information, and EPA contact information. While this requirement may be practical in the some facilities with well-defined entry points or one primary building, this requirement may not be effective in the case of large facilities with multiple buildings or multiple operators such as airport and seaports which may have multiple entry points and permitted facilities that are located in areas with limited public access (i.e. airfields).

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 6 – NRMCA strongly opposes requiring covered facilities to post a sign notifying the public of permit coverage. NRMCA questions what the purpose of such a requirement serves and what environmental benefit it adds. Currently, there are avenues that qualified professionals and citizens can use to obtain information on a covered facility's permit. NRMCA's experience is that inviting unqualified individuals into the permitting and/or compliance enforcement process, such as may be random passersby in this instance, undoubtedly results in unfounded, false, misleading, arbitrary, and/or costly environmental claims, heightened security risks and allegations with no added environmental benefit. NRMCA strongly urges EPA to reconsider adding this requirement to the MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

As the majority of information regarding a regulated entity's coverage under the MSGP is already publicly available through the EPA's various National Pollution Discharge Elimination System (NPDES) tools such as the ECHO or through a Freedom of Information Act request, the requirement for regulated entities to post and maintain signs at both a publicly accessible area and all "potentially impacted public access areas" is burdensome and unnecessary oftentimes requiring permits, installation costs, and on-going maintenance.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Public sign related to permit coverage. EPA's proposed signage requirements should not be adopted. All relevant NOI information already is publicly available online. Moreover, industrial facilities are fixed in location and readily identifiable, so a signage requirement will provide no added benefit.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 6**

The FWQC and FSWA oppose EPA's proposed signage requirements. The CGP requires signage, but the requirement is not warranted in the context of the MSGP for ongoing industrial activity. Because CGP coverage is much more transient and limited in duration, there may be a public benefit to seeing that a site is covered by the CGP and appropriate permit-related information. Unlike the construction program, industrial sites are established and not transient, with most facilities existing at their current locations since the first MSGP in 1995 and all of the relevant NOI information is available online. A sign would not provide any added benefit.

It is also worth noting that many industrial sites are large enough that outfalls are not even visible for public observation from a location where a sign might be (i.e. where a fence is located). Also, placing signs in the proposed locations could pose a security issue. For all of these reasons, the online data provides much more useful and accessible information to the public.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement to post a sign is unnecessary and puts an added burden on permittees. Information about facilities with stormwater permit coverage, including all the information described in Part 1.3.6 of the proposed MSGP, is readily available to the public online.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Should Not Require Posted Signs of Permit Coverage or Solicit Public Reporting of "Indicators of Pollution" on Any Signage**

AAR recommends that signage relating to permit coverage, including information regarding how to obtain a copy of the SWPPP and how to contact EPA if a violation is suspected, be included as a guideline rather than a permit requirement.

EPA has proposed that facilities must post a sign or other form of notice of coverage under the permit in "a safe, publicly accessible location in close proximity to the facility" in order that "interested parties [be] better informed on how to obtain the SWPPP and how to identify the site if reporting permit violations."[8] It is understandable to require signage at construction sites covered under an NPDES permit as it is often difficult to determine who is operating the site because of limited signage.

Industrial facilities, however, are ongoing places of business and typically have established signage that identifies the company name and contact information. Additionally, all information contained on the proposed sign is already available to the public through regulatory agencies and public websites.

Moreover, many industrial sites do not have "safe, publicly accessible" locations conducive to posting this type of signage. For example, rail yards are generally not accessible without trespassing on private property. Further, in areas with frequent heavy truck and equipment traffic, posting signs can create safety concerns. Finally, posted signs can be frequently damaged, resulting in short periods where the signs are not visible.

To the extent EPA includes signage requirements with public reporting instructions in the final permit, AAR respectfully requests further details on how such public reporting would be handled by EPA. For example, how would public reporting of "potential permit violations"[9] be investigated and what standards would be used to determine whether there was a violation or "observations of indicators of stormwater pollutants" from the public. While AAR appreciates inclusion of a public reporting component, it is not clear from the language in the MSGP whether a public report would be deemed a violation or how public reports would be independently verified by EPA or refuted by the facility. Any report from the public would need to be independently verified by the EPA prior to any type of enforcement action.

[8] See EPA Final Proposed 2020 MSGP Fact Sheet at 29.

[9] Fact Sheet at 29.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  Henniker Sand and Gravel
**Document Control Number:**  EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Part 1.3.6: Requirement to Post a Sign indicating Permit Coverage; Request for Comment 6

We disagree with the proposed requirement to post a sign to indicate permit coverage and provide EPA contact information as it seems this information is easily accessible through online search engines.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  45
**Excerpt Status:** Final

**Comment Excerpt:**

**X. Signage**

Section 1.3.6 proposes to require the posting of a sign indicating permit coverage to the general public. We oppose the imposition of any sign, which will likely cause the public to believe that a facility is a construction site as opposed to a food and beverage manufacturing facility. If a sign is required, it would only be appropriate to notify the public at the main facility entrance and not at any "public access" areas. It is important to also note that stormwater maps with sensitive

chemical storage information and confidential business information should not be made available to the public.

**Comment Response:**

EPA's requirement for a sign is not envisioned to confuse the public as to the type of facility or business operations. In the final 2021 MSGP, EPA requires that the sign include a statement that the facility is permitted for industrial stormwater discharges, which should alleviate this confusion.

Regarding the note that sensitive chemical storage information and confidential business information should not be made available to the public, Part 6.4 of the 2021 MSGP indicates that confidential business or restricted information (as defined in Appendix A) is not required to be available to the public.

---

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

Permit Coverage Sign: EPA should eliminate the proposed requirement to post a public sign of permit coverage.

LQD SMCRA regulations require mines to post site specific informational signs at their entrance roads. These signs include the name of the mine, a contact name and phone number, along with NPDES and Stormwater permit numbers. In our experience, that amount of posted information is sufficient and manageable. The additional information discussed in the proposed rules were not justified in the MSGP nor in the support documents submitted with the 2020 MSGP renewal proposal.

The remaining sign items proposed in the 2020 MSGP renewal are not necessary and will simply result in more maintenance of an overly large sign that will be hard to keep intact in Wyoming's winds.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**B. EPA's Proposed New MSGP Public Signage Requirements Are of Limited Value.**

...

CCIG supports the goal of EPA's proposal—providing information and transparency to the public. The Group, however, believes that adopting new public signage requirements would be of limited value and provide little to no benefit in helping to accomplish EPA's goal. First, the information EPA proposes to include on the required signs already is publicly available and easily accessible on EPA's website. Second, many of the signs that would be required would be in areas with minimal public traffic, and the volume of traffic would be even lower during weather events where stormwater discharges potentially could become an issue. Based on the lack of need for and nominal utility of imposing additional signage requirements, the Group recommends that EPA not adopt these requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Colorado supports public transparency and building awareness for concerned citizens. The public often calls us to report potentially unpermitted sites and we find it is important that a copy of the permit and SWPPP is available and on site for review during an inspection and ultimately that the SWPPP is implemented. Please note, however, that requiring signage would also require the development of variance procedures when local governments do not allow such signage.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0219-A1, Excerpt Number 7.

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

The Navy recommends that the 2020 MSGP does not include a requirement that requires MSGP operators to post a sign of permit coverage in close proximity to our facilities. As secured facilities, outer fence line of our bases do not provide readily accessible and safe options to post signage. Would recommend instead that such permit information be available on our public web pages.

**Comment Response:**

Part 1.3.6 of the Proposed 2020 MSGP proposed to require operators to post a sign "…at potentially impacted public access areas." EPA has removed this language in the 2021 MSGP.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

If it is determined that signage should be posted, recommend revising language completely on the sign to include the facility POC information in addition to the EPA, so that the permittee has an opportunity to address the observed indicators in-house before reaching out for EPA notification and/or support.

**Comment Response:**

Part 1.3.6 of the Proposed 2020 MSGP proposed specific sign requirements, which includes providing a facility contact name and phone number for obtaining additional facility information. The final 2021 MSGP requires a contact phone number for obtaining additional facility information along with other information.

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

Sign posting at an accessible location. (Proposed 1.3.6, request for comment 6). EPA proposes that the 2020 MSGP require posting of a sign or other notice of permit coverage "at a safe, publicly accessible location in close proximity to your facility" and that the sign should inform the public to contact EPA if there are observations of "indicators of stormwater pollutants in the discharge or in the receiving waterbody. . . ." Proposed MSGP at 1.3.6.4. The proposal is inconsistent with practical considerations for many remote mine and exploration sites. For example, there may be no safe and publicly accessible location close to the facility. Additionally, it is not clear how EPA is directing the public to make reports; first-flush storm events (particularly those in the arid west) are nearly always characterized by receiving waters with high turbidity regardless of location. The suggestion that the public look for "indicators" is flawed without more direction on what constitutes an "indicator" and potentially encourages private citizens to report conditions during potentially dangerous situations (and without adequate training to make that report a viable one). Moreover, such reports often necessitate significant, and unnecessary, follow-up by agency staff and permittees. The requirement to post a sign documenting permit coverage should be eliminated from the proposed MSGP; similarly, the notice to citizens regarding reporting of indicators should be eliminated.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

1.3.6

In the font designation, specify the maximum velocity at which the viewer must be able to read the sign, and what part of the sign must be read at that velocity. Note that local community signage, visual impact, and/or architectural standards may impede on some facilities ability to comply with this provision. Allowances for such provisions are recommended. Signage in a public place may require easement leasing or some form of licensing with a public entity or a

private entity visible from the public right of way. Such costs may be prohibitive for some small businesses.

**Comment Response:**

See response to EPA-HQ-OW-2019-0372-0219-A1, Excerpt Number 7.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

As drafted, this proposed provision would appear to require all MSGP holders to post the required sign. In the airport context, where an airport, airlines, fixed-base operators and other entities may hold general permits, the requirement would result in posting many signs providing repetitive information. This likely would not serve the purpose of informing the public and the sheer number of signs may give the public the impression that a water pollution problem "must" exist at the airport. Further, the locations at airports where one might "observe indicators of stormwater pollutants in the discharge or receiving waterbody" would likely be restricted either for safety or security reasons, In short, this provision appears to have been developed with sites that are very different from airports (e.g., construction sites easily observed from public roads and pedestrian ways). In addition, under existing 2015 MSGP permittees already are required to submit a "complete and accurate NOI" (Part 1.2.1.1) and do so "electronically per Part 7.1." The Proposed 2020 Permit retains these requirements pursuant to Proposed Part 1.3.2. In other words, all information which would be required under Proposed Part 1.3.6 already is available in electronic format. Accordingly, we respectfully submit that this requirement would be neither practical nor effective when applied in the airport context and request the Agency specifically exempt Subsector S permittees from the requirement.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0196-A1, Comment Excerpt Number 11.

## 1.3.7. Obtaining Authorization to Discharge - Coverage Under Alternative Permits

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 46
**Excerpt Status:** Final

**Comment Excerpt:**

**XI. Termination of Coverage**

We request clarification of section 1.3.7.2, which seems to contradict the requirement to submit a Notice of Termination (NOT) in Sections 1.4.1 and 1.4.2.4. Does the written notification provided eliminate the need to submit a NOT once the Notice of Intent (NOI) submittal deadline is met and the alternative permit is effective ending coverage under the 2020 MSGP? Similarly, in section 1.3.7.3, the current wording appears to reflect that 2020 MSGP coverage is automatically terminated once coverage under an alternative permit is authorized.

**Comment Response:**

EPA agrees clarification is necessary. EPA has revised Part 1.3.8 of the 2021 MSGP to reflect that EPA Regional Offices will terminate MSGP coverage at the time the alternative permit becomes effective. Further, EPA has revised Part 1.4.2.4 to reflect that submittal of a Notice of Intent (NOT) is required unless the EPA Regional Office has terminated your coverage under the MSGP per Part 1.3.8.

## 1.5. Conditional Exclusion for No Exposure

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

No exposure facilities be required to post a notice of no exposure

**Comment Response:**

EPA does not agree that no exposure facilities should be required to post a notice of no exposure. Such facilities are eligible for the no exposure exclusion under 40 CFR 122.26(g) (see Part 1.5 of the 2021 MSGP) and may file a No Exposure Certification (NEC).

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

For smaller facilities, and even for larger ones, the costs and administrative burdens of implementing the MSGP can be significant and can easily outweigh the potential environmental benefits provided by compliance with the MSGP. Accordingly, we support a robust approach to identifying facilities, portions of facilities, or outfalls that should be considered "no exposure" and exempt from the requirement to obtain MSGP coverage.

**Comment Response:**

EPA acknowledges the commenter's support for the Conditional Exclusion for No Exposure. Regarding application of the exclusion to portions of facilities or discharge points, EPA notes that the NPDES regulations at 40 CFR 122.26(g)(3) indicate that the conditional exclusion from the requirement for an NPDES permit is available on a facility-wide basis only, not for individual discharge points or areas of a facility. Therefore, the conditional exclusion would not be available to the individual operations within an overall facility.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 1.5 Conditional Exclusion for No Exposure:***

Currently, the only way to obtain this exclusion electronically through use of NeT-MSGP is for an entire facility to be considered in "no exposure" status. Large diverse facilities may have several industrial sites in various industrial sectors operating within the contiguous facility. For example, a facility may have a warehouse, a metal shop, and a carpenter shop. If the warehouse and carpenter shop have achieved "no exposure" status but the metal shop has not, and all sites are covered by a single permit tracking number, the No Exposure Certification (NEC) cannot be submitted electronically.

*Recommendation:*

Please add a line to the form for a specific site description (e.g., carpenter shop), so an individual site within alarge facility could file for "no exposure" without the entire facility being identified as such. This information, along with the required SIC code and identification of sector would be enough to identifu the specific site requesting "no exposure" status for the regulatory authority.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0154-A1, Comment Excerpt Number 4.

---

**Commenter Name:** M. Jamerson
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0197
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

II. How Can a TRI Reporter Gain a "No Exposure Certification," Yet Pollute the Environment with Toxic Chemicals?

In January, 2020, I visited a TRI Reporting facility who had acquired an NEC because they said their facility was built to avoid SWR coverage. Due to the heat in the facility, they keep every garage door wide open. Doesn't this defeat eligibility for an NEC? Is EPA law predicated on curb appeal and good housekeeping? Most people in industry don't think in terms of science, particulate matter, dusts, fumes, or microns. They just look for ways to skirt the requirements of the law, and generally find inspectors willing to go along with their loopholes, because the inspector's hands are tied with such ambiguous regulations.

III. The "No Exposure Certification" NEC) Should Be Abolished.

The multi-part listing of polluting activities accompanying the NEC is a good one. However, it amazes me just how many people fill out the form "under penalty of law," send it in, and never bother to meet their 5-year commitment to what they signed. The only way the NEC should be approved is through the certification by a third party or Professional Engineer (P.E.) with documentation certifying that certain parameters are met on a monthly, quarterly or semi-annual basis. In essence, the NEC has become a loophole for people in industry for an avoidance of meeting the intentions of the EPA and State of Record.

**Comment Response:**

The conditional no exposure exclusion applies to 10 of the 11 categories of stormwater discharges from regulated industrial activities in Categories One through Nine and Eleven. EPA clearly defines "no exposure" and "storm-resistant shelters" in defining "No Exposure." In addition, EPA's *Guidance Manual for Conditional Exclusion from Stormwater Permitting Based on "No Exposure" of Industrial Activities to Stormwater* states that the permitting authority may determine that materials sheltered from precipitation can still be deemed exposed if the materials can be mobilized by wind. The permitting authority can review the information provided in the certification, contact, and inspect the facility if there are questions regarding the facility's no exposure claim. Further, pursuant to 40 C.F.R. sect. (g)(3)(iv), EPA "retains the authority to require permit authorization (and deny this exclusion) upon making a determination that the discharge causes, has a reasonable potential to cause, or contributes to an instream excursion

above an applicable water quality standard, including designated uses." Also, if changes at a facility result in industrial activities or materials becoming exposed, the no exposure exclusion ceases to apply. Operators must maintain a condition of no exposure; the no exposure exclusion is conditional. Therefore, if conditions change resulting in the exposure of industrial activities or materials to stormwater, the facility operator must obtain coverage under an NPDES stormwater permit immediately. The certification form is signed under penalty of law. The form contains the prerequisite conditions and checklists operators must consider and check off to be eligible for no exposure before signing. This approach functions to ensure no exposure accuracy.

EPA disagrees that the NEC must be certified by a professional engineer or third party.

---

**Commenter Name:** Gary A. Jones
**Commenter Affiliation:** Printing United Alliance
**Document Control Number:** EPA-HQ-OW-2019-0372-0198-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

For the printing industry, covered under the old SIC Code 27xx, we offer the following codes that should be included for "No Exposure Certification."

32311. Printing

This industry comprises establishments primarily engaged in printing on apparel and textile products, paper, metal, glass, plastics, and other materials, except fabric (grey goods). The printing processes employed include, but are not limited to, lithographic, gravure, screen, flexographic, digital, and letterpress. Establishments in this industry do not manufacture the stock that they print, but may perform postprinting activities, such as folding, cutting, or laminating the materials they print, and mailing.

323111, Commercial Printing (except Screen and Books) (SIC Code 2758)

This U.S. industry comprises establishments primarily engaged in commercial printing (except screen printing, books printing) without publishing (except grey goods printing). The printing processes used in this industry include, but are not limited to, lithographic, gravure, flexographic, letterpress, engraving, and various digital printing technologies. This industry includes establishments engaged in commercial printing on purchased stock materials, such as stationery, invitations, labels, and similar items, on a job-order basis. Establishments primarily engaged in traditional printing activities combined with document photocopying services (i.e., quick printers) or primarily engaged in printing graphical materials using digital printing equipment are included in this industry.

Therefore, the following NAICS codes should be included in the SIC Major Group 27 category:

- 323113, Screen Printing (SIC Code: 2759). This U.S. industry comprises establishments primarily engaged in screen printing without publishing (except books, grey goods, and manifold business forms). This industry includes establishments engaged in screen printing on purchased stock materials, such as stationery, invitations, labels, and similar items, on a job-order basis. Establishments primarily engaged in printing on apparel and textile products, such as T-shirts, caps, jackets, towels, and napkins, are included in this industry.
- 323117, Books Printing. This U.S. industry comprises establishments primarily engaged in printing or printing and binding books and pamphlets without publishing.
- 339950, Sign Manufacturing. This industry comprises establishments primarily engaged in manufacturing signs and related displays of all materials (except printing paper and paperboard signs, notices, displays).
- 3222 Converted Paper Product Manufacturing. This industry group comprises establishments primarily engaged in converting paper or paperboard without manufacturing paper or paperboard.
- 32221 Paperboard Container Manufacturing. This industry comprises establishments primarily engaged in converting paperboard into containers without manufacturing paperboard. These establishments use corrugating, cutting, and shaping machinery to form paperboard into containers. Products made by these establishments include boxes, corrugated sheets, pads, pallets, paper dishes, and fiber drums and reels.
- 322212 Folding Paperboard Box Manufacturing. This U.S. industry comprises establishments primarily engaged in converting paperboard (except corrugated) into folding paperboard boxes without manufacturing paper and paperboard.
- 322219 Other Paperboard Container Manufacturing. This U.S. industry comprises establishments primarily engaged in converting paperboard into paperboard containers (except corrugated, solid fiber, and folding paperboard boxes) without manufacturing paperboard.
  - Illustrative Examples:.
    - Fiber cans and drums (i.e., all-fiber, nonfiber ends of any material) made from purchased paperboard
    - Milk cartons made from purchased paper or paperboard
    - Sanitary food containers (except folding) made from purchased paper or paperboard
    - Setup (i.e., not shipped flat) boxes made from purchased paperboard
- 322220 Paper Bag and Coated and Treated Paper Manufacturing. This industry comprises establishments primarily engaged in one or more of the following: (1) cutting and coating paper and paperboard; (2) cutting and laminating paper, paperboard, and other flexible materials (except plastics film to plastics film); (3) manufacturing bags, multiwall bags, sacks of paper, metal foil, coated paper, laminates, or coated combinations of paper and foil with plastics film; (4) manufacturing laminated aluminum and other converted metal foils from purchased foils; and (5) surface coating paper or paperboard
- 322230 Stationery Product Manufacturing. This industry comprises establishments primarily engaged in converting paper or paperboard into products used for writing, filing, art work, and similar applications.
  - Illustrative Examples:
    - Computer paper, die-cut, made from purchased paper
    - Die-cut paper products for office use made from purchased paper or paperboard
    - Envelopes (i.e., mailing, stationery) made from any material
    - Stationery made from purchased paper
    - Tablets (e.g., memo, note, writing) made from purchased paper Tapes (e.g., adding machine, calculator, cash register) made from purchased paper

- 3261 Plastics Product Manufacturing. This industry group comprises establishments primarily engaged in processing new or spent (i.e., recycled) plastics resins into intermediate or final products, using such processes as compression molding; extrusion molding; injection molding; blow molding; and casting. Within most of these industries, the production process is such that a wide variety of products can be made.
- 326111 Plastics Bag and Pouch Manufacturing. This U.S. industry comprises establishments primarily engaged in (1) converting plastics resins into plastics bags or pouches and/or (2) forming, coating, or laminating plastics film or sheet into single-web or multiweb plastics bags or pouches. Establishments in this industry may print on the bags or pouches they manufacture.
- 326112 Plastics Packaging Film and Sheet (including Laminated) Manufacturing. This U.S. industry comprises establishments primarily engaged in converting plastics resins into plastics packaging (flexible) film and packaging sheet.

**Comment Response:**

EPA is continuing to rely on Standard Industrial Classification (SIC) codes (and in some cases activity codes) to maintain consistency with the industrial stormwater regulations at 40 CFR 122.26(b)(14)(i-ix, xi). However, recognizing that NAICS codes replaced SIC codes and are commonly used by industry, EPA included an appendix (Appendix N, List of SIC and NAICS Codes) in the 2021 MSGP that matches up regulated SIC codes with the most up-to-date NAICS codes for informational purposes.

A review of Appendix N of the 2021 MSGP indicates that NAICS codes 32311, 323113 are included under Sector V. NAICS code 323117 is included under Sector X. NAICS codes 322212, 326111, 326112 are included under Sector B (sub-sector B2). NAICS code 339950 is included under Sector Y. Therefore, these categories are already considered in the MSGP. NAICS codes 322219 and 322220 are not included in the current list included as Appendix N as covered facility types. At this time, EPA is not adding new industry types for coverage under the MSGP. However, EPA notes that, Sector AD in the MSGP covers other stormwater discharges designated by the Director as needing a permit (see 40 CFR 122.26(a)(9)(i)(D)) or any facility discharging stormwater associated with industrial activity not described by any of Sectors A-AC.

## 1.5.RFC7. Conditional Exclusion for No Exposure - RFC 7 New acronym for the no exposure certification acronym (NOE to NEC)

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Make sense

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports changing the acronym for the No Exposure Certification from "NOE" to "NEC" to more accurately represent the acronym.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

The City supports the proposed acronym change from NOE to NEC for the term No Exposure Certification.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The acronym for "No Exposure Certificate" should be NEC.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:**  Lisa Stevens or Jeanne Riley
**Commenter Affiliation:**  State of Utah Department of Environmental Quality
**Document Control Number:**  EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Utah uses the acronym NEC for the No Exposure Certification and finds that permittees with facilities in other states are familiar with this acronym. DWQ supports the EPA's proposed change to NEC.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

We agree that the acronym should be changed from NOE to NEC to more accurately represent what the acronym stands for and to avoid confusion with "Notice of Enforcement (NOE)".

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**4. Request for Comment 7: No Exposure Certification Acronym from "NOE" to "NEC"**

We agree with this proposal to change the acronym for No Exposure Certification from "NOE" to "NEC" to more accurately represent what the acronym stands for.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 1.5 Conditional Exclusion for No Exposure (Request for Comment 7):***

Presumably, a majority of facilities requesting coverage under the 2020 MSGP will be existing permitted MSGP facilities. These facilities are familiar with acronyms used in the 2015 MSGP (e.g., NOE). In addition, these facilities may have an internal plan or procedure that refers to No Exposure Certification as "NOE." Changing the acronym would require a change to the plan or procedure.

*Recommendation:*

Retain the acronym "NOE" for No Exposure Certification.

**Comment Response:**

EPA disagrees and based on numerous comments supporting the change in acronym, stating that it is a more accurate representation of what the acronym means, the 2021 MSGP changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for. Given that operators are required to review and update plans (e.g., SWPPP) routinely for coverage under the MSGP, updating the acronym from "NOE" to "NEC" should not create undue burden for operators.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI finds that the proposal to change the abbreviation for "No Exposure Certification" from "NOE" to "NEC" is sensible.

However, "NEC" in Appendix N of the Proposed 2020 MSGP is used already to mean "Not Elsewhere Classified" respecting SIC and NAICS Codes. Also, "NOE" continues to appear in the Proposed 2020 MSGP in Part 7.1 and Appendices A (Definitions, Abbreviations, and Acronyms), B (Standard Permit Conditions), and K (NEC Form).

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

We agree.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Changing NOE to NEC:  NAIMA supports this common-sense change.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on changing the acronym for the No Exposure Certification from "NOE" (as used in the 2015 MSGP) to "NEC" to more accurately represent what the acronym stands for. **[Yes.]**

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

AIM has no objection to this change.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

NMED agrees "NEC" more accurately represents No Exposure Certification.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 7 asks whether EPA should change the acronym for No Exposure Certification from "NOE" to "NEC". **MWRA supports this change;** the current acronym is confusing. **EPA will need to update all occurrences of "NOE" in the appendices as well as in the body of the permit.**

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Changing the No Exposure Certification acronym to NEC would more accurately represent the term for which it stands.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Benjamin J. Beller
**Commenter Affiliation:** Nebraska Public Power District (NPPD)
**Document Control Number:** EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

NPPD supports changing the acronym for No Exposure Certification from "NEO" to "NEC".

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 7**

The FWQC and FSWA support this proposed modification.

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Concur to use NEC

**Comment Response:**

In the 2021 MSGP, EPA changed the acronym for the No Exposure Certification from "NOE" as was used in the 2015 MSGP to "NEC" to more accurately represent what the acronym stands for.

## 1.6. Permit Compliance

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The fundamental concepts of nonpoint source pollution prevention remain effective as originally rolled out under the Group Permits of 1992 and then, with significant improvement to the MSGP, in 1995. The Waters of the United States will not be improved with the scrapping of the MSGP foundation in favor of the punitive and financially burdensome AIM system. This system, layered on top of the MSGP that has evolved over the past 25 years, will only impact those facilities with permits. By itself, this hierarchy of compliance evaluation, including the forced hiring of Professional Engineers for major infrastructure modifications to these small businesses will result in the insolvency of a large portion of the recycling industry in the US. The MSGP published in 1995, with its modifications over the past 25 years, has been touted as a regulation the small "Mom and Pop" organizations could comply with. The "Mom and Pop" organizations with less than 20 employees will immediately be adversely impacted by this punitive and

onerous modification. It is strongly recommended that the entire AIM concept be eliminated in favor of equitable enforcement of the existing NPDES permitting structure.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

It is excessive to issue a permit violation for an event such as a benchmark exceedance if relevant deadlines were not met under Part 5. Compliance with AIM will likely be difficult to measure against, for both the permittee and EPA. Simplot recommends this permit condition be revised to "Where an Additional Implementation Measure (AIM) is triggered by an event that does not constitute permit noncompliance, such as an exceedance of an applicable benchmark, no permit violation will be issued for these types of events."

**Comment Response:**

EPA does not agree with the comment's recommended revision to Part 1.6 to remove the requirement to comply with the required responses within the relevant deadlines established in Part 5. As discussed in the Fact Sheet to the 2021 MSGP, EPA finalized new Additional Implementation Measures (AIM) for responding to benchmark exceedances. Previous MSGPs required corrective action in the event of an exceedance of a benchmark monitoring value. EPA included certain deadlines for responses to benchmark exceedances to facilitate implementation of any follow-up responses in a timely manner and addresses previous stakeholder concerns that the prior MSGP's corrective actions were not sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality. In addition, EPA may also grant operators an extension to response deadlines in some instances based on an appropriate demonstration by the operator. The response deadlines in Part 5 are those that EPA considers reasonable for making the necessary repairs or modifications and are included specifically so that inadequacies are not allowed to persist indefinitely. See also Comment Response Essay 3 Additional Implementation Measures.

## 2. Control Measures and Effluent Limits

**Commenter Name:** Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:** GZA GeoEnvironmental, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0171-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

If a facility makes a determination that no further pollutant reductions are economically feasible and reasonably achievable (Section 2 of MSGP), we recommend a description of the steps and documentation EPA would expect the facility to maintain. Further, would a facility be required to address non-industrial activity sources of potential contamination (e.g., sources related to infrastructure, but not industrial activity)?

**Comment Response:**

Operators should retain documentation that provides design removal specifications and records of proper operation and maintenance, including inspection documentation. As stated in Part 6.5 of the 2021 MSGP, EPA requires operators to retain specific documentation, which includes but is not limited to, documentation of maintenance and repairs of control measures. Also, given that monitoring data is collected to provide an indicator of the performance of stormwater control measures undertaken to meet discharge requirements, operators should retain monitoring data and records appropriate to document pollutant reductions at the facility.

EPA notes that the 2021 MSGP does not include an exception for feasibility, such as one found in the 2015 MSGP (i.e., no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice) for benchmark exceedances. This exception to AIM is inappropriate in the 2021 MSGP for several reasons. Feasibility considerations are not relevant at AIM Level 1 because the operator can self-determine that no additional measures are warranted, as well as AIM Level 2 where the operate can select pollution prevention/house-keeping measures they deem appropriate. At AIM Level 3, repeated benchmark exceedances have occurred to a point at which implementation of permanent stormwater control measures is warranted. Industrial stormwater discharges are explicitly required to meet all provisions of CWA §301, including applicable water quality standards (CWA §402(p)(3)(A)).

Regarding the question of whether a facility would be required to address non-industrial activity sources of potential contamination, Part 1.2.2 of the MSGP identifies authorized non-stormwater discharges and specifies that the permit does not authorize any other non-stormwater discharges requiring NPDES permit coverage.

---

**Commenter Name:** M. Patrick McGuire
**Commenter Affiliation:** Edison Electric Institute (EEI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should be clear in the final MSGP that it intends to continue to allow facilities latitude to implement controls related to effluent limits appropriate for individual facilities, as necessary, accounting for variabilities such as geography, weather, and configuration.

**Comment Response:**

Comment noted. See response to EPA-HQ-OW-2019-0372-0226-A1, Comment Excerpt Number 9.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  33
**Excerpt Status:** Final

**Comment Excerpt:**

"EPA notes that it does not "intend" for any permit requirement to conflict with state water rights law." Does the word "intend" mean that in the case that any permit provision that conflicts with a state water rights law, that the state water rights law supersedes the permit provision and the permit provision, in that circumstance, is null and void?

**Comment Response:**

The 2021 MSGP includes the same definition for "infeasible" as was included in the 2015 MSGP. The use of "intend" in the specific definition for "infeasible" does not mean that if any permit provision conflicts with state water rights law that the state water rights law supersedes and causes the permit provision to become null and void. If a state water rights issue conflicts with the control of stormwater, then the state water rights defines the requirement. Such a conflict does not, however, render a permit provision "null and void" (i.e., not legally valid).

## 2.1. Control Measures

**Commenter Name:**  Randall M. Lyons
**Commenter Affiliation:**  Massachusetts Marine Trades Association (MMTA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Our members' businesses are not simply related to the water, they are dependent on it. The sustainability of the boating industry is directly related to the waters it serves. As a result, we have numerous members who have purchased state-of-the art stormwater control measures for power washing to preserve their local water quality.

Yet these business owners who have gone the extra mile are subject to the same quarterly testing requirements as all facilities. When our members (or other facilities) make environmentally beneficial investments such as water capture systems and other runoff reduction infrastructure, they should be rewarded for it. They should not be subject to blanket benchmark monitoring requirements for all actors, as the MSGP currently provides.

We therefore recommend that the 2020 MSGP include an incentive or credit system for those facilities which undertake sizable stormwater control measures. You're not going to have permitees make these types of capital investments if EPA does not provide a monetary or regulatory inducement. If EPA truly seeks wide scale water quality improvements, it should be encouraging investments that will have a long-term improvement on water quality.

**Comment Response:**

EPA acknowledges the commenter's interest in the MSGP including incentives for implementing stormwater control measures. Operators who properly install, operate, and maintain stormwater control measures are likely to reduce pollutants in their stormwater discharges to a level below benchmark thresholds and therefore would only have to monitor periodically, rather than all five years of permit term. EPA notes that it is not finalizing the proposed universal benchmark monitoring requirements in the proposed 2021 MSGP. Instead, the 2021 MSGP includes a new indicator monitoring requirement for pH, TSS, and COD as "report-only" for operators in the 22 subsectors without sector-specific benchmarks. See Comment Response Essay 2 Monitoring for additional discussion of the indicator monitoring requirements.

---

**Commenter Name:** Chuck Chaitovitz
**Commenter Affiliation:** US Chamber of Commerce
**Document Control Number:** EPA-HQ-OW-2019-0372-0214-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

This letter urges your consideration of including alternative compliance options for stormwater management as EPA finalizes its multisector general National Pollutant Discharge Elimination System permit (MSGP). The U.S. Chamber of Commerce leads a multi-stakeholder coalition that has been advocating for a set of principles to advance stormwater innovation policy implementation.

**Alternative stormwater management compliance.** EPA and the state-delegated authorities should provide MSGP permit holders with flexibility to implement stormwater control measures (SCMs). This includes green infrastructure practices and, in some instances, other nature-based approaches (e.g., natural channel design implementation) to meet regulatory compliance through alternative stormwater management compliance (alternative compliance) policies. Alternative stormwater management compliance policies may be used to meet permit requirements if the permit holder meets the conditions associated with the specific alternative compliance policy established by EPA and/or the state-delegated authorities.

Alternative stormwater management compliance measures may be used if on-site SCM options have technical or physical limitations or are deemed unreasonably costly, there are concerns for public health and safety, or enable other objectives to be met, such as Total Maximum Daily Load allocations.

Alternative stormwater management compliance measures include the following:

1. Off-site compliance through the construction of off-site facilities that provide all required treatment, retention, detention, or other performance standard conditions not addressed at the project site or address other stormwater-related issues or priorities within the community, such as ecological restoration, flooding, open space, or resilience.
2. Modification of performance standards due to site constraints or public health concerns.
3. Payment of an offset fee for all or a portion of treatment, retention, detention, or other performance standards not provided at the project site.
4. Purchase of credits or similar currency that accounts for treatment, retention, or detention provided at another location at the proportion not provided at the project site.
5. A combination of items 1–4.

Alternative compliance programs may be delivered by market-based solutions. The specific policies and elements of alternative stormwater management compliance adopted by EPA and/or the state-delegated authorities will be defined by EPA, and/or the state-delegated agencies, and/or the local stormwater authorities.

**Definitions**

- **Stormwater Control Measures**—A technique, measure, or structural control that is used for a given set of conditions to manage the quantity and improve the quality of stormwater runoff in the most cost-effective manner.[1]
- **Green Infrastructure Practices**—The range of measures that use plant or soil systems, permeable pavement or other permeable surfaces or substrates, stormwater harvest and reuse, or landscaping to store, infiltrate, or evapotranspirate stormwater and reduce flows to sewer systems or to surface waters.[2]
- **Natural Channel Design**—The application of fluvial geomorphology to create stable channels that do not aggrade or degrade over time and maximize stream functions given site constraints.[3]
- **On-site Stormwater Control Measures**—The use of stormwater control measures on a site to meet regulatory requirements associated with the treatment of urban stormwater runoff.
- **Market-based Solutions**—The off-site provision of required stormwater controls on another site, or in another way, that is seen as more cost effective to a property owner or developer, but equally effective in attainment of the regulatory standard.[4]

- **Off-site Compliance**—A general term that covers off-site mitigation and refers to meeting all redevelopment stormwater requirements, as specified in the local stormwater bylaw or ordinance, at an off-site location(s).[5]
- **Off-site Facility**—A stormwater management measure located outside the subject property boundary described in the permit application for land development activity[6].
- **Offset Fees**—Monetary compensation paid to a local government for failure to meet pollutant load reduction targets.[7]
- **Total Maximum Daily Load**—The calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that particular pollutant.[8]

Only 7% of state permits contain off-site compliance options, and 2% of state programs include market-based mechanisms.[9] Linking these policy tools to stormwater control measures, including green infrastructure will provide key dual-use benefits, such as predisaster mitigation and water quality management.

[1] https://yosemite.epa.gov/oa/eab_web_docket.nsf/Attachments%20By%20ParentFilingId/54E1B 2AAA29D010D85257C5100567581/$FILE/EPA-BAFB-00001211%20(1412-1434).pdf

[2] https://www.epa.gov/green-infrastructure/what-green-infrastructure

[3] https://www.epa.gov/sites/production/files/2015-07/documents/ncd_review_checklist.pdf

[4] https://www.epa.gov/sites/production/files/202001/documents/final_draft_stormwater_finance_t ask_force_report_for_board_review.pdf

[5] https://www3.epa.gov/region1/npdes/stormwater/ma/ma-off-site-mitigation-guidance-manual.pdf

[6] https://www.epa.gov/sites/production/files/2015-12/documents/modelillicit_0.pdf

[7] Ibid.

[8] https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls

[9] https://www.cincybuilders.com/uploads/3/9/7/6/39765682/stormwater-developers-guide-1.pdf

**Comment Response:**

EPA does not agree with the recommendation to provide alternative stormwater compliance management options, as this comment describes. The MSGP provides considerable flexibility to operators in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, and EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. See also response to EPA-HQ-OW-2019-0372-0226-A1, Comment Excerpt Number 9.

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Justification of rationale for selection of all BMPs (not just ones deviating from manufacturer's specifications) should be included in the SWPPP.

**Comment Response:**

EPA notes that Part 6.2.4 of the 2021 MSGP requires operators to document in their SWPPP the location and type of control measures chosen and designed to comply with the non-numeric technology-based effluent limits in Part 2.1.2. Part 6.2.4.6 further requires operators to document how they addressed the selection and design considerations in Part 2.1.1 and the pollutant sources identified in 6.2.3. Thus, Part 6.2.4 already requires rationale for selection of all stormwater control measures in the SWPPP.

The note in Part 2.1 regarding deviations from manufacturer's specifications requires additional documentation requirements to provide justification and rationale for such deviations in the SWPPP.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 34
**Excerpt Status:** Final

**Comment Excerpt:**

2.1
"good engineering practices" should be replaced with "the standard of care for Design Professionals." "Good Engineering Practices" is not as well defined in terms of liability for a system not achieving performance or other requirements.

**Comment Response:**

EPA does not agree with the recommended revision. Part 2.1 includes that operators must select, design, install, and implement SCMs, in accordance with good engineering practices and manufacturer's specifications…." Good engineering practice is a term frequently used and in other environmental and engineering contexts besides stormwater. The commenter did not

provide sufficient data or justification to warrant a change. No change has been made in the 2021 MSGP as a result of this comment.

## 2.1.1. Control Measures - Control Measure Selection and Design Considerations

**Commenter Name:**  M. Patrick McGuire
**Commenter Affiliation:**  Edison Electric Institute (EEI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

**B. EPA Must Allow Facilities the Flexibility to Implement Effluent Limitations in a Manner that Accounts for Variabilities.**

...

As noted by EPA, stormwater discharges can be highly intermittent, are usually characterized by very high flows occurring over relatively short time intervals, and carry a variety of pollutants whose source, nature and extent varies. See id. EPA continues to assert that the combination of pollution prevention and structural management practices required by these limits are the best technologically available and economically practicable and achievable controls, as well as the most environmentally sound way to control the discharge of pollutants in stormwater runoff from industrial facilities. Id. While this concept is broadly correct in that the vast majority of facilities utilize an amalgam of pollution prevention measures to mitigate stormwater discharges, EPA should be specific in the final MSGP in noting that it intends to continue to allow facilities latitude to implement controls appropriate for the facility, accounting for variabilities such as geography, weather, and configuration. This flexibility will allow EEI member facilities to continue to mitigate stormwater discharges in an efficient and effective manner.

**Comment Response:**

The MSGP provides considerable flexibility to permittees in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, and EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. Operators are free to select their own site-specific controls, as long as such controls meet the permit's effluent limits.

## 2.1.1.RFC8. Control Measures - RFC 8 Enhanced measures for major storms

**Commenter Name:**  Anne Germain
**Commenter Affiliation:**  National Waste & Recycling Association (NWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0194-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether to include language that would require facilities to consider implementing enhanced controls to minimize impacts from storm water discharges caused by extreme flooding generated by major storm events.. NWRA notes that section 2.1.1 of the proposed MSGP sets forth various considerations that permit holders "must consider" when selecting and designing control measures. While the control measures and designs listed on pages 13-14 of the proposed MSGP are appropriate, given the unique operations of each facility, they may not be suitable for the local conditions at every facility and instead prove to be overly prescriptive. We request that "must consider" be changed to "may consider" to allow NWRA members the flexibility to determine suitable stormwater control measures that take into account local conditions.

In doing so, we recommend that EPA consider other regulatory programs that defer to individual facilities in identifying control measures. The Spill Prevention, Control and Countermeasures regulations (40 CFR. § 112.1 et seq.), for example, reference the 24-hour, 25-year storm event, a well understood industry metric.

With regard to which facilities are the highest risk for stormwater impacts to cause extreme flooding conditions, EPA could establish a 24-hour, 25-year storm event precipitation threshold beyond which a facility would need to consider enhanced stormwater mitigation measures designed for extreme flooding events. The National Oceanic and Atmospheric Administration has an extensive dataset on precipitation trends across the entire country that EPA could leverage to determine these thresholds. EPA could also consider local mitigating factors in its analysis, such as facility elevation, downstream land use or location of facility within or near a FEMA Special Flood Hazard Area.

**Comment Response:**

The 2021 MSGP retains the requirement that operators consider implementing enhanced stormwater control measures for facilities that could be impacted by major storm events, such as hurricanes, storm surge, extreme precipitation, and historic flood incidents. EPA recognizes that not all of the considerations listed in Part 2.1.1, including the controls for major storm events, will be applicable to every facility nor will they always affect the choice of control measures. EPA is not requiring operators to implement additional controls if the operator determines it unnecessary, but rather to consider the benefit of selecting and designing control measures that reduce risks to their industrial facility and the potential impact of pollutants in stormwater discharges caused by major storm events.

EPA acknowledges that many operators may already have emergency and risk management plans or may have already implemented such controls due to existing requirements mandated by other state, local, or federal agencies. Therefore, EPA has added the following text to the 2021 MSGP to clarify that operators already implementing such plans or controls need only describe those measures in the SWPPP: "If such controls or measures are already in place due to existing requirements mandated by other state, local or federal agencies, you must document in your SWPPP a brief description of the controls and a reference to the existing requirement(s)."

Further, EPA has included the following guidance in the 2021 MSGP: "To determine if your facility is susceptible to an increased frequency of major storms or flooding, you may reference FEMA, NOAA or USGS flood map products at https://www.usgs.gov/faqs/where-can-i-find-flood-maps?qt-news_science_products=0#qt-news_science_products". See Part 2.1.1.8 of the 2021 MSGP and Part 2.1.1 of the fact sheet.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**9. AAAE opposes the addition of proposed Part 2.1.1.8, regarding controls to minimize impacts from major storms that cause extreme flooding, as unnecessary.**

Under proposed Part 2.1.1.8, airports would have to consider, when selecting and designing SCMs, the implementation of structural improvements, enhanced pollution prevention measures, and other mitigation measures to minimize impacts from stormwater discharges from major storm events that cause extreme flooding conditions. EPA has requested comment on whether it is appropriate to include this additional requirement for permitted facilities. (Request for Comment 8.) Certain AAAE members expressed concern over this proposed addition, indicating that it was subjective and unnecessary in some areas, inappropriate for the MSGP, and could be better addressed elsewhere.

Certain airports expressed confusion regarding EPA's expectations for compliance with this part because the terms "major storm events" and "extreme flooding conditions" are subjective and undefined. Many airports would also be in geographical locations where such conditions would not exist. Moreover, airports and their tenants have already implemented BMPs to manage and address impacts from heavy rainfall on potential pollutant discharges. These measures are outlined in their SWPPP in accordance with proposed Part 6, making this additional provision unnecessary. AAAE recommends that EPA's concern would be better addressed at the local level through municipal separate storm sewer systems or, alternatively, by issuing guidance with suggestions or other examples for airports to consider implementing.

**Comment Response:**

Regarding concerns that the provision is unnecessary in some areas and inappropriate for the MSGP, see response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

To address confusion between the terms "major storm events" and "extreme flooding conditions," EPA has removed the term "extreme flooding conditions" from the 2021 MSGP. In addition, EPA has revised Part 2.1.1.8 to add examples of "major storm events", including

hurricanes, storm surge, extreme precipitation, and historic flood incidents. Heavy precipitation refers to instances during which the amount of rain or snow experienced in a location substantially exceeds what is normal. What constitutes a period of heavy precipitation varies according to location and season. Heavy precipitation does not necessarily mean the total amount of precipitation at a location has increased—just that precipitation is occurring in more intense or more frequent events. For more information, see https://www.epa.gov/climate-indicators/climate-change-indicators-heavy-precipitation.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

Proposed Part 2.1.1.8 is unnecessary. EPA seeks comments regarding whether it is appropriate for the permit to include language regarding specific BMP implementation for facilities to use to minimize impacts from extreme flooding conditions. VMA does not support the imposition of specific requirements on the use of specific BMPs based on a facility's location. Additionally, "extreme flooding conditions" is not defined in the proposal and could lead to subjective applications. Some industrial facilities in Virginia are within the 100-year flood zone, but their systems and infrastructure are designed with that in mind and there are often local zoning code requirements that provide further regulation. EPA should remove this provision from any final MSGP.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Daniel Mumm
**Commenter Affiliation:**  Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: Storms in the southwestern United States, where our facility is located, tend to be more isolated and unpredictable compared to other areas in the United States. Because of this,

our facilities were designed to be well above the BFE. Sites that are not designed above the BFE would be subject to guessing which storms will be severe. More often than not, a chance of rain in the southwest is no more than sprinkles, so creating these delays and temporary storage areas would be arduous for facilities to comply with in areas of unpredictable weather.

WSJM would agree with developing complementary procedures to the SWPPP which identifies staff and contractor contacts. Our facility doesn't have a formal plan in place, but when a large storm event hits, our environmental team is sent out to check discharge points for NPDES and MSGP covered areas. Creating a formal plan would be more appropriate for our facility and other facilities in the southwest.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1. To satisfy the permit condition, the operator could document the considerations noted in the comment in the SWPPP.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The flood plain map seems like a good idea.

**Comment Response:**

EPA acknowledges the commenter's support of this proposed permit provision.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

Consideration of major storm control measure enhancements

I agree that operators would be required to consider implementing enhanced measures for facilities located in areas that could be impacted by stormwater discharges from major storm events that cause extreme flooding conditions.

**Comment Response:**

EPA acknowledges the commenter's support of this proposed permit provision. EPA finalized Part 2.1.1.8 of the 2021 MSGP requiring that operators consider implementing enhanced stormwater control measures for facilities that could be impacted by major storm events, such as hurricanes, storm surge, extreme precipitation, and historic flood incidents. See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Charles Job
**Commenter Affiliation:** National Ground Water Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

NGWA Comment: The Federal Emergency Management Agency has already released floodplain maps for the United States that the proposed permit should specifically identify for use in evaluating risk from industrial stormwater practices. Industrial site experts utilizing professional surveyors should be capable to identify facilities that have the highest risk for releasing regulated and unregulated contaminants to stormwater. EPA should require the identification of the location of all water wells in areas where flood conditions may occur at industrial sites that intend to infiltrate stormwater. Since floodplain delineations are updated regularly, industrial site managers should check at permit renewal to determine whether their sites are in floodplains and require additional contamination prevention measures.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

2021 EPA MSGP Response to Comments
January 15, 2021

BES supports the inclusion of permit language that requires operators to implement enhanced controls to minimize impacts from stormwater discharges from storms that cause flooding conditions. BES recommends that the words, "major" and "extreme" be removed from the first sentence under Section 2.1.1.8 as facilities should implement stormwater control measures for any flood condition that could result in potential stormwater contamination in order to protect the environment. The terms "major" and "extreme" are also vague and without definition and should be removed to avoid subjective interpretation.

BES recommends the underlined text replace the strike-through text in the sentence in Section 2.1.1 that states, "You must address in the SWPPP consider the following when selecting and designing control measures: ... " The word "consider" does not lead to any concrete action or outcome nor does it ensure that the control measures are protective of stormwater. By requiring operators to "address" the control measures in their SWPPP, the operator must present, at a minimum, a description in the SWPPP of whether the items were implemented and, if not, a description of the rationale.

**Comment Response:**

EPA retained the word "consider" in Part 2.1.1 of the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Evan Jenkins
**Commenter Affiliation:**  Environmental Compliance Division, City of Nampa, ID
**Document Control Number:**  EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests that this consideration be moved to an appendix, fact sheet, or other guidance document. The City already has design standards to address impacts from major storm events. The proposed language under this permit part could be confusing for facilities seeking to comply with both the MSGP and City design standards.

**Comment Response:**

The 2021 MSGP retained this requirement in Part 2.1.1. To address the comment regarding existing design standards to address impacts from major storm events, see response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

This permit is required for established businesses. These owners typically do not want to lose their property. Yes, controls are needed, but not extraordinary controls such to control a 500 year storm, hurricane, micro-burst, tornado, etc. The required extraordinary controls do not guarantee that property will not be destroyed by "mother nature".

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

As proposed, this requirement is not entirely clear. EPA says that operators must "consider" enhanced measures. What will constitute adequate "consideration" and how will that consideration have to be documented. Without a clearer standard of conduct, it does not appear that this proposed requirement would result in any real environmental benefit. At the same time, the proposed requirement could lead to compliance issues since the standard is not entirely clear and the requirement could be interpreted in different ways by permittees and compliance staff (e.g., what action is required, how much is enough, how should action be documented in the SWPPP, what happens when enhanced measures are appropriate for a forecasted storm but prove to be inadequate for the actual storm). As EPA notes in its proposal, there are also the questions of what constitutes enhanced measures, and which facilities are subject to this proposed requirement. We recognize that with climate change continuing to affect weather patterns, major storms are another factor that affect stormwater. We have concern regarding the clarity of this provision, and the limits of how much facilities can reasonably do under a stormwater general permit.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Attempting to transfer the accountability and responsibility to the permittee is both counterproductive and redundant with zero potential improvement on water quality. These subjects are currently addressed in the existing public policy arena of federal, state and local zoning and planning policies. All of these subject matters are currently addressed in the business planning and management processes of the facilities. In essence, this language places accountability for the impacts of rising sea levels and increased intensity of storms on the permittee.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Jennie F. Formier
**Commenter Affiliation:** John W. Furrh Associations Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0151
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

COMMENT #8:

In relation to "Major Storm Events", I feel that this is already a concern that is taken into consideration as the majority of facilities are located adjacent to the water. And any more controls put in place for that situation would put an unwarranted financial and time burden on them.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1

**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet does not agree with the proposed requirements for additional BMPs associated with a 1% storm event (once every 100 years).  One of the requirements is that when a delivery is expected within 48-hours of a storm event, to delay deliver until after the storm event is entirely unworkable in certain portions within the country during rainy season. Some hurricanes do not trigger the 1% rain event demonstrating how improbable this event is and the fact that there are proposed requirements for such an event.  This is beyond the scope of many facilities to prepare for.  This concern is best left to a location and the reasonable approach to protect property during extreme events in emergency contingency plans that are better served to be site specific and address specific local concerns such as flooding, tornadoes, hurricanes, etc.

*Recommendation*

Howmet believes that the flooding requirement is too far-reaching and with all of the issues that need to be addressed with stormwater pollution, a 100-year storm event seems an inappropriate use of resources.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The MSGP already has requirements for Corrective Action and requiring modification of control measures in the event of recurring flooding in industrial areas of the facility which may cause stormwater pollution. Use of FEMA flood maps is already used by many facilities to install structural control measures for regulated areas where stormwater may contact pollutants. EPA should provide guidance on using the 100-year flood event to predict pollution prevention.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 11.

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Please define "major storm event" in the proposed MSGP. Depending on location within the United States, a "major storm event" will have variable rainfall amounts, duration, and intensity. Each of these factors influence appropriate control requirements for preventing loss of materials stored outdoors.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 11.

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend excluding facilities located in Zone X and Zone X (shaded) from this requirement. Including sites located within Zones X and X (shaded) increases the total number of facilities affected by this regulation significantly, without demonstrating the probable impact from "major storm events" (undefined) within these zones.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 11.

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

We agree that facilities may need to address material handling and storage in areas regulated as within a zone affected by a "major storm event" to prevent a discharge of pollutants from these rain events with structural controls such as tank tie-downs for bulk storage tanks in excess of 10,000 gallons, for example. We request that EPA provide limitations to this requirement based on container type, size, and other potentially protective features (substantially similar protective measures). We note that the Floodplain Administrator may already have authorized similar controls during installation and we contend that these should be considered sufficient for compliance with the MSGP.

**Comment Response:**

To address the comment regarding existing design standards to address impacts from major storm events, see response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed mitigation measures in Section 2.1.1.8 of the draft MSGP may compete with provisions administered by FEMA and County Floodplain Administrators (FPAs). The mandate to design controls for flood mitigation will require facilities to utilize a certified floodplain manager (CFM) and professional engineer (PE) to address proposed mandatory criteria such as b) preventing floating of semi-stationary structures by elevating above the base flood elevation (BFE) and d) temporarily storing materials above the BFE level.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Retrofits to existing facilities could be very costly and provide a benefit that could be met through non-structural controls, if the option was open to the permittee to address. We recommend making these recommendations, not requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

Item 2.1.1.8(c) would require an MSGP operator to delay delivery of materials when a storm is anticipated within 48-hours of a delivery. Rain events may be predicted, and not occur. Rain events may occur without a prediction. This delay not only creates a supply-chain logistics problem for operators, but also, proof of compliance creates an additional documentation burden. Would this delivery delay apply when facilities are equipped with rain guards at bay doors as a best management practice (BMP) (or other controls) to prevent contact with precipitation? We suggest that this mitigation measure is too prescriptive and creates an unnecessary burden on permittees. We recommend making these recommendations, not requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

Item 2.1.1.8(d), (e), and (f) would require an MSGP operator to (d) temporarily store materials and waste above the BFE level; (e) temporarily reduce or eliminate outdoor storage; and (f) temporarily relocate mobile vehicles and equipment to an upland area. Many operators will have

insufficient funds and/or space to implement these mandates, especially existing operations that are constrained by existing infrastructure and surrounding land uses. We recommend making these recommendations, not requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Item 2.1.1.8(g) and (h) would require an MSGP operator to incorporate emergency action plans (OSHA), as well as emergency response plans (FEMA), and local emergency planning and response coordination plans into the stormwater pollution prevention plan, simply for being within the 100-year flood plain. We recommend that EPA consider acknowledgement of existing regulations and planning elements as the MSGP BMP, rather than mandating additional controls that may not be appropriate for all MSGP sites within floodplains.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

**5. Request for Comment 8: Enhanced Stormwater Controls for Major Storms**

We oppose the proposed Section 2.1.1.8 for prescriptive enhanced flood controls, because the MSGP is an environmental permit, not a one-size-fits-all nationwide stormwater design manual. Flood controls have been, and continue to be, addressed in federal, state and local flood control laws, rules and ordinances as well as in local stormwater design codes and manuals.

We are also concern that these proposed requirements appear to be regulating stormwater flowrate and volume as a "stormwater pollutant", which is outside of the CWA's permitting authority and which has been rejected by the courts. If implemented, USEPA would become a flood management agency, sharing the responsibility and liability for failures of any flood controls implemented under this section.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

EPA does not agree that inclusion of this requirement constitutes regulation of stormwater flowrate and volume as a pollutant. The purpose of this requirement is to consider ways to minimize impacts from pollutants in stormwater discharges from major storm events when selecting and designing control measures.

---

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 2.1.1.8 Control Measure Selection and Design Considerations (Request for Comment 8):***

Some locations of existing industrial facilities covered by the 2015 MSGP are not included in the Federal Emergency Management Agency's Flood Map Service Center.

*Recommendation:*

Please provide clarification of what system would be used to determine if operators have a risk of extreme flooding, if their location is not included in the Federal Emergency Management Agency's Flood Map Service Center.

**Comment Response:**

EPA included the following footnote in Part 2.1.1.8 of the 2021 MSGP: "To determine if your facility is susceptible to an increased frequency of major storm events that could impact the discharge of pollutants in stormwater, you may reference FEMA, NOAA, or USGS flood map products at https://www.usgs.gov/faqs/where-can-i-find-flood-maps?qt-news_science_products=0#qt-news_science_products."

---

2021 EPA MSGP Response to Comments
January 15, 2021

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>FPA does not support mandating structural containment and other physical structures that are described in the proposed changes to the MSGP stormwater permit,</u>** because they are costly and may, or may not, have any preventative effect in the case of severe or catastrophic flooding. We also wish to point out that facilities that are located in areas that are prone to flooding already are likely to have SMCs in their stormwater permits that are tailored to local conditions and concerns about flood zones. Some also may have structural containment facilities, like those described in the proposed revisions, if they are separately be subject to Spill Prevention, Control, and Countermeasure (SPCC) plan requirements under the Clean Water Act based on oil-based materials at a plant, because Congress understood that such facilities posed threats to all waters of the United States. Requiring additional physical structures, based on FEMA recommendations for flood zones, regardless of processes and materials utilized at a plant, for stormwater generally should not be mandated. FPA recommends that permit regulators and covered facilities should be advised to consider these requirements if they are located in FEMA-designated flood zones, depending on the type of facility that is involved.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI opposes Part 2.1.1.8 in the Proposed 2020 MSGP for enhanced control measures for extreme flooding. Proposed Part 2.1.1.8 would require facilities when selecting and designing control measures to consider "structural improvements, enhanced pollution prevention measures, and other mitigation measures, to minimize impacts from stormwater discharges from major storm events that cause extreme flooding conditions".

From a physical perspective, many of the contemplated activities and measures in proposed Part 2.1.1.8 are especially challenging and perhaps infeasible for industrial sectors that have large

outdoor operations with heavy equipment and materials, such as the Industry. These include, with reference to the subparts of proposed Part 2.1.1.8:

1. reinforcing structures that are already designed to withstand high forces from heavy material (e.g., scrap steel);
2. delaying delivery of thousands of tons of material for at least 2 days, which will back up supply chains (this could also imply moving partially finished or completed orders to downstream consumers prematurely, also potentially upsetting the supply chain);
3. temporarily moving thousands of tons of outdoor materials to higher ground that might not exist or be available (e.g., due to administrative building);
4. temporarily moving thousands of tons of outdoor materials to indoor storage areas that do not and cannot exist because of space or engineering constraints; and
5. temporarily moving tons of mobile vehicles and equipment to upland areas that might not exist or be available (e.g., due to administrative building);

Some of these proposed activities and measures raise the question of whether temporary relocation of industrial vehicles, equipment, and/or materials into non-industrial areas of activity (e.g., employee parking lot) converts these non-industrial areas into areas of industrial activity. This could result in MSGP compliance issues.

Much as implied by EPA's discussion of this proposed provision in its request for comment, the definitions of "major storm" and "extreme flooding event" were not proposed and are not clear. Conceptually, some extreme flooding events might be so large that any of the contemplated activities and measures would be futile. Also, how would a permittee document that they considered each of the activities and measures under Parts 2.1.1.8 and decided not to implement them? The existence of this proposed provision raises all sorts of potential liability issues in the aftermath of a flooding event, whether "extreme" or not and whether from a "major storm" or not.

ISRI opposes proposed Part 2.1.1.8 being included in the 2020 MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Excerpt Number 11.

---

**Commenter Name:**  Paul Bredwell
**Commenter Affiliation:**  U.S. Poultry & Egg Association et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**6. USEPA, state regulatory agencies and permittees have limited resources, and the MSGP should not include any significant new requirements specific to flood-prone areas, as the**

assimilative capacity of receiving waters for various constituents of concern is typically increased during extreme flooding conditions. Other Federal, State and Local governmental agencies generally have existing regulatory requirements specific to flood-prone areas that provide various water pollution protections.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that EPA not adopt the proposed new requirement that facilities consider major storm control measure enhancements to address flooding issues.*

Existing Best Management Practices (BMPs) at iron and steel mills should already account for site-specific conditions, including potential flooding or other extreme weather-related events. To the extent that EPA considers "extreme weather" to include the 100-year, 50-year, or even 20-year storm events, imposing requirements on that basis in this permit is improper. The MSGP is a 5-year permit, and facilities are responsible for controlling pollutants from the types of conditions that should be expected to occur. In addition, most facilities covered by the MSGP have maintained coverage since at least 1995, so they have 25 years of experience with the types of conditions that should be expected. Additional requirements in this area are excessive and unnecessary.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA not adopt the proposed new requirement that facilities consider major storm control measure enhancements to address flooding issues.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

It seems appropriate to use the FEMA map systems. However, if a facility is currently maintaining compliance, with no past or current NOVs for discharges, and maintaining an appropriate SWPPP, it should be a recommendation and not a requirement. These facilities should have a flood plan established in the SWPPP or separate Flood Plan to accompany the SWPPP, if indeed in a flood zone. This should be regulated by inspections.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA seeks to impose a new requirement that facilities consider major storm enhancement to address possible flooding.  NAIMA believes that specific permit conditions currently in place already address potential flooding, so adding them to the new rule seems duplicitous.  Consideration of extreme weather conditions that would include a 100-year or 50-

year project impose the impossible on the applicant.  The MSGP is a five-year permit and any consideration of events outside the scope of that time frame is improper and illogical.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Christopher M. Kilian
**Commenter Affiliation:**  Conservation Law Foundation (CLF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

As described in detail herein, Section 2.1.1.8 of the Proposed MSGP concerning preventing "stormwater discharges from major storm events that cause extreme flooding conditions" improperly limits permittees' existing duties to design, construct, operate, and maintain their facilities in a manner that avoids flooding and damage from the reasonably anticipated impacts of climate change, as one among other weather driven factors, during the facilities' design life. The 2015 MSGP adopted a "good engineering practices" standard for developing pollution control measures and preparing of the Stormwater Pollution Prevention Plan ("SWPPP"). 2015 MSGP §§ 2.1 ("[T]he selection, design, installation, and implementation of [] control measures must be in accordance with good engineering practices . . . ." (emphasis added)); 5.1 ("The SWPPP shall be prepared in accordance with good engineering practices and to industry standards."). To comply with these and other provisions of the 2015 MSGP, permittees must develop enforceable measures to address the risks of flood-induced contaminated stormwater discharges and chemical disasters as a component of their legally binding SWPPP and to prevent violations of other effluent limits as well as water quality standards. As explained below and in the attached Declarations, good engineering standards dictate that durable infrastructure be designed to withstand anticipated weather and climate-related risks, including the risks posed by climate-change-induced severe weather, sea level rise, and storm surge.

EPA should not adopt the proposed language of Section 2.1.1.8 of the proposed 2020 MSGP because it appears to unlawfully narrow the scope of necessary consideration of flood risk from the 2015 version in violation of the Clean Water Act's ("CWA") antibacksliding provision. Accordingly, the Agency should strengthen the proposed language in Section 2.1.1.8 by underscoring existing obligations requiring applicants to use good engineering practice, disclose information in their possession, consider all reasonably available data and information, and thoroughly document present-day and future flood risks, such as hurricane storm surge and high tides, extreme precipitation, known and committed sea level rise, and historic flood incidents. EPA should further underscore that applicants must include specific enforceable design, operation, and maintenance measures in their SWPPPs to fully address identified risks of pollutant discharges. Relying upon the self-reported data and information contemplated in this

proposal, EPA should evaluate the universe of permitted facilities at risk of flooding and prioritize inspections, outreach, technical assistance, and compliance resources to the most vulnerable facilities.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1. To address the comment that EPA should strengthen the language in Part 2.1.1.8, EPA notes that the following language from Part 2.1 of the MSGP applies to the measures selected under Part 2.1.1.8, "The selection, design, installation, and implementation of control measures to comply with Part 2 must be in accordance with good engineering practices and manufacturer's specifications." To address the comment that EPA should provide outreach and compliance assistance, footnote 6 in Part 2.1.1.8 the MSGP provides a link to USGS flood map resources and related information.

---

**Commenter Name:**  Christopher M. Kilian
**Commenter Affiliation:**  Conservation Law Foundation (CLF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**I. Climate Change Poses an Imminent and Certainly Impending Threat to Industrial Infrastructure Recognized by Government, Industry, and Engineers Alike**

There is widespread consensus that climate change has already caused dramatic changes in the frequency and severity of precipitation and major storms, including severe tropical storms responsible for storm surges and flooding, has caused and contributed to sea level rise, and has dramatically shifted air, water, and surface temperatures. Increased impacts in the near and long-term are already guaranteed as a result of emissions to-date and will be severely exacerbated by continued reckless emissions of greenhouse gases. It is beyond any reasonable dispute that climate disruption poses severe risks to riverine and coastal infrastructure. The devastation wrought in recent years by Hurricane Harvey and Superstorm Sandy spotlight the dangers to private and public infrastructure throughout the country. For example, among many other disastrous impacts of the storm, the Arkema facility in Houston caught fire and exploded after flood waters breached the facility during Hurricane Harvey. The Shell facility in Sewaren, New Jersey spilled 378,000 gallons of oil after tidal surge damaged its bulk storage tanks during Superstorm Sandy. The devastation caused by releases of stored petroleum products from the Murphy Oil facility in New Orleans as a result of Hurricane Katrina still resonates as a signal example as well.

The risks and costs to industrial and community infrastructure have been brought starkly into the public eye through reports by the Union of Concerned Scientists [Rising Tides Rising Risks] and

by the Center for Climate Integrity as well. See generally The Center for Climate Integrity Resilient Analytics, High Tide Tax: The Price to Protect Coastal Communities from Rising Seas (June 2019), available at https://climatecosts2040.org/files/ClimateCosts2040_Report.pdf. These risks have been underscored by industry as well. See Effectively addressing climate risk through adaptation for the Energy Gulf Coast (Oct. 2010), available at https://www.entergy.com/userfiles/content/our_community/environment/GulfCoastA daptation/report.pdf

The flooding risks to infrastructure are well recognized by the United States government, as detailed in the Goldsmith Declaration. For example, the Army Corps of Engineers—the preeminent engineering organization in the country issued a regulation in 2013 entitled "Incorporating Sea Level Change in Civil Works Programs." That regulation states:

[Sea level change] can cause a number of impacts in coastal and estuarine zones, including changes in shoreline erosion, inundation or exposure of low-lying coastal areas, changes in storm and flood damages, shifts in extent and distribution of wetlands and other coastal habitats, changes to groundwater levels, and alterations to salinity intrusion into estuaries and groundwater systems.

Army Corps of Engineers, Regulation No. 1100-2-8162, at B-1 (Dec. 31, 2013), available at https://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1100 -2-8162.pdf. Indeed, the Army Corps of Engineers acknowledges that sea level change is likely to impact coastal projects, and "[a]s a result, managing, planning, engineering, designing, operating, and maintaining for [sea level change] must consider how sensitive and adaptable 1) natural and managed ecosystems and 2) human and engineered systems are to climate change and other related global changes." Id. at 2.

The EPA itself has similarly recognized the danger even before drafting the major storm provision in Section 2.1.1.8. In its Framework for Protecting Public and Private Investment in Clean Water Act Enforcement Remedies, EPA stated: "Extreme weather events, such as storms, floods, and droughts, pose significant risks to water infrastructure and water pollution control measures, and these risks are likely to affect the ability of regulated entities to comply with CWA requirements over time" and that, in appropriate circumstances, "EPA will require as part of the remedy that regulated entities implement resilience and adaptation measures based on the results of . . . vulnerability assessments and the expected useful life of the infrastructure in question, as needed to ensure long-term compliance with the CWA." Id. at 6. It concludes, "[I]t is important for each regulated entity to assess its own vulnerability and consider a range of options that address its particular obligations and goals as well as resource challenges." Id. at 9.

The regulated community similarly recognizes the risks to their infrastructure poses by climate change. Corporations–from oil majors, chemical companies, and Wall Street— have all issued statements describing the threats posed by climate-change induced severe weather. See Goldsmith Decl. ¶¶ 22-34. Similarly, the engineering profession responsible for designing the infrastructure has developed specific guidelines for incorporating climate resilience into that infrastructure. See Goldsmith Dec. ¶¶ 35-47.

As a result of this consensus, "any asset/project owner, and by extension any reasonable engineer tasked with design and/or operations of durable infrastructure and other complex facilities, will find it necessary to analyze the potential anticipated climate-change related threats to the asset throughout its design life." Goldsmith Dec. ¶ 49.

**Comment Response:**

Comment noted. See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Christopher M. Kilian
**Commenter Affiliation:**  Conservation Law Foundation (CLF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**III. The permit conditions and standards in Section 2.1.1.8 and Request for Comment 8 of the proposed 2020 MSGP are less stringent and therefore unlawful under the Clean Water Act's anti-backsliding prohibitions. 33 U.S.C. § 1342(o).**

The CWA's anti-backsliding provision prohibits permits from having less stringent effluent limitations than the previous permit. See 33 U.S.C. § 1342(o). Section 402(o)(3) of the CWA specifically provides an absolute limitation on backsliding:

This section of the CWA prohibits the relaxation of effluent limitations in all cases if the revised effluent limitation would result in a violation of applicable effluent guidelines or water quality standards, including antidegradation requirements. Thus, even if one or more of the backsliding exceptions outlined in the statute is applicable and met, CWA section 402(o)(3) acts as a floor and restricts the extent to which effluent limitations may be relaxed. The requirement affirms existing provisions of the CWA that require effluent limitations, standards, and conditions to ensure compliance with applicable technology and water quality standards.

U.S. ENVTL. PROT. AGENCY, NPDES Permit Writers' Manual, at 7-4 (Sept. 2010), https://www3.epa.gov/npdes/pubs/pwm_chapt_07.pdf.

The language proposed by EPA in Section 2.1.1.8 violates Section 402(o) "by narrowing the scope of the control measures to exclude consideration of all of climate change related impacts, including sea-level rise and storm surge, and by basing a facility's risk designation solely on Federal Emergency Management Agency ('FEMA') flood risk assessments." Goldsmith Dec. ¶ 72; see also Thomas Dec. ¶ 23. As discussed above and in Dr. Goldsmith's and Mr. Thomas' declaration, the 2015 MSGP requires consideration of all climate change impacts and requires a prospective risk assessment based on good engineering practices. Sole reliance on base flood

elevations from often-outdated flood insurance maps not intended for regulatory use and that fail to consider climate change impacts is not consistent with good engineering practice and would simply guarantee disastrous pollutant discharges and public health and safety consequences. Accordingly, the permit conditions and standards in the 2020 MSGP are less stringent than those in the 2015 Permit and adoption of the language proposed in Section 2.1.1.8 of the 2020 MSGP is in violation of Section 402(o) of the CWA.

**A. The proposed use of temporary measures to accommodate major storm events impermissibly weakens the permit because it assumes that facilities will flood, thereby implying more permanent measures are unnecessary.**

As Dr. Goldsmith stated in her declaration, "Sections 2.1.1.8(c)–(f) weaken the 2020 MSGP by identifying temporary measures to be taken only in the event of an oncoming storm. Such temporary measures presuppose that i) storms will be infrequent enough to make temporary measures sustainable on a regular basis, ii) facilities will be able to predict in advance and with certainty which storms will pose a flooding risk, and iii) permanent infrastructure (such as warehouses for storing or roads for transporting necessary materials or equipment) is already out of harm's way in the event of a flood." Goldsmith Dec. ¶ 84. As a result, Section 2.1.1.8 apparently takes for granted that facilities will be flooded by severe storms and does not address methods for preventing flooding.

However, building standards based on good engineering practice require permitted facilities be designed to ensure that flood waters cannot enter a facility, e.g., by raising the facility above the anticipated flood level. Engineers designing industrial facilities cannot satisfy their standard of care by assuming that facilities will flood and merely taking efforts to ensure that structures don't float away, especially when those facilities contain substances that are hazardous to human health or the environment. In fact, many industrial sites contain extensive soil contamination or other contaminants that can be mobilized by flood waters if allowed to enter the facility. As was required in the 2015 MSGP, engineers must design facilities to avoid any reasonably anticipated potential for flooding throughout the design life of the facility. Therefore, to avoid prohibited backsliding, Section 2.1.1.8 should include a provision for control measures that prevent flood waters from entering the facility for any reasonably anticipated flooding that might occur during the design life of the facility. Failing to do so impermissibly weakens the MSGP and violates Section 402(o) of the CWA.

**B. The manner in which the 2020 MSGP proposes to rely on FEMA maps unlawfully weakens effluent limitations by narrowing the universe of flood data that must currently be considered under the 2015 MSGP.**

Proposed Section 2.1.1.8 constrains the flood-risk analysis solely to base flood elevations (BFE) "shown on the Federal Emergency Management Agency's Flood Maps and on the flood profiles, which can be access through https://msc.fema.gov/portal/search." Proposed MSGP at Section 2.1.1.8, n.5. As Mr. Thomas states in his declaration, "The use of the Base Flood Elevation (BFE) indicated on a FEMA Flood Insurance Rate Map (FIRM) without further site specific based engineering and research is not adequate for most engineering design and construction

purposes, and especially not in cases understood to involve risk to human life and health as well as damage to clean water." Thomas Dec. ¶ 23.

EPA is well aware that FEMA flood hazard designations are insufficient to capture present-day coastal flood risks, which include hurricane storm surge and nuisance or 'sunny-day' tidal flooding, to sites discharging industrial stormwater. See generally, Highfield, Wesley E., Norman, Sarah A., et al., Examining the 100-Year Floodplain as a Metric of Risk, Loss, and Household Adjustment, Risk Anal. (May 22, 2012). Further, the underlying models used by FEMA to identify flood risks for flood insurance rate development were never intended for use in regulatory programs and are based upon retrospective data. See Thomas Dec. ¶¶ 24 32. Therefore, FEMA designations are outdated in many cases and even across entire regions in some instances. See id. ¶ 25.

Moreover, the proposed use of the one percent flood level or BFE as calculated by FEMA also ignores Executive Order 11988 ("EO 11988"). EO 11988 applies to among other things, "Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities." EO 11988, 42 Fed. Reg. 26951 (May 24, 1977) at Section 1. It further provides that

[e]ach agency shall take floodplain management into account when formulating or evaluating any water and land use plans and shall require land and water resources use appropriate to the degree of hazard involved. Agencies shall include adequate provision for the evaluation and consideration of flood hazards in the regulations and operating procedures for the licenses, permits, loan or grants-in-aid programs that they administer. Agencies shall also encourage and provide appropriate guidance to applicants to evaluate the effects of their proposals in floodplains prior to submitting applications for Federal licenses, permits, loans or grants.

EO 11988 § 2(c). As described in Mr. Thomas' Declaration, guidance for application of EO 11988 requires floodproofing and planning to at least the .2 percent or 500-year flood level for critical actions like permitting facilities that will discharge pollutants harmful to human health and the environment if flooded. Thompson Dec. ¶¶ 33-36; see also FEMA, Guidelines for Implementing Executive Order 11988, Floodplain Management, and Executive Order 13690, Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input, available at: https://www.fema.gov/media library/assets/documents/110377; FEMA, Further Advice on Executive Order 11988 Floodplain Management. 8. https://www.gsa.gov/cdnstatic/Advice_EO11988.pdf.

Concerns about potential repercussions from reliance on FEMA designations alone are especially grave given that climate change has resulted in a rise in mean sea level of 8–9 inches "since 1880, with about a third of that coming in just the last two and a half decades." Lindsey, Rebecca, Climate Change: Global Sea Level, NOAA (Nov. 19, 2019), available at https://www.climate.gov/news-features/understanding-climate/climatechange-global-sea-level. Climate change has also increased the frequency and intensity of severe weather and floods to levels far in excess of historic levels. For example, as Dr. Goldsmith discussed in her declaration, "Hurricane Harvey was a 500-year storm (in the traditional historic context) that devasted the Houston area, a slow-moving onslaught of rain that caught the city unawares and wreaked havoc

on Houston homes and industrial facilities alike. Yet Harvey was not the first such storm to pass through Houston in 500 years. In fact, Harvey was the third such storm in three years to bombard the area, and it was Houston's very reliance on the 1-in-500 year probability that led the city to inadequately prepare, leading to unnecessary and disastrous consequences." Goldsmith Dec. ¶ 74 (citing Dara Lind, The "500-year" flood: why Houston was so underprepared for Hurricane Harvey, VOX (Aug. 28, 2017), https://www.vox.com/science-andhealth/2017/8/28/16211392/100-500-year-flood-meaning.); see also Blake, Eric S. & Zelinsky, David, A., Nat'l Hurricane Ctr., Tropical Cyclone Report: Hurricane Harvey, 9 (2018), available at https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf. (stating total damages from Harvey have been difficult to calculate in part because a majority of the residential flood loss claims came from outside the 500-year flood plain).

These climate change effects are expected to continue to increase for the foreseeable future. Moreover, as seen with Harvey in Houston, dramatically intensified development of impervious surfaces over the last several decades further confounds simple reliance on the FEMA designations. See Satija, Neena & Collier, Kiah, Boomtown, Flood Town, TEXAS TRIBUNE & PROPUBLICA (Dec. 7, 2016), available at https://projects.propublica.org/houston-cypress/. ("As wetlands have been lost, the amount of impervious surface in Harris County[, Texas] increased by 25 percent from 1996 to 2011," said Sam Brody, a Texas A&M University at Galveston researcher. "And there's no way that engineering projects or flood control regulations have made up for that change, he said."). As a result, currently applicable spatial flood hazard designations significantly underestimate present-day risk. Indeed, the Army Corps of Engineers' Regulation 1100-2-8162 notes that historic data on water levels is insufficient, stating:

[A]nalysts shall consider what effect changing relative sea level rates could have on design alternatives, economic and environmental evaluation, and risk. The analysis shall include, as a minimum, a low rate that shall be based on an extrapolation of the historical tide gauge rate, and intermediate and high rates that include future acceleration of [global mean sea level].

Army Corps of Engineers, Regulation No. 1100-2-8162, at B-6. Reliance on FEMA BFEs alone in Section 2.1.1.8 and Request for Comment 8 artificially constrains the 2015 MSGP requirements and would be arbitrary and unreasonable given current scientific consensus regarding both the insufficiencies of the FEMA maps and the dramatic current and certainly impending effects of climate change.[2]

## C. The 2020 MSGP does not require consideration of ALL climate change-related impacts and therefore relaxes effluent limitations in violation of the anti-backsliding provision.

Section 2.1.1.8 of the 2020 MSGP is silent on climate change and its associated impacts and therefore unlawfully weakens effluent standards by narrowing the focus of preparedness to "major storm events that cause extreme flooding conditions." "[T]his language not only implies facilities need not consider prospective increases in risk based on increased frequency and severity of storms and sea-level rise, but, combined with the suggestion that FEMA FIRMs are an accurate measure of current risk, the language indicates that risk calculation based on historical data is sufficient to protect facilities, surrounding communities, and the environment in the event of a storm." Goldsmith Dec.¶ 82.

Dr. Goldsmith further elucidates that "even if the language could be read to include consideration of the increased frequency of storms, both major and minor, and the increasingly severe nature of storms, the 2020 MSGP still falls short of the 2015 version because it excludes consideration of sea-level rise and storm surge flooding. Storm surge flooding exacerbates and contaminates stormwater by infiltrating and flooding secondary containment structures and drainage areas, carrying debris that clogs drainage areas and creates backup, and potentially mobilizing heavy objects which may then destroy control measures and/or other structures." Id. at ¶ 83. This narrowing of the permit's scope necessarily creates less stringent effluent limitations than the 2015 MSGP and therefore constitutes prohibited backsliding.

[2] This is not to say that FEMA maps serve no purpose whatsoever; CLF is simply highlighting the limited nature of the maps as an engineering tool, especially when used in a vacuum with no additional information. As discussed below, FEMA designations represent basic information that must be considered when identifying present-day flood risks and risk over the design life of a facility.

**Comment Response:**

EPA disagrees that the requirement that operators consider implementing mitigation measures to minimize impacts from major storm events constitutes backsliding. This is a new effluent limitation or condition over the previous permit, and as such not "effluent limitations which are less stringent" as specified in section 402(o) of the Act or the regulations at 40 CFR 122.44(l). Anti-backsliding simply does not apply to a new condition. The 2021 MSGP includes this provision to consider implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures for the first time as the 2015 MSGP did not include a similar provision. The 2021 MSGP asks operators to both document in their SWPPP any existing stormwater control measures in place if required by state, local, or federal agency and consider implementing additional stormwater control measures. The 2015 MSGP had no equivalent provision. Thus, the 2021 MSGP provides conditions that enhance the protection of water quality standards. Nevertheless, EPA also disagrees with the commenter's characterization of the provision. , EPA does not agree that permanent, structural control measures are necessary to mitigate risks of pollution from major storm events. For many facilities, the effluent limits can be achieved without using highly engineered or complex treatment systems. The specific limits in Part 2.1 of the MSGP emphasize "low-tech" controls, such as minimizing exposure to stormwater, regular cleaning of outdoor areas where industrial activities may take place, proper maintenance, etc. However, EPA acknowledges that sometimes treatment devices or constructed/installed controls may be necessary, particularly where a facility might otherwise not meet water quality standards. EPA has added to the 2021 MSGP the following language, " Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures will help to minimize impacts from stormwater discharges from major storm events, such as hurricanes, storm surge, extreme precipitation, and historic flood incidents." Therefore, the 2021 MSGP does address storm surge. In addition, EPA has included the following footnote in Part 2.1.1.8 of the 2021 MSGP: "To determine if your facility is susceptible to an increased frequency of major storm events that could impact the discharge of pollutants in stormwater, you may reference FEMA, NOAA, or USGS flood map products at

398

https://www.usgs.gov/faqs/where-can-i-find-flood-maps?qt-news_science_products=0#qt-news_science_products."

---

**Commenter Name:** Christopher M. Kilian
**Commenter Affiliation:** Conservation Law Foundation (CLF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**IV. Necessary Improvements to Avoid Prohibited Backsliding**

Regardless of whether the proposed permit changes substantively impact permittees' duties, CLF appreciates that EPA recognizes the importance of severe weather and flooding risks to industrial infrastructure and is attempting to address the issue expressly in the Proposed MSGP. However, as discussed supra, the proposed changes hinder rather than further that purpose. To make the 2020 MSGP accord with the CWA's anti-backsliding provision, as well as with good science and engineering practice, below are necessary additions to carry out that purpose.

EPA should require applicants to report identified flood risks in their NOI application following consultation with resources and data sets applicable to present and future flood risks as discussed below. As with the prior permit, the draft permit requires applicants to document their consideration of the design and selection of control measures in their SWPPP (Part 6.4), which includes consideration of the risks of major storm events and extreme flooding conditions. Consistent with good engineering practice and in order to support meaningful evaluation of an applicant's consideration of potential major storm and flood risk, EPA should make explicit that applicants must identify 1) the specific present-day flood risks and reasonably foreseeable flood risks over the design life of their facilities; 2) all of the information and analysis applicants have in their or their agents' possession relevant to flood risk; and 3) information and analysis relied upon for consideration and implementation of control measures to address identified risks.

EPA should also require applicants to self-designate exposure to flood risk if any part of their facility's footprint is located within a geographic area at risk of flooding based upon the best available flood projection information and models for that area. This must include consideration of all reasonably available data and information consistent with good engineering practice. For example, EPA should make explicit that applicants must, at a bare minimum, identify areas designated by FEMA as in or adjacent to a flood risk zone with a 0.2 percent or greater annual chance of flooding. Despite their underestimation of risk and flaws, the FEMA designations of statistical probability are based upon streamflow measurements and coastal flooding data, which are available for a widespread geography.

EPA should also make explicit that applicants must self-designate exposure to flood risk if any part of their facility's footprint is located within geographic areas that are projected by NOAA to

be exposed to present-day or future risk of dry-weather tidal flooding, including so-called 'king tides,' 'sunny-day,' recurrent, and nuisance flooding. Tidal flooding is already impacting coastal regions, including industrial areas and public infrastructure such as storm sewers and roadways. NOAA has identified coastal areas that are exposed to present-day nuisance flooding, based upon decades of observed data. The risks of coastal nuisance flooding are also increasing due, for example, to observed land subsidence and sea level rise. The coincidence of high tidal conditions with major storms and related flood conditions also has the potential to exacerbate the risk of harm to industrial sites. Therefore, EPA should make clear that applicants must identify a site's risk of exposure to nuisance flooding (in accordance with NOAA modeled projections) and consider accordingly the necessary control measures to account for those risks.

Nevertheless, identification of flood risks based solely upon the aforementioned analyses and designations will not adequately reflect the universe of present-day flood risk at MSGP-covered facilities which are typically comprised of infrastructure with a long service life. There is no substitute for site-specific flood data and future data-driven projections; accordingly, EPA should also require applicants to self-designate exposure to flood risk if any part of their facility has been flooded within the last 20 years. The past incidence of flooding is another indicator of present-day risk and should be disclosed by applicants and should also serve as a mandatory basis for selection and design of control measures.

Additionally, Section 2.1.1.8 should make clear that the standard for appropriate control measures depends on the quantity and characteristics of pollutants housed at the site. The current text of Section 2.1.1.8 makes no attempt to differentiate control measures based upon the potential harm to human health and the environment that could result from a release at different types of facilities. For example, the potential ecological consequences of flooding at a sawmill are very different from the potential consequences of flooding at a petrochemical facility or a superfund. Section 2.1.1.8 should expressly include a provision requiring stronger control measures when the facility is handling large amounts of potentially hazardous materials and constituents.

The MSGP should be explicit that permittees must consider a range of alternatives when designing, operating, and maintaining their facilities throughout its design life to prevent discharging pollutants in the event of flooding. The characteristics of each individual facility, including its location, the type of pollutants maintained, the amount of impermeable surface nearby, to name but a few, will determine the scope of choices available, from building floodgates for use in heavy storms, to running a facility outside "the rainy" season only, to building a new facility away from coastal and riverine resources to abate the flood risk dramatically. See Goldsmith Dec. ¶ []. The MSGP must require each permitted facility to develop a resilience plan, using the best data available consistent with good engineering practice, to assess its flood risk and appropriate flood mitigation options in both the near and long-term. In some instances, it must be acknowledged that facilities located in harm's way pose too great a danger to the surrounding area and community and retreat will be necessary in order to meet environmental standards and protect the public health, safety, and welfare. See id. ¶ []. In these situations, the MSGP must require the permittee to consider i) the range of possible floodproofing mechanisms; ii) how those mechanisms apply to the facility; and iii) implement

those measures in a way that minimizes risk over the permit term but ultimately considers a permanent, climate resilient solution.

The MSGP must also require that all facilities maintain safe, dry access via a land route throughout flooding events. Ingress and egress to implement emergency measures within the confines of a facility is fundamental to assuring that pollutants will not be discharged during flood events and to protect critical infrastructure. Even if required flood-proofing measures are fully implemented, a lack of dry access to the facility dramatically increases the risk that discharges and releases will occur. For example, a facility located significantly below the base flood elevation and hundreds of yards away from the inland extent of a readily anticipated flood event might end up completely surrounded by flood or surge waters with large waves and dangerous currents. While a desktop design exercise might show adequate facility design to "flood proof" the facility, the chaotic reality of such severe events makes it absolutely critical to have safe, dry access to implement response actions during such events to prevent catastrophic pollutant releases.

If EPA adopts the proposed requirements described above in the final MSGP, as it must to prevent backsliding, then the Agency will have more robust site-specific information and analysis with which to deliver compliance assistance to flood vulnerable facilities during the permit cycle, while also collecting valuable nation- and sector-wide data for the purpose of revising future permit requirements responsive to flood risks.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0200-A1, Comment Excerpt Number 4.

---

**Commenter Name:**  Christopher M. Kilian
**Commenter Affiliation:**  Conservation Law Foundation (CLF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0200-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**II. The 2015 MSGP Requires Permittees to Consider the Elevated Risk of Flooding Posed by Climate Change Impacts**

The 2015 MSGP already requires permittees to construct their facilities in a manner that avoids flooding and damage from the reasonably anticipated impacts of climate change during the facilities' design life by imposing a "good engineering practices" standard to the facilities' control measures and SWPPP preparation.

Section 2.1 of the 2015 MSGP requires permittees to "select, design, install, and implement control measures . . . to *minimize* pollutant discharges" and to do so "in accordance with *good engineering practices* and manufacturer's specifications." 2015 MSGP ¶ 2.1 (emphasis added). The 2015 MSGP further defined minimize to mean "reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable *in light of best industry practice*." 2015 MSGP § 2 (emphasis added). With these provisions, the 2015 MSGP expressly incorporates the professional standard of an engineer into the permit's control measures requirements. As detailed in Dr. Goldsmith's Declaration, the control measures required by the 2015 MSGP are intended to minimize the potential for contamination of stormwater, stop the discharge of contaminated stormwater, and minimize the potential for any non-stormwater discharges from the facility. Goldsmith Decl. ¶ 56 (quoting 2015 MSGP § 2.1).

In light of the scientific consensus on the current and future increasingly severe precipitation and storms, "[b]y requiring permittees to use 'good engineering practices' to develop and implement control measures, the MSGP requires industrial facilities to assess their vulnerabilities in light of climate change, develop engineering design plans to adequately address those vulnerabilities, and ultimately implement measures that will protect each facility and other surrounding communities from contamination from this facility." Goldsmith Dec. ¶ 61.

**Comment Response:**

EPA acknowledges that the use of "good engineering practices" to develop control measures should consider flood risks. EPA considers the specific provision contained in Part 2.1.1.8 necessary to confirm that operators have expressly considered control measures to mitigate impacts from stormwater discharges from major storm events.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 8:**

**Control Measure Selection and Design Considerations (Part 2.1.1)**

Part 2.1.1 of the proposed 2020 MSGP requires operators to consider a long list of factors when selecting and designing control measures. Specifically, EPA proposes that operators would be "required to consider implementing enhanced measures, such as structural improvements, additional pollution prevention measures, and other mitigation measures that are complementary to regular stormwater pollution planning" in order to encourage operators to "consider the

risks…and potential impact" from major storm events that cause flooding.[7] EPA has requested comment on whether it is appropriate for the permit to include this language in the 2020 MSGP.

NMA does not believe that this language is necessary and opposes the inclusion of these additional requirements. Mine operators already conduct careful analysis and planning as part of both their general facility permitting efforts (which usually require alternative site evaluations), and the SWPPP and general site runoff management. It is not necessary to duplicate these requirements and require operators to contemplate additional measures that may not even be applicable to the site. EPA has proposed to use the Federal Emergency Management Agency's (FEMA) Flood Map Service Center tool to determine if a facility is in a high-risk area. NMA does not believe this is an appropriate tool for mine sites. Many mine sites are located in remote areas that do not even have electronic mapping data available from this tool. As this proposed requirement is duplicative, unnecessary, and infeasible at remote mine sites, we recommend that the agency remove it from the final MSGP.

[7] Proposed 2020 Fact Sheet at 26.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Marie Gargas
**Commenter Affiliation:**  Plastics Industry Association (PLASTICS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS opposes mandating structural containment and other physical structures as described in the proposed 2020 MSGP.** While these structures may not be effective in the event of severe or catastrophic flooding, facilities subject to Spill Prevention, Control and Countermeasure plan requirements may already have similar containment structures. Facilities in flood-prone locations are already likely to have best management practices designed to address scenarios and concerns in their area. Should a covered facility be located in a FEMA-designated flood zone, depending on the type of facility operation(s) involved, we recommend that they be advised to consider these requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

2021 EPA MSGP Response to Comments
January 15, 2021

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether it is appropriate for the permit to include language similar to the proposed language above that facilities should consider implementing enhanced controls to minimize impacts from stormwater discharges from major storms that cause extreme flooding conditions. **[Yes.]**

**Comment Response:**

EPA acknowledges the commenter's support for this permit provision. EPA finalized Part 2.1.1.8 of the 2021 MSGP requiring that operators consider implementing enhanced stormwater control measures for facilities that could be impacted by major storm events. See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Resource Management Associates (RMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 8 – We disagree with the need for language that facilities should implement enhanced controls to minimize impacts from stormwater discharges from major storms that cause extreme flooding conditions. While the rationale for these controls is justifiable, we do not believe that these "water quantity" requirements should be made part of a "water quality" permit, and should be managed through other channels, such as through State and local stormwater management control programs, not through the MSGP. Furthermore, if this requirement is to be made part of the MSGP, then a considerable volume of additional detail is needed (as well as in the proposed permit) in order to fully understand what is being required by the USEPA and states relative to this requirement. Simply put, this is not the right place for these requirements, and they should not be made part of the MSGP. On a separate note, if a site was to be required to have "enhanced controls" in a location where they could contribute to discharges that cause extreme flooding (such as indicated by FEMA mapping), then what about locations that were not in mapped flood zones? Would they qualify for "relaxed controls"? Might that not give some form of indication that these types of locations were somehow less important to both the water quality and water

quantity of our nation's waterways? As stated previously, we recommend removal of this requirement from the MSGP.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0179-A1, Comment Excerpt Number 6.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

This requirement is not based on the quality of facility discharges and does not adhere to the adaptive management principle contained in the MSGP. These requirements would likely result in significant capital outlays to install structural controls and BMPs for a potential scenario that could or could not occur. Actions required by the permit are currently and should continue to be limited to adaptive management corrective actions and be based on the actual quality of stormwater discharges from a facility. It would be appropriate for the EPA to recommend and issue guidance that facilities evaluate potential flooding and install control measures at their discretion; however, installing control measures to address potential flooding events should not be incorporated as a requirement in the MSGP.

**Suggested Revision:**

Delete Part 2.1.1.8 from the final version of the MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

I believe it is entirely appropriate for Permit holders to use FEMA Flood Maps to identify areas with increased risk of storm flooding. But I think this section is not necessary. Each permit holder is responsible to ensure levels above the Benchmarks are not discharged from their facility ... whether it is from a light rain or a 500 year flood. Each permit holder will need to use various and differing methods to achieve compliance but Section 2.1.1 should instead be listed as Best Management Practices for the permit holders to choose from to achieve compliance. I request Section 2.1.1 be eliminated and moved to BMP's.

**Comment Response:**

EPA disagrees. The requirements contained in Part 2.1.1 are appropriately categorized as "Stormwater Control Measure Selection and Design Considerations", which must be considered when selecting and designing control measures, and not a definitive list of best management practices, which could inadvertently limit the controls which operators may use to fulfill the permit requirement. Also see response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Established businesses governed under this permit have by the best of their ability developed controls, systems, and spent extensive capital on infrastructure to comply and keep America's waterways safe under the clean water act. It is not appropriate to include language that facilities must implement enhanced controls and infrastructure to rninimize the impacts of storm water discharges from major "act of god" storms. Extraordinary controls would not save a business from complete destruction in the event of a tornado, hurricane, or some other rare and extreme event.

Enhanced pollution prevention measures like reinforcing structures to withstand flooding are extremely ambiguous and potentially expensive. What engineering standard represents proper structure reinforcement in this regard? And how could businesses afford completely redesigning and rebuilding their existing structures onsite?

The enhanced measure of temporarily reducing or eliminating outdoor storage may be impossible for some businesses, given that they may not have enough indoor storage to comply. The idea of moving materials, equipment, and strucrures above Base Flood Elevation (BFE) level before an impending storm may be logistically impossible given several factors:

-Established storage areas (I suggest removing: Too much material) already onsite within the facility to move, the location of the facility already being below BFE in its entirety, or lack of staff to accommodate such a migration of assets and materials in a short time. The safety of each facilities staff must also be considered. If a 500 year storm is imminent, proper evacuation of the area may be required by local governments before days' worth of rearranging can be accomplished to move everything above BFE or inside.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA includes conditions on the use of Federal Emergency Management Agency's (FEMA) Flood Maps, then the relevant and applicable age and updates of the maps should be clarified in the MSGP. Including information in their SWPPP on past flooding events at the facility and effectiveness of flooding controls may also help permittees select and design enhanced measures.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  47
**Excerpt Status:** Final

**Comment Excerpt:**

*15. EPA Should Adopt its Proposal for "Consideration of Major Storm Control Measure Enhancements," with Certain Revisions.*

Flood risks to industrial facilities and, in particular, the threat of flood-induced contaminated stormwater discharges and chemical disasters are a present and increasing risk and must continue to be fully addressed in the MSGP. The MSGP has long required regulated facilities that are

exposed to extreme weather and flood risks to develop SWPPPs with enforceable measures to address those risks and to comply with effluent limits, water quality standards, antidegradation requirements for high quality waterways, and applicable waste load allocations. The well-documented current and increasing effects of climate change, such as increased frequency of severe storms, extreme precipitation, storm surge, and sea level rise, only intensify the risk of harm from contaminated stormwater discharges and catastrophic spills to water quality, public health and safety.[129]

While the narrative standards contained in the 2015 and prior versions of the MSGP already require permittees to take these issues into consideration and implement appropriate controls and actions at facilities, the proposed 2020 MSGP language as it currently stands is not sufficient because it appears to narrow the necessary consideration of flood risk from the 2015 version. Accordingly, the Agency should strengthen the proposed language in Part 2.1.1.8 by underscoring existing obligations requiring applicants to use good engineering practice, disclose information in their possession, consider all reasonably available data and information, and thoroughly document present-day and future flood risks, such as hurricane storm surge and high tides, extreme precipitation, known and committed sea level rise, and historic flood incidents. EPA should further underscore that applicants must include specific enforceable design, operation, and maintenance measures in their SWPPPs to fully address identified risks of pollutant discharges. Relying upon the self-reported data and information contemplated in this proposal, EPA should evaluate the universe of permitted facilities at risk of flooding and prioritize inspections, outreach, technical assistance, and compliance resources to the most vulnerable facilities.

---

[129] Minovi, D. Toxic Floodwaters: Public Health Risks and Vulnerability to Chemical Spills Triggered by Extreme Weather, Center for Progressive Reform (May, 2020) (attached); *also* Government Accountability Office. *Superfund: EPA Should Take Additional Actions to Manage Risks from Climate Change*. GAO-20-73: Published: Oct 18, 2019. Publicly Released: Nov 18, 2019. https://www.gao.gov/products/GAO-20-73.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1 and DCN EPA-HQ-OW-2019-0372-0200-A1, Comment Excerpt Number 4.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  48
**Excerpt Status:** Final

**Comment Excerpt:**

*a. EPA Should Require Applicants to Self-Identify Risk of Flooding Conditions Resulting from Major Storms in Notice of Intent Applications for Permit Coverage*

EPA should require applicants to report identified flood risks in their NOI application following consultation with resources and data sets applicable to present and future flood risks as discussed below. As with the prior permit, the draft permit requires applicants to document their consideration of the design and selection of control measures in their SWPPP (Part 6.4), which includes consideration of the risks of major storm events and extreme flooding conditions. Consistent with good engineering practice and in order to support meaningful evaluation of an applicant's consideration of potential major storm and flood risk, EPA should make explicit that applicants must identify 1) the specific present-day flood risks and reasonably foreseeable flood risks over the design life of their facilities; 2) all of the information and analysis applicants have in their or their agents' possession relevant to flood risk; and 3) information and analysis relied upon for consideration and implementation of control measures to address identified risks.

EPA should require applicants to self-designate exposure to flood risk if any part of their facility's footprint is located within a geographic area at risk of flooding based upon the best available flood projection information and models for that area. This must include consideration of all reasonably available data and information consistent with good engineering practice.

Unfortunately, proposed Part 2.1.1.8 narrows the universe of data that must currently be considered under the MSGP by constraining the flood-risk analysis solely to "base flood elevations (BFE) shown on the Federal Emergency Management Agency's Flood Maps and on the flood profiles, which can be accessed through https://msc.fema.gov/portal/search."[130] As EPA is well aware, FEMA flood hazard designations are insufficient to capture present-day coastal flood risks, which also include hurricane storm surge and nuisance or 'sunny-day' tidal flooding, to sites discharging industrial stormwater.[131] Further, the underlying models used by FEMA to identify flood risks for flood insurance rate development were never intended for use in regulatory programs and are based upon retrospective data. Therefore, FEMA designations are outdated in many cases and even across some entire regions. These concerns are especially grave given observed increases in precipitation intensity, severe storm frequency, and sea level rise. Dramatically intensified development of impervious surfaces over the last several decades further confounds simple reliance on the FEMA designations. As a result, currently applicable spatial flood hazard designations significantly underestimate present-day risk. Reliance on FEMA BFEs alone in this proposed provision artificially constrains the 2015 MSGP requirements and would be arbitrary and unreasonable given current scientific consensus regarding both the insufficiencies of the FEMA maps and the dramatic current and certainly impending effects of climate change.

Nevertheless, FEMA flood hazard designations represent basic information that must be considered for identifying present-day flood risks and risk over the design life of a facility. EPA should make explicit that applicants must, at a bare minimum, identify areas designated by FEMA as in or adjacent to a flood risk zone with a 0.2 percent or greater annual chance of flooding. Despite their underestimation of risk and flaws, the FEMA designations of statistical probability are based upon streamflow measurements and coastal flooding data, which are available for a widespread geography.

EPA should also make explicit that applicants are required to self-designate exposure to flood risk if any part of their facility's footprint is located within geographic areas that are projected by NOAA to be exposed to present-day risk of hurricane storm surge. NOAA has developed multiple hurricane storm surge models and projections. For example, NOAA's National Hurricane Center publishes coastal storm surge vulnerability projections based upon the agency's SLOSH (Sea, Lake, and Overland Surges from Hurricanes) model, which is based upon analysis of different tropical storm trajectories and intensities.[132] Coastal areas are already at risk of flooding due to storm surge, and that risk is growing due to increased frequency and intensity of hurricane storms and observed sea level rise.[133] Therefore, EPA should require applicants to identify a site's risk of exposure to storm surge arising from any of five categories of hurricanes (in accordance with NOAA modeled projections) and consider accordingly the necessary control measures to account for those risks.

EPA should also make explicit that applicants must self-designate exposure to flood risk if any part of their facility's footprint is located within geographic areas that are projected by NOAA to be exposed to present-day or future risk of dry-weather tidal flooding, including so-called 'king tides,' 'sunny-day,' recurrent and nuisance flooding. Tidal flooding is already impacting coastal regions, including industrial areas and public infrastructure such as storm sewers and roadways.[134] NOAA has identified coastal areas that are exposed to present-day nuisance flooding, based upon decades of observed data.[135] The risks of coastal nuisance flooding are also increasing due, for example, to observed land subsidence and sea level rise.[136] The coincidence of high tidal conditions with major storms and related flood conditions also has the potential to exacerbate the risk of harm to industrial sites. Therefore, EPA should make clear that applicants must identify a site's risk of exposure to nuisance flooding (in accordance with NOAA modeled projections) and consider accordingly the necessary control measures to account for those risks.

Identification of flood risks based solely upon the aforementioned analyses and designations will not adequately reflect the universe of present-day flood risk at MSGP covered facilities which are typically comprised of infrastructure with a long service life. FEMA and NOAA projections are typically based upon analysis of historical data; there is no substitute for site-specific flood data and future data-driven projections. In addition, EPA should require applicants to self-designate exposure to flood risk if any part of their facility has been flooded within the last 20 years. The past incidence of flooding is another indicator of present-day risk and should be disclosed by applicants and should also serve as a mandatory basis for selection and design of control measures.

Further, in accordance with the foregoing and good engineering practice, EPA should make explicit that applicants must identify a "Site-Specific Flood Planning Elevation". Certain sites may be exposed to more than one type of present-day flood risk, so the identified Site-Specific Flood Planning Elevation can simplify the applicant's consideration of flood risk in the selection and design of control measures. In particular, EPA should require applicants to certify that they have (1) modeled the efficiency of existing control measures; (2) designed and implemented measures in accordance with their self-reported Site-Specific Flood Planning Elevation; and (3) that their SWPPP includes a "Storm and Flood Protection Protocol," as described in the following section.

[130] Draft Permit at 14, Part 2.1.1.8, Note 5

[131] Highfield, W.E., Norman, S.A. and Brody, S.D. (2013), Examining the 100-Year Floodplain as a Metric of Risk, Loss, and Household Adjustment. Risk Analysis, 33: 186-191. doi:10.1111/j.1539-6924.2012.01840.x.

[132] National Hurricane Center. National Storm Surge Hazard Maps - Version 2, National Oceanic and Atmospheric Administration, US Department of Commerce (accessed May 26, 2020). Available at https://www.nhc.noaa.gov/nationalsurge/; *also,* National Hurricane Center Storm Surge Unit. National Storm Surge Hazard Maps, National Oceanic and Atmospheric Administration, US Department of Commerce (accessed May 26, 2020). Available at https://noaa.maps.arcgis.com/apps/MapSeries/index.html?appid=d9ed7904dbec441a9c4dd7b277 935fad &entry=1.

[133] Fleming, E., J. Payne, W. Sweet, M. Craghan, J. Haines, J.F. Hart, H. Stiller, and A. Sutton-Grier, 2018: Coastal Effects. In *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 322–352. doi: 10.7930/NCA4.2018.CH8.

[134] National Ocean Service. What is high tide flooding? National Oceanic and Atmospheric Administration, US Department of Commerce (accessed May 26, 2020). Available at https://oceanservice.noaa.gov/facts/nuisance-flooding.html; *also*, Jacobs, J. M., Cattaneo, L. R., Sweet, W., & Mansfield, T. (2018). Recent and Future Outlooks for Nuisance Flooding Impacts on Roadways on the U.S. East Coast. Transportation Research Record, 2672(2), 1–10. https://doi.org/10.1177/0361198118756366.

[135] Sweet, W.V.; Duseket, G.; Obeysekera, J. and Marra, J.J. (2018) Patterns and Projections of High Tide Flooding Along the U.S. Coastline Using a Common Impact Threshold. Silver Spring, MD, NOAA NOS Center for Operational Oceanographic Products and Services, 44pp. (NOAA Technical Report NOS CO-OPS 086), DOI: http://dx.doi.org/10.25607/OBP-128; Office for Coastal Management. Sea Level Rise and Coastal Flooding Impacts – Sea Level Rise Viewer, National Oceanic and Atmospheric Administration, US Department of Commerce (accessed May 26, 2020). Available at https://coast.noaa.gov/slr/#/layer/slr.

[136] Sweet, W. P. J., Marra, J., Zervas, C. & Gill, S. Sea Level Rise and Nuisance Flood Frequency Changes Around the United States, NOAA Technical Report NOS CO-OPS 073 (NOAA, 2014). Available at http://tidesandcurrents.noaa.gov/publications/NOAA_Technical_Report_NOS_COOPS_073.pdf.


**Comment Response:**

EPA added language in Part 2.1.1.8 of the 2021 MSGP that recommends operators of facilities that "…may be exposed to or has previously experience such extreme weather," consider

additional stormwater control measures. See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 49
**Excerpt Status:** Final

**Comment Excerpt:**

Lastly, EPA should make an explicit presumption against no-exposure certifications for facilities at-risk of flooding, as above, and should prohibit eligibility for no-exposure certification for any facility that has experienced flooding in the last twenty years. EPA should revise the form application for no-exposure certification to require applicants or a qualified professional to affirm that an applicant facility does not meet any of the flood exposure criteria described above. EPA may also allow applicants seeking no exposure certification to otherwise provide a detailed analysis prepared by a third-party engineer demonstrating that existing site-specific features and control measures will prevent inundation on any part of the site and the discharge of runoff contaminated by pollutants present on the premises.

**Comment Response:**

EPA does not agree that EPA should prohibit eligibility for the no exposure certification based on flood risks or require an affirmation of no flood exposure to obtain the no exposure certification. The regulations at 40 CFR 122.26(g) do not address flood risk as a prohibition to obtaining a no exposure exclusion. 40 CFR 122.26(g) outlines criteria for obtaining the conditional exclusion for "no exposure", which include the provision of a storm-resistant shelter to protect industrial materials and activities from exposure to rain, snow, snow melt, and runoff. The no exposure exclusion addresses industrial activities and materials that are completely sheltered. EPA currently may deny a no exposure exclusion, based on a determination that a facility's stormwater discharges have a reasonable potential to cause or contribute to a violation of applicable water quality standards.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 50
**Excerpt Status:** Final

**Comment Excerpt:**

*b. EPA Should Make Explicit that Facilities Must Implement Measures Designed to Prevent Pollutant Discharges from Floods*

In addition to requiring applicants to explicitly document and describe the process for selection and design of control measures that is responsive to identified flood risks, the Agency should also make clear that operators of facilities at-risk of flooding must implement such measures concurrent with their annual SWPPP update. EPA should explicitly require operators to assess and report on the flood vulnerability of sites and pollution control measures in the initial submission and subsequent updates of SWPPPs. As a component of this required self-evaluation, operators must continue to model the efficiency of existing control measures and design additional control measures in accordance with their self-reported Site-Specific Flood Planning Elevation.

EPA should explicitly require operators of facilities at-risk of flooding to implement additional pollution prevention and mitigation measures necessary to address site-specific flood vulnerabilities as necessary to comply with effluent limits, applicable water quality standards, and other requirements of the MSGP. EPA should require operators to submit engineering designs for control measures within 6 months of SWPPP completion or update; implement necessary control measures within 12 months; and commence post-construction monitoring within 24 months.

EPA should require applicants to include a Storm and Flood Protection Protocol for safe full/partial shutdown of facility and application of temporary stormwater pollution control measures during an emergency caused by forecasted storm or flooding and the site-specific risks of flooding (as above). The protocol may be copied from or incorporated by reference to other emergency planning documents applicable to the facility. If so incorporated by reference, those other documents will become integrated into a site's SWPPP. EPA should also require operators to indicate on proposed publicly-accessible signage whether a site is exposed to any risk of flooding, while the more detailed information about flood risk and a facility's plan for control measure changes and flood response protocols would be made accessible its SWPPP.

EPA should explicitly require operators to monitor and report on flooding impacts to sites and pollution control measures. EPA should require visual assessment for flooding impacts as part of required routine facility inspections (Part 3.1) and quarterly visual assessments (Part 3.2), for example. Visual assessment of flooding impacts should also be required as part of required procedures for monitoring (i.e. measurable storm events, Part 4.1.3). Operators should be required to document "Adverse Weather Conditions," and, in doing so, assess and document flooding impacts (Part 4.1.5).

EPA should use facility-reported information and data, as well as other relevant resources, to evaluate the universe of permitted facilities at risk of flooding and to prioritize inspections, outreach, technical assistance, and compliance assistance to the most vulnerable facilities. If EPA adopts the proposed requirements, as above, in the final MSGP, then the Agency will have more robust site-specific information and analysis with which to deliver compliance assistance to flood vulnerable facilities during the permit cycle, while also collecting valuable nation- and sector-wide data for the purpose of revising future permit requirements responsive to flood risks.

This information would include, for example, self-identification of Exposure to Flood Risk (NOI), including data for historic, site-specific incidents of flooding; Site-Specific Flood Planning Elevation (NOI); certification and modeling of control measures in accordance with the Site-Specific Flooding Planning Elevation (NOI and SWPPP); certification and submission of Storm and Flood Protection Protocol (NOI and SWPPP); and site-specific incident documentation for flooding and adverse weather conditions.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

ARA opposes a mandate distinguishing the types of BMPs that might be used based on a permittee's location. All permittees must implement BMPs and those BMPs should account for site-specific conditions.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

This should be encouraged, but not required unless justified by verifying flood frequency that would justify.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

This requirement is problematic, because it is not clear when or if a violation can occur. If a facility considers different control measures due to the potential for flooding and makes changes that prove to be ineffective, would it be in violation? This could force some facilities to perform extensive studies and lead to disagreements with inspectors. How would a disagreement between an inspector and the facility be resolved? Some areas of the country are already highly restricted by local zoning and building codes and this provision adds redundancy. Also, the decision to address these potential issues and defining criteria should be left to the person developing the SWPPP. Some facilities may have other contingency and continuity plans that address these concerns and could be referenced in the SWPPP. Based on these arguments, this requirement should be removed.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1. In the case of disagreement between an inspector and operator, the MSGP allows operators to determine and select the appropriate stormwater control measures for their facility. Further, Part 2.1 of the MSGP states "You must modify your stormwater control measures per Part 5.1 if you find that your control measures are not achieving their intended effect of minimizing pollutant discharges (i.e., your discharges will be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards or meet any of the other non-numeric effluent limits in this permit)." Therefore, the operator is required to reconsider stormwater control measures if they are not achieving the intended purpose.

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

It is appropriate for the permit to require facilities to consider implementing measures to minimize impacts from major storms. In addition to the suggestion to delay delivery of materials

when a storm is anticipated, facilities should verify the tightness and security of above ground storage tanks prior to the storm and, if possible, install additional containment.

**Comment Response:**

The 2021 MSGP finalized the proposed provisions related to major storm considerations that the commenter supports.. With respect to the suggestion to add verification of tightness and security for above ground storage tanks, and install additional containment, EPA notes that Part 2.1.1.8 includes reinforcement of materials storage structures to withstand flooding and additional exertion of force, which addresses this suggestion.

---

**Commenter Name:**  Emily Remmel
**Commenter Affiliation:**  National Association of Clean Water Agencies (NACWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0230-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Must Eliminate the Proposed Requirements for Enhanced Control Measures to Mitigate Major Storm Events**

**...**

NACWA opposes this mandate for control measures based on the Federal Emergency Management Agency's (FEMA) flood maps. POTWs are traditionally located on low-lying topography and have long-standing experience dealing with building resilience from major storm events and serious flooding. Clean water utilities are dedicated to improving resiliency within their communities and do so through various measures including capital improvements and green infrastructure. Including requirements in the MSGP that could impede or conflict with these efforts is inappropriate. EPA should avoid these concerns by eliminating the unnecessary proposed enhanced control measures in the final MSGP.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA Request for Comment 8 suggests that one approach to determine the definition of a major storm event would be to use the Federal Emergency Management Agency's (FEMA) Flood Map Service Center to determine if the facility is in a 100-year flood zone or 500-year flood zone. Requiring the implementation of stormwater improvements and measures to prepare for major flood events, especially a 500-year flood event with a very low potential of occurring, is overly conservative and would put an undue burden on facilities. Under more frequent flood risks, such as extreme flooding during a more likely event such as a 25-year flood, the type of implementation action under Part 2.1.1.8 may be appropriate. Simplot noticed that the FEMA online mapping tool https://msc.fema.gov/portal/search does not include maps or digital data for many remote areas throughout the Western United States. Simplot requests that if this tool is used to measure compliance with Part 2.1.1.8, that an exception be put in place for areas that are not covered by the FEMA mapping tool.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The addition of proposed permit language for consideration of enhanced stormwater management controls in areas more prone to flooding is excessive and seems unnecessary. Based on our experience in the northeast region, a relatively large percentage of timber industry facilities are located near water bodies and this would place an undue burden on those regulated permittees. We have found that many of these facilities already employ controls to minimize the potential of flooding impacts that could result in significant loss of materials and products during large storm events. Permit language requiring "consideration" is vague and would not result in the desired outcome that the EPA appears to be looking for. The remaining proposed MSGP requirements would in most cases protect receiving water quality from regulated entities. Furthermore, new and re-development activities, requiring MSGP coverage in flood prone areas must also typically comply with other state and federal regulatory programs that address floodplain impacts.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

**Commenter Name:**  Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:**  Utility Water Act Group (UWAG)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**V. UWAG Recommends EPA Remove the Proposed Consideration of Enhanced Major Storm Control Measures Based on a Facility's Geographic Location**

EPA proposes to require operators to consider implementing enhanced storm control measures, in addition to regular stormwater pollution prevention planning, in an attempt to encourage operators to consider the risks of their industrial activities and the potential impact of pollutant discharges caused by stormwater discharges from major storm events. Proposed Fact Sheet, Part 8 2.1.1.8, at 14. EPA states that operators should consider how they might bolster existing procedures to account for the impacts of their stormwater controls measures and potential pollutant discharges during extreme wet weather. Proposed Fact Sheet, Part 2.1.1, at 36-37.

The requirement to consider the proposed enhancements is unnecessary and should not be adopted in the final permit. The proposed requirement would be particularly relevant for many UWAG members, given the waterfront locations of most power plants. Despite their waterfront locations, many of these facilities have no history of flooding that would impact stormwater outfalls, or, where extreme flooding has occurred, the stormwater controls under consideration would not have prevented the impacts. Additionally, facilities that are vulnerable to extreme weather conditions are already required to have emergency response plans to address these storm events. Therefore, EPA's proposal would do little to prevent discharges during major storms and would impose an unnecessary burden on permittees.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 8 – NRMCA strongly opposes requiring covered facilities to implement "enhanced controls to minimize impact from stormwater discharges from major storms that cause extreme flooding conditions." Controlling discharges due to extreme flooding would be impossible for the vast majority of covered facilities. Most facilities do not have the capacity or capacity ability, and may never, to hold or manage such large volumes of floodwaters. NRMCA does not believe that the purpose of the MSGP should be to attempt to harness such extreme weather conditions that would result in discharges. In order to contain these discharges infrastructure changes would be required at nearly every ready mixed concrete plant in the US, at tremendous cost and effort, and likely would be impractical. This requirement would surely impose an unnecessary burden on ready mixed concrete plants.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1. The commenter asserts the requirement would impose an unnecessary burden but did not support this assertion with data or specific examples.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requested comment on whether it is appropriate for the permit to include language that facilities should consider implementing enhanced controls to minimize impacts from stormwater discharges from major storms that cause extreme flooding conditions. Such additional requirements are too descriptive and excessively costly to implement. Structural permit conditions should already be included under new building code requirements. ATA recommends facilities implement appropriate Best Management Practices (BMPs) in-lieu-of additional enhanced controls.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1. The commenter asserts the requirement would impose an unnecessary burden but did not support this assertion with data or specific examples.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

- Consideration of major storm control measure enhancements. EPA's proposed requirement that facilities consider major storm control measure enhancements to address flooding issues should not be adopted. BMPs should already account for site-specific conditions, including potential flooding or other extreme weather. To the extent that EPA considers "extreme weather" to include the 100-year, 50-year, or even 20-year storm events, imposing requirements on that basis in this permit is improper. The MSGP is a 5-year permit and facilities are responsible for controlling pollutants from the types of conditions that should be expected to occur. In addition, most facilities covered by the MSGP have maintained coverage since at least 1995, so they have 25 years of experience with the types of conditions that should be expected.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 8**

The FWQC and FSWA oppose this requirement for enhanced controls to minimize impacts from stormwater discharges from major storms that cause extreme flooding conditions, and this requirement should be deleted. This proposal raises significant questions regarding how EPA will define "extreme flooding conditions," "major storm events," "wet weather events," and "good engineering practices" and could create liability for sites that are not prone to flooding caused by precipitation. Requiring SWPPP modifications (as described in the new clarification in Part 6) based on undefined terms creates unjustified liability and fails to provide regulatory guidance to permittees. EPA also has already addressed the issue of potential impacts from major storm events or extreme flooding in Part 6.0 ("Facilities must keep their SWPPP up-to-date throughout their permit coverage, such as making revisions and improvements to their stormwater management program based on new information and experiences with wet weather events, including major storm events and extreme flooding conditions."). There is no need to repeat or confuse things by the proposed mandates in Part 2.1.1.

Whether or not a site is in a flood plain, site-specific conditions exist that may make a particular facility more or less likely to flood based on the topography immediately around the facility. More specifically, all permittees must implement BMPs, and those BMPs should already account for site-specific conditions, including potential flooding caused by precipitation, significant run-on from neighboring facilities, or other unique circumstances.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

We suggest eliminating this provision, and instead, consider that all facilities covered under the MSGP are already required to evaluate appropriate site-specific controls as part of the requirement to select, design, install, and implement control measures to minimize pollutant discharges as described in Part 2 of the MSGP. Facilities that are at a particular risk for flooding should evaluate appropriate and feasible controls as part of the review described in Part 2.1.1. It is not necessary, and overly burdensome, to specify the controls that must be considered and the conditions under which they should be implemented as proposed in Part 2.1.1.8. This reduces flexibility and further complicates compliance requirements for operators.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**Enhanced Controls for Extreme Flooding Should Not be "Requirements" in the Final Permit**

It would be inappropriate for EPA to require facilities to implement enhanced controls to minimize impacts from stormwater discharges from major storms that cause extreme flooding conditions. This requirement is not based on the quality of facility discharges and does not adhere to the adaptive management principle contained in the MSGP. Actions required should be limited to adaptive management corrective actions. Facilities should engage in an iterative process as a result of visual or inspection monitoring and the evaluation of potential corrective actions that address actual deficiencies with that facility's stormwater quality discharge.

To apply blanket prescribed measures would fail to take into account the feasibility for a specific measure in light of the facility's characteristics. Rail yards differ significantly across the county, and no single set of measures would universally address potential issues with extreme flooding. For example, it would not be possible to "[t]emporarily relocate any mobile vehicles and equipment to upland areas" at many railyards.[10] Moreover, generic corrective measures would be too vague to be useful.

Instead, EPA should issue guidance related to enhanced controls to minimize impacts from excessive flooding.

[10] See EPA Final Proposed 2020 MSGP Fact Sheet at 36.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**C. CCIG Recommends that EPA Clarify and Modify its Proposal to Require Consideration of Major Storm Control Measure Enhancements.**

**...**

CCIG recommends that EPA clarify and revise certain aspects related to the applicability and control measures of this new MSGP requirement. Group members are committed to ensuring public safety, reducing stormwater pollution, and adopting practicable measures to mitigate related risks. While the Group shares EPA's goals related to this proposed requirement, the

Group believes that the Agency would be better positioned to achieve these goals by adopting the recommendations below.

## 1. Applicability

Essential aspects of this proposal related to its applicability require clarification. The proposal does not, for example, define key terms related to the scope of applicability. Although "major storm events" and "extreme flooding conditions" are the underlying bases for this proposal, EPA neither defines these terms in its regulations nor in the proposed 2020 MSGP. Without fully understanding the meaning EPA ascribes to these terms, CCIG cannot provide precise comments on this proposed requirement. If EPA adopts this proposal, CCIG recommends that the Agency clearly and narrowly define these terms in a way that correlates with the criteria the Agency decides to use to identify which facilities would be subject to this new requirement (*e.g.*, Special Flood Hazard Areas). CCIG suggests associating the terms with the Federal Emergency Management Agency's ("FEMA's") definition of "100-year flood."[9] For those facilities that are determined to be subject to these requirements (*e.g.*, those within a Special Flood Hazard Area), a facility should be required to consider implementing enhanced control measures that address flood events that are no smaller than a 25-year, 24-hour event.

Relatedly, EPA has not identified what facilities would be subject to this new requirement.[10] CCIG generally believes that agencies should avoid prescribing unnecessary or unhelpful regulatory requirements. With this in mind, the Group encourages EPA to avoid adopting overly broad criteria that would subject facilities to this new requirement simply because those facilities *could be* impacted by major storm events or extreme flooding conditions. Instead, it would be better to limit applicability only to those facilities that (1) present a meaningful risk of experiencing those events and conditions within the MSGP's five-year duration, and (2) where the occurrence of those events and conditions at those facilities likely would lead to significant pollution impacts from stormwater discharges.

CCIG believes that relying on whether a facility is located in a "Special Flood Hazard Area" or another greater risk flood hazard area based on FEMA's Flood Map Service Center may provide EPA with a reasonable basis for determining whether a facility presents a meaningful risk of experiencing major storm events and extreme flooding conditions. Should EPA adopt this approach, CCIG would recommend that the Agency modify proposed Part 2.1.1.8 in the following way:

*__If a facility is located in a Special Flood Hazard Area as defined by the Federal Emergency Management Agency at 44 C.F.R § 59.1__, implementing structural improvements, enhanced pollution prevention measures, and other mitigation measures, to minimize impacts from stormwater discharges from major storm events that cause extreme flooding conditions __(such as a 100-year flood as defined by 44 C.F.R § 59.1)__.*

In addition to this modification, CCIG recommends that EPA include a provision that exempts facilities that can make a reasonable showing that the occurrence of major storm events and extreme flooding conditions affecting the facility likely would not lead to significant pollution impacts from stormwater discharges during the five-year life of the permit.

[9] 44 C.F.R § 59.1.

[10] Proposed 2020 MSGP, Part 2.1.1.8.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Excerpt Number 11.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**C. CCIG Recommends that EPA Clarify and Modify its Proposal to Require Consideration of Major Storm Control Measure Enhancements.**

**...**

CCIG recommends that EPA clarify and revise certain aspects related to the applicability and control measures of this new MSGP requirement. Group members are committed to ensuring public safety, reducing stormwater pollution, and adopting practicable measures to mitigate related risks. While the Group shares EPA's goals related to this proposed requirement, the Group believes that the Agency would be better positioned to achieve these goals by adopting the recommendations below.

…

**2. Control Measures**

In response to EPA's request for information on other potential control measures, CCIG recommends that the Agency consider on-site or regional stormwater retention. Existing EPA-commissioned research confirms that this is a viable way to mitigate impacts from major flood events.

In 2005, following Hurricane Katrina, EPA commissioned a report that analyzed, among other things, pollution in the resultant floodwaters.[11] That study found that "large amounts of water resulting from the hurricanes may have actually helped some of the water pollution concerns . . . due to dilution."[12] In addition, and most relevant here, the study found that "the time consuming process of dewatering allowed many solids to settle, likely removing some sorbed constituents from the water column."[13] Based on these and other findings, the study concluded that "[i]nitial concerns about a 'toxic gumbo,' . . . have not been supported by sampling and analyses."[14]

In its conclusion, the study recommended that "the lessons learned from Katrina should be crystallized in a generic form" to be better prepared to deal with major storm events.[15] The value of using stormwater retention measures to reduce pollution impacts of stormwater discharges is one of these lessons. Notably, this approach has been used in other parts of the country. For example, the City of Chandler, Arizona requires developed land parcels to "[retain] rainfall from a 100-year frequency, 2-hour duration storm that falls on a parcel."[16] This requirement recognizes what the EPA-commissioned study found—retention is a proven stormwater treatment technology because it limits and controls runoff volume while allowing pollutants to settle. Accordingly, EPA may wish to consider this as an alternative control measure.[17]

[11] *See* EPA, Water Quality Assessment and Monitoring in New Orleans Following Hurricane Katrina, https://archive.epa.gov/emergencies/content/fss/web/pdf/roper_3.pdf.

[12] Id. at 4.

[13] Id.

[14] Id. at 12-13.

[15] *See id.* at 13.

[16] City of Chandler, Arizona, Drainage Policy & Standards, 3.11, https://www.chandleraz.gov/sites/default/files/documents/imported/UDM_TDM3.pdf.

[17] CCIG also recommends that EPA include in the MSGP appropriate best management practices to capture the sediment associated with stormwater runoff.

**Comment Response:**

EPA received many comments that opposed or voiced concerns about the AIM level 3 option to install infiltration or retention controls as an alternative or adjunct to structural source controls and/or treatment controls. Many of the concerns revolved around the potential for groundwater contamination. Given care must be taken to avoid potential obstacles with this option, such as potential aquifer impacts, hydrologic connectivity to waterbodies, groundwater impacts and the type of pollutants of concern, EPA has decided to not finalize this specific option. EPA intends to continue researching this topic to assess the feasibility of a future infiltration/retention approach and how to implement it for industrial stormwater discharges. Therefore, EPA has decided not to finalize the option to install infiltration or retention controls as an option under AIM level 3. .

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)

**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Recommend removing this requirement for facilities located outside of flood zones.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Minimizing Impacts from Extreme Storm Events (Proposed MSGP 2.1., request for comment 8).
Section 2.1.1.8 of the draft permit establishes a set of requirements specific to preventing
stormwater impacts from major flooding events. AEMA members routinely consider the full
range of potential precipitation conditions in designing their stormwater management systems
and practices as documented in their SWPPPs. Mining facilities typically also have detailed
emergency planning and response procedures for large hazard events (such flooding as well as
earthquakes, fires, etc.) There is no need, and EPA has not justified, why this has to be a separate
requirement in the permit. Moreover, since our facilities are often located in areas with limited
coverage in national databases like FEMA Flood Maps, any requirement to use such databases
would be extremely problematic for our members. Therefore, AEMA strongly urges EPA to
delete this section as a requirement from the final permit.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

One approach could be to use the Federal Emergency Management Agency's (FEMA) Flood Map Service Center (found at https://msc.fema.gov/portal/search) to determine if the facility is in a "Special Flood Hazard Area" or Other Area of Flood Hazard. SFHAs are defined as the area that will be inundated by the flood event having a 1-percent chance of being equaled or exceeded in any given year. The 1-percent annual chance flood is also referred to as the base flood or 100-year flood. SFHAs are labeled as Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-A30, Zone AR/A, Zone V, Zone VE, and Zones V1-V30. "Other flood hazard areas" (or moderate flood hazard areas) are labeled Zone B or Zone X (shaded) are also shown on the Flood Map and are the areas between the limits of the base flood and the 0.2-percent-annual-chance (or 500-year) flood. The areas of minimal flood hazard, which are the areas outside the SFHA and higher than the elevation of the 0.2-percent-annual-chance flood, are labeled Zone C or Zone X (unshaded)[2].

WEF also recommends that EPA specifically include language that facilities may also refer or make use of available appropriate information from the local stormwater agency and floodplain administrator to get specific information on local flooding that is not covered in FEMA maps.

WEF is of the position that facilities subject to these additional requirements for major storm impact mitigation should be restricted to facilities that would cause an extreme impact by virtue of the nature of the facility. For example, facilities prone to flooding and with fuel tanks that could float, break open and pollute waterways during major storms should be included. SARA Title III Tier 2 reporting would also identify vulnerable material storage facilities.

WEF agrees that FEMA floodplain mapping is a good first screening step to identify potential facilities. As a first phase, facilities in 100-year flood plain could be included. Then, as discussed above, the facilities would be further screened to include only those facilities that would have an extreme impact on water pollution during major storm events. Depending on the results of this first phase, a second phase including facilities within the 500-year flood plain could be implemented, and similarly, the facilities could be further screened to include only those with extreme pollution impacts during major storm events. We are concerned about the potentially high financial impact of requiring structural improvements such as flood walls. Another concern is the potential overlap of these regulations with other flood protection regulations. We do not think the solutions listed above the Request for Comment 8 in the Fact Sheet are appropriate for facilities that would have extreme impacts to pollution during major storms.

One way to help smaller facilities would be to partner with USACE Silver Jackets to bring together state, federal and local resources to learn from one another in reducing flood risk and other natural disasters. EPA could implement the Community Rating System (CRS), a voluntary program that recognizes, encourages and rewards a community for floodplain management activities that exceed the National Flood Insurance Program's minimum standards. The community is rewarded through reduced flood insurance premiums. The CRS program is flexible and allows communities to choose from a list of activities to earn points. Incentive levels are based on the flood risk reduction from floodplain management activities, such as outreach, mitigation, higher regulatory standards, and increased mapping.

[2] More information on FEMA flood zones can be found at https://www.fema.gov/flood-zones

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 41
**Excerpt Status:** Final

**Comment Excerpt:**

WEF recommends that EPA focus on specific facilities that pose a high hazard risk during major flood events (100- 500 Year) if they fail. Given some of the technical issues noted above, it may not be feasible to implement "major storm controls" as written in the draft permit. Primarily please note:

1. Weather forecasts rarely predict the return period of a pending storm event. They may predict the total depth of rain anticipated, but not the duration over which that will occur, which is required to estimate the flood level anticipated from a storm event. Stopping deliveries, diverting staff from production to flood risk mitigation, and other actions required in this provision, during every forecasted rain event with a total depth above the storm event level that would cause "extreme" flooding at the facility, or contact of flood waters with pollutants, can potentially be a significant financial burden on an operation that is in an area of the country with frequent rainfall. Also, the weather forecasts of total rainfall depth tend to be of low accuracy, making it possible that actions may not be taken prior to an "extreme" flood event, which can put an operator at risk of being in violation when the information available to them did not inform them that an action was needed.

2. In areas prone to flash flooding, forecasts do not provide quantitative information of the severity of the potential flood or the flood risk. Warnings are typically issued whenever rain is predicted. Disrupting operations every time rain is predicted may be a financial burden on an operation that can make their ability to stay in business impossible at that location.

3. Under the current NFIP, facilities can purchase flood insurance. Their insurance rates will vary depending on what physical protections they invest in to prevent damage during the flood that reaches the BFE, among other resiliency measures. The decision to invest in physical protections is currently based on financial criteria. The provisions in the permit make such investments a compliance requirement. This differs from the current NFIP. They should be consistent.

4. In some areas, at sometimes, to prevent downstream flooding, the U.S. Army Corps of Engineers (USACE) has elected to breach levees and flood areas they consider of low impact. Should a facility be in such an area where FEMA maps designate them as protected, but a discretionary action by USACE removes that protection, they should explicitly not be in violation of this permit.

5. The same is true of public flood control agency maintenance lapses that result in failure to existing protections. Should such protections fail through no fault of the facility operator, they should not be in violation of this permit. That needs to be made clear if this provision is to remain in the permit.

6. Some areas flood when no precipitation occurs over the facility. This is the case along the Red, Missouri, and Mississippi river basins, among others. While not classified as flash flooding, upstream winter snowmelt along with upstream precipitation can increase river levels to the point where they overtop banks and flood along floodways and floodplains. This is not due to any one storm event. This provision states that structural improvements to prevent impacts from such floods up to the BFE are required. Regarding the actions the permit requires, it is not clear if such actions are required when such flooding conditions are pending. That needs to be clarified if this permit provision is to remain. The specific flood risk required before actions are required should also be included. For example, as a river level increases (or decreases), USACE models of the river system add updated temperature and precipitation data throughout the river basin and update their forecasts of flood risk. Such risks go up and down each modeling run depending on changes in weather patterns throughout the river basin.

Finally, generally, as it relates to major storm events, we think there to be an interesting underlying question on whether EPA is advocating compliance with water quality standards in case of floods? As in" stormwater discharges from major storm events that cause extreme flooding conditions". WEF thinks resilience to be an important issue within this area, but are those facilities subject to sampling requirements during those events to demonstrate compliance? WEF invites EPA to further dialogue in this area.

**Comment Response:**

Part 2.1.1.9 of the 2021 MSGP requires that operators whose facility may be exposed to or has previously experienced major storm events consider additional stormwater control measures. The 2021 MSGP does not include a sampling requirement particular to confirming compliance with this requirement. In regards to the question about applicability of water quality standards and major storm events, Part 2.1 of the 2021 MSGP indicates that operators must modify their stormwater control measures per Part 5.1 if they find that their control measures are not achieving their intended effect of minimizing pollutant discharges (i.e., their discharges will be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards or meet any of the other non-numeric effluent limits in this permit). See response to DCN EPA-HQ-OW-2019-0372-0194-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comments No. 8 seeks input on whether proposed language requiring permit holders to consider implementing structural improvements, enhanced pollution prevention measures, and other mitigation measures to minimize impacts from stormwater discharges from major storm events that cause extreme flooding conditions should be included in the final permit.

As a threshold matter, flooding is antithetical to safe operation by commercial aviation, and airports and other facilities that host commercial airlines design, maintain and operate their facilities to avoid the accumulation of even small quantities of water in unwanted locations. This is no accident. FAA regulations control these design, maintenance and operational activities to ensure the safety of operation and safety of flight. These critical and pervasive regulatory controls cannot be made to compete with terms of an NPDES permit. Thus, to the extent any new obligation is imposed on other holders of the MSGP, that obligation should exclude or recognize the preexisting compliance of facilities regulated under Sector S of the MSGP.

Moreover, if such a provision were to be included, the Record would need to include bases for a number of critical programmatic underpinnings. For example, by what process and through what procedure would facilities be designated as "at risk" of major storm events that could result in flooding? Would flooding not dependent on a localized major storm event be excluded from that decision making process? How would "extreme flooding" be differentiated from any other event?

Further, the Record would need to be expanded to include documentation connecting "extreme flooding conditions" with new or exacerbated pollutant sources. Similarly, Record support would be needed to identify, document and validate the efficacy of any "structural improvements, enhanced pollution prevention measures, and other mitigation measures" to be required. If the Agency has not considered the criteria to be used when identifying and then judging the suitability of such measures, then the regulated community would be left with an over-broad obligation and no means of determining – or allowing the Agency or a court to determine – whether compliance had been achieved.

For these reasons and others,[38] we believe that inclusion of language of the kind presented in proposed Section 2.1.1.8 of the Proposed 2020 MSGP is premature. Because it is unsupported by the current record and likely would create more confusion than concrete progress toward an appropriate goal of the NPDES program, we recommend removal of that section from the final permit.

[38] For example, there remains a question whether any effects of "extreme flooding conditions" would impact discharges regulable under the CWA and the degree to which the proposed language would or could be made to differentiate between obligations relating to discharges regulable under the NPDES program andthose that are outside of the program's jurisdiction.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Excerpt Number 11.

## 2.1.2. Control Measures - Non-Numeric Technology-Based Effluent Limits (BPT/BAT/BCT)

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1

**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

20. Employee Training Recommendations

1. Reviewing the permit and the stormwater pollution prevention plan (SWPPP) and
2. Determining whether the SWPPP meets the requirements set forth in the permit;
3. Reviewing records, including self-inspection reports, to verify that the permittee is complying with the permit and the SWPPP;
4. How to conduct a rigorous walking inspection of the entire industrial site and verifying that the SWPPP is accurate and that the SCMs are in place and functioning; and
5. How to identifying actions that need to be taken to effectively manage stormwater pollution.

**Comment Response:**

Part 2.1.2.8 of the 2021 MSGP addresses the areas of required employee training and covers the recommendations offered in this comment.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that 2.1.2.l(c-e) be moved to Section 2.1.2.4 - Spill Prevention and Response for clarity as these conditions are spill prevention and response actions. In addition, BES recommends that Section 2.1.2.4(d) be revised to include the underlined text, "Keep spill kits onsite stocked with cleanup materials appropriate to the site's activities, located near areas where spills may occur or where a rapid response can be made; and ... " This requirement will ensure the operator's spill kits contain sufficient material and quantities based on the petroleum and chemical contents onsite.

**Comment Response:**

EPA agrees with the recommendation to move Part 2.1.2.1 (Minimize Exposure) (c) through (e) to Part 2.1.2.4 (Spill Prevention and Response) and has included that revision in the 2021 MSGP. In addition, the permit requirement stated at Part 2.1.2.1(d) of the proposed 2020 MSGP has been re-worded in the 2021 MSGP to split the requirement in two parts. One part remains in Part 2.1.2.1(c) (Minimize Exposure) and requires that leaky vehicles and equipment are stored indoors; the other part has been moved to Part 2.1.2.4(b) (Spill Prevention and Response) and

indicates that if leaky vehicles and equipment are stored outdoors, the operator is required to use drip pans and absorbents to implement spill prevention and response measures.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the permit require catch basin cleaning at <u>one-half</u> the sump depth instead of two-thirds of the sump depth in keeping with the information provided in the EPA Storm water O&M Fact Sheet for Catch Basin Cleaning (EPA 832-F-99-11. Sept. 1999). The EPA Fact Sheet states, "Typically, a catch basin should be cleaned if the depth of deposits is greater than or equal to one third of the depth from the basin to the invert of the lowest pipe opening into or out of the basin." Based on BES' experience enforcing the Oregon General Industrial Stormwater Permit, the requirement that catch basins be cleaned when debris reaches two-thirds full is not conservative enough and may allow stormwater to bypass the treatment and resuspend sediments trapped in the catch basin. BES recommends that operators clean their catch basins at one-half full to minimize sediments from stormwater being transported to surface water.

**Comment Response:**

Part 2.1.2.3.a of the 2021 MSGP requires catch basin cleaning "when the depth of debris reaches two-thirds (2/3) of the sump depth…"  The "catch basin cleaning" effluent limit requirement is necessary to ensure the functionality of the control and has a basis in the Part 2.1 requirement: "The selection, design, installation, and implementation of control measures to comply with Part 2 must be in accordance with good engineering practices and manufacturer's specifications." EPA acknowledges the commenter's concern that the requirement should be adjusted and included in the 2021 MSGP language that requires catch basin cleaning when the depth of debris reaches two-thirds (2/3) of the sump depth, in line with manufacturer specifications, whichever is lower.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

It is recommended that the use of chemicals or polymers for ground applications, regardless of their application purpose or method, be identified on some sort of an approved list managed by the Agency.

It is redundant to require that use must be identified in the SWPPP. All comprehensive SWPPPs include these in the discussion of Best Management Practices. It is more important that the facility be aware of the discharge parameters that might be a part of a TMDL in the receiving water body because these erosion control chemicals are not typically a part of a Stormwater Sampling Plan.

**Comment Response:**

Part 2.1.2.5 of the 2021 MSGP requires operators that use polymers and/or chemical treatments as part of erosion and sediment controls to identify the polymers and/or chemicals used and the purpose of their use in the SWPPP. The MSGP does not require that the polymers and/or chemicals be identified on any approved list managed by EPA. The MSGP requires operators to identify pollutant sources in the SWPPP and a component of identifying pollutant sources is identifying the reason the pollutant source exists—thus, identifying the use of polymers and/or chemical treatments as part of erosion and sediment controls.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Keeping exposed areas "free" of garbage and floatable debris

Discussion/Recommendations

Recycle paper mills receive baled shredded materials that frequently result in inert materials present on their grounds at times. Change "free" to "minimized to extent practical". This is a more reasonable and achievable standard since "free" would indicate a single piece of scrap paper on the grounds of a facility would be non-compliant.

**Comment Response:**

EPA does not agree that the good housekeeping control measure at Part 2.1.2.2(d) should be revised as suggested. EPA notes that Part 2.1.2.2(d) in the 2015 MSGP already required operators to "minimize the potential for waste, garbage and floatable debris to be discharged." EPA defines the term "minimize" in Part 2 as "reduce and/or eliminate to the extent achievable using stormwater control measures (SCMs) (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice."

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Plastic Materials Requirements

Discussion/Recommendations

Similar to the discussion above with garbage, requiring recycle mills to "eliminate" plastic materials is an unachievable standard. Change "free" to "minimized to extent practical".

**Comment Response:**

See DCN EPA-HQ-OW-2019-0372-0154-A2, Comment Excerpt Number 7.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

*Section entitled "Stormwater Infiltration Control Measures Subject to the Underground Injection Control (UIC) Regulations."*

This section is currently under Part 2.1.2.10 - Dust Generation but may be more suitable under Part 2.1.2.6 - Management of Runoff.

**Comment Response:**

EPA agrees and moved the section entitled "Stormwater Infiltration Control Measures Subject to the Underground Injection Control (UIC) Regulations" into Part 2.1.2.6 of the 2021 MSGP Fact Sheet as suggested.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Completion of spill response training by staff should be documented in accordance with 6.2.5.1.e.

**Comment Response:**

Part 2.1.2.8.b of the 2021 MSGP requires employee training in the areas of spill response procedures, amongst other areas. Part 6.2.5.1.e of the 2021 MSGP requires operators to document in the SWPPP employee training (that is required in Part 2.1.2.8), including the content of the training (Part 6.2.5.1.e.i) and a log of the dates on which specific employees received training (Part 6.2.5.1.e.iii).

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

*d. Technology/BMP Based Effluent Limitations Expressed in the Proposed Permit Have Failed and Will Continue to Fail to Ensure Compliance with Water Quality Standard.*

Industrial dischargers have been operating under a MSGP since 1995. This permit, in its various iterations, has relied, and continues to rely, on narrative technology based effluent limitations (BMPs to achieve BCT/BAT) in order to reduce or prevent the discharge of pollutants in storm

water discharges from thousands of industrial facilities, and under the proposed reissuance of the Permit, to achieve WQS. The technology-based effluent limitations first contained in the 2000 MSGP, and now again in the proposed MSGP, have not and cannot ensure that all permitted industrial discharges comply strictly with WQS as required by the CWA. In fact, the Permit's BMP/technology based effluent limitations have resulted in widespread failure of industrial discharges to comply with WQS, strictly or otherwise. (See subsection that follows immediately below).

In addition, subjectively deeming a discharger in compliance with WQS just because a permittee is implementing BMPs to meet technology-based standards is tantamount to providing a compliance schedule of indefinite duration. 33 U.S.C. section 1342(p)(4)(A) provides that permits must require compliance with WQS as expeditiously as practicable, but in no event later than 3 years after the issuance of the permit. By allowing dischargers to simply implement more BMPs in response to WQS violations, the Permit does not require compliance from permittees within 3 years as required by the CWA.

Given the failure of narrative BMP/technology-based effluent limitations to achieve strict compliance with WQS and the difficulties associated with applying narrative requirements to achieve strict compliance with WQS, EPA must adopt and include within the proposed permit numeric effluent limitations for all pollutants in industrial discharges which cause, or have the reasonable potential to cause or contribute to WQS violations. Numeric WQBELs are the most reliable vehicle by which to achieve strict compliance with WQS and are necessary given the variety and extent of industrial discharges and the variety and extent of impairing pollutants present in waters.

**Comment Response:**

The 2021 MSGP requires that discharges are explicitly required to meet all provisions of section 301 of the Clean Water Act, including applicable water quality standards. Further, EPA is finalizing revisions to the 2015 MSGP's provisions regarding benchmark monitoring exceedances and a new tiered "additional implementation measures" (AIM) that are triggered by benchmark monitoring exceedances. This process provides more regulatory certainty as to what is required of an operator and in what timeframe once a benchmark triggering event occurs. The new requirements also facilitate the identification of any issues and implementation of any follow-up responses in a timely manner and addresses previous stakeholder concerns that the prior MSGPs' corrective actions were not sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality. In addition, Part 2.2.1 of the 2021 MSGP indicates that EPA may require certain facilities to undertake additional control measures to meet applicable water quality standards.

However, at this time EPA maintains that EPA lacks sufficient data to calculate numeric effluent limits for stormwater discharges from all facilities subject to this permit. This is because such site-specific limitations would require much more data given the variability inherent in stormwater events. In addition, EPA has determined that the non-numeric limits in this permit are reasonably necessary to carry out the purposes and intent of the CWA.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 74
**Excerpt Status:** Final

**Comment Excerpt:**

*20. EPA Must Strengthen and Adopt Other Provisions for Monitoring and Control of Plastics Pollution.*

Many facilities that EPA proposes to cover under the 2020 MSGP (Permit Parts 1-9 with related appendices)[162] discharge plastic pellets, powders, granules, and flakes into surface waters during the process of transferring plastic pellets internally and while packaging and preparing plastic pellets for transport between facilities.[163] This industry is also in the midst of a boom. According to the American Chemistry Council, the plastics and chemical industry is investing more than $204 billion in the United States for an estimated 333 projects (including new facilities and expansions) designed in large part to convert plentiful and affordable natural gas from shale into petrochemical and plastic products).[164] The industry aims to increase North American plastics production by at least 35 percent by 2025.[165] These new plastics will be used to manufacture a variety of products, including water bottles, straws, utensils, food wrappers, packaging, shopping bags, and other single-use items that account for approximately 40 percent of plastic use.[166]

Plastic pollution that escapes via stormwater from facilities that produce and handle preproduction plastic can adversely impact the aquatic environment in numerous ways, including from: ingestion by marine animals, including fish, sea turtles, birds, and marine mammals; becoming embedded in sediments and plant matter; introducing toxic plastic additives to the environment, such as bisphenol a and nonylphenol; and accumulating other toxic chemicals on pellet surfaces, such as PCBs and dioxin, which end up in the aquatic food chain when ingested.

The measures proposed by the 2020 MSGP are unchanged from those in the 2015 MSGP and are entirely inadequate to address this problem and eliminate (or even reduce) the discharge of plastic materials into waters of the United States. They are inadequate for the jurisdictions and facilities over which EPA retains permitting authority,[167] and they set too low of a bar for programs delegated to the majority of states. EPA's 2020 MSGP has two options: (1) it must include a zero-discharge standard for plastic pellets, powders, flakes, granules, and other plastic material from industrial sources of stormwater and monitoring and enforcement provisions to ensure this standard is met; or (2) EPA must exclude facilities that handle pre-production plastic from coverage under the 2020 MSGP.

*Plastic pollution from industrial facilities harms water quality and the environment.*

Plastic production and use in industrial facilities results in the loss of millions of plastic pellets to the environment. These plastic pellets are often spilled in outdoor areas, picked up in stormwater

runoff, and discharged to surface waters. Once in the environment, plastic pellets are persistent and can be transported long distances from their source in flowing surface waters such as streams, rivers, and oceans. Similarly, user plastic accumulating on shorelines and in the oceans has become a staggering pollution problem.

Trillions of pieces of plastic float in the world's oceans.[168] The vast majority of marine debris—including plastic—originates from land-based sources like urban runoff; inadequate waste disposal and management; and industrial activity.[169]

Unfortunately, the plastic pollution problem continues to grow. Global trends reveal increasing plastic accumulations in aquatic habitats, consistent with the increasing trend in plastic production: a 560-fold increase in just over 60 years.[170] Tragically, under a business-as-usual scenario, the ocean is expected to contain one ton of plastic for every three tons of fish by 2025, and more plastics than fish (by weight) by 2050.[171] We must find ways to stem the tide of plastic pollution, including pollution with the microplastic pellets that petro-plastics facilities produce.

Microplastic Impacts - Local

Of the 51 trillion plastic particles currently floating in the world's oceans,[172] 92 percent are microplastics.[173] Microplastics, generally defined as plastic particles less than five millimeters in length or diameter, constitute a major threat to marine wildlife and water quality. While some microplastics are the result of larger pieces breaking down, up to 30 percent of the ocean's microplastics originate as plastic pellets, or nurdles, that are used as a raw material to make plastic products.[174] Microplastics are ubiquitous to coastal and marine environments, found at sites worldwide from the poles to the equator and from the ocean surface to the sea floor.[175] One California survey reported 118,705,732 plastic pellets on the state's beaches, and in the Los Angeles area alone, 20 tons of microplastics are carried into the Pacific Ocean every day (Moore et al. 2011).[176]

Plastic pellets—also known as primary microplastics—have caused documented damage to freshwater, coastal, and marine ecosystems. They also represent one of the most common types of plastic pollution in these environments.[177] Pellets frequently spill during handling at plastic factories as well as during loading and transportation both on land and at sea.[178] Road runoff and wind transfer also lead to pellet pollution.[179]

Extant protective measures, including U.S. federal regulations, appear insufficient to curb the flow of pellet pollution. Formosa Plastic's Point Comfort, Texas, plastics manufacturing facility continues to release plastic pollution in violation of its discharge permit.[180] The company explained that plastic can escape in loading areas, which "unavoidably happens when billions of tiny polyethylene pellets are produced and are transferred from one materials handling unit to another."[181] In a recent federal court decision holding Formosa liable for its plastic pollution discharges, the court noted that the company and the Texas Commission on Environmental Quality had repeatedly failed to prevent discharges of plastics.[182] Absent updated and more stringent regulations monitoring that reflect best available technology, plastic pollution from these facilities will continue.

Microplastic Impacts – Global

a. The scale and expanse of microplastic pollution

A rapidly growing body of research suggests there is not one square mile of ocean surface anywhere on earth not polluted with microplastics.[183] Microplastics comprise the majority of plastic pollution in the global ocean.[184] Ocean currents rapidly disperse microplastic particles, and scientists have found microplastics accumulating in remote locations far from population centers, including Arctic and Antarctic waters.[185] Given the alarming amount of plastic polluting coastal and marine ecosystems worldwide, we must seek ways to reduce the flow of primary microplastics into our oceans. Existing regulatory schemes have proven insufficient to prevent this pollution, and continuing to permit new petro-plastics facilities under these schemes will only exacerbate the ongoing plastic pollution catastrophe.

b. Microplastic impacts on aquatic wildlife

*1. In General*

Plastics harm fish and wildlife both through physical effects of ingestion (e.g. intestinal blockage) and by acting as a transfer agent for toxic chemicals.[186] Many plastics— including pellets—adsorb persistent environmental chemicals,[187] such as polychlorinated biphenyls (PCBs), pesticides like dichlorodiphenyltrichloroethane (DDT), polycyclic aromatic hydrocarbons ("PAHs"), heavy metals, and dioxins.[188] Scientists began acknowledging plastic's role as a toxin vector as early as 1973.[189] Because of their large surface-area-to-volume ratio and their tendency to attract contaminants more readily than natural sediments, plastic fragments concentrate organic pollutants; these concentrations can be up to 1,000,000 times higher than that of the surrounding seawater.[190] The two types of plastic that the petro-plastics facilities discussed in this petition will primarily produce—polyethylene and polypropylene—show a particularly strong adsorption capacity for harmful chemicals, including PAHs and DDT.[191]

Aquatic species may ingest these pollutant-laden plastic particles, resulting in lethal and sublethal harms. The absorbed toxins—as well as plastic additives such as bisphenol A ("BPA"), phthalate plasticizers, and flame retardants—can leach from ingested plastics into animal tissues,[192] inducing adverse effects such as endocrine disruption (that is, the disruption of hormone systems), neurotoxicity, and carcinogenesis.[193]

Scientists have documented over 2200 species impacted by ocean plastic pollution and at least 690 that have ingested microplastics.[194] Because of their small size and environmental persistence, microplastics remain readily available to ingestion by a wide variety of marine organisms for an extended period of time.[195] Plankton, invertebrates, fish, sea birds, sea turtles, and marine mammals all are known to adsorb, ingest, or otherwise uptake microplastics.[196] Trophic transfer of microplastics (*i.e.,* transfer up the food chain) also occurs, with the potential transfer of microplastics to humans when they eat shrimp, bivalves, fish, or other marine organisms containing these pollutants .[197]

Smaller and larger microplastic particles harm wildlife in different ways. Larger particles may have longer residence time in the digestive tract, in turn leading to increased toxicant release.[198] Smaller micro- and nanoplastics may move into an organism's cells, causing a variety of harms discussed in more detail below.[199] Smaller particles may also carry more of a toxicant load, as their increased surface area to volume ratio allows them to adsorb more contaminants.[200] Documented harms from ingestion of microplastics and adsorbed contaminants include but are not limited to decreased feeding and growth; increased stress; behavioral modifications; reproductive harms; immunotoxicity; neurological harms; alteration of gene expression; cancer; and increased mortality.[201]

### 2. Plankton

Microplastics inhibit growth of planktonic marine microalgae; they also decrease growth, fertility, and fecundity, and increase mortality of copepods, an important zooplankton species.[202] Scientists observed a similar reproductive response, as well as reduced feeding, growth, and survival rates, in freshwater *Daphnia* species.[203] These impacts not only affect the planktonic organisms themselves, but also higher trophic level organisms that rely on plankton as a primary food source.[204] Finally, impacts to plankton species that uptake $CO_2$ from the atmosphere may significantly reduce the ocean's ability to absorb and store greenhouse gases, with serious implications for atmospheric warming.[205]

### 3. Marine Invertebrates

Scientists report microplastic ingestion in a variety of marine invertebrate species, including molluscs, sea worms, and crabs.[206] Effects include inflammation; reduced feeding activity; suppressed immune system function; reproductive harms; damage to gills and digestive tract; increased mortality; and possible DNA damage.[207] Microplastics also harm corals by reducing calcification and inducing bleaching and tissue death.[208]

### 4. Fish

Freshwater, estuarine, and marine fish ingest microplastics and their adsorbed pollutants either directly or through contaminated prey.[209] Such ingestion induces physiological effects and harm, including liver toxicity, endocrine disruption, behavioral changes, and intestinal effects.[210]

### 5. Seabirds

Seabirds are among the most sensitive wildlife species to microplastics pollution due to high frequency of ingestion, impacts on body condition, and transmission of toxic chemicals.[211] Ingested plastic may stay in seabirds' stomachs for months, potentially interfering with feeding behavior and increasing leached contaminant loads.[212] Laboratory studies show that contaminants (including PCBs and DDT) from microplastics ingested by shearwater chicks are released once inside the bird's body.[213] Plastic contaminants like endocrine-disrupting phthalates affect seabirds across the globe, even in remote environments like the Arctic.[214] Scientists estimate that by 2050, the percentage of seabird species ingesting plastic will reach 99.8 percent, resulting in increased mortality and decreased reproduction.[215]

*6. Sea Turtles*

Plastic pollution also poses a serious risk to sea turtles.[216] Scientists have documented ingestion of microplastic particles in all seven species of sea turtles.[217] This microplastic consumption exposes sea turtles to dangerous toxins and pathogens that affect reproduction and survival.[218]

*7. Marine Mammals*

Marine mammals, including whales and seals, likewise ingest and may be harmed by microplastics and adsorbed contaminants. Such ingestion occurs directly as a consequence of feeding activity or through predation on contaminated prey.[219] There also exists the possibility that whales inhale microplastics when they surface to breathe.[220] In addition to leaching contaminants, microplastics can clog baleen, which impedes feeding behavior, reduces body condition, and suppresses immune response.[221] Nelms et al. (2019) found evidence of a possible relationship between a cetacean's body burden of microplastics and cause of death—specifically that animals dying from infectious disease contained a higher number of plastic particles than those dying from other causes.[222]

c. Human health risks associated with marine microplastic pollution

Marine species from plankton to invertebrates to large pelagic fishes have been shown to ingest microplastics (or prey that contain them).[223] Thus, people who ingest aquatic plants or seafood may be exposed to dangerous levels of contaminants. Scientists have yet to fully investigate the human health implications of microplastic ingestion from fishes and other seafood, but it stands to be serious, especially given the prevalence of microplastics in fish caught and sold for human consumption both nationally and internationally.[224]

Robust medical evidence links various persistent organic pollutants commonly found on microplastics with a host of human illnesses, including cancers (e.g., breast cancer, pancreatic cancer, non-Hodgkin's lymphoma, adult-onset leukemia, and soft tissue sarcomas), neurological disorders (e.g., attention deficit disorder, impaired memory, learning disabilities, and behavioral problems), and reproductive disorders (e.g., menstrual disorders, abnormal sperm, miscarriages, pre-term delivery, low birth weight, altered sex ratios, and shortened lactation periods).[225] Many of these persistent organic pollutants bioaccumulate and biomagnify up the food chain, posing a risk of harm for higher trophic-level organisms, including humans.[226]

An additional human health concern from microplastic pollution relates to plastics' ability to harbor infectious agents.[227] Both viruses and bacteria, including *Escherichia coli* and *Vibrio* (which cause gastrointestinal illness in humans), find refuge on pellets. The potential for microbial contamination-related impacts grows as coastal regions warm from climate change; such warming increases both the range of pathogenic microbes and the likelihood that storm surges and other events bring contaminated pellets into contact with humans.[228]

Another concerning development is the discovery that microplastic is contaminating drinking water supplies. Scientists have only recently studied plastic pollution in freshwater, but it is now documented in groundwater,[229] and it is at least as ubiquitous in rivers and streams as it is in

marine environments.[230] For example, a scientist recently swam the length of the Tennessee River—the drinking water source for 4.7 million people—and found one of the highest concentrations of microplastics in the world.[231] Samples showed 18,000 particles per cubic meter of water, which is 8,000 percent higher than measurements in the Rhine and 80 percent higher than measurements in the Yangtze River—the source of 55 percent of all river-born microplastic entering the ocean.[232]

Recent studies have also found microplastics at the outflows of drinking water treatment facilities, and in tap water, bottled water, and even domestic beer.[233] The first study that looked at microplastics in bottled water found concentrations as high as 10,000 plastic pieces per litre of water, with only 17 of 259 bottles testing free of microplastics.[234]

d. Ecological impacts from microplastics

In addition to the wildlife and human health impacts just described, microplastic pollution impacts ecosystem structure and function.[235] For example, microplastics affect seafloor and open ocean habitats by altering biogeochemical cycles, including carbon storage (with implications for climate change).[236]

Microplastics affect nearshore and inshore environments—such as sandy beaches— through sediment contamination.[237] The presence of microplastics also alters physical properties of beaches, including heat transfer and water movement.[238] These changes may have broad ecological implications for a wide variety of beach dwelling organisms and their eggs— including crustaceans, molluscs, fish, and sea turtles—and climate change may exacerbate these impacts.[239] These concerns are not merely theoretical: researchers recently found anthropogenic marine debris, including plastics, at 10 loggerhead sea turtle nesting beaches—including protected areas.[240]

In addition, because plastics do not readily degrade, they become vehicles for invasive species dispersal—effectively serving as a raft for exotic species transport and as a colonizing surface in areas otherwise lacking one.[241] These invasive organisms can prove devastating when they move into a new area, wiping out native species, and also harming human health and local economies (*see* discussion on viruses and bacteria, *supra*).[242]

Environmental plastic pollution also directly contributes to climate change.[243] When plastic particles are exposed to the elements, they slowly break down. Photodegradation (*i.e.,* degradation caused by exposure to sunlight) of plastic triggers the production of greenhouse gases; this off-gassing increases as the plastic particles become smaller. The breakdown of low-density polyethylene, in particular, releases methane, ethylene ($C_2H_4$), ethane, and propylene at a high rate. As more plastic accumulates in the environment, so too will greenhouse gas emissions from this source increase.[244]

Finally, plastic pollution litters our beaches, harming the aesthetic, recreational, tourism, and economic values of our waterways and seashores.

**a. Proposed Sector-Specific Revisions for Plastics**

As described above, microplastics are an increasing threat to human health and the environment. Currently, the only restrictions or treatment requirements for stormwater are found in the Best Management Practices contained in either state- or EPA-issued industrial stormwater permits, including the expiring MSGP.[245] This is an entirely unreasonable and insufficient response to this pollution problem.

Best Management Practices, which typically include measures such as minimizing exposure of pollutants to precipitation or managing runoff via swales and filtration devices, have been wildly ineffective at preventing plastic particles produced at plastics facilities from entering the nation's waterways. Plastic pellets, flakes, and powders regularly escape from petro-plastics facilities, contaminating nearby beaches and waterways, and harming wildlife and communities.[246] The toxins from these substances leach into the environment, exposing wildlife and human communities to hazardous compounds that can result in cancer, neurotoxicity, and death. Prohibiting the discharge of any plastic debris from these facilities is necessary to safeguard our rivers, coasts, and communities from harmful pollutants. This is particularly true due to increasing threats from major storm events that can cause extreme flooding conditions.

The 2019 NAS study included a section titled "Overarching Message" that summarizes our concerns with EPA's stale approach to the regulation of industrial stormwater discharges generally and plastic pellets and other materials specifically:

[T]he [Multi-Sector General Permit] should incorporate the best available science in the MSGP process. Science continues to improve our understanding of the environmental and human health impacts of industrial stormwater. Technologies for water quality monitoring, stormwater treatment, and modeling are advancing at rapid rates, and new data can inform understanding of the performance of stormwater control measures. New tools are being developed to improve toxicological assessments and data management and visualization… In general, EPA has been slow to adopt new knowledge into its [Multi-Sector General Permit] permit revisions, but the [Multi-Sector General Permit] should not be a static enterprise. Both permitted facilities and the nation's waters would be best served by a progressive and continuously improving [Multi-Sector General Permit] based on analysis of new data and focused data-gathering efforts, advances in industrial stormwater science and technology, and structured learning to develop and evaluate permit improvements. (NAS 2019).

EPA has the authority and obligation in the 2020 MSGP to ensure that our nation's waterways, wildlife, and communities are not polluted by pre-production plastic, including but not limited to pellets, resins, flakes, granules, and powders. Not only is the MSGP important for facilities that EPA continues to directly regulate,[247] but it also serves as the model (and floor) for states with delegated permitting authority (NAS 2019). As technology advances and industry changes, the Clean Water Act requires EPA to revise its regulations to advance the Act's ultimate objective of eliminating pollution into our nation's waters. [248] This fundamental goal is not reflected in the 2020 MSGP's proposed regulation of stormwater from Sector B (Paper and Allied Products Manufacturing, including single-web and multi-web plastic bags), Sector C (Chemical and Allied Products Manufacturing) or Sector Y (Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Industries). With respect to plastic pollution, the MSGP appears to be utterly unchanged from the prior MSGP.

[162] Including many listed in Appendix D, Table D-1 under Sector B: Paper and Allied Products Manufacturing (e.g. SIC 2673 Plastics, Foil, and Paper Bags), Sector C: Chemicals and Allied Products (e.g. C4, SIC 2821-2824 Plastics Materials and Synthetic Resins, Synthetic Rubber, Cellulosic and Other Manmade Fibers) and Sector Y: Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Industries (e.g. Y2, 3081-3089 Miscellaneous Plastic Products).

[163] U.S. Envtl. Prot. Agency, 1993, Plastic Pellets in the Aquatic Environment Sources and Recommendations, A Summary, EPA 842-S-93-001; California Environmental Protection Agency (CalEPA), State Water Resources Control Board, *Preproduction Plastic Debris Program*, https://www.waterboards.ca.gov/water_issues/programs/stormwater/plasticdebris.shtml (last updated April 14, 2014).

[164] American Chemistry Council, U.S. Chemical Investment Linked to Shale Gas: $204 Billion and Counting (May 2019), https://www.americanchemistry.com/Policy/Energy/Shale-Gas/Fact-Sheet-USChemical- Investment-Linked-to-Shale-Gas.pdf.

[165] Center for International Environmental Law, et al., How Fracked Gas, Cheap Oil, and Unburnable Coal Are Driving the Plastics Boom (2017), https://www.ciel.org/wp-content/uploads/2017/09/Fueling-Plastics- How-Fracked-Gas-Cheap-Oil-and-Unburnable-Coal-are-Driving-the-Plastics-Boom.pdf; Center for International Environmental Law, Plastic & Health: The Hidden Costs of a Plastic Planet (Feb. 2019a), https://www.ciel.org/plasticandhealth/. [CIEL 2019a]; Center for International Environmental Law, Plastic & Climate: The Hidden Costs of a Plastic Planet (May 2019b), https://www.ciel.org/wpcontent/ uploads/2019/05/Plastic-and-Climate-FINAL-2019.pdf. [CIEL 2019b].

[166] Geyer, R. et al., Production, use, and fate of all plastics ever made, 3 Sci. Adv. (2017), doi:10.1126/sciadv.1700782.

[167] These include the District of Columbia, Idaho (authority for general and stormwater permits transferring in 2020-21), Massachusetts, New Hampshire, and New Mexico and the territories of American Samoa, Guam, Johnston Atoll, Midway Island, Northern Mariana Islands, Puerto Rico, and Wake Island. U.S. EPA, NPDES State Program Information, available at https://www.epa.gov/npdes/npdes-state-program-information.

[168] Eriksen, Marcus et al., Plastic pollution in the world's oceans: more than 5 trillion plastic pieces weighing over 250,000 tons afloat at sea, 9 PLoS ONE e111913 (2014); van Sebille, Erik et al., A global inventory of small floating plastic debris, 10 Environ. Res. Letters 124006 (2015); Derraik, Jose G.B., The pollution of the marine environment by plastic debris: a review, 44 Marine Pollution Bull. 842 (2002); Barnes, David K.A. et al., Accumulation and fragmentation of plastic debris in global environments, 364 Phil. Trans. R. Soc. B 1985 (2009); Rodrigues, Alyssa et al., Colonisation of plastic pellets (nurdles) by E. coli at public bathing beaches, 139 Marine Pollution Bull. 376 (2019).

[169] Gordon, Miriam, Eliminating Land-Based Discharges of Marine Debris in California: A Plan of Action from the Plastic Debris Project (June 2006), https://www.coastal.ca.gov/publiced/coordinators/Plastic_Debris_Action_Plan.pdf

[170] Thompson, Richard C. et al., Lost at Sea: where is all the plastic? 304 Science 838 (2004); Goldstein, Miriam C. et al., Scales of spatial heterogeneity of plastic marine debris in the northeast Pacific Ocean, 8 PLos ONE e80020 (2013).

[171] World Economic Forum, Ellen MacArthur Foundation, The new plastics community: Rethinking the future of plastics (Jan. 2016), http://www3.weforum.org/docs/WEF_The_New_Plastics_Economy.pdf.

[172] van Sebille et al. 2015.

[173] Eriksen et al. 2014.

[174] Boucher, Julien & Damien Friot, Primary microplastics in the oceans: a global evaluation of sources, IUCN (2017), https://portals.iucn.org/library/sites/library/files/documents/2017-002.pdf; Karkanorachaki, Katerina et al., Plastic pellets, meso- and microplastics on the coastline of Northern Crete: Distribution and organic pollution, 133 Marine Pollution Bull. 578 (2018).

[175] Barnes et al. 2009; Bergmann, Melanie, Lars Gutow & Michael Klages (eds.), MARINE ANTHROPOGENIC LITTER (2015); Browne, Mark Anthony et al., Accumulations of microplastic on shorelines worldwide: sources and sinks, 45 Envtl. Sci. & Tech. 9175 (2011); Ferreira, Guilherme V.B., Mario Barletta & Andre R.A. Lima et al., Use of estuarine resources by top predator fishes. How do ecological patterns affect rates of contamination by microplastics?, 655 Sci. Total Envt. 292 (2019); Ivar do Sul, Juliana A. & Monica F. Costa, The present and future of microplastic pollution in the marine environment, 185 Envtl. Pollution 352 (2014); Obbard, Rachel W. et al., Global warming releases microplastic legacy frozen in Arctic Sea ice, 2 Earth's Future 315 (2014); O'Donovan, Sarit et al., Ecotoxicological Effects of Chemical Contaminants Adsorbed to Microplastics in the Clam *Scrobicularia plana*, 5 Frontiers in Marine Sci. (2018), doi: 10.3389/fmars.2018.00143; Woodall, Lucy C. et al., The deep sea is a major sink for microplastic debris, 1 R. Soc'y Open Sci. 140317 (2014).

[176] Moore, C.J., G.L. Lattin & A.F. Zellers, Quantity and type of plastic debris flowing from two urban rivers to coastal waters and beaches of Southern California, 11 Revista da Gestao Costeira Integrada 65 (2011).

[177] Moore et al. 2011; Anbumani, Sadasivam & Poonam Kakkar, Ecotoxicological Effects of Microplastics on Biota: A Review, 25 Envtl. Sci. & Pollution Res. 14,373 (2018); Karkanorachaki et al. 2018; O'Donovan et al 2018; Rodrigues et al. 2019..

[178] Ashton, Karen et al., Association of metals with plastic production pellets in the marine environment, 60 Marine Pollution Bull. 2050 (2010).

[179] Rodrigues et al. 2019.

[180] Sneath, S., *Former Formosa worker finds plastic pellets in bay*, VICTORIA ADVOCATE, Feb. 20, 2016, https://www.victoriaadvocate.com/news/business/former-formosa-worker-finds-plastic-pellets-inbay/ article_45c91c0e-f8dd-586b-9acc-5b4f0a969d49.html.

[181] *Id.*

[182] *San Antonio Bay Estuarine Waterkeeper, et al., v. Formosa Plastics Corp., Texas, et al.*, Civil Action No. 6:17-CV-0047 Order and Consent Decree (2019).

[183] Eriksen et al. 2013.

[184] To illustrate, a recent study on plastic particles flowing from two rivers into coastal areas in southern California found that microplastic particles were 16 times more abundant and had a cumulative weight three times greater than larger particles (Moore et al. 2011); *see also* Boucher & Friot 2017.

[185] Isobe, Atsuhiko, Percentage of microbeads in pelagic microplastics within Japanese coastal waters, 110 Marine Pollution Bull. 432 (2016); Cozar, Andres et al., The Arctic Ocean as a dead end for floating plastic in the North Atlantic branch of the Thermohaline Circulation, 3 Sci. Advances e1600582 (2017); O'Donovan et al. 2018; Chen, Q. et al., Marine microplastics bound dioxin-like chemicals: model explanation and risk assessment, 364 J. Hazardous Materials 82 (2019).

[186] Hammer, Jort, Michiel H.S. Kraak & John R. Parsons, Plastics in the Marine Environment: The Dark Side of a Modern Gift, 220 Rev. Envtl. Contamination & Toxicology (2012); CIEL 2019b.

[187] Adsorbed toxins are toxins that are "stuck" to plastic particles. Interestingly, toxin adsorption to plastic surfaces may reduce contaminant biodegradation—meaning the contaminants do not break down and persist for an even longer time in the environment than they would were they not adsorbed to plastic (Hammer et al. 2012).

[188] Teuten, Emma L. et al., *Transport and release of chemicals from plastics to the environment and to wildlife*, 364 Phil. Trans. R. Soc'y B 2027 (2009); Rochman, Chelsea M. et al., Ingested plastic transfers hazardous chemicals to fish and induces hepatic stress, 3 Scientific Reports 3263 (2013); Wright, Stephanie L. et al., Microplastic ingestion decreases energy reserves in marine worms, 23 Current Biology R1031 (2013); Hammer et al. 2012; O'Donovan et al. 2018; Chen et al. 2019.

[189] CIEL 2019b.

[190] Guzzetti, Eleonora et al., Microplastic in Marine Organisms: Environmental and Toxicological Effects, 64 Envtl. Toxicology & Pharmacology 164 (2018); Rios, Lorena M., Charles Moore & Patrick R. Jones, Persistent organic pollutants carried by synthetic polymers in the ocean environment, 54 Marine Pollution Bull. 1230 (2007); Bakir, Adil et al., Enhanced desorption of persistent organic pollutants from microplastics under simulated physiological

conditions, 185 Envtl. Pollution 16 (2014); Anbumani & Kakkar 2018; Karkarnorachaki et al. 2018.

[191] O'Donovan et al. 2018.

[192] These contaminants can be released into animal digestive tracts up to 30 times faster than to seawater (CIEL 2019b).

[193] Teuten at al. 2009; Hammer et al. 2012; Rochman et al. 2013; Anbumani & Kakkar 2018; O'Donovan et al. 2018.

[194] Gall, S.C. & R.C. Thompson, The Impact of Debris on Marine Life, 92 Marine Pollution Bull. 170 (2015); Litterbase: Online Portal for Marine Litter (2019), https://litterbase.awi.de/; CIEL 2019b; *see also* Table 2, "Observed Ecotoxicity of Microplastics in Different Model Systems," *in* Anbumani & Kakkar 2018.

[195] Nelms, S.E. et al., Microplastics in marine mammals stranded around the British coast: ubiquitous but transitory?, 9 Scientific Reports 1075 (2019).

[196] Duncan, Emily M. et al., Microplastic ingestion ubiquitous in marine turtles, 25 Global Change Biology 744 (2019); Herrera, A. et al., Microplastic ingestion by Atlantic chub mackerel (Scomber colias) in the Canary Islands coast, 139 Marine Pollution Bull. 127 (2019); Donohue, Mary J. et al., Evaluating exposure of northern fur seals, Callorhinus ursinus, to microplastic pollution through fecal analysis, 138 Marine Pollution Bull. 213 (2019); Anbumani & Kakkar 2018; Gall & Thompson 2015; Guzzetti et al. 2018; O'Donovan et al. 2018.

[197] O'Donovan et al. 2018; CIEL 2019b; Ferreira et al. 2019; Herrera et al. 2019.

[198] O'Donovan et al. 2018.

[199] *Id.*

[200] Anbumani & Kakkar 2018; O'Donovan et al. 2018.

[201] O'Donovan et al. 2018.

[202] Anbumani & Kakkar 2018; Guzzetti et al. 2018.

[203] *Id.*

[204] *Id.*

[205] CIEL 2019b.

[206] Graham, Erin R. & Joseph T. Thompson, Deposit and suspension-feeding sea cucumbers (*Echinodermata*) ingest plastic fragments, 368 J. Experimental Marine Biology & Ecology 22 (2009); Gall & Thompson 2015; Guzzetti et al. 2018; CIEL 2019b; Duncan et al. 2019.

[207] Mearns, Alan J. et al., Effects of Pollution on Marine Organisms, 85 Water Envt. Research 1828 (2013); Browne, Mark A. et al., Ingested microplastic plastic translocates to the circulatory system of the mussel, *Mytilus edulis* (L.), 42 Envtl. Sci. & Tech. 5026 (2008); Anbumani & Kakkar 2018; Duncan et al. 2019; Guzzetti et al. 2018; Herrera et al. 2019; O'Donovan et al. 2018; Wright et al. 2013.

[208] Chapron, L. et al., Macro- and microplastics affect cold-water corals growth, feeding and behavior, 8 Sci. Reports 15,299 (2018); Reichert, Jessica et al., Responses of reef building corals to microplastic exposure, 237 Envtl. Pollution 955 (2018); Gall & Thompson 2015; Donohue et al. 2019.

[209] Anbumani & Kakkar 2018; Duncan et al. 2019; Herrera et al. 2019.

[210] Anbumani & Kakkar 2018; CIEL 2019b; Guzzetti et al. 2018.

[211] Wilcox, Chris, Erik Van Sebille & Britta Denise Hardesty, Threat of plastic pollution to seabirds is global, pervasive, and increasing, 112 Proc. Nat'l Acad. Sci. 11899 (2015); CIEL 2019b.

[212] Gall & Thompson 2015.

[213] Ryan, P.G., A.D. Connell & B.D. Gardner, Plastic ingestion and PCBs in seabirds: is there a relationship? 19 Marine Pollution Bull. 174 (1988); Teuten et al. 2009; Hammer et al. 2012; Gall & Thompson 2015; O'Donovan et al. 2018.

[214] Sample, Ian, *Plastics Reach Remote Pristine Environments, Scientists Say*, THE GUARDIAN, Feb. 17, 2019, https://www.theguardian.com/science/2019/feb/17/plastics-reach-remote-pristine-environmentsscientists- say.

[215] Wilcox et al. 2015.

[216] CIEL 2019b.

[217] Garrison, Samantha R. & Mariana M.P.B. Fuentes, Marine Debris at Nesting Grounds Used by the Northern Gulf of Mexico Loggerhead Recovery Unit, 139 Marine Pollution Bull. 59 (2019); Guzzetti et al. 2018; Duncan et al. 2019.

[218] Schuyler, Qamar et al., To eat or not to eat? Debris selectivity by marine turtles, 7 PLoS ONE e40884 (2012); Duncan et al. 2019; Garrison et al. 2019; Guzzetti et al. 2018.

[219] Zhu et al., Cetaceans and microplastics: First report of microplastic ingestion by a coastal delphinid, *Sousa chinensis*, 659 Sci. Total Envt. 649 (2019).

[220] Nelms et al. 2019.

[221] Guzzetti et al. 2018.

[222] *See also* Donohue et al. 2019; Gall & Thompson 2015) (discussing microplastics' effects on seals and sea lions).

[223] Romeo, Teresa et al., First evidence of presence of plastic debris in stomach of large pelagic fish in the Mediterranean Sea, 95 Marine Pollution Bull. 358 (2015).

[224] *See,* e.g., Van Cauwenberghe, Lisbeth & Colin R. Janssen, Microplastics in bivalves cultured for human consumption, 193 Envtl. Pollution 65 (2014); Bergmann et al. 2015; Rochman, Chelsea M. et al., Anthropogenic debris in seafood: plastic debris and fibers from textiles in fish and bivalves sold for human consumption, 5 Sci. Reports 14,340 (2015); Herrera et al. 2019.

[225] CIEL 2019a.

[226] Wassermann, M. et al., World PCBs map: storage and effects in man and his biologic environment in the 1970s, 320 Ann. N.Y. Acad. Sci. 69 (1979); Gobas, Frank A.P.C. et al., Time response of the Lake Ontario ecosystem to virtual elimination of PCBs, 29 Envtl. Sci. & Tech. 2038 (1995); Rochman et al. 2013.

[227] Wright et al. 2013; Donohue et al. 2019; Mearns et al. 2013; CIEL 2019a; Rodrigues et al. 2019.

[228] Rodrigues et al. 2019.

[229] Panno, Samuel V. et al., Microplastic Contamination in Karst Groundwater Systems, 57 Groundwater 189 (2019).

[230] Koelmans, Albert A. et al., Microplastics in freshwaters and drinking water: Critical review and assessment of data quality, 155 Water Res 410 (2019); McCormick, Amanda R. et al., Microplastic in surface waters of urban rivers: concentration, sources, and associated bacterial assemblages, 7(11) Ecosphere e01556 (2016).

[231] Tennessee Aquarium, *A Plastic Pandemic - German Scientist's Analysis Finds Staggering Levels of Microplastic Pollution in Tennessee River* (Oct. 18, 2018), https://www.tnaqua.org/newsroom/entry/a-plastic-pandemic-german-scientists-analysis-finds-staggering-levels-of-microplastic-pollution-intennessee- river.

[232] *Id.*

[233] Eerkes-Medrano, Dafne et al., Microplastics in drinking water: A review and assessment, 7 Envtl Sci & Health 69 (2019); Novotna, Katerina et al., Microplastics in drinking water treatment – Current knowledge and research needs, 667 Sci Total Environ 730 (2019); Pivokonsky, Martin et al., Occurrence of microplastics in raw and treated drinking water, 43 Sci

Total Environ 1644 (2018); Kosuth, Mary et al., Anthropogenic contamination of tap water, beer, and sea salt, 13(4) PLoS ONE e0194970 (2018); Koelmans et al. 2019.

[234] Kosuth et al. 2018.

[235] Guzzetti et al. 2018; CIEL 2019b.

[236] *Id.*

[237] Oehlmann, Jorg et al., A critical analysis of the biological impacts of plasticizers on wildlife, 364 Phil. Trans. R. Soc'y B 2047 (2009); Rios et al. 2007; Gall & Thompson 2015.

[238] Carson, Henry S. et al., Small plastic debris changes water movement and heat transfer through beach sediments, 62 Marine Pollution Bull. 1708 (2011); Gall & Thompson 2015.

[239] Carson et al. 2011; Valenzuela, N. et al., Extreme Thermal Fluctuations from Climate Change Unexpectedly Accelerate Demographic Collapse of Vertebrates with Temperature-Dependent Sex Determination, 9 Nature Sci. Rep. 4254 (2019), https://www.nature.com/articles/s41598-019-40597-4.pdf.

[240] Garrison et al. 2019.

[241] Gregory, Murray R., Environmental implications of plastic debris in marine settings—entanglement, ingestion, smothering, hangers-on, hitch-hiking and alien invasions, 364 Phil. Trans. R. Soc'y B 2013 (2009); Barnes et al. 2009; Hammer et al. 2012; Mearns et al. 2013; Wright et al. 2013; Gall & Thompson 2015; Guzzetti et al. 2018.

[242] Barnes et al. 2009.

[243] CIEL 2019b.

[244] *Id.*

[245] For example, EPA has not established numeric effluent limitations for contaminated runoff/stormwater for the Plastics Materials, Synthetic Resins, and Nonvulcanizable Elastomers industry group, including the Organic Chemicals, Plastics, and Synthetic Fibers (40 C.F.R. § 414) or Plastics Molding and Forming (40 C.F.R. § 463) point source categories. Stormwater is only covered under Part 414 if it is combined with process wastewaters (EPA 1987; EPA 2004) 40 C.F.R. Part 414.

[246] *San Antonio Bay Estuarine Waterkeeper, et al., v. Formosa Plastics Corp., Texas, et al.*, Civil Action No. 6:17-CV-0047 Order and Consent Decree (2019).

[247] EPA Office of Water, EPA-833-F-06-018, December 2006, Industrial Stormwater Fact Sheet Series, Sector C: Chemical and Allied Products Manufacturing and Refining, https://www.epa.gov/sites/production/files/2015-10/documents/sector_c_chemical.pdf. *See also*

National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. § 122.26).

[248] *See* U.S. EPA, Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, 80 Fed. Reg, 67,837 (Nov. 3, 2015); California NPDES General Permit for Storm Water Discharges Associated with Industrial Activities, effective July 1, 2015, Part XVIII, https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/industrial/2014indgenp ermit/wq o2014_0057_dwq_revmar2015.pdf.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 93.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  75
**Excerpt Status:** Final

**Comment Excerpt:**

*21. EPA Should Revise Deadlines for Maintenance and Repairs of Control Measures.*

For maintenance, repairs, and development of most control measures, the 14 day timeframe is appropriate.[258] However, if meeting that time frame is infeasible or impracticable ("feasible" is not defined but must be if the concept remains in the final regulation, given its frequent use in these regulations – see Comment Section 16 for an additional discussion of "feasibility"), the amount of time to deploy maintenance or repairs should be set at 30, not 45 days (note that even 30 days, during an especially rainy month in a watershed or sub-watershed severely stressed by various stormwater pollutants and high water volumes, can do substantial damage to water quality in that waterbody and beyond). Then, if completion must take longer due to certain engineering and design or unavoidable construction delays, the notification to EPA specified in the draft language should be made, and the rationale for a 45-day timeframe adequately documented.

[258] Draft Permit at 17, Part 2.1.2.3(b)(ii)

**Comment Response:**

EPA does not agree with the recommended changes to the maintenance deadlines in Part 2.1.2.3.b, which requires final repairs/replacement of stormwater controls as soon as feasible but no later than the corrective action timeframes in Part 5.1.3. EPA considers the time limits in Part 5.1.3 to be reasonable for making the necessary repairs or modifications and includes them

specifically so that inadequacies are not allowed to persist indefinitely. Part 5.1.3 of the 2021 Fact Sheet discusses the timeframe for maintenance and repairs of control measures, stating, "EPA recognizes that identifying both the need to take corrective action and the appropriate modifications to the control measures will, in some cases, be an iterative process." Further, EPA notes in Part 5.1.3 of the 2021 Fact Sheet that in some cases it may be possible to immediately correct visible sources of the pollutants; however, also noting that in certain situations, "…several storm events may be needed to determine how to fully resolve the triggering issue(s)."

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 91
**Excerpt Status:** Final

**Comment Excerpt:**

*i. EPA must require a zero discharge of plastic standard in lieu of the ineffective and unenforceable standard of "best management practices" in the MSGP*

The proposed regulations rely on "good housekeeping" to allegedly "eliminate such plastic discharges in stormwater."[249] Specifically, the regulation provides that "best management practices" be used:

e. Plastic Materials Requirements: Facilities that handle pre-production plastic must implement best management practices to eliminate discharges of plastic in stormwater. Examples of plastic material required to be addressed as stormwater pollutants include plastic resin pellets, powders, flakes, additives, regrind, scrap, waste and recycling.[250]

The proposed MSGP then gives examples of those best management practices just for Sector Y "where determined to be feasible:"

**8.Y.2.2** *Controls for Plastic Manufacturers Minimize the discharge of plastic resin pellets in your stormwater discharges through implementation of control measures such as the following where determined to be feasible (list not exclusive): minimizing spills; cleaning up of spills promptly and thoroughly; sweeping thoroughly; pellet capturing; employ education; and disposal precaution.*

The "best management" guidance has limited value and contains no engineering, monitoring or discharge requirements and no effective enforcement mechanism. No standards are set for the quantity of plastics that can be discharged ("minimize" is not a standard). Industry is given total discretion regarding whether to adopt the "best management," because industry can determine that certain measures are not "feasible" (EPA provides no standards to determine feasibility). Furthermore, the control examples are vague and unenforceable.

Additionally, source control – stopping plastics from hitting the ground – is in the economic interest of those with plastics at their facilities, provided there are rules prohibiting the eventual discharge of those plastics, which this regulation lacks. Rather than maintain vague ideas about how to manage plastics inside the plant, EPA should prohibit the discharge of plastics from these facilities.

Draft permit, Part 2.1.2.2(e) should be amended to state.

e. Plastic Materials Requirements: Facilities that handle pre-production plastic ~~must implement best management practices to eliminate~~ <u>shall not</u> discharge~~s of~~ plastic<u>s</u> in stormwater. Examples of plastic<u>s</u> ~~material~~ required to be addressed as stormwater pollutants include plastic resin pellets, powders, flakes, additives, regrind, scrap, waste and recycling. <u>No discharge of plastics will be permitted.</u>

To ensure compliance with a zero-discharge standard, monitoring and enforcement provisions must be added. The following language should be added:

(e) All facilities that handle pre-production plastics shall comply with the following:

1. zero discharge and zero release of preproduction plastics of may occur from the facility,
2. the facility will conduct monthly monitoring outside the property line of the facility and in any receiving waters for stormwater discharges to confirm that the zero discharge requirements are being met, with stormwater monitoring conducted within 8 hours of a rainfall event,
3. any preproduction plastics found outside the property line of a facility will be presumed to have been released or discharged by that facility,
4. the facility will report any exceedance of the zero discharge to the regulatory agency within 2 working days, and
5. the facility will be given an opportunity to prove that preproduction plastics found outside the property line of the facility did not originate from that facility;
6. violations of the zero discharge are a violation of the permit; and
7. a permittee shall be required to clean up any discharged or released plastics in a manner that cleans up the most plastics possible without causing harm to the ecosystem.

[249] Draft Permit at 16, Part 2.1.2.2 Good Housekeeping.

[250] *Id.*, Part 2.1.2.2(e).

[251] Draft Permit - Part 8 Sector Requirements for Industrial Activity at 117-118, Part 8.Y.2.2.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 93.

---

**Commenter Name:**  Lealdon Langley
**Commenter Affiliation:**  Massachusetts Department of Environmental Protection (MassDEP)

**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

In the 2016 Massachusetts Small MS4 General Permit, a catch basin must be cleaned when the depth of debris reaches 50% of the sump depth. Even though MSGP permittees have more stringent monitoring requirements than MS4 permittees, we recommend that the requirement of cleaning catch basins should be when the debris reaches a maximum of 50% of the sump.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0130-A1, Comment Excerpt Number 24.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 48
**Excerpt Status:** Final

**Comment Excerpt:**

**XIII. Container Labeling**

Section 2.1.2.4 at part (a) requires the labeling of containers to encourage proper handling. We recommend that this section be clarified to require secondary containers be plainly labeled and avoid having to add additional labeling to primary containers that could impact Globally Harmonized System of Classification and Labelling of Chemicals (GHS) compliance.

**Comment Response:**

The 2021 MSGP does not require duplicative labeling on primary and secondary containers. Plainly labeling a secondary container in a manner that encourages proper handling and facilitates rapid response if spills or leaks occur would satisfy the requirements of Part 2.1.2.4.d. There is no change necessary in response to this comment.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1

**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Add new Part 2.1.2.11

The division requests the below text be added to the MSGP because PFAS in stormwater, even in very low quantities, can represent a significant threat to human health. PFAS are a component of some fire-fighting foams used for training, testing, and emergency fire-fighting. These activities are sometimes associated with certain industrial activities. In addition to fire fighting, PFAS are present in numerous non-firefighting products that may be present at industrial facilities.

**<u>PFAS storage and release.</u>**

*Pollution prevention requirements for Aqueous Film Forming Foam:* With the exception of emergency fire-fighting activity, minimize the discharge of AFFF by substituting products that do not contain PFAS. For emergency fire-fighting, evaluate types of fires where foams that do not contain PFAS may be used. If foam containing PFAS is anticipated to be used for emergency firefighting, develop procedures to prevent or minimize releases to stormwater including removal of residuals.

All fire-fighting foams containing PFAS must be contained, collected, and legally disposed of without re-introduction to wastewater or surface water.

*Pollution prevention requirements for other products containing PFAS:* Any other materials containing PFAS must be contained, collected, and legally disposed of without re-introduction to wastewater or surface water. A list of common substances that may contain PFAS is provided below; however, you are responsible for identifying other sources of PFAS at your industrial facility.

❑ Chemguard foam
❑ Scotchgard
❑ Tridol
❑ Dry chemicals used for type B fires
❑ ANKOR WETTING AGENT F
❑ Clepo Chrome Mist Control
❑ Fumetrol 140 Mist Suppressant
❑ Benchmark Benchbrite STX
❑ Benchmark CFS
❑ MacDermid Proquel B
❑ MacDermid Macuplex STR
❑ Plating Process Systems PMS-R

❏ Femetrol-140
❏ Brite Guard AF-1 fume control
❏ Goretex
❏ Teflon or teflon-type coating (including PTFE coatings)
❏ Electrostatic control agents
❏ Friction control agents
❏ Dirt repellant
❏ Anti-adhesives

Please note that adding this provision, or something similar regarding the containment, collection and storage of PFAS-containing materials, in the final permit for permittees discharging to stream segments with Water Supply classifications may be needed in order to comply with Colorado's narrative water quality standard, 5 CCR 1002-31, Reg. 31.11(1)(a)(iv) ("...state surface waters shall be free from substances attributable to human-caused point source or nonpoint source discharge in amounts, concentrations or combinations which are harmful to the beneficial uses or toxic to humans, animals, plants, or aquatic life."). If the final draft of this permit lacks such provisions, this permit may not comply with the applicable provisions of sections 301 and 302 of the Clean Water Act as applicable to Colorado and thus could be grounds for a conditional certification or certification denial for this permit by the state of Colorado. 33 USC § 1341.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0219-A1, Comment Excerpt Number 16.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

2.1.2.5
Coagulants can be beneficial for a range of pollutant removal processes. Defining them as "Cationic" can be limiting in that there are a range of potential coagulants that can be employed depending on the nature of pollutant being removed. Concerns have been raised in California and Washington from stakeholder groups regarding the safety of the coagulants themselves. In the California case, provisions were developed to require toxicity testing prior to the use of coagulants in a stormwater treatment process. This had the result of limiting the use of coagulants for construction stormwater runoff. In a national permit, similar water quality concerns are anticipated. Washington state elected to pre-approve specific treatment systems with specific coagulant allowances using laboratory and field testing of their systems. This

allows broader use of coagulation where it is effective but limits the options to existing pre-approved systems or requires testing of proposed systems. The administration of the approval program requires funding, some of which comes from applicant fees.

If EPA is to allow the use of coagulants in stormwater BMPs to meet effluent limitations, such administration of a program showing that the coagulants will not cause or contribute to an impairment of water quality is suggested by WEF. Additionally, if the use of coagulants would become BPT/BAT/BCT, then a program approving systems and coagulant mixes would need to be fair to all technology developers and providers. Cost-effectiveness of operating a coagulant system would need to be completed as well as its evaluation as BPT/BAT/BCT per existing regulatory guidelines.

**Comment Response:**

Part 2.1.2.5 of the 2021 MSGP requires that whenever polymers and/or other chemical treatment will be used for erosion control, the polymers and/or chemicals and their purpose must be identified in the SWPPP. The purpose of this requirement is to ensure that these polymers and/or other chemical treatment are properly used. No change is necessary in response to this comment.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

2.1.2.6
Infiltration of runoff, particularly from an industrial facility, requires evaluation of impacts on groundwater, to avoid causing or contributing to an impairment of that potential water supply. This provision can be inconsistent with several state and local groundwater protection regulations, water rights laws, and/or local standards for managing drinking water supplies to meet Safe Drinking Water Act requirements. Specific requirements for protection of groundwater from infiltration of industrial stormwater runoff need to be included if evaluation of the feasibility of infiltration is to be a requirement of this permit.

**Comment Response:**

EPA received many comments that opposed or voiced concerns about the AIM level 3 option to install infiltration or retention controls as an alternative or adjunct to structural source controls and/or treatment controls. Many of the concerns revolved around the potential for groundwater contamination. Given care must be taken to avoid potential obstacles with this option, such as potential aquifer impacts, hydrologic connectivity to waterbodies, groundwater impacts and the type of pollutants of concern, EPA has decided to not finalize this specific option. EPA intends

to continue researching this topic to assess the feasibility of a future infiltration/retention approach and how to implement it for industrial stormwater discharges. Therefore, EPA has decided not to finalize the option to install infiltration or retention controls as an option under AIM level 3. .

## 2.1.2.RFC3. Control Measures - See RFC 3

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

BES does not think that it is necessary to add an eligibility criterion for operations that plan to add cationic treatment chemicals to stormwater and/or authorized nonstormwater prior to discharge. ln contrast to the EPA's Construction General Permit, facilities with NPDES General Industrial Stormwater Permits typically only install cationic treatment systems in response to corrective action requirements triggered by benchmark exceedances. BES recommends that the permit include language that the facility must identify in the Stormwater Pollution Prevention Plan (SWPPP) practices and procedures designed to ensure that the use of cationic treatment chemicals will not lead to discharges of those treatment chemicals or cause an exceedance of water quality standards. Since preventing an overdose of polymer/floc requires specific controls (e.g., injection dosing calibration and routine pump maintenance), BES recommends that the underlined text be added to 2.1.2.5 as follows: " If you use polymers and/or other chemical treatments as part of your controls, you must identify the polymers and/or chemicals used, the purpose and the mechanisms for controlling the dose in your SWPPP." In addition, since many facilities use cationic treatment to reduce metals in stormwater, BES recommends moving this requirement to Section 2.1.1.

**Comment Response:**

EPA did not finalize the proposed eligibility criterion regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

2.1.2.8 – Request for Comment 3 – The cationic treatment chemicals have never been used that I know of. This would only be used in a construction situation, I can't imagine using this method to control everyday non-construction erosion and sediment issues.

**Comment Response:**

EPA did not finalize the proposed eligibility criterion regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Cationic treatment chemicals would only be used in a construction situation, therefore using this method to control everyday non-construction erosion and sediment issues would not be implemented. Recommend that this requirement not be added to the MSGP, as it is covered more appropriately under the CGP.

**Comment Response:**

EPA did not finalize the proposed eligibility criterion regarding use of cationic treatment chemicals in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0093-A1, Comment Excerpt Number 1.

---

## 2.2. Water Quality-Based Effluent Limitations

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

***10. EPA Must Ensure Compliance with Water Quality Standards and Ensure Consistency with Waste Load Allocations.***

The Clean Water Act, 33 U.S.C. § 1251 et seq., ("CWA") unambiguously requires all NPDES permits to ensure compliance with Water Quality Standards (WQS). See CWA § 301(b)(l )(C) and 402(p)(3)(A); 40 CFR § 122.44(d). The permitting authority, whether EPA or a delegated state, may issue an NPDES permit only when the permit meets all applicable CWA requirements. See, e.g., 33 U.S.C. §§ 1311(a), 1342(a); see also, 40 C.F.R. § 122.4 ("No permit may be issued: (a) When the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA ...."). In addition, "[n]o permit may be issued ... when the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d).

The CWA also requires EPA to set effluent limitations for point sources that can reasonably be expected to contribute to the attainment or maintenance of water quality in a specific portion of navigable waters. 33 U.S.C. § 1312(a). Permit "limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director determines are or may be discharged at a level which will cause, have reasonable potential to cause, or contribute to an excursion above any State water quality standards, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1)(i). "Permit writers must consider the impact of every proposed surface water discharge on the receiving water" to determine the need for water-quality based effluent limits. EPA, NPDES Permit Writers' Manual, at 87 (1996).1 This is critically important because Section 402(k) of the CWA creates a "permit shield" limiting a discharger's obligations to those enumerated in the permit. 33 U.S.C. § 1342(k).

Unfortunately, however, the proposed permit again falls far short of ensuring compliance with WQS. Because the proposed MSGP regulates all industrial dischargers, including many who are violating water quality standards, the permit's actual terms and conditions must ensure that all discharges will comply with water quality standards.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 23.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

*a. Industrial Stormwater Discharges Must Comply Strictly with Water Quality Standards*

Congress has required industrial storm water discharges and industrial storm water discharge permits to achieve strict compliance with WQS due to the potential for industrial pollutants to impair the Nation's waters. When the stormwater program was expressly added to the CWA in 1987, language was added to the statute specifically requiring that industrial stormwater permits must require compliance with water quality standards: "Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title." 33 U.S.C. § 1342(p)(3)(A). In Defenders of Wildlife v. Browner, (1999) 191 F.3d 1159, the U.S. Court of Appeals for the 9th Circuit held that Congress has expressly required industrial storm water dischargers to comply with the requirements of 33 U.S.C. Section 1311 and, therefore, such dischargers shall achieve any more stringent effluent limitation, including those necessary to meet water quality standards established pursuant to any federal or state law or regulation. "In other words, industrial discharges must comply strictly with state water quality standards." Defenders, 191 F.3d at 1165 (emphasis added). Although EPA does not dispute that the permit is required to ensure that the discharges it authorizes will comply with WQS, the proposed permit utterly fails to do so. As laid out in more detail below, the proposed permit fails to determine whether the discharges have the reasonable potential to cause or contribute to water quality standards violations; it fails to set water-quality based effluent limitations for pollutants that are identified as having the reasonable potential to cause or contribute to water quality standards violations; it fails to comply with the prohibition on new or expanded discharges into impaired waterbodies; it fails to ensure compliance with applicable TMDLs; and it lacks any method even to determine whether (much less set conditions to ensure that) discharges authorized by the permit are in compliance with WQS.

A general permit cannot ensure compliance with any of those standards unless it contains provisions to evaluate the impact of proposed discharges on a particular water body and to develop water-quality based effluent limitations for all discharges that have the reasonable potential to cause or contribute to a violation of those standards. As the Ninth Circuit noted in Defenders, "Section 301 further mandates that NPDES permits include requirements that receiving waters meet water quality-based standards." 191 F.3d at 1165 (internal citation omitted) Many if not most of the states' impaired waters are impaired by pollutants associated with industrial activities. For example, 11,388 miles of assessed rivers and streams are listed as impaired by industrial sources. https://ofmpub.epa.gov/waters10/attains_nation_cy.control.

Many industrial pollutants are toxic, or "priority," pollutants for which numeric water quality criteria have been established by EPA, and which are included in the NTR. In addition, industrial facilities have the potential to discharge other non-priority pollutants, such as oil and grease, pesticides from irrigation and other pollutants that may violate WQS. The discharge of an impairing pollutant above WQS by an industrial facility to waters already impaired by that pollutant by definition causes or contributes to impairment of water quality and constitutes a WQS violation. Further, the discharge of any bioaccumulative or persistent pollutants by an industrial facility to a water body impaired by that pollutant causes or contributes to impairment, and therefore constitutes a WQS violation. Under the CWA, any Permit ultimately issued by EPA must contain requirements to ensure the elimination of this contribution.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 23. In addition, Part 1.1.6.2 of the 2021 MSGP includes requirements for "new dischargers" and "new sources" to address discharges to water-quality impaired waters. For discharges to waters with an applicable EPA-approved or established TMDL, the operator must submit information to demonstrate that there are, in accordance with 40 CFR 122.4(i), sufficient remaining wasteload allocations in the TMDL to allow your discharge and that existing dischargers to the waterbody are subject to compliance schedules designed to bring the waterbody into attainment with water quality standards (e.g., a reserve allocation for future growth).

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

*b. The CWA Requires Reasonable Potential Analyses (RPAs) for Each NPDES Permit. EPA's Failure to conduct RPAs in Conjunction with the Proposed MSGP is Unlawful.*

In order to ensure WQS are achieved, the Clean Water Act, and its implementing regulations, require Reasonable Potential Analyses ("RPAs") for all NPDES permits when the discharges they permit may cause, or have reasonable potential to cause, violations of water quality standards: Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard . . .40 C.F.R. § 122.44(d)(l)(i).

At a minimum, the RPA must consider the following four factors in projecting potential exceedances of water quality standards: "existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and, where appropriate, the dilution of the effluent in the receiving water." 40 CFR § 122.44(d)(l)(ii).

EPA has developed guidance documents to assist permit writers in undertaking the RPA analysis. The EPA Permit Writer's Handbook (1996) sets out the threshold requirement for RPAs:

*Reasonable Potential and Numeric Criteria*

*When conducting an effluent characterization to determine if WQBELs are needed based on chemical-specific numeric in the water quality standards, the permit writer projects the receiving*

*waters concentration of pollutants contained in the effluent once that effluent enters the receiving water. If the projected concentration exceeds the applicable numeric water quality criteria for a specific pollutant, there is reasonable potential that the discharge may cause or contribute to an excursion above the applicable water quality standards and the permit writer must develop a WQBEL. Permit Writer's Handbook, p. 100.*

The Handbook goes on to explain the data to be evaluated:

*Determining Reasonable Potential With Effluent Monitoring Data*

*When characterizing an effluent for the need for a WQBEL, the permit writer should use any available effluent monitoring data as well as other information relating to the discharge ...as the basis for a decision...EPA recommends monitoring data be generated prior to permit limit development for the following reasons: (1) the presence or absence of a pollutant can be more clearly established or refuted; and (2) effluent variability can be more clearly defined. Permit Writer's Handbook, p. 101 (emphasis added).*

Once the RPA is complete, EPA must, through an NPDES Permit, implement limitations that control all pollutants or pollutant parameters which the EPA determines "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(l)(i).

For waters that are Section 303(d) listed as impaired, the RPA for discharges of impairing pollutants is simple: discharges above WQS have the reasonable potential to cause, or contribute, to excursions above State WQS. Similarly, developing the WQBEL to be included in the General Permit is simple: the WQBEL is the NTR or State WQS for that pollutant. For waters not impaired, and thus with some assimilative capacity, the RPA and the development of the WQBEL can be more complicated. Nonetheless, EPA is required to undertake this analysis in developing all NPDES permits, including the proposed MSGP.

While it admits that it has not conducted an RPA (or required dischargers to do so), EPA has provided no justification for this failure. EPA may not ignore the CWA's regulatory scheme for conducting RPAs and making determinations regarding the reasonable potential of industrial discharges to cause or contribute to excursions above WQS.

**Comment Response:**

The WQBEL in Part 2.2.1 of the MSGP states, "[y]our discharge must be controlled as necessary to meet applicable water quality standards of all affected states." EPA has made a reasonable potential determination that the discharges potentially covered by this permit, as a class, have the reasonable potential to cause or contribute to an excursion above state water quality standards. This is based on record information indicating that industrial stormwater is likely to discharge toxic, conventional and non-conventional pollutants and many waters are impaired for pollutants discharged in stormwater from industrial activity (National Research Council. 2009. *Urban Stormwater Management in the United States.* Washington, DC: The National Academies Press.

https://doi.org/10.17226/12465.; National Academies of Sciences, Engineering, and Medicine. 2019. *Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges.* Washington, DC: The National Academies Press. https://doi.org/10.17226/25355; EPA. 1983. *Results of the Nationwide Urban Runoff Program.* Water Planning Division, PB 84-185552. Washington, DC: EPA; EPA. 2009. *National Water Quality Inventory: Report to Congress 2004 Reporting Cycle.* EPA 841-R-08-001). Caselaw indicates the "NPDES regulations do not require the Region to use any particular methodology or conduct any specific modeling to determine whether the 'reasonable potential' standard is met." *In re: City of Taunton, Dep't of Public Works*, 17 E.A.D. 105 at *1 (EAB 2016); *see also In re: Upper Blackstone Water Pollution Abatement District*, 14 E.A.D. 577 at *16, n. 29 (EAB 2010) (holding that EPA is not limited "to acting only where there is a certainty of an existing causal link between a specific discharge and a particular violation of water quality standards" and that a reasonable potential analysis "requires some degree of certainty greater than a mere possibility, but it leaves to the permit writer's scientific and technical judgment how much certainty is necessary"); *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9 (1st Cir. 2012) (affirming reasonable potential analysis). For this reason, Part 2.2 establishes a WQBEL that requires controls on discharges as stringent as necessary to meet WQS. *See* CWA § 301(b)(1)(C) (providing that the permit must include limitations that are "as stringent as necessary to meet water quality standards"). Additionally, where further information suggests that the discharge is not controlled as stringently as necessary to meet water quality standards, EPA may identify additional stormwater controls that are necessary for the discharges to meet water quality standards, or require the facility to obtain coverage under an individual permit.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

*c. Water Quality Based Effluent Limitations Must Be Included in the Permit Where Permitted Discharges are Determined to Cause, or Have the Reasonable Potential to Cause Excursions Above Water Quality Standards.*

Once RPAs are conducted, EPA is required to include Water Quality Based Effluent Limitations ("WQBELs") in any NPDES Permit for discharges of pollutants that the EPA determines causes, or has the reasonable potential to cause or contribute to, excursions above WQS. 40 C.F.R. § 122.44(d)(l). The proposed MSGP fails to require that any of these types of effluent limitations are set for every discharge that has the reasonable potential to cause or contribute to a violation of WQS.

Moreover, while the EPA may claim that it is infeasible to develop numeric WQBELs in this context, EPA has not demonstrated that it is infeasible, either from a technical or from a practical standpoint. Numeric WQBELS are both feasible and necessary.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 21.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

*e. Available Monitoring Data Shows Widespread Noncompliance with Water Quality Standards Under Current General Permit.*

EPA possesses a wealth of information and evidence relating to discharges from industrial stormwater dischargers, including most relevantly the sampling data collected by the dischargers themselves since 1995. However, the proposed MSGP fails to reflect any attempt by EPA to analyze this wealth of data and incorporate responsive requirements in a meaningful fashion. In the face of EPA's failure to conduct an analysis of industrial stormwater compliance data, the Commenters are compelled to undertake such an analysis, below.

*i. Compliance Data Under California's General Industrial Stormwater Permit Demonstrate Massive Exceedances of WQS.*

In 2005, Waterkeeper Alliance member programs in California conducted an analysis for industrial dischargers permitted under that state's General Industrial Storm Water Permit, which is similar to EPA's current MSGP. Industrial dischargers have been operating under the California statewide permit since 1992. As with the MSGP, the permit relies on narrative technology based effluent limitations (BMPs to achieve BCT/BAT) in order to reduce or prevent the discharge of pollutants in storm water discharges.

California dischargers have submitted over ten years of sampling data (representing thousands of samples) under the current General Permit. While the California State Water Quality Board staff apparently failed to consider any of this data in preparing the 27 state's own draft General Permit, between 1993 and 1995 the San Francisco Regional Board entered General Permit sampling data into a database, between 2001 and 2002 the Los Angeles Regional Board created a similar database, and between 1996 and 2001 the Orange County Regional Board created its own database. Waterkeeper Alliance's analysis of the available electronic data supports the following conclusions:

- For all industrial dischargers sampling for Cu, Pb, and Zn, concentrations of pollutants discharged have increased rather than decreased between 1993 and 2002.

- For dischargers in the Los Angeles Region sampling for Cu, Pb and Zn (chosen because all major receiving waters in the Los Angeles Region are impaired for those pollutants), 99.5% exceed WQS for Cu, 99.9% exceed WQS for Pb, and 92.4% exceed WQS for Zn.

As demonstrated by this limited analysis of monitoring data in the Los Angeles area, extensive evidence (i.e., monitoring data) shows that concentrations of pollutants discharged pursuant to the General Permit routinely cause or contribute to exceedances of the chemical specific numeric criteria inapplicable water quality standards.

*ii. Compliance Data Under the Current EPA MSGP Also Demonstrates Numerous Exceedances of WQS.*

Dischargers have submitted over five years of sampling data under the current General Permit. While EPA staff apparently failed to compare any of this data to the applicable Water Quality Standards in preparing the proposed MSGP, the docket includes data collected between 1999 and 2004 in Alaska, Arizona, Idaho, Maine, Massachusetts, New Hampshire, New Mexico and the District of Columbia. The Commenters analyzed this data in an effort to gain a better understanding of the effectiveness of the narrative and technology-based BMP standards in the current MSGP. This effort examined data from 1,642 total monitoring events for the priority pollutants arsenic, cadmium, copper, lead, mercury, nickel, selenium, silver, and zinc. A thorough analysis of this data was frustrated by its poor quality, incomplete nature, and variations within reporting methodologies between the states and permittees. These limitations aside, the information collected by the above states, and submitted to EPA presents a compelling portrait of the current MSGP's failure to adequately prevent WQS violations by industrial stormwater discharges.

On average, discharges of industrial stormwater covered under the 2000 MSGP violated each state's acute toxicity water quality standards for dissolved metals over 45% of the time. With the unexplained exception of Idaho, the highest "success rate" for the MSGP is found in Alaska, where only one in five discharges of industrial stormwater violate water quality standards. In Arizona, by contrast, violations occur in over 65% of discharges. (See Table 1, below)

Table 1: Percentage of Reported Stormwater Discharges Exceeding each State's Acute Toxicity WQS

| State | Exceedances (percent) |
|---|---|
| Alaska | 20.51 |
| Arizona | 65.52 |
| Idaho | 5.22 |
| Maine | 49.66 |
| Massachusetts | 50.71 |
| New Hampshire | 51.20 |
| New Mexico | 23.29 |
| Total | 46.63 |

Based upon even this limited review of stormwater sampling data collected and submitted by General Permittees, EPA cannot ensure that the BMP based approach continued in the draft General Permit will achieve compliance with the applicable WQS on an acceptable basis. Furthermore, EPA's failure to account for the performance of its current MSGP in developing a successor program is arbitrary and capricious.

**Comment Response:**

EPA finalized revisions to the 2015 MSGP's provisions regarding benchmark monitoring exceedances. The 2021 MSGP includes new AIM provisions, a three-stage protocol that prescribe sequential and increasingly robust responses when a benchmark exceedance occurs, and thus more protective, when monitoring results exceed or repeatedly exceed benchmark values. The corrective action conditions, subsequent action deadlines, and documentation requirements in Part 5.1 of the 2021 MSGP remain unchanged from the 2015 MSGP. However, in Part 5.2 of the 2021 MSGP, EPA includes AIM requirements that are triggered by benchmark monitoring exceedances. Operators would be required to respond to different AIM levels with increasingly robust responses depending on the nature and magnitude of the benchmark threshold exceedance. See also Comment Response Essay 3 Additional Implementation Measures.

Further, EPA's electronic reporting tools are expected to continue to improve compliance and enhance EPA's ability to monitor permit effectiveness.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

*f. The Proposed MSGP Fails to Control Discharges to Impaired Waterways, Particularly of Pollutants Generally Responsible for These Impairments.*

The CWA requires all discharges authorized by any NPDES permit, including the MSGP, the comply with the water quality standards of the receiving water, but there are additional requirements applicable to discharges to impaired waters, to waters that have a TMDL, and to waters of exceptional quality to ensure that discharges into those waters receive additional scrutiny in the permitting process. In addition to the substantive comments below, we also have a process suggestion for enhancing the ability of the public to assist the permitting authority in identifying discharges likely to violate these requirements. The NOI should identify not only the name of the receiving water into which the discharge will be made, but should also indicate whether the receiving water is classified as impaired, and if so, for what pollutants, whether TMDLs have been finalized for any of the pollutants causing that impairment, and, if so, for which pollutants, and whether it is classified as a Tier I, Tier II or Tier IHI water for purposes of anti-degradation analysis and if so, for which pollutants.

**Comment Response:**

The Notice of Intent (NOI) for the 2021 MSGP requires documentation of impaired waterbody information, including the name of the receiving water, pollutants causing impairment, information on applicable TMDLs, and tier level of the waterbody for antidegradation purposes (see Appendix G, Parts E.3 and E.6).

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

*i. Impaired Waters with TMDLs Will Not Be Adequately Protected by the Proposed MSGP.*

The proposed permit deletes language requiring that discharges must "be consistent with" a TMDL and instead includes new eligibility provisions for discharges into impaired waters with TMDLs and impaired waters for which a TMDL has not yet been completed. The proposed changes contravene the CWA's presumptive ban on new discharges into impaired waters unless there are specific remaining pollutant loads to allow for the discharge. See 40 CFR § 122.4(i). Instead, the proposed MSGP operates on the opposite assumption, i.e., that storm water discharges from industrial sites are authorized unless the TMDL expressly states that the discharge is not permitted, either by "specifically articulat[ing] a wasteload allocation requiring more stringent controls than can be achieved with this permit" or by expressly "appl[ying] a wasteload allocation of zero to a discharge (either specifically or categorically)." (Fact Sheet p. 31). EPA itself acknowledges that "most TMDLs do not include these kinds of wasteload allocations of stormwater" and that as a result, "this provision is not likely to preclude authorization ... of very many industrial stormwater discharges." Id. Thus, as EPA itself admits, the proposed provisions fail to protect impaired waters with TMDLs from most polluted storm water discharges.

**Comment Response:**

Part 1.1.6.2 of the 2021 MSGP requires any new source or new discharger to demonstrate its ability to comply with 40 CFR 122.4(i) (i.e., prohibiting the issuance of permits to new sources and new dischargers that will not meet water quality standards) prior to coverage under the permit. If the operator is unable to satisfy the requirements of 40 CFR 122.4(i), the operator is not eligible for coverage under the MSGP. To satisfy the requirements of 40 CFR 122.4(i), an operator must complete one of the following: (a) prevent all exposure to stormwater of the pollutant(s) for which the waterbody is impaired, and retain documentation with the SWPPP on how this was accomplished; (b) submit technical information or other documentation to the applicable EPA Regional Office via NeT-MSGP at the same time the operator prepares and submits the NOI to support a claim that the pollutant(s) for which the waterbody is impaired is not present at the site; or (c) submit data or other technical documentation to the applicable EPA

Regional Office via NeT-MSGP at the same time the operator prepares and submits the NOI to support a conclusion that the discharge will be controlled as necessary such that the receiving water or the United States will meet applicable water quality standards. For discharges to waters without a TMDL, the information must demonstrate that the discharge of the pollutant for which the water is impaired will meet water quality standards at the point of discharge to the water of the United States. For discharges to waters with a TMDL, the information must demonstrate that there are sufficient remaining wasteload allocations in the TMDL to allow the discharge and that existing dischargers to the waterbody are subject to compliance schedules designed to bring the waterbody into attainment with water quality standards (e.g., a reserve allocation for future growth). In order to be eligible under Part 1.1.6.2.c, the operator must receive a determination from the applicable EPA Regional Office that the discharge will be controlled as necessary such that the receiving water of the United States will meet applicable water quality standards. In addition, as stated in Part 2.2 of the 2021 MSGP Fact Sheet, if an NOI indicates that the facility will discharge to an impaired waterbody with an EPA-approved or established TMDL, EPA can analyze the relevant information to determine whether any additional control measures are necessary to meet the permit's effluent limits and whether discharges will be consistent with the TMDL and WLAs.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

*ii. The Proposed MSGP Fails to Protect Impaired Waters for which TMDLs Have Not Yet Been Established*

The proposed permit's treatment of impaired waters for which TMDLs have not yet been established ("pre-TMDL waters") is just as problematic. Ignoring the presumptive ban of 40 CFR § 122.4(i) on new discharges into impaired waters absent a specific load allocation, the proposed MSGP authorizes new discharges into pre-TMDL impaired waters without requiring any demonstration that the impaired water can handle the additional pollutant load and still comply with water quality standards. This presumption that a new discharge will not cause or contribute to a violation of water quality standards is unlawful and completely divorced from reality, since new discharges will necessarily add to the pollution of impaired waters. Under 40 CFR 122.4(i), "there cannot be a new source or a new discharger if the waterbody is a [water quality limited segment] impaired waterway unless the state completes a TMDL beforehand." San Francisco Baykeeper, Inc. v. Browner, 147 F. Supp 2d 991, 995 (N.D. Cal. 2001) (emphasis added); Friends of Pinto Creek v. EPA, 504 F.3d 1007, 1012 (9th Cir. 2007).

**Comment Response:**

Part 2.2.2.2 of the 2021 MSGP requires discharges to impaired waters without an EPA-approved or established TMDL to comply with Part 2.2.1 and the monitoring requirements of 4.2.5. As stated in Part 2.2.2.2 of the 2021 MSGP Fact Sheet, facilities discharging to impaired waters without an EPA-approved or established TMDL must still control their discharges as necessary to meet water quality standards (as also required per Part 2.2.1). EPA expects an operator will achieve this if it complies with the other requirements in the permit, including monitoring requirements applicable to impaired waters discharges in Part 4.2.4, benchmark monitoring requirements (based on national EPA-recommended water quality criteria), routine inspections, and quarterly visual assessments. However, if information in the NOI, required reports, or from other sources indicates that discharges are not controlled as necessary to meet applicable water quality standards, EPA may inform an operator that it needs to implement additional measures on a site-specific basis to ensure the WQBEL is met, or, alternatively, of the need to apply for an individual permit.

## 2.2.1. Water Quality-Based Effluent Limitations - Water Quality Standards

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

**Application of Water Quality Standards to Stormwater Discharges**

Parts 1.1.6.1, 1.1.6.2, 1.1.7, 2.2.1, and 5.1.1.3 contain language suggesting in various contexts that permitted stormwater discharges must "meet surface water quality standards." In the 2015 version of the MSGP[59] and fact sheet[60] (as well as in other prior versions[61]), EPA included language that clarified that the requirement to "meet surface water quality standards" meant stormwater discharges must not cause or contribute to an exceedance of an applicable water quality standard in the downstream receiving water. Without any explanation or basis, EPA has removed this clarifying language from the proposed 2020 MSGP and fact sheet, which leaves the language requiring discharges to "meet surface water quality standards" as potentially ambiguous - it is not clear where compliance with this requirement is assessed or what it actually requires notwithstanding that surface water quality standards are directly relevant only to receiving waters.

To avoid misinterpretation (including in states that have NPDES primacy and attempt to pattern their permits after the federal MSGP) and to be consistent with prior EPA clarifications, EPA should replace the phrase "meet surface water quality standards" in the proposed 2020 MSGP and fact sheet with the more accurate phrase "not cause or contribute to an exceedance of an applicable surface water quality standard in the receiving water." If for some reason EPA continues to retain the confusing phrase that discharges must "meet water quality standards," it should at least clarify in the permit and fact sheet that the phrase means to not cause or contribute

to an exceedance of an applicable surface water quality standard similar to how it clarified such language in the 2008 and 2015 versions of the MSGP.

The governing standard for stormwater discharges should be that they not cause or contribute to exceedances of applicable water quality standards in receiving waters, not that the stormwater discharges themselves meet every applicable standard. The CWA as well as EPA's permitting approach have long recognized that stormwater is different and harder to control than standard effluent, and have made allowances accordingly.

The ambiguous language suggesting that stormwater discharges must "meet applicable water quality standards" also ignores the potential for upstream impacts to water quality that have no relation to the permitted discharge of stormwater. The focus of a permit requirement related to water quality should be on the impact of the permitted discharge on the receiving water and whether the discharge causes or contributes to an exceedance of an applicable water quality standard in the receiving water. Changing from an ambiguous requirement to meet water quality standards to a requirement to not cause or contribute to an exceedance of applicable water quality standards is critical because it focuses on the actual impact of stormwater discharges on water quality in receiving waters versus a generic requirement to meet water quality standards even if the stormwater discharges have no impact on water quality in the receiving waters.

Such clarification regarding water quality compliance also would be consistent with statements from the 2019 NRC Study. For instance, on page 10 of the study, it discusses concerns with applying water quality criteria or standards to stormwater discharges: "Most often, [water quality] criteria are pollutant specific and numeric and are designed around a low-flow dry weather condition, with the idea that this condition represents the highest pollutant concentration in a water body. However, stormwater flows will occur during quite different flow and loading conditions than those for which the criteria are typically established. Questions have been raised about the applicability and relevance of these criteria to wet weather conditions, but separate criteria for wet weather allowances have not been developed and implemented for industrial stormwater discharges. WQBELs are established when analyses determine that a discharge causes or has the reasonable potential to cause or measurably contribute to an instream excursion above water quality criteria."

[59] 2015 MSGP at Parts 1.1.4.7, 1.1.4.8, 2.2.1, 8.G.8.4, 8.H.8.1, 8.J.8.1, & Appendix B.16(B).

[60] 2015 MSGP Fact Sheet at 12, 32, 33, 61,

[61] For instance, in the 2008 MSGP (Part 2.2.1), a facility was required to take corrective action if a discharge causes or contributes to an exceedance of applicable water quality standards. EPA explained in the fact sheet to the 2008 MSGP (page 53) that this means that stormwater discharges must be controlled "as necessary to meet applicable water quality standards in the receiving waterbody".

**Comment Response:**

EPA uses "meet water quality standards" in the MSGP as that is recognizable, plain language that has been used in NPDES documents previously. Nevertheless, in Part 2.2.1, EPA clarifies "[i]f at any time [an operator] become[s] aware, or EPA determines, that [an operator's] stormwater discharge will not be controlled as necessary such that the receiving water of the United States will not meet an applicable water quality standard, [the operator] must take corrective action(s) as required in Part 5.1 and document the corrective actions as required in Part 5.3.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations for Clarification on the Requirement that Stormwater Discharges to "Meet Water Quality Standards" (Parts 1.1.6.1, 1.1.6.2, 1.1.7, 2.2.1, and 5.1.1.3)**

Although EPA has not requested comment on this issue specifically, the FWQC and FSWA seek clarification on the statements in Parts 1.1.6.1, 1.1.6.2, 1.1.7, 2.2.1, and 5.1.1.3 that stormwater discharges must "meet water quality standards." In the 2008 MSGP, a facility was required to take corrective action if a discharge caused or contributed to an exceedance of applicable water quality standards. EPA explained in the 2008 MSGP Fact Sheet that this meant that stormwater discharges must be controlled "as necessary to meet applicable water quality standards in the receiving waterbody."[5] In the 2015 MSGP Fact Sheet, EPA included language clarifying that to "meet water quality standards" means that stormwater discharges must not cause or contribute to an exceedance of an applicable water quality standard in the downstream receiving water. Without any explanation or basis, EPA has removed this clarifying language from the Proposed 2020 MSGP and Fact Sheet. Accordingly, the FWQC and FSWA request that EPA incorporate the clarifying language above from prior MSGPs.

[5] 2008 MSGP Fact Sheet, at p. 53.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 38.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**

**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

## MSGP Effluent Limits vs. Water Quality Standards

The proposed language of Part 2.2.1 may cause confusion between effluent limits for stormwater discharges and water quality standards. This same issue arose with the draft 2015 MSGP, which EPA subsequently revised. This is equally relevant to the draft 2020 MSGP, as follows.

Part 2.2.1 of the draft 2020 MSGP states:

"Your discharge must be controlled as necessary to meet applicable water quality standards of all affected states."

I recommend this be revised to read, which is the language EPA adopted for the final 2015 MSGP:

"Your discharge must be controlled as necessary to meet applicable water quality standards of all affected states (i.e., your discharge must not cause or contribute to an exceedance of applicable water quality standards in any affected state)."

The issue then, as it is now, is that water quality standards are not the same as end-of-pipe effluent limits for stormwater discharges. For the draft 2015 MSGP, the Water Environment Federation (WEF) provided the following comment, which I think applies as well to the draft 2020 MSGP:

"WEF notes that this language may cause confusion, both on the part of permittees and regulatory authorities, since it may convey the impression that numeric water quality criteria would be applied as effluent limits to stormwater discharges at the point of discharge from the industrial site. Water quality standards (WQS) are meant to preserve designated uses of bodies of water. As defined by EPA, WQS are composed of designated uses, water quality criteria (WQC's) to protect those uses, and antidegradation policies. Water quality criteria are not meant to apply as effluent limits at the point of discharge. However, the way this section is worded may convey the impression that EPA's intent is that WQC's apply as effluent limits to stormwater discharges."

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 38.

## 2.2.2. Water Quality-Based Effluent Limitations - Discharges to Water Quality-Impaired Waters

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  39
**Excerpt Status:** Final

**Comment Excerpt:**

2.2.2.3
New Discharger or New Source to an Impaired Water. If a facility has authorization to discharge under this permit relied on Part 1.1.6.2 for a new discharger or a new source to an impaired water, it must implement and maintain any measures that enabled it to become eligible under Part 1.1.6.2, and modify such measures as necessary pursuant to any Part 5 corrective actions. It must also comply with Part 2.2.1 and the monitoring requirements of Parts 4.2.4.1. WEF recommends that EPA clarify and place all requirements in one place to avoid subjectivity and confusion.

**Comment Response:**

No change to the 2021 MSGP is necessary in response to this comment. Part 2.2.2.3 of the 2021 MSGP is clear in that it states that operators must implement and maintain the measures that enabled eligibility under Part 1.1.6.2 and states that compliance is necessary with the requirements of Part 2.2.1 and associated monitoring requirements in Parts 4.2.4.1. The 2021 MSGP clearly directs operators to refer to Part 5 if corrective actions are necessary. As the Fact Sheet for the 2021 MSGP indicates, EPA organized the 2021 MSGP to streamline and simplify language throughout the permit to present the requirements in a generally more clear and readable manner; this reorganization includes formatting requirements in a certain order to present the requirements in more sequential sense.

## 3. Inspections

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

We suggest combining the routine facility inspections with the quarterly visual sample assessment requirements. For example, EPA might require facilities to conduct at least two routine facility inspections each year during a runoff event and observe/record visual observations (sheen, film, discoloration, etc.) of the discharges at the facility outfall(s) during

those inspections without having to collect a stormwater sample. In this scenario, the separate requirement to collect quarterly stormwater samples and perform/record visual assessments could be eliminated. At least one authorized state (Minnesota) allows this. This would achieve essentially the same result as the current quarterly visual sample inspection requirement but would simplify the process for operators and streamline recordkeeping requirements. Consolidating the requirements in this way seems even more appropriate given the proposed universal benchmark monitoring that all sectors may have to comply with for the 2020 MSGP.

**Comment Response:**

EPA disagrees with the comment of combining these two types of separate and distinct inspection requirements and eliminating the current frequency because they have differing evaluation metrics and recordkeeping requirements. The 2021 MSGP does not preclude a routine (visual) facility inspection from being conducted in conjunction with the required quarterly discharge (stormwater sampling) inspections.

EPA does not agree with the comment,*" ... require facilities to conduct at least two routine facility inspections each year during a runoff event and observe/record visual observations (sheen, film, discoloration, etc.) of the discharges at the facility outfall(s) during those inspections without having to collect a stormwater sample."* Routine facility inspections are visual assessment inspections of areas of the facility (e.g., industrial areas, potential pollutant sources, areas of past spills/leaks, and control measure implemented) which must be conducted quarterly with at least one of these inspections conducted during a stormwater discharge event. Quarterly visual assessments are physical (sample collection) and visual assessments (general water quality characteristics) of stormwater discharges at each discharge point from the facility. EPA finds it important that at least one routine inspection each year occur during a stormwater discharge to provide the operator a visual demonstration of the adequacy of existing controls. EPA notes that the MSGP contains exceptions that will reduce burdens associated with visual assessments for some facilities. Visual assessments can be distributed in other quarters for facilities facing adverse weather conditions or irregular stormwater runoff. Visual assessments do not apply for facilities that are inactive, unstaffed, and where no industrial materials or activities are exposed to stormwater. In addition, EPA agrees and notes that the visual assessment can be conducted concurrently with other analytic monitoring requirements (quarterly sampling) to reduce the permittee's burden in terms of field activities. EPA disagrees that the visual assessment requirements are overly prescriptive in the MSGP. Regular visual assessments are an inexpensive and valuable method for identifying potential problems that could result in discharges that exceed water quality standards. EPA encourages all facilities, especially facilities with significant activities and materials exposed to stormwater, to consider conducting more frequent visual assessments.

## 3.1. Routine Facility Inspections

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1

**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Please add that inspectors should verify that all documents are certified by properly authorized representatives per Appendix B.11.

**Comment Response:**

EPA agrees with comment and notes that Appendix B.11.B of the 2021 MSGP requires the following signatory requirements for facility compliance documentation (i.e., inspection reports):  *"Your SWPPP, including changes to your SWPPP to document any corrective actions or advanced implementation measures taken as required by Part 5, and any other compliance documentation required under this permit, including the Annual Report, DMRs, and inspection reports, must be signed by a person described in Appendix B, Subsection 11.A above or by a duly authorized representative of that person."*

EPA notes that the 2021 MSGP permit Part 3.1.1 requires that "Qualified Personnel" (defined below) perform the inspections. EPA also notes that   2021 MSGP Part 3.1.6.7 (Routine Inspection Documentation) states that all findings must be documented and include "A statement, signed and certified in accordance with Appendix B, Part 11." EPA did not make any change to this permit part for the 2021 MSGP.

Qualified personnel are defined in Appendix A of the 2021 MSGP as those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit.

Part 6.2.1 of the 2021 MSGP requires "You must identify the staff members (by name or title) that comprise the facility's stormwater pollution prevention team as well as their individual responsibilities. Your stormwater pollution prevention team is responsible for overseeing development of the SWPPP, any modifications to it, and for implementing and maintaining control measures and taking corrective actions and/or AIM responses when required. Each member of the stormwater pollution prevention team must have ready access to either an electronic or paper copy of applicable portions of this permit, the most updated copy of your SWPPP, and other relevant documents or information that must be kept with the SWPPP."

### 3.1.1. Routine Facility Inspections - Inspection Personnel

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1

**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

Two Inspectors are needed for quarterly routine facility inspections.

3.1.1 Inspection Personnel. **Qualified personnel** (as defined in Appendix A. quoted below) must perform the inspections with at least one member of your stormwater pollution prevention team participating. Inspectors must consider the results of visual and analytical monitoring (if any) for the past year when planning and conducting inspections.

-Definition from Appendix A.

"**Qualified personnel** are those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit." Suggestion - A change to Inspection Personnel: The inspection should be completed by a minimum of one qualified person who is a SWPPP Team Member. It seems excessive to require two people to complete the quarterly routine facility inspection.

**Comment Response:**

EPA does not intend to require that two people be required to complete the quarterly routine facility inspection. Part 3.1.1 of the 2021 MSGP has been revised to clarify that the qualified personnel may be a member of the stormwater pollution prevention team. However, if the qualified personnel is a third-party you hire (i.e., a contractor), at least one member of the stormwater pollution prevention team must participate in the inspection.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Qualified personnel

Discussion/Recommendations

"Qualified Personnel" should include internal environmental staff; if so, do they need some level of formal training and certification (should be included in economic impact). If it must be third party individuals, the economic impact is much greater (engineering fees).

**Comment Response:**

Qualified personnel are defined in Appendix A of the 2021 MSGP as those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit.

This definition remains unchanged from the 2015 MSGP and does not represent a new economic burden under the 2021 MSGP. Further, the definition does not necessitate costly formal training and certification.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

*Requirement for the qualified person performing inspections to do so with at least one member of the stormwater pollution prevention team.*

This section assumes the inspector is not necessarily a member of the stormwater pollution prevention team. This language might be confusing for those who have a qualified person on their team or who interpret it to mean that they should hire someone outside their team to perform inspections. DWQ recommends clarifying this section to explain that if the qualified person is not a member of the stormwater pollution prevention team, a member of the team must be present.

**Comment Response:**

EPA does not intend to require that two people be required to complete the quarterly routine facility inspection. Part 3.1.1 of the 2021 MSGP has been revised to clarify that the qualified personnel may be a member of the stormwater pollution prevention team. However, if the qualified personnel is a third-party you hire (i.e., a contractor), at least one member of the stormwater pollution prevention team must participate in the inspection.

**Commenter Name:** Asciatu Whiteside
**Commenter Affiliation:** Dallas Fort Worth International Airport (DFW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0208-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed permit requires that routine inspections by performed by Qualified Personnel and at least one member of the Pollution Prevention Team (PPT). It is requested that this section be modified to allow Qualified Personnel who are members of the PPT, be allowed to perform such inspections independently.

**Comment Response:**

EPA does not intend to require that two people be required to complete the quarterly routine facility inspection. Part 3.1.1 of the 2021 MSGP has been revised to clarify that the qualified personnel may be a member of the stormwater pollution prevention team. However, if the qualified personnel is a third-party you hire (i.e., a contractor), at least one member of the stormwater pollution prevention team must participate in the inspection.

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

ACI-NA requests that this section be modified to indicate that Qualified Personnel can be a member of the PPT and in such instances may perform such inspections independently. Qualified Personnel may include airport environmental staff and/or tenant environmental staff, depending on the circumstances.

**Comment Response:**

EPA does not intend to require that two people be required to complete the quarterly routine facility inspection. Part 3.1.1 of the 2021 MSGP has been revised to clarify that the qualified personnel may be a member of the stormwater pollution prevention team. However, if the qualified personnel is a third-party you hire (i.e., a contractor), at least one member of the stormwater pollution prevention team must participate in the inspection.

## 3.1.2. Routine Facility Inspections - Areas that You Must Inspect

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

A rigorous inspection should also include:

a. SWPPP review
• A determination that all points of discharge are identified
• Any applicable water quality standards are documented

b. All waste management

c. Outdoor storage of waste, scrap, and equipment, all containers covered

d. Vehicles and equipment used outdoors

e. Dumpsters

f. Loading docks

**Comment Response:**

EPA acknowledges the comment request for additional items to inspect be considered for the 2021 MSGP Permit Part 3.1.2, Areas that You Must Inspect and Part 3.1.3, What You Must Look for During an Inspection. However, EPA disagrees that the revisions are necessary because existing requirements in Part 3.1.2.2 of the 2021 MSGP require inspecting areas identified in the Stormwater Pollution Prevention Plan (SWPPP) and those that are potential pollutant sources.

## 3.1.3. Routine Facility Inspections - What You Must Look for During an Inspection

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

3.1.3
There are provisions to control erosion, but no inspection requirement to look for erosion. WEF

recommends that it should be included. Additionally, known areas of contaminated surface soil inspections should be included explicitly.

**Comment Response:**

EPA acknowledges the comment on an inspection requirement for assessing erosion and known areas of contaminated surface soils. Part 3.1.3 of the 2021 MSGP has been revised to include evidence of erosion as an item that must be included in an inspection. Specifically, Part 3.1.3.5 states, "*Erosion of soils at your facility, channel and streambank erosion and scour in the immediate vicinity of discharge points, per Part 2.1.2.5.*"

Part 3.1.3.1 of the 2021 MSGP further requires that qualified personnel examine or look out for industrial materials, residue or trash that may have or could come into contact with stormwater, which may include known areas of contaminated surface soil.

### 3.1.4. Routine Facility Inspections - Inspection Frequency

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the permit be revised to require a monthly inspection frequency instead of quarterly inspection frequency. Based on BES's experience, quarterly inspections are not sufficient to discover and control potential sources of pollutants. Despite a monthly inspection frequency requirement in Oregon, during compliance oversight inspections, BES often discovers control measures in need of maintenance, Stormwater Pollution Control Plans not being implemented and a significant lack of stormwater controls to minimize exposure. Facilities should be inspecting their sites more frequently than every three months to verify that site control measures are being implemented as described in their SWPPPs and that preventative maintenance schedules are adequate in preventing the discharge of pollutants in stormwater.

BES also recommends the following sentence be deleted: "Increased frequency may be appropriate for some types of equipment, processes and stormwater control measures, or areas of the facility with significant activities ... " The permit does not identify any specific requirement to do this; therefore, the sentence serves no purpose. If the EPA feels that this is appropriate to add to the permit, BES recommends that the permit state specific types of equipment, processes and control measures and specific inspection frequencies.

**Comment Response:**

EPA acknowledges the comment request to require "monthly" inspections as an explicit requirement rather than the proposed 2020 MSGP Permit Part 3.1.4, Inspection

Frequency, language suggesting that facilities only consider increased frequency inspections (e.g., monthly) and only " ... in some instances." EPA requires that inspections occur at least quarterly in Part 3.1.4 of the 2021 MSGP and encourages all facilities, especially facilities with significant activities and materials exposed to stormwater, to consider conducting more frequent facility inspections. EPA also notes that operators must document relevant inspection schedules in the Stormwater Pollution Prevention Plan (SWPPP).

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 76
**Excerpt Status:** Final

**Comment Excerpt:**

*22. EPA Should Clarify and Strengthen Required Routine Inspections of Control Measures.*

With respect to exceptions to routine inspection frequency,[259] it is not clear which facilities may need to conduct monthly inspections to ensure the proper functioning of control measures. Additionally, while it is perhaps appropriate for certain facilities (i.e. where neither equipment nor industrial materials are exposed to the elements), to conduct inspections once/year *when stormwater discharges are occurring*, for any and all others, where discharges may routinely carry pollutants into control structures, an (approximate) quarterly inspection should be required during storm events.

[259] Draft Permit at 22 and 23, Parts 3.1.4 and 3.1.5, respectively.

**Comment Response:**

EPA acknowledges the comment request to further clarify the language in Part 3.1.4, Inspection Frequency, to identify which facilities (in some instances) should conduct inspections more frequently (e.g.., monthly). EPA requires that inspections occur at least quarterly in Part 3.1.4 and encourages all facilities, especially facilities with significant activities and materials exposed to stormwater, to consider conducting more frequent facility inspections. EPA also notes that operators must document relevant inspection schedules in the Stormwater Pollution Prevention Plan (SWPPP).

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1

**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

In arid locations, timing an inspection during regular operating hours during a precipitation event may be infeasible some years. A provision to not be in violation should, under such circumstances, an inspection during a rain event does not occur.

**Comment Response:**

EPA acknowledges the comment about challenges of sampling in arid locations during normal facility operating hours in some years. EPA's 2021 MSGP Part 3.2.2.2 and Part 3.2.3.7 allows permittees to document " ... why it was not possible to take samples within the first 30 minutes ..." for quarterly visual assessments at facilities. EPA also notes that Part 3.2.4.2, Climates with Irregular Stormwater Discharges, states that facilities located within arid or semi-arid climates in which measurable storm event discharges do not occur for extended period of times may obtain  samples for the quarterly visual assessments during seasons when precipitation occurs.

EPA disagrees that it is infeasible for facilities in the arid southwest to conduct a facility inspection at least once during a period when a stormwater discharge is occurring per Part 3.1.4. It is important that at least one routine inspection each year occur during a stormwater discharge to enable the operator to observe the control measures implemented and ensure they are functioning correctly. To clarify the requirement, the inspection must occur during a period when a stormwater discharge is occurring, which means that the inspection does not necessarily need to cover the entire facility coincident with the storm's duration (i.e., it can occur after the storm event has ended provided a discharge is occurring). Because such an inspection must occur only once in a calendar year, EPA expects that operators covered under the 2021 MSGP will be able to meet the requirement.

Because of the infrequency of visual assessments (quarterly), EPA expects that operators will be able to comply with the requirement during normal business hours. EPA points out that there are many sources of weather forecast information available to operators so that adequate preparation for monitoring storm events, whether during business hours or not, can be done. For the rare case when an operator is not able to conduct the assessment in the quarter because of the timing of storm events, the permit provides the option of scheduling the "quarterly" assessment in other seasons when storm events are more accessible, which addresses the commenter's concerns about potential safety issues and permit violations.

### 3.1.5. Routine Facility Inspections - Exceptions to Routine Facility Inspections for Inactive and Unstaffed Sites

**Commenter Name:**  Ed Dunne
**Commenter Affiliation:**  Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0229-A1

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Exceptions to Routine Facility Inspections for Inactive and Unstaffed Sites - DOEE is requesting clarification on whether seasonal facilities, at which industrial activities only occur for part of the year, would be exempted from routine inspections during periods when the site is inactive and unstaffed. For example, would year-round routine inspections be required for salt domes or locations where leaves are temporarily stored during leaf season?

**Comment Response:**

The exceptions to routine facility inspections for inactive and unstaffed facilities specified in Part 3.1.5 of the 2021 MSGP establish requirements for active facilities to change to inactive and unstaffed facilities. Specifically, Part 3.1.5 states, "*If you are already covered under the permit and your facility has changed from active to inactive and unstaffed, you must modify and re-certify your NOI. You must also include a statement in your SWPPP per Part 6.2.5.2 indicating that the site is inactive and unstaffed, and that there are no industrial materials or activities exposed to stormwater, in accordance with the substantive requirements in 40 CFR 122.26(g)(4)(iii). The statement must be signed and certified in accordance with Appendix B, Subsection 11.*" Facilities may be exempt from routine facility inspections if the specified requirements are met.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  28
**Excerpt Status:** Final

**Comment Excerpt:**

To what extent does this apply to facilities with known areas of contaminated surface soils? A provision requiring ongoing inspections of BMPs applied to known areas of contaminated surface soils is recommended.

Is EPA implying the use of Catch basins to collect contaminated stormwater? This section is not well stated. How about requiring operators to maintain sumps and catch basins regularly. It is important to ensure hooded catch basin and catch basin inserts are maintained and installed correctly. If an area is uncovered, connect sump outlet to sanitary sewer (if possible) or to appropriate treatment such as an American Petroleum Institute (API) or Coalescing Plate (CP) oil/water separator, catch basin filter, or other appropriate system. These are very different technologies and have different levels of performance and the ability to handle loads.

EPA should include statements about periodic inspection of the entire drainage system including infiltrations systems, detention systems manholes, catch basins, pipes and outfalls. For example, in page 110, EPA includes the Use sand filters or other end-of-pipe treatment as back-up measures for outfalls receiving drainage from areas where oil is potentially present.

WEF SMEs have done a review of these recommendations from EPA and suggests that EPA spend additional time in clarifying these recommendations. WEF SMEs would be available to discuss several them and provide additional input.

**Comment Response:**

Comment noted. EPA notes that if the facility discharges to a federal CERCLA Site listed in Appendix P, then the operator must notify the EPA Region 10 Office when submitting an NOI and the regional office must determine that the operator is eligible for permit coverage. EPA notes in Part 6.2.3.3) that Significant spills and leaks include, but are not limited to, releases of oil or hazardous substances in excess of quantities that are reportable under CWA section 311 (see 40 CFR 110.6 and 40 CFR 117.21) or section 102 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 USC §9602. This permit does not relieve you of the reporting requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302 relating to spills or other releases of oils or hazardous substances.

Further, Part 3.1.5 of the 2021 MSGP does not absolve the facility from required maintenance activities, such as those specified in Part 2.1.2.3 of the 2021 MSGP, which requires that all control measures, industrial equipment and systems used to achieve the effluent limits and used to minimize pollutant discharges be maintained.

## 3.2. Quarterly Visual Assessment of Stormwater Discharges

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Requirement to draw sample for visual assessment and monitoring within the first half hour of discharge is unrealistic and impossible in some outfalls. This should be changed to the state's requirements that are more realistic.

**Comment Response:**

EPA points out that it is important that operators take a sample towards the beginning of the storm event in order to account for first flush effects, since this is when potential pollutants in discharges tend to be more concentrated and are times when receiving stream flows are the lowest representative of stormwater discharge), and thus potential effects to receiving waters are

higher. Accordingly, the permit continues to require a sample to be taken within the first 30 minutes of a discharge associated with a measurable storm event, but does provide that when this is impractical, a grab sample can be taken as soon as practicable (and the operator must document and keep with the SWPPP an explanation of why a grab sample during the first 30 minutes of a discharge could not be collected).

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Quarterly Visual Assessment of Stormwater Discharges - DOEE recommends the facility be required to take time stamped photos of samples collected and retain the photos. This would ensure facilities are collecting the samples and would allow inspectors to identify facilities that are not accurately evaluating characteristics. DOEE inspectors have discovered a problem with facilities that not actually collecting samples or properly assessing the quality of runoff, which appears to occur because there is little accountability.

**Comment Response:**

The 2021 MSGP  Part 3.2.3, Visual Assessment Documentation, requires specific documentation including, but not limited to:  location, date and time, personnel collecting the sample and conducting the visual assessment  and their signatures, nature of the discharge, probable sources of any observed stormwater contamination, a reason why it was not possible to take samples within the first 30 minutes (if applicable), and a statement signed and certified. EPA considers this information sufficient to provide documentation, but acknowledges there is utility in operators providing additional information including photographs to further document the assessments.

## 3.2.2. Quarterly Visual Assessment of Stormwater Discharges - Visual Assessment Procedures

**Commenter Name:** Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:** GZA GeoEnvironmental, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0171-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

When conducting a quarterly visual assessment (QVAs; Section 3.2 of MSGP), would incidental sediment observed in a stormwater sample trigger AIM if it were associated with sanding during winter for public safety?

**Comment Response:**

EPA notes that a determination of whether there is evidence of stormwater pollution in a discharge is site-specific and depends on many factors (e.g., the nature of industrial activities taking place). Quarterly visual assessments are separate requirements that differ from benchmark monitoring whose exceedances trigger Additional Implementation Measures (AIM) in Part 5.2.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Autosamplers or a passive sampler should be allowed at locations where it may be unsafe to take visual samples during a storm event. Even though odor and foam may disperse, it may be more useful than no visual monitoring at all.

**Comment Response:**

EPA acknowledges the comment about safety concerns during storm event sample collection and suggestion for use of auto or passive samplers instead of grab samples. EPA notes that 2021 MSGP Part 3.2.4.1 and Part 4.1.5 Adverse Weather Conditions, allows for operators to take a substitute sample during the next qualifying measurable storm event and document the rationale for lack of visual assessment as specified in 2021 MSGP Part 6.5.6.

EPA notes that in the final 2021 MSGP, EPA is continuing to require grab samples to be collected during the first 30 minutes of a discharge. The use of grab samples for visual assessment is well documented for the parameters specified in Part 3.2.2.4 of the 2021 MSGP, and thus preferable. The use of an autosampler or passive sampler may not provide comparable results for parameters such as floating solids, settled solids, foam, oil sheen, and other indicators of stormwater pollution. EPA may evaluate the use of autosamplers and passive samplers in future versions of the MSGP.

In Part 4.1.4 of the 2021 MSGP EPA has added an explicit clarification that composite sampling is allowed for indicator monitoring and benchmark monitoring. Composite samples can provide a more comprehensive characterization of the facility's discharge than grab samples. EPA had allowed facilities to use composite sampling in previous versions of the MSGP, but in the 2021 MSGP, EPA is explicitly allowing composite sampling except for those parameters that require a

short holding time before processing, such as pH and those parameters that can degrade or transform quickly. Composite sampling may be performed manually or with the use of automated sampling equipment. For manual sampling, a facility would collect multiple grab samples during a storm event and combine portions of each grab sample to form a single composite sample that is then analyzed. For automated sampling, a facility would install an automatic sampler at the end of a flume, weir, or other similar device to direct the stormwater to a collection point. The sampler could be set up to collect samples on some interval, and, depending on the equipment, may be able to combine individual samples automatically into a composite sample. Automated samplers can also collect either flow-weighted or time-weighted composites. Using automated samplers can eliminate the need for a person to physically collect samples, which can be helpful if a storm happens outside of normal business hours. These samplers can lower labor costs and mitigate any safety concerns although they require maintenance which would not otherwise be needed if done manually. Operators may also find that portable electronic meters, sensors, and data loggers used in the field can be a cost-effective way to monitor parameters like turbidity, conductivity, dissolved oxygen, and pH.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 49
**Excerpt Status:** Final

**Comment Excerpt:**

## XIV. Inspections

We believe that requiring the collection of visual assessment samples pursuant to section 3.2.2.2 within 30 minutes of discharge is an unreasonable timeframe and not consistent with state permits that are already more stringent then the EPA MSGP. For example, the California industrial general permit sampling requirement originally required permittees to sample stormwater within 30 minutes, but the State Water Board made the change to within 4 hours due to the difficulties to meet the 30-minute timeframe. We recommend that the timeframe be extended to within 4 hours of discharge. This request would also need to be reflected in Section 3.2.3.7 documentation of the visual assessment.

**Comment Response:**

EPA notes that it is important that permittees take a sample towards the beginning of the storm event in order to account for first flush effects, since this is when discharges tend to be more concentrated and are times when receiving stream flows are the lowest, and thus potential effects to receiving waters are higher. Accordingly, the permit continues to require a sample to be taken within the first 30 minutes of a discharge associated with a measurable storm event, but when this is impractical, a grab sample can be taken as soon as practicable (and the permittee must document and keep with the SWPPP an explanation of why a grab sample during the first 30

minutes of a discharge could not be done). Parts 3.2.2.2 and 3.2.3.7 of the 2021 MSGP allows permittees to document " ... why it was not possible to take samples within the first 30 minutes ..." of discharge from a measurable event for quarterly visual assessments at facilities.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

The Navy requests that the requirement to sample within the first half hour of discharge be changed to be consistent with Washington State's requirements. The permit requirement to monitor all outfalls for visual monitoring and stormwater sample collection within the first half hour of discharge is relatively difficult to achieve due to the far proximity of all the outfalls related to each other located at the facility.

**Comment Response:**

EPA notes that it is important that permittees take a sample towards the beginning of the storm event in order to account for first flush effects, since this is when discharges tend to be more concentrated and are times when receiving stream flows are the lowest, and thus potential effects to receiving waters are higher. Accordingly, the permit continues to require a sample to be taken within the first 30 minutes of a discharge associated with a measurable storm event, but when this is impractical, a grab sample can be taken as soon as practicable (and the permittee must document and keep with the SWPPP an explanation of why a grab sample during the first 30 minutes of a discharge could not be done.  Parts 3.2.2.2 and 3.2.3.7 of the 2021 MSGP allows permittees to document " ... why it was not possible to take samples within the first 30 minutes ..." of discharge from a measurable event for quarterly visual assessments at facilities.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

3.2.2.2
WEF recommends that EPA needs to clarify that the sample is to be collected within 30 minutes of a stormwater discharge, not "assessed.

3.2.2.4

WEF recommends that EPA needs to specify the time to wait after sample collection before visual observations are to be logged. This will affect the amount of settled solids and still floating solids, which makes data more comparable. EPA should specify what quantitative measurements are to be logged. For example, log the depth of settled solids after allowing to rest for 1 hour. Log the diameter and other dimensions of the container. Log the thickness of floating solids after allowing to rest for 1 hour. Log the thickness of any oil and grease observed. Log the thickness and color of any foam observed. Without such quantitative metrics, comparison between samples to determine effectiveness of BMPs or sources of pollutants is not feasible.

3.2.2.5

WEF recommends that EPA define what quantitative measure of the visual assessment sample constitutes "stormwater pollution." In the case of oil and grease, it is likely binary – any sheen or more. In the case of settled solids, it may be less binary and more dependent on the size of the catchment the sample is collected from. In the case of clarity, there is no stormwater runoff, lake water, river water, ocean water, or any natural water source with the clarity of bottled water. EPA should define a quantitative measure of clarity to be used to define "stormwater pollution."

**Comment Response:**

Comment noted regarding recommended language change from "assessment of sample" to "collection of sample" in the 2021 MSGP Part 3.2.2.2. EPA notes that sample collection language is clarified in the 2021 MSGP Fact Sheet Part 3.2.2. and requires that both the collection and assessment be conducted within the first 30 minutes of a discharge.

EPA disagrees with the commenters recommendation that EPA specify a time to wait after sample collection before visual observations are recorded, and that quantifiable metrics be recorded. Visual monitoring and assessment that occurs quickly following discharge provides a useful and inexpensive means for operators to evaluate the effectiveness of their control measures, and it is not intended to further assess the chemical properties of the facility's stormwater discharges. The current visual assessment provides inexpensive and meaningful results upon which the operator may act quickly to reduce pollution. Quantifiable analytical data to better characterize a discharge and further assess the performance of BMPs is provided via indicator monitoring (Part 4.2.1) and benchmark monitoring (Part 4.2.2).

EPA notes that it is not possible to list each and every possible sign of stormwater pollution. A determination of whether there is evidence of stormwater pollution in a discharge is site-specific and depends on many factors (e.g., the nature of industrial activities taking place). Examples of stormwater pollution evidence could include algal growth, a visible oil sheen, and lack of translucence (i.e. diminished clarity) in or near the stormwater drainage area or outfall.

## 3.2.4. Quarterly Visual Assessment of Stormwater Discharges - Exceptions to Quarterly Visual Assessments

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)

**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Permittees should document rainfall events or lack thereof in the SWPPP records. They may find it useful to document the typical amount of rainfall that produces a discharge at their facility as evidence that smaller events may not produce discharges.

**Comment Response:**

EPA acknowledges that operators may find documentation of smaller rainfall events useful, however Part 3.2.2.3 and Part 4.1.3 of the 2021 MSGP have not been revised and only requires documentation of measurable storm events during which the operator conducts monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

As written in Part 3.2.4.3 of the proposed MSGP, operators "must" collect a sample of snowmelt for at least one quarterly visual assessment in areas that receive snow. We suggest changing the phrase in Part 3.2.4.3 from "at least one quarterly visual assessment <u>must</u>" to "the quarterly visual assessment <u>may</u>," to provide flexibility to operators since it may not be feasible to capture snowmelt. Based on Part 4.1.6 of EPA's 2020 MSGP Fact Sheet, it seems that this is EPA's intent where the fact sheet explains that EPA is providing for "alternative" monitoring in areas subject to snow to allow permittees "flexibility to allocate their resources effectively to capture the required number of stormwater discharge events during the permit term."

**Comment Response:**

EPA declines to make a change requested by the commenter. It is important that at least one visual assessment be from snowmelt because the pollutant characteristics of such discharges may differ from stormwater coming from a rain event. For example, snow piles sometimes contain buried trash and other debris that has been picked up through plowing or shoveling and could be discharged in snowmelt. Snow piles also can contain products used for deicing, such as salt, sand, and chemical deicers that could be discharged in snowmelt. For these reasons, snowmelt needs to be assessed to ensure the controls are adequately minimizing pollutants from such discharges. EPA notes that the 2021 MSGP provides for the implementation of alternative monitoring schedules for facilities located in arid and semi-arid climates, or in areas subject to

snow or prolonged freezing. Alternate monitoring schedules allow operators the flexibility to allocate their resources effectively to capture the required number of measurable stormwater discharge events during the permit term (2021 MSGP Part 3.2.4.2, Part 3.2.4.3 and Part 4.1.6).

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

3.2.4.4
WEF recommends that inactive facilities with areas of known surface soil contamination should be periodically monitored.

**Comment Response:**

EPA notes that if the facility discharges to a federal CERCLA Site listed in Appendix P, then the operator must notify the EPA Region 10 Office when submitting an NOI and the regional office must determine that the operator is eligible for permit coverage. EPA notes in Part 6.2.3.3 that significant spills and leaks include, but are not limited to, releases of oil or hazardous substances in excess of quantities that are reportable under CWA section 311 (see 40 CFR 110.6 and 40 CFR 117.21) or section 102 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 USC §9602. This permit does not relieve you of the reporting requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302 relating to spills or other releases of oils or hazardous substances.

## 4.1. Monitoring Procedures

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

22. Sampling

a. Review the sampling procedure for pH and chemicals

b. All samples reported

c. All water non-stormwater and stains on the site.

**Comment Response:**

EPA is uncertain of the comment's specific sampling concerns and therefore cannot respond further.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  42
**Excerpt Status:** Final

**Comment Excerpt:**

## APPENDIX A

**WEF SPECIFIC COMMENT ON OIL & GREASE ANALYSES IN THE 2020 MSGP**
Requiring MSGP permittees to analyze effluent samples for "oil and grease" ("O&G") should not be added without additional consideration. It is far simpler, and more cost-effective, to require a visual check in stormwater samples and discharges. If a visible oil sheen is reported, the agency reviewing the report can require the specific permittee to undertake testing using more detailed methods. Also, the regulatory agency can inspect the specific facility to identify the sources of oil pollution. If a visible oil sheen is not present, potential for environmental harm is very low.

40 CFR 110 addresses discharges of oil regulated under the Clean Water Act (CWA). The criteria used to determine if oil is discharged in quantities that "may be harmful" to water quality are: (1) the discharge causes a violation to water quality standards (many state or territorial WQSs consider a visible oil sheen as a violation); or (2) discharge causes a visible oil sheen on the surface of the water (40 CFR 110.3). Note that specific sampling for "oil and grease" is not required to determine if a discharge contains oil in quantities that may be harmful to water quality. A blanket requirement for "O&G" analyses in stormwater discharges covered by the 2020 MSGP would be more stringent than the requirements set by 40 CFR 110.

EPA method 1664 is presently listed as the only method for "O&G" accepted by 40 CFR 136. The method is like Standard Method 5520. However, significance of results obtained by this method must be noted. The 2017 edition of Standard Methods states that:
"In the determination of oil and grease, an absolute quantity of a specific substance is not measured. Rather, groups of substances with similar physical characteristics are determined quantitatively based on their common solubility in an organic extracting solvent. Thus "Oil and Grease" is defined as any material recovered as a substance soluble in the solvent. It includes other material extracted by the solvent from an acidified sample (such as sulfur compounds,

certain organic dyes, and chlorophyll) and not volatilized during the test." (Standard Method 5520).

WEF's members' experience show that "O&G" measured with the solvent method is often subject to interferences by materials such as vegetative matter, humus, and other substances that may occur in nature.

The various issues with the standard "O&G" test have prompted users and some regulatory agencies to use other methods for determining if harmful amounts of oil are being discharged. Often this is done by using tests for total petroleum hydrocarbons (TPH) that are not listed in 40 CFR 136. Tests adapted from EPA SW-846 have been used for this purpose. These tests are complex, expensive, and require laboratories that can perform chromatographic or spectrophotometric analyses.

Further, collection of samples to be analyzed for "O&G" requires special skills. EPA method 1664 states that only grab samples can be used for "O&G" analyses, because extractable material may adhere to sampling equipment and result in measurements that are biased low. This condition precludes collection of a composite sample in the field, as well as the use of automatic sampling equipment. A grab sample is only representative of the instant when it was collected. To obtain a real picture of the amount of "O&G" present in a discharge, analysis of a few samples collected at prescribed time intervals would be required, with subsequent averaging of the results. In the context of stormwater, these conditions would be more complex.

In summary, WEF recommends that a blanket requirement for "O&G" analyses in stormwater discharges covered by this proposed MSGP is not needed or effective, imposing an undue burden on dischargers. Use of the visible oil sheen criterion of 40 CFR 110 can be an effective alternative.

**Comment Response:**

The 2021 MSGP does not establish any new monitoring requirements for oil and grease. Consistent with the 2015 MSGP, the 2021 MSGP only requires effluent limitations monitoring for Sector D for asphalt emulsion facilities to determine compliance with the applicable effluent limitations.

EPA does not agree with the comment's suggestion to use an alternative method for oil and grease analyses. 40 CFR 122.41(j)(4) requires that "[m]onitoring must be conducted according to test procedures approved under 40 CFR Part 136 unless another method is required under 40 CFR subchapters N or O." As indicated in the comment, EPA has approved EPA Method 1664 (Revisions A and B) and Standard Method 5520B for oil and grease analyses in 40 CFR 136. In accordance with 40 CFR 122.41(j)(4), operators performing effluent limitations monitoring for oil and grease must perform the analysis using these approved methods, in accordance with 40 CFR 122.41(j)(4).

EPA does not agree with the comment that sample collection for oil and grease requires special skills, or that additional samples collected at prescribed time intervals is necessary. Consistent

with the 2015 MSGP, the 2021 MSGP requires a minimum of one grab sample from a discharge resulting from a measurable storm event. Although the 2021 MSGP provides operators with the option to perform composite sampling in-lieu of grab sampling for benchmark monitoring, the 2021 MSGP does not allow for composite sampling for parameters that have a short holding time for processing or that degrade or transform quickly, such as oil and grease. Grab samples collected during the first 30 minutes of a discharge are adequately reflective of the quality of the stormwater discharge such that the operator can determine whether it is necessary to investigate and take corrective action, as necessary, to ensure that stormwater discharges from the facility achieve water quality standards.

### 4.1.1. Monitoring Procedures - Monitored Discharge Points

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Sampling Methods

Discussion/Recommendations

General concerns with analytic sampling of stormwater. May outlets are difficult to sample, either being submerged, a hillside with no actual point of discharge, or comingled with upstream sources.

**Comment Response:**

Part 4.1.1 of the 2021 MSGP requires monitoring to be conducted at each discharge point authorized by the permit, except as otherwise exempt from monitoring as a "substantially identical discharge point." Consistent with 40 CFR 122.41(j)(1), the standard permit condition for monitoring and records at Appendix B, Part B.10 of the 2021 MSGP requires that samples and measurements taken for the purpose of monitoring must be representative of the volume and nature of the monitored activity.

EPA acknowledges the difficulty of selecting representative monitoring locations in certain circumstances. EPA's March 2009 Industrial Stormwater Monitoring and Sampling Guide (EPA 832-B-09-003) provides guidance on where to collect samples. For discharge points that are inaccessible (e.g., underwater discharges or unreachable discharges), the guidance recommends going upstream of the discharge until a sample can be taken (i.e., to the nearest manhole or

inspection point). The guidance also provides recommendations for sampling sheet flow, which could be used for sampling stormwater from a hillside.

Part 4.1.2 of the 2021 MSGP requires that, if any authorized discharges commingle with discharges not authorized under the permit, operators must conduct required sampling of the authorized discharges at a point before they mix with other waste streams, to the extent practicable. This provision is intended to ensure that monitoring results are representative of discharges covered under the permit and not indicative of other discharges from the facility. EPA acknowledges that in certain instances, such as when authorized stormwater discharges are commingled with other waste streams prior to on-site treatment, sampling only authorized stormwater may be difficult. Where stormwater from industrial areas commingles with stormwater discharges from non-industrial areas or areas not regulated under the MSGP before it reaches the surface waterbody or a municipal separate storm sewer system (MS4), EPA's guidance recommends sampling the industrial stormwater discharge before it mixes with stormwater from non-industrial areas.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Sampling Methods

Discussion/Recommendations

Also with the multiple sampling requirements throughout the year, and various limitations on when samples can be taken, staff may feel pressure to "get enough sample" causing them to scrape up water from surfaces, or take from puddles, etc. which are not representative of the actual free flowing stormwater discharge.

**Comment Response:**

EPA acknowledges the concern expressed in the comment regarding sampling staff collecting samples that are not representative of the discharge. However, EPA notes that Part 4.1.3 of the 2021 MSGP requires operators to conduct all required monitoring on a storm event that results in

an actual discharge (i.e., a measurable storm event). Thus, sampling should not be conducted during storm events that do not result in an actual discharge.

Furthermore, the standard permit condition for monitoring and records at Appendix B, Part B.10 of the 2021 MSGP requires that samples and measurements taken for the purpose of monitoring must be representative of the volume and nature of the monitored activity, consistent with 40 CFR 122.41(j)(1). Accordingly, samples that are not representative of the monitored discharge point (e.g., samples scraped up from surfaces or taken from puddles) would be inconsistent with the permit requirements and inappropriate to report.

See also response to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**4.1.1 Monitored Discharge Points.** This section allows monitoring only one of a set of "substantially identical discharge points" ("SIDP") except when a discharge point is "covered by a numeric effluent limit as identified in Part 4.2.2." i.e. Effluent Limitations Monitoring. Section 4.2.1, Benchmark Monitoring, states "The benchmark thresholds are not effluent limitations". MWRA interprets this section to therefore mean, **that monitoring one of the SIDP is sufficient for benchmark monitoring. MWRA recommends explicitly stating this in section 4.1.1 as well.**

**Comment Response:**

EPA agrees that the substantially identical discharge point (SIDP) exemption in Part 4.1.1 of the 2021 MSGP applies to benchmark monitoring; however, EPA does not agree that a revision to the permit is necessary.

The SIDP provision provides facilities that have multiple stormwater discharge points with a means to reduce the number of discharge points that must be sampled and analyzed while still providing monitoring data that are indicative of discharges from each discharge point. This may result in a substantial reduction of resources required for a facility to comply with analytical monitoring requirements, including benchmark monitoring requirements. EPA clarifies in Part 4.1.1 that the allowance for monitoring only one of the SIDPs is not applicable to any discharge point with numeric effluent limitations. Operators must monitor each discharge point covered by a numeric effluent limitation as identified in Part 4.2.3.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Significantly Identical Discharge Points (SIDPs)—This exemption should not be removed for NEL discharge points. The discharger is already certifying that they meet the requirements for SIDPs, so the applicable NEL at the SIDP is sufficiently sensitive to detect if additional BMPs are needed at the facility. This requirement would be an unfeasible burden logistically and financially on facilities with NEL requirements, effectively increasing their sampling burden that could not occur within the required 30-minute timeframe.

**Comment Response:**

EPA disagrees that the SIDP exemption should be allowed for effluent limitations monitoring. EPA clarified in the 2015 MSGP that the allowance for monitoring only one of the SIDPs is not applicable to any discharge points with numeric effluent limitations, and this requirement has been retained in the 2021 MSGP. Monitoring is required at each discharge point with numeric effluent limitations in accordance with 40 CFR 122.44(i)(3), which requires NPDES permits to include conditions to "report monitoring results for storm water discharges associated with industrial activity which are subject to an effluent limitation guideline… on a case-by-case basis with a frequency dependent on the nature and effect of the discharge, but in no case less than once a year." This monitoring is necessary to determine compliance with the applicable effluent limitations.

## 4.1.2. Monitoring Procedures - Commingled Discharges

**Commenter Name:** Daniel Curtin
**Commenter Affiliation:** Crystal Cove Marina
**Document Control Number:** EPA-HQ-OW-2019-0372-0106-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, the MSGP does not address the complexities caused by stormwater from private facilities mixing with municipal stormwater basins, and where the responsibility lies for testing. At our facility, our run off goes (via an underground pipe) into a basin that collects both our facility's stormwater and the town's storm water. This shared basin floods our sample area 2-3 times a year, which results in our runoff (and accompanying test results) being very much influenced by flooding activity that has nothing to do with our 'industrial' operations. Our facility has made huge investments in clean infrastructure - we have replaced our entire rip-rap, eliminated one of the only two run off areas in our facility, and installed a state-of-the-art boat-

washing facility whereby we can catch and properly dispose of all contaminants which would otherwise have washed into our basin. Yet, despite all these costly environmental improvements, we are still required to pay for quarterly stormwater testing while the Town and EPA make no concessions.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0154-A2, Comment Excerpt Number 12.

## 4.1.3. Monitoring Procedures - Measurable Storm Events

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 4.1.3 Measurable Storm Events:***

This Part indicates the time (in days) since the previous measurable storm event must be identified. In light of the NODI reporting requirements, please provide information to the permittees as to why this is still required.

*Recommendation:*
Delete the requirement to track the time (in days) since the previous measurable storm event.

**Comment Response:**

EPA does not agree with recommendation to delete the requirement to track the time (in days) since the previous measurable storm event. Part 4.1.3 requires that operators collect samples from the discharge resulting from a storm event that occurs at least 72 hours (3 days) after a previous measurable storm event. The 72-hour (3-day) period is included in an attempt to eliminate monitoring discharges soon after a previous storm event washed away residual pollutants; operators may waive this requirement where they document that less than a 72-hour (3-day) interval is representative for local storm events during the season when sampling is being conducted. Documentation of the time (in days) since the previous measurable storm event is required to demonstrate consistency with this requirement. The no discharge indicator (NODI) codes reported in NetDMR would not provide relevant information to determine when the last measurable storm event occurred prior to the actual sampling event.

## 4.1.4. Monitoring Procedures - Sample Type

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council

**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Both the 2015 MSGP and the proposed 2020 MSGP require quarterly sampling of runoff. Most of the wood products industry operates on a single shift, 5-day work schedule in rural areas where staff do not live close to the facility. In all areas of the country, and particularly in the arid regions, facilities report difficulty in being able to obtain samples from a qualifying rainfall event quarterly, or four times a year. The proposed rule states that samples must be initiated during the first 30 minutes of the same storm event. If it is not possible to initiate sampling within the first 30 minutes of a measurable storm event, the permittee is required to initiate sampling as soon as possible after the first 30 minutes and keep documentation explaining why it was not possible to initiate sampling within the first 30 minutes.

Therefore, facilities must have qualifying rainfall events that start during normal working hours in order for personnel to be available to collect samples. The TWC requests that the sampling frequency be changed to an annual basis, which would allow the industry to more easily comply with the permit terms without disruption to employees' time away from work. The present requirements put many facilities in a position of continual non-compliance. The TWC requests that the USEPA allow samples to be taken later in the runoff period of rainfall frequency or duration, if required by operational or sampling limitations.

**Comment Response:**

EPA notes the timing issues noted in the comment with quarterly benchmark monitoring. EPA declines to specify when a sampling event must take place (e.g., within normal business hours). General permits are flexible, so operators may determine when it is best to monitor within a given quarter, as long as the overall schedule is met. Accurate and easily accessible weather forecasting is a great aid in preparing for monitoring. Because of the infrequency of benchmark monitoring (quarterly), EPA expects that operators will be able to comply with the requirement during normal business hours. EPA points out that there are many sources of weather forecast information available to operators so that adequate preparation for monitoring storm events, whether during business hours or not, can be completed.

For operators located in areas where limited rainfall occurs during parts of the year (e.g., arid or semi-arid climates) or in areas where freezing conditions exist that prevent discharges from occurring for extended periods, the permit allows operators to distribute their required monitoring events during seasons when precipitation occurs. See Comment Response Essay 2 Monitoring for additional discussion of monitoring requirements for facilities in climates with irregular stormwater discharges.

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Most of our rainfall events occur during the summer monsoon season in the evening hours after staff leaves for the day. Our facilities are spread throughout the City, often near the outskirts. It is impossible to collect grab samples from all of the facilities within the first 30 minutes of discharge even if local contractors are utilized to assist. Use of automated samplers may be the only viable means of collecting samples. However, as pointed out in the statement above, some parameters that degrade quickly may not yield reliable results. What then is the preferred option? Risk no sample if unable to obtain a grab sample or forego sampling for parameters that degrade quickly and collect composite samples via automated samplers that are costly to install and maintain?

**Comment Response:**

EPA acknowledges the difficulty some operators face in meeting their monitoring requirements due to factors such as rainfall patterns, facility size, and number of discharge points; however, EPA notes that the 2021 MSGP provides operators with flexibilities to address these concerns. First, if it is not possible to collect the sample within the first 30 minutes of a measurable storm event, Part 4.1.4 of the 2021 MSGP requires operators to collect the sample as soon as possible after the first 30 minutes and keep documentation with the Stormwater Pollution Prevention Plan (SWPPP) explaining why it was not possible to take samples within the first 30 minutes. Second, Part 4.1.1 of the 2021 MSGP allows operators with two or more discharge points with SIDPs to monitor the stormwater effluent of just one of the discharge points. Third, for operators located in areas where limited rainfall occurs during particular parts of the year (e.g., arid or semi-arid climates) or in areas where freezing conditions exist that prevent discharges from occurring for extended periods, the permit allows operators to distribute their required monitoring events during seasons when precipitation occurs. See Comment Response Essay 2 Monitoring for additional discussion of monitoring requirements for facilities in climates with irregular stormwater discharges.

In Part 4.1.4 of the 2021 MSGP, EPA has also added an explicit clarification that composite sampling is allowed for indicator monitoring and benchmark monitoring in lieu of grab samples. The composite sampling may be performed manually or with the use of automated sampling equipment. Automated samplers can collect either flow-weighted or time-weighted composites. Using automated samplers can eliminate the need for a person to physically collect samples, which can be helpful if a storm happens outside of normal business hours. These samplers can lower labor costs and mitigate any safety concerns although they require maintenance which would not otherwise be needed if done manually. Operators may also find that portable

electronic meters, sensors, and data loggers used in the field can be a cost-effective way to monitor many types of parameters like turbidity, conductivity, temperature, dissolved oxygen, and pH in-situ. Where such in-situ measurements are taken, the composite sampling methodology shall be modified by calculating an average of all individual measurements, weighted by flow volume if applicable.

Regarding the requirement to sample during business hours, see response to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that EPA provide flexibility within the MSGP permit to allow reasonable stormwater outfall sampling requirements based on the site-specific circumstances at each facility with respect to the sampling frequency and numbers of stormwater outfalls to be sampled.*

Section 4.1.4 of the proposed MGSP would require stormwater samples to be collected "within the first 30 minutes of a discharge associated with a measurable storm event." Under the proposed MGSP, this would apply to all stormwater outfalls regulated by the permit. There are iron and steel mills that have more than 40 stormwater outfalls. Many other iron and steel facilities have several outfalls that are located across large sites. It is not possible to sample all outfalls in the proposed MSGP timeframe. It would also be difficult and costly to sample more than 40 outfalls during a quarter. Consideration should be given to allow selective sampling of "substantially identical or representative" outfalls during a sampling period to lessen the burden. Furthermore, requiring quarterly sampling is excessive, and the permit should allow for less frequent sampling if outfalls are below benchmarks for several sampling events.

**Comment Response:**

Regarding the requirement to collect samples within the first 30 minutes for operators with numerous outfalls, see response to DCN EPA-HQ-OW-2019-0372-0159-A1, Comment Excerpt Number 3.

Regarding the quarterly sampling frequency for benchmark monitoring, see Comment Response Essay 1 Monitoring.

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA provide flexibility within the MSGP permit to allow reasonable stormwater outfall sampling requirements based on the site-specific circumstances at each facility with respect to the sampling frequency and numbers of stormwater outfalls to be sampled.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0159-A1, Comment Excerpt Number 3.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should eliminate the requirement that samples be collected in the first thirty minutes of a discharge.

...

4.1.4 Sample Type. This section requires collection of samples within the first thirty minutes of discharge; otherwise the reason for not doing so must be documented. In MWRA's experience, this can be very challenging when the facility encompasses a wide area with many outfalls (discharge points). In order to sample all the outfalls – or even to sample one in each group of substantially identical discharge points - sampling multiple storms may be required in each quarter. Adding universal benchmark testing will complicate this still further, because sampled storms must generate enough flow to conduct chemical analysis as well as visual inspection. Visual inspection requires only a minimal volume in the sample collection tube. To collect enough volume to measure pH, total suspended solids, and chemical oxygen demand will require dropping the sampling tube into the catch basin multiple times, which is time-consuming. Furthermore, pH testing must be completed within 15 minutes of sample collection (40 CFR

136) and thus in practice the sampler will have to complete the field test before moving on to the next discharge point. Thus, it will be possible to sample only two or three outfalls within the 30-minute window. A highly automated, modern wastewater treatment plant operates with few staff relative to its acreage. In Sector T, managing wastewater during large storms requires considerable additional work for collections and treatment staff, so deploying additional stormwater sampling staff is impractical. EPA should eliminate the requirement that samples be collected in the first thirty minutes of a discharge.

The 2020 draft permit allows flow- or time-weighted composite samples for benchmark monitoring, but also continues to allow grab samples. Composite samples (especially flow-weighted) are impractical for stormwater sampling. Collecting flow-weighted composite samples requires specialized equipment and staff and may not be possible at all discharge points. Specifically, the configuration of the discharge structure may make it physically impossible to install a composite sampler, or if the manhole is located on public property adjacent to the industrial facility it would be vulnerable to vandalism. The NAS report recognizes that composite sampling is not always possible, and recommends that it be encouraged but not required; the draft permit reflects this.

**Comment Response:**

EPA does not agree with the comment's suggestion to eliminate the requirement to collect samples within the first 30 minutes of a discharge. See response to DCN EPA-HQ-OW-2019-0372-0159-A1, Comment Excerpt Number 3.

EPA acknowledges the comment's support for the revision to allow for composite sampling. See comment response to DCN EPA-HQ-OW-2019-0372-0159-A1, excerpt number 3.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

Sampling time—30 minutes is not representative of the discharge from industrial activities at the site, as it is a "first flush" that includes environmental accumulations, see California rationale for 4-hour window.

**Comment Response:**

EPA does not agree that samples collected within the first 30 minutes of a discharge are not representative of discharges from industrial activities. It is important that permittees take a sample towards the beginning of the storm event in order to account for first flush effects, since

this is when discharges tend to be more concentrated and are times when receiving stream flows are the lowest, and thus potential effects to receiving waters are higher. Accordingly, the permit continues to require samples to be taken within the first 30 minutes of a discharge associated with a measurable storm event.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Composite sampling and timeframe for sampling need definition.

Discussion/Recommendations

We should support the use of composite sampling. A definition for composite sampling (both flow and time weighted) should be provided in the definition list, and the minimum number of aliquots defined (e.g., four).

As specified in several state general stormwater permits, storm samples should only be required during normal business hours and when environmental staff is on site. It is both unsafe and introduces a potential source of error when nighttime sampling is required and other personnel (such as security guards on-site) must be used to collect samples.

**Comment Response:**

EPA acknowledges the comment's support for the revision to allow for composite sampling. EPA has revised Part 4.1.4 of the 2021 MSGP to clarify that the composite method may be either flow-weighted or time-weighted and performed manually or with the use of automation equipment. For the purposes of the permit, a flow-weighted composite sample means a composite sample consisting of a mixture of aliquots collected at a constant or variable time interval, where the volume of each aliquot included in the composite sample is proportional to the estimated or measured incremental discharge volume at the time of the aliquot collection compared to the total discharge volume estimated or measured over the monitoring event flow rate of discharge. A time-weighted composite sample means a composite sample consisting of a mixture of equal volume aliquots collected at a regular defined time interval over a specific period of time. For parameters measured in-situ with a probe or meter such as dissolved oxygen,

conductivity, pH, or temperature, the composite sampling method shall be modified by calculating an average all individual measurements, weighted by flow volume if applicable.

Regarding the concerns for monitoring during normal business hours, see response to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7.

---

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**3. AAAE supports EPA's proposal to provide airports with the option of using composite sampling to comply with benchmark monitoring requirements.**

AAAE supports EPA's proposal in Part 4.1.4 to allow airports to use the composite sampling method instead of taking grab samples in order to comply with both universal and sector-specific benchmark monitoring requirements. Most airports believe that utilizing composite sampling techniques would provide more reliable and consistent data on pollutant concentration compared to grab samples. This option would provide flexibility for airports by allowing them to collect more representative samples in an economical manner and help prevent unnecessary benchmark exceedances. The proposal was also a recommendation made by the NRC Study, which endorsed the composite sampling option. (NRC Study, at 5, 64.) AAAE acknowledges and agrees that composite sampling would and should only be available for monitoring pollutants that are unaffected by storage time. AAAE also supports making this method optional, not mandatory, providing flexibility for airports who may want to take grab samples.

**Comment Response:**

EPA acknowledges the comment's support for the revision to allow for composite sampling.

---

**Commenter Name:**  Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:**  Utility Water Act Group (UWAG)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

**VII. UWAG Supports Optional Composite Sampling**

EPA proposes to allow – but not require – facilities to use composite sampling for benchmark monitoring. While some UWAG members currently utilize composite sampling, others have noted that implementing this form of sampling would require additional equipment, staff, and training. UWAG believes that EPA's proposed approach will provide facilities the flexibility to decide which sampling option best suits their needs.

**Comment Response:**

EPA acknowledges the comment's support for the revision to allow for composite sampling. See comment response to DCN EPA-HQ-OW-2019-0372-0159-A1, Excerpt Number 3.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations for Composite Sampling Definition and Timeframe (Part 4.1.4)**

Although EPA has not requested comment on this issue specifically, the FWQC and FSWA support the use of composite sampling. The definition list in Part 4.1.4 should provide for composite sampling (both flow and time weighted) and specify the minimum number of aliquots defined (e.g., four). As with several state general stormwater permits, stormwater samples should only be required during normal business hours, under safe weather conditions, and when environmental staff is on site. Requiring nighttime sampling or sampling during extreme weather is both unsafe and introduces a potential source of error, especially when other personnel (such as security guards on-site) must be used to collect samples.

**Comment Response:**

EPA acknowledges the comment's support for the revision to allow for composite sampling. See comment response to DCN EPA-HQ-OW-2019-0372-0159-A1, Excerpt Number 3.

Regarding the comment's suggested permit clarifications, see response to DCN EPA-HQ-OW-2019-0372-0154-A2, Comment Excerpt Number 15.

Regarding the comment's concern that sampling during extreme weather is both unsafe and introduces a potential source of error, EPA notes that Parts 3.2.4.1 and 4.1.5 of the 2021 MSGP address sampling during adverse weather conditions. When adverse weather conditions prevent the collection of samples during a quarter, the 2021 MSGP requires operators to take a substitute sample during the next qualifying storm event. Adverse conditions are those that are dangerous or create inaccessibility for personnel, such as local flooding, high winds, electrical storms, or situations that otherwise make sampling impractical, such as extended frozen conditions.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

Composite sampling for benchmark monitoring. (Proposed MSGP 4.1.4). AEMA supports allowing use of composite sampling for benchmark monitoring recognizing that composite sampling is not appropriate for parameters that have a short holding time, i.e., the three parameters proposed for universal benchmark monitoring (TSS, pH and COD) and for chromium.

**Comment Response:**

EPA acknowledges the comment's support for the revision to allow for composite sampling. See comment response to DCN EPA-HQ-OW-2019-0372-0159-A1, Excerpt Number 3.

Part 4.1.4 of the proposed 2020 MSGP stated that, "Composite sampling may not be used to measure parameters that have a short holding time for processing or that degrade or transform quickly such as pH, temperature, oil and grease (O&G), and chromium." In the 2021 MSGP, EPA has replaced this statement with the following: "Composite sampling may not be used in situations where hold times for processing or sample preservation requirements cannot be satisfied. For parameters measured in-situ with a probe or meter such as dissolved oxygen, conductivity, pH, or temperature, the composite sampling method shall be modified by calculating an average all individual measurements, weighted by flow volume if applicable." This change provides flexibility for operators to use the composite sampling method for parameters measured in-situ.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0084

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Composite Sampling:
Once again, it appears the proponents think that every permittee is operating a factory where these activities are easy and routine. Not so. And nearly every sampling event includes both short and long holding time samples. So permittees would be asked to coordinate sample collection, processing, shipping, and reporting over multiple timelines for ONE sample event. Unreasonable and unnecessary.

**Comment Response:**

EPA does not agree that the revision to allow composite sampling is unreasonable and unnecessary and notes that use of composite sampling in lieu of grab sampling for indicator monitoring and benchmark monitoring is an option and not required. Part 4.1.4 of the 2021 MSGP specifies that operators must take a minimum of one grab sample, or alternatively a composite sample, from the measurable storm event being monitored. EPA emphasizes that the 2021 MSGP does not require composite sampling; rather, the 2021 MSGP allows operators to use composite sampling as an alternative to grab sampling for indicator monitoring and benchmark monitoring, as the NRC study recommended. Composite samples can provide a more comprehensive characterization of the facility's discharge than grab samples but can be costlier in some ways. EPA had allowed facilities to use composite sampling in previous versions of the MSGP, but in the 2021 MSGP, EPA is explicitly allowing composite sampling, except where hold times for processing or sample preservation requirements cannot be satisfied.

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Part 4.1.4, Sample Type - DOEE does not support the use of composite samples. Composite samples minimize the potential effects of acute concentrations from first flush on aquatic life.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.1.5. Monitoring Procedures - Adverse Weather Conditions

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Many of our storm events occur in the evening hours and weekends when hold times for necessary collection parameters cannot be met. In addition, some remote locations do not allow for safe collection after dark or are manned by contracted security personnel not trained to collect samples. We would like to request a similar exemption for events that occur outside of normal working hours.

**Comment Response:**

See responses to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7 and DCN EPA-HQ-OW-2019-0372-0245-A1, Comment Excerpt Number 27.

## 4.1.6. Monitoring Procedures - Climates Where Limited Rainfall Occurs During Parts of the Year or Freezing Conditions Exist that Prevent Discharges

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Implementation of the philosophy should provide a higher quality assessment of the discharge over time.

**Comment Response:**

EPA acknowledges the comment's support for the monitoring procedures for facilities in climates with irregular stormwater discharges. This has been retained in Part 4 of the 2021 MSGP.

---

**Commenter Name:** Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:** GZA GeoEnvironmental, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0171-A1

**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

For certain facilities, discharge may not occur during a quarter due to a lack of intensity/rainfall to generate discharge. For a facility that does not experience observable discharge during reasonable sampling times (*e.g.*, during business hours, during a qualifying event), which NODI Code should be selected, and would that facility be required to collect a substitute (makeup) sample (Section 4.1.5 of MSGP)?

**Comment Response:**

Part 4.1.6 of the 2021 MSGP allows operators in climates with irregular stormwater discharges to distribute the required monitoring events during seasons when precipitation occurs, or when snowmelt results in a measurable discharge from the facility. Per Part 4.1.7, these operators may define alternate monitoring periods, provided that the operator keep documentation of the revised schedule with the Stormwater Pollution Prevention Plan (SWPPP).

As discussed in response to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7, EPA declines to specify when a sampling event must take place (e.g., within normal business hours). Unless the operator has established alternate monitoring periods under Part 4.1.7, EPA expects monitoring to be conducted during any applicable monitoring period in which a measurable storm event has occurred. Failure to conduct monitoring during an applicable monitoring period in which a measurable storm event occurs constitutes a violation of the permit requirements. If an operator chooses not to sample a measurable storm event because it occurs outside normal business hours, the operator should plan to collect a sample from a subsequent measurable storm event prior to the end of the monitoring period.

If a measurable storm event does not occur during the monitoring period, the operator should report No Data Indicator (NODI) Code C (No Discharge), which does not constitute a violation. If a measurable storm event occurs during the monitoring period and the operator fails to perform the required sampling, the operator should report NODI Code E (Failed to Sample/Required Analysis Not Conducted), which constitutes a violation.

---

**Commenter Name:** Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:** GZA GeoEnvironmental, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0171-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

With respect to Section 4.1.6, for those facilities located in areas with irregular precipitation events over the course of a year (e.g., 48 hours between qualifying events versus 72 hours is normal for certain parts of the year), please provide additional description of the types of documentation a facility should maintain to demonstrate that this condition occurs and how the samples can be redistributed to meet the requirements of the permit.

**Comment Response:**

The comment refers to Part 4.1.6, which pertains to facilities in climates with irregular stormwater discharges. This part is intended to address facilities located in areas where limited rainfall occurs during parts of the year (e.g., arid or semi-arid climates) or in areas where freezing conditions exist that prevent discharges from occurring for extended periods.

Part 4.1.3 of the 2021 MSGP requires operators to conduct all required monitoring on measurable storm event that follows the preceding measurable storm event by at least 72 hours (3 days). However, the 72-hour (3-day) storm interval does not apply if the operator is able to document that less than a 72-hour (3-day) interval is representative for local storm events during the sampling period. EPA does not specify the specific types of information needed to make such a demonstration. Examples of acceptable documentation include precipitation data from the National Oceanic and Atmospheric Administration (NOAA) or rainfall tracking information (e.g., dates and amount of rainfall) recorded and maintained at the facility.

## 4.2. Required Monitoring

**Commenter Name:** Randall M. Lyons
**Commenter Affiliation:** Massachusetts Marine Trades Association (MMTA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Similarly, just as agricultural stormwater discharges are not considered "point sources" under the Clean Water Act, we do not believe stormwater flow over gravel and parking lots (the bulk land area for most of our members' facilities) should be subject to NPDES permitting and required stormwater monitoring. We have heard countless complaints from members about the futility of stormwater monitoring both in respect to the difficulties of getting a sample 'grab' from an undefined non-existent "outfall" and from the test results which show the same numbers every time despite best management practices. Those complaints are in addition the standard complaint we hear from members about the expense of quarterly testing (lab fees, transport fees, etc.). Regional guidance has been literally to form a cone from a piece of paper or plastic to attempt to capture overland flow of rainwater. This is NOT a "point source" under the statute and should not be under the MSGP program.

**Comment Response:**

The Clean Water Act specifically excludes agricultural runoff as a point source discharge. Federal regulations at 40 CFR 122.26(b)(14)(i)-(xi) require stormwater discharges associated with specific categories of industrial activity to be covered under NPDES permits (unless otherwise excluded). The definition of "stormwater discharges associated with industrial activity" in Appendix A of the 2021 MSGP states, in part, "The term excludes areas located on plant lands separate from the plant's industrial activities, such as office buildings and accompanying parking lots as long as the drainage from the excluded areas is not mixed with stormwater drained from the above described [manufacturing, processing, or raw materials storage] areas."

Regarding the comment's concern with sampling overland flow, EPA notes that EPA's Industrial Stormwater Monitoring and Sampling Guide (EPA 832-B-09-003) includes guidance for sampling sheet flow.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

NSSGA recommends that EPA consider the many problems with analytical monitoring and develop other methods for facilities that have demonstrated a clear pattern of compliance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Although the coalition opposes all analytical monitoring, the coalition members have joined together to support the alternative approach in EPA's proposal to exclude "low-risk" facilities from analytical monitoring and to oppose the imposition of additional monitoring requirements on any facilities, especially coalition member facilities.

EPA has proposed imposing monitoring and corrective measures for many facilities that have been successfully implementing stormwater control programs for decades without analytical monitoring and do not pose a threat to water quality. In most instances, industry data that reflect Coalition member industrial activities demonstrate concentration levels well below EPA benchmarks.

With the release of the 1995 MSGP, it took years for facilities to train employees and implement the complex procedures to successfully obtain grab samples in the first thirty minutes of storm events, handle samples and lab submissions, and analyze data. The Agency proposal would roughly double the number of current monitoring facilities. Under the proposal, tens of thousands of new facilities would face this challenge at great cost.[2]

[2] The Coalition is estimating the number of facilities that could be subject to this new requirement under both Federal and state permit requirements, since the federal MSGP serves as the model for states. According to EPA, 37 states have adopted requirements from the Federal MSGP. US EPA MSGP slide presentation, Emily Halter, March 2020; Other commenters will address that monitoring costs are well more than EPA's $100 estimate per sample for all three universal benchmarks. These costs are not inconsequential for small firms.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

EPA proposed adding PFAS as a toxic chemical to the Emergency Planning and Community Right-to-Know Act. PFAS monitoring should be implemented for facilities under sectors under the NAICS codes listed (https://www.federalregister.gov/documents/2019/12/04/2019-26034/addition-of-certain-per--and-polyfluoroalkyl-substances-community-right-to-know-toxic-chemical).

**Comment Response:**

There are currently no promulgated analytical methods for per and poly-fluoroalkyl substances (PFAS) compounds in 40 CFR Part 136. At such time as methods for PFAS compounds are promulgated, EPA may include PFAS monitoring if identified as pollutants of concern. To

recognize that industrial facilities can conduct activities that use, store, manufacture, transfer, and/or dispose of PFAS-containing materials and in alignment with EPA's "Interim Strategy for Per- and Polyfluoroalkyl Substances in Federally Issued National Pollutant Discharge Elimination System Permits: Recommendations from the PFAS NPDES Regional Coordinators Committee," EPA revised each of the sector-specific fact sheet guidance documents to include practices that could be used by operators to minimize PFAS in stormwater discharges.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

*e. Benchmark monitoring summary*

Broadly speaking, the need for more industrial stormwater monitoring data is plain. If EPA were to simply require quarterly benchmark monitoring for all benchmark parameters, including sector-specific parameters, it would address all of the concerns raised by the NAS – it would produce more data overall, it would address the need for data over the course of the permit term, it would address the need for more data for sectors with high coefficients of variation, and it would begin to create the foundation for the development of numeric effluent limitations – all at a minimal additional cost to permittees. Uniform quarterly benchmark monitoring is EPA's only reasonable policy choice. Additionally, EPA should require quarterly benchmark monitoring where stormwater discharges are subject to specific ELGs or occur in impaired waters, the latter for particular pollutant stressors. EPA must require quarterly benchmark monitoring throughout the permit term for all benchmark parameters, including both universal and sector-specific parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1. Required Monitoring - Benchmark Monitoring

**Commenter Name:** Daniel Curtin
**Commenter Affiliation:** Crystal Cove Marina
**Document Control Number:** EPA-HQ-OW-2019-0372-0106-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP, like the current MSGP, imposes incredibly stringent and technical testing requirements for marinas.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:**  Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

For the past several years, CDA and IZA have been engaged with USEPA in an effort to harmonize scientific methods across the Office of Water; current methods applied for metals create inconsistencies between stormwater benchmarks (Office of Wastewater Management) and ambient water quality criteria (Office of Science and Technology). Formal input has been provided through public comment on the draft MSGP (2013), an established Cooperative Research and Development Agreement (CRADA) with USEPA (since 2018), contributions to National Academies of Sciences (NAS) sub-committee on "Improving the Next- Generation EPA Multi-Sector General Permit for Industrial Stormwater Discharges" (2018), and face to face meetings with Office of Wastewater Management (2017/2018). We have also engaged the Office of Management (OMB) on these matters (2019).

In view of this engagement, we were encouraged at the steps USEPA has proposed but believe more needs to be done. To that point, we were pleased that the Agency specifically requested "comments on whether the benchmark should change in the 2020 MSGP to allow facilities that repeatedly exceed the copper benchmark to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis." We hope that these comments along with all of our previous engagement with the Agency and the NAS are useful to that request.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR

**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

BES believes that four samples are not enough to verify that the facility is achieving benchmark pollutants and recommends that at least eight samples are collected for verification. BES recommends that the following underlined text replace the strike-through text in Section 4.2.1.2(b): "For all sector-specific benchmark monitoring parameters, you must conduct quarterly benchmark monitoring, as identified in Part 6. 1. 7, for your first eight four full quarters of permit coverage commencing no earlier than [date 90 days after permit effective date]. If the geometric mean of the first eight samples annual average for any parameter does not exceed the benchmark threshold, you have fulfilled your benchmark monitoring requirements for that parameter for the permit term and can discontinue benchmark monitoring for that parameter."

Additional samples will ensure site conditions and controls are appropriately evaluated. If EPA retains the four-sample requirement in the permit, BES recommends that at least one sample per year be required to demonstrate the benchmarks are being achieved.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the TSS benchmark of 100 mg/L be lowered to be protective of the environment. It is BES's experience that a sample with a TSS of 100 mg/L will appear turbid. Schedule 3.2 requires visual assessment of stormwater discharges to include color and suspended solids and requires corrective actions if the assessment is positive. It is BES's opinion that a TSS benchmark of 100 mg/L conflicts with the visual assessment language.

**Comment Response:**

EPA does not agree that the TSS benchmark should be lowered from the current benchmark of 100 mg/L, which has been retained from the 2015 MSGP and is based on the National Urban Runoff Program (NURP) median concentration.

**Commenter Name:** Randall M. Lyons
**Commenter Affiliation:** Massachusetts Marine Trades Association (MMTA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Next, we do not support the current benchmark monitoring figures themselves. We believe that the MSGP's benchmark monitoring concentrations are closer to drinking water standards than normal stormwater runoff standards. Because of these excessive benchmark concentrations, the marine trades industry is forced to continue stormwater testing which aims for value reductions the industry cannot possibly meet because stormwater itself doesn't meet the benchmarks. For the proposed permit to build a new action plan requirement upon these irrational figures (Part 5.2) just makes the imbalance worse.

Moreover, it is unfair for the proposed AIM action plan to impose a 'red light' for concentrations that exceed benchmarks without also having a 'green light' for concentrations which are well below the benchmark. Wouldn't it be more beneficial to regulated facilities and the environment where progress is rewarded rather than just continually observed? We recommend that, in addition to reassessing whether the current benchmark concentrations need to be at such low levels, the 2020 MSGP incorporate some type of sliding scale system where once repeat samples demonstrate the "background" levels using best management practice, it is only necessary to test annually to reconfirm, not quarterly, or to get a waiver to stop testing for that constituent.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

Is the pH test to be done in the field or at a laboratory? EPA needs to include that instruction in the permit.

**Comment Response:**

All indicator and benchmark monitoring, whether collected via grab samples or composite samples, must be analyzed consistent with 40 CFR Part 136 analytical methods which designate maximum hold times and the appropriate analytical method for each parameter.

---

**Commenter Name:** Brian Miller
**Commenter Affiliation:** V&S Amboy Galvanizing LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0144-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We recognize that the United States Environmental Protection Agency (USEPA), by requesting comment on use of bioavailability-based approaches for stormwater monitoring benchmarks for copper, is open to considering sophisticated approaches for establishing benchmarks. However, the proposed 2020 MSGP does not sufficiently make use of such approaches. With this update, the USEPA has an opportunity to appropriately incorporate bioavailability-based approaches in the MSGP benchmarks for metals. We are aware of bioavailability-based nationally recommended water quality criteria (WQC) for copper and aluminum, and strongly support their use for directly establishing stormwater monitoring benchmarks. Additionally, we are aware of ongoing efforts through the cooperative research and development agreement (CRADA) between several metals associations and USEPA to identify a modeling approach that will be used for efficient development and implementation of bioavailability-based WQC for a number of metals. Therefore, we anticipate the development and release of bioavailability-based WQC for zinc and other metals in the near future. As such, recognition of how those developments will inevitably be incorporated into the MSGP is necessary in this update.

If bioavailability-based approaches are not used to derive national stormwater monitoring benchmarks, then sufficient flexibility should be provided such that facilities can work with the USEPA to use state-of-the-science bioavailability-based tools to develop site-specific solutions. This could be done by providing an alternative option to use bioavailability-based WQC as benchmarks for facilities exceeding the national benchmark. However, this should be applicable to any metal that has (or will have) a corresponding bioavailability-based WQC (i.e., should not be applicable to copper only). An additional option would be to extend the Additional Implementation Measures (AIM) Tier 3 exception regarding water quality standards to AIM Tiers 1 and 2. Either approach would provide flexibility to facility operators while also allowing use of USEPA's tools to more accurately characterize potential environmental risks from industrial stormwater. Application of better tools will ultimately help with proper allocation of resources (on the part of industry, states, and the Federal Government) to address real rather than perceived environmental problems.

Overall, we strongly urge the USEPA to use bioavailability-based approaches for metals as stormwater monitoring benchmarks. If these approaches are not used directly as national benchmarks, USEPA should consider allowing their use to more accurately characterize potential

environmental risks at facilities with repeated benchmark exceedances. We appreciate this opportunity to provide comments on the proposed 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Virginia supports updating the MSGP benchmarks to reflect current standards and data.

**Comment Response:**

EPA acknowledges the comment's support for updating the benchmarks in the 2021 MSGP. See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Joshua Wheatley
**Commenter Affiliation:**  James Environmental Management (JEM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

When the Agency writes sentences such as "You must comply with Part 5.2 (Additional Implementation Measures), it is a strong indication that the Agency has already made up its mind, without any input from the regulated community. The entire AIM philosophy seems to be written with disregard for the negative impact this philosophy will have on overall water quality.

**Comment Response:**

No change to the wording is required. The "you must comply with" text in the Proposed 2020 MSGP was proposed as permit text that could be finalized and does not indicate that a decision was made prior to receiving and considering public comments. EPA notes that it solicited public comments on the proposed 2020 MSGP and has revised the AIM requirements in the 2021

MSGP upon consideration of the public comments. See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that the monitoring frequency for universal benchmark and sector-specific benchmark monitoring be revised from quarterly to semiannual monitoring, once in the period January 1 to June 30 and once in the period July 1 to December 31 each year. We believe that semiannual benchmark monitoring coupled with quarterly visual assessments and quarterly routine inspections will provide timely indicators of water quality and will simplify the monitoring requirements for facilities while maintaining protection of water quality. This modified frequency will reduce the cost burden on permittees, especially important to smaller facilities, and allow facilities additional time to evaluate and implement new or revised stormwater control measures (SCMs) that may be indicated before the next sampling event. For facilities located in areas with irregular rainfall, this will increase the likelihood they will be able to conduct monitoring in each specified monitoring period and reduce the need to devise a modified schedule, report the schedule to the EPA Region office, and prepare DMRs for periods in which no qualified discharges occurred.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**Additional Comment: Clarify when sector-specific benchmark monitoring may be discontinued if the annual average is below the benchmark.**

Section 4.2.1.2.b states that if the annual average for any sector-specific parameter does not exceed the benchmark threshold during the first four quarters of permit coverage, then sector-

specific benchmark monitoring may be discontinued. If a benchmark exceedance does occur during the first four quarters, please clarify whether sector-specific benchmark monitoring may be discontinued if no exceedance occurs in a subsequent four quarters of permit coverage.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jeffrey T. Miller
**Commenter Affiliation:**  Treated Wood Council
**Document Control Number:**  EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed 2020 MSGP requires benchmark monitoring parameters that are both universal (applicable to all sectors) and sector-specific. According to the proposed 2020 MSGP, benchmark monitoring data are primarily for the facility's use to determine the overall effectiveness of control measures and to assist in determining when additional action(s) may be necessary to comply with effluent limitations.

The USEPA describes the use of benchmark values as a means for facilities to assess the effectiveness of their stormwater control measures; however, many benchmark values (especially those for metals) are based on aquatic life criteria. Aquatic life criteria are derived from laboratory testing used to determine the effects of pollutants on insects and fish, and there is no correlation to stormwater control measures. The proposed 2020 MSGP indicates benchmark values are technology-based and stormwater control measures should be used that are technologically available and economically practicable and achievable in light of best industry practice. The USEPA provides no data as part of the MSGP that show whether current benchmark values are technologically available and economically practicable and achievable in light of best industry practice. The current benchmark values do not achieve the goal of providing data on the effectiveness of stormwater control measures at a permitted facility; however, they are used by regulators as a means of assessing the effectiveness of these controls.

The benchmark values should be established based on a reasonably conservative estimate of in-stream concentrations. Typical industrial process wastewater effluent limitations are established based on the use of extreme low-flow stream conditions because the industry is expected to have a constant discharge independent of receiving stream flow. However, when storm water runoff occurs from an industrial site, the receiving stream flow is higher than normal due to runoff from other areas of the drainage basin, and in-stream concentrations associated with an individual industrial facility would be quite low due to the high flow in the receiving stream diluting in-stream concentrations. The USEPA has previously used a generic dilution and attenuation factor (DAF) to account for similar circumstances. TWC recommends the use of a DAF of 100, which

would still be a conservative value. The TWC requests that if the USEPA is going to use water quality criteria to derive benchmark values, that a reasonable DAF such as 100 be employed in their development.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council
**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Part 8 of the proposed 2020 MSGP establishes benchmark parameters as total recoverable zinc, total recoverable arsenic, and total recoverable copper.

The current benchmarks for arsenic, copper, and zinc listed in Part 8 of the proposed 2020 MSGP are for total (unfiltered) metals concentrations; however, the acute criteria that provide the basis for the current benchmark values are derived from the USEPA National Recommended Water Quality Criteria (NRWQC) established for the protection of aquatic life based on (filtered) dissolved metal concentrations. USEPA promulgated aquatic life NRWQC for these metals based on the dissolved fraction because the dissolved concentration more closely approximates the bioavailable and toxic metal ion (USEPA, 1993[1]; USEPA, 2007[2]); total recoverable metal concentrations include the free metal ion, as well as metal complexes that are less bioavailable and toxic. Consistent with the derivation of the NRWQC, the dissolved (filtered) phase is the appropriate basis for arsenic, copper, and zinc benchmarks established for the protection of aquatic life.

Distinguishing between total and dissolved phase metals is particularly important in evaluating the potential impacts to aquatic life associated with exposure to metals in stormwater because of the increased concentrations of suspended particulates in stormwater. Data from the National Stormwater Quality Database (NSQD), which is an urban stormwater runoff characterization database developed by Dr. Robert Pitt, P.E. of the University of Alabama and the Center for Watershed Protection under support from the USEPA, shows that the average value of copper in dissolved samples is 50.5 percent lower than the average value of total samples (NSQD Version 4.02, 2015). This indicates that a substantial portion of total copper concentrations are associated with particulate-bound metal complexes that are less bioavailable and toxic.

Based on this technical rationale, the TWC recommends that arsenic, copper, and zinc (and other metals) be analyzed on a dissolved (filtered) basis and compared to dissolved benchmarks established for the protection of aquatic life. Comparisons of dissolved (filtered) stormwater

sample results to benchmarks derived based on dissolved criteria would be more appropriate in assessing potential impacts to aquatic life and would be consistent with the technical basis of the NRWQC promulgated by the USEPA.

[1] USEPA 1993. *Office of Water Policy and Technical Guidance on Interpretation and Implementation of Aquatic Life Metals Criteria. U.S. Environmental Protection Agency. Office of Water. October 1, 1993*

[2] USEPA, 2007. *Framework for Metals Risk Assessment. U.S. Environmental Protection Agency. Office of the Science Advisor. EPA 120/R-07/001. March 2007.*

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council
**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Part 8 of the proposed 2020 MSGP establishes benchmark parameters as total recoverable zinc, total recoverable arsenic, and total recoverable copper.

Consistent with Comment 3, the NASEM report acknowledges that dissolved metals are more biologically available than particulate-bound metals; therefore, dissolved metal concentrations provide a more useful means of evaluating potential impact to aquatic life. For this reason, NASEM recommends that industries with repeated benchmark exceedances from total metal samples should be allowed to sample for dissolved metals. NASEM recognizes that the sampling for dissolved metals is more complex than sampling for total metals, so it suggests that dissolved metal sampling should be an option, not a requirement. Specifically, for copper and some other metals, the more complex Biotic Ligand Model (BLM) is used to determine the bioavailability of the metals to aquatic life based on ten parameters of the water body in question. Using the BLM for a specific site would require obtaining water quality parameters of the receiving waters, including hardness, pH, dissolved organic carbon, major ions, alkalinity, etc.

As with dissolved metals, NASEM recommends that the MSGP should allow facilities who have repeated benchmark exceedances for total metals to be allowed to develop a BLM for their receiving water in order to establish a site-specific benchmark value. The report describes how watershed-based collaborative relationships between industries, municipalities, and other dischargers could be established in order to develop watershed-specific benchmark

concentrations for copper using the BLM, and it states that this has already been done in Oregon. The TWC recommends the NASEM approach.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

*Metals*

Howmet's primary concern with benchmark monitoring is not the conventional pollutants but the metals testing. The concern is associated with the test methods and overly conservative values that the test method yields. Many metals including aluminum, iron, and zinc are present in soil and the testing for these parameters leads to false positive results not because of failed BMPs but because of the test method.

Total metals testing involves lowering the pH of the water sample to 2 in acid, heating and stirring for upwards to 8 hours, and then filtering the sample for final analysis. This processing step dissolves all silicate and organo-metallic metals making the test method conservative when used for stormwater testing.

The Ohio River Sanitation Commission (ORSANCO) started collected river data in 1998 and then began to test for dissolved metals in October 2000 because the total metals data indicating aquatic life impairment was not consistent with the finding of its fish population studies.[2]

The metals aspect of the AIMs system is just one part of the issue but according to the National Academy of Sciences (NAS) report that EPA commissioned, several industries including the fabricated metals industry failed annual benchmarks for aluminum 36% of the time and zinc 74% of the time and this category wasn't the worst but actually almost a median for those categories that had to test for these metals.

*Stormwater Data Review*

Stormwater data was collected from three (3) sites within Howmet that monitors for metals (aluminum, zinc, and nickel) and total suspended solids and put them together along with data from ORSANCO to examine trends and similarities. The following charts and discussion highlight some of the key points already discussed.

The aluminum charts from the Howmet facilities and a sampling point along the Ohio River yield very similar information and similar trend lines.



The data shows that the river and stormwater are similar in aluminum response because of the Total Suspended Solids, TSS. The TSS is dirt and silt washed from surface runoff.   The dissolved aluminum actually decreases as TSS increases according to ORSANCO, but the data presented here shows a nearly flat line.  This means that an increase in particulate aluminum will not increase the biologically available aluminum in the receiving stream.

Nickel and zinc are a little different with the industrial stormwater having a slightly more concentrated response, meaning that there is particulate matter concentrated with those metals that is a part of the total suspended solids.



However, similar to aluminum, dissolved metals of zinc and nickel do not become more biologically available as the metal increases within the water column.

The metals data demonstrates that the totals metals method of measuring metals from stormwater is too conservative and are simply indicator values and do not represent the true impact on aquatic organisms within the receiving stream.

[2]ORSANCO Web Site; http://www.orsanco.org/data/clean-metals/

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Aluminum Criteria

EPA requested comments on several metals including selenium, cadmium, magnesium and iron, but never requested comment on aluminum even though the aluminum criteria was changed on December 21, 2018.  EPA finalized (83 FR 65663) the aluminum criteria reflective of the current science and this revised approach is not reflected within the proposed MSGP and Howmet believes that it should be included within the proposal.  EPA has also developed implementation guidance for the criteria to assist the states in their efforts.  Notably, EPA proposed an implementation rule for the state of Oregon in 2019  (84 FR 18454) which is near finalization.  The state of Iowa (EPC proposed amendment to Chapter 61, Water Quality Standards of the Iowa Administrative Code, March 17, 2020) is also near final implementation of an aluminum criteria revision.  As mentioned previously in "request for comment #21", the test method, the ubiquitous nature of aluminum, and the false positives associated with it necessitate the need for the new criteria to be included within the proposal.

*Recommendation*

Howmet recommends the inclusion of the new aluminum criteria, with the option for site specific benchmark derivation coupled with a national default value based on the aluminum criteria guidance document.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Zinc and other Metals

One area that warrants more review and is noted in the NAS report is in the area of metals particularly zinc. For those industrial sectors that are required to test for zinc, few can demonstrate continued benchmark attainability. There are two major reasons, building siding and tires. Many industrial facilities have galvanized sheet metal exteriors and fencing, and this metal naturally releases zinc during rain events. The second reason is that zinc is prevalent in tires and rubber products. Delivery vehicles, fork trucks, and even employee parking contribute to the issue. The zinc associated with tires is normally in the fine particulate form but as discussed earlier the test method creates an issue with false positive tests. Howmet believes that zinc and other metals should be measured in the dissolved forms to measure actual impacts on the environment. The current totals method is too restrictive and unobtainable by those that have zinc benchmarks.

*Recommendation*

Howmet requests that zinc and all other metals with the exception of aluminum be evaluated on the dissolved metals fraction basis to accurately reflect the nature of concern for these metals and most recent guidance for evaluation of water quality criteria in receiving waters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Ligia Duarte Botelho
**Commenter Affiliation:** North American Metals Council (NAMC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0161-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

While NAMC questions the overall justification and usefulness of benchmark monitoring as applied to stormwater discharges from the North American metals industry, NAMC appreciates the opportunity to provide the following comments on the benchmark monitoring requirements

**Comment Response:**

No response required.

---

**Commenter Name:** Ligia Duarte Botelho
**Commenter Affiliation:** North American Metals Council (NAMC)

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0161-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposed MSGP requires certain benchmark monitoring parameters, which are designed for facilities to use to determine the overall effectiveness of stormwater control measures. However, for metals, many benchmark values are based on aquatic life criteria, which are derived from laboratory testing and used to evaluate the effects of pollutants on fish and insects. There is no connection between aquatic life criteria and effectiveness of stormwater control measures. Typical industrial process wastewater effluent limitations are established based on the use of extreme low-flow stream conditions because the industry is expected to have a constant discharge independent of receiving stream flow. When stormwater runoff occurs from an industrial site, however, the receiving stream flow is higher than normal due to runoff from other areas of the drainage basin. Additionally, in-stream concentrations associated with an individual industrial facility would be quite low due to the high flow in the receiving stream diluting in-stream concentrations. To account for this situation, NAMC recommends that EPA establish benchmark values based on a reasonably conservative estimate of in-stream concentrations. More specifically, EPA should use a dilution and attenuation factor (DAF) of 100, which would still be a conservative value.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Ligia Duarte Botelho
**Commenter Affiliation:** North American Metals Council (NAMC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0161-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP benchmarks for arsenic, copper, and zinc are for total *(unfiltered)* metals concentrations. Importantly, however, these benchmarks are based on acute criteria that are derived from EPA's National Recommended Water Quality Criteria (NRWQC) for the protection of aquatic life, which is based on *(filtered)* dissolved metal concentrations. The distinction between total and dissolved phase metals is particularly relevant in evaluating potential impacts to aquatic life associated with exposure to metals in stormwater because of the increased concentrations of suspended particulates in stormwater. Data from the National Stormwater Quality Database (NSQD)[1] show that the average value of copper in dissolved samples is 50.5 percent lower than the average value of total samples (NSQD Version 4.02, 2015). This result indicates that a substantial portion of total copper concentrations is associated

with particulate-bound metal complexes that are less bioavailable and toxic. Therefore, NAMC urges EPA to use the dissolved (filtered) phase as the basis for a benchmark that is established for the protection of aquatic life. The comparisons would be more appropriate in assessing potential impacts to aquatic life and would be consistent with the technical basis of EPA's NRWQC.

[1]NSQD is an urban stormwater runoff characterization database developed by Dr. Robert Pitt, P.E., of the University of Alabama and the Center for Watershed Protection under EPA support.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ligia Duarte Botelho
**Commenter Affiliation:**  North American Metals Council (NAMC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0161-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should use the same approach outlined by the National Academies of Sciences, Engineering, and Medicine (NASEM) in its 2019 report[2] which: (1) acknowledges that dissolved metal concentrations more accurately evaluate potential impact to aquatic life; and (2) recommends that facilities with repeated benchmark exceedances for total metals should be allowed to sample for dissolved metals.

[2]NASEM. 2019. Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Benchmark Monitoring: WMA recommends that EPA remove benchmark monitoring from the MSGP. The benchmarks have not been scientifically justified, and as proposed and coupled with the proposed AIM framework, operate as a de facto effluent limitations in violation of the CWA. Instead, EPA should consider alternatives to benchmark monitoring, such as visual monitoring.

Benchmark monitoring was originally intended to be used as a tool for operators to assess whether stormwater measures were effective at their sites. If values were above a certain level, it was a general indicator to the operator that he may need to reevaluate his stormwater control measures or at least investigate them. If values were below a certain level, it was a general indicator that the stormwater control measures were working properly. Benchmarks were never intended to be used by EPA to trigger mandatory compliance responses. In response to comments on the 2015 MSGP, EPA affirmed that benchmarks were not intended to be used as a compliance mechanism, but rather designed for use as "a trigger for the operator to investigate and take corrective action, as appropriate."[2] The agency's view of benchmarks as flags, targets, and general indicators of possible problems has remained consistent throughout renewals of the MSGP program. EPA should revise the draft 2020 MSGP renewal to remove any use of benchmarks that would equate to a permit violation.

As documented in the NMA comments to EPA on this proposal (supported, referenced and adopted herein), there is no meaningful relationship between the benchmark levels and the ability to control the quality of stormwater discharges. The entire process of adopting the benchmarks remains deeply flawed. EPA's initial mining sector benchmarks were not developed or tailored specific for mining, rather they were imported from other water quality programs and are not representative of mining stormwater scenarios. Second, the EPA benchmarks do not recognize the complexity and variability of stormwater systems, regional differences, as well as differences in facility operations. That is unchanged from prior renewals. There remains no scientific basis for utilizing benchmark monitoring for evaluating performance of stormwater controls at most mining facilities.

In Wyoming, stormwater runoff quality from disturbed and undisturbed areas is more influenced by the type and intensity of the storm event, and the time since the last rain event, than by the type of control measures implemented. The water quality of discharged stormwater has been seen to vary significantly even when there has been no change in the control measures.

Additionally, the benchmarks are set at levels that are orders of magnitude below what is often found in ambient undisturbed waters. There is a significant range in ambient concentrations of benchmark parameters such as total suspended sediment (TSS) and total metals in some regions. Arbitrarily setting benchmark levels at a national level completely ignores the regional variation in natural stormwater processes in these locations. Benchmark monitoring represents a disconnect from the reality of the variability in storm events and resulting runoff conditions. Since its inception, benchmark monitoring has provided EPA an avenue for data collection but provided little more. From WMA's perspective, this aspect of the MSGP has not provided any meaningful environmental benefit at the outfall, facility, or industry level. Because there is no clear connection between the proposed benchmark concentrations and control measure effectiveness (or with applicable water quality standards), the imposition of benchmarks becomes an arbitrary and technically unsupportable exercise, with expensive consequences.

For these reasons, WMA advocates for removal of the benchmark program from the MSGP process altogether. Lacking that, we believe the EPA should withdraw the proposed changes and renew the benchmark program as contained in the approved 2015 MSGP renewal.

[2] EPA 2015 Response to Comments at 2. (emphasis added).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA wants to use benchmark values as if they are numeric limits that trigger mandatory responses, then it must revise the benchmark values to reflect best available technology (BAT) and best control technology (BCT) consistent with the CWA.[3] In other words, because they are designed to indicate nothing more than a level of concern for the operator, if EPA wants to use them as something more, like an effluent limitation, then they must be developed consistent with BAT and BCT as required by the Clean Water Act. That was not done in this case; therefore the EPA must withdraw the proposed AIM approach in its entirety.

In summary, the arbitrary benchmarks that EPA imposes will undoubtedly be exceeded at some locations, since they are higher than background at most Wyoming sites. The main problem continues to be EPA's expectation that the benchmark levels are appropriate, when they have repeatedly been proven to not be appropriate. Requiring operations to review and install additional controls even when the existing controls are operating effectively is unrealistic and would be an extremely costly exercise.

[3] 33 U.S.C. 1311(b)(2)(A) and 1342(b)(2).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1

**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Advocacy recommends that EPA adopt a tiered approach to benchmark monitoring, with a focus on gathering high quality data for future rulemakings rather than immediate burdensome regulatory requirements, to ensure that the 2020 MSGP will not have a significant economic impact on a substantial number of small entities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

**C. EPA should adopt the tiered monitoring approach recommended by the NRC, without AIM for all industrial sectors.**

EPA should focus its effort and resources on industrial sectors and facilities that pose the highest risk to water quality and reduce the burden on industries and facilities that are unlikely to threaten water quality. The NRC Study provides a good starting point with examples of possible criteria for low-risk activities. This list can be significantly expanded, on an activity-by-activity basis, in consultation with small business permittees.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:**  GZA GeoEnvironmental, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0171-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

In regards to metals benchmark exceedances and the proposed Additional Implementation Measures, background (naturally occurring) metals contributions are discussed but how does EPA recommend addressing metal-containing infrastructure not related to the permitted industrial activity (e.g., galvanized safety railings and pipes, metal-containing roofing materials)?;

**Comment Response:**

How to identify and correct exceedances is a site specific issue.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Since the 1990 NPDES regulations were promulgated, stormwater management has become one of the most important operational and regulatory issues for the Industry, as stormwater permits typically affect every aspect of facility operations. ISRI has developed and provided information to its members on stormwater management and compliance and has been an advocate for the industry during the development and renewal of state general permits and the Federal MSGP. The Industry's preferred approach to stormwater management is the design, implementation, operation, and maintenance of appropriate, effective nonstructural and structural control measures and BMPs to reduce the impact of recycling activities on the quality of stormwater discharges. However, the use of benchmark monitoring with its associated benchmarks as indicators of the effectiveness of stormwater pollution prevention plans (SWPPPs) and the control measures and BMPs described in SWPPPs has been problematic. Benchmarks have been problematic not simply because they are unrelated to the intrinsic capabilities of control measures and BMPs to limit or reduce benchmark parameter concentrations in stormwater runoff that is discharged (i.e., they do not reflect control measure or BMP effectiveness). Exceedances of these benchmarks have been used as "evidence" of permit violations in threats of Section 505 CWA citizen lawsuits by third parties against ISRI members, despite EPA's correct view that a benchmark exceedance is not per se a permit violation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)

**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI is disappointed that EPA did not follow NASEM's recommendation concerning aluminum in the Proposed 2020 MSGP as EPA did for cadmium. ISRI supports NASEM's recommendation to raise the benchmark for aluminum from 750 µg/L to provisionally 1,400 µg/L (Report at 33). This recommendation was based on the draft aquatic life criteria[4] for aluminum that were available when the Committee conducted its work under contract with EPA. NASEM stated that "the next version of the MSGP should reflect this change, if the new aluminum criteria are finalized" (Report at 33).

EPA could have included in the Proposed 2020 MSGP NASEM's recommendation to update the aluminum benchmark based on "new aluminum criteria". EPA could have requested comment on this recommendation, as a suggestion, without including it in the Proposed 2020 MSGP. However, EPA simply chose to do neither. In the accompanying Fact Sheet[5], EPA stated that "[g]iven the criteria is still in draft form, EPA proposes to use the same benchmark value for aluminum as listed in the 2015 MSGP, but may update it if the criteria is issued before EPA finalizes the 2020 MSGP" (Fact Sheet at 64). The criteria may have been in draft form when the sentence was typed out in an early draft of the Fact Sheet, but this was not true later, before release of the Proposed 2020 MSGP. In December 2018, EPA issued the updated aquatic life criteria for aluminum as a range of values that depend on "a site's pH, total hardness, and [Dissolved Organic Carbon (DOC)]"[6]. The final updated aquatic life criteria were issued more than one year before the Proposed 2020 MSGP was released. However, the final criteria's release occurred when the Report was nearing completion (a prepublication Report was released on February 20, 2019[7]). While the timing of the final criteria may have prevented NASEM from making a recommendation based on them, NASEM did make a recommendation based on availability of final criteria. The final criteria were available well enough in advance for EPA to have included an updated aluminum benchmark in the Proposed 2020 MSGP.

ISRI requests that EPA update the aluminum benchmark in the 2020 MSGP as recommended by NASEM. According to the final updated aquatic life criteria[8], a new aluminum benchmark based on pH = 7.5 (midpoint of proposed benchmark range for pH), DOC = 1.0 mg/L, and total hardness = 100 mg/L would be 1,500 µg/L.

[4] 82 Fed. Reg. 35198-35200.
[5] Docket ID No. EPA-HQ-OW-2019-0372-0064.
[6] 83 Fed. Reg. 65663-65665.
[7] ISRI received an e-mail announcement from NASEM staff on February 20, 2019 with subject "New Report on Industrial Stormwater Discharges Now Available".
[8] EPA. Final aquatic life ambient water quality criteria for aluminum – 2018. EPA-822-R-18-001: Appendix K (EPA-HQ-OW-0260-0077).

**Comment Response:**

2021 EPA MSGP Response to Comments
January 15, 2021

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA's request for comments on the benchmark values for only a handful of metals (i.e., cadmium, aluminum, arsenic, copper, selenium),[4] the Steel Associations herein offer a broader recommendation that the Agency update all benchmark values for metals using more sophisticated approaches that consider bioavailability. This recommendation is consistent with nationally recommended bioavailability-based ambient water quality criteria ("WQC") for metals (e.g., the biotic ligand model ("BLM")), and supported by ongoing work within the Health and Ecological Criteria Division of the Office of Science and Technology.

For instance, the current nationally recommended WQC for copper is based on the BLM, and the WQC for aluminum is based on multiple linear regression ("MLR") models. Both approaches represent the state-of-the-science with regard to bioavailability. Adopting these WQC as benchmark values in the MSGP would therefore ensure consistency with the NRC's recommendation that "Benchmarks should be based on the latest toxicity criteria designed to protect aquatic ecosystems from adverse impacts from short-term or intermittent exposures, which to date have generally been acute criteria."[5] Harmonizing the MSGP's benchmark values with bioavailability-based WQC would further assist in identifying that stormwater discharges of metals may pose less of a concern than the benchmarks would otherwise indicate. Use of this more accurate information is potentially very important, as it would limit an unnecessary allocation of resources to address discharges that warrant them.

[4] In addition to iron and magnesium as discussed above.

[5] "Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges" National Academies of Sciences, Engineering, and Medicine's National Research Council (February 2019); https://www.nap.edu/catalog/25355/improving-the-epa-multi-sector-general-permit-for-industrial-stormwater-discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The perspective of NAIMA's member companies is that benchmark monitoring has not achieved the objective contemplated by EPA. Benchmark tests misrepresent and inflate the appearance of non-compliance. Therefore , NAIMA and its members join various other industry sectors in urging EPA to eliminate the benchmark program. If, however, the benchmark program is preserved by EPA, NAIMA requests serious consideration of the modification to the benchmark program as set forth in these comments.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**Analytical Monitoring has Been Largely Unsuccessful under the MSGP**

There have been many problems with analytical monitoring that have never been reasonably addressed by EPA. The SBLRC's comments address these issues in significant detail including high cost, lack of support for the many factors influencing results including storm event dilution, arid vs. humid climates, seasonal changes, and facility site activity variability amongst other factors. Benchmarks have been demonstrated to be too low for practicable implementation, such as high metal concentrations that are naturally present in soil. NSSGA agrees with the SBLRC that this regime should be ended and replaced by the current comprehensive set of requirements for SWPPP plan implementation, including inspections and reporting, at least until EPA develops science-based benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 9:**

**Benchmark Monitoring (Part 4.2.1)** EPA has requested comment on viable alternative approaches to benchmark monitoring for characterizing industrial sites' stormwater discharges, quantifying pollutant concentrations, and assessing stormwater control measure effectiveness. In the following section, our members have provided several alternatives to benchmark monitoring.

However, we urge EPA to first reevaluate its use of benchmark monitoring for mining operations generally. In the 25 years since EPA first published the MSGP, the agency has not provided sufficient scientific justification for benchmark monitoring. NMA, many of our individual member companies, and other industry groups have raised concerns with benchmark monitoring in our comments on the last four versions of the MSGP that we do not believe have been adequately addressed by the agency. As explained in more detail below, NMA has serious concerns with benchmark monitoring generally and requests that the agency refrain from using benchmark monitoring and reevaluate its use prior to finalizing any expanded use of benchmarks, particularly any use that would equate to a permit violation.

1.  The proposed benchmark monitoring requirements far exceed their original purpose.

The new benchmark monitoring requirements in the 2020 MSGP have fundamentally changed the way benchmarks have been used historically. Benchmark monitoring was originally intended to be used as a tool for operators to assess generally whether stormwater measures were effective at their sites. If values were above a certain level, it was a general indicator that the operator may need to reevaluate the stormwater control measures (SCMs) or at least investigate them. If values were below a certain level, it was a general indicator that the SCMs were working properly. A historical look at previous MSGPs show that benchmarks were never intended to be used by EPA to trigger mandatory compliance responses.

In 1995, EPA first established acute water quality criteria (or 3.18 times the method detection limit (MDL) where the MDL was higher than water quality criteria) for benchmark values to use "as a standard of comparison for an individual permitted facility that wishes to qualify for the low concentration waiver to be relieved from monitoring in the fourth year of the permit."[8] EPA believed that the benchmark values selected in 1995 were reasonable for that particular purpose (to qualify for a waiver and avoid monitoring in the fourth year).[9] During the 1995 comment process on the MSGP, commenters pointed out that the benchmark values did not consider dilution of the discharge in the receiving water, did not take into account local conditions or

background levels, and seemed to operate as effluent limitations. EPA rejected the comments, reasoning that the limited and nonprescriptive nature of the benchmark monitoring process supported its use of water quality criteria for benchmark monitoring:

EPA emphasizes that the pollutant benchmark concentrations are not storm water effluent limitations…Facilities are not required to meet these concentrations as effluent limitations in their discharges. The benchmarks are designed to assist facility operators in determining if their pollution prevention plans are reducing pollutant concentrations to below levels of concern. *Given the purpose of these benchmarks/monitoring cut-off values, EPA does not believe that dilution or background concentrations of each pollutant need to be considered. The monitoring benchmark cutoff values are not effluent limitations. For this same reason, local conditions do not need to be considered.* [10]

The preamble of the 1995 MSGP further explained that benchmarks were not effluent limitations and were "*merely levels* which EPA has used to determine if a storm water discharge from any given facility merits further monitoring to ensure that the facility has been successful in implementing a storm water pollution plan."[11] EPA further noted that these levels "represent a *target concentration* for a facility to achieve through implementation of pollution prevention measures at the facility."[12]

EPA affirmed its position on benchmarks in the 2000 MSGP, reiterating that "EPA only intends for [benchmarks] to be used as indicators of possible problems and as a flag to reevaluate the SWPPP and possibly the operation of the facility – *not as a trigger to begin mandatory SWPPP or operational revisions* (unless after employing BPJ, the operator deems such revisions are necessary)."[13] This distinction is further clarified in the agency's response to comments on the 2008 MSGP, in which EPA drew a distinction between benchmarks as targets rather than effluent limitations, noting that "because benchmarks *are not limits*, but targets to be used by permittees for improving their control measures, a different approach is required when it comes to corrective actions."[14] In response to comments on the 2015 MSGP, EPA again affirmed that benchmarks were *not intended to be used as a compliance mechanism*, but rather designed for use as "a trigger for the operator to investigate and take corrective action, as appropriate."[15] The agency's view of benchmarks as flags, targets, and general indicators of possible problems has remained consistent.

II. EPA has not provided scientific justification for benchmark monitoring.

In addition, EPA has never provided sufficient scientific justification for the use of benchmark monitoring for measuring the effectiveness of stormwater control measures. At least two National Academy of Sciences National Research Council (NRC) studies funded by EPA in the last decade have sought to establish the connection between benchmark monitoring and the effectiveness of stormwater control measures. Yet to date, neither of these studies have yielded evidence that the immense regulatory burden of benchmark monitoring results in better stormwater control measures on mine sites, or industrial sites generally.

EPA erroneously developed numeric benchmark levels for stormwater discharges from water quality criteria derived for low flow, constant exposure, instream conditions which were never

intended to be applied to short duration high flow storm event. This scientifically flawed application led to the arbitrary application of benchmarks that fail to achieve environmental benefit. In fact, the NRC in its 2009 review of the program found that the benchmark approach had largely been a failure and that it was unclear if exceedances provided useful indicators of SWPPP inadequacies or water quality problems. The NRC concluded that a national numeric benchmark should be avoided and that if it had its way the current MSGP benchmark monitoring would be eliminated.[16]

Review of existing benchmark monitoring data clearly demonstrates the failure of implementing benchmark thresholds that do not apply to stormwater conditions In fact, EPA recognized in its Fact Sheet to the 2013 draft MSGP that facilities with identified benchmark exceedances have not been able to implement cost-effective changes to control measures to address such exceedances.[17] This finding alone suggests that benchmark monitoring should be removed, because compliance with benchmarks has no correlation to control measure improvements and simply results in the imposition of immense costs without any corresponding environmental benefits. This is especially concerning when considering the proposed and overly onerous corrective action scheme that will unfairly expose our members to significant and costly liability.

EPA itself has acknowledged deficiencies in its benchmark monitoring framework. In response to a comment on the 2000 MSGP that monitoring had marginal value in assessing and protecting stormwater quality, EPA admitted that "it is true that many impacts of storm water are short-term and that many pollutants are not really toxic or bioaccumulative. A short term water quality standard violation is not necessarily going to persist long enough to be toxic."[18] Similarly in its 2015 Response to Comments, EPA reaffirmed "that benchmark exceedances are not necessarily indicative of water quality issue" and further explained that they "are meant to act as a screen to identify potential water quality issues and ultimately avoid dischargers discharging stormwater from industrial activity that exceed water quality standards."[19] The agency also clarified its position that benchmark monitoring is "part of a larger scheme to include water quality-based effluent limits in the permit to ensure that the permit includes limits to achieve water quality standards." But again, EPA provided no scientific justification for benchmark monitoring itself.

Specifically, in the mining context, there is no meaningful relationship between the benchmark levels and the ability to control the quality of stormwater discharges. Experience has shown that stormwater discharge quality is determined by the type and intensity of the rain event. This suggests the entire process of adopting the benchmarks is inherently flawed. First, EPA's initial mining sector benchmarks were not developed or tailored specific to mining. Rather they were imported from other water quality programs and are not representative of mining stormwater scenarios. Second, there is no recognition of the complexity and variability of stormwater systems, including the significant variability in stormwater flow due change in rainfall intensity and duration, regional differences in environmental characteristics, and differences in facility types and operational processes. Therefore, there is no scientific basis for utilizing benchmark monitoring for evaluating performance of stormwater controls at most mining facilities. Several of our members' experience has been that stormwater runoff quality from disturbed and undisturbed areas, particularly in the arid southwest, is influenced as much or more by the type and intensity of the storm event and the time since the last rain event, than by the type of control

measures implemented. The quality of stormwater discharge has been seen to vary significantly even when there has been no change in the control measures.

Additionally, for certain regions such as the arid west, the benchmarks are set at levels that are orders of magnitude below what is often found in ambient undisturbed site waters. There is a significant range in ambient concentrations of benchmark parameters such as TSS and total metals in some regions. Arbitrarily setting benchmark levels at a national level completely ignores the regional variation in natural stormwater processes in these locations. Benchmark monitoring represents a disconnect from the reality of the variability in storm events and resulting runoff conditions. Since its inception, benchmark monitoring has provided EPA an avenue for data collection but provided little more. From NMA's perspective, this aspect of the MSGP has not provided any meaningful environmental benefit at the outfall, facility, or industry level. Because there is no clear connection between the proposed benchmark concentrations and control measure effectiveness (or, more importantly, with applicable water quality standards), the imposition of benchmarks becomes an arbitrary and technically unsupportable exercise, with expensive consequences.

[7] Proposed 2020 Fact Sheet at 26.
[8] 60 Fed. Reg. 51076 (1995).
[9] Id.
[10] Id. (emphasis added).
[11] Id. at 50825 (emphasis added)
[12] Id. (emphasis added)
[13] 65 Fed. Reg. 64768 (Oct. 30, 2000)
[14] EPA 2008 Response to Comments at 599-601.
[15] EPA 2015 Response to Comments at 2 (emphasis added).
[16] 2009 NRC Report at 433, 439, and 435.
[17] 2013 Draft Fact Sheet at 52.
[18] 65 Fed. Reg. 64796 (Oct. 20, 2000).
[19] EPA 2015 Response to Comments at 2.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

**Sector Specific Benchmark Monitoring Aluminum, Selenium, and Nitrate + Nitrite Nitrogen (Part 4.2.1.2)**

_Aluminum Benchmark_: The NRC Study recommended that EPA update certain benchmark thresholds based on EPA's recent or ongoing work to address updated aquatic life criteria. For aluminum specifically, the study recommended incorporating EPA's new approach to determine bioavailability using a multiple linear regression model. EPA recognized in the Fact Sheet that the information the NRC relied upon was in draft form at the time of the study, so has proposed retaining the aluminum benchmark at the level in the 2015 MSGP (0.75 mg/L).

Since the NRC completed its study, however, EPA has finalized its aquatic life ambient water quality criteria for aluminum and we understand the agency is in the process of finalizing implementation guidance. Among the several implementation issues that NMA has identified with the aluminum criteria, one issue that must be addressed prior to its implementation in this context centers on the complexity of deriving the benchmark threshold for varying environments and the large differences expected in site specific DOC, pH, and hardness. Utilization of the updated standard should not result in our members collecting more water quality parameters to justify a fluctuating benchmark value. Further, the aluminum criteria is applicable to receiving waters, not stormwater runoff.

NMA recommends that aluminum be eliminated from the benchmark monitoring for mining sectors. Non-bioavailable aluminum is a primary constituent in the mineral particles that comprise soil and sediment. Aluminum is the third most abundant element in the Earth's crust, making it ubiquitous in the environment. Use of the total recoverable analytic method for measures all of the metal, both dissolved and particulate, in the sample. For stormwater samples that are high in TSS, the total metals results are highly skewed by the sediment concentration. In such samples, the total recoverable concentration is significantly higher than the actual bioavailable fraction of the metal, as much of the measured metal is associated with mineral-bound, non-toxic particulates. This confounds the use of total recoverable metals results for evaluating potential effects on aquatic life and makes them essentially an unusable indicator of anything other than sediment aluminum content.

If EPA decides to retain the aluminum benchmark, it should provide additional clarity and specifically address the issue of non-bioavailable aluminum in stormwater. While we appreciate keeping the aluminum benchmark at the 2015 MSGP level, we are concerned by the agency's statement in the Fact Sheet that it "may update [the benchmark value] if the criteria is issued before EPA finalizes the 2020 MSGP."[31] The final criteria was already issued in December 2018, more than a year before EPA proposed the 2020 MSGP. We want to ensure that EPA will not change the aluminum benchmark based on the new criteria between now and when the 2020 MSGP is finalized. Our members need clarity and certainty in advance to evaluate how the aluminum benchmark will impact their operations, so we recommend that EPA clarify that it will not update the aluminum benchmark based on the final instream aluminum criteria in the final 2020 MSGP.

[31] Proposed 2020 Fact Sheet at 64.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

*Nitrate + Nitrite Nitrogen Benchmark:* The proposed 2020 MSGP, as with prior MSGPs, establishes a benchmark for nitrate and nitrite nitrogen of 0.68 mg/L, a value orders of magnitude lower than the national recommended water quality criteria for nitrate of 10 mg/L. This proposed benchmark is based on the National Urban Runoff Program (NURP), an urban runoff study conducted in the late 1970s that resulted in a benchmark set at essentially background conditions and bears no connection to protection of receiving waters from water quality impairments. As the Fact Sheet for the 2020 MSGP specifically states, where possible, benchmarks are "set equal to recommended ambient water quality criteria for the receiving waters," which creates a reliable level of protection of instream water quality.[32] Consistent with this statement and with its general process for developing MSGP benchmarks, EPA should align the nitrate and nitrite nitrogen benchmark to reflect protection of the receiving water by assigning a benchmark at the generally-applicable water standard of 10 mg/L or at a higher water quality standard, where applicable. This is particularly true given the significant corrective measures triggered by exceeding the benchmark; otherwise, the corrective measures requirements would trigger continuously new, unending and unproductive compliance obligations even in cases where stormwater concentrations are at background and at concentrations an order of magnitude below the water quality standard.

[32] Id.

**Comment Response:**

EPA does not agree that the nitrate + nitrite benchmark should be modified from the current benchmark, which has been retained from the 2015 MSGP and is based on the National Urban Runoff Program (NURP). EPA prefers not to weaken a discharge requirement unless good scientific evidence exists that a pollutant is less impactful at the lower concentration than previously believed. Based on an analysis performed by the National Academies of Sciences, the median value for most sectors that submitted benchmark data for nitrate + nitrate under the 2015 MSGP was below the benchmark value (National Academies of Sciences, Engineering, and Medicine. 2019. *Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges.* Washington, DC: The National Academies Press. https://doi.org/10.17226/25355.). EPA also notes that Part 5.2.6 includes five exceptions that could allow an operator to be

relieved of compliance wih AIM requirements and continued benchmark monitoring at any AIM level. Two exceptions are carry-overs from the 2015 MSGP: one being that the exceedance was caused by natural background levels of pollutants causing the elevated levels and the other being that the exceedance was caused by run-on from a neighboring source which elevates the operator's pollutant levels, which requires EPA approval before the operator can qualify for this exception. Three additional exceptions are included in the 2021 MSGP as well: one being that the exceedance was an abnormal event; one for discharges of copper and aluminum using facility-specific criteria; and the other that the exceedance does not result in any exceedance of water quality standards. EPA notes that these exceptions are not available for effluent limitation monitoring (Part 4.2.3).

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**Background History of the MSGP Benchmark Reporting Establishes that the Benchmark Program is Fatally Flawed**

Since the beginning of the 1995 MSGP permit, EPA has been unable to provide a science-based justification for the program. The benchmark approach has repeatedly been criticized by the iconic National Academy of Sciences, stormwater academic experts, knowledgeable stormwater practitioners, federal agencies, and state authorities. We are very concerned that despite the decades of criticisms, rather than eliminating this costly experimental benchmark program, EPA is proposing to expand its applicability to all industry sectors, increase the frequency of monitoring and greatly elevate the consequences of benchmark exceedances.

Despite promises to examine the utility of the benchmark approach over multiple permit terms since 2000, EPA failed to perform such an analysis until 2013. It is interesting to note that the one time that EPA did so in 2013, its analysis, not surprisingly, indicated that the SWPPP improvements had no apparent effect on reducing benchmark exceedances.[15]

The benchmark approach does not distinguish between facilities with good and poor SWPPP implementation, which has been the justification for benchmarks since the beginning. There is overwhelming evidence that analytical monitoring is a costly enterprise without concomitant benefits. The lack of a sound scientific basis ultimately led to widespread agreement that the benchmark approach has failed.

As explained below, the failure results from the fact that EPA did not have in 1995 and does not have in 2020, science-based benchmarks for stormwater monitoring. EPA's record supporting benchmarks lacks information reflecting storm event dilution, time between storms, arid vs.

humid climates, mixing zones, dissolved (bioavailable fraction) vs. total concentrations, storm variability, seasonal changes, and facility site activity variability.

The Federal Storm Water Association (FSWA) captured it best in its 2013 comments:

In fact, the basis for benchmark monitoring was never grounded in science and EPA has never fully justified how and why a facility should use, for example, ambient low flow in-stream WQS to gauge technology-based control strategies for stormwater discharges that are episodic, high flow, variable, and likely exist a significant distance from the type of receiving stream used as the bases for the WQS.[16]

Furthermore, many criticized the benchmarks as being too low for practicable implementation, because, for example, high metal concentrations are naturally present in soil and frequently found in construction materials and equipment in use today. One state commenter on the proposed 2005 permit stated that natural soils would have to achieve a TSS concentration of around 10 mg/l to not exceed the aluminum benchmark.[17]

[15] 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review at 2 (EPA 2013).

[16] December 23, 2013 FSWA Comment at 12.

[17] California Department of Transportation 2005 MSGP Comments at 2-3. Also, compounding this problem, EPA declined to propose raising the Aluminum benchmark in this proposal, despite the NRC recommendation in its 2019 report to update this benchmark using more recent analyses performed by the Agency. According to EPA, the draft 2017 draft WQS update for aluminum suggested a revision from 0.75 mg/l to 1.4 mg/l, an increase that would dramatically decrease the high number of aluminum benchmark exceedances. EPA declined to act on the "draft criteria," and provided no additional relief. However, we see the final criteria was published in December 2018. 83 Fed. Reg.65663-65 (December 21, 2018). EPA has not explained this discrepancy. Relief for the Aluminum benchmark should be provided. The EPA Table 1 on this page shows 59% of 66 permittees exceed the low aluminum benchmark in a 2008 MSGP analysis. See Reline Fact Sheet at 62.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

In October 2014, URS Corporation (now AECOM) presented a pathbreaking analysis of the metals benchmarking monitoring data and the runoff data from the National Stormwater Quality Database (NSQD) to EPA.[18] The paper presents a compelling case that metals are ubiquitous in nature and the urban environment, and are detected at high levels in all types of stormwater runoff, including that from even nonindustrial and residential land areas. The analysis described a high percentage of benchmark exceedances for common metals, using the below table developed by EPA.[19] As URS observed, "[t]he contribution of these metals to total exceedances is further demonstrated by the fact that EPA's analysis shows that a full 72 percent of the facilities that exceeded one or more benchmarks, had an exceedances attributable to a metal parameter."[20] The high level of exceedances drives the corrective action costs under the MSGP.

**Table 1. EPA Benchmark Data Analysis for Select Metal Parameters**

| Parameter | Number of Permittees | Permittees with 1 or More Annual Exceedance | % of Permittees with 1 or More Annual Exceedance |
|---|---|---|---|
| Aluminum | 66 | 39 | 59 |
| Copper | 42 | 34 | 81 |
| Iron | 114 | 90 | 79 |
| Lead | 39 | 16 | 41 |
| Magnesium | 1 | 1 | 100 |
| Zinc | 60 | 43 | 72 |
| *Subtotal* | 322 | 223 | 69 |

In a February 2015 update, URS found that in a majority of cases, "the benchmark exceedances in the MSGP database are not likely due to industrial activities and cannot be addressed through corrective actions."[21] URS suggested raising the benchmarks to levels that would substantially reduce the exceedances that are attributable to background nonindustrial or residential levels.[22] EPA has not considered this approach.

[18] Jack Waggener, URS Corporation, Comments on the Benchmark Values of the Proposed MSGP, October 9, 2014.

[19] 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review, Table 1, available in the 2015 MSGP proposal docket.

[20] NRC confirms this view adding that , "[l]imited data suggest that benchmark compliance is more difficult at industrial sites for iron, aluminum, copper, and soft-water conditions for lead and zinc; inadequate data are available for other pollutants." 2019 NRC Study at 4; and "When evaluating the results by sector, several sectors emerge that have a large percentage of samples with concentrations above the benchmark threshold for more than one pollutant, and even some with a large percentage of samples with concentrations above eight times the benchmarks…

Copper, zinc, and iron also showed large percentages of samples above the benchmarks from most sectors.." Id. at 23.

[21] Jack Waggener, URS Corporation, Comments on the Benchmark Values of the Proposed MSGP at 4-5, October 9, 2014. February 15, 2015 update.

[22] Jack Waggener, URS Corporation, Comments on the Benchmark Values of the Proposed MSGP at 4-5, October 9, 2014.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

**The History of the MSGP Demonstrates that Benchmark Monitoring Has No Utility**

To evaluate the utility of the benchmark framework, a review of MSGP history is in order.

In 1995, EPA justified benchmark monitoring on the basis that such monitoring would provide an indication whether the SWPPPs were performing adequately and whether there were environmental effects that warranted addressing.[32] Benchmark monitoring came under significant scrutiny soon after the implementation of the 1995 MSGP began. Facilities were experiencing multiple exceedances, particularly for metals found in the natural background. Exceedances generated the need to evaluate and possibly modify many SWPPPs and changes at the site were made. Nonetheless, exceedances continued unabated.[33] There was little evidence that the benchmark regime was properly identifying facilities for corrective measures.

In contrast, the quarterly visual inspections, and the comprehensive site inspections that facilities implement were useful in identifying SWPPP improvements (without any costly analytical monitoring). Many industrial facilities have been effectively managing stormwater for decades without any analytical monitoring. The 1995 permit justified this no-monitoring regime for approximately half of the industrial subsectors, and EPA subsequently expressed no concern with this approach for those subsectors until now.

During development of the 2000 MSGP, EPA received substantial public comment questioning the value of benchmark monitoring. EPA admitted that it was "difficult to determine or confirm the existence of a discharge problem," and further that it had "no alternative that provides

547

stakeholders with an equivalent indicator of program effectiveness."[34] In effect, EPA acknowledged deficiencies, but concluded, without supporting evidence, that facilities needed this data.

In the 2000 MSGP, EPA committed to using 1995 and 2000 MSGP monitoring data "...to evaluate the effectiveness of management practices on an industry sector basis and to evaluate the need for changes in monitoring protocols for the next [i.e. 2005 proposed] permit."[35]

By 2005, there was a growing chorus of dissatisfaction among the regulated facilities. Therefore, EPA proposed a partial accommodation in the proposed 2005 permit.

EPA recognizes that there may be circumstances where benchmarks may not be reasonably achieved because of elevated background levels of pollutants. For example, high natural background levels of iron in soils or groundwater could contribute to exceedances of a benchmark. Concern has also been expressed that there may be other circumstances when an operator has taken all economically reasonable and appropriate measures to control pollutants, but a benchmark may still be exceeded. To address these situations, MSGP 2006 is proposing to provide an opportunity for permittees, following a review of their SWPPP, to determine that they are implementing all reasonable and appropriate BMPs to reduce pollutants in the discharge, and to document the basis for this determination in the SWPPP.[36]

In other words, EPA's proposed a pragmatic "work-around" solution to the inadequacy of the benchmark regime: permit an exit from unnecessary remedial actions after one engineering SWPPP review.

Many commenters on the proposed 2005 MSGP still expressed great concern with the high level of benchmark exceedances that led to unnecessary engineering evaluations. Commenters asserted that it was practically impossible for facilities to meet some of these benchmarks, particularly for iron, zinc, aluminum, and copper.[37]

To assist EPA on this issue, the U.S. Small Business Administration (SBA) Office of Advocacy sponsored a contractor report by Pechan & Associates, Inc. to recommend a better solution than ignoring the benchmark exceedance after an engineering review. The 2006 Pechan report[38] summarized the defects of the proposed 2005 permit and concluded that EPA did not have any evidence that poor SWPPP performance was correlated with benchmark exceedances.[39] Pechan discussed the results of a study by two UCLA professors[40] that found that the existing grab sample monitoring data "show very limited utility."[41]

These concerns, in part, led to EPA's decision not to finalize its proposed TSS monitoring for all sectors, and instead await more technical advice.[42] Nonetheless, it did finalize the "no alternatives" work-around approach discussed above.[43]

The Agency turned for the first time to the NRC for advice.[44] The 2009 NRC Study was very critical of the benchmark program stating that "it is not clear whether [benchmark] exceedances provide useful indicators of stormwater pollution prevention plan inadequacies or potential water

quality problems."[45] It cited "variability in sampling parameters, sampling time, and sampling strategy – that is poor data."[46]

Notably, NRC reported that the MSGP approach to benchmark monitoring has "largely been a failure."[47] Furthermore, NRC stated if it had its way, "the current benchmark monitoring conducted by MSGP facilities would be eliminated."[48]

In 2013, EPA finally wrote a memorandum to assess the benefits of benchmark monitoring that it first promised in 2000.[49] The Agency conceded that the memorandum failed to demonstrate that there was any relationship between benchmark exceedances and SWPPP deficiencies, which was the remaining primary justification for the monitoring program at that time.[50] In sum, throughout the 25 year history of the permit, the Agency has been unable to justify the utility of benchmarks to designate facilities that warrant intervention.

[32] 60 Fed. Reg. 50804, 56825 (September 29, 1995).

[33] See related Waggener analysis in Section II.

[34] 65 Fed. Reg. 64745, 64769 (October 30, 2000).

[35] Id.

[36] 2006 Proposed Reissuance of National Pollutant Discharge Elimination System (NPDES) Stormwater Multi- Sector General Permit for Industrial Activities, Fact Sheet, December 1, 2005 at 33.

[37] See related Waggener URS analysis at Section II of this letter.

[38] Analysis of Multi-Sector General Permit (MSGP) Stormwater Discharge Monitoring Requirements, Technical Memorandum, prepared for US SBA Office of Advocacy, E.H. Pechan & Associates, Inc., Durham, NC (March 2006).

[39] Pechan Report at 18-20.

[40] Stenstrom, one of the authors, was a member of the 2019 expert NRC panel.

[41] *Industrial Storm Water Monitoring Program Existing Statewide Permit Utility and Proposed Modifications*, Michael K. Stenstrom and Haejin Lee, University of California at Los Angeles, Final Report, January 2005. at 26.

[42] See Response to Comments, 2006 MSGP.

[43] The work-around permits facilities to end SWPPP evaluations once it determines that no more modifications were feasible or appropriate considering persistent benchmark exceedances.

[44] *Reducing Stormwater Discharge Contributions to Water Pollution*, 2009 NRC Study. The NRC is the operating arm of the National Academy of Sciences.

[45] Id. at 430.

[46] Id. at 439.

[47] Id. at 439

[48] Id. at 435.

[49] 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review (EPA 2013).

[50] EPA stated; "EPA found that most facilities (89%) are developing complete SWPPPs, but there is significant noncompliance with monitoring requirements. Only 35% of facilities submitted complete monitoring data and all facilities that submitted benchmark monitoring data had at least one benchmark exceedance. Of the facilities that completed benchmark monitoring, 84% identified corrective actions. None of the facilities reviewed had documented a clear reduction in benchmark exceedances after implementing corrective actions; most facilities continued to have benchmark exceedances after the corrective actions. 2008 MSGP Benchmark Report at 2 (EPA 2013).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

In its 2019 Study, NRC added three specific criticism of the derivation of the toxicity-based current benchmarks, but EPA's proposal fails to address two of the three. First, NRC states that dilution should be addressed through the application of a mixing zone concept.[58] Second, NRC states EPA should allow benchmark monitoring against dissolved metal concentrations, instead of total metal concentrations for the application of required remedial actions.[59] Actions by EPA to address these two issues would decrease the stringency of the existing scheme.

[58] Mixing zone allows dilution in a larger zone to be considered in protecting water quality.

[59] 2019 NRC Study at 61.

**Comment Response:**

See Comment Response Essay 2 Monitoring. In addition, mixing zones must comply with state regulations and are site specific and not applicable to NPDES general permits that are applicable throughout the United States.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**Part 4.2.1.1 - pH Benchmark**
According to the EPA, normal rain is a pH of between 5.0 and 5.5. So if a permitted facility incurs a normal pH rainfall and that storm water discharges from the permitted site without coming into contact with any other materials, that is an exceedance of the Benchmark range of a pH between 6 and 9. If each of the first 4 quarterly samples are taken after a normal rainfall, the facility would now be in Tier 1. If this occurred for 8 consecutive quarters, the facility would be in Tier 2. And if this happened for 12 consecutive quarters, the facility would be in Tier 3. And all of this occurred without a single drop of rain water coming into contact with any materials .. . the rain just fell out of the sky.

Now we should discuss the pH of "normal" rain in the Northeast where acid rain is not uncommon. According to the EPA, acid rain is typically a pH between 4.2 and 4.4. Therefore it is realistic to propose that a New England rainfall will be a pH between 4.2 and 5.6. This is outside of the Benchmark parameters and will result in Tiering of the facility only because it rained.

The pH benchmark is entirely unrealistic and should be completely removed from this Proposed Rule. EPA's own data shows naturally occurring rainfall is outside of the Benchmark parameters.

**Part 4.2.1.1 COD Benchmark**
My brief research into this new benchmark leaves me with a lot of question I am not sure there is enough definitive data out there to establish a valid and workable benchmark. The Proposed Rule sets a COD benchmark of 120 mg/L but the Swiss Government (an entity I would expect to be relatively conservative) sets their standard as 200-1200 mg/L. Obviously considerably higher than what the EPA is proposing here.

**Comment Response:**

As stated in the NRC study: "pH detects excess acidic or alkaline substances in the water, and pH excursions indicate corrosive (acidic or basic) and/or toxic concerns. Stormwater discharges that are excessively polluted may not exhibit problems with respect to pH. However, pH excursions that are highly acidic or highly alkaline and do not fall into the benchmark range (6.0–9.0) can be indicative of a major polluting event or process failure and can be impactful to receiving waters. Unexpected pH values also can indicate that a stormwater treatment system is not operating properly" (NRC, 27-28). "Chemical Oxygen Demand (COD) is a surrogate measure of organic pollutants in water (through measurement of oxygen demand). It is a conventional water quality parameter with established industrial stormwater benchmarks. In addition to the measure of oxygen demand, high COD can also be indicative of oils and hydrocarbon pollution and, as with TSS, can be an indicator of overall site cleanliness. Increases in COD could also indicate problems with the treatment SCM effectiveness, including the need for maintenance" (NRC, 27). EPA retains the pH and COD benchmarks and their values as proposed for certain sectors. EPA also includes monitoring requirements for pH and COD for other sectors as "report only" indicator monitoring. The source of these values are the Secondary Treatment Regulations (40 CFR 133) for pH and a factor of 4 times BOD5 (5-day biochemical oxygen demand) concentration - North Carolina Benchmark for COD. See 2021 MSGP Fact Sheet part 4.2.2.2.

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should provide an update on the implementation into the MSGP of latest recommended aquatic life criteria in Federal Register Notice, Final Aquatic Life Criteria for Aluminum in Freshwater dated December 21, 2018 which is based on the water chemistry data for pH, hardness and dissolved organic carbon (DOC) entered into the criteria calculator for a given location (see https://www.epa.gov/wqc/aquatic-life-criteria-aluminum).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

2021 EPA MSGP Response to Comments
January 15, 2021

### ii. Benchmark monitoring schedule for sector-specific benchmarks

EPA inexplicably and arbitrarily ignores the NAS recommendation with respect to sector-specific benchmarks and fails to require any monitoring beyond the initial four quarters that are currently required.[46] EPA did not even solicit comment on this issue. This is an egregious oversight on EPA's part, and one that the Agency must correct.

There was nothing in the NAS report to suggest that its recommendations for more frequent monitoring were limited to the universal benchmarks. The two-part rationale for recommending ongoing annual monitoring – statistical confidence and accounting for changing conditions – apply equally to sector-specific benchmark monitoring parameters. EPA failed to provide any justification for ignoring the NAS recommendation, so we are forced to speculate. Perhaps EPA believes that quarterly monitoring of the universal benchmark monitoring parameters will provide adequate assurances of site performance. This would be unreasonable. Only the sector-specific benchmarks provide information about "total" metals, for example, including metals in dissolved form. The NAS notes that TSS is not a reliable indicator of dissolved pollutants, and not even the best indicator of particulate matter.[47] According to the NAS, "attaining the benchmark for TSS at industrial sites is not a sufficient surrogate for meeting the metals benchmark[s]."[48] It would be arbitrary and unwise for EPA to forego annual monitoring for total metals because the dissolved fraction is "more biologically available than particulate-bound metals" and "more important in assessing pollutant risk."[49] According to the NAS, "[i]n a number of stormwater studies, a significant fraction (approximately 30 to 70 percent) of copper, cadmium, and zinc was found in dissolved form."[50]

Again, the NAS strongly recommended at least ongoing annual monitoring for all benchmarks, not just the universal benchmarks. Given that permittees are already required to collect quarterly storm event samples and would be required by the draft MSGP to analyze for universal benchmarks, there would be very little additional burden on permittees to analyze sector-specific benchmarks on a quarterly basis.

EPA must require ongoing, quarterly monitoring of sector-specific benchmarks throughout the permit term.

[46] Draft Permit at 30, Part 4.2.1.2(b).

[47] NAS at 28.

[48] *Id.* at 40.

[49] *Id.* at 61.

[50] *Id.*

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

*c. More frequent benchmark monitoring for sectors with high coefficients of variation*

The NAS urged EPA to require more monitoring from sectors with unacceptably high coefficients of variation (COVs).[51] A high COV shows that the existing monitoring data for a sector are too variable and/or uncertain to provide a meaningful characterization of that sector's discharges.

One important reason for requiring more data is so that EPA can evaluate the need for numeric effluent limitations and develop such limitations where necessary. The only reason that the NAS did not recommend the development of new limitations at present is that EPA lacks the necessary data:

Based on the paucity of industrial SCM performance data available at this time, no specific sectors are recommended for development of new numeric effluent limitations *solely based* on existing data, data gaps, and the current likelihood of filling them."[52]

Numeric effluent limitations may in fact be necessary, and the only thing standing between EPA and the developmental of new limitations is a lack of data. This includes targeted SCM performance data (discussed elsewhere in this comment letter), but more frequent benchmark monitoring data would also be useful for this purpose.

As EPA notes in the Fact Sheet, in order to derive numeric effluent limitations, "[m]any samples are needed because of the high variability (i.e., coefficients of variation) for industrial stormwater (which is much greater than for drinking water and wastewater). The benchmark monitoring data that is currently collected in the MSGP is not suitable or sufficient for determining [numeric effluent limitations]."[53] Here we see that EPA acknowledges the problem with high coefficients of variation, but the Agency fails to respond to the NAS recommendations aimed at ameliorating this problem.

It is worth pointing out that the NAS suggested specific monitoring frequencies that might be appropriate for the sectors with high coefficients of variation: 2-4 samples per year.[54] In other words, if EPA were to adopt uniform, quarterly monitoring for all benchmark monitoring parameters, including sector-specific parameters, it would automatically address the data gaps flagged by the NAS.

[51] *Id.* at 5, 51, 65.

[52] *Id.* at 41 (emphasis added).

[53] Fact Sheet at 6.

[54] NAS at 51.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

*12. EPA Should Not Adopt Certain Proposals to Revise Benchmark Values and Adopt Other Proposals, with Certain Revisions.*

The NAS recommended that EPA review benchmark levels for certain pollutants, namely aluminum, arsenic, cadmium, copper, iron, magnesium, selenium, and PAHs.[67] The fact sheet explains how EPA responded to the NAS recommendations,[68] and we provide comment on each decision below. As a general matter, we note that the Clean Water Act is designed to progressively ratchet pollution limits down over time. The "national goal" of the Clean Water Act is that "the discharge of pollutants into the navigable waters be eliminated." Short of that zero-discharge goal, the Clean Water Act allows for water-quality based limits, but it is important to remember that maintaining water quality is only an "interim goal" on the path to zero discharge.[69] EPA's role is to progressively tighten pollution limits. This is reflected in various provisions of the CWA and its implementing regulations, including "anti-backsliding" provisions that generally serve to prevent the weakening of pollution limits,[70] and technology-based limits that represent "a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges."[71]

In light of EPA's mandate under the Clean Water Act, any relaxation of pollution limits should be rare or exceptional, and supported by a strong evidentiary record. We support some of EPA's decisions with respect to the derivation of benchmark levels, but we oppose others. In particular, we oppose the removal of the iron benchmark. And we are troubled by EPA's mischaracterization of the NAS report with respect to PAHs. The NAS strongly urged EPA to require PAH monitoring and did not support the idea that COD could be a useful surrogate for PAHs. EPA must require PAH monitoring.

[67] NAS at 31-34.

[68] *See, e.g.*, Fact Sheet at 3. The Fact Sheet cites the NAS report as the "NRC Study," using the acronym for the National Research Council, once a subunit of the National Academies of Sciences, Engineering and Medicine.

[69] 33 USC §1252(a)(2).

[70] 33 USC §1342(o).

[71] *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 74 (1980).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

**Aluminum.** The NAS recommended that EPA update the aluminum benchmark to reflect the most recent water quality criteria for aluminum.[72] The fact sheet explains that EPA is not changing the aluminum benchmark because the underlying criteria document is not yet final.[73] Although we support EPA's stated rationale – we agree that it would be inappropriate to relax a benchmark on the basis of a draft document – it appears that EPA did finalize the criteria document in 2018.[74] However, this should not change EPA's decision. As explained below, EPA would be justified in retaining the existing benchmark even after considering the 2018 criteria document. EPA would not be justified in setting a benchmark any higher than 980 µg/L.

The 2018 aluminum criteria document does not provide single values for either the criteria maximum concentration (CMC) or the criterion continuous concentration (CCC). Instead, the new criteria document presents a calculator for deriving site-specific criteria based on pH, hardness, and dissolved organic carbon (DOC) conditions.[75] Both EPA and the NAS cite the 2017 draft criteria document as recommending an "acute criteri[on] of 1,400 µg/L based on a pH value of 7, hardness value of 100 mg/L, and DOC value of 1 mg/L."[76] This value now appears to be outdated, and EPA should not adopt this value.

In keeping with past practice, EPA should set the aluminum benchmark equal to the CMC. The NAS recommended adopting the draft aluminum criteria document approach.[77] If EPA did take this approach, using the same default pH, hardness and DOC values cited in the draft document – pH of 7, hardness of 100 mg/L, and DOC of 1 mg/L – then the criteria calculator would yield a CMC (and benchmark) of 980 ug/L.

However, if EPA is choosing to select a fixed benchmark that will protect all receiving streams, it would make more sense to select a lower bound value. The aluminum criteria calculator states that "EPA aluminum criteria recommend staying within specified limits for pH (5.0-10.5), total hardness (0.01-430 mg/L as CaCO3) and DOC (0.08-12.0 mg/L) for generating criteria." Applying these parameter ranges yields aluminum CMC values as low as 0.0014 µg/L.[78] These conditions are of course very unlikely to occur in the real world, but this example serves to demonstrate that a static value would have to be significantly lower than 1,400 µg/L to be protective of all or even most receiving streams.

To take a much more realistic example, at a pH of 6.5, hardness of 45 mg/L, and DOC level of 3 mg/L, the CMC would be 750 µg/L – equal to the current benchmark. The same result can be achieved by adjusting the three parameters to various levels near the middle of their recommended ranges. This means that the current benchmark is appropriate for ordinary, real-world scenarios. The aluminum criteria document therefore supports EPA's decision to retain the existing benchmark. It should be noted, however, that neither the 750 µg/L benchmark nor a benchmark of 980 µg/L would be protective in all cases.

To summarize, the current aluminum criteria document supports EPA's decision to retain the existing aluminum benchmark of 750 µg/L. If EPA does choose to revise the aluminum benchmark, it should adopt a value no greater than 980 µg/L.

[72] NAS at 33.

[73] Fact Sheet at 64.

[74] U.S. Envtl. Prot. Agency, Final Aquatic Life Ambient Water Quality Criteria for Aluminum 2018, EPA-822-R-18-001 (Dec. 2018).

[75] U.S. Envtl. Prot. Agency, Aluminum Criteria Calculator V2.0, https://www.epa.gov/sites/production/files/2018-12/aluminum-criteria-calculator-v20.xlsm (last accessed Apr. 7, 2020).

[76] Fact Sheet at 64; NAS at 33.

[77] NAS at 33.

[78] Where pH = 5, hardness = 0.01 mg/L, and DOC = 0.08 mg/L.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rebecca McGrew
**Commenter Affiliation:**  North American Coal Corporation

**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmark Monitoring**

Application of any numeric criteria to stormwater is problematic given (1) the unique conditions that occur during episodic storm events and (2) the failure to account for the receiving water assimilation of the pollutant or for a mixing zone or similar approach (when appropriate).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

In addition to the universal benchmarks, aluminum is included as a parameter of concern in many of our operation's MSGPs. EPA's new aluminum criteria was finalized in December 2018 and relies on a multiple linear regression model to determine the appropriate regulatory limit for the bioavailable fraction (i.e. toxic) form of aluminum. While industry generally supports the new aluminum water quality criteria, there is no currently approved test method capable of testing the bioavailable fraction of aluminum in discharges. As a result, the new criteria requires permit limits be issued for total recoverable aluminum. This is problematic as the total recoverable aluminum test method uses a very strong acid which extracts non-bioavailable aluminum from suspended clay particles present in the sample. The extraction process can cause significant overestimation of toxic aluminum present in stormwater.

NACoal requests the 2020 MSGP permit continue to rely on the 2015 MSGP aluminum limit of 750 ug/L. This will allow for consistent monitoring while EPA works to implement the new 2018 aluminum criteria.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

NACoal understands EPA agreed to several terms as part of a sue-and-settle lawsuit initiated by NGOs against the 2015 MSGP. One of these terms included instituting an "Additional Implementation Measures" (AIM) benchmark exceedance protocol. EPA's proposed benchmark monitoring provisions (given the expanded corrective action provisions in the proposed 2020 MSGP) have the effect of turning benchmarks into de facto compliance standards, and there is no legal or technical basis to impose them as such.

Stormwater runoff quality from disturbed and undisturbed areas is often influenced as much or more by the type and intensity of the storm event, and the time since the last rain event, than by the type of control measures implemented. The quality of storm water discharge has been seen to vary significantly even where there has been no change in control measures.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

The changes proposed to the MSGP in relationship to benchmark monitoring and values raise a number of questions:

1. What "universal" monitoring should be done?
2. What pollutants/parameters should be included in the individual sector monitoring requirements?
3. How should previous monitoring results and background conditions be considered in regards to monitoring, the frequency of monitoring, and actions taken by the permit holder?
4. What is the frequency of monitoring?
5. What should be the basis of benchmark values?

Benchmark monitoring and the concept of using a "benchmark value", that once exceeded requires an evaluation or additional actions by the permittee, have been a major component of

the MSGP program for decades. <u>Simplot recommends that EPA use this process in updating the MSGP to holistically look at benchmark monitoring and values.</u> The objective should be to:

1. Determine what is appropriate universal monitoring to provide basic measures of stormwater quality.
2. For individual industrial sectors, determine what individual pollutants or parameters monitoring needs to reflect potential key pollutants from that sector.
3. Establish benchmark values that reflect what control measures can achieve and account for background conditions.

Ultimately, regulated waters need to attain designated beneficial uses, and thus meet the water quality standards that represent those beneficial uses. If a water body/segment is not meeting water quality standards, then as a part of a state's plan to address this issue, further requirements may be needed for stormwater discharges that may contribute to any standards exceedance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

EPA has proposed a number of changes in the Benchmark part (monitoring, frequency and values) of the MSGP. A number of these changes are based on the NAS Report. As described earlier, the NAS Report has a number of shortcomings, and these are very evident in the recommendations related to the benchmark monitoring and applicable values. The expansion of the "universal" benchmark monitoring to include pH and COD will result in increased expenses with a very uncertain level of benefit as these parameters are not relevant to a number of industrial sectors. Furthermore, benchmark values need to be appropriately selected and account for number of factors, such as background conditions, past monitoring data, geographical setting and toxicity (acute) concentrations. Benchmark values (and water quality standards) should not be viewed as de facto stormwater effluent limits. Rather the purpose of the benchmark value is to have a "threshold", which when exceeded, results in a review of potential improvements in BMPs and control measures.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Aluminum – It appears that the fact sheet is incorrect. Aluminum criteria were updated in December 2018, and the listed criteria for aluminum are now out of date and need to be updated in the final MSGP. Information on Aluminum criteria can be found here: https://www.epa.gov/wqc/aquatic-life-criteria-aluminum#2018.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

It appears the current recommended national criteria for Silver (https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table) are not hardness dependent. We ask EPA to clarify why a hardness dependent number is being used, or correct this if it is an error.

**Comment Response:**

The acute criterion for silver referenced in the National Recommended Water Quality Criteria – Aquatic Life Criteria Table on EPA's website, as referenced in the comment, reflects the hardness-based criterion at a specific hardness. The hardness-based equation for the recommended acute aquatic life criterion is $e^{(1.72[\ln(hardness)]-6.52)}$. See EPA's 1980 Ambient Water Quality Criteria for Silver (EPA 440/5-80-071). The current EPA recommended water quality criteria for silver has been included in the 2021 MSGP.

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1

**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Given that the ammonia criteria are equation based, can EPA clarify how they arrived at the benchmark concentration for ammonia?

**Comment Response:**

The current benchmark (2.14 mg/L) is based on EPA's 1999 recommended criteria (acute based on pH = 8.5).

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

For Chromium III, it appears the benchmark for freshwater should be hardness dependent, as shown here: https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table. Please clarify why the number used is not hardness dependent, or correct this if it is an error.

**Comment Response:**

The proposed chromium III benchmark was removed in the 2021 MSGP since EPA is not finalizing the benchmarks that were proposed for Sector R (Ship and Boat Building and Repair Yards). At this time, EPA is requiring indicator monitoring for pH, TSS, and COD for facilities in Sector R1. The indicator monitoring will provide operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control effectiveness at these facilities, as recommended by NRC. EPA will use the results of the indicator monitoring to re-assess the need for additional chemical-specific benchmark monitoring for the next reissuance of the MSGP. See also Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Lealdon Langley
**Commenter Affiliation:** Massachusetts Department of Environmental Protection (MassDEP)

**Document Control Number:** EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Chromium VI has different concentrations listed for saltwater. In the permit it says 110 ug/L and the fact sheet says 1100 ug/L. Please correct this and ensure consistency between the documents.

**Comment Response:**

The proposed chromium VI benchmark was removed in the 2021 MSGP since EPA is not finalizing the benchmarks that were proposed for Sector R (Ship and Boat Building and Repair Yards).

---

**Commenter Name:** Benjamin J. Davenport
**Commenter Affiliation:** Idaho Mining Association (IMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Benchmark Monitoring. In the 2015 MSGP, benchmark monitoring is required for one year of discharges from limited areas within mining operations. Proposed language in the 2020 permit requires expanded spatial and temporal benchmark monitoring with lack of clarity regarding the value of the monitoring data and its pertinence to the mining industry.

*IMA requests EPA review the changed language in Section 4.2.4 of the draft permit. with consideration for implementation and how the presence of pollutants from background sources will be managed. Additionally, we request that benchmark monitoring be limited to locations otherwise required to have sector-specific monitoring.*

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt:**

- **Analyzing for Dissolved metals** in lieu of total metals does help meet the benchmark for some parameters, and NORA believes this is appropriate for water quality derived benchmarks because metals trapped in the particulates in stormwater are generally not available to aquatic organisms. We therefore support the use of dissolved metals analyses for benchmark monitoring. However, the metal benchmarks listed in the Benchmark Table in the proposed MSGP Fact Sheet (pages 69-72) still list all metal benchmarks as "total recoverable" which requires an acid digestion (to dissolve the metals) prior to the laboratory analysis. Another minor drawback is that the sampling for dissolved metals analysis can be another source of contamination. This can largely be overcome by training the sampler in capturing clean filtered samples for dissolved metals analysis in the field through an in-line 0.45 micron filter (using a peristaltic pump). Most importantly, the sampler must allow for a significant amount of water to flow through the filter before collecting the grab sample, in order to flush through contamination that may be present in the filter device. The water quality limits for some metals are extremely low, and contamination from the filter apparatus could possibly cause the sample to exceed the benchmark in the small volume of sample (100 to 200 mL) usually taken for this purpose. For example, dissolved sampling may not be successful for some metals that are highly prone to contamination such as copper, where the benchmark can be in the very low (3.8 ppb) range.
- **Aluminum**-NORA would support updating the benchmark limit for aluminum from 0.75 mg/L to 1.4 mg/L, as per the latest WQ data. Aluminum is one of the most common constituents of most soils (just after oxygen and silicon in average concentration, according to Texas A&M online Textbook: "Soil and Crop Sciences"), so there are a high number of benchmark exceedances for the 0.75 mg/L benchmark.
- **Zinc**-is one of the benchmark parameters that remains problematic for compliance, as noted in the 2019 NRC report. Zinc is a very common metal, and the problems with zinc can include background and/or contamination problems similar to those outlined for copper in the following section of these comments

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**Sector Specific Benchmarks – Aluminum**

Background and Current Status

The draft MSGP Sectors C, E, F, H, M, N, Q, and AA contain sector specific benchmarks for aluminum set at 750 ug/L of Total Recoverable Aluminum. This is unchanged from the 2015 MSGP and the 750 ug/L level is the 1988 acute criteria for aluminum. EPA notes in the draft MSGP fact sheet (page 65 of 109) that the NRC study recommended updating the aluminum benchmark using new data available since 1988 but that the new criteria was still in draft form and therefore not available for use. Further, that EPA would consider updating the benchmark if the criteria were "issued before EPA finalizes the 2020 MSGP."

On December 21, 2018, EPA finalized (83 FR 65663) the aluminum criteria reflective of the current science. In addition, EPA has also been developing implementation guidance for the criteria to assist the states in their efforts. Notably, EPA proposed an implementation rule for the state of Oregon in 2019 (84 FR 18454) which is near finalization. The state of Iowa (EPC proposed amendment to Chapter 61, Water Quality Standards of the Iowa Administrative Code, June 3, 2020) is also near final implementation of an aluminum criteria revision.

The Iowa proposed rule uses the 2018 EPA aluminum criteria calculator to set the acute criteria at 2500 ug/L. This criterion was calculated using the lowest 10th percentile of individual model outputs using spatially and temporally representative model inputs from across the state. Similarly, EPA's Oregon proposed rule provides three methods for calculating criteria values that will result in protection of aquatic life at a site. One of the three methods proposed is to calculate a protective criterion by taking the lowest 10th percentile of the distribution of individual model outputs based on spatially and temporally representative measured input values.

Requested Action

EPA should use the 2018 aluminum criteria calculator to set the sector specific benchmark for aluminum in the 2020 MSGP. This should be done by utilizing data available to EPA in the nationwide waterbody sampling and analytical database and inputting it into the 2018 criteria calculator for acute toxicity to determine the lowest 10th percentile of individual model outputs using spatially and temporally representative model inputs from across the nation. The output number from this calculation would then be set as the sector specific aluminum benchmark. Individual facilities should also be allowed to use site-specific receiving stream water body data from upstream of the discharge point as input to the 2018 criteria calculator to set a site-specific benchmark for aluminum.

**TSS and Bioavailability**

Background and Current Status

The median aluminum content in 'natural TSS' (i.e., TSS not associated with any industrial activity) is around 8% due to the significant presence of aluminum compounds in the earth's crust and its associated soils, sediments, and minerals. By extension, stormwater with a level of TSS at 9.4 mg/L or greater is likely to fail the sector specific aluminum benchmark of 750 ug/L Total Recoverable Aluminum (750 ug/L Al / 0.08 = 9.38 mg/L) without any aluminum contribution by industrial activities on the site.

Aluminum exists is several forms within the water column. There are the dissolved, colloidal, silicate, and organo-metallic forms. Not all of these forms are "biologically" available to the aquatic life in the receiving streams. The only forms that are bioavailable are the dissolved and colloidal fractions. Most metals are moving towards dissolved metals for this reason but the colloidal fraction of aluminum, often $AlOH_3$ or $Al(OH)$– can cause some issues with the aquatic life. For this reason, dissolved aluminum testing may not be sufficient to capture all of the toxicity within the water column due to aluminum.

The analytical procedure for total recoverable metals involves lowering the pH of the water sample to 2 in sulfuric acid, heating and stirring for upwards to 8 hours, and then filtering the sample for final analysis. This processing step dissolves all silicate and organo-metallic aluminum, thus far overstating the amount of aluminum that is bioavailable under ambient conditions and making the test method far too conservative for use in stormwater testing. In recognition of this situation, a new test method involving lowering of the pH of the water sample to 4 is being developed through ASTM to more accurately measure the bioavailable fraction of aluminum in waters with TSS components. This test method was recognized by EPA within the preamble of the final aluminum criteria (page 41 of 329) stating:

*"The validation of the pH 4 extraction method is still on-going, with the expectation that this approach will better estimate the bioavailable fraction of aluminum in natural waters."*

Unfortunately, it is unlikely that the bio-available test method will be finalized and available for use prior to issuance of the 2020 MSGP. However, the method has been published in the peer reviewed literature (*Rodriguez P, Arbildua J, Villavicencio G, Urrestarazu P, Opazo M, Cardwell A, Stubblefield W, NordheimE, and Adams W. 2019. Determination of Bioavailable Aluminum in Natural Waters in the Presence of Suspended Solids. Environ Toxicol and Chem. 38 (8): 1668–1681.*)

Requested Action

EPA should include a provision in the 2020 MSGP for the sector specific aluminum benchmarks that once the ASTM bioavailable aluminum test method is finalized, measurement of aluminum for comparison against the benchmark can be done using the bioavailable method rather than total recoverable method.

...

Zinc and all other metals except for aluminum should be evaluated on a dissolved metals basis to accurately assess the environmental impact of these metals.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Metals

Test methods used for metals testing are over-conservative for the purpose of evaluating stormwater (see aluminum specific discussion above as an example). This presents a situation where a testing result is over a benchmark level not because of failed (BMP's) but because of interpretation of the test method results.

Total metals testing involves lowering the pH of the water sample to 2 in sulfuric acid, heating and stirring for upwards to 8 hours, and then filtering the sample for final analysis. This processing step dissolves all silicate and organo-metallic metals present which makes the test method very conservative when applied to stormwater.

The Ohio River Sanitation Commission (ORSANCO) began testing the Ohio River for dissolved metals in October 2000 because the total metals data indicating serious aquatic life impairment was not consistent with the finding of its fish population studies (i.e. the fish were alive and thriving whereas the test results indicated they should be impaired/dead).

Zinc and Other Non-Aluminum Metals

Few industrial sectors that are required to test for zinc in their stormwater discharge can demonstrate benchmark applicability. There are two major reasons for this - building siding and tires. Many industrial facilities have galvanized sheet metal exteriors and fencing, and the galvanizing process involves zinc which is subsequently released zinc during rain events. However, building materials such as building cladding and fencing that are designed for outdoor use are not listed in the EPA definition of industrial activity subject to stormwater permitting applicability. The second reason is zinc's inherent prevalence in tires and rubber products. Delivery vehicles, fork trucks, and even vehicle tires in employee parking areas contribute to the issue. The zinc arising from normal tire wear is typically in the fine particulate form but total recoverable test methods significantly over-predict the amount of its environmental impact.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater

Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations for Aluminum Benchmarks**

Although EPA has not requested comment on this issue specifically, the FWQC and FSWA note that EPA's statements regarding aluminum in the Proposed 2020 MSGP suggest that the criteria for aluminum are in draft form. This is incorrect, however, as the criteria became final in December 2018.[30] Accordingly, the FWQC and FSWA recommend that EPA acknowledge the final criteria and use such criteria to develop the new aluminum benchmarks.

[30] See "2018 Final Aquatic Life Criteria for Aluminum in Freshwater," EPA-822-R-18-001 (December 2019) available at https://www.epa.gov/wqc/2018-final-aquatic-life-criteria-aluminum-freshwater .

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations as to Use of Dissolved Form for Metals**

While EPA does not specifically ask for comment on the issue of using the dissolved form for metals benchmarks, the FWQC and FSWA believe that this is an important issue, and should be dealt with in the MSGP. Examples of proposed permit benchmark parameters include total recoverable zinc, total recoverable arsenic, and total recoverable copper whose criteria are based on the dissolved form of the metal. The NRC report acknowledges that dissolved metals are more biologically available than particulate-bound metals; therefore, dissolved metal concentrations provide a more useful means of evaluating potential impact to aquatic life. For this reason, the NRC report recommends that industries with repeated benchmark exceedances from total metal samples should be allowed to sample for dissolved metals. The NRC recognizes

that the sampling for dissolved metals is more complex than sampling for total metals, so it suggests that dissolved metal sampling should be an option, not a requirement.

For copper and some other metals, the more complex Biotic Ligand Model (BLM) is used to determine the bioavailability of the metals to aquatic life based on ten parameters of the water body in question. Using the BLM for a specific site would require obtaining water quality parameters of the receiving waters, including hardness, pH, dissolved organic carbon, major ions, and alkalinity. The NRC report recommends that the MSGP should allow facilities who have repeated benchmark exceedances for total metals to develop a BLM for their receiving water in order to establish a site-specific benchmark value. The report describes how watershed-based collaborative relationships between industries, municipalities, and other dischargers could be established in order to develop watershed-specific benchmark concentrations for copper using the BLM, and it states that this has already been done in Oregon. EPA should allow this option.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

We support that facilities should be allowed to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis, and to discontinue comparison to national benchmarks for certain metals (such as copper) as described in the proposed 2020 MSGP. In addition, it is reasonable to update the benchmark concentrations for other metals as appropriate based on the current available aquatic life criteria.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

<u>If Benchmarks for Common Metals and TSS are Imposed on the Rail Industry, the Benchmark
Limits Must be Revised.</u>

In the event that EPA opts to proceed with imposing benchmark monitoring requirements and the
AIM enforcement system on Sector P and, more specifically, the rail industry, the benchmark
limits for many Common Metals and TSS must be revised. The concentration of ambient water
quality standards are unsuitable for stormwater benchmark limits and, when combined with the
proposed AIM corrective responses, set the stage for frequent benchmark failures with
unnecessary radical increases in corrective actions and cost.

For the reasons explained above, there should be no benchmark monitoring requirement imposed
on railroads or Sector P. If, however, EPA opts to proceed with implementing a benchmark
monitoring, such limits need to be based on technologically-achievable levels specific to the
industry. The benchmarking limits in the Proposed 2020 MSGP do not have a proven in-use
technology that can achieve the proposed values, nor have they been vetted for economic
feasibility. In reality, the proposed benchmark requirements are unattainable, as consistently
demonstrated by data derived from each successive MSGP.[37] To base such limits solely on
ambient water quality could result in Sector P facilities, and in particular the rail industry,
exceeding the benchmarking limits despite the best technologically-achievable efforts to avoid
exceedances.

The following table, extracted from EPA's own assessment of the EPA data from the 2008 EPA
MSGP, illustrates that high percentages of facilities had at least one annual failure for the
following parameters despite corrective actions:

**Table 5. EPA Benchmark Data Analysis for Select Metal Parameters (2008 MSGP)**

| Parameter | Number of Permittees | Permittees with 1 or More Annual Exceedance | % of Permittees with 1 or More Annual Exceedance |
|---|---|---|---|
| Aluminum | 66 | 39 | 59 |
| Copper | 42 | 34 | 81 |
| Iron | 114 | 90 | 79 |
| Lead | 39 | 16 | 41 |
| Magnesium | 1 | 1 | 100 |
| Zinc | 60 | 43 | 72 |
| *Subtotal* | 322 | 223 | 69 |

The full 2014 URS Report, included as Appendix E to these comments, discusses Table 5 and
provides suggestions as to how the benchmarks could be revised to reflect background
conditions.

[37] EPA Document "2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review" (Docket ID EPA-HQ-OW-2012-0803-0002).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

It should be noted that the NRC Study critiqued the DMR results collected for the 2015 EPA MSGP and also indicated that the exceedance percentages remained very high for most of these same parameters. Under the proposed AIM Tiers, these exceedances would become increasingly more costly. As such, EPA should allow facilities to choose from several options in comparing their discharges to the benchmarks. Several recommended options are discussed below.

Option 1: Base the Benchmarks for Common Metals and TSS on Non-industrial Stormwater Runoff Using the EPA Supported National Stormwater Quality Database (NSQD).

Actual stormwater runoff from any source will not meet all of the ambient water quality benchmark limits all of the time. One purpose of the MSGP is to assist an industry in avoiding significant increases in pollutants over what would normally be received from the rest of the (non-industrial) locality in which they are located. It is therefore logical to compare industrial runoff to other typical stormwater runoffs from non-industrial sources.

The NSQD surveys stormwater runoff from urban and suburban city environments.[38] It assigns sampling locations to eight different Land Use categories, which are also further broken into additional designations of mixed land use (such as commercial-residential, etc.). The land uses include industrial, commercial, freeway, residential and "open space" designations. The 2014 URS memo[39] selected the NSQD "residential" land use runoff data for comparison to the industrial MSGP DMR data, and uses the NSQD data as a guide to setting MSGP benchmarks. This report takes the approach of using the 95th percentile of the residential runoff to determine the MSGP benchmark for the specific common metal compounds, in addition to the TSS benchmark. EPA should consider using these 95th percentile values as benchmarks for grab samples taken during the first 30 minutes of discharge. For example, under this approach the benchmark for TSS would be 470 mg/L.[40]

[38] http://www.bmpdatabase.org/nsqd.html (version 3 is reference 1 in the URS report, and is available online, there is also a version 4 EPA should consider)

[39] Attached as Appendix E.

[40] AAR comments on 2015 MSGP Docket ID EPA-HQ-OW-2012-0803-0080.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

It should be noted that the NRC Study critiqued the DMR results collected for the 2015 EPA MSGP and also indicated that the exceedance percentages remained very high for most of these same parameters. Under the proposed AIM Tiers, these exceedances would become increasingly more costly. As such, EPA should allow facilities to choose from several options in comparing their discharges to the benchmarks. Several recommended options are discussed below.

...

Option 2: Analyze for Dissolved Metals for Comparison to Benchmarks in lieu of Total Metals for Benchmark Monitoring.
Analyzing grab samples for dissolved metals and comparing to benchmarks is appropriate for water quality derived benchmarks because metals trapped in the particulates, such as soil particles in stormwater, are generally unavailable to aquatic organisms. This approach is particularly effective for meeting the lead and zinc benchmark limits, and possibly other common metals if performed correctly.[41]

[41] However, all the metal benchmarks listed in the Benchmark Table in the proposed MSGP Fact Sheet are still listed as "total recoverable" which requires an acid digestion (to dissolve particulate metals) prior to the laboratory analysis. A drawback is that the sampling for dissolved metals analysis can become another source of contamination. This can largely be overcome by proper training of samplers in clean field techniques using an in-line 0.45 micron filter using a peristaltic pump, and not sampling the first 100 or so milliliters of sample coming off the filter. However, the water quality limits for some metals are extremely low, and contamination from the filter apparatus could possibly cause the sample to fail the benchmark. For example, dissolved sampling may not be successful for some metals that are highly prone to contamination such as copper, where the benchmark can be as low as 3.8 parts per billion.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

It should be noted that the NRC Study critiqued the DMR results collected for the 2015 EPA MSGP and also indicated that the exceedance percentages remained very high for most of these same parameters. Under the proposed AIM Tiers, these exceedances would become increasingly more costly. As such, EPA should allow facilities to choose from several options in comparing their discharges to the benchmarks. Several recommended options are discussed below.

...

Option 3: Set a Standard Background Correction to the MSGP Benchmark Analyses Using Non-Industrial Stormwater Runoff Data from NSQD.

AAR supports EPA's proposed changes to the background subtraction allowance, which allows a facility to subtract a background sample concentration from the facility discharge. Background analyses have been allowed in previous MSGPs, and this allows a facility to be considered in compliance with the benchmark if the resultant difference between the background and the benchmark analysis is lower than or equal to the benchmark limit. It is difficult, however, to find suitable background stormwater runoff locations, particularly in urban or suburban settings. Further, background data should be collected for a series of rain events, since rain events have great variability that can have a major impact as to how much of a benchmark parameter is present in a single background stormwater sampling. Accomplishing this could involve a significant amount of effort, and it may not provide useful results. EPA should therefore use as background a standard residential use background as has been cataloged within the NSQD database.

Presented below is an example from the database of the average data for the most common benchmark parameters present in background runoff.

**Table 6: Average Stormwater Runoff Values in 2008 NSQD for Residential Land Use**[42]

| Benchmark Parameters | Copper (ug/L) | Iron (ug/L) | Lead (ug/L) | Zinc (ug/L) | TSS (mg/L) |
|---|---|---|---|---|---|
| NSQD Average Value for Residential Land Use | 25.6 | 3293 | 16.9 | 115 | 120 |

[42] Some comments concerning this table:
• Only land use that was labeled "residential" was used, no mixtures such as residential-commercial were used.
• The intended purpose of the MSGP is to control pollutants in stormwater that are caused by industrial activity. However, these common metals are also clearly present at levels that exceed many of the benchmark limits in ordinary residential stormwater runoff.
• The average value for iron, as can be seen, can also be quite high even in residential runoffs. That AAR supports the EPA proposal to remove benchmark monitoring for iron.
• The average for lead is over the lowest hardness level benchmark but is below the other eleven benchmark levels.
• The average TSS level for the residential land use is already over the benchmark. This is an indication that industrial facilities are not the only land use that has trouble with even basic benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  Henniker Sand and Gravel
**Document Control Number:**  EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Part 4.2.1.2.b: Schedule for Sector-Specific Benchmarks: We generally support EPA's the proposed schedule of benchmark monitoring but request that EPA change that this section to state that the benchmark monitoring (BM) requirements will be met for any parameter if the annual average value is below the benchmark threshold for any four consecutive quarters and not just the first four quarters. It should not make any difference if the annual value is below the BM threshold in the first four quarters or any subsequent four consecutive quarters during the permit term. This would provide relief if a qualified storm event does not occur or if there is insufficient discharge runoff/discharge on one or more of the first four quarters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

*C. Benchmark Data Does Not Provide an Indication of Effective SWPPP Plans*

Benchmark monitoring is supposed to provide insight into the effectiveness of SWPPP implementation and lead to reduced exceedances. However, EPA's own analysis indicates that benchmark monitoring-driven SWPPP improvements had no apparent effect on reducing future benchmark exceedances.[34] As a result, EPA introduced a work-around in the 2006 MSGP to address this concern.[35]

The benchmark approach also suffers from EPA's inability to address exceedances that are due almost entirely to natural background sources, particularly metals. Waggener of URS (now AECOM) demonstrated that exceedances were often driven by background levels in the U.S., and not from industrial activity. In a February 2015 memo to EPA, URS found that in a majority of cases, "the benchmark exceedances in the MSGP database are not likely due to industrial activities and cannot be addressed through corrective actions."[36] As URS observed, "[t]he contribution of these metals to total exceedances is further demonstrated by the fact that EPA's analysis shows that a full 72 percent of the facilities that exceeded one or more benchmarks, had an exceedance attributable to a metal parameter."[37] For example, EPA monitoring data shows that facility exceedances were driven almost entirely by EPA's choice of monitoring parameters and dominated by facilities that have aluminum, iron, copper, or zinc benchmarks that are very low. The analysis described a high percentage of benchmark exceedances for common metals, using the below table developed by EPA.[38] A remarkable proportion, between 59% and 79% of facilities with any one of these benchmarks exceed one of these benchmarks.[39] The percentage is higher for facilities with more than one of these four benchmarks. It is difficult or impossible for such facilities to meet these unrealistic benchmarks and this challenge is found throughout the MSGP program.[40] These findings provide insight into why benchmark exceedances are not reliable indicators of poor SWPPP performance.

The Waggener paper presents a compelling case that metals are ubiquitous in nature and the urban environment and are detected at high levels in all types of stormwater runoff, including that from even nonindustrial and residential land areas. The high level of exceedances drives the corrective action costs under the MSGP.

| Table 1. EPA Benchmark Data Analysis for Select Metal Parameters | | | |
|---|---|---|---|
| Parameter | Number of Permittees | Permittees with 1 or More Annual Exceedance | % of Permittees with 1 or More Annual Exceedance |
| Aluminum | 66 | 39 | 59 |
| Copper | 42 | 34 | 81 |
| Iron | 114 | 90 | 79 |
| Lead | 39 | 16 | 41 |
| Magnesium | 1 | 1 | 100 |
| Zinc | 60 | 43 | 72 |
| *Subtotal* | 322 | 223 | 69 |

[34] 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review at 2 (EPA 2013).

[35] "To address these situations, MSGP 2006 is proposing to provide an opportunity for permittees, following a review of their SWPPP, to determine that they are implementing all reasonable and appropriate BMPs to reduce pollutants in the discharge, and to document the basis for this determination in the SWPPP." It allows facilities to drop SWPPP modifications after one engineering review, irrespective of whether the benchmark exceedance disappears. 2006 Proposed Reissuance of National Pollutant Discharge Elimination System (NPDES) Stormwater Multi-Sector General Permit for Industrial Activities, Fact Sheet, December 1, 2005 at 33.

[36] Jack Waggener, URS Corporation, Comments on the Benchmark Values of the Proposed MSGP at 4-5, October 9, 2014. February 15, 2015 update.

[37] See Jack Waggener, URS Corporation, Comments on the Benchmark Values of the Proposed MSGP at 4-5, October 9, 2014; February 15, 2015 update and Table 1 reprinted below.

[38] 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review, Table 1, available in the 2015 MSGP proposal docket.

[39] See EPA Table 1, infra.

[40] See 2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review, Table 1, available in the 2015 MSGP proposal docket. 59% of aluminum monitoring facilities and 72% of zinc monitoring facilities report annual exceedances, as reported in this table.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1

**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

<u>Benchmark Monitoring</u>: EPA should wholesale remove benchmark monitoring from the MSGP. The benchmarks have not been scientifically justified, and as proposed and coupled with the proposed Additional Implementation (AIM) framework, become effluent limitations. This is a violation of the CWA rulemaking process. Instead, EPA should consider alternatives to benchmark monitoring, such as visual monitoring.

Benchmark monitoring was originally intended to be used as a tool for operators to assess generally whether stormwater measures were effective at their sites. If values were above a certain level, it was a general indicator to the operator that he may need to reevaluate his stormwater control measures or at least investigate them. If values were below a certain level, it was a general indicator that the stormwater control measures were working properly. Benchmarks were never intended to be used by EPA to trigger mandatory compliance responses. EPA has affirmed that benchmarks were *not intended to be used as a compliance mechanism*, but rather designed for use as "a trigger for the operator to investigate and take corrective action, as appropriate."[2] The agency's view of benchmarks as flags, targets, and general indicators of possible problems has remained consistent throughout renewals of the MSGP program. EPA should remove any use of benchmarks from the MSGP that would equate to a permit violation.

Unfortunately, the benchmarks were not developed or tailored specific for mining, but rather were imported from other water quality programs and are not representative of mining stormwater scenarios. The benchmarks do not recognize the complexity and variability of stormwater systems, regional differences, as well as differences in facility types. There is no scientific basis for utilizing benchmark monitoring for evaluating performance of stormwater controls at most coal mining facilities. The benchmarks are set at levels that are orders of magnitude below what is often found in ambient undisturbed waters. Arbitrarily set benchmark levels at a national level completely ignores the regional variation in natural stormwater processes. Since its inception, benchmark monitoring has provided EPA an avenue for data collection but provided little more. Therefore, it appears the proposed 2020 MSGP benchmark monitoring will not provide any meaningful environmental benefit, since there is no clear connection between the proposed benchmark concentrations and control measure effectiveness. Instead the imposition of benchmark monitoring becomes simply an arbitrary and technically unsupportable, very costly exercise.

EPA should use the 2020 MSPG renewal to drop the benchmark program from the MSGP process altogether. Lacking that, the EPA should withdraw the proposed changes and renew the benchmark program as now contained in the approved 2015 MSGP renewal.

[2] EPA 2015 Response to Comments at 2. (emphasis added).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:**  EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.1.2.b

Benchmark "annual average" needs to be better defined or described in this section for situations where there are less than 4 discharge events during a year, either because of arid conditions and/or because of the use of infiltration control measures, ponds, and other conditions where discharge events are infrequent. In these instances the permittee would need more than one year to collect four benchmark samples. The division suggests changing the text to "If the annual ~~average for any parameter~~ average of the first four quarterly benchmark samples for any parameter does not exceed the benchmark threshold…."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

The Navy recommends the use test strips for pH. pH probes are notoriously unreliable and fail frequently. The pH probe is used only quarterly for stormwater sampling. Such limited usage subjects the probes to more frequent calibration errors, both human and mechanical in nature, and causes the pH sample to provide inaccurate results. Conducting sampling at multiple outfalls within the half hour requirement is not achievable for pH monitoring.

**Comment Response:**

See Comment Response EPA-HQ-OW-2019-0372-0142-A1.

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Recommend: Permitted activity should be able to use historical results in determining which metals should be analyzed quarterly. Plan should be approved by EPA.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

- Applicability of Benchmarks. References throughout the proposed MSGP suggest that eligibility for coverage hinges on meeting applicable water quality standards in stormwater discharges. See, e.g., Proposed Permit, 1.1.6.1. In fact, stormwater runoff should be assessed in the context of whether discharges cause or contribute to a violation of water quality standards in the receiving waters; the references to meeting water quality standards in stormwater discharges are overbroad and could limit prospective permittees whose stormwater flows may have variable concentrations of constituents consistent with the episodic nature of stormwater runoff but which flows do not cause or contribute to violations of receiving water standards. AEMA notes that the 2019 National Academies of Sciences, Engineering and Medicine's National Research Council study (referred to as the "2019 NRC Study") also recognized a possible disconnect between traditional water quality standards considerations and those that should be evaluated in the context of stormwater flow events. The 2019 NRC Study acknowledges the episodic nature of stormwater flows and the likelihood of instream dilution and attenuation; those conditions must be factored into the assessment of standards and the relevance of benchmarks based on aquatic life criteria. See generally 2019 NRC Study at 43.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

2021 EPA MSGP Response to Comments
January 15, 2021

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

### OTHER PERMIT-SPECIFIC SUGGESTIONS.

General Comment. The 2019 NRC Study includes discussion of whether to require benchmark monitoring for total or dissolved metals. On page 61, the authors specifically state:

*Because dissolved metal concentrations provide a more accurate measure of potential toxicity, it would be reasonable for the MSGP to allow industries that have had repeated exceedances of benchmark levels for total metals to sample for dissolved metals and compare this quantity against the existing benchmark. However, sampling for dissolved metals requires more complex sampling methodology, including filtering within 15 minutes of sampling. Because rapid filtering for dissolved metals puts an additional burden on industry, the committee does not recommend that dissolved metals analyses be required for all permittees covered by the MSGP, but should be an option if all proper sampling procedures are followed.*

AEMA concurs that requiring all permittees to conduct dissolved analyses would present challenges for those without the ready capability to properly filter samples in the field. However, at many mine sites, our members conduct significant discharge and surface water monitoring programs, including analyses for both dissolved and total metal concentrations. As a result, our members often have the equipment and trained personnel to support dissolved metal analyses. Since, as stated in the 2019 NRC Study, total and total recoverable metals analyses often overestimate toxicity during high flow, storm event conditions, AEMA strongly urges EPA to include an option to conduct dissolved, in lieu of total recoverable, metal benchmark monitoring in the final permit.

Changes to benchmark levels. (Requests for comment 14-19). AEMA provides the following responses to EPA's request for comment on proposed changes to the sector-specific benchmark levels. The reliance on aquatic life criteria as benchmarks may, as referenced above, be misplaced because those criteria are often not relevant to first flush runoff and would many times be exceeded in natural receiving water conditions. AEMA does, however, have comments on proposed benchmark changes to the extent the benchmarks persist for Sector G and/or Sector F. As a general rule, a benchmark standard should never be based on chronic aquatic life criteria. The following briefly reviews the proposed changes to the identified benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

Beryllium (Sector G). EPA has retained the benchmark for beryllium in the proposed permit. Our members rarely see beryllium at elevated levels in any waters discharged from mining projects and it is typically not limited in individual mine site discharge permits (based on reasonable potential). At each permit issuance, it is EPA's responsibility to consider where monitoring (and a benchmark) for a specific parameter is justified – note that the 2019 NRC study recommends periodic review of the appropriateness of all benchmarks. Part of this effort should be to consider updated data and assess whether controlling certain parameters will also ensure compliance with applicable water quality standards for other parameters. Unless EPA can document a specific need to include the beryllium benchmark, AEMA recommends removing it from the final permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

Aluminum (Sector F). EPA has revised its aluminum aquatic life criteria to provide for calculation of site-specific acute criteria based on the dissolved organic carbon (DOC), pH, and hardness conditions in the receiving water. Given the burden of collecting receiving water data under a range of conditions and calculating a facility-specific benchmark based on the new criteria, AEMA recommends that EPA retain the 750 ug/L criterion as the default value in the final permit. This value is extremely conservative and should be protective of aquatic life for virtually all of our members' sites. However, AEMA also suggests that the applicable sector-specific requirements in the final permit allow dischargers to calculate a facility-specific benchmark for aluminum based on the new criteria (considering background, bioavailability and other factors) and substitute it for the default value. The calculations can be included in the SWPPP documentation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.1
WEF recommends that EPA clarify this statement: "At your discretion, you may take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges". Each facility is required to sample each discharge point 4 times per year. That would suggest that each sampling event is a "discharge event." Some facilities may have 1 discharge point. Some may have a dozen. WEF recommends that EPA clarify these statements.

**Comment Response:**

EPA clarifies that "separate discharge event" as used in the final 2021 MSGP Part 4.2.2 means that samples can be collected during separate measurable storm events (i.e., a storm event that results in an actual discharges that follows the preceding measurable storm event by at least 72 hours). EPA notes that the applicable monitoring requirements apply to each discharge point, except as otherwise exempt from monitoring as a "substantially identical discharge point."

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**Aluminum (p. 64).** The Fact Sheet states that the aquatic life criteria for aluminum are "still in draft form and not yet issued … EPA proposes to use the same benchmark value for aluminum as listed in the 2015 MSGP, but may update it if the criteria is issued before EPA finalizes the 2020 MSGP." In fact, EPA issued the updated aquatic life criteria for aluminum some time ago, and the basis for the benchmark should be the updated acute criterion.

Another option could be to have two benchmarks and let permittees choose which one to use. Available data suggest that a benchmark derived under the new criteria, which are based on site-specific water quality parameters, will be significantly higher than the current benchmark (0.75 mg/L total aluminum). With this option, permittees could use the current benchmark, if they meet it, or they could collect site-specific water quality data and use a benchmark based on the updated criterion for aluminum.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  B. Clemence
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

**Table: "MSGP Benchmark Values and Sources" (p. 69-72).** I note that EPA has revised the acute saltwater criterion for lead, the basis for the saltwater benchmark. It is now 140 µg/L dissolved lead, which should make the benchmark 140 µg/L total lead.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

Second, the Agency should confirm that Universal Benchmarking Monitoring and any related response actions apply only to outfalls that discharge "stormwater associated with industrial activity." That limitation on the authority to require and to issue NPDES permits for discharges of stormwater derives from Section 402(p)(2)(B) of the CWA. It appears the Agency's intention is to require Universal Benchmark Monitoring only at such outfalls. It is particularly important to be clear about this limitation in the aviation sector, however, because the definition of so-called "Transportation" facilities as sources of stormwater associated with industrial activity expressly

provides that it is only the areas of a transportation facility that engage in specific, enumerated activities (e.g., vehicle maintenance, fueling, and aircraft deicing operations) that are deemed to be "associated with industrial activity."[32]

Similar clarification was provided in the Fact Sheet of the 2008 MSGP where the reach of benchmark monitoring requirements was differentiated from the reach of effluent limitations established by effluent limitations guidelines.[33] We request that similar language recognizing that Universal Benchmark Monitoring applies only to outfalls that discharge "stormwater associated with industrial activity" is in order, particularly for industry sectors like Transportation in which only specific activities are categorized as "industrial activity."

[32] 40 CFR 122.26(b)(14)(viii).

[33] Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) – Fact Sheet at Section X.B.1.a.iii., page 99 (2008).

**Comment Response:**

EPA confirms that applicable monitoring requirements, including indicator and benchmark monitoring, apply to each discharge point authorized by the permit, per Part 4.1.1 of the 2021 MSGP. The permit authorizes only stormwater discharges associated with industrial activity and the authorized non-stormwater discharges.

## 4.2.1.RFC9. Required Monitoring - RFC 9 Alternative approaches to benchmark monitoring

**Commenter Name:**  Daniel Mumm
**Commenter Affiliation:**  Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: WSJM suggests that guidance on monitoring in areas with elevated natural background conditions and climates with limited rainfall periods be added here. WSJM was able to find the "Details on AIM Exception due to Natural Background Conditions" under the AIM Exceptions in Part 5.2.4, but it only provides direction on calculating based on a four quarter concentration.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:** Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Given 50 percent of the MSGP sub-sectors have metals monitoring requirements, harmonizing methods within Office of Water and adopting the state of the science into stormwater benchmarks for metals will improve the quality and intent of environmental regulations, whereby shifting economic resources for public and private operations from unnecessary compliance technologies to job growth and innovation. All of this can be accomplished in a way that maintains simplicity, adds flexibility, recognizes science already embraced by several other USEPA offices, and, most importantly, protects the environment.

**1. Use benchmark values based on more sophisticated approaches for considering metals bioavailability.** While there is an understandable need to maintain a simple approach towards calculating and evaluating compliance with effluent limits, more sophisticated approaches are needed when considering metals. Such recommendations are supported by ongoing work within other USEPA Office of Water groups, namely the Office of Science and Technology - Health and Ecological Criteria Division. Harmonized approaches would assist identification of stormwater discharge scenarios in which metals are of greater concern than the current MSGP benchmarks would indicate, or conversely, identify stormwater discharge scenarios where metals are of less concern than the benchmarks would indicate. The latter would limit an unnecessary allocation of resources to address perceived environmental problems.

- **Recognize bioavailability-based nationally recommended ambient water quality criteria (WQC) for metals (e.g., the biotic ligand model [BLM]) as stormwater monitoring benchmarks.** The current nationally recommended WQC for copper is based on the BLM, and that for aluminum is based on multiple linear regression (MLR) models. Both approaches represent the state-of-the science with regard to bioavailability. Use of these WQC for benchmarks would be consistent with one of the conclusions from the NAS (2019) study: "Benchmarks should be based on the latest toxicity criteria designed to protect aquatic ecosystems from adverse impacts from short-term or intermittent exposures, which to date have generally been acute criteria." Such a change would harmonize methodologies used across the Office of Water and would demonstrate USEPA's confidence in and support for the WQC that they have developed. Not using the current nationally recommended WQC sends a conflicting message and demonstrates unsupported reluctance to applying USEPA's state-ofthe-science tools to industrial stormwater.
- **Consider the appropriate measurement basis (e.g., total or dissolved) for comparing metal concentrations to stormwater benchmarks.** Except for aluminum, dissolved metal is the relevant fraction to consider for bioavailability-based WQC. Again, the NAS (2019) study recognized that this would be an improvement in the next iteration of the MSGP: "…it would be reasonable for the MSGP to allow industries that have had repeated exceedances of benchmark levels for total metals to sample for dissolved metals and compare this quantity against the existing benchmark." However, if the quantity to be compared against the benchmark remains

585

based on total metal concentration, a dissolved:total metal translator could be used to properly relate total metal concentrations in the effluent with dissolved concentrations in the receiving water. Finally, we also believe that to properly compare dissolved metal concentration in a stormwater effluent with a receiving water-based benchmark, it may also be necessary to consider the implications associated with mixing zones. For example, application of a dilution factor other than 1 (i.e., no dilution) could be relevant in some scenarios.

...

- **Prepare for emergence of bioavailability-based criteria for metals in the next five years.** The small subset of current bioavailability-based nationally recommended WQC (e.g., copper and aluminum) presents an opportunity for USEPA to evaluate their use for stormwater monitoring benchmarks before such approaches become more widespread. Therefore, now is the time to apply these approaches to determine if there are potential issues that could be informative from the perspective of "lessons learned" that will be applicable when other metals WQC are revised. It is likely that USEPA will receive widespread requests for the use of bioavailability-based stormwater benchmarks once WQC for metals are revised. From the CRADA activities, mentioned above, we know that bioavailability-based WQC for aluminum, copper, lead, nickel, and zinc are likely to be developed or revised within the next five years.
- **Identify options for bioavailability-based benchmarks in a tiered approach.** We recognize that the MSGP benchmark monitoring requirements are meant to be "as least burdensome as possible on operators" while still accomplishing their intended purpose (i.e., determining if there are deficiencies in a facility's stormwater pollution prevention plan). Ultimately, any potential issues related to stormwater discharges should be evaluated from a risk-based perspective, which is the direct link to WQC. Therefore, as an alternative, more sophisticated bioavailability based approaches should, at a minimum, be an option as part of a tiered approach to assessing potential impacts of industrial stormwater on surface water quality (as discussed in the next section). Exercising such an option would place additional burden on facilities only if they choose to go that route.

...

- MSGP benchmarks for metals should be consistent with bioavailability-based WQC for metals, if such WQC are available and recommended by USEPA. Our position, which is to use bioavailability based tools to establish benchmarks, is parallel with the NAS (2019) recommendation "that the MSGP should incorporate the best available science in the MSGP process".

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

BES strongly supports benchmark monitoring requirements and does not believe viable alternative approaches exist to characterize and quantify industrial sites' stormwater discharges. Based on BES' experience managing and enforcing hundreds of General Industrial Stormwater Permits, BES believes that visual observations and/or routine inspections do not provide an appropriate substitute. For example, in 2018-19, 26 percent of BES' enforcement actions related to the General Industrial Stormwater Permit were the result of inadequate inspections and documentation. Inspections are also a poor substitute for quantifying the effectiveness of source control improvements and additional implementation measures at an operator's site. BES recommends that benchmark monitoring requirements remain in the final permit in order to demonstrate a more accurate determination of water quality.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Though imperfect, the Benchmark Sampling philosophy as adopted with the 1995 MSGP remains a reasonable solution to monitoring of nonpoint discharges. It is illogical to think that the implementation of the AIM burden is anything more than making the sampling result basically a numeric effluent limit with enforcement and penalties based on this imperfect science of sampling. Again, the language of the AIM, on top of the existing BMPs, will have only one impact. That impact will be on the existing permittees who do their very best to attempt to follow the regulations. Without equitable enforcement for those "flying under the radar", so to speak, there will be no improvement to water quality. Benchmark monitoring provides the clearest and most reliable measure available to ascertain the water quality of stormwater discharges. Current measures in place to rectify exceedances are sufficient and feasible. With proper oversight, the current measures allow for improved water quality through a clearly obtainable process for facilities to follow existing monitoring and reporting requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

As discussed in the FWQC/FSWA comments, EPA has decades of benchmark data and those data do not support the continued use of benchmarks. Overall, benchmarks have not achieved the intended objectives, and they tend to overstate the lack of compliance with the MSGP or Water Quality Based Effluent Limits (WQBELs). EPA should eliminate benchmarks and take the time to carefully develop wet weather water quality standards that reflect the differences between stormwater and wastewater (e.g., stormwater is episodic, while wastewater typically has continuous flow).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet does not agree of the approach proposed within the MSGP that establishes AIMs based upon annual average sampling or elevated benchmark values during a stormwater sampling event. Stormwater benchmarks are were never intended to be limits and the AIMs approach turns benchmarks into pseudo limits.

*Background and Development of Benchmarks*

The benchmark approach finalized in 1995 was developed to provide quantitative data directionally as to the effectiveness of the best management practices (BMPs) within the stormwater pollution prevention plan. EPA did not establish technology-based stormwater limits for the stormwater program but instead used the ambient water quality standards.  EPA admits as much within the response to comments to the NRC within the fact sheet stating:

"the MSGP benchmark monitoring requirements were designed to be as least burdensome as possible on operators while still providing the intended utility: a tool to for determining whether operators could have SWPPP/stormwater control measure deficiencies."

The benchmark approach does not accurately characterize potential pollution impacts of stormwater discharges. Many standard (non-stormwater) industrial NPDES permits have either technology-based limits or water quality standards and those ambient water quality standards are based on toxicity data, usually laboratory data, then scaling that up with sufficient safety factor, then uses low-flow conditions, Q7Q10, the lowest seven-day flow in a 10-day period for a receiving stream, and any mixing zone allowances for continuous flow of an effluent discharge.  Because of the usually elevated flow, sporadic nature of the discharge, and no analysis of the receiving stream, water quality standards are not appropriate for use for stormwater limits.  However, EPA never developed those limits, so the water quality data was improperly used as a benchmark and now EPA is perpetuating the improper use of benchmarks by establishing them as limits that may require significant resources and capital to comply with and in some cases may not be able to be met.

*Sporadic Nature of Discharge*

Stormwater by its very nature is sporadic and highly variable.  Some events can be high-intensity rainfall events or low-intensity and all ranges in between and can be variable from region to region.  Because of the variable nature of stormwater and associated discharge, a single quarterly sample may not indicate a facility's stormwater discharge[1]. The use of a single sample to move to a new AIMs level is not suitable for an MSGP that uses blanket coverage for many locations with differing stormwater systems.  The fact that a single data point could elevate an average value for an annual season indicates the concerns with the AIMs approach.

...

*Recommendation*

For the reasons stated above, Howmet believes that the implementation of the AIMs methodology is not justified because of the derivation of the benchmarks are questionable, the manner in which some benchmarks are derived are overly conservative, the risk to aquatic life is minimal, and the costs for complying with incorrect science is quite  high.  For these reasons, Howmet strongly encourages the agency to withdraw the proposed AIMS system and continue with the use of Best Management Practices (BMPs) to address anomalies within the stormwater monitoring program.

Howmet also recommends that EPA develop wet weather-based water quality standards in order to properly administer the program.  There is little doubt that the program is moving in the direction of the AIMs program and EPA needs to properly characterize the impacts of stormwater on the receiving stream in order to properly manages stormwater discharges.  Until such a time as EPA develops wet weather-based standards, AIMs-type responses are not appropriate.

[1]California General Permit for Stormwater Discharges, CAS000001, Fact Sheet Pg. 56

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

In the arid southwest where storm events are also infrequent, pollutant concentrations are often more a function of the length of time between rain events than of the volume of discharge. Use of BMPs to mitigate spills, such as regular good housekeeping inspections and enforcement of corrective actions are more useful than the expensive and ineffective attempts to time stormwater discharges and collect resulting runoff. Use of refrigerated automated samplers, the only viable method to collect samples at remote locations in the arid southwest, are costly to purchase and maintain, and cannot be used to measure parameters with short holding times.

...

As noted earlier, the infrequency of rainfall events resulting in discharge at an outfall and timing of such events are key impediments to sample collection efforts. Attempts to increase monitoring efforts under such conditions removes limited resources for compliance efforts from more beneficial activities. The COA, as a municipality, is on a limited budget and can spend its compliance dollars on increased monitoring efforts or on installation of additional stormwater control features at its facilities. It would prefer to do the latter.

In addition, after spending over 25 years collecting and attempting to collect storm water runoff from outfalls as part of its Urban Waters Monitoring Program, the COA believes that the value of data collected is extremely low for the amount of money expended. Variability in parameter values are more dependent upon the length of time between storm events, their size, duration, and track than upon possible pollutants generated by dischargers. Such data is of little value in sizing or determining the efficiency of stormwater control features. Instead, we have found that sizing features to manage the 90% storm event discharge volume to be to be an effective practice given the unpredictable nature of our storm events.

As part of cooperative efforts in our Middle Rio Grande Watershed Based Permit, monitoring is conducted in the water body of concern, the Middle Rio Grande, at up and downstream locations as well as at several intermediate locations during storm events in order to determine the impacts of stormwater runoff. This is performed in lieu of attempting to capture runoff at outfall locations

along the Middle Rio Grande. Any exceedances are tracked to upstream locations. Such an approach would be more beneficial than the proposed benchmark monitoring.

Inspections in-lieu of benchmark monitoring would also be a preferred option as discussed in greater detail in the response to Comment 11.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Steve Whitt
**Commenter Affiliation:**  Martin Marietta, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

If an industry has experienced systematic issues with a specific pollutant, then there is clear justification to implement benchmark sampling in order to confirm the situation and develop an appropriate effluent limit. Simply placing universal sampling requirements across all industry sectors is clearly not a solution. If there is a broader water quality problem for an industry sector, maybe the best solution is to remove that sector from consideration for the MSGP and develop an appropriate permit that addresses their specific issues.

We are also not directly aware of water quality impairment in a region created by any of the industries covered under this MSGP. A more likely cause is general development and an uptick in flash flooding caused by increased impervious surfaces and urban sprawl. It seems very convenient to add sampling requirements under this permit but a more appropriate solution may be to initiate programs and actions to address the actual sources.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

## 6. Request for Comment 9: Alternatives to Benchmark Monitoring

There has been over 20 years of stormwater sampling, with the data submitted to USEPA and/or the state EPAs. This existing stormwater dataset should be sufficient for USEPA to make characterizations about industrial sites' stormwater discharges in order to provide some stormwater sampling relief. Unfortunately, it appears that USEPA is moving in the opposite direction, towards greater stormwater sampling to meet expanded, lowered benchmarks, coupled with more onerous, prescriptive corrective actions. This trend raises the enforcement liability for "non-compliance of process" on the regulated community, apart from any real stormwater quality benefit, and is characteristic of a topdown, command-and-control regulatory regime.

For these reasons, USEPA should develop alternatives to benchmark monitoring. In particular, the MSGP should provide improved off-ramps for facilities to rely on visual inspections, without analytical sampling, once they have developed record of meeting benchmarks. This is particularly true for the new Universal Benchmark monitoring requirements (see comment 7). Additionally, the benchmarks should align more closely with water quality standards, because in many cases the benchmarks are far more stringent than the applicable in-stream standard. Adjusting the benchmarks will relieve unnecessary burden by making the off-ramps more available and minimizing the risk of perpetual BMP escalation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA agrees, in part, that a viable alternative approach to benchmark monitoring may be triggering such monitoring in AIM in response to permit violations.** However, we suggest that AIM generally should be tailored to the facility itself and the potential cause of a reported violation. For instance, filing late reports, seems to us to be a particularly poor basis for adding punitive sampling to a facility's permit, and could simply make it tougher for a facility to report timely, particularly if on-site sampling and analysis would be required. Similarly, since AIM is generally meant to be related to the root cause or potential root cause of a reported event, bench mark monitoring is, again, sampling for the sake of sampling and could impose unnecessary costs or information of little interest with respect to the site. Comparison of this information for purposes of benchmarking facilities, again, is arbitrary because it is related to the locale of the industry, it's process, and other factors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI believes that this request for comment misses an important situational aspect of "benchmark monitoring for characterizing industrial sites' stormwater discharges, quantifying pollutant concentrations, and assessing stormwater control measure effectiveness". Benchmark monitoring reflects only half of what is actually happening during a storm event at an industrial facility. It is likely that the facility's receiving water is also changed by the same storm event that gave rise to the stormwater discharge from the facility. In the absence of the storm event (and also melting snow), the facility is not discharging stormwater, and the receiving water is likely experiencing dry-weather flow conditions.

At the same time, benchmark values are much closer to water quality standards (WQSs) for receiving waters (if not identical to WQSs) than to the effluent concentrations achieved or achievable by stormwater control measures (SCMs) for reducing concentrations in influent stormwater to those SCMs. NASEM notes in its Report (at 60) that "[m]any MSGP benchmarks are based on water quality criteria". WQSs are based on dry-weather flow conditions, but apply to receiving waters under both dry- and wet-weather flow conditions.

Benchmark monitoring effectively assumes that a facility's stormwater discharges enter the receiving water under dry-weather flow conditions because "all MSGP benchmarks are applied at the point of discharge without dilution" (Report at 60). It is possible and even likely that during wet-weather conditions at the facility, the receiving water may receive a chemical constituent via the facility's stormwater discharge without exceeding that constituent's WQS after mixing with the receiving water's storm-enhanced volumetric flow. This mismatch between the dry-weather basis for benchmark monitoring and the likely wet-weather conditions for the receiving water does not make technical sense. NASEM noted that "industrial stormwater discharges occur during wet weather conditions when the receiving stream is expected to be flowing at some reasonable capacity above base flow, which could provide dilution of stormwater discharges" (Report at 60). NASEM supported use of mixing-zone allowances by permittees under certain conditions (Report at 61).

One alternative to dry-weather benchmark monitoring is wet-weather benchmark monitoring. A facility would qualify for wet-weather benchmark monitoring if it can reasonably demonstrate that its receiving water experiences additional volumetric flow substantially greater than the flow

contributed to the receiving water by the facility itself during the same storm event. If the additional volumetric flow of the receiving water is much greater than the facility's volumetric contribution, the applicable wet-weather benchmark for the facility would be greater than the dry-weather benchmark, depending in part on the quality of the additional volumetric flow not contributed by the facility.

Another alternative, which could be adopted alone or in addition to wet-weather benchmark monitoring, is to make the benchmark for metal parameters applicable to only the metal's dissolved concentration. NASEM noted that "[d]issolved metals are more biologically available than particulate-bound metals and are more important in assessing pollutant risk" and that "dissolved metal concentrations provide a more accurate measure of potential toxicity" (Report at 61). NASEM supported "sampl[ing] for dissolved metals and compar[ing] this quantity against the existing benchmark" in certain circumstances (Report at 61). Because "sampling for dissolved metals requires more complex sampling methodology" and "rapid filtering for dissolved metals puts an additional burden on industry" (Report at 61), this alternative should be an option for permittees.

EPA should adopt this or similar wet-weather benchmark monitoring and also the option of using dissolved-metals benchmarks in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Paul Bredwell
**Commenter Affiliation:**  U.S. Poultry & Egg Association et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Collection of Visual Examination Samples: We believe quarterly sampling and analysis of storm water discharges and visual examinations of these samples for pollutants provides sufficient data to determine the effectiveness of storm water pollution prevention practices. Data from visual monitoring has indicated this type of monitoring is a very effective tool and is much less burdensome and costly for permittees. Visual monitoring of storm water discharges is included in the proposed 2020 MSGP. Another more reasonable and cost-effective alternative is reduce the frequency of universal benchmark monitoring to annually for the entire permit term. If two (2) consecutive annual results for the universal benchmark parameters exceed the benchmark the applicable AIM response would be triggered, as proposed by the Agency. This approach would reduce the burden on facility personnel and simplify the benchmark monitoring requirements of the MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

No alternative suggested. Benchmark monitoring requirements should be for detailed Sectors, or SIC's within a Sector, that are identified as a high risk potential. Sectors, or SIC's within a Sector, that are identified as a low risk potential and have no limitations based on the industrial sector should not require benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Applicability of Benchmark Monitoring: NMA recommends that EPA reevaluate benchmark monitoring and remove it from the MSGP. The benchmarks have not been scientifically justified, and as proposed and coupled with the proposed AIM framework, operate as de facto effluent limitations in violation of the CWA. Instead, EPA should consider alternatives to benchmark monitoring, such as visual monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 9:**

**Alternatives to Benchmark Monitoring**

As explained in detail, NMA does not believe that benchmark monitoring is appropriate for the mining sector for numerous reasons and instead has provided several alternatives. One alternative to benchmark monitoring is robust annual reporting and visual assessments completed by qualified site personnel. Annual reporting and visual assessments that detail the measure taken to address stormwater pollutants and improvements to these controls remain more effective in protecting water quality than routine stormwater benchmark monitoring, that just provide instantaneous snapshots rather than comprehensive information on performance. Another alternative could be to require enhanced maintenance requirements for BMPs, such as requiring a specific schedule for the clean-up and regular maintenance of BMPs. A third alternative to benchmark monitoring that the agency should consider is to monitor physical changes of BMPs/outfalls with newer technologies, such as drones, artificial intelligence (AI), and Interferometric Synthetic Aperture Radar (InSAR) where available. If the volume of a detention basin is reaching critical level, for instance, the use of drones and AI could identify this issue for operators without the costly and burdensome requirements of increased benchmark monitoring.

EPA also could consider allowing operators to provide EPA with a summary of applicable monitoring data collected to date at a facility, including an evaluation of parameters of importance and frequency of events. If benchmark monitoring performed under the 2015 MSGP did not result in any exceedances at a facility, then this outcome should qualify a facility for inspection-only status in lieu of universal benchmark monitoring, assuming that there were no major changes at the facility which could impact stormwater quality.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS partially agrees that triggering additional measures in response to permit violations may be a feasible alternative to benchmark monitoring.** Additional Implementation Measures (AIM), however, should generally be designed for the facility and the potential cause(s) of the reported permit violation; not unrelated, disproportionate or punitive. Benchmark monitoring, as in our next comment, may impose needless costs for little value whereas AIM is generally intended to relate to an event's root cause or possible root cause.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

We make the following recommendations:

- EPA should terminate the 25-year-old benchmark experiment, pending a science-based replacement based on new wet weather-based water quality standards, and focus on the remaining parts of the MSGP that have been working successfully for decades.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

The U.S. SBA Office of Advocacy and stormwater industry leaders have sought for nearly twenty years to modify this poorly designed, costly, and unnecessary program, and substitute a robust combination of quarterly visual inspections, comprehensive site inspections, and an

annual report. This concept was captured as early as 2006 in the Pechan report[28] sponsored by the U.S. Small Business Administration Office of Advocacy.[29] The benchmark program should be shelved, at least in the interim, until the completion of a well-executed plan to propose and develop wet weather-based water quality standards.

[28] Analysis of Multi-Sector General Permit (MSGP) Stormwater Discharge Monitoring Requirements, Technical Memorandum, prepared for US SBA Office of Advocacy, E.H. Pechan & Associates, Inc., Durham, NC (March 2006).

[29] The origin of the concept goes back to at least 2003. *Replace Benchmark Grab Sampling with Simple Annual Reports?*, The Stormwater Quarterly, Issue 94, National Stormwater Center, John Whitescarver, Q.E.P. Stuart, Florida.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

**The Benchmark-Based Approach is Not Based in Science and Does Not Provide Useful Data; EPA Should Terminate the Analytical Monitoring Based Approach**

EPA requests comment on whether the analytical monitoring program can be replaced with another system for ensuring effective stormwater controls at industrial facilities.[30] *EPA Request for Comment 9*. As explained below, we strongly dispute the Agency's description of the analytical monitoring program and its value. In sum, we respectfully reiterate the view that the analytical monitoring experiment should finally end for all facilities. Based on our extensive knowledge and experience over 25 years, it would be unacceptable to extend this non-scientific approach with its numerous and documented shortcomings to any new facilities, and particularly those identified as "light industry" by EPA, and any facilities without current MSGP monitoring.[31]

[30] Fact Sheet at 58.

[31] There is a large overlap between "light industry" designations and the no monitoring determination in the 1995 MSGP. However, there are a few sectors outside of "light industry" with favorable pollution data that had no 2015 MSGP monitoring requirements based on the monitoring results from the 1993 group permit applications.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

In short, EPA has acknowledged that the benchmarks it derived are overly conservative, but still proposes to apply the stringent AIM Tiers 2 and 3 to benchmark exceedances with no opportunity to revise the methodology of deriving benchmarks (with the possible exception of the BLM approach for copper and other metals).

EPA's failure to create true science-based stormwater water-quality based standard is the source of the flawed experimental benchmark approach. The science demands a dynamic methodology that accounts for episodic, variable stormwater discharges that flow into remote reaches that require wet weather-based water quality standards. Because EPA's experiment in benchmark-driven stormwater controls is not based in science, it has resulted in the application of a poorly designed regime that randomly requires unlucky facilities to engage in unnecessary engineering evaluations and resulting costly remedial actions that are unlikely to benefit water quality. This regime should be ended, and be replaced by the current comprehensive set of requirements for SWPPP plan implementation, including inspections, corrective action, and reporting, at least during the interim period while EPA develops new wet weather science-based benchmarks.[62]

EPA should **not** extend benchmark monitoring to **any new facilities**, based on this inadequate evidentiary record. Instead, analytical monitoring for all facilities should end.

[62] See related discussion in Section V.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 9 – EPA Should Terminate Analytical Benchmark Monitoring and Rely on Existing Requirements for Visual Inspections, Routine Inspections, Corrective Action, and Reporting.**

Comment 9 requests comments on alternatives to the benchmark monitoring approach. Initially, the Agency requests an alternative stormwater pollution protection program that provides a "quantitative evaluation of stormwater discharges."[63] Such an inquiry is circular because the only known method of quantifying pollution discharges is to measure them, which assumes this is feasible or desirable. Instead of assuming that quantification is desirable or necessary, the substitute neutral question that EPA should have posed is: what alternative stormwater pollution protection program effectively minimizes contaminated stormwater discharges?

The statements in Comment 9 reflect EPA's continued reliance on the 1995 MSGP preamble. But in relying on the 1995 assumptions, the Agency ignores the seriously flawed implementation of the MSGP benchmark program and the two critical NRC Studies and critical academic studies that occurred after 1995.

First, EPA, as mentioned above, states it seeks a "viable alternative" for "characterizing industrial sites' stormwater discharges, quantifying pollutant concentrations, and assessing stormwater control measure effectiveness."[64] If one specifies the goal of "quantifying pollutant concentrations" as the means of establishing stormwater control measures, you guarantee that there is no alternative to benchmark monitoring, because a monitoring regime is the only known system of "quantifying pollutant concentrations" that can deliver such data.

The Agency has apparently forgotten that "quantifying pollutant concentrations" with precision is not reasonably affordable, even if it were desirable.[65] The 2019 NRC Study clearly demonstrated that repeated sampling to reduce uncertainty was unrealistic.[66] It is unreasonable to obtain reliable pollutant concentrations because the required number of samples would be prohibitively costly.[67] The Agency even rejected the use of more accurate composite samples in 1995 based on cost considerations.[68] The 2019 NRC Study suggested that monitoring would only be desirable for the highest risk facilities, "major industrial facilities" for which this could be affordable.[69] In the 3-tiered NRC paradigm, quantifying stormwater flows would not be used for "low-risk" plants.[70] EPA should carefully heed the advice of the NRC.

Next, EPA merely repeats the justification for benchmark monitoring provided in the 1995 MSGP rule, apparently unaware that these 1995 premises have been thoroughly undermined by academic scholars and two authoritative NRC reports:

The benchmark thresholds are the pollutant concentrations above which represent a level of concern. The level of concern is a concentration at which a stormwater discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish. The benchmarks are also set at a level, that if below, a facility's discharges pose less potential for a water quality concern. As such, the benchmarks provide an appropriate level

to determine whether a facility's stormwater control measures are successfully implemented. See 60 FR 50804 for a discussion on the origin of the MSGP's benchmarks.[71]

Simply repeating the original justification without any supporting analysis does not make it valid. As stated above, the only attempt EPA made to analyze the utility of the benchmark scheme occurred in 2013 and failed to support EPA's assertions[72] that (1) benchmarks represent a "level of concern," and (2) benchmark compliance helps determine whether stormwater controls are successfully implemented. These are misplaced expressions of faith, not realities.

EPA also makes several other statements of questionable validity. The Agency opines:

Analytical results from benchmark monitoring are quantitative and therefore can be used to compare results from discharge to discharge and to quantify any improvement in stormwater quality attributable to the stormwater control measures, or to identify a pollutant that is not being adequately controlled….

Benchmark monitoring data, however, provides numerical indicators of stormwater control effectiveness, what pollutants are being discharged, and at what magnitude, which can be addressed in real-time and compared over time....

Although quarterly visual assessments and quarterly benchmark monitoring occur at the same frequency, visual assessments again result in narrative descriptions of stormwater pollution and may not provide the precision necessary for the operator to address a specific pollutant problem.[73]

Each statement shares the unsupported 1995 assumption that quantitative data has utility for evaluating the efficacy of stormwater controls. This has been contradicted by the developing evidence over the past 25 years. Further, EPA assumes that there is "precision" in "grab samples" today, but there is no basis for this statement, which flies in the face of post-1995 analysis.

EPA presents no evidence that comparing grab results from storm events for any pollutant can quantify "any improvement in stormwater quality attributable to storm water control." But, long after 1995, such a claim is no longer credible.

Stenstrom and Lee (2005) found that grab sample monitoring data "show very limited utility,"[74] in a study of the 1992-2001 California industrial stormwater program. The Pechan report describes some of the paper's other key conclusions about grab samples:

- The monitoring data were highly variable, with coefficients of variation that are generally higher than mean pollutant concentrations, and that are 2 to 60 times higher than those of other water quality monitoring programs;
- Sources of the variability include the use of grab sampling and untrained sampling personnel;
- The data are insufficient for use in identifying high dischargers and for use in identifying discharge differences by industry sector; and

- Data variability is so large that the collection of additional data points (up to ten or more storms per year) will still not provide the necessary data precision and a more promising approach is to use composite sampling in place of grab sampling.

As stated earlier, the 2009 NRC Study was so dismissive of the program it suggested that benchmark monitoring could be eliminated.[75] The 2019 NRC suggests that this can be done, and only retains monitoring for "medium risk" and "high risk" plants.[76]

EPA adds yet another argument to bolster its support for benchmarks that is not persuasive:

Annual reporting only occurs once per year during the permit term, and thus limits the number of opportunities and delays the time the operator must assess and react to potential problems at their facility. Additionally, while annual reports contain valuable information on facility inspections, visual assessments, corrective actions, and Additional Implementation Measures, the data is subjective, anecdotal, and qualitative.[77]

This statement overlooks the comprehensive inspection and reporting activities that occur throughout the year. The SWPPP requires periodic inspections, quarterly, and more often where needed of critical portions of the site, including the outfalls. These are fully designed to "react to potential problems at their facility." The facility is not permitted under the MSGP to delay needed repairs until the annual report is completed. The annual report does not "limit" in any manner the requirement to perform timely corrective repairs or improvements.

For example, proposed MSGP Permit Part 2.1.2.4 requires regular maintenance and self-inspection for all storage tanks and secondary containment areas. If that were not required, the SWPPP would not be following the MSGP requirements.

EPA appears unaware the of the numerous effective EPA programs that are based on inspection and reporting regimes. While EPA criticizes these requirements as being "subjective, anecdotal and qualitative," such inspection regimes are highly effective and utilized today at construction sites, industrial sites, hazardous waste facilities, and underground storage sites under a wide variety of EPA programs. These share many common characteristics: periodic routine inspections, reporting, and corrective action, and they are not considered failures for lack of quantitative reports. Is EPA suggesting that such other EPA regulatory programs are inadequate?

Finally, EPA's nostalgia for 1995 apparently has its limits. Unlike EPA, we find substantial merit in in the 1995 EPA explanation of why analytical monitoring for many industrial sectors was **not** necessary. This view has substantial merit today. Here is a typical excerpt from the 1995 MSGP preamble that addresses the wood and metal furniture sector W [one member of the coalition represents facilities that belong in sector W].

As discussed above, EPA *does not believe that analytical monitoring is necessary for wood and metal furniture and fixture manufacturing facilities. (italics added)* EPA believes that between quarterly visual examinations and site compliance evaluations potential sources of contaminants can be recognized, addressed, and then controlled with BMPs. In determining the monitoring requirements, EPA considered the nature of the industrial activities and significant materials exposed at these sites, and performed a review of data provided in Part 2 group applications.[78]

We could not have stated this better in so few words. This 1995 observation is still valid in 2020. We have no explanation as to why EPA chose to quote favorably substantial portions of the 1995 MSGP rationale yet failed to credit the multiple determinations in the 1995 permit preamble to exclude sectors from monitoring in 1995. We find much to credit in the 1995 portions of the preamble that EPA has ignored. In sum, the EPA statements in the 2020 Fact Sheet, selectively reprise obsolete 1995 themes but fails to provide a basis for retention of the current benchmark monitoring scheme.

[63] Redline Fact Sheet at 59.

[64] Redline Fact Sheet at 57.

[65] This cost problem was addressed in both the 2008 and 2019 NRC studies, and is not contested by EPA here.

[66] 2019 NRC Study at 50.

[67] Id.

[68] EPA has rejected, for example, the requirement of a composite sample in 1995 on costs alone. In addition, the costs of multiple samples in a year would clearly not be considered economically feasible under the Clean Water Act (not considered "BAT" or best available technology economically achievable). 60 Fed. Reg, 50804, 50827 (September 29, 1995).

[69] "Enhanced stormwater monitoring is considered to be within the financial resources and/or expertise of a major industrial facility and may prove beneficial to the industry by more accurately characterizing the stormwater discharge than by using grab-sample first-flush benchmark monitoring." 2019 NRC Study at 59.

[70] 2019 NRC Study at 59.

[71] Redline Fact Sheet at 58.

[72] See earlier footnote about 2013 EPA analysis.

[73] Redline Fact Sheet at 58-59.

[74] Stenstrom and Lee (2005) at 26.

[75] 2009 NRC Study at 435.

[76] 2019 NRC Study at 54-56.

[77] Id. at 58-59.

[78] 60 Fed. Reg. 50804, 51029 (September 29, 1995).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  40
**Excerpt Status:** Final

**Comment Excerpt:**

We request that EPA consider terminating its 25-year-old experiment of benchmark monitoring given the overwhelming evidence that this regime has created substantial regulatory burdens without significant environmental benefit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Philip G. Rahrig
**Commenter Affiliation:**  American Galvanizers Association (AGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0207-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

AGA is a non-profit trade association dedicated to serving the needs of specifiers, architects, engineers, contractors, fabricators, and after-fabrication hot-dip galvanizers throughout North America. The AGA's stormwater interest is in the use of state-of-the- science bioavailability-based approaches for metals in developing stormwater monitoring benchmarks.

We recognize that the United States Environmental Protection Agency (USEPA), by requesting comment on use of bioavailability-based approaches for stormwater monitoring benchmarks for copper, is open to considering sophisticated approaches for establishing benchmarks. However, the proposed 2020 MSGP does not sufficiently make use of such approaches. With this update, the USEPA has an opportunity to appropriately incorporate bioavailability-based approaches in the MSGP benchmarks for metals. We are aware of bioavailability-based nationally recommended water quality criteria (WQC) for copper and aluminum, and strongly support their use for directly establishing stormwater monitoring benchmarks. Additionally, we are aware of ongoing efforts through the cooperative research and development agreement (CRADA) between

several metals associations and USEPA to identify a modeling approach that will be used for efficient development and implementation of bioavailabilitybased WQC for a number of metals. Therefore, we anticipate the development and release of bioavailability-based WQC for zinc and other metals in the near future. As such, recognition of how those developments will inevitably be incorporated into the MSGP is necessary in this update.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Philip G. Rahrig
**Commenter Affiliation:**  American Galvanizers Association (AGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0207-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

If bioavailability-based approaches are not used to derive national stormwater monitoring benchmarks, then sufficient flexibility should be provided such that facilities can work with the USEPA to use state-of-the-science bioavailability-based tools to develop site-specific solutions. This could be done by providing an alternative option to use bioavailability-based WQC as benchmarks for facilities exceeding the national benchmark. However, this should be applicable to any metal that has (or will have) a corresponding bioavailability-based WQC (i.e., should not be applicable to copper only). An additional option would be to extend the Additional Implementation Measures (AIM) Tier 3 exception regarding water quality standards to AIM Tiers 1 and 2. Either approach would provide flexibility to facility operators while also allowing use of USEPA's tools to more accurately characterize potential environmental risks from industrial stormwater. Application of better tools will ultimately help with proper allocation of resources (on the part of industry, states, and the Federal Government) to address real rather than perceived environmental problems.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Philip G. Rahrig
**Commenter Affiliation:**  American Galvanizers Association (AGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0207-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Overall, we strongly urge the USEPA to use bioavailability-based approaches for metals as stormwater monitoring benchmarks. If these approaches are not used directly as national benchmarks, USEPA should consider allowing their use to more accurately characterize potential environmental risks at facilities with repeated benchmark exceedances.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Resource Management Associates (RMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 9 – From our experience, we would state that we continue to believe that for most common stormwater parameters, the use of benchmark monitoring provides an effective means of assessing stormwater program effectiveness. However, we feel that in many cases the use of benchmarks is given too much relevance, with these numerical benchmarks becoming "lines in the sand" for performance. For example, a TSS result of 110 mg/L is "over the benchmark", but from a water quality perspective is not significantly different from a "passing value" of 90 mg/L. So many times, a quantitative evaluation of what is often a highly variable, qualitative natural system, is not appropriate. But together, benchmark monitoring and qualitative (visual) monitoring seem to provide a reasonable indicator of program performance. We would recommend that benchmark monitoring be reviewed from a positive perspective as well as a negative perspective. For example, if a facility with a well designed and implemented stormwater management program consistently yields excellent benchmark monitoring results, then this should be reflected in continued monitoring requirements, such as quarterly results going to semi-annual, then to annual, then to visual only. This would reward program excellence, foster better stormwater quality management, and lead to higher environmental benefit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

ARA proposes as a viable approach in alternative to benchmark monitoring that one approach would be for a facility to simply have to take action if there is a significant change in their baseline data and exhibits an increase in contaminant loading over time. ARA also recommends that representative sampling should be allowed in all cases.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment (Request for Comment 9) on viable alternative approaches to benchmark monitoring. **If the universal benchmark requirement for pH is retained, MWRA recommends that permittees be allowed to use pH test strips or a handheld colorimeter to obtain a screening-level measure of pH**. Although this is not an approved method per 40 CFR 136, it would suffice to determine whether pH was outside the fairly broad permissible range of 6 to 9. If the pH appeared to be outside that range using this simpler test, the permit could require a follow up measurement with an approved, quantitative test method. In reporting the results, the screening result could be reported as an integer number of apparent pH exceedances, and a separate parameter could store the quantitative follow-up result when required.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0258-A1, Comment Excerpt Number 6.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

An alternative to universal benchmark monitoring may be to provide EPA with a summary of all monitoring data collected to date at a facility, including an evaluation of parameters of importance and frequency of events.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

It is our opinion that benchmark monitoring continues to be a reasonable and effective means to characterize stormwater discharges.

**Comment Response:**

EPA acknowledges the comment's support for benchmark monitoring.

---

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmark Monitoring and Tiered AIM Approach (EPA Request for Comment #9 and #21)**

Background and Current Status

The benchmark approach was originally developed to provide quantitative data directionally as to the implementation and effectiveness of best management practices (BMPs) within stormwater pollution prevention plans. EPA did not establish technology-based stormwater

limits for the stormwater program but instead used the ambient water quality standards available at the time (note aluminum discussion above). However, because of the elevated flow, sporadic nature of the discharge, and lack of analysis of specific receiving streams, water quality standards are not suitable for use as stormwater benchmarks, much less limits. Because EPA never developed stormwater-specific limits, water quality standards were used as benchmarks; in the proposed rule EPA is improperly converting those benchmarks into limits (Section 5.2.3.2 - *You must select controls with pollutant removal efficiencies that are sufficient to bring your exceedances below the benchmark threshold*) which will likely require significant resources and capital cost to comply with, and in some cases compliance may not even be possible given some of the factors discussed further below.

...

Requested Action

The Association requests that the EPA withdraw the benchmark monitoring and proposed AIM approach and continue with the use of Best Management Practices (BMPs) to address anomalies at facilities within the stormwater monitoring program. Wet weather-based water quality standards should also be developed in order to properly apply the MSGP benchmark program in future permits. And benchmarks must remain that – benchmarks, and not de-facto limits, as EPA has proposed once AIM Tier III is reached.

...

Until such time as EPA develops wet weather-based standards and addresses the testing misalignment between total recoverable metals and bioavailable metals, use of benchmarks and the AIM approach is not tenable.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 9 – NRMCA disagrees that the inclusion of the new universal benchmark monitoring change "would provide a baseline and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors." If these benchmarks are needed, they should be set by territories, states and local

agencies on an individual basis that meet their unique needs. Otherwise, many facilities will certainly be forced to needlessly conduct monitoring that does not apply to their facility, resulting in time, money and resources being spent to adhere to a compliance mandate with no environmental benefit. NRMCA suggests EPA instead allow states and territories to determine what base monitoring parameters are needed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

- Benchmark program generally. Overall, benchmarks have not achieved the intended objectives, and they tend to overstate the lack of compliance with the MSGP or Water Quality-Based Effluent Limits (WQBELs). In light of the repeated shortcomings and lack of justification for the benchmark monitoring program over the last twenty-five years, the FWQC and FSWA recommend that EPA eliminate the benchmark monitoring program entirely. Instead, as a long-term project, EPA should initiate the development of wet-weather related water quality criteria. While those are being developed, EPA should focus on annual reporting and quarterly visual inspections for most facilities subject to the MSGP. If the benchmark program is retained, EPA should make the changes in its proposal that are recommended in these comments.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 9**

EPA first devised its benchmark process nearly twenty-five years ago, which is more than a reasonable time period to determine whether EPA should or should not continue its benchmark experiment. The following comments tracing EPA's history, foundation, justifications, and support for benchmark monitoring demonstrate that EPA has had ample opportunity but has failed to demonstrate that benchmark monitoring serves a greater purpose than mere information collection.

In 1995, EPA justified benchmark monitoring on its theory that such monitoring would provide useful "flags" or indicators to industrial facility operators regarding the benefits of their technology-based controls and potential environmental impacts. That theory gave the program an opportunity to prove that benefits would result from the investment in analytical monitoring and a comparison of those results to the existing resource of water quality standards (WQS) and review of best management practices (BMPs). The foundation upon which EPA created its benchmark monitoring scheme was arbitrary at best and has never resulted in the type of robust process for which EPA had hoped. In fact, the basis for benchmark monitoring was never grounded in science, and EPA has never fully justified how and why a facility should use, for example, ambient low flow in-stream WQS to gauge technology-based control strategies for stormwater discharges that are episodic, high flow, variable, and potentially a significant distance from the type of receiving stream used as the basis for the WQS.

EPA has established what it believes are appropriate WQBEL requirements in Sections 2.2 and 4.2. Therefore, in retrospect, any relationship that benchmarks originally may have had to WQBELs in the 1995 and subsequent MSGPs is mostly irrelevant today. However, the fact that the water quality criteria that are used to establish benchmarks were never derived for such use or for assessing the impacts of stormwater discharges from industrial sites remains a scientifically flawed remnant of the 1995 MSGP development.

Therefore, FSWA and FWQC urge EPA to initiate a long-term plan to establish wet weather water quality standards, to fill the regulatory void that has existed since Congress added CWA Section 402(p) in 1987. Wet weather WQS must be developed eventually, and this administration should demonstrate leadership in filling the void and creating the type of regulatory tool needed for all future stormwater permits.

In its MSGP 2000 and 2008 Fact Sheets, EPA committed to analyzing all of the monitoring data and protocols associated with benchmark monitoring since 1995 to determine if benchmark monitoring provides "useful indicators of control measure inadequacies or potential water quality problems." MSGP 2008 Fact Sheet at 96. For whatever reason, EPA never produced—or at least EPA has never released —any analyses that would support or defend the use of benchmarks.

In 2013, EPA drafted a memorandum that purports to assess the benefits of benchmark monitoring titled, "2008 MSGP Benchmark Discharge Monitoring Report Analysis and SWPPP Compliance Review."[18] However, while the FWQC and FSWA do not endorse EPA's methodology or analysis which serves as the basis for the memorandum, our review indicates that that memorandum actually supported the premise that benchmark monitoring provides no benefits to facilities forced to invest in that scheme. Attachment B of the memorandum is a

compliance review that EPA randomly conducted of 20 facilities. The following conclusions are worth noting:

- 35% of facilities randomly sampled for EPA's analysis used EPA's SWPPP template. The experience of our members is that many if not most facilities that develop their own SWPPP go well beyond EPA's SWPPP template, but we can assume that at least 35% should achieve full compliance using EPA's template.
- All but one facility submitted a complete SWPPP. Accordingly, we can assume that in total, 89% of the facilities believed that they had satisfied the MSGP's technology-based non-numeric effluent limits (i.e., BAT).
- However, 100% of the facilities surveyed had violated benchmarks, which means that either (1) EPA's SWPPP template is not sound, and each facility's belief that it had achieved BAT through its SWPPP is misplaced, or (2) benchmark monitoring is not a very reliable or accurate tool for measuring SWPPP compliance or water quality impacts.

In a separate attempt to improve its stormwater permitting program, EPA charged the National Research Council (NRC) in 2006 to conduct its first comprehensive external review of municipal, construction, and industrial stormwater programs. The NRC explained that "[t]he broad goals of the study were to better understand the links between stormwater pollutant discharges and ambient water quality, to assess the state of the science of stormwater management, and to make associated policy recommendations."[19] In particular, EPA set forth five specific areas of particular interest that it expected the NRC to address, including asking the NRC to:

*Consider how useful monitoring is for both determining the potential of a discharge to contribute to a water quality standards violation and for determining the adequacy of stormwater pollution prevention plans. What specific parameters should be monitored and when and where? What effluent limits and benchmarks are needed to ensure that the discharge does not cause or contribute to a water quality standards violation?*

Contrary to EPA's assessment of NRC findings, the NRC in its 2009 Report criticizes national benchmark monitoring. In assessing EPA's benchmark monitoring program, the NRC found that the MSGP's approach "has largely been a failure."[20] Reviews of benchmark monitoring data "showed no relationship between facility type and stormwater discharge quality. The reasons that NRC cited for the poor relationship included variability in sampling parameters, sampling time, and sampling strategy—that is, poor data."[21.] NRC also found that "it is not clear whether [benchmark] exceedances provide useful indicators of stormwater pollution prevention plan inadequacies or potential water quality problems." [22] Finally, the NRC concluded that a "national numeric benchmark should be avoided. . . ."[23] and, if NRC had its way, "the current benchmark monitoring conducted by MSGP facilities would be eliminated."[24]

Again, even if the bases for the original or revised benchmarks could be defended from a scientific or legal basis, the methodology EPA used to apply them to various industries was unquestionably arbitrary and capricious. There was substantial uncertainty and randomness associated with the group permit application monitoring process that generated the data EPA used to determine final industry benchmark mandates. Every group had to collect data from ten percent of the group members for certain basic parameters, but then each group and each

monitoring facility was given total discretion whether to monitor for other "likely" pollutants or only the basic list of parameters.

A simple review of EPA's existing benchmark monitoring mandates reveals numerous inconsistent and illogical results due to the arbitrary nature of EPA's original process. It is true that benchmark monitoring has generated significant data that are still relevant and useful, including from the original group application process. However, EPA has never fully analyzed all of the data it collected. As a result, the industries subject to the current benchmark monitoring program are burdened with a never-ending "do-loop" of monitoring and corrective action responses, even in situations where there is no actual water quality problem. And now that EPA has proposed a corrective action scheme that unfairly exposes regulated parties to significant liabilities based on this benchmark monitoring do-loop (see comments 21 through 26), the problems related to benchmark monitoring are more significant than any time in the MSGP's history.

The Agency's various historical analyses show that the EPA's SWPPP template is flawed and that benchmark monitoring cannot accurately measure most permittees' efforts to comply with BAT requirements. Therefore, there is no further need or use for such monitoring. Benchmark monitoring is not an accurate measuring tool for SWPPP or BAT compliance, for the many reasons that have been raised in our comments on the various MSGP proposals since 1995 (e.g., variability, background sources, and wrong benchmark values). Benchmark monitoring forces facilities that otherwise are meeting BAT requirements to continue corrective action perpetually. This wrongly creates the perception that facilities are deficient or out of permit compliance, when in fact there is no evidence that the industrial stormwater discharges from the facility are negatively impacting the environment. The Fact Sheet on the proposal (at pp. 57–58) explains some of the criticisms from various divergent stakeholders but offers little in terms of EPA support of benchmark monitoring. Even today, EPA does not seem to be able to reach conclusions or provide any basis for assessing how or to what extent use of benchmarks results in greater environmental protection or permit compliance.

In sum, benchmark monitoring should be eliminated from the MSGP, because benchmarks: (1) do not provide any benefits for assessing SWPPP/BAT compliance; (2) provide random or imprecise data that wrongly imply that facilities are not meeting BAT; (3) were criticized by the NRC 2009 report as not helpful; and (4) are not necessary for assessing compliance with WQBELs.

The FWQC and FSWA have provided information to EPA regarding the challenges that all regulated facilities have in attempting to meet benchmarks as stringent as many water quality standards. (As noted elsewhere in these comments, those standards are set for low-flow and constant exposure in the receiving stream, which is far from the scenario during a wet weather event subject to benchmark monitoring). The most recent NRC study also discusses many of the challenges associated with benchmark monitoring. In addition, several FSWA and FWQC members have conducted separate analyses of EPA and national stormwater databases, which provide further evidence that benchmark monitoring is obsolete.

The FWQC and FSWA urge EPA to begin work on wet weather water quality standards and, in the interim, to rely on annual reporting and quarterly visual assessments as the main mechanisms to assess stormwater control effectiveness at industrial facilities. EPA states that benchmark monitoring provides objective data, but it fails to explain why these data are meaningful or how use of those data translates to improved water quality. Robust annual reporting and visual assessments, which detail the steps taken to address particular pollutant problems, are more effective in protecting water quality than rote monitoring once per quarter.

[18] EPA-HQ-OW-2012-0803-0002 (2012), available at https://www.regulations.gov/document?D=EPA-HQ-OW-2012-0803-0002 .

[19] NRC "Reducing Stormwater Discharge Contributions to Water Pollution," available at https://www8.nationalacademies.org/pa/projectview.aspx?key=48711.

[20] See NRC Report at 439.

[21] Id.

[22] Id. at 30.

[23] Id. at 433.

[24] Id. at 435.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

*D. Visual Inspections, Routine Monitoring, Corrective Actions and Reporting Provide a Science-Based and Effective Approach to Stormwater Management*

A second 2006 Pechan report[41] summarized the defects of the proposed 2005 permit and concluded that EPA did not have any evidence that poor SWPPP performance was correlated with benchmark exceedances.[42] Pechan report was very prescient in its 2006 paper, and presented its own concept of an inspection-only approach:

Requiring facilities subject to the MSGP to prepare annual reports that document the following information: (a) results of visual monitoring; (b) inspection of facility/site attributes with potential to affect stormwater pollutant discharges to receiving waters (i.e., an annual inspection of facility premises to identify leaks, spills, surface erosion, etc.); (c) documentation of activities taken to address issues identified from (a) and/or (b) or rationale why no such actions are necessary; and (d) certification that the facility has not been notified/is not aware that stormwater discharges due to pollutants that are directly related to the facility's industrial activity are contributing to an exceedance of any water quality standard in receiving waters;[43]

In other words, Pechan suggested that the facility employ an in-house stormwater professional, ideally the same person who was responsible for the SWPPP development and implementation, and that inspections should be both quarterly visual at outfalls and annually for the entire site.[44] This closely conformed to then current 2000 MSGP, and also became the requirements for the 2008 and 2015 MSGPs.

This approach takes advantage of the considerable infrastructure of routine inspections, corrective action, and reporting that is required in the 2015 permit. It is also entirely consistent with the 1995 framework for facilities that have no chemical monitoring, such as the food and beverage industry, which relies entirely on the implementation of the SWPPP.

The Agency applied the 1995 inspection/compliance scheme to seventeen sectors in the 1995 permit. Here is one random example, which described the non-monitoring scheme for wood and metal furniture (sector W).

As discussed above, EPA does not believe that analytical monitoring is necessary for wood and metal furniture and fixture manufacturing facilities. EPA believes that between quarterly visual examinations and site compliance evaluations potential sources of contaminants can be recognized, addressed, and then controlled with BMPs. In determining the monitoring requirements, EPA considered the nature of the industrial activities and significant materials exposed at these sites and performed a review of data provided in Part 2 group applications.[45]

Without scientific justification, EPA should re-embrace the fundamental soundness of the 1995 MSGP permit that chemical monitoring is not warranted for every sector.

[41] Analysis of Multi-Sector General Permit (MSGP) Stormwater Discharge Monitoring Requirements, Technical Memorandum, prepared for U.S. SBA Office of Advocacy, E.H. Pechan & Associates, Inc., Durham, NC (March 2006).

[42] Pechan Report at 18-20.

[43] Pechan Report at 25.

[44] The annual inspection of the entire site is now contained in the routine inspection sections 3.1.1 – 3.1.6, and it specifies the areas to be inspected.

[45] 60 Fed. Reg. 50804, 51029 (September 29, 1995).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

*C. The Food and Beverage Industry's Stormwater Pollution Prevention Plan (SWPPP) Compliance has been Successful.*

Along with 16 other non-monitoring "low exposure" industry sectors that were first identified in the 1995 rule, the food and beverage industry has been subject to the MSGP requirements for inspection, corrective action, and reporting for 25 years. In sum, EPA determined in 1995 that there was inadequate pollution to monitor and the 2008 and 2015 MSGP data confirm that there is NO evidence that this system is failing to provide fulsome and cost-effective environmental protection.

EPA appears unaware of the multitude of other effective EPA programs that are based on inspection and reporting regimes. While EPA attempts to criticize these MSGP inspection and related requirements as being "subjective, anecdotal and qualitative,"[57] such inspection regimes are highly effective and utilized today at construction sites, industrial sites, hazardous waste facilities, underground storage sites under a wide variety of EPA programs.[58] These share many common characteristics: periodic routine inspections, reporting, and corrective action, and these programs are not considered inadequate for lack of quantitative discharge reports.

[57] Request for Comment #9, EPA's Proposed Multi-Sector General Permit (MSGP) Fact Sheet For Stormwater Discharges Associated With Industrial Activity (2020 MSGP Fact Sheet) at 59.
[58] See for example, underground storage tank regulations (40 CFR Parts 280 and 281); Treatment, Storage and Disposal (Hazardous Waste Facilities; 40 CFR Parts 122 and 267; Small Quantity Generators of Hazardous Waste (40 CFR Parts 260 and 261); and Construction General Permit, 82. Fed. Reg. 6534 (January 19, 2017).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

- Alternatives to Benchmarks. Many of EPA's requests for comments relate to the role of benchmarks in the regulation of stormwater. While benchmarks have been implemented in some way since the initial MSGP, AEMA members' concerns regarding their relevance to many exploration and mining sites persist. For example, assessment of benchmark compliance does not consider dilution, short-term effects of the event, background conditions and the inherent water quality consequences related to the mobilization of naturally occurring sediments as evidenced every time there is a "gully washer" in the arid west. Correspondingly, the benchmarks are overly conservative when applied to stormwater flow and could, under the approach to implementation in the proposed permit, trigger mandatory stormwater control measures that are unnecessary, expensive and difficult to maintain. As noted throughout the comments, there are other options for assessing stormwater management compliance. These other options warrant more focused analysis, a concept supported by the 2019 NRC Study; the 2019 NRC study specifies that since the MSGP-related legal settlement requires more rigorous implementation measures that are tagged to benchmark excursions, those changes "place greater emphasis on ensuring the MSGP uses appropriate benchmarks." 2019 NRC Study at 21. AEMA concurs with that assessment and, since stormwater benchmarks are particularly challenging to verify, maintains that the MSGP should include inspection-related alternatives to benchmarks for Sectors F and G sites. As documented below, AEMA also has significant concerns related to specific, proposed benchmark values.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Alternatives to Benchmarks (Proposed MSGP 4.2.1, request for comment 9). EPA references studies that document the viability of stormwater control measures at controlling pollutants. *See, e.g.*, Fact Sheet at 33 (citing the 2009 National Research Council's Urban Stormwater Management report). Whereas urban practices may not directly correlate to exploration and mine sites, AEMA acknowledges the effectiveness of these stormwater management practices and supports refinement of these management practices rather than the current detailed monitoring

and benchmark approach. In particular, AEMA suggests that the stormwater program's effectiveness can be best documented through site inspection, control measure maintenance and documentation of the same. Whereas EPA has stated that compiling and evaluating information from annual reports or visual assessments could be more challenging than reviewing quantitative benchmark data, that assessment approach is preferable where quantitative data is not necessarily reflective of impacts to receiving waters. In short (and not unlike the proposed MSGP emphasis on control measure documentation, measures already incorporated into the detailed technology-based effluent limits for active mining activities, e.g., Proposed MSGP at 8.G.5), permit compliance is best focused on documenting the ongoing success of stormwater management. As outlined in the 2019 NRC Study, low-risk facilities (which the Study indicates include well managed sites) may be better suited to evaluation through inspection rather than data monitoring. 2019 NRC Study at 6, 55, 57. In that regard, exploration and mining sites often fall within that low-risk category. The sites are subject to layers of regulation. Site operators are adept at stormwater control implementation in the context of reclamation, safety and environmental obligations mandated by that regulatory oversight.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

WEF has no specific comment on viable alternative approaches to benchmark monitoring. However, WEF suggests that sector-specific benchmark monitoring is both appropriate and feasible.

**Comment Response:**

EPA acknowledges the comment's support for benchmark monitoring.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Alternatives to benchmark monitoring include allowing for "low risk" facilities to conduct "inspection-only" and for facilities with no exceedances of benchmarks over a period of time to "revert" to being a "low risk" facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1.RFC10. Required Monitoring - RFC 10 Universal benchmark monitoring

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Bromberg Regulatory Strategy, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0076-A2
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

First, I am submitting two data sets for the docket that were employed by the National Research Council (of the National Academy of Sciences) in producing the 2019 NRC report on improving the MSGP (see Attachment A describing the 2015 MSGP data). These data must be made available in the docket for use by EPA and the interested public in formulating specific recommendations regarding the proposed chemical monitoring requirements, including the new proposed universal benchmark monitoring, and the exclusion from monitoring for "low risk" facilities. From my initial review, it appears that EPA has not reviewed that data in formulating the proposed fact sheet and permit.

I have attached the NRC's recommendations regarding how EPA could evaluate sector-specific data (Attachment B). The robust 17,000 record database that NRC relied on to develop its recommendations and conclusions is found in Appendix D. That dataset is the most recent and largest dataset available to address industrial stormwater discharges yet appears to be missing from the docket. I also recommend that EPA consider the extensive (albeit older) dataset cited in the November 19, 1993 (58 Fed. Reg. 61146) proposed MSGP. That comprehensive dataset was developed through the extensive and industry-specific mandates associated with the "group permit application" process set forth in EPA's original stormwater regulations.

I believe that EPA should review these and other data, which I assert should lead the agency to modify and improve many of its proposed chemical monitoring provisions, including deleting all the potentially expensive and unnecessary corrective action requirements that were proposed for the so-called "universal benchmark" requirements which are being applied for the first time to approximately half the MSGP's regulated facilities. In my view, despite EPA's apparent presumption to the contrary, the NRC clearly did not intend EPA to adopt potentially expensive corrective action requirements and create other significant liabilities for facilities in its

recommendations that EPA collect more extensive stormwater discharge data for future use and consideration.

**Comment Response:**

EPA considered the recommendations in the NRC study in conjunction with other information (e.g., data from other states) in making final permit decisions. The information and resources considered during permit development were adequate to make determinations on the final permit changes.

Regarding review of the dataset used for the NRC study, see response to EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 40.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmarks:
Because permittees aren't burdened enough with useless one-size-fits-all requirements, it is now proposed that thousands of permittees should be required to monitor for constituents such as COD, at significant expense, when COD never has, and never will occur at their sites; for the convenience of whom? Only an informed commercial laboratory or parcel post lobby could get behind this. My site has passed TSS for decades and visual inspection is more than adequate. Yet mandatory TSS testing is proposed. Ridiculous.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Daniel Mumm
**Commenter Affiliation:**  Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: WSJM believes that benchmark monitoring should consist of the parameters listed in each subsector and not be universal.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Victoria R. Branson
**Commenter Affiliation:**  National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Parameters universally applied to all eligible outfalls may not be practical. For example, COD and TSS sample results in arid environments could result in "potentially unreliable monitoring data" (Fact Sheet, Proposed 2020 MSGP, Part 4.2.1.1, "Applicability of Benchmark Monitoring").

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Since most surface water is limited by nitrogen and phosphorous, should the universal benchmark parameters also include nitrogen and phosphorous?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmark monitoring for all sectors

I agree with requiring universal benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Charles Job
**Commenter Affiliation:** National Ground Water Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Groundwater monitoring must be specifically incorporated into benchmark monitoring for characterizing stormwater discharges. The lack of inclusion of groundwater monitoring in stormwater permits is a serious shortcoming of the program that creates the potential to contaminate communities' aquifers and drinking water sources by nonpoint source pollution.

With regard to testing of specific contaminants, the constituents listed may be appropriate for surface water but are not appropriate for groundwater. A list for groundwater testing by all industries should include one or more simple indicators of dissolved pollutants that will infiltrate and flow with groundwater, e.g., specific conductance, TDS, and chloride. Testing for additional contaminants should be based on chemicals the industry produces and/or uses. Testing for suspended solids in stormwater runoff may be appropriate at sites where infiltration is chosen to manage stormwater, but is meaningless for testing of groundwater.

**Comment Response:**

EPA does not agree that the groundwater monitoring should be incorporated into the benchmark monitoring requirements. The MSGP's benchmark monitoring requirements were not developed with respect to the protection of groundwater. The benchmark thresholds are based on surface water quality criteria and benchmark monitoring was developed with respect to stormwater discharges to surface waters.

However, EPA notes that the MSGP includes provisions that will ensure protection of groundwater from stormwater that is infiltrated. For example, Part 2.1.1 states that "care must be taken to avoid ground water contamination" when infiltrating runoff onsite. In Part 1.2.2 of the Fact Sheet, in the context of green infrastructure practices, EPA cautions "if there are doubts regarding the presence of contaminants in the washwater, even after treatment, operators should not discharge it to be safe." In Part 2.1.2.6 of the Fact Sheet, EPA includes that operators should pay special attention to the discussion about stormwater infiltration and groundwater as well as stormwater infiltration control measures subject to the Underground Injection Control (UIC) regulations.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Environmental Strategies & Management (ES&M)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0128
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement for universal benchmark monitoring (ph, TSS, and COD) to be conducted for all sectors is rather onerous and burdensome especially to smaller businesses in industrial sectors whose stormwater discharges have very minor if any effect to surface water. A case in point is one entity is a manufacturing facility where all stormwater is non-contact water that discharges to a retention/detention basin with overflow to a municipal stormwater system leading to a surface water. I do not see the benefit of the collection of data in this example and visual inspections should be adequate.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

BES strongly supports universal benchmark monitoring for all sectors be included in the final permit. Monitoring provides a fair and consistent method of evaluating an operator's contribution

2021 EPA MSGP Response to Comments
January 15, 2021

of pollutants to the receiving water body. BES agrees with the National Academies of Sciences Engineering, and Medicine report[3] that suggested that monitoring pH, total suspended solids (TSS) and chemical oxygen demand (COD) would provide broad, low-cost indicators for understanding industrial stormwater risk and stormwater control effectiveness; however, BES recommends the permit include additional monitoring parameters as discussed below.

BES agrees that both TSS and COD can be indicative of overall facility cleanliness; however, COD may not be helpful in identifying activities or pollutant sources as the components of COD are so varied. The EPA should consider that when operators need to further identify their source of COD if Additional Implementation Measures (AIM) are triggered, then additional and more expensive analytical tests will likely be necessary. As an alternative to COD, BES recommends that the EPA consider adding total petroleum hydrocarbons (TPH) to the list of universal benchmark monitoring. The EPA may also consider including PAH monitoring at each discharge point one time only during the first year of permit assignment in order for the operator to evaluate the site's pollutant contribution and potential need for additional controls.

BES recommends that total zinc be added to the universal benchmark monitoring requirements for all sectors. BES has not found a direct correlation between TSS and total metals and believes that including total zinc as a benchmark parameter is an acceptable compromise among stakeholders. Zinc is a ubiquitous pollutant in industrial areas often found in the dissolved form and can be minimized with stormwater controls. Stormwater controls implemented to reduce zinc in discharges are likely to reduce the concentration of other metals in the discharge as well. Benchmark monitoring of zinc will help operators determine the sources and appropriate controls necessary to minimize toxic metals in the environment.

BES recommends that E.coli be added as a one-time only monitoring requirement in the first year of permit assignment. BES believes that this requirement will serve as an important tool for identifying and eliminating cross connections from the sanitary sewer and septic system failures. This is a small burden on operators with a large impact on the protection of human health and the environment.

[3] National Academies of Sciences, Engineering, and Medicine. 2019. Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges. Washington, DC: The National Academies Press. https://doi.org/10.17226/25355 .

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Evan Jenkins
**Commenter Affiliation:**  Environmental Compliance Division, City of Nampa, ID
**Document Control Number:**  EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests limiting universal benchmark monitoring to only using parameters measurable with field instruments. This monitoring could include turbidity in place of total suspended solids (TSS). Additionally, industrial facilities with a limited amount of vegetation and no organic processing or chemicals should be allowed to forgo chemical oxidation demand (COD) testing.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Universal parameter - pH

https://www3.epa.gov/acidrain/education/site_students/phscale.html states: "Normal, clean rain has a pH value of between 5.0 and 5.5, which is slightly acidic."

The pH result of a stormwater discharge sample has little meaning if the rain water itself is not also sampled and tested for pH. The comparison of the two results is the "Measurement". Develop a Parameter Concentration for the difference between the rain water sample and the stormwater discharge sample.

The table below is from the Proposed 2020 MSGP. It states that the Concentration should be between 6.0 - 9.0 s.u. If the rain water pH sample result is 5.5 s.u. and the stormwater discharge result also is 5.5 then the sample would be "Normal". As it is now, the proposed pH requirement will not give an adequate picture of how the facility influenced the pH in the stormwater discharge.

| Subsector | Parameter | Concentration |
|---|---|---|
| All | sectors/subsectors | pH 6.0 – 9.0 s.u. |

The above scenario shows that the 5.5 s.u. from the stormwater sample is not within the Concentrations, but it is the same as the rain water sample. Corrective Actions and AIM should not apply to this parameter in the way that it is proposed.

Is the pH test to be done in the field or at a laboratory? EPA needs to include that instruction in the permit.

**Comment Response:**

In the 2021 MSGP, EPA is requiring indicator monitoring for pH for sectors without applicable benchmarks. Indicator monitoring for applicable operators is required as "report-only." Unlike sector-specific benchmark monitoring, indicator monitoring does not have a threshold or baseline value to compare to; therefore, no follow-up action is triggered or required based on the sampling results in this part. The requirement in Part 2.2.1 that the discharge must be controlled as necessary to meet applicable water quality standards still applies.

Consistent with the 2015 MSGP, the 2021 MSGP continues to require sector-specific benchmark monitoring for pH for Subsector G2 and Sector S (areas where deicing occurs). EPA notes that Part 5.2.6.1 of the 2021 MSGP provides an exception from AIM requirements and additional monitoring where the operator can demonstrate that the benchmark exceedance is solely attributable to the presence of that pollutant in natural background sources. For additional information on the natural background exception, see Comment Response Essay 3 Additional Implementation Measures.

With respect to the proper analysis of pH samples, EPA notes that the 2021 MSGP requires that samples must be analyzed consistent with 40 CFR Part 136 analytical methods. 40 CFR Part 136 provides approved analytical methods for pH using electrometric measurement (Standard Method 4500-H$^+$B, ASTM D1293-99 A or B, 973.41, and USGS I-1586.85) and automated electrode (EPA Method 150.2 and USGS I-2587-85). It also requires that samples for pH be analyzed within a holding time of 15 minutes. Due to the short holding time, pH analysis is typically performed in the field.

---

**Commenter Name:** Meghan Morel
**Commenter Affiliation:** South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

## I. Benchmark Monitoring and AIM Should Not Be Universal

Currently, EPA does not require that POTWs covered under the MSGP as Treatment Works conduct benchmark monitoring. However, in response to a recommendation made by the National Academies of Sciences, Engineering, and Medicine's (NAS's) National Research Council (NRC), EPA has proposed in the 2020 MSGP (Section 4.2.1.1) that all sectors conduct quarterly benchmark monitoring for pH, TSS, and COD. If a facility exceeds a benchmark (6.0-9.0 s.u. for pH, 100 mg/l for TSS, and 120 mg/l COD), it would not be in non-compliance, but it would be required to take additional steps called Additional Implementation Measures (AIM) in Section 5.2.

EPA is proposing a detailed 3-tiered approach to requiring AIM. Each tier is triggered by either an exceedance of the benchmark threshold based on annual average or based on the amount a single sample exceeds the threshold. Each tier has its own required responses. There are two AIM exceptions applicable to all three tiers: (1) if a facility can demonstrate that benchmark exceedance is related to natural background pollutant levels or (2) if the facility can demonstrate that exceedance is related to run-on from a nearby source (and if EPA agrees).

SCWQA is concerned that exceeding benchmarks will put a permittee on the path to having to take numerous, repetitive corrective actions, some of which could be expensive and time-consuming. For example, an AIM Tier 3 response must include the installation of permanent controls (such as permanent cover, secondary containment, berms, or forms of treatment) or the installation of infiltration or retention controls.

We are not convinced that POTWs would have significant enough discharges of pH, TSS, and COD to justify this level of expense. Even though a permittee may trigger AIM based on concentration levels in the samples, the overall loadings of the pollutant of concern may be low enough that it would not be reasonable or cost-effective to require an expensive "fix."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Meghan Morel
**Commenter Affiliation:**  South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Low-Risk Permittees Should Not Be Required to Follow the AIM Tiers**

If EPA retains the concept of universal benchmark monitoring for pH, TSS, and COD, SCWQA recommends that permittees who have not previously conducted benchmark monitoring only be required to conduct the monitoring without triggering the AIM tiers. As EPA explains in the Proposed Fact Sheet (p. 10), the NAS study suggested universal benchmark monitoring to "provide a baseline and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors." Once we have a better sense for whether there are significant issues relating to Sector T and other low-risk permittees, we can have a more informed discussion regarding corrective responses.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

At present under the VPDES ISW general permit, there is a large group of permittees that are not subject to analytical monitoring. This approach reflects the requirements in the EPA 2015 MSGP. Although universal benchmark monitoring could be of general value, DEQ does not support this proposed requirement based on several concerns. First, the proposed requirement does not appear to be based on data from the specific sectors affected. Rather, it appears to be intended to characterize and compare the sectors. While such characterization would be valuable, it seems such work should be conducted by EPA as research and not made an additional permit requirement. Second, many of the sectors impacted by this proposed requirement are not sophisticated operations and may not have the resources to pay for expanded monitoring. Compliance with the proposed universal benchmark monitoring would impose a large cost for the facilities affected, additional burden on DEQ's compliance staff, and necessitate storage of significant amounts of data. We estimate that COD benchmark analytical costs at ($31. 00 - $38.00 per sample) for 1,300 permittees for 10 samples X 1 outfall = $403,000 -$494,000 per permit term. We estimate that TSS analytical costs as approximately $20. 75 - $25. 00 per sample. Note that these analytical costs do not include the much larger expense of hiring a consultant to collect the samples - an approach that is very common in stormwater permitting. Additionally, while pH is a field parameter, operators must purchase a pH instrument, calibrate it, and train staff or hire a consultant (given the 15 minute hold time for pH, permittees are most likely going to have to monitor this parameter themselves, which imposes additional requirements on the permittees and DEQ inspectors). Our VPDES program currently finds it challenging to attain consistent compliance in some smaller sectors under the ISW general permit. We believe that one reason for this is these permittees' limited experience implementing VPDES permits and limited resources. An alternative for more basic operations is focusing on proper implementation of BMPs in SWPPPs (this supports some form of an inspection-only approach). With the ongoing implementation of e-reporting, non-reporting of new monitoring requirements can trigger violations that are not necessarily based on water quality. Finally, we would note that in reissuing our ISW general permit in 2019, DEQ recently moved sectors with no benchmark monitoring to a new sector AE.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Though a broad application of COD monitoring will give an improved and more comprehensive picture of the discharge parameters, it must be recognized that this is an expensive parameter to sample for and adds financial burden. There should also be a benchmark level that takes into account prevailing conditions for pH and COD with a corresponding ability to waiver out of the requirement upon completion of a minimum number of samples below the benchmark. (See reply comment 13 for further discussion.)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend pH and TSS be used as universal benchmark parameters. In state permits that require benchmark monitoring, pH and TSS are more commonly included as industry-wide benchmark monitoring parameters and provide an indication of general storm water quality. COD should be included as a sector-specific parameter in appropriate sectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 4.2.2.1 – Request for Comment 10 – Should have an allowance to use test strips for pH. pH probes are notoriously unreliable, failing frequently. Having a pH probe that is only used quarterly pretty much guarantees that when you need it to conduct sampling it will more than likely not calibrate correctly and cause you to miss your pH sampling requirement. This also questions the within a half hour requirement, with multiple outfalls how are you going to conduct pH monitoring to this requirement.

**Comment Response:**

See DCN EPA-HQ-OW-2019-0372-0258-A1, Comment Excerpt Number 6.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

We oppose this measure as it will add yet another layer of testing and burdens to the extensive monitoring that is currently required. The addition of new testing and remediating for these new benchmark thresholds will lead to more complexity to the work we already find challenging to do. Furthermore, pH monitoring has not been proven as a good indicator of impacts to stormwater from industrial discharges especially when naturally occurring rainfall is a major factor.

If the EPA is truly concerned about MSGP benchmark monitoring requirements being "least burdensome as possible on operators while still providing the intended utility on whether operators could have SWPPP/stormwater control measure deficiencies," this proposed universal benchmark monitoring will in fact be multiplying our burdens.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

As stated above, EPA should eliminate benchmarks in favor of wet weather water quality standards. However, EPA instead is proposing to expand the use of benchmarks by adding new universal benchmark monitoring requirements for pH, total suspended solids, and chemical oxygen demand; and benchmark monitoring for PAHs. EPA has not adequately justified the expense of these new monitoring requirements considering the deficiencies with benchmarks.

If, nonetheless, the final MSGP retains universal benchmark monitoring including COD, EPA should allow for substitution of BOD5 for COD. There is an existing benchmark for BOD5 (30 mg/L) and it is certainly more appropriate for timber products and pulp and paper facilities for wood related discharges. BOD5 is a better measure of impact on a receiving stream. In the Fact Sheet for Timber Products, most of the sources (other than for wood preservatives) document BOD5 as the pollutant of concern. Additionally, if EPA utilizes a BOD5 benchmark, then 30 mg/L (which is based on a 30 day average for secondary biological treatment of municipal wastewater) should at least be adjusted to a more episodic number (the 7 day average of 65 mg/L for treatment equivalent to secondary treatment.[1] Our detailed comments attached discuss other concerns with the use of COD as a benchmark. In addition, obtaining valid measurements of pH in a stormwater context is particularly difficult, due to equipment needs and short holding times for analysis.

[1] 40 C.F.R. § 133.105(a)(2) (2001).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, we include in our detailed comments a number of other steps the agency can take to reduce administrative burden without sacrificing environmental benefit, such as .... not expanding universal benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

All dischargers should monitor for the universal benchmarks of COD, TSS and pH.

Discussion/Recommendations

EPA should eliminate benchmarks from the MSGP. However, if benchmarks are retained, EPA should allow substitution of BOD5 for COD, if COD is retained as a benchmark. There is an existing benchmark for BOD5 (30 mg/L) and it is certainly more appropriate for timber products and paper facilities for wood related discharges. BOD5 is a better measure of impact on a receiving stream. In the Fact Sheet for Timber Products, most of the sources (other than for wood preservatives) document BOD5 as the pollutant of concern. Tannins and lignins which may show up as color will be measured in a COD test and color treatment is not economically feasible for storm water (much less most industrial process wastewaters). Also, as we've experienced, we would expect unwarranted COD exceedances with a benchmark of 120 mg/L for these types of facilities.

The COD benchmark should be reviewed and reset due to the arbitrary basis (4 times the BOD5 benchmark – based on North Carolina COD benchmark) and the BOD5 benchmark be reset to a minimum of 45 mg/L (Equivalent to Secondary treatment 30 day average, 40 CFR 133.105), since storm water treatment facilities do not provide biological treatment. AF&PA believes, however, that this benchmark should actually be reset to 65 mg/L (equivalent to Secondary treatment, 7-day average, 40 CFR 133.105) which would be more characteristic of a storm condition than a 30-day average.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmark monitoring is not appropriate in all locations in the arid southwest. Flow from outfalls that discharge to undeveloped landscapes likely infiltrate and do not reach Waters of the US (WOTUS). In addition, a number of sites only discharge during 5 or 10 year rainfall events. Exceptions should be made for these outfall locations.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Also, of note the proposed benchmark monitoring of TSS is not of benefit in an arid climate where most of the TSS in discharges results from windblown sediments that build up on pavement. Even frequents street sweeping efforts often can't keep up wind-blown sediments that result from our desert's loose sandy soils.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Chuck Baltzer, Environmental Support Services (ESS)
**Commenter Affiliation:** Rio Algom Mining L.L.C, subsidiary of BHP Copper Inc. (BHP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0160-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**COMMENT 1 – Do Not Apply Universal Monitoring Parameters**: EPA proposes monitoring for pH, TSS, and COD across all sectors in response to NRC's related comment[2]. EPA appears to accept NRC's basis that these parameters are indicative of stormwater quality across all sectors. Neither the Draft Fact Sheet nor draft MSGP-2020 show how this determination was made "...based on best available science, [or] new data..." to meet NRC's overarching recommendation. As such EPA should not unilaterally apply these parameters to any sectors until such a demonstration can be made and is provided in the MSGP2020 Fact Sheet.

**Discussion**: Part 4.2.1 of the Draft Fact Sheet confirms that "Since first issuance of the MSGP in 1995, benchmark monitoring has been employed as a means by which to measure the concentration of a stormwater pollutant in a facility's industrial stormwater discharges."[3] Additionally, Part 4.2.1.1 of the Draft Fact Sheet provides the following discussion:

*The 2015 MSGP required benchmark monitoring for around 55 percent of MSGP facilities; the other 45 percent of facilities did not have any chemical-specific benchmark monitoring. More specifically, in the 2015 MSGP, 19 subsectors were not subject to any benchmark monitoring requirements (B2, C5, D2, E3, F5, I1, J3, N2, P1, R1, T1, U3, V1, W1, X1, Y2, Z1, AB1, and AC1) while the remaining 34 subsectors did have required benchmark monitoring.*

At this point in time EPA has amassed 25 years' worth of benchmark monitoring for a majority of facility sectors, much of which included the proposed "Universal Benchmark Monitoring" parameters. And yet given the absence of relevant discussion in the Draft Fact Sheet, it appears that the results from this difficult and expensive monitoring effort by U.S. industry were not reviewed or discussed to determine if it provided a useful metric for evaluating stormwater controls or to determine if "benchmark concentrations" provided a meaningful threshold for reacting to the performance of stormwater controls. This is in direct conflict to what EPA considers to be the NRC's overarching recommendation: i.e., to change the permit based only on best available science, new data, and technological advances. EPA has been directed to NOT change permit monitoring parameters until these data are evaluated using best available science that compares the 25 years of information with the 25 years of technological advances.

**Comment Summary:**

1. EPA should evaluate the 25 years' worth of benchmark monitoring data obtained to date and use that information to identify functional Universal Benchmark Monitoring parameters.

[2] - P. 58 of 103, Draft Fact Sheet.

[3] - P. 57 of 103, Draft Fact Sheet

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Chuck Baltzer, Environmental Support Services (ESS)
**Commenter Affiliation:** Rio Algom Mining L.L.C, subsidiary of BHP Copper Inc. (BHP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0160-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**COMMENT 2 – TSS and COD Monitoring Should Not Have Benchmark Thresholds**: EPA has historically set benchmark monitoring concentrations for total suspended solids (TSS) and chemical oxygen demand (COD) at 100 mg/L and 120 mg/L, respectively. These same (now called "threshold") concentrations are being universally applied to all dischargers at Part 8 of Draft MSGP-2020. Notwithstanding RAML's Comment 1 (above), the thresholds for these two parameters should be either eliminated, adjusted to meet receiving water requirements in states for which a standard has been developed, or at the very least removed as triggers for Corrective Actions or the newly proposed Additional Implementation Measures at Part 5 of MSGP-2020.

**Discussion**: Part 4.2.1 of EPA's Draft Fact Sheet describes the applicability of setting benchmark thresholds as follows:

*The benchmark thresholds are the pollutant concentrations above which represent a level of concern. <u>The level of concern is a concentration at which a stormwater discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.</u> The benchmarks are also set at a level, that if below, a facility's discharges pose less potential for a water quality concern. As such, the benchmarks provide an appropriate level to determine whether a facility's stormwater control measures are successfully implemented.*[4] [Emphasis added.]

Surface water standards have not been set for TSS or COD within New Mexico, Arizona Tribal Lands, and many other western states. Therefore there is no potential for these parameters to reach a concentration "at which a stormwater discharge could potentially impair or contribute to impairing water quality" (including aquatic and human health standards).

<u>In the case of TSS</u>, southwestern states have monsoonal precipitation patterns that very commonly lead to discharges that are higher than the benchmark threshold of 100 mg/L. Receiving waters are commonly arroyos that have natural flows with TSS concentrations that are orders of magnitude higher than the benchmark. In fact Arizona has eliminated the requirement to monitor for TSS at outfalls that discharge to ephemeral waters and it would be inconsistent to apply the TSS monitoring requirement to ephemeral receiving waters under MSGP-2020 at facilities subject to MSGP-2020, such as Tribal Lands. New Mexico applies suspended solids as a narrative standard that would vary with the characteristics of the receiving water as follows:

*Suspended or settleable solids from other than natural causes shall not be present in surface waters of the state in quantities that damage or impair the normal growth, function or reproduction of aquatic life or adversely affect other designated uses.* [5]

In the case of COD, Arizona rests in disagreement with EPA's position that monitoring of COD could "determine whether a facility's stormwater control measures are successfully implemented" as explained in the Draft Fact Sheet[6]. After having the COD benchmark monitoring requirement implemented in their state for nearly 25 years (since issuance of EPA's MSGP-1995), Arizona eliminated it from their MSGP-2019 with the following statement: "*For example, parameters such as BOD and COD were generally removed / substituted for a parameter that has a Arizona surface water quality standard, as the results of those parameters (BOD and COD) are often difficult to apply in a meaningful manner to industrial stormwater runoff.*"[7] Importantly, Region 9 EPA agreed and allowed issuance of this permit.

**Comment Summary**:

1. Total Suspended Solids (TSS) and Chemical Oxygen Demand (COD) should not have benchmark thresholds that trigger Corrective Actions, Additional Implementation Measures, or actions associated with enforcement.

[4] p. 57 of 103, Draft Fact Sheet.

[5] *Standards for Interstate and intrastate Surface Waters*; 20.6.4.13.A.1. New Mexico Department of Environmental Quality, Environmental Protection, Water Quality,

[6] p. 57 of 103, Draft Fact Sheet.

[7] 2019, 5 May. P. 3, *Arizona Pollutant Discharge Elimination System (AZPDES) Fact Sheet, Multi-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity from Industrial Facilities*.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Howard Marks
**Commenter Affiliation:** National Asphalt Pavement Association (NAPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

NAPA does not support nor see the benefit of universal benchmark monitoring. The 2015 MSGP benchmark monitoring requirements are based on decades of sector-specific discharges. For example, NAPA sees no reason for monitoring COD at industrial operations that don't use, process, or produce residual food and agricultural organic wastes which is typically what COD is

used to assess. This type of monitoring has no applicability to many industrial sectors, including asphalt pavement manufacturing.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee notes that in arid environments with sparse vegetation, total suspended solids (TSS) is a highly variable and natural component of the environment and may not be an ideal indicator of pollutant mobility and discharge. For remote locations that might not be accessible for sample collection within 24 hours of storm flow, chemical oxygen demand (COD) might be an unreliable proxy for organic contaminants. Permittee suggests that where acceptable knowledge exists for organic contaminants, that those contaminants be monitored.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

The NRC Study's justification for universal benchmark monitoring data collection is that the data will provide "broad, low-cost indicators of the effectiveness of stormwater control measures on site."[4] Such statements do not pass the smell test for "justification". Instead, it appears as simply an opportunity for EPA to collect national water quality data on someone else's dime. Sampling for these parameters is not inexpensive, and most importantly, these parameters are not necessarily effective indicators of stormwater control measures. For these reasons, EPA should not implement the proposed universal benchmark monitoring parameters.

WMA has specific concerns with the requirement for universal benchmark monitoring for chemical oxygen demand (COD). As explained previously, Wyoming stormwater permits at mine sites forbid runoff or effluent from pit dewatering, maintenance and coal processing areas from being directed to stormwater facilities. Hence there is no need or justification for COD monitoring of stormwater from our mining sectors.

The other two proposed universal benchmarks (pH and TSS) are also unnecessary, inadequately justified, and overly burdensome for Wyoming coal mining operations. Please reference the extensive NMA comments on this proposed MSGP renewal for additional details regarding concerns with setting the benchmark TSS at 100 mg/L. The NMA comments document that the 100 mg/L standard proposed by the EPA is often lower than what naturally exists in the west, including in Wyoming, and hence is grossly inappropriate. Any such benchmark standard should be tailored to the State or region.

In summary, the proposed imposition of these universal benchmarks appears to be mostly an expensive data gathering exercise for the EPA, instead of a requirement the EPA justifies based on a need to solve an environmental problem. There simply was no identification in the draft rules nor in the NRC Study of a compliance or environmental degradation situation that justified more monitoring.

In fact, the NRC study uses data from a coal processing site as justification for more benchmark sampling. However, in Wyoming, coal stockpile and processing waste is not allowed to be discharged through the MSGP program. Instead effluent from coal processing must be routed through an NPDES discharge site. We believe the wholesale benchmark monitoring requirement should be eliminated for operations with such limitations.

[4] 2019 NRC Study at 6.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

**C. EPA lacks a scientific basis for universal benchmark monitoring and the alternative implementation measures.**

EPA proposes to require universal benchmark monitoring with prescriptive requirements for corrective actions when monitoring results exceed benchmark thresholds. However, EPA's rationale for this new regulatory compliance mechanism is not based in the NRC study or the information presented by EPA. As such, EPA should revisit the purpose behind NRC's recommendations alongside the need for better data with which to justify the MSGP program in the future and tailor its provisions to likely environmental impacts.[40] As proposed, the 2020 MSGP would impose an unreasonable burden on small businesses that currently are only subject to visual monitoring without justification based on available data.

[40] ". . . the committee found that many of the program elements have been hampered by shortfalls in generating, considering, and acting on new information. This has resulted in missing opportunities for refining the MSGP monitoring requirements in support of improved stormwater management." NRC Study, pp. 1.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

**1. The NRC recommends universal monitoring but does not recommend universal benchmark thresholds.**

The NRC Study recommends "a suite of water quality parameters [pH, TSS, and COD] for benchmark monitoring by all industrial sites that must do stormwater sampling, including those that currently only do visual monitoring."[41] It states that these three parameters are good direct measures of water quality and the potential presence of other pollutants, as well as indications of SCM absence, neglect, failure.

Nonetheless, the NRC Study only cites specific thresholds for pH, saying that it "can be indicative of a major polluting event or process failure."[42] It does not claim that such severe events would not be detected by visual monitoring or inspections. For TSS and COD, the NRC Study discusses the established history and procedures of these tests but does not assert that there are well-established benchmark thresholds. The usefulness of this monitoring is in its value in identifying industrial sectors for further study. To be useful now, EPA would need to be able to associate new benchmark thresholds with the circumstances of each industrial sector for which it does not currently have data, including cost-effectiveness and technical feasibility of additional SCMs.[43]

Elsewhere, the emphasis of the NRC Study is forward-looking, with an emphasis on gathering quality data for future MSGP revisions. The report has recommendations on electronic reporting, minimizing monitoring error and a tiered approach to monitoring. The NRC Study recognizes that established monitoring tests have significant sources of sampling error and variability. [44]

These sources of error make it particularly important that benchmark thresholds be established based on the real world data of permittees, including the specifics and cost effectiveness of the SCMs adopted or required to be adopted. In its recommendation for the tiered approach, the NRC Study discusses the benefit of reducing the burden on low-risk facilities while ensuring "that high-risk industries that are more likely to be significant sources of stormwater pollution invest in the necessary monitoring to confirm that SCMs are effective in reducing pollutants and risks to receiving water. . . . Combined with suggested improvements to monitoring protocols, training, data management discussed in [Chapter 3], the tiered approach is also expected to increase the usefulness of data collected towards improving the management of industrial stormwater." The NRC Study emphasizes the need for better data before establishing new stormwater management measures.

[41] NRC Study, pp. 27.

[42] *Id.*

[43] ". . . the benchmarks provide an appropriate level to determine whether a facility's stormwater control measures are successfully implemented." *Proposed 2020 MSGP*, Fact Sheet, Part 4.2.1.

[44] *See* NRC Study, Table 3-1.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Darling
**Commenter Affiliation:**  American Coatings Association (ACA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmark Monitoring for Paint Manufacturing Industry (SIC 2851) is not needed**

The paint industry (SIC 2851) was designated "in light industry" since most activities at SIC 2851 are located at located in buildings; stack emissions are minimal; unhoused industrial equipment is minimal; outside material storage, disposal or handling activities are not part of manufacturing process; and minimal source of dust and particulates. As such there will be

limited exposure of stormwater to contaminants. As such the paint and coatings manufacturing industry has no benchmark monitoring requirements, as none are justified for this industry. However, without any sound technical justification EPA is now proposing to add a pH, TSS, and COD benchmark monitoring requirements. EPA has not included any additional justification for including the proposed benchmark requirement for our industry at this time – a change that is unduly burdensome and without any stated commensurate environmental benefit.

ACA believes the current visual examinations requirements for our industry are a useful and inexpensive means for permittees to evaluate the effectiveness of SWPPPs, as a result there is no need to add the benchmark monitoring requirements. Further, grab sampling is problematic since natural pollutants (blown-in offsite dusts; atmospheric deposition, pollen, leaves, forest fire ash, etc.) may be present in a grab sample taken at the start of a rain event could lead to false positive readings for pH, TSS, and COD. EPA acknowledged this back in 2000 when it stated "there may be circumstances where benchmarks may not necessarily be achieved because of elevated background levels of pollutants." ACA is concerned that non industrial related natural dusts and pollens will lead to benchmark exceedances, resulting in further burdensome monitoring as well as installation of expensive Appendix Q Stormwater Control Measures. Therefore, we believe that EPA has substantially underestimated the cost of adding the monitoring requirements – as a result this requirement will be costly and burdensome to our industry.

It is also important that EPA recognize that the paint and coatings industry has changed over the last few decades, with significant improvements over the last five years. The industry is a customer and technology driven industry. ACA members have consistently led the regulatory curve in reducing both the toxicity and Volatile Organic Compound (VOC) and Hazardous Air Pollutant (HAP) concentrations of our products. The introduction of high solids, low VOC paints; the use of low vapor pressure solvents, which results in lower air emissions through manufacturing have all significantly reduced VOC and HAP (90% reduction since 1990) emissions from our manufacturing processes as well as end user processes. These changes have been made in response to market forces, which in turn leads to a response in technology.

Business conditions have also led to dramatic changes in our manufacturing process. One example is smaller batch sizes. As business pressures have increased on both the manufacturing and surface coating side, inventory levels of paints have been reduced. Our industry has become more of a "made to order" oriented business then a "made to stock" business. This has in turn led to manufacturing and other technological advances. It is anticipated that this will not change, but in fact, smaller batch sizes and shorter lead times will prevail, especially in the industrial and specialty coatings arenas. The predominance of smaller batch sizes, which means paints are being made in one container and not transferred, eliminates emissions from transfer/loading operations during manufacturing. Further the industry is trending towards using slurries as opposed to dry pigments where possible to minimize exposure and emission issues related to particulates.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmark Monitoring for Adhesive and Sealants Manufacturing Industry (SIC 2891) is not needed**

Adhesive and Sealants manufacturing operations should be designated "in light industry" like paint manufacturing. Most adhesive manufacturing activities are located within commercial buildings; stack emissions are minimal and controlled; unhoused industrial equipment is minimal; outside material storage, disposal or handling activities are not part of manufacturing process; and are minimal sources of dust and particulates. In addition, like the coatings industry, the adhesive and sealant manufacturing industries have significantly reduced VOC and HAP product content and related process emissions. The adhesive and sealant industries are "made to order-type" production industries resulting in significantly reduced raw materials and finished goods storage at manufacturing facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

ACA strongly believes that EPA is not justified in its proposal to add TSS, pH and COD as monitoring benchmarks for the paint and coatings (SIC 2851) or adhesive and sealants manufacturing industry (SIC 2891).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

The arid southwest has dry conditions and frequent dust storms. It would be disproportionate to hold arid regions to the same TSS benchmark as wetter areas of the country. The City suggests that EPA allow for regional differentiation for the TSS benchmark monitoring level so that this parameter is equally achievable in different areas of the country and does not place a disproportional burden on facilities in arid climates.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA "Request for Comment 10" proposing to require universal benchmark monitoring for pH, TSS, and COD for all MSGP permittees (all sectors):

1. Pollutants in stormwater runoff are generated from specific source areas. For example, pH fluctuates with exposure of acids/bases found in surfactants, lime, and other feedstocks. TSS loading originates from erosion, dust, and materials management. COD measures oxygen demand from organic compounds including food, emulsions, etc. While useful parameters for some industries, we disagree that all sectors have source areas for these new benchmarks. We recommend enhancing sector-specific benchmarks for these pollutants, when inherent to industrial activities at a facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.

**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA "Request for Comment 10" regarding whether these parameters are appropriate for universal benchmark monitoring, we propose that they are not appropriate for universal benchmark monitoring.

1. These monitoring requirements can increase nationwide data about concentrations of these pollutants in runoff, but will also include measurements of the concentrations in run-on to these monitored sites, not a clear understanding of industrial sector contributions to these pollutants. This additional monitoring for sectors that do not contribute these pollutants is an additional cost and sampling burden to the regulated community.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Harry Childress
**Commenter Affiliation:** Virginia Coal and Energy Alliance (VCEA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0175-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

VCEA opposes the addition of additional benchmark monitoring parameters pH, TSS, and COD for all sectors. If additional benchmark parameters are warranted based on data for a specific sector, EPA should only add the parameters for such sectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

## There is no Justification for Universal Benchmark Monitoring Requirements

In this section we will attempt to address several questions asked by the EPA. These all relate to universal sampling for all facilities regardless of risk. From the outset, this addition to the 2020 MSGA appears to violate one of the key positions of the NAS, which is to reduce the workload of low-risk facilities. Below are the questions that will be discussed.

...

Benchmark monitoring is not new. Some state permits have incorporated this sampling concept for several permit terms. As a stakeholder we always express the same concerns and questions over this process when we meet with permit writers and those that craft environmental programs. What is the justification for this blanket sampling, who is reviewing the collected data, and what has the collected data shown? We have yet to hear an explanation that justifies continuing the process, but it is always repeated in the next permit cycle. We feel that the same will hold true for the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

We also see benchmark monitoring as a process with a limited life. Our understanding has always been that this collection of data is used to determine if an issue exists, and if it does, the information will be used to develop effluent limits. As we sit today, we are not aware of any case where benchmark monitoring has been implemented that resulted in the discovery of a systematic issue. We are also not aware of any use of benchmark monitoring that has been terminated within a permit. We urge the EPA to pull back this notion of benchmark monitoring and if it does remain in the 2020 MSGP, we push for a defined timeline that data collection will occur and if no systematic issues are seen for an industry sector, that sector needs to be released from benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Steve Whitt
**Commenter Affiliation:**  Martin Marietta, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Sector J Facilities have no impact on Chemical Oxygen Demand</u>**

Seeing COD as a universal benchmark sampling requirement was a genuine surprise. I have managed environmental permits for Sector J facilities for over 30 years and have never seen or heard of a COD concern related to our discharges. It is so unusual that I had to research the primary sources that lead to low oxygen levels in stream systems. What I found in no way relates to the aggregates industry. We do not use or process organic materials. Our efforts to extract natural deposits of aggregate also do not create any organic materials.

Primary industrial contributors that have the potential to be high in organics appear to be sewage treatment plants, food processing, chemical manufacturing, automobile salvage operations, the energy sector, and metals production to name a few. Sectors that specifically had COD testing in the past include sawmills (Sector Al), pulp manufacturing (Sector B2), paper mills (Sector B2), copper mining (Sector G), hazardous waste facilities (Sector K), pharmaceutical producers (Sector CS), waste recycling (Sector N), airports (Sector S), fats and oil production (Sector U).

The NAS Study claims that COD is a basic indicator of the effectiveness of stormwater-control measures employed on site. The stormwater control measures at a Sector J operation are primarily deployed to settle out suspended solids consisting of rock fines and native soils. COD is not an appropriate measure of stormwater controls at a Sector J facility. Again, the EPA is placing a universal requirement across an industry sector that does not impact the immediate concern. We urge you to remove this unnecessary sampling for those industries that have little to no impact on COD.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

IMA-NA does not feel the Agency has adequately justified the requirement of universal benchmarking to the MSGP and recommends EPA re-evaluate the potential environmental benefits of such a requirement for mining operations. The Association is concerned that under the proposed 2020 MSGP the role of benchmark monitoring will fundamentally change into a compliance and enforcement tool. As industry groups have noted during every MSGP update process, since the 1990s, benchmarking was adopted as a tool for operators to gauge the efficacy of their Stormwater Control Measures ("SCM"). Benchmarking was not intended to be used as a trigger for permit violations or forced compliance measures. Throughout each MSGP update EPA reiterated the intention to use benchmark monitoring as a tool to flag potential problems not as a compliance mechanism. Assuming the Agency's historical position on the utility of benchmark monitoring has not fundamentally changed, IMA-NA recommends the EPA reconsider the decision to adopt universal benchmarking as a component of the MSGP and the proposed causal relationship between benchmark exceedances and the Additional Implementation Measures ("AIM"). By tying benchmark exceedances to AIM, the EPA is shifting the focus of benchmark monitoring to compliance actions inappropriately.

The proposed realignment of benchmark monitoring is particularly troublesome in the lack of practical benefit to gain from adopting a universal benchmarking system. While there can be utility in gathering and maintaining data and information related to stormwater discharges, the EPA has failed to demonstrate how this data will improve, or offer additional protections to, surface waters in the United States. The Association feels the utility of universal benchmarking in this proposal is in providing the Agency with significantly more data rather than providing a benefit to water quality. To look again at the issue of benchmark monitoring, there has not been scientific evidence that benchmark monitoring reflects overall water quality or even accurately reflects the potential risks in SCM. Numerous studies from the NAS over the years have demonstrated reason to question the quality of useful information to be learned from benchmark monitoring in the case of stormwater. The lack of clarity from NAS on the benefits of benchmark monitoring lead IMA-NA to ask whether the current MSGP proposal just expands the level of data necessary to track and report to EPA without a corresponding environmental benefit...

...In addition to concerns over the actual benefits to expanded benchmark monitoring, IMA-NA believes the lack of attention to differences between industries covered by the MSGP has resulted in a flawed proposal that fails to acknowledge the variation of benchmark exceedances across industries...

...Finally, IMA-NA would recommend that the goals of the MSGP for our sector can be achieved through thorough reporting on an annual basis, visual assessments of discharge, and regular inspections, maintenance and improvements to Best Management Practices ("BMP"). Our members believe a combination of focused work in these specific areas would continue to protect our nation's surface waters better than the adoption of the universal benchmarking.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Patrick A. Jacomet
**Commenter Affiliation:**  Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The MSGP's universal benchmark monitoring would require that aggregates operations test for chemical oxygen demand (COD), which is unnecessary because aggregates operation processes would not affect COD in water.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

### 7. <u>Request for Comments 10 & 13: Universal Benchmark Monitoring</u>

We strongly oppose the introduction of stormwater benchmark requirements to **<u>all permittees</u>** with the addition of universal benchmarks. The intent of this new requirement has been addressed by the BMP approach in the MSGP, a successful cornerstone of stormwater management from a wide variety of sites.

Universal benchmark monitoring, at this point in time in the stormwater permitting program, would be more compliance "busy work" for no purpose other than to provide for more enforcement or citizen lawsuit opportunities for "non-compliance of process" in the implementation of these universal benchmark monitoring. Stormwater sampling is arduous, costly, and should be reserved for cases of known, significant stormwater pollutants (e.g., SARA Title III, Section 313 water priority chemicals), in order to mitigate real, actual pollution concerns.

...

Finally, once this universal benchmark monitoring is inserted into the MSGP, there is real concern that what starts out as three (3) parameters (i.e., pH, TSS, COD) will expand to a host of other parameters in future MSGPs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Rather than mandating quarterly universal benchmark monitoring, USEPA should make this type of stormwater sampling an alternative to existing BMP approaches. Also, rather than mandating the three (3) parameters (i.e., pH, TSS, COD) for all permitted sites, each site should be able to determine which parameters should be monitored, if at all, if these parameters are significant stormwater pollutants from the site's industrial activities. Another suggestion, if USEPA persists with this universal benchmark monitoring, is to mandate only pH monitoring, which is a cost-effective field test, and leaving benchmark monitoring of other parameters as optional.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP includes additional parameters pH, TSS, and COD for benchmarking monitoring for all sectors and also would no longer allow a facility to discontinue benchmark monitoring after monitoring results indicate that BMPs and their implementation are effective through achievement of these benchmark levels. EPA seeks comment in request for comment 10 regarding the addition of these parameters. These proposed additional monitoring parameters for all sectors are unnecessary and EPA has not fully established the benefit that they would bring.

Further, additional monitoring will result in even more onerous and expensive monitoring especially for facilities that may be low risk. In particular, pH monitoring would be nearly impossible to fully implement in the field. Within EPA standard methods, pH monitoring is required within 15 minutes of collection of samples. Collection of samples, transport, and analysis would be extremely onerous and expensive for the marginal benefits that might result. If EPA believes additional monitoring for these parameters is warranted for some sectors, EPA should tailor the monitoring requirements to those specific sectors rather than imposing additional benchmark monitoring on all sectors. VMA supports the ability for permittees to utilize composite samples.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

*Part 4.2.1.1.u. Universal and Sector-specific Benchmark Monitoring (Request for Comment 10):*

Relative to adding pH as a universal benchmark, Table II of 40 CFR Part 136 requires pH to be measured within 15 minutes of collection, as pH is a parameter that degrades or transforms quickly.

Our facility has 17 monitored outfalls spread out over approximately 48 acres. These outfalls are equipped with automated samplers to enable collection of samples within 30 minutes of stormwater discharge occurring during, and outside, business hours and on weekends and holidays. Measuring pH at 17 monitored outfalls within 15 minutes of sample collection is not reasonably achievable, regardless of whether the storm event occurs during, or outside of, normal staffing hours. Additionally, past experience has shown that in-situ pH probes are designed for use in continuous flow environments (e.g., wastewater treatment plants), and are difficult to properly implement in nonperennial receiving waters. The probes must be kept submerged in water to prevent them from drying out (resulting in irreparable damage), which is impractical to maintain in an arid or semi-arid environment where the outfall channel is completely dry for days, weeks or even months between storm events.

*Recommendation*:

Allow for a practical strategy and flexibility to comply with pH holding times for large facilities with numerous monitored outfalls that does not create an unworkable logistical requirement or installation of equipment not suited to ephemeral or intermittent receiving waters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ram Singhal
**Commenter Affiliation:**  Flexible Packaging Association (FPA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA opposes the proposed requirement for universal benchmark sampling for several reasons.** First, FPA does not believe that the recommendation in the 2019 NRC Study (*IMPROVING THE EPA MULTI-SECTOR GENERAL PERMIT FOR INDUSTRIAL STORMWATER DISCHARGES*) for industry-wide monitoring in the MSGP for pH, TSS, and COD as basic indicators is well supported by evidence in the NRC report or by EPA's Notice of proposed rulemaking. Further, FPA does not believe that such "benchmark" sampling provides useful information to EPA or to the public about "baseline conditions across sectors" because turbidity and pH are influenced by many factors, including specific storm events, and they also are time-and-place dependent. Such data also can be highly dependent not only on process, but by geographical location and weather, as well as by surrounding structures, industry and community activities. Nearby roads, particularly in floodplains, likely have more impact on storm water than do ingress and egress from a plant. Moreover, vegetative planting, containment areas, and plant-specific characteristics affect stormwater run-off and collection. These variables that are highly specific to each facility and thus, by definition they do not lend themselves to a good methodology for benchmarking stormwater controls across industry sectors and/or across the country, a state, or a locality. Thus, the proposed "universal benchmark sampling" requirements would be unreasonable for EPA to adopt.

...

In summary, the flexible packaging industry believes that existing inspection requirements in the MSGP have served well in identifying and minimizing risk associated with stormwater runoff. We do not believe that the EPA or the NRC have provided a sufficient explanation of the purpose for random baseline testing to justify the expense of such sample collection and analysis. Testing "for the sake of testing" rarely provides a reasonable basis for additional regulatory requirements and is by definition, arbitrary and capricious.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

AAAE is particularly concerned regarding the proposal to require universal benchmark monitoring for all permit holders because EPA has provided no basis for the proposal and would mandate monitoring for EPA-permitted airports regardless of past performance or facility risk.

...

**1. EPA has not substantiated its proposal to require universal benchmark monitoring for any EPA-permitted airport.**

Certain AAAE members expressed concern over EPA's proposal to require universal benchmark monitoring for any EPA-permitted airport discharging stormwater because the agency has provided no justification or basis for expanding the scope of airports subject to monitoring. Under EPA's 2015 MSGP, benchmark monitoring requirements only applied to airports that used more than 100,000 gallons of pure glycol in glycol-based deicing fluids and/or 100 tons or more of urea on an average annual basis. (Part 8.S.7, 2015 MSGP.) Under the proposed 2020 MSGP, any airport seeking coverage for stormwater discharges would be held to universal monitoring requirements, regardless of their prior history, and, if exceedances result, the corrective measures and AIM process in proposed Part 5.

The report that recommended industry-wide monitoring under the MSGP did not identify deficiencies in the monitoring that airports currently conduct and/or any of the SCMs that airports implement. As EPA is aware, per the agreement that settled challenges to the 2015 MSGP, the National Academy of Sciences, Engineering, and Medicine's (NAS) National Research Council (NRC) prepared recommendations for improving EPA's MSGP, known as the NRC Study.[1] The NRC Study's recommendation for EPA to require universal monitoring was based on the desire to "provide indicators of problems for a wide range of sites and a baseline understanding of industrial stormwater risk for all sectors." (NRC Study, at 27.) AAAE does not believe that EPA's need for improved quality of data from many industries covered under the MSGP justifies imposing monitoring requirements and associated costs on airports without regard for past performance or facility risk.

Certain AAAE members believe universal benchmark monitoring should not apply to airports, especially airports with no history of prior exceedances and that do not meet the threshold for sector-specific monitoring. EPA should instead keep intact quarterly visual assessments of

stormwater discharges and, subject to the improvements recommended below, the sector-specific benchmark monitoring requirements for airports that meet the existing threshold. (Proposed Part 3.2, 8.S.7.) Indeed, Sector S is specifically tailored for airports and focused on areas and pollutants that may be of particular concern to EPA and the industry. Under universal benchmark monitoring, airports would have to sample quarterly throughout the year even though the primary reason for including airports within the scope of the "industrial activity" is because of their deicing operations, which occur during a narrower deicing season. (See 40 C.F.R. § 122.26(b)(14)(viii).)

AAAE's primary concern with universal benchmark monitoring is that airports can vary significantly by size, resources, geography, among many other factors, highlighting the need for a risk-based approach to monitoring as opposed to industry-wide requirements that may not be suitable for all airports. In the event that EPA maintains the universal benchmark monitoring requirement, AAAE offers three recommendations for improving this proposal:

- First, EPA should exclude airports that fall within the scope of sector-specific benchmark requirements from also complying with universal benchmark requirements. This would eliminate redundant monitoring requirements.
- Second, any airport that must comply with universal benchmark monitoring should not be required to comply with the proposed AIM process outlined in Part 5. The NRC Study's recommendation for universal benchmark monitoring was based on the need to collect better data and identify potential problems areas. EPA should wait to review and analyze any data collected to understand and identify any issues prior to prescribing specific corrective measures for airports.
- Third, airports should not have to monitor and report data for the proposed parameters for the entire permit term if the annual average does not exceed the benchmark threshold. The purpose of benchmark monitoring is to determine the overall effectiveness of the facility's SCMs. If the SCMs have been proven effective through monitoring data, the airport should be permitted to discontinue monitoring, similar to sector-specific monitoring, unless the airport makes substantial modifications to the facilities or changes to the SCMs. (See Proposed Part 4.2.1.2.b.)

[1] National Research Council, Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges (2019) (hereinafter "NRC Study"). (EPA-HQ-OW-2019-0372-0005.)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI opposes the universal component of proposed Part 4.2.1.1.a, Universal and Sector-specific Benchmark Monitoring, in the Proposed 2020 MSGP. EPA needs to reconsider "universal benchmarks" and to substantially revise its approach for the 2020 MSGP (please also see comments in Section B.9).

The concept of universal benchmarks emerged from the recommendations by NASEM for "Industry-wide monitoring only" for pH, TSS, and COD (Report at 6; emphasis added):

*All facilities in sectors **that do not merit additional pollutant monitoring** would conduct industry-wide monitoring for pH, TSS, and COD. These data would provide broad, low-cost indicators of the effectiveness of stormwater control measures on site.*

EPA's proposal simply did not follow this NASEM recommendation. Rather than applying monitoring of pH, TSS, and COD to only facilities without applicable sector-specific benchmark monitoring, as recommended, EPA instead proposed to require all facilities to monitor pH, TSS, and COD, regardless of whether they also have and have had sector-specific benchmark monitoring. Sector-specific benchmark monitoring may also include any of these three parameters independently. Sector N1 benchmark parameters have included COD and TSS since the 1995 MSGP.

Universal benchmark monitoring does not make sense and is not necessary for the recycling industry (Sector N1). The recycling industry has conducted sector-specific benchmark monitoring, including COD and TSS, for more than 25 years, which includes the period of ISRI's Industry Group Permit before the 1995 MSGP. Even pH was a monitored parameter during ISRI's Industry Group Permit, but pH was not included as a benchmark parameter in the 1995 MSGP. After 25 years, there is no need to add pH now via universal benchmarks or otherwise.

Implementing this recommendation is somewhat complicated by EPA's proposed simultaneous imposition of both new universal benchmarking and new sector-specific benchmarking on some industrial sectors. EPA needs to reconsider whether and how to implement this NASEM recommendation in the 2020 MSGP, including for which industrial sectors, if any.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that universal benchmark monitoring for total suspended solids (TSS), chemical oxygen demand (COD) and pH, if retained in the final MSGP, not apply to Sector F (Primary Metals Facilities), and not apply to iron and steel mills in particular.*

*Part 8, Table 8.1.1 – Universal Benchmark Monitoring Applicable to All Sectors*

The proposed MSGP at Table 8.1.1 contains the following universal benchmark concentrations applicable to all sectors:

| pH | 6.0 to 9.0 su |
|---|---|
| Total Suspended Solids (TSS) | 100 mg/L |
| Chemical Oxygen Demand (COD) | 130 mg/L |

TSS and COD are not included in state ambient water quality standards for protection of human health, aquatic life, wildlife or for enhancement of primary or secondary contact recreational activities in and on the water. State narrative water quality standards typically prohibit discharges of substances that will settle to form putrescent or otherwise objectionable deposits. However, TSS discharged from iron and steel mills in treated process waters and in stormwater are inorganic in nature are not associated with putrescent deposits. Thus, there is no direct link between TSS discharged from iron and steel mills and either ambient narrative or numerical water quality standards.

Furthermore, aside from process wastewaters from by-product cokemaking operations, COD is not a significant component of process wastewaters from integrated steel mill "hot end" steel manufacturing operations (i.e., sintering, blast furnaces, basic oxygen furnaces, vacuum degassing operations, continuous casting, direct reduced iron), and from process wastewaters from hot rolling and steel finishing operations (acid pickling, alkaline cleaning, hot dip coating, electroplating). Electric arc furnace (EAF) plants at non-integrated steel mills have dry air pollution controls and therefore have no COD component associated with EAFs. The continuous casting, hot rolling and steel finishing operations at EAF steel mills are similar to those at integrated steel mills. By the nature of the iron and steel manufacturing operations, industrial stormwater is not characterized by contamination by organic materials that contribute to COD.

To the extent COD is present in stormwater from iron and steel mills, it is effectively regulated by effluent limits for oil and grease that are typically applied at concentrations of 10 mg/L or 15 mg/L for stormwater discharges and non-stormwater discharges, far less than the proposed universal benchmark COD concentration of 130 mg/L.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

- That universal benchmark monitoring for total suspended solids (TSS), chemical oxygen demand (COD) and pH, if retained in the final MSGP, not apply to Sector F (Primary Metals Facilities), and not apply to iron and steel mills in particular.
- That EPA withdraw the proposed Universal Benchmark concentration for COD, or make it a Sector-Specific Benchmark Concentration only where warranted. This would not apply to iron and steel facilities that do not have by-product cokemaking operations.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement for universal benchmark monitoring of pH, total suspended solids ("TSS"), and chemical oxygen demand ("COD") is not necessary to assure the effectiveness of stormwater control measures at facilities operated by members of the Steel Associations. The principal industry sectors under which the Steel Associations' member operate (Sector F: Primary Metals and Sector N: Scrap Recycling) already require sector-specific benchmarks that were selected by the Agency, in part because they provide industry specific insight into the effectiveness of stormwater controls. While adoption of benchmark monitoring requirements for pH, TSS, and COD may aid in the assessment of stormwater controls at facilities in industry sectors that currently have no benchmark monitoring requirements, use of the generalized parameters does not add any meaningful insight as to the effectiveness of controls in sectors that already have sector-specific parameters. The proposed requirement to universally require monitoring of these generalized parameters on top of existing sector-specific benchmarks is therefore duplicative and unnecessary. The Steel Associations therefore recommend that EPA withdraw its proposal to require universal benchmark monitoring of pH, TSS, and COD for facilities in industry sectors with existing benchmark monitoring requirements. At a minimum, the Agency should withdraw

its proposal to require monitoring of these parameters throughout the permit term. EPA should allow facilities to discontinue monitoring for these parameters after one year if the facility does not exceed the benchmark values.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  DG Whitefield, LLC and Springfield Power, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0188
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

We strongly urge EPA to not add universal benchmark monitoring (UBM) for pH, COD and TSS. We strongly support the "inspection only" option as discussed further below. Monitoring for pH and COD seems nebulous and unrelated to industrial activity. We are concerned that both pH and COD are more likely to be influenced by natural or background conditions, than any industrial activity at our facility. In New Hampshire, as well as the Northeast region, it is widely known rainfall contains low pH levels that are typically below 6.0. Thus, we would likely exceed the suggested benchmark monitoring thresholds of 6.0 to 9.0 regardless of any activity or operations and if even we met the criteria for No Exposure Certification. Thus, we believe that pH monitoring will only lead to erroneous or misleading results and then extensive additional monitoring and unnecessary added costs to demonstrate that the potential exceedances are due background levels even though the cause for low pH levels is already well documented. We have similar concerns about COD being potentially influenced by the presence and decay of natural organic materials and not directly associated with facility operations resulting in erroneous results...

...As mentioned earlier, we believe the "inspection only" option is most appropriate for low risk facilities such as ours rather than universal benchmark monitoring. We are a small operation with limited staff resources that are already stretched to keep up with the quarterly inspections, visual assessments and reporting. The proposed UBM requirements seems highly unnecessary and overly burdensome with limited potential benefit. However, if EPA insists that universal BM is necessary, we suggest that TSS be the only indicator parameter required for universal benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

We do not agree that universal benchmark monitoring is appropriate. Please reference Comment #9.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Perhaps the most troubling element of EPA's proposed changes to the MSGP requirements is the new requirement for benchmark monitoring of pH, total suspended solids, and chemical oxygen demand. Specifically, the addition of lead as a new benchmark monitoring requirement makes no sense for the fiber glass and rock and slag wool industry. While lead may be found in trace amounts, according to tests, in certain raw materials, there have never been levels detected in stormwater that would justify increased monitoring. NAIMA and its members also oppose EPA's expansion of benchmark monitoring to all facilities subject to the MSGP. This is a dramatic increase from the approximate 50 percent of the sectors that had been subject to benchmark monitoring since 1995.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anne Germain
**Commenter Affiliation:** National Waste & Recycling Association (NWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0194-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comments on establishing universal benchmark monitoring that includes quarterly monitoring for all sectors for pH, total suspended solids (TSS) and chemical oxygen demand (COD). Under the 2015 MSGP, nineteen sectors were not required to conduct quantitative benchmark monitoring. Although universal benchmark monitoring could provide useful data to gauge the effectiveness of stormwater control measures, imposing quarterly universal benchmark monitoring requirements on these sectors may be unreasonably burdensome for facilities that previously had no such requirements.

Further, some sectors already conduct quantitative monitoring under the 2015 MSGP. For example, hazardous treatment, storage, and disposal facilities (sector K) annually monitor stormwater for TSS and pH; and, landfills (sector L) annually monitor stormwater for COD and pH and quarterly monitor TSS. These facilities would be required to increase monitoring of these parameters to quarterly. Sectors with current benchmark monitoring requirements already have quantitative metrics with which to gauge the effectiveness of stormwater mitigation measures. Increasing the frequency of monitoring adds little value.

NWRA recommends that EPA avoid imposing universal benchmark monitoring requirements for facilities that already have sector-specific quarterly benchmark monitoring requirements under the 2015 MSGP. NWRA further recommends that EPA limit requirements for the universal benchmark monitoring to annual for sectors that do not currently have benchmark monitoring requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Universal Benchmark Monitoring Requirements are Unnecessarily Burdensome</u>**

EPA has failed to explain how requiring universal sampling – with no indication of how it will be used – will improve the quality of the nation's surface waters. Coupled with the lack of detail for how a low risk determination should be made, EPA violates one of the key positions of the NAS: to reduce the workload of low risk facilities. Below in italics are some of the questions NSSGA will answer in this section; however, a question is: should blanket benchmark

monitoring for all facilities, regardless of risk and processes, be required? The answer, based on sound science and environmental impact, is no.

...

The rationale for the new benchmark monitoring for all industries is not persuasive. According to the NAS study, only certain industries have a history of exceeding standards. While benchmarking was mentioned as one potential way to determine if control measures were effective, a blanket requirement makes no sense. Who will be evaluating all of this additional data? Does EPA have the manpower to utilize this data once collected? For industries already sampling for water quality data, what purpose does additional benchmarking achieve? None of this is addressed in the proposal. NSSGA suggests that EPA more fully evaluate already collected data and engage with industry before requiring additional costly and burdensome sampling. EPA should request sampling only based on a scientific need by industry sector. Industry wide benchmark testing is duplicative, unnecessary and burdensome.

In the proposal, EPA indicates that the three parameters would provide a baseline and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors. NSSGA strongly questions the rationale behind "broader water quality problems" which implies that this measurement is not for onsite activity that NPDES permits are intended to regulate, but general water quality impairment in a region. Industrial permit operators are not responsible for water quality issues outside of their control. Nonpoint sources, sewage overflow and natural conditions can all affect water quality in an area. Stormwater permittees should not have to pay for analyses not related to their operations. Business owners are responsible for their activities that impact water; therefore, testing beyond their activities should not be forced upon them.

If, in the final permit, EPA includes universal benchmark testing, it should only be for a limited period of time. Existing testing should count towards the benchmark testing (i.e. annual testing should substitute for benchmark testing), and only for industries that are determined to need it. EPA should also be clearer in exemptions and assistance for operators working in arid regions. Requiring all industries in all situations to do benchmark testing far exceeds the conditions of the settlement and is punitive to industries demonstrating compliance and good stewardship. A facility that has demonstrated compliance for many consecutive quarters, or many consecutive years, should be exempt from collecting benchmark samples for the entire 5-year permit term.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1

**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

## Chemical Oxygen Demand Testing is Unnecessary for Aggregates Operations

While NSSGA strongly opposes benchmark testing for all sectors in all situations as unnecessary, requiring COD for aggregates is especially egregious. Aggregates do not use or process organic materials, nor does the simple process of extracting stone, sand and gravel create organic material. Requiring COD analysis by aggregates operations serves no purpose and is unreasonable under the CWA. In the 1995 MSGP evaluation, aggregates operations were tested for COD, and the industry did not trigger monitoring.

COD measures the ability of a receiving water to break down, or decompose, a chemical structure that requires oxygen for the reaction, leading to low oxygen levels. Examples include wastewaters that are high in organics, nitrogen compounds, oils and fats (plant or animal based, including petroleum). Sectors that specifically had COD testing in the past include sawmills, pulp manufacturing, paper mills, copper mining, hazardous waste facilities, pharmaceutical producers, waste recycling, airports, fats and oil production. Based on the NAS, only a handful of these sectors exceeded their benchmark more than 25% of the time.

Requiring unnecessary testing is rife with problems and costs. Natural sources that might influence COD include algae, tannins, as well as artificial organic sources. In addition, chloride is an interference chemical, so coastal samples tend to be inaccurate. Demonstrating that high results were due to background levels or interference would be very expensive and difficult, particularly for small businesses.

Most states operate their own state permitting programs and have many other chemicals of interest based on local conditions. COD is required by some states for a very limited number of industries, where the processes might warrant it. The fact that most states do not require COD for aggregates is further proof that COD is not an appropriate measure for water quality from aggregates operations.

It is unlawful to require testing for a parameter that a facility does not use or discharge without any scientific basis other than it was deemed "inexpensive" by a research organization. Indeed, imposing permit conditions that do not have a legal cause and effect relationship to determining if a state's water quality standards will be violated undermines the regulatory structure of the CWA. Courts have recognized that conditions imposed by state regulators must meet legal causation principles. *The Aransas Project v. Shaw*, 756 F. 3d. 801 (5th Cir. 2014) while decided under the ESA and not the CWA is a good example. In that case, The Texas Commission on Water Quality restricted water withdrawals for various users to protect the downstream habitat of the endangered whooping crane. The Fifth Circuit reversed the lower court and held that the withdrawal condition was not the legal (or proximate) cause of the alleged taking of whopping cranes through habitat modification due to other intervening causes such as storm events. By analogy, requiring aggregate operators to monitor for COD where the industry has determined that storm water discharges from aggregate sites do not interact with organic materials is not

legally related to whether such discharges would violate state water quality conditions. Thus, EPA's adoption of NRC's "blanket" recommendation that COD benchmark monitoring for all industrial source categories fails to provide exceptions for source categories such as aggregate operations where there is no legal causation relationship to meeting state water quality standards. In fact, the proposed permit (sec. 4.1.2) states that sampling must be conducted at a point before the storm water mixes with other waste streams, although it may be difficult to separate out sampling of storm water from a point where it is commingled with other waste streams prior to discharge. Indeed, in many states commingled waste streams are not considered storm water discharges and are regulated as industrial waste streams.

Aggregates operations are highly efficient, and technology allows many operations to employ few people on site at any one time. These employees serve multiple roles, which keeps them busy. As such, there is little time for multiple employees to engage in the training necessary to complete regular sampling. Sampling is often done by one individual for multiple sites. Adding additional, unnecessary sampling puts a burden on operations far above the not insubstantial cost of laboratory testing. Some operations may be required to hire special consultants to complete sampling, which adds to the cost. Again, this is not for necessary sampling to ensure that operations do not negatively impact surface waters, but to sample more often and in the case of COD, for a parameter that aggregates operations do not impact.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

While NSSGA objects to the universal benchmark testing, at a minimum COD benchmarking should not be considered appropriate for Sector J.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jeff Hannapel
**Commenter Affiliation:**  American Foundry Society (AFS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0199-A2

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

In the draft 2020 MSGP, EPA proposed universal benchmark monitoring for pH, TSS and COD. First, establishing benchmark levels and requiring monitoring for stormwater discharges associated with industrial activity is not necessary to protect human health and the environment for all of these parameters and all sectors. EPA should reconsider applying each of these universal benchmarks and monitoring requirements to all sectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Universal Benchmark Monitoring: NMA objects to universal benchmark monitoring, especially for chemical oxygen demand (COD) and total suspended solids (TSS).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 10:**

**Applicability of Benchmark Monitoring for Universal Benchmarks (Part 4.2.1.1)**

EPA has requested comment on whether the proposed universal benchmark monitoring requirements for pH, TSS, and COD are appropriate. NMA strongly believes that the 12 proposed provisions are inappropriate for mining sites and should be eliminated from the final MSGP. The NRC Study explained that "all three parameters are direct measures of water quality and are appropriate choices for industry-wide sampling because all three can be indicators of broader water quality problems and the presence of other pollutants."[20] The NRC Study justified the increased data collection of these parameters because it was believed this data would "provide broad, low-cost indicators of the effectiveness of stormwater control measures on site."[21] However, this conclusion is not necessarily true for all industries or facilities, and more importantly, there is not sufficient scientific justification to impose these broad requirements. The proposed benchmark monitoring requirements serve mostly as a data collection mechanism rather than a meaningful process to address environmental protection, and should not be finalized in the 2020 MSGP.

[20] Proposed 2020 Fact Sheet at 57.
[21] 2019 NRC Study at 65.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

1. TSS

Our industry has been subjected to pH and TSS monitoring as part of its industry-specific requirements and has experienced firsthand the improper implementation of benchmark thresholds. At many mining operations, the benchmark value for TSS (100mg/L) is not representative of water quality. Exceedances of that value can be attributed to natural background concentrations rather than broader water quality problems, particularly where WOTUS are not involved. The proposed TSS level is well below naturally occurring levels during storm events in many parts of the United States, including much of the Western United States and steeper portions of the Appalachian Basin (even when vegetated). Unlike some other industries, mining facilities are required to conduct extensive sampling of waterbodies within and adjacent to the permit area to comply with pre-mining, during mining, and post-mining collection requirements specified in mining regulatory frameworks. For mining in particular, EPA should allow for modification of all benchmark monitoring concentrations to levels that more closely approach background levels in the facility's permit area. At many surface coal

mines, for example, it is well documented that baseline water quality data is readily available. At such sites, the facility should be allowed to use a representative statistical measure of baseline TSS measured in onsite and adjacent streams. The benchmark modification process needs to be streamlined so as to not create an added burden on the benchmark process.

In addition, NMA recommends the removal of the TSS benchmark at mines in the arid West. During development of the Coal Mining Western Alkaline Rule for incorporation into the Effluent Limitation Guidelines, EPA concluded that in areas with naturally high TSS, the prolonged use of sediment ponds has the potential to disrupt the hydrologic balance and can cause an increase in downstream erosion of the streambed. The development document for the rule explains that "Sediment is in abundance within the channels where flow occurs and occurs at concentration levels near or at flow carrying capacity. Sediment concentration frequently varies over a wide range of concentration levels during a given flow event. Sediment content from a few thousand to 500,000 mg/L may be expected with values in the 25,000 to 150,000 mg/L range being common."[22] As a result, EPA promulgated the Western Alkaline Coal Mining subcategory in the ELGs, which promoted the removal of sediment basins and implementation of reclaimed areas, which were able to demonstrate sediment concentrations in runoff were equal to or better than pre-mining runoff conditions. Nonetheless, EPA has continued to impose an arbitrary benchmark of 100 mg/L at mining operations in the arid West in the MSGP. Similarly, EPA has made no showing that 100 mg/L is an appropriate benchmark for the Midwest or Eastern United States. If the TSS benchmark monitoring is to be retained, NMA suggests EPA reconsider the benchmark values and use concentrations that are appropriate at the regional level.

[22] Development Document for Final Effluent Limitations Guidelines and Standards for the Western Alkaline Coal Mining Subcategory, U.S. Environmental Protection Agency (Dec. 2001), *available at* https://www.epa.gov/sites/production/files/2014-08/documents/coal_mining_dd_western_subcategory_2001.pdf.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

  II COD

NMA opposes the proposed benchmark monitoring requirement for COD and recommends that the agency remove it for several reasons. First, COD is not a parameter of concern at mine sites.

The COD test is a method of estimating how much oxygen is depleted from a body of receiving water as a result of biological oxidation of labile organic (i.e. carbon-based) pollutants. The COD test is commonly required for wastewater discharges where elevated levels of organic material are possible. It can be an important indicator parameter for identifying the release of organic pollutants from sewage treatment plants, failing septic systems, wood and paper facilities, and food manufacturing facilities.

However, COD monitoring should not be required for industries where organic pollutants are not reasonably expected to occur. Outside of fuel for motor vehicles, organic compounds are not used in mining processes. Labile organic pollutants, capable of causing oxygen depletion in receiving streams, are uncommon in mining operations and are not expected to be present in stormwater runoff. Any COD measured in stormwater from mining facilities likely would be the result of natural materials (algae, other vegetation matter) present in stormwater. It should also be noted that chlorides, such as those that might be present in common dust suppressant materials applied to roads onsite, can provide a false positive result in a COD test. The 2019 NRC study stated that high concentrations of COD can be indicative of oils and hydrocarbon pollution. While this may be true, oil and grease are already monitored as a part of the proposed 2020 MSGP's quarterly visual inspection requirements. It is unclear what additional environmental benefit would be provided from monitoring COD.

Second, it is unrealistic to apply new benchmark monitoring parameters to industries without the ambient background information critical to address exceedances of arbitrary benchmark thresholds. COD is not a widely monitored water quality parameter and limited information is available for ambient concentrations expected to be present at mine sites. The inclusion of a benchmark with COD is particularly concerning considering the benchmark was established from biochemical oxygen demand effluent limits derived for secondary treatment at wastewater and sewage treatment plants[23] that use advanced settlement and biologic treatment methods that far exceed economical or necessary stormwater control measures that could be applicable to mine sites. If universal monitoring is implemented, benchmark thresholds should not be applied during this 2020 MSGP permit term.

Finally, the general stormwater permit program was designed to cover similar types of discharges on a sector by sector basis. The MSGP for the mining sectors is specifically tailored to address mining-related discharges. COD is not a pollutant typically associated with the mining sector and therefore, it is inappropriate to impose a monitoring requirement for purely informational purposes. There must be some connection between the permit requirements imposed and water quality protection. For COD, there is no such connection. For these reasons, inclusion of COD as a universal benchmark parameter is arbitrary and unnecessary.

[23] 40 C.F.R. § 133.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS opposes the proposed requirement for universal benchmark sampling** and does not believe it would provide useful information to EPA or the public. Among the factors that influence pH, turbidity and TSS are geology, nearby land use and infrastructure, time, and vegetation. This variability does not lend itself to reliable methods for benchmarking across industry sectors and across an area. Further, the NRC study notes the existing requirement for permitted facilities to perform quarterly visual monitoring of stormwater samples; members do this in conjunction with visual inspections of storm drains, in cases monthly or more frequently (e.g., after major weather events). The proposed universal benchmark sampling is not be expected to be "relatively inexpensive" for smaller companies, at the proposed frequency and with potential jurisdiction-specific requirements for each analysis. Existing MSGP requirements appear sufficient, and we do not believe the need or expense of random baseline testing has been sufficiently justified.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Members could also support, if routine benchmark monitoring is retained, discontinuing the requirement based on a demonstrated history of consecutive samples within benchmark levels. That said, we would remain opposed to the use of TSS and a benchmark parameter, as the nature of storm events often impacts turbidity, which shows up as TSS but does not necessarily reflect operations or activities at the plant. PLASTICS favors a risk-based approach for determining when additional inspections or sampling should be applied.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

We make the following recommendations:

...

- EPA should also reject the proposed universal quarterly benchmark monitoring for pH, TSS and COD industry-wide. EPA has been unable to demonstrate the utility of analytical chemical monitoring as an indicator of SWPPP implementation and stormwater control.
- At a minimum, If EPA adopts universal benchmark monitoring, the requirements should not be extended to any new industrial sectors. These sectors were excluded from all such monitoring in 1995 because EPA examined the underlying data and concluded that no chemicals warranted monitoring.
- If EPA adopts universal benchmark monitoring for any sector, it should allow individual facilities to waive monitoring in later years if the facility achieves benchmark compliance, as in the current MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

In 2020, however, EPA is proposing substantial revisions to the program. Without explanation, EPA has jettisoned the 1995 protocol of considering the monitoring data available for each subsector. EPA does not consider whether the chosen chemical or parameter were even connected to industrial materials or practices. The Agency has proposed the addition of pH, COD and TSS monitoring (so-called universal benchmark monitoring) for ALL facilities,[12] irrespective of whether these facilities are subject to analytical monitoring today, or whether there is any value to monitoring for these three parameters for these facilities.[13]

[12] The current EPA benchmarks are found in the back of this letter as Attachment A.

[13] EPA did not consider whether the parameters are even relevant to the industrial activities, as it did in the 1995 evaluation. See later discussion of COD infra.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

EPA had already proposed the addition of one of these three parameters, TSS, in the draft 2005 MSGP. It received multiple comments in opposition to the TSS monitoring and the exceptionally low TSS benchmark.[23]

- Comments stated that facilities could not meet the 100 mg/l benchmark.[24]
- The TSS benchmark derivation was based on faulty application of the data; EPA used data from paved areas in urban area to represent runoff in unpaved industrial areas.[25]
- The Association of American Railroads recalculated that proper weighting of the data would have yielded a median result of 155 mg/l, and not 100 mg/l. benchmark adopted by EPA.[26]
- The Agency employed composite sample values instead of grab values in the calculation, which further decreased the calculated benchmark value.[27]

EPA failed to adopt those monitoring requirements, stating it would leave this issue until after NRC completed its 2009 study. Now, fifteen years later, EPA is proposing to require TSS monitoring again, without addressing any of the issues raised in the 2006 permit proposal. Unfortunately, TSS happens to be one of the three key parameters of universal BM monitoring that EPA has proposed for quarterly monitoring by all facilities throughout the five-year permit. In sum, there is overwhelming evidence that the Agency needs to engage in a new effort to develop stormwater benchmarks that can be connected to true water quality standards in the affected water bodies. It is widely acknowledged that these benchmarks are not scientifically justified.

[23] Response to Comment pages 17-18, 136-138, 2006 MSGP (EPA 2006); 2005 Association of American Railroads Comment at 3-9.

[24] Id. at 473-74.

[25] The 2005 FSWA Comments explained: EPA's TSS monitoring requirement also focuses attention on the TSS benchmark (100 mg/l). This benchmark concentration was derived from the National Urban Runoff Program (NURP) studies in the early 1980s. It does not represent industrial stormwater discharges, but rather "typical" urban runoff, generally from highly paved and impervious surfaces. Facilities that are not fully paved will have significant difficulty meeting the 100 mg/l standard, but that does not mean that they will have any negative impacts on receiving waters. We have attached a compilation of data measuring TSS at USGS stations across New Mexico. The vast majority of the data (as well as overall averages) significantly exceed the 100 mg/l benchmark. The TSS benchmark is not a justifiable basis from which to judge all permittees' BMP effectiveness or permit compliance. *2006 EPA MSGP Response to Comments at 136.*

[26] Association of American Railroads, 2005 Comments, 2006 EPA MSGP Response to Comments, at 462.

[27] Id. at 469.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  30
**Excerpt Status:** Final

**Comment Excerpt:**

**Universal Benchmark Monitoring Should Be Rejected for All Facilities Request for Comments 10 and 13**[101]

EPA proposed, based on the NRC recommendation, that all facilities monitor for three "universal" benchmarks: pH, COD and TSS. The rationale is that these parameters can provide a low cost method of detecting problems with stormwater contamination.[102] However, EPA's low cost assessment has overlooked the fact that these chemical samples need to be taken 4 times a year for five years, often for facilities whose personnel have no familiarity with benchmark sampling, following sampling protocols, insuring integrity of the samples, and evaluation of monitoring results. Approximately half of the federal facilities have no analytical monitoring requirements today.[103] Further, in combination with applicable AIM Tiers 1, 2, and 3, the outcome of the monitoring could be extremely expensive (and likely unnecessary) implementation of the SCMs specified in the new roundly criticized Appendix Q SCMs. Finally, following NRC's own advice, a review of the most current monitoring data in the 2019 NRC

Study confirms that none of the universal benchmarks should be subject to monitoring because the pollutant concentrations are too low to warrant attention (see below).

The application of AIM Tiers 1-3 to universal benchmarks raise the greatest concern here. There are 20 opportunities every permit term to trigger these expensive requirements. EPA asserts that it "assumes" that NRC was recommending that the corrective action AIM measures were to be applied to all facilities for the universal benchmarks.[104] We are confident that NRC did not intend that the costly AIM measures be applied to universal benchmark for two reasons: (1) there was no data review by NRC on each sector regarding whether the pollutant warranted monitoring for the sector and applicable benchmarks were achievable, and (2) NRC expressly indicated that it favored universal benchmark monitoring because the additional cost burden was "small."[105] The small cost burden description would certainly not apply to implementation of SCM measures that could cost tens or hundreds of thousands of dollars at a single facility. It is apparent that NRC was seeking a low-cost measure of obtaining some chemical data that would characterize the site and may reveal problems, and not that it would automatically trigger implementation of corrective measures.[106, 107]

As detailed above, EPA had already proposed the addition of one of these three parameters, TSS, in the draft 2005 MSGP for all sectors, and declined to promulgate the requirement in the face of adverse comments. EPA did not attempt to address these comments in the 2020 Fact Sheet, although the same arguments are applicable today.

Regarding COD, there are many facilities for which monitoring bears all costs and no utility. The National Sand, Stone and Gravel Association (NSSGA) reports "that aggregates operations have no activities that would affect chemical oxygen demand (COD), yet will now be required to test for it on a quarterly basis from each outfall."[108]

COD measures the ability of a receiving water to break down, or decompose, a chemical structure that requires oxygen for the reaction, leading to low oxygen levels. Examples include wastewaters that are high in organics, nitrogen compounds, oils, and fats (plant or animal based, including petroleum). Sectors that specifically had COD testing in the past include sawmills, pulp manufacturing, paper mills, copper mining, hazardous waste facilities, pharmaceutical producers, waste recycling, airports, fats, and oil production. Based on the NAS, only a handful of these sectors exceeded their benchmark more than 25% of the time.

Requiring unnecessary testing is rife with problems and costs. Natural sources that might influence COD include algae, tannins, as well as artificial organic sources. In addition, chloride is an interference chemical, so coastal samples tend to be inaccurate. Demonstrating that high results were due to background levels or interference would be very expensive and difficult, particularly for small businesses.

Most states operate their own state permitting programs and have many other chemicals of interest based on local conditions. COD is required by some states for a very limited number of industries, where the processes might warrant it. The fact that most states do not require COD for aggregates is further proof that COD is not an appropriate measure for water quality from aggregates operations.[109]

Further, at a minimum, EPA should follow NRC's advice and review the available data, or obtain data for each sector, before imposing these monitoring requirements and related burdensome obligations.[110] EPA declined to add TSS, COD, and pH for many sectors in 1995, finding that there were no significant pollutant concentrations associated with industrial activity. Consistent with the 1995 MSGP permit, it is not cost-effective to require facilities to monitor for chemicals of little or no relevance to stormwater contamination at their sites.

Below is the data reported for all chemicals in the Table 2-3 of the 2019 NRC Study. Very few sectors are in red, which designates sectors whose median facility exceeds the benchmark (over 50% of the facilities over the benchmark), for COD and TSS. Sectors targeted by the exceedances, as determined in the 1995 MSGP, would be the most appropriate manner to target in this proposed monitoring request. Yet of the total of 42 sectors with reported data, only 1 sector appears in red for COD and 3 sectors appear in red for TSS. This means tens of thousands of facilities would be required to sample quarterly for five years with only a remote chance of exceeding a benchmark. This explains why NRC insists: read the data first to determine if the monitoring of those sectors will serve any purpose.

2021 EPA MSGP Response to Comments
January 15, 2021



TABLE 2-3 NetDMR 2015 MSGP Data According to the Percentage of Results Above Benchmarks

| No data | Insufficient data (<8 results) | <10% above benchmark (BM) | 10-25% above BM | 26-50% above BM | >50% above BM |
|---------|-------------------------------|---------------------------|------------------|------------------|----------------|
|         |                               |                           |                  |                  |                |

Table 2-5 of the NRC Study provides confirming data based on the 2008 MSGP data, the earlier permit term. This further confirms the 2015 MSGP data above that COD and TSS benchmark exceedances are extremely rare, and thus benchmark data for all sectors is extremely wasteful. This shows the number of facilities with average concentrations above benchmarks. For both TSS and COD, there are no sectors above 50% exceedances using annual averages. Thus, EPA cannot justify universal benchmark monitoring based on a review of the most current 2015 MSGP data and the 2008 MSGP data.

673

**TABLE 2-5**
Percent Benchmark Exceedances in 2008 MSGP NetDMR Data Based on Annual Averages as Reported in EPA (2012)

| | Al | NH₃ | As | BOD₅ | Cd | COD | Cu | CN | Fe | Pb | Mg | Hg | NO₂+NO₃ | TP | Se | Ag | TSS | Zn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | | | | | | 33 | 100 | | | | | | | | | | 16 | 17 |
| B | | | | | | 0 | | | | | | | | | | | | |
| C | 19 | | | | | | | | 48 | 0 | | | 17 | 0 | | | | 100 |
| D | | | | | | | | | | | | | | | | | 14 | |
| E | | | | | | | | | 71 | | | | | | | | 19 | |
| F | | | | | | | | 71 | 50 | | | | | | | | 0 | 72 |
| J | | | | | | | | | | | | | 25 | | | | 8 | |
| K | | 0 | 0 | | 0 | 0 | | 0 | | 0 | 100 | 0 | | | 0 | 0 | | |
| L | | | | | | | | | 91 | | | | | | | | 38 | |
| M | 25 | | | | | | | | 52 | 22 | | | | | | | 9 | |
| N | 53 | | | | | 43 | 75 | | 88 | 50 | | | | | | | 37 | 67 |
| O | | | | | | | | | 67 | | | | | | | | | |
| Q | 40 | | | | | | | | 33 | 0 | | | | | | | | 100 |
| U | | | | 0 | 0 | | | | | | | | 20 | | | | 20 | |
| Y | | | | | | | | | | | | | | | | | | 0 |
| AA | 36 | | | | | | | | 65 | | | | 26 | | | | | 74 |

| No data reported | <10% above BM as annual average | 10-25% above BM as annual average | 26-50% above BM as annual average | >50% above BM as annual average |
|---|---|---|---|---|
| | | | | |

Below appear the results for the remaining universal benchmark: pH. The boxplot data is derived from the 2015 MSGP data (2019 NRC Figure D-14). Again, there is little justification to monitor for pH judging from this data. pH excursions are isolated. The acceptable range for pH is 6-9.

## pH

Figure D-14 shows the NetDMR 2015 MSGP data for pH. The pH benchmark is set based on maintaining an optimum range for water quality between pH 6 and 9. The complete data set is summarized in Table D-18, including the last column which sums the percentage of reported results in each sector that were below pH of 6.0 or above pH of 9.0. Sectors with at least eight reported results where ≥10 percent of the data were outside the pH benchmark range were G1 (copper mining), L1 (landfills), and AB (transportation equipment).



**FIGURE D-14**
pH results from NetDMR 2015 MSGP reported data through February 2018.
NOTE: Orange lines denote minimum and maximum of optimal pH range of 6.0-9.0.

[101] Redline Fact Sheet at 58.

[102] "There are well-established standardized analytical procedures for all three parameters of pH, TSS, and COD and analytical determinations are expected to be relatively inexpensive. The NRC study acknowledges that the additional cost burden for these three parameters is expected to be relatively small given that all facilities are already required to collect quarterly stormwater samples for visual monitoring." Redline Fact Sheet at 64.

[103] Redline Fact Sheet at 59.

[104] Id.

[105] 2019 NRC Study at 28. See also Redline Fact Sheet at 69.

[106] This is explained in more detail in the 2006 Tetra Tech memorandum that was cited by NRC in support of this recommendation.

[107] In addition, NRC relied on the O'Donnell (2005) memorandum for this recommendation, using the same arguments as O'Donnell in the NRC Study at 27-28. There was no AIM in 2015

for EPA to "assume" that O'Donnell was recommending benchmark compliance regime. Memorandum re: Review of 2000 MSGP monitoring requirements and suggested changes, March 15. Fairfax, VA: Tetra Tech, Inc (O'Donnell) 2015.

[108] NSSGA MSGP Comment at 8.

[109] NSSGA Comment at 8.

[110] 2019 NRC Study at 30-31.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  42
**Excerpt Status:** Final

**Comment Excerpt:**

Regardless of the above determinations, the Agency should certainly not extend universal benchmark monitoring to facilities that have performed no monitoring in the past 25 years.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Asciatu Whiteside
**Commenter Affiliation:**  Dallas Fort Worth International Airport (DFW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0208-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed permit requires permittees to perform universal benchmark monitoring for pH, TSS, and COD at permitted outfalls for the entire term of the permit. While the use of universal benchmark monitoring may be beneficial to aid in assessing the effectiveness of stormwater control measures for typical permit operators, the use of this technique may be impractical for large non-traditional industrial facilities with multiple operators, many common-use areas, and

facilities with numerous outfalls such as airports or seaports. At our facility, we have over 50 industrial outfalls, and the cost related to satisfying the universal benchmark monitoring can be over $30,000/ year for labor and analytical costs.

If universal benchmark monitoring is to be incorporated into the new permit, it is recommended that more flexibility be provided to the application of universal benchmark monitoring criteria. Recommendations are provided below:

- Allow permittees operating at facilities with multiple operators to conduct universal benchmark monitoring at an upstream drainage area prior to discharging into comingled stormwater collection systems, such as an inlet- instead of the final outfall. By allowing this alternative, the permittee will be able to more accurately identify the source of problem areas and the appropriate BMPs for their respective area of control. If universal benchmark is only performed at the final outfall and Additional Implementation Measures (AIM) are triggered, all operators may be subject to implement costly and unnecessary operational controls that do not specifically address the source of pollution.
- Furthermore, if monitoring is only required to be performed at the final outfall, such actions may fall under the sole responsibility of the airport authority, and would be difficult for the airport authority to identify appropriate responsible parties, and execute the appropriate corrective actions in the specified 14, 30, or 90 day time table. If the cause of the benchmark exceedance cannot be identified, the airport authority would need to collaborate with all other permittees participating in a Shared SWPPP program to modify stormwater control measures in a very short period of time (i.e. between 14 and 30 days unless additional extensions are granted).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Resource Management Associates (RMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 10 – Universal benchmark monitoring for pH, TSS and COD is reasonable.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

We do not have any process water discharge at our facility. Our discharge is Limited only to stormwater. There is no part of our process that would affect the pH of our runoff. The proposed requirement to test the pH of our runoff is unnecessary and over burdensome, and for facilities in most of New England, the acceptable range of 6.0-9.0 cannot be met. In Massachusetts alone, the average annual pH of rainfall is 4.2 (6 times more acidic than uncontaminated rainfall.), and does not even meet the EPA Human Health Criteria range of 5.0-9.0. We cannot meet the benchmark and are essentially set up for failure by this additional universal benchmark.

If the universal benchmark testing is part of 2020 MSGP, the benchmarks should be regulated the same as the sector specific testing. If the universal benchmark is not exceeded for four quarters, this is an indication that the stormwater control measures are in fact working effectively and the testing parameter should be discontinued for the remainder of the permit. There is no reason to believe that the stormwater control measures would degrade as we are required to maintain our stormwater control measures as a condition of the permit. The testing for pH, TSS, and COD for the entire permit is a burden and unnecessary.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rebecca C. Tolene
**Commenter Affiliation:** Tennessee Valley Authority (TVA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0215-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

TVA does not believe that COD is a meaningful indicator of water quality and questions whether COD monitoring would provide useful data which would justify the additional burden and costs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Under the proposal all facilities would be required to monitor for three universal benchmark pollutants (pH, TSS and COD) for the entire period of permit. Currently, the benchmark monitoring requirement is one year unless exceedances occur.

Although testing for sector specific benchmark constituents could be eliminated for results below benchmarks for four consecutive quarters, that is not true for the universal benchmarks. Facilities will be required to monitor these benchmarks for the entire term of the permit.

This change will impact lots of sources – only about 55% of the facilities covered by the current MSGP had any benchmark monitoring requirements and many do not have monitoring requirements for the three universal benchmarks. Five years of quarterly testing for three additional benchmarks will be a significant increase in costs for the facilities currently without monitoring requirements or facilities with monitoring requirements that don't currently include any one of the three universal benchmarks. AIM opposes these requirements without a true economic impact statement and urges EPA to remove universal testing requirements after a period of time for those facilities who have met the benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmarking is appropriate to collect baseline data on how BMPs (both structural and non-structural) are performing and meeting requirements to protect water quality. This is also important from an antidegradation standpoint to ensure that narrative standards are protected. If a permittee takes more than four samples to determine the average, each sample should still be considered to determine when AIM is implemented.

**Comment Response:**

40 CFR 122.41(l)(4)(ii) states that if an operator monitors more frequently than required by the permit, those results must be included in the data submitted in the discharge monitoring report.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

*8. EPA Should Adopt Universal Benchmark Monitoring, with Certain Revisions.*

The NAS made a number of recommendations about universal benchmark monitoring, the frequency of benchmark monitoring, and how benchmark monitoring should be conducted. EPA adopts some NAS recommendations, declines to adopt others, and raises additional issues in requests for comment. We respond to each issue in detail below.

In short, <u>EPA must require quarterly benchmark monitoring throughout the permit term for all benchmark parameters, including both universal and sector-specific parameters</u>.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

*a. Industry-wide (universal) benchmark monitoring* The NAS recommended "industry-wide" benchmark monitoring for pH, TSS and COD, noting that these parameters "can serve as broad indicators of poor site management, insufficient SCM [source control measures], or SCM failure, which can lead to high concentrations of these and other pollutants."[27] EPA adopted this recommendation by requiring "universal" benchmark monitoring for pH, TSS and COD in section 4.2.1.1 of the permit.[28]

*i. Industry-wide benchmark monitoring for pH, TSS and COD*

We strongly support EPA's decision to require universal benchmark monitoring for pH, TSS and COD. The NAS report confirms our experience with industrial stormwater monitoring – permittees do not collect nearly enough monitoring data to provide useful information. As the NAS observed, "[i]t is widely recognized that the monitoring program suffers from a paucity of useful data," and this in turn leads to "poor accountability."[29] Indeed, "[m]any industrial sectors have never collected and reported data for any of the conventional and nonconventional pollutants, toxic pollutants, and hazardous substances listed in Appendix B."[30]

### ii. Industry-wide benchmark monitoring for other parameters

EPA requests comment on whether there are any other parameters that should be required.[31] The answer is yes. There is no way to assess pollution loads without flow rates. EPA must also require some measure of flow-rate and discharge, ideally continuous flow monitoring, but at the very least synoptic flow rate measurements coincident with benchmark monitoring sample collection events. The NAS report states that a "pollutant concentration measured at a single time during a stormwater event cannot be considered to be representative of the [event mean concentration]," which is necessary for determining pollutant loads and therefore downstream water quality impacts and impairments.[32] It is clear that EPA also recognizes the necessity of flow-rate data for determining whether industrial stormwater discharges cause or contribute to downstream violations of water quality standards by, for example, requiring operators to measure and report flow-rates of their discharges as a component of the proposed Additional Implementation Measures.[33] There are a number of time-tested, low- to medium-cost monitoring technologies and methodologies for measuring flow-rates for a variety of discharges from, for example, culverts and piped outfalls.[34] Requiring low-cost flow monitoring of all permittees has the potential to provide a substantial and diverse (E.g. by geography, industrial sector, suite of SCMs) data-set for pollutant loading by industrial stormwater dischargers, which could contribute significantly to future development of numeric effluent limitations.[35] EPA cannot meet its Clean Water Act mandates – to eliminate pollution to the maximum extent possible and to protect water quality – without information about the quality *and* quantity of industrial wastewater discharges, and information about the extent to which SCMs are reducing pollutant loads. Furthermore, as the NAS noted, the development of numeric effluent limits may be necessary, but can only happen after EPA collects more data.[36]

[27] NAS at 3, 27-29, 42.

[28] Draft Permit at 29, Part 4.2.1.1.

[29] NAS at 18 (internal citations omitted).

[30] *Id*. at 21.

[31] Draft Permit at 29, Request for Comment 10.

[32] NAS at 46.

[33] Draft Permit at 45, Part 5.3.3.2.b.2.

[34] Burton, G. A., and R. E. Pitt. 2002. Pp. 357–377 in Stormwater effects handbook: A toolbox for watershed managers, scientists, and engineers, G. A. Burton and R. E. Pitt, eds. Boca Raton, FL: Lewis Publishers.

[35] Fact Sheet at 6.

[36] NAS at 41.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

ARA recommends that EPA reviews the available data by sector to set sector-specific benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 10 asks whether universal benchmark monitoring is appropriate and what parameters should be required. EPA has proposed a 'universal' benchmark monitoring requirement for pH, total suspended solids ("TSS"), and chemical oxygen demand ("COD") that would apply to all facilities and sectors subject to the MSGP, regardless of sector, as recommended by the 2019 NAS study. This proposed requirement would apply to all sectors/subsectors, including those industries, like Sector T, that were not required to conduct chemical-specific benchmark monitoring under the 2015 MSGP; DITP falls into this category.

The NAS study suggested, and EPA concurred, that broad-based monitoring under the 2020 MSGP would provide baseline metrics and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors.

While acknowledging the value of the comparability of quantitative analytical monitoring data, **MWRA questions the necessity of creating significant additional burden to facilities that have demonstrated a long-term record of excellent compliance with established MSGP benchmarks, without demonstrating a preponderance of evidence that illustrates the specific and scientifically defensible need for such a broad dataset, especially from low-risk industrial sectors.**

Sector T, Treatment Works facilities, are staffed by teams of trained professionals whose career goals, organizational objectives and employee livelihoods are driven by a mission of clean water management, and represents one industrial sector which should be considered low-risk and exempted from expanded benchmark testing. The changes to the 2020 MSGP are being proposed in order to place greater emphasis on ensuring that the MSGP use appropriate benchmarks and respond to industry sectors with large or repeated benchmark exceedances. **Therefore MWRA suggests that EPA focus its expanded sampling and mitigation efforts on those sectors with demonstrated large or repeated benchmark exceedances in the near term.**

MWRA's track record of compliance with the MSGP has been exemplary, despite the logistical burdens of compliance with the current visual observation requirements at DITP under the MSGP. DITP covers a footprint of 210 acres, with 14 separate outfalls. When a qualifying event is forecast, MWRA must enhance staffing levels of personnel trained in visual observation techniques, often at over-time expense. Due to staff limitations, historically, MWRA has been required to conduct monitoring of more than one qualifying storm each quarter to monitor all 14 outfalls and achieve compliance with previous iterations of the MSGP.

The proposed expansion of monitoring activities to include sample collection and preparation in accordance with EPA standard methodologies, including bottle and sample preparation, laboratory coordination, hold-time management, etc., would require an even larger contingent of trained personnel to complete within 30 minutes of a qualifying event. Expanding benchmark monitoring to DITP would require enhanced training of these staff in use and operation of sampling equipment, proper collection techniques and sample handling, and as well as increased overhead project/personnel management and laboratory analytical costs, constituting an increased burden to MWRA management and staff, and significant cost to MWRA ratepayers.

It is not clear how EPA intends to use this information. **Therefore, adding potentially burdensome sampling, analytical and reporting requirements to low-risk, professionally run industrial sectors, like Sector T, may be unnecessary. Data collection efforts may be better focused on high exceedance industry sectors.**

For example, MWRA suggests that EPA focus on other industrial sectors which have historically displayed large or repeated benchmark exceedances, as illustrated in Table 2-4 of the NAS study. The added scrutiny and assessment of these sectors can serve as a pilot of rigorous environmental impact evaluation and engineering mitigation solutions. Once success is proven in

the industrial sectors with historical exceedances, tools and management techniques can be adapted, tested, and evaluated. Once proven effective, if data supports the need, expansion of quantitative benchmark monitoring should be considered for lower risk industrial sectors, such as Sector T.

...

MWRA appreciates EPA's noted concern for the significant additional burden the proposed expansion of benchmark monitoring requirements would have on the regulated community. **MWRA urges EPA to revise the proposed 2020 MSGP to focus its data collection, assessment and mitigation strategies on industry sectors with large or repeated benchmark exceedances, and to exempt from any additional monitoring requirements those lower risk industrial sectors, including specifically Sector T, where proactive water protection measures are part of the organizational ethos.**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  M. Patrick McGuire
**Commenter Affiliation:**  Edison Electric Institute (EEI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

**1. The new requirement for benchmark monitoring for pH, TSS, and COD should be modified.**

...

A universal requirement for benchmark monitoring for pH, TSS, and COD for Sector O would increase costs without necessarily any commensurate increase environmental benefits. First, Sector O sources already are required to comply with effluent limits for TSS and pH under the 2015 MSGP and Proposed MSGP to ensure water quality and the proposed monitoring requirements would be redundant. See Proposed MSGP at 89-90. Second, many facilities do not discharge anything that impacts pH, TSS, and COD in meaningful amounts nor would they in the foreseeable future. EPA should therefore allow facilities, including Sector O sources, to "test out" of quarterly benchmark for these parameters to allow facilities to focus their resources on monitoring parameters more relevant to environmental protection.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmark monitoring for pH, TSS, and COD has the potential to be expensive and excessive. EPA should review data more closely to identify site-specific necessary benchmark requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding pH: There is concern about how to implement the benchmark exceedance triggers (AIM) for pH, which is measured on a logarithmic scale. The proposed triggers for all tiers of AIM include comparing the average of monitoring results to the threshold or using the sum of the results to see if it is four (or eight) times the benchmark value. These comparisons are on a linear scale. For example, a monitoring result of pH 9.6 is an exceedance of the proposed benchmark of pH 6 to 9. Using a linear scale, one would determine that the exceedance is 1.07 times the benchmark, when really it is four times the benchmark. The calculation required to convert from a log scale to linear scale is complicated and will lead to confusion and non-compliance. An alternative would be to add a pH chart with pre-defined exceedance thresholds in the permit and online that could be used for comparison. Or the EPA could adjust the AIM trigger criteria for pH.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding chemical oxygen demand (COD): We oppose applying the requirement to monitor for COD as a universal benchmark to all industry sectors. There is no evidence presented that suggests that all sectors use or process materials that affect COD. Nor is it clear what remedies a facility would have to take to understand what caused the upset, as it is an "indicator" analyte, rather than a specific pollutant. Industries with no obvious materials or processes with the potential to affect COD would have to initiate additional investigation by a consultant to determine the pollutant causing the exceedance and how to address it. The added cost of investigation to decipher the nature of the COD exceedance does not appear to be considered in EPA's analysis.

CRH agrees that certain industrial activities, such as wastewater treatment plants, animal feed lots, paper mills, and few others, have a higher potential to impact COD. Therefore, the EPA should limit the applicability of the benchmark requirement to only those high-potential industrial activities, rather than including all sectors without better justification or eliminate the requirement for all industries until further analysis can be performed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Emily Remmel
**Commenter Affiliation:** National Association of Clean Water Agencies (NACWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0230-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Must Seek an Alternate Approach to Universal Benchmark Monitoring**
The proposed 2020 MSGP includes new benchmark monitoring requirements for total suspended solids (TSS), pH, and chemical oxygen demand (COD) for all industry sectors covered under the permit. EPA is seeking comment on viable alternative approaches to benchmark monitoring for characterizing industrial site stormwater discharges, quantifying concentrations, and assessing control measure effectiveness.

NACWA urges EPA not to finalize these novel universal benchmark monitoring provisions, or in the alternative to exclude historically low-risk industries that have not shown significant benchmark exceedances including Sector T, Treatment Works. Under previous MSGP iterations, POTWs were not required to conduct benchmark monitoring because they are not significant contributors to water quality exceedances. Neither EPA nor the NRC study provide data to demonstrate any change in circumstances that would justify the imposition of such monitoring requirements now. Moreover, the universal benchmark requirement to monitor for these three water quality parameters will substantially increase the burden to POTWs to be on call for sample collection within 30 minutes of a qualifying event and will necessitate costly additional laboratory analysis.

POTWs are not significant contributors of industrial stormwater discharges that result in water quality exceedances for pH, COD, or TSS, and monitoring requirements would therefore impose unjustified costs on the clean water community. EPA should either eliminate this one-size-fits-all approach to benchmark monitoring or exclude POTWs from the proposed universal benchmark monitoring requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Emily Remmel
**Commenter Affiliation:**  National Association of Clean Water Agencies (NACWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0230-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Appropriate MSGP Requirements are Particularly Critical in Light of the National Precedent the Permit Establishes**

The 2020 MSGP could be used as a model for multiple other EPA- and state-issued stormwater permits nationwide, including the municipal separate storm sewer system (MS4) permits that dictate how many large and small communities across the country manage stormwater.[2] NACWA is therefore particularly troubled by EPA's proposed one-size-fits-all universal benchmark monitoring approach that would unduly burden sectors, including POTWs, that rarely if ever exceed benchmark thresholds for the proposed water quality parameters, as well as EPA's proposed storm mitigation measures. EPA has not demonstrated any need for these prescriptive provisions and should not include them in a permit that serves as a model for clean water communities and stormwater utilities across the country.

...

NACWA urges EPA to abandon its proposed universal benchmark monitoring approach for facilities that are considered low-risk, such as Sector T facilities and eliminate resiliency requirements that are outside the scope of the permit, particularly in light of the MSGP's precedential impacts.

---

[2] Municipal separate storm sewer systems (MS4s) are subject to a unique permitting standard under the Clean Water Act (CWA) and are required to "reduce the discharge of pollutants to the maximum extent practicable (MEP)" or what is known as the MEP standard. 33 U.S.C. § 1342(p)(3)(B)(iii); 40 C.F.R. § 122.26(d)(2)(iv) (applicable to Large and Medium MS4s); 40 C.F.R. § 122.34 (applicable to Small MS4s). The MS4 standard is different than the CWA's usual tools for regulating discrete discharges that often include numeric effluent limitations, like those found in the industrial stormwater MSGP. NACWA has concerns that the prescriptive requirements found industrial stormwater MSGP could serve as model language for MS4 permit writers seeking to include more stringent numeric limits and similar prescriptive requirements which would be an unlawful divergence from the MEP standard afforded to MS4 permittees.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Historically, TSS has been the primary "universal" parameter measured. EPA is proposing to require all active and staffed facilities to conduct quarterly universal benchmark monitoring throughout the permit term for pH, Total Suspended Solids (TSS), and Chemical Oxygen Demand (COD).

Total suspended solids (TSS) is the pollutant most often associated with stormwater discharges. Often, it can be a "surrogate" for the control of stormwater associated with industrial activities. For a number of pollutants (but not all), measures put in place to reduce such pollutants from stormwater can be reflected in the measurement of TSS. TSS is an appropriate parameter to continue to measure in stormwater.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Chemical Oxygen Demand (COD) is not an appropriate universal monitoring parameter. The COD test is a measurement of the total quantity of oxygen required for oxidation to carbon dioxide and water. Thus, this test is applicable to trying to measure the "strength" of organic compounds present in water.[9] Such organic compounds/materials would not be expected to be associated with stormwater discharges from a number of industrial sectors, such as mining facilities. Specifically for mining, most likely any COD measured in stormwater from mining facilities would be the result of natural materials (algae, other vegetation matter) present in stormwater. It should also be noted, that chlorides (such as those that might be present in common dust suppressant materials applied to mining roads) can provide a false positive result in a COD test. Finally, COD testing results in the generation of a hazardous waste. Simplot recommends that COD be removed from the list of required parameters for universal benchmark monitoring.

[9] It should be noted, that this test does not distinguish between any "industrial organic compounds) and those organic materials that might be naturally present (such as algae).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

pH also is not an appropriate parameter for universal monitoring. pH is an expression (measurement) of the hydrogen ion concentration.[10] When an acid is added to water, it ionizes in the water and the hydrogen-ion concentration increases; consequently the hydroxyl-ion concentration must decrease in conformity with the ionization constant. Likewise, if a base is added to water, the hydroxyl-ion concentration will increase and the hydrogen ion concentration will decrease. Like COD, pH is a parameter that is not applicable to all industrial sectors. Its

usefulness as an indicator of stormwater controls or even changes to water quality to a receiving stream is likely very limited.[11] Simplot recommends that pH be removed from the list of required parameters for universal benchmark monitoring.

[10] pH is the negative logarithm of the hydrogen ion concentration in a liquid.

[11] For example, depending upon ionic makeup of the receiving water, the "buffering" capacity of such waters greatly influences how the pH of a stormwater discharge affects water quality.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed benchmark value for TSS (i.e., 100 mg/L) is not representative of industrial stormwater discharges or typical background conditions. As explained in the preamble to the 1995 MSGP, the 100 mg/l TSS number is based on the median concentration from the National Urban Runoff Program (see 60 Fed. Reg. 50825 dated Sept. 29, 1995). Using urban runoff data from paved areas to establish a benchmark that is also applicable to unpaved areas results in an unrealistic benchmark for many industries (such as Sector F, G, and J facilities) and leads to monitoring that does not generate useful information. TSS is well below naturally occurring levels in many parts of the Western United States, especially in areas of steep terrain. Most discharges of stormwater from undisturbed areas will naturally exceed the 100 mg/L benchmark. For mining in particular, EPA should allow for modification of all benchmark monitoring concentrations to levels that reflect background levels in the facility's permit area. A facility should be allowed to use the average of baseline TSS measured for runoff from the facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)
**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**IV. UWAG Opposes Industry-wide Monitoring for pH, TSS, and COD, Which is Particularly Inappropriate and Unnecessary for Sector O Facilities**

EPA proposes to require all facilities to conduct benchmark monitoring for pH, total suspended solids (TSS), and chemical oxygen demand (COD), as recommended by the NAS Panel. Proposed Fact Sheet, Part 4.2.1.1, at 58-59. EPA proposes the following universal benchmark thresholds: pH – 6.0-9.0 s.u.; TSS – 100 mg/L; and COD – 120 mg/L. Proposed 2020 MSGP, Part 8, Table 8.1.1. The Agency proposes quarterly monitoring for each year of permit coverage commencing no earlier than 90 days after the permit effective date. Id. at Part 4.2, at 29-31. The Agency proposes quarterly monitoring, regardless of exceedances, because it believes this frequency of monitoring for these parameters will ensure there are current indicators of the effectiveness of stormwater control measures. Proposed Fact Sheet, Part 4.2.1.2, at 62-63. EPA proposes allowing facilities to justify benchmark exceedances based on local natural background concentrations. Proposed Fact Sheet, Part 5.2.4, at 83-86.

EPA should consider a more focused expansion of monitoring in certain sectors to determine whether or not benchmarks are necessary. Expanded benchmark monitoring for Sector O is particularly unnecessary and redundant because effluent compliance monitoring is conducted annually for pH and TSS (where applicable). As a result of these effluent limitations, Sector O facilities are already required to take action such as elimination of sources or installation of SCMs where the limits are not met. As such, quarterly pH and TSS benchmark monitoring is unnecessary for Sector O facilities because it would result in redundant, onerous requirements that may provide unrepresentative data.

...

For these reasons, universal benchmarks are not necessary for and should not be required of Sector O facilities

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:**  Utility Water Act Group (UWAG)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

For example, one UWAG member notes that quarterly benchmark monitoring for TSS could lead to unrepresentative data. At the member's facilities in Texas, during the first rain after a long dry spell, TSS levels are high because dust and other materials may have settled during the dry period. Then, after the first rain, TSS levels generally drop off to normal levels. Another member describes the difficulty in monitoring accurately for TSS in an arid climate with natural clays in the soil. When it rains, water tends to flash-flow and pick up substantial amounts of red clay that is natural background. There is no way to meet the benchmark of 100 mg/L for TSS, so the plant samples from several "background" locations simultaneously with the outfall samples in order to demonstrate that the TSS is consistent with natural background. The major challenge has been to get to all outfall and background locations to collect samples while the water is still flowing. Any water that flows in that area does so for a very short duration and will always contain very high TSS that is unrelated to industrial activity.

As another example, another UWAG member raised concerns with quarterly pH benchmark monitoring. The member indicates that field sampling for pH is difficult because it must be analyzed within 15 minutes of collecting a sample, unless the operator has a portable device. This timeline is not realistic for many facilities and operators. UWAG also questions whether universal monitoring of COD would provide useful data that justifies the additional burden and costs, as many industries do not have industrial materials whose discharges would be reflected by COD levels.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Scott D. Parker
**Commenter Affiliation:**  NORA, An Association of Responsible Recyclers
**Document Control Number:**  EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP also requires universal benchmark monitoring for pH, COD, and TSS, as was recommended in the 2019 report from the National Research Council (NRC) of the National Academy of Sciences (NAS). However, EPA has gone far beyond the NRC recommendations for one year of quarterly analyses for informational purposes, and instead is requiring a full five years of monitoring, which will immediately be subjected to the AIM Tier System for compliance. This is discussed in Section I.

...

**I. Universal Benchmarks for pH, TSS, and COD Are Unnecessary and Should Not be Subject to AIM Tier Enforcement Program**

The NRC Study recommended that the pH, COD, and TSS should be used as industry-wide required monitoring for information gathering. The NRC summarizes the uses of this monitoring as follows:

"A primary goal of the MSGP benchmark monitoring requirements is to indicate the performance of structural and nonstructural SCMs for ensuring the quality of stormwater leaving industrial sites. The committee recommends a suite of water quality parameters for benchmark monitoring by all industrial sites that must do stormwater sampling, including those that currently only do visual monitoring. Such industry-wide monitoring would provide indicators of problems for a wide range of sites and a baseline understanding of industrial stormwater risk for all sectors. Industry-wide monitoring would also provide stormwater quality information that could be compared across all industries regardless of sector and would help address some of the monitoring disparities that resulted from the group application process."[1]

EPA echoed this purpose in its Proposed 2020 MSGP fact sheet, stating "[t]he NAS study suggested that such universal benchmark monitoring would provide a baseline and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors. See Part 4.2.1 of the proposed permit."[2] The NRC Study, however, also emphasized that these are routine standard environmental parameters of water quality that are inexpensive and could be analyzed on the same quarterly samples that are collected for visual monitoring, so that the additional costs would be minimal and were estimated to be less than $100 for all three.

It should be noted that the NRC, while recommending monitoring for these parameters, emphasized information gathering activities and did not address whether this industry-wide monitoring should be incorporated into the AIM enforcement system, as included in the Proposed 2020 MSGP. The frequent emphasis on low cost in analyzing these parameters is a strong indication that the universal monitoring was not contemplated to be immediately subject to expensive corrective action measures. The entire NRC rationale for universal benchmark monitoring appears to mirror the same points made in the Tetra Tech memorandum (including the low-cost argument), and the Tetra Tech memorandum did not recommend that benchmark-driven corrective action be added to the permit for these parameters.

Since neither NRC nor Tetra Tech recommended application of corrective action for pH, COD, or TSS, EPA's rationale is not evident for proposing such stringent and potentially unnecessary requirements to new sectors, particularly in view of the lack of underlying benchmark data supporting such an outcome for the new sectors. EPA noted in its fact sheet that it "assumes" that the NRC "was aware of EPA's obligation to propose the AIM protocol for benchmark exceedances."[3] EPA's reliance on its assumption and lack of explanation for the utility of these particular benchmarks for these new sectors argues against subjecting the universal benchmarks to corrective action.

[1] NRC Study, at 27.
[2] EPA, Proposed 2020 MSGP Fact Sheet, 10.
[3] EPA Fact Sheet, at 60. EPA does not explain how knowledge of the AIM protocol leads the

agency to believe that NRC intended the AIM procedures to be applied to the new universal benchmark monitoring, as opposed to the current chemical monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's universal benchmark proposal would be impractical for large non-traditional industrial facilities with multiple operators, many common-use areas, and facilities with numerous outfalls such as airports or seaports. For example, one ACI-NA member airport, as an example, has over 50 industrial outfalls, and the cost related to satisfying the universal benchmark monitoring would easily exceed $30,000/ year for labor and analytical costs. Many medium and small airports have extensive drainage systems and the additional monitoring mandates could have significant economic impacts.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Benjamin J. Beller
**Commenter Affiliation:** Nebraska Public Power District (NPPD)
**Document Control Number:** EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

NPPD does not support universal benchmark monitoring for all sectors. For many covered facilities, benchmark monitoring is not necessary and will not provide any additional benefit to water quality. If benchmark monitoring is to be required, it should only be required of certain "high-risk" facilities. If pH is included as a universal benchmark, additional clarifications need to be included. For example, what if the pH of the rainfall is out of compliance with the desired benchmark before falling on the site? Will pH be measured in the laboratory or in the field?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

- Monitoring changes. The proposed new requirements as to benchmarks should not be adopted, including universal benchmark monitoring requirements for pH, total suspended solids, and chemical oxygen demand; the addition of new benchmark monitoring requirements for particular sectors; and benchmark monitoring for PAHs. In particular, EPA's expansion of benchmark monitoring to all facilities subject to the permit (as opposed to less than 50 percent of the sectors that have been subject to benchmark monitoring since 1995) is an unwarranted expansion of benchmark monitoring that will have significant cost and compliance impacts on many small businesses and other regulated parties.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 10**

The FWQC and FSWA oppose EPA's proposal for universal benchmark monitoring. As discussed above, the FWQC and FSWA have serious concerns regarding the scientific and regulatory foundation upon which EPA created its benchmark monitoring scheme. Benchmark monitoring has not achieved the robust process that EPA envisioned. EPA has not provided sufficient technical and economic impact analyses for such a significant expansion in the

benchmark monitoring, which would apply to all sectors for these three parameters—pH, TSS, and COD—under the proposed MSGP.

This proposal does not reflect the most appropriate or best response to the recent NRC study. The NRC concluded that EPA should collect additional data and that the cost impact on facilities that previously only conducted visual monitoring would be relatively small.[25] While there is confusion about whether such monitoring should be subject to benchmarks in the NRC report, the NRC could not have meant for new facilities to collect samples for analysis and then implement the entire AIM corrective action. This process clearly would not be "relatively inexpensive," as the NRC stated, if it meant that every site was subject to benchmarks and AIM corrective action. The primary focus of the NRC recommendation was for EPA to collect more data. And, this need to collect data does not itself support the imposition of benchmarks.

Instead, EPA should collect data to support an effort to develop wet weather water quality standards and end the use of benchmark monitoring. There is absolutely no basis for EPA to more than double the amount of benchmark monitoring in the new MSGP compared to all prior MSGPs and expose all regulated dischargers to unfair and unjustified corrective action liabilities.

FSWA and FWQC do not oppose the collection of more data to assess stormwater quality, but EPA should not subject operators to a punitive benchmark monitoring scheme in order to collect data. Currently, fewer than half of the sectors covered by the MSGP are subject to benchmark monitoring. Rather than expanding monitoring to all sectors, EPA should consider a more focused expansion of monitoring to support a long-term effort to develop wet weather water quality standards. There are many alternative ways for EPA to collect new or additional data without more than doubling the currently challenged benchmark program.

Finally, if EPA proceeds with any aspect of its universal benchmark monitoring approach, the FWQC and FSWA oppose the use of COD as a "universal" pollutant parameter. In fact, very few of the sectors have industrial sources whose discharges would give rise to significant COD levels.[26]

[25] NRC Report at 36.
[26] Some sectors have existing benchmark monitoring for $BOD_5$;; those sectors should be provided the option of monitoring, either for $BOD_5$ or COD.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

We suggest eliminating the requirement for pH monitoring as it may not be a good indicator of impacts to stormwater from industrial activity. Consider that rainwater may have a pH lower than the proposed benchmark of 6.0, which would not be an indicator of impacts from industrial activity. If pH monitoring is to be required, we suggest allowing field measurement because of the short (24-hour) hold time required for analyzing pH at a laboratory. Consider that facility operators may be collecting samples during times when laboratories are not open and may not be able to meet the short hold time requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**No Benchmark Monitoring is Warranted for Sector P as the Underlying Data Demonstrates that Universal Benchmark Concentrations Substantially Declined Between 1993 and 2015**

From a legal perspective, section 402 of the Clean Water Act, which created the NPDES Permit Program, authorizes two types of effluent limitations that EPA can impose – water quality-based effluent limitations ("WQBELs") and technology-based effluent limitations ("TBELs"). In promulgating the stormwater regulations under Section 402, EPA determined that only those activities involving cleaning operations, vehicle maintenance, and deicing operations required NPDES permits for railroad operations.[11] Other activities are exempt from the NPDES permitting program. EPA has not established TBELs for rail transportation (identified as Standard Industrial Code ("SIC") 40). And WQBELs are established on a water body specific basis, rather than based on a particular industrial activity.[12] Without a TBEL or WQBEL, EPA lacks the authority to impose benchmark monitoring requirements on the rail industry.

Beginning with the original 1995 MSGP and continuing through today, benchmark monitoring has not been required for Sector P. This makes sense, because this sector has been determined to engage in relatively low-risk industrial activities. Therefore, only visual monitoring has been required. Available DMR data discussed in these comments confirms that visual monitoring of the Sector P discharges has been successful by identifying opportunities for best management practice addition or enhancement.

2021 EPA MSGP Response to Comments
January 15, 2021

The EPA 2015 MSGP database includes the three universal parameters, pH, COD and TSS for Sector P. Below are reviews of the NRC assessments of that data with additional AECOM input. The AECOM comments are limited to how many facilities appear to have failed to meet the benchmark limit for an entire year of quarterly monitoring, as the NRC assessment already includes a comparison of individual samples to the benchmark limits. Table 1, below, examines the potential impact of this monitoring on Sector P facilities.

**Table 1.**

| Data Source | Sector | Parameter | Number of Samples | Mean | Min | Max | Median | 90th percentile | 95th percentile | Number Over Bench-mark | Percent Over BM | Number of samples >x BM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Old Data from 1993 Federal Register Sector P | P2 Railroads | pH (BM=6.0-9.0) | 114 | NA | 3.6 | 10.2 | NA | NC | NA | NA | | NC |
| Old Data from 1993 Federal Register Sector P | P4 Trucking Depots and Warehouses | pH (BM=6.0-9.0) | 215 | NA | 2.8 | 9.5 | NA | NC | NA | NA | | NC |
| 2015 MSGP Data from NSC Report (10 facilities, NR) | P | pH (BM=6.0-9.0) | 57 | | 5.8 | 8.9 | 7.2 | 8.2 | | 1 | 2 | 0 |
| Old Data from 1993 Federal Register Sector P | P2 Railroads | COD (BM=120 mg/L) | 117 | 318 | 0 | 11,800 | 118 | NA | 781 | NA | 50% (est) | 20% (est) |
| Old Data from 1993 Federal Register Sector P | P4 Trucking Depots and Warehouses | COD (BM=120 mg/L) | 242 | 146.1 | 0 | 1800 | 79 | NA | 580 | NA | 40%(est) | 10% (est) |
| 2015 MSGP Data from NSC Report (12 facilties, NR) | P | COD (BM=120 mg/L) | 66 | 66 | 0.2 | 440 | 46 | 142 | 305 | 10 | 15.15% | 0 |
| Old Data from 1993 Federal Register Sector P | P2 Railroads | TSS (BM=100 mg/L) | 118 | 517 | 0 | 4680 | 172 | NA | 2800 | NA | 70% (est) | NA |
| Old Data from 1993 Federal Register Sector P | P4 Trucking Depots and Warehouses | TSS (BM=100 mg/L) | 242 | 466 | 0 | 4700 | 159 | NA | 1890 | NA | 70% (est) | NA |
| 2015 MSGP Data from NSC Report (12 facilities, NR) | P | TSS (BM=100 mg/L) | 138 | 96 | 2 | 1400 | 15.5 | 247.4 | 510 | 25 | 18.10% | 9 (6.5%) |

Note: for the 1993 data, the results for grab samples were used. The data was selected for railroads and trucking depots as these were the largest sub-sectors at that time.

In 1993, Sector P was contemplated to have several subsectors. Sector P Land Transportation is now consolidated so that it contains no subsectors.

Estimated percentages over benchmark for 1993 data are based on the median vs mean value, to the closest 10% as unable to calculate actual results

Average of four quarters over benchmark parameter is determined only on facilities that reported at least four consecutive quarters of results for that parameter, unless their partial quarterly averages were so high that it would not meet the benchmark with additional quarterly data. Example: BM exceeded by >4X for the first quarter

NC = Data not presented in dataset and could not be calculated from just summary data. NA=data set reported the results as not available. NR = No railroads included in f

Table 1 compares out-takes of the summary data from the November 19, 1993 Federal Register[13] when EPA proposed its first MSGP permit. For its evaluation, AECOM selected the two largest subcategories from the 1993 Federal Register, which constituted over 80% of the samples taken from facilities that had a SIC code identified as being part of Sector P at that time.[14] These data were compared to the 2015 EPA MSGP Data (which represented data for the years 2012-2015) used in the 2019 NRC Study. All data sets were limited to facilities that were listed as being in Sector P.[15]

For pH, the 1993 summary data was sparse; it provided only the number of samples and the minimum and maximum values that were common with the 2019 NRC Study. However, the spread between the minimum and maximum in both 1993 sources was much larger than for the NRC data, and the NRC data had only one Sector P pH benchmark that was slightly outside the acceptable benchmark limits of pH between 6.0 and 9.0.

A better comparison was available for COD between the 1993 data and the 2019 NRC Study. The main differences were noted in the median and percentile results, which are likely indicative of the percentage of samples that will meet the benchmark. For the P1 data, the median was almost equal to the COD benchmark of 120 mg/L, while the 95th percentile of 781 mg/L was more than 7 times higher than the benchmark. The P4 data was similar, although the 95th percentile was still more than four times higher than the benchmark. For the 2016-2018 NRC data, the median was only 46 mg/L, and the 95th percentile was only 305 mg/L. While 10 samples in the NRC data were over the benchmark (15%), the estimates for P2 and P4 show that 50% and 40% were over the benchmark, respectively. No sample from the NRC data was above four times the benchmark. AECOM found that none of the 12 Sector P facilities had a single quarter where the average benchmark was exceeded for COD.

For TSS, the median values for P2 and P4 were 172 and 159, both over the TSS benchmark of 100 mg/L. This means that the percent of samples exceeding the benchmarks can be estimated as approaching 70%. The 95th percentiles were 18 to 20 times higher than the benchmark, meaning that many, if not most facilities would not meet their annual benchmark limit, had there been a benchmark limit in effect at that time. However, the 2016-2018 NRC data also showed that despite a median value of only 15.5 mg/L TSS, and only 18% of the samples being over the benchmark, there still were some problems with compliance. This is due, in part, to the fact that TSS is sensitive to the type of rainfall as high energy rainfalls will mobilize much more sediment than lighter rainfalls, even if those events last longer and have more total runoff. It was found that five facilities (of the twelve in the dataset) experienced at least one year where the average of the four quarters for at least one outfall (some with multiple outfalls) was over the benchmark. For two of these facilities, it happened in the two successive years they conducted sampling for the 2015 MSGP permit.

This data demonstrates that Sector P, which mostly includes facilities without regular benchmark monitoring for these parameters, have made significant progress over the years in reducing stormwater pollutants. Comparison of the extensive 2015 dataset to the 1993 data demonstrates that runoff from similar facilities was much lower in 2015 for all three parameters (pH, COD, and TSS). Because monitoring is not warranted for sectors in which the median facility is below the benchmark, no benchmark monitoring is, therefore, warranted for Sector P.

[11] 40 C.F.R. § 122.26(b)(14)(viii) ("Only those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, airport deicing operations [] are associated with industrial activity.").

[12] CWA Section 302; 40 C.F.R. § 122.44(d); 2010 EPA NPDES Manual, Ch. 6.

[13] 58 Fed. Reg. 61146. The tables for Sector P titled P2 and P4 are on pages 61335 and 61336.

[14] Table P1 consisted of railroad facilities, while Table P4 primarily consisted of trucking depots and associated warehousing facilities.

[15] The summary data categories presented from the 1993 Federal Register were analogous to, but not the same as some of the data categories presented in the 2019 NRC Study, however, a reasonable comparison can be made between the 2019 report and the old data from the Federal Register for these three parameters. Also, in 1993, the benchmark limits had not been established, so there is no exact count of samples exceeding the benchmark limits.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

**Universal Benchmarks for pH, TSS, and COD Are Unnecessary and Should Not be Subject to AIM Tier Enforcement Program**

The NRC Study recommended that the pH, COD, and TSS should be used as industry-wide required monitoring for information gathering. The NRC summarizes the uses of this monitoring as follows:

A primary goal of the MSGP benchmark monitoring requirements is to indicate the performance of structural and nonstructural SCMs for ensuring the quality of stormwater leaving industrial sites. The committee recommends a suite of water quality parameters for benchmark monitoring by all industrial sites that must do stormwater sampling, including those that currently only do visual monitoring. Such industry-wide monitoring would provide indicators of problems for a wide range of sites and a baseline understanding of industrial stormwater risk for all sectors. Industry-wide monitoring would also provide stormwater quality information that could be compared across all industries regardless of sector and would help address some of the monitoring disparities that resulted from the group application process."[33]

EPA echoed this purpose in its Proposed 2020 MSGP fact sheet, stating "[t]he NAS study suggested that such universal benchmark monitoring would provide a baseline and comparable understanding of industrial stormwater risk, broader water quality problems, and stormwater control effectiveness across all sectors. See Part 4.2.1 of the proposed permit."[34] The NRC

Study, however, also emphasized that these are routine standard environmental parameters of water quality that are inexpensive and could be analyzed on the same quarterly samples that are collected for visual monitoring, so that the additional costs would be minimal and were estimated to be less than $100 for all three per sampling event.

It should be noted that the NRC, while recommending monitoring for these parameters, emphasized information gathering activities and did not address whether this industry-wide monitoring should be incorporated into the AIM enforcement system, as included in the Proposed 2020 MSGP. The frequent emphasis on low cost in analyzing these parameters is a strong indication that the universal monitoring was not contemplated to be immediately subject to expensive corrective action measures. Indeed, the entire NRC rationale for universal benchmark monitoring appears to mirror the same points made in the Tetra Tech memorandum (including the low-cost argument),[35] and the Tetra Tech memorandum did not recommend that benchmark-driven corrective action be added to the permit for these parameters.

Since neither NRC nor Tetra Tech recommended application of corrective action for pH, COD, or TSS, EPA's rationale for proposing such stringent and potentially unnecessary requirements to new sectors is unclear, particularly in view of the lack of underlying benchmark data supporting such an outcome for the new sectors. EPA noted in its fact sheet that it "assumes" that the NRC "was aware of EPA's obligation to propose the AIM protocol for benchmark exceedances."[36] EPA's reliance on its assumption and lack of explanation for the utility of these particular benchmarks for these new sectors argues against subjecting the universal benchmarks to corrective action.

Indeed, the scientific approach to chemical monitoring outlined by NRC relies on a robust review of the monitoring data. However, it is not clear whether imposing costly and unknown corrective action requirements upon half of all MSGP facilities would have been proposed without any knowledge of the underlying data. At a minimum, EPA should collect universal benchmark data from the new sectors before considering imposing such corrective action requirements on any new sectors. However, should EPA include Universal Benchmark Monitoring in the final permit, AAR requests that any such monitoring be informational only, limited to one year, and not subject to the AIM requirements.

[33] NRC Study, at 27.

[34] EPA, Proposed 2020 MSGP Fact Sheet, 10.

[35] See O'Donnell memo.

[36] EPA Fact Sheet, at 60. EPA does not explain how knowledge of the AIM protocol leads the agency to believe that NRC intended the AIM procedures to be applied to the new universal benchmark monitoring, as opposed to the current chemical monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Bill Arcieri
**Commenter Affiliation:** Henniker Sand and Gravel
**Document Control Number:** EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Part 4.2.1.1 Universal Benchmark Monitoring Requirements; Request for Comment 10

We strongly urge EPA to not add universal benchmark monitoring (UBM) on top of the sector-based benchmark monitoring (BM) we already have. Adding more monitoring parameters seems highly unnecessary and just adds more compliance costs and demands on our already stretched staff resources. We fail to see how the proposed use of pH and COD as indicator parameters for UBM could be useful as these parameters are more likely to be influenced by natural or background conditions, than any facility operations. It is widely known that pH levels in rainwater are typically below 6.0. in the Northeast. Thus, it is almost certain that we would exceed the suggested UBM thresholds regardless of any effect from our operations and even if we met the criteria for No Exposure Certification. This will lead erroneous or misleading results, extensive additional monitoring to demonstrate that the potential exceedances are due to natural causes even though this is already widely documented and possibly costly and unnecessary corrective actions.

Based on the Permit fact sheet, it appears that BM was primarily intended for evaluating the effectiveness of stormwater controls. It is unclear how monitoring for pH and COD would be useful in assessing the effectiveness of stormwater controls. As mentioned above, pH levels are already below the suggested thresholds in rainwater and the presence and natural decay of organic materials that may accumulate along the natural flow path could influence COD levels without any direct influence by facility operations or its control measures.

We already sample for TSS as part of our sector-based monitoring and TSS would seem to be an appropriate indicator parameter for evaluating our facility operations on stormwater quality. Monitoring for pH and COD will significantly increase our sampling time and cost. The laboratory cost for COD analyses is well over $100 per sample, which will nearly double our current sampling costs for sector-based BM monitoring. This will add thousands of dollars to our current sampling costs. We would need to purchase a pH meter and periodically calibrate this meter to ensure accurate readings requiring additional staff time. The added time to process samples and maintain meter calibration will greatly add to an already challenging sampling regime, especially when there are multiple locations to sample.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

FBIA members own and operate food and beverage processing and related facilities nationwide and often seek coverage under EPA - or state-issued - general permits regulating stormwater discharges. Due to the rigorous no-exposure criteria used in the permitting process, many facilities with small or negligible discharges are required to obtain general permits even if those discharges are not causing or contributing to water quality concerns. Most FBIA members with permit coverage operate under the U3 Food Processing and Kindred Products MSGP industry subsector, and thus have never been required to conduct benchmark monitoring. Other members in the U sector, as well as members in other sectors, who may have some benchmark requirements, rely on the ability to discontinue benchmark monitoring after one year if the average benchmark threshold is not exceeded.

 … As explained in our comments below, EPA's record for the proposed 2020 MSGP lacks a justification for adding "universal" quarterly benchmark monitoring for pH, Total Suspended Solids (TSS) and Chemical Oxygen Demand (COD), and prior MSGP records raise serious questions about the efficacy of benchmark monitoring. Nonetheless, EPA is proposing that *all* food and beverage industries in all U sectors conduct the benchmark monitoring and implement costly Additional Implementation Measures (AIMs). EPA proposes this change without demonstrating that food and beverage processing facilities as a sector are violating their permits or contributing to violations of water quality standards. Even for our members that are conducting some benchmark monitoring, EPA provides no justification for adding quarterly universal benchmark monitoring. These requirements are arbitrary and inconsistent with the Administration's deregulatory goals set by EO 13771, by establishing requirements that do not carry commensurate benefits.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should reject the proposed universal quarterly benchmark monitoring for pH, TSS and COD for all industries. Benchmark monitoring is not supported by science and the record reflects that for 25 years, and EPA has been unable to demonstrate the efficacy of chemical monitoring as an indicator of Stormwater Pollution Prevention Plans[2] (SWPPPs) implementation and stormwater control.

[2] The Stormwater Pollution Prevention Plan is the plan for implementation of measures to ensure minimization of contaminated stormwater discharge, and establish plans for inspection, monitoring, corrective action, and reporting.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA finalizes universal benchmarking monitoring, the requirements should not be extended to the food and beverage sector.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

**I. Introduction**

The MSGP was established to allow general permit coverage for discharges of stormwater "associated with industrial activity."[3] EPA initiated a program of chemical analytical monitoring for certain facilities as a means of evaluating the quality of their stormwater discharges. To determine when analytical monitoring would be required under the MSGP, EPA first established "benchmark" pollutant concentrations in 1995.[4] EPA described these benchmarks as the pollutant concentrations that, when exceeded, represent a "level of concern."[5]

Next, EPA compared the list of potential pollutants to be monitored for each sector/subsector with the lists of significant exposed materials and industrial activities that occur within each industry sector/subsector as described in the 1993 group permit Part 1 application information. Where EPA was able to identify a source of a pollutant that was directly related to the industrial activities of an industry sector/subsector, the MSGP selected the pollutant for analytical chemical monitoring. If EPA could not identify a source of a pollutant that was associated with the sector/subsector's industrial activity, the MSGP did not require the sector/subsector to monitor for that pollutant. Analytical monitoring was not required for sectors/subsectors for which all pollutants' median concentrations were lower than benchmark levels.[6]

At the time, EPA justified the benchmarks as providing useful information for determining whether a facility's SWPPP is implemented successfully.[7] The existing benchmark concentrations were often based on federal water quality standards, although EPA also stated that it sought to identify values that could realistically be measured and achieved by industrial facilities.[8]

Decades later, in the proposed 2020 MSGP, EPA now seeks to require pH, COD & TSS monitoring (so-called universal benchmark monitoring) for all facilities, regardless of whether facilities are subject to chemical monitoring under their MSGPs today. In addition, instead of continuing the current protocol of one year of quarterly data for the three chemicals (4 times per permit term), EPA seeks to expand the monitoring frequency to five years of quarterly monitoring data (20 times per permit term). Moreover, the Agency proposes to add a series of new AIM Tiers 1 to 3,[9] which are increasingly stringent and costly as the number and magnitude of the benchmark exceedances rise. Those new corrective action measures, in the form of potentially expensive and mandatory SCMs, greatly concern the FBIA members.

During the 25-year history of the MSGP benchmark monitoring, EPA has failed to provide a science-based justification for the program. Importantly, there is no evidence showing that the benchmark approach distinguishes between facilities with good and poor SWPPP implementation – which was EPA's justification for establishing benchmarks in the first place. The benchmark approach has repeatedly been criticized by the National Academy of Sciences (NAS), stormwater academic experts, knowledgeable stormwater practitioners, federal agencies, and state authorities. The MSGP has a large impact on small businesses, so it is not surprising that for nearly twenty years, the U.S. Small Business Administration's (SBA) Office of Advocacy[10] and stormwater industry leaders have sought to modify this poorly designed, costly, and unnecessary benchmark monitoring program, and substitute a robust combination of quarterly visual inspections, comprehensive site inspections and an annual report. FBIA will explain its position as part of the "Inspection-Only" option for "low-risk" facilities.

FBIA members are very concerned that despite decades of criticisms, rather than eliminating or modifying the benchmark program, EPA is proposing to expand its applicability to all industry sectors, increase the frequency of monitoring, and greatly elevate the consequences for minor benchmark exceedances. We believe that the 2020 MSGP proposes an entirely new regulatory program within the permit itself.

[3] "Associated with industrial activity" was defined in the 1990 Stormwater Rule. 55 Fed. Reg. 47990, 48008 (November 16, 1990).

[4] 60 Fed. Reg. 50804, 50824 (September 29, 1995).

[5] Id. at 50825.

[6] Id. at 50827.

[7] 60 Fed. Reg. 50804, 50825 (September 29, 1995)

[8] Id. at 50825.

[9] The AIM Tiers are described in more detail in the section on AIM requirements.

[10] Analysis of Multi-Sector General Permit (MSGP) Stormwater Discharge Monitoring Requirements, Technical Memorandum, prepared for U.S. SBA Office of Advocacy, E.H. Pechan & Associates, Inc., Durham, NC (March 2006).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**II. EPA's Benchmark-Driven Compliance Program Should be Eliminated**

*A. Background of MSGP Benchmark Program*

EPA asks in Request for Comment 10 whether the proposed universal benchmark monitoring should be applicable to all sectors. A review of prior MSGP rulemakings and lessons learned over 25 years of implementation of the MSGP program leads to the conclusion that the

benchmark program either needs serious reform or should be eliminated, and certainly not expanded to all sectors.

Beginning in 1995, EPA justified benchmark monitoring as a means of determining whether a facility's SWPPP was performing adequately and whether there were environmental effects that warranted addressing. However, benchmark monitoring came under significant scrutiny soon after its implementation in the 1995 MSGP. Facilities were documenting benchmark exceedances, particularly for natural background metals. Facilities expended substantial resources to amend SWPPPs and yet exceedances continued. At the time, there was little evidence that the benchmark regime was properly identifying facilities for corrective measures. In contrast, the quarterly visual inspections and the comprehensive site inspections conducted by industry sectors without benchmark monitoring (such as the food and beverage industry) were useful to identify SWPPP improvements.[11] In fact, food industry facilities have been effectively managing stormwater for decades without chemical monitoring.

During the next rulemaking for the 2000 MSGP, EPA received substantial public comment questioning the value of benchmark monitoring. In the preamble to the final 2000 MSGP, EPA acknowledged that in using benchmark monitoring, it was "difficult to determine or confirm the existence of a discharge problem."[12] Nonetheless, the Agency continued with the benchmark monitoring requirements for certain sectors because it had "no alternative that provides stakeholders with an equivalent indicator of program effectiveness."[13] In effect, EPA acknowledged that benchmark monitoring did not achieve its intended results, but concluded that it was the best it could do.

Five years later, during the 2005 MSGP rulemaking, commenters again voiced concern with the high level of benchmark exceedances that led to unnecessary engineering evaluations without demonstrating improvements in controlling stormwater discharges.[14] Commenters asserted that it was practically impossible for facilities to meet some of these benchmarks, particularly for iron, zinc, aluminum, and copper.

A growing consensus emerged regarding the lack of utility of the benchmark monitoring program. For example, a 2005 UCLA study found that the existing grab sample monitoring data "show very limited utility."[15] Recognizing the concerns, EPA then engaged the National Research Council (NRC) of the NAS for advice in 2009.[16] The 2009 NRC report was very critical of the benchmark program, stating that "it is not clear whether [benchmark] exceedances provide useful indicators of stormwater pollution prevention plan inadequacies or potential water quality problems."[17] Notably, NRC reported that the MSGP approach to benchmark monitoring has "largely been a failure."[18] Importantly, the NRC concluded that if it had its way, "the current benchmark monitoring conducted by MSGP facilities would be eliminated."[19] (emphasis added) We believe the NRC was suggesting that the benchmark scheme was irrevocably broken in 2009.

As the result of a settlement agreement resolving litigation over the 2015 MSGP, EPA agreed to fund another NRC review of the MSGP program and consider all NRC recommendations for the 2020 proposed permit. In contrast to the prior NRC 2009 report conclusion noted above, the 2019 NRC report attempted to reverse itself by recommending continuation of the benchmark monitoring program for "mid-risk" and "high-risk" facilities.[20] Acknowledging that facilities

with lower exceedance levels had the most "unreliable data," it recommended an exclusion for "low-risk" facilities that could avoid this failed "do-loop" program.[21] The 2019 report states that "[t]he elimination of benchmark monitoring by low-risk facilities would provide a non-monitoring option for oversight of these facilities and eliminate some of the most suspect, unreliable monitoring data."[22] EPA proposes this option and asks industry to offer specific recommendations for identifying "low-risk" facilities for the inspection-only option (see comments below). Given the failure of the current benchmark approach, FBIA members strongly believe it is inappropriate to add any new facilities to this chemical monitoring regime.

[11] See EPA Response to Comments on 2015 MSGP at 231; "FSWA has always supported a thorough and comprehensive inspection program and believe that such inspections are the primary source for assessing the site's stormwater pollution control program. (emphasis added) In addition, FSWA has supported enhanced inspections in lieu of benchmark monitoring as a far more effective and logical compliance check. As discussed in comments on EPA's benchmark requirements (see below), benchmark monitoring is inefficient, wasteful, and unjustified as a compliance tool." 2013 FSWA Comment at 8.

[12] 65 Fed. Reg. 64745, 64769 (October 30, 2000).

[13] Id. at. 64769.

[14] See 2013 Comments of American Association of Railroads at 3-9. Institute of Scrap Recycling Industries, Inc. at 9-11.

[15] Michael K. Stenstrom and Haejin Lee, University of California at Los Angeles, Final Report, Industrial Storm Water Monitoring Program Existing Statewide Permit Utility and Proposed Modifications, January 2005 at 26. The MSGP is based on grab samples for analytic monitoring.

[16] Reducing Stormwater Discharge Contributions to Water Pollution, 2009 NRC Report. The NRC is the operating arm of the National Academy of Sciences.

[17] Id. at 430.

[18] Id. at 439.

[19] Id. at 435.

[20] 2009 NRC Report at 59. The NRC recommended retaining benchmark monitoring for "high-risk" facilities. The report continues:

This approach also ensures that high-risk industries that are more likely to be significant sources of stormwater pollution invest in the necessary monitoring to confirm that SCMs are effective in reducing pollutants and risks to receiving waters. In total, this proposed framework is expected to reduce the monitoring burden on the lowest-risk facilities while increasing the quality of the

*data available on the overall population of industrial facilities including the largest, highest-risk facilities. Combined with suggested improvements to monitoring protocols, training, and data management discussed in this chapter, the tiered approach is also expected to increase the usefulness of the data collected toward improving the management of industrial stormwater.*

[21] The do-loop reference is commonly used for this program whereby there is a continuous sequence of benchmark exceedances followed by engineering evaluations/fixes followed by more exceedances, etc.

[22] 2019 NRC Report at 59.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

*B. Benchmarks Lack A Scientific Basis*

During the 25-year history of the MSGP benchmark monitoring, EPA has failed to provide a science-based justification for the program, resulting in unrealistic benchmark limits that are not tied to water quality. EPA's record supporting benchmarks lacks key information reflecting storm event dilution, time between storms, arid vs. humid climates, mixing zones, dissolved (bioavailable fraction) vs. total concentrations, storm variability, seasonal changes, and facility site activity variability – all of which are necessary for establishing science-based monitoring.[23] Stenstrom and Lee's key article also demonstrated that grab samples are too variable and unreliable to provide evidence of stormwater quality.[24]

Moreover, in 2005, the 100 mg/l benchmark for TSS was called into question because it is based on the National Urban Runoff Program studies conducted in the early 1980s. Among many concerns, those studies relied on grab samples collected in the first 30 minutes of a rain event to ensure maximum TSS concentration. And, the studies were based not on typical industrial discharge areas, but on typical urban runoff.[25]

The SBA's Office of Advocacy sponsored a contractor report by Pechan & Associates, Inc. to address this concern and others. Importantly, the Pechan report offered a critique of the TSS benchmark derivation in another 2006 report submitted to EPA.[26] It pointed out that, based on the 1995 EPA analysis, "EPA determined that TSS was not a pollutant of concern for the 12

major industrial sectors for which EPA is now proposing to extend these analytical monitoring requirements."[27] The Pechan report further stated: "EPA should set the TSS benchmark no lower than 530 mg/l given EPA's current MSGP protocol of averaging four quarterly grab samples. This value represents the approximate mean TSS concentration Pechan calculated from the part 2 group application grab sample data."[28]

Table 2.  Summary of Part 2 Group Application TSS Grab Sample Data[29]

| Statistic | Mean | 25th Percentile Value | Median | 75th Percentile Value |
|---|---|---|---|---|
| Total Suspended Solids (TSS)* | 532 | 19 | 79 | 321 |

Based on the Pechan analysis above, EPA is engaging in substantial overreach by seeking to require all facilities to conduct TSS monitoring using a benchmark that is more than five times too low.

The Federal Stormwater Association, the leading industry voice on stormwater issues, said it best in 2013:

In fact, the basis for benchmark monitoring was never grounded in science and EPA has never fully justified how and why a facility should use, for example, ambient low flow in-stream WQS to gauge technology-based control strategies for stormwater discharges that are episodic, high flow, variable, and likely exist a significant distance from the type of receiving stream used as the bases for the WQS.[30]

These statements were echoed by UCLA professors, Stenstrom and Lee,[31] other stormwater experts, and finally NRC reports in 2009[32] and 2019.[33] Instead of perpetuating this scientifically flawed practice, EPA needs to develop a new science-based methodology for setting wet weather water quality standards.

[23] Based on the inadequate scientific basis for the benchmarks, one can expect that these benchmarks have no predictive effect on evaluating effectiveness of stormwater control.

[24] Industrial Storm Water Monitoring Program Existing Statewide Permit Utility and Proposed Modifications, Michael K. Stenstrom and Haejin Lee, University of California at Los Angeles, Final Report, January 2005. at 26.

[25] In 2005, the FSWA Comments explained; "EPA's TSS monitoring requirement also focuses attention on the TSS benchmark (100 mg/l). This benchmark concentration was derived from the National Urban Runoff Program (NURP) studies in the early 1980s. It does not represent industrial stormwater discharges, but rather "typical" urban runoff, generally from highly paved and impervious surfaces. Facilities that are not fully paved will have significant difficulty meeting the 100 mg/l standard, but that does not mean that they will have any negative impacts on receiving waters. We have attached a compilation of data measuring TSS at USGS stations across New Mexico. The vast majority of the data (as well as overall averages) significantly exceed the 100 mg/l benchmark. The TSS benchmark is not a justifiable basis from which to judge all permittees' BMP effectiveness or permit compliance." 2006 EPA MSGP Response to

Comments at 136.

[26] Review and Analysis of EPA Proposal to Require Analytical Monitoring of TSS as Part of MSGP (TSS Pechan); Prepared for the U.S. SBA Office of Advocacy; November 2006.

[27] TSS Pechan at 6.

[28] TSS Pechan at 12.

[29] TSS Pechan at 12.

[30] December 23, 2013 FSWA Comments at 12.

[31] Industrial Storm Water Monitoring Program Existing Statewide Permit Utility and Proposed Modifications, Michael K. Stenstrom and Haejin Lee, University of California at Los Angeles, Final Report, January 2005. at 26.

[32] 2009 NRC Report at 430.

[33] NRC describes inaccuracy of sampling results, suggests improvements for more precise sampling, and recommends eliminating benchmarks for low-risk sites with unreliable data. 2019 NRC at 45, 49-53, and 54-58.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

**III. Benchmark Monitoring Should Not Be Required for the Food and Beverage Industry**

Designated as "light-industry" [46] in 1990, most sectors of the food and beverage industry have been successfully managing stormwater controls for decades under the current MSGP inspection regime without chemical monitoring. Indeed, as food and beverage manufacturers have modernized over the last 25 years, we believe the industry's compliance record has only strengthened and improved. As we discuss below, EPA determined in 1995 that the food industry (Sector U) did not generally warrant benchmark monitoring based on actual exceedance data.[47] Now, 25 years later, the proposed text of the 2020 MSGP would, for the first time, subject food and beverage industry subsectors to benchmark monitoring without similar exceedance data or any data to show that this industry sector is failing in controlling its stormwater.

[46] Light manufacturing and light industries are interchangeable terms.

[47] The 1993 proposal addressed Sector U as a whole, and as a whole the sector did not warrant monitoring. See data on the following page and the later discussion of the Subsectors U1, U2 and U3 individually.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

*A. The Food Industry's Designation as "Light Industry"*

EPA established the "light industry" designation in the 1990 stormwater rule to distinguish between light exposure to stormwater contamination and high exposure.[48] The designation was based on parameters indicative of limited exposure of stormwater to contaminants (as opposed to no exposure certification requirements listed in proposed Appendix K) and are summarized below:

1. Most activities located in buildings
2. Minimal stack emissions
3. Minimal unhoused industrial equipment
4. Outside material storage, disposal, or handling – not part of manufacturing process
5. Minimal source of dust and particulates

EPA reaffirmed this distinction in 1999 and has retained it in the stormwater program.[49] EPA can rely on this classification to find that chemical monitoring for such low concentrations will provide no information of value (even if one assumes that grab samples yield valuable information).

[48] 55 Fed. Reg. 47990, 48008 (November 16, 1990).

[49] 40 CFR 122.26(b)(14)(xi); 64 Fed. Reg. 68722 (December 8, 1999).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

<u>Universal Benchmark Monitoring</u>: The NRC Study's justification for universal benchmark monitoring data collection is that the data will provide "broad, low-cost indicators of the effectiveness of stormwater control measures on site."[4] Such statements do not adequately justify the cost and risk involved to mining operators. Sampling for these parameters is not low cost, and most importantly, these parameters are not necessarily indicators of effectiveness of stormwater control measures. For these reasons, EPA should not implement the proposed universal benchmark monitoring parameters.

There is no justification for universal benchmark monitoring for chemical oxygen demand (COD). Wyoming MSGP coal mine stormwater permits forbid runoff or effluent from pit dewatering, maintenance and coal processing areas from being directed to stormwater facilities. Hence there is no need or justification for COD monitoring of stormwater from Sector H.

The other two proposed universal benchmarks (pH and TSS) are also unnecessary, inadequately justified, and overly burdensome for coal mining operations. The 100 mg/L standard proposed by the EPA is often lower than what naturally exists in the west, including in Wyoming, and hence is grossly inappropriate. Any such benchmark standard should be tailored to the State or region.

In summary, the proposed imposition of these universal benchmarks appears to be mostly an expensive data gathering exercise for the benefit of the EPA. The EPA is required to justify such an imposition based on a need to solve an environmental problem. The draft rules lacked such justification.

The Wyoming MSGP program does not allow coal stockpile and processing waste to be discharged through the MSGP program. Instead effluent from coal processing must be routed through an NPDES discharge site. We believe the wholesale benchmark monitoring requirement should be eliminated for operations with such limitations, be they mandated or voluntary.

[4] 2019 NRC Study at 6.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**1. CCIG Recommends that EPA Reconsider Its Universal Benchmark Monitoring Proposal.**

**a. Universal Benchmark Monitoring for All Sectors is Unnecessary.**

CCIG supports EPA's goal of better understanding industrial stormwater risks, broader water quality problems, and stormwater control effectiveness across all sectors. However, the Group believes that EPA does not need to adopt universal benchmark monitoring across all sectors to accomplish that goal.

EPA originally established benchmarking requirements based on sector-specific data. This approach ensured that the Agency would require individual sectors to monitor only pollutants relevant to their particular operations. Considering that pollutants from, for example, steam electric power generating facilities have not changed, the proposal to require this sector to perform universal benchmark monitoring lacks a rational basis. In other words, using the general permit to force operators to collect data on pollutants not directly arising from their operations would be inappropriate.

Should EPA wish to obtain this data to address concerns about broader water quality problems, the Agency has other mechanisms at its disposal. For instance, EPA could commission independent studies to gather data from affected sources and use that data to identify what, if any, specific sectors should be monitoring for pH, total suspended solids ("TSS"), and/or chemical oxygen demand. EPA could then require relevant sectors to monitor those elements for the next permit term. EPA could then periodically commission similar studies to ensure that the proper sectors are monitoring for these elements. With these alternative and more appropriate tools available to EPA, the Agency does not need to impose universal benchmark monitoring as proposed.

Finally, universal benchmark monitoring could result in unreliable monitoring data when it is impracticable or unsafe for employees to access outfalls shortly after precipitation events. For example, some Group members have sources located in regions where precipitation events primarily occur at night or early in the morning. Sampling at these sources immediately after such precipitation events could be difficult or dangerous as a result of the adverse weather, low light, or other safety conditions. Considering that pH has a relatively short holding time (approximately 15 minutes), such delayed sampling could result in unreliable pH sampling data.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**b. If EPA Decides to Finalize Universal Benchmark Monitoring Requirements, the Agency Should Alter Its Proposed Approach.**

To the extent EPA were to retain the universal benchmark monitoring requirements, CCIG would recommend the following changes. First, any benchmark values adopted should remain as an alert level only, from which a facility owner or operator can make necessary adjustments to operations and activities in response to data.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Universal Monitoring (Proposed MSGP 4.2.1, request for comment 10). EPA suggests the need for industry-wide universal benchmark monitoring and proposes a program to monitor "basic indicators" of the effectiveness of stormwater controls employed at a site. The proposed MSGP includes mandatory quarterly pH, TSS and COD benchmark monitoring for all dischargers for the entire permit term. The proposal is problematic for at least three reasons.

First, the proposed universal benchmark monitoring is inconsistent with what is required in the industry-specific sector obligations. For example, active metal mining facilities must evaluate discharges from waste rock or overburden (the facilities specifically subject to benchmark monitoring in Sector G). Those discharges must be monitored for pH and TSS (and COD for active copper mines) once in the first year of permit coverage. If the benchmark is not exceeded, the monitoring obligation is complete.[1] Otherwise, the discharges are monitored twice per year

for the duration of the permit cycle. Compare 4.2.1.2.b with 8.G.8.2. There is no explanation as to why Sector G facilities must supplement the monitoring proposed in the sector-specific requirements with the same sort of monitoring in the universal benchmark approach. In addition, the language related to sector-specific benchmark monitoring (4.2.1.2.b) is confusing because it appears to conflict with the monitoring frequencies specified in 8.G, which explicitly defines the requirements for the metal mining sector. This section should simply reference the relevant section of Part 8. Finally, the reference to 6.1.7 is incorrect since this section is not found in the 2020 MSGP; it is presumably to 4.1.7.

Second, the proposed universal monitoring would appear to contradict the focus on limited monitoring at the specified areas of the mine site identified in 8.G.8.2. and 8.G.8.3. If there are monitoring obligations at far flung areas of mining or exploration sites, those could create requirements inconsistent with the specific sectors (both with respect to frequency and expansiveness of monitoring) but with no evidence that the monitoring is triggered by a specific issue relative to protection of the chemical, physical and biological integrity of receiving waters. Again, EPA has not adequately explained the foundation for the universal benchmark requirement. Third, EPA's proposed COD monitoring of stormwater runoff at mine sites is misplaced. While TSS and pH monitoring of waste rock and overburden is already obligatory under the MSGP for Sector G, the addition of other constituents like COD and more frequent monitoring for constituents already monitored can be particularly burdensome from a time, resource and staffing perspective for large sites in remote areas.[2] Given the low level of potential stormwater exposure to organic pollutants at mine sites, taking into account the significant secondary containment and spill prevention requirements for hydrocarbon storage, transfer, and use, EPA has not justified why COD monitoring is specifically required.

[1] The Fact Sheet suggests, unlike the actual proposed terms of the MSGP, the monitoring schedule for sector-specific benchmark monitoring would be unchanged except for pH, TSS and COD which would follow the newly proposed schedule of at least quarterly for the first four full quarters of permit coverage. See Fact Sheet at 63. The Fact Sheet also requests comment on whether the permit should require all facilities to monitor and report for the three parameters on a quarterly basis for the entire permit term. Notably, the sector-specific requirements in 8.G.8 do not include these distinctions and retain a potential single sample obligation in the first year of permit coverage. As noted above, the approach should focus more on inspection, control measure implementation and thorough documentation of the same.

[2] The 2019 NRC Study addressing possible improvements to the MSGP suggests that the additional analyses would provide a baseline understanding of industrial stormwater management across all sectors and would be "relatively inexpensive." 2019 NRC Study at 3. In fact, the universal benchmark obligation would be onerous for many large mine sites. The vast expanse and flashiness of storm events makes monitoring at these sites particularly challenging in terms of time and resources.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

WEF questions the appropriateness of universal benchmark monitoring. The Fact Sheet clarifies that universal benchmark monitoring is proposed because these parameters can indicate the absence, neglect, or failure of a stormwater control measure and can be indicators of broader water quality problems and the presence of other pollutants. There was discussion of the contribution of natural elements (such as tree pollen) which can cause a spike in COD and TSS measurements. TSS could also reflect organic and non-organic matter collected within the catch basins and not a result of the storm-related discharge. WEF requests that EPA clarify which categories of pollutants COD measurements are expected to capture. WEF disagrees that COD is a universal benchmark.

WEF notes that the industrial stormwater permitting program is a mature program nearly 30 years old, and facilities should have an inspection program to correct any lapses - all within the SWPPP. WEF notes that for many facilities, universal benchmark monitoring will reflect parking lot runoff and little else. Would the results be the same from a 2-acre Walmart parking lot vs. a 2-acre automotive maintenance facility? Request for Comment 10 directly follows Section 4.2.1.1(a), which states "Samples must be analyzed consistent with 40 CFR Part 136 analytical methods…". WEF also notes that pH measurements consistent with 40 CFR Part 136 requirements can be problematic considering the short holding time of 15 minutes, especially where facilities rely on outside contractors for sampling. Therefore, the 2020 MSGP needs to include a provision for field measurement of pH. Other similarly problematic parameters, such as DO, should have similar provisions.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** National Association for Surface Finishing
**Document Control Number:** EPA-HQ-OW-2019-0372-0262-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

In the draft 2020 MSGP, EPA proposed universal benchmark monitoring for pH, TSS and COD. First, establishing benchmark levels and requiring monitoring for stormwater discharges associated with industrial activity is not necessary to protect human health and the environment for all of these parameters and all sectors. EPA should reconsider applying each of these universal benchmarks and monitoring requirements to all sectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmarks for non "low risk" facilities are appropriate.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Victor Ventura
**Commenter Affiliation:**  Los Angeles Department of Water and Power (LADWP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

LADWP believes that requiring universal benchmark monitoring, without considering the characteristics of each sector that would justify this expansion needs more research in order to determine the necessity of this expansion.. Sector O facilities are already required to conduct effluent compliance monitoring for pH and TSS, and are therefore required to take action such as elimination of sources or installation of storm control measures when the facility has an exceedance. It appears that further requirements due to the purpose of benchmark monitoring which is to potentially trigger Additional Implementation Measures (AIM), is redundant to the implementation of BMPs already in place when benchmarks are exceeded. The addition of universal benchmark monitoring would be redundant to already in place requirements. and

LADWP believes this could be confusing and an unwarranted use of resources where requirements already exist for sector O facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victor Ventura
**Commenter Affiliation:** Los Angeles Department of Water and Power (LADWP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Furthermore, LADWP believes that requiring COD as a universal benchmark parameter would not provide useful data since COD is not a parameter that tags any type of issue without conducting other tests with the COD. Therefore, LADWP requests clarification on the COD requirement.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victor Ventura
**Commenter Affiliation:** Los Angeles Department of Water and Power (LADWP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, LADWP believes the EPA should consider varying hydrologic conditions through each region when determining benchmark threshold values. In regions that are significantly drier than other parts of the United States like the arid Southwest, reaching these universal benchmark values may not be feasible due to the long periods of drought that typically precede rain events in the area. Therefore, LADWP suggest the EPA should consider having dynamic thresholds that vary through the regions, and consider the hydrologic characteristics of each region to justify each threshold value.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victor Ventura
**Commenter Affiliation:** Los Angeles Department of Water and Power (LADWP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

LADWP believes that the implementation of universal benchmark monitoring should be further studied for Sectors that already require triggers to implement additional control measures, including Sector O facilities. Therefore, LADWP recommends the EPA remove the addition of these universal benchmarks until there is further study where the EPA consider sector specific operations, monitoring, and hydrologic characteristics.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

### 4.2.1.RFC11. Required Monitoring - RFC 11 Inspection-only option in lieu of benchmark monitoring

**Commenter Name:** J. Callahan
**Commenter Affiliation:** ES&M
**Document Control Number:** EPA-HQ-OW-2019-0372-0074
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I would like to provide comment on the draft EPA NPDES MSGP permit for industrial discharges. Specifically EPA Comment 11 on the the inspection only option for low-risk industries. I believe it should remain inspection-only at a quarterly frequency assessing active discharges at permitted outfalls for color, clarity, flow, turbidity, etc. and the inspection not to be limited to by a PE but can be conducted by a credentialed environmental professional including a Massachusetts, Licensed Site Professional, Certified Hazardous Materials Manager, Massachusetts Toxics Use Reduction Planner, among others.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection Only:
Inspection only in lieu of benchmarking certainly applies where water quality based standards have been met for a period of time. My site has to repeat monitoring requirements with every single MSGP renewal despite the water quality based discharge limits having been met for nearly 20-years.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victoria R. Branson
**Commenter Affiliation:** National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**Identifying "Low-Risk" Facilities**

An inspection-only option for facilities meeting low-risk criteria would allow for better use of resources by removing analytical sampling that results in demonstrably unreliable data. SNL/NM proposes that environmental conditions, such as a low potential for stormwater discharges to reach WOTUS, be considered for the inspection-only option in addition to activity-level criteria such as the "light manufacturing" proposed in the 2020 Proposed MSGP. An example would be underdeveloped sites in arid environments, characterized by basin topography (i.e., flat terrain with unconsolidated, permeable soils) that lack defined drainages. In these conditions, stormwater discharge would have to travel considerable distance as sheetwash to reach WOTUS. Such discharges must still be regulated because the first receiving waters are defined as ephemeral or intermittent WOTUS regardless of the evidence showing the unlikelihood of discharges reaching those waters. The low-risk criteria would allow for redirection of resources in these conditions to other more effective methods of monitoring that would identify changes in stormwater discharge patterns, such as routine site inspections discussed below.

SNL/NM agrees with the EPA other proposed option for low-risk criteria discussed in Fact Sheet, Proposed 2020 MSFP, Part 4.2.1.1., Comment 11, for facilities that "had coverage under the 2015 MSGP and did not have any benchmark exceedances during that permit term; [or]…the facility had coverage under the 2015 MSGP and did have a benchmark exceedance but amended their SWPPP and did not have repeat exceedances." Potential for new pollutants in stormwater discharge may best be identified through continued monitoring during routine and wet weather inspections.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victoria R. Branson
**Commenter Affiliation:** National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**Frequency of Inspections**

SNL/NM proposes that maintaining the requirements for routine quarterly and wet weather inspections as required in the 2015 MSGP would be the best alternative monitoring methodology if analytical sampling is determined to result in unreliable data, both in terms of effectiveness in identifying pollutants in discharges from industrial activities and in terms of cost-effectiveness. Based on process knowledge, SNL/NM Stormwater Program personnel have found these routine inspections to be a valuable pg. 4 monitoring tool for documenting site conditions and changes through time (e.g., erosion, condition of control measures, and changes in drainage morphology).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victoria R. Branson
**Commenter Affiliation:** National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt:**

**Professional Inspector Credentials**

In the past, SNL/NM has hired third-party inspectors for NPDES-permitted sites and asserts that third-party contractors can have their own business-oriented biases and, in addition, do not always have familiarity with the local environment. SNL/NM contends that resources are better spent on inspections conducted by a qualified (i.e., certified) stormwater professional with a non-commercial background in the environmental sciences. Monitoring by an on-site stormwater team results in greater continuity between analytical, visual, and inspection monitoring, which is invaluable for identifying changes in site conditions, addressing all aspects of corrective conditions, and developing corrective actions and effective control measures. This can be done in partnership with facilities and engineering staff at larger organizations such as SNL/NM. Also important to consider, the on-site stormwater team can respond to corrective conditions such as illicit discharges more immediately than can third-party contractors.

There are several opportunities for stormwater inspectors to acquire credentials through certifying training programs that cover a wide range of decision-making issues in stormwater controls and the various measures that are implemented to maintain or restore stormwater quality. Certified Inspector of Soil and Erosion Control and Certified Professional in Erosion and Sediment Control, among other certifying programs, as well as on-the-job training in site-specific environments, are arguably the most relevant and cost-effective qualifications for inspectors.

SNL/NM does not agree with the requirement for a professional engineer (PE) that is discussed in the Fact Sheet under Comment 11 and contends that PE credentials are not necessarily the best qualifications for inspectors of stormwater industrial sites. Heavily engineered solutions are giving way to more environmental-based strategies for stormwater controls. A PE would likely still play a critical role in the design of stormwater control measures, but putting resources toward stormwater personnel trained in a wider range of environmental sciences—such as hydrogeology and biology as well as green stormwater infrastructure, arid low impact development, and green infrastructure development—would be more effective and cost-efficient for stormwater quality monitoring and maintenance activities. As discussed above, several credentialing programs are designed specifically for stormwater that could be required of stormwater inspectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The National Stormwater Center has trained over 8,000 professionals as certified stormwater inspectors and this is one suggested alternate to using a P.E. to conduct an inspection.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Would the low risk exclusion apply to only sector-specific parameters or include the universal benchmark parameters (Section 4.2.1.1)?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

18. Low-Risk Facilities

a. A low rick facility must meet the following criteria:
• No discharge to an impaired water body
• No reportable spills or a report of violation in the last 3 years
• No fueling on site

• No outdoor exposed storage or industrial activities
• The total area of industrial activity does not exceed one acre

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

Qualified Inspector
a. I recommend the definition of a "qualified inspector" must be (1) an employee or contractor that is currently qualified as a result of a formal training program, (2) the municipal separate storm sewer system (MS4) with authority, and (3) the inspector is not directly involved in the day-to-day operation or oversight of the facility being inspected.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jason F. Nall, Sr.
**Commenter Affiliation:**  Kohler Co.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0124-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The additional alternative inspections for "low-risk" facilities seem overly burdensome and redundant of other inspection permit conditions requiring qualified personnel. If certain facilities are considered "low-risk," the requirement for universal benchmark testing should not be applied, nor inspections required in addition to those already required to be conducted by qualified personnel. Sectors and/or SICs eligible for "low-risk" assignment should be specifically identified in the MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

BES does not recommend that the MSGP include an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring. Identifying "low risk" facilities puts an administrative burden on the regulator, would be difficult to implement and likely would not be fairly applied across industries and sectors based on true risk to the environment.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

In response to the EPA's request for comment on whether the permit should include an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring, the City supports including this option in the permit. Suggestions for determining a low-risk facility include using previously submitted monitoring data (e.g., data included in discharge monitoring reports submitted under the 2015 MSGP) and considering whether pollutants of concern in receiving waters are likely to be present in authorized discharges from the facility, based on activities conducted at the facility. Facilities with a good compliance record may also be considered low risk.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Randall M. Lyons
**Commenter Affiliation:**  Massachusetts Marine Trades Association (MMTA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

However, presuming that Sectors Q and R continue to be regulated under the MSGP, we support the 'Inspection Only' option referenced in "Request for Comment 11."  We request, however, that the "Inspection Only" option only be used for those facilities which do not generate industrial activity outside of requiring hazardous material disposal.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

"Low Risk" Facility

Any established facility that has been permitted under the previous three MSGPs and has completed the first years benchmark monitoring and the annual average for all parameters did not exceed the benchmarks should be considered a "Low Risk" facility. The inspection frequency should continue to be quarterly and follow the requirements of the quarterly routine site inspection. The individual who qualifies to complete the inspection should have an understanding of the MSGP, of their SWPPP, and be familiar with stormwater controls. No "license" should be required.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Meghan Morel
**Commenter Affiliation:**  South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.

**Document Control Number:** EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Should Include an Inspection-Only Option for Low-Risk Permittees**

EPA has requested comment on whether the permit should "include an inspection-only option for "low risk" facilities in lieu of conducting benchmark monitoring, as recommended in the NRC study." Proposed MSGP, Request for Comment 11 (p. 29).

SCWQA agrees with an inspection-only option for POTWs. EPA has not required benchmark monitoring for certain sectors in the past precisely because certain types of facilities are unlikely to be significant dischargers of pollutants. For example, under the current MSGP, Sector T Treatment Works has a very limited set of additional SWPPP (stormwater pollution prevention plan) and inspection requirements, but has no benchmark monitoring requirements at all. In contrast, Sector G Metal Mining is subject to extensive sector specific requirements, including benchmark testing for numerous parameters. EPA's 2020 MSGP should continue to acknowledge differences in the types of facilities covered.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Frederick J. McNeill
**Commenter Affiliation:** City of Manchester, New Hampshire
**Document Control Number:** EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

The City is in support of identifying low-risk facilities with inspection-only options. Suggestions for determining a low-risk facility include:

- identifying facilities that were not previously required to perform any type of benchmark monitoring,
- using previously collected monitoring data where the data supports a facility has historically been significantly below benchmark criteria (where required), and
- using site specific information on the facility size, type and intensity of industrial activities, impairments in the receiving water, use of stormwater treatment BMPs, etc., as obtained through a series of screening questions.

**Comment Response:**

2021 EPA MSGP Response to Comments
January 15, 2021

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

DEQ supports a reduced compliance monitoring approach, such as an inspection-only approach, for smaller, more standardized, low risk operations (e.g., land transportation, warehousing, possibly airports, etc.). Such an approach focuses on effective SWPPP implementation. With regard to identifying low risk operations, DEQ supports the use of criteria such as light manufacturing, size, and the pollutants potentially discharged. We agree with EPA that any third-party inspector would need to be knowledgeable regarding stormwater control measures and positioned to be objective and fair. We do not believe that such inspectors would need to be professional engineers, as this may make the cost of such an approach infeasible (see EPA cost document, pg. 52), and appropriate stormwater management training should be sufficient. One concern with using third-party inspectors is that their knowledge and interpretation of DEQ regulations does not always match that of our compliance staff. We assume that universal benchmark requirements would not apply to facilities subject to an inspection-only requirement.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

James Environmental Management would like to express thanks for the language in the permit that is designed to give attention to low risk designations as an alternative for facilities that pose minimal impacts on stormwater quality. The need for benchmark monitoring is not necessarily applicable for all facilities and this would prove an effective path for these facilities to achieve compliance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Joshua Wheatley
**Commenter Affiliation:**  James Environmental Management (JEM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Small scale "Mom and Pop shops" that have a minimal amount of activity and are truly low risk facilities would stand to benefit from this option and it might encourage registration and compliance. Annual inspections, combined with quarterly visual monitoring, should provide sufficient data to determine the status of the facility and maintain compliance. Inspections should be based on the Industry Sector-specific requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Nina Schittli
**Commenter Affiliation:**  Blymyer Engineers Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment: No inspection-only option for "low risk" facilities**
We recommend that there be no inspection-only option for "low-risk" facilities. As stated in the Fact Sheet, categorizing low-risk facilities would be challenging. Of the criteria suggested for consideration, which include SIC code, previous benchmark monitoring results, and facility size, only previous benchmark monitoring is a potential predictor of future stormwater quality. However, it is likely many "low-risk" facilities were not required to perform benchmark monitoring in the 2015 permit. Requiring all facilities to perform benchmark monitoring will result in a pool of monitoring data that is representative of the entire regulated community. The data may be useful to identify possible low-risk categories of facilities for consideration in future permits. Facilities that are "low-risk" because their industrial activities are performed indoors are eligible to file for a conditional no exposure exclusion and would continue to be exempt from benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jennie F. Formier
**Commenter Affiliation:**  John W. Furrh Associations Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0151
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

COMMENT #11:

Inspection only option in lieu of benchmark monitoring for low risk facilities. I feel this is not a good idea, it is too difficult to detect the exposure some chemicals/metals create. The unseen truly only shows up in a sample analysis. And nothing has more of an impact on an owner/manager then when they see high results and thought there would be nothing.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

We also support the inspection-only option for "low-risk" facilities. Regarding the identification of "low-risk" facilities, the FWQC and FSWA support characterizing certain sectors as "low-risk", but also recommend identifying characteristics for designating certain facilities as "low-risk" even if they are not in a "low-risk" sector. For example, a facility that is not in a "low-risk" category, but conducts most or all of its operations indoors, should qualify as a "low-risk" facility. In this regard, "low-risk" facilities within higher-risk sectors should have the opportunity to submit information or evidence to EPA that they are a "low-risk" facility. In any event, AF&PA requests that "light industry," as defined in 40 C.F.R. § 122.26(b)(14)(xi) (2014), should automatically be categorized as "low risk."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Should the permit include an "inspection-only" option in lieu of benchmark monitoring.

Discussion/Recommendations

The concept of low-risk facilities is accepted already in the Spill Prevention, Control, and Countermeasure (SPCC) regulation: an oil capacity threshold of 1,320 gallons for regulation which exempts a great many small facilities, and Tier 1 reduced compliance requirements which provides streamlined provisions for small low-risk facilities.

Low risk facilities should be defined as:
• Those in the "light manufacturing" classification
• Other manufacturing facilities may qualify for an inspection only option by meeting conditions of having minimal exposure (factors such as no exposed residual piles or other similar factors) based on a review and certification by a PE (or PG for certain mining sectors). The existing "No Exposure Checklist" could be fashioned into a rating system that would allow a stormwater professional to score the risk of a site to demonstrate a low risk. Converting-only paper facilities are a good example of low risk facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

The COA agrees that the permit should include an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring. In addition to the activity level criteria proposed, facilities that discharge to intermittent drainages or those that are at considerable distance from WOTUS should also be allowed an inspection-only option.

Routine quarterly inspections and wet weather inspections, increased frequency for non-compliance, should be sufficient. The COA have performed routine quarterly good housekeeping inspections for years and have found them to be an effective monitoring tool for documenting site conditions and condition of control measures.

The COA has relied on its own trained inspection staff to conduct good housekeeping inspections and disagrees with the requirement for a professional engineer (PE). While a PE may play a critical role in the design of stormwater control measures, staff that are trained in a wide range of environmental sciences and those who receive on-the-job and supplemental credentialed stormwater training tend to provide site specific and cost efficient monitoring and inspection efforts.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Howard Marks
**Commenter Affiliation:** National Asphalt Pavement Association (NAPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

NAPA supports the concept of an "inspection-only" option for certain industry sectors and have submitted additional comment as part of the "Small Business Low-Risk Coalition".

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

***Low-risk facility definition***

Large-scale facilities that engage in light industrial activities and do not qualify as "No Exposure" can still have significant amounts of pollutants present and be high-risk. The size of the industry, as well as the type, should be considered to help limit this alternative to facilities that are low- risk. Smaller facilities will typically find the sampling requirements more burdensome, engage in less industrial activity, and have fewer chemicals or product onsite. DWQ recommends against using acreage to determine whether a facility is small.

The number of employees is a better gauge of facility resources available and the level of active industrial activity. The option to discontinue universal sampling could be limited to light industrial facilities that have a small number of employees. The Small Business Administration (SBA) provides employee counts for specific industry types to determine if they are a small business. Unfortunately, these numbers seem high for a risk determination (750 employees for wood-cabinet manufacturing, for example). The 50-employee cutoff used for the Affordable Care Act requirements may be more appropriate.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

***Inspections***

The alternative mentioned is a waiver from the quarterly universal benchmark sampling rather than a replacement for inspections. EPA's cost analysis recognized that requiring a professional engineer (PE) to perform site inspections can be more costly than the sampling. In rural areas, it may also be difficult to find someone locally to perform this inspection, increasing costs further. It could be burdensome to have a low-risk facility conduct self-inspections, pay for professional inspections, and undergo EPA inspections. Sampling to demonstrate permit compliance is preferable, but requiring an inspection that can be conducted by qualified personnel is a valid alternative.

Utah's requirements for inspections seem similar to EPA's proposal, offer a valid option for low-risk facilities, and don't require an inspection by a PE. DWQ requires all permittees to use a qualified person to complete a comprehensive annual evaluation. To reduce the burden of these evaluations, Utah doesn't require an outside inspector or PE. Larger or more complicated sites often hire an outside consultant or have corporate-level environmental staff conduct them. The comprehensive evaluation includes an inspection of all areas contributing to stormwater discharges associated with industrial activity, a review of whether controls are effective and meet the permit requirements, if additional controls are needed, a check on all equipment needed to implement the plan (includes items like spill kits), identification of necessary revisions to the Stormwater Pollution Prevention Plan (SWPPP) for potential pollutant sources and measures/controls, and a report that documents all observations made and actions taken.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

WMA supports the inspection-only option in lieu of benchmark monitoring. As explained above, Wyoming mining facilities are heavily regulated for stormwater, which include SPCC, SMCRA and NPDES and therefore would be good candidates for this option.

As explained above, WMA does not believe that benchmark monitoring is appropriate for the mining sector. Robust annual reporting and visual assessments completed by qualified professionals could be an acceptable alternative. Visual assessments and routine maintenance are more effective in protecting water quality than meaningless routine water monitoring.

Another alternative could be to require enhanced maintenance requirements for Best Management Practices (BMPs), such as requiring a specific schedule for the clean-up and regular maintenance of BMPs.

EPA also could consider allowing operators to summarize monitoring data collected to date at a facility. If benchmark monitoring performed under the 2015 MSGP did not result in any exceedances at a facility, then this outcome should qualify a facility for inspection-only status in lieu of universal benchmark monitoring.

The EPA asked if an inspection only requirement would be suitable instead of benchmark monitoring for low-risk facilities. WMA supports this option. As stated previously, the Wyoming

MSGP permit requires Wyoming mining operations to route pit dewatering, facilities and process area runoff through NPDES management facilities. Very little disturbed area runoff remains to be routed through MSGP regulated controls. We propose that operations like ours should qualify as "low-risk" if MSGP coverage is limited to non-process areas that total less than 10% (or similar) percentage of the total footprint of the facility.

Wyoming mining operations have a high level of regulatory oversight and other comprehensive protections in place. Mining operators should qualify as low-risk facilities since they are strictly regulated under layers of federal and state laws, regulations, and permitting requirements. As explained previously, Wyoming coal mining operations are regulated under both SMCRA and NPDES programs as well as hundreds of other regulations and permitting requirements. Federal or state inspectors visit our sites at least monthly to ensure compliance with various laws, regulations, and permits. SCM are inspected by highly trained LQD staff at least quarterly at SMCRA mines. This level of federal and state oversight is unheard of in any other industry sector.

Finally, mining operations are incredibly well managed facilities that employ, directly and indirectly, professional hydrologists, geologists, engineers, permitting specialists, and other environmental experts that have deep technical and practical expertise in the field. EPA should consider the expertise that facilities employ as part of its determination of whether a facility is low risk.

EPA has proposed requiring eligible low-risk facilities to undergo two "comprehensive site inspections" during their permit coverage instead of conducting benchmark monitoring. One inspection would occur during the first year of the permit coverage and the second would occur during the third year of the permit coverage. WMA supports this option, if the mines can use in-house staff.

EPA has requested comment on the certifications or qualifications the Agency should consider for a third-party professional inspector for this option. First, WMA does not believe a third-party inspector should be a requirement. Second, WMA does not believe that an inspection must be conducted by a Professional Engineer (PE) or similarly credentialed inspector. Hiring a PE will increase the cost of the inspection-only option. The 2015 MSGP required qualified personnel to prepare the SWPPP and conduct facility self-inspections. In this context, "qualified personnel" is defined as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit."[5] We believe that qualified personnel, as described, would meet the requirements necessary to conduct an inspection for a low-risk facility for the inspectiononly option. Further, EPA should recognize that on-site personnel have knowledge of the environment at the site and how the facility operates and hence will be able to more readily identify any issues during the inspection.

[5] Id.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**Qualifications of the Inspector**

ACA suggests that there is no need for an independent inspector nor a professional engineer to collect stormwater samples. An in house technician will likely perform a better job than an independent inspector and/or professional engineer who flies in for a one-time visit. In house or staff technicians also better understand the local environment, facility and operations. In addition, in house or staff technicians can most efficiently respond and gather representative stormwater samples as opposed to an independent inspector or engineer that has to travel to the facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

The City agrees with the inspection only option for monitoring at low risk sites as an effective alternative to benchmark monitoring. The City suggests that facilities meeting the low risk alternative be re-evaluated on a regular basis (e.g. per permit term or significant change as defined by EPA).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection frequency: The inspection-only option frequency for low -risk facilities is likely sufficient once every permit term or five years. If the inspection identifies significant problems, the facility should be ineligible for the inspection-only option.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Professional Inspector Credentials: Municipal Separate Storm Sewer (MS4) inspectors should not be called upon to provide the third-party inspections suggested in the "low risk/inspection-only" scenario. Though MS4 staff are undoubtedly well qualified, they have obligations to conduct their permit-required industrial inspections. Suggesting that MS4 inspectors conduct these third -party inspections twice in a five-year MSGP permit term would unnecessarily add to their existing work load and potentially transfer cost of MSGP compliance to the public rate payers who fund most MS4 programs. Proposed inspector qualifications could be a qualified person with a certification in stormwater control measures and inspection techniques with a course curriculum and duration deemed appropriate by EPA.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix

**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Low Risk Facilities: In addition to the proposed approach to use 'light manufacturing' standard industrial classification (SIC) codes to define "low risk" facilities, EPA should consider:

1. Facilities in a jurisdiction with local regulations that require the facility to be designed to retain stormwater on-site;
2. Facilities with no violations (for example during the past 5-year permit term); or
3. A preliminary inspection process to determine the potential for stormwater pollution (similar to the No Exposure Certification); and
4. A process to allow facilities to be periodically evaluated for inclusion as low risk.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

Ways to identify eligible "low-risk" facilities

1. The NRC study suggests using criteria such as facility size or a hybrid of size and type/intensity of industrial activity to identify "low-risk" facilities. However, size is not an indication of toxicity of materials stored outdoors and "intensity" is too subjective a term for eligibility criterion.
2. EPA has also suggested that "light manufacturing" SIC codes may be a criteria for "low-risk" because the majority of activity is assumed to be primarily indoors. The MSGP already contains a No Exposure Certification to minimize compliance obligations for facilities that are primarily located indoors. Consider expanding the rationale on "low-risk" facilities to provide objective and measurable metrics to address water quality that might facilitate low-risk status for SIC codes other than "light" as they may be eligible or able to meet specific criteria outlined in the permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

What the inspection should entail

1.  Inspections would mimic the existing sector specific periodic inspection requirements established by the MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

Professional Inspector Credentials

1.  We disagree that a P.E. is a necessary qualification for an "inspector" of stormwater control measures. EPA's definition of a qualified person can be anyone with the correct combination of experience and education, and familiarity with the facility. Per the Cost Impact Analysis guidance provided, EPA appears to value a third-party observer, not involved in the day-to-day operation of the facility. A broad range of third-party professionals may meet the requirements of "qualified person" without being a P.E.
2.  While EPA cannot endorse a specific, private inspection certification program, EPA should allow personnel who have been provided with the appropriate education and experience to evaluate industrial stormwater compliance onsite to conduct these inspections. Appropriate education and experience could be defined by EPA as having a specific number of years of experience, educational background, etc., similar to the "Environmental Professional" designation established for performance of Environmental Site Assessments under the 40 CFR Part 312.10 standard.
3.  We request that EPA also consider that each state P.E. licensing board has discrete requirements for the engineer to hold a license in the state in which the work is to be performed. This places an additional burden on the permittee to identify and recruit a qualified P.E. that is licensed in the state where the facility is located. We contend that this is not a good practice for determining qualified professionals for this program.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Harry Childress
**Commenter Affiliation:** Virginia Coal and Energy Alliance (VCEA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0175-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Further, VCEA supports the proposed visual inspection option. In response to EPA request for comment 11, VCEA supports the use of visual inspections in lieu of benchmark monitoring and believes this option should be made widely available and made expressly available for mining facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Sector J Facilities should qualify for the inspection-only option (Low-Risk)</u>**

The EPA Request for Comment 11 speaks to whether there should be an inspection-only option for low-risk facilities instead of conducting benchmark monitoring. The comment asks for ways to identify eligible facilities, the frequency of the inspection, details of the inspection, and qualifications for the inspector. We strongly agree that an inspection-only option is appropriate and would like to offer support to include aggregate facilities in this process.

We also feel that the National Academy of Sciences Study indicates a poor understanding of our industry which greatly limits eligibility as low-risk. While that committee clearly states that there are difficulties in defining the characteristics of a low-risk facility, they do not seem to have a grasp on the physical nature of our industry. That study speaks to a low-risk site being less than 1-acre in size. On page 55 of the NAS study it says that "for a site to be considered at low risk of impacting water quality, it should have a low likelihood of discharging toxic substances in toxic amounts, generally have a small area of exposed industrial activity, and be well managed". It is

not the size of the site that should be a prime consideration for risk, but what processes occur on that size and how any risk is minimized.

We feel that aggregate operations fit well into the NAS criteria for a low-risk facility. The following specifics help to justify this classification:

- **Aggregate Operations involve Natural Processes**
  Our products are sourced from natural deposits with no chemical additives involved in the process. We break, sort and wash this material to the specifications required by various end-users (federal and state department of transportations, ready mix, asphalt, etc.). The various products that go out our front gate have the same chemical composition as the natural deposit.
- **Aggregate Operations have minimal Impervious Surfaces**
  Our sites are very large with the average operation covering approximately 600 acres. Much of this total remains undisturbed and is used for natural buffers to screen our activities from adjacent property owners. Only a very small portion of the remaining area is impervious. Our sites usually only have a few small buildings and minimal paving. All of this contributes to minimizing runoff which actually helps to protect adjacent streams during a storm event.
- **Aggregate Operations capture Stormwater for Use**
  Water is critical in the production of aggregates. With most of our operations outside of areas served by municipal water, we rely on collected stormwater as a major part of our water needs. This water is used to wash our products, reduce dust on roadways and within the plant, cooling water for machinery, and for general cleaning. This water is collected in the pit sump and stored in supply ponds or an unused area of our excavation. Without the water we can't operate so we always try to have enough storage to get us through any sort of dry period.
  This desire to hoard the water means that we go to great effort to limit our discharge. A large percentage of our operations go months showing no discharge.
- **Aggregate Operations are Heavily Regulated**
  We are also a low-risk industry based on all of the permits we hold. The Mine Permits issued to us by state agencies covers detailed sediment & erosion control design, buffer requirements, reclamation standards, channel design, surface stabilization requirements, and revegetation plans. The Air Permits we obtain cover property line offsets and ingress/egress maintenance to limit vehicle tracking. The Spill Prevention, Control and Countermeasures Plans (SPCC) we must have to cover our petroleum storage includes secondary containment requirements, tank inspections, spill response, material handling, and design requirement to reduce the chance for a spill.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

## Inspections for Low-Risk Facilities should not be limited to Third Party Individuals

Because of the many layers of permits already covering our operations, someone intimately familiar with these sites is best suited to conduct the inspection. That person is usually the environmental professional directly over that operation. This engineer would have detailed knowledge of the site including input in the design and location of all the sediment & erosion control BMPs, outfall locations, sample collection, effluent data, storage of petroleum products, and inspections and recordkeeping. If an outside inspector was involved, that individual would most likely obtain most of the information necessary to conduct an adequate inspection, from this internal environmental engineer. This same internal environmental engineer may also be signing and certifying records, forms and submittals that cover this operation. If they are relied upon and trusted to handle all of the day to day compliance work, they certainly should be trusted to conduct a low-risk inspection.

Cost for an outside inspector to evaluate an aggregates operation is also going to be an issue for many producers. If a professional engineer is utilized (the most appropriately qualified individual) those costs are estimated to be between $2,000 and $6,000, depending on the size of the operation and travel time. Many aggregate operations are not located in or near larger towns that are going to support an engineering firm that is staffed to handle this work. That individual may need to travel several hours to reach the site. Based on an expected hourly rate, the invoice amount for travel, site time, necessary records review and development of a summary report, could push into the thousands of dollars. The EPA Cost Analysis shows an estimated $8,235 per inspection and specifically notes that the cost may be prohibitive for this to be a viable option. We agree and push for use of internal personnel as an option.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

IMA-NA supports the EPA's proposal to include an inspection-only option in lieu of benchmark monitoring for low-risk facilities. The Association agrees designating certain permit holders as low risk decreases the cost to operators and as other stakeholders have mentioned allows the Agency to focus more directly on facilities that need the most attention. While IMANA supports the adoption of a low-risk designation we offer the following comments on the question of identifying criteria and the manner in which the inspections are carried out.

While the EPA develops the criteria to decide whether facilities are low-risk, IMA-NA would suggest, the Agency consider both the likelihood of "discharging toxic substances in toxic amounts" as well as the level of existing regulatory framework to monitor and address discharges. If EPA considers both aspects when establishing the rubric for low-risk designation, IMA-NA would propose that industrial mineral operations fall into the low-risk category in totality under the 2020 MSGP. For purposes of the MSGP, mining operations pose a low risk to surface water given the practices of onsite water reuse and "no discharge" facilities. For operations that rely on the MSGP, in addition to the individually held NPDES permits for discharges, the areas of exposure are relatively small, such as haulroads. When these aspects are taken in conjunction with the regulatory framework the mining industry operates under as a whole, IMA-NA believes the industry stands solidly in the low-risk category.

As noted earlier, the mining industry operates under the most complex system of state, local, and federal regulations and permitting requirements of any industry in the United States. Mines are regulated under the Clean Air Act, Clean Water Act, the Resource Conservation and Recovery Act (RCRA), Comprehensive Environmental Response, Contamination, and Liability Act (CERCLA), Emergency Planning and Community Right-to-Know Act (EPCRA), Toxic Substances Control Act (TSCA), National Environmental Policy Act (NEPA), the Safe Drinking Water Act (SDWA), the Endangered Species Act (ESA), the Wilderness Act, the Wild and Scenic Rivers Act, as well as hundreds of additional regulations and permitting requirements. Federal and state inspectors visit mine sites quarterly, monthly, and in some instances, weekly to ensure compliance with various laws, regulations, and permits. The mining community's compliance to the established thresholds for discharges under this intensive regulatory framework should be a consideration when deciding whether industrial mineral producers fall into the low-risk category. IMA-NA believes in meeting the various environmental protection requirements in the extensive regulatory system, our members are prime candidates to be considered low-risk particularly when taken with the NAS suggested basis for evaluation...

...Additionally, while the Association recognizes the need for a qualified individual to perform the inspection, we believe the model of the 2015 MSGP requirement simply for qualified personnel to prepare the Storm Water Prevention Plan ("SWPP") and conduct facility self-inspections can be appropriately applied in this case. Under the 2015 MSGP, "qualified personnel" are "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit." With that definition in mind, IMA-NA believes the same standard can be used for the low-risk inspection requirement. In fact, as many of our members have noted many times inspectors, as individuals unfamiliar with the specifics of the site, are not as knowledgeable as the professionals who designed and work with the systems regularly. The Association believes this additional flexibility honors the stated goals of lessening the burden on low-risk facilities without compromising on environmental outcomes.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

### 8. Request for Comment 11: Inspection-only Option for "Low-Risk" Facilities

We support an "inspection-only" option, but are concerned about the potential for additional, onerous requirements to utilize this option. For this option to work, it should not end up involving more resources on the regulated community than what is required for benchmark monitoring. We would recommend that the quarterly facility inspections (Part 3.1 of the draft MSGP) be the basis for this inspection-only option, perhaps at increased frequency (e.g., monthly).

Also, the "Qualified Personnel" defined in Appendix A of the draft MSGP should be the person(s) able to perform the inspections under this option, and the qualification requirements should not be made more restrictive (e.g., no specialized licensures). Many environmental laws allows facility personnel/authorized representatives to certify environmental results, and this precedent should apply to the inspection-only protocols under the MSGP, where facility personnel knowledgeable about the site conditions is qualified to certify under the MSGP.

Additionally, the "inspection-only" option should be available to facilities that have historically met benchmarks, with the inspection protocol providing the basis for continued compliance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA request for comment 11, VMA appreciates the inclusion of the proposed "inspection-only option in lieu of benchmark monitoring." In response to EPA's request for comment number 11 as to whether this option for "low-risk" facilities should be included, VMA believes it should be included, but any final provisions need several clarifications. First, EPA should provide additional clarity regarding how a facility qualifies as a "low-risk" facility. For example, to what extent does the size of a facility come into play in determining its relative risk level? While facility size does not always correspond to low risk, it should be a factor that is considered. Additional means of identifying low-risk sites could include allowing facilities that were covered under the 2015 MSGP and were able to consistently achieve benchmark thresholds during that permit term to qualify as low-risk facilities, or where a 2015 MSGP permittee did have a benchmark exceedance but has amended its Stormwater Pollution Prevent Plan ("SWPPP") and did not have repeat exceedances. Second, EPA should include a broad range of options for eligible professional credentials that could qualify to conduct inspections. Currently, the rule only allows a professional engineer to conduct these inspections. VMA agrees with EPA's point in the Fact Sheet -- that this will be very expensive for permittees. A broader range of qualifications for inspectors will provide more flexibility and still achieve the desired results. Specifically, EPA should include Certified Stormwater Inspectors and Responsible Land Disturbers as eligible credentials to conduct inspections. Alternatively, EPA could include requirements for qualifications of an inspector such as familiarity with SWPPPs, stormwater flow, BMPs, and identification of contaminant sources. Additionally, the inspection for assessing active discharges at permitted outfalls should only be required on a quarterly basis.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ram Singhal
**Commenter Affiliation:**  Flexible Packaging Association (FPA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**In response to RFC 11, FPA supports identifying a low risk facility option if the agency adopts additional requirements for the collection and analysis of pH, TSS, and COD samples**. Because FPA believes there is no useful purpose for benchmark baseline testing at flexible packaging facilities, and significant costs related to such a requirement, we would support adoption of a low risk option for certain industry sectors. In regard to how "low risk facilities" would be identified, FPA agrees with the agency discussion in the fact sheet that SIC/NAICS code should be a significant determining factor in identifying "low risk facilities." (Flexible packaging is in one of the proposed low-risk SIC categories in this rulemaking.) Other criteria to be used could include the type of sources that would contribute to stormwater contamination. In flexible packaging plants, for instance, the main potential outside sources of

storm water pollution are (1) resin silos, (that have containment for collection of resin pellets) and (2) solvent tanks (which all have secondary containment). Since there is no potential direct discharge from these process sources, the facility poses a low risk of storm water pollution. It should be noted, in several states in which FPA members operate, the states have given facilities that only have outside resin silos a "No Exposure" certification. Other criteria that could be relevant might include the number of storm water drains or sewers at a plant and the number of plant personnel. Both criteria are somewhat arbitrary, however, because the number of stormwater sewers or drains may be heavily influenced by location and/or local zoning. Therefore, FPA favors a risk-based approach be used for determining when additional inspections or sampling should be applied.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, AAAE believes EPA should provide airports with additional flexibility in a number of areas of the permit, including providing an inspection-only option in lieu of universal benchmark monitoring (if EPA moves forward with the proposal); allowing composite sampling as an alternative to grab samples; and permitting airports to report a percentage of aircraft deicing fluids (ADFs) captured as an alternative option to sector-specific benchmark monitoring.

...

**2. An inspection-only option, in lieu of universal benchmark monitoring, should be available for certain airports if EPA moves forward with such monitoring requirements.**

EPA requested comment on whether the permit should include an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring, as recommended in the NRC Study. (Request for Comment 11; NRC Study, at 65.) AAAE generally supports the concept of an inspection-only option that would be available for airports in lieu of such monitoring. As explained previously, certain AAAE members expressed concern over EPA's proposal to require industry-wide benchmark monitoring for all airports, regardless of past performance or risk. By contrast, the inspection-only option would provide flexibility and facilitate easier compliance for airports that have no history of exceedances or otherwise pose minimal risk of contributing to water quality issues through stormwater discharge.

2021 EPA MSGP Response to Comments
January 15, 2021

AAAE recommends that the inspection-only option be made available to any airport that is not currently required to conduct sector-specific benchmark monitoring under Part 8. This would include airports using less than 100,000 gallons of pure glycol in glycol-based deicing fluids and/or 100 tons or less of urea on an average annual basis. (Part 8.S.7, 2015 MSGP.) AAAE believes all airports, particularly outside the scope of Part 8, have a low likelihood of discharging pollutants in large amounts because airports, unlike many industrial facilities seeking coverage under the MSGP, are not producing large quantities of regulated chemicals. In addition, airports already implement many BMPs and are heavily regulated by FAA.

Indeed, EPA's primary concern with airports' stormwater discharge activities has focused on deicing operations. However, FAA requires commercial service airports to prepare, maintain and carry out a snow and ice control plan (SICP) that includes, among other things, procedures for applying and controlling aircraft deicing fluids (ADFs) and mitigating stormwater runoff. (14 C.F.R. § 139.313; FAA Advisory Circular (AC) 150/5200-30D, at 2-7–2-8.) FAA specifically advises airports to ensure that the SICP complements the airport's stormwater discharging permit requirements and helps the operator achieve compliance with such regulations. FAA also makes eligible for federal funding under the Airport Improvement Program (AIP) many projects that allow the airport to comply with their responsibilities regarding stormwater discharge. (49 U.S.C. § 47106; FAA Order 5100.38D (CHG1).)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Paul Bredwell
**Commenter Affiliation:**  U.S. Poultry & Egg Association et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**3. Allowing "low-risk" facilities to choose the option of an inspection only requirement, rather than benchmark monitoring is a good alternative for facilities with minimal potential for polluted stormwater discharge.**

<u>Light Manufacturing SIC Code Should be Used</u>: Using the basis of "light manufacturing" SIC codes to determine inspection only eligibility is an appropriate approach to making this distinction. SIC Codes relevant to the poultry industry include 2015 for Poultry Slaughtering and Processing which includes egg processing, 2047 for Dog and Cat Food feed mills, 2048 for Prepared Feeds and Feed Ingredients for Animals and Fowls, and 2077 for Animal and Marine Fats and Oils, which are all considered "light manufacturing,"

1. Data analysis for facilities in Sectors U1 and U2 indicates that these facility's average benchmark parameters were well below the sector specific benchmarks included in Table 8.U-1 of the Draft 2020 MSGP and the proposed universal benchmark thresholds in Table 8.1.1 of the Draft 2020 MSGP (based on data harvested from state environmental regulatory agency databases for industrial storm water monitoring).

2. Additionally, analysis of recent benchmark storm water monitoring data for 74 facilities in USEPA Region 4 across subsectors U1, U2 and U3 (SIC code 2015) indicated facilities to be significantly below the median values reported in 60 Fed. Reg. 31010 (September 29, 1995) for BOD, COD, TSS and Oil & Grease, and were also consistent with values given for pH (based on data harvested from state environmental regulatory agency databases for industrial storm water monitoring). This analysis indicates significant progress has been made in stormwater pollution control in these subsectors, further demonstrating the minimal risk associated with these facilities.

Local Trucking without Storage: SIC Code 4212 – Local Trucking without Storage should also be included in a "low-risk" category since the potential for stormwater pollution is generally very low for food and kindred related transportation facilities.

Sufficiency of Proposed Inspection Frequency: The proposed inspection frequency of twice per permit term is sufficient for evaluating the effectiveness of a facility's SCMs. This option would allow for the discontinuation of quarterly benchmark monitoring. Therefore, facility resources can be allocated to other activities or tasks on site, rather than having personnel spend time performing benchmark sampling that would consistently show a facility is well under benchmark thresholds.

Role of Inspection Reports: Proposed contents of the inspection and Agency follow up actions are reasonable and sufficient. The inspection reports would provide the facility operators comprehensive feedback on their SWP3, their compliance with recordkeeping requirements per the MSGP, and the performance and effectiveness of their SCMs as well as recommendations to address any inadequacies found by the inspector or any questions or concerns the operators may have.

Role of Inspector Credentials: Required inspector credentials based on the current definition proposed for "qualified personnel" are reasonable and sufficient for a thorough and meaningful inspection to be performed. Working with third-party engineering and consulting firms for engineering and regulatory assistance is already common practice at many facilities. Therefore, retaining these third-party firms to perform the required inspections would be reasonable and practical for these low-risk facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  DG Whitefield, LLC and Springfield Power, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0188

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

We fully support allowing the "inspection only option" for low risk facilities in lieu of benchmark monitoring and especially universal benchmark monitoring. This option should be widely available for a most facilities rather than a minority and should be based on a broad range of eligibility factors that suggest low risk such as facility size, type of operations, amount of material processed or stored onsite, previous benchmark results, proximity to receiving waters, good housekeeping measures and the type and number of storm water controls.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

We agree on Inspections rather than benchmarks following proposed sections 3.1-3.1.4, and 3.1.5-3.1.6.7 for inactive or unstaffed facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

Low Risk Facilities:  NAIMA supports inspection only options for low risk facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anne Germain
**Commenter Affiliation:**  National Waste & Recycling Association (NWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0194-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

NWRA supports the recommendations of the National Response Center (NRC) study, Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges, to include in the 2020 MSGP an inspection-only option for low-risk facilities in lieu of conducting benchmark monitoring. NRC's recommendation is sensible and rewards facilities whose operations and activities do not adversely impact receptors with their stormwater discharges. Beyond identifying specific types of facilities or scenarios that would be deemed as low-risk (e.g., facilities that perform light manufacturing indoors), EPA should consider including a quantitative pathway in the 2020 MSGP that allows facilities to "test into" the low-risk designation. Such a pathway would reward those facilities that, through consistent benchmarking and/or annual monitoring that reflect below-threshold limits, demonstrate that they are eligible for an inspection-only option.

It would be appropriate to conduct inspections at the low-risk facilities twice over the permit term: once near the beginning and once towards the end, preferably in the aftermath of a qualifying storm event. This timeline would allow for an initial confirmation of low-risk conditions, and a later assessment of maintenance of the low-risk status heading into the next renewal cycle. Inspections should focus on a review of operational practices, including specific review of established stormwater mitigation systems. Moreover, these types of inspections should also focus on documentation, with a review designed to determine the efficacy of a facility's Stormwater Pollution Prevention Plan (SWPPP) and its accompanying documentation.

The current standard is to allow properly trained company representatives to conduct self-inspections, including professionally licensed engineers, geologists, hydrologists, or other personnel who can demonstrate significant experience in industrial stormwater management. EPA should afford a degree of flexibility in allowing facilities to select an inspector that is qualified to conduct a low-risk inspection. In terms of the qualifications or certifications that an in-house inspector should have, NWRA believes a Professional Engineer (P.E.) or trained Project Manager would be best qualified to assess the efficacy of stormwater prevention measures at a facility. NWRA thus encourages EPA to allow the low-risk facilities to use properly trained and qualified in-house personnel who are licensed P.E.s to conduct the inspections. NWRA further recommends that EPA design a suitable inspection form or checklist that can be used by in-house personnel to conduct these types of inspections.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**Aggregates Operations are a Low Risk to Surface Water**

NSSGA agrees that an inspection-only option should be allowed instead of benchmarking, but feels the suggested framework is too narrow and would exclude lower risk industries such as aggregates. Aggregates operations are an inherently low risk to surface water for many reasons: a simple, mechanical process that does not use or produce toxic chemicals, a history of compliance and meeting benchmarks, the many other state and federal requirements that protect surface water quality, widespread use of best management practices, and a low impervious surface area creates little runoff at aggregates operations.

The 2015 data used by the National Academies of Sciences, Engineering, and Medicine (NAS)[2] in evaluating the MSGP show that the industry should be considered low risk. Tables from Appendix D of the NAS evaluation are included below and show a mean well under the benchmark limits for Nitrate and Nitrite (0.68 mg/L) and Total Suspended Solids (100 mg/L) as well as within the pH range of 6-9.

**TABLE D-17**
Statistical Summary and Benchmark Comparison of 2015 MSGP Reported Results for Nitrite Plus Nitrate Nitrogen

|    | No. Reported Results | No. Facilities | Min. (mg/L) | Max. (mg/L) | Median (mg/L) | 75th Percentile (mg/L) | Percent >BM | Percent >4× BM | Percent >8× BM |
|----|----|----|----|----|----|----|----|----|----|
| J1 | 99 | 25 | <0.02 | 7 | 0.35 | 0.89 | 29 | 4 | 2 |
| J2 | 38 | 5 | <0.05 | 24 | <0.5 | <0.5 | 21 | 13 | 11 |

**TABLE D-18**
Statistical Summary and Benchmark Comparison of 2015 MSGP Reported Results for pH

|    | No. Reported Results | No. Facilities | Min. | Max. | Median | 75th Percentile | Percent <6 | Percent >9 | Percent Outside BM Range |
|----|----|----|----|----|----|----|----|----|----|
| J1 | 44 | 8 | 7.0 | <9 | 7.8 | 8.2 | 0 | 0 | 0 |
| J2 | 104 | 20 | 5.5 | <9 | 7.4 | 7.8 | 2 | 0 | 2 |

**TABLE D-22**
Statistical Summary and Benchmark Comparison of 2015 MSGP Reported Results for Total Suspended Solids

|    | No. Reported Results | No. Facilities | Min. (mg/L) | Max. (mg/L) | Median (mg/L) | 75th Percentile (mg/L) | Percent >BM | Percent >4× BM | Percent >8× BM |
|----|----|----|----|----|----|----|----|----|----|
| J1 | 211 | 28 | 0.11 | 558 | 7 | 19 | 4 | 2 | 0 |
| J2 | 428 | 35 | 0.19 | 5,000 | 15 | 49 | 14 | 6 | 3 |

Preliminary data from California supports the 2015 data, with TSS well below the benchmark. This verified data will be provided to EPA separately.

EPA should also consider numerous factors at operations that can impact surface water quality far beyond the assumption that only small, light-industrial, indoor operations are deemed to be low risk. EPA should consider what processes and materials are used, historical data, other regulations and requirements that a facility holds that prevent impacts to surface water, and other issues that create risks to surface water.

Aggregates operations mechanically remove naturally occurring material from the ground and in the case of stone crush it (sand typically does not need this step). Materials are sorted as specified for various uses. The process does not use, handle, or produce hazardous or controlled chemicals. Sites are selected so that nearly all the material is utilized, unlike other forms of mining. Therefore, there are not concentrated hazardous materials from processing, and no chemicals are used to remove the valuable ore; i.e. the raw material is the naturally occurring material that typically already has contact with groundwater and/or surface water. The naturally occurring material is only mechanically altered by size and removed from the site. Aggregates operations often pump groundwater from pits and store and use this water onsite. Therefore,

many of the assumptions about wastewater content, as well as stormwater contact with processed materials made by the NAS and compounded by EPA in this permit do not apply to aggregates operations. The potential impacts to surface waters are from pH and suspended solids and monitoring for these parameters is already required for aggregates producers.

Settling ponds and retention ponds control water are widely used by the industry to limit suspended solids. Very little of the site is paved or even disturbed at any time. Furthermore, many of the issues mentioned in the MSGP Fact Sheet are already strictly regulated by detailed permits & plans such as state Mine Permits, Air Permits, SPCC Plans, Flood Emergency Response Plans, Reclamation Plans, Sediment & Erosion Control Plans, Fugitive Dust Control Plans, etc. EPA should consider a facility low risk if it already has equivalent coverage and protections already in place.

Here is a typical aggregates operation land use to further show that "small" should not be a determining factor in determining risk:
Total site 655 acres; permitted to disturb 435 acres in the following manner:
Pit/mine excavation – 196 acres
Ponds/closed loop system – 13 acres
Stockpiles – 31 acres
Overburden piles (vegetated) – 133 acres
Plant/Haul Roads (unpaved) – 44 acres
Rail Spur - 19 acres

Therefore, at this site, about half of the site is undisturbed land, much of the site is not impervious, only a small fraction is industrial, and none contains, uses, stores or creates hazardous chemicals. Additionally, many aggregates operations must follow mining and reclamation requirements at the state level. These cover many issues in the MSGP, including many aspects of design of the sediment and erosion control structures, storage, grading, and reclamation.

The quality of low risk inspections would not be improved by an outside inspector, and many other programs do not require outside inspections – these are detailed in the SBLRC comments. EPA does not explain why an inspector with little knowledge of an operation would be better positioned than an experienced onsite professional. Cost for an outside inspector to evaluate an aggregates operation would involve travel to often remote areas and based on the size of the operation range from $2,000 to $6,000 or more (possibly multiplied by 4 quarterly inspections per year). This is not an insubstantial sum, particularly for small business, and would for safety reasons require site personnel stop their current work to accompany an inspector. Conversely, an onsite staff person who is responsible for compliance and understands the facility, would be a more appropriate evaluator of the site. While the offsite inspector was recommended by the NAS, this appears to be based on certain state programs they reviewed, and not based on a comparison of an experienced onsite professional vs. an outside consultant who many not be as knowledgeable. NSSGA urges EPA to allow facilities to determine whether an outside professional or onsite staff makes the most sense for their facility.

[2] National Academies of Sciences, Engineering, and Medicine, 2019, Improving the Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

Aggregates operations should be considered low risk due to meeting benchmarks and other criteria.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jeff Hannapel
**Commenter Affiliation:**  American Foundry Society (AFS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0199-A2
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should specifically identify metal casting facilities as low-risk facilities, or alternatively, establish clear and reasonable criteria on how a facility would qualify as a low-risk facility. As discussed above, the addition of universal benchmark monitoring would be unduly burdensome for metal casting facilities and would produce minimal environmental benefits. Accordingly, AFS supports providing low-risk facilities aninspection-only option to demonstrate the effectiveness of a facility's SCM in lieu of benchmark monitoring. This could help minimize the unnecessary burdens on metal casting facilities and ensure that human health and the environment are protected.

The proposed inspection frequency of twice per permit term would be sufficient to evaluate the effectiveness of a facility's SCM. In addition, by eliminating quarterly benchmark monitoring

facilities would be able to reallocate resources to more productive activities to promote environmental compliance.

The inspection-only option for low-risk facilities should not require the use of a third-party firm. Requiring third-party engineering and consulting firms to conduct the inspection would be expensive and burdensome for many small businesses in the metal casting industry. As an alternative, EPA should establish criteria for the inspections that could be conducted by facility personnel that are responsible for implementing SCM without the need for a third-party consultant.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection-Only Option for Low-Risk Facilities: NMA supports the creation of an inspection-only option for low risk facilities in lieu of benchmark monitoring and explains several reasons why mining facilities would be good candidates for this option given the complex federal and state regulatory frameworks that apply to our operations.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 11:**

**Inspection-only Option for Low-Risk Facilities** EPA has requested comment on whether the permit should include an inspection-only option for low-risk facilities in lieu of conducting benchmark monitoring, as recommended by the NRC Study, and requests comment on ways to identify and manage these facilities.[25] NMA supports EPA's proposal to create an inspection-only option for low-risk facilities in lieu of benchmark monitoring. This option will decrease costs for operators and streamline EPA's efforts to focus on the sites in need of the most assistance. NMA encourages the agency to consider the following recommendations.

[25] Proposed 2020 Fact Sheet at 59.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

1. Identifying Low-Risk Facilities

EPA acknowledged that identifying low-risk facilities that would be eligible for this inspection-only option is challenging. The 2019 NRC Study provided potential recommendations in Table 3-3 of its report, but ultimately left it to EPA to develop "concrete and implementable criteria conditions" for low-risk facilities.[26] Specifically, the NRC Study stated that a low-risk facility is one that "should have a low likelihood of discharging toxic substances in toxic amounts, generally have a small area of exposed industrial activity, and be well managed."[27]

In general, and via current stringent environmental regulations, mining operations pose a low risk to surface water. As described previously, many facilities are "no discharge" facilities and reuse, evaporate, or infiltrate water onsite rather than discharging. For those sites that rely on MSGP coverage, it is typically for limited areas outside of drainage control, such as haul roads, where runoff is not otherwise captured by permitted NPDES industrial wastewater outfalls. One approach to determining which operations could potentially qualify as "low-risk" is to set a percentage limit based on MSGP coverage required for stormwater from non-process areas (e.g. if it less than 10% or another percentage of the total footprint of the mine).

In addition, low-risk facilities should include those facilities that have a high level of regulatory oversight and other comprehensive protections in place already. Mining operations likely would qualify under that requirement, as they are strictly regulated under layers of federal and state laws, regulations, and permitting requirements. Mines are regulated under the Clean Air Act,

CWA, the Resource Conservation and Recovery Act (RCRA), CERCLA, Emergency Planning and Community Right-to-Know Act (EPCRA), Toxic Substances Control Act (TSCA), National Environmental Policy Act (NEPA), the Safe Drinking Water Act (SDWA), the Endangered Species Act (ESA), the Wilderness Act, the Wild and Scenic Rivers Act, and SMCRA, as well as hundreds of other regulations and permitting requirements. Federal and state inspectors visit our sites quarterly, monthly, and in some instances, weekly to ensure compliance with various laws, regulations, and permits. This level of federal and state oversight is unheard of in any other industry sector.

Finally, mining operations are comprehensively managed facilities that employ, directly and indirectly, professional hydrologists, geologists, engineers, permitting specialists, and other environmental experts that have deep technical and practical expertise in the field. EPA should consider the this extensive onsite or readily available expertise as part of its low-risk determination. NMA welcomes the opportunity to further explain why many mining operations should be considered low-risk facilities.

[26] 2019 NRC Study at 57.
[27] 2019 NRC Study at 55.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

II. Inspection Frequency, Content of Inspection, and Professional Inspector Credentials

EPA has proposed requiring eligible low-risk facilities to undergo two "comprehensive site inspections" during their permit coverage instead of conducting benchmark monitoring. One inspection would occur during the first year of permit coverage and the second inspection would occur during the third year of the permit coverage. NMA believes that the frequency should be reduced to one comprehensive site inspection during the permit term. Additional inspections will drive up the cost of the inspection-only option and make it less feasible for smaller facilities to select this option.

EPA has also requested comment on what follow-up the agency should require with the inspection report of a low-risk facility and has proposed requiring the operator to submit the original, unmodified inspection report from the professional inspector to EPA electronically

within 30 days of the inspection. NMA believes that the follow-up after the inspection is incredibly important and warrants additional discussion. As proposed in the 2020 Fact Sheet, operators do not appear to have an opportunity to correct any unintentional errors or misrepresentations in the report before EPA uses the report to "consider requiring the operator to conduct benchmark monitoring."[28] EPA should clarify that operators would have an opportunity to review the inspection report before it is filed with the agency to explain or correct any findings from the inspection.

In addition, EPA has requested comment on the certifications or qualifications that an inspector should be required to hold. First, we do not believe that an inspection must be conducted by a third party. Onsite personnel have more experience with how a facility operates and will more readily identify any issues during the inspection. In addition, NMA does not believe that an inspection must be conducted by a Professional Engineer (PE) or similarly credentialed inspector. EPA has not made the case or presented any information as to what additional expertise a PE (or Professional Geologist) would bring in regard to stormwater inspections and stormwater management. Hiring a PE will increase the cost of the inspection-only option. Instead, the agency should adopt the approach of the 2015 MSGP. The 2015 MSGP required qualified personnel to prepare the SWPPP and conduct facility self-inspections. In this context, "qualified personnel" was defined as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit."[29] We believe that qualified personnel, as described, would meet the requirements necessary to conduct an inspection for a low-risk facility for the inspection-only option, and a PE or similarly credentialed inspector would not be required.

[28] Proposed 2020 Fact Sheet at 61.
[29] Id.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marie Gargas
**Commenter Affiliation:**  Plastics Industry Association (PLASTICS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Because PLASTICS does not accept benchmark monitoring for pH, TSS and COD as reasonable requirements, comment on identification of low risk facilities is not pertinent.**

**However, in the event routine benchmark monitoring is retained, we support identifying a low-risk facility option for certain industry sectors.** PLASTICS appreciates EPA's background[3] on the option to use primary standard industrial classification (SIC) codes and believes this (or North American Industry Classification System, NAICS codes) should be a significant determinant in identifying low-risk facilities.

Part of the determining criteria could include source types – e.g., outside sources without the potential for direct discharges (e.g., resin silos with pellet containment or solvent tanks with secondary containment) that pose a low risk of stormwater pollution. This considers the conditional exclusion and certification for "no exposure" of industrial activities to stormwater.

[3] "United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Proposed Multi-Sector General Permit (MSGP) Fact Sheet For Stormwater Discharges Associated With Industrial Activity," available at: https://www.epa.gov/sites/production/files/2020-02/documents/final_proposed_2020_msgp_-_fact_sheet.pdf. Last accessed June 1, 2020.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

We make the following recommendations:

...

- In the alternative, if the Agency maintains monitoring, EPA should implement the NRC "inspection-only" recommendation for "low-risk" facilities. Specifically, it should adopt four different alternative options, including the Standard Industrial Classifications (SIC) code "light industry" option, for defining "low-risk" facilities that will be eligible for the "inspection-only" option.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

In 2019, EPA again turned to the NRC to rescue its flawed program. The 2019 NRC report attempted to justify the monitoring program for "mid-risk" and "high-risk" plants. Acknowledging that small facilities had the most "unreliable data," it developed a "low-risk" carve-out so that at least some facilities could escape this failed "do-loop" program.[54] The Study recommended a risk-based approach to improve data quality from the "largest, highest risk facilities, while *moderating the burden on the lowest risk facilities.* " (emphasis added)[55] The NRC retained substantial doubts about the efficacy of the analytical monitoring regime from its first review. The 2019 Study states that "[t]he elimination of benchmark monitoring by low-risk facilities would provide a non-monitoring option for oversight of these facilities and eliminate some of the most suspect, unreliable monitoring data."[56] Mindful of its earlier negative 2008 Study regarding benchmark monitoring, NRC proposed an exclusion from the benchmark monitoring-driven scheme for the facilities with the most unreliable data and the lowest need to improve stormwater control measures in the 2019 Study.[57] EPA proposes this option and we offer specific recommendations for identifying "low-risk" facilities for the inspection-only option in Section V.

[54] The do-loop reference is commonly used for this program whereby there is a continuous sequence of benchmark

exceedances followed by engineering evaluations/fixes followed by more exceedances, etc.

[55] 2019 NRC Study at 2.

[56] NRC Study at 59. The NRC recommended retaining benchmark monitoring for "high-risk" facilities. The report continues: This approach also ensures that high-risk industries that are more likely to be significant sources of stormwater pollution invest in the necessary monitoring to confirm that SCMs are effective in reducing pollutants and risks to receiving waters. In total, this proposed framework is expected to reduce the monitoring burden on the lowest-risk facilities while increasing the quality of the data available on the overall population of industrial facilities including the largest, highest-risk facilities. Combined with suggested improvements to monitoring protocols, training, and data management discussed in this chapter, the tiered approach is also expected to increase the usefulness of the data collected toward improving the management of industrial stormwater.

[57] Id.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

We understand that EPA has proposed an alternative path for exiting the analytical monitoring program. If EPA choses the inspection-only approach as an alternative for "low-risk" facilities, the Agency must carefully evaluate this "low-risk" option to minimize the compliance burden. We address that option in section V of our comments (Request for Comment 11).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 11: EPA Should Adopt Four Options for the Low-Risk Definition for the "Inspection-Only" Alternative Including (1) "Light Industry," (2) "Clean in 1995" or "Clean in 2015" Category, (3) "Clean 2015 MSGP Permits" or, (4) Low-Exposure NRC Table 3-3 Criteria.**

We acknowledge and appreciate the Agency's willingness to consider the option in Request for Comment 11 for excluding "low-risk" facilities from analytical monitoring. The EPA has proposed, based on advice from the NRC, an inspection-only option to substitute for the analytical monitoring.

**Inspection-Only Option:**

The NRC Study recommended that EPA provide low-risk facilities with an option to have a certified inspector preform (sic) a comprehensive site inspection in lieu of benchmark monitoring requirements in the proposed 2020 MSGP. Providing an option for inspection in lieu of

monitoring can reduce the burden on small, low-risk facilities and eliminate potentially unreliable monitoring data, while improving stormwater management.[79]

This section provides four alternate definitions for the "low-risk" facility definition that EPA should adopt. Because of the enormous burdens placed on small businesses by this proposal and the minimal utility, if any, of BM monitoring for these facilities, EPA needs to develop broad categories of low-risk facilities, to maximize the ability of small firms to qualify as "low-risk."

### A. Option 1: EPA 1990 "Light Industry" Designation Should Qualify the Industrial Sector as "Low-Risk"

EPA presents its primary option for identifying low-risk facilities by using the "light industry" designation as the single qualifying criterion. This designation was first established by the Agency in a 1990 rule that identified low exposure industries based on criteria that are essentially similar to the NRC activity-based criteria to identify low-risk facilities.[80] This "light industry" definition covered Standard Industrial Classifications (SIC) Codes: Facilities under SIC Codes 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221-25.[81] Standard Industrial Classifications Code 20 represents the food industry manufacturers and is included in light industry.[82]

As EPA states in the Fact Sheet,[83] this 1990 designation was based on low exposure characteristics of the facility operations, and EPA reaffirmed this finding in the 1999 Phase II final regulation.[84]

EPA justified the light industry designation in November 1990 (40 CFR 122.26(b)(14)(xi))[85] based on certain parameters listed in the 1990 Federal Register notice. These parameters are indicative of limited exposure of stormwater to contaminants (as opposed to no exposure certification requirements listed in proposed Appendix K) and are summarized below:

1. Most activities located in buildings;
2. Stack emissions minimal;
3. Unhoused industrial equipment minimal;
4. Outside material storage, disposal, or handling – not part of manufacturing process; and
5. Minimal source of dust and particulates.

EPA estimates that the light industry facilities number only 436 facilities out of an estimated 2200, or roughly 20% of the universe.[86] This is a reasonable proportion of all facilities in the universe of facilities to be considered "low-risk." Under this definition, 80% of the facilities would still be subject to full analytical monitoring.[87]

### B. Option 2: "Clean in 1995" or "Clean in 2015" Industries Should Qualify as Low-Risk

As an alternative simple low-risk definition, EPA could also define a separate category based on the no-monitoring designation that followed from the Agency's evaluation of the 1993 group permit application data for each sector. These facilities were deemed to be relatively clean in 1995 and did not fail the median facility benchmark test. The industrial management activities and monitoring data were thoroughly reviewed in the 1995 permit preamble. Those sectors that

escaped monitoring like Sector W described above also should be designated as "low-risk," based on the thorough review of the permit application data in 1995. Unsurprisingly, there are several sectors that were both "light industry" and "Clean in 1995," like Sector W, because these facilities have little exposure to stormwater contamination.

EPA should also consider a "Clean in 2015" exemption for those sectors identified in the 2019 NRC Discharge Monitoring Report (DMR) database with low monitoring concentrations, such as sector W. This is the most recent set of data known to be available to EPA. The 1995 permit preamble discussion reveals benchmark exceedances for nitrite plus nitrate nitrogen, and zinc for Sector W.[88] However, after a review of the facility characteristics, it concluded that the exceedances were unlikely to be caused by industrial activity.[89] Therefore, we suggest that EPA consider as Option 2 qualifying entire industrial sectors for "low-risk" for being either "Clean in 1995" or "Clean in 2015."

The California stormwater data (years 2011 – 2019) with more than 750,000 records provides an independent and robust confirmation of the results of the 2015 MSGP DMR data from the four EPA states (Idaho, Massachusetts, New Hampshire and New Mexico), and a much larger database.[90] The median data in California closely resembles the low concentration NRC reported data.[91] Many sectors will qualify for the "Clean in 2015" option using either dataset.[91] We provide preliminary data for one "light industry" sector – the food and beverage industry (SIC code 20) below as an example. Some SIC sector preliminary analysis is provided in Attachment #C.[92]

**California Industrial Stormwater Data: SIC Code 20, Food Sector (2011-2019)**

|       | Records | MED | % OVER BENCHMARK |
|-------|---------|-----|------------------|
| COD   | 1316    | 32  | 11               |
| TSS   | 13221   | 18  | 9                |
| pH    | 13150   | 7   | NA               |

6/1/20 Preliminary Analysis

### C. Option 3: Clean in 2015 Permit

EPA proposed another alternative in the fact sheet:

*One other possible criterion could be that the facility had coverage under the 2015 MSGP and did not have any benchmark exceedances during that permit term; another possible criterion could be that the facility had coverage under the 2015 MSGP and did have a benchmark exceedance but amended their SWPPP and did not have repeat exceedances.[93]*

This suggested option by EPA has considerable merit. It is the facility analogue to "Clean in 2015" for the sector. Such an option should be available to facilities that show low pollution concentrations, just as a sector could qualify as "low-risk" as a sector.

### D. Option 4: Table 3-3 NRC Criteria

We understand that it is difficult to establish across the board national low exposure criteria for the purpose of designating individual (not industry wide) facilities as "low-risk."[94] However, EPA should entertain requests from industry members for a sector– specific criteria approach, particularly for sectors that can demonstrate that a facility that complies with these criteria has "small but nonzero" exposure to stormwater contamination. Compliance with EPA-specified criteria under Table 3-3, just like the "light industry" low exposure criteria, should qualify a facility as "low-risk."

Option 4 also carries an additional significant environmental benefit. Well-tailored criteria would provide a powerful incentive for a facility to reduce contact with stormwater. EPA should encourage development of these industry-specific criteria.

[79] Fact Sheet at 58.

[80] See 2019 NRC Study Table 3-3 at 57 and Option 4 discussion in this letter.

[81] 40 CFR 122.26(b)(14)(xi).

[82] According to EPA estimates, food manufacturers represent approximately one quarter of the "light industry" facilities subject to the MSGP; Halter, Emily, EPA MSGP slide presentation (March 2020).

[83] Redline Fact Sheet at 61.

[84] Id.

[85] 55 Fed. Reg. 47990, 48008 (November 16, 1990).

[86] EPA's estimate of total facilities is 2,400, but based on data legacy issues, only accounts for 2,200 in its analysis.

[87] We also believe that is reasonable to exclude other facilities, based on other reasons, such as demonstrating in the past low volumes of contaminated runoff through chemical monitoring. For example, we endorse EPA's additional low-risk definition of excluding facilities from monitoring where the facility met all the benchmarks in the previous permit term.

[88] 60 Fed. Reg. 50804, 51028 (September 29, 1995).

[89] Id.

[90] Data accessed on May 31, 2020 from California stormwater website for data from 2011 and later, https://ciwqs.waterboards.ca.gov/ciwqs/readOnly/CiwqsReportServlet?inCommand=reset&reportName=esmrAnalytical In contrast, the NRC dataset has only 17,000 records over several years (2015-2018) from four EPA permit states.

[91] "Clean in 2015" denotes Clean as determined by 2015 MSGP data, which covers 2016 and later data.

[92] Additional data analysis is ongoing, including review of "zero" data entries. SBLRC intends to provide additional analysis with this data as we work with California State Water Board personnel to examine this data.

[93] Redline Fact Sheet at 60.

[94] The NRC stated: These criteria are intended to lead to a determination that the type, intensity, and extent of industrial activities are unlikely to generate discharges of pollutants of a kind and a quantity that may cause or contribute to water quality problems in receiving waters. The intent is to create a category of facilities that do not meet the rigorous criteria of no exposure but encompass facilities with activities that are small but nonzero in spatial extent, frequency, intensity, and/or presence of residuals. 2019 NRC Study at 57.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

**Elements of Inspection – Only Option: EPA Should Retain Existing Inspection and Reporting Requirements in Parts 5 and 7 of the Permit, Not Add Requirements**

EPA requests comments on three elements of the inspection-only option. First, what should the qualifications of the inspector be? Second, what should the frequency of the inspection be during the permit term? Third, what should the content of the inspection be?

Neither the EPA nor the NRC acknowledge the existing inspection and reporting requirements, developed over the last 25 years for the MSGP. These elements were carefully designed by the public and EPA, over many permit terms to ensure that facilities develop and implement

appropriate SWPPP requirements to minimize stormwater pollution. EPA's proposal suggested an independent inspection by a professional engineer. We submit that no new requirements are needed.

The suggestion to retain the current regulatory scheme for the inspection-only option corresponds to the recent recommendation of the US Department of Energy (DOE) National Nuclear Security Agency.[95] There is no need for an independent inspector nor a professional engineer. In fact, the inhouse expert is highly likely to be more expert and perform a better job than an engineer who flies in for a one-time visit. DOE stated that third-party contractors were not familiar with the local environment, and that monitoring by the onsite stormwater team resulted in greater continuity between the visual and other monitoring programs. DOE also opposed the requirement for a Professional Engineer, suggesting that storm water professionals have better credentials in hydrogeology and biology, as well as green infrastructure, which is more appropriate for stormwater analyses.[96]

In an analogous situation, EPA proposed using an independent expert for the chemical Risk Management Plan.[97] This choice was roundly criticized by industry commenters and chemical experts alike. In the final rule, EPA agreed with most industry commenters, who indicated that inhouse personnel would be preferred to outside consultants because these personnel have much greater familiarity with the site and issues that need to be addressed.[98]

The DOE also suggested that no additional inspection or certification requirements were needed, noting the existing inspection and certification programs should be maintained. Such a program, DOE stated, was the best in terms of identifying pollutants in discharges and cost-effectiveness.[99]

A short summary of these inspection, reporting and certification requirements appears below.[100] We, of course, object to the introduction of the AIM Tier requirements, but the other provisions are appropriate, and we are relying on the newer proposed 2020 language, as reorganized, for the inspection-only option. To be clear, in our view, EPA does not need to revert to the 2015 version for this "low risk" option.

1. Permittees are required to conduct routine inspections, at least quarterly, of all areas of the facility where industrial materials or activities are exposed to stormwater, and other areas specified in Part 3.1.2. 2.
2. Qualified personnel must conduct the routine facility inspections and must meet the inspection frequencies specified in the SWPPP. Inspectors must include at least one member of the Pollution Prevention Team. Part 3.1.1
3. Quarterly visual inspections of all stormwater discharges are required. Grab samples must be taken and examined visually for indication of stormwater contamination. If a problem is observed, action should be taken to locate the source of contamination. Summarize findings in the annual report. Part 3.2.3
4. Part 3 specifies the areas subject to inspection. Part 3.1.3
5. At least once per calendar year, the routine facility inspection must be conducted during a rain event. Part 3.1.6
6. Corrective action must be taken within specified periods of time (generally 14 days) when SWPPP defects are observed. Part 3.2.3
7. An annual report outlining all the quarterly inspections, SWPPP reviews, corrective actions, and site inspections must be submitted to the Agency. Appendix I lists the requirements.

1. A summary of your past year's routine facility inspection documentation required by Part 3.1.6 of the permit.
2. A summary of your past year's quarterly visual assessment documentation required by Part 3.2.3 of the permit.
3. Information copied or summarized from the corrective action and/or advanced implementation measures (AIM) documentation required per Part 5.1.3 (if applicable). If corrective action and/or advanced implementation measures are not yet completed at the time of submission of this Annual Report, you must describe the status of any outstanding corrective action(s)/advanced implementation measures. You must also describe any incidents of noncompliance in the past year or currently ongoing, or if none, provide a statement that you are in compliance with the permit. Part 7.5 and Appendix I

This comprehensive list of routine site inspections, visual assessments, evaluations, and reporting, all in compliance with SWPPP plan to minimize stormwater contamination, ensures an effective stormwater program. The industrial stormwater program and the construction stormwater program have developed a large cadre of qualified personnel over almost three decades. Many states have developed their own requirements for stormwater inspectors. EPA has spent 25 years building a robust inspection and reporting MSGP regime, and qualified inspectors and inspector trainers have met the challenge in the marketplace.

[95] MSGP comments dated, April 17, 2020.

[96] DOE Comment at 4.

[97] 84 Fed. Reg. 69834, 69875 (November 29, 2019).

[98] Id.

[99] DOE Comment at 3.

[100] The summary uses the new proposed requirements in the proposed MSGP permit, which we understand are little changed from the 2015 permit, but the location of some provisions have been re-arranged in the proposed 2020 permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  41
**Excerpt Status:** Final

**Comment Excerpt:**

In the alternative, the Agency should develop broad alternative eligibility criteria for the "low-risk" option carefully developed by the NRC and the Agency in this proposal.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**[A Certified Professional in Industrial Stormwater Management (CPISM) could be an option.  See https://envirocertintl.org/cpism/ .]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Asciatu Whiteside
**Commenter Affiliation:**  Dallas Fort Worth International Airport (DFW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0208-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA requests comment on whether the permit should include an inspection-only option for low-risk facilities in lieu of conducting benchmark monitoring.

The inclusion of an inspection-only alternative to benchmark monitoring for low-risk facilities is highly recommended. Such an option would not only encourage permittees to limit industrial activities conducted onsite, it would also encourage facilities to perform such activities in areas with minimal impact to stormwater runoff (i.e. indoors). The EPA should consider requiring low risk facilities to self-certify annually to meeting established criteria or qualification such as:

- The storage of all chemicals indoors,
- The elimination of any onsite fueling operations (stationary or contract-based),
- The use of self-contained trash containers,

- The elimination of exterior material staging except for those materials or final products manufactured for outdoor use,
- The elimination of exterior vehicle or equipment maintenance activities,
- Stormwater runoff does not discharge impact impaired waters, and
- No reportable releases have occurred at the facility in the past 3 years.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Resource Management Associates (RMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 11 – We agree that inspection-only monitoring is appropriate for "low-risk" facilities in lieu of benchmark monitoring. It is recommended that the identification of "low risk" facilities be based on three factors. One, "light industrial" facilities with the large percentage of industrial activities indoors or under cover should be identified directly by NAICS code as a low risk facility. Second, any facility of any type which is capable of achieving a reasonably high degree of "non-contact status" between industrial materials or activities capable of imparting pollutants and stormwater which is discharges (e.g., such as a heavy industrial facility which is located nearly or entirely indoors or under cover) should be identified as a low risk facility after some form of identification as such by the facility and confirmation as such by EPA or a state. Third, any facility which has demonstrated, through benchmark monitoring which have consistently produced results below applicable benchmarks, that they are a low risk facility, and should be suitable for inspection-only monitoring.

Comment 11 – With regards to who is capable of conducting facility inspections at inspection-only low risk facilities, we recommend that the requirement be that inspections can only be made by individuals who possess, and can demonstrate, the knowledge and experience relative to industrial stormwater water quality management required to conduct these types of inspections. Many states presently have such criteria for those capable of making inspections, such as Indiana's condition for who can conduct an inspection as: "an individual who is trained and experienced in storm water treatment techniques and related fields as may be demonstrated by state registration, professional certification, experience, or completion of coursework that enable the individual to make sound, professional judgments regarding storm water control or treatment and monitoring, pollutant fate and transport, and drainage planning." (It is recommended that EPA review the requirements imposed by individual delegate states for individual capable of conducting stormwater permit inspections and create a reasonable compilation). Examples of those with demonstrated knowledge and experience might include, but may not be limited to, EnviroCert's Certified Professional in Industrial Stormwater Permitting (CPISM), their Certified

Professional in Stormwater Quality (CPSWQ), applicable National Registry of Environmental Professional certifications in stormwater management, a licensed Professional Engineer with experience in stormwater quality management, etc.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Visual monitoring of discharges may be a simple and effective enough method to determine if there is high turbidity in the runoff. "Low risk facilities" could include those that have met their benchmarks or are inactive. Inspector qualifications should be documented in the SWPPP, but requiring a certification for small facilities seems excessive.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

*9. EPA Should Not Adopt an "Inspection-Only" Tier for Certain Facilities.*

Commenters agree with EPA's decision not to create an "inspection-only" category that exempts certain facilities from benchmark monitoring. The NAS suggested that EPA consider providing an "inspection-only" option in lieu of monitoring *if* it "can reduce the burden on small, low-risk facilities."[56] However, as EPA has acknowledged, the "inspection-only" option "may not be a viable alternative and [] benchmark monitoring may be more cost effective for operators."[57] Therefore, this option would not actually reduce the burden on small, low-risk facilities. Commenters also point out that this "inspection-only" option would be even more expensive

771

than estimated by EPA's Cost Impact Analysis. This is because EPA's own analysis does not take into account the additional costs an "inspection-only" option would put on the Agency. For example, the additional tasks of reviewing inspection reports and following up with inspectors would be extremely resource- and time-intensive for Agency staff.

Also, the Proposed 2020 MSGP includes no clear provisions or guidelines for operators, inspectors, and EPA staff on the factors that would trigger additional inspections, corrective actions, or benchmark monitoring. This would burden permittees and the rest of the public with unnecessary uncertainty regarding compliance with and enforceability of the MSGP for these exempt facilities. Further, EPA's Cost Impact Analysis does not take into account the costs of any follow-up inspections that would be borne by the facility.

[56] NAS at 54-55.

[57] U.S. Envtl. Prot. Agency. Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (2020) at 50.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

As EPA acknowledges, "categorizing low-risk facilities that would be eligible for an inspection-only option is somewhat challenging."[58] If EPA were to adopt an "inspection-only" option, the Agency would also have to adopt the recommendations laid out in the NAS study to define this category.[59] Among other things, EPA would have to require:

1. Publicly accessible,[60] facility-level determinations verified by certified inspectors;[61]
2. A demonstration that each facility has a low likelihood of discharging toxic substances in toxic amounts using specific criteria such as those suggested by the NAS;[62]
3. A demonstration that the facility has a "small area" of exposed industrial activity, where "small area" would be formally defined as roughly equivalent to "less than 0.5 to 1 acre";[63]
4. A demonstration that the facility is well-managed.

Further, if this option is adopted, the final 2020 MSGP permit would have to spell out the factors that would trigger follow-up inspections, benchmark monitoring, and/or corrective actions, along with enforceable timetables.

[58] Fact Sheet at 58-62, Part 4.2.1.1.

[59] NAS at 54-58.

[60] *Id*. at 56.

[61] *Id*. at 55-58.

[62] *See id*. at 57, Table 3-3.

[63] *Id*. at 55.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rebecca McGrew
**Commenter Affiliation:**  North American Coal Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed 2020 MSGP would require universal benchmark sampling for pH, total suspended solids (TSS), and chemical oxygen demand (COD). NACoal posits the proposed universal benchmark monitoring requirements serve as a data collection mechanism rather than a meaningful process to address environmental protection. The proposed benchmark value for TSS (100 mg/L) is not representative of regional stormwater discharges, rather it represents a median concentration developed by the National Urban Runoff Program. The TSS benchmark value is well below naturally occurring levels of TSS in stormwater in many parts of rural United States where mining typically occurs. The TSS benchmark therefore is not justifiable to protect water quality or to use as a determining factor of a permittee's BMP effectiveness.

The COD test is a method of estimating how much oxygen would be depleted from a body of receiving water as a result of biological oxidation of labile organic (i.e. carbon-based) pollutants. The COD test is commonly required for wastewater discharges where elevated levels of organic material are possible. Organic compounds are not used in the process of mining coal even though coal itself can be considered organic. The difference is coal is generally considered a recalcitrant source of carbon and is resistant to biological weathering.[1] Labile organic pollutants, capable of causing oxygen depletion in receiving streams, are uncommon in the mining space and are not expected to be present in stormwater runoff. Inclusion of COD as a universal benchmark parameter seems arbitrary and unnecessary.

[1] http://www.soilquality.org.au/factsheets/organic-carbon-pools (last accessed 5/19/2020)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**Inspection-Only Option for "Low-Risk" Facilities**

NACoal supports EPA's proposal to create an inspection-only option for "low-risk" facilities in lieu of benchmark monitoring. NACoal encourages the agency to consider the following recommendations on potential ways to identify facilities that would be eligible for this option, what frequency would be appropriate for such an inspection, what the inspection should entail, and what qualifications or certifications required of an inspector.

EPA acknowledged that identifying low-risk facilities that would be eligible for an inspection-only option is challenging. The NRC study provided some potential recommendations in Table 3-3 but ultimately left it to EPA to develop "concrete and implementable criteria conditions" for low-risk facilities. The NRC Study recommended that EPA define and create this category to ease the burden on "small, low-risk facilities while improving stormwater management" but also explained that a small size is not necessarily determinative of "low-risk." Specifically, the NRC Study stated that a low risk facility is one that "should have a low likelihood of discharging toxic substances in toxic amounts, generally have a small area of exposed industrial activity, and be well managed." The NRC Study envisioned "this determination to be facility based rather than sector based and would be verified by a certified inspector."

Surface coal mines are subject to regulatory oversight by the Office of Surface Mining Reclamation and Enforcement (OSMRE), a division of the U.S. Department of the Interior (DOI). Mine operations must comply with the Surface Mine Control and Reclamation Act (SMCRA) of 1977 which requires operators to "minimize the disturbances to the prevailing hydrologic balance at the minesite and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation".[4] Surface coal mines are inspected by regulatory authorities on at least a monthly basis. Due to the heavy regulatory oversight of surface coal mines, this sector should automatically be considered "low-risk".

Furthermore, NACoal operations typically rely on MSGP coverage for limited areas outside of drainage control (such as haulroads) where runoff is not otherwise captured by permitted NPDES outfalls. As a result, NACoal suggests operations may also qualify as "low-risk" if MSGP coverage is required for stormwater from non-process areas totaling less than 10% of the total footprint of the mine.

To reiterate, NACoal posits surface coal mines should be considered "low risk" because:

1. Permitted NPDES outfalls and associated ponds must be in place prior to disturbance.

2. Extremely low likelihood of discharging toxic substances since toxic substances are not typically used. 3. Coal mines are heavily regulated, monitored on a regular basis, and are, at a minimum, inspected on a monthly basis by State and/or Federal regulators.

[4] 30 U.S.C. 1265 (b)(10)(B)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**Inspections**

NACoal does not object to the list of inspection items identified in the Fact Sheet.[5] NACoal does not believe that an inspection must be conducted by a Professional Engineer (PE). Hiring a PE will increase the cost of the inspection-only option without bringing additional value. The 2015 MSGP required qualified personnel to prepare the SWPPP and conduct facility self-inspections. In this context, "qualified personnel" is defined as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit." We believe that qualified personnel, as described, adequately meets requirements necessary for the inspection-only option.

[5] Fact Sheet at 60.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

- Wastewater treatment facilities (Sector T) should qualify as "low risk", even if they are large, provided they have a robust stormwater pollution prevention program.
- Low risk facilities should be allowed to implement an inspection only requirement.

...

In Request for Comment 11, EPA asks whether the permit should include an inspection-only option for "low-risk" facilities in lieu of conducting benchmark monitoring, as recommended in the NAS study. EPA also requested comment on the schedule for inspections, the content of the inspections, and the qualifications of inspectors.

**MWRA believes low-risk facilities should be allowed to conduct inspections in lieu of benchmark monitoring.** The Fact Sheet suggests one inspection in the first year of permit coverage, and one in the third year; this seems reasonable. **MWRA agrees with the list of items suggested in the Fact Sheet for inclusion in the inspection:**

- Review permit and SWPPP
- Review records and provide an opinion on whether the permittee is in compliance
- Walk the site to verify that control measures are functioning and the SWPPP is accurate
- Identify other control measures that should be added
- Evaluate the degree to which industrial activities and materials are exposed to stormwater
- Provide a written report for the permittee to submit to EPA within 30 days.

The MWRA recommends that the inspections be conducted by a third-party Professional Engineer. To the extent possible, the inspection and reporting should be integrated with inspections and reports required under other programs (for example RCRA and SPCC).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**

**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, in lieu of conducting benchmark monitoring, and as recommended by the NRC study, we believe the permit should include an 'inspection only' option for 'low-risk' facilities. We request our facilities, whom had coverage under the 2015 MSGP and did not have any benchmark exceedances during that permit limit, be identified as 'low-risk' facilities if they again show no benchmark exceedances in the first full year of 2020 MSGP coverage. We believe this option can help reduce the burden on small, low-risk facilities, like ours, and eliminate potentially unreliable monitoring data, while improving stormwater management. We recommend that the new permit in Sector A differentiates between facilities that water logs like the previous MSGP permit, and low volume producers. Sector A facilities that do not water logs, or that process under 60MMbf of logs should qualify as low risk.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Frequency of inspection: Inspection frequency of two inspections per permit term is affordable (every other year after 1 year successful lab analysis monitoring), provided third-party environmental consultant could easily tie into quarterly inspections.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Contents of the Inspection: Inspections, in addition to routine quarterly inspection and quarterly visual assessment of outflow, should include checks of all areas where potential contaminants are stored for effectiveness and spill control and containment, all operational areas for effective control of potential emissions, all emission control structures and their effectiveness, and the potential need for any other emission controls.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Professional Inspector Credentials: A decade of experience in environmental regulatory work should be as good a qualification as a Professional Engineer (PE). Additionally, EPA has existing guidance on industrial stormwater monitoring and sampling, which can be found at: https://www3.epa.gov/npdes/pubs/msgp_monitoring_guide.pdf "This guidance explains how to conduct visual and analytical monitoring of stormwater discharges and can be used by facilities required to comply with the MSGP's monitoring requirements, as well as facilities subject to state-issued industrial stormwater permits. EPA may consider updating this guidance as a separate activity from the permit proposal. Although EPA recognizes the benefits of developing a new comprehensive industrial stormwater training or professional certificate program, establishing such a program would require significant time, resources, and indefinite EPA staff commitment, and is outside the scope of the permit and capabilities of EPA's industrial stormwater program at this time.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Cost of the Inspection-Only Option: As a third-party inspector, this would be a good option for the facilities we monitor as we have the ability to tie in our quarterly inspections with the two inspections per permit term via the 'inspection-only' option.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

This appears to be a good option for some facilities and CRH supports this effort in general, as it provides relief for smaller operations that may not have the resources of a larger facility or company. The applicability determination could be made by someone with a general set of qualifications, rather than a specific certification. Certainly, an individual with a professional license or certification in a field related to earth sciences could make the determination (e.g., PE, PG, or certified erosion control professionals). But, in order to expand the options available to large and small companies alike and to help keep potential costs down, we believe the determination could be made by an individual in the company that possesses demonstrable experience in the field of storm water permitting, implementation, and/or pollution prevention practices. This person may have a degree in a related earth science field, have extensive experience in storm water compliance, or have comprehensive knowledge of the facility. This would allow companies to perform this work in-house without additional cost. Additionally, the EPA should propose a definition of a low risk facility and allow for comment prior to including this provision in the permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ed Dunne
**Commenter Affiliation:**  Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0229-A1

**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Page 61 - DOEE recommends that only state or local inspectors should qualify as certified unless some certification program is created. Facilities often very loosely define "qualified personnel" and they likely are not capable of fully performing a compliance evaluation inspection.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

II.B. Professional Qualifications/Credentials

The NAS Report and EPA proposal raise the question of what qualifications are needed for the activities associated with stormwater inspections, monitoring, etc. Simplot does not believe that an inspection must be conducted by a Professional Engineer (PE) or by other similar accreditations (Professional Geologist). EPA has not made the case or presented any information as to what additional expertise or skills a PE brings in regards to stormwater inspections and stormwater management. Hiring a PE will increase the cost of the inspection-only option. The 2015 MSGP required qualified personnel to prepare the SWPPP and conduct facility self-inspections. In this context, "qualified personnel" is defined as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit."[6] We believe that qualified personnel, as described, adequately meets requirements necessary for the inspection-only option.

[6] Fact Sheet at 61.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Simplot requests that universal benchmark monitoring not apply to "low risk" (light manufacturing) facilities such as warehouses and food processing facilities. The EPA factsheet suggests comprehensive inspections should apply at "low risk" facilities in lieu of benchmark monitoring. EPA suggests two comprehensive inspections be conducted by a professional inspector during the 5-year term of the 2020 MSGP. An environmental consultant or Simplot environmental professional has prepared the Stormwater Pollution Prevention Plans (SWPPPs) for Simplot-MSGP regulated facilities and regular inspections are conducted by qualified personnel trained in stormwater, including the comprehensive annual inspection currently required by the 2015 MSGP and the proposed 2020 MSGP. Facilities that already have a robust stormwater management program in place should not be required to perform additional comprehensive inspections. In addition, if a third party consultant (especially a registered professional engineer or professional geologist) is required to perform comprehensive inspections, then these inspections would be very costly to perform due to the extensive travel time required to reach remote sites. Therefore, annual comprehensive inspections are sufficient for "low risk" facilities in lieu of universal benchmark monitoring and a professional inspector should not be required.[12]

[12] Rather than "professional inspector" (whatever than means), the real focus should be on "qualified environmental personnel."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

If benchmark monitoring performed under the 2015 MSGP did not result in any exceedances at a facility, then this outcome should qualify a facility for inspection-only status in lieu of universal benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

**Typical examples of "low risk" industrial activities might include:**

- Facilities with minimal industrial activities exposed to stormwater;
- Facilities where all fueling activities are conducted under cover or on a fueling pad;
- Facilities with little to no handling of industrial materials, where these handling activities may be exposed to precipitation; or
- Facilities which had coverage under the 2015 MSGP and did not have any benchmark exceedances during that permit term; or did have a benchmark exceedance, but amended their SWPPP and did not have repeat exceedances.

These types of facilities pose a much lower risk of contaminating surface waters with industrial stormwater discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

**Inspection Frequency:** The first professional site inspection could be conducted within the first year of permit coverage, and the second inspection could occur in the third year of permit coverage, with two total inspections over the permit term. We agree with this approach as a reasonable option for inspection frequency.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

**Contents of the Inspection:** The inspection could include the following, or a combination thereof:

- Review the permit and the Stormwater Pollution Prevention Plan (SWPPP); include in the report a detailed description and professional opinion of whether and/or to what degree the SWPPP meets the requirements set forth in the permit;
- Review all permit-related records, including self-inspection reports; include in the report a detailed description and professional opinion of whether and/or to what degree the facility is complying with the permit and meeting the goals of the SWPPP;
- Walk the facility site and verify that the SWPPP is accurate and that the SCMs are in place and functioning; include in the report a detailed description and professional opinion of whether and/or to what degree the SWPPP is accurate and that the SCMs are in place and functioning; and
- Identify in the report additional control measures or other actions the facility needs to take and the timeframe by which those measures or actions should be completed to effectively manage stormwater pollution.
- Consideration of the degree of exposure of industrial activities and materials at a facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

**Inspection Follow up:** Operator must submit the original, unmodified inspection report from the professional inspector to the EPA electronically within 30 days of the inspection.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Qualifications of Inspector: We recommend requiring a Professional Engineer (P.E.) or "qualified personnel". We recommend the following definition of "qualified personnel" should be modified to include the following:

- Individuals who are not involved with day to day operation or oversight of the facility being inspected;
- Who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention;
- Who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality; and
- Who have the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit.

These individuals could include private third party contractors, or an employee of a parent corporation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)
**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

### III. UWAG Supports, with Further Clarification, Inspection-Only Monitoring for "Low-Risk" Facilities

The NAS Panel recommended that EPA allow low-risk facilities to undergo a site inspection by a permitting authority or certified inspector in lieu of benchmark monitoring requirements in the proposed 2020 MSGP. NAS Panel Report, at 54-55. UWAG generally supports allowing "low-risk" facilities the option for an inspection in lieu of benchmark monitoring and suggests that EPA recognize that Sector O facilities would generally qualify as "low-risk." In particular, UWAG recommends that EPA provide the following clarifications:

- UWAG supports EPA's proposal to consider facilities with "light manufacturing" standard industrial classification (SIC) codes, as listed in 40 C.F.R. § 122.26(b)(14)(xi), "low-risk" facilities that qualify for the inspection-only option. Proposed Fact Sheet, at 59-60. Based on their SIC code of 3510, steam electric generating facilities would be deemed "light manufacturing" facilities that are eligible for the inspection-only option. UWAG agrees that "light manufacturing" facilities, like those included in Sector O, should be deemed "low-risk" because they "exhibit a lower risk of contributing to water quality problems via stormwater discharges." Id. at 60.

- Alternatively, if Sector O facilities are ultimately not deemed low-risk, UWAG recommends that EPA allow facilities to demonstrate that their individual outfalls meet the qualifications to undergo site inspections in lieu of benchmark monitoring. Some facilities contain outfalls that historically have not discharged elevated levels of pollutants. Allowing such outfalls to qualify as "low-risk" will allow facilities to focus their resources to monitor and inspect outfalls at more industrially active areas.

- UWAG also generally supports EPA's proposal to allow facilities to qualify as "low-risk" if they were covered under the 2015 MSGP and did not have any benchmark exceedances during the permit term. For purposes of this inquiry, however, EPA should clarify that exceedances that occur because of natural background concentrations of any benchmark threshold should not eliminate facilities from consideration as "low-risk." Therefore, UWAG suggests that EPA specify a clear natural background exemption for Sector O facilities – similar to what EPA proposes for its AIM Tiers. Proposed Fact Sheet at 10. Likewise, in light of its proposed removal of the iron benchmark, previous exceedances of the iron benchmark should not disqualify a facility from being deemed "low-risk," given that EPA plans to remove that benchmark for the reasons discussed above.

- EPA seeks feedback on whether "qualified personnel" are sufficient for the professional, third-party inspection envisioned for the inspection-only option for "low-risk" facilities. Proposed Fact Sheet at 62. It is also considering requiring a Professional Engineer (PE) qualification. Id. UWAG opposes EPA's proposal to require that inspections be conducted by a PE. Such a requirement would be particularly onerous for "Qualified Facilities" under the SPCC program, which are allowed to self-certify their SPCC plans. The definition of "qualified personnel" in the Proposed 2020 MSGP provides sufficient credential requirements for the inspection-only option for "low-risk" facilities. Neither the current MSGP nor other similar regulations require inspections by certified PEs. In particular, the 2015 MSGP and 2020 MSGP mandate only that "qualified personnel" prepare the Stormwater Pollution Prevention Plan (SWPPP) and facility self-inspection. The 2015 MSGP and Proposed 2020 MSGP define qualified personnel as "those who are knowledgeable in the principles and practices of industrial Stormwater controls and pollution prevention, and who possess the education and ability to assess the conditions at the industrial facility that could impact Stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit." 2015 MSGP, Appendix A, at 7; Proposed 2020 MSGP, Appendix A, at 7. UWAG believes qualified personnel are sufficiently capable of conducting facility inspections for the

inspection-only option proposed by EPA. EPA retains authority to require follow-up action if needed. Based on these considerations, UWAG believes that the PE requirement is unnecessary, and the additional cost associated with a PE certification is an unnecessary and unwarranted additional burden.

- UWAG recommends that the proposed contents of any inspection reports associated with this category not be more burdensome than other similar programs, such as the Occupational Safety and Health Administration's (OSHA) Process Safety Management (PSM) program or EPA's Risk Management Plan (RMP) program. According to the Proposed Fact Sheet, EPA is considering whether it should require operators "to submit the original, unmodified inspection report from the professional inspector to EPA electronically within 30 days of the inspection." Proposed Fact Sheet, Part 4.2.1.1, at 61 (emphasis added). UWAG is unaware of other programs that require such reports. UWAG opposes any provisions that would require the submission of additional information currently not required by other similar programs. It should be expected that inspectors could make adjustments to their reports as needed based on, for example, communications with facility personnel who can provide information based on their experience and familiarity with the facility.

- UWAG also recommends that EPA provide "low-risk" facilities an option to undergo a "compliance audit," similar to the approach used in EPA's RMP, as an alternative to inspections. See 40 C.F.R. § 68.58. Under EPA's RMP rule, owners or operators of regulated facilities must inspect their facilities at least every three years to determine they are in compliance with their RMPs and develop a report of their findings. Id. § 68.58(a). Owners or operators must respond to each of the report's findings and document what actions, if any, are taken to address any deficiencies. Id. § 68.58(c)-(d). The Agency believes this approach ensures that RMPs are up to date and being implemented and helps owners and operators to identify problem areas and take corrective actions. See, e.g., EPA, Office of Solid Waste and Emergency Response, General Guidance on Risk Management Programs for Chemical Accident Prevention (2004). In the MSGP context, a facility could conduct a similar inspection to evaluate the elements of the facility's SWPPP and allow the facility to provide an explanation or response to any deficiency, including a corrective action date. Based on the compliance audit and corresponding report, EPA could decide whether the "low-risk" facility should be required to conduct benchmark monitoring. This approach would provide facilities an alternative to the inspection-only approach proposed by the Agency while ensuring that facilities maintain a continuing commitment to stormwater management improvement and implementation of provisions in their SWPPPs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

The inclusion of an inspection-only alternative to benchmark monitoring for low-risk facilities is supported by ACI-NA members. Such an option would not only encourage permittees to limit industrial activities conducted onsite, it would also encourage facilities to perform such activities in areas with minimal impact to stormwater runoff (i.e. indoors). The airport industry participated in a group stormwater permit application leading up to the first 1995 MSGP. Based on extensive data collected across the country and analyzed by EPA, the Agency concluded that airports generally were low-risk, with the exception of those that use greater than 100,000 gallons of deicing fluids or 100 tons of urea. As discussed below, EPA's Deicing Effluent Limitations Guidelines essentially banned the use of urea by mandating extremely costly stormwater collection and treatment requirements. Hence, only airports that use greater than 100,000 gallons of deicing fluid should be subject to benchmark monitoring, if at all. EPA does not have any other information that demonstrates that any other airport category is anything other than "low-risk." As such all other airports should be subject to EPA's "low-risk" inspection protocol.

In addition, airports that use significant quantities of deicing fluid also should be able to demonstrate that they are "low-risk" either through past monitoring data that demonstrate that they do generally meet benchmarks. Finally, airports also should be able to demonstrate that they are "low-risk" despite the use of significant deicing fluids by engaging in the type of assessment set forth in the NRC report at Table 3-3. Airport-specific criteria might include considerations, such as:

- The storage of industrial materials and chemicals indoors,
- The use of self-contained trash containers,
- Minimizing exterior material staging except for those materials or final products manufactured for outdoor use,
- Minimizing exterior vehicle or equipment maintenance activities, except, for example, vehicle washing that is plumbed to the sanitary sewer system or away from stormwater drainage,
- Stormwater runoff does not impact impaired waters, and
- No reportable releases have occurred at the facility in the past 3 years that impacted the stormwater drainage system.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Walgenbach
**Commenter Affiliation:**  National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 11 – NRMCA agrees that the MSGP should include an option for "low risk" facilities. The inspection frequency for these facilities should be conducted semiannually. NRMCA suggests identifying facilities that would be eligible as "low risk" through their NAICS Code, and specifically for the ready mixed concrete industry, facilities that produce under a certain cubic yardage threshold. NRMCA requests, specific to ready mixed concrete facilities, that an acceptable qualification for an inspector would be those that complete NRMCA's comprehensive Environmental Course. Such inspections should include the parameters outlined by EPA in the proposed MSGP's accompanying Fact Sheet[3]. The annual inspection and its elements should be documented by the inspector and kept on file for any potential EPA review.

[3] EPA Proposed 2020 MSGP, Fact Sheet, page 60

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Benjamin J. Beller
**Commenter Affiliation:**  Nebraska Public Power District (NPPD)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

If benchmark monitoring is to be required for all sectors, NPPD would support an inspection-only option for all facilities in lieu of benchmark monitoring. NPPD does not believe this option should be limited to certain types of facilities. Even among the same types of industries, within the same SIC code, there can be a wide range of stormwater pollution risk. If a facility is able to meet the requirements for an inspection-only option, regardless of their Sector or SIC code, then they should be eligible. In terms of how to identify low-risk facilities, NPPD supports the proposed criterion which involves using benchmarking data from the previous permit term. If a facility had coverage under the 2015 MSGP and did not have any benchmark exceedances or had a benchmark exceedance but amended their SWPPP and did not have any further exceedances, then they should be categorized as "low-risk" and eligible for the inspection-only option as long as the potential pollutants at the facility has not changed significantly.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Benjamin J. Beller
**Commenter Affiliation:** Nebraska Public Power District (NPPD)
**Document Control Number:** EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

For the inspection-only option, NPPD believes that one inspection per permit term would be sufficient. If any practices or potential pollutants at the facility have significantly changed, another inspection might be necessary.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

ATA requests that benchmark monitoring be sector-specific and that low-risk sectors continue with quarterly visual monitoring in-lieu-of benchmark monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

ATA agrees with EPA in that inspectors should possess basic qualifications whether through professional licensing, training accreditation, or other certification means.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requested comments on whether the permit should include an inspection-only option for "low-risk" facilities in-lieu-of conducting benchmark monitoring, as recommended in the NRC study as well as comments on ways to identify facilities that would be eligible for an inspection-only option, what frequency would be appropriate for such an inspection, what the inspection should entail, and what qualifications or certifications an inspector should have.

ATA's primary concern is how best to define and identify "low-risk" facilities. The following are possible criteria for consideration on ways to define such facilities:

- A facility that maintains a robust spill clean-up training/certification program.
- A facility that carries at all times ample spill clean-up supplies that are quickly and readily available.
- A facility with competent/informed site personnel that have received proper training.
- A facility with a robust site, location, and equipment inspection/audit program that is supported and enforced by on-site and corporate management.
- A facility that participates in at least an annual corporate-sponsored inspection/audit/training program with follow-up conclusions and recommendations.
- A facility with a sound relationship with local emergency authorities.
- A facility with a sound site security measures program.
- Low potential surrounding environmental receptors.
- A facility with adequate secondary containment that was designed into the initial or subsequent construction process.
- Any facility where stormwater is not discharged to a water of the United States or a Municipal Separate Stormwater Sewer System.
- Any facility where stormwater is not discharged to a listed impaired water as defined under Section 303(d) of the Clean Water Act.
- Any facility located in an area where the annual average precipitation amount is typically lower than the national average so the stormwater discharges will be minimal.
- A facility without any documented spills or releases within a fixed number of years or quarters.
- Quarterly inspections are conducted by an environmental professional or trained individuals following a prescribed inspection format or checklist.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 11**

The FWQC and FSWA support the inspection-only option suggested by the NRC as well as other compliance streamlining considerations for "low-risk" facilities.[27] As an initial matter, the FWQC and FSWA recommend that "light industry," as defined in 40 C.F.R. § 122.26(b)(14)(xi), be automatically defined as "low-risk." Those "so-called" category xi facilities have been considered "low risk," light industry sites since EPA devised its stormwater program in 1990. EPA conducted its Phase 2 stormwater study before developing its Phase 2 regulations in 2000, and determined that no further industrial or commercial sources should be regulated by its stormwater permitting regulations. In other words, the category xi light industries represent the line between the types of sites subject to NPDES permits and those that remain subject to Congress's outright permitting exemption contained in CWA Section 402(p)(1).

In addition to the category xi light industries, facilities in sectors that EPA determined were sufficiently "clean" in 1995 and did not warrant benchmark monitoring (and have not since 1995) also should be defined as "low risk." EPA's group stormwater permit application program in the early 1990s allowed industry sectors to collect national stormwater discharge data and apply for industry-specific permits. EPA was overwhelmed with over 1,100 such applications, leading to its development of the MSGP. In developing the first MSGP in 1995, EPA analyzed thousands of data points to determine potentially "higher-risk" sectors that would be subject to benchmark monitoring, and "lower-risk" sites subject to visual inspections. EPA has no better information now than before to change its determination and somehow turn those lower-risk sectors into higher-risk. Hence, those "clean" sectors in 1995 should continue to be "low risk" until EPA has information suggesting otherwise, which it would have included in its 2020 Proposed MSGP if it had such data.

As an incentive for EPA to obtain additional stormwater data (a need identified by the NRC), EPA also could make available a process similar to the group stormwater application process where existing sectors subject to benchmark monitoring could demonstrate on a national basis that their stormwater discharges have improved to the point of becoming similar to other "low-risk" sectors and quality for the annual inspection related to low-risk.

EPA should also allow individual facilities to be considered "low risk" if the permittees have prior data that indicate that average benchmark values are below benchmarks. More recent data that show a facility is below benchmarks are likely the result of years of implementing BMPs that would reflect the benefits of process changes, focus on "no exposure" where possible, and improved collection and perhaps even treatment. Those sites that may be working towards No Exposure, or that have other controls in place that demonstrate through benchmark monitoring to be working, also should be "low risk."[28]

Finally, EPA also should review the NRC Table 3-3 "activity related" criteria that can be used as evidence of low exposure, and hence, low risk. The criteria set out by the NRC would be evidence of a "well-managed" site, or perhaps could be applied across sectors to confirm that such sectors are "low risk." This "low-risk" option would be assessed entirely independently of benchmark or other monitoring, which the FWQC and FSWA have argued have limited benefits, as discussed above.

[27]Conceptually, the FWQC and FSWA believe that any facility could become "low risk" through a number of methods, including by industrial sector or by various data collected and analyzed by the individual facility, regardless of sector. For example, a facility that is not in a "low-risk" category but conducts most or all of its operations indoors, should qualify as a "low-risk" facility. In this regard, a "low-risk" facility within a theoretically "higher-risk" sector should have the opportunity to submit information or evidence to EPA showing that it is a "low-risk" facility.

[28] Also, an existing facility should have the ability to gather new data to demonstrate "low risk." There may be process changes, manufacturing changes to expand indoor activities, changes in raw materials, changes in raw material handling, etc. that will allow a facility to now be considered "low risk" and may not be able make the demonstration based on historical data. Also if an existing facility becomes subject to a new benchmark and not in a "low risk" sector, they should be able to gather test data to determine if a "low risk" facility for that parameter.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA Request for Comment #11, an inspection-only option for low-risk facilities in lieu of benchmark monitoring is reasonable. This could be an option for facilities in certain

light industrial categories as described in the proposed MSGP, and/or facilities that have met applicable benchmarks during previous permit terms. We suggest that this should also be considered as an option for individual drainage areas/outfalls at a facility rather than only being considered facility-wide. For example, if a facility met applicable benchmarks for one drainage area/outfall but not another, they might be eligible to use the inspection-only option for the drainage area/outfall that qualifies. If an inspection-only option is included in the MSGP, it should be incorporated into the existing requirements for routine facility inspections performed by permittees.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**Sector P Should Be Classified as "Low-risk" with the Option of Using the "Inspection Only" Option Without Benchmark Monitoring**

AAR supports as an alternative to benchmark monitoring the "Inspection Only" option for Sector P and other low risk sectors. In these comments AAR has demonstrated that railroad facilities should be considered low risk with the option of opting for an "Inspection Only" program without benchmark monitoring. Any railroad facility that prefers this option should be allowed to use it.

As discussed in the 2020 MSGP Fact Sheet "Inspection Only" monitoring would entail a facility inspection by a qualified professional inspector (QPI) twice during the 5-year permit period. Such inspections could occur during the first and third years of the permit. The inspection could be performed by a third-party Professional Engineer ("P.E.") or parent company P.E. that is not directly involved in the day-to-day operations and oversight of the facility. The QPI would prepare and certify the inspection report.

The content of the inspection and report should be as follows:

- Review the permit and the Stormwater Pollution Prevention Plan (SWPPP); include in the report a detailed description and professional opinion of whether and/or to what degree the SWPPP meets the requirements set forth in the permit;
- Review all permit-related records, including self-inspection reports, include in the report a detailed description and professional opinion of whether and/or to what degree the facility is complying with the permit and the SWPPP;

- Walk the facility site and verify that the SWPPP is accurate and that the Stormwater Control Measures (SCMs) are in place and functioning; include in the report a detailed description and professional opinion of whether and/or to what degree the SWPPP is accurate and that the SCMs are in place and functioning. As with the EPA Spill Prevention, Control, and Counter Measures Rule the QPI can designate an experienced person under his control to perform the facility inspection;
- Identify in the report additional control measures or other actions the facility needs to take and the timeframe by which those measures or actions should be completed to effectively manage potential stormwater pollution; and
- Consider the degree of exposure of industrial activities and materials at a facility.

The data supporting the classification of Sector P generally, and the rail industry specifically, as "low-risk" is supported further below.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Bill Arcieri
**Commenter Affiliation:** Henniker Sand and Gravel
**Document Control Number:** EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Part 4.2.1.1 Inspection Only Option for Low Risk Facilities: We fully support allowing for the "inspection only option" for low risk facilities in lieu of benchmark monitoring and especially universal benchmark monitoring. This option should be widely available for a most facilities rather than a minority and should account for broad range of eligibility criteria such as facility size, type of operations, amount of material processed or stored onsite, previous benchmark results, proximity to receiving waters, good housekeeping measures and the type and number of stormwater controls.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

In the alternative, if EPA adopts universal benchmark monitoring, it should allow eligibility for an "inspection-only" option for "low-risk" facilities based on four different alternative options, including the Standard Industrial Classifications (SIC) code "light industry" option. The Agency should not create new inspection requirements for facilities and inspectors should not be required to be from third parties or possess a Professional Engineer (PE) license.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

FBIA members would support a low-risk inspection-only option for the food and beverage sector with a workable inspection program. If EPA determines that a low-risk inspection-only option is appropriate, it should be applicable to the food and beverage industry, including the entire sector SIC Code 20. This section identifies four alternate definitions that warrant the "low-risk" facility definition.

In its 2020 MSGP Fact Sheet, the Agency proposes the "light industry" designation as its primary option for as qualifying as low risk.[79] As we discussed above, SIC code 20 represents the food industry manufacturers and the entire SIC 20 is included in light industry.

[79] 2020 MSGP Fact Sheet at 60.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt:**

*A. EPA "Light Industry" Designation Should Qualify Food Sector as Low-Risk*

As we discussed above in section IIIA,[80] the 1990 "light industry" designation was based on low exposure related characteristics of the facility operations, and that EPA reaffirmed this finding in the 1999 Phase II final regulation.[81] We support EPA's use of the "light industry" designation to qualify for "low-risk" status. The "light industry" designation originated in a 1990 rule that identified low exposure industries based on criteria that are essentially similar to what is suggested by the NRC alternative. In this alternative, activity-based criteria would be used to identify low-risk facilities.[82] This "light industry" definition covered SIC Codes: Facilities under SIC Codes 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221-25.[83] The SIC code 20 represents the food industry manufacturers and is included in light industry. Other FBIA members would fall into other SIC codes on this list that would be covered by this light industry definition.

EPA estimates that light industry facilities number only 436 out of an estimated 2200, or roughly 20% of the universe, which we believe is a reasonable proportion.[84] Under this definition, 80% of the facilities would still be subject to full chemical monitoring.[85]

*B. The Alternate Designations for "Low Exposure in 1995" or "Low Exposure in 2015" Should Qualify Food Sector for Low-Risk Status*

We suggest that either designation "Low Exposure in 1995" or "Low Exposure in 2015" (the most recent available data) should qualify the sector for "low-risk" designation. Again, as discussed above in section IIIB, Sector U3 which constitutes the bulk of Sector U, was found to be "low exposure" in the 1995 rule based on EPA's data review of benchmark exceedances.

Further, the 2015 NRC data, as discussed above, also establishes U3 as "low exposure" in 2015. We urge EPA to allow facilities without new data to employ the 1993 group application data (which is extensive) to qualify as low-risk. Those with adequate 2015 data should be subject to qualify as low-risk with 2015 data. The low-risk test should be based on the 1995 test,[86] the median sector facility pollutant concentration should be below the benchmark concentration. This was the case for subsector U3.

[80] See page 10 of comments above.

[81] Id; 64 Fed. Reg. 68722 (December 8, 1999).

[82] See 2019 NRC Report Table 3-3 at 57.

[83] 40 CFR 122.26(b)(14)(xi).

[84] EPA's estimate of total facilities is 2,400, but based on legacy data issues, is only accounting for 2,200 in its analysis.

[85] However, we also believe that is reasonable to exclude other facilities, based on other reasons, such as demonstrating low volumes of contaminated runoff through data. For example, we endorse EPA's additional low-risk definition of excluding facilities from monitoring where the facility met all the benchmarks in the previous permit.

[86] We note that the NRC specifically endorsed the 1995 EPA median facility test as the one the agency should continue to use. 2019 NRC Report at 30-31.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

*C. Low Exposure in 2015 Permit Should Qualify a Facility for Low-Risk Status*
Facilities in sectors that did not qualify under the sector tests above, could qualify as an individual facility. EPA proposed this alternative in the 2020 MSGP Fact Sheet.

*One other possible criterion could be that the facility had coverage under the 2015 MSGP and did not have any benchmark exceedances during that permit term; another possible criterion could be that the facility had coverage under the 2015 MSGP and did have a benchmark exceedance but amended their SWPPP and did not have repeat exceedances.[87]*

FBIA supports this EPA recommendation in addition to the sector approaches recommended above. It is the facility-based version of the "Low Exposure in 2015" option for those sectors that are currently conducting chemical monitoring. Such an option should be available to facilities that show low pollution concentrations, just as a sector could qualify as "low-risk" as a sector.

[87] 2020 MSGP Fact Sheet at 60.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,

**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

*D. Table 3-3 NRC "Activity-Based Low-Risk" Criteria Can Be Developed*

We understand that it is difficult to establish national low exposure criteria for the purpose of designating individual facilities (not industry-wide) as "low-risk."[88] NRC suggested that EPA formulate more specific activity-related criteria to qualify facilities as "low-risk." The "light industry" designation originated in the 1990 rule that identified low exposure industries based on criteria similar to the NRC activity-based criteria used to identify low-risk facilities.[89] Since all of the food industry qualifies as "light industry," developing such criteria for food industry or other like-light industry facilities could be feasible. While an activity-based option for facilities could provide a workable alternative approach, this is significant undertaking that should be done outside of the permit writing process. If EPA wishes to further explore this option, the food and beverage industry would be willing to engage with EPA to develop industry-specific criteria.

[88] The NRC stated: "These criteria are intended to lead to a determination that the type, intensity, and extent of industrial activities are unlikely to generate discharges of pollutants of a kind and a quantity that may cause or contribute to water quality problems in receiving waters. The intent is to create a category of facilities that do not meet the rigorous criteria of "no exposure" but encompass facilities with activities that are small but nonzero in spatial extent, frequency, intensity, and/or presence of residuals. 2019 NRC Report at 56.

[89] See 2019 NRC Report Table 3-3 at 57 and Option discussed in Section VI.D of this letter.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 36
**Excerpt Status:** Final

**Comment Excerpt:**

**VII. Inspection – Only Option: EPA Should Retain Existing Inspection and Reporting Requirements in Parts 5 and 7 of the Permit and Not Add Requirements**
EPA requests comments on three elements of the inspection-only option relating to the scope of

the inspection and qualifications of the inspector. We are concerned that EPA and the NRC failed to acknowledge existing inspection and reporting requirements, developed over the last 25 years, which more than adequately ensures that facilities develop and implement appropriate SWPPP requirements to minimize stormwater pollution. The current inspection requirements provide a comprehensive list of routine site inspections, visual assessments, evaluations, and reporting, all in compliance with SWPPPs to minimize stormwater contamination and ensure an effective stormwater program.

The existing requirements in the 2015 MSGP permit are more than adequate.[90] These are found in Part 2 (control measures); Part 3 (inspections including quarterly visual assessments of outfalls); Part 4 (corrective action); and Part 7 annual report, reporting and recordkeeping. These mark an evolution and enhancement of the original permit provisions that EPA deemed adequate in 1995.

[90] The 2015 MSGP Fact Sheet describes all applicable requirements. EPA-HQ-OW-2019-0372-0004.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, FBIA opposes an inspection requirement that demands use of an independent inspector or an inspector with Professional Engineer (PE) qualifications. The industrial stormwater program and the construction stormwater program have developed a large cadre of qualified personnel over almost three decades. Many states have developed their own requirements for stormwater inspectors. Training courses to develop qualified personnel are abundant. Facilities should have the flexibility to utilize the most appropriate expert to conduct facility inspections. An in-house expert is more likely to have the expertise necessary to conduct the appropriate inspection than a third-party engineer who is unfamiliar with the facility and its SWPPP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

In an analogous situation, EPA proposed that facilities retain the services of an independent expert for compliance with EPA's chemical Risk Management Plan – a proposal that was widely criticized by industry commenters and chemical experts alike, including FBIA members.[94] In the final 2019 chemical Risk Management Program rule, EPA agreed with most industry commenters who indicated that in-house experts would be preferable to outside consultants because these experts have much greater familiarity with the site and issues that need to be addressed.[95]

Early in the currently rulemaking, the non-PE qualified stormwater inspectors sent comments to the docket promoting their skills, and asserting that the PE credential is not unnecessary, but that stormwater qualified personnel are to be preferred. It should be an easy call for the Agency to reaffirm the definition of qualified personnel already in the 2015 MSGP for this purpose and proposed in the 2020 MSGP without change. EPA admits it didn't take the time to evaluate the needed qualifications, and just made a conservative choice based on the NRC inspection-only option to ensure that the facility would continue to be a "low-risk" source of stormwater contamination.[96] EPA has spent 25 years building a robust inspection and reporting MSGP regime, and qualified inspectors and inspector trainers have met the challenge in the marketplace.

[94] EPA described industry comments on the proposed Risk Management Program which echo our comments above: "Many commenters stated that the Amendments rule's requirements for auditor competency and independence would make it difficult for companies to find and afford qualified auditors, and that EPA provided no evidence that internal auditors were insufficiently objective or competent to perform audits. Several industry trade associations commented that it is false to assume that third parties are more capable, credible, and objective than a facility's own audit staff." 84 Fed. Reg. 69834, 69875 (November 29, 2019).

[95] Id. at 69834.

[96] See 2020 MSGP Fact Sheet at 61.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Beth Goodnough
**Commenter Affiliation:** Western Fuels Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

<u>Inspection-Only Option for Low-Risk Facilities</u>: We support inspection-only in lieu of benchmark monitoring. As explained above, Wyoming mining facilities are heavily regulated for stormwater, SPCC, SMCRA and NPDES and therefore are good candidates for this option.

Benchmark monitoring is inappropriate for the mining sector since the benchmarks were inappropriately established. Quarterly visual inspections, robust annual inspections, and routine maintenance completed by qualified professionals should be considered an acceptable alternative to the proposed quarterly universal benchmark monitoring. Visual assessments and routine maintenance are more effective in protecting water quality than meaningless routine water monitoring.

Wyoming coal mining operations should qualify for the "low-risk" inspection only option since:

- The Wyoming MSGP permit requires mining operations to route pit dewatering, facilities and process area runoff through NPDES management facilities. Therefore, there is only a small amount of runoff that is managed under the MSGP program.
- Wyoming mining operations have a high level of regulatory oversight and other comprehensive protections in place. Mining operators should quality as low-risk facilities since they are strictly regulated under layers of federal and state laws, regulations, and permitting requirements. As explained previously, Wyoming mining operations are regulated under both SMCRA and NPDES programs as well as hundreds of other regulations and permitting requirements. Federal or state inspectors visit our sites at least monthly to ensure compliance with various laws, regulations, and permits. SCMs are inspected by highly trained LQD staff at least quarterly at SMCRA mines. This level of federal and state oversight is unheard of in any other industry sector.
- Finally, Wyoming coal mining operations are incredibly well managed facilities that employ, directly and indirectly, professional hydrologists, geologists, engineers, permitting specialists, soils specialists and other environmental experts that have deep technical and practical expertise in the field. EPA should consider the expertise that facilities employ part of its determination of whether a facility is low risk.

EPA has proposed requiring eligible low-risk facilities to undergo two "comprehensive site inspections" during their permit coverage instead of conducting benchmark monitoring. One inspection would occur during the first year of the permit coverage and the second would occur during the third year of the permit coverage. We support this option, if the mines can use in-house staff.

It is impractical to automatically require a third-party inspector for the low risk option, nor that an inspection be conducted by a Professional Engineer (PE) or similarly credentialed individual. Hiring a PE will increase the cost of the inspection-only option. The 2015 MSGP required qualified personnel to prepare the SWPPP and conduct facility self-inspections. In the 2015

MSGP, "qualified personnel" is defined as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit."[5] We believe that the 2015 definition of qualified inspection personnel is adequate. In house staff have more experience with the environment at the site, the locations of the controls, readily available maintenance equipment, materials, and available nearby contractors. Hence are more readily equipped to identify and resolve issues found during inspections. Also, at MSHA regulated facilities, outside personnel must be escorted by in-house MSHA trained personnel. The mining sites are so large and roads to locations change so frequently that outside contractors cannot safely find the sites without the in-house escort. Hence, bringing in a third-party inspector is impractical since the same in-house staff have to go to the sites anyway.

[5] Id.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

**c. CCIG Supports an Inspection-Only Option for "Low-Risk" Facilities.**

CCIG supports an inspection-only option as an alternative to universal benchmark monitoring for facilities that have a low risk of their stormwater discharges significantly contributing to water quality problems. This option would free low-risk facilities from unnecessary and minimally helpful testing requirements while improving stormwater management through inspections, which can provide unique opportunities to educate facility operators on the most effective ways to improve stormwater management. If EPA adopts this option, CCIG recommends that the Agency require quarterly inspections only during the first year of the MSGP and that those inspections be limited to visual inspections of active discharges at permitted outfalls. Additionally, CCIG requests that EPA not require inspectors to be licensed professional engineers. Other certified and recognized professional stormwater organizations can and do provide similar services at a level equivalent to what a licensed professional engineer can provide.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Although EPA should consider a variety of factors when determining whether a facility qualifies as low-risk, certain types of facilities categorically should be deemed to be low-risk. These facilities would include, among others, the following:

- Those facilities identified earlier in Section II.D.1.b of these comments.
- Facilities that have small areas that are exposed to industrial activity that could pose water quality pollution risks.
- Facilities located in areas that historically experience low levels of rainfall that impact surface waters (*e.g.*, desert or arid environments).

In a similar vein, there may be certain types of facilities that categorically would not be deemed to be low-risk. With this in mind, CCIG recommends that EPA not determine that Effluent Limitation Guidelines ("ELG") applicability would preclude a facility from qualifying as low-risk. Facilities subject to ELGs under 40 C.F.R. Part 423—depending on their location, size, and other factors—are capable of posing low risks related to stormwater discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

The division would support a potential option of inspection only for low risk sites instead of benchmark monitoring requirements. Many facilities in Colorado already claim no discharge due to the arid nature of the climate. In addition, many permittees are challenged by the complexity of the DMR submittal process. An allowance of inspection only at low risk sites allows facilities

to devote more resources to high quality inspections versus paying consultants or facility personnel to submit DMRs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection-Only Option (Proposed MSGP 4.2.1.1, request for comment 11). AEMA supports EPA's proposal to create an inspection-only option for "low-risk" facilities in lieu of benchmark monitoring. EPA acknowledged that identifying low-risk facilities that would be eligible for an inspection-only option is challenging. The NRC Study provided some potential recommendations in Table 3-3 but ultimately left it to EPA to develop "concrete and implementable criteria conditions" for low-risk facilities. 2019 NRC Study at 57. Overall, active mine facilities are subject to comprehensive and effective regulatory controls pertaining to water management and intensive oversight by regulatory agencies. For example, all materials such as waste rock typically must be characterized and shown to be inert prior to construction use. Secondary containment is common for all fuel and hazardous chemical transport, storage and use, and spill response and contingency plans are required at mine sites. All process related water is fully contained in net evaporation settings, or reused or discharged under an individual NPDES permit in settings where precipitation exceeds net evaporation. Mine sites are typically required to immediately stabilize and reclaim areas that are no longer in active operations. Trained environmental professionals are employed at mine sites to monitor all aspects of environmental compliance, including Stormwater Pollution Prevention Plan ("SWPPP") implementation. As such, Sectors G and F stormwater discharges covered by the MSGP generally pose minimal risk of causing water quality impacts and should be eligible for low risk designation and requirements. One option would be to make designation of low risk facilities based on the permittee's certification that there is negligible risk of pollutant releases above benchmarks (as documented in the SWPPP and considering background and other site-specific issues) regardless of the overall sector designation of the facility. In addition, for the mining sector, low risk areas could also include runoff from reclaimed and stabilized areas and/or facilities constructed of inert materials (also as documented by the permittee). Finally, AEMA could also support allowing facilities to move to low risk designation after multiple years of monitoring showing no exceedances of the benchmark values (considering estimates of background and other site-specific issues) and where facility operations and stormwater discharges do not change over time.

As for inspection requirements associated with "low risk" facilities, we do not believe a separate, comprehensive oversight process is needed. In our experience, the primary mechanism for ensuring compliance with the permit requirements is verification of SWPPP implementation. Except for benchmark monitoring, all other SWPPP requirements would continue to apply to low risk facilities. Self-verification and documentation of SWPPP compliance has worked successfully for decades at mine sites with independent oversight provided through frequent agency inspections. Presumably, facilities would have to certify that they adhere to the low risk eligibility requirements and continue to document such conditions throughout the permit term. Neither the 2019 NRC Study nor EPA has proven the need for a separate inspection system. Finally, if EPA does establish separate inspection requirements, we suggest a single inspection during the permit term is sufficient to demonstrate compliance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

WEF questions the value of the universal benchmark monitoring as compared to the inspection-only option since the industrial stormwater permitting program, dating to the early 1990s, has led to many facilities to have eliminated rainfall contact with industrial activities and have eliminated rainfall contact with industrial activities and have maintained a Stormwater Pollution Prevention Plan (SWPPP). WEF notes that "Industrial stormwater sampling generally requires outside contractors; most industrial facilities will not have proper sample equipment or staff to collect samples. Sampling to capture the correct storm quarterly will necessarily include more than 4 mobilizations per year. Analytical costs will be small, the sampling costs will be significant." For this reason, WEF considers an inspection-only option to be appropriate and necessary for this permit.

WEF also looked at the value of this data. One exceedance in a quarter does not show a trend or identify a problem that needs to be fixed. In addition, there is a time delay of waiting on sample results or another storm event to confirm the data. If the objective is to communicate to the discharger when to act, then this is not an efficient method.

WEF concurs with the discussion in the Fact Sheet Request for Comment addressing the identification of "low-risk" facilities; Categorizing and defining such facilities is somewhat challenging and has not yet been adequately addressed. WEF concurs with the discussion in the Fact Sheet Request for Comment that size alone may not fully represent the risk profile. WEF

recommends that EPA establish a definition of "low risk" in the 2020 MSGP and agreed that the definition needs to be distinct from that of "no-exposure."

Finally, WEF recommends that EPA clarify what "low risk" is, before it proposes any substitution for benchmarks. Providing no quantitative decision on what "low risk" is will cause a lot of confusion.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection only for "low-risk" facilities runs into a number of issues for collection system managers in that there is then no information that can be effectively used to find sources of pollutants they are detected either in their collection system monitoring or their receiving water monitoring programs. If an inspection only option is to be included, WEF recommends that it be done after a minimum of 3 years of benchmark monitoring is completed for the "low-risk" facilities and that "low risk" be defined as all activities conducted indoors, in actuality, not "typically." Note that we are finding in California that air discharges from a manufacturing process can sometimes result in sufficient concentrations of some constituents in stormwater to exceed benchmarks. The clean air act does not permit to protect water quality, so operations can continue to cause or contribute to an exceedance of a water quality criteria, which is ultimately imposed on local collection system operators as TMDL waste load allocations. If there are no industrial permit monitoring requirements, we would not know that, so an inspection-only option is not likely to adequately address ongoing impairments in receiving waters overall.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** National Association for Surface Finishing
**Document Control Number:** EPA-HQ-OW-2019-0372-0262-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should specifically identify surface finishing facilities as low-risk facilities, or alternatively, establish clear and reasonable criteria on how a facility would qualify as a low-risk facility. As discussed above, the addition of universal benchmark monitoring would be unduly burdensome for surface finishing facilities and would produce minimal environmental benefits. Accordingly, NASF supports providing low-risk facilities an inspection-only option to demonstrate the effectiveness of a facility's SCM in lieu of benchmark monitoring. This could help minimize the unnecessary burdens on surface finishing facilities and ensure that human health and the environment are protected.

The proposed inspection frequency of twice per permit term would be sufficient to evaluate the effectiveness of a facility's SCM. In addition, by eliminating quarterly benchmark monitoring facilities would be able to reallocate resources to more productive activities to promote environmental compliance.

The inspection-only option for low-risk facilities should not require the use of a third-party firm. Requiring third-party engineering and consulting firms to conduct the inspection would be expensive and burdensome for many small businesses in the surface finishing industry. As an alternative, EPA should establish criteria for the inspections that could be conducted by facility personnel that are responsible for implementing SCM without the need for a third-party consultant.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

The permit should include inspection-only for "low risk" facilities. Eligibility should be self-certified, similar to NEC, and annual inspections for recertification should be required.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victor Ventura
**Commenter Affiliation:** Los Angeles Department of Water and Power (LADWP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

LADWP supports the EPA's decision to include inspection-only options for "low-risk" facilities. LADWP suggests the EPA consider generating stations as "low-risk" facilities that could qualify for inspection-only options. Providing the opportunity to inspect "low-risk" facilities would eliminate the need for expenditure of resources on monitoring and reporting requirements that would not otherwise be needed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Victor Ventura
**Commenter Affiliation:** Los Angeles Department of Water and Power (LADWP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, LADWP believes that a storm water professional without a Professional Engineer (PE) license could be qualified to inspect a low risk facility with certain training and certifications. The requirement of allowing only a Professional Engineer inspect the facility to be exempt from conducting benchmark monitoring is limiting and expensive, where another professional certification could be adequate. Such as Enviro cert provides certifications for storm water professionals and these types of certifications could be utilized/accepted by the EPA. LADWP believes that "qualified personnel", defined in the MSGP as "those who are knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and who possess the education and ability to assess conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit,[1]" can perform the inspection to the highest regard of stormwater management and stormwater quality. LADWP believes to only allow a PE inspect the facility is too limiting and could place a shortage on the needed resource. The qualified personnel who are responsible for the development of the Stormwater Pollution Prevention Plan (SWPPP), should be sufficiently capable to perform the professional, third-party inspection for the inspection-only option for "low-risk" facilities.

[1] Multi-Sector General Permit Fact Sheet, page 49-50, accessed May 20, 2020 from: https://www.epa.gov/sites/production/files/2020-02/documents/final_proposed_2020_msgp_-_fact_sheet.pdf

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

First, we support the inclusion of a "low risk" classification under which a facility would be authorized to perform periodic inspections in lieu of Universal Benchmark Monitoring. We believe that the areas in which aircraft operate or maintained or serviced at airports constitute excellent candidates for inclusion in such a classification for at least three reasons. First, these aircraft operations areas are held to high standards by the FAA to ensure the safety of the traveling public. Second, these areas are inherently intolerant of the presence of spills and other pollutant sources for which the NRC Report argues that pH, TSS and COD are especially qualified indicators.[31] Finally, airports maintain and report on any spills that do occur under any number of other programs (notably, the SPCC program and related provisions of the Act's Oil Spill Prevention Program) and, thus, create a superior documentary record of precisely the kinds of events that the NRC report states are capable of being detected by monitoring the three proposed pollutants because it captures all such events instead of relying on monitoring to coincide with a spill event. We recommend that the final permit account for these characteristics, either by making them criteria for inclusion in a "low risk" category, or by expressly including the areas in which aircraft operate or are maintained or serviced at airports that serve commercial aviation as "low risk" for this purpose.

[31] The other two kinds of events that the NRC argued could be detected by monitoring of pH, TSS and COD – process upsets and treatment system failures – are not of concern in the aviation setting, where there is no traditional production "process" capable of being upset, and in the vast majority of cases the quality of stormwater runoff is protected by Best Management Practices (including pollution prevention measures), and not through traditional wastewater treatment systems.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1.RFC12. Required Monitoring - RFC 12 Chemical-specific benchmark monitoring

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

Sectors with new benchmarks

I agree that benchmark monitoring should be required for Sector I, P and R

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports EPA's decision to include additional benchmark monitoring for Sectors I (Oil and Gas Extraction), P (Land Transportation and Warehousing) and R (Ship and Boat Building and Repair Yards); however, BES does not think it is necessary to include total recoverable mercury as a Sector P benchmark monitoring requirement. The National Academies of Sciences' study referenced above recommended mercury be added to benchmark monitoring for this sector based on information from Toxic Release Inventory (TRI) data; however, mercury emissions reported in TRI data are generally indicative of air emissions from total releases from the transportation industry, not representative of emissions at a stormwater discharge point(s) on the facility itself. Mercury emitted from sources in this sector is transported into the atmosphere and deposited in water. BES believes that requiring facilities to sample stormwater on their site will likely not yield useful data. Removing mercury as a sector benchmark will help to reduce the burden of increased monitoring for operators in Sector P.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Randall M. Lyons
**Commenter Affiliation:** Massachusetts Marine Trades Association (MMTA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Absent clear explanation from EPA, and in response to "Request for Comment 12," we strongly request that the Boat Building and Repair sector and the Water Transportation sector be exempted from NPDES permitting, or at least from the 2020 MSGP's required benchmark monitoring under Part 4.2.1.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Chemical-specific benchmark monitoring proposed in Part 8 for Sectors P and R.

Sector P - Land transportation and warehousing. Suggested metals for Sector P are Lead and Mercury. Sector P should have additional subsectors for the long list of SIC numbers as Mercury may not apply to all listed SICs. SIC 4111 is defined as "Establishments primarily engaged in furnishing local and suburban mass passenger transportation over regular routes and on regular schedules, with operations confined principally to a municipality, contiguous municipalities, or a municipality and its suburban areas." Testing for Mercury should not apply to SIC 4111.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1

**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Sector R - Ship and boat building and repair yards.

The benchmark values for Copper in Table 1 in Proposed Appendix J shows that if the hardness value of the receiving water is 250 mg/L or greater, then the benchmark for copper will be 33.2 ug/L (0.0332 mg/L as listed in 2015). When researching copper levels and checking with Massachusetts' requirements, I noted that both the state and federal Action Level for public drinking water is 1.3 mg/L. I also checked the Massachusetts Contingency Plan and found in 40.0362 (1)(a) and (b): Reportable Concentrations that there are two categories for groundwater, RCGW-1 and RCGW-2 (1)(a) Reporting Category RCGW-1. Reporting category for all groundwater samples obtained:

• within a Current Drinking Water Source Area; or
• within a Potential Drinking Water Source Area.
(1)(b) Reporting Category RCGW-2. Reporting category for all groundwater samples that are not obtained from category RCGW-1 areas.

The reportable concentrations in groundwater for RCGW-1 is 10 mg/L and for RCGW-2 is 100 mg/L. The benchmark values for Copper in Table 1 in Proposed Appendix J needs to be updated to reflect realistic values.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Nina Schittli
**Commenter Affiliation:**  Blymyer Engineers Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment: Recommend Oil & Grease for Sector P instead of mercury and lead**
We recommend Oil & Grease as a more appropriate sector-specific indicator for Sector P facilities for the following reasons:
The primary sources of mercury to the environment are emissions from the combustion of products containing mercury, resulting in atmospheric accumulations that can be deposited in soil and water. Additional sources of mercury include legacy coal and mercury mining, cement production, chloralkali production, petroleum production and mining, and waste incineration.

Sector P facilities use petroleum products, which can contain trace amounts of mercury, in fueling and maintenance activities. However, these activities do not produce combustion emissions and are unlikely to contribute mercury to the environment.

*References:*
*Wentz, D.A., Brigham, M.E., Chasar, L.C., Lutz, M.A., and Krabbenhoft, D.P., 2014, Mercury in the Nation's streams— Levels, trends, and implications: U.S. Geological Survey Circular 1395, 90 p., http://dx.doi.org/10.3133/cir1395.*
*Wilhelm, S. M., Mercury in Petroleum and Natural Gas: Estimation of Emissions from Production, Processing, and Combustion, U.S. Environmental Protection Agency, Washington, D.C., EPA/600/R-01/066, 2001.*

Like mercury, the primary source of lead in the environment also comes from combustion of materials containing lead, producing atmospheric accumulations. Additional sources of lead include mining, lead paint in older buildings and accumulations from leaded fuels before they were banned in 1978 and 1996, respectively. It is very unlikely that these activities take place at Sector P facilities. Automotive batteries contain lead and may be utilized in vehicle maintenance activities, which are commonly performed indoors. Widely practiced battery-handling SCMs include indoor storage and battery recycling to prevent contact with stormwater.

*Reference:*
*Agency for Toxic Substances and Disease Registry, Lead Toxicity, 2017.*
*https://www.atsdr.cdc.gov/csem/lead/docs/CSEM-Lead_toxicity_508.pdf*

Among the most commonly-used potential pollutants at Sector P facilities are petroleum-based fuels and lubricants. Analyzing for Oil & Grease will be an effective method for detecting the presence of these pollutants in stormwater runoff. We recommend Oil & Grease as a more appropriate sectorspecific parameter for Sector P facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 4.2.2.1 – Request for Comment 12 – Why lead and mercury for Sector P?  Lead and mercury, where sampled previously, have never been an issue and are always much

lower than the benchmarks or not detectable. What is the justification for lead and mercury for sector P, what would be the source of concern?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

We believe the Sector R testing proposed for Chromium III/ Chromium VI is unnecessary as it has not been an additive in the products we utilize. While some larger players in this sector may utilize products with this ingredient, we do not. More new required tests and remediating will lead to evermore complexity to the SWPPP that we already find a burden to work with.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Provide comment on chemical-specific benchmark monitoring for Sectors I, R and P (Transportation and Warehousing).

Discussion/Recommendations

Sector P (Transportation and Warehousing) is a concern to any Sector A and B facility due to the definition of "co-located activity" in Appendix A. Since most facilities have significant trucking and warehouse operations, this sector could be construed to also apply. Regardless, a facility

should not have to automatically monitor for added parameters (i.e. lead and mercury) if those activities of fueling, vehicle maintenance etc. are not exposed, are not practiced on site or have no or little exposure.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 4.2.1.1.a. Universal and Sector-specific Benchmark Monitoring (Request for Comment 12):***

Regarding whether the addition of total recoverable mercury is appropriate for addition to industrial Sector P as a monitoring parameter, data are provided in Attachment 2 for an existing Sector P facility that contains warehouses, heavy equipment shops and storage yards for asphalt and soil for reuse. The attached data suggests it is not appropriate, as mercury was non-detect it all samples.

*Recommendation:*

Do not include total recoverable mercury as a required benchmark monitoring parameter for Sector P.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Sector I – Oil and Gas Exploration should continue under the 2015 MSGP. EPA, State, and RRC guidelines are strict for bore hole up flow waste waters to be collected, treated and recycled.

Sector P – We disagree. Many SIC's fall into this Sector with strict regulations regarding Control Measures, SWPPP, House Keeping regarding storage, cleaning, maintenance, fueling, transfers, etc. Certain industries that are more subject to PAH's are covered by EPA for storage and transfers that eliminate potential for pollutants in storm water. This Sector would be considered low risk, therefore qualifying for "Inspections" rather than benchmarks.

Sector R – We agree.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Expansion of Monitoring to Three New Sectors:  NAIMA and its members oppose requiring universal benchmark monitoring for pH, TSS, and COD.  In addition, a facility should not have to automatically monitor for added parameters such as lead or mercury if those activities of fueling, vehicle maintenance, and related activities have little or no exposure or are not conducted on the site.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, benchmark monitoring is appropriate for sectors I, P and R

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 39
**Excerpt Status:** Final

**Comment Excerpt:**

The NAS also recommends PAH monitoring for two specific sectors. Regarding the Oil and Gas sector (Sector I), the NAS noted that "[s]pills and leaks can also lead to petroleum hydrocarbon contaminants in stormwater, including PAHs, which have been shown to be highly toxic to aquatic life. Chemical-specific monitoring is appropriate for this sector to ensure that stormwater is appropriately managed."[112] The NAS said the same thing about the Motor Freight and Transportation sector (Sector P),[113] and EPA notes that the same reasoning applies to Sector R (Ship and Boat Building and Repair Yards).[114]

[112] *Id*. at 29 (internal citations omitted).

[113] *Id*. at 30.

[114] Fact Sheet at 62.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 43
**Excerpt Status:** Final

**Comment Excerpt:**

***14. EPA Should Adopt its Proposal to Establish Sector-Specific Benchmark Monitoring for Sector I (Oil and Gas Extraction), Sector P (Land Transportation and Warehousing), and***

817

***Sector R (Ship and Boat Building and Repair Yards) in Accordance with the
Recommendations by the National Academies and Other Certain Revisions.***

Commenters urge EPA to adopt its proposal to include new sector-specific benchmark
monitoring requirements for Sector I (Oil and Gas Extraction), Sector P (Land Transportation
and Warehousing), and Sector R (Ship and Boat Building and Repair Yards).[120] However, EPA
should also revise its proposal to require PAH benchmark monitoring for Sectors I, P, and R in
accordance with the recommendations of the National Academies and by the Commenters, as
discussed more fully in the preceding comment section. EPA should also include additional
benchmark monitoring requirements for Sectors I, P, and R as described below.

[120] Fact Sheet at 62.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 44
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should require operators in Sector I (Oil and Gas Extraction) to conduct benchmark
monitoring for radium and other radionuclides, radioactive constituents, or appropriate surrogate
or indicator for technologically enhanced naturally occurring radioactive material associated with
oil and gas extraction. Studies have demonstrated significant and widespread radioactive
contamination by drilling fluids and wastewaters (including "brine") from hydraulic fracturing
and other conventional methods of oil and gas extraction.[121] The land application of wastewaters
from oil and gas extraction is permitted within several jurisdictions, including New Mexico, for
dust suppression, road deicing, road maintenance, and/or for disposal onto or within the land
upon which oil and gas extraction facilities are located.[122] Permitted land applications or other
pathways for stormwater exposure of wastewater at oil and gas extraction facilities covered by
the MSGP may result in stormwater discharges contaminated by radioactive constituents that
reach receiving waterways and contribute to violations of applicable surface and drinking water
standards. EPA must adopt stormwater controls to address discharge of radioactive constituents
by facilities in Sector I.[123]

[121] Tasker TL, Burgos WD, Piotrowski P, et al. Environmental and Human Health Impacts of Spreading Oil and Gas Wastewater on Roads. *Environ Sci Technol*. 2018;52(12):7081-7091. doi:10.1021/acs.est.8b00716 (attached); Lauer NE, Warner NR, and Vengosh A. Sources of Radium Accumulation in Stream Sediments near Disposal Sites in Pennsylvania: Implications for Disposal of Conventional Oil and Gas Wastewater. *Environ Sci Technol*. 2018 *52* (3), 955-962. DOI: 10.1021/acs.est.7b04952; Nelson AW, May D, Knight AW, Eitrheim ES, Mehrhoff M, Shannon R., Littman R, and MK Schultz. Matrix Complications in the Determination of Radium Levels in Hydraulic Fracturing Flowback Water from Marcellus Share. *Environ Sci Technol. Lett.* 2014; *See also*, Justin Nobel. America's Radioactive Secret. *Rolling Stone*, Jan. 21, 2020. Available at https://www.rollingstone.com/politics/politics-features/oil-gas-fracking-radioactive-investigation-937389/.

[122] Tasker TL, et al.; *also* Troutman MA. Still Wasting Away: The Failure to Safely Manage Oil and Gas Waste Continues (May, 2019) at 18 and 60-63. Available at https://earthworks.org/cms/assets/uploads/2019/06/National-Phase-1_WastingAway_2.0-5-2019.pdf.

[123] Conference of Radiation Control Program Directors, Inc. E-42 Task Force Report Review of TENORM in the Oil & Gas Industry, (June, 2015) at 24, 73-76 (attached), Publication No. CRCPD E-15-2. Available at https://www.epa.gov/radtown/radioactive-waste-material-oil-and-gas-drilling.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 45
**Excerpt Status:** Final

**Comment Excerpt:**

The Transportation and Warehousing Sector (P) has quite literally an outsized footprint in the Chesapeake Bay watershed, for example, especially in Pennsylvania – and also likely in other states which host key shipping and goods distribution centers along, or at multiple intersecting Interstate highways. Break-bulk and major warehouse and highway-related trucking facilities are a dominant land use in parts of Pennsylvania where several Interstate highways intersect, where major north-south interstate routes (I-95, I-81) carry freight along the heavily populated East Coast corridor, and where east-west routes connect East Coast shipping ports with Midwestern population centers.

Land transportation and warehouse facilities of 50-75 acres in size are not unusual, and additional attention is required for their stormwater loads. While the Commonwealth of Pennsylvania issues its own stormwater permits for Pennsylvania's industrial facilities, its industrial stormwater general permits have regularly hewed very closely to EPA's MSGP -- just as the MSGP serves as a basic template for many other states across the country. As such, the MSGP should attend closely to this sector.

Sector-specific benchmarks appropriately include total recoverable lead and mercury benchmarks (e.g. 1.4micrograms/L for the former, depending on water hardness, which is listed); these are important toxic pollutants and relate directly to various types of transportation equipment and fuels.[124] But these alone are insufficient. Benchmarks should be established for more prosaic stormwater runoff pollutants, such as nitrogen, phosphorus, total suspended solids, and indeed, water volume itself -- since the massive impervious surfaces, from rooftops to parking and service areas in these sizeable warehousing and shipping centers, generate extensive runoff subject to large and fast-moving volumes of water, which either carry nutrient (N and P) and sediment or contribute to such loading by blowing out stream banks and beds. These physical configurations lead to significant adverse water quality impacts in streams and rivers and should require specific controls related to those specific pollutants.

[124] Draft Permit at 93, Part 8.P.6.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  46
**Excerpt Status:** Final

**Comment Excerpt:**

Sector-specific benchmarks for Sector R (Ship and Boat Building and Repair Yards) are long overdue and must be included in the Final MSGP. Copper-based bottom paint is customarily applied to the bottom of ships and boats for its anti-fouling properties. Blasting, refinishing, and painting activities at ship and boat yards often result in the release of copper laden overspray, paint chips, and dust, which can easily pollute stormwater and receiving waters. Additionally, ship and boat yards often engage in engine maintenance and repair, parts cleaning, metal working, welding, cutting and grinding – industrial activities which are known to produce heavy metals pollution.[125] Despite the fact that heavy metals are often associated with Sector R's industrial activities, previous iterations of the MSGP have failed to require ship and boat yards to

analyze their stormwater samples for heavy metals. Commenters appreciate that the Agency has adopted NAS's recommendations[126] in favor of including sector-specific benchmarks for Sector R in the 2020 MSGP.

In response to the Agency's Request for Comment 12(127) for any data related to Sector R, Commenters have attached a compilation of self-reported industrial stormwater sampling results from Sector R facilities located in California for the heavy metals chromium, copper, lead, nickel, and zinc.128 Of the more than 80 Sector R facilities in California, approximately 30 analyzed their industrial stormwater samples for heavy metals in the past five years. As evidenced by the attached sampling results, heavy metals are present in stormwater discharged from Sector R facilities, and thus must be monitored and controlled across this entire industrial sector.

Accordingly, the Agency must include sector specific benchmarks for Sector R for chromium (III), chromium (VI), copper, lead, nickel, and zinc in the Final 2020 MSGP.

[125] NAS at 30.

[126] *Id.* at 30.

[127] Fact Sheet at 62.

[128] Commenters downloaded from California's Stormwater Multiple Application and Report Tracking System (SMARTS) database self-reported parameter results (i.e. chromium, copper, lead, nickel, and zinc) for Sector R (i.e., SIC Codes 3731 and 3732) for facilities located in California (attached).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 12. The proposed 2020 MSGP requires sector-specific benchmark monitoring for total recoverable lead, total recoverable mercury, and hardness at Sector P - Land Transportation and Warehousing facilities. Leaded fuel was banned

in 1996, which was over 20 years ago. <u>Simplot requests the proposed sector-specific benchmark monitoring requirements in Part 8 for Sector P be removed</u> since leaded fuel use was banned so long ago it would be inappropriate to sample for these parameters in the proposed 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  31
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 12**

The FWQC and FSWA oppose the expansion to these three new sectors. As discussed above, EPA established a process in the 1995 MSGP for determining which sectors warranted monitoring and for what pollutants. The proposed expansion does not result from the kind of robust industry-specific analyses that went into the 1995 permits.

For example, Sector P (Transportation and Warehousing) operations can affect Sector A and B facilities due to the definition of "co-located activity" in Appendix A. Because most facilities have significant trucking and warehouse operations, this Part could be construed to apply also to Sectors A and B. Regardless, a facility should not have to automatically monitor for added parameters (i.e. lead and mercury) if those activities of fueling, vehicle maintenance, and related activities have little or no exposure or are not conducted on site.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

**Proposed Mercury and Lead Benchmark Monitoring Are Neither Justified Not Needed for Sector P**

TRI Data Evaluation is Not Appropriate for Sector P as the Vast Majority of Sector P facilities are Not Subject to TRI Reporting.

EPA's proposal to require facilities in Sector P to monitor for mercury and lead appears to be based entirely on a 2005 memorandum from an EPA contractor, Tetra Tech.[16] Tetra Tech's recommendations were based on its 2005 assessment of Toxic Release Inventory ("TRI") responses for discharges to stormwater for Sector P for the years 1998-2002.[17] The O'Donnell Memo also notes that the TRI data for its analysis was limited.[18] It should be noted that out of the 35 NAICS codes currently listed under Sector P, only six have ever been subject to TRI reporting.[19] More particularly, railroads have not been subject to TRI reporting. Therefore, no conclusion from the O'Donnell Memo which is based on TRI data should be used as a basis for any MSGP requirement for Sector P because TRI data is not representative of the vast majority of the industries and activities in the Sector or for railroads. Similarly, no conclusion from the NRC Study based on TRI data for Sector P should be used as basis to implement requirements for the entire Sector.

[16] NRC Study, at page 30, citing O'Donnell, J. O. [Tetra Tech] Memorandum Re: Review of 2000 MSGP Monitoring Requirements and Suggested Changes, EPA Docket EPA-HQ-OW-2019-0372-0006 (Mar. 15, 2005) (hereinafter O'Donnell Memo).

[17] O'Donnell Memo.

[18] O'Donnell Memo, at 8.

[19] Compare Proposed 2020 MSGP, Appendix N, at N-17 to N-18 with 40 CFR 372.23 (listing SIC and NAICS codes required to submit TRI reports).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Were TRI Data to be Appropriate, Evaluation of Existing TRI Data Does Not Support Lead or Mercury Monitoring.

Even if evaluation of the limited and unrepresentative TRI data would be appropriate for Sector P, the Proposed 2020 MSGP provides no analysis of this now twenty-year-old data regarding mercury or lead and no new data appears to have been evaluated for this purpose.

The Tetra Tech analysis found few mercury releases in stormwater from Sector P between 1999 and 2002. In 2005, Tetra Tech evaluated the 1999-2002 TRI reports[20] and determined that for Sector P, 96 facilities reported either mercury or mercury compounds in their TRI, and of these, nine facilities (9.4%) indicated potential stormwater loadings. It is important to note that none of these are railroad facilities. The actual concentration levels for any parameter found in stormwater are not included in the TRI assessment.

In addition, this same collection of TRI data showed that for Sector P, 301 facilities cited lead or lead products, however, only 24 (8%) indicated that the stormwater might contain lead. Again, there was no information whether the concentrations exceeded benchmark values. And, again, none of these were railroad facilities.

---

[20] EPA-HQ-OW-2005-0007-0008.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

Monitoring for Lead or Mercury for Sector P is Not Allowed Under the Clean Water Act, nor is it Supported by Actual Stormwater Discharge Data or Industry Knowledge.
As a preliminary matter, the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") regulates the "addition of pollutants" into a water of the United States by the discharging entity.[21] Recognizing this limitation, EPA's monitoring regulations[22] specify that samples and measurements taken for monitoring purposes must be representative of the monitored activity.[23] In the case of AAR's members, these would be rail activities. Where a pollutant – for example lead or mercury – is not a component of the activity, there is no authority to impose monitoring requirements for those pollutants.

Here, there is no "addition" of lead or mercury from rail operations. Indeed, for the purposes of the MSGP, railroads are unique from other Sector P industries in this sense. Indeed, though the

NRC Study suggests that some Sector P industries constitute sources of mercury and lead, those pollutants have not been identified as present or potentially present as a potential pollutant in stormwater with respect to the rail industry. This is supported by evaluation of the DMR data presented below, which confirms that there are insignificant amounts of mercury or lead in the stormwater for Sector P facilities.

Actual stormwater discharge data, with a direct and measurable correlation between lead or mercury and the rail industry, would be the only appropriate dataset to evaluate whether lead or mercury benchmark monitoring can be required for the railroads. It should be noted that a separate 2005 Tetra Tech assessment of the 2000 EPA MSGP DMR dataset did not find any benchmark analytical data for lead or mercury for the rail industry, or even for Sector P.[24] Absent this data, EPA cannot impose monitoring requirements for lead and mercury on the rail industry.

While the EPA fact sheet supporting the Proposed 2020 MSGP listed potential areas of industrial activity and chemicals used on site, it did not explain any nexus between those activities or chemicals and mercury or lead, and it did not explain how monitoring specifically for mercury and lead is justified.[25] Although the 2019 NRC Study is cited as identifying "potential sources of stormwater pollution" for Sector P, the NRC recommendation suggested only that "chemical-specific monitoring within the MSGP would be appropriate."[26] The NRC Study merely noted that greater than 25 percent of DMR results for Sector P were above benchmarks for aluminum, copper, and iron, with no mention of lead or mercury. The NRC Study did not expressly recommend the addition of lead or mercury monitoring. As such, there is no data-based, historical, or policy reason provided nor is there a clear explanation as to why these two parameters should be added to benchmark monitoring for Sector P. Without such data, EPA lacks the authority to impose such requirements.


21 See S. Fla. Water Mgt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95 (2004); Nat. Wildlife Fed. v. Consumers Power Co., 862 F.2d 580, 583 (6th Cir. 1988); Nat. Wildlife Fed. v. Gorsuch, 693 F.2d 156, 165 (D.C. Cir. 1982); Missouri ex rel. Ashcroft v. Dep't of the Army, 672 F.2d 1297, 1304 (8th Cir. 1982).

22 40 C.F.R. § 122.41.

23 40 C.F.R. § 122.21(j). See also EPA NPDES Manual at 8.11.

24 EPA-HQ-OW-2005-0007-0003.

25 EPA, National Pollutant Discharge Elimination System (NPDES) Proposed Multi-Sector General Permit (MSGP) Fact Sheet for Stormwater Discharges Associated With Industrial Activity, 62 (Draft) (hereinafter "EPA Fact Sheet").

26 NRC Study at p. 30.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

NRC Study Recommendations for Establishing New or Modified Benchmarking Do Not Show a Basis for Lead or Mercury Monitoring.
The NRC Study provided recommendations for establishing new or modified benchmark monitoring, summarized as follows:

1. Consider literature review and update industry practices and pollutant creating processes;
2. Review fact sheets, DMR (Discharge Monitoring Reports), and TRI (Toxics Release Inventory) data;
3. Review state industrial permits for new practices in stormwater chemical monitoring; and
4. Where data is lacking, acquire monitoring data for the specific chemicals over a 1-year period.

There is no evidence in the supporting documentation for EPA's proposal that any of these four steps were performed in concluding that mercury or lead should be monitored for Sector P. Without more than the TRI data that represents only a small fraction of Sector P industries, there is no justification or need for the addition of mercury and lead monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The 2015 MSGP Database Assessed in the NRC Study Shows No Significant Mercury Stormwater Releases

Using the raw 2015-2018 data (17,000 records) described in the NRC Study, Appendix E,[27] there are 157 sample data points for mercury in the 2015 MSGP database. Only four data points are from one facility in Sector P, as reproduced in Table 2 below.

**Table 2. Statistical Summary and Benchmark Comparison of 2015 MSGP Reported Results for Mercury**

| | No. Reported Results | No. Facilities | Min. (µg/L) | Max. (µg/L) | Median (µg/L) | 75th Percentile (µg/L) | Percent >BM | Percent >4× BM | Percent >8× BM |
|---|---|---|---|---|---|---|---|---|---|
| C3 | 4 | 1 | <0.2 | <4 | <0.3 | <1.3 | 25ᵃ | 0 | 0 |
| C5 | 8 | 2 | <0.00001 | 0.06 | <0.026 | <0.05 | 0 | 0 | 0 |
| G1 | 4 | 1 | <0.2 | <0.2 | <0.2 | <0.2 | 0 | 0 | 0 |
| G2 | 24 | 3 | <0.2 | 1 | <1 | <1 | 0 | 0 | 0 |
| K | 90 | 8 | <0.002 | <2 | <0.067 | 0.12 | 1ᵃ | 0 | 0 |
| N1 | 5 | 3 | <0.1 | 0.2 | <0.2 | <0.2 | 0 | 0 | 0 |
| P | 4 | 1 | 0.027 | 0.062 | 0.044 | 0.049 | 0 | 0 | 0 |
| Q | 4 | 1 | 0.06 | 0.29 | 0.095 | 0.17 | 0 | 0 | 0 |
| R | 5 | 1 | <0.1 | <0.15 | <0.1 | <0.1 | 0 | 0 | 0 |
| U3 | 8 | 3 | <0.05 | 5000 | <0.05 | 0.10 | 13 | 13 | 13 |

As the data in Table 2 demonstrates, the highest Sector P result for mercury of 0.062 ug/L is only about 4% of the freshwater mercury benchmark limit of 1.4 ug/L. Pursuant the 1995 MSGP protocol,[28] monitoring for a chemical is not justified if the median facility is below the benchmark. For Sector P, the data for the one cited facility is far below the benchmark. Given the lack of industrial activity involving mercury for Sector P, this is the expected result. Indeed, a review of the 2015 MSGP mercury data for all sectors reveals a similar pattern, even for sectors which were previously selected for mercury monitoring in previous MSGPs, as summarized below:

- Six of the nine other subsectors do not have a single mercury benchmark exceedance[29].
- In subsector K, there were 90 samples taken for mercury. Only a single sample, representing 1% of this subset, may have exceeded the mercury benchmark. However, note that the reporting limit was higher than the benchmark.
- Subsector C3 had only four samples, and again the highest and only result that exceeded the mercury benchmark was a non-detect result with a reporting limit of 4 ug/L, too high to determine compliance with the mercury benchmark.
- For Sector U3, there was one sample (out of eight, of which five others were from the same facility) that exceeded the mercury benchmark.[30]

Since at least the 2008 MSGP, EPA has required the use of test procedures with quantitation limits at or below the benchmark threshold.[31] It should be noted that all three of the mercury results in the 2015 MSGP data that exceeded the mercury benchmark were reported as non-detect, but used reporting limits that were too high and, therefore, did not meet MSGP requirements. The NRC chose to use the reporting limits shown on the DMR reports. However, for statistical purposes, the better practice is to ignore results that are inconsistent with EPA requirements. Irrespective of the approach to non-detected results, the 157 mercury data points from all sectors for the EPA 2015 MSGP data set were overwhelmingly below the benchmark,

except for three samples that were reported as non-detect but with reporting limits that did not meet the MSGP requirements.

Removing mercury and mercury products from the industrial environment has been ongoing for at least 40 years. As such, no mercury benchmark monitoring should be required for the types of facilities that were initially determined to be low risk for such pollutant discharges, including Sector P. While NRC cited the assessments of previous MSGP data evaluation by Tetra Tech, NRC made no specific recommendation that a mercury benchmark should be required for Sector P. In addition, the EPA Fact Sheet and other supporting materials make no mention that EPA considered the robust 2015 MSGP mercury database as part of its proposed mercury benchmark monitoring.

Because the 2015 MSGP data does not support that there is any significant risk for exceeding the mercury benchmark value of 1.4 ug/L, whether from Sector P or other sectors, no additional benchmark monitoring should be necessary in the Proposed 2020 MSGP.

[27] NRC Study, Appendix D at 121. "The data obtained from EPA represented sites that were required under the 2015 MSGP to report their compliance information to the NetDMR database. The period of record for reported results was from mid-2015 through February 13, 2018. The data include more than 17,000 reported results from MSGP sites in the four states where EPA has primacy for the regulations (Idaho, Massachusetts, New Hampshire, and New Mexico), the District of Columbia, all U.S. territories, Indian country, and some federal facilities throughout the United States."

[28] Fed. Reg. Vol 60, No.189, Friday, Sept 29, 1995.

[29] These subsectors are C5, G1, G2, N1, Q, and R.

[30] Note that for the eight samples, only one sample had a detected result. The NRC Study converted metals results to micrograms per liter for plotting. As such, all the non-detected results indicated that the reporting limit was either 0.2 or 0.05 micrograms per liter, except for one U3 sample, where the result was reported as less than 5 milligrams per liter. NRC recognized that this one sample greatly skewed the results for Sector U3, and agreed it was very unlikely. It appears that several other samples were taken from the same location for the same quarter (beginning on 3/16/2016) as if there was a high mercury value to be averaged. NRC stated "[b]ecause the analytical result is possible, although highly unlikely, it was retained for the analysis." Further, because the U3 Sector is for meat, dairy, other food products, and beverages, it therefore appears even less likely that the mercury contamination, if present, was due to the current industrial activity at this site.

[31] "Samples must be analyzed consistent with 40 CFR Part 136 analytical methods and using test procedures with quantitation limits at or below benchmark thresholds for all benchmark parameters for which you are required to sample."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The 2015 MSGP Database Does Not Support Lead Monitoring for Sector P

Although lead is not currently required for benchmark monitoring for Sector P, lead data is available in the EPA 2015 MSGP database. Eighty-five Sector P samples were noted to have been analyzed for lead in stormwater, including samples taken from twelve different Sector P facilities. Based on notes within the DMR dataset, most of these analyses were performed either because of State MSGP requirements or due to a facility's location in an impaired watershed where lead was required to be monitored. AECOM, on behalf of AAR, compared this raw data to the NRC Study assessment of this same data. [32] As summarized in Table 3 below, only five samples (or 6% of the samples) exceeded the lead benchmark and no facility exceeded the benchmark for four quarters. Therefore, like mercury, there is no justification for lead monitoring for Sector P based on the 2015 MSGP data.

**Table 3.  NRC versus AECOM Assessment of EPA 2015 MSGP Data for Lead in Sector P**

| NRC Sector P Data Assessment for Lead | AECOM Sector P Data Assessment for Lead | Key Parameters for DMR Lead Data, Sector P |
|---|---|---|
| 81 | 85 | count |
| 0.35 | 0.35 | minimum |
| 742 | 742 | maximum |
| 1 | 1.1 | 10th percentile (all ug/L) |
| 2.8 | 2.8 | 25th percentile (all ug/L) |
| 6 | 5.4 | 50th percentile (all ug/L) |
| 20.4 | 19.3 | 75th percentile (all ug/L) |
| 52 | 50 | 90th percentile (all ug/L) |
| 10 | 10 | Count Exceeding Soft Water BM for lead (45ug/L) |
| 12.34568% | 11.8% | percent exceeding soft BM |
| 3 | 3 | Count Exceeding Hard water BM for lead (216ug/L) |
| 3.703704% | 3.5% | percent exceeding hard BM |
|  | 5 | Count Exceeding site-specific Benchmark as per DMR (includes 4 samples labeled as "<" results with high RLs) |
|  | 5.9% | Percent Exceeding BM as Identified in DMR data (4.7% of which were samples with "<" reporting limits |
|  | 12 | Number of Sector P Facilities testing for lead in 2015 EPA DMR |
|  | 0 | Number of times avg Quarter exceeded BM for 4 quarters at same facility (MSGP criteria for corrective actions) |

Of the five samples that did not meet the facility-specific benchmark in the 2015 EPA MSGP dataset, four reported non-detect results for lead where the laboratory reporting limit already exceeded the site-specific benchmark limit. Of the ten samples that exceeded the NRC soft water benchmark of 45 ug/L, four were reported as non-detect values. These analyses do not meet the MSGP criteria for benchmark monitoring, which states: "Samples must be analyzed consistent with 40 CFR Part 136 analytical methods and using test procedures with quantitation limits at or below benchmark thresholds for all benchmark parameters for which you are required to sample." Several (but not all) of the approved EPA Methods for lead analysis can achieve reporting limits lower than the lowest lead benchmark. Had this principal been followed, many of these samples might not have been found to exceed the benchmark limits.

Based on the Sector P data in the 2015 EPA DMR dataset, although five of the eighty-five samples may have failed to meet their respective facility-specific benchmark, not one facility in Sector P had the average concentration for four successive quarters exceed their benchmark limit. The maximum lead detected was in a single sample at 742 ug/L, compared to a benchmark level of 95 ug/L for that site. However, the average of all four quarters for that year was below the 95 ug/L benchmark.

For Sector P, the 50th percentile concentration of all the data is only 6.0 ug/L, which is less than half of the lowest lead benchmark (for 0-24.99 mg/L hardness, lead being one of the parameters that has different benchmark limits depending on the hardness of the receiving stream). The NRC Study also showed that only 10 samples exceeded their selected "soft water" benchmark of 45 ug/L (with four of these samples being non-detect results with elevated reporting limits), and only 3 samples exceeded their selected "hard water" benchmark of 216 ug/L, (with two of these three being non-detected results (again with elevated reporting limits). AECOM observed that of the 85 samples in Sector P having lead results, 70 of the samples also noted a site-specific benchmark limit for lead in the DMR report. AECOM analyzed how many results were over the corresponding site-specific benchmark. (For the remaining 15 samples that did not report their site-specific benchmark, AECOM assumed a mid-level hardness benchmark limit of 95 ug/L.)

AECOM found only five samples that exceeded their site-specific benchmark, and four of those were samples reported as non-detect, but the reporting limit exceeded the hypothetical benchmark of 95 ug/L. (These four samples were among those that did not report a benchmark limit, and it may be possible those facilities used a higher reporting limit because it was under their actual, unreported benchmark.) AECOM noted that of the twelve Sector P sites that provided lead benchmark data to the 2015 EPA MSGP Database, there was no facility that was shown to have definitely exceeded their site-specific lead benchmark on average for four successive quarters, which would require corrective actions under the 2015 MSGP and the Proposed 2020 MSGP.

The above evaluation demonstrates that the underlying DMR data does not support a lead benchmark for any sector or specifically for Sector P.

[32] The AECOM analysis differs from the NAS analysis in two respects: (1) AECOM uses 85 data points, while NAS used only 81 of the available data points and (2) AECOM uses the site-specific lead benchmark to determine benchmark compliance. With regard to the first difference,

it appears that NAS did not use four samples from the EPA where the DMR failed to identify the units of measurement. However, this same facility in the DMR also reported 24 other sample results for lead, and all those results were reported as mg/L. Moreover, milligrams per liter was the largest unit reported by any facility (either micrograms or milligrams per liter were reported for lead in the DMR data), so assuming these four results were also milligrams per liter would only overestimate (if incorrect) the lead concentrations for the four stormwater samples. The results for these four samples were all detected, and ranged from 0.005 to 0.007, presumably as milligrams per liter. These results are all below the lowest (soft water) benchmark value for lead of 0.014 milligrams per liter. AECOM included that data in their assessment.

The other main difference in the AECOM analysis from the NAS assessment is that, where possible, AECOM compared the data to the actual site-specific benchmark limit (based on hardness) when it was available. This is possible because facilities reported the receiving water hardness range and/or the site-specific benchmark limit for over 90% of the samples. There was a total of fifteen samples where the actual MSGP hardness-dependent benchmark was not listed. For these fifteen facilities, AECOM assumed a benchmark value of 95 ug/L, equivalent to a hardness value of 100-124.99 mg/L. NAS based their benchmark assessments by comparing all the data for lead to both the "soft water (they assumed a hardness of 60 mg/L in the receiving stream)" and "hard water (assumed a hardness of 200 mg/L). For lead, this would mean benchmark values of 45 ug/L (soft water) and 216 ug/L (hard water), respectively. Both the NAS and AECOM approaches yield useful information, so both are included in the following assessment.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

What is the justification for lead and mercury for sector P?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

What would be the pollutant source of concern be from lead and mercury?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

WEF generally agreed that chemical specific benchmark monitoring for Sectors I, R, and P were appropriate. WEF recommends the use of oil and grease as a parameter to be measured only in those cases where appropriate (see attached Appendix A). There was also a suggestion to remove lead if it was demonstrated to not be associated with the operations.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Additional chemical-specific benchmarks are not necessary because each site is already required to conduct other monitoring as required by EPA, which can occur on a site-specific basis.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1.RFC13. Required Monitoring - RFC 13 Quarterly benchmark monitoring for entire permit term

**Commenter Name:**  Daniel Mumm
**Commenter Affiliation:**  Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: WSJM suggests adding language in this section to describe how facilities in areas with precipitation only occurring during certain months should report.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

This is consistent with the NRC study and should be included. See response to comment no. 10.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jason F. Nall, Sr.
**Commenter Affiliation:**  Kohler Co.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0124-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The additional universal benchmark parameters of pH, TSS, and COD are appropriate for facilities without a "low-risk" designation in addition to, or in lieu of, additional sector-specific benchmark parameters. However, the duration of testing over the entire permit term is not necessary for the purposes of maintaining best management practices (BMPs) when other mechanisms exist the permit for ensuring their maintenance, including routine inspections and visual assessments. Universal benchmark monitoring over the duration of the permit will generate quantifiable data in the compilation of an industrial data set, but does not serve the intent of the permit given the time scale for performance degradation of structural BMPs or conformance of operations to nonstructural BMPs which would be observed during required inspections. It is recommended that the universal benchmarking schedule follow the schedule for sector-specific benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports EPA's permit requirement that facilities be required to monitor and report for the proposed universal benchmark monitoring parameters pH, TSS, and COD (alternatively TPH), on a quarterly basis for the entire permit term to ensure facilities have current indicators of the effectiveness of their stormwater control measures throughout the permit term. BES agrees with the National Academies of Sciences report referenced above that recommends annual sampling at a minimum but only for operators who have demonstrated consistent quarterly sampling results below the benchmarks. If the final permit does not require universal benchmark monitoring for the entire permit term, an annual sample should be required. Annual sampling will assist in detecting operational changes and/or deficiencies in housekeeping, employee training or preventative maintenance. Annual monitoring may help to ensure stormwater controls are maintained and compliance with the benchmarks is still achievable.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The City suggests reducing the frequency of sampling events from quarterly to semi-annually or annually if the EPA chooses to require benchmark monitoring throughout the permit term. Alternatively, the City suggests maintaining the existing requirements and opportunities to remove constituents from the sampling program that are consistently below benchmark thresholds.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

For the Universal parameters TSS and COD
As with the sector-specific parameters, these universal parameters should be treated in the same manner and monitoring should be discontinued if the annual average does not exceed the benchmark threshold. As stated in Part 4.2.1.2.b. "Schedule for Sector-Specific Benchmarks. .... For all sector-specific benchmark monitoring parameters, you must conduct quarterly benchmark monitoring, for your first four full quarters of permit coverage... If the annual average for any parameter does not exceed the benchmark threshold, you have fulfilled your benchmark monitoring requirements for that parameter for the permit term and can discontinue benchmark monitoring for that parameter."

Unless there is a change at the facility such as construction, no change would be expected in TSS and COD results. Therefore, there is no need to monitor TSS and COD for the entire permit term. Another option would be to monitor for the length of the permit, but not require Corrective Actions and AIM.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Frederick J. McNeill
**Commenter Affiliation:**  City of Manchester, New Hampshire
**Document Control Number:**  EPA-HQ-OW-2019-0372-0145-A1

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests that EPA consider allowing a reduction in the frequency of benchmark monitoring if two years of data show thresholds are not exceeded. At that point, monitoring could be reduced to semiannually or annually for the remainder of the permit term. If exceedances occur or there are site or operational changes, quarterly benchmark monitoring would recommence. This monitoring schedule would provide relief to facilities that have shown to have little to no pollutants in their stormwater discharges while remaining protective of receiving waters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

The addition of universal benchmark monitoring for pH, TSS and COD is not reasonable. It becomes cost-prohibitive when considering that this particular sampling frequency will in essence be a tenfold increase in the typical sampling schedule. By itself, this sampling cost will make compliance with the new MSGP force a large number of small businesses to insolvency.

Requiring universal benchmarks through the entire permit term, even after repeated acceptable sampling benchmarks, could cause confusion about compliance efforts if a facility has the sector-specific benchmarks waived. Approval to waive the requirements for universal benchmark monitoring, in addition to sector-specific benchmark monitoring, after consistently demonstrating compliance, should be allowed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.

**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment: Change universal benchmark monitoring frequency to semiannual (twice per year) and require facilities to monitor the entire permit term**

We recommend that the benchmark monitoring frequency be changed from quarterly to semiannual, once in the period January 1 to June 30 and once in the period July 1 to December 31, for the entire permit term. We believe semiannual monitoring coupled with quarterly visual assessments and quarterly routine inspections will provide timely indicators of water quality. Facilities will have additional time to evaluate and implement any new SCMs that may be required before the next monitoring event and will reduce the time and cost burden on permittees while maintaining protection of water quality.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Adding new required testing on a quarterly basis will be more burden to our business. Quarterly monitoring throughout the term of the permit will be excessive and costly. We support once a year testing for these new universal benchmarks if needed. But again we have serious concerns about potential exceedances and associated costs from remedial action.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A1

**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Other suggestions include reducing the sampling frequency if quarterly sample results are stable or are very low.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Should the permit require facilities to monitor quarterly throughout the permit term for the universal benchmark monitoring.

Discussion/Recommendations

In lieu of quarterly monitoring, AF&PA suggests that any benchmark monitoring allow for 4 samples to be taken annually instead of quarterly with the first and last samples being no closer than 6 months apart. This should not require EPA approval as stated in 4.2.1.2.c. This allows facilities in regions that may have limited rainfall in certain seasons to concentrate compliance during the rainy season(s). Also AF&PA suggests that consistent with the concepts in the EPA guidance on Reduced Monitoring for NPDES permits, that monitoring can be reduced to 2/year if the first 2 year benchmark average is less than 50% of the benchmark, and to 1/year if the first 2 year benchmark average is less than 25% of the benchmark for the remainder of the permit term on an outfall-by-outfall basis.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet believes that the continuous quarterly monitoring for the life of a general permit is excessive. The NAS study stated that additional information was needed but did not get information from delegated states and associated regulated facilities but rather used a limited data pool of EPA regulated states.  This limited pool of information would indeed seem inadequate.  Perhaps a better way to gather data would be to look at the state databases and asses the information from there rather than require extra data collection. The additional testing, especially for those facilities that already meet benchmarks is not appropriate when BMPs are adequate.  Additionally, needing to have pH probes calibrated and proper laboratory collection methods will be expensive for the life of the permit.

None of this addresses the concerns over drought conditions, snow conditions etc.  Sometimes it is just no possible to collect a sample every quarter.  Sometimes the only sample available is off-shift or late at night.  These issues do exist for many facilities and the proposed requirement will only offer another opportunity for failed compliance.

*Recommendation*

Howmet believes an approach similar to Ohio would be beneficial by allowing quarterly sampling over a three (3) year period to determine the annual average.  Another approach would be to perform the quarterly sampling and then an annual sampling event.  The optimal approach would be to combine those two approaches and the annual sampling event is coupled with a visual sampling event to ensure calibration of the two sampling methods by a sampler.

**Comment Response:**

See Comment Response Essay 2 Monitoring. Additionally, as part of the 2015 MSGP Settlement Agreement, EPA agreed to fund a study conducted by the National Academies of Sciences, Engineering, and Medicine's (NAS) National Research Council (NRC) and to consider all of the recommendations suggested in the completed NRC study. NAS used an open and comprehensive process to select the study committee, which was composed of representatives from both the environmental and regulated communities. The committee collected information from individuals and stakeholder organizations representing various interests and heard from several state permitting authorities for industrial stormwater. EPA used information and resources adequate to inform development of the proposed 2020 MSGP and the final 2021 MSGP, including the NRC study in conjunction with public comments and other available information.

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Further, if universal benchmark monitoring for these parameters (pH, TSS and COD) are adopted, the permittee recommends the permit have a sunset clause based on the path available to the sector-specific benchmarks, e.g., "If the four-quarter annual average for any parameter does not exceed the benchmark threshold, the operator has fulfilled the sector-specific benchmark monitoring requirements for that parameter for the permit term and can discontinue benchmark monitoring for that parameter". Best management practice (BMP) inspections and storm event sampling for known contaminants below BMPs should be sufficient indicators of good function.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

One option to reduce the financial burden of quarterly benchmark sampling would be to sunset quarterly monitoring as described in response to EPA request for comment #10.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

*Universal benchmark burdens*

There are many possible options to reduce universal benchmark burdens, such as allowing low-risk sites to discontinue universal sampling once they've demonstrated that their discharges meet the universal benchmark requirements. This could be satisfied through one of the options below:

- No exceedance of benchmarks during the 2015 permit term with at least four samples taken.
- No exceedance of benchmarks during the first four quarters of sampling under the 2020 permit
- Exceedance of AIM Tier 1 benchmark under the 2020 permit that was corrected. Sampling during the four quarters after the correction does not exceed benchmark levels.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

EPA also requested comment on whether it should require facilities to monitor the proposed universal benchmark monitoring parameters on a quarterly basis for the entire permit term. WMA supports the elimination of benchmark monitoring in its entirety. However, if benchmark monitoring remains in place, if the annual average of the first four samples taken during the term is below the benchmark, then operators should be allowed to discontinue benchmark monitoring for that parameter for the remainder of the term. EPA has provided no justification for collecting additional data from sites that demonstrate that their stormwater control mechanisms (SCM) are effective at controlling pollutants. Visual inspections of SCM's will continue to be completed quarterly and are effective for evaluating controls and identifying any needed repairs. Visual assessments and timely repairs remain the most effective way to address stormwater discharges at industrial sites

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Darling
**Commenter Affiliation:** American Coatings Association (ACA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0168-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmarking Sunset**

If over our objection, the benchmark monitoring requirements are adopted as proposed, that EPA include a sunset provision, that after one year of benchmark monitoring and the benchmarks are not exceeded, the benchmarking provisions should be rescinded.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

If universal benchmark monitoring is required, it should be identical to how sector-specific benchmark monitoring is now handled in the EPA MSGP. (If the four-quarter annual average for a parameter does not exceed the benchmark threshold, the benchmark monitoring for that parameter can be discontinued).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

We propose that a facility should have ability to waive universal benchmark parameters just like normal benchmark parameters, if monitoring demonstrates that water quality criteria has been met.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, if the universal benchmark is included, the proposed language should be revised to clarify that annual averaging is
allowed and to add efficient and permanent off-ramps for those facilities that meet the benchmarks in the first year. Quarterly sampling for the entire permit period (and for subsequent permits) is unreasonable and of no substantive value.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, in response to request for comment 13, VMA supports the concept of reduced monitoring for quarterly benchmark monitoring. This rewards facilities that have shown through prior benchmark monitoring results that their facilities have implemented Best Management Practices well. Part 4.2.4.1 includes proposed language allowing benchmark monitoring to cease after three consecutive years of benchmark monitoring do not show any detection of the monitored pollutants. VMA submits that requiring benchmark monitoring for three years is unnecessary and that EPA should revise this provision to only require one year of benchmark monitoring and to set the threshold as monitoring results below the benchmarks, not non-detect.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 4.2.1.2.a. Schedule for Universal Benchmark applicable to all Sectors (pH, TSS, and COD) (Request for Comment 13) :***

The permit should apply the same monitoring schedule to Universal benchmarks as it does to Sector specific Benchmarks. "If the annual average for any parameter does not exceed the benchmark threshold, you have fulfilled your benchmark monitoring requirements for that parameter for the permit term and can discontinue benchmark monitoring for that parameter."

*Recommendation:*

As EPA assumes that the same protocol for exceedances [Additional Implementation Measures (AIM)] should equally apply to Universal and Sector-specific benchmarks, the same monitoring schedule should also equally apply.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

In addition to opposing the universal component of proposed Part 4.2.1.1.a, Universal and Sector-specific Benchmark Monitoring, ISRI also opposes the associated Part 4.2.1.2.a, Schedule for Universal Benchmarks Applicable to All Sectors (pH, TSS, and COD), in the Proposed 2020

MSGP. EPA also needs to reconsider the schedule for any monitoring of universal benchmarks for the 2020 MSGP.

The concept of universal benchmarks emerged from the recommendations by NASEM for "Industry-wide monitoring only" for pH, TSS, and COD (Report at 6; emphasis added):

*All facilities in sectors **that do not merit additional pollutant monitoring** would conduct industry-wide monitoring for pH, TSS, and COD. These data would provide broad, low-cost indicators of the effectiveness of stormwater control measures on site.*

EPA proposed to require monitoring of these three parameters every quarter during the MSGP term, regardless of whether the results exceed benchmark values or not. To the extent that universal benchmarks are intended to be indicators of whether a facility's SWPPP and SCMs are adequate and being properly implemented, this requirement does not make sense generally. Meeting benchmarks should end annual quarterly monitoring for any benchmark parameter. Quarterly universal benchmark monitoring might make sense specifically if a facility's industrial sector has no history of benchmarking monitoring; in this case, this quarterly monitoring would serve to provide baseline data for evaluation of potential changes to requirements for that sector. It does not make sense for the recycling industry (Sector N1) as it has conducted sector-specific benchmark monitoring for more than 25 years, including the period of ISRI's Industry Group Permit before the 1995 MSGP.

EPA needs to reconsider scheduling of any universal benchmark monitoring for the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Paul Bredwell
**Commenter Affiliation:** U.S. Poultry & Egg Association et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**1. A quarterly Universal benchmark monitoring frequency for the entire permit term of five (5) years is excessive and will impose significant burden and sampling and analytical costs on permittees.**

Avoiding Excessive Burdens: While it is understood that an improved database of benchmark monitoring data across all sectors may prove to be an invaluable tool for better understanding the relationship between industrial stormwater discharges and the water quality of receiving water bodies, the means of obtaining the data must not be an excessive burden to the individual

facilities, and is not appropriate to be collected under a strictly regulatory approach. The responsibility of collecting such data should be held by the United States Environmental Protection Agency (USEPA) or contracted third parties to develop a comprehensive database and should not fall on industrial facilities as a requirement of their MSGP coverage. It should be noted that significant stormwater monitoring data is available in state environmental regulatory agency files and databases, and the USEPA could request this information through other available channels.

Analytical Monitoring Challenges: There are various factors that make storm water analytical monitoring challenging and cumbersome. Specifically, a rain event must be a qualifying storm, the facility must be operating, sampling personnel must be available to collect storm water samples within the first 30 minutes of a discharge occurring, conditions must be safe to allow facility personnel to collect samples (i.e., lightning storms, darkness, high stream flows, outfall accessibility during certain rain events, contract laboratories etc. prohibit safe sample collection), and samples must be delivered to the laboratory for analysis within USEPA specified holding times (i.e., per 40 CFR Part 136. Many facilities are located in rural areas where local laboratories are not readily available, which requires shipping samples to contract laboratories and/or driving samples long distances to labs for drop off to meet sample holding time requirements), and other factors. Furthermore, at some facilities such as livestock and pet food feed mills, there is a limited number of staff present onsite, who are there to perform other specific duties and tasks related to feed production, plant maintenance and repairs, recordkeeping for product QA/QC and feed safety (to meet FDA requirements) purposes, etc., which further limits the ability and resources available to collect additional storm water samples.

Less Burdensome Alternatives: The practicability of performing quarterly benchmark monitoring for the five-year permit term is overburdensome, costly and unnecessary for all industry sectors. Less burdensome and more cost-effective alternatives to quarterly analytical testing for COD, TSS, pH and other industry sector specific constituents of concern are available and provide more reasonable means of evaluating storm water pollution prevention effectiveness at regulated facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring. Including discharge monitoring requirements in permits to determine compliance with permit conditions and provide data for evaluating treatment efficiencies is well-established and required by the National Pollutant Discharge Elimination System (NPDES) regulations at 40 CFR 122.48(b). As stated in the fact sheet for the 2021 MSGP, indicator monitoring for pH, TSS, and COD will provide operators and EPA with an understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control measure effectiveness at these facilities.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1

**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

No. Quarterly analysis plus Sector parameter analysis would be redundant and would burden permitted facilities with unnecessary additional costs. Only high-risk Sectors, or SIC's within a Sector, should qualify for benchmark monitoring. Low risk Sectors or SIC's within that Sector should be under "Inspections."

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Quarterly Monitoring:  NAIMA urges EPA to forego mandating quarterly testing.  The additional testing will prove to be costly and burdensome.  EPA's previous guidance is that if there is an exceedance of the universal benchmark parameters, there should be four samples to be taken annually rather than quarterly with the first and last samples being no closer than six months apart.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** American Foundry Society (AFS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0199-A2
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Second, the quarterly monitoring frequency for five years is excessive, burdensome, and unnecessarily expensive, especially for many small businesses in the metal casting industry. EPA

needs to consider effective and less burdensome ways to address these benchmark parameters, including visual monitoring and inspections as a more reasonable approach. In many cases the minimal environmental benefits expected from the quarterly monitoring do not justify the burdens posed by the monitoring frequency and the excessive costs for monitoring these new benchmark parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  22
**Excerpt Status:**  Final

**Comment Excerpt:**

**Request for Comment 13:**

**Schedule for Universal Benchmarks - pH, TSS, and COD (Part 4.2.1.2)**

EPA has requested comment on whether it should require facilities to monitor the proposed universal benchmark monitoring parameters on a quarterly basis for the entire permit term. As previously explained, NMA supports the elimination of benchmark monitoring and does not believe it should be required for these parameters. However, if benchmark monitoring remains in place, EPA should align the monitoring schedule for the universal benchmarks to the requirements of the sector-specific benchmarks. As written, the universal benchmark monitoring parameters of pH, TSS, and COD will require quarterly benchmark monitoring for each year of the permit coverage. For sector-specific benchmarks, EPA has proposed to require quarterly benchmark monitoring for the first four quarters of permit coverage. If the annual average for any parameter does not exceed the benchmark, then operators can discontinue benchmark monitoring for that parameter. Quarterly monitoring of the universal benchmark parameters for the entirety of the 5-year permit term is an unnecessary burden for permittees that have already shown no exceedances during the collection of the first four quarters of samplings. EPA has provided no justification for collecting additional data from sites that demonstrate through initial samples that their stormwater control mechanisms are effective at controlling pollutants. Visual inspections of SCMs will continue to be completed quarterly and are effective for evaluating the sites controls and identifying any repair needs. Visual assessments and timely repairs remain the most effective way to address controls on stormwater discharges at industrial sites.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Members could also support, if routine benchmark monitoring is retained, discontinuing the requirement based on a demonstrated history of consecutive samples within benchmark levels.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, instead of relying on the long-established one-year requirement of quarterly monitoring data for the three monitoring parameters (4 times per permit term), EPA has proposed five years of quarterly monitoring data (20 times per permit term). In lieu of allowing monitoring to stop after one year based on compliance with the benchmarks, a facility must continue to monitor quarterly for five years through the duration of the permit, irrespective of benchmark compliance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, if universal benchmark monitoring is required, at a minimum, facilities should be allowed to discontinue monitoring for any parameter where the annual average falls below the respective benchmarks. At a maximum, EPA could allow termination of monitoring after one or two years.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether to permit should require facilities to monitor and report for the proposed universal benchmark monitoring parameters (pH, TSS, and COD) on a quarterly basis for the entire permit term, regardless of any benchmark threshold exceedances, to ensure facilities have current indicators of the effectiveness of their stormwater control measures throughout the permit term. **[Yes.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Resource Management Associates (RMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 13 – We disagree with the need for benchmark monitoring throughout the entire term of the permit, regardless of the results of benchmark monitoring. As previously stated in Comment 9, if a facility with a well designed and implemented stormwater management program

consistently yields excellent universal benchmark monitoring results, then this should be reflected in continued monitoring requirements, such as quarterly results going to semi-annual, then to annual, then to visual only. This would reward program excellence, foster better stormwater quality management, and lead to higher environmental benefit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

There is no allowance to discontinue universal benchmark monitoring if the annual average for a given parameter is achieved. Permit language should be added to Section 4.2.1.2.a similar to that which is included in Section 4.2.1.2.b for sector-specific benchmarks. Permittees who implement effective source control measures to proactively manage stormwater discharges from their facility should be provided this allowance as they have demonstrated compliance with the MSGP. Continuing quarterly sampling requirements in such cases places an undue burden on the permittees. Should the EPA desire to retain ongoing universal benchmark monitoring, a single annual sample could be used to reduce the sampling requirements at those facilities that have achieved universal benchmarks for one year.

**Suggested Revision:** Add underlined text to Part 4.2.1.2.a: Schedule for Universal Benchmarks Applicable to All Sectors (pH, TSS, and COD). For universal benchmark monitoring parameters of pH, TSS, and COD, you must conduct quarterly benchmark monitoring, as identified in Part 4.1.7, for your first four full quarters each year of permit coverage commencing no earlier than [date 90 days after permit effective date]. If the annual average for any universal benchmark parameter does not exceed the benchmark threshold, you have fulfilled your universal benchmark monitoring requirements for that parameter for the permit term and can discontinue universal benchmark monitoring for that parameter. You must comply with Part 5.2 (Additional Implementation Measures) for any data exceeding the benchmark threshold as specified in Parts 5.2.1.1, 5.2.2.1, and 5.2.3.1.

Alternately, add underlined text to Part 4.2.1.2.a:

Schedule for Universal Benchmarks Applicable to All Sectors (pH, TSS, and COD). For universal benchmark monitoring parameters of pH, TSS, and COD, you must conduct quarterly benchmark monitoring, as identified in Part 4.1.7, for each year of permit coverage commencing no earlier than [date 90 days after permit effective date]. If the annual average for any universal

benchmark parameter does not exceed the benchmark threshold, then universal benchmark monitoring must only be conducted once each year. A facility may average the annual sample with any other samples taken over the course of the year. A Permittee whose annual sample exceeds the benchmark during the reduced universal benchmark monitoring period must resume quarterly universal benchmark monitoring. You must comply with Part 5.2 (Additional Implementation Measures) for any data exceeding the benchmark threshold as specified in Parts 5.2.1.1, 5.2.2.1, and 5.2.3.1.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Rebecca C. Tolene
**Commenter Affiliation:**  Tennessee Valley Authority (TVA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0215-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmarks are not necessary for and should not be required of Sector O facilities. In the event EPA moves forward with such a universal benchmark requirement, however, the monitoring schedule should be similar to the schedule for sector-specific benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

NMED supports the approach that baseline parameters pH, TSS and COD should be required for the entire permit term.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

*b. Benchmark monitoring schedule*

The NAS recommended that EPA require benchmark monitoring for four quarters at the beginning of a permit term (as is currently required), and then annually for the duration of each permit term.[37] As the NAS explains, "four quarterly samples are insufficient to assess the adequacy of stormwater management at a facility over the course of a permit term of 5 years."[38] This is in large part a matter of statistical power: "Collection of more samples increases the confidence that a site is complying with the requirements by reducing the acceptable error."[39] But the NAS also provides a second, eminently reasonable basis for recommending annual monitoring – conditions at a site may change over time. Routine monitoring is the only way to ensure that permittees "continue to implement and maintain SCMs," and the only way to provide a "consistent representation of stormwater discharge as operations and personnel change over the duration of a permit term."[40]

The NAS also recommends that EPA require more frequent monitoring for sectors with unacceptably high coefficients of variation (COVs).[41]

EPA's response to the NAS recommendations on benchmark monitoring frequency is inadequate. EPA must require quarterly monitoring throughout the permit term for all benchmark monitoring parameters, including both the universal and the sector-specific benchmark monitoring parameters, and must also require more frequent monitoring for sectors with unacceptably high coefficients of variation.

*i. Benchmark monitoring schedule for universal benchmark monitoring parameters*

The draft permit does require consistent monitoring of the three "universal" parameters – pH, TSS and COD – on a quarterly basis for the entire permit term.[42] EPA requests comment on whether this is appropriate.

Yes, it is entirely appropriate and reasonable for EPA to require consistent quarterly monitoring of the universal benchmark monitoring parameters, for at least three reasons.

1. As EPA notes in its request for comment, quarterly monitoring helps to "ensure facilities have current indicators of the effectiveness of their stormwater control measures throughout the permit term."
2. From a statistical perspective, quarterly monitoring is still not good enough. As the NAS observed, assuming a COV of 1, "for a TSS benchmark of 100 mg/L, any quarterly average

concentration from 0 to 225 mg/L is statistically indistinguishable from the benchmark." Achieving a "scientifically preferred" error rate would require 150 samples per year.[43] Quarterly monitoring is not sufficient, but it is an important step in the right direction.

3.  As NAS correctly notes, the burden of quarterly sampling for permittees is trivial. "Considering that all permittees must collect quarterly storm event samples for visual monitoring, the additional cost burden [of analyzing pH, TSS and COD] is expected to be small."[44] The NAS estimates that analyzing all three parameters would cost less than $100.[45]

For all of these reasons, we support EPA's decision to require ongoing quarterly monitoring of the universal benchmark monitoring parameters.

[37] *Id.* at 5, 49-51.

[38] *Id.* at 50.

[39] *Id.*

[40] *Id.*

[41] *Id.* at 5, 51, 65.

[42] Draft Permit at 30, Part 4.2.1.2(a).

[43] NAS at 50.

[44] *Id.* at 28; *see also,* Fact Sheet at 63.

[45] NAS at 28.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

ARA takes the position that in prior years, the presumption was that permittees did not need to monitor on an ongoing basis if no benchmark threshold exceedances occurred. We support the concept that consistent monitoring below benchmarks should result in reduced monitoring or elimination of monitoring requirements. ARA opposes this change because there is no need to

require permittees to collect four samples per year if the permittees have demonstrated that those parameters are not an issue in terms of exceedances. We believe that one annual sample would be sufficient.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

The draft permit requires quarterly universal benchmark monitoring to be conducted until the end of the permit term. In Request for Comment 13, EPA asks whether permittees should be able to discontinue benchmark monitoring. **MWRA suggests that after one year of benchmark monitoring with no exceedance of benchmark thresholds, facilities be permitted to convert to "inspection-only"**. The existing quarterly visual inspections, supplemented by an inspection by a professional, third party inspector, would suffice to ensure that stormwater control measures continue to function; collecting additional data would not provide much new information.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  M. Patrick McGuire
**Commenter Affiliation:**  Edison Electric Institute (EEI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

As allowed in the 2015 MSGP, quarterly benchmark monitoring should be required only for the first four full quarters of permit coverage. See EPA, 2015 MSGP (June 5, 2015) at 42. Under the 2015 MSGP, after collecting the first four samples, if the annual average for any parameter does not exceed the benchmark threshold, facilities are able to fulfill their benchmark monitoring requirements for the permit term and discontinue benchmark monitoring for those parameters unless there is a substantial change in the operating parameters of the facility. See id.

The approach taken in the 2015 MSGP is reasonable. There is no need to require permittees to collect four samples per year over the life of the permit, as required in the Proposed MSGP, if permittees have demonstrated that pH, TSS, and COD are not an issue in terms of exceedances. Furthermore, it may be difficult or unreasonable to require operators to collect consistent, quarterly samples because measurable rainfall events do not occur in every region of the country during every quarter. Continuing to allow permittees to "test out" of quarterly benchmark monitoring consistent with the 2015 MSGP would allow facilities to focus money, time, and efforts on separate and higher priority monitoring parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Any parameters deemed necessary would do best to follow previous successful set in place requirements. There should be conditions under which easing of the lab analysis schedule is lightened, if not sunset.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend sunsetting into inspections, or inspections and one annual lab analysis, after 4 consecutive quarters of good lab analysis readings.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

This change is too burdensome for many facilities and not justified for facilities with good compliance status. It also adds complications for those sectors that are subject to additional benchmark monitoring. The differing rules for universal and sector-specific benchmark monitoring will create confusion and could lead to non-compliance.

If this is adopted, an alternative would be to monitor and report the universal benchmarks on the same schedule as all other benchmark parameters. In other words, a permittee should monitor and report for all benchmark parameters (universal and sector-specific) for all 4 quarters of the first year of the permit. If results are below the applicable benchmarks, then monitoring for those parameters could be discontinued for remainder of the permit term. If there is an exceedance that triggers corrective actions/AIMs, the facility would follow those requirements, including additional monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 13. The proposed 2020 MSGP requires a quarterly schedule for universal benchmark monitoring for the duration of the permit term. Simplot requests the following condition be added to the proposed 2020 MSGP to allow a facility to discontinue universal benchmark monitoring based on this criteria: If the annual average for any parameter does not exceed the benchmark threshold, you have fulfilled your benchmark monitoring requirements for that parameter for the permit term and can discontinue benchmark monitoring for that parameter.

In addition, facilities located in arid climates in the Western United States should not be held to the same quarterly schedule requirement for universal benchmark monitoring as areas in the Eastern United States that discharge regularly to waterways. <u>Simplot requests that the monitoring schedule in arid climates be related to storm events and not quarterly events.</u>

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

In past permits, benchmark monitoring was only required for permitted facilities during a portion of the MSGP term. This approach seemed reasonable, and provided a permittee could meet the benchmark requirements, allowed some cost relief during the remainder of the permit. Many of the permittees we assist have been part of the EPA's MSGP program for multiple permits and have a reasonable understating of what BMPs must be implemented to minimize stormwater pollutants from their facilities. Switching to a requirement of universal benchmark monitoring for the proposed permit again seems excessive. In or opinion, if a facility can demonstrate they can meet benchmarks during he first year of the permit, as has been the requirement for many years, it is a reasonable assumption that they would continue to meet benchmarks in subsequent years without additional monitoring. Those permittees that cannot meet benchmarks already must implement controls to minimize pollutant loads until such time as their benchmarks are met. This would still seem to be the most logical way to continue.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:**  Utility Water Act Group (UWAG)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

...Additionally, the monitoring schedule should be similar to the schedule for sector-specific benchmarks. In other words, quarterly benchmark monitoring should be required only for the first four full quarters of permit coverage commencing no earlier than 90 days after permit effective date. Then, if the annual average for any parameter does not exceed the benchmark threshold, facilities will have fulfilled their benchmark monitoring requirements for the permit term and can discontinue benchmark monitoring for those parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Curt Wells
**Commenter Affiliation:**  The Aluminum Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**Sampling Frequency (EPA Request for Comment #13)**

Background and Current Situation

The draft MSGP proposes continuous quarterly monitoring for the life of the general permit for universal benchmarks and at least for the first year for sector-specific benchmarks. This is excessive. This additional testing, especially for those facilities that already meet benchmarks is not appropriate when BMP implementation is adequate.

One area of concern about this approach is situations of drought or snow conditions where it is simply not possible to collect a sample every quarter. In addition, in some cases the only sample available is off-shift or late at night. While these situations are not routine, they do exist for many facilities and the new proposed quarterly sampling requirement will only offer another opportunity for failed compliance despite good faith efforts of the permittee.

Requested Action

For the universal benchmarks, EPA should require only one annual sample for those permittees that do not experience exceedances of the benchmark parameters. Similarly, EPA should reduce all benchmark monitoring to twice per year if a facility's first two-year benchmark average is less than 50% of the benchmark, and reduce monitoring to once per year if the first two-year average is less than 25% of the benchmark.

For those facilities that have experienced exceedances of benchmarks, the benchmark monitoring should allow for four samples to be taken annually instead of quarterly with the first and last

samples being no closer than 6 months apart. This approach allows facilities in regions that may have limited rainfall in certain seasons to concentrate compliance during the rainy season(s).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Benjamin J. Beller
**Commenter Affiliation:**  Nebraska Public Power District (NPPD)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

NPPD does not support requiring covered facilities to perform benchmark monitoring for the entire permit term. NPPD believes that 4 quarters of benchmark monitoring is adequate for assessing the effectiveness of stormwater controls. As long as site conditions do not significantly change in the remaining permit term, there should be no need to conduct any further benchmark monitoring when the limits are met. In addition, NPPD believes the possibility of ceasing benchmark monitoring after 4 successful quarters provides a meaningful incentive for facilities to quickly address any site deficiencies.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

If quarterly benchmark monitoring is mandated for all industrial activities, the permit should include a waiver exemption for any parameter which does not exceed the respective benchmark for four consecutive quarters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.1.2 -- Benchmark Monitoring Schedule

EPA is proposing universal quarterly monitoring of stormwater discharge for pH, TSS and COD. The existing permit and the 2020 draft permit already require the following:

- Facility specific Stormwater Pollution Prevention Plans (SWIPPs) that include BMPs to help prevent potential pollutants from entering stormwater discharge.
- Quarterly facility inspections to identify and subsequently mitigate potential pollutant sources.
- Quarterly visual inspections of stormwater discharge samples to assess whether indicators of pollutants are present in stormwater discharge.

ATA does not disagree with the proposed universal benchmark monitoring, however, we propose it be performed on an annual basis, rather than quarterly. In conjunction with the above existing permit requirements, annual benchmark monitoring should be sufficient to both provide an indicator of the effectiveness of a facility's stormwater control measures and limit the burden to industry. Should a benchmark be exceeded during an annual monitoring event, then the permit could include a requirement for follow up monitoring (during the next quarter) to evaluate whether the exceedance was an anomaly or whether additional BMPs or control measures may be necessary.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 13**

The FWQC and FSWA oppose this proposed modification. There is no justification for requiring four samples per year for the proposed universal benchmark monitoring parameters if permittees have demonstrated that those parameters are not an issue in terms of exceedances. For those permittees that do not experience exceedances of the universal benchmark parameters, one annual sample is sufficient. Similarly, reducing monitoring to twice per year if a facility's first two-year benchmark average is less than 50% of the benchmark, and reducing monitoring to once per year if the first two-year average is less than 25% of the benchmark, is consistent with EPA's guidance on Reduced Monitoring for NPDES permits.[29]

Further, for those facilities that have experienced exceedances of benchmarks, the FWQC and FSWA recommend that any benchmark monitoring allow for four samples to be taken annually instead of quarterly, with the first and last samples being no closer than 6 months apart. This type of monitoring should not require EPA approval. This approach allows facilities in regions that may have limited rainfall in certain seasons to concentrate compliance during the rainy season(s).

EPA has failed to follow through on prior commitments to analyze data collected through the benchmark monitoring program. It cannot rationalize or justify collecting additional data from sites that can demonstrate through initial samples that their stormwater control mechanisms are effective at controlling pollutants. In addition, EPA should provide greater flexibility for any monitoring mandated by the final MSGP. EPA should allow four samples per year and not limit those samples to "quarterly" monitoring, while also allowing composite or other sampling techniques that would actually improve the accuracy and value of the data being submitted. In any event, EPA should not be mandating increased benchmark monitoring in any aspect of the next MSGP.

[29] Additionally, if monitoring results show consistent levels over a period of time, a facility should be able to reduce the frequency of monitoring.

**Comment Response:**

See Comment Response Essay 2 Monitoring. Additionally, the 2021 MSGP requires indicator monitoring for subsectors that do not have sector-specific benchmark monitoring requirements. Previously, monitoring data for those subsectors have not been required and therefore have been unavailable for analysis by EPA or facility operators in the past.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

We suggest that universal benchmark monitoring should discontinue after the average of four consecutive samples has met the benchmark, like other benchmark monitoring requirements. Or, at most, monitor only once per year after meeting universal benchmark concentrations. Quarterly monitoring throughout the permit term for facilities whose discharge has been shown to be below benchmark concentrations is overly burdensome to operators.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, the Proposed 2020 MSGP does not provide a way for a facility to discontinue universal benchmark monitoring if the annual average for a given parameter does not exceed the benchmark threshold as is provided for sector-specific benchmarks. If a facility can show effective source control measures have been implemented to proactively manage stormwater discharges and have demonstrated compliance with the MSGP, the need for continued quarterly sampling is obviated and should no longer be required for that facility.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA adopts benchmark monitoring for any part of the U sector, it should allow individual facilities to waive monitoring in later years if the facility achieves benchmark compliance, as allowed in the 2015 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, if universal benchmark monitoring is required, at a minimum, facilities should be allowed to discontinue monitoring for any parameter where the annual average falls below the respective benchmarks. EPA could consider requiring this for one or two years to qualify for this relief.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Beth Goodnough
**Commenter Affiliation:** Western Fuels Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

EPA also requested comment on whether it should require facilities to monitor the proposed universal benchmark monitoring parameters on a quarterly basis for the entire permit term. As stated previously, the benchmark monitoring program should be eliminated in its entirety. However, if benchmark monitoring remains in place, if the average of the first four samples taken during the term is below the benchmark, then operators should be allowed to discontinue benchmark monitoring for that parameter for the remainder of the term. Quarterly visual inspections of SCM's will continue, and those are effective for evaluating controls and identifying any needed repairs. Visual assessments and timely repairs remain the most effective way to address stormwater discharges at industrial sites.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Alternatively, the AIM provisions and requirements for quarterly universal benchmark monitoring should be withdrawn or significantly revised.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**b. If EPA Decides to Finalize Universal Benchmark Monitoring Requirements, the Agency Should Alter Its Proposed Approach.**

To the extent EPA were to retain the universal benchmark monitoring requirements, CCIG would recommend the following changes. … Second, if the average concentrations of all monitoring events at a facility are below benchmark values for two years, EPA should waive additional benchmark monitoring requirements for the remainder of the permit term. Third, even if monitoring events exceed benchmark values, EPA should waive additional benchmark monitoring requirements where the facility can demonstrate that it is not a substantial cause of the exceedance over a period of two consecutive years. As alternatives to a complete waiver in these two scenarios, EPA could either reduce universal benchmark monitoring to an annual basis for the remaining duration of the MSGP or determine that these facilities are low-risk and impose inspection-only requirements, as discussed below.

**Comment Response:**

See Comment Response Essay 2 Monitoring. Additionally, EPA has not finalized the "inspection-only" option for low-risk facilities.

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** National Association for Surface Finishing
**Document Control Number:** EPA-HQ-OW-2019-0372-0262-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Second, the quarterly monitoring frequency for five years is excessive, burdensome, and unnecessarily expensive, especially for small businesses that make up the surface finishing industry. EPA needs to consider effective and less burdensome ways to address these benchmark parameters, including visual monitoring and inspections as a more reasonable approach. In many cases the minimal environmental benefits expected from the quarterly monitoring do not justify the burdens posed by the monitoring frequency and the excessive costs for monitoring these new benchmark parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA Request for Comment Number 13: The permit should be acceptable as written.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**MSGP Fact Sheet**

**Request for Comment 13 – Universal Benchmarks**. I recommend that this monitoring not be required for the full permit term—that it be treated like the other benchmarks in this regard.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

4.2.1.RFC14. Required Monitoring - RFC 14 Selenium benchmark

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  36
**Excerpt Status:** Final

**Comment Excerpt:**

**Selenium.** The current benchmarks for selenium are 5 µg/L (freshwater) and 290 µg/L (saltwater), based on chronic water quality criteria and taking into consideration selenium's bioaccumulative properties. EPA revised the freshwater selenium criteria in 2016, and the new criteria are 1.5 µg/L (for still water) and 3.1 µg/L (for flowing water).[95] EPA did not derive acute criteria for selenium, but the criteria document does provide a method for translating the chronic criteria to acute or intermittent exposure.[96] The NAS implied that EPA should revise the benchmark to be consistent with the new criteria, noting that "[t]he selenium benchmark based on chronic aquatic life criteria is now outdated."[97] However, the NAS also suggested that EPA should allow for site-specific benchmarks, based on the translation of the chronic criteria for acute or intermittent exposure, for facilities with repeated benchmark exceedances.[98]

EPA is proposing to retain the existing selenium benchmarks. We fail to see why EPA would not revise the freshwater benchmark to reflect the revised water quality criteria. The Agency previously determined that the chronic criterion was a suitable basis for the benchmark and has not provided any indication that its position on this issue has changed. The selenium benchmark for freshwater should be revised to 3.1 µg/L (or, to the extent that any permittees are discharging into lakes or ponds, 1.5 µg/L for those permittees).

EPA has tentatively decided against allowing for site-specific alternative benchmarks as described above, reasoning that "the translation of the chronic criteria would require gathering additional data, including background base-flow concentration of selenium in the receiving water and the length of exposure."[99] We agree with EPA's reasoning. Furthermore, as with copper, we are opposed to the idea of site-specific benchmarks because the idea lacks detail in the draft fact sheet. EPA cannot finalize the site-specific alternative selenium benchmark without a more substantial proposal that answers critical questions, including those raised with respect to copper above. At this point in time, given the lack of clarity, we oppose the idea.

EPA should revise the selenium benchmark to 3.1 µg/L and should not adopt a site-specific alternative for facilities that repeatedly exceed the benchmark.

[95] *Id.* at 64.

[96] *Id.* at 65.

[97] NAS at 33.

[98] *Id.*

[99] Fact Sheet at 65.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP would leave the aluminum benchmark unchanged (750 ug/1) unless revised criteria are finalized before the MSGP becomes final. For selenium and copper, EPA has proposed that where facilities repeatedly exceed their benchmarks, the MSGP would allow them to use the relevant aquatic life criteria water quality risk on a site-specific basis and discontinue comparisons to the benchmark. DEQ appreciates the flexibility being proposed, however, based on our experience it is unclear that facilities discharging industrial stormwater within many sectors would evaluate water quality criteria on a site-specific basis due to the time, cost and complexity involved. Such assessments are more similar to the analysis completed in developing an individual permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix

**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is requesting comment on updating the water quality standards for selenium, arsenic, cadmium and copper. The City concurs that it is appropriate to evaluate water quality risk on a site-specific basis using standards developed by each state.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

For Sectors, or SIC's within a Sector, we agree this should be site specific and for repeated exceedances only.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

*Selenium Benchmark*: For selenium, NMA recommends that the 2020 MSGP should allow operators that exceed the selenium benchmark values to use the recommended 2016 aquatic life criteria to evaluate water quality risk on a site-specific basis and relative to the intermittent nature of stormwater discharges discontinue comparisons to national benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 14**

The FWQC and FSWA recommend that, rather than using the 2016 benchmark for selenium, EPA include no benchmark for selenium, so that it can be developed on a site-specific basis. Specifically, EPA should eliminate the current benchmark because it was replaced in 2016. EPA has proposed to keep the current benchmark, generally, but allow permittees to replace that benchmark on a site-specific basis using the 2016 criteria. Notably, for the 2016 criteria, the primary elements are based on selenium concentrations in fish tissue. The elements based on fish tissue supersede the elements based on water quality where fish tissue data are available. EPA's "Aquatic Life Ambient Water Quality Criterion for Selenium – Freshwater 2016" states that "selenium acute toxicity has been reported rarely in the aquatic environment."[31]

Accordingly, any permittee, not just those permittees exceeding the benchmark, should be able to use fish tissue data to derive a site-specific benchmark for selenium. If EPA is unwilling to allow permittees to derive site-specific benchmarks for selenium based on fish tissue data, EPA should use the formula in the 2016 criteria to develop a short-term criterion that can be used to set a benchmark.

[31] EPA 822-R-16-006 (June 2016) available at https://www.epa.gov/sites/production/files/2016-07/documents/aquatic_life_awqc_for_selenium_-_freshwater_2016.pdf .

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1

**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Selenium (Sector G). The MSGP should allow operators that repeatedly exceed the selenium benchmark value to use the recommended 2016 aquatic life criteria to evaluate water quality risk on a site-specific basis. (4.2.1.2, request for comment 14). AEMA's view is that applying the 5 microgram per liter (ug/L) benchmark is overly conservative and completely unjustified. Like the other metals, the selenium benchmark should be based on an appropriate acute exposure criterion. AEMA acknowledges EPA's 2016 revisions to the selenium criteria take into account bioaccumulation in aquatic life. While these revisions include specific chronic criteria, acute, short-term exposure criteria were not established. Instead formulas are provided to calculate "acute" criteria from the applicable chronic criteria, the background concentrations in the receiving water, and an assessment of the duration of potential exposure. While scientifically supported, in practice, such calculations place significant burden on permittees. It should also be noted that EPA's national criteria are extremely conservative in terms of bioaccumulation in fish species, actual bioaccumulation will almost always be much lower on a site-specific basis. Forcing Sector G permittees to determine how to interpret the new criterion as an alternative to the 5 ug/L is not supported by any direct evidence that such stormwater discharges would reasonably be expected to cause violation of water quality standards and impact aquatic life. This issue is magnified by the fact that selenium is extremely difficult and costly to remove from water – potentially creating a scenario where AEMA's members would have to implement corrective actions that could significantly impact the economic viability of their operations. As an alternative, EPA could adopt a benchmark of 20 ug/L that is based on previous acute criteria and remains the standard in many states that have not yet adopted the revised criteria. This could then be updated in the next MSGP issuance after EPA and states complete additional work on how the revised standards should be applied to short-term exposure scenarios (low duration of exposure, high dilution, etc.). Like other parameters, the permit requirement that prohibits violation of water quality standards provides an additional level of protection from impacts to aquatic life.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

**[The 2020 MSGP should <u>NOT</u> allow operators that repeatedly exceed the selenium benchmark values to use the recommended 2016 aquatic life criteria to evaluate water quality risk on a site-specific basis.  Comparisons to national benchmarks must continue.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

NMED does not support allowing operators that repeatedly exceed the benchmark values to use the 2016 aquatic life criteria on a site specific basis and discontinue comparisons to national benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 14. The 2016 national selenium criteria are chronic thresholds. USEPA (2016) states that "Aquatic communities are expected to be protected by this chronic criterion from any potential acute effects of selenium." The water values are derived from the fish tissue values. Thus, any site-specific criteria derived (tissue and water values) for a site have considered the factors affecting bioaccumulation of selenium into aquatic organisms. EPA has proposed allowing dischargers to evaluate water quality risks on a site-specific basis and discontinue comparisons to national benchmarks.[13] It is not clear what EPA intends with "evaluate water quality risk on a site-specific basis". This sounds like developing a

site- specific water quality standard. The MSGP is not about developing such site-specific standards.[14]

Exposures to aquatic organisms from any pollutants in a stormwater discharge are expected to be of a short duration because of the nature of stormwater. Thus, when picking benchmark values, "acute" toxicity values are much more relevant. As stated earlier, in 2016 EPA did not establish a new acute toxicity value for selenium. At this time, Simplot recommends that EPA utilize the previous selenium acute toxicity value (20 micrograms/liter) as the benchmark value.

[13] This recommendation came from the NAS report. This is another example of the "disconnect" from the NAS report and what the MSGP program is about and even how the Clean Water Act works. The MSGP is not about developing site specific "standards" to determine if "adverse effects" are occurring "under site specific conditions." As described earlier, the benchmark program is about gathering a certain level of data to use in evaluating existing stormwater controls and if additional controls should be implemented. It is not about determining whether stormwater is causing site specific adverse effects. If a water body is not attaining designated beneficial uses and the associated water quality standards, then a TMDL is put in place. The TMDL will look at all inputs into that water segment, including stormwater, and then appropriate measures will be determined to reduce pollutant loadings so that designated beneficial uses can be attained.

[14] Developing a site-specific water quality standard for selenium, because of the fish tissue and other aquatic system sampling that is needed, is a very expensive and multi-year effort. Simplot spent over a million dollars developing information for a site-specific selenium water quality standard in southeastern Idaho. Once again, this level of effort is *not consistent* with the aim of the stormwater program and MSGP program.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee is unclear on whether new selenium benchmarks based on 2016 recommended national criteria would apply to sediment retention ponds, which sometimes contain lentic waters and limited aquatic life (no fish). If so, this would be increasing stringency on engineered structures designed to reduce pollution transport. Sediment retention ponds should be exempt; however, for discharges from ponds to fishable lotic waters, acute, lotic selenium limits should apply.

**Comment Response:**

Part 4.1.1 of the 2021 MSGP specifies that applicable monitoring requirements apply to each discharge point authorized by the permit, where "discharge point" is defined in Appendix A for the purposes of this permit as "the location where collected and concentrated stormwater flows are discharged from the facility such that the first receiving waterbody into which the discharge flows, either directly or through a separate storm sewer system, is a water of the U.S." The answer to the commenter's question would require additional information to fully answer. EPA notes that the applicable selenium benchmark (1.5 µg/L for still water or 3.1 µg/L for flowing water) would apply to stormwater discharges.

## 4.2.1.RFC15. Required Monitoring - RFC 15 Arsenic benchmark

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports EPA's update to the arsenic freshwater benchmark threshold based on the recommended acute criterion of 340 ug/L rather than the chronic criterion of 150 ug/L.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

For arsenic, EPA has requested comment on updating the arsenic freshwater benchmark threshold based on the recommended acute criterion of 340 ug/L rather than the chronic criterion of 150 ug/L and specifically any concerns related to near coastal freshwater discharges flowing into sensitive saline waters. Our data does not indicate significant arsenic exceedances under the existing benchmark. We do support using the acute criterion given that stormwater discharges are typically short duration.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council
**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Part 8 of the proposed 2020 MSGP establishes the benchmark monitoring concentrations for arsenic as 150 micrograms per liter (μg/L) for freshwater and 69 μg/L for saltwater.

The National Academies of Sciences, Engineering and Medicine (NASEM) 2019[3] report "Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges" recommends using acute, not chronic water quality criteria for the arsenic benchmark concentration, which is currently used in the proposed 2020 MSGP. The USEPA National NRWQC acute water quality standards for the protection of aquatic life are 340 μg/L for freshwater and 69 μg/L for saltwater based on dissolved (filtered)[4] arsenic concentrations. In the proposed 2020 MSGP, USEPA established the saltwater total arsenic benchmark concentration to be 69 μg/L to match the NRWQC saltwater acute aquatic criterion; however, they established the chronic NRWQC aquatic life criterion as a freshwater benchmark concentration of 150 μg/L "based on concerns about near-coastal freshwater discharges flowing quickly into sensitive saline waters" (USEPA MSGP Fact Sheet Section 4.2.1.2). NASEM recommended that unless USEPA can justify this unique concern for arsenic discharges, or it develops a criterion based on intermediate exposure (instead of acute exposure), USEPA should adopt the acute standard of 340 μg/L for the freshwater benchmark value for arsenic.

In addition to the comment above regarding the establishment of acute versus chronic aquatic life criteria as the freshwater benchmark value for arsenic, please refer to Comment 3 regarding the establishment of benchmark values based on total recoverable arsenic concentrations using aquatic life criteria expressed in terms of the dissolved (filtered) metal concentration.

[3] NASEM. 2019. Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges.
[4] Dissolved concentrations are operationally defined as the fraction passing a 0.45-micron filter (USEPA, 1993).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Permittees support the National Academy of Sciences (NAS) recommendation of a 340-µg/L benchmark for arsenic, as this is in agreement with the acute criterion for the state water quality standards of New Mexico (20.6.4 New Mexico Administrative Code).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

Arsenic:  NAIMA supports EPA's proposed updating of the freshwater benchmark for arsenic.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 15. The current arsenic criteria are based on the arsenic (III) species or arsenite using acid soluble measurements. Arsenic is a naturally

occurring element, very prevalent in groundwater in the western United States. As such it is nearly ubiquitous in the environment (groundwater, surface waters, and soils) in the West. This is especially true in mineralized areas. Similar to selenium, the arsenic aquatic life acute criterion of 340 micrograms/liter is likely an appropriate benchmark threshold.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  35
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 15**

The FWQC and FSWA support the proposed modification as it relates to the freshwater benchmark, but oppose the proposal to the extent that it would impose more stringent criteria for near-coastal discharges flowing into saline waters. EPA should not impose a benchmark there, because it has not yet developed appropriate levels for that situation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

Arsenic (Sector G). EPA requests comment on whether the arsenic benchmark value should be updated to reflect the recommended acute criterion of 340 ug/L rather than the chronic criterion of 150 ug/L. (request for comment 15). AEMA's view is that retaining the 150 ug/L benchmark for arsenic is entirely unsupported and the benchmark should be set at 340 ug/L. EPA indicates that, unlike the other benchmarks for metals, it is retaining the chronic water quality criterion

because of concern of proximity to saltwater where the lower benchmark of 69 ug/L applies. EPA has not identified any analysis to document such proximity and the vast majority of our members' sites are located in inland areas hundreds of miles from saltwater. As such, the applicable acute freshwater quality criterion of 340 ug/L is the applicable standard for the receiving waters. Moreover, many of our facilities are located in western areas where there is significant naturally occurring arsenic in unimpacted soils and surface water – often above 150 ug/L but generally below 340 ug/L. While the 2020 MSGP does allow for consideration of background levels, this requires significant and burdensome efforts to characterize site conditions. If EPA is concerned about the rare conditions where a Sector G site is proximate to saltwater, it could include a specific permit provision explicitly designating when the 150 ug/L criterion should be applied. This is another case where the underlying permit requirement prohibiting violations of applicable water quality standards provides a backstop to prevent impacts to aquatic life.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is requesting comment on updating the water quality standards for selenium, arsenic, cadmium and copper. The City concurs that it is appropriate to evaluate water quality risk on a site-specific basis using standards developed by each state.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Remain the same as MSGP 2015 at 0.15 mg/L

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**[The arsenic freshwater benchmark threshold shall base on the chronic criterion of 150 ug/L.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

**Arsenic.** The arsenic benchmarks are currently 150 and 69 µg/L for fresh and saltwater, respectively. The freshwater benchmark is based on a chronic freshwater criterion, supported by concerns about stormwater flowing into saline water, where arsenic is more toxic.[79] The NAS recommended that EPA adopt the current acute freshwater aquatic life criterion for arsenic (340 µg/L) as the freshwater benchmark.[80] EPA declined to change the arsenic benchmark, reasoning that "it prefers not to weaken a discharge requirement unless good scientific evidence exists that a pollutant is less toxic than previously believed."[81]

We strongly support EPA's decision and reasoning. As discussed above, the CWA is designed to achieve progressively tighter pollution limits, working toward a goal of eliminating pollution entirely. EPA should not relax benchmarks without a good reason for doing so.

[79] NAS at 32; Fact Sheet at 65.

[80] NAS at 32.

[81] Fact Sheet at 65.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1.RFC16. Required Monitoring - RFC 16 Cadmium benchmark

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports EPA's update to the cadmium benchmark value to be based on the updated recommended 2016 acute criterion.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP would update the benchmark for cadmium. The proposed general permit would also remove the benchmarks for magnesium and iron. Virginia supports these two changes.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee supports a cadmium benchmark value of 1.8 µg/L.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is requesting comment on updating the water quality standards for selenium, arsenic, cadmium and copper. The City concurs that it is appropriate to evaluate water quality risk on a site-specific basis using standards developed by each state.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 4.2.1.2.b Schedule for Sector-Specific Benchmarks (Request for Comment 16):***

Per Part 9.6.2 of the 2015 MSGP, the State of New Mexico already requires facilities authorized to discharge under the MSGP to use New Mexico water quality standards in place of the general benchmarks identified in the MSGP. These standards are hardness based acute and chronic water quality criteria.

*Recommendation:*

Consider excluding or waiving this requirement for facilities within states that have already included a requirement in Part 9 to use hardness based acute or chronic state water quality standards.

**Comment Response:**

EPA notes that the New Mexico water quality hardness-based values provided in Part 9 replace the benchmark values listed in Appendix J and are the applicable benchmark values for New Mexico in the 2021 MSGP. EPA has incorporated New Mexico's benchmark values into the electronic reporting system so that operators' DMRs will be populated appropriately.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI supports NASEM's general recommendation to update benchmarks to match aquatic life criteria. NASEM noted that "acute aquatic life criteria for cadmium have been developed (EPA, 2016a) and will need to be incorporated into the next MSGP revisions" (Report at 32).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

We believe that 1.8 ug/L in unreasonably low and do not support updating the benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Cadmium:  NAIMA supports EPA's update to the benchmark value for cadmium.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

**Cadmium.** The cadmium benchmarks are currently hardness-dependent for freshwater and 40 µg/L for saltwater. The effective default freshwater benchmark is 2.1 µg/L, corresponding to a hardness of 100 mg/L.[82] NAS recommended that EPA update these benchmarks to reflect 2016 EPA water quality criteria. EPA agreed and proposes to revise the benchmarks. The new freshwater benchmark would continue to be hardness-dependent; at a hardness of 100 mg/L the benchmark would be 1.8 µg/L.[83] The new saltwater benchmark would be 33 µg/L .[84]

We support EPA's decision with respect to cadmium.

- *We note that EPA appears to have made a typographical error on page 65 of the fact sheet: In "Request for Comment 16" EPA refers to the "acute chronic life criteria." We presume that this should read "acute aquatic life criteria."*

[82] *See, e.g.*, NAS at 33; Fact Sheet at 70.

[83] Fact Sheet at 65, 70.

[84] *Id*. at 70.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

EPA acknowledges the typographical error in Request for Comment 16 of the proposed 2020 MSGP. This text has been removed from the 2021 MSGP.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 16. The EPA 2016 cadmium criteria represents the latest state of the science relative to acute and chronic thresholds for effects of cadmium to aquatic organisms. While the acute values are slightly lower in the 2016 document compared to the 2001 criteria, the values are not substantially lower. It is puzzling however, that the values cited in the MSGP document as benchmarks are cited as total recoverable since the values they are citing are dissolved concentrations in the criteria documents. Also, the equation for calculating the hardness adjusted cadmium acute criteria should be included.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

Regarding the suggestion to include the equation for operators to calculate the hardness-based acute criteria for cadmium, EPA declines to add the equation to the 2021 MSGP. EPA notes in the footnote to Table 4-2 in Part 4.2.2.2. of the 2021 MSGP that certain "pollutants are dependent on water hardness where discharged into freshwaters. The freshwater benchmark value listed is based on a hardness of 100 mg/L. When a facility analyzes receiving water samples for hardness, the operator must use the hardness ranges provided in Table 1 in Appendix J of the 2021 MSGP and in the appropriate tables in Part 8 of the 2021 MSGP to determine applicable benchmark values for that facility." In order to simplify the requirement for operators discharging stormwater to freshwater and eliminate the need for them to perform additional calculations, EPA has calculated the benchmark values for cadmium and other hardness-dependent metals based on a range of hardness values (0 to 250+ mg/L) and provided the resulting range for benchmark values in Part 8 of the permit. For informational purposes, the

equation for the recommended acute aquatic life criterion from the Aquatic Life Ambient Water Quality Criteria Cadmium – 2016 (EPA-820-R-16-002) is provided below:

Criteria maximum concentration (CMC) (µg/L, dissolved conc.) = $e^{(0.9789 \text{ x } \ln(\text{hardness}) - 3.866)}$ x CF

Where CF (conversion factor from total to dissolved) = 1.136672 - [(ln hardness) x (0.041838)]

In regards to the use of total recoverable metals, see Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  36
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 16**

The FWQC and FSWA do not oppose the proposed update to the benchmark value for cadmium.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

The permit should be updated to reflect the best science available.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

## 4.2.1.RFC17. Required Monitoring - RFC 17 Magnesium benchmark

**Commenter Name:**  Frederick J. McNeill
**Commenter Affiliation:**  City of Manchester, New Hampshire
**Document Control Number:**  EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The City is in support of removing magnesium and iron benchmark sampling requirements since they are naturally occurring and are not anticipated to be toxic to most aquatic organisms.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP would update the benchmark for cadmium. The proposed general permit would also remove the benchmarks for magnesium and iron. Virginia supports these two changes.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.1.2 – Request for Comment 17 and 18 – I agree with removing these from the monitoring requirements.  Iron and magnesium have only been an issue in outfalls that have groundwater intrusion into the storm piping.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Iron and Magnesium Criteria (EPA request for comment #17 and #18)

Howmet agrees with the removal of these two parameters from the list of benchmark monitoring parameters and in agreement with the recommendations of the NAS Report.

*Recommendation*

Iron and magnesium should be removed from the benchmark monitoring requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee supports removal of magnesium and iron benchmarks, particularly if other pollutant proxy benchmarks are included (COD, suspended sediment concentration [SSC]).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:** Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The Steel Associations support EPA's proposal to delete the current benchmarks for iron and magnesium. This proposal is consistent with the National Research Council ("NRC's") 2019 study,[3] which found that there is no credible evidence of acute effects of iron or manganese on aquatic organisms and recommended that EPA delete these benchmarks. As the NRC study noted, iron and magnesium are natural components of surface and groundwater and do not appear to be toxic to a majority of aquatic organisms at concentrations likely to be encountered in most waters. Given the absence of any meaningful evidence of adverse impacts to aquatic life from the concentration of manganese or iron that are likely to be present in stormwater, EPA's proposed deletion of Benchmark monitoring requirements for these parameters is reasonable and appropriate.

[3] "Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges" National Academies of Sciences, Engineering, and Medicine's National Research Council (February 2019); https://www.nap.edu/catalog/25355/improving-the-epa-multi-sector-general-permit-for-industrial-stormwater-discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

We fully support removal of the magnesium benchmark. In addition to its low toxicity, Magnesium is a normal constituent in caliche soils of the arid southwest. As such, magnesium is considered a background constituent and should not impact benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Magnesium:  NAIMA supports the proposed deletion of the magnesium benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Geoff Brosseau
**Commenter Affiliation:** California Stormwater Quality Association (CASQA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0204-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

COMMENT: ADOPT THE NATIONAL ACADEMIES' RECOMMENDATION TO REMOVE THE MAGNESIUM BENCHMARK IN THE MSGP

**Background:** EPA established a magnesium benchmark in the 1995 MSGP. Most benchmarks were established based on the acute freshwater criteria in EPA's National Recommended Criteria for the protection of aquatic life and human health. However, no criteria existed (or currently exist) for magnesium. EPA calculated the magnesium benchmark as the minimum limit multiplied by a factor of 3.18, resulting in a benchmark value of 0.064 mg/L. This benchmark has not been modified since the initial establishment in 1995.

In 2014, the California State Water Board adopted the EPA benchmarks from the 2008 MSGP as part of the California IGP to serve as Numeric Action Levels (NALs), including the magnesium benchmark value of 0.064 mg/L. As described in the California IGP, NALs are designed to provide feedback on industrial sources of pollutants as part of a multiple-objective performance measurement system.

In 2017, a committee was created by the National Academies of Sciences, Engineering, and Medicine through support by EPA, to address several concerns related to stormwater monitoring in the MSGP. The committee collected information from individuals and stakeholder organizations representing various interests and released a report in 2019: Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges with recommendations including that EPA remove the magnesium benchmark in the MSGP.

In 2018, CASQA initiated an evaluation of the magnesium numeric action level in the California Industrial General Permit. As summarized in the evaluation report (see attachment), the magnesium NAL presents significant cost to industrial permittees, as well as significant legal liability, without environmental or public health benefit.

The March 2, 2020 Federal Register notice includes a proposed 2020 MSGP Fact Sheet that includes the following:

*The 2015 MSGP required subsector K1 to monitor for magnesium and included a benchmark value of 0.064 mg/L. The NRC [Ed. National Research Council] study recommended that EPA remove the magnesium benchmark from the 2020 MSGP since it is a "natural component of surface and groundwater and does not appear to be toxic to a majority of aquatic organisms at concentrations likely to be encountered in most waters" (NAS, 41). Significant evidence does not exist to indicate adverse impacts of aquatic organism and EPA does not provide an aquatic life criterion for magnesium. Magnesium concentrations present in stormwater are not anticipated to be toxic to most aquatic organisms6. EPA could not find any information to support continuing to require this benchmark parameter and therefore proposes to remove magnesium as a benchmark parameter in the 2020 MSGP.*

**Request for Comment 17:** *EPA requests comment or any information related to the acute effects of magnesium on aquatic organisms that would warrant retaining a magnesium benchmark in the 2020 MSGP.*

In response to this request, CASQA submits the following recommendation to EPA.

**CASQA Recommendation:**

- CASQA agrees with the National Academies' MSGP benchmark assessment and recommends that EPA remove the magnesium benchmark in the MSGP until sufficient information related to the acute effects of magnesium on aquatic organisms warrant the inclusion of a magnesium benchmark in the MSGP or a NAL in the IGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.

**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

**Magnesium.** We are not aware of significant evidence of magnesium toxicity to aquatic life at levels found in industrial stormwater and defer to the NAS and EPA on whether a magnesium benchmark is useful or necessary.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**Magnesium**-EPA has proposed to remove magnesium from the benchmark limits. We support this change as being logical due to the ubiquity of this element in most surface waters, and the fact that it is a primary component of water hardness.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**Iron and Magnesium (EPA Request for Comment #17 and #18)**

Background and Current Situation

The draft MSGP proposes to remove iron and magnesium from the benchmark monitoring requirements consistent with the recommendations of the NAS report.

Requested Action

Remove iron and magnesium from the benchmark monitoring requirements in the final MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 17**

The FWQC and FSWA support the proposed deletion of the magnesium benchmark, for the reasons stated by the NRC.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Agree with removing these from the monitoring requirements. Iron and magnesium are only an issue in outfalls that have groundwater intrusion into the storm piping.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Magnesium and Iron (Sector G). EPA requests comment on whether the magnesium and iron benchmarks should be eliminated. (requests for comment 17, 18). AEMA agrees that these benchmarks should be eliminated. As noted in the 2019 NRC Study, since "[m]agnesium is a natural component of surface water and groundwater and does not appear to be toxic to a majority of aquatic organisms at concentrations likely to be encountered in most waters," the magnesium benchmark requirement should be removed. See generally 2019 NRC Study at 34.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The magnesium benchmark should be removed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

**[Do not remove the magnesium benchmark since there is no good reason to do so.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.1.RFC18. Required Monitoring - RFC 18 Iron benchmark

**Commenter Name:**  Frederick J. McNeill
**Commenter Affiliation:**  City of Manchester, New Hampshire
**Document Control Number:**  EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

The City is in support of removing magnesium and iron benchmark sampling requirements since they are naturally occurring and are not anticipated to be toxic to most aquatic organisms.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP would update the benchmark for cadmium. The proposed general permit would also remove the benchmarks for magnesium and iron. Virginia supports these two changes. There are high background levels of iron in the state and our data indicate that iron benchmark exceedances under the ISW general permit (which are likely due to some undetermined extent on these background levels) are among those most prevalent statewide.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.1.2 – Request for Comment 17 and 18 – I agree with removing these from the monitoring requirements.  Iron and magnesium have only been an issue in outfalls that have groundwater intrusion into the storm piping.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Denny Wene
**Commenter Affiliation:**  Howmet Aerospace, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

Iron and Magnesium Criteria (EPA request for comment #17 and #18)

Howmet agrees with the removal of these two parameters from the list of benchmark monitoring parameters and in agreement with the recommendations of the NAS Report.

*Recommendation*

Iron and magnesium should be removed from the benchmark monitoring requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee supports removal of magnesium and iron benchmarks, particularly if other pollutant proxy benchmarks are included (COD, suspended sediment concentration [SSC]).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI supports NASEM's recommendation to suspend the iron benchmark (Report at 32) and EPA's proposed elimination of iron as a benchmark parameter in the Proposed 2020 MSGP. As a general matter, ISRI supports setting the benchmark value of a constituent based on its potential impact to receiving waters in-situ due to acute aquatic toxicity. In the case of iron, it does not have an acute aquatic life criterion, and existing studies on the impact of iron to aquatic organisms would suggest a significantly higher benchmark value than the current value of 1,000 µg/L (Report at 32). Other factors could also influence the setting of benchmark values, including wet-weather flow conditions in a receiving water and the greater biological availability of dissolved over particulate-bound metals.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The Steel Associations support EPA's proposal to delete the current benchmarks for iron and magnesium. This proposal is consistent with the National Research Council ("NRC's") 2019 study, [3] which found that there is no credible evidence of acute effects of iron or manganese on aquatic organisms and recommended that EPA delete these benchmarks. As the NRC study noted, iron and magnesium are natural components of surface and groundwater and do not appear to be toxic to a majority of aquatic organisms at concentrations likely to be encountered in most waters. Given the absence of any meaningful evidence of adverse impacts to aquatic life from the concentration of manganese or iron that are likely to be present in stormwater, EPA's proposed deletion of Benchmark monitoring requirements for these parameters is reasonable and appropriate.

[3] "Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges" National Academies of Sciences, Engineering, and Medicine's National Research Council (February 2019); https://www.nap.edu/catalog/25355/improving-the-epa-multi-sector-general-permit-for-industrial-stormwater-discharges.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

We agree that iron should be removed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1

**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

Iron:  NAIMA supports the deletion of the iron benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 18**

**Benchmark Monitoring for Iron (Part 4.2.1.2)**

EPA has requested comment on information that would warrant an iron benchmark in the 2020 MSGP. NMA supports the EPA's removal of the iron benchmark for the mining sectors.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

ARA supports the deletion of the iron benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** M. Patrick McGuire
**Commenter Affiliation:** Edison Electric Institute (EEI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should finalize the removal of the iron benchmark as removal will allow EEI members and EPA to focus their resources on monitoring parameters more relevant to environmental protection

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** M. Patrick McGuire
**Commenter Affiliation:** Edison Electric Institute (EEI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**2. The removal of benchmark monitoring for iron is warranted.**
EPA proposes to remove the iron benchmark that was in the 2015 MSGP, as the NRC found few studies on the acute effects of iron on aquatic organisms and recommended that EPA no longer require such a benchmark. Fact Sheet at 66. Removal of iron benchmark monitoring is appropriate as it will allow EEI members and EPA to focus their resources on monitoring parameters more relevant to environmental protection. EPA should finalize the removal of this benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)

**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

**UWAG Supports EPA's Proposal to Remove the Iron Benchmark**

Under EPA's 2015 MSGP, Sector O facilities were required to comply with the benchmark for iron. All previous iterations of the MSGP, including the current 2015 MSGP, included a 1,000 µg/L iron benchmark, despite a lack of scientific data to support the threshold. In accordance with the National Academies of Science, Engineering, and Medicine (NAS) Panel's recommendation, EPA proposes removing the benchmark for iron in the 2020 MSGP. Proposed Fact Sheet, Part 4.2.1.2, at 66. The NAS Panel noted that there is no nationally recommended acute criterion for iron and that few studies on the acute effects of iron on aquatic organisms exist. NAS Panel Report, at 32. The NAS Panel also acknowledged that iron has relatively low toxicity and bioaccumulation in aquatic species. Id. Based on these factors, the NAS Panel recommended that EPA suspend the benchmark for iron required under Part 4.2.1.2 of the 2015 MSGP.

As evidenced by the NAS Panel report, the previous MSGP iron threshold is based on "dated and limited" science that provides negligible environmental benefit, but creates significant burden, including for at least some Sector O facilities. Results from Sector O facilities studied by the NAS Panel demonstrated a relatively modest exceedance frequency of the iron benchmark (26- 50 percent of values). NAS Report, Table 2-3. This is consistent with UWAG members' experience. Some UWAG members have noted that iron benchmarks have been difficult to meet in certain locations because, as the NAS report noted, common stormwater control measures (SCMs) are not effective at reducing iron concentrations to below the current outdated iron benchmarks. For all of these reasons, UWAG strongly supports EPA's proposal to eliminate the iron benchmark for the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**Iron**-EPA has requested comment on retaining iron as a benchmark parameter. The NRC report indicated that iron was among the benchmarks that were exceeded greater than 25% of the time. Based on occasional dissolved iron data reported for stormwater, it appears a substantial portion of the iron is often contained in the particulate material suspended in the water, which could be one potential solution. However, NORA would support discontinuing iron as a benchmark parameter because it simply is not very toxic to aquatic organisms, especially when in the particulate form.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Curt Wells
**Commenter Affiliation:**  The Aluminum Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**Iron and Magnesium (EPA Request for Comment #17 and #18)**

Background and Current Situation

The draft MSGP proposes to remove iron and magnesium from the benchmark monitoring requirements consistent with the recommendations of the NAS report.

Requested Action

Remove iron and magnesium from the benchmark monitoring requirements in the final MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Benjamin J. Beller
**Commenter Affiliation:**  Nebraska Public Power District (NPPD)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

NPPD supports removing the iron benchmark from the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 18**

The FWQC and FSWA support deletion of the iron benchmark for the reasons stated by the NRC. Please note that Part 8—Sector Requirements for Industrial Activity Subpart C – Sector C Chemical and Allied Products Manufacturing and Refining, Subsector C2 Industrial Inorganic Chemicals (SIC 2812-2819)—lists a "Total Recoverable Iron as a Benchmark." The FWQC and FSWA request that EPA delete this benchmark, in accordance with its stated proposal to delete the iron benchmark.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

**3. CCIG Supports EPA's Proposal to Suspend Iron Monitoring.**

CCIG supports EPA's proposal to suspend iron monitoring and remove the iron benchmark.[19] The iron benchmark threshold criteria value of 1,000 ug/l is based on limited and outdated information that has not been updated by EPA since the MSGP originally was established decades ago.[20] Nor does the value incorporate the effects of water quality characteristics on iron

toxicity. EPA's proposal also corresponds with the recommendation from the National Academies of Sciences, Engineering, and Medicine's National Research Council.[21] Given this, CCIG supports EPA's proposal to suspend iron monitoring and remove the iron benchmark from the MSGP until or unless EPA can develop more accurate acute criteria for use with benchmark monitoring.

[19] Proposed 2020 MSGP Fact Sheet, Part 4.2.1.2.

[20] The chronic aquatic life criterion used as a benchmark threshold for iron in previous multi-sector general permits was based on EPA's 1976 "red book" criteria document. *See* EPA, Quality Criteria for Water, 1976; *see also* 60 Fed. Reg. 50,804, 50,975 (September 29, 1995).

[21] Proposed 2020 MSGP Fact Sheet, Part 4.2.1.2.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Agree with removing these from the monitoring requirements. Iron and magnesium are only an issue in outfalls that have groundwater intrusion into the storm piping.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

Magnesium and Iron (Sector G). EPA requests comment on whether the magnesium and iron benchmarks should be eliminated. (requests for comment 17, 18). AEMA agrees that these benchmarks should be eliminated.(…….

……. AEMA also concurs with the 2019 NRC Study's observations that given iron's low toxicity and bioaccumulation "it is unlikely that a criterion based on intermittent exposure would be necessary." 2019 NRC Study at 32. Further, proposed 8.G.8.3 inexplicably retains iron monitoring for discharges from waste rock and overburden piles in the aluminum, titanium, and iron ore subcategories. For the same reasons, this monitoring is unjustified and should be eliminated from the final permit.)

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The iron benchmark should be removed.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  B. Clemence
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 18 – Iron.** I concur with EPA's proposal to remove the benchmark for iron from the 2020 MSGP. The current water quality criterion for iron (the basis for the benchmark) is problematic for three reasons: (1) it is a chronic criterion, which is inappropriate for stormwater discharges; (2) it has not been updated in many years; and (3) it has never been clear whether it applies to total or dissolved iron. Regulatory agencies in the U.S. and Canada

have applied it to both total and dissolved iron, resulting in a diverse set of criteria that are of little use.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Victor Ventura
**Commenter Affiliation:**  Los Angeles Department of Water and Power (LADWP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0265-A2
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

The 2015 MSGP required multiple sectors, including Sector O facilities, to monitor for iron and comply with its benchmark value. The National Academies of Science, Engineering, and Medicine (NAS) National Research Counsel (NRC) conducted a study and found few studies on the acute effects of iron on aquatic organisms and recommended that EPA no longer require an iron benchmark.

LADWP suggests that because benchmark thresholds should be based on the latest toxicity criteria designed to protect aquatic ecosystems from short-term exposures, the EPA should consider removing the benchmark for iron in the 2020 MSGP given the lack of supplemental studies on the acute effects of iron on aquatic organisms.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

**[Do not remove the iron benchmark since there is no good reason to do so.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

**Iron.**  The current iron benchmark is 1 mg/L. The NAS recommended removing the iron benchmark based on a lack of evidence showing acute toxicity.[88] EPA is proposing to remove the iron benchmark for the same reason.[89] We oppose this part of the proposal, because the scientific literature does in fact show evidence of iron toxicity, including evidence of acute toxicity at concentrations well below the current benchmark.

One recent study observed that "[i]n neutral waters, [iron] has been found to increase turbidity, reduce primary production, and reduce interstitial space in the benthic zone, which smothers invertebrates, periphyton, and eggs. Iron precipitates also physically clog and damage gills causing respiratory impairment."[90] That same study evaluated iron toxicity in several species over a period of 30 days. The authors found that iron was lethal in boreal toad tadpoles, and also caused a variety of sublethal effects, including "reduced growth for boreal toad tadpoles and mountain whitefish, reduced development for boreal toad tadpoles, and reduced reproduction for *Lumbriculus* [blackworm]."[91] Using the results of their study, combined with other chronic toxicity literature values, the authors derived a Final Chronic Value (FCV) of 499 μg/L. Although this result is not directly relevant to the question of acute iron toxicity, it does suggest that EPA's current chronic criterion for iron (1 mg/L) may be too high.

The same authors performed a separate, 10-day "mesocosm" experiment in which they exposed naturally colonized communities of benthic macroinvertebrates in experimental streams to various iron concentrations.[92] These experiments yielded EC20 values as low as 234 μg/L, and the authors derived a FCV of 251 μg/L, again suggesting that EPA's current water quality criterion for iron may be too high.

In a study focused on acute effects, Shuhaimi-Othman et al. describe a series of four-day toxicity tests on eight freshwater aquatic species.[93] For iron, species-specific LC50 values ranged from 0.12 to 8.49 mg/L. Following EPA guidance, the authors derived a Final Acute Value (FAV) of 74.5 μg/L, and a CMC of 37.2 μg/L. This is of course much lower than the current iron benchmark of 1 mg/L.

We are not suggesting that EPA should use these studies, by themselves, to derive a new benchmark. The derivation of a new iron benchmark would presumably take years of research

and analysis. What we are suggesting is that it would be unreasonable to eliminate a benchmark where EPA has evidence of toxicity, including acute toxicity, at levels significantly lower than the current benchmark. To repeat EPA's reasoning with respect to arsenic, the Agency should choose "not to weaken a discharge requirement unless good scientific evidence exists that a pollutant is less toxic than previously believed."[94] This reasoning applies with added force to iron. Not only is there a lack of evidence that iron is less toxic than previously believed, there is in fact evidence that iron is more toxic than previously believed.

In sum, the predicate for NAS's recommendation and EPA's proposed decision with respect to iron – that there is no evidence of acute or subchronic toxicity – is false. We cite and attach two studies showing iron toxicity over periods of 4 and 10 days at levels well below the current benchmark. In light of this evidence, it would irresponsible and unreasonable for EPA to remove the iron benchmark. We support the idea that EPA should derive new water quality for iron, but in the meantime, EPA should continue to require iron monitoring using the current iron benchmark.

[88] NAS at 32.

[89] Fact Sheet at 66.

[90] P. Cadmus et al., Chronic Toxicity of Ferric Iron for North American Aquatic Organisms: Derivation of a Chronic Water Quality Criterion Using Single Species and Mesocosm Data, 74 Arch. of Envtl. Contamination and Toxicology 605, 611 (2018) (attached).

[91] *Id*.

[92] *Id*; see also C.J. Kotalik et al., Indirect Effects of Iron Oxide on Stream Benthic Communities: Capturing Ecological Complexity with Controlled Mesocosm Experiments, 53 Envtl. Sci. Technol. 11532 (2019).

[93] M. Shuhaimi-Othman et al., Deriving Freshwater Quality Criteria for Iron, Lead, Nickel, and Zinc for Protection of Aquatic Life in Malaysia, Scientific World Journal (2012) (attached).

[94] Fact Sheet at 65.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:**  EPA-HQ-OW-2019-0372-0256-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Colorado has not established acute iron statewide standards for the protection of aquatic life. See 5 CCR 1002-31, Table III. Colorado does not support removal of the iron benchmark until EPA develops acute aquatic life criteria for iron.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

### 4.2.1.RFC19. Required Monitoring - RFC 19 Copper benchmark

**Commenter Name:**  Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:**  Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

**2. Establish a new "off ramp", which would allow permittees who have violated effluent limits to conduct additional study** before the requirements under Section 5 (Corrective Actions and Additional Implementation Measures) are triggered. Result would potentially reduce legal (economic) liability for both public and private facilities alike.

- **Allow permittees to utilize bioavailability-based approaches for metals as alternatives to national benchmarks.** These approaches should be available as optional benchmarks or as a component of additional study prior to triggering Corrective Actions and AIM. Functionally these options could be equivalent, because additional study may be needed to acquire the necessary data to apply an optional bioavailability-based benchmark. Furthermore, NAS (2019) offered recommendations for streamlining water chemistry characterization (as has been done in Oregon for the copper BLM) for the purpose of developing watershed-specific benchmarks. Such an approach could reduce the scope of additional study needed for individual facilities.
- **Apply bioavailability-based WQC for copper and other metals as stormwater monitoring benchmarks (USEPA's Request for Comment 19).** This idea is consistent with our "off ramp" concept, and essentially amounts to a tiered approach to stormwater benchmark monitoring by allowing application of a bioavailability-based, and therefore, site-specific approach for copper. We commend USEPA for considering such an approach as it represents progress toward harmonizing approaches within the Office of Water. However, this approach should be generally applicable for other benchmarks (e.g., aluminum) for which bioavailability-based approaches are available and recommended by USEPA as ambient WQC. Therefore, we recommend

generalizing this approach to benchmarks for other metals, as it is likely that WQC will be updated to incorporate bioavailability in the near future (i.e., through the CRADA efforts).

...

- If MSGP benchmarks for metals are not based on nationally recommended bioavailability-based WQC, site-specific options should be available before facilities enact corrective actions and AIM.
  - Regarding "Request for Comment 19": The site-specific analysis recommended by NAS (2019) and for which USEPA requested input should be allowed for copper. However, this approach should be generalized to any metal with bioavailability-based nationally recommended WQC. Currently, this would apply to aluminum, but should also be applicable to additional metals (e.g., lead, nickel, and zinc) as their WQC are revised to incorporate bioavailability.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Frederick J. McNeill
**Commenter Affiliation:** City of Manchester, New Hampshire
**Document Control Number:** EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The City also supports the permit providing flexibility to evaluate water quality risk associated with copper on a site-specific basis where the existing benchmark has been repeatedly exceeded. We ask that EPA provide guidance and examples for performing these site-specific calculations.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

We support a change in the evaluation method of analyzing the copper benchmark which is far too low to achieve. As we understand, aquatic life criteria can potentially play a vital role in evaluating water quality risks if it would enable site-specific analysis to be used rather than the generic national benchmarks. It also makes no sense to enforce unattainable low benchmarks when public drinking water supplies are allowed a much higher benchmark level (1.3 ppm). The NRC study has recommended that the EPA allow facilities who have repeatedly exceed the benchmark to use the latest aquatic life criteria as a method of evaluation.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jeffrey T. Miller
**Commenter Affiliation:**  Treated Wood Council
**Document Control Number:**  EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Part 8 of the proposed 2020 MSGP establishes the benchmark monitoring concentrations for copper as hardness dependent for freshwater and 4.8 µg/L for saltwater.

Copper is a hardness-dependent metal, meaning the benchmark value for a facility is based on the total hardness of the receiving stream. The copper benchmark values were established based on acute toxicity values to aquatic life based on aquatic life criteria expressed in terms of dissolved (filtered) metal concentrations. The NASEM report provides data on various industries and various pollutants sampled. The report shows that the majority of samples reported under the MSGP for the wood preserving industry exceeded the benchmark, and 81 percent of the samples were over eight times the benchmark for copper. In 2012-2013, sampling data was gathered from TWC members, and 924 samples taken from 45 locations at 22 facilities located throughout the United States were reviewed. From these data collected, 93.8 percent of total copper samples failed to meet the current copper benchmark established based on dissolved aquatic life criteria. These facilities currently employ numerous technology-based stormwater controls including retention ponds, detention ponds, rip rap spillways, and filtration units. Despite the failure to meet the copper benchmark at a high percentage for these TWC facilities, none of the receiving waters for the facilities are listed as 303(d) impaired streams for copper based on exceedances of aquatic life NRWQC expressed in terms of dissolved (filtered) metal concentrations. This demonstrates a severe lack of evidence that copper levels above the current benchmarks do substantial harm to aquatic life.

The copper benchmark value should allow the option of using either the benchmark or utilize the recommended criteria equation for calculating site-specific toxicity (Refer to Comment 6 for further discussion) and should not be based on whether the facility has had numerous benchmark

exceedances or not. The site-specific equation should be used during the first instance of benchmark exceedance as a follow-up tool and/or confirmation using site-specific information. Further, as discussed in Comment 3, the benchmark value should be based on the dissolved (filtered) copper concentration.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Ligia Duarte Botelho
**Commenter Affiliation:**  North American Metals Council (NAMC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0161-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

One example pertinent to certain metals such as copper is the Biotic Ligand Model (BLM), which is used to determine the bioavailability of the metals to aquatic life. NASEM recognizes that the sampling for dissolved metals is more complex than sampling for total metals and suggests that dissolved metal sampling should be an option, not a requirement. Specifically, for copper and some other metals, the more complex BLM is used to determine the bioavailability of the metals to aquatic life based on ten parameters of the water body in question. NAMC urges EPA to follow NASEM's recommendation that the MSGP allow facilities with repeated benchmark exceedances for total metals to develop a BLM for their receiving water to establish a site-specific benchmark value. The report describes how watershed-based collaborative relationships among municipalities, industries, and other dischargers could be established to develop watershed-specific benchmark concentrations for copper using the BLM (which has already been done in Oregon).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is requesting comment on updating the water quality standards for selenium, arsenic, cadmium and copper. The City concurs that it is appropriate to evaluate water quality risk on a site-specific basis using standards developed by each state.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**9. Request for Comment 19: Site-specific Benchmark Basis**

We support this proposal for this "off-ramp" from the copper national benchmarks, on a site-specific basis, and suggest that this site-specific risk assessment "off-ramp" option be made available for all of the other benchmark parameters.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Although not a part of the Proposed 2020 MSGP, ISRI supports an option for facilities that exceed the copper benchmark repeatedly to use the updated aquatic life criteria for copper to develop an alternative facility-specific copper benchmark based on risk to the facility's receiving water. This option may share some informational and computational aspects with ISRI's suggestion of wet-weather benchmark monitoring (please also see comments in Section B.7).

ISRI's support for this option stems from two factors. First, the copper benchmark has been the most-difficult benchmark to meet on a regular basis for the recycling industry. It is the lowest

among the benchmark parameters for Sector N1. The original copper benchmark was 63.6 μg/L (1995 MSGP). In the Proposed 2006 MSGP, it was reduced to a minimum of 14 μg/L, the value based on a receiving-water hardness of 100 mg/L ($CaCO_3$ equivalent). However, it was finalized in the 2008 MSGP as hardness dependent. Lower receiving-water hardness values give lower benchmark values (e.g., 7.3 μg/L at 50 mg/L hardness). A copper saltwater benchmark of 4.8 μg/L was introduced in the 2015 MSGP. From a practical perspective, 14 μg/L translates into 1.44 g or 0.16 $cm^3$ of metallic copper per acre-in (27,154 gal) of stormwater discharge. This is a miniscule amount of copper at the benchmark. Even 8 times the benchmark is a very small amount (1.28 $cm^3$ of copper per acre-in). Because most recycling facilities handle copper or copper-containing scrap metal and can be tens of acres in size, achieving this benchmark value during storm events is extremely difficult even with excellent SCMs. NASEM recognized "the critical need for more data to assess the achievability of many benchmarks", including the copper benchmark (Report at 40).

Second, NASEM offered that "[b]enchmarks should be based on the latest toxicity criteria designed to protect aquatic ecosystems from adverse impacts from short-term or intermittent exposures" (Report at 3). Specifically, NASEM recommended that "permittees with repeated benchmark exceedances to use the latest aquatic life criteria for … copper to evaluate water quality risk on a site-specific basis and discontinue comparisons to national benchmarks, as appropriate" (Report at 4).

ISRI requests that for the 2020 MSGP, any facility may use "the latest [aquatic life] criteria for … copper [that] include equations for calculating toxicity criteria based on short-term exposure, using additional water chemistry and/or flow data" (Report at 4).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

Third, NRC recommends that EPA provide flexibility for considering higher metal benchmarks by application of the Biotic Ligand Model (BLM).[60] It endorsed the approach for copper taken by Oregon in the site-specification application of the BLM model. In the 2020 proposal, EPA has requested comment on this approach for copper.[61] We appreciate EPA's tentative plan to address the third issue, although we would request that EPA extend this approach to other metals.

---

[60] Id. at 61-62.

[61] Proposed Fact Sheet at 64 (Request for Comment 19).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 39
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 19**

The copper benchmark value should allow the option of using either the benchmark or the EPA-recommended criteria equation for calculating site-specific toxicity, and use of those options should not depend on whether the facility has had numerous benchmark exceedances. The site-specific equation should be used during the first instance of benchmark exceedance as a follow-up tool and/or confirmation using site- specific information. Further, as discussed below, the benchmark value should be based on the dissolved (filtered) copper concentration.

Copper is a hardness-dependent metal, meaning that the benchmark value for a facility is based on the total hardness of the receiving stream. The copper benchmark values were established based on acute toxicity values to aquatic life based on aquatic life criteria expressed in terms of dissolved (filtered) metal concentrations. The NRC report provides data on various industries and various pollutants sampled. As an example, the report shows that the majority of samples reported under the MSGP for the wood preserving industry exceeded the benchmark, and 81 percent of the samples were over eight times the benchmark for copper. In 2012-2013, sampling data were gathered from facilities in that industry, and 924 samples taken from 45 locations at 22 facilities located throughout the United States were reviewed. Of the samples collected, 93.8 percent failed to meet the current copper benchmark established based on dissolved aquatic life criteria. These facilities currently employ numerous technology-based stormwater controls including retention ponds, detention ponds, rip rap spillways, and filtration units. Despite the failure to meet the copper benchmark at a high percentage of these facilities, none of the receiving waters for the facilities are listed as 303(d) impaired streams for copper based on exceedances of aquatic life that were expressed in terms of dissolved (filtered) metal concentrations. This demonstrates a severe lack of evidence that copper levels above the current benchmarks do substantial harm to aquatic life.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Copper (Sector G). EPA requests comment on whether the copper benchmark should be adjusted to reflect water quality risk on a site-specific basis. (request for comment 19). AEMA supports the option of allowing permittees to develop site-specific benchmarks based on EPA's updated criteria.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

The permit should allow for use of the latest recommended criteria.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Permittee asks if current national criteria for copper (biotic ligand model [BLM]) is the benchmark. How do permittees treat state criteria which differ and are the basis for other permits (Individual Permit, for instance)?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 19 – Copper.** This request could be made clearer by noting that the site-specific criteria for copper apply only to freshwater. There is a separate benchmark for saltwater that is not site-specific.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP would leave the aluminum benchmark unchanged (750 ug/1) unless revised criteria are finalized before the MSGP becomes final. For selenium and copper, EPA has proposed that where facilities repeatedly exceed their benchmarks, the MSGP would allow them to use the relevant aquatic life criteria water quality risk on a site-specific basis and discontinue comparisons to the benchmark. DEQ appreciates the flexibility being proposed, however, based on our experience it is unclear that facilities discharging industrial stormwater within many sectors would evaluate water quality criteria on a site-specific basis due to the time, cost and complexity involved. Such assessments are more similar to the analysis completed in developing an individual permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

The 2020 MSGP should address copper in the same manner as the 2015 MSGP – no changes.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

**[The copper benchmark should not be changed to accommodate the failing facilities.]**

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

NMED does not support allowing operators that repeatedly exceed the benchmark values to use the 2016 aquatic life criteria on a site specific basis and discontinue comparisons to national benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

**Copper.** The current benchmarks for copper are hardness-dependent for freshwater and 4.8 μg/L for saltwater. The most recent EPA water quality criteria document for copper uses a "Biotic Ligand Model" that requires 10 input parameters to calculate site-specific freshwater criteria.[85] The NAS approved of EPA's prior decision to retain a simpler, hardness-dependent benchmark.[86] EPA now proposes to continue this approach, retaining the hardness-dependent freshwater benchmark and the static saltwater benchmark. We support this decision for the reasons articulated in the NAS report.

EPA is also requesting comment on whether the Agency "should allow facilities that repeatedly exceed the copper benchmark to use the latest recommended aquatic life criteria to evaluate water quality risk on a site-specific basis."[87] We do not support this idea because it would introduce considerable complexity into the compliance framework, and EPA has not explained how it would work. The very brief request for comment fails to shed any light on numerous critical questions:

1. What does it mean to "repeatedly exceed" the benchmark?
2. Would the use of an alternative, site-specific benchmark be subject to prior EPA approval?
3. Would that EPA approval process include a public comment period?
4. What would happen if a permittee opted to use a site-specific benchmark, but failed to do it correctly?
5. Would EPA then require the permittee to return to the use of the default benchmark?
6. How often would a permittee be allowed (or required) to update the derivation of a site-specific benchmark?

EPA cannot finalize the site-specific alternative copper benchmark without a more substantial proposal that answers these and other critical questions. At this point in time, given the lack of clarity, we oppose the idea. EPA should retain the existing copper benchmarks and apply them consistently and uniformly to all permittees.

- *We note that EPA appears to have made a conversion error on page 70 of the fact sheet. The saltwater benchmark for copper should be 4.8 µg/L, not 48 µg/L.*

[85] Fact Sheet at 66; NAS at 33.

[86] NAS at 33 ("Given the extra sampling burden, the 2015 MSGP did not recommend using the biotic ligand model for copper benchmark monitoring, which is reasonable for a national permit").

[87] Fact Sheet at 66.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

EPA has updated the Fact Sheet to correct the saltwater benchmark value for copper to 4.8 µg/L.

---

**Commenter Name:** Jennie F. Formier
**Commenter Affiliation:** John W. Furrh Associations Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0151
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

COMMENT #19:

Again, based on the industries I deal with, the ability to get under the benchmark for copper is almost impossible, the nature of their business warrants a high number of related items/materials outside and exposed to the elements. Giving them another criteria to evaluate by only complicates their life more, so much of this program is becoming so elevated beyond the lay person it almost requires a business to hire a designated person to handle everything related to this permit. Bottom line my opinion regarding copper from the beginning has been that the benchmark is too low and almost impossible to achieve.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1

**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Copper-The benchmark parameters remain very problematic for copper. This is also fully confirmed in the NRC 2019 report, and in the 2015 MSGP DMR data. EPA has specifically requested comments concerning the copper benchmark status. The current benchmark limits for copper (which is hardness dependent) start as low as 3.8 micrograms-per-liter. Copper is a common laboratory contaminant that is also ubiquitous at similarly low levels in surface water and stormwater runoff. Accurate measurements of copper at these low levels require ultra-clean laboratories that specialize in extreme low-level metals analysis; the ordinary sampling and analytical procedures are not adequate. The only reasonable relief for copper would appear to be a reasonable background subtraction mechanism that utilizes a stormwater background value that is reasonable for urban stormwater runoff, such as the NSQD data as discussed in the next section.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  30
**Excerpt Status:** Final

**Comment Excerpt:**

The saltwater benchmark for copper is extremely low and should also be updated.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

The triggers for AIM must be based on realistic benchmarks that can be achieved with economically feasible controls and have a reasonable cost benefit. The current copper benchmark for saltwater of 0.0048 mg/L would force us into Tier 3 within the first year of testing. It is not possible for us to put controls that would achieve copper levels below 0.0048 mg/L.

We have reached out to engineers in efforts to learn about and then determine the cost of a collection and treatment system with the capability of meeting the 0.0048 mg/L copper benchmark. No one has been able to provide us any guidance.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

Benchmark for Total Recoverable Copper - 0.0048mg/L (saltwater)
We do not have any process water discharge at our facility. Our discharge is limited only to stormwater. We have easily met all benchmarks in the 2015 permit except copper. The copper benchmark of 0.0048mg/L is not achievable. We have regularly exceeded this benchmark by more than 8 times despite all efforts to find and correct the source.

Eighty-one percent of industry copper sample results exceeded the benchmark by more than 8 times during the 2015 MSGP regardless of strict housekeeping measures and expensive advanced control measures. The saltwater benchmark requirement is unachievable. The US EPA action level for copper in drinking water is 1.3mg/L based on EPA's Human Health Criteria. The Copper benchmark of 1.3mg/L is a realistic benchmark and should be the benchmark considered for the 2020 MSGP.

Recent testing of our town's drinking water taken by the water department at 30 sites shows 90% of the samples to have a copper level less than or equal to 0.495 mg/L. This is well below the EPA Action Limit of 1.3 mg/L (EPA Human Health Criteria) for drinking water. Comparing this to the stormwater benchmark, the drinking water samples averaged 103 times the benchmark. Pouring drinking water on the ground in fact will exceed the benchmark. (It must be noted that the EPA Action Limit of 1.3 mg/L copper in drinking water is 270 times greater than the stormwater benchmark of 0.0048mg/L.).

Consideration must be given to allowing facilities receiving municipal water supplies with a copper content in excess of the stormwater benchmark to correct for this uncontrolled

background contribution. The EPA action limit for drinking water is 1.3mg/L, which is 207 times the 0.0048mg/L copper benchmark. Why has a benchmark for copper been proposed at a level more stringent than drinking water standards?

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Matthew Paxton
**Commenter Affiliation:** Shipbuilders Council of America (SCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0217-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

The 2015 Multi-Sector General Permit (MSGP) did not require analytical testing in Sector R, Shipbuilders. However, in Part 9 of the 2015 MSGP, covered states did require Shipbuilders to test for aluminum, iron, lead, and copper. The benchmarks for all analytes have been found to be attainable with the exception of copper.

The 2015 MSGP set the copper saltwater benchmark at 0.0048mg/l. This is significantly lower than the copper action level for drinking water. Currently the action level for copper in drinking water is set at 1.3 mg/l. This is equivalent to the benchmark for copper in drinking water being over 270 times greater than the requirement for stormwater runoff. If the standard for drinking water is considered to be safe for human consumption, certainly it should be considered permissible for stormwater runoff.

Additionally, in efforts to maintain good housekeeping practices, businesses including shipyards will occasionally use publicly sourced tap water to pressure wash buildings and other exterior facilities. When the water that is publicly sourced contains a significantly higher level of copper content than what is allowed under the MSGP benchmark, facilities are set up to fail.

SCA believes the benchmark of 0.0048mg/l for copper in stormwater runoff is unreasonable and should be realigned closer to the federal action level of 1.3mg/l of copper in drinking water.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

### 4.2.1.RFC20. Required Monitoring - RFC 20 PAHs

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.

**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

***13. EPA Must Require PAH Monitoring for Sectors I, P, R, C, F and Q, in Accordance with the Recommendations by the National Academies and for Other Reasons.***

EPA must require PAH monitoring for at least Sectors I, P and R (based on NAS recommendations) and Sectors C, F and Q (based on the analysis in EPA's fact sheet). The NAS recommendations are clear, and the NAS <u>does not</u> support using COD as a surrogate. More fundamentally, while we recognize that it would be outside the scope of the current rulemaking, EPA must establish water quality criteria for PAHs, as Canada has done.[100] In the meantime, the very least EPA could do is require the monitoring data necessary to characterize the pollution problem and stormwater treatment capabilities.

[100] See, e.g., NAS at 43.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

The NAS notes that "PAHs have been shown to be extremely toxic to fish and aquatic invertebrates and are known to bioaccumulate," and that "PAHs are expected at industrial sites with petroleum hydrocarbon exposure."[101] In the draft fact sheet, EPA itself discusses the risks associated with PAH pollution.[102]

The NAS report and the EPA fact sheet barely scratch the surface of what we know about the risks of PAH exposure. Many PAHs are carcinogenic, cause organ damage, and/or suppress the immune system. They also comprise one of the most ubiquitous classes of compounds that industrial facilities discharge into the air and water.[103] EPA lists 17 PAHs as Priority Pollutants, including a number of chemicals commonly found in NPDES permits associated with Sector C, F, and Q facilities: acenaphthene, anthracene, benz(*a*)anthracene, benzo(*k*)fluoranthene, chrysene, fluoranthene, fluorene, naphthalene[FN] phenanthrene, and pyrene.[104]

The toxicity of PAHs has long been known. The scientific community first identified the carcinogenic nature of benzo(*a*)pyrene in 1918. Albers 2003 and a 1987 U.S. Fish and Wildlife Service Biological Report called PAHs "among the most potent carcinogens known to exist, producing tumors in some organisms through single exposures to microgram quantities."[105] When metabolized, PAHs byproducts can cause a host of problems in humans and animals, including inflammation, suppressed immune system function, endocrine (hormone) system disruption, genotoxicity, embryotoxicity, mutation, developmental malformations, tumors, and cancer (specifically, lung, skin, gastrointestinal, and bladder cancers).[106]

As in humans, PAHs induce a wide variety of detrimental effects in aquatic organisms, including reproductive harm, compromised immune system function, cancer, and death.[107] These harms impact species across taxa, from bacteria to invertebrates, fish to reptiles, birds to mammals. Aquatic organisms exposed to PAHs may exhibit reduced growth; deformities; endocrine disruption; inhibited reproduction and reduced survival of young; toxicity to embryos; suppressed immune systems; liver and kidney toxicity; cancers; and mortality.[108] The most striking evidence for the effect of PAHs on marine mammals comes from an eight-year study on St. Lawrence Estuary beluga whales (*Delphinapterus leucas*). A quarter of adult St. Lawrence Estuary belugas—which are exposed to PAHs through the ingestion of contaminated worms—die from cancer.[109]

In short, PAHs are extremely toxic and their discharge in industrial stormwater must be controlled. It should go without saying that PAHs must also be monitored. The NAS goes on to observe that "PAHs were not previously monitored as part of the MSGP process, but aquatic impacts of PAHs are now better understood and analytical technologies have advanced significantly since the 1992 group application,"[110] before concluding that "[a]dditional information and data gathering for polycyclic aromatic hydrocarbons (PAHs) could help EPA determine if benchmark monitoring is needed for sectors that have the potential to release PAHs."[111]

[101] NAS at 33 (internal citations omitted).

[102] Fact Sheet at 21.

[103] Canadian Council of Ministers of the Environment, Canadian Water Quality Guidelines for the Protection of Aquatic Life: Polycyclic Aromatic Hydrocarbons (CWQG PAHs) (1999).

[104] U.S. Envtl. Prot. Agency, 2014, Priority Pollutant List, https://www.epa.gov/sites/production/files/2015-09/documents/priority-pollutant-list-epa.pdf; Collier, T. K. et al., Effects on fish of polycyclic aromatic hydrocarbons (PAHs) and naphthenic acid exposures, 33 Organic Chemical Toxicology of Fishes 195 (2014); Eisler, R., Polycyclic aromatic hydrocarbon hazards to fish, wildlife, and invertebrates: a synoptic review, U.S. Fish & Wildlife Serv. Biological Report 85(1.11) (May 1987); Kannan, K. & E. Perrotta, Polycyclic aromatic hydrocarbons (PAHs) in livers of California sea otters, 71 Chemosphere 649 (2008).

[105] Eisler 1987, at 4.

[106] Abdel-Shafy, Hussein I. & Mona S.M. Mansour, A review on polycyclic aromatic hydrocarbons: source, environmental impact, effect on human health and remediation. 25 Egyptian J. Petroleum 107 (2016); Albers, P., *Petroleum and Individual Polycyclic Aromatic Hydrocarbons, Ch. 14 in* HANDBOOK OF ECOTOXICOLOGY (David J. Hoffman et al. eds. 2nd ed. 2003); Albers, P.H. & T. R. Loughlin, *Effects of PAHs on Marine Birds, Mammals and Reptiles, Ch. 13 in* PAHS: AN ECOTOXICOLOGICAL PERSPECTIVE (Peter E.T. Douben ed. 2003); Collier et al. 2014; Kabir, Eva Rahman et al., A review on endocrine disruptors and their possible impacts on human health, 40 Envtl. Toxicology & Pharmacology 241 (2015); Kannan & Perrotta 2008; Rengarajan, T. et al., Exposure to polycyclic aromatic hydrocarbons with special focus on cancer, 5 Asian Pacific J. Tropical Biomedicine 182 (2015); Troisi, G. et al., Impacts of oil spills on seabirds: unsustainable impacts of non-renewable energy, 41 Int'l J. Hydrogen Energy 16,549 (2016).

[107] Eisler 1987; Albers 2003.

[108] Albers 2003; Albers & Loughlin 2003; Bell, Barbara et al., High incidence of deformity in aquatic turtles in the John Heinz National Wildlife Refuge, 142 Envtl. Pollution 457 (2006), at 463-64; Eisler 1987; Collier et al. 2014; Cousin, Xavier and Jerome Cachot, PAHs and fish—exposure monitoring and adverse effects—from molecular to individual level, 21 Envtl. Sci. & Pollution Research 13,685 (2014); CWQG PAHs 1999; Goodale, Britton C., PH.D. DISSERTATION: DEVELOPMENTAL TOXICITY OF POLYCYCLIC AROMATIC HYDROCARBONS: DEFINING MECHANISMS WITH SYSTEMS-BASED TRANSCRIPTIONAL PROFILING (Aug. 12, 2013); Malcolm, H. M. & Richard F. Shore, *Effects of PAHs on Terrestrial and Freshwater Birds, Mammals and Amphibians*, *in Ch. 12* PAHS: AN ECOTOXICOLOGICAL PERSPECTIVE  Peter E.T. Douben ed. 2003); Meador, J.P. et al., Bioaccumulation of Polycyclic Aromatic Hydrocarbons by Marine Organisms, 143 Review of Envtl. Contamination & Toxicology 79 (1995); Payne, J. F. et al., *Ecotoxicological Studies Focusing on Marine and Freshwater Fish*, *in Ch. 11* PAHS: AN ECOTOXICOLOGICAL PERSPECTIVE (Peter E.T. Douben ed. 2003); Reynolds, J. & D. Wetzel, *PowerPoint presentation: Polycyclic Aromatic Hydrocarbon (PAH) Contamination in Cook Inlet Belugas* (undated); Troisi et al. 2016; Zychowski, G. V. et al., Reptilian exposure to polycyclic aromatic hydrocarbons and associated effects, 36 Envtl. Toxicology & Chemistry 25 (2017).

[109] Albers & Loughlin 2003; Martineau, Daniel, *Contaminants and Health of Beluga Whales of the Saint Lawrence Estuary*, *in Ch. 17* ECOSYSTEM HEALTH AND SUSTAINABLE AGRICULTURE 2 (Norrgren, L. & J. Levengood eds. 2012).

[110] NAS at 31.

[111] Id. at 3; see also id. at 33 and 42.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

EPA also presents "industrial process wastewater discharges" of PAHs from various MSGP sub-sectors "as a proxy" for stormwater loads.[115] This analysis suggests that EPA should also require PAH monitoring for Sectors C, F and Q, which contain the top five subsectors for process wastewater PAH loads.

[115] Id. at 67-68.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 41
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's suggestion[116] that the NAS approves of COD as a surrogate for PAHs is plainly false. The NAS said no such thing. To the contrary, the NAS repeatedly said the opposite:

- "While both COD and TOC are gross measures of organic pollution, they are not specific enough or sensitive enough to detect possible excursions of toxic pollutants (e.g., polycyclic aromatic hydrocarbons [PAHs]) at moderate/low concentrations."[117]
- "Analytical methods for determination of PAHs are standardized and readily available (EPA, 2015c). It may appear that [Chemical Oxygen Demand] can be used as a surrogate for PAHs, but PAHs can be toxic at concentrations orders of magnitude lower than the [Chemical Oxygen Demand] benchmark (120 mg/L). Canadian water quality guideline values for PAHs for the protection of aquatic life range from 0.012 µg/L (anthracene) to 5.8 µg/L (acenaphthene) (Canadian CME, 1999). Currently, EPA has no recommended aquatic life criteria for individual or total PAHs.[118]

What the NAS actually recommended with respect to PAHs and COD is that EPA <u>first</u> require PAH monitoring, and then evaluate whether COD could be an adequate surrogate.[119] Based on

the information available now, and the NAS's discussion, it should be clear that COD is not an adequate surrogate.

[116] *Id.* at 69.

[117] NAS at 28.

[118] Id. at 43 (emphasis added).

[119] Id. at 33.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  42
**Excerpt Status:** Final

**Comment Excerpt:**

In light of the known toxicity of PAHs, the clear NAS recommendations for sector-specific monitoring, and the fact that COD is not a reliable surrogate for PAHs, EPA must require PAH monitoring for Sectors I, P and R, and also for sectors C, F and Q while it works on developing water quality criteria for PAHs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

BES has attached PAH data collected by industrial sources covered under the Oregon NPDES General Industrial Stormwater Discharge Permit No.1200-Z (permit) within the City of Portland.

This data set is comprised of data that was required to be collected as part of the impairment monitoring requirements in the permit. BES has supplied available data from 119 facilities for the date range of July 1, 2012 to present. Prior to July 1, 2012 permit registrants were not required to monitor for impairment pollutants. The data set includes a unique facility identifier, the primary SIC code of the industrial facility, the date of sample collection (please note that each facility may have more than one monitoring. location), the specific PAH analyte, the numeric result and any applicable data qualifiers. Non-detect data is displayed as less than the Method Reporting Limit (MRL), E data qualifier equals estimated value and J data qualifier equals J flagged data: a data point that is less than the MRL but greater than or equal to the Method Detection Limit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The COD test is a cost effective option as a surrogate.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

DEQ has serious concerns regarding setting benchmarks for PAHs and imposing extensive requirements to address PAHs under the MSGP. DEQ believes that PAHs present questions regarding wet versus dry deposition versus spills or industrial material used or produced onsite due to ignition by-products. Many facilities could be "chasing" a contaminant they have no

control over. We recognize that PAHs are detrimental to human health and the environment, but the simple presence of petroleum products at a site does not always result m a PAH issue. Facilities covered by our ISW general permit are not authorized to discharge petroleum products or process water under the general permit and must cleanup spills immediately.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

PAH pollutant load attributed to Sector A1 (General Sawmills and Planing Mills) and Sector A2 (Wood Preserving).

Discussion/Recommendation

The Table documents 251 and 206 kg/year for Sectors A2 and A1 respectively. The source of this data is not documented, though EPA says later, "The analysis looked at industrial process wastewater discharges as a proxy to identify industries that may use, handle, or generate PAHs." Since Sector A1 and A2 typically do not have industrial process wastewater discharges (unless it is to a POTW, the validity of this data is questionable, and it is not accurate to include these Sectors as significant PAH sources.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Comment on PAH sources, the correlation of COD to PAH and appropriate control measures for PAH.

Discussion/Recommendations

Obviously, as stated in EPA's own documents, the understanding of PAH is still evolving, and EPA has yet to produce any aquatic life criteria for PAH. It therefore is premature to apply any type of PAH benchmark, or even a surrogate. See also previous comments on Fact Sheet above. It would appear that most types of facilities potentially having PAH in stormwater discharges are due to fueling or other use or production of petroleum products. The existing oil and grease test may offer an eventual better surrogate for PAH. The likely applicability of trying to use COD as a surrogate for PAH will not work, since for example, BOD to COD ratios vary quite widely. Visual inspections of stormwater samples already examine for the presence of a sheen, which can be due to even minor oil and grease contributions. This should suffice until EPA can research and develop the science around PAH more.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that benchmark monitoring for polynuclear aromatic hydrocarbons (PAHs) not be included in the final EPA MGSP.*

By its Request for Comment No. 20, EPA is soliciting comments about whether PAHs should be considered for stormwater benchmark monitoring. AISI believes stormwater benchmark monitoring for PAHs is unwarranted as a universal benchmark requirement and for iron and steel mills in particular. Benchmark monitoring for PAHs should not be required or set out as EPA guidance that would apply to iron and steel facilities.

Aside from byproduct cokemaking operations, PAHs are not characteristic of any integrated steel mill or EAF steel mill operations (see references at footnotes 1 and 2). For those iron and steel mills without by-product cokemaking operations, existing controls through stormwater effluent limits for oil and grease and through provisions of SPCC Plans are sufficient to address possible stormwater discharges of PAHs.

PAH in process water discharges from by-product coke plants are regulated by the categorical BAT effluent limitations guidelines at 40 CFR Part 420, specifically at §420.13(a). It is standard practice at by-product coke plants to collect stormwater from the immediate process areas and treat that stormwater with process wastewaters. This is encouraged and provided for by 40 CFR Part 420 at §420.08 where NPDES permit effluent limits for regulated pollutants are adjusted to account for additions of stormwater from the immediate process area. Also, PAH monitoring is required at combined non-contact cooling water/stormwater discharges at certain by-product coke plants. Consequently, stormwater from process areas at by-product coke plants is effectively monitored and regulated. If any PAH stormwater benchmark monitoring is proposed for the iron and steel industry, it should only apply to stormwater discharges associated with by-product coke plants, and not stormwater discharges associated with other iron and steel operations or outdoor slag processing operations.

Also, we reiterate our above comments regarding the proposed Universal Benchmark Monitoring Concentration for COD. Stormwater discharges and combined process water/non-contact cooling water/stormwater discharges at iron and steel mills are typically limited to 10 mg/L or 15 mg/L of oil and grease. Thus, these existing controls would apply to PAHs as well. Furthermore, benchmark monitoring for PAHs is not cost effective and would be superfluous at many iron and steel mills where oil and grease monitoring is required.

AISI requests that EPA not include benchmark monitoring for PAHs as an element of a final MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA not adopt a Universal Benchmark Concentration or a Sector-Specific Benchmark Concentration for PAHs, or require stormwater monitoring for PAHs as may be applied to iron and steel facilities;

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

This should be location dependent and should apply only to Industrial Sectors, or SIC's within a Sector, that are a) discharging to potential high value waterways, b) effecting endangers species, c) location of outfalls increase the potential to contaminate, or d) have control measures in place. Again, only high-risk Sectors, or SIC's within a Sector, should be subject to benchmark monitoring. Low risk Sectors and SIC's within that Sector should be "Inspection" only.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  CJ Environmental
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

Release of PAHs via stormwater discharge via lumber mill not likely.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and
Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Sector A facilities typically have multiple sources which could discharge PAHs in stormwater
(e.g. oil storage, leaky vehicles and equipment, creosote from treated wood products, coal tar
sealed roadways, etc.) Based on our review, it does not appear that enough data exists concerning
the correlation between PAHs and COD levels. Given that COD is now proposed as a Universal
Benchmark for all sectors, perhaps the necessary data will be available in the future, and can be
addressed in subsequent MSGPs.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**IV. PAH benchmarking should not be included in the final permit absent additional
justification and further notice and comment**
In its Fact Sheet, EPA suggests that "EPA may consider additional monitoring for PAH's in the
final permit if it receives sufficient information to develop an appropriate benchmark
threshold."[5] The NRC Report noted that information should be gathered in order to potentially
correlate PAHs with COD concentrations and determine whether PAH monitoring is needed for
sectors that have the potential to release PAHs.[6]

Final agency action may not be taken without adequate public notice and comment on the PAH
benchmark and the specific basis for such a requirement.[7] EPA's statement that it "may consider
additional monitoring for PAHs" in the final 2020 MSGP is insufficient to meet this burden.
Thus, including such a requirement without additional notice and comment would violate the
Administrative Procedures Act. Moreover, as observed by the NRC, EPA has routinely stated the
chemical oxygen demand ("COD") is the most cost-effective surrogate for PAH sampling and
has previously noted that data regarding aquatic life toxicity are extremely limited.[8] Before
imposing additional requirements related to PAHs on industry, EPA should research the extent to

which COD concentrations are correlated with PAHs, as the NRC suggested. Imposing such a requirement on all industries would constitute an expensive burden with little benefit due to PAHs being ubiquitous and not necessarily related to the industrial activity in question.

[5] EPA 2020 MSGP Fact Sheet at 5.

[6] NRC Report at 33.

[7] Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016).

[8] NRC Report at 33.

**Comment Response:**

Regarding the comment pertaining to PAH monitoring, see Comment Response Essay 2 Monitoring.

For the comment pertaining to the Administrative Procedures Act, see Comment Response Essay 1 Legal.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  41
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 20**

The FWQC and FSWA oppose establishing additional requirements or monitoring for sectors related to PAHs. There are many types of PAHs, some of which have no impact and others that are naturally-occurring. Further, PAHs differ widely in bioaccumulative potential. The risk of PAH bioaccumulation in stormwater is low, as the discharges are not long term continuous loadings; rather, PAH loadings peak during wet weather and dissipate quickly thereafter.

In order to establish any benchmark for PAHs, EPA must evaluate risk for specific PAH compounds and account for the fact the PAH exposure in stormwater is low. EPA states that "[t]he analysis looked at industrial process wastewater discharges as a proxy to identify industries that may use, handle, or generate PAHs." However, Sector A1 and A2, for example, typically do not have industrial process wastewater discharges (unless it is to a POTW).

Accordingly, the validity of EPA's data is questionable. Some sectors are not significant sources of PAHs and, consequently, should not be included in any PAH requirements, if adopted.

Similarly, using COD as a surrogate benchmark for PAHs does not appear to account for risks of exposure. EPA should conduct an analysis to evaluate whether or not COD is an appropriate surrogate for PAHs, accounting for exposure risk. In establishing COD as a surrogate for PAHs, EPA presumes that PAHs pose a risk without providing sufficient data to support such a presumption. EPA's own understanding of PAHs is still evolving, and EPA has yet to produce any aquatic criteria for PAHs. Therefore, it is premature to apply any type of PAH benchmark, or even a surrogate, until the science is more fully developed.

Using COD as a surrogate for PAH will not work well in many instances.[32] For example, BOD-to-COD ratios vary quite widely. Further, many PAH stormwater discharges result from fueling or other use or production of petroleum products. Accordingly, the existing oil-and-grease test eventually may offer a better surrogate for PAH. Visual inspections of stormwater samples already examine for the presence of a sheen, which can result from very minor oil-and-grease contributions. EPA should continue to use visual inspections until it can research and develop the science surrounding PAHs more fully.

[32] Additionally, from an analytical technique perspective, COD should not be a surrogate for PAHs, as COD is measured in ppm and PAHs are normally found in ppb (an order of magnitude lower).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

The MSGP already imposes requirements on discharges to PAH-limited waters. Section 4.2.4.1 of the 2020 Proposed MSGP provides for monitoring of discharges to impaired waters without an EPA-approved or -established TMDL, as well as for discharges to impaired waters with an EPA-approved or -established TMDL. This approach represents a more nuanced and appropriate process for monitoring and addressing discharges to PAH-limited waters than the proposed eligibility requirements.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

<u>PAH Benchmarking Should Not Be Included in the Final Permit</u>

In its Fact Sheet, EPA suggests that "EPA may consider additional monitoring for PAH's in the final permit if it receives sufficient information to develop an appropriate benchmark threshold."[45] The NRC Report noted that information should be gathered in order to potentially correlate PAHs with COD concentrations and determine whether PAH monitoring is needed for sectors that have the potential to release PAHs.[46]

Final agency action may not be taken without adequate public notice and comment on the PAH benchmark and the specific basis for such a requirement.[47] EPA's statement that it "may consider additional monitoring for PAHs" in the final 2020 MSGP is insufficient to meet this burden. Thus, including such a requirement without additional notice and comment would violate the Administrative Procedures Act.

Moreover, as observed by the NRC, EPA has routinely stated the chemical oxygen demand ("COD") is the most cost-effective surrogate for PAH sampling and has previously noted that data regarding aquatic life toxicity are extremely limited.[48] Before imposing additional requirements related to PAHs on industry, EPA should research the extent to which COD concentrations are correlated with PAHs, as the NRC suggested. Imposing such a requirement on all industries would constitute an expensive burden with little benefit due to PAHs being ubiquitous and not necessarily related to the industrial activity in question.

[45] EPA 2020 MSGP Fact Sheet at 5.

[46] NRC Report at 33.

[47] Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016).

[48] NRC Report at 33.

**Comment Response:**

Regarding the comment pertaining to PAH monitoring, see Comment Response Essay 2 Monitoring.

For the comment pertaining to violation of the Administrative Procedures Act, see Comment Response Essay 1 Legal.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 20 – PAHs.** I think it's inappropriate to require benchmark monitoring for PAHs at this time. The Fact Sheet notes that "EPA does not have national recommended aquatic life criteria for individual or total PAHs … The NRC study recommended that EPA collect data or require monitoring related to PAHs in the MSGP to determine an adequate surrogate or if additional PAH monitoring is warranted … EPA may consider additional monitoring for PAHs in the final permit if it receives sufficient information to develop an appropriate benchmark threshold."

I believe that EPA—not the permittees—bears responsibility for collecting these data and developing aquatic life criteria that are suitable for a federally issued permit. I think the PAH data that EPA has requested is unlikely to be adequate for developing a benchmark and requiring benchmark monitoring. The states may adopt their own criteria and include them in Part 9 of the MSGP, but the validity of incorporating such criteria, or benchmarks derived from them, in a federally issued permit is also questionable.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

## 4.2.2. Required Monitoring - Effluent Limitations Monitoring

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

*d. Monitoring based on Effluent Limitation Guidelines (ELGs)[55] (and where discharges are to impaired waters)*

Where stormwater discharges are subject to specific ELGs (or occur in impaired waters), quarterly monitoring should be used at each discharge point containing the pollutant discharges identified in Table 6-1 and for the pollutants listed as adversely affecting water quality standards. The draft language in these two sections would otherwise allow such discharges to persist as long as a year before potential discovery and remediation, which is too long for the pollutants with ELGs or those specifically listed as limiting water quality. Some of these pollutants, discharged in locations where water bodies are already stressed for a particular pollutant or its major component(s), pose specific threats to water quality. For example, urea used as a deicer at airports contains a very high nitrogen content, which could add significant nutrients to a waterbody already threatened by or undergoing eutrophication. More frequent – i.e. quarterly -- monitoring and, as necessary, possible corrective action, is required in these two circumstances.

[55] Draft Permit at 32 and 33, Parts 4.2.2.1 and 4.2.4.1, respectively.

**Comment Response:**

EPA does not agree that more frequent monitoring should be required for effluent limitations and impaired waters monitoring. Only a single monitoring event per year is required to be taken and reported for discharges subject to an Effluent Limitations Guideline (ELG), per 40 CFR 122.44(i)(3). For all other types of monitoring, 40 CFR 122.44(i)(4) requires the monitoring frequency to be established on a case-by-case basis dependent on the nature and effect of the discharge. Consistent with previous versions of the MSGP, the 2021 MSGP establishes only the minimum monitoring requirements. EPA encourages operators to monitor more frequently based on changes in their control measures, facility operations, or to satisfy any alternate schedules or other conditions established in the SWPPP. Operators subject to numeric ELGs may have alternate monitoring frequencies or schedules for effluent limit monitoring to minimize the effects of variability on the facility's compliance performance. Additionally, the 2021 MSGP requires additional follow-up monitoring when an operator exceeds a numeric effluent limit. For these reasons, EPA finds that the frequency for effluent limitations and impaired waters monitoring in the 2021 MSGP is sufficient.

See Comment Response Essay 2 Monitoring for additional discussion of the impaired waters monitoring requirements in the 2021 MSGP.

---

**Commenter Name:**  Ed Dunne
**Commenter Affiliation:**  Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

DOEE believes that an annual sample is too infrequent to ensure the effectiveness of monitoring based on Effluent Limitations Guidelines.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 15.

---

**Commenter Name:**  Lealdon Langley
**Commenter Affiliation:**  Massachusetts Department of Environmental Protection (MassDEP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0232-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Given that many of the sectors covered under the MSGP have the potential to use products containing per- and poly-fluorinated substances (PFAS) and that there are growing concerns about the impacts of PFAS on human health and the environment, MassDEP requests that EPA add a requirement for annual PFAS monitoring of effluent for the sectors listed below. MassDEP recommends that this requirement include monitoring for PFOA and PFOS at a minimum, given these are the two compounds EPA is addressing in its drinking water advisory.

a) Sector B – Paper and Allied Products

b) Sector C – Chemical and Allied Products Manufacturing

c) Sector D – Asphalt Paving and Roofing Materials and Lubricant Manufacturing

d) Sector K – Hazardous Waste Treatment Storage, or Disposal Facilities

e) Sector L – Landfills, Land Application Sites and Open Dumps

f) Sector N – Scrap Recycling and Waste Recycling Facilities

g) Sector S – Air Transportation

h) Sector V – Textile Mills, Apparel, and Other Fabric Products

i) Sector W – Furniture and Fixtures

j) Sector Y – Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Industries

k) Sector Z – Leather Tanning and Finishing

l) Sector AA – Fabricated Metal Products

m) Sector AC – Electronic and Electrical Equipment and Components, Photographic and Optical Goods

**Comment Response:**

There are currently no promulgated analytical methods for per and poly-fluoroalkyl substances (PFAS) compounds in 40 CFR Part 136. To recognize that industrial facilities can conduct activities that use, store, manufacture, transfer, and/or dispose of PFAS-containing materials and in alignment with EPA's "Interim Strategy for Per- and Polyfluoroalkyl Substances in Federally Issued National Pollutant Discharge Elimination System Permits: Recommendations from the PFAS NPDES Regional Coordinators Committee," EPA revised each of the sector-specific fact sheet guidance documents to include practices that could be used by operators to minimize PFAS in stormwater discharges.

---

## 4.2.3. Required Monitoring - State or Tribal Required Monitoring

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 4.2.3 and 4.2.4.1 – Current 2015 MSGP Section 9 invalidates this section of the permit.  Currently section 9 requires quarterly monitoring of impaired waters and never lets you cease, it is required for the entire permit term.

**Comment Response:**

Part 4.2.4.1 (Sectors Required to Conduct State or Tribal Monitoring) of the 2021 MSGP requires operators to comply with any state or tribal monitoring requirements specified in Part 9 (Permit Conditions Applicable to Specific States, Indian Country Lands, or Territories). Part 9 includes requirements that state, territory, and tribal entities certify are necessary in order for the permit to include limits to achieve their water quality standards. To the extent that the applicable monitoring frequencies in Part 9 for discharges to impaired waters are more frequent than required by Part 4.2.5 (Impaired Waters Monitoring), the operator must comply with the monitoring frequency specified in Part 9.

## 4.2.4. Required Monitoring - Impaired Waters Monitoring

**Commenter Name:** Daniel Curtin
**Commenter Affiliation:** Crystal Cove Marina
**Document Control Number:** EPA-HQ-OW-2019-0372-0106-A1

**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

First, the MSGP's benchmark figures expect stormwater quality standards to be that of drinking water, and require those of us operating near impaired water bodies to test for constituents which are in no way being caused by our operations (like fecal coliform).

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Would the 3-year timeframe to cease monitoring for impaired waters with no approved TMDL also apply to the universal benchmark parameters (Section 4.2.4.1)?

**Comment Response:**

EPA did not finalize universal benchmark monitoring requirements in the 2021 MSGP.

---

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Impaired waters monitoring

I agree that operators discharging to impaired waters must monitor once per year for pollutants for which the waterbody is impaired and can discontinue monitoring if these pollutants are not detected or not expected in the discharge.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

Facilities should be required to monitor at least one time for all pollutants for which the waterbody is impaired without an EPA approved or established TMDL and for which a standard analytical method exists to ensure their stormwater discharge is not contributing to the impairment. Some impairment analytes may remain onsite from past industrial activity and be mobilized via stormwater discharges regardless of the current site activity.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Frederick J. McNeill
**Commenter Affiliation:**  City of Manchester, New Hampshire
**Document Control Number:**  EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Where a discharge is to an impaired water, the City is in support of only having to monitor pollutants that are associated with the industrial activity, rather than all pollutants of concern in the receiving water. The City requests that sampling be discontinued after two years of monitoring instead of the proposed three years as that schedule would remain protective of receiving waters while providing monitoring relief to facilities if they have demonstrated that they have little to no pollutants in their stormwater.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality (DEQ)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Virginia's ISW general permit requirements applicable to monitoring discharges to impaired waters are comparable to, and may be a bit more stringent than, the requirements proposed in the MSGP. Virginia's ISW general permit requires dischargers to monitor discharges to impaired waters that are not subject to a final TMDL once per monitoring period (our ISW general permit specifies two monitoring periods per year, so such monitoring occurs two times per year) for pollutants that cause the impairment, whereas the proposed requirement would require monitoring once per year. Where a pollutant is below the quantitation limit or caused solely by natural background sources, a permittee may request that impaired water monitoring be discontinued. The ISW general permit does not expressly specify that the pollutant must be associated with industrial activity or benchmarks, as proposed in the MSGP, however, only discharges of stormwater associated with industrial activity are regulated under our ISW permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Nina Schittli
**Commenter Affiliation:**  Blymyer Engineers Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment: Allow monitoring of discharges to impaired waters without an approved TMDL to be discontinued if the pollutant is not detected for two consecutive years**

The proposed permit states that monitoring of discharges to impaired waters without an EPA approved or established TMDL may be discontinued if the monitored pollutant is not detected for three consecutive years. The 2015 permit allowed monitoring to be discontinued if the monitored pollutant was not detected after one year. We recommend allowing monitoring to be discontinued after two consecutive years if the monitored pollutant is not detected. We believe that two consecutive years with non-detectable results are sufficient to demonstrate the absence of the monitored pollutant in facility industrial activities and is more stringent than the 2015 permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Monitoring discharges to impaired waters without an EPA-approved or established TMDL

Discussion/Recommendations

Since mercury is well-known to be caused primarily by atmospheric deposition, allow exclusion for monitoring for mercury until such time as a TMDL is completed documenting the primary sources, especially because of the difficulty for sampling for mercury by the wide range of operator expertise at regulated facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

*Part 4.2.4.1 Facilities Required to Monitor Discharges to Impaired Waters:*

Paragraph 2 states:"Compare the list of industrial pollutants identified in Part 6.2.3.2 and any sector' specific benchmark monitoring pollutants to the list of pollutants for which the waterbody is impaired and for which a standard analytical method exists (see 40 CFR Part 136). You must

monitor for pollutants that appear on both lists, including "indicator" or "surrogate" pollutants that clearly overlap those lists."

Part 6.2.3.2 describes pollutants as "A list of the pollutant(s) or pollutant constituents (e.g., crankcase oil, zinc, sulfuric acid, cleaning solvents associated with each identified activity, which could be exposed to rainfall or snowmelt and could be discharged from your facility. The pollutant list must include all significant materials that have been handled, treated, stored or disposed, and that have been exposed to stormwater in the three years prior to the date you prepare or amend your SWPPP.

If an impairment is for a pollutant which has been banned from use (e.g., PCBs), or not handled/treated/stored/disposed at the facility for three years, does this permit provision allow the permittee to not monitor for those pollutants? The permit should include language that clarifies the basis for the exclusion of 303(d) pollutants from monitoring.

*Recommendation:*

For the reasons provided below, this facility does not agree with the requirement to measure non-detects for three consecutive years in order to discontinue monitoring for a given impaired water pollutant. Our facility has measured 303(d) pollutants as non-detect during the first monitoring year for 2 consecutive MSGP permit cycles. This new requirement triples our analytical costs for pollutants that have not been detected in over 11 years and therefore provides no added value. The estimated increase in analytical costs for the additional two years of monitoring for non-detected pollutants at our facility is $5000.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify requirements for impaired waters monitoring, specifically when temperature is a pollutant of concern and facilities may be a source, and additionally when a water is listed as impaired because of toxics (such as PCBs) in fish tissue.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed 2020 MSGP does not appear to explain or provide timeframes for the EPA Regional Office concurrence process in Part 4.2.4.1 (impaired waters) for natural background sources. Part 4.2.4.1 states "you may discontinue monitoring for that pollutant only after submitting a Change NOI with the appropriate justification." However, Part 7.4.1 requires EPA Regional concurrence. EPA should clarify that a facility may discontinue monitoring only after concurrence.

EPA should also include notification to state, tribes and public for review and comment of a facility determination justification before Regional concurrence decisions.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  28
**Excerpt Status:** Final

**Comment Excerpt:**

*11. EPA Must Reject its Proposal to Weaken Monitoring Requirements for Permittees that Discharge Pollution to Impaired Waterways without an EPA-Approved or Established TMDL.*

EPA must also reject its own proposal to weaken monitoring requirements in the 2020 MSGP for permittees that discharge pollution to impaired waterways without an EPA-approved or established TMDL.[64] EPA proposes to roll back the requirement in the 2015 permit that permittees monitor for "all pollutant(s) causing the impairment or their surrogate(s)."[65] Instead, EPA proposes to "narrow[] the list of pollutants that operators must monitor for" by only requiring operators to only monitor for those pollutants or surrogate constituents that correspond to both the pollutant(s) or surrogate(s) for which the receiving waterway is impaired and the list of sector-specific benchmark pollutants applicable industrial activities or appear on the industrial pollutants listed on the operator's own self-reporting (Part 6.2.3.2).

EPA fails to assert a technical or legal justification for narrowing the scope of required monitoring and must not include this revision in the issuance of the final MSGP. This proposal is flawed, in part, because it will exclude operators from monitoring for pollutants that are present at their facilities and that contribute to waterway impairments only as a result of the operator failing to affirmatively include the constituent in its self-reporting or, while not associated with industrial activities as defined by EPA and assigned to operator's facility, the pollutant(s) is otherwise still present in detectable quantities.

For example, an operator may not be aware that a particular pollutant, which contributes to a receiving waterway impairment, is present at its facility in any quantity, and that pollutant is not otherwise included in the list of applicable sector-specific benchmark constituents. Under the requirements in the 2015 MSGP, the operator would be required to monitor for the pollutant pursuant to its inclusion in the impairment listing, thereby allowing the EPA and states to ascertain and subsequently address the contribution from the facility to the impairment and violation of water quality standards. Pursuant to the proposal in the draft 2020 MSGP, the facility's contribution to the ongoing waterway impairment and violation of a water quality standard would continue unknown to the operator and EPA, absent required monitoring, and unabated.

In the alternative, EPA should strengthen the provision from the 2015 MSGP by aligning required TMDL monitoring with benchmark monitoring requirements by requiring quarterly sampling coincident with benchmark monitoring. The additional data will improve EPA's effort to develop TMDLs and to ensure compliance with water quality standards and applicable waste load allocations.

Commenters do, however, urge EPA to adopt its proposal to impose an assumption that operators that discharge to impaired waters with an EPA-approved or established TMDL must monitor for pollutants corresponding to the TMDL, rather than relying upon an affirmative order or notice by to EPA to conduct such required monitoring.[66]

[64] Draft Permit at 33-34, Part 4.2.4.1.a.

[65] Fact Sheet at 75.

[66] *See* Fact Sheet at 75; Draft Permit at 34, Part 4.2.4.1.b.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**Impaired Waters Monitoring**

Increasingly, States are assessing waters using macroinvertebrate metrics which subsequently indicate impairment. These streams are listed on the State 303(d) list of impaired water but Total Maximum Daily Load (TMDL) values may not be developed for low priority systems. NACoal agrees with EPA's position that no additional monitoring is required for discharges to biologically impaired streams where no pollutant has been identified and/or where no TMDL has been determined.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

This language in section 4.2.3.1.1 is not entirely clear:

*If the monitored pollutant is not detected in your discharge for three consecutive years, or it is detected but you have determined that its presence is caused solely by natural background sources, you may discontinue monitoring for that pollutant.*

The 2015 permit allows demonstration that the monitored pollutant is caused by natural background conditions after the first year of sampling. The language in the draft 2020 permit appears to say that the permittee must conduct three rounds of annual impaired waters monitoring before determining that the pollutant is due to natural background conditions. **MWRA strongly recommends that the permittees be allowed to demonstrate that the cause is natural background conditions, after one year**. It is very unlikely that additional years would add any value or change the conclusion. EPA should clarify that monitoring can be discontinued after one year if the pollution is due to natural background sources, as in the 2015 permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  42
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations on Monitoring Discharges to Impaired Waters Without an EPA-Approved or Established TMDL (Part 4.2.4.1)**

Although EPA has not requested comment on this issue specifically, the FWQC and FSWA request that EPA provide an exclusion for mercury monitoring under this provision. Because mercury loadings are well-known to be coming mainly from non-stormwater sources, an exclusion for mercury monitoring is appropriate until a TMDL is completed documenting the primary sources. This exclusion is necessary, especially in light of the difficulty in sampling for mercury and the wide range of operator expertise at regulated facilities.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Bill Arcieri
**Commenter Affiliation:**  Henniker Sand and Gravel
**Document Control Number:**  EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Part 4.2.4 Impaired Waters Monitoring: For discharges to an impaired water, we request that this monitoring be for only pollutants that are associated with the industrial activity, rather than all pollutants of concern in the receiving water. In addition, we request that the impaired waters be discontinued after two years of monitoring instead of the proposed three years.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**2. CCIG Supports EPA's Proposed Impaired Waters Monitoring Changes.**

CCIG supports EPA's proposed change that would require facility operators discharging to impaired waters to monitor only for those pollutants that are both causing impairments and are associated with the industrial activity and/or benchmarks.[18] This proposed requirement fairly ensures that facilities are not required to test for pollutants that they do not produce. Additionally, CCIG agrees with the general proposal that if a monitored pollutant is not detected in a facility's discharge for a certain period of consecutive years (or is detected but has been determined to be caused solely by natural background sources), operators may discontinue monitoring for that pollutant. EPA proposes a period of three consecutive years. Given the short term of the MSGP (five years), CCIG recommends that EPA change this to a period of two consecutive years.

[18] 85 Fed. Reg. at 12,292.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Current (MSGP 2015) Section 9 is not consistent with section 4.2 of the draft permit. Current (MSGP 2015) section 9 requires quarterly monitoring of impaired waters and never lets you cease, it is required for the entire permit term. Recommend that final Section 9 language of the 2020 permit allow for discontinuing monitoring similar to Section 4.2 language.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0150-A1, Comment Excerpt Number 11.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  30
**Excerpt Status:** Final

**Comment Excerpt:**

Impaired Waters Monitoring (Proposed 4.2.4). The 2015 MSGP required monitoring for any pollutant for which the receiving water is impaired and a TMDL is not in place. In 4.2.4.1.a of the proposed MSGP, EPA has modified this monitoring requirement. The changes limit the required monitoring to pollutants that are identified by permittees as potentially found in stormwater discharges at the site or for which a benchmark is established, and for which the receiving water is listed as impaired. AEMA supports this provision of the proposed permit.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  35
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.4.1a

Making the standard "non-detect" to establish that a facility is not causing or contributing to an impairment goes beyond the waste load allocations established in a TMDL, should one exist for that impairment. If a TMDL exists, the standard should be the waste load allocation established for industrial discharges to that impaired waterbody. If a TMDL does not exist, using the water quality criteria with a factor of safety may be more feasible than using a non-detect requirement. For example, in nitrate-N impaired waterbodies, achieving non-detect in stormwater runoff even if all a facility's BMPs are operating perfectly, may be impossible simply through atmospheric deposition of nitrates. Even using a water quality criteria for nitrate-N minus a factor of safety may not be sufficient to prevent atmospheric deposition from exceeding that benchmark. Some local agencies may not accept the proposition that atmospheric deposition constitutes "natural background." Nevertheless, using non-detect is, to some extent, requiring industrial dischargers

to compensate for other lesser controlled sources. WEF recommends not using non-detect as the standard for cessation of monitoring, but establishing appropriate benchmarks based on established TMDL waste load allocations or what a TMDL waste load allocation would be given the water quality criteria for the specific pollutant.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  36
**Excerpt Status:** Final

**Comment Excerpt:**

4.2.4.1b

Where at TMDL exists, requiring a separate EPA action to require monitoring for that pollutant is not recommended. Since collection system operators will have waste load allocations for that TMDL, having data associated with industrial contributions to those collection systems is very useful information in terms of programs to implement to meet waste load allocations. We recommend that all industrial facilities within a TMDL watershed do the TMDL based monitoring for matching pollutants per 4.2.4.1a.

**Comment Response:**

See Comment Response Essay 2 Monitoring.

---

## 4.2.5. Required Monitoring - Additional Monitoring Required by EPA

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 4.2.5 – If monthly monitoring is invoked why aren't we using the sector specific benchmarks?

**Comment Response:**

Part 4.2.6 (Additional Monitoring Required by EPA) of the 2021 MSGP requires operators to perform additional discharge monitoring where EPA determines that monitoring is necessary to meet the permit's effluent limitations, specifically the permit's water quality-based effluent limit. Where required, EPA will provide the operator with a notice stating the reasons for the monitoring, locations, and parameters to be monitored, frequency and period of monitoring, sample types, and reporting requirements.

EPA clarifies that the additional monitoring requirements in Part 4.2.6 are not benchmark monitoring requirements. The benchmark monitoring requirements apply only to those sectors identified in Part 8. If additional monitoring is required for a parameter and the operator is not subject to benchmark monitoring for that parameter, comparison with a benchmark threshold for that parameter is not required.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Under current (MSGP 2015) permit, the Navy is required to conduct monthly zinc and copper monitoring. The standards established are not consistent with sector specific benchmark levels. Request that the sector specific benchmarks be applied to the additional monitoring requirements.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0150-A1, Comment Excerpt Number 13.

## 5. Corrective Actions and Additional Implementation Measures (AIM)

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Proposed Part 5. Corrective Actions:

I have read Part 5 a few times to understand, I understand the nature of the section, but the "How to" of the section is very confusing.

1st Suggestion: Remove the example tables from Part 5 and place the tables in an appendix or in a stand alone document such as a fact sheet. As it is, it does not enhance the section.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.1. Corrective Action

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Also if EPA wants required documentation as stated in Part 5.3 to apply to Part 5.1, then that wording should be included in Part 5.1. Currently it is not clear. Include a reference to Part 5.3 in section Part 5.1.2. Deadlines.

**Comment Response:**

EPA declines to make this change. Part 5.1 of the 2021 MSGP specifies the conditions and deadlines for performing corrective actions. Part 5.3 specifies the requirements for documenting that the operator has undertaken the corrective actions, as required. These requirements are included in separate sections to clearly denote the conditions, deadlines, and documentation requirements for corrective actions. Note that Parts 5.3.1, 5.3.2.2, and 5.3.3 include specific references to the corrective action requirements in 5.1.

## 5.1.2. Deadlines for Corrective Actions

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Note that in 5.1.2.2, "Where your corrective actions result in changes to any of the controls or procedures documented in your SWPPP, you must modify your SWPPP accordingly within 14 calender days of completing corrective action work." I suggest that the corrective action

document prepared per the permit and kept with the SWPPP should satisfy this requirement until the SWPPP can be updated. Remember, per the Proposed MSGP, the SWPPP is to be updated annually.

**Comment Response:**

EPA declines to make this change. Part 5.1.3.2 of the 2021 MSGP (Part 5.1.2.2 of the proposed 2020 MSGP) requires documentation in the SWPPP when corrective actions result in changes to any of the controls or procedures documented in the SWPPP. The SWPPP is a living document and operators must keep their SWPPP up-to-date throughout their permit coverage. As required by Part 6.3, operators must modify the SWPPP based on the corrective actions and deadlines required under Part 5.

EPA notes that the additional documentation requirements in Part 6.5, which includes documentation of corrective actions, are distinct from the SWPPP and are included to ensure that operators document the implementation (including inspection, maintenance, monitoring, and corrective action) of the permit requirements.

EPA clarifies that the requirement in Part 6.4.1 to update the SWPPP no later than 45 days after conducting the final routine facility inspection for the year to remain current for all three options for making the SWPPP publicly available does not negate the need to update the SWPPP more frequently, as required by Part 5.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Definition of "Immediate Actions"

Discussion/Recommendations

"Immediate" should be defined as follows:

*In Part 5, the term "immediately" means ~~that~~ the ~~day~~ 24-hour period beginning when you find a condition requiring corrective action,. You must take all reasonable steps during this time to minimize or prevent the discharge of pollutants until you can implement a permanent solution.*

~~However, if you identify a problem too late in the work day to initiate corrective action, you must perform the corrective action the following work day morning~~

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

In terms of immediate corrective action, the proposed MSGP removes language that allows permittees to document why corrective action is unnecessary. There are many instances where corrective action may be warranted but due to other circumstances or controls is not necessary and the final MSGP should retain this flexibility for permittees to provide a sufficient explanation of why immediate corrective action is not necessary.

**Comment Response:**

The 2015 MSGP included the following language that the commenter refers to: "'All reasonable steps' for purposes of complying with Part 4.2 Conditions Requiring SWPPP Review to Determine if Modifications Are Necessary, when you conclude a corrective action is, in fact, not necessary, could include documenting why a corrective action is unnecessary." Part 4.2 of the 2015 MSGP has been substantially replaced by new Additional Implementation Measures (AIM) in Part 5.2 of the 2021 MSGP. The AIM process provides more regulatory certainty as to what is required of an operator and in what timeframe once a benchmark triggering event occurs. The new requirements also facilitate the identification of any issues and implementation of any follow-up responses in a timely manner and addresses previous stakeholder concerns that the prior MSGP's corrective actions were not sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality. The 2015 MSGP's corrective actions for benchmark exceedances, including the exception the commenter references, may have allowed facilities to only make minimal changes, or no changes, in their SWPPP or to their SCMs, which may have led to limited stormwater control measure effectiveness. Under the 2015 MSGP's requirements, facilities' benchmark exceedances as well as their attempts to reduce pollutant levels below the benchmark thresholds could potentially continue in an endless loop, without clear expectations in the permit for how to improve the necessary response, if warranted, nor for how to comply with certainty. In the 2021 MSGP, EPA provides operators the flexibility to demonstrate and document that their existing controls are sufficient, that modifications to or additional control is infeasible, or that they qualify for one of the AIM exceptions. Therefore, EPA declines to continue to include this exception under AIM.

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 52
**Excerpt Status:** Final

**Comment Excerpt:**

*a. EPA Should Revise its Proposed "Too Late in the Work Day" Exception for Corrective Action*

Section 5.1.2.1 requires permittees to minimize or prevent the unauthorized discharge of pollutants "immediately," and defines the word "immediately" to include an exception for problems that occur "too late in the work day to initiate corrective action," in which case "immediately" means the next day. EPA should limit the "too late in the work day" exception to immediate actions in order to prevent unnecessary harm from spills and leaks that go unaddressed overnight. The exception for "too late in the work day" should not apply to an unauthorized release or discharge (5.1.1.1), because spills should be controlled and leaks or other unauthorized discharges abated as soon as possible so as to limit discharge of pollutants to receiving waterways during overnight (12+ hours) periods.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 54
**Excerpt Status:** Final

**Comment Excerpt:**

*c. EPA Should Shorten Unreasonably Long Extension Periods for Corrective Action*

EPA should reduce the proposed extension period for required "Subsequent Actions" and require operators to provide adequate justification for extensions.[137] After immediately taking all reasonable steps to correct with interim controls a discovered problem, the proposed rule requires the basic control to be modified as necessary, before the next storm event and within 14 calendar days, to complete the repair and eliminate the problem. If the 14-day period is infeasible for reasons fully documented by the permit holder, the proposed rule requires corrective action within 45 days after discovery. First, this unreasonably long *initial* extension period should be reduced to 30 days. If the permit holder then finds that a longer period is still necessary due to

necessary design or construction delays, such should be fully justified to EPA, and that period should be specified as 45 days without beginning to incur Clean Water Act penalties for permit violation. Only extraordinary circumstances might be cited to justify a 60-day period during which no penalties would be incurred.

[137] Draft Permit at 36, Part 5.1.2.2.

**Comment Response:**

EPA does not agree that the extension period for performing corrective actions should be reduced from 45 days to 30 days or that justification should be submitted to EPA for extensions greater than 30 days; therefore, EPA declines to make these changes. The corrective action deadlines remain largely unchanged from the 2015 MSGP and EPA considers them to be reasonable for making the necessary repairs or modifications.

## 5.2. Additional Implementation Measures (AIM)

**Commenter Name:**  Victoria R. Branson
**Commenter Affiliation:**  National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Universal Benchmark Monitoring for TSS**

SNL/NM proposes that if universal benchmark monitoring for TSS is required, then certain conditions such as those described below would be considered for an exception to pg. 2 corrective actions triggered by TSS exceedances (i.e., AIM Tier requirements in Section 5 of the 2020 Proposed MSGP):

TSS sampling may result in unreliable data for remote sites located in arid, undeveloped landscapes where stormwater is collected from sheet flow and infiltrates before reaching WOTUS. In a basin environment of the Basin and Range topography of the Southwest, the landscape is virtually flat, with sparse vegetation and unconsolidated soils. Low-energy flows can drop-out soils to samplers in greater concentrations compared to locations where defined drainages exist. This is especially evident in first-flow conditions, after long antecedent dry periods, which is also common in arid environments.

If low potential for stormwater to reach WOTUS can be demonstrated, an exception should be allowed for the conditions described above so that resources can be directed toward corrective measures at outfalls where more reliable data can be collected and where there is more direct impact of TSS in stormwater reaching WOTUS.

**Universal Benchmark Monitoring for COD**

Under conditions that prohibit access to samplers within 30 minutes, analytical data for COD could be considered "potentially unreliable," especially in arid environments. SNL/NM proposes that if universal benchmark monitoring for COD is required, then certain conditions such as those described below would be considered for an exception to corrective actions triggered by COD exceedances (such as the AIM Tier requirements in Section 5 of the 2020 Proposed MSGP):

COD sampling may result in unreliable data when it is impracticable and/or unsafe to access outfalls within 30 minutes or even within the same day. For example, at SNL/NM, several conditions make accessing samplers within 30 minutes impracticable. Multiple outfalls are located in remote areas across a 51,000-acre facility. Access can be difficult due to adverse weather and safety conditions, including lightning and flash floods, which are not uncommon during the Southwest regional monsoon season. Testing operations also can delay access to samplers. In addition, high afternoon temperatures are typical during the monsoon season that defines the MSGP monitoring periods for this arid environment. COD can change rapidly in samples that are exposed to high temperatures and other elements when standing longer than 30 minutes. COD results in these conditions would result in an unreliable sample set.

If low potential for stormwater to reach WOTUS can be demonstrated, an exception should be allowed for COD exceedances and corrective measures requirements in conditions described above so that resources can be directed towards corrective measures at outfalls where more reliable data can be collected and where there is more direct impact of COD in stormwater reaching WOTUS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The examples included in the Tier 1,2 and 3 portions of the permit should not be a part of the body of the permit, but either could be included as an appendix or a guidance document (Section 5.2).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

Additional implementation measures (AIM)

I support the AIM proposal

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the permit eliminate the AIM Tier 1, 2, 3 examples. The examples presented are unnecessarily confusing and the permit requirements are self-explanatory.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Randall M. Lyons
**Commenter Affiliation:**  Massachusetts Marine Trades Association (MMTA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that the 2020 MSGP take the same control measures it mandates in the event of exceedances (Part 5.2.2.2) and utilize them into a new incentive-based system where facilities which voluntarily adopt these controls are subject to less testing (annual vs. quarterly, for example).

**Comment Response:**

EPA declines to make this change. EPA notes that some incentives are already built into the MSGP, including the allowance for operators to discontinue benchmark monitoring requirements if the AIM triggers are not exceeded in the first or fourth years of their permit coverage.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

In Part 5.2, first line of wording appears to include a typo. Should it read "5.2.1, 5.2.2, or 5.2.3"?

**Comment Response:**

EPA has corrected the typographical error in Part 5.2 of the 2021 MSGP.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

I suggest that the acronym "AIM" and the wording "Additional Implementation Measures" adds no value to the corrective action section but only complicates the section. Since AIM is only associated with benchmark exceedances then would not the section be called "Corrective Actions required due to Benchmark Exceedances". I suggest substituting the word Level for the word

Tier. Remember this section is to assist the permittee by describing the steps to take in order to reduce pollutants in their stormwater discharge.

**Comment Response:**

EPA declines to make the suggested change. EPA finds that the term "Additional Implementation Measures" accurately reflects the intent to require additional and increasingly robust controls with each subsequent AIM level. These requirements are distinct from the corrective action requirements specified in Part 5.1.

As described further in Comment Response Essay 3 Additional Implementation Measures, EPA has revised the terminology from AIM "tiers" to AIM "levels" in the 2021 MSGP, as suggested by the comment.

---

**Commenter Name:**  Meghan Morel
**Commenter Affiliation:**  South Carolina Water Quality Association (SCWQA), West Virginia Municipal Water Quality Association (WVMWQA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0143-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is proposing a detailed 3-tiered approach to requiring AIM. Each tier is triggered by either an exceedance of the benchmark threshold based on annual average or based on the amount a single sample exceeds the threshold. Each tier has its own required responses. There are two AIM exceptions applicable to all three tiers: (1) if a facility can demonstrate that benchmark exceedance is related to natural background pollutant levels or (2) if the facility can demonstrate that exceedance is related to run-on from a nearby source (and if EPA agrees).

SCWQA is concerned that exceeding benchmarks will put a permittee on the path to having to take numerous, repetitive corrective actions, some of which could be expensive and time-consuming. For example, an AIM Tier 3 response must include the installation of permanent controls (such as permanent cover, secondary containment, berms, or forms of treatment) or the installation of infiltration or retention controls.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Melanie Davenport
**Commenter Affiliation:**  Commonwealth of Virginia Department of Environmental Quality

(DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

DEQ has strong concerns regarding the AIM requirements due to the significant complexity of the requirements and process proposed. While the concept of a tiered approach to corrective action makes sense where benchmark exceedances continue or are pronounced, the proposed approach is not appropriate for this group of permittees overall since these facilities have limited to no capacity to take on additional permit requirements associated with monitoring, tracking, and implementing the tiered corrective action steps specified. In some regards, from an implementation perspective, the complexity of the proposed AIM requirements challenges the limits of a general permit. Any potential advantages of this approach need to be balanced against the burden of implementing the tiered approach and tracking compliance. The ISW general permit covers a large universe of permittees, many of whom do not have a great deal of permit implementation experience or resources to dedicate to such implementation. It will be very difficult for such permittees to properly implement the proposed AIM requirements. In addition, it will be challenging for DEQ to integrate this framework into our established permitting and compliance data system. If it cannot be added to our data system, or reported data is incomplete or inaccurate (which occurs with greater frequency as complexity increases), implementation will have to be manually tracked by compliance auditors, which creates a tremendous amount of work and thus presents a major challenge given the very large regulated universe and limitations on staff resources. In our view, any AIM approach would have to be simplified to be implemented effectively.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

EPA acknowledges the challenges of integrating the AIM requirements in VA DEQ's permitting and compliance data system. In the proposed 2020 MSGP, EPA requested comment on the most appropriate method to methods for tracking AIM levels that may have been triggered by an operator, including an approach that would require the operator to self-select any AIM levels that have been triggered in the past quarter when submitting quarterly monitoring results. In the 2021 MSGP, EPA plans to implement changes in the electronic reporting systems that help the operator identify their AIM level (if any) based on submitted benchmark monitoring data; additionally the 2021 MSGP requires operators to document the AIM triggering event and responses and include a summary with the annual report. Further, except for Indian country within the state of Virginia, the 2021 MSGP is not applicable to industrial stormwater discharges in Virginia and, as an authorized state, Virginia DEQ is not obligated to incorporate these requirements in their VPDES permits.

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

However, the permit also causes concern with the approach toward exceedances and bringing facilities into compliance under the proposed Additional Implementation Measures (AIM). The qualifiers are complex and lack clarity on the basis for placing a facility in one of the three tiers. The bureaucratic complexity and short deadlines for implementation would prove difficult for most facilities to accomplish in order to comply.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The 2015 MSGP offered clear steps to address exceedances effectively and bring facilities into compliance. While James Environmental Management recognizes the advantages of a tiered monitoring system, the triggers and duplicate documentation would make achieving compliance financially burdensome and time consuming on the permittees, especially smaller operations with limited resources of time, finances, and personnel to implement the required measures under AIM. The implementation of the philosophy eliminates the ability of a facility to achieve compliance with out hiring outside professional services. Without equitable enforcement of the existing permit requirements on all members of the regulated community, not on just those that file a permit. Adding additional regulation only to those seeking to comply with the permit will not improve water quality.

**Comment Response:**

The AIM process is an improvement upon the 2015 MSGP protocol for benchmark exceedances and provides more regulatory certainty as to what is required of an operator and in what timeframe once a benchmark triggering event occurs. The new requirements also facilitate the identification of any issues and implementation of any follow-up responses in a timely manner and addresses previous stakeholder concerns that the prior MSGP's corrective actions were not

sufficient to ensure that discharges under the permit are sufficiently controlled to protect water quality. Additionally, EPA does not agree that the Agency inequitably enforces the industrial stormwater regulations for permitted and unpermitted operators. The 2021 MSGP requires operators that meet the eligibility criteria to obtain coverage under the general permit unless already covered by another permit. Clean Water Act section 309 authorizes EPA to bring civil or criminal action against operators that discharge pollutants without a permit or discharge in violation of NPDES permit conditions and monetary penalties. EPA takes appropriate enforcement action where EPA becomes aware of an operator discharging without an NPDES permit. The fact that some operators may be operating without a permit does not obviate the need for updates to the MSGP that are necessary to control stormwater discharges from industrial activity and protect water quality.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

The concept of AIM and the tiered enforcement implementation places an excessive burden on those attempting to comply and has no effect on those that are not attempting to comply. This is punitive to those that try to use good stormwater practices and significantly drives up the cost of compliance should initial sampling, or one bad sample, throw a facility into Tier 2 or 3. The punitive nature of the redundant oversight and its corresponding costs will dramatically increase the overall non-compliance posture. AIM measures pose a significant, complex, bureaucratic, and financially infeasible option for facilities that are unable to obtain professional services to ensure compliance management.

The absolute most cost-effective solution to improved water quality through the NPDES program will only be achieved through effective equitable enforcement of the existing MSGP. It is strongly believed that the Agency can more positively impact water quality by encouraging and assisting with the implementation of best practices for a broader universe of those requiring a permit, in lieu of the heavy handed enforcement of the AIM philosophy on an increasingly smaller number of permits.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0147-A1, Comment Excerpt Number 5 and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jennie F. Formier
**Commenter Affiliation:**  John W. Furrh Associations Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0151
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

COMMENT #21-26:

AIM Program dramatically increases the workload to parties responsible at a facility, feel this is excessively burdensome and potentially very costly. It also seems like it is opening the door to future ways to violation penalties. With so many businesses that will be struggling financially due to what has happened with being closed during the Covid-19 and the lack of business some of them will experience, I feel it is a very bad time to implement even tougher guidelines to be followed.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 1 and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

It is of utmost concern that this new AIM proposal would be extremely complex and excessive to achieve compliance for exceeding benchmarks set far too low to achieve. Many in the field have instituted, in good faith and at high costs, a range of management practices and controls. We find that many of these controls have been expensive to maintain as it currently exists. To push us beyond what we are currently undertaking due to this new triggering process would make this effort totally infeasible and burdensome. Additionally we are concerned about the timetables and costs of implementing additional controls under any tight schedule as presented in the proposed new permit.

In reviewing the Stormwater Control Measures in Appendix Q, several requirements for equipment modifications and/or improvements to structures will be impossible to meet in 14-45 days. Many are cost prohibitive. Additional documentation required to support these changes will be an extreme burden on facility operators.

We would recommend the elimination of this requirement to implement AIM based on complexities and uncertainties.  We further suggest that the requirement to review the averages of quarterly samples be kept in place.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  The Passenger Vessel Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0153-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

In the 2020 proposed MSGP, facilities are required to follow a sequence of Additional Implementation Measures (AIM) working through tiered levels based on the magnitude of an exceedance of benchmark testing values. Part 5 of the 2020 MSGP addresses these Additional Implementation Measures (AIM) as well as Tier Corrective Actions, and section 5.2.3.3 sets Tier 3 deadlines.

Industry is concerned that the proposed deadline does not allow adequate time to implement the additional measures to prevent further exceeding of benchmark criteria. Implementing certain Tier measures, specifically those of Tier 3, will require engineering, design time, and installation of permanent structures, which will also require permitting through local, state, and federal entities. From industry's experience, this process can take years to work through. The proposed MSGP timeframe of implementation, currently a maximum of 90 days, should be extended.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

As proposed, the AIM scheme misrepresents the settlement negotiations that resolved litigation over the prior MSGP and creates unjustified confusion and related financial impacts on regulated parties. ... It also should be sequential: any kind of benchmark exceedance, regardless of the degree of the exceedance, should only initially put a discharger into Tier 1; continued exceedances after the second year should place the discharger into Tier 2; and likewise for the third year for Tier 3.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Structure of AIM process

Discussion/Recommendations

The AIM process needs to be sequential: any kind of benchmark exceedance, regardless of the degree of the exceedance, should only initially put a discharger into Tier 1,: continued exceedances after the second year should kick the discharger into Tier 2; and likewise for the third year for Tier 3.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jeffrey T. Miller
**Commenter Affiliation:**  Treated Wood Council
**Document Control Number:**  EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

Section 5 of the proposed 2020 MSGP outlines Corrective Actions and AIM levels, which prescribe increasingly robust responses to address benchmark exceedances. The AIM proposed in the 2020 MSGP includes a tiered approach. When stormwater monitoring identifies exceedances of benchmark values, the tiered approach requires actions to be taken in a relatively short period of time (14-30 days). This tiered approach implies that a facility can directly be imposed into a Tier 3 if there is a significant increase in benchmark exceedances, which requires permit controls that can be very costly. This is a significant change from the prior concept of monitor, make changes, monitor again, make changes, etc. With the potential to skip AIM tiers under the proposed MSGP, individual facilities could potentially go from the monitoring stages to implementing permanent controls in less than 30 days. TWC recommends altering the tiered approach to include adequate monitoring and flexibility for a facility prior to being escalated to a higher tier. As currently stated, the AIM tiered approach could impose requirements for costly stormwater controls and demands on facility resources that may be unattainable.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Additional Implementation Measures (AIM): WMA opposes the proposed AIM framework in its entirety and urges EPA to withdraw it. The AIM approach is fundamentally flawed and is a significant escalation and revision to the MSGP. The EPA has not identified concerns with compliance under the current program, and hence provided no justification for imposing this new AIM program. The AIM approach essentially operates with the force of law without the necessary justification. AIM "violations" would trigger criminal and civil violations of the Clean Water Act. It is completely inappropriate for EPA to finalize and implement new enforcement requirements with severe criminal and civil penalties based on benchmark water quality standards that have been arbitrarily set and are not based on science.

**Comment Response:**

See Comment Response Essay 2 Monitoring and Comment Response Essay 3.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**2. EPA does not justify the AIM requirements.**

As required by the Settlement Agreement, EPA proposes AIM, which impose a progressive series of requirements on permittees based on the frequency and severity of benchmark monitoring threshold exceedances. The first tier requires a permittee to review and reconsider SCMs. The second tier requires implementation of "all feasible SCMs" from a sector-specific checklist.[45] The third tier requires new structural or water treatment SCMs.

EPA proposes these requirements without addressing the cost-effectiveness of implementing AIMs or the technical achievability of proposed thresholds using SCMs. The NRC Study reviews recent MSGP data using the AIM triggers and finds significant numbers of industrial sectors with high percentages of exceedances that would trigger AIM tiers 2 and 3,[46] but for Tier 2 compliance EPA assumes that "[r]esponses are substantially similar to those requirements in the 2015 MSGP."[47]

This assumption is particularly problematic when considering the requirement that facilities implement "all feasible SCMs," EPA does not specify whether the feasibility to be evaluated is technical or financial, but the caveat itself creates an unreasonable burden for the facility to make a showing on a case-by-case basis and for multiple potentially overlapping SCMs. If the assumption stated is correct, then this provision imposes a significant paperwork burden without a resulting benefit to water quality. If the assumption is incorrect, neither the burden nor the potential water quality benefits are evaluated.

Small business representatives have also expressed a concern that EPA or future litigants will be able to second-guess their evaluation of feasibility, thus putting their permit compliance in jeopardy.

[45] *Proposed 2020 MSGP*, Permit sections 5.2.2.2 and Appendix Q.

[46] NRC Study, pp. 22-26, table 2-3.

[47] *Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (MSGP)*, pp. 5.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should implement AIM only for those industrial sectors for which EPA can demonstrate a history of water quality issues under the MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Harry Childress
**Commenter Affiliation:** Virginia Coal and Energy Alliance (VCEA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0175-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding EPA's proposed Additional Implementation Measures (AIM) approach for exceedances of benchmark monitoring, VCEA believes EPA has not sufficiently vetted this approach with affected stakeholders and that EPA should remove it from any final MSGP and convene a stakeholder process to determine if any AIM approach is necessary.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>The Tiered System of Additional Implementation Measures (AIM) is Confusing</u>**

One of the greatest changes to the 2020 MSGP is the introduction of the tiered AIM format. In this process, benchmark monitoring results can trigger different levels of action that need to be taken by the permittee. The action could be triggered by exceeding the annual average or by the magnitude of the exceedance. As written, this process is confusing, and in my opinion, may lead to serious issues of noncompliance by permit holders thinking that they are doing what is correct.

The concept of the Additional Implementation Measures (AIM) is also a challenge to understand. Are these recommended measures to assist with a problem area or are they required? They may not have any bearing on the issue and would be an absolute waste of money and resources. We also struggle with the constant reference to implementing these AIMs "immediately". So many factors come into play when trying to repair, construct or improve these features. A contractor is often involved based on the type of equipment utilized. That equipment may be on another job and mobilization to the site may not be "immediately" possible. Even giving the permittee until the next morning, as specifically mentioned in the permit, is no degree of relief. We realize that the sooner the AIM is in place the more likely it will be ready for the next storm event. No one is arguing that. But to do this work right the first time, with the necessary proper engineering behind the project, it can take a degree of planning and preparation.

In some cases, the installation of various AIM features may require permits or permit amendments. Installing sediment & erosion control features can trigger modification of existing mine permits. These actions not only need to be engineered by the permittee, but must be reviewed and approved by the permit agency. Proceeding without approval could justify enforcement action by that agency. Other AIM features may involve more complicated features that justify a bid process for moving forward. Such is the process in many larger companies. Keep in mind that all of this is undertaken for an exceedance of a benchmark standard, which is not an effluent limitation. While we agree that there are situations that justify the installation of additional measures, we more often see maintenance as the issue and agree that those corrections take less time and can usually be handled by equipment that may already be on site. But even those situations can involve contractor and equipment that must be mobilized to the site.

We also struggle with understanding the concept of providing background concentrations and calculating volumes. With many small producers under the MSGP program, this is going to be a very difficult process. We encourage the EPA to pull back this tiered approach and retool it for possible inclusion in the 20205 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt:**

IMA-NA has substantial concerns over the proposed Alternative Implementation Measures. Not only does the EPA's proposal consider exceedances of benchmark limits a violation of the permit, but the structure of the AIM needs significant work to limit potential harm to permit holders. As discussed earlier, the intent of benchmark monitoring was not to establish effluent levels nor to act as a trigger for compliance purposes. Therefore, establishing AIM fundamentally alters the historic and intended role of benchmarking, reinterpreting the response to exceedances in a punitive fashion. In addition to the inappropriateness of this change, the structure of the AIM in theory provides a structure of corresponding responses to exceedances but in reality, the application could lead to snowballing costs for facilities with unclear returns on the measures. The tiered nature of the AIM gives the appearance of flexibility while it is in fact quite rigid. As the AIM is geared towards addressing an exceedance reported under the benchmark monitoring it is not a holistic view of operations. Given the natural changeability of stormwater discharges due to myriad external events, it is feasible a facility with years of no exceedances could experience two or three exceedances in close proximity. Under the proposal that facility would face a rapid escalation of expected AIM, costing the operator substantial time and money to implement new SCM that may be utterly unnecessary.

...

Overall, IMA-NA feels the combination of universal benchmarking and the AIM will increase overall costs, burdens, and confusion for our members. While the ideas behind both measures are well-intentioned in practice the impact is significant without a corresponding environmental benefit. In order to maximize positive outcomes and minimize the burden the EPA needs significantly more engagement with stakeholders to develop clearer and better programmatic changes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Patrick A. Jacomet
**Commenter Affiliation:** Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The tiered system of additional implementation measures is confusing...

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

## 10. General Comments on Additional Implementation Measures (AIM)

We strongly oppose the introduction of the Additional Implementation Measures (AIM) to the MSGP. We note that this requirements has been added solely as a result of a 2016 USEPA "sue-and-settle" case, (now contrary to federal policy) in which the regulated community was not given adequate opportunity to provide input or to object. The AIM attempts to impose a definitive SCM requirement on all facilities, irrespective of relevance or benefit, and without any link at all to in-stream water quality. This proposal simply goes far beyond the reach of the CWA.

If USEPA intends to finalize the AIM provisions, over our objections, then the potential exists for many many sites to be in "perpetual" "non-compliance of process". To mitigate this untenable situation, all of the proposed exceptions provided for each of the three (3) AIM tiers should be made available to every tier: (a) background or run-on, (b) "aberrant event", and (c) demonstration that the stormwater discharges do not result "…in any exceedance of water quality standards…" Additionally, if AIM is included, USEPA must update all benchmarks to link them to actual water quality standards, as a minimum benchmark, not urban run-off studies from the 1970s and early 1980s.

...

Regarding the AIM compliance schedules, subject to our objections to the unreasonable, rigid nature of the new Appendix Q requirements, we further object to the time frames for compliance with AIM triggers. If included in the final MSGP, these time frames must include more flexibility for facility management to review, develop and secure funding for the new SCMs, which in some cases will involve ordering new equipment, modifying site layout, constructing new control features, and retaining experts to assist in planning. The "hammers" of 30 and 45 days reflect the top-down, command and control regulatory approach that unnecessarily burdens businesses. A simple narrative time frame will achieve the same water quality goals without creating "noncompliance of process" issues.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

Regarding the suggestion that EPA update benchmarks based on water quality standards rather than urban run-off studies, EPA declines to make this change. Consistent with the 2015 MSGP, the 2021 MSGP includes benchmarks for TSS and nitrate and nitrite nitrogen based on National Urban Runoff Program (NURP) median concentrations. EPA established these benchmarks in the absence of applicable national recommend acute or chronic aquatic life criteria. EPA continues to find that these benchmark thresholds are appropriate.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**Additional Implementation Measures (AIM)**

The proposed MSGP includes a new tiered Additional Implementation Measures ("AIM") approach for exceedances of benchmark monitoring. VMA has some concerns regarding the feasibility of meeting certain AIMs for certain tiers.

...

Additionally, the proposed implementation timelines for the AIM tiers may be unachievable. For example, while a facility may be able to implement several of the BMPs under the AIM tiers quickly, some BMP implementation may take more time or be more capital intensive which may be impractical under the proposed timeline. EPA should provide more flexibility to facilities to implement BMPs that might be more capital intensive.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**7. EPA should adjust the timeframes incorporated into the AIM Tier 2 and 3 triggering events and extend deadlines for implementing response requirements.**

According to the AIM framework in proposed Part 5.2, any airport that falls within AIM Tier 2 would only have 14 days to (1) implement all feasible SCMs listed in appendix Q; (2) document how such SCMs will achieve benchmark thresholds; and (3) explain why any SCMs from the checklist were not implemented. (Proposed Part 5.2.2.3.) If SCMs would be feasible to implement, although not within 14 days, airports would have to explain why and implement them within 45 days. Any airport that falls within Tier 3 would have to install structural source controls and/or treatment controls, or (b) install infiltration or retention controls for its industrial stormwater, subject to EPA approval. (Proposed Part 5.2.3.2.) The airport would only have 30 days to install these control measures or, if not feasible, implement them within 90 days. (Proposed Part 5.2.3.3.) Table 1, appended to these comments, outlines EPA's proposed triggering events for AIM Tiers 2 and 3 and required deadlines for implementing response requirements, and summarizes AAAE's recommendations.

For a number of reasons, AAAE is concerned over EPA's expectations regarding the ability for permitted airports to achieve the desired results and implement certain corrective measures in the timelines identified. First, the deadlines for implementing certain SCMs for AIM Tier 2 and structural source control measures for AIM Tier 3 are problematic and unachievable for airports. Installing structural source controls at an airport would take at least a year because of the need to conduct an engineering assessment, submit documentation to FAA for review and approval, conduct a bidding process, and procure funding in accordance with local government plans and budgets. Moreover, one SCM in appendix Q is to establish a centralized aircraft deicing station. To illustrate, a centralized deicing facility at O'Hare International Airport, completed in 2019, took 20 months to construct at a cost of $168 million. This does not include additional time for planning and design, environmental reviews and approvals, and contracting, which may take several more years. In short, AAAE does not believe that 14 days (or 45 days with an extension) for AIM Tier 2 and 30 days (or 90 days with an extension) for AIM Tier 3 are realistic and workable deadlines for implementing what can be significant adjustments to the airport's stormwater management program.

Second, the AIM timeframes and deadlines for the installation of structural source controls are not compatible with FAA review requirements for making such improvements. Nearly all commercial service airports are eligible for federal funding for airport development projects under the FAA's AIP. As a condition of accepting these funds or imposing local Passenger Facility Charges (PFCs), airports agree to a series of "grant assurances" that legally obligate the airport to, among other things, maintain an FAA-approved airport layout plan (ALP) that shows the location and nature of existing and proposed airport facilities and structures, including for non-aviation areas and improvements. (Grant Assurance 29.) FAA must approve any changes to the ALP, which would also include an evaluation of the environmental consequences of the proposed development or improvement. (49 U.S.C. § 47107(a); FAA AC 150/5070-6B, at 81.) The reviews can be lengthy at times and most certainly could not be completed within the timeframe contemplated by the proposed MSGP.

Finally, the AIM timeframes and deadlines must allow for airports to obtain AIP grants or other funding in order to pay for corrective measure obligations that may arise under the proposed MSGP. As mentioned above, FAA provides AIP funding to airports to enable the airport to comply with their responsibilities regarding stormwater discharge. (49 U.S.C. § 47106.) These federal funds are particularly important for smaller airports with fewer alternative revenue sources, and even more so in light of the ongoing pandemic. However, funding is not available on an expedited basis. FAA must review the projects and determine eligibility and needs of other airports throughout the national airspace before awarding grants. Additionally, demand for AIP grants far exceeds the amount of funding provided by Congress on an annual basis.

AAAE believes one fundamental problem with the proposed AIM framework, among others, is that the proposed timelines are too short and prevent airports from implementing effective SCMs. AAAE offers two recommendations for improving the proposed AIM Tier 2 and Tier 3 timeframes.

- First, EPA should not require airports to complete responses before a prescriptive deadline, but instead require airports to initiate such actions within a specified period. The timeframe for SCM implementation will naturally depend on the type of corrective measure and airports should have flexibility to pursue and obtain funding and other necessary reviews and approvals. For instance, EPA proposes to require the implementation of structural source controls and/or treatment controls for AIM Tier 3 within 30 days. AAAE believes that if EPA moves forward with the proposed AIM framework, EPA should only require the airport to initiate the implementation of such controls within 30 days if feasible.
- Second, EPA should reevaluate how quickly airports move from AIM Tier 1 to Tier 2 and from Tier 2 to Tier 3 in light of the above challenges and considerations that are unique to airports. For instance, an airport would fall in AIM Tier 2 if they had two consecutive annual averages for a parameter that are each over the benchmark threshold (or AIM Tier 3 with three consecutive annual averages). However, if an airport were to begin a multi-year project after falling in AIM Tier 1 or Tier 2, they could eventually fall into Tier 2 or Tier 3 while they are still implementing new SCMs. AAAE believes that an airport should not be unnecessarily punished while actively improving control measures and should instead be given temporary reprieve from the three-stage AIM process until SCMs have been fully implemented.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comments on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

**8. AAAE supports the exceptions to the AIM tier levels and making them available to all AIM tier triggering events and/or response requirements.**

The proposed three-tier AIM approach would make available to airports three exceptions that would take the facility out of a tier or preclude the facility from implementing the proposed response requirements. For AIM Tier 2, an airport could demonstrate that a single sampling event was an "aberration" notwithstanding results that trigger a Tier 2 response.

(Proposed Part 5.2.2.1.c.) For all three AIM tiers, an airport would not have to implement corrective measures specified in the response requirements if it documents that the exceedance is solely attributable to natural background sources or, with EPA agreement, run-on sources. (Proposed Part 5.2.4.) In addition, airports would not have to install structural source controls as part of an AIM Tier 3 response if it could demonstrate that the discharge does not result in any exceedance of a water quality standard. (Proposed Part 5.2.3.3.b.) Table 2, appended to these comments, outlines all the exceptions proposed by EPA, including the AIM tiers to which they are applicable, and summarizes AAAE's recommendations.

As provided above, AAAE has significant concerns regarding proposed AIM Tier 2 and the timeframes and deadlines incorporated into the AIM framework.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Triggering Event

The proposed timeframes for determining AIM tier triggering events are unworkable, especially if an airport decides to implement SCMs that may require a year or more to implement. AAAE believes that an airport should not be unnecessarily punished while actively improving control measures and should instead be given temporary reprieve from AIM triggering events until SCMs have been fully implemented.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Triggering Event

AAAE's Response and Recommendations

AAAE opposes the proposed required responses, particularly for AIM Tier 2 and the implementation of all feasible SCMs in appendix Q, for reasons previously listed. Notwithstanding, if EPA moves forward with the proposed AIM framework, EPA should not require airports to complete responses before a prescriptive deadline, such as 14 days, that is unrealistic in the airport context. The timeframe for SCM implementation will naturally depend on the type of corrective measure and airports should have flexibility to pursue and obtain funding and other necessary reviews and approvals.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

**b. AIM Framework**

More importantly, the proposed AIM Framework in the Proposed 2020 MSGP is inherently problematic and not consistent with the monitoring framework envisioned by NASEM (Report at 53). While AIM Tier 1 is similar to the current corrective action mechanism in the 2015 MSGP, the proposed AIM Framework is too aggressive in its movement of permittees up the AIM tiers based on exceedances of existing WQS-based benchmark values (if not updated benchmarks as

recommended by NASEM (Report at 31)). The AIM Framework also entails compliance complexities that promise to burden permittees, especially those with large outdoor facilities.

According to the Fact Sheet (at 77), AIM was intended to address past inadequate "compl[iance] with the permit by making only minimal SCM changes, or no changes, and often th[o]se changes did not lower pollutant levels below the benchmark thresholds, indicating poor stormwater control effectiveness". This rationale contains two important issues. First, it identifies a problem related to lack of corrective action in follow-up to benchmark exceedances, independent of what the follow-up corrective actions would be. Second, it assumes that benchmarks reflect the intrinsic capabilities of SCMs to produce effluent with concentrations of benchmark parameters at or below benchmarks. NASEM notes in its Report (at 60) that "[m]any MSGP benchmarks are based on water quality criteria". The proposed AIM Framework, notwithstanding conditions of the settlement agreement, does not address either of these two issues. The existence of AIM does not correct the identified lack of or inadequate compliance; it just increases requirements on those permittees that have been complying. AIM cannot and does not address the existing disconnect between the intrinsic capabilities of SCMs and benchmark values based on WQSs.

The proposed AIM Framework suffers from the following issues, some of which are overlapping or rendered moot by others:

- The proposed AIM Framework is not clear about resetting of the annual sampling period after an AIM tier is triggered and the required corrective actions are completed. Statements such as "to bring your exceedances below the parameter's benchmark threshold for the next 12-month period" (e.g., in Part 5.2.1.2.b) and "you must continue quarterly benchmark monitoring into the next year" (e.g., in Part 5.2.1.2.b) do not explicitly reset, or state a resetting of, the sampling period for computing annual averages. It seems possible that a permittee could end up having multiple annual sampling periods for different combinations of benchmark parameter and monitored outfall. A permittee would likely have difficulty tracking multiple annual sampling periods and reporting results to EPA.
- The proposed AIM Framework leaves open the possibility that a permittee will reach AIM Tier 3 within the first year, perhaps even bypassing AIM Tier 2. This is a significant step-change from corrective action due to benchmark exceedances in the 2015 MSGP. It would rush permittees through substantial corrective action processes and activities that should not be rushed. Such an outcome is a disproportionate response to the underlying problem of some permittees not conducting corrective action completely or at all. This is true even with a resetting of the annual sampling period to compute annual averages.
- In the proposed AIM Framework, Part 5.2.3, AIM Tier 3, effectively imposes enforceable numeric effluent limitations (NELs) in contradiction to Part 4.2.1, Benchmark Monitoring. Proposed Part 5.2.3.2.a, Install Permanent Controls, includes the following requirement: "[The Permittee} must select controls with pollutant removal efficiencies that are sufficient to bring [the Permittee's] exceedances below the benchmark threshold". To the extent that applicable benchmark thresholds remain based on WQSs, this requirement effectively converts such benchmarks to NELs. The consequence of "failed" permanent controls is detailed in proposed Part 5.2.3.3.c: "If [the Permittee] continue[s] to exceed the benchmark threshold for the same parameter even after installation of structural source controls or treatment controls, EPA may require [the Permittee] to apply for an individual permit." This outcome contradicts Part 4.2.1: "The benchmark thresholds are not effluent limitations; a benchmark exceedance, therefore, is not a permit violation. However, if a benchmark exceedances triggers Additional Implementation

Measures (AIM) in Part 5.2, failure to conduct any required measures would be a permit violation." This internal contradiction calls into question then entire proposed AIM Framework.

- The proposed AIM Framework is based on the questionable assumption that one attempt at conducting an AIM tier corrective action will be absolutely indicative of whether that AIM tier corrective action can improve the quality of stormwater discharges at or below applicable benchmarks. Such an assumption may be based on the presumption that stormwater discharge quality is as easy to control as industrial wastewater discharge quality. This presumption is exemplified in the Proposed 2020 MSGP by the AIM Tier 3 requirement that a permittee "must select controls with pollutant removal efficiencies that are sufficient to bring [the permittee's] exceedances below the benchmark threshold" (Part 5.2.3.2.a). This is a curious requirement in AIM Tier 3. If such controls were known and cost-effective, would not the permittee likely have used them in the first place? While "hav[ing] a professional engineer or geologist to assist with the installation of such [AIM Tier 3] controls" makes sense for ensuring maximum performance, it does not guarantee performance or meeting benchmarks. This is especially true given the existing disconnect between SCM performance and benchmarks that are based on WQSs.

  This questionable assumption is false because the presumption is false. Stormwater discharge quality is much more difficult to control than industrial wastewater discharge quality due to the vast differences between highly variable, occasional storm events on a dynamic outdoor environment (i.e., the operating facility) and regular controlled industrial wastewater flows from a highly designed, usually sheltered manufacturing environment (i.e., indoor manufacturing operations). Due to facility complexities and the variability of storm events, some amount of experimentation with SCMs is necessary to ascertain whether the implemented SCMs produce the expected results at the expected magnitudes. If the SCMs do not, the approach taken needs to be modified within that same AIM tier. The permittee should have the ability to conduct AIM tier corrective actions for a certain period of time before being moved into the next AIM tier. This could be facilitated in part through a generally available "aberrant event" exception (as discussed above).

- The proposed AIM Framework seems to reflect a significant lack of awareness of its inherent potential compliance complexities. It is very unclear how a permittee could be expected to manage and maintain compliance in more than one AIM tier across the applicable benchmark parameters and monitored outfalls at the same time on potentially different annual sampling periods. Each AIM tier trigger applies to every applicable benchmark parameter at each monitored outfall. In the Proposed 2020 MSGP, the Industry is poised to have seven benchmark parameters (COD, TSS, pH (new), Al, Cu, Pb, and Zn). It is not inevitable or necessarily true that benchmark exceedances across parameters are correlated. It is possible that a permittee could reach different AIM tiers for different parameters in different monitored outfalls at different times. Is an AIM tier response only specific to the drainage area of the monitored outfall where the exceedance occurred or facility-wide? If the permittee reached AIM Tier 2 for one parameter in one monitored outfall and later AIM Tier 2 for another parameter in a different monitored outfall, would the permittee have two AIM Tier 2 processes in the different parts of the facility or facility-wide? How would EPA characterize that permittee's AIM tier status? As proposed, the AIMTier 2 process requires review and evaluation of the sector-specific SCMs listed in Appendix Q and "implement[ation of] all feasible SCMs within 14 days" (Part 5.2.2.3). The listed SCMs for the Industry (Sector N) in Appendix Q are so broad and generic that they do not generally apply to specific benchmark parameters (except perhaps for SCMs for spent lead-acid batteries and fluids) (please also see comments in Section B.17.c). Going through exactly the same process again would not make sense and would be operationally inefficient.

  While this question also applies to AIM Tier 3, in all likelihood being in AIM Tier 3 for one parameter (mostly likely Cu) is equivalent to being in AIM Tier 3 for all other parameters as well.

To improve the target parameter (e.g., Cu), it may be necessary to remove the other parameters well below their benchmarks because their presence interferes with the removal of the target parameter (e.g., reduce 100,000 µg/L TSS to reduce Cu from 30 to 14 µg/L). The interference could be physical (e.g., particles that clog sand filters) or chemical (e.g., Zn competes with Cu for removal). It is difficult to imagine that EPA could justify ousting a permittee from the 2020 MSGP and into an individual permit because Cu concentrations in the discharge could not be reduced below 20 µg/L. It is difficult to see how an individual permit would improve the environmental outcome; it would only allow EPA to declare NEL and permit violations.

- The proposed AIM Framework does not recognize or acknowledge the permittee's prerogative under Part 4.2.1 to "take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges". For instance, proposed AIM Tier 1 states:

  o *An annual average exceedance can occur from the average of four quarterly samples for a parameter, or from less than four samples with results such that an exceedance is mathematically certain (i.e., the sum of quarterly sample results to date is already more than four times the benchmark threshold).*

- This statement completely ignores the ability, even right, of the permittee to take additional samples during the remainder of an annual sampling period to attempt to make the annual average at or below the benchmark. As shown in proposed AIM Tier 1 Example B, the permittee is denied the opportunity to take additional samples during the remainder of the period following the first two TSS results of 300 and 110 mg/L. Mathematically, three more sample results at 30 mg/L each or four more samples at 40 mg/L each would result in an annual average at or below the TSS benchmark of 100 mg/L. Similarly, in proposed AIM Tier 1 Example C, the permittee is denied the opportunity to take additional samples during the remainder of the period following the first TSS of 405 mg/L. Mathematically, four more sample results at 20 mg/L each would result in an annual average below the TSS benchmark of 100 mg/L. To be sure, the permittee would likely have to conduct activities similar to those required under AIM Tier 1, but at least the permittee could first conduct those activities without the requirements of AIM Tier 1. If the additional sampling did not achieve an annual average at or below the benchmark by the end of the annual period, the permittee would then be firmly in AIM Tier 1.

- 

  The permittee must have the choice of either (i) continuing to sample during the remainder of the current annual sampling period even if a result is at or above 4-times the benchmark in the case of AIM Tier 1 or (ii) accepting that the annual average for the current annual period will exceed the benchmark (e.g., after three samples) regardless of additional sampling results during the remainder of the period, triggering AIM Tier 1 requirements before the end of the period. It is mathematically possible to have an annual average at or below the benchmark with more than four sample results and with one result at or above 4-times the benchmark. In this circumstance, meeting the benchmark with an annual average should negate and supersede the AIM Tier 1 trigger for one result at or above 4-times the benchmark within that average. Meeting the benchmark would be per se evidence that the result at or above 4-times the benchmark was an aberration, whatever its cause.

- Besides the general issues above, there are specific AIM Framework issues for the recycling industry. Under the Proposed 2020 MSGP, the industry has aluminum (Al), copper (Cu), lead (Pb), and zinc (Zn) among the sector-specific benchmark parameters. These parameters have very different benchmarks (100 mg/L hardness): Al, 750 µg/L; Cu, 14 µg/L; Pb, 82 µg/L; and Zn, 120 µg/L. On an acre-inch of stormwater basis (27,154 gal), these benchmarks equate to the following quantities per acre-inch: Al, 77 g (30 cm3); Cu, 1.4 g (0.16 cm3); Pb, 8.4 g (0.75 cm3); and Zn, 12.3 g (1.7 cm3). From a practical perspective, the benchmarks for Cu, Pb, and Zn, especially Cu,

represent miniscule amounts of material in stormwater discharges. Even multiples of these benchmarks, especially Cu, represent very small quantities of material, usually spread out over large areas that are difficult to control from an engineering perspective, especially given the high variability of storm events. The proposed AIM framework seems poised to result in huge investments in SCMs at AIM Tier 3, even if to control only a small amount of Cu, in the absence of cost-effective SCMs designed to and capable of meeting benchmarks, especially if receiving waters have low hardness (i.e., <100 mg/L). Larger facilities will be burdened with larger investments to control larger annual stormwater flows with relatively small quantities of materials. The use of design storms as recommended by NASEM (Report at 77) in developing SCMs could be helpful to moderate the financial impact of investment in SCMs.

Given these many issues, especially the internal contradiction between AIM Tier 3 and the concept of benchmark monitoring, ISRI opposes the proposed AIM Framework.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that EPA provide for broad availability of the proposed exceptions for "aberrant" events, pollutant run-on from neighboring properties, and natural background levels within the Additional Implementation Measures (AIM) protocol.*

The MSGP permit should contain various triggers for corrective actions, whether related to inspections or limited monitoring, but the AIM scheme that EPA has built from the prior MSGP settlement misrepresents the settlement negotiations and creates unjustified confusion and related financial impacts on regulated parties. To the extent EPA proceeds with the AIM program, it should provide for broad availability of the proposed exceptions for "aberrant" events, pollutant run-on from neighboring properties, and natural background levels within the AIM protocol.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)

2021 EPA MSGP Response to Comments
January 15, 2021

**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA provide for broad availability of the proposed exceptions for "aberrant" events, pollutant run-on from neighboring properties, and natural background levels within the Additional Implementation Measures (AIM) protocol.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:** Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

The Steel Associations do not believe it is appropriate for the proposed MSGP to require facilities with benchmark exceedances to adopt costly and potentially unnecessary Additional Implementation Measures ("AIM"). Benchmarks are not effluent limits. They are simply one of many means of evaluating the effectiveness of stormwater management systems and controls. As such, a benchmark exceedance is not a permit violation, nor is an exceedance necessarily evidence that a stormwater management system is ineffective. A benchmark exceedance is merely a trigger for further inquiry and examination into the effectiveness of stormwater controls.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

NAIMA is disturbed by the various triggers for corrective actions, whether connected with an inspection or limited monitoring, that EPA has infused into these proposed modifications and changes. What seems apparent is that EPA has orchestrated a variety of plausible events and turned them into violations. NAIMA understands that governmental entities seek to increase its revenues, but there should be, on the part of EPA, a recognition that many of these types of events are aberrant and outside the control of NAIMA's manufacturers. Such events might include natural background levels within the protocol and run-off from neighboring properties. NAIMA specifically requests that this multitude of "violation traps" be eliminated.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>The Tiered System of Additional Implementation Measures (AIM) Needs Work</u>**

EPA is proposing benchmark monitoring results which will trigger different levels of measures that need to be taken based on exceeding an annual average or magnitude of an exceedance, which is one of the largest regulatory changes in the program history. The proposed language is extremely confusing, and one cannot discern if all of the AIMs are requirements or recommendations. The time limits for implementing corrective actions (or determining their feasibility) are arbitrary, and operators are subject to CWA violations if measures are not implemented immediately.

NSSGA understands and supports the logic behind imposing additional requirements on facilities that demonstrate years and years of exceedances of limits and that it is part of the settlement agreement for the 2015 MSGP. However, the settlement envisioned the potential for this complicated system to not apply to all facilities under the MSGP, and the NAS echoes this in their summary that facilities operating at higher risk of impacting water quality face more

stringent requirements and that lower risk facilities be less burdened. This tiered system does not recognize this important distinction. EPA needs to adopt a more robust system for facilities to qualify as low risk, and corrective action should only be required by higher risk facilities and/or those with a history of non-compliance.

The proposed permit's confusing and unclear provisions for requiring corrective action creates legal risks for aggregate operators. Section 309 of the CWA empowers EPA to enforce for violations of specific and enumerated provisions in the Act such as violations of technology and water quality-based effluent limitations, categorial effluent limitations for toxic pollutants, reporting and record keeping requirements, and discharges in violation for NPDES permits. EPA even admits that "Benchmark monitoring thresholds are not effluent limitations and a benchmark exceedance is not a violation of the Act since benchmark thresholds are not water quality standards based effluent limits" (section 4.2.1 and Fact sheet p. 77). EPA also "does not mandate the specific storm water control measure that operators must select , design, install and implement to meet the technology based effluent limits" noting that "the permit provides operators the flexibility to determine their site specific controls, taking into consideration what controls are most suited for their industry in terms of economic practicability and technological availability." (Fact Sheet p. 34). However, EPA's tiered system of AIMs seems to contradict these principles. While EPA admits that such benchmark exceedance are not violations, it then sets forth time periods by which the exceedance must be remedied. EPA further indicates that failure to remedy the exceedance within those time frames would be a permit violation. In effect, EPA has mandated a corrective action remedy for a non-violation which is equivalent to mandating a criminal penalty without first establishing guilt. This contradiction is especially problematic for Tier 3 facilities by mandating structural controls that may be very expensive and impractical, especially for small businesses facing severe financial difficulties due to COVID 19 closures. Further, operators also face the prospect of CWA section citizen suits. Citizens are likely to seize on benchmark monitoring exceedance reporting alleging that such exceedance does constitute a CWA violation contradicting EPA's legal position and then challenge an operator's failure to implement structural controls where the operator instead relies on other less expensive best management practices (BMPs) to address such exceedance. While NSSGA understands that the settlement agreement requires tiered control implementation, there is a need for a clearer and more flexible approach to addressing exceedances. Under the AIM program, operators will have to prove background concentrations and calculate volumes. These are beyond the capability of many operators, particularly small businesses.

EPA fails to explain how crucial aspects of the tiered system will work in practice. For example, in Tier 1, 4X of the benchmark threshold is a trigger. How does this work for pH which is on a logarithmic scale? This is just one of the many questions not addressed by the proposed permit.

Furthermore, EPA should not require that all industries follow this approach, only those that EPA demonstrates a pattern of non-compliance. An additional serious issue is that these measures are non-discretionary and do not allow for better compliance at a lower cost. It is not apparent if all AIMs must be implemented, or one measure from each section, or even if other alternatives that are not listed may be used. Finally, the way in which these requirements are interpreted and applied is not addressed by EPA and leaves businesses vulnerable to the open-ended nature of this inadequate proposal.

Because of these serious issues, EPA needs to develop a much more inclusive category of low-risk facilities, as well as making the AIM process both easier to understand and more difficult for facilities to fall into.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Additional Implementation Measures (AIM): The AIM approach is fundamentally flawed and is a significant escalation and revision to the MSGP. NMA opposes the entire proposed framework and urges EPA to withdraw it at least until the 2025 permit renewal and until the agency completes a more comprehensive analysis and obtains input from industry stakeholders.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

**Additional Implementation Measures (Part 5.2)**

  I. The AIM approach is fundamentally flawed and should not be implemented as part of the 2020 MSGP.

NMA opposes the entire AIM approach. It was developed without any input from stakeholders in the regulated community and is not based on any scientific data. We welcome the opportunity to work with EPA on establishing a commonsense approach, but we urge EPA not to finalize this approach in the 2020 MSGP until a more robust stakeholder engagement process is commenced,

including a transparent analysis of the data underlying this recommendation. NMA similarly opposes the corresponding removal of language from the 2015 MSGP that allowed permittees, in response to benchmark exceedances, to document that "no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice to meet the technology or water quality-based effluent limits in the permit." [33] EPA has provided no justification for the removal of this important provision.

Because benchmark monitoring and the corresponding benchmark levels are not appropriate for numerous reasons, as described previously, triggering increasingly severe response requirements in response to benchmark exceedances is not workable. This approach will result in our members wasting resources to upgrade control measures simply for the sake of attempting to meet arbitrary benchmarks that may have no relation to protecting or improving water quality in the receiving waters. Further, the AIM approach essentially operates with the force of law without the necessary justification. AIM "violations" would trigger criminal and civil violations of the CWA, even where WOTUS are not present. It is completely inappropriate for EPA to finalize and implement new enforcement requirements with severe criminal and civil penalties based on levels that have been arbitrarily set and not based on science.

[33] 2015 MSGP Part 6.2.1.2.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

II. The proposed AIM approach exceeds the agency's authority under the CWA.

As previously explained, benchmark exceedances were not intended to be used, and have not been used, to trigger mandatory compliance actions or as the basis for enforcement actions. The proposed AIM process functions the same way that EPA explicitly rejected in the 2008 MSGP previously and treats benchmark exceedances as de facto effluent limitations in violation of the CWA. Operators have expressed concerns over this approach for some time. For instance, in EPA's response to comments on the 2000 MSGP, EPA addressed the comment that "permittees fear benchmark limits would be viewed as effluent limitations." In response, EPA agreed "that benchmark limits are not effluent limitations and should not be used, in and of themselves, *as the basis for issuing an enforcement action*."[34]

Legal precedent supports the position that benchmark exceedances should not be interpreted as violations of effluent limitations. In *Santa Monica Baykeeper v. Kramer Metals, Inc.*, the court held that "EPA benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs, but that samples in excess do not necessarily constitute a violation" of the general permit at issue here. The court "[was] not persuaded it would be appropriate to hold that samples showing concentrations in excess of the [b]enchmark levels constitutes a violation of [effluent limitations] simply by virtue of exceeding those [b]enchmark levels. Doing so would effectively – and inappropriately – turn these [b]enchmarks into numeric effluent limitations." Further, the court noted that "the MSGP indicates that [b]enchmark levels are to be used as signals that an SWPPP may need adjusting, not as a bright-line proxy for compliance or noncompliance." (emphasis added).[35]

The proposed AIM approach does exactly what the California court said benchmarks should *not* do – it interprets benchmarks as a bright-line proxy for compliance or noncompliance, operating as de facto effluent limitations. If EPA wants to use benchmark values as if they are numeric limits that trigger mandatory responses, then it must revise the benchmark values to reflect best available technology (BAT and BCT) consistent with the procedures established in the CWA.[36] In other words, because they have not been developed to operate as numeric limits, if EPA wants to use them as if they are numeric limits, like an effluent limitation, then they must be developed consistent with BAT and BCT as required by the CWA.

[34] 65 Fed. Reg. 64797 (Oct. 20, 2000).

[35] Baykeeper v. Kramer Metals, Inc., 619 F. Supp. 2d 914 (C.D. Cal. 2009).

[36] 33 U.S.C. 1311(b)(2)(A) and 1342(b)(2).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

III. EPA's historical approach to corrective action does not support the AIM approach.

The proposed AIM framework far exceeds EPA's authority under the CWA and contradicts the agency's historical approach to corrective action. While the proposed AIM approach is new to the MSGP, corrective action has been part of the MSGP since its inception. The 1995 and 2000

MSGP described corrective action as a "set of tracking or follow up procedures to be used to ensure that appropriate actions are taken" that were required if BMPs were performing ineffectively based on quarterly visual examinations of stormwater discharge. The 2008 MSGP strengthened the requirements for corrective action. However, it only required operators with benchmark exceedances to review their control measures and determine if modifications were necessary.[37]

Importantly, EPA distinguished the corrective actions required for benchmark exceedances (reviewing if modifications were necessary) from the mandatory changes required by effluent limitation exceedances. In response to comments on the 2008 MSGP, EPA acknowledged that "because benchmark concentrations are not limits, but targets to be used by permittees for improving their control measures, *a different approach is required when it comes to corrective action*."[38] The agency's proposed corrective structure triggered a "'review' process" rather than "an automatic requirement to eliminate the condition."[39] The trigger of a review process rather than an automatic requirement to eliminate the condition was changed from the draft to the final permit. EPA thought this clarification "more appropriately [reflected] different implications of exceeding a benchmark as opposed to an effluent limit."[40]

The 2015 MSGP expanded aspects of the corrective action provisions but still maintained that benchmark exceedances required SWPPP review to determine if modifications were necessary to meet effluent limits in the permit.[41] Further, the 2015 MSGP included the important qualifier that a benchmark exceedance does not trigger a corrective action "if you make a finding that no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice."[42] This clearly demonstrates that EPA intended benchmark exceedances to go through a review process rather than trigger automatic, mandatory responses.

[37] 2008 MSGP, Part 3.2.
[38] EPA Response to Comments on 2008 Proposed MSGP at 601 (Dec. 1, 2005).
[39] Id.
[40] Id.
[41] 2015 MSGP at 27.
[42] Id.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  52
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, EPA's proposed Alternative Implementation Measures (AIM) would, for the first time in the history of the MSGP, consider exceedances of benchmark limits a violation of the permit.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Without consideration of the underlying data, including data examined in detail by the 2019 National Research Council (NRC) Study,[3] EPA is proposing that all industrial facilities conduct new universal benchmark monitoring for a suite of three parameters: pH, chemical oxygen demand (COD), and total suspended solids (TSS) and be subject to increased costs through the application of a new initiative, entitled Additional Implementation Measures (AIMs). This proposal, unlike the 2015 permit, could require the implementation of a long list of structural stormwater control measures (SCMs), without any reasonable expectation of commensurate benefits, or possibly any benefits. This is a startling departure in the history of this permit and is particularly challenging to struggling small businesses at this time of great economic stress.

[3] Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges (National Research Council (NRC) 2019 at Appendix D.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

We make the following recommendations:

...

- EPA should reject any Additional Implementation Measures (AIM) requirements[5] that are triggered by benchmark exceedances in place of the current corrective action measures.

[5] See later discussion of Additional Implementation Measures (AIM), which were proposed as part of the 2016 settlement with litigants over the 2015 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

And most significant and concerning, the Agency proposes a series of new Additional Implementation Measures (AIM) Tiers 1 to 3,[14] which are increasingly stringent and costly as the number and magnitude of the benchmark exceedances rise. Those corrective action measures, in the form of potentially expensive SCMs, are triggered by arbitrary exceedances of benchmarks that are not based on science and occur almost randomly. The required SCMs are often inappropriate for a given industry or facility, and may result in substantial costs with no significant pollution reduction benefits.

[14] The AIM Tiers are described in more detail in the section on AIM requirements. See Section IX, infra.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's allowance of the "no alternative" engineering demonstration available in the 2006 permit reduced the level of concern about the 2006 and later reasonably flexible MSGP permits. Earlier permits allowed permittees, following a review of their SWPPP, to determine that they are implementing all reasonable and appropriate BMPs to reduce pollutants in the discharge, and to document in the SWPPP the basis for this determination. Facilities could simply determine that their BMPs were effective, and their SWPPP obligations would be discharged. That will not be the case under the proposed 2020 MSGP.

In the proposed permit, EPA has eliminated the 2015 menu of Best Management Practices (BMPs), from which the facility using its engineering and financial judgment, could choose among one or more BMPs to apply without close EPA scrutiny. Instead, EPA has proposed a list of stormwater control measures (SCMs), which could be mandated by the permit terms. Furthermore, EPA has dramatically increased the stringency of the proposed 2020 SCMs from the 2015 permit BMPs, apparently without informed input from affected industries and other affected sectors. This problem is heightened by the relative inflexibility of the application of new AIM Tier 2 and Tier 3 requirements, which are triggered by arbitrary benchmark exceedances.[51]

In the proposed MSGP permit, under Tier 2, a facility, must justify, in writing, whether each SCM found in Appendix Q is economically feasible, and if so, the SCM must be installed.[52]

...

The consequences of benchmark monitoring in the proposed 2020 world are far more burdensome than in previous MSGPs.)

[51] See subsequent discussion of AIM in section IX, infra.

[52] MSGP Permit 5.2.2.2.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  33
**Excerpt Status:** Final

**Comment Excerpt:**

**Proposed AIM Tier Costs are Prohibitively Expensive and Should Not be Adopted: EPA Should Retain the Existing Corrective Action Scheme.**

Implementation of the Additional Implementation Measure (AIM) Tiers 2 and 3 would be expensive and problematic. The current corrective action scheme, without Tiers has been working. Facilities consider whether cost-effective improvements are needed for the site and deploy them where appropriate. Instead, EPA has now proposed a major increase in compliance costs, with questionable benefits.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  36
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tiers 2 and 3 should be shelved until the next permit term, when more appropriate provisions, consistent with the MSGP settlement can be devised.[116]

[116] The most objectionable part of the AIM provisions is the provision in 5.2.3.1 that effectively transforms the benchmark into an effluent limit itself, contrary to statements in the fact sheet. The facility must "select controls with pollutant removal efficiencies that are sufficient to bring your exceedances below the benchmark threshold." See the 2020 FSWA MSGP comments that discuss this in detail.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

The methods for determining AIM Tier response levels are overly complicated and confusing and will make it difficult for permittees to determine what AIM Tier response level they are at and to develop stormwater management strategies to maintain compliance with the MSGP. Combined with the short timeframe proposed to implement AIM Tier 2 and AIM Tier 3 responses, facilities could be required to invest significant resources into the installation of structural or treatment source control measures within the first year of coverage under the 2020 MSGP. As proposed in the draft 2020 MSGP, single-sample event exceedances could take a facility from baseline to AIM Tier 2 associated with one sampling event or AIM Tier 3 associated with two sampling events. This does not allow for Permittees to implement adaptive management strategies to maintain compliance as intended by the MSGP. To allow for adaptive management, AIM Tier level progression should only be based exceedances of the annual average for a specific parameter over the benchmark threshold, and progress from year to year. For example:

- Calculation of annual averages of each parameter for comparison against benchmark thresholds should begin in calendar year 2021, with an annual exceedance placing a facility into AIM Tier 1 in 2022.
- If the annual average for the same parameter exceeds the benchmark threshold in 2022 (i.e., two consecutive annual averages each over the benchmark threshold), then the facility would be placed in AIM Tier 2 for 2023.
- If the annual average for the same parameter exceeds the benchmark threshold in 2023 (i.e., three consecutive annual averages each over the benchmark threshold), then the facility would be placed in AIM Tier 3 for 2024.

Using the annual exceedance approach will also make AIM Tier 1, Tier 2, and Tier 3 deadlines consistent across permittees and from year to year, as the AIM Tier levels would be triggered on an annual basis, and adequate time could be provided to implement AIM Tier 2 and Tier 3 responses. If after the 2020 MSGP cycle, EPA identifies that single-event exceedances are warranted based on collected data, then single-event exceedances could be added to the 2025 MSGP.

**Suggested Revision:**

See Part 5.2 proposed changes at end of this attachment. Language should be retained in 5.2.1.1.a, 5.2.2.1.a and 5.2.3.1a for AIM Tier 1, Tier 2 and Tier 3 responses to be triggered by exceedances of the annual average for a given parameter over the benchmark threshold.

The language in the following parts of the MSGP should be deleted in the final version of the MSGP:

- 5.2.1.1.b AIM Tier 1 Triggering Events
- 5.2.2.1.b and 5.2.2.1.c AIM Tier 2 Triggering Events
- 5.2.3.1.b, 5.2.3.1.c, and 5.2.3.1.d AIM Tier 3 Triggering Events

**5.2.1.1 AIM Tier 1 Triggering Events.**

If ~~any of~~ the following events occurs, you are in AIM Tier 1. You must follow AIM Tier 1 responses (Part 5.2.1.2) and deadlines (Part 5.2.1.3).

**a.** One Annual Average Over the Benchmark Threshold. If one annual average for a parameter is over the benchmark threshold, you are in AIM Tier 1. An annual average exceedance can occur from the average of four quarterly samples for a parameter, or from less than four samples with results such that an exceedance is mathematically certain (i.e., the sum of quarterly sample results to date is already more than four times the benchmark threshold). <u>At your discretion, you may take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges.</u>

**b.** ~~One Single Sampling Event Over 4 Times the Benchmark Threshold. If one single sampling event for a parameter is over 4 times the benchmark threshold, you are in AIM Tier 1.~~ *~~(If one single~~* ~~sampling event~~ *~~is 8 times over the benchmark, you are in AIM Tier 2).~~*

...

**5.2.2.1 AIM Tier 2 Triggering Events.** If ~~any of~~ the following event<u>s</u> occurs, you are in AIM Tier 2. You must follow AIM Tier 2 responses (Part 5.2.2.2) and deadlines (Part 5.2.2.3).

**a. Two Consecutive Annual Averages Each Over the Benchmark Threshold.** If two consecutive annual averages for ~~a~~ <u>the same</u> parameter are each over the benchmark threshold, you are in AIM Tier 2. An annual average exceedance can occur from the average of four quarterly samples for a parameter, or from less than four samples with results such that an exceedance is mathematically certain (i.e., the <u>sum</u> of quarterly sample results to date is already more than four times the benchmark threshold). <u>At your discretion, you may take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges.</u>

**b. ~~Two Sampling Event Results in 2-Year Period Each Over 4 Times the Benchmark Threshold~~**. ~~If two single sampling event results for a parameter within a 2-year period are each over 4 times the benchmark threshold, you are in AIM Tier 2.~~

**c. ~~One Single Sampling Event Over 8 Times the Benchmark Threshold.~~** ~~If one single sampling event for a parameter is over 8 times the benchmark threshold, you are in AIM Tier 2.~~ **~~i. Exception:~~** ~~This event triggers Tier 2 unless you immediately document per Part 5.3 that the single event was an aberration, how any measures taken within 14 days of such event will prevent a reoccurrence, and you take a sample during the next qualifying rain event that is either less than the benchmark threshold, in which case you do not trigger any AIM requirements based on the aberrant event, or less than 4 times but greater than 1 time the benchmark threshold, in which case you trigger Tier 1. You may only avail yourself of the "aberration" demonstration opportunity one time per parameter per discharge point, which shall include substantially similar discharge points.~~

...

**5.2.3.1 AIM Tier 3 Triggering Events.** If ~~any of~~ the following events occurs, you are in AIM Tier 3. You must follow AIM Tier 3 responses (Part 5.2.3.2) and deadlines (Part 5.2.3.3):

**a. Three Consecutive Annual Averages Each Over the Benchmark Threshold.** If three consecutive annual averages for ~~a~~ <u>the same</u> parameter are each over the benchmark threshold, you are in AIM Tier 3. An annual average exceedance can occur from the average of four quarterly samples for a parameter, or from less than four samples with results such that an exceedance is mathematically certain (i.e., the sum of quarterly sample results to date is already more than four times the benchmark threshold). <u>At your discretion, you may take more than four samples during separate discharge events to determine the average benchmark parameter value for facility discharges.</u>

~~**b. Three Sampling Event Results in 3-Year Period Each Over 4 Times the Benchmark Threshold.** If three sampling event results for a parameter within a 3-year period are each over 4 times the benchmark threshold, you are in AIM Tier 3.~~

~~**c. Two Sampling Events in 3-Year Period Each Over 8 Times the Benchmark Threshold.** If two sampling events for a parameter within a 3-year period are each over 8 times the benchmark threshold, you are in AIM Tier 3.~~

~~**d. Four Consecutive Samples Each Over Benchmark Threshold with Average More than 2 Times the Benchmark.** If four consecutive samples for a parameter are each over the benchmark threshold and their average is more than 2 times the benchmark threshold, you are in AIM Tier 3.~~

**Comment Response:**

EPA declines to add the recommend revision to add language regarding an operator's discretion to take more than four samples during separate discharge events to determine the average concentration in Part 5.2. EPA notes that this statement is already included in Part 4.2.2 of the 2021 MSGP. For discussion of EPA's response to the other suggested changes, see Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

**Proposed Changes to the Draft 2020 MSGP, Part 5.2**

In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

**5.2 Additional Implementation Measures (AIM)**

If any of the following events in Parts 5.2.1, 5.2.2~3~, or 5.2.3 occur, you must follow the response procedures described in those parts, called "additional implementation measures" or "AIM." There are three AIM levels: AIM Tier 1, Tier 2, and Tier 3. You are required to respond to different AIM levels which prescribe increasingly robust responses depending on the nature and magnitude of the benchmark exceedance. <u>The AIM responses are only required to be implemented for the parameter(s) that exceeded the applicable benchmark threshold. It is possible to have different parameters in different AIM levels at the same time.</u> See Part 5.2.4 for AIM exceptions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

The triggers for AIM must be based on realistic benchmarks that can be achieved with economically feasible controls and have a reasonable cost benefit. The current copper benchmark for saltwater of 0.0048 mg/L would force us into Tier 3 within the first year of testing. It is not possible for us to put controls that would achieve copper levels below 0.0048 mg/L.

We have reached out to engineers in efforts to learn about and then determine the cost of a collection and treatment system with the capability of meeting the 0.0048 mg/L copper benchmark. No one has been able to provide us any guidance.

**Comment Response:**

See Comment Response Essay 2 Monitoring and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Robert A. Rio
**Commenter Affiliation:**  Associated Industries of Massachusetts (AIM)

**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Under current law, facilities that exceed benchmarks must only review their control measures to see if modification are necessary and continue to monitor until there are no exceedances. Part 5.2 of the new permit would impose a three-tiered response (AIM Tier 1, Tier 2 and Tier 3) depending on the threshold of exceedance: low, moderate, or high.

Facilities that exceed benchmarks would be required to respond to increasingly stringent control measures depending on the magnitude of the exceedance.

Exceedances by a low threshold could simply follow the current rules - review control measures, implement changes if necessary and continue monitoring until there are no exceedances. Exceedances by moderate thresholds would require a facility to implement all feasible controls as indicated in EPA's sector fact sheet and continue monitoring until no exceedances occur. Facilities with exceedances by a high threshold would have to install a permanent structural source and treatment controls and continue to monitor until there are no exceedances.

In general, we find this section confusing, difficult to follow and very costly and we urge EPA to work with impacted companies to develop a simpler approach to this section. Each section should be clarified with proper attention to industry standards and applicability. In general, the cost estimates contained in these proposals are likely to be far higher in Massachusetts than in many other states and this permit could jeopardize the viability of many companies already suffering.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Matthew Paxton
**Commenter Affiliation:** Shipbuilders Council of America (SCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0217-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

SCA is concerned that the process of moving from tier 1 to tier 3 could happen in such quick succession that it would not allow the facility adequate time to implement additional measures to prevent exceeding benchmark values. With the unrealistically low benchmark for analytes like copper, facilities could be forced into tier 3 within the first year of testing. The mandated

response for tier 3, such as installing permanent structures on the facility's grounds, require engineering, design time, and permitting through local, state, and federal entities which can take years to work through. Unfortunately, the tier 3 compliance deadlines are supposed to be met within a maximum of 90 days, creating an impractical standard for reaching compliance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should not name the Additional Implementation Measures "Tiers" which may be confused with Tier 1, 2, 2.5 and 3 waters. EPA's trigger analyses appear to be complex, and NMED recommends moving trigger examples to an Appendix.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA decides to include Additional Implementation Measures triggers, then the MSGP should include example scenarios when there is "no discharge," below detection, or below quantification.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify if facilities must monitor natural background every time benchmark samples are collected to determine triggers.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  55
**Excerpt Status:** Final

**Comment Excerpt:**

**18. EPA Should Adopt its Proposal for Additional Implementation Measures, with Certain Revisions.**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  66
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should shorten proposed deadlines and timeframes for implementation in each of the three proposed tiers and require operators to provide adequate justification when seeking extensions. In general, the proposed deadlines are too generous and fail to promote timely effort by operators to identify modifications that would mitigate or prevent ongoing exceedances. For example, if

there is a Tier I trigger, and if the 14-day deadline is infeasible for documented reason(s), modifications should be implemented within 30 days. A permittee may seek a 45-day period if extraordinary circumstances explain why action could not be taken sooner, such as special difficulties obtaining design and construction assistance.

EPA should also shorten the 31-day deadline extensions in Part 5.2.1.3 and Part 5.2.3.3 and the 60-day deadline extension in Part 5.2.3.3. In the alternative, EPA should provide a justification for the length of these proposed extensions, which includes, in part, reference to the specific information that provides the basis for 31 and 60-day periods. EPA should also address concerns about the use of the term "feasibility" (as discussed fully in Comment Section 16 above) as it relates to implementation of modifications to control measures that an operator has deemed "infeasible" for implementation within the 14-day deadline.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  71
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify whether the "next year" is the following four quarters or all of the four quarters in the following calendar year, or whichever is longer. Parts 5.2.1.2.c., 5.2.2.2.b., and 5.2.3.2.c.

**Comment Response:**

EPA has clarified the benchmark monitoring schedule in Parts 4.2.2.2.a.i and 4.2.2.2.a.ii of the 2021 MSGP, which state, "If the annual average for a parameter exceeds the benchmark threshold, you must comply with Part 5 (Additional Implementation Measures responses and deadlines) and continue quarterly benchmark monitoring for that parameter until results indicate that the annual average is no longer exceeded, after which you can discontinue benchmark monitoring for that parameter for the remainder of permit coverage." Furthermore, Parts 5.2.3.3, 5.2.4.3, and 5.2.5.3 of the 2021 MSGP specify that, after compliance with the applicable AIM level responses and deadlines, the operator "must continue quarterly benchmark monitoring for the next four quarters for the parameter(s) that cause the AIM triggering event at all affected discharge points, beginning no later than the next full quarter after compliance."

**Commenter Name:** Mark D. Williams
**Commenter Affiliation:** Luck Companies, Luck Stone
**Document Control Number:** EPA-HQ-OW-2019-0372-0223-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

The tiered system of additional implementation measures is confusing.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

The various scenarios under which exceeding a benchmark threshold triggers an AIM are complicated. The EPA webinar included some good illustrative slides. **When the permit is final, it would be helpful to provide a guidance document that includes those illustrations.**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Generally, the language used in the AIM Tier explanations needs to be simplified and clarified. For example, consider the trigger criteria found in permit Section 5.2.3.1(d): "Four consecutive samples each over benchmark threshold with average more than 2 times the benchmark." This sentence is just one example of how convoluted the language of this permit has become. Even

after multiple readings, it is difficult to know what the trigger is. The EPA claims that this permit attempts to improve regulatory certainty, this example shows that additional clarification is needed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

Apart from the language used, the Tier system is also quite convoluted and may create compliance challenges for some operators that do not have employees with specialized knowledge or other resources to help determine which Tier applies and what AIMs would be required. In its own public presentation of the issue, the EPA had to prepare explanatory figures and tables to guide attendees through the various triggering scenarios for just one parameter. Please consider that as proposed, all industrial sectors will have at least three benchmark parameters to monitor, plus any sector-specific benchmark parameters. Therefore, a facility could potentially have to track several AIM categories at once; it may be in Tier I for pH, Tier II for TSS, and Tier III for COD. The EPA needs to consider that the added complexity will undoubtedly create situations of non-compliance, even for facilities diligently working towards eliminating pollutants from their storm water. To expect operators to contract consultants or new employees to track these activities would incur much higher costs. If this change is adopted without amendment, the EPA should consider developing an online, anonymous "Tier calculator" and create an anonymous hotline to assist the regulated community. However, CRH believes that this tiered system is too complex. The EPA should consider issuing the permit with the corrective action schedules and requirements of the 2015 MSGP until a more streamlined AIM system can be developed. Any changes to the proposed AIM triggers or requirements should be opened to the public for comment before finalization.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1

**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

## V. COMMENTS: SPECIFIC – ADDITIONAL IMPLEMENTATION MEASURES (AIM)

<u>Simplot opposes the entire AIM approach</u>. As previously explained, benchmark exceedances were not intended to be used, and have not been used, as triggers for mandatory compliance requirements. The proposed AIM process functions the same way that EPA explicitly rejected in the 2008 MSGP previously and treats benchmark exceedances as de facto effluent limitations in violation of the Clean Water Act. This issue has been raised in previous revisions of the MSGP. For instance, in EPA's response to comments on the 2000 MSGP, EPA addressed the comment that "permittees fear benchmark limits would be viewed as effluent limitations." In response, EPA agreed "that benchmark limits are not effluent limitations and should not be used, in and of themselves, as the basis for issuing an enforcement action."[15]

There is legal precedent that benchmark exceedances should not be interpreted as violations of effluent limitations. In *Santa Monica Baykeeper v. Kramer Metals, Inc.,* the court held that "EPA benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs, but that samples in excess do not necessarily constitute a violation" of the general permit at issue here. The court noted that "the MSGP indicates that [b]enchmark levels are to be used as signals that an SWPPP may need adjusting, <u>not as a bright-line proxy for compliance or noncompliance</u>." (emphasis added).[16]

The proposed AIM approach does exactly what the California court said benchmarks should *not* do – it interprets benchmarks as a bright-line proxy for compliance or noncompliance, operating as de facto effluent limitations. If EPA wants to use benchmark values as if they are numeric limits that trigger mandatory responses, then it must revise the benchmark values to reflect best available technology (BAT and BCT) consistent with the CWA.[17] In other words, because they are designed to indicate nothing more than a level of concern for the operator, if EPA wants to use them as something more, like an effluent limitation, then they must be developed consistent with BAT and BCT as required by the Clean Water Act.


[15] 65 Fed. Reg. 64746 (Oct. 20, 2000) at 64797.
[16] Baykeeper v. Kramer Metals, Inc., 619 F. Supp. 2d 914 (C.D. Cal. 2009).
[17] 33 U.S.C. 1311(b)(2)(A) and 1342(b)(2).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

Besides the issues of AIM being inconsistent with prior regulatory and legal precedents, this tiered system will be extremely problematic to implement. Compliance will be difficult to track, certain actions (Sector Control Methods) that EPA expects to be evaluated and used are inappropriate, and the time frames for action are unrealistic. As just one example of how problematic this system is, the management of AIM triggering events will be difficult with many different triggering events under each tier, involved responses, rolling averages, and tight deadlines. Furthermore, because benchmark monitoring and the corresponding benchmark levels are not appropriate for numerous reasons as described previously, triggering increasingly severe requirements in response to benchmark exceedances is not workable. This approach will result in a monetary burden to upgrade control measures simply for the sake of attempting to meet arbitrary benchmarks that may have no relation to protecting or improving water quality in the receiving waters.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

Because of all these issues, Simplot recommends that EPA not use the AIM approach and instead use language from 2015 MSGP (see Part 6.2.1.2) that allows permittees, in response to benchmark exceedances, to document that no further pollutant reductions are technologically available, economically practicable and achievable in light of best industry practice.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

If EPA does move forward with an AIM, tiered approach, Simplot requests AIM triggering events be streamlined with fewer triggering events and simpler mathematical averaging methods to determine benchmark exceedances. Also, Simplot has further comments on changes that EPA should make, if EPA were to move forward with this flawed approach.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

V. A. AIM Tier 1, 2 and 3 Triggering Events (Part 5.2.1.2; Part 5.2.2.1 and Part 5.2.3.1 )

Simplot requests AIM Tier triggering events be streamlined so they are either based on simple annual average or single benchmark exceedances rather than both. Numerous types of triggering events would not be practical to track for compliance and would create an increase in documentation. Recommendations are as follows:

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

V.B. AIM Tier 1, 2 and 3 Responses and Deadlines (Part 5.2.1.2-3, Part 5.2.2.2-3, and Part 5.2.3.2-3) .

The proposed responses and timeframes for responding to exceedances of benchmarks are not realistic. Specific examples and recommendations include the following:

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Benjamin J. Davenport
**Commenter Affiliation:**  Idaho Mining Association (IMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0233-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Additional Implementation Measures (AIM). The proposed 2020 MSGP recognizes that benchmark excursions do not constitute permit noncompliance. However, it requires a hierarchal set of control or corrective measure obligations for exceedances including benchmark exceedances. The conditions for implementation of AIM should be reconsidered for several reasons. The first is that benchmarks are just that: "benchmarks." As stated earlier in these comments, natural conditions can result in "pollutants" exceeding the established benchmarks. Thus, IMA recommends that EPA keep in place the existing framework for responding to exceedance for benchmarks andnot incorporate the AIM system in the MSGP. The proposed AIM system is very complex and has unrealistic timelines. As an example, timeframes for implementing Tier 2 and Tier 3 AIM are unrealistically short considering some of the extensive remedial actions required. As part of tiering AIM, we believe EPA should expand the use of AIM options including use of infiltration.

*IMA requests that AIM system not be incorporated into the MSGP. If EPA chooses to continue with the AIM system, conditions be reconsidered to extend implementation timeframes for Tier 2 and Tier 3 actions. We also request that additional alternatives be added to Tier 1 and Tier 2 situations, specifically infiltration.*

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and
Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Based on our review, it does not appear that the intent of the NRC study is to add additional
corrective actions associated with the new Universal Benchmarks. These corrective actions
should only be applied where exceedances of the facility's sector specific benchmarks are noted.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

While greatly increasing the penalties for not achieving the benchmark limits via the AIM
requirements, EPA has not sufficiently addressed industry concerns expressed in previous MSGP
comments that the benchmark limits are set far too low for many common and ubiquitous
parameters found in storm water. This is discussed in Section II.

...

**II. The EPA Proposal for AIM, which involves Multiple Progressive Tiers of Corrective
Actions and Continued Benchmark Monitoring when Benchmark Limits are Exceeded
makes the Benchmark Exceedance Issues for Common and Ubiquitous Metals of Critical
Importance**

The AIM "Tier System" of corrective actions introduced in the proposed 2020 MSGP mandates
increasing corrective action for continued benchmark limit exceedance. This presents a real
problem for certain benchmark limits of common and ubiquitous metals that are nearly always
present in most stormwater runoffs. For the 2015 MSGP comments were made concerning
several common metals that should either be dropped from benchmark monitoring, or else should
have the benchmark limits revised up to levels which appropriate normal stormwater controls
and diligent housekeeping can be expected to achieve. These specific parameters were

aluminum, copper, iron, lead, magnesium, and zinc. EPA has made some improvements for some metals, but they are likely insufficient in some cases. Some of these issues are discussed in the following.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Scott D. Parker
**Commenter Affiliation:**  NORA, An Association of Responsible Recyclers
**Document Control Number:**  EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

Of greatest concern is the imposition of increasing Tiers of compliance for failing to meet benchmark limits. Many benchmarks, especially for copper, have been set at extremely low levels—levels that are not likely achievable simply through enhancing stormwater BMPs. This problem has been made far more acute due to the imposition of a graded "Additional Implementation Measures (AIM)" consisting of three Tiers of increasingly punitive requirements for benchmark failures, which in practice and in costs would make the benchmark limits essentially the same as permit regulatory limits. In addition, the deadlines for completing the lengthy Tier 2 and Tier 3 requirements are unrealistically short.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Curt Wells
**Commenter Affiliation:**  The Aluminum Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Sporadic Nature of Discharge

Stormwater by its very nature is sporadic and highly variable. Precipitation events can span the spectrum from high-intensity to low-intensity as well as vary substantially between regions. Because of the variable nature of stormwater and its associated discharge, a single quarterly

sample cannot be representative of a facility's stormwater discharge. Therefore, the use of a single sample to increase the applicable AIM tier is not suitable for a general permit that uses blanket coverage for many locations with differing stormwater systems and scenarios. It is worth noting that as proposed, a single sampling data point could elevate an average value for an annual season and thereby increase the applicable AIM tier. This is not defensible given the discussion above.

...

AIM Tiers

The AIM concept was designed to allow regulated parties an opportunity to identify sources of pollutants that might exceed benchmarks and then implement control measures on a pollutant-specific and outfall specific approach to achieve benchmark levels. The approach "ramps up" year-to-year when a facility demonstrates that it is having difficulty controlling the industrial pollutant at the outfall that is exceeding benchmarks. But there never was a concept of "skipping" tiers or moving into Tier 1, then Tier 2, then Tier 3 in a single year as is contemplated in the draft permit. The notion of skipping tiers completely ignores one of the fundamental concepts of benchmark monitoring—that stormwater sampling is a highly variable and unpredictable event. This variability is why regulated sites are required to assess potential causes for high sample results, plan to address and correct what issues might be occurring, and then resample to assess progress. As currently proposed, the draft MSGP would allow that one bad sample for one pollutant at one outfall during the first year of permitting (especially when many facilities may have to sample pursuant to this permit for the very first time ever) could immediately put that site into Tier III status. This is well beyond anything contemplated in the 2015 MSGP settlement negotiations or the subsequent NRC study and is grossly inappropriate for the variable and unpredictable flows associated with stormwater.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

The tiered AIMs are overly-complicated. ATA suggests that the EPA benchmark with state agencies that have already implemented a tiered corrective action process such as Washington and Oregon.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

- Additional implementation measures. The permit should contain various triggers for corrective actions, whether related to inspections or limited monitoring, but the Additional Implementation Measures (AIM) scheme that EPA has built from the prior MSGP settlement misrepresents the settlement negotiations and creates unjustified confusion and related financial impacts on regulated parties. To the extent EPA proceeds with the AIM program, it should provide for broad availability of the proposed exceptions for "aberrant" events, pollutant run-on from neighboring properties, and natural background levels within the AIM protocol.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 43
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA General Recommendations Relating to the AIM Program**

EPA has fundamentally altered the AIM approach that was included in the 2016 Settlement. The AIM structure was based on a similar structure that was reflected in the California Industrial General Permit's (IGP's) Exceedance Response Actions (ERAs).[33]

Modifications to California's ERA process were negotiated by all parties in the 2016 Settlement discussions, to fit the MSGP structure and address other concerns raised during the negotiations. One fundamental premise from the California system was not changed; a facility's status under the various tiers can be elevated or return to "baseline" only on an annual basis.[34]

It is important to recognized, as an initial matter, that AIM is not a "corrective action" per se and its measures are different from "corrective actions."[35] The AIM process was developed solely as a tool to address responses to benchmark monitoring results as an "enhancement" to traditional corrective actions. The entire concept was to allow regulated parties an opportunity to identify sources of pollutants that might exceed benchmarks, and then to implement control measures on a pollutant-specific and outfall-specific approach to further a facility's goals of meeting benchmark levels. This approach was intended to "ramp up" year-to-year stormwater controls with in the BAT/BCT framework when a facility demonstrates that it is having difficulty controlling a specific industrial pollutant at a specific industrial outfall that monitoring data indicate is exceeding benchmarks. But, there was never a concept of "skipping" tiers or moving into Tier 1, then Tier 2, then Tier 3 in a single year. As negotiated, Tier 3 status was intended to reflect three years of challenges at a site in which the site operator implements control measures targeting that single pollutant at that outfall.

EPA's 2020 Proposed 2020 MSGP confuses the AIM process and misapplies the 2016 Settlement by introducing the concept of skipping tiers. There is no such concept in the California IGP, which formed the structural basis for the AIM negotiations. Moreover, EPA's explanation of various aspects of the AIM process is entirely inconsistent with the concept of "skipping" tiers. For example, in the Proposed 2020 MSGP Fact Sheet, EPA clearly recognizes the challenges associated with the variability of stormwater sampling results and the "small sample set of monitoring results."[36] Yet, EPA explains that even if AIM was triggered during the first quarter of the first year of monitoring, "EPA proposes that the facility would first comply with the AIM Tier 1 requirements, continue monitoring for the remaining three quarters, and then continue monitoring into the following year."[37] Regardless of the amount of the benchmark exceedance, a regulated site should only move from baseline into Tier 1 after an entire year (unless an off-ramp or exemption applied).

...

The notion of skipping tiers completely ignores one of EPA's fundamental concepts of benchmark monitoring—that stormwater sampling is a highly variable and unpredictable event. This is why regulated sites are required to assess potential causes for high sample results, plan to address and correct what issues might be occurring, and then resample to assess progress. That is the basis for the California IGP model. It is also the immediate response to NGO concerns with the 2015 MSGP. The NGO concern, as stated, was that under the 2015 MSGP, "any corrective action," regardless of how meaningless, protected a site from liability for significant benchmark exceedances. In response, the MSGP 2015 litigants worked to establish a more structured approach that recognized pollutant sources (i.e., industrial versus background), outfall-specific challenges, measured response actions, and continued monitoring, with the difficulty and treatment responsibilities ramping up year to year.

In sum, the concept negotiated in the 2016 Settlement was that sites that continue to have trouble controlling a particular industrial pollutant discharged from a particular outfall over a three-year period would have had ample opportunity to implement appropriate controls. Only if the site failed over that three year period would more significant structural controls be necessary. The concept in the Proposed 2020 MSGP - that one bad sample for one pollutant at one outfall, during the first year of permitting (especially when many facilities may have to sample pursuant to this permit for the very first time ever) could immediately put that site into Tier 3 - grossly misconstrues the 2016 Settlement.

The FSWA and FWQC - who were intervenors in the 2015 MSGP litigation and parties to the related 2016 Settlement - have never supported or agreed to such a process. It was the understanding of all parties that review of AIM tiers occurs only on an annual basis. The California IGP served as a basic structural approach, which then allowed time, consistency, and opportunity to address potential problematic industrial pollutants, with potential off-ramps for interference from natural background levels, site run-on, or where benchmark exceedances still had no impact on local water quality impairments. EPA has improperly altered (and as a result utterly confused) that process in its 2020 Proposed MSGP, which is inconsistent with what EPA agreed to propose in the 2016 Settlement.

Another significant concern with EPA's proposed AIM approach is that the Agency has essentially turned benchmarks into numeric effluent limitations. This is a scenario that the regulated community has fought and warned against for 25 years, and one that is contrary to EPA's reassurances that benchmarks would never become numeric effluent limitations (NELs). In the Fact Sheet, EPA continues to reaffirm its prior position that benchmarks are not NELs and that exceeding benchmarks is not a permit violation:

However, the Agency has always and continues to hold that benchmark thresholds by themselves are not water quality-based effluent limits (or any effluent limit) and therefore facilities whose responses to benchmark exceedances comply with the permit's requirements, but do not achieve sub-benchmark pollutant levels, cannot be in violation of the permit, because a benchmark exceedance is not definitive proof that a water quality standard has been exceeded.[39]

...

Based on the issues raised in the benchmark monitoring comments above, and EPA's proposal to expand the AIM corrective actions to treat benchmarks as numeric limits, FSWA and FWQC believe that benchmark monitoring has exceeded any current or future benefit, while representing staggering liabilities to the regulated community. If EPA truly desires and intends to develop numeric effluent limitations, the more appropriate and necessary pathway is for EPA to refocus on developing wet weather water quality standards. In doing so, EPA would eliminate the need for the AIM process, because regulated sites would have to meet appropriately-promulgated wet weather WQS.

In the time period between the next MSGP and completing wet weather WQS, FSWA and FWQC will work with EPA to develop a fair and appropriate corrective action approach. These comments detail specific concerns with EPA's rejection of a fair corrective action approach,

expansion of benchmarks, and implementation of an unjustified accelerated AIM program. We believe that the EPA approach would move the industrial stormwater program backwards, not forwards, using an approach that was initially created as experimental and which has never been fully justified over the past 30 years.

[33] See CA IGP (https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/industrial/2014indgen permit/order.pdf) at Section XII.

[34] 2016 Settlement at p. 13 ("regarding annual averages, their calculation is reset upon triggering and
complying with each tier individually").

[35] Compare 2020 Proposed MSGP Parts 5.1 and 5.2 and related definitions in Appendix A.

[36] Fact Sheet at 80.

[37] Id.

[39] Fact Sheet at 77.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Triggers and thresholds for AIM levels as proposed by EPA are extremely convoluted. Keeping track of the applicable AIM Tier parameter-by-parameter and outfall-by-outfall will become very complicated for operators, particularly considering that calculation of annual averages re-sets upon each triggering event. Facilities are likely to have triggering events at different times of the year for different pollutants and at different outfalls, and to jump to higher tiers based on single results, making tracking of the AIM status extremely complex over the course of the permit term. We suggest eliminating the requirement to immediately implement AIM based on mathematical certainty and eliminating the provisions for immediately jumping to AIM higher tiers (e.g., based on one result), keeping only the requirement to review the average of the four quarterly samples against the benchmark concentrations at the end of each monitoring year. At least one authorized state (Rhode Island) allows this in their MSGP. We believe that this would be more effective at

achieving benchmark concentrations because it would allow facilities more time to evaluate the most appropriate and effective additional measures that should be implemented, and in some cases it would allow facilities an opportunity to trial different types of additional control measures to help evaluate the best options. Consider that facility operators, many of whom have numerous other responsibilities aside from managing stormwater compliance, are only provided 14 days after a triggering event to identify, evaluate, and implement additional controls. If these time constraints are changed as suggested above, it is more likely that facilities will implement additional measures that have been thoroughly evaluated, thought-out, and possibly tested, and this is likely to result in more effective reductions in benchmark pollutants by the end of each monitoring year.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 1 and 2, we suggest adding a provision (like the 2015 MSGP) to allow for additional time if circumstances are such that it will take more than 45 days to design/install/ implement controls. There could be circumstances when 45 days may not be sufficient time (e.g., installation of stormwater treatment structures may require local and/or state permits that take longer than 45 days to obtain; winter weather conditions may delay installation; etc.) Even though AIM Tier 1 and Tier 2 control measures may not specifically require installation of permanent structures or treatment, a facility may choose to do this at the Tier 1 or Tier 2 level since many facilities that will be covered under the 2020 MSGP were covered under previous versions of the MSGP and have already exhausted feasible options for operational and source controls.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1

**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

As proposed, the concept of immediately triggering AIM based on one benchmark sample result is inconsistent with EPA's provision in Part 4.2.1 that allows facilities to collect more than the minimum required number of samples during a monitoring period and determine the average benchmark parameter value, if they choose to do so. If EPA is allowing facilities to take additional samples during one monitoring period, which is reasonable, permittees must be allowed to wait until the end of the monitoring period (i.e., four calendar quarters) before triggering AIM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

The Proposed Deadlines for AIM Tiers 2 and 3 are Not Feasible.

Facilities will be unable to meet EPA's proposed deadlines for Tiers 2 and 3. The Proposed MSGP suggests a deadline of 14 days, with an outside window of 45 days if infeasibility of 14-day deadline is documented in the SWPPP, to implement corrective actions for Tier 2 responses. These may include "pollutant prevention, stormwater treatment [], and enhanced training and inspections."[43] For Tier 3, corrective measures must be implemented within 30 days, or 90 days if documented in the SWPPP. Such corrective measures would include the identification, installation or construction, and testing of "one or more permanent, structural or treatment technology train."[44]

Notably, however, both AIM Tiers 2 and 3 responses include structural control or treatment control measures, which in many cases are not available on the market as an "off-the-shelf" solution. Implementation of structural or treatment control measures will necessarily require engineering, planning, and review, some of which may be extensive depending on the size and complexity of the facility, conveyance, and discharge. Capital planning, which may require budget adjustments, must be factored in the deadlines. Further, additional time may be needed at the outset of the MSGP as the need for control measures will not be known until sampling is completed and many controls simply cannot be planned for in advance of the MSGP. A number

of measures will also require hiring outside consultants and contractors, for which contracting time must be considered. In addition, the local climate and severe weather conditions (e.g., frozen ground, rainy season) may impact the ability to complete installation of structural and/or treatment SCMs. Operators will be required to allocate significant resources on structural SCMs and rushing this process may result in misallocation of resources on stormwater SCMs that may not work well for a given facility or achieve the objective of the MSGP to reduce pollutants of concern in stormwater runoff from permitted facilities.

[43] EPA 2020 Proposed MSGP Fact Sheet at 82.
[44] Id. at 83.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

The meager timelines outlined by EPA in the 2020 Proposed MSGP are insufficient to allow for these significant structural and technological corrective measures and must be increased. A more realistic timeline would allow for up to 18 months for the installation of structural SCMs and 36 months for treatment controls. This would provide adequate time to evaluate structural SCM alternatives that would work for a given facility.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

Overall, the methods for determining AIM Tier response levels are unnecessarily complicated and overly burdensome. As proposed in the draft 2020 MSGP, a single-sample event exceedance could move a facility from baseline to AIM Tier 2 based on one sampling event or to AIM Tier 3 based on only two sampling events. Such does not allow for facilities to implement adaptive management strategies to maintain compliance – as is the intent and purpose of the MSGP. To allow for adaptive management, AIM Tier level progression should only be based on exceedances of the annual average for a specific parameter over the benchmark threshold, and progress from year to year. Otherwise, facilities will be left to invest significant resources into the installation of structural or treatment source control measures within only the first year of coverage.

To capture the range of comments for the proposed AIM Tier response structure, suggested edits are provided in Appendix A, with strikethrough text representing suggested deletions and underlined text representing suggested additions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should reject any AIM requirements triggered by benchmark exceedances. Any exceedances should only trigger current corrective action measures.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

**IV. Proposed AIM Tiers Costs are Randomly Imposed, Prohibitively Expensive, and Unlikely to Provide Water Quality Benefits: EPA Should Retain the Currently Effective Corrective Action Scheme**

The proposed 2020 MSGP retains the current corrective action scheme effectively utilized by industry for the last 25 years. Under prior permits, facilities consider whether cost-effective improvements are needed for the site and deploy them where appropriate. We oppose EPA's proposal to impose new AIMs, which can be triggered for minor exceedances and are unnecessary in light of current corrective action requirements. If triggered, AIMs would result in a major increase in compliance costs with questionable benefits.

We have several major objections to the proposed AIM Tiering requirements.[66] It is our understanding that the AIM Tiered approach, which derives from the legal settlement agreement, was based on a California industrial stormwater program.[67] However, we do not believe EPA has aligned its proposal with the California program that served as the model for these provisions. The key difference is that under the EPA proposal, a facility can trigger a very costly Tier 2 or Tier 3 response simply by having a single very high exceedance level, and it can be triggered in the first year. In contrast, the California program only requires Tier 2 responses after the facility attempts to address the stormwater issue for one year in Tier 1, and Tier 3 responses after 2 years of remedial attempts.

Equally importantly, a facility with two exceedances just over the annual average triggers a Tier 2 response. In other words, if a facility has even a minor exceedance of the annual average for just one benchmark parameter, that facility would trigger Tier 1. If the minor exceedance continues for two years, Tier 2 would be triggered and so on. Given the inherent large variability and inaccuracy of grab samples, this could result in frequent occurrences of exceedances even among the U3 sector lacking such a history. EPA makes no attempt to connect exceedances, no matter how small, to any material impact on the water quality of the receiving water before triggering the costly AIMs. Thus, the AIM Tier triggers are, in our view, poorly designed and inappropriate, especially without confirmation that the benchmark limits are scientifically based.

[66] Tiers 1, 2, and 3 are triggered by increased magnitude or number of benchmark exceedances by the facility.

[67] 2019 NRC Report at 58.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1

**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, EPA has failed to address why non-monitoring facilities, including food and beverage processors, (a) need to monitor for de minimis pollutant concentrations and (b) have been targeted for upgraded enforcement attention. We respectfully submit that the Agency re-engage with the litigation partners and work out options that are consistent with the settlement agreement. In the meantime, EPA should rely on the well-crafted 2015 BMPs in use today.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Beth Goodnough
**Commenter Affiliation:** Western Fuels Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

If finalized as proposed, the 2020 MSGP would require additional complex, costly, and burdensome regulatory requirements on Sector H. In addition, in a significant change from prior renewals, the EPA's proposed Alternative Implementation Measures (AIM) would result in exceedances of benchmark limits being a violation of the permit.

Wyoming coal mining operations are tens of thousands of acres in size, subject to comprehensive state and/or federal mining requirements. Only a small portion of these areas is covered by the MSGP stormwater program. Wyoming coal mining operations are also regulated under the Surface Mining Control and Reclamation Act[1] (SMCRA) program, which contains comprehensive requirements for protection of the hydrologic balance and implementation of erosion control measures onsite. Under the Wyoming MSGP permit program, runoff from the vast majority of the disturbed areas, along with all pit dewatering, and maintenance and coal handling facilities are required to be directed to ponds or discharge points regulated under NPDES permits. Hence these must be discharged in accordance with NPDES, not MSGP limits. Only small areas, typically on the outer boundaries of a facility, are allowed to be managed under the MSGP program, and then only upon approval by the SMCRA regulatory agency.

In Wyoming, the Wyoming Land Quality Division (LQD) is the approved SMCRA regulatory authority. For these small areas managed under the MSGP program, construction of a NPDES impoundment is often impracticable or would cause more environmental harm through its construction than the use of alternative sediment control measures. Instead of impacting

additional lands, the WQD, LQD and mine operators are in agreement that the use of best management stormwater practices are a better approach than installing more large NPDES sized containment ponds. On both the watershed and mine site scale, these small MSGP stormwater structures (SCMs) present a minimal risk of environmental impact.

The LQD inspects coal mining operations monthly and WQD inspects the mines at least annually. Sediment control measures and stormwater management practices are often a focus of these inspections. The 2015 MSGP rules were reasonable. However, the proposed 2020 changes to the MSGP program at these facilities is overly duplicative and costly. It is also risky from a compliance risk management perspective.

Our overall concern is that the draft AIM rules are punitive and costly to the point that the use of the MSGP program at mines will be unworkable. If implemented as proposed, it is likely the program will be mostly discontinued at Wyoming coal mining operations. This will result in a return to the old water management method where huge NPDES treatment impoundments were installed everywhere, instead of the practical MSGP measures now in place in a few small areas. Going back to the old way will unnecessarily disturb more lands causing more harm to the environment.

[1] 30 C.F.R. 816.42-816.57 and 817.42-817.57

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

Additional Implementation Measures (AIM): We oppose the proposed AIM framework in its entirety and urge EPA to withdraw it. The EPA has not identified concerns with compliance under the current program, and hence provided no justification for imposing this new AIM program. The AIM approach essentially operates with the force of law without the necessary justification. AIM "violations" would trigger criminal and civil violations of the Clean Water Act. It is completely inappropriate for EPA to finalize and implement new enforcement requirements with severe criminal and civil penalties based on benchmark water quality standards that have been arbitrarily set and are not based on science.

The benchmarks are designed to indicate nothing more than a level of concern for the operator. If EPA wants to use them as something more, like an effluent limitation, then they must be

developed consistent with BAT and BCT as required by the Clean Water Act (CWA).[3] That was not done in this case; therefore the EPA must withdraw the proposed AIM approach in its entirety.

Because the benchmarks were improperly established, the arbitrary benchmarks will undoubtedly be exceeded at some locations, since they are higher than background at most western coal mines. Requiring operations to review and install additional controls even when the existing controls are operating effectively for the local conditions is unrealistic and will be extremely costly. Because of the risk involved, we believe it will simply result in most mining operations abandoning this avenue of managing stormwater. They will simply return to installing overly large NPDES impoundments in all areas. As explained previously, this will cause unnecessary land disturbances at coal mines and will unnecessarily result in more damage to the environment.

[3] 33 U.S.C. 1311(b)(2)(A) and 1342(b)(2).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Beth Goodnough
**Commenter Affiliation:**  Western Fuels Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

We have significant concerns with many of the new provisions contained in this renewal. To impose the desired benchmark monitoring and the AIM measures as proposed appears to be a violation of the approved CWA processes. They will both impose unacceptable and unjustified cost and compliance risk on facilities. We recommend the EPA withdraw the proposal in its entirety and instead reimplement the 2015 MSGP renewal regulations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1

**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

**E. CCIG Recommends that EPA Modify the Proposed Additional Implementation Measures ("AIM").**

CCIG appreciates EPA's desire to improve the MSGP's provisions for responding to benchmark exceedances through a tiered compliance approach. Nevertheless, to ensure necessary flexibility in designing and selecting remedial measures, the Group requests that EPA modify AIM Tier 2 and AIM Tier 3 measures. This flexibility is especially important when considering that the MSGP applies across the country and that the effectiveness of a remedial measure likely will differ depending on location (*i.e.*, soil conditions, levels of rainfall, and other location-specific characteristics of an industrial source). Accordingly, as explained below, CCIG recommends that EPA modify the tiered approach to provide industrial sources with the necessary flexibility to ensure that appropriate stormwater controls are implemented based on site-specific assessments.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

- Additional Implementation Measures. The proposed MSGP properly recognizes that benchmark excursions do not constitute permit noncompliance. In contrast, it proposes a hierarchal set of implementation measure obligations (Additional Implementation Measures or "AIMs") that are triggered by excursions of benchmarks. Given the cited concerns with the concept of benchmarks, particularly at mine sites where those benchmarks do not accurately reflect stormwater impacts on receiving waters, the provisions identifying mandatory (and onerous) response measures directly related to benchmark excursions are also flawed. Indeed, the proposed MSGP establishes that any failure to comply with an AIM deadline triggers permit noncompliance. To the extent that the tiered obligations are based on benchmarks that may not accurately reflect impacts to receiving waters, the related proposal to comply with mandatory approaches to site water management is also flawed. In an effort to mitigate this oversight and if the AIM requirements are retained, AEMA proposes EPA clarify the breadth of exceptions to AIM measures some of which are documented in the various tiers.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

EPA proposes three tiers of implementation obligations triggered by benchmark monitoring exceedances which "prescribe increasingly robust responses depending on the nature and magnitude of the benchmark exceedance". Proposed MSGP 5.2. As identified above, all of the tiers are predicated on excursions of benchmark thresholds. The proposed MSGP continues to presume, without adequate scientific underpinning, that the benchmarks are specific enough to effectively assess the implications of stormwater on receiving waters. The approach may result in expansive stormwater control measure commitments which, aside from the lack of support for the thresholds, could result in huge burdens on operators looking to evaluate control measures, implement on-the-ground changes and design treatment technologies. Because of the flaws in the benchmark framework that triggers varying degrees of stormwater control measures, exceptions to those AIM obligations should be accessible where those exceptions are consistent with the overarching goal to protect the receiving waters.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

The response measures mandated in the tier levels also need to account for accessibility issues. For example, if access is restricted to an area due to unsafe conditions, stormwater control measures may not be able to be maintained for some period of time. If benchmark excursions are due to that temporary inaccessibility to a site, the data should not automatically trigger the prescribed implementation measures. The proper measured response may be as simple as fixing

the existing management practices as soon as the site can be accessed. Benchmark excursions related to temporary site inaccessibility should be excepted from any of the AIM tier response measure requirements or additional benchmark monitoring.

**Comment Response:**

Consistent with the 2015 MSGP, Part 4.1.5 of the 2021 MSGP allows operators to take a substitute sample during the next qualifying storm event when adverse weather conditions prevent collection of samples according to the relevant monitoring schedule. Adverse weather conditions are those that are dangerous or create inaccessibility for personnel, such as local flooding, high winds, electrical storms, or situations that otherwise make sampling impractical, such as extended frozen conditions. EPA clarifies that, where the results of the substitute sample result in an AIM triggering event, the operator is not exempt from the required AIM response or continued benchmark monitoring.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

1. Implementation Schedule (for benchmarking and AIM)
The MGSP implies that a facility is kicked into tier 1 or 2 immediately with the first sample 4X or 8X. WEF recommends that California's standards present an option or direction, where the State provides a compliance year where you can collect your data and then trigger implementation to tier 1 measures. Ex. 1 year of data collection + 6 months of implementation for tier 1. Wisconsin has 2 tiers based on facility SIC code not monitoring plus no exposure exemptions, another option.

2. Triggers
WEF requests clarification on: if a facility meets its commitment – is it back to baseline and does it stop sampling? WEF requests that EPA clarify how the AIM tier affects the facility's monitoring and sampling frequency/schedule.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)

**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

4. Start of compliance year
WEF recommends that EPA clarify what a compliance year is. EPA should clarify when a compliance year starts after a trigger sample.

5. Deadlines
Comments on all Tiers 1, 2, 3, very short deadlines particularly for structural changes for Tier 3 up to 90 days.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 71 and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

11. Final General Comments:
This entire section is written as if a facility only has 1 outfall. The more outfalls a site has the more likely it is to trigger. There is no way to acknowledge that many facilities have more than 1 outfall to monitor. EPA should provide clarification on outfall/parameter specific requirement. What happens if your outfalls are in different tiers, parameters, etc? WEF recommends that EPA clarify if site-wide averaging is applicable. WEF also suggests that without a design storm it will be difficult to determine a structural treatment control.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

EPA declines to define a design storm requirement for design of structural treatment controls. Rather, Part 5.2.5.1 of the 2021 MSGP states, "The controls or treatment technologies or treatment train you install should be appropriate for the pollutants that triggered AIM Level 3 and should be more rigorous than the pollution prevention/good housekeeping-type measures implemented under AIM Tier 2 in Part 5.2.4. You must select controls with pollutant removal

efficiencies that are sufficient to bring your exceedances below the benchmark threshold." The MSGP provides operators the flexibility to select the appropriate control measures to address their site-specific conditions.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Schedule—The corrective action deadlines outlined in the AIM process include response for Tier 1 and 2 within 14 days, with 45 days if demonstrated as infeasible and for Tier 3 within 30 days or 90 days if infeasible. Especially when considering design, permit, and install for such items as infiltration options, this schedule is not feasible and should be extended, see California ERA process timeframe.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Proposed Section 5.2 – Additional Implementation Measures (the "Proposed AIM Provision"), as currently structured, cannot properly be applied to the Air Transportation Sector. Notably, Section 5.2 is as flawed as the EPA's 2015 attempt under the previous Administration to impose requirements on the Air Transportation Sector through the MSGP. In its Proposed 2015 MSGP,[10] EPA initially sought to make the Permit's mandates more concrete and detailed by changing requirements to "consider" particular technologies and control measures to requirements to "use" or "implement" the technologies and control measures "where practicable" or "as appropriate." In our comments on the Proposed 2015 MSGP,[11] A4A pointed out that this structure, as applied to the Air Transportation Sector, squarely contradicted the Act and the Agency's own findings and determinations in its final *Deicing ELG*.

Most relevantly, we highlighted that with exactly the same task before the Agency that it faces here (establishing BAT/BCT applicable across multiple airport sites), the Agency identified a host of factors such as safety, land availability (space) and flight operations (including the potential for delays) that can and do limit the availability of pollution control technologies across airports and specific aircraft operations. For example, the Agency "agree[d] that delays must be a factor in considering today's possible requirements and recognizes that such delays fundamentally affect U.S. and international business and recreational interests."[12] The Agency also "determined that none of the ADF [aircraft deicing fluid] collection technologies considered for today's final rule represents the best available technology for the entire category. Rather, EPA conclude[d] that best available technology determinations should continue to be made on a site-specific basis because such determinations appropriately consider localized operational constraints (e.g., [aircraft] traffic patterns), land availability, safety considerations, and potential impacts to flight schedules."[13] We detailed the record related to EPA's development of and determinations pursuant to the Deicing ELG in our comments and, rather than restating that detail in these comments, incorporate our previous comments by reference here.

To its credit, in response to our Comments on the Proposed 2015 MSGP, the EPA incorporated a number of changes to ensure consistency with the Act and the Deicing ELG. In its 2015 EPA MSGP Response to Comments, the Agency "agree[d]" "that aviation-specific factors including safety, effects on aircraft operations (particularly delays) and the interdependencies that connect these and other design factors should be considered when determining what pollution control practices are available at individual airports."[14] The Agency cited Part 8.S.3.1.3 as an example of the language it had developed to reflect this determination and emphasized that this language had "been applied in other parts of this sector as well as other parts of the permit where stormwater control options are listed."[15] Specifically, in every instance in Subpart S-Air Transportation where it identified a control measure for potential implementation, the Agency explicitly recognized the control measure need only be implemented ***"where determined to be feasible and [to] accommodate considerations of safety, space, operational constraints and flight considerations."*** *See*, *e.g.,* 2015 MSGP Parts 8.S.4.1.1 (Aircraft, Ground Vehicle and Equipment Maintenance Areas), 8.S.4.1.3 (Aircraft, Ground Vehicle and Equipment Storage Areas), 8.S.4.1.4 (Material Storage Areas), 8.S.4.1.S (Airport Fuel System and Fueling Areas), 8.S.4.1.6.1 (Source Reduction – Runway Deicing Operations), 8.S.4.1.6.2 (Source Reduction – Aircraft Deicing Operations), 8.S.4.1.7 (Management of Runoff).

To emphasize the paramount importance of ensuring safety where deicing of aircraft and runways are concerned, the Agency explicitly provided in Part 8.S.4.1.6 that any "Source Reduction" control measure only applied where "[c]onsistent with safety considerations." Critically, in Part 8.S.4.1.6.2 the Agency also recognized that "the evaluations and determinations" regarding whether the control measures related to Aircraft Deicing Operations identified in fact are "consistent with considerations of flight safety", "feasible," and "accommodate considerations of safety, space, operational constraints and flight considerations" should "be carried out by the personnel most familiar with the particular aircraft and flight operations and related systems in question (versus an outside entity such as the airport authority)." As a result, the 2015 MSGP identified a long, elaborate list of control measures related to Aircraft Deicing Operations that could be potentially implemented to address associated discharges, but explicitly acknowledged that such control measures would not and

could not be implemented unless determined to be feasible and consistent with safety, space, operational and flight considerations by "personnel most familiar with the particular aircraft and flight operations and systems in question." In its 2015 EPA MSGP Response to Comments, the Agency explicitly "acknowledge[d] that technology selections that relate to aircraft deicing discharge must be based on an evaluation of factors identified in the Deicing ELG . . . ."[16]

To be clear, these conditions reflect the Agency's recognition that – as we have explained many times, including in comments to the Agency on the Deicing ELG and 2015 MSGP[17] – the Federal Aviation Administration ("FAA") exercises primary and exclusive jurisdiction over air safety and aircraft operations. This follows Congress' mandate that the Secretary of Transportation is to "assign[] and maintain[] safety as the highest priority in air commerce"[18] and airport infrastructure projects "that increase the capacity of facilities to accommodate passenger and cargo traffic be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease."[19] Congress also has affirmed the need to meet environmental objectives consistent with the overriding safety imperative and the ability of the National Airspace System ("NAS") to accommodate the needs of the nation's economy and culture.[20] As repeatedly affirmed by the Supreme Court, however, the Federal Aviation Act establishes a "uniform and exclusive system of federal regulation" of aircraft operations,[21] which extends to both aircraft in flight and aircraft-related operations on the ground[22] that is administered by the FAA. In other words, any mandate to implement control measures related to Air Transportation required by the MSGP (or the Deicing ELG or any NPDES permit) must be consistent "safety, space, operational constraints and flight considerations" because independent Federal Law administered by an independent Federal agency (the FAA) requires it.

Unfortunately, the Draft 2020 MSGP repeats the flaw of the Draft 2015 MSGP initially proposed under the previous Administration by effectively mandating the implementation of particular control measures and technologies by the Air Transportation Sector, without consideration of safety, space, operational and flight considerations. For example, under Proposed Part 5.2.2.2.a, where "AIM Tier 2 Responses" are triggered, a permittee "must . . . [i]mplement all feasible SCMs [Stormwater Control Measures] from the relevant sector-specific Stormwater Control Measure Checklist(s) that applies to your facility in Appendix Q of the permit." A review of Appendix Q indicates that the control measures listed there constitute a laundry list of measures apparently gleaned from a variety of sources, including those listed in Subpart S itself. As a result, whereas Subpart S in the Draft 2020 MSGP (Part 8.S.4.1.6) appropriately retains the conditions on any requirement to implement control measures related to "Aircraft Deicing Conditions" discussed above (in 2015 MSGP Part 8.S.4.1.6.2), these same control measures are exported to Appendix Q absent these conditions, which are required by the Act and Agency determinations in the Deicing ELG. For example, in the 2015 MSGP Part 8.S.4.6.1.2 / Draft 2020 MSGP Part 8.S.4.6.1, permittees are required to "Determine whether excessive application of deicing chemicals occurs and adjust as necessary, consistent with considerations of flight safety." However, in the event a "AIM Tier 2 Response" is triggered under Proposed Part 5.2.2.2.a, a permittee "must", per page Q-423 of Appendix Q, "determine whether excessive application of deicing chemicals occurs and adjust as necessary", *regardless of whether this is "consistent with considerations of flight safety" condition*. Similarly, Subpart S, Part 8.S.4.1.6 of the 2015 MSGP and Draft 2020 MSGP requires permittees to implement "measures for reducing deicing fluid" such as "forced-air deicing systems, computer-controlled fixed-gantry

systems, infrared technology . . . [etc.]", "where determined to . . . accommodate considerations of safety, space, operational constraints and flight considerations." However, where a "AIM Tier 2 Response" is triggered under Proposed Part 5.2.2.2.a, a permittee is required to implement these same control measures, *without regard to whether these measures "accommodate considerations of safety, space, operational constraints and flight considerations*." Importantly, the requirement found in Subpart S, § 8.S.4.1.6.2, that "evaluations and determinations" required in this Part are to be made "by personnel most familiar with the particular aircraft and flight operations and control systems in question (versus an outside entity such as the airport authority)," also is not incorporated into Part 5.2 of the Draft 2020 MSGP and Appendix Q.

The bald mandate under Part 5.2.3.2 to require Subsector S permittees to install permanent structural source controls and /or treatment controls without regard to whether this can be accomplished consistent with safety, space, operational constraints and flight considerations is even more egregious. The Agency explicitly and unequivocally rejected this approach in the Deicing ELG and 2015 MSGP, recognizing that deployment of such control measures at airports could only be done on a site-specific basis taking into account all of these factors.

In sum, as presently formulated, Part 5 of the Draft 2020 MSGP as applied to the Air Transportation Sector is contradicted by the factual, legal and policy determinations the Agency made in its Deicing ELG and 2015 MSGP. We respectfully suggest that, as it did under the prior Administration, the Agency recognize and address this flaw. We suggest that this be accomplished by using the same language used to condition the applicability of mandates to implement control measures pursuant to Subpart S, to condition the applicability of any mandates to implement control measures pursuant to Part 5. We suggest the most efficient means of accomplishing this would be to add the following exception tailored to the Air Transportation Sector in Part 5.2.4:

5.2.4.2 Air Transportation Sector. You are required to implement any control measure pursuant to Part 5.2.2. or 5.2.3 only where the control measure is determined to be feasible and to accommodate considerations of safety, space, operating constraints and flight considerations. Consistent with Part 8.S.4.1.6, evaluations and determinations pertaining to Source Reduction control measures should be carried out by the personnel most familiar with the particular aircraft and flight operations and related systems in question (versus an outside entity such as an airport authority).

Unless this or some other equivalent change is made to ensure consistency with the Act and the Deicing ELG, A4A likely will be compelled to challenge the resulting rule as applied to the Air Transportation Sector and, on the basis of the record, we would expect a court to find in our favor.[23] Accordingly, we urge EPA to address this issue now.

[10] 78 Fed. Reg. 59,672 (Sept. 27, 2013).

[11] Our Comments on the Proposed 2015 MSGP (EPA-HQ-OW-2012-0803-0067) are incorporated here by reference.

[12] 77 Fed. Reg. at 29178-79.

[13] Id. at 29178.

[14] EPA-HQ-OW-2012-0803-0135 (June 4, 2015) at 21.

[15] Id.

[16] Id. at 22.

[17] See, e.g., A4A Comments on the Proposed 2015 MSGP (EPA-HQ-OW-2012-0803-0067), Section III.A.1.a.

[18] 49 U.S.C. § 40101(a)(1)

[19] 49 U.S.C. § 47101(a)(7)

[20] 49 U.S.C. § 47101(a)(6).

[21] The seminal case here is *Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624m (1973).

[22] *See, e.g., Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 )9th Cir. 1992) and *City of Houston v. FAA*, 679 F.2d 1184 (5th Cir. 1982).

[23] Changing policy as set forth in the Deicing ELG and the 2015 MSGP without developing a new record that provides a rational basis for effecting such a change would be arbitrary and capricious in violation of the Administrative Procedures Act and would constitute an independent ground for overturning the 2020 MSGP as applied to the Air Transport Sector.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

We emphasize that it is critical that EPA subject <u>any</u> obligation to implement a SCM pursuant to Part 5 on the condition that it is "feasible" – i.e., "technologically possible and economically practicable and achievable in light of best industry practices." As EPA quite rightly points out in the Proposed Fact Sheet (at 77) (emphasis added):

[T]he Agency has <u>always and continues to hold</u> that benchmark thresholds by themselves are not water quality based effluent limits (or any effluent limit) and <u>therefore facilities whose responses to benchmark exceedances comply with the permit's requirements, but do not achieve subbenchmark pollutant levels, **cannot be in violation of the permit**</u>, because a benchmark exceedance is not definitive proof that a water quality standard has been exceeded

Accordingly, 2015 MSGP included language in Parts 4.2 and 6.2.1.2, providing the any obligation to implement a "corrective action" in response to the exceedance of a benchmark threshold would not be triggered where a permittee made a "finding" or determination" that "no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice." This, of course, is consistent with the Act, which establishes that NPDES Permit, including the MSGP, can require measures that deviate from what is determined to be BAT/BCT.

The Draft 2020 MSGP omits this critical language. For example, Parts 5.2.1.2.b and 5.2.3.2.a provide in relevant part (emphases added):

[5.2.1.2.b]: [Y]ou must implement additional measures to ensure the effectiveness of your control measures <u>to bring your exceedances below the parameter's benchmark threshold</u>; or . . . document . . . and . . . report why your existing control measures <u>to bring your exceedances below the parameter's benchmark threshold</u> . . .

[5.2.2.3.a]: [You must] [i]nstall structural controls . . . and/or treatment controls . . . You must select controls with pollutant removal efficiencies that are <u>sufficient to bring your exceedances below the benchmark threshold.</u>

This language is flatly at odds with the Agency's affirmation in the Draft Fact Sheet, noted above, that permittees can implement measures that are in compliance with the permit "but do not achieve subbenchmark pollutant levels." It also represents a significant change in EPA policy as implemented in all prior MSGPs, including the 2015 MSGP. The only justification EPA asserts for incorporating Part 5.2 in the Proposed 2020 MSGP is that it agreed to do so to settle litigation. EPA, though, has entirely failed to provide any basis, rational or otherwise, for deviating from its prior policy as established in the 2015 MSGP. Indeed, the Agency's own statements in the Administrative Record in this proceeding flatly and unambiguously establish that permittees cannot be in violation of a NPDES permit simply because benchmark thresholds are exceeded.[27]

Accordingly, Proposed Part 5.2 cannot be finalized without violating the requirements of the Administrative Procedure Act and the Clean Water Act. These legal infirmities could potentially be addressed by including a provision in Part 5.2.4 patterned on the language (referenced above) which is included in 2015 MSGP Parts 4.2 and 6.2.1.2.[28]

<u>Technological Availability and Economically Feasibility:</u> You are not required to perform AIM or additional benchmark monitoring for any parameters where you make and document a determination that no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice.

[27] Any distinction between a violation triggered by exceedance of a benchmark threshold and a violation triggered by a failure to implement control measures sufficient to meet a benchmark threshold is sophistry – in both instances, the objective measure of whether a violation exists is the benchmark.

[28] The language suggested here is similar to the language suggested above for inclusion in Proposed Part 5.2.2.2.a., and inclusion of this generally applicable language may mitigate the need for the suggested changed to Proposed Part 5.2.2.2.a.

**Comment Response:**

See Comment Response Essay 1 Legal and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, we are also concerned about the potential applicability of Part 5.2 to facilities subject to the "universal benchmark monitoring" requirement proposed in Part 4.2.1.1. in the Draft 2020 MSGP. We explain our concerns about to this new requirement below. In this context, we emphasize that EPA has provided no rational basis for applying the AIM regime proposed in Part 5.2 where exceedances of universal benchmarking parameters occur. The "justification" set forth in the Draft Fact Sheet appears to be that the NRC Study somehow provides a basis for applying Part 5.2 AIM requirements at facilities where exceedance of the universal benchmarks occur. However, the "justification" offered by EPA itself reveals that it is no justification at all: "Because the NRC Study recommended pH, TSS and COD as benchmark parameters and not some other type of monitoring, EPA assumes the same protocol for exceedances should apply to these parameters just like any other benchmark parameter."[29] It hardly needs pointing out that Agency "assumptions" do not constitute a rational basis for establishing an enforceable regulation. More importantly, the assertion that the NRC Study somehow supports application of the Proposed Part 5.2 AIM regime to facilities that experience exceedances of universal benchmarks is itself contradicted by EPA in the Draft Fact Sheet. "EPA notes that the NRC Study did not opine on a specific or different corrective action protocol possible exceedances of universal benchmark parameters."[30] That is, EPA itself unambiguously explains why even the "assumption" it offers for applying Part 5.2 requirements where universal benchmarks are exceeded is wholly unfounded.

[29] Draft Fact Sheet at 59 (emphasis added).

[30] Id.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.1. AIM Tier 1

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  30
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the following underlined text replace the strike through text: "One single sampling event over 2 4 times the benchmark threshold." BES believes that the proposed AIM Tier 1 trigger for 4 times over the benchmark is too extreme. A result twice the benchmark indicates that a significant amount of pollutant is entering the storm system and controls are necessary. BES does not believe this would pose a burdensome requirement on the operators and would help to protect the environment.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

Part 5.2.1

In the first year of sampling:

During the first quarter (first year) of sampling, one of the parameters has exceeded the benchmark by four times, the result triggers AIM Tier 1. Another scenario listed in Part 5.2.1.1.b says that if during the first quarter (first year) of sampling and one of the parameters has

exceeded the benchmark by eight times, the result has triggered AIM Tier 2.
5.2.1.2 Tier 1 Responses:

-You must review.... and implement additional measures or if determined nothing further needs to be done with your control measures, you must document per Part 5.3 and include why you expect your existing control measures to bring your exceedances below the parameter's benchmark **for the next 12 months**.

Question: Does that mean that the four consecutive sampling events start again or does the permittee test just 3 more times for a total of 4 samples to finalize the first year?

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 71 and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  The Passenger Vessel Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0153-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

- The compliance deadlines for Additional Implementation Measures (AIM) and Tier Corrective Actions proposed in the 2020 MSGP should be extended.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

**Part 5.2.1.1 AIM Tier 1 Triggering Events:**

In AIM Tier 1, Example B, Example 2 (provided below), the annual average based on results from Qtr. 1 and Qtr. 2 are mathematically certain to exceed the benchmark.



### AIM Tier 1 Example B:
### One Annual Average Over the Benchmark Threshold

Below are example benchmark monitoring results that WOULD trigger AIM Tier 1. In these results, AIM Tier 1 is triggered because the annual average exceeds the benchmark threshold (or an exceedance of the four-quarter average is mathematically certain i.e., if the sum of quarterly sample results to date is more than four times the benchmark threshold).

| Parameter | Benchmark | AIM Tier 1 trigger: |
|---|---|---|
| Total Suspended Solids (TSS) (mg/L) | 100 mg/L | A 4-/3-/2-sample benchmark average = 101 – 200 mg/L |

| Anytime during Quarterly Monitoring | | | | | |
|---|---|---|---|---|---|
| Samples | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 4-Sample Average |
| Ex. 1 | 105 | 120 | 100 | 95 | 105 |
| Ex. 2 | 300 | 110 | * | * | Between 100 and 200 |

In Example 1, Tier 1 is triggered in the 4th quarter because after 4 samples, the annual average exceedance (105 + 120 + 100 + 95 = 420/4 = 105 mg/L) exceeds the benchmark threshold (100 mg/L). Quarterly benchmark monitoring would continue into the next year.

In Example 2, Tier 1 is triggered in the 2nd quarter because the 1st and 2nd quarter results (300 mg/L and 110 mg/L) mean an exceedance of the four-quarter average of the benchmark threshold (100 mg/L) is mathematically certain (300 + 110 = 410/4 = 102.5 mg/L). The samples denoted with * would be taken after Tier 1 response requirements have been complied with in the 2nd quarter. Quarterly benchmark monitoring would continue into the next year.

The last sentence states, "Quarterly benchmark monitoring would continue into the next year." Does this mean that quarterly monitoring continues in Qtr. 3 of the same year, or Qtr. I of the following year?

If quarterly monitoring continues in Qtr. 3 of year 1, and the results from Qtr. 3 and Qtr. 4 were to also result in an annual average exceedance for the same parameter, would this count as the second consecutive annual average exceedance, and therefore be a Tier 2 triggering event?

If quarterly monitoring continues in Qtr. 3 and Qtr. 4 of year one and Qtr. 1 and Qtr.2 of year 2 and, the average of those four quarters did not exceed the benchmark value, would monitoring then cease for the remainder of the permit term for that benchmark parameter?

Our facility is seeking additional clarification regarding the benchmark monitoring schedule following a Tier Trigger. In the event of a benchmark exceedance and associated Tier Trigger, is benchmark monitoring required during the next storm event in the following quarter, or during the next storm event in the following quarter after corrective action is complete?

Generally, for a large facility operating under multiple industrial sectors, the tracking of potential tiers per individual benchmark parameter will be difficult. Our facility uses an alternative two month monitoring season due to its location in a semi-arid environment with freezing conditions during certain months of the year. Our monitoring season starts in April and ends in November of each calendar year. Here are some scenarios that our facility would like clarification on. For example, a stormwater sample is collected on May 20th (towards the end of Qtr. 1) and the results are received on June 20th (off-site analytical laboratory is on a standard 30 day turn-around-time). If the result somehow triggered Tier 1 and the corrective action took 14 days, our facility is already into our second monitoring quarter.

If the next measurable storm event occurred early in the second monitoring quarter, it is possible another benchmark sample may be collected prior to corrective action being completed. Would that sample count in the next four quarter yearly average even though corrective action was not complete? Alternatively, would it be appropriate not to collect a sample until after corrective action was complete? What would be the appropriate response if no measurable storm event occurred within the remainder of a quarter after corrective action is completed? Should there be a NODI code to reflect this? In all of the examples provided in the proposed 2020 MSGP, it is assumed that corrective action is complete prior to the next quarterly monitoring event. However, this may not always occur.

*Recommendation*:

The preferred option would be to have benchmark monitoring resume after corrective action is complete for a tier triggering event. This would prevent overlap of monitoring while corrective action is still taking place in the event a sample is collected late in a monitoring quarter. This is especially important for facilities with short alternative monitoring quarters (e.g., two month monitoring quarters). Alternatively, or in addition, the permit could include additional clarifying language in the examples regarding data collection and evaluation for the remainder of the monitoring year following a Tier Trigger. For example, stating "Quarterly benchmark monitoring would resume in Qtr. 1 of the next year" or "Quarterly benchmark monitoring would resume upon completion of the Corrective Action" (or the appropriate intent, if different).

**Comment Response:**

In the 2021 MSGP, EPA has simplified the AIM triggering events and response deadlines. Furthermore, as discussed in the response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 71, EPA has clarified the expectations for continued benchmark monitoring in the 2021 MSGP. EPA expects that these simplified requirements and clarifications will address the comment's concern and confusion. See also Comment Response Essay 3 Additional Implementation Measures.

The comment requests clarification on the benchmark monitoring expectations where an operator collects the first quarterly sample on May 30th and receives the laboratory results 30 days later (June 30th), in the second quarter, and determines that AIM Level 1 has been triggered. In this scenario under the 2021 MSGP, the operator would be required to implement any modifications to or additional control measures necessary with 14 days of receiving the laboratory results (i.e.,

by July 14th), unless infeasible. After compliance with the AIM Level 1 response and deadline, the operator must continue quarterly benchmark monitoring for the next four quarters for the parameter(s) that caused the AIM triggering event at all affected discharge points, beginning no later than the next full quarter after compliance (i.e., the third quarter).

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposed "Tier I" AIM (for the lowest level of exceedances) appropriately recognizes this fact and therefore would require facilities with low-level exceedances to conduct only a review of their control measures and to continue monitoring until the exceedances cease. This approach is consistent with the 2015 MSGP and consistent with the premise that benchmark exceedances are triggers for further examination – not permit violations. The Steel Associations therefore support the AIM approach outlined under EPA's proposal for Tier I exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

**Proposed Changes to the Draft 2020 MSGP, Part 5.2**

In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

...

**5.2.1.2 AIM Tier 1 Responses.** Except as provided in Part 5.2.4 (AIM Exceptions) if ~~any of~~ the triggering event~~s~~ in Part 5.2.1.1 occurs, you must:

**a. Review Stormwater Control Measures.** Immediately review the selection, design, installation, and implementation of your control measures to determine if modifications are necessary to meet the benchmark threshold for the applicable parameter[1] and

**b. Implement Additional Measures.** After reviewing your control measures, you must implement additional implementation measures to ensure the effectiveness of your control measures to bring your exceedances below the parameter's benchmark threshold; or if you determine nothing further needs to be done with your control measures, you must document per Part 5.3 and include in your annual report why you expect your existing control measures to bring your exceedances below the parameter's benchmark threshold for the next 12-month period; and

**c. Continue Quarterly Benchmark Monitoring.** After compliance with (a) and (b) in this Part, you must continue quarterly benchmark monitoring into the next year.

**5.2.1.3 AIM Tier 1 Deadlines**. If any modifications related to control measures are necessary, you must implement those actions or modifications within 14 days, unless doing so within 14 days is infeasible. If doing so within 14 days is infeasible, you must document per Part 5.3 why it is infeasible and implement such modifications within 45 days.

**a. Exception:** You do not have to implement any modifications if you determine and document in your SWPPP that the exceedance is solely attributable to natural background sources or, with EPA agreement, run-on sources or aerial deposition sources, consistent with Part 5.2.4 (AIM Exceptions).

[1] Examples include: review sources of pollution, spill and leak procedures, and/or non-stormwater discharges; conducting a single comprehensive clean-up, making a change in subcontractor, implementing a new control measure, and/or increasing inspections

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 69
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify that the One Annual Average Over the Benchmark Threshold is defined as the average of any four sequential quarterly samples, irrespective of the calendar year in which the samples were collected. Part 5.2.1.1.a. In other words, EPA should clarify whether the

average or mathematically certain average exceedance may be based upon four or fewer sequential quarterly samples collected in two different calendar years.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 71 and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 70
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify how the requirement to "Review Stormwater Control Measures" in Part 5.2.1.2.a. is different from the requirement for "SWPPP Review and Revision," for example, in Part 5.1.1.

**Comment Response:**

The requirements to review the SWPPP and control measures under Part 5.1.1 of the 2021 MSGP and Part 5.2.3.1.a of the 2021 MSGP (Part 5.2.1.2.a of the proposed 2020 MSGP) are substantially similar; however, the provisions address different conditions necessitating a review of the SWPPP and control measures.

Part 5.1.1 of the 2021 MSGP specifies the conditions requiring SWPPP review and revision to ensure effluent limits are met. Those corrective action conditions in Part 5.1.1 include an unauthorized release, an exceedance of numeric effluent limits, failed or improperly installed stormwater control measures, and visual assessments indicating water quality standards may be violated.

Part 5.2.3.1.a of the 2021 MSGP (Part 5.2.1.2.a of the proposed 2020 MSGP) requires review of the SWPPP and selection, design, installation, and implementation of control measures if an AIM trigger event occurs.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 72
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should revise the language in Parts 5.2.1.2.a. and b. to note that, in addition to the requirement for operators to document their determination that nothing needs to be done with control measures in response to an AIM Tier 1 trigger, operators are also required to document their (a.) review of stormwater control measures and (b.) implementation and/or modifications of control measures, in accordance with Part 5.3.3.

As discussed above, EPA should require operators to submit this documentation to NeT-DMR within the deadline specified in Part 5.3.3 in addition to the proposed requirement for reporting a summary of corrective action and/or AIM responses in the annual report per Part 7.5.

**Comment Response:**

EPA declines to revise Parts 5.2.3.1.a and b of the 2021 MSGP (Parts 5.2.1.2.a and b of the proposed 2020 MSGP, as suggested in the comment. EPA notes that operators triggering AIM Level 1 would be required to comply with the AIM documentation requirements in Part 5.3, even if they determine that nothing further needs to be done with your control measures.

Regarding the comment to submit documentation in NetDMR, see Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier I: if the rolling annual average over one year exceeds the benchmark concentration, this should only trigger a review of Stormwater Control Measures. In addition, EPA should provide a template within the NetDMR reporting tool to assist with these calculations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1

**Comment Excerpt Number:** 41
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 1: The requirement to review control measures "immediately" seems overly strict and infeasible. Simplot requests the timeframe to review control measures be increased from "immediately" to "within 7 days or as soon as is practicable".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 42
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: The AIM Tier 1 implementation deadlines of 14 days for the normal deadline and 45 days for the extenuating circumstances deadline as presented in Part 5.2.1.3 seem overly stringent. Simplot suggests Tier 1 implementation deadlines be extended to 30 days for the normal deadline and 60 days for the extenuating circumstances deadline.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

5.2.1 throughout section

The term "annual average" needs to be better defined or described in this section for situations where there are less 4 discharge events during a year, either because of arid conditions and/or because of the use of infiltration control measures, ponds, and other conditions where discharge events are infrequent. In these instances the permittee would need more than one year to collect four benchmark samples. The division suggests that "annual average" be changed to "average of the set of four quarterly benchmarks" or "four sample set average"

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.1.RFC21. Additional Implementation Measures (AIM) - RFC 21 Tier 1 triggering event

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

This makes sense.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

BES does not believe that requiring an AIM Tier 1 trigger based on facility changes is necessary. The proposed AIM trigger is similar to the requirement to update the SWPPP. The facility will be revising the SWPPP in response to relevant facility changes and the permit requires that best management practices be implemented; therefore; an AIM requirement would be redundant and burdensome for the operator.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

"Facility Changes, ie., if construction or a change in design, ....significantly increases the quantity of pollutants discharged". Facility changes etc. do not need to be included in AIM as the nature of the paragraph is covered in Part 5.1.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Comment on requiring an AIM Tier 1 trigger based on facility changes.

Discussion/Recommendations

The existing stricken language in Section 5.1.1 of the 2015 MSGP appears appropriate and in the right section. Requiring a review for facility changes is consistent with concepts in the SPCC and Cluster Rule BMP regulations. It should not, however, classify the facility of having triggered AIM Tier 1, since this implies "additional" implementation measures are required. It may be that the existing BMPs are entirely suitable for the facility changes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council
**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, the proposed 2020 MSGP requests comment on requiring an AIM Tier 1 trigger based on facility changes (i.e., if construction or a change in design, operation, or maintenance at the facility significantly changes the nature of pollutants discharged in stormwater at the facility, or significantly increases the quantity of pollutants discharged.). TWC requests this measure not be included in the final 2020 MSGP. A facility change equivalent to those described in the AIM Tier 1 should remain as a condition requiring SWPP review to determine if modifications were necessary, as stated in Part 4.2 of the 2015 MSGP. Inclusiveness into the AIM Tier 1 should be based solely on benchmark results. A facility should be able to identify if increased production or related facility changes have altered the types or amounts of pollutants in stormwater by testing and then determine if the results are applicable to the AIM tiered approach.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kim Lebak
**Commenter Affiliation:** Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:** EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Permittees support, as appropriate, the facility changes as defined that trigger additional implementation measures (AIM) Tier 1 responses. For low-risk, inspection-only facilities, a "facility change" could trigger an additional inspection.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

The City suggests that EPA define a "significant" construction, design, operation or maintenance change that would trigger the AIM Tier 1. Not all facility changes will result in a quality or quantity of stormwater discharge. An increase in quality or quantity of stormwater discharge or other facility change does not automatically mean that benchmark monitoring exceedances will occur. In addition, the mechanism to identify or modify specific control measures already exists in the MSGP. A SWPPP review may be warranted, however an AIM Tier 1 should not be triggered.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

The existing 2015 MSGP already requires a SWPPP review and update to reflect changes in on-site activities. We do not agree that changing a facility's industrial activities should trigger a formal AIM Tier 1 procedure. These changes are planning changes and, if performed correctly, will modify monitoring processes, SCMs, etc. We disagree that AIMs are necessary to enact these planning changes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.

**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

Proposed AIMs are the initiation of a corrective action program designed to bring benchmark exceedances into compliance. Changing a regulated activity should not impose an additional burden on facilities where no benchmark level has been exceeded nor require self-reporting into a corrective action system for no actual impacts to water quality.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Harry Childress
**Commenter Affiliation:** Virginia Coal and Energy Alliance (VCEA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0175-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

VCEA also opposes the use of facility changes as a trigger for AIM Tier 1 responses. Given the dynamic nature of mining operations, this proposed triggering event could result in mining operations constantly being subject to the AIM Tier 1 requirements.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**11. Request for Comment 21: Additional AIM Tier 1 Trigger for Facility Changes**

We oppose this additional AIM Tier 1 trigger based on facility changes, as it is qualitative in nature, and risks subjective interpretation. The AIMs, as proposed, are onerous requirements, unlike a SWPPP review and revision (per Part 4.2 of the 2015 MSGP), so any AIM trigger needs to be quantitative in nature to address actual stormwater pollution.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

First, EPA requests comment regarding whether AIM Tier 1 should be triggered based on facility changes (EPA request for comment 21). VMA does not support an AIM Tier 1 trigger simply for facility changes. The fact that there is a change in design, operations or maintenance at the facility alone does not warrant corrective action. Only where such change results in an actual benchmark exceedance should AIM Tier 1 be triggered.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

*Part 5.2.1.1 AIM Tier 1 Triggering Events (Request for Comment 21):*

The trigger should remain as a condition to require SWPPP review to determine if modifications are necessary, as included in the 2015 MSGP. This is a preventative action, rather than a corrective action. The AIM Tiered response process is based solely on benchmark exceedances. Site design or operational changes do not constitute benchmark exceedances, therefore

implementation of Tier 1 response for site changes to mitigate a benchmark exceedance that hasn't occurred is incongruous.

*Recommendation:*

Do not require an AIM Tier I trigger based on facility changes, i.e., if construction or a change in design, operation, or maintenance at the facility significantly changes the nature of pollutants discharging in stormwater from the facility, or significantly increases the quantity of pollutants discharged. The AIM Tiered response process should remain solely applicable to benchmark exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Ram Singhal
**Commenter Affiliation:**  Flexible Packaging Association (FPA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>FPA opposes mandating AIM if an owner or operator of a plant is lucky enough to have reason to expand a covered facility or add a new process.</u>** EPA should not penalize the company for having that good fortune. A mere change, does not by itself, merit additional implementation measures in a permit. To do so would be an unreasonable and arbitrary exercise of EPA's CWA authority and could be sufficient disincentive to expand or modify a plant.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI does not support EPA's suggestion to make facility changes a trigger for AIM Tier 1. The purposes of AIM are to address benchmark exceedances and to prevent future exceedances as appropriate and applicable to "the nature and magnitude of the benchmark exceedance[s]". Facility changes are not benchmark exceedances and do not belong in AIM Tier 1 (or any AIM Tier). They also do not constitute a "corrective action" because changing a facility is not a permit violation. This means that facility changes per se should not be addressed in Part 5, Corrective Actions and Additional Implementation Measures (AIM). Labeling "facility changes" as a "corrective action" could put permittees at unreasonable regulatory risk because such status would be so reflected in publicly available information and could be inappropriately used against the permittee.

In the Proposed 2020 MSGP, review and updating of the SWPPP is already required under Part 6, Stormwater Pollution Prevention Plan (SWPPP) (**emphasis added**):

*Facilities must keep their **SWPPP up-to-date throughout their permit coverage, such as making revisions and improvements to their stormwater management program** based on ….*

Facility changes, if substantial enough, require changes to the stormwater management program. As "[t]he SWPPP is a living document" (Part 6), any facility changes that affect the management and/or quality of stormwater discharges must be captured in the SWPPP through timely revision of the SWPPP. This could be emphasized more in Part 6, and a parenthetical note could be added to Part 5.1.1 (Conditions Requiring SWPPP Review and Revision to Ensure Effluent Limits are Met), about the Part 6 requirement to keep SWPPPs up-to-date in connection with substantial changes to the facility.

Facility changes should not be a trigger for AIM Tier 1 in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

No. Modifications made at a facility could change the sector identification that would not trigger AIM Tier 1, but simply only modifications to the SWPPP and possible Control Measures/devises needed to maintain discharge. Also, modifications could be made to qualify a facility for "No Exposure Certification" (NEC).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

Triggering Events:  EPA seeks comments on requiring an AIM Tier 1 trigger based on facility changes.  A facility change could be a change in design, operation, or maintenance at the facility that significantly changes the nature or quantity of pollutants discharged in stormwater from the facility.  NAIMA opposes modifications to the AIM Tier 1 trigger based on  facility changes.  Facilities that apply for MSGP are dynamic in nature and are changing all the time.  This proposal is suggesting that certain events can trigger a change in tiers.  Typically, the only trigger to Tier 1 should be exceedance of the benchmark.  Most of the events described by EPA will not cause an exceedance of the benchmark, and, as such, should not be a trigger for elevation to Tier 1.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Anne Germain
**Commenter Affiliation:**  National Waste & Recycling Association (NWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0194-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

NWRA recommends that EPA avoid including an Additional Implementation Measure (AIM) Tier 1 trigger based solely on facility changes that alter the nature of pollutants discharged from the facility and instead retain the trigger that was included in Part 4.2 of the 2015 MSGP as a condition requiring SWPPP review to determine if modifications are necessary when facility changes occur. All AIM triggers should be based solely on quantitative benchmark exceedances, as benchmark testing is the best indicator of the efficacy of stormwater pollution prevention measures. Rather than tying AIM Tier 1 triggers to subjective qualitative metrics, EPA should utilize objective quantitative measures to determine triggering events. Part 4.2 of the 2015

MSGP therefore should remain in the final 2020 MSGP without amendment, as it adequately incorporates a requirement for SWPPP review whenever design, operational, or maintenance changes occur that could impact the nature or quantity of pollutants discharged in stormwater.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 21**:

**AIM Tier 1 Triggering Events (Part 5.2.1.1)**

EPA has requested comment on requiring an AIM Tier 1 trigger based on facility changes. NMA does not believe that facility changes should trigger an AIM Tier 1 response. Such a determination for mining operations would be exceedingly difficult. Surface mining operations are dynamic, with new areas being disturbed and previous areas being reclaimed as the active mining area progresses. Underground mines similarly have areas expand and reclaim as the mine expands underground, sometimes requiring additional ventilation shafts, rock dust and utility boreholes, and expanded refuse areas. These normal aspects of the mining process do not result in a significant change in the nature of pollutants. While there may be new stormwater outfalls added as the mining process advances, this should not automatically constitute a Tier 1 trigger. The potential sources (overburden, coal, and mineral materials) and types of pollutants will be substantially the same as the previously established stormwater outfalls and in most cases will fall under the substantially identical discharge points category. If AIM Tier 1 were triggered each time new outfalls are added at a facility, this would create a recurring administrative burden at the site with no additional environmental benefits being realized.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS opposes mandating AIM solely because an owner/operator is able to expand a covered facility or add a new process.** This should not automatically subject the company to permit measures that amount to a penalty and may disincentivize expansion or modification. We believe this is an unwarranted and inappropriate use of EPA's authority.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Resource Management Associates (RMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0209-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Comment 21 – We believe that the requirement for an AIM Tier I trigger based on facility changes is too vague and should be clarified. What degree of facility change would trigger Tier I? While it is stated that this would occur when a change "changes the nature of pollutants" or "significantly increases the quantity of pollutants", these criteria are not elaborated on or quantified, and as such nearly any change at a permitted facility, regardless of how small or inconsequential, could be considered by EPA or a state as requiring an AIM Tier I trigger as a result.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment:**

An AIM Tier 1 response is not necessary to conduct a review and update of the SWPPP to ensure the SWPPP is kept current with site conditions due to construction or changes in design, operation or maintenance at the facility. AIM responses should be based on the quality of stormwater discharges and should not be necessitated by a change in facility design, operation or maintenance. The 2015 MSGP includes a provision to conduct a SWPPP review to ensure the SWPPP is consistent with current site conditions, and this approach is sufficient to ensure that stormwater control measures are implemented for changes in facility design, operation or maintenance.

**Suggested Revision:**

Language in 2015 MSGP Part 4.2 should be retained that requires SWPPP review to determine if modifications are necessary due to changes in facility design, operation or maintenance. Language should not be added to the 2020 MSGP to require an AIM Tier 1 response due to changes in facility design, operation or maintenance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 63
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should require an AIM Tier 1 trigger for "facility changes," including those described in the Request for Comment 21 and specified in Part 4.2 of the 2015 MSGP. Response to Request for Comment 21. The 2015 MSGP includes "facility changes" as a corrective action condition requiring operators to conduct a SWPPP review and implementation of modifications, if necessary. Failing to include "facility changes" as an AIM Tier 1 trigger or condition for corrective action in the 2020 MSGP would effectively roll back the effluent limitation as it is contained in the 2015 MSGP. At the very least, EPA must provide a legal and technical justification for not including "facility changes" as a corrective action condition or AIM trigger, in accordance with the anti-backsliding requirements of the Clean Water Act. CWA Section 402(o) and CFR 122.44(l).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

ARA opposes any modification requiring an AIM Tier 1 trigger based on facility changes. Such a trigger is not necessary unless benchmark exceedances occur. An increase in the nature or quantity of pollutants does not necessarily mean that benchmark monitoring exceedances will occur. In this regard, a facility change alone should not automatically constitute a trigger. ARA also opposes Appendix Q BMPs as a regulatory requirement because it demonstrates that the authors did not have sufficient working knowledge of the automotive Recyclers industry. *See ARA's comments for Appendix Q BMPs.*

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requested comment (Request for Comment 21) on requiring an AIM Tier 1 trigger – that is, SWPPP review – if there is a change to the facility that changes the nature or increases the amount of pollutants discharged. **MWRA agrees it makes sense to review and if necessary, modify, the SWPPP in that situation.**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

2021 EPA MSGP Response to Comments
January 15, 2021

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Any changes in the nature or quantity of pollutants due to construction or changes in design of the facility would be addressed in the SWPPP and potentially require a revised NOI. AIM would not be required as control measures would have to be in place before amending the SWPPP/NOI.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Given our earlier comment for EPA Request for Comment 10, that a continuation of current benchmark monitoring requirements be included in the proposed MSGP, it would be reasonable for the EPA to require additional benchmark monitoring for significant facility changes that affect the nature of penitential pollutant discharges in stormwater. We support this revision based on similar language in Part 4.2 of the 2015 MSGP, provided the proposed universal benchmark monitoring requirements are not implemented, as previously noted.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 21 – NRMCA does not believe the inclusion of "additional implementation measures or AIM" tiers to the MSGP is necessary, as corrective actions for non-compliance already exist within the current MSGP structure. As well, the AIM triggering events make it far too easy for facilities to fall into any of the AIM tiers and unnecessarily requiring erroneously extensive corrective actions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 46
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 21**

The FWQC and FSWA oppose modifications requiring an AIM Tier 1 trigger based on facility changes. This requirement would be inconsistent with the clear distinction that EPA has created between "corrective actions" and AIM measures. In the 2015 MSGP, "significant change" triggered the corrective action of reviewing and revising the facility's SWPPP. Now, EPA has proposed to convert that "significant change" corrective action into an AIM trigger, with no justification or foundation for such a change. Therefore, the most consistent an appropriate place for proposed Part 4.2 is either in proposed Part 5.1 or generally under Part 6.0, as part of the corrective action process.

That is how the MSGP has always operated. Facilities regulated by the MSGP are dynamic sites that change all of the time. A SWPPP is supposed to be a dynamic planning document that permittees modify and improve as a result of site changes and new information about possible industrial pollutants. To immediately thrust most sites into Tier 1 without any of the basic requirements or triggers negotiated in the 2016 Settlement creates the same type of unwarranted confusion and concern that the "skipping" process that EPA has proposed creates elsewhere within the AIM proposal. The only trigger that is necessary or appropriate to trigger Tier 1 relates to benchmark exceedances during the first or subsequent years of monitoring individual outfalls.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA Request for Comment #21, a facility change should not be a trigger for AIM Tier 1. If there are facility changes that significantly change the nature or quantity of pollutants discharged, facilities should review and modify their SWPPPs as appropriate. This should be included as a component of Part 6.3 (Required SWPPP Modifications), along with time frames for required modifications (e.g., within 30 days after facility changes were made).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

**Facility Changes Should Not Trigger AIM Tier 1**

EPA requests comment on whether the Final 2020 MSGP should include facility changes as a triggering event for AIM Tier 1. Such a requirement would be duplicative to each facility's Stormwater Pollution Prevention Plan ("SWPPP").

Facilities are required to update and revise their SWPPP based on, among other things, changes in the structure, design, operation, or maintenance of a site. This should be sufficient. AIM Tiers should be triggered only based on the quality of stormwater discharges and not changes to the facility. Instead, language in 2015 MSGP Part 4.2 should be retained that requires SWPPP review to determine if modifications are necessary due to changes in facility design, operation or maintenance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  53
**Excerpt Status:** Final

**Comment Excerpt:**

We reiterate our opposition to all permit provisions that incorporate AIM Tiers, as we expressed above. In the event EPA implements AIM Tiers, we also oppose the insertion of this AIM Tier 1 trigger as unnecessary and confusing.

In the 2015 MSGP, a change in facility design, as described in Part 4.2 simply required a review of a facility's SWPPP to determine necessary changes. This provision has no counterpart in the proposed 2020 permit. Instead, EPA asks whether the facility design/operation change should trigger a SWPPP review tied to the Tier 1 objective of meeting benchmarks, which will be unworkable and extremely confusing to permittees. Few design/operational changes are expected to have meaningful effects on benchmark exceedances, given the high amount of variability and all the other concerns about the unreliability of benchmark monitoring. The Tiers were supposedly designed to achieve benchmark compliance, and we are concerned that the facility design trigger is unlikely to influence benchmark compliance. By triggering Tier 1, the permittee is directed simply to achieve benchmark compliance under Part 5.2.1.2, regardless of whether that will make sense for or is related to the design trigger. This type of provision is yet another reminder of why benchmark monitoring should be discontinued, as we recommend above.

Finally, in the 2020 MSGP Fact Sheet for Part 5.2.1.2 which addresses Tier 1 responses, EPA readily admits that Tier 1 facilities could decide that "[w]ith the variability of stormwater and the small sample set of monitoring results, it may be reasonable to conclude that the current control measures are performing appropriately[....]"[97] Given this admission, and the resulting confusion, EPA should clearly reject this ill-considered modification. If EPA wishes to retain the requirement to perform SWPPP reviews for design changes as it did per Part 4.2 in the 2015 MSGP, it could simply add the 2015 MSGP Part 4.2 provision inside the new proposed 2020 5.1.1 which lists the other events that trigger SWPPP reviews.

[97] 2020 MSGP Fact Sheet at 80.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

WEF recommends no, and that "tiers" and "structural changes" are two different things. Tiers means "there is an issue with benchmark compliance" whereas structural changes are different. And may or may not affect compliance with benchmarks. Modification of the SWMM due to construction may affect the tier. WEF asks that EPA clarify what it means by designating the type of construction and if the industrial process is exposed to stormwater compared to other construction changes on site (ex: office space).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

A Tier 1 trigger is not required based on facility changes, as a SWPPP is already required to be reviewed for updates when a facility changes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.2. AIM Tier 2

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Part 5.2.2 Tier 2

If in the second year and the average is above benchmark then Tier 2 applies. (There is no need to be in second year if the parameter is already averaged out in the first year and the permittee may have already triggered Tier 2 in the first year with 2 samples over four times the benchmark). So should the wording be "if the situation were to occur again, then..." ?

Wording in Part 5.2.2.1.b. is confusing as this situation may occur in the first year. Should we clarify that Tier 2 can only occur in the second year? What about the previously stated 8 times in the first year moving right into Tier 2?

Would it be better to explain what is expected each year of the permit, such as, if you continue to exceed then:_____.

The wording for each scenario needs to be clarified. Which should be emphasized, the exceedance or the year in which the exceedance occurred? The triggers need to be simplified. This wording is hard to understand and a permittee may choose to do nothing then to take action into compliance as this may seem paralyzing to the permittee. Whatever they choose may take them into a non-compliance situation because they did not chose accordingly. This needs to be step 1, step 2, and step 3. When this happens.... then step 1, but to jump around with trigger numbers makes understanding difficult. The permittee may be in non-compliance just by a miss-understanding.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Clarify that the implementation of all feasible SCMs should not apply to the entire facility but to the affected outfall and drainage basin and pollutant in question.

Discussion/Recommendations

The language in 5.2.2.2.a needs clarification since this language can be taken to require application of all SCMs facility-wide for any pollutant. EPA did not probably intend this, but the language or paragraph should be clarified.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Expand response options for AIM Tier 2

Discussion/Recommendations

As stated in the comments for the Fact Sheet, the facility should have the following minimum options for AIM 2:

- To use the facility specific menus of SCMs (not checklists) in Appendix Q to select only appropriate added SCMs;
- Using qualified stormwater personnel, develop a response report for the specific pollutant and the specific outfall based on a source and BMP review, and identify additional implementable BMPS (summarized in a response plan report) with schedule for implementation;
- Employ a third-party PE to develop additional site-specific BMPS, documented in a response report.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

AIM Tier 2 deadlines are not realistic.

Discussion/Recommendations

The likelihood that a facility could get approval within a 45 day time frame for an extension from EPA for additional measures implementation is unlikely and reduces the overall available implementation time frame. Suggest instead that a response report include a schedule for implementation if implementation beyond 45 days is required without approval that is retained in files. This is consistent with programs such as Cluster Rule BMPs and SPCC. Note that SPCC allows 6 months for implementation.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

VMA also questions the approach for stormwater control measures ("SCMs") required for specific sectors under the AIM proposal. These SCMs may be wholly unrelated to the parameter for which the facility may have exceeded the benchmark leading to the need for AIM. For example, requiring a facility to implement labeling of oil tanks when the benchmark exceedance is related to Total Nitrogen does not target the actual problem at the site. SCMs should be targeted to the specific benchmark pollutants that led to the need for AIM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on the stormwater control measures, which were included in proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

*Part 5.2.2.1 AIM Tier 2 Triggering Events:*

In AIM Tier 2, Example A, Example 2 (provided below), the second annual exceedances occurs in Year 2, with no results shown for the Qtr. 3 and Qtr. 4 in Year 1. The * implies that monitoring resumed in Year 2 as there are no results shown for the second half of Year 1.

**AIM Tier 2 Example A:**
**Two Consecutive Annual Averages Each Over the Benchmark Threshold**

Below are example benchmark monitoring results that would trigger AIM Tier 2. In these results, AIM Tier 2 is triggered because TWO consecutive annual averages exceed the benchmark threshold (or an exceedance of the four-quarter average is mathematically certain i.e., if the sum of quarterly sample results to date is more than four times the benchmark threshold).

| Parameter | Benchmark | AIM Tier 2 trigger: |
|---|---|---|
| Total Suspended Solids (TSS) (mg/L) | 100 mg/L | A second 4-/3-/2-sample benchmark average = 101 – 200 mg/L |

| Samples | Year 1 of Quarterly Monitoring | | | | | Year 2 of Quarterly Monitoring | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 1st year 4-Sample Average | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | 4th Qtr. | 2nd year 4-Sample Average |
| Ex. 1 | 105 | 120 | 100 | 95 | 105 | 115 | 100 | 90 | 135 | 110 |
| Ex. 2 | 300 | 110 | * | * | Between 100 and 200 | 150 | 270 | ** | ** | Between 100 and 200 |

In Example 1, Tier 1 is triggered in the 4th quarter of the first year because after 4 samples, the annual average (105 + 120 + 100 + 95 = 420/4 = 105 mg/L) is above the benchmark threshold (100 mg/L). Quarterly benchmark monitoring would continue into the next year. Then in the second year, Tier 2 is triggered in the 4th quarter of the second year because after another 4 samples, the second annual average (115 + 100 + 90 + 135 = 440/4 = 110 mg/L) is again above the benchmark threshold (100 mg/L). Quarterly benchmark monitoring would continue into the next year.

In Example 2, Tier 1 is triggered in the 2nd quarter of the first year because the 1st and 2nd quarter results (300 mg/L and 110 mg/L) mean an exceedance of the four-quarter average of the benchmark threshold (100 mg/L) is mathematically certain (300 + 110 = 410/4 = 102.5 mg/L). The samples denoted with * would be taken after Tier 1 response requirements have been complied with in the 2nd quarter of the first year. Quarterly benchmark monitoring would continue into the next year. Then in the second year, Tier 2 is triggered in the 2nd quarter of the second year because, again, the 1st and 2nd quarter results (150 mg/L and 270 mg/L) mean an exceedance of the four-quarter average is mathematically certain (150 + 270 = 420/4 = 105 mg/L). The samples denoted with ** would be taken after Tier 2 response requirements have been complied with in the 2nd quarter of the second year. Quarterly benchmark monitoring would continue into the next year.

Tier 2 response requires implementation of all feasible stormwater control measures from the relevant sector-specific Stormwater Control Measure (SCM) Checklist(s) that applies to your facility in Appendix Q. For example, if COD attained Tier 2 in July of Year 3 and TSS attained Tier 2 the same year in September, would the checklist have to be filled out twice for the same outfall and site that was within the same sector?

*Recommendation:*

Only require implementation of the SCM Checklist once per year per sector even if more than one Tier 2 triggering event occurred within a specific sector that year. The SCM Checklist is performance based, not parameter/concentration based. So, triggering two different benchmark parameters within the same sector in one year should not require two different assessments.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Furthermore, AAAE strongly recommends that EPA reevaluate key components of the proposed Additional Implementation Measures (AIM) process. In particular, EPA should avoid mandating that airports implement specific stormwater control measures (SCMs) from a list in appendix Q if an airport exceeds certain benchmarks and falls in AIM Tier 2. Airports should instead be given flexibility to implement innovative solutions that are commensurate with the magnitude of any exceedances; responsive to any issue identified; and appropriate to the airport's size, location, and prior history, among other factors. A one-size-fits-all approach is unworkable for the airport industry, particularly in today's challenging environment where fewer resources are available. EPA also needs to provide airports with reasonable deadlines to implement SCMs in the event of a benchmark exceedance. The proposed timeframes are unrealistic and inconsistent with the time needed to obtain funding and various approvals from the Federal Aviation Administration (FAA) and state and local governments.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Required Response & Deadlines

AAAE's Response and Recommendations

AAAE opposes the proposed required responses, particularly for AIM Tier 2 and the implementation of all feasible SCMs in appendix Q, for reasons previously listed.

Notwithstanding, if EPA moves forward with the proposed AIM framework, EPA should not require airports to complete responses before a prescriptive deadline, such as 14 days, that is unrealistic in the airport context. The timeframe for SCM implementation will naturally depend on the type of corrective measure and airports should have flexibility to pursue and obtain funding and other necessary reviews and approvals.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Type of Exception

Triggering Event Exception

Exception Description

An airport would not fall within AIM Tier 2 if the airport (1) documents that the single event (over eight times the threshold) was an aberration and how any measures taken within 14 days of such event will prevent a reoccurrence, and (2) takes a sample during the next qualifying rain event that is either (a) less than the threshold (in which no response is required), or (b) less than four times but greater than one time the threshold (in which a Tier 1 response is required). (Proposed Part 5.2.2.1.c.i.)

AAAE's Response and Recommendations

This exception should be made available for AIM Tiers 1 and 3 as well.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Paul Bredwell
**Commenter Affiliation:** U.S. Poultry & Egg Association et al.

**Document Control Number:** EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Change AIM Tier 2 Response Verbiage: We recommend changing the AIM Tier 2 response to "Implement Site-Specific Stormwater Control Measures" per the facility's SWP3 instead of "Implement Sector-Specific Stormwater Control Measures" per Appendix Q. Inclusion of the SCMs in Appendix Q in the proposed 2020 MSGP, limit permittee, USEPA and state and local environmental regulatory agency flexibility to employ (and require/encourage in the case of regulatory agencies) the most applicable, technically feasible and cost effective SCMs.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:** Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's proposed AIM for Tier II and Tier III exceedances, however, seemingly cease to reflect an Agency recognition that benchmark exceedances are merely one of many measures of the efficacy of stormwater controls and instead appear to be more punitive. EPA's proposed AIM for Tier II, for instance, require facilities that exceed benchmarks by modest thresholds to adopt all feasible controls identified on EPA's proposed sector-specific fact sheets. For the industry sectors under which the Steel Associations' members are most frequently permitted, those control requirements are voluminous – there are nearly 200 requirements for Primary Metals Manufacturing (Sector F) and over 200 requirements for Scrap Recycling (Sector N). While many of these requirements are likely already required as best management practices ("BMPs") and/or encompassed in facilities' Stormwater Pollution Prevention Plans ("SWPPP"), EPA's proposal to require that facilities inventory each of these hundreds of measures and describe their adoption or infeasibility creates an onerous and largely empty paperwork exercise. The goal of benchmark monitoring is to identify and correct potential issues with the efficacy of stormwater controls. Those potential stormwater control issues are best addressed by facility personnel using their site-specific knowledge and engineering judgment. These potential stormwater control issues are not likely to be addressed by requiring facility personnel to laboriously document the implementation or infeasibility of hundreds of recommended measures on generic industry-wide

checklists. Regardless of the amount by which a benchmark is exceeded, facilities should be permitted to identify and address stormwater control issues using the means they find most effective and efficient. By proposing to prescribe these voluminous control requirements rather than allowing facilities to efficiently address Tier II benchmark exceedances through site-specific engineering judgement, EPA is opting to punish Tier II benchmark exceedances rather than facilitate their prompt correction. And by proposing to subject facilities to these voluminous paperwork requirements, EPA is seemingly prioritizing documentation over actual corrective action. As paperwork exercises such as those proposed here become more voluminous and detailed, so too does the risk that a minor documentation error or omission can become the source of an enforcement action. EPA must not create a situation where facilities' reasonable concern over committing petty paperwork violations compel them to redirect resources away from actual engineering and corrective action work. The Steel Associations therefore recommend that EPA withdraw the AIM for Tier II benchmark exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on the stormwater control measures in proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

I. The proposed requirement to review all feasible SCMs listed in Appendix Q is unduly burdensome.

NMA also has significant concerns with the Tier 2 framework. Specifically, Part 5.2.2.2 of the proposed 2020 MSGP requires operators to "implement all feasible" stormwater control measures (SCMs) from the relevant sector-specific checklist listed in Appendix Q. EPA has not provided any clarity on how to determine a "feasible" SCM. The only guidance it has provided is a note in the proposed permit that "you do not have to implement an SCM where it would be counterproductive to the implementation of another control measure, or not result in any reduction in the discharge of the pollutant of concern."[43] NMA also has concerns with the requirement to "notate in the checklist which SCMs you implement and keep the checklist with your SWPPP." The Fact Sheet further states that "the operator must indicate why the SCM is not being selected." Appendix Q lists almost 200 potential SCMs for each of the mining sectors. It is unrealistic to require operators to review these SCMs and determine which are "feasible," implement those responses within 14 days, and also indicate in the checklist why other SCMs were not selected. This provision is not practical and nearly impossible to implement properly.

Requiring operators to detail why each SCM was implemented and why other SCMs were not selected for implementation is an administrative burden that provides no meaningful environmental benefit. The time it would take to analyze more than 200 potential SCMs and explain the nuances of a particular site far outweigh the value of providing this additional information to EPA, particularly if the SCM is not appropriate for the site.

[43] Proposed 2020 MSGP at 40.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

We have two major objections to the proposed AIM Tiering requirements.[114] Under this proposal, for AIM Tier 2, permittees must implement everything feasible in Appendix Q and the applicable Fact Sheet for a relevant industry. The Fact Sheets contain extensive SCMs, some of which are mutually exclusive, poorly designed, and very costly. Many of these are substantially more expensive than the 2015 specified BMPs. In addition, unlike the current permit, the permittee must identify every SCM and implement every SCM that is "economically feasible," despite low or nonexistent stormwater-related benefits.

[114] Tiers 1, 2 and 3 are triggered by the increased magnitude or number of benchmark exceedances by the facility.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Asciatu Whiteside
**Commenter Affiliation:**  Dallas Fort Worth International Airport (DFW)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0208-A1

**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed permit requires facilities that exceed benchmark standards at a level initiating AIM Tier 2 responses to review Appendix Q sector specific stormwater control measures (SCMs) and implement all feasible SCMs, which are relevant to the exceeded parameter, within 14 days. The use of this methodology to correct exceedances in benchmark values is not recommended. Going down an exhaustive list of options, many of which are not viable (e.g. – infrared deicing) and explaining why any individual option is infeasible is contrary to how a proper engineering analysis should be conducted. A properly conducted root cause analysis would facilitate more effective designs that select the optimal engineering solution for the specific problem. Furthermore, limiting permittees to select control measures from a pre-defined list does not allow room for innovation and new technologies. Also missing, is the key step of characterizing the problem causing the benchmark area exceedance. For example, if results from a single outfall indicates an exceedance, revising the overall approach to deicer management may not be necessary. Instead, a focus on identifying the issue, using the SCM checklist as a guide and then select the BMPs relevant to the specific issue.

It is recommended that the EPA require the Qualified Personnel be responsible for evaluating the cause of the exceedance with collaboration from other the PPT members, and the selection of the SCMs as appropriate.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The AIM Tier 2 response requires the permittee to implement all feasible Stormwater Control Measures (SCMs) from the relevant sector-specific SCM Checklist. All of the SCMs in Appendix Q should not be required at one time as all of the SCMs would not be required for a given facility to meet applicable benchmark thresholds. Many of the SCMs in Appendix Q are provided as alternatives to SCMs so implementing all SCMs in Appendix Q at one time does not make sense. The permittee should be allowed to choose at least one SCM from Appendix Q for each applicable activity/potential pollutant source that the permittee believes would enable the

facility to achieve benchmark(s) for the parameter(s) that exceeded the benchmark threshold in two consecutive years. SCMs in Appendix Q that would not impact the parameter for which the facility is in AIM Tier 2 should not need to be considered as part of the AIM Tier 2 response (i.e., the AIM Tier 2 response must be parameter-specific). Language to clarify the scope of AIM Tier 2 responses needs to be added to the MSGP.

Some of the SCMs contained in Appendix Q go beyond the scope of the Clean Water Act and stormwater management including "SCMs" regulated by other mechanisms related to waste management and disposal, wastewater management, air quality, underground storage tanks and SPCC requirements. The Sector Q Water Transportation SCMs in Appendix Q include overwater or in-water activities that are regulated by the Vessel General Permit. The SCMs included in Appendix Q should be limited to those control measures that are specific to stormwater management and fall under the scope of the Clean Water Act. In addition, the SCMs are highly repetitive and sometimes conflict with each other. The SCMs should be reviewed and updated to eliminate redundancy and conflicts between them.

**Suggested Revision:** See Part 5.2 proposed changes at end of this attachment and specific comments in Attachment B for SCMs for Sector Q Water Transportation in Appendix Q.

…

**Proposed Changes to the Draft 2020 MSGP, Part 5.2**

In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

…

**5.2.2.2 AIM Tier 2 Responses.** Except as provided in Part 5.2.4 (AIM Exceptions), if ~~any of~~ the events in 5.2.2.1 occurs, you must:

**a. Implement Sector-Specific Stormwater Control Measures.** Review the SCMs from the relevant sector-specific Stormwater Control Measure Checklist(s) that applies to your facility in Appendix Q of the permit to determine which SCMs would help meet the benchmark threshold for the parameter(s) that exceeded the annual benchmark threshold for two consecutive years. Implement a selected set of ~~all~~ feasible SCMs from the checklist these relevant sector-specific Stormwater Control Measure Checklist(s) that ~~applies to your facility in Appendix Q of the permit~~ are targeted at the parameter(s) for which AIM Tier 2 was triggered. SCMs must be selected by the operator in a good faith effort to meet the benchmark thresholds for the parameter(s) for which AIM Tier 2 was triggered. You must notate in the checklist which SCMs you implement and keep the checklist with your SWPPP. (*Note: You do not have to implement an SCM where it would be counter-productive to the implementation of another control measure, or not result in any reduction in the discharge of the pollutant of concern.)*

**b. Continue Quarterly Benchmark Monitoring**. After compliance with (a) in this Part, you must continue quarterly benchmark monitoring into the next year.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

The 14- and 45-day timelines should only apply to AIM Tier 1 responses. AIM Tier 2 responses include structural SCMs that in many cases are not "off the shelf" solutions and require engineering, capital planning, and contracting to implement. In addition, depending on the local climate, severe weather conditions (e.g., frozen ground, rainy season) may impact the ability to complete installation of structural and/or treatment SCMs. Allowing 6 months is a more realistic timeline for the installation of structural SCMs. This would provide adequate time to evaluate which structural SCM alternatives would work for a given facility. Operators often must allocate significant resources on structural SCMs and rushing these decisions could result in SCMs that won't work for a given facility.

**Suggested Revision:** See Part 5.2 proposed changes at end of this attachment.

…

**Proposed Changes to the Draft 2020 MSGP, Part 5.2** In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

…

**5.2.2.3 AIM Tier 2 Deadlines.** The SCMs selected by the operator should be implemented as soon as possible. However, you ~~You~~ must implement ~~all feasible~~ selected SCMs within 6 months ~~14 days~~ and document per Part 5.3 how the measures will achieve benchmark thresholds and why you did not implement any sector-specific measures from the checklist. ~~If it is feasible for you to implement a measure, but not within 14 days, you may take up to 45 days to implement such measure. You must document per Part 5.3 why it was infeasible to implement such measure in 14 days.~~ EPA may also grant you an extension beyond 6 months ~~45 days~~, based on an appropriate demonstration by you, the operator.

a. **Exception**: You do not have to implement any of the feasible control measures if you determine and document in your SWPPP that the exceedance is solely attributable to natural

background sources or, with EPA agreement, run-on sources or <u>aerial deposition sources</u>, consistent with Part 5.2.4 (AIM Exceptions).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 64
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should not limit the Tier 2 trigger in Part 5.2.2.1.a. to only consecutive annual exceedances. EPA should provide the technical basis for limiting this trigger to specifically consecutive annual average exceedances. For example, the Agency should offer a technical justification for excluding a Tier 2 trigger in the event that a facility experienced below-average rainfall during an intervening year, resulting in comparatively lower precipitation quantity and intensity with the potential to cause onsite contamination of stormwater discharges.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: triggering events should be streamlined so they are either based on simple annual averages or single benchmark exceedances rather than both. Simplot also requests the number of single benchmark exceedances for Tier 2 triggering events be reduced. Numerous types of triggering events would not be practical to track for compliance and would create a significant increase in documentation.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  36
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: "mathematically certain" (projected) annual averages should not be used in AIM calculations. Pollutant levels (such as TSS) can fluctuate more by the intensity of the storm event than of the stormwater control measures and their effectiveness. For instance, a sudden snowmelt or heavy rain event may lead to a TSS benchmark exceedance in the spring (second quarter), while following discharges may drop considerably in concentrations throughout the rest of the calendar year. Pre-emptively triggering Tier 2 responses based on a "mathematically certain" quarterly or annual average is not appropriate for areas like the arid West.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  43
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: Requiring documentation of the SCMs which are *not* selected should not be required. For some sectors (like mining), the list of SCM exceeds 200 potential actions, require documentation on why it was not implemented.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on documentation of stormwater control measures in proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 44
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: The AIM Tier 2 implementation deadlines of 14 days for the normal deadline and 45 days for the extenuating circumstances deadline as presented in Part 5.2.2.3 seem overly stringent. Simplot suggests Tier 2 implementation deadlines be extended to 30 days for the normal deadline and 60 days for the extenuating circumstances deadline.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

ACI-NA recognizes that there are many fundamental flaws in EPA's proposed AIM program, as set forth in the FSWA comments attached and in the Appendix Q comments below. In addition, the AIM process conflicts with the successful VPRP program discussed in the General Comments Section above. In addition, the use of EPA's proposed methodology to correct exceedances in benchmark values is not recommended. Going through an exhaustive list of options, many of which are not viable (e.g. infrared deicing), and explaining why any individual option is infeasible is contrary to how a proper engineering analysis should be conducted. The pick from the list approach leaves no room for proper root cause analysis in order to design and select the most appropriate engineering solution to address the specific problem.

Furthermore, limiting permittees to select control measures from one sole list allows no room for innovation and new technology. Also EPA is ignoring a key step of characterizing the problem causing the benchmark area exceedance. If one outfall experiences a problem, airport staff would not necessarily begin with redoing the entire approach to deicer management. Airport staff would focus on identifying the issue and then identifying BMPs that could remedy the specific issue in that outfall's particular drainage area.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tier 2: The requirement to review and notate all feasible stormwater control measures (SCMs) on the sector-specific Stormwater Control Measures Checklist (Appendix Q) is unnecessary and overly burdensome. As an example, the Sector P SCM Checklist is 20 pages and includes various areas and activities that do not apply to many of the industrial facilities covered under Sector P such as warehouse and distribution centers. The requirement for all permit holders to review 20 pages of activities that may or may not apply to their facilities and to notate the reason why the SCM is inappropriate or not implemented is unnecessary and not the best use of a stormwater expert's time. The regulated entities are the experts in regard to understanding their operations and potential impacts, and those experts should have the flexibility to review their industrial activities and implement appropriate corrective actions. This is similar to the tiered corrective action programs outlined in the Washington and Oregon MSGPs. As the EPA still retains the authority to enforce the permit, the determination of an effective corrective action should be the responsibility of the regulated entity.

ATA requests that the SCM Checklists be modified to be an optional reference document and in lieu of attaching the SCM Checklist to the SWPPP, require the AIM Tier 2 response be notated elsewhere in the SWPPP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 44
**Excerpt Status:** Final

**Comment Excerpt:**

Tier 2 was intended to increase the level of scrutiny and obligations for sites that continued to have benchmark exceedances on a pollutant and outfall-specific basis beyond the first year of efforts to reduce the industrial pollutant at that specific outfall. This scrutiny would increase either because average benchmark values continued to exceed  benchmarks (i.e., the site continued to have control challenges), or because challenges controlling the pollutant discharges actually increased pollutant loadings.

In other words, a site could end up in Tier 2 if: (1) most of the eight samples required through the second year of permitting exceeded benchmarks; (2) two samples—one during Year 1 and one in Year 2—exceeded four times the benchmark; or (3) a site already in Tier 1 had one sample that was at least eight times the benchmark during Year 2. The same approach should apply moving from Tier 2 to Tier 3. Each movement to the next Tier "resets the clock" upon triggering and complying with each tier individually.[38]

[38] 2016 Settlement at p. 13.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Woodard & Curran, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tier 2 requires operators to implement "all feasible" sector-specific stormwater control measures (SCMs) from the applicable checklist(s) in Appendix Q within 14 days (or up to 45 days if not feasible within 14 days), and for each listed SCM that was not implemented, to document why the operator didn't implement them. Each sector-specific checklist includes many SCMs (for example, the Sector A checklist includes more than 150 SCMs), several of which could require equipment modifications, structural improvements, etc. that might not be possible to implement within 14 (or 45) days. The process of documenting why each infeasible option was not selected is overly burdensome, considering that operators may be reviewing more than 150 SCMs. We suggest changing the reference to Appendix Q such that it is a resource for facility operators to review when triggering AIM, but remove the requirement for implementation of "all feasible" SCMs and remove the requirement for operators to document the reason for each SCM that was not implemented.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Of further concern, the AIM Tier 2 response would require the facility to implement all feasible SCMs from the relevant sector-specific Stormwater Control Measure Checklist. However, all of the SCMs in Appendix Q should not be required at one time as all of the SCMs would not be required for a given facility to meet the benchmark thresholds. The facility should be allowed to choose appropriate SCMs from Appendix Q for the activity or potential pollutant source that the permittee believes would enable the facility to achieve benchmark(s) for the parameter(s) which exceeded the benchmark threshold in two consecutive years. SCMs in Appendix Q that would not impact the parameter for which the facility is in AIM Tier 2 should not need to be considered as part of the AIM Tier 2 response; the AIM Tier 2 response should be parameter-specific.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

For AIM Tier 2, permittees must implement each feasible SCM in Appendix Q, many of which were apparently developed without industry input and are substantially more expensive than the 2015 specified BMPs.[68] In addition, unlike the current permit, the permittee must identify and document every SCM and implement every SCM that is "economically feasible," despite its low or nonexistent stormwater-related benefits.

[68] EPA has replaced the menu of optional BMPs with potentially mandatory SCMs.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

First, CCIG recommends that EPA modify the proposed Tier 2 measures to require the implementation of only those sector-specific stormwater control measures ("SCMs")[22] that are appropriate and reasonable based upon site-specific factors such as slope, geology, and operations. Not granting sources this flexibility to select the most effective measures could have severe ramifications as the failure to implement appropriate remedial measures could trigger the implementation of Tier 3 SCMs, or worse, result in a direct permit violation (*e.g.*, if effluent limitation guidelines are exceeded during annual monitoring). CCIG, therefore, requests that EPA modify Tier 2 to provide industrial sources the necessary flexibility to ensure appropriate stormwater controls are implemented based on site-specific assessments.

[22] See Proposed 2020 MSGP, Appendix Q.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on the stormwater control measures in proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Mark Compton
**Commenter Affiliation:**  American Exploration & Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

Section 5.2.2.2.a of the draft permit requires implementation of "all feasible SCMs from the relevant sector-specific Stormwater Control Measure Checklist(s) that applies to your facility in Appendix Q of the permit." In Appendix Q, there are more than 50 pages of SCMs applicable to

Sectors F and G. The note in the MSGP states that "You do not have to implement an SCM where it would be counter-productive to the implementation of another control measure, or not result in any reduction in the discharge of the pollutant of concern." This suggests permittees would have to implement everything in the list that could reduce pollutant levels regardless of whether a smaller subset would yield concentrations lower than the benchmark. AEMA requests that EPA change this language to only require what is needed to meet any relevant benchmark in the final permit. This is consistent with the Fact Sheet language that emphasizes the need to only require SCMs that are needed and not redundant with other SCMs.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

We also note the qualifications included in the "Note" to Part 5.2.2.2.a: "You do not have to implement an SCM where it would be counterproductive to the implementation of another control measure or not result in any reduction in the discharge of the pollutant of concern." While we can generally support the former qualification, we cannot support the latter. As an initial matter, it is very difficult to conceive how a permittee would go about proving the required negative, i.e., that implementation of a control measure would "not result in <u>any</u> <u>reduction</u> in the discharge of the pollutant of concern."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, as written this provision requires a permittee to implement all SCMs listed for the relevant sector in Appendix Q (as long as they are not "counterproductive" to other measures or "do not result in any" discharge reduction), regardless of the level of reductions achieved by other measures. In other words, where a facility exceeds a benchmark and the permittee implements SCM-A and SCM-B and succeeds in driving discharges below the benchmark, the permittee is still required by Part 5.2.2.2.a to implement <u>any</u> other SCM listed in Appendix Q (e.g., SCM-C) if feasible. As we point out elsewhere, because benchmark thresholds are used to trigger a requirement to implement SCMs and as the measure of the sufficiency of the SCMs, the benchmarks function as effluent limits, which is not authorized by the Act. In the context of Part 5.2.2.2.a, the Agency goes even further – here, the Agency actually proposes using benchmarks to require permittees to take further action <u>even if the benchmark has already been achieved.</u> Nothing in the Act authorizes use of benchmark thresholds as the functional equivalents of effluent limits in the first instance and nothing in the Act authorizes the Agency to mandate a permittee to take action even where the benchmark has already been achieved[25].

[25] This suffers from the additional flaw of subjecting different permittees to different standards of compliance. If Facility A never exceeds a threshold the permittee is not required to implement further SCMs. At the same time, if Facility B does experience a benchmark exceedance the permittee is required to implement all SCMs if feasible. Thus, even if Facility B already achieves the benchmark it is required to take further action, even if it may exceed the performance of facilities (like Facility A) which never experience a benchmark exceedance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Just as importantly, the Agency's formulation of this qualification implies that an SCM must be implemented <u>regardless of the cost</u> or its achievability as a practical matter. We assume that the Agency intends this qualification to be read as applying to <u>feasible</u> SCMs (i.e., SCMs that are "technologically possible and economically practicable and achievable in light of best industry practices" as defined in Appendix A). The term "minimize" as defined in Appendix A[26] should also be used to reinforce this point. Accordingly, we suggest that the Agency amend the "Note" included in Part 5.2.2.2.a as follows:

(Note: You do not have to implement an SCM if it is not feasible and even if feasible where it would be counterproductive to the implementation of another control measure, or would not contribute significantly to the minimization of result in any reduction in the discharge of the pollutant of concern.)

[26] Draft 2020 MSGP Permit, Appendix A ("Minimize – for the purposes of this permit, minimize means to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices.")

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.2.RFC22. Additional Implementation Measures (AIM) - RFC 22 Aberrant event exception

**Commenter Name:** John P. Whitescarver
**Commenter Affiliation:** Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

This makes sense

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

BES does not support making an "aberrant event" available to other AIM Tier levels and/or AIM triggering events as proposed in Part 5.2.2.l.c.i a. This condition, and term, is too vague and would make tracking and enforcement too challenging and open to interpretation among both regulators and operators

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

We believe it is appropriate to make the suggested exception for an "aberrant event" if the AIM Tier level proposal is to be implemented. We do not support the need to provide additional actions, analysis and documentation for any such exceptions when in fact such additional requirements would be redundant and excessive.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Comment on whether it is appropriate to make the above exception for an "aberrant event" available to other AIM Tier levels and/or AIM triggering events.

Discussion/Recommendations

Section 5.2.2.1.c.i should recognize that sampling and analytical errors DO occur, and a facility should qualify under this provision to retest for either 5.2.2.1.b or c, especially since obtaining a representative sampling regimen is much more difficult with the stormwater program than

2021 EPA MSGP Response to Comments
January 15, 2021

wastewater. A basis for retesting is already provided for Whole Effluent Toxicity testing. Perhaps, this subsection should instead be entitled "Exceptions and Retesting".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Nancy S. Allen
**Commenter Affiliation:**  Office of Environmental Programs, City of Phoenix
**Document Control Number:**  EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

The suggestion to include an exception for an "aberrant event" is appreciated and should be extended to each AIM tier and triggering events. The mechanism to identify or modify specific control measures and take corrective actions already exists in the permit. Permittees should be required to explain why the event is "aberrant" but should not be required to demonstrate why the event was not contemplated in the SWPPP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  30
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend inclusion of an aberrant sample exemption in Tier 1 AIM triggers to avoid the scenario where one sample result that is exceptionally high, followed by three subsequent analysis at zero or well below threshold, would trigger the AIM corrective actions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  31
**Excerpt Status:** Final

**Comment Excerpt:**

We agree that an aberrant sample result be defined and acknowledged by the MSGP within the AIM Tier 2 triggers. This can include the demonstration criteria document in Permit 5.3, though it may be more accurate to provide the discussion separately than the criteria for documenting an AIM corrective action (currently the title of Section 5.3).

**Comment Response:**

EPA declines to make the suggested revision.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  32
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that an aberrant sample be excluded from calculating an AIM Tier 3 triggering event. This allows the facility to identify, document, and correct a single unusual sampling event without it continuing to affect future compliance and escalating regulatory obligations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

**12. Request for Comment 22: "Aberrant Event" AIM Exception**

With reference to our previous AIM general comments, we are in support of extending this "aberrant event" exception from AIM to all three (3) tiers. In addition, we had suggested another exception to the AIM provisions, which is a non-industrial pollutant source demonstration, where the benchmark chemical(s), such as Zinc, is not from the industrial activities of the site (e.g., not in raw materials), but from ubiquitous items (e.g., building envelope, fencing) found in industrial, non-industrial and residential sites.

Also, in order to not overwhelm all USEPA offices with applications for approvals of AIM exceptions, sites that are able to make AIM exception claims should be required to document these exceptions in their SWPPP, subject to disclosures already provided for in the MSGP, but not needing USEPA approval.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

With respect to the AIM exception documentation requirements, EPA notes that the 2021 MSGP requires submission of documentation for an AIM exception for run-on, the exception relating to copper and aluminum benchmark exceedances, and benchmark exceedances not resulting in an exceedance of water quality standards.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

VMA supports the inclusion of an "aberrant event" exception to the need for AIM. EPA has requested comment on whether it is appropriate to make the "aberrant event" exception in proposed Part 5.2.2.1.c.i available to other AIM Tier levels and/or AIM triggering events (EPA request for comment 22). VMA supports this exception but questions some of the requirements proposed in order to use such an exception. For such events, it should be sufficient for a permittee to maintain a record of the event in its SWPPP, and the permittee should not be required to make any demonstration as to why the event was not contemplated under the SWPPP. Such a requirement would undermine the purpose of the exception as addressing "aberrant" events.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 5.2.2.1.c.i. Exception (Request for Comment 22):***

The exception for an "aberrant event" should be for any tier criteria trigger where any one result could trigger the tiered response. For example , 5.2.1.1.b. a single sampling event over 4 times the benchmark threshold, or 5.2.2.7.c. one single sampling event ever 8 times the benchmark threshold, as is currently proposed.

*Recommendation:*

Allow the exception for an "aberrant event" for Part 5.2. 1 . 1 .b

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>FPA supports allowing a covered facility's owner or operator to demonstrate that an aberrant event caused a permit violation,</u>** and we do not oppose the MGSP including this exception with requirements that the covered facility submit within 60-days documentation of why the event should be considered "aberrant" and the type of mitigation that was taken in response to the event and any measures that have been taken to prevent a recurrence of such an event, even though it was "aberrant." <u>However,</u> the owner or operator of such a facility also should be able to show that because the event was *aberrant*, it is not technically or economically feasible to prevent such a violation from recurring. In other words, FPA points out that if an event was indeed "aberrant," it is unlikely that the event will recur, and thus, additional AIM would be highly unreasonable to require as a result.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Notwithstanding, AAAE believes that exceptions should be more widely available throughout the AIM process to ensure that airports have the necessary flexibility to comply with their obligations. With that in mind, AAAE offers several recommendations to improve the value of EPA's proposed AIM exceptions.

- First, the aberrant event exception should be made available to any single sampling event that would trigger a response requirement in AIM Tier 1, 2, or 3. (See Request for Comment 22.) AAAE does not see any reason for allowing airports to demonstrate an aberrant event for only AIM Tier 2. A single event may become an aberration in any of the three triggering scenarios.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI supports Part 5.2.2.1.c.i of the Proposed 2020 MSGP that excepts permittees from triggering AIM Tier 2 if they can show that "the single event [of >8 times the benchmark] was an aberration". ISRI further supports exceptions for proven aberrant events related to any other trigger of an AIM tier based on an exceedance that is greater than a specific multiple of the benchmark.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

All Tiers, especially Tier 1. A facility with a Tier 1 event caused by an aberrant or one-time occurrence should be allowed to demonstrate compliance, with two consistent analysis at different dates and within 30 days, or during two qualifying rainfall events, discharge concentrations below parameter limits; including documentation of what measures are taken to prevent re-occurrences and any changes needed to the SWPPP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

Aberrant Event:  Similar to the comment immediately above, NAIMA would not support an aberrant event being the trigger for elevation to Tier 1.  Rather, as stated above, the exceedance of the benchmark is the trigger for Tier 1.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS believes it is appropriate and supports allowing a covered facility's owner or operator to demonstrate that an "aberrant event" resulted in a permit violation.** However, an "aberrant" event by its nature may be unlikely to recur, rendering a requirement for additional AIM unreasonable. In submitting the required documentation to support consideration of the event as "aberrant," describing the mitigation in response, and along with any measures taken to prevent a recurrence, the owner or operator also should be able to make a case (given the event was "aberrant") that it is not technically or economically feasible to prevent a violation from recurring.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

An aberrant event exception would not be required if the AIM Tier level progression did not include "single-event exceedances" and instead followed an annual exceedance progression as discussed in Comment 4. By allowing for AIM Tier levels to be triggered by only annual exceedances, a permittee would have the opportunity to implement additional stormwater control measures to bring the average annual concentrations for a given parameter to below benchmark levels. Should the EPA decide to maintain "single-event exceedances" in the final 2020 MSGP, providing an exception for an "aberrant event" would allow for a limited form of adaptive management for permittees. Documentation for the "aberrant event" could include a discussion of what led to the "aberrant event" and the stormwater control measures that were implemented to address the benchmark exceedance.

**Suggested Revision:**
If "single-event exceedances" are included in the final 2020 MSGP, then an exception for an "aberrant event" should be allowed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Robert A. Rio
**Commenter Affiliation:** Associated Industries of Massachusetts (AIM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0216-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

We support this section as stormwater control measures are based on normal events, not aberrant ones and the facility would have no control over this.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 62
**Excerpt Status:** Final

**Comment Excerpt:**

*iii. Proposed Exception for an "Aberrant Event"*

EPA should eliminate the proposed "aberrant event" exception entirely or, alternatively, adopt a well-defined regulatory term of art, as described below. EPA proposes that an *"aberration"* or *"aberrant event"* (noted within "Request for Comment 22") should be one of the three exceptions to one of the triggering events described for requiring Tier 2, "Additional Implementation Measures" (AIM's), at Part 5.2.2.1.c.i. The triggering event is where one sampling event is more than eight times the benchmark threshold. But this exception to that trigger states that such an instance may be characterized as an "aberration" if (1) immediate documentation is undertaken; (2) the documentation includes a description of how measures taken will prevent a recurrence; and (3) the next qualifying rain event sampling is either less than the benchmark (and therefore one is excused entirely from any Tier triggering), or the sample is less than four times the benchmark, wherein one is excused from triggering Tier 2, but still triggers Tier 1. An industrial source may only avail itself of this excuse one time per parameter per discharge point.

"Aberration" or "aberrant event" are not, to our knowledge, terms found anywhere in the federal Clean Water Act or elsewhere in other CWA regulations or guidance. They require a clear definition or better, a substitution (together with a definition). Such a substitution might be to use the more common term, "upset," as found throughout federal CWA (and other environmental)

permitting. For example, the "Glossary" in the *U.S. EPA NPDES Permit Writers' Manual* contains this definition for the "upset:'

*An exceptional incident in which there is unintentional and temporary noncompliance with technology-based effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.[152]*

This definition hearkens back to 40 C.F.R. §122.41(n)(1), which contains it, and which sets conditions necessary for its demonstration (among others, submitting notice of the upset within 24 hours of the occurrence) as well as a burden of proof related to any subsequent enforcement proceeding. Qualifying exceedances caused, even in part, by human action likely indicate deficiencies in control measures requiring modifications, which should not fall within the definition of an upset. With the exception of the addition of a requirement for immediate mitigation (with which Commenters agree), the MSGP should not attempt to invent a wholly new, previously undescribed standard, new, untested words, or new conditions of applicability, to describe essentially the same thing.

[152] U.S. Envtl. Prot. Agency, *NPDES Permit Writers' Manual*, EPA 833-K-10-001 (September 2010), Exh.A-2, at A-17. The definition cites to 40 C.F.R. §122.41(n)(1).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

ARA takes the position that permittees design their SWPPP based on likely pollutants and expected storm events, but not based on aberrant events. Because a SWPPP would not have addressed an unexpected or "aberrant" event, a permittee should not need to further explain why the SWPPP does not address the aberrant event.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

In Request for Comment 22, **EPA asked whether the exception for an "aberrant event" in 5.2.2.1.c.i should also be applied to AIM Tiers 1 and 3 as well as Tier 2. It seems reasonable to do so since sampling or analytical outliers can occur regardless of the results obtained during other storms.**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  CJ Environmental
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Seems fair and reasonable, however, needs clarification around definition and how many times per year can an 'aberration' be claimed. Recommendation to require detailed documentation in the incident report and ways to prevent reoccurrence from happening again.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

CRH supports this exception as it allows for a facility to react to unforeseen deviations without triggering stricter responses. The added flexibility provides a facility with options to react and control the situation without affecting overall compliance status.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  37
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 2: the exception of "You may only avail yourself of the "aberration" demonstration opportunity one time per parameter per discharge point, which shall include substantially similar discharge points" is overly stringent. Situations might occur that such an event is repeated outside the operators' control. Language stating that repeated aberrations for the same parameter at a discharge point must include a clear explanation as to why the discharge occurred and how it was different from the previous discharge. Including such a stringent requirement could lead to undue burden on the facility.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

It would seem appropriate to include the "aberrant event" exceptions for all three proposed AIM Tier levels. The event should still require follow-up actions, as practicable, such as documentation that appropriate BMPs will be implemented to minimize the potential for the discharge of pollutants during future events. We do not believe that an incident report is

necessary given the reporting requirements already included in the proposed MSGP, specifically the annual report.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 47
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 22**

The FWQC and FSWA reiterate the general AIM concerns set forth elsewhere in these comments. If AIM is implemented, we support an "aberrant" event exception for all AIM levels. Permittees design their SWPPP based on likely pollutants and expected storm events, but not based on aberrant events. EPA recognizes the limitations with benchmark monitoring and the highly variable nature of storm events and monitoring conditions. It also recognizes that a SWPPP is a "living document"[40] that should reflect real world experience, which would not be expected to address events that are completely unexpected or "aberrant." Hence, a permittee should not need to further explain why the SWPPP does not address the aberrant event.

[40] 2020 Proposed MSGP Part 6.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA Request for Comment #22, it is reasonable to make the exception for an "aberrant event" available to all AIM Tiers and/or triggering events.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP identifies two other exemptions applicable to certain categories of benchmark excursions, a proposed Tier 2 exception for a single sampling event that is over eight times the benchmark threshold (5.2.2.1 and request for comment 22) and a proposed Tier 3 exception for "discharges not resulting in any exceedance of water quality standards" (5.2.3.3 and request for comment 23). AEMA supports extending both of the exceptions (presuming any benchmark monitoring is required) to any of the AIM tier response measure requirements or additional benchmark monitoring.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

The concept that a single event could result in aberrant readings is realistic. This aberrant event exception should, however, be more broadly available and relevant to any obligatory control measure as long as the discharger can demonstrate the potential cause of the event and the measures implemented to try and minimize the chance for reoccurrence. The aberrant event exception could include identified notification time frames specified (e.g., 14 days for the notification) and up to 45 days to implement any identified changes (unless those changes involve permanent structural source controls or treatment control measures in which case the

permittee would have 90 days (with the option to seek an extension)). See generally proposed MSGP 5.2.1.3, 5.2.2.3, 5.2.3.3. The MSGP should clarify that the aberrant event exception is an exception to any of the AIM tier response measure requirements or additional benchmark monitoring.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

California gives their discharges "a pass" in case of those events by not having a trigger to the next Tier until two samples are over. Include in annual reporting of "this is what happened, and this is what we did". No reason for immediate reporting.

**Comment Response:**

EPA does not agree with the comment's suggestion to provide a "pass" where an operator claims the abnormal event exception. Instead, the 2021 MSGP requires the operator to collect a sample during the next measurable storm event to demonstrate that the result is less than the benchmark threshold. The requirement to perform a follow-up sample during the storm event is important to verify that the exceedance was indeed the result of an abnormal event and that benchmark exceedances will not persist. EPA notes that operators are required to comply with the documentation requirements of Part 5.3 but are only required to include a summary with the annual report. Operators are not required to submit this documentation to EPA, unless specifically required or requested to do so.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

It is appropriate to make exception for an "aberrant event" given the requirements for documentation and corrective action.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

We support the inclusion of an aberrant event exclusion for Tier 2 and Tier 3. At base, this exclusion acts ensure that one single elevated sample result that results from an atypical event should not be the trigger the evaluation and implementation of what likely will be capital intensive additional SCMs if the atypical event itself has been adequately addressed. By definition, an "aberrant event" is one that is not normally encountered by a facility in a particular sector. Because the implementation of AIM Tier 2 and Tier 3 Responses would trigger consideration and potential implementation of SCMs that are specifically tailored to the normal operation of a sector facility, it would be particularly unsupportable to activate those obligations based on an event for which they facially are not designed. Further, the aberrant event exception should not be a one-time exception, but should apply in any case where an event that is not a part of facility operations that the sector-specific Tier 2 or Tier 3 controls are designed to address. Otherwise, sector-specific controls will be mandated in response to events that they are manifestly not intended to address, a result unsupported by this administrative record.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.3. AIM Tier 3

**Commenter Name:**  Charles Job
**Commenter Affiliation:**  National Ground Water Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The National Ground Water Association supports the Environmental Protection Agency action for reducing pollution to the nation's streams but urges that the Agency not do so at the expense of contaminating groundwater through stormwater infiltration and creating nonpoint source pollution that could then discharge to streams. The NGWA is concerned that the Proposed Multi-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity does not take into account major problems raised about infiltration of stormwater raised in at least three reports:

National Research Council. 1994. Ground Water Recharge Using Waters of Impaired Quality.

Environmental Protection Agency. 2018. The Influence of Green Infrastructure Practices on Groundwater Quality: The State of the Science. EPA/600/R-18/227.

National Academies of Science. 2019. Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges.

All three reports highlight the vulnerability of groundwater quality from stormwater infiltration. Each report points to aspects of aquifers and the groundwater environment that should be considered when designing, permitting, and implementing stormwater infiltration. However, none of the reports provide guidance to design stormwater infiltration systems that are protective of groundwater and all reports clearly state that more research needs to be done because, relative to research on surface water systems, comparatively little has been done regarding stormwater impacts on groundwater. The reports indicate that the research is needed to provide definitive guidance on where infiltration may be appropriate and done with adequate protections. The research has not been done and as a result, permit processes such as MGSP, are being implemented without adequate guidance to public and industry sectors regarding stormwater management, risking significant impacts on communities that rely on groundwater for drinking water supply. Consequently, EPA is fostering a process to transfer pollutants from one water source to another – from surface water to groundwater – without having done the necessary research and development to support protective measures for downstream aquatic and public receptors.

By not adequately addressing groundwater protection in MSGP, EPA is creating risk for (1) concentrating pollutants in groundwater (2) creating by regulation a new and uncontrolled nonpoint pollution source, (3) discharging pollutants to streams and lakes, and (4) creating treatment needs and costs to drinking water systems to meet maximum contaminant levels that use either or both the affected groundwater and surface water for community water supply. This circumstance is not only a transfer of pollutants but of responsibility from program to program, creating a greater federal, state and local administrative burden and cost. The most effective approach would be to reduce or eliminate the pollution at the source.

For situations in which infiltration is the selected approach, injection of stormwater into the subsurface may be applied that use processes protective of groundwater addressed by the Underground Injection Control (UIC) program under the Safe Drinking Water Act. Industries can apply for a permit to inject stormwater as a pollution control measure that protects drinking water and potentially addresses concerns of reducing stormwater pollutants to surface waters.[1]

A further concern is that "constituents of emerging concern" produced and used at industrial sites are not addressed in NPDES permits and that these contaminants may be captured and infiltrated to groundwater by stormwater facilities. The permit process should provide for documenting unregulated contaminants that are released by the industrial sector and potentially picked up in stormwater. EPA has over 86,000 chemical compounds listed in the TSCA Chemical Inventory[2], yet relatively a limited number are regulated under the Clean Water Act or the Safe Drinking Water Act. Unregulated chemicals have become ubiquitous in the environment as exemplified by PFAS/PFOS/PFOA, MTBE, Perchlorate, 1,2-Dioxane and many others that have been identified because they were found in water supplies. Releasing these chemicals to groundwater potentially creates unusable zones of water around the United States that will be costly to remediate.

Additionally, the ruling of the United States Supreme Court on the case, County of Maui v. Hawaii Wildlife Fund, No. 18-260, that point source discharges to groundwater and its eventual travel to surface water discharge locations is functionally equivalent to discharges regulated under the Clean Water Act National Pollutant Discharge Elimination System highlights the significance of releases to industrial stormwater infiltration facilities potentially impairing groundwater. Each stormwater infiltration site may be a point source of pollution. Where groundwater is used as source of drinking water in communities near industrial sites with stormwater infiltration, general permits for stormwater discharges that are not protective of groundwater may be highly problematic and not protective of human health.

[1] U.S. Environmental Protection Agency. 2008. Clarification on which stormwater infiltration practices/technologies have the potential to be regulated as "Class V" wells by the Underground Injection Control Program. Memorandum of June 13, 2008, Water Division Directors, Regions 1-10, from Linda Boornazian, Director, Water Permits Division, and Steve Heare, Director, Drinking Water Protection Division.

[2] U.S. Environmental Protection Agency. 2019. TSCA Chemical Substance Inventory. https://www.epa.gov/tscainventory/about-tsca-chemical-substance-inventory.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Charles Job
**Commenter Affiliation:** National Ground Water Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Groundwater Quality Inadequately Considered
NGWA Comment: Groundwater does not appear to be included in any substantial way in the

permit due to EPA's interpretation of the Clean Water Act. This is a significant shortcoming since EPA is promoting stormwater infiltration as a major alternative to polluting streams. The permit should at least indicate whether the stormwater will create a nonpoint source of pollution so that the pollution control framework as currently interpreted can manage the transfer of pollutants.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Charles Job
**Commenter Affiliation:** National Ground Water Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Groundwater Protection and Monitoring

NGWA Comment: NGWA commends EPA for proposing new requirements for benchmark and other types of monitoring. Monitoring of wastewater injectate would occur under the UIC program permit process if infiltration by well were the selected method of stormwater disposal. However, despite the repeated recommendations for groundwater monitoring, monitoring is not mentioned in the proposed permit, and so apparently not included due to EPA's interpretation of the Clean Water Act application to groundwater.

The National Academies of Science convened a high-level technical panel constituting a committee to review EPA's Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity. The NAS report indicates that groundwater monitoring at stormwater infiltration sites may provide significant information to wastewater managers to be protective of groundwater. The committee issued a consensus report in 2019 on this subject. The major points made in this report regarding groundwater protection and monitoring are:

• Unless pretreatment is provided to reduce all pollutants below levels of concern, dry wells or subsurface injection are not appropriate for industrial stormwater infiltration because these systems provide little to no removal of contaminants.

• Risks to groundwater from infiltration of industrial stormwater can be greatly reduced by requiring that infiltrated water meet stringent water quality requirements, such as those for drinking water, as defined by the Safe Drinking Water Act. However, drinking water standards may not provide a sufficient screening tool because many industrial chemicals that may be highly toxic are not regulated under the Safe Drinking Water Act.

• Monitoring of groundwater quality at sites of industrial stormwater infiltration should be a priority of the permit program, with water quality monitored and evaluated in the infiltration device or at the base of the vadose zone.

• EPA should develop guidance for retention and infiltration of industrial stormwater for protection of groundwater.

• Because of the potential risks to groundwater, industrial stormwater infiltration is not recommended in states that lack the legal authority to manage and enforce groundwater quality.

NGWA concurs with these points and encourages EPA to address them in the NPDES program.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Charles Job
**Commenter Affiliation:**  National Ground Water Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Stormwater infiltration should not be used: at sites that are already contaminated (including Superfund sites) as this may cause contamination to flow to new locations; at sites with high water tables as this may negatively impact nearby shallow wells, basements, and buried utilities; and, at sites of karst or fractured bedrock as these locations and conditions provide for rapid preferential flow of contaminants toward local streams and groundwater users.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Charles Job
**Commenter Affiliation:**  National Ground Water Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0126-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

NGWA Comment: A national model of permitting for stormwater management should take an integrated water approach. Treatment is one option, infiltration another, a combination may be still another depending on the site. Consideration of infiltration must incorporate subsurface conditions and specifically-engineered protection targeted for groundwater where possible. Additionally, pollutant reduction at the source should also be an essential factor in permitting decisions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  28
**Excerpt Status:** Final

**Comment Excerpt:**

BES strongly supports the permit requirements for both an analysis of the appropriate siting for infiltration as a stormwater control and EPA approval before infiltration can be constructed. BES recommends that the permit require specific analysis and certain sectors with heavy industry (for example, Sectors M, P, R) to provide pre-treatment controls such as sand filters and/or solids settling. BES has inspected numerous facilities where infiltration areas were constructed as a storm water control measure whose operations are not appropriate for infiltration, such as auto wrecking, scrap metal recycling, metal fabrication and storage, and waste processing. The potential for groundwater contamination from toxic pollutants in stormwater from certain industrial sites is too great to allow infiltration as a stormwater control option for many operators. In addition, infiltration on previously contaminated sites may remobilize soil or groundwater contamination. Groundwater contamination may occur well beyond the site boundary that is expensive to remediate, if even discovered.

Stormwater pretreatment prior to infiltration is also a recommendation in the EPA study, "Potential Groundwater Contamination from Intentional and Nonintentional stormwater lnfiltration" (1994). This study states, "Infiltration of urban runoff having potentially high concentrations of pollutants that may pollute groundwater requires adequate pretreatment, or the diversion of these waters away from infiltration devices."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

The City suggests extending the deadlines for Tier 3 Additional Implementation Measures from 30 days to 180 days, if feasible, with a maximum of one calendar year where the response requires installing permanent controls or infiltration practices. For complex structures, the proposed deadline is too short for any facility to adequately conduct a site survey, evaluate treatment alternatives, design the treatment system, and install the control(s). Rushing any part of this process can lead to even more significant water quality impacts and increases the likelihood of future failure.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Tier 3 Triggering Events:

5.2.3.1.b

Tier 3 may apply during the first year. If each of the first three consecutive samples in the first year are 4 times the benchmark, then the permittee has moved through Tier 1, Tier 2, and Tier 3 in the first 9 months. Is this what EPA meant to say or is the Tier compliance more to do with each year? Please clarify.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

5.2.3.1.c

Tier 3 may apply during the first year. If the first two consecutive samples are 8 times the benchmark, then the permittee will need to comply with Tier 2 and Tier 3 in the first 6 months of the permit.

If I thought the above Tier descriptions confusing, try to explain 5.2.3.1.d. "If four consecutive samples for a parameter are each over the benchmark threshold and their average is more than 2 times the benchmark threshold, you are in AIM Tier 3." I can't even begin to teach this one, as most likely it will be mathematically certain that the average of 3 samples is above the benchmark, this is just a different way to state 5.2.3.1.a.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Frederick J. McNeill
**Commenter Affiliation:** City of Manchester, New Hampshire
**Document Control Number:** EPA-HQ-OW-2019-0372-0145-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The City suggests extending the deadlines for installing permanent controls or infiltration practices under the Tier 3 Additional Implementation Measures from 30 days to as soon as feasible where funding must be secured through a public process. Any proposed permanent controls at a City facility would have to be budgeted and the budget approved before funding is available. The timing of when a facility is categorized as Tier 3 will influence the timing for securing funding (e.g., which fiscal year budget it makes it into). The current proposed implementation deadline of 30 days is insufficient for any municipal facility to allocate and receive approval for funds, conduct site surveys, evaluate alternatives, design the systems, and install the treatment system.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nina Schittli
**Commenter Affiliation:** Blymyer Engineers Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0149-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**Comment: Requirement for installing permanent controls or infiltration is overly burdensome**
The requirement for installing permanent controls or infiltration is overly burdensome, particularly to smaller facilities. As the Fact Sheet states, "Treatment and structural controls are regarded as a last resort due to the complexity and cost to the operator…"

Smaller facilities may have limited space for treatment controls or structural controls. Taking away space for installing permanent controls, particularly berms, retention ponds, and infiltration structures, could interfere with essential business operations. Many small facilities have unpaved yard areas. If installing permanent treatment controls or structural controls is not feasible, the only option may be to pave the yard. This would increase stormwater runoff and decrease infiltration, contributing further to urban runoff.

Another concern regarding a requirement for permanent controls is leased facilities. It is not unlikely that a landlord could refuse to pay for costly permanent improvements. If the If the lessee operator were to be held responsible for the design, installation, and the substantial cost of permanent structural or treatment controls it would be making costly improvements to a property it does not own.

As an alternative we recommend that non-permanent treatment and structural controls be allowed to meet AIM Tier 3 Response requirements. Examples include filtration socks and berms, filter inserts in storm drains, tracking grates, barriers to direct traffic away from erodible areas, etc. Filter media is available to treat and capture various pollutants, including sediment, oil and grease, and metals.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2

2021 EPA MSGP Response to Comments
January 15, 2021

**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

AIM Tier 3 deadlines are not realistic.

Discussion/Recommendations

The 30 to 90 day allowance for conducting a review and identifying such added structural/treatment measures to install in unrealistic. Suggest allowing 90 days for conducting a PE review to identify added measures. Then, similar to SPCC have 6 months following EPA approval to implement the measures, unless a longer time frame is approved by EPA.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 34
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

30 day installation

Discussion/Recommendations

30 days to install structural source and/or treatment control measures is not likely to ever be feasible. EPA will likely receive numerous requests for extension. Change to 90 (or more) days with extension available from EPA.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tier 3 triggers lead to structural source controls, which are unlikely to be fully implemented in either 30 or 90 days as required by the draft permit. These corrective measures would require project planning, engineering designs, budget allocation, and construction. Permittees suggest 1 year as a deadline.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Lisa Stevens or Jeanne Riley
**Commenter Affiliation:**  State of Utah Department of Environmental Quality
**Document Control Number:**  EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

While the discharge might not cause an exceedance of a water quality standard at the discharge point, it may cause a problem downstream when combined with discharges from other sources. If this exception were to be allowed, it should take into account all downstream discharges and uses before granting an exception.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Travis Deti
**Commenter Affiliation:**  Wyoming Mining Association (WMA)

**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Also, it will be impossible for operators to implement the required Tier 3 structural source controls within the specified 30 to 90 day timeframe.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

The timeframes included in the draft MSGP to install structural source controls and/or treatment controls may be difficult if not impossible for public entities to meet due to government budgeting processes. Public agencies should be allowed at a minimum eighteen months to make changes that require significant spending.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

EPA will not make an exception determination for 90 days, but the control measures are required to be installed within 30 days. The City requests that the language in Part 5.2.3.3(b) be clarified: "You do not have to install structural source controls or treatment controls if you ~~adequately demonstrate~~ submit information to EPA within 30 days of the Tier 3 trigger occurrence that your

discharge does not result in any exceedance of water quality standards and EPA approves such ~~demonstration~~ information within 90 days of receipt." If EPA doesn't approve the information, then the 30-day requirement for control measure installation should begin from the date of non-approval.

**Comment Response:**

EPA notes that Part 5.2.3.3.b of the proposed 2020 MSGP, which included the documentation requirements for an exception from Tier 3 responses for discharges that do not result in an exceedance of water quality standards, is now allowed at all AIM levels in the 2021 MSGP. The documentation requirements in Part 5.2.6.5 of the 2021 MSGP requires demonstration (i.e., submission) to EPA within 30 days of the AIM trigger occurrence and provides timeframes for EPA review of the submitted demonstration.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

Tier 3: Facilities that exceed a benchmark parameter sufficient to trigger Tier 3 AIM corrective actions may be subject to either 1) installing a permanent treatment device 2) installing a retention/infiltration technology, or 3) applying for an individual permit.

1. Facilities may become subject to Tier 3 AIM corrective actions, bypassing Tier 1 and 2 corrective actions, due to high concentrations of a pollutant of concern. In our experience, this can commonly occur for TSS loading at a site without pavement. Therefore, we disagree with EPA that there would be very few permittees potentially subject to Tier 3 AIMs without first addressing Tier 1 and 2 corrective actions. We recommend a protective measure be considered for permittees in this scenario.
2. With regards to 1) permanent treatment devices: in some states, treatment of stormwater with chemicals is prohibited or is allowed as long as no negative impacts to water quality or aquatic life occur, but without specific conditions for implementation and testing. States need not adopt the EPA recommendations but must adhere to mandates, so if this is a mandatory obligation, consider the impacts to State rulemaking that does not currently address the use of treatment chemicals in stormwater permits.
    1. Typical procedures associated with the use of treatment chemicals are a) testing for concentration of pollutants to be treated, b) application of products in specific doses to address pollutant concentrations, and c) testing of treated water prior to discharge, including whole effluent toxicity testing, to avoid negative impacts to water quality and aquatic health. This is level of effort is more in line with wastewater permitting or individual permitting, but is excessive relative to stormwater benchmark testing. We disagree that Corrective Action for Tier 3 AIMs include mandatory treatment devices.

3.  With regards to 2) retention/infiltration, we note that many industrial facilities have space limitations that would prevent them from using onsite detention/retention basins to achieve pollutant reductions for compliance with the rule. Alternative practices should be encouraged for benchmark exceedances. Due to the variety of potential site scenarios and potential engineered solutions, escalation to engineered BMPs should be prescribed through an enforcement criterion, rather than corrective actions identified in the MSGP.

4.  With regards to 3) requiring an applicant to apply for an individual permit, we assert that this is an enforcement response applied to a benchmark value intended to allow the permittee options for solving a water quality issue associated with typical pollutants in runoff. We further assert that the Tier 3 AIMs are not the right location for referral of an applicant to enforcement and individual permitting. Rather, this enforcement criteria exists through other functions of the NPDES process, including anti-degradation criteria.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 5.2.3.2 AIM Tier 3 Responses:***

Text indicates that source controls required to be implemented under the Tier 3 response (e.g., permanent controls such as permanent cover, berms, and secondary containment) should be more rigorous than the pollution prevention-type measures employed under AIM Tier 2 in Part 5.2.2. However, several sector specific SCMs identify berms, permanent cover and secondary containment.

*Recommendation:*

Please clarify how these two differ.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Paul Bredwell
**Commenter Affiliation:**  U.S. Poultry & Egg Association et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

**5. The USEPA has proposed developing national guidance for stormwater retention and infiltration system which we believe is inappropriate and unnecessary given this issue is generally addressed by other Federal, State and Local environmental regulatory agencies and/or governmental entities.**

The sizing, design, construction, and maintenance of storm water retention and infiltration systems is area specific and based on existing state and local regulatory requirements, soil conditions and properties, planning and development requirements, climatic conditions, and various other factors. Discharges to ground water also generally falls under the jurisdiction and regulation of States.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The Steel Associations also recommend that EPA withdraw the proposed AIM for Tier III exceedances. These requirements to construct permanent structures and stormwater controls based on a handful of exceedances appear to be more punitive than necessary. Here again, EPA can most effectively address these and similar concerns by proposing AIM that are not designed to punish facilities through overly prescriptive or inflexible response requirements. When facilities experience benchmark exceedances, they must take steps to identify and address the cause of the exceedance, but they should not be prohibited from using their site-specific engineering judgment to implement the measures they deem most effective and efficient. Depriving facilities of this flexibility and prescribing the imposition of specific controls irrespective of the cost-effectiveness of the control for the specific application would require companies to implement controls that make no sense on a cost-per-ton basis and prohibit companies from pursuing more economical options. Compelling this approach on companies

simply because they experienced a benchmark exceedance is inconsistent with the goal of benchmark monitoring, unnecessarily punitive, and unlikely to result in the superior environmental outcomes that can be achieved through the use of site-specific engineering knowledge.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 23:**

**AIM Tier 3 Triggering Events (Part 5.2.3.2)**

EPA's proposal to require structural source controls at mining locations in response to Tier 3 triggering events is not practicable. As explained in the previous discussion on 25 benchmarks, the arbitrary benchmarks that EPA continues to impose will undoubtedly be exceeded at some locations. Requiring that operations continue to review and install additional controls even when the existing controls are operating effectively would be an extremely costly exercise. The disconnect here continues to be EPA's expectation that the benchmark levels are appropriate. From a practical perspective, the administrative burden of determining Tier 3 benchmark exceedances will be immense, especially at a site with many outfalls. Further, it will be near impossible for operators to implement the required structural source controls within the 30 day (or 90 day) timeframe. Implementing these types of permanent controls can take years to do properly and does not even make sense in most applications due to the dynamic nature of a mine site. Even doing the necessary research, contracting with the necessary providers, planning, traveling and setting up the operation at a remote area, will take more time than the proposed deadline.

The proposed alternative option to structural source controls and/or treatment controls is to install infiltration or retention controls if such an approach is appropriate and feasible based on site-specific conditions. If EPA retains this section, it should provide additional clarity. If a facility which is not triggering AIM Tier 3 wants to install infiltration controls, does the infiltration plan still have to be approved by EPA? Or does the infiltration plan need to be approved by EPA only in the case if infiltration controls are installed in response to triggering AIM Tier 3? If the infiltration method at the site is "compliant with regulations for ground water protection and underground injection control", it should not be necessary to also require the EPA

Regional Office to approve an infiltration plan. Jurisdiction over groundwater is within the purview of the States and most states operate groundwater protection programs, including authorization for underground injection. Any requirement for EPA approval of state permits for discharges to groundwater would rightfully be viewed as an unlawful overreach.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

Second, in the case of Tier 3 exceedances, there is not even an opportunity to reject any SCM on the basis of economic feasibility.[53]

[53] MSGP Permit 5.2.3.2. Tier 3 requirement.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tier 3 is the most troublesome because structural changes are required, including selecting from the SCM list found in Appendix Q, and that there is no exception for economic feasibility. These can be very costly, and the NRC 2015 data shows that many sectors are affected by AIM Tier 3.[115]

[115] Tier 3 exceedances could be frequent. An analysis performed by BRS, LLC (Attachment B) indicate that all five rubber products industry sector Y1 facilities identified in an EPA benchmark exceedance analysis triggered exceedances in three consecutive years to just cite one example.

The analysis demonstrated that this data would trigger a Tier 3 response for two or more of these five facilities. Y1 is required to monitor for zinc, and zinc shows an exceedance rate of 72% in Table 1 above.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Installing structural or treatment SCMs within 30 days or 90 days is infeasible given the engineering, capital planning, and contracting required to implement structural or treatment control measures. In many cases, structural SCMs are not "off the shelf" solutions and in nearly all cases, treatment control measures are not "off the shelf" and require detailed engineering analysis to facilitate the success of the selected stormwater or treatment control measure. In addition, depending on the local climate, severe weather conditions (e.g., frozen ground, rainy season) can limit the construction season for up to 3 to 6 months out of the year and may impact the ability to complete installation of structural and/or treatment SCMs. Allowing 6 months is a more realistic timeline for the installation of structural SCMs and 12 months for the installation of treatment SCMs. This would provide adequate time to evaluate structural and treatment alternatives that would have a higher potential for achieving benchmarks for stormwater discharges from a given facility. Some steps in the source evaluation and planning process for structural and treatment SCMs include source tracing, sampling for particle size distribution, inspection and cleaning, CCTV camera investigation of on-site stormwater system (e.g., identify damaged or broken pipes that may be contributing groundwater and/or sediment to the stormwater system), engineering evaluation, capital planning, development of final plans, bidding the project, and selection of contractors. Accomplishing all of these tasks within 90 days is unrealistic and would lead to rushed decisions that result in misallocation of resources on SCMs that won't be effective and achieve the objective of the MSGP to reduce pollutants of concern in stormwater runoff from permitted facilities. Operators will be required to allocate significant resources on structural or treatment SCMs to meet this permit requirement and the MSGP should allow for adequate time to properly evaluate, plan and implement these critical stormwater management decisions.

**Suggested Revision:**

See Part 5.2 proposed changes at end of this attachment.

...

**Proposed Changes to the Draft 2020 MSGP, Part 5.2** In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

...

**5.2.3.3 AIM Tier 3 Deadlines**. The SCMs selected by the operator should be implemented as soon as possible. However, you ~~You~~ must install the appropriate structural source control measures within 6 months and/or treatment control measures within 12 months ~~30 days. If is not feasible within 30 days, you may take up to 90 days to install such measures, documenting in your SWPPP why it is infeasible to install the measure within 30 days.~~ EPA may also grant you an extension beyond 6 months for structural SCMs and 12 months for treatment SCMs ~~90 days~~, based on an appropriate demonstration by you, the operator. Should EPA deny any such extension request, the AIM Tier 3 deadlines will be based on the date of receipt of this denial by the operator.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jane Dewell
**Commenter Affiliation:** Port of Seattle, WA
**Document Control Number:** EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

In order to demonstrate that Water Quality Standards are not being exceeded, a detailed evaluation needs to be completed, including sampling of receiving waters. The draft 2020 MSGP includes 30 days to complete the Water Quality Standards demonstration, which is not enough time to adequately investigate the quality of local receiving waters and prepare a report that demonstrates Water Quality Standards are not being exceeded. A minimum of 6 months should be allowed to complete the Water Quality Standards demonstration. If EPA adopts the suggested recommendations to only include annual average exceedances as discussed in comments 8 and 9, this would provide permittees through September 30 to complete this evaluation and allow the evaluation to occur over the spring and summer when extreme weather conditions would not restrict activities necessary to complete the Water Quality Standards demonstration. The suggested edits to Part 5.2 at the end of this attachment include a revised process for permittees to notify the EPA within 30 days that they will complete the demonstration, and then permittees would be allowed 6 months to complete and submit the demonstration. During this time, the AIM process would be "paused" and additional exceedances would not trigger additional AIM

responses. Should the EPA deny the demonstration, the Tier 3 deadlines would be based on the date of the permittee's receipt of EPA's denial.

**Suggested Revision:** See Part 5.2 proposed changes at end of this attachment.

…

**Proposed Changes to the Draft 2020 MSGP, Part 5.2**

In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

…

**a. Exception:** You do not have to install structural source controls or treatment controls if you determine and document in your SWPPP that the exceedance is solely attributable to natural background sources or, with EPA agreement, run-on sources or aerial deposition sources, consistent with Part 5.2.4 (AIM Exceptions).

**b. Exception:** You do not have to install structural source controls or treatment controls if you

1. notify adequately demonstrate to EPA within 30 days of the Tier 3 trigger occurrence that you intend to adequately demonstrate that your discharge does not result in any exceedance of water quality standards;

2. submit a report to EPA within 6 months of the Tier 3 trigger occurrence that adequately demonstrates your discharge does not result in any exceedance of water quality standards; and

3. EPA approves such demonstration within 90 days of receipt (EPA may take up to 180 days upon notice to you before the 90th day that EPA needs such extra time). The demonstration to EPA, which will be made publicly available, must include the following minimum elements in order to be considered for approval by EPA:

i1. the water quality standards applicable to the receiving water;

ii2. the flow rate of the stormwater discharge;

iii3. the instream flow rates of the receiving water immediately upstream and downstream of the discharge point;

iv4. the ambient concentration of the parameters) of concern in the receiving water immediately upstream and downstream of the discharge point demonstrated by full-storm composite sampling;

v5. the concentration of the parameter(s) of concern in the stormwater discharge demonstrated by fullstorm, flow-weighted composite sampling;

vi6. any relevant dilution factors applicable to the discharge; and

vii7. the hardness of the receiving water.

**c.** If EPA disapproves such demonstration within 90 days (or 180 days if EPA notifies you that it needs more than 90 days), you must install structural source controls within 6 months and/or treatment controls within 12 months 30 days of such disapproval (or 90 days if you document in your SWPPP why it is infeasible within 30 days; EPA may also grant an extension beyond 6 months for structural controls or 12 months for treatment controls 90 days based on an appropriate demonstration by you, the operator). If you continue to exceed the benchmark threshold for the same parameter even after installation of structural source controls or treatment controls, EPA may require you to apply for an individual permit. If EPA does not approve or disapprove the demonstration within 90 days (or 180 days if EPA has provided notice that it needs that extra time), then you may submit to EPA a Notice of Dispute. Within 30 days, EPA shall submit a response. If that response does not include an approval or disapproval of the demonstration, then both filings shall be submitted to the Director of the Water Management Division for the EPA Region, who shall approve or disapprove the demonstration within 30 days of receiving the filings. Time for action by you, the operator, upon disapproval shall be tolled during the period from filing of the Notice of Dispute until the decision is issued by the Director of the Water Management Division. That decision shall be final and not appealable.

1. Should EPA deny such demonstration, the AIM Tier 3 deadlines will be based on the date of receipt of this denial by the operator.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

The MSGP should clarify the impact to a facility's AIM Tier response status after an AIM Tier 3 response is completed. After an AIM Tier 3 response is completed, the facility should then go back to "baseline" where an exceedance of annual benchmark threshold would place the facility in AIM Tier 1. The MSGP should also identify that when a facility is in AIM Tier 3, benchmark threshold exceedances are not counted against the facility until the AIM Tier 3 response has been completed.

**Suggested Revision:** See Part 5.2 proposed changes at end of this attachment.

…

**Proposed Changes to the Draft 2020 MSGP, Part 5.2**

In Part 5.2 below, strikethrough text represents suggested deletions and underlined text represents suggested additions.

…

**5.2.3.2 AIM Tier 3 Responses.** Except as provided in Part 5.2.4 (AIM Exceptions), if ~~any of~~ the triggering events in 5.2.3.1 occurs, you must:

**a. Install Permanent Controls.** Install structural source controls (e.g. permanent controls such as permanent cover, berms, and secondary containment), and/or treatment controls (e.g., sand filters, hydrodynamic separators, oil-water separators, retention ponds, and infiltration structures), except as provided in Part 5.2.4 (AIM Exceptions). The treatment technologies or treatment train you install should be appropriate for the pollutants that triggered AIM Tier 3 and should be more rigorous than the pollution prevention-type measures employed under AIM Tier 2 in Part 5.2.2. You must select controls with pollutant removal efficiencies that are sufficient to bring your exceedances below the benchmark threshold. You must have a professional engineer or geologist assist with the installation of such controls for the discharge point in question and for substantially similar discharge points, unless you individually monitor those substantially similar discharge points and demonstrate that Tier 3 requirements are not triggered at those discharge points; and/or

**b. Alternative Option: Infiltrate.** As an alternative or adjunct to structural source controls and/or treatment controls, you may install infiltration or retention controls (e.g., through green infrastructure) for your industrial stormwater, if such an approach is appropriate and feasible for your site-specific conditions. If this approach is feasible, the execution must be compliant with regulations for ground water protection and underground injection control (UIC). The analysis that shows infiltration/retention is appropriate for your site-specific conditions and is compliant with other applicable regulations must be provided to the EPA Regional Office in Part 7 BEFORE you can choose this option and the EPA Regional Office must concur with your conclusions. Successful compliance with the provisions in this part may allow EPA to waive or lessen benchmark monitoring requirements; and

**c. Continue Quarterly Benchmark Monitoring.** After compliance with (a) and/or (b) (if EPA approves) in this Part, you must continue quarterly benchmark monitoring into the next year. <u>After compliance with (a) and/or (b), the facility is back at baseline and if annual benchmark threshold is exceeded, the facility would be at AIM Tier 1. During the time in which a facility is implementing an AIM Tier 3 response, exceedances of benchmark thresholds will not trigger additional AIM responses.</u>

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The time frames for Tier 3 implementation are unrealistic and unworkable. Tier 3 measures will require engineering, design time, and permitting through local, state and federal entities. It can easily take as long as two years tor waterfront construction permits to be issued.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 65
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify the requirements and deadlines for operators seeking to except substantially similar discharge points from Tier 3 requirements for installation of permanent controls. Part 5.2.3.2.a. As drafted, the provision requires operator to "individually monitor" these discharge points and "demonstrate that Tier 3 requirements are not triggered" at those points. However, the Agency does not specify requirements for: (1) how and by when an operator must conduct this monitoring; (2) which data and analysis, at a minimum, are required to make the demonstration; and (3) by which date the data and the demonstration must be made available to the Agency.

**Comment Response:**

EPA declines to make this change.

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1

**Comment Excerpt Number:** 67
**Excerpt Status:** Final

**Comment Excerpt:**

Installing permanent "structural" controls (including GI), as required by Part 5.2.3 for Tier 3, should not be considered a "penalty" or "consequence," rather, undertaking such actions should be what permittees must do in any case.

**Comment Response:**

EPA agrees that the Tier 3 responses are not penalties or consequences; rather, they represent more robust control measures necessary to abate benchmark exceedances where earlier attempts to lower pollutants via pollution prevention/good housekeeping and other procedural changes fail to do so in AIM Levels 1 and 2. For further discussion, see Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 73
**Excerpt Status:** Final

**Comment Excerpt:**

*19. EPA Must Revise or Eliminate its Proposal for Stormwater Retention in Order to Protect Groundwater Resources, in Accordance with the Recommendations of the National Academies of Sciences.*

The NAS suggested that it might be appropriate for EPA to encourage stormwater retention and infiltration systems by developing retention system guidance, but cautioned that retention and infiltration poses serious risks that must be carefully managed:[153]

*When evaluating the potential for stormwater retention at an industrial facility, extreme caution should be used to ensure that infiltration does not result in groundwater contamination or mobilization of existing soil or groundwater contamination. Many common pollutants found in stormwater, such as heavy metals and toxic organics, have some mobility in the soil column (Armstrong and Llena, 1992; Clark et al., 2010; Treese et al., 2012). Without appropriate treatment, as well as spill prevention and containment, industrial stormwater retention can lead to groundwater contamination well beyond the site boundary that is difficult and costly to remediate.[154]*

And indeed, "[g]roundwater contamination from stormwater infiltration has been documented in various locations around the country."[155]

EPA has not taken the NAS recommendations seriously. The Agency proposes to encourage the use of retention and infiltration as an alternative to structural or treatment controls in Tier 3 AIM responses, but without carefully protecting groundwater.[156] EPA states that it "intends to develop guidance on determining the feasibility of an infiltration/retention approach" at some unspecified future time.[157] This is entirely inappropriate and backward. EPA cannot allow for a risky practice prior to developing guidance for ensuring that the practice is implemented safely.

The NAS provided very specific guidelines for how the promotion of retention and infiltration could be done safely. Ensuring groundwater protection requires, among other things:[158]

- Rigorous permitting
- Pretreatment
- Monitoring. Among other things, "water quality should be monitored and evaluated in the infiltration device or at the base of the vadose zone."
- Site characterization
- "In lieu of other information on the attenuation of contaminants in groundwater . . . infiltrated groundwater should be required to meet primary drinking water standards for inorganic chemicals and organic chemicals, and secondary standards for chloride and total dissolved solids."
- And, again, EPA guidance, including guidance "for demonstrating that exceeding the benchmark during storms with precipitation amounts greater than the design storm do not result in exceedance of water quality standards."

None of these things are in the draft permit or the fact sheet. Instead, EPA offers a retention/infiltration alternative that is virtually unlimited by any criteria whatsoever. EPA merely states that permittees:

may install infiltration or retention controls (e.g., through green infrastructure) for your industrial stormwater, if such an approach is appropriate and feasible for your site-specific conditions. If this approach is feasible, the execution must be compliant with regulations for ground water protection and underground injection control (UIC). The analysis that shows infiltration/retention is appropriate for your site-specific conditions and is compliant with other applicable regulations must be provided to the EPA Regional Office in Part 7 BEFORE you can choose this option and the EPA Regional Office must concur with your conclusions.[159]

The only truly limiting factor in this broad grant of flexibility is the approval of an EPA regional office. But that approval is itself unlimited by any of the criteria recommended by the NAS, or any other criteria.

EPA cannot simply encourage a practice that poses a serious threat to groundwater without any assurances of groundwater protection. This would only move pollution from surface water to groundwater, at a net environmental cost (relative to what would happen under AIM implementation without the infiltration alternative). EPA must require the all of the NAS recommendations, including the following:

- Monitoring of water in the infiltration device or at the base of the vadose zone.
- Pretreatment sufficient to ensure that stormwater complies with primary and secondary drinking water standards "either before the stormwater is applied to the infiltration area or after passing through the infiltration/treatment media at the base of the unsaturated zone."[160]

- Site characterization sufficient to demonstrate that there is no potential to "mobilize existing contaminants in the subsurface."[161]

These must be required of permittees in applications for infiltration under section 5.2.3.2.b, and EPA approval must be contingent on a finding that all of the NAS-recommended conditions have been met.

[153] NAS at 6-7, 67-80.

[154] *Id.* at 71.

[155] *Id.* at 72.

[156] Fact Sheet at 8, 83.

[157] *Id.* at 83.

[158] *Id.* at 78-79.

[159] Draft Permit at 44, Part 5.2.3.2.b.

[160] NAS at 76.

[161] *Id.* at 72.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

The deadline of 30 days to install permanent structural best management practices is too short to allow for necessary procurement and installation. DOEE recommends 60 days.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 3: triggering events should be streamlined so they are either based on simple annual averages or single benchmark exceedances rather than both. Simplot also requests the number of single benchmark exceedances for Tier 3 triggering events be reduced. Also, compliance periods for single benchmark exceedances should be based on each calendar year periods rather than 3-year periods. Numerous types of triggering events would not be practical to track for compliance and would create an enormous increase in documentation.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 39
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 3: "Mathematically certain" (projected) annual averages should not be used in AIM calculations. Pollutant levels (such as TSS) can fluctuate more by the intensity of the storm event than of the stormwater control measures and their effectiveness. For instance, a sudden snowmelt or heavy rain event may lead to a TSS benchmark exceedance in the spring (second quarter), while following discharges may drop considerably in concentrations throughout the rest of the calendar year. Pre-emptively triggering Tier 3 responses based on a "mathematically certain" quarterly or annual average is not appropriate for areas like the arid West.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 45
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 3: EPA needs to clarify the review of infiltration option requirement: if a facility which is not triggering AIM Tier 3 wants to install infiltration controls, does the infiltration plan still have to be approved by EPA? Or does the infiltration plan need to be approved by EPA only in the case if infiltration controls are installed in response to triggering AIM Tier 3? [Note: since groundwater quality is the domain of the states; it is not clear what the legal basis is for EPA approving infiltration plans that are based on state specific groundwater quality requirements.]

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 46
**Excerpt Status:** Final

**Comment Excerpt:**

For Tier 3: The requirement to install permanent controls may require substantial capital investment. Design and construction of permanent controls typically requires more than 90 days to complete. Also, such completion may be subject to appropriate weather conditions. For such situations, the deadline to install controls needs to be determined on a case by case basis.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 45
**Excerpt Status:** Final

**Comment Excerpt:**

However, in mistranslating the AIM process from the 2016 Settlement to the Proposed 2020 MSGP, EPA contradicts the above Fact Sheet language, in Section 5.2.3.2 AIM Tier 3 Responses, which provides:

Except as provided in Part 5.2.4 (AIM Exceptions), if any of the triggering events in 5.2.3.1 occur, you must:

1. Install Permanent Controls. Install structural source controls (e.g. permanent controls such as permanent cover, berms, and secondary containment), and/or treatment controls (e.g., sand filters, hydrodynamic separators, oil-water separators, retention ponds, and infiltration structures), except as provided in Part 5.2.4 (AIM Exceptions). The treatment technologies or treatment train you install should be appropriate for the pollutants that triggered AIM Tier 3 and should be more rigorous than the pollution prevention-type measures employed under AIM Tier 2 in Part 5.2.2. *You __must__ select controls with pollutant removal efficiencies that are sufficient __to bring your exceedances below the benchmark threshold.__* You must have a professional engineer or geologist assist with the installation of such controls for the discharge point in question and for substantially similar discharge points, unless you individually monitor those substantially similar discharge points and demonstrate that Tier 3 requirements are not triggered at those discharge points; (emphasis added)

While the FWQC and FSWA hope that there is a reasonable explanation to the contrary, the plain reading of this section is that AIM Tier 3 mandates that resulting stormwater discharges are below benchmark levels. Hence, EPA is now proposing to mandate benchmarks as numeric effluent limitations after 30 years of precedent and assertions to the contrary. And as provided further below, the FWQC and FSWA assert that EPA's proposal to eliminate economic feasibility from Tier 3 measures is contrary to the AIM agreements in the 2016 Settlement and directly conflicts with the fundamental Best Available Technology Economically Achievable principles and precedent in the NPDES permitting program for non-numeric effluent limitations. See 40 CFR § 122.44(k).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, the MSGP should clarify the impact to a facility's AIM Tier response status after an AIM Tier 3 response is completed. AAR recommends that after an AIM Tier 3 response is completed, the facility should then go back to "baseline" where an exceedance of annual benchmark threshold would place the facility in AIM Tier 1. The MSGP should also identify that when a facility is in AIM Tier 3, benchmark threshold exceedances are not counted against the facility until the AIM Tier 3 response has been completed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Michel J. (Mike) Paque
**Commenter Affiliation:** Ground Water Protection Council (GWPC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0250-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Our comments are limited to the use of infiltration of contaminants in industrial stormwater to groundwater as a remedy under 5.2.3.2 AIM Tier 3 Responses. Some of the infiltration methods that could be used may be Class V injection wells under the safe drinking water act. We note that the draft general permit does state in 5.2.3.2 that regarding infiltration, "the execution must be compliant with regulations for ground water protection and underground injection control (UIC)." GWPC encourages EPA to be clear that certain designs may require a UIC state or federal permit in addition to coverage under the Industrial Multi-Sector General Permit.

The attached memo, *Clarification on which stormwater infiltration practices/technologies have the potential to be regulated as a "Class V" well by the Underground Injection Control Program*, dated June 13, 2008, was sent to the Water Division Directors, EPA Regions 1-10, jointly from the Directors of the Water Permits Division and the Drinking Water Protection Division. The memo contains a discussion and a table which details stormwater practices and technologies that may be regulated under the UIC program.

We suggest that the table contained in the attached Memo be included in the general permit to clarify for the applicants seeking coverage under this MSGP what types of infiltration practices may need an additional UIC authorization. GWPC also recommends that potential need for a Class V permit or authorization be mentioned in other places within the General Permit where infiltration, which could qualify as a Class V well, is discussed.

The UIC program is focused on preventing contamination of underground sources of drinking water, and additional standards or practices may need to be met before the infiltration would be allowed under the UIC program. This is especially important where the General Permit will be used in an area where the UIC Class V program has been delegated to states and territories by

EPA (see the attached table of *States' and Territories' Responsibility for the UIC Program*). At the very least, there is a need for communication between the stormwater program and the delegated UIC programs to ensure water quality protection.

Some Class V injection wells are "high tech" in their construction and inject below the base of underground sources of drinking water (10,000 milligrams per liter total dissolved solids) while others are relatively simple in construction and include shallow wells and shallow subsurface distribution systems that inject into or above underground sources of drinking water. All injection is authorized either by rule or by individual permit under the delegated Class V programs.

These authorizations require the safe injection of fluids. It is a violation of a delegated UIC program and federal direct implementation programs for an owner or operator of an injection well to construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation pursuant to 40 CFR part 142 or may otherwise adversely affect the health of persons (40 CFR §144.12). The applicant for a Class V authorization has the burden of demonstrating that these requirements are met.

While groundwater is not a jurisdictional water under the CWA, that should not prevent coordination with the UIC program. GWPC points out that there should be a common purpose for protecting drinking water sources under both the CWA and the SDWA. The practice of infiltration of stormwater runoff to groundwater should also be protective of groundwater quality. If polluted stormwater runoff is redirected to groundwater for either disposal or shallow recharge, GWPC recommends that the two Acts be implemented to prevent rather than redirect contamination from surface water resources to the detriment of groundwater resources.

GWPC recognizes that there are multiple federal court cases that are currently addressing CWA citizen suits regarding the need for an NPDES permit when discharges are made to groundwater and the pollutants traveling through groundwater are discharged to jurisdictional waters. It is unclear how these various judicial reviews will be resolved. Therefore, GWPC recommends that EPA proceed with caution on this general permit, especially on the infiltration provisions under 5.2.3.2 AIM Tier 3 Responses.

Part of GWPC's mission is to provide a forum for stakeholder communication and research to improve the role of government in the protection and conservation of groundwater. GWPC feels that collaboration and cooperation with the delegated State, Territory, and Tribal programs is necessary for EPA to effectively address issues surrounding underground injection to groundwater and storm water infiltration.

Communication between the NPDES and UIC programs at both the EPA Regional level and the State, Territory, and Tribal level is essential to protecting both surface water and groundwater quality. We would be pleased to convene a workgroup of state water quality and UIC agencies and federal and non-governmental experts in hydrogeology to assess the potential for NPDES-UIC regulatory coordination that will allow the goals of both the CWA and SDWA to be met.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Bill Arcieri
**Commenter Affiliation:** Henniker Sand and Gravel
**Document Control Number:** EPA-HQ-OW-2019-0372-0251
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Part 5.2.3.3.b AIM Tier 3 Deadlines We request that the deadline for installing permanent controls or infiltration practices under the Tier 3 Additional Implementation Measures be extended from 30 days to 60 days or as soon as feasible contingent on available funding. Major permanent controls may require substantial capital funds that are not available in the operating budget.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tier 3 is the most troublesome on several grounds. Under Tier 3, structural changes can be required from the SCM list found in Appendix Q, and there is no exception for economic feasibility. These SCMs can be very costly, even for lower risk facilities that may have a continued, but very minor exceedance. Moreover, in Part 5.3.2.2, the proposal states "you must select controls with pollutant removal efficiencies that are sufficient to bring your exceedances below the benchmark threshold" [69] (emphasis added). In other words, the benchmark becomes an enforceable effluent limit within the permit if a facility has reached a Tier 3 exceedance, even if the magnitude of the exceedance is minor. We strongly oppose any provision that, for all practical purposes, imposes an effluent limitation within the permit itself. EPA has historically avoided establishing numeric limits in an MSGP because it understood that benchmarks were not well connected to water quality standards (see below).[70]

EPA, in fact, correctly recalls its historic contrary view in the 2020 MSGP Fact Sheet:

EPA's (sic) concurs that more specific responses to benchmark exceedances may be appropriate in certain situations. However, the Agency has always and continues to hold that benchmark thresholds by themselves are not water quality-based effluent limits (or any effluent limit) and therefore facilities whose responses to benchmark exceedances comply with the permit's requirements, but do not achieve sub-benchmark pollutant levels, cannot be in violation of the permit, because a benchmark exceedance is not definitive proof that a water quality standard has been exceeded.[71]

If EPA finalizes the AIMs into the permit, it is important for EPA to correct this error, since this would be the first time that a facility can violate a permit because of multiple benchmark exceedances. As written, the permit requires a facility to take action that is "sufficient to bring your exceedances below the benchmark limit." Proposed Part 5.3.2.2.

[69] Proposed 2020 MSGP Part 5.3.2.2.

[70] We note this is not the first time EPA has caused confusion about enforceable limits. This confusion was raised regarding the previous 2015 MSGP. "Although EPA has stated that benchmarks are not enforceable, EPA repeatedly emphasizes in the fact sheet to the draft MSGP (see pages 36-38 of 72) that the new requirement to undertake "corrective action" as necessary to "eliminate" benchmark exceedances and "prevent" their reoccurrence are enforceable. This new requirement, which derives from the proposed consolidation of Parts 3.1 and 3.2 in the 2008 MSGP, has the effect of making the benchmarks de facto discharge limitations. Because the required responses to benchmark exceedances already are addressed in separate provisions of the draft MSGP (Part 6.2.1.2), the reference to benchmark exceedances triggering corrective action should be removed from the corrective action provisions in the draft MSGP or at the very least the benchmark provisions in the corrective action section of the 2008 MSGP (Part 3.2) should be retained." Arizona Mining Association, December 23, 2013, Comments at 7.

[71] 2020 MSGP Fact Sheet at 77.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

Second, CCIG recommends that EPA makes the following changes with respect to Tier 3 requirements:

- Remove the proposed Tier 3 requirement that affected sources hire a "professional engineer or geologist [to] assist with the installation of controls" because the requirement is unclear (*e.g.*, the meaning of "assist" is not defined or otherwise clarified). If EPA retains this proposed requirement, CCIG requests that EPA clarify the provision and whether an affected source must document the professional engineer's or geologist's assistance. Additionally, consistent with its recommendation above, CCIG asks that EPA broaden the scope of who may assist affected sources with the installation of controls. EPA's proposed language is unnecessarily narrow as other certified and recognized professional stormwater organizations can and do provide such services at a level equivalent to what a professional engineer or geologist can provide.
- For the proposed Tier 3 alternative infiltration option, remove the requirement that the "EPA Regional Office must concur with your conclusions" because obtaining EPA approval could delay implementation and jeopardize compliance deadlines. Instead, CCIG recommends that EPA allow a professional engineer or geologist or other certified and recognized professional stormwater organization to concur with the conclusions and certify the design plans.
- Extend the Tier 3 deadline to install control measures from 30 days to 60 days, without documentation, as 30 days may be infeasible for most Tier 3 demonstrations that require public comment.
- Extend the 24-hour documentation requirement to 72 hours because a 24-hour requirement would be difficult for some facilities, especially smaller ones, to comply with if an event were to occur over a weekend or during a holiday.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.3.RFC23. Additional Implementation Measures (AIM) - RFC 23 Exception for discharges not resulting in any exceedance of water quality standards

**Commenter Name:**  Victoria R. Branson
**Commenter Affiliation:**  National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

SNL/NM agrees that it is appropriate to make the exception for AIM Tier 3 (Part 5.2.3.3.b) applicable to all AIM Tiers. The criteria may prove relevant to arid landscapes where permitted sites are characterized by soils that are high in natural minerals and runoff is primarily via sheet flow that infiltrates before reaching WOTUS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:** Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

- **Incorporate NAS (2019) recommendations.** We are encouraged that USEPA has partially incorporated receiving water characterization in the proposed demonstration process for the water quality standard exception in Tier 3 of the additional implementation measures (AIM). However, requiring that such a demonstration be provided within 30 days of the Tier 3 trigger occurrence does not provide enough time for the necessary receiving water study. We recognize that adopting additional NAS (2019) recommendations (e.g., sampling for dissolved metals and using bioavailability-based tools) will be challenging, but we think now is the perfect time for USEPA to act.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Carrie Claytor and Eric Van Genderen
**Commenter Affiliation:** Copper Development Association (CDA) and International Zinc Association (IZA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0116-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

- **Extend the AIM Tier 3 exception to AIM Tiers 1 and 2 (USEPA's Request for Comment 23).** Extending the AIM Tier 3 exception to the other AIM Tiers could be a general way to apply the "off ramp" concept to other metals. To remain consistent with the intensity of the AIM triggers, the AIM exceptions could be made progressively more rigorous from Tier 1 to Tier 3. We recommend that an approach, consistent with the following, be incorporated into the MSGP, and that it be made appropriately generic so that it would apply to other metals that have bioavailability-based WQC (e.g., aluminum) or will have bioavailability-based WQC in the near future (e.g., lead, nickel, and zinc).
  - AIM Tier 1 exception: measure dissolved and total recoverable metal concentrations in the downstream receiving water or measure dissolved metal concentration in the effluent and then compare to the hardness-based national benchmark. Measuring both dissolved and total recoverable concentrations in the receiving water would provide data regarding the utility of a translator. However, we recognize the potential difficulty of acquiring

downstream samples, so as a practical alternative at this first Tier, we propose the option of sampling for dissolved metal in the effluent.

- o AIM Tier 2 exception: measure dissolved metal concentration in the downstream receiving water and then compare to a bioavailability-based benchmark. Conceptually, this would be similar to the idea referenced in USEPA's Request for Comment 19, where after repeated exceedances of the national benchmark, the current WQC would replace the national benchmark on a site-specific basis.
- o AIM Tier 3 exception: as described in the draft MSGP, this represents a receiving water study that would consider a site-specific water quality standard appropriate measurement basis, and incorporate a dilution factor as appropriate.

...

- • Regarding "Request for Comment 23": The exception to AIM Tier 3 should be extended to AIM Tiers 1 and 2. If this exception is extended to AIM Tiers 1 and 2, it could represent a general approach to incorporating dissolved metal concentrations and bioavailability-based benchmarks as site-specific options to national benchmarks. Functionally, these could provide options for application of the more sophisticated tools that we and USEPA collectively support and will provide a mechanism for the enhanced monitoring recommended by NAS (2019) for facilities repeatedly exceeding benchmarks.

**Comment Response:**

See Comment Response Essay 2 Monitoring and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

BES does not support making an exception for "discharges not resulting in any exceedance of water quality standards" available to any AIM Tier levels and/or AIM triggering events, as proposed in Part 5.2.3.3.b. Without collecting and analyzing a sample of the discharge, there is no way to determine if the discharge did not result in an exceedance of water quality standards. In addition, the permit provision poses an equity issue across operators. Small operators may not have the same available resources to show that their discharge did not result in an exceedance of water quality standards as larger operators. The provision allows for too much of a "loophole" for operators whose discharges exceed benchmark values and should not be required in the final permit.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Evan Jenkins
**Commenter Affiliation:**  Environmental Compliance Division, City of Nampa, ID
**Document Control Number:**  EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

The City also requests that the Tier 3 exception "Discharge does not result in exceedance of water quality standards" be available for use in Tier 1 and Tier 2 where the facility can demonstrate the exception.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Marge Morneau
**Commenter Affiliation:**  RELCO Compliance Services
**Document Control Number:**  EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

It would seem appropriate if Part 5.2.3.3.b exception applied to Tier 3, it should also apply to Tier 1 and Tier 2.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Brian Miller
**Commenter Affiliation:**  V&S Amboy Galvanizing LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0144-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

An additional option would be to extend the Additional Implementation Measures (AIM) Tier 3 exception regarding water quality standards to AIM Tiers 1 and 2. Either approach would provide flexibility to facility operators while also allowing use of USEPA's tools to more accurately characterize potential environmental risks from industrial stormwater. Application of better tools will ultimately help with proper allocation of resources (on the part of industry, states, and the Federal Government) to address real rather than perceived environmental problems.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Chuck Baltzer, Environmental Support Services (ESS)
**Commenter Affiliation:**  Rio Algom Mining L.L.C, subsidiary of BHP Copper Inc. (BHP)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0160-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

**COMMENT 4 – EPA's Request for Comment #23; Exceptions to AIM Triggering Events**:
EPA has created a new Part 5.2 in MSGP-2020 referred to as "Additional Implementation Measures," or "AIM." EPA has also included an exception to Tier 3 of AIM provided a discharger demonstrates to the applicable EPA Region that exceedance of the benchmark parameter did not result in an exceedance of an applicable water quality standard. EPA's request for comment #23 asks if this exception should likewise be applied to Tiers 1 and 2 provided the same demonstration can be made. RAML concurs that the exception to AIM should be applicable to all Tiers of AIM and should likewise be extended to all aspects of Corrective Action Measures at Part 5.1 of MSGP-2020.

**Discussion**: RAML is concerned that the way MSGP-2020 applies benchmark thresholds to monitored parameters, and then further applies the Corrective Action and AIM programs when benchmark thresholds are "exceeded" is an overreach of the non-numeric, narrative standards applicable to the stormwater program. The overarching narrative standard that is applicable to the stormwater program is that *a discharge may not cause or contribute to a violation of a receiving water quality standard*. Creating "benchmark thresholds" and describing monitoring results above these thresholds as "exceedances" sounds very much like a numeric effluent limitation.

The cleanest solution to this potential regulatory over-reach is the elimination of benchmark thresholds and significant narrowing of the triggers for Corrective Action and AIM programs. Since EPA is unlikely to take this approach, the only remaining solution is to allow a discharger to use collected data to demonstrate they have not caused or contributed to an exceedance of a

numeric or narrative water quality standard at any and all points of the stormwater program; but particularly for exemptions from all Corrective Action and AIM program elements.

RAML refers EPA to our Comment 2, "TSS and COD Monitoring Should Not Have Benchmark Thresholds." "Exceedance" of these parameter thresholds can only be shown to cause or contribute to a violation of a water quality standard if such a standard exists in the state where the discharge is occurring. Thus, applying a threshold that when exceeded results in Corrective Action or AIM requirements is nonsensical given that exceptions will ultimately be provided if there is no water quality standard for that parameter.

**Comment Summary:**

1. RAML concurs with EPA request for comment #23 that the exception to AIM should be applicable to all Tiers of AIM.
2. RAML believes that to be consistent with the non-numeric, narrative standards of the stormwater program, the exception should likewise be extended to all aspects of Corrective Action Measures at Part 5.1 of MSGP-2020.
3. Total Suspended Solids (TSS) and Chemical Oxygen Demand (COD) should not have benchmark thresholds that trigger Corrective Actions, Additional Implementation Measures, or actions associated with enforcement.

**Comment Response:**

See Comment Response Essay 2 Monitoring and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

The City supports extending this exception to other AIM Tier levels and/or AIM triggering events particularly because the proposed new MSGP AIM language requires facilities to respond to different AIM levels with increasingly robust control measures depending on the nature and magnitude of the benchmark threshold exceedance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  POWER Engineers, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:**  33
**Excerpt Status:** Final

**Comment Excerpt:**

We concur that AIM Tier 1-3 actions should not be triggered when an exceedance of benchmark parameters is not also an exceedance of water quality standards associated with the receiving stream.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

**13. Request for Comment 23: "Discharges Not Resulting in any Exceedance of Water Quality Standards" AIM Exception**

With reference to our previous AIM general comments, we are in support of extending this AIM exception for "discharges not resulting in any exceedance of water quality standards" to all three (3) tiers. Again, in order to not overwhelm all USEPA offices with applications for approvals of AIM exceptions, sites that are able to make AIM exception claims should be required to document these exceptions in their SWPPP, subject to disclosures already provided for in the MSGP, but not needing USEPA approval.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Patrick J. Fanning
**Commenter Affiliation:**  Virginia Manufacturers Association (VMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0180-A1

**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding EPA's request for comment number 23, VMA supports the extension of an exception for "discharges not resulting in any exceedance of water quality standards" in proposed Part 5.2.3.3.b available to all AIM Tier levels or AIM triggering events. Benchmarks were developed as a surrogate to water quality limits due to the variability of rain events. Wet weather standards have not been developed. VMA supports the ability for a facility to generate data and/or a scientific basis that discharges from their stormwater is protective of water quality and therefore meeting the purpose of the CWA. If a discharge can be demonstrated as not exceeding water quality standards consistent with appropriate evaluation criteria, then no AIM should be necessary. A statement like this should exist at all levels of the AIM program and in every state stormwater program.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Notwithstanding, AAAE believes that exceptions should be more widely available throughout the AIM process to ensure that airports have the necessary flexibility to comply with their obligations. With that in mind, AAAE offers several recommendations to improve the value of EPA's proposed AIM exceptions.

...

- Second, the water quality exception, which is proposed to only be available for AIM Tier 3, should be made available to any AIM tier level as an exception to implementing the proposed response requirements. (*See* Request for Comment 23.) Similar to the aberrant event exception, AAAE does not see any reason to preclude airports from having the flexibility to demonstrate that water quality is not materially affected by the discharge.
- Third, the proposed 30-day deadline for demonstrating that the discharge does not result in any exceedance of water quality standards is not realistic or achievable. (*See* Proposed Part 5.2.3.3.b.) Water quality studies that characterize deicing impacts must be conducted during the season when deicing activities occur and may be required over more than one season due to variability in

weather. AAAE believes airports should be required to initiate the study within a specified timeframe rather than complying with the proposed 30-day deadline.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

Type of Exception

Response Requirement Exception

Exception Description

An airport does not have to implement response requirements if the airport demonstrates to EPA, within 30 days, that the discharge does not result in any exceedance of water quality standards and EPA approves such demonstration. (Proposed Part 5.2.3.3.b.)

AAAE's Response and Recommendations
Two recommendations:

- First, this exception should be made available for AIM Tiers 1 and 2 as well.
- Second, airports should only be required to initiate steps to conduct the water quality demonstration within a specified timeline; the proposed 30-day deadline is unrealistic and unachievable.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI supports making Part 5.2.3.3.b of the Proposed 2020 MSGP generally available to permittees at any time or in any AIM tier. As proposed, Part 5.2.3.3.b would allow permittees to be exempted or excused from AIM Tier 3 corrective actions if they can show that their "discharge does not result in any exceedance of water quality standards".

The proposed minimum informational elements of Part 5.2.3.3.b for demonstrating no WQS exceedance in the receiving water would support necessary flow- and mass-balance calculations. Some clarity is needed concerning dilution factors (mentioned) and mixing zones (not mentioned), which NASEM covered in its Report (at 60).

Obtaining the minimum information in Part 5.2.3.3.b.1-7 should not be so onerous or time-consuming (i.e., longer than 30 days to obtain) so as to make qualifying for the exception practically impossible. This provision does not allow the permittee to request additional time to obtain the information, even though EPA may take up to an additional 90 days beyond the initial 90-day period to respond to a permittee's exception demonstration.

Also, during the time that the permittee is trying to obtain the Part 5.2.3.3.b exception, the permittee's compliance status is unclear, especially while waiting for EPA's response. EPA should address this in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 2 Monitoring and Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

We agree. Needs to be available for all Tier levels and triggering events for the exception of an Aberrant or One-Time event.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

Natural Background:  NAIMA supports EPA's proposed method for determining the role natural background pollutants play in exceedance of benchmarks.  The 2020 method – subtracting natural background concentration from the total benchmark exceedance – more accurately  accounts for the natural background concentration and allows permittees to discharge up to benchmark limits regardless if background concentrations eliminate a disproportionate burden on permittees that discharge into receiving water with high background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

EPA requests comment on whether it is appropriate to make the above exception for a "discharges not resulting in any exceedance of water quality standards" in proposed Part 5.2.3.3.b available to other AIM Tier levels and/or AIM triggering events. **[This is unnecessary.]**

**EPA** requests comment on whether it is appropriate to make the above exception for a "discharges not resulting in any exceedance of water quality standards" in proposed Part 5.2.3.3.b available to other AIM Tier levels and/or AIM triggering events. **[This is unnecessary.]**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Philip G. Rahrig
**Commenter Affiliation:** American Galvanizers Association (AGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0207-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

An additional option would be to extend the Additional Implementation Measures (AIM) Tier 3 exception regarding water quality standards to AIM Tiers 1 and 2. Either approach would provide flexibility to facility operators while also allowing use of USEPA's tools to more accurately characterize potential environmental risks from industrial stormwater. Application of better tools will ultimately help with proper allocation of resources (on the part of industry, states, and the Federal Government) to address real rather than perceived environmental problems.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 68
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should not adopt its proposed exception for "discharges not resulting in any exceedances of water quality standards" available to other AIM Tier levels or triggering events. Response to Request for Comment 23. Permittees should be required to undertake all efforts required pursuant to Tier 1 and 2 in order to resolve exceedances of benchmark standards and ensure that control measures are operating as required by the permit.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1

**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 23 questions whether an exception for "discharges not resulting in any exceedance of water quality standards" in Part 5.2.3.3.b should also be applied to AIM Tiers 1 and 2 as well as Tier 3. **If discharges do not cause exceedance of water quality standards, then requiring the permittee to implement additional controls is not warranted, whether those controls are simple and inexpensive, or complex and costly.**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  CJ Environmental
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

Yes, the exception proposed in Part 5.2.3.3b should be made available to other AIM Tier levels and/or AIM triggering events.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

It would seem appropriate to make the exception noted in EPA Request for Comment 22 available for the other Tier levels, and not only Tier 3.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 49
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 23**

The FWQC and FSWA reiterate the general AIM comments set forth elsewhere in these comments. AIM-Tier 3 raises additional specific concerns, and is inconsistent with the 2016 Settlement. EPA's proposal would require sites to install treatment technologies "more rigorous than the pollution prevention-type measures employed under AIM Tier 2 in Part 5.2.2." Part 5.2.3.2(a). However, the SCMs required in AIM-Tier 2 already reflect all of the treatment technologies EPA has identified for any given sector. Hence, what EPA is forcing dischargers to do is to essentially repeat that process in Tier 3 AND deny the regulated party the ability to consider cost feasibility.[42] Regulated parties already would have identified which SCMs are infeasible in Tier 2, which they would be forced to implement in Tier 3, contrary to all basic BAT and NPDES principles.

If the AIM process is retained, it is critical that EPA retain, from the proposal, its recognition that appropriate and reasonable "off-ramps" from AIM are needed. These are provisions that the FWQC and FSWA strongly supported in the 2016 Settlement, and we would strongly oppose any efforts to narrow or eliminate them. The FWQC and FSWA want to ensure that the WQS exception is available at the highest Tier levels, but we also believe that the exception should be available at all AIM Tier levels. Corrective actions must have a causal connection directly to the industrial stormwater pollutant discharges through a point source to a water of the United States. Accordingly, where a benchmark exceedance does not result in any impairments to water quality, corrective action would not be appropriate under the MSGP. Again, this discussion clearly raises and points to the need for EPA to develop wet weather water quality standards in lieu of benchmarks and AIM.

EPA should clarify that the mandates contained in the MSGP are intended to address only those circumstances that would lead to a discharge of pollutants through a point source to a water of the United States in violation of technology-based or water quality based effluent limitations. Accordingly, an exception for "discharges not resulting in any exceedances of water quality standards" should be available at all AIM Tier levels and for all AIM triggering events.

[42]While it is not clear from the text of the 2020 Proposed MSGP, the Fact Sheet states: "EPA proposes that an exception for feasibility at AIM Tier 3 is inappropriate because benchmark exceedances at AIM Tier 3 are substantially egregious to warrant the permanent control measures proposed to be implemented, that feasibility considerations are already accounted for in the previous AIM Tiers, and that industrial stormwater discharges are explicitly required to meet all provisions of CWA §301, including applicable water quality standards (CWA §402(p)(3)(A))." It is worth noting here that despite EPA's claims, Tier 3 events do not necessarily represent "egregious" exceedances. EPA has long recognized that stormwater and benchmark monitoring are subject to high variability and consistency challenges.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures. Regarding the comment on the stormwater control measures, which were included in proposed Appendix Q, see Comment Response Essay 4 Proposals Not Finalized.

EPA disagrees with the comment that the AIM Level 3 triggering events do not represent "egregious" exceedances. Operators triggering AIM Level 3 have repeatedly exceeded the applicable benchmark thresholds on an annual average basis. Additional and more robust control measures are necessary at this level where earlier attempts to lower pollutants via pollution prevention/good housekeeping and other procedural changes fail to do so in AIM Levels 1 and 2.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding the Tier 3 exception if you demonstrate to EPA within 30 days that your discharge does not result in any exceedance of water quality standards: Part 5.2.3.3 provides EPA up to 180 days to review a facility's demonstration that it's discharge does not result in any exceedance of water quality standards, but only provides 30 days for operators to perform the evaluation, sampling, and submittal to EPA. One element of this demonstration requires the operator to perform "full-storm composite sampling" in the receiving water immediately upstream and downstream of the discharge point, and another element requires the operator to perform "full-storm" flow-weighted composite sampling of the discharge. These requirements will take time to coordinate and will require an appropriate storm event to occur in order to perform sampling (note that storm criteria for the "full-storm" sampling is not defined in the proposed MSGP for this exception). Operators should be provided at least 90 days to perform this review/demonstration, the exception should be made applicable to all AIM Tiers, and EPA should provide more information about storm criteria and other requirements for "full-storm" sampling."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

Although the proposed Tier 3 requirements would allow a facility to demonstrate that a discharge does not result in any exceedance of water quality standards by submitting a detailed evaluation within 30 days. The proposed evaluation would include an assessment of local receiving waters, which may include collection of samples, and preparation of a report. In order to ensure a proper assessment and allow time for collection of samples and report preparation to adequately demonstrate water quality standards are not being exceeded, initial notification could be made within 30 days, however, a minimum of nine months should be allowed to complete the report with the AIM Tier 3 response deadline based on EPA approval of the study. During this evaluation, additional exceedances should not trigger additional AIM response.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed MSGP identifies two other exemptions applicable to certain categories of benchmark excursions, a proposed Tier 2 exception for a single sampling event that is over eight times the benchmark threshold (5.2.2.1 and request for comment 22) and a proposed Tier 3 exception for "discharges not resulting in any exceedance of water quality standards" (5.2.3.3 and request for comment 23). AEMA supports extending both of the exceptions (presuming any benchmark monitoring is required) to any of the AIM tier response measure requirements or additional benchmark monitoring.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

It is possible that any of the identified excursions associated with the proposed AIM tiers would not result in an exceedance of water quality standards. Proposed MSGP 5.2.3.3.b. While the water quality exceedance exception is proposed to be applicable to AIM tier 3, the MSGP should clarify if permittees can demonstrate no exceedances of water quality standards in the receiving water, that circumstance is not subject to any of the AIM tier response measure requirements. In addition, proposed 5.2.3.3.b.1-7 establish detailed minimum elements for a demonstration of no exceedance. AEMA respectfully suggests that such determinations should be dependent on site-specific factors (such as the baseline levels in the receiving water, the discharge flow versus the receiving water flow, the standard value versus the threshold, etc.) and not all of the elements should be required for all demonstrations. Therefore, AEMA recommends making the elements suggested components not minimum requirements – recognizing the burden is placed on the permittee to make an appropriate demonstration. Further, at a minimum, AEMA suggests that this exception could be incorporated in tier 2 as a factor to consider in what, if any, stormwater control measures ("SCMs") need to be implemented. See request for comment 23. Finally, given the complexities of making water quality standard determinations especially if simultaneous storm event sampling of discharges and receiving waters is required, AEMA recommends allowing at least 60 days for permittees to submit their demonstrations to EPA.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

It is appropriate to make the exceptions available to other AIM Tier levels/triggering events because the discharges do not result in any exceedance to water quality standards.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

### 5.2.4. AIM Exemptions

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

To the extent EPA proceeds with the AIM program, it should provide for broad availability of the proposed exceptions for "aberrant" events, pollutant run-on from neighboring properties, and natural background levels within the AIM protocol.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, we propose a fourth AIM exception, which is a non-industrial pollutant source demonstration, where the benchmark chemical(s), such as Zinc, is not from the industrial activities of the site (e.g., not in raw materials), but from ubiquitous items (e.g., building envelope, fencing) found in every industrial, non-industrial and residential sites.

...

Also, in order to not overwhelm all USEPA offices with applications for approvals of AIM exceptions, sites that are able to make AIM exception claims should be required to document these exceptions in their SWPPP, subject to disclosures already provided for in the MSGP, but not needing USEPA approval.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, the run-on exception in Section 5.2.4.2 should be revised to remove the conditions related to notifying the upstream party and USEPA. This poses an onerous burden on the innocent party to play "police". While in some cases the regulated parties will in fact notify the neighboring contributor as a matter of its normal business relationships, in other cases such an approach could result in business interruptions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 34
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 24:**

**AIM Exception for Natural Background (Part 5.2.4)**

Assuming that benchmark monitoring is retained for the mining sector, notwithstanding the above comments demonstrating why benchmark monitoring is inappropriate for the mining sector, EPA should clarify the natural background exception to benchmark exceedances. As mentioned above, mining operations are often located in mineralized areas where elevated levels of metals are expected due to natural background concentrations. Benchmark levels for naturally

occurring metals may be set below levels that would be seen in naturally occurring runoff from those mineralized areas, even those that have not been mined.

We are concerned that a subtle language change in the 2020 MSGP will cause confusion. In the 2015 MSGP, facilities with benchmark exceedances due solely to the presence of a pollutant in the natural background were required to "document and maintain with your SWPPP…your supporting rationale for concluding that benchmark exceedances are in fact attributable solely to natural background pollutant levels." The 2015 MSGP also required that facilities "include in your supporting rationale any data previously collected by you or others (including literature studies) that describe the levels of natural background pollutants in your stormwater discharge."[45]

The proposed MSGP has changed this language subtly but in a way that could put our members at risk. In the proposed 2020 MSGP, facilities are now subject to a new requirement to "submit your analysis and documentation to the EPA Regional Office." The previous MSGP did not contain this additional provision to submit analysis to the EPA Regional Office. Our members have expressed concerns that this provision does not provide clarity on how to obtain approval from EPA. Will EPA append this demonstration to each quarter's benchmark discharge monitoring reports (DMRs) or submit it with the annual review? Is there a timeframe for EPA's review to ensure that our members would not miss the opportunity to address benchmark exceedances through AIM and thus be out of compliance. The AIM Tier 1 and Tier 2 deadlines range from 14-45 days and the Tier 3 deadline ranges from 30-90 days. Without EPA's timely review of an exemption request, our members would likely be forced to complete the AIM process to ensure compliance even if the exemption was ultimately approved. If EPA needs to approve these exemptions rapidly, it should consider adding a check box or no data indicator (NODI) code to DMRs.

[45] 2015 MSGP at 42.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Jane Dewell
**Commenter Affiliation:**  Port of Seattle, WA
**Document Control Number:**  EPA-HQ-OW-2019-0372-0210-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

**5.2.4 AIM Exceptions.** At any point or tier level of AIM, the below exceptions from AIM requirements and additional benchmark monitoring below may apply. You must still review your

stormwater control measures, SWPPP, and other on-site activities to determine if actions or modifications are necessary or appropriate.

**5.2.4.1 Natural Background Pollutant Levels**: You are not required to perform AIM or additional benchmark monitoring for any parameters for which you can demonstrate that the benchmark exceedance is solely attributable to the presence of that pollutant in natural background sources, provided that all the following conditions are met and you submit your analysis and documentation to the EPA Regional Office:

**a.** The four-quarter average concentration of your benchmark monitoring results minus the concentration of that pollutant in the natural background is less than or equal to the benchmark threshold; and

**b.** You document and maintain with your SWPPP, as required in Part 6.5, your supporting rationale for concluding that benchmark exceedances are in fact attributable solely to natural background pollutant levels. You must include in your supporting rationale any data previously collected by you or others (including literature studies) that describe the levels of natural background pollutants in your stormwater discharge. Natural background pollutants are those substances that are naturally occurring in soils or ground water. Natural background pollutants do not include legacy pollutants from earlier activity on your site, or pollutants in run-on from neighboring sources which are not naturally occurring, such as other industrial facilities or roadways.

**5.2.4.2 Run-On:** You are not required to perform AIM or additional benchmark monitoring for any parameters for which you can demonstrate and obtain EPA agreement that run-on from a neighboring source (i.e., ~~e.g.,~~ a source external to your facility) is the cause of the exceedance, provided that all the following conditions are met and you submit your analysis and documentation to the EPA Regional Office for concurrence: a. After reviewing and revising your SWPPP, as appropriate, you should notify the other facility or entity contributing run-on to your discharges and request that they abate their pollutant contribution. b. If the other facility or entity fails to take action to address their discharges or sources of pollutants, you should contact your EPA Regional Office.

**5.2.4.3 Aerial Deposition:** You are not required to perform AIM or additional benchmark monitoring for any parameters for which you can demonstrate and obtain EPA agreement that aerial deposition from a source in proximity to your facility (i.e., a source external to your facility) is the cause of the exceedance, provided that all the following conditions are met and you submit your analysis and documentation to the EPA Regional Office for concurrence:

a. After reviewing and revising your SWPPP, as appropriate, you should notify the other facility or entity contributing pollutants via aerial deposition to your discharges and request that they abate their pollutant contribution.

b. If the other facility or entity fails to take action to address their aerial deposition or sources of pollutants, you should contact your EPA Regional Office.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 61
**Excerpt Status:** Final

**Comment Excerpt:**

*ii. Proposed Exception for "Run-On" Contributions to Exceedances*

EPA proposes to waive "AIM or additional benchmark monitoring" where "run-on from a neighboring source . . . is the cause of the exceedance."[151] For all of the reasons set forth in the preceding section, we object to this waiver.

It is not clear what EPA means by "the cause," but we suspect that EPA intends for this section to mirror section 5.2.4.1, such that EPA would apply the same flawed logic with respect to exceedances "solely attributable" to natural background. Again, for all of the reasons set forth above, EPA cannot waive monitoring just because run-on contributes to a benchmark exceedance. If a permittee is causing or contributing to a benchmark exceedance, then that permittee must continue the AIM process and additional benchmark monitoring.

The only theoretical scenario in which a permittee might legitimately be exempt is where the pollutant load is entirely attributable to run-on (i.e., where the contribution from onsite industrial stormwater is zero). However, we question whether there is any value in a carve-out for this scenario. If a permittee is able to separately monitor run-on, then the permittee should be able to avoid commingling, and no net calculations should be necessary.

[151] *Id.* at 50.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 42
**Excerpt Status:** Final

**Comment Excerpt:**

We also support retention of the current protocol, that such calculations be maintained in the SWPPP, and not forwarded for EPA approval. EPA offices should not be burdened with additional paperwork.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Possible Clarification of Exceptions to AIM-Type Responses. The MSGP should further clarify four exemptions to all AIM requirements. The proposed MSGP includes the natural background benchmark exception from the 2015 permit and proposes that such a showing constitutes an exception to AIM obligations if the excursions are "solely attributable" to natural background (and run-on sources of the constituents if approved by EPA). Proposed MSGP 5.2.4.1. Natural background conditions during storm events at many mine sites are often characterized by elevated constituent levels such as TSS that far exceed existing benchmark thresholds. Dischargers should have the ability to demonstrate the existence of those natural background conditions without having to undertake a separate, expansive monitoring program. To that end, the MSGP should clarify that if any benchmark monitoring is required, the support for asserting elevated natural background conditions can be established on a case-by-case basis without site-specific monitoring data (such as through literature information based on available geology, soil characteristics and, photographic evidence of area runoff conditions). The MSGP should further clarify that if dischargers are able to demonstrate that the nature of the benchmark exceedances constitutes non-bioavailable forms of the measured constituents, those excursions would also constitute exceptions to any of the AIM tier response measure requirements or additional benchmark monitoring. Further, our members' experience is that natural background levels are highly dependent on site-specific factors such as runoff flow and natural soil characteristics.

Therefore, we recommend that EPA not universally adopt national or regional values for background levels. Permittees should have the option to use these levels where justified but not be required to do so. Finally, we strongly support EPA's revision to the method of incorporating background into the exception requirements.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

9. Run on
If approval is required from EPA, WEF is not clear this is going to happen in the 14 day deadline (or even 45 day) for Tier 1 or 2. WEF recommends that site should be able to subtract Run-on source from discharge to measure against benchmarks similar to natural background.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.4.RFC24. Additional Implementation Measures (AIM) - RFC 24 Changing the natural background pollutant exception threshold

**Commenter Name:**  Daniel Mumm
**Commenter Affiliation:**  Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: Our facility will be above the threshold for both Total Recoverable Aluminum and Total Suspended Solids due to natural conditions. Northwest New Mexico is a high desert, with soils that are high in aluminum and iron. Native ephemeral streams see TSS values over 100,000 mg/L regularly during large storm events. The average value for samples collected upstream of the facility is 236,149 mg/L for TSS and 743,000 ug/L for Total Recoverable Aluminum, both well above the monitoring threshold for Sector H (100 mg/L for TSS and 750 ug/L for Total Recoverable Aluminum). With levels this high in the natural conditions, utilizing the subtraction method seems inappropriate in determining whether an exceedance is facility caused or natural in our case. Additionally, our facility is in a climate where storms resulting in discharges mostly occur in during a three-month period in the late summer and fall. If the first condition is to be kept, language should be added to clarify how facilities without consistent precipitation year-round should calculate the average concentration.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

Regarding clarification for calculating the average concentration for operators located in areas without consistent precipitation year-round, EPA notes that Part 4.1.6 of the 2021 MSGP provides for the implementation of alternative monitoring schedules for facilities located in arid and semi-arid climates. Operators that choose to distribute their required monitoring events during seasons when precipitation occurs must still collect the required number of samples. The annual average must be calculated based on all samples collected during the last four quarters.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

BES supports a natural background provision; however, BES does not believe the proposed method is appropriate. Subtracting natural background concentrations from the total benchmark exceedance to determine if natural background levels are solely responsible for the exceedance is not appropriate. Subtraction does not account for the proportion of flow due to natural background sources in the discharge and assumes that the natural background flows are equal to the stormwater discharge flows. BES recommends that EPA amend their guidance on substantiating a natural background condition as described in the Proposed 2020 MSGP Factsheet, page 85. BES has not found a non-human impacted reference site within any of the City's watersheds for concurrent monitoring purposes. BES recommends that the EPA reconsider the method for substantiating a natural background condition to approve a method that is achievable in all areas of the United States.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

The City requests that the EPA provide more guidance regarding determination of natural background levels. Publishing case studies and/or a stepwise approach to making this determination would be beneficial for permittees seeking to use the "Natural Background Levels" exception.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Joshua Wheatley
**Commenter Affiliation:**  James Environmental Management (JEM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

The current language here is helpful to the permitted facility. The previous MSGP required that, when evaluating discharge for background concentration, the facility had to prove that it did not contribute to a discharged concentration of pollutant at all. This language allows the facility to prove the contribution to the pollutant concentration is below the benchmark level.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  The Passenger Vessel Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0153-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

- PVA supports EPA's suggested "natural background exception" giving consideration to facilities that use municipal water supplies that already exceed the MSGP copper benchmark.

...

PVA supports EPA's 2020 MSGP suggested changes to the "natural background exception." This EPA proposal creates a method of subtracting natural background concentrations from the total benchmark exceedance to determine if natural levels in the water are solely responsible for

the excess. This is an improvement over the 2015 MSGP, which required no net facility contributions.

Correcting this would assist facilities that otherwise would be in compliance, except for the natural background concentration levels that exceed allowable benchmarks. This would give consideration for those facilities that use municipal water supplies, which already exceed the MSGP copper benchmark.

Also, in response to EPA's specific questions for comment on this topic, PVA believes that it is appropriate to make an exception for a "discharge not resulting in any exceedance of water quality standards" in proposed Part 5.2.3.3.b of the 2020 MSGP. This should apply to all Additional Implementation Measures (AIM), AIM Tier levels, and AIM triggering events.

**Comment Response:**

For the comment related the natural background exception, see Comment Response Essay 3 Additional Implementation Measures.

Regarding the comment on the exception for discharges not resulting in any exceedance of water quality standards, EPA has revised the 2021 MSGP to allow the exception for all AIM triggering events and levels (see Part 5.2.6.5).

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Comment on changing the threshold for the natural background exception throughout the permit from the 2015 MSGP, which required no net facility contributions, to the proposed 2020 MSGP method of subtracting natural background concentrations from the total benchmark exceedance to determine if natural background levels are solely responsible for the exceedance.

Discussion/Recommendations

Support allowing natural background loads to be subtracted from facility loads. This is consistent with other NPDES programs. In those cases, site specific measurements are utilized to document the natural background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 34
**Excerpt Status:** Final

**Comment Excerpt:**

We concur that subtracting the natural background concentration of a parameter prior to comparison to benchmark levels makes sense for permitees to better understand and address pollutant loading from their operations. The 2015 provision requiring no net contribution from the facility was unrealistic and not useable in practice.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

Section 5.2.4.1 of the draft 2020 MSGP appears to require a permitee to submit natural background monitoring data and analysis to the EPA Regional Office in order to claim the natural background exception. The 2015 MSGP does not have this requirement for natural background sources, requiring the documentation within the SWPPP of monitoring data and rationale for concluding that benchmark exceedances are in fact attributable solely to natural background pollutant levels. This change appears to conflict with the Settlement Agreement reached in Waterkeeper Alliance et al. v. EPA that indicates "The operator does not have to implement any modifications if it determines and documents in its SWPPP that the exceedance is solely attributable to natural background sources or, with EPA agreement, run-on sources, consistent with the requirements in the 2015 MSGP pertaining to natural background sources." The text in the Settlement Agreement appears to only require the submission of data and rationale to the EPA regarding run-on sources, not natural background sources.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Rob Brundrett
**Commenter Affiliation:**  The Ohio Manufacturers' Association (OMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:**  18
**Excerpt Status:** Final

**Comment Excerpt:**

## 14. Request for Comment 24 & 25: Natural Background AIM Exception

We also agree that the exception for natural and run-on background contributions must allow for a demonstration that but for the background contribution, the facility's discharge would meet benchmarks. In practice, many jurisdictions already acknowledge this important component of a background exception and it would simply reflect the actual facility discharge.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

On general principle, ISRI supports Part 5.2.4.1, Natural Background Pollutant Levels, in the Proposed 2020 MSGP and its application to all AIM tiers. This part allows a permittee to be exempt or excused from "perform[ing] AIM or additional benchmark monitoring for any parameters for which [the permittee] can demonstrate that the benchmark exceedance is solely attributable to the presence of that pollutant in natural background sources". ISRI understands this proposed exception to apply when a parameter result (e.g., an annual average) above the benchmark would be at or below that benchmark if the contribution of that parameter from natural background sources were subtracted from the result (e.g., a Pb result of 100 µg/L with 25 µg/L from natural background sources, resulting in 75 µg/L against an applicable benchmark of 82 µg/L). This provision is fair and would represent a vast improvement over the exception in the

2015 MSGP that requires natural background sources to account for the entire result above the benchmark (i.e., no net facility contribution).

While this exception might be intended to cover the impact of pre-development sources (e.g., native soils) on a permittee's results, it is also known that medium- and long-range transport of air, in addition to transport of local air, can contribute to air quality at a facility. To the extent that deposition of constituents from transport of off-site air affects a permittee's results, this situation is not obviously covered by the exceptions for either natural background or run-on. This situation is closer to "natural background" in the sense that the facility has no, or may have no, practical ability to protect itself again such air impacts. EPA should clarify the availability of any exceptions for this situation, and if necessary provide another exception for such situations in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

Subtraction of Concentrations are legitimate method. Unknown pollutant run-on or up-stream pollutant sources from neighboring sources should definitively be considered as well. Again, only for benchmarks relating to Sectors, or SIC's within a Sector, that are considered high risk and not including low risk Sectors, or SIC's within a Sector, that qualify for "Inspections."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anne Germain
**Commenter Affiliation:** National Waste & Recycling Association (NWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0194-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

NWRA supports EPA's proposal to propose a new requirement in the 2020 MSGP that allows facilities to demonstrate that a benchmark exceedance is solely attributable to the presence of that pollutant in natural background sources. This approach would provide a more realistic picture of a facility's benchmark data and performance by ensuring natural background contributions are considered and could minimize the need for facilities to conduct unnecessary AIM or additional benchmark monitoring. Moreover, rather than requiring facilities to submit their analysis and documentation on natural background sources to the agency's Regional Offices, EPA should consider allowing facilities to maintain this documentation with the facility's SWPPP to be made available upon request.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

**The Revised Methodology for Determining Background Levels has Issues**
NSSGA supports EPA's recommended revision to simplify the natural background calculation by allowing a subtraction of the natural background pollutant concentration in the calculation of benchmark exceedances...

...NSSGA does not support the revision in reporting but instead the reporting should remain like that in the 2015 MSGP. The parties signing the settlement agreement demonstrated an understanding that permittees should not fall into a difficult and costly quagmire of Additional Implementation Measures due to background levels. According to the August 16, 2016 settlement agreement, EPA was to propose that the next MSGP include in the benchmark monitoring section requirements language addressing "additional implementation measures" that was "substantially similar" to the following: "The operator does not have to implement any modifications if **it** determines and documents in its SWPPP that the exceedance is solely attributable to natural background sources or, with EPA agreement, run-on sources, consistent with the requirements in the 2015 MSGP pertaining to natural background and run-on sources." (settlement agreement, pp 9- 11)

However, even though the consent decree specifically references the 2015 requirements for natural background and document it in the SWPPP, EPA's proposal essentially modifies the consent decree language by adding a reporting requirement related to these determinations. In the

2015 permit, if a facility determined that benchmark exceedances were due to background, they simply had to record their decision/analysis/research with the SWPPP. Now EPA, with no rationale, is requiring facilities to "submit your analysis and documentation to the EPA Regional Office." (Proposed Permit, p. 49, Section 5.2.4.1). This part of the proposed change should be removed.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0174-A1, Comment Excerpt Number 35.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 24:**

**AIM Exception for Natural Background (Part 5.2.4)**

NMA generally supports EPA's proposed change on the threshold for the natural background exemption. The natural background exception in the 2015 MSGP was so strict that it was essentially meaningless. The proposed 2020 MSGP method, which subtracts natural background concentrations from the total benchmark exceedance to determine if natural background levels are solely responsible for the exceedance, is more practical and provides our members with additional flexibility.

However, EPA should consider various on-the-ground challenges for implementing this approach. In order to determine background concentrations, the reference reach must be sampled during the same storm event as the outfall so that direct comparisons can be made. This presents several challenges, such as identifying an appropriate reference reach, accounting for increased sample collection and lab costs, considering the geographic variability of isolated storm events, other physical constraints associated with sample collection, and safety concerns.

In addition, in its proposal EPA suggests the use of the annual mean for determining background concentrations during storm events. The arithmetic mean can be significantly affected by outliers, which is an inherent aspect of stormwater monitoring. For parameters that show significant variability, other measures such as the median, geometric mean, interquartile range, or confidence intervals around the mean may be more appropriate for determining a significant increase above background. EPA's attempt to simplify stormwater systems with an annual mean is better than comparison of individual samples, but continues to ignore the irregularity of

stormwater events. EPA should allow the use of other statistical measures where it is determined the use of the annual mean is not appropriate.

Furthermore, in many cases the magnitude of natural background concentrations is so far above the benchmark levels that the proposed calculation does not account for the variability inherent in sampling and analytic methods. For example, in the arid west background concentrations of total aluminum and TSS are often up to three orders of magnitude higher than the EPA's current benchmarks in the MSGP. Under EPA's proposal, with a background TSS concentration of 100,000 mg/L and a MSGP stormwater sample of 100,101 mg/L, the stormwater sample would not be eligible for the exception. At levels of TSS and total aluminum that are commonly seen in the natural environment during storm events, these two results are essentially the same. The difference in concentration easily falls within the range expected due to differences in sample timing, storm event magnitude and duration, sampling variability, and accuracy of the analytic method. For areas where background exceeds the benchmark by an order of magnitude, a percentile or percent difference approach would more accurately account for the natural range of these parameters. For example, a percent difference of greater than 25% could be used as the threshold in areas with background TSS greater than 1,000 mg/L. Under this approach, a natural background of 1,000 mg/L would have an exceedance threshold or 1,250 mg/L. If natural background is 100,000 mg/L, the exceedance threshold would be 125,000 mg/L. A percentile approach makes more sense in areas where the background levels exceed the benchmark by an order of magnitude. In areas where background is within the same order of magnitude of the benchmark, EPA's proposal may provide a workable solution.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Marie Gargas
**Commenter Affiliation:**  Plastics Industry Association (PLASTICS)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

**PLASTICS supports exceptions to AIM resulting from a permit violation if the facility can document that it was caused by run-on or natural background levels.** PLASTICS shares concerns that setting an evidentiary standard in the MSGP is not advisable, as such demonstrations are expected to be highly specific. However, if such evidence exists (e.g., upstream monitoring shows the presence of contaminants prior to combining with the facility's discharge), then this should provide adequate support to relieve potential violation. It is recognized that such monitoring adds cost and should be done concurrent with required facility monitoring. Therefore, such action may be limited to only visually apparent parameters such as TSS. While the NSQD may be useful in specific instances, its data is both limited and flawed; it

is unclear whether comparisons with site-specific data would be useful to demonstrate regional inconsistencies in background level data. We also do not expect it to be helpful in tracing run-on of parameters that are not visually apparent; such parameters are more likely to depend on physical attributes of the property (e.g., groundwater or surface water gradients) and upstream activities and processes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

We support EPA's recommended revision to simplify the natural background calculation by allowing a simple subtraction of the natural background pollutant concentration in the calculation of benchmark exceedances. We also support retention of the current protocol, that such calculations be maintained in the SWPPP and not forwarded for EPA approval. EPA offices should not be burdened with additional paperwork.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** EnviroCert International
**Document Control Number:** EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

**[If the natural background concentrations are set, changing the threshold for the natural background exception throughout the permit from the 2015 MSGP would be unnecessary.]**

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

If the combination of natural background and facility contributions continues to result in a benchmark or other monitoring exceedance, then an impacts analysis on the receiving water to show effect may be warranted.

Determination of natural background would be complex. Runoff pollutant concentrations would depend on several factors (e.g., rainfall intensity that varies during the storm event, storm duration, drought, etc.). Any subtracting of natural background concentrations from the total benchmark exceedance would need to be based on an upland and benchmark monitoring sample collection at relatively the same time.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 57
**Excerpt Status:** Final

**Comment Excerpt:**

*i. Proposed Exception for "Natural Background" Pollutant Levels*

EPA proposes to waive "AIM or additional benchmark monitoring" for pollutants whose benchmark exceedances are "solely attributable to the presence of [a] pollutant in natural background sources,"[139] and solicits comment on whether the proposed approach should be applied "throughout the permit."[140]

EPA's proposed section 5.2.4.1 is arbitrary and capricious, mathematically flawed, and contrary to law, and must not be finalized in any form, in any part of the MSGP.

[139] Draft Permit at 49, Part 5.2.4.1.

[140] *Id.*, Request for Comment 24.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 58
**Excerpt Status:** Draft

**Comment Excerpt:**

*1. EPA's proposed methodology is mathematically flawed*

EPA purports to be waiving monitoring for pollutants whose benchmark exceedances are "solely" attributable to background, yet the draft permit language would do something very different. The draft permit would actually waive monitoring unless the exceedances are solely attributable to the permittee:

*You are not required to perform AIM or additional monitoring . . . provided that the following conditions are met: (a) The four-quarter average concentration of your benchmark monitoring results minus the concentration of that pollutant in the natural background is less than or equal to the benchmark threshold.[141]*

This language is not at all limited to exceedances "solely" attributable to background. In fact, it would exempt a wide range of benchmark exceedances, including exceedances with a trivial natural background contribution. Consider the following hypothetical examples:

| | Pollutant | Benchmark | Average benchmark monitoring result | Natural background concentration | Net contribution from permittee |
|---|---|---|---|---|---|
| Ex. 1 | TSS | 100 mg/L | 120 mg/L | 10 mg/L | 110 mg/L |
| Ex. 2 | TSS | 100 mg/L | 120 mg/L | 60 mg/L | 60 mg/L |
| Ex. 3 | TSS | 100 mg/L | 105 mg/L | 6 mg/L | 99 mg/L |

- Example 1 illustrates EPA's proposal working as we presume the Agency intended. After subtracting the natural background concentration, the permittee's net contribution to the benchmark monitoring result is 110 mg/L. This exceeds the benchmark, and this permittee would not be eligible for the monitoring exemption.
- In Example 2, the benchmark monitoring result exceeds the benchmark by the same amount, but in this case half of the TSS load is coming from natural sources. Here, the benchmark exceedance

is clearly *not* "solely" attributable to natural background – again, only half of the TSS is coming from natural sources. Yet the language would exempt the permittee from further monitoring.

- Example 3 present a more extreme, though by no means unrealistic, scenario. In this case, virtually all of the TSS load is coming from the permittee, and only a small fraction is coming from natural sources, yet the permittee would still be exempt from further monitoring because its net contribution is less than the benchmark.

EPA's proposal completely inverts its stated intent. It does not limit the exemption to situations where exceedances are solely attributable to natural sources. Instead, it asks whether an exceedance is solely attributable to the permittee. If not, the exceedance is ignored.

The discussion in the fact sheet suffers from basic mathematical and logical mistakes. In EPA's example,[142] the natural contribution is 80 mg/L, and the industrial contribution is 40 mg/L, for a total concentration of 120 mg/L. In this case, the exceedance would not occur without the natural contribution, so EPA concludes that the natural contribution is "solely" responsible. The problem with EPA's logic is that it applies equally to the permittee – the exceedance would not occur without the permittee, so EPA would have to also conclude that the permittee is solely responsible. This is of course impossible. The reality is that neither source is solely responsible, but both sources are contributing to an exceedance.

Or consider this thought experiment: There are two sources of pollution. They combine to cause an exceedance, but neither one would cause an exceedance by itself (i.e., EPA's example, or example 2 above). One is natural and one is industrial, but we don't reveal which is which. We simply say 'both samples have 60 mg/L of TSS.' How would one decide which source is "solely" responsible? Again, the fact is that neither source would be solely responsible; both would be partially responsible.

Mathematically, the only time an exceedance can be "solely" attributable to natural background is when natural background is the only source. The net contribution from the permittee in such a case would be zero. In order for EPA's proposal to reflect its stated intent, the proposed condition in 5.2.4.1(a) would have to read '*[t]he four-quarter average concentration of your benchmark monitoring results minus the concentration of that pollutant in the natural background is less than or equal **to zero.***'

[141] *Id.*, Part 5.2.4.1.

[142] Fact Sheet at 84.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1

**Comment Excerpt Number:** 59
**Excerpt Status:** Final

**Comment Excerpt:**

*2. EPA's proposal is contrary to law*

The idea that polluters are only responsible for their pollution load when that load is <u>by itself</u> enough to cause water quality problems is directly contrary to the Clean Water Act.

The "national goal" of the Clean Water Act is that "the discharge of pollutants into the navigable waters be eliminated." Short of that zero-discharge goal, the Clean Water Act allows for water-quality based limits, but it is important to remember that maintaining water quality is only an "interim goal" on the path to zero discharge.[143] Polluters – including industrial stormwater permittees – are required by the Clean Water Act to minimize their pollution loads, regardless of water quality impacts. This is why the Act requires technology-based effluent limitations (TBELs), which include the narrative requirements in the MSGP.[144] TBELs "represent[] a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges."[145] TBELs represent the floor, or minimum level of effort that EPA must require, again regardless of water quality impacts. EPA is not permitted to waive TBELs just because a polluter is not the sole source of pollution.

Even within the context of water-quality based effluent limitations, the Clean Water Act clearly applies to every source of pollution that might be contributing to a water quality impairment, regardless of whether it is the sole source. This can be seen, for example, in the Act's provisions for Total Maximum Daily Loads (TMDLs), which start from the goal of restoring a certain level of water quality, and then work backward to estimate the extent to which each polluter in a given watershed contribute to the problem, and the level of reduction that each polluter must make. The TMDL framework does not require that any individual source be solely responsible, or that any individual source have a pollution load that would, by itself, be enough to cause water quality impairments. The operative question is simply whether the cumulative pollution load is too high:

[W]here the applicable water quality standard has not yet been attained, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section may be revised only if (i) <u>the cumulative effect</u> of all such revised effluent limitations based on such total maximum daily load or waste load allocation will assure the attainment of such water quality standard, or (ii) the designated use which is not being attained is removed in accordance with regulations established under this section.[146]

Indeed, the CWA's TMDL provisions illustrate exactly why EPA's current 'natural background' proposal is illegal. Consider Example 2 above, where a natural source and an industrial source each add equal amounts of pollution to a waterway. Assume that the receiving stream is impaired for the pollutant in question. If a TMDL were established, the regulatory agency would have to calculate the necessary pollution reductions and allocate the reductions among the various sources. In Example 2, there is nothing that can be done about the natural source; the industrial

source would be required to reduce its pollution load and would in fact be required to make <u>all</u> of the necessary reductions, even though it is not the sole cause of the impairment.

To sum up and simplify, the Clean Water Act requires pollution reductions from all polluters, and the Act holds polluters responsible whenever they cause <u>or contribute</u> to water quality problems. EPA cannot waive benchmark monitoring just because a permittee is not the sole cause of a benchmark exceedance.

Finally, we note that EPA's proposed change from the "no net facility contribution" language in the 2015 MSGP to the proposed 2020 MSGP method would have the effect of making the benchmark monitoring requirements less stringent. This constitutes impermissible backsliding, in violation of the CWA's anti-backsliding prohibition.[147]

[143] 33 USC §1252(a)(2).

[144] *See, e.g.*, NAS at 11 ("Under the MSGP, TBELs are provided either through a limited number of ELGsor through a suite of narrative requirements").

[145] *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 74 (1980).

[146] 33 U.S.C.A. § 1313 (emphasis added).

[147] 33 U.S.C. §1342(o).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

ARA supports this proposed exception for background pollutants impacting benchmarks.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

As described in the previous section, the benchmark levels established for TSS are not appropriate and so exceedances triggering increasingly severe response requirements are untenable. EPA attempts to provide an "off-ramp" to AIM requirements in Part 5.2.4; however, the two exception pathways are unwieldy. The first exception requires demonstration that exceedances result from run-on from a neighboring source and required EPA approval of the exception.

The second exception to a benchmark exceedance is to prove causation from an elevated background concentration. In order to prove elevated background, a reference site, in the same watershed, must be identified. This site must demonstrate no known mining, forestry, or other human activities upstream of the reference site. EPA goes on to say in the 2020 fact sheet[2], the background concentration of a pollutant should be determined by evaluating ambient monitoring data or using information from a peer-reviewed publication. The use of the word "ambient" is ambiguous in this context.

Pollutants of concern for the mining industry are almost wholly related to TSS. Stormwater has elevated concentrations of TSS due to the energy associated with rapidly moving water and the ability of this water to transport sediments. More water means more energy which translates to more sediment loading.

EPA envisions determining a numeric value for background pollutants and subtracting that value from stormwater outfall results.[3] If the resulting number is less than the benchmark, no violation has occurred. In order to determine meaningful background concentrations of a pollutant (especially TSS), the reference reach must be sampled during the same storm event as the outfall so direct comparisons can be made. This poses several challenges including identifying an appropriate reference reach (if such a reach exists given the "no human activity" requirement), an increase in expense (sample collection and lab costs), geographic variability of isolated storm events, and physical constraints associated with sample collection. Sampling outfalls during a storm event often poses safety concerns. There also may be timing considerations with catching appropriate flow in several outfalls that are not proximate to each other. Addition of a reference reach what will likely be some distance from the mining operations adds to these challenges.

These concerns are amplified as EPA removed the language from the 2015 MSGP (see Part 6.2.1.2) that allows permittees to respond to benchmark exceedances by documenting that no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice to meet the technology or water quality-based effluent limits in the permit.

NACoal appreciates EPA's attempt to provide a useable exception for background concentrations of a pollutant; however, the on-the-ground implementation will be challenging. Mining operations are required to collect baseline data from streams prior to initiating mining activities. NACoal suggests that if pollutant concentrations are within the range of concentrations identified in the baseline sampling, no additional monitoring of a reference reach should be required.

[2] Fact Sheet at 85.

[3] Fact Sheet at 84.

**Comment Response:**

Regarding comments related to the natural background exception, see Comment Response Essay 3 Additional Implementation Measures.

Regarding the concerns that EPA removed the language from the 2015 MSGP that allows permittees to respond to benchmark exceedances by documenting that no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice to meet the technology or water quality-based effluent limits in the permit, EPA finds that this exception to AIM is inappropriate in the 2021 MSGP for several reasons. Feasibility considerations are not relevant at AIM Level 1 because the operator can self-determine that no additional measures are warranted, as well as AIM Level 2 where the operator can select pollution prevention and good housekeeping measures that they deem appropriate. At AIM Level 3, repeated benchmark exceedances are sufficiently egregious to warrant the implementation of permanent control measures. Additionally, industrial stormwater discharges are explicitly required to meet all provisions of CWA §301, including applicable water quality standards (CWA §402(p)(3)(A)).

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Section 5.2.4.1 b defines these as "Natural background pollutants are those substances that are naturally occurring in **soils or ground water"** (emphasis added). An earlier section, Section 4.2.4.1.a says "Natural background pollutants include those that occur naturally as a result of **native soils, and vegetation, wildlife, or ground water**" (emphasis added). **These conflicting definitions should be reconciled – both definitions should include vegetation and wildlife.**

EPA requested comment (Request for Comment 24) on whether natural background concentrations be subtracted from the total benchmark exceedance to determine if the exceedance would occur without any industrial contribution. **MWRA supports this change to the 2015 MSGP.** It will require some effort to establish what natural background levels are in each case, but if there is a possibility that they would exceed the benchmark, efforts spent on stormwater control measures will likely never reduce the industrial stormwater concentrations below the benchmark.

**Comment Response:**

Regarding the comment related to the natural background exception, see Comment Response Essay 3 Additional Implementation Measures.

Regarding the definition of "natural background pollutants", EPA has removed the language that was in Part 4.2.4.1.a of the proposed 2020 MSGP. As stated in Part 5.2.6.1 of the 2021 MSGP, natural background pollutants are those substances that are naturally occurring in soils or ground water.

---

**Commenter Name:** CJ Environmental
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0227-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

If the concentrations are properly identified, subtracting natural background concentrations seem appropriate.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

CRH is not necessarily opposed to the new threshold for the natural background exception, however it does oppose the need to submit the analysis and documentation to the EPA Regional Office, as stated in section 5.2.4.1 of the proposed MSGP. This new reporting requirement is vague and not clearly established in the reporting requirements of the MSGP. Nor is any justification for the new requirement provided. The comparable language in the 2015 MSGP (Section 6.2.1.2) does not require the Regional office to be notified. In addition, the reporting requirement could become overly burdensome for those facilities subject to monitoring for many parameters. Any documentation related to investigation and conclusions regarding natural background levels and whether a facility is subject to additional AIM should be maintained at the facility and made available for inspectors, consistent with the 2015 MSGP. Notification, if required, should only consist of an option in the NeT-MSGP system to allow a facility to discontinue monitoring for those pollutants for which it has determined that the results are due to natural background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 24. Overall, Simplot is supportive of the increased flexibility in the proposed examination of natural background sources. Simplot requests that the permit specify how the analysis and documentation required in 5.2.4.1(a) should be provided to the EPA Regional Office (i.e. should it be part of the Annual Report?). Simplot disagrees that "pollutants in run-on from neighboring sources which are not naturally occurring" should be excluded from background; this essentially requires the receiving facility to treat run-on stormwater before discharge. In addition, Simplot requests that a clarifying statement be added to 5.2.4.1(b) as follows: "Current or legacy pollutants entering the same receiving water upstream are a part of the background concentration, even if they are not naturally occurring."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and

Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

This seems reasonable to make the proposed change given that it may help improve assessment of whether benchmark exceedances may be a result of natural background levels and not solely attributable to the permittee.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)
**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, the natural background exception for benchmark monitoring, as currently proposed, contains major shortcomings that will severely limit its effectiveness. First, the exception fails to properly account for benchmark threshold exceedances attributable to rainwater or other flashflowing water. The MSGP defines natural background pollutants as only those pollutants that are naturally occurring in *soils* or *groundwater*. Proposed Fact Sheet, Part 5.2.4, at 84 (emphasis added). To qualify for the exception, permittees must subtract the natural pollutant concentrations from a facility's sampling results. Id. Thus, some facilities would be precluded from relying on the exception, even though they do not contribute to the benchmark exceedance. One UWAG member, for example, states that it has collected pure rainfall samples at its facility that exceeded the 6.0 s.u. threshold for pH. Although the exceedance was caused by naturally occurring conditions in the rainwater, the operator was reported as exceeding pH values as required by its individual permit. Another UWAG member notes that it would be impossible for it to treat for TSS or install BMPs to prevent water with low TSS levels due to its location in a region with a semi-arid climate, high clay content, and low vegetation. Under the proposed benchmark monitoring scheme, operators of similarly situated facilities would be unable to rely on the natural background exception to justify exceedances and would be subject to AIM requirements. EPA's proposed background exception also fails to consider the difficulty in accurately calculating background levels of TSS. Samples with high background levels of TSS must be diluted, which results in a higher detection limit and higher range of acceptable error. For EPA's proposed benchmark of 100 mg/L, the dilution of a sample would create values that are rounded to the ten thousands. Thus, two samples may be off by thousands, but still within the

acceptable range of error. As a result, subtracting the background level of TSS would not provide the necessary degree of precision need to evaluate whether natural background TSS is solely responsible for the benchmark exceedance.

...

In the event EPA moves forward with such a universal benchmark requirement, however, the natural background exception should be modified to account for background levels naturally occurring in rainwater and the difficulty in accurately calculating background levels, particularly for TSS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Request for Comment 24 – NRMCA believes the natural background pollutant levels scheme observed in the 2015 MSGP should remain intact for the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Benjamin J. Beller
**Commenter Affiliation:** Nebraska Public Power District (NPPD)
**Document Control Number:** EPA-HQ-OW-2019-0372-0243-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

NPPD supports the method proposed in the 2020 MSGP for determining the applicability of an exception due to natural background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 50
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 24**

The FWQC and FSWA support EPA's proposed method in the Proposed 2020 MSGP for determining whether or not natural background levels are solely responsible for an exceedance. The 2015 MSGP method accounted for circumstances where permittees could not achieve benchmark values because of high natural background levels of certain constituents in soils or groundwater, or from vegetation and wildlife sources. While the 2015 MSGP did not hold permittees responsible for pollutants generated by the natural background conditions, it did not authorize the permittee to discharge any concentration of pollutants if background levels already exceeded the benchmark. That approach to measuring background levels imposes disproportionate burdens on permittees discharging into receiving waters with high background concentrations and incentivizes permittees to discharge into waters with lower background concentrations.

The method announced in the Proposed 2020 MSGP—subtracting natural background concentrations from the total benchmark exceedance—more accurately accounts for natural background concentrations and allows permittees to realize the benefit of coverage under the MSGP. Moreover, this approach is consistent with other NPDES programs where site-specific measurements are utilized to document the natural background levels. Allowing permittees to discharge up to benchmark limits regardless of background concentrations eliminates the disproportionate burden on permittees that discharge into receiving waters with high background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1

**Comment Excerpt Number:** 41
**Excerpt Status:** Final

**Comment Excerpt:**

In response to Request for Comments 24 and 25, we support EPA's recommended revision to simplify the natural background calculation by allowing a simple subtraction of the natural background pollutant concentration in the calculation of benchmark exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

**F. CCIG Supports EPA's Proposed Modification of the Method for Determining Natural Background Pollutant Contributions.**

CCIG supports EPA's proposal to modify the method for determining natural background pollutant contributions from requiring no net facility contributions to a method of subtracting natural background concentrations from the total benchmark exceedance to determine if natural background levels are solely responsible for the exceedance. In many cases, exceedances are due to natural background conditions or run on beyond a facility's reasonable control. Accordingly, the "no net facility contributions" approach often assigns unwarranted responsibility and liability to industrial facilities for pollutants associated with typical background conditions. CCIG believes that EPA's proposed change would help ensure that facilities would not be subject to AIMs or benchmark monitoring for parameters where facilities are not substantial causes of benchmark exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1

**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Second, EPA should clarify whether EPA would require facilities to control background concentrations that are less-than-benchmark values (*i.e.*, require site contributions to be reduced by a specified factor or eliminated completely in the event of a large natural background contribution).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:**  EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Colorado does not support this change. EPA's proposed threshold for natural background allows dischargers to contribute pollutants in amounts greater than the benchmark and could cause or contribute to water quality impairments. If the natural background is due to run-on from neighboring sources that are not industrial facilities (and is naturally occurring) and concentration in this run-on is less than the concentration that the facility would otherwise discharge or is actually discharging, then the background is diluting the site's runoff. On the contrary, the proposed subtraction method essentially allows for permittees to discharge higher concentrations than previously allowed without triggering corrective actions. This is an attractive alternative to permittees as it could reduce requirements to provide control measures. Reduced control measures would result in an increase in pollutants discharged. When considering the compounding effects of additional permittees seeking natural background credit, this could lead to potential increases in water quality impacts that would trigger antidegradation review requirements under Colorado Regulation 31.8(3).

Please note that keeping this provision in the final permit may mean that this permit may not comply with the applicable provisions of sections 301 and 302 of the Clean Water Act as applicable to Colorado and thus could be grounds for a conditional certification or certification denial for this permit by the state of Colorado. 33 USC § 1341.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

WEF supports EPA subtracting natural background concentrations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Subtracting natural background concentrations is a reasonable approach.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.2.4.RFC25. Additional Implementation Measures (AIM) - RFC 25 Methods for characterizing natural background pollutant concentrations

**Commenter Name:** Daniel Mumm
**Commenter Affiliation:** Westmoreland San Juan Mining LLC (WSJM), a subsidiary of Westmoreland San Juan Mining LLC (WSJM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0098-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

WSJM Comment: The NSQD does not contain the appropriate information to determine natural background levels in the area of our facility (Northwest New Mexico). While it would work well in determining concentrations in urban areas, it would not be accurate for facilities outside of the city. WSJM would prefer to use samples collected in the area of our facility during storm events to calculate natural conditions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Victoria R. Branson
**Commenter Affiliation:** National Nuclear Security Administration, Sandia Field Office (DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

SNL/NM proposes that data from local natural background studies would be more appropriate than the NSQD data. This proposal is particularly applicable to New Mexico because (1) the NSQD has no data from New Mexico and therefore would not represent "pollutant concentrations attributable only to natural background sources" in this large and geologically diverse state, and (2) within New Mexico, the Basin and Range geology is highly variable in pg. 6 bedrock and soil composition. Where it exists, local data should be allowed for determination of natural background levels.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

BES agrees with the EPA's concern that the National Stormwater Quality Database (NSQD) does not accurately represent pollutant concentrations that are attributable only to natural background sources; therefore, BES does not support the use of this database. Too many variables exist

relative to the local conditions regarding geology, soil types, geomorphology, etc. In addition, the use of a national database could be misused to justify inappropriate background values.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Joshua Wheatley
**Commenter Affiliation:**  James Environmental Management (JEM)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

The applicability of this to facilities that are outside of an MS4 region could be difficult to connect or link to background pollutants. This is reflected in the concerns of the EPA over-using this as the sole source of quantifying background pollutants. It is recommended that other official data bases (ie: state or county environmental resources) also be allowed as alternative sources of documentation.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Paula Dodge-Kwan
**Commenter Affiliation:**  Engineering Division, Albuquerque, NM
**Document Control Number:**  EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

The NSQD dataset contains no data from New Mexico. Therefore, local background studies that take into account site specific bedrock and soil compositions would be more applicable.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

It is burdensome for a facility to perform an environmental study to determine Natural Background Pollutant Levels for a site. Offsite factors contributing to pollution are beyond the control of the permittee and are always changing. The City prefers the use of the NSQD to determine background pollutant levels rather than the manpower and cost of performing and documenting an individual environmental study. However, an alternative to NSQD could be for a region/locality or Sector industry to obtain their own data on background pollutant concentrations using previous analytical data or data from a similar nearby site to estimate Background Pollutant Levels. For example, a permittee could use analytical results from an upstream location or historical MS4 data.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

## 14. Request for Comment 24 & 25: Natural Background AIM Exception

With reference to our previous AIM general comments, we are in support of extending this natural background exception from AIM to all three (3) tiers. However, it is our observation that the definition of "natural background" is too strict to be practically useful. By this, we mean that it is commonly interpreted that "natural background" means pre-Industrial Revolution, undisturbed soils - a situation which does not exist outside of the most pristine of the National Parks. The reality is that what constitutes natural background is highly location-specific, and as varied as the topography and land use of this country. A greater acceptance of this variability in "natural backgrounds" is needed, as has been the case in other USEPA programs. A good definition of what is "natural" is warranted (e.g., undeveloped, rural, agricultural), but may be a challenge in the current political climate.

We believe that the National Stormwater Quality Database (NSQD) is a good resource to define the "natural backgrounds" from developed, urban areas. If agricultural lands are assumed to constitute the "natural background" of soils, then data from USDA and/or Soil and Water Conservation Districts could also be good resources.

Another suggestion is for USEPA to allow for the methods prescribed in other USEPA programs (e.g., Superfund) for determining natural background for stormwater compliance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

VMA accepts that the National Stormwater Quality Database ("NSQD") is likely the most abundant supply of run-off data; however, it is based to MS4 and urban run-off. In response to request for comment number 25, VMA would support an approach that allows for site-specific or local methods for calculating natural background concentrations. Samples collected from representative non-industrial areas could be monitored for determination of background concentrations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA supports other exceptions to AIM as a result of a permit violation if the facility can document that it was caused by natural background levels "or" run-on from a neighboring source.** However, FPA also cautions that setting an evidentiary standard in the MSGP is unwise,

because such demonstrations are likely highly factual specific. While use of the NSQD may be helpful is each instance, the data is flawed and comparison of it with site-specific data may or may not be useful to demonstrate regional inconsistencies in background data. It is likely not to be helpful at all in tracing "run on," which is more likely to be dependent on groundwater or surface water gradients and other physical attributes of the property and variations in facilities processes, including but not limited to the type of materials being used in the manufacturing processes.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

NSQD should be used due to the fact it contributes to any upstream sampling from any outfalls in question. Facilities affected by upstream pollutants from other facilities or open land spaces (past landfills) should not be subject to violations. With that said, it should not be the only source; additional sampling upstream should be conducted to determine potential back ground concentrations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

National Stormwater Quality Database:  NAIMA supports the use of the National Stormwater Quality Database for determining levels of pollutants in the natural background.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should allow the use of appropriate data in the National Stormwater Quality Data in the geographic area of the site for pollutant concentrations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 36
**Excerpt Status:** Final

**Comment Excerpt:**

**Request for Comment 25:**

**AIM Exception for Natural Background (Part 5.2.4)**

EPA requested comment on the advantages and limitations of the National Stormwater Quality Database (NSQD) dataset and whether and how it can be adjusted for use in determining natural background concentrations for purposes of the MSGP. NMA does not believe that this is appropriate for mining operations. Our members are open to using background data from publicly available sources if applicable, but this data must be representative of the site it is applied to and should not supersede a site-specific dataset.

As previously discussed, the NSQD dataset may be appropriate for urban runoff in cities but is not applicable to mine sites. Every facility is unique based on specific location, natural land features, proximity to water, and facility design with respect to installed BMPs. Flash flowing water in one area may have different characteristics than in another area. Also, depending on the severity of the individual storm, natural background values may be higher for one event than from a previous event at the exact same location. It should be considered that, when natural

background is substantially higher than the permit benchmark limits, it is not possible for water to flow under any conditions and not lead to a exceedance of that limit. Natural background is the only defense for this condition, and the difference in reportable significant figures can and likely will lead to an artificially created compliance issue. Our members cannot treat for nor install BMPs to prevent high sediment loads in regions with high clay content and low vegetation due to a semi-arid climate.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

Also, to reduce the burden of data collection for natural background calculations, EPA should permit use of appropriate data in the National Stormwater Quality Data in the geographic area of the site for pollutant concentrations. The Agency should also allow use of comparable reliable alternative reference sources in their regional or watersheds.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

NSQD data may not be appropriate for use in showing background levels of pollutants. It needs to be a site-specific analysis because of the wide variety of types of facilities, the varied locations and ecoregions across the state, resulting in different contributions to stormwater from geology and other natural conditions.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 60
**Excerpt Status:** Final

**Comment Excerpt:**

*3. EPA's proposal is impracticable*

EPA solicits comment on "appropriate methods to characterize natural background concentrations."[148] The request reflects how difficult it is to conceptualize, define or characterize "natural background" in the context of industrial stormwater. By process of elimination, we conclude that it is effectively impossible. According to EPA, none of the following options are available:

*The National Stormwater Quality Database.* We strongly agree with EPA that the NSQD cannot be used as a source of background values, because it "does not accurately represent pollutant concentrations that are attributable only to natural background sources."[149] There are two specific problems with using the NSQD in this way. First, the NSQD does not reflect "natural" stormwater, but instead reflects stormwater with municipal and industrial contributions. Second, it should go without saying that the NSQD, which is by definition a "national" database, cannot be a reliable proxy for site-specific background water quality data. It would be entirely inappropriate for any permittee to compare its discharge to other industrial (or partially industrial) stormwater, and only log an exceedance if the difference between the two exceeded a benchmark. This would theoretically (but realistically) waive monitoring even for permittees that are the sole source of an exceedance. If, for example, a permittee is discharging 140 mg/L of TSS, but some subset of the NSQD – from totally different locations – shows an average TSS concentration of 50 mg/L, the permittee would be exempt from further monitoring. This is of course an absurd outcome that precludes the use of the NSQD.

*Legacy pollutants from the site.* According to EPA, "[n]atural pollutants do not include legacy pollution from earlier activity on your site." We agree with EPA on this point. It would be antithetical to the CWA to allow a permittee to remove itself from liability for pollutants originating on its property, regardless of when those pollutants were deposited at the site. It would also be technically challenging, to say the least, to segregate pollution loads according to the pollutants' date of origin.

*Run-off from neighboring sources.* We also agree with EPA that it would irresponsible to allow permittees to subtract runoff from neighboring, non-natural sources such as other industrial facilities or roadways. Again, the technical challenge of segregating pollution loads should by

itself take this option off the table. Furthermore, allowing permittees to subtract industrial run-on would undermine and contradict other sections of the permit, including run-on controls.[150]

Since natural background cannot include offsite municipal/industrial stormwater, onsite legacy pollution, or non-natural run-on, there are very few remaining sources of "natural background." Perhaps EPA imagines that facilities will want to subtract the pollutants running onto a site from a neighboring forest (or other natural land use), or from on-site natural land uses. We presume that these situations are very rare, to the point that we see no value in creating an option with such a dubious technical foundation. It will be virtually impossible for permittees to segregate pollution loads among different natural and non-natural sources. The only sure-fire way to do this would be to physically separate the component stormwater flows through run-on and run-off controls, so that each component can be sampled separately. But if a permittee is separating the stormwater flows, then there is no need for netting out the natural contribution, because there is no commingling.

In short, EPA's proposal is mathematically unsound, contrary to law, and technically impracticable.

[148] Draft Permit at 50, Request for Comment 25.

[149] *Id*.

[150] Draft Permit at 15, Part 2.1.2.1(a); *See also* Draft Permit at 13, Part 2.1 ("Regulated stormwater discharges from your facility include stormwater run-on that commingles with stormwater discharges").

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Sandy Blalock
**Commenter Affiliation:**  Automotive Recyclers Association (ARA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

ARA believes that the NSQD contains the largest amount of data and is the appropriate database to use.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

The process for establishing a "natural background exception" as described in the Fact Sheet is somewhat complex. It may be difficult to find a "non-human impacted reference site" near some industrial facilities. In Request for Comment 25, EPA asked about other appropriate methods to determine natural background pollutant concentrations. Unfortunately the NAS report does not address the usefulness of the National Stormwater Quality Database (NSQD) values for urban open space runoff. Because natural conditions can vary between watersheds and from site to site within watersheds, EPA would need to consider this variability when applying any values derived from a national database. It is likely that an expert evaluation would be required to determine which, if any data from the NSQD are appropriate and relevant to represent natural background for a particular industrial site.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 25. NSQD applies to urban locations but not remote locations. For clarity and consistency, it may be beneficial for the 2020 MSGP to cite guidance on establishing natural background pollutant concentrations at remote locations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:** New Hampshire Timberland Owners Association (NHTOA) and
Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

The majority of our clients in the northeast are in rural and not urban settings and therefore, we
agree with the EPA's concern that the NSQD may accurately represent pollutant concentrations
that are attributable only to natural background sources. Calculating exceptions based on the
NSQD derived from MS4s would seem to be problematic and not appropriate when evaluating
benchmark exceedances. Regional or site specific data for naturally occurring background
concentrations would be preferred when possible, but placing that burden on permittees would
potentially be cost prohibitive.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Scott D. Parker
**Commenter Affiliation:** NORA, An Association of Responsible Recyclers
**Document Control Number:** EPA-HQ-OW-2019-0372-0238-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

**III. Using the NSQD Urban Stormwater Data from the Residential Land Use category is a
Logical Choice to Use as Background for Industrial Stormwater Runoff**

The following table, extracted from EPA's own assessment of the EPA DMR data from the 2008
EPA MSGP (Docket ID EPA-HQ-OW-2010-0803-0002), illustrates that high percentages of
facilities had at least one annual failure for the following parameters despite corrective actions:

**Table: EPA Benchmark Data Analysis for Select Common Metal Parameters (2008 MSGP)**

| Parameter | Number of Permittees | Permittees with 1 or More Annual Exceedance | % of Permittees with 1 or More Annual Exceedance |
|---|---|---|---|
| Aluminum | 66 | 39 | 59 |
| Copper | 42 | 34 | 81 |
| Iron | 114 | 90 | 79 |
| Lead | 39 | 16 | 41 |
| Magnesium | 1 | 1 | 100 |
| Zinc | 60 | 43 | 72 |
| *Subtotal* | 322 | 223 | 69 |

The above data summary from the 2008 EPA MSGP DMRs appears to show that actual stormwater runoff from any source will not meet all of the ambient water quality benchmark limits all of the time for these common metal parameters. One purpose of the MSGP is to assist an industry in avoiding significant increases in pollutants over what would normally be received from the rest of the (non-industrial) locality in which they are located. It is therefore logical to compare industrial runoff to other typical stormwater runoffs from non-industrial sources.

EPA's proposed changes to the background subtraction allowance to allow a facility to subtract a background sample concentration from the facility discharge. Background analyses have been allowed in previous MSGPs. The change allows a facility to be considered in compliance with the benchmark if the resultant difference between the background and the benchmark analysis is lower than or equal to the benchmark limit (The previous version required the result to be zero or less, otherwise the benchmark was exceeded.) However, this problem is still flawed in that a background site "unimpacted by human activity" must be sampled. It is difficult, however, to find such stormwater runoff locations, particularly in urban or suburban settings. Further, background data should be collected for a series of rain events, since rain events have great variability depending on the strength and duration of the rainfall. The use of an accepted standard for urban runoff background that is not significantly impacted by industrial activity to be used as background is what should be done. The NSQD survey of urban runoff water (that is in part sponsored by EPA) could, and should be used.

The NSQD surveys stormwater runoff from urban and suburban city environments.[4] It assigns sampling locations to eight different Land Use categories, which are also further broken into additional designations of mixed land use (such as commercial-residential, etc.). The land uses include industrial, commercial, freeway, residential and "open space" designations. This comment has selected the NSQD "residential" land use category of stormwater runoff data to be used as a source for background information on common metal parameters that might also be found in stormwater runoff from non-industrial sources. It is suggested that the average of the residential data be used as a background for the MSGP. Presented below is an example from the database of the average data for the most common benchmark present in background runoff.

**Table: Average Values from the NSQD Database for Residential Land Use Only (no mixed land uses were applied)**

| Benchmark Parameters | Copper (ug/L) | Iron (ug/L) | Lead (ug/L) | Zinc (ug/L) | TSS (mg/L) |
|---|---|---|---|---|---|
| NSQD Average Values Residential Land Use Runoff | 25.6 | 3293 | 16.9 | 115 | 120 |

Most of the data above would appear to be a reasonable background for urban runoff. The iron data was based on only a few dozen entries, and it might be skewed by individual samples. (EPA has asked for comment about the removal of iron as a benchmark, a move that NORA does support, so this may be of no consequence.) Also, the NSQD currently does not monitor for aluminum. The other parameter averages are all based on a large amount of sample data.

[4] http://www.bmpdatabase.org/nsqd.html (version 3 of the NSQD is available online was used to calculate the above averages, there is also a version 4 now online that EPA should consider, it contains additional more recent data)

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 51
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 25**

The FWQC and FSWA support the use of the NSQD dataset, as it contains the largest amount of stormwater data. At the same time, if regulated parties have access to more accurate or alternative datasets that better reflect and represent conditions in their regions or watersheds, then they should be able to use alternative datasets.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

**AAR Supports the Use of the National Stormwater Quality Database (NSQD) as a Tool to Characterize the Natural Background Pollutant Concentrations**

As noted above, the NSQD surveys stormwater runoff from urban and suburban city environments.[49] It assigns sampling locations to eight Land Use categories, which are also further broken into additional designations of mixed land use (such as commercial-residential, etc.). AAR supports the use of this detailed and extensive stormwater data for characterizing background pollutant concentrations.

[49] http://www.bmpdatabase.org/nsqd.html (version 3 is reference 1 in the URS report, and is available online, there is also a version 4 EPA should consider)

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 43
**Excerpt Status:** Final

**Comment Excerpt:**

Also, to reduce the burden of data collection for natural background calculations, EPA should permit use of appropriate data in the National Stormwater Quality Database in the geographic area of the site for pollutant concentrations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Jared R. Wigginton
**Commenter Affiliation:** Baker Botts L.L.P
**Document Control Number:** EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

While supportive of the proposed determination modification, CCIG requests that EPA clarify two related aspects. First, EPA should specify how operators measure background levels of TSS in stormwater (*i.e.*, from flowing stormwater upstream of the best management practices prior to a stormwater outfall or from a location discharging onsite away from industrial activities).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should clarify what is background and how a site should go about doing a background pollutant concentration analysis. WEF recommends that EPA provide guidance on how to do it accurately and consistently. Statistical approaches that EPA has provided can apply to any dataset but may be difficult for most operators to be able to use them.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

## 5.3. Corrective Action and AIM Documentation

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

The annual report is sufficient for communicating any corrective actions taken, no need to add another box to the DMR.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

Imagine that the sample result triggers the need for Corrective Actions and AIM. The first step is to document the condition or event that triggered the corrective action within 24 hours. In the 24 hour documentation section, Part 5.3.2.3, a statement, signed and certified in accordance with Appendix B, Subsection 11 requires a lot of office work. The 24 hour documentation should be allowed to be a hand-written document with the details required in Parts 5.3.1. through Part 5.3.2.2. I suggest that the statement, signed and certified be required in Part 5.3.3 Documentation within 14 days.

**Comment Response:**

EPA does not agree that the requirement to include a signed and certified statement as part of the corrective action documentation within 24 hours should be removed. The Clean Water Act and Appendix B.11.G provide that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under the permit shall, upon conviction, be punished by a monetary fine or imprisonment, or both. 40 CFR 122.22(b) and (d) requires that all reports required by permits and other information requested by the Director be signed by an appropriate signatory or duly authorized representative. By signing the certification statement, the signatory is certifying under penalty of law that the information provided is true, accurate, and correct.

---

**Commenter Name:** Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:** GZA GeoEnvironmental, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0171-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Provide clarification and a description of the type of documentation a facility should provide to support a determination that AIM implementation is not economically practicable or reasonably achievable?;

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 53
**Excerpt Status:** Final

**Comment Excerpt:**

*b. EPA Should Strengthen Notification, Documentation, and Reporting Requirements for Corrective Action*

EPA should require operators to provide timely and complete notifications for conditions or events requiring corrective actions, as well as reporting for any and all subsequent efforts to implement corrective actions, because the Agency acknowledges that such conditions have the potential to be violations of the permit. Parts 5.1 and 5.3. EPA acknowledges that conditions or events requiring corrective actions (5.1.1) may include permit violations. See Part 5.1.3. However, the Agency proposes a requirement that operators report these potential permit violations and subsequent corrective actions in an annual report only. See Parts 5.3.1 and 5.3.3. At that reporting timescale, potential permit violations and harm to downstream water quality may continue for an unjustifiably long period of time.

In all cases, EPA should require operators to notify the Agency of conditions or events requiring corrective actions pursuant to Parts 5.1.1, 5.1.2.1-2, and 5.1.4, and then provide the required documentation for corrective actions through NeT-DMR, so that the Agency may ensure that potential permit violations are adequately and timely addressed. EPA should require submission of notification for corrective action conditions or events and required documentation for corrective actions within a defined period no greater than 14 days.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

### 5.3.1. Documentation within 24 Hours

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  47
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement to complete documentation within 24 hours for conditions listed in Parts 5.1.1, 5.2.1.1, 5.2.2.1, and/or 5.2.3.1 seems overly stringent. Simplot requests the deadline to complete this documentation be revised from "within 24 hours" to "within 7 days".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

### 5.3.3. Documentation within 14 Days

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  48
**Excerpt Status:** Final

**Comment Excerpt:**

The requirement to complete Corrective Action and AIM documentation within 14 days for conditions listed in Part 5.1.1, 5.2.1.1, 5.2.2.1, and/or 5.2.3.1 seems overly stringent. Simplot requests the deadline to complete this documentation be revised from "within 14 days" to "within 30 days".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

### 5.3.3.RFC26. Corrective Action and AIM Documentation - RFC 26 Method for tracking triggered AIM Tiers

**Commenter Name:**  Stacy Hibbard
**Commenter Affiliation:**  Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:**  EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the permit require the operator to submit all AIM Tier reports that have been triggered in the past quarter with the monitoring results per proposed Part 7.4 as opposed to submitting AIM Tier reports with the annual report. In addition, BES does not support the option for an operator to self-select the submittal of AIM reports. All AIM reports should be submitted with monitoring results to keep operators on track with implementing corrective actions in a timely manner. BES also recommends the underlined text be added to Section 5.3.1: "Documentation with 24 Hours. You must document the existence of any of the conditions listed in Parts 5.1.1, 5.2.1.1, 5.2.2.1, and/or 5.2.3.1 within 24 hours of becoming aware of such condition or from the date of laboratory report receipt, if applicable." This requirement holds the facility accountable for implementing additional implementation methods immediately. For example, operators may have received a laboratory report but have delayed evaluating the results.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

EPA declines to make the suggested revision to add reference to laboratory report receipt. The requirement to provide documentation within 24 hours "of becoming aware of such condition" would account for operators becoming aware of an exceedance based on receipt of laboratory reports.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, the proposed self-reporting of AIM tiers by the facilities themselves further deviates from the historical spirit and intent of the MSGP to promote compliance and improve stormwater quality by implementation of benchmark monitoring and sector specific best management practices (BMPs) that facilities have been required to implement. These BMPs have proven effective in the effort to improve water quality.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

With the existing MSGP, there is a self-reporting system built into the Quarterly Monitoring. The addition of the language above only further complicates and increases the costs of compliance with no corresponding benefit to the quality of the Waters of the United States. Again, the 70 to 80 percent of those requiring a permit that never file will not be impacted. There would be zero need for this activity should a policy of equitable enforcement of the existing MSGP be implemented.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Comment on methods for tracking AIM Tiers that may have been triggered by an operator.

Discussion/Recommendations

The permit language requires documentation within 24 hours. Change the written documentation to 5 days to be consistent with NPDES written reporting requirements per 40 CFR 122.41(l)(6)(i).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Lisa Stevens or Jeanne Riley
**Commenter Affiliation:** State of Utah Department of Environmental Quality
**Document Control Number:** EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Due to the complexity and multi-year nature of Additional Implementation Measures (AIMs), it would be appropriate for the database (NeT, or another database that accepts DMR data) to notify the permittee when a benchmark is exceeded and if an AIM Tier may have been triggered. There are exceptions to the AIM triggers, so an override or option to handle exceptions would need to be implemented. DWQ believes there will be significant non-compliance with this permit provision absent a "smart" database that notifies users of exceedances.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 36
**Excerpt Status:** Final

**Comment Excerpt:**

AIM Tiers may be triggered quarterly or annually, or after a period of 2 or 3 years. The permittee may not know that the corrective actions have been triggered during an early monitoring period, but may become aware at a later date. While we agree that tracking is a good idea for permit compliance, connecting it to an existing reporting feature may have limited success. We suggest submittal of a separate report for AIM corrective actions may be more functionally appropriate to the regulated community.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1

**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

We concur that permittees should report the use of an aberrant determination for a single sample. This annotation could be made on the Quarterly Discharge Monitoring Report, an Annual Report, and/or be remitted as an Incident Report to EPA Region. However, in light of response a above, we recommend that a separate reporting system be used to track aberrant data as well, rather than combining with an existing reporting requirement.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's request for comment 26 asks for comment regarding how to track AIM tiers. VMA does not support submission of AIM tiers with quarterly monitoring results. The AIM program is based on an annual review process and therefore should not require quarterly reporting. The AIM tier should be tracked by the permittee and reported annually.

...

The proposed revisions to the SWPPP section include requirements for the tracking of AIM events. VMA believes utilizing the SWPPP to track AIM events is more appropriate than EPA's proposal to require AIM reporting in quarterly monitoring results.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1

**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**FPA support this new provision in the final rule.** FPA's members believes it is reasonable for permittees to track the efficacy of AIM measures, and to be able to eliminate and or substitute measures that are ineffective

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

In the Proposed 2020 MSGP, ISRI is much less concerned about methods of tracking triggered AIM tiers than the proposed AIM Framework in Part 5.2, Additional Implementation Measures (AIM). As discussed below, ISRI opposes including in the 2020 MSGP a specific reporting requirement for changes in a permittee's AIM tier status, the proposed AIM Framework, and proposed Appendix Q.

**a. AIM Tier Tracking**

Regarding methods of tracking, ISRI notes that proposed Part 5.3.1 states the following:

[The Permittee] *must document the existence of any of the conditions listed in Parts 5.1.1, 5.2.1.1 [AIM Tier 1], 5.2.2.1 [AIM Tier 2], and/or 5.2.3.1 [AIM Tier 3] within 24 hours of becoming aware of such condition.* [The Permittee is] *not required to submit this documentation to EPA, unless specifically required or requested to do so. However,* [the Permittee] *must summarize your findings in the annual report per Part 7.5.*

Summarizing events or conditions related to AIM Tiers 1, 2, and/or 3 in the annual report would seem to amount to annual tracking. EPA should indicate whether and why more frequent tracking than annual tracking is necessary.

The only other regular reporting that exists in the Proposed 2020 MSGP is quarterly submission of discharge monitoring reports (DMRs), as EPA noted in its request for comment. If EPA

demonstrates the need for more-frequent reporting of AIM tier status than annual (via the annual report), such more-frequent reporting should be done with quarterly submission of DMRs.

In addition, any tracking of AIM tiers by EPA will have to account for tracking of AIM tiers by benchmark parameter and monitored outfall. The permittee will have to assess each monitored outfall for each benchmark parameter to determine whether an AIM tier has been triggered for a given benchmark parameter. A permittee might not exist in just one AIM tier at any moment; a permittee could exist in all three AIM tiers at one time across different parameters and monitored outfalls. The permutations of AIM tier status for a permittee are potentially quite large. Besides the compliance implications (please see Section B.17.b), specific reporting of changes in multiple AIM tier tracks (by parameter and monitored outfall) would be difficult for both the permittee and EPA to manage.

Specific (i.e., stand-alone) reporting of changes in a permittee's AIM tier status should not be included in the 2020 MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

An operator discovering a compliance issue due to inspection or observation should not trigger an AIM Tier. Self-reporting with changes to Control Measures and the facility SWPPP should not be mandated by an AIM Tier. Requirements to report such changes to facility SWPPPs and Control Measures should remain.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Marie Gargas
**Commenter Affiliation:** Plastics Industry Association (PLASTICS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0202-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

<u>PLASTICS members believe this is reasonable and support this new provision</u>; permittees can track AIM efficacy and should be able to eliminate or replace ineffective measures.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

EPA's electronic reporting DMR database and software should be updated/upgraded to flag and notify facility operators when triggers are met. Alternatively, EPA should develop a spreadsheet tool.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  31
**Excerpt Status:** Final

**Comment Excerpt:**

Operators should be required to self-select AIM tiers as appropriate during quarterly monitoring and reporting.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 56
**Excerpt Status:** Final

**Comment Excerpt:**

*a. Reporting and Documentation Requirements*

EPA should substantially strengthen the reporting and documentation requirements for the proposed Additional Implementation Measures provisions. The Agency states that a "[…] benchmark exceedance is not definitive proof that water quality standard has been exceeded." Pg. 77 of Fact Sheet. However, where required AIM reporting is limited to notification of benchmark exceedances and annual reporting, the Agency will have limited information with which to timely ensure that exceedances and other incidents have not caused or contributed to an episodic or ongoing violation of water quality standards, for example, or other requirements of the MSGP and Clean Water Act.

EPA should require operators to provide timely and complete documentation for (1) notifications of all incidents that have or are likely to meet the criteria for any AIM Tier trigger and (2) reporting for any and all required efforts to review, implement, and/or modify stormwater control measures, including exceptions proposed by the operator.[138] The Agency acknowledges that such conditions have the potential to be violations of the permit or of an applicable water quality standard. re: Part 5.3 and Request for Comment 26, among other relevant provisions cited below. The notification and reporting of documentation within the specified deadlines for action will allow EPA to identify permit violations at a comparatively reasonable time-scale (e.g. within weeks or months instead of annually) and guard against noncompliance or bad-faith efforts to comply. In all cases, EPA should require operators to submit this documentation to NeT-DMR within the deadline specified in Part 5.3 in addition to the proposed requirement for reporting a summary of corrective action and/or AIM responses in the annual report per Part 7.5.

EPA should require operators to document the information and technical analysis supporting the rationale for not implementing certain sector-specific stormwater control measures because the measures are counter-productive or would not result in any reduction in the discharge of the pollutant of concern. This documentation is necessary for the Agency to evaluate whether adoption of this exception is technically appropriate and will have the added benefit of guarding against noncompliance or bad-faith efforts to comply. As above, EPA should require operators to submit documentation supporting the claim exception to NeT-DMR within the specified deadline (i.e. 14 days at Part 5.2.2.3).

[138] Provisions in the Draft Permit that should be subject to improved reporting and documentation requirements include Parts 5.2.1.1, 5.2.1.2, 5.2.1.3, 5.2.2.1, 5.2.2.2, 5.2.2.3, 5.2.3.1, 5.2.3.2, 5.2.3.3, and 5.2.4.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

ARA opposes the change to AIM reporting from annual to quarterly.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

EPA asked in Request for Comment 26, how AIM Tiers that have been triggered by an operator should be tracked. The suggested method of requiring the operator to self-select any AIM Tiers that have been triggered, when reporting quarterly results, seems straightforward but may be unnecessary since **the same information will be reported in the annual report.** Keep in mind that the operator will likely have already begun to implement the AIM by the due date of the quarterly DMR, and depending on the Tier, may have completed the AIM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 49
**Excerpt Status:** Final

**Comment Excerpt:**

This comment pertains to EPA request for Comment 26. <u>Simplot requests AIM Tiers triggers be reported in the annual report rather than quarterly reports.</u> In particular, some sampling is based on annual averages so it does not make sense to report them on the quarterly reports.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

We support that operators self select any AIM Tiers that have been activated in the past quarter, when submitting quarterly monitoring results. This information, along with any required AIM Tier corrective action documentation should also be reported in the facility's annual report and documented in the facility's SWPPP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  52
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 26**

The FWQC and FSWA oppose this change to the extent that it expands AIM reporting from annual reporting to quarterly reporting. The AIM protocol contemplates an annual review process, not a quarterly review process. Each of the AIM Tiers provide for an "annual" average,

which allows the permittee to implement BMPs and corrective action over the course of at least a year in order to avoid triggering a higher AIM Tier. EPA should clarify that this modification does not fundamentally change the annual review process established by the AIM protocol.

Additionally, for any event described in Parts 5.1, 5.2.1.1, 5.2.2.1, or 5.2.3.1, operators must document basic information describing the event that triggers corrective action and their response to that event. Operators must maintain a copy of this documentation with their SWPPP as well as summarize this information in the annual report. The permit establishes conditions for both immediate and longer response periods. The proposal requires written documentation within 24 hours. The FWQC and FSWA recommend changing the written documentation to 5 days, to be consistent with NPDES written reporting requirements in 40 C.F.R. § 122.41(l)(6)(i).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  Claudio H. Ternieden
**Commenter Affiliation:**  Water Environment Federation (WEF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

In other states, many track and self-report. EPA does notify facilities on what tier they are depending on their data. In California operators can go online and search what level tier their facility is included. States should have their own database's that allow facilities to log-in and receive their own tier/tracking information. This may not be applicable for every state since some states do not do their own regulation. It is up to facilities to keep track of their own tier information. WEF agrees that operators can self-select if EPA reviews those and agrees.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:**  James Westbrook and Elizabeth Zernik
**Commenter Affiliation:**  Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

Self-certification is a reasonable approach.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures.

---

**Commenter Name:** Jesse Levine
**Commenter Affiliation:** U.S. Tire Manufacturers Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0259-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

**High-level recommendations and issues with the proposed MSGP and Appendix Q Fact Sheet for Rubber Manufacturing**
While we appreciate that the MSGP provides flexibility in allowing facilities to select control measures from Appendix Q industry-specific fact sheets to address exceedances, the requirement to document every Appendix Q control measure not adopted should be removed because this requirement creates a significant recordkeeping burden for USTMA members. Additionally, many of the control measures outlined in the Appendix Q Fact Sheet for rubber manufacturing are not practical, possible, or cost effective and therefore should be removed. For example:
  b. Not loading and unloading materials when it is raining may not be possible as many businesses provide "just in time" delivery for production materials that must be unloaded when they arrive. P Q-557.

  c. Sloping an impervious concrete floor or pad to collect spills and leaks and convey them to proper containment and treatment is costly for an existing facility. P Q-557.

  d. Enclosing material handling systems can be costly depending on the type of system in place. P Q-558.

  e. Storing permanent tanks on an impervious surface surrounded by dikes with a height sufficient to contain a spill would be costly if not currently in place. P Q-561.

  f. Providing tanks with overflow protection may not be possible for existing tanks. P Q-561.

  g. Keeping liquid transfer nozzles/hoses in a secondary containment area can be costly if a new containment area needs to be installed or an existing area needs to be modified. P Q-562.

  h. Retrofitting facilities to provide cover for drums may be costly and unnecessary. P Q-563.

  i. The measure to equip the final discharge point of all facility sewers to prevent discharges in the event of a spill is not practical. P Q-563.

j. Use of a temporary containment area during use of a portable drip pan appears to be unnecessary as the drip pan itself should be sufficient to catch spills. P Q-565.

k. If a facility does not have dust collection systems for material handling operations, it can be a costly add-on. P Q-566.

l. Direction to change dust collector bags "promptly" is unclear and may not be practicable. P Q-566.

m. Covering dumpsters or moving them indoors may not be practicable. P Q-568.

n. Placing tubs around vents and stacks to collect particulates may not be practical or fully effective as stacks are usually tall and airflow won't allow particles to be captured. P Q -569.

o. Automatic dispensing and weighing equipment may not always be possible or practical. P Q-570

p. A direction to use alternate compounds to zinc stearate coatings may not be feasible. P Q-571. Tires are highly engineered products that must meet stringent safety and performance requirements. Tires contain a number of rubber compounds each specifically formulated to serve a specific purpose in the tire (e.g., the rubber compound that makes the tire tread is formulated to achieve certain performance requirements such as wet traction and rolling resistance). Modification in compounds may change a tire's performance, so any modification in compound formulation must ensure tires continue to meet performance and safety requirements.

q. Adding roof or containment areas for fueling operations can be costly if not already in place. P Q-573. USTMA also recommends deleting language from the permit in Part 6.2.3 that refers to roofs and fences as potential sources of pollutants, unless they are specifically tied to pollutants generated during the industrial activities of that facility. As noted in the comments of the Federal Water Quality Coalition, which USTMA is a member of, roofs and building materials are not listed in the definition of industrial activity in 33 CFR 122.26(b)(14) and therefore should be outside the scope of the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

6.1. Person(s) Responsible for Preparing the SWPPP

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1

**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

Part 6.1: In addition to Professional Engineer or Professional Geologist, EPA should add nationally certified SWPPP Preparer to the list of certifiers for revisions to SWPPPS found inadequate. This will not endorse a specific company. NMED suggests adding a requirement to include a description of the qualifications of the SWPPP Preparer in the SWPPP. Knowledge of the effectiveness of stormwater controls is adequate for an inspector, however the SWPPP Preparer needs deeper knowledge. The permit should address required education and ability: personnel must be familiar with the use of soil loss prediction models and design of erosion and sediment control systems based on these models.

**Comment Response:**

EPA declines to make the commenter's suggestion to add nationally certified Stormwater Pollution Prevention Plan (SWPPP) SWPPP Preparer to the list of certifiers for revisions to the SWPPPs found inadequate. EPA notes that final 2021 MSGP Part 6.1, Person(s) Responsible for Preparing the SWPPP and Appendix A, defines "qualified person" without additional prescribed certification burden to facilities. The professional credentials requirement option (e.g., P.E., P.G.) is discretionary and limited to occurrences where EPA determines a SWPPP is deficient and requires a SWPPP to be reviewed or amended by a Professional Engineer or a Professional Geologist with the educations and experience necessary to prepare an adequate SWPPP. This does not preclude other qualified individuals from reviewing or amending SWPPPs where EPA does not determine the services of a Professional Engineer or Professional Geologist are necessary.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Person(s) Responsible for Preparing the SWPPP—The permit should include in the definition of "qualified person" erosion control certifications as listed on EnviroCert International website, in addition to a professional engineer or geologist.

**Comment Response:**

EPA declines to make the commenter's suggestion to expand the definition of a "qualified person" to include individuals with erosion control certifications as listed on EnviroCert International website.

EPA notes that the final 2021 MSGP Part 6.1, Person(s) Responsible for Preparing the SWPPP and Appendix A, defines "qualified person" without additional prescribed certification burden to facilities. The professional credentials requirement option (e.g., P.E., P.G.) is discretionary and limited to occurrences where EPA determines a Stormwater Pollution Prevention Plan (SWPPP) is deficient and requires a SWPPP to be reviewed or amended by Professional Engineer or a Professional Geologist with the education and experience necessary to prepare an adequate SWPPP. This does not preclude other qualified individuals from reviewing or amended SWPPPs where EPA does not determine the services of a Professional Engineer or Professional Geologist are necessary.

## 6.2. Required Contents of Your SWPPP

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0150-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Draft Permit Section 6.2.3.4 – Why did the non-stormwater discharges evaluation move to within the first year of permit coverage?  Is it only required once in the first year of coverage or should this be an annual requirement?

**Comment Response:**

EPA recognizes the importance of identifying and eliminating unauthorized discharges or obtaining a separate individual National Pollutant Discharge Elimination System (NPDES) permit for these discharges. This requirement has been added into Part 6.2.3.4 of the 2021 MSGP to ensure EPA is able to assess the frequency and compliance with operators identifying and eliminating unauthorized non-stormwater discharges at facilities and for protection of water quality. Part 6.2.3.4 ensures an initial evaluation is conducted "By the end of the first year of your permit coverage ... ", so that unauthorized non-stormwater discharges are identified and addressed as necessary. EPA notes that Part 2.1.2.9 of the 2021 MSGP (which is unchanged from previous MSGP control measure permit requirements) maintains requirements for operators to routinely evaluate for and identify potential unauthorized non-stormwater discharges. EPA has also added language to Part 3.1.3, What You Must Look for During an Inspection, to remind operators to continually examine and evaluate areas of the facility for "non-authorized" non-stormwater discharges (Part 3.1.3.6).

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

EPA proposes a new requirement to inspect and document all discharge points within the first year of coverage under the permit. This provision should not apply to permittees who were previously covered under the 2015 MSGP but should only apply to new permittees.

**Comment Response:**

EPA disagrees with the comment that only new operators should be subject to the requirement to inspect and document all discharge points within the first year of coverage. To minimize the potential for unauthorized non-stormwater discharges that may impact water quality, EPA retains the requirement language for both "new" and "existing" operators.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 53
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations Regarding Summary of Pollutant Sources (Parts 6.2.3)**

Part 6.2.3 of the proposed permit requires the permittee to summarize potential pollutant sources. While EPA has not specifically requested comment on this provision, the FWQC and FSWA are concerned that this provision, and the accompanying Fact Sheet language, go beyond EPA's authority, and are inconsistent with the Agency's own regulations and guidance. In Part 6.2.3, EPA states that "For structures located in areas of industrial activity, you must be aware that the structures themselves are potential sources of pollutants. This could occur, for example, when metals such as aluminum or copper are leached from the structures as a result of acid rain." The corresponding section of the Fact Sheet goes into further detail on this issue, stating as follows:

[P]otential pollution sources include a facility's roof(s) and other surfaces that could accumulate pollutants originating from an industrial process and deposited through the air. Roofs, walls, etc., exposed to emissions from industrial areas can build up such pollutants over dry periods, which can be mobilized during a rain event or in snowmelt, so the operator needs to identify these areas

and include them in the SWPPP. Likewise, industrial structures containing materials that could become pollutants discharged in stormwater (e.g., copper cladding on buildings or zinc from galvanized fences) must also be identified as potential pollutant sources.

EPA's broad characterization of roofs and building materials as potential pollution sources is not supported by its regulations. Roofs are not listed in the definition of industrial activity in 33 CFR § 122.26(b)(14). Moreover, EPA has previously stated, when it issued the NPDES stormwater permit regulations, that roofs and roof drains do not pose environmental problems.[43] Accordingly, the Fact Sheet should not assume that roofs are a source, as a "discharge" still would need to occur in order for the source to be covered by the permit requirements. Some roof drains could be routed to grassy areas to minimize of prevent pollutant discharges. Further, roofs can be used to control exposure for storage areas, fueling areas, and other industrial activities as part of the No Exposure Certification. The Fact Sheet language should not discourage the use of roofs as BMPs. Consistent with EPA guidance,[44] the Fact Sheet should clarify that a roof is only a potential pollutant source when industrial pollutants are emitted onto the roof and subsequently "discharged."

Similarly, building materials are not listed in the EPA definition of industrial activity, and any pollutants that runoff from building materials are not "associated with industrial activity."[45] Notably, 40 CFR § 450.21(d)(2) provides that "[m]inimization of exposure [of building materials] is not required in cases where the exposure to precipitation and to stormwater will not result in a discharge of pollutants" or when exposure of the materials poses little risk of stormwater contamination, "such as final products or materials intended for outdoor use." Obviously, cladding on a building, or galvanized fences, are intended for outdoor use. Accordingly, EPA should delete references in the permit and Fact Sheet to "building materials' and roof drainage as potential sources of pollutants unless they are specifically tied to pollutants generated during the industrial activities of that facility.

[43] 55 Fed. Reg. 47990 (Nov. 16, 1990).
[44] EPA, "Guidance Manual for Conditional Exclusion from Storm Water Permitting Based On "No Exposure" of Industrial Activities to Storm Water," EPA 833-B-00-001 (June 2000), at pp. 6–7. That guidance provides as follows: "As stated in the Phase II regulation, particulate emissions from roof stacks / vents do not cause a condition of exposure, provided they are in compliance with other applicable environmental protection programs (e.g., air quality control programs) and do not cause storm water contamination. Deposits of particles or residuals from roof stacks / vents not otherwise regulated and which could be mobilized by storm water runoff, are considered exposed. Exposure also occurs when, as a result of particulate emissions, pollutants can be seen being "tracked out" or carried on the tires of vehicles.").
[45] See 33 C.F.R. § 122.26(b)(14).

**Comment Response:**

EPA disagrees with the commenter that the requirements of Part 6.2.3 go beyond EPA's authority, and are inconsistent with EPA regulations and guidance. EPA notes that the definition of stormwater specified in 40 CFR 122.26(b)(14) may include, and certainly does not exclude, structures located in industrial areas. EPA disagrees that pollutants in stormwater discharged

from structures themselves within areas of industrial activity cannot be considered potential pollutant sources "associated with industrial activity." In the Conditional No Exposure Exclusion from Industrial Activity Appendix K, EPA states "Particulate matter or visible deposits of residuals from roof stacks and/or vents not otherwise regulated (i.e., under an air quality control program) and evident in stormwater outflow are considered exposed. Likewise, visible "track out" (i.e., pollutants carried on the tires of vehicles) or windblown raw materials is considered exposed." The language in the 2021 MSGP Part 6.2.3 alerts permittees to the potential for other sources of pollutants to contribute pollutants to stormwater discharges associated with industrial activity, and thus the need to ensure that the discharge of any pollutants from those sources is minimized or controlled appropriately. For further clarification on this requirement, the fact sheet provides the following explanation:

"*Note that potential pollution sources include a facility's roof(s) and other surfaces that could accumulate pollutants originating from an industrial process and deposited through the air. Roofs, walls, etc., exposed to emissions from industrial areas can build up such pollutants over dry periods, which can be mobilized during a rain event or in snowmelt, so the operator needs to identify these areas and include them in the SWPPP. Likewise, industrial structures containing materials that could become pollutants discharged in stormwater (e.g., copper cladding on buildings or zinc from galvanized fences) must also be identified as potential pollutant sources.*"

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 51
**Excerpt Status:** Final

**Comment Excerpt:**

In addition, according to section 6.2.2. condition c.ix. and c.x., the permit would require the site map to include locations of all stormwater monitoring points and stormwater discharge points, respectively. Prior to c.ix., there is no use of the term "monitoring points". In section 4.1.1, the permit refers to monitored discharge points as discharge points authorized by this permit. We recommend clarification regarding the use of the terms monitoring points and stormwater discharge points and how they differ or if they refer to the same points as defined by section 4.1.1. Please explain if the difference is caused by the identification of "substantially identical" outfalls that do not require monitoring.

**Comment Response:**

Part 4.1.1 of the MSGP clarifies that monitoring requirements apply to each discharge point authorized by the permit, except as otherwise exempt from monitoring as a "substantially identical discharge point." Part 4.1.1 of the 2021 MSGP does authorize discharges at discharge points where benchmark monitoring or indicator monitoring will not occur because they are substantially identical discharge points. As such, there is a distinct and notable difference in a

"monitored discharge point" and a "discharge point" authorized under the 2021 MSGP. EPA has not revised the terminology in the final 2021 MSGP related to defining "monitored discharge points" and "discharge points".

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Add new 6.2.3.7

The division requests the below text be added to the MSGP.

Document in your SWPPP the locations of materials containing PFAS that have been stored or used.

See comment above. In order to effectively control the release of PFAS in stormwater permittees must first have an awareness of their existence. By inventorying and locating PFAS on a site, the permittee can then develop appropriate procedures for their safe storage, use, and disposal.

**Comment Response:**

To recognize that industrial facilities can conduct activities that use, store, manufacture, transfer, and/or dispose of PFAS-containing materials and in alignment with EPA's "Interim Strategy for Per- and Polyfluoroalkyl Substances in Federally Issued National Pollutant Discharge Elimination System Permits: Recommendations from the PFAS NPDES Regional Coordinators Committee," EPA revised each of the sector-specific fact sheet guidance documents to include practices that could be used by operators to minimize PFAS in stormwater discharges.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Navy Federal Engineering Command NorthWest (NAVFAC NW)
**Document Control Number:** EPA-HQ-OW-2019-0372-0258-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Recommend changing "By the end of the first year of your permit coverage under this permit" to "At least once during the term of your permit coverage under this permit". Restricting the timeframe to the first year only makes it very difficult for larger permitted facilities, such as the Navy, to conduct a robust Unauthorized Non-Stormwater Discharge Evaluation at all of our facilities.

**Comment Response:**

EPA acknowledges the commenter's recommendation for reducing operator frequency of evaluating for non-stormwater discharges. However, EPA disagrees that conducting inspections and evaluations for unauthorized non-stormwater discharges by the end of the first year is restrictive and expects that operators will be able to comply with the requirement during normal business hours over the course of a year. EPA points out that the Final 2021 MSGP Part 6.2.3.4 allows operators to document infeasibility with this "by end of first year" requirement and create an alternative schedule. EPA also points out that operators must comply with the non-numeric technology-based effluent limits in Final 2021 MSGP Part 2.1.2 and 6.4.1.3, for continually evaluating for the presence of non-stormwater discharges and eliminating or obtaining a separate National Pollutant Discharge Elimination System (NPDES) permit for such discharges. EPA also notes that operators must evaluate their respective facilities through required routine inspections (Final 2021 MSGP Part 3.1.3.6) and documentation for unauthorized non-stormwater discharges that may impact water quality.

---

**Commenter Name:** Jesse Levine
**Commenter Affiliation:** U.S. Tire Manufacturers Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0259-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

- We recommend that EPA remove the requirement, outlined in Part 6.2.3, to identify roofs and fences as potential sources of pollutant sources and to include those sources in a stormwater pollution prevention plan (SWPPP).

**Comment Response:**

EPA disagrees that pollutants in stormwater discharged from structures themselves within areas of industrial activity cannot be considered potential pollutant sources "associated with industrial activity." In the Conditional No Exposure Exclusion from Industrial Activity Appendix K, 2021 MSGP, EPA states "Particulate matter or visible deposits of residuals from roof stacks and/or vents not otherwise regulated (i.e., under an air quality control program) and evident in stormwater outflow are considered exposed. Likewise, visible "track out" (i.e., pollutants carried on the tires of vehicles) or windblown raw materials is considered exposed." The language in the 2021 MSGP Part 6.2.3 alerts permittees to the potential for other sources of pollutants to contribute pollutants to stormwater discharges associated with industrial activity, and thus the

need to ensure that the discharge of any pollutants from those sources is minimized or controlled appropriately. Also see comment response to DCN EPA-HQ-OW-2019-0372-0245-A1 comment excerpt number 53.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

BES strongly recommends that this section include a requirement for an operations and maintenance plan for specific control measures as needed. In BES's experience, operators often neglect operations and maintenance of control measures resulting in reduced functioning or failure of control measures. By requiring an O&M plan in the SWPPP, the EPA can ensure that site controls are maintained according to manufacturer's specifications or a specific maintenance schedule. BES recommends this requirement be added to Section 6.2.5.1.

**Comment Response:**

Regarding the comment that operators should prepare and include an operation and maintenance plan for specific control measures in the SWPPP, EPA disagrees and feels this would be redundant with existing final 2021 MSGP requirements. EPA points out that the final 2021 MSGP permit requires operators to select, design, install, and implement control measures (including best management practices) in accordance with good engineering practices and manufacturer's specifications (final 2021 MSGP Part 2.1, Stormwater Control Measures). Additionally, EPA notes that "qualified personnel" (defined below) must conduct inspections to ensure proper selection, design, installation, and maintenance of control measures at facilities. The 2021 MSGP Part 6.2.5, Schedules and Procedures, requires the SWPPP maintain preventative maintenance procedures and inspection frequencies for all control measures implemented.

EPA notes that the MSGP, as a general National Pollutant Discharge Elimination System (NPDES) permit, covers similar operations and similar types of discharges that can be sufficiently controlled with standard requirements and stormwater control measures that are applied across an array of facilities; therefore, requirements for an additional operation and maintenance plan with the SWPPP may also be overly costly or burdensome to some facilities.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1

**Comment Excerpt Number:** 52
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, in section 6.2.5.1, condition c states that other plans for SPCC developed for the facility may be referenced in the SWPPP by following Part 5.4 of the permit. However, there is no section 5.4. The reference appears to be to Part 6.2 and we recommend correction.

**Comment Response:**

The 2021 MSGP has been revised to correctly reference Part 6.4 (SWPPP Availability) of the revised MSGP.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 50
**Excerpt Status:** Final

**Comment Excerpt:**

With respect to section 6.2, this permit condition requires that relevant portions of documents referenced by the SWPPP, such as Spill Prevention Control and Countermeasures (SPCC) and EMS documentation, be kept with the SWPPP. In practice, this could create redundancy and maintenance issues. We recommend that relevant portions of those documents be readily accessible rather than kept with the SWPPP.

**Comment Response:**

EPA disagrees that the 2021 MSGP does not allow for "readily accessible" formats and creates redundancy. EPA notes that 2021 MSGP Part 6.4, SWPPP Availability, allows for Stormwater Pollution Prevention Plans (SWPPPs) and documents incorporated by reference be kept "in any accessible format" (e.g., internet URL option), and therefore it would not be consistent for EPA to require them be kept "on site." The 2021 MSGP Part 6.4 also provides that documents can be "incorporated by reference." Therefore, the permit already makes clear that the SWPPP need not "recreate the same text from such other documents". Additionally, EPA notes that operators must make their SWPPPs publicly available by either attaching it to the NOI, including a URL in the NOI, or providing additional information from the SWPPP on the NOI. Therefore, EPA is retaining the requirement for all industrial sector operators to make the SWPPP, or portions of the SWPPP, publicly available either via a URL or on the NOI.

---

## 6.4. SWPPP Availability

**Commenter Name:**  Victoria R. Branson
**Commenter Affiliation:**  National Nuclear Security Administration, Sandia Field Office
(DOE/NNSA/SFO), U.S. Department of Energy (DOE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0099-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

**Request to Extend the EPA 45-Day Deadline Required for SWPPP Modifications**

The requirement from Part 5.4.1. of the 2015 MSGP that is carried over to Part 6.4.1 of the 2020
Proposed MSGP states that the SWPPP update shall be posted "no later than 45 days after
conducting the final routine facility inspection for the year." SNL/NM asks EPA to consider a
longer period after the last inspection of the year to complete the SWPPP update. Completing a
revised SWPPP that captures all changes in the previous year within 45 days at a large
organization such as a national laboratory is impracticable: data results from the last monitoring
period of the year may not be approved by EPA through the NeTDMR reporting tool until the
end of December or later. This occurs when the last day of the last monitoring period for an
organization is on or after October 31. If a storm event occurs on this last day and samples are
sent to the analytical laboratory for this storm event, results for that sample are not approved by
EPA through the NeTDMR reporting tool until December at earliest.

Forty-five days is insufficient time to synthesize the data, determine SWPPP modifications
(including determining modifications to control measures or removing analytical sampling from
outfalls that meet permit requirements based on data results), and complete the required review
and approval process by both the operator and the owner. SNL/NM proposes a 90-day period
after the last inspection is completed for that year to complete the modifications to the SWPPP
and upload the document for public access.

**Comment Response:**

EPA disagrees with the comment that 45-days is insufficient and an extension of 90-days after
the final routine facility inspection for the year is needed for operators to make revisions and
updates to the SWPPP. EPA points out that SWPPP updates should be a dynamic and ongoing
process throughout each year of permit coverage as required by the 2021 MSGP Part 6 which
states, "The SWPPP is a living document. Facilities must keep their SWPPP up-to-date
throughout their permit coverage, such as making revisions and improvements to their
stormwater management program based on new information and experiences with major storm
events."

EPA also notes that the final 2021 MSGP Part 5.1.1,Conditions Requiring SWPPP Review and
Revision to Ensure Effluent Limits are Met, requires that conditions detected during an
inspection, monitoring or other means, then the owner and operator must review and revise, as

appropriate, the SWPPP (e.g., sources of pollution; spill and leak procedures; non-stormwater discharges; the selection, design, installation and implementation of your control measures) so that this permit's effluent limits are met and pollutant discharges are minimized. EPA notes that SWPPP revisions, as applicable, are typically required to be implemented within the corrective action timeframes deadlines of within 14-days but no longer than 45 days after discovery (not just capturing all changes for the entire year after final inspection).

EPA also points out that the 2021 MSGP Part 5.1.3.2, Subsequent Actions, requires "Where your corrective actions result in changes to any of the controls or procedures documented in your SWPPP, you must modify your SWPPP accordingly within 14 calendar days of completing corrective action work" and "These time intervals are not grace periods, but are schedules considered reasonable for documenting your findings and for making repairs and improvements. They are included in this permit to ensure that the conditions prompting the need for these repairs and improvements do not persist indefinitely."

Additionally, EPA notes that operators must make their SWPPPs publicly available by either attaching it to the NOI, including a URL in the NOI, or providing additional information from the SWPPP on the NOI. Regardless of how often the industrial activity associated with stormwater discharges changes throughout the permit term, the requirement to update the SWPPP information in the NOI is not overly burdensome in the 2021 MSGP.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

Posting SWPPP on the internet

Part 6.4.1 and Part 6.4.2 (from page 94 of Fact Sheet)

"Operators must post an updated SWPPP at least once a year no later than 45 days after conducting the final routine facility inspection for the year required in Part 3.1."

The timing for updating the SWPPP needs to be the same date as the annual report, Jan 30th. The final routine facility inspection for calendar year can be confused with the final of 4 consecutive quarters of the permit. It would be easier to comply if both compliance dates were the same. The permittee will be in the electronic system once and submit the annual report and update the SWPPP.

**Comment Response:**

EPA disagrees with the comment that this requirement to post Stormwater Pollution Prevention Plan (SWPPP) updates be the same as the annual report submittal date of January 30th for each year of permit coverage. EPA points out that SWPPP updates should be a dynamic and ongoing process throughout each year of permit coverage as required by 2021 MSGP Part 6 which states "The SWPPP is a living document. Facilities must keep their SWPPP up-to-date throughout their permit coverage, such as making revisions and improvements to their stormwater management program based on new information and experiences with major storm events."

Additionally, EPA notes that operators must make their SWPPPs publicly available by either attaching it to the NOI, including a URL in the NOI, or providing additional information from the SWPPP on the NOI. Regardless of how often the industrial activity associated with stormwater discharges changes throughout the permit term, the requirement to update the SWPPP information in the NOI is not overly burdensome in the 2021 MSGP.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 36
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Privacy of employees / potential harassment

Discussion/Recommendations

SWPPP's typically list employee cell phone numbers that they carry with them 24/7. This could lead to invasions of privacy or harassment of our employees.

**Comment Response:**

EPA disagrees with the comment that SWPPP contact information would cause concerns about privacy and security. EPA points out that the 2021 MSGP Part 6.4 and Part 6.4.1 addresses privacy and security concerns associated with the public availability of SWPPP information by not requiring the operator to make public "confidential business information" or "restricted information," as defined in the 2021 MSGP Appendix A. With this provision, sensitive security information (such as employee information not suited for public consumption) would not be required to be divulged to the public. Additionally, EPA has not seen evidence that providing the public access to important information found in the SWPPP will result in a misuse of the data or

information by the public, nor did the commenter provide data or information to support this concern.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 37
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Any modifications on Change NOI form

Discussion/Recommendations

If this requires notification of any change, including administrative types of changes, this will require a flood of notices. With employee staff changes, phone number changes, etc., many NOI's will have to be completed that do not warrant use of company or regulatory time. This is overly burdensome for both parties.

**Comment Response:**

Comment noted. EPA disagrees that the requirement to update the NOI information is not overly burdensome in the 2021 MSGP. These requirements remain unchanged from the 2015 MSGP. EPA's electronic reporting system, NeT-MSGP, includes a streamlined and user-friendly electronic "Modify NOI" feature where the operator can simply re-open their existing NOI, make the necessary changes to phone numbers, for example, and re-submit the form.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

It is overly burdensome, costly, and presents safety concerns for regulated entities to host and maintain a public URL site to post their SWPPP. The requirement to post the SWPPPs on a

public URL is unnecessary as the public may request a regulated entity's SWPPP through the EPA. Posting of detailed and readily-available site information also elevates safety risks for companies from criminal elements seeking facility points of access and or fuel materials storage. There are no identified benefits of this requirement to justify the significantly increased time, costs and manpower necessary for compliance. EPA should consider removing this requirement or at a minimum, remove posting for low-risk facilities within Sector P.

**Comment Response:**

EPA disagrees with the comment that posting of a SWPPP on a public URL is burdensome or would cause concerns about privacy and security. EPA points out that the 2021 MSGP Part 6.4 and Part 6.4.1 addresses concerns about privacy and security concerns associated with the public availability of SWPPP information by not requiring the permittee to make public "confidential business information" or "restricted information," as defined in the 2021 MSGP Appendix A. With this provision, sensitive security information (such as employee information not suited for public consumption) would not be required to be divulged to the public. Additionally, EPA has not seen evidence that providing the public access to important information found in the SWPPP will result in a misuse of the data or information by the public.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA is requesting additional information that is already required to be contained within the facility's SWPPP on the Notice of Intent to Discharge (NOI) form if the regulated entity chooses not to post their SWPPP on a public URL. The information being requested on the NOI is duplicative of the information already required to be contained within the facility's SWPPP. This requirement is duplicative and unnecessary as the EPA may request a copy of the SWPPP and the regulated entity is required to make the SWPPP available to the public per Section 6.4.

**Comment Response:**

EPA disagrees with the comment that publicly providing SWPPP information is burdensome and duplicative. Enhanced transparency and public accessibility of required NPDES documentation are Agency priorities and will better enable the goals and requirements of the CWA to be met. Timely, complete, and accurate information regarding potential pollutant sources, the types and concentration of receiving water pollution, stormwater control measures implemented, etc., are vital for protecting water quality and can provide a powerful incentive to improve compliance and performance. Operators who object to making SWPPP information publicly available may instead apply for an individual NPDES permit. The permit provides three options for meeting the

requirement to make the operator's SWPPP or SWPPP information publicly available. Part 6.4.1.1 details the option to attach the SWPPP to the NOI. Part 6.4.1.2 details the option to provide a URL of the operator's SWPPP location on their NOI form. In line with these goals, EPA prefers to have all relevant SWPPP information immediately available to the Agency (and to the public) through the NOI (as text or attachment) or Internet URL options in the permit.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Part 6.4 includes requirements for providing the facility's SWPPP at a URL included in the NOI or including certain SWPPP information in the NOI. This language is essentially the same as in the 2015 MSGP but needs clarification.

In Part 6.4.1, the permit states "to remain current, you must post any SWPPP modifications, records, and other reporting elements required for the previous year at the same URL as the main body of the SWPPP." If no URL was provided and instead information from the SWPPP was included in the NOI, you are required (Part 6.4.2) to "report any modifications to the SWPPP information required by Part 7.3 through submittal of a "Change NOI" form." Both of these require the update to be completed no later than 45 days after conducting the final routine inspection for the year. The language in Part 6.4 of the proposed MSGP appears to require updating the publicly available SWPPP or the SWPPP information provided in the NOI *only if modifications were made t*o the SWPPP during the previous calendar year. The use of the phrase "SWPPP modifications, records, or other reporting elements" in Part 6.4.1 is confusing and is only included with reference to posting the SWPPP at a URL. Is it EPA's intention to require facilities to provide not only the updated SWPPP (if there were changes during the year), but also "records and other reporting elements" at the URL? If so, which records and reporting elements is this in reference to? Other required SWPPP records and reporting elements are already being separately reported to EPA via NeT-DMR and annual reports (which include a summary of routine inspections, quarterly visual inspections, corrective actions, etc.). If a URL was not provided in the NOI, the language in Part 6.4.2 for submittal of a Change NOI only requires updating the information described in Part 7.3 of the MSGP with no reference to records or other reporting elements. To clarify this section of the proposed MSGP, we suggest removing the phrase "records and other reporting elements" in Part 6.4.1. It would be overly burdensome to require operators to provide all SWPPP records and reporting elements every year at the URL, given that these are already being separately reported to EPA. In addition, many facilities will not have made any changes to their SWPPPs during the year and if that is the case there should be no need to update the SWPPP (either at a URL or elements reported in an NOI).

**Comment Response:**

EPA acknowledges the comment and has included clarifying language in the 2021 MSGP and Fact Sheet with three options for operators to make their SWPPP and SWPPP information publicly available. Part 6.4 and Parts 6.4.1 thorough 6.4.1.3 of the 2021 MSGP state:

Part 6.4.1, Making a SWPPP Publicly Available, states "You have three options to comply with the public availability requirements for the SWPPP: attaching your SWPPP to your NOI; providing a URL of your SWPPP in your NOI; or providing SWPPP information in your NOI. To remain current for all three options, you must update your SWPPP (by updating the attachment via a Change NOI per Part 6.4.1.1, updating your webpage per Part 6.4.1.2, or updating the SWPPP information in the NOI via a Change NOI per Part 6.4.1.3) no later than 45 days after conducting the final routine facility inspection for the year required in Part 3.1. You may switch your preferred option throughout your permit coverage, but you must update your NOI as necessary to indicate your change in option."

Option 1: Part 6.4.1.1, Attaching the SWPPP on the NOI, states "You may attach a copy of your SWPPP, and any SWPPP modifications, records, and other reporting elements that must be kept with your SWPPP, to your NOI in NeT-MSGP."

Option 2: Part 6.4.1.2, Providing a URL of the SWPPP in the NOI, states "You may provide a URL in your NOI in NeT-MSGP where your SWPPP can be found, and maintain your current SWPPP at this URL. You must post any SWPPP modifications, records, and other reporting elements that must be kept with your SWPPP required for the previous year at the same URL as the main body of the SWPPP."

Option 3: Part 6.4.1.3, Providing SWPPP Information in the NOI Form, clarifies which information may be included in operators NOI in Net-MSGP. For example, onsite industrial activities exposed to stormwater, pollutants associated with industrial activity, stormwater control measures, and facility schedules for good housekeeping and maintenance inspections.

EPA notes that this new flexibility provides operators with a time-saving option to easily upload SWPPPs and other documents that must be kept with the SWPPP as outlined in the permit. EPA clarifies that all operators must post an updated SWPPP at least once a year regardless of whether or not modifications were made. EPA disagrees with the comment that "… many facilities will not have made any changes to their SWPPPs during the year …" and therefore, SWPPP records would not need to be updated each year. EPA points out that SWPPPs (including Site Maps) are intended to be a "living document" and it is highly unlikely that a facility's control measures would not need be maintained as a result of inspections conducted throughout the course of a year which must be documented and reported, in addition to any corrective actions or AIM responses from monitoring exceedances.

EPA is maintaining the language that "…records, and other reporting elements that must be kept with the SWPPP" must also be uploaded with the SWPPP. EPA notes that Part 6, Stormwater Pollution Prevention Plan, Part 6.5, Additional Documentation Requirements, and Part 7.2, Submitting Information to EPA, of the 2021 MSGP, provides clarification on the records and documentation requirements for inclusion in operator SWPPPs and submission to EPA each year.

## 6.5. Additional Documentation Requirements

**Commenter Name:** Patrick J. Fanning
**Commenter Affiliation:** Virginia Manufacturers Association (VMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0180-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

EPA also proposes the removal of language in former section 6.1.1.2 regarding documentation requirements for SWPPPs where a finding that no further pollutant reductions were technologically available and economically practicable in light of best industry practice. VMA believes this language should be reinstated in any final MSGP to allow a permittee to demonstrate this finding.

**Comment Response:**

EPA points out that this language has been removed from the benchmark monitoring exceptions in the final 2021 MSGP. Part 5.2.6 of the 2021 MSGP Fact Sheet explains "That this exception to AIM is inappropriate in the 2021 MSGP for several reasons. Feasibility considerations are not relevant at AIM Level 1 because the operator can self-determine that no additional measures are warranted, as well as AIM Level 2 where the operator can select pollution prevention/house-keeping measures they deem appropriate. At AIM Level 3, repeated benchmark exceedances have occurred to a point at which implementation of permanent stormwater control measures is warranted. Industrial stormwater discharges are explicitly required to meet all provisions of CWA §301, including applicable water quality standards (CWA §402(p)(3)(A))."

EPA expects the great majority of operators performing AIM responses will determine there are modifications that can be made to the control measures that are technologically available, and economically practicable and achievable. The MSGP provides considerable flexibility to operators in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, and EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. EPA also notes that benchmark monitoring applies to only approximately half of the covered facilities, many of which will fulfill the benchmark monitoring requirements in the permit after the first year of permit coverage or will qualify for one of the exceptions to reduce or discontinue monitoring (e.g., because exceedances are due to pollutants in the natural background) until the fourth year of their permit coverage.

---

**Commenter Name:** David L. Wagger
**Commenter Affiliation:** Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0184-A1

**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

As a "bookkeeping" matter, ISRI noticed that the references in Part 6.5.8.4 to "natural background pollutant levels per Part 5.2.5.2" and in Part 6.5.8.5 to "run-on, per Part 5.2.4.3" are incorrect. Neither of these referenced parts exists in the Proposed 2020 MSGP. As proposed, "Natural Background Pollutant Levels" is addressed by Part 5.2.4.1, and "Run-On" is addressed by Part 5.2.4.2. Parts 6.5.8.4 and 6.5.8.5 (or their successors) should be revised to correct these references.

**Comment Response:**

Comment noted. EPA has made the appropriate reference changes in the 2021 MSGP.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 50
**Excerpt Status:** Final

**Comment Excerpt:**

It appears that there is a typo in the reference to "Part 5.2.5.2" in Part 6.5.8.4 above, since Part 5.2.5.2 does not exist in the proposed 2020 MSGP. Simplot requests that the text to "Part 5.2.5.2" be replaced with a reference to "Part 5.2.4.1".

**Comment Response:**

Comment noted. EPA had made the appropriate references changes in the 2021 MSGP.

## 7. Reporting and Recordkeeping

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0113
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

I strongly oppose the proposed action. Pushing back the deadline by five years for National Pollution Discharge system reporting and compliance is not in the best interest of the country

and the public sector that the system was established to protect. THe permit should not be issued; reporting and compliance should proceed as originally envisioned.

**Comment Response:**

Comment noted.

---

**Commenter Name:**  Angus E. Crane
**Commenter Affiliation:**  North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0193-A1
**Comment Excerpt Number:**  27
**Excerpt Status:** Final

**Comment Excerpt:**

Annual Reporting:   NAIMA supports maintaining annual reporting and does not support any action that will take the reporting from annual to quarterly reporting.

**Comment Response:**

Comment noted.

## 7.1. Electronic Reporting Requirement

**Commenter Name:**  Taunia Van Valkenburg
**Commenter Affiliation:**  Triad National Security LLC's
**Document Control Number:**  EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 7.1 Electronic Reporting Requirement:***

EPA should allow an additional condition for needing a waiver from electronic reporting.

Our facility is unable to use NeT-MSGP, but not for either of the stated conditions. Instead, the limitation is due to the NeT-MSGP system's inability to accommodate Permit Conditions Applicable to Specific States, Indian Country Lands, or Territories in Part 9 of the Permit. In the 2015 MSGP, the State of New Mexico required modification of hardness-based benchmarks to align with state Water Quality Standards in 40.6.4.900 NMAC. These modifications extended to changing total to dissolved species for certain metals (dissolved metals are not available in NeT-MSGP) and resulted in hardness-based benchmark limits that differed from the national hardness-based benchmarks loaded into NetDMR. Additionally, in 2015 NeT-MSGP was not

using the most current version of the NM CWA 303(dy305(b) Integrated Report, therefore incorrect Impaired Waters pollutants were assigned by default to some outfalls, and not all pollutants were available for selection (e.g., dissolved metals and Adjusted Gross Alpha) to correct the default assignments. The inability to use NeT-MSGP to submit our NOI results in our inability to submit Change NOIs, Annual Reports, and NOTs electronically as well, therefore our waiver must apply to all submittals for the entire permit term.

As Part 9.6.2 of the 2015 MSGP applied to the State of New Mexico, the conflict between these modified permit requirements and NeT-MSGP's system capabilities presumably impacted every MSGP facility in the state either belonging to a Sector having hardness-based benchmarks or discharging into an impaired water. In essence, the MSGP is a general permit, but with monitoring requirements that depart from the national requirements for facilities in New Mexico. NeT-MSGP is not currently configured to accommodate these modified requirements. By not offering a condition that reflects these system limitations, the permittee's signature on the NOI effectively certifies an inaccurate reason for requesting a waiver.

*Recommendation*:

We respectfully request a waiver based on system limitations to accommodate Permit Conditions Applicable to Specific States, Indian Country Lands, or Territories in Part 9 of the Permit in order to support certification of a complete and accurate NOI.

**Comment Response:**

EPA acknowledges the comment and reminds the operator as stated in the final 2021 MSGP permit part 7.1, Electronic Reporting Requirement, that in certain circumstances (e.g., the owner/operator's headquarters is physically located in a geographic area (i.e., ZIP code or census tract) that is identified as under-served for broadband Internet access in the most recent report from the Federal Communications Commission; the owner/operator has issues regarding available computer access or computer capability) the operator may be granted waiver by request and review of the applicable EPA Regional Office. Otherwise, operators need to submit electronically and should contact their respective EPA Regional Office regarding any inaccuracies in DMRs forms or modifications to reflect state requirements.

## 7.2. Submitting Information to EPA

**Commenter Name:**  Ryan Crosbie
**Commenter Affiliation:**  CRH Americas, Inc. (CRH)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

Some companies have experienced significant problems with adding, removing, or modifying outfalls within the internet based (NeT MSGP) reporting system. The system either does not

accept the changes or simply crashes. Since the permit requires a facility to make certain changes in its NOI/facility information if inspections or changes at a facility warrant, then the reporting system should be dynamic enough to handle those changes. Otherwise, a facility could be considered out of compliance even though they had no control of the reporting system. Despite repeated attempts to work with CDX and EPA, the problem does not appear to be resolved.

**Comment Response:**

Comment noted.

### 7.4. Reporting Monitoring Data to EPA

**Commenter Name:** Evan Jenkins
**Commenter Affiliation:** Environmental Compliance Division, City of Nampa, ID
**Document Control Number:** EPA-HQ-OW-2019-0372-0133-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA's online reporting tools NDMR-R10ID and NETMSGP should be upgraded or modified to provide a smoother user experience for permittees submitting monitoring data and reports to the EPA. The NetDMR reporting tool, adapted from wastewater use for stormwater use, is designed for collecting data at scheduled regular intervals, and it does not include the flexibility needed for reporting makeup samples or addressing site changes, such as adding or removing outfalls in a timely manner. These issues lead to confusion for permittees and extra work to ensure compliance with reporting deadlines. Additionally, the system flags benchmark data that is above thresholds as a limit exceedance, an instance of noncompliance, rather than just a notification or other more appropriate indicator. The City requests that as part of the EPA's effort to overhaul monitoring requirements in the proposed 2020 MSGP, appropriate attention is also paid to improving the NetDMR system to make compliance reporting as straightforward as feasible for permittees.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

Update the DMR in NeTDMR

Is it possible to include all required parameters on one DMR for each outfall? Some permittees must complete multiple DMRs. Example: Often 3 DMRs are required per outfall as each hardness dependent metal will generate its own DMR. Should the permittee have 3 outfalls, then there are 9 DMRs required for each quarter. Should there be two co-located sectors then there are even more DMRs. Please combine all parameters for one outfall on one DMR.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0142-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

Part 7.4.1 Submitting Monitoring Data via NeT-DMR. You must submit all monitoring data collected pursuant to Part 4.2 to EPA using EPA's electronic DMR system .... no later than 30 days after you have received your complete laboratory results for all monitoring discharge points for the reporting period.

Response to Part 7.4.1 - First the stormwater sample is taken and a visual assessment completed. Next the sample is sent to the laboratory or picked-up by laboratory or driven to the laboratory. In approximately 10 to 14 days later, the lab results are either emailed or mailed to the company contact. This may be two full work weeks after the sample was taken. Results are reviewed and if the results are within benchmarks, then the next step is to submit the results through NeTDMR. This is a time consuming task and must be scheduled into the work day. Often it is the Operator or Plant Manager who completes this task. This task may include changing one's password without success, calling CDX for help, and interruption(s) that move the task to another day. The long and short of it is, that 30 days from receiving the laboratory report, even with good results and submitting through NeTDMR is opportunity for NON-compliance. Submitting stormwater results within 30 days from the end of quarter would be more appropriate.

**Comment Response:**

EPA acknowledges the comment request for an extension to submitting monitoring data results from 30 days of receipt of laboratory results to no later than 30 days from the end of quarter. EPA disagrees and is requiring operators to submit benchmark monitoring data 30 days following receipt of laboratory results to provide EPA, states, and other stakeholders with an opportunity to periodically evaluate discharge levels and to be able to respond in a timely manner if there are water quality concerns. If operators wait until the 30 days from the end of the

quarter to submit the data, EPA loses valuable time to ensure that any necessary corrective action measures are taken and/or water quality concerns addressed. EPA also points out that for operators subject to effluent limitation monitoring, permit Part 4.2.3 of the 2021 MSGP, those operators must conduct follow-up monitoring within 30 calendar days (or during the next measurable storm event) for NEL exceedances and implement appropriate corrective actions per permit part 5.1 along with submitting an exceedance report 30 days from receipt of the monitoring laboratory results.

---

**Commenter Name:**  Paula Dodge-Kwan
**Commenter Affiliation:**  Engineering Division, Albuquerque, NM
**Document Control Number:**  EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

The DMR reporting tool does not allow for multiple entries in one reporting period. In the arid southwest, we may not experience storm events for several quarters but then have several qualifying events in one quarter that may be used to make up for quarters in which no discharges occurred.

**Comment Response:**

Comment noted.

---

**Commenter Name:**  Ian P. Gaudreau and Claire Golden Lund
**Commenter Affiliation:**  GZA GeoEnvironmental, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0171-A1
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

GZA recommends that the U.S. Environmental Protection Agency (EPA) add a section or appendix to the 2020 MSGP that provides a list of No Data Indicator codes (NODI) for NetDMR, a description of the codes, and clarification of when a code should specifically be used. Certain NODI Codes in NetDMR will trigger an automatic violation, regardless of comments provided on the EPA ECHO page, and potentially flags the next 3 subsequent quarters as automatic violations. Since this is such an important reporting parameter, additional NODI information/guidance should be provided so there is certainty and consistency in the codes being selected;

**Comment Response:**

EPA is planning to provide a list of NODI codes on the industrial stormwater website in response to this comment.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

Add "No Discharge Report" to section heading (e.g., 7.4.4 Submission Deadline for Benchmark Monitoring Data, including No Discharge Report). EPA should include clear language (e.g., "You must submit DMR no later than 30 days after the end of the reporting period even if there was no discharge") for each type of monitoring. EPA may need to include more instruction on submitting "no discharge" and no discharge (NODI) codes in DMRs, including which codes indicate non-compliance.

**Comment Response:**

EPA points out that this permit part is now Part 7.3.4 of the 2021 MSGP, Submission Deadline for Indicator and Benchmark Monitoring Data, and the permit does include language requiring submitting monitoring information even if the discharge points did not have a discharge. Permit Part 7.3.4 of the 2021 MSGP states "Or, for any of your monitored discharge points that did not have a discharge within the reporting period, using EPA electronic DMR tool, you must report that no discharges occurred for that discharge point no later than 30 days after the end of the reporting period."

## 7.5. Annual Report

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

The COA would like to request an extension of the due date to the Annual Report by another month to February 28. One month (30 days) including the holiday period does not give us adequate time to process information obtained from the month of December into the report.

**Comment Response:**

EPA disagrees. EPA expects that operators prepare and gather information in advance for filling out the Annual Report come January and that any additional information obtained in December can be reasonably compiled and incorporated  within the provided timeframe

## 7.7. Additional Standard Recordkeeping and Reporting Requirements

**Commenter Name:**  Paula Dodge-Kwan
**Commenter Affiliation:**  Engineering Division, Albuquerque, NM
**Document Control Number:**  EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

Please include contact information for the local MS4 Operator in Part 9 or in an Appendix. The contact information for the City of Albuquerque is MS4Compliance@cabq.gov .

**Comment Response:**

EPA declines to list the contact information of local Municipal Separate Storm Sewer System (MS4) operators in Part 9 of the 2021 MSGP. This information would likely become outdated during the 5-year permit term.7.9. Addresses for Reports

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  34
**Excerpt Status:** Final

**Comment Excerpt:**

Update EPA Region 6's mailing address to 1201 Elm Street, Suite 500, Dallas, TX 75202

**Comment Response:**

EPA has updated Regional addresses in Part 7.

## 8. Sector Requirements for Industrial Activity

**Commenter Name:**  John P. Whitescarver
**Commenter Affiliation:**  Whitescarver Foundation, National Stormwater Center, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0114-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

There are threshold levels in section 8 where the tables mix mg/L and ug/L. Believe they should be all in the same units. See Table 8.F.1 as an example.

**Comment Response:**

Comment noted. EPA has intentionally revised some units of measurement in the final 2021 MSGP to match the original units of the value source.

---

**Commenter Name:** Jeffrey A. Cox
**Commenter Affiliation:** Division of Sewerage and Drainage, Department of Public Utilities, Columbus, OH
**Document Control Number:** EPA-HQ-OW-2019-0372-0131-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

2. Columbus requests that USEPA consider either allowing industries to be classified by more than one code or allow for use of a single code that represents the most pollution potential, and not the most revenue-generating potential, of the site.

**Comment Response:**

EPA is revising the definition of a "Primary Industrial Activity" in the permit to match 40 CFR 122.26(b)(14) (refer to definition below).

The 2021 MSGP Appendix A defines: "Primary Industrial Activity – includes any activities performed on-site which are (1) identified by the facility's primary SIC code and included in the descriptions of 122.26(b)(14)(ii), (iii), (vi), (viii), or (xi); or (2) included in the narrative descriptions of 122.26(b)(14)(i), (iv), (v), (vii), or (ix). [For co- located activities covered by multiple SIC codes, it is recommended that the primary industrial determination be based on the value of receipts or revenues or, if such information is not available for a particular facility, the number of employees or production rate for each process may be compared. The operation that generates the most revenue or employs the most personnel is the operation in which the facility is primarily engaged. In situations where the vast majority of on-site activity falls within one SIC code, that activity may be the primary industrial activity.] Narrative descriptions in 40 CFR 122.26(b)(14) identified above include: (i) activities subject to stormwater effluent limitations guidelines, new source performance standards, or toxic pollutant effluent standards; (iv) hazardous waste treatment storage, or disposal facilities including those that are operating under interim status or a permit under subtitle C of the Resource Conservation and Recovery Act (RCRA); (v) landfills, land application sites and open dumps that receive or have received

industrial wastes; (vii) steam electric power generating facilities; and (ix) sewage treatment works with a design flow of 1.0 mgd or more."

---

**Commenter Name:** Jeffrey A. Cox
**Commenter Affiliation:** Division of Sewerage and Drainage, Department of Public Utilities, Columbus, OH
**Document Control Number:** EPA-HQ-OW-2019-0372-0131-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

3. Columbus requests that USEPA consider creating an additional category for soil recycling and soil brokering facilities or clarifying under what NPDES permits such facilities are to be regulated for stormwater runoff. These types of industries are typically permanent facilities involved with the storage and remediation of contaminated soils or the buying, selling, storage and transport of clean fill material. Presently, these industries do not appear to be eligible for coverage under the MSGP nor do they appear to be considered construction sites eligible for coverage under the Construction General permit.

**Comment Response:**

EPA points out that prior to the issuance of the 1995 MSGP an analysis of industrial sources not covered under the stormwater Phase I rule was performed to determine whether any such industries should be covered under the 1999 stormwater Phase II rule (Report to Congress, March 1995, EPA 833-K-94-002). Ultimately, no new industrial sources were included in the stormwater Phase II rulemaking. While EPA recognizes the benefits of the recommendation to cover facilities with activities similar to those already covered by the MSGP, such an expansion would require a separate regulatory action to modify the definition of "stormwater discharges associated with industrial activity" in 40 CFR 122.26(b)(14) and is outside of the scope of this permit. Additionally, in Sector AD, the MSGP covers other stormwater discharges designated by the Director as needing a permit (see 40 CFR 122.26(a)(9)(i)(C) & (D)) or any facility discharging stormwater associated with industrial activity not described by any of Sectors A-AC.

---

**Commenter Name:** Randall M. Lyons
**Commenter Affiliation:** Massachusetts Marine Trades Association (MMTA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

We first write to object to the fact that the Proposed 2020 MSGP continues to consider ordinary marinas to be businesses specializing in water transportation (Sector Q) and now also considers recreational boat repair (Sector R) to also be "industrial" activities subject to federal monitoring and quarterly testing.

Our member businesses are marinas and boat repair facilities who do the bulk of their repair work on land, mostly under cover, and use modern, environmentally-conscious technology that automatically collects all of their power washing water for proper reuse and disposal. Yet, the fact that they do power washing at all triggers these marinas to be treated as if they are "industrial" facilities whose operations are having a serious effect on water quality. This could not be farther from the truth. In fact, the two pollutants commonly associated with "impaired water bodies" in Massachusetts are not metallic compounds, but instead are nitrogen and fecal coliform. And we know for a fact that these pollutants are not coming from marine businesses because Massachusetts is a "no discharge" state by law and marinas do not use nitrogen or generate fecal coliform. It has become a dramatic burden on the small businesses to pay for stormwater testing when their operational effects on water quality are so limited and unrelated to the reasons for impaired waterways. These are no longer the days of yore when marinas or boat repair facilities had no environmental controls and the proposed MSGP should be revised to reflect those changes.

**Comment Response:**

EPA acknowledges the comment relating to businesses specializing in water transportation and recreational boat repair being identified as covered industrial activities under Sector Q and Sector R. EPA points out as the comment does that these sectors and sector specific requirements were also contained in the 2015 MSGP. EPA recognizes that facilities in Sector Q (Water Transportation) and Sector R (Ship and Boat Building and Repair Yards) perform activities like fluid changes, mechanical repairs, engine maintenance and repair, parts cleaning, refinishing, paint removal, painting, fueling, metal working, welding, cutting, and grinding. These sorts of activities can include using solvents, oils, fuel, antifreeze, acid and alkaline wastes, abrasives, and paints and can create dust.

EPA notes that 40 CFR 122.26(b)(14)(viii) regulates those Sector Q and R facilities which have "vehicle maintenance shops" and "equipment cleaning operations" and only those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) and equipment cleaning operations. Vehicle maintenance shop refers to "a nontransient location or area at a transportation facility's site that is designated for use for vehicle maintenance or in which vehicle maintenance is conducted on a regular or repeated basis, including intermittently or sporadically." *In re San Pedro Forklift, Inc.* 15 E.A.D. 838, 858 (EAB 2013).

The 2021 MSGP, as with the 2015 MSGP, requires that operators in Sector Q have benchmark monitoring for total recoverable aluminum, total recoverable lead, total recoverable zinc.EPA recognizes that the comment states all member businesses " ... collect all of their power washing water for proper reuse and disposal."; however, EPA recognizes that this may not be the case for all of these types of businesses and associated industrial activities nationwide. Additionally, EPA

notes that the final 2021 MSGP Part 4.2.2.2 provides for many operators, after the first year of benchmark monitoring, operators can discontinue monitoring until 4th year of their permit coverage if the annual average for a parameter does not exceed the benchmark threshold.

After consideration of public comments on establishing benchmark monitoring for Sector R, EPA is not finalizing benchmark monitoring requirements for this sector. See Comment Response Essay 2 Monitoring. The 2021 MSGP does requires that operators in Sector R conduct indicator "report-only" monitoring for Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), and pH, and Polycyclic Aromatic Hydrocarbons (PAHs) (for facilities under SIC Code 3731 and 3732 only). Indicator monitoring for these parameters will provide a baseline and comparable understanding of industrial stormwater discharge quality, potential water quality problems, and stormwater control effectiveness for these operators

**Commenter Name:** Howard Marks
**Commenter Affiliation:** National Asphalt Pavement Association (NAPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

While there are no substantial changes to the proposed 2020 MSGP sector-specific benchmark monitoring parameters for SIC 2951, NAPA recommends further delineation between asphaltic and coal tar-based paving materials. The proposed, current, and historic MSGP has always differentiated subsector D1 (discharges from asphalt paving mixture manufacturing) from subsector D2 (discharges from asphalt emulsion facilities). However, SIC 2951 also includes the manufacture of coal tar paving materials. Due to substantial physical and chemical differences between asphaltic and coal tar paving materials, we recommend EPA further differentiate such discharges from the manufacture or use of coal tar paving products. Further, we recommend EPA remove coal tar paving materials from SIC 2951 since the source category is defined as asphalt paving mixtures and blocks. The chemical differences and end-use parameters between asphaltic and coal tar paving materials question why both materials are identified under the same SIC.

**Comment Response:**

Comment noted. Following consideration of the comments, EPA is not finalizing the coal-tar eligibility criterion that was proposed in the proposed 2020 MSGP. See Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.4.1, 8.H.4.4.1, and 8.J.4.4.1: The requirement to conduct an inspection "within 24 hours of a storm event of 0.25 inches or greater" should be removed from this provision, as well as from all other provisions in Parts 8.G, 8.H, and 8.J that impose such a requirement. The current requirement is to inspect within 24 hours of the end of a storm event of 0.5 inches or greater—a requirement that already imposes a significant burden. WMA member companies that are complying with the existing requirement have found that, even after storm events of 0.5 inches or greater, there are rarely stormwater discharges. To require additional inspections based on an even lower threshold of measurable precipitation would place a strain on those companies' resources with no demonstrable benefit. Finally, given the absence of any explanation for the change in this requirement, it appears that EPA has not fully considered the impracticability of complying with this requirement in areas with large permit areas or sites with multiple operations. For example, Wyoming bentonite operations have mining pits scattered over multiple Wyoming Counties. For large sites and sites like those it is not feasible to conduct inspections at the proposed frequency (i.e., after each 0.25 inch precipitation event).

Parts 8.G.4.4.2, 8.H.4.4.2, and 8.J.4.4.2: The reduction of inspection frequency to once per month for frozen conditions is still too frequent for remote areas that can only be accessed by snowmobile. EPA should revise the provision to allow for the discontinuation of inspections during frozen conditions. Runoff is not occurring then anyway, so why are we inspecting when the ground is frozen?

**Comment Response:**

The commenter mischaracterizes the 2015 MSGP requirement to inspect within 24 hours of a storm event of "0.5 inches or greater". EPA points out that the requirement for the 2015 MSGP Part 8.G, 8.H, and 8.J is to conduct an inspection "Once every 14 calendar days and within 24 hours of a storm event of 0.25 inches or greater." not "0.5 inches" as stated in the comment. EPA did not change or propose to modify this requirement from the 2015 MSGP and retains the same requirement in the 2015 MSGP.

EPA disagrees with comment assertion the new MSGP is more burdensome and difficult to understand. EPA points out that the 2021 MSGP sector specific Parts 8.G, 8.H, and 8.J have not had significant changes that would impact inspection frequencies; therefore, should not create any additional burden for operators fulfilling the past requirements.

While the once per month inspection requirement is already relaxed for frozen conditions, and EPA allows operators to take safety into account when performing such tasks, the 2021 MSGP, like the 2015 MSGP, already includes the flexibility to address the extreme conditions the commenter references (excerpt below):

"Frozen conditions: You may temporarily suspend or reduce inspections to once per month until thawing conditions occur if frozen conditions are continuous and disturbed areas have been stabilized. For extreme conditions in remote areas, e.g., where transit to the site is

perilous/restricted or temperatures are routinely below zero, you may suspend inspections until such time the conditions are conducive to safe access, and monthly inspections can resume."

This requirement remains unchanged from the 2015 MSGP.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 42
**Excerpt Status:** Final

**Comment Excerpt:**

Parts G, H, and J: EPA should revise these parts to include language stating that the SWPPP AIM requirements do not apply to inactive mining facilities. The proposed MSGP includes one such clarification for Sector J facilities in Part 8.J.6: "The requirements in Part 8.J.6 are not applicable to inactive mineral mining facilities." Yet, no such language appears in the parts applicable to Sectors G and H. EPA should add identical clarifying language to Parts 8.G.6 and 8.H.6.

**Comment Response:**

Comment noted. EPA points out that the final 2021 MSGP Part 8.G.6, 8.H.6, and 8.J.6 all incorporate the following language "Note: The requirements in Part 8.[ ].6 are not applicable to inactive metal mining facilities."

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 43
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.1.2, 8.H.4.1.2, and 8.J.4.1.2: The requirement to complete a repair by the end of next work day is problematic for small companies that may not have a sufficient labor force to meet this requirement with respect to large areas requiring maintenance. The area for mine development disturbance, and especially for exploration, would be significantly larger than the area anticipated in the 2012 CGP for a linear road project. Moreover, it often will be very difficult to coordinate with maintenance personnel to access remote power line sites or

exploration drill hole sites/roads to meet this requirement as proposed, which does not take into account the need to make access to these remote areas safe after a runoff event.

**Comment Response:**

EPA acknowledges the comment regarding the potential for small companies limitations on mobilization and completion of erosion and sediment control maintenance requirements in Parts 8.G.4.1.2, 8.H.4.1.2, and 8.J.4.1.2 of the 2021 MSGP which states that these should be initiated immediately upon discovery and completed " ... by the end of the next work day.". The 2021 MSGP specifies that "immediately" means that the day the operator finds a condition requiring corrective action (as in Part 5.1.1.4), it must take all reasonable steps to minimize or prevent the discharge of pollutants until it can implement a permanent solution. However, if the operator identifies a problem too late in the work-day to initiate corrective action, the operator must perform the corrective action the following work-day morning. The requirement to initiate maintenance efforts immediately upon discovery and complete by the end of the next work day for erosion and sedimentation controls is appropriate to ensure that these controls continue to operate effectively and minimize discharges of sediment from facilities. These requirements remain unchanged from the 2015 MSGP and are consistent with the relevant Construction General Permit (CGP) requirements for these controls to which operators in these sectors would otherwise likely be subject to if their earth-disturbing activities were not covered under the MSGP.

EPA acknowledges the comment regarding safe access to areas to conduct maintenance of stormwater controls. EPA points out that it is anticipated that if operators are able to conduct inspections in a safe manner to identify erosion and sediment control maintenance items then operators should also be able to safely conduct maintenance activities. However, if inspections are unable to be conducted in a safe manner, Parts 8.G.4.4.5, 8.H.4.4.5, and 8.J.4.4 of the final 2021 MSGP allow operators to include documentation (reason and location(s)) of portions of a site that were unsafe to inspect.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 44
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.2.3, 8.H.4.2.3, and 8.J.4.2.3: These parts set forth three compliance alternatives if earth disturbances will occur within 50 feet of a water of the U.S.: (i) a 50- foot undisturbed natural buffer; (ii) an undisturbed natural buffer less than 50 feet supplemented by additional controls so long as they collective achieve a sediment load reduction equivalent to a 50-foot buffer; or (iii) if it is infeasible to provide an undisturbed natural buffer of any size, implement controls that will achieve a sediment load reduction equivalent to a 50-foot buffer. These

requirements do not account for regional and topographical variation across mine sites. For instance, many western sites are dominated by ephemeral drainages to which the buffer concept should not apply, in part because of naturally low vegetative cover. Many areas within the 50-foot buffer may also be composed of exposed rock or bedrock with little to no vegetation in arid/semiarid regions. During storm events, those ephemeral drainages that rarely flow can convey storm waters with elevated, naturally occurring suspended solids typical of such events (and during which the flows are virtually indistinguishable whether in disturbed or undisturbed areas).

Thus, it is unclear whether or how a natural buffer would result in load reduction or how controls are to be evaluated to assess "equivalency" with respect to sediment load reductions. Moreover, some areas in and around mine sites may be topographically limited (e.g., narrow, confined drainages). In those areas, there may be insufficient room for buffers. How would one measure equivalency in those circumstances? The MSGP should allow for flexibility with respect to control measures for construction sites at mining operations. Facilities should have the flexibility to adopt BMPs on a case-by-case basis during construction in lieu of buffers and without regard to the "equivalency" requirement.

**Comment Response:**

EPA acknowledges the comment regarding clarity on exceptions and alternative "equivalency" of a natural buffers as well as the comment to allow for operators to adopt BMPs on a case-by-case basis in lieu of buffers. EPA points out that conserving and/or restoring riparian buffers is vital to help protect streams from stormwater and improve water quality. EPA disagrees that the permit lacks clarity on exceptions and alternatives to natural buffers for operators. Specifically, 2021 MSGP Parts 8.G.4.2.3, 8.H.4.2.3, and 8.J.4.2.3 provides exceptions for when buffer requirements do not apply for operators including for: lack of a discharge potential to a water of the U.S., buffer elimination from preexisting development disturbances, covered under separate CWA 404 permit, and for linear project aspects. Additionally, these permit parts provide a link to guidance on establishment of natural buffers and/or equivalent sediment controls to comply with alternatives (See buffer information under "Fact Sheets and Guidance on EPA's industrial stormwater webpage: https://www.epa.gov/npdes/stormwater-discharges-industrial-activities)

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 45
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.1.6, 8.H.4.1.6, and 8.J.4.1.6: These parts identify the need to provide storage for either (i) the 2-year, 24-hour storm, or (ii) 3,600 cubic feet per acre drained. It is unclear how EPA arrived at this storage size requirement or how that obligation would better control sediment

than other BMPs. The proposed permit's sediment discharge control requirements may be well suited for a conventional construction site but are potentially inapplicable to mine sites. For example, many mine sites are located in terrain that does not lend itself to establishment of specifically sized sediment basins (e.g., those in the Appalachian Basin). The permit should clarify that sediment ponds are not mandatory. Rather, facilities should be permitted to identify site-specific BMPs. For example, smaller sediment basins or traps could be appropriate. Additionally, the requirement to "remove tracked-out sediment by the end of the work day" should be limited to situations where there are sediment volumes on roads in direct proximity to a navigable water.

**Comment Response:**

EPA disagrees with the comment that the proposed 2020 MSGP language suggests that sediment basins are "mandatory". EPA points out that the final 2021 MSGP Parts 8.G.4.1.6, 8.H.4.1.6, and 8.J.4.1.6 establishes minimum requirements only *if* the operator intends to install a sediment basin to treat stormwater from earth-disturbing activities. The requirements state "If you intend to install a sediment basin to treat stormwater from your earth-disturbing activities, you must provide storage for either (1) the 2-year, 24-hour storm, or (2) 3,600 cubic feet per acre drained." EPA also points out that the referenced requirements have been the process under previous permits and are not new requirements under the 2021 MSGP.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 46
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.1.8, 8.H.4.1.8, and 8.J.4.1.8: This part restricts the use of cationic treatment chemicals absent a specific authorization by EPA. EPA does not provide any explanation for imposing this requirement, nor is there a basis for EPA to do so. For example, one NMA member has used cationic flocculants for over twenty years in Alaska with no toxic effects. That facility has never failed a WET test due to flocculent toxicity. Not all cationic polymers are toxic to aquatic resources. NMA opposed this provision in its comments on the 2015 MSGP and continues to recommend EPA remove this provision.

**Comment Response:**

EPA points out that the use of cationic treatment chemicals is only prohibited if not authorized on a case by case basis from the respective EPA Regional Office to ensure appropriate controls and procedures are implemented to be protective of water quality. EPA also notes that this criterion for use of treatment chemicals is similar to EPA's Construction General Permit (CGP) eligibility criterion related to the use of cationic treatment chemicals at construction sites. Public

comments on the proposed 2012 CGP indicated that EPA should take extreme precaution when authorizing the use of cationic treatment chemicals, especially considering data suggesting that they are acutely toxic to aquatic species. For the CGP, EPA concluded that the evidence of toxicity required additional safeguards that are generally included in the individual permit process. Similarly, given the potential for toxicity, additional safeguards have been included for industrial stormwater. This requirement remains unchanged from the 2015 MSGP.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 47
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.4.1, 8.H.4.4.1, and 8.J.4.4.1: The requirement to conduct an inspection "within 24 hours of a storm event of 0.25 inches or greater" should be removed from this provision, as well as from all other provisions in Parts 8.G, 8.H, and 8.J that impose such a requirement. As a threshold matter, the MSGP proposes to define "Storm Event" generically as "a precipitation event that results in a measurable amount of precipitation," but additional clarity is needed. For example, must 0.25 inches of precipitation fall in one day, or would a continuous light rain that eventually produces over 0.25 inches of precipitation over the course of many days also warrant an inspection? EPA should also clarify whether snow melt constitutes a storm event. EPA does not provide any justification for changing the existing requirement to inspect within 24 hours of the end of a storm event of 0.5 inches or greater—a requirement that already imposes a significant burden. NMA member companies that are complying with the existing requirement have found that, even after storm events of 0.5 inches or greater, there are rarely discharges from stormwater ponds. To require additional inspections based on an even lower threshold of measurable precipitation would place a strain on those companies' resources with no demonstrable benefit. Finally, given the absence of any explanation for the change in this requirement, it appears that EPA has not fully considered the impracticability of complying with this requirement in high elevation areas. For example, one NMA member company conducts mining operations at an elevation of approximately 7,000 feet. At such elevations, there are often localized storms that occur more frequently than at lower elevations, such as in nearby towns. For such high elevation mining operations, or operations in complex terrains, it is not feasible to conduct inspections at the frequencies set forth in these parts.

**Comment Response:**

The commenter mischaracterizes the requirement. Requirements remain unchanged from the 2015 MSGP. See response to comment DCN EPA-HQ-OW-2019-0372-0166-A1, Comment Excerpt Number 14.

EPA acknowledges the comment request to "clarify whether snow melt constitutes a storm event." EPA points out that snow melt has been associated with a storm event since the CWA amendments of 1987. The definition of stormwater in Appendix A of the MSGP plainly states this (see definition below). The point of inspections following a storm event is to ensure the controls implemented for stormwater discharges, which has the potential to be erosive and/or a vehicle for transporting other pollutants, are functioning properly. A commonsense reading of the inspection requirement would preclude simple snowfall, in the absence of melting, as having the capacity to cause a discharge, and thus being a trigger for inspections or monitoring. These requirements remain unchanged from the 2015 MSGP.

"Stormwater – stormwater runoff, snow melt runoff, and surface runoff and drainage. See 40 CFR 122.26(b)(13)." (final 2021 MSGP Appendix A, Definitions)

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  48
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.4.2, 8.H.4.4.2, and 8.J.4.4.2: The reduction of inspection frequency to once per month for frozen conditions is still too frequent for remote areas that can only be accessed by snowmobile and where temperatures are typically consistently below freezing for long periods of time. EPA should revise the provision to allow for the discontinuance of inspections during frozen conditions.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 47.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  49
**Excerpt Status:** Final

**Comment Excerpt:**

Parts 8.G.4.4.4, 8.H.4.4.4, and 8.J.4.4.4: The proposed permit would require inspection of "[t]he quality and characteristics of the discharge" in the event a discharge is occurring. EPA should clarify this statement. For example, what water quality parameters must a facility document in

the inspection report? As drafted, there are no numeric limits, and this provision does not define any attributes that must be documented. Operators need more guidance in order to comply with this permit condition.

**Comment Response:**

EPA acknowledges the comment and need for clarity on what the final 2021 MSGP Parts 8.G.4.4.4, 8.H.4.4.4, and 8.J.4.4.4 narrative mean by "[t]he quality and characteristics of the discharge". EPA clarifies that the requirement for observing "The quality and characteristics of the discharge" must include observations and documentation of water quality characteristics that may indicate issues from pollutants that are not required to be monitored for.

Quality and characteristics observations from the final 2021 MSGP Part 3.2.2.4 must include: color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of stormwater pollution.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 51
**Excerpt Status:** Final

**Comment Excerpt:**

*16. EPA Must Adequately Define the Terms "Feasible" and Feasibility," or Adopt an Appropriate Alternative Standard.*

*"Feasible" and "feasibility"* – These terms are used repeatedly, usually within the phrase "where determined to be feasible" and connected to stormwater controls recommended as examples to be implemented within specific industrial sectors. While the controls offered as examples are generally good ones, and they are usually closely connected to that sector's type of potential stormwater pollution, the phrase and the concept require a complete definition to be operable. Without objective criteria in a definition, this concept is entirely subjective and thus ineffective. What are some factors that would make something "infeasible?" Is cost a relevant factor, and how much is too much? Is too much effort with a small or limited staff another criterion? Is technical practicability a third? Are there others? In addition to the necessity for fully *defining* this concept within this regulation, leaving its *determination* wholly to the permittee is a form of flexibility which may not legally be granted.

For example, in **8.N.3.1.5 Scrap and Recyclable Waste Processing Areas**, operators are directed to minimize the discharge of runoff with control measures (examples given), "where determined to be feasible". Or, for **Automobile Salvage Yards**, **8.M.2.3. - Management of Runoff**, "Implement control measures to minimize discharges of pollutants in runoff such as the

following, where determined to be feasible." Without a clear definition of feasibility and how it is to be determined, this is an impermissibly broad standard.

The opposite (and effective) way to phrase such a directive, is to simply state the minimization standard and provide examples. This is found, for example, under **8.N.3.1.3, Stockpiling of Turnings Exposed to Cutting Fluids (Outdoor Storage)**: "Minimize contact of surface runoff with residual cutting fluids by storing all turnings exposed to cutting fluids under some form of permanent or semi-permanent cover, or establishing dedicated containment areas…." The requirement goes on to describe how containment areas should be constructed, and if runoff is discharged from such areas, that it must be collected and treated by an oil and water separator, or its equivalent.

A third, but much less than optimal, option for stating such a regulatory standard is to simply end each of these types of sentences, across the regulation, with the words "shall be minimized," and then providing clear examples of some of the possible controls that might be deployed which meet the minimization concept. Leaving "feasibility" to be determined solely by the permittee is legally fraught, especially with no definition or criteria by which neither the permittee nor the Agency may judge its attribution in particular circumstances.

**Comment Response:**

EPA declines to revise the referenced language, and points out that the final 2021 MSGP, Appendix A, Definitions, defines the term "Feasible" as - "for the purposes of this permit, feasible means technologically possible and economically practicable and achievable in light of best industry practices. EPA notes that it does not intend for any permit requirement to conflict with state water rights law."

Beginning in the 2015 MSGP, EPA replaced "appropriate" with "feasible", and has defined the latter along with "infeasible" in Appendix A consistent with their intended meaning and usage in Agency documents. For uniformity, EPA also replaced "practicable" in the permit with "feasible".

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

*Repair Timing*

Parts 8.G.4.1.2, 8.H.4.1.2, and 8.J.4.1.2: The requirement to complete a repair by the end of next work day is problematic for small companies that may not have a sufficient labor force to meet

this requirement with respect to large areas requiring maintenance. The area for mine development disturbance, and especially for exploration, would be significantly larger than the area anticipated in the 2012 CGP for a linear road project. Moreover, it often will be very difficult to coordinate with maintenance personnel to access remote power line sites or exploration drill hole sites/roads to meet this requirement as proposed, which does not take into account the need to make access to these remote areas safe after a runoff event.

*Buffer Requirements*

Parts 8.G.4.2.3, 8.H.4.2.3, and 8.J.4.2.3: These parts set forth three compliance alternatives if earth disturbances will occur within 50 feet of a water of the U.S.: (i) a 50- foot undisturbed natural buffer; (ii) an undisturbed natural buffer less than 50 feet supplemented by additional controls so long as they collectively achieve a sediment load reduction equivalent to a 50-foot buffer; or (iii) if it is infeasible to provide an undisturbed natural buffer of any size, implement controls that will achieve a sediment load reduction equivalent to a 50-foot buffer. These requirements do not account for regional and topographical variation across mine sites. For instance, many western sites are dominated by ephemeral drainages to which the buffer concept should not apply. In storm events, those ephemeral drainages that rarely flow can convey storm waters with elevated, naturally occurring suspended solids typical of such events (and during which the flows are virtually indistinguishable whether in disturbed or undisturbed areas).

Thus, it is unclear whether or how a natural buffer would result in load reduction or how controls are to be evaluated to assess "equivalency" with respect to sediment load reductions. Moreover, some areas in and around mine sites may be topographically limited (e.g., narrow, confined drainages). In those areas, there may be insufficient room for buffers. How would one measure equivalency in those circumstances? The MSGP should allow for flexibility with respect to control measures for construction sites at mining operations. Facilities should have the flexibility to adopt BMPs on a case-by- case basis during construction in lieu of buffers and without regard to the "equivalency" requirement.

*Sediment Ponds*

While NACoal agrees sedimentation control ponds are excellent sediment control BMPs, they are not applicable in all situations (hence the need for a MSGP at some coal mines). All of NACoal's mines rely on NPDES permitted sedimentation control ponds to control the majority of the surface flow. There are instances; however, where it is not practicable to construct a sedimentation control pond such as along a haul road or railroad track.

Parts 8.G.4.1.6, 8.H.4.1.6, and 8.J.4.1.6: These parts identify the need to provide storage for either (i) the 2-year, 24-hour storm, or (ii) 3,600 cubic feet per acre drained. The permit should clarify that sediment ponds are not mandatory. Rather, facilities should be permitted to identify site-specific BMPs. For example, smaller sediment basins or traps could be appropriate. Additionally, the requirement to "remove tracked-out sediment by the end of the work day" should be limited to situations where there are sediment volumes in direct proximity to a navigable water.

*Cationic Polymers*

Parts 8.G.4.1.8, 8.H.4.1.8, and 8.J.4.1.8: This part restricts the use of cationic treatment chemicals absent a specific authorization by EPA. EPA does not provide any explanation for imposing this requirement, nor is there a basis for EPA to do so.

**Comment Response:**

EPA recognizes the comments parts and provides applicable response references below:

<u>Repair Timing</u>

See response to DCN: EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 43.

<u>Buffer</u>

See response to DCN: EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 44.

<u>Sediment Ponds</u>

See response to DCN: EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 45.

<u>Cationic Polymers</u>

See response to DCN: EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 46.

---

**Commenter Name:**  Rebecca McGrew
**Commenter Affiliation:**  North American Coal Corporation
**Document Control Number:**  EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

*Stabilization and Revegetation Requirements*

Parts 8.G.4.1.9, 8.H.4.1.9, and 8.J.4.1.9: In these Parts, EPA proposes to impose requirements that go well beyond those in previous MSGPs. Such requirements will be costly and could require the use of temporary equipment and manpower resources. EPA has not provided a sufficient justification for imposing these new requirements and thus, it should retain the requirements from the 2008 MSGP. Alternatively, should EPA insist upon imposing these new requirements, it should include another exception to site stabilization requirements to account for circumstances where construction activity on a portion of the mine site has temporarily ceased, but where earth-disturbing activities will be resumed. For example, stabilization requirements

should not be triggered where construction will resume within 21 days. This makes sense given that there are sites where construction occurs in phases. By including this clarification, facilities would appropriately be relieved of a stabilization obligation where cessation of activity is only temporary. In addition, EPA should remove any strict vegetation requirements from these parts. The area subject to revegetation under the proposed permit could, in fact, be part of mine operation postconstruction. Re-vegetation of those areas would be senseless. Also, the proposed revegetation requirements may be inconsistent with any associated reclamation obligations imposed under federal and state mine permitting requirements. In particular, SMCRA permits are far more site-specific and any reclamation requirements therein should override conflicting requirements in the MSGP.

*Inspection Frequency*

Parts 8.G.4.4.2, 8.H.4.4.2, and 8.J.4.4.2: The reduction of inspection frequency to once per month for frozen conditions is still too frequent for remote areas that can only be accessed by snowmobile and where temperatures are typically -40° F. EPA should revise the provision to allow for the discontinuance of inspections during frozen conditions.

**Comment Response:**

EPA recognizes the comments parts and provides applicable response references below:

Stabilization and Revegetation Requirements

EPA points out that sector specific 2021 MSGP Parts 8.G, 8.H, and 8.J have not had significant changes that would impact site stabilization requirements; therefore, should not create any additional burden for operators fulfilling the past requirements.

EPA understands that certain aspects of the MSGP overlap with requirements in SMCRA permits. For this reason, EPA has included the following provision Part 8, Subpart G of the MSGP for the mining sectors: "*Note: Where compliance with a requirement in a separate exploration permit, mining permit, reclamation plan, Surface Mining Control and Reclamation Act (SMCRA) requirements, etc. will result in you fully meeting any requirement in this Subpart, you are considered to have complied with the relevant requirement in this Subpart. You must include documentation in your SWPPP describing your rationale for concluding that any particular action on your part is sufficient to comply with the corresponding requirement in this Subpart.*" However, not all aspects of the SMCRA permit are addressed in the MSGP.

Inspection Frequency

EPA points out that the 2021 MSGP sector specific Parts 8.G, 8.H, and 8.J have not had significant changes that would impact inspection frequencies; therefore, should not create any additional burden for operators fulfilling the past requirements.

While the once per month inspection requirement is already relaxed for frozen conditions, and EPA allows operators to take safety into account when performing such tasks, the 2021 MSGP,

like the 2015 MSGP, already includes the flexibility to address the extreme conditions the commenter references (excerpt below):

"Frozen conditions: You may temporarily suspend or reduce inspections to once per month until thawing conditions occur if frozen conditions are continuous and disturbed areas have been stabilized. For extreme conditions in remote areas, e.g., where transit to the site is perilous/restricted or temperatures are routinely below zero, you may suspend inspections until such time the conditions are conducive to safe access, and monthly inspections can resume."

This requirement remains unchanged from the 2015 MSGP.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

*Discharge Documentation*

Parts 8.G.4.4.4, 8.H.4.4.4, and 8.J.4.4.4: The proposed permit would require inspection of "[t]he quality and characteristics of the discharge" in the event a discharge is occurring. EPA should clarify this statement. For example, what water quality parameters must a facility document in the inspection report? As drafted, there are no numeric limits, and this provision does not define any attributes that must be documented. Operators need more guidance in order to comply with this permit condition.

**Comment Response:**

See response to comment DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 49.

8.A. Sector A - Timber Products

**Commenter Name:** John Bird
**Commenter Affiliation:** Arauco North America, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0139-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Arauco has found through extensive wastewater pilots and stormwater best management practice installations that COD is an extremely challenging if not impossible benchmark for many wood products facilities because of the recalcitrant lignins and tannins in wood that react with the COD water quality test. Treated water with virtually no residual BOD5 can easily have COD in excess of the Sector Benchmark. Arauco would like to request that the Sector A benchmarks be amended to BOD5 benchmarks to reflect the fact that these tannin and lignin materials are naturally occurring and not deleterious to receiving water bodies in the concentrations that would typically leave a wood products site.

Wood products facilities are often located in remote, forested areas and this poses unique challenges for meeting the COD benchmark as well. Offsite swamps that flow on to wood product manufacturing sites can significantly contribute to COD benchmark exceedances. Arauco has water quality testing showing that offsite forested swamps when discharging on to Arauco property are contributing to exceedances of the COD benchmark in stormwater outfalls.

Wood products facilities rely heavily on outdoor material storage and there is inherent stormwater contact with wood yards at these facilities, which is why the Timber Products effluent guidelines specifically exclude raw material yard runoff as a "wastewater" in 40 CFR 429.11(c).

 Arauco is always striving to reduce offsite impacts in stormwater but would like to make the EPA aware of the challenges it has seen since implementation of the General stormwater NPDES program across the United States. Arauco's wood products facilities have ample incentive to reduce runoff via wood yard design that discourages loss of raw material and resilient BMP installations. That being said, it is still extremely challenging for the sector to meet benchmarks for COD while processing wood. Arauco feels BOD5 is more indicative of potentially detrimental offsite impacts from wood product manufacturing sites and the Sector A benchmark should be amended to BOD5 from COD. If you would like to discuss in more detail, please contact John Bird at 919-642-6658.

**Comment Response:**

EPA appreciates the comment to (Request for Comment 9) providing BOD5 as an alternative to COD benchmark monitoring for Sector A - Timber Products facilities.

EPA has determined that complying with the benchmark monitoring requirements in the 2021 MSGP is both technologically and economically achievable. As noted in the 2021 MSGP Fact Sheet, EPA does not anticipate that AIM responses undertaken in response to benchmark exceedances under the MSGP will necessitate complex or costly actions for most operators; rather, modifications to the stormwater controls in response to benchmark exceedances will in most cases be commonsense and pollution prevention-oriented in AIM Levels 1 and 2. In some cases, when pollution prevention measures do not prove to be adequate, treatment controls would also be needed in AIM Level 3 to provide sufficient means for minimizing pollutants in stormwater discharges. EPA expects the great majority of operators complying with AIM responses will determine there are modifications that can be made in AIM Levels 1 and 2  The

MSGP provides considerable flexibility to operators in selecting the control measures used to meet the permit's benchmarks and effluent limits, and EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. EPA also notes that benchmark monitoring applies to only approximately half of the covered facilities, many of which will completely fulfill the benchmark monitoring requirements in the permit after the first year of permit coverage or will qualify for one of the exceptions to reduce or discontinue monitoring (e.g., because exceedances are due to pollutants in the natural background) until 4th year of their permit coverage.

EPA's position remains that benchmark monitoring is necessary with other components of the permit to achieve water quality standards. An exceedance of a benchmark concentration is not in and of itself a violation, but rather is a trigger for the operator to investigate and take the appropriate AIM response. EPA also acknowledges that benchmark exceedances are not necessarily indicative of a water quality issue, but are meant to act as a screen to identify potential water quality issues and ultimately avoid discharging stormwater from industrial activity that exceed water quality standards, which is not permissible under CWA section 301(b)(1)(C) and EPA's implementing regulations.

---

**Commenter Name:** Jeffrey T. Miller
**Commenter Affiliation:** Treated Wood Council
**Document Control Number:** EPA-HQ-OW-2019-0372-0155-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

According to the proposed 2020 MSGP, all facilities in the Wood Preserving subsector (Subsector A2) must include arsenic and copper as benchmark monitoring constituents.

Since the reduction in the use of Chromated Copper Arsenate (CCA) preservative in 2003, there are a large number of treaters who do not use arsenic or copper in their preservative chemistries. As such, TWC recommends the monitoring requirements for arsenic and copper be waived for facilities that have discontinued the use of such preservatives in their operations, or facilities that do not use these constituents in their operations. The additional expense incurred by monitoring of these constituents should not be required for facilities that do not use these constituents in their operations or have discontinued the use of these constituents.

Further, the TWC requests that the USEPA only require facilities to monitor for total suspended solids (TSS) and the specific parameters associated with the preservatives used to treat the wood in storage on-site. For example, facilities using only inorganic preservatives should only be required to monitor for TSS and the specific compounds associated with the inorganic preservatives in use at the facility. Facilities treating with only organic preservatives, such as pentachlorophenol or creosote, should only be required to monitor for TSS and chemical oxygen

demand (COD). Facilities using both types of preservatives would monitor for TSS and all applicable parameters.

**Comment Response:**

EPA acknowledges the comment requesting that Wood Preserving operators who do not use arsenic or copper (or specific constituents) have an exception or as the comment states (waiver) for the monitoring of these parameters.

EPA disagrees with the waiver approach as this would be difficult to track and require specific facilities to routinely report specific compounds used at their facilities and conduct monitoring accordingly. EPA also recognizes that the discontinued use of arsenic and copper preservative chemistries may not be the case for all of these types of sector businesses and associated industrial activities nationwide.

EPA also clarifies that the current benchmark monitoring approach is not intended to burden operators with a never-ending "do-loop" of monitoring. First, the permit does not necessarily require an action to be taken in response to a four quarterly average benchmark exceedance. Instead, it requires operators to review their SWPPP and the selection, design, installation, and implementation of the stormwater control measures to ensure the effectiveness of existing measures and determine if modifications are necessary to meet the benchmark threshold for the applicable parameter If the operator determines nothing further needs to be done with the stormwater control measures, the operator must document per Part 5.3 and include in the annual report why it expects the existing control measures to bring the exceedances below the parameter's benchmark threshold for the next 12-month period. Additionally, EPA points out that the final 2021 MSGP Part 4.2.2.2 provides that after the first year of benchmark monitoring, operators can discontinue monitoring until 4th year of their permit coverage if the annual average for a parameter does not exceed the benchmark threshold.

EPA notes that sector specific 2021 MSGP Part 8.A has not had significant changes that would create any additional burden for operators fulfilling the past requirements.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

A majority of facilities in the Timber Industry Sector already monitor for the benchmark parameters TSS and COD, so the addition of pH would not be unreasonable. We request that the EPA carefully review the continued inclusion of Zinc as a benchmark parameter for Sector A

permittees, however, because we have observed regional variations in naturally occurring zinc concentrations in the northeast that can exceed the EPA's benchmark values which are based on the hardness of receiving waters.

**Comment Response:**

Comment noted. EPA  is retaining the zinc benchmark in the final 2021 MSGP but did not finalize universal benchmarks for pH, TSS, and COD.

## 8.C. Sector C - Chemical and Allied Products Manufacturing and Refining

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 78
**Excerpt Status:** Final

**Comment Excerpt:**

**8.C - Chemical and Allied Products (Sub-sectors of importance to Chesapeake Bay watershed: industrial organic chemicals, fertilizer mixing)[260]**

In the Chesapeake Bay watershed of six Mid-Atlantic states and the District of Columbia, this sector is one of about a half-dozen industrial sectors or sub-sectors that are a small subset (<1%) of all industrial facilities subject to industrial stormwater permits, *but whose pollutant loadings are more than 10x the Waste Load Allocations* in the Chesapeake Bay Total Maximum Daily Load (TMDL),[261] at least as measured in one major jurisdiction, the Commonwealth of Virginia.[262] It is possible -- even likely – that, upon investigation, other states across the country might also find this sector/subsector contributing a disproportionate amount of nutrient pollution to waterways. These regulations, however, do not provide any focus on these sub-sectors, or these pollutants.

Given that there is a Chesapeake Bay TMDL with Waste Load Allocations for Nitrogen, Phosphorus, and Sediment, and follow-on state-developed Watershed Implementation Plans with a year-2025 deadline; given the fact that in the Bay watershed, this sector and those specific sub-sectors are among the few producing a substantial proportion of stormwater pollutants into the Bay (29% of the overall phosphorus load and 20% of the overall nitrogen load coming from stormwater);[263] and given that many other states outside the Chesapeake Bay watershed have similarly-sized, similarly-characterized industrial sectors -- and similarly challenged waterways -- we believe this MSGP should contain such a focus. In fact, there is no discussion nor are there any examples provided of possible controls related to various components or activities unique to this sector as a whole, as there are for most other sectors in these regulations.

[260] Draft Permit - Part 8 Sector Requirements for Industrial Activity at 6-8, Subpart C - Sector C.

[261] U.S. Envtl. Prot. Agency, *Chesapeake Bay Total Maximum Load for Nitrogen, Phosphorous and Sediment* (December 29, 2010), https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdldocument

[262] Letter from Joseph D. Wood, Ph.D. and Margaret L. Sanner to Matt Richardson (December 18, 2018) (commenting upon Virginia Industrial Stormwater Permit and discussing extensive research conducted by the Chesapeake Bay Foundation pertaining to state data on various industrial stormwater pollution sources) (attached). Note that the Commonwealth issues its own NPDES permits for Industrial Stormwater. This MSGP, however, can and does generally set a floor for such regulations in the Bay watershed and elsewhere across the country, and should reflect the most complete industrial stormwater pollution information and standards available.

[263] *Id.*

**Comment Response:**

Comment noted. EPA points out that the final 2021 MSGP Part 2.2.2, Discharges to Water Quality-Impaired Waters, provides narrative water quality based effluent limits regarding discharges to impaired waters and TMDLs.

## 8.E. Sector E - Glass, Clay, Cement, Concrete, and Gypsum Products

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  39
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Removal of iron as a benchmark for Sector E

Discussion/Recommendations

Support the removal of the benchmark.

**Comment Response:**

EPA suspended iron benchmark monitoring in final 2021 MSGP.

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Permit Part 8 – Sector Requirements: (8.E.2.1) – The requirement under "Good Housekeeping Measures" to use "sweeping, vacuuming or other equivalent measures" to "prevent or minimize the discharge of… significant materials in stormwater… at least once a week… in areas where… settled dust are being handled or processed and may be discharged into stormwater", in many circumstances is too stringent. Often times throughout the course of the year, concrete plants may see downturns or slow weeks where little to no concrete is being produced, but yet the concrete is not closed. Imposing this requirement for weekly sweeping when there would not be any material to sweep in such locations is onerous. NRMCA suggests changing this language from "at least once a week" to "on an as needed basis" or eliminate the weekly frequency reference completely since the 8.E.2.1 already used the term "at regular intervals". Either change would still require the housekeeping measures, but allow flexibility for when such measures are actually needed. Furthermore, OSHA has limited forms of dry sweeping to prevent respirable crystalline silica4 exposure in direct opposition to this housekeeping measure.

**Comment Response:**

EPA disagrees and it is EPA's expectation that operators will be able to comply with the requirement during normal business hours and the frequency is adequate. EPA points out that the final 2021 MSGP Part 8.E.2.1, Good Housekeeping Measures (also contained in the 2015 MSGP), allows operators to identify in the SWPPP the frequency of " ...  or other equivalent measures" not just sweeping and vacuuming, as long as the measures are implemented at least once a week.

## 8.F. Sector F - Primary Metals

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

*AISI requests that the proposed TR aluminum benchmark concentration of 750 ug/L be removed from Table 8.F-1 for the final MSGP for iron and steel facilities.*

Part 8.F.5 of the proposed MSGP at Table 8.F-1 includes a proposed benchmark concentration of 750 ug/L for total recoverable aluminum (TR aluminum) and a hardness-dependent benchmark

for total recoverable zinc (TR zinc). TR zinc benchmark concentrations would be 130 ug/L at a freshwater hardness range of 100 to 125 mg/L, and 230 ug/L at a freshwater hardness range of 200 to 225 mg/L.

TR aluminum is not a useful metal for benchmarking the effectiveness of stormwater pollution prevention measures at integrated iron and steel mills or at EAF steel mills. US EPA did not find aluminum to be a pollutant of concern in iron and steel industry process wastewaters when 40 CFR Part 420 was promulgated in 1982 and later amended in 2002.[1,2] Aluminum is not a regulated pollutant in 40 CFR Part 420 for any iron and steel effluent limitations guidelines process subcategory.

Furthermore, aluminum is not a useful benchmark pollutant because it is abundant as a natural element in surface soils. Exhibit 1 is a brief report prepared in 2006 for comments on proposed West Virginia water quality standards for aluminum and iron in the Ohio River. The report highlights the following:

- Aluminum is found in Upper Ohio River basin surface soils at concentrations ranging from 35,000 to 82,000 mg/kg (3.5 wt. % to 8.2 wt. %; median 5.4 wt. %), and at similar, but somewhat lower ranges in Ohio River sediments;
- Runoff from surface soils and resuspension of Ohio River sediments account for elevated concentrations of aluminum found in the Ohio River under high Ohio River flow conditions. Daily mass flowing loads in excess of 500,000 pounds have been observed in the Upper Ohio River under high flow conditions; and,
- Contributions of naturally occurring aluminum to the Upper Ohio River from surface soils far exceed possible point source contributions from municipal and industrial facilities.

This indicates that if a stormwater benchmark concentration of 100 mg/L were imposed for TSS, and when TSS is associated with natural surface soils at iron and steel mills, aluminum concentrations in excess of the proposed TR aluminum benchmark concentration of 750 ug/L can be expected routinely. Consequently, AISI requests that the proposed TR aluminum benchmark concentration be removed from Table 8.F-1 for the final MSGP for iron and steel facilities.

[1] *Development Document for Effluent Limitations Guidelines and Standards for the Iron and Steel Manufacturing Point Source Category*. United States Environmental Protection Agency. Effluent Guidelines Division. Washington, DC. EPA 440/1-82/024. May 1982. [Volume 1, Appendix C].

[2] *Development Document for Final Effluent Limitations Guidelines and Standards for the Iron and Steel Manufacturing Point Source Category*. United States Environmental Protection Agency. Office of Water. Washington, DC. EPA-821-R-02-04. April 2002.

**Comment Response:**

EPA declines to remove the aluminum benchmark parameter. EPA notes that the aluminum benchmark is retained based on new and current water quality criteria. EPA also acknowledges the comment that aluminum may be present as a natural element in surface soils. As a result,

EPA is retaining the natural background exception from benchmark monitoring, Part 5.2.6 of the final 2021 MSGP, which specifies that operators may discontinue benchmark monitoring if a benchmark exceedance is solely attributable to the presence of that pollutant in the natural background (i.e., surface soils). This provision addresses benchmark exceedances due to naturally occurring pollutants (e.g., concerns about high levels of TSS, aluminum, and other pollutants that could exist in the natural background).

EPA modified the benchmark monitoring thresholds in the 2021 MSGP for aluminum, copper for discharges to freshwater, selenium for discharges to freshwater, and cadmium based on revised CWA section 304(a) national recommended aquatic life water quality criteria and suspended the benchmark monitoring thresholds for magnesium and iron based on lack of documented acute toxicity. The 2021 MSGP is also allowing operators who exceed the revised benchmark thresholds for discharges to freshwater for aluminum and copper to demonstrate to EPA that their discharges do not result in an exceedance of a facility-specific value calculated by the operator using the national recommended water quality criteria multi-variable models in-lieu of the applicable MSGP benchmark threshold.

EPA also notes that benchmark monitoring applies to only approximately half of the covered facilities, many of which will completely fulfill the benchmark monitoring requirements in the permit after the first year of permit coverage or will qualify for one of the exceptions to reduce or discontinue monitoring until 4th year of their permit coverage.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA withdraw the Sector-Specific Benchmark Concentration for total recoverable aluminum (TR aluminum) that is proposed for iron and steel facilities at Subsector F.1.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0186-A1, Comment Excerpt Number 13.

## 8.G. Sector G - Metal Mining

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 54
**Excerpt Status:** Final

**Comment Excerpt:**

The successful implementation of SMCRA and Bureau of Land Management (BLM) regulations at these facilities for over 40 years has resulted in a continuous focus on sediment and erosion control at all levels of mining operations. In some ways, the MSGP can be duplicative and unnecessary at these facilities, especially when considering the breadth of these regulations on erosion control and stormwater management and the minimal areas that are regulated under the MSGP.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Shelly Lemon
**Commenter Affiliation:** New Mexico Environment Department (NMED)
**Document Control Number:** EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

**Part 8.G.4.2.3 and Similar Parts for Sectors H and J:** Requirements for Natural Buffers provide a link to the 2017 CGP appendix. EPA should include the document in the MSGP Appendix, not provide a link to another general permit that is on a different effective date cycle.

**Comment Response:**

Comment noted. In the final 2021 MSGP, EPA removed the link to the CGP appendix and replaced it with a link to the MSGP website where EPA will provide the appropriate information for complying with alternatives.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Tidal Vision (TV) USA
**Document Control Number:** EPA-HQ-OW-2019-0372-0221-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Section 8.G.4.1.8 prohibits coverage under MSGP if cationic flocculants, polymers or other cationic charged chemistries are to be used, unless approval for use by Regional EPA. Comments submitted here, seek to show the need for cationic treatment is necessary BMP that is economically and practically available. The use of Chitosan Enhanced Sand Filtration (CESF) and Active Treatment Systems (ATS) to achieve superior water quality for TSS removal and pretreatment for soluble pollutants is well established with significant track record. The current proposed rule prohibits, limits and discourages the use of such effective solutions to provide clean water for discharge. The EPA's desire to have uniformity across general permits is superseding two more obvious and more important considerations:

- The MSGP is significantly different and more complex than the Construction General Permit (CGP) as shown in industry Based Effluent limits, far beyond just TSS and pH. Heavy metal removal, PAH, selenium, arsenic, lead, etc.. require the Best Available Technology (BAT), and anionic polyacrylamides alone is **NOT** the Best Available Technology
- The Clean Water Act requires permitting authorities, SWPPP designers & engineers & facility operations the rules, tools, designs and practices to have the ability to discharge CLEAN WATER. EPA itself recognized, as part of the Effluent Limit Guidelines for Construction industry in 2008/09, Active Treatment Systems as Best Available Technology. Yet Section 8.G.4.1.8 prohibits its usage.

**Comment Response:**

See response to comment DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 46.

**8.G.RFC27. Sector G - Metal Mining - RFC 27 Sector G monitoring requirements for discharges from waste rock and overburden piles at active metal mining facilities**

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0192-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

We agree.

**Comment Response:**

Comment noted.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  EnviroCert International
**Document Control Number:**  EPA-HQ-OW-2019-0372-0205-A1
**Comment Excerpt Number:**  17
**Excerpt Status:** Final

**Comment Excerpt:**

**[There is no need to suspend the analytical monitoring currently required. Operators shall continue to perform analytical monitoring to ensure there is no observed increment over time.]**

**Comment Response:**

EPA clarifies that the change was to maintain consistency in the final 2021 MSGP Parts 8.G.8.4 with 8.G.8.3. EPA is adding the following clarifying language to 8.G.8.4 "The schedule for monitoring for this Part 8.G.8.4 is the same as specified in Part 8.G.8.3; once in the first year for the parameters listed in Table 8.G-4 (except radium and uranium), and twice annually in all subsequent years of coverage under this permit for any parameters for which the benchmark has been exceeded."

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  54
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations to EPA Request for Comment 27**

The FWQC and FSWA support suspension of the uranium and radium monitoring outlined in Part 8.G.8.3 until a relevant water quality criterion can be developed.

**Comment Response:**

Comment noted on support of suspension of uranium and radium monitoring. EPA points out that 2021 MSGP Part 8.G.8.4 language does not fully suspend uranium and radium monitoring, as mentioned in the comment, but rather discontinues uranium and radium monitoring after operators first full quarterly monitoring period is conducted. EPA is adding the following clarifying language to 8.G.8.4 "The schedule for monitoring for this Part 8.G.8.4 is the same as specified in Part 8.G.8.3; once in the first year for the parameters listed in Table 8.G-4 (except radium and uranium, and twice annually in all subsequent years of coverage under this permit for any parameters for which the benchmark has been exceeded.… For radium and uranium, which do not have corresponding benchmarks in Table 8.G-3, there are no applicable benchmarks. For radium and uranium, the operator must monitor quarterly (as identified in Part 4.1.7) for the first four full quarters of permit coverage commencing no earlier than May 30, 2021, after which the operator may discontinue monitoring for these two parameters.

---

**Commenter Name:** Mark Compton
**Commenter Affiliation:** American Exploration & Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0260-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

Uranium and Radium (Sector G). EPA requests comment on whether to remove the uranium and radium monitoring requirements that are retained in the proposed permit from the 2015 MSGP for the uranium, radium, and vanadium ore subcategories. As EPA indicates, no benchmarks have been set for these parameters and EPA has provided no justification (e.g., monitoring data) to support why they should be retained. Note also that EPA appears to have duplicated the requirements for the vanadium ore subcategory. See generally Table 8.G-3.

**Comment Response:**

EPA appreciates the comment and EPA agrees with the comment that uranium and radium benchmarks values have not been determined or proposed at this time in the final 2021 MSGP. EPA points out that this is based on additional research and relevant water quality criterion analyses to be conducted and developed. EPA notes that since there is no benchmark, uranium and radium will only need to be monitored quarterly for the first year of permit coverage, after which operators may discontinue monitoring for these two parameters.

---

**Commenter Name:** James Westbrook and Elizabeth Zernik
**Commenter Affiliation:** Industrial Environmental Coalition of Orange County (IEC/OC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0263-A1

**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

No comment except to concur to suspend monitoring required until relevant water quality criteria and benchmark value can be developed.

**Comment Response:**

Comment noted on support of suspension of uranium and radium monitoring. See response to DCN EPA-HQ-OW-2019-0372-0205-A1, Comment Excerpt Number 17.  Also, see response to DCN EPA-HQ-OW-2019-0372-0245-A1, Comment Excerpt Number 54  &  DCN EPA-HQ-OW-2019-0372-0260-A1, Comment Excerpt Number 23.

## 8.H. Sector H - Coal Mines and Coal Mining-Related Facilities

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  50
**Excerpt Status:** Final

**Comment Excerpt:**

Part 8.H.5.1: EPA should retain the phrase "consider using" from the 2008 MSGP. Each of the requirements in this part may not be appropriate at certain mining facilities. Sweepers are not used on unpaved roads, and paving is not possible on most roads at a mine site. Covered storage is not possible for certain large-volume materials such as topsoil or overburden stockpiles. Conserving vegetation is not possible in areas to be stripped of topsoil prior to mining. Alternatively, at a minimum, EPA should move the phrase "where practicable" to the beginning of the sentence to avoid creating any impression that the qualifying language applies only to conserving vegetation.

**Comment Response:**

EPA declines to make the requested change and clarifies that it has incorporated plain language and clarity where it was deemed appropriate in the permit. More terms have been defined and nebulous or missing compliance details and timeframes have been clarified, creating less need for interpretation on the part of operators. The "consider using" 2008 MSGP terminology replacement with "where determined to be feasible" is one example of this clarification. The term "Feasible" is defined in the Final 2021 MSGP Appendix A, Definitions. "*Feasible – for the purposes of this permit, feasible means technologically possible and economically practicable and achievable in light of best industry practices.*"

EPA notes that the MSGP provides considerable flexibility to operators in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, and EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. EPA also points out that the final 2021 MSGP Part 8.H.5.1, Good Housekeeping states " ... implement control measures such as the following, where determined to be feasible (list not inclusive): ... " which indicates that these control measures shall be considered by operators but is not an exhaustive list of controls that may be selected and implemented. Additionally, EPA noted that the TBEL for active mining activities (permit part 8.H.5) does not apply for any discharges from earth disturbing activities conducted prior to active mining.

EPA points out that this requirement permit language for Part 8.H.5.1 has been the same under the previous 2015 MSGP permit as well.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 53
**Excerpt Status:** Final

**Comment Excerpt:**

Small areas, typically on the outer boundaries of a facility, can be exempted from these requirements upon an environmental performance demonstration by the operator and approval by the regulatory agency. For these small areas, construction of a sediment basin is often impracticable or would cause more environmental harm through its construction than the use of alternative sediment control measures and best management practices (BMPs) such as road crossings and conveyor crossings near drainages. These small areas that are not directed to sediment basins are typically where the stormwater provisions of the MSGP apply. On both the watershed and mine site scale, these small areas present a minimal risk of environmental impact.

**Comment Response:**

See response to comment **DCN** EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 45.

The MSGP provides considerable flexibility to operators in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, recognizing that the control measures needed to adequately minimize pollutants will vary considerably for each facility.

---

**Commenter Name:** Rebecca McGrew
**Commenter Affiliation:** North American Coal Corporation
**Document Control Number:** EPA-HQ-OW-2019-0372-0224-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

*BMPs*

Part 8.H.5.1: EPA should retain the phrase "consider using" from the 2008 MSGP. Each of the requirements in this part may not be appropriate at certain operations. Sweepers are not used on unpaved roads, and paving is not possible on most roads at a mine site. Covered storage is not possible for certain large-volume materials such as topsoil or overburden stockpiles. Conserving vegetation is not possible in areas to be stripped of topsoil prior to mining. Alternatively, at a minimum, EPA should move the phrase "where practicable" to the beginning of the sentence to avoid creating any impression that the qualifying language applies only to conserving vegetation.

**Comment Response:**

See also response to DCN EPA-HQ-OW-2019-0372-0201-A1, Comment Excerpt Number 50.

---

**Commenter Name:** Beth Goodnough
**Commenter Affiliation:** Western Fuels Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0253-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Inspection Frequency: Part 8.H.4.4.1. The requirement to conduct an inspection "within 24 hours of a storm event of 0.25 inches or greater" should be removed from this provision, as well as from all other provisions in Parts 8.H that impose such a requirement. The current requirement is to inspect within 24 hours of the end of a storm event of 0.5 inches or greater—a requirement that already imposes a significant burden. To require additional inspections based on an even lower threshold of measurable precipitation would place a strain on those companies' resources with no demonstrable benefit. It is impractical to comply with this requirement in areas with large permit areas. Part 8.H.4.4.2: Inspecting during frozen conditions is not necessary. EPA should revise the provision to allow for the discontinuance of inspections during frozen conditions, when there is no runoff.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0166-A1, Comment Excerpt Number 14.

## 8.J. Sector J - Non-Metallic Mineral Mining and Dressing

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

**Nitrate Sampling for S&G Operations**

The 2020 MSGP retains the nitrate/nitrite sampling for sand and gravel operations from past permits. It appears that this requirement was initiated in the 1995 version of the permit. The assumed justification behind the sampling relates to the possible reclamation activities conducted by these operations that involve fertilizing areas where there is an effort to establish vegetation. These operations are often hundreds of acres with the area where new vegetation is being established covering just a few acres. This is also not a consistent activity that would be expected to impact stormwater. In some cases, the reclamation work does not occur until the end of mining. Sand and gravel deposits are also commonly within the alluvial plain areas along river systems. Another major activity occurring in this same area is agriculture, based on the fertile soil commonly found in the same zone. As a frequent user of products high in nitrates/nitrites, any effort to isolate a sand and gravel operation as the source may be difficult. We see this nitrate/nitrite sampling as unnecessary and ask that it be removed.

**Comment Response:**

EPA disagrees that nitrate/nitrite sampling for sand and gravel operations is unnecessary and has not revised the 2021 MSGP to remove this monitoring. EPA's approach for benchmark monitoring since the MSGP's first issuance is to require monitoring for pollutants of concern in stormwater, as necessary, on a sector-specific basis. The requirements are based upon discharge data and other information submitted to EPA by covered facilities in past issuances of the MSGP. EPA points out that it is retaining the natural background exception from benchmark monitoring in the final 2021 MSGP Part 5.2.6.1, which specifies that an operator may discontinue benchmark monitoring if a benchmark exceedance is solely attributable to the presence of that pollutant in the natural background. This provision addresses many comments regarding benchmark exceedances due to naturally occurring pollutants (e.g., concerns about high levels of TSS, aluminum, and other pollutants that could exist in the natural background).

---

**Commenter Name:** Patrick A. Jacomet
**Commenter Affiliation:** Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

These comments are directed at MSGP's Sector J for Non-metallic mineral mining, which affects discharge regulations in all states.

We incorporate by reference NSSGA's comments on this proposal. Specifically, we note:

- Storm water discharges from aggregates operations pose a low risk to surface water because of the lack of chemicals used in processing aggregates and other factors.

**Comment Response:**

EPA disagrees that stormwater discharges from aggregates operations pose a low risk to surface waters solely due to a lack of chemicals used in processing. No revisions to the final 2021 MSGP have been made related to this comment.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Nitrate/Nitrite Should Not Be Required for Sand & Gravel Operations</u>**

The current proposal continues the unnecessary and excessive requirements for sand and gravel operations to test for substances not used, produced or concentrated during sand and gravel production. EPA made an error when they required this in the 1995 MSGP and have continued this error throughout subsequent updates. The 1995 MSGP Federal Register notice[3] indicates that fertilizers may be used in reclamation activities (page 50920). While this can occur, it seems absurd to require active facilities to test for something that could be used years in the future. This requirement was based on very limited data, and it is unclear how background values were determined in EPA's analysis. Sand and gravel operations are often in rural areas with nearby agriculture, and it is much more likely that these exceedances in the MSGP were from nearby activities, not sand and gravel operations. As described previously, the industry's more recent 2015 data shows a median well below the benchmark level. For these reasons, nitrate and nitrite should no longer be required for sand and gravel operations.

[3] Final National Pollutant Discharge Elimination System Storm Water Multi-Sector General Permit for Industrial Activities, Federal Register / Vol. 60, No. 189 / Friday, September 29, 1995

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0176-A1, Comment Excerpt Number 13.

---

**Commenter Name:** Mark D. Williams
**Commenter Affiliation:** Luck Companies, Luck Stone
**Document Control Number:** EPA-HQ-OW-2019-0372-0223-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Luck Stone is an aggregates-producing mining company based in Goochland, Virginia, and we believe that changes are necessary to the proposed MSGP. We rely on clean water to operate, and we live in the communities in which our facilities are located. We take great effort and pride in our record of environmental stewardship, including our past recognition as a winner of Virginia's Governor's Environmental Excellence Award Gold Medal, and many industry awards. These comments address MSGP's Sector J for Non-metallic mineral mining, which affects discharge regulations in all states, and is the basis for Virginia's general permit.

...

In closing, we feel this proposal creates an unreasonable economic burden to industry without improving environmental quality. The control measures listed in Appendix Q need major revisions, COD should not be a benchmark measure for Sector J, and aggregates mining represents such a low risk that visual assessments should be appropriate instead of the need for quarterly benchmark monitoring.

**Comment Response:**

EPA disagrees with comment assertion the new MSGP creates unreasonable economic burden and has determined that complying with the monitoring requirements in the MSGP is economically practicable. For facilities that are required to conduct continued monitoring throughout the permit term, laboratory costs are not expected to be unduly burdensome; in fact, based on laboratory data in areas where EPA is the permitting authority, EPA estimates the average laboratory cost per quarter for a operator subject to continued monitoring to be under $60. EPA points out that the 2021 MSGP sector specific Parts 8.J has not had significant changes that would impact inspection frequencies; therefore, should not create any additional burden for operators fulfilling the past requirements.

EPA did not finalize COD as a benchmark parameter for Sector J in the 2021 MSGP. The 2021 MSGP includes indicator "report-only" monitoring for Subsector J3. EPA emphasizes that indicator monitoring parameters (e.g., COD) are neither benchmark monitoring nor numeric effluent limitations. Indicator monitoring for this subsector is appropriate, given that the 2015 MSGP only required sector-specific benchmark monitoring for around 55 percent of MSGP subsectors; the other 45 percent of subsectors did not have any chemical-specific analytical

benchmark monitoring, meaning these operators were only conducting visual monitoring and collecting little, if any, numeric data on performance of their stormwater control measures. With these changes, 22 subsectors under the 2021 MSGP without sector-specific benchmark monitoring, and around 40 percent of total facilities, are now required to conduct indicator monitoring for pH, TSS, and COD. EPA also points out that indicator monitoring (including COD) is "report-only" and does not have a threshold or baseline value for comparison nor does it require follow-up actions; however, the requirement in Part 2.2.1 of the 2021 MSGP to meet applicable water quality standards does still apply. EPA also notes that the COD parameter will provide operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control effectiveness at these facilities. See Part 4.2.1 of the 2021 MSGP.

*"Chemical Oxygen Demand (COD) is a surrogate measure of organic pollutants in water (through measurement of oxygen demand). It is a conventional water quality parameter with established industrial stormwater benchmarks. In addition to the measure of oxygen demand, high COD can also be indicative of oils and hydrocarbon pollution and, as with TSS, can be an indicator of overall site cleanliness. Increases in COD could also indicate problems with the treatment SCM effectiveness, including the need for maintenance" (NRC, 27).*

Based on indicator monitoring data collected and analyzed under the 2021 MSGP, EPA may evaluate whether sector/subsector-specific benchmarks are warranted in a future proposed permit. No revisions to the final 2021 MSGP have been made related to this comment.

---

**Commenter Name:** Mark D. Williams
**Commenter Affiliation:** Luck Companies, Luck Stone
**Document Control Number:** EPA-HQ-OW-2019-0372-0223-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Stormwater discharges from aggregates operations pose a low risk to surface water because of the lack of chemicals used in processing aggregates, and other factors.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0178-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Mark D. Williams
**Commenter Affiliation:** Luck Companies, Luck Stone
**Document Control Number:** EPA-HQ-OW-2019-0372-0223-A1

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The MSGP's universal benchmark monitoring would require that aggregates operations test for chemical oxygen demand (COD), which is unnecessary because aggregates operation processes would not affect the chemical oxygen demand in water.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0223-A1, Comment Excerpt Number 1.

---

**Commenter Name:** Ryan Crosbie
**Commenter Affiliation:** CRH Americas, Inc. (CRH)
**Document Control Number:** EPA-HQ-OW-2019-0372-0228-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Additionally, there is concern that some facilities in Sector J, and perhaps others, that may be subject to both a pH benchmark and a pH numeric effluent limit (NEL). The NEL for Sector J applies only to dewatering discharges from pits or quarries. There may be another outfall at the same facility where dewatering water is not comingled, and therefore would be only subject to the pH benchmark. Though the threshold values of benchmark and NEL are the same (pH 6-9), the implications of an exceedance at each are completely different. This should be rectified or explained in the permit.

**Comment Response:**

EPA did not finalize pH as a benchmark parameter for Sector J in the 2021 MSGP. The 2021 MSGP includes indicator "report-only" monitoring for Subsector J3. EPA points out and clarifies that Part 4.2, Part 8 introduction, and Table 8.1.1 of the final 2021 MSGP and the fact sheet provides operators with information for those industrial sectors subject to more than one type of monitoring (i.e., indicator and benchmark) and the associated requirements for exceedances, as applicable.

## 8.L. Sector L - Landfills, Land Application Sites, and Open Dumps

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0137

**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

8.L.4.5. It is interesting to note that in regards to Sector L non-hazardous landfills that this proposed rule defines non-contaminated storm water as water flowing off of daily cover while Solid Waste Disposal Facility Criteria EPA 530-R-93-017 (3.8.3 Technical Considerations) includes water flowing off of daily cover as leachate.

Some clarification would be helpful.

**Comment Response:**

EPA points out that the MSGP is a general permit, not a rule, as stated in the comment.

EPA acknowledges the comment regarding differences in the general definition of "non-contaminated stormwater" (proposed 2020 MSGP Part 8.L.4.5) and stormwater defined as "leachate" in EPA's Solid Waste Disposal Criteria Technical Considerations (part 3.8.3). Specifically, the solid waste criterial manual part 3.8.3 states "If stormwater enters the landfill unit and contacts waste (including water within daily cover), the stormwater becomes leachate and must be managed as leachate." In comparison, Sector L - Landfills, Land Application Sites, and Open Dumps of proposed 2020 MSGP Part 8.L.4.5 identifies "non-contaminated stormwater" as "stormwater that does not come into direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater. Non-contaminated stormwater includes stormwater that flows off the cap, cover, intermediate cover, daily cover, and or final cover of the landfill."

EPA is clarifying by striking the language from last sentence in 2021 MSGP Part 8.L.4.5 regarding stormwater flows off of landfill covers being considered non-contaminated stormwater. This should clarify and better align with the solid waste disposal facility criteria (Part 3.8.3) of stormwater that comes into contact with "landfill unit and waste" as being contaminated stormwater (2021 MSGP Part 8.L.4.1).

## 8.M. Sector M - Automobile Salvage Yards

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

*Most notable is the elimination of the Iron (Fe) benchmark in Sector M automobile salvage. There is agreement with the elimination of any of the benchmark parameters, but it is suggested*

*that these deletions be based on good science and thorough analysis of existing data for this parameter.*

**Comment Response:**

EPA has removed the Iron (Fe) benchmark due to lack of documented toxicity/acute effects.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

**(Pg #149) 8.M.2.2 Employee Training.** (See asloe Part 2.1.2.8) If applicable to your facility, address the following areas ( at a minimum) in your employee training program: proper handling (collection, storage, and disposal) of oil, used mineral spirits, anti-freeze, mercury switches, and solvents.

*Recommend adding "fuels" and changing "mineral spirits" to "solvents", amending the permit to read " proper handling (collection, storage, and disposal) of oil, fuels, used solvents, antifreeze, and mercury switches." This addresses the issue that facilities may encounter vehicles that still contain gasoline or diesel. This also recognizes that auto recyclers do not use mineral spirits but they do have, at times, small quantities of selected petroleum-based or aqueous-based solvents.*

**Comment Response:**

EPA appreciates the comment recommending additional employee training topics. EPA points out that the final 2021 MSGP employee training requirements (Part 8.M.2.2 and 2.1.2.8) provide "(at a minimum or at least)" a list of training items. EPA recognizes that there are many other topics that may vary by facility or sector and encourages operators to incorporate these training items into stormwater management and pollution prevention practices.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 26
**Excerpt Status:** Final

**Comment Excerpt:**

8.M.4 Additional Inspection Requirements. (See also Part 3.1)

Immediately (or as soon thereafter as practicable) inspect vehicles arriving at the site for leaks. Inspect quarterly for signs of leakage all equipment containing oily parts, hydraulic fluids, any other types of fluids, or mercury switches. Also, inspect quarterly for signs of leakage all vessels and areas where hazardous materials and general automotive fluids are stored, including, but not limited to, mercury switches, brake fluid, transmission fluid, radiator water, and antifreeze.

*Though this part in itself is very poorly worded, the intent is still met through the existing permit. The concept of quarterly inspections continues to provide the greatest documentation of implementation and effectiveness of Best Management Practices identified in the SWPPP. This practice should continue.*

**Comment Response:**

Comment noted.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  79
**Excerpt Status:** Final

**Comment Excerpt:**

**8.M- Automobile Salvage Yards** [264]

**8.M.3.2 Potential Pollutant Sources –** This section states that the potential for pollution from certain activities needs to be assessed, but it does not say what is to be done if the potential is assessed to be moderate to high and such activities or equipment need to be isolated, buffered or otherwise controlled.

[264] Draft Permit - Part 8 Sector Requirements for Industrial Activity at 79-80, Subpart M - Sector M.

**Comment Response:**

EPA acknowledges the comment and clarifies that Part 6.2.3 of the 2021 MSGP provides a list of the documentation items for operator evaluations of potential pollutant sources. EPA also notes that Part 6.2.4 Description of Control Measures to Meet Technology-Based and Water Quality-Based Effluent Limits requires operators to address the selection and design considerations in Part 2.1.1 and how they address the pollutant sources identified in MSGP Part 6.2.3.

## 8.N. Sector N - Scrap Recycling and Waste Recycling Facilities

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that the permit include PCB benchmark monitoring for certain facilities in
Sector N, specifically, those that receive or process scrap metal. These facilities continue to
receive old scrap transformers, many of which once contained PCB oil, and PCB fluorescent
light ballasts. The risk of residual oil from transformers is significant not all of the oil can be
removed during decommissioning. These items generally get handled by forklifts and processed
with a mobile shear. This material handling activity can lead to PCB contamination in
stormwater. BES has observed that many facilities do not have effective procedures in place for
eliminating the introduction of PCB ballasts and transformers from their suppliers.

**Comment Response:**

EPA appreciates the comment request recommending PCB benchmark monitoring for certain
Sector N facilities (as comment stated " ... specifically those that receive or process scrap metal"
(i.e., scrap transformers). At this time, EPA does not have enough information to accurately
gauge the extent of the problem nor what it would take, resource-wise, to address it. EPA will
consider the comment received for future permitting decisions or inclusion in future MSGPs as
the supporting information and reasonableness for doing so are obtained.

EPA also points out that the 2021 MSGP Part 6.2.3.3, Spills and Leaks, requires operators to
document where potential spills and leaks to stormwater may occur and document all significant
spills and leaks of oil or toxic or hazardous substances that may have occurred within three years
prior to preparing or amending SWPPP. Furthermore, the final 2021 MSGP Part 8.N.2.1,
Prohibition of Non-Stormwater Discharges. states "(See also Part 1.1.3) Non-stormwater
discharges from turnings containment areas are not covered by this permit (see also Part
8.N.3.1.3). Discharges from containment areas in the absence of a storm event are prohibited
unless covered by a separate NPDES permit. (EPA includes these prohibited non-stormwater
discharges here solely as a helpful reminder to the operator that the only non-stormwater
discharges authorized by this permit are at Part 1.1.3.)"

*"Note: Significant spills and leaks include, but are not limited to, releases of oil or hazardous
substances in excess of quantities that are reportable under CWA section 311 (see 40 CFR 110.6
and 40 CFR 117.21) or section 102 of the Comprehensive Environmental Response,
Compensation and Liability Act (CERCLA), 42 USC §9602. This permit does not relieve you of
the reporting requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302 relating to spills or
other releases of oils or hazardous substances."*

*"Significant Materials – includes, but is not limited to: raw materials; fuels; materials such as solvents, detergents, and plastic pellets; finished materials such as metallic products; raw materials used in food processing or production; hazardous substances designated under section 101(14) of CERCLA; any chemical the facility is required to report pursuant to section 313 of Title III of SARA; fertilizers; pesticides; and waste products such as ashes, slag and sludge that have the potential to be released with stormwater discharges. See 40 CFR 122.26(b)(12)." See also 40 CFR §261.2.*

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

BES also recommends that the permit include hexavalent chromium (Cr (VI)) benchmark monitoring for certain facilities in Sector N, specifically those that receive or process scrap metal. Cr (VI) is a component of fume produced by torch cutting stainless steel, a high value scrap commodity. The Occupational Safety and Health Authority (OSHA) guidance 3348-05 2008 has documented the prevalence of exposure to Cr (VI) in scrap metal recycling facilities. Torch cutting is a common processing method for non-ferrous scrap metal recycling facilities and can produce heavy smoke that may contaminate ground surfaces with Cr (VI), which can then contaminate stormwater. The EPA may also consider including this sector benchmark in this permit if a facility processes stainless steel.

**Comment Response:**

EPA appreciates the comment recommending to include hexavalent chromium benchmark monitoring for facilities in Sector N. EPA does not have enough information to accurately gauge the extent of the problem (residuals remaining after decommissioning) nor what it would take, resource-wise, to address it. EPA will consider the comment received for future permitting decisions or inclusion in future MSGPs as the supporting information and reasonableness for doing so are obtained.

---

**Commenter Name:** Stacy Hibbard
**Commenter Affiliation:** Bureau of Environmental Services (BES), Portland, OR
**Document Control Number:** EPA-HQ-OW-2019-0372-0130-A1
**Comment Excerpt Number:** 33
**Excerpt Status:** Final

**Comment Excerpt:**

BES recommends that Sectors M (Auto Salvage Yards) and N (Scrap and Waste Materials) include mercury as an additional benchmark monitoring requirement due to mercury's prevalence in the industrial activities at specific facilities in these sectors, for example, salvaging and crushing of scrap vehicles and scrap metal recycling. Demolition debris is often sold to scrap metal facilities and may include old mercury thermostats, pumps and other mercury-containing equipment. From BES' experience working with operators in this sector, glass mercury capsules are often found among recycled copper wire due to their prevalence in appliances and equipment containing switches.

In addition, mercury switch removal from scrap vehicles is not mandatory and the recycling of mercury switches may not be routinely done. The switches are difficult to find since switches can be located in multiple places and their presence and location varies by year, make and model, and removal and proper disposal or recycling is complicated and time consuming. A benchmark monitoring requirement for mercury may lead to better controls within these sectors. BES would support only requiring mercury monitoring within sector N for facilities that receive or process scrap metal.

**Comment Response:**

EPA acknowledges the comment recommending to include mercury benchmark monitoring for facilities in Sector M (Automobile Salvage Yards) and Sector N (Scrap Recycling and Waste Recycling Facilities). EPA does not have enough information to accurately gauge the extent of the problem nor what it would take, resource-wise, to address it. EPA will consider the comment received for future permitting decisions or inclusion in future MSGPs as the supporting information and reasonableness for doing so are obtained.

---

**Commenter Name:** Joshua Wheatley
**Commenter Affiliation:** James Environmental Management (JEM)
**Document Control Number:** EPA-HQ-OW-2019-0372-0147-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

There have been no sector-specific changes to sector N that deviate from the 2015 MSGP permit, aside from the new universal benchmark monitoring, Additional Implementation Measures (AIM), and general changes to the permit listed in the comments above. Please refer to the above comments on those subjects for more information.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 40
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Inspections of inbound recyclables

Discussion/Recommendations

This requirement should be removed as compliance is not reasonably achievable. Inbound paper bales are too big and dense to inspect in any meaningful way. They are unloaded via fork/clamp trucks, staged in stacked rows, and then loaded again by fork or clamp truck to conveyors where the debanding process and forward through repulping is mostly automated. Removal of personnel from undbanding areas is key to their personal safety. It would be unlikely to be aware of a pollutant (e.g. mercury thermometer) being present in a paper bale before (or after) it enters a pulper. Request to remove this item.

**Comment Response:**

EPA will consider removing the language for inspection of inbound recyclables when it updates the sector-specific fact sheets, which are not required for the 2021 MSGP.

## 8.O. Sector O - Steam Electric Generating Facilities

**Commenter Name:** Rebecca C. Tolene
**Commenter Affiliation:** Tennessee Valley Authority (TVA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0215-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should consider a more focused expansion of monitoring in certain sectors to determine whether or not benchmarks are necessary. Expanded benchmark monitoring for Sector O is particularly unnecessary and redundant because monitoring is required annually for pH and TSS (where applicable). As a result, Sector O facilities are already required to take action such as elimination of sources or installation of SCMs where the benchmarks are not met. As such, quarterly pH and TSS benchmark monitoring is unnecessary for Sector O facilities because it would result in redundant, onerous requirements that may provide unrepresentative data. Field

sampling for pH is difficult because it must be analyzed within 15 minutes of collecting a sample, unless the operator has a portable device. This timeline is not realistic for many facilities and operators.

**Comment Response:**

EPA acknowledges the comment that suggests it is unnecessary for Sector O (Steam Electric Generating Facilities) to monitor for both indicator monitoring parameters finalized in the 2021 MSGP and sector-specific effluent limitations.

EPA notes that indicator monitoring parameters (e.g., pH, TSS, and COD) are conducted quarterly and are not the same as benchmark monitoring nor an effluent limitation. EPA points out that indicator monitoring is "report-only" and does not have a threshold or baseline value for comparison nor does it require follow-up actions. EPA's position remains that benchmark and effluent limitation monitoring is necessary with other components of the permit to achieve water quality standards. The numeric effluent limits included in the MSGP, for which an exceedance would be a violation, were promulgated under separate Agency actions, and it is non-discretionary that EPA include them in the MSGP for the discharges to which they apply.

Part 4.2 of the final 2021 MSGP explains that when more than one type of monitoring for the same pollutant at the same discharge point applies (e.g., total suspended solids once per year for an effluent limitation and once per quarter for benchmark monitoring at a given discharge point), you may use a single sample to satisfy both monitoring requirements (i.e., one sample satisfying both the annual effluent limitation sample and one of the four quarterly benchmark monitoring samples). When the effluent limitation is lower than the benchmark threshold for the same pollutant, your Additional Implementation Measure (AIM) trigger is based on an exceedance of the effluent limitation threshold, which would subject you to the AIM requirements of Part 5.2. Exceedance of an effluent limitation associated with the results of any analytical monitoring type required by this Part subjects you to the corrective action requirements of Part 5.1.

In response to the comment that in-situ pH measurements are unrealistic and difficult to obtain, EPA has determined that portable electronic meters, sensors, and data loggers used in the field are a cost-effective way to monitor many types of parameters like turbidity, conductivity, temperature, dissolved oxygen, and pH in-situ.

---

**Commenter Name:** M. Patrick McGuire
**Commenter Affiliation:** Edison Electric Institute (EEI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should allow Sector O facilities to "test out" of the newly required universal quarterly benchmark monitoring for pH, total suspended solids (TSS), and chemical oxygen demand (COD) as some facilities already are required to comply with effluent limits for TSS and pH under the current and Proposed MSGP and many others do not discharge anything that impacts pH, TSS, and COD in meaningful amounts nor would they in the foreseeable future

**Comment Response:**

EPA did not finalize universal benchmarks in the 2021 MSGP. See response to DCN EPA-HQ-OW-2019-0372-0215-A1, Comment Excerpt Number 2.

---

**Commenter Name:** M. Patrick McGuire
**Commenter Affiliation:** Edison Electric Institute (EEI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0226-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Further, EPA should continue to review benchmarks for Sector O and ensure that the MSGP does not become the equivalent of an effluent limitation guideline.

**Comment Response:**

Comment noted.

---

**Commenter Name:** Kerry L. McGrath, Hunton Andrew Kurth LLP
**Commenter Affiliation:** Utility Water Act Group (UWAG)
**Document Control Number:** EPA-HQ-OW-2019-0372-0236-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**II. UWAG Urges EPA to Make Key Revisions to the Sector O Checklist**
As part of the 2015 MSGP Settlement Agreement, EPA is proposing to update the sector-specific fact sheets to incorporate emerging SCMs that reflect the best available technology economically achievable (BAT) and best conventional pollutant control technology (BCT). Proposed Fact Sheet at 103. The sector-specific fact sheets are presented as checklists in Appendix Q of the 2020 MSGP. Appendix Q does not, as EPA committed to do, revise and improve the prior fact sheets. Appendix Q includes a laundry list of SCMs without any discussion of the individual requirements or support for their inclusion. The over-inclusive nature of the checklists makes it

clear that EPA did not get input from the relevant industry sectors to evaluate the SCMs that are included.

Unlike the previous fact sheets, which presented a discussion of best management practices (BMPs) that could be used to minimize pollutants in stormwater discharges, Appendix Q includes checklists of SCMs. The sector-specific measures are significant for EPA's Additional Implementation Measures (AIM), the proposed three-tiered protocol for corrective action in the event of an exceedance of a benchmark monitoring value. Where AIM Tier 2 is triggered,[2] Sector O facilities would be required to select and implement all feasible SCMs from the proposed Sector O checklist in Appendix Q. Id.

The checklist for Sector O includes new pollutant sources, as well as additional SCMs, many of which are duplicative with requirements of other environmental programs and, as such, are unnecessary to incorporate into the industrial stormwater program. Although these proposed measures would not be required for every facility under Sector O, the checklist could be misinterpreted to present industry standards for all facilities within the sector. Moreover, the checklist format could be misinterpreted to suggest that facilities should be implementing all of the listed measures, unless they can provide an explanation as to why those measures could not be implemented. Therefore, UWAG urges EPA to make key revisions to the Sector O checklist as outlined in this section, including removal of SCMs that are unduly restrictive, duplicative of existing requirements under other regulatory programs, and unclear or vague. To assist the Agency, UWAG provides the attached redline of the Sector O checklist, Attachment 1, with specific UWAG suggestions.

The 2020 MSGP would expand the list of pollutant sources to include "Materials Handling and Storage," and "Vehicle and Equipment Storage and Parking." Proposed Fact Sheet, Appendix Q, at 322-330, 340-41. Because EPA has failed to provide any technical information or data to warrant the addition of these new pollutant sources and corresponding SCMs, UWAG recommends removing the proposed pollutant sources and corresponding new SCMs from the final Sector O checklist.

In addition, the Sector O checklist includes new or revised SCMs that are unduly restrictive and difficult to implement. For instance, the 2015 MSGP Sector O Fact Sheet directs industrial facilities to train applicable employees in good housekeeping, spill prevention and control, and materials management and disposal procedures. The Sector O checklist would require that employees receive all requisite training within the first week of employment and subsequently attend refresher training annually. Proposed Fact Sheet, Appendix Q, at 330 (emphasis added). UWAG members have expressed that it would be particularly burdensome to train applicable employees on all required topics within the one week deadline. UWAG does not dispute the value in training employees in good housekeeping, spill prevention and control, and materials management and disposal procedures. However, the way in which a new employee is trained should be a management decision informed by factors such as an employee's position at the plant and the company's onboarding program. Stormwater management and control may be appropriate for employees with direct responsibility for plant environmental compliance. On the other hand, such training may not be as crucial for other employees whose primary duties are unrelated to environmental compliance, like energy market bidding or accounting.

The Sector O checklist also contains SCMs that are covered by other regulatory programs, and adding such duplicative requirements as SCMs serves no purpose. The proposed SCMs for delivery vehicles, for example, are already covered under a facility's individual Spill Prevention, Control and Countermeasure (SPCC) plan. Establishing redundant SCMs will force industrial facilities to account for a single action under different regulatory schemes and has the potential to create conflicting or inconsistent requirements if the provisions in one program (e.g., SPCC) are revised while the SCMs remain the same. Such redundancy creates additional burdens on industrial facilities and provides no appreciable environmental benefit.

Perhaps even more problematic from a compliance standpoint are EPA's proposed SCMs that conflict with existing regulatory requirements. For example, under SPCC requirements, only a visual observation is required prior to discharging stormwater from a containment area; however, the Sector O checklist would require that a facility check/test stormwater before discharging. Proposed Fact Sheet, Appendix Q, at 325. Establishing SCMs that are inconsistent with and/or more stringent than requirements under existing regulatory programs would make it increasingly arduous for operators to ensure they are complying with all applicable conditions. This is particularly true given that several of the SCMs target activities clearly governed by other statutory schemes. For example, the Sector O checklist features SCMs concerning the cleanup of waste materials and dust management, which that are regulated under the Resource Conservation and Recovery Act (RCRA) and the Clean Air Act (CAA), respectively. See Proposed Fact Sheet, Appendix Q, at 320-321; 325-327.

UWAG urges EPA to make key revisions to the Sector O checklist as outlined in Attachment 1, including removal of SCMs that are unduly restrictive, duplicative of existing requirements under other regulatory programs, and unclear or vague. Many of these requirements go well beyond EPA's authority and are unnecessary for stormwater control at Sector O facilities.

[2] Under the proposal, EPA proposes three triggering events for AIM Tier 2: (1) repeat benchmark exceedances from Tier 1, where two consecutive annual averages each exceed a benchmark value; (2) two sampling events for a parameter within a two-year period that are over four times the benchmark threshold; or (3) a single sample being more than eight times the benchmark threshold. Proposed Fact Sheet at 81.2 Under the proposal, EPA proposes three triggering events for AIM Tier 2: (1) repeat benchmark exceedances from Tier 1, where two consecutive annual averages each exceed a benchmark value; (2) two sampling events for a parameter within a two-year period that are over four times the benchmark threshold; or (3) a single sample being more than eight times the benchmark threshold. Proposed Fact Sheet at 81.

**Comment Response:**

EPA will consider appropriate amendments with stakeholder in put when the Agency updates the sector-specific fact sheets, which are not required for the 2021 MSGP. EPA removed Appendix Q (SCM checklists) from the final 2021 MSGP.

## 8.P. Sector P - Land Transportation and Warehousing

**Commenter Name:** Paula Dodge-Kwan
**Commenter Affiliation:** Engineering Division, Albuquerque, NM
**Document Control Number:** EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Rather than implement additional benchmark monitoring requirements in arid environments with infrequent, short duration storm events that yield unreliable data, the COA would prefer greater emphasis on implementing additional structural BMPs or increasing the frequency of non-structural BMPs such as good-housekeeping inspections, sweeping, and spill prevention.

**Comment Response:**

Comment noted. EPA notes that the final 2021 MSGP will continue to provide for the implementation of alternative monitoring schedules for facilities located in arid and semi-arid climates, or in areas subject to snow or prolonged freezing. Alternate monitoring schedules allow operators the flexibility to allocate their resources effectively to capture the required number of measurable stormwater discharge events during the permit term (2021 MSGP Part 3.2.4.2, part 3.2.4.3 and part 4.1.6). EPA also notes that the 2021 MSGP part 4.1.6 special exception will provide EPA with more data that can be used to evaluate facility pollutant levels and to reexamine the benchmark monitoring framework in a future MSGP issuance.

---

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 83
**Excerpt Status:** Final

**Comment Excerpt:**

**8.P.3.1. Good housekeeping measures (required).**[268] While these measures are required for important activity areas (vehicle and equipment storage areas, fueling areas, material storage areas, vehicle and equipment cleaning areas, and vehicle and equipment maintenance areas), the proposed rule inappropriately states that such facilities must implement these practices "where determined to be feasible" (note comments on the definition of "feasibility," below).

[268] *Id.* at 91-92.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 51.

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Table 8.P-1 identifies benchmarks that apply to specific subsectors of Sector P. These benchmarks apply to both primary industrial activity and any co-located industrial activities. The draft permit proposes to require Sector P facilities to monitor for total recoverable lead and mercury. Transportation and related warehousing activities should not be required to monitor for either total recoverable lead or total recoverable mercury given the extreme unlikelihood that Sector P facilities generate and/or use substances having such content.

The National Academies paper references a 2005 study by J.O. O'Donnell that recommended the additional parameters of lead and mercury based on Toxic Release Inventory (TRI) data; however, many of the facilities under Sector P are warehouse and distribution and other facilities of which many do not have TRI emissions. There is no justification to require mercury sampling across all industrial facilities under Sector P, and in fact, there are no states with mercury benchmarks for Sector P and therefore no data to support this monitoring requirement. Mercury and lead are not typical pollutants for Sector P activities and ATA requests the analysis behind requiring such benchmarking analysis.

**Comment Response:**

After consideration of public comments on establishing benchmark monitoring for Sector P, EPA is not finalizing benchmark monitoring requirements for this sector. See Comment Response Essay 2 Monitoring.

## 8.Q. Sector Q - Water Transportation

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 80
**Excerpt Status:** Final

**Comment Excerpt:**

**8.Q - Water Transportation (sub-sector of importance to Chesapeake Bay watershed: Marine Cargo Handling)[265]**

**8.Q.3.1 Good Housekeeping Measures –** Some of the specific areas of control do have a clear "minimize" directive (e.g., blasting and painting areas, material storage areas). Others, (e.g. engine maintenance and repair areas, material handling areas, and dry-dock activities) use the ineffective "where determined to be feasible" language. As noted previously, such language is inappropriate without further definition, and providing even clearer direction is a better approach in this sub-section and in following sub-sections with the same phrase.

[265] *Id.* at 94-96, Subpart Q - Sector Q.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0220-A1, Comment Excerpt Number 51.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

## MSGP Part 8, Subparts Q and R

**Pressure washing vessels**. The Part 8 requirements for pressure washing vessels should be clarified for consistency and to reflect other disposal options that are available and approved. The draft 2020 MSGP states:

*"**8.Q.3.1.1 - Pressure Washing Area.** If pressure washing is used to remove marine growth from vessels, the discharge water must be permitted by a separate NPDES permit. Collect or contain the discharges from the pressure washing area so that they are not commingled with stormwater discharges authorized by this permit."*

*"**8.R.3.1.1 - Pressure Washing Area.** If pressure washing is used to remove marine growth from vessels, the discharged water must be permitted as a process wastewater by a separate NPDES permit."*

The Massachusetts Department of Environmental Protection and the Office of Coastal Zone Management have recommended that marinas utilize the MSGP, provided that they collect and recycle their vessel wash water. I recommend that the pressure washing requirements be revised as follows for both Sector Q and Sector R:

*"**Pressure Washing Area**. If pressure washing is used to remove marine growth from vessels,* <span style="color:red">and the wash water is discharged to a receiving water</span>, *the discharge water must be permitted by*

a separate NPDES permit. Collect or contain the discharges from the pressure washing area so that they are not commingled with stormwater discharges authorized by this permit."

**Comment Response:**

EPA declines to make the requested change. NPDES permits cover the discharge of pollutants into receiving waters. If a discharge of pollutants is not occurring and will not occur, the operator is not required to obtain coverage under an NPDES permit and the existing text is not applicable to that activity. However, where discharges of pollutants may occur from the activity, NPDES permit coverage is required. The industrial activity of pressure washing vessels or vessel hulls can release paint chips, paint liquids, copper, zinc, lead and a host of other potential contaminants into surrounding land and waters and is considered a "point source" discharge. For vessels, this washing typically occurs within, directly over, or adjacent to stormwater drainage systems and receiving waters (water of the U.S.). EPA also points out that the final 2021 MSGP sector specific permit parts 8.Q.3.1.1 and 8.R.3.1.1 have not had any changes to the permit requirements from the prior MSGPs.

---

**Commenter Name:**  B. Clemence
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

**Benchmark Monitoring**. I recommend that copper be added to the benchmark monitoring requirements for Sector Q. It is included under Sector R and is equally relevant to both sectors. Massachusetts will likely add copper under Sector Q in Part 9 of the MSGP; including it in Part 8, however, will make it easier for EPA to create the Discharge Monitoring Reports for permittees. My experience suggests that the Sector Q requirement to monitor for lead at marinas is unnecessary. Analytical results for lead are generally at least an order of magnitude below the benchmark. An EPA review of DMRs for this sector might help clarify that trend.

**Comment Response:**

EPA points out that the approach for benchmark monitoring since its first issuance of the MSGP in 1995 has been to require monitoring for pollutants of concern in stormwater on a sector-specific basis. The requirements are derived from discharge data and other information submitted to EPA by regulated facilities as a part of the old group application process. EPA then established benchmark monitoring thresholds for the various pollutants that were identified in such data and information as being discharged from the different sectors of industrial activity. The actual levels selected for the benchmark monitoring thresholds are based on EPA's CWA section 304(a) recommended water quality criteria.  Accordingly, the benchmark monitoring

requirements in the MSGP are appropriately tailored to the pollutants of concern in each sector and at levels that are appropriately tailored to water quality protection.

 Also See response to DCN EPA-HQ-OW-2019-0372-0141-A1, Comment Excerpt Number 1.

## 8.R. Sector R - Ship and Boat Building and Repair Yards

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0152-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

As with others in the shipyard repair industry, it is extremely difficult to achieve the copper benchmark as it currently stands. We have implemented strict best management practices and measures, costing significant dollars yet the requirement to meet the benchmark remains unachievable. We support a much more realistic copper benchmark in the 2020 MSGP.

**Comment Response:**

EPA is adjusting permit conditions to allow the calculation of site-specific copper benchmark values based on the Biotic Ligand Model (BLM) if the benchmark value is exceeded. This approach provides flexibility for operators while remaining protective of water quality. Please also see Essay No. 2, Monitoring.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  The Passenger Vessel Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0153-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

- The proposed copper benchmark testing requirement for water runoff should be adjusted because the municipally provided water supply used by a facility already exceeds the MSGP copper benchmark levels.

...

PVA's comments pertain to the proposed 2020 MSGP Part 8 Subpart R - Sector R Ship and Boat Building and Repair Yards. PVA's MSGP regulated facilities do not have any process water discharges, and their discharges are limited to storm water only.

Included in the current 2015 Multi-Sector General Permit were requirements for chemical analyte monitoring parameters for aluminum, iron, led, and copper. Industry has learned that meeting the acceptable benchmark levels for these has been achievable, with the exception of copper.

The 2015 MSGP set the copper benchmark at 0.0048mg/L for stormwater runoff. The industry has found that this level is unachievable, despite adherence to strict housekeeping precautions and advanced control measures.

Shipyards use municipal water supplies in their facilities and washing exterior areas. It is our understanding that publicly sourced water often contains a significantly higher level of copper content than what is permitted by the MSGP benchmark.

The EPA action level for copper in drinking water is 1.3mg/L based on EPA's Human Health Criteria. This makes the MSGP standard for copper approximately 270 times more stringent than that of drinking water. EPA's standard for drinking water is considered safe for human consumption. EPA should give consideration for this and adjust the MSGP to account for the higher levels of copper currently found in municipal drinking water.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0152-A1, Comment Excerpt Number 9.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**MSGP Part 8, Subparts Q and R**

**Pressure washing vessels**. The Part 8 requirements for pressure washing vessels should be clarified for consistency and to reflect other disposal options that are available and approved. The draft 2020 MSGP states:

*"8.Q.3.1.1 - Pressure Washing Area.* If pressure washing is used to remove marine growth from vessels, the discharge water must be permitted by a separate NPDES permit. Collect or contain the discharges from the pressure washing area so that they are not commingled with stormwater discharges authorized by this permit."

"*8.R.3.1.1 - Pressure Washing Area.* If pressure washing is used to remove marine growth from vessels, the discharged water must be permitted as a process wastewater by a separate NPDES permit."

The Massachusetts Department of Environmental Protection and the Office of Coastal Zone Management have recommended that marinas utilize the MSGP, provided that they collect and recycle their vessel wash water. I recommend that the pressure washing requirements be revised as follows for both Sector Q and Sector R:

"***Pressure Washing Area***. If pressure washing is used to remove marine growth from vessels, and the wash water is discharged to a receiving water, the discharge water must be permitted by a separate NPDES permit. Collect or contain the discharges from the pressure washing area so that they are not commingled with stormwater discharges authorized by this permit."

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0264-A1, Comment Excerpt Number 2.

## 8.S. Sector S - Air Transportation

**Commenter Name:**  Lisa Stevens or Jeanne Riley
**Commenter Affiliation:**  State of Utah Department of Environmental Quality
**Document Control Number:**  EPA-HQ-OW-2019-0372-0164-A1
**Comment Excerpt Number:**  11
**Excerpt Status:** Final

**Comment Excerpt:**

**Response to Part 8.S.4.1.8 - Sector S**: *Implementation of control measures, including any BMPs, facility inspections, and monitoring must be conducted with particular emphasis throughout the defined deicing season. As a result, airports will conduct monitoring four times during the deicing season but not quarterly monitoring for the universal benchmarks.*

This lack of required sampling and inspections during warmer weather (i.e., outside the deicing period) is concerning. Deicing is likely the primary pollutant source for stormwater at airports, but elimination of monitoring outside this period means that other pollutant sources could be completely missed. There may be an increase in outdoor maintenance activities during the summer that would not be captured. This sends the message that summer activities or any activities not involved in deicing are unimportant. Identifying the levels of seasonal fluctuations in pollutants also provides valuable information.

**Comment Response:**

EPA disagrees that requirements for Sector S send the message that summer activities or any activities not involved in deicing are unimportant. EPA points out that Part 8.S.4.1 of the 2021 MSGP requires year-round implementation of good housekeeping measures for industrial

activities anticipated to occur throughout a facility, such as vehicle and equipment maintenance, material storage, and fueling.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**4. EPA should eliminate the biochemical oxygen demand (BOD$_5$) parameter from the sector-specific benchmark requirements in Sector S of Part 8.**

AAAE recommends that EPA remove BOD$_5$ as a parameter that airports must monitor under sector-specific benchmark monitoring requirements in Part 8. Under the existing 2015 MSGP and proposed 2020 MSGP, airports that use a certain amount of pure glycol in glycol-based deicing fluids or urea must conduct benchmark monitoring of four parameters: BOD$_5$, chemical oxygen demand (COD), ammonia, and pH. (Proposed Part 4.2.1, 8.S.7.) In the NRC Study, which EPA commissioned, one key recommendation was that EPA should be periodically reviewing and updating sector-specific benchmark monitoring requirements that incorporate new scientific information. (NRC Study, at 42.) In its response to the recommendation, EPA agreed and pointed to certain examples where they have revisited various sector-specific benchmark monitoring requirements. (EPA Proposed 2020 MSGP Fact Sheet, at 5.)

AAAE believes that airports should not have to monitor BOD5 because monitoring COD is a better indicator for airports of the effectiveness of control measures and whether additional actions are needed. Indeed, during EPA's rulemaking process to develop effluent limitations guidelines (ELGs) and new source performance standards (NSPS) for the airport deicing category, EPA published a technical development document that outlined why the agency selected COD over BOD$_5$ for regulation.[3] EPA explained: (1) COD analyses are simple to conduct and can be measured in real time compared to a five-day test for BOD; (2) COD eliminates the need to consider water temperature when evaluating water quality concerns; and (3) COD analysis is more robust than BOD analysis because of certain ADF additive compounds that are present in deicing stormwater. (TDD for Airport Deicing, at 64.) Moreover, the BOD$_5$ benchmark was derived from secondary treatment standards for wastewater treatment systems, making it inappropriate for airports and stormwater. Thus, EPA should remove BOD5 and allow airports under Sector S to only monitor COD, ammonia, and pH.

[3] See 40 C.F.R. § 449.11; U.S. Environmental Protection Agency, Technical Development Document for the Final Effluent Limitations Guidelines and New Source Performance Standards for the Airport Deicing Category (2012) (hereinafter "TDD for Airport Deicing").

**Comment Response:**

EPA declines to remove the BOD5 benchmark at this time. The COD benchmark is much greater than the existing BOD benchmark, as is necessary to account for additional oxidizing elements that may be present in a discharge. BOD is specific to biochemical oxygen demanding substances and nitrogenous demanding substances, and thus is more targeted towards these types of pollutants. EPA has not determined that COD is a direct or functional substitute for BOD. EPA may evaluate the recommendation to remove BOD5 as a benchmark in future iterations of the MSGP.

Further, EPA has provided monitoring relief if the annual average for any parameter does not exceed the benchmark threshold. Operators with benchmark monitoring results that are compliant with the annual average for any parameter during the first year may discontinue benchmark monitoring for that parameter until 4th year of permit coverage.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

**5. EPA should provide airports with the option to report percentage of ADFs captured in lieu of sector-specific benchmark monitoring.**

AAAE recommends that EPA provide permitted airports with additional flexibility for complying with their sector-specific benchmark monitoring requirements under Part 8. More specifically, AAAE believes that any airport that can report a sufficient percentage or amount of ADFs captured should satisfy sector-specific benchmark monitoring requirements and be able to discontinue such monitoring. These airports could be required to report on an annual or other regular basis the amount of ADFs sprayed and the amount captured within a given timeframe. Airports could also demonstrate that receiving waters meet certain water quality standards, demonstrating how potential impacts from stormwater discharge associated with deicing activities have been mitigated. To be clear, AAAE believes this should only be an alternative option available to airports where this may be suitable.

As EPA is aware, airports across the country can vary significantly by size, resources, and geography, among many other factors, highlighting the need for flexibility rather than prescriptive requirements that may not be suitable for all airports. One method that works for a certain segment of airports may not work for another segment. EPA recognized this during the 2012 rulemaking process to develop ELGs and NSPS for the airport deicing category, concluding that the "best available technology determinations should continue to be made on a site-specific basis because such determinations appropriately consider localized operational constraints (e.g., traffic patterns), land availability, safety considerations, and potential impacts

to flight schedules."[4] Thus, EPA should adopt this fundamental principle in Sector S and provide for alternative options and methods to satisfy benchmark monitoring requirements.

[4] Effluent Limitations Guidelines and New Source Performance Standards for the Airport Deicing Category, 77 Fed. Reg. 29,168, 29,178 (May 16, 2012).

**Comment Response:**

EPA declines to make the requested MSGP modification at this time. EPA opted to require benchmark monitoring for airport de-icing activities based on an analysis of industry activities and the fact that significant quantities of chemicals are used and discharged in airport runoff during deicing activities; however, EPA recognizes that this may not be the case for all of these types of air transportation businesses and associated industrial activities nationwide. EPA may revisit in future iterations of the MSGP, the appropriateness of the benchmark values established for airports and adjust those benchmarks as necessary.

---

**Commenter Name:**  David Flores et al.
**Commenter Affiliation:**  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  81
**Excerpt Status:** Final

**Comment Excerpt:**

**8.S - Air transportation (sub-sector of importance to Chesapeake Bay watershed: Airports, Flying Fields and Services)[266]**

**8.S.4.1.1 Good Housekeeping –** Subsections concerning aircraft; ground vehicle and equipment maintenance and storage areas; material storage areas; and fuel systems and fueling areas all require that control measures should be used "where determined to be feasible."

**8.S.4.1.6 Source Reduction** – This section pertains to deicing operations for both runways and aircraft; the nitrogen pollution impacts of urea-based fluids is discussed above. The "where determined to be feasible" language should be removed and substituted as noted above. Nitrogen should be added as a benchmarked pollutant.

**8.S.4.1.7 Management of Runoff** – Eliminate the "where determined to be feasible" language and substitute as noted above.

[266] *Id.* at 101-107, Subpart S - Sector S.

**Comment Response:**

Comment noted. The language in these Sector S specific permit parts remain the same as in the 2015 MSGP. EPA points out that the term "Feasible" is defined in the Final 2021 MSPG Appendix A, Definitions.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**The Airport-Tenant Relationship**

Airports differ by size as well as by aviation mission from large commercial airports to small general aviation airports, with no two being just alike. Some accommodate the full range of activities, including scheduled airline passenger service, cargo activity, charter flights, general aviation, flight training, and military. Others handle only some of these functions.

The airport authority, usually a public entity such as a department of city government or a special aviation or port authority, is responsible for the direction and management of the airport. This entity is not often responsible for many of the industrial activities occurring at an airport, including aircraft maintenance, aircraft fueling, aircraft deicing, or other activities associated with aircraft operations. These activities are typically under the care and control of airport tenants and operators. As such, the airport authority must manage the airport in a role similar to a landlord with its tenants including airlines, concessionaires and other firms doing business on airport property.

In order to operate efficiently, air carriers need certain facilities at each airport to perform activities such as maintenance, fueling, and deicing. The air carrier may perform these functions as part of its operation or may contract with a type of concessionaire called a fixed base operator (FBO). Any activities related to the operation, maintenance, storage, fueling or deicing of aircraft are performed directly by the air carrier or it's contracted FBO.

The FAA is responsible for the regulation and oversight of civil aviation within the U.S. The FAA sets standards and guidelines for the safe operation of aircraft, and the air carriers are responsible for meeting these standards. The FAA issues regulations on specific activities, such as maintenance and deicing, to ensure the safe operation of aircraft under all conditions.

While the airport authority is the administrator and manager or the airport, it is the tenant that conducts the majority of the industrial activities that are the subject of this permit. The airport is responsible for managing its stormwater drainage system, but must coordinate activities and other actions of its tenants that discharge regulated stormwater into the airport's drainage system.

Arguably, stormwater issues at airports are more complex and raise issues not otherwise applicable to most other sectors of the MSGP.

As set forth more completely in specific comments below, a number of the proposed permit provisions for Sector S mandate coordination of activities between airports and their tenants, owners, and operators of regulated activities at their facilities. We believe these specific coordination requirements exceed the EPA's regulatory authority and encroach on the regulatory authorities of EPA's sister agencies, such as FAA. We are also concerned about the challenge of effectively implementing mandated coordination activities involving entities that are not governed by the permit. ACI-NA would like to continue this discussion with EPA, focusing on how permit considerations, such as a flexible co-permittee structure, might be helpful in this regard.

**Comment Response:**

EPA declines to implement a co-permittee/co-operator structure in the 2021 MSGP. The requirement for all airport operators to submit NOIs has been unchanged since the 1995 MSGP, even if the 1995 and 2000 MSGP versions also used the term "co-permittee". EPA discontinued usage of the term "co-permittee" in the 2008 permit due to confusion about its meaning, but retained the long-standing requirement for NOI submittal by individual operators, as well as the responsibilities associated with being a co-permittee if an airport authority and some or all of its tenants wish to pursue that route. As such, EPA maintains the separate operator filing an NOI requirement in this permit based on the regulation at 40 CFR 122.28(b)(2)(i): "Dischargers… seeking coverage under a general permit shall submit to the Director a written notice of intent to be covered by the general permit. A discharger… who fails to submit a notice of intent in accordance with the terms of the permit is not authorized to discharge… under the terms of the general permit unless the general permit… contains a provision that a notice of intent is not required or the Director notifies a discharger… that it is covered by a general permit... A complete and timely, notice of intent (NOI), to be covered in accordance with general permit requirements, fulfills the requirements for permit applications for purposes of §§ 122.6, 122.21 and 122.26." However, EPA notes that the regulations do provide flexibility so that non-EPA states could, if they wish, adopt a permitting paradigm different from EPA's; (i.e., authorizing such industrial discharges without NOI submittals where they are "co-permittees" or covered under a broader entity's NOI and permit (i.e., as in the case of an airport authority and its tenants).

EPA notes that sharing compliance responsibilities among multiple operators in a stormwater permit has a basis in the stormwater regulations; for MS4 permitting this is explicitly supported pursuant to 40 CFR 122.35. To provide clarity to air transportation facilities, the Sector S sections in the 2015 MSGP are retained in the final 2021 MSGP (permit part 8.S.3, Multiple Operators at Air Transportation Facilities and subsections) where the responsibilities and options for such facilities with multiple operators are enumerated.

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

**Section 8.S.2.2 Prohibition of Non-Stormwater Discharges**

*"This permit does not authorize the discharge of aircraft, ground vehicle, runway and equipment wash waters; nor the dry weather discharge of deicing chemicals."*

As written, this language prohibits stormwater-generated flows during dry weather which presents two significant concerns. First, it is important that EPA recognize that not all stormwater flows occur during storm events. For example, flows from airport pavement under drains or infiltration into stormwater systems are the result of precipitation and snowmelt that infiltrates the pavement and into the subsurface, where it ultimately reaches the airport's storm sewer system. Thus, these flows are driven by wet weather, but are delayed in their delivery to the storm sewers and outfalls.

This situation is the same as with snowmelt, which the MSGP clearly considers a form of stormwater. Due to the design and workings of airports and their drainage systems, stormwater flows can be delayed and EPA needs to recognize that such delayed flows do not change the fact that they are stormwater. EPA must make it clear in the permit that stormwater that is delayed in its discharge is not somehow transformed to non-stormwater. Improperly changing the characterization of stormwater somewhere in the middle of its drainage process from the actual wet weather event to its ultimate discharge from airport property unnecessarily complicates EPA's MSGP and implicates other ongoing controversies about "discharges to groundwater" that are not helpful to EPA or the aviation industry.

Secondly, blanket prohibition of dry weather discharge of deicing chemicals can be interpreted to be any detectable concentration. Laboratory detection limits for components of deicers are in the very low parts per million. Concentrations of a couple of parts per million of glycol, for example, in the small volumes of water associated with snowmelt or pavement under drains have no relevance to BMP performance or environmental risk. Further, merely because some deicing material might make it into the stormwater drainage system does not mean that it is "discharged" from the outfall. Dry weather deicing (or defrosting) may cause insignificant amounts of deicing products to enter a storm drain inlet. Generally, that product will not be "discharged" until a wet weather event comes along and generates flow through the drainage system.

It is recommended that the reference to dry weather discharge of deicing chemicals be deleted.

**Comment Response:**

EPA clarifies that it is not presumed that a lag time between the precipitation event and the discharge event changes the fundamental nature of the effluent. For example, the definition of "stormwater" in Appendix A ("stormwater runoff, snow melt runoff, and surface runoff and drainage. See 40 CFR 122.26(b)(13)") clearly states that snowmelt, which can discharge some period after its original storm event, is "stormwater". Stormwater controls such as holding ponds or other impoundments have been included in EPA guidance and other documents since 1992 and discharges from such controls are stormwater by definition. Likewise, "non-stormwater discharges" are defined in Appendix A as those "that do not originate from storm events". EPA has nothing on record that supports the premise that stormwater transforms into non-stormwater over time (provided that the impounded stormwater is composed entirely of rainfall or snowmelt, and not commingled with process wastewater or other unauthorized non-stormwater (e.g., wash waters).

EPA points out that the Final 2021 MSGP Part 8.S.2.2, Prohibition of Non-Stormwater Discharges, for Sector S states, "Note that a discharge resulting from snowmelt is not a dry weather discharge." Also this permit part clarifies that the examples (aircraft, ground vehicle, runway and equipment wash waters, nor the dry weather discharge of deicing chemicals) provided by EPA are a helpful reminder to operators that the only authorized non-stormwater discharges covered by the permit are outlined in Final 2021 MSGP Part 1.2.2.

In regard to the prohibition of dry weather deicing chemicals, EPA points out that this requirement has been retained from past MSGPs and is consistent with the Final 2021 MSGP Appendix A, Definitions of Non-Stormwater Discharges (i.e., not originating from storm events).

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

**Section 8.S.3.3 SWPPP Requirements**

*"A single comprehensive SWPPP must be developed for all stormwater discharges associated with industrial activity at the airport before submittal of any NOIs. The comprehensive SWPPP should be developed collaboratively by the airport authority and tenants. If any operator develops a SWPPP for discharges from its own areas of the airport, that SWPPP must be coordinated and integrated with the comprehensive SWPPP. All operators and their separate SWPPP contributions and compliance responsibilities must be clearly identified in the comprehensive SWPPP, which all operators must sign and certify per Part 6.2.7."*

The requirement that a single SWPPP be developed collaboratively with individual permittees that obtain a separately issued permit appears to be outside of EPA's authority and establishes an excessive regulatory burden on the airport authority (assuming that the airport authority will be expected to coordinate development of the entire airport SWPPP). In addition, the ability for the airport authority to maintain compliance with this requirement would be out of the airport authority's control, as it relies on the performance of other MSGP permittees. Furthermore, the compliance status of each and every permittee at the airport would be dependent on the performance of other permitted entities outside of other permittee's control.

EPA must recognize that every airport is unique in terms of its structure, management, and tenant relationships. Therefore, there is no "one-size-fits-all" approach that will work. There are many models across the country that have proven to be highly efficient and successful, and yet not repeatable in other situations. We recognize that this provision relates to EPA wanting to simplify its enforcement mechanisms, but for airports, this approach does not work.

ACI-NA requests that this requirement be modified to state that the airport authority SWPPP shall, at a minimum, reference the SWPPPs developed by the airport's tenants and operators so that the existence of those SWPPPs is acknowledged and provide any SWPPP reviewer with sufficient information to obtain other SWPPPs available from airport tenants. We recommend that the Fact Sheet be modified to encourage coordination between the various permittees. However, EPA must maintain maximum flexibility for airports and their tenants through some combination of permit compliance, tenant leasehold contracts, and other factors outside the scope of the MSGP.

### Section 8.S.4.1.6 Source Reduction

*"Consistent with safety considerations, minimize the use of urea and glycol-based deicing chemicals to reduce the aggregate amount of deicing chemicals used that could add pollutants to stormwater discharges. Chemical options to replace pavement deicers (urea or glycol) include (list not exclusive): potassium acetate; magnesium acetate; calcium acetate; and anhydrous sodium acetate."*

There are several concerns with this paragraph and the two subsequent bullets regarding runway deicing operations and aircraft deicing operations. First, any mandate for source reduction associated with deicing operations is inappropriate. Deicing operations at airports are complex and driven by the need to ensure safe wintertime operations and comply with FAA regulations. It is inappropriate for the EPA to establish source reduction expectations within a stormwater permit that may conflict with FAA requirements or establish stormwater permit compliance requirements that could impact the safety of airport and aircraft operations. The focus of the MSGP should be on addressing the resulting runoff from deicing operations to reduce pollutant discharges. After all, EPA's authority rests in controlling pollutant discharges through point sources to U.S. waters, not regulating internal site operations that are regulated by FAA or other agencies and may not even impact stormwater discharges.

Second, the language is very confusing because the options listed only apply to pavement deicing, while the subparagraphs that follow cover both pavement and aircraft deicing

operations. Given the noted complexity of deicing operations, as well as the continually evolving technologies and products used (see also the discussion of the VPRP in the General Comments Section above), it is inappropriate for EPA to specify particular alternatives that may become obsolete within the life of the permit.

ACI-NA recommends that specific source reduction requirements related to aircraft and airfield deicing operations in the proposed MSGP be deleted.

**Comment Response:**

EPA notes that sharing compliance responsibilities among multiple operators in a stormwater permit has a basis in the stormwater regulations; for MS4 permitting this is explicitly supported pursuant to 40 CFR 122.35. To provide clarity to air transportation facilities, EPA introduced new sections to Sector S in the 2015 MSGP which are retained in the Final 2021 MSGP (permit part 8.S.3, Multiple Operators at Air Transportation Facilities and 8.S.3.3 subsection) where the responsibilities and options for such facilities with multiple operators are enumerated.

Also see response to DCN EPA-HQ-OW-2019-0372-0239-A1, Comment Excerpt Number 3.

EPA acknowledges the comment on the deicing chemical source reduction requirement of the Final 2021 MSGP Part 8.S.4.1.6 stating: " ... the mandate for source reduction associated with deicing operations is inappropriate" and that EPA should " ... focus on addressing the resulting runoff from deicing operations to reduce pollutant discharges." Since all tenants at airports must be individually covered and should have read the permit, EPA expects operators who deice will be able to both control runoff and reduce sources of pollution, wherever possible. The permit already acknowledges that the ability to comply with specific effluent limits is based on what is "achievable", which is part of the definition of "minimize". And because "minimize" is already defined as "reduce or eliminate to the extent achievable…" the phrase "and where practicable eliminate" has been excised from the Final 2021 MSGP Part 8.S.4.1.6. For clarity, EPA has included language that says reductions are to be made consistent with considerations of flight safety. The Final 2021 MSGP Part 8.S.4.1.6 Source Reduction language is: "Consistent with safety considerations, minimize the use of urea and glycol-based deicing chemicals to reduce the aggregate amount of deicing chemicals used that could add pollutants to stormwater discharges. Chemical options to replace pavement deicers (urea or glycol) include (list not exclusive): potassium acetate; magnesium acetate; calcium acetate; and anhydrous sodium acetate."

Similarly, the comment stated EPA should not tell operators how best to conduct aircraft deicing operations, as "these are based on safety considerations and FAA requirements." EPA points out that the requirements only include stormwater discharge control options for consideration that are feasible and that take into account the factors that influence the selection of such controls. EPA has added other currently employed practices to this section that may be suitable controls for aircraft deicing: "Consider using ice-detection systems and airport traffic flow strategies and departure slot allocation systems where feasible and that accommodate considerations of safety, space, operational constraints, and flight schedules." EPA acknowledges that technology

selections that relate to aircraft deicing discharges must be based on an evaluation of the factors identified in the Deicing ELG and 40 CFR 125.3(d)(2) or (d)(3), as appropriate.

EPA acknowledges the comment on source reduction language being confusing. EPA added the following language to the final 2021 MSGP Part 8.S.4.1.6 subbullet "*Runway Deicing Operations*" which states "Chemical options to replace pavement deicers (urea or glycol) include (list not exclusive): potassium acetate; magnesium acetate; calcium acetate; and anhydrous sodium acetate."

The comment concern that, in general, EPA should not enumerate specific control measures for the different types of deicing that occur at airports (outside the types specified in the deicing ELG) and that control measures should not be required if there is no environmental benefit. EPA believes proffering options for operators to consider is the kind of appropriate compliance assistance the Agency routinely provides. The Agency has provided the clarification that control measures are required only to the extent necessary to achieve the "minimize the discharge of pollutants" standard. The permit's stormwater control options were selected based on their being already in use at airports and, therefore, could be considered feasible… The comment also points out that aviation-specific factors including safety, effects on aircraft operations (particularly delays) and the interdependencies that connect these and other design factors should be considered when determining what pollution control practices are available at individual airports. EPA agrees and has incorporated the factors commenters' provided that influence selection of controls. The following language in the Final 2021 MSGP Part 8.S.4.1.3 reflects these changes: "Implement control measures to minimize the discharge of pollutants in stormwater from aircraft, ground vehicle and equipment storage areas. Control measures may include, where determined to be feasible and that accommodate considerations of safety, space, operational constraints, and flight schedules, the following (list not exclusive): storing aircraft and ground vehicles indoors; using drip pans for the collection of fluid leaks; and perimeter drains, dikes or berms surrounding the storage areas." Similar language has been applied in other parts of this sector as well as other parts of the permit where stormwater control options are listed.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

**Section 8.S.4.1.7 Management of Runoff**

There are a number of substantial concerns with language included in this section. An overall concern is that the language does not reflect an in-depth understanding of deicing operations and practices at airports, nor does it address the varied size of airport and industrial activity subject to the permit. The requirements for use or consideration of specific technologies at all airports

subject to the permit will lead to lack of flexibility on the part of permittees, as well as confusion and misinterpretation on the part of permit writers who use the MSGP as the basis for state-level general industrial stormwater permits. The MSGP should focus on effective implementation of BMPs appropriate for each permittee and its specific activities and not contain such detailed prescriptive elements.

In addition, there are numerous suggested operations/technologies that are not appropriate to dictate in the MSGP. For example, identifying where storage of collected stormwater should occur, the disposal options (recycling or treatment) of collected fluid, and technologies employed to collect fluids are all issues that EPA cannot dictate through the MSGP. Once fluid has been collected, the stormwater permit is not relevant in disposal options of the collected fluid, as long as it is not discharged back to the storm sewer system.

ACI-NA recommends that this section be removed or re-worded such that it is less prescriptive and more flexible with regard to effective management of collected deicing fluids in order to accommodate considerations of safety, space, operational constraints, and flight considerations.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 13.

See response to DCN EPA-HQ-OW-2019-0372-0239-A1, Comment Excerpt Number 12.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

**Section 8.S.4.1.7 Management of Runoff**

*"When applying deicing fluids during non-precipitation events (also referred to as "clear ice deicing"), implement control measures to prevent unauthorized discharge of pollutants…"*

This comment is related to the comment previously provided with regard to Section 8.S.2.2 (Prohibition of Non-Stormwater Discharges) above. This language does not reflect the actual conditions encountered at airports and with regard to deicing activity and the complexity of defining certain runoff as dry weather versus other runoff as wet weather. Wet weather will ultimately convey the discharge of deicing chemicals through the storm sewer system, regardless of whether those deicing events happened during precipitation events. Furthermore, and as indicated in the previous comment on this subject, dry weather discharges of deicing-impacted stormwater may occur due to the delay between precipitation events and the runoff entering the

storm sewer system. Establishing the expectation that different operational procedures will exist between deicing events occurring during precipitation and those events happening to remove prior precipitation or ice formation is infeasible and unwarranted.

It is recommended that this paragraph be deleted.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0239-A1, Comment Excerpt Number 11.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

**Section 8.S.5.2 Potential Pollutant Sources**

*"Deicing operators must provide the above information to the airport authority for inclusion with any comprehensive airport SWPPPs."*

As noted previously, an airport's compliance with the MSGP cannot be dependent on activities over which the airport has no control, namely other permittee's (an airport tenant or operator) compliance with permit requirements. In this instance, airport operators work with airport tenants and FBOs regarding the level of information exchange is appropriate for managing deicing operations. For example, an airport with a deicing pad that is plumbed to the sanitary sewer would have no impact on the stormwater drainage system and the type of information the airport might collect will be different than the same airport without a deicing pad.

It is recommended that this sentence be deleted from the permit.

**Comment Response:**

EPA points out that this language was retained from the previous MSGP.

See response to DCN EPA-HQ-OW-2019-0372-0239-A1, Comment Excerpt Number 3.

---

**Commenter Name:** Melinda Pagliarello
**Commenter Affiliation:** Airports Council International – North America (ACI-NA) et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0239-A1

**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

**Table 8.S-1 Ammonia Benchmark Monitoring**

*Table 8.S-1 identifies benchmarks that apply to Sector S. These benchmarks apply to both your primary industrial activity and any co-located industrial activities.*

EPA has established an ELG to address pavement deicing if urea is still being used at the airport. For the most part, urea has been banned from pavement deicing. The sampling and benchmark requirements for ammonia are a vestige of the original 1995 MSGP when urea was commonly used as a pavement deicer. Today, additional monitoring requirements for ammonia are not warranted. It is recommended that ammonia be removed from the benchmark monitoring table.

**Comment Response:**

EPA declines to make revisions related to the comment.

EPA develops benchmark parameters and values irrespective of industry-specific discharges, with these values selected as appropriate to protect water quality above which EPA determined represents a level of concern. EPA selected sectors for which specific benchmark values were to apply based on a statistical analysis of group application data submitted in the early 1990s. At that time, airports were not required to monitor stormwater during de-icing activities and as such, the Agency did not have group application data demonstrating whether de-icing activities were cause for concern. However, EPA opted to require benchmark monitoring for airport de-icing activities based on an analysis of industry activities and the fact that significant quantities of chemicals are used and discharged in airport runoff during deicing activities. EPA recognizes that this may not be the case for all these types of businesses and associated industrial activities nationwide. EPA may revisit the appropriateness of the benchmark values established for airports and adjust those benchmarks as necessary.

EPA points out that the Final 2021 MSGP Sector S permit part Table 8.S-1 which includes ammonia, as stated by the comment, is based on deicing related activities and only requires to have samples collected during the timeframe deicing activities are occurring by operators as defined in the Final 2021 MSGP Part 8.S.4.2. Additionally, EPA notes that the final 2021 MSGP Part 4.2.2.2 provides for many operators, after the first year of benchmark monitoring, operators can discontinue monitoring until 4th year of their permit coverage if the annual average for a parameter does not exceed the benchmark threshold.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment

**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

8.S.5.2

Add to end of paragraph:

If PFAS materials are stored, the location, quantity, and method of storage.

**Comment Response:**

EPA is adding language to Sector S fact sheets as guidance for operators addressing PFAS materials.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Water Quality Control Division, Colorado Department of Public Health and the Environment
**Document Control Number:** EPA-HQ-OW-2019-0372-0256-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

8.S.5.4

Document control measures for storage and transfer of PFAS containing materials and their proper collection and disposal methods in the event of a release from their container. If the final draft of this permit lacks such provisions, this permit may not comply with the applicable provisions of sections 301 and 302 of the Clean Water Act as applicable to Colorado and thus could be grounds for a conditional certification or certification denial for this permit by the state of Colorado. 33 USC § 1341.

**Comment Response:**

EPA is adding language to Sector S specific fact sheets as guidance for operators addressing PFAS materials.

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)

**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, Universal Benchmark Monitoring should be required only at airports that use more than 100,000 gallons of glycol-based deicing/ anti-icing chemicals and/or 100 tons or more of urea on an average annual basis. This lower boundary for monitoring and reporting was established by the very first MSGP, which was issued in September of 1995.[34] The basis for establishing this boundary was identified as two independent FAA and industry studies, each demonstrating that the vast majority aircraft deicing chemicals are used at airports at or above that threshold. Because data reflecting the majority of aircraft deicer could be recovered by monitoring at airports that met this threshold, EPA adopted the threshold as a reasonable balance between the Agency's need for information and the substantial burden on small facilities of collecting analytical data.[35]

This monitoring threshold has been observed in Sector S of each of the intervening MSGPs, including for benchmark monitoring.[36] The record supporting the Proposed 2020 MSGP does not contain any basis for deviating from the application of this long-standing and well-supported threshold.[37] We request that the final permit make clear that, as with other required monitoring, Universal Benchmark Monitoring applies at airports that use more than 100,000 gallons of glycol-based deicing/ anti-icing chemicals and/or 100 tons or more of urea on an average annual basis.

[34] 1995 MSGP, Sector S, Section 5(b).

[35] "The results of the storm water survey conducted by FAA (June 1992) showed that 10 percent of the respondents who conduct deicing activities used more than 100,000 gallons of glycol-based deicing chemicals during winter seasons. In addition, those facilities using more than 100,000 gallons of glycol-based deicing chemicals accounted for 71 percent of the total amount of glycol-based deiced chemicals reported by all respondents in the survey. In a similar survey conducted by the American Association of Airport Executives, 4 percent of the airports conducting deicing activities used more than 100,000 gallons of ethylene glycol which represented approximately 76 percent of the total amount of ethylene glycol used by all airports surveyed." 60 Fed. Reg. 50804, at 50998-99 and 51002, col. 2 (September 9, 1995).

[36] 2000 MSGP, Section 6.S.6, Table S-1.-Sector-Specific Numeric (sic)Limitations and Benchmark Monitoring; 2009 MSGP, Section 8.S.6, Table 8.S-1; 2015 MSGP, Section 8.S.7, Table 8.S-1.

[37] Indeed, the proposal for Universal Benchmarking appears to be grounded exclusively on the recommendation contained in the National Research Council (NRC) National Academies of Sciences (NAS) industrial stormwater study, *Improving the EPA Multi-Sector General Permit for Industrial Discharges* (2019). However, the NRC, praises "[t]he original 1995 MSGP monitoring scheme" as "based on program elements embedded in sound administrative,

scientific, and public policy principles (EPA, 1995, p. 50804)." NRC Study at 21. While the NRC asserts the monitoring requirements are "dated" and "have not been substantially updated over time" (NRC Study at 21), the bases cited by the NRC for establishing universal benchmarks do not apply to the Air Transportation Sector as the sector has been "generating, considering, and acting on new information" regarding discharges from airports throughout 1995-present and "the performance of structural and nonstructural SCMs for ensuring the quality of stormwater leaving" airports (specifically including airports that do not exceed the 100,000 gallons ADF/100 tons urea thresholds) has been the subject of intense Agency scrutiny, including in the Deicing ELG process. As an aside, we also note that while the NRC pointed out that the present requirements "caus[ed] monitoring data submittal discrepancies among some sectors" we respectfully submit that the appropriate means of addressing any such discrepancies is not to increase the burden on sectors that have been submitting substantial monitoring data since the inception of the requirement in 1995.

**Comment Response:**

Comment noted. EPA has revised the final 2021 MSGP to remove universal benchmark monitoring for Sector S - Air Transportation. Only sector-specific benchmark monitoring is conditionally required. Table 8.S-1 specifically states, "For airports where a single permittee, or a combination of permitted facilities use more than 100,000 gallons of pure glycol in glycol-based deicing fluids and/or 100 tons or more of urea on an average annual basis, monitoring the first four parameters in ONLY those outfalls that collect runoff from areas where deicing activities occur (SI 4512-4581)."

---

**Commenter Name:** Tim A. Pohle
**Commenter Affiliation:** Airlines for America (A4A)
**Document Control Number:** EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

We also request that EPA clarify that only those airport tenants that "discharge stormwater associated with industrial activity" will require a permit. While we recognize this is established through, among other features of the MSGP, the definition of "Operator", it would be helpful to make this clarification in the Fact Sheet and amend Part 8.S.3 to read (additional language underlined): "Air transportation facilities often have more than one operator who could discharge stormwater associated with industrial activity. Operators include the airport authority and (if they discharge stormwater associated with industrial activities) airport tenants . . . ."

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0239-A1, Comment Excerpt Number 3.

## 8.U. Sector U - Food and Kindred Products

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 82
**Excerpt Status:** Final

**Comment Excerpt:**

**8.U – Food and Kindred Products (subsectors of importance to Chesapeake Bay watershed: Meat Packing Plants, Canned and Cured Fish and Seafood, Prep Feeds and Ingredients for Animals)[267]**

These sub-sectors are among the SICs presenting the highest runoff pollutant loading rates of any industrial sector in parts of the Chesapeake Bay watershed. The noted sub-sectors may also present runoff pollution problems in other states and regions where similar industrial profiles are prevalent and where this MSGP applies or is used as a model for state regulation. The draft regulations do not provide any focus on these sub-sectors, however, nor is there any discussion of possible controls related to various components or activities unique to this sector as a whole, as there is for other sectors. There should be.

**8.U.6 Sector-Specific Benchmarks –** Phosphorus should be added to the list of benchmarks to be measured in Table 8.U-1, as it is a limiting pollutant in the Chesapeake Bay and is part of the TMDL developed for the Chesapeake Bay states.

[267] *Id.* at 110-111, Subpart U - Sector U.

**Comment Response:**

EPA points out that it will inform operators of their monitoring responsibilities when there is an applicable TMDL, and these requirements will be based on EPA's examination of the applicable TMDL and wasteload allocation (2021 MSGP Part 4.2.5.1). EPA agrees with comment that such monitoring would provide a useful tool to assess progress in meeting the goals of the TMDL. EPA also informs the operator of necessary measures for discharges to be consistent with the assumptions and requirements of an applicable TMDL and its wasteload allocation, as specified in 2021 MSGP Part 2.2.2.1.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

*B. EPA Lacks Data to Support Benchmark Monitoring for U Sector*

In 1995, EPA determined that an industry sector's benchmark monitoring requirement would be based on whether the median facility concentration exceeded a benchmark. In the proposed 1993 permit, EPA examined the following four key parameters from the U subsector based on 1993 group permit data.[50]

SECTOR U DATA

| Sector U Data | Median Grab | Median Composite | Benchmark | Median Exceeded |
|---|---|---|---|---|
| COD | 83 | 63 | 120 | No |
| TSS | 72.5 | 53.5 | 100 | No |
| BOD | 13.9 | 11 | 30 | No |
| N&N | 0.56 | 0.55 | 0.68 | No |

*Source: MSGP Proposed Permit; Table U-3; 58 Fed. Reg. 61146, 61377 (November 19, 1993).*
*(mg/L)*

With hundreds of data points, both the median grab and median composite values[51] are below all four benchmarks for Sector U. In the 1995 final permit, EPA divided U into U1 (SIC 204x), U2 (SIC 207x), and U3 (SIC codes: 201x, 202x, 203x, 205x, 206x, 208x, 209x and 211x) with U3 representing the largest group of facilities by far. Based on this data in the table above, EPA determined that the U3 subsector did not require chemical monitoring and established more limited monitoring for the U1and U2 subsectors.[52]

In addition, the most recent NRC Discharge Monitoring Data (DMR)[53] for TSS from the 2015 MSGP permit data reveals that Sector U3 facilities are still "low exposure" – 43% of facilities are above benchmark. Thus, the median facility concentration was still below benchmarks, as in 1995. And Sector U1 showed 38% are above benchmark – even lower exposure. Not enough data was reported for COD for either subsector. U3 reported 9% exceeded the pH benchmark of 9.[54]

Finally, as addressed earlier, the 2015 U3 data for TSS and pH further validates U3 as "low exposure" and weighs against benchmark monitoring. Moreover, the 2019 NRC Table 2-3 confirms the "low exposure" status for 5 additional chemicals for sector U3 for which there are eight samples or more.[55]

Notwithstanding the data-driven record originating in 1990, there is no evidence that EPA reviewed any portion of the 2015 U sector DMR data prior to proposing the 2020 permit. This is contrary to the NRC's 2019 report recommendation that EPA review the data before making decisions about monitoring for given sectors.[56] A review of this data, as described above, would have led the Agency to conclude that the food and beverage industry should not be subject to new monitoring.

[50] The pH data was not included in the reported 1993 dataset. The U Sector reflects all of what later become U1, U2 and U3 subsectors in 1995.

[51] A composite sample is a volume-weighted composite sample, which is more representative of stormwater flow than a grab sample. EPA chose grab samples as the permit requirement in 1995 because composite samples are much more costly, although it is now considering providing permittees the choice in the 2020 proposed permit.

[52] A sector is considered "low exposure" for a given pollutant if the median facility concentration falls below the EPA benchmark. U1 (grains) is required to monitor for TSS alone; U2 (fats and oils) is required to monitor for BOD, COD, N&N and TSS. We employ the designation of "low exposure" for chemicals for which the median facility in the sector is less than the benchmark value. The test is performed on each chemical potentially subject to monitoring. This was the test employed in the 1995 MSGP. 60 Fed. Reg. 50804, 50827 (September 29, 1995).

[53] 2019 NRC Report at 125. DMR data includes more than 17,000 records from 2015-2018 for MSGP facilities reporting in the four states where EPA has primary jurisdiction (Idaho, Massachusetts, New Hampshire, and New Mexico).

[54] Data found in Table D-18 for pH (22 results, 7 facilities for U3) and D-22 for TSS (123 results, 7 facilities for U3); (37 results, 7 facilities for U1).

[55] Improving the EPA Multi-Sector General Permit for Industrial Stormwater Discharges (NRC 2019) Table 2-3 at 24.

[56] Id. at 30-31.

**Comment Response:**

Under the 2021 MSGP, sector specific benchmarks are retained from the 2015 MSGP. For Sector U.3, indicator "report-only" monitoring is required. See Essay No. 2, Monitoring.

## 8.X. Sector X - Printing and Publishing

**Commenter Name:** Gary A. Jones
**Commenter Affiliation:** Printing United Alliance
**Document Control Number:** EPA-HQ-OW-2019-0372-0198-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Similar to printing operations in SIC 27, there are some activities in SIC 26 that use some of the same conventional and digital printing technologies to product packaging and other converted materials. These include paperboard containers and boxes, converted paper and paperboard products, and corrugated containers. The manufacturing processes at paper and allied product manufacturing facilities are not typically exposed to storm water.

Since the promulgation of the MSGP permit in 1995, there have been significant changes in the printing and publishing industry, SIC 27 and the description of activities and potential exposure to stormwater needs to be revised. One of the most significant changes has been the introduction and growth of digital printing technologies. These technologies encompass several approaches that include a print-on-demand method of printing in which an electronic output device transfers variable data, in the form of an image, from a computer to a variety of substrates. Digital printing methods include, but are not limited to, inkjet printing, electrophotographic printing, dye sublimation printing, thermal wax printing and solid ink printing.

The incorporation of digital technologies has caused a significant change in the printing industry. In many instances, the digital printing devices have replaced conventional presses thus eliminating the need to prepare printing plates, screens and other image carriers. In addition, many of the devices use cartridges for inks and have almost eliminated using large volumes of cleaning solutions. Facilities are no longer purchasing cleaning solvents in drum quantities as the need for cleaning large printing presses has been eliminated.

For those facilities that are using conventional printing presses, the technology for plate making has dramatically changed over the past 25 years. Plates are now imaged directly with lasers and the unhardened image area is washed off the plate with either water or plate development chemistry that is aqueous based and, in some instances, may have a higher pH. Plates are not etched with acids and other toxic materials. In the case of gravure cylinders, they are now laser etched and then plated with chrome. However, emerging technology will soon replace this conventional approach. Similar to the commercial print industry, the processes and chemicals used to image screens used for the screen printing process has changed.  Since the late 1990's, film processing within screen printing operations has disappeared.  The use of digital pre-press has allowed screen printing operations to remove the use of film processing chemistries from their facilities.  Further, the use of direct to screen technologies further reduces the use of chemistries in these facilities.  These direct to screen operations involve the use of was to image the screens used for the printing process thereby removing the need for the use of any traditional chemistries.

Due to regulatory requirements such as the Coalition of Northeastern Governors (CONEG) Model Toxics in Packaging Legislation and the Consumer Product Safety Commission's requirements for toys and children's products along with Canadian and European Union regulations on heavy metals in products, the use of these in inks has been eliminated. For example, CONEG's model legislation has been adopted by 19 states, and requires reductions in the amount of four heavy metals (specifically, mercury, lead, cadmium, and hexavalent chromium) in packaging and packaging components sold or distributed in these states.

The other driving force have been changes in EPA regulations for controlling air toxic emissions and the release of Control Techniques Guidelines for controlling VOC emissions. EPA has issued a Maximum Available Control Technology Standard under its National Emission Standards for Hazardous Air Pollutants (NESHAP) program for the printing and publishing industry (40 CFR Part 63 Subpart KK).  The regulation sets strict emission limits for the release of Hazardous Air Pollutants (HAPs) emitted from printing operations. To comply with the requirements, almost all covered operations have had their inks and coatings reformulated to

eliminate the HAPS so the limits can be met. This regulation has spurred more research and development into more water-based ink systems, although some solvent-based inks are still used depending upon the product being produced.

The chrome NEHSAP addressing chromium compound air emissions from existing and new hard chromium electroplating, decorative chromium electroplating, and chromium anodizing tanks (40 CFR Part 63 Subpart N) has reduced emissions from gravure cylinder preparation.

The release and subsequent adoption by state and local air pollution control authorities of several Control Techniques Guidelines (CTG) has caused the reformulation of inks, coatings, fountain solutions, and cleaning solvents to reduce VOC contents and subsequent emissions. The CTGs impacting printing operations are the Control Techniques Guidelines for Offset Lithographic Printing and Letterpress Printing, Control Techniques Guidelines for Flexible Package Printing, and Control Techniques Guidelines for Industrial Cleaning Solvents.

The primary substrates utilized by printing operations primarily include paper, textiles, and a wide variety of plastics and laminates. In some operations, printing can occur on metal substrates such as aluminum for cans. In addition, printing inks and overprint coatings (hydrocarbon based, solvent based, water based, and radiation cured), and solvents for ink dilution and cleaning. Other materials include dry toner, lubricating fluids, fuels, and adhesives/glues. Paper and other substrates are stored indoors because exposure to precipitation would destroy the quality. The other raw materials arrive at the facilities in drums or smaller containers and are also stored inside for dispensing. At very large operations including newspapers, some materials are received and stored in large portable totes and above ground storage tanks, which are also kept inside. In the case of newspapers, the tanks are filled from tanker trucks that pump the ink via an internal piping system that is connected on the outside of the building. In rare instances, some solvents can be stored in aboveground tanks outside of the facility, depending on the facilities' space and primary activity.

Some printing operations have fuel oil stored in aboveground tanks that is used to either heat the facility or as a backup fuel for an emergency generator. Some newspaper operations will have an underground storage tank holding fuel for their delivery vehicles.

Both nonhazardous and hazardous wastes are produced from the printing process. Hazardous wastes include some ink wastes, but primarily they are solvent wastes. These wastes are generated in small quantities at some of the facilities within this industrial group. Solvent wastes result from cleaning of printing presses. Ink wastes are generated from the cleaning of printing plates and from excess ink used in printing. Nonhazardous wastes from this industry group include waste paper and other plastics, paper dust, scrap steel and packaging materials, and used wooden pallets.

Occasionally, facilities will store drums of solvent and ink or waste ink and solvent in outside storage buildings specially constructed to meet OSHA regulations. The more common items found outside a printing operation are dumpsters for refuse, compactors, and pallets. If the dumpster and compactor is not covered or if the pallets are contaminated, they have the potential to contaminate storm water discharges.

Because of the lack of industrial activities occurring outdoors, the primary sources of storm water pollutants originate from materials handling, storage of materials, and waste management or disposal activities. Pollutants that may be associated with printing operations include TSS, pH, oil and grease, and COD.

Material handling activities such as loading and unloading areas, and liquid transfer (solvents from outdoor storage tanks to facility) may be exposed to storm water discharges. Exposure of these areas to storm water may be minimized by covering of the shipping/receiving and liquid transfer areas.

For those facilities engaged in fueling and vehicle maintenance, gasoline and diesel fuel are frequently stored outdoors in aboveground storage tanks and drums. Most vehicles and equipment require oil, hydraulic fluids, antifreeze, and other fluids that may leak and contaminate storm water discharges.

**Comment Response:**

EPA appreciates the comment and industry operations overview and recommendations. EPA may revisit in future iterations of the MSGP, the appropriateness of the benchmark values established for Sector X – Printing and Publishing industry and adjust those benchmarks as necessary.

---

**Commenter Name:** Gary A. Jones
**Commenter Affiliation:** Printing United Alliance
**Document Control Number:** EPA-HQ-OW-2019-0372-0198-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

We recommend that the US EPA move to utilize the NAICS codes when discussing covered printing operations. NAICS codes were established in 1997 on a production-oriented, or supply-based, conceptual framework. This means that producing units that use identical or similar production processes are grouped together in NAICS.  It was our understanding that the US EPA was seeking to move towards the use of the NAICS code system.

**Comment Response:**

EPA appreciates the comment. EPA has used SIC codes to maintain consistency with the industrial stormwater regulations at 122.26(b)(14)(i-ix, xi). However, recognizing that NAICS codes are commonly used by industry, EPA has included in the final 2021 MSGP, as with the 2015 MSGP, Appendix N which lists both SIC and NAICS Codes for operator informational

purposes. If an industrial facility operator is unsure if they are in a SIC code or Activity Code regulated under the MSGP, EPA recommends they contact the applicable EPA Regional Office.

EPA also points out that a complete list of SIC Codes (and conversions from the NAICS) can be obtained from the Internet at (www.census.gov/epcd/www/naics.html) or in paper form from various locations in the document titled Handbook of Standard Industrial Classifications, Office of Management and Budget, 1987.

## Appendix A. Definitions, Abbreviations, and Acronyms

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

**Appendix A Definitions and Acronyms**

In section A.2 several carriage returns are missing – what was intended to be multiple columns of acronyms ran together, in the PDF.

Page D-4 of 6, the following phrase is cut off in the Sector T section because the table cell is too small: "compliance with section 405 of the CWA"

**Comment Response:**

EPA addressed these changes in the final 2021 MSGP.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Woodard & Curran, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0248-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

In many places in the proposed 2020 MSGP, EPA removed language related to operators being able to make a determination that "no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice" and for demonstrating no further reductions are achievable. However, some of this language remains in the definitions of "minimize" (Part 2 and Appendix A), "feasible" (Appendix A), "infeasible" (Appendix A).

We request that EPA clarify whether facilities may make the above-referenced demonstration in relation to benchmark monitoring. Since this is still a component of the key terms "minimize," "feasible," and "infeasible," please explain why the provision for operators to demonstrate that no further reductions are achievable was removed

**Comment Response:**

EPA agrees that this language has been removed in some parts/provisions of the final 2021 MSGP permit; however, EPA points out that this language is still relevant to the permit and is included in language throughout the permit. EPA notes that this language was removed from the benchmark monitoring documentation due to AIM requirements. See the final 2021 MSGP Fact Sheet Part 5.2.6 which states the following:

*"The 2021 MSGP does not include an exception for feasibility, such as one found in the 2015 MSGP (i.e., no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice). This exception to AIM is inappropriate in the 2021 MSGP for several reasons. Feasibility considerations are not relevant at AIM Level 1 because the operator can self-determine that no additional measures are warranted, as well as AIM Level 2 where the operate can select pollution prevention/house-keeping measures they deem appropriate. At AIM Level 3, repeated benchmark exceedances have occurred to a point at which implementation of permanent stormwater control measures is warranted. Additionally, industrial stormwater discharges are explicitly required to meet all provisions of CWA § 301, including being controlled as necessary such that the receiving waters of the United States meets applicable water quality standards (CWA § 402(p)(3)(A))."*

## Appendix C. Areas Eligible for Permit Coverage

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 41
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>EPA Should Provide an Administrative Extension of 2015 MSGP to Idaho Facilities.</u>**

The EPA has authorized Idaho Department of Environmental Quality (IDEQ) to implement a NPDES permit program and IDEQ will obtain permitting authority for general industrial NPDES permits on July 1, 2021. Based on the rapidly approaching transition schedule of these permits from EPA to IDEQ authority, NMA proposes that the 2015 MSGP coverage be administratively extended for MSGP in Idaho until the State of Idaho takes primacy and issues stormwater permits for sources covered by the MSGP. Under EPA's current schedule, NOIs would be due February 12, 2021.With potential delays to finalizing the proposed 2020 MSGP, the timeframe to submit an NOI will likely be close to the date when Idaho becomes the permitting authority.

Requiring facilities to submit two separate NOIs and comply with two different stormwater general permits within a short timeframe would be unnecessarily burdensome.

**Comment Response:**

Comment noted. EPA is working with IDEQ on this matter.

## Appendix D. Facilities and Activities Covered

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0115
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

What is the EPA's position on mainline direct-to-locomotive (DTL) fueling operations with regards to storm water permitting? Is this fueling activity considered an "industrial activity" that warrants permitting? There has not been a general consensus formed within the railroad industry on the matter so an EPA interpretation would definitely be helpful.

**Comment Response:**

40 CFR 122.26(b)(14)(viii) regulates stormwater discharges from the following: "Transportation facilities classified as Standard Industrial Classifications 40, 41, 42 (except 4221-25), 43, 44, 45, and 5171 which have vehicle maintenance shops, equipment cleaning operations, or airport deicing operations. Only those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, airport deicing operations, or which are otherwise identified under paragraphs (b)(14) (i)-(vii) or (ix)-(xi) of this section are associated with industrial activity."

In a Q&A document that accompanied the 1990 stormwater regulations, EPA stated that "only nontransient vehicle maintenance shops are included in the transportation category" (See question 32 on page 12 of the "NPDES Stormwater Program Question and Answer Document Volume 1, March 1992). Therefore, vehicle maintenance shop refers to "a nontransient location or area at a transportation facility's site that is designated for use for vehicle maintenance or in which vehicle maintenance is conducted on a regular or repeated basis, including intermittently or sporadically." *In re San Pedro Forklift, Inc.*, 15 E.A.D. 838, 858 (EAB 2013). If the activity in question is classified under Standard Industrial Classifications 40, 41, 42 (except 4221-25), 43, 44, 45, or 5171 and meets these conditions of a vehicle maintenance shop under 40 CFR 122.26(b)(14)(viii) would require an NPDES permit for industrial stormwater discharges.

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

**3. EPA does not narrowly tailor its regulatory proposal to the data it has.**

The categorization of industrial activity under the proposed 2020 MSGP is a legacy of the 1994 MSGP. SIC codes are outdated, having last been updated in 1987, and inappropriate for the regulatory classification of industrial activities. The grouping of SIC codes in MSGP sectors creates rigidly uniform requirements over industries of great diversity. The NRC Study discussed this issue, citing inconsistent monitoring requirements for similar sectors with similar industrial activities.[48]

EPA's proposed new monitoring requirement for Sector P, Land Transportation and Warehousing, provides a good example of this issue. This is a broad sector, covering many disparate industry activities, from railroads to petroleum terminals and chemical distribution facilities. EPA proposes to require benchmark monitoring for mercury and lead for all Sector P permittees, citing the NRC Study.[49] (The NRC Study does not specifically recommend benchmark monitoring for mercury and lead benchmark monitoring, suggesting only that "chemical-specific monitoring with the MSGP would be appropriate.") The NRC Study cites a recommendation by O'Donnell (2005) for mercury and lead monitoring.[50] O'Donnell is further based on analyses of the Toxic Release Inventory (TRI) data from 1999-2002[51] and 2000 MSGP Discharge Monitoring Reports (DMR).[52] However, in the TRI, all of the reports of interest came from only one of the 12 SIC Codes in Sector P, Petroleum Bulk Stations and Terminals. In the DMR, for Sector P, "no applicable data were reported."[53] From the data presented, EPA's proposes mercury and lead benchmark monitoring on industrial sectors that it has not identified as likely to have mercury and lead in stormwater runoff. Small business representatives in this sector believe that this is unfair and an unnecessary burden.

[48] NRC Study, pp. 29.

[49] *Proposed 2020 MSGP*, Fact Sheet, pp. 10.

[50] Memorandum from John O'Donnell, Tetra Tech Inc., *Re: Review of 2000 MSGP Monitoring Requirements and Suggested Changes* (2006) (regulations.gov Document ID EPA-HQ-OW-2019-0372-0006).

[51] Memorandum from Jon Harcum, Susan Adair, and Jim Collins, Tetra Tech, Inc., *Re: Review of Toxic Release Inventory data from 1999-2002 as related to the NPDES Industrial Storm Water Permit Program* (February 9, 2005) (regulations.gov Document ID EPA-HQ-OW-2005-0007-0008

[52] Memorandum from Jon Harcum and Jim Collins, Tetra Tech, Inc, *Re: Review of Discharge Monitoring Report data from the MSGP 2000* (January 26, 2005) (regulations.gov Document ID EPA-HQ-OW-2005-0007-0003.

[53] *Id.* at 9.

**Comment Response:**

EPA appreciates the comment. EPA has used SIC codes to maintain consistency with the industrial stormwater regulations at 122.26(b)(14)(i-ix, xi). However, recognizing that NAICS codes are commonly used by industry, EPA included Appendix N, List of SIC and NAICS Codes, in the final 2021 MSGP for operator informational purposes. If industrial facility operators are unsure if they are in an SIC code or Activity Code regulated under the MSGP, EPA recommends they contact the EPA Regional Office.

EPA also points out that a complete list of SIC Codes (and conversions from the newer North American Industry Classification System" (NAICS)) can be obtained from the Internet at (www.census.gov/epcd/www/naics.html) or in paper form from various locations in the document titled Handbook of Standard Industrial Classifications, Office of Management and Budget, 1987.

See Essay No. 2, Monitoring related to chemical-specific benchmark monitoring for Sectors I, P, and R.

---

**Commenter Name:**  Shelly Lemon
**Commenter Affiliation:**  New Mexico Environment Department (NMED)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0219-A1
**Comment Excerpt Number:**  38
**Excerpt Status:** Final

**Comment Excerpt:**

Please add private and government to the description of covered facilities (e.g. "Your permit eligibility is limited to discharges from private and government facilities in the "sectors" of industrial activity summarized in Table D-1.").

**Comment Response:**

EPA disagrees, and declines to make the suggested permit modifications based on this comment. EPA points out that federal regulatory requirements and the final 2021 MSGP do not distinguish between facilities' activities needing coverage and ownership.

## Appendix E. Procedures Relating to Endangered Species Protection

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

***3. EPA Must Strengthen and Revise Eligibility Criteria Related to Endangered Species Act Reviews.***

EPA's proposed Appendix E – Procedures Relating to Endangered Species Protection – is insufficient to protect threatened and endangered species and their proposed or designated critical habitat from industrial stormwater pollution. Too much is left to the discharger's discretion. Criterion C in particular delegates duties of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (NMFS) (the "Services") under the Endangered Species Act to the discharger with no guaranteed oversight or accountability to ensure that eligibility is appropriately determined or that required controls and other measures to reduce impacts support a "not likely to adversely affect" determination. EPA received approximately twice as many Form Cs as expected according to the Biological Opinion issued by NMFS on the 2015 MSGP, which highlights the need to confirm that these determinations are correct and eligibility is warranted and maintained through the life of the MSGP.[9]

We request the following changes to ensure eligibility is based on the best available science and accurately determined:

1. The Service(s) must affirmatively review and confirm eligibility under the selected eligibility criterion in all cases.
2. The NOIs and confirmations issued by the Service(s) must be made publicly available on EPA and the Service(s) websites with notice of availability published in the Federal Register.
3. EPA and the Services should jointly commit to auditing some proportion of Form A-C facilities to verify the correctness of eligibility determinations and the implementation of measures that formed the basis for eligibility for coverage under the MSGP. The results of the joint compliance study must be made publicly available with notice of availability published in the Federal Register.

[9] "Based on data from the 2008 MSGP, out of the approximate 2,365 facilities expected to seek coverage under the new MSGP, only approximately 400 of those facilities are expected to fall under the Part 1.1.4.5 eligibility criterion C in the new proposed permit." National Marine Fisheries Service. Biological Opinion on EPA Multi-Sector General Permit for Industrial Stormwater Discharges Pursuant to the National Pollution Elimination System, (2015) at 190. Office of Protected Resources, National Marine Fisheries Service, National Oceanic and

Atmospheric Administration. U.S. Department of Commerce, FPR-2014- 9094, https://doi.org/10.7289/V5D798G7.

**Comment Response:**

EPA disagrees, and declines to make the suggested permit changes at this time. EPA points out the following information related to the comment:

1. EPA clarifies that the following language has been added to Appendix E for strengthening coordination with "Services" which states "While coordination between you and the U.S. Fish and Wildlife Service (USFWS) and/or the National Marine Fisheries Service (NMFS)(together, the "Services") is not necessarily required in all cases, EPA encourages you to coordinate with the Services, to **[sic]** document that coordination, and to do so early in the planning process prior to submitting your NOI." EPA also points out the final 2021 MSGP Fact Sheet Part 6.2.6.1 requires documentation of operators SWPPP and Services communications related to eligibility criterion. Appendix E criteria was developed in consultation with the Services to ensure that discharges covered under the permit were protective of ESA-protected species and critical habitats. EPA also points out that eligible operators must complete their eligibility determination outlined in the Endangered Species Protection section of the Notice of Intent (NOI) in the NPDES eReporting Tool (NeT-MSGP) and provide all information as required on the NOI that supports the Part 1.1.4 eligibility criterion that the operator qualifies under. Operators eligible under Criterion C3 or Criterion F must complete additional questions in the Endangered Species Protection section of the NOI in NeT-MSGP, unless the EPA Regional Office grants a waiver from electronic reporting, in which case the operator must submit a completed Criterion C3 Eligibility Form to EPA a minimum of 30 days <u>prior</u> to NOI submittal for permit coverage. Operators eligible under Criterion C2 must also submit completed Criterion C2 Eligibility information at the same time as NOI submittal, which will be held for 30 additional days prior ot the standard 30-day review for all NOIs. All eligible operators must certify with the NOI that the operator meets one of the criteria (A-E) outlined in the final 2021 MSGP Appendix E to determine eligibility for MSGP permit coverage. EPA made some revisions to the criteria to ensure the they are adequately protective of ESA-listed species and designated critical habitat(s) (see summarized changes in final 2021 MSGP Fact Sheet Part 1.1.4).

2. In response to the comment on publicly available NOI and ESA information, the Final 2021 MSGP requires operators to complete a series of NOI ESA worksheet questions and submit with the NOI in NeT-MSGP. If operators opt to attach the Stormwater Pollution Prevention Plan (SWPPP) to the NOI or provide a URL for the SWPPP location in NeT-MSGP, this would provide publicly available information regarding the SWPPP and associated documentation which includes ESA documentation as required in the Final 2021 MSGP Part 6.2.6.1. Refer to the following final 2021 MSGP parts for additional information on publicly available operator SWPPP and associated information: 1.3.1, Prepare Your Stormwater Pollution Prevention Plan (SWPPP) Prior to Submitting Your Notice of Intent (NOI); 1.3.5, Requirements to Post a Sign of your Permit Coverage, which includes the URL or the location of EPA Regional Office where a copy of the SWPPP may be obtained; and 6.4, SWPPP Availability.

3.  EPA worked with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to improve instructions and other information related to the eligibility criteria related to Endangered Species Act (ESA) Listed Species and Critical Habitat Protection. EPA plans to continue working with the Services through the implementation of the 2021 MSGP. Joint commitments between the EPA and the Services to perform future studies is beyond the scope of this permit.

Appendix G. Notice of Intent (NOI) Form

Commenter Name:  David Flores et al.
Commenter Affiliation:  Center for Progressive Reform et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:**  86
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix G, NOI form: not clear on the paper form what information regarding TMDLs the permittee is expected to provide if their receiving water is subject to a TMDL.

**Comment Response:**

EPA added to the paper NOI form fields for TMDL ID and the associated pollutants for which there is a TMDL to provide additional clarity.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

**Appendix G Notice of Intent**

Note that the term "outfall" has been replaced with "Discharge Point" in the body of the permit, but not in this form.

**Comment Response:**

EPA updated the NOI form to ensure consistent use of "discharge point."

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA estimates four hours to conduct the necessary research and completion of the NOI. This estimation is inaccurate. The length of the NOI has been increased to 16 pages (hard copy). If a potential impact to an endangered species or critical habitat is identified, the NOI process could be extended by weeks if USFWS or NOAA consultation is required. In addition, the current requirement for Sector P facilities is to perform a hardness analysis on the receiving water in order to determine the appropriate benchmark for total recoverable lead. That analysis will require the entity to hire a consultant and lab to perform the analysis and will take a minimum of two weeks to perform in most areas.

**Comment Response:**

EPA disagrees. EPA recognizes that costs of compliance will vary considerable among and even within industrial sectors. The cost estimates included in the proposed and final MSGP are industry averages. See the Cost Impact Analysis for the 2021 MSGP.

## Appendix I. Annual Report Form

**Commenter Name:** David Flores et al.
**Commenter Affiliation:** Center for Progressive Reform et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0220-A1
**Comment Excerpt Number:** 87
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix I, annual report form: should be beefed up by adding the following requirements:

- report any changes to outfalls (number, area drained, etc)
- provide the dates that routine inspections were completed and identify the wet weather inspection date
- provide the dates that quarterly visual assessments of stormwater were completed
- Certify via checkbox that: SWPPP is up to date

A more robust approach to the annual report is exemplified by the New York DEC's Annual Certification Report.[278]

278 New York State Dept. of Environmental Conservation. Annual Certification Report GP-0-17-004. Stormwater Compliance Coordinator NYSDEC, Bureau of Water Compliance (attached).

**Comment Response:**

EPA appreciates the comment on including additional information items to the final 2021 MSGP Appendix I - Annual Report Form. EPA points out that operators were previously required under the 2015 MSGP and continue to be required by the final 2021 MSGP Part 7.6.8 to promptly submit facts or relevant information (e.g., discharge points) in the NOI or for corrections to the NOI. EPA notes that the electronic NOI submittal form through NeT-MSGP will automatically populate operators' DMR forms accordingly. EPA agrees that date information for inspections and quarterly visual assessments would be useful in the annual report summaries and will add language to the annual report form for inclusion of date information. EPA disagrees that the annual report should include a certification of the SWPPP, as this is already required in the development of the SWPPP and NOI submittal for coverage. EPA also points out that the SWPPP is considered a "living document" that should be reflective of current facility conditions; therefore, operators must evaluate and update the SWPPP not just annually but as necessary and required (e.g., No later than 45 days after conducting the final routine inspection for the year) throughout the course of the permit term.

## Appendix K. No Exposure Certification Form

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

MWRA supports the revision of the form name from "NOE" to "NEC". This is less confusing. Where the acronym "NOE" appears on the form it should be changed to "NEC" to match the permit text.

**Comment Response:**

EPA appreciates the comment on acronym discrepancies noted. EPA updated "NOE" to "NEC" throughout the permit language.

## Appendix M. Discharge Monitoring Report (DMR) Form

**Commenter Name:** Taunia Van Valkenburg
**Commenter Affiliation:** Triad National Security LLC's
**Document Control Number:** EPA-HQ-OW-2019-0372-0181-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

***Part 4.1.9 Monitoring Reports and Appendix M:***

Text in this Part indicates 'You must report monitoring data using EPA's electronic DMR tool, as described in Part 7.4 (unless the EPA Regional Office grants you a waiver from electronic reporting, in which case you may submit a paper DMR form). The paper DMR form in Appendix M requires the "time since previous measureable storm event in days" to be entered. However, if a facility used the electronic DMR tool for submittal of DMRs in the past, this information was not required.

*Recommendation:*

Delete the requirement to submit "time since previous measureable storm event in days" from Appendix M so information required on the paper and electronic DMR are consistent.

**Comment Response:**

EPA appreciates the comment on this discrepancy in the requirements from the paper and electronic DMR forms. EPA ensured that permit requirements and forms are consistent.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  29
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI notes that the proposed Discharge Monitoring Report (DMR) Form (Appendix M) includes Check-Off Box 3.m for "Exceedance but discharge does not result in any exceedance of water quality standards per Part 5.2.3.3.b AIM Tier 3". DMR data are made publicly available. It seems very likely that these reported values will be taken out of context for Section 505 CWA citizen suit purposes by certain people who access the information. EPA should reconsider reporting of results that exceed benchmarks but do not cause exceedances of applicable WQSs.

**Comment Response:**

EPA disagrees and declines to make this change and retains this reporting requirement in the final 2021 MSGP. EPA has a duty to provide NPDES permit information to the public, as specified in CWA section 402(j). The permit and fact sheet provide context for these reports and the data reported therein and are available publicly. note that EPA and permittees must furnish non-CBI information to the public upon request, including reporting of results that exceed benchmarks but do not cause exceedances of applicable water quality standards. EPA also notes that Congress empowered individual members or groups to enforce the CWA under CWA

section 505. EPA furthermore notes that permit enforcement, including citizen suits, is outside the scope of this action, which is the re-issuance of the MSGP.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  31
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI notes that the proposed Discharge Monitoring Report (DMR) Form (Appendix M) includes Check-Off Box 3.l for "Exceedance was a single aberration per Part 5.2.2.1.c.i. AIM Tier 2". DMR data are made publicly available. It seems very likely that reported values of proven aberrant events will be taken out of context for Section 505 CWA citizen suit purposes by certain people who access the information. Part 5.2.2.1.c.i. should specify that permittees report the value of the required follow-up "sample [taken] during the next qualifying rain event" rather than the initial aberrant value. If necessary, reporting of the follow-up value instead could include checking off a new substitute box to note "Follow-up sample result per Part 5.2.2.1.c.i. AIM Tier 2". This approach could be used for each type of aberrant exception.

**Comment Response:**

See response to DCN: EPA-HQ-OW-2019-0372-0184-A1, Comment Excerpt Number 29.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  32
**Excerpt Status:** Final

**Comment Excerpt:**

ISRI notes that the proposed Discharge Monitoring Report (DMR) Form (Appendix M) includes Check-Off Box 3.j for "Exceedance due to natural background pollutant levels". This box label should include a reference to Part 5.2.4.1. DMR data are made publicly available. It seems very likely that reported exceedances caused by natural background will be taken out of context for Section 505 CWA citizen suit purposes by certain people who access the information. Part 5.2.4.1 should specify that permittees report the net value of the result (i.e., the actual result less the contribution from natural background). If necessary, reporting of the net value instead could include checking off a new substitute box to note "Result is net of natural background contributions per Part 5.2.4.1".

This same approach to reporting should be applied to results above the benchmark that include contributions from run-on. The proposed Discharge Monitoring Report (DMR) Form (Appendix M) includes Check-Off Box 3.k for "Exceedance due to run-on". This box label should include a reference to Part 5.2.4.2. This part should specify that permittees report the net value of the result (i.e., the actual result less the contribution from run-on). If necessary, reporting of the net value instead could include checking off a new substitute box to note "Result is net of run-on contributions per Part 5.2.4.2".

**Comment Response:**

See response to DCN: EPA-HQ-OW-2019-0372-0184-A1, Comment Excerpt Number 29.

---

**Commenter Name:**  Carolyn M. Fiore
**Commenter Affiliation:**  Massachusetts Water Resources Authority (MWRA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0225-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

**Appendix M Discharge Monitoring Report Form**

Note that the term "outfall" has been replaced with "Discharge Point" in the body of the permit, but not in this form.

In 3.d, "Quarterly benchmark monitoring" is replaced by "UBM - Universal benchmark monitoring; SSBM - Sector-specific benchmark monitoring". However the instructions on page M-7 have not made the corresponding updates to the list of types of monitoring.

**Comment Response:**

EPA appreciates the comment recognizing the terminology differences in the MSGP and DMR forms. EPA ensured consistent use of "discharge point" in the DMR form.

EPA also appreciates the comment recognizing the terminology differences in the MSGP and forms. EPA ensured consistent use of "Universal Benchmark Monitoring" throughout.

## Appendix O. Summary of Reports Permit Submittals

**Commenter Name:**  Ed Dunne
**Commenter Affiliation:**  Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0229-A1

**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix O - Deadlines for submission of the Change NOI form to EPA should also be included in Appendix O.

**Comment Response:**

EPA appreciates the comment. EPA made this change accordingly in the MSGP and forms.

## Appendix Q. Stormwater Control Measures

**Commenter Name:**  Randall M. Lyons
**Commenter Affiliation:**  Massachusetts Marine Trades Association (MMTA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0141-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

While we commend the Proposed MSGP's inclusion of easy-to-understand sector-specific checklists (Appendix Q), the MSGP does not offer any credit for those permitees which voluntarily adopt the items on these checklists.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

We reviewed the Appendix Q checklists for Sectors A and B. They are largely generic and will cause unnecessary time to be spent on documenting why certain Stormwater Control Measures (SCMs) are not selected and implemented. Rather than these being considered "checklists" which must be documented as to why or why not they were used, AF&PA recommends converting them to a menu of SCMs from which facilities can chose only those SCMs that are

most appropriate for the activity and pollutant, without having to justify the reasoning other SCMs were not used.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  28
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

The Appendix Q checklists are largely generic and will cause unnecessary time to be spent on documenting why certain SCMs are not done.

Discussion/Recommendations

The Appendix Q checklists include a number of general SCMs but also exclude or misuse several typical SCMs. The Appendix Q Checklists appear overly weighted (almost half of the pages) devoted to vehicle use, storage, fueling, maintenance and parking. Rather than these being considered "checklists" which must be documented as to why/why not they were not used, recommend converting them to a menu of SCMs that can be used in the approach below.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Checklist Structure

Issue

Design of checklist is around generic SCMs and not pollutant specific.

Discussion/Recommendations

The purpose of adding additional SCMs should be to address reducing specific pollutants' contributions. All of the SCMs are too generic and none speak to the pollutants that will be addressed. Because the document is structured as a checklist, generally each of these SCMs will have to be included as part of the analysis or discounted, requiring substantial time, effort and documentation. Instead, they should be converted to a menu of SCMs from which facilities can chose only those SCMs that are most appropriate for the activity and pollutant, without having to justify the reasoning other SCMs were not used.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

Section is entitled "Log, Lumber and Wood Product Storage"

Discussion/Recommendations

As pollutant sources, it makes sense to separate this into "Log Storage" and "Finished Product Storage" especially since the next section deals with "Residual Storage".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

Missing SCMs

Discussion/Recommendations

There is nothing in this section dealing with typically used SCMs such as:

- Jersey barriers for defining log laydown areas and containing large debris
- Use of bark and chip screen in drainage ways to capture debris and wood residuals
- Use of bark separators or settling ponds and their maintenance to remove wood residuals

Thus, EPA should add several typical SCMs in this section.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3

**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

No mention of access roads or rail lines

Discussion/Recommendations

Access roads and rail lines can typically be significant sources of wood debris. There are no SCMs to address these.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

Lack of pollutant focus on COD and TSS specific sources

Discussion/Recommendations

Sector A requires monitoring for COD and TSS. Any COD in the stormwater discharge is going to come from decaying wood residuals, typically in ponds or catchment basins or filled conveyances (ditches). TSS is going to be due to sampling outfalls too close to sources with no controls and/or ponds/basins/screens or ditches full of sediment and/or wood debris that require periodic maintenance. The SCMs should be primarily focused on these and their maintenance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Divert stormwater around storage areas using vegetated swales, and/or berms. A properly designed vegetated swale can also provide infiltration benefits."

Discussion/Recommendations

Remove the second editorial sentence as it provides no value to the SCM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Locate storage areas on stable, well-drained soils with slopes of 2—5 percent to prevent ponding and to convey stormwater leachate to treatment."

Discussion/Recommendations

Log storage is either wet (a wet deck) or dry (no water spray). Dry storage is usually used for relatively short holding times of wood while wet decks provide for longer term storage. Wet deck effluents are covered by effluent guidelines. Dry wood storage typically only produces stormwater (not leachate) from the log storage itself. EPA should more carefully delineate these and the SCMs that could be used for each.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Limit slopes to prevent erosion."

Discussion/Recommendations

For an existing facility, the slopes are what the site provides. SCMs are not meant to be design suggestions. EPA should remove this SCM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Use sedimentation measures such as silt fencing to prevent sediment from leaving storage area."

Discussion/Recommendations

Silt fencing is generally recognized as a temporary SCM until more permanent SCMs can be provided. This is not a good SCM to suggest in a woodyard as it typically doesn't last long around logs and heavy equipment and it should be removed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "For log storage piles, develop a leachate collection system to capture and treat discharges (do not allow leachate to discharge to the storm sewer system)."

Discussion/Recommendations

See above discussion on log storage and leachate. Also, log storage facilities are seldom around storm sewers and are typically surrounded by either collection ditches or sheet flow into vegetated areas.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Sweep the log storage yard on a regular basis."

Discussion/Recommendations

Remove this or change language to reflect simple debris removal. Most log storage facilities are not paved and would not support sweeping, so this SCM should be removed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Train personnel who work in log, lumber, and wood product storage areas within the first week of employment followed by refresher training annually and as needed."

Discussion/Recommendations

Change the training requirement for new personnel to first 30 days. There are a lot of competing training requirements especially safety, which have to happen in the first week.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Provide secondary containment for chemical storage areas. If containment structures have drains, ensure that the drains have valves and that valves are maintained in the closed position. Check/test stormwater in containment areas prior to discharge."

Discussion/Recommendations

Log storage facilities typically may only have a fuel and lubricant storage (no chemicals) to support vehicles. Thus, this SCM is more appropriately covered in the several sections dealing with vehicles.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:**  14
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 3 and Pollutant Source 4

Issue

Sections 3 and 4 deal with "Residuals Storage" and "Materials Handling and Storage"

Discussion/Recommendations

Whether a woodyard or a plywood facility, it makes a lot more sense to break down these first four sections into the following:

- Log storage and handling
- Residuals storage and handling
- Finished Product storage and handling

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 4

Issue

This section has a significant focus on containers, chemicals, batteries and hazardous materials.

Discussion/Recommendations

A small woodyard, lumber yard or wet deck may have relatively few materials such as drums, but it would be required to go through all 8 pages and say why they aren't done, even if they have very few containers. While these SCMs are good, they do not address COD and TSS, which should be the focus. EPA should revise the SCMs accordingly.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A3
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 5 and following subsections

Issue

Significant focus on vehicle fueling, maintenance, washing, parking and storage.

Discussion/Recommendations

There are 9 pages devoted to SCMs for vehicle and equipment fueling, maintenance, washdown and parking/storage - there is too much focus on these ancillary operations, especially if the primary focus is controlling COD or TSS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Sector B section

Issue

Observations on difference in types of facilities and use of MSGP

Discussion/Recommendations

This Sector ranges from small facilities (such as corrugated container plants or some secondary fiber facilities) to large integrated mills. Small facilities typically have their limited areas drain to stormwater outfalls covered by the MSGP and their pollutant sources are limited. Large facilities usually direct most on site stormwater to an NPDES permitted wastewater treatment system. At these larger facilities, the MSGP may typically cover ancillary areas such as rail lines, access roads, warehousing and/or loading areas (like those covered in Sector P), etc. Thus, structuring these sections is going to prove difficult for the wide range of conditions faced by the very small to very large facilities, and will unnecessarily complicate this 20-page checklist for the greater number of very small facilities. EPA should try to group the SCMs according to the size and complexity of the facility (see below)

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Sector B subsection organization

Issue

Reorganize sections to address wide range of facility operations

Discussion/Recommendations

AF&PA suggests the following subsections and order to try and address the wide range of facility operations:

- Log and wood residuals handling and storage
- Access roads and rail lines
- Materials handling and storage (includes loading and unloading)

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 1: Loading and Unloading Areas

Issue

Section heading coverage? Pollutant Source

1: Loading and Unloading Areas

Discussion/Recommendations

Is this for raw materials only? This section is confusing as to what it should cover since Material handling is covered in Section 3.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 1: Loading and Unloading Areas

Issue

SCM of "Cover storage areas with roof or tarp".

Discussion/Recommendations

Most storage piles at large mills if discharging to a MSGP- regulated outfall would have too much turnover and are too large to consider such an SCM. This is an example of having to provide unnecessary evidence in this list of SCMs for an obvious answer—that the SCM is not feasible. It should be removed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 1: Loading and Unloading Areas

Issue

SCM of "Provide secondary containment for storage tanks and drum storage".

Discussion/Recommendations

This SCM should be more appropriately covered in Materials Handling.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2: Log, Lumber, and Wood Product Storage

Issue

Inappropriate naming of Section for this Sector

Discussion/Recommendations

Paper and Allied Products do not produce lumber or other finished wood products. Entitle as "Log and Wood residuals handling and storage".

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

Missing SCMs

Discussion/Recommendations

There is nothing in this section dealing with typically used SCMs such as:

- Jersey barriers for defining log laydown areas and containing large debris
- Use of bark and chip screen in d• rainage ways to capture debris and wood residuals
- Use of bark separators or settling ponds and their maintenance to remove wood residuals

Thus, this section needs several typical SCMs added.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

No mention of access roads or rail lines

Discussion/Recommendations

Access roads and rail lines can typically be significant sources of wood debris. EPA should develop a few SCMs specific to these areas.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

Lack of pollutant focus on TSS-specific sources

Discussion/Recommendations

Sector B requires monitoring for TSS for Paperboard facilities. In this subsection, TSS exceedances will likely be due to sampling outfalls too close to sources with no controls and/or ponds/basins/screens or ditches full of sediment and/or wood debris that require periodic maintenance. The SCMs should be primarily focused on these and their maintenance.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Divert stormwater around storage areas using vegetated swales, and/or berms. A properly designed vegetated swale can also provide infiltration benefits."

Discussion/Recommendations

Remove the second editorial statement as it provides no value to SCM.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 11
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Locate storage areas on stable, well-drained soils with slopes of 2—5 percent to prevent ponding and to convey stormwater leachate to treatment."

Discussion/Recommendations

Log storage is either wet (a wet deck) or dry (no water spray). Dry storage is usually used for relatively short holding times of wood while wet decks provide for longer term storage. Wet deck effluents are covered by effluent guidelines. Dry wood storage typically only produces stormwater (not leachate) from the log storage itself. EPA should revise the SCMs accordingly.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Limit slopes to prevent erosion."

Discussion/Recommendations

For an existing facility, the slopes are what the site provides. SCMs are not meant to be design suggestions; this SCM should be eliminated.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Use sedimentation measures such as silt fencing to prevent sediment from leaving storage area."

Discussion/Recommendations

Silt fencing is generally recognized as a temporary SCM until more permanent SCMs can be provided. This is not a good SCM to suggest in a woodyard as it typically doesn't last long around logs and heavy equipment and it should be eliminated.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "For log storage piles, develop a leachate collection system to capture and treat discharges (do not allow leachate to discharge to the storm sewer system)."

Discussion/Recommendations

See above discussion on log storage and leachate. Also, log storage facilities are seldom around storm sewers and are typically surrounded by either collection ditches or sheet flow into vegetated areas.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Sweep the log storage yard on a regular basis."

Discussion/Recommendations

Change language to reflect this is just at paved sites and provide a separate SCM for debris removal at unpaved sites. While some mills have paved storage areas, many log storage facilities are not paved and would not support sweeping.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Train personnel who work in log, lumber, and wood product storage areas within the first week of employment followed by refresher training annually and as needed."

Discussion/Recommendations

Change the training requirement for new personnel to first 30 days. There are a lot of competing training requirements especially safety, which have to happen in the first week.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 2

Issue

SCM of "Provide secondary containment for chemical storage areas. If containment structures have drains, ensure that the drains have valves and that valves are maintained in the closed position. Check/test stormwater in containment areas prior to discharge."

Discussion/Recommendations

Log storage facilities typically may only have a fuel and lubricant storage (no chemicals) to support vehicles. Thus, this SCM is more appropriately covered in the several sections dealing with vehicles.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 3

Issue

SCM of "Store permanent tanks on an impervious surface surrounded by dikes with a height sufficient to contain a spill (the greater of either 10 percent of the volume of all containers or 110 percent of the volume of the largest tank."

Discussion/Recommendations

This SCM doesn't comply with all states' standards or is inconsistent with common engineering containment design practices (use of a 25-year, 24-hour storm). It should be revised accordingly.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 3

Issue

This section has a significant focus on containers, chemicals, batteries and hazardous materials.

Discussion/Recommendations

A small corrugated container plant or recycling facility may have relatively few materials such as drums but is required to go through all 8 pages and say why they aren't done, even if they have few containers. While these SCMs are good, the SCMs for Paperboard should be focused on reducing TSS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A4
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Subsection

Pollutant Source 4 and following subsections

Issue

Significant focus on vehicle fueling, maintenance, washing, parking and storage.

Discussion/Recommendations

There are 9 pages devoted to SCMs for vehicle and equipment fueling, maintenance, washdown and parking/storage - there is too much focus on these ancillary operations, especially if the primary focus is controlling COD or TSS.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Howard Marks
**Commenter Affiliation:**  National Asphalt Pavement Association (NAPA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

NAPA does not support universal stormwater control measures (SCM) as identified in Appendix Q, and recommends Appendix Q be removed from the final rule. While such SCMs are helpful in reducing stormwater pollutant loads, they must be tailored to each individual sector because of differences and constraints in facility geography, processing layout, operations, chemical production, and storage requirements. We would welcome the opportunity to assist EPA in the development of industry-specific applicable and appropriate SCMs for SIC 2951.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Steve Whitt
**Commenter Affiliation:**  Martin Marietta, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Should Pull Back the Enhanced Control Measures in Appendix Q**

As written, the existing list of Stormwater Control Measures (SCMs) are an exhaustive list of measures currently required by all of the other permits we obtain to operate a Sector J facility. These could possibly be implemented if any AIM Tier 2 is triggered. As written it is difficult to tell if this is a list of possible control measures available under Sector J, or if these are required. Sites may utilize some of the SCMs but it is going to be rare to find all of these utilized. In may case, administrative controls will take the place of these engineering controls. In other words, if a site has implemented good maintenance and housekeeping procedures (administrative controls) around the shop, there is no need to consider features such as oil/water separators, fueling slabs, or roofs over the containment structure (engineering controls).

In many cases, the installation of these SCMs are going to be a last step when all other measures have failed. The cost alone for many of these will make them prohibitive to most companies. Small producers will be unable to justify the monetary expenditure required. Our machinery and mobile equipment fall on a scale unimaginable to most, which causes these features to be heavily engineered items. Our offroad haul trucks can weigh as much as a 747-passenger jet. They can be 20-feet wide with a bed that raises higher than a 3-story building. The wheeled loaders used in conjunction with these trucks is 20- feet tall and over SO-feet long. All of this contributes to the fact that any SCMs installed for these items will be built to withstand heavy loads and at a size outside of normal proportions. This adds engineering, permitting, area requirements and capital expenditure.

Some examples of these SCMs with their associated costs are as follows:

- Fueling pad - $60,000
- Roof over a containment structure - $70,000
- Oil/Water Separator - $60,000 ($40,000 estimated annual maintenance)
- Wheel Wash - $125,000 - $300,000 (additional $125,000 needed if water supply not available)
- Purchase a street sweeper/vacuum - $192,000
- Annual cost to have contractor conduct sweeping/vacuum - $100,000 - $400,000 depending on the size of the facility)

The Appendix Q section for Sector J facilities is 28-pages long. As written it is a study in all of the measures that we must design, permit and install in order to operate. The SCMs noted on these pages are covered by numerous layers of regulations and permits outside of the MSGP. There is incredible overlap here with what already exists.

The following regulations/permits cover the noted Pollutant Source Categories:

- **State Mine Permits**
  - Pollutant Source 1, 2 & 3 - Site Preparation
  - Pollutant Source 4 - Mineral Extraction
  - Pollutant Source 5 - Overburden, Material Piles
  - Pollutant Source 6 - Reclamation
  - Pollutant Source 7 - Material Handling and Storage
- **Spill Prevention, Control and Countermeasures Plans (SPCC}**
  - Pollutant Source 7 - Material Handling and Storage
  - Pollutant Source 8 - Vehicle and Equipment Fueling
  - Pollutant Source 9 - Vehicle and Equipment Maintenance

- o   Pollutant Source 10 - Vehicle and Equipment Storage and Parking
- **Sediment & Erosion Control Permits**
  - o   Pollutant Source 1, 2 & 3 - Site Preparation
  - o   Pollutant Source 5 - Overburden, Material Piles
- **Zoning Permits (SUP/CUP)**
  - o   Pollutant Source 1, 2 & 3 - Site Preparation
  - o   Pollutant Source 5 - Overburden, Material Piles
- **Reclamation Plans**
  - o   Pollutant Source 2 & 3 - Site Preparation
  - o   Pollutant Source 4 - Mineral Extraction
  - o   Pollutant Source 5 - Overburden, Material Piles
- **Fire Codes**
  - o   Pollutant Source 7 - Material Handling and Storage
  - o   Pollutant Source 8 - Vehicle and Equipment Fueling
- **State Air Permits**
  - o   Pollutant Source 7 - Material Handling and Storage
  - o   Pollutant Source 10 - Vehicle and Equipment Storage and Parking
- **Resource Conservation & Recovery Act (RCRA)**
  - o   Pollutant Source 7 - Material Handling and Storage
  - o   Pollutant Source 9 - Vehicle and Equipment Maintenance
- **404/401 Permits**
  - o   Pollutant Source 1, 2 & 3 - Site Preparation
- **MSHA (Mining Safety & Health Administration)**
  - o   Pollutant Source 4 - Mineral Extraction
  - o   Pollutant Source 5 - Overburden, Material Piles
  - o   Pollutant Source 7 - Material Handling and Storage
  - o   Pollutant Source 8 - Vehicle and Equipment Fueling
  - o   Pollutant Source 10 - Vehicle and Equipment Storage and Parking

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

IMA-NA has significant problems with Appendix Q and the lack of clarity around the sector-specific Stormwater Control Measure Checklist(s). Under the 2020 MSGP AIM proposal operators must "implement all feasible" SCMs, but there is a lack of attention paid to defining feasibility nor the balance of SCMs. Given the shift towards treatment of exceedances as violations, it is not unreasonable for stakeholders to want clarity on the levels to which they are

expected to go to come back into compliance. Is the list to be taken in totality? How are operators supposed to draw distinctions between the number and type of SCMs they adopt from Appendix Q? Who decides what SCMs are appropriate or enough to manage the exceedance? Will the checklist turn into a defacto list of requirements? These questions become more important when considering the proposal can open operators up to new and severe civil and criminal penalties based on the new approach to benchmarking and AIM. The Agency needs to take some time to fully establish the parameters for using Appendix Q and define the terms, expectations, and application of the checklist more completely. Furthermore, many of the timelines set for the AIM are completely unrealistic. Evaluating the need for a new SCM, deciding what best meets the need, and then implementing that new technology or practice takes longer than the timelines established in the 2020 proposal.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

**Pollutant Source 4: Mineral Extraction – Pits, Quarries, and Underground Mines**
Item: In mined out portions or inactive areas of the site as active mining moves to new areas, recontour and vegetate to stabilize soils and prevent erosion (topsoiling, seedbed preparation, seeding, establishing willow cuttings).

Concern: There is a concern with determining what the appropriate length of time an inactive area of a site is. It is common practice to consider all areas active mining even though there may be areas that are not accessed (and have not been accessed for years). They remain active until the entire mine is deemed inactive and ready for reclamation/closure. Often, during the inactive period, vegetation or soil crust forms naturally, which decreases soil erosion.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

**Pollutant Source 7: Materials Handling and Storage**

Item: Storage Areas – General

Concern: With the pollutant sources not being identified and the general requirements listed this would not be attainable if applied to some materials and products for industrial mineral producers.

Item: Permanent Tanks

Concern: This would require double walled tanks but not allow single walled within containment areas.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:** 15
**Excerpt Status:** Final

**Comment Excerpt:**

**Pollutant Source 9: Vehicle and Equipment Maintenance**
Item: Prohibit washing parts or equipment outside, if possible.

Concern: Many of our member sites have outdoor truck washes for over the road trucks (to eliminate any track out or fugitive dusting from the loading process) and they do not always have an oil water separator and are rudimentary in design. Most states require truck washing prior to leaving the site, as a control against fugitive dust and/or sedimentation from track out.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  16
**Excerpt Status:** Final

**Comment Excerpt:**

**Pollutant Source 10: Vehicle and Equipment Storage and Parking**
Item: When parking/storing vehicles and equipment outside, install berms and dikes in storage areas.
Concern: This is not practical for our members' mining equipment, especially in areas with high annual rainfall.

Item: For vehicles and equipment waiting for maintenance, place drip pans underneath.
Concern: This seems reasonable only if there is a maintenance issue with the vehicle causing an abnormal drip. Would this require operators to place a drip pan beneath a vehicle if there are no issues?

Overall, it appears the purpose of these requirements is to eliminate oils and greases from entering the stormwater system. Why not just have a requirement against drips and leaks during normal operations?

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Patrick A. Jacomet
**Commenter Affiliation:**  Ohio Aggregates & Industrial Minerals Association (OAIMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0178-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

...the enhanced control measures in Appendix Q are redundant, costly and in some cases conflict with other requirements.

...

In particular, the control measures listed in Appendix Q need major revisions and should not be included in the final MSGP.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Rob Brundrett
**Commenter Affiliation:** The Ohio Manufacturers' Association (OMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0179-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

## 15. Appendix Q – Stormwater Control Measures (SCM)

We are strongly opposed to the inclusion of the new Appendix Q of SCMs in the MSGP. Instead, this extensive list of SCMs should be made a separate USEPA guidance document, and not be a part of the MSGP or otherwise imposed as a requirement in any way.

At a time when our leaders are talking about regulatory reform and making regulatory programs more efficient, it is disappointing that USEPA is "ballooning" the MSGP with the proposed **672-page** Appendix Q of SCMs, forming the majority of this **1000+ page MSGP**! USEPA may have intended to provide more guidance to the regulated community with this appendix, but its inclusion has the unfortunate consequence of imposing greater legal jeopardy on the regulated community.

The inclusion of this Appendix Q in the MSGP requires permittees to wade through its 672-pages to ensure compliance with all applicable SCMs, with the real potential of legal liability of missing SCM items, even if due to inadvertent human error. In addition, each SCM in Appendix Q is followed by the requirement for the permittee to state the "Reason Why Inappropriate/Not Done". Again, this raises concerns about "non-compliance of process" for not answering the SCM question to the satisfaction of USEPA and in fact flips the idea of facility-selected BMPs entirely on its head: under the new proposal, USEPA has selected the BMPs as the starting point for facility management.

Another concern with this Appendix Q is that what is now a 672-page appendix will "balloon" out even more with each future MSGP renewal. Therefore, we again strongly oppose the inclusion of this Appendix Q of SCMs in the MSGP, and suggest that it be made a separate USEPA guidance document.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Justin Barkowski
**Commenter Affiliation:** American Association of Airport Executives (AAAE)
**Document Control Number:** EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

**6. AAAE strongly opposes the proposed AIM Tier 2 response requirement to implement sector-specific SCMs in appendix Q as ineffective and overly burdensome for airports.**

Under the proposed 2020 MSGP, EPA is proposing to implement a three-tier AIM protocol that becomes progressively more prescriptive with the required SCMs when monitoring results exceed or repeatedly exceed benchmark values. An airport would fall in AIM Tier 2 if (a) two consecutive annual averages for a parameter are each over the benchmark threshold, (b) two sampling event results in a two-year period are each over four times the threshold, or (c) one single sampling event is over eight times the threshold. (Proposed Part 5.2.2.1.) In that case, an airport would be required to implement "all feasible" SCMs outlined in appendix Q to the MSGP that are applicable to airports. (Proposed Part 5.2.2.2.) Appendix Q contains 204 SCMs that are specific to Sector S and transportation facilities.

AAAE strongly opposes the AIM Tier 2 response requirements, particularly the obligation to implement all feasible 204 SCMs, for several reasons. First, reviewing an exhaustive list of solutions, many of which are not viable, and explaining why each option is not feasible is contrary to how a proper engineering analysis should be conducted. If an airport would fall in AIM Tier 2, the more appropriate approach would be to evaluate and understand potential problems that are causing the exceedances first, and then determine what feasible solutions would fix the issue. Focusing on a list of predetermined solutions, without regard for the identified problem, is an illogical and unnecessarily prescriptive approach that would prevent airports from developing innovative solutions and exploring new technologies that may become available. EPA should provide airports with flexibility to implement and manage the exceedances in a manner that is best suited for their particular circumstances.

Second, the AIM Tier 2 response requirements fail to recognize that airports already implement many BMPs to prevent benchmark threshold exceedances and regularly review and update these BMPs. Airports select, design, install, and implement a number of SCMs to minimize pollutant discharges in accordance with Part 2.1 of the MSGP, the Stormwater Pollution Prevention Plan (SWPPP), and other requirements imposed by FAA. Appendix Q would also force airports to adopt many SCMs that are outdated or no longer viable. Certain SCMs such as infrared

technology have been proven to be ineffective at airports, while others, including recycling deicing fluid (a treatment alternative), would not improve water quality. With the proposed MSGP providing coverage for a five-year term, certain SCMs could also become quickly outdated. Technologies and solutions may evolve several years into the permit term and the appendix Q list does not reflect this dynamic.

Third, AAAE disagrees with the burden-shifting approach where airports would be required to document and explain why they did not implement a particular SCM in appendix Q. (Proposed 5.2.2.3.) The proposed MSGP states that a specific SCM in appendix Q would not have to be implemented if it would not result in any reduction in the discharge of a pollutant of concern. However, airports would have to document and explain why they did not implement each SCM. (Proposed Part 5.2.2.3.) This burden-shifting requirement would only lead to unnecessary costs and time while providing minimal, if any, benefits. Airports would be forced to investigate and explain why they did not implement a plethora of SCMs when only one could theoretically solve the problem.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  David L. Wagger
**Commenter Affiliation:**  Institute of Scrap Recycling Industries, Inc. (ISRI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0184-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

**c. Appendix Q**

In the proposed AIM Framework, Part 5.2.2.2, AIM Tier 2 Responses, requires the permittee to "[i]mplement all feasible SCMs from the relevant sector-specific Stormwater Control Measure Checklist(s) that applies to your facility in Appendix Q of the permit". Proposed Part 5.2.2.3 requires the permittee to "implement all feasible SCMs within 14 days and document per Part 5.3 how the measures will achieve benchmark thresholds".

Based on an analysis of proposed Appendix Q and the existing Sector N fact sheet[9], the SCMs in proposed Appendix Q appear to be composed of the BMPs listed in Table 2 of the existing Sector N fact sheet with some changes and some additional measures. The changes between the BMPs of the existing Sector N fact sheet and the SCMs of proposed Appendix Q tend to provide specific and greater frequencies for activities and direct actions in place of planned actions, among other things. For instance, in most but not all occurrences, existing regular inspections become weekly inspections. Employee training becomes training during the first week of

employment and annually. Scheduling of frequent cleanings become regular cleanings. New SCMs include baghouse maintenance, placing absorbent material between contaminated runoff and discharge point, collecting liquid waste in a labeled container, keeping manifests of wastes removed from the facility, cleaning oil and grease from pavement daily, and providing dust control. Despite these changes and new SCMs, which may be common sense and/or required under other regulations, proposed Appendix Q does not appear to be a significantly updated version of the BMPs listed in the existing industrial stormwater fact sheet series[10], if the differences for Sector N are representative. It is difficult to see how proposed Appendix Q will help permittees to meet proposed Part 5.2.2.3. This appears to be a lost opportunity to provide better stormwater management guidance to permittees.

While the BMPs in the existing Sector N fact sheet generally follow the outline of the Sector N requirements in Part 8, Subpart N of the 2015 MSGP, the SCMs of proposed Appendix Q less obviously follow Part 8, Subpart N of the Proposed 2020 MSGP. For instance, cohorts of SCMs are identified in proposed Appendix Q by "Pollutant Source" number, but the Proposed 2020 MSGP does not contain such terminology. Also, as an example, SCMs related to scrap lead-acid batteries (SLABs) are mentioned under Pollutant Sources 1, 2, 3, 6, 8, and 11. Does the permittee have to check off or implement all of them even if doing some SCMs covers other SCMs? Are all or only some of the SLAB-related SCMs applicable? These and other issues raise questions about how a permittee would properly use proposed Appendix Q as part of its AIM Tier 2 response. In any case, a permittee would likely need much more than 14 days to implement all feasible SCMs in Appendix Q.

ISRI recommends that EPA withdraw proposed Appendix Q and engage in a process to develop updated stormwater guidance for the various covered industrial sectors consistent with other recommended changes to the Proposed 2020 MSGP.

The proposed AIM Framework and proposed Appendix Q need to be replaced or withdrawn. EPA should consider implementing a tiered monitoring framework that is based on the framework envisioned by NASEM (Report at 53), accounts for wet-weather conditions, mixing zones, and the greater bioavailability of dissolved metals, and includes an inspection-only option for "low risk" facilities.

[9] U.S. EPA Office of Water. 2006. Industrial Stormwater Fact Sheet Series: Sector N: Scrap Recycling and Waste Recycling Facilities. EPA-833-F-06-029. December.
[10] These industrial stormwater fact sheets are listed at https://www.epa.gov/npdes/stormwater-discharges-industrial-activities#factsheets. Viewed May 26, 2020.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Paul Bredwell
**Commenter Affiliation:** U.S. Poultry & Egg Association et al.
**Document Control Number:** EPA-HQ-OW-2019-0372-0185-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**2. The Stormwater Control Measures (SCMs) presented in Appendix Q are overly prescriptive and should not be included in the 2020 MSGP, but rather should be included in regulatory guidance documents (e.g., USEPA Industrial Storm Water Fact Sheet Series, or "Developing Your Storm Water Pollution Prevention Plan, A Guide for Industrial Operators," June 2015).**

Proposed SCMs are Not Appropriate, and Others Should be Included: SCMs are very site specific, therefore prescribing a set list of SCMs in the Permit that are to be considered in an AIM Tier 2 response is not appropriate and is unreasonable. For example, the weekly frequency required inspection for certain activities/areas such as loading and unloading, material storage, etc. may be too frequent for some facilities, and not frequent enough for others. Also, there are various SCMs that are effectively employed by Sector U facilities that are not included in Appendix Q of the proposed 2020 MSGP (e.g., first flush storm water collection systems with diversion to treatment system). By including a set list of SCMs in the 2020 MSGP that cannot be readily updated and revised by the USEPA to accommodate changes in technologies or changes in industry processes significantly constrains both permittees, the USEPA, and state and local environmental regulatory agencies.

SCMs Should be Provided in Guidance Documents: In addition, including very prescriptive and extensive SCMs in the MSGP, will likely subject permittees to unnecessary scrutiny and possible third-party legal challenges on their selection and/or exclusion of the various SCMs. We anticipate permittees will be required to defend their choices and rationale for selecting some SCMs and not others, which will potentially take time and resources away from the most important task, enhancing their stormwater quality and storm water pollution prevention practices. The proposed 2020 MSGP requires permittees to develop a site-specific pollution prevention plan which must include all applicable SCMs. These SCMs should be based on a menu of SCMs included in: regulatory guidance documents (see above), the International Stormwater BMP Database (available at http://www.bmpdatabase.org/); and other various resources (e.g., SCMs developed by industry organizations).

Appendix Q is an Overstep on SWP3 Development Guidance Document: Additionally, the Appendix Q is an overstep into guidelines set forth by the EPA in the SWP3 development guidance document issued with the 2015 MSGP and the Sector Specific Fact Sheet Series issued in 2006, where they are referred to as Best Management Practices (BMPs). A SWP3 developed by qualified personnel (as defined by the EPA) would include all base level BMPs/SCMs deemed necessary and appropriate to minimize pollutants in stormwater discharges and avoid benchmark exceedances. Again, the SCMs or BMPs given in a site-specific SWP3 will be more relevant and useful to operators as they work to address potential benchmark exceedances.

Remove and Replace Appendix Q: As an alternative, we propose removing Appendix Q from the 2020 MSGP and updating the SWP3 guidance document, *Developing Your Stormwater Pollution Prevention Plan, A Guide for Industrial Operators* and the sector-specific fact sheets, to include a comprehensive list of potential SCMs/BMPs that may apply, such as those presented in Appendix Q. Doing so will allow for better development of SWP3s that include a comprehensive and current, yet site-specific, "menu" of SCMs. This may include SCMs that are standard to the site and a list of enhanced SCMs that shall be implemented should a benchmark exceedance occur.

SCMs are Better Located in Guidance Document: The SCMs/BMPs are better located in guidance documents where they are currently provided, rather than in the MSGP so that they can be continually updated as new technology and information becomes available. These SCMs/BMPs should serve as suggestions and guidance for operators facing difficulty with compliance. By placing them in the MSGP, there is greater potential for overlap with other regulatory requirements for wastewater, air, SPCC Program, and state and local environmental agency regulatory requirements, etc. which could result in confusion and ultimately increased noncompliance as operators struggle to implement all of the required SCMs/BMPs that may or may not be applicable or effective to their facility.

...

Conclusion: The proposed MSGP should be modified to create a clear distinction between BMPs offered as a safe harbor for compliance with the MSGP and effluent limitations under that permit. The line between enforceable effluent limitations and BMPs should not be blurred by incorporation of BMPs into the body of the MSGP. Such a change has the risk of encouraging third-party citizen suit enforcement for BMP compliance and misdirecting limited agency resources to address the enforceability of BMPs by such third parties. Under the logic of the Clean Water Act permit writing guidelines, BMPs should not be incorporated as NPDES permit conditions and potentially permit effluent limitations. This distinction is no less important in a general permit context.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Draft

**Comment Excerpt:**

Proposed Stormwater Control Measures (SCMs) for Sector F – Primary Metals Facilities

*AISI requests the proposed Stormwater Control Measures (SCMs) for Sector F – Primary Metals Facilities be withdrawn and replaced with reasonable and appropriate SCMs.*

Appendix Q of the proposed MSGP sets out EPA's proposed sector-specific SCMs. The proposed SCMs for the Primary Metals Facilities are listed under Sector F. AISI and its member companies find that many, if not the majority, of the proposed sector-specific SCMs are impractical and unreasonable for iron and steel mills. If they were required to be implemented by state agencies as part of their stormwater programs, the cost impacts in terms of capital investments for new facilities and requirements for new staff to implement the SCMs would be unreasonable and wholly out of proportion to any possible environmental benefits that could be realized. As described below, if one or more of the proposed Sector F SCMs were required to be implemented by state permitting agencies, the investment costs for integrated iron and steel mills and EAF steel mills would be in the tens of millions of dollars on a per facility basis. Most of the prescriptive SCMs and requirements set out in Appendix Q for Sector F are duplicative of the non-numeric technology-based effluent limit requirements set out in the following sections of the proposed MSGP:

• Section 2.1.2.1 (Minimize Exposure);

• Section 2.1.2.2 (Good Housekeeping);

• Section 2.1.2.3 (Maintenance);

• Section 2.1.2.4 (Spill Prevention and Response);

• Section 2.1.2.5 (Erosion and Sediment Controls);

• Section 2.1.2.6 (Management of Runoff);

• Section 2.1.2.8 (Employee Training);

• Section 2.1.2.9 (Non-Stormwater Discharges); and,

• Section 2.1.2.10 (Dust Generation and Vehicle Tracking of Industrial Materials).

Accordingly, these overly prescriptive SCMs should not be duplicated in the Appendix Q checklists, and they should be removed.

Our specific comments on the proposed SCMs are presented in Exhibit 2. We took the approach of providing comments in a Word file of Sector F, with our comments typed in red alongside the proposed SCMs.

Several proposed SCMs advise providing cover for intermediate steel products temporarily stored outdoors; providing cover or maintaining raw materials indoors; storing slag indoors,

under cover or in enclosed containers; and, providing asphalt or concrete pads for stockpiling materials.

Each of these proposed requirements is not feasible for iron and steel mills. Exhibit 3 presents annotated aerial photographs for two integrated steel mills and two EAF steel mills where the raw material storage areas, intermediate product storage areas and slag processing areas are highlighted. Summaries are provided in Table 1.

Table 1
Raw Material and Intermediate Product Storage Areas
and Slag Processing Areas at Iron and Steel Mills

| Outdoor Raw Material, Intermediate Product Storage and Slag Processing Areas | Integrated Steel Mills | | EAF Steel Mills | |
|---|---|---|---|---|
| | Mill A (Exhibit 3A) | Mill B (Exhibit 3B) | Mill C (Exhibit 3C) | Mill D (Exhibit 3D) |
| Coal | 17 acres | 24 acres | - | - |
| Coke | 34 acres | 31 acres | - | - |
| Coke, Iron Ore & Flux | 9 acres | 31 acres | - | - |
| Iron Ore | 8 acres | 11 acres | - | - |
| Iron Ore, Flux & Slag | - | 7 acres | - | - |
| Flux, Scrap Metal, Mill Scale & Slag | - | 75 acres | - | - |
| Scrap Metal | 13 acres | 28 acres | | 51 acres |
| Pig Iron | - | - | 35 acres | |
| Direct-Reduced Iron (DRI) | - | - | | - |
| Hot Briquetted Iron (HBI) | - | - | | - |
| Slag Processing and Mill Scale | 170 acres | 19 acres | 30 acres | 45 acres |
| Wastewater Treatment Residuals | - | 27 acres | - | - |
| Slab Storage | - | 47 acres | - | - |
| Coil Storage | 28 acres | 1 acre | 17 acres | 33 acres |
| Beam Storage | - | - | 38 acres | - |
| Total Above Areas | 279 acres | 301 acres | 120 acres | 129 acres |
| Approximate Total Facility Area | 3,000 acres | 2,100 acres | 800 acres | 690 acres |
| Per Cent of Total Facility Area | 9.3 % | 14 % | 15 % | 19 % |

Clearly, the respective proposed SCMs that address the areas highlighted in Exhibit 2 and Table 1 are impractical, unreasonable and not appropriate for iron and steel mills. There is even a proposed Sector F SCM for Pollutant Source 14 (Materials Handling and Storage) that states: "Maintain dry ground surfaces." This is a nonsensical requirement that cannot be met at any iron and steel mill. Given that raw material, product storage areas and slag processing areas at iron and steel mills are outdoors, it is simply not possible to maintain dry ground surfaces. As an example of the impracticality of the proposed SCMs, the potential cost impacts of providing impervious surfaces for raw material storage areas is addressed in our comments below on EPA's assessment of costs associated with the proposed MGSP.

AISI member companies could also be affected by proposed SCMs for other sectors where AISI member companies have related activities such as Landfills (Sector L), Scrap Recycling (Sector N), and Fabricated Metal Products Manufacturing Facilities (Sector AA). The Appendix Q requirements for those sectors were reviewed and we have similar concerns for those sectors as well as duplicative requirements of Section 2.1 of the proposed MSGP and duplicative requirements for air and solid waste regulations.

Because many of the proposed SCMs are so far afield, AISI and its member companies propose to set up a working group with EPA to develop appropriate and reasonable SCMs for iron and steel mills that would build on existing and effective industry best management practices (BMPs)

for stormwater and existing successful facility SWPPPs. We believe the contemporary environmental standards of performance for stormwater control across the iron and steel industry meet Clean Water Act objectives.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  24
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA withdraw the proposed SCMs for Sector F (Primary Metals Facilities). AISI and its member companies propose to work with EPA to develop reasonable and effective SCMs for iron and steel facilities that would build on existing and effective best management practices for stormwater control that are being implemented at iron and steel mills; and,

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Wayne J. D'Angelo, Kelley Drye & Warren LLP
**Commenter Affiliation:**  Steel Manufacturers Association (SMA) and Specialty Steel Industry of North America (SSINA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0187-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

We also believe that EPA should provide a separate comment opportunity or otherwise meaningfully engage impacted industries on the elements of the sector-specific fact sheets in

proposed Appendix Q. Our quick review of the fact sheets most applicable to the Steel Associations' members' operations indicates that the fact sheets contain corrective action recommendations that are inapplicable for the sectors or incapable of being utilized in the manner suggested. While we recognize that EPA's proposed approach would allow facilities to document the inapplicability/infeasibility of these recommended corrective actions on a case-by-case basis, we believe it is much more efficient to address these issues while the fact sheets are being developed. Moreover, regardless whether the fact sheets in Appendix Q are used as mandatory checklists as EPA proposes or are simply used as guidelines for facilities undertaking their own site-specific stormwater control evaluations, meaningful Agency engagement with knowledgeable personnel in the various industry sectors can help EPA assure that these fact sheets provide useful and relevant information and recommendations.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, NSSGA requests that Appendix Q should be withdrawn in this permit and reworked for the 2025 permit because many of the control measures are redundant (and in some cases conflict) with other requirements of the Clean Water Act (CWA) and other federal and state laws.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Should Not Finalize Enhanced Control Measures in Appendix Q Until the 2025
Permit Because They are Redundant & Conflict with Other Requirements**

EPA is proposing that the feasible stormwater control measures (SCMs) in Appendix Q (pages
Q195-Q222 for Subpart J) be implemented for any AIM Tier 2 triggers, or an explanation of why
each measure on this extremely problematic and exhaustive list was not performed.

This also conflicts with the 1995 MSGP Federal Register notice which points out the unique
nature of each mine site necessitating different BMPs at different sites: "The selection of the
most effective BMPs will be based on site-specific considerations such as: facility size, climate,
geographic location, hydrogeology and the environmental setting of each facility, and volume
and type of discharge generated. Each facility will be unique in that the source, type, and volume
of contaminated storm water discharges will differ." (page 50924)

Changing a long list of potential BMPs to requirements as per those listed in Appendix Q creates
many problems. While some of these might make sense in certain situations, as requirements
they are onerous, confusing, redundant and/or conflict with other federal, state and local
requirements, exceed CWA authority, and in some cases unnecessary and worst of all, would not
improve environmental quality. For these reasons, NSSGA urges EPA to not finalize this list
until they have worked with industry on a more logical approach.

These SCMs are redundant and in some cases conflict with:

Spill Prevention, Control, and Countermeasure (SPCC) Plans

State Mine Permits

Sediment & Erosion Control Permits

Reclamation Plans

Flood Emergency Response Plans

Clean Air Act (CAA) permits

MSHA (Mining Safety & Health Administration)

Federal Emergency Management Agency (FEMA)

U.S. Army Corps of Engineers permits

Resource Conservation & Recovery Act (RCRA)

Zoning restrictions and Special Conditions

Shoreland protection restrictions

In particular, pre-construction activities are already covered in the sector-specific requirements of the MSGP. In some states, overburden removal is defined as a construction phase instead of as active mining. In numerous states, mine permits are issued covering reclamation requirements. The portions of the checklist dealing with fuel/oil storage and management are redundant with SPCC plans. Requiring that a tank is labeled has dubious storm water pollution prevention benefits, and in any event these labels are already required by MSHA. Some of the requirements conflict with safety requirements, including the size of roads and other mine construction activities.

This checklist of Control Measures risks being considered as mandatory by inspectors, and even if such measures are unnecessary at sites, they put operations in danger of being out of compliance with a voluntary measure. This checklist means that a site would have to justify why they choose one method over another, and then must explain why during every single inspection. The SWPPP asks general questions about what potential sources are, and what BMPs facilities employ. While some of the SCMs are widely accepted and are part of a spectrum of principles and practices originating from a number of design standards, pre-existing regulations and state programs, others are not practical for the aggregates industry.

No aggregates facility should be expected to install roofs over secondary containment, construct fueling pads, parking pads, install oil/water separators, etc. when the actions and BMPs already employed yield no pattern of non-compliance. These items are all very expensive, impractical, with very little gain over existing measures and may conflict with safety and fire-fighting initiatives...

...

For example, the SCM to make roads as small as possible (Appendix Q, Subpart J, Pollutant Source 1) is outside of stormwater program control. Roads are built to the safety standards of the Mining Safety and Health Administration (MSHA). MSHA requires specific clear distance between passing vehicles including the placement of barriers along certain roadways. All of this adds to roadway width. If a facility has appropriate control/treatment measures in place to ensure effluent limits are met at the outfall, this SCM is impractical, and conflicts with safety requirements. This is just another instance of EPA applying one size fits all logic to this permit, rather than meeting with industrial stakeholders. Instead, EPA has put facilities in the position of violating the CWA or ensuring the safety of workers.

MSHA also has requirements related to sloping, benching, setbacks, and other mining activities. Another example, in material handling and storage, potential sources cannot be placed on concrete pads or undercover. In the case of aggregates operations this is unnecessary because the material is the naturally occurring aggregate at that location. These facilities have acre upon acre of material stockpiles that must be accessed by large off-road machinery. Also counter to other requirements, one SCM recommends maintaining dry ground surfaces. This is not practical and goes against some of the other SCMs. Areas are kept moist to reduce dust based on state air permits and to comply with federal limits under the Clean Air Act.

For these reasons, EPA should not include Appendix Q in this permit, but work with industry and re-propose this in the 2025 permit.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should also withdraw Appendix Q and work with industries for a more tenable version in 2025.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Gary A. Jones
**Commenter Affiliation:**  Printing United Alliance
**Document Control Number:**  EPA-HQ-OW-2019-0372-0198-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed fact sheet Sector X Printing and Publishing and the stormwater control measures (SCMs) in Appendix Q needs to be revised. For the reasons stated above, there have been significant changes in the printing industry and many of the identified BMPs are no longer applicable or relevant to preventing stormwater contamination. Attached is a marked-up version of the fact sheet with comments for consideration.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** American Foundry Society (AFS)
**Document Control Number:** EPA-HQ-OW-2019-0372-0199-A2
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

As part of the draft 2020 MSGP, EPA included Appendix Q that listed stormwater control measures (SCM) applicable to each industry sector. Appendix Q was not included in the 2015 MSGP. The comprehensive list of SCM for Sector F that includes metal casting operations is overly prescriptive, would be expensive to implement, and for most, if not all, metal casting facilities would produce little, or no, environmental benefits. In addition, EPA has proposed to require facilities to document why they are not using a listed SCM. Facilities should not have to document why they are not implementing a SCM, particularly if they already have effective best management practices in place.

The SCM in Appendix Q should not be included as part of the 2020 MSGP. The SCM should, most appropriately, be included as a regulatory guidance to assist facilities in identifying the best management practices to address their stormwater discharges. To maintain Appendix Q as part of the 2020 MSGP would be unduly burdensome to the many small businesses in the metal casting industry.

Facilities subject to the 2020 MSGP continue to need flexibility to implement only the most applicable, technically feasible, and cost-effective SCM. AFS urges EPA to remove Appendix Q from the 2020 MSGP and include the comprehensive list of SCM in a regulatory guidance document that identifies the options that a facility can implement to effectively control stormwater discharges.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

II. Many of the proposed SCMs in Appendix Q are contradictory and impractical.

Many of the proposed SCMs represent impractical solutions, that explicitly contradict and conflict with other regulatory requirements at mining operations. For example, EPA recommends that the width of haul roads and access roads be as small as possible to meet regulatory requirements and designed to match the natural contours of the area. There are multiple unrealistic aspects of even considering this as a viable SCM. The width of the haul road is designed to *safely* allow passage of haulage trucks and equipment, with the primary concern being worker safety. These roads are designed to withstand the loaded weight of the trucks and equipment that will be using them, which requires construction of a base of adequate thickness and competent material, often involving the compaction and grading of thousands of cubic yards of material. Additionally, the length of a haul route is a significant aspect of the overall operating cost of a mining operation. EPA's recommendation of moving a haul road, even a minor distance, represents a significant operational change that would require multiple levels of regulatory approval by the appropriate regulatory authorities and would require months of construction activity, far more than considered by EPA's 14-day deadline.[44]

Furthermore, lengthening a road to "match the natural contours" will actually increase the overall disturbance footprint of the road, contrary to the direction of the relevant laws and regulations and the overall intent of EPA's stormwater permitting program. Another SCM that cannot be completed within 14 (or even 45) days is the requirement to settle out sediment from runoff, construct sediment detention basins (either permanent pool or flow through). Operators cannot even collect and analyze data and design a sediment detention basin in accordance with the parameters required to maximize the basin's "trap efficiency" within that timeframe. Finally, forcing operators to implement certain measures within the arbitrary 14 (or 45 day) timeline proposed could be harmful to the environment. For instance, reclamation work in particular is sensitive to the time of year in which changes are made. Attempting to modify an area in the winter or during spring runoff could cause significant environmental harm.

In addition, the requirement to use overburden and topsoil stockpiles to fill in a pit or quarry is incompatible with existing mining and reclamation regulations that cover pit backfill requirements. Live topsoil should be maintained as a resource to be used in other areas of the site at appropriately-shallow depths (topsoil that is piled too deep can "kill" topsoil), not used to backfill a void. This SCM is duplicative and conflicting. The conflicting frequencies for various inspections onsite are also confusing. For instance, EPA recommends inspecting berms, curbs, and secondary containment systems weekly; inspecting the fueling areas for leaks and spills daily; and inspecting the maintenance area weekly to ensure SCMs are implemented. When frequencies are listed in this table conflict with Routine Inspection Frequencies (monthly, quarterly, etc.), which frequency takes precedence? The requirement to vegetate as much overburden, waste rock, and raw material piles similarly is confusing and contradictory. Mine sites are dynamic and operators should not have to document why this was or was not done at each pile on a mine site.

The proposed SCMs also show a lack of understanding of the requirements for mining operations under SMCRA and state-level regulatory programs. The majority of SCMs listed by EPA are already put into practice under the SMCRA framework and state-level regulatory programs for

control of onsite runoff and minimization of erosion. For example, mulching, and temporary and permanent seeding are a required part of the reclamation plan of an operation under 30 CFR 780.18. Clean water and disturbed area diversions are designed and maintained to reduce impacts to the hydrologic balance and minimize erosion and offsite transport of suspended sediment through the use of vegetation and rock materials as required by 30 CFR 816.43. Silt fence, gabions, rock check dams, and erosion control fabrics are common BMPs incorporated into a sites operation and reclamation practices to comply with the sediment control measure requirements outlined in 30 CFR 816.45. Detention basins, sediment ponds, siltation structures and sumps are required to be designed, constructed, and maintained to higher standards (typically 10-yr 24-hr precipitation events) than those recommended by EPA and must be implemented for all affected drainage areas except where it is infeasible to do so under 30 CFR 816.46- 816.49.

The proposed SCMs also contain disconnects between the existing EPA effluent limitation guidelines. Coal storage piles are required to be regulated under 40 CFR 434 Subpart B, which contains NPDES requirements for the Coal Preparation Plants and Coal Preparation Plant Associated Areas. It is common, if not required practice to locate coal storage piles within NPDES drainage control onsite and with water quality sampling in receiving streams, groundwater, and NPDES basins. All of these practices are regularly inspected by onsite and mining agency staff and corrective actions are identified and addressed with rational solutions and reasonable timeframes through SMCRA's inspection and reporting process.

In summary, EPA's proposed SCMs are redundant with other regulatory frameworks. This is problematic because implementation requirements can be and are likely often conflicting. The administrative burden placed on operators is not a workable approach to regulation of the minimal areas that are actually regulated under the MSGP stormwater framework and will only delay addressing issues identified with existing controls that are in place.

[44] For example, for mines on federal lands (U.S. Forest Service, BLM), the location and width of haul roads is part of the project plan. This project plan, with any modifications made by federal land agencies, is in the Record of Decision. Therefore, making changes in the location of haul roads or the size of them requires considerable regulatory process in addition to the significant cost and time to make changes. The reality of mine planning is that the location and width of haul roads is carefully developed based on safety, volume of traffic, natural landscape conditions, minimizing land disturbance and minimizing other environmental effects (wetland disturbance, ability to manage runoff, etc.)

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)

**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

We make the following recommendations:

...

- EPA should not finalize Appendix Q as part of the permit or use it in connection with AIMs. The current non-binding best management practices (BMPs) should be retained in lieu of mandatory stormwater control measures (SCMs).

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Kevin Bromberg
**Commenter Affiliation:** Small Business Low-Risk Coalition (SBLRC)
**Document Control Number:** EPA-HQ-OW-2019-0372-0203-A1
**Comment Excerpt Number:** 32
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA's Proposed SCMs in Appendix Q Should be Eliminated**

EPA is proposing that the feasible stormwater control measures (SCMs) in Appendix Q be implemented for any AIM Tier 2 triggers or provide an explanation of why each measure on this extremely problematic and exhaustive list was not implemented. This conversion from the 2015 list of recommended BMPs to a mandatory list of SCMs is problematic and ill-advised. In the words of NSSGA:

Changing a long list of potential BMP to requirements as per those listed in Appendix Q creates many problems. While some of these might make sense in certain situations, as requirements they are onerous, confusing, redundant and/or conflict with other federal, state and local requirements, exceed CWA authority, and in some cases unnecessary and worst of all, would not improve environmental quality. For these reasons, NSSGA urges EPA to not finalize this list until they have worked with industry on a more logical approach.[111] EPA's failure to develop a sound list of Appendix Q SCMs (more than 650 pages!) originated in the Agency's apparent failure to abide by the 2016 Settlement Agreement to incorporate "emerging" SCMs that "reflect BAT and BCT."[112] Instead of a well-researched and vetted best practices of industry sectors, the

list appears to have been developed by adopting any SCM that has ever been applied to any sector, irrespective of the costs, relevance, feasibility, practicability or even legality of the SCM to that sector.

The addition of Appendix Q and the sector-specific SCMs to the permit (as opposed to BMP guidance) has been criticized by a large variety of industry sectors.[113] It is readily apparent that industry sources were not adequately consulted in deriving these measures, particularly for those measures that are expensive, impractical, or unlikely to provide stormwater benefits. For example, virtually all the actions in Appendix Q for the printing sector do not have any bearing on potential stormwater contamination. These activities occur indoors and are not exposed to storm water. In addition, many SCMs are outdated and no longer applicable. The regulated parties who have reviewed the MSGP permit are virtually in agreement that the Appendix Q list and approach, of all the serious issues with this proposal, is the most problematic portion of the proposed permit.

Reforming the SCMs in Appendix Q is an immense undertaking. A serious effort to fix Appendix Q would severely delay the release of the 2020 permit. The 2015 permit expires in June 2020, creating a real problem for new industrial facilities who need MSGP coverage.

We recommend a practical solution. EPA should solicit help from regulated entities over the next 6 to 12 months, and revise, where needed, the 2015 menu of the widely accepted and utilized BMPs. By proceeding in this manner, EPA could improve the current BMPs, reflect on the "emerging" technologies and the applicable BAT and BCT standards, as EPA agreed in the 2016 settlement. In this manner facilities would benefit from revised guidance in the short term, in collaboration with the Agency. We offer our help to EPA in this effort.

[111] 2020 NSSGA MSGP comments at 13.

[112] BAT is "best available technology economically achievable" and BCT is "best control technology." These terms are further defined in the permit. See definitions in Appendix A.

[113] We do not take up space here to discuss the multiple criticisms that many parties are submitting to EPA.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Rebecca C. Tolene
**Commenter Affiliation:**  Tennessee Valley Authority (TVA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0215-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

**I. TVA Urges EPA to Make Key Revisions to the Sector O Checklist**

EPA is proposing to update the sector-specific fact sheets. Sector O facilities would be required to select and implement all *feasible* Stormwater Control Measures (SCMs) from the proposed Sector O checklist in Appendix Q. The 2020 MSGP would expand the list of pollutant sources for Sector O to include "Materials Handling and Storage," and "Vehicle and Equipment Storage and Parking." EPA has not provided any technical information or data to support the addition of these new pollutant sources and corresponding SCMs. TVA recommends removing the new proposed pollutant sources and corresponding new SCMs from the final Sector O checklist.

The Sector O checklist includes new or revised SCMs that are unduly restrictive and difficult to implement. For instance, the 2015 MSGP Sector O Fact Sheet directs industrial facilities to train applicable employees in good housekeeping, spill prevention and control, and materials management and disposal procedures. The Sector O checklist would require that employees receive all requisite training *within the first week* of employment and subsequently attend refresher training annually. It would difficult to train applicable employees on all required topics within the one week deadline.

The Sector O checklist also contains SCMs that are covered by other regulatory programs and would be duplicative to include for stormwater control. SCMs for delivery vehicles, for example, are already covered under a facility's individual Spill Prevention, Control and Countermeasure (SPCC) plan. Inclusion of redundant SCMs will place additional burdens on industrial facilities while providing no appreciable environmental benefit.

Even more problematic from a compliance standpoint are EPA's proposed SCMs that conflict with existing regulatory requirements. For example, under SPCC requirements, only a visual observation is required prior to discharging stormwater from a containment area; however, the Sector O checklist would require that a facility check/test stormwater before discharging. Establishing SCMs that are inconsistent with and/or more stringent than requirements under existing regulatory programs would make it increasingly arduous for operators to ensure they are complying with all applicable conditions. This is particularly true given that several of the SCMs target activities clearly governed by other statutory schemes. For example, the Sector O checklist features SCMs concerning the cleanup of waste materials and dust management, which would be regulated under the Resource Conservation and Recovery Act (RCRA) and the Clean Air Act (CAA), respectively.

The portions of the checklist which apply to coal storage are redundant or impracticable. Runoff from coal piles is subject to a TSS ELG and so long as the requirements are met, the controls needed should not be dictated. Minimum fuel storage requirements are dictated by weather conditions, energy demands and grid stability requirements. They may also be impacted by delivery pinch points and fuel contract obligations.

TVA urges EPA to make key revisions to the Sector O checklist including removal of SCMs that are unduly restrictive or, duplicative of existing requirements under other regulatory programs. Many of these requirements are unnecessary for stormwater control at Sector O facilities.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Sandy Blalock
**Commenter Affiliation:** Automotive Recyclers Association (ARA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0222-A1
**Comment Excerpt Number:** 16
**Excerpt Status:** Final

**Comment Excerpt:**

The ARA's concerns with the Sector M specific Stormwater Control Measures (SCM) addressed in the Appendix Q comments center on the clear lack of industry knowledge by the author of the proposed standards in the Proposed 2020 MSGP.

Specifically, at issue, are the following concerns:

- The proposed SCMs reflect automotive repair procedures and not the unique automotive recycling processes. In some cases, there are multiple SCMs common in auto repair but not performed in auto recycling.
- The proposed SCMs reflect metal recycling processes not common in automotive recycling.
- The proposed SCMs omit pollution prevention opportunities in the automotive recycling/salvage industrial process by not addressing fluid evacuation.
- The proposed SCM neglect the sheer size of most operations that would prohibit covered storage on a broad scale.
- Some proposed SCMs are too prescriptive on workflow that are in fact driven by the commodities market and do not have direct impact on stormwater runoff.
- The proposed SCMs do not take in to account the high-tech computerized inventory management systems commonly used in auto recycling.

To simplify the tracking process and add industry expertise to the material, ARA suggests that the Stormwater Control Measures (SCM) follow the industry process flow.

ARA recommends reordering the sections to follow a logical process flow of end-of-life vehicles (ELVs), from fluid evacuation and dismantling, to vehicle and part storage, parts cleaning, vehicle crushing, fluid storage, through final stage of selling to a metal recycling processor all view through the lens of shielding potential contamination from stormwater runoff per the purview of the NPDES permit.

Furthermore, the ARA comments endeavored to eliminate duplication of effort including inspections where the proposed SCMs lack of industry knowledge created redundant tracking.

Pollutant Source 1: Dismantling & Fluid Evacuation

Pollutant Source 2: Outdoor Vehicle and Parts Storage

Pollutant Source 3: Parts washing

Pollutant Source 4: Vehicle Crushing Area

Pollutant Source 5: Illicit Storm sewer should be addressed in Parts Cleaning section Source 3

Pollutant Source 6: Materials Handling and Storage (including SPCC information)

Pollutant Source 7: FUELING this should be addressed in - Materials Handling and Storage in Source 6

Pollutant Source 8: Equipment Maintenance - this should be addressed in Dismantling & Fluid Evacuation in Source 1 or eliminated due to not being relevant to auto Recyclers

Pollutant Source 9: Vehicle & Equipment Storage and parking - this should be addressed in Outdoor Vehicles and Parts Storage in Source 2

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Mark D. Williams
**Commenter Affiliation:**  Luck Companies, Luck Stone
**Document Control Number:**  EPA-HQ-OW-2019-0372-0223-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

These comments address MSGP's Sector J for Non-metallic mineral mining...

...the enhanced control measures in Appendix Q are redundant, costly and in some cases conflict with other requirements. Some examples include the requirement to reduce haul road sizes that are dictated by MSHA safety regulations, or to use a covered concrete pad for fueling mobile vehicles that would be impractical for trucks as large as those used in mining.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 51
**Excerpt Status:** Final

**Comment Excerpt:**

VI.A. Appendix Q: Stormwater Control Measures Checklist: Sector J – Mineral Mining and Processing Facilities:

In general, there is unnecessary overlap with the SCMs listed for Sector J, specifically Pollutant Sources 7-10, and other plans, such as the Spill Pollution Control and Countermeasure (SPCC) plan and air quality fugitive dust control plan. Simplot requests that EPA update the Sector J checklist with check boxes for facilities with relevant plans, rather than repeating the SCMs for those facilities.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 52
**Excerpt Status:** Final

**Comment Excerpt:**

*Pollutant Source 2: Site Preparation – Haul/Access Roads (Construction and Post Construction) Surface Stabilization Measures:*

*Establish a graveled area or pad on which vehicles can drop their mud and sediment before entering onto roadways (Page Q-196).*

Simplot requests that EPA clarify that "roadway" in this condition means public or paved roads and is not intended for unpaved gravel or mine roads.

Several SCMs listed on pages Q-196, Q-197, Q-200, Q-203, Q-205 refer to practices that could mislead permittees to conduct unpermitted activities in regulated waters. Such activities described in the SCMs include installing riprap in channel bottoms, installing riprap on stream banks or shore lines, "stream alteration", and reducing the grade of natural channels. Simplot recommends EPA add a disclaimer to the SCMs that have potential to cause activities to be performed in regulated waters.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Alan L. Prouty
**Commenter Affiliation:**  J.R. Simplot Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:**  53
**Excerpt Status:** Final

**Comment Excerpt:**

*Pollutant Source 3: Runoff Control and Conveyance Measures (Page Q-202) and Runoff Conveyances and Diversion (Pages Q-197 & Q-198)*

Several references are made to specific flowrates and the applicability of SCMs. Simplot requests that EPA provide the specific storm event (year and duration) used to calculate the specified velocities.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Philip Ruck, P.E. President, Stillwater Environmental Engineering, Inc.
**Commenter Affiliation:**  New Hampshire Timberland Owners Association (NHTOA) and Northeastern Lumber Manufacturers Association (NELMA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0235-A1
**Comment Excerpt Number:**  12
**Excerpt Status:** Final

**Comment Excerpt:**

We agree that the proposed updates to the sector specific fact sheets are appropriate.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Melinda Pagliarello
**Commenter Affiliation:**  Airports Council International – North America (ACI-NA) et al.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0239-A1
**Comment Excerpt Number:**  13
**Excerpt Status:** Final

**Comment Excerpt:**

ACI-NA is concerned with EPA's proposed approach set forth in the AIM process and in developing the proposed Appendix Q. The aviation industry had found the prior sector-specific fact sheet helpful, although the VPRP program (see General Comments Section) has well-surpassed EPA's basic fact sheet. Now, however, EPA's massive and random list of BMPs is unworkable, with its presumption that an airport should implement a BMP unless they provide a reason for the BMP for being inappropriate or why it has not been adopted. Requiring airports to evaluate an exhaustive list of options is overly burdensome and contrary to how a proper BMP review and selection should be conducted. In light of EPA's Deicing Effluent Limitations Guidelines and the industry's related Voluntary Pollution Reduction Program, it would be impossible for the industry to comply with the AIM proposal and related SCMs in Appendix Q.

EPA's proposal does not consider size, industrial activity, or current stormwater management program implementation. Individual airport industrial activity, infrastructure, airline agreements, discharge characteristics, and other aspects related to BMP program implementation are incredibly varied and greatly limit the value of a required evaluation of Appendix Q stormwater control measures.

In addition, and equally as concerning, is the inclusion of Stormwater Control Measures that are technically infeasible, overreach the jurisdiction of stormwater permitting, or nearly impossible to comply with under the circumstances set forth in EPA's proposed MSGP.

Providing a line-by-line inventory of concerns brought forth from the airport community would be challenging, if not impossible, in the context of this comment letter and the time available to respond (and limited resources due to the COVID-19 pandemic). Nevertheless, in an effort to demonstrate the challenges with the Sector S Appendix Q control measures, the following examples are provided for EPA's review. We look forward to meeting with EPA staff to further discuss how Appendix Q can be corrected, if at all.

*Technical Infeasibility*

**Page Q-426 of 672**

**"Computer-controlled fixed-gantry systems"**

This item represents one of many listed control measures in Appendix Q that is technically infeasible and is not a control measure available or effective within the aviation industry. This type of deicing system has been tested in decades past and proven to be unsuccessful as a replacement for traditional deicing means. The large infrastructure requirements and inflexibility given operational or fleet mix changes has made these systems obsolete at airports where they were implemented. We are unaware of any gantry systems in operation within the United States at this time.

*Jurisdictional Overreach*

**Page Q-424 of 672**

**"Release controlled amounts to a publicly owned treatment works, if allowed"**
This control measure relates to the management of collected glycol-impacted stormwater (GISW) and demonstrates one of the many items of jurisdictional overreach within the context of the stormwater permit. The ultimate means of treating/disposing/recycling collected GISW is not relevant within a stormwater permit as long as untreated collected GISW is not discharged back into the stormwater system. Each airport that operates a glycol collection program evaluates the most appropriate treatment/disposal/recycling option for their unique situation and is independent of stormwater discharge issues.

*Potential Conflict with FAA Requirements*

**Page Q-424 of 672**

**"Determine whether excessive application of deicing chemicals occurs and adjust as necessary"**

This control measure is an example of one of the many control measures that attempts to modify airport operational requirements that are regulated by other entities (in this case the FAA). Aircraft deicing decisions are the responsibility of the aircraft pilot. Subsequent deicing is conducted by trained employees to effectively deice aircraft to maintain safe flying conditions. We have concern over items in Appendix Q that appear to establish an expectation that stormwater permittees will be evaluating and making recommendations regarding how to manage aircraft or airport safety requirements.

*Hasty Development*

**Page Q-422 of 672**

**"Use tarmac ice-detection systems"**

It appears that this list was developed in haste and not thoroughly vetted for accuracy and feasibility. This has led to an exhaustive list that would create confusion and reduce value for permittees reviewing the control measures. An example that demonstrates this concern is the tarmac ice-detection recommendation as a control measure listed under the "Deicing (Including Anti-Icing) Aircraft". Tarmac ice-detection systems are designed to assist with pavement deicing decisions and provide no information that would be used in making aircraft deicing decisions. Furthermore, the concept of tarmac ice detection systems is listed on three separate occasions. This also supports that Appendix Q did not undergo a thorough review prior to publishing.

### *Redundancy with Existing Permit Language or Requirements*

**Page Q-437 of 672**

**"Maintain proper control of oil leaks/spills"**

Numerous items included in Appendix Q are redundant to existing permit language or other regulatory requirements. The end result is an Appendix Q that is longer than needed and the items provide not additional value, therefore, increasing the burden to each permittee as they consider the various control measures listed. In the case of this example, there are other areas both in this permit and in other leak/spill regulations that identified the need for effective spill management.

### *Revisiting Stormwater Permit Elements Previously Addressed by EPA* **Page Q-430 of 672 "Use deicers that have less of an environmental impact than urea or glycol."**
The EPA has previously developed an Effluent Limitation Guideline (ELG) for the airport/aviation industry. Including within this ELG is a prohibition on the use of urea for pavement deicing unless the permittee conducts effluent monitoring and maintains compliance with a discharge limit. This Appendix Q item appears to ignore the existence of this ELG and revisits this issue. Through the ELG, the EPA has implemented measures to encourage the use of non-urea pavement deicing chemicals and it is unnecessary to include additional evaluation criteria as a potential control measure.

### *Impractical Training Obligations*

**Page Q-439 of 672 (and many other identical references) "Train applicable employees…within the first week of employment"**

Throughout Appendix Q there are references to employee training occurring within one week of employment on various activities. Requiring training within one week is not feasible and likely insufficient to accomplish desired goals. Employees' responsibilities shift throughout their employment, and therefore training employees in the first week for nearly any activity that may be required in the future is not practical. Training should be provided only for individuals responsible for operating or maintaining stormwater control measures and this training is provided prior to individual's being assigned those responsibilities, not during the first week.

*No Consideration to Airport Size or Activity*

**Page Q-422 of 672**

**"Establish a centralized aircraft deicing station"**

This control measure demonstrates the lack of consideration to airport size and/or industrial activity to the entire Appendix Q evaluation concept. Infrastructure utilization, land use, and capital improvement project decisions are complex and unique to each airport. This draft permit has the potential to apply to small general aviation airports and large international airports. The expectation that an airport with very little deicing exposure should consider the establishment of centralized deicing station does not align with the intent of the permit and could lead to massive infrastructure requirements that have negligible to no impacts on stormwater discharge quality.

For the many reasons provide above, we suggest removing the exhaustive list of stormwater control measures requiring evaluation from Appendix Q of the Proposed MSGP. As mentioned elsewhere in this comment letter, we would welcome a meeting between our technical representatives and EPA to further discuss the Sector S fact sheet/Appendix Q to determine an appropriate path that considers the differences between the various permittees to be covered under this permit and does not create burdensome work of little to no value to the airport community and will also not significantly impact stormwater discharge quality.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

Appendix Q – Sector E: (pages 81-100)

NRMCA objects to the stormwater control measures (SCMs) detailed in Appendix Q. The measures listed, as detailed below, are redundant, confusing, overburdensome, erroneous, contradictory, impose industry safety concerns and conflict with other executive branch agency regulatory requirements. While the SCMs list an option to detail the "Reason Why Inappropriate / Not Done", NRMCA believes that for those specific SCMs listed in Appendix Q that are inappropriate and will not be done, or apply at all ready mixed concrete facilities, they should be removed from Appendix Q.

Pollutant Source 1: Bulk Materials

- Currently, air permits for ready mixed concrete plants require dust collection systems. Adding this as a requirement for stormwater regulations is unnecessarily redundant and creates added duplicate compliance monitoring for concrete plants. Due to this requirement being part of concrete plant air permits, NRMCA recommends its removal.
- Requiring to "promptly dispose of waste materials from dust collection systems and other operations", begs the question of what the definition of "promptly" is. Furthermore, the materials from dust collection systems are not always considered waste materials. Often times these materials are not disposed of, but rather reused in the concrete production process. NRMCA suggests that this language be removed, however, absent its removed, it should be replaced to reflect language found under Pollutant Source 3: Dust Collection reading "Regularly remove and recycle or dispose of collected dust."[5]
- Training new employees on material handling within their first week of employment is unrealistic. Regularly, the first week for a new employee is occupied by required employment and benefits paperwork, being familiarized with the facility or facilities, and specific, important safety training. Requiring material handling training within the first week, also seems arbitrary and absent of flexibility for inherent differences between different companies and facilities. NRMCA recommends changing the new employee training language to state that training should take place immediately prior to any physical or directed handling or managing of materials. As well, training requirements that are redundant from air permit requirements should be eliminated as to not create confusing and/or countering compliance requirements.

Pollutant Source 2: Mixing Operations

- See Bulk Materials comment above regarding redundancy between current air permits and proposed 2020 MSGP for dust collectors.
- See Bulk Materials comment above regarding proposed training.

Pollutant Source 3: Dust Collection

- See Bulk Materials comment above regarding redundancy between current air permits and proposed 2020 MSGP for dust collectors, which also applies for bag houses.

Pollutant Source 4: Materials Handling and Storage

- Ready mixed concrete producers manage their stormwater and process water separately, the requirement to "Maintain dry ground surfaces" is overly broad and unnecessary. This particular measure, while likely only meant for areas relating to stormwater, can easily be confused to regard an entire facility. This confusion would be a grave miscalculation overreach, as an inherent part of the manufacture of concrete is water usage, as well as water usage for dust control. Maintaining dry ground surfaces is also contradictory to the dust control measure of using watering trucks to wet surfaces. Use of watering trucks is a widely use and accepted form of control measure that is effective. Any language that would discourage the use of water trucks should be removed from the proposal.
- The mention of providing secondary containment for storage tanks, while simultaneously calling for use of double-walled tanks is redundant. Double-walled tanks, by definition, are their own secondary containment. The contradictory language signals that even if a facility has a double-walled tank, it would still need extra containment. This scenario runs counter to current, widely used and accepted practices for many different types of tanks.

- Requiring empty or used drums to be stored in secondary containment with a cover is an unrealistic requirement. Many facilities do not have the space or ability to have continuous secondary containment or covers for drums that are no longer a threat for water quality concerns, or their lack of contents. Current practices allow for storage outside, without cover, in a designated area until they are disposed of properly or a vendor is procured for their removal. Any departure from this practice lacks an explanation or connection to an environmental benefit. Furthermore, covering tanks and containers is regularly prohibited by different fire codes, as it could prevent any potential fire extinguishing actions.
- While NRMCA agrees that all drums, tanks and containers should be labeled, however this requirement is already mandated and accounted for under the Occupational Safety and Health Administration's (OSHA) Hazard Communication standard[6] . The OSHA Hazard Communication standard already requires labeling of such containers, their hazards and inspections, among numerous other requirements. Requiring this control in another standard is duplicative and does not add any further environmental benefit. NRMCA suggests all references to requirements for labeling be removed from the proposal.
- See Bulk Materials comment above regarding redundancy between current air permits and proposed 2020 MSGP for dust collectors.
- Inspections of storage tanks and their areas weekly is not a necessary inspection benchmark, especially when the proposal already calls for monthly inspections. A weekly inspection frequency should be changed to coincide with the monthly inspection requirements instead.

## Pollutant Source 5: Vehicle and Equipment Fueling

- See Materials Handling and Storage comment above regarding weekly inspections. As well, the requirement for daily inspections of fueling areas seems overly burdensome and arbitrary. This particular inspection would be more realistic if required weekly instead.
- See Bulk Materials comment above regarding proposed training.

## Pollutant Source 6: Vehicle and Equipment Maintenance

- Requirements for daily inspections of vehicles and equipment is likely too frequent. As well, concerning commercial motor vehicles (CMVs), twice daily inspections are required through the Federal Motor Carrier Safety Administration's (FMCSA) pre- and post-trip standard, also known as driver vehicle inspection reports (DVIRs)[7] . This standard requires inspection parameters proposed in the MSGP, and numerous others. Not removing these requirements from the proposal would be overly and unnecessarily burdensome to conduct for multiple standards.
- See Materials Handling and Storage comment above regarding the OSHA Hazard Communication standard, which also applies to having an organized inventory of materials.
- Covered washing operations are entirely unheard of at ready mixed concrete plants. The vehicles and equipment needing washing are very large, thus prohibiting structures or tents needed for covering. Such coverings would require infrastructure and space at a ready mixed concrete plant is regularly not available or practical. This same sentiment covers the requirement for parking vehicles indoors. NRMCA suggests these requirements be removed from the proposal.
- See Bulk Materials comment above regarding proposed training.
- See Materials Handling and Storage comment above regarding weekly inspections.

## Pollutant Source 7: Vehicle and Equipment Storage and Parking

- See Vehicle and Equipment Maintenance comment above regarding indoor/covered parking of vehicles and equipment.

- See Vehicle and Equipment Maintenance comment above regarding the FMCSA DVIR requirements.
- See Materials Handling and Storage comment above regarding weekly inspections.
- See Bulk Materials comment above regarding proposed training.

[5] EPA Proposed 2020 MSGP, Appendix Q, Sector E, Pollutant Source 3: Dust Collection, bullet two, page 82

[6] Title 29 of the Code of Federal Regulations, Section 1910.1200

[7] Title 49 of the Code of Federal Regulations, Section 396.11

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:**  48
**Excerpt Status:** Final

**Comment Excerpt:**

**FWQC and FSWA Recommendations Concerning Use in AIM Process of "Fact Sheets" in Appendix Q**

EPA's AIM Tier 2 proposal also raises other, significant issues that go beyond what was contemplated by the 2016 Settlement, particularly in the extent and nature of the changes to the industry-specific fact sheets. Those fact sheets have been available for about 20 years. In the 2016 Settlement, EPA agreed to revise and update those fact sheets to incorporate "emerging" stormwater control mechanisms that "reflect BAT and BCT." EPA asserts that its proposed Appendix Q represents that effort. However, Appendix Q does not "revise and update" the Agency's prior fact sheets. Rather, Appendix Q represents a complete, inappropriate rejection and replacement of those fact sheets that is inconsistent with the 2016 Settlement. It also does not reflect "emerging" SCMs and does not contain any reference or analysis to support any claims related to BAT or BCT.

Appendix Q is merely a list of any possible SCM that ever applied to any given industry sector, whether proven to be beneficial or not. Moreover, Appendix Q is not "guidance" on SCMs to be selected on a site specific basis. Instead, the permit requires that each facility explain why a BMP listed in Appendix Q is not applicable and therefore implemented. That is not "guidance." EPA's AIM process and related Appendix Q are unnecessarily burdensome, particularly in light of the

fact that such an exercise in justifying reasons for not selecting each measure in a long list of possible SCMs has no environmental benefit.[41]

Members of FSWA and FWQC had offered to assist EPA in its revisions of the prior fact sheets over the past few years, but EPA has declined those offers. As a result, Appendix Q lists some SCMs that are no longer considered BAT or BCT, some that conflict with one another, and some that raise liabilities and other legal conflicts if implemented. This inconsistency creates an impossible challenge for the regulated community to address in attempting to comply with AIM Tier 2 or Tier 3. Attachment A to these comments provides a detailed analysis of specific issues that one FWQC member raised with respect to Appendix Q. Other members identified similar issues and are submitting individual or sector-specific comments.

In sum, Appendix Q is unworkable. It also has the potential to set precedent for every state MSGP, which would be disastrous to industrial stormwater permit programs across the country. EPA should convene sector-specific meetings to obtain appropriate and knowledgeable input, in order to recraft Appendix Q to reflect the expectations that existed when EPA committed to revising and improving the prior industry fact sheets. If EPA cannot complete that effort prior to finalizing the upcoming MSGP, it should rely upon the older fact sheets that provide much better and clearer information on SCMs appropriate to various sectors.

[41] For example, regulated parties should not have to waste time and resources justifying why they would not select SCMs that are known to be less effective than existing SCMs already selected. However, that is what EPA's proposal would mandate.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Federal Water Quality Coalition (FWQC) and Federal StormWater Association (FSWA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0245-A1
**Comment Excerpt Number:** 55
**Excerpt Status:** Final

**Comment Excerpt:**

Attachment A

**Comments on Appendix Q "Stormwater Control Measures: Sector C – Chemical and Allied Products Manufacturing and Refining" Stormwater Control Measures (SCMs)**

Please find below comments that have been prepared for the Federal Water Quality Coalition to incorporate into its larger comment package on the draft MSGP which are due to EPA by June 1, 2020.

Page Q-43 of 672 regarding "Pollutant Source 1: Manufacturing Process Components," we offer the following comments:

1.    The SCM on use of curbing, dikes, and gutters to collect spills is overly broad. The 2015 MSGP requirement related to this only applies to some specific activities, such as storage, loading and unloading. Facilities are already required to minimize exposure and manage spills. We are also concerned that the addition of the word "components" without any definition for that term would expand the applicability of SCMs for curbing, dikes or guttering systems to areas associated with air handling units, wastewater treatment plant units, evaporators and many other pieces of equipment to have their drainage and collection systems arbitrarily challenged.

2.    Keeping spill cleanup materials readily available is already required. We are concerned that EPA may have an unexplained concern with what "readily available" means.

3.    Requiring all facilities subject to this MSGP to "Develop and implement spill prevention, control, and countermeasure (SPCC) plans" is not necessary and unnecessarily expands the SPPC rules under 40 CFR 112. Not all facilities regulated by the NPDES rule are regulated by the SPPC rules and EPA should not require facilities under the applicability thresholds in the SPCC rules to prepare SPPC plans.

4.    The SCM to train personnel who perform manufacturing tasks on appropriate SCMs within first week of employment followed by refresher training annually and as needed" is too short a time period for training. The current training frequency is a recommendation and not a requirement. Since most employees do not work a 7 day work week, this requirement would require training within 5 business days to meet this requirement, which is a much shorter period. We believe that training should occur prior to executing a defined regulated task under the P (?).

Page Q-44 to Q-52 of 672 regarding "Pollutant Source 1: Materials Handling and Storage," we offer the following comments:

5.    Requiring all cleanup of materials on concrete pads to facilitate cleanup of leaks/spills is not necessary. Some materials are stored over plastic containment systems or plastic/metal trays and on double containment pallets. We are concerned that having all materials on concrete pads will require capital investments and will not offer any additional environmental protection.

6.    "Providing secondary containment for storage tanks and drum storage areas" is beyond what the existing MSGP requires. The 2015 MSGP authorizes the use of other control measures, such as berms, to manage stormwater runoff. We are concerned that having secondary containment everywhere will require capital investments and will not offer any additional environmental protection.

7.    "Maintain dry ground surfaces" is a very vague proposed requirement. Current site plans already have a requirement to control erosion and sedimentation. We recommend that EPA maintain the existing SCMs regarding this issue.

8.    We do not believe that wholesale use of the SCMs under the SPCC rules for storage areas for liquid fuels need to be incorporated into the SCMs in this MSGP. The SCM stating that if an area is uncovered it must connect the sump outlet to sanitary sewer (if possible) or to appropriate treatment such as an American Petroleum Institute (API) or Coalescing Plate (CP) oil/water separator, catch basin filter, or other appropriate system is too broad. We are concerned that, without a definition of what "covered" means, all sumps outside of buildings would have to meet this requirement. We are concerned that having all sumps connected to sanitary sewers or to treatment devices will require capital investments and will not offer any additional environmental protection. This added requirement could also require more pre-treatment wastewater operators if treatment is required.

9.    For permanent tanks the SCM to store permanent tanks on an impervious surface surrounded by dikes with a height sufficient to contain a spill (the greater of either 10 percent of the volume of all containers or 110 percent of the volume of the largest tank) is only for oil storage areas. We do not believe that this SCM needs to be extended to all materials and may overlap with other regulatory programs run by EPA.

10.  For permanent tanks the proposed SCM to "Clearly label all permanent tanks" is vague. The current MSGP only requires us to label the type/name of the material in the container. We request that EPA maintain the 2015 MSGP requirement.

11.  For permanent tanks the proposed SCM to "Provide controls for aboveground tanks" is vague. Many controls are already in place on aboveground tanks. What types of controls beyond what is already being required is EPA requesting?

12.  We do not believe that wholesale use of a double-walled tanks SCM under the SPCC rules is needed for all permanent storage tanks areas for liquids. We are concerned that having double-walled tanks for all aboveground storage tanks everywhere will require capital investments and will not offer any additional environmental protection.

13.  We do not believe that the wholesale requirement to provide all tanks with overflow protection like the SPCC rules is needed for all permanent storage tank areas for liquids. We are concerned that having overflow protection everywhere will require capital investments and will not offer any additional environmental protection.

14.  The proposed SCM requirement to "Keep valves on permanent storage tanks in "off" position and locked at all times, except when collected water is removed" is overly broad. Currently, this is only an SPCC requirement. We request that EPA keep the existing MSGP requirements which are covered by SPCC only.

15.  The proposed SCM requirement to "Institute protocols for testing stormwater in containment areas prior to discharge" will consume additional time resources from other operations

depending on the type of material storage. Many sites have prioritized and instituted pH, Organic Load and GC testing in select areas, but this SCM requirement could open up testing for all containment areas. At one site, this could more than triple resources for testing containment areas, with increased costs greater than $50,000 per year.

16.   The proposed SCM requirement to "Keep ep (?) liquid transfer nozzles/hoses in secondary containment area" is currently an SPCC requirement. This SCM should not apply all materials.

17.  The proposed SCM requirements to "Store drums, including empty or used drums, in secondary containment with a roof or cover (including temporary cover such as a tarp that prevents contact with precipitation) and "Store drums indoors when possible" are not needed for areas that already provide secondary containment options (berms and diversion structures). We believe that this SCM should not specifically cover empty drums.

18.  The proposed SCM to "Identify potentially hazardous materials, their characteristics, and their use" is overly broad. The current MSGP only requires the permittee to identify the material stored. Adding information on "characteristics" and "use" is vague and could conflict with other labeling information.

19.  The proposed SCM requirements to "Clearly identify whether a drum contains materials that should be stored outdoors or indoors" and require "Drums stored outdoors should be stored under cover" is overly broad. Many materials can be stored outdoors and indoors, not just one or the other. It is also not clear what criteria are to be used for storage. We support the current MSGP to identify material storage areas.

20.  The proposed SCM requirement to "Use spill troughs for drums with taps" is unclear. We do not understand what EPA is asking for without clearer information on what this means.

21.  The proposed SCM requirement of "If facility drainage is not engineered as listed above, equip the final discharge point of all facility sewers to prevent discharge in the event of an uncontrolled spill" sounds like EPA is requiring first flush capture systems everywhere a facility is not "engineered" to meet all of the SCM requirements. This is very costly and unnecessary. Our experience is that these systems can easily exceed $500,000 in capital costs.

22.  The SCM requirement to "Document potentially hazardous materials including their characteristics and use" is not clear. We are assuming that this is to be done in the site Stormwater Pollution Prevention Plan (SWPP).

23.  The proposed SCM to "Secure and carefully monitor hazardous materials to prevent theft, vandalism, and misuse" is overly broad. Currently, this is only an SPCC requirement. We believe that EPA keep the existing MSGP requirements which are covered by SPCC only. We estimate that one of our sites would have to spend more than $100,000 per year to expand its surveillance program to meet this proposed requirement.

24.  The proposed SCM to "Use fluid level indicators" on all tanks and containers is overly broad. Currently, this is only an SPCC requirement. We request that EPA keep the existing

MSGP requirements which are covered by SPCC only. We estimate that one of our sites would have to spend more than $500,000 in capital and increase its operating expenses by $100,000 per year to expand its program to meet this proposed requirement.

25.  The proposed SCM to "Clearly identify accumulation dates on the outside of waste chemical storage units" is overly broad. RCRA already requires this information at the containers. Based on the requirement, we believe that EPA means this SCM applies to all waste chemicals. Not all "waste chemicals" are hazardous waste and may have very different storage allowances. This proposed SCM requirement could increase one of our site operating expense budgets by $100,000 per year to expand its program to meet this proposed requirement.

26.  The proposed SCM to "Return toxic material packaging to the supplier for re-use" is not practical and is unnecessary. In some cases, this may not be feasible due to RCRA. Also, many materials may be purchased from suppliers outside of the United States. It is best to let the local facility decide its most efficient and cost effective waste packaging strategy.

27.  The SCM requirement to "Clean up leaks and spills immediately" and "Use dry methods if possible" is inconsistent with the MGSP. The proposed SCM allows the use of more than dry methods for cleanup, if possible, while the MSGP does not. The MSGP should be changed to match this SCM requirement.

28.  The SCM requirement to "Provide drip pads/pans where chemicals are transferred from one container to another to recover and reuse leaks/spill" is overly broad. Does this proposed requirement cover any size container? It is impractical to think that this SCM requirement is needed for every operation and every material involving 1 pint, 1 quart, 1 gallon or even a 5 gallon container. As written, this requirement could easily increase operation expenses at a site by more than $10,000 per year.

29.  The SCM requirement of "When using portable drip pans, employ temporary containment" is not appropriate or necessary. For example, if a piece equipment is noticed to have a drip and a drip pan could adequately contain the leak rate before maintenance is done to provide a repair, secondary containment should not be necessary. This proposed SCM requirement could add additional operating expenses without environmental benefit.

30.  The SCM requirement to "Promptly dispose of waste materials from dust collection systems and other operations" is vague. How much time would be allowed meet the "promptly" timeframe? We support the current practice of having preventative maintenance procedures to describe proper waste disposal practices associated with disposal of dust collection materials.

31.  The SCM requirement to "Clean material handling equipment and vehicles to remove accumulated dust and residue on a regular basis" is overly broad and burdensome. Does this mean that a site would have to clean pollen of vehicles and outdoor surfaces each spring? This could easily cost a medium-sized manufacturing facility to spend more than $50,000 per year to meet this requirement. This requirement needs to be more practical or eliminated.

32.  It is unreasonable to think that all facilities can "Use a detention pond or sedimentation basin to reduce suspended solids." Some sites may not have enough area or may need to discharge to a wastewater treatment plant. If a facility needs this type of control, it is highly dependent on the type of operation.

33.  The SCM requirement to "Inspect berms, curbs, and secondary containment systems weekly" and "Perform repairs as needed" is unreasonable. Under the current MSGP, facilities must inspect the condition of our site berms, curbs and secondary containment at least once per quarter under the current MSGP. Moving to a weekly inspection frequency would increase resource needs by a factor of 13. For a medium-sized manufacturing facility, this would increase annual operating expenses by approximately $250,000 to perform and document these inspections on a weekly basis.

34.  The SCM requirement to "Inspect storage tanks and piping systems (pipes, pumps, flanges, couplings, hoses, and valves) for failures or leaks weekly and during significant rainfall events", "Inspect monthly for deterioration such as corrosion, cracks, or damage" and "Perform preventive maintenance as needed" is excessive and impractical. At some of our sites, many of our storage tanks and piping systems (pipes, pumps, flanges, couplings, hoses, and valves) are inspected annually, semi-annually or quarterly depending on manufacturer recommendations and other regulations. Requiring all of this equipment to be inspected could easily increase costs at a medium-sized manufacturing site by more than $500,000 per year. We request EPA respect recommended manufacturer inspection frequency and allow for the application of good engineering judgement.

35.  The SCM requirement to "Conduct container integrity testing annually or as recommended and provide leak detection" and "Ensure that a qualified professional does integrity testing" for all material containers is impractical and unreasonable. Because of the size of containers and type materials covered, this type requirement may work for the SPCC rules, but it does not lend itself to broad application to all materials and their associated containers. Requiring all containers be inspected annually could easily increase costs at a medium-sized manufacturing site by more than $200,000 per year. We request EPA respect recommended manufacturer inspection frequencies, frequencies in place by other regulatory bodies (U.S. Department of Transportation) and allow for the application of good engineering judgement.

36.  The SCM requirement to "Inspect the storage area for filled drip pans and other problems weekly or more frequently, as needed" is not practical and reasonable for all materials. Requiring all storage areas be inspected weekly or more frequently could easily unnecessarily increase (costs?) at a manufacturing site. For additional information, see previous comments (comment 33 and 34) on the costs associated with weekly inspections for berms, curbing and secondary containment.

37.  The SCM requirement to "Inspect and maintain baghouses monthly to prevent the escape of dust from the system" and "Immediately remove any accumulated dust at the base of exterior bag houses" should better align with the inspection requirements set by the EPA Office of Air and Radiation Safety. Baghouses subject to the EPA air rules already are inspected monthly. We

believe that the SCM should keep all other baghouses at a quarterly inspection schedule as is recommended under the current MSGP.

Page Q-52 to Q-54 of 672 regarding "Pollutant Source 3: Vehicle and Equipment Fueling," we offer the following comments:

38.  The SCM requirement to "Conduct fueling operations (including the transfer of fuel from tank trucks) on an impervious or contained pad, or under a roof/canopy where possible" and requiring "Covering should extend beyond spill containment pad to prevent precipitation from entering" should be consistent with the SPCC rules regarding permanent versus mobile fueling operations. We are concerned that this requirement sets up facilities for dual enforcement action under the SPCC and NPDES rules.

39.  The SCM requirement of "When fueling in an uncovered area, conduct fueling operations on a concrete pad (asphalt is not chemically resistant to the fuels being handled)" is not necessary. The SPCC rules already require containment controls according with the fueling rate and time of response. Deviation form the SPCC rules could require additional capital expenses.

40.  The SCM requirement of "Use fueling hoses with check valves to prevent hose drainage after filling" is unreasonable. EPA should consider whether other controls can be used depending on the hose size and the material viscosity.

41.  The SCM requirement to "Inspect storage tanks weekly to detect leaks or spills and monthly for deterioration such as corrosion, cracks, or damage" and "Perform preventive maintenance as needed" is unnecessary. Requiring all storage areas be inspected weekly or more frequently could unnecessarily increase operating expenses at a manufacturing site. For additional information, see previous comments (comment 33 and 34) on the costs associated with weekly inspections.

Page Q-55 to Q-59 of 672 regarding "Pollutant Source 4: Vehicle and Equipment Maintenance," we offer the following comments:

42.  The proposed SCM requirements to "Eliminate floor drains that are connected to the stormwater or sanitary sewer", "If necessary, install a sump that is pumped regularly" and "Collected wastes should be properly treated or disposed of by a licensed waste hauler" is not flexible and ignores infrastructure that has been put in place at facilities. In a Utilities area, there are many floor drains that are connected to an oil/water separator before it discharges to a wastewater treatment plant. Also, we are very concerned that, as written, this SCM will require the maintenance of other "Equipment", such as cooling towers, chillers and boilers.

43.  The SCM requirement to "Eliminate or reduce the number and amount of hazardous materials and waste by substituting nonhazardous or less hazardous materials" is no something an NPDES Permit should address. Such a broad "requirement" could have broad switching implications. In some cases, manufacturers and sites validate equipment using specific materials. For example, a sterile block parenteral production facility cannot just switch cleaners used to

sanitize a manufacturing area. Switching to a less toxic cleaner with necessary validation to satisfy the U.S. Food and Drug Administration typically costs about $500,000.

44.  The SCM requirement to "Keep manifests of all waste materials hauled away from the facility" is not practical. While there are some requirements for some specific wastes, such as hazardous waste, used oil and biological waste, there may not be "manifests" for domestic waste and some others non-hazardous wastes. In some cases, sites depend on rate of generation information records (i.e. greater than 15 cubic yards per week) provided by service suppliers. We are also concerned that this requirement sets up facilities for dual enforcement action under RCRA and NPDES rules.

45.  In regard to the SCM requirement of "When conducting washing operations outdoors, cover the cleaning operation and ensure that all wash water drains to the intended collection system " for Vehicle and Equipment Washing, it is not necessary to cover that operation if it discharges to a wastewater treatment system. It is our understanding that the current MSGP does not allow this type of discharge to the storm sewer system.

46.  IF EPA does allow the discharge of wash water from limited types of Vehicle and Equipment Washing, the SCM requirements to "Confine activities to designated areas outside drainage pathways and away from surface waters" and "Collect stormwater runoff form the cleaning area and provide treatment or recycling" could likely cause

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

It should be noted that a number of the SCMs contained in Appendix Q go beyond the scope of the Clean Water Act and stormwater management, and overlap with other existing regulatory programs. For example, many of the SMCs are related to waste management and disposal, wastewater management, air quality, underground storage tanks and SPCC requirements. Instead, the SCMs in Appendix Q should be limited to those control measures that are specific to stormwater management and fall under the scope of the Clean Water Act to avoid confusion or conflict with existing regulations and requirements of those other programs. Some SCMs are also repetitive and present conflict with other SCMs. As such, the SCMs should be reviewed and updated to eliminate redundancy and conflicts.

Suggested changes, specific to the Appendix Q SCM Checklist to address some of the above comments and Sector P, are provided in Appendix B.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  8
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should not finalize Appendix Q as part of the permit or use it in connection with AIMs. The current non-binding best management practices (BMPs), provided in Table 2 of EPA's current sector-specific Fact Sheets, should remain effective until the Agency seeks feedback from the food and beverage industry regarding appropriate SCMs.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

**V. Proposed Appendix Q SCMs Should be Modified and Restated as Non-Binding BMPs**

Prior MSGP allowed permittees, following a review of their SWPPP, to determine whether a facility is implementing all reasonable and appropriate BMPs to reduce pollutants in the facility's stormwater, and to document in the SWPPP the basis for this determination. Facilities could simply document how their BMPs were effective, and its corrective action obligations would be discharged. Under prior permits, BMPs were identified in separate, free-standing industry-specific Fact Sheets.[72] Those Fact Sheets note that "a variety of BMP options

may [added emphasis] be applicable to eliminate or minimize the presence of pollutants in stormwater discharge…." Facilities, therefore, currently have the flexibility to select which BMPs are appropriate and effective for their operations, using engineering and financial judgment.

In the 2020 MSGP proposal, EPA departs from BMPs and replaces the BMP Fact Sheets with a new Appendix Q, which is contained as a requirement in the permit itself. The new permit language states that Appendix Q is an additional permit condition "that applies to all operators covered under this permit."[73] Appendix Q includes a list of sector-specific SCM that are more expansive and specific than the BMPs.

We oppose the inclusion of Appendix Q and the sector-specific SCMs in the permit for several reasons. First, as mentioned above, we are unaware of any outreach to the food and beverage industry to develop the Sector U SCMs prior to proposing the permit. Some of the SCM's listed in Appendix Q were lifted from prior sector-specific BMPs, but 36 SCMs are entirely new and 9 are similar to prior BMPs with some wording differences. EPA is proposing to require use of all SCMs by facilities with an exceedance and mandate that a facility document and justify why an SCM was not implemented. Even without exceedances, adding Appendix Q to the permit could mean that a facility is out of compliance if all relevant SCMs were not adopted. In other words, EPA has incorporated each and every SCM as a potential permit term.[74] We oppose incorporating SCMs as permit terms because they remove the flexibility facilities need to respond to potential stormwater measures and place regulators in charge of how facilities take corrective actions by second guessing how to respond to potential stormwater pollution issues.

[72] https://www.epa.gov/npdes/industrial-stormwater-fact-sheet-series

[73] Proposed MSGP Permit (Parts 1-7) at page 1.

[74] This is even more likely to occur under state regulatory programs. 75 One engineering consultant quoted $30,000 to install a 20,000-gallon

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:**  EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:**  26
**Excerpt Status:** Final

**Comment Excerpt:**

Based on feedback from some FBIA members, we believe that many of the SCMs are inflexible, inappropriate, unclear, costly, redundant and/or conflict with other federal state and local requirements. Most significantly, many of these measures are likely to require significant resources and yet are unlikely to benefit water quality. Therefore, these should not be mandated through the MSGP. For the Raw Material Unloading/Product Loading SCMs, some of the materials required, such as rubber seals for truck loading docks, do not perform well in cold weather. Other SCMs in this section are exceedingly burdensome, such as the requirement to install diversion berms, dikes or vegetated swales.[75] To implement this SCM, operators would need to hire engineers to construct the structure and depending on the size of the berm, this could cost tens of thousands of dollars and upward. Requirements such as constructing catch basins, detention ponds and sedimentation basins are also very costly.

[75] One engineering consultant quoted $30,000 to install a 20,000-gallon retention pond and related engineering design. To install a 100-foot concrete berm, fencing, asphalt resurfacing, pump, electric and engineering, the consultant quoted $200,000 to $300,000 for installation and design. These are examples for two of the SCMs listed.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 27
**Excerpt Status:** Final

**Comment Excerpt:**

Updating facility schematics to accurately reflect all plumbing connections is very costly. Also, installation of impervious pads for unloading/loading areas may be counter-productive, especially when a gravel or dirt road would be more appropriate to slow the flow of stormwater to a drain or increase drainage to groundwater, as opposed to stormwater. The inflexibility of this SCM prevents facilities from utilizing the best method to control stormwater.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 28
**Excerpt Status:** Final

**Comment Excerpt:**

FBIA members questioned the practicality and cost of the section relating to materials handling and storage. Even though most storage in the food and beverage industry is already under roof, the requirement to provide secondary containment for storage tanks and drum storage areas could be very costly, particularly for facilities with limited space. Similarly, the requirement to prevent run-on to storage area could be very costly and difficult. Some members expressed confusion over the category of "tanks" subject to the SCMs.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

FBIA members raised concerns that several SCMs appear to overlap with other regulatory requirements and therefore may be outside of the scope of the MSGP or conflict with other regulatory programs. For example, the requirement to secure and monitor hazardous materials to prevent theft, vandalism and misuse appears to overlap with Chemical Facility Anti-Terrorism Standards inventory control. The requirement to maintain Underground Storage Tanks appears to be related more to unregulated groundwater than stormwater. EPA provides no scientific justification for adding these SCMs to Appendix Q.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

Inspections are important for minimizing stormwater contamination, but the SCMs generally require weekly rather than monthly inspections. The training requirements may also pose staffing challenges as it may be impractical and unnecessary to train new employees within one week of hire and annually thereafter.[76] Importantly, some SCMs, such as pesticide use and tub placement, may not be as applicable to the food and beverage industry because of primary food safety concerns.

[76] It is common practice to train employees in new responsibilities before they perform new responsibilities, but not all training can be performed within one week of hiring. Appendix Q at 474.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 31
**Excerpt Status:** Final

**Comment Excerpt:**

For each pollutant source section of Appendix Q, EPA has transformed what were once a menu of options for facilities to consider in eliminating stormwater contamination to what now becomes a mandate – with the requirement to justify why each SCM was not utilized.

EPA has not fully explored the impact of including Appendix Q in the permit and expanding BMPs in the SCM list and should not adopt these revisions in the 2020 MSGP.[77] We recommend that SCMs listed in Appendix be designated as non-binding BMPs, and that EPA should work with the food and beverage industry to update the BMPs, understand costs to the industry and benefits to minimize discharges.

[77] One member company of the American Beverage Association reported that any SCM that would require a separate permit (e.g. building permit) causes additional concern. That company

had to obtain a permit to pour a new concrete pad in a water treatment room, which triggered an additional requirement to replace the front steps to the building. "In some locations, the inspector will tour the entire facility and require repairs or other actions before they grant any permit."

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jesse Levine
**Commenter Affiliation:** U.S. Tire Manufacturers Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0259-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

- Our comments outline why many of the control measures in the Appendix Q Fact Sheet for rubber manufacturing are not practical, possible, or cost effective, and we recommend they be removed.
- While we appreciate that the MSGP provides flexibility in allowing facilities to select control measures from Appendix Q industry-specific fact sheets, the requirement to document every Appendix Q control measure not adopted should be removed because this requirement creates a significant recordkeeping burden for USTMA members.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jesse Levine
**Commenter Affiliation:** U.S. Tire Manufacturers Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0259-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

**IV. High-level recommendations and issues with the proposed MSGP and Appendix Q Fact Sheet for Rubber Manufacturing**

While we appreciate that the MSGP provides flexibility in allowing facilities to select control measures from Appendix Q industry-specific fact sheets to address exceedances, the requirement

to document every Appendix Q control measure not adopted should be removed because this requirement creates a significant recordkeeping burden for USTMA members. Additionally, many of the control measures outlined in the Appendix Q Fact Sheet for rubber manufacturing are not practical, possible, or cost effective and therefore should be removed. For example:

b. Not loading and unloading materials when it is raining may not be possible as many businesses provide "just in time" delivery for production materials that must be unloaded when they arrive. P Q-557.

c. Sloping an impervious concrete floor or pad to collect spills and leaks and convey them to proper containment and treatment is costly for an existing facility. P Q-557.

d. Enclosing material handling systems can be costly depending on the type of system in place. P Q-558.

e. Storing permanent tanks on an impervious surface surrounded by dikes with a height sufficient to contain a spill would be costly if not currently in place. P Q-561.

f. Providing tanks with overflow protection may not be possible for existing tanks. P Q561.

g. Keeping liquid transfer nozzles/hoses in a secondary containment area can be costly if a new containment area needs to be installed or an existing area needs to be modified. P Q-562.

h. Retrofitting facilities to provide cover for drums may be costly and unnecessary. P Q563.

i. The measure to equip the final discharge point of all facility sewers to prevent discharges in the event of a spill is not practical. P Q-563.

j. Use of a temporary containment area during use of a portable drip pan appears to be unnecessary as the drip pan itself should be sufficient to catch spills. P Q-565.

k. If a facility does not have dust collection systems for material handling operations, it can be a costly add-on. P Q-566.

l. Direction to change dust collector bags "promptly" is unclear and may not be practicable. P Q-566.

m. Covering dumpsters or moving them indoors may not be practicable. P Q-568.

n. Placing tubs around vents and stacks to collect particulates may not be practical or fully effective as stacks are usually tall and airflow won't allow particles to be captured. P Q - 569.

o. Automatic dispensing and weighing equipment may not always be possible or practical. P Q-570

p. A direction to use alternate compounds to zinc stearate coatings may not be feasible. P Q-571. Tires are highly engineered products that must meet stringent safety and performance requirements. Tires contain a number of rubber compounds each specifically formulated to serve a specific purpose in the tire (e.g., the rubber compound that makes the tire tread is formulated to achieve certain performance requirements such as wet traction and rolling resistance). Modification in compounds may change a tire's performance, so any modification in compound formulation must ensure tires continue to meet performance and safety requirements.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Claudio H. Ternieden
**Commenter Affiliation:** Water Environment Federation (WEF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0261-A1
**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

1. Index Checklist
a. Checklist should be indexed and there should be one master list with uniform and consistent language and the sections that are specific to that industry.

2. Incoherent and Inaccurate Statements
a. Checklist contains statements that are misleading or confusing (need to provide examples)
b. There are technical inconsistencies; refer to California Stormwater Quality Association Manual for information on BMPs and checklists

3. Potential SCM Options or menu of SCM options rather than Checklist
a. This appendix is part of the permit and permits cannot be too prescriptive on the type of BMPs or SCMs that can be used at a site. Therefore, this appendix should be a general list of options to be considered for the site rather than a specific checklist.

4. Reference National Academy Report – Additional Monitoring Needed
a. Many of the SCMs referenced in Appendix Q were based on comments made in the National Academies Study that was conducted to support this. One of the recommendations from the academy (see page 4 of report) is that additional monitoring is needed to understand capacity and performance of SCMs, by being too prescriptive the permit will not allow for that to happen at the industry level.

5. Appendix Q is Oversimplified
a. Checklist is not comprehensive enough, may be missing BMPs that are applicable to the sector

and the use of this checklist may lead practitioners to simply go through the list without identifying a clear solution to problems that could arise at a site. Appendix Q should describe process for developing good solutions and then provide the checklist as examples of what needs to be developed.

6. Other
a. Refer EPA to states that have robust stormwater practices and systems.

b. Inquire if this listing is useful for an MS4 permittees as they are looking at responsibilities such as illicit discharges or sources of pollutants that they might be finding at the end of the system.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Jeff Hannapel
**Commenter Affiliation:** National Association for Surface Finishing
**Document Control Number:** EPA-HQ-OW-2019-0372-0262-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

As part of the draft 2020 MSGP, EPA included Appendix Q that listed stormwater control measures (SCM) applicable to each industry sector. Appendix Q was not included in the 2015 MSGP. The comprehensive list of SCM for Sector AA that includes surface finishing operations is overly prescriptive, would be expensive to implement, and for most, if not all, surface finishing facilities would produce little, or no, environmental benefits. In addition, EPA has proposed to require facilities to document why they are not using a listed SCM. Facilities should not have to document why they are not implementing a SCM, particularly if they already have effective best management practices in place.

The SCM in Appendix Q should not be included as part of the 2020 MSGP. The SCM should, most appropriately, be included as a regulatory guidance to assist facilities in identifying the best management practices to address their stormwater discharges. To maintain Appendix Q as part of the 2020 MSGP would be unduly burdensome to the small businesses that make up the surface finishing industry.

Facilities subject to the 2020 MSGP continue to need flexibility to implement only the most applicable, technically feasible, and cost-effective SCM. NASF urges EPA to remove Appendix Q from the 2020 MSGP and include the comprehensive list of SCM in a regulatory guidance

document that identifies the options that a facility can implement to effectively control stormwater discharges.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** B. Clemence
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0264-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>MSGP Appendix Q</u>**

I note that in Appendix Q, Sector Q does not include pressure washing, while Sector R does. It should be included under both sectors.

Under Sector Q, "Pollutant Source 1: Vessel Cleaning (In Water)" is not a source of stormwater pollutants regulated by the MSGP. I

suggest this be deleted.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Howard Nusbaum
**Commenter Affiliation:** National Salvage Vehicle Reporting Program (NSVRP)
**Document Control Number:** EPA-HQ-OW-2019-0372-0267-A2
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

Our main concern is with the proposed best management practices requiring the removal or deployment of the airbags prior to crushing a vehicle.[1] Our concerns are two-fold. The first concern is that the deployment of airbags prior to crushing or shredding of a vehicle is likely to

result in unnecessary injury or death to workers at these facilities. Airbags deploy explosively, and it is exactly this risk of injury or death from the explosive deployment of airbags that is the basis of the tens of millions of vehicles presently under recall. Requiring the deployment of airbags as a means of minimizing stormwater runoff pollution will likely cause significant increases in workplace injury or death. There are many airbags on a vehicle and with damaged vehicles, it may be difficult to safely initiate a deployment of the airbag. Furthermore, if the airbag module has been compromised in any way by an accident, the subsequent deployment of that airbag in a compromised module potentially has a much greater risk of fragmentation that could result in injury or death to the employee. NSVRP would consider any language from the EPA that suggests a directive encouraging deployment of an airbag could result in parties engaging in what is a potentially fatal incident that otherwise would never have taken place. This language is effectively guiding a business to engage in activities that increase safety risks and should be avoided from being made as a requirement or recommendation by a government agency.

Of additional concern is that the deployment of airbags on vehicles could potentially result in an increase in the chances of increased stormwater pollution rather than minimizing the chances of stormwater pollution. This effect can be understood in that airbag modules are environmentally sealed units and so long as they have not been deployed, they do not cause a risk of pollution from stormwater when it rains. This is because the contents of the airbags are sealed from air and moisture. However, if the airbags were to be deployed, then the containers are fully breached, and as a result in the case of heavy rain, the residual chemicals are then in a position to be washed onto the ground and they would become a source of stormwater runoff. As such, NSVRP would argue that the recommendation to deploy the airbag is actually counterproductive towards controlling stormwater runoff from airbags.

In our opinion the best alternative would be to either have a good, needed un-deployed airbag removed for resale by a recycler, or to have the recycler leave unsaleable airbags intact on the vehicle so when the vehicle is processed by a shredder the resultant waste is safely contained by the shredder as part of their containment processing. Alternatively, airbags can be removed intact when practical under OEM sponsored airbag recovery programs by a recycler. Otherwise, they should remain in the vehicle and then processed intact on the remaining vehicle and processed as part of the shredding operation. In the transmittal documentation, the recycler should be required to provide a cover letter to the shredder indicating that the vehicles have remaining airbags on them so to alert the shredder of their need to process and collect the residue in a storm water containment resistant environment when doing the final processing.

[1] Proposed 2020 MSGP, Appendix Q, Sector M. Page Q-273 of 672.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

**Commenter Name:**  Tim A. Pohle
**Commenter Affiliation:**  Airlines for America (A4A)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0269-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

It is also important to highlight that the list of SCMs included in Appendix Q for the Air Transportation Sector reflects a lack of familiarity with our industry and underscores the need for the Agency to review this list in more detail with the input from the industry. For example, pursuant to the Section of Proposed Appendix Q that pertains to "Deicing (including Anti-Icing) Aircraft" beginning on page Q-422, the Agency would require "use of <u>tarmac</u> ice-detection systems," which are only relevant to <u>pavement</u> deicing. In addition, many of the SCMs listed in Appendix Q, while they may have been contemplated in the past as potentially beneficial technologies, have long been considered impractical, ineffective, or both. For example, as far back as 2000, EPA itself had this to say about "computer-controlled fixed gantry systems:" "Fixed-gantry systems have been installed at only a few airports worldwide, and, although purported to deice aircraft quickly and efficiently, they have failed to receive widespread approval from the industry. . . . Despite [its] purported advantages, fixed-gantry systems are not popular with airlines or airport authorities."[24] Similarly, while "infrared technology" had been considered in the past, the technology never passed the trial stage in the U.S. In addition, the 14- and 45-day "deadlines" for implementing SCMs listed in Appendix Q (per, e.g., Part 5.2.2.3) indicate a complete lack of consideration or awareness of the practical constraints relevant in the aviation context. As noted above, as reflected in reports developed in our VPRP program (and comments on the EPA's proposed Deicing ELG), the industry has detailed knowledge of aircraft and pavement deicing technologies. We would welcome the opportunity to engage with the Agency to ensure that the SCMs listed in Appendix Q are appropriate.

[24] *See*, *Preliminary Data Summary – Airport Deicing Systems (Revised)* (EPA-821-R-00-016; August 2000) at 6-10 to 6-11. To our knowledge, the only major U.S. airport to ever deploy a gantry (or fixed-boom) system, Philadelphia International Airport (PHL), recently replaced this system (which only serviced a portion of flights in need of deicing) with a new, truck-based facility bringing it to industry-level standards.

**Comment Response:**

See Comment Response Essay 3 Additional Implementation Measures and Comment Response Essay 4 Proposals Not Finalized.

CIA.General. Cost Impact Analysis - General

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2

**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Containment for dumpsters - Should be added into economic impact

Discussion/Recommendations

Containment curbs, or roofs, to be built around or over outdoor uncovered dumpsters/ rolloff boxes add expenses to companies and should be added to the economic impact assessment. If curbing will need to be inspected and drained where treatment is not available, this will include ongoing labor expenses.

**Comment Response:**

EPA included a unit cost of the dumpster (that are generally used as a covered container for solid wastes) and other common stormwater control measures for all 29 MSGP sectors specified in Table 5 of the updated 2021 Cost Impact Analysis report. EPA also included unit costs for different types of canopies/covers, containment trenches, and storage shelter in the cost impact analysis.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 9
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Cleaning catch basins - Should be added into economic impact

Discussion/Recommendations

Cleaning of catch basins will be a new permit required activity leading to increased labor costs (inhouse or contracted) which should be added to the economic assessment.

**Comment Response:**

EPA evaluated the incremental cost implications of the final permit changes in the 2021 MSGP cost impact analysis compared to the 2015 MSGP. As cleaning the catch basin is an existing permit requirement, EPA does not foresee additional incremental cost associated with this permit requirement. However, for informational purposes, EPA included a unit cost to install catch basins in Table 5 of the updated cost impact analysis report.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Must divert, infiltrate, reuse, contain, etc.

Discussion/Recommendations

Redirecting stormwater from direct discharge at facilities will create large capital projects. This requirement should be removed. If not, this needs to be included in the economic assessment.

**Comment Response:**

EPA evaluated the incremental cost implications of the final permit changes in the 2021 MSGP cost impact analysis compared to the 2015 MSGP. As stormwater diversion, infiltration, reuse, and containment to minimize pollutants in the discharge is an existing permit requirement, EPA does not foresee additional incremental cost associated with this permit requirement. However, for informational purposes, EPA included a unit cost for stormwater diversion measures (e.g., installation of berms, curbs, and grassed swales), infiltration structure (e.g., basins and trenches), and containments (e.g., trenches, secondary containment) in different sections of updated 2021 MSGP Cost Impact Analysis report.

---

**Commenter Name:**  Jerry Schwartz
**Commenter Affiliation:**  American Forest & Paper Association (AF&PA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0154-A2

**Comment Excerpt Number:** 35
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Professional Engineer

Discussion/Recommendations

EPA may require certification by a PE. This should be added to the economic assessment.

**Comment Response:**

EPA decided not to include an inspection-only option in lieu of benchmark monitoring in the 2021 MSGP. EPA updated the 2021 MSGP Cost Impact Analysis accordingly to reflect this change.

---

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 38
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Economic impact

Discussion/Recommendations

Staff and/or third party consultant time to complete an Annual Report should be included in the economic impact.

**Comment Response:**

EPA evaluated the incremental cost implications of the final permit changes in the 2021 MSGP Cost Impact Analysis compared to the 2015 MSGP. As annual report submission is an existing

requirement, EPA does not foresee any additional incremental cost associated with this permit requirement.

---

**Commenter Name:** Major L. Clark, III
**Commenter Affiliation:** Office of Advocacy, Small Business Administration
**Document Control Number:** EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

**3. EPA must tailor its analysis of significant impacts to individual industries.**

EPA's discussion of costs is at the sector level, but the impacts to small entities will vary widely within sectors. EPA states that it does not "currently collect data on the number of employees or annual receipts of entities that may seek coverage under the MSGP, and therefore estimating impacts on small entities is not possible."[39] EPA can find firm size data by receipts and by employment in SUSB, and use SUSB estimates to assess the impacts of the rule on small entities. Affected industries should be specifically identified. An example of this data is below: Each industry affected by the permit should be considered individually to fully understand the impacts.

Advocacy prepared examples of the potential impacts on small entities in three industries to illustrate how impacts can differ. For Petroleum Bulk Stations and Terminals, which is part of Sector P: Land Transportation and Warehousing, the costs of the rule as estimated by EPA represent a very small portion of receipts, even for the smallest entities.

Table 1: Impacts by Firm Size in NAICS 424710, Petroleum Bulk Stations and Terminals

| Enterprise Employment Size | Number of Firms | Estimated 2017 Receipts per firm ($) | Cost Per Entity ($) | Cost as a Percentage of Receipts |
|---|---|---|---|---|
| 01: Total | 2,334 | 227,661,246 | 2,363 | 0.0% |
| 02: <5 | 508 | 4,625,051 | 2,363 | 0.1% |
| 03: 5-9 | 415 | 18,561,169 | 2,363 | 0.0% |
| 04: 10-19 | 411 | 21,714,669 | 2,363 | 0.0% |
| 05: <20 | 1,334 | 14,225,742 | 2,363 | 0.0% |
| 06: 20-99 | 612 | 108,771,529 | 2,363 | 0.0% |
| 07: 100-499 | 251 | 188,678,163 | 2,363 | 0.0% |
| 08: <500 | 2,197 | 60,493,188 | 2,363 | 0.0% |
| 09: 500+ | 137 | 2,908,451,190 | 2,363 | 0.0% |

Census Bureau Statistics of U.S. Businesses, 2017

For other industries in the same sector, the impacts are larger for small entities. NAICS 484110: General Freight Trucking, Local is also in Sector P. For this industry, costs represent about 4 percent of receipts for the smallest firms, and considerably less for larger small firms (Table 2).

However, in another example, NAICS 485113: Bus and Other Motor Vehicle Transit Systems, which is also in Sector P, has relatively large impacts for small firms (Table 3). For the smallest firms, EPA's estimated costs of the rule represent 5 percent of receipts.

Table 2: Impacts by firm size in NAICS 484110: General Freight Trucking, Local

| Enterprise Employment Size | Number of Firms | Estimated 2017 Receipts per firm ($) | Cost Per Entity ($) | Cost as a Percentage of Receipts ($) |
|---|---|---|---|---|
| 01: Total | 25,754 | 1,340,553 | 2,363 | 0.2% |
| 02: <100,000 | 6,077 | 53,176 | 2,363 | 4.4% |
| 03: 100,000-499,999 | 10,823 | 254,963 | 2,363 | 0.9% |
| 04: 500,000-999,999 | 3,401 | 762,568 | 2,363 | 0.3% |
| 05: 1,000,000-2,499,999 | 2,734 | 1,666,444 | 2,363 | 0.1% |
| 06: 2,500,000-4,999,999 | 1,129 | 3,646,765 | 2,363 | 0.1% |
| 07: 5,000,000-7,499,999 | 429 | 6,264,715 | 2,363 | 0.0% |
| 08: 7,500,000-9,999,999 | 267 | 8,281,175 | 2,363 | 0.0% |
| 09: 10,000,000-14,999,999 | 216 | 11,363,350 | 2,363 | 0.0% |
| 10: 15,000,000-19,999,999 | 127 | 14,833,636 | 2,363 | 0.0% |
| 11: 20,000,000-24,999,999 | 67 | 17,333,913 | 2,363 | 0.0% |

Census Bureau Statistics of U.S. Businesses, 2012. Receipts in 2017 dollars. Data suppressed for larger firm sizes.

Table 3: Impacts by firm size in NAICS 485113: Bus and Other Motor Vehicle Transit Systems

| Enterprise Receipts Size | Number of Firms | Estimated 2017 Receipts per firm ($) | Cost Per Entity ($) | Cost as a Percentage of Receipts ($) |
|---|---|---|---|---|
| 01: Total | 625 | 5,309,079 | $2,363 | 0.0% |
| 02: <100,000 | 147 | 47,385 | $2,363 | 5.0% |
| 03: 100,000-499,999 | 211 | 262,399 | $2,363 | 0.9% |
| 04: 500,000-999,999 | 78 | 762,987 | $2,363 | 0.3% |
| 05: 1,000,000-2,499,999 | 78 | 1,689,948 | $2,363 | 0.1% |
| 06: 2,500,000-4,999,999 | 36 | 3,354,527 | $2,363 | 0.1% |
| 07: 5,000,000-7,499,999 | 15 | 4,882,671 | $2,363 | 0.0% |
| 08: 7,500,000-9,999,999 | 4 | 7,691,070 | $2,363 | 0.0% |
| 09: 10,000,000-14,999,999 | 15 | 10,975,933 | $2,363 | 0.0% |
| 10: 15,000,000-19,999,999 | 7 | 13,230,961 | $2,363 | 0.0% |
| 11: 20,000,000-24,999,999 | 4 | 22,098,602 | $2,363 | 0.0% |

Census Bureau Statistics of U.S. Businesses, 2012. Receipts in 2017 dollars. Data suppressed for larger firm sizes.

Due to the heterogeneity of industries within the sectors EPA intends to regulate under the permit, EPA must estimate small entity impacts at the industry level. Analysis at the industry level will also reveal where small business burdens are greatest, and where the best opportunities to provide regulatory relief may be.

[39] *Id.* at 3.

**Comment Response:**

As described in the MSGP Cost Impact Analysis, EPA conducted a generic assessment of economic impacts because of limitations on the data availability, as cited by the commenter, and the site-specific nature of the changes in the MSGP. EPA's assumption is appropriate and necessary in order to generate some cost analysis for a general permit, which covers varied sectors, activities, and sizes of facilities located in various parts of the United States. Using this approach, EPA determined that the 2021 MSGP is economically achievable.

EPA also clarifies that it is infeasible to estimate the cost associated with industry and site specific controls because EPA is unclear about what type of current control measures are currently in place for each facility. Moreover, the implementation and modification of the site-specific controls are contingent upon AIM triggering events. As the information on the prevalence of the triggering events among currently permitted operators is not captured by any current reporting requirement under the 2015 MSGP, EPA assessed the unit cost of each permit requirement, ensuring operators have a general cost estimate for each of the common control

measure that could be used to comply with the permit requirement and to calculate the estimated total cost in the future (see discussion in Part C of the 2021 MSGP Cost Impact Analysis).

EPA also clarifies that providing unit cost for control measures is the only practical option for this cost impact analysis considering the variability of site size and type of activities.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  20
**Excerpt Status:** Final

**Comment Excerpt:**

**2. EPA must account for all direct costs to small entities, including costs of site-specific controls.**

An analysis of small entity impacts should be comprehensive. EPA has estimated incremental per-entity costs of $2,363 that consist primarily of monitoring costs. This estimate excludes the significant potential costs of site-specific controls per entity. To properly certify the rule, EPA must estimate the total per-entity impact for small entities, inclusive of site-specific controls costs.

By excluding the cost of implementation measures, EPA underestimates the compliance costs to small entities. EPA states that estimating the total cost is challenging because of the wide variation in effects across industries and mitigation activities, and that making a "unique global assumption for all facilities" is difficult. However, a "unique global assumption" is neither appropriate nor necessary. Instead, EPA can produce realistic per entity cost ranges that representative small entities in each industry group or sector may reasonably have to undertake. Cost ranges should be based on clearly articulated assumptions about what small entities would do to comply with the rule. Those assumptions should then be offered for public comment to ensure they are reasonable.

EPA included unit costs for some control measures in the cost analysis but does not suggest what individual entities would pay. For example, EPA suggests a cost of $130-$276 per linear foot for a floodwall but does not generate a per-entity estimate of the cost of a complete floodwall. It is unclear how many small entities would need to build a floodwall, or how large a floodwall would need to be for a typical site in an industry. EPA recognizes that there are many variables affecting the potential costs for an entity to comply with the permit. Considering this uncertainty, EPA should provide a more comprehensive picture of the per-entity costs. Advocacy recommends consulting with small entities in the affected industry by convening a SBREFA panel.

**Comment Response:**

EPA acknowledges that the incremental cost primarily consists of monitoring cost. However, EPA also clarifies that it is infeasible to estimate the cost associated with industry and site-specific controls because EPA is unclear about what type of current control measures are currently in place for each facility. Moreover, the implementation and modification of the site-specific controls are contingent upon AIM triggering events. As the information on the prevalence of the triggering events among currently permitted operators is not captured by any current reporting requirement under the 2015 MSGP, EPA assessed the unit cost of each permit requirement, ensuring operators have a general cost estimate for each of the common control measure that could be used to comply with the permit requirement and to calculate the estimated total cost in the future (see discussion in Part C of the 2021 MSGP Cost Impact Analysis).

EPA also clarifies that providing unit cost for control measures is the only practical option for this cost impact analysis considering the variability of site size and type of activities.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 2
**Excerpt Status:** Final

**Comment Excerpt:**

The Cost Analysis does not address many of the true costs of implementation and, in reality, the cost of several prescribed mandates will cause a financial burden, especially to small businesses.

**Comment Response:**

EPA acknowledges that the cost analysis does not include implementation cost under AIM requirements, considering data unavailability and the site-specific nature of the permit implementation. Therefore, EPA included the unit cost of control measures in the 2021 MSGP Cost Impact Analysis to provide cost information, wherever feasible. Overall, EPA notes that it has determined the requirements of the 2021 MSGP to be economically practicable and achievable for all sectors covered.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

**<u>Costs of Compliances are Greatly Underestimated</u>**

The estimated cost of just under $2,500 over 5 years is too low by many orders of magnitude. This disregards the very real cost for the need for outside consultants and experts to help with compliance. Merely understanding and complying with the new regulatory system of Additional Implementation Measures Tiers is very confusing even for NSSGA members with many years of experience, let alone small producers who do not have access to the same level of expertise. Complying with these measures involves outside contractors and experts, for which merely a site visit can exceed $2,500, and this does not involve an inspection, technical work or report which would be many thousands more. A project engineer estimated that for a 600-acre site in North Carolina based on local material costs have estimated just one potential corrective action in Appendix Q to exceed $300,000 (see the section of these comments covering Enhanced Control Measures). For this same site, the cost of curb and gutter would be prohibitive with no environmental improvement: this work is bidding out at about $35 - $40 per linear foot. A simple entrance road at this operation would require about 500 feet, therefore the entire project estimate is $35,000 - $40,000 to do both sides of the road.

For a low-cost material like aggregates, these costs could easily exceed the value of the materials and force operations to close. This could have the unintended consequence of negative environmental impacts, because aggregates operations that are located further from customers require extra delivery distances, which typically means heavy trucks traveling further which have environmental impacts to air quality and increased safety impacts.

**Comment Response:**

In the 2021 MSGP Cost Impact Analysis, EPA has provided greater clarity about how the cost estimates were derived. EPA removed permit requirements for SCM measures implementation under the proposed AIM corrective action responses (Appendix Q). EPA also simplified the AIM requirement language so that the AIM Levels are sequential and built off the baseline (MSGP trigger of 4 quarter annual average exceedance). EPA has updated the cost analysis accordingly to reflect these changes. See response to DCN EPA-HQ-OW-2019-0372-0174-A1, Comment Excerpt Number 2.

---

**Commenter Name:**  Theresa L. Romanosky
**Commenter Affiliation:**  Association of American Railroads (AAR)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

Also, it is not clear whether implementation of the SCMs in Appendix Q were considered in the Cost Analysis.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Paul N. Backhouse
**Commenter Affiliation:**  Seminole Tribe of Florida
**Document Control Number:**  EPA-HQ-OW-2019-0372-0268-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

**II. Disproportionate and Unfunded Burden**

The proposed changes would require a more robust monitoring; including but not limited to: (1) universal monitoring for pH, total suspended solids, and chemical oxygen demand; (2) revising or removing benchmark values for some constituents based on the latest toxicity science; (3) additional benchmark monitoring requirements for various industry sectors; and (4) consideration of major storm control measures enhancements. This would likely result in implementation of more costly control/response measures and more costly response actions. While the Seminole Tribe supports protection of water resources, it should not bare an inordinate burden and an unfunded mandate to do so. The Tribe is concerned that EPA's cost analysis is based on multiple tangentially related "best case scenario" assumptions and most associated, additional, costs are essentially unknown. Ultimately, permittees will bare the cost of implementation of the 2020 MSGP. **To ensure implementation of the 2020 MSGP in Indian Country is not a financial burden and an unfunded mandate, EPA should also: (1) adequately budget financial assistance/funding to Indian Country, including the Seminole Tribe, and (2) provide the necessary training to Tribes.**

**Comment Response:**

EPA acknowledges in the 2021 MSGP Cost Impact Analysis that incremental costs associated with new MSGP requirements exist. In regards to cost being representative of "best case scenario", the cost estimate provided in the 2021 MSGP Cost Impact Analysis represents incremental costs for the average facility due to the costing limitations discussed below. It is infeasible to estimate the cost associated with industry and site-specific controls because EPA is unclear about what type of current control measures are currently in place for each Facility. Moreover, the implementation and modification of the site-specific controls are contingent upon AIM triggering events. As the information on the prevalence of the triggering events among currently permitted operators is not captured by any current reporting requirement under the 2015 MSGP, EPA assessed the unit cost of each permit requirement, ensuring operators have a

general cost estimate for each of the common control measure that could be used to comply with the permit requirement and to calculate the estimated total cost in the future (see discussion in Part C of the 2021 MSGP Cost Impact Analysis).

EPA also clarifies that providing unit cost for control measures is the only practical option for this cost impact analysis considering the variability of site size and type of activities.

## CIA.V. Cost Impact Analysis - Cost Implications of Key Proposed Permit Changes

**Commenter Name:**  Anonymous
**Commenter Affiliation:**
**Document Control Number:**  EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

Cost Estimate:
The "average" cost estimate of $462/year is laughable as it applies to my site. My site far exceeds that in newly proposed man hour requirements alone. ... Overnight freight on just ONE sample is close to $50, not to mention 60-miles of round-trip road transportation from a remote facility to the shipper. Then, countless man hours monkeying around on the phone with the EPA while trying to get DMR forms corrected is in the thousands of dollars.

New requirements/changes will undoubtedly require even more time in trying to get DMR's corrected. Meanwhile, automatically triggered NOV's rack up not due to legitimate permittee violations, but due to faulty DMR fields in the EPA reporting system.

**Comment Response:**

EPA clarifies that the sampling cost specified in the cost impact analysis includes lab analysis cost, but does not include labor costs for sample collection, preparation and transportation. The number of sample collection events over the course of a permit term can vary widely among operators depending on multiple factors such as the overlapping frequencies for various monitoring requirements, sample collection preferences and potential issues (e.g., the need to re-sample a discharge point). Considering the complexity of estimating labor costs for sampling, EPA proposes a unit cost of $82.16 per operator per sampling event assuming average number of discharge points of 2.04 and an hourly wage rate of $35.96.

---

**Commenter Name:**  Paula Dodge-Kwan
**Commenter Affiliation:**  Engineering Division, Albuquerque, NM
**Document Control Number:**  EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

The timing and duration of our monsoonal storm events makes it difficult to obtain grab samples from our scattered, often remote facilities, necessitating the use of refrigerated automated samplers. The City of Albuquerque has obtained cost estimates for the purchase and installation of 18 autosamplers at outfalls for 8 facilities that fall under MSGP requirements. These cost estimates, obtained from 3 local consultants range from $544,000 to $645,000. Additional annual operation and maintenance and sample collection cost estimates range from $108,000 to $212,000. Sample analysis costs are roughly $35,000.

Installation of these units doesn't guarantee occurrence of storm events or sufficient discharge to obtain a sample. In addition field parameters, such as temperature and pH would not be obtained. Therefore our options under this program are to continue to attempt to collect a grab sample at a low probability of collection or install expensive autosamplers that may give a slightly higher probability of sample collection for most parameters but yield no results for some constituents

**Comment Response:**

Provisions in the 2021 MSGP do not require operators to collect samples during monsoonal storm events and provides flexibility due to adverse weather conditions that would prevent the collection of a sample. EPA notes that the use of autosamplers is optional and is not required by the 2021 MSGP.

EPA acknowledges the reported costs by the commenter. EPA clarifies that the sampling cost in the total incremental cost includes lab analysis cost, but does not include labor costs for sample collection, preparation and transportation. The number of sample collection events over the course of a permit term can vary widely among operators depending on multiple factors such as the overlapping frequencies for various monitoring requirements, sample collection preferences and potential issues (e.g., the need to re-sample a discharge point). Considering the complexity of estimating labor costs for sampling, EPA provides a unit cost of $82.16 per operator per sampling event assuming average number of discharge points of 2.04 and an hourly wage rate of $35.96. EPA did not include this unit cost in the calculation of the total incremental cost; rather, EPA is providing it as a resource for operators to estimate sampling costs that reflect their site, monitoring requirements, and sample collection preferences.

Also see comment response to DCN EPA-HQ-OW-2019-0372-0155-A1, Comment Excerpt Number 7 and DCN EPA-HQ-OW-2019-0372-0159-A1, Comment Excerpt Number 3.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

In the *Federal Register* notice, EPA makes an assertion that the 2020 MSGP will not have a significant economic impact on a substantial number of small entities, using the language of a certification under 5 U.S.C. 605(b) and referencing the economic impact analysis.[30] However, the cost analysis for the proposal does not estimate the cost impact on small entities, stating that because EPA does not have employee numbers or annual receipts for permittees, "estimating impacts on small entities is not possible."[31]

[30] 85 Fed. Reg. at 12294.

[31] *Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (MSGP)* (regulations.gov

Document ID EPA-HQ-OW-2019-0372-0063).

**Comment Response:**

Comment noted. See comment responses to DCN EPA-HQ-OW-2019-0372-0167-A1, comment excerpts 8 and 9.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

**The Costs of Compliance is Far Greater than Projected**

This topic is of greatest concern based on the impact it could have on small businesses. There is no better example than the times we are facing right now. Additional costs and unjustified spending could be all that it takes to force a small producer to go out of business. As a large producer, we would even have difficulties with laying out the capital necessary to deal with some of the potential costs included in this MSGP.

The Cost Impact Analysis for the MSGP indicates an approximate cost for compliance at $2,363 per facility over the 5-year term. The report clearly shows an underestimation and admittance to not being all-inclusive based on a comment that many of the proposed requirements are highly location-specific making it difficult to develop an assumption to cover all facilities. It goes on to admit that there was no accounting for the cost impacts on the 41 state MSGPs that will be impacted by this permit. Many of the big-ticket items are shown with unknown costs so they did not contribute to the totals. Of course, many of these big-ticket items would come into play if a

site entered the AIM process but they still need to be considered since they are part of the proposal. All of this makes the Cost Impact Analysis useless.

The list of potential costs associated with this permit are lengthy and include some of the following:

- Signage - $2,000 each
- Additional sampling - $2,100
- Third-party inspections - $2,000 to $6,000 each
- Stormwater Control Measures {SCMs}
  - Fueling slab - $60,000 each
  - Roof over containment structure - $70,000 each
  - Oil/Water Separator - $60,000 with annual maintenance estimated at $40,000
  - Wheel Wash - $125,000 with an additional $125,000 if water supply needed
  - Purchase Street Sweeper/Vacuum - $150,000
  - Contract Street Sweeper/Vacuum - $100,000 - $400,000 per year depending on site size
  - Curb & Gutter - $40 per linear foot {500-foot entrance would cost $40,000)

One interesting comment from the Cost Impact Analysis relates to the estimate of the inspection by a professional. Those figures show a projected cost of $16,470 for the permit term. This appears to include 2 inspections. The report states that these costs may make the alternative prohibitive. This is interesting in that many of the AIM measures far exceed these figures but there appears to be no consideration from the EPA on those costs as being prohibitive.

**Comment Response:**

EPA acknowledged that the total cost is not all inclusive. But it is noteworthy that the requirements to implement control measures are sequential to AIM Level triggering events (i.e., annual average exceedances of benchmark data). In absence of the AIM triggering events, operators will not be required to implement any AIM specific controls. These conditional requirements make the overall analysis unable to calculate total cost. See response to DCN EPA-HQ-OW-2019-0372-0167-A1 (Comment Excerpt Number 20) and 0183-A1 (Comment Excerpt Number 10) for more information.

EPA estimated a unit cost to implement control measure recommended under AIM Level 2 controls suggested in the permit. The approximate unit cost estimate already includes cost for crushed stone and gravel, containment structure, covers, oil/water separator, and street sweeper. EPA total incremental cost also includes potential cost associated with the new signage requirements.

EPA decided not to include inspection-only option in lieu of benchmark monitoring in the final 2021 MSGP.

EPA notes that states with NPDES authority are not required to use the MSGP requirements included in the 2021 MSGP and therefore does not include state permit costs in the cost analysis.

**Commenter Name:** Paul Balserak
**Commenter Affiliation:** American Iron and Steel Institute (AISI)
**Document Control Number:** EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:** 10
**Excerpt Status:** Final

**Comment Excerpt:**

Furthermore, given the scope and prescriptive nature of the proposed MSGP and proposed SCMs, we find that EPA's assessment of the cost impacts of the proposed MSGP is unrealistically low and inadequate.

Although the proposed MSGP and proposed Sector-Specific SCMs would not apply directly to most AISI member facilities because they are regulated by NPDES permits that include provisions for stormwater and combined process water/non-contact cooling water/stormwater discharges, a final MSGP and final SCMs will likely have substantial impacts because it is very likely that state regulatory agencies will use a final MSGP and final SCMs as EPA guidance for their stormwater regulatory programs. We suspect this will happen even if most iron and steel facilities will not be subject directly to a final MSGP.

EPA attempts to address the issue of potential costs accrued to this MSGP which are not directly the result of this MSGP, but result from NPDES permits issued by authorized states (Cost Analysis, page 4 of 54). EPA argues that NPDES-authorized states are not required to conform or match their industrial stormwater permits to EPA's MSGP. However, EPA goes on to acknowledge that up to 77% of state MSGP permits are either substantially similar or somewhat similar to EPA's MSGP. EPA then states, "To the extent a given state decides to propose their next MSGP to mirror any changes proposed in EPA's MSGP, those state permittees would likely incur similar incremental costs detailed in this analysis." (page 4 of 54). EPA's cost analysis derives a per facility estimate for this MSGP of $2,363 per facility over the 5-year permit term. As detailed below, we project the per facility costs for steel mills could range in the tens of millions of dollars per facility if the proposed stormwater control measures (SCMs) for Section F (Primary Metals) of Appendix Q are required to be implemented by state permitting agencies. EPA did not factor implementation of the proposed SCMs, or any indirect costs associated with the proposed SCMs, by states in their storm water management programs.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0174-A1 (Comment Excerpt Number 2), and DCN EPA-HQ-OW-2019-0372-0183-A1 (Comment Excerpt Number 10).

EPA reiterates that states with NPDES authority are not required to use the MSGP requirements included in the 2021 MSGP and therefore does not include state permit costs in the cost analysis.

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  15
**Excerpt Status:** Final

**Comment Excerpt:**

*In addition to withdrawing the proposed Stormwater Control Measures (SCMs) for Sector F, AISI requests that EPA include in its cost assessment, the likely costs to facilities from state implementation of the proposed MGSP in iron and steel facility-specific NPDES permits.*

EPA's Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (MSGP) is faulty primarily because it ignores the secondary implementation and administrative costs that will likely be imposed on iron and steel facilities by state agencies, and it does not account for massive investment costs that would be required to implement the proposed SCMs. EPA also did not take into account indirect costs associated with implementation of the proposed MSGP such as maintenance of covered areas, changes in material handling practices and others. These ongoing costs, along with the high capital investment costs would be excessive and burdensome with no commensurate environmental benefit.

As noted above, we firmly believe that state agencies, as they have in the past, will use a final MSGP and final sector-specific SCMs as part of the stormwater control programs they implement through NPDES permits for iron and steel facilities that are not subject to the MSGP. If some of the more impractical and unreasonable proposed SCMs are imposed as requirements in facility Stormwater Pollution Prevention Programs (SWPPPs), the cost impacts across the industry would be in the billions of dollars.

This is demonstrated in Table 2, where we provide estimates of investment costs for providing impervious surfaces for raw material and other material storage piles, as would be required by the following proposed SCM for Sector F:

*Practice good stockpiling practices such as storing materials on concrete or asphalt pads and/or surrounding stockpiles using diversion dikes or curbs to limit run-on and to slow runoff.*

AISI's estimates of the investment costs for providing impervious surfaces for raw material storage areas are based on the following considerations:

- Because of the large volumes of raw materials and slags that must be stored at iron and steel mills, and the weight of those materials, asphalt pads would not be suitable for such applications;
- A 2-foot thick concrete pad with heavy steel reinforcement would be required to provide structural support for the massive weight of raw material and slag storage piles; and,
- Nominal estimate for installed cost for concrete of $300 and $500 per cubic yard.[3]

Table 2
Estimated Investment Costs for Impervious Surfaces
for Raw Material Storage Areas at Iron and Steel Mills

| Raw Material Storage Area | Cubic Yards of Concrete Required for 2-Foot Base | Estimated Investment Costs | |
|---|---|---|---|
| | | $300/cu yd | $500/cu yd |
| 10 acres | 33,267 | $9,680,000 | $16,100,000 |
| 25 acres | 80,667 | $24,200,000 | $40,300,000 |
| 50 acres | 161,333 | $48,400,000 | $80,700,000 |
| 100 acres | 322,677 | $96,800,000 | $161,000,000 |
| 200 acres | 645,333 | $194,000,000 | $323,000,000 |

Table 2 does not include estimated costs for maintenance of the concrete pads, diversion dikes or curbs as noted in the proposed SCM, or for covering raw material stockpiles as noted in other SCMs. The proposed SCMs that would require concrete pads would also result in increased surface runoff that, in many cases, would require additional stormwater control facilities. The substantial investment and operation and maintenance costs for such stormwater control facilities are also not included in Table 2.

If the costs set out in Table 2 were applied to the raw material and product storage areas for the two integrated steel mills and the two EAF steel mills described in Table 1 and Exhibit 3, the aggregate cost for the four steel mills would be more than $800,000,000 to $1,300,000,000. The cost across the industry would be staggering and unbearable. This is clearly an unreasonable and perhaps unintended consequence of the proposed MSGP and proposed SCMs for Primary Metals Facilities.

[3] Installed costs for concrete are regional. The estimated investment cost estimates presented in Table 2 are directly proportional to unit costs ($/cubic yard) for installed concrete.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 10.

---

**Commenter Name:**  Paul Balserak
**Commenter Affiliation:**  American Iron and Steel Institute (AISI)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0186-A1
**Comment Excerpt Number:**  25
**Excerpt Status:** Final

**Comment Excerpt:**

AISI and its US producer members request and recommend the following:

...

- That EPA conduct a comprehensive cost impact analysis that takes into account state agency implementation of a proposed revised MSGP and proposed revised SCMs through NPDES permits for iron and steel facilities that are not subject to the MSGP

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 10.

EPA reiterates that states with NPDES authority are not required to use the MSGP requirements included in the 2021 MSGP and therefore does not include state permit costs in the cost analysis.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 39
**Excerpt Status:** Final

**Comment Excerpt:**

**EPA Grossly Underestimated Compliance Costs.**

NMA believes that EPA has grossly underestimated compliance costs. EPA estimated that compliance costs would increase by approximately $2,300 per facility over the 5-year permit term. Based on feedback from our members, we believe that the increased costs on a facility basis would be thousands of dollars more than EPA's estimates. EPA was unable to estimate the compliance costs of the key components of the proposed MSGP, including the proposed AIM approach. The agency's inability to estimate the costs of the most significant parts of the proposed 2020 MSGP is problematic. Our members need regulatory certainty and notice of potential implementation costs in order to plan their operations appropriately. EPA should engage with industry stakeholders to help estimate the potential costs associated with the proposed 2020 MSGP before it is finalized.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1 (Comment Excerpt Number 20) and 0183-A1 (Comment Excerpt Number 10) for more information.

---

**Commenter Name:** Kevin Walgenbach
**Commenter Affiliation:** National Ready Mixed Concrete Association (NRMCA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0242-A1
**Comment Excerpt Number:** 14
**Excerpt Status:** Final

**Comment Excerpt:**

Cost Impact Analysis

EPA's cost estimates do not match the reality of costs ready mixed concrete plants incur for compliance with the MSGP. The cost of initial reading and understanding how these changes affect a ready mixed concrete production facility will definitely exceed EPA's 5-year estimates. Theses changes will force most small ready mixed concrete producers to hire expensive consultants simply just to help them understand their responsibilities. If fully implemented the MSGP could cost hundreds of thousands of dollars, and even cause some companies to shutter facilities resulting in lost jobs.

**Comment Response:**

Without additional detail of cost inaccuracies, EPA is unable to address the commenter's concerns. EPA does note that it has determined the requirements of the 2021 MSGP to be economically practicable and achievable for all sectors covered.

---

**Commenter Name:**  Glen P. Kedzie
**Commenter Affiliation:**  American Trucking Associations (ATA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:**  19
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA estimates that the annual incremental costs increase per facility under the proposed 2020 MSGP changes to be a mere $2,363, a figure we believe to be greatly underestimated. Additional costs will also be incurred for any and all corrective actions as part of the proposed AIM tiered corrective action requirements and for costs incurred during the NOI process to perform a hardness analysis on the receiving water and perform an endangered species assessment as necessary and outlined in Appendix E.

**Comment Response:**

The cost impact analysis is solely focused on the incremental costs associated with permit requirement changes between 2015 and 2021 MSGP. Therefore, EPA disagrees with the comment that implies additional costs will be incurred to perform receiving water hardness analysis and endangered species assessment, considering both are existing requirements under the 2015 MSGP. Additionally, EPA clarified and provided justification in the 2021 MSGP Cost Impact Analysis on not including additional costs associated with AIM requirements. See response to DCN EPA-HQ-OW-2019-0372-0167-A1 (Comment Excerpt Number 20) and 0183-A1 (Comment Excerpt Number 10) for more information.

Additionally, EPA notes that it has determined the requirements of the 2021 MSGP to be economically practicable and achievable.

**Commenter Name:** Theresa L. Romanosky
**Commenter Affiliation:** Association of American Railroads (AAR)
**Document Control Number:** EPA-HQ-OW-2019-0372-0249-A1
**Comment Excerpt Number:** 29
**Excerpt Status:** Final

**Comment Excerpt:**

Using the same assumptions as EPA's Cost Impact Analysis, AAR calculated costs for a model railroad facility, as detailed in Appendix C. These calculated costs are significantly higher than EPA's estimates presented in the Cost Impact Analysis. As such, AAR respectfully requests EPA reevaluate its costs before finalizing the 2020 MSGP, considering the following information.

Based on AAR's cost calculations, the likely cost impact of the Proposed 2020 MSGP may be up to 100 times higher than EPA's estimate. A comparison is provided in Table 7 below.

**Table 7. AAR's Sector P Facilities Estimated Costs Versus EPA's Estimated Costs for the Entire 5-Year Permit Period of the MSGP**

| Category | EPA | AAR | AAR |
|---|---|---|---|
| | Sector P Cost for 426 facilities for 5-Year Permit | Sector P Cost for 426 facilities for 5-Year Permit | Extrapolated Cost for Railroad Yard for 1,000 facilities for 5-Year Permit[50] |
| Additional Implementation Measures (AIM) | $0 | $130,992,222 | |
| Impaired Waters Monitoring | $58,762 | $98,994 | |
| Universal Benchmark Monitoring for pH, TSS and Chemical Oxygen Demand (COD) | $1,094,820 | $3,738,320 | |
| Add new Benchmarks for Certain Sectors | $251,734 | $476,268 | |
| Post Information Sign About SWPPP | $80,940 | $218,990 | |
| Major Storm Risk Planning | $0 | $62,190,794 | |
| TOTAL Estimated Cost | $1,486,256 | $197,715,589 | $464,121,101 |
| Average 5-Year Permit Cost Per Facility in Sector P | $3,489 | $464,121 | $464,121 |

AAR's estimated costs were calculated based on a single Sector P facility's first permit year coverage, which was then extrapolated to estimate the facility's cumulative cost over the full five-year permit term. The estimated total cost to the railroads for 1000 facilities was extrapolated based on the average cost per facility of $464,121. The major differences between the EPA and AAR estimates shown here are reflective of the estimated costs for the AIM

requirements (which are quite costly) and major storm risk planning requirements, both which were excluded from EPA's analysis but included in AAR's. These cost estimates are supported by the Excel spreadsheets attached in Appendix D.

Based on AAR's estimate, the 426 Sector P facilities[51] will bear higher costs than EPA's analysis suggests. As shown above, the cost for all Sector P facilities was calculated to be a total of $197,715,589, as compared to EPA's estimated cost of $1,486,256 for these same facilities. The average cost per facility was calculated at $464,121 for the 5-Year Permit period, as compared to EPA's estimated cost of $3,489 per facility.

With approximately 1,000 Railroad facilities/yards[52] located in NPDES authorized and unauthorized states that may be subject to the new requirements in the Proposed 2020 MSGP, AAR estimates that the proposed requirements are likely to impose a cost of approximately $464,270 per facility, costing AAR's members approximately $464,270,000 over the 5-year permit period.

Note that AAR's cost estimates were based on the same cost categories that EPA used in estimating the costs of the proposed MSGP, which included:

- Additional Implementation Measures (AIM);
- Impaired Monitoring, Universal Benchmark Monitoring;
- New benchmarks for Certain Sectors;
- Public Signage of Permit Coverage; and
- Major Storm Risk Planning.

It was noted that EPA's cost estimate did not include the costs for certain requirements. In addition to revising the cost estimate based on AAR's additional information provided here, EPA should update the Cost Impact Analysis to include these omitted categories of expenses, including the expansion of the existing CERCLA eligibility criterion to all EPA regions, adding new eligibility criterions to Coal Tar Sealants ("CST") use, and the impacts of the SCMs included in Appendix Q for each sector.

[50] The original railroad application for the 1995 MSGP contained approximately 1,000 facilities. It is possible there could be more facilities today.

[51] Proposed 2020 MSGP Permit, at 6 (noting 426 facilities for Sector P).

[52] See note 27.

**Comment Response:**

EPA has provided greater clarity about how the cost estimates were derived in the 2021 MSGP Cost Impact Analysis and confirmed that the cost represents an industry average cost. EPA also explained that the total incremental cost does not include the cost associated with implementing control measures under each AIM Level. See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 20, for more information.

In addition, the 2021 MSGP requires operators to consider certain factors, including how implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures will help to minimize impacts from stormwater discharges from major storm events. If facilities already have emergency and risk management plans or have already implemented such controls due to existing requirements mandated by other state, local or federal agencies, operators should include in their SWPPP a description of measures in place for such events and a reference to the existing requirement(s).

EPA also removed the following requirements from the final 2021 MSGP: eligibility criterion regarding coal tar sealcoat (CTS) EPA, universal benchmark monitoring, Appendix Q (SCM checklists), and expansion of CERCLA eligibility criterion to all regions. Therefore, EPA does not anticipate any additional cost burden under 2021 MSGP from these permit requirements.

## CIA.V.A. Cost Impact Analysis - Streamlining of Permit

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

On streamlining the permit:
It appears in some cases, this means replacing flexible language with one-size-fits-all requirements. It may be streamlined for the enforcement people, but it also applies unnecessary and burdensome requirements and costs to the permittee, just to make an enforcement easier for those least affected by the requirements.

**Comment Response:**

Without further specification from the commenter regarding which requirements are identified as resulting from streamlining and are burdensome, EPA is unable to respond to the direct concerns of the commenter.

## CIA.V.B.1. Cost Impact Analysis - Eligibility Coal Tar Sealcoat

**Commenter Name:** Chelsea Herrick
**Commenter Affiliation:** Daniel B. Krieg, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0077-A1
**Comment Excerpt Number:** 1
**Excerpt Status:** Final

**Comment Excerpt:**

This would effectively ban refined coal-tar based pavement sealcoat, which **accounts for 8% of our small, disadvantaged businesses' total sales. The proposed 2020 MSGP will have a negative financial impact on our small business, our employees, our customers, and the overall pavement maintenance industry.** In an already frightening economic situation (due to COVID-19), the proposed 2020 MSGP would catastrophically damage the pavement maintenance industry. A ban on RTS will give customers a negative perception on **all** sealcoating products, which will cripple our industry and local businesses across the U.S.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  John Hartz
**Commenter Affiliation:**  Hartz Sealcoating
**Document Control Number:**  EPA-HQ-OW-2019-0372-0105
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed change will have a serious negative impact on my business and employees because we use RTS exclusively in our application because it lasts longer than other sealers. Other applications must be done multiple times, nearly every year, while we apply every 3-5 years. It is our number one source of income and restrictions would likely cause a negative perception on all sealcoating products which would put our business in danger of failing.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Jim Sandlin
**Commenter Affiliation:**  Reece Seal Coating Inc
**Document Control Number:**  EPA-HQ-OW-2019-0372-0109-A1
**Comment Excerpt Number:**  3
**Excerpt Status:** Final

**Comment Excerpt:**

Any attempted ban on coal tar pavement sealers would be detrimental to our business and force us to use inferior pavement sealers that don't last through Indiana's rough weather patterns. Such

issues that we would face would be a loss of revenue. Our customer base will not pay a higher price for an inferior product that may not last more than a year. With the same regards, our customers who contract us to apply pavement coatings will not want to pay a premium price for coating their parking lots with coatings that simply will not last. **This would also force us to decrease our workforce and put hard working Hoosiers out of a job.**

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  John Garcia
**Commenter Affiliation:**  Rooters Asphalt, Rooters American Maintenance, Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0111-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

- The proposed change will have a negative impact on my business and employees. In the Midwest our sealing season would be shortened immensely due to the weather. Not only will this decrease the volume of business we can perform but also reduce hours for employees which could also lead to layoffs.
- A ban on RTS would negatively impact the pavement maintenance industry in more ways than one. Applicators who often use RTS during sealcoating projects would lose a source for income. Aside from that, we have heard from businesses located in communities with restrictions on the use of RTS that customers are also more likely to form a negative perception of all sealcoating products in light of the RTS ban. This decrease in sales for all pavement maintenance services would have a catastrophic effect on Rooters American Maintenance and local businesses across the U.S.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  John Zarlengo Jr.
**Commenter Affiliation:**  John Zarlengo Asphalt Paving Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0121
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

I, John Zarlengo Jr. oppose the EPAs proposed use of the 2020 MSGP to make facilities using RTS to seal pavement ineligible for coverage under the MSGP, requiring them instead to apply for an individual permit. This would effectively ban refined coal tar-based pavement seal coat, which should not be allowed due to the following reasons: Our business applies these products safely and to standards that assure the safety of the public. The proposed change will have an negative impact on our family business and employees. Our business is a seasonal business and I envision a shortening of the seal coat season which will adversely impact on our business profits and decrease the salaries of our employees. A ban on RTS would mean we would have to decrease our employee force, possibly by 50%

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Carolina Striping Solutions
**Document Control Number:**  EPA-HQ-OW-2019-0372-0125
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed change will have a negative impact on my business and employees. It would take more than half of my revenue and would be shortening of the sealcoating season, especially in N.C. where we get longer rainy seasons.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion

---

**Commenter Name:**  No Name
**Commenter Affiliation:**  Acme Sealcoating
**Document Control Number:**  EPA-HQ-OW-2019-0372-0135
**Comment Excerpt Number:**  1
**Excerpt Status:** Final

**Comment Excerpt:**

The proposed change will have a negative impact on my business and employees by shortening the timeframe for sealcoating related to the longer rainy season in Florida where we conduct

business. This will result in further loss of income to companies already suffering from the current pandemic losing their source of income. This decrease in sales for all pavement maintenance services would have a catastrophic effect on Acme Sealcoating and local businesses across the U.S.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Allan Heydorn
**Commenter Affiliation:**  Pavement Maintenance & Reconstruction
**Document Control Number:**  EPA-HQ-OW-2019-0372-0156
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

I have worked with hundreds of contractors and the industry's material producers, outlining "best practices" for sealcoating as well as other aspects of pavement maintenance. As a rule, the contractors in this industry are small to mid-size and many are family owned. These businesses contribute to the local communities by helping asphalt pavement last longer. They also contribute significant dollars to local economies and employ local workers. Passage of the 2020 MSGP, requiring the facilities these contractors work for to apply for an individual permit, puts an undue burden on both the facilities and the contractors.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Bill Kerchusky
**Commenter Affiliation:**  Sure Seal Asphalt Paving & Maintenance Company Inc.
**Document Control Number:**  EPA-HQ-OW-2019-0372-0157
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

By eliminating this product from the market, it will cause undue hardship on my 37 year old business and my only recourse will have to be early retirement and to let go of my employees.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

EPA also needs to give more attention to the costs of restricting coal-tar sealcoat. EPA assumes that "most facilities who intend to use coal-tar sealcoat will be able to find a product alternative at negligible cost difference."[38] It may be true that there are alternatives to coal-tar sealcoat available at a similar cost, but EPA needs to verify that losing access to coal-tar sealcoat will have no significant economic impact on the operations of affected small entities. If entities have chosen to use coal-tar sealcoat, they may well have chosen it based on an important attribute that EPA is overlooking. A SBREFA panel could also cover the potential impacts of this provision.

[38] *Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (MSGP)*, pp. 11.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Brian J. Anthony
**Commenter Affiliation:**  The Brewer Company
**Document Control Number:**  EPA-HQ-OW-2019-0372-0191-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

While you are correct, there are alternatives to refined coal tar sealants. What has not been taken into consideration is whether these alternatives are cost effective compared to refined coal tar sealants. The asphaltic and acrylic sealants cited as alternatives have repeatedly demonstrated inferior results in the market place, typically lasting only half as long as refined coal tar sealants, at an equal or substantially higher product cost. If these were "truly cost-effective alternatives" to refined coal tar sealants, would not traditional market forces/demand have caused them to

overtake and replace market share from refined coal tar sealants? Instead, these so-called alternatives are applied only in situations where refined coal tar sealants are currently restricted from use. These alternatives simply do not perform, require frequent applications and, subsequently, result in increased carbon footprints and installed costs, just to attain similar results as refined coal tar sealants.

Additionally, we are gravely concerned about how a ban on coal tar sealants could deleteriously affect what we believe to be a sizeable industry of small business owners and their employees. Forcing the use of inferior products, like the so-called alternatives, will cause property owners to re-evaluate their return on investment, as it relates to seal coating and the pavement life cycle. They will likely determine that the more frequent applications of these alternative products is a more costly investment than simply letting the pavement reach its inherent failure point, followed by an overlay, or inevitable replacement. When the property owner determines that maintenance of their asphalt pavement with these alternative sealcoats is no longer cost effective due to inferior performance, then nearly 700 of our loyal customers, all small businesses, representing conservatively 7,000 employees in 15 States, will be in jeopardy of going out of business/losing their jobs. This just reflects the impact to our customers. Given the number and geographic scope of other refined coal tar sealant manufacturers, we can readily envision 10 to 20 times this number of businesses/employees negatively impacted, as a consequence of this de facto ban. Is the threat to the number of small businesses and employee jobs not relevant in your cost impact analysis?

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:**  Fredric P. Andes
**Commenter Affiliation:**  Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:**  23
**Excerpt Status:** Final

**Comment Excerpt:**

- EPA's cost-impact analysis is deficient. EPA's cost-impact analysis addresses potential costs associated with the use of coal tar-based sealant alternatives and the cost of compliance with proposed COD monitoring and PAH benchmarks. However, it fails entirely to account for the significant economic impacts across the RTS value chain—from coal tar producers, to coal tar refiner and RTS manufacturers, to RTS applicators—which has an estimated annual economic value in excess of $100 million dollars.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

---

**Commenter Name:** Fredric P. Andes
**Commenter Affiliation:** Pavement Coatings Technology Council (PCTC) and Coke Oven Environmental Task Force (COETF)
**Document Control Number:** EPA-HQ-OW-2019-0372-0246-A1
**Comment Excerpt Number:** 24
**Excerpt Status:** Final

**Comment Excerpt:**

- EPA's proposal is inconsistent with the Regulatory Flexibility Act ("RFA"). This 2020 Proposed MSGP rulemaking will have a "significant economic impact on a substantial number of small entities," thus triggering the RFA. However, EPA took no action to comply with the RFA, even though it could and should have been able to ascertain the significant economic impact on small businesses.

**Comment Response:**

EPA removed the eligibility criterion regarding Coal Tar Sealcoat (CTS) from 2021 MSGP. Therefore, EPA does not include costs attributed to the proposed eligibility criterion.

## CIA.V.C.1. Cost Impact Analysis - Getting MSGP Authorization Relating to Enforcement

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

The Cost Impact Analysis Section C.1 assumes there is no additional cost for this proposed eligibility criteria. However, denial of permit coverage prevents legal operation of the facility which has a cost implication for the operator. Denial after an extended wait period results in an individual permit application process (minimum 180-days), which has a further cost implication for the operator. We disagree that there is no additional cost associated with this proposal.

**Comment Response:**

EPA excluded the proposed 2020 MSGP requirement related to the extended waiting period for Notice of Intent (NOI) review for permit authorization relating to a pending enforcement action.

EPA has included additional questions in the NOI form. The two additional questions in the NOI are for operators who have a pending enforcement action who were not previously covered under the 2015 MSGP. EPA assumes an incremental cost of $6,802 for the new NOI question requirement assuming additional labor cost considering 5 minute of data entry and an hourly wage rate of $35.96 for all 2,270 operators.

## CIA.V.C.2. Cost Impact Analysis - Public Signage of Permit Coverage

**Commenter Name:** Anonymous
**Commenter Affiliation:**
**Document Control Number:** EPA-HQ-OW-2019-0372-0084
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Just the signage requirement is at least $200 by the time the sign language is created, the sign made, shipped and placed.

**Comment Response:**

EPA notes that the incremental cost under 2021 MSGP cost impact analysis includes incremental cost associated with signage that is representative of actual cost that operators may experience while installing and maintaining similar signage. This cost includes the cost of production (including purchase of an 8-foot metal pole), installation, and maintenance of signage. The associated labor cost assumes that installation and maintenance will be performed by in-house staff. However, the cost could be higher if an operator decides to hire a professional to install and maintain the sign.

---

**Commenter Name:** Steve Whitt
**Commenter Affiliation:** Martin Marietta, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0176-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA Cost Impact Analysis discusses this sign on pages 14 and 15. Some of the specifics mentioned further outlines a lack of understanding of what is specifically being asked and the costs involved. That document mentions a letter size of 3 inches in order to allow viewing from 30 feet. It goes on to mention costs obtained for signs that are 10" x 18" to 24" x 42" in size.

**Comment Response:**

EPA acknowledges that the language in the cost analysis discussing the height of the font letters and readability of the signage was redundant. Therefore, EPA removed the language as EPA does not include requirements related to signage dimension or readability distance.

## CIA.V.D. Cost Impact Analysis - Control Measures for Major Storm Planning

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 13
**Excerpt Status:** Final

**Comment Excerpt:**

We further recommend that the cost analysis be revisited to adjust for the PE and CFM requirements on these design controls.

**Comment Response:**

Neither the 2015 MSGP nor the 2021 MSGP requires facilities to implement major storm control measures under PE or CFM supervision. Instead, EPA recommends a list of enhanced control measures in the permit and estimated a unit cost to implement each enhanced control measure. EPA provided considerable flexibility to operators in selecting appropriate control measures for their facilities. Moreover, EPA's 2021 cost impact analysis only includes the incremental cost that will incur from the changes in requirements between 2015 and 2021 MSGP. As the PE or CFM is neither an existing nor a new permit requirement, EPA declines to update the cost analysis to adjust for the PE and CFM requirements.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

The Cost Impact Analysis, Item D.1 Major Storm Planning fails to consider:

i.        the cost associated with USACE 404 permitting, threatened & endangered species impacts, and cultural resources impacts resulting from work mandated within a water of the United States;

ii.        the cost for design of flood control walls, dikes, levees, etc.;

iii.        the ongoing maintenance costs of these designed controls;

iv.        the cost of transportation of materials to off-site, indoor, rented storage spaces, including hazardous materials shipping, etc.;

v.        v. the cost of storage to comply with fire codes, RCRA requirements, SPCC elements for containment, etc. that may be applicable and considered at the facility location;

vi.        vi. the availability of sufficient storage space in areas with flood potential;

vii.        vii. the potential space requirements necessary for storage of industrial materials (i.e., 20 by 20 feet is likely too small for the majority of operators).

We recommend that these items be considered, and an associated cost analysis be incorporated. The monies spent on storage may be better spent engineering site controls intended to protect the materials on-site during a major storm event.

**Comment Response:**

EPA disagrees that the cost impact analysis failed to consider the additional costs listed by the commenter. EPA estimated a unit cost to implement each enhanced control measure for major storm planning suggested in the permit. The approximate unit cost estimate already includes cost of different type of barriers (levee/floodwalls), elevating existing base flood elevation (BFE), anchoring, temporary storage space, etc. EPA also discusses the cost to develop a scenario-based emergency procedure for major storms. For clarity, EPA updated the cost analysis to reflect the rental cost of indoor industrial/commercial material storage during a flood event based on rental storage facilities considering a large rental climate-controlled storage space.

## CIA.V.E.1. Cost Impact Analysis - Monitoring: Discharges to Impaired Waters

**Commenter Name:** Jerry Schwartz
**Commenter Affiliation:** American Forest & Paper Association (AF&PA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0154-A2
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Issue

Impaired waters

Discussion/Recommendations

Monitoring/testing for discharges of ubiquitous pollutants such as PCBs to impaired waters should be added to economic impact. Is there economic removal technology available for PCB's in stormwater if detected? How would the standard differ from direct effluent monitoring?

**Comment Response:**

EPA declines to add monitoring cost for selected parameters such as PCBs. The list of pollutants required to be monitored under impaired water monitoring could vary between receiving waterbodies and monitoring periods. It is impractical to determine and add cost for certain selected pollutants in the impaired water monitoring cost. Instead, EPA estimated the impaired water monitoring cost, assuming the average single pollutant sampling cost of $25.44, which is not unduly burdensome and not limited to any particular industry. EPA calculated this cost based on the average individual sampling cost for 12 pollutants (i.e., BOD, COD, TSS, pH, turbidity, ammonia, nitrate plus nitrite, total Kjeldahl nitrogen, total phosphorus, cyanide, mercury, and one metal) quoted by six laboratories from the New England region (Tetra Tech. 2015. Memorandum: Cost data for MSGP benchmark monitoring).

## CIA.V.E.2. Cost Impact Analysis - Monitoring: Additional Implementation Measures

**Commenter Name:** Denny Wene
**Commenter Affiliation:** Howmet Aerospace, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0158-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Howmet has facilities in several states including California which has instituted a system similar to what EPA has proposed. The one facility that was located within The Inland empire area of Southern California had to go to the level advocated by EPAs proposed AIMs level III due to elevated levels of aluminum, zinc, and background nitrite/nitrates (no nitrites on-site). The total cost for the rerouting of outfalls and installing equipment was $360,000 for three final outfalls bring the cost of each outfall to be $120,000. This is for an area that received ten (10) rain events per calendar year. The operating costs are $1,000-$2,000 per year with additional periodic costs for filter bed replacements. Rainer climates will have additional operating costs. The chosen solution for this facility was the lowest cost solution with some options doubling or tripling the chosen cost.

**Comment Response:**

Comment noted. EPA notes that costs for the requirements depend on the stormwater control measures selected and other facility-specific characteristics. EPA has determined the requirements of the 2021 MSGP to be economically practicable and achievable. Also see comment responses to DCN EPA-HQ-OW-2019-0372-0167-A1, comment excerpts 8 and 9.

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  10
**Excerpt Status:** Final

**Comment Excerpt:**

Finally, AAAE is concerned that EPA is moving forward with the AIM Tier 2 response requirements without understanding the unique implications on airports. In its Cost Impact Analysis for the proposed 2020 MSGP, EPA indicated that the agency was "unable to estimate 'total cost' associated with the proposed [AIM] responses because the information on the prevalence of the proposed triggering events among currently permitted facilities is not captured by any current reporting requirement under the 2015 MSGP." (Cost Impact Analysis, at 5, 31.) While EPA, at the very least, attempted to determine potential costs for implementing AIM Tier 1 and 3 response requirements, no similar analysis was performed for AIM Tier 2. (See id. at 22–34.) It is also worth noting that the NRC Study contained no recommendations or analysis regarding the proposed list of SCMs in appendix Q for Sector S. These unknowns are further indication that EPA should reevaluate its approach for AIM Tier 2 and eliminate the proposal to implement prescriptive control measures outlined in appendix Q.

**Comment Response:**

EPA did not finalize proposed Appendix Q and the corresponding requirement to implement all feasible sector-specific stormwater control measures (SCMs) under AIM Level 2 Response (previously, AIM Tier 2 Responses). Instead, the 2021 MSGP requires operators to review the stormwater pollution prevention plan (SWPPP) and implement additional pollution prevention/good housekeeping SCMs, considering good engineering practices, beyond what was done in AIM Level 1 responses that would reasonably be expected to bring exceedances below the parameter's benchmark threshold.. EPA also refers operators to the MSGP sector-specific fact sheets for recommended controls found at [https://www.epa.gov/npdes/stormwater-discharges-industrial-activities-fact-sheets-and-guidance]. EPA evaluated all stormwater controls for each of the 29 industrial sectors specified in this industrial stormwater fact sheet series and identified twenty-three (23) control measures that are most widely recommended among sub-sectors. EPA estimated the unit cost to implement each of the 23-stormwater control measures, as summarized in the updated 2021 MSGP Cost Impact Analysis. EPA also included unit cost to comply with continuous benchmark monitoring requirements under AIM Level 2 responses.

**Commenter Name:**  Emily W. Coyner
**Commenter Affiliation:**  National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0196-A1

**Comment Excerpt Number:** 21
**Excerpt Status:** Final

**Comment Excerpt:**

The costs of some of the SCMs for an aggregates operation are estimated below; these were estimated for a 600-acre site in North Carolina by a plant engineer based on local material costs:

- Concrete slab for fueling - $60,000
- Roof over a containment structure - $70,000
- Oil/Water Separator - $60,000 with an estimated $40,000 in annual maintenance
- Wheel Wash - $125,000-300,000 with an additional $125,000 needed for water supply and $5000 per year in parts, not including labor costs
- Purchase a street sweeper/vacuum - $192,000
- Annual cost to have contractor conduct sweeping/vacuum - $100,000 - $400,000

**Comment Response:**

The updated cost analysis includes unit costs for crushed stone and gravel, containment structure, oil/water separator, and street sweeper. For additional information, see the response to DCN EPA-HQ-OW-2019-0372-0183-A1, Comment Excerpt Number 10.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 30
**Excerpt Status:** Final

**Comment Excerpt:**

Last, but not the least, the AIM approach will be expensive with very uncertain environmental benefits. Table 2 shows the costs just for a Tier I response and does not include the actual BMP equipment/capital costs.

2021 EPA MSGP Response to Comments
January 15, 2021

**Table 2**
**AIM Tier I Response Costs**

| AIM Tier 1 Response – Estimated Associated Costs | Rate | Quantity | Total |
|---|---|---|---|
| **a. Review Stormwater Control Measures** | | | |
| SWPPP review | $115 | 1 | $115 |
| Field review | $115 | 2 | $230 |
| **b. Implement Additional Measures** | | | |
| BMP design | $115 | 10 | $1150 |
| BMP procurement | $115 | 4 | $460 |
| BMP install | $65 | 10 | $650 |
| Or | | | |
| *Document per Part 5.3* | | | |
| Documentation | $115 | 1 | $115 |
| Immediate Actions | $65 | 1 | $65 |
| | | | |
| Include in annual report | $115 | 1 | $115 |
| **c. Continue Quarterly Benchmark Monitoring** *Already included in quarterly benchmark monitoring costs (same monitoring)* | | | |
| | | | |
| Minimum | | | $640 |
| Maximum | | | $2,720 |

Assumes labor cost of technician = $65/hour
Assumes labor cost of environmental engineer = $115/hour
Estimate above does not include costs of continued benchmark
sampling per 5.2.1.2, since already included in quarterly
benchmark monitoring costs provided earlier.

Minimum represents a) and documentation portion of b) above.
Maximum represents a) and BMP portion of b) and annual report
portion of b) above.

**Comment Response:**

EPA acknowledges the site and situational-specific estimated costs submitted by the commenter.
EPA recognizes that costs of compliance will vary considerably among and even within
industrial sectors. The cost estimates included in the proposed and final MSGP are industry
averages and incremental costs. Therefore, it does not represent the actual cost for any particular
facility or a specific industrial sector. EPA has determined the requirements of the 2021 MSGP
to be economically practicable and achievable for all sectors covered.

---

**Commenter Name:** Curt Wells
**Commenter Affiliation:** The Aluminum Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0240-A1
**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

Capital Cost

The Association has member company facilities located in California - which has instituted in
certain regions the IGP permit with a tiered system similar to what EPA is proposing. One
facility had to go to the level advocated by EPA's proposed AIM level III due to elevated levels
of aluminum, zinc, and background nitrite/nitrates (without nitrites/nitrates even onsite) in its

stormwater sampling. The total cost for the rerouting of outfalls and installing equipment was $360,000 for three final outfalls bringing the average cost of each outfall to be $120,000. This is for an area that received ten (10) rain events per calendar year. In addition, the operating costs are $1,000-$2,000 per year with additional periodic costs for filter bed replacements with wetter climates having higher operating costs. The chosen solution for this facility offered the lowest cost with other options doubling or tripling the chosen cost.

**Comment Response:**

Comment noted. EPA recognizes that costs of compliance will vary considerably among and even within industrial sectors. The cost estimates included in the proposed and final MSGP are industry averages and incremental costs. Therefore, it does not represent the actual cost for any particular facility or a specific industrial sector.  EPA notes that it has determined the requirements of the 2021 MSGP to be economically practicable and achievable.

## CIA.V.E.3. Cost Impact Analysis - Monitoring: New Sector Specific Benchmarks

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  9
**Excerpt Status:** Final

**Comment Excerpt:**

Regarding new benchmark monitoring for sector P (lead, mercury and hardness) will result in an additional $224.88/site as per our analysis. This represents an unfunded mandate.

**Comment Response:**

EPA is not finalizing the sector specific benchmarks for Sector P in the 2021 MSGP. See Comment Response Essay 2 Monitoring.

---

**Commenter Name:**  Major L. Clark, III
**Commenter Affiliation:**  Office of Advocacy, Small Business Administration
**Document Control Number:**  EPA-HQ-OW-2019-0372-0167-A1
**Comment Excerpt Number:**  22
**Excerpt Status:** Final

**Comment Excerpt:**

EPA should give special attention to Sectors I, P, and R that could experience higher incremental costs because they have not been subject to universal benchmark monitoring before. Small business representatives have expressed a significant concern that small entities in these sectors

will need to spend more upfront resources adjusting procedures and training staff than EPA has accounted for in the cost analysis. The introduction of monitoring may also entail higher site-specific costs for entities in these sectors.

**Comment Response:**

In the 2021 MSGP, EPA excluded the proposed universal benchmark monitoring requirements for all applicable sectors, including sectors I, P and R. Instead, EPA includes analytical "report-only" indicator monitoring for pH, Total Suspended Solids (TSS), and Chemical Oxygen Demand (COD) for certain sectors quarterly for the duration of the permit. This requirement applies to all operators in the following subsectors that do not have sector-specific benchmark monitoring requirements in the 2021 MSGP: B2, C5, D2, E3, F5, I1, J3, L2, N2, O1, P1, R1, T1, U3, V1, W1, X1, Y2, Z1, AB, AC, and AD. See Comment Response Essay 2 Monitoring. Indicator monitoring data for pH, TSS, and COD will provide the operators and EPA with a baseline and comparable understanding of industrial stormwater discharge quality, potential water quality problems, and stormwater control measure effectiveness. EPA updated the cost analysis to reflect these changes that resulted in an additional monitoring and data entry cost for 844 operators. Analytical determinations are expected to be relatively inexpensive (less than $50/quarter for all three parameters). The NRC study acknowledges that the additional cost burden for these three parameters is expected to be relatively small, given that all operators are already required to collect quarterly stormwater samples for visual monitoring.

## CIA.V.E.4. Cost Impact Analysis - Monitoring: Universal Benchmark Monitoring for All Sectors

**Commenter Name:**  Paula Dodge-Kwan
**Commenter Affiliation:**  Engineering Division, Albuquerque, NM
**Document Control Number:**  EPA-HQ-OW-2019-0372-0159-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

As discussed in the response to Section 4.1.4, the timing and duration of our monsoonal storm events makes it difficult to obtain grab samples from our scattered, often remote facilities, necessitating the use of refrigerated automated samplers. The City of Albuquerque has obtained cost estimates for the purchase and installation of 18 autosamplers at outfalls for 8 facilities that fall under MSGP requirements. These cost estimates, obtained from 3 local consultants range from $544,000 to $645,000. Additional annual operation and maintenance and sample collection cost estimates range from $108,000 to $212,000. Sample analysis costs are roughly $35,000.

Installation of these units doesn't guarantee occurrence of storm events or sufficient discharge to obtain a sample. In addition field parameters, such as temperature and pH would not be obtained. Therefore our options under this program are to continue to attempt to collect a grab sample at a low probability of collection or install expensive autosamplers that may give a slightly higher probability of sample collection for most parameters but yield no results for some constituents.

**Comment Response:**

Provisions in the 2021 MSGP do not require operators to collect samples during monsoonal storm events and provides flexibility due to adverse weather conditions that would prevent the collection of a sample. EPA notes that the use of autosamplers is optional and not required on the 2021 MSGP.

EPA acknowledges the reported costs by the commenter. EPA clarifies that the sampling cost specified in the cost impact analysis includes lab analysis cost, but does not include labor costs for sample collection, preparation and transportation. The number of sample collection events over the course of a permit term can vary widely among operators depending on multiple factors such as the overlapping frequencies for various monitoring requirements, sample collection preferences and potential issues (e.g., the need to re-sample a discharge point). Considering the complexity of estimating labor costs for sampling, EPA proposes a unit cost of $82.16 per operator per sampling event assuming average number of discharge points of 2.04 and an hourly wage rate of $35.96.

---

**Commenter Name:**  Howard Marks
**Commenter Affiliation:**  National Asphalt Pavement Association (NAPA)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0162-A1
**Comment Excerpt Number:**  4
**Excerpt Status:** Final

**Comment Excerpt:**

While the actual cost to include other universal benchmarks may not seem consequential, it still requires resources and monetary capital without clearly benefitting overall stormwater quality for those non-applicable sectors. We strongly urge that universal benchmark monitoring parameters are not adopted.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:**  Kim Lebak
**Commenter Affiliation:**  Newport News Nuclear BWXT-Los Alamos, LLC (N3B)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0163-A1
**Comment Excerpt Number:**  7
**Excerpt Status:** Final

**Comment Excerpt:**

Analytical costs for new universal benchmark parameters represent an unfunded mandate. For a small permit (six sites), our economic analysis indicates an annual cost of $1,128.24. This could be cost-prohibitive for larger permits.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 20
**Excerpt Status:** Final

**Comment Excerpt:**

In response to EPA "Request for Comment 10" proposing to require universal benchmark monitoring for pH, TSS, and COD for all MSGP permittees (all sectors): a. Pollutants in stormwater runoff are generated from specific source…

…b. The Cost Impact Analysis Item 4 fails to consider the labor, transportation, and assessment time associated with additional monitoring events.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

EPA clarifies that the sampling cost in the total incremental cost includes lab analysis cost, but does not include labor costs for sample collection, preparation, and transportation. The number of sample collection events over the course of a permit term can vary widely among operators depending on multiple factors such as the overlapping frequencies for various monitoring requirements, sample collection preferences, and potential issues (e.g., the need to re-sample a discharge point). Considering the complexity of estimating labor costs for sampling, EPA provides a unit cost of $82.16 per operator per sampling event, assuming average number of discharge points of 2.04 and an hourly wage rate of $35.96 96 in the cost impact analysis. EPA did not include this unit cost in the calculation of the total incremental cost; rather, EPA is providing it as a resource for operators to estimate sampling costs that reflect their site, monitoring requirements, and sample collection preferences.

---

**Commenter Name:** Ariel Hill-Davis
**Commenter Affiliation:** Industrial Minerals Association - North America
**Document Control Number:** EPA-HQ-OW-2019-0372-0177-A1

**Comment Excerpt Number:** 8
**Excerpt Status:** Final

**Comment Excerpt:**

IMA-NA does not support an increased administrative and financial burden on mine operators without a clearly articulated benefit to surface waters in the nation...

...The adoption of universal benchmarking will result in costly monitoring for operators that does not accurately reflect the mining industry's particular relationship to stormwater management. In particular, the inclusion of chemical oxygen demand ("COD") in the universal benchmarking is inappropriate for mine operations. A COD test measures the amount of oxygen removed from a body of water in the process of oxidizing organic pollutants. While COD tests are beneficial, if not necessary, to monitor discharges from facilities such as wastewater treatment plants with high concentrations of organic material it has little to no place monitoring waters from industrial mineral mine sites. Industrial mineral surface mining involves stripping the organic layer of soil; once this layer is removed, there is virtually no opportunity for any organic matter to enter the stormwater systems. Mineral processing does not introduce any organic materials or chemicals into the system. Furthermore, any industrial process water wastes would be covered under the NPDES program, which could include COD requirements as applicable and appropriate. In light of the fact industrial mineral sites do not produce materials that would register in a COD test, it is unreasonable to adopt it as part of the universal benchmarking required under the MSGP. The burden on operators to carry out additional testing unreflective of the industry and potential discharges is inappropriate. This is especially true for small operators. The costs associated with adopting universal benchmarking that includes a test irrelevant to industrial mineral operations are an unwarranted encumbrance.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:** Ram Singhal
**Commenter Affiliation:** Flexible Packaging Association (FPA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0182-A1
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, the costs of the proposed universal benchmark sampling, certainly are not, as argued by the NRC--and by extension, the EPA-- "relatively inexpensive." As observed in that Report, all permitted facilities are currently required to conduct visual monitoring of quarterly stormwater samples. (In contrast, FPA's members report that they currently are conducting monthly, or weekly, visual inspections of storm drains and storage areas exposed to stormwater,

based on existing permits and facility characteristics. Many also conduct storm water inspections after loading operations, and they collect and analyze stormwater after significant rain events.)

Importantly, assessment of pH, TSS, and COD would be costly, even on a quarterly basis. Most flexible packaging plants do not have on-site capability to sample and test stormwater for pH, TSS, and COD. And we emphasize, pH analysis of a sample needs to be performed immediately after sample collection and may require, depending on a State's regulations, a certified or trained person to perform the analysis. The cost of retaining contractors for onsite testing and analysis, therefore, is not inexpensive, particularly to smaller companies—even if it were limited to quarterly samples.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:** Bill Arcieri
**Commenter Affiliation:** DG Whitefield, LLC and Springfield Power, LLC
**Document Control Number:** EPA-HQ-OW-2019-0372-0188
**Comment Excerpt Number:** 3
**Excerpt Status:** Final

**Comment Excerpt:**

Moreover, the testing procedures and analytical costs for pH and COD are not as cheap or relatively straightforward as opined in the NRC study. EPA estimated the annual cost to address the UBM requirements would be $269 per year, as discussed in the Permit fact sheet (p.46), which seems woefully underestimated. The cost for COD analysis alone at a commercial laboratory is well over $100 per sample, which can quickly add up to over a $1,000 per year when sampling multiple discharge locations over multiple events. We understand that pH must also be tested within 15 minutes of sample collection and thus we would be required to purchase a pH meter and calibrations standards to maintain the calibration of this meter to ensure accurate readings. The purchase costs as well as the cost of additional staff time to collect and process samples and maintain meter calibration on a quarterly basis will also easily exceed thousands of dollars on an annual basis.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:** Angus E. Crane
**Commenter Affiliation:** North American Insulation Manufacturers Association (NAIMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0193-A1

**Comment Excerpt Number:** 5
**Excerpt Status:** Final

**Comment Excerpt:**

NAIMA and its members urge EPA to look closely at this unwarranted expansion of benchmark monitoring and recognize that with this comes significant increases in costs and additional compliance impacts for all companies, including many that are small businesses. NAIMA does not believe that EPA has thoroughly contemplated the impact to small businesses. Some NAIMA members are small businesses and would be drastically harmed by additional monitoring costs. These additional costs will surely be exacerbated by the current uncertainty of the construction industry caused by the corona virus pandemic.

**Comment Response:**

See response to DCN EPA-HQ-OW-2019-0372-0167-A1, Comment Excerpt Number 22.

---

**Commenter Name:** Caitlin McHale
**Commenter Affiliation:** National Mining Association
**Document Control Number:** EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:** 17
**Excerpt Status:** Final

**Comment Excerpt:**

### III. Cost Implications

While the NRC Study and EPA estimated that the additional costs of sampling for these parameters would be minimal, the costs our members will incur are not limited to the sampling itself. Other costs include staff training, sample transport (which can be especially costly if from remote areas), lab coordination including the contracting, scheduling, and invoicing of lab services, data validation, data compilation, and complicated exceedance tracking with the new AIM triggers. One of our members estimated that benchmark monitoring at their site currently costs approximately $3,000 per quarter. If monitoring requirements increase as proposed, that cost will dramatically increase as well. The NRC Study's justification for this data collection effort is that the data will provide "broad, low-cost indicators of the effectiveness of stormwater control measures on site."[24] As explained previously, sampling for these parameters is not low cost, and most importantly, these parameters are not necessarily indicators of effectiveness of stormwater control measures. For these reasons, EPA should not finalize the proposed universal benchmark monitoring parameters.

[24] 2019 NRC Study at 6.

**Comment Response:**

See the response to the DCN EPA-HQ-OW-2019-0372-0167-A1 (Comment Excerpt Number 22), and DCN EPA-HQ-OW-2019-0372-0174-A1 (Comment Excerpt Number 20).

---

**Commenter Name:** Marge Morneau
**Commenter Affiliation:** RELCO Compliance Services
**Document Control Number:** EPA-HQ-OW-2019-0372-0212-A1
**Comment Excerpt Number:** 4
**Excerpt Status:** Final

**Comment Excerpt:**

EPA estimates the incremental cost impact from this Proposed Rule to be $472.75/year for each permitted Facility. This cost estimate is magnitudes below what the actual costs will be. For our facility, just the additional cost of the Benchmark monitoring will be over $425 plus containers plus labor plus delivery or shipping to the laboratory. Then there will also be additional administrative work with handling the return paperwork and evaluating the results. EPA estimates of incremental costs are incorrect and these additional costs represent an unfair burden on small business.

**Comment Response:**

EPA recognizes that costs of compliance will vary considerably among and even within industrial sectors. The cost estimates included in the proposed and final MSGP are industry averages and incremental costs. Therefore, it does not represent the actual cost for any particular facility or a specific industrial sector. Instead, it designates an average cost considering all applicable industrial sectors. EPA also acknowledged that the annual incremental compliance costs for benchmark monitoring cost specified in the cost analysis do not include the sample collection, preparation, and transportation cost. Therefore, EPA updated 2021 MSGP Cost Impact Analysis to add a unit cost of $82.16 per operator per sampling event.

---

**Commenter Name:** Alan L. Prouty
**Commenter Affiliation:** J.R. Simplot Company
**Document Control Number:** EPA-HQ-OW-2019-0372-0231-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmark monitoring requirements are overly burdensome in they have a high cost of compliance and will be time-consuming to implement, from both a labor and laboratory analytical cost burden perspective, especially for a property with many outfalls. Benchmark monitoring conducted under the 2015 MSGP should be considered as adequate data for the 2020

MSGP since it was reported in the EPA 2020 MSGP Factsheet that 55% of permitted facilities were required to do benchmark monitoring for the 2015 MSGP. As such, the 2015 MSGP benchmark monitoring data provides a large data set sufficient for decision making. Benchmark monitoring requirements should be based solely on industrial activities' risk to receiving waters. The laboratory analytical costs and labor and sample prep/shipping costs per quarter associated with benchmark monitoring effort at an average facility with three outfalls is estimated at $1,395 (see Table 1). The cost estimate included the following tasks: laboratory analytical costs, sample collection, sample bottle preparation, sample bottle shipping, data management, data validation, reporting, and administrative tasks such as setting up contracts with laboratories, consultants, and invoices.

**Table 1**
**Costs for Proposed Universal Monitoring**

| Benchmark Sampling Laboratory Analytical Costs and Labor and Sample Prep/Shipping Costs Per Quarter | Rate | Quantity | Total |
|---|---|---|---|
| Laboratory Analytical Costs | | | |
| pH | $10 | 3 | $30 |
| TSS | $10 | 3 | $30 |
| COD | $40 | 3 | $120 |
| Sample Collection | $65 | 3 | $195 |
| Sample Bottle Prep | $65 | 1 | $65 |
| Cooler and Ice Costs | $100 | 1 | $100 |
| Sample Shipping Cost | $50 | 1 | $50 |
| Data Management/validation | $115 | 1 | $115 |
| Reporting | $115 | 2 | $230 |
| Administrative (contracts and invoices) | $115 | 4 | $460 |
| | | Sum | $1,395 |

Assumes labor cost of technician = $65/hour
Assumes labor cost of environmental engineer = $115/hour
Estimate assumes benchmark sampling
Costs for chemical preservatives and bottles were included in the lab costs
Assumes average facility has 3 outfalls

**Comment Response:**

See the response to DCN EPA-HQ-OW-2019-0372-0174-A1 (Comment Excerpt Number 20), and DCN EPA-HQ-OW-2019-0372-0212-A1(Comment Excerpt Number 4).

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

Universal benchmarks are proposed to be applied across all regulated entities and require quarterly analysis of TTS, pH, COD. As the National Academies paper indicates, only four states currently have one or more of these parameters as industry wide benchmarks. The National Academies paper also suggests that sampling costs for these three parameters is only $100. It should be noted that the costs estimated by the National Academies study include only the lab

analytical costs and do not include any costs incurred by staffing, mobilization, or equipment and materials.

...The costs of quarterly benchmark monitoring for Sector P facilities for the proposed parameters are estimated between $5,000 - $12,500 per facility per year. This estimate includes the cost of staffing, lab analysis, and equipment and materials and will vary greatly depending on the number of permitted outfalls.

**Comment Response:**

See the response to DCN EPA-HQ-OW-2019-0372-0174-A1(Comment Excerpt Number 20), EPA-HQ-OW-2019-0372-0212-A1(Comment Excerpt Number 4), and, DCN EPA-HQ-OW-2019-0372-0167-A1 (Comment Excerpt Number 22).

---

**Commenter Name:** Glen P. Kedzie
**Commenter Affiliation:** American Trucking Associations (ATA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0244-A1
**Comment Excerpt Number:** 18
**Excerpt Status:** Final

**Comment Excerpt:**

The EPA's cost estimates per facility over the 5-year permit period are grossly underestimated. In discussions with fleets over the costs of quarterly benchmark monitoring for Sector P facilities under the new proposed parameters, annual monitoring cost estimates per facility ranged between $5,000 - $12,500 compared to current annual monitoring costs per facility ranging between $0 - $1,900. These estimates include the cost of staffing, lab analysis, and equipment and materials, and varies greatly depending on the number of permitted outfalls.

**Comment Response:**

See the response to DCN EPA-HQ-OW-2019-0372-0212-A1, Comment Excerpt Number 4.

---

**Commenter Name:** No Name
**Commenter Affiliation:** Food and Beverage Issues Alliance (FBIA), et al.,
**Document Control Number:** EPA-HQ-OW-2019-0372-0252-A1
**Comment Excerpt Number:** 19
**Excerpt Status:** Final

**Comment Excerpt:**

*D. Benchmark Monitoring is Burdensome and Costly*

EPA proposes that all facilities monitor for three "universal" benchmarks: pH, COD and TSS. The rationale is that these parameters can be a low-cost method of detecting issues with stormwater contamination. However, EPA has not taken into consideration the full cost and impact of taking these samples four times a year, with possible multiple outfall locations per facility, for five years.[59] These samples would have to be analyzed in accordance with EPA's required test procedures."[60] This would require use of qualifying third-party labs or require facilities to have staff qualified to perform these tests. Quarterly visual samples, which are currently required in the 2015 MSGP and would still be required in the proposed 2020 MSGP, do not have to be collected and analyzed consistent with EPA test procedures. Although some state permits require some chemical monitoring, many facilities in the food and beverage industry do not have chemical monitoring requirements (Federal or state). Further, in combination with applicable AIM Tiers 1, 2 and 3, the outcome of the monitoring could be the extremely expensive (and likely unnecessary) implementation of SCMs specified in the new proposed Appendix Q.

In its proposal EPA seems to "assume" that NRC was recommending that the AIM measures should be applied to all facilities and universal benchmarks.[61] We are confident that NRC did not intend for AIM measures to be applied to universal benchmarks for two reasons: (1) there was no data review by NRC on each sector as to whether a given pollutant warranted monitoring for the sector and applicable benchmarks were achievable; and (2) NRC expressly indicated that it favored this approach because the additional cost burden was "small."[62] The small cost burden description would certainly not apply to implementation of SCM measures at a cost of tens or hundreds of thousands of dollars.[63] We believe that NRC was looking for a low-cost measure of having some chemical data that may be indicative of potential issues at low cost, and not automatically trigger implementation of SCM measures.[64]

As discussed above, EPA had already proposed the addition of one of these three parameters, TSS, in the draft 2005 MSGP. It received multiple comments in opposition to the TSS monitoring and the derivation of the TSS benchmark.[65] It did not finalize those requirements, stating it would leave this issue until after NRC completed its 2009 report. Yet, EPA does not attempt to address these comments in the 2020 proposal, although the same arguments are largely applicable today.

At a minimum, EPA should follow NRC's advice and review available data, or obtain data for each sector, before imposing these monitoring requirements and heavy related obligations.

[59] According to one member of the International Dairy Foods Association (IDFA), in those facilities in states that currently require chemical sampling, getting a quality sample within the appropriate time frame is very challenging and can undermine the effectiveness and predictive value of the monitoring program.

[60] 40 CFR Part 136, EPA's "Guidelines Establishing Test Procedures for the Analysis of Pollutants."

[61] 2020 MSGP Fact Sheet at 60.

[62] 2019 NRC Report at 28.

[63] We do not agree that the costs associated with chemical monitoring and analytical testing is "small." Considering the number of tests, frequency of testing, number of outfalls per facility, laboratory fees and SWPPP changes, the cost impacts of EPA's proposal can easily run thousands of dollars per facility, exclusive of employee time. Even EPA's cost estimate of less than $100 per year for analytical testing for all three of the universal benchmark parameters is not realistic. Some of our members currently are required to do chemical monitoring under state permits report testing costs for each sample of $60- 80 for each parameter.

[64] This explained in more detail in the 2006 Tetra Tech memorandum that was cited by the NRC in support of this recommendation.

[65] Response to Comment pages 17-18, 136-138, 2006 MSGP (EPA 2006); 2006 Association of American Railroads Comment at 4-12; 2006 WESTCAS Comment at 5-7; 2006 FSWA Comment at 6-8.

**Comment Response:**

EPA excluded the proposed universal benchmark monitoring requirements for all applicable sectors and Appendix Q that included stormwater control measures (SCM) implementation that would have been used under AIM corrective action responses. EPA simplified the Additional Implementation Measure (AIM) requirement language so that the AIM Levels are sequential and built off the baseline (MSGP trigger of 4 quarter annual average exceedance). EPA includes analytical "report only" indicator monitoring requirements for pH, Total Suspended Solids (TSS), and Chemical Oxygen Demand (COD) for certain sectors quarterly for the duration of the permit. This requirement will incur additional compliance costs for the following subsectors that do not have sector-specific benchmark monitoring requirements in the 2021 MSGP: B2, C5, D2, E3, F5, I1, J3, L2, N2, O1, P1, R1, T1, U3, V1, W1, X1, Y2, Z1, AB, AC, and AD. EPA has updated the 2021 MSGP Cost Impact Analysis accordingly to reflect these changes.

EPA disagrees with the comment stating, "*EPA has not taken into consideration the full cost and impact of taking these samples four times a year, with possible multiple outfall locations per facility, for five years*". Wherever feasible, EPA included incremental annual cost per facility considering average outfall, incremental sampling frequency, and full permit term. The yearly incremental indicator monitoring cost for pH, TSS, and COD is estimated at $407 - $463 per operator assuming a full permit term coverage, 20 incremental samples, an average sampling and analysis cost of pH, TSS, and COD of $46.96 (considering a total sampling quote for 3-pollutants from third party laboratories) and an average number of 2.04 discharge points per operator.

## CIA.V.E.5. Cost Impact Analysis - Monitoring: Inspection-only Option in Lieu of Benchmark Monitoring

**Commenter Name:** Melanie Davenport
**Commenter Affiliation:** Commonwealth of Virginia Department of Environmental Quality

2021 EPA MSGP Response to Comments
January 15, 2021

(DEQ)
**Document Control Number:** EPA-HQ-OW-2019-0372-0146-A1
**Comment Excerpt Number:** 6
**Excerpt Status:** Final

**Comment Excerpt:**

We do not believe that such inspectors would need to be professional engineers, as this may make the cost of such an approach infeasible (see EPA cost document, pg. 52), and appropriate stormwater management training should be sufficient.

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:** Travis Deti
**Commenter Affiliation:** Wyoming Mining Association (WMA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0166-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Cost for the inspection only option should be reduced. Reducing the number of inspections to one per the permit term and allowing qualified personnel, including in-house personnel, to conduct the inspection will ensure this option is cost effective and accessible for low-risk facilities.

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:** No Name
**Commenter Affiliation:** POWER Engineers, Inc.
**Document Control Number:** EPA-HQ-OW-2019-0372-0174-A1
**Comment Excerpt Number:** 25
**Excerpt Status:** Final

**Comment Excerpt:**

Cost considerations

1. Based on the Cost Impact Analysis, EPA acknowledges that the P.E. driven inspections are more expensive than benchmark monitoring. These costs would be reduced by re-evaluating the Professional Inspector Credentials discussed in item c above.

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:**  Ariel Hill-Davis
**Commenter Affiliation:**  Industrial Minerals Association - North America
**Document Control Number:**  EPA-HQ-OW-2019-0372-0177-A1
**Comment Excerpt Number:**  6
**Excerpt Status:** Final

**Comment Excerpt:**

As to the practical application of inspections in lieu of benchmark monitoring, IMA-NA would ask EPA to consider allowing flexibility in the choice of inspector. The Association does not believe the Agency should require the inspection to be done by a Professional Engineer ("PE"). Part of the benefit of an inspection-only low-risk designation is the money, resources, and staff time operators will save from the burdens of benchmark monitoring. If operators need to engage with a third-party PE to accomplish the inspection a significant portion of the cost savings benefit will disappear. Assuming there will be tremendous natural overlap between low risk facilities and small operators the financial burden of contracting a PE is not insignificant.

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:**  Justin Barkowski
**Commenter Affiliation:**  American Association of Airport Executives (AAAE)
**Document Control Number:**  EPA-HQ-OW-2019-0372-0183-A1
**Comment Excerpt Number:**  5
**Excerpt Status:** Final

**Comment Excerpt:**

AAAE recognizes that EPA's cost impact analysis indicates that the inspection-only option would be more expensive than universal benchmark monitoring.[2] (Cost Impact Analysis, at 49–52.) However, these calculations depend on a series of assumptions regarding the scope and requirements for the inspection that should be adjusted. In terms of frequency of inspections, EPA assumes two comprehensive site inspections conducted by a certified, professional inspector during the five-year permit term. (Id. at 49.) AAAE believes one inspection is more appropriate and would be consistent with the recommendation from the NRC Study. (NRC Study, at 56.) That change alone would reduce cost estimate significantly. AAAE also suggests that the airport operator could conduct most of the inspection itself instead of relying heavily upon a certified inspector. Airports already have a great deal of experience self-inspecting existing outfalls. The inspector could instead perform an oversight role to ensure the accuracy of the records and representations being made by the airport operator. This would also reduce costs for facilities while not compromising the quality and value of the inspection. These are common sense adjustments that should be made, especially for facilities that by definition are considered low risk.

[2] Based on a series of assumptions made, EPA estimated the total cost for all applicable facilities over a five-year permit term would be $4,607,400 for universal benchmark monitoring compared to $7,180,920 for an inspection-only option. (Cost Impact Analysis for the Proposed 2020 Multi-Sector General Permit (MSGP), at 6 (hereinafter "Cost Impact Analysis"). (EPA-HQ-OW-2019-0372-0063.))

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:** Emily W. Coyner
**Commenter Affiliation:** National Stone, Sand & Gravel Association (NSSGA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0196-A1
**Comment Excerpt Number:** 7
**Excerpt Status:** Final

**Comment Excerpt:**

Cost for an outside inspector to evaluate an aggregates operation would involve travel to often remote areas and based on the size of the operation range from $2,000 to $6,000 or more (possibly multiplied by 4 quarterly inspections per year). This is not an insubstantial sum, particularly for small business, and would for safety reasons require site personnel stop their current work to accompany an inspector.

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

---

**Commenter Name:**  Caitlin McHale
**Commenter Affiliation:**  National Mining Association
**Document Control Number:**  EPA-HQ-OW-2019-0372-0201-A1
**Comment Excerpt Number:**  21
**Excerpt Status:** Final

**Comment Excerpt:**

III. Cost of Inspection-Only Option

NMA is concerned that EPA's evaluation of the cost of the inspection-only option refutes the entire purpose of creating this option. Specifically, EPA acknowledged that "costs show the inspection-only option *may not be a viable alternative and that benchmark monitoring may be more cost effective* for operators."[30] We do not understand why EPA would propose to create an entirely new regulatory framework for the express purpose of easing the burdens of expensive monitoring procedures for smaller facilities that "may also have limited financial resources" when that framework is more expensive than the monitoring itself. If it is not cost effective for the facilities it is intended to assist, then EPA should seriously consider revising the requirements for this option. These costs can be significantly reduced by reducing the number of inspections to once per permit term and allowing onsite qualified personnel to conduct the inspection. These reduced regulatory burdens and costs could make this option more cost effective and accessible for low-risk facilities.

[30] Id. (emphasis added).

**Comment Response:**

EPA decided not to include an inspection-only option in-lieu of benchmark monitoring in the final 2021 MSGP. EPA updated the cost analysis accordingly to reflect this change.

FS.General. Fact Sheet - General

**Commenter Name:**  Kevin Bromberg
**Commenter Affiliation:**  Bromberg Regulatory Strategy, LLC
**Document Control Number:**  EPA-HQ-OW-2019-0372-0076-A2
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

Second, I would urge EPA to review the proposed fact sheet and the proposed permit's section 8 to correct or reconfirm the accuracy (and consistency) of all the proposed 2020 MSGP chemical specific benchmarks. My colleagues have noted multiple apparent errors and inconsistencies between these two important documents, causing confusion and unnecessary work in developing appropriate comments on the benchmarks. I discussed this with EPA staff on Monday, March 23. I hope that EPA will review and correct these apparent errors immediately, update the docket with corrected versions as soon as possible, and provide public notice so that the public will have more accurate information for public comment. Such actions will help protect against confusion in developing public comments and for the Agency in interpreting public comments, saving time and effort for both in the process.

Among the examples are (not a complete list):

**Fact Sheet Errors:**

(1) Copper seawater benchmark should be 4.8 ug/l not 48 ug/l. (units conversion error)
(2) Hardness dependent nickel benchmark for 100 mg/l should be 470 ug/l, not the 47 ug/l listed in the table. (units conversion error)

**Fact Sheet Inconsistent with Section 8 of Permit**

(1) Hardness dependent nickel benchmark for 100 mg/l listed as 47 ug/l in factsheet (should be 470 ug/l) but section 8 of the permit lists this as 420 ug/l.

**Comment Response:**

EPA agrees that the proposed 2020 MSGP and fact sheet included typographical errors, as noted in the comment. EPA has corrected the permit and fact sheet to reflect the applicable saltwater benchmark for copper (4.8 µg/L) and freshwater benchmark for nickel (470 µg/L).

---

**Commenter Name:** Ed Dunne
**Commenter Affiliation:** Department of Energy & Environment (DOEE), Government of the District of Columbia DC
**Document Control Number:** EPA-HQ-OW-2019-0372-0229-A1
**Comment Excerpt Number:** 12
**Excerpt Status:** Final

**Comment Excerpt:**

Pages 6-7 - DOEE recommends mandatory training for operators, especially since EPA provides online training. Some form of certification, such as a printout or email database registry, should be available for inspectors to ensure training has occurred.

**Comment Response:**

EPA declines to require mandatory training for operators. The NRC study recommendation, as cited in the proposed 2020 MSGP Fact Sheet section referenced in comment, suggested that EPA update and strengthen industrial stormwater monitoring, sampling, and analysis protocols and training to improve the quality of monitoring data. Although EPA recognizes the benefits of developing a new comprehensive industrial stormwater training or professional certificate program, establishing such a program would require significant time, resources, and indefinite EPA staff commitment, and is outside the scope of the permit and capabilities of EPA's industrial stormwater program at this time. EPA will continue to share information aimed at reducing the impacts of industrial stormwater including information related to implementation.

Part 2.1.2.8 requires operators to provide training to ensure personnel who are responsible for conducting and documenting monitoring and inspections, as required in Parts 3 and 4 respectively, understand the requirements of the permit and their specific responsibilities. Part 6.2.5.1.e requires operators to document employee training in the SWPPP, including the training content, frequency/schedule, and log of dates on which employees received training.

## FS.IV. Fact Sheet - Summary of Proposed Changes from the 2015 MSGP

**Commenter Name:** Nancy S. Allen
**Commenter Affiliation:** Office of Environmental Programs, City of Phoenix
**Document Control Number:** EPA-HQ-OW-2019-0372-0170-A1
**Comment Excerpt Number:** 22
**Excerpt Status:** Final

**Comment Excerpt:**

EPA is proposing to update the existing sector-specific fact sheets that include information about stormwater pollution prevention for each sector. These fact sheets are also proposed to be used when implementing Tier 2 AIM as implemented in the Appendix Q checklists (see MSGP Part 5.2.2.2). For the final permit, EPA will consider comments received and replace the current Table 2 contained in each of the sect or-specific factsheets with the updated information in Appendix Q.

1. Fact sheets are not considered part of the permit. Any requirements in the fact sheets that are expected to be implemented as part of the permit must also be included in the MSGP.

**Comment Response:**

See Comment Response Essay 4 Proposals Not Finalized.

---

**Commenter Name:** Carolyn M. Fiore
**Commenter Affiliation:** Massachusetts Water Resources Authority (MWRA)
**Document Control Number:** EPA-HQ-OW-2019-0372-0225-A1

**Comment Excerpt Number:** 23
**Excerpt Status:** Final

**Comment Excerpt:**

EPA suggests using automated samplers to collect composite samples and eliminate the need for a person to physically collect samples. In MWRA's experience, this is impractical for stormwater sampling. Permittees would need to obtain multiple autosamplers, each with a flow sensor. The flow sensor would likely not work properly in locations that have standing water in dry weather, or where the stormwater flows through a channel in the silt that builds up on the bottom of the drain, in spite of routine maintenance. **In practice stormwater sampling requires a human sampler to determine where the water is and whether it is flowing, in order to capture a representative sample for each event.**

The last sentence of this section suggests using "electronic sensors and data loggers" for pH and some other parameters. However the permit (part 4.1.4) specifically requires grab samples for pH.

**Comment Response:**

EPA emphasizes that the 2021 MSGP does not require composite sampling; rather, the 2021 MSGP allows operators to use composite sampling as an alternative to grab sampling for indicator monitoring and benchmark monitoring in most situations, as the NRC study recommended.

EPA acknowledges that a person would need to initially setup the sampler and ensure it's ready to capture a representative sample prior to storm events, but a human sampler would not need to be present during the actual storm event. For automated sampling, an operator could install an automatic sampler at the end of a flume, weir, or other similar device to direct the stormwater to a collection point. The sampler could be set up to collect samples on some interval, and, depending on the equipment, may be able to combine individual samples automatically into a composite sample. Automated samplers can also collect either flow-weighted or time-weighted composites. Using automated samplers can eliminate the need for a person to physically collect samples.

Part 4.1.4 of the proposed 2020 MSGP stated, "Composite sampling may not be used to measure parameters that have a short holding time for processing or that degrade or transform quickly such as pH…" EPA clarifies in Part 4.1.4 of the final 2021 MSGP that composite sampling may not be used in situations where hold times for processing or sample preservation requirements cannot be satisfied. For parameters measured in-situ, such as dissolved oxygen, conductivity, pH, or temperature, composite sampling may be allowed where the sampling method is modified by calculating an average of all individual measurements.

**Commenter Name:**  Jared R. Wigginton
**Commenter Affiliation:**  Baker Botts L.L.P
**Document Control Number:**  EPA-HQ-OW-2019-0372-0255-A1
**Comment Excerpt Number:**  2
**Excerpt Status:** Final

**Comment Excerpt:**

**A. CCIG Supports EPA's Effort to Streamline the MSGP.**

EPA proposes to streamline the MSGP by simplifying its language, reordering its sections, and otherwise improving its readability.[3] CCIG generally supports this proposal. Revising the MSGP in this manner should promote compliance and transparency by clarifying MSGP requirements for regulated entities and the public. With that said, several of CCIG's recommendations addressed below arise from MSGP provisions that remain ambiguous or otherwise unclear as proposed. Consistent with EPA's general effort to streamline the MSGP, CCIG encourages the Agency to accept those recommendations and, as appropriate, otherwise clarify MSGP provisions.[4]

[3] 85 Fed. Reg. at 12,291-12,292.

[4] CCIG notes that Part 4.2.2.1, Table 6-1, refers to Part 8.O.8 effluent limitations, which do not exist. CCIG believes that this reference is intended to refer to Part 8.O.7 effluent limitations.

**Comment Response:**

EPA acknowledges the comment's support for EPA's efforts to streamline the MSGP.

With changes to Part 8 of the 2021 MSGP, including the additional of indicator monitoring requirements, the effluent limitations for discharges from coal storage piles at Steam Electric Generating Facilities are now in Part 8.O.8. EPA checked Table 2-1 (Stormwater-Specific Effluent Limitations Guidelines) of the 2021 MSGP Fact Sheet and confirms the correct reference.