# Exhibit L



**Division of Surface Water**
**Response to Comments**

**National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Storm Water Associated with Industrial Activity (Multi-Sector General Permit)**

**Ohio EPA General Permit No.:  OHR000006**

<u>Agency Contacts for this Permit</u>

Division Contact:                        Jason Fyffe
                                               Division of Surface Water
                                               (614) 728-1793
                                               Jason.Fyffe@epa.ohio.gov

Public Involvement Coordinator:     Mary McCarron
                                               Public Interest Center
                                               (614) 644-2160
                                               Mary.McCarron@epa.ohio.gov

Ohio EPA held a public hearing and information session on January 9, 2017 regarding NPDES General Permit for Discharges of Storm Water Associated with Industrial Activity (OHR000006). This document summarizes the comments and questions received at the public hearing and/or during the associated comment period, which ended on January 16, 2017.

Ohio EPA reviewed and considered all comments received during the public comment period. By law, Ohio EPA has authority to consider specific issues related to protection of the environment and public health. Often, public concerns fall outside the scope of that authority. For example, concerns about zoning issues are addressed at the local level. Ohio EPA may respond to those concerns in this document by identifying another government agency with more direct authority over the issue.

In an effort to help you review this document, the questions are grouped by topic and organized in a consistent format.  The name of the commenter follows the comment in parentheses.

<u>General</u>

Comment 1:            **Though Part 4.3 of the previous general permit (OHR000005) regarding comprehensive site inspections was removed from this draft general permit renewal, there remain some references to Section 4.3, as follows which should be corrected:**

- **Part 8.D.3.1 (page 44)**
- **Part 8.E.4.1 (page 46)**
- **Part 8.J.8.1 (page 58)**

**Response 1:**    Ohio EPA agrees with this comment and the reference to Part 4.3 for the noted above Parts has been corrected within the final permit. Inactive and unstaffed facilities which have permit coverage are required to conduct an annual site inspection in accordance with Part 4.1 of the final permit. This is consistent with U.S. EPA's 2015 Multi-Sector General Permit.

## Part 2

**Comment 2:**    **"Economically practicable and achievable in light of best industry practice" continue to be vague terms. Is there a test that will be used to determine this? There are concerns this will not be equally applied to all permittees.** *(The David J. Joseph Company)*

**Response 2:**    Ohio EPA's NPDES industrial storm water multi-sector general permit requires that the potential for storm water exposure from outdoor wastes, industrial materials, leaks, spills and other releases, which are major sources of storm water pollution, be minimized. The term "minimize" is defined, for the purposes of this permit, as "to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices." Examples of feasible actions that can be done in compliance with corrective action include, but are not limited to, covering materials, moving materials indoor or under roof, placing materials on pallets to prevent surface contact, avoid waste disposal while it's raining, etc.

Ohio EPA expects the great majority of permittees performing corrective actions (for any of the situations described in Part 3) will determine there are modifications that can be made to the control measures that are technologically available, economically practicable and achievable, and commonly employed in the industry. Such a determination must be made by "qualified personnel" as defined in Appendix A of the permit. Qualified personnel are those who possess the knowledge and skills to assess conditions and activities that could impact storm water quality at the facility, and who can also evaluate the

effectiveness of control measures. The permittee is not required to retain a professional engineer or other consultant in order to make this determination.

OHR000006 provides considerable flexibility to permittees in selecting the control measures used to meet the permit's technology-based and water quality-based effluent limits, and Ohio EPA recognizes that the control measures needed to adequately minimize pollutants will vary considerably for each facility. For example, OHR000006's good housekeeping technology-based effluent limit requirement does not specify the frequency with which potential sources of pollutants must be swept or vacuumed. If an exceedance of the four-quarter benchmark average for TSS occurs, and site cleanliness is a suspected or likely cause, a possible corrective action could be to increase the frequency of the sweeping or vacuuming. If successful, permittees would have to document this corrective action as a SWPPP modification.

It is also U.S. EPA's and Ohio EPA's experience that, in many cases, benchmark exceedances are often the result of control measures being improperly implemented or maintained (e.g., open dumpsters, leaking fuel tanks, open valves). As a result, U.S. EPA has determined that proper implementation and regular maintenance of storm water controls are technologically available and economically practicable for all permittees, and thus has made these permit requirements in the federal MSGP and OHR000006 is consistent. However, where permittees have examined their control measures and determined, after considering good engineering practices, that no further pollutant reductions are technologically available and economically practicable for any pollutant, no SWPPP modifications are required (provided that Part 6.2.2 effluent limitations are being met, if applicable).

Ohio EPA may choose to inspect such facilities to assess the validity of the operator's determination that no further pollutant minimization is possible. In reviewing permittees' determinations that additional corrective actions are not technologically available and economically practicable in order to meet the technology-based effluent limits, Ohio EPA may consider whether there are control measures or practices that other facilities are currently implementing where the costs of the controls are reasonable so that facilities do not experience undue economic hardship. If

questions arise, Ohio EPA encourages permittees to contact their Ohio EPA District Office for assistance and guidance.

In most cases, commonsense pollution prevention oriented storm water control modifications will be possible for facilities to make corrective actions, such as benchmark exceedances. A determination that no further pollutant reductions are technologically available and economically practicable and achievable will be highly site-specific, and must be based on well-documented engineering judgment. Again, the permittee is not required to retain a professional engineer or other consultant in order to make this determination. Ohio EPA notes that if existing facilities subject to benchmark monitoring have previously made such a determination under OHR000005, they still must conduct benchmark monitoring under OHR000006. However, if benchmark concentrations are again exceeded under OHR000006, existing permittees may rely on their previous rationale supporting a determination that no further pollutant reductions are technologically available and economically practicable, provided that there have been no significant changes in the facility's operation that could impact the level of pollutants in storm water discharges. In such circumstances, there is no ongoing requirement to undertake corrective actions to modify storm water controls or to expend additional resources to justify a determination that no further pollutant reductions are technologically available and economically practicable.

Ohio EPA recognizes each industry is unique with specific resources and needs pursuant to maintaining operations. As a result, the agency chooses to evaluate **"economically practicable and achievable in light of best industry practice"** on a case-by-case basis.

## Part 3

**Comment 3:**        <u>Parts 3.1 and 3.2</u>. **The section states that if "you find in your routine facility inspection or quarterly visual assessment that your control measures are not being properly operated and maintained..." It is not clear what would be considered minor and not trigger corrective action reporting.  This requirement is too onerous if corrective action reporting is expected for minor issues that can be immediately corrected (e.g., replacing a sediment log).** *(The David J. Joseph Company)*

**Response 3:**    Parts 3.1 and 3.2 of OHR000006 identify events which require corrective actions in accordance with Parts 3.3 and 3.4. Replacing control measures, such as a sediment log, could require corrective action depending upon the situation.

If replacing the control measure after inspections and/or general knowledge indicate the control measure is or soon will be in need of replacement, it is considered simply routine maintenance. This would not be an event requiring corrective action. For example, it would be routine maintenance if you replaced the sediment log because it was beginning to rip/deteriorate. Whereas, if the sediment log was completely deteriorated then this would require corrective action because the control measure was obviously not being properly operated and maintained. This same logic would apply to all control measures regarding when corrective action would be required.

## Part 4

**Comment 4:**    **Part 4.2.3. The permit should address non-business hours under all exceptions and monitoring stations. If the expectation is the permittee must conduct monitoring during non-business hours (even in the middle of the night) then this should be clarified throughout the permit in relevant storm water monitoring sections.** *(The David J. Joseph Company)*

**Part 4.2.3. All potential hazards to employee safety should be addressed, not just adverse weather. For example, some facilities are located in areas where there is increased risk of crime during evening hours. Sampling during night time hours poses unique challenges with regard to employee safety, in particular working in and around a surface water body during wet weather, as visibility is reduced. It is recommended that the addition of a section that addresses employee safety and facility security be added.** *(The David J. Joseph Company)*

**Response 4:**    The general permit does not have the expectation that a facility conduct quarterly visual assessments of storm water discharges during non-business hours. Part 4.2 of the general permit is very flexible and only requires that a permittee select one storm event per quarter and take a grab sample to be visually inspected. The general permit stipulates that the grab sample be taken within the first 30

minutes of an actual discharge from a storm event and that the discharge be at least 72 hours (3 days) from the previous storm water discharge.  In the case of snowmelt, the sample can be taken anytime during a discharge.

Part 4.2.1 of the general permit does provide language that, if it is not possible to collect the sample within the first 30 minutes of a discharge, the permittee can collect the sample as soon as practicable after the first 30 minutes and document why it was not possible to collect within the first 30 minutes of discharge. Additionally, if no rain events were to occur during normal working hours for a permittee for an entire quarter, this could be documented as an "Adverse Weather Conditions" per Part 4.2.3. Ohio EPA feels that the general permit does provide enough flexibility that samples can be taken during normal working hours. No permit changes were made based on this comment.

## Part 5

**Comment 5:**        <u>**Part 5.1**</u>**. It is not always practicable to keep physical copies of relevant portions of other facility documents in the SWPPP itself. This makes document versions more difficult to track and update and it also contradicts what is stated in Section 5.1.5.1. This should be revised to read "when the SWPPP refers to procedures in other facility documents, those facility documents must be made readily available to the Storm Water Pollution Prevention Team."** *(The David J. Joseph Company)*

**Response 5:**       Any documents which the SWPPP references for incorporation into the SWPPP must be available on site. This could be in either hard copy format or electronically. Language has been added to Part 5.1.5.1 to clarify that an electronic version is acceptable.

**Comment 6:**        <u>**Part 5.3**</u>**. SWPPP Availability states that "Ohio EPA may provide access to portions of your SWPPP to a member of the public upon request". If it is the intent of Ohio EPA to emulate the 2015 Federal MSGP requiring industrial permit holders to post a copy of their SWPPP at a URL, then we strongly resist this approach. Such a requirement could expose vulnerabilities at a plant (and/or other locations) for undesirables to exploit and cause harm and/or damage to people or facilities. We respectfully suggest the language clearly require that the SWPPP be available upon a request to the industry**

directly rather than through Ohio EPA or via a URL.
[*City of Akron Water Reclamation Services (AWRS)*]

**Flexible Pavements of Ohio affirms the inclusion of this language within Part 5.3 of the general permit. It provides some measure of confidentiality and protection from ill-intentioned actions against a permit holder.**
[*Flexible Pavements of Ohio (FPO)*]

**Response 6:** Unlike the 2015 Federal MSGP, OHR000006 does not require a permittee to post their SWPPP at a URL. Language within Part 5.3 requires that a permittee's current SWPPP or information from your current SWPPP be made available to the public on request. An exception to this, includes any confidential business information (CBI) or restricted information, but the permittee must clearly identify the potions of the SWPPP that are being withheld from public access.

Ohio EPA does not require a permittee's SWPPP to be submitted to Ohio EPA unless specifically requested. However, if Ohio EPA has requested a copy of a permittee's SWPPP and has it on file, it is a public record which Ohio EPA must provide if a request is made. As such, any CBI information must be clearly identified if submitted to Ohio EPA to be withheld from the public. CBI information may not be withheld from those staff cleared for CBI review within Ohio EPA. No changes to this permit condition were made.

**Comment 7:** <u>Part 5.4</u>. **Please clarify that maintaining electronic versions of these documents is also acceptable. For example, our facilities complete all inspections electronically using an application on a mobile device and these inspection records are auto-uploaded to a dedicated SharePoint site in a PDF format. No paper records are generated.** *(The David J. Joseph Company)*

**Response 7:** Yes, it is acceptable to maintain records required by the permit in an electronic format as long as they are readily available for employee use and to Ohio EPA in the event of an inspection. Regarding inspection reports, these reports are required to include the certification statement found in Part B.11.E of the general permit and be signed by the personnel performing the inspection. If the mobile device allows the permittee's inspector to sign the inspection, this could simply be uploaded as described in the comment. However, if the mobile device doesn't allow for the

individual(s) performing the inspection to sign the inspection report on the mobile device, the inspection report would need to be printed, signed and could then be scanned to be saved electronically.

**Part 6**

**Comment 8:**        **Part 6.1.4. Storm Water Sampling during a Measurable Storm Event. The general permit continues to require the collection of storm water samples within the first 30 minutes of a measurable storm event ("first flush"). If it is not possible to collect the sample within the first 30 minutes, then the sample must be collected as soon as practicable and rationale for such failure be documented in the SWPPP.**

**Because of ongoing operational demands, it is often not feasible to grab samples within the first 30 minutes of a rain event. Manufacturing facilities are conducting ongoing operations with personnel busy performing operational duties. The thought to grab a storm water sample within the first 30 minutes of a rain event is probably not the top priority on the manufacturing floor. Ohio EPA needs to recognize this real-world timing demand and balance this time restriction with the need for the information within the first 30 minutes.**

**The current benchmarks in the general permit are based on very conservative assumptions, resulting in very low values that are difficult to achieve under most circumstances. Coupled with the requirement to compare these strict benchmarks against the "first flush" storm water, that typically reflects the worst storm water quality, makes complying with the benchmarks very difficult, if not impossible.**

**For example, the current benchmarks included in the general permit for the metals that are based on hardness reflect the lower Outside Mixing Zone Maximum ("OMZM") in Ohio's aquatic life water quality values. Instead, it is suggested that these benchmarks reflect higher Inside Mixing Zone Maximum ("IMZM") in Ohio's aquatic life water quality values. The IMZM values should be considered since the current storm water sampling requirements is the "first flush" which takes place within 30 minutes of the start of the discharge, which is more akin to a wastewater point source**

**discharge with IMZM requirements. One additional benefit of raising the metals benchmarks to the IMZMs would be to account for the contributions from non-industrial sources of these metals, such as zinc, while being protective of Ohio's water quality.**

**If Ohio EPA does not think it feasible to move to IMZM values, then Ohio EPA should consider moving to a longer sampling window, which would better reflect the purpose of using the lower OMZM as the benchmark. Other states (e.g., California, Washington and Oregon) have moved to much wider 12-hour sampling windows with justified reasoning.**

**A longer period of time (at least 4 hours) will adequately balance the purpose behind the sampling with the operational demands of a facility, allowing personnel time to grab the sample while not rushing off from the job at hand. Allowing more than 30 minutes provides better coordination with operational responsibilities and planning that will improve the quality of the sampling procedure.**

**As a result, it is recommended that Part 6.1.4 be revised to allow up to 12 hours after the measurable rain event to grab the storm water sample. As an alternative, we would recommend that at least 4 hours be provided.**
*(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, The Ohio Concrete Association, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 8:**     OHR000006's benchmark monitoring requirements provide facilities flexibility. OHR000006 requires that each storm water outfall, excluding substantially identical in accordance with Part 5.1.5.2, have four grab samples collected during the first 12 quarterly monitoring periods. Quarterly monitoring periods are as follows:
- Jan. 1 – March 31
- April 1 – June 30
- July 1 – Sept. 30
- Oct. 1 – Dec. 31

The only stipulation is that each quarter needs to be represented by a sample. Therefore, OHR000006 provides a total of 9 months for each quarter to collect a grab sample. Ohio EPA believes this benchmark monitoring schedule

provides sufficient flexibility to permittees to meet these requirements.

OHR000006 requires that benchmark monitoring be performed from a measurable storm event. The general permit defines a measurable storm event as a storm event that results in an actual discharge from your site and that follows the preceding measurable storm event by at least 72 hours (3 days). In the case of snowmelt, monitoring can be performed at any time a discharge is occurring from your site.

OHR000006 requires that a grab sample be collected within the first 30 minutes of a measurable storm event. However, Part 6.1.4 provides flexibility and states that if it is not possible to collect the sample within the first 30 minutes of a measurable storm event, the sample shall be collected as soon as practicable after the first 30 minutes and documentation shall be kept with the SWPPP explaining why it was not possible to take the samples within the first 30 minutes.

Ohio EPA believes that the general permit provides facilities the necessary flexibility in order to complete the benchmark monitoring requirements. No changes to the general permit were made based on this comment.

**Comment 9:**        **Part 6.2.1.2. Storm Water Run-on from Neighboring Properties. The proposed general permit contains a provision that allows permittees that may exceed a benchmark due to a neighboring facility's storm water run-on to document and account for this situation (see Part 6.2.1.2). Ohio Concrete appreciates the Agency's recognition of off-site storm water influences in accounting for a permittee's storm water discharge.**

**However, it was recommended that the reporting of run-on sampling results be inserted in the comment section within eDMR when reporting benchmark monitoring data versus the requirement to notify the applicable Ohio EPA District Office. This will provide the run-on data in the same reporting database as the benchmark data versus a district office notification which will likely not be maintained with the benchmark monitoring data.**
*(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, The Ohio*

Concrete Association, PCS Nitrogen Ohio, L.P., The
Fertilizer Institute)

**Flexible Pavements of Ohio affirms the added language
pertaining to runoff from a neighboring facility.** [*Flexible
Pavements of Ohio (FPO)*]

**Response 9:**    Ohio EPA agrees.  As such, language was changed to
require that such sampling results be documented within
eDMR's comment section. This will replace the requirement
of notifying the appropriate Ohio EPA District Office that was
in the draft general permit renewal.

**Comment 10:**    **Part 6.2.1. In the last general permit, Ohio EPA included
a provision that benchmarks could be re-evaluated
based on sampling data collected during the 5-year
period of the previous general permit. At the time of the
last general permit, neither Ohio EPA nor permittees had
any sampling data on storm water runoff because such
information was not required in the previous general
permit (OHR000004). Now that Ohio EPA has 5-years'
worth of data, that data should be analyzed to identify if
any benchmarks are unreasonably achievable and may
need to be revised accordingly.**

**Our review of the data for the past five years indicates
that several benchmarks are not realistic, including but
not limited to, the zinc and the nitrate plus nitrite
nitrogen benchmarks monitoring concentrations.  Based
on the zinc numbers, facilities are experiencing
benchmark exceedances in the range of a 20-70 percent
failure rate, which means that almost half of Ohio's
industrial activity facilities are experiencing
exceedances of the zinc benchmark. As stated
previously, zinc is not even present in the industrial
activities at most of the facilities, and most zinc is
coming from building components at the facility, or from
sources beyond the control of the facility.**

**The problem is compounded when the facility is
required to undertake corrective action to address the
zinc exceedances. What corrective action can address
this issue short of reconstruction of the building
components? It is imperative from a regulatory
perspective to avoid a situation of "perpetual non-
compliance" even when all reasonable control measures
have been undertaken.**

**As mentioned previously, using the IMZM levels for zinc, as well as for other benchmarks based on OMZM values, would be a great start to address this low benchmark issue.** *(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 10:**     Part 6.2.1 of the general permit states that benchmark concentrations are not effluent limitations; a benchmark exceedance, therefore, is not a permit violation. Benchmark monitoring data are used to determine the overall effectiveness of control measures and to assist permittees in evaluating when additional corrective action(s) may be necessary to comply with the control measures/best management practices (BMPs) in Part 2.

Furthermore, Part 6.2.1.2 states that, based on the average of your monitoring results, if the monitoring values for any parameter exceeds the benchmark, you shall perform the following:

- In accordance with Part 3.2, review the selection, design, installation and implementation of your control measures to determine if modifications are necessary to meet the Part 2 control measures/best management practices (BMPs) of this permit; **or**
- Make a determination that no further pollutant reductions are technologically available and economically practicable and achievable in light of best industry practice to meet the control measures/best management practices (BMPs) in Part 2 of this permit.  You shall also document your rationale for concluding that no further pollutant reductions are achievable, and retain all records related to this documentation with your SWPPP. You shall also notify Ohio EPA of this determination in your next benchmark monitoring report.

Therefore, OHR000006 provides flexibility for situations where a benchmark exceedance occurs and a facility determines that it is not reasonable to achieve further pollutant reductions for the parameter. Please see Response 2 regarding "economically practicable and achievable in light of best industry practice". In addition, see Response 13 regarding non-industrial discharges.

**Comment 11:**    **Part 6.2.1.2. It's requested that Ohio EPA add a provision to the draft general permit for permittees to have the option to develop alternative benchmark concentrations for Ohio EPA review. If authorized, the alternative benchmark concentration would be in lieu of the default benchmark concentrations listed in the draft general permit. The proposed language below is based on the alternative benchmark analysis, which has been a component of the Georgia general permit since 2012.**

*Proposed Language, Section 6.2.1.2, new third paragraph:*

**Permittees have the option of establishing their own alternative benchmark for any or all of the sector-specific benchmark pollutants. Alternative benchmarks shall be for the same pollutants as the benchmarks in this permit. An alternative benchmark must be documented in the SWPPP, which must contain any supporting data used to develop the alternative benchmark, and submitted to Ohio EPA. Unless notified by Ohio EPA in writing to the contrary within 90 days of Ohio EPA's receipt of the alternative benchmark submittal, permittees who submit such documentation are authorized to use the alternative benchmark for discharge of storm water associated with industrial activity under the terms and conditions of this permit. An alternative benchmark shall be based on the following:**

i.    **A study by qualified person(s) published within 5 years of the effective date of this permit that establishes the industry standard; or**

ii.   **A site-specific study by a professional engineer registered in the state of Ohio. The study must be signed, dated and sealed; or**

iii.  **Ohio's Water Quality Standards or U.S. EPA's Water Quality Criteria value multiplied by the ratio of the combined drainage areas for the receiving waterbody and the storm water discharge to the drainage area for the storm water discharge. The value of this ratio shall not**

be less than one (1) nor greater than one hundred (100). If the facility is in one of the industrial sectors subject to benchmark concentrations that are hardness-dependent, include in the SWPPP with the first benchmark result a hardness value, established consistent with the procedures in Appendix J, which is representative of the storm water discharge combined with the receiving waterbody.

iv.  **Use of alternative benchmarks cannot cause or contribute to an exceedance of a Water Quality Standard.**

This alternative benchmark provision would allow regulated parties to use either the default benchmark values as the target reference for BMP evaluation, or to develop one of these specific parameters to allow for a more thorough, detailed and accurate evaluation of BMPs. Because many of the benchmark parameters in the draft general permit are equal to the in-stream water quality standards, a value far more stringent than required by law, the alternative benchmark provisions would ensure that regulated facilities are not required to implement unnecessary BMPs. Without such an alternative benchmark provision, the draft general permit would impose arbitrary and capricious requirements by imposing continuous BMP evaluations where they are not necessary to maintain water quality standards. *(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 11:**  Ohio EPA evaluated this comment but determined to not include the suggested language for an option to develop alternative benchmark concentrations for Ohio EPA review. Ohio EPA believes that this approach is better served by an individual NPDES permit and not the industrial storm water general permit. All facilities have the option of applying for and obtaining an individual NPDES permit if they feel the general permit conditions are not appropriate to their site specific conditions.

However, Ohio EPA did add language in Part 6.2.1.2 which would allow a facility to default to a different benchmark

value if a parameter's water quality standard is less restrictive than OHR000006's benchmark value.

**Comment 12:**     <u>**Part 6.2.1.2.**</u> **The benchmark monitoring schedule requires industries that obtain permit coverage near the end of the permit term meet the requirements of benchmark monitoring prior to permit expiration. This places an unfair burden of either an accelerated schedule or utilization of an average from fewer samples simply because of the timing of their application. Rather, it would be more reasonable to require completion of benchmark monitoring in the first three years of permit coverage, regardless of the expiration of the permit.** [*City of Akron Water Reclamation Services (AWRS)*]

**Response 12:**     The suggestion provided in the comment was evaluated prior to public noticing the draft general permit for comment, but Ohio EPA elected to not adopt this suggestion with the general permit renewal. The suggestion would have entities which obtain coverage in years four and five of the permit potentially needing the following general permit term to satisfy benchmark monitoring requirements. This approach would cause confusion and be very difficult to track. Additionally, many facilities obtaining coverage later in the permit term where actually already in operation but failed to obtain NPDES storm water coverage early in the permit term.

OHR000006 provides permittees the first three years of their permit coverage to complete the benchmark monitoring requirements which is consistent with OHR000005. In addition, it requires permittees obtaining coverage during years four and five of the general permit to complete benchmark monitoring requirements to the extent of remaining monitoring periods available before the general permit expires.

Ohio EPA believes that requiring facilities obtaining coverage later in the permit term to sample a maximum of once/quarter to complete a permit term is not burdensome. U.S. EPA's 2015 MSGP requires permittee's to conduct benchmark monitoring for their first four full quarters of permit coverage. Therefore, OHR000006's approach to address entities which obtain coverage later in the permit term would be consistent with U.S. EPA. No changes were made to the general permit based on this comment.

**Comment 13:**    Part 6.2.1.2. **While it appears that Ohio EPA is acknowledging that storm water run-on from a neighboring facility may influence the storm water runoff from a permittee's facility, the general permit does not contain any specific language that such run-on influence may be deducted from a facility's discharge in determining whether a benchmark has been exceeded. As a result, it was recommended that the following language be added to Part 6.2.1.2:**

> **If samples of run-on from neighboring properties demonstrate that such run-on impacts a facility's storm water run-off discharge, the contaminants from the run-on may be deducted from the facility's storm water runoff discharge in determining whether a benchmark has been exceeded.**

*(The Ohio Manufacturers' Association, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

Part 6.2.1.2. **While Part 6.2.1.2 allows for the recognition of "natural background pollutants" in determining whether a benchmark has been exceeded, there is no likewise recognition for "non-industrial" pollutant sources, which are commonly part of a facility's building materials (e.g., zinc from galvanized steel roofing and siding, galvanized roof gutters and painted surfaces; copper from copper or brass water pipes and fittings), road traffic on or off the industrial property (e.g., zinc in tire dust), or in items beyond the control of the industrial facility (e.g., zinc in potable city water).**

**These sources are common to all industrial sites, whether in or out of the storm water permit program. They are present with or without the industrial activity, at all industrial sites regardless of their Standard Industrial Classification (SIC) codes or whether exempted or not. Moreover, there is no feasible corrective action or reasonable control measure to address contamination from these ubiquitous "non-industrial" sources. Because of this anomaly, it is recommended that Part 6.2.1.2 also include a provision that contamination from a facility's non-industrial sources can also be deducted for purposes of determining whether a benchmark has been exceeded, similar to the provision and procedures for neighboring**

**run-on. It is recommended that the following language be included in Part 6.2.1.2:**

> **Ideally your storm water samples will contain only runoff from the industrial activities at your site. However, storm water may come into contact with building materials and other non-industrial sources at your facility, possibly adding contaminants not found in the industrial activities at your facility. The SWPPP site description shall document the locations and sources of any non-industrial sources, such as building materials. If you feel your discharge is exceeding a benchmark value due to contact with non-industrial sources, you can account for non-industrial sources for purposes of evaluating impacts to your regulated storm water discharge and report these non-industrial source impacts in the parameter comment section when reporting the benchmark monitoring data in eDMR. All sample data and findings shall be maintained with your SWPPP. If samples of storm water from non-industrial sources demonstrate that such sources impact a facility's storm water runoff discharge, the contaminants from the non-industrial sources may be deducted from the facility's storm water runoff discharge in determining whether a benchmark has been exceeded.**

*(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, The Ohio Concrete Association, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 13:**    Ohio EPA added language in Part 6.2.1.2 to address concerns raised in this comment. Language was added which allows contaminant concentrations from run-on from neighboring properties to be deducted from the facility's storm water runoff discharge when determining whether a benchmark has been exceeded. Such sampling results are to documented within eDMR's comment section.

U.S. EPA's 2015 MSGP fact sheet discusses that industrial structures containing materials that could become pollutants discharged in storm water must be identified as potential pollutant sources in the SWPPP. The following is an excerpt from page 44 of U.S. EPA's 2015 MSGP fact sheet:

*Note that potential pollution sources include a facility's roof(s) and other surfaces that could accumulate pollutants originating from an industrial process and deposited through the air. Roofs, walls, etc., exposed to emissions from industrial areas can build up such pollutants over dry periods, which can be mobilized during a rain event or in snowmelt, so these areas need to be identified and included in SWPPP development. Likewise, industrial structures containing materials that could become pollutants discharged in stormwater (e.g., copper cladding on buildings or zinc from galvanized fences) must also be identified as potential pollutant sources.*

OHR000006 provides flexibility for situations where a benchmark exceedance occurs and a facility determines that it is not reasonable to achieve further pollutant reductions for the parameter. For additional information, see Response 2 regarding economically practicable and achievable in light of best industry practice. Ohio EPA has added language to Part 6.2.1.2 which identifies that determined pollutant concentrations from a facility's non-industrial discharges can be utilized by a permittee in determining whether it is economically practicable and achievable to implement any additional control measures. Such sampling results and rationale for conclusion shall be maintained with your SWPPP.

## Sector C

**Comment 14:**     **As drafted, the permit appears to move all companies operating under SIC 2875 from Subsector C1 to Subsector C6 (see Table 8.C-1). However, the activity description of that subsector is limited to composting operations, and item 11 of the draft permit fact sheet indicates that C6 was newly created to provide monitoring parameters appropriate for the composting industry. Considering that SIC 2875 covers many operations involving agricultural chemicals other than composting (such as fertilizer blending), it would be appropriate to make that distinction in the permit, and allow non-composting facilities to remain in Subsector C1. Historically, facilities operating under SIC 2875 have been included in Subsector C1, and the parameters specified for that subsector will likely be more appropriate for the non-composting facilities.** *(Turf Care Supply Corp.)*

**Response 14:**     Ohio EPA agrees.  As such, Table 8.C-1 and Appendix D, Sector C will be revised to specify that SIC 2875 (non-composting) will be subject to Subsector C1 and SIC 2875 (composting) will be subject to Subsector C6.

**Comment 15:**     **The draft general permit establishes sector-specific benchmark monitoring concentrations for nitrate plus nitrite nitrogen for a number of sectors (including, but not limited to Subsector C1 -- Agricultural Chemicals, SIC 2873-2879, except 2874 and 2875). For example, Subsector C1 of Table 8.C-1 is shown below in Table 1 for reference.**

Table 1

| Table 8.C-1 | | |
|---|---|---|
| **Subsector** | **Parameter** | **Benchmark Monitoring Concentration** |
| **Subsector C1. Agricultural Chemicals (SIC 2873-2879, except 2874 and 2875)** | **Nitrate plus Nitrite Nitrogen** | 0.68 mg/L |
| | **Total Lead** | **Hardness Dependent** |
| | **Total Zinc** | **Hardness Dependent** |
| | **Phosphorus** | **2.0 mg/L** |

**The nitrate plus nitrite nitrogen value above is identical in all sectors that include this benchmark parameter. These benchmark monitoring parameters, apart from lead, have concentrations that are identical to the benchmark monitoring concentrations presented in the 2015 Multi-Section General Permit developed by U.S. EPA. U.S. EPA's fact sheet associated with the 2015 Multi-Sector General Permit identifies the basis for the benchmark monitoring concentrations, which are summarized below in Table 2.**

Table 2
EPA's Basis for Benchmark Monitoring Concentrations

| Parameter | Basis |
|---|---|
| Nitrate plus Nitrite Nitrogen | National Urban Runoff Program (NURP) median concentration |
| Total Lead | "National Recommended Water Quality Criteria." Chronic Aquatic Life Freshwater (EPA-822-F-04-010 2006-CCC) |
| Total Zinc | "National Recommended Water Quality Criteria." Acute Aquatic Life Freshwater (EPA-822-F-04-010 2006-CMC) |
| Phosphorus | North Carolina storm water benchmark derived from NC water quality standards |

As summarized in Table 2, although all the other benchmarks are based on water quality criteria, the benchmark for nitrate plus nitrite nitrogen is set using a reference value unrelated to water quality criteria compliance, and, in fact, is unrelated to storm water discharges from industrial facilities (including, in particular, agricultural chemical facilities). Specifically, the nitrate plus nitrite nitrogen benchmark is based on the median values from a nationwide assessment of urban runoff, conducted by U.S. EPA between 1979 and 1983, without any reference to Ohio water quality standards.

Ohio EPA has relied upon this 30-year old NURP study without demonstration that this study has relevance under Ohio law or applicability to industrial facilities (and specifically agricultural chemical facilities) in Ohio. Ohio EPA has established no record of its evaluation of this historical data or the necessity of such a benchmark parameter (based on a 30-year old data set) to protect water quality or indicate the effectiveness of industrial storm water BMPs. The NURP values are essentially anthropogenic background values that assume zero discharge of the constituents, a scenario that would not even necessitate a storm water permit to begin with. Additionally, an exceedance of these median NURP levels does not pose any water quality concern and, consequently, should not serve as the basis for triggering enhanced monitoring and BMP evaluation. Such a requirement would go well beyond the authority of the Ohio Water Pollution Control Act, O.R.C. § 6111 et seq. Accordingly, the proposed benchmark value is arbitrary and capricious and Ohio EPA must revise the nitrate plus nitrite nitrogen benchmark monitoring concentrations, including those in Subsector C1, to meet the standards of Ohio law.

In developing a nitrate plus nitrite nitrogen benchmark value, Ohio EPA needs to consider the concentration of nitrate plus nitrite nitrogen expected due to natural conditions as well as incidental increases in concentration attributed to the type of industrial facilities being regulated, where such facilities have implemented reasonable and appropriate BMPs and do not impair the designated uses of the receiving stream. As described in Section 6.2.1 of the draft general permit, benchmark monitoring data are for the permittee's use

to determine the overall effectiveness of control measures and to assist the permittee in knowing when additional corrective action(s) may be necessary to comply with the control measures and BMPs. We believe that the proposed nitrate plus nitrite nitrogen concentration is so stringent that it would not serve as a functional threshold for evaluating control measures or BMP performance in Ohio. This belief is further supported by the nitrate plus nitrite nitrogen data collected by Ohio during the last general permit cycle. The median nitrate plus nitrite nitrogen concentration was 0.66 mg/L, just slightly below the benchmark concentration of 0.68 mg/L. Therefore, nearly half the nitrate plus nitrite nitrogen results achieved by the regulated community resulted in benchmark exceedances. Additionally, this data set included data collected by all sectors, and does not represent the higher values reasonably and appropriately expected from agricultural chemical facilities covered under Section C1.

Based on data collected during the previous permit term, The Fertilizer Institute (TFI) indicated that over 80 percent of fertilizer facilities covered under this permit would exceed the 0.68 mg/L benchmark value for nitrate plus nitrite nitrogen.  Additionally, TFI noted that the U.S. EPA Safe Drinking Water Act regulates nitrate nitrogen at 10 mg/L for finished drinking water.

Without these adjustments, the draft general permit will not be consistent with Ohio law and industrial facilities covered under the GSWP will needlessly and unnecessarily embark on enhanced monitoring campaigns and costly documentation that pollutant reductions are not technologically available and economically practicable and achievable in light of best industry practice. *(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 15:**    The agency understands some benchmark values were derived from medium values supported in NURP studies conducted prior to the implementation of the storm water program. Ohio EPA further recognizes this data set was collected during a period of time where there were limited considerations towards storm water pollution prevention and the associated BMPs to minimize storm water

contamination. As such, it is Ohio EPA's position, through appropriate storm water management and proper BMP implementation, the benchmark values are appropriate. In addition, if exceedances continue, the permittee may evaluate their benchmark values and seek relief pursuant to Part 6.2.1.2

## Sector D

**Comment 16:**       **Table 8.D-2. The governing activity code for "Discharges from asphalt emulsion facilities" is ambiguous. Currently, the industrial activity shown in Table 8.D-2 is not identified by any subsector.  For purpose of clarification, it is recommended including in Table 8.D-2 language stating this activity is associated with SIC 2992 [see pg. 132, Table D-1, Subsector D2, SIC code for Misc. Products of Petroleum]. The suggested language further clarifies that effluent limitations outlined in Table 8.D-2 are not applicable to Subsector D1, "Asphalt Paving and Roofing Materials."** *[Flexible Pavements of Ohio (FPO)]*

**Response 16:**      The federal effluent limitation in Table 8.D-2 is only applicable to runoff from facilities which manufactures the asphalt emulsion. The federal effluent limitation would not be applicable to the more common asphalt batch plants which receive the asphalt emulsion and mix with an aggregate. It could be possible that a Subsector D1 facility could have a co-located facility which manufactures the asphalt emulsion. Whereas, the federal effluent limitation would only be applicable for runoff from areas of the facility involved with manufacturing the asphalt emulsion.

Ohio EPA reviewed this suggestion but believes that the federal effluent for "discharges from asphalt emulsion facilities" is clear enough and no changes were made to the final permit.

## Sector N

**Comment 17:**       **Part 8.N.3.1.7. It appears this section is referencing stationary outdoor equipment and not mobile equipment (e.g., loaders). This should be clarified as it would not be possible to provide engineered secondary containment around most pieces of mobile equipment.** *(The David J. Joseph Company)*

**Response 17:**     Ohio EPA agrees.  This permit condition is referencing stationary outdoor equipment and not mobile equipment (e.g., loaders). Language has been added to this permit condition for clarification.

**Comment 18:**     **Part 8.N.4.2. This requirement is unclear, please clarify the expectation. Is the permit asking to specifically state in the SWPPP the frequency in which recovered fluids are hauled off-site? This is largely done either weekly or on as needed basis.** *(The David J. Joseph Company)*

**Response 18:**     Yes, to satisfy this permit condition the SWPPP should include the expected frequency which recovered fluids will be hauled off-site (i.e., weekly or on an as needed basis). Additionally, the SWPPP needs to identify where such fluids will be properly disposed/recycled and a log maintained with the SWPPP that identifies dates that recovered fluids are hauled off-site.

**Appendix A**

**Comment 19:**     **Appendix A. Outfall definition.  There is confusion in the field with Ohio EPA inspectors and facility personnel as to what constitutes an "outfall" for purposes of storm water monitoring. There is no definition or guidance in the general permit as to what is an "outfall." We recommend that the general permit include a definition of "outfall" similar to that found in Indiana's general storm water permit for industrial activity (see IAC 15-6-4). We recommend that the following definition of "outfall" be added the general permit:**

**"Outfall" means the point of discharge from a discernible, confined and discrete conveyance including a pipe, ditch, channel, tunnel or conduit.** *(The Ohio Manufacturers' Association, Ohio Chamber of Commerce, Ohio Chemistry Technology Council, The Ohio Concrete Association, PCS Nitrogen Ohio, L.P., The Fertilizer Institute)*

**Response 19:**     Permit applicability is triggered based on a point source being present.  U.S. EPA has interpreted a point source being created by simply changing the surface of the land or changing the grading patterns of the land with storm water then discharged to jurisdictional waters (please see page 47997 of the Nov. 16, 1990 Federal Register). Therefore, if storm water enters surface waters of the State from a facility

subject to NPDES industrial storm water permitting, permit coverage would be required. In addition, the issue of collecting storm water samples from sheet flow has been an issue addressed by U.S. EPA.  Guidance has been provided to effectively collect storm water samples from areas where sheet flow is present.  See guidance at ***www3.epa.gov/npdes/pubs/msgp_monitoring_guide.pdf*** (see pages 9 and 10).

The following is an excerpt from U.S. EPA's Docket to the 2008 MSGP which specifies that sampling requirements must be conducted where storm water leaves a permittee's property whether that is via discrete outfall or via sheet flow (the entire comment and U.S. EPA response has been provided but the relevant parts have been underlined):

> *Comment ID:* MSGP.0068.10
> *Author Name:* Robert Elam
> *Organization:* American Chemistry Council
> Benchmark Monitoring and Reporting (Section 3.2.2)
>
> This section requires benchmark monitoring for the industrial sectors specified. It is not clear, however, how facilities that do not have discrete outfalls (i.e., those with sheet flow runoff), or that have their stormwater combined with other facilities (such as in an industrial park) at the outfall, or have sheet flow runoff to a municipal storm sewer, would meet the requirements of this section. ACC recommends that EPA specifically state that monitoring is only required for those MSGP facilities that discharge via discrete outfalls.
>
> In Section 3.2.3.1, EPA establishes a proposed total suspended solids (TSS) limitation for coal pile runoff of 50 mg/l. The TSS benchmark value for all the industrial sectors is 100 mg/l. ACC urges that EPA modify the TSS limit for Coal Pile runoff to 100 mg/l to maintain consistency with TSS benchmarks for the industrial sectors. For many facilities the coal pile runoff is combined with the stormwater runoff from the rest of the facility. It is much simpler for compliance purposes to have one TSS limitation for the entire discharge rather than to determine the coal pile component of the stream, and to evaluate it against its limitation and the remainder against its limitation.

*EPA Response*

<u>EPA disagrees that monitoring should only be required for facilities with discrete outfalls. Facilities subject to benchmark and effluent limit monitoring requirements must sample their stormwater discharges as it leaves their property</u>. If their discharges are combined with other stormwater discharges, sampling should be conducted, where possible, before the commingling. Flow collectors are available from commercial sources if facilities cannot find any large enough outfalls on their property or simple flow collection devices can be constructed that provide an area for flow to accumulate such that a sample can be collected. EPA guidance (NPDES Stormwater Sampling Guidance Document, July 1, 1992) is available that demonstrates how to construct such a collection device.

The coal pile runoff limitation is based on a national effluent limitation guideline developed specifically for coal pile runoff at steam electric power plants (40 CFR Part 423). EPA cannot change this effluent limitation without promulgating an updated regulation. EPA did revise the applicability of the 40 CFR Part 423 limit, consistent with the intended scope of this effluent guideline limitation, to apply only to steam electric generating facilities. The detailed analysis that formed the basis of these limits was specific to that sector and was not intended to determine BAT for coal pile runoff from other industrial sectors, including those facilities that generate power only as an ancillary or co-located activity. EPA believes that facilities in other sectors with coal storage piles will be adequately regulated under several different technology-based limits in Part 2.1.2.

Ohio EPA has added language to Part 6.1.1 which clarifies that for monitoring purposes, an outfall can include a discrete conveyance (i.e., pipe, ditch, channel, tunnel or conduit) or a location where sheet flow leaves the facility's property.

## Appendix B

**Comment 20:**      **B.9. Inspection and Entry. Flexible Pavements of Ohio asserts inspections by Ohio EPA should be announced.**

**This allows company personnel familiar with the site SWPPP and site control measures to be available as a resource to ensure the inspector is fully informed of company practices and documentation. There have been occasions where a notice of violation was written only for the inspector to backtrack once becoming aware of vital information. If it is necessary that unannounced inspections be conducted, it is recommended that a process be followed wherein a meeting with company environmental compliance officer(s) is held post-inspection but prior to final determination of compliance. The meeting is for the purpose of (1) allowing the Ohio EPA inspector to present findings of the inspection and (2) provide opportunity for the compliance officer to affirm the inspection findings or provide information which the inspector may not have had knowledge or understanding of during the inspection. Only after this due process should a notice of violation be determined.**
[*Flexible Pavements of Ohio (FPO)*]

**Response 20:**     ORC 6111.05 provides an authorized representative from Ohio EPA access at reasonable times for purposes of evaluating compliance. In most cases, these MSGP inspections are announced with the intent to address the issues stated in the comments. However, Ohio EPA reserves the right, pursuant to ORC 6111.05, to conduct unannounced inspections for purposes of evaluating compliance relative to normal operating conditions. No changes to the final permit were made based on this comment.

**End of Response to Comments**