# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 3, 2025 |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT ROBERT NAIRN'S OPINIONS AND TESTIMONY

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") move to exclude two categories of opinions offered by Plaintiff's expert Dr. Robert Nairn, pursuant to Federal Rules of Evidence 401–403 and 702.

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  Dr. NAIRN's OPINIONS AND QUALIFICATIONS ....................................... 3

III. LEGAL STANDARD ......................................................................................... 4

IV.  ARGUMENT ...................................................................................................... 6

A.   Dr. Nairn's Opinions Are Irrelevant and Inadmissible Because They Were Not Identified in CLF's NOI or Complaint ................................................................................................ 6

  1.   CLF's Cannot Maintain Claims That It Did Not State in Its NOI and Plead in Its Complaint........................................................................................................................ 7

  2.   Dr. Nairn's Opinions Cannot Assist the Jury Because They Do Not Relate to the 2018/2021 Permit ....................................................................................................... 11

B.   Dr. Nairn's Are Not Based on a Reliable Methodology Because They Create a Definition of "Best Industry Practice" Not Found in the 2018/2021 Permit or Associated Guidance.............. 13

  1.   Dr. Nairn's Recommendations Concerning Terminal Flood Preparedness Are Unrelated to the 2018/2021 Permit ................................................................................................... 15

  2.   Dr. Nairn Did Not Read the 2018/2021 Permit or Attempt to Apply His Opinions to the Terminal ....................................................................................................................... 17

  3.   Dr. Nairn Ignored Applicable EPA and CT DEEP Regulations and Guidance Which Are Necessary to Sustain a Reliable Methodology........................................................... 20

C.   Dr. Nairn's Opinions Concerning Standard Industry Practice Are Not Based Upon a Reliable Methodology ......................................................................................................... 21

  1.   Dr. Nairn's Opinions Are Based on Alleged Standards and Practices that Are Not Included in the 2018/2021 Permit and Do Not Apply to the Terminal ...................................... 22

  2.   Dr. Nairn's Opinions Are Based on an Amalgam of Standards and Practices that Do Not Govern the Permit or Terminal ................................................................................... 23

  3.   Dr. Nairn's Conclusory Pure Opinion Testimony About Irrelevant "Best Industry Practices" Is Not Reliable ........................................................................................... 30

  4.   Dr. Nairn Failed to Consider Relevant Evidence and Applicable Legal and Regulatory Standards and Guidance............................................................................................... 32

D.   Admitting Dr. Nairn's Irrelevant, Unsupported, Unreliable, and Unhelpful Opinions Will Mislead the Jury and Result in Confusion of the Issues and Unfair Prejudice to Defendants ..... 36

  V.   CONCLUSION................................................................................................. 38

## I.    INTRODUCTION

In this lawsuit, Plaintiff Conservation Law Foundation, Inc. ("CLF") alleges Defendants Triton Terminaling LLC ("Triton") and Equilon Enterprises LLC ("Equilon") violated the General Permit for Discharge of Stormwater Associated with Industrial Activity applicable to the New Haven Terminal ("the Terminal"), issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") in 2018, which was extended in 2021 without substantive changes ("the 2018/2021 Permit").  Ruling on Mot. to Dismiss at 34–62 (filed Sep. 16, 2022) (ECF 111).  In support of its interpretation of the 2018/2021 Permit, CLF put forth the expert report and testimony of **Robert Nairn, Ph.D.**, a water resources consultant.  According to Dr. Nairn, the 2018/2021 Permit included obligations related to climate change—especially flooding protection—where **no such obligation exists** in the 2018/2021.

Nowhere in the 2018/2021 Permit requires permittees to consider the "climate change risks" alleged by Dr. Nairn.  Instead, Dr. Nairn contends that his own self-made obligations are "implied" by the 2018/2021 Permit's reference to "best industry practice."

While making this claim, Dr. Nairn testified during his deposition that he is not—and was not—offering an opinion on the central issue in this case:  whether Defendants failed to comply with the technical requirements the Permit.  Contrary to his testimony the Defendants are not in violation, Dr. Nairn somehow feels comfortable stating the Terminal is not implementing his self-imposed definition of "best industry practices."  Instead, Dr. Nairn creates Defendants' obligations under the Permit based only on his own say-so; Dr. Nairn's aspirational requirements are nowhere to be found in CLF's claims in this case (i.e., its NOI or Complaint)[1] or the Permit at

---

[1] The Clean Water Act requires multiple pre-filing disclosure requirements and notification requirements involving the U.S. Environmental Protection Agency ("EPA") and the Connecticut Department of Energy and Environmental Protection ("CT DEEP").  Dr. Nairn's May 6, 2025 Expert Report is attached as Exhibit A.  Dr. Nairn's July 22,

the center of this case, and Dr. Nairn provides no data on other petroleum bulk storage terminals that show they are using the methods that Dr. Nairn claims are "best industry practices." Accordingly, the Court should exclude Dr. Nairn's opinions for three independent reasons.

**First,** Dr. Nairn's opinions are not included in CLF's NOI or Complaint. In Clean Water Act ("CWA") citizen suits like this one, the pre-suit NOI is mandatory to put Defendants, EPA, and CT DEEP on notice of the Defendants alleged violations. *See* 33 U.S.C. § 1365(b)(1)(A); 44 U.S.C. § 6972(a)(1); 40 CFR § 135.3(a). Under the Clean Water Act and applicable regulations, CLF was required to "identify the specific standard, limitation, or order alleged to have been violated [and] the activity alleged to constitute a violation." 40 CFR § 135.3(a).

Yet years after CLF filed suit, Dr. Nairn seeks to offer opinions never previously identified in CLF's NOI or Complaint, for example, about Defendants' alleged failed "berm" structure and flooding protections. Since CLF never provided Defendants with the required timely notice identifying its allegations, Defendants never received notice of Dr. Nairn's new allegations until they appeared in his expert report. Under Rule 702, Dr. Nairn's opinions about matters that are not at issue in this lawsuit are irrelevant and inadmissible. *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002) (holding admissible expert testimony must "rest[] on a reliable foundation and [be] *relevant to the case before the court*") (emphasis added); Fed. R. Evid. 401-402, 702.

**Second**, Dr. Nairn's methodology is unreliable and inadmissible under Rule 702 because he makes up his own implied "best industry standard" under the 2018/2021 Permit to read into the Permit his own subjective requirements. For example, Dr. Nairn cannot point to a single industry group or regulatory agency, including CT DEEP, who interprets the 2018/2021 Permit

_____

2025 Rebuttal Report is attached as Exhibit B. Any emphasis to quoted excerpts is added for the purposes of this Motion only.

to require his "implied obligations," for example that Defendants prepare for hypothetical climate-related flooding events. The 2018/2021 Permit does not even **mention** flooding. Put simply, Dr. Nairn reads into the Permit obligations that do not exist. Dr. Nairn's opinions, based only on his own subjective authority, are not reliable and not admissible. Fed. R. Evid. 702.

*Third*, the minimal probative value of Dr. Nairn's opinions, if any, is substantially outweighed by the danger of misleading the jury. confusing the issues, and unfair prejudice to Defendants. Fed. R. Evid. 403. For instance, Dr. Nairn's opinions attempt to impose obligations on Defendants that do not exist in the Permit—or anywhere other than Dr. Nairn's opinions of alleged violations of the 2018/2021 Permit, but were never before stated by CT DEEP. If Dr. Nairn were permitted to essentially redefine what constitutes permit terms, citizen suits would become a vehicle for rewriting permits to an expert's liking, supplanting the role of CT DEEP and EPA, rewriting the Clean Water Act, and leaving permittees without adequate notice and guidance as to what they must do to comply with the terms of the 2018/2021 Permit. Introduction of Dr. Nairn's irrelevant and misleading opinions about matters beyond the scope of this lawsuit can only result in unfair prejudice to Defendants and confusion of the issues.

## II.    DR. NAIRN'S OPINIONS AND QUALIFICATIONS

CLF is an environmental advocacy group that has filed CWA citizen suits across the Northeastern seaboard[2] asserting novel claims that the terms of permits issued under the CWA implicitly included an obligation to consider climate change and adoption of resiliency measures. In support, CLF identified Dr Nairn as an expert in coastal engineering, flooding, and erosion,

---

[2] Plaintiff has filed lawsuits asserting identical claims against petroleum bulk storage terminals across New England. *See Conservation Law Found., Inc. v. Shell Oil Products US, et al.*, No. 1:17-cv-00396-WES-LDA (D.R.I.); *Conservation Law Found., Inc. v. ExxonMobil Corp.*, No. 1:16-cv-11950 (D. Mass.); *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.*, No. 3:21-cv-00932 (D. Conn.).

among other things.  *See* Dep. at 22:4–8, 59:1–13.[3]  According to Dr. Nairn, his assignment was to "look at whether the containment areas of the facility flooded or could flood, and then the stability of the berms during flood events."  *Id*. at 23:18–24:1.

Despite being tasked with a technical assignment—to assess whether "the containment areas of the facility flooded or could flood" and "the stability of the berms during flood events"—Dr. Nairn lacks any relevant experience or expertise on the Permit requirements at issue in this case.  He is not registered as a structural, industrial, chemical, mechanical, or tank engineer.  *See id.* at 59:14–60:11.  He also is not an expert on "the potential for failure of above-ground oil storage tanks," which is not within his area of expertise."  *Id*. at 60:12–21.

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

## III.    LEGAL STANDARD

As clarified by the recent amendments to Rule 702, as the proponent of the testimony, CLF bears the burden of proving that expert testimony is admissible by a preponderance of the evidence.  *See Wang v. Omni Hotels Management Corporation*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *2 (D. Conn. June 27, 2025) (citation modified).  Federal Rule of Evidence 702 prohibits a witness who is qualified as an expert from testifying unless: "(a) the expert's

---

[3] Cited excerpts of the transcript of Dr. Nairn's August 13, 2025 deposition are attached as Exhibit C.  Any emphasis to cited testimony was added for the purposes of this Motion only.

scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *1 (D. Conn. Oct. 30, 2024) (summarizing Fed. R. Evid. 702); *see also, e.g.*, Advisory Committee Note to 2023 Amendments to Rule 702 ("Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."); *United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *17 (D. Conn. Oct. 20, 2023) ("[T]he *Daubert* inquiry requires courts to 'examine not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case.") (citing *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.2d 334, 350 (2d Cir. 2005)).

The importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal quotations omitted); *see also TMI Tr. Co. v. WMC Mortg., LLC,* No. 3:12-CV-1538 (CSH), 2017 WL 6617050, at *4 (D. Conn. Dec. 28, 2017) ("The principal target of *Daubert* and Rule 702 is the professional expert witness—well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors."). It follows that the proponent of the expert's opinions must also establish that they are admissible under Rule 403. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

## IV.    ARGUMENT

At issue in this lawsuit is whether the Defendants complied with the 2018/2021 Stormwater Permit developed and promulgated by the CT DEEP based on the Clean Water Act. Not at issue in this lawsuit are (1) the alleged "violations" by Dr. Nairn addressing issues not covered in the 2018/2021 Permit, and (2) the alleged "best industry practices" crafted by Dr. Nairn.

As explained below, the Court should exercise its gatekeeping duty to exclude Dr. Nairn's expert opinions for three reasons: (1) Dr. Nairn's opinions are irrelevant because they are not noticed in CLF's NOI or Complaint and do not relate to the specific Permit claims in this case; (2) Dr. Nairn's opinions are not reliable under Federal Rule of Evidence 702 because his methodology is based only on his own subjective interpretation instead of objective data and established best industry practices required by the 2018/2021 Permit; and (3) if not excluded for these evidentiary reasons, Dr. Nairn's opinions are unfairly prejudicial and unhelpful to the jury because he seeks to impose on Defendants his own made-up standards through a citizen suit without any prior notice to Defendants or tie to the 2018/2021 Permit.

### A.    Dr. Nairn's Opinions Are Irrelevant and Inadmissible Because They Were Not Identified in CLF's NOI or Complaint

Dr. Nairn's opinions are inadmissible because CLF did not identify them as violations in its NOIs as required by the CWA statute and regulations and RCRA statute and regulations —or in CLF's Complaints. Accordingly, they are not properly before the Court for adjudication. *See infra* n.5; Fed. R. Civ. P. 8. Dr. Nairn's opinions are also irrelevant because they will *not* assist the jury in resolving the facts before it, which are limited to claims that CLF properly noticed and pled. Indeed, Dr. Nairn did not recall whether he ever read CLF's NOI. Dep. at 24:25-25:3. And though he read the Complaint "[a]t one point in time," when asked to explain his

"understanding of the claims CLF is making in this case, Dr. Nairn responded that he "wouldn't be best to answer that question." *Id.* at 24:12-20. Based on his lack of knowledge concerning the facts and technical issues in this lawsuit, his expert opinions are inadmissible because they are not based on sufficient facts or data, nor are they relevant to CLF's claims. Fed. R. Evid. 702; *Amorgianos*, 303 F.3d at 259 (holding admissible expert testimony must "rest[] on a reliable foundation and [be] *relevant to the case before the court*") (emphasis added).

### 1.    CLF's Cannot Maintain Claims That It Did Not State in Its NOI and Plead in Its Complaint

Unlike typical civil lawsuits, plaintiffs in CWA and RCRA citizen suits like this case *must* provide notice of alleged deficiencies to both the potential defendant and governmental agencies, such as the EPA and CT DEEP before filing suit. *See generally* ECF 632 (incorporated fully by reference). The intent of the pre-suit NOI is to afford the EPA, the state regulating agency, and the alleged violator an opportunity to correct any issues before a citizen suit is initiated. *See, e.g.*, *Brod v. Omya, Inc.*, 653 F.3d 156, 166 (2d Cir. 2011) (explaining that "the content of a NOI must serve the purpose of giving the appropriate governmental agencies an opportunity to act and the alleged violator an opportunity to comply."). Once notice has been provided, a plaintiff is prohibited from filing a citizen suit under the CWA or RCRA until sixty (60) days after submitting a NOI. *See* ECF 601.

By statute, that Clean Water Act notice must adequately outline and explain the basis for plaintiff's eventual lawsuit. Pursuant to applicable regulations, a NOI:

> shall include sufficient information to permit the recipient to **identify the specific standard, limitation, or order alleged to have been violated, <u>the activity alleged to constitute a violation,</u>** the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (emphasis added).

This is not a toothless, technical procedure—it is mandatory under the CWA.  As well established under applicable case law, failure to meet this requirement means a court cannot adjudicate unnoticed claims premised on unnoticed allegations.  *See, e.g., Hallstrom v. Tillamook Cnty.*, 493 U.S. 29, 25 (1989) ("[C]ompliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit."); *Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 995 (9th Cir. 2000) ("If a party seeking to bring a citizen enforcement action has not complied with the CWA's notice requirement, then the district court in which that action is brought lacks subject matter jurisdiction and must dismiss the action.").

Absent adequate notice, district courts must dismiss any claim based on alleged violations not identified in the NOI, even if those claims are later raised in a complaint.  *See Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 487 (2d Cir. 2001) (affirming dismissal of thermal discharge claims not adequately identified in the NOI).[4]

CLF's original NOI disclosed its intent to pursue *twelve* CWA claims and three RCRA claims.  [ECF 1, Ex. A].[5]  CLF supplemented its NOI twice but *never identified* additional claims.  [ECF 1, Ex. B; ECF 47, Ex. A].  Despite CLF's failure to identify additional claims on two separate occasions, CLF still decided to disclose many experts (including Dr. Nairn) that would go on to opine about allegations or claims **never before noticed** in this case in the NOI **or** Complaint (*see* Table 1 below describing a summary of Dr. Nairn's unnoticed opinions).

---

[4] A recent Second Circuit decision held the "pre-suit notice requirement is not jurisdictional." *Mid-New York Env't and Sustainability Promotion Comm. v. Dragon Springs Buddhist, Inc.*, No. 24-2451, 2025 WL 2653616 (2d Cir. Sept. 16, 2025).  The ruling in *Dragon Springs* does not change the result here.  The court in *Dragon Springs* reiterated the continued importance of the NOI notice requirement, finding the pre-suit NOI must "provide the recipient with effective, as well as timely, notice."  2025 WL 2653616, at *10 (citing *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995)).  That is not the case here because it is undisputed that the NOI and Complaint do not include the alleged violations of the CWA that Dr. Nairn offers regarding the alleged violations listed above (e.g., secondary containment capacity and permeability).

[5] CLF has one RCRA claim against Defendants alleging "creation of an imminent and substantial endangerment to health or the environment in violation of RCRA."  *See* Ruling on Mot. to Dismiss [ECF 111].  CLF's experts did not provide opinions to support the RCRA claim.

**Table 1. Summary of Dr. Nairn's Unnoticed Opinions.**[6]

| Undisclosed New Opinions in Dr. Nairn's Report | Identified in NOI? | Included in Complaint? | CT Deep Notified? | EPA Notified? |
|---|---|---|---|---|
| ████████████████ ████ | No | No | No | No |
| ████████████████ | No | No | No | No |

---

[6] In addition to not meeting the pre-suit Clean Water Act requirements for filing a citizen suit, CLF has never provided notice to this to CT DEEP or EPA, another mandatory statutory requirement under the Clean Water Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. at § 135.3(a); *see also* 42 U.S.C. § 6972(a)(1) (substantially similar and equally applicable provision of the Resource Conservation and Recovery Act).



| | | | | |
|---|---|---|---|---|
| ███████ | | | | |
| ███████ | No | No | No | No |
| ███████ | No | No | No | No |

When CLF first disclosed these inadmissible opinions, Defendants immediately filed a Motion to Strike improper expert opinions [ECF 623], which the Court denied without prejudice but noted the issues should be addressed at a later time. Defendants now challenge Dr. Nairn in this Motion based on Federal Rules of Evidence 401–403, and 702, as the Court directed. *See* Omnibus Ruling Den. Mot. to Stay, Den. Mot. to Strike, Vacating Ruling on Mot. for Rule 37 Sanctions, and Referring Mots. to Seal and to Strike at 12 [ECF 641].

Unsurprisingly, Dr. Nairn had no idea whether he had reviewed the NOI or whether the

NOI included any of his opinions.

> **Q. Have you read the Notices of Intent that were served prior to the Complaint being served?**
>
> A.  I don't recall.

*      *      *

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████

> **Q.   Okay.  Would you have any reason to dispute that your opinions regarding ingress and egress routes at the terminal are not included in the Notices of Intent that Plaintiff served in this case?**
>
> A. I am not aware one way or the other.

Dep. at 24:25–25:3; *see also, e.g., id.* at 106:19–107:6 (similar) (objections omitted).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████    CLF served the NOI on July 28, 2020.  *See* NOI, ECF 683-3.  It is

impossible to allege violations of standards that only became effective four years later, not to

mention, gave no notice to Defendnats.  ECF 1–2.

　　The fact is clear:  Dr. Nairn's opinions are not stated in any of CLF's NOIs or CLF's

Amended Complaints.  *See generally* Am. Compl., ECF 47; ECF 683-3 & 683-4 (July 28, 2020

NOI & Feb. 17, 2021 Supp. NOI).  Because the pre-suit NOI and the Complaint identify what

claims and violations are at issue in this citizen suit, CLF cannot now—at the eleventh hour—

assert through its experts' new claims premised on allegations not contained in its required NOI.

As a matter of law, expert opinions are inadmissible if they are based on claims that are

improperly alleged, which is the case here.

　　　　**2.**　　　　**Dr. Nairn's Opinions Cannot Assist the Jury Because They Do Not Relate to the 2018/2021 Permit**

11

Dr. Nairn's opinions are irrelevant given that they will not "assist the trier of fact to understand the evidence or to determine a fact in issue," because his opinions are *not at issue*, either in the NOI, Complaint, or under the 2018/2021 Permit.  Fed. R. Evid. 702; *see also FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983), *cert. denied*, 464 U.S. 895, (1983) (excluding expert opinion concerning industry practice and FAA policy because it was "irrelevant to the jury's determination of violations of the regulations").

Because the NOIs do not include Dr. Nairn's opinions, CLF cannot pursue any claim(s) premised upon them at trial.  Extraneous opinions about claims that do not exist and other issues outside the scope of this trial are irrelevant and cannot assist the jury in resolving the questions before it.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) ("[T]he proffered expert testimony must assist the trier of fact . . . [which] goes beyond mere relevance because it requires the testimony to share a valid scientific connection to the pertinent inquiry.  This means that even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*.") (emphasis in original; citation otherwise modified).

Dr. Nairn was unable to state conclusively whether his opinions support the claims CLF stated in the NOIs and Complaint:

> **Q.  Would you have any reason to dispute that your opinions regarding ingress and egress routes at the terminal are not included in the Notices of Intent that Plaintiff served in this case?"**
>
> A.  I am not aware one way or the other.

*      *      *

> **Q.  Do you have any reason to dispute that those opinions regarding bare soil on berm faces or any facts about bare soil on berm faces are not included in the Notice of Intent?**
>
> A.  I am not aware one way or the other.

**Q.  Do you have any reason to dispute that your opinions regarding inadequate berm height are not factually represented in the Notices of Intent that Plaintiffs served in this case?**

A.   I'm not aware one way or the other.

Dep. at 107:6–18; 108:8–23.

As a matter of law, Dr. Nairn's issues regarding NHTSA, "threshold depths," "bare soil on berm faces," and "berm heights" are not a requirement of the Permit or the CWA and thus would not logically be in a CWA NOI.  *See generally* 2018/2021 Permit, attached as Exhibit D. These flooding issues that Dr. Nairn brings to bear are not enforceable by the CWA, thus a CWA suit would be an inappropriate vehicle to air these grievances.

Because Dr. Nairn cannot connect his opinions to the claims at issue, they are irrelevant, which renders them inadmissible.  Fed. R. Evid. 702; *Max Zach Corp.*, 2024 WL 4614487, at *1 (this Court applying Rule 702, as amended in 2023); *Donald*, 2023 WL 6958797, at *17 (noting determining admissibility of expert testimony "requires courts to examine not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue") (citation omitted).

**B.    Dr. Nairn's Are Not Based on a Reliable Methodology Because They Create a Definition of "Best Industry Practice" Not Found in the 2018/2021 Permit or Associated Guidance**

Similarly, the Court should exclude Dr. Nairn's opinions because his "methodology" for defining "best industry practice," the lynchpin of CLF's claims, is unreliable because it was crafted solely for litigation purposes.  Dr. Nairn's opinions about what Defendants *should have done* to assess and address possible risks of climate change—*i.e.*, protecting against possible flood events and addressing its structural berm engineering—are completely untethered from any requirement in the 2018/2021 Permit, including anything constituting "industry practice."

By way of example, Dr. Nairn could *not* cite to a "bulk storage facility" that considered the "hundred-year return period" or "500-year return period storm event in conducting its risk assessment operations" in Connecticut—*i.e.*, no facility is completing a risk assessment as a means to comply with the 2018/2021 Permit, because that is *not a requirement*.  Dep. at 200:13–201:16.  Dr. Nairn alleges these are the "best industry standard" under the 2018/2021 Permit, but he cites absolutely no actual petroleum bulk storage Terminal or other facility of any kind anywhere in the State of Connecticut (or the U.S. for that matter) that relies on what he says are "best industry practices."

As other courts hold, "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267 (affirming the exclusion of an expert who "inexplicably" did not include relevant data in his opinions).  "At a minimum, an expert opinion requires some explanation as to how the expert came to [her] conclusion and what methodologies or evidence substantiate that conclusion." *See Max Zach*, 2024 WL 4614487, at *4 (internal quotation omitted) (finding expert opinion unreliable when it was impossible to "discern the exact methodology" that the expert used); *see also Conn. Mun. Elec. Energy Coop. v. National Union Fire Ins. Co. of Pittsburgh, PA*, No. 19-CV-839 (JBA), 2021 WL 4170757, at *19 (D. Conn. Sept. 14, 2021) ("Rule 702 demands more than the exercise of an expert's subjective judgment for his or her testimony to be 'reliable' under the Federal Rules, including an explanation of how the expert's subjective judgment is applied to the facts."), *on reconsideration*, No. 19-CV-839 (JBA), 2021 WL 5039035 (D. Conn. Oct. 29, 2021).

To be clear, "the *point* of the 2018/2021 Permit is to prevent discharges" that violate water quality standards, not to protect against flooding as Dr. Nairn suggests. *Natural Res. Def. Council v. U.S. E.P.A.*, 808 F.3d 556, 579 (2d Cir. 2015). As such, a permittee must put in place best industry practices "to minimize[7] the discharge of pollutants from the permitted facility." Ex. D, 2018/2021 Permit, Section 5(b). Notably, the Terminal **is in compliance with its 2018/2021 Permit and is not violating water quality standards**. So, the Terminal is attaining the point of the 2018/2021 Permit. Dr. Nairn's opinions about are "[a]t most . . . amount to an observation, in hindsight, that [Defendants] could have done something differently that would have produced a better result." *See Delshah 60 Ninth, LLC v. Free People of PA LLC*, No. 20 Civ. 5905 (JMF) (SLC), 2024 WL 1120388, at *10 (S.D.N.Y. Mar. 13, 2024).

### 1. Dr. Nairn's Recommendations Concerning Terminal Flood Preparedness Are Unrelated to the 2018/2021 Permit

The Court should exclude Dr. Nairn's irrelevant opinions because they cannot assist the jury in resolving the only question for determination at this trial: whether Defendants violated the 2018/2021 Permit. Indeed, even Dr. Nairn did not identify the Permit in his reliance materials, and he does not know whether his opinions address this issue:

> Q. Let me ask you a really specific question. If we go to a trial in this case, you are not going to sit on the witness stand and hold up a copy of the permit and say, I looked at page 50 and this is the provision that Defendants violated? That is not something that you intend to do?

> **A. I don't know what I will do at trial. I haven't been instructed by CLF. . . . I have not been instructed by CLF.**

Dep. at 112:5–14.

> **Q. Am I correct that you are not offering any opinions in this case that Defendants actually violated a particular permit provision**?

---

[7] "'Minimize', for purposes of implementing control measures in Section 5(b) of this general permit, means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of **best industry practice**." Ex. D, 2018/2021 Permit.

A.  I have provided – I addressed the charge that CLF gave me, and I would –so I don't know legally what they are going to do with it.

**Q.  At least in your role, you are not offering any opinions that Defendants violated a specific permit provision?**

A.  I may – the information I am provided may have gone to that end or may go to that end.  I don't know.

**Q.  In other words, you are not drawing a conclusion, at least in your role, that a certain permit provision was violated; is that fair?**

A.  I – no, I don't think that is fair.

**Q.  Well, tell me then.**

A.  Tell you what?

**Q.  Are you offering any opinions in this case that Defendants violated a specific permit provision?**

A.  I think I answered that I am providing information that would be the basis for determining whether a permit has been violated, but from a permitting and legal standpoint, I don't know.

*Id.* at 83:10–84:12.

Dr. Nairn's opinions in this case have nothing to do with the 2018/2021 Permit.  If Dr. Nairn himself cannot discern whether his conclusions apply to the issue in this trial, they cannot provide assistance to lay jurors.  Any attempt by Dr. Nairn to speculate about the terms of the Permit based on his instructions from CLF, *id.* at 112:5–14 (**"I don't know what I will do at trial. I haven't been instructed by CLF. . . . I have not been instructed by CLF."**), would be nothing more than improper advocacy disguised as expert opinion, which the Court should not allow.  *See In re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (precluding experts from "improperly assuming the role of advocates for the plaintiffs' case") (citation modified); *In re: Trasylol Prods. Liab. Litig.*, 709 F. Supp. 1323, 1351 (S.D. Fla. 2010) ("Plainly stated, Dr. Parisian is an advocate, presented with the trappings of an expert . . . Her testimony is unreliable and would not be of assistance to the jury.").

2.    **Dr. Nairn Did Not Read the 2018/2021 Permit or Attempt to Apply His Opinions to the Terminal**

Dr. Nairn's Opinions do not apply to the 2018/2021 Permit that was applicable during the relevant time period. Dr. Nairn conceded, he never read the Permit, much less considered whether his opinions apply to the Permit based on its terms. Dep. at 82:3-9 ("[Q.] Am I correct that you have not reviewed any of the actual permits for the Equilon New Haven Terminal? **A. I might – I may have a long time ago.** Q. Do you know for sure? **A. No, I don't know for sure.**"). ██████████████████████████████████████████████

██████████████████████████ Dr. Nairn was also unable to provide testimony concerning the content of the permit, including whether the 2018 Permit was the Permit applicable to the Terminal when this lawsuit was filed in 2021. *Id.* at 108:25–109:4. In other words, Nairn offers opinion about flooding, for example, when the Permit itself does not regulate flooding (it regulates only stormwater "discharges"), and the alleged "non-compliance" because the Terminal may flood. *See, e.g.*, *Id.* at 205:3–25 ("Q. Do you believe it is a violation of any requirement if the terminal would be flooded in any way? . . . THE WITNESS: I can't opine on whether it is a violation or not. I can only opine on what happens in the conditions that I looked at. . . . Q. So the mere fact of a flood at a terminal is not a violation of any regulatory requirement that you are aware of? . . . THE WITNESS: Yeah, I guess I can't offer that in terms of– I guess you used the word 'violation' again, I believe, in that question, and that requires me to provide a legal opinion.").

Dr. Nairn never cites specific Permit requirements he believes were not met by Defendants, much less citing Permit requirements that were met. For example, Dr. Nairn "believe[s] [he] might have reviewed" the 2018 Permit, and he "recall[s] something to [the] effect" that the 2018 Permit was later updated to the current Permit. *Id.* at 109:17–110:11. As he

candidly conceded throughout his deposition, however, Dr. Nairn did not consider the Permit,

nor did he assess whether the Terminal violates any provision thereof. Dr. Nairn conceded, he

did not read the Permit, much less consider whether his opinions apply to the Permit's terms; he

does not know what the Permit terms are. ███████████████████████████████

███████████████████████████

> **Q. Am I correct that you have not reviewed any of the actual permits for the**
> **[Terminal]?**
> A. I might – I may have reviewed permits, but it was some time ago.

Dep. at 82:3–83:7.

Dr. Nairn was also unable to provide testimony concerning the content of the 2018/2021

Permit, including whether the 2018 Permit was the Permit applicable to the Terminal when this

lawsuit was filed in 2021. *Id.* at 108:25–109:4. Dr. Nairn also does not offer whether the

Terminal violates any provision of the 2018/2021 Permit:



Dep. at 84:18–85:6.

> **Q. Do you agree that the New Haven Terminal is subject to the 2021 Connecticut**
> **General Permit for Industrial Stormwater Discharge?**
> A. Again . . . I am not opining on, you know, which permits apply when and where.

*Id.* at 159:11–18.

> Q. Do you agree that the permit specifies that best management practices only
> require actions that are either, quote, 'technologically available and economically
> practicable'?
> **THE WITNESS: I am not aware of the details of that part of the permit.**

*Id.* at 201:21–202:3.

Because he did not consider the specific Permit requirements in reaching his conclusions

in this lawsuit concerning an alleged violation of it, Dr. Nairn was unable to answer whether his

18

suggested standards were required by the Permit.  More specifically, Dr. Nairn was unable to state an of the following with certainty:

- **whether the Permit "speak[s] to ingress or egress routes at industrial facilities," including the words "ingress" and "egress,"** *id.* at 114:16–115:15 ("It may not speak to ingress or egress, but the implications of what must be done under the permit would require ingress and egress. . . . [P]hysical presence would be impossible if you can't get in or get out, and I don't think you are going to be there in the middle of a storm."), *id.* at 115:16–116:19 ("Q. Do you agree at least in the abstract that if the words ['ingress' and 'egress'] are not included in the permit, then the permit doesn't include those words; correct?  A. That much I can say yes to.");

- **"cite[s] regulations from the National Highway Traffic and Safety Administration" ("NHTSA"),** *id.* at 116:20–25;

- **"direct[s] an owner and operator of a bulk fuel storage facility as to what they must use to construct secondary containment berms," if any**, *id.* at 120:2–11 ("I can't answer that question.");

- **"factually states how tall a secondary containment berm must be,"** *id.* at 121:24–122:3; *id.* at 205:3–13 ("Q.  Do you believe it is a violation of any requirement if the terminal would be flooded in any way? . . . A.  I can't opine on whether it is a violation or not.  I can only opine on what happens in the conditions that I looked at.");

- **cannot point to any example in Connecticut where a "bulk storage facility" considers the "hundred-year return period" or 500-year return period storm event in conducting its risk assessment operations."** *id.* at 200:13–201:16.

Instead, Dr. Nairn attempts to expand the language of the Permit by importing his interpretation of "industry practice" and "standard practice," and non-binding guidance, as if they were enforceable legal requirements imposed by the 2018/2021 Permit.  *See Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (excluding expert opinion concerning industry practice and FAA policy because it was "irrelevant to the jury's determination of violations of the regulations").  Dr. Nairn fails to provide any methodology that reasonably connects his ideas of what *should be* implemented at the Terminal to the 2018/2021 Permit itself.

### 3. Dr. Nairn Ignored Applicable EPA and CT DEEP Regulations and Guidance Which Are Necessary to Sustain a Reliable Methodology

In his deposition, for example, Dr. Nairn testified that he did not address, or even mention, key documents that are not consistent with his conclusions. This is manifestly unreliable and demonstrates his cherry-picking of the miscellaneous inapposite guidance documents to attempt to support his irrelevant and unreliable opinions. Of course, the Terminal in this case is subject to the CT DEEP stormwater discharge permit based on its EPA SIC code industrial classification as a "Petroleum Bulk Storage Terminal." 2021 EPA MSGP, Appendix N – List of SIC and NAISC Codes at N-19, attached as Exhibit E (SIC Code 5171 – Petroleum Bulk Stations and Terminals); Ex. D, 2018/2021 Permit at 6.

In his deposition, Dr. Nairn was unable to state with certainty whether he reviewed the following:

- **any EPA or CT DEEP guidance materials for how one should go about preparing a SWPPP**, *id.* at 85:16–86:5;

- **any EPA or CT DEEP guidance concerning "how one should go about preparing an SPCC,"** which are not included on his list of reliance materials, *id.* at 86:16–87:18

- **the EPA Multi-Sector General Permit**, *id.* at 83:4–9 [the U.S. EPA's form industrial stormwater permit];

- **CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan** dated March 22, 2011; *id.* 215:11–216:10, 221:24–222:7

To be sure, agencies including EPA, CT DEEP, and industry groups issue different types of guidance that is arguably relevant to compliance **with the Industrial Stormwater Permit**. In contrast, Dr. Nairn failed to consider documents specifically relevant to this lawsuit, including the Permit applicable to the Terminal, because they do not support his opinions about flooding protections he alleges were required. Ignoring clearly relevant information and data is yet

another reason to exclude Dr. Nairn because it shows the lack of a reliable methodology.  Fed. R.

Evid. 702.

   **C.    Dr. Nairn's Opinions Concerning Standard Industry Practice Are Not Based Upon a Reliable Methodology**

This Court should exclude Dr. Nairn's opinions concerning "best industry practices"

because his litigation-driven methodology is unreliable.  Fed. R. Evid. 702.  In fact, CT DEEP

rejected his interpretation that the 2018/2021 Permit has ever included an implied requirement to

expansively prepare for flooding events under the 2018/2021 Permit.  CT DEEP included in its

2024 *draft* permit[8] a requirement that permittees assess for climate resilience **for the first time**,

and explained in its Fact Sheet that this was an entirely "new component").  *See* 2024 Draft

Permit, attached as Exhibit F; CT DEEP Fact Sheet (Nov. 2024 Draft), attached as Exhibit G, at

11 ("The resiliency measures element is a *new component* of the SWPPP and was added in

response to Connecticut's commitment to preparing for ongoing climate changes.") (emphasis

added).

In other words, the 2024 draft permit makes clear that 2018/2021 Permit did *not* require

that Defendants address the possible effects of climate change, including climate-based flood

events.  Dr. Nairn ignored relevant evidence and information but instead formed his conclusions

in a piecemeal fashion, combining the irrelevant standards and practices that best support his

self-serving definition.

███████████████████████████████

███████████████████████████████████

██████████████████████████████

---

[8] CT DEEP finalized the draft permit on October 1, 2025, the "New Permit."  The New Permit has the same resiliency measures element that the 2024 draft permit contained.

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████ If so, the case would

focus on the allegations of Dr. Nairn, and not the actual requirements of the 2018/2021 Permit.

       **1.**     **Dr. Nairn's Opinions Are Based on Alleged Standards and Practices that Are Not Included in the 2018/2021 Permit and Do Not Apply to the Terminal**

Dr. Nairn's testimony is irrelevant because he grounds his opinions in standards that are never even identified or referenced in the Permit, and they are never even mentioned by the U.S. EPA or the CT DEEP as being relevant to the industrial stormwater permit at issue in this lawsuit. That fact is undisputed.

In contrast, Dr. Nairn failed to consider relevant documents and information that did not support his opinions, limiting his analysis to a self-selected collection of miscellaneous inapplicable, unrelated, and nonbinding information from various professional societies, to create a definition that supports his conclusions. From an evidentiary perspective fatal to CLF's claims, Dr. Nairn admitted that "the General Permit and its discussion of best management practices and best industry practices" were "[**n]ot something [he] looked at in detail**." Dep. 198:5–11. But that is the sole legal standard in this dispute over the New Haven Terminal.

By way of example, rather than consider the best practices of the relevant industry, Dr. Nairn defined "best industry practices" ███████████████████████████

███████████████████████████████████████████

█████████████████████████████████████ *Id.* 198:23–199:21.

In other words, although the Permit governs the Terminal practices with regard to *containment*, Dr. Nairn offered opinions concerning practices regarding *flood management*, which is beyond the scope of the Permit.  In the context of his *flood management* opinions, Dr. Nairn created and applied a best practices standard—that has nothing to do with *containment*—to support his conclusion that Defendants containment practices under the Permit were inconsistent with the inapposite flood management practices that are not even tangentially related to the Permit.

Dr. Nairn's inapposite conclusion based on his litigation-based definition of best practices not included in the Permit belies their relevance and reliability.  *See Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) ("A scientist who has a formed opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results."); *In re Seroquel Prods. Liab. Litig*., No. 6:06-md-1769, 2009 WL 3806434, at *5 (M.D. Fla. June 18, 2009) ("[T]he reliability of an expert's opinion should be seriously questioned when it is shown that the expert formed his or her opinion prior to reviewing scientific evidence, and, thereafter, merely cherry-picked evidence favorable to that opinion.").

>    **2.      Dr. Nairn's Opinions Are Based on an Amalgam of Standards and Practices that Do Not Govern the Permit or Terminal**

Further divorcing his conclusions from the facts and issues in this case, Dr. Nairn applied his own preferred standards and practices—albeit irrelevant standards and practices—that are not consistent with those of any qualified expert in the field or generally accepted within the relevant industry or related scientific community.  The Court should exclude Dr. Nairn's unsupported assurances that his preferred standards are accepted an unspecified industry, as applied "within the context of his opinions."  Dep. at 198:23–199:21; *see Boucher v. U.S. Suzuki Motor Corp.*, 73

F.3d 18, 22 (2d Cir. 1996) ("[E]xpert testimony should be excluded…if it is based on assumptions" that amount to "an apples and oranges comparison.").

By definition, when an expert fails to point to an objective criteria for industry standards, his opinion is unreliable under Rule 702. *Conn. Mun. Elec. Energy Coop*, 2021 WL 4170757, at *19 (excluding as unreliable expert testimony about "best practices" for attorneys, based only on "his professional experience"); *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 379 (N.D.N.Y. 2001) (excluding expert testimony as unreliable where the experts "formulat[ed] their own standards on which to base their conclusions"); *Yazujian v. PetSmart*, 2018 WL 1830931, at *2 (3d Cir. Apr. 17, 2018) (affirming district court's exclusion of a retail safety expert's testimony because, in part, the expert "conceded that there are no formal industry standards in the area of retail safety" and "offer[ed] an opinion ... of what the best industry practices were[ ] based on a review of unspecified retail manuals."); *Hawley v. Hannaford Bros. Co. LLC*, No. 2:16-CV-00249, 2018 WL 3647202, at *4 n. 4 (D. Vt. Aug. 1, 2018) (excluding expert testimony that defendant's product did not conform to industry safety standards based on lack of support for any such standard).

For instance, in the *Meineker* case, the court excluded an expert whose methodology was unreliable because it did not rely on any objective "industry standards." *See* 154 F. Supp. 2d 379–80. There, the plaintiff's expert opined that a movie theater failed to comply with the Americans with Disabilities Act ("ADA") because it offered "inferior seating to patrons in wheelchairs." *Id.* at 378. The Court determined "there are no industry standards to provide a foundation" for the expert's testimony, and thus, the expert's "methodology was based on his subjective determination" of which seats were "best" and "worst." *Id.* at 380. Such subjective methodology "inhibit objective testing and there are no standards to control the operation of this

technique." *Id.*  The case law is very clear: Dr. Nairn cannot manufacture his own "best industry practice" standard without having data to define the industry and industry "practice."

To be sure, agencies including EPA and industry groups issue different types of guidance relevant to compliance **with the Industrial Stormwater Permit**.  But Dr. Nairn's are not relevant to that issue, as evidenced by Dr. Nairn's failure to cite even a single reference to his preferred standards in the 2018/2021Permit, or related applicable guidance from the CT DEEP, which issued the Permit.

According to that CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan dated March 22, 2011,[9] "Control measures are the best management practices (BMPs) or other structural or non-structural practices that are used to prevent or minimize the discharge of pollutants in stormwater."  Dep. at 219:5-14.  The CT DEEP Guidance document identifies 13 control measures, which are outlined in the Permit.  *Id.* at 223:21-224:15 and Ex. 18 at 18.  Dr. Nairn was unable to state with certainty whether he ever reviewed the CT DEEP Guidance."  *Id.* at 215:11-216:10, 221:24-222:7.

Nor did he provide any explanation for his decision to disregard these standards.  Instead, he attempted to shift the scope of this case by offering his opinions of the best practices "within the field of coastal engineering," with regard to "flood risk reduction projects," rather than from CLF's claim in this lawsuit concerning an alleged violation of a Permit dealing with bulk fuel storage and containment.  *See, e.g.*, *id.* at 204:12-17.

Dr. Nairn essentially relies to pack all of his opinions into three words in the 2018/2021 Permit: "best industry practice."  The 2018/2021 Permit's reference to "best industry practice" in is the definitions section under the word "minimize."  Ex. D, 2018/2021 Permit at 6.

---

[9] The March 11, 2011 CT DEEP Guidance Document for Preparing a [SWPPP] has not been revised.  Dep. at 217:15-218:5

Consequently, the 2018/2021 Permit's enumerated control measures in Section 5(b)—none of which encompass Dr. Nairn's opinions—are "intended to 'minimize' the discharge of pollutants from the permitted facility":

> '*Minimize*,' for purposes of implementing control measures in Section 5(b) of this general permit, means to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable ***in light of*** **best industry practice**.

*Id.* at 6, 18–19 (emphasis added).

Stated differently, the listed control measures in the 2018/2021 Permit are cabined by "best industry practice," but best industry practice does not—and cannot—create entirely new obligations. *See*, *e.g.*, Ohio EPA Div. of Surface Water Response to Comments (March 2017), attached as Exhibit H (responding to comment that "best industry practice" language in the Ohio industrial stormwater permit was vague, explaining that the agency "recognizes each industry is unique with specific resources and needs pursuant to maintaining operations" and as a result, it would "evaluate … 'best industry practice' on a case-by-case basis."); *id.* at 2 ("Ohio EPA expects the great majority of permittees performing corrective actions (for any of the situations described in Part 3) will determine there are modifications that can be made to the *control measures that are technologically available, economically practicable and achievable, and commonly employed in the industry*.") (emphasis added, parenthesis in original); *id.* at 4 ("Ohio EPA recognizes each industry is unique with specific resources and needs pursuant to maintaining operations. As a result, the agency chooses to evaluate 'economically practicable and achievable in light of best industry practice' on a *case-by-case-basis*.") (emphasis added).

Dr. Nairn's process of designing his possible flood model is illustrative.  There, Dr. Nairn relied on standards that are not incorporated, referenced, or alluded to in the Permit or representative of "best industry practice" for a petroleum bulk storage fuel industry, and are

therefore irrelevant to analyze whether the Terminal complies with the Permit. Specifically, Dr. Nairn cites several non-governing organizations and professional societies to support his conclusions, including the United States Army Corps of Engineers ("USACE"), the Federal Emergency Management Agency ("FEMA"), the American Society of Civil Engineers ("ASCE"), and the Association of Floodplain Managers. *See* Dep. at 170:8–172:7; Nairn Rept. at ii–v.

While these organizations may offer their own insight or suggest guidance, they are irrelevant for purposes of setting the *requirements* applicable to the Permit, which is the only disputed issue to be resolved at trial—which is governed by its terms and the standards of the CT DEEP, which issued the 2018/2021 Permit. As the governing regulatory agency, CT DEEP's interpretation of its own regulations receives deference, regardless of Dr. Nairn's preferences. *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 207-08 (2d Cir. 2009) ("[W]e will generally defer to an agency's interpretation of its own regulations . . .").

Dr. Nairn did not explain his decision to rely on guidance documents that (1) do not control or set relevant "best industry practices," and (2) are not included in the Permit, including any explanation of "the relationship between guidelines and the requirements of the [P]ermit." Dep. at 174:3–9. Indeed, there is none: *None* of these organizations has authority over the Terminal.[10] Nor do they have any regulatory or other governing authority—including under the CWA and RCRA—over bulk petroleum storage facilities. By their terms, none of those guidance documents apply to an existing bulk fuel storage facility that is not undergoing a substantial modification.

---

[10] To the extent that the USACE has any authority over the Terminal, it is limited with respect to permitting discharges of dredge or fill material, which is not at issue here and is wholly unrelated to stormwater permitting.

The most obvious example of Dr. Nairn's irrelevant and unreliable conclusions is █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

As a matter of law, CLF cannot pursue a claim to enforce an alleged violation of the National Traffic and Motor Vehicle Safety Act or NHTSA regulations in this lawsuit under the plain language of the CWA and RCRA. *See, e.g.*, 33 U.S.C. § 1365(a)(1). The National Traffic and Motor Vehicle Safety Act specifies procedural prerequisites to filing a lawsuit that CLF has not satisfied here. *See* 49 U.S.C.A. § 30162. CLF could not bring a claim to enforce this violation in this CWA citizen suit. Dr. Nairn's opinions in this regard are also factually inaccurate as the facility has emergency access points that the Nairn fails to consider or misrepresents where they are located. And there is no private right of action to enforce the NHTSA. *See, e.g.*, *U.S. v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006) ("Experts are permitted to testify regarding how their government agency applies rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case.").

As another example, the ASCE, ASPM, and FEMA standards upon which Dr. Nairn relies "apply to new facilities and substantial improvement of existing facilities." Dep. at 173:10–25. In fact, the ASCE Standard itself repeatedly states that the standard only applies to "new construction." Ex. I, ASCE Standard 24-14 at 1.[5] Factually, the over 70-year-old Terminal is certainly not "new construction." The ASCE Standard does not even mention petroleum bulk storage terminals. As a matter of law, these standards that do not apply to an operating Terminal cannot be "best industry practice" for the legacy petroleum bulk storage Terminal or somehow create obligations under the 2018/2021 Permit.

███████████████████████████ ███████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████     Again,

the document does not apply to future modifications.  In Dr. Nairn's opinion, the documents

referenced in his reports "provide guidelines where if you are the owner/operator of a facility,

you want to know whether it achieves the requirements from time to time."  Dep. at 174:14–

175:1.  Based on Dr. Nairn's "interpretation" of those documents, "*if* a facility is shown to

require substantial improvement, then these guidelines *would* apply."  *Id*. at 174:1–12.

Dr. Nairn's speculative interpretation has *nothing* to do with the issue here—whether

Defendants violated a term of the Permit.  Dr. Nairn's reference to standards that specifically

don't apply to an operating facility is the definition of irrelevant and unhelpful expert opinion.  It

also based on hypothetical circumstances that do not exist, in lieu of the existing condition of the

Terminal, which does not reflect a reliable application of methodology to the facts presented

here.  *See Karavitis v. Makita U.S.A., Inc.*, 243 F.Supp.3d 235, 245 (D. Conn. 2017), *aff'd*, 722

Fed. Appx. 53 (2d Cir. 2018) (excluding unhelpful expert opinion that did "not provide any

independent analysis of the cited sources explaining how they support his conclusions").

Like in *Meineker*, Dr. Nairn's methodology—selecting random sources that are not

relevant (and do not even mention) the petroleum bulk fuel industry as best industry practice—

"inhibit[s] objective testing" for what is required under the 2018/2021 Permit.  *See* 154 F. Supp.

2d 379–80.  Indeed, using Dr. Nairn's same (illusive) methodology, any expert could interpret the

terms of state-issued permits to his liking, usurping the authority of EPA and state agencies like

CT DEEP and blindsiding permittees about what a permit requires. This Court should exclude Dr. Nairn's opinions as unreliable because he relies on only his own "subjective determination" to interpret "best industry practice" and the requirements of the 2018/2021 Permit. *Id.* (excluding expert opinion based only on the expert's "subjective determination").

### 3. Dr. Nairn's Conclusory Pure Opinion Testimony About Irrelevant "Best Industry Practices" Is Not Reliable

Not only did Dr. Nairn fail to identify "best practices" that apply to relevant facilities within the same industry, but he also failed to provide support for his opinion that his preferred practices are generally accepted by qualified professionals in the relevant field and industry. In other words, Dr. Nairn's failure to explain how his conclusions are "reasonably related" to the facts of this case renders his opinions irrelevant and inadmissible. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001)

Dr. Nairn's endorsement of his own expertise to define "best industry standards" hardly qualifies as reliable support for his conclusions. *See Rezulin*, 309 F. Supp. 2d at 543 ("Rule 702 still requires that 'expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'") (quoting *Daubert*, 509 U.S. at 590). ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ █ ██

---

[11] Defendants acknowledge their expert, Dr. Craig Jones, developed a flood vulnerability model at the Terminal. However, Defendants did so for the purposes of rebutting CLF's expert, not for the purposes of complying with the Permit.

████████████████████████████████████████████

████████████████████████████████████████

From an evidentiary perspective, Dr. Nairn did not attempt to identify any other individual or entity that endorsed his opinions or definitions.  Instead he sought to apply portions of miscellaneous guidance that he personally certified without other support.  If Dr. Nairn never identified any examples of any other companies in the petroleum storage tank terminal industrial sector actually using the procedures referenced by Dr. Nairn, they cannot be "best industry practice" actually used in the petroleum storage tank industrial sector.  Nairn's lack of data for his definition of "best industry practices" is reason to strike his speculative opinions. *See Munn v. Hotchkiss Sch.,* 24 F.Supp.3d 155, 201–03 (D. Conn. 2014) (Underhill, J.) (parentheses in original), *aff'd*, 724 Fed. Appx. 25 (2d Cir. 2018) (striking expert proffered to testify about industry standards who instead "gave unsupported personal lay opinions disguised as industry standards" where he based his opinions not on surveys of relevant industry members, but instead on his own "individual practice" and "anecdotal conversation with only a handful of" industry members).

Dr. Nairn's self-endorsement of his practices and methodology is insufficient, but that is his only support for his view of "best industry practices."  *See, e.g.*, *Connecticut Mun. Elec. Energy Coop.*, 2021 WL 4170757, at * 19 ("[W]hen an expert witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (citing *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003)), *motion for reconsideration granted on other grounds*, 2021 WL 5039035 (Oct. 29,

---

[12] The pages of Appendix A to Dr. Nairn's rebuttal report are not numbered.  These citations reference the page of the pdf copy of that document.

2021); *see also, e.g.*, *Castelluccio v. Int'l Bus. Machines Corp.*, No. 3:09CV1145 DJS, 2012 WL 5408420, at *5 (D. Conn. Nov. 6, 2012) (Squatrito, J.) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Amorgianos*, 303 F.3d at 266).; *Duchimaza v. United States*, 211 F.Supp.3d 421, 431 (D. Conn. 2016) (Shea, J.) (excluding expert opinion that was "just his own *ipse dixit*, uninformed by relevant expertise, and would not "help the trier of fact"). Dr. Nairn provides absolutely no data, information, examples or other reports that supports his claim of "best industry practice."

### 4. Dr. Nairn Failed to Consider Relevant Evidence and Applicable Legal and Regulatory Standards and Guidance

Dr. Nairn's analysis is based on cherry-picking the information most favorable to his conclusions and ignoring documents that do not support his conclusions, regardless of their relevance to the issues in this lawsuit. To support his conclusions, Dr. Nairn subjectively selected and interpreted certain standards to his self-created view of "industry standards" and "industry practices." Yet it is well established that an expert cannot substitute "his personal opinions (*ipse dixit*) or his individual practice for a proper expert opinion about industry standards." *See Munn,* 24 F.Supp.3d at 202–03 (parentheses in original). But that is exactly the approach Dr. Nairn employed here by forming conclusions based on his own unreliable and unsupported assumptions. Time and again, his analysis fails to consider whether there was a connection between those standards and the facts of this case, choosing instead to pick and choose certain provisions of different guidance documents that are not included in the Permit and do not apply to the Terminal.

As an initial matter, although Dr. Nairn concludes that Defendants failed to conduct a climate change risk assessment at the Terminal, he could not identify support in the Permit for

his opinion that any such assessment was required.  Again, it is undisputed that Dr. Nairn pointed to no section of the Permit that requires a "climate change risk assessment."  In fact, Dr. Nairn was not able to state whether the Permit includes the words "climate change," related terms such as "storm surge" and "return period events," because he did not "know enough about the comparison of the two permits" to allow him to do so.  *Id.* at 292:16–293:12.  On its face, the Permit does not include these terms.  *See* Ex. D, 2018/2021 Permit.  Permit aside, Dr. Nairn failed to identify any documents supporting his suggestion that Defendants were required to conduct any type of "climate change vulnerability" risk assessment.  There are none, despite Dr. Nairn's suggestion otherwise.

His deposition testimony makes clear that Dr. Nairn does not have such supporting evidence.  For example, Dr. Nairn is not "aware of" anything in the Permit, SWPPP, or SPCC "that says that a certain return period [to identify potential future storms] should be used by the permittee in conducting its operations."  Dep. at 155:3–158:13.  Dr. Nairn also concedes he does not know "one way or the other" whether any other private sector bulk fuel storage facility within the State of Connecticut that is looking at a 500-year return period storm event in conducting its risk assessment operations."  *Id.* at 200:13–201:5.

Nor is he aware of any bulk fuel storage facility in the State of Connecticut that is even looking at a hundred-year return period storm event in conducting its risk assessment practices."  *Id.* at 201:6–16.  Despite this clear deficiency, Dr. Nairn—along with many other of CLF's experts—assess the vulnerability of the Terminal under unpredicted adverse weather events supposedly resulting from ongoing climate change.

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ Fed. R. Evid. 702.  Here again, Dr. Nairn was not

able to identify anything in the Permit, the SWPPP, or the SPCC to support his opinions about

containment berms.  Dep. at 125:5–128:11.  Ignoring this fact, Dr. Nairn (again) creates and

imposes non-existent requirements to arrive at his proffered conclusion.  In other words, despite

the fact that "the Permit is silent as to what materials should be used to construct a secondary

containment berm," Dr. Nairn "would expect the permit anticipates that the berms are made of

something that would resist a storm condition."  *Id.* at 119:14–120:11.  Additionally, Dr. Nairn's

opinion about the current stability of the containment berms is based only on his site visit visual

observations and photographs.  Dr. Nairn did not perform geotechnical investigation, modeling

with actual Terminal-specific data, or any type of field testing.  ████████████████

███████████████████████████████████████

Under Rule 702, an expert must have sufficient data and an appropriate method to

support their opinions.  That's a bedrock principle under Rule 702.  However, Dr. Nairn also

failed to assess whether any of his preferred practices is even possible, much less economically

feasible.  For example:

> **Q. You agree that it would not be economically practicable, for example, for Defendants to build a dome over the entire facility to protect it from rainfall?**
>
> \*        \*        \*
>
> THE WITNESS: I would have to do the risk evaluation and the economic cost-benefit.
>
> **Q. So a cost-benefit analysis would be part of that risk analysis and risk evaluation; correct?**
>
> A. Yes, including the consideration of the health and ecosystem risks.

Dep. at 202:5–203:1.

> **Q. But it wouldn't be economically practical to build a 50-foot fortress wall around the whole facility?**

\*     \*     \*

THE WITNESS: Well, again, I think it is a question of more than economic
practicalities.  It is a question of . . . eco risk and human health risk. But I don't
know. Sitting here, doing the calculations, I don't know –without doing the
calculations, sorry.

*Id.* at 203:15–204:3.

**Q. Do you agree that it would not be possible to prevent all instances of
flooding from ever occurring at the terminal, no matter what you did?**

\*     \*     \*

THE WITNESS: I think within the field of coastal engineering, that is why we
refer to these types of projects as flood risk reduction projects versus flood
protection projects, because there could always –the 10,000-year storm could
happen tomorrow.

**Q. And obviously, you can't prevent rain falling from the sky either; correct?**

\*     \*     \*

THE WITNESS: Well, yeah, I don't think anybody can say that anybody could do
that.

*Id.* at 204:5–23.

Dr. Nairn's narrative descriptions of his preferred standards are neither best industry

practices or best management practices. *See Munn*, 24 F. Supp. 3d at 207 n. 34 (finding with

regards to industry standards that "when an expert offers his opinion to determine that standard,

his opinion must be based in fact or data, must employ sound methods, and must apply those

facts and methods to the instant litigation").  In fact, in reaching his conclusions here, Dr. Nairn

did not review any SWPPPs or SPCCs for other industrial facilities in Connecticut.  *Id*. at 200:2-

11.

As each of these examples demonstrates, Dr. Nairn's limited analysis is not based on

sufficient facts and data, eliminating even the possibility of a reliable methodological

application; therefore, it cannot provide the jurors with "useful information" that can assist them

in their determination.  *See, e.g.*, *Bustamante v. KIND, LLC*, 100 F.4th 419, 430 (2d Cir. 2024)

(affirming exclusion of expert testimony "even ignoring . . . methodological failures," it provided "no useful information"); *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co*., 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002) ("A survey should be excluded where it is so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect.").  It therefore fails to satisfy the prerequisites to admissibility under Rule 702.

> **D.    Admitting Dr. Nairn's Irrelevant, Unsupported, Unreliable, and Unhelpful Opinions Will Mislead the Jury and Result in Confusion of the Issues and Unfair Prejudice to Defendants**

In addition to the many deficiencies under Rule 702, the Court should exclude Dr. Nairn's unhelpful opinions under Federal Rule of Evidence 403.  The Court must take great care with Dr. Nairn's expert testimony under Rule 403 "given the unique weight such evidence may have in a jury's deliberations." *Nimely,* 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595).  In the same vein, district courts must be "especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law." *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 511 (2d Cir. 1977) (citation omitted) (reversing the district court allowing an expert to testify about securities law and usurp the role of the jury).

Where, as here, an expert's opinion (1) is not based on a reliable methodology, and (2) failed to consider critical relevant facts, "the probative value of such testimony 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, . . . and must be excluded for that reason as well."  *See Castelluccio v. Int'l Bus. Machines Corp.*, No. 3:09CV1145 DJS, 2012 WL 5408420, at *7 (D. Conn. Nov. 6, 2012) (Squatrito, J.).

The prejudice created by Dr. Nairn's proposed opinions is particularly clear in this case. Dr. Nairn crafted his own personal, hypothetical obligations related to flood protection under the

2018/2021 Permit, even though his subjective obligations (or even flood protection) **are not mentioned** in the CWA or RCRA, or of course, the 2018/2018 Permit itself.

For this reason, Dr. Nairn should not be permitted to introduce new opinions—not supported by any agency guidance or relevant industry standards—that wrongly expand the scope of this case—or send misleading interpretations—and unfairly prejudice Defendants by injecting into the 2018/2021 Permit flood protection requirements that CT DEEP never intended.

The risk of unfair prejudice is particularly acute here, give, the likelihood that the jurors may ascribe undue weight to Dr. Nairn's unsupported and unreliable opinions because he will be introduced to them as an expert with an esteemed reputation. *See, e.g.*, *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("We cannot ignore the tendency of juries on occasion "to decide simply according to the preponderance of numbers and of influential names."); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors.").

Given the court's obligation "not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law," Dr. Nairn's testimony must be excluded under Rule 403. *Marx & Co., Inc.*, 550 F.2d at 511.

Dr. Nairn is exactly that—a "paid advocate" for CLF, who injects his flood preparedness advocacy with legal obligations in the 2018/2021 Permit never before stated by CT DEEP. *Id.* (reversing the district court allowing an expert to testify about securities law and usurp the role of the jury). His opinions certainly risk confusing and misleading the jury, which the Court should not allow. Fed. R. Evid. 403.

And what is more, introduction of Dr. Nairn's opinions about matters not CLF has not properly noticed or pled would result in substantial and irreparable unfair prejudice to

Defendants by violating their due process. *See* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."); *see also, e.g.*, *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with 'an opportunity to present every available defense.'" (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).

Defendants are entitled to a full and fair opportunity to defend themselves against the claims against them. The Court should not allow Plaintiff to compromise Defendants' due process rights by ignoring the mandatory CWA and RCRA pre-suit notifications of the specific violations and notification to the U.S. EPA and the CT DEEP.

## V.    CONCLUSION

The Court should exclude Dr. Robert Nairn's expert opinions pursuant to Federal Rules of Evidence 401–403, and 702.

Dated: October 3, 2025                              Respectfully submitted,

                                                   /s/ *Douglas A. Henderson*
                                                   Douglas A. Henderson (phv05547)
                                                   Carmen R. Toledo (phv20194)
                                                   King & Spalding, LLP
                                                   1180 Peachtree Street, N.E.
                                                   Atlanta, GA 30309
                                                   T: (404) 572-2769
                                                   dhenderson@kslaw.com
                                                   ctoledo@kslaw.com

                                                   Antonio E. Lewis (phv03069)
                                                   King & Spalding, LLP
                                                   300 S Tryon Street
                                                   Suite 1700

Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed

with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all

counsel of record by sending a Notice of Electronic Filing.

<u>/s/ Douglas A. Henderson</u>
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com