# Exhibit C

Case 3:21-cv-00933-VDO    Document 744-4    Filed 10/04/25    Page 2 of 65

Robert Nairn , Ph.D.                     August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 1

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF CONNECTICUT

3

4    --------------------------

5    CONSERVATION LAW FOUNDATION,)

6    INC.,                       )

7                 Plaintiff,    )

8           v.                  )

9                                ) Case No:

10   EQUILON ENTERPRISES LLC      ) 3:21-CV-00933-VDO

11   D/B/A SHELL OIL PRODUCTS US,)

12   TRITON TERMINALING LLC, and )

13   MOTIVA ENTERPRISES LLC,      )

14                 Defendants.   )

15   --------------------------)

16

17   --- VIDEOTAPED DEPOSITION of ROBERT NAIRN Ph.D.,

18   held at the offices of Veritext Legal Solutions,

19   located at 77 King Street West, Suite 2020,

20   Toronto, Ontario, on the 13th day of August, 2025.

21

22                  --------

23   Reported By:  Deana Santedicola, CSR (Ont.), RPR,

24                 CRR

25

Robert Nairn , Ph.D.                              August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

                                                      Page 2

1    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:

4    CONSERVATION LAW FOUNDATION

5    PER:   Ken Rumelt, Esq.,

6              62 Summer Street

7              Boston, MA 02110-1016

8              krumelt@clf.org

9

10              - and -

11

12   TARRANT, GILLIES, SHEMS LLP

13   PER:   David K. Mears, Esq.

14              44 East State Street

15              Montpelier, VT 05602

16              david@tarrantgillies.com

17

18   FOR THE DEFENDANTS:

19   KING & SPALDING

20   PER:   Ryan T. Kearney, Esq.,

21              1180 Peachtree Street, N.E.

22              Atlanta, GA 30309

23              rkearney@kslaw.com

24

25   Also Present:  P. Rodney Barnes, Videographer

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 3

1                    INDEX   OF   PROCEEDINGS

2

3    WITNESS:  ROBERT NAIRN

4                                              PAGES

5    EXAMINATION BY MR. KEARNEY............... 11 - 329

6    EXAMINATION BY MR. RUMELT................ 329 - 331

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 22

1              And, Dr. Nairn, I am going to instruct
2     you not to answer the question.
3              BY MR. KEARNEY:
4              Q.   Well, Dr. Nairn, in this case, for
5     example, you have been disclosed as an expert on
6     coastal engineering, flooding and erosion at the
7     New Haven Terminal; is that correct?
8                  A.   Those are some of the areas.
9                  Q.   My question is only limited to
10    that.  I am not trying to get into opinions or
11    testimony on Pike Fuels.  Generally speaking, is
12    that the same area of testimony that you will be
13    offering in the Pike Fuels case?
14                 MR. RUMELT:  And I have the same
15    objection.  That is work product that is protected,
16    and I am going to instruct Dr. Nairn not to answer
17    that question.
18                 BY MR. KEARNEY:
19                 Q.   Okay.  Dr. Nairn, what do you
20    understand your expert role to be in this case?
21                 A.   If I could have my report, I could
22    read you the charge that I have for this case.
23                 Q.   Right.  I am just asking,
24    generally speaking, what do you understand your
25    role to be in this case?

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 23

1          A.   So you are asking me to remember
2     what my charge is, so --
3          Q.   Can you not remember what you are
4     talking about in this case without viewing your
5     expert report?
6          A.   I just want to make sure --
7          MR. RUMELT:  I --
8          THE WITNESS:  -- I don't miss anything.
9          MR. RUMELT:  Dr. Nairn, if you could
10    give me a moment after he asks the question so I'm
11    able to raise an objection if I need to.
12          BY MR. KEARNEY:
13          Q.   Yeah, we are going to get into
14    more detail as to your opinions in this case
15    certainly.  I am just asking you if you can give us
16    a very basic summary as to the opinions you have
17    been asked to offer in this case.
18          A.   At a high level and not
19    exclusively, it was to look at whether the
20    containment areas of the facility flooded or could
21    flood, and then the stability of the berms during
22    flood events.
23          And then - see, I'm trying to remember
24    my report now - the evaluation of what it would
25    require to provide sufficient flood risk reduction

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 24

1    for the facility.

2              Q.    Okay.  Dr. Nairn, we are obviously

3    going to spend a lot of time today talking about

4    the Equilon Terminal in New Haven, Connecticut.

5              I just want to say at times I may refer

6    to that simply as "the terminal" or the "Equilon

7    Terminal", perhaps the "New Haven Terminal".

8    Unless I say otherwise, can we agree that if I use

9    those terms, I am talking about the Equilon

10   Terminal in New Haven, Connecticut?

11             A.    Yes.

12             Q.    What is your understanding of the

13   claims that CLF is making in this case?

14             MR. RUMELT:  Rob, I am just going to

15   object to the extent it is outside the scope of

16   your report.

17             But you can answer.

18             THE WITNESS:  It has been a long time

19   since I read the claim, so I wouldn't be best to

20   answer that question.

21             BY MR. KEARNEY:

22             Q.    Have you read the Complaint in

23   this case?

24             A.    At one point in time.

25             Q.    Have you read the Notices of

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 25

1    Intent that were served prior to the Complaint

2    being served?

3                A.    I don't recall.

4                Q.    Do you have an understanding as to

5    who the Defendants are in this case?

6                A.    Yes.

7                Q.    And who are they?

8                A.    I would assume the owner/operators

9    of the facility.  I don't know much more than that.

10               Q.    And so, for example, who is the

11   owner of the Equilon Terminal in New Haven?

12               A.    I don't know the ownership

13   structure.  I know Shell is somehow involved,

14   but...

15               Q.    Do you know who the operator is of

16   the Equilon Terminal in New Haven?

17               A.    No.

18               Q.    Do you understand that one of the

19   Defendants, Motiva Enterprises, is no longer the

20   owner or operator of the New Haven Terminal as we

21   sit here today?

22               MR. RUMELT:  Ryan, I am going to object

23   to the line of questioning to the extent that it

24   seeks a legal opinion about what entity is an

25   operator based on the operator liability claims

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 26

1    that we have in this case.

2              Subject to that, you can answer.

3              THE WITNESS:  I read something about

4    Motiva, but I don't remember the timing or exactly

5    what happened.

6              BY MR. KEARNEY:

7              Q.   Do you have any reason to dispute

8    that Motiva ceased any ownership or operation of

9    the terminal as of May 1st, 2017?

10             MR. RUMELT:  Objection to the extent it

11   is outside the scope of your report, Dr. Nairn.

12             THE WITNESS:  I don't recall the dates.

13             BY MR. KEARNEY:

14             Q.   I'll represent to you that the

15   three Defendants in this case are Equilon

16   Enterprises LLC, Triton Terminaling LLC and Motiva

17   Enterprises LLC, and that there are no additional

18   Defendants in this case.  Is that your

19   understanding?

20             A.   As I said, I didn't really

21   understand who the Defendants were.

22             Q.   Well, let me ask you a different

23   question.  Do you understand that, for example,

24   Shell USA is not a Defendant in this case?

25             A.   I wasn't aware of the -- of who

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 27

1    the Defendants were.

2              Q.   Well, the same question I would

3    have for Shell PLC.  Do you have any reason to

4    dispute that they are not a Defendant in this case?

5              A.   I am not aware of who is a

6    Defendant exactly.

7              Q.   I take it you have reviewed the

8    Notice of Deposition for your appearance today?

9              A.   I don't think I have seen that.

10             Q.   Okay.  Let's mark it as an

11   exhibit.

12             EXHIBIT NO. 2:  Notice of Deposition

13             for the appearance of Dr. Robert Nairn.

14             BY MR. KEARNEY:

15             Q.   For the record, this will be Nairn

16   Exhibit 2.

17             So, Dr. Nairn, why don't you take a

18   second to just flip through that, and let me know

19   when you are ready.

20             MR. RUMELT:  Ryan, if I can ask if you

21   intend to also introduce the Objections?

22             MR. KEARNEY:  I don't have a printout.

23   If you have it, you are more than welcome to

24   introduce it as an exhibit.

25             MR. RUMELT:  Okay.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 49

1    applies to.
2                  Q.   You have a Ph.D. in coastal
3    engineering, right?
4                  A.   Coastal engineering and coastal
5    processes I believe is the name of the Ph.D., but
6    it also included river engineering courses or river
7    engineering studies.
8                  Q.   I'll mark as the next exhibit --
9    we are up to 7 now; is that correct?
10                 COURT REPORTER:  Yes.
11                 MR. KEARNEY:  So Nairn Exhibit 7, for
12   the record, is a printout of your LinkedIn bio.  I
13   apologize.  It is a part of the job, but --
14                 [Court Reporter intervenes for
15                 clarification.]
16                 MR. KEARNEY:  Oh, I'm sorry, yes.
17                 EXHIBIT NO. 7:  Printout of the
18                 LinkedIn biography of Dr. Robert Nairn.
19                 BY MR. KEARNEY:
20                 Q.   I'll keep this one.  Thank you.
21                 So, Dr. Nairn, is this a copy of your
22   LinkedIn bio?
23                 A.   It could be.  I don't think I have
24   looked at this in a long time.
25                 Q.   The reason I asked you the

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 53

1          A.    Some of the projects.

2          Q.    Okay.  You stated earlier that

3    perhaps it doesn't include all of the projects that

4    you worked on, but generally speaking, it

5    summarizes various projects that you have worked on

6    that are included?

7          A.    It summarizes the ones I show

8    here.

9          Q.    Your CV demonstrates that you have

10   been involved in a significant number of projects

11   in the Gulf of Mexico; correct?

12         A.    Correct.

13         Q.    I count 20 in total, if my math is

14   correct, on this CV.  Do you have any reason to

15   dispute that number?

16         A.    I haven't counted them.

17         Q.    That includes ten projects in

18   Louisiana alone, approximately?

19         A.    I haven't counted them.

20         Q.    Five other projects on the Gulf

21   Coast of Texas?

22         A.    Was that a question, sorry?

23         Q.    Yes.

24         A.    I haven't counted them.

25         Q.    Do you have any reason to dispute

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 55

1    projects in your CV relate to the Gulf of Mexico;
2    correct?
3              A.   Correct.
4              Q.   In addition to what we have
5    discussed, you have also worked on other projects
6    at locations within the Caribbean Sea; correct?
7              A.   Correct.
8              Q.   Some in Barbados and some in the
9    Bahamas, for example?
10             A.   Certainly Barbados.  Possibly
11   Bahamas too.
12             Q.   And if my math is correct, when I
13   add up your work in the Gulf of Mexico and the
14   Caribbean Sea, that comes to 24 projects in that
15   region alone?
16             A.   I haven't counted them.
17             Q.   Okay.  Throughout your career,
18   have you ever provided any consulting services for
19   an oil and gas company?
20             A.   Yes.
21             Q.   Which companies?
22             A.   I can recall project names, but I
23   am not -- I don't remember the structure of the
24   contracts and whether we worked directly for
25   companies, oil and gas companies.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 59

1              Q.    So you have stated that your
2     primary expertise is in the areas of coastal
3     engineering, flooding and erosion; correct?
4              A.    I think you asked that earlier,
5     and I said coastal and river engineering.
6              Q.    So your primary expertise is in
7     the area of coastal and river engineering, as well
8     as flooding and erosion?
9              MR. RUMELT:  Object to form.
10             BY MR. KEARNEY:
11             Q.    Is that correct?
12             A.    Flooding erosion formed part of
13    coastal and river engineering.
14             Q.    You are not a structural engineer,
15    are you?
16             A.    I'm not a registered structural
17    engineer.
18             Q.    You are not an industrial
19    engineer?
20             MR. RUMELT:  Object to form, vague.
21             BY MR. KEARNEY:
22             Q.    You can answer.
23             A.    I would have to understand the
24    definition of "industrial engineering".
25             Q.    Are you a registered industrial

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 60

```
 1   engineer?
 2              A.    No.
 3              Q.    Are you a registered chemical
 4   engineer?
 5              A.    No.
 6              Q.    Are you a registered mechanical
 7   engineer?
 8              A.    No.
 9              Q.    Are you a registered tank
10   engineer?
11              A.    No.
12              Q.    Have you ever published an article
13   regarding the potential for failure of above-ground
14   oil storage tanks?
15              A.    No.
16              Q.    And that is not within your area
17   of expertise, is it?
18              A.    What?
19              Q.    The failure of above-ground fuel
20   storage tanks.
21              A.    Not directly, no.
22              Q.    You are not a meteorologist?
23              A.    I have a good understanding of
24   meteorology.
25              Q.    Would you say you are an expert in
```

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 61

1    meteorology?

2                    A.    I have sufficient understanding of

3    meteorology to inform the opinions I developed

4    here.

5                    Q.    In this case?

6                    A.    In this case, and in many of the

7    projects we do.

8                    Q.    And you are speaking as to

9    opinions that may be included in your expert

10   reports that we have received in this case?

11                   A.    Correct.

12                   Q.    You are not a metocean engineer;

13   correct?

14                   A.    Yeah, I do practice metocean

15   engineering.

16                   Q.    Okay.  Do you belong to any

17   metocean engineering professional organizations?

18                   A.    Not that I can think of right now

19   right here.  It is really at the heart of what we

20   do.

21                   [Court Reporter intervenes for

22                   clarification.]

23                   THE WITNESS:  It is at the heart of

24   what we do, metocean.

25                   BY MR. KEARNEY:

Robert Nairn , Ph.D.                     August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 62

1              Q.    You are not a toxicologist; we can
2      agree on that?
3              A.    That's correct.
4              Q.    You would defer to a toxicologist
5      to evaluate toxicity of potential contaminants?
6              A.    Correct.
7              Q.    You are not a risk assessor, are
8      you?
9              A.    We assess -- I assess risk in
10     almost all of my projects.
11             Q.    Referring to the general field of
12     work of someone might have a title "Risk Assessor",
13     that is not you; correct?
14             MR. RUMELT:  Object to form.
15             THE WITNESS:  I don't know what that
16     title would entail, but as I say, most of our
17     projects involve risk assessment.
18             BY MR. KEARNEY:
19             Q.    You are not an expert on climate
20     change attribution, are you?
21             MR. RUMELT:  Object to form.
22             THE WITNESS:  I would say I'm an expert
23     on more than climate change attribution.
24             BY MR. KEARNEY:
25             Q.    What do you mean by that?

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 63

1              A.   Evaluating the impact of climate
2     change on meteorological conditions and then
3     those -- how those conditions relate to rainfall
4     and storm surge.
5              Q.   Do you understand what I mean when
6     I say "attribution"?  I am talking about causing,
7     the causes of climate change.
8              MR. RUMELT:  Object to form.
9              THE WITNESS:  Yes, I do.
10             BY MR. KEARNEY:
11             Q.   Okay.  And your answer was a
12    little bit different than that, so I'll re-ask the
13    question.
14             Are you an expert on climate change
15    attribution?
16             MR. RUMELT:  Object to form.
17             THE WITNESS:  I think I answered yes
18    and beyond that.  So in other words, attribution
19    typically refers to a single storm.
20             BY MR. KEARNEY:
21             Q.   Do you believe you are an expert
22    on the causes of climate change; in other words,
23    what is causing climate change to happen?
24             MR. RUMELT:  Object to form.
25             THE WITNESS:  No.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 82

1    either list or in your report and ask you whether

2    you have reviewed them.

3              Am I correct that you have not reviewed

4    any of the actual permits for the Equilon New Haven

5    Terminal?

6              A.   I might -- I may have reviewed

7    permits, but it was some time ago.

8              Q.   Do you know for sure?

9              A.   No, I don't know for sure.

10             Q.   In any event, you did not cite any

11   of the permit documents in your expert reports;

12   correct?

13             A.   Not that I am aware of.

14             Q.   And --

15             A.   I made -- yeah, I guess I made

16   reference to the implications of those within the

17   SPCC, but I don't directly cite.

18             Q.   So you do cite the SPCC in your

19   expert reports; correct?

20             A.   I believe so.

21             Q.   And it is on your list of your

22   materials considered?

23             A.   I believe so.

24             Q.   So I'm asking you -- that is why

25   I'm asking you about the permit, because I see

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 83

1    certain documents on the list and I see certain

2    documents that I know of that are not on the list,

3    so that is what I am asking you about it.

4              Am I correct that you have not reviewed

5    the EPA MSGP?

6              A.    I don't recall if I have or have

7    not.

8              Q.    Do you know what that is?

9              A.    Multi-Sector General Permit.

22             Q.    In other words, you are not

23   drawing a conclusion, at least in your role, that a

24   certain permit provision was violated; is that

25   fair?

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 84



1          A.    I -- no, I don't think that is

2    fair.

3          Q.    Well, tell me then.

4          A.    Tell you what?

25    conclusion.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 85

12          [Court Reporter intervenes for

13          clarification.]

14          THE WITNESS:  A Judge.

15          BY MR. KEARNEY:

16          Q.   Am I correct that you have not

17   reviewed any of the EPA or CT DEEP guidance

18   materials for how one should go about preparing a

19   SWPPP?

20          MR. RUMELT:  Object to form, vague.

21          THE WITNESS:  I may have reviewed those

22   at some point in time, either in this case or at

23   least with respect to EPA and other times, but I

24   don't recall.

25          BY MR. KEARNEY:

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 86

1              Q.   So it sounds like you can't be

2      sure, as you sit here today, whether you reviewed

3      those materials for purposes of your testimony in

4      this case?

5              A.   Correct.

6              Q.   The same question for how one

7      should go about preparing an SPCC.  Have you

8      reviewed for the purposes of this case any EPA or

9      CT DEEP guidance materials for doing that?

10             A.   I --

11             MR. RUMELT:  One second.  Object to

12     form, vague and compound.

13             THE WITNESS:  Could you repeat the

14     question?

15             BY MR. KEARNEY:

16             Q.   Sure.  Similar to the last

17     question I asked you about guidance materials about

18     preparing a SWPPP, but this time we are talking

19     about SPCCs, right.

20             So my question to you is, have you

21     reviewed any of the EPA or CT DEEP guidance

22     materials for how one should go about preparing an

23     SPCC --

24             MR. RUMELT:  The same objection.

25             BY MR. KEARNEY:

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 87

1               Q.   -- for purposes of your testimony

2      in this case?

3               MR. RUMELT:  Sorry, the same objection.

4               THE WITNESS:  I think I might have, but

5      it has been awhile since I looked at them.

6               BY MR. KEARNEY:

7               Q.   I ask you because it is not

8      included in your list of materials considered, so

9      it sounds like, like with the SWPPP question, you

10     are not sure whether you have done that for

11     purposes of this case?

12              MR. RUMELT:  Object to form, vague.

13              THE WITNESS:  I am just trying to

14     recall two or three years ago whether I read those

15     documents or not.  And I appreciate they may not be

16     on the list, but as I said, that list is not

17     necessarily exhaustive.  It is the best we could do

18     in everything we looked at.

19              BY MR. KEARNEY:

20              Q.   It is what I have from --

21              A.   Yes.

22              Q.   Okay.  Am I correct that you have

23     not reviewed the Connecticut Stormwater Quality

24     Manual?

25              A.   Actually, I think I did look at

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 105

1    citizen suits like this one before; correct?

2                    A.    I am not sure.

3                    Q.    Do you know what a citizen suit

4    is?

5                    A.    Not specifically.

6                    Q.    I'll represent to you that a

7    citizen suit is when a particular law or statute

8    authorizes someone who is not the government

9    themselves to bring a cause of action to enforce

10   that statute.  That is what we call a citizen suit.

11                   Have you worked on those kinds of cases

12   before?  I think you have said you have worked on a

13   Clean Water Act case, for example.

14                   A.    To be honest, I don't know whether

15   the cases I have worked on fit under that

16   description or not.

17                   Q.    Are you familiar with what is

18   referred to as a Notice of Intent to Sue that is

19   served in a case like this by the Plaintiff?

20                   A.    Not really.

21                   Q.    Okay.  Did you work with CLF in

22   the preparation of any of its Notices of Intent to

23   Sue that were served in this case?

24                   MR. RUMELT:  Objection, work product.

25   I'll instruct you not to answer that question.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 106

1          BY MR. KEARNEY:

2          Q.    Are you aware of the requirement

3    that in order to bring a certain cause of action in

4    a citizen suit case, you have to first include that

5    in the pre-suit Notice of Intent?

6          A.    I don't have an awareness of any

7    of that legal stuff.

8          Q.    Okay.  Have you actually reviewed

9    the Notices of Intent that Plaintiffs served in

10   this action?

11         A.    I may have.

12         Q.    And not on your list of materials

13   considered.

14         A.    Yeah, I don't recall doing it,

15   and --

16         Q.    One way or the other?

17         A.    As I said, I may have.

18         Q.    Okay.  Do you know whether or not

19   the opinions you express in your expert reports

20   were actually included in the Notices of Intent

21   that Plaintiffs served?

22         MR. RUMELT:  Objection.  This is beyond

23   the scope of Dr. Nairn's work in this case.

24         MR. KEARNEY:  That is exactly what I am

25   asking him, whether it is or it isn't.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 107

1              MR. RUMELT:  You can ask your question.

2              BY MR. KEARNEY:

3              Q.   I have.

4              A.   I -- not that I am aware of, but I

5    can't answer that yes or no.

6              Q.   Okay.  Would you have any reason

7    to dispute that your opinions regarding ingress and

8    egress routes at the terminal are not included in

9    the Notices of Intent that Plaintiff served in this

10   case?

11             MR. RUMELT:  Objection.  The document

12   speaks to itself, and it also -- I believe the

13   question calls for a legal opinion about the

14   contents of the Notice of Intent.

15             [Court Reporter intervenes to request

16             counsel speak more loudly.]

17             THE WITNESS:  I am not aware one way or

18   the other.

19             BY MR. KEARNEY:

20             Q.   Do you have any reason to dispute

21   that your opinions regarding the presence of bare

22   soil on berm faces appears anywhere in Plaintiff's

23   Notices of Intent in this case?

24             MR. RUMELT:  The same --

25             THE WITNESS:  I am not aware.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 108

1            MR. RUMELT:   The same objection as

2      before.

3            THE WITNESS:   I am not aware one way or

4      the other.

5            BY MR. KEARNEY:

6            Q.   I think I asked a bad question

7      there.

24           BY MR. KEARNEY:

25           Q.   At the time that this lawsuit was

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 109

1    filed in 2021, the applicable permit for the

2    Equilon New Haven Terminal was the 2018 General

3    Permit; correct?

4              A.    I don't recall.

5              Q.    Okay, and I am going to mark that

6    as an exhibit.  Are we on 10?

7              COURT REPORTER:  11.

8              MR. KEARNEY:  11.  That is the hardest

9    part of my job.

10             So I'm going to mark this as Nairn

11   Exhibit 11.

12             EXHIBIT NO. 11:  General Permit for the

13             Discharge of Stormwater Associated with

14             Industrial Activity, issued by CT DEEP,

15             effective date of October 1, 2018.

16             BY MR. KEARNEY:

17             Q.    Dr. Nairn, I'll represent to you

18   that this is the 2018 General Permit for the

19   Discharge of Stormwater Associated with Industrial

20   Activity that was issued by CT DEEP.

21             You'll recall that we had some

22   discussion earlier today about whether you reviewed

23   the permits or not.  Having looked at this document

24   in your hands now, is this something that you

25   reviewed in preparing your opinions in this case;

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 110

1   yes or no?

2                    A.    Yeah, I believe I might have

3   reviewed this one, yeah.

4                    Q.    A long time ago, it sounds like?

5                    A.    Probably, again, in relationship

6   to the Jones report rebuttal.

7                    Q.    Do you understand that this permit

8   was later updated and that we now have a new

9   version of the General Permit that is in place

10  today?

11                   A.    I recall something to that effect.

12                   Q.    All right, we'll mark that as

13  well.

14                   This will be Nairn Exhibit 12.

15                   EXHIBIT NO. 12:   General Permit for the

16                   Discharge of Stormwater Associated with

17                   Industrial Activity, issued by CT DEEP,

18                   effective date of October 1, 2021.

19                   BY MR. KEARNEY:

20                   Q.    And, Dr. Nairn, I'll represent to

21  you that this is the 2021 version of the General

22  Permit for the Discharge of Stormwater Associated

23  with Industrial Activity, again, issued by CT DEEP.

24                   The same question.  Have you reviewed

25  this document in preparation for your opinions in

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 112



Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 114

1   just look for "visual" and I could get there really

2   quick, but it might take awhile to get there here.

3              It is in here somewhere about visual

4   monitoring before discharge.

5              Q.   Is it safe to say at least that

6   you are not an expert in what is specifically

7   spelled out in this permit and what is not?

8              MR. RUMELT:  Objection, calls for a

9   legal conclusion or a legal opinion.

10             THE WITNESS:  From a legal perspective,

11  no, but I am aware of that requirement on visual

12  monitoring before discharge, and that it is in

13  here.  And if I could search the document in Word

14  or in PDF, I could get you to it quickly.

15             BY MR. KEARNEY:

16             Q.   Do you have any reason to dispute

17  that this permit does not speak to ingress or

18  egress routes at the -- at industrial facilities?

19             MR. RUMELT:  Object to form.

20             THE WITNESS:  It may not speak to

21  ingress or egress, but the implications of what

22  must be done under the permit would require ingress

23  and egress.

24             BY MR. KEARNEY:

25             Q.   What is your basis for saying that

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 115

1    the permit requires consideration of ingress and

2    egress routes?

3                A.   For example, if you -- you need to

4    be physically present at the facility to visually

5    monitor discharge before you discharge out of the

6    secondary containment areas or the detention ponds.

7                And physical presence would be

8    impossible if you can't get in or get out, and I

9    don't think you are going to be there in the middle

10   of the storm.

11               Q.   But you are not offering the

12   opinion that this permit tells you that ingress and

13   egress routes must be considered in order to comply

14   with the permit itself?

15               A.   I just answered that question.

16               Q.   Do you dispute that this permit

17   does not include the word "ingress"?

18               A.   I would have to search it, but --

19   sorry.

20               MR. RUMELT:  Yeah, give me a moment --

21               THE WITNESS:  Sorry.

22               MR. RUMELT:  -- to raise an objection.

23               I'll just object in that, you know, the

24   document speaks for itself to the extent that it

25   has a word or not.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 116

1              BY MR. KEARNEY:

2              Q.   Did you dispute that this permit

3      does not include the word "egress"?

4              A.   I would have to search the

5      document.

6              Q.   As you sit here today, could you

7      tell me what page it is on?

8              A.   No, because I would have to search

9      the document.

10             Q.   Do you have any reason to dispute

11     what I am representing for the record, that the

12     permit does not include those words?

13             A.   Well, not unless I was able to

14     search the document.

15             Q.   Do you agree at least in the

16     abstract that if the words are not included in the

17     permit, then the permit doesn't include those

18     words; correct?

19             A.   That much I can say yes to.

20             Q.   Right.  Do you have any reason to

21     dispute that this permit does not cite regulations

22     from the National Highway Traffic and Safety

23     Administration?

24             A.   I don't know if it does or

25     doesn't.

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 119

1  serve as secondary containment of the product

2  stored in the tanks should there be a release from

3  the tank?

4          MR. RUMELT:  Object to form.

5          THE WITNESS:  I think there might be

6  other reasons.

7          BY MR. KEARNEY:

8          Q.  You concede that that is the

9  primary reason?

10         MR. RUMELT:  Object to form.

11         THE WITNESS:  I don't know whether I

12 would rank it primary or secondary.  It is one of

13 the reasons.

14         BY MR. KEARNEY:

15         Q.  Do you agree that the permit

16 itself is completely silent on what materials

17 should be used to construct secondary containment

18 berms?

19         MR. RUMELT:  Object to form.  Also

20 object to the extent it calls for a legal opinion

21 about what the permit requires or does not require.

22         THE WITNESS:  I would expect the permit

23 anticipates that the berms are made of something

24 that would resist a storm condition.  Otherwise,

25 why would you build it?

Robert Nairn , Ph.D.                August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 120

```
 1              BY MR. KEARNEY:

 2              Q.   Just for a more specific question

 3    then, does the permit direct an owner and operator

 4    of a bulk fuel storage facility as to what they

 5    must use to construct secondary containment berms?

 6              MR. RUMELT:  Object to form.  Also

 7    object to the extent it calls for a legal

 8    conclusion about what the permit requires or does

 9    not require.

10              THE WITNESS:  I can't answer that

11    question.

12              BY MR. KEARNEY:

13              Q.   Do you have any reason to dispute

14    that the permit does not specifically state how

15    tall a secondary containment berm must be?

16              MR. RUMELT:  Object to form.  Also

17    object to the extent it calls for a legal opinion

18    about what the permit requires or does not require.

19              THE WITNESS:  I think the crest

20    elevation obviously is one of the most important

21    things in terms of the secondary containment berm

22    to contain.

23              BY MR. KEARNEY:

24              Q.   Does the permit factually state

25    how tall a secondary containment berm must be?
```

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 121

1              MR. RUMELT:  The same objection.

2              THE WITNESS:  I am not aware, and I

3      don't think it is up to the permit to do that.

4              BY MR. KEARNEY:

5              Q.   Do you agree that the permit

6      states that the berms must be designed in order to

7      contain certain volumes of product in the event of

8      a leak or spill?

9              MR. RUMELT:  Object to form.  Also

10     object to the extent it calls for a legal

11     conclusion about what the permit requires or does

12     not require.

13             THE WITNESS:  My understanding is one

14     of the functions of the secondary containment areas

15     are to contain spilled material.

16             BY MR. KEARNEY:

17             Q.   Right.  And that is actually

18     spelled out in the permit, isn't it?

19             MR. RUMELT:  Object to form.

20             THE WITNESS:  I believe so.  I would

21     have to look at the specific location.

22             BY MR. KEARNEY:

23             Q.   But you reviewed certain

24     calculations prepared by RPMS in this case about

25     the secondary containment volume at the New Haven

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 122

1    Terminal; correct?

2              A.    Yes.

3              Q.    And those calculations are based

4    on a certain requirement of a certain volume that

5    needs to be contained; is that right?

6              MR. RUMELT:  Object to form.  Also

7    object to the extent it calls for a legal

8    conclusion or opinion about what the permit

9    requires or does not require.

10             THE WITNESS:  RPMS provides some

11   estimates of containment volume.

12             BY MR. KEARNEY:

13             Q.    And their estimates of actual

14   containment volume at the site are included in

15   those documents in comparison to what is required

16   under the permit; correct?

17             MR. RUMELT:  Object to form.  And also

18   object to the extent it mischaracterizes documents

19   that RPMS authored.

20             THE WITNESS:  RPMS considered different

21   aspects of the functionality than I did.

22             BY MR. KEARNEY:

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 155

9             MR. RUMELT:  I'll object to the extent

10    that it mischaracterizes Dr. Nairn's report.

11             BY MR. KEARNEY:

12             Q.   It is just foundation.

13             A.   I have evaluated conditions at the

14    facility under those two return periods.

15             Q.   So you now have the benefit of

16    having three, the permit for the New Haven

17    Terminal, the SWPPP for the New Haven Terminal and

18    the SPCC for the New Haven Terminal in front of

19    you.  Can you tell me where in any of those three

20    documents there are specific endorsements of using

21    any particular return period in conducting a risk

22    assessment of the terminal?

23             MR. RUMELT:  Object to form and object

24    to the extent the question calls for a legal

25    opinion about what any of those documents require

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 156

1    or do not require.

2            And, Ryan, I would ask for a standing

3    objection on those grounds to the extent you are

4    asking about requirements in the SPCC.

5            BY MR. KEARNEY:

6            Q.   You may have a standing objection.

7    I'll restate that I am just asking about what is

8    factually stated in those three documents and what

9    is not.

10           MR. RUMELT:  And I will object again

11   and disagree that the question is limited to what

12   is in factually these documents or not.

13           THE WITNESS:  So I need to point you to

14   a clause in here that then will allow me to answer

15   your question.

16           BY MR. KEARNEY:

17           Q.   Fair enough.



Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 158

██
██
██
██
██

```
 6              BY MR. KEARNEY:
 7              Q.   How about the General Permit?  Is
 8    there anywhere in the General Permit that specifies
 9    which return period storm events should be
10    considered for risk management purposes in
11    operating the terminal?
12              MR. RUMELT:  The same objections.
13              THE WITNESS:  I am not aware of that.
14    I am trying to remember, because Jones did
15    reference the hundred-year in relation to one of
16    the permits, or maybe it was the EPA basis for the
17    permits, the hundred-year, several times in his
18    report.
19              BY MR. KEARNEY:
20              Q.   So those three documents that we
21    have been discussing, so the permit, the SWPPP and
22    the SPCC, would you agree that those are the three
23    permitting documents that Defendants must comply
24    with in operating the New Haven Terminal?
25              MR. RUMELT:  Object to form, and also
```

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 159

1    standing objection.

2                THE WITNESS:  That is beyond my

3    opinion.

4                BY MR. KEARNEY:

5                Q.   Do you have an opinion as to that?

6                MR. RUMELT:  The same objection.

7                THE WITNESS:  Beyond my opinion.  I

8    have read to you the parts of this report that

9    relate to my opinion.

10               BY MR. KEARNEY:

11               Q.   Do you agree that the New Haven

12   Terminal is subject to the 2021 Connecticut General

13   Permit for Industrial Stormwater Discharge?

14               MR. RUMELT:  Object to the extent it

15   calls for a legal opinion, but you can answer.

16               THE WITNESS:  Again, I am not -- I am

17   not opining on, you know, which permits apply when

18   and where.

19               BY MR. KEARNEY:

20               Q.   These are the documents, again,

21   these three documents I have been referring to

22   issued by CT DEEP, that specify what Defendants

23   must do to comply with their permitting obligations

24   for the terminal; correct?

25               A.   That may be.  I don't know whether

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 160

1    it is the entirety.

2                  Q.    I want to introduce another

3    exhibit.  We have talked about it a little bit, but

4    we haven't put it in front of you yet.

5                  And this will be Nairn Exhibit 16, I

6    believe.  It is a large document.  And I'll state

7    for the record this is the 2004 Connecticut

8    Stormwater Quality Manual.

9                  EXHIBIT NO. 16:  Document titled "2004

10                 Connecticut Stormwater Quality Manual".

11                 BY MR. KEARNEY:

12                 Q.   Dr. Nairn, I think we had talked

13   about this before earlier today.  This is a

14   document that you have seen before at some point;

15   correct?

16                 A.   Correct.

17                 Q.   And this is a document that

18   permittees may look to as a manual for how to

19   conduct their stormwater operations in the State of

20   Connecticut?

21                 MR. RUMELT:  Object to the extent it

22   calls for speculation.

23                 THE WITNESS:  When I looked through

24   this, my recollection was that I didn't see how it

25   directly -- it applies in a general sense to the

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 170

1    the expert who is familiar with these types of

2    situations of flooding and the risk involved in

3    them.

4                But I can't answer the question of what

5    is in here and what is not without doing a search

6    on the document.

7                BY MR. KEARNEY:

Page 171

```
 1   with then a designated return period.

 2                 BY MR. KEARNEY:

 3                 Q.   Are any of those regulations that

 4   the New Haven Terminal is required by law to

 5   follow?

 6                 MR. RUMELT:  Object to form, and object

 7   to the extent the question calls for Dr. Nairn to

 8   offer a legal opinion about what is or isn't

 9   required at the terminal.

10                 THE WITNESS:  I am not a lawyer.  I

11   can't answer that question.

12                 BY MR. KEARNEY:

13                 Q.   Do you agree that there is a

14   difference between a regulatory requirement and a

15   recommendation in a guidance document from an

16   organization like the American Society of

17   Floodplain Managers?

18                 MR. RUMELT:  Object to form, and object

19   to the extent it calls for a legal opinion.

20                 THE WITNESS:  Yeah, I can't answer that

21   in terms of their relationship with the legality.

22                 BY MR. KEARNEY:

23                 Q.   Those documents we are talking

24   about, for example, the American Society of

25   Floodplain Managers, FEMA, American Society of
```

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 172

```
 1   Civil Engineers, are design recommendations;
 2   correct?
 3              MR. RUMELT:  Object to form, and object
 4   to the extent it calls for Dr. Nairn to make a --
 5   give a legal opinion.
 6              THE WITNESS:  As an expert within the
 7   field, I use them as guidance in developing design.
 8              BY MR. KEARNEY:
 9              Q.   And that is primarily for the
10   design of new facilities; correct?
11              A.   No.
12              Q.   Explain.
13              A.   It is for both facilities -- new
14   facilities and for facilities that require a
15   substantial improvement.
16              Q.   Right.  So those documents -
17   again, we are talking about the American Society of
18   Floodplain Managers, FEMA, American Society of
19   Civil Engineers - provide design recommendations to
20   be used for either the new build of a new facility
21   or the substantial modification of an existing
22   facility; correct?
23              MR. RUMELT:  Object to form, and object
24   to the extent the opinion -- or the question calls
25   for a legal opinion.  Also object to the extent it
```

Robert Nairn , Ph.D.                      August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 173

1    mischaracterizes the requirements of one or more of
2    the documents that you referenced in your question.
3              THE WITNESS:  I think you better ask
4    that question again, if you could.
5              MR. KEARNEY:  Could you just read it
6    back, if you don't mind?
7              Thank you.  It's the first time I've
8    had to ask.
9              COURT REPORTER:  The question was:
10                  "Right.  So those documents -
11                  again, we are talking about the
12                  American Society of Floodplain
13                  Managers, FEMA, American Society of
14                  Civil Engineers - provide design
15                  recommendations to be used for
16                  either the new build of a new
17                  facility or the substantial
18                  modification of an existing
19                  facility; correct?"
20              MR. RUMELT:  The same objections.
21              THE WITNESS:  If you are referring to
22    the ASCE 24 and the AS -- well, I don't know the
23    date on the ASPM that I referenced in my report,
24    and the FEMA 2007, they apply to new facilities and
25    substantial improvement of existing facilities.

Page 174

1          BY MR. KEARNEY:

2          Q.   So in other words, they do not

3    apply to an existing facility unless it is

4    undergoing a substantial modification?

5          MR. RUMELT:  Object to form, and object

6    to the extent it calls for Dr. Nairn to give a

7    legal opinion.

8          THE WITNESS:  My interpretation is

9    that - and I think it would be an expert's

10   interpretation - would be that, in the field, that

11   if a facility is shown to require substantial

12   improvement, then these guidelines would apply.

13         BY MR. KEARNEY:

14         Q.   If an existing facility is not

15   either undergoing a substantial improvement or,

16   using your words, shown to require that, it was

17   just an existing facility, there is nothing in

18   those documents that would suggest those facilities

19   should just affirmatively start looking at return

20   periods that are cited in the documents; correct?

21         MR. RUMELT:  Object to form.

22         THE WITNESS:  No, I think I would

23   disagree, because I think those documents provide

24   guidelines where if you are the owner/operator of a

25   facility, you want to know whether it achieves the

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 175

1    requirements from time to time.

2                    BY MR. KEARNEY:

3                    Q.    I mean, the requirements are set

4    forth in the permit; correct?

5                    MR. RUMELT:  Object to form.

6                    THE WITNESS:  As I said, I don't

7    make -- I can't make the legal opinion on

8    whether -- the relationship between guidelines and

9    the requirements of the permit.

10                    MR. KEARNEY:  So I am going to mark an

11    exhibit.

12                    Is this 18?

13                    COURT REPORTER:  It's 17.

14                    MR. KEARNEY:  17.  I thought it was 18.

15                    EXHIBIT NO. 17:  Excerpt of the 2024

16                    Connecticut Stormwater Quality Manual

17                    with the Publication Date of September

18                    30, 2023 and Latest Revision Date of

19                    March 26, 2024.

20                    BY MR. KEARNEY:

21                    Q.    I will state for the record that

22    this is an excerpt, because it is a very large

23    document, but this is an excerpt of the 2024

24    Connecticut Stormwater Quality Manual that we were

25    just discussing a moment ago when we were talking

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 198

 1              MR. RUMELT:  Object.  Object to form.

 2              THE WITNESS:  It was a hybrid storm.

 3     That is where the name originated.

 4              BY MR. KEARNEY:

 5         Q.   All right.  I want to talk about

 6     the General Permit and its discussion of best

 7     management practices and best industry practices.

 8     Are you familiar with the language in the General

 9     Permit that discusses those terms?

10         A.   Not something I looked at in

11     detail.

12              MR. RUMELT:  And, Ryan, again, to the

13     extent you are going to be questioning Dr. Nairn

14     about the content of the permit and the meaning of

15     the permit, I would like a standing objection, that

16     is, object to the extent it calls for a legal

17     opinion about what the permit requires or does not

18     require.

19              And, further, I would object to the

20     scope of the questions as being outside the scope

21     of Dr. Nairn's report.

22              BY MR. KEARNEY:

23         Q.   In the context of best industry

24     practices, what do you believe is the relevant

25     industry to look to when assessing what practices

Page 199

1   should be implemented at a bulk fuel storage

2   facility?

3              MR. RUMELT:  So, Ryan, just again, the

4   standing objection, and you didn't confirm on the

5   record whether you would accept the standing

6   objection.

7              MR. KEARNEY:  Sure.  Let's have a

8   party.

9              [Court Reporter intervenes for

10             clarification.]

11             MR. KEARNEY:  Sure.

12             MR. RUMELT:  Sure, yes, you'll accept

13  the standing objection?

14             MR. KEARNEY:  Yes.

15             MR. RUMELT:  Okay.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 200

1    Society of Floodplain Managers.

2                Q.    In preparing your opinions in this

3    case, did you review any SWPPPs or SPCCs for other

4    industrial facilities in the State of Connecticut

5    whatsoever?

6                MR. RUMELT:  Object to form, and also

7    object to the extent it is outside the scope of

8    Dr. Nairn's report and what he was asked to do.

9                THE WITNESS:  As we went through in the

10   beginning of my report, that was not part of my

11   scope.

12               BY MR. KEARNEY:

13               Q.    Do you have any evidence that any

14   other private sector bulk fuel storage facility is

15   actually looking at a 500-year return period storm

16   event in conducting its risk assessment operations?

17               MR. RUMELT:  The same objection.

18               THE WITNESS:  I can think of two.

19               BY MR. KEARNEY:

20               Q.    What are those?

21               A.    Well, I'm not sure the second is

22   bulk storage, but the first is the Venture Global

23   site on the Mississippi River, the Plaquemines site

24   that I referred to.

25               Q.    But my question was regarding the

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 205

1    that, yeah.

2              A.    Yes.

3              Q.    Do you believe it is a violation

4    of any requirement if the terminal would be flooded

5    in any way?

6              MR. RUMELT:  Object to form, and object

7    to the extent it calls for Dr. Nairn to offer a

8    legal opinion, and object to the extent it is

9    beyond the scope of his expert report and opinions

10   he includes in his report.

11             THE WITNESS:  I can't opine on whether

12   it is a violation or not.  I can only opine on what

13   happens in the conditions that I looked at.

14             BY MR. KEARNEY:

15             Q.    So the mere fact of a flood at a

16   terminal is not a violation of any regulatory

17   requirement that you are aware of?

18             MR. RUMELT:  Object to form, and object

19   to the extent it calls for Dr. Nairn to offer a

20   legal opinion and is beyond the scope of the

21   opinions that he has offered in his report.

22             THE WITNESS:  Yeah, I guess I can't

23   offer that in terms of -- I guess you used the word

24   "violation" again, I believe, in that question, and

25   that requires me to provide a legal opinion.

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 215

1            Q.   Okay.  Do you have any reason to

2    believe that the words "storm surge" are referenced

3    anywhere in the permit, the SPCC or the SWPPP?

4            A.   I am not aware one way or the

5    other.

6            Q.   Do you have any reason to dispute

7    my representation to you that those words do not

8    appear in any of those documents?

9            A.   Not without sitting here and

10   searching the word.

11           Q.   Okay.  I am going to go to the

12   next exhibit, and this should be 18, I believe,

13   Nairn Exhibit 18.

14           EXHIBIT NO. 18:  CT DEEP Guidance

15           Document for Preparing a Stormwater

16           Pollution Prevention Plan dated March

17           2011.

18           BY MR. KEARNEY:

19           Q.   I'll represent for the record that

20   this is the CT DEEP Guidance Document for Preparing

21   a Stormwater Pollution Prevention Plan dated March

22   2011.

23           I'll wait for you to get a copy,

24   Dr. Nairn.

25           And let me just first ask you,

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 216

1    Dr. Nairn, have you ever seen this document before?

2               A.    Not recently.  I can't say whether

3    I have looked through this one or not.

4               Q.    Okay.  So you are not sure one way

5    or the other whether you have reviewed this

6    document before today?

7               A.    Correct.

8               Q.    Okay.

9               A.    I think I might have, now as I go

10   through it, but it has been awhile.

11              Q.    So if you could turn to page 2.

12   And these are double-sided, so it is just the

13   reverse page of the front page there.  And if you

14   look down to the third paragraph, it reads:

15                    "This guidance document

16                    outlines the major elements required

17                    in a Plan and provides templates for

18                    certain elements of the Plan."

19                    Did I read that correctly?

20              A.    Yes.

21              Q.    And the document further up

22   towards the top states that:

23                    "[The] guidance document [was]

24                    prepared by the Department of

25                    Environmental Protection [...] to

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 217

1              assist you in complying with the

2              requirements of the General Permit

3              [...]"

4              Did I read that correctly?

5              A.   Yes, you did.

6              MR. RUMELT:  I'll just note that, Ryan,

7    you did not complete the sentence.

8              BY MR. KEARNEY:

9              Q.   Sure, and I will clear that up in

10   my next question.

11             So you see in this document it makes

12   reference to a General Permit that was effective in

13   2011; correct?

14             A.   Yes.

15             Q.   I'll represent to you that there

16   has been no revision of this document in the time

17   since 2011, and do you have any reason to dispute

18   that representation to you?

19             MR. RUMELT:  Ryan, just for clarity,

20   are you talking about Exhibit 18 or the permit --

21             MR. KEARNEY:  18, the Guidance Document

22   for Preparing a Stormwater Pollution Prevention

23   Plan.

24             MR. RUMELT:  Okay.

25             BY MR. KEARNEY:

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 218

1          Q.   In other words, do you have any

2     reason to believe that this 2011 Guidance Document

3     is not still the most recent Guidance Document from

4     CT DEEP on this issue?

5          A.   I don't know one way or the other.

6          Q.   Okay.  If you can flip to page 15,

7     and you see up at the top where it says "Stormwater

8     Control Measures"?

9          A.   Yes.

10         Q.   Okay.  This Guidance Document

11    provides some specific guidance on what is --

12         A.   Oh, wait.  Where are you reading

13    from?

14         Q.   This is not quote.

15         A.   Oh.

16         Q.   Yeah, so -- but do you have any

17    reason to dispute that this Guidance Document

18    provides some guidance on what is meant by the

19    terms "control measures" and "best management

20    practices" as those terms are seen in the permit

21    itself?

22         MR. RUMELT:  Objection.  The document

23    speaks for itself, and in addition, object to the

24    extent your question calls for Dr. Nairn to give a

25    legal opinion.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 219

1              THE WITNESS:  I would have to take

2      another look at this to see whether your

3      characterization is correct or not.

4              BY MR. KEARNEY:

5              Q.   So you see right under that header

6      at the top of the page, it says:

7                      "Control measures are the best

8                      management practices (BMPs) or other

9                      structural or non-structural

10                     practices that are used to prevent

11                     or minimize the discharge of

12                     pollutants in stormwater."

13             Did I read that correctly?

14             A.   Yes.

15             Q.   And is this document explaining

16     what those terms mean in the permit itself?

17             MR. RUMELT:  Objection.  Dr. Nairn has

18     already said that he would need to review this

19     document to answer questions about it.

20             THE WITNESS:  Yeah, I haven't seen this

21     document in awhile, and you are asking me to relate

22     it to the permit, what the permit says.  I would

23     have to look at both and spend some time with them

24     to answer that question properly.

25             BY MR. KEARNEY:

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 221

1    site-specific?

2              MR. RUMELT:  Object to the extent it

3    calls for a legal opinion and is beyond the scope

4    of Dr. Nairn's report.

5              THE WITNESS:  Yeah, I don't think I

6    have looked at any of these specifically, these

7    bullet points.  It is outside my scope.

8              BY MR. KEARNEY:

9         Q.   Yeah, I am getting to the point

10   here.  If you flip then to page 18.  And by the

11   way, in the preceding pages you will see, right,

12   these are the control measures.  The 13 control

13   measures that are outlined in the permit are shown

14   here, and then there is some text about those

15   control measures; is that fair to say?

16        A.   Well, gee, I don't know.

17             MR. RUMELT:  Well, I'll just object to

18   the extent the document and the permit, whichever

19   permit you are referencing, speaks for themselves.

20             BY MR. KEARNEY:

21        Q.   So just to make that clearer, on

22   page 15 there is that header that says "Control

23   Measure Elements", and then there are a number of

24   sections that follow that have these bolded

25   headers; correct?

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 222

1              A.    That is what the report has, yes.

2              Q.    I can show you in the permit if

3      you like, but I'll represent to you that these

4      headers are the control measures that are specified

5      in the permit.  The same words show up in the

6      permit as are shown here.

7              MR. RUMELT:  Object to the extent you

8      are indicating what you believe the permit requires

9      or does not require as far as best management

10     practices, and also the documents speak for

11     themselves.

12             THE WITNESS:  You'll have to repeat the

13     question.

14             BY MR. KEARNEY:

15             Q.    Give me a moment, please.

16             All right, you still have the permit in

17     front of you, right?  I just want to show you why

18     this comparison is being drawn.

19             So if you could pull up the permit,

20     which I think was 12, right.

21             Oh, no, it is number -- yeah, it is

22     number 12, Exhibit 12, the 2021 permit.

23             And if you go to page 23, which is at

24     the bottom of the document.

25             MR. RUMELT:  Ryan, you are at what page

Robert Nairn , Ph.D.                              August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 223

1    of -- was it Exhibit 12?

2              MR. KEARNEY:  Yeah, page 23.

3              MR. RUMELT:  Okay.

4              BY MR. KEARNEY:

5              Q.   Which talks about the stormwater

6    control measures.

7              Do you see below that where it starts

8    with 7(b)(1) and continues through those pages?

9    The first one referenced is as "Good Housekeeping".

10             A.   Sorry, this is page 23 of 70 on

11   Exhibit 12?

12             Q.   Am I in the --

13             MR. RUMELT:  Ryan, I am not seeing that

14   language in mine.

15             BY MR. KEARNEY:

16             Q.   Oh, I'm sorry, I had the wrong --

17   okay, it is tab -- I had a different number on my

18   system.  I'll get the right page number for you.

19             Okay, so it is page 18 of 70.  My

20   apologies.

21             So on page 18 of 70, do you see where

22   it says "(b) Control Measures"?

23             A.   Yes.

24             Q.   And then there are numbered

25   subsections below that, the first one being "Good

Page 224

1    Housekeeping", the second one being "Vehicle or
2    Equipment Washing", and so on?
3            A.    Yes.
4            Q.    And if you start comparing that
5    with the 2011, how to prepare a SWPPP guidance,
6    right, on page 15 the first one is "Good
7    Housekeeping".  If you flip to page 16, you see
8    "Vehicle or Equipment Washing", and so on and so
9    forth, right, and it tracks those control measures
10   that are shown in the General Permit are then
11   discussed in this Guidance Document.  Does that
12   appear to be the case?
13           A.    It appears to be the case, but I
14   am sort of looking at it and doing this comparison
15   for the first time.
16           Q.    Well, I want to direct your
17   attention to a specific one, but I just wanted to
18   get that point in first, right.
19           So these sections in the Guidance
20   Document are talking -- are giving guidance as to
21   what these control measures that are talked about
22   in the permit in shorter text mean and how
23   permittees should approach them.  Is that fair?
24           MR. RUMELT:  Object to form, and object
25   to the extent you are offering your own opinion

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 292

1    be significant changes from the old permit regime

2    under the 2021 permit?

3              MR. RUMELT:  Objection, calls for

4    speculation and calls for Dr. Nairn to offer a

5    legal opinion, and also calls for an opinion

6    outside the scope of his report authored in this

7    case.

8              THE WITNESS:  I don't think I could

9    really answer that question.  I would just say

10   that, you know, "significant changes" could mean

11   that there is other changes versus them being

12   significant in comparison.

13             So who knows what it means.  I

14   certainly don't.

15             BY MR. KEARNEY:

16             Q.   Well, we looked previously at the

17   current permit which did not include some of the

18   phrases like "storm surge", like "climate change",

19   like "return period events", and to the extent that

20   they would then be included in a new permit, would

21   you agree that those are significant changes?

22             MR. RUMELT:  Objection, calls for

23   Dr. Nairn to offer a legal opinion that is also

24   beyond the scope of his expert report and what he

25   has been asked to do in this case.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 293

1              THE WITNESS:  I can't answer that
2      question.
3              BY MR. KEARNEY:
4              Q.   Why not?
5              A.   Because I don't -- I don't know
6      enough about the comparison of the two permits, the
7      meaning of "significant", whether the meaning here
8      of "significant" is the meaning I think you are
9      taking versus saying there are other changes that
10     are not as significant.
11             So I really don't -- I can't answer
12     that question.
13             Q.   Are you aware of any permit that
14     currently exists in the State of Connecticut that
15     requires permittees to consider storm surge events
16     in operating their facilities?
17             MR. RUMELT:  Objection, calls for
18     Dr. Nairn to render a legal opinion, including
19     about permits that are beyond the scope of this
20     case.
21             THE WITNESS:  I'm not aware one way or
22     the other.
23             BY MR. KEARNEY:
24             Q.   Can you point to any statement
25     from EPA or CT DEEP that would support the position