# Exhibit D

Filed Under Seal

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


---------------------------x
CONSERVATION LAW                :
FOUNDATION, INC.,               :
                                :
        Plaintiff               :
                                :CASE NO.
    -versus-                    :3:21-CV-00933-VDO
                                :
EQUILON ENTERPRISES LLC         :
d/b/a SHELL OIL PRODUCTS   :
US, TRITON TERMINALING LLC :
and MOTIVE ENTERPRISES LLC,:
                                :
        Defendants              :
---------------------------x

Videotaped Deposition of MATTHEW BARLOW, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure, held at the law offices of WIGGIN AND
DANA, LLP 20 Church Street, 16th Floor, Hartford,
Connecticut, before Julia Flynn Cashman, RPR, CSR
and Notary Public in and for the State of
Connecticut, on Wednesday, September 10, 2025, at
9:00 a.m.

Page 2

A P P E A R A N C E S:


         ATTORNEY FOR PLAINTIFF:
         MOTLEY RICE LLC
         401 9th Street NW, Suite 630
         Washington, DC  20004
         BY:  DEVIN X. WILLIAMS, ESQUIRE
              Dwilliams@motleyrice.com


         ATTORNEY FOR DEFENDANTS:
         WIGGIN AND DANA LLP
         One Century Tower
         265 Church Street
         New Haven, Connecticut  06510
         BY:  JAMES O. CRAVEN, ESQUIRE
              Jcraven@wiggin.com



    ALSO PRESENT:    Joe'l Mafrige, Esquire
                     Senior Legal Counsel
                     Global Litigation
                     Shell USA
                     Houston, Texas
                     (Remotely)

                     Ameya Gehi, Esquire
                     Conservation Law
                     Foundation
                     (Remotely)

                     Kevin Aspinwall,
                     Videographer
                     (In person)

Page 3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all technicalities as to proof of the official character before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the reading and signing of the deposition by the deponent are not waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

* * * * *

Page 35

A. I don't know.

Q. So my question is are you aware of whether or not Dr. Jones or Dr. Zeeb provided testimony in this case?

A. I certainly don't recall being aware of that.

Q. Did you ask to see the testimony of either Dr. Jones or Dr. Zeeb?

A. I don't recall.

Q. You don't recall whether you asked to see it?

A. Yeah, I don't recall.

Q. Do you recall whether you asked to see the testimony of any other experts that have provided testimony in this case?

A. I don't recall.

Q. Do you recall whether or not you asked to see the testimony of any other experts related to issues covered in your report?

A. I don't recall.

Q. Have you been to the port in New Haven?

A. Not that I recall, I don't think so.

Q. Were you aware that there were site visits in connection with this case where experts were allowed to go on site and actually look around the

Page 36

terminal at issue in this case?

A. That some site visits were made sounds familiar, but I don't recall anything about the specifics.

Q. You did not attend any site visits in this case, true?

A. True.

Q. Did you review any documents that any of the defendants produced in this case, other than the two expert reports that are referenced on Exhibit Number 5?

A. It's possible, but I don't recall.

Q. Are you relying upon any documents that were produced by the defendants in this case?

MR. WILLIAMS:  Object to form.

A. Not to my knowledge.

Q. And as you sit here today, you're not aware of whether or not you possess any documents that the defendants produced in this case?

A. Not to my knowledge.

Q. Have you reviewed something referred to as a BCP?

A. Could you explain what a BCP is?

Q. As you sit here today, do you know what a BCP is?

Page 41

in this case, you didn't go to the port area to evaluate the site conditions, true?

A. That's correct.

Q. And you didn't do that in connection with your opinions for Gulf either, true?

MR. WILLIAMS:  Object to form.

A. That's correct.

Q. You didn't do any environmental sampling of soil conditions or anything like that in this case, true?

A. That's correct.

Q. You haven't looked at any such sampling if it exists, true?

A. That's correct.

Q. You haven't done any sort of study of the bulk storage terminal tanks at the terminal?

A. That's correct.

Q. You don't consider yourself an expert as to sort of the structural components of bulk storage terminal tanks, do you?

MR. WILLIAMS:  Object to form.

A. I don't consider myself an expert in bulk terminals.

Q. Okay.  You don't -- well, do you have a recollection of reviewing the defendants HAP?

Page 60

defendant's facility, or even the Gulf facility, is resilient?

A. That's correct.

Q. Have you reviewed the Connecticut General Permit from 2018?

A. Not that I recall.

Q. Did you review the Connecticut General Permit from 2021?

A. Not that I recall.

Q. Did you review the Complaint that sets forth the allegations that CLF is making in this case?

A. I think so.

Q. Dr. Barlow, can you look in your report and see if you see any reference to the Complaint in this case as either a reference or something that you reviewed as additional material?

A. I don't see any reference to the Complaint.

Q. Does that suggest to you that you didn't review the Complaint in this case?

A. No, it suggests to me that I didn't find it relevant to the opinion.

Q. Were you aware that the picture of where the terminal is is in the Complaint?

A. That sounds likely.

Q. But as you sit here today, you don't have a

Page 61

recollection of reviewing that, or you have a recollection of seeing it?

A. Of seeing the image?

Q. Yeah.

A. I have a vague recollection of seeing an image of the site, yes.

Q. And notwithstanding having a vague recollection of seeing the image in a Complaint that's not referenced in your reliance materials, you're not able to say on Exhibit 7 where you believe the Shell terminal is located?

MR. WILLIAMS:  Object to form.

A. Not more specifically than I have indicated.

Q. Would it be important to you to know where the facility is located?

A. Not at spatial scales smaller than what I have indicated.

Q. So other than it being somewhere within the circle that you have indicated on Exhibit 7, it's not important for you to know where it's located?

A. For the purposes of the opinion in the report, yes, that's sufficient.

Q. For purposes of the opinions in your report, you didn't need to know specifically where the Equilon terminal is located other than what you've

Page 63

no.

Q. Are you aware that Gulf sold their facility?

MR. WILLIAMS:  Object to form.

A. I'm not aware of the details of the ownership.

Q. Are you aware of where the Buckeye facility is?

MR. WILLIAMS:  Object to form.

A. I don't know what the Buckeye facility is.

Q. Are you aware how many different terminals there are in the harbor of New Haven?

A. No.

Q. Are you -- have you looked at any of the permitting materials related to any of the terminals in the Port of New Haven?

A. Not that I recall.

Q. Have you reviewed any of the permitting materials for any terminal located in the state of Connecticut?

A. Not that I recall.

Q. Do you have any opinions in this case as to what's required under any Connecticut permit?

A. I do not have opinions on permitting.

Q. Or what is required under any permit?

A. Or what is required.

Page 64

Q. Do you have a recollection of reviewing the 2024 draft industrial permit?

A. No.

Q. Do you have a recollection of reviewing any of the fact sheets related to the Connecticut General Industrial Permit for Stormwater Purposes?

A. No.

Q. Are you familiar with CIRCA?

A. Not off the top of my head, although I hear a lot of acronyms.

Q. Are you familiar with the Connecticut Institute For Resilience and Climate Adaptation?

A. Yes.

Q. Abbreviated as CIRCA?

A. Yes.

Q. And how are you familiar with them?

A. I'm familiar with their work.  I don't recall off the top of my head who is employed there, but I imagine I know them professionally.

Q. Are you aware that -- let's mark this.

            (DEFENDANT'S EXHIBIT 8 FOR

            IDENTIFICATION, Received and Marked.)

Q. Are you aware that the Connecticut Institute For Resilience and Climate Adaptation is affiliated with the University of Connecticut?

Page 119

A. They clicked "Yes."

Q. Have you seen Exhibit 12 prior to today?

A. 12 or 13?

Q. 13, sorry.

A. Not to my knowledge, no.

Q. Let me ask that again.  Prior to today, did you see Exhibit 13?

A. Not to my knowledge, no.

Q. Prior to today, did you have any communications with anyone at Connecticut DEEP with regards to any of the terminal or facilities in the New Haven Harbor?

A. Not to my knowledge.

Q. Did you have any communications prior to today with anyone from US EPA with regards to any of the facilities at New Haven Harbor?

A. Not to my knowledge.

Q. Have you seen any inspection documents related to the Gulf facility that you prepared a report on?

        MR. WILLIAMS:  Object to form.

A. Not to my knowledge.

Q. And, again, you're not offering any opinions in this case as to whether or not the facilities in New Haven Harbor are able to withstand any

Page 120

increase in precipitation or particular storm, or storm surge, true?

MR. WILLIAMS: Object to form.

Q. You're not saying whether they can or can't; you have no opinions about that, right?

A. That's correct.

Q. Did you review -- sorry. That's okay, take a break if you need a drink. I don't want to ask you when your mouth's full.

Did you review any documents related to after action analysis or after action reports from any particular storm or extreme precipitation event that was prepared by officials investigating those events, or something like that?

A. Not related to the facility. I did look at some National Weather Service storm reports, which are broader.

Q. So you looked at some National Weather storm reports about particular storms in the past?

A. Yes.

Q. And what I'm trying to get at is sometimes after a storm, there is damage in particular areas that stems from a storm. You understand that, true?

A. Yes.

Page 121

Q. Did you look, for part of your opinions in this case, as to whether or not there were any after action reports with regards to damage that was caused or happened during those storms?

A. I'm not fully sure exactly what kind of after storm reports we're looking at.  I did cite the Weather Service, I know, ones that I looked at, so those are in the report.

Q. So let me do this.  Have you looked at any reports from EPA at all in this case?

A. I don't think so.

Q. Did you look at any reports from Connecticut DEEP in this case?

A. I don't think so.

Q. Did you look at any reports from the US Coast Guard in this case?

A. I don't think so.

Q. Did you look at any documents from any bulk storage fuel terminal facility related to the impacts of storms?

A. No.

Q. So to the extent that you looked at official weather service reports, it was related to the weather from a particular storm?

A. Yes.  I mean, sometimes they track number of

Page 123

A. I focused on storm information from the northeast from a physical understanding point of view.  There are similarities in precipitation that cover all extra tropical land masses.  So I did refer in some of the physical understanding pieces to those more broad considerations.

Q. Are you aware or did you look at documents related to flood preparation for various types of facilities?

A. No, I don't think so.

Q. Again, that wasn't part of your opinion in this case.  You don't have any opinions as to types of preparations or what preparations should be done by various facilities, true?

A. That's correct.

(DEFENDANT'S EXHIBIT 14 FOR

IDENTIFICATION Received and Marked.)

Q. Dr. Barlow, I'm going to show you Exhibit 14, which is a document that, at the top of the documents, it says "General Permit Registration For the Discharge of Stormwater Associated With Industrial Activity, Effective October 1st, 2011." Do you see that?

A. Yes.

Q. And you see that the next section talks

Page 126

comment period closed."  Do you see that?

A. Yes.

Q. Are you familiar with any of those sentences or descriptions that I just read to you on Exhibit 14?

A. Not in any substantial way.

Q. Okay.  Did you review a Pollution Prevention Plan in this case?

A. Not that I recall.

Q. Okay.  Some people call it a Stormwater Pollution Prevention Plan.  If I refer to it as a Stormwater Pollution Prevention Plan, is it the same answer, that you haven't reviewed anything like that in connection with this case?

A. Not that I recall, yes.

Q. You're not going to offer any opinions in this case as to whether or not, one way or another, the Stormwater Pollution Plan in connection with the facility in this case is compliant or not compliant?

A. I will not be offering opinions on that, yes.

(DEFENDANT'S EXHIBIT 15 FOR

IDENTIFICATION Received and Marked.)

Q. Dr. Barlow, I'm showing you what's been

Page 158

A. It does.

Q. And paragraph number 5, what does that say?

A. "I have evaluated the new permit."

Q. And so when I just went through the permits that you said you didn't think you had reviewed, you submitted a Declaration to the Connecticut Department of Energy and Environmental Protection saying that you had evaluated the new permit?

A. That is correct, which -- that is correct.

Q. So which is it?  Did you evaluate the new permit or didn't you evaluate the new permit?

MR. WILLIAMS:  Object to form.

A. Yes, I evaluated the new permit.

Q. In your Declaration to Connecticut DEEP on the 6th of May, 2024, did you advocate for Connecticut DEEP to do something other than rely upon the NOAA Atlas 14?

A. Yes.

Q. And I have just gone through the Stormwater Quality Management Manual with you, sir.  You have seen that Connecticut DEEP has in fact adopted the NOAA Atlas 14.  True?

A. Yes.

Q. You're aware that after it received your submission, Declaration, it came out with a

Page 159

revised draft permit that did not include what you were asking them to include?

MR. WILLIAMS:  Object to form.

Q. True?

A. Is that one of the -- I'm not sure which of these permits that is.

Q. Well, certainly after you -- did you review the permit that came out after you submitted your comments?

A. The permit that came after I submitted my comments?

Q. Yes.

A. I'm not sure.

Q. Well, you remember I went through documents and dates from November of 2024, December of 2024, and January of 2025?

A. Yes.

Q. And I think you testified earlier, you didn't review any of those documents.  True?

A. I certainly didn't remember reviewing any of those documents, yes.

Q. As you sit here today, is it your understanding that Connecticut DEEP has adopted the NOAA Atlas 14?

A. That's my understanding today, yes.

Page 160

Q. So to the extent that you were advocating for them to adopt something other than NOAA Atlas 14, they decided not to do that; isn't that true?

A. That appears to be the case, yes.

Q. And so to the extent that in your expert report for this case, you are making the same assertions about NOAA Atlas 14, those aren't accurate either.  True?

MR. WILLIAMS:  Object to form.

A. What is -- the discussion of NOAA 14 is accurate, scientifically accurate, to the best of my possible -- to the best of my knowledge in the report.

Q. Sure.  But in the report, you didn't say Connecticut DEEP doesn't require anything other than NOAA Atlas 14; isn't that true?

MR. WILLIAMS:  Object to form.

A. I did not say that.

Q. And now that I have gone through the documents with you, wouldn't you agree that you should have at least acknowledged that Connecticut DEEP, as the regulator under the permit that this lawsuit is being brought, doesn't require anything other than NOAA Atlas 14?

MR. WILLIAMS:  Object to form.

Page 161

A. My expert witness focuses on the scientific piece, not the regulatory and the permit piece.

Q. So to the extent that Connecticut DEEP has reviewed and assessed a NOAA Atlas 14+, or the NOAA Atlas 14++, or some other mechanism other than NOAA Atlas 14, you would agree a permittee isn't required to do anything other than NOAA Atlas 14?

MR. WILLIAMS:  Object to form.

A. I don't have -- sorry.  I don't have the expertise to discuss permitting.

Q. Okay.  Do you think you should have put in your report that Connecticut DEEP doesn't require anything other than NOAA Atlas 14, --

MR. WILLIAMS:  Object to form.

Q. -- but that you believe and advocated for DEEP to change that standard, but they didn't?

MR. WILLIAMS:  Object to form.

A. I focused my report on the scientific piece, not the permitting piece.

Q. In your submission to Connecticut DEEP, where you talk about NOAA Atlas 14, did you talk about what Connecticut DEEP had just done in their Stormwater Quality Manual?

A. I'm not sure I understand what you're

Page 176

A. Yes.

Q. And so looking at that report, someone could project annually, if that data was accurate, what the increase in precipitation days would be over the next five years?

A. I think so.

Q. And sitting here today, that's not something that you have done for purposes of your report. Your report focuses a little bit farther out, mid-century and end-of-century projections, true?

A. Right.

Q. And has the projections for the end of century -- strike that.

Have the -- strike that. I'm going to ask a different question.

You also have in your report, references to several historical storms. Do you recall that?

A. Yes.

Q. And you specifically say in your report that these storms did not occur in New Haven. True?

A. That their highest impact was not in New Haven.

Q. Yeah, I think you said on page 19 -- and you can look -- you said "I emphasize that the maximum impacts given below did not occur in New Haven,

Page 178

MR. WILLIAMS:  Object to form.

A. It would have some limited relevance.

Q. In any event, as you sit here today, you don't know whether or not the defendant's terminal ever flooded, true?

A. That's correct, I don't know.

Q. And you don't know whether or not the Gulf terminal ever flooded, true?

A. True.

Q. You made no effort to find out whether or not the defendant's terminal, the Gulf terminal, ever flooded, true?

MR. WILLIAMS:  Object to form.

A. That's correct.

Q. You made no effort to determine whether or not any of the terminals in the Port of New Haven have ever flooded, true?

MR. WILLIAMS:  Object to form.

A. That's correct.

Q. Did you make any effort to determine whether or not there's ever been any river flooding on the rivers connected to the Port of New Haven?

A. I don't recall.

Q. I didn't see anything in your report.  I'm just -- would you have put it in your report if

Page 193

report.

Q. Do you recall publishing an article in October of 2022 where you said that "How the number of hurricanes that form each year may change is another major question that is not well understood"?

A. It sounds familiar, yes.

Q. And is that -- was that your belief at the time that you wrote that?

A. Yes, the overall number.

Q. You also went on to say that there's no definitive theory explaining the number of storms in the current climate, or how it will change in the future.  Was that your opinion at that time?

A. Yes.

Q. And is that still your opinion today?

A. Yes.

Q. Are you familiar with the Connecticut Coastal Management Act?

A. I don't think so.

Q. Are you familiar with the Resource Conservation and Recovery Act, some people refer to as RCRA?

A. That sounds vaguely familiar.

Q. Do you consider yourself an expert in RCRA?

Page 194

A. No.

Q. Do you intend to offer any opinions in this case with regards to RCRA?

MR. WILLIAMS:  Object to form.

A. No.

Q. Do you intend to offer any opinions in this case related to the Clean Water Act?

MR. WILLIAMS:  Object to form.

A. Not from a policy perspective.

Q. Do you have any understanding as to the regulatory structure of Clean Water Act?

A. I'm not an expert in regulatory matters.

Q. So you're not going to offer any opinions that the Clean Water Act requires something or doesn't require something in this case?

A. That's correct.

Q. Did you review any of the testimony of any of the fact witnesses in this case?

A. I'm not sure I know what a fact witness is.

Q. Are you aware that some of the defendants' employees have been provided testimony about the facility and how the facility is run and operates?

A. Not to my knowledge.

Q. You didn't review any of that testimony?

A. I don't think so.

Page 197

Q. You don't socialize with people from CLF that you're aware of?

A. Not that I know of.  Not that I wouldn't.

Q. Have you performed any work for any energy companies?

A. Not that I'm aware of.

Q. Are you a member of the American Chemistry Council?

A. No.

Q. ASTM?

A. No.

Q. ISO?

A. No.

Q. Would it be fair to say to the extent that you're a member of an organization, that's covered on your CV?

A. As far as I'm aware.

Q. Do you have LinkedIn?

A. I do.

Q. And is that up to date?

A. I'm going to say not really.

Q. Do you have any knowledge whatsoever as to how the facility at issue in this case handles precipitation or stormwater?

A. Not really, no.

Page 202

MR. WILLIAMS:  Object to form.

A. I think so.

Q. Okay.  Do you know who the defendants are? I think I asked you that already, but I just want to be clear.

MR. WILLIAMS:  Objection, asked --

Q. You said in that paragraph, you used the word "defendants," right?

MR. WILLIAMS:  Counsel, asked and answered.

A. Yes, I used that word.

Q. Okay.  But as you sit here today, you don't know who the defendants actually are in this case, true?

MR. WILLIAMS:  Objection; asked and answered.

A. Off the top of my head, no.

Q. Do you have any current plans to do additional work in connection with this case?

A. Beyond being at trial, potentially, I don't know what else, what additional work would look like.

Q. Do you have any specific opinions as to how many days increase in rain there will be in New Haven for the year 2026?

Page 203

MR. WILLIAMS:  Object to form.

A. I don't have a specific opinion as to 2026. I could calculate an estimate considering 2026 to be similar to the current five-year period and make an estimate of how that's differed from preindustrial or some other baseline.  That would be possible to do.

Q. As you sit here today, you haven't done that calculation?

A. No.

Q. Is that no, you haven't done that?

A. No, I have not done that calculation.

Q. If I asked the same question for 2027, 2028, 2029, 2030, is it the same answer?

A. I think it's the same answer.  2030 is also a period I have looked at a little bit.  But it would be a similar answer, yes.

Q. Do you have an understanding as to what the duration of the permits are in this case?

MR. WILLIAMS:  Object to form.

A. No.

Q. Do you have an understanding -- strike that. Other than your belief that there will be an increase in the frequency and/or severity of storms, do you have an opinion as to what that