**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 3, 2025 |
| Defendants. | |

**DEFENDANTS' CORRECTED MEMORANDUM IN SUPPORT OF MOTION TO**
**EXCLUDE TO EXCLUDE WENDI GOLDSMITH**

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises

LLC (collectively, "Defendants") respectfully move to exclude Plaintiff, Conservation Law

Foundation Inc.'s ("CLF's") expert, Wendi Goldsmith under Federal Rules of Evidence 702,

402, and 403.

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 4

        A.      Dr. Goldsmith is Not an Engineer and Has No Experience with the
                Petroleum Bulk Storage Industry ................................................................ 4

        B.      Dr. Goldsmith Opinions Do Not Reference the Defendants In This Case .............. 5

        C.      Dr. Goldsmith Opines the 2018/2021 Permit "Implicitly" Required
                Defendants to Consider Climate Change Risks ........................................... 5

        D.      Dr. Goldsmith's Subjective Interpretation of "Best Industry Practice" ................. 7

III.    LEGAL STANDARD .............................................................................................. 9

IV.     ARGUMENT .......................................................................................................... 11

        A.      Dr. Goldsmith Lacks Expertise in Engineering and the Petroleum Bulk
                Fuel Industry, Which Are the Subject of Her Opinions and this Dispute. ............ 11

        B.      Dr. Goldsmith's Methodology is Unreliable Because She Points to No
                Objective Standard for "Best Industry Practice" Beyond Her Own
                "Interpretation." ........................................................................................ 16

                1.      Dr. Goldsmith's Reliance on "Best Industry Practice" For The
                        "Implied" Obligation to Assess for Climate Change Is
                        Unfounded ...................................................................................... 17

                2.      Dr. Goldsmith Ignores Industry Guidance Relevant to Industrial
                        Stormwater Permitting That Does Not Support Her Opinions ................. 21

                3.      Dr. Goldsmith Selectively Relies on Three Irrelevant Sources as
                        "Best Industry Practice." ................................................................ 24

                4.      Dr. Goldsmith Testified She Does Not Consider Any Other
                        Sources as "Best Industry Practice" ................................................ 28

                5.      Dr. Goldsmith's Methodology is Unreliable ........................................ 29

        C.      Dr. Goldsmith's Opinions Beyond the Obligations in the 2018/2021
                Permit Must Also Be Excluded As Irrelevant ............................................. 30

                1.      Dr. Goldsmith Cannot Provide Opinions Not Included in CLF's
                        NOI ................................................................................................ 31

                2.      Dr. Goldsmith's Opinions Must Be Excluded as Irrelevant .................. 34

        D.      Dr. Goldsmith's Opinions Should Be Excluded as Prejudicial and
                Confusing Because She Holds Defendants to a "Higher Standard" Based
                on Her Own Climate Advocacy ................................................................ 36

i

V.      CONCLUSION ................................................................................................... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Duchimaza v. United States*,
211 F. Supp. 3d 421 (D. Conn. 2016) ...................................................................................12

*United States v. Diallo*,
40 F.3d 32 (2d Cir.1994) ......................................................................................................12

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002) ............................30

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ..............................................................................................9, 16

*Andrews v. Brethren Mut. Ins. Co.*,
No. 4-19-CV-02107, 2023 WL 6690710 (M.D. Pa. Oct. 12, 2023) .......................................10

*Brod v. Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011) ................................................................................................31

*Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of N.Y.*,
273 F.3d 481 (2d Cir. 2001) ................................................................................................32

*Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
No. 19-CV-839 (JBA), 2021 WL 4170757 (D. Conn. Sept. 14, 2021)
..................................................................................................................17, 21, 22, 29

*Conservation Law Found., Inc. v. ExxonMobil Corp.*,
No. 1:16-cv-11950 (D. Mass.) ..............................................................................................4

*Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.*,
No. 3:21-cv-00932 (D. Conn.) ..............................................................................................4

*Conservation Law Found., Inc. v. Shell Oil Products US, et al.*,
No. 1:17-cv-00396-WES-LDA (D.R.I.) ..................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................................................. *passim*

*Grdinich v. Bradlees*,
187 F.R.D. 77 (S.D.N.Y 1999) ...................................................................................21, 27, 28

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989) ...............................................................................................................32

*Hallstrom v. Tillamook Cnty.*,
  493 U.S. 29 (1989) ...................................................................................................32

*Hawley v. Hannaford Bros. Co. LLC*,
  No. 2:16-CV-00249, 2018 WL 3647202 (D. Vt. Aug. 1, 2018) ...............................22

*Marx & Co., Inc. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977) ...............................................................................37, 38

*Max Zach v. Marker 17 Marine*,
  No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024)
  (Oliver, J.) ...............................................................................................................16

*Meineker v. Hoyts Cinemas Corp.*,
  154 F. Supp. 2d 376 (N.D.N.Y. 2001) ..............................................22, 23, 29, 30

*Mid-New York Envt'l and Sustainability Promotion Comm. v. Dragon Springs
  Buddhist, Inc.*,
  No. 24-2451, 2025 WL 2653616 (2d Cir. Sept. 16, 2025) .......................................32

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  982 F.3d 113 (2d Cir. 2020) ......................................................................................9

*Munn v. Hotchkiss Sch.*,
  24 F.Supp.3d 155 (D. Conn. 2014) (Underhill, J.), *aff'd,* 724 Fed. Appx. 25
  (2d Cir. 2018) .....................................................................................................22, 29

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
  236 F.3d 985 (9th Cir. 2000) ...................................................................................32

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir 2005) ........................................................................... *passim*

*Pub. Interest Research Grp. of New Jersey, Inc. v. Hercules, Inc.*,
  50 F.3d 1239 (3d Cir. 1995) .....................................................................................32

*Pugliano v. United States*,
  315 F. Supp. 2d 197 (D. Conn 2004) ............................................................30, 34, 36

*Ruggiero v. Warner–Lambert Co.*,
  424 F.3d 249 (2d Cir. 2005) .....................................................................................30

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) .....................................................................................10

*United States v. Cruz*,
  363 F.3d 187 (2d Cir. 2004) ...............................................................................12, 15

*United States v. Jones*,
965 F.3d 149 (2d Cir. 2020)........................................................................................10

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990)........................................................................................11

*Wang v. Omni Hotels Management Corporation*,
3:18-cv-2000, 2025 WL 1782264 (D. Conn. June 27, 2025) (Oliver, J.)..................9

*Yazujian v. PetSmart*,
2018 WL 1830931 (3d Cir. Apr. 17, 2018) ...............................................................22

**Statutes**

33 U.S.C. § 1365..................................................................................................30, 31

44 U.S.C. § 6972..................................................................................................30, 31

**Other Authorities**

40 CFR § 135.3...........................................................................................30, 31, 32, 34

Fed. R. Evid. 401 ..........................................................................................................2

Fed. R. Evid. 403 .................................................................................................. *passim*

Fed. R. Evid. 702 .................................................................................................. *passim*

## I.    INTRODUCTION

In this lawsuit, Conservation Law Foundation ("CLF") alleges that Defendants Triton Terminaling, LLC, Equilon Enterprises LLC, and Motiva Enterprises LLC ("Defendants") violated the State of Connecticut "industrial stormwater management" permit (the "2018/2021 Permit")[1] at Defendants' New Haven Terminal (the "Terminal"), a petroleum bulk storage facility, because they did not address the risk of climate change. In support of its interpretation of the 2018/2021 Permit, CLF put forth the expert report and testimony of Wendi Goldsmith, a geologist and self-proclaimed expert who frequently collaborates with CLF. Dr. Goldsmith offers opinions that Defendants, the current or former owners of the Terminal, failed to comply with obligations under the 2018/2021 Permit by not assessing for and protecting against the risks of climate change.

But there is no dispute that the 2018/2021 Permit does not expressly require permittees to consider climate change risks. Instead, Dr. Goldsmith contends that expansive and cutting-edge climate change obligations are "implied" by the 2018/2021 Permit's reference to "best industry practice." The Court should exercise its gatekeeping duty to exclude **all** of Dr. Wendi Goldsmith's opinions for four reasons.

***First***, Dr. Goldsmith lacks the specialized knowledge and expertise required to offer opinions about engineering practices and the petroleum bulk storage industry. Dr. Goldsmith is not an engineer, and she readily admits that she has zero experience with the petroleum bulk storage industry or even stormwater permit compliance for petroleum terminals. Ex. A, Goldsmith Dep. at 28:3, 20:13–15, 30:2–5, 24:12–15. Not only that, in providing her opinions on

---

[1] At the time this lawsuit was filed, the applicable permit was the 2018 General Permit. In 2021, Connecticut Department of Energy & Environmental Protection ("CT DEEP") renewed the permit without any substantive changes. This Motion refers to the permits collectively as the "Permit."

1

"best industry practice," Dr. Goldsmith never contacted anyone in the industry, never conducted a survey to identify industry practices, and never visited a petroleum bulk storage facility outside of her role as a paid expert. *Id.* at 237:3–6, 235:22–236:3, 21:22–22:1. As shown below, Dr. Goldsmith's opinions about the engineering and "best industry practice" purportedly applicable to the Terminal stray drastically from the scope of her actual experience, such that she is not qualified to testify under Fed. R. Evid. 702.

**Second**, Dr. Goldsmith's methodology is unreliable and inadmissible under Fed. R. Evid. 702 because she makes up her own implied standard under the 2018/2021 Permit to assess for and protect against climate change based on her subjective "interpretation" of "best industry practice." Yet, Dr. Goldsmith cannot point to a single industry group or regulatory agency, including CT DEEP, who interprets "best industry practice" to support her interpretation. In fact, CT DEEP has discredited Dr. Goldsmith's very interpretation by proposing climate resiliency measures in its 2024 draft permit **for the first time** as a "new component." *See* Ex. B, 2024 Draft Permit; Ex. C, CT DEEP Fact Sheet (Nov. 2024 Draft) at 11.[2] She instead relies on three cherry-picked sources from entirely different industries and her own say-so about what the 2018/2021 Permit requires. In other words, Dr. Goldsmith never objectively defines any "best industry practice" for the industry at issue in this lawsuit, the petroleum bulk storage terminal industry.

**Third**, Dr. Goldsmith's opinions are also inadmissible under Fed. R. Evid. 401 and 402. For one, Dr. Goldsmith's opinions are irrelevant because they include alleged violations that were not included in CLF's Notices of Intent to Sue ("NOI") or Complaint, a mandatory requirement in Clean Water Act ("CWA") citizen suits. For another, while the claims in this case

---

[2] CT DEEP issued a *final* version of this permit, the "New Permit" on October 1, 2025.

relate to alleged violations of the 2018/2021 Permit, Dr. Goldsmith's opinions venture far beyond any obligation in the relevant 2018/2021 Permit, EPA or CT DEEP regulation or guidance, or any relevant industry guidance. None of Dr. Goldsmith's opinions even reference the 2018/2021 Permit for the Terminal at issue in this lawsuit and most do not even mention best industry practice for permittees under the 2018/2021 Permit or for petroleum bulk fuel terminals.

*Fourth,* even if Dr. Goldsmith's opinions had any modicum of relevance, the probative value of her opinions is substantially outweighed by the danger of unfair prejudice and confusing the issues. Dr. Goldsmith's opinions are inadmissible under Fed. R. Evid. 403 because she admitted that she holds Defendants to a "higher standard" than the 2018/2021 Permit requires. Dr. Goldsmith is, quite simply, a paid advocate for CLF, who confuses her advocacy for increasing climate resilience with legal obligations in the 2018/2021 Permit never before stated by CT DEEP.

Dr. Goldsmith's creative "interpretation" of the 2018/2021 Permit's terms is not supported by any agency guidance or relevant industry standards for the industry in this lawsuit. If Dr. Goldsmith were permitted to essentially redefine what constitutes permit terms such as "best industry practice," citizen suits would become a vehicle for rewriting permits to an expert's liking, supplanting the role of CT DEEP and EPA, rewriting the Clean Water Act, and leaving permittees without adequate notice and guidance as to what they must do to comply with the terms of the 2018/2021 Permit. Anyone could file a citizen suit based solely on an expert's "interpretation" of a permit's term, even if no one has ever interpreted it that way before. Indeed, the issue in this case is not whether climate change is a legitimate or important objective for industry to assess, but only whether it was required by the 2018/2021 Permit in effect at the time CLF filed this lawsuit. Accordingly, and for all the reasons explained below, Dr. Goldsmith's

3

opinions are inadmissible under Fed. R. Evid. 702, 402, and 403.

## II.    BACKGROUND

CLF is an environmental advocacy group that has filed CWA citizen suits across the Northeastern United States[3] asserting novel claims that the terms of permits issued under the CWA implicitly included an obligation to consider climate change and adopt of climate change resiliency measures. Dr. Goldsmith is CLF's long-time advocate, who has supported CLF's argument that climate change should be a mandated consideration under state-issued permits in public comments to regulatory agencies and in declarations submitted in litigation since at least 2016. *See, e.g.,* Ex. D, Goldsmith Decl., No. 1:16-cv-11950-MLW (Dec. 20, 2016), Dkt. 21-11, Ex. K. In fact, before Dr. Goldsmith began testifying in litigation, she filed declarations to support CLF comments to EPA, touting the same theories here (i.e., state-issued permits should consider climate change), which EPA routinely **rejected**. *See* Ex. E, 2021 EPA MSGP Response to Comments (Jan. 15, 2021).

### A.    Dr. Goldsmith is Not an Engineer and Has No Experience with the Petroleum Bulk Storage Industry

Dr. Goldsmith is a geologist by trade and a self-proclaimed "transdisciplinary expert in climate-resilient infrastructure, applied geoscience, and environmental policy integration." Ex. F, Goldsmith Rpt. at Appendix A at i. Dr. Goldsmith's experience is in climate-related "sustainability and disaster resilient planning" for cities and communities after natural disasters, like hurricanes. *Id.* at 3–8. Dr. Goldsmith admitted, "I am not an engineer at all," Ex. A, Goldsmith Dep. at 28:3, and she agreed she would not be "offering any engineering opinions in

---

[3] Plaintiff has filed lawsuits asserting identical claims against petroleum bulk storage terminals across New England. *See Conservation Law Found., Inc. v. Shell Oil Products US, et al.*, No. 1:17-cv-00396-WES-LDA (D.R.I.); *Conservation Law Found., Inc. v. ExxonMobil Corp.*, No. 1:16-cv-11950 (D. Mass.); *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.*, No. 3:21-cv-00932 (D. Conn.).

this case," *id.* at 28:4–6.

Dr. Goldsmith also does not have any "expertise in operating a petroleum bulk storage terminal" or "operational experience in the oil and gas industry," more generally. Ex. A, Goldsmith Dep. at 20:13–15, 30:2–5. She has never "worked for any party on environmental compliance for operating a petroleum bulk storage terminal," *id.* at 24:12–15, nor has she worked with CT DEEP on industrial stormwater permitting, *id.* at 27:2–11.

**B.    Dr. Goldsmith Opinions Do Not Reference the Defendants In This Case**

Dr. Goldsmith expresses no opinions about the Defendants in this case, Equilon, Triton Terminaling, and Motiva. As this Court is well aware, Shell plc has never been a party to this litigation [ECF 111 at 5–6]. Plaintiff has not asserted any claims against Shell plc, nor has it sought to hold Shell plc liable under any theory. *See* ECF 47; ECF 529.Any opinions regarding Shell plc's conduct, policies, or alleged operational control are wholly irrelevant to the liability or penalty determinations that must be made with respect to the actual Defendants. Goldsmith testified that her opinions did not reference the actual Defendants because "keeping track of the ownership structure was not my focus area." Ex. A, Goldsmith Dep. at 120:9–10.

**C.    Dr. Goldsmith Opines the 2018/2021 Permit "Implicitly" Required Defendants to Consider Climate Change Risks**

Dr. Goldsmith's threshold opinion in this case is that the 2018/2021 Permit required that Defendants "consider and protect against reasonably foreseeable risks, including risks due to climate change," like severe weather, storm surges, precipitation, and sea level rise (collectively "Climate Change Risks"). Ex. F, Goldsmith Rpt. at 15–26 ("Opinion 1"). As Dr. Goldsmith concedes, however, nothing in the 2018/2021 Permit references climate change, Ex. A, Goldsmith Dep. at 75:2–7, and CT DEEP has never issued guidance expressly requiring permittees to consider climate change at the Terminal, *id.* at 65:17–24 (objection omitted).

5

Instead, Dr. Goldsmith's opinion that the 2018/2021 Permit required Defendants to address Climate Change Risks is what she calls an **implied** obligation, packed into three words in the 2018/2021 Permit: "best industry practice." *Id.* at 109:19–110:1. The 2018/2021 Permit's reference to "best industry practice" is found in the definition section under the word "minimize," as it relates Section 5(b) of the 2018/2021 Permit, which lists "control measures" intended to "minimize" pollution:

> "'*Minimize,*' for purposes of implementing control measures in Section 5(b) of this general permit, means to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable *in light of* **best industry practice**."

Ex. G, 2018 Permit at 6, 18–19 (emphasis added).

Dr. Goldsmith expands the words "best industry practice" to encompass every one of her opinions about what she believes the 2018/2021 Permit required related to climate change:

- The Terminal must evaluate and address Climate Change Risks for the entire life-expectancy of the Terminal, instead of only the 5-year Permit period. Goldsmith Rpt. at 27– 28 (citing EPA Region 1 Recommended Procedures … for Wastewater Treatment Systems and/or Sewer Systems).
- **Opinion 2:** [Nonparty] Shell has not addressed increasing Climate Change Risks, referencing her involvement in the response to Hurricanes Katrina and Rita. *Id.* at 29–32.

- **Opinion 3:** Past storms put Defendants on notice of increasing Climate Change Risks at the Terminal, including Hurricanes Katrina, Rita, Harvey, and Sandy. *Id.* at 32–39 (citing the "North Atlantic Coast Comprehensive Study" ("NACCS"), conducted after Hurricane Sandy).

- **Opinion 4:** The Terminal is not engineered or operated pursuant to "best industry practice," for example, because the Terminal's berm heights (oil spill containment structures) are not high enough, the infrastructure is outdated, the Terminal's secondary containment area intended to contain an oil spill is inadequate, stormwater drainage is inadequate, etc. *Id.* at 30–42 (citing ASCE 24-14 Standard and the ASFPM Guide in Nairn's (Plaintiff's expert) report).

- **Opinion 5:** The Terminal's stormwater management system is not sufficient to mitigate Climate Change Risks because the Terminal could discharge non-stormwater and other pollutants under more severe flooding conditions. *Id.* at 30–42.

6

- **Opinion 6:** The Terminal's berms and containment areas are insufficient to contain an oil spill based on Climate Change Risks because Dr. Goldsmith personally observed inadequate erosion control measures and noted she has not seen planning for flood management. *Id.* at 43–45.

- **Opinion 7:** The Terminal is not engineered or operated to prevent discharge of pollutants in the event of a severe storm, like Hurricanes Sandy or Harvey. *Id.* at 46–47.

- **Opinion 8**: Frameworks exist to guide engineering and infrastructure measures to address Climate Change Factors at the Terminal, like the NACCS or U.S. Army Corp of Engineering projects. *Id.* at 48–49.

- **Opinion 9:** Defendants failed to apply "best industry practice" in its risk management program to assess for Climate Change Risks based on the UN Industrial Development Organization risk assessment guidelines. *Id.* at 48–49.

- **Opinion 10**: The Terminal risks failure and poses a threat of pollution to the community and environment in the event of a severe storm. *Id.* at 52–59.

None of Dr. Goldsmith's opinions reference the 2018/2021 Permit and most do not mention best industry practice.

### D.    Dr. Goldsmith's Subjective Interpretation of "Best Industry Practice"

Because Dr. Goldsmith **believes that "best industry practice" in the 2018/2021 Permit required that Defendants assess for and protect against Climate Change Risks, Dr. Goldsmith testified at length about her interpretation of "best industry practice." Dr. Goldsmith's interpretation on "best industry practice" underlies all of her opinions and the issues involved with this lawsuit.**

At the outset, when asked how Dr. Goldsmith defined **"industry," she described a Venn diagram with three "circles": the "Metocean science and engineering industry," the "professional civil engineering industry," and "the planners, like myself." Ex. A, Goldsmith Dep. at 243:13–244:23. In the middle of the three overlapping circles, she explained, is "the bulk petroleum folks."** *Id.* **She did not provide a source for her "industry" Venn diagram explanation. Of course, the Terminal in this case is subject to the CT DEEP stormwater discharge permit based on its EPA SIC code industrial classification as a "Petroleum Bulk**

**Storage Terminal." Ex. H, 2021 EPA MSGP, Appendix N – List of SIC and NAISC Codes at N-19 (SIC Code 5171 – Petroleum Bulk Stations and Terminals); Ex. G, 2018 Permit at 6. Dr. Goldsmith was not aware that the EPA SIC code classifies the Terminal as a "Petroleum Bulk Storage Terminal." Ex. F, Goldsmith Dep. at 229:6–19.**

To discern best industry practice, Dr. Goldsmith did little to identify what "industry practices" are actually used in the EPA SIC code for the Terminal, the actual "industry" involved in this dispute. For example, Dr. Goldsmith testified that she did not conduct a survey of the petroleum bulk storage industry or conduct any of her own modeling for any terminal. Ex. A, Goldsmith Dep. at 235:22–236:3, 35:20–36:3. Dr. Goldsmith testified that she did not consider a multitude of EPA and industry guidance about industrial stormwater practices, including an EPA "Developing Your Stormwater Pollution Prevention Plan" guide for industrial operators, *id.* at 200:13–15, or the Connecticut Stormwater Quality Manual on Climate Change Considerations, *id.* at 199:9–12.

Instead, Dr. Goldsmith testified that she considered three sources in her report as establishing a climate change assessment as "best industry practice" under the 2018/2021 Permit: (1) Ex. I, the ASCE Standard 24-14, "Flood Resistant Design and Construction"; (2) Ex. J, EPA Region 1, "Recommended Procedures and Resources for the Development of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems"; (3) Ex. K, ASFPM Floodplain Regulations Committee, "A Guide for Higher Standards in Floodplain Management." To be clear, Dr. Goldsmith did not clearly define any of these three sources as "best industry practice" in her report. As explained below, none of these three sources apply to the Terminal or the 2018/2021 Permit.

### III.    LEGAL STANDARD

District courts play a crucial "'gatekeeping' function' under Rule 702 and are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Wang v. Omni Hotels Management Corporation*, 3:18-cv-2000 (VDO), 2025 WL 1782264, at *2 (D. Conn. June 27, 2025) (Oliver, J.) (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 259, 265 (2d Cir. 2002) (same). As the Supreme Court notes, the importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal quotations omitted).

Federal Rule of Evidence 702 prohibits a witness who is qualified as an expert from testifying unless the proponent proves it is more likely that not that:

> "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702.

Failure to comply with any of the Rule 702 elements is fatal to an expert's opinion, because even if an expert is qualified to testify, the expert's opinions must also be reliable and relevant to the issues in the case. *See Daubert*, 509 U.S. at 589 ("under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but

reliable"). The party proffering the expert—here, CLF—bears the burden of establishing Rule 702's requirements by a preponderance of the evidence. *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020); *see also* Fed. R. Evid. 702. ("A witness who is qualified as an expert ... may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is *more likely than not* that [the criteria for admissibility are met] ...." (emphasis added)).

Congress amended Rule 702 in late 2023 to emphasize that courts must fulfill their gatekeeper role by strictly enforcing the requirements of the Rule. As the Advisory Committee noted in an accompanying comment, a prior trend of cases that held flaws in expert analysis went to "questions of weight and not admissibility" reflected "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 Advisory Comm. Note to 2023 Amend. 6. The amended Rule makes abundantly clear that "the proponent [of an expert must] demonstrate[] to the court that it is more likely than not" that the four Rule 702 factors are met—in particular that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Courts have relied on the amendment to draw stricter boundaries around the admissibility of expert opinions. *See, e.g.*, *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) (reversing admission of expert opinions where district court had not fully analyzed relevance and reliability); *Andrews v. Brethren Mut. Ins. Co.*, No. 4-19-CV-02107, 2023 WL 6690710, at *6, n.69 (M.D. Pa. Oct. 12, 2023) (citing *Sardis* and excluding speculative conclusions and the unsupported rejection of alternative causes of the relevant conduct).

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir 2005) (quoting Fed. R. Evid. 403). The Supreme Court and Second Circuit have

10

emphasized "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Id.* (citing *Daubert*, 509 U.S. at 595). In fact, because expert testimony has a greater chance of misleading the jury, a court evaluating potential prejudice under Rule 403 "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## IV.   ARGUMENT

As a consultant for CLF for more than 20 years, CLF asked Dr. Goldsmith to offer opinions on "best industry practices" for an industry she knows nothing about. Rule 702 prohibits Dr. Goldsmith from manufacturing her own definition of "best industry practice." As explained below, the Court should exercise its gatekeeping duty to exclude Dr. Goldsmith's expert opinions for four reasons: (1) Dr. Goldsmith lacks the relevant expertise to testify about engineering and the petroleum bulk storage industry; (2) Dr. Goldsmith's methodology is unreliable because it is based only on her own subjective "interpretation" of best industry practice instead of any objective or identifiable standard, as required by law; and (3) Dr. Goldsmith's opinions are irrelevant because they are not noticed in CLF's NOI or Complaint and do not relate to the claims in this case, and (4) Dr. Goldsmith's opinions are unfairly prejudicial and unhelpful to the jury because she seeks to impose on Defendants her own made-up standard through a citizen suit without any prior notice to Defendants or tie to the 2018/2021 Permit.

**A.     Dr. Goldsmith Lacks Expertise in Engineering and the Petroleum Bulk Fuel Industry, Which Are the Subject of Her Opinions and this Dispute.**

Rule 702 first requires that an expert witness is qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Even then, "[a]n expert may be qualified to testify on certain matters and not others." *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) (citation omitted) (affirming the district court's exclusion of a drug expert's

11

testimony about recordkeeping procedures, for which his expertise was not established); *see also*

*Nimely*, 414 F.3d at 399 n. 13 (even if an expert witness is qualified in "certain matters or areas

of knowledge, it by no means follows that he or she is qualified to express expert opinions as to

other fields."). Accordingly, "district courts, in their role as gatekeepers, must be ever vigilant

against expert testimony that could stray from the scope of a witness's expertise." *United States*

*v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004).

The *Cruz* case is a cautionary tale where the Second Circuit determined that the district

court "failed to satisfy its obligations as a gatekeeper" by allowing an expert to offer testimony

that "stray[ed] from the scope of his expertise." *Id.* at 194–196. There, the expert witness was a

DEA agent who interpreted the meaning of the phrase, "to watch someone's back" by suggesting

that the defendant was a "lookout" during a drug deal. *Id.* at 193–194. But there was no evidence

that "to watch someone's back" was drug-related, so allowing the expert to provide his own

interpretation of an ambiguous phrase strayed from the scope of his expertise and indeed, was

error for the district court to allow. *Id.* at 196.

To determine whether a witness qualifies as an expert, courts "compar[e] the area in

which the witness has superior knowledge, skill, experience, or education with the subject matter

of the witness's testimony." *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir.1994); *see*

*also Duchimaza v. United States,* 211 F. Supp. 3d 421, 431 (D. Conn. 2016) (excluding expert

opinions about Electronic Benefit Transfer data in the SNAP program where the expert was only

qualified in "certain features" of the SNAP program as it operated in the 1980s). Simply put, the

Court must answer: does the expert's experience match the subject matter of her testimony?

Dr. Goldsmith is a geologist and self-styled "transdisciplinary expert in climate-resilient

infrastructure, applied geoscience, and environmental policy integration." Ex. F, Goldsmith Rpt.

at Appendix A at i. Dr. Goldsmith has master's degrees in landscape design and in plant and soil science, and a doctorate in business and social science from a Danish university. *Id.* at ii.

Dr. Goldsmith's report does not claim any project experience related to private industrial facilities, the oil and gas industry, petroleum bulk storage, CT DEEP, or state-issued stormwater discharge permit compliance. *See id.* at 3–6. In fact, Dr. Goldsmith testified that she is not an engineer, Ex. A, Goldsmith Dep at 28:1–3, and represented that she is not offering engineering opinions in this case.

> **Q. Are you offering any engineering opinions in this case?**
> **A. No.**

*Id.* at 28:4–6.

Contrary to her admission, Dr. Goldsmith's Rule 26 Expert Report is replete with engineering opinions. (*See* Table). And despite her complete lack of industry experience or even permitting experience related to petroleum bulk storage terminals, Dr. Goldsmith's "objective" for every one of her opinions was to "assess available information to determine if Shell"—who is not a party to this action—"used best **industry** practices to minimize or mitigate" Climate Change Risks at the Terminal. Ex. F, Goldsmith Rpt. at 9 (emphasis added). Highlighting the Rule 702 arguments in this motion, outside of her role in litigation, Dr. Goldsmith has never stepped foot on-site any commercial petroleum bulk storage facility. *See* Ex. A, Goldsmith Dep. at 21:7–24:11.

| Dr. Goldsmith's Lack of Engineering and Industry Experience | Subject Matter of Goldsmith's Opinions |
|---|---|
| **Engineering**<br><br>• "Q. I think you testified earlier you're not a licensed engineer in Connecticut, correct? A. **I am not an engineer at all.**" Ex. A, Goldsmith Dep. at 28:1–3 (emphasis added).<br><br>• "Q. Do you have a degree in engineering? A. | • The "objective" of Dr. Goldsmith's opinions was to determine if the petroleum bulk storage Terminal adhered to "best **industry** practices." Ex. F, Goldsmith Rpt. at 9. |

No." *Id.* at 16:3–4.

- "Q. Have you ever been a licensed engineer in any state? A. No." *Id.* at 16:5–7.

- "Q. Are you a member of the American Society of Civil Engineers? A. I am not, although I have collaborated with the organization." *Id.* at 107:17–20.

- "Q. And you are not a civil engineer? A. Correct." *Id.* at 107:21–22.

**Industry/Industrial Stormwater Permitting**

- "Q. Do you have any operational experience in the oil and gas industry? A. No." *Id.* at 20:13–15.

- "Q. Do you have any expertise in operating a petroleum bulk storage terminal? A. No." *Id.* at 30:2–5 (objection omitted).

- "Q. Have you ever worked for any party on environmental compliance for operating a petroleum bulk storage terminal? A. No." *Id.* at 24:12–15.

- "Q. Have you ever interacted with Connecticut DEEP [] on any industrial stormwater permitting issue? A. Not on industrial stormwater." *Id.* at 27:2–5.

- "Q. So you have no experience in negotiating industrial stormwater permitting issues with Connecticut DEEP? A. Correct." *Id.* at 27:6–11 (objection omitted).

- "[I]t is my opinion that the New Haven Terminal is not **engineered** … pursuant to best **industry** practice." *Id.* at 41–42.

- Listing "**[e]ngineering** improvements including raising the berm heights," or secondary oil spill containment structures, as necessary to address climate-related flooding. *Id.* at 39.

- Opining that defendants have not conducted "**engineering** toward achieving flood management production" such as implementing precautions to terminal "berms and containment areas." *Id.* at 45.

- "[I]t is my opinion that the New Haven Oil Terminal is not **engineered** … to prevent the discharge of pollutants." *Id.* at 48.

- Opining that information is available to "guide **engineering** of infrastructure measures. *Id.* at 48.

- "Best **industry** practice … demand that Shell critically reviews and adjusts to match developments in climate science and storm damage **engineering** approaches." *Id.* at 56.

Not only does Dr. Goldsmith lack any industry experience with petroleum bulk storage facilities, she did not do any independent expert work to understand "industry" practices for petroleum bulk storage terminals, as confirmed by her deposition testimony.

- "Q. … How do you identify what the industry practices are? A. **I have not conducted a survey of industry practices in the bulk petroleum storage or any industry**." *Id.* at 235:22–236:3 (emphasis added).

- "Q. Did you interview any of the … ten other petroleum bulk storage terminals? A. No other." *Id.* at 237:3–6.

14

- "Q. … So you said you did not do any modeling of potential contaminant movement to these ecological resources. A. Correct. That was done by others." *Id.* at 35:20–23.

- "Q. Did you actually conduct any test of soil at the New Haven terminal? A. No. I didn't have my trusty shovel with me." *Id.* at 37:7–10.

- "Q. Did you conduct any samples of stormwater at the New Haven terminal? A. No." *Id.* at 37:11–13.

- "Q. Did you take any samples of groundwater at the New Haven terminal? A. No." *Id.* at 37:14–16.

- "Q. I just want to know, did you contact any other industries outside of the petroleum bulk storage and ask them, 'Are you guys doing a climate change vulnerability risk assessment?' Yes or no? A. No. I didn't even call my relatives to ask them if they had considered their home site." *Id.* at 238:6–11.

Even if some of Dr. Goldsmith's experience involved *collaborating* with engineers or involved projects that *encompassed* petroleum bulk storage facilities, Dr. Goldsmith's disaster-relief community planning expertise does not permit her to testify about engineering and best industry practice. Like in the *Cruz* case, it would be error to allow Dr. Goldsmith to "stray from her expertise" and provide her own unfounded interpretation. *Cruz*, 363 F.3d at 194 (holding that the district court "failed to satisfy its obligations as a gatekeeper" by allowing an expert to "stray from the scope of his expertise" by interpreting the meaning of an ambiguous phrase as drug-coded without any supporting evidence).

To be sure, opinions from witnesses with only litigation-driven expertise are not admissible. Expert testimony based solely on a review of the record and regurgitated attorney argument—"[a]bsent some relevant specialized knowledge"—does not "meet the requirements of Rule 702." *Duchimaza,* 211 F. Supp. 3d at 430–31 (excluding an expert whose opinions "reflect mere characterization of the sort of data that a layperson could make."). That's exactly what Dr. Goldsmith's opinions are: regurgitated attorney-argument, consistent with Dr. Goldsmith's long history of advocacy for CLF. For these reasons, the Court should exclude the expert testimony of Dr. Goldsmith based on her clear lack of expertise.

15

B.    **Dr. Goldsmith's Methodology is Unreliable Because She Points to No Objective Standard for "Best Industry Practice" Beyond Her Own "Interpretation."**

Dr. Goldsmith's opinions should be excluded under Rule 702 because her method—crafted by Dr. Goldsmith solely for litigation—is unreliable. In fact, CT DEEP has rejected her interpretation based on its 2024 draft Permit. *See* Ex. B, 2024 Draft Permit; Ex. C, CT DEEP Fact Sheet (Nov. 2024 Draft).[4] Accordingly, her entire methodology worked backwards from her conclusions, selecting three irrelevant sources with no relationship to the petroleum bulk storage industry as "best industry practice" based only on her own subjective beliefs. Under Rule 702, the Court should exclude **all** of Dr. Goldsmith's opinions because her threshold opinion that "best industry practice" includes expansive Climate Change Risk obligations permeates her entire report, and her specific opinions (*e.g.*, criticizing the height of berms, infrastructure, and secondary containment engineering, requiring a risk management program, etc.) all flow from the same defective methodology.

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267 (affirming the exclusion of an expert who "inexplicably" did not include relevant data in his opinions). "At a minimum, an expert opinion requires some explanation as to how the expert came to [her] conclusion and what methodologies or evidence substantiate that conclusion." *See Max Zach v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *4 (D. Conn. Oct. 30, 2024) (Oliver, J.) (internal quotation omitted) (finding expert opinion unreliable when it was impossible to "discern the exact

---

[4] As noted above, CT DEEP issued a *final* version of this permit, the "New Permit" on October 1, 2025.

16

methodology" that the expert used); *see also Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 19-CV-839 (JBA), 2021 WL 4170757, at *19 (D. Conn. Sept. 14, 2021) ("Rule 702 demands more than the exercise of an expert's subjective judgment for his or her testimony to be 'reliable' under the Federal Rules, including an explanation of how the expert's subjective judgment is applied to the facts."), *on reconsideration*, No. 19-CV-839 (JBA), 2021 WL 5039035 (D. Conn. Oct. 29, 2021).

### 1.    Dr. Goldsmith's Reliance on "Best Industry Practice" For The "Implied" Obligation to Assess for Climate Change Is Unfounded.

Dr. Goldsmith's report states that she utilized a "gap analysis" methodology to assess "the Terminal's compliance" with the 2018/2021 Permit, hinging her entire analysis on the assumption that the 2018/2021 Permit's reference to "best industry practice" requires that permittees assess for and protect against Climate Change Risks. Ex. F, Goldsmith Rpt. at 9. Then, Dr. Goldsmith endeavored to "describe best industry practices" under the 2018/2021 Permit and identify gaps with the Terminal's compliance. *Id.* at 10.

The 2018/2021 Permit's reference to "best industry practice" modifies the word "minimize" in the context of the Permit's enumerated control measures in Section 5(b), which are "intended to minimize the discharge of pollutants from the permitted facility":

> "'*Minimize*,' for purposes of implementing control measures in Section 5(b) of this general permit, means to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable *in light of* **best industry practice**."

Ex. G, 2018 Permit at 6, 18–19 (emphasis added). Stated differently, the listed control measures in the 2018/2021 Permit are cabined by "best industry practice"; best industry practice does not—and cannot—create entirely new obligations. *See, e.g.*, Ex. L, Ohio EPA Div. of Surface Water Response to Comments (March 2017) (responding to comment that "best industry

17

practice" language in the Ohio industrial stormwater permit was vague, explaining that the agency "recognizes each industry is unique with specific resources and needs pursuant to maintaining operations" and as a result, it would "evaluate … 'best industry practice' on a case-by-case basis.").

Even if Dr. Goldsmith were right that "best industry practice" creates an implied obligation—she is not—she couldn't even begin to define what "industry" she thought the language refers to. In a bizarre description of industry practice made up entirely for this litigation, Dr. Goldsmith described an overlapping Venn diagram encompassing **four** industries, and including "planners, like myself."

> Q.   … [W]hat does the word "industry" mean to you?
>
> …
>
> A.   So I sketched out my imaginary Venn diagram, and I suggested that there's a section in the center where those three circles overlap. That can be described as being part of the petroleum bulk storage industry, the Metocean science and engineering industry, and the world of professional civil engineers who put the stuff into practice, and the planners, like myself, who tee up, scope, and otherwise initiate -- help to initiate those processes.

Ex. A, Goldsmith Dep. at 243:13–244:23. Given her limited experience with this industry, Dr. Goldsmith was not aware that the Terminal was regulated under the 2018/2021 Permit because it is classified by EPA in the "Petroleum Bulk Storage Terminal" industry. *Id.* at 229:6–19. Dr. Goldsmith's inability to even define what "industry" the "best industry practice" standard refers to is "the essence of unverified subjectivity." *Nimely*, 414 F.3d at 399.

Throughout this case, Dr. Goldsmith's reliance on the 2018/2021 Permit's "best industry practice" language is a sleight of hand to inject into the 2018/2021 Permit whatever obligations Dr. Goldsmith (and CLF) believes *should* be required—addressing Climate Change Risks by increasing the Terminal's berm and containment areas, updating the Terminal's infrastructure and

18

stormwater management system, and implementing a risk management program, just to name a few.

> Q. So it's your testimony that the Connecticut DEEP has had an implied obligation in its Industrial Stormwater Permit to conduct the climate change vulnerability risk assessment; is that correct?
>
> A. Yes. I would say that **under best practices**, that has been absolutely a factor.

*Id.* at 109:19–110:1 (objection omitted) (emphasis added). But Dr. Goldsmith's reading of an "implied" obligation to assess for climate change into the 2018/2021 Permit's reference to "best industry practice" is unfounded. Dr. Goldsmith concedes that the 2018/2021 Permit does not **mention** climate change.

> Q.   How about climate change? Does it mention climate change anywhere in the 2018 permit?
>
> A.   **Not specifically**. But I think implicitly.
>
> Q.   Does the 2018 permit mention specifically climate resilience?
>
> A.   **No, it doesn't**.

Ex. A, Goldsmith Dep. at 75:2–7 (emphasis added). Similarly, Dr. Goldsmith could not name any CT DEEP guidance that requires that the Terminal consider Climate Change Risks.

> Q. Has Connecticut DEEP ever stated in writing that it wanted all industrial permittees under the stormwater permit to specifically conduct a climate change vulnerability risk assessment?
>
> A. **I'm not aware of anything**.

*Id.* at 65:17–24 (objection omitted) (emphasis added).

Dr. Goldsmith is on an island with her "best industry practice" interpretation. In fact, CT DEEP rejected her interpretation that the 2018/2021 Permit has ever included an implied requirement to assess and address Climate Change Risks in under the 2018/2021 Permit, in "best industry practice" or otherwise. As Dr. Goldsmith knows, CT DEEP included in its 2024 *draft* permit a requirement that permittees assess for climate resilience **for the first time**, and

explained in its Fact Sheet that this was an entirely "new component"). *See* Ex. B, 2024 Draft Permit; Ex. C, CT DEEP Fact Sheet (Nov. 2024 Draft) at 11 ("The resiliency measures element is a **new component** of the SWPPP and was added in response to Connecticut's commitment to preparing for ongoing climate changes.") (emphasis added). In other words, the 2024 draft permit makes clear that 2018/2021 Permit did **not** require a climate change assessment, implicitly in "best industry practice" or otherwise. Dr. Goldsmith would not acknowledge that CT DEEP itself stated that the 2024 Permit included a "new component" to prepare for climate change, brushing it off based on her own "interpretation."

> Q.   So from this fact sheet, Dr. Goldsmith, is it clear that the Connecticut DEEP implemented this provision to address climate change in the Industrial Stormwater Permit?
>
> A. … So this was just a more explicit step towards pointing people who may be the laggards, as I mentioned earlier, towards the resources that they may not have otherwise been...
>
> Q.   And that's your interpretation, correct?
>
> A.   **That's my interpretation**.

Ex. A, Goldsmith Dep. at 103:13–104:8 (emphasis added).

Dr. Goldsmith acknowledges that CT DEEP does not "state what the best industry practice is in general." *Id.* at 110:14–20. Even as she provides her own opinion on the issue, Dr. Goldsmith never asked CT DEEP if her "best industry practice" interpretation was correct or cite any evidence to support it.

- Dr. Goldsmith has not "asked Connecticut DEEP if this best management practice includes an obligation to complete a climate change vulnerability risk assessment." *Id.* at 112:13–17.
- Dr. Goldsmith testified that she did not "believe that Connecticut DEEP made mention of" assessing for climate change "in any emails or other correspondence I reviewed." *Id.* at 55:15–21.
- When asked whether CT DEEP "has ever said that best industry practice provision of Section 5(b) of the permit requires an assessment of climate change vulnerability risk[s]"

in the millions of pages of production in this lawsuit, she responded, "I wouldn't know." *Id.* at 117:14–24.

- Dr. Goldsmith did not know if CT DEEP "has ever requested permittees to evaluate the climate change effects under any version of the Industrial Stormwater Permit in the State of Connecticut." *Id.* at 87:23–88:3.

- She was not aware of any enforcement actions against permittees for failure to assess for Climate Change Risks. *Id.* at 116:3–16,

- She did not "believe" that CT DEEP had "issued a notice of violation to defendants about stormwater." *Id.* at 54:10–55:14.

Dr. Goldsmith's methodology, interpreting "best industry practice" to imply expansive climate change obligations in the 2018/2021 Permit based only on her own "subjective judgment" is unreliable. *Conn. Mun. Elec. Energy Coop*, 2021 WL 4170757, at *19 (excluding as unreliable expert opinion about the "best practice" that was based on the expert's "subjective judgment"). Applying that case and under Rule 702, Dr. Goldsmith's testimony on best industry practice should be excluded.

### 2.    Dr. Goldsmith Ignores Industry Guidance Relevant to Industrial Stormwater Permitting That Does Not Support Her Opinions

Even if Dr. Goldsmith's theory of "best industry practice" under the 2018/2021 Permit held water, Dr. Goldsmith started with the assumption that Defendants should assess for Climate Change Risks and worked backwards, selecting irrelevant guidelines and studies that she deemed "best industry practice" to support her conclusions. Expert opinion about industry standards like "best industry practice" must have a reliable foundation, based on more than the expert's "own authority." *Grdinich v. Bradlees*, 187 F.R.D. 77, 81–82 (S.D.N.Y 1999). In the *Grdinich* case, the court excluded an expert who claimed to rely on "industry standards" about retail safety but who "was not aware of any industry trade group that provides guidelines" on retail safety and did not cite any objective "industry standards" in his report. *Id.* Similarly, in *Munn v. Hotchkiss School*, this Court struck expert testimony about the "standard of care" for school study abroad

21

programs, including "practices" to prevent insect-borne diseases. *Munn v. Hotchkiss Sch.*, 24 F.Supp.3d 155, 201 (D. Conn. 2014) (Underhill, J.), *aff'd*, 724 Fed. Appx. 25 (2d Cir. 2018). There, the expert failed to support his "standard of care" opinions with "survey results or other reliable facts or data of a type reasonably relied upon by other experts in the field." *Id.* Instead, the expert offered "unsupported, **personal lay opinions disguised as industry standards**." *Id.* (emphasis added). "The court concluded that, "for the first time in over fourteen years on the bench, I struck testimony as false and misleading." *Id.* That is exactly what Dr. Goldsmith did in this dispute: effectively, she admitted to relying on only her own opinion (rather than industry standards) in her deposition.

> Q.  And all of those **interpretations** come from **your opinion** on what the word "best industry practice" means?
>
> A.  Yeah. I think my report is pretty clear that even my gap analysis goes to understanding what is stated explicitly in the permit and then the additional analysis of what is brought to bear through the best industry practice reference.

Ex. A, Goldsmith Dep. at 146:1–8 (emphasis added).

By definition, when an expert fails to point to an objective criteria for industry standards, her opinion is unreliable under Rule 702. *Conn. Mun. Elec. Energy Coop*, 2021 WL 4170757, at *19 (excluding as unreliable expert testimony about "best practices" for attorneys, based only on "his professional experience"); *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 379 (N.D.N.Y. 2001) (excluding expert testimony as unreliable where the experts "formulat[ed] their own standards on which to base their conclusions"); *Yazujian v. PetSmart*, 2018 WL 1830931, at *2 (3d Cir. Apr. 17, 2018) (affirming district court's exclusion of a retail safety expert's testimony because, in part, the expert "conceded that there are no formal industry standards in the area of retail safety" and "offer[ed] an opinion ... of what the best industry practices were[ ] based on a review of unspecified retail manuals."); *Hawley v. Hannaford Bros. Co. LLC*, No.

2:16-CV-00249, 2018 WL 3647202, at *4 n. 4 (D. Vt. Aug. 1, 2018) (excluding expert testimony that defendant's product did not conform to industry safety standards based on lack of support for any such standard). For instance, in the *Meineker* case, the court excluded an expert whose methodology was unreliable because it did not rely on any objective "industry standards." *Meineker*, 154 F. Supp. 2d 379–80. There, the plaintiff's expert opined that a movie theater failed to comply with the Americans with Disabilities Act ("ADA") because it offered "inferior seating to patrons in wheelchairs." *Id.* at 378. The Court determined "there are no industry standards to provide a foundation" for the expert's testimony, and thus, the expert's "methodology was based on his subjective determination" of which seats were "best" and "worst." *Id.* at 380. Such subjective methodology "inhibit objective testing and there are no standards to control the operation of this technique." *Id.* The case law is very clear: Dr. Goldsmith cannot manufacture her own "best industry practice" standard without having data to define the industry and industry "practice."

CT DEEP and EPA have never issued guidance that "best industry practice" language in the 2018/2021 Permit includes or "implies" that permittees must assess for Climate Change Risks. *See* Ex. A, Goldsmith Dep. at 110:14–20, 66:12–13. Quite the opposite: CT DEEP has made clear that the 2024 draft permit contains a "new component" to assess climate resilience— a component not included in the 2018/2021 Permit. *See* Ex. C, CT DEEP Fact Sheet at 11 (Nov. 2024 Draft).

To be sure, agencies including EPA and industry groups issue all kinds of guidance relevant to compliance **with the Industrial Stormwater Permit**, but Dr. Goldsmith did not consider any of those relevant documents because they do not support her opinion that "best

23

industry practice" requires that the Terminal assess for and protect against Climate Change

Risks. For example, Dr. Goldsmith did not consider any of the following sources:

- **The U.S. EPA, "Developing Your Stormwater Pollution Prevention Plan – A Guide for Industrial Operators" (March 2021)**. Ex. A, Goldsmith Dep. at 200:13–15 ("Q. But you're not offering any opinions about the contents of this document? A. Not about the document itself."); *id.* at 202:3–5 ("Q. And so you don't have an opinion whether this is a best industry practice document or not? A. No, I do not.")

- **The U.S. EPA Office of Water, "Industrial Stormwater Fact Sheet Series."** *Id.* at 200:10–18 ("Q. Are you offering any opinions for this document identified as Exhibit G21? And for the record, it's called, "Industrial Stormwater Fact Sheet Series." A. I don't think this came into play in my opinions. Q. And you're not offering any opinions in this case about this document, are you? A. No.").

- **The 2023 Connecticut Stormwater Quality Manual, Appendix G – Climate Change Considerations.** *Id.* at 199:9–12 ("Q. Dr. Goldsmith, I'm just confirming, you did not cite this in any of your reports, and you're not offering any opinions on this document, are you? A. No.").

- **The Region 6 Regional Response Team, Flood Preparedness, Recommended Best Practices**. *Id.* at 194:20–22 ("Q. Now, you did not cite this document in your expert report, did you? A. No.").

Simply put, although extensive agency and industry guidance exists on best practices for

compliance with the industrial stormwater permit, Dr. Goldsmith ignored anything that did not

support her opinions. Ignoring clearly relevant information and data is yet another reason to

exclude Dr. Goldsmith because it shows the lack of a reliable methodology.

### 3. Dr. Goldsmith Selectively Relies on Three Irrelevant Sources as "Best Industry Practice."

Dr. Goldsmith testified in her deposition that three sources in her report establish

assessing Climate Change Risks as "best industry practice." None of these constitute "best

industry practice" for the industry involved in this dispute—the petroleum bulk storage industry

or SIC Code 5171.

***ASCE Standard 24-14, "Flood Resistant Design and Construction"***

Dr. Goldsmith asserts that the ASCE Standard 24-14 is "best industry practice," which

Dr. Goldsmith says, "recommend[s] that fuel storage facilities are designed to prevent flooding up to the 500-year flood elevation." Ex. F, Goldsmith Rpt. at 41. But in a striking example of Dr. Goldsmith's failed method, the ASCE Standard itself repeatedly states that the standard only applies to "new construction.". Ex. I, ASCE Standard 24-14 at 1.[5] The over 70-year-old Terminal is certainly not "new construction." The ASCE Standard does not even mention petroleum bulk storage terminals. Yet, Dr. Goldsmith baselessly asserts that the standard is "best industry practice," contrary to its own language.

> Q. First of all, is it your opinion that this applies to a facility that's 100 years old and containment is operating today? Yes or no.
>
> A. Yes. I don't have any basis for thinking that it somehow does not apply or would not apply.

Ex. A, Goldsmith Dep. at 132:7–11. Neither EPA nor CT DEEP has cited the ASCE Standard as a "best industry practice," as Dr. Goldsmith testified, "other than their reference of best industry practice in the – you know, they assume that these things speak for themselves." *Id.* at 137:10–15. Similarly, CT DEEP has never issued any statement or guidance indicating that the ASCE Standard applies to existing facilities.

Again, Dr. Goldsmith manufactured her interpretation of "best industry practice," but never identified any "industry" that is actually utilizing her supposed "practices." By definition, a best industry practice is an established practice, actually used by members of the industry. But Dr. Goldsmith did not look at any of these aspects of the term "best industry practice," as used in the 2018/2021 Permit at the center of this dispute. *Id.* at 136:22–137:1 ("Q. What companies have adopted this [ASCE Standard] as a best industry practice? A. I don't have a lot of visibility

---

[5] The ASCE Standard can also apply to "substantial improvements" at facilities, which the standard defines as reconstruction "which equals or exceeds 50% of its pre-improvement value. Ex. I, ASCE Standard 24-14 at 5. Dr. Goldsmith did not provide any opinion that the Terminal underwent "substantial improvements." Ex. A, Goldsmith Dep. at 134:13–20 ("I did not evaluate that.").

into companies' adoption of anything.").

### *EPA Region 1, Recommended Procedures and Resources for the Development of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems*

Dr. Goldsmith testified that the EPA Region 1 guidance is a "best industry practice," Ex. A, Goldsmith Dep. at 150:15–17, which Dr. Goldsmith says requires that "best industry practice" is evaluating climate risks at a facility "*over the life of the asset*" instead of the 5-year permit period, Ex. F, Goldsmith Rpt. at 28 (emphasis in original). The EPA Recommended Procedures for "Wastewater Treatment Systems and/or Sewer Systems" is just that: recommended procedures for wastewater treatment systems or sewer systems—not industrial petroleum bulk storage terminals or indeed any industrial facilities.

> Q. So this applies to a wastewater treatment system, right?
> A. **Wastewater treatment and sewer systems**.

Ex. A, Goldsmith Dep. at 152:8–10 (emphasis added). EPA certainly knows the difference between sewer systems and petroleum bulk storage facilities, and indeed, classifies them as different industries. Ex. H, 2021 EPA MSGP, Appendix N at N-19.

Dr. Goldsmith should be prohibited not only from redefining the industry in dispute, but from selectively picking documents that don't apply to the Terminal and are only intended to craft her litigation-driven view of "best industry practice." Dr. Goldsmith is unable to identify any "industry" that has adopted the Region 1 wastewater and sewer system guidance as a best industry practice. Ex. A, Goldsmith Dep. at 161:13–15. Dr. Goldsmith agreed that the Region 1 guidance does not state that it is best industry practice for Industrial Stormwater Permitting, *id.* at 153:3–11, and she "was not aware" of CT DEEP ever incorporating the Region 1 guidance as best industry practice under the 2018/2021 Permit, *id.* at 162:9–13. As to whether EPA has ever adopted its Region 1 guidance as a best industry practice for industrial stormwater permittees, all

26

she could provide was, "That is my interpretation."

> Q.  Has EPA adopted its Region 1 guidance document as a best industry practice for Industrial Stormwater Permittees?
>
> A.  I believe given that the title is "Region 1 Recommended Procedures and Resources for the Development of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems," I believe that that implies they consider it a best practice at EPA, the source and author of this.
>
> Q.  Again, EPA has never written that in this document at all. That's your interpretation, correct?
>
> A.  **That is my interpretation**.

*Id.* at 162:4–18 (emphasis added). Like in *Grdinich*, when experts default to saying "that's my interpretation," it's a signal they can't meet Rule 702. *Grdinich*, 187 F.R.D. at 81–82 (excluding expert testimony about industry standards based only on his "own authority").

### *ASFPM Floodplain Regulations Committee Guide for Higher Standards in Floodplain Management*

Dr. Goldsmith testified the ASFPM Guide is "best industry practice" for permittees under the Industrial Stormwater Permit, *id.* at 206:23–207:2, which Dr. Goldsmith says requires that "critical facilities" implement certain flood protection elevation engineering, Ex. F, Goldsmith Rpt. at 41. Notably, Dr. Goldsmith's Rule 26 report does not even cite the actual ASFPM Guide, instead referencing it as it was discussed in Nairn's report, another of CLF's experts. *Id.* at 30–42. Dr. Goldsmith admits that the Guide "developed new model ordinances for communities," not any industry.

> Q. Can you name one industry that has adopted this as a best industry practice?
>
> A. This is written for **communities** to adopt into their community rating system ordinance development.

Ex. A, Goldsmith Dep. at 212:14–18 (emphasis added). Again, Dr. Goldsmith acknowledges that the 2018/2021 Permit does not mention the ASFPM Guide. *Id.* at 208:7–11. And of course, the

27

Terminal is not a "community water system" and the Terminal does not promulgate "ordinances."

None of these three sources mention the petroleum bulk fuel industry, and CT DEEP has not indicated that any of these sources create obligations under the 2018/2021 Permit. Under Rule 702, Dr. Goldsmith's opinions lack foundation because none of her cited support represents best industry practice under the 2018/2021 Permit. *Grdinich*, 187 F.R.D. at 81–82 (excluding as unreliable expert opinions that failed to cite any applicable "industry standards").

### 4. Dr. Goldsmith Testified She Does Not Consider Any Other Sources as "Best Industry Practice"

As for other documents cited in her Report, Dr. Goldsmith confirmed at her deposition that the remaining sources cited in her report are not "best industry practice." *See* Ex. A, Goldsmith Dep. at 164:16–19 (ASCE Policy Statement 360 is "not a best industry practice."); *id.* at 177:4–13 (FEMA Policy Standards for Flood Risk Analysis and Mapping is not a best industry standard); *id.* at 140:12–14, 141:8–12 (NRC, Responding to Changes in Sea Level "certainly isn't a best industry practice today"); *id.* at 203:19–204:3 (FEMA Risk Management Series Design Guide is "not really a best practice.").

Even the NACCS study conducted after Hurricane Sandy, on which she heavily relies for her opinion that past storms put Defendants on notice of increasing Climate Change Risks at the Terminal, Ex. F, Goldsmith Rpt. at 32–39), "is not a best industry practice." Ex. A, Goldsmith Dep. at 184:12–14. Dr. Goldsmith contends that the NACCS "represents" best industry practices (but is not a best industry practice itself), likening it to a "souffle" that represents a recipe (but is not a recipe itself). *Id.* at 187:6–20 ("The recipe, especially if it's Julia Child's recipe, is best practice. The souffle is what you actually want to eat."). Even if this rationalization made any sense, Dr. Goldsmith still could not identify any written document from any industry association

28

showing that the NACCS is a best industry practice for evaluating climate change. *Id.* at 184:4–11.

### 5.    Dr. Goldsmith's Methodology is Unreliable

Like in *Meineker*, Dr. Goldsmith's methodology—selecting three random sources that are not relevant (and do not even mention) the petroleum bulk fuel industry as best industry practice—"inhibit[s] objective testing" for what is required under the 2018/2021 Permit. *Meineker*, 154 F. Supp. 2d 379–80. Indeed, using Dr. Goldsmith's same methodology, any expert could interpret the terms of state-issued permits to her liking, usurping the authority of EPA and state agencies like CT DEEP and blindsiding permittees about what a permit requires. If the Court takes Dr. Goldsmith at her word that she relied on her own "interpretation" of best industry practice, it should exclude her opinions as unreliable. *Id.* (excluding expert opinion based only on the expert's "subjective determination").

Even if Dr. Goldsmith's cherry-picked sources somehow constituted "best industry practice" for the petroleum bulk fuel storage industry, none of them gives her the license to offer any opinion she wishes about how Defendants should address Climate Change Risks. In her report, Dr. Goldsmith did not cite any of these three sources as broadly establishing a "best industry practice," and instead, the vast majority of her opinions cite to Plaintiffs' other expert reports (Nairn and Horner) or her own experience, *see generally*, Ex F, Goldsmith Rpt*.,* which certainly is not best industry practice. *Connecticut Mun. Elec. Energy Coop*., 2021 WL 4170757, at \*19 (excluding expert testimony "informed by his own professional experiences" as unreliable to testify about "best practices" of federal criminal defense attorneys).

Dr. Goldsmith's methodology in this case—selecting irrelevant sources as best industry practice to support her already-formed conclusion—rests solely on "unsupported, personal lay opinions disguised as industry standards." *Munn*, 24 F.Supp.3d at 201 (excluding expert standard

of care opinion unsupported by "reliable facts or data"); *see also Meineker*, 154 F. Supp. 2d 379–80 (excluding expert who could not cite to industry standards and instead relied on his own "subjective determination"). Because Dr. Goldsmith's opinions as unreliable under Rule 702, they should be excluded.

### C.    Dr. Goldsmith's Opinions Beyond the Obligations in the 2018/2021 Permit Must Also Be Excluded As Irrelevant

The Court should exclude Dr. Goldsmith's opinions because her opinions about expansive climate change obligations are irrelevant to the claims in this case. Rule 702 requires that "an expert's opinion reflects a reliable application of the principles and methods to the facts of the case," i.e., the so-called 'fit' requirement." *Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn 2004). An expert must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

As the Second Circuit has held, "[t]his condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 255 (2d Cir. 2005). In other words, expert testimony "may fail to meet the fit requirement if it relates to facts or data that have not been adequately established in the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001) (excluding expert testimony relying on data that did not "fit" the facts of the case), *aff'd*, 303 F.3d 256 (2d Cir. 2002).

First, several of Dr. Goldsmith's opinions were never stated in NOI or Complaint, as required by statute and regulation. 33 U.S.C. § 1365(b)(1)(A); 44 U.S.C. § 6972(a)(1); 40 CFR § 135.3(a). And if CLF is barred from asserting allegations not in its NOI, expert opinions based on those allegations are certainly not relevant under Rule 702. Second, Dr. Goldsmith's opinions are irrelevant because they are not tied to any obligation under the 2018/2021 Permit.

30

### 1.    Dr. Goldsmith Cannot Provide Opinions Not Included in CLF's NOI

Dr. Goldsmith's opinions about a range of alleged 2018/2021 Permit violations that she says are required to address Climate Change Risks are not admissible because they were not identified as violations in CLF's NOIs, as required by statute and thus are not properly before the Court for adjudication. Because the NOI and the Complaint identify what claims and violations are at issue in this citizen suit, CLF cannot now assert claims premised on allegations not contained in its NOI. It necessarily follows that expert opinions based on those same allegations not included in the NOI and Complaint are irrelevant and inadmissible under Rule 702.

Unlike normal lawsuits, plaintiffs in citizen suits like the instant one are required to provide notice of alleged deficiencies to both the potential defendant and governmental agencies like the EPA and CT DEEP before filing suit. The pre-suit Notice of Intent is intended to afford the EPA, the state regulating agency, and the alleged violator an opportunity to correct any issues before a citizen suit is initiated. *See, e.g., Brod v. Omya, Inc.*, 653 F.3d 156, 166 (2d Cir. 2011) (explaining that "the content of a NOI must serve the purpose of giving the appropriate governmental agencies an opportunity to act and the alleged violator an opportunity to comply."). Once notice has been provided, a plaintiff is prohibited from filing a citizen suit under the CWA or RCRA until sixty days after submitting a Notice of Intent. *See* 33 U.S.C. § 1365(b)(1)(A); 44 U.S.C. § 6972(a)(1); 40 CFR § 135.3(a).

That notice must adequately outline and explain the basis for plaintiff's eventual lawsuit. Pursuant to applicable regulations, a Notice of Intent:

> shall include sufficient information to permit the recipient to **identify the specific standard, limitation, or order alleged to have been violated, <u>the activity alleged to constitute a violation,</u>** the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

31

40 CFR § 135.3(a) (emphasis added).

This is not some toothless, technical procedure; it is mandatory. In other words, failure to meet this requirement means that the court cannot adjudicate unnoticed claims premised on unnoticed allegations. *See, e.g.*, *Hallstrom v. Tillamook Cnty.*, 493 U.S. 29, 25 (1989) ("[C]ompliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit."); *Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 995 (9th Cir. 2000) ("If a party seeking to bring a citizen enforcement action has not complied with the CWA's notice requirement, then the district court in which that action is brought lacks subject matter jurisdiction and must dismiss the action."). Absent adequate notice, district courts must dismiss any claim based on alleged violations not identified in the Notice of Intent, even if those claims are later raised in a complaint. *See Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 487 (2d Cir. 2001) (affirming dismissal of thermal discharge claims not adequately identified in the Notice of Intent).[6]

It logically follows as a necessary corollary that expert opinions based on allegations not properly in this case are irrelevant given that they will not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

---

[6] Defendants are aware of a recent Second Circuit decision that held that the "pre-suit notice requirement is not jurisdictional." *Mid-New York Envt'l and Sustainability Promotion Comm. v. Dragon Springs Buddhist, Inc.*, No. 24-2451, 2025 WL 2653616 (2d Cir. Sept. 16, 2025). Defendants respectfully disagree with that ruling based on *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 25 (1989), *Catskill Mountains Ch. Of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481 (2d Cir. 2001), and other authorities cited in Defendants' Motion to Strike Improper Expert Opinions [ECF 623]. Nonetheless, the ruling in *Dragon Springs* does not change the result here. The court in *Dragon Springs* reiterated the continued importance of the NOI notice requirement, and held that the pre-suit NOI must "provide the recipient with effective, as well as timely, notice." 2025 WL 2653616, at *10 (citing *Pub. Interest Research Grp. of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995)). In *Dragon Springs*, the court held that in that case the NOI and complaint adequately identified the violation. Here, that is not the case, since it is undisputed that the NOI and complaint do not include any of the opinions Dr. Horner has offered regarding the alleged violations listed above (e.g., secondary containment capacity and permeability).

CLF's original Notice of Intent disclosed its intent to pursue twelve CWA claims and three RCRA claims. [ECF 1, Ex. A]. CLF supplemented its NOI twice but did not identify any additional claims. [ECF 1, Ex. B; ECF 47, Ex. A]. When CLF disclosed its experts, many experts (including Dr. Goldsmith) opined on allegations or claims **never before noticed** in this case in the NOI **or** Complaint. Defendants filed a Motion to Strike improper expert opinions [Dkt. 623], which the Court denied without prejudice. Defendants now challenge Dr. Goldsmith in this Rule 702 motion, as the Court directed.[7] Her irrelevant opinions about matters outside the proper scope of this lawsuit are inadmissible.

In particular, the Court should exclude the following opinions not noticed in Plaintiff's NOI or Complaint. And by extension, CLF never provided notice to the EPA or to CT DEEP of these alleged "violations." Again, these are statutory requirements for moving forward with a CWA or RCRA citizen suit, and Dr. Goldsmith cannot offer opinions that were never identified as required by the CWA and RCRA.

| New Alleged Violations in Dr. Goldsmith's Report | Identified in an NOI? | Included in Complaint? | CT DEEP Notified? | EPA Notified? |
|---|---|---|---|---|
| Inadequate Capacity of Secondary Containment. Ex. E, Goldsmith Report at 40, 43, 44, 46, 47. | No | No | No | No |
| Permeability of Secondary Containment Areas. *Id.* at 40, 43. | No | No | No | No |
| Low Points in Secondary Containment Areas. *Id.* at 40, 43. | No | No | No | No |
| Structural Integrity of Secondary Containment Berms. *Id.* at 40, 45. | No | No | No | No |
| Wave Attacks on Secondary Containment Berms. *Id.* at 40, 47. | No | No | No | No |
| Bare Soil on Secondary Containment Berms. *Id.* at 40. | No | No | No | No |

---

[7] This Court denied Defendants motion to strike as "not the proper vehicle" for resolution of the issues raised, leaving open Defendants' ability for future challenges via *Daubert* motions or motions *in limine*. [ECF 641 at 10]

| New Alleged Violations in Dr. Goldsmith's Report | Identified in an NOI? | Included in Complaint? | CT DEEP Notified? | EPA Notified? |
|---|---|---|---|---|
| Failure to Report on Secondary Containment Deficiencies. *Id.* at 40. | No | No | No | No |
| Emergency Vehicle Access for Ingress and Egress. *Id.* at 40, 41. | No | No | No | No |
| Failure to Apply Best Industry Practice in Defendants' Risk Management Program (under UN Industrial Development Organization risk assessment guidelines). *Id.* at 49-52. | No | No | No | No |
| Tank Spacing Violates National Fire Protection Association Guidance. *Id.* at 54. | No | No | No | No |
| Defendants violated the Connecticut Coastal Management Act. *Id.* at 40. | Not a stand-alone claim | Not a stand-alone claim[8] | No | No |

If Dr. Goldsmith were permitted to provide these opinions, Defendants would find themselves unexpectedly having to defend against allegations never before mentioned in the statutorily-required NOI or complaint in this case. And CLF provided no notice to CT DEEP or the U.S. EPA about the "alleged" violation, which is also a statutorily requirement prior to filing suit. Because these allegations or claims are not properly in this case based on the exacting NOI requirements, 40 CFR § 135.3(a), Dr. Goldsmith's opinions about them are irrelevant and should be excluded under Fed. R. Evid. 702.

### 2.    Dr. Goldsmith's Opinions Must Be Excluded as Irrelevant

Dr. Goldsmith's opinions are irrelevant under Rule 702 because they fail the "fit requirement." *Pugliano*, 315 F. Supp. 2d at 202. As is clear from the Complaint, the sole claim in this case is that Defendants failed to comply with the CT DEEP 2018/2021 Permit. As discussed

---

[8] CLF's Complaint mentions the Coastal Management Act based the Permit's reference to the Coastal Management Act. [ECF 47 at 36] CLF did not raise any stand-alone state-law claims based on the Coastal Management Act. [*See* CLF's Mot. to File Sec. Am. Compl., ECF 683; Defs' Opp. to Mot. to Am. Compl., ECF 689]

above, Dr. Goldsmith's opinions about what the Terminal *should have done* to assess for and address Climate Change Risks are completely untethered from anything in the 2018/2021 Permit, including anything constituting "best industry practice." This fatal error permeates every one of Dr. Goldsmith's opinions and renders them irrelevant to deciding this case, i.e., Defendants' compliance with the 2018/2021 Permit.

But even Dr. Goldsmith's statement that the "objective" of her report was to "determine if [Defendants] used best industry practices to minimize or mitigate" Climate Change Risks is deceiving. Ex. F, Goldsmith Rpt. at 9. None of Dr. Goldsmith's opinions reference the 2018/2021 Permit and most do not mention best industry practice. Instead, all of Dr. Goldsmith's opinions are personal suggestions for addressing climate resilience at the Terminal, primarily supported by her own disaster relief experience or by citing to Plaintiff's other experts' reports.

For example, Dr. Goldsmith opines that past storms, including Hurricanes Katrina, Rita, and Harvey, put Defendants on notice of increasing Climate Change Risks. *Id.* at 32–39 ("Opinion 3"). How hurricanes in the Texas-Louisiana area could be relevant to a Connecticut Terminal's compliance under the 2018/2021 Permit is beyond comprehension. Similarly, Dr. Goldsmith lists her engineering grievances at the Terminal, including the Terminal's berm height, infrastructure, secondary containment area, and stormwater drainage system, all without any citation to 2018/2021 Permit requirements or established industry standards. *Id.* at 34 ("Opinion 4"). Ironically, Dr. Goldsmith could not name an instance that CT DEEP cited the Terminal for noncompliance with the 2018/2021 Permit.

> Q.   Have they ever issued a notice of violation to defendants about stormwater?
>
> A.   Um, I don't believe they've done that in recent years.

*See* Ex. A, Goldsmith Dep. at 54:10–55:14 (objection omitted).

Similarly, Dr. Goldsmith opines that Defendants failed to "apply best industry practices in its risk assessment program" based on UN Industrial Development Organization risk assessment guidelines, Ex. F, Goldsmith Rpt. at 49–50 ("Opinion 9"), again with no reference to the 2018/2021 Permit for any "risk management program" requirement and without supporting that the UN guidelines are "best industry practice." And as discussed above, Dr. Goldsmith view that Defendants did not comply with standards applicable to wastewater treatment systems or municipalities, standards that are certainly not referenced in the 2018/2021 Permit or anywhere else related to petroleum bulk storage terminals. *See* Ex. A, Goldsmith Dep. at 152:8–10 (EPA Region 1 standard); *id.* at 212:14–18 (ASFPM guide).

Accordingly, the Court should exclude all of Dr. Goldsmith's opinions, which are no more than broad and unsupported grievances detached from any requirements in the 2018/2021 Permit, as irrelevant under Rule 702. Her commentary on climate change and suggestions for climate resilience do not "fit" the claims in this case, i.e., related to compliance with the 2018/2021 Permit, *Pugliano*, 315 F. Supp. 2d at 202, and are therefore not helpful to the jury. Fed. R. Evid. 702.

> **D.   Dr. Goldsmith's Opinions Should Be Excluded as Prejudicial and Confusing Because She Holds Defendants to a "Higher Standard" Based on Her Own Climate Advocacy**

Even if Dr. Goldsmith's opinions held any ounce of relevance, the Court should exclude her opinions under Rule 403 because the probative value of her opinions are substantially outweighed by the danger of unfair prejudice and confusing the issues. The Court must take great care with Dr. Goldsmith's expert testimony under Rule 403 "given the unique weight such evidence may have in a jury's deliberations." *Nimely,* 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595). In the same vein, district courts must be "especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning

matters of domestic law." *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 511 (2d Cir. 1977) (citation omitted) (reversing the district court allowing an expert to testify about securities law and usurp the role of the jury).

Under her self-defined "best industry practice," Dr. Goldsmith testified that the Terminal is held to a "higher standard" than other facilities as a "critical infrastructure"—again, something the 2018/2021 Permit does not mention or require.

> Q.  Does it impose any more stringent standards on critical infrastructure in the 2018 permit?
>
> A.  My interpretation of the manner in which that permit invokes best industry practice for control measures would require that the subsector of **critical infrastructure** that includes bulk petroleum storage facilities would necessarily need to meet a **higher standard** than a bulk mayonnaise storage facility or a dairy processing plant, for that matter.
>
> Q.  **But the permit, itself, does not impose in any specific words a requirement that it applies to critical infrastructure**?
>
> A.  **Correct**.  But it would also follow, of course, that with a more rigorous risk profile for **critical infrastructure facilities**, that **higher standards** that are industry-specific would be expected.

Ex. A, Goldsmith Dep. at 138:6–23 (emphasis added).

The prejudice created by this testimony is clear. Dr. Goldsmith crafted a new imaginary obligation under the 2018/2021 Permit —that the 2018/2021 Permit requires additional measures for "critical infrastructure" facilities, like hospitals—that is not mentioned in the CWA or RCRA. Neither the U.S. EPA or CT DEEP have ever suggested that a petroleum bulk storage terminal is a "critical infrastructure" or suggest that the Terminal is held to a higher standard because it provides fuel to the Northeast area.

This "critical infrastructure" theory under the CT DEEP industrial stormwater permit is Dr. Goldsmith's and Dr. Goldsmith's alone. No federal or state regulations require this, no agency guidance requires this, and no scientific or industry association requires this. If Dr.

Goldsmith were permitted to introduce a new theory of the 2018/2021 Permit with no basis in the actual language of the 2018/2021 Permit, it would significantly prejudice Defendants. Dr. Goldsmith's threshold opinion that "best industry practice" requires assessing for and addressing Climate Change Risks and indeed, imposes a "higher standard" on the Terminal than on other facilities, pervades every opinion in this case. Again, Dr. Goldsmith should not be permitted to introduce new opinions—not supported by any agency guidance or relevant industry standards—that drastically expand the scope of this case and prejudice Defendants by injecting into the 2018/2021 Permit "critical infrastructure" requirements that CT DEEP never intended.

Dr. Goldsmith's expert testimony is the type of information prohibited by Rule 403 "given the unique weight such evidence may have in a jury's deliberations." *Nimely,* 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595). Given the court's obligation "not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law," Dr. Goldsmith's testimony must be excluded under Rule 403. *Marx & Co., Inc.*, 550 F.2d at 511.

Dr. Goldsmith is a "paid advocate" for CLF, who confuses her advocacy for increasing climate resilience with legal obligations in the 2018/2021 Permit never before stated by CT DEEP. *Id.* (reversing the district court allowing an expert to testify about securities law and usurp the role of the jury). Her opinions certainly risk confusing and misleading the jury. For this reason, the Court should exclude all of Dr. Goldsmith's opinions under Rule 403.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude Wendi Goldsmith's expert opinions pursuant to *Daubert*, Rule 702, and Rule 403.

Dated: October 3, 2025                    Respectfully submitted,

/s Douglas A. Henderson
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

39

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

41