# Exhibit A

Filed Under Seal

Page 1

                              Volume I
                           Pages 1 to 291
                         Exhibits See Index
             UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -x
                                 :
  CONSERVATION LAW FOUNDATION,    :
  INC.,                           :
              Plaintiff,          :
                                 : Civil Action
         vs.                      : No.
                                 : 3:21-cv-00933-
  EQUILON ENTERPRISES LLC D/B/A   : VDO
  SHELL OIL PRODUCTS US, TRITON   :
  TERMINALING LLC, and MOTIVA     :
  ENTERPRISES LLC,                :
              Defendants.         :
                                 :
- - - - - - - - - - - - - - - - -x

          VIDEOTAPED DEPOSITION OF WENDI GOLDSMITH,
  Ph.D., PG, a witness called by counsel for the
  Defendants, taken pursuant to the Federal Rules of
  Civil Procedure, before Jane M. Werner, Registered
  Merit Reporter and Notary Public in and for the
  Commonwealth of Massachusetts, appearing at the
  Offices of Conservation Law Foundation, Inc., 62
  Summer Street, Boston, Massachusetts, on Wednesday,
  August 20, 2025, commencing at 10:02 a.m.

  PRESENT:

      Conservation Law Foundation
          (by Christopher M. Kilian, Esq.)
          15 East State Street, Suite 4, Montpelier,
          VT 05602, for the Plaintiff.
          ckilian@clf.org
          802.223.5992

Page 2

PRESENT:   (Continued)
     Conservation Law Foundation
            (by Ana McMonigle, Esq.)
            195 Church Street, Mezzanine Level,
            Suite B, New Haven, CT 06510,
            for the Plaintiff.
            amcmonigle@clf.org
            203.298.7692
     King & Spalding
            (by Douglas A. Henderson, Esq.)
            1180 Peachtree Street, NE, Suite 1600,
            Atlanta, GA 30309, for the Defendants.
            404.572.4600
     Wiggin and Dana LLP
            (by James Craven, Esq.)
            One Century Tower, 265 Church Street,
            New Haven, CT 06510, for the Defendants.
            jcraven@wiggin.com
            203.4984361

  Also Present:  Oleg Bolotov, Videographer
                 Andrew Miller (Via Zoom)

                  * * * * *

Page 3

I N D E X

WITNESS:                          DIRECT   CROSS

WENDI GOLDSMITH, Ph.D., PG
(By Mr. Henderson)                9
(By Mr. Kilian)                          259

                    *   *   *

                E X H I B I T S

EX. NO.                                   PAGE

EXHIBIT G1  Expert Report of Wendi Goldsmith,
            dated 5/8/25                       71

EXHIBIT G2  Expert Rebuttal Report of Wendi
            Goldsmith, dated 8/1/25            71

EXHIBIT G3  Document entitled "General Permit
            for the Discharge of Stormwater
            Associated with Industrial
            Activity, Effective Date:
            10/1/18"                           71

EXHIBIT G4  Document entitled "General Permit
            for the Discharge of Stormwater
            Associated with Industrial
            Activity, Effective Date:
            10/1/21"                           71

EXHIBIT G5  Document entitled "Connecticut
            Department of Energy and
            Environmental Protection,
            National Pollutant Discharge
            Elimination System General
            Permit for the Discharge of
            Stormwater Associated with
            Industrial Activities, General
            Permit No.: CTR050000"             72

Page 4

E X H I B I T S, (Continued)

EX. NO.                                                    PAGE

EXHIBIT G6   Document entitled "National
             Pollutant Discharge
             Elimination System General
             Permit for the Discharge of
             Stormwater Associated with
             Industrial Activity Fact Sheet"    100

EXHIBIT G7   Document entitled "Supplemental
             Fact Sheet Draft General NPDES
             Permit for the Discharge of
             Stormwater Associated with
             Industrial Activities," dated
             March 2025                         103

EXHIBIT G8   (Not used)

EXHIBIT G9   Document entitled "National
             Pollutant Discharge Elimination
             System General Permit for the
             Discharge of Stormwater
             Associated with Industrial
             Activity Fact Sheet, General
             Permit No.: CTR050000              105

EXHIBIT G10  Document entitled "Supplemental
             Fact Sheet (December 2024)         108

EXHIBIT G11  Document entitled "Appendix G –
             Climate Change Considerations      199

EXHIBIT G12-16  (Not used)

EXHIBIT G17  Document entitled "Policy
             Statement 360 -Climate change"     163

EXHIBIT G18  Document entitled "Flood
             Resistant Design and
             Construction," Standard 24-24      128

EXHIBIT G19  Document entitled "Flood
             Resistant Design and
             Construction," Standard 24-14      127

Page 5

E X H I B I T S, (Continued

EX. NO.                                                 PAGE

EXHIBIT G20 Document entitled "A Guide
            for Higher Standards in
            Floodplain Management,"
            Revised March 2013                           206

EXHIBIT G21 Document entitled "Industrial
            Stormwater Fact Sheet Series"                200

EXHIBIT G22 Document entitled "U.S.
            Environmental Protection Agency
            SPCC Field Inspection and Plan
            Review Checklist"                             168

EXHIBIT G23 Document entitled "Flood
            Preparedness Recommended Best
            Practices"                                    194

EXHIBIT G24 Document entitled "Developing
            Your Stormwater Pollution
            Prevention Plan, A Guide for
            Industrial Operators,
            March 2021"                                   201

EXHIBIT G25 Document entitled "FEMA Policy
            Standards for Flood Risk,
            Analysis and Mapping, FEMA
            Policy #FP 204-078-1 (Rev 10)"                176

EXHIBIT G26 Document entitled "EPA Region 1
            Recommended Procedures and
            Resources for the Development
            of Adaptation Plans for
            Wastewater Treatment Systems
            and/or Sewer Systems"                         150

EXHIBIT G27 (Not used)

EXHIBIT G28 Document entitled "New York
            State Petroleum Terminal
            Resiliency Assessment NYSERDA
            Contract 30186, Final Report,
            March 2014"                                   214

Case 3:21-cv-00933-VDO   Document 750   Filed 10/04/25   Page 7 of 63

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 6

E X H I B I T S, (Continued

EX. NO.                                                    PAGE

EXHIBIT G29 Document entitled "Natural Hazard
            Risk Assessment Guidance for
            Marine Oil Terminals, December
            2024"                                           224

EXHIBIT G30-33 (Not used)

EXHIBIT G34 Document entitled "Responding to
            Changes in Sea Level: Engineering
            Implications (1987"                             140

EXHIBIT G35 Document entitled "Risk
            Management Series, Design Guide
            for Improving Critical Facility
            Safety from Flooding and High
            Winds, FEMA 543/January 2007        202

                        *   *   *

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 16

Q.   Is that what shows up on the diploma?

A.   Yes.

Q.   Do you have a degree in engineering?

A.   No.

Q.   Have you ever been a licensed engineer in any state?

A.   No.

Q.   Are you a licensed geologist in Connecticut?

A.   No.

Q.   Do you have any hydrology specialty certificates?

A.   No.

Q.   Are you a meteorologist?

A.   No.

Q.   Are you an atmospheric scientist?

A.   No.

Q.   Are you an expert in financial analysis?

A.   No.

Q.   I noticed you had a degree from Conway. Are you a licensed landscape architect?

A.   No.

Q.   How about a soil scientist in Connecticut?

A.   Not licensed.

Page 20

is not, you know, like, engineering plan certification type work.  But there is some professional liability coverage, as well as other coverages.

Q.    So for oil and gas, have you ever been to an offshore facility?

A.    I've been pretty close.

Q.    Have you ever been to an offshore facility?

A.    I have never been on an offshore facility.

Q.    Have you ever been an operator of any oil and gas equipment?

A.    No.

Q.    Do you have operational experience in the oil and gas industry?

A.    No.

Q.    Outside of your experience for CLF, have you ever been to a petroleum bulk storage terminal, fuel storage tank facility?

A.    Yes.

Q.    And where was that?

A.    I toured, using multiple forms of transportation, facilities throughout Greater New Orleans and the Gulf Coast area impacted after Hurricane Katrina.

Page 21

Q.   And what names of those facilities did you inspect?

A.   I know one was Murphy Oil.  And there were a bunch of upstream and midstream facilities along the Mississippi River, primarily.  But I overflew a couple weeks after the hurricane.

Q.   How many petroleum bulk storage terminals have you been to personally, where you got out and walked around?

A.   I'd say a dozen.

Q.   And where are those?

A.   Louisiana, Massachusetts, Connecticut, Maine.

Q.   Can you list the ones in Maine you've been to?

A.   I don't recall.

Q.   How about the ones in Connecticut?

A.   Shell and Gulf.

Q.   Have you been to Buckeye?

A.   I've had a good gander at it, but I have not been in the facility.

Q.   For Shell and for Gulf, was that in your role for CLF for the litigation or potential litigation?

Page 22

A.    Yes.

Q.    For the ones in Maine, was that for litigation or potential litigation?

A.    There was a trip I made to Maine for reviewing coastal dynamics issues in the proximity of a couple of terminals after a major coastal storm probably two years ago.  But -- it may sound a little strange; but at this point, I have intense curiosity about these matters.  So I will take detours and have a look to see many coastally facing industrial sites.

Q.    Did you actually go onto the site of the terminal in Maine?

A.    No, I have never been on a site there.

Q.    So just to be clear, you haven't been to a petroleum bulk storage terminal in Maine?

MR. KILIAN:  Objection.

A.    I have not been --

Q.    You have not been onsite --

A.    Correct.

Q.    -- to a petroleum bulk storage facility in Maine.

How about in Connecticut?  Have you been onsite to what you refer to as the "Shell New Haven

Page 23

terminal"?

A.   Yes.

Q.   And the Gulf?  Have you been onsite at the Gulf?

A.   Yes.

Q.   Is that now known as "Pipe Fuels"?

A.   For some with more nimble minds than I, yes.

Q.   Have you been onsite at any other petroleum bulk storage facility in Connecticut?

A.   Not that I recall.

Q.   How about Mass.?  Have you been onsite at a petroleum bulk storage terminal there?

A.   I've been on many former sites.

Q.   Have you been on any operating petroleum bulk storage terminal facilities in Massachusetts?

A.   Not inside the fence line.

Q.   What other states have you been to for petroleum bulk fuel storage terminals?

A.   I mentioned Louisiana.

Q.   And for Louisiana, what was the name of that terminal that you were onsite?

A.   Well, I mentioned that I overflew the coastal area impacted by Hurricane Katrina just a

Page 24

few weeks after the hurricane, and many of the roads were not passable.  And I was in the air, but at about 400-feet elevation, so I was able to get a close look at a lot of these facilities, but I was not boots on the ground.

Q.    So did you actually go onsite, walk after the flood at any petroleum bulk storage terminal?

A.    No.  But I have been on noncommercial petroleum bulk storage facilities at the major pumping stations throughout Greater New Orleans, which themselves include large storage tanks.

Q.    Have you ever worked for any party on environmental compliance for operating a petroleum bulk storage terminal?

A.    No.

Q.    Have you ever operated any equipment at a petroleum bulk storage facility?

A.    No.

Q.    Did you participate in any permitting activities when you were at Bioengineering that occurred at petroleum bulk storage terminals?

A.    Some having to do with clean-up, stabilization and closure of existing permits, but not related to the bulk oil storage function itself.

Page 27

the site for filter system backwash treatment.

Q. Have you ever interacted with Connecticut DEEP, CT D-E-E-P, on any industrial stormwater permitting issue?

A. Not on industrial stormwater.

Q. So you have no experience in negotiating industrial stormwater permitting issues with Connecticut DEEP?

MR. KILIAN: Objection.

Q. You can answer.

A. Correct.

Q. Now, have you ever designed a stormwater groundwater infiltration system?

A. Yes.

Q. In the State of Connecticut?

A. In Connecticut, I have been involved on an interdisciplinary team working on that multiple times.

Q. But have you designed one?

A. I have not. It is often the case that there is science, landscape, architecture, and engineering involvement, and I would be contributing to the science and the water quality treatment plant planning phases of the work.

Page 28

Q.   I think you testified earlier you're not a licensed engineer in Connecticut, correct?

A.   I am not an engineer at all.

Q.   And are you offering any engineering opinions in this case?

A.   No.

Q.   Now, how about SPCC plans; Spill, Prevention, Control and Countermeasure plans?  Have you ever certified an SPCC plan?

A.   No.

Q.   Have you ever drafted an SPCC plan yourself?

A.   I have not drafted, but I have reviewed them.

Q.   Are you an engineer that can certify an SPCC plan?

A.   No.

Q.   How about preparing a stormwater pollution prevention plan, an S-W-P-P-P or a SWPPP?  Have you ever certified a SWPPP in the State of Connecticut?

A.   Not in Connecticut.

Q.   Are you capable of certifying a SWPPP in the State of Connecticut?

A.   Not in Connecticut.

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 30

A.   They were in the closure process.

Q.   Do you have any expertise in operating a petroleum bulk storage terminal?

MR. KILIAN:  Objection.

A.   No.

Q.   Have you ever negotiated a consent decree with any state agency over an Industrial Stormwater Permit?

A.   No.

Q.   Dr. Goldsmith, how about the EPA?  Have you had any experience working with EPA?  Let me ask this:  Have you ever represented EPA before directly as a contractor?

A.   I have held contracts with EPA.

Q.   Who is -- what does "held contracts" mean?

A.   Well, my signature was on a contract between -- multiple contracts between Bioengineering Group and various offices of U.S. EPA.

Q.   How about with the Corps of Engineers? Have you worked for the Corps of Engineers?

A.   Yes.

Q.   Have you ever been terminated from a project by the Corps of Engineers?

A.   One project.  They sent us a letter to

Page 35

A.   In particular, I think Opinion 10 speaks about some contaminant pathways and receptors at the terminal facility.

Q.   And what is your opinion?

A.   I speak to the availability of different coastal storm damage effects to contribute to release and dispersal of contaminants affecting known habitats and different aspects of community -- nearby communities.

Q.   Did you conduct any surface water flow studies to see how any dispersal might affect the ecological resources?

A.   I did not conduct modeling.  However, I did conduct preliminary visual observation of site conditions and surface water features and some desktop understanding of the terrain and drainage features and natural channel features in the area. And I reviewed other expert reports prepared in this matter on behalf of CLF.

Q.   I meant, what did you do.  So you said you did not do any modeling of potential contaminant movement to these ecological resources.

A.   Correct.  That was done by others.

Q.   Did you collect any data on stormwater for

Page 36

the New Haven terminal owned and operated by

defendants?

     A.   I did not collect any data, but I reviewed

many different documents containing stormwater data

that had been collected primarily by the defendants

and their contractors.

     Q.   Are you HAZWOPER certified?

     A.   No.

     Q.   Do you have any firsthand knowledge on how

the New Haven terminal owned and operated by the

defendants creates any hazardous waste?

     A.   I have read a lot of documents that I

identify different known -- different known

contaminants onsite.

     Q.   When you were at the site, did you actually

observe any hazardous waste management activities?

     A.   Well, there were many large tanks full of

bulk petroleum products and ancillary chemical

additives and what not.  And there were also, you

know, stormwater -- an oil/water separator device.

I definitely peered in and had a good whiff of that.

And I read a number of reports about the legacy

contaminants within different areas of the site,

including some reportable incidents where spills and

Page 37

general presence of contaminants had been identified and reported.

Q.   And that's in your report?

A.   I know I referred generally to the presence of contaminated sediment, soil and groundwater in different areas of the site.

Q.   Did you actually conduct any test of soil at the New Haven terminal?

A.   No.  I didn't have my trusty shovel with me.

Q.   Did you conduct any samples of stormwater at the New Haven terminal?

A.   No.

Q.   Did you take any samples of groundwater at the New Haven terminal?

A.   No.

Q.   Did you take any samples of soil sediment -- river sediment?

A.   No.

Q.   Did you conduct any samples of pool water?

A.   No.

Q.   Do you offer any opinions that the defendants violated any section of RCRA?

A.   I believe that my Opinion No. 10 speaks to

Page 40

entering the dispersal processes that would be very active in that area during a major coastal storm event.

Q.    Did you do any modeling to understand how far they would migrate, those substances?

A.    I did not do modeling, as I mentioned earlier.

Q.    And you're not saying there are current conditions.  It would be the conditions from a failure of a tank?

MR. KILIAN:  Objection.

A.    I cited that there are mechanisms such as through the breach of a berm, where concentrated flow could easily suspend, infiltrate, and otherwise entrain different contaminants.  I do believe there is, um, ongoing infiltration with no pretreatment into known contaminated areas onsite, which I know is a violation of a stormwater permit in the State of Connecticut.

I don't know exactly how RCRA governs that particular issue.  That was not a main focus area of my scope.  But I am clarifying that it's not only in the event of a tank leak; that there is other contaminant -- there's other contaminated material

Page 49

A.   Not that I recall.

Q.   Have you ever taken samples at any other terminal in the New Haven Harbor?

A.   Not at the terminal.

Q.   How about any other terminal other than the New Haven terminal owned by defendants?

A.   I have never conducted any sampling inside the fence at any terminal.

Q.   Have you ever sampled stormwater flowing off of a terminal in New Haven?

A.   Yes, I have.

Q.   And which one was that at?

A.   Um, I have taken samples flowing under Water Street, in front of the Gulf terminal and discharging into the -- essentially under the Quinnipiac Bridge, roughly in the alignment of Water Street, which contained multiple facilities, stormwater discharges.

Q.   And what were the results of those tests?

A.   They weren't great.  They were also done during dry weather; not during an optimal first flush condition, as is standard.

Q.   What do you mean by "not great"?

A.   Well, when you are able to capture the

Page 54

terminal?

MR. KILIAN:  Objection.

A.    I know that the training is discussed.  I have no knowledge of what the curriculum is.

Q.    Do you know if Connecticut DEEP has ever inspected the New Haven terminal?

A.    I know that there have been various occasions where personnel from DEEP have been at the facility.

Q.    Have they ever issued a notice of violation to defendants about stormwater?

MR. KILIAN:  Objection.

A.    Um, I don't believe they've done that in recent years.

Q.    Have you reviewed the Connecticut DEEP files on the New Haven terminal?

A.    I don't believe I've seen any files that were sourced from Connecticut DEEP directly.  I have read a number of files that include correspondence with Connecticut DEEP from the defendant.

Q.    Has EPA ever issued a notice of violation to the New Haven terminal for industrial stormwater?

MR. KILIAN:  Objection.

A.    I don't know.

Page 55

Q.    Has Connecticut DEEP ever cited the terminal for noncompliance?

MR. KILIAN:  Objection.

A.    I don't recall.

Q.    How about OSHA?  Has it ever cited the New Haven terminal for any violations of OSHA?

MR. KILIAN:  Objection.

A.    I don't recall seeing any OSHA-related correspondence.

Q.    How about the Coast Guard?  Have they ever issued a notice of noncompliance to the New Haven terminal?

MR. KILIAN:  Objection.

A.    I don't recall seeing any.

Q.    Has Connecticut DEEP ever asked the terminal to do a climate change vulnerability analysis?

MR. KILIAN:  Objection.

A.    I don't believe that Connecticut DEEP made mention of that in any emails or other correspondence I reviewed.

Q.    Has Connecticut DEEP ever asked the New Haven terminal to change any of its practices or procedures involving stormwater at the New Haven

Page 65

Q.   Again, I'm just trying to get your views.

Has Connecticut DEEP ever stated in writing to any industrial permitee under the stormwater permit in Connecticut that they were required to complete an assessment of climate change effects for their facilities?

MR. KILIAN:  Objection.  Overbroad.

Q.   Go ahead.  You can answer.

A.   I believe the existence of the CIRCA program is there to help make that information available to everyone; residential, industrial, municipal alike.  Anybody who is in Connecticut operating anything has access to a set of informed tools to guide how they handle whatever needs are influenced by climate, which reaches out and touches almost everything.

Q.   Has Connecticut DEEP ever stated in writing that it wanted all industrial permitees under the stormwater permit to specifically conduct a climate change vulnerability risk assessment?

MR. KILIAN:  Objection, overbroad.

Q.   That's my question.

MR. KILIAN:  It calls for hearsay.

A.   I'm not aware of anything.

Page 66

Q.    Are you aware of EPA ever stating in writing that all permitees under an Industrial Stormwater Permit should complete a risk assessment or a vulnerability assessment, as you called it, of climate change on their facilities?

MR. KILIAN:  Objection.

A.    I am aware of many EPA publications that talk about coastally situated facilities with tanks and surface ponds enclosed by berms, etc., specifically in relation to wastewater treatment facilities, which are often situated and configured that way.  I don't recall seeing anything that EPA prepared about bulk petroleum storage facilities. But the tanks and open bermed areas are similar.

Q.    Are you offering any opinions that defendants should be raising the height of the terminal?

A.    I didn't really make any recommendations at all, although I attempted to synthesize some of the findings of the NACCS study and also -- which did make some recommendations for mitigation measures around New Haven Harbor, including for the petroleum storage facilities and other waterfront industrial facilities.  And I did offer my opinion that I felt

Page 75

A.    I don't think it does.

Q.    How about climate change?  Does it mention climate change anywhere in the 2018 permit?

A.    Not specifically.  But I think implicitly.

Q.    Does the 2018 permit mention specifically climate resilience?

A.    No, it doesn't.

Q.    If you could turn to the definitions of "minimize" in the 2018 permit.  Is this where you get the term "best industry practice"?

A.    Yes.

Q.    Is this the only place that it appears in the permit, 2018 permit?

A.    Well, I mean, a very big staple of the permit is implementation of control measures.  So the best industry practice that would be applied to achieve the definition of "minimize" covers a lot, even though the definition is where that through line is drawn.

Q.    So the word "minimize" means "to reduce and/or eliminate to the extent achievable."  Can you read that definition of "minimize."

A.    In quotes, "'Minimize,' for purposes of implementing control measures in Section 5(b) of

Case 3:21-cv-00933-VDO   Document 750   Filed 10/04/25   Page 27 of 63

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 87

knowledge.

Q.   Do you have a copy of any statement by DEEP to that effect?

A.   Not permitee-specific, no.

Q.   Do you have a copy of any emails that they've sent to permitees in the State of Connecticut requesting that they consider the effects of climate change?

A.   Not from Connecticut DEEP, but certainly from other programs in Connecticut that are very focused on that topic.

Q.   But Connecticut DEEP, who regulates industrial stormwater, has never made that request that its permitees consider climate change effects under the Industrial Stormwater Permit, correct --

MR. KILIAN:  Objection.

Q.   -- before 2024?

MR. KILIAN:  Objection.

A.   I am not aware of that, nor am I aware of them providing any statement that it is somehow separated and not a factor under the Industrial General Permit.

Q.   Do you know if Connecticut DEEP has ever requested permitees to evaluate the climate change

Page 88

effects under any version of the Industrial Stormwater Permit in the State of Connecticut?

A.   No.

Q.   So I think you have the 2018 permit in front of you.  I think it's marked Exhibit G3.

Does it ever mention the National Highway Transportation and Safety Act in the permit?

A.   Um, I have some familiarity with the Act. I honestly can't tell you if it's included in this comment or not.

Q.   Do you have any documents, copies of emails or any statements from Connecticut DEEP, that an Industrial Stormwater Permitee under the Industrial Stormwater Permit in Connecticut should consider the National Highway Traffic Safety Act in operating its facilities?

A.   Not that I recall.

Q.   Does the 2018 Industrial Stormwater Permit talk about flooding at dry docks?

A.   Um, the permit talks about very specific sectors in a lot of depth, which was not part of the scope of my assignment on this matter.

Q.   So it doesn't mention it?  Or it does mention flooding --

Page 103

prepare for ongoing climate changes.

This is something that preceded this.  So this was just a more explicit step towards pointing people who may be the laggards, as I mentioned earlier, towards the resources that they may not have otherwise been...

Q.   And that's your interpretation, correct?

A.   That's my interpretation.

MR. HENDERSON:  I'm going to hand you what's going to be marked Exhibit G7, which for the record is a supplemental fact sheet from the Connecticut DEEP that was posted April 1, 2024.

(Document marked as

Exhibit G7 for identification)

Q.   Dr. Goldsmith, on this document, if you could look at Page 3 of 4.

A.   What are we looking at on 3 of 4?

Q.   Page 3 of 4, towards the middle of the section.  This is a second statement by the Connecticut DEEP.  And is this -- if you read the first sentence of Section 1.5, including the heading.

A.   "As adapted from the U.S. EPA MSGP permit, the draft IGP includes a new section, 'Corrective

Page 104

Actions,' providing consistent and concise compliance determinations (i.e., what constitutes a permit violation) and provides the permitee with a roadmap for the necessary steps to return to compliance.  This section includes built-in compliance deadlines to further specify DEEP's expectations for the type of actions that must be taken within a specific time frame and simplifies the reporting requirements for the permitee."

Q.   On Page 3 of 4 above that, is it the same language that you previously read in Exhibit G6 about -- can you read the first sentence of that paragraph, Section 1.4.

A.   "The Resiliency Measure section is a new component of the SWPPP and was added in response to Connecticut's commitment to prepare for ongoing climate change."

Q.   Thank you.

A.   It's pretty similar.  Is it exactly a match?  They're also saying "resiliency" in some places and "resilience" in others.  So I do see a little bit of a hash with their verbiage.

Q.   So they repeated their view that this was a new section to deal with climate change?

Page 107

permit that you instructed me to read doesn't

actually -- the resilience measures, they have good

practices with or without climate change.  And they

don't mention climate there.

MR. HENDERSON:  Jane, can you just read

back my question.

*(Question read)

MR. KILIAN:  My objection is noted.

A.    Um, the permit was silent on it one way or

another, other than referencing best industry

practice and requiring engineer certification of the

SWPPP, for instance.  With engineers, many of the

engineers I've worked closely with were involved

with and otherwise deeply aware of American Society

of Civil Engineers' climate change positions and

climate resilience focused standards.

Q.    Are you a member of the American Society of

Civil Engineers?

A.    I am not, although I have collaborated with

the organization.

Q.    And you're not a civil engineer?

A.    Correct.

Q.    You have no degree in civil engineering?

A.    Correct.

Page 109

A.   "The Resiliency Measures section is a new component of the SWPPP," yes.

Q.   And your testimony is that it was just implied in the prior permit; the duty to complete a climate change vulnerability risk assessment?

MR. KILIAN:  Objection.

A.   Well, I think incorporating climate change considerations into any risk evaluation and general planning process, investigating and analyzing the site and its pollutant-related risks overall, yes, I think climate has been for decades a relevant factor to be considered there under the prior permit versions.

Q.   So it's your testimony that this obligation to complete a climate change vulnerability risk assessment has been implicit in the permit for how many years?

A.   Basically, I would say about 20 years.

Q.   So it's your testimony that Connecticut DEEP has had an implied obligation in its Industrial Stormwater Permit to conduct the climate change vulnerability risk assessment; is that correct?

MR. KILIAN:  Objection.

A.   Yes.  I would say that under best

Page 110

practices, that has been absolutely a factor.  I think, if anything, it's this word "resiliency" or "resilience" that is maybe one of the newer angles on this and something that is -- I'm familiar with how many trained professionals in the field find the term a little confusing or a little broad.  It's an interesting choice of words.  I don't think it's problematic, but it's novel to a lot of folks.

Q.   So your opinion is it's been an implied requirement of the permit for 25 years?  Is that what you said?

A.   I said "20."

MR. KILIAN:  Objection.

Q.   20.  But yet at no time has Connecticut DEEP ever stated it was an implied requirement of the Industrial Stormwater Permit in Connecticut, correct?

MR. KILIAN:  Objection.

A.   Um, they don't state what the best industry practice is in general.

Q.   So they reissued multiple permits in the past, and they've never mentioned climate change, even though you believe it's an implied requirement of the Connecticut Industrial Stormwater Permit,

Page 112

say right here, "This new element of the SWPPP is intended to identify resource gaps, promote emergency planning and preparedness, and identify additional processes and procedures that may need to be considered and, if necessary, employed when experiencing variable weather patterns."

So they're talking about all of these things being their intent.  They are not saying to take note that climate change is a new thing. They're not suggesting anything.  They're saying they want to identify resource gaps, promote emergency planning, and identify additional stuff.

Q.   Have you ever asked Connecticut DEEP if this best management practice includes an obligation to complete a climate change vulnerability risk assessment?

A.   No, I have not.

Q.   Why haven't you?

MR. KILIAN:  Objection.

A.   Well, first of all, Connecticut DEEP is an organization, not a person I could just send an email or have a chat with.  It's a broader organizational question.  And I mentioned earlier that I have over the years been in discussion with

Page 116

Q.   I'm asking about Connecticut DEEP.  The question is pretty simple.

Do you know if Connecticut DEEP has ever taken any enforcement action against any permitee under the Industrial Stormwater Permit in Connecticut for the failure to complete a climate change vulnerability risk assessment?

A.   And my answer is, in cases where such failure has, in fact, led to exposures that -- incidents that --

Q.   I'm asking about Connecticut DEEP.  I'm not asking about any other state.  Connecticut DEEP.  Do you know?  Yes or no.

A.   I'm not aware of any -- I don't know very much about Connecticut DEEP's enforcement actions from one cause or another.

Q.   Do you know if Connecticut DEEP has ever sent any document to anybody -- to any facility in the State of Connecticut saying, "We recommend you consider climate change vulnerability risk assessments"?

MR. KILIAN:  Objection, asked and answered, irrelevant, among other things.

Q.   You can respond.

Case 3:21-cv-00933-VDO  Document 750  Filed 10/04/25  Page 36 of 63

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 117

A.    I know that Connecticut DEEP has awareness of the NACCS study.

Q.    I just asked about enforcement, any document.  Have they ever said -- have they made a recommendation to any permitee in the State of Connecticut that DEEP recommended or believed one was required under the Industrial Stormwater Permit in the State of Connecticut?

MR. KILIAN:  Objection.

Q.    That's all I'm asking.

A.    I have never read through any type of tabulation of Connecticut DEEP's enforcement actions.

Q.    So in this lawsuit -- where there have been millions of pages of DEEP documents, there have been SWPPPs from other facilities -- there's not one piece of paper where DEEP has ever said that the best industry practice provision of Section 5(b) of the permit requires an assessment of climate change vulnerability risk?

MR. KILIAN:  Objection, beyond the scope.

Q.    If you know of any, please tell me.  If you don't know of any, just state that for the record.

A.    I wouldn't know.

Page 120

site was a little windshield tour drive-by.  I see a "Shell" sign, and it's reflected in my photographs and in my memory as such.  And as I said early in our exchange today, I refer to, you know, the facility.  I refer to throughout my report and my testimony as the "Shell New Haven terminal" or the "terminal belonging to Shell."  And there's been other changes of ownership and other names on the permit documents.  But keeping track of the ownership structure was not my focus area.  So I've referred to it with the branded name "Shell."

Q.  On Page 1 of your report, you talk about "The terminal is unprepared for impending foreseeable hazards."  Do you see that?  It's sort of in the middle of the page.

A.  No, I'm not --

Q.  Page 1, almost directly in the middle of the page.

A.  Oh.  Right under the word "kill"?

Q.  No.  It's under "300,000 gallons of diesel fuel."

A.  Yeah, okay.

Q.  In your expert report, you never even mentioned the Business Continuity Plan for the

Case 3:21-cv-00933-VDO  Document 750  Filed 10/04/25  Page 38 of 63

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 132

sure, fall into a category of substantial
improvements.

        MR. HENDERSON:  Jane, can you read back my
question.

        *(Question read)

    A.    Um --

    Q.    First of all, is it your opinion that this
applies to a facility that's 100 years old and
containment is operating today?  Yes or no.

    A.    Yes.  I don't have any basis for thinking
that it somehow does not apply or would not apply.

    Q.    Even though the standard says it applies to
new construction?

    A.    Yeah, new construction and substantial
improvements in high-risk flood hazard areas.

    Q.    Has there been any substantial improvements
at the New Haven terminal?  Yes or no.

    A.    From what I've seen over the years, yes,
there have been substantial improvements.

    Q.    Do you know what the definition of
"substantial improvements" means?  Look it up.
Let's flip to Page --

    A.    And I know there was a corrective action
prescribed that was then abandoned that definitely

Page 134

Q.   So because of that, you don't know if this standard applies to the existing New Haven terminal owned and operating by the defendants in this action?

MR. KILIAN:  Objection, asked and answered.

A.   (No response)

Q.   So you don't know, do you?

A.   I mentioned that I have seen the corrective action that was prepared and abandoned by Shell. And the nature of that work did appear to trigger substantial improvement in the many jurisdictions where I have seen a detailed evaluation happen.

Q.   But there's nothing in your report that shows that you looked at the definition of "substantial" -- Page 5.  There's nothing in your report that says that you did an assessment to determine that there was a substantial improvement at the New Haven terminal that would trigger ASCE Standard 24-14, did you?

A.   I did not evaluate that.

MR. HENDERSON:  We're going to take a break for our lunch.

MR. KILIAN:  Sure.

MR. HENDERSON:  Okay, let's do that.

Page 137

companies' adoption of anything.

Q.   Has the EPA ever cited this document as a best industry practice?

MR. KILIAN:  Objection.

A.   I would say probably, but I'm not sure.  It wouldn't be necessary either, in the sense that a lot of what EPA says in the water quality world speaks to applying relevant engineering or best industry practices.

Q.   Has CT DEEP adopted this as a best -- or cited this as a best industry practice?

MR. KILIAN:  Objection.

A.   No, other than their reference of best industry practice in the -- you know, they assume that these things speak for themselves.  That the definition of "best industry practice" speaks to standards and demonstrable utilization of certain materials, measures, principals and practices.

Q.   So, Dr. Goldsmith, we were talking about the 2018 permit.  I believe it was Exhibit G3.  It actually doesn't use the word "critical infrastructure" anywhere in that permit, does it?

A.   Um, I just want to make sure I'm thinking of the right -- no.  It doesn't describe a lot of

Page 138

things.

Q.   But does it describe "critical infrastructure"?

A.   No, not to my knowledge.  I wouldn't expect it to.

Q.   Does it impose any more stringent standards on critical infrastructure in the 2018 permit?

A.   My interpretation of the manner in which that permit invokes best industry practice for control measures would require that the subsector of critical infrastructure that includes bulk petroleum storage facilities would necessarily need to meet a higher standard than a bulk mayonnaise storage facility or a dairy processing plant, for that matter.

Q.   But the permit, itself, does not impose in any specific words a requirement that it applies to critical infrastructure?

A.   Correct.  But it would also follow, of course, that with a more rigorous risk profile for critical infrastructure facilities, that higher standards that are industry-specific would be expected.

Q.   The concept of risk profile does not

Page 146

Q.   And all of those interpretations come from your opinion on what the word "best industry practice" means?

A.   Yeah.  I think my report is pretty clear that even my gap analysis goes to understanding what is stated explicitly in the permit and then the additional analysis of what is brought to bear through the best industry practice reference.

Q.   Do you know of any consensus document by any scientific organization that states the Industrial Stormwater Permit should add additional precautions for stormwater discharges or climate change impacts to critical infrastructure?

A.   I am not aware of one, nor would there be an expectation that one would exist.

Q.   So explain the last point you made.  Why wouldn't you expect?

A.   There needs to be some analysis about the 24-hour rainstorm, for an example.  But it doesn't say whether it's acceptable to use a hand calculator or a packaged computer model.  You know, there's a lot of...  But I don't think anybody's punching in the numbers on a calculator nowadays.  And with the packaged software, there's a lot of work that gets

Page 150

Q.   And you're not relying on any in your expert report or your rebuttal report?

A.   Correct.

Q.   In fact, Connecticut DEEP does not even define the term "critical infrastructure," does it, in any of the stormwater permits?

A.   I don't believe they do.

MR. HENDERSON:  Dr. Goldsmith, this is an exhibit we're going to mark as Exhibit G26.

(Document marked as

Exhibit G26 for identification)

Q.   So, Dr. Goldsmith, have you seen this document before?

A.   Yes, I have.

Q.   And you cite this, I believe, as an example of a best industry practice in your report?

A.   Yes, I did.

Q.   And for the record, this is an EPA Region 1 recommended procedures for adaptation plans for wastewater treatment systems and sewer systems, correct?

A.   Yes.

Q.   And EPA Region 1, does that include Connecticut?

Page 152

and/or sewer systems to develop adaptation plans as required in Region 1 NPDES permits.  The document provides recommendations and procedures for use of a free EPA tool developed specifically for water utilities.  However, as described in the permit itself, other approaches providing equivalent analysis may also be used."

Q.   So this applies to a wastewater treatment system, right?

A.   Wastewater treatment and sewer systems.

Q.   So is the New Haven terminal considered a wastewater treatment system under this document?

A.   My answer to that is, Not exactly.  Wastewater treatment plants are also considered a critical infrastructure.  They also include tankage and open impoundments holding, for instance, stormwater or secondary containment volumes, as well as wastewater treatment volumes.

Q.   Isn't this memo focused on local government wastewater treatment systems?

A.   I wouldn't say that.  It's true that in New England, the majority of wastewater treatment systems are owned and/or operated by government entities, but many are actually privately owned and

Page 153

operated.  And especially, you know, on an increasing number.

Q.    Is the New Haven terminal a sewer system?

A.    No, it's not.

Q.    This document nowhere says it's a best industry practice for Industrial Stormwater Permitting, does it?

A.    It doesn't say that, but it is --

Q.    So it doesn't say that.  You agree to that, correct?

A.    Correct.

Q.    Now, if you look on Page -- just counting pages, one, two, three, four -- sorry, it's Page 5. And it talks about steps permitees can take.  And that means permitees under wastewater treatment systems and permitees under sewer systems, correct?

A.    Yes.

Q.    Now, if you look at the examples towards the end here, Attachment A, which unfortunately is labeled "Page 12," all of the examples are local government wastewater treatment plants:  Manchester by the Sea.  And it says it's a wastewater treatment plant, Manchester Harbor.

Second example is Western Mass. - South

Page 161

documents any mention of Industrial General Permits or multi-sector General Permits.  These are not something -- these programs have never attempted to cross-reference each other in the past, to my knowledge.

Q.    So there's different programs that regulate critical infrastructure that are different from the Industrial Stormwater Permitting program?

A.    Not that regulates stormwater, no.

Q.    So let's go back to Exhibit 26, which was the Region 1 waste treatment system and sewer system memo.

What industry has adopted that Region 1 guidance as a best industry practice?

A.    I don't know.

Q.    What company has adopted that as a best industry practice?

A.    I don't know.

Q.    Has EPA adopted its Region 1 guidance document as a best industry practice for Industrial Stormwater Permitees?

A.    I believe given that the title is "Region 1 Recommended Procedures and Resources for the Development of Adaptation Plans for Wastewater

Case 3:21-cv-00933-VDO   Document 750   Filed 10/04/25   Page 47 of 63

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 162

Treatment Systems and/or Sewer Systems," I believe that that implies they consider it a best practice at EPA, the source and author of this.

Q.   Again, EPA has never written that in this document at all.  That's your interpretation, correct?

A.   That is my interpretation.

Q.   Okay, thank you.

And Connecticut DEEP has never incorporated this document or said it was a best practice in any way for Industrial Stormwater Permitees, correct?

A.   I am not aware of Connecticut DEEP having opined on this one way or the other.

THE VIDEOGRAPHER:  I'm sorry, I'm going to go off the record for ten seconds.  The time is 2:37.  We're off the record.

(Off the record)

THE VIDEOGRAPHER:  The time is 12:38. We're back on the record.

BY MR. HENDERSON:

Q.   So, Dr. Goldsmith, in your expert report you have referenced the American Society of Civil Engineers' Policy Statement 360?

A.   Yes.

Page 194

study.

Q.   So these practices in the NACCS, have they been written down anywhere --

A.   Yes.

Q.   -- on what the standard is?  Where at?

A.   Well, the NACCS study itself documents all of that.  And then there are a whole series of engineering standards and data source recommendations that typically get updated every three years.

MR. HENDERSON:  I think we have a response on the record.  Let's keep moving.

Here's another document that's going to marked as Exhibit G23.

(Document marked as

Exhibit G23 for identification)

Q.   Dr. Goldsmith, have you seen this document before?

A.   I have.

Q.   Now, you did not cite this document in your expert report, did you?

A.   No.

Q.   Did you even know about this document before your expert report?

Case 3:21-cv-00933-VDO  Document 750  Filed 10/04/25  Page 49 of 63

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 199

back on the record.

MR. HENDERSON:  Dr. Goldsmith, I'm going to hand you what's going to be marked Exhibit G11.  And this is a copy of a document -- copy of a chapter from the 2023 Connecticut stormwater quality manual.

(Document marked as

Exhibit G11 for identification)

BY MR. HENDERSON:

Q.   Dr. Goldsmith, I'm just confirming, you did not cite this in any of your reports, and you're not offering any opinions on this document, are you?

A.   No.

Q.   And just to be super clear, you're not saying that this is a best industry practice.  You didn't cite it for any reason, so you don't have an opinion in this case about this document, correct?

A.   The handbook covers some of the more rudimentary configuration -- it's like a Stormwater Management 101 primer that tends not to be as relevant on complex, intensively used industrial sites or sites subject to coastal storm damage and flooding.

Q.   But you're not offering any opinions in this case about the Connecticut stormwater quality

Page 200

manual, are you?

A.   No.

MR. HENDERSON:  Dr. Goldsmith, I'm going to hand you what will be marked Exhibit G21.

(Document marked as Exhibit G21 for identification)

Q.   Have you seen this document before?

A.   Not that I -- I've probably reviewed something similar on the website.

Q.   Are you offering any opinions for this document identified as "Exhibit G21?  And for the record, it's called, "Industrial Stormwater Fact Sheet Series."

A.   I don't think this came into play in my opinions.

Q.   And you're not offering any opinions in this case about this document, are you?

A.   No.

Q.   You are or not?

A.   I am not.

MR. HENDERSON:  Just to be clear, then you're not offering any opinions.

Dr. Goldsmith, I'm going to hand you what will be marked Exhibit G24.

Page 202

my general knowledge of stormwater management and water quality management.

Q.   And so you don't have an opinion whether this is a best industry practice document or not?

A.   No, I do not.

Q.   You're not offering an opinion this is or is not a best industry practice?

A.   I'm not offering that opinion.

Q.   That it's not --

A.   I'm not offering an opinion on this document.

MR. HENDERSON:  Okay.  Dr. Goldsmith, I'm going to hand you what's going to be marked as Exhibit G35.

(Document marked as Exhibit G35 for identification)

Q.   I'll give you the good copy.

Dr. Goldsmith, you refer to this document in your expert report.  Is this evidence of best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

MR. KILIAN:  Before we proceed, I just want to clarify that this is basically just the Table of Contents?

Page 206

MR. HENDERSON:  G20, sorry.

MR. KILIAN:  Do you have one for me?

MR. HENDERSON:  Oh, sorry.

(Document marked as

Exhibit G20 for identification)

BY MR. HENDERSON:

Q.   So, Dr. Goldsmith, I've handed you what's been marked G20.

A.   Uh-hum.

Q.   And you cite this document in your report -- or actually, I think Dr. Nairn cites it, and you cite Dr. Nairn.

A.   Uh-hum.

Q.   But is this a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   I think it's one of the older versions, but ASFPM is a cutting-edge organization that tends to be pretty nimble in developing its plans -- it's practices.  It's all right up there in the best practices, although best strictly -- someone's got to be at the head of that horse race.

Q.   So is this a best industry practice, in your opinion, for permitees under the Industrial

Page 207

Stormwater Permit in the State of Connecticut?

A.    Yes.

Q.    And this document is dated, "Revised March 2013," which I believe is the current standard.

A.    That's probably true.

Q.    So if you could turn to Page 2 of 29.

A.    Uh-hum.

Q.    Can you read the first paragraph under "Introduction."

A.    "The purpose of the Guide for Higher Regulatory Standards in Floodplain Management is to provide options for communities that want to implement floodplain regulations which reduce flood damage and the overall impacts of floods.  These impacts include human risk, environmental damage, property damage, flood insurance claims, displacement of residents, and burden on community infrastructure and services."

Q.    So does it state anywhere here that it's a best industry practice for permitees under stormwater permits across the United States?

MR. KILIAN:  Objection.

A.    While the paragraph that I just read does not mention any specific permit or any specific

Page 208

permitee, it talks about human risk and environmental damage and burden on community infrastructure and services, all of which are factors that come into play under the terminals' Clean Water Act permit and are complicated in the SPCC and the SWPPP at the terminal.

Q.   Dr. Goldsmith, the 2018/2021 Industrial Stormwater Permit for the State of Connecticut does not mention this document by the ASFPM, "A Guide for Higher Standards in Floodplain Management," does it?

A.   No, it doesn't.

Q.   And the document, itself, doesn't say that it's a best industry practice for anyone, does it?

A.   Not in the paragraph you had me read --

Q.   Does it anywhere in this document say it is a best practice for anything?

A.   On the very bottom of this Page 2 of 29, it says, "The higher standards options in this guide are described in detail because they are recommended for safer development and use the natural protection provided by the natural functions and resources of the floodplain.  Please note that the model language presented in this document was developed to promote effective floodplain management and mesh with the

Page 212

about "critical development protection."  It does not use the words "critical infrastructure."  But it describes the rationale as being "Facilities which provide critical services or services that are depended upon during flooding or other hazardous events should be protected to an even higher standard than other development.  Failure to provide flood protection to these types of critical facilities creates severe and unacceptable public safety risk.  The objective is to provide critical facilities and development against damage and to minimize the potential loss of life in flooding.  Model language is then provided."

Q.  Can you name one industry that has adopted this as a best industry practice?

A.  This is written for communities to adopt into their community rating system ordinance development.

Q.  Right.  So it's not an industry practice?

MR. KILIAN:  Objection.

A.  It becomes an industry practice when industries that are seeking municipal permits in community rating system communities, they must adhere to it.

Page 213

Q.    Right.    But this is not a requirement in the Industrial Stormwater Permit for the State of Connecticut?

MR. KILIAN:    Objection.

A.    Well, it reflects best industry practice related to flood risk reduction.

Q.    Where does it state that it is a practice that industries should follow?

A.    Well, going back to Page 7, I think, under the "Rationale," it describes that "Facilities which provide critical services or services that are depended on during flooding and other hazardous events should be protected to an even higher standard than other development."

Q.    But does it say it applies to industry? This guide developed new model ordinances for communities.

A.    Right.

MR. KILIAN:    Objection.

A.    But this is the particular model ordinance that would cover what is known as "critical development," "critical facilities" or "critical infrastructure."

Q.    And New Haven has not adopted this model?

Page 229

Q.    That's your opinion.  And you can identify it as an opinion.  But in terms of the permit, what is the industry that is regulated by the permit?

MR. KILIAN:  Asked and answered. Objection.

Q.    So does the permit regulate certain SIC codes?

A.    It does.  And then it also has the "everything else" category, which is what this terminal falls under.

Q.    So it's your opinion that this terminal is in the "everything else" and not because it's in the SIC code?  I just want to be clear.

A.    I deal with permits in different jurisdictions, so --

Q.    No.  Does this facility have to get an Industrial Stormwater Permit because of its SIC code?  That's the question.

A.    I'm not sure how to answer your question.

Q.    So why does this facility require an Industrial Stormwater Permit from the State of Connecticut?

MR. KILIAN:  Objection.

Q.    You can answer.

Page 235

an industry by transferring information.  Other times, it's already grown up inside, imbedded in an industry.

Q.   I think we have your answer now, and that's what I was trying to get you to answer on that.

How do you identify other terminals like the New Haven terminal to see what they were doing?

A.   One of the things that I looked at was the NACCS study, which had identified various critical facilities.

Q.   What other terminals did you identify that are like the New Haven terminal and that you looked at their practices at their facility?

MR. KILIAN:  Objection.

Q.   You can answer.

A.   I have knowledge of many different terminals.  But that's not how I define what best practices are.

Q.   I'm not asking about best.  I'm asking about industry practices.  I didn't ask for best or worst or greatest.

How do you identify industry practices at a restaurant or in the petroleum bulk storage?  How do you identify what the industry practices are?

Page 236

A. I have not conducted a survey of industry practices in the bulk petroleum storage or any industry.

Q. Anywhere in the United States did you look at any?

A. I started a conversation this morning by explaining especially forensic reconnaissance observations that included petroleum terminals.

Q. Did you come up with a list of all the petroleum bulk storage facilities in Connecticut?

A. No, I did not.

Q. Would they be part of the industry that would have industry practices? I don't mean best. I mean any.

How did you establish what industry practices were in the petroleum bulk storage industry?

MR. KILIAN: Objection.

Q. You didn't do a survey, right?

A. No, I didn't.

Q. Did you email a list of other petroleum bulk storage facilities and say, "I'm doing a survey, an analysis of practices"?

A. I finished saying that I haven't and am not

Page 237

in the business of doing surveys of bulk petroleum operators or any type of industry.

Q.   Did you interview any of the, like, ten other petroleum bulk storage terminals?

A.   No other.

Q.   Did you look at their permits to see if they were required to do climate change vulnerability risk assessments?

A.   I have reviewed a number of --

Q.   Are they identified in your expert report?

A.   No.

Q.   Did you attempt to contact any other industries along the Connecticut coast outside of petroleum bulk storage --

MR. KILIAN:  Objection, relevance.

Q.   -- where they were conducting climate change vulnerability risk assessments?

A.   As I mentioned, the NACCS provided up and down the entirety --

Q.   I just asked if you contacted any other industries.

A.   Why would I?  The NACCS assembled and integrated all of that information for me and anyone else who wants access to it.

Page 238

Q.   I didn't ask that.  I asked, did you contact any of those industries to see if they were doing a climate change vulnerability risk assessment.

A.   The NACCS performed that.

Q.   I just want to know, did you contact any other industries outside of the petroleum bulk storage and ask them, "Are you guys doing a climate change vulnerability risk assessment?"  Yes or no.

A.   No.  I didn't even call my relatives to ask them if they had reconsidered their home site.

Q.   Did you call up API, American Petroleum Institute, and say, "Can I ask you about what are best practices at petroleum bulk storage facilities"?

A.   I read a number of their reports.

Q.   But did you attempt to contact anybody to get firsthand information?

A.   No, but I attend many engineering-related meetings and events, working meetings, as well as industry events.  And I'm fairly abreast of developments in the field.

Q.   Did you review Renee Boudreau's expert report?

Page 243

A.   I'm answering exactly the question that you asked.

Q.   No, you didn't.

So my question said "industry."

Were you in the room when industry developed best practices?

MR. KILIAN:  Objection.  It's asked and answered.  And "industry" is not limited -- she testified that "industry" is not limited to one industry; that it's a general term that refers to risk assessment across multiple sectors.  She testified to that 20 minutes ago.

Q.   So do you have a basis for why the word "industry" means -- what does the word "industry" mean to you?

A.   Are you familiar with Venn diagrams?

Q.   No.  Why don't you explain.

A.   Okay.  So I'll pretend I have a pen.  So if you can say this is the bulk petroleum industry. This is the Metocean science and engineering industry.  This is the professional civil engineering industry.  In the middle, there could be something that intersects, where the bulk petroleum folks, the Metocean scientists who might work for a

Page 244

government agency or within let's say Shell.  And then different civil engineers that are hired to solve a problem.  They're all operating within the overlapping area of those multiple, let's call them, circles.

*Q.   So if I hear you correctly, you didn't actually collect any data on what practices the industry was actually employing to evaluate climate change, correct?

A.   That is not correct.

MR. HENDERSON:  Could you read the question.

*(Question read)

A.   So I sketched out my imaginary Venn diagram, and I suggested that there's a section in the center where those three circles overlap.  That can be described as being part of the petroleum bulk storage industry, the Metocean science and engineering industry, and the world of professional civil engineers who put the stuff into practice, and the planners, like myself, who tee up, scope, and otherwise initiate -- help to initiate those processes.

So do I know what's going on outside of