# Exhibit F

## Filed Under Seal

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Shell New Haven Terminal

Case No. 3:21-CV-00933-VDO

## EXPERT REPORT OF WENDI GOLDSMITH

May 8, 2025

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**I. Introduction**................................................................................................................1

**II. Professional Background and Methodology**..................................................................3

    Professional Background........................................................................................3

    Expert Testimony..................................................................................................8

    Methodology........................................................................................................9

**III. Opinions**.....................................................................................................................15

    Opinion 1 – Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change. ............................................15

        Best Industry Practice Required Shell to Consider Long-Term Risks for the Service Life of the New Haven Oil Terminal, not Only Risks During the Permit Period ..........................................27

    Opinion 2 – More Severe Weather, Precipitation, Storm Surge, and Sea Level Rise Have Created Reasonably Foreseeable and Significant Risks to the New Haven Oil Terminal that Shell has not Addressed. ...............................................................................................................29

    Opinion 3 – Past Storms Put Shell on Notice of the Increased Risks to Coastal Facilities from Severe Weather, Storm Surges, Precipitation, and Sea Level Rise. ......................................32

    Opinion 4 – The New Haven Oil Terminal is Not Engineered or Operated Pursuant to Best Industry Practice..................................................................................................39

    Opinion 5 – The New Haven Terminal's Stormwater Management System is Not Sufficient to Mitigate the Risks of Potential Flood Hazards and Severe Storms. ...................................42

    Opinion 6 – The New Haven Oil Terminal's Berms and Containment Areas are Insufficient to Contain the Petroleum in the Event of Oil Spill. ........................................................43

    Opinion 7 - The New Haven Oil Terminal is Not Engineered or Operated to Prevent the Discharge of Pollutants. ........................................................................................46

    Opinion 8 – Adequate Decision Support Frameworks Currently Exist to Guide Engineering of Infrastructure Measures to Effectively Manage Flood Risk at the New Haven Oil Terminal. .......48

    Opinion 9 – Shell Fails to Apply Best Industry Practice in Its Risk Management Program. ..........49

    Opinion 10 – A Severe Storm Poses a Threat of Potential Pollution in the Surrounding Community and Environment Given the Current Condition of the Shell New Haven Terminal. 52

        The Terminal is Not Prepared to Prevent a Catastrophic Failure by a Severe Storm..................52

        The Terminal Poses a Threat to the Surrounding Community ........................................56

**Appendix A: Wendi Goldsmith *Curriculum Vitae***................................................................i

**Appendix B: Additional Materials Considered**....................................................................ix

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## I.    Introduction

Overview of Expert Report

My name is Wendi Goldsmith. I am 59 years old and competent to testify to all facts contained in this Report. I submit this Report in support of Conservation Law Foundation, Inc. ("CLF")'s Complaint in the litigation matter of Conservation Law Foundation, Inc. v. Shell, Case No. 3:21-cv-00933-SALM (D. Conn.).

I was retained by CLF to serve as an expert witness in this matter with a focus on the expert stage of discovery. I was asked to investigate the site (within its surrounding context) of Shell's bulk storage and fuel terminal ("Terminal"), located at 481 East Shore Parkway in New Haven, Connecticut, and produce an Expert Report to submit to Defendants in this case. My Expert Report integrates the findings of other subject matter experts retained by CLF and my independent opinions are based on detailed analysis of the record of facts in this case, specifically relating to gaps and shortcomings in the current design and operational plans for the Terminal. I generally find conditions at the Terminal lack rigor when compared to best industry practice in ways that result in the facility remaining vulnerable to multiple forms of tank failure capable of causing catastrophic petrochemical releases. The focus of my evaluation is not related to minor infractions of an administrative nature, but rather it is on the largely unmitigated exposure to storm-related damage that poses a credible risk of catastrophic release of toxic and hazardous pollutants from the Terminal. Upon initial review, I found conditions at the Terminal to be concerning; upon thorough analysis, the level of credible risk is severe. Like many petrochemical bulk storage and transfer facilities, the Terminal has a documented history of releasing pollutants into the surrounding waterways, groundwater, and soil. Like its sister facility in Sewaren, NJ that released over 300,000 gallons of diesel fuel into the Arthur Kill during Hurricane Sandy in 2012, the Terminal is currently grossly unprepared for the impending, foreseeable hazards presented by severe weather that can reasonably be expected to cause significant future pollutant releases. Since its original siting and construction around 1950, the Terminal's exposure level to these hazards has already increased and will continue to be further exacerbated by effects of climate change. The facts I have reviewed indicate that the Terminal has not taken the necessary steps to mitigate weather-related risks according to recognized best industry practice.

My report proceeds as follows:

Section I describes my professional background and explains my qualifications as an expert on these matters. It outlines the methodologies applied and documents relied upon for factual basis in my work in the Shell New Haven Terminal matter. It summarizes my compensation for expert services in this matter and my opinions.

Section II evaluates the Terminal in terms of its application of scientific consensus, engineering standards, and best industry practice. The ten opinions rendered each address a facet of the systematic pattern of shortfalls identified, including specific gaps, selective inconsistencies, broad non-compliance, and quantifiable consequences. Each opinion considers how climate change's impact on precipitation and sea level rise are already causing serious problems in New Haven and how the impacts are expected to worsen. The opinions examine the Terminal's lack of conformance with multiple published engineering standards that share in common the requirement to recognize future hazard levels based on projections for changes in relevant conditions throughout the service

1

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

life of a facility, including trends in storm intensity and frequency due to climate change. The opinions elaborate upon the issues of concern due to Shell's stormwater management systems failing to account for the impacts of climate change, contrary to best industry practice as required by the Connecticut Department of Energy and Environmental Protection's General Permit for Industrial Stormwater Discharge ("Permit"). The Opinions rendered are as follows:

Opinion 1 – Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change

Opinion 2 – More Severe Weather, Precipitation, Storm Surge, and Sea Level Rise Created Reasonably Foreseeable Risks to the New Haven Oil Terminal

Opinion 3 – Past Storms Put Shell on Notice of the Increased Risks to Coastal Facilities from Severe Weather, Storm Surges, Precipitation, and Sea Level Rise

Opinion 4 – The New Haven Oil Terminal is Not Engineered or Operated Pursuant to Best Industry Practice

Opinion 5 – The New Haven Terminal's Stormwater Management System is Not Sufficient to Mitigate the Risks of Potential Flood Hazards and Severe Storms

Opinion 6 – The New Haven Oil Terminal's Berms and Containment Areas are Insufficient to Contain the Petroleum in the Event of Oil Spills

Opinion 7 – The New Haven Oil Terminal is Not Engineered or Operated to Prevent the Discharge of Pollutants

Opinion 8 – Adequate Decision Support Frameworks Currently Exist to Guide Engineering of Infrastructure Measures to Effectively Manage Flood Risk at the New Haven Oil Terminal

Opinion 9 – Shell Fails to Apply Best Industry Practice in Its Risk Management Program

Opinion 10 – A Severe Storm Poses a Threat of Potential Pollution in the Surrounding Community and Environment Given the Current Condition of the New Haven Oil Terminal

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## II.    Professional Background and Methodology

**Professional Background**

I have over thirty-five years of experience providing services for sustainable and disaster resilient planning, flood management infrastructure, military and civilian development, and natural resource restoration, much of which involved critical infrastructure protection and complex facilities. I have contributed to the systematic development of engineering standards and best industry practices that are now firmly established. My work for the US Army Corps of Engineers (USACE) after hurricanes Katrina and Rita included direct involvement in refining and applying federal policies and procedures for climate resilient planning and engineering of infrastructure for flood risk management. My post-graduate academic training has been interspersed with professional work since completing my undergraduate studies at Yale University in 1988. My second master's degree and PhD studies were funded by public agencies to help further develop, document, publish, and disseminate green infrastructure practices I had pioneered. The resulting collaboration with these agencies ensured that my research documented recent advances in scientific knowledge and professional practice and was structured to facilitate wider uptake and continued development by relevant users, including public agencies.

I regularly consult and advise nationally and internationally on established and emerging procedures and standards related to critical infrastructure systems and components, including petrochemical storage and handling facilities, which are critical for U.S. energy security and industrial operations.

I have worked throughout the U.S. and internationally, including intensively in New England, as a consulting scientist, planner, advisor, and program/project manager for the USACE, state and municipal governments, and industry, primarily on waterfront and waterways projects, predominantly on those impacted by storm damage or engineered to function to provide storm damage risk reduction.

I have worked at a large century-old engineering firm, Charles T. Main, in Boston, MA serving infrastructure and industrial clients. Various project roles involved the vulnerability of regional power grids and public water supply systems, including how these issues were (or were not) incorporated into engineering analysis.

I worked as a Fluvial Geomorphologist consulting to Bestmann Ingenieurbiologie GmbH near Hamburg, Germany in 1991. My work involved planning, overseeing regulatory procedures, and providing contractor oversight on multiple projects for stabilization, environmental remediation, and ecological restoration of rivers, streams, reservoirs, wetlands, and coastal areas in Germany and other countries in Europe and Asia.

In 1992, I founded Bioengineering Group and served as CEO until its sale in 2014.  I led the planning, permitting and design of large-scale infrastructure projects such as renewable energy generation, highways, municipal and industrial stormwater management systems, flood control facilities, and parks/greenways, as well as contaminated properties regulated under the Resource Conservation and Recovery Act  (RCRA) and Superfund sites. As the firm's innovative work in research and development as well as planning and design spheres gained recognition, I was tapped to provide inputs into high-level USACE policies and standards, including those related to stormwater management, on Department of Defense (DoD) facilities, interdisciplinary planning,

3

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

specifications and protocols to support effective stakeholder engagement, design-build project delivery methods for improved schedule and site-adapted performance, and more. Bioengineering Group provided planning and design services for over 20 USACE offices throughout the U.S. between 1996 and 2005 and was hired to perform independent technical reviews of work by others to facilitate improved quality, innovation, and best practice adoption.

A prominent project during my time as CEO at Bioengineering Group addressed flood vulnerability using multiple lines of defense surrounding New Orleans and its neighboring parishes following Hurricanes Katrina and Rita. Bioengineering Group was invited to participate in the series of federal and state meetings and workshops in the aftermath of Hurricanes Katrina and Rita, where it was obvious that the forces exerted by the storm exceeded the limits of engineering that led to nearly 2000 deaths and catastrophic failures of critical infrastructure. Therefore, post-hurricane design criteria warranted a complete re-evaluation, not an in-kind replacement.

USACE awarded the two largest contracts for planning and engineering services for the new flood solutions to the international team that I led. The project, which started in 2006, delivered $14 billion of infrastructure designed to function as a proper system, accounting for climate change adaptation and resilience. It resulted in an estimated $30 billion in prevented damages during Hurricane Isaac in 2012 when the project was substantially complete but not quite finished. Unlike the flood infrastructure before Katrina, the rapidly planned, designed, and constructed Hurricane Storm Damage Risk Reduction System (HSDRRS) did not rely only on hindward-looking data as the basis of design. Instead, the system was engineered based on known trends in sea level rise, local land subsidence rates, and storm patterns (rainfall, wind speed, wind field size, and more) and predicted future conditions throughout the intended service life of the project. The project resulted in adoption of new protocols for multi-parameter risk-based forecast-informed engineering guidance by the USACE. These published protocols[1] require addressing future increased storm damage hazards on USACE projects and have been incrementally developed and updated over the years and broadly adopted as best practice in the U.S. for such work across federal agencies and for non-federal critical infrastructure facilities.

In October 2005, the USACE announced the Interagency Performance Evaluation Task Force (IPET) mission "…to provide credible and objective scientific and engineering answers to fundamental questions about the performance of the hurricane protection and flood damage reduction system in the New Orleans metropolitan area."[2] IPET was soon tasked with conducting a detailed forensic evaluation of failure modes triggered by Hurricane Katrina, as well as the underlying assumptions about terrain and subsurface conditions, storm damage effects, operability of floodwater pump stations, land subsidence lowering intended structure levels, and even risk assessment as a foundation to support consistent and wisely tailored engineering decisions at the systems level. The multi-disciplinary IPET study was conducted by over 300 experts from multiple state and federal agencies, companies, and academia.

---

[1] Hurricane and Storm Damage Risk Reduction System Design Guidelines INTERIM, https://www.mvn.usace.army.mil/portals/56/docs/engineering/hurrguide/entiredocument.pdf (With revisions through June 2012) (retrieved 4/24/2025).

[2] U.S. Army Corps of Engineers, "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System: Report 1 Evaluation Plan and Interim Status ", https://aapa.files.cms-plus.com/SeminarPresentations/06_FacEng_Pezza.pdf.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

The USACE released the IPET Report in 2006.[3] Among other things, it examined future infrastructure measures in terms of risk and uncertainty and developed a risk assessment method suitable for a large, complex, and geographically distributed system.[4] Ed Link, IPET's leader, and I were invited to co-author an article "Lessons learned after Katrina," which was published in The Military Engineer for industry outreach in one of the oldest industry publications.

My firm Bioengineering Group was awarded $200 million in contracts to provide services for planning, design, and program management in the $14 billion post-Katrina HSDRRS, a regional-scale climate-adapted infrastructure system that eventually won top national awards from the American Society of Civil Engineers, the American Council of Engineering Companies, and others. My role involved integrating applied climate science with rigorous risk-based decision support for $7 billion of the most complex and sensitive elements of the HSDRRS. I held senior signing authority over the design contracts that incorporated the data, methods, and tools being developed by IPET and the U.S. Army Engineer Research and Development Center ("ERDC"). I led oversight of the engineering reviews to ensure the new datasets and methods were correctly applied and coordinated overarching quality assurance reviews. Our team was responsible for engineering the largest storm surge barrier in the world, the largest pump station in the world, thousands of acres of restored wetlands, hundreds of miles of levees and floodwalls that replaced the ones that experienced failure during Katrina, and many other tangible top tier outputs. Other outputs included the implementation of risk-based, forecast-informed climate-resilient engineering practices at scale to deliver a fully integrated solution that functioned as a system. We also delivered the design and construction management of the first levee system to be certified under the National Levee Safety Program (enacted as Title IX of the Water Resources Development Act of 2007), which provides authority for various activities led by the USACE and the Federal Emergency Management Agency (FEMA). The socioeconomic recovery of Greater New Orleans depended upon ensuring the region had achieved this certification at the highest possible level of risk reduction and resilience.

Through the firm's ongoing contracted work for ERDC, I led research and development programs for the U.S. Department of Defense (DoD), developing methods for evaluating and optimizing renewable energy and efficient/resilient buildings, critical infrastructure, and site design to improve multi-hazard resilience for military and civilian and communities. Throughout 2010-11, I helped formulate cornerstone policies that translated successful research and professional practice into goals, objectives, and viable financial strategies to systematically improve the security, disaster resilience, self-sufficiency, sustainability, and life-cycle cost-effectiveness of defense facilities, the largest portfolio of real property in the world. I also advised site development and infrastructure projects regarding sustainable development methods suitable to changing climate and land use patterns.

I have written and presented extensively on climate change resilience in urban settings, and frameworks for decision-making under risk and uncertainty, including book chapters, peer-reviewed articles, reports, and formal seminars for multiple public agencies and academic institutions including Yale School of the Environment, Harvard Graduate School of Design, Metropolitan Transit Authority of New York, USACE, US Environmental Protection Agency, and more.

---

[3] U.S. Army Corps of Engineers, "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Draft Final Report of the Interagency Performance Evaluation Task Force." New Orleans, Louisiana: Interagency Performance Evaluation Task Force, US Army Corps of Engineers, 2006.

[4] *Performance Evaluation, Draft Final Report*, I-50

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Through this extensive experience, I have expertise in the practical application of climate science in the built environment based on an understanding of storm damage and post-Katrina standards and methods for addressing known and foreseeable risks.

I have been intimately familiar with the coastal area in which the Terminal lies since the 1980s. I am familiar with the geography, biology, and the area's vulnerability over the next 50 years and have contributed to the design of appropriate climate-resilient bank and shoreline treatments along the Mill River Greenway..

I have worked on disaster resilience infrastructure projects across and outside the country for a diverse range of clients. A few examples include:

    a. Following Hurricane Sandy, I was selected to review climate science and geomorphology best practices in relation to disaster recovery and climate resilient infrastructure improvements for LaGuardia Airport in New York, New York for two terminals operated by Delta Airlines. The project aimed to examine vulnerabilities and risks, identify appropriate mitigation measures and costs, and implement solutions that incorporated green infrastructure measures suitable for regional transportation critical infrastructure.

    b. I led a Disaster Resilient Infrastructure Training Program for the Metropolitan Transportation Authority (MTA)/New York City Transit to address recovery, disaster resilience and climate change factors following Hurricane Sandy. I ultimately researched and updated design team managers regarding global best industry practice for overall risk management and for tunnel and rail flood mitigation. I recommended appropriate climate change factors to guide design based on then-current data and federal policy. The MTA previously had not established procedures or adopted specific climate resilience standards for addressing the transit critical infrastructure indispensable for the tri-state region it serves. My work aided the management team to identify specific deficits and feasible remedies to better coordinate multiple repairs and new construction elements in and around the New York City Subway System after it sustained billions in damages from Hurricane Sandy.

    c. After a cluster of hurricanes affected the Gulf of Mexico shortly after commencement of engineering for the Panama Canal Expansion Project, I was asked by the canal design team to lead an interdisciplinary review to ensure use of best industry practices for engineering with regard to climate change and disaster resilience. Under my guidance, the team identified several deficiencies related to failure to address threats and vulnerabilities due to combined events, cascading cause-effect processes, and forecasts of environmental conditions anticipated during the project's service life. Specific recommendations were made to address design improvements to remedy these deficiencies.

    d. After the impact of Hurricane Sandy closed the New York Stock Exchange and NASDAQ for days and caused damage and partial interruptions to operations at the Federal Reserve Bank of New York, I was engaged to lead the Federal Reserve Bank Climate Risk Study in Boston, Massachusetts, which evaluated the risk from

6

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

sea level rise and storm surge to its waterfront property in downtown Boston. The main gap in the then-current understanding of facility vulnerability was the high potential for existing stormwater infrastructure to operate in reverse (bringing water into the site, rather than conveying it away) or to entirely rupture/collapse due to age and degraded condition during combined heavy rainfalls and high-water levels driven by storm surge in Boston Harbor. The Federal Reserve Bank Climate Risk Study recommendations included increasing resilience through redundant measures, such as the construction of a stormwater "barricade" system around the building and across the driveway down to its underground garage, as well as modification/relocation of the facility's existing mechanical systems.

e.  In 2020, I led a Climate Vulnerability Assessment and Resilience Plan which advised the Commonwealth of Dominica's nationally owned utility company on how to apply international standards for critical infrastructure engineering to address the known current threats as well as increasing climate-related flooding, drought, wildfire, and other site-specific hazards. Hurricane Maria inflicted devastating losses to the tiny Caribbean nation estimated at nearly 300% of the national GDP, and the Prime Minister declared the world's first national policy requiring climate resilient standards for all major projects. Insurance companies, investors, and multilateral aid agencies demanded that reconstruction and upgrades specifically address climate resilience for power generation and transmission assets throughout their service life per best industry practice.

f.  In 2012, I led an Energy Quality Flow Analysis for Ultra-Low Communities for multiple Army installations for the DoD seeking to reduce their vulnerability to loss of operations due to multi-hazard climate exacerbated threats, while simultaneously improving their greenhouse gas footprint and reducing operating costs throughout facility life. Threats included changing climate conditions capable of shifting technical requirements and posing operational interruptions, as well as potential military contingency and terrorist incidents. The project identified cost-effective and risk-resilient energy choices, focusing on thermal energy through combined wastewater, district heating/cooling, and on-site renewables. Findings from this study have been incorporated into planning and design standards for US and NATO military critical infrastructure systems.

I was inducted as a Fellow and lifetime member of the Society of American Military Engineers, dedicated for over a century to providing engineering solutions to national security infrastructure challenges. I am an active member of the InfraGard National Disaster Resilience Council (NDRC), one of several cross-sector councils established to develop and disseminate information to protect, secure and ensure the operational resilience of the nation's interdependent critical infrastructures, which is overseen by the FBI's National Infrastructure Protection Unit. I am a member of PIANC, the World Association for Waterborne Transport Infrastructure, and together with General "Bo" Temple, Former Chief of USACE, I co-authored *Engineering Infrastructure for the Post-Katrina Future*, one of four technical articles published in the 2013 PIANC Yearbook. I am a member of the Society for Risk Analysis.

I received a Doctor in Philosophy (PhD) from Aarhus University in Denmark in 2016. My doctoral thesis was on Integrating Natural Systems with Engineering: Decision Support to Guide Sustainable

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Development and Climate Resilient Design. I received a Master of Science from the University of Massachusetts at Amherst in Plant and Soil Science in 2002 and a Master of Arts from the Conway School in Ecological Land Planning Design in 1990. I received a dual Bachelor of Arts degree from Yale University in Earth & Planetary Sciences and Studies in the Environment in 1988. I am a Licensed Professional Geologist in New Hampshire and Louisiana, and a Certified Professional Geologist by the American Institute of Professional Geologists. I am a Certified Professional in Erosion and Sediment Control and a Certified Professional in Stormwater Quality by EnviroCert International.

I have held multiple senior roles in management and governance and have been certified by the National Association of Corporate Directors, of which I am a member. I am knowledgeable and experienced regarding corporate risk management practices, reporting and disclosure standards, and audit procedures for financial and non-financial metrics. From 2008 to 2012, I served as a Federal Appointee to the National Women's Business Council (advisors to the President, Congress, and the U.S. Small Business Administration, and I have served on state and municipal committees related to water resources and coastal resilience. These experiences have equipped me with a broad understanding of integrating policy, science, and management principles and practices at the highest levels within government and business.

Outside of my career, in 1999, I co-founded the Center for Urban Watershed Resilience, a non-profit organization revitalizing the ecological, economic and social value of degraded urban sites. I served as Board Director for the Center since its founding and served as President from 2005 until its closure in 2024. I have been on the International Council of Advisors for the Asian University of Women since 2010. From 2014 to 2020 I served as Board Director for the Soil and Water Conservation Society, where I remain an active member. I have served as Board Director for the Green Infrastructure Foundation since 2015. In 2016, the American Association of Engineering Societies and National Audubon Society awarded me the Joan Hodges Queneau Palladium Medal. I am also a 2012 recipient of the Bronze Order of the De Fleury Medal for inspirational leadership to the Army Engineer Regiment, which was bestowed in recognition of my contributions to promulgating and implementing the risk-based, forecast-informed, climate-resilient critical infrastructure decision support procedures recognized internationally as best practice.

My CV is attached as Appendix A.

**Expert Testimony**

I have not testified as an expert at trial or by deposition during the previous 4 years.

I was retained by CLF in 2022 to provide expert testimony support during this litigation regarding the Terminal, including document review, multiple formal site visits and visits to the surrounding area, and written and oral testimony. My base rate is $370/hour and my compensation is not contingent upon the outcome of the case. My work in this case is ongoing, and I reserve the right to take into consideration any new information that becomes available to me and to supplement or amend my conclusions based on such information. I anticipate that I will testify to opinions outlined in this report, and if I testify at trial, I may provide and rely on visual aids and/or demonstrative exhibits to summarize my opinions and the basis for them.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

The materials I reviewed and relied upon in forming my opinions and drafting this report are cited herein. Additional materials I reviewed and relied upon in forming my opinions and drafting this report are listed in Appendix B.

## Methodology

My opinions are based on the application of accepted methodology, with the ten opinions derived from a nested set of analyses as the basis for each opinion rendered. I conducted a literature review of peer-reviewed publications. I performed a gap analysis of issues related to the Terminal's compliance under the Clean Water Act and RCRA, including requirements to use best industry practice for control measures. Gap analysis is recognized under the International Organization for Standardization ("ISO") ISO 9001:2015 and other ISO standards as a fundamental practice to identify shortcomings and potential solutions in various business practices, such as regulatory compliance, within many sectors to support continuous improvement. The structured process identifies discrepancies between an organization's current practices and regulatory requirements. It involves systematically evaluating existing policies, procedures, and documentation against current regulations with the goal of pinpointing areas requiring improvement to comply with relevant laws and standards.

Gap Analysis

Gap analysis and risk assessment are important components of a compliance program despite differing in purposes, scopes and requirements. While a compliance gap analysis is more narrowly focused on adherence to regulatory or framework compliance, a risk assessment has a broader focus. It considers operational risks, security risks, and other business threats, vulnerabilities, and issues, in addition to compliance risks. Aspects of risk management were embedded into the gap analysis by assessing risk management practices, incorporating probability and uncertainty of foreseeable hazards, assessing potential failure modes, surfacing pollutant release scenarios, and identifying potential risk mitigation measures through Failure Modes and Effects Analysis (FMEA), a widely accepted best industry practice.

I performed Compliance Gap Analysis according to the following steps:

1. Define Objectives:
   - Clean Water Act permit and RCRA stated requirements were listed.
   - Secondary requirements arising from the above were listed.
   - The objective was to assess available information to determine if Shell used best industry practices to minimize or mitigate risk of pollution from reasonably foreseeable weather-related impacts at the terminal.

2. Data Collection and Review:
   - Reviewed documents obtained from Defendants, which included company-wide and facility-specific information, including:
     o Terminal engineering plans, permits, reports, and data;
     o Shell policies, procedures, tools, reports, and engineering protocols;
     o documents related to engineering and operations;
     o documents related to other Shell owned or operated facilities;
     o deposition transcripts;

9

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- o and other expert reports submitted in this matter.
- Reviewed relevant laws, regulations, and standards, including:
  - o The CT DEEP General Permit for Industrial Stormwater;
  - o Connecticut Coastal Management Act;
  - o federal, state, and local environmental regulations;
  - o risk management;
  - o coastal management;
  - o climate resilience;
  - o engineering decision support;
  - o and engineering design criteria.

3. Analysis:
- Described best industry practices for evaluating and addressing weather-related risks to critical infrastructure facilities such as the Terminal
- Compared the Terminal's design and operation against best industry practices to identify and evaluate gaps

4. Gap Identification:
- Documented gaps and failure modes identified during the analysis
- Considered the risks created by these gaps in terms of the Terminal's compliance with the Permit and risk to surrounding communities and environments

5. Mitigation Plan:
- Identified strategies to address each identified gap, including corrective actions and preventative measures
  - o Performed screening level confirmation for feasibility of measures
  - o Prepared brief description of mitigation measures

10

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

| Performance Category | Stated Regulatory Requirement | Current Practice / Site Condition / Foreseeable Event | Gap Status |
|---|---|---|---|
| CWA | A. Identify and eliminate non-stormwater discharges | *Foreseeable flooding from wave overtopping<br>*Foreseeable flooding from storm surge<br>*Current stream flowing through facility | ✓ |
| CWA | B. Minimize known imminent risk of oil and chemical spills adversely impacting coastal areas | *Storm surge and wave overtopping exceed containment capacity<br>*Coastal storm damage effects foreseeably impede spill cleanup | ✓ |
| CWA | C. Comply with law in certification of SWPPP | *Failed to disclose or consider known reasonable foreseeable risk of pollutant discharge due to past and future climate change<br>*Improperly certified SWPP without addressing spill prevention and control procedures sufficient to address climate change | ✓ |
| CWA | D. Identify potential sources of pollutants | *Did not consider current and foreseeable non-stormwater on site | ✓ |
| CWA | E. Implement measures to manage runoff | *Failed to consider flooding from foreseeable wave, surge, and stream sources described above | ✓ |
| CWA | F. Minimize the potential for spills and leaks | *Failed to consider flooding from foreseeable wave, surge, and stream sources described above | ✓ |
| CWA | G. Submit to CT DEEP required updates t to correct inaccurate, misleading, or omitted information | *Failed to consider flooding from foreseeable wave, surge, and stream sources described above<br>*Failed to disclose potential pollutant discharges due to factors described above | ✓ |
| CWA | H. Amend or update the SWPPP based on site changes, required actions, or identifed pollutant sources | *Failed to consider flooding from foreseeable wave, surge, and stream sources described above<br>*Failed to disclose potential pollutant discharges due to factors described above | ✓ |
| CWA | I. Identify any impaired waters to which Terminal discharges | *Failed to identify New Haven Harbor is impaired<br>*Failed to document details of implementing monitoring permit | ✓ |
| CWA | J. Monitor discharges to impaired waters | *Failed to monitor for oil and grease, PCBs, nutrients, and dissolved oxygen | ✓ |
| CWA | K. Implement "Control Measures"…"in light of best industry practice" | *Failed to apply best industry practice in connection with Control Measures<br>*Secondary requirements arising from this permit requirement are listed below as BIP | ✓ |

11

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

| Performance Category | Stated Regulatory Requirement or BIP Secondary Requirement | Current Practice / Site Condition / Foreseeable Event | Gap Status |
|---|---|---|---|
| RCRA | L. Mitigate risk of imminent and substantial endangerment to human health or the environment | *Failed to implement hardening measures to mitigate risk of pollutant discharge due to storm surge and severe weather<br>*Failed to disclose or address known hazards from fire and explosion affecting ASTs | ✓ |
| BIP | M. Apply BIP to Risk Management Program | *Failed to apply standards such as consistency of risk levels and risk register | ✓ |
| BIP | N. Apply BIP to Consider and Protect Against Reasonably Foreseeable Risks | *Failed to address flooding risk from foreseeable wave, surge, and stream sources described above | ✓ |
| BIP | O. Apply BIP in Considering Current Conditions and Documented Trends in Severe Weather, Precipitation, Storm Surge, and Sea Level Rise | *Failed to address flooding risk from foreseeable wave, surge, and stream sources described above | ✓ |
| BIP | P. Apply BIP to Implement Lessons Learned from Past Storms Regarding Coastal Facility Risk from Severe Weather, Storm Surge, Precipitation, and SLR | *Failed to maintained Risk Register consistently<br>*Failed to conduct Lessons Learned or similar continuous improvement effort after Sewaren incident | ✓ |
| BIP | Q. Apply BIP to Consider Long Term Risks, Not Only During the Permit Period | *Failed to consider service life, not permit period, in risk evaluation<br>*Apply Critical Infrastructure standards, not conventional standard | ✓ |
| BIP | R. Apply BIP Engineering and Operations at Terminal | *Implement hardening and coastal resilience measures and practices<br>*Address foreseeable storm damage effects in contingency operations for preparation and emergency response | ✓ |
| BIP | S. Apply BIP to Stormwater Management System at Terminal | *Identified contaminants are able to infiltrate into permeable basins<br>*Address current and foreseeable future precipitation and flooding | ✓ |
| BIP | T. Apply BIP to Secondary Containment System at Terminal | *Capacity   *Permeability   *Erodibility   *Storm damage Breach      *Insufficient tranfer pipe      *Tank spacing | ✓ |

12

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Failure Modes

Within the petrochemical sector, high-value refineries, tank farms, pipelines, and other infrastructure elements have experienced incidents causing fatalities, injuries, fires, explosions, and catastrophic pollutant releases harmful to human health and the environment. Documentation of the failure modes, incident frequencies, and impact scales are inconsistently made available for public consumption. However, peer reviewed publications exist, and one that is recent, relevant, comprehensive, and already known within Shell is a global petrochemical industry 2018 technical report (Necci, et al., 2018) which summarized its key findings as follows:

> "From the analysis of past events, the report concludes that Natech (defined as: natural-hazard-triggered technological) events caused by storms are frequent and that their relative occurrence is increasing compared to the overall occurrence of technological incidents from other causes in the analysed databases. The largest losses were generally triggered by heavy rain and flooding, while the most frequent trigger was lightning. The study also highlighted the role of a loss of power supply in triggering an incident or hampering the mitigation of its consequences."[5]

The study presents lessons learned from the forensic analysis of past events and makes recommendations for future risk reduction for all storm effects. Issues such as accidentally overfilling tanks have become better managed by installing sensor equipment. The most severe failure modes have been found to be related to heavy rains and flooding associated with coastal storms. The study emphasized the important lesson that storm predictions based on past events are not sufficient to be well prepared for future events, in particular in the face of climate change. Additionally, the report concluded that:

> "The number of storm-triggered incidents recorded over the last years could have been lower if natural hazards were not underestimated during both facility design and operation. The lessons learned and recommendations identified in the frame of this study should help to prevent such events in the future and to better mitigate their consequences."[6]

The Terminal lies within a known flood hazard zone between an industrial urban harbor and a residential community, with biodiverse habitats further inland and seaward. Exposure of the Terminal site to storm damage impacts was analyzed in the Nairn Expert Report on the Terminal's Flood Risk ("Nairn Report"). The report's key findings detail the Terminal's exposure to hazards including flooding due to storm surge, flooding due to wave overtopping, and flooding due to containment berm erosion and resulting breaching. Contributing factors, including worsening trends in sea level rise and precipitation patterns, were also considered. Heavy rains and flooding from coastal storms could foreseeably impact critical components at the Terminal, such as power systems, containment structures, pumps, and emergency shut-off valves, increasing the risk of pollutant release. Consistent with Necci, et al., the documented worst-case credible scenarios for pollutant release include failure modes triggered by storm surge, flooding, wave impact, and debris impact on vulnerable infrastructure. The Necci report has identified reported failure types, mechanisms, consequences and notable examples, as identified in the table below, which are relevant to the

---

[5] Necci, Amos, Krausmann, Elisabeth, and Girgin, Serkan. 2018. "Emergency Planning and Response for Natech Accidents."
[6] Necci, "Emergency Planning and Response", 55.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Terminal.

| Failure Type | Mechanism | Consequence | Notable Example |
|---|---|---|---|
| **Catastrophic Tank Buoyancy Failure and Floatation** | Rising floodwaters exceed tank anchoring strength, causing tanks to float or topple | Full or partial rupture leads to an uncontrolled release of stored petroleum into floodwaters, dispersing contaminants over a wide area | Hurricane Katrina (2005) – Flooded tanks floated off foundations, spilling oil over vast areas |
| **Tank and Pipeline Rupture from Wave and Debris Impact** | High storm surge and wave action propel heavy debris (e.g., vehicles, trees, shipping containers) into storage tanks, pipelines, or transfer stations | Structural compromise results in oil spills and hazardous vapor releases; fire/explosion risks escalate if volatile compounds are released near ignition sources | Superstorm Sandy (2012) – Extensive petroleum contamination in coastal refineries due to debris impact |
| **Structural Collapse from High-Velocity Flooding** | Sustained hydrodynamic forces from storm surge or tsunami-like wave action erode tank foundations, leading to collapse or partial failure. | Crude oil, refined fuels, and toxic byproducts mix with floodwaters, contaminating nearby properties, waterways, and municipal infrastructure | Galveston Hurricane (1900) – Coastal industrial infrastructure wiped out by storm surge |
| **Overflow and Secondary Containment Breach** | Storm surge overtops containment berms, or extreme rainfall exceeds secondary containment capacity, leading to uncontrolled petroleum | Direct discharge into urban floodwaters, resulting in widespread contamination of land, residences, and waterways | Hurricane Harvey (2017) – Widespread refinery and chemical plant containment breaches led to extensive flooding of hazardous materials |
| **Storm-Induced Fire and Explosion** | Electrical failures, lightning strikes, or equipment malfunctions ignite vapor clouds formed by hydrocarbon releases | Fire escalates with floodwaters carrying ignited fuels into residential and commercial zones, further exacerbating damage | Texas City Explosion (1947) – Though not flood-related, it demonstrated the catastrophic potential of vapor cloud ignition in a harbor setting |
| **Subsurface Infrastructure Breach** | Flood-induced soil liquefaction, scouring, or erosion destabilizes underground pipelines, leading to rupture | Hidden contamination spreads through groundwater, reaching drinking water sources or natural ecosystems over time | Hurricane Ivan (2004) – Undersea pipeline ruptures from sediment displacement |
| **Emergency System Failures** | Power loss disables emergency shutoff valves, backup containment systems, or stormwater treatment infrastructure | Loss of operational control exacerbates environmental impact and delays emergency response | Hurricane Katrina (2005) – Pump station failures led to prolonged oil releases |

The Nairn Report includes analysis under existing conditions, as well as anticipated future conditions, along with calculated cumulative probabilities of storm damage affecting the Terminal over multiple time periods. Even without considering future trends in storm intensity and frequency or sea level rise, analysis reveals an unacceptable risk of inundation at the Terminal, which subjects the Terminal to serious risk of catastrophic pollutant releases.

14

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

### III.    Opinions

**Opinion 1 – Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change.**

Shell is required to employ Best Industry Practice (BIP) under its Permit which states:

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility.  The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.[7]

Best industry practice is continuously advancing and, for more than 35 years, has been to incorporate the physical impacts of climate change in evaluating risks to critical infrastructure like the Terminal.  It is based on addressing foreseeable risks, evaluating those risks, and engineering solutions to mitigate those risks. Ignoring known and foreseeable risks has never been, and should never be, considered best industry practice.

Best industry practice is frequently described in publicly available references by relevant professional societies, industry associations, government policies, and published agency manuals, as well as internal documentation produced by Shell. The American Society of Civil Engineers (ASCE) is a leading non-governmental body in the U.S. which develops and disseminates evolving information, guidance, policy, and positions related to professional engineering practice. In this capacity, ASCE supports both "[g]overnment policies that encourage anticipation of and preparation for impacts of climate change on the built environment," "[r]evisions to engineering design standards, codes, regulations and associated laws that strengthen the sustainability and resiliency of infrastructure at high risk of being affected by climate change," and "[i]dentifying critical infrastructure that is most threatened by changing climate in a given region and informing decision makers and the public."[8] ASCE approved its first policy statement on climate change in 1990.

ASCE currently concludes:

> Civil engineers are responsible for the planning, design, construction, operations, and maintenance of infrastructure systems. Most infrastructure systems typically have long service lives (50 to 100 years) and are expected to remain functional, durable, and safe during that time. These systems are exposed to and often are vulnerable to the effects of extreme climate and weather events. Engineering practices and standards associated with these systems must be revised and enhanced to address climate change and resiliency to ensure they continue to

---

[7] Connecticut Department of Energy and Environmental Protection, General Permit for the Discharge of Stormwater Associated with Industrial Activity, October 1, 2021, 18.

[8] "Policy statement 360 – Climate Change," ASCE | American Society of Civil Engineers, https://www.asce.org/advocacy/policy-statements/ps360---climate-change.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

provide low risks of failures and to reduce vulnerability to failure in functionality, durability, and safety over their service lives.[9]

Since 1987, industry publications and government reports have highlighted the growing risks to critical infrastructure, including accelerated sea level rise. These risks must be taken into account in coastal engineering, design, and maintenance projects across the entire service life of such designs. Shell's internal documents and actions reflect this reality as well, demonstrating that, since at least 1986, it was aware of reasonably foreseeable risks and the need to evaluate those risks to Shell assets for their own protection and for neighboring communities and their environment.

In 1986, Shell completed a study of global warming caused by man-made carbon dioxide and began preparation of a report titled the "Greenhouse Effect" for what was called the Shell Environmental Conservation Commission.[10] Completed in 1988, the report states that global warming "could create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather. These changes could be larger than any that have occurred over the last 12,000 years. Such relatively fast and dramatic changes would impact the human environment, future living standards and food supplies, and could have major social, economic and political consequences."[11] Shell found, "There is reasonable scientific agreement that increased levels of greenhouse gases would cause a global warming."[12]

The Greenhouse Effects Report states that there is uncertainty about the precise impacts, but still explains that, "[d]irect operational consequences can be expected from a rising sea level, impacting offshore installation, **coastal facilities and operations** (e.g. platforms, harbors, refineries, depots) with an uncertain magnitude."[13] The report even notes a rise in sea level of less than 1 meter implicates the "[l]ocation of Shell installations."[14] Along with the rest of industry, Shell was clearly aware of foreseeable risks to its facilities due to climate change, including specifically coastal facilities like the Terminal.

In 1987, the National Research Council (NRC) published a report entitled "Responding to Changes in Sea Level: Engineering Implications."[15] The goal of the report was to "establish a basis for coastal planners, engineers, and government agencies to carry out their responsibilities in the presence of an anticipated increase in the rate of sea level rise over the next several decades."[16] The report discussed the need to plan for "accelerated sea level rise," stating that it would be "appropriate to allow for an acceleration of sea level rise in the initial design" and recommending that "sea level change during a structure's design service life should be considered."[17] The NRC report was widely discussed in the industry and readily available to Shell.

---

[9] Policy statement 360.

[10] SOPUS_NHVN02463861: "The Greenhouse Effect" Report, published by Shell International Petroleum Health, Safety, and Environment Division.

[11] *Id.* at 1.

[12] *Id.*

[13] *Id.* at 27.

[14] *Id.*

[15] National Research Council. 1987. Responding to Changes in Sea Level: Engineering Implications. Washington, DC: The National Academies Press. https://doi.org/10.17226/1006.

[16] Responding to Changes in Sea Level, 1987, v – vi.

[17] *Id.* at 4.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

In 1990, the NRC published another report discussing sea level change.[18] While the purpose of the report was to discuss the process of sea level change and to forecast the global rise in sea level during the next 100 years, the report again noted that sea level change "can have significant implications for coastal engineering practices."[19] The USACE also issued guidance regarding the need to implement measures to address the risks of severe weather, storm surge, and sea level rise.

In 2000, the USACE incorporated the 1987 NRC recommendations into its guidance for coastal projects, stating: "Potential relative sea level change should be considered in every coastal . . . feasibility study that the Corps undertakes."[20] The guidance required designers to consider the "impact a higher relative sea level rise rate would have on the design based on the historical rate," and noted that "it may be appropriate to consider plans that . . . incorporate features to facilitate future [sea level] changes, or plans designed for future conditions."[21]

Between 2004 and 2005, Hurricanes Katrina, Rita, and Ivan devastated the fossil fuel industry, demonstrating the tremendous impacts of climate change. Following these storms, USACE released the IPET Force report in multiple early drafts and eight final volumes detailing forensic analysis findings of the flood infrastructure system components, the forces created by Katrina, the failure mechanisms, their effects, risk and reliability levels prior to Katrina that proved inadequate.[22]

In 2007, the USACE also released Hurricane and Storm Damage Risk Reduction System Design Guidelines INTERIM.[23] These were working draft design guidelines meant to "*provide a comprehensive collection of best practices for those engaged in this project*."[24] The original draft Guidelines and those that followed marked the inflection point when best industry practice embraced accounting for future conditions, in particular climate-driven risks.

That same year, the Intergovernmental Panel on Climate Change ("IPCC") completed its Fourth Annual Report (AR4)report, "Climate Change 2007, the Physical Science Basis."[25] The report highlighted rising sea levels due to global warming and provided numerical estimates of sea level rise.[26] It noted that "physical impacts from climate changes are occurring now and future impacts are unavoidable even if we do succeed in reducing emissions."[27] The IPCC observed, "Increasingly reliable regional climate change projections are now available for many regions of the world due to

---

[18] National Research Council. 1990. *Sea-Level Change*. Washington, DC: The National Academies Press. https://doi.org/10.17226/1345.

[19] *Id*. at 5.

[20] U.S. Army Corps of Engineers. "Engineer Regulation 1105-2-100." 2000, E-142.

[21] *Id*.

[22] "IPET and HPDC Investigations." US Army Corps of Engineers | Institute for Water Resources Website. https://www.iwr.usace.army.mil/About/History/IPET-and-HPDC-Investigations/. U.S. Army Corps of Engineers, "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance Evaluation Task Force." New Orleans, Louisiana: Interagency Performance Evaluation Task Force, US Army Corp of Engineers, 2009.; *Performance Evaluation: Draft Final Report,* 2006.

[23] US Army Corps of Engineers, "Hurricane and Storm Damage Risk Reduction System Design Guidelines INTERIM". New Orleans, Louisiana. 2012.

[24] *Id*. at xi (emphasis added).

[25] Intergovernmental Panel on Climate Change, "Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change." Cambridge, United Kingdom: Cambridge University Press, 2007, 1.

[26] *Id*. at 5.

[27] *Id*. at 1.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

advances in modeling and understanding of the physical process of the climate system."[28] At this point, industry was well aware of the risks and should have been taking action to forestall harms. Shell even cited to this report for its later work on climate change.

In 2010, Dell and Pasteris published a paper, "Adaptation in the Oil and Gas Industry to Projected Impacts of Climate Change," that was presented at the Society of Petroleum Engineers conference in Rio de Janeiro, Brazil in April of 2010.[29] The paper noted,

> In the 2007 IPCC Fourth Assessment Report, it was reported that some physical impacts from climate changes are occurring now and future impacts are unavoidable even if we do succeed in reducing emissions. Adaptation to climate change is now widely recognized as an equally and complementary response to greenhouse gas (GHG) mitigation in addressing climate change (OECD 2008). The global community recognizes that the most effective climate change strategy requires both mitigation efforts to reduce emissions to minimize the magnitude of climate change impacts and adaptation to minimize the effects from current and future impacts that are not avoided through emissions reductions."[30]

The paper presented a fossil fuel industry specific methodology for risk assessment, and it was later cited positively in Shell's internal climate risk assessment materials.[31] Shell scientist Paul Verlaan cited the paper as a credible source for adoption of a risk management framework.[32]

Weather-driven spills and releases associated with climate-driven, severe precipitation and storms have been regularly demonstrated at facilities like the Terminal on an increasingly regular basis. While other internal documents at Shell may exist but were not made available to CLF in this litigation, the documents that Shell did provide, and which I reviewed, show that the company began developing specific internal guidelines and assessment tools regarding climate change risks. In 2010, and possibly earlier, Shell engaged a consultant, Acclimatise, which provided protocols and standards for risk management of climate change risk at Shell facilities.[33] A 2020 internal Shell report titled "Water Risks – Climate Change – Tools: A Review" is very telling. Though drafted in 2020, the "Water Risks" report includes a section titled "Internal work, project / asset assessments" regarding climate risks to facilities.[34]  It notes, "[v]arious studies, reports have been undertaken internally relate to climate change impacts on projects / assets" and lists many of them, including "~2011 work by Acclimatise on climate change and risk management."[35]  The report lists some "take-aways" from the Acclimatise work:

---

[28] *Id.* at 2.
[29] J.J. Dell, et al., "Adaptation in the Oil and Gas Industry to Projected Impacts of Climate Change", 2010.
[30] *Id.* (Emphases in original)
[31] *Id.* at 1.
[32] *See* SOPUS_NHVN02409042 at 42: "Climate Change Impact and Adaptation," published by Shell Global Solutions (June 2020) (listing it as reference).
[33] SOPUS_NHVN02407297 at 21: Water Risks – Climate Change – Tools: A review, published by Shell Global Solutions.
[34] *Id.*
[35] *Id.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- develop Shell's understanding of the 'adaptation challenge' in order to inform a potential Group position and strategy, which would act to avoid, minimize or manage the risks of physical climate change to Shell, and address increasing questions from stakeholders, including investor groups, on climate risk management.

- delivered high-level analysis of physical climate change risks across Shell's portfolio,

- held an ENVID/HAZID workshop in August 2010 "to identify areas or operations that may be affected by climate change" and references an "Acclimatise Risk Assessment" report that I understand the Defendants in this case would not provide.  The Water Risk Report lists additional files that I understand Defendants would not provide in this litigation which would be highly likely to contain additional pertinent information for my report.[36]

The "Water Risks" report goes on to reference a "number of climate change adaptation workshops for various parts of the world" involving former Shell employees, including Alison Brown, a "technical lead" at Shell from 2013–2015.[37]  Risks of flooding for some assets were also identified.[38] The report indicates that Shell had this information on its computer network, but I understand that they did not provide this information to CLF in this litigation.[39]

During this same time period, in 2011, the USACE reiterated that "the direct and indirect physical effects of projected future sea-level change" should be incorporated into "all phases" of "managing, planning, engineering, designing, constructing, operating and maintaining" civil works programs.[40] The guidance circular, "Sea-level Change Considerations for Civil Works Programs," noted that despite its age, the information and guidance in the 1987 NRC study regarding how projects may be affected by sea level change was still useful, and planners and engineers should continue to consider the study throughout the life-cycle of projects.[41]  The circular states, "analysts shall consider what effect changing relative sea-level rates could have on design alternatives, economic and environmental evaluation, and risk."[42] The circular includes a step-by-step flow chart designers can use to account for changes in mean sea level and to select project designs that "best accommodate the range of sea-level change scenarios throughout the project life-cycle."[43]

In 2012, when Shell owned Motiva through a joint venture, Hurricane Sandy struck U.S. east coast and caused extensive damage. Motiva's Sewaren, New Jersey terminal (Sewaren Terminal) spilled

---

[36] *Id.*

[37] *Id.* at 22.

[38] *Id.*

[39] *See* Deposition of Paul Verlaan (Shell Global Solutions), March 20, 2025, 85:3–91:1.

[40] US Army Corps of Engineers, "Sea-level Change Considerations for Civil Works Programs: Regulation No. 1165-2-212." Washington, DC: US Army Corps of Engineers, 2011, 1.

[41] *Id.* at B-10.

[42] *Id.*

[43] *Id.* at C-1 to C-4.

300,000 gallons of diesel fuel into the Arthur Kill waterway when the terminal became inundated with water and tanks failed during Hurricane Sandy.[44]

In 2012, Shell publicly acknowledged climate change risks and claimed in its Carbon Disclosure Project Submission that it was taking steps to address those risks.[45] It stated, "Rising sea levels could impact our coastal facilities (e.g. refineries ports, terminals etc.) as events such as floods, related to storm surges, could become more frequent"[46] and noted that "[b]asing decisions on historical climate information is no longer robust."[47]

Despite Shell's early knowledge of the risks from sea level rise and other climate change factors to its facilities and the need to both study and prepare for those impacts, Shell did not consistently act on these threats. After Hurricanes Katrina, Rita and Ivan devastated fossil fuel facilities and the IPCC completed its AR4 report, Shell did little while best industry practice required more. Indeed, the same year Shell's Carbon Disclosure Project Submission was released, the Sewaren terminal spilled 300,000 gallons of fuel into the Arthur Kill waterway during Hurricane Sandy.

One year later, in 2013, Shell hosted and participated in a meeting of the International Petroleum Industry Environmental Conservation Association (IPIEC). The meeting acknowledged climate change risks and the need to respond and apply tools to assess the risks.[48] The same year, Shell began working with the United Kingdom Met Office Hadley Center to run a pilot project study into managing vulnerability of climate change at its facilities. The Met Office completed their report in 2014. The report both defines and recognizes risks, as well as identifies defines readily available methods and practices for assessing and addressing risks.[49] In 2014, the IPCC issued the Fifth Assessment Report (AR5), further detailing the physical risks of climate change and affirming the widely available knowledge of climate change driven risk.[50]

In 2015, Shell began developing and publishing internal engineering standards to account for climate change risks called Design Engineering Practices ("DEPs").[51] DEPs are meant to "set the standard for good design and engineering practice to be applied by Shell companies[']" facilities to "help achieve maximum technical and economic benefit from standardization,"[52] though they are not so rigid to prevent operating units within Shell to adapt the DEPs "to their own environment and requirements."

The draft 2015 DEP, Specification and Informative for "Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaptation to Climate Change," (2015 Adaptation DEP) was meant to "cover[] the risk assessment process and provide[] standard risk

---

[44] 30(b)(6) Deposition of Shell Oil Co. (Michael Sullivan), February 6, 2025 ("30(b)(6) Sullivan Dep."), 143:4–144:16.

[45] PSCT018952: 2012 Shell Carbon Disclosure Project Submission.

[46] Id. at Section 5.1c.

[47] Id. at Section 5.1d.

[48] PSCT074593: "Addressing adaptation in the oil and gas industry," published by the International Petroleum Industry Environmental Conservation Association.

[49] SOPUS_NHVN02407015: 2014 MET Office UK Climate Change Risk Assessment – Pilot Project.

[50] Intergovernmental Panel on Climate Change, "Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change," Geneva, Switzerland, 2014, 151.

[51] SOPUS_NHVN02448985: DEP 37.00.10.14-Gen., Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaptation to Climate Change - Draft.

[52] Id.

20

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

assessments for various asset types" even though it was not "exhaustive and some projects or regions may have additional risks which need to be considered."[53] Shell selected twelve hazards for the "generic risk assessment" of climate risks applicable to all regions based on Shell's "internal assessment" with the IPCC AR5 report.[54] Based on the IPCC AR5 report, Shell concluded that the general risk assessment for climate change risks should include sea level rise, risks associated with flooding from precipitation extremes including tropical cyclone activity.[55] The Informative contains a section on "Projected Major Changes in Relation to Phenomena" for North America, which discusses how "increased precipitation in extratropical cyclones will lead to large increases in wintertime precipitation of the northern third of the continent; [and] extreme precipitation increases in tropical cyclones making landfall along the . . . eastern coast of the USA and Canada."[56]

The 2015 Adaptation DEP indicates that adaptation measures may be required for existing facilities, noting that the cost to adapt may be higher after the facility begins operating if it was originally located in a vulnerable area where relocation would not have been possible.[57] Examples of when design adaptation is "required" include an "highly vulnerable" situations such as an "increase in rainfall intensity leading to an over capacity of plant drainage systems and flooding" and an "increase in wave and water levels" at coastal facilities.[58] While Shell notes it is more cost effective to site a facility away from a highly vulnerable areas, design adaptation may still be "required" for facilities already in operation.[59]

The 2015 Adaptation DEP Informative includes detailed information for making climate change assessments and states, "Shell is developing a [sic] non-stationery extreme value assessment method which should be robust to this problem and can be used once approved."[60] Information about emissions scenarios is also included in the Informative. It describes the 2000 Special Report on Emissions Scenarios (SRES) report by the IPCC.[61] Shell explains, "Generally, many climate adaptation studies use projections using . . . the business-as-usual' emissions scenario. This is the scenario used in the majority of the Pilot Project studies (excluding sea level rise)."[62] This appears to refer to "pilot projects" commissioned by Shell such as the May 2014 Climate Risk Assessment Pilot Project Met Office Climate Consultancy described in my report above and listed in the "Other Documents" section of the Adaptation Informative. Shell's 2015 Adaptation DEP Informative also lists then-new scenarios developed by the IPCC called Representative Concentration Pathways (RCPs) that represent a range of future climate forcing scenarios.[63]

The 2015 Adaptation DEP Information includes "[g]uidance for global sea level rise projections."[64] The guidance discusses the Fifth Assessment Report (AR5) published by the IPCC in 2013 and concludes that "a global average rise of 69 cm is suggested by the end of the century for a business

---

[53] *Id.* at 5.
[54] *Id.* at 5.
[55] *Id.* at 5.
[56] *Id.* at 5.
[57] *Id.* at 8.
[58] *Id.* at 8.
[59] *Id.* at 8.
[60] *Id.* at 10.
[61] *Id.* at 10.
[62] *Id.* at 10.
[63] *Id.* at 10–11.
[64] *Id.* at 11.

as usual emissions scenario, with a 1 in 20 chance of exceeding 84 cm."[65] "***This estimate can be used for Shell projects . . . [although] more detailed analysis can also be undertaken on a project specific basis, if required***."[66]

While Adaptation DEP Informative explains that it "provides guidance on the processes for including climate change . . . in the metocean design criteria for *all types of offshore and onshore installations*," it also describes several case studies provide real world reasons for addressing climate change.[67] As Shell noted, "***Failure of structures*** have occurred in instances where incomplete metocean assessments have been conducted which include ***insufficient understanding of changes in means, extreme or variability in design criteria, which have caused loss of structural integrity***."[68]  The case studies include hurricanes Katrina and Rita where onshore impacts after Katrina included "four onshore refineries in Louisiana and Mississippi were out of action for weeks or months. Environmental concerns were also a problem as nearly 6.7 million gallons of fuel spilled from refineries or tank farms."[69] Shell stated in italics, "*We cannot be certain global warming intensified Katrina per se, it clearly has created circumstances under which powerful storms are more likely to occur than they were in the past*."[70] While perhaps not as dramatic as Hurricanes Katrina and Rita, the Informative references a liquified natural gas (LNG) facility that "experienced flooding due to intense rainfall event which cause a problem with the drainage system, leading to some pollution."[71]

In 2016, Shell scientist Alison Brown who, as discussed above, was the "technical lead" for climate adaptation workshops from 2013 to 2015,[72] completed a two-part Shell guideline titled "Reducing Impact of Weather and Climate Hazards on Operations Shell's Assets" that covered "Weather Risk Assessment and Mitigation" and "Main Weather-Related Hazards and Considerations by Region."[73] The guide was meant to "provide[] information, guidance, tools and avenues of support to help metocean and operations personnel plan for, predict and manage these risks to [as low as reasonably possible] ALARP . . . for general operation[s]." [74]

Guideline 1 states, "Detailed analysis of the Shell and industry weather-related incidents concluded that weather-related risk assessments sometimes miss important factors or are not undertaken and that the magnitude of the weather risk is not sufficiently understood."[75] "To help mitigate these risks, a standardised weather risk assessment method [was] created for use by regional Metocean groups in collaboration with operations personnel."[76] The guides explained that a "rigorous approach to weather hazards assessments is required" for reasons including:

---

[65] *Id.* at 11.

[66] *Id.* at 11. (emphasis added).

[67] *Id.* at 15. (emphasis added)

[68] *Id.* at 15. (emphasis added)

[69] *Id.* at 15. (emphasis added)

[70] *Id.* at 15. (emphasis in original)

[71] *Id.* at 15.

[72] SOPUS_NHVN02407297, at 22.

[73] SOPUS_NHVN02409148: Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 1; SOPUS_NHVN02409214: Reducing the Impact of Weather and Climate Hazards on Operations – Guideline 2.

[74] SOPUS_NHVN02409148, at III.

[75] *Id.*

[76] *Id.*

- The weather-related hazards are **not always identified as the cause** of a past incident. Incident investigations often link to other causes more within our control.

- Past weather-related **incidents are often not known by the person making the assessment**.

- Industry weather-related **incident statistics are often unknown**.

- Weather-related risks are grouped together in an incident database so the specific **mechanism causing the incident may not be clear**.[77]

Shell internal documents from 2017 continue to reflect Shell's knowledge of best industry practice. In February 2017, Shell modified its Design Engineering Practice Specification entitled "Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal and Onshore" (DEP 37.00.10.10-Gen.) to include consideration of climate change.[78] As is that case with all Shell DEPs the "Preface" to this DEP makes clear that: "The objective is to set the standard for **good design and engineering practice** to be applied by Shell companies in oil and gas production, oil refining, gas handling, gasification, chemical processing, or any other such facility, and thereby to help achieve maximum technical and economic benefit from standardization."[79]

The "Scope" of the DEP is stated, in pertinent part addressing climate change, as follows:

> Part V of this DEP covers the requirements to include the impact of climate change metocean and hydrological design and operating specific requirements. This DEP includes design and operating requirements previously addressed by DEP 37.00.10.14-Gen. for onshore structures and the requirements to include the impact of climate change on design and operating criteria for both onshore and offshore structures.[80]

> The DEP explicitly apples to "**onshore structures of all types** used in the petroleum and natural gas industries."[81] It states, This DEP is intended for use in facilities related to offshore oil and gas production. This DEP may also be applied in other similar facilities. When DEPs are applied, a Management of Change (MOC) process shall be implemented; this is of particular importance when **existing facilities** are to be modified.[82]

It is clear that the DEP applies to coastal facilities like the Terminal.

---

[77] *Id.* at 9 (emphasis added).
[78] SOPUS_NHVN02448857: DEP 37.00.10.10 – Gen. – Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal, and Onshore (Amendments/Supplements to ISO 19901-1:2015) (emphasis added).
[79] *Id.* at 2 (emphasis added).
[80] *Id.* at 5.
[81] *Id.* (emphasis added).
[82] *Id.* (emphasis added).

Concurrently in 2017, Shell's Metocean Scientist Alison Brown published internally the "Metocean Design and Operating Considerations - Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation,"[83] which states in its Executive Summary:

> This Guideline specifies the approach and gives recommendations for inclusion of climate change risk in Metocean design and operational criteria. It applies to offshore, **coastal** and onshore facilities and can be used to support **quantification of climate change impact on these facilities**. It also provides support where there is a need to include adaptation measures for climate change risk during the project design phase. This Guideline should be used in conjunction with the requirements in (and is referenced by) DEP 37.00.10.10-Gen, Part V.[84]

The guideline includes a specific sea level rise projection (69 cm) that can be used at Shell facilities worldwide.[85]

In 2018, the International Association of Oil and Gas Producers, along with other stakeholders held a workshop in the United Kingdom, "Our Future Climate, Understanding the spread of physical risk for the oil and gas industry."[86]  Representatives from across the oil and gas industry attended the conference, including several individuals from Shell.[87] There were numerous relevant and detailed presentations, and a stated purpose of sharing "best practices."[88]  The program for the workshop noted that "changes in climate have the potential to create significant disruption and uncertainty in the oil and gas sector" including "environmental impacts from the overflow of drainage systems from increased participation" and stated that "understanding both the physical risks and vulnerabilities of the oil and gas sector will help IOGP Members develop and implement adaptation strategies to manage the physical impacts of climate change."[89]

In 2019, Alison Brown co-authored a publicly available paper as part of the Proceedings of the ASME 2019 38th International Conference on Ocean, Offshore and Arctic Engineering.[90]  Her co-authors include another Shell scientist, Jon Upton, two individuals from Acclimatise, and one person from the STFC Centre for Environmental Data Analysis.  Brown and her co-authors state, "This paper focuses on a simple approach developed to ensure that climate change is included in engineering design, by considering climate change risk and the uncertainty inherent in future projections of climate change into design requirements."[91]

In 2020, Shell Metocean scientist Paul Verlaan issued a report, "Climate Change Impact and Adaptation Report" which identified and retroactively indicated understanding of the main hazards driven by climate change as sea level rise, coastal flooding, exacerbation of tropical cyclones, and

---

[83]  SOPUS_NHVN02407227: Metocean Design and Operating Considerations – Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation.
[84] *Id.*
[85] *Id.* at 31.
[86] PSCT047246: "Our Future Climate: Understanding the spread of physical risk for the oil and gas industry"
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] PSCT108939: "Including the Impact of Climate Change in Offshore and Onshore Metocean Design Criteria to Ensure Asset Robustness," published by Alison Brown.
[91] *Id.* at 1.

coastal storms.[92]  The report also acknowledges that Shell's facilities managers and engineers had a low level of technical knowledge and understanding of these risks dating back in time.[93]

In 2020, Shell completed its "Water Risks" review of climate change-related tools regarding storms and sea levels.[94]  The report first issued in August 2019, but was revised and approved by management in March 2020 to "integrate new information gained from Munich RE on NATHAN and feedback from Shell metocean scientist, Paul Verlaan.[95] Munich RE is a German insurance company that provides insurance and re-insurance for industry.[96] NATHAN is a tool for assessing climate risks.[97]

Shell notes that, "Changing weather / climate patterns result in water related impacts for the environment, humans, infrastructure, and operational activities. Compared to the oil/gas industry, the finance and insurance industry have already invested quite a bit into addressing water related impacts due to changing weather / climate patterns, and to develop their own tools."[98] Despite acknowledging the need to assess climate vulnerability at its facilities since at least 2010 when Shell engaged Acclimatise, Shell did not invest resources in actualizing their knowledge of the risk. Perhaps because Shell did not see an immediate financial need to address the risk, whereas the insurance industry did, it began to consider more thoroughly various tools for evaluating flood risks at its facilities, including a review of Acclimatise's work.  "The aim of this project was to complete an assessment of tools that have been developed to determine risk from related impacts from climate change, namely flooding, droughts, and water quality."[99]  Shell's methodology began with an "[e]xtensive literature review of internal, external reports and peer-reviewed publications."[100] It also involved reaching out to "internal [Shell] stakeholders (outside Water Risk Support Team) to talk about previous / ongoing work related to this topic within the departments of COG Eng[ineering] and Proj[ect] Excellence, Treasury Operations and Business Treasury Risk Management" and "Group Carbon Strategy."[101]  Shell also reached out to external organizations, including Munich Re, to discuss their climate risk tools, reviewed and tested tools, and identified providers of climate change risk assessments.[102]

Shell's "Water Risks" report linked climate-related risks to stormwater pollution.  It notes that Shell experienced the impacts of climate-enhanced intense rainfall events at a Los Angeles, California facility where "due to an unauthorized non-stormwater discharge from the retention pond to Domingue Channel. The trigger for this event was a heavy rainfall event."[103]

Based on my professional training and experience, including guidelines since as far back as 2007 and as verified by Shell's internal documents, best industry practice requires Shell to consider past events, like the Sewaren spill, unequivocal upward trends in weather-related risks, and reasonably

---

[92] SOPUS_NHVN02407397: Climate change impact and adaptation.
[93] *Id.*
[94] SOPUS_NHVN02407297.
[95] *Id.* at 3.
[96] *See* "Munich RE Home Page," Munich RE, https://www.munichre.com/en.html.
[97] SOPUS_NHVN02407297.
[98] *Supra* note 49 at 2.
[99] *Id.* at 4.
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] SOPUS_NHVN02407297, at 10.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

foreseeable increases in the severity and frequency of storms and sea level rise for the Terminal. Shell must factor these parameters into the design and operation of the Shell New Haven Terminal to minimize the future risk of pollutant discharges triggered by these reasonably foreseeable risks.

Failure to consider both current and reasonably foreseeable weather-related risks leads to cascading impacts in terms of the Terminal's compliance with the permit, including requirements for the stormwater pollution prevention plan ("SWPPP"). Without considering these risks, it is my opinion that Shell cannot sufficiently describe potential sources of pollutants that may affect stormwater quality, discuss the appropriateness and priorities of control measures and how they address potential sources of pollutants, address the need to divert uncontaminated run-on, or minimize the potential for leaks and spill, evaluate conditions that could result in pollutant discharges and develop control measures to mitigate those risks, update the SWPPP as conditions change and to disclose known risks to regulators, or address aspects of the Connecticut Coastal Management Act which requires Shell to:  "consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards."[104] I understand that these are all requirements in its current and previous permit.

Critical Infrastructure (CI) Policy and Best Practice Applicable to Petroleum Storage and Distribution

Best industry practice also requires a more conservative approach at the New Haven Terminal compared to other structures because it is considered "critical infrastructure." To properly understand the public policies and resulting best industry practice that apply to the Shell New Haven Terminal and other similar types of facilities, it is important to be aware of its critical infrastructure ("CI") status and associated implications. At its essence, critical infrastructure refers to a facility or wider network or system that is important not only to the private business or public entity that operates it but is indispensable to the security and prosperity of all others who rely on it. Hence, special attention is warranted to ensure reliable functionality through heightened coordination and application of more rigorous standards. Generally, the service life of critical infrastructure facilities is defined as far longer than other categories of construction, with 100 years commonly referenced. However, some facilities include components that have shorter effective service lives before being replaced or updated.

For critical infrastructure systems to be reliable when needed most (such as to furnish home heating oil during a winter blizzard, or tanks of gas fueling families evacuating before a hurricane) an array of private companies with infrastructure components of different classes, ages, and conditions must somehow deliver a well-orchestrated end result, even under dire circumstances. Unlike some nations where major infrastructure systems are government run, the U.S. relies on a complex mosaic of private and public infrastructure elements that are interdependent, and which have often evolved over the course of centuries without any central planning or direct oversight. Often in hindsight, and under wartime threat profiles or when faced with natural catastrophes, our nation has realized that the systems our society depends on are not necessarily as reliable as presumed, often with

---

[104] Permit §§ 5(b), 5(b)(7) (Shell must "investigate the need for stormwater management or treatment practices," "consider the potential of various sources at the facility to contribute pollutants to stormwater discharges," and "implement and maintain" those measures), (9); 5(c)(2)(D). Conn. Gen. Stat. § 22a–92 (cited in Permit § 3(b)).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

debilitating consequences that could have been better mitigated. In 1996, the first dedicated federal policy initiative addressing critical infrastructure summarized the issues clearly:

> Certain national infrastructures are so vital that their incapacity or destruction would have a debilitating impact on the defense or economic security of the United States. These critical infrastructures include telecommunications, electrical power systems, *gas and oil storage and transportation,* banking and finance, transportation, water supply systems, emergency services (including medical, police, fire, and rescue), and continuity of government. Threats to these critical infrastructures fall into two categories: physical threats to tangible property ("physical threats"), and threats of electronic, radio-frequency, or computer-based attacks on the information or communications components that control critical infrastructures ("cyber threats"). *Because many of these critical infrastructures are owned and operated by the private sector, it is essential that the government and private sector work together to develop a strategy for protecting them and assuring their continued operation.*[105]

### Best Industry Practice Required Shell to Consider Long-Term Risks for the Service Life of the New Haven Oil Terminal, not Only Risks During the Permit Period

Best industry practice, particularly for critical infrastructure, and as reflected in Shell's internal documents, requires that climate risks are evaluated for the facility's expected service life. In 2014, USACE published a technical letter discussing adaptation to changing sea levels and providing additional guidance for addressing impacts of projected sea level change on coastal projects.[106] The letter noted, "the longer the life of engineered systems . . . the more important it becomes to evaluate the sustainability and resiliency . . . in the face of climate change effects."[107] It included a tiered, risk-based framework for assessing the importance of sea level change to various projects and identifying measures to reduce their vulnerability.[108]

EPA Region 1 recommends procedures for adaptation plans for wastewater treatment and sewer systems in light of climate change impacts and experiences during severe weather events.[109] These recommendations, which I find applicable to the New Haven Terminal, make clear that a 5-year window for evaluating and addressing risks of major storm and flood events is not appropriate. EPA specifically states that one should assume a 20-year life expectancy for mechanical and electrical systems, a fifty-year life for "tankage and similar structures," and that new infrastructure should consider even longer life expectancies, "especially in coastal areas subject to sea level rise and coastal erosion."[110] A five-year horizon, even for existing facilities, is clearly not appropriate.

---

[105] "Executive Order 13010 of July 15, 1996, Improving Critical Infrastructure Cybersecurity," *Federal Register*: 61 FR 37347 (1996) (emphasis added).

[106] US Army Corps of Engineers, "Engineer Technical Letter (ETL) 1100-2-1." Washington, DC, 2014.

[107] *Id.* at 5-1.

[108] *Id.*

[109] "EPA Region 1 Recommended Procedures and Resources for the Developmnet of Adaptation Plans for Wastewater Treatment Systems and/or Sewer Systems (2025)", Environmental Protection Agency, Feb. 18, 2025. https://www.epa.gov/system/files/documents/2025-02/adaptation-plan-recommended-procedures-case-studies-02182025.pdf.

[110] Id. at pg. 8.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Shell's own policies for considering metocean parameters for evaluating climate risks was developed a decade ago and required *at least* a 20-year window for evaluating future climate change impacts. Shell acknowledged this first in the 2015 Adaptation DEP Specification, which states that impacts should be evaluated to ensure the facility can withstand "potential changes in both typical and extreme conditions *over the life of the asset*."[111]

In 2017, Shell reaffirmed this principal in "Metocean Design and Operating Considerations – Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation" ("2017 Climate Change Guideline") and "Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal and Onshore" ("2017 Metocean DEP Specification").[112] Both state the minimum period to consider climate change risks "**should not be less than 20 years**" for existing facilities, and for existing facilities should be for a "**minimum period of 40 years**,"[113] and noting that an estimate of facility life "can change during an asset life time due to reassessment and life extension."[114]

Shell recognized that "changes to the earth's climate, including both natural and those that may result from anthropogenic causes, already pose a risk to Shell's operations and assets."[115] Shell identified an approach that required both "mitigation," which is reduction in greenhouse gas emissions, and adaptation.[116] Shell knew that, "Due to climate change, historical data is no longer a reliable predictor of future impacts," mandating the need to evaluate both current and future risks at their facilities.[117] This fundamental concept—acknowledging the past no longer predicts the future—is at the heart of why best industry practice requires consideration of climate change impacts. And the impacts should be evaluated to ensure it can withstand "potential changes in both typical and extreme conditions *over the life of the asset*."[118]

A five-year timeframe for evaluating future climate impacts at the terminal is unrelated to any engineering standard and is not appropriate.

Based on my in-depth review of the documents, the 2017 Metocean DEP Specification and the 2017 Climate Change Guideline together can be readily applied to the New Haven Terminal and have been available in final adopted form to Shell at all times during this lawsuit as Shell's own definition of "good engineering practice." While it could be improved, it is a serviceable representation of "best industry practice" for assessing severe weather and climate change hazards for the life of the Terminal.

Designing, operating, and maintaining durable structures and complex facilities, such as the Terminal, demands more than taking a short-sighted view of foreseeable conditions based on past data; it requires considering risks over the service-life of the Terminal while incorporating forward-looking data. To do otherwise results in designing a Terminal and committing to operating plans

---

[111] SOPUS_NHVN02449001 at 9.

[112] SOPUS_NHVN02407227; **SOPUS_NHVN02448857**.

[113] SOPUS_NHVN02407227 at 16; SOPUS_NHVN02448857 at 20.

[114] SOPUS_NHVN02407227 at 16.

[115] *Id.* at 8.

[116] *Id.*

[117] *Id.* at 9.

[118] *Id.*

that are stale, leading to multiple foreseeable problems that allow non-stormwater to enter the site, and pollutants to be released.

**Opinion 2 – More Severe Weather, Precipitation, Storm Surge, and Sea Level Rise Have Created Reasonably Foreseeable and Significant Risks to the New Haven Oil Terminal that Shell has not Addressed.**

Based on my review of the reports of Matthew Barlow ("Barlow Report"), Richard Horner ("Horner Report", James O'Donnell ("O'Donnell Report"), and Dr. Nairn, my professional experience and knowledge, and strong scientific consensus, it is my opinion that more severe weather, precipitation, storm surge, and sea level rise have created reasonably foreseeable increasing weather-related risks to the New Haven Terminal. These risks are substantial, and scientific consensus is high. As discussed above, Shell's internal documents also recognize how these risk factors affect their assets and that preventable weather-related incidents have occurred despite existing risk management policies and procedures.

When assessing risk, several factors matter, including probability of occurrence, magnitude of effect, consequences of impact, level of exposure, and ability to adapt or prepare quickly enough to mitigate the risks. In the case of the Terminal, there are several factors contributing to storm-related risks: severe weather, precipitation, storm surge and sea level rise. At the Terminal, sea level rise will not single-handedly cause sudden overwhelming damage at the Terminal or occur abruptly. Viewed in isolation, *i.e.* without considering how it compounds the risk of flooding and storm surge, consideration of sea level rise will inappropriately lead to a false sense of security and rank lower in terms of risk priority. Shell's 2016 reports, described above, recognize this problem.

I know from professional experience that access to detailed scientific information and engineering guidance is not always sufficient to ensure that it is used appropriately. When an organization's risk management program is flawed, as reported in Shell's 2016 internal documents, or when personnel responsible for key decisions are insufficiently informed, trained, or otherwise equipped to apply risk management principles to facilities in their purview, problems arise. Effective risk management also depends on prioritizing those factors that rise to a level of concern, and educating people about mechanisms commonly associated with catastrophic failure but are rare in most people's experience. Even people with knowledge of relevant incidents often lack adequate detailed understanding of how to learn from them to apply to improved risk management in the future. Whatever the reason may be, when asked if he would do anything different than what the operators had done at Sewaren during Sandy, Michael Sullivan's answer, which I understand to be on behalf of Shell, was no, he would have made the same decisions.[119] This indicates that the probability of a similar spill occurring at the Terminal today is as high as it was at Sewaren 13 years ago and does not represent best industry practice.

Mr. Sullivan's answer runs against widely understood upward-trending weather-related risks in New England that are influenced by climate change including severe weather of all types, precipitation, and storm damage. Relative Sea Level is rising due to polar ice melting, its effects on ocean currents, expanding oceans, and factors unrelated to climate change as examined in detail by Dr. O'Donnell. And within the petrochemical industry, it is well known that the largest losses are attributable to

---

[119] 30(b)(6) Sullivan Dep., 207:5–12.

29

events triggered by heavy rains and flooding.[120] As an example, the Necci article documented that the relative occurrence of storm-related incidents is increasing compared to incidents related to technological incidents unrelated to climate trends.[121]

Flooding poses serious threats to many facilities, but not all flooding has equal impact, and various flooding types merit differing risk priority. So-called "still-water flooding" inundates and causes water damage and likely sediment or other residues or contaminants in and around a structure. Structures inundated by moving water, such as from rivers overflowing their banks, are subjected to physical forces capable of causing severe damage, which is further compounded by materials from large pieces of debris or microorganisms and various substances that cause lingering harms. For these reasons, still-water flooding merits lower risk rating than floods involving moving water.

Storm surge is typically the most damaging aspect of severe weather, especially when combined with wave forces and/or additional debris that greatly increase physical forces. Storm surge without waves or debris is not common, because conditions that generate storm surge (which are not discussed here) are capable of generating waves. Together, the additive effects of waves above surges are capable of breaking away and carrying objects small and large, which commonly batter all structures they contact until waves abate or floodwaters recede and deposit debris. The debris in turn clogs storm drains, blocks roads, and poses other complications in the aftermath. For purposes of this report, it is convenient at times to refer to the impactful effects of storms collectively as "storm damage" or "coastal storm damage."

Having been directly involved with leading professionals from around the world on projects that have assessed and addressed the increasing trends in severe weather, precipitation, storm surge, and sea level rise, I am well versed in foreseeable risks they create. For perspective, the impact on a structure, or "load" of hurricane winds ranges from 50–100psf, the load of a storm surge might likely be 600+/-psf, and the load of surge with additional waves can range upwards to 3000psf. If additional large debris objects carried by waves atop surge strike a structure, the load can be far higher, by ten times or more, due to the forces of moving water being concentrated into the impact area struck by debris items. Several resources focus on the magnitude of extreme storm damage forces, particularly those related to debris.[122]

I noted above in the background section that I was personally involved in the response to Hurricanes Katrina and Rita. I, along with others whom I supervised and worked alongside, was brought in to evaluate foreseeable flood-related risks to critical infrastructure for the greater New Orleans region and west to Grand Isle. We were charged with not simply rebuilding the same flood protection system that was proven entirely inadequate, but with ensuring that people and critical infrastructure were protected against the future risks, which prudent engineers had shown in prior

---

[120] Necci, et al. 2018, RRT-6 documentation.

[121] Necci, et al. 2018.

[122] *See e.g.,* FEMA, Coastal Construction Manual: Principles and Practices of Planning, Siting, Designing, Constructing, and Maintaining Residential Buildings in Coastal Areas (4th ed.) (August 2011) ("FEMA P-55"), at 55, https://www.fema.gov/sites/default/files/2020-08/fema55_voli_combined.pdf (detailed analysis of flood and wind forces); ASCE 7-22 Standard (Minimum Design Loads for Buildings and Other Structures) (Engineering specifications); USACE Shore Protection Manual (dynamic wave impact forces on coastal structures); FEMA P-55 (chapter on Debris Impact Loads); ASCE 7-22, § 6.6: Flood Loads and Debris Impact Loads; USACE Coastal Engineering Manual (CEM) — Debris impact in flood and coastal environments; FEMA Technical Bulletin 5: Free-of-Obstruction Requirements — Cautions about debris loading under storm surge conditions.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

decades were becoming worse. Because the risks were becoming worse, we resolved to evaluate future risks by using the best science and risk-based decision support available.

In my opinion, consistent with the scientific consensus, more severe storms and sea level rise are occurring and are the result of climate change. Regardless of the cause, however, more severe weather, storm surges, precipitation, and sea level rise are well-documented realities that Shell must consider and address to manage the risks to the New Haven Terminal.

Shell did not follow its internal procedures for assessing risk at the Terminal. Shell determined that its coastal facilities have a risk rating of 4B according to their RAM Risk Matrix, meaning there is a high potential asset under Step 4 of the Metocean Adaptation Guidelines.[123] Accordingly, facilities like the Terminal are risk rated and pursuant to the 2017 Metocean DEP and Adaptation Guidelines document, Shell should have gone through each step of the risk assessment process. I understand that Michael Sullivan provided testimony on behalf of the Defendants in this case, including about whether Defendants or anyone else ever considered climate change impacts when developing a SWPPP. He testified that they had not, **because he and others believed there was no credible threat**.[124] But these accounts by Mr. Sullivan, including during an off-book evaluation by people who have no apparent knowledge or expertise in any relevant field, did not follow the process for evaluating risk that Shell spelled out in its own DEPs and the Adaptation Guidelines.[125]

As is detailed above, by the time CLF filed its lawsuit, best industry practice within the oil and gas industry was known to require consideration of foreseeable climate change impacts over the life of a facility. Further, measurable and substantial changes in known trends in changing rainfall intensity are well explained by climate change models based on observations of historic events. For example, New England, including Connecticut, has already endured numerous events which are officially recognized as being part of a pattern of extreme weather conditions affected by climate change processes. As is discussed in the Barlow Report, published findings based on updated statistical methodologies conclude that recent decades of rainfall patterns show rainfall intensity is substantially higher than in prior decades, in essence documenting that rainfall volumes experienced today in the Northeast US are already almost twice what they were understood to be in the past.[126]

The O'Donnell Report details the contributing factors and future conditions for sea level in New Haven Harbor. As discussed above, climate change effects on sea levels usually occur at a slow pace, in contrast to the sudden rise caused by flooding or storm surge. In addition to Connecticut's documented and increasing long term trend of sea level rise, the sea surface can also present impending risks of a sudden, though short-lived, effect which periodically occurs due to ephemeral shifts in ocean currents which affect how water flows, causing it to "pile up" along coastlines, creating higher water surface elevations. The Atlantic Meridional Overturning Circulation (AMOC) is a system of currents in the Atlantic Ocean that move warm surface waters northward and cooler, deeper waters southward, providing crucial functions within Earth's climate. Studies have revealed that the AMOC can slow down drastically for periods as brief as a few months which leads to unpredictable short local or regional spikes in sea level. According to work by the University of

---

[123] S.R. 16.13305.
[124] Deposition of Michael Sullivan (Shell Oil Co.), March 23, 2023 ("Sullivan Dep."), 109:10–110:11; 118:4–121:8.
[125] S.R. 16 13305.
[126] Expert Report of Dr. Matthew Barlow ("Barlow Rep."), May 1, 2025, at 8.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Arizona, this occurred in 2009–10.[127] The study found that a strongly negative North Atlantic Oscillation favored strong northeast winds across the far northwest Atlantic, which not only contributed to a 30% slowdown of the AMOC but caused seawater to be pushed directly toward the Northeast U.S. coast, effectively piling it up similarly to storm surge formation. According to the study, measured coastal sea levels from New York City northward jumped by a startling 5 inches in 2009–10; by 2011, sea levels were observed at their previous levels.[128]

Patterns of how the AMOC flows are understood to become more variable due to several climate change factors; it currently influences water surface elevations up to three feet or more, and potentially more in the future under specific circumstances under study. One long-term concern about the AMOC has been the recognition that substantial arctic melting could cause its breakdown due to shifts in colder meltwater contributions to warmer oceans in centuries to come. Such a breakdown is forecast to cause severe sea level rise, with exact effects varying locally. Studies by Yale University in 2017 suggest that an all-out collapse of the AMOC at some point in time within 300 years is more plausible than earlier thought.[129]

**Opinion 3 – Past Storms Put Shell on Notice of the Increased Risks to Coastal Facilities from Severe Weather, Storm Surges, Precipitation, and Sea Level Rise.**

Hurricanes Katrina, Rita, Harvey, and Sandy caused substantial impacts to coastal and inland industrial facilities, with ensuing spread of contaminants. Many oil terminals, including Shell's, experienced damage to the facilities themselves which then interrupted critical fuel supplies for the region (such as fuel for cars, trucks, and back-up generators).[130] This concerning and edifying wake-up call has been considered a game-changing event by all professionals actively engaged in infrastructure and/or waterfront projects, including those in military, government, private, and academic roles. Major publicly known incidents such as these put Shell on notice of required actions per best industry practice as follows:

      a.   Inclusion of incidents in risk register for use in internal risk management process

      b.   Identification of coastal facility vulnerability and exposure to coastal storm damage

      c.   Mitigation of identified risks through corrective action

These storms revealed how unprepared and under-designed the facilities were. Whether suffering direct hits, or observing impacts on others, the industry was aware of a clear need to adapt to worsening hazards. Policies were developed and actions taken to recognize and mitigate increased risks that threatened public and private assets including many critical infrastructure facilities.

The USACE developed and implemented entirely updated risk-based planning and engineering methods which were used for the design of the new, comprehensively integrated HSRRS

---

[127] *See* Paul B. Goddard, et al., "An Extreme Event of Sea-Level Rise Along the Northeast Coast of North America in 2009–2010," 6 *Nature Communications* 6346 (2015).

[128] *Id.*

[129] *See* Wei Liu, et al., "Overlooked Possibility of a Collapsed Atlantic Meridional Overturning Circulation in Warming Climate," 3 Science Advances (2017), available at https://www.science.org/doi/full/10.1126/sciadv.1601666?cookieSet=1.

[130] *See e.g.* Sullivan Dep., 39:24–40:2; 143:4–145:17.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

infrastructure for New Orleans, as described herein. After Hurricane Sandy, USACE recognized that essentially all previous projects had relied upon information, assumptions, and methods that did not consider current and future storm damage conditions.

The USACE conducted the North Atlantic Coast Comprehensive Study (NACCS) to address coastal storm and flood risks in the wake of Hurricane Sandy.[131] This study highlighted significant flaws in previous infrastructure design methodologies, particularly in accounting for climate change impacts. The NACCS provided a Coastal Storm Risk Management Framework and emphasized the need for upgrades to key infrastructure systems. It served as a benchmark for evaluating the adequacy of risk management practices and engineering standards for critical infrastructure. The findings underscored the urgency of addressing these risks to protect vulnerable communities and assets against future climate hazards, including at the Terminal.

Shell also took steps to address climate-enhanced risks in its internal engineering practices, including the development of its 2015 Adaptation DEP that calls out the need to address climate change, "[t]o ensure facilities meet design requirements both typical and extreme conditions associated with a steady state climate and potential changes in both typical and extreme conditions over the life of the asset shall be taken into account."[132] It also notes that data from the past is inadequate for reflecting current and future impacts:

> Due to climate change, historical data is no longer a reliable predictor of future impacts, and where required, metocean criteria shall be supplemented by the requirements in this DEP to take into account climate change hazards severity.[133]

Shell also undertook projects to understand and mitigate risk in its existing facilities, which had been affected by Hurricane Harvey, in light of the overwhelmingly strong evidence that rainfall had been underestimated in the past and that efforts were underway to establish public "design storm" standards reflecting future potential rainfall intensity:

> . . . AECOM proposes to extract NOAA Atlas 14 data for the Deer Park facility. NOAA Atlas 14 is a new statistical analysis of rainfall across Texas which will be used by local, state, and Federal entities to define new design storms. Preliminary data shows the 100-year 24-hour storm may increase from its current value of between 12-13 inches to upwards of 17 inches across portions of Houston. NOAA Atlas 14 has been released for preliminary review, and is anticipated to be finalized and made official within the next three months. This information will be presented in a letter memorandum summarizing and comparing the current definition of a design storm with the proposed NOAA Atlas 14 definition. This information will

---

[131] US Ary Corps of Engineers, North Atlantic Coast Comprehensive Study: Resilient Adaptation to Increasing Risk, Main Report (January 2015) ("NACCS").

[132] *See* SOPUS_ NHVN02449001 at 9: DEP Specification. METOCEAN DESIGN AND OPERATING CONSIDERATIONS FOR OFFSHORE AND ONSHORE STRUCTURES – ADAPTION TO CLIMATE CHANGE. DEP 37.00.10.14-Gen. (Feb. 2015) (not final approved).

[133] *Id.*

help Shell to better understand their risk profile, based on a more accurate estimate of potential rainfall.[134]

Significant engineering efforts were undertaken to investigate failure mechanisms at Port Arthur Refinery and at Shell's Deer Park facility and to better mitigate future risks proportionate with foreseeable severe storms.[135]

"Motiva Port Arthur Refinery (PAR) Storm Water Improvement Program (SWIP)" details some of these efforts for Port Arthur.[136]  The primary objective of the PAR SWIP was to "evaluate, rationalize, prioritize, debottleneck, and rectify the primary infrastructure problems identified in the extreme rainfall that occurred during Tropical Storm 'Harvey' in late August 2017."[137] The executive overview to the SWIP stated that PAR flooded because the site was designed "***for a 25-year 24-hour storm with a water rate of 10.***" It states that post-Harvey, PAR will be designed "***for a rate of rise in rainfall of 4 inches in an hour.***"[138] Strategies identified to improve the existing stormwater management system included: increasing the discharge capacity and operational integrity of the current Storm Water lift stations and impoundment reservoirs; constructing new storm water lift stations where appropriate; increasing the storage capacity of existing impoundment reservoirs; investigating the feasibility of additional impoundment reservoirs; and constructing topographic barriers to protect at-risk areas.[139]

At its Deer Park Facility, Shell's internal "Engagement Notice" addressed the included 2018 proposal from AECOM following flooding at Shell's Deer Park facility during Hurricane Harvey.[140] The Notice reads that, "Shell would like to evaluate the existing drainage system to assess improvements which could make the Deer Park facility more resilient to future floods."[141] The included AECOM proposal:

- gave an estimated return frequency for Hurricane Harvey (between 100-year and 1,000+-year storm depending on duration analyzed;

- provided an example scope of work for evaluating and documenting drainage infrastructure across the facility (two staff up to five days for a total of 80 hours);

- outlined the different drainage areas AECOM would produce for the facility (one where the system performs as designed and one covering the "extreme event" drainage area); and

- recognized that the "definition of a statistical design event is changing, based on recent extreme events, which could impact Shell's recommended design criteria for any proposed improvements."

---

[134] *See* SOPUS_NHVN01533207 at 4: AECOM, Deer Park Watershed Mitigation RFQ - Phase I (Mar. 26, 2018).
[135] MTV_000005880: "PAR Storm Water Improvement Project Executive Overview"; SOPUS_NHVN01533207. *See also* SOPUS_NHVN02367286: Chelsea Terminal SWPPP which addresses climate change.
[136] MTV_000005880.
[137] *Id.* at 1.
[138] *Id.*
[139] *Id.*
[140] SOPUS_NHVN01533207.
[141] *Id.* at 1.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

The proposal goes on to specify that **preliminary rainfall data from NOAA Atlas 14 "shows the 100-year 24-hour storm may increase from its current value of between 12–13 inches to upwards of 17 inches across portions of Houston**."[142]

AECOM intended to present Shell with a letter memo comparing the then-current definition of the design storm with the proposed NOAA Atlas 14 definition, saying "**This information will help Shell to better understand their risk profile, based on a more accurate estimate of potential rainfall**."[143]

Hurricane Sandy directly impacted similarly situated facilities in the northeast region well known to Shell personnel. Impacted facilities included the terminal in Sewaren, NJ, terminals in New York, and terminals in Bridgeport, CT.[144] Following the Sewaren spill, public agencies, such as the New Jersey Department of Environmental Protection (NJDEP), and news outlets documented the scale of the damage and the extensive environmental response involving some 200 people, including the deployment of more than 18,000 feet of containment boom and recovery of diesel using skimmers and vacuum trucks, and the treatment and death of many oiled birds.[145] However, despite the documented severity, Shell has made no corresponding update to their risk classification systems,[146] continuing to rely on frameworks that underreport and underestimate the likelihood and consequences of such events.

As previously mentioned, the NACCS provides a detailed, tailored, highly publicized decision support framework that also provides information on storm damage risks and resilience measures suitable for critical infrastructure facility owners like Shell to adopt.

Shell, which is responsible for vulnerable assets within the geographic of the NACCS, would have had to willfully ignore knowledge of the study, the issues it addresses, and NACCS-related tools for evaluating climate risks at the Terminal. In my experience, multinational companies like Shell with assets vulnerable to weather-related risks in the U.S. closely follow USACE studies like the NACCS, or at a minimum know of them through media coverage, legal advisors, audit reviews, insurance/reinsurance outreach and formal review, or engineering/consulting outreach. While other framework, including more recent versions of decision support tools and published data may be even better than what NACCS offered when released by USACE in 2015, exist ten years later, it remains the prime candidate for adoption by critical infrastructure and other complex facilities, particularly those already affected by Hurricane Sandy. The NACCS is a ready-made framework for use by industry and others, as reflected in its Executive Summary:

---

[142] *Id.*

[143] *Id.* at 3, 7.

[144] Reuters, "Factbox: NY Harbor oil terminals, refineries crippled by Sandy," Nov. 11, 2012, https://www.reuters.com/article/business/environment/factbox-ny-harbor-oil-terminals-refineries-crippled-by-sandy-idUSBRE8AA0IP/.

[145] NBC New York, "Thousands of Gallons of Diesel Fuel Spill in Arthur Kill," Oct. 31, 2012, https://www.nbcnewyork.com/news/local/arthur-kill-oil-spill-diesel-fuel-motiva-staten-island-woodbridge-nj/1966724/; New Jersey Department of Environmental Protection (NJDEP), "News Release No. 12/144," Nov. 1, 2012, https://www.nj.gov/dep/newsrel/2012/12_0144.htm

[146] Sullivan Dep., 144:12–145:11.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

> The NACCS, through extensive collaboration, streamlines the risk management planning process for the North Atlantic communities and others undertaking coastal storm risk management initiatives. Partners representing the public and local communities, State and Federal agencies, Tribal entities, regional bodies, NGOs, academia, **and industry** can use the information and products presented in the NACCS to pursue a more resilient and sustainable coastline considering site-specific vulnerabilities and future sea level change. The NACCS products will also save time and resources when the Framework is implemented at smaller scales. NACS Executive Summary p. viii, emphasis added.

The importance of the contribution of the NACCS to identify risk, reduce risk, improve resilience, and avoid damages is stated clearly starting on its first page:

> The purpose of the North Atlantic Coast Comprehensive Study (NACCS) is to identify flood risk and plan and implement strategies, in collaboration with others, to reduce that risk now and in the future. Action is needed to reduce the risk from, and make the North Atlantic region more resilient to, the impacts of future storms and sea level change. Hurricane Sandy could have been more devastating. Initial "damages prevented" estimates shortly after the storm suggest that existing coastal storm risk management infrastructure prevented some $1.9 billion in damages (USACE 2012). The NACCS will help the region to prepare now for future storms, climate change (including sea level change), and other increasing risks.[147]

The NACCS provides a now decade-old framework that provides consistency with federal agency science and engineering data and policies, thus alignment with applications related to compliance and other federal or state regulations.

The NACCS geographic area covers four Shell terminals that suffered High or Very High Storm Impact: Shell's New Haven Terminal, Providence, Rhode Island Terminal, Sewaren, New Jersey Terminal, and Long Island Terminal facilities. The relevance of the tools and resources contained in the NACCS was or should have been readily apparent to any Shell personnel or contractors with basic familiarity of the Terminal and its regulatory obligations.

---

[147] NACCS at 1 (emphasis added).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Figure I-2. Areas Impacted by Hurricane Sandy with Highlighted Counties Included in NACCS Study Area (FEMA MOTF 2013) NACCS, p. 2

The NACCS summarizes its key findings in a readily understandable chart, identifies increasing vulnerability in the North Atlantic region, illustrates various measures for storm risk management, describes sea level change interactions with flooding, and concludes by stating the particular vulnerability of critical infrastructure (such as petroleum terminals). The relevance to Shell's New Haven Terminal is readily apparent.

The NACCS evaluated and disseminated information on the vulnerability of critical infrastructure of various types, public and private. The pie chart characterizing the relative value of critical infrastructure categories in Connecticut includes the largest proportion of 71%, which includes energy sector critical infrastructure such as oil terminals. The relevance of the NACCS to critical infrastructure asset owners and operators could not be missed.



NACCS Appendix D-4, State of Connecticut, p. 20

The magnitude of storm damage was already known to Shell directly because of substantial interruptions and damages sustained, and the NACCS included a description of key metrics and statistics related to Hurricane Sandy's impact on Connecticut (as well as other affected states and Washington, DC). The scale of the floodwaters reached a combined 17 to 21 feet above tide levels accounting for storm surge levels and wave heights adding to that level. Measured water levels were higher than previously recorded. In Stamford, CT where the state's only hurricane barrier exists, its closure avoided an estimated $26 million in damages. In addition to destruction of homes and businesses, sand and debris filled buildings, streets, and coastal low-lying areas. Communication networks and sewage plants were cripped, with 911 dispatch networks failing and 15 to 20 million gallons of sewage released in Bridgeport, CT alone. Travel by air, train, and ship ceased or reduced. Fuel supplies ran short when terminals in Bridgeport and New Haven could not be serviced, a majority of gas stations lost power, and long lines at those still open were exacerbated by New York residents in search of scarce fuel options.[148]

The NACCS provides a highly detailed geographically precise description of areas throughout Connecticut, breaking out specific risk areas which are then further characterized by existing shoreline conditions. The reported conditions for New Haven are as follows:

> The area of high exposure identified for this stretch of coastline includes the cities of New Haven and West Haven. This area of high exposure is the first of several densely populated and developed portions of the coastline in Connecticut that would be *subject to very significant damage if a Sandy-like event were to hit*. This area begins at the Morris Cove on the *east side of New Haven Harbor* and terminates at the Prospect Beach area in West Haven. The area extends as far inland as Sackett Point Road along the Quinnipiac River. There are *several thousand residential, commercial, industrial, and municipal structures located in this area of high exposure. New Haven Harbor is*

---

[148] NACCS Appendix D-4 (State of CT), at 6–7.

> *surrounded with many petroleum and bulk cargo-based industries* that rely heavily on the port for moving those products. The area includes two major interstate highways, Routes 95 and 91, that are critical to the region for moving traffic. There are many important rail lines that run through this area as well. There are several wastewater treatment facilities located here that are subject to inundation.[149]

Clearly the many record-breaking severe storms that exceeded prior assumed hazard levels put Shell on notice that the past is no longer an adequate predictor of future events. Based on knowledge of documented storm damage from recent severe events, including impacts and near misses to Shell's own and similar facilities, personnel within the organization and relevant consultants and stakeholders were aware of the issues exposed. In the wake of these catastrophic storms, evidence discussed above shows Shell's internal recognition of best industry practice related to changing conditions in terms of extreme precipitation and coastal hazards, including the relevance of climate change trends. Yet, Shell has failed to utilize best industry practice at the New Haven Terminal for these risks despite Hurricane Sandy and other storms.[150] It is my professional opinion that past storms put Shell on notice of the increased risks to coastal facilities from severe weather, storm surges, precipitation, and sea level rise.

**Opinion 4 – The New Haven Oil Terminal is Not Engineered or Operated Pursuant to Best Industry Practice.**

I have read the O'Donnell Report that systematically details the changes in relative sea level rise, including changes over the past 75 years since the Terminal was built, and those estimated for the future and enshrined into Connecticut coastal management policy.  I have read the Nairn Report which details the ways in which flooding can occur at the Terminal due primarily to waves, tides, and storm surge today and a foreseeable rise in sea levels.  I have evaluated the implications of storm damage on the Terminal's containment berms due to the physical forces of wave action and overflow from storm surge and overtopping waves. My evaluation of the expert reports of Dr. Nairn and Dr. Horner confirm the existence of material deficiencies in existing site conditions that fail to sufficiently address known risks currently, and at future points in time under foreseeable forecasted hazard conditions.

I have also identified additional potential failure mechanisms and consequences of concern, as well as feasible potential mitigation measures. I have also considered known hazards related to waterborne debris carried by surge and waves. In my opinion, Shell has failed to apply best industry practice to adequately address risks to the Terminal both today and throughout its service life.

In summary, areas where Shell has failed to address current and foreseeable weather-related risks due to climate change of greatest concern are as follows:

- The facility has not adapted to known, foreseeable risks, such as increasing storm intensity and storm surge events, which should have triggered necessary engineering improvements.
- Engineering improvements include raising the berm heights (or similar flood protection) and addressing structural integrity deficiencies in existing secondary containment berms as discussed in the Nairn Report.

---

[149] NACCS Appendix D-4 (State of CT), at 30.
[150] *See e.g.* 30(b)(6) Sullivan Dep., 196:20–197:3, 207:5–12, 144:12–145:11.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- The facility's infrastructure is outdated and in deteriorated condition.
- The Terminal's secondary containment area is not able to contain a large spill contemplated by the permit.
- The company fails to implement best practices for storm preparedness and response (e.g., improved stormwater drainage, structural hardening, backup power solutions, improved logistics).

Failure to implement best industry practice to address these issues creates substantial risk that unlawful discharges and releases of pollutants will occur, including a repeat of the Sewaren Terminal spill. Shell has not implemented effective controls to eliminate non-stormwater discharges and there is no evidence that Shell has assessed or adopted best industry practices to mitigate the risks of leaks and spills from weather-related risks as amplified by climate change. Additionally, the Terminal is unprepared for ongoing and amplified risks due to climate change, including sea level rise mandated by the Coastal Management Act as incorporated into the permit.

The SWPPP and ERAP indicate a lack of preparedness leading to present, substantial risks of weather-related spills and releases. This lack of preparedness creates compounding risks as climate change factors worsen over time. Shell has failed to address deficiencies that were obvious to me during my visit to the site, including the lack of berm stability.

The Horner Report demonstrates that the secondary containment volume at the Terminal is insufficient, and that the secondary containment area is not impermeable or sufficiently impervious as required by the permit and regulation. On the secondary containment volume deficiencies, Dr. Horner elaborates on Shell's inappropriate reliance on a drastically undersized transfer pipe to address secondary containment volume deficiencies. Documents and testimony reveal Shell's stunning lack of due diligence in accepting a "solution" to inadequate secondary containment volume without considering flow hydraulics.[151]  It also reveals that another consultant, Triton, had earlier proposed a potentially adequate solution for the secondary containment volume inadequacies, which Shell rejected.

Dr. Horner also shows that the secondary containment areas are not impermeable or sufficiently impervious, and that Shell directed Triton to certify Shell's SWPPP based on previous work by others without verifying the accuracy of the work.[152]  Collectively, these issues indicate that best industry practices were not implemented for the secondary containment system. Shell knew or should have been aware of these critical weaknesses at the Terminal and initiated systematic upgrades. These concerns remained unaddressed, even though Shell clearly acknowledged the problems and had developed a Corrective Action Plan for one significant deficiency.

The Nairn Report demonstrates the Terminal is subject to coastal storm damage effects like those that contributed to the catastrophic tank failure at the Sewaren Terminal during Hurricane Sandy. Dr. Nairn's modeling shows the Terminal's tanks are subject to inundation by overtopping waves and storm surge, causing breaching of secondary containment berms, and blocking access due to lingering inundation which commonly results in major debris deposits. The Nairn Report identifies inadequate secondary containment berm stability, which can cause breaches and expose ASTs to more forceful flood impacts, provide an avenue for pollutant releases, and expand the zone of fire

---

[151] SOPUS_NHVN00190734; Sullivan Dep., 303:20–309:2.
[152] SOPUS_NHVN00190734

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

risks due to escaping flammable liquids. The hazards of flooding and sea level rise have been and will continue to be exacerbated by the effects of climate change, yet the New Haven Terminal does not have adequate measures in place to prevent the release of pollutants due to these conditions.

The Nairn Report assessed the Terminal's susceptibility to flood scenarios under existing conditions and for future conditions, accounting for climate change.[153] Specifically, Dr. Nairn assessed the terminal's vulnerability to flooding under 100-year and 500-year storm surge events with current sea level conditions and with projected sea level conditions in 2050 and 2075.

The Nairn Report has identified and applied appropriate best industry practice for risk-based, forecast-informed, climate-adapted engineering suitable for the Terminal's categorization as Critical Infrastructure. Dr. Nairn noted that Shell applied similar, though more stringent, approaches internally at their Port Fourchon, LA facility. The American Society of Civil Engineers (ASCE) guidelines recommend that fuel storage facilities are designed to prevent flooding up to the 500-year flood elevation.[154] FEMA recommends that "levees that protect critical facilities usually are designed for at least the 0.2-percent-annual-chance flood (500-year) and have freeboard to increase the factor of safety,"[155] which adds to the level of risk reduction. The Association of State Floodplain Managers (ASFPM) states that for critical facilities, the flood protection elevation shall be two feet above the 0.2% [500-yr] flood elevation and that elevation shall be used as the basis for the ingress/egress to the site,[156] incorporating the need to address flood risk for key access functions, not only the facility. To summarize, all three national organizations or agencies recommend that critical facilities, such as this Site, should be protected to withstand at least a 500-year return period flood, and including two feet of freeboard for facilities and access are appropriate for a critical infrastructure facility.[157] Shell scientists Sequeiros and Jaramillo (2020) recommend a 1,000-year level of flood protection (including an allowance for sea level rise) and 50-year service life for upgrading an onshore Shell-operated facility in Port Fourchon, Louisiana, reflecting a more rigorous degree of risk management. The Nairn Report analyzed the 100-year and 500-year storm surge events for both existing conditions and for 1.64 ft of sea level rise starting from 1992. Sea level rise of 1.64 ft represents a Connecticut intermediate estimate for 2050 (considering a 25-year service life) and a federal agency average mid-range estimate for 2075 (considering a 50-year service life). I consider this methodology to be an effective combined approach to addressing climate change and critical infrastructure best industry practice.

The Terminal's existing site features and control measures do not represent best industry practice for today's weather-related risks and are even more deficient when considering the effects of storm damage and other extreme weather effects will worsen over time due to climate change. Shell's failure to apply best industry practice poses an unacceptably high risk of catastrophic pollutant release, including because Shell states that it would not do anything different if faced with storm threat like the one resulting in a catastrophic spill at Sewaren Terminal.[158] The Terminal's critical components—including stormwater management, secondary containment, and overall facility storm damage integrity—are not designed to withstand foreseeable extreme weather events that have already occurred in the region. Based on my knowledge of the site and relevant information, it is my

---

[153] Expert Report of Robert Nairn ("Nairn Rep."), May 1, 2025, at ii.
[154] See ASCE24-14, Flood Resistant Design and Construction.
[155] Nairn Rep., iii.
[156] *Id.*
[157] *Id.*
[158] Sullivan Dep., 207:5–12

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

opinion that the New Haven Terminal is not engineered or operated pursuant to best industry practice.

**Opinion 5 – The New Haven Terminal's Stormwater Management System is Not Sufficient to Mitigate the Risks of Potential Flood Hazards and Severe Storms.**

My knowledge of the terminal and its surroundings combined with my evaluation of the expert reports of Dr. Nairn and Dr. Horner confirm the existence of material deficiencies in existing site conditions that fail to sufficiently address known risks currently, and future risks under forecasted hazard conditions. I have identified additional potential failure mechanisms and consequences of concern, as well as potential mitigation measures that appear initially feasible.

According to Shell's 2017 SWPPP, the Terminal has a rudimentary stormwater management system which is described in detail in the Horner Report. The General Permit prohibits the discharge of all non-stormwater except as provided in the non-stormwater certification.  Connecticut requires that Permittees exclude non-stormwater from these systems, and general mention is made of measures that may be applicable. Non-stormwater can pose higher risk and greater uncertainty through mismatch with treatment system processes and/or introducing multiple sources of water capable of inundating and incapacitating sensitive elements of the stormwater system itself.

As described by Dr. Horner, Shell has provided no due diligence to verify that non-stormwater is not entering the facility.[159] Such diligence commonly includes testing of stormwater samples which can reveal signatures of other sources. Other methods involve studying physical conditions to reveal routes by which non-stormwater is capable of entering, then taking appropriate corrective action. Triton Environmental, Inc. prepared the 2017 SWPPP which on page 6 states, "There are no non-stormwater discharges at the facility."[160] However, in the same document, Appendix G, Limitations, includes language undermining the credibility of that statement:

> The use of this SWP3 does not guarantee protection from fines, regulatory actions, or other such liabilities that may arise from information provided or omitted from this document. The non-stormwater certification is based on site observations, and reasonable inquiries and communications with Shell's personnel. However, Triton cannot be held responsible for identifying facility activities, operations, floor drains, discharges, etc. that were not observed or capable of being observed during the facility review.

> Triton is not aware of monitoring having been completed specifically to demonstrate whether the discharge at the site is comprised solely of stormwater. While routine monitoring may provide some insight into the characteristics of the stormwater discharge, analytical testing of the discharge will not likely provide a positive determination of whether the discharge is comprised solely of stormwater. As such, the non-stormwater certification does not represent that "testing and evaluation of the stormwater discharge from the site" has been completed in accordance with the language in the certification.

---

[159] Expert Report of Richard Horner ("Horner Rep."), May 1, 2025, at 51.
[160] SHELLNH_TRI00408.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Furthermore, as discussed in detail herein, the Nairn Report details the flood hazards that expose the Terminal to overwhelming impacts under current climate conditions and worsening throughout the estimated service life of the facility. Dr. Nairn demonstrates that these hazards will result in non-stormwater entering and inundating the entire facility during foreseeable storm events. Specific damage to stormwater system components resulting from severe storms includes breach of berms, a fundamental element of the site's stormwater system. The consequences of major tank damage would be unmitigated by damaged berms and insufficient secondary containment volumes and would likely permanently damage the loading rack area of the Terminal outside of the AST areas.

To ensure adequate design, operation, and maintenance of facilities, Shell must assess and address known risks including system level or network effects. Without consideration and development of management practices to address resilience at the system level, the Terminal will continue to be at severe risk of flooding resulting in pollutant discharges, including catastrophic discharges. For example, the Emergency Response Action Plan[161] (ERAP) discusses the need to be aware of hurricane watch or warning advisories, upon which all personnel should leave the facility and survey for damages after the storm. No consideration is made of how the hurricane/severe storm is foreseen to impact the site. There is no indication in the documents I have reviewed that indicates Terminal personnel are aware of how flooding is predicted to occur on and around the Terminal.

During the last site inspection, I observed the location of the emergency power generator and its 50-gallon diesel fuel tank, and they are subject to flooding without mitigation by elevation or positioning behind any type of berm. A foreseeable scenario is that the electrical power service is lost, and concurrently backup power is also lost. Such generator failure events are not rare, and a backup generator used for floodwater pumping or other purposes may experience random mechanical failure, have its stored fuel supplies washed away by wave action, be contaminated with water by debris puncturing tanks or supply lines, or otherwise be affected by the very storm conditions that necessitated the equipment in the first place.

**Opinion 6 – The New Haven Oil Terminal's Berms and Containment Areas are Insufficient to Contain the Petroleum in the Event of Oil Spill.**

The Horner Report confirms that the secondary containment areas at the Terminal do not comply with the permit's requirements for secondary containment in terms of volume. While Shell has repeatedly represented in its SWPPP certifications that the containment volume is adequate, that representation is not correct. Further, I observed the surficial condition of the berms and noted overly steep eroding banks displaying settlement and slumping, inadequate erosion control measures, active erosion in routine weather conditions, and absence of any flood damage hardening measures. The system visibly lacks the physical integrity to remain stable over time and maintain its basic function to contain a spill, even during typical weather conditions. The Horner Report assesses that the secondary containment area is neither impermeable, as the Permit requires, nor sufficiently impervious, as required by SPCC regulations:

- spill containment is not in compliance and known violations have existed since at least 2011;
- Shell directed Triton to rely on old data developed by others without determining whether conditions had changed in the intervening years;

---

[161] SOPUS_NHVN00012582 at 3–16

- Triton developed a Corrective Action Plan that was included in a 2017 Draft SWPP but omitted from the final version with no disclosure to DEEP, as required, indicating the need for improvements to control measures, and ultimately not implemented;
- the secondary containment is not impermeable and containment volume is insufficient, creating the potential for pollutant release to the New Haven Harbor;
- the bypass pipe Shell installed to create required secondary containment volume is insufficient as it will not transfer released product in time to avoid overflow into the drainage channel leading to New Haven Harbor.[162]

The Terminal's containment berms, which were installed to contain leaks and spills from the above ground storage tanks, are not designed or maintained to remain stable under reasonably foreseeable storms.[163] For largely the same reasons the secondary containments are insufficient for their stated purpose, they are also insufficient for flood protection, and one cannot presume that the Terminal's containment berms also serve as flood protection.

Many otherwise preventable flooding tragedies have been forensically documented as being caused by property owners or entire communities mistakenly relying on a berm/levee structure that was never adequately designed and/or maintained to control flooding. The distinctions between those structures conforming to National Levee Safety Program requirements and those created for other miscellaneous purposes with varying (and often very little) rigorous planning or analysis, let alone consistent maintenance and routine inspection, are crucial for justifying reliance on these structures for specific flood control functions.[164]

Consistent with my knowledge and experience, the Nairn Report assesses that berm height is not the only factor in ensuring adequate flood protection. Whether a berm is capable of furnishing reliable flood control, a thorough evaluation would be needed related to the initial design, ongoing maintenance, and conformance with documentation protocols. For example, an engineer must certify the following factors when determining (and representing on maps or otherwise) a berm's ability to protect against flooding:

    i) elevation information for the berm/levee crest and toe;

    ii) adequacy of appropriate freeboard (defined as extra vertical clearance—a margin of error, in essence);

    iii) implementation of the berm/levee operations and maintenance plan (and associated reports on compliance with the plan);

    iv) evaluation of structural design requirements to confirm whether berms/levees meet current requirements;

    v) review of inspection reports (by trained and specialized levee inspectors); and

---

[162] Horner Rep. at 14–52.

[163] Nairn Rep. at 69.

[164] *See* Am. Soc'y of Civ. Eng'rs, *So you Live Behind A Levee!,* (2010), available at https://ascelibrary.org/doi/epdf/10.1061/9780784410837 (last accessed Nov. 3, 2022) (short primer explaining distinctions between berms for flood protection and berms for other purposes).

vi) evaluation of overtopping erosion potential and associated destructive factors.[165]

I have not seen any evidence from Shell for planning or engineering towards achieving flood management function. My visual observations confirm lack of maintenance suitable for containment or flood protection functions, and no documentary evidence or site observation indicates structural design or overtopping erosion or other destructive factors have been addressed. No basis exists to support any presumption that the berms are capable of excluding floodwaters without succumbing to failure mechanisms.

Dr. Nairn confirms the berms are susceptible to failure. Shell's berms are not adequate for the purpose for which they were built, secondary containment, let alone adequate for flood protection which must meet more stringent standards.[166] Shell admits knowledge of berm deficiency, awareness of suitable measures to correct it, developed a plan to implement corrective actions, and has still not done so after many years.[167] Based on the Horner and Nairn Reports and my visual observations, I conclude that the berms are inconsistent with suitable design criteria to endure basic inundation or overtopping.  They visibly lack suitable features and well-maintained conditions necessary to be relied upon as flood protection measures, or even to withstand coastal storm forces while providing reliable secondary containment. Furthermore, the secondary containment system is highly susceptible to storm damage of several types, which would result in catastrophic release of spilled oil.[168] If breached or overtopped by waves and/or storm surge, the inadequately stabilized berms are likely to fail to prevent floodwaters from entering containment areas.[169] If impacted by floating debris items, the berms likewise lack evidence of adequate surface hardening or internal cohesion, compaction, or other sources of resistance.

Storm surge plus additional waves often generate rapid breach failures; and large volumes of water flowing through an initially small breach has enough force to carve through berms within minutes or hours. I have observed similar scale flood protections breached, and the sudden rush of water was strong enough to cause concentrated damage far greater than without this "firehose effect" from a breach. In the event large debris items such as unmoored vessels are carried on waves and surges, impacts to an unreinforced earthen berm can cause nearly instantaneous breaching. Whatever the cause of flooding may be, inundation poses a corollary threat to tank integrity due to flotation, toppling, or battering by floating debris. While Motiva and Shell did not issue a report on the exact nature of failure mechanisms causing or contributing to the Sewaren incident, it is apparent that sufficient flood protection could have likely prevented and better contained the spill.[170] In short, deficiencies in the Terminal's berms also have the potential to increase the severity of damage during a storm surge event.

Based on the above, my professional opinion is that the New Haven oil terminal's berms and containment areas are insufficient to contain the petroleum in the event of an oil spill or protect against storm surge flooding.

---

[165] Federal Emergency Management Agency, *Policy Standards for Flood Risk Analysis and Mapping,* Policy #FP 204-078-1, (2019), available at https://www.fema.gov/sites/default/files/2020-02/FEMAPolicyStandardsforFloodRiskAnalysis andMappingNov2019_0.pdf.
[166] Horner Report, Nairn Report.
[167] SHELLNH_TRI_01214; SHELLNH_TRI_00686
[168] *See* Nairn Report.
[169] *Id.*
[170] Sullivan Dep., 184:8–187:14.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**Opinion 7 - The New Haven Oil Terminal is Not Engineered or Operated to Prevent the Discharge of Pollutants.**

Shell has failed to reduce or eliminate discharge of pollutants.  Even without storm damage impacts, the Terminal is at risk of a significant oil release due to insufficient capacity of the southernmost containment basin. Per the Horner Report, 4,087,554 gallons is the volume of the largest tank within the undersized secondary containment system. According to Dr. Horner, loss of primary containment at this tank would overwhelm the secondary containment and result in release of nearly three million gallons. This scenario could arise even without storm damage, although severe weather and flooding conditions exacerbate the risk.

The Nairn Report summarizes that "under the 500-year event water flows freely into and out of the containment areas without any inspection or treatment."[171] Best industry practice for critical infrastructure facilities like the Terminal requires addressing risk from the 500-year flood. Shell has not assessed the risk of a catastrophic event, such as a 500-year flood, and has not acted to mitigate the risks of such an event to the Terminal and the surrounding community.

Shell has failed to account for high consequence, low frequency events such as severe storms, the very hazard that has repeatedly caused catastrophic spill incidents at other oil terminals. The magnitude of consequences is equally important to the frequency of events that may cause them. The Terminal is not engineered to address foreseeable conditions during severe weather, including an event like Hurricane Sandy, which led to the Sewaren Terminal releasing over 300,000 gallons of diesel fuel. The exclusion of meaningful mitigation measures to address the potential storm damage effects is not best industry practice.

In addition, the estimated frequency of such events has been shown to be less reliable than commonly assumed.[172] Under changing climate conditions, frequency and intensity of storms has already been documented to change and are understood to continue to change. Shell is aware of this as discussed herein.[173] One of the clearest examples of underestimated risk at a given facility is Hurricane Harvey. Harvey has been classified as a 500-year storm (in the traditional historic context) that devasted the Houston area, a slow-moving storm that surprised the city and wreaked havoc on Houston homes and industrial facilities. Yet Harvey was not the first such storm to pass through Houston in 500 years. In fact, Harvey was the third such storm in three years to bombard the area, and it was Houston's very reliance on the 1-in-500-year probability that led the city to inadequately prepare, leading to unnecessary and disastrous consequences.[174] As Lind noted, "[e]ither Houston is incredibly unlucky or the risk of severe flooding is a lot more serious than the FEMA modeling has

---

[171]  Nairn Rep. at iv.

[172] *See, e.g.*, SOPUS_NVHVN02407297 at 20: "2020 Water Risks – Climate Change – Tools: A Review"; Barlow Rep., at 30.

[173] *See, e.g.*, Opinion 1.

[174] See Dara Lind, "The "500-year" flood: why Houston was so underprepared for Hurricane Harvey," VOX (Aug. 28, 2017), https://www.vox.com/science-and-health/2017/8/28/16211392/100-500-year-flood-meaning ("Tomball, Texas, Public Works director David Esquivel told a local paper there this year that the Houston area had 'two 500-year storms back to back': over Memorial Day weekend of 2015 and early April 2016. That means that Hurricane Harvey constitutes the third '500-year' flood in three years.").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

predicted — and the odds of a flood as bad as the ones Houston has seen for the past few years are actually much higher than 1 in 500."[175]

To the extent spill potential has been analyzed at the Terminal, it consists of a rudimentary calculation to satisfy a reporting requirement, namely to disclose the administratively assumed spill volume to be considered for secondary containment purposes. The ERAP for the Terminal describes at B-1 Worst Case Discharge (WCD) as "100% of the largest single tank," calculated at B-2 as 220,654 barrels at the Terminal, which I have calculated to be 9,267,468 gallons. This volume reflects the single largest tank at the Terminal, and, in the event of catastrophic loss of containment, this volume is high enough to be concerning. While Shell has represented that secondary containment for spills is adequate, Dr. Horner's analysis indicates otherwise. Based on his calculations, the secondary containment area spill volume is inadequate and does not meet the permit's requirements.

Similarly, because secondary containment systems are not interchangeable in form or function with coastal storm damage risk mitigation measures, it is improper to rely on them to address such risks. No documentary evidence was produced by Shell that indicates any type of analysis has been conducted to evaluate risk related to storm damage at the Terminal to secondary containment berms, nor to tanks and appurtenances. Under storm damage scenarios analyzed in the Nairn Report, mechanisms exist to compromise the berms, both by overtopping them and by breaching them. Recognizing the physical stressors arising from inundation, breach, waves, and associated large debris objects, the potential exists for severe damage to the berms and ASTs similar to the Sewaren spill.

As previously discussed, severe storms have significantly impacted facilities similar to the Terminal. These disruptions often occur based on the failure of multiple mechanisms capable of causing pollutant release, and the failure of response actions to mitigate spills after they occur. Recent storms affecting the North Atlantic region have also included notorious examples of mistaken preparations. For example, the Port Authority of New York and New Jersey has been transparent in sharing lessons learned from its flawed course of action in preparation for Superstorm Sandy. Their reports have disclosed the key personnel interpreted official forecasts concerning Superstorm Sandy as posing a hazard mainly due to wind forces, rather than flooding. The preparatory measures included lowering crane equipment to ground level, out of harm's way of heavy wind action. The actual storm brought record-breaking storm surge and heavy precipitation, so the result was actually the opposite of what was intended: the equipment was moved down *into harm's way* rather than out of it. Throughout the NY/NJ regional waterfronts, many small and large petroleum spills occurred as well, indicating either erroneous selection of preparatory measures or inadequate measures overall. Notably, the largest reported spill into the Arthur Kill waterway took place at a facility in Sewaren, NJ, at the time owned and operated by the Shell Joint Venture, Motiva Enterprises. While no documentation of after-action reporting or formal lessons learned was provided by Shell, it is reasonable to assume that preparations did not account for major flooding hazards. Moreover, the resulting spill indicates catastrophic failure of that terminal's ability to mitigate risk in the face of coastal storm damage.

---

[175] *Id.*; see also Eric S. Blake & David A. Zelinsky, "Nat'l Hurricane Ctr., Tropical Cyclone Report: Hurricane Harvey," at 9 (2018), available at https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf (noting that "a majority of the residential flood loss claims [from Harvey] are from outside the 500-year flood plain").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Based on my review of documentary evidence, expert reports, and professional knowledge, it is my opinion that the New Haven Oil Terminal is not engineered or operated to prevent the discharge of pollutants.

**Opinion 8 – Adequate Decision Support Frameworks Currently Exist to Guide Engineering of Infrastructure Measures to Effectively Manage Flood Risk at the New Haven Oil Terminal.**

Based upon my professional experience with three decades in national and international professional associations representing multiple sectors, I am confident that Shell has access to all the information and decision support frameworks to plan and engineer measures to address risks to the New Haven Terminal from severe weather, storm surge, intense precipitation, and sea level rise.

I am familiar with many examples where failure to adequately assess and address these risks has ended tragically, with loss of life, health, livelihoods, communities, businesses, and serious environmental damage. Representatives from many business and industrial sectors, including many within Shell itself, know the risks of weather-related events on their operations and assets, and the concurrent dangers industrial accidents pose to personnel, nearby communities, and the environment. Shell publicly endorses the UN Sustainable Development Goals,[176] aligned with and supported by the UN's Sendai Framework for Disaster Risk Reduction,[177] which aims to reduce disaster damage to critical infrastructure through resilience by 2030. Shell has had the resources to evaluate and improve flood risk management at the Terminal by applying its own internal DEPs and professional expertise, or retain outside firms, but has chosen not to do so.

Just as the NACCS provided a suite of appropriate tools and information to support the planning phases for development of suitable risk reduction measures for the New Haven Terminal as discussed in Opinion 3, the City of New Haven and USACE provided a suite of closely matched and detailed project engineering studies for comprehensive flood management and coastal resilience measures surrounding at Long Wharf across New Haven Harbor from the Shell Terminal. While the topographic features, access issues, land use types, and overall project intent differ from current Shell Terminal conditions and potential preferences for its future uses, the engineering design documentation, detailed cost estimates, and environmental assessment materials are reasonably similar and applicable to the Terminal to suggest a framework for evaluating risks.

The City of New Haven hired engineering consultant firm GZA to prepare the Long Wharf Flood Protection Final Report, March 2017 for the mile-long frontage directly across the harbor from Gulf New Haven Terminal.[178] GZA applied the data and decision support framework provided by NACCS to complete their feasibility study. New Haven also has conducted planning and design studies for a 3,600 linear foot (lf) living shoreline design to control erosion and improve coastal resilience in the intertidal zone along Long Wharf.

The Final Integrated Feasibility Report and Environmental Assessment was prepared by the USACE (with GZA and other team members) assimilating the prior City of New Haven studies for the

---

[176] "UN Sustainable Development Goals," Shell, https://www.shell.com/sustainability/our-approach/un-sustainable-development-goals.html.

[177] United Nations (2015) Sendai Framework for Disaster Risk Reduction 2015–2030.

[178] "Long Wharf Flood Protection Study and Living Shoreline Design," GZA, https://www.gza.com/projects/long-wharf-flood-protection-study-and-living-shoreline-design.

48

area.[179] The USACE project accounts for "future annual exceedance probability water levels under the intermediate and high sea level change scenarios" by CIRCA and NACCS. The Nairn Report discusses in detail the data, modeling tools, and assumptions used for the uniquely relevant and conveniently local project currently proposed at Long Wharf.

For flood damage risk reduction infrastructure suitable for the mixed-use urban redevelopment project at Long Wharf—which does not store millions of gallons of petrochemicals and cannot be considered critical infrastructure—a proposed design elevation of 15 feet NAVD88 was considered appropriate. The study called out that this elevation aligns well with the 2074 1% water level (1% annual risk of still-water flood exceedance) according to the intermediate sea level change scenario used by USACE. This level also provides an allowance for wave action and/or storm surge effects on flooding capable of temporarily overtopping flood walls (and being dewatered by a proposed major pumping station). Stage-frequency data used for the study was drawn from NACCS which are currently considered reasonable for use in USACE planning studies. It should be noted that for site-specific, purpose-built flood measures, it would always be considered necessary to conduct further studies that integrate geotechnical conditions, hazard profile of activities and materials on site, access logistics, etc.

Using USACE flooding and economic models to calculate expected annual damage at Long Wharf without the project being implemented, the financial impacts were estimated to increase by 101% over the next 50 years. This finding highlights the fact that when accounting for future changes affecting coastal flood hazard risk levels, the future is highly unlikely to resemble the past, and exposure to damage is expected to increase predictably and substantially.

The Long Wharf project proposes 5800 lf of structurally independent floodwall on piles to be placed along the berm supporting I-95. The total cost is estimated at $59 million, for an estimated unit cost of $10,000/lf. The project includes 475 lf of road closure structures for a total cost of $5.2 million, roughly equal to wall costs on a linear foot unit cost basis. The project also includes a pumping station capable of moving water at the rate of 900 cfs (cubic feet per second) to ensure rainfall, overtopping harbor waves, and storm surge flood levels can be rapidly pumped out of the enclosed area. The project also includes other items and costs related to general conditions, real estate/ROW expenses, engineering fees, etc. and the wage levels are likely higher than commercially standard contracting due to the federal requirements to use prevailing wage rates. These categories are not considered further, nor is the countervailing factor of cost escalation since the estimates were published.

These unit costs for similar floodwalls, road closure structures, and pumping station at the Shell facility are relevant for planning level estimate for suitable coastal flood measures capable of delivering an appropriate level of flood risk reduction on site but would necessarily change based on engineering and design choices that are beyond the scope of my report.

**Opinion 9 – Shell Fails to Apply Best Industry Practice in Its Risk Management Program.**

Shell's risk management policies and procedures have not tracked industry standards. For example, the International Organization for Standardization (ISO), the worldwide federation of national

---

[179] CT DEEP & USACE, "Fairfield & New Haven Counties, Connecticut Coastal Storm Risk Management Feasibility Study," Oct. 2020, https://www.nae.usace.army.mil/Portals/74/docs/Topics/FairField/FinalFeasibilityStudy/Final-Main-Report.pdf.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

standards bodies, publishes risk management standards and guidelines including ISO 31000:2018 – Risk Management – Guidelines, which is designed to ensure that risk management is integrated, transparent, and responsive to emerging conditions.[180] I conducted a comparative analysis of ISO 31000 and ISO/IEC 31010 (which emphasizes the incorporation of relevant incident data) standards against Shell's disclosed core risk assessment tools, namely its HSSE & SP Risk Matrix and its Risk Register inserted below, sourced from Shell's internal documents.[181]



Shell's corporate HSSE & SP Risk Assessment Matrix reflects a pattern that fundamentally undermines the integrity of its risk management program as it relates to the Terminal. The pattern directly contradicts internationally accepted risk management standards such as ISO 31000, which emphasize dynamic, transparent, and data-informed processes tailored to real-world operational contexts.

ISO standards provide comprehensive guidance on risk management processes, including the development and maintenance of risk registers or similar listings of incidents, including lessons learned. ISO 31000:2018 – Risk Management Guidelines emphasizes the importance of documenting risk information systematically.[182] Organizations are encouraged to maintain records of risk identification, analysis, and evaluation processes. A risk register serves as a practical tool to compile this information, ensuring that risks are consistently recorded, monitored, and reviewed.

Shell maintains a risk registry to identify events useful in estimating the likelihood by categories on the scale, which is then used to assess overall risk using the RAM. However, Shell has excluded from

---

[180] International Standard for Standardization (2021) ISO 3100:2018 Risk Management. United Nations Industrial Development Organization
[181] SOPUS_NHVN00201608.
[182] International Standard for Standardization (2021) ISO 3100:2018 Risk Management. United Nations Industrial Development Organization

its risk register, and therefore its risk matrix calibration, a major spill event that occurred at the Sewaren, New Jersey Terminal during Superstorm Sandy.

During Superstorm Sandy in October 2012, the New Jersey Department of Environmental Protection reported that 378,000 gallons of diesel fuel were released from the Motiva Sewaren terminal into the Arthur Kill waterway due to storm surge damage.[183] Despite the scale of the incident and the clear implications for risk management and climate resilience, no mention of the event appears in Shell's risk register.

The omission of the Sewaren incident is a deficiency in implementing guidance provided in ISO/IEC 31010:2019 (Risk Assessment Techniques), which explicitly requires the inclusion of relevant historical incidents in scenario analysis and frequency estimation.[184] Selectively omitting qualifying events from the dataset undermines the HSSE & SP Risk Assessment Matrix tool, underestimates damage potential, prevents accurate actionable risk classifications, and degrades enterprise risk management integrity. In short, failure to include known events such as the Sewaren incident violates ISO 31010 requirement of structured, evidence-based analysis. Internal Shell documents reveal that its risk management systems are not improving. Shell recently implemented revisions that increased the dollar-value thresholds used to classify the severity of "Asset" damage by a multiple of ten. This abrupt and unqualified shift in severity metrics—far beyond any adjustment for economic inflation—has the effect of reclassifying many previously high-severity events as instead classifying them as moderate or low severity. By doing so, Shell effectively reduces the number of events that qualify for the highest levels of mitigation, executive oversight, or public disclosure.

The table 'Changes from old RAM' summarizes that values were increased by a multiple of 10. The threshold costs listed reflect the dollar values after the abrupt 10-fold increase. This change is not consistent with inflation (which would suggest a ~2–3x increase over 20 years, not 10x in one revision cycle). The sudden increase results in reframing consequence criteria that imposes an abrupt decrease to internal Shell triggers for mitigation, executive action, or regulatory compliance. The change disrupts the consistency of Shell's risk management program and fails to apply ISO 31000 principes related to "best available information," instead changing thresholds without reliance of standard practices and sources related to economic information. The timing and scale of this change run counter to the increasing body of scientific and industry evidence pointing to escalating climate-related risks — more frequent, more intense storms with greater potential for infrastructure damage and pollutant release. Insurance industry reports document rising trends in the frequency and intensity of major incidents related to natural disasters related to climate change effects.[185] Shell's response does not support decision-making to address mitigation measures by highlighting potentially serious risks. Instead, it raises the bar so high that few real-world events even register within its own "Major" or "Massive" risk categories.  The effect on enterprise risk management would be the creation of a gap in the material corporate record while reducing identified risks levels

---

[183] New Jersey Department of Environmental Protection (NJDEP), News Release No. 12/144, Nov. 1, 2012. https://www.nj.gov/dep/newsrel/2012/12_0144.htm; Rob Barry, Dionne Searcey, and John Carreyrou, "Sandy Stirs Toxic-Site Worry," *The Wall Street Journal* (Nov. 11, 2012), https://www.wsj.com/articles/SB10001424127887324073504578109550624063018.

[184] International Standard for Standardization (2019) ISO 31010:2019 Risk Management – Risk assessment techniques. United Nations Industrial Development Organization

[185] Howard Kunreuther and Michael Useem, *Mastering Catastrophic Risk, How Companies Are Coping with Disruption* (Oxford University Press 2018).

by 90%. In practice, the effect would be to reduce resources dedicated to facility and operational improvements for managing risks proactively and instead shift towards addressing them reactively after incidents.

Shell relies on its HSSE & SP Risk Assessment Matrix (RAM) as a cornerstone of its enterprise risk management system. The RAM assigns a likelihood of an event occurring in the future in ascending order based on the following scale:

"never heard of in the industry"

"heard of in the industry"

"has happened in the organization or more than once per year in the industry"

"has happened more than once per year at the location.

The Sewaren spill met three of four criteria for a 'Massive' severity rating under Shell's own framework. Its exclusion represents a conspicuous gap within Shell's risk frequency data—one that enables assignment of inaccurately low likelihood ratings to similar incidents, including foreseeable climate-related events.

The types of risk governed by the HSSE & SP Risk Assessment Matrix include both those with financial and non-financial metrics, and those which are non-discretionary, including consequences to community and environment to which the CT DEEP Stormwater Industrial General Permit pertains. However, Shell's abrupt escalation of the financial thresholds for asset damage and failure to disclose the Sewaren incident as one which "happened in the organization" or other storm-related clusters spills as "happened more than once per year in the industry" shifts the overall rating results, resulting in an inconsistent and non-evidence-based reduction in risk recognition. This apparent reduction in recognized risk moves in the opposite direction of known trends in major spill incidents connected to climate risk, such as those documented by Necci, et al. When Shell's risk management system mischaracterizes these risks, it fails to accurately disclose to management, Board, and shareholders material risks related to regulatory compliance, asset loss exposure, operational continuity, and human health & safety. Undercounting risk also results in reduced access to corporate funds to apply towards mitigating these risks as is required under the Permit. In my professional opinion, Shell fails to apply best industry practice in its risk management program.

**Opinion 10 – A Severe Storm Poses a Threat of Potential Pollution in the Surrounding Community and Environment Given the Current Condition of the Shell New Haven Terminal.**

### The Terminal is Not Prepared to Prevent a Catastrophic Failure by a Severe Storm.

The Terminal's current conditions and operations render it vulnerable to catastrophic failure and oil spills similar to those experienced at other oil facilities during Hurricanes Ida (Category 4 storm; total 230,000 gallons; 2021),[186] Harvey (Category 4 storm; total 800,000 gallons; 2017), Sandy (Category 1 equivalent superstorm; multiple spills, all of which were exacerbated by delayed and

---

[186] Naomi Yoder, "Analysis shows More than 2,200 Pollution Reports After Ida," Healthy Gulf (June 13, 2022), https://healthygulf.org/report-shows-more-than-2200-pollution-reports-after-ida/ (last visited May 6, 2022).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

ineffectual response actions impeded by flooded road access; the single largest spill was 300,000 gallons from the current Shell affiliate facility along the Arthur Kill in Sewaren, NJ; 2012),[187] and Katrina (Category 3 storm; total 8 million gallons; 2005).[188]

Sullivan's testimony on behalf of Defendants does not suggest storm surge and flood risks are going to be managed sufficiently.  Sullivan testified that Motiva, the company that formerly owned the Sewaren and New Haven Terminals, never analyzed the causes of the spill that occurred during Sandy.[189] He could only make guesses about what may have happened or what led to the spill.[190] He also could not identify any steps that were taken after the accident to prevent it from happening again.[191] When asked if he would do anything different than what the operators had done at Sewaren during Sandy his answer was no, he would have done the same thing.[192] He also couldn't identify any changes to the New Haven Terminal that were made in order to prevent a similar accident from happening again.  Since there was no effort to determine why whatever systems were in place to prevent tank failure at Sewaren, and there was no effort to change any practices or designs to address the cause of tank failure, the only reasonable way to prevent the same thing from happening at the New Haven Terminal is to prevent the ASTs from flooding.  The Nairn Report and opinions provide a baseline for preventing a similar result by erecting adequate flood barriers.

Shell's response to the Sewaren, NJ oil spill also highlights their failure to apply best industry practice. The steps Shell took to mitigate the disaster at its Sewaren, NJ Terminal, whatever they were, failed during Superstorm Sandy. Sullivan's testimony highlights Shell's, at best, indifference towards finding the cause of the Sewaren incident and preventing a similar event from happening at other facilities.[193] This is insufficient and will not mitigate future spills from happening again in the event of a severe storm or other weather event. Shell's actions, or lack thereof, place the surrounding community in danger while merely hoping that an event such as Sandy will not occur again. However, as discussed above, climate change makes severe weather events, such as Sandy, more likely to occur in the future.

However, the Sewaren incident is not included within Shell's risk register, nor were formal lessons learned recorded for it.[194] This omission weakens the tool and instead inaccurately allows the tool's users to base important health, safety, security, and environmental decisions on skewed data. Given that individuals within Shell are aware of incidents including Sewaren, the omission of the incident reveals, at minimum, generally inconsistent risk management practices, including failure to correct a known omission. This deficiency in the very practices Shell purports to use for managing the risk puts the surrounding community and environment at significant risk.

Shell's internal risk management system shows that it recognizes the importance of understanding risks that could lead to environmental and community disasters, and the need to be aware of site

---

[187] "Major Progress Made in Containing and Cleaning Up Arthur Kill Fuel Spill Caused by Sandy, Commissioner Martin Lauds Coordinated Effort", New Jersey Dep't of Envtl. Protection, https://www.nj.gov/dep/newsrel/2012/12_0144.htm (last visited May 6, 2022).

[188] Sue Sturgis, "The Katrina Oil Spill Disaster: A Harbinger for the Atlantic Coast?," Facing South (Aug. 28, 2015), https://www.facingsouth.org/2015/08/the-katrina-oil-spill-disaster-a-harbinger-for-the.html.

[189] 30(b)(6) Sullivan Dep., 160:3–163:2.

[190] *Id.*, 184:8–186:14.

[191] *Id.*, 162:11–163:2.

[192] *Id.*, 207:5–12.

[193] *Id.*, 153:1–153:25.

[194] *Id.*, 223:3–7.

factors that increase vulnerability and exposure to hazards. Shell has developed its Trading & Supply Operations DGAME manual (2018) as part of its Hazards & Effects Management Process (HEMP).[195] It serves as a tool to: "provide specific sight [sic] insight in terms of project execution consideration, including health, safety, security, & environment (HSSE)."[196] The manual offers technical standards and resources that relate to prevention of "worst case credible scenarios with a RAM red, yellow 5a, or yellow 5b risk."[197] This type of tool can work effectively within a risk management program if it is used properly.

Should Shell suffer a catastrophic leak, it would release highly flammable liquids that could ignite. Shell internal documents highlight the risk of fire at similar facilities. Lightning strikes during severe storms are responsible for a significant number of fires at oil refineries each year.  Furthermore, wind can also create friction between mobile metal parts and generate sparks that can also ignite flammable vapors.  Severe flooding can also create ignition due to flooded electrical equipment generating short circuits and sparks.  Shell observed lessons from the Buncefield fire at the Hertfordshire Oil Storage Terminal and drafted its own response to the incident.  During the Buncefield fire, Shell highlighted the importance of "engineering against loss of secondary and tertiary containment," specifically "leak-tight, fire resistant bunds and joints, bund capacity, fire water management, and tertiary containment."[198]  Shell's Project Response Report 1 highlighted Shell's need to "[reinforce] [Shell's] current systems, procedures and equipment integrity requirements enabling further reduction in the likelihood of a product loss from primary containment."[199]  In addition, the report included guidance on fuel storage and specified the "minimum expected standards of control which should be in place at all establishments storing large volumes of petroleum and similar products capable of giving rise to a large flammable vapour cloud in the event of a loss of primary containment."[200]

Despite serious risk of fire during a major release of extremely flammable liquids, Shell documents show that tank spacing in New Haven is not aligned with internal Shell DEPs or NFPA criteria. Shell's tank inspection consultant reported in 2014 that tank spacing at New Haven Terminal was inadequate to protect against fire and explosion risks.[201] Shell's consultants recommended that guidance from the National Fire Protection Association (NFPA) should be followed.[202] The NFPA guidance recommended that the distance between the tanks be 1/3 the sum of the diameters of the adjacent tanks.[203] Given the risk of combustion of the tank contents, this recommendation should be followed to prevent a fire spreading to the other tanks or the nearby community. Nevertheless, Shell testified that no changes were made to the facility in response to this report.[204] The combination of berms that are too short to prevent flooding, too unstable to prevent breaching during a flood, and a facility that is not aligned with fire safety standards because the tanks are too close together places

---

[195] SOPUS_NHVN00058172: Trading & Supply Operations DGAME Manual (2018).

[196] *Id.* at 38.

[197] *Id.* at 44.

[198] SOPUS_NHVN00210900.

[199] *Id.*

[200] *Id.*

[201] SOPUS_NHVN00288923; SHELLNH_RPMS_02013; SHELLNH_RPMS_02019.

[202] *Id.*

[203] SHELLNH_RPMS_02013.

[204] 30(b)(6) Sullivan Dep., 196:20–197:3.

the Terminal's neighbors, the closest located only 195 feet away, at an unreasonable yet preventable risk.[205]

In the past two decades, the vast majority of major spills have occurred in conjunction with record-breaking rainfall and coastal storm damage which are trending upward due to climate change.[206] Extreme weather events often affect multiple facilities simultaneously, cause catastrophic failures to large storage tanks, and spread hundreds of thousands to multiple millions of gallons of petrochemicals into waterways and surrounding land areas, including densely populated communities. The magnitude of these incidents can dwarf regional capacity to prepare, endure, and recover from them.

The major spill during Hurricane Sandy in Sewaren, NJ, was the largest of several that occurred in an urban harbor with surrounding biodiverse habitats fairly similar to those in the vicinity of the Shell New Haven Terminal, and the areas across which the diesel fuel spread reflect what might be expected for a similar incident in New Haven.

Commonly under stormy conditions, communities have been evacuated or told to remain home and facility operators sent away for their own safety before the storms. After the storms, roads have often been blocked by floodwater, debris, and damaged bridges and culverts. Emergency response contractors commonly fail to gain access within the regulatory timeline required for cleanup actions, and the general public has often been excluded for safety reasons for days or weeks. First responders, including local fire departments, the US Coast Guard, and EPA inspectors, are often overwhelmed, making it challenging to accurately document contamination. Damage assessments can take months or years and verifying their accuracy is difficult.

The spill response was handled by state and federal agencies and the nature of species and habitats at risk and resulting approach to cleanup was summarized in an official post by NOAA's Office of Response and Restoration:

> The most sensitive habitats in the area are salt marshes, which are often highly productive and are important wildlife habitat and nursery areas for fish and shellfish. Though thin sheens contain little oil, wind and high water levels after the storm could push the diesel deep into the marsh, where it could persist and contaminate sediments. Because marshes are damaged easily during cleanup operations, spill response actions will have to take into account all of these considerations. In addition, diesel spills can kill the many small invertebrates at the base of the food chain which live in tidal flats and salt marshes if they are exposed to a high enough concentration. Resident marsh fishes, which include bay anchovy, killifish, and silversides, are the fish most at risk because they are the least mobile and occupy shallow habitats. Many species of heron nest in the nearby inland marshes, some of the last remaining marshlands in Staten Island. Swimming and diving birds, such as Canada geese and cormorants, are also vulnerable to having their feathers coated by the floating oil, and all waterfowl have the potential to consume oil while feeding. Based on the risks to species and habitats from both oil

---

[205] SHELLNH_RPMS_02020.
[206] Necci, et al. 2018.

55

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

and cleanup, we weigh the science carefully before making spill response recommendations to the Coast Guard.[207]

In decades past, a heavily industrialized setting may have lowered public expectations and prevented scrutiny from multiple concerned stakeholders. However, it is no longer fitting for Shell to operate its Terminal largely as it has for decades, accepting conditions at the Terminal as they have existed in the past and assuming future hazards and operational challenges will continue as before. Best industry practice, as well as local stakeholder interests, demand that Shell critically reviews and adjusts to match developments in climate science and storm damage engineering approaches, as well as in the surrounding community and environmental conditions.

## The Terminal Poses a Threat to the Surrounding Community

Managing severe spill incident risks can never be handled effectively by just considering the site without its environmental context; it is best achieved by considering the surrounding watershed, harbor, and community components. Otherwise, pollutants from an inadequately resilient site suffering storm-damage-related impacts may then enter or otherwise affect vulnerable areas around as well as within the Terminal. The ERAP in section 6 specifically identifies potential impact of an incident at the Terminal on surrounding socioeconomically diverse communities and discusses nearby fish, wildlife, and habitats as well as locally documented endangered species. A residential area directly abuts the east property line of the Terminal, and two gates designated for emergency evacuation in the SWPPP lead to residential streets.[208]

---

[207] "Post Hurricane Sandy, NOAA Aids Hazardous Spill Cleanup in New Jersey and New York," National Oceanic and Atmospheric Administration (Nov. 15, 2022), https://response.restoration.noaa.gov/about/media/post-hurricane-sandy-noaa-aids-hazardous-spill-cleanup-new-jersey-and-new-york.html#:~:text=Species%20and%20Habitats%20at%20Risk&text=Though%20thin%20sheens%20contain%20little,recommendations%20to%20the%20Coast%20Guard.

[208] SHELLNH_TRI_00453.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



The Mill River Greenway Outreach Sign (depicted above), north of the Terminal and along the Mill River Greenway, summarizes the location of this site within the larger US Fish and Wildlife Service designated New Haven Watershed and Urban Wildlife Refuge. This site is located on the Mill River's east bank north of Grand Ave. upstream from the confluence of the Mill and Quinnipiac Rivers north of the Terminal. I became deeply familiar with the area beginning in 2016 when I contributed to project planning, design, and construction oversight and observed water quality and habitat conditions. During rising tides, petrochemical odors were common, especially following rain events. Located on the important bird migration route known as the Atlantic Flyway, the estuary hosts many species and also functions process stormwater and mitigate flooding, two increasingly recognized public values.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Recreational and subsistence fishing (depicted to the right) are common along the banks of the Mill River (seen here near the Grand Ave. Bridge) along with birdwatching, hiking, etc. The estuary hosts a diverse riparian plant community spanning mature trees and native marsh plants adapted to brackish water. Pole stubs (near mens' feet) from largely decayed wood cribbing structures along the river banks are converting to saltmarsh plants.



Even chronic relatively low-level pollutant discharges to receiving waters is harmful to the environment and the community that relies on it. The waterbodies surrounding the Terminal are already impaired, though Shell has neglected to capture that fact in its SWPPP for the New Haven Terminal. According to at least 15 years of State of Connecticut Integrated Water Quality Reports published by the Connecticut Department of Energy and Environmental Protection pursuant to Section 305(b) and 303(d) of the Clean Water Act, the waters surrounding the Terminal, including New Haven Harbor and the mouths of the Quinnipiac, Mill, and West Rivers, are impaired.[209]

These waters are impaired for oil and grease, fecal coliform, dissolved oxygen saturation, dissolved oxygen, and enterococcus. According to the CT DEEP reports, many of these impairments come from stormwater, industrial point source discharges, municipal discharges, landfills, illicit discharge, remediation sites, groundwater contamination, and combined sewer overflow. Ongoing documented contamination levels within New Haven Harbor trigger its listing on the EPA's 303(d) list of impaired waterbodies. The existing contamination levels provide clear indication of the need to manage pollution in accordance with Clean Water Act permitting requirements.

These impairments have been evaluated at length in scientific literature and, depending on the pollutant, activity, and effects of recent rainfall or other pollutant mobilizing events, pose recognized health risks to humans exposed to them via swimming and/or eating finfish or shellfish. Similarly, multiple species of flora and fauna are known to be affected at various life stages by pollutant exposure. In keeping with the requirements of the Permit, Shell is obligated to use control measures to minimize or eliminate industrial stormwater discharges through a single outfall. In addition, Shell is required to "eliminate" all non-stormwater discharges unless authorized by the non-stormwater discharge report, except as provided in a "Non-Stormwater Discharge Certification."[210] In addition, as explained above, it is and has been best industry practice to consider climate change for more than a decade, including as acknowledged within Shell. Shell's 2015 draft Adaption DEP Informative acknowledges the clear link between an increase in intense rainfall events that "cause a problem with the drainage systems, leading to some pollution."[211]

---

[209] CT Dept. of Env. Prot., Water Quality 305(b) Reports to Congress, available at https://portal.ct.gov/DEEP/Water/Water-Quality/Water-Quality-305b-Report-to-Congress/Archive-Previous-IWQR-Cycles.
[210] PSCT016082.
[211] SOPUS_NHVN02449001.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Shell experienced the impacts of climate-enhanced intense rainfall events at a Los Angeles, California facility "due to an unauthorized non-stormwater discharge from the retention pond to Domingue Channel. The trigger for this event was a heavy rainfall event."[212]  This is precisely the same risks that the Terminal faces and which best industry practice demands consideration of to protect impaired waters in which the Terminal discharges.

Designing, operating, and maintaining durable structures and complex facilities, such as the Terminal, demands more than taking a short-sighted view of foreseeable conditions based on past data; it requires considering risks over the service-life of the Terminal while incorporating forward-looking data.  To do otherwise results in designing a Terminal and committing to operating plans that are stale, leading to multiple foreseeable problems that allow non-stormwater to enter the site, and pollutants to be released.

As a professional frequently involved in the aftermath of major storm damage to urban areas, I have observed the catastrophic results a storm can inflict on critical infrastructure that is ill prepared for severe weather. Shell's avoidance of comprehensive assessments, and failure to disclose secondary containment issues or implement necessary control measures, have compounded environmental risks and increased the likelihood of catastrophic failure that today threatens the surrounding environment and neighboring community. These threats will only increase as weather-related risks are amplified by climate change.  Based on the information discussed throughout this report, it does not appear that Shell intends to take the steps needed to prevent a release of materials stored in tanks at the Terminals or that have a history of being spilled in the Terminal containment areas.

---

[212] SOPUS_NHVN02407297 at 10: Water Risks – Climate Change – Tools: A Review.  Focus on Flood – Drought – Water Quality, brief touch regarding Storms and Sea Level (March 2020).

**CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER**

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability. My opinions are stated to a reasonable degree of certainty and consistent with prevailing and scientific standards of practice.

*Submitted* on this 8th day of May, 2025.

Wendi Goldsmith

_____

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**Appendix A**: Wendi Goldsmith *Curriculum Vitae*

# Wendi Goldsmith, PhD, PG          Curriculum Vitae

617-901-2306     sustainabilityvisions@gmail.com

## Summary

Dr. Wendi Goldsmith is a transdisciplinary expert in climate-resilient infrastructure, applied geoscience, and environmental policy integration. With over three decades of experience spanning consulting, research, and public sector advising, she has shaped high-impact strategies to reduce risk and optimize sustainability across sectors including water, energy, defense, and transportation. Her pioneering work connects ecological function, engineering rigor, and stakeholder values through actionable, science-based decision support. A licensed Professional Geologist, published author, and expert witness, Dr. Goldsmith has led multi-billion-dollar resilience and infrastructure programs in the U.S. and abroad. She is recognized for transforming situational uncertainty into resilient design strategies that stand up to climate stressors and regulatory scrutiny alike.

## Experience

**RECENT HIGHLIGHTS, 2015-ongoing**

**Climate Vulnerability Assessment & Resilience Plan** — DOMLEC, Comm. of Dominica
Assembled and led team of selected experts to assess threats to electricity sector by flooding, landslides, and seismic hazards. Prepared roadmap to address 50 years of future trends due to sea level rise, rainfall intensity, and hurricane frequency driven by climate change. Recommendations for diverse renewable and locally sourced energy generation options assembled into resilient microgrids were developed with stakeholder engagement. Detailed infrastructure investment action plans included technical and financing recommendations. Project funding for post-Maria recovery was supported by Caribbean Development Bank. 2020-2023.

**DECISION ANALYSIS RESEARCH, DEVELOPMENT, AND CONSULTING FOR ENVIRONMENTAL MANAGEMENT AND RISK ASSESSMENT OF MILITARY TECHNOLOGIES AND ACTIVITIES** — USACE ERDC, Vicksburg, MS
Subject Matter Expert and Program Advisor for team providing multiple Value of Information and Decision-Analytical tools to support novel and anticipated future areas of activity with recognized uncertainties due to their lack of precedent and associated data. Topics included advanced military technology development and acquisitions; military and civil works operations; synthetic biology and emerging chemicals; and industrial nanomaterial manufacturing and consumer products for civil works research. Portfolio analysis methods were developed for risk reduction and resilience enhancement of civil works projects. Tasks included stakeholder coordination for identification of emerging products and decision support topics, identifying decision factors and associated uncertainties to examine appropriate approach to improve decision confidence, and identifying management alternatives for consideration in terms of correlated impacts of management actions. Developed multiple spreadsheet-based modeling tools and demonstrated application through case-studies depicting military activities, including user manual. 2015-ongoing

**SUBJECT MATTER EXPERT AND PROGRAM ADVISOR** — Confidential Client
Provided technology and policy inputs and contributed to refining a RDT&E program supporting testing, prototype development, and standards development for retrofit and new manufacturing of improved equipment to address recognized vulnerabilities to multiple natural and human-induced hazards in electronics-heavy vehicles. Initiated the launch of expanding industry attention to this topic. 2021- ongoing

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## Education

**Doctor of Philosophy in Business and Social Science**                2016
Aarhus University, Herning, Denmark
> Dissertation title: *Integrating Natural Systems with Engineering: Decision Support to Guide Sustainable Development and Climate Resilient Design.*
> Committee: Allan Gross, Chair; Brynhildur Davíðsdóttir, Igor Linkov

**Master of Science in Plant and Soil Science**                2002
University of Massachusetts, Amherst, MA
> Thesis title: *Soil strength reinforcement by plants.*

**Master of Arts in Landscape Design**                1990
Conway School, Conway, MA

**Bachelor of Arts in Earth & Planetary Sciences, Environmental Studies**  1988
Yale University, New Haven, CT

**Licensed Professional Geologist**: New Hampshire, 2002, #433; Louisiana, 2015, #822
**Certified Professional Geologist**: American Institute of Professional Geologists, 1999, #10455 **Certified Professional Erosion and Sediment Control**: EnviroCert, 1994, #963
**Certified Professional in Storm Water Quality**: EnviroCert, 1999, #007
**Certified Director**: National Association of Corporate Directors, exp. 2027

## Teaching

**Short Course Instructor** — Harvard University, Cambridge, MA, 2013 and 2014
Building on past lectures and ExecEd seminars, was requested by Graduate School of Design Executive Education Program to develop curriculum and lead 2-day course, *Climate Resilient Design: Buildings, Neighborhoods, and Infrastructure.* Format attracted architecture, landscape architecture, urban planning, and related professionals. Themes included gaps in conventional practice, economic assessment informed by risk, forecast, and scenario analysis, and legal considerations affecting design choices.

**Guest Lecturer** — Multiple Universities, US and abroad, 1994-2020
Invited lecturer, paid and unpaid, to graduate students in programs related to urban planning, landscape architecture and architecture, engineering, public administration, energy efficiency, flood management, and evolving practice of ecologically based solutions for economically, socially, and environmentally viable technology applications. Selected institutions include: Yale, MIT, UVA, UC Davis, Universities of Bologna, Ferrara, and Ravenna, Italy, Danish Technological Institute, Aarhus University, and Korean Institute of Machinery and Materials.

**Instructor** — Multiple Public Agencies and Professional Societies
Led or supported an average of three seminars annually ranging 1-5 days long for 15-150 students with 8-36 credit hours under contract to USACE, EPA, NYC-MTA, IECA, SAME, SCUP, ULI, and others. Subjects spanned technical eco-geotechnical design/implementation to cultural/economic considerations in decision process for adopting novel approaches. Locations were US and Asia.

**CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER**

## Research

**PhD Research** — Aarhus University, Herning, Denmark, 2012-2016
Support through NORD-STAR, the Nordic Centre of Excellence for Strategic Adaptation Research which pursues innovative science, sound economic analysis, and effective communication to enable Nordic stakeholders to design and implement successful adaptation policy and practice. NORD-STAR's work focuses on three main issues: land-use change, energy transitions, and insurance & finance. Research addressed one NORD-STAR key innovation: policy analysis tools to help bridge the gaps between adaptation science, practice, and policy, and an explicit link between climate adaptation and mitigation.

**Contract Research** — USACE Engineer Research and Development Center, Construction Engineering Lab, Champaign, IL, 2010-2012
Co-PI for *Energy Quality Flow Analysis for Ultra-Low Communities,* investigation of reductions in energy use for military and civilian communities based on energy recovery rather than efficiency alone with the general finding that energy sharing and recovery systems can reduce up to 90% of energy, water, and waste. Highlights included energy assessment of Fort Carson, CO Heat Plant to become less dependent on grid and pipeline utilities for cost and disaster resilience improvement. Recommendations included equipment to maximize electricity generation, absorption chillers for peak summer heat load. Evaluated wastewater treatment plant and recommended equipment retrofit to anaerobic process for methane-powered electricity.

**Cooperative Advanced Research** — NATO Science for Peace and Security Programme, Brussels, Belgium, 2010-2016
Industry Research Partner for Civilian Community and Military Base Sustainable Development, Industrial Processes, and Climate Resilient Planning hosted in Iceland and Denmark. Role included planning policy and technology themes and coordination of participants from government, academia, and industry from NATO partner nations based on established relationships. Secured supplemental funding to support ancillary activities, facilitated interdisciplinary working group sessions, and prepared four book chapters as lead and contributing author.

**Research Oversight Committee** — National Academy of Engineering, Transportation Research Board, Washington, DC, 1999-2005
Shaped inquiry topic, selected research team, and reviewed deliverables for $200,000 funding level National Cooperative Highway Research Program (NCHRP) Report 544: *Environmentally Sensitive Channel- and Bank-Protection Measures* examines novel yet rigorous solutions, and includes recommended design guidelines for their application and a selection system for helping to determine the most appropriate channel- and bank-protection measure.

**Contract Research** — EPA Office of Research and Development, Chicago, IL, 1999-2001
PI for investigation into role of vegetation in environmental engineering applications including landfill caps, river/ coastal bank revetments, and other high-performance measures. Work included field and laboratory testing and resulted in two juried conference publications heavily cited by practitioners.

## Honors & Awards

**Joan Hodges Queneau Palladium Medal** awarded by the American Association of Engineering Societies and Audubon Society recognizing individuals who encourage cooperation between

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

engineering professionals and environmentalists to create innovative solutions to environmental problems. 2016

**Outstanding Civil Engineering Achievement Award** for Inner Harbor Navigation Canal Surge Barrier, highest national recognition by the American Society of Civil Engineers. 2014

**National Engineering Excellence Award** for Alewife Stormwater Wetlands by American Consulting Engineers Council. Personally led initial planning through final design. 2014

**Bronze Order of the de Fleury Medal** for inspirational leadership to the Engineer Regiment of the US Army, by the AEA, in recognition of 20 years of environmental stewardship and engineering innovation culminating in personally signing off on all aspects of science/engineering integration for climate change resilient regional infrastructure for the greater New Orleans Hurricane and Storm Damage Risk Reduction System. Nominated by General M.W.B. Temple. 2012

**Grand Conceptor Award** for Engineering Excellence for IHNC Lake Borgne Surge Barrier Project, highest national recognition by American Council of Engineering Companies. 2012

**Honor Award** for Engineering Excellence for Gulf Intracoastal Water Way West Closure Complex Pump Station in Greater New Orleans American Council of Engineering Companies. 2012

**AIA Top Ten Green Award** for International Fund for Animal Welfare HQ; personally guided conceptual design for water harvesting for habitat enhancement. 2009

**AIA Top Ten Green Award** for CT Regional Water Purification Facility and Park Project; personally led team interactions to foster exemplary sustainable approach embraced by watershed management agency. 2007

**Grand Award for Engineering Excellence**, American Council of Engineering Companies for MIT Stata Center, Cambridge, MA for integration of building and site design and operations for water and energy conservation. 2005

**Gold Award for Sustainable Site Design**, American Council of Engineering Companies of Massachusetts, for MIT Stata Center, Cambridge, MA for stormwater management wetland, native plant landscape in urban plaza, green roof, and water harvesting and re-use. 2005

**Winner of International Design Competition** for Toolenberg Zuid, Netherlands (with StevenHoll Architects); personally guided water and land conceptual design for a high-performance urban community approaching net zero energy, waste, and materials consumption. 2001

**Engineering Excellence Award,** American Council of Engineering Companies (ACEC) of Massachusetts for End Street Ravine Restoration, Chicopee, MA featuring hazard mitigation and native landscape management. 2001

iv

**CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Engineering Excellence Small Firm Award** American Council of Engineering Companies of Massachusetts for Hearthstone Quarry Brook Restoration, Chicopee, MA using natural channel design and native plants to stabilize degraded stream. 1998

**Environmental Achievement Award** from International Erosion Control Association, for Bioengineered Detention System and Constructed Wetlands at Fort Devens Medical Center, Ayer, MA which was first ever stormwater management system in regulated wetlands corridor in MA. 1996

Publications

**Goldsmith, W**. et al (2017) Net Zero Waste: Issues, Technologies, Trends, and Commercially Viable Solutions, in *Green Defence Technology: Triple Net Zero Energy, Water, and Waste Models and Application*s, Goodsite, M. E. and Juhola, S., eds. Springer.

**Goldsmith, W**. (2016) Resilient communities through environmental planning and design: accounting for future scenarios and regenerative capacity, in *Climate Health Risks in Megacities*, Marolla, C. CRC Press.

**Goldsmith, W**. & Flanagan, T. (2016). Value methodology – case studies within climate resilience and sustainability policy application. Architectural Engineering and Design Management.

**Wendi Goldsmith** & Lewis "Ed" Link (2015) Lessons Learned From Katrina, The Military Engineer, JSTOR.

**Goldsmith, W**., Bernardi, D. & Schippa, L. (2015) River, delta and coastal morphological response accounting for biological dynamics. Proceedings of the International Association of Hydrological Sciences.

Temple, M. W. B. & **Goldsmith, W.** (2013) Engineering Infrastructure for the Post-Katrina Future, in PIANC Yearbook. ISBN: 987-2-87223-217-8.

**Goldsmith, W.,** D. Gray, and J. McCullah (2014) *Bioengineering Case Studies: Sustainable Stream Bank and Slope Stabilization*. Springer.

Nathwani, J., Chen, Z., Case, M.P., Collier, Z.A., Roege, P.E., Thorne, S., **Goldsmith, W.**, Ragnarsdottir, K.V., Marks, P.M., Ogrodowski, M. (2013) Sustainable Energy Pathways for Smart Urbanization and Off Grid Access: Options and Policies for Military Installations and Remote Communities. In I. Linkov, editor, *Sustainable Cities and Military Installations*. Springer.

**Goldsmith, W**., Desoto-Duncan, A. & Durham-Aguilera, K. (2012) Achieving the Unprecedented in New Orleans, The Military Engineer, JSTOR.

**Goldsmith, W.,** B. Barnhart, Hirata, S. (2011) An Energy-Secure DOD Future -- Movement towards net-zero energy military installations can ensure resilient operational effectiveness while reaping long-term cost savings. The Military Engineer, Sept-Oct.

**Goldsmith, W**., Barnhart, B., and Hurt, A. (2011) Implementing a DOD Net-Zero Strategy. The Military Engineer, Mar./Apr.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Barattino, W.J., Cross, B.J., Smith, D.J., **Goldsmith, W**. Foster, S., Holt, M., and Roege, P.E. (2011) The Business Case for SMRs on DOD Installations. In Proc. ASME. 54730; ASME 2011 Small Modular Reactors Symposium, Washington, DC.

**Goldsmith, W**., Bitsko, D., and Burkhart, J. (2010) The Green Soup to Tree Nuts of Sustainable Community Design, Water Environment Federation, Cities of the Future, Boston, MA.

**Goldsmith, W.** (2010) Integration Challenges for Sustainable Energy Use. SAME/IFMA Facilities Management Workshop, Washington, DC.

**Goldsmith, W**., Bitsko, D., Rowan, J., and Burkhart, J. (2010) Yes We Can! Reviving Lost Water Resources Functions in Urban Environments, Water Environment Federation, Urban River Restoration, Boston, MA.

**Goldsmith, W**. (2009) Urban Pond and Marsh Restoration – A Cost-Saving Paradigm. National Conference on Ecological Restoration, Los Angeles, CA.

MacBroom, J. and **Goldsmith, W.** (2007) Environmental Engineering. In *Land and Natural Development (LAND) Code: Guidelines for Sustainable Land Development*, D. Balmori and G. Benoit, editors. Wiley.

**Goldsmith, W.** (2006) Soil Strength Reinforcement by Plants. In Proceedings of Conference XXXVI, International Erosion Control Assoc., Houston, TX.

**Goldsmith, W.** (2002) Integrating ecology, geomorphology, and bioengineering for watershed-friendly design. In *Handbook of Watershed Sensitive Planning and Design*. R.L. France, editor. CRC Press.

**Goldsmith, W.** (2001) Science, engineering, and art of restoration: Two case studies in wetland construction. In *Manufactured Sites: Rethinking the Post-Industrial Landscape*. N. Kirkwood, editor. Taylor & Francis.

Barrett, K., **Goldsmith, W**., and Silva, M. (2006) Integrated bioengineering and geotechnical treatments for streambank restoration and stabilization along a landfill. Journal of Soil and Water Conservation, 61/3:144-152.

**Goldsmith, W.** (2006) What Sustainable Redevelopment in Louisiana Could Look Like: Realizing Many Big Dreams. Association of State Wetland Managers Conference, Amherst, MA.

**Goldsmith, W**., Robert, M., Toth, G. (2004) Integrating ecological & transportation infrastructures for community based solutions. In Proceedings of CIATrans, Portland, ME.

**Goldsmith, W.** and Reinhart, K. (2001) Kettle pond restoration and erosion control, Olmstead Center, Flushing, New York: Wetlands and Restoration Conference, So. Burlington, Vermont.

**Goldsmith, W**. and Reinhart, K. (2001) Preserving the Nature of Walden Pond, Landscape Architect and Specifier News, feature article.

**CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Goldsmith, W**., M. Silva, and C. Fischenich (2001) Determining optimal degree of soil compaction for balancing mechanical stability and plant growth capacity. Technical Note EL-97-8, U.S. Army Engineer Research & Development Center, Vicksburg, MS.

**Goldsmith, W**. and Buchanan, D. (1999) Practical bioengineering applications in watershed management. Land and Water 43/4.

**Goldsmith, W.** (1998) Soil reinforcement by river plants: Progress results. Proceedings of the ASCE Conference on Wetlands Engineering and River Restoration.

Fripp, J., O'Neill, J., **Goldsmith, W.** (1998) Do ecologists and engineers have differing views of stream restoration? In Proceedings ASCE Wetlands Engineering & River Restoration Conference, Denver, CO.

Barrett, K.R. and **Goldsmith, W**. (1998) Bioengineered ponds and wetlands in an existing stream channel for stormwater management and ecological enhancement. In Proceedings ASCE Wetlands Engineering & River Restoration Conference, Denver, CO.

**Goldsmith, W**., Barrett, K.R., Larson, M., and Lattrell, W. (1998) Restoration of an urban, incised channel integrating geomorphology and bioengineering: Design, construction and monitoring results. In Proceedings ASCE Wetlands Engineering & River Restoration Conference, Denver, CO.

**Goldsmith, W**. (1998) Lead-contaminated sediments prove susceptible to phytoremediation. Soil & Groundwater Cleanup. Feb./Mar.

**Goldsmith, W.** (1997) Phytoremediation potential for lead-contaminated river sediments. In Proceedings of 12th Annual Conference on Contaminated Soils, Amherst, MA.

Larson, M. and **W. Goldsmith (**1997) Incised channel stabilization and enhancement integrating geomorphology and bioengineering. In Proceedings of the conference on management of landscapes disturbed by channel incision, S.S.Y. Wang, ed., University of Mississippi, Oxford.

**Goldsmith, W.** (1992) Bioengineering techniques used for lake and reservoir management in Germany. Federal Interagency Workshop-Reservoir Shoreline Erosion: A National Problem. MacAlester, OK. October.

**Goldsmith, W**. and L. Bestmann (1992) An overview of bioengineering for shore protection. In Proceedings of Conference XXIII, International Erosion Control Assoc., Reno, NV.

## Leadership
- Board Member – Green Infrastructure Foundation
- Board Member – Center for Urban Watershed Resilience
- Advisory Board – Asian University for Women (2010–Ongoing)
- Fellow – Society of American Military Engineers (SAME)
- Member – Society for Risk Analysis
- Member – PIANC (World Association for Waterborne Transport)
- Member – Soil and Water Conservation Society
- Member – Soil Science Society of America

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## Employment

| | |
|---|---|
| 2015-present | Self-Employed |
| 1992-2015 | Bioengineering Group (sold to Chester Engineers) |
| 1991 | Consultant to Bestmann Ingenieurbiologie GmbH |
| 1990-1991 | Charles T. Main |

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**Appendix B**: Additional Materials Considered

**Public Documents**

Baily, A., Yilmaz, K., Quamber-Hill, S. & Radulovic, V. (2024) Climate Resilience Pathways – Catalyzing Private Sector Action. C2Es, Resilience Rising & Resilience First

Brown, K. A. (2006) Critical Path – A Brief History of Critical Infrastructure Protection in the United States (Spectrum Publishing Group, Inc. Fairfax, VA)

International Standard for Standardization (2009) International Standard: Risk management – Risk assessment techniques. International Electrochemical Commission

International Standard for Standardization (2021) ISO 3100:2018 Risk Management. United Nations Industrial Development Organization

United Nations (2015) Sendai Framework for Disaster Risk Reduction 2015-2030

United States Army Corps of Engineers (2015) NACCS Appendix C – Planning Analyses

United States Army Corps of Engineers (2015) NACCS Appendix D – State and District of Columbia Analyses

United States Army Corps of Engineers (2015) North Atlantic Coast Comprehensive Study – Main Report

United States Army Corps of Engineers (2023) Engineering Circular 1100-113 Guidance for Incorporating Study-Specific Projections of Climate-Changed Meteorology and Hydrology

United States Department of Homeland Security (2015) Energy Sector-Specific Plan

**Litigation Documents**

Amended Complaint & Attachments 1–9 thereto, Conservation Law Foundation v. Shell Oil Company, et al., Case No. 3:21-cv-0933 (D. Conn. Feb 11, 2022), ECF No. 047 & 047-1 – 9

SOPUS_NHVN00326984: Shell Trading & Supply Distribution Operations US East Business Continuity and Storm Action Plan (Rev. Apr. 2024)

SOPUS_NHVN02489740: Email Thread Between Lizzie Smith (All4) and Theresa Geijer (Shell) + Attachment, Re: New Haven SWPPP Resiliency Section (Dec. 2024)

**Litigation Testimony**

30(b)(6) Deposition Transcript & Exhibits of Shell Oil Co. (Brian Evans), February 12, 2025

30(b)(6) Deposition Transcript & Exhibits of RPMS Consulting Engineering (Robert Perla), November 3, 2023.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

30(b)(6) Deposition Transcript & Exhibits of Sovereign Consulting (Scott Burrus), March 7, 2023.

30(b)(6) Deposition Transcript & Exhibits of Triton Terminaling, Inc. (Paul Simonetta), February 16, 2023.

30(b)(6) Deposition Transcript & Exhibits of Witt O'Brien (John Carroll III), March 16, 2023

Deposition Transcript & Exhibits of Jennifer Bothwell (Motiva Enterprises), December 6, 2024

Deposition Transcript & Exhibits of James Kent Yeates (Shell Oil Co.), December 22, 2022