**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 3, 2025 |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
EXPERT OPINIONS OF PLAINTIFF'S EXPERT RICHARD R. HORNER**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................. 1

II.     DR. HORNER'S EXPERIENCE AND OPINIONS ........................................... 3

        A.      Dr. Horner's Experience and Qualifications ............................................ 3

        B.      Dr. Horner's Lack of Relevant Qualifications ........................................ 4

        C.      Dr. Horner's Opinions .............................................................................. 7

III.    LEGAL STANDARD ........................................................................................... 8

IV.     ARGUMENT ........................................................................................................ 10

        A.      Dr. Horner lacks the scientific, technical, or other specialized knowledge
                necessary to offer the opinions stated in his Report ............................... 11

                1.      Dr. Horner has no experience with Connecticut permitting issues or
                        regulatory inspections ................................................................... 12

                2.      Dr. Horner has no knowledge or expertise with bulk petroleum storage
                        facilities ........................................................................................ 14

                3.      Dr. Horner is not a licensed professional engineer and therefore is
                        unqualified to review or opine on SWPPPs ................................... 16

                4.      Dr. Horner lacks any relevant or timely real-world experience to draw
                        upon having retired in 2008 .......................................................... 18

                5.      Dr. Horner readily admits that his opinions are based on nothing more
                        than a "plain" reading of the 2018/2021 Permit and regulations ......... 19

        B.      Dr. Horner's opinions are irrelevant and do not meet the "fit" requirement for
                admissibility ............................................................................................. 20

                1.      Dr. Horner's opinions not identified in the NOI or the Complaint are
                        irrelevant and inadmissible ............................................................ 20

                2.      Dr. Horner's opinion that the 2018/2021 Permit requires consideration
                        of climate change has no basis in fact and is contradicted by the
                        available evidence ......................................................................... 24

        C.      Dr. Horner does not employ a discernible or reliable methodology in reaching
                his opinions ............................................................................................... 26

                1.      Dr. Horner's opinions are not based on data and consist of personal
                        opinion and *ipse dixit* conclusions .............................................. 26

                2.      Dr. Horner has no basis for or understanding of what a "best industry
                        practice" is in the oil and gas industry ......................................... 30

                3.      Dr. Horner's New Haven Harbor contamination opinion ignores
                        alternative sources of contaminants for New Haven Harbor ............ 31

                4.      Dr. Horner attempts to hold the Terminal to an inapplicable standard ..... 34

D.    Dr. Horner's opinions should be excluded under Rule 403 ................................. 36

V.    CONCLUSION ........................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002)..............................20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................................................................................8, 26, 27, 35

*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009).....................................................................................33

*Beam v. McNeilus Trauck & Mfg., Inc.*,
697 F. Supp. 2d 1267 (N.D. Ala. 2010)..................................................................................15

*Bristol-Meyers Co. v. FTC*,
738 F.2d 554 (2d Cir. 1984)...............................................................................................25, 36

*Brod v. Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011)....................................................................................................21

*Buckley v. Deloitte & Touche USA LLP*,
888 F. Supp. 2d 404 (S.D.N.Y. 2012), aff'd, 541 Fed. Appx. 62 (2d Cir. 2013).....................33

*Burton v. Danek*,
No. 95-5565, 1999 WL 118020 (E.D. Pa. Mar. 1, 1999) ........................................................16

*Castelluccio v. Int'l Bus. Machines Corp.*,
No. 3:09CV1145 DJS, 2012 WL 5408420 (D. Conn. Nov. 6, 2012)......................................37

*Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of N.Y.*,
273 F.3d 481 (2d Cir. 2001)....................................................................................................22

*Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh,
PA*, No. 3:19CV839 (JBA), 2021 WL 4170757 (D. Conn. Sept. 14, 2021)............................25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................................................................................ *passim*

*Design Resources, Inc. v. Leather Indus. of Am.*,
No. 1:10CV157, 2014 WL 4159991 (M.D.N.C. Aug. 19, 2014) .........................................29

*Duchimaza v. United States*,
211 F. Supp. 3d 421 (D. Conn. 2016).................................................................................12, 20

*Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ..................................................................................17

*Eghnayem v. Bos. Sci. Corp.*,
    57 F. Supp. 3d 658 (S.D.W. Va. 2014) ...................................................................29

*FAA v. Landy*,
    705 F.2d 624 (2d Cir. 1983) ...................................................................................31

*First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*,
    2015 WL 5734413 (D. Md. Sept. 22, 2015) ...........................................................31

*Grajeda v. Vail Resorts Inc.*,
    No. 2:20-CV-00165, 2023 WL 2613543 (D. Vt. Mar. 23, 2023)............................26

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    No. 1:02-CV-2600-RDP, 2010 WL 11561917 (N.D. Ala. Sept. 2, 2010)...............13

*Hallstrom v. Tillamook Cnty.*,
    493 U.S. 20 (1989)...............................................................................................6, 22

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................31

*Lin v. Solta Med., Inc.*,
    No. 21-CV-05062-PJH, 2024 WL 5199905 (N.D. Cal. Dec. 23, 2024)..................12

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)...................................................................................33

*Marx & Co., Inc. v. Diners' Club Inc.*,
    550 F.2d 505 (2d Cir. 1977)..............................................................................37, 38

*Max Zach Corp. v. Marker 17 Marine*,
    No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024).............9

*Mid-New York Envt'l and Sustainability Promotion Comm. v. Dragon Springs
    Buddhist, Inc.*, No. 24-2451, 2025 WL 2653616 (2d Cir. Sept. 16, 2025).............22

*Nat. Res. Def. Council v. Sw. Marine, Inc.*,
    236 F.3d 985 (9th Cir. 2000) .................................................................................22

*Newton v. City of Muskogee*,
    No. CIV-06-532-C, 2007 WL 4150936 (E.D. Okla. Nov. 19, 2007) ......................18

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005).................................................................9, 10, 11, 37

*Penor v. Columbia Cnty.*,
No. CV 08-1114-HU, 2010 WL 916211 (D. Or. Mar. 9, 2010).............................................18

*In re Prempro Prods. Liab. Litig.*,
554 F. Supp. 2d 871 (E.D. Ark. 2008)........................................................................................14

*Prohaska v. Sofamor, S.N.C.*,
138 F. Supp. 2d 422 (W.D.N.Y. 2001)........................................................................................16

*Pugliano v. United States*,
315 F. Supp. 2d 197 (D. Conn 2004).........................................................................................20

*Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.*,
954 F.2d 19 (1st Cir. 1992)........................................................................................................18

*Ruggiero v. Warner–Lambert Co.*,
424 F.3d 249 (2d Cir. 2005).................................................................................................20, 35

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) .....................................................................................................27

*Scentsational Techs., LLC v. Pepsi, Inc.*,
No. 13 Civ. 8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ..........................14, 15

*M.B. ex rel. Scott v. CSX Transp., Inc.*,
130 F. Supp. 3d 654 (N.D.N.Y. 2015).......................................................................................12

*In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods.*
*Liab. Litig.*, No. 1:17-MD-2775, 2021 WL 781682 (D. Md. Mar. 1, 2021)............................29

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) .....................................................................................................19

*TMI Horner Dep. Co. v. WMC Mortg., LLC*,
No. 3:12-CV-1538 (CSH), 2017 WL 6617050 (D. Conn. Dec. 28, 2017)....................8, 35, 36

*United States v. Cruz*,
363 F.3d 187 (2d Cir. 2004).......................................................................................................12

*United States v. Diallo*,
40 F.3d 32 (2d Cir.1994).............................................................................................................12

*United States v. E. Ky. Power Coop.*,
No. 04-34-KSF, 2007 WL 4732047 (E.D. Ky. Mar. 30, 2007).................................................26

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) .................................................................................................38

*United States v. Roldan-Zapata*,
  916 F.2d 795 (2d Cir. 1990)...................................................................................11

*Wang v. Omni Hotels Management Corporation*,
  3:18-cv-2000, 2025 WL 1782264 (D. Conn. June 27, 2025) (Oliver, J.)..............................8, 9

**Statutes**

33 U.S.C. § 1365(b)(1)(A).......................................................................................21

44 U.S.C. § 6972(a)(1)............................................................................................21

33 U.S.C. 1251 *et seq.*.................................................................................. *passim*

42 U.S.C. § 6201 *et seq.*......................................................................1, 7, 21, 22, 23

**Other Authorities**

40 CFR § 135.3(a)...........................................................................................6, 21, 22

Fed. R. Civ. P. 8...............................................................................................8, 21, 22

Fed. R. Civ. P. 12.......................................................................................................22

Fed. R. Evid. 104(a)......................................................................................................8

Fed. R. Evid. Rule 403....................................................................................10, 36, 38

Fed. R. Evid. Rule 702................................................................................... *passim*

## I.    INTRODUCTION

In this citizen suit, Plaintiff Conservation Law Foundation, Inc. ("CLF") alleges Triton Terminaling LLC (the owner of the New Haven Terminal (the "Terminal")) and Equilon Enterprises LLC (the operator of the Terminal)[1] have violated the Connecticut Department of Energy and Environmental Protection ("CT DEEP") industrial stormwater permit for the Terminal.  The principal argument asserted by CLF – and the position parroted by its experts, including Dr. Horner – is that the 2018/2021 Permit[2] required consideration of climate change factors, even though that permit did not include any such express requirement.  CLF contends that Defendants' failure to consider climate change factors at the Terminal constitutes violations of the Clean Water Act, 33 U.S.C. 1251, *et seq.* ("CWA"), and the Resource Conservation and Recovery Act, 42 U.S.C. §  6201, *et seq.* ("RCRA").[3]  *See generally* Am. Compl. [ECF No. 47].

Dr. Horner offers various opinions regarding the requirements of the 2018/2021 Permit and how the Terminal did not comply with those requirements, including that the 2018/2021 Permit required the Terminal to consider "relevant policies and guidelines in development of the [Stormwater Pollution Prevention Plan ("SWPPP")]" and "meteorological and climatological factors, including climate change effects."  Rpt. at 5-6.  Specifically, he opines that the secondary containment areas do not meet the Permit's impermeability requirement, should have been lined,

---

[1] Dr. Horner expresses no opinions about the Defendants in this case, Equilon, Triton Terminalling, and Motiva, instead referring to the Terminal in his report as "Shell."  As this Court is aware, Plaintiff dismissed Shell Oil Company [ECF No. 529], and Shell plc has never been a party to this litigation [ECF No. 111 at 5–6].  This represents at best inattentiveness to detail and at worst, a misunderstanding as to which entity owns the Terminal at issue in this lawsuit.  Regardless of the reason, it is concerning and is further proof of the unreliability of his opinions generally.

[2] The permit in effect at the time this lawsuit was filed was the 2018 Industrial Stormwater General Permit; it was renewed without substantive changes in 2021.  Both will be referred to collectively as the 2018/2021 Permit or just the "Permit."

[3] Triton, Equilon, and Motiva Enterprises LLC (a former operator of the Terminal) are referred to collectively as "Defendants."

1

and cannot adequately contain runoff in the event of a large, rapid product release.  Dr. Horner is unqualified to offer these opinions because he has no experience working in Connecticut, with CT DEEP, or with Connecticut regulators generally (the applicable permit was issued and is enforced by CT DEEP) and has limited experience with bulk petroleum storage facilities.  And his opinions are not helpful to the jury because, as he readily admits, he is merely reading the Permit and regurgitating what it states is required; are readily debunked by the facts in this case and the plain language of the Permit; are premised solely on his own unverifiable and untestable personal preferences; and fail to identify or employ a discernable methodology accepted by the scientific community.

Most importantly, the vast majority of Dr. Horner's opinions are not included in the Notices of Intent to Sue (the "NOI"), which CLF was required by statute to serve on Defendants, EPA, and CT DEEP before filing suit.  *See* Notice of Intent to Sue (filed July 28, 2020); First Supplemental Notice of Intent to Sue (filed February 17, 2021); Second Supplemental Notice of Intent to Sue (filed November 21, 2024) (collectively, "NOI") (composite **Ex. A**).[4]  The NOI and the Complaint together list the claims at issue in this lawsuit, and the failure to adequately identify and describe the specific alleged violations of the 2018/2021 Permit means those violations are not before the Court.  Any opinions about alleged violations not identified in the NOI and Complaint—as most of Dr. Horner's were not—are therefore irrelevant and unhelpful

---

[4] Prior to filing its Complaint, as required by statute, Plaintiff served a Notice of Intent to Sue identifying Defendants' alleged violations, all of which related to Defendants' alleged failure to consider climate change factors in its operation of the Terminal and Defendants' alleged failure to properly certify the Terminal's SWPPP. Plaintiff's CWA claims seek to enforce its novel interpretation of the terms of the 2018/2021 Permit.  For the four years this case has been pending, Defendants have conducted discovery and litigated this case relying on the allegations and claims CLF identified in its NOI and Complaint.  Plaintiff now seeks to have the Court ignore this statutory requirement by improperly adding new alleged violations through expert reports.

to the jury.  Now, at the eleventh hour of this lawsuit, CLF presents new allegations and claims not contained in the NOI through experts such as Dr. Horner.

As will be explained further below, the Court should exclude Dr. Horner's opinions because: (1) he is unqualified to offer them, (2) his opinions are irrelevant because the alleged violations he intends to testify about were not included in the NOI or Complaint, and (3) his opinions are unreliable because they are demonstrably false or based on unsound or nonexistent methodology and principles.

## II.    DR. HORNER'S EXPERIENCE AND OPINIONS

In support of its case, CLF designated Richard Horner, Ph.D., to offer opinions about permit compliance and the "standard of care" Defendants should have allegedly met in operating the bulk petroleum storage facility at issue in this Clean Water Act lawsuit involving stormwater discharges.

### A.    Dr. Horner's Experience and Qualifications

As noted in his expert report, Dr. Horner is a professional witness who has been testifying on behalf of non-governmental organizations ("NGOs") and other plaintiffs in citizen suits and in challenges to permits since the 1980s.  He has worked on more than 80 legal cases (over 30 in the last 4 years), **Ex. B**, 2025.05.01 Report of Richard R. Horner, Ph.D. (the "Report" or "Rpt.") at 9 and Attachment B, p. xiii, and he has always found violations of the applicable permits.  **Ex. C**, 2025.08.11 Deposition of Richard R. Horner ("Horner Dep.") at 30:12-15 ("Q. In each of these cases where you served as an expert in a citizen suit case, was it your opinion that the facility at issue was in violation of its permit?  A. Yes.").  Dr. Horner, however, has no experience with or knowledge of bulk petroleum storage terminals or "best industry practices" for that specific industry.  Nor did he conduct any research or survey to be able to identify what operators

of bulk petroleum storage terminals actually do and what the true "best industry practices" are for that industry.[5]

Dr. Horner received his engineering degrees from the University of Pennsylvania and University of Washington in the 1960's and 1970's.  His only non-teaching job experience was at an Exxon Research facility as a Project Engineer over five decades ago, where he did not perform any work on bulk petroleum storage facilities.  Rpt. at Attachment B, p. xiii; Horner Dep. at 44:21-45:14.  Starting in 1981, he worked as a research associate professor of engineering and landscape architecture at the University of Washington and served as a paid consultant and expert in litigation.  Rpt. at Attachment B, p. xiii-xiv; Horner Dep. at 34:10-16. He was never a tenured professor at the university.  *Id.*

Dr. Horner retired from teaching in 2008 and has not taught any classes since then.  *Id.* at 50:11-14, 51:2-6.  He is no longer an "active researcher."  *Id.* at 50:15-23.  After taking *emeritus* status, he researched no more than 12 to 20 hours a week.  *Id.*  But he has not performed any research in recent years.  *Id.* at 50:24-51:1.  For the past 15 years, Dr. Horner has primarily worked as a paid consultant and litigation expert in scores of citizen suits and permit challenges filed by environmental NGOs similar to Plaintiff. *See id.* at 52:11-18.

**B.      Dr. Horner's Lack of Relevant Qualifications**

Dr. Horner is not now (nor has he ever been) a licensed professional engineer, which means he is not qualified to certify any evaluation, construction, or modification of the design of

---

[5] The CWA claims in this case are based on CLF's interpretation of the term "best industry practice" to *impliedly* include a requirement that permittees consider climate risk factors in evaluating risk at their facilities and make modifications and adaptations to prepare their facilities for such risks. *See, e.g.*, Plfs' Opposition to Motion to Dismiss [ECF No. 53] at 18 ("The ongoing requirement to comply with the "best industry practice" standard is consistent with the statutory scheme of the CWA, which places rigorous demands on dischargers to achieve higher and higher levels of pollution abatement. . . . Defendants have failed to follow best industry practice at the Terminal, in part because they have not designed or adapted the Terminal to address precipitation and/or flooding, which is exacerbated by storms and storm surges, sea level rise, and increasing sea surface temperatures.").

a stormwater drainage system in Connecticut.  *Id.* at 35:13-23, 42:3-43:1.  He has no other certifications or other degrees.  *Id.* at 35:10-12.

Despite offering multiple opinions on aboveground tank design, he is also admittedly not a tank engineer.  *Id.* at 88:6-7.  He is also not a risk assessor, meteorologist, or climate scientist despite attempting to offer opinions on each of these subjects.  *Id.* at 78:5-10, 87:25-88:5.

And critically for this case involving a stormwater permit, he has never prepared a stormwater pollution prevention plan ("SWPPP") or published any papers discussing stormwater pollution prevention plans, but that doesn't stop him from offering criticisms of the Terminal's infrastructure with respect to stormwater and the contents and certification of the SWPPP.  *Id.* at 35:18-20 ("Q.  You've never prepared a SWPPP before, have you? A.  I have not prepared one, no."), 66:25-67:3 ("Q. Have you published any papers discussing stormwater pollution prevention plans?  A. No papers on SWPPPs specifically, no.").  He offers his criticisms even though SWPPPs require certification by a licensed professional engineer, a qualification Dr. Horner admittedly lacks.  *Id.* at 35:21-23 ("Q. And generally, regulations require that a SWPPP be certified by a PE.  Do you agree?  A. Yes."); *see also* **Ex. D**, Bureau of Materials Management and Compliance Assurance Water Permitting and Enforcement Division, "Guidance Document for Preparing a Stormwater Pollution Prevention Plan," March 2011, at 6 ("The Plan must be signed by a duly authorized representative pursuant to Section 5(c)(4) and shall also be certified, in accordance with Section 5(c)(7), by a Professional Engineer licensed in the State of Connecticut or a Certified Hazardous Materials Manager."), 17 ("Be aware that any evaluation, construction, or modification of the design of a stormwater drainage system requires certification by a Professional Engineer licensed to practice in the State of Connecticut, and must be discussed in your Plan.").

Dr. Horner likewise has no relevant knowledge of or experience with bulk petroleum storage facilities outside of litigation.  He has never worked, overseen operations, or performed any projects at a bulk petroleum storage facility.  Horner Dep. at 45:12-14, 45:18-23.  He has never designed a bulk petroleum storage terminal.  *Id.* at 45:24-46:3.  And he has no experience with environmental compliance management at a bulk petroleum storage terminal.  *Id.* at 80:11-14.  In fact, the *only* experience he has with "industrial [s]ites that receive and distribute petroleum products by land and are located at or near marine waters" has been in the context of litigation as a paid expert for plaintiffs such as CLF who are claiming the facility is in violation of a permit.  *Id.* at 36:4-16.  At each of those facilities, he visited for no more than three or four hours as part of a litigation-driven inspection.  *Id.* at 36:23-37:5.

Despite his lack of relevant experience, Dr. Horner offers wide-ranging opinions that the Terminal "has violated" the 2018/2021 Permit because it allegedly has "inadequate capacity of secondary containment," *id.* at 165:2-166:8; its soil is not "impermeable," *id.* at 166:9-11; the secondary containment area and the retention pond should have impermeable liners, *id.* at 166:12-19; and the secondary containment bypass is inadequate, *id.* at 166:21-25; *see also* Rpt. at 4-6.  He also suggested that the Terminal should implement advanced stormwater treatment systems, even though he acknowledged that the Terminal is in compliance with all of its effluent limitations.  Horner Dep. at 101:16-102:7.  Yet none of Dr. Horner's opinions about secondary containment was identified in the NOI or in the Complaint, as specifically required by the Clean Water Act.[6]

---

[6] As mentioned above and as will be discussed further below, a plaintiff in a citizen suit must serve a Notice of Intent to Sue ("NOI") that identifies all claimed violations as a pre-filing requirement.  *See* 40 CFR § 135.3(a); *see also Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 25 (1989) ("[C]ompliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit.").  Nearly all of Dr. Horner's opinions are new – meaning they are not included in the NOIs or Complaint.

Dr. Horner admittedly is not offering any opinions about the likelihood of failure of the Terminal's aboveground storage tanks, *id.* at 117:6-11; tank stability or lack of it, *id*. at 117:12-13; or violations of RCRA, *id*. at 167:4-6.

### C.     Dr. Horner's Opinions

Dr. Horner offers opinions related to the requirements of the 2018/2021 Permit, the nature and characteristics of the Terminal's second containment areas, and the ways in which those secondary containment areas allegedly did not meet the 2018/2021 Permit's requirements.  Dr. Horner opines that the Permit requires:

- The Terminal's secondary containment area hold at least 100 percent of the volume of the largest tank or 10 percent of the total volume of all tanks, whichever is larger;

- The secondary containment area be impermeable;

- Runoff from the Terminal be treated prior to infiltration and that the treatment system for this purpose have an impermeable liner; and

- The Terminal's SWPPP contain proper verification of tank capacity and impermeability; containment area capacity and "a lack of proper verification of tank containment area capacity and impermeability; "consideration of relevant policies and guidelines in development of the plan;" and consideration of "meteorological and climatological factors, including climate change effects."

Rpt. at 4-6. Dr. Horner also opines that the Terminal violates the 2018/2021 Permit because:

- The Terminal's stormwater treatment basins do not meet "the level of best industry practice";

- The soils in the secondary containment area are mostly permeable sand and gravel;

- The Terminal's secondary containments are not lined but should be lined;

- Installing a liner in the secondary containments is feasible;

- Non-party "Shell"[7] knew the secondary containments were "inadequate" but failed to inform CT DEEP;

- The bypass pipe installed in 2022 is not large enough to transfer "released products" quickly enough to prevent overflow into the drainage channel leading to New Haven Harbor in the event of a "large, rapid product release"; and

---

[7] Dr. Horner expresses no opinion about the Defendants in this case (Equilon and Triton), instead referring generally to "Shell."  *See* fn. 1, *supra.*

- The groundwater at the Terminal is "highly subject to contamination owing to the highly infiltrative soils and lack of stormwater treatment or liners in tank secondary containments and the treatment basins," moves in the direction of New Haven Harbor, and "can transport contaminants in groundwater to the harbor in a few years or less."

*Id.* at 4-6.  Not one of these alleged violations was included in the NOI or Complaint.  In addition, Dr. Horner expresses opinions about alleged technical permit violations relating to certification of the SWPPP and other alleged reporting violations.  *Id.*

As explained below, the Court should exclude Dr. Horner's opinions because Plaintiff cannot establish that, "more likely than not," the proffered opinions meet the prerequisites to admissibility set forth under the Federal Rules of Evidence and applicable precedent.  *See* Fed. R. Evid. 104(a), 702 (advisory committee's note to 2023 amendment).

## III.   LEGAL STANDARD

District courts play a "'gatekeeping' function' under Rule 702 and 'are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Wang v. Omni Hotels Management Corporation*, 3:18-cv-2000 (VDO), 2025 WL 1782264, at *2 (D. Conn. June 27, 2025) (Oliver, J.) (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 259, 265 (2d Cir. 2002) (same). The importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (internal quotations omitted); *see also TMI Horner Dep. Co. v. WMC Mortg., LLC,* No. 3:12-CV-1538 (CSH), 2017 WL 6617050, at *4 (D. Conn. Dec. 28, 2017) ("The principal target of *Daubert* and Rule 702 is the professional expert witness—well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors.").

Federal Rule of Evidence 702 prohibits a witness who is qualified as an expert from testifying unless: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *1 (D. Conn. Oct. 30, 2024) (this Court's summarizing Fed. R. Evid. 702). Interpreting the pre-2023 Rule 702, the Second Circuit explained that a Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). In other words, even if an expert is qualified to testify, expert opinions are not admissible unless they are both reliable and relevant to the issues in the case. *See Daubert*, 509 U.S. at 579 ("under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

The party proffering the expert—here, CLF—bears the burden of establishing Rule 702's requirements by a preponderance of the evidence.  *See Wang*, 2025 WL 1782264, at *2.  The recent amendments to the Rule emphasize that the court must rigorously exercise its gatekeeping responsibility and make sure the proffered opinions are more likely than not to meet all four requirements of the Rule, including the requirement that the expert reliably apply the principles and methods to the facts of the case" in arriving at opinions.  *See* Advisory Committee Note to 2023 Amendments to Rule 702 (explaining that "Rule 702(d) has also been amended to

9

emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology.").

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 403). In fact, because expert testimony has a greater chance of misleading the jury, a court evaluating potential prejudice under Rule 403 "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. The Supreme Court and Second Circuit have emphasized "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595). In fact, because expert testimony has a greater chance of misleading the jury, a court evaluating potential prejudice under Rule 403 "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## IV.    ARGUMENT

As its main witness for Plaintiff's "permitting" allegations at the New Haven Terminal, instead of offering a witness with directly relevant experience for the issues in this lawsuit, Plaintiff put up Dr. Horner, from Seattle, Washington, who has **no** experience with the CT DEEP industrial stormwater permit, **no** experience with petroleum bulk storage facilities, **no** experience with SWPPPs (the document that Plaintiff alleges should have included the "climate change" requirement), and **no** experience with designing secondary containment for stormwater permits. Nor has Dr. Horner ever been a licensed engineer in any state, much less the State of Connecticut, although the Permit itself requires any engineer offering opinions on the Permit to be licensed in Connecticut.  And Dr. Horner conducted no survey, no interviews, no document

10

review—nothing—to establish "best industry practices" for the petroleum bulk storage industrial sector, the only industry involved in this lawsuit.

The Court should exercise its gatekeeping duty to exclude Dr. Horner's expert opinions for four reasons: (1) Dr. Horner lacks the relevant knowledge, expertise, and expertise to offer opinions about the petroleum bulk storage industry, CT DEEP, and the Connecticut Permit generally; (2) Dr. Horner's methodology is unreliable because it is premised on his own vague "interpretation" of best industry practice instead of any objective or identifiable standard; (3) Dr. Horner's opinions are irrelevant because they are not included in the NOI or Complaint and do not relate to the claims in this case; and (4) Dr. Horner's opinions are unfairly prejudicial and unhelpful to the jury.

### A.    Dr. Horner lacks the scientific, technical, or other specialized knowledge necessary to offer the opinions stated in his Report

Dr. Horner lacks the qualifications and expertise necessary to render opinions about the Permit, permeability, and the requirements necessary for secondary containment areas.[8]  Rule 702 requires that an expert witness first be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Even so, "[a]n expert may be qualified to testify on certain matters and not others." *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) (citation omitted) (affirming the district court's exclusion of a drug expert's testimony about recordkeeping procedures, for which his expertise was not established); *see also Nimely*, 414 F.3d at 399 n.13 ("even if an expert witness is qualified in "certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to

---

[8] The Permit requires permittees with above-ground storage tanks installed prior to the date of the Permit (like the Terminal) to have "an impermeable secondary containment area."  *See* Permit § 5(b)(9)(A)(i)(2).  Neither the Permit nor any CT DEEP regulation, however, defines the term "impermeable."  As described below, Dr. Horner applies a subjective definition of the term (i.e., "it does not transmit," Horner Dep. at 92:14-16).

11

other fields."). Accordingly, "district courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (holding that the district court "failed to satisfy its obligations as a gatekeeper" by allowing an expert to "stray from the scope of his expertise.").

To determine whether a witness qualifies as an expert, courts compare "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir.1994); *see also Duchimaza v. United States,* 211 F. Supp. 3d 421, 431 (D. Conn. 2016) (excluding expert opinions about Electronic Benefit Transfer data in the SNAP program where the expert was only qualified in "certain features" of the SNAP program as it operated in the 1980s). The key question, therefore, is whether the expert's experience matches the subject matter of his testimony. An expert must support his claim of expertise in a specific area with reference to his actual experience, must be careful to "stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 671–672 (N.D.N.Y. 2015) (citations omitted). Dr. Horner fails that test.

### 1. Dr. Horner has no experience with Connecticut permitting issues or regulatory inspections

Dr. Horner is unqualified to offer the opinions in his Report because he has no experience working in Connecticut or with CT DEEP, the state regulatory agency that issued and ensures compliance with the 2018/2021 Permit and which regulates the Terminal. *Cf. Lin v. Solta Med., Inc.*, No. 21-CV-05062-PJH, 2024 WL 5199905, at *3 (N.D. Cal. Dec. 23, 2024) (quotation omitted) (excluding a doctor who practiced in Taiwan as unqualified to testify on the standard of care in California and stating that "geographic location is especially relevant to a determination

12

of an expert witness's qualifications"); *see also Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, No. 1:02-CV-2600-RDP, 2010 WL 11561917, at *3 (N.D. Ala. Sept. 2, 2010) (where geography is relevant to the issues at hand, expertise must be geography specific).

Dr. Horner has scant experience working outside of the State of Washington.  The other four industrial sites Dr. Horner has inspected as a litigation expert were all located in Washington State and California. Horner Dep. at 36:4-22.  He has never worked on a project in Connecticut. *Id.* at 64:5-8.  He has no experience with CT DEEP, has never consulted or worked for the agency, and has never even spoken to anyone at the agency regarding the Terminal or the 2018/2021 Permit.  *Id.* at 64:9-14, 81:12-14.

Indeed, he has at best limited experience with any governmental agency.  He has never worked for or been retained by EPA or conducted site inspections for any governmental regulatory agency.  *Id.* at 36:4-22, 80:15-22, 81:12-17.  And in this case, he reviewed but disagreed with EPA's inspection report, in which EPA inspectors found that the Terminal complied with the Spill Prevention, Control, and Countermeasure ("SPCC") regulations:

> **Q.  And I believe that you did review an EPA document that shows an inspection relating to SPCC compliance.  Is that true?**
>
> A.  That is true.
>
> * * *
>
> **Q.  And EPA does inspect facilities for compliance with SPCC, correct?**
>
> A.  Correct.
>
> **Q.  And this document is an inspection report for one such inspection of the terminal, correct?**
>
> A.  Yes.
>
> **Q.  Did EPA find any violation to the SPCC regulations in its inspection?**
>
> A.  No. But I disagree.
>
> **Q.  Are you a qualified EPA inspector?**
>
> A.  A practitioner and a citizen has a right to disagree with the EPA.

13

*Id.* at 115:5-8, 115:22-116:8.  Even though Dr. Horner has no experience as an inspector, he still proffers an unsupported opinion second-guessing experienced EPA inspectors.  And to the extent he disagrees as "a citizen," he brings no special expertise to his opinions, as required by Rule 702(a).

Where an expert is offering opinions based on what is required under a state permit such the 2018/2021 Permit at issue in this case, that expert needs to have experience with the particular regulating entity to offer admissible expert testimony.  Here, Dr. Horner admittedly lacks any knowledge or experience of CT DEEP or the 2018/2021 Permit itself other than simply reading the Permit and other related documents.  Given his lack of relevant experience, if Dr. Horner counts as an expert qualified to opine on the terms of the 2018/2021 Permit, then anyone can be.  The ability to read a document does not qualify someone to opine on the complex regulatory scheme under which this Terminal operates.  *See, e.g.*, *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645 (KBF), 2018 WL 1889763, at *3-4 (S.D.N.Y. Apr. 18, 2018) (holding that an expert may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story.") (citation omitted); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 882 (E.D. Ark. 2008) (excluding expert for reading selected excerpts from documents but providing no expertise).

### 2. Dr. Horner has no knowledge or expertise with bulk petroleum storage facilities

Dr. Horner likewise has no experience with bulk petroleum storage facilities outside of litigation.  He has never worked or performed work at a bulk petroleum storage facility. *Id.* at 45:12-14.  He has never overseen the operations of a bulk petroleum storage terminal.  *Id.* at 45:18-23.  He has never designed a bulk petroleum storage terminal.  *Id.* at 45:24-46:3.  And he

14

has no experience with environmental compliance management at a bulk petroleum storage terminal. *Id.* at 80:11-14.

In fact, he has only ever even stepped foot at four such industrial terminals, all of which were smaller, and only for a few hours to conduct a litigation inspection:

> **Q. And about how much time did you spend at each of those facilities?**
>
> A. Similar to our site visit in New Haven, which was three or four hours.
>
> **Q. In what capacity did you inspect those facilities? Were you serving as an expert in litigation?**
>
> A. Yes.
>
> **Q. Were those facilities similar to the New Haven terminal?**
>
> A. They were smaller.
>
> **Q. Did they also have above-ground storage tanks?**
>
> A. Yes.
>
> **Q. Did you conclude after your inspections that each of those four facilities was violating its stormwater permit?**
>
> A. Yes.

*Id.* at 36:23-37:14. Regardless of the number of cases an individual may have been engaged in as an expert, an individual cannot qualify as an expert where he lacks any experience or expertise with the object of his opinions, here bulk petroleum storage facilities. *See, e.g., Beam v. McNeilus Trauck & Mfg., Inc.*, 697 F. Supp. 2d 1267, 1277 (N.D. Ala. 2010) (excluding testimony from purported expert on guarding devices and warnings for a garbage truck where "his prior experience did not involve garbage trucks or similar motor vehicles designed for road use").

Rather, as demonstrated by his deposition testimony where he admitted that in every case in which he was retained as an expert he found the facilities to be in noncompliance with their permits, his opinions are pre-decided. Horner Dep. at 37:11-14 ("Q. Did you conclude after your inspections that each of those four facilities was violating its stormwater permit? A. Yes."). This

15

sort of litigation-driven experience does not qualify Dr. Horner to express opinions about the Terminal's operations or compliance with the 2018/2021 Permit. *See, e.g.*, *Burton v. Danek*, No. 95-5565, 1999 WL 118020, at *4 (E.D. Pa. Mar. 1, 1999) (noting that a "significant consideration is whether the expert is proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation, or whether the expert developed his or her opinions expressly for purposes of testifying" and excluding expert where "opinion was generated solely in the context of this litigation, not based upon independent research or treatment of patients"); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001) (noting that litigation-driven expertise is a negative factor in admissibility and excluding doctor for lack of experience with the specific type of surgery at issue in case). Dr. Horner has done nothing but serve as a litigation expert in citizen suits and permit challenges for many, many years. His litigation-driven opinions are inadmissible.

### 3. Dr. Horner is not a licensed professional engineer and therefore is unqualified to review or opine on SWPPPs

Dr. Horner is admittedly not a licensed professional engineer, and he has never been licensed in any state. Horner Dep. at 35:13-15. But the 2018/2021 Permit and the Connecticut DEEP guidance document for SWPPP preparation expressly require existing registrants, like Defendants, to "update their current plan and have the plan recertified at the time of registration for this general permit by a professional engineer, PE, licensed to practice in the state of Connecticut, or a certified hazardous materials manager, CHMM." *Id.* at 41:14-23; **Ex. E**, "Guidance Document for Preparing a Stormwater Pollution Prevention Plan, March 2011" at 5. Specifically, "any evaluation, construction, or modification of the design of a stormwater drainage system requires certification by a professional engineer licensed to practice in the state of Connecticut and must be discussed in your plan" as well. Horner Dep. at 42:3-12; Ex. E at 17.

16

Dr. Horner's technical opinions on permeability and the alleged requirements that the secondary containment area must include a liner or that the treatment basin berm height needs to be raised all fall squarely within the "evaluation, construction, or modification of the design of a stormwater drainage system" umbrella.  Because he is not a licensed professional engineer, according to Connecticut DEEP's own guidance documents, he is not qualified to offer these opinions.  His lack of requisite credentials is telling and indicates that his lack of specialized knowledge is the reason he is offering opinions that a licensed professional engineer has not.  *See Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science.  A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."). Of note, ***Plaintiff has not come forward with a single professional engineer who opined that the Terminal is in violation of the 2018/2021 Permit or that any of the measures recommended by Dr. Horner is necessary or appropriate***.

In fact, the Terminal is in compliance with the Permit.  Dr. Horner conceded that he is not aware of any notice of violation issued against the Terminal, nor is he aware of any changes required by the agency at the Terminal:

> **Q. To your knowledge, has Connecticut DEEP ever issued a notice of violation to the terminal?**
>
> A. I have not seen a notice of violation. I can't say whether one has ever been issued.
>
> **Q. Did you do any research or contact anyone to try to determine whether the facility had been cited for any violation relating to stormwater?**
>
> A. I didn't put that specific question to anybody, no.
>
> **Q. And to your knowledge, DEEP has never required the terminal to change any of its processes. Would you agree?**
>
> A. To my knowledge, I have not -- I would agree.

**Q. And nor has DEEP ever indicated that the terminal SWPPP is in violation of the permit.  Is that your understanding?**

A.  Yes. …

Horner Dep. 116:12-117:3.

Even if Dr. Horner were allowed to offer his opinions, they are not helpful to a jury because Dr. Horner has not and cannot offer any opinions or point to any evidence that his proposed design changes would ultimately be approved by a licensed professional engineer.  As noted above, according to Connecticut's own requirements, Defendants cannot accept and implement any of the advocated changes, unless a licensed professional engineer certifies them.  No licensed professional engineer has done so and, absent such certification, Dr. Horner's testimony and opinions on these matters are unhelpful in determining whether Defendants have violated the Permit.

### 4.    Dr. Horner lacks any relevant or timely real-world experience to draw upon having retired in 2008

Assuming for the sake of argument that Dr. Horner was ever qualified to offer opinions on the 2018/2021 Permit or Defendants' compliance with that Permit, he is no longer qualified given that he has been retired since 2008 and since 2011 has worked only as a paid consultant and litigation expert.  Expertise goes stale – just because someone may have at some point had professional expertise to offer expert opinions does not mean that individual continues to be qualified to this day.  *See, e.g.*, *Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 22 (1st Cir. 1992) (affirming exclusion of an expert in part where the expert admitted "it had been ten years since he last dealt with a [comparable project]" ); *Penor v. Columbia Cnty.*, No. CV 08-1114-HU, 2010 WL 916211, at *2 (D. Or. Mar. 9, 2010) (excluding expert whose last relevant experience was "nearly twenty years" old); *see also Newton v. City of Muskogee*, No. CIV-06-532-C, 2007 WL 4150936, at *1 (E.D. Okla. Nov. 19, 2007) (expert who sought to testify based

18

on his experience as a police officer 12 years prior to the filing of the motion was no longer qualified to testify as to current law enforcement practices and procedures).

Here, Dr. Horner retired from teaching in 2008 and has not taught any classes since then. Horner Dep. at 50:11-14, 51:2-6. He is no longer an "active researcher." *Id.* at 50:15-23. After taking *emeritus* status, he researched no more than 12 to 20 hours a week. *Id.* But he has not performed any research in recent years. *Id.* at 50:24-51:1. For the past 15 years, Dr. Horner has primarily worked as a paid consultant and litigation expert. *See id.* at 52:11-18. Thus, the only relevant experience that Dr. Horner may still have would be derived solely from his paid consulting or litigation experience. That is not enough.

When faced with a similar situation, the Fourth Circuit ruled that "it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989). Yet that is exactly what Dr. Horner attempts to do here.

> **5.** **Dr. Horner readily admits that his opinions are based on nothing more than a "plain" reading of the 2018/2021 Permit and regulations**

Given the lack of relevant experience or expertise necessary to offer the opinions in his Report, Dr. Horner falls back on basic reading comprehension as a justification for his opinions. His testimony is simple: the 2018/2021 Permit speaks for itself and sets forth a clear and unambiguous standard which must be met. *See, e.g.,* Horner Dep. at 92:6-8 ("The SPCC and the permit have very clear language. It's unexceptional.").[9]

---

[9] In any event, this statement is not true here, since CLF and Dr. Horner are urging this Court to read "implied" terms into the 2018/2021 Permit.

Dr. Horner's review of documents, including the 2018/2021 Permit, and his interpretation of those documents based on what he claims is their "clear language" is not the stuff of expert testimony. Expert testimony based solely on a review of the record and regurgitated attorney argument—"[a]bsent some relevant specialized knowledge"—does not "meet the requirements of Rule 702." *Duchimaza v. United States*, 211 F. Supp. 3d 421, 430–31 (D. Conn. 2016) (excluding an expert whose opinions "reflect mere characterization of the sort of data that a layperson could make.").

## B.      Dr. Horner's opinions are irrelevant and do not meet the "fit" requirement for admissibility

The Court should exclude Dr. Horner's opinions because they are irrelevant to the facts and claims in this case. Rule 702 requires that "an expert's opinion reflects a reliable application of the principles and methods to the facts of the case," i.e., the so-called 'fit' requirement." *Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn 2004). An expert must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

As the Second Circuit noted, "[t]his condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 255 (2d Cir. 2005); *Pugliano*, 315 F. Supp. 2d at 202. Accordingly, expert testimony "may fail to meet the fit requirement if it relates to facts or data that have not been adequately established in the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002).

### 1.      Dr. Horner's opinions not identified in the NOI or the Complaint are irrelevant and inadmissible

Specifically, Dr. Horner's opinions about Permit violations not related to climate change factors or certification of the SWPPP are not admissible because they were not identified as violations in CLF's NOIs as required by statutes—or in CLF's Complaints—and thus are not

20

properly before the Court for adjudication.[10]  Fed. R. Civ. P. 8.  In fact, and as discussed below, some of his alleged violations premised on the Connecticut Stormwater Quality Manual are missing from the NOI because they rely on standards that did not exist until 2024.  Because the NOI and the Complaint identify what claims and violations are at issue in this citizen suit, CLF cannot now assert claims premised on allegations not contained in its NOI.  It necessarily follows that expert opinions based on those same allegations not included in the NOI and Complaint are irrelevant and inadmissible under Rule 702.  Nor can these extraneous opinions about matters outside the scope of this lawsuit assist the jury in resolving the issues actually before it.

Unlike normal lawsuits, plaintiffs in citizen suits like the instant one are required to provide notice of alleged deficiencies to both the potential defendant and governmental agencies like the EPA and CT DEEP before filing suit.  The pre-suit Notice of Intent is intended to afford the EPA, the state regulating agency, and the alleged violator an opportunity to correct any issues before a citizen suit is initiated.  *See, e.g., Brod v. Omya, Inc.*, 653 F.3d 156, 166 (2d Cir. 2011) (explaining that "the content of a NOI must serve the purpose of giving the appropriate governmental agencies an opportunity to act and the alleged violator an opportunity to comply.").  Once notice has been provided, a plaintiff is prohibited from filing a citizen suit under the CWA or RCRA until sixty days after submitting a Notice of Intent.  *See* 33 U.S.C. § 1365(b)(1)(A); 44 U.S.C. § 6972(a)(1); 40 CFR § 135.3(a).

That notice must adequately outline and explain the basis for plaintiff's eventual lawsuit. Pursuant to applicable regulations, a Notice of Intent:

> shall include sufficient information to permit the recipient to **identify the specific standard, limitation, or order alleged to have been violated, <u>the activity alleged to constitute a violation,</u>** the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such

---

[10] *See generally* Defendants' Motion to Strike Improper Expert Opinions [ECF No. 601].

violation, and the full name, address, and telephone number of the person giving notice.

40 CFR § 135.3(a) (emphasis added).

This is not some toothless, technical procedure; it is mandatory.  In other words, failure to meet this requirement means that the court cannot adjudicate unnoticed claims premised on unnoticed allegations.  *See, e.g.*, *Hallstrom*, 493 U.S. at 25 ("[C]ompliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit."); *Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 995 (9th Cir. 2000) ("If a party seeking to bring a citizen enforcement action has not complied with the CWA's notice requirement, then the district court in which that action is brought lacks subject matter jurisdiction and must dismiss the action.").  Absent adequate notice, district courts must dismiss any claim based on alleged violations not identified in the Notice of Intent, even if those claims are later raised in a complaint.  *See Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 487 (2d Cir. 2001) (affirming dismissal of thermal discharge claims not adequately identified in the Notice of Intent).[11]

---

[11] Defendants are aware of a recent Second Circuit decision that held that the "pre-suit notice requirement is not jurisdictional." *Mid-New York Envt'l and Sustainability Promotion Comm. v. Dragon Springs Buddhist, Inc.*, No. 24-2451, 2025 WL 2653616 (2d Cir. Sept. 16, 2025).  Defendants respectfully disagree with that ruling based on *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 25 (1989), *Catskill Mountains Ch. Of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481 (2d Cir. 2001), and other authorities cited in Defendants' Motion to Strike Improper Expert Opinions [ECF No. 601].  Defendants preserve their objections on these grounds, including all objections based on the applicable provisions of the CWA and RCRA and Federal Rules of Civil Procedure 8 and 12.  Nonetheless, the ruling in *Dragon Springs* does not change the result here.  The court in *Dragon Springs* reiterated the continued importance of the NOI notice requirement, and held that the pre-suit NOI must "provide the recipient with effective, as well as timely, notice." 2025 WL 2653616, at *10 (citing *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995)).  In *Dragon Springs*, the court held that in that case the NOI and complaint adequately identified the violation.  Here, that is not the case, since it is undisputed that the NOI and complaint do not include any of the opinions Dr. Horner has offered regarding the alleged violations listed above (*e.g.*, secondary containment capacity and permeability).

It logically follows as a necessary corollary that expert opinions based on allegations not properly in this case are irrelevant given that they will not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702.

Prior to filing its lawsuit, CLF was required to file a Notice of Intent identifying the specific alleged violations and details concerning the allegations, including the violations alleged in Dr. Horner's expert opinion. By Dr. Horner's own admission, they did not.

CLF's original Notice of Intent disclosed its intent to pursue twelve CWA claims and three RCRA claims. Ex. A. CLF supplemented its NOI twice but did not identify any additional claims. Ex. A (see ECF Nos. 1 and 47). When CLF disclosed its experts, many experts (including Dr. Horner) opined on allegations or claims **never before noticed** in this case in the NOI **or** Complaint. Defendants filed a Motion to Strike improper expert opinions [ECF No. 601], which the Court denied without prejudice. Defendants now challenge Dr. Horner in this Rule 702 motion, as the Court directed.

Dr. Horner had not seen the NOIs prior to issuing his Report in this case. Horner Dep. at 33:14-18, 34:4-9 (stating that he had never reviewed the NOIs that CLF served in the case because "I wasn't asked to"). When asked whether his opinions were contained anywhere in the NOIs, he candidly admitted that they were not. In reviewing the NOIs for the first time at his deposition, he admitted that the NOIs did not contain any allegation or claim that:

- The Facility had "inadequate capacity of secondary containment," *id.* at 165:2-166:8;

- The Facility's soil failed to meet a "permeability" requirement, *id.* at 166:9-166:11;

- The Facility's secondary containment area should include a liner, *id.* at 166:12-166:19; and

- The Facility's bypass was inadequate, *id.* at 166:21-25.

23

Because none of these opinions are found anywhere in any of the NOIs, and therefore no claims may be premised upon them, they are irrelevant to the lawsuit. They are therefore inadmissible as they do not meet the "fit" requirement and will be unhelpful to the jury.

> **2.      Dr. Horner's opinion that the 2018/2021 Permit requires consideration of climate change has no basis in fact and is contradicted by the available evidence**

Dr. Horner opines that Defendants' SWPPP is not compliant with the 2018/2021 Permit in part because it pays "no attention to meteorological and climatological factors, including climate change effects, that have strong influences on how well a stormwater management system functions." Rpt. at 5-6; *see also* Horner Dep. at 202: 9-14 (stating that "considerations of climate change are instrumental in managing water"). This opinion does not fit this case because the Permit makes no reference climate change and does not require consideration of climate change factors.

Even a cursory review of the 2018/2021 Permit demonstrates that it does not reference or mention climate change. *See* **Ex. F**, General Permit for the Discharge of Stormwater Associated with Industrial Activity (October 1, 2018). CT DEEP rejected comments suggesting that the 2018/2021 Permit has ever included an "implied" requirement to assess and address Climate Change Risks, in "best industry practice" or otherwise. Notably, CT DEEP included in its new 2025 Permit, which just became effective on October 1, 2025, a requirement that permittees assess for climate resilience ***for the first time***.[12]  *See* **Ex. G**, National Pollutant Discharge Elimination System, General Permit for the Discharge of Stormwater Associated with Industrial Activities, Permit No.: CTR050000, at § 4.3.2, p. 28, https://portal.ct.gov/-/media/deep/

---

[12] CT DEEP first released the draft permit for public comment in 2024. CT DEEP just announced that the new permit became final and takes effect October 1, 2025. *See* https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/industrial-stormwater-gp ("The Industrial Stormwater General Permit was issued October 1, 2025.").

water_regulating_and_discharges/stormwater/industrial/2025-permit-documents/2025-industrial-stormwater-general-permit-part-1--2erc.pdf?rev=27a88fc492124e02be50a56884b93df1&hash=72F28107771ADCD7EB4D27ED9669C868 (requiring "Resilience and Adaptive Measures – Describe measures to increase site resilience to extreme weather events and long-term climate impacts").  That requirement is not in prior versions of the Connecticut Stormwater Permit.  That this specific language is new to the 2025 Permit is *prima facie* evidence that it was ***not*** required for prior versions.  In other words, the 2025 Permit makes clear that 2018/2021 Permit did **not** require a climate change assessment, implicitly in the term "best industry practice" or otherwise.  *Compare Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:19CV839 (JBA), 2021 WL 4170757, at *1 (D. Conn. Sept. 14, 2021), on reconsideration, No. 3:19CV839 (JBA), 2021 WL 5039035 (D. Conn. Oct. 29, 2021) (excluding as unreliable expert opinion about the "best practice" of federal criminal defense attorneys that was based on the expert's "subjective judgment").

In any event, Dr. Horner admits that the Terminal does consider weather events, severe weather, and climate change considerations in connection with operation of the Terminal:

> **Q. Is it your opinion that defendants give no consideration to weather events or severe weather or climate change considerations in connection with their operation of the terminal?**
>
> A. You ask if I think they give no consideration.  No, I would not make that charge that they give no consideration. I think that they should give more consideration.

Horner Dep. at 203:1-9.  Given that the 2018/2021 Permit does not require consideration of climate change issues, and that CT DEEP has confirmed that such interpretation of the 2018/2021 Permit is wrong, Dr. Horner's opinions to the contrary, which are based on nothing more than his own subjective opinions, untethered from objective evidence, do not fit the case and would be unhelpful and confusing to a jury.  *See Bristol-Meyers Co. v. FTC*, 738 F.2d 554,

25

559 (2d Cir. 1984) (holding that only applicable regulations are relevant to a case and noting that "[i]nsofar as FDA requirements and regulations are concerned, they simply do not govern this case"); *see also United States v. E. Ky. Power Coop.*, No. 04-34-KSF, 2007 WL 4732047, at *3 (E.D. Ky. Mar. 30, 2007) (quoting *United States v. Ohio Edison Co.*, No. 2:99-CV-1181, 2003 WL 723269, at *1 (S.D. Ohio Feb. 25, 2003)) (holding that that because "[t]he interpretation of EPA regulations is [a] function that rests solely with the Court," "[w]itnesses testimony as to the EPA's interpretation . . . improperly invades the province of the Court to determine the applicable law"). These opinions, therefore, are inadmissible.

### C.    Dr. Horner does not employ a discernible or reliable methodology in reaching his opinions

Expert testimony must rest on a reliable, recognized methodology properly applied to the case-specific facts. Courts routinely exclude opinions that overemphasize anecdotal evidence, subjective judgment, and/or assumptions disconnected from the record. *See Grajeda v. Vail Resorts Inc.*, No. 2:20-CV-00165, 2023 WL 2613543, at *5 (D. Vt. Mar. 23, 2023) (excluding expert opinion, in part, because "[r]eliance on anecdotal knowledge… will not suffice.") (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005)); *see also, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266–67 (2d Cir. 2002). Dr. Horner's opinions suffer from precisely these flaws. His opinions are based on cherry-picked data and personal and subjective interpretations that are not based on all the available data.

### 1.    Dr. Horner's opinions are not based on data and consist of personal opinion and *ipse dixit* conclusions

Dr. Horner nowhere explains *how* he reached the conclusion that the Terminal is not in compliance with the Permit, even while acknowledging that he is not aware of any notice of violation from CT DEEP.

26

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos,* 303 F.3d at 266 (quoting *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997)); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 292, 296 (4th Cir. 2021) (reversing district court's decision to allow jury to hear expert testimony supported by a "vague *ipse dixit*"); *Daubert*, 509 U.S. at 590 ("'[K]nowledge' connotes more than subjective belief or unsupported speculation."); Fed. R. Evid. 702 Adv. Comm., 2000 amend. ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").  That is exactly what Dr. Horner tries to do here: offer opinions supported only by his own *ipse dixit*.

One example of Dr. Horner's lack of a reliable methodology can be seen in his opinion that the Terminal's secondary containment area is not "impermeable."  *See* Rep at 17.  To determine the permeability of soil, it is necessary to run tests.  Dr. Horner concedes that there are "no measurements of hydraulic conductivity in the terminal."  Horner Dep. at 114:10-11.  But Dr. Horner did not collect any samples to test the soil, even though the Court allowed Plaintiff to do so.  *Id.* at 113:8-22, 114:8-9.  When pressed on this point, he candidly admitted the gap in his analysis, stating "I wish I had done that."  *Id.*

Given the lack of permeability test data, Dr. Horner instead relies on historical soil boring samples.  Rpt. at 17.  However, Dr. Horner considered only 67 soil boring samples from 2003.  *Id.* at 193:15-18 ("Q. … [S]o you reviewed the 67 soil borings from 2003 … from the Sovereign report, right?  A. Right.").  He did not, however, consider all of the available data.  In fact, he was not aware that numerous other soil borings had been collected in 2020 and 2024, even though the results were included in one of the defense expert reports that he reviewed:

**Q. Were you aware that there were additional boring logs available from 2020 and 2024?**

27

A. No. I didn't get that information.

Q. **So you didn't have an opportunity to review those reports, correct?**

A. I did not.

Q. **Did you see a discussion about those additional soil borings in Dr. Zeeb's report?**

A. I don't recall seeing that. I don't recall it.

Q. **And are you aware that those Sovereign reports are publicly available through CT DEEP's online portal?**

A. I'm not aware of that.

Q. **Did you look?**

A. No. I had no idea that they existed.

*Id.* at 193:19-194:8.

Dr. Horner reaches an opinion on permeability without considering all the available data, and without collecting his own data and running his own tests. Dr. Horner does not attempt to explain how this scant evidence could support any rigorously testable conclusion of impermeability. Instead, he merely declares that this small subset of data shows that the soil failed to meet his subjective definition of impermeability. *Id.* at 93:11-14 ("Q. Did you may any effort to determine whether Connecticut defines the term 'impermeable'? A. I did not look for the definition, as I very well understand what impermeable means."). That is improper.

Dr. Horner merely claims that the soil is impermeable because liquids can "rapidly infiltrate it and percolate downward," Rpt. at 4, but offers no evidence for how he reached that conclusion. In fact, he readily admits he performed no qualitative analysis regarding percolation rate. Horner Dep. at 146:25-147:25. He admits this analysis is merely in the "eye of the beholder," which in this instance, is his. *Id.* ("Q. And the eye of the beholder is your, Dr. Horner's, eye, right? A. It is mine. I believe it would be widely agreed upon." [objection omitted]). When pressed on how he reached the conclusion that the soil had for example, "high hydraulic conductivities," Rpt. at 17, and was thus not impermeable, he responded that he merely

28

reached the conclusion based on his "years of association with practitioners in my field." Horner Dep. at 146:25-147:25. And when asked if he reviewed any literature or article or guidance to support his conclusion that a synthetic liner was required under these circumstances, he could not identify a single one. *Id.*

Here, to qualify as admissible expert testimony, Dr. Horner needed to do more. He should have taken his own soil samples. He should have tested the permeability of the soil by calculating a percolation rate. If he truly believed the soil to be permeable, he should have reached that conclusion only after applying scientific rigor by performing repeatable testing which could itself be verified and tested by others to confirm its accuracy.

Courts regularly reject such leaps in logic, because the "personal opinion of an expert … is not enough." *Design Resources, Inc. v. Leather Indus. of Am.*, No. 1:10CV157, 2014 WL 4159991, at *5 (M.D.N.C. Aug. 19, 2014), *aff'd*, 789 F.3d 495 (4th Cir. 2015) (quoting *First Health Grp. Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 849 (N.D. Ill. 2000), *aff'd sub nom. First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001)); *see also Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 699 (S.D.W. Va. 2014) ("An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on the record of evidence.").

Dr. Horner's subjective testimony—serving as a conduit for Plaintiff's version of the story—is irrelevant, unhelpful to the jury, and unreliable. *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 1:17-MD-2775, 2021 WL 781682, at *13 (D. Md. Mar. 1, 2021) ("[A]ny opinions [that] are based on any of the experts' subjective beliefs—as opposed to his or her specialized knowledge, skill, experience, training, or education—are unreliable and should be excluded").

29

### 2.    Dr. Horner has no basis for or understanding of what a "best industry practice" is in the oil and gas industry

Dr. Horner opines that the Terminal's "stormwater treatment basins do not meet the requirement of the Stormwater Permits to use control measures at the level of best industry practice" and should be replaced with "a form of advanced stormwater treatment."  Rpt. at 5, 30.  But when pressed during his deposition, he admitted he did nothing to determine what the best industry practice was in the oil and gas industry for implementing stormwater controls or why such best industry practice must "consider[] the modifications forecast to accompany climate change."

Dr. Horner's understanding of best industry practice in the oil and gas industry is nonexistent and his assumption that such practices must account for climate change is baseless and unfounded.  Despite admitting that a given "best industry practice" is industry specific, Horner Dep. at 61:6-8, Dr. Horner concedes that he did not:

- Research and took no steps to determine what best industry practices for bulk petroleum storage terminals are.  *Id.* at 95:11-23.

- Research for the oil and gas industry more broadly.  *Id*. at 104:23-9.

- Review any literature on the subject.  *Id*. at 95:11-23.  All he did was read the permit, *id.*—which does not define "best industry practice" anywhere.

- Make any effort to contact anyone in the oil and gas industry to help determine or understand industry-specific best practices.  *Id.* at 104:23-9.

- Look to see whether any EPA region had issued guidance on best industry practices.  *Id.* at 106:3-8.

- Review any of the practices or protocols in effect at the Terminal (which he contends was "outside the scope" of what he was asked to do).  *Id.* at 112:21-113:6.

In short, Dr. Horner does not know what the "best industry practice" is for a bulk petroleum storage terminals, has no basis on which to opine what that standard would be, and conducted no independent investigation to determine what it is.  Indeed, he does not even know what sector the Terminal is classified under in the Permit to determine whether any specific

30

control measures apply.  *Id.* at 144:23-25 ("Q. You don't really know what sector the terminal

is classified under?  A.  I don't.").

Dr. Horner's reliance on the 2018/2021 Permit's "best industry practice" language is

just a sleight of hand to inject into that Permit whatever obligations Dr. Horner believes *should*

be required, as opposed to what is required.  *See FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.

1983) (excluding expert opinion concerning industry practice and FAA policy because it was

"irrelevant to the jury's determination of violations of the regulations"), *cert. denied*, 464 U.S.

895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983)).

**3.      Dr. Horner's New Haven Harbor contamination opinion
ignores alternative sources of contaminants for New Haven
Harbor**

A significant objective of the Rule 702 *Daubert*/*Kumho Tire* analysis is to ensure that "an

expert, whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  An expert's

failure to explore and account for other potential causes of phenomena—especially those causes

with which that expert is undisputedly familiar—is a reason to exclude that expert's opinion.

*See, e.g.*, *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 2015 WL 5734413, at *3 n.9

(D. Md. Sept. 22, 2015), *aff'd*, 672 F. App'x 229 (4th Cir. 2016) (rejecting expert testimony in

part due to a "fail[ure] to account for other causes of consumer confusion").

Dr. Horner ultimately opines that the Terminal's failure to comply with the Permit has led

to contamination of the New Haven Harbor.  *See* Rpt. at 19 ("[T]he Terminal soils were

extensively contaminated with a host of toxic materials that potentially could migrate deeper, and

probably have done so."), 24-25 ("[O]verall migration of groundwater COC concentrations at the

site is considered to have predominantly flowed west-southwest toward New Haven Harbor

31

(gradient direction)"), 25 ("These measurements indicate the movement of a range of contaminants elevated in concentration above SWPCs in the prevailing direction of groundwater flow. New Haven Harbor is 1300 ft from the Terminal, and the groundwater flow rate is characterized as 0.007 to 1.3 ft/day. While this range is so broad as not to be reliable for forecasting, a rate somewhere in the broad center would convey the contaminants to the harbor in a few years or less."), 26 ("[M]y opinion [is] that the potential for contamination of water resources by the Terminal's stormwater, as well as from a spill or leak, is very high.").  In particular, he contends that making the changes to the secondary containment areas outlined in his Report, will "alleviate the ongoing contamination of groundwater and transport of pollutants to New Haven Harbor." *Id.* at 4.  Dr. Horner's opinion is largely in service of his principal opinions on permeability and the alleged need for secondary containment area liners.

But he failed to consider alternative sources of stormwater to New Haven Harbor in asserting this opinion.  Dr. Horner readily admits he did not have access to and did not look for any environmental data from New Haven Harbor.  Horner Dep. at 69:21-70:1.  He did not consider or investigate surrounding properties with aboveground storage tanks as possible sources of contaminants.  *Id.* at 71:2-20.  Nor did he consider or investigate I-95 as a possible source of contaminants, even though he admits that both ultimately drain to the New Haven Harbor and likely contribute to contamination.  *Id.*

In fact, Dr. Horner did not review the water quality data for New Haven Harbor and did not review any measured concentrations.  *Id*. at 72:18-22. He likewise did not cross reference any contaminants in New Haven Harbor to see if those same contaminants are present at the Facility.  *Id*. at 72:23-73:2.  He does not know to what extent the New Haven Harbor is contaminated from sources upstream of the Terminal.  *Id*. at 73:3-6, 73:23-25. Ultimately, he

32

admits that it would "be impossible to distinguish the sources if it's measured in the waterbody that is receiving runoff from an industrial area and a relatively large city and transportation facilities, et cetera." *Id*. at 70:2-10.

In short, Dr. Horner fails to show that implementing the specific measures he proposes would alleviate the ongoing impacts to groundwater and transport of stormwater to New Haven Harbor. His opinion is not grounded or based on any actual investigation or scientific rigor. It is rank speculation, which is not admissible. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("Although the Federal Rules of Evidence espouse a liberal standard for the admissibility of expert testimony, courts will not admit expert opinions that are without factual basis."); *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012), aff'd, 541 Fed. Appx. 62 (2d Cir. 2013) (excluding expert opinions "without factual basis and [] based on speculation or conjecture"); *see also Arista Records LLC v. Usenet.com, Inc*., 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) (excluding an expert "who simply repeat[ed] the hearsay of the client who retained him, without any independent investigation or analysis").

Courts regularly exclude expert opinions "without factual basis and [] based on speculation or conjecture." *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012), aff'd, 541 Fed. Appx. 62 (2d Cir. 2013). "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge." *Arista Records LLC v. Usenet.com, Inc*., 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) (excluding an expert "who simply repeat[ed] the hearsay of the client who retained him, without any independent investigation or analysis").

33

**4.    Dr. Horner attempts to hold the Terminal to an inapplicable standard**

In one of his key opinions regarding stormwater discharges, Dr. Horner cites and relies on the Connecticut Stormwater Quality Manual to suggest Defendants have "violated" the 2018/2021 Permit. Dr. Horner opines that the Terminal's activities qualify as "land uses or activities with higher potential pollutant loads" ("LUHPPL"), Horner Dep. at 168:3-5, and that because the Terminal's activities meet this LUHPPL definition, it is required to employ specific management of stormwater infiltration measures and the failure to do so would violate the Permit. *See* Rpt. at 21, 23 ("[T]he regulatory provisions require pre-treatment of infiltrated stormwater runoff from any part of a LUHPPL facility."). In fact, this is the basis for his opinion that the Terminal is required to install a liner for its secondary containment area. *Id.* at 21 ("[T]he [Stormwater] Manual . . . states that, "A liner is required for stormwater ponds that receive runoff from Land Uses with Higher Potential Pollutant Loads (LUHPPLs).").

As is typical of his drive-by analysis in this case, Dr. Horner relies on the 2024 Connecticut Stormwater Quality Manual, a document which is dated ***three years after this lawsuit was filed***, to support his opinion that Defendants violated the 2018/2021 Permit. *See* **Ex. H**, 2025.07.25 Rebuttal Report of Richard R. Horner, Ph.D. (the "Rebuttal Report" or "Rebut. Rpt.") at 17 ("As an industrial facility subject to the Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity, the Shell Terminal is a LUHPPL. . . . [T]he Stormwater Manual states, '[a]n impermeable liner is generally required for stormwater BMPs that receive stormwater from LUHPPLs and that could potentially discharge to groundwater …' The Terminal employs no liners in any location, secondary containments or stormwater basins, where stormwater infiltration is highly likely to occur and to discharge to groundwater, as is clearly required by this provision.").

Under Rule 702, opinions premised on these subsequent standards are unhelpful to a jury and employ a flawed and inapplicable methodology. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 **mandate** the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (emphasis added); *see also Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 255 (2d Cir.2005) (same). Dr. Horner looks to the Connecticut Stormwater Quality Manual to claim that Defendants were required to adhere to it with respect to management of the permittee's runoff, including "the management of stormwater infiltration of from land uses or activities with higher potential pollutant loads (LUHPPLs)." But that standard did not exist at the time the lawsuit was filed, a fact Dr. Horner readily admits.

> **Q. Okay. Well, the original publication date is September 30th, 2023, with an effective date of March 30, 2024. Do you see that on the cover?**
>
> A. Yes.
>
> * * *
>
> **Q. Now -- and Chapter 10 for LUHPPLs says, when it describes going back to the description, at the beginning of Chapter 10, it says that this chapter -- in the box, it says, 'This chapter is a new addition to the Connecticut Stormwater Quality Manual.' Do you see that? Page 176.**
>
> A. All right. I'm at 176.
>
> **Q. And I'm just saying, the box on the right-hand side expressly states that this is a new addition, this chapter?**
>
> A. I see that.
>
> * * *
>
> **Q. But the stormwater manual postdates the filing of this lawsuit and does not apply to established facilities, right?**
>
> A. It postdates the filing of the lawsuit. I don't agree that it has no bearing on the operation of the facility.

Horner Dep. at 119:18-22, 169:15-25, 171:5-11.

The LUHPPL chapter of the Connecticut Stormwater Quality Manual was new in the 2024 version of that manual, and when confronted with that fact, Dr. Horner offered no

35

explanation for why it serves as a basis for the Facility allegedly violating the 2018/2021 Permit. Dr. Horner's opinions, especially his opinion that a synthetic liner is required at the Terminal, are premised on inapplicable standards.

Dr. Horner's unreliable analysis and reliance on a document that post-dates the applicable time period is not an isolated incident.  In his Report, he also opines that the containment area 1 bypass pipe, which was installed in 2022, was a "qualifying activity," and therefore "brought it under the auspices of" the Connecticut Stormwater Quality Manual."  Horner Dep. at 121: 25-3. But, as Dr. Horner admits, the bypass was completed in 2022.  *Id*. at 122:16-18.  Factually and legally, the installation of the bypass pipe "predated the 2024 Stormwater Quality Manual's effective date."  *Id*. at 122:19-22 (admitting "yes, literally the dates are as you claim").  These are clear simple errors for which Dr. Horner fails to offer any explanation.  These examples, in a nutshell, demonstrate Dr. Horner's flawed analysis.  Defendants cannot be held to nonexistent standards or standards which have not yet been made effective.  *See, e.g.*, *Bristol-Meyers Co.*, 738 F.2d at 559 (holding that only applicable regulations are relevant to a case and noting holding that "[i]nsofar as FDA requirements and regulations are concerned, they simply do not govern this case")When confronted, Dr. Horner acknowledges these facts but nevertheless maintains that Defendants should be held to higher standards not expressly included in the 2018/2021 Permit.  Under any standard, Dr. Horner's opinions are not based on a reliable methodology, but rather are subjective and litigation-driven.  They are inadmissible.

### D.      Dr. Horner's opinions should be excluded under Rule 403

In addition to the many deficiencies under Rule 702, even if Plaintiff could overcome the procedural and evidentiary flaws inherent in Dr. Horner's opinions, the Court should nevertheless exclude Dr. Horner's unhelpful opinions under Federal Rule of Evidence 403.  The Court must take great care with Dr. Horner's expert testimony under Rule 403 "given the unique

weight such evidence may have in a jury's deliberations." *Nimely,* 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595).  In the same vein, district courts must be "especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law." *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 511 (2d Cir. 1977) (citation omitted) (reversing the district court allowing an expert to testify about securities law and usurp the role of the jury). Where, as here, an expert's opinion 1) is not based on a reliable methodology, and 2) failed to consider critical relevant facts, "the probative value of such testimony 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, . . . and must be excluded for that reason as well." *See Castelluccio v. Int'l Bus. Machines Corp.*, No. 3:09CV1145 DJS, 2012 WL 5408420, at *7 (D. Conn. Nov. 6, 2012) (Squatrito, J.).

The prejudice created by Dr. Horner's proposed opinions is clear. As stated above, Dr. Horner's opinions are irrelevant.  His opinions relate to alleged violations that are not at issue in this case because they were not included in the NOI or Complaint.  And his opinions that the Facility must have considered climate change factors to be in compliance with the Permit are imagined fabrications. Nowhere in the 2018/2021 Permit does it reference or even intimate that compliance requires consideration of meteorological and climatological factors, including climate change effects.  Dr. Horner should not be permitted to introduce opinions—not supported and at times contradicted by any agency guidance or relevant industry standards—that drastically expand the scope of this case and prejudice Defendants by injecting into the 2018/2021 Permit flood protection requirements that CT DEEP never intended.  The risk of unfair prejudice is particularly acute here, given the likelihood that the jurors may ascribe undue weight to Dr. Horner's unsupported and unreliable opinions because he will be introduced to them as an expert

37

with an esteemed reputation. *See, e.g.*, *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("We cannot ignore the tendency of juries on occasion "to decide simply according to the preponderance of numbers and of influential names."); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors.").

Given the court's obligation "not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law," Dr. Horner's testimony must be excluded under Rule 403. *Marx & Co., Inc.*, 550 F.2d at 511. Accordingly, Dr. Horner's opinions and testimony should be excluded under Rule 403.

## V.    CONCLUSION

Dr. Horner is a litigation expert who makes a living testifying regularly in citizen suits. He is more an advocate than an expert. He lacks the necessary qualifications to proffer his opinions, his opinions fail the "fit" and reliability requirements of Rule 702, and his opinions are likely to confuse the jury and unfairly prejudice Defendants. For the foregoing reasons, Defendants respectfully request that the Court exclude all of Dr. Horner's opinions.

Dated: October 3, 2025                                Respectfully submitted,

*/s/ Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street

38

Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190

39

breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

41