# Exhibit B

## Filed Under Seal

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Shell New Haven Terminal

Case No. 3:21-CV-00933-VDO

# Report of Richard R. Horner, Ph.D.

May 1, 2025

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 3

II. SUMMARY OF FINDINGS AND OPINIONS ................................................. 3

    A.  Introduction .............................................................................................. 3

    B.  Principal Findings and Opinions ............................................................ 4

III. PROFESSIONAL BACKGROUND AND QUALIFICATIONS ..................... 6

IV. SITE DESCRIPTION ....................................................................................... 10

    A.  Terminal Facilities and Operations ...................................................... 10

    B.  Storm Drainage System ........................................................................ 11

V.  ASSESSMENT OF STORMWATER CONTAINMENT PRACTICES ......... 14

    A.  Shell's Implementation of Stormwater Containment ........................... 14

        1. Assessment of Containment Structures and Their Setting in the Terminal ..................... 14

        2. Assessment of the Containment Area 1 Bypass ................................. 30

        3.  Assessment of the Treatment System in Relation to Best Industry Practice ................. 34

VI. ASSESSMENT OF 2017 STORMWATER POLLUTION PREVENTION PLAN CERTIFICATION ............................................................................................ 37

    A. 2017 SWPPP Certification Process ...................................................... 37

        1. Appendices Pertaining to Certification ............................................. 37

        2. Corrective Action Plan Removed from the 2017 SWPPP .................. 38

        3. Outline of My Assessment .................................................................. 39

    B. Tank Secondary Containment Capacity ............................................... 40

        1. Summary of Deposition Testimony .................................................... 40

        2. Commentary on Deposition Testimony .............................................. 40

    C.  Tank Secondary Containment Impermeability ..................................... 41

        1. Summary of Deposition Testimony .................................................... 41

        2. Commentary on Deposition Testimony .............................................. 43

    D. The Corrective Action Plan ................................................................... 43

        1. Summary of Deposition Testimony .................................................... 43

        2. Commentary on Deposition Testimony .............................................. 45

    E.  Consideration of Shell and EPA Guidelines and Challenging Conditions in Preparing the SWPPP ............................................................................................... 45

        1. Summary of Deposition Testimony .................................................... 45

        2. Commentary on Deposition Testimony .............................................. 46

    F.  My Overall Assessment of the Certification's Adequacy and the SWPPP's Validity ..... 47

1

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**VII. SWPPP'S DEVELOPED BEFORE AND AFTER 2017** ................................................ 49

   A. 2011 SWPPP ............................................................................................................ 49

   B. SWPPPs Subsequent to 2017 ................................................................................. 50

**ATTACHMENT A**: New Haven Terminal Photographs ................................................................ i

**ATTACHMENT B**: Richard Horner *Curriculum Vitae* .............................................................. xiii

**ATTACHMENT C**: Summary of Previous Testimony ............................................................. xliii

**ATTACHMENT D**: Materials Considered ............................................................................. xlvi

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## I. INTRODUCTION

My name is Richard R. Horner and my address is 230 NW 55th Street, Seattle, Washington 98107.  I have been retained as an expert on stormwater management issues by Plaintiff Conservation Law Foundation (CLF or the Plaintiff) in its lawsuit versus the Shell and Motiva Defendants regarding the New Haven Bulk Oil Storage Terminal (Shell or the Defendant).  This is my expert report presenting my analysis of the Defendant's operations at the Shell New Haven Terminal (the Terminal) relevant to stormwater management in support of the Plaintiff's Clean Water Act (CWA) citizen suit.  In addition to applying my experience and expertise, in forming the opinions expressed below I drew upon my observations during a site visit conducted on April 10, 2025; photographs of the facility taken on that date, some of which are contained in Attachment A; and documents cited herein.

## II. SUMMARY OF FINDINGS AND OPINIONS

### A. Introduction

Based upon my analyses, it is my opinion that the Defendant has been out of compliance with the Clean Water Act, and the Oil Pollution Prevention regulation at 40 CFR part 112, and the 2011 and 2021 Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity (the Stormwater Permits)[1] on several grounds, including, but not necessarily limited to, those summarized immediately below.

---

[1] Connecticut Department of Energy & Environmental Protection (CT DEEP); General Permit for the Discharge of Stormwater Associated with Industrial Activity; Bureau of Materials Management & Compliance Assurance; Water Permitting & Enforcement Division; effective October 1, 2021, available at 20210614-gsi_reissuancenotice-websitesigned.pdf (accessed April 24, 2025) ("SWPPP 2021").  The 2021 permit was a reissuance of the 2011 permit without modifications.

3

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**B. Principal Findings and Opinions**

Following is a summary of the main points I reached through my analysis of the Defendant's stormwater management:

- Shell operates under regulatory requirements to provide impermeable tank secondary containments that hold at least 100 percent of the volume of the largest tank or 10 percent of the total volume of all tanks, whichever is larger, and to contain discharged petroleum product until being cleaned up.

- Shell's tank secondary containments are not lined, lie on soils predominant in sand and gravel through which liquids rapidly infiltrate and percolate downward to groundwater, and are thus not impermeable.

- The soil has been documented in two investigations over the years to be heavily contaminated with many constituents of concern associated with Shell's products.

- Groundwater beneath the Shell Terminal is subject to regulations requiring that the entire volume of infiltrated runoff be treated prior to infiltration and that the treatment system for this purpose have an impermeable liner.  The water infiltrating from Shell's unlined tank secondary containments is not treated, nor are the treatment basins to which stormwater runoff is directed.

- Groundwater at the site is within a very few feet of the surface; is highly subject to contamination owing to the highly infiltrative soils and lack of stormwater treatment or liners in tank secondary containments and the treatment basins; and, like the soil, has been documented in two investigations over the years to be heavily contaminated with many constituents of concern associated with Shell's products.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- Groundwater movement at the Terminal is in the direction of New Haven Harbor, about a quarter mile away, and moving at a rate that can transport contaminants in groundwater to the harbor in a few years or less. The groundwater table also intersects a drainage channel through the Terminal that flows to the harbor.

- I assessed the implications of making the secondary containments impermeable with liners and concluded that lining them is entirely feasible and should be done to alleviate the ongoing contamination of groundwater and transport of pollutants to New Haven Harbor.

- Shell was informed of the inadequacies of the tank secondary containments in 2017 but failed to inform the state regulator as required by the Stormwater Permits.

- I assessed the operation of a bypass pipe installed in 2022 to drain the contents of the inadequately sized Containment Area 1 into Containment Area 2 in the event of a large, rapid product release. I found that it would not transfer the released products in time to avoid overflow into the drainage channel leading to New Haven Harbor.

- Shell's stormwater treatment basins do not meet the requirement of the Stormwater Permits to use control measures at the level of best industry practice. They should be replaced with a form of advanced stormwater treatment.

- The certification of Shell's 2017 stormwater pollution prevention plan is not compliant with the requirements of the Stormwater Permits because of: (1) a lack of proper verification of tank containment area capacity and impermeability; (2) failure to immediately implement a Corrective Action Plan and report deficiencies to CT DEEP within the requisite five-day period; (3) lack of consideration of relevant policies and guidelines in development of the plan; (4) no attention to meteorological

5

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

and climatological factors, including climate change effects, that have strong influences on how well a stormwater management system functions; and (5) no demonstration that the discharge from the stormwater drainage system is comprised solely of stormwater.

- The stormwater pollution prevention plans developed in 2011, 2020, and 2023 are deficient in numerous important respects.  Furthermore, the latter two versions were not properly certified as required.  The 2017 plan is therefore the operative one, despite the inadequacy of its certification.

I elaborate on all of these points and justify my opinions after presenting my background and qualifications and providing a site description.

## III.  PROFESSIONAL BACKGROUND AND QUALIFICATIONS

I have over 58 years of professional experience, 43 teaching and performing research at the college and university level.  For the last 47 years I have specialized in research, teaching, and consulting in the area of stormwater runoff and surface water management.

I received a Ph.D. in Civil and Environmental Engineering from the University of Washington in 1978, following two Mechanical Engineering degrees from the University of Pennsylvania.  Although my degrees are all in engineering, I have had substantial course work and practical experience in aquatic biology and chemistry.

For 12 years beginning in 1981, I was a full-time research professor in the University of Washington's Department of Civil and Environmental Engineering.  From 1993 until 2011, I served half time in that position and had adjunct appointments in two additional departments (Landscape Architecture and the College of the Environment's Center for Urban Horticulture).  I spent the remainder of my time in private consulting through a sole proprietorship.  My

6

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

appointment became emeritus in late 2011, beyond which I continued university research and teaching at a reduced level while maintaining my consulting practice.  My research, teaching, and consulting have embraced all aspects of stormwater management, including determination of pollutant sources; their transport and fate in the environment; physical, chemical, and ecological impacts; and solutions to these problems through better structural and non-structural management practices.

I have conducted numerous research investigations and consulting projects on these subjects.  Serving as a principal or co-principal investigator on more than 40 research studies, my work has produced three books, approximately 30 papers in the peer-reviewed literature, and over 20 reviewed papers in conference proceedings.  I have also authored or co-authored more than 100 scientific or technical reports.

In addition to graduate and undergraduate teaching, I have taught many continuing education short courses to professionals in practice.  My consulting clients include federal, state, and local government agencies; citizens 'environmental groups; and private firms that work for these entities, primarily on the West Coast of the United States and Canada but in some instances elsewhere in the nation.

Over a 17-year period beginning in 1986, I spent a major share of my time as the principal investigator on two extended research projects concerning the ecological responses of fresh water resources to urban conditions and the urbanization process.  I led an interdisciplinary team for 11 years in studying the effects of human activities on fresh water wetlands of the Puget Sound lowlands.  This work led to a comprehensive set of management guidelines to reduce negative effects and a published book detailing the study and its results.  The second effort involved an analogous investigation over 10 years of human effects on Puget Sound's salmon

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

spawning and rearing streams.  These two research programs have had broad sponsorship, including the U.S. Environmental Protection Agency, the Washington Department of Ecology, and a number of local governments.

I have helped to develop stormwater management programs in Washington State, California, and British Columbia, and studied such programs around the nation.  I was one of four principal participants in a U.S. Environmental Protection Agency-sponsored assessment of 32 state, regional, and local programs spread among 14 states in arid, semi-arid, and humid areas of the West and Southwest, as well as the Midwest, Northeast, and Southeast.  This evaluation led to the 1997 publication of "Institutional Aspects of Urban Runoff Management:  A Guide for Program Development and Implementation" (subtitled "A Comprehensive Review of the Institutional Framework of Successful Urban Runoff Management Programs").

I was a member of the National Academy of Sciences-National Research Council (NAS-NRC) committee on Reducing Stormwater Discharge Contributions to Water Pollution.  NAS-NRC committees bring together experts to address broad national issues and give unbiased advice to the federal government.  The panel was the first ever to be appointed on the subject of stormwater.  Its broad goals were to understand better the links between stormwater discharges and impacts on water resources, to assess the state of the science of stormwater management, and to apply the findings to make policy recommendations to the U.S. Environmental Protection Agency relative to municipal, industrial, and construction stormwater permitting.  The committee issued its final report to the public in October 2008, with a printing date of 2009.  My principal but not sole contribution to the report was the chapter presenting the committee's recommendations for broadly revamping the nation's stormwater program.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

I have substantial familiarity and experience with the industrial stormwater permits, stormwater pollution prevention plans under these permits, measures industries can take to reduce pollutants in stormwater runoff to comply with their permits, and permit monitoring requirements. I have provided analyses and expert testimony in two appeals of the state of Washington's Industrial Stormwater General Permits.

I have inspected scores of industries of various sizes and types and other kinds of facilities to evaluate pathways of discharges, stormwater management practices and issues related to the environmental impacts of stormwater and to make recommendations on these issues. I have inspected four other industrial sites that receive and distribute petroleum products by land and are located on or near marine waters. At these facilities, I have analyzed sources of stormwater contamination, probable negative effects on receiving waters, stormwater pollution prevention plans, existing and potential best management practices, adherence to industrial stormwater general and individual permit terms, and stormwater monitoring procedures and results.

My experience includes activities concerning industrial stormwater within and outside the litigation framework. I have provided analyses and, in some cases, expert testimony in more than 80 legal cases involving industrial stormwater permits. I was appointed as a special master by Judge Christina A. Snyder of the Federal Court for the Central District of California to offer advice on bringing a Los Angeles automobile recycling yard into compliance with the terms of a consent decree entered into with a citizen environmental group. Additionally, I was a member of a panel formed to develop an industry-specific industrial stormwater general permit (for metal recyclers) under the jurisdiction of California's Santa Ana Regional Water Quality Control Board. The panel included representation from the industry and its consultants, environmental

9

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

groups and their consultants, and the Board.  The resulting permit was in effect for approximately six years and then was reissued.  Having demonstrated its utility for a full term, it was a model for stormwater permits in other California Regional Water Quality Control Boards.

Attachment B provides my *curriculum vitae*, including a list of all publications I have authored in the previous ten years and many previously.  Attachment C presents a list of cases for which I have provided expert testimony in written form or by appearance at deposition, trial, or hearing during the last four years and certain prior relevant cases.

I am being compensated at my regular hourly consulting rate of $250 for my investigation and analysis and at my regular hourly rate of $250 for expert testimony in this matter.

## IV. SITE DESCRIPTION

### A.  Terminal Facilities and Operations

This account and that in report section IV.B below are based principally on Shells's stormwater pollution prevention plan dated July 2017 (2017 SWPPP)[2] and my observations during my site visit on April 10, 2025.  The Shell Terminal is located at 481 East Shore Parkway, New Haven, Connecticut.

The facility is a bulk petroleum storage terminal with operations principally consisting of the receipt, storage, and truck loading of petroleum products and additives.  Products are received at an off-site dock and conveyed via product transfer lines and trucks to aboveground storage tanks (ASTs).  Products are primarily distributed from the Truck Loading Rack (Appendix A, Photograph 1) but are also shipped via pipeline.  The Truck Loading Rack has

---

[2] Stormwater Pollution Prevention Plan; July 2017; Shell Oil Products US; 481 East Shore Parkway, New Haven, Connecticut; Prepared by Triton Environmental, Inc. ("SWPPP 2017"). As discussed below in section VII, the 2017 SWPPP is the operable SWPPP.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

eight loading positions for dispensing products.  Each loading bay is on a concrete surface that drains to a perimeter trough drain (*e.g.*, Photograph 2) and then to an oil/water separator.

The Terminal has 39 ASTs for storage of gasoline, distillates, ethanol, gasoline and diesel additives (*e.g.*, Photograph 3).  The tank farm is organized with three main containment areas (Containment Areas 1 to 3).  Containment Areas 2 and 3 are separated by a berm and surrounded by a perimeter berm.  Containment Area 1, in the southern part of the Terminal, is bermed separately from the other two.  The containment area floors and berms are earthen and crushed stone materials (*e.g.*, Photograph 4).  The soil on the floors, visually and to the touch, is sandy, gravelly material (*e.g.*, Photograph 5).  There are also three horizontal butane ASTs in the southwest portion of the facility with an offloading pad for receiving butane shipments by truck (*e.g.*, Photograph 6).

Off-loading petroleum additives takes place east of the Truck Loading Rack (*e.g.*, Photograph 7).  The area has a containment berm with a connection to an oil/water separator and a lift station that pumps water to the primary retention basin, the first in a series of two.  Product pump-off from trucks into the ASTs is performed either in this area or at the Truck Loading Rack.

Other facilities include an Office, Warehouse, Storage sheds, Electrical Sheds, an emergency generator, Fire Suppression Buildings, Butane Laboratory, Compressor Buildings, and Vapor Recovery Unit.

### B.  Storm Drainage System

Stormwater drainage at the Terminal consists of one drainage area separated into four sections designated Drainage Areas 001A, 001B, 00lC, and 001D.  Stormwater runoff is ultimately directed to two structures in series that the 2017 SWPPP terms primary and secondary

11

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

stormwater retention basins (*e.g.*, Photograph 8). Water flows from the first to the second basin through an oil/water separator when it reaches an overflow pipe. While the label "retention" in the stormwater management field literally means that a structure does not have a surface discharge, these basins do discharge at Outfall 001 in the southwest portion of the site. They are thus more properly called detention basins. Outfall 001 discharges from the secondary retention basin to the city storm sewer in East Shore Parkway, near the Terminal's truck entrance, when a manually activated pump rated at 300 gallons per minute is operated. The outfall is the Terminal's stormwater sampling point.

Drainage Area 001A is coincident with Containment Area 3. It has 17 tanks, product piping entering the Terminal, Fire House F- I (with foam tanks), an additive tank, and a skid for tank corrosion inhibitor. Stormwater flows overland into a series of catch basins from where it is piped to lift stations in low areas (*e.g.*, Photograph 9). The lift stations pump runoff through piping into Drainage Area 001B.

Containment Area 2 and Drainage Area 001B are coincident. This subcatchment contains 14 tanks. It also has a network of catch basins and lift stations that pump water to a low area in the south portion of the drainage area from where it flows into the primary retention basin through an 8-inch pipe.

Containment Area 1, also Drainage Area 001C, houses three tanks. All stormwater here flows to a catch basin and lift station in the northwest corner of the area from where it discharges via a 6-inch pipe to the primary retention basin (Photograph 8). This containment area does not have the legally required capacity to hold the contents of the largest tank in the event of a full release. In 2022 in an attempt to offset the insufficiency, the containment area was fitted with a

12

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

12-inch overflow pipe to convey the contents of the containment area by gravity, should it fill to the top of the berm, into Drainage Area 001B. (*e.g.*, Photograph 10).

Drainage Area 001D, also referred to as the Yard Area, has five tanks and includes the Office, Warehouse, Truck Loading Rack, Butane System, and Vapor Recovery Unit. Roof leaders from the Office and Warehouse discharge to catch basins to the north and southwest of the buildings. These catch basins flow to a lift station and then to the primary retention basin. One set of roof storm drainage leaders discharges directly to the storm sewer.

The Truck Loading Rack is equipped with roof leaders that discharge to catch basins. The catch basins and trough drain (*e.g.*, Photograph 2) direct any stormwater flow or released product at the rack to a 15,000-gallon oil/water separator. Drainage from the additive and truck pump off area is also directed to the oil/water separator from a bermed containment area with a catch basin. The separator effluent drains by gravity to a lift station where it is pumped to the primary retention basin. However, if a release were to occur at the rack or additive/truck pump off transfer areas, the separator flow can be stopped by manually closing valves at the inlet or outlet.

Stormwater in the vicinity of the butane tanks and offloading system drains into catch basins that discharge to the primary retention basin. Most of the remaining catch basins in the Yard Area, except for two that discharge directly to Outfall 001, are directed to a series of underground lines that direct flow, via lift stations, to the primary retention basin.

A drainage channel that originates off-site in the city neighborhood runs through the Terminal. It enters at the northeastern corner of the property (*e.g.*, Photograph 11) and flows east of Containment Areas 1 and 2 toward the south (*e.g.*, Photograph 12). It then turns west and runs between Containment Areas 1 and 2, where it is joined by a second channel originating off the

13

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

southeast edge of the Terminal.  The channel exits near the southeast corner and flows on the surface for a short distance before entering a culvert under East Shore Parkway.  I consulted City of New Haven municipal separate storm sewer system (MS4) maps to trace the course of conveyance onward after its exit from the Shell property.  MS4 Map_#1590742.1, Sheet S-22 shows the channel heading toward the public road at coordinate E558,600.  MS4 Map_#1590743.1, Sheet S-23 picks up the course of the conveyance at that coordinate and shows it proceeding southwest, then south, and again southwest, joined by other storm sewers along the way, one of which is the pipe in East Shore Parkway where the stormwater basin outfall 001 discharges.  There is a tide gate after a turn toward the northwest, beyond which the flow is on the surface.  The channel finally turns mostly toward the west at approximately coordinate N163,700.  It meets MS4 Map_#1590743.1, Sheet R-23 at that point and flows through a discharge structure into New Haven Harbor.

## V.  ASSESSMENT OF STORMWATER CONTAINMENT PRACTICES

### A.  Shell's Implementation of Stormwater Containment

#### 1. <u>Assessment of Containment Structures and Their Setting in the Terminal</u>

##### a.  *Regulatory Requirements and Associated Guidance*

The Shell Terminal is subject to the secondary containment requirements of the Stormwater Permits, including:

- For any storage area . . . installed prior to the authorization of this general permit, an impermeable secondary containment area which will hold at least 100% of the volume of the largest tank or container or 10% of the total volume of all tanks and

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

containers in the area, whichever is larger without overflow from such secondary containment area;[3] or

- For any storage area . . . installed after the date of authorization of this general permit, an impermeable secondary containment area which will hold at least 110% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow from such secondary containment area."[4]

Furthermore, Shell must adhere to the requirements of Spill Prevention, Control, and Countermeasure (SPCC) rule (40 CFR Part 112). The U.S. Environmental Protection Agency (EPA) document SPCC Guidance for Regional Inspectors[5] guides EPA inspectors of such facilities but also to their owners and operators.

Section 112.7(c) covers containment to prevent discharge. It states that, "The entire secondary containment system, including walls and floor, must be capable of containing oil and must be constructed so that any discharge from a primary containment system ... will not escape containment before cleanup occurs." With respect to bulk storage containers at onshore facilities (except oil production facilities), §§112.8(c)(2) and 112.12(c)(2) state that diked areas must be "… sufficiently impervious to contain discharged oil." The purpose of the secondary containment requirement is to prevent discharges as described in §112.1(b); therefore, effective secondary containment methods must be able to contain oil until it is cleaned up. The SPCC Guidance goes on to say (at section 4.4.2) that, "Floor and walls constructed of sandy material, for example, may not be appropriate to hold refined products such as gasoline. If earthen

---

[3] Stormwater Permits (*e.g.,* SWPPP 2017, SWPPP 2021), § (5)(b)(9)(A)(i)(2).

[4] *Id*. at § (5)(b)(9)(A)(i)(3).

[5] SPCC Guidance for Regional Inspectors; Prepared by the Regulation and Policy Development Division of the EPA Office of Emergency Management; December 16, 2013 ("SPCC Guidance").

15

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

material is used, then it should have a high clay content and be properly compacted, not simply formed into a mound."

To summarize these provisions:

- Secondary containment systems must be impermeable so that they contain discharged oil and do not permit it to escape containment before being cleaned up.

- Constructing these containments with sandy material may not be appropriate, and any earthen material used should have a high clay content and be properly compacted.

- Based on the Shell Terminal's permitting history, an impermeable secondary containment area must hold at least 100 percent of the volume of the largest tank or container or 10 percent of the total volume of all tanks and containers in the area, whichever is larger, without overflow.

**b.  *Soils at the Shell Terminal***

Sovereign Consulting, Inc. reported on an investigation of the Terminal's soils and hydrogeologic environment in 2022 (2022 Sovereign report)[6] and issued a remediation plan in 2023 (2023 Sovereign remediation plan).[7]  The reports accompanied Electronic Transmittal Forms for DEEP Remediation and LUST Secure File Transfer (SFT) to the Connecticut Department of Energy and Environmental Protection, Remediation Division.  The Electronic Transmittal Form for the 2022 Sovereign report characterized the Terminal's overburden material (soil) as "sands."[8]

---

[6] Sovereign Consulting, Inc. 2022. Completion of Investigation Report.  Prepared for Shell Oil Products US, Carson, California ("2022 Sovereign Report").

[7] Sovereign Consulting, Inc. 2023. Remedial Action Plan.  Prepared for Shell Oil Products US, Carson, California ("2023 Sovereign Report").

[8] *Id.* at 4.

16

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Offering more detail, Sovereign Consulting, Inc. transmitted the results of a subsurface investigation of the Shell property in October 2003.[9]  A total of 67 soil borings were advanced in locations throughout the Terminal, most in the first 4 ft below ground surface but some as deep as 8ft.  Table 1 summarizes the soil texture observations.  Relatively coarse textured soils are heavily dominant in the Terminal's soils, and clay content is minimal.  These soil conditions are not consistent with the SPCC Guidance provisions for secondary containments cited above.  With their relatively high hydraulic conductivities, water can readily infiltrate and permeate through their profiles.

Table 1.  Shell Terminal Soil Texture Classification

| Texture Class | Number of Borings in Which Recorded | Percent of Total Borings |
|---|---|---|
| Sand[a] | 67 | 100% |
| Gravel | 65 | 97.0% |
| Cobbles | 17 | 25.4% |
| Weathered rock or rock | 28 | 41.8% |
| Trace clay | 3 | 4.5% |
| Clay | 2 | 3.0% |
| Silt | 1 | 1.5% |

[a] Variously described as fine sand, coarse sand, silty sand, etc.

I also consulted the Soil Survey of New Haven County.  The specific location of the Terminal is characterized as urban, but immediately adjacent to the east is a Manchester gravelly sandy loam (MgB) formation. The surface layer is sandy loam 6-inches thick.  The subsoil is gravelly sandy loam and gravelly loamy sand 10-inches thick.  The substratum, to a depth of 60 inches, is stratified sand and gravel.[10]  This description fits with the on-site measurements.

---

[9] Letter from W. Scott Burns, Sovereign Consulting, Inc.; to Jennifer Bothwell, Shell Oil Products US; December 8, 2003; with attachments ("2003 Sovereign Letter").

[10] Soil Survey of New Haven County, Connecticut; United States Department of Agriculture, Soil Conservation Service in cooperation with Connecticut Agricultural Experiment Station and Storrs Agricultural Experiment Station; page 38; available at https://archive.org/details/usda-newhavenCT1979/page/n11/mode/2up (accessed April 3, 2025) ("Soil Survey of New Haven County").

17

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

### c. Relative Permeability of Secondary Containment Areas

As noted above, the Terminal's soils, including in the tank secondary containments, are relatively coarse in texture, formations known to infiltrate water through the surface readily and rapidly percolate it downward through the soil profile. The topic Groundwater at the Shell Terminal below gives quantitative information on soil hydraulic conductivity. As I observed during my site visit, there are no liners in the tank secondary containments. In my opinion, these conditions do not comply with the "impermeable" terms of the Stormwater Permits or the "sufficiently impervious" requirements of the SPCC guidance.

### d. Adequacy of Berms in Containment Areas

The following statement appears in an undated draft SWPPP, attached to an April 28, 2017 email between Paul Simonetta and Jennifer Bothwell,[11] specifically in Appendix C, Corrective Action Plan:

> Portions of the secondary containment berms for the tank farm were observed to be eroded resulting in low points in the containment areas. Specifically, low points were observed along the western boundary of Containment Area 1 and northern boundary of Containment Area 3. Triton recommends that Shell verify that secondary containment is still adequate based on the reduced capacity resulting from the observed low points. If containment is not sufficient, it is recommended that Shell complete repairs to the eroded berms.

There was an exchange referencing this passage in the deposition by Paul Simonetta of Triton Environmental, Inc. in this case, as follows:

> Q.      So are these secondary containment area deficiencies the same that are being noted years later in 2021 when Triton performed secondary containment evaluations?
>
> THE WITNESS        It appears that the Containment Area 1, which we had identified as being deficient in 2021, was also noted to have some eroded areas.[12]

---

[11] SHELLNH_TRI_01214.

[12] 30(b)(6) Deposition of Triton Environmental, Inc. (Paul Simonetta), February 16, 2023 ("30(b)(6) Simonetta Dep."), 126:13–20.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

This testimony indicates that nearly four years after Triton noted instances of berm erosion, their representative returned and found the same conditions.  Therefore, from at least 2017 to 2021, Shell was not fully in compliance with terms of the SPCC and Stormwater Permits regarding the berms of tank secondary containments.

### e.    Soil Contamination Data at the Shell Terminal

The 2022 investigation conducted by Sovereign detected 51 organic and 13 metallic constituents of concern (COCs) in soils, with the metals attributed to background conditions.[13]  A total of 16 COCs exceeded one or more applicable remediation criteria.[14]

The 2003 Sovereign investigation analyzed 105 Terminal soil samples for a range of organic and metallic contaminants mostly associated with petroleum and its derivatives.  Table 2 displays the results.  BTEX. MTBE, TPHs, PAHs, arsenic, beryllium, lead, and pesticides were detected in a majority of the samples tested for each.  PAHs and lead were found to be leachable in detectable quantities.  As an example of the federal regulations pertaining to hazardous wastes that are restricted from land disposal, benzene, toluene, ethylbenzene each have limits of 10 mg/kg; and the limit for total xylenes is 30 mg/kg,[15] in the aggregate far below the top of the range measured in the Terminal soils.  These data show that, even as of 2003, the Terminal soils were extensively contaminated with a host of toxic materials that potentially could migrate deeper, and probably have done so.

Soil contamination was discussed in a CT DEEP meeting in 2019.[16]  One subject was a history of material releases at the Terminal site over the years.  Of 37 recorded releases, 23

---

[13] 2022 Sovereign Report, at 5–6 (Electronic Transmittal Form for the Report).
[14] *Id.*, at 6–7.
[15] "Code of Federal Regulations – Part 268 Land Disposal Restriction," https://www.ecfr.gov/current/title-40/chapter-I/subchapter-I/part-268#268.48 (accessed March 31, 2025).
[16] Project Meeting at CT DEEP Shell Oil Products US New Haven Terminal, June 12, 2019 ("CT DEEP Meeting Notes").

occurred since 2000, although the largest quantities were earlier.  Most were the petroleum products handled by the Terminal, with a few involving additives.

Table 2.  Contaminants Detected in Shell Terminal Soil Samples[17]

| Contaminant | Number of Samples Analyzed | Number of Detections | Detection Percentage | Concentration Range |
|---|---|---|---|---|
| Benzene, toluene, ethylbenzene, xylenes (BTEX) | 12 | 7 | 58.3% | 0.003-2190 mg/kg |
| Methyl tertiary-butyl ether (MTBE) | 12 | 7 | 58.3% | 0.038-0.066 mg/kg |
| Total petroleum hydrocarbons (TPHs) | 60 | 43 | 71.7% | 35-13400 mg/kg |
| Polycyclic aromatic hydrocarbons (PAHs) | 47 | 33 | 70.2% | 0.29-18.5 mg/kg |
| Synthetic precipitation leaching procedure (SPLP) PAHs | 11 | 4 | 38.4% | 6-130 µg/L |
| Total arsenic | 4 | 4 | 100% | 1.8-23.9 |
| SPLP arsenic | 0 | 0 | 0% | |
| Total beryllium | 9 | 5 | 55.6% | 0.51-0.82 mg/kg |
| SPLP beryllium | 0 | 0 | 0% | |
| Total lead | 4 | 4 | 100% | 88.6-1080 mg/kg |
| SPLP lead | 4 | 4 | 100% | 0.008-0.32 mg/L |
| Pesticides | 6 | 5 | 83.3% | 0.0117-1.45 mg/kg |

### *f.  Regulatory Groundwater Protection Requirements*

The Stormwater Permits require compliance with the Connecticut Stormwater Quality Manual, stating that with regard to management of runoff the permittee "shall ensure that such measures are properly designed, implemented and maintained in accordance with the Stormwater Quality Manual."[18]  The Connecticut Stormwater Quality Manual (the Stormwater Manual)[19] specifies the management of stormwater infiltration of from land uses or activities with higher potential pollutant loads (LUHPPLs).  As an industrial facility subject to the Connecticut General

---

[17] 2003 Sovereign Letter, *op. cit.*
[18] Stormwater Permits, § (5)(b)(7).
[19] Connecticut Department of Energy & Environmental Protection; Connecticut Stormwater Quality Manual; Hartford, Connecticut; September 30, 2023.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Permit for the Discharge of Stormwater Associated with Industrial Activity, the Shell Terminal is a LUHPPL, as designated by the Stormwater Manual's Table 10-4.

Both the Stormwater Manual (at page 191) and the Connecticut National Pollutant Discharge Elimination System General Permit for the Discharge of Stormwater from Small Municipal Separate Storm Sewer Systems (the MS4 Permit, in Appendix C)[20] observe that infiltration of LUHPPL stormwater can contaminate public and private groundwater supplies and surface waters via groundwater flow.  According to the Stormwater Manual, infiltration of stormwater from certain LUHPPLs is not allowed, while in other cases it may be allowed by the review authority under the following conditions:

- The entire volume of runoff to be infiltrated should be treated, prior to infiltration, using one or more of the Filtering BMPs, Stormwater Pond and Wetland BMPs, Water Quality Conveyance best management practices (BMPs), or Proprietary BMPs presented in Chapter 7 - Overview of Structural Stormwater Best Management Practices.

- Treatment BMPs that precede an infiltration system may be an integral part of the infiltration BMP (*e.g.*, a bioretention system without an underdrain) or a stand-alone treatment BMP.  Stand-alone treatment BMPs that precede an infiltration system should have an impermeable liner under the bottom and along the side slopes of the treatment BMP to prevent infiltration into the underlying and adjacent soil.

Furthermore, the Manual (at page 356) states that, "A liner is required for stormwater ponds that receive runoff from Land Uses with Higher Potential Pollutant Loads (LUHPPLs)."

---

[20] Connecticut Department of Energy & Environmental Protection; Connecticut National Pollutant Discharge Elimination System General Permit for the Discharge of Stormwater from Small Municipal Separate Storm Sewer Systems; State Permit No: GSM000000; Federal CWA Permit No: CTR030000; effective October 1, 2023.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

### g.  Groundwater at the Shell Terminal

I obtained the available information on the water table position in the Terminal vicinity. Two principal types of aquifers underlie Connecticut glacial till deposits: (1) unconsolidated stratified-drift aquifers composed of sand and gravel, and (2) bedrock aquifers composed of sedimentary, igneous, and metamorphic rocks.[21]  Figure 2 in the referenced report shows that the Shell Terminal area has the unconsolidated sand and gravel aquifer,[22] consistent with the on-site soils data reported earlier.  The average depth to the water table is generally 10 to 15 ft in the till deposits in Connecticut, based on several hundred measurements of water levels in dug wells.[23] The Electronic Transmittal Form for the 2022 Sovereign report cited the depth to the water table at the Terminal as even less, only 1-5 ft.[24]

Table 1 in the Melvin *et al.* (1992) report gives the median hydraulic conductivity in this coarse-grained aquifer as a very high 170 ft/day (85 inches/hour).[25]  For the MgB soil formation adjacent to the Terminal, the Soil Survey, states that permeability is rapid in the surface layer and subsoil and very rapid in the substratum.  Quantitatively, it cites the rates as 6.0-20.0 inches/hour in the 0-6 and 6-16-inch layers and > 20.0 inches/hour at 16-60 inches depth.[26]  From these two reports, it is clear that a high rate of hydraulic conductivity characterizes the Terminal subsurface.

---

[21] Melvin, R.L., B.D. Stone, J.R. Stone, and N.J. Trask.  1992.  Hydrogeology of Thick Till Deposits in Connecticut, U.S. GEOLOGICAL SURVEY Open-File Report 92–43, at 8, available at https://pubs.usgs.gov/of/1992/0043/report.pdf (accessed April 2, 2025). Prepared in cooperation with the Connecticut Department of Environmental Protection, Hartford, Connecticut.

[22] *Id.* at 9.

[23] *Id.* at 25.

[24] *Id.* at 4.

[25] *Id.* at 10.

[26] Soil Survey of New Haven County, *op, cit.*, at 182.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

### h. *Assessment of the Potential for Groundwater Contamination*

To summarize the assessment of the secondary containment structures and their setting, the regulatory provisions require pre-treatment of infiltrated stormwater runoff from any part of a LUHPPL facility.  The BMPs for this purpose entail bed and side slope liners.  The beds of the Terminal tank secondary containments are in predominantly relatively coarse-textured sandy gravelly soils, are not lined or otherwise made impermeable, and the stormwater collecting in these containments is not pre-treated.  To the extent it does not infiltrate into the groundwater, stormwater flows by gravity to six low areas in the tank secondary containment areas, where it ponds until infiltrating there or being pumped through the drainage system described earlier.  Three days before my site visit, 0.10 inch of rainfall was recorded in New Haven.[27]  Each low-lying intermediate collection area had visible ponding, with some having wetland plants growing in the ponded water.  The Terminal's two-stage stormwater basins are in the same soils, and there is no evidence that they have liners.  In my opinion, it is highly probable that stormwater and the pollutants it contains infiltrate from Containment Areas 1-3 and the stormwater basins into the Terminal's soils.  Moreover, the stormwater permeates through soil having rapid hydraulic conductivity and elevated concentrations of many contaminants.  Finally, the water table is consistently only a few feet below the surface.

The Stormwater Permits require the stormwater management system BMPs to be designed and implemented in a manner that is consistent with the Stormwater Manual.  The system in place at the Terminal is not consistent with the Manual.  Its design allows untreated

---

[27] Weather Underground, East Haven, CT Weather History, https://www.wunderground.com/history/daily/us/ct/east-haven/KHVN/date/2025-4-7 (accessed April 24, 2025).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

stormwater to infiltrate the soils into groundwater, especially when ponded for some time in the low areas.

### i. Groundwater Contamination Data at the Shell Terminal

The investigation conducted by Sovereign detected 51 organic and 13 metallic constituents of concern (COCs) in groundwater, with 12 of the metals attributed to background conditions.[28]  The organics are principally petroleum derivatives associated with the products stored and handled at the Terminal.  A total of 14 COCs exceeded an applicable remediation criterion, 13 being surface water protection criteria (SWPC).[29]

### j. Assessment of the Potential for Surface Water Contamination

There are several modes by which the types of organic chemicals detected by Sovereign travel in groundwater.  They are soluble to an extent, with those of lower molecular weight being relatively more soluble.  Dissolved compounds move integrally with the water (termed advection).  Insoluble chemicals also travel by advection, although not necessarily with the same pattern as the water.  Otherwise, compounds can disperse[30] or diffuse[31] into aquifer pore spaces and form a spreading plume.  Finally, they can sorb (bind) with soil particles and travel with them.[32]

Sovereign reported that the overall groundwater gradient for the terminal has consistently sloped towards the south-southwest.[33]  Furthermore, overall migration of groundwater COC

---

[28] 2022 Sovereign Report, at 5–6 (Electronic Transmittal Form for the Report).

[29] *Id.* at 7.

[30] Spread due to variations in velocity or other factors.

[31] Move from an area of high concentration to an area of low concentration, driven by random molecular motion.

[32] Yadav, P.K., Chapter 18, Groundwater Hydrology V (Advection, Dispersion, Diffusion and Sorption).  In Sharma, H.R.  2019.  *Water Resources and Management*, available at https://ebooks.inflibnet.ac.in/esp05/chapter/groundwater-hydrology-v-advection-dispersion-diffusion-and-sorption/ (accessed April 24, 2025).

[33] CT DEEP Meeting Notes, *op. cit.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

concentrations at the site is considered to have predominantly flowed west-southwest toward New Haven Harbor (gradient direction).[34]

COCs associated with the Terminal have been detected above their SWPCs in downgradient groundwater monitoring wells MWs), as follows:

- Extractable petroleum hydrocarbons (ETPHs)[35] in MW-57, MW-58, and MW-60;

- Several polycyclic aromatic hydrocarbons (PAHs) [acenaphthylene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)-fluoranthene, benzo(k)fluoranthene, chrysene, and indenol,2,3-cd)pyrene] in MW-60;

- Arsenic in MW-58 and MW-60;

- Cadmium in MW-58; and

- Lead and zinc in MW-60.[36]

These measurements indicate the movement of a range of contaminants elevated in concentration above SWPCs in the prevailing direction of groundwater flow. New Haven Harbor is 1300 ft from the Terminal, and the groundwater flow rate is characterized as 0.007 to 1.3 ft/day.[37] While this range is so broad as not to be reliable for forecasting, a rate somewhere in the broad center would convey the contaminants to the harbor in a few years or less.

The channel that runs through the Terminal and on into the City MS4 and its terminus at New Haven Harbor is another potential contamination pathway. A Site Plan Depicting ETPH Isoconcentration Contours presented at the 2019 CT DEEP meeting shows the channel falling within the zone where groundwater ETPH is above the SWPC.[38] With the very shallow water

---

[34] 2022 Sovereign Report, *op. cit.*, at 32.
[35] ETPH is an analytical method used in Connecticut that measures the C9 to C36 range of petroleum hydrocarbons, which includes the major components of a number of widely used petroleum products
[36] 2023 Sovereign Report, *op. cit.*, at 24.
[37] 2022 Sovereign Report, at 4 (Electronic Transmittal Form for the Report).
[38] CT DEEP Meeting Notes, *op. cit.*

25

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

table position, it is highly likely in my opinion that groundwater intersects the channel, at least at times.  There is then no barrier to downstream conveyance of the pollutant.

New Haven Harbor is listed under section 303(d) of the Clean Water Act as impaired for polychlorinated biphenyls (PCBs), oil and grease, nutrients, and dissolved oxygen, which negatively affect the beneficial use Habitat for Marine Fish, Other Aquatic Life and Wildlife; for enterococcus impeding the beneficial use Recreation; and for fecal coliform impacting the beneficial use Commercial Shellfish Harvesting.[39]  Total Maximum Daily Loads (TMDLs) have been issued for fecal coliform, dissolved oxygen, total nitrogen, and nutrient/eutrophication biological indicators.[40]

### k.  My Overall Judgment of the Containments' Adequacy

The conditions I summarized immediately above all support my opinion that the potential for contamination of water resources by the Terminal's stormwater, as well as from a spill or leak, is very high.  Accordingly, the tank secondary containment structures and stormwater basins are inadequate and not in compliance with the controlling regulations.  Furthermore, these violations appear to have existed since at least 2011.  There is no evidence of a liner since at least 2011, or before, or any change in the soils in that period.  Groundwater contamination was documented to predate that year, has been measured since, and is consistent with what to expect given the sources at the Terminal.

In addition, Shell failed to report to CT DEEP that the Terminal's secondary containment system was insufficient.  Section 6(b) of the General Permit, "Duty to Correct and Report Violations" states:

---

[39] State of Connecticut Department of Energy and Environmental Protection, 2022 Integrated Water Quality Report ("IWQR"), at Appendix B-1 (List of Impaired Waters for Connecticut (EPA Category 5)).
[40] IWQR *op. cit.*, at Appendix B-2 (Waterbodies with Adopted TMDLs (EPA Category 4a)).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

> Upon learning of a violation of a condition of this general permit, a permittee shall immediately take all reasonable action to determine the cause of such violation, correct such violation and mitigate its results, prevent such further violation, and report in writing such violation and such corrective action to the commissioner within five (5) days of the permittee's learning of such violation. Such report shall be certified in accordance with Section 6(d) of this general permit.

Shell was informed in the April 2017 Corrective Action Plan that the Terminal's secondary containment was insufficient.[41]  Shell knew by at least April of 2021 that the secondary containment volume was insufficient.[42]  Jennifer Bothwell, Shell's Environmental Coordinator, testified in her deposition that if the SWPPP contained representations that were incorrect "the state should be notified," but she was not sure whose responsibility it would have been to notify CT DEEP of the issue.[43]  There is no evidence that Shell complied with the General Permit and reported these violations.

### l.   Implications of Making the Secondary Containments Impermeable

I have stated and justified my opinion that the Terminal is out of compliance with the regulations governing petroleum product tank secondary containments in conditions with high potential for groundwater contamination and documented evidence that such contamination has occurred.  I therefore believe that Shell is obligated to make the secondary containment floors

---

[41] SHELLNH_TRI_01214 (April 28, 2017 Email from Paul Simonetta to Shell Oil Company); SHELLNH_TRI_00686 (Draft SWPPP).

[42] SHELLNH_TRI_00936 (April 8, 2021 – May 17, 2021 Email chain involving Triton Environmental and Shell); SHELLNH_TRI_00110 (July 28, 2021 Letter from Triton Environmental, Inc. to Shell).

[43] Deposition of Jennifer Bothwell (Motiva Enterprises), December 6, 2023; 109:6–111:4 ("Bothwell Dep.").

27

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

impermeable, probably using an impermeable liner.  High-density polyethylene (HDPE) was introduced as a tank containment liner in the 1950s.[44]  Other materials available for this service include reinforced polyethylene (RPE), low-density polyethylene (LDPE), and polyvinyl chloride (PVC).[45]

Lining the tank secondary containments would cut off the infiltration that now occurs and result in more stormwater collecting in the containments.  I examined the implications of that outcome by estimating the extent of ponding that would occur under various scenarios.  I am cognizant that relatively deep and/or extended ponding in the tank secondary containments could negatively affect Shell's operations.

I obtained the plant's secondary containment area and impervious area from the 2017 SWPPP's site map.  I assumed that, with lined containments, the lift stations would pump water collecting in the containments to the stormwater treatment basin as they do now and that stormwater collecting in the other locations would continue to flow there too.  To estimate the treatment basin volume, I got closely agreeing results for the basin length and width from scaling the site map, measurement on Google Earth, and pacing the perimeter in the field; and I found the depth from elevation contours on the site map.  I obtained precipitation frequency and duration data from the Tweed New Haven Airport National Oceanic and Atmospheric Administration (NOAA) station, very close to Shell.[46]

I analyzed how the Terminal would be able to function with lined tank secondary containments in large precipitation events, which are anticipated due to ongoing climate change

---

[44] "The Evolution of Tank Liners: A Comprehensive Guide," https://tankliners.com.au/evolution-of-tank-liners-guide/ (accessed April 24, 2025).

[45] "What does it take to properly line an Oil and Field Field Containment Area?" https://www.btlliners.com/what-does-it-take-to-properly-line-an-oil-and-fuel-field-containment-area (accessed April 24, 2025).

[46] "NOAA Atlas 14 Point Precipitation Frequency Estimates: CT," https://hdsc.nws.noaa.gov/pfds/pfds_map_cont.html?bkmrk=ct (accessed April 16, 2025).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

impacts. If Shell would prefer, for operational considerations, that the lined containments not pond any water temporarily, to prevent uncontrolled treatment basin overflow during the 25-year, 24-hour event (6.38 inches), the current pumping capacity of 300 gpm could be increased to approximately 600 gpm. It would need to increase to about 770 and 1030 gpm, respectively, to avoid overflow in the 100-year, 24-hour (8.13 inches) and 500-year, 24-hour (10.9 inches) events. Lift stations may have to be upgraded to maintain present operating conditions. Alternatively, the treatment basin berm heights could be raised to avoid overflow. If temporary tank secondary containment ponding depth of approximately 4 to 9.75 inches during and after the 25-year, 24-hour through 500-year, 24-hour storms would not negatively affect operations, the 300-gpm pump would still suffice. Hence, there is a range of reasonable options to continue what to me is orderly Terminal functioning with lined tank secondary containments under even the most demanding conditions. This demonstration of manageable operation in large storms signifies that the much more frequent and smaller events would be also not be problematic. This analysis has convinced me that lining the containments is entirely feasible and should be done to alleviate the ongoing contamination of groundwater and the transport of pollutants to New Haven Harbor.

Another consideration is climate change, with the tendency toward larger and more intense storms, to which the Shell New Haven Terminal is vulnerable.[47] Climate change has implications for Shell's entire stormwater management system. Affected are the lift station pumps, piping throughout the system, oil/water separators, the stormwater basin size, and its discharge pump. The increased precipitation will produce more industrial stormwater runoff

---

[47] Barlow, M. 2025. The Impact of Climate Change on Storms and Extreme Precipitation Relevant to the Shell Terminal in New Haven, Connecticut (Expert Report Prepared for the Conservation Law Foundation) ("Barlow Report").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

transporting pollutants to groundwater and, as I have reasoned, to New Haven Harbor.  I have seen no evidence that Shell has given any thought to these matters in preparing its SWPPP or any other context.  It should do so in coordination with lining the containments.  The Stormwater Permit at sections 2 and 5(b) requires implementing stormwater controls that are technologically available and economically practicable and achievable at the level of "best industry practice."  In my experience, considering the modifications forecast to accompany climate change is best industry practice in specifying stormwater quantity and quality control BMPs.

## 2. Assessment of the Containment Area 1 Bypass

### a. Quantitative Evaluation

In 2022 RPMS Consulting Engineers surveyed the interior of the containment dike around tanks T-1, T-2, and T-3[48] and calculated containment capacity.  It was found the existing volume was insufficient to contain tank contents with the occurrence of a break or leak, even without considering the stormwater quantity produced by the 25-year, 24-hour precipitation event specified by the SPCC Guidance.  The consultant recommended that Shell install a bypass pipe between the tanks T-1 to T-3 diked area and the adjacent Containment Area 2, which has sufficient capacity to receive extra water and still serve its own area.  The overflow pipe was installed in August 2022.[49]

The recommended solution has a serious flaw.  It is not enough simply to have sufficient aggregate volume for the two areas.  Beyond this obvious necessity, the system must be capable of transferring the flow during a spill incident rapidly enough to prevent overtopping the dike and releasing contaminated water to the drainage channel leading directly to New Haven Harbor.

---

[48] RPMS referred to the tanks as J-I, J-2, and J-3, but I am using the 2017 SWPPP designations.
[49] Letter from Robert P. Perla, RPMS Consulting Engineers; to Michael Sullivan, Shell Oil Products, U.S.; December 22, 2022; with attachment ("RPMS Letter").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

To avoid this occurrence, high-rate flow transfer would be required in event of a large, rapid spill, particularly if it coincided with a relatively intense storm; an extratropical cyclone or Nor'easter; a spill in the latter stages of a large storm when the containment has already collected water; storm surge flooding; or some combination.  The solution did not account for these circumstances.

I investigated the consequences of a rupture emptying the largest tank, T-1, in a 60-minute (min.) period.  This tank holds 4,087,554 gallons (gal.) of gasoline according to the 2017 SWPPP site map.  A 60 min. failure would be at a rate of 68,126 gallons/min. (gpm).  The highly conductive soil of the containment would infiltrate some of the gasoline, an estimated 9,188 gpm at the 6.0 inch/hour rate reported above.  The approximate rate of buildup in the containment would be 68,126 – 9,188 = 58,938 gpm.  The containment for tanks J-1 to J-3 can hold 176,625 cubic ft[50], which equals 1,321,155 gal.  At the rate of 58,938 gpm, the containment would fill in 22.4 min. (less if there was already water in the containment and perhaps much less in combination with heavy precipitation).  At that point the bypass pipe would begin to transfer water to Containment Area 2.

I proceeded to estimate that rate at which the transfer would occur.  For this estimate, I used Manning's Equation, which is preferred to the alternative of Bernoulli's Equation for unpressurized, gravity flow and because it accounts for pipe roughness and resulting friction.  Manning's Equation requires as input data:  (1) pipe diameter = 12 inches; (2) pipe slope, which is a function of the pipe length and elevation drop; (3) and the friction factor, known as Manning's n.  The pipe length measured 100 ft during my site, which agreed with scaling it on the 2017 SWPPP site map.  For the elevation drop, I consulted the tables in the RPMS letter

---

[50] RPMS Letter; *op. cit.*; Attach., § 1.0.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

attachment for the respective containment areas, which give berm contour elevations. The highest elevations given are 11.5 ft for the tank J-1 to J-3 containment and 8.5 ft for the tank 24 containment. I thus presumed that the approximate pipe elevation drop is 3 ft. In siting the pipe during my visit, I concluded that this is a reasonable estimate. For Manning's n, I consulted the standard reference, Chow (1959),[51] which gives n = 0.012 for steel pipe. Using these data, I computed the flow rate for the bypass pipe to be 2962 gpm.

After the hypothetical spill would reach the overflow point in 22.4 minutes, 2,216,069 gal. would be released in the next 37.6 min. At the rate of 2962 gpm, I estimate that 120,257 gal. would be transferred through the bypass pipe. That would leave 2,216,069 – 120,257 = 2,095,812 gal. that would not be contained. It would go into the channel between the two containment areas, which flows to New Haven Harbor. This analysis demonstrates that with a major gasoline release from tank T-1, Shell would be out of compliance with 40CFR Section 112.7(c) by failing to prevent discharge before cleanup occurs. This discharge would occur even without considering the additional burden created by the stormwater produced by any precipitation event. For compliance, Shell must install a lift station and piping capable of conveying to Containment Area 2, before overflow occurs, both the tank contents and stormwater quantities determined through the climate change assessment that I advocated Shell conduct above.

### b. The Bypass in the Context of the Terminal's Stormwater Permit Obligations

A permittee is required upon learning of a violation of a condition of the Stormwater Permit [under section 6(b)] to report it to CT DEEP within five days in writing, with

---

[51] Chow, V.T. 1959. *Open-Channel Hydraulics*. McGraw-Hill Book Company, New York, New York.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

certification.  Shell did not comply with this requirement when learning that the Containment Area 1 was insufficient.

Because the bypass was installed in 2022, the system that was described in the 2011 and 2017 SWPPPs was inadequate to meet the SPCC regulations, because the volume of Containment Area 1 was insufficient.  After the installation, the total volume could in theory be considered to be sufficient; but in actuality, because the connecting pipe is undersized, even this system is inadequate under any meteorological circumstances if a rapid, large-scale tank breach occurs.

The Containment Area 1 secondary containment volume has been insufficient since at least 2011.  Table 7-1 in the 2011 Integrated Contingency Plan, at pdf pages 206-208, shows the same tanks to be present in Containment Area 1 as listed in Table 1 of 2017 SWPPP, at pdf pages 9-11.  The map of facility in the 2011 Integrated Contingency Plan, at pdf pages 66, 68, and 69, shows that the location of the tanks and the location and topographic contours of the berms in Containment Area 1 was the same as on the 2017 SWPPP's site map, at pdf page 46.  Therefore, in the case of Containment Area 1, Shell has been in violation of the Stormwater Permit's requirement to provide a secondary containment area that will hold at least 100 percent of the volume of the largest tank since at least 2011.

Stormwater Permit section 5(c)(2) states that a SWPPP "shall be representative of current site conditions.  It is thus contrary to the Stormwater Permit not to update the SWPPP when the bypass pipe was installed.  Section 5(c)(5) then specifies that the SWPPP must be updated within 120 days of a change.  Accordingly, Shell has been in violation of these provisions of the Stormwater Permit from that point in time through the present day.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

### 3.  Assessment of the Treatment System in Relation to Best Industry Practice

The pond system used by Shell to treat its stormwater and improve its water quality before discharge has been superseded as best industry practice by various forms of advanced treatment capable of more thoroughly capturing and retaining pollutants.  Advanced stormwater treatment practices generally employ pre-settling and then a particle flocculation step to coalesce smaller particles into larger ones for easier capture, followed by a sand filter.  Effective removal of some pollutants from runoff sometimes requires an additional, specialized step using media such as perlite, zeolite, activated carbon, or ion exchange.  Several companies market advanced treatment systems using such media.  Treatment units can be installed flexibly where space exists, and vendors offer units in a modular form that can be moved onto a site quickly and even shifted around to different positions if circumstances change.  Their flexibility extends from their original development for temporary application on construction sites.  I believe that Shell should move toward replacement of its treatment basins with one of the forms of advanced treatment I describe here.

Chitosan, a bio-polymer derived from crab and shrimp shells, has performed extremely well at construction sites in reducing sediment loadings through particle flocculation and subsequent filtration, as well as in reducing metallic and organic pollutants in contaminated groundwater exposed in dewatering construction sites.  The technology has been successfully applied in industrial stormwater applications over the past 10-15 years. The polymer is generally employed in a chitosan-enhanced sand filtration ("CESF") configuration.  Testing and

34

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

experience have shown CESF capable of greatly reducing concentrations of a range of pollutants, including solids, copper, and zinc, to levels far below the regulatory limits.[52]

Chemical polymer alternatives to chitosan yield even better results for some runoff streams.  The optimum polymer is typically identified by conducting bench tests on several alternatives using the actual runoff from the site at issue to determine which maximizes flocculation.

An alternative to chemical polymer coagulation is electrocoagulation.  In an electrocoagulation cell, multiple reactions take place simultaneously.  First, a metal ion is driven into the water from the anode (positive pole).  Meanwhile, electrons flow from the cathode (negative pole) to destabilize surface charges on suspended solids and emulsified oils.  As the reaction continues, flocculation occurs, forming large masses that entrain suspended solids, heavy metals, emulsified oils and other contaminants.  Finally, the masses are removed from the water in downstream solids separation and filtration process steps.  Like CESF, electrocoagulation is now in industrial stormwater application.  Testing and experience have also shown electrocoagulation to have performance capability equivalent to CESF, including

---

[52] Crini, G., N. Morin-Crini, N. Fatin-Rouge, S. Deon, and P. Fievet. 2017. Metal removal from aqueous media by polymer-assisted ultrafiltration with chitosan. *Arabian Journal of Chemistry*, 10(2): S3826-S3839; *see* Ziemer, J. Biopolymer Offers Biodegradable Alternative in Water Treatment. WaterWorld. February 1, 2008. http://www.waterworld.com/articles/uwm/articles/print/volume-2/issue-1/features/biopolymer-offers-biodegradable-alternative-in-water-treatment.html (last accessed on April 25, 2023) and DMRs submitted by Industrial Stormwater General Permit holders using CESF in Washington state.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

decreasing turbidity, copper, and zinc to levels far below the benchmarks.[53]  Another similarity

with CESF is that the equipment is modular and flexible.[54]

In March 2021 I contacted three companies that market polymer-based and

electrocoagulation treatments, as well as some other advanced types, to ask how many systems

they have installed.  One replied that they numbered 50-60 at permitted industrial sites.[55]  The

second and third counted 38[56] and 31,[57] respectively, in that service.  By this point, a relatively

robust performance database exists for these treatment systems, because their operators submit

discharge monitoring reports under industrial stormwater permit auspices.  I believe that these

120-some advanced industrial stormwater treatment systems in service, surely substantially more

by now, signify that they are technologically available and economically practicable and

achievable in light of best industry practice.  In my opinion, the treatments I have described meet

the Stormwater Permit's section 2 and 5(b ) requirements to utilize BMPs that are

technologically available and economically practicable and achievable at the level of best

industry practice.  The many installations in functioning industries demonstrate their

achievability and economic practicality.  The modular nature and flexibility of the advanced

treatment systems I have described furnishes particular advantages in the face of changing

circumstances, such as the future entails with climate change and its altered precipitation

patterns.  If a unit's hydraulic capacity becomes insufficient, it can easily be changed out with a

---

[53] Sahu, O., B. Mazumdar, and P.K. Chaudhari. 2014. Treatment of wastewater by electrocoagulation: a review. *Environmental Science Pollution Research* 21:2397–2413; Herrera Environmental Consultants.  2011.  Literature Review of Existing Treatment Technologies for Industrial Stormwater. Washington Department of Ecology, Northwest Regional Office, Bellevue, Washington and DMRs submitted by ISGP Permittees using electrocoagulation.

[54] While the 2019 Level 3 Engineering Report recommended gravity settling/detention tanks and cartridge filtration for treatment, it commented that if that treatment does not achieve benchmarks, the proposed systems will be equipped to upgrade to CESF or electrocoagulation treatment.

[55] T.J. Mothersbaugh, WaterTectonics, Inc.; Everett, Washington; personal communication; March 10, 2021.

[56] D. Medlin, Clear Water Services; Everett, Washington; personal communication; March 12, 2021.

[57] D. Heitz, Clear Creek Systems; Pacific, Washington; personal communication; March 19, 2021.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

larger device.  If discharge benchmarks get more restrictive, a different or additional treatment technology can readily be installed.  Shell's present basin system has none of that flexibility and would be hard to modify when circumstances change.  It would be both wise and fully in line with the Stormwater Permit for Shell to convert its stormwater treatment to an advanced form, which states in Section 5(b):

> Control Measures are required Best Management Practices (BMP) that the permittee must implement to <u>minimize</u> [emphasis added] the discharge of pollutants from the permitted facility.  The term "minimize" means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

## VI. ASSESSMENT OF 2017 STORMWATER POLLUTION PREVENTION PLAN CERTIFICATION

### A. 2017 SWPPP Certification Process

#### 1. <u>Appendices Pertaining to Certification</u>

The 2017 SWPPP was certified with a signature by Stephen Benben of Triton Engineering on July 10, 2017, which is required by section 5(c)(2)(F) of the Stormwater Permits. These provisions require a professional judgment-based certification that the stormwater discharge from the site consists only of stormwater, stormwater combined with authorized wastewater, or stormwater combined with specific discharges that do not contribute to a violation of water quality standards.  The terms further require affirmation that certification is based on testing and/or evaluation of the stormwater discharge from the site.  They also have some additional provisions regarding non-stormwater discharges and building floor drains.

The 2017 SWPPP Appendix D, titled Secondary Containment Calculations, states that Triton was directed to rely for its SWPPP certification on the Professional Engineering

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Certification of compliance with SPCC secondary containment requirements prepared by RPMS Consulting Engineers (April 13, 2009), 8 years in the past. Furthermore, Triton did not perform an independent evaluation of RPMS 's work but rather relied entirely on the SPCC certification in relation to the tank farm areas, loading rack, and yard area drainage systems. Finally, Triton relied on volumetric measurements by the terminal and calculations by Witt O'Brien for certification of the small containment areas in the Terminal.

The 2017 SWPPP Appendix G, titled Limitations, first repeats the Appendix D statement. It then alleviates Triton from responsibility for identifying facility activities, operations, floor drains, discharges, etc. that were not observed or capable of being observed during the facility review. The appendix goes on to assert that Triton is not aware of monitoring having been completed specifically to demonstrate whether the discharge at the site is comprised solely of stormwater. Accordingly, the non-stormwater certification does not represent that "testing and evaluation of the storm water discharge from the site" have been completed in accordance with the language of the Stormwater Permits, despite Mr. Benben's attesting to fulfillment of this term. Finally, the appendix declares that Triton assumes site information provided by terminal personnel is accurate.

## 2. Corrective Action Plan Removed from the 2017 SWPPP

Preceding the issuance of the 2017 SWPPP, there was a draft that differed from the final version in an important respect. Its Appendix C contained a Corrective Action Plan.[58] Its stated purpose was to provide a course of action to correct identified deficiencies as required by regulation/regulatory guidance. It declared that Shell's commitment to implement Triton's

---

[58] Stormwater Pollution Prevention Plan (SWP3), DRAFT, Shell Oil Company, 478 East Shore Parkway, New Haven, CT; Prepared by Triton Environmental, Inc.

38

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

recommended improvements has been included in the approvals section of Appendix A, although I do not see that assurance explicitly expressed there.

The plan consisted of seven corrective actions, one that Triton considered to be required and to necessitate a SWPPP update. The other six were regarded as recommended BMPs not needing SWPPP revision. The required action was to maintain copies of monitoring and monthly inspection records in the SWPPP itself. The recommendations were:

- Include in the SWPPP documentation that the dock is not subject to the Stormwater Permit;

- Place all drums and totes in the Warehouse on spill pallets;

- Consider options for addressing leaks from Fire House foam tanks that could potentially affect stormwater;

- Verify that secondary containment is still adequate with the reduced capacity resulting from eroded tank farm containment berms; if not adequate, complete repairs;

- Replace missing crushed stone on tank farm floors; and

- Provide adequate secondary containment for a Transmix (mixed petroleum product) drum.

Therefore, the one "required" action was purely a paperwork matter, while five of the six merely "recommended" measures would have direct environmental contamination implications.

### 3. Outline of My Assessment

My assessment, to follow, examines four general issues associated with the 2017 SWPPP certification:

- Tank secondary containment capacity;

- Tank secondary containment impermeability;

39

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- The Corrective Action Plan; and

- Consideration of EPA guidelines and Shell policies in preparing the 2017 SWPPP.

I conclude with my opinions regarding the certification's adequacy and the 2017 SWPPP's validity in light of my assessment.

### B. Tank Secondary Containment Capacity

#### 1. Summary of Deposition Testimony

Paul Simonetta of Triton Environmental testified at deposition that Triton can provide verification of the adequacy of secondary containments assuming information is available verifying that adequacy according to regulatory requirements.  In preparing the 2017 SWPPP, Triton was directed by Shell's Environmental Coordinator, Jennifer Bothwell, to rely on the certification of compliance with the SPCC secondary containment requirements prepared by RPMS Consulting Engineers, dated April 13, 2009.  Mr. Simonetta testified that Triton had requested from Shell the ability to rely on others' certifications.[59]  His firm did not perform an independent evaluation of RPMS's certification and relied on it entirely.  No one at Shell requested any work to calculate secondary containment capacity.[60]

#### 2. Commentary on Deposition Testimony

For verification of the adequacy of tank secondary containment, Shell and its consultant agreed that a 2017 SWPPP certification could rely on evidence 8 years old.  Beyond the very real possibility that conditions changed over intervening years, there was no testimony or other record presented on what work RPMS performed to conclude that the containment capacity was adequate in 2009.  In my opinion, these are faulty grounds on which to base a determination of adequacy and not consistent with the Stormwater Permits' requirement [at sections 2 and 5(b)] of

---

[59] 30(b)(6) Simonetta Dep., *op. cit.,* 70:16–71:3.
[60] *Id*. at 51:1–55:16, 70:1–25.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

implementing best industry practices.  As I discussed earlier, a survey in 2022 determined that the capacity of Containment Area 1 was insufficient to contain the contents of the largest tank with the occurrence of a break or leak even not considering a 25-year, 24-hour precipitation event according to the SPCC Guidance.  The 2017 SWPPP certification in this respect was thus erroneous.  In that situation, section 6(d)(g) of the Stormwater Permits requires the permittee to submit a certified correction to CT DEEP within 15 days after becoming aware of the inaccuracy.  There is no record that Shell did so.

The Stormwater Permit at section 5(c)(7) further specifies that the certification be based on a review and site visit by the certifying party or his or her agent and professional judgment that the SWPPP meets the Stormwater Permit's criteria.  Relying completely on RPMS's certification, no Triton representative performed the designated review and site visit or exercised independent professional judgment.  Hence, Triton improperly certified the 2017 SWPPP.

### C.  Tank Secondary Containment Impermeability

#### 1. Summary of Deposition Testimony

Mr. Simonetta testified that Triton Environmental would not certify a SWPPP if not provided with information to demonstrate that secondary containment areas meet the state and federal definitions for impermeability.  No one at Shell requested that Triton perform its own evaluation of secondary containment impermeability.  When asked if Triton was provided with the relevant information, Mr. Simonetta answered, "I believe we were provided with containment volume calculations."[61]  Triton did not do its own surveys or analyses to determine if the secondary containment areas' impermeability was adequate.[62]  Nevertheless, when asked if

---

[61] *Id*. at 56:3–57:11, 93:14–17.
[62] *Id*. at 93:18–22.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

it is best industry practice to perform impermeability studies when reviewing impermeability of containment areas, Mr. Simonetta answered affirmatively.[63]

The witness agreed that the certified 2017 SWPPP does not conclude that the secondary containment areas are impermeable.  He stated that, like the containment capacity verification, the permeability evaluation was based on the SPCC certification.  While Triton informed Shell that they were capable of assessing impermeability, Shell did not ask them to do so.  When asked if Triton could have withheld certification until Triton confirmed that the secondary containment areas were impermeable, Mr. Simonetta answered, "Triton could have withheld the certification of the plan for any number of reasons.[64]

In her deposition, former Shell Environmental Coordinator for the New Haven Terminal, Jennifer Bothwell added context to the discussions between Triton and her company regarding containment impermeability.  An email she received from Mr. Simonetta on April 21, 2017 stated, "It is difficult for us to certify that the containment areas are 'impermeable' per the General Permit."  He asked if it is acceptable to rely on the SPCC Plan certification for the 2017 SWPPP certification.  She replied with her approval.[65]

In addition to the impermeability of the containment floor, another aspect of impermeability concerns the surrounding berm.  The original draft of the 2017 SWPPP contained a Corrective Action Plan, removed from the final version, that listed as one action for Shell to verify that secondary containment is still adequate based on the reduced capacity resulting from observed low points in berms and, if not adequate, repair them.  Triton itself did not verify the

---

[63] *Id*. at 94:2–5.
[64] *Id*. at 95:16–96:9.
[65] *Id*. at 103:5–105:14.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

adequacy with these low points.[66]  Mr. Simonetta testified that, years later, he observed the same low points still to exist.[67]

### 2. Commentary on Deposition Testimony

While containment volume information is pertinent to the preceding topic of tank secondary containment capacity, it has nothing to do with impermeability of the containment floor.  The testimony presented comes down to the same basis for judging the important factor of containment impermeability as for capacity, a certification 8 years in the past without an exposition of the basis relied upon then.  As I stated earlier, the soils at the site are totally inconsistent with containment floor impermeability, and there is no liner.  Furthermore, groundwater is near the surface, very vulnerable to contamination by infiltrating fluids, and documented to be heavily contaminated.  Even while Mr. Simonetta admitted that it was difficult to certify containment impermeability with the information at hand, and his firm did not draw such a conclusion, it issued a certification dependent on this very conclusion.  Mr. Simonetta and I agree that, in contrast to the inferior procedures employed in the certification, best industry practice is to perform actual impermeability studies.

### D. The Corrective Action Plan

#### 1. Summary of Deposition Testimony

Mr. Simonetta testified that regulatory guidance allows certification of a SWPPP even with corrective actions pending.  He described that guidance to be in the form of written communications between Triton and staff in EPA and CT DEEP.  He testified further that he could have gotten this guidance in connection with a different project but also applied it to the

---

[66] *Id*. at 92:9–13.
[67] *Id*. at 126:13–20.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Shell New Haven Terminal.[68]  Mr. Simonetta stated his opinion that the SWPPP could be certified even with six of the seven items in the Corrective Action Plan being recommendations only and not requirements.[69]  Later when questioned if Triton's BMP review considered their adequacy only in terms of the operation of the drainage system, he answered that a number of other BMPs would be considered.[70]  With further questioning asking if these other BMPs include secondary containment capacity, impermeability, and berm height, Mr. Simonetta answered negatively to each of the three inquiries.[71]

Mr. Simonetta's opinion is that if Shell certifies the SWPPP by signing off on finalizing the SWPPP with Shell's management certification, it is a declaration that they agree to the corrective action plan.[72]  Specifically, Shell accepts the statement in the Corrective Action Plan, "Shell's commitment to implement the following facility improvements has been included in the approval section included at Appendix A."  With that commitment, Mr. Simonetta believes that Triton could then certify the 2017 SWPPP.[73]

The Corrective Action Plan was ultimately not included in the final, certified 2017 SWPPP.  It appears that the deletion followed an exchange between Shell and Triton in which Jennifer Bothwell expressed her opinion that it is not appropriate to include recommendations and suggestions in the plan (presumably, the Corrective Action Plan) or reference them in the certification statement, a point she confirmed in her deposition.[74]  CT DEEP was not notified of

---

[68] *Id*. at 66:24–68:18.
[69] *Id*. at 73:24–74:6.
[70] *Id*. at 79:9–15.
[71] *Id*. at 79:14–24.
[72] *Id*. at 85:6–86:1.
[73] *Id*. at 86:12–23.
[74] Bothwell Dep., *op. cit.,* 83:10–84:10.

44

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

the items that needed to be addressed per the Correction Action Plan, another instance of non-compliance with section 6(d)(g) of the Stormwater Permits.

### 2. Commentary on Deposition Testimony

There has been no evidence presented of communications with regulatory agencies allowing SWPPP certification with unfinished corrective actions and no schedule to implement them. It is my opinion that a SWPPP must be a complete document providing a road map for the operation of a permittee's stormwater management program. I believe that this opinion is consistent with best industry practice, the standard of the Stormwater Permits. My view, in contrast to Mr. Simonetta's, is that among the most fundamental and important BMPs for the Shell Terminal are adequate secondary containment capacity, impermeability, and berm height as specified by the and Stormwater Permits and SPCC. In my opinion, effective BMPs in these categories are essential to comply with the Stormwater Permits' stipulation to employ practices that are technologically available and economically practicable and achievable at the level of best industry practice. The effect of Mr. Simonetta's testimony that Shell's commitment to implement the Corrective Action Plan's improvements makes the 2017 SWPPP certifiable means that the deletion of that plan renders the certification illegitimate. I consider that action to be a violation of Stormwater Permit 5(c)(7) in that Triton did perform a review and applied professional judgment to devise the Corrective Action Plan, as that provision specifies, and then eliminated it.

### E. Consideration of Shell and EPA Guidelines and Challenging Conditions in Preparing the SWPPP

### 1. Summary of Deposition Testimony

Mr. Simonetta was asked at his deposition if he was aware of Shell's health, safety, security, and environment control (HSSE) framework, to which he answered that he was not

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

familiar with it.[75]  He was not asked to follow it in preparing the 2017 SWPPP and was unaware of Shell's consideration of HSSE catastrophe risk.[76]  He was likewise unaware of Shell's hazards and effects management process.[77]  He was also not familiar with or asked to review any Shell design and engineering practice manual.[78]  To a question on whether he incorporated EPA guidance on stormwater management best management practices when drafting the 2017 SWPPP, Mr. Simonetta answered no.[79]

Mr. Simonetta was then asked a series of questions about challenging conditions that potentially affect stormwater management and if he was asked to consider them.  They included: (1) severe weather, (2) storm surge, (3) heavy or intense precipitation, (4) impacts of climate change, (5) rising sea levels, and (6) storm frequency.  He answered negatively to each question.[80]

### 2. **Commentary on Deposition Testimony**

I believe that the testimony recounted here signifies failure on the part of both Shell and Triton to communicate important points relevant to development of the 2017 SWPPP for the Terminal's circumstances.  Shell should have identified its policies and regulations through a reasonable investigation of its own files and presented them to its consultant, and the consultant should have made sure to acquire and understand them.

The omissions regarding challenging conditions are additional examples of failures to adhere to best industry practices in my opinion.  Any industry is subject to weather conditions that may not happen frequently but can overwhelm stormwater management systems when they

---

[75] 30(b)(6) Simonetta Dep., *op. cit.,* 33:24–25, 34:1–2.
[76] *Id.* at 34:6–11.
[77] *Id*. at 36:10–12
[78] *Id*. at 37:1–5.
[79] *Id*. at 38:1–5.
[80] *Id*. at 38:23–25, 39:1–25.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

occur, and climate change is exacerbating these incidents.  Shell's New Haven Terminal is subject to the effects of storm surge, rising sea levels, and other effects of climate change.[81, 82] Michael Sullivan, Facilities Manager of the New Haven Terminal, testified at deposition that there is no exception from the Stormwater Permit for significant storm events, including hurricanes.[83]  An example of a document that Triton should have received is DEP 37.00.10.10-Gen.,[84] which has a section titled Requirements for Inclusion of Climate Change.

In my opinion, the failure to obtain and consider all of the information pertaining to certification is a breach of section 6(d) of the Stormwater Permit.  That passage requires that the certification be based on reasonable investigation of the truth, accuracy, and completeness of the information.

### F.  My Overall Assessment of the Certification's Adequacy and the SWPPP's Validity

I do not believe that the 2017 SWPPP certification is complete and unqualified in conformance with the Stormwater Permits' section 5(c)(2)(F).  I am unaware of any regulation or other professional basis for supporting a certification based on future corrective action under the Stormwater Permits.  Any certification based on future corrective action, or actions known to be needed but omitted from the document to be certified, is inconsistent with best industry practice in my opinion.  The reasons follow for my belief that the certification is inadequate and inappropriate and the 2017 SWPPP is invalid under the Stormwater Permits' terms.

---

[81] Robert Nairn. 2025. Expert Report on the Shell Oil Terminal Flood Risk, Shell Oil Terminal – New Haven, Connecticut. Prepared for Conservation Law Foundation by W.F. Baird Associates Ltd.

[82] Barlow Report; *op. cit.*

[83] 30(b)(6) Deposition of Shell Oil Co. (Michael Sullivan), February 6, 2025 ("30(b)(6) Sullivan Dep."), 39:2–7, 42:9–13.

[84] Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal and Onshore (Amendments/Supplement to ISO 19901-1 :2015); February 2017.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- Verification of the adequacy of tank containment area capacity and impermeability depended on another certification issued 8 years before with no account or analysis of the basis relied upon then or assessment of how conditions may have changed in the meantime.

- The certification was issued despite no finding that the tank containment areas were sufficiently impermeable as specified by the Stormwater Permits and SPCC.  The highly conductive sandy soils and lack of liners are patently inconsistent with those specifications.

- It was discovered later that one containment area capacity was and still is inadequate, but no correction to the SWPPP or its certification was issued as required by the Stormwater Permits.

- Expunging the Corrective Action Plan from the SWPPP invalidates the certification and constitutes another case in which the obligation to inform CT DEEP was disregarded.

- Even if the Corrective Action Plan had remained in the final 2017 SWPPP, the permit does not directly authorize SWPPPs to be certified with unfinished correct actions.

- Neither the commissioner of the 2017 SWPPP (Shell) or the preparer (Triton) made certain that relevant policies and guidelines were considered in its development.

- There was no attention to meteorological and climatological factors that have strong influences on how well a stormwater management system functions throughout the operational life of the facility when stressed.

- Without evidence of monitoring to demonstrate that the discharge is comprised solely of stormwater, the non-stormwater certification is not in compliance with the Stormwater Permits.

48

- The above deficiencies overall constitute failure to operate at the level of best industry practice as enshrined in the Stormwater Permits.

## VII.  SWPPP'S DEVELOPED BEFORE AND AFTER 2017

### A. 2011 SWPPP

I have been asked by CLF to evaluate the 2011 SWPPP regarding its descriptions of the same deficiencies and issues I have concluded exist in the 2017 SWPPP.  The 2011 SWPPP is contained in the Terminal's Integrated Contingency Plan Annex 10 and bears a date of May 2011 (Bates number SOPUS_NHVN00247413) and was certified by a professional engineer Robert Perla on May 31, 2011 and by Shell management representative Michael Sullivan on June 7, 2011.  The 2011 SWPPP states it was prepared in accordance with the 2011 Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity, which is the same Permit that was in force when the 2017 SWPPP was prepared.

Although residing in Integrated Contingency Plan Annex 10, the 2011 SWPPP also references and incorporates the SPCC and parts of other Annexes, most importantly Annex 7 and the site figures from Annex 1.[85, 86]  The 2011 SWPPP describes the same tank secondary containment system that was portrayed in the 2017 SWPPP, and it is my opinion that the 2011 SWPPP is deficient for the same reasons as expressed above regarding the 2017 SWPPP containment system.

Moreover, the scattershot approach of spreading out the information through a long, diversified document makes the SWPPP virtually useless to Terminal personnel charged with functionally implementing the stormwater management program.  As I expressed earlier, I

---

[85] Integrated Contingency Plan (ICP); Annex 10, 2011 SWPPP; referencing Annex 7, at 27 (PDF pages 341–348); *see also* Annex 7, PDF pages 205–232.
[86] *Id.* at 330 (referencing Annex 1).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

believe that the purpose of a SWPPP is to provide a road map for the operation of a stormwater management system. The 2011 SWPPP in no way serves this purpose.

### B. SWPPPs Subsequent to 2017

I have been asked by CLF to evaluate which SWPPP is currently enforceable at the New Haven Terminal in light of February 6, 2025 corporate testimony on behalf of all Defendants by Michael Sullivan that the 2017 SWPPP has been replaced by a 2023 SWPPP prepared by Witt O'Brien.[87] This testimony conflicts with Mr. Sullivan's prior testimony in his personal deposition on March 23, 2023, that the July 2017 SWPPP was the "most recent version,"[88] that Witt O'Brien had not been retained to draft a SWPPP,[89] and that a document appearing to be a 2020 Witt O'Brien SWPPP was a draft template "that was not officially used."[90] In my review of the 2023 SWPPP, I concluded that it is incomplete, at the very least because it does not contain the required certifications.[91] The 2020 SWPPP is also not an official SWPPP and is better described by Witt O'Brien's corporate designee in a 2023 deposition as a draft document integrated into Witt O'Brien's system that "we did not develop or do anything other than host it on a software platform." [92] My understanding is there has been no claim that the 2020 SWPPP is a certified document that has ever been in force at the Terminal. The 2020 and 2023 SWPPPs by Witt O'Brien look very similar and the 2023 SWPPP is likely the same type of document as the

---

[87] 30(b)(6) Sullivan Dep., *op. cit.,* 243:17–25, 244:1, 246:12–22.

[88] Deposition of Michael Sullivan, March 23, 2023 ("Sullivan Dep."), 229:19–25, 230:1–9.

[89] *Id.* at 225:23–25, 226:1–6 ("Q. So do you know why this document is dated 2020? I believe you said you thought it was a draft. A. Yes. The way the Witt service worked, New Haven decided to go in a different direction with a different vendor. . . . [W]e decided in 2017 to use Triton Environmental Consulting to draft our SWPPP, and that is the one that's in effect.").

[90] *Id.* at 224:25–225:1.

[91] Stormwater Pollution Prevention Plan, Revision Date: May 2023, Prepared for Triton Terminaling LLC.

[92] 30(b)(6) Deposition of Witt O'Brien (John Carroll III), March 16, 2023 ("30(b)(6) Carroll Dep."), 334:8–25, 35:1–11.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

2020 SWPPP, which is just a template hosted on Witt O'Brien's software platform;[93] and Witt O'Brien would similarly disclaim it is a functional document.

The 2023 SWPPP that Defendants' claim is the SWPPP currently in force at the Terminal carries a date of May 2023, but the management certification is dated April 4, 2014;[94] and does not contain a professional engineer's certification.[95] For these reasons alone it is not a certified SWPPP that could be in force over the 2017 SWPPP, which bears certification signatures from 2017. If I consider the 2023 SWPPP despite its lack of proper or up-to-date certifications, the this SWPPP is very incomplete, as it does not contain even contain a description of the stormwater drainage system and treatment basins, simply making a reference to the site map. It does not cover the system for bypassing Containment Area 1 contents to Containment Area 2 if necessary. Also missing are structural control and non-structural pollutant source control measures and stormwater monitoring, all of which are central and essential elements of a SWPPP. The primary contents of the 2023 SWPPP stem from before the 2017 SWPPP. The site map is from 2013,[96] whereas the 2017 SWPPP has a 2017 site map. The 2023 SWPPPP contains a description of an Outfall 2, but Michael Sullivan testified in his 2023 deposition that Defendants had petitioned the state and shut down that Outfall years prior.[97] Furthermore, the 2023 SWPPP includes a history of spills that only includes those occurring up to 2013;[98] whereas the 2017 SWPPP listed spills that occurred in 2014 and 2016. The 2023 SWPPP also regularly references Motiva,[99] when my understanding is Motiva has not been the owner or operator of the Terminal for many years. In my opinion the 2023 SWPPP is outdated and grossly incomplete,

---

[93] Sullivan Dep., *op. cit.,* 226:3–6.
[94] SOPUS_NHVN02144575, at 9, 29, and 31 (2023 Witt O'Brien SWPPP).
[95] *See id.* at 83 (Blank Certification Page).
[96] *Id.* at 51 ("Edited August 2013").
[97] Sullivan Dep., *op. cit.,* 287:3–17.
[98] SOPUS_NHVN02144575 at 41–47 (2023 Witt O'Brien SWPPP).
[99] *Id.* at 4, 51, 57, 63, 82–83.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

which when combined with the lack of required certifications, makes it neither a SWPPP, nor a document that could be submitted to CT DEEP, nor in force at the Terminal.

Thus, the 2017 SWPPP is the most recent certified SWPPP, notwithstanding my conclusions regarding the inadequacy of the certification in Section VI.F above.  It is therefore the operable SWPPP upon which my opinions and conclusions are based.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability. My opinions are stated to a reasonable degree of certainty and consistent with prevailing and scientific standards of practice.

**Signed** this 1st day of May 2025 at Seattle, Washington,

Richard R. Horner

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**ATTACHMENT A**: New Haven Terminal Photographs



Photograph 1.  Several loading positions of the Truck Loading Rack

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 2.  A portion of the trough drain around the Truck Loading Rack

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 3.  Tanks and piping in Containment Area 3

**CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER**



Photograph 4.  View of a berm in the lower right and a containment area floor in the center of the photograph

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 5.  Close up of a containment area floor, made up of sandy, gravelly material

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 6.  Butane tanks

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 7.  Petroleum additive Tank 47



Photograph 8.  Primary retention basin in the foreground; secondary basin in the background; berm separating the two basins at the base of the yellow steps in the right center of the photograph; the discharge point at the base of second set of yellow steps in the center; the blue 6-inch discharge pipe from Drainage Area 001C at the left

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 9.  A lift station in Drainage Area 001A

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 10.  Overflow pipe (at the left) from Drainage Area 001C to 001B, with pipe length being measured

x

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 11.  Point where off-site stormwater runoff enters the Terminal at the northeast corner

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER



Photograph 12.  Channel carrying off-site drainage through the Terminal

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**ATTACHMENT B**: Richard Horner *Curriculum Vitae*

Richard Horner *Curriculum Vitae*

HORNER, Richard Ray

| | |
|---|---|
| 230 NW 55th Street | University of Washington: |
| Seattle, WA  98107 | Emeritus Research Associate Professor, |
| Telephone:  (206) 782-7400 | Departments of Landscape Architecture and Civil |
| E-mail:  rrhorner1@msn.com | and Environmental Engineering and |
| rrhorner@u.washington.edu | Sole Proprietor Consultant |

EDUCATION

1976 - 1978    University of Washington, Seattle, Washington; Ph.D. (Civil Engineering)

1965 - 1966    University of Pennsylvania, Philadelphia, Pennsylvania; M.S. (Mechanical Engineering)

1961 - 1965    University of Pennsylvania, Philadelphia, Pennsylvania; B.S. *Cum Laude* (Mechanical Engineering)

HONORS AND AWARDS

Augustus Trask Ashton Scholarship, University of Pennsylvania, 1961 - 65
Annual Academic Honors, University of Pennsylvania, 1961 - 65
Tau Beta Pi National Engineering Honor Society
National Science Foundation Traineeship, University of Pennsylvania, 1965 - 66

EMPLOYMENT

1986 - Present    Richard R. Horner, Sole Proprietor (offering services in environmental engineering and science)

2011 - Present    University of Washington, Seattle, Washington
Emeritus Research Associate Professor

1981 - 2011    University of Washington, Seattle, Washington
Research Associate Professor

1986 - 1990    King County, Seattle, Washington
Coordinator of Puget Sound Wetland and Stormwater Management Research
Program (part-time; continued under contract to University of Washington)

1969 - 1981    Northampton Community College, Bethlehem, Pennsylvania
Engineering Department (Coordinator, 1971 - 73 and 1978 - 79)

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Environmental Studies Department (Co-coordinator, 1973 - 76 and 1978 - 1981)
Professor, 1978 - 1981; Associate Professor, 1973 - 78;
Assistant Professor, 1969 - 73,
Leave of Absence, 1977 - 78; Sabbatical Leave, 1976 - 77

1977 - 1978    University of Washington, Seattle, Washington
Department of Civil Engineering
Research Engineer, Highway Runoff Water Quality Project

1976 - 1977    University of Washington, Seattle, Washington
Department of Civil Engineering and Institute for Environmental Studies
Research Assistant and Teaching Assistant

1966 - 1969    Exxon Research and Engineering Company, Florham Park, New Jersey;
Project Engineer

1965 - 1966    University of Pennsylvania, Philadelphia Pennsylvania
Department of Mechanical Engineering; Research Assistant

## NATIONAL COMMITTEES

National Academy of Sciences Panel on Reducing Stormwater Discharge Contributions to Water Pollution, 2007-2008.

Technical Advisory Panel for Water Environment Federation projects on Decentralized Stormwater Controls for Urban Retrofit and Combined Sewer Overflow Reduction, 2005-2007.

Co-chair, Engineering Foundation Conference on Effects of Watershed Development and Management on Aquatic Ecosystems, 1996.

National Academy of Sciences Panel on Costs of Damage by Highway Ice Control, 1990-91.

U.S. Environmental Protection Agency National Wetland Research Planning Panel, 1988, 1991.

## RESEARCH PROJECTS

* Principal Investigator.
** Co-Principal Investigator.  (Where undesignated, I was a member of the faculty investigation team without principal investigator status).

Effects of Waterfront Stormwater Solutions Prototypes on Water Quality Runoff in Puget Sound near Pomeroy Park - Manchester Beach; Washington Sea Grant; $148,838; 2015-17.

xiv

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Development of a Stormwater Retrofit Plan for Water Resources Inventory Area (WRIA) 9 and Estimation of Costs for Retrofitting all Developed Lands of Puget Sound; U.S. Environmental Protection Agency and King County (WA); $243,619; 2010-13.

Ultra-Urban Stormwater Management; Seattle Public Utilities; $1,130,000; 1999-2008.*

Roadside Vegetation Management Study; Washington State Department of Transportation; $50,000; 2004-05.

The Ecological Response of Small Streams to Stormwater and Stormwater Controls; U. S. Environmental Protection Agency, cooperating with Watershed Management Institute (Crawfordsville, FL); $579,117; 1995-2003.*

Vegetated Stormwater Facility Maintenance; Washington State Department of Transportation; $86,000; 1998-2000.*

Roadside Drainage System Management for Water Quality Improvement; King and Snohomish (WA) Counties; $70,000; 1997-2000.*

Standardization of Wet Weather Protocols for Stream Impact and Treatment Technology Performance Assessments; Water Environment Research Foundation, cooperating with Water Research Center (Huntington Valley, Pennsylvania) and University of Illinois; $125,000; 1996-97.

Road Shoulder Treatments for Water Quality Protection; Washington State Department of Transportation and King County Roads Division; $90,000; 1995-96.**

Control of Nuisance Filamentous Algae in Streams by Invertebrate Grazing; National Science Foundation; $193,691; 1994-96.

Criteria for Protection of Urban Stream Ecosystems; Washington Department of Ecology; $230,000; 1994-96.

Region-Specific Time-Scale Toxicity in Aquatic Ecosystems; Water Environment Research Foundation, cooperating with Water Research Center (Huntington Valley, Pennsylvania) and University of Illinois; $670,000; 1994-96.

Establishing Reference Conditions for Freshwater Wetlands Restoration; U. S. Environmental Protection Agency; $75,000; 1993-97.

Stormwater Management Technical Assistance to Local Governments; Washington Department of Ecology; $115,000; 1992-93.*

Center for Urban Water Resources Management; Washington Department of Ecology; $336,490; plus $157,400 matching support from seven local governments; 1990-93.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

University of Washington Cooperative Unit for Wetlands and Water Quality Research; King County, Washington; amount varied by year; 1987-95.*

Assessment of Portage Bay Combined Sewer Overflows; City of Seattle; $132,676; 1990-91.*

Velocity-Related Critical Phosphorus Concentrations in Flowing Water, Phase 3; National Science Foundation; $108,332; 1988-90.**

Design of Monitoring Programs for Determining Shellfish Bed Bacterial Contamination Problems; Washington Department of Ecology; $12,000; 1988-89.*

Puget Sound Protocols Development; Tetra Tech, Inc. and Puget Sound Estuary Program; $10,144; 1988.*

Improving the Cost Effectiveness of Highway Construction Site Erosion/ Pollution Control, Phase 2; Washington State Department of Transportation; $97,000; 1987-89.*

Wetland Mitigation Project Analysis; Washington State Department of Transportation; $74,985; 1987-89.*

Lake Chelan Water Quality Assessment; Harper-Owes, consultant to Washington State Department of Ecology; $42,977; 1986-88.

Quality of Management of Silver Lake; City of Everett; $67,463; 1986-88.

Effectiveness of WSDOT Wetlands Creation Projects; Washington State Department of Transportation; $42,308; 1986-87.*

Improving the Cost Effectiveness of Highway Construction Site Erosion/Pollution Control; Washington State Department of Transportation; $41,608; 1986-87.*

Management Significance of Bioavailable Phosphorus in Urban Runoff; State of Washington Water Research Center and Municipality of Metropolitan Seattle; $32,738; 1986-87.**

Environmental Monitoring and Evaluation of Calcium Magnesium Acetate (CMA); Transportation Research Board of National Academy of Sciences; $199,943; 1985-87.*

Conceptual Design of Monitoring Programs for Determination of Water Quality and Ecological Change Resulting from Nonpoint Source Discharges; Washington State Department of Ecology; $49,994; 1985-86.**

Development of an Integrated Land Treatment Approach for Improving the Quality of Metalliferous Mining Wastewaters; Washington Mining and Mineral Resources Research Institute; $4,000; 1985-86.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Preliminary Investigation of Sewage Sludge Utilization on Roadsides; Washington State Department of Transportation; $6,664; 1984-85.*

Source Control of Transit Base Runoff Pollutants; Municipality of Metropolitan Seattle; $26,867; 1984-85.**

Lake Sammamish Future Water Quality; Municipality of Metropolitan Seattle; $28,500; 1984-85.

Implementation of Highway Runoff Water Quality Research Results; Washington State Department of Transportation; $13,998; 1984-85.*

Performance Evaluation of a Detention Basin and Coalescing Plate Oil Separator for Treating Urban stormwater Runoff; Washington State Water Research Center; 1984-85; $11,724.**

Velocity-Related Critical Phosphorus Concentrations in Flowing Water, Phase 2; National Science Foundation; $99,088; 1983-85.**

Development of a Biological Overland Flow System for Treating Mining Wastewaters; Washington Mining and Mineral Resources Research Institute; $6,030; 1983-84.*

Nutrient Contributions of Agricultural Sites to the Moses Lake System; Moses Lake Conservation District; $15,039; 1982-84.*

Planning Implementation of Runoff Water Quality Research Findings; Washington State Department of Transportation; $12,735; 1982-83.**

Transport of Agricultural Nutrients to Moses Lake; Brown and Caldwell Engineers; $22,725; 1982-83.**

Investigation of Toxicant Concentration and Loading Effects on Aquatic Macroinvertebrates; University of Washington Graduate School Research Fund; $3,788; 1982.*

Sampling Design for Aquatic Ecological Monitoring; Electric Power Research Institute; $542,008; 1981-86.

Velocity-Related Critical Phosphorus Concentrations in Flowing Water; National Science Foundation; $70,310; 1980-82.

Highway Runoff Water Quality; Washington State Department of Transportation; $461,176; 1977-82.

BOOKS

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Shaver, E., R. Horner, J. Skupien, C. May, and G. Ridley.  *Fundamentals of Urban Runoff Management: Technical and Institutional Issues*, 2nd Edition.  U.S. Environmental Protection Agency, Washington, D.C., 2007.

Azous, A. L. and R. R. Horner.  *Wetlands and Urbanization: Implications for the Future*.  Lewis Publishers, Boca Raton, FL, 2000.

Horner, R. R., J. J. Skupien, E. H. Livingston, and H. E. Shaver.  *Fundamentals of Urban Runoff Management: Technical and Institutional Issues*.  Terrene Institute, Washington, D. C., 1994.

REFEREED JOURNAL PUBLICATIONS AND BOOK CHAPTERS

Wright, O.M., E. Istanbulluoglu, R.R. Horner, C.L. DeGasperi, and J. Simmonds.  2018.  Is There a Limit to Bioretention Effectiveness?  Evaluation of Stormwater Bioretention Treatment Using a Lumped Ecohydrologic Watershed Model and Ecologically-Based Design Criteria.  *Hydrological Processes* 2018:1-17.

Chapman, C. and R.R. Horner.  Performance Assessment of a Street-Drainage Bioretention System.  *Water Environment Research* 82(2): 109-119, 2010.

Horner, R. R. et al.  Structural and Non-Structural Best Management Practices (BMPs) for Protecting Streams.  In *Linking Stormwater BMP Designs and Performance to Receiving Water Impact Mitigation*, B. K. Urbonas (ed.), American Society of Civil Engineers, New York, pp. 60-77, 2002.

Comings, K. J., D. B. Booth, and R. R. Horner.  Storm Water Pollutant Removal by Two Wet Ponds in Bellevue, Washington.  *Journal of Environmental Engineering* 126(4):321-330, 2000.

Anderson, E. L., E. B. Welch, J. M. Jacoby, G. M. Schimek, and R. R. Horner.  Periphyton Removal Related to Phosphorus and Grazer Biomass Level.  *Freshwater Biology* 41:633-651, 1999.

Horner, R. R., D. B. Booth, A. Azous, and C. W. May.  Watershed Determinants of Ecosystem Functioning.  In *Effects of Watershed Development and Management on Aquatic Ecosystems*, L. A. Roesner (ed.), American Society of Civil Engineers, New York, pp. 251-274, 1997.

Horner, R.R.  Toward Ecologically Based Urban Runoff Management.  In *Urban Runoff and Receiving Systems*, E.E. Herricks (ed.), Lewis Publishers, Boca Raton, Florida, pp. 365-378, 1995.

Walton, S. P., E. B. Welch, and R. R. Horner.  Stream Periphyton Response to Grazing and Changes in Phosphorus Concentration.  *Hydrobiologia* 302:31-46, 1994.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Reinelt, L. E. and R. R. Horner.  Pollutant Removal from Stormwater Runoff by Palustrine Wetlands Based on a Comprehensive Budget.  *Ecological Engineering* 4:77-97, 1995.

Horner, R.R. and M.V. Brenner.  Environmental Evaluation of Calcium Magnesium Acetate for Highway Deicing Applications.  *Resources, Conservation and Recycling* 7:213-237, 1992.

Brenner, M.V. and R.R. Horner.  Effects of Calcium Magnesium Acetate on Dissolved Oxygen in Water.  *Resources, Conservation and Recycling* 7:239-265, 1992.

Reinelt, L.E., R.R. Horner, and R. Castensson.  Nonpoint Source Water Quality Management: Improving Decision-Making Information through Water Quality Monitoring.  *Journal of Environmental Management* 34:15-30, 1992.

Horner, R.R., M.V. Brenner, R.B. Walker, and R.H. Wagner.  Environmental Evaluation of Calcium Magnesium Acetate.  In *Calcium Magnesium Acetate (CMA):  An Emerging Bulk Chemical for Multi-purpose Environmental Applications*, D.L. Wise, Y.A. Lavendis, and M. Metghalchi (eds.), Elsevier Science Publishers B.V., The Netherlands, pp. 57-102, 1991.

Horner, R.R., E.B. Welch, M.R. Seeley, and J.M. Jacoby.  Responses of Periphyton to Changes in Current Velocity, Suspended Sediments and Phosphorus Concentration.  *Freshwater Biology* 24:215-232, 1990.

Horner, R.R.  Long-Term Effects of Urban Stormwater on Wetlands.  In *Design of Urban Runoff Quality Controls*, L.A. Roesner, B. Urbonas, and M.B. Sonnen (eds.), American Society of Civil Engineers, New York, pp. 451-466, 1989.

Welch, E.B., R.R. Horner, and C.R. Patmont.  Phosphorus Levels That Cause Nuisance Periphyton:  A Management Approach.  *Water Research* 23(4):401-405, 1989.

Butkus, S.R., E.B. Welch, R.R. Horner, and D.E. Spyridakis.  Lake Response Modeling Using Biologically Available Phosphorus.  *Journal of the Water Pollution Control Federation* 60(9):1663-1669, 1988.

Reinelt, L.E., R.R. Horner, and B.W. Mar.  Nonpoint Source Pollution Monitoring Program Design.  *Journal of Water Resources Planning and Management* 114(3):335-352, 1988.

Welch, E.B., J.M. Jacoby, R.R. Horner, and M.R. Seeley.  Nuisance Biomass Levels of Periphytic Algae in Streams.  *Hydrobiologia*, 157:161-168, 1988.

Reinelt, L.E., R. Castensson, and R.R. Horner.  Modification of an Existing Monitoring Program to Address Nonpoint Source Pollution, A Case Study of the Svarta River Basin, Sweden.  *Vatten* 43:199-208, 1987.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Mar, B.W., R.R. Horner, J.S. Richey, D.P. Lettenmaier, and R.N. Palmer.  Data Acquisition, Cost-Effective Methods for Obtaining Data on Water Quality.  *Environmental Science and Technology* 20(6):545-551, 1986.

Horner, R.R., J.S. Richey, and G.L. Thomas.  A Conceptual Framework to Guide Aquatic Monitoring Program Design for Thermal Electric Power Plants.  *Rationale for Sampling and Interpretation of Ecological Data in the Assessment of Freshwater Ecosystems*, Special Technical Publication 894 of the American Society for Testing and Materials, Philadelphia, Pennsylvania, pp. 86-100, 1986.

Welch, E.B., D.E. Spyridakis, J.I. Shuster, and R.R. Horner.  Declining Lake Sediment Phosphorus Release and Oxygen Deficit Following Wastewater Diversion.  *Journal of the Water Pollution Control Federation* 58(1):92-96, 1986.

Richey, J.S., B.W. Mar, and R.R. Horner.  The Delphi Technique in Environmental Assessment, Part 1:  Implementation and Effectiveness. *Journal of Environmental Management* 21:135-146, 1985.

Richey, J.S., R.R. Horner, and B.W. Mar.  The Delphi Technique in Environmental Assessment, Part 2:  Consensus on Critical Issues in Environmental Monitoring Program Design. *Journal of Environmental Management* 21:147-159, 1985.

Horner, R.R. and B.W. Mar.  Assessing Impacts of Operating Highways on Aquatic Ecosystems. *Transportation Research Record* 1017:47-55, 1985.

Horner, R.R., E.B. Welch, and R.B. Veenstra.  Development of Nuisance Periphytic Algae in Laboratory Streams in Relation to Enrichment and Velocity.  In *Periphyton of Freshwater Ecosystems*, R.G. Wetzel (ed.), Dr. W. Junk BV, the Hague, The Netherlands, pp. 121-134, 1983.

Horner, R.R. and B.W. Mar.  A Guide for Assessing Water Quality Impacts of Highway Operations and Maintenance.  *Transportation Research Record* 948:31-40, 1983.

Chui, T.W., B.W. Mar, and R.R. Horner.  A Pollutant Loading Model for Highway Runoff. *Journal of Environmental Engineering Division*, ASCE 108:1193-1120, 1982.

Horner, R.R. and E.B. Welch.  Stream Periphyton Development in Relation to Current Velocity and Nutrients.  *Canadian Journal of Fisheries and Aquatic Sciences* 38:449-457, 1981.

REVIEWED PROCEEDINGS PUBLICATIONS

Horner, R. R.  Stormwater Runoff Flow Control Benefits of Urban Drainage System Reconstruction According to Natural Principles.  Presentation at Puget Sound—Strait of Georgia Research Conference, Vancouver, B. C., 2003.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

May, C.W. and R.R. Horner.  2002. The Limitations of Mitigation-Based Stormwater Management in the Pacific Northwest and the Potential of a Conservation Strategy Based on Low-Impact Development Principles.  Proc. 2002 ASCE Stormwater Conference, Portland, OR.

Horner, R. R. and C. R. Horner.  Performance of a Perimeter ("Delaware") Sand Filter in Treating Stormwater Runoff from a Barge Loading Terminal.  Proc. Comprehensive Stormwater and Aquatic Ecosystem Management Conf.; Auckland, New Zealand; February 1999, pp. 183-192, 1999.

Horner, R. R. and C. W. May.  Regional Study Supports Natural Land Cover Protection as Leading Best Management Practice for Maintaining Stream Ecological Integrity.  Proc. Comprehensive Stormwater and Aquatic Ecosystem Management Conf.; Auckland, New Zealand; February 1999, pp. 233-248, 1999.

Horner, R. R.  Constructed Wetlands for Urban Runoff Water Quality Control.  Proc. National Conf. on Urban Runoff Management; Chicago, Illinois; March 1993, pp. 327-340, 1995.

Horner, R. R.  Training for Construction Site Erosion Control and Stormwater Facility Inspection. Proc. National Conf. on Urban Runoff Management; Chicago, Illinois; March 1993, pp. 426-450, 1995.

Horner, R. R.  Overview of the Puget Sound Wetlands and Stormwater Management Research Program.  Proc. Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995, pp. 141-145, 1995.

Horner, R. R. and L. E. Reinelt.  Guidelines for Managing Urban Wetlands.  Proc. Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995, pp. 171-178, 1995.

Taylor, B. K. Ludwa, and R. R. Horner.  Urbanization Effects on Wetland Hydrology and Water Quality.  Proc. Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995, pp. 146-154, 1995.

Reinelt, L.E. and R.R. Horner.  Urban Stormwater Impacts on the Hydrology and Water Quality of Palustrine Wetlands in the Puget Sound Region.  Proc. Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1991; pp. 33-42.

Horner, R.R.  Environmental Effects of Calcium Magnesium Acetate, Emphasizing Aquatic Ecosystem Effects.  Proc. Conf. on Environmental Impacts of Highway Deicing, Institute of Ecology Publication No. 33, University of California, Davis; 1990; pp. 97-119.

Stockdale, E.C. and R.R. Horner.  Using Freshwater Wetlands for Stormwater Management:  A Progress Report.  Proc. Wetlands 1988:  Urban Wetlands and Riparian Habitat Symposium; Oakland, California, June 1988.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R.R.  Highway Construction Site Erosion and Pollution Control:  Recent Research Results.  Proc. 39th Annual Road Builders' Clinic; Moscow, Idaho; March 1988; pp. 37-54.

Horner, R.R., F.B. Gutermuth, L.L. Conquest, and A.W. Johnson.  Urban Stormwater and Puget Trough Wetlands.  Proc. 1st Annual Meeting on Puget Sound Research; Seattle, Washington; March 1988; pp. 723-746.

Weiner, R.F., R.R. Horner, and J. Kettman.  Preliminary Comparative Risk Assessment for Hanford Waste Sites.  Proc. Waste Management 88; Tucson, Arizona; February 1988.

Stockdale, E.C. and R.R. Horner.  Prospects for Wetlands Use in Stormwater Management.  Proc. Coastal Zone 87 Conf.; Seattle, Washington; May 1987; pp. 3701-3714.

Horner, R.R.  A Review of Wetland Water Quality Functions, Proc. Conf. on Wetland Functions, Rehabilitation, and Creation in the Pacific Northwest:  The State of Our Understanding; Port Townsend, Washington; May 1986; pp. 33-50.

Bain, R.C., Jr., R.R. Horner, and L. Nelson.  Nonpoint Pollution Control Strategies for Moses Lake, Washington.  Proc. Fifth Annual Conf. North American Lake Management Society; Lake Geneva, Wisconsin; November 1985; pp. 170-176.

Shuster, J.I., E.B. Welch, R.R. Horner, and D.E. Spyridakis.  Response of Lake Sammamish to Urban Runoff Control.  Proc. Fifth Annual Conf. North American Lake Management Society; Lake Geneva, Wisconsin; November 1985; pp. 229-234.

Horner, R.R., J.S. Richey, and B.W. Mar.  A General Approach to Designing Environmental Monitoring Programs.  Proc. Pacific Section AAAS Sym. on Biomonitors, Bioindicators and Bioassays of Environmental Quality; Missoula, Montana; June 1985.

Horner, R.R.  Improvement of Environmental Impact Assessment of Nonpoint Sources of Water Pollution.  Proc. Non-point Pollution Abatement Sym.; Milwaukee, Wisconsin; April 1985.

Horner, R.R., E.B. Welch, M.M. Wineman, M.J. Adolfson, and R.C. Bain, Jr.  Nutrient Transport Processes in an Agricultural Watershed.  Proc. Fourth Annual Conf. North American Lake Management Society; McAfee, New Jersey; October 1984; pp. 221-228.

Horner, R.R. and B.W. Mar.  A Predictive Model for Highway Runoff Pollutant Concentrations and Loadings.  Proc. Stormwater and Water Quality Management Model Users' Group Meeting.  EPA 600/9-82-015; Alexandria, Virginia; March 1982; pp. 210-224.

TECHNICAL REPORTS

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R.R.  Development of a Stormwater Retrofit Plan for Water Resources Inventory Area 9: Flow and Water Quality Indicators and Targets.  King County Water and Land Resources Division, Seattle, Washington, 2013.

Horner, R.R. and J. Gretz.  Investigation of the Feasibility and Benefits of Low-Impact Site Design Practices Applied to Meet Various Potential Stormwater Runoff Regulatory Standards.  Report to U.S. Environmental Protection Agency by Natural Resources Defense Council, 2011.

Horner, R.R.  Section 4-2, Protection and Restoration Strategies for Watersheds and Tributaries; Chapter 4:  A Science-Based Review of Ecosystem Protection and Restoration Strategies for Puget Sound and Its Watersheds; Puget Sound Science Update.  Puget Sound Partnership, Tacoma, WA, 2010.

Garrison, N., R.C. Wilkinson, and R. Horner.  How Greening California Cities Can Address Water Resources and Climate Challenges in the 21st Century.  Natural Resources Defense Council, 2009.

Horner, R. R.  Supplementary Investigation of the Feasibility and Benefits of Low-Impact Site Design Practices ("LID") for the San Francisco Bay Area.  Natural Resources Defense Council, 2009.

Horner, R. R.  Initial Investigation of the Feasibility and Benefits of Low-Impact Site Design Practices ("LID") for the San Francisco Bay Area.  Natural Resources Defense Council, 2009.

Horner, R. R.  Investigation of the Feasibility and Benefits of Low-Impact Site Design Practices ("LID") for Ventura County.  Natural Resources Defense Council, 2008.

Horner, R. R. and C. Chapman.  NW 110th Street Natural Drainage System Performance Monitoring, With Summary of Viewlands and 2nd Avenue NW SEA Streets Monitoring.  Report to City of Seattle Public Utilities, 2007.

Horner, R. R.  Investigation of the Feasibility and Benefits of Low-Impact Site Design Practices ("LID") for the San Diego Region.  Natural Resources Defense Council, 2006.

Horner, R. R.  SPU Drainage Rate Analysis Options:  Recommendations on Certain Technical Issues.  Report to City of Seattle Public Utilities, 2005.

Hill, K. and R. Horner.  Assessment Of Alternatives In Roadside Vegetation Management.  Report to Washington State Department of Transportation, 2005.

Horner, R. R. and Entranco, Inc.  Regional Detention Facilities Retrofit Project:  Evaluation of Regional Stormwater Ponds for Water Quality Improvements.  Report to City of Bellevue Utilities Department, 2005.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R. R. and T. Osborn.  Removal of Fecal Coliforms from Stormwater Runoff:  A Literature Review.  Report to City of Blaine, 2005.

Horner, R.R., H. Lim, and S.J. Burges.  Hydrologic Monitoring of the Seattle Ultra-Urban Stormwater Management Projects:  Summary of the 2000-2003 Water Years, Water Resources Series Technical Report Number 181.  Department of Civil and Environmental Engineering, University of Washington, Seattle, WA.  Report to City of Seattle Public Utilities, 2004.

Horner, R.R., C.W. May, and E.H. Livingston.  Linkages Between Watershed and Stream Ecosystem Conditions in Three Regions of the United States. Report to U.S. Environmental Protection Agency by Watershed Management Institute, Inc., Crawfordville, FL, 2003.

Karr, J. R., R. R. Horner, and C R. Horner.  EPA's Review of Washington's Water Quality Criteria: An Evaluation of Whether Washington's Criteria Proposal Protects Stream Health and Designated Uses.  Report to National Wildlife Federation, 2003.

Horner, R.R., H. Lim, and S.J. Burges.  Hydrologic Monitoring of the Seattle Ultra-Urban Stormwater Management Projects, Water Resources Series Technical Report Number 170. Department of Civil and Environmental Engineering, University of Washington, Seattle, WA.  Report to City of Seattle Public Utilities, 2002.

Miller, A.V., S.B. Burges, and R.R. Horner.  Hydrologic Monitoring of the Seattle Ultra-Urban Stormwater Management Projects, Water Resources Series Technical Report Number 166. Department of Civil and Environmental Engineering, University of Washington, Seattle, WA.  Report to City of Seattle Public Utilities, 2001.

Mills, M. and R. R. Horner.  Comprehensive Ditch and Culvert Program.  Report to City of Seattle Public Utilities, 2001.

Colwell, S., R. R. Horner, D. B. Booth, and D. Gilvydis.  A Survey of Ditches Along County Roads for Their Potential to Affect Storm Runoff Water Quality.  Report to Snohomish County Surface Water Management Division, Snohomish County Road Maintenance, King County Land and Water Resources Division, King County Department of Transportation Road Maintenance, 2000.

Cammermayer, J. W. and R. R. Horner.  Vegetated Stormwater Facility Maintenance.  Report to Washington State Department of Transportation, WA-RD-495.1, 2000.

Azous, A. L. and R. R. Horner (eds.).  Wetlands and Urbanization:  Implications for the Future. Report to Washington Department of Ecology, 1997.

May, C. W., E. B. Welch, R. R. Horner, J. R. Karr, and B. W. Mar.  Quality Indices for Urbanization Effects in Puget Sound Lowland Streams.  Report to Washington Department of Ecology, 1997.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Livingston, E. H., H. E. Shaver, J. J. Skupien, and R. R. Horner. Operation, Maintenance, and Management of Stormwater Management Systems. Report to U. S. Environmental Protection Agency, 1997.

Livingston, E. H., H. E. Shaver, R. R. Horner, and J. J. Skupien,. Watershed Management Institute. Institutional Aspects of Urban Runoff Management: A Guide for Program Development and Implementation. Report to U. S. Environmental Protection Agency, 1997.

St. John, M. S. and R. R. Horner. Effect of Road Shoulder Treatments on Highway Runoff Quality and Quantity. Report to Washington State Department of Transportation, WA-RD-429.1, 1997.

Horner, R.R. Storm Drainage Water Quality Rate Basis Recommendations. Report to City of Bellevue Utilities Department, 1996.

Horner, R. R. and C. R. Horner. Impacts on Aquatic Ecosystems and Organisms of Airplane and Airport Runway Deicing Chemicals. Report to Port of Seattle, Seattle, Washington, 1996.

Horner, R. R. Constituents and Sources of Water Pollutants in Urban Stormwater Runoff. Report to Natural Resources Defense Council, Los Angeles, California, 1995.

Horner, R. R. Program Recommendations and Review of Submittals for Los Angeles County Stormwater NPDES Compliance. Report to Natural Resources Defense Council, Los Angeles, California, 1995.

Horner, R. R. and C. R. Horner. Design, Construction, and Evaluation of a Sand Filter Stormwater Treatment System, Part II, Performance Monitoring. Report to Alaska Marine Lines, Seattle, Washington, 1995.

Horner, R. R. Review of Draft Design Memorandum, Lakemont Boulevard Extension. Report to City of Bellevue, Washington, 1995.

Economic and Engineering Services, Inc. and R. R. Horner. Wetpond Restoration for Water Quality Enhancement. Report to City of Bellevue, Washington and Washington Department of Ecology, 1995.

City of Bellevue Utilities Department (R. R. Horner contributing author). Characterization and Source Control of Urban Stormwater Quality. Report to Washington Department of Ecology, 1995.

Horner, R. R. Constituents and Sources of Water Pollutants in Highway Stormwater Runoff. Report to Natural Resources Defense Council, Los Angeles, California, 1994.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R. R.  Program Recommendations and Review of California Department of Transportation Submittals for Santa Monica Bay Watershed Stormwater NPDES Compliance, Support Materials.  Report to Natural Resources Defense Council, Los Angeles, California, 1994.

Horner, R. R.  Peer Review of Assessment of Potential Impacts from Sediment and Phosphorus Loading to Lewis Creek and Lake Sammamish - Lakemont Boulevard Extension Project. Report to City of Bellevue, Washington, 1994.

Horner, R. R.  Review of the Literature on Constructed Wetlands for Municipal Wastewater Treatment.  Report to Kramer, Chin and Mayo, Inc., Seattle, Washington, 1994.

Engineering Technologies Associates, Inc. and R. R. Horner.  Conceptual Framework for Hydrograph Classification.  Report to Water Research Center, Huntington Valley, Pennsylvania, 1994.

Horner, R. R.  Phantom Lake Stormwater Controls Evaluation, Review of Water Quality Data and Literature.  Report to CH2M-Hill, City of Bellevue Storm and Surface Water Utility, and Boeing Computer Services Corporation, Bellevue, Washington, 1993.

Horner, R. R.  Boeing Customer Service Training Center Stormwater Quality Monitoring and Assessment Program.  Report to Boeing Commercial Airplane Company, Sverdrup Corporation, and City of Renton, Washington, 1992.

Welch, E.B., R.J. Totorica and R.R. Horner.  Approach to Developing Nutrient Loading Criteria for Franklin D. Roosevelt Lake.  Report to Washington Department of Ecology, Olympia, 1992.

Municipality of Metropolitan Seattle (R. R. Horner contributing author).  Biofiltration Swale Performance, Recommendations, and Design Considerations. Report to Washington Department of Ecology, Olympia, 1992.

Horner, R.R. and P. Kalina.  Water Quality Assessment of Portage Bay.  Report to City of Seattle, 1991.

Horner, R.R. and C.R. Horner.  Transport and Fate of Metal and Organic Toxicants in Arid-Region Wetlands.  Report to U.S. Environmental Protection Agency, Corvallis Laboratory, 1991.

King County Resource Planning Section (R. R. Horner contributing author).  Development of Guidance for Managing Urban Wetlands and Stormwater. Report to Washington Department of Ecology, Olympia, 1991.

Horner, R.R. and C.R. Horner.  Use of Underdrain Filter Systems for the Reduction of Stormwater Runoff Pollutants: A Literature Review.  Report to Kramer, Chin and Mayo, Inc., 1990.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Reinelt, L.E. and R.R. Horner.  Characterization of the Hydrology and Water Quality of Palustrine Wetlands Affected by Urban Stormwater.  Report prepared for the Puget Sound Wetlands and Stormwater Management Research Program, Seattle, WA, 1990.

Horner, R. R.  Analysis of Proposed Surface Water Source Control Requirements for the Commencement Bay Nearshore/Tideflats Superfund Area.  Report to Port of Tacoma, Washington, 1989.

Horner, R.R. and K.J. Raedeke.  Guide for Wetland Mitigation Project Monitoring.  Report to Washington State Department of Transportation, 1989.

Horner, R.R., J. Guedry, and M.H. Kortenhof.  Improving the Cost-Effectiveness of Highway Construction Site Erosion and Pollution Control.  Report to Washington State Department of Transportation, 1989.

Horner, R.R., J. Guedry, and M.H. Kortenhof.  Highway Construction Site Erosion and Pollution Control Manual.  Report to Washington State Department of Transportation, 1989.

Horner, R.R., M.V. Brenner, and C.A. Jones.  Design of Monitoring Programs for Determining Sources of Shellfish Bed Bacterial Contamination Problems.  Report to Washington Department of Ecology, 1989.

Horner, R. R. and C. R. Horner.  A Technical Review of the Sediment/Toxicant Retention and Nutrient Removal Transformation Functions of WET 2.0.  Report to AScI Corporation and U. S. Environmental Protection Agency, Duluth, Minnesota, 1989.

Horner, R. R. and M. Benjamin.  Washington State Pulp and Paper Plant Water Treatment Effluent Limitations.  Report to Technical Resources, Inc., Rockville, Maryland, 1988.

Tetra Tech, Inc., University of Washington (R.R. Horner), and Battelle Pacific Northwest Laboratories.  Recommended Protocols for Measuring Conventional Water Quality Variables and Metals in Fresh Waters of the Puget Sound Region.  Report to Puget Sound Estuary Program, U.S. Environmental Protection Agency, Region 10, Seattle, 1988.

Horner, R.R.  Biofiltration Systems for Storm Runoff Water Quality Control.  Report to Municipality of Metropolitan Seattle, Seattle, 1988.

URS Consultants, R.R. Horner, Matrix Management Group, Weston/Northwest Cartography, and Water Resources Associates.  City of Puyallup Stormwater Management Program.  Report to City of Puyallup, 1988.

Welch, E.B., J. Oppenheimer, R.R. Horner, and D.E. Spyridakis.  Silver Lake Water Quality Nutrient Loading and Management.  Report to City of Everett, 1988.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R.R.  Environmental Monitoring and Evaluation of Calcium Magnesium Acetate (CMA)--Final Report.  Report to National Research Council, National Academy of Sciences, 1988.

Horner, R.R., E.B. Welch, S.R. Butkus, and D.E. Spyridakis.  Management Significance of Bioavailable Phosphorus.  Report to Municipality of Metropolitan Seattle and State of Washington Water Research Center, 1987.

Horner, R.R. and S.E. Cassatt.  Effectiveness of Wetlands Creation in Mitigating Highway Impacts.  Report to Washington State Department of Transportation, 1987.

Horner, R.R. and M.H. Kortenhof.  Improving the Cost-Effectiveness of Highway Construction Site Erosion/Pollution Control, Phase 1.  Report to Washington State Department of Transportation, 1987.

Horner, R.R., B.W. Mar, L.E. Reinelt, and J.S. Richey.  Design of Monitoring Programs for Determination of Ecological Change Resulting from Nonpoint Source Water Pollution in Washington State.  Report to Washington State Department of Ecology, 1986.

Horner, R.R., E.B. Welch, M.R. Seeley, and J.M. Jacoby.  Velocity-Related Critical Phosphorus Concentrations in Flowing Water, Phase II.  Report to National Science Foundation, 1986.

Horner, R.R., J.S. Richey, and D.P. Lettenmaier.  Source Control of Transit Base Runoff Pollutants--Final Report.  Report to Municipality of Metropolitan Seattle, 1985.

Welch, E.B., R.R. Horner, D.E. Spyridakis, and J.I. Shuster.  Response of Lake Sammamish to Past and Future Phosphorus Loading.  Report to Municipality of Metropolitan Seattle, 1985.

Horner, R.R. and S.R. Wonacott.  Performance Evaluation of a Detention Basin and Coalescing Plate Oil Separator for Treating Urban Stormwater Runoff.  Report to State of Washington Water Research Center and U.S. Geological Survey, 1985.

Cahn, D.C. and R.R. Horner.  Preliminary Investigation of Sewage Sludge Utilization in Roadside Development.  Report to Washington State Department of Transportation, 1985.

Horner, R.R.  Highway Runoff Water Quality Research Implementation Manual, Vol. 1-2, FHWA WA-RD 72.1,2.  Report to Washington State Department of Transportation, 1985.

Horner, R.R.  Suggested Revisions to WSDOT Manuals for Implementing Washington State Highway Runoff Water Quality Research Results, FHWA WA-RD 72.3.  Report to Washington State Department of Transportation, 1985.

Mar, B.W., D.P Lettenmaier, R.R. Horner, J.S. Richey, R.N. Palmer, S.P. Millard, and M.C. MacKenzie.  Sampling Design for Aquatic Ecological Monitoring, Vol. 1-5.  Final Report on Electric Power Research Institute, Project RP1729-1, 1985.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner, R.R., J.S. Richey, D.P. Lettenmaier, and J.F. Ferguson.  Source Control of Transit Base Runoff Pollutants, Task 1--Interim Report.  Report to Municipality of Metropolitan Seattle, 1984.

Brown and Caldwell Engineers and R.R. Horner.  Moses Lake Clean Lake Project, Phase I. Report to Moses Lake Irrigation and Rehabilitation District, 1984.

Mar, B.W., D.P. Lettenmaier, J.S. Richey, R.R. Horner, R.N. Palmer, S.P. Millard, and G.L. Thomas.  Sampling Design for Aquatic Ecological Monitoring, Phase II--Methods Development, Vol. 1-2.  Report to Electric Power Research Institute, 1984.

Horner, R.R.  Highway Runoff Water Quality Technology Transfer Workshop Handbook. Prepared for Washington State Department of Transportation, 1983.

Pedersen, E.R., R.R. Horner, and G.L. Portele.  SR 528 - 4th Street Extension, Marysville, Snohomish County, Washington:  Draft Environmental Impact Statement.  Prepared for City of Marysville, 1983.

Horner, R.R., B.W. Mar, B. Chaplin, and F. Conroy.  Implementation Plan for Highway Runoff Water Quality Research Results.  Report to Washington State Department of Transportation, 1983.

Little, L.M., R.R. Horner, and B.W. Mar.  Assessment of Pollutant Loadings and Concentrations in Highway Stormwater Runoff, FHWA WA-RD-39.17.  Report to Washington State Department of Transportation, 1983.

Horner, R.R., and E.B. Welch.  Velocity-Related Critical Phosphorus Concentrations in Flowing Water.  Final Report to National Science Foundation for award number (CME) 79-18514, 1982.

Horner, R.R., and E.B. Welch.  Impacts of Channel Reconstruction on the Pilchuck River, FHWA WA-RD-39.15.  Report to Washington State Department of Transportation, 1982.

Mar, B.W., R.R. Horner, J.F. Ferguson, D.E. Spyridakis, and E.B. Welch.  Summary - Highway Runoff Water Quality, 1977-1982, FHWA WA-RD-39.16.  Report to Washington State Department of Transportation, 1982.

Horner, R.R. and B.W. Mar.  Guide for Water Quality Assessment of Highway Operations and Maintenance, FHWA WA-RD-39.14.  Report to Washington State Department of Transportation, 1982.

Mar, B.W., D.P. Lettenmaier, R.R. Horner, D.M. Eggers, R.N. Palmer, G.J. Portele, J.S. Richey, E.B. Welch, G. Wiens, and J. Yearsley.  Sampling Design for Aquatic Ecological Monitoring, Phase 1.  Report to Electric Power Research Institute, 1982.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Portele, G.J., B.W. Mar, R.R. Horner, and E.B. Welch.  Effects of Seattle, Area Highway Stormwater Runoff on Aquatic Biota, FHWA WA-RD-39.11.  Report to Washington State Department of Transportation, 1982.

Wang, T.S., D.E. Spyridakis, B.W. Mar, and R.R. Horner.  Transport, Deposition, and Control of Heavy Metals in  Highway Runoff, FHWA WA-RD-39.10.  Report to Washington State Department of Transportation, 1982.

Chui, T.W., B.W. Mar, and R.R. Horner.  Highway Runoff in Washington State:  Model Validation and Statistical Analysis, FHWA WA-RD-39.12.  Report to Washington State Department of Transportation, 1981.

Mar, B.W., J.F. Ferguson, D.E. Spyridakis, E.B. Welch, and R.R. Horner.  Year 4, Runoff Water Quality, August 1980-August 1981, FHWA WA-RD-39.13.  Report to Washington State Department of Transportation, 1981.

Horner, R.R. and S.M. Grason.  An Ecological Study of the Monocacy Creek and its Groundwater Sources in the Vicinity of Camels Hump.  Report to the Monocacy Creek Watershed Association, Bethlehem, Pennsylvania, 1981.

Horner, R.R. and E.B. Welch.  Background Conditions in the Lower Pilchuck River Prior to SR-2 Construction.  Report to Washington State Department of Transportation, 1979.

Horner, R.R. and B.W. Mar.  Highway Runoff Monitoring:  The Initial Year, FHWA WA-RD-39.3.  Report to Washington State Department of Transportation, 1979.

Horner, R.R. and E.B. Welch.  Effects of Velocity and Nutrient Alterations on Stream Primary Producers and Associated Organisms, FHWA WA-RD-39.2.  Report to Washington State Department of Transportation, 1978.

Horner, R.R., T.J. Waddle, and S.J. Burges.  Review of the Literature on Water Quality Impacts of Highway Operations and Maintenance.  Report to Washington State Department of Transportation, 1977.

Horner, R.R.  A Method of Defining Urban Ecosystem Relationships Through Consideration of Water Resources.  U.S. Man and the Biosphere Project 11 Report, 1977.

Horner, R.R. and R. Gilliom.  Bear Lake:  Current Status and the Consequences of Residential Development.  Report to Bear Lake Residents' Association, Kitsap County, Washington, 1977.

PRESENTATIONS AND DISCUSSIONS

*Presented by a co-author.  In all other cases, I presented the paper.

xxx

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Stormwater Runoff Flow Control Benefits of Urban Drainage System Reconstruction According to Natural Principles.  Puget Sound/Georgia Strait Research Meeting; Vancouver, British Columbia; April 2003.

Structural and Non-Structural Best Management Practices (BMPs) for Protecting Streams.  Invited presentation at the Engineering Foundation Conference on Linking Stormwater BMP Designs and Performance to Receiving Water Impact Mitigation; Snowmass, Colorado; August 2001.

Performance of a Perimeter ("Delaware") Sand Filter in Treating Stormwater Runoff from a Barge Loading Terminal.  Invited presentation at the Comprehensive Stormwater and Aquatic Ecosystem Management Conf.; Auckland, New Zealand; February 1999.

Regional Study Supports Natural Land Cover Protection as Leading Best Management Practice for Maintaining Stream Ecological Integrity.  Invited presentation at the Comprehensive Stormwater and Aquatic Ecosystem Management Conf.; Auckland, New Zealand; February 1999.

Watershed Determinants of Ecosystem Functioning.  Invited presentation at the Engineering Foundation Conference on Effects of Watershed Development on Aquatic EcosystemsUrban Runoff and Receiving Systems; Snowbird, Utah; August 1996.

Overview of the Puget Sound Wetlands and Stormwater Management Research Program.  Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995.

Guidelines for Managing Urban Wetlands.  Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995.

Urbanization Effects on Wetland Hydrology and Water Quality.  Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1995 (prepared with B. Taylor and K. Ludwa).*

Constructed Wetlands for Urban Runoff Water Quality Control.  Invited presentation at National Conf. on Urban Runoff Management; Chicago, Illinois; March 1993.

Training for Construction Site Erosion Control and Stormwater Facility Inspection.  Invited presentation at National Conf. on Urban Runoff Management; Chicago, Illinois; March 1993.

Toward Ecologically Based Urban Runoff Management.  Invited presentation at The Engineering Foundation Conference on Urban Runoff and Receiving Systems; Crested Butte, Colorado; August 1991.

How Stormwater Harms Shellfish.  Invited presentation at the Pacific Rim Shellfish Sanitation Conference; Seattle, Washington; May 1991.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Environmental Evaluation of Calcium Magnesium Acetate for Highway Deicing Applications. Invited presentation at Conference on Calcium Magnesium Acetate, An Emerging Chemical for Environmental Applications; Boston, Massachusetts; May 1991.

Issues in Stormwater Management.  Statement to State Senate Environment and Natural Resources Committee; Olympia, Washington; January 1991.

Urban Stormwater Impacts on the Hydrology and Water Quality of Palustrine Wetlands in the Puget Sound Region.  Invited presentation at Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; January 1991 (prepared with L.E. Reinelt).

The Impact of Nonpoint Source Pollution on River Ecosystems.  Invited presentation at the Northwest Rivers Conference; Seattle, Washington; November 1990.

Research Program Overview and Discussion of Hydrologic and Water Quality Studies. Presented at the Puget Sound Wetlands and Stormwater Management Research Program Workshop; Seattle, Washington; October 1990.

Control of Urban Runoff Water Quality.  Invited presentations at American Society of Civil Engineers Urban Stormwater Short Courses; Bellevue, Washington; April, 1990; Portland, Oregon; July 1990.

Various Aspects of Erosion Prevention and Control.  Invited presentations at University of Wisconsin Erosion Control Short Course; Seattle, Washington; July 1990.

Examination of the Hydrology and Water Quality of Wetlands Affected by Urban Stormwater. Presented at the Society of Wetland Scientists Annual Meeting; Breckenridge, Colorado, June 1990 (prepared with L.E. Reinelt).*

Analysis of Plant Communities of Wetlands Affected by Urban Stormwater.  Presented at the Society of Wetland Scientists Annual Meeting; Breckenridge, Colorado; June 1990 (prepared with S.S. Cooke).*

Environmental Evaluation of Calcium Magnesium Acetate.  Invited presentation at the Symposium on the Environmental Impact of Highway Deicing; Davis, California; October 1989.

Application of Wetland Science Principles in the Classroom and Community.  Invited presentation at the Annual Meeting of the Association of Collegiate Schools of Planning; Portland, Oregon; October 1989.

Structural Controls for Urban Storm Runoff Water Quality.  Invited presentation at the Northwest Regional Meeting of the North American Lake Management Society; Seattle, Washington; September 1989.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

The Puget Sound Wetlands and Stormwater Management Research Program.  Invited presentation at the U.S. Environmental Protection Agency Workshop on Wetlands and Stormwater; Seattle, Washington; September 1989.

An Overview of Storm Runoff Water Quality Control.  Invited presentation at the American Water Resources Association Workshop on Forest Conversion; LaGrande, Washington; November 1988.

Progress in Wetlands Research.  Invited presentation at the Pacific Northwest Pollution Control Association Annual Meeting; Coeur d'Alene, Idaho; October 1988.

Long-Term Effects of Urban Stormwater on Wetlands.  Invited presentation at the Engineering Foundation Conference on Urban Stormwater; Potosi, Missouri; July 1988.

Highway Construction Site Erosion and Pollution Control:  Recent Research Results.  Invited presentation at the 39th Annual Road Builders' Clinic; Moscow, Idaho; March 1988.

Urban Stormwater and Puget Trough Wetlands.  Presented at the 1st Annual Puget Sound Water Quality Authority Research Meeting; Seattle, Washington; March 1988 (prepared with F.B. Gutermuth, L.L. Conquest, and A.W. Johnson).

Preliminary Comparative Risk Assessment for Hanford Waste Sites.  Presented at Waste Management 88; Tucson, Arizona; February 1988 (prepared with R.F. Weiner and J. Kettman).*

What Goes on at the Hanford Nuclear Reservation?  Invited presentation at the Northwest Association for Environmental Studies Annual Meeting; Western Washington University, Bellingham, WA; November 1987.

The Puget Sound Wetlands and Stormwater Management Research Program.  Invited presentation at the Pacific Northwest Pollution Control Association Annual Meeting; Spokane, Washington; October 1987.

Design of Cost-Effective Monitoring Programs for Nonpoint Source Water Pollution Problems.  Invited presentation at the American Water Resources Association, Puget Sound Chapter, Annual Meeting; Bellevue, Washington; November 1986.

A Review of Wetland Water Quality Functions.  Invited plenary presentation at the Conference on Wetland Functions, Rehabilitation, and Creation in the Pacific Northwest:  The State of Our Understanding; Port Townsend, Washington; May 1986.

Nonpoint Discharge and Runoff session leader.  American Society of Civil Engineers Spring Convention; Seattle, Washington; April 1986.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Prevention of Lake Sammamish Degradation from Future Development.  Invited presentation at the American Society of Civil Engineers Spring Convention; Seattle, Washington; April 1986.

Design of Monitoring Programs for Nonpoint Source Water Pollution Problems.  Invited presentation at the American Society of Civil Engineers Spring Convention; Seattle, Washington, April 1986 (prepared with L.E. Reinelt, B.W. Mar, and J.S. Richey).*

Nonpoint Pollution Control Strategies for Moses Lake, Washington.  Presented at the Fifth Annual Meeting of the North American Lake Management Society; Lake Geneva, Wisconsin; November 1985 (prepared with R.C. Bain, Jr., and L. Nelson).

Response of Lake Sammamish to Urban Runoff Control.  Presented at the Fifth Annual Meeting of the North American Lake Management Society; Lake Geneva, Wisconsin; November 1985 (prepared with J.I. Shuster, E.B. Welch, and D.E. Spyridakis).*

A General Approach to Designing Environmental Monitoring Programs.  Invited presentation at the Pacific Section AAAS Symposium on Biomonitors, Bioindicators, and Bioassays of Environmental Quality; Missoula, Montana; June 1985 (prepared with J.S. Richey and B.W. Mar).

Panel Discussion on the Planning Process for Non-point Pollution Abatement Programs.  Non-point Pollution Abatement Symposium; Milwaukee, Wisconsin; April 1985.

Nutrient Transport Processes in an Agricultural Watershed.  Presented at the Fourth Annual Meeting of the North American Lake Management Society; McAfee, New Jersey; October 1984 (prepared with E.B. Welch, M.M. Wineman, M.J. Adolfson, and R.C. Bain Jr.).*

Nutrient Transport Processes in an Agricultural Watershed.  Presented at the American Society of Limnology and Oceanography Annual Meeting; Vancouver, British Columbia; June 1984 (prepared with M.M. Wineman, M.J. Adolfson, and R.C. Bain, Jr.).

Factors Affecting Periphytic Algal Biomass in Six Swedish Streams.  Presented at the American Society of Limnology and Oceanography Annual Meeting; Vancouver, British Columbia; June 1984 (prepared with J.M. Jacoby and E.B. Welch).*

A Conceptual Framework to Guide Aquatic Monitoring Program Design for Thermal Electric Power Plants.  Presented at the American Society for Testing and Materials Symposium on Rationale for Sampling and Interpretation of Ecological Data in the Assessment of Freshwater Ecosystems; Philadelphia, Pennsylvania; November 1983 (prepared with J.S. Richey, and G.L. Thomas).

Panel Discussion.  Public Forum:  Perspectives on Cumulative Effects; Institute for Environmental Studies; University of Washington; Seattle, Washington; August 1983.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

A Guide for Assessing the Water Quality Impacts of Highway Operations and Maintenance. Presented at the Transportation Research Board Annual Meeting; Washington, D.C.; January 1983 (prepared with B.W. Mar).

Assessment of Pollutant Loadings and Concentrations in Highway Stormwater Runoff. Presented at the Pacific Northwest Pollution Control Association Annual Meeting; Vancouver, British Columbia; November 1982 (prepared with B.W. Mar and L.M. Little).

Phosphorus and Velocity as Determinants of Nuisance Periphytic Biomass. Presented at the International Workshop on Freshwater Periphyton (SIL); Vaxjo, Sweden; September 1982 (prepared with E.B. Welch and R.B. Veenstra).*

The Development of Nuisance Periphytic Algae in Laboratory Streams in Relation to Enrichment and Velocity. Presented at the American Society of Limnology and Oceanography Annual Meeting; Raleigh, North Carolina; June 1982 (prepared with R.B. Veenstra and E.B. Welch).

A Predictive Model for Highway Runoff Pollutant Concentrations and Loadings. Presented at the Stormwater and Water Quality Model Users' Group Meeting; Alexandria, Virginia; March 1982 (prepared with B.W. Mar).

Stream Periphyton Development in Relation to Current Velocity and Nutrients. Presented at American Society of Limnology and Oceanography Winter Meeting; Corpus Christi, Texas; January 1979 (prepared with E.B. Welch).

A Comparison of Discrete Versus Composite Sampling of Storm Runoff. Presented at the Northwest Pollution Control Association Annual Meeting; Victoria, British Columbia; October 1978 (prepared with B.W. Mar and J.F. Ferguson).*

A Method of Defining Urban Ecosystem Relationships Through Consideration of Water Resources. Presented at UNESCO International Man and the Biosphere Project 11 Conference; Poznan, Poland; September 1977.

GRADUATE AND UNDERGRADUATE COURSES TAUGHT (University of Washington)

Civil and Environmental Engineering 552, Environmental Regulations; 8 quarters.

Landscape Architecture 590, Urban Water Resources Seminar; 3 quarters.

Landscape Architecture 522/523, Watershed Analysis and Design; 15 quarters.

Engineering 260, Thermodynamics; 1 quarter.

Engineering 210, Engineering Statics; 2 quarters.

Civil Engineering/Water and Air Resources 453, Water and Wastewater Treatment; 1 quarter.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Civil Engineering/Water and Air Resources 599, Analyzing Urbanizing Watersheds; 1 quarter.

CONTINUING EDUCATION SHORT COURSES TAUGHT (University of Washington; multiple offerings)

Infiltration Facilities for Stormwater Quality Control

Wetlands Ecology, Protection, and Restoration

Storm and Surface Water Monitoring

Fundamentals of Urban Surface Water Management

Applied Stormwater Pollution Prevention Planning Techniques

Construction Site Erosion and Pollution Control Problems and Planning

Construction Site Erosion and Pollution Control Practices

Construction Site Erosion and Sediment Control Inspector Training

Inspection and Maintenance of Permanent Stormwater Management Facilities

Biofiltration for Stormwater Runoff Quality Control

Constructed Wetlands for Stormwater Runoff Quality Control

LOCAL COMMITTEES

Stormwater Panel advising Puget Sound Partnership, 2007.

Technical Advisory Committee, City of Seattle Environmental Priorities Project, 1990-91.

Environmental Toxicology Graduate Program Planning Committee, University of Washington, 1990.

Habitat Modification Technical Work Group, Puget Sound Water Quality Authority, 1987.

Underground Injection Control of Stormwater Work Group, Washington State Department of Ecology, 1987.

Nonpoint Source Pollution Conference Advisory Committee, 1986-87.

Puget Sound Wetlands and Stormwater Management Research Committee, 1986-90.

xxxvi

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Accreditation Review, University of Washington Department of Landscape Architecture, 1986.

Planning Committee for University of Washington Institute for Environmental Studies Forum on Perspectives on Cumulative Environmental Effects, 1983.

CONSULTING

Equity Legal Services, Inc., Fairview Heights, Illinois; Technical assistance in a legal case seeking injunctive relief and damages for repeated, widespread neighborhood flooding; 2023-present.

U.S. Department of Justice; Technical assistance in Clean Water Act legal cases; 2017-2018 and 2022-2024.

Food and Water Watch, Washington, D.C.; development of a water quality monitoring program for confined animal feeding operations; 2022.

Brinnon Group, Brinnon, Washington; development of a water quality and aquatic ecological monitoring program for the local watershed and marine waters; 2021-2022.

Kampmeier & Knutsen PLLC, Portland, Oregon; Technical assistance in Clean Water Act legal cases; 2017 and 2021-present.

Chesapeake Legal Alliance; Annapolis, Maryland; Assessment of and comment on Maryland's draft Municipal Separate Storm Sewer Discharge Permits and Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated; 2020-2021.

Gonzaga University Legal Assistance; Spokane, Washington; Review of technical documents supporting a proposal for a PCB water quality variance for the Spokane River; 2020.

City of Monrovia, California; Recommendations for improving a watershed management plan; 2020.

Columbia Riverkeeper; Portland Oregon; Assessment of a port industrial development; Technical assistance in Clean Water Act legal cases pre-settlement and follow up post-settlement; 2020-present.

Columbia Riverkeeper and Northwest Environmental Defense Center; Portland Oregon; Assessment of Oregon Department of Environmental Quality's actions regarding setting Water Quality-Based Effluent Limits; 2020.

Coast Law Group, Encinitas, California; Technical assistance in Clean Water Act legal cases pre-settlement and follow up post-settlement, expert testimony; 2019-present.

Monterey County District Attorney, Monterey, California; Assessment of pollution issues at two construction company yards; 2019-2020.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Seneca Lake Guardian, Seneca Falls, New York; Assessment of potential water quality problems associated with an industrial plant; 2019.

Endangered Habitats League, Los Angeles, California; Assessment of stormwater management systems proposed for a large residential development; 2018-2019.

Ziontz Chestnut Law Firm, Seattle, Washington; Assistance with implementation of a court order on a settled case.

Black Warrior Riverkeeper, Birmingham, Alabama; Review and comment on a total maximum daily load assessment for the Black Warrior River; 2017.

DeLano and DeLano, Escondido, California; Assessment of stormwater management systems proposed for residential and commercial developments; 2012-2021.

Salmon-Safe, Inc.; assessment of sites for possible certification representing practices that protect salmon; 2004-present.

Puget Soundkeeper Alliance and Smith and Lowney, PLC, Seattle, Washington; Technical assistance in Clean Water Act legal cases and expert testimony; 1996, 2002-present.

Natural Resources Defense Council, Los Angeles, California; Technical and program analysis and expert testimony on legal cases involving municipal and industrial stormwater NPDES permit compliance and assistance in reacting to California municipal stormwater permits; 1993-2020.

Santa Monica Baykeeper (now Los Angeles Waterkeeper); Technical and program analysis and expert testimony on legal cases involving municipal and industrial stormwater NPDES permit compliance; 1993-present.

Orange County Coastkeeper; Assistance with legal cases involving industrial and construction site pollution control and monitoring and expert testimony; 2001-present.

Lawyers for Clean Water, succeeded by Sycamore Law; Assistance with legal cases involving stormwater discharges and expert testimony; 2004-present.

Earthjustice; Report and testimony regarding Washington state municipal stormwater permit before Pollution Control Hearing Board; 2008, 2013; assessment of Washington, DC combined sewer overflow control plan; 2015.

Tulane Environmental Law Clinic; Assessment and declaration on a legal case involving discharge under an industrial stormwater permit and expert testimony; 2015.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

San Diego Coastkeeper, San Diego, California; Technical and program analysis and expert testimony on potential legal cases involving municipal and industrial stormwater NPDES permit compliance; liaison with City of San Diego; 1996-2011 and 2019-present.

Stillwater Science and Washington Department of Ecology; Water quality modeling for Puget Sound Characterization, Phase 2; 2010-2011.

City of Seattle Public Utilities; Analysis of technical aspects of stormwater management program; 2000-2008.

Ventura Coastkeeper; Technical and program analysis and expert testimony on legal cases involving municipal and industrial stormwater NPDES permit compliance; 2010-2015.

San Diego Airport Authority; Peer review of consultant products, training; 2004-2006.

U. S. Federal Court, Central District of California; Special master in Clean Water Act case; 2001-2002.

Storm Water Pollution Prevention Program, City of San Diego; Advising on response to municipal stormwater NPDES program; 2001-2002.

Kerr Wood Leidel, North Vancouver, B.C.; subconsultant for Stanley Park (Vancouver, B.C.) Stormwater Constructed Wetland Design; 1997-1998.

Clean South Bay, Palo Alto, California; Technical and program analysis and expert testimony on potential legal cases involving municipal and industrial stormwater NPDES permit compliance; 1996.

Resource Planning Associates, Seattle, Washington; Assistance with various aspects of monitoring under Seattle-Tacoma International Airport's stormwater NPDES permit; 1995-1997.

Watershed Management Institute, Crawfordsville, Florida; Writing certain chapters of guides for stormwater program development and implementation and maintenance of stormwater facilities; 1995-2003.

King County Roads Division, Seattle, Washington; Teaching two courses on construction erosion and sediment control; 1995.

Snohomish County Roads Division, Seattle, Washington; Teaching a course on construction erosion and sediment control; 1995.

Alaska Marine Lines, Seattle, Washington; Performance test of a sand filter stormwater treatment system; 1994-95.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Economic and Engineering Services, Inc., Bellevue, Washington; Assessment of the potential for water quality benefits through modifying existing stormwater ponds; technical advice on remedying operating problems at infiltration ponds; 1994-96.

Washington State Department of Transportation, Olympia, Washington; Teaching courses on construction erosion and sediment control; 1994.

City of Bellevue, Washington; Peer review of documents on potential erosion associated with a road project; analysis of stormwater quality data; 1993-95.

City of Kelowna, B. C., Canada; Teaching short courses on constructed wetlands and erosion and sediment control; 1993.

Oregon Department of Environmental Quality, Portland, Oregon; Technical review of Willamette River Basin Water Quality Study reports; 1992-93.

Whatcom County, Bellingham, Washington; Mediation on lakeshore development moratorium among county, water district, and local community representatives; 1993.

Boeing Commercial Airplane Company, Renton, Washington and Sverdrup Corporation, Kirkland, Washington (at request of City of Renton); Review of stormwater control system design; design of performance monitoring study for system; 1992-94.

Golder Associates, Redmond, Washington; Technical advisor for study of stormwater infiltration; 1992.

Smith, Smart, Hancock, Tabler, and Schwensen Attorneys, Seattle, Washington; Technical advice on a legal case involving a stormwater detention pond; 1992.

PIPE, Inc., Tacoma, Washington; Teaching a course on the stormwater NPDES permit; 1992.

CH2M-Hill, Inc., Bellevue, Washington and Portland, Oregon; Technical seminar on constructing wetlands for wastewater treatment; literature review on toxicant cycling in arid-region wetlands constructed for waterwater treatment; literature and data review on lake nutrient input reduction; expert panel on TMDL analysis for Chehalis River; 1989-1995.

Kramer, Chin and Mayo, Inc., Seattle, Washington; Watershed analysis in Washington County and Lake Oswego, Oregon; literature review in preparation for stormwater infiltration system design; literature review and contribution to design of constructed wetland for municipal wastewater treatment; 1989-1995.

Woodward-Clyde Consultants, Portland, Oregon and Oakland, California; Analysis of wetland capabilities for receiving urban stormwater; design of a constructed wetland for urban stormwater treatment; technical advisor on Washington Department of Ecology and City of Portland stormwater manual updates; 1989-1995.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

R.W. Beck and Associates, Seattle, Washington; Assessment of pollutant loadings and their reduction for one master drainage planning and two watershed planning efforts; 1989-92.

Boeing Computer Services Corporation, Bellevue, Washington; mediation among Boeing, citizens' group, and City of Bellevue on stormwater control system design; 1990.

Parametrix, Inc., Bellevue, Washington; Review of Kitsap County Drainage Ordinance; 1990.

U.S. Environmental Protection Agency, Duluth Laboratory; Review of certain provisions of WET 2.0 wetland functional assessment model; 1989.

King County Council, Seattle, Washington; Review of King County Surface Water Design Manual; 1989.

Port of Tacoma, Washington; Assessment of stormwater control strategies; 1989.

Municipality of Metropolitan Seattle, Seattle, Washington; Assessment of land treatment systems for controlling urban storm runoff water quality; 1988-1992.

Impact Assessment, Inc., La Jolla, California (contractor to Washington State Department of Ecology); Socioeconomic impact assessment of the proposed high-level nuclear waste repository at Hanford, Washington; 1987.

Technical Resources, Inc., Rockville, Maryland (contractor to U. S. Environmental Protection Agency); assessment of water treatment waste disposal at pulp and paper plants; 1987-88.

Dames and Moore, Seattle, Washington; analysis of the consequences of a development to Martha Lake; 1987.

Harper-Owes, Seattle, Washington; project oversight, data analysis, and review of limnological aspects for Lake Chelan Water Quality Assessment Study; 1986-88.

URS Corporation, Seattle, Washington and Columbus, Ohio; presentation of a workshop on nonpoint source water pollution monitoring program design; analysis of innovative and alternative wastewater treatment for Columbus; development of a stormwater utility for Puyallup, Washington; watershed analysis for Edmonds, Washington; 1986-88.

Entranco Engineers, Bellevue, Washington; environmental impact assessment of proposed highway construction; technical review of Lake Sammamish watershed management project; technical review of Capital Lake wetland development; 1981-82; 1987-88; 1990.

Washington State Department of Ecology, Olympia, Washington; review of literature on wetland water quality, preparation of conference plenary paper, and leading discussion group at conference; analysis in preparation for a Shoreline Hearing Board case; 1986-87.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Richard C. Bain, Jr., Engineering Consultant, Vashon Island, Washington; analysis of watershed data and development of a policy for septic tank usage near Moses Lake, Washington; 1984-87.

University of Washington Friday Harbor Laboratory; analysis of adjacent port development and preparation of testimony for Shoreline Hearing Board; 1986.

Washington State Department of Transportation and Morrison-Knudsen Company, Inc./H.W. Lochner, Inc., Joint Venture, Mercer Island, Washington; environmental assessment of disposal of excavated material by capping a marine dredge spoil dumping site; 1984.

Foster, Pepper, and Riviera Attorneys, Seattle, Washington; analysis and testimony on provisions to reduce pollutants in stormwater runoff from a site proposed for development; 1983.

Williams, Lanza, Kastner, and Gibbs Attorneys, Seattle, Washington; collection and analysis of water quality data to support a legal case and preparation of testimony; 1982.

Herrera Environmental Consultants, Seattle, Washington; lake data analysis and report preparation; 1982-83.

Brown and Caldwell Engineers, Seattle, Washington; data collection and analysis for watershed study; 1982-83.

City of Marysville, Washington; environmental impact assessment of proposed bridge construction; 1982-83.

F.X. Browne Associates, Inc., Lansdale, Pennsylvania; contributions to manual on lake restoration for U.S. Environmental Protection Agency; preparation of funding proposals and permits for lake restoration; lake data analysis; literature reviews and analysis of septic tank contributions to lake nutrient loading and availability of different forms of nutrients; 1980-83.

Reston Division of Prentice-Hall, Inc., Reston, Virginia; review of and contributions to texts on environmental technology; 1978-79.

Butterfield, Joachim, Brodt, and Hemphill Attorneys, Bethlehem, Pennsylvania; analysis of environmental impact statements; expert witness; 1973.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**ATTACHMENT C**: Summary of Previous Testimony

Before the United States District Court for the Western District of Washington—citizens' suit against Girard Resources & Recycling LLC in 2023 (No. 2:21-cv-00443-RAJ-GJL).

Before the United States District Court for the Western District of Washington—citizens' suit against Pacific Pile & Marine LP in 2023 (No. 2:22-cv-00848-TL).

Before the United States District Court for the Western District of Washington—citizens' suit against UFP Washington LLC; UFP Industries, Inc. in 2023 (No. 2:21-cv-01636-MJP).

Before the United States District Court for the Central District of California—citizens' suit against Pick-Your-Part Auto Wrecking in 2022 (No. 2:22-cv-388-PA-JC).

Before the United States District Court for the Central District of California—citizens' suit against Corona Clay Co. in 2019 and 2022-2023 (No. 8:18-cv-00333 DOC (DFM)).

Before the United States District Court for the Western District of Washington—citizens' suit against Willis Enterprises, Inc., Moon Island Facility and Port of Grays Harbor in 2022 (No. 3:20-cv-05913-BHS).

Before the United States District Court for the Western District of Washington—citizens' suit against Willis Enterprises, Inc., Oakville Facility in 2021 (No. 3:20-cv-05912).

Before the United States District Court for the Southern District of California—citizens' suit against Watkins Manufacturing in 2019 (No. 18-CV-00555-GPC-KSC).

Before the United States District Court for the Western District of Washington—citizens' suit against Fruhling Sand & Topsoil, Inc. in 2019 (No. No. 2:17-cv-00498-RSM).

Before the United States District Court for the Western District of Washington—citizens' suit against Port of Olympia in 2019 (No. 3:17-CV-05445-BHS).

Before the United States District Court for the Central District of California—citizens' suit against Trojan Battery Company, Inc. in 2018 (NO. 18-cv-02189-SVW (FFM)).

Before the United States District Court for the Western District of Washington—citizens' suit against SSA Marine, Inc.; SSA Terminals, LLC; and Port of Tacoma in 2018 and 2021 (No. 3:17-CV-05016-BHS).

Before the United States District Court for the Western District of Washington—citizens' suit against Seattle Iron and Metals in 2018 (No. 12-cv-01201RSM).

Before the United States District Court for the Western District of Washington—citizens' suit against Coast Seafoods Company in 2017 (No. 3:16-cv-05906-RJB).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Before the United States District Court for the Western District of Washington—citizens' suit against Astro Auto Wrecking, LLC in 2016 (No. 15-CV-00796-JCC).

Before the United States District Court for the Western District of Washington—citizens' suit against Louis Dreyfus Commodities, LLC; Louis Dreyfus Commodities NA, LLC; Louis Dreyfus, LLC; LDC Washington, LLC; LD Commodities Seattle Export Elevator, LLC in 2015 (No. 14-cv-00803-RAJ).

Before the United States District Court for the Western District of Washington—citizens' suit against Cruise Terminals of America, LLC and Port of Seattle in 2015 (No. 2:14-00476-JCC).

Before the United States District Court for the Western District of Washington—citizens' suit against Rainier Petroleum Corporation in 2015 (No. 2:14-CV-000831-RSM).

Before the United States District Court for the Western District of Washington—citizens' suit against Rainier Petroleum Corporation in 2015 (No. 2:14-cv-00829-JLR).

Before the United States District Court for the Western District of Washington—citizens' suit against Whitley Manufacturing Company, Inc.; Whitley Evergreen, Inc. in 2015 (W.D. Wash. 13-cv-01690-RSL)

Before the United States District Court for the Eastern District of Louisiana— citizens' suit against United Bulk Terminals Davant LLC in 2015 (Civil Action No. 14-608)

Before the Washington Pollution Control Hearing Board—appeal of NPDES permit for Seattle Iron & Metals in 2014 (PCHB No. 13-137c)

Before the United States District Court for the Central District of California—citizens' suit against Magic Mountain, LLC, *et al.* in 2014 (2:12-cv-05600-GAF-MAN)

Before the United States District Court for the Northern District of California—citizens' suit against Levin Enterprises, Inc. in 2014 (12-04338-EDL)

Before the Washington Pollution Control Hearing Board— appeal of the Municipal Stormwater Permit, Phases 1 and 2, in 2013 (PCHB Nos. 12-093c and 12-097c)

Before the United States District Court for the Western District of Washington—citizens' suit against Willis Enterprises Inc. in 2013 (W.D. Wash. No. 3:12-CV-05096-BHS)

Before the United States District Court for the Western District of Washington—citizens' suit against Sierra Pacific Industries in 2013 (W.D. Wash. No. 2:12-05059-RBL)

Before the United States District Court for the Central District of California—citizens' suit against City of Malibu in 2011(CV 08-1465-AHM (PLAx))

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Before the United States District Court for the Western District of Washington—citizens' suit against BNSF Railway Company in 2011 (W.D. Wash. No. 2:09-CV-01087-JCC)

Before the Washington Pollution Control Hearing Board—appeal of the Industrial Stormwater General Permit in 2011 (PCHB Nos. 09-135 through 09-141)

Before the United States District Court for the Central District of California—citizens' suit against the County of Los Angeles in 2009 (CV 08-01467 AHM (PLAx))

Before the United States District Court for the Central District of California—citizens' suit against Kramer Metals, Inc. in 2008 (CV 07-03849 DDP (FMOx))

Before the United States District Court for the Central District of California—citizens' suit against International Metals, Ltd. in 2008 (CV 07-03856p DDP (FMOx))

Before the Washington Pollution Control Hearing Board—appeal of the Municipal Stormwater General Permit, Phases 1 and 2, in 2008 (PCHB Nos. 07-021 through 07-023, 07-025 through 07-031, 07-037)

Before the Washington Shoreline Hearings Board, appeal of a Kitsap County road project in 2008 (SHB No. 07-031)

Before the Washington Pollution Control Hearing Board—appeal of the Construction Stormwater General Permit in 2007 (PCHB Nos. 05-157 through 05-159)

Before the Washington Pollution Control Hearing Board—appeal of the Boatyard General Permit in 2006 (PCHB Nos. 05-150 through 05-151)

Before the Washington Pollution Control Hearing Board in 2003—appeal of the 2002 Washington Industrial Stormwater General Permit (that was modified following the appeal and became the 2005 Washington Industrial Stormwater General Permit ("2005 General Permit")

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**ATTACHMENT D**: Materials Considered

**Public Sources**

Crini, G., N. Morin-Crini, N. Fatin-Rouge, S. Deon, and P. Fievet. 2017. Metal removal from aqueous media by polymer-assisted ultrafiltration with chitosan. Arabian Journal of Chemistry, 10(2): S3826-S3839; Ziemer, J. Biopolymer Offers Biodegradable Alternative in Water Treatment. WaterWorld. February 1, 2008. http://www.waterworld.com/articles/uwm/articles/print/volume-2/issue-1/features/biopolymer-offers-biodegradable-alternative-in-water-treatment.html

Chow, V.T.  1959. Open-Channel Hydraulics.  McGraw-Hill Book Company, New York, New York.

"Code of Federal Regulations – Part 268 Land Disposal Restriction," https://www.ecfr.gov/current/title-40/chapter-I/subchapter-I/part-268#268.48 (accessed March 31, 2025).

Connecticut Department of Energy & Environmental Protection (CT DEEP); General Permit for the Discharge of Stormwater Associated with Industrial Activity; Bureau of Materials Management & Compliance Assurance; Water Permitting & Enforcement Division; effective October 1, 2021, available at 20210614-gsi_reissuancenotice-websitesigned.pdf (accessed April 24, 2025).

Herrera Environmental Consultants.  2011. Literature Review of Existing Treatment Technologies for Industrial Stormwater. Washington Department of Ecology, Northwest Regional Office, Bellevue, Washington.

Melvin, R.L., B.D. Stone, J.R. Stone, and N.J. Trask.  1992. Hydrogeology of Thick Till Deposits in Connecticut, U.S. GEOLOGICAL SURVEY Open-File Report 92–43, at 8, available at https://pubs.usgs.gov/of/1992/0043/report.pdf (accessed April 2, 2025).

"NOAA Atlas 14 Point Precipitation Frequency Estimates: CT," https://hdsc.nws.noaa.gov/pfds/pfds_map_cont.html?bkmrk=ct (accessed April 16, 2025).

Sahu, O., B. Mazumdar, and P.K. Chaudhari. 2014. Treatment of wastewater by electrocoagulation: a review. Environmental Science Pollution Research 21:2397–2413

Soil Survey of New Haven County, Connecticut; United States Department of Agriculture, Soil Conservation Service in cooperation with Connecticut Agricultural Experiment Station and Storrs Agricultural Experiment Station; page 38; available at https://archive.org/details/usda-newhavenCT1979/page/n11/mode/2up (accessed April 3, 2025).

The Evolution of Tank Liners: A Comprehensive Guide," https://tankliners.com.au/evolution-of-

tank-liners-guide/ (accessed April 24, 2025).

United States Environmental Protection Agency, Waterbody Report for LIS CB Inner – New Haven Harbor, New Haven, https://mywaterway.epa.gov/waterbody-report/CT_DEP01/CT-C1_013-SB/2022

Weather Underground, East Haven, CT Weather History, https://www.wunderground.com/history/daily/us/ct/east-haven/KHVN/date/2025-4-7 (accessed April 24, 2025).

"What does it take to properly line an Oil and Field Field Containment Area?" https://www.btlliners.com/what-does-it-take-to-properly-line-an-oil-and-fuel-field-containment-area (accessed April 24, 2025).

Yadav, P.K., Chapter 18, Groundwater Hydrology V (Advection, Dispersion, Diffusion and Sorption).  In Sharma, H.R.  2019.  Water Resources and Management, available at https://ebooks.inflibnet.ac.in/esp05/chapter/groundwater-hydrology-v-advection-dispersion-diffusion-and-sorption/ (accessed April 24, 2025).

Yu, C., Loureiro, C., Cheng, J.-J., Jones L.G., Wang, Y.Y., Chia, Y.P., and Faillace, E., "Data Collection Handbook to Support Modeling the Impacts of Radioactive Material in Soil," United States Department of Energy, April 1993.

**Litigation Documents**

Amended Complaint, Conservation Law Foundation v. Shell Oil Company, et al., Case No. 3:21-cv-0933 (D. Conn. Feb. 11, 2022).

SHELLNH_TRI_01214

SHELLNH_TRI_00686

SHELLNH_TRI_00936

SHELLNH_TRI_00110

SHELLNH_TRI_00408

SOPUS_NHVN02144575

SOPUS_NHVN00001480

SOPUS_NHVN00227849

SOPUS_NHVN00527912

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

SOPUS_NHVN02448774

SOPUS_NHVN00000518

SOPUS_NHVN00247293

SOPUS_NHVN02143134

City of New Haven, Connecticut, Bureau of Engineering, MS4 Planimetric Map #1590742.1.

City of New Haven, Connecticut, Bureau of Engineering, MS4 Planimetric Map #1590743.1.

Connecticut Department of Energy & Environmental Protection; Connecticut National Pollutant Discharge Elimination System General Permit for the Discharge of Stormwater from Small Municipal Separate Storm Sewer Systems; State Permit No: GSM000000; Federal CWA Permit No: CTR030000; effective October 1, 2023.

Connecticut Department of Energy & Environmental Protection; Connecticut Stormwater Quality Manual; Hartford, Connecticut; September 30, 2023.

Connecticut Department of Energy & Environmental Protection; Environmental Condition Assessment Form (ECAF) Submission for New Haven Terminal; May 9, 2017.

D. Medlin, Clear Water Services; Everett, Washington; personal communication; March 12, 2021.

D. Heitz, Clear Creek Systems; Pacific, Washington; personal communication; March 19, 2021.

Integrated Contingency Plan (ICP), Motiva Enterprises LLC, May 2010, Annex 7 & 10.

Letter from Michael Sullivan, Shell Oil Products, U.S.; to Water Toxics Program Coordinator, Connecticut Department of Energy & Environmental Protection; August 9, 2017; with attachment.

Letter from Robert P. Perla, RPMS Consulting Engineers; to Michael Sullivan, Shell Oil Products, U.S.; December 22, 2022; with attachment.

Letter from W. Scott Burns, Sovereign Consulting, Inc.; to Jennifer Bothwell, Shell Oil Products US; December 8, 2003; with attachments.

Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal and Onshore (Amendments/Supplement to ISO 19901-1 :2015); February 2017.

Project Meeting at CT DEEP Shell Oil Products US New Haven Terminal, June 12, 2019.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Sovereign Consulting, Inc. 2022. Completion of Investigation Report. Prepared for Shell Oil Products US, Carson, California.

Sovereign Consulting, Inc. 2023. Remedial Action Plan. Prepared for Shell Oil Products US, Carson, California.

SPCC Guidance for Regional Inspectors; Prepared by the Regulation and Policy Development Division of the EPA Office of Emergency Management; December 16, 2013.

State of Connecticut Department of Energy and Environmental Protection, 2022 Integrated Water Quality Report.

Stormwater Pollution Prevention Plan; July 2017; Shell Oil Products US; 481 East Shore Parkway, New Haven, Connecticut; Prepared by Triton Environmental, Inc.

Stormwater Pollution Prevention Plan, Revision Date: May 2023, Prepared for Triton Terminaling LLC.

Stormwater Pollution Prevention Plan (SWP3), DRAFT, Shell Oil Company, 478 East Shore Parkway, New Haven, CT; Prepared by Triton Environmental, Inc.

T.J. Mothersbaugh, WaterTectonics, Inc.; Everett, Washington; personal communication; March 10, 2021.

Wit O' Brien's; Spill Prevention Control and Countermeasure Plan; Revision Date: August 2017; Prepared for Triton Terminaling LLC.


**Litigation Testimony**

30(b)(6) Deposition Transcript & Exhibits of RPMS Consulting Engineering (Robert Perla), November 3, 2023.

30(b)(6) Deposition Transcript & Exhibits of Shell Oil Co. (Michael Sullivan), February 6, 2025.

30(b)(6) Deposition Transcript & Exhibits of Sovereign Consulting (Scott Burrus), March 7, 2023.

30(b)(6) Deposition Transcript & Exhibits of Triton Environmental, Inc. (Paul Simonetta), February 16, 2023.

30(b)(6) Deposition Transcript & Exhibits of Witt O'Brien (John Carroll III), March 16, 2023.

Deposition Transcript & Exhibits of Jennifer Bothwell (Motiva Enterprises), December 6, 2023.

Deposition Transcript & Exhibits of Michael Sullivan (Shell Oil Co.), March 23, 2023.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Reports**

Matt Barlow. 2025. The Impact of Climate Change on Storms and Extreme Precipitation Relevant to the Shell Terminal in New Haven, Connecticut (Expert Report Prepared for the Conservation Law Foundation).

Robert Nairn. 2025. Expert Report on the Shell Oil Terminal Flood Risk, Shell Oil Terminal – New Haven, Connecticut. Prepared for Conservation Law Foundation by W.F. Baird Associates Ltd.