# Exhibit C

## Filed Under Seal

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

_____

CONSERVATION LAW FOUNDATION,       )
INC.,                              )
                 Plaintiff,        )
                                   )
     vs.                           )
                                   ) Case No.
EQUILON ENTERPRISES LLC D/B/A      ) 3:21-cv-00933-VDO
SHELL OIL PRODUCTS US, TRITON      )
TERMINALING LLC, and MOTIVA        )
ENTERPRISES LLC,                   )
                                   )
                 Defendants.       )
_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

RICHARD R. HORNER, Ph.D.

_____

MONDAY, AUGUST 11, 2025

9:05 A.M. PST

Veritext - Seattle, WA

1200 Sixth Avenue, Suite 610

Seattle, WA 98101

JOB No. ATL 7530788

REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322

Richard R. Horner , Ph.D. August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

                         A P P E A R A N C E S
     FOR THE PLAINTIFF:
          MOTLEY RICE LLC
          Elizabeth Smith
          401 9th St. NW
          Suite 1001
          Washington, DC 20004
          (401) 457-7700
           Esmith@motleyrice.com
          MOTLEY RICE LLC
          Shalom D. Jacks
          28 Bridgeside Boulevard
          Mount Pleasant, SC 29464
          (866) 604-2715
          Sjacks@motleyrice.com


     FOR THE DEFENDANTS:
          KING & SPALDING LLP
          Carmen R. Toledo
          1180 Peachtree Street NE
          Suite 1600
          Atlanta, GA 30309
          (404) 572-3438
          Ctoledo@kslaw.com



     ALSO PRESENT:  ADAM SWEETS, VIDEOGRAPHER

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

                                                        Page 3

                        I N D E X
   EXAMINATION BY:                                  PAGE(S)
   MR. TOLEDO                                        5,229
   MS. SMITH                                          208


   EXHIBITS FOR IDENTIFICATION                        PAGE
   Exhibit 1    Notice of Deposition Richard          10
                Horner
   Exhibit 2    Richard Horner Original Report        15
   Exhibit 3    Richard Horner Rebuttal Report        15
   Exhibit 4    Robert Horner Invoices                20
   Exhibit 5    NOI                                    33
   Exhibit 6    NOI                                    33
   Exhibit 7    Connecticut DEEP guidance document    40
                for preparing a SWPPP
   Exhibit 8    2009 Report Urban Stormwater          54
                Management in the United States
   Exhibit 9    Aerial photograph of New Haven        70
                Terminal and nearby facilities
   Exhibit 10   Flood Preparedness Fact Sheet by     106
                Region 6 Regional Response Team
                Executive Committee
   Exhibit 11   EPA Inspection Document              115
   Exhibit 12   Connecticut Stormwater Quality       119
                Manual
   Exhibit 13   RPMS Document                        127
   Exhibit 14   Survey Drawings Bates page ending    132
                56
   Exhibit 15   2018 Connecticut General Permit      138
   Exhibit 16   Table 4.2 from Stormwater Manual     171
   Exhibit 17   Notes of Connecticut DEEP meeting    180
   Exhibit 18   Richard Horner Calculations          185
   Exhibit 19   Letter Report from Sovereign         189
                Consulting to Jennifer Bothwell
   Exhibit 20   Meteorological and Oceanographic     199
                Design and Operating
                Considerations Offshore, Coastal,
                and Onshore from February2017
   Exhibit 21   Excerpts from the 2004 Connecticut   213
                Stormwater Quality Manual
   Exhibit 22   Excerpts from 2004 Stormwater        229
                Quality Manual

Page 30

report.  In some cases, expert report, plus deposition.

Q.  Okay.  I guess I was -- I understood you to say that every matter listed here was a case in which you testified either at a hearing, deposition, or trial.

Are you saying that some of these actually were just expert reports?

A.  Yes.  I think -- I think we didn't quite -- or I didn't quite communicate correctly there, yes.  If it involved the filing of an expert report, I included it.

Q.  I see.

In each of these cases where you served as an expert in a citizen suit case, was it your opinion that the facility at issue was in violation of its permit?

A.  Yes.

Q.  Have you ever testified in litigation in favor of an owner or -- owner or operator of an industrial facility?

A.  I have not testified in litigation for an owner or operator under a permit.

Q.  Have you ever testified in litigation in favor of a municipality?

A.  I have not testified in litigation for a municipality, but I've worked for a number of them in other contexts.

Page 33

Have you heard that?

A.   Yes, I have.

Q.   Okay.  Have you reviewed NOIs in the citizen suits that you have worked -- worked on before?

A.   In some cases, yes, and in some, no.

Q.   Okay.  Do you usually review the NOIs before you prepare your report?

A.   I would say roughly, very roughly, half the time.

Q.   Are you aware that to be able to assert a claim in a citizen suit it must have been expressly listed in the NOI?

A.   I am aware as a lay person in that respect.

Q.   Did you review the NOIs that CLF served in the case relating to the terminal?

A.   No.

Q.   Why not?

A.   I wasn't asked to.

Q.   Let's go ahead and get those marked.  And I believe that will be Exhibits 5 and 6.

          MS. TOLEDO:  This will be 5.

          (Exhibit 5 marked for identification.)

          MS. TOLEDO:  And 6.

          (Exhibit 6 marked for identification.)

   BY MS. TOLEDO:

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 34

Q.   Okay.  Have you had a chance to just look at those?

A.   Just the cover pages.

Q.   And just to confirm, you have not seen these before; is that right?

A.   That's correct.

Q.   Okay.  And you didn't ask to review them before you started working on your report, correct?

A.   I did not.

Q.   What percentage of your income is derived from your litigation-consulting work?

A.   Well, I do several things, and litigation such as we're doing today is probably about 40 percent.

Q.   Okay.  The remaining 60 percent would be consulting work?

A.   Yes, it would be consulting work of some form.

Q.   To your knowledge, has your testimony been excluded or limited in any case?

A.   No.

Q.   If we could turn to your CV.  That was Attachment B in your report, which is Exhibit 2.  And I believe it's, like I said, Attachment B.  Got it?

A.   Yeah.

Q.   And I believe you stated earlier that this is the most current version of your CV; is that right?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 35

A.   That's right.

Q.   And you have your education listed first.  And it says here you got your Ph.D. in civil engineering from the University of Washington; is that right?

A.   Yes.

Q.   And before that, you had degrees -- you obtained degrees in mechanical engineering from the University of Pennsylvania, right?

A.   Correct.

Q.   Do you have any other certifications or degrees?

A.   No.

Q.   You're not a licensed professional engineer, correct?

A.   Correct.

Q.   Have you ever been a PE?

A.   No.

Q.   You've never prepared a SWPPP before, have you?

A.   I have not prepared one, no.

Q.   And generally, regulations require that a SWPPP be certified by a PE.  Do you agree?

A.   Yes.

Q.   Have you reviewed the Connecticut DEEP's guidance document for preparing a SWPPP?

Page 36

(Reporter clarification.)

MS. TOLEDO:  You're doing awesome.

BY MS. TOLEDO:

Q.  In your May 1st report, you state on Page 9 that you have, quote, "Inspected four other industrial cites that receive and distribute petroleum products by land and are located on or near marine waters."

Do you remember that?

A.  Yes.

Q.  Okay.  What facilities were those?

A.  It was Rainier Petroleum, which is in Seattle. An outfit called APP, which I think is Associated Petroleum Products, in Tacoma.  There is a second one in Tacoma, I forget the name now.  Let's see.  I'm not coming up with the fourth one, I'm sorry.  I don't remember.

Q.  Were all four in the state of Washington?

A.  I believe so.  I was attempting to determine if there was one in California, but I believe they were all in Washington.

Q.  None on the East Coast, right?

A.  No.

Q.  And about how much time did you spend at each of those facilities?

A.  Similar to our site visit in New Haven, which

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37

was three or four hours.

Q.   In what capacity did you inspect those facilities?   Were you serving as an expert in litigation?

A.   Yes.

Q.   Were those facilities similar to the New Haven terminal?

A.   They were smaller.

Q.   Did they also have above-ground storage tanks?

A.   Yes.

Q.   Did you conclude after your inspections that each of those four facilities was violating its stormwater permit?

A.   Yes.

Q.   What were the violations that you noted for those facilities, as best you can remember?

A.   Generally speaking, these cases arise because of reports of pollutants in their discharges, which are related to the quality of their best management practices.   I -- in these cases, I am sure that those were the principal issues.

Q.   Can you -- going back to Attachment C, can you identify for me which of the cases are the four that had to do with industrial sites that receive and distribute petroleum products?

Case 3:21-cv-00933-VDO  Document 754  Filed 10/04/25  Page 11 of 62

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 41

A.   Correct.

Q.   Have you ever advised a client on preparation of a SWPPP?

A.   Well, my clients have not prepared SWPPPs.

Q.   Okay.

A.   I've advised them on the qualities of SWPPPs. I've certainly spoken to industry representatives and/or consultants about my opinions about SWPPPs.

Q.   About SWPPPs that were in existence?

A.   Yes.

Q.   You were never involved in writing or preparing a SWPPP, right?

A.   I was not.

Q.   Okay.  And as we discussed before, if you go to Page 5 of this document, under Existing Registrants, halfway through the paragraph it says that, "Existing registrants must update their current plan and have the plan recertified at the time of registration for this general permit by a professional engineer, PE, licensed to practice in the state of Connecticut, or a certified hazardous materials manager, CHMM."

Did I read that correctly?

A.   Yes.

Q.   And that's as we discussed before, that it must be prepared and certified by a registered

Page 42

professional engineer, correct?

A.  Correct.

Q.  And if you'll turn to Page 17, the last paragraph of that page it provides that -- under Management of Runoff it says, "Be aware that any evaluation, construction, or modification of the design of a stormwater drainage system requires certification by a professional engineer licensed to practice in the state of Connecticut and must be discussed in your plan."

Did I read that correctly?

A.  Yes.

Q.  So you would agree with me that, based on the clear language of this guidance, for anyone to evaluate the design of a stormwater drainage system of a permitted facility in Connecticut, such as a terminal, that person must be a professional engineer licensed in the state of Connecticut, wouldn't you?

MS. SMITH:  Objection to form.  Calls for legal conclusion as well.

You can go ahead and answer.

THE WITNESS:  The formal certification must be done by such a person, but there is nothing that says that somebody else cannot evaluate the plan and contribute to it during the preparation, for that

Case 3:21-cv-00933-VDO   Document 754   Filed 10/04/25   Page 13 of 62

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 43

matter.

BY MS. TOLEDO:

Q.  So you are drawing a distinction between the language as stated here and what you have done in this case, correct?

MS. SMITH:  Objection to form.

You can answer.

THE WITNESS:  I think it's very literal here that the certification requires the stamp of a professional engineer.  But there's nothing that says that contributors to or evaluators of have to be a licensed professional engineer in Connecticut.

BY MS. TOLEDO:

Q.  Well, it expressly says that any evaluation must be certified by a professional engineer, doesn't it?

MS. SMITH:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I would interpret that to mean that an evaluation that affects the content of the plan has to be certified.

In other words, if an evaluator contributes something to the plan, that action must be certified by a professional engineer, but not that an evaluation can't be conducted by somebody else.  That's my

Page 44

interpretation.

BY MS. TOLEDO:

Q.   Let's go back to your CV, Attachment B of the report.  And we talked earlier about your education, and I wanted to ask you about your work experience.

And it looks like your first listed job was as a research assistant at the University of Pennsylvania; is that right?

A.   Yes.

Q.   Was that for a specific professor?

A.   Yes.

Q.   Who was that?

A.   His name was TK Chu.

Q.   What was your research area?

A.   I was -- excuse me -- in mechanical engineering, and it was plasma flow work.

Q.   Explain to me what that means.

A.   Plasma is a gas that transmits material.  And specifically, the application of that, the intended application, I don't recall.

Q.   And after you graduated with your master's, looks like you went to work for Exxon Research and Engineering in New Jersey, correct?

A.   Yes.

Q.   And you worked there for about three years?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 45

A.  About two and a half.

Q.  Two and a half years.

This was a research facility, correct?

A.  That's in the name, but the work that I did was not research.

Q.  What work did you do there?

A.  I did design basis setting for the support facilities and refineries in chemical plants; that is, facilities that are not part of refining, the chemical process, but rather the mechanical and civil works that support the -- those processes.

Q.  Did you do any work at bulk petroleum storage facilities?

A.  No.

Q.  It looks like after that you worked at North Hampton Community College in the engineering department; is that correct?

A.  Correct.

Q.  And there you were an instructor or professor?

A.  Yes.

Q.  Which one?   What was your title?

A.  Professor, working my way up from assistant to professor.

Q.  What courses did you teach there?

A.  I once took a count, I taught more than 30

Richard R. Horner , Ph.D.                          August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 46

courses in engineering and environmental studies.

Q.   That was before you got your Ph.D.; isn't that true?

A.   Before and after.

Q.   Okay.  So nowadays we can do that with Zoom, right, and remote work.

How did you manage that in the late '60s?

A.   How did I manage?

Q.   Getting your Ph.D. and working as a professor at the same time?

A.   Oh, I was on leave of absence.

Q.   I see.

A.   I returned -- I had a sabbatical.  I was obligated to return for a year.  I, in fact, worked three more years after my Ph.D. at the community college.  So my Ph.D. studies were separate.  They were 3,000 miles apart.

Q.   So then you returned to the University of Washington after getting your Ph.D. three years later; is that right?

A.   That's right.

Q.   And that was in 1981; is that right, according to your CV?

A.   Correct.

Q.   And you began working as a research associate

Page 50

Q.   Were these courses, these continuing education short courses, how long would they go for?

A.   From one to five days.

Q.   And you took emeritus status in 2011 at the University of Washington; is that correct?

A.   Correct.

Q.   Are you still affiliated with the University?

A.   In that status since taking the emeritus, I have done some research.  It's not been in the last several years.  And I have guest spoken in classes.

Q.   Okay.  Do you still teach any courses?

A.   No.

Q.   When did you stop teaching on a regular basis?

A.   I believe 2008.

Q.   About how many hours do you devote to your research work for the University?

A.   Did I, when I was an active researcher?

Q.   No, after you took emeritus status.

A.   Oh, how many hours a week?   Probably as a broad average, trying to think, I would say about 12 to 15.

Q.   Hours a week?

A.   Yes.

Q.   To this day?

A.   Oh, no, no, no.  I said I have not done

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 51

research in recent years.

Q.   Have you taught courses in recent years?

A.   No.   The last course that I taught that I was responsible for was 2008.   I have spoken in classes since, but I have not been the assigned professor for a course since 2008.

Q.   Those times where you do a guest professor class, are those classes mostly in the landscape architecture department?

A.   They have been, yes.

Q.   Do you continue to occasionally teach or -- strike that.

Do you continue to go to some of these classes as a guest speaker to this day?

A.   I have not in several years.   I believe because, as time passes, my associates move on and do different things.   And so what I had been doing regularly, that professor is no longer active in that area.

Q.   When did he become no longer active in that area?

A.   Well, she, and it was --

Q.   Oh, she, sorry.

A.   Let's see.   I recall doing one by Zoom during COVID.   That would have made that -- or in 2021, I

Richard R. Horner , Ph.D.                                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 52

believe.  I did it one more time, I think, for somebody else.  So it's been about three years.

Q.  Now, your CV also states that you began offering services in environmental engineering and science in 1986; is that right?

A.  Yes.

Q.  Is that when you began your consulting business?

A.  Yes.  There was not a lot of consulting at that time, but I had some.

Q.  Since your retirement in 2011, is your consulting business your primary source of income?

A.  Yes.

Q.  What percentage of your income is from your consulting business?

A.  Well, other than my retirement, which I'm drawing, and Social Security, let's see.  What would it be?  It's a half to two-thirds.

Q.  Okay.  From 1986 to 1990, you also list a part-time position with King County, and I believe you referenced that earlier; is that right?

A.  Yes.

Q.  It says you were coordinator of Puget Sound Wetland and Stormwater Management Research Program; is that right?

Page 61

A.   Right.   That is a term that is not probably alone used by Connecticut, but is used in the Connecticut permit.   Terms that mean the same thing or much the same thing are used in other permits in Washington and in California.

Q.   And best industry practice must take into account the specific industry.   Would you agree?

A.   Yes.

Q.   And BIPs are generally accepted practices in a given industry and it may not be applicable to others, right?

MS. SMITH:   Objection to form.

You can answer.

THE WITNESS:   I interpret it more broadly.   It is not industry-by-industry, but industry that discharged stormwater, in my field.   And this is the way it is definitely used in Washington and California.   And I believe the intention is the same in Connecticut.   It is not specific to industry-by-industry, but those under the industrial general stormwater permit have a obligation to use the best practices that the market provides.

BY MS. TOLEDO:

Q.   What is the basis for that opinion?

A.   The basis is that I've seen the best

Page 64

permit --

Q.   Okay.

A.   -- what your reference is.

Q.   We will get to that.

I believe earlier you testified that you have not worked on projects in Connecticut before; is that right?

A.   That's right.

Q.   Have you ever consulted with Connecticut DEEP in any capacity?

A.   No.

Q.   Have you ever spoken with anyone from Connecticut DEEP in connection with this case?

A.   No.

Q.   Have you made your opinions about alleged violations at the terminal available to the Connecticut DEEP?

A.   My opinions are in my two reports.  That's the expression of them.  Otherwise, I did not distribute them in any way.

Q.   And you've not discussed them with anyone at EPA either?

A.   No.

Q.   Going back to your report and your CV to your publications, starting on page Roman numeral 18, you

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 66

stormwater management.  And if you'll allow me to go down the list, I could tell you which ones do.

Q.  Well, let's -- let's move on because we have a lot to cover.

Do you recall off the top of your head any articles that you published regarding industrial stormwater management?

A.  As I said, some of these pertain to industrial stormwater management.  For example, how to monitor.  Monitoring is a function of industrial stormwater management, so it pertains to it.  You know, that's one example that comes to mind.  I would have to go down the list point by point.

Q.  So when you say "pertain," it means that you discussed issues that apply to industrial stormwater management?

A.  Yes.  We did a research project for the Electric Power Research Institute, and it was how to monitor electric power plants, you know, how to improve monitoring electric power plants.  That would be monitoring for stormwater and other, you know, functions, monitoring functions that they had to perform.  So there are several papers that have to do with that.

Q.  Have you published any papers discussing

Richard R. Horner , Ph.D.                              August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 67

stormwater pollution prevention plans?

A.   No papers on SWPPPs specifically, no.

Q.   You have written about the positive impact of nonstructural BMPs, correct?

A.   Yes.

Q.   So you do agree that nonstructural BMPs can be effective to protect water quality, correct?

A.   They're one of the categories that is widely recognized to be part of the strategy, yes.

Q.   The majority of your papers and reports have to do with urban runoff.  Is that fair?

A.   Yes.  Although, as I said, there are aspects of them that pertain quite directly to industries, too.

Q.   But generally, urban stormwater management strategies differ from the strategies employed in industrial stormwater management.  Would you agree?

MS. SMITH:  Objection to form.

Go ahead.

THE WITNESS:  Not entirely.

BY MS. TOLEDO:

Q.   Why not?

A.   Well, Shell uses a wet pond.  Municipalities use wet ponds.  Just one example.

Q.   So you're considering municipalities to fall under the urban stormwater umbrella?

Page 69

industrial runoff.  It may not be detected above a specific limit, but it's detected.

Then there are total petroleum hydrocarbons, which are a group.  There are gasoline fractions, diesel fractions, and heavy oil fractions.  They are usually detected, again, not above specific limits a lot of times.

And then there are all kinds of individual petroleum hydrocarbons.  Many.  Dozens.  Hundreds.

BY MS. TOLEDO:

Q.  And petroleum hydrocarbons that are on roadways can make their way to waterways through runoff, correct?

A.  Yes.

Q.  And in New Haven Harbor we have the interstate that crosses the harbor, correct?

A.  I -- I know it's close.  I don't know specifically how close.  I didn't get around that area.

Q.  Did you see it when you visited?

A.  I don't believe I saw the interstate.

Q.  Did you consider other sources of contaminants to New Haven Harbor in connection with your work evaluating the terminal?

A.  Well, I didn't say anything about any contaminants in New Haven Harbor itself.  I had no data

Page 70

from New Haven Harbor.  I didn't discuss it.

Q.  Is that not significant for your opinions in this case?

MS. SMITH:  Objection to form.

THE WITNESS:  It would be impossible to distinguish the sources if it's measured in the waterbody that is receiving runoff from an industrial area and a relatively large city and transportation facilities, et cetera.  My scope was the conditions and practices at the terminal itself.

MS. TOLEDO:  Let's mark the next exhibit.  It will be No. 9.

(Exhibit 9 marked for identification.)

BY MS. TOLEDO:

Q.  And I'll represent to you that this is an aerial photograph of the terminal and nearby facilities and New Haven Harbor.

Do you see that?

A.  Yes.

Q.  Okay.  Do you see I-95?

A.  Yes.

Q.  Okay.  And that crosses just to the north of the terminal and crosses over -- I don't know if by then it's the river or the harbor, but it crosses a waterway, correct?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 71

A.   Yes.

Q.   Okay.  And there's also other facilities with ASTs, right?

A.   With what?

Q.   ASTs, above-ground storage tanks?

A.   Yes.

Q.   Okay.  Did you conduct any research relating to those facilities?

MS. SMITH:  Objection.  Beyond the scope.

You can answer.

THE WITNESS:  No.

BY MS. TOLEDO:

Q.   And I-95 and the other facilities can and likely do contribute pollutants to the harbor.  Would you agree?

MS. SMITH:  Objection to form, speculation, and beyond the scope.

You can answer.

THE WITNESS:  I agree.

BY MS. TOLEDO:

Q.   But I believe you said you did not look at those because you focused on the facility itself, the terminal?

A.   That's right.

Page 72

Q.   Okay.  You did look at some data concerning area soils, correct?

A.   Yes.

Q.   And it is -- was data publicly available that you researched and obtained; is that right?

A.   Well, I had information on soils that was produced by Shell's consultants, as well as publicly available.

Q.   Is it your understanding that New Haven Harbor is impaired waters?

A.   Yes.

Q.   Do have any understanding as to what the contaminants are at issue in New Haven Harbor?

A.   It's in my report.  And since I don't have it in memory, it's going to take a little time to find it.

Q.   How about Page 26?

A.   Okay.

Q.   So you did look at the water quality data of New Haven Harbor, correct?

A.   I looked at what it was listed for.  I did not look at the measured concentrations at any point in time.

Q.   Did you make any analysis or do any research to identify which, if any, of these constituents are used at the terminal?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 73

A.   I didn't do any research, but -- excuse me -- oil and grease very definitely is connected.

Q.   Is New Haven Harbor impaired upstream from the terminal?

A.   I don't know anything about any upstream waters, just the harbor itself.

Q.   Do you know where any releases from the terminal enter the harbor, if at all?

A.   Could you repeat that, please?

Q.   Do you know where the releases, if any, from the terminal enter the harbor --

A.   Yes.

Q.   -- in your opinion?

A.   Yes.  As a matter of fact, I traced that and it's in here.  And, again, we can look for it.

Q.   Can you -- going back to Exhibit 9, the photograph, the aerial photograph, looking at that, can you identify where that is?

A.   I -- I believe it is between New Haven Harbor power plant and tertiary treatment tanks.

                (Reporter clarification.)

 BY MS. TOLEDO:

Q.   So when I say "upstream," I mean anything that is north of that.

A.   I don't know about anything that is north of

Page 78

mean, I have enough background to judge the qualities of substances that I might see reference to in documents.

BY MS. TOLEDO:

Q.  You are not a risk assessor, correct?

MS. SMITH:  Objection to form.

THE WITNESS:  No, I don't consider myself a risk assessor.  But I -- again, I have -- I set out to structure my education to lead into a broad practice in this field.

That's why I went to the University of Washington.  It allowed me and encouraged me and demanded, in fact, that I take courses farther afield than the civil -- later, civil and environmental engineering department.

BY MS. TOLEDO:

Q.  You -- I'm sorry.  Were you done?

A.  So I -- I encounter and, in many cases, work with other practitioners.  And, yeah, today, you know, right now, I work with somebody who considers himself to be a risk assessor.  I don't consider myself to be a risk assessor, but I have an appreciation for risk and how it's assessed.

Q.  Who is that risk assessor you work with?

A.  You mean his name?

Page 80

A.   I did design basis work in that industry.   I think, as I recall, it was really production, not bulk storage.

Q.   Have you ever designed above-ground storage tanks?

A.   No.

Q.   You're not a member of API, correct?

A.   Correct.

Q.   And you do know what API is?

A.   Yes, I do.

Q.   Do you have any experience in environmental compliance management at a bulk petroleum storage terminal?

A.   No.

Q.   Have you ever worked for EPA?

A.   I've never been employed by EPA.

Q.   Have you done projects for EPA?

A.   I've had some funding from EPA, research funding.

Q.   Have you been retained by EPA to do any projects aside from research?

A.   No.

Q.   Have you worked for the State of Washington Department of Ecology?

A.   I have had research funding from the

Page 81

Department of Ecology.

Q.   And are those projects described or listed in your CV?

A.   Yes, the major -- well, yeah, it's represented in -- in the material in general.  As a matter of fact, in the body of the report, I discuss the wetland project and another project on streams that were heavily funded by the Department of Ecology.

Q.   And you identified King County and the City of Seattle and work you've done for them, right?

A.   Yes.

Q.   But you've never done any work for Connecticut DEEP?

A.   No.

Q.   Have you ever worked as an inspector for any government regulatory agency?

A.   No.

Q.   Have you over spoken with anyone from EPA regarding stormwater regulations?

A.   Certainly I've spoken with personnel from EPA about various aspects of the stormwater field.

Q.   Was that in connection with the panel that you participated in?

A.   No.  EPA was the commissioner of that panel but did not sit on it.  There have been EPA

Page 87

that are as stringent as the federal requirements, correct?

A.   That's my impression.

Q.   Are you aware that Connecticut DEEP has published a draft permit in 2024 although it's not yet effective?

A.   I have a really elementary awareness of that. I certainly have not seen it.

Q.   You may -- you did not go to review the draft permit?

A.   No.

Q.   Do you have an understanding of what the draft permit includes as new requirements were different from the 2021 permit?

A.   No, I have not been asked to review it and have not reviewed it.

Q.   So I would assume that if you've not reviewed it, you didn't provide comments; is that right?

A.   That's right.

Q.   Are you aware that CLF did provide comments?

A.   I am not aware.

Q.   Are you aware that Connecticut DEEP did not adopt the majority of the comments that CLF proposed?

A.   I am not aware of that either.

Q.   You're not a climate scientist, correct?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 88

MS. SMITH:  Objection to form.

THE WITNESS:  Correct.

BY MS. TOLEDO:

Q.  And you're not a meteorologist, right?

A.  No, but I use meteorological data frequently.

Q.  You're not a tank engineer, would you agree?

A.  I would agree with that.

Q.  You've not designed above-ground storage tanks?

A.  I have not.

Q.  And you've never published an article regarding the potential for failure of above-ground storage tanks, correct?

A.  Correct.

Q.  Are you familiar with best industry -- best industry -- excuse me.  Strike that.

Are you familiar with best industry practices relating to above-ground storage tanks?

A.  The SPCC and the provisions of the permit define those quite well.

Q.  The SPCC defines best industry practices for above-ground storage tanks?

A.  With respect to its scope, which is spill prevention, containment, and countermeasures.

Q.  Can you identify best industry practices for

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 92

Q.   Is it your testimony that those best industry practices apply based on your experience and knowledge of stormwater management, rather than specific industry practice?

MS. SMITH:  Object to the form.

THE WITNESS:  The SPCC and the permit have very clear language.  It's unexceptional.  That is what it's based on.

I understand what impermeable means.  I understand what sufficient volume of containment means, to be cleaned up before it has a chance to escape. That's what it is based on.

BY MS. TOLEDO:

Q.   What does "impermeable" mean?  What's your definition?

A.   "Impermeable" means that it does not transmit.

Q.   And where is that definition found?

A.   I would say in Merriam-Webster.  It's a term that is kind of an absolute, you know, general term in the English language.

Q.   Does the EPA define the term "impermeable"?

A.   I don't know.

Q.   Does Connecticut DEEP define the term "impermeable" in their -- in the Connecticut regulations?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 93

A.   Bringing up a passage in my mind here.   The DEEP, of course, refers to the stormwater manual.   And the stormwater manual specifies what can produce a condition of impermeability.   So if you consider that to be a definition.

Q.   Well, Connecticut regulations do define certain terms relating to stormwater.   Would you agree with that?

A.   You would have to point out to me what you're referring to, "certain terms."

Q.   Did you make any effort to determine whether Connecticut defines the term "impermeable"?

A.   I did not look for the definition, as I very well understand what impermeable means.

Q.   Are you saying that impermeable means zero percent can go through?

A.   Not necessarily zero percent.

Q.   So what is your definition?   Do you have a quantitative definition of impermeable?

A.   Well, impermeable literally does mean zero percent.   But in this context, if it prevents -- if, for example, it is a natural soil condition which is adequate to retain spilled material and not let it escape before it can be cleaned up, it is sufficiently impermeable according to the prevailing regulations.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 95

SPCC to identify either a natural soil condition or some sort of modification of that condition that would be allowable.

Q. But none of those documents provides a definition or rate that would be acceptable, correct?

A. They definitely don't have a rate, no.

Q. Okay. Are you aware whether there is a rate that is adopted as part of the definition in any state?

A. I am not aware that such a rate exists. It may, but I don't know of it.

Q. Did you conduct a review of any relevant industry literature to try to identify what best industry practices are for bulk petroleum storage terminals?

A. The permit in the SPCC told me what those practices are in the scope in which I was working.

Q. Well, the permits don't talk about issues that are specific to these types of sites, correct?

MS. SMITH: Objection to form.

Go ahead.

THE WITNESS: It applies to any site with a -- the potential to have a situation in which it's not impermeable in its -- its terms.

BY MS. TOLEDO:

Q. Well, permeability is not the only best

Richard R. Horner , Ph.D.                              August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 101

either of these technologies being used at any bulk petroleum storage terminal, correct?

A.   I don't have a specific example of one, no. But the abilities, their abilities, lend themselves to use at such a location.

Q.   Well, contaminants are common across different permitting scenarios, right?

A.   That's my point.

Q.   But the requirements imposed by the different permits for different industries and different activities are different, aren't they?

A.   Well, generally the effluent limits, however they're phrased, are common across -- I mean, there are not different benchmarks for different industrial categories.

Q.   But we agreed earlier that the terminal is meeting all of its effluent limits, right?

A.   It met them for a period of time as specified by the permit to allow it to stop monitoring for some period.  It's not monitored now for several years as -- as a result of being compliant with the benchmarks for a period of time.

Q.   If it is in compliance with its effluent limits, there is no requirement to change the technology.

Richard R. Horner , Ph.D.                      August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 102

MS. SMITH:  Objection to form.

BY MS. TOLEDO:

Q.  Wouldn't you agree?

MS. SMITH:  Objection to form.

Go ahead.

THE WITNESS:  There is no requirement for it to change that at this time.  My recommendation was that this be considered because it has flexibility that would have some benefits in the future.  It's easy to change out if circumstances change, whether they be the magnitudes of the effluent limits, whether it be more water to handle, you know.

So I didn't say that it's required now.  I said it is best industry practice, in my opinion, and it would have some benefits.

BY MS. TOLEDO:

Q.  Well, is it best industry practice if no other bulk storage -- bulk petroleum storage terminal is using it?  Is it a best industry practice for that industry?

MS. SMITH:  Objection to form.

So go ahead.

THE WITNESS:  Well, we were through this before and I said I define the term "industry" a little bit differently than your suggestion, and that is that

Page 104

Q.   Okay.   But, again, you're not familiar with any terminal, whatever the industry, any facility in Connecticut that has adopted either of these treatment technologies, correct?

A.   I don't know of an industry in Connecticut.   I don't know whether they have or have not.

Q.   And if a facility is meeting its effluent limits and is in compliance, isn't that facility meeting best industry practice?

MS. SMITH:   Objection to the form. Asked and answered, I believe.

Go ahead.

THE WITNESS:   I -- I never said that they should tear out their ponds and put these in now. I put them forward as best industry practice that should be at least strongly considered should these circumstances of redevelopment come up.

And they would do themselves a favor if they were aware of the existence of these options because it could lend some advantages to their continued operation.

BY MS. TOLEDO:

Q.   Did you make any effort to contact anyone from oil and gas companies to try to determine what best industry practices are for that industry, using my

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 106

manual are accepted.

BY MS. TOLEDO:

Q.   Did you look to see whether any EPA region has issued guidance on recommended best practices?

MS. SMITH:  Objection to form and scope.

Go ahead.

THE WITNESS:  I did not check the EPA regions, no.

MS. TOLEDO:  I'm going to mark the next exhibit, Exhibit 10.

(Exhibit 10 marked for identification.)

BY MS. TOLEDO:

Q.   Have you seen this document before --

A.   No.

Q.   -- Dr. Horner?

I'll represent to you that it is a Fact Sheet prepared by the Region 6 Regional Response Team Executive Committee looking at flood preparedness.

Do you see that?

A.   Yes.

Q.   Okay.  The -- if you look at the first paragraph of this document, it indicates that they were looking at the large number of spills generated by Hurricanes Katrina and Rita.

Do you see that?

Page 112

part of CLF's claim here is that -- is the allegation that the terminal is not protected from severe weather events caused by climate change.

Do you agree with that?

MS. SMITH:  Objection to the form.

THE WITNESS:  The --

MS. SMITH:  Scope.

THE WITNESS:  It doesn't matter whether it is protected or not, according to the regulations. It doesn't matter.  Yes, it should take into account the effects of meteorological conditions on its operations as a whole.  But irrespective of that, whether it does or doesn't, it needs to provide that level of containment.

BY MS. TOLEDO:

Q.  Do you have any indication that a regulatory agency has found the terminal not to be meeting the SPCC regulations?

A.  I do not have any rulings in that regard, but I myself determined that they aren't.

Q.  Going back to the best practices recommended by Region 6, did you review any of the practices or protocols in effect at the terminal to address the issues that this document raises?

MS. SMITH:  Objection to the form and

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 113

outside the scope.

THE WITNESS:  That was, again, outside of my scope.  My scope was to determine, can it contain the contents of a spill from the largest tank or not. Is it sufficiently impervious to allow for cleanup before this escape of a product?  That was my scope.

BY MS. TOLEDO:

Q.  To determine whether this soil in a secondary containment area is sufficiently impervious to meet the SPCC standard, the way to do that is to collect samples and run tests, isn't it?

A.  Many samples of the soil were collected and analyzed by Shell's own consultant on two different occasions.

Q.  Are you aware that CLF and you had permission and could have collected soil samples during your site visit?

MS. SMITH:  Objection to the form.  And objection -- well, objection.

Go ahead.

THE WITNESS:  I was not informed of that.

BY MS. TOLEDO:

Q.  Okay.  Do the soil boring results give any kind of quantitative information regarding the

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 114

permeability or impermeability of the soil?

A.  The soil results are very clear.  It is highly sand and gravel, very little clay.  It is virtually axiomatic in the industry, in my industry, that is, that hydraulic conductivity rates in such a soil are very rapid.

And in my rebuttal report, I quoted from two sources agreeing with the rates of different types of soil from sand to clay.

There have been no measurements of hydraulic conductivity in the terminal.  This is true, I admit that.  Neither I have them, nor the experts on the other side have them.

But it is just incontrovertible in the work that I do, the work that I've done for years, that soils of this type are highly conductive.  They are far from effectively impermeable.

Q.  You could have gathered samples and run tests.

A.  I wish I had done that.

MS. SMITH:  Objection to the form and the accuracy of that.

BY MS. TOLEDO:

Q.  What is -- and you told me before that you don't have an idea of what is the rate of conductivity that would qualify as impermeable or as sufficiently

Page 115

impervious; is that right?

A.   I don't have a quantitative number, but I have a, say, condition, which is a soil that is heavily in the clay region of the continuum of soil conditions.

Q.   And I believe that you did review an EPA document that shows an inspection relating to SPCC compliance.  Is that true?

A.   That is true.

Q.   Let me see if I can find that.

MS. TOLEDO:  Let's go ahead and mark that.  It's -- apologies.  I'm just trying to find the EPA document.

Okay.  So I believe this is 11.

(Exhibit 11 marked for identification.)

BY MS. TOLEDO:

Q.   Is this the inspection document that you reviewed?

A.   Yes.

Q.   And this is a document that was cited by Eric Kovich, right?

A.   Yes.

Q.   And EPA does inspect facilities for compliance with SPCC, correct?

A.   Correct.

Q.   And this document is an inspection report for

Page 116

one such inspection of the terminal, correct?

A.   Yes.

Q.   Did EPA find any violation to the SPCC regulations in its inspection?

A.   No.  But I disagree.

Q.   Are you a qualified EPA inspector?

A.   A practitioner and a citizen has a right to disagree with the EPA.

Q.   Did you communicate with EPA that you disagree with its findings?

A.   No.

Q.   To your knowledge, has Connecticut DEEP ever issued a notice of violation to the terminal?

A.   I have not seen a notice of violation.  I can't say whether one has ever been issued.

Q.   Did you do any research or contact anyone to try to determine whether the facility had been cited for any violation relating to stormwater?

A.   I didn't put that specific question to anybody, no.

Q.   And to your knowledge, DEEP has never required the terminal to change any of its processes.  Would you agree?

A.   To my knowledge, I have not -- I would agree.

Q.   And nor has DEEP ever indicated that the

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 117

terminal SWPPP is in violation of the permit.

Is that your understanding?

A.   Yes.  But, again, a practitioner and a citizen has a right to make their own evaluation and disagree, if they find reason to.

Q.   Going back to the issue of ballasting and the safety of the tanks, from your testimony my understanding is that you're not offering an opinion about the likelihood or not of failure of any of the tanks; is that right?

A.   That is right.

Q.   Or opinions about tank stability, right?

A.   No.

Q.   Did you ever speak with a Dr. Kameshwar about the likelihood of failure of tanks at the terminal?

A.   I don't know that name.

Q.   Have you ever reviewed any of his articles relating to tank failures?

A.   No.

Q.   You did review the deposition of Mike Sullivan, right?

A.   Yes.

Q.   And Mr. Sullivan testified that the terminal does fill the tanks when a storm is anticipated.

Do you remember that testimony?

Page 119

Q.   Okay.   We are going to mark the next exhibit. It's the Connecticut Stormwater Manual.   And that will be Exhibit 12.

(Exhibit 12 marked for identification.)

BY MS. TOLEDO:

Q.   And for the record, this is Connecticut Stormwater Quality Manual and it's the latest revision dated March 26, 2024.

Do you see that?

A.   Yes.

Q.   Is this a document that you reviewed?

A.   Yes.

Q.   Okay.   Now, just to be clear, this document dated 2024, obviously, was not in effect at the time this lawsuit was filed in 2021, right?

A.   It was not revised in 20 years.   No, it was not in effect.

Q.   Okay.   Well, the original publication date is September 30th, 2023, with an effective date of March 30, 2024.

Do you see that on the cover?

A.   Yes.

Q.   And if we go to Page 147, which is Chapter 9 -- again, this is excerpts.   I'll just make that clear for the record.   It's not the entire

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 121

could have been done at that time to provide for the full volume of secondary containment required.

Q.   Your opinion is that the installation of that bypass was a retrofit.  Is that your opinion?

A.   It was a construction project.  Not new construction.  I would place it in the redevelopment category.

Q.   And what is the basis for calling it "redevelopment"?   Is there a definition in the manual that allows for consideration of that pipe installation as redevelopment?

A.   Let's refer to my rebuttal report.

Q.   Well, there were no new tanks built, right?

A.   No new tanks.

Q.   And no new buildings?

A.   No.  On Page 18, my rebuttal report, "The stormwater manual defines redevelopment as any construction activity with an existing drainage infrastructure or at an existing site to modify expand, or add on to existing buildings, structures, grounds, or infrastructure."

That's the standard in the manual for redevelopment.  Then I go on to say --

(Reporter clarification.)

THE WITNESS:  "The terminal installed

Page 122

the containment area 1 bypass pipe in 2022, which, in my opinion, was a qualifying activity, bringing it under the auspices of the stormwater manual."

BY MS. TOLEDO:

Q.   There is no new processes involved, correct?

A.   It changed the existing structures and/or infrastructure.  I mean, the point is, the containment could have made -- the volume of the containment, secondary containment, could have been made adequate at that time.

Q.   And you're basing that opinion on that reference to the manual, which is -- the footnote says it's Table 4-2, right?

A.   I don't see that in this paragraph.

Q.   I'm looking at --

A.   Oh, you're -- oh, okay.

Q.   -- Footnote 33 --

A.   Yes, yes, the footnote.

Q.   -- your reference.

A.   Right.  Yes.

Q.   So you're saying it's redevelopment, not necessarily retrofit?

A.   It changed the structures and/or infrastructure.  It changed them.  Therefore, it fits the definition.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 144

permeability and capacity, correct?

A. Correct.

Q. And as far as the others, employee training, non-stormwater discharges, is it your opinion that the terminal is in violation on either of those?

A. Not -- no, not of those, that I know of.

Q. And the last one, No. 13, sector-based control measures, those do not apply to the terminal, correct?

A. Well, I'd have to review Section 5-J to answer it authoritatively.

Q. I believe it's F.

A. I'm sorry, 5-F.

Q. And that's on Page 38. And it there lists the various sectors. Sector A is Asphalt Plans, Page 38.

A. Yeah, I've got it.

Yeah. Scrap recycling. Steam electric power. Transportation and public works. Marinas, et cetera. Small scale composting. I think that's probably it.

Q. So nothing that applies to the terminal, correct?

A. Well, I could make a case about No. 5, minimize exposure.

Q. You don't really know what sector the terminal is classified under?

A. I don't.

Page 146

that you were referring to?

A.   The stormwater manual --

Q.   Oh.

A.   -- which is, you know, associated -- provides more of the specifics of implementation under the permit.  It allows -- it -- it requires a liner, a synthetic liner.  It names it.  But it lets open the possibility for another method with permission.

Q.   But, again, that's from 2024, right?

A.   Yes.  I -- yes, that is the language in the 2024 manual.

Q.   Okay.  And it provides expressly that it applies to new development, redevelopment, and upgrades to existing development, as we discussed before, right?

A.   Well, yes, but long predating that is the conditions of effectively impervious -- sufficiently impervious and impermeable.  They do not depend on the vintage of the stormwater manual.  They're absolute.  They've existed for some time before the 2024 stormwater manual.

Q.   Is there anywhere in the SPCC regulations that has an express requirement for a synthetic liner?

A.   No.  But there is requirement for sufficiently impervious.

Q.   Okay.  And as we have discussed before,

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 147

there's no quantitative standard regarding the percolation rate.

A.   There is no quantitative standard.  The eye of the beholder is that this is a case in which it's over in the opposite extreme.  It is the kind of soil that is known to be very permeable.

Q.   And the eye of the beholder is your, Dr. Horner's, eye, right?

MS. SMITH:  Objection to form.

Go ahead.

THE WITNESS:  It is mine.  I believe it would be widely agreed upon.

BY MS. TOLEDO:

Q.   Based on what?

A.   By the years of association with practitioners in my field.

Q.   Is there any literature or any article or guidance that you can cite to me as we sit today, as we sit here today, that supports your argument that just -- that a synthetic liner would be required in these conditions?

MS. SMITH:  Objection to form.  Asked and answered.

Go ahead.

THE WITNESS:  One needs to achieve

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 165

BY MS. TOLEDO:

Q.  I'm so sorry.  I gave you -- I marked the wrong thing.  So I will give you new ones, and we will mark it in a minute.  I'll give you this one.  It has the 5 up on top.

Did you see any reference to inadequate capacity of secondary containment?

MS. SMITH:  Same objection.

THE WITNESS:  I haven't had a chance to read it.  So I guess you represented to me it's not there, but I can't affirm that.

BY MS. TOLEDO:

Q.  Well, take your time and read it.

A.  It's going to take a while.

Q.  Just those sections, the violations listed.  It's three pages.

A.  Now, if you're asking me if I see the word "bypass."  At the bottom of Page 10 I've not seen the word "bypass."  However, I do see that the requirement -- the permit requires that the SWPPP shall map and describe potential sources of pollutants that may reasonably be expected to affect stormwater quality at the site or that may result in the discharge of pollutants during dry weather from the site.  That could include the bypass.

Page 166

Q.   My question was whether there's any reference to inadequate capacity of secondary containment?

MS. SMITH:  Same objection.

THE WITNESS:  I did not see the words "inadequacy of secondary containment."  However, I still maintain the general statement that I read to you earlier is a requirement to consider all specific sources of contamination, and that would be one.

BY MS. TOLEDO:

Q.   Did you see any reference to permeability?

A.   No.

Q.   Did you see any reference to a requirement that the secondary containment area should have a liner?

MS. SMITH:  Same objection.  Requires legal interpretation and conclusion.

Go ahead.

THE WITNESS:  It's not in this document, but it's in the regulations.

BY MS. TOLEDO:

Q.   Is there any mention in that document about the bypass being inadequate?

MS. SMITH:  Same objection.

THE WITNESS:  It's not there, but I was asked to analyze it.  It's on the list.

Case 3:21-cv-00933-VDO   Document 754   Filed 10/04/25   Page 55 of 62

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 167

BY MS. TOLEDO:

Q.   I understand.   Yeah.   We need to get the sticker on this one.

Are you offering any opinions in this case about violations of RCRA?

A.   No.

MS. SMITH:   I'm going to object, I'm sorry, to that last question for the same reason, to the extent it calls for a legal analysis or conclusion.

BY MS. TOLEDO:

Q.   In your report, going back to your report, on Page 20 -- are you there?

A.   Yes.

Q.   I'm looking at the section that begins, "F, Regulatory Groundwater Protection Requirements."

Do you see that?

A.   Yes.

Q.   And you opine there that the stormwater manual requires specific management of stormwater infiltration from land uses or activities with higher potential pollutant loads.

I believe that's pronounced LUHPPLs; is that correct?

A.   As far as I know.

Q.   But you expressed the opinion about LUHPPLs

Richard R. Horner , Ph.D.                              August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 168

there, right?

A.   Yes.

Q.   And is it your opinion that the terminal qualifies as a LUHPPL?

A.   Yes.

Q.   And what is the basis for this opinion?

A.   It's subject to the stormwater permit.  That, itself, as the following sentence says, is reason enough for qualification.

Q.   If we go to the stormwater manual, which is what you're relying on here, correct?

A.   Yes.

Q.   And the LUHPPL section of the 2024 stormwater manual is new.  Isn't that true?

MS. SMITH:  Objection to form, I guess, is the best one.

Go ahead.

THE WITNESS:  I didn't compare it to the 2004 manual, so I don't know that for a fact.

BY MS. TOLEDO:

Q.   Well -- okay.  Well, let's go to -- back to the stormwater manual.  And if you go -- it says that the 2023 -- the second paragraph highlights -- starts highlighting --

A.   Which page?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 169

Q.  Oh, I'm so sorry, Page 3.  I thought I had said.

A.  Okay.

Q.  And it's -- it expressly says that Chapter 10 is a new chapter, the third bullet down.

Do you see that?

A.  Yes.

Q.  And do you agree that Chapter 10 is the chapter that describes the LUHPPL requirements?

A.  Yes, Table 10-4.

Q.  Okay.  So starting on Page 191, it talks -- it defines the LUHPPLs, right, what constitutes a LUHPPL, and then has them listed on Table 10-4, as you said?

A.  Yes.

Q.  Now -- and Chapter 10 for LUHPPLs says, when it describes going back to the description, at the beginning of Chapter 10, it says that this chapter -- in the box, it says, "This chapter is a new addition to the Connecticut Stormwater Quality Manual."

Do you see that?  Page 176.

A.  All right.  I'm at 176.

Q.  And I'm just saying, the box on the right-hand side expressly states that this is a new addition, this chapter?

A.  I see that.

Page 171

terminal is not in an aquifer protection area, correct?

A.  Yeah, this specific appendix by its title does not apply.  However, the stormwater manual does not refer to only areas of protected or supply.

Q.  Right.  But the stormwater manual postdates the filing of this lawsuit and does not apply to established facilities, right?

MS. SMITH:  Objection to the form.

THE WITNESS:  It postdates the filing of the lawsuit.  I don't agree that it has no bearing on the operation of the facility.

BY MS. TOLEDO:

Q.  Okay.  Well, let's go ahead and mark this next exhibit, which I believe is 15.

THE REPORTER:  I have 16.

(Exhibit 16 marked for identification.)

BY MS. TOLEDO:

Q.  And I'll represent to you this is Table 4.2 from the stormwater manual that we mentioned before but I had not copied in the excerpts that I provided earlier.

Do you remember seeing this table when you reviewed the stormwater manual before?

A.  I don't remember this table, no.

Q.  I can't recall if it's in your original report

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 193

of the following soil types?   If you have a soil that is 100 percent sand, a soil that is 70 percent sand and 30 percent silt, soil that is 50 percent sand and 50 percent silt, or a soil that is 30 percent sand and 70 percent silt, which -- how do they rank?

A.   Well, the way you --

MS. SMITH:   Objection to form.

Go ahead.

THE WITNESS:   Well, the way you've laid it out is permeability is decreasing down your list.

BY MS. TOLEDO:

Q.   So 100 percent sand is the most permeable out of those combinations, correct?

A.   Correct.

Q.   Are you -- so you reviewed the 67 soil borings from 2003, right?   That are from the Sovereign report, right?

A.   Right.

Q.   Were you aware that there were additional boring logs available from 2020 and 2024?

A.   No.   I didn't get that information.

Q.   So you didn't have an opportunity to review those reports, correct?

A.   I did not.

Q.   Did you see a discussion about those

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 194

additional soil borings in Dr. Zeeb's report?

A.   I don't recall seeing that.  I don't recall
it.

Q.   And are you aware that those Sovereign reports
are publicly available through CT DEEP's online portal?

A.   I'm not aware of that.

Q.   Did you look?

A.   No.  I had no idea that they existed.

Q.   Did you do any independent research to
determine what information was available about the soil
at the terminal?

A.   Well, I accessed the soil survey for New Haven
County, and I looked at the soil in the vicinity of the
terminal.

Q.   Are you aware that soil at the terminal also
contains fill that was brought in?

MS. SMITH:  Objection to form.

THE WITNESS:  I'm not -- I'm not aware
of it, no.

BY MS. TOLEDO:

Q.   Would you agree that your analysis would be
more accurate if you had all of the available data?

MS. SMITH:  Objection to form.

THE WITNESS:  I would certainly liked to
have had all the available data.

Richard R. Horner , Ph.D.                              August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 202

this is one document that should have been provided to them.  That's how I cited it.

BY MS. TOLEDO:

Q.  Are you proffering an opinion that the defendants have engaged in fraud or deceit relating to anything relevant to this lawsuit?

A.  No, I would not frame anything as fraud or deceit.

Q.  Are you stating any opinions that changes are needed at the terminal to address climate change?

A.  Climate change is -- considerations of climate change are instrumental in managing water.  I -- you know, that's my general point.  That's the only point that I've made, really.

Q.  Are you proffering an opinion that defendants were negligent in anything relating to the terminal?

MS. SMITH:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I don't like to use adjectives like that.  I think that in that -- as of 2017, their document included a section, had a section on the inclusion of climate change considerations, that it should be more integral to their management strategy and procedures today.

BY MS. TOLEDO:

Veritext Legal Solutions
800.808.4958                                            770.343.9696

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 203

Q.   Is it your opinion that defendants give no consideration to weather events or severe weather or climate change considerations in connection with their operation of the terminal?

MS. SMITH:   Objection to form.

THE WITNESS:   You ask if I think they give no consideration.   No, I would not make that charge that they give no consideration.   I think that they should give more consideration.

BY MS. TOLEDO:

Q.   Well, you've said that you haven't reviewed any of the documents that show what considerations they have given, right?

MS. SMITH:   Objection to form.

THE WITNESS:   Well, in that there's more larger and more intense storms are predicted, and that affects the operation of the stormwater pond and of the collection within the secondary containments.   And I haven't seen evidence that that's been taken into account.

BY MS. TOLEDO:

Q.   Well, but you have admitted that you have not looked at any of the procedures or protocols that are in place regarding consideration of management procedures?