# Exhibit C

Filed Under Seal

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NO. 3:21-cv-00933-JAM

_____

CONSERVATION LAW FOUNDATION, INC.,
                    Plaintiff,
vs.
SHELL OIL COMPANY, EQUILON
ENTERPRISES LLC D/B/A SHELL OIL
PRODUCTS US, SHELL PETROLEUM INC.,
TRITON TERMINALING LLC, and MOTIVA
ENTERPRISES, LLC,
                    Defendants.

_____

          VIDEOTAPED DEPOSITION OF
       CONSERVATION LAW FOUNDATION, INC.
              BY EDWIN LEVINE
called as a witness by and on behalf of
the Defendants, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Danielle Grant,
Notary Public, within and for the State of New
York on Thursday, September 11, 2025 commencing
at 9:47 a.m.

Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 2

A P P E A R A N C E S:

FOR THE PLAINTIFF:

TARRANT GILLIES SHEMS LLP

    44 East State Street

    Montpelier, Vermont 05602

BY:   DAVID K. MEARS, ESQ.

    david@tarrantgillies.com


FOR THE DEFENDANTS:

WIGGIN & DANA, LLP

    265 Church Street

    One Century Tower

    New Haven, Connecticut

By:   JAMES O. CRAVEN, ESQ.

    jcraven@wiggin.com


ALSO PRESENT:

DANIEL ACOSTA, Video Operator

Edwin Levine                                 September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 15

Q    Does that cover everything that you have done on this case from July 22, 2025 until today?

A    It covers everything I can recollect, yes.

Q    Other than speaking to counsel for CLF, have you spoken to anyone else about your opinions in this case?

A    No.

Q    Are you aware that other witnesses have provided testimony in this case?

A    Yes.

Q    And did you review any of the testimony of any of the other witnesses?

A    No.

Q    Why not?

A    It was never presented to me.

Q    Did you ask to see it?

A    No.

Q    So you knew the testimony of other witnesses had been taken, but you never asked to see that testimony?

A    Correct.

Q    Were you aware that the

Edwin Levine                          September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 51

would you be able to tell me what their expertise is and what their background and training is?

A    I don't know their background and training.  I know what they were covering in their reports.

Q    Do you know Dr. French-McCay?

A    Yes.

Q    Have you worked with Dr. French-McCay?

A    Yes.

Q    Have you worked with Dr. French-McCay prior to this litigation?

A    Yes.

Q    On what types of things have you worked Dr. French-McCay on?

A    Oil spills.

Q    Have you, in fact, engaged Dr. French-McCay to assist you on various matters?

A    I have not; NOAA has.

Q    And have you recommended to NOAA that they engage her on certain matters, too?

A    No.

Page 52

Q    Do you believe that Dr. French-McCay is well-qualified?

A    Yes.

Q    Do you rely upon her expertise or have you relied upon her expertise in other matters?

A    Yes.

Q    Okay.  Do you believe that the methodology that she employs in doing what she does is generally reliable?

A    Yes.

Q    Do you know Dr. Etkin?

A    Yes.

Q    Have you worked with Dr. Etkin before today?

A    Yes.

Q    Is Dr. Etkin someone that you respect?

A    Yes.

Q    Do you believe that the methodology that Dr. Etkin employed in her reports in this case is a reliable methodology?

A    Yes.

Q    Would you say that

Edwin Levine                     September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 53

Dr. French-McCay and Dr. Etkin are experts in their field?

A    Yes.

Q    Would it be fair to say that they're actually some of the top experts in the world in what they do?

MR. MEARS:  Objection.  Form.

A    Probably.

Q    Would you say that the United States has some of the top experts in oil and gas and spill?

A    There's people all around the world that -- I -- yes, but not -- we don't have a -- kind of what's the word I want?  It -- there are other people around the world as well, you know, we don't have a --

Q    Yeah, there are other top experts around the world in this field too, true?

A    Yes, thank you.

Q    But you would agree, at least within the United States, Dr. French-McCay and Dr. Etkin are some of the top experts in their field?

Page 54

A     Yes.

Q     They're experts that NOAA retains when they need expertise in the fields that they're in?

MR. MEARS:   Objection.   Form.

A     I don't know if NOAA has ever hired Dr. Etkin Schmidt.   I know they have hired Dr. French-McCay.

Q     In your experience with both Dr. French-McCay and Dr. Etkin, have you relied upon their expertise in the areas that they're experts in?

A     Yes.

Q     My understanding in your -- as your role doing what you did before you retired was often to work with multidisciplinary teams of experts when you responded to oil spill incidents?

MR. MEARS:   Objection. Mr. Levine hasn't testified to that.

Q     You can answer.

A     Yes.

Q     Okay.   If you look at the CFR definition of the position that you held,

Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 63

performed or that you were part of in New Haven Harbor?

A       Some of them.

Q       Have you relied upon any of the simulations that you were a part of in forming your opinions in this case?

A       Yes.

Q       Which ones specifically are you relying upon?

A       Can I refer to the report?

Q       Sure.

And just so the record is clear, you're referring to Exhibit 3?

A       Yes.  The one here was the Magellan facility for a spill drill in April 2008.

Q       So Exhibit 3, which is your report, has reference to a simulation drill that you were involved in related to the Magellan facility in the New Haven Harbor?

A       Yes.

Q       Does your report rely upon any other simulation drills?

A       Not this report, no.

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 76

Am I pointing to it?

Q    Yes.

And, Mr. Levine, you have a picture in your report of where the Equilon facility is located because you did some modeling based upon its location, true?

A    True.

Q    And would you agree that, when you're performing modeling or assessments of a facility, knowing where the facility is located is important?

A    Yes.

Q    And would you agree with me that the Equilon bulk storage terminal facility is not located on the water?

MR. MEARS:   Objection.   Form.

A    They have a dock that goes out on the water.

Q    Okay.   Would you agree with me that the bulk storage tanks at the Equilon facility are not located on the water?

A    Yes.

Q    And do you know the distance from the bulk storage terminal tanks to

Page 79

Q     Would you agree with me that the -- given the fact that the storage tanks at the Equilon facility are farther from the water than the oil tanks at a number of the other facilities in the harbor is an important factor to consider?

MR. MEARS:  Objection.  Form.

A     It's a factor.  But, again, depending on the type of release, there is a potential for oil to get from the facility into the water.

Q     Mr. Levine, did you do any modeling of potential pathways for releases in this case other than the model that you have in the appendix?

A     No.

Q     Did you look at the modeling that was performed by Dr. Etkin and Dr. French-McCay in this case.

A     I don't believe Dr. Etkin did any modeling.

Q     Did you review the modeling that Dr. French-McCay did in this case?

A     Yes.

Q     And the modeling that

Page 82

A      I do.

Q      And do you see that that -- at least for the first page, the layers that are activated or clicked are sea level rise layers, and then the mean high or high water.

Do you see that?

And then the ten-year flood event plus 20 inches SLR.

Do you see that?

A      Yes.

Q      And I think you mention in your report that Connecticut has adopted an "up to 20-inch by 2050" sea level rise projection.

A      Yes.

Q      And so are you aware that CIRCA was involved in coming up with that formulation?

MR. MEARS:  Objection.  Form.

A      Without checking the report, I don't know -- remember if this was part of the Connecticut zone.

Q      If you look at Exhibit 6 --

(Whereupon, the court reporter

Page 83

requested clarification.)

THE WITNESS:  The exhibit --
I'm not -- without checking my
report, I don't know if this was
the one that the reference was in
my report.

Q    Sir, if you look at Exhibit 6,
which was the --

A    Yeah.

Q    -- the text printout?

A    Yeah.

Q    And you see that very first
paragraph?

A    Yep.

Q    The second sentence?

A    Yes.

Q    It says:  CIRCA research
recommends that planning anticipates sea
level be 20 inches higher than the
national tidal datum in Long Island
Sound --

A    Yeah.

Q    -- by 2050.

Do you see that?

A    Yes.

Edwin Levine                          September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 84

Q     And then the very next sentence says:  CIRCA's report on sea level rise provided the basis for projections in Bill S.B. 7, which was introduced in the 2018 legislative session and was enacted into law.

Do you see that?

A     I see that.

Q     Okay.  So when we go back to Exhibit 7 and you see the references to, in the potential layers --

A     Yes.

Q     -- in this document to "20 inches SLR" --

A     Yes.

Q     -- that may correspond to the projections that CIRCA is doing for sea level rise as to 2050.

MR. MEARS:  Objection.  Form.

Q     True?

A     If you say so.

Q     Okay.  Looking at page 1 of Exhibit 7, do you see that, by using the ten-year flood event plus 20 inches SLR, it shows some effects on various coastal

Page 90

A    No.

Q    Would you agree that based on the modeling that you have seen on Exhibit 7 that the projections from a hundred-year flood event, a hundred-year flood event plus 20 inches SLR, a 500-year flood event, and a 500-year flood event plus 20 inches SLR would not impact the area where the bulk storage terminal facilities are located at the Equilon facility?

MR. MEARS:  Objection.  Form.

A    According to the inputs used in the model, it shows no impact to the Equilon facility.

Q    Okay.

MR. CRAVEN:  Is that 8?

COURT REPORTER:  Eight.

MR. CRAVEN:  Thanks.

(Whereupon, an Aerial photo was marked as Levine Exhibit No. 8 for identification, as of this date.)

MR. CRAVEN:  Mr. Levine, I'm showing you what's been marked as

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 94

Q    And do you know what "SPCC" stands for?

A    Yes.  But I can't tell you.

Q    Sir, if you turn to the very first page of this document, and the very first paragraph.

A    Spill prevention control and countermeasures.

Q    Okay.  In connection with your evaluation and opinions in this case, did you review the Equilon terminal SPCC?

A    Yes.

Q    You did review it?

A    Yes.

Q    Did you review the Equilon facility's FRP in connection with your review in this case?

A    Yes.

Q    Sir, I don't believe either of those documents are referenced in your report.

A    I reviewed them.  I didn't comment on them.

Q    Okay.  Did you review the Equilon facility's BCP?

Edwin Levine                                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 95

A     BCP.   I don't -- I don't --
what is BCP?

Q     Do you know what "BCP" is?

A     I just -- no.

Q     Okay.   Are you familiar with a
"business continuity plan"?

A     I know the term, yes.

Q     Okay.   Did you due review the
Equilon facility's business continuity
plan?

A     No, I don't believe so.

Q     Okay.   You're not going to
offer any opinions in this case about the
facility's business continuity plan?

A     No.

Q     Okay.   Did you review
Equilon's HAP?

A     What is an HHP [sic]?

Q     A hurricane action plan.

A     No.

Q     You're not going to offer any
opinions as to the Equilon facility's
hurricane action plan?

A     No.

Q     Can you turn to page 4 of 14.

Page 96

A      Got it.

Q      And you see that about midway down there is a box that says:  112.3, in parentheses D?

A      Yes.

Q      And do you see that there is five bullets there?

A      Yes.

Q      And you see the third bullet, what does that say?

A      Plan is prepared in accordance with good engineering practice including consideration of applicable industry standards and requirements of 40 CFR Part 112.

Q      And is there boxes next to that bullet?

A      Yes.

Q      And is there an indication as to what the inspectors found as part of their investigation?

A      Yes.

Q      And the box is hit yes, true?

A      Yes.

Q      And that would indicate to you

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 97

that the inspectors performing the inspection, at least on the date that they did the inspection here, found that the plan was prepared in accordance with good engineering practice including consideration of applicable industry standards?

MR. MEARS:  Objection.  Form.

A     Yes.

Q     Can you turn to page 6 of this report, sir?

A     Yes.

Q     And you see that there is a row that starts with the words:  Plan follows?

A     Yes.

Q     Can you read that.

A     Plan follows sequence of the rule or as equivalent plan meeting all applicable rule requirements and includes a cross-reference of provisions.

Q     And did the inspectors, at least as of the date of the inspection referenced in this document, find that the plan followed all of the rules?

Edwin Levine                          September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 98

A    Yes.

MR. MEARS:  Objection.  Form.

Q    And there is a box that's checked yes, true?

A    Yes.

Q    Okay.  Can you turn to page 8.

A    Yes.

Q    And the top box is 112.7 C?

A    Yes.

Q    The second row in the middle that starts with the order "identify," do you see that?

A    No.

Q    Do you see a sentence that starts:  Identify which of the following are president -- present at the facility?

A    No, I don't see that.

Q    The second box down?

A    Oh, second box down, yeah, yes.

Q    Do you see the area that says: Identify which of the following are present at the facility?

A    Yes.

Q    If appropriate containment

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 99

and/or diversionary or structures or equipment are provided as described above.

Do you see that?

A     Yes.

Q     And is there -- below that, does it reference bulk storage containers?

A     Yes.

Q     And is the box yes hit?

A     Yes.

Q     And does that indicate that the inspectors felt that at the date of their inspection that there was appropriate containment and/or diversionary structures?

MR. MEARS:  Objection.  Form.

A     Yes.

Q     Can you turn to page 9 of 14.

A     Yes.

Q     And the top row, it starts with 112.7, parentheses E?

A     Yes.

Q     And it says:  Inspections and tests conducted in accordance with written procedures.

Do you see that?

Page 100

A     Yes.

Q     And is the box hit yes for that?

A     Yes.

Q     And does that indicate to you that the inspectors found that the inspections and test were conducted at the facility in accordance with written procedures?

A     Yes.

MR. MEARS:  Objection.  Form.

Q     The next sentence says: Record of inspections or tests signed by supervisor and inspector.

You see that?

A     Yes.

Q     And is that box hit yes, too?

MR. MEARS:  Object.

A     Yes.

MR. MEARS:  Sorry.  Withdrawn.

Q     And do you see that the box below that has a heading:  Personnel, comma, Training, comma, and Oil Discharge Prevention Procedures?

A     Yes.

Page 101

Q    And do you see that the first sentence says:  Training of oil handling personnel and operation and maintenance of equipment to prevent discharges, semicolon, discharge procedures, protocols, applicable pollution control laws, rules, and regulations, general facility operations, and contents of SPCC plan.

Do you see that?

A    Yes.

Q    And is the box hit yes for that, too?

A    Yes.

Q    Okay.  Turn to page 111 of this document.

A    Yes.

Q    And you see down at the -- near the bottom, there is a section pertaining to 112, dot, A, parentheses, C, reference bulk storage containers?

Do you see that near the bottom of the page?

A    Yes.

Q    And, below that, you see there

Page 102

is a row that -- there's a parentheses, one?

A    Yes.

Q    And do you see that it says: Containers, materials, and construction are compatible with material stored and conditions of storage such as pressure and temperature?

You see that?

A    Yes.

Q    Does this indicate to you that the inspectors inspected the -- or at least a inspector inspected bulk storage containers at the Equilon facility?

A    Yes.

Q    Okay.  And based on your understanding and your experience responding to facilities after incidents, it would be typical for you to look for a document, like inspections, to determine whether or not facilities had past inspections?

MR. MEARS:  Objection.

A    No.

MR. MEARS:  Form.

Page 105

A    I don't know.

Q    Do you know what a SWPPP is?

A    No.

Q    Have you had experience ever preparing a SWPPP?

A    I don't know what a SWPPP is, so I don't know if I prepared one or not.

Q    Okay.  Well, if you prepared one, you probably know what it is, right?

A    I would hope so.

Q    Yeah.

Do you intend to offer any opinions in this case as to what various permit requirements are in Connecticut or the -- under the Clean Water Act?

A    No.

Q    Were you aware that Motiva no longer had a ownership interest in the facility after May of 2017?

A    No.

Q    Do you have any understanding as to what Triton Terminaling's role is with regard to the facility?

A    No.

Q    Have you worked, to your

Page 120

Q    Okay.  Do you have any expertise in bulk storage tank engineering?

A    No.

Q    There is expert reports by Bayles & Pace that at some point are referenced in your materials as having been considered or reviewed or provided to you in some sense.

You're not rebutting any of their opinions in this case?

A    No.  Just the -- what -- the Marathon Oil is one item that I reference as a bulk storage tank with a complete failure that had been inspected and -- so, just...

Q    Well, to be clear, that tank was something that got transported from somewhere else?

A    Yeah.

MR. MEARS:  Objection.  Form.

A    Yes.

Q    Yes?

A    Yes.

Q    And after it got transported

Page 122

failed during the first time it was being filled?

A    Yes, it does.

Q    That failure didn't occur to a tank that had been in use for years and inspected for years and was -- failed as a result of some sort of weather event, true?

MR. MEARS:  Objection.  Form.

A    True.

Q    Did you take any pictures or do any research on what the effects of any storms have been on the terminal at issue in this case?

A    I have no photographs of the terminal, and I have not looked at the effects of any weather specific on that terminal.

Q    As you sit here today, you don't know whether there has been any flooding at the Equilon terminal as a result of any storms, true?

A    True.

Q    And you're not going to offer any opinions that pertain to the

Page 123

structural aspects of the Equilon

facility, true?

        A    True.

        Q    So to the extent there have

been experts that have talked about the

engineering and structural integrity of

the storage tanks currently at the Equilon

facility, you don't intend to rebut any of

their opinions on those issues?

        A    I guess my only comment on

that would be I don't know if they've

taken into account all the potential

impacts to the tanks.

        Q    Okay.  You don't know if they

have or they haven't?

        A    Yes.

        Q    And so, therefore, because you

don't know that, you're not going to offer

any opinions about that?

        A    Correct.

        Q    I want to make sure it's clear

that you're not going to offer any

opinions in this case one way or another

what the permit that at least is partially

at issue in this case requires or doesn't

Edwin Levine                        September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 124

require?

A    Correct.

Q    So to the extent that your report has language about certain things that you believe Defendants should consider or shouldn't consider, to the extent the permit requires that or doesn't require that, you're not going to offer an opinion about that?

MR. MEARS:  Objection.  Form.

A    Correct.

Q    Okay.  Are you familiar with what RCRA is?

A    Yes.

Q    I didn't see any opinions in your report related to anything related to RCRA; is that true?

A    Yes.

MR. MEARS:  Objection.  Form.

Q    You're not offering any opinions in this case related to RCRA?

A    Correct.

Q    Have you reviewed the Connecticut Stormwater Quality Manuals?

A    No.

Page 163

a little while ago, "simulation," what I should have said was "spill drill"?

A    Yes.

Q    Okay.  Would you agree that for the USCG spill drill in 2008, they re-used the Magellan oil storage facility?

A    Yes.

Q    And would you agree that, for that spill drill, they used a scenario of 50,000 gallons of fuel oil?

A    Yes.

Q    And were -- would you agree that the Magellan tank farm is closer to the water than the bulk storage tanks at the Equilon facility?

A    Yes.

MR. MEARS:  Objection.  Form.

Q    And would you agree, for this spill drill, they used a model that had fuel oil Number 4?

A    Yes.

Q    And would you agree that the types of fuel stored in the tanks can impact the effects of a spill from that tank?

Edwin Levine                      September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 164

A     Yes.

Q     And do you have a recollection that the experts that were retained by Defendants in this case did calculations based on the types of fuel that were stored in the Defendants' tanks?

A     Yes.

Q     And you're not critical of the experts for doing that in their analysis?

MR. MEARS:   Objection.   Form.

A     Correct.

Q     I think you say in your report, Exhibit 3, that oil spills are unique?

A     Yes.

Q     Do you agree with that?

A     Yes.

Q     Do you agree that you have never been to the same spill twice?

A     Yes.

Q     Do you agree that no model is perfect?

MR. MEARS:   Objection.   Form.

A     Yes.

Q     Would you agree that there are

Edwin Levine                    September 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 167

Q    One of the changes, when you revised your report marked as Exhibit 3 in September, was to change the reference on page 3 at the bottom of page where it says "see Section 1 in Appendix 2," you changed that to "see Section 1 in Appendix 1"?

A    Yes.

Q    Can you turn to page 4 of your report?

A    Yes.

Q    And this bottom paragraph is on both the original Exhibit 3 and the revised Exhibit 4, true?

A    True.

Q    And you say that:  While the expert report prepared by Dr. Schmidt Etkin states, quote, Oil facility spills are unlikely events for any particular facility or storage tank, end of quote.  I would point out that the percent probability of a spill is not zero.

Did I read that correctly?

A    Yes.

Q    Do you agree that oil facility spills are highly unlikely events for any

Page 168

particular facility or storage tank?

MR. MEARS:  Objection.  Form.

A    Yes.

Q    But your opinion is is that the percent probability is not zero?

A    It's not my opinion.  That's the fact.  You know, the spills are low probability high impact events.

Q    On page 5 at the bottom of the page, you have a paragraph starting: Looking at trends.

A    Yes.

Q    And you have a sentence that starts with:  The relative rise in sea level trend.

Do you see that on the middle of the paragraph?

A    I do.

Q    Can you read that?

A    The relative rise in sea level trend is 3.44 millimeters per year with a 95 percent confidence interval of plus or minus 0.38 millimeters per year based on monthly mean sea level data from '64 -- 1964 to '24 -- 2024 which is equivalent to

Page 174

reading in your report of one of the
circumstances from a spill where elevated
water kept the oil in a ruptured tank
until the water receded.

          Do you remember that?

          MR. MEARS:  Objection.  Form.

     A    No.

     Q    Do you agree that spills that
occur at storage tanks at coastal
terminals will usually be contained within
required secondary containment?

          MR. MEARS:  Objection.  Form.

     A    Yes.

     Q    If you can turn to page 5 --

     A    I can.

     Q    -- and there is a paragraph
four paragraphs down on that page that
starts with the words "Hurricane Katrina."

     A    Yes.

     Q    And three quarters of the way
through that paragraph there is a
reference that starts with:  Though the
pressure from the flood waters kept the
oil inside the tank until the waters had
receded to about four feet.