# Exhibit A

Filed Under Seal

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Shell New Haven Terminal

Case No. 3:21-CV-00933-VDO

## EXPERT REPORT OF PROFESSOR JOSHUA C. MACEY

May 8, 2025

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................................................... 2

II.   SUMMARY OF QUALIFICATIONS ........................................................................... 2

III.   BACKGROUND ON CORPORATE STRUCTURE ..................................................... 4

IV.   OPINIONS .................................................................................................................... 8

   A. Opinion 1: Defendants All Exerted Operational Control Over the Terminal ........................ 9

   B. Opinion 2: Throughout Motiva and Equilon's Involvement in the New Haven Terminal, Defendants All Exerted Operational Control Over the Terminal in Furtherance of Shell Environment and Climate Policy ......................................................................................... 15

   C. Opinion 3: Shell Has a Healthy Balance Sheet and Is Capable of Paying a Large Fine ...... 22

V. CONCLUSION .............................................................................................................. 24

VI. EXHIBIT A: Joshua Macey Curriculum Vitae .................................................................. i

VII. EXHIBIT B: Materials Considered .............................................................................. viii

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## I.    INTRODUCTION

1.    Counsel for Conservation Law Foundation retained me in this lawsuit against Motiva Enterprises LLC, Triton Terminaling LLC, and Equilon Enterprises LLC (collectively, "Defendants").  I was asked to provide opinions about the corporate structure and interrelationship of Defendants, specifically with regard to the operation of their New Haven bulk petroleum storage terminal, located in New Haven, Connecticut.  In sum, it is my opinion, based upon a review of the evidence set forth in my reliance list, that the Defendants collectively owned, operated, participated in, controlled, and managed the New Haven Terminal.

2.    My hourly rate for work on this matter is $825.00 per hour.  In addition to this hourly rate, I will charge for reasonable out-of-pocket expenses, including travel and lodging, if needed.  My fees and expenses are not contingent on the outcome of the case.  A copy of my *curricula vitae* is attached to this report as Exhibit A.

3.    I have not testified as an expert or witness in the past four years.  I reserve the right to supplement and amend my opinions based upon any new relevant information or literature that subsequently becomes available to me.

## II.    SUMMARY OF QUALIFICATIONS

4.    I am currently an Associate Professor at Yale Law School.  My teaching and research specialties include bankruptcy, corporate law, corporate governance, energy and environmental law, and the regulation of financial institutions.

5.    I received my Bachelor of Arts (BA) degree in English Literature from Yale College in 2012, and my Juris Doctor (JD) degree from the Yale Law School in 2017.  While at Yale, I was an editor of the *Yale Law Journal*.  I also received an M.Sc. in political theory from the London School of Economics.

2

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

6.      Before becoming a professor at the Yale Law School, I held the following professional positions: (a) Assistant Professor of Law, the University of Chicago Law School (2020–2024); (b) Visiting Assistant Professor, Cornell Law School (2019–2020); (c) Post-Doctoral Associate, Cornell Law School (2018–2019); (d) Law Clerk to J. Harvie Wilkinson III (2017–2018); (e) Analyst, Morgan Stanley (2013–2014).

7.      I teach or have taught the following courses: Bankruptcy Law, Climate Change and the Law, Corporate Scandals, Energy Law, and Environmental Law.

8.      I have received the following professional awards:

- Berkeley Center for Law and Business Best Paper Award for legal research in Environmental, Social, and Governance (junior category, 2024);

- Three-time winner of Morrison Prize for most influential environmental law article of the previous year (2021, 2022, 2023);

- Recognized by the American Bankruptcy Institute as one of the 40 emerging insolvency professionals under 40 (2023).

9.      My work on bankruptcy and corporate groups has been cited by multiple courts, including the U.S. Supreme Court. *See Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024).*

10.     I have written extensively in the areas of bankruptcy, corporate governance, corporate law, energy law, and environmental law.  A list of my writings is contained in my CV.

11.     I am a co-author of the casebook, Energy, Economics, and the Environment. My academic work has appeared in the country's top law journals, including the *Harvard Law Review*, the *Stanford Law Review*, and the *Yale Law Journal*.

3

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

## III.     BACKGROUND ON CORPORATE STRUCTURE

12.     Multinational corporate conglomerates are large-scale companies that own other companies across multiple countries.[1]   These various companies are usually organized under a parent company that owns subsidiaries that are linked for financial and strategic purposes.   These corporate conglomerates maintain subsidiaries for a variety of reasons—primarily to manage risk, expand into new markets, and optimize operations and finances.[2] By structuring businesses into separate legal entities, conglomerates can isolate liabilities, diversify revenue streams, and potentially gain tax advantages.

13.     Vertical integration is a business strategy where a company expands its operations into different stages of the same production process.[3] Vertical integration can be useful if it reduces markups a company pays to middlemen, allows the company to take advantage of scale economies, or allows firms to coordinate processes necessary to develop products.[4] Companies also vertically integrate to enforce consistent quality standards across production and distribution.

14.     Vertically integrated companies often create separate subsidiaries that are responsible for different parts of the business.[5] Typically, a parent company owns a controlling interest (more than 50%) in the subsidiary's stock, but the subsidiary is a legally separate entity.[6] The subsidiary can thus own assets, incur liabilities, and enter contracts on its own.[7]

---

[1] *See* Sumantra Ghoshal & D. Eleanor Westney, *Organization Theory and The Multinational Corporation* 2nd ed. (Palgrave Macmillan, 2005).

[2] *See* Henry G. Manne, *Our Two Corporation Systems: Law and Economics*, 53(2) VA. L. REV. 259 (March 1, 1967); Frank H. Easterbrook and Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. CHI. L. REV. 89 (1985).

[3] *See* Martin K. Perry, "Vertical Integration: Determinants and Effects" (Chapter 4) in *Handbook of Industrial Organization* 183, ed. Richard L. Schmalensee (1989).

[4] *See e.g.*, Raghuram Rajan & Luigi Zingales, *The Firm as a Dedicated Hierarchy: A Theory of the Origin and Growth of Firms* (Nat'l Bureau of Econ. Research, Working Paper No. 7546, 1998).

[5] *See* Easterbrook and Fischel, "Limited Liability and the Corporation."

[6] *See id*.

[7] *See id*.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

15.    One of the primary benefits of creating separate subsidiaries is that investors in the parent company are (usually) not liable for actions taken by the subsidiary.[8] This protection is known as limited liability, and it limits that investors' financial exposure to the amount of their investment. With certain exceptions described below, limited liability means that, if the subsidiary gets sued, goes bankrupt, or incurs large debts, only the subsidiary's assets are at risk. Even though the subsidiary is owned by the parent company, it is its own legal entity, so the parent's financial exposure is limited to the assets it invested in the subsidiary except in certain instances described below.

16.    Limited liability can be a useful strategy for containing risk. If one part of the business gets sued or goes bankrupt, liabilities are typically limited to that subsidiary.[9] This allows the parent to contain financial losses to the value of its investment, preventing risk from spreading to the entire corporate group.  This may reduce the firm's cost of debt, since it may be easier to bring in outside investors or partners that are willing to invest in a specific segment of the business but do not want to be exposed to risk from the entire enterprise.[10]

17.    Separate subsidiaries can also facilitate efficient management by creating clear lines of accountability and allowing the firm to appoint specialists to leadership positions.[11] In this way, managers and executives of different subsidiaries can develop strategy and oversee operations suited to each individual business segment.[12] Relatedly, it may be easier to separately track

---

[8] *See id.*

[9] *See* Jonathan M. Landers, *A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy*, 42 U. CHI. L. REV. 589 (1975).

[10] *See id.*; Kenneth Ayotte, *Subsidiary Legal Entities and Innovation*, REV. CORP. FIN. STUD. 39 (2017).

[11]  Yan Du, Marc Deloof, and Ann Jorissen, *The Roles of Subsidiary Boards in Multinational Enterprises*, J. INT'L MGMT. 169 (2015).

[12] *See id.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

performance, costs, and profitability of different parts of the supply chain by creating separately incorporated subsidiaries.[13]

18.    Typically, although each subsidiary operates as a separate legal entity with responsibility for certain financial or business activities, a parent company will exercise control of the subsidiary by installing the subsidiary's board of directors and sometimes top executives as well. In addition, as the majority shareholder of the subsidiary, the parent can vote to approve major decisions and impose company-wide policies related to the legal obligations or compliance protocols.

19.    In addition to creating separate legal subsidiaries, companies can also use joint ventures to pursue specific projects. A joint venture is a business arrangement where two or more parties come together to collaborate on a specific project or business activity even though those two parties remain separate legal entities.[14] The parties typically agree to share profits, losses, and control of the venture.[15]

20.    Joint ventures create many of the same benefits as separate subsidiaries but allow multiple different firms to jointly pursue a project. They are often created for specific purposes such as launching a product, entering a market, or building infrastructure.[16] Each party to the joint venture contributes capital, resources, or expertise. Ownership is usually split based on contributions or negotiated terms (e.g., 50/50 or 70/30).[17] They can be temporary or long-term, depending on the project, but the crucial feature is that they allow two or more companies to share ownership in a

---

[13] A firm may also create separate subsidiaries for marketing and branding purposes or to take advantage of favorable tax jurisdictions *See* Jan Lindemann, *The Financial Value of Brands*, in BRANDS AND MARKETING 26, ed. Rita Clifton & John Simmons (the Economist Series) (2004).  Firms may also create separate subsidiaries to take advantage of favorable tax jurisdictions. *See* Farok J. Contractor, *Tax Avoidance by Multinational Companies: Methods, Policies, and Ethics*, 1 RUTGERS BUS. REV. 27 (2016).

[14] *See* Bruce Kogut, *Joint Ventures: Theoretical and Empirical Perspectives*, 9 STRAT. MGMT. J. 319 (1988).

[15] *See id.*

[16] *See id.*

[17] *See id.*

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

project.[18] Some joint ventures form a new legal company.[19] Others operate as contractual agreements without creating a new entity.[20] When they create a new legal entity, joint ventures generally create limited liability, as risk is typically limited to the joint ventures' operations, not the parent companies' other assets.[21]

21.    Control over joint ventures is usually governed by a joint venture agreement, which defines decision-making rules, board structure, voting rights, and other governance provisions.[22] Each member of the joint venture will typically have a right to appoint a portion of the joint venture's board members.[23] Sometimes, parent companies insert key managers or technical experts into joint venture roles.[24] The parent may also reserve control or veto power over key decisions such as the budget or asset sales.[25] Nonetheless, the managers of a joint venture owe a duty of loyalty to the joint venture and not to the individual firms that invest in the venture.[26]

22.    Although limited liability is the default rule, there are two important exceptions that extend liability to parent companies and to companies that invest in joint ventures: first, if the parent directly operates an asset responsible for environmental harm, it can be found liable as a direct operator;[27] and, second, if the parent exerts excessive control, courts can pierce the corporate veil

---

[18] *See id.*

[19] *See* Sarath Sanga, *A Theory of Corporate Joint Ventures*, 106 CAL. L. REV. 1437, 1461 (2018) (explaining that creating a joint venture "limits the liability of both companies for the venture's actions").

[20] *See id.*

[21] *See id.*

[22] *See id.*

[23] *See id.*

[25] However, one important reason to form a joint venture is that corporate managers may be conflicted from certain decisions. Creating a joint venture may allow firms to appoint managers who are not conflicted. *See id.* at 1460 ("The innovation of the joint venture entity is that corporations counterintuitively use a separate entity to *avoid* conflicts by delegating decisions for which the beneficiaries (i.e., the corporate partners) are conflicted.").

[26] *See id.* at 1460 (describing a joint venture between Boeing and Lockheed Martin that "has a separate set of agents who work only for ULA and not for either Boeing or Lockheed. As a matter of law, these managers owe a duty of loyalty to ULA itself, *not* to either co-venturer.").

[27] *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) ("But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held diectly liable in its own right as an operator of the facility.").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

on the ground that there is no formal separateness between the parent and the subsidiary.[28] Importantly, although the parent may control how profits are distributed or reinvested, in order to maintain legal separateness and avoid liability, the parent must allow the subsidiary to run day-to-day operations independently.[29] If the parent controls operational decisions or "operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture,"[30] then courts may pierce the corporate veil on the ground that there is no legal separateness and the parent entirely controls the subsidiary. Alternatively, and especially in the context of environmental harms, if the parent or investor is itself controlling or directing environmental compliance, it can be held liable as a direct operator under state or federal environmental law.

## IV.    OPINIONS

23.    My methodology in this case is drawn from and consistent with years of conducting research on and writing about the structure and design of corporate groups, specifically with respect to liability for environmental remediation. My research has specifically focused on the field of corporate governance and operations and involves evaluating corporate structure, particularly in the design, implementation, and organizational hierarchies within companies, and the requirements and procedures for operating a business as a separate entity from its owner or sister subsidiaries.

---

[28] *See id*. at 61 ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 YALE L.J. 193 (1929)); *see id*. at 62 ("there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.").

[29] *See id.*

[30] *Id*. at 71.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

24.    In forming my opinions, I considered all the documents referenced in Exhibit B.  I also relied upon the knowledge and experience that I have gained from my education, training, professional experience, and scholarly work.

**A. Opinion 1: Defendants All Exerted Operational Control Over the Terminal**

25.    On paper, the New Haven Terminal's ownership history is complicated but not unusual. Shell plc, formerly known as Royal Dutch Shell, is a holding company and ultimate shareholder of over 1,100 companies across the globe.[31]  Motiva Enterprises LLC ("Motiva") was created as a joint venture in 1998 between Shell Oil Company, Texaco, Inc., and the Saudi Arabian Oil Company for the purpose of refining, distributing, and producing fuel.[32] .[33] More specifically, Texaco and Shell Oil Company each had partial ownership of Equilon Enterprises LLC D/B/A Shell Oil Products ("Equilon"), which is the entity that entered into a joint venture with the Saudi Arabian Oil Company to form Motiva.[34] As part of these operations, Motiva operated the New Haven Terminal between 2000 and 2017.

---

[31] SOPUS_NHVN02159944: Shell USA, Inc. (formerly Shell Oil Company) 2022 Consolidated Financial Statements; Rechtbank Den Haag (The Hague Dist. Ct.), 26 Mei 2021, C/09/571932 (Vereniging Milieudefensie, et al. / Royal Dutch Shell PLC), § 2.2.2 (Neth.) ("Since the 2005 restructuring of the Shell group, RDS has been the top holding company of the Shell group. . . RDS is the direct or indirect shareholder of over 1,100 separate companies established all over the world.")

[32] *See* SOPUS_NHVN02449351: Motiva LLC Amended and Restated Limited Liability Company Agreement, Among SOPC Holdings East LLC, Texaco Refining and Marketing (East), Inc., and Saudi Refining, Inc. (Feb. 13, 2002).

[33] *See id.*

[34] *See id.*

26.    Motiva was dissolved in 2017.[35] After Motiva was dissolved, Shell maintained control over Motiva's Northeast assets, including the New Haven Terminal.[36] Also in 2017, Triton Terminaling LLC ("Triton") became the owner of the New Haven Terminal.[37]

27.    Today, all the former Motiva/Shell Northeast terminals are owned by Triton, except the Long Island Terminal, which is owned by Equilon.[38] All the terminals are operated by Equilon.

28.    Although Motiva was the owner of the New Haven Terminal between 1998 and 2017 with responsibility for managing day-to-day operations, it shared operational authority with Equilon.  This is especially evident with regard to environmental compliance and climate adaptation at the Terminal, where Equilon directly managed and controlled emergency response programs, as well as environmental reporting and compliance.

29.    The extent of Equilon's operational control over the New Haven Terminal is perhaps most evident from the fact that Equilon was empowered to contract on behalf of the New Haven Terminal for services related to management and environmental compliance of Motiva assets, including the New Haven Terminal.[39]  Equilon received this authority from the Service Level Agreement between Motiva and Equilon dated January 1, 2011, which gave Equilon

---

[35] *See* SOPUS_NHVN02449103: Separation Agreement by and Among SOPC Holdings LLC, Saudi Refining, Inc., & Aramco Financial Services Relating to the distribution of Certain Assets of Motiva Enterprises LLC and Related Transactions (Feb. 17, 2017); SOPUS_NHVN00075899: Permit Assignment and Assumption Agreement, Among Motiva Enterprises LLC and Equilon Enterprises LLC (Feb. 17, 2017).

[36] *See* SOPUS_NHVN02365078: Letter re Application for Permit Transfer of Salt Caverns & Salt Water Disposal Well Operated by Motive Enterprises LLC (Mar. 27, 2017); SOPUS_NHVN00075899.

[37] *See* SOPUS_NHVN00001029: Permit Transfer Application (May 1, 2017); SOPUS_NHVN00075899; SOPUS_NHVN02449103; SOPUS_NHVN00075895: Property Transfer Application (June 2017); SOPUS_NHVN00120890 at -890: Email from Bothwell, Jennifer to Estes, Adam RE: Shell Trading & Supply (East Coast) Tier II Reporting (Nov. 17, 2017) ("Also, please note, all of the East terminals are <u>owned</u> by Triton Terminaling, except the Long Island Terminal which is owned by Equilon. The terminals are <u>operated</u> by Equilon Enterprises LLC DBA Shell Oil Products US."); 30(b)(6) Deposition of Shell Oil Co. (Brian Evans), February 12, 2025, 200:15–20 ("Equilon does not own Triton. Triton is the owner of the New Haven terminal, and Equilon is the operator doing business as SOPUS, Shell Products US.").

[38] *See* SOPUS_NHVN00120890.

[39] *See, e.g.* SOPUS_NHVN00236178 at -184:Contract Documents for Maintenance Dredging, Dewatering and Transportation, Motiva Terminal Facility New Haven, CT (Jan. 2012) to CLE Engineering, § 1(8): ("Shell Companies shall be permitted to issue purchase Orders under this Purchase Contract.")

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

responsibility for environmental advocacy, environmental compliance, and environmental management.[40] As a result of the Service Level Agreement, Equilon was responsible for crisis and emergency management services, hurricane preparation and supplies, and environmental advocacy services.[41] Equilon also agreed to document regulatory developments, oversee and provide support during EPA multi-media audits and inspections, assist in development of Motiva environmental standards, and prepare procedures and guidelines designed to move Motiva toward stronger environmental compliance, risk reduction, and continuous performance improvement.[42] In that capacity, Equilon directly coordinated with U.S. Government agencies about environmental compliance and emergency management at Motiva-owned facilities.  For example, Equilon, not Motiva, was responsible for coordinating and interfacing with the U.S. Coast Guard, the Environmental Protection Agency ("EPA"), and state environmental agencies about spill response at Motiva-owned facilities, including the New Haven Terminal. Indeed, consultants retained to provide support and assistance with environmental compliance represented to the Connecticut Department of Energy and Environmental Protection in 2020 that they worked for both Triton *and* Equilon.[43]

30.     Equilon's operational authority over Motiva-owned facilities encompassed highly specific compliance functions, including compliance with the Toxic Release Inventory and overseeing a Spill Management Team that coordinated response exercises as required by the Oil

---

[40] SOPUS_NHVN01091520: Motiva Service Level Agreement re Environmental and Emergency Management Services between Equilon/SOPUS and Motiva (Jan. 1, 2011).

[41] *See id.*

[42] *See id.*; *see also* SOPUS_NHVN01091509: Change Order #1 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement; SOPUS_NHVN02458905: Change Order #2 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement; SOPUS_NHVN01091503: Change Order #3 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement.

[43] SHELLNH_SOV_09114: Letter from W. Scott Burrus, Sovereign Consulting Co., to Craig Bobrowiecki, CT Dep't of Energy and Env. Prot. (Apr. 30, 2020) ("Sovereign Consulting Inc. (Sovereign), on behalf of Triton Terminaling LLC (Triton) and Shell Oil Products US (Shell), submits this Addendum to the Request for Schedule Extension in order to provide the information requested in your February 5, 2020 letter to Triton Terminaling, LLC.").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Pollution Act of 1990.[44] This goes beyond ordinary advisory functions and highlights the extent to which Equilon managed and controlled specific emergency response and environmental compliance practices at Motiva-owned facilities. Thus, across many operational and compliance functions, Equilon directly integrated with Motiva in preparing for, managing, and responding to environmental emergencies related to Motiva-owned facilities.

31.    Another example of the breadth of Equilon's operational control over Motiva's bulk storage petroleum facilities was its oversight of an EPA refitting consent decree, a legal commitment, dated August 21, 2001, between Motiva, Shell Deer Park Refining Company and Shell Oil Products US resolving certain environmental issues at several of its other facilities.[45] The settlement addressed Clean Air Act compliance problems with refineries owned by Motiva, Equilon, and the Deer Park Refining Limited Partnership.[46] Although the New Haven Terminal was not specifically listed as one of the refineries in this compliance order, the fact that Equilon was specifically named in the settlement indicates that Equilon directly operated Motiva facilities.

32.    Equilon also contracted directly with third parties for services related to environmental management and environmental compliance for facilities owned by Motiva.  These services included multiple contracts that procured services designed to reduce the environmental hazards associated with managing oil terminals. For example, in a purchase contract dated September 1, 2013, Equilon entered into the contract for Oil Spill and Hazardous Material Response, Pipeline Response, Safety Supplies, Tank Cleaning and Decontamination.[47] Similarly, Equilon, not

---

[44] SOPUS_NHVN01091509 at -514; SOPUS_NHVN01091520.
[45] SOPUS_NHVN01091520.
[46] *See id.*
[47] SOPUS_NHVN00217769: Purchase Contract for the Oil Spill and Hazardous Material Response, Pipeline Response, Safety Supplies, Tank Cleaning and Decontamination between Equilon Enterprises, LLC and OMI Environmental Solutions; SOPUS_NHVN01091509.

12

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Motiva, was the counterparty in a contract dated September 1, 2016 with Shell Pipeline Company LP in which Shell Pipeline Company agreed to provide emergency services for Motiva-owned facilities.[48] In the operating agreement, Equilon gave the Shell Pipeline Company complete authority to "operate the Facilities and provide the other services contemplated by this Agreement."[49]

33.    In that capacity, Shell Pipeline Company managed core operational responsibilities at Motiva-owned facilities. For example, Shell Pipeline Company was responsible for transporting and handling crude oil and refined products, procuring supplies needed to operate the facilities, inspecting Facilities to make sure they can be operated safely and efficiently, acting as Equilon's representative in communications with government agencies in matters relating to the physical operation of the facilities, preparing and maintaining manuals to make sure that the Facilities were compliant with applicable laws, and responding to and coordinating legal and regulatory claims, including environmental claims.[50] This agreement is notable both because it highlights the extent to which different Shell subsidiaries were responsible for the routine operations of Motiva-owned facilities and because it shows that Equilon was in a position to contract for services related to core operational services of Motiva-owned facilities .

34.    Equilon's integration into emergency management and environmental compliance was also reflected in the day-to-day operations of the Motiva terminals. One example of this is that Equilon maintained spreadsheets and oversaw reporting showing that Motiva-owned facilities complied with Shell Design and Engineering Manuals and Shell Design Engineering Practices,

---

[48] *See* SOPUS_NHVN00816878: Second Amendment to Operating Agreement SLPC-SOPUS, Among Equilon Enterprises LLC and Shell Pipeline Company LP (Feb. 1, 2020).
[49] *Id*. at -890 (§ 2(a) of First Amendment to Operating Agreement SPLC-SOPUS (Dec. 12, 2017)).
[50] *Id*. at -903 (Exhibit A of First Amendment to Operating Agreement SPLC-SOPUS (Dec. 12, 2017)).

which set minimum technical requirements for uniform performance and integrity for all Shell group assets.[51]

35.    In 2017, Motiva was dissolved, and ownership of the Terminal went to Triton.  Although Triton became the official owner of the New Haven Terminal, very little changed in terms of Equilon's involvement in the management of the New Haven Terminal. Equilon continued to share in the operational authority over the Terminal, contract directly with third parties for environmental services, manage environmental compliance and climate risk mitigation, and oversee environmental reporting.

36.  Continuity between Motiva, Triton, and Equilon after 2017 is evidenced by the fact that, throughout Motiva and Triton's operation of the New Haven Terminal, Equilon often had authority and responsibility for making decisions about how to operate and manage the facility. For example, Equilon entered into multiple contracts with third parties for services related to operating Motiva-owned facilities, including with the Shell Pipeline Company, and for services related to the transportation and maintenance of various Triton assets, including the New Haven Terminal.[52] Those agreements concerned highly specific functions about the care and maintenance of Motiva-owned facilities, including responsibility for transporting and handling crude oil; procuring materials and services; surveilling and assessing physical assets; communicating with government agencies about the physical operation, maintenance, and repair of facilities; providing equipment; preparing, maintaining, and implementing operating manuals and contingency plans; and even indemnifying contractors for liability incurred services provided to the Terminal.[53] It was also

---

[51] SOPUS_NHVN00026287: Selection of DEPs & DEM1 Checklist Tool (Rev. 4.1), Based on DEPs v35 & DEM1 Version 8 (Exhibit 1014 to Deposition of James Kent Yeates (Shell Pipeline Company US), December 22, 2022).
[52] SOPUS_NHVN01361121 at § 7(a): First Amendment to Operating Agreement SPLC-SOPUS (Dec. 12, 2017).
[53] SOPUS_NHVN00816878 at -895 (§ 7(a) of First Amendment to Operating Agreement SPLC-SOPUS) ("SOPUS hereby releases  and agrees to defend, indemnify, and hold harmless SPLC, its Affiliates, and their respective

14

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

Equilon, not Motiva or Triton, that entered into contracts for mechanical services,[54] construction services,[55] electrical work,[56] and tank cleaning and inspections.[57] In short, Equilon interfaced and coordinated with contractors about day-to-day activities, including environmental compliance, at the New Haven Terminal.

37.    In summary, the record evidence establishes that, although Motiva was the owner of the New Haven Terminal between 1998 and 2017, it shared operational authority during that period with Equilon.  These activities went far beyond basic support activities and constitute direct management of environmental compliance. Equilon continued to exert operational control over and managed day-to-day operations of the New Haven Terminal after 2017. Throughout this entire period, Equilon's management and control over the New Haven Terminal went beyond ordinary support and guidance and instead amounted to direct management of environmental compliance and safety protocols.

**B. Opinion 2: Throughout Motiva and Equilon's Involvement in the New Haven Terminal, Defendants All Exerted Operational Control Over the Terminal in Furtherance of Shell Environment and Climate Policy**

38.    Throughout Defendants' involvement in the New Haven Terminal, Defendants' collective operational control over the New Haven Terminal was done in conjunction with and in furtherance of their parent company's policies, procedures, and general business interest.

---

officers, directors, shareholders, employees, representatives, agents or trustees . . . from and against any and all losses, claims, expenses, damages, costs, (other than the costs for providing the Services), or liabilities . . . caused by, arising out of, or in any way incidental to or in connection with the performance of Services.")

[54] SOPUS_NHVN00405260: Purchase Contract for Purchases of Goods and Services Between Equilon Enterprises LLC and DFI Construction, Inc. (Nov. 29, 2021).

[55] SOPUS_NHVN00405260; SOPUS_NHVN00405406: Purchase Contract Between Equilon Enterprises LLC and JJ White Incorporated (Nov. 29, 2021).

[56] SOPUS_NHVN00891135: Purchase Contract Between Equilon Enterprises LLC and IPF Electric, LLC (Jan. 27, 2022).

[57] SOPUS_NHVN01186017: Purchase Contract Between Equilon Enterprises LLC and Mix Bros. Tank Services, Inc. (Apr. 3, 2019).

39.    Shell plc has created environmental and climate policies that apply to the entire firm, including its subsidiaries. A variety of Shell processes are designed to make sure that its subsidiaries, including Defendants, act in a manner that is consistent with the company's overall climate and environmental policies. To that end, Shell plc's predecessor, Royal Dutch Shell, said in a 2019 Sustainability Report that its Board had "oversight of climate change risk management."[58] Shell also has created a Corporate and Social Responsibility Committee (CRSC) that "review[s] and advise[s] the Board on Shell's strategy, policies and performance in the areas of safety, environment, ethics and reputation against the Shell General Business Principles, the Shell Code of Conduct, and the [Health, Safety, Security, Environment, and Social Policy] HSSE & SP Control Framework."[59]  This Corporate and Social Responsibility Committee reports directly to the RDS Executive Committee and the Board and ensures that the Executive Committee and the Board understand and consider "the energy transition and climate change, Shell's Net Carbon Footprint ambition, the Company's environmental and societal licence to operate, and its ethics programme."[60] This HSSE & SP Control Framework requires that joint ventures, including non-operated ventures, have environmental, risk assessment, and audit procedures at least on par with Shell's own.

40.    Many of Shell's climate and environmental compliance and adaptation processes are administered through the company's HSSE & SP commitment Control Framework. The HSSE & SP Control Framework "consists of a series of mandatory manuals that align with the Shell Commitment and Policy on HSSE & SP and the Shell Code of Conduct."[61]

---

[58] "Sustainability Report 2019," Royal Dutch Shell PLC, at 39, https://www.shell.com/sustainability/reporting-centre/reporting-centre-archive.html#tab-2019.

[59] Rechtbank Den Haag (The Hague Dist. Ct.), 26 Mei 2021, C/09/571932 (Vereniging Milieudefensie, et al. / Royal Dutch Shell PLC), at § 2.5.7 (Neth.).

[60] *See id.*

[61] "Powering Progress: Annual Report and Accounts," Royal Dutch Shell PLC (Dec. 31, 2020), at 90.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

41.     Two manuals outline how Shell entities should comply with HSSE requirements. These are the HSSE & SP Performance Management System and the HSSE & SP Control Framework.[62] The Management System and Control Framework are expected "to deliver sufficient and effective controls within the HSSE & SP risk areas."[63] The Framework applies globally and "requires every Royal Dutch Shell Company to manage HSSE in a systematic manner."[64] More specifically, every Shell entity "must have their own HSSE & SP MS that adheres to the HSSE & SP Control Framework HSSE & SP MS Requirements."[65] The Control Framework establishes accountability mechanisms such as periodic reviews to make sure that every Shell entity meets HSSE standards. These manuals outline how Shell entities and facilities should manage asset risks, design facilities, report and identify risks and hazards, and identify acceptable contractors.

42.     Equilon took a number of steps to make sure that the New Haven Terminal followed HSSE & SP processes.

43.     First, Shell oversaw the development and implementation of HSSE & SP manuals and processes for the New Haven Terminal in order to make sure that the Terminal complied with Shell environmental and climate policies.[66] These manuals and protocols imposed site-specific

---

[62] SOPUS_NHVN00018508 at -510: Trading & Supply Health, Safety, Security, Environment and Social Performance Management System (HSSE & SP MS) Manual (2013).

[63] *Id*. at -510.

[64] *Id*. at -513.

[65] *Id*. at -513.

[66] SOPUS_NHVN00018508 at -517 ("In T&S the HSSE & SP Control Framework as well as a number of T&S specific standards as referred to in this manual provide the mandatory requirements for managing HSSE & SP risks to ALARP. The Relevant HSSE GM within T&S, where appropriate, may create additional standards and requirements that manage HSSE risks specific to their operations."); SOPUS_NHVN00022030: Playbook: HSSE & SP Control Framework Integration Process for United States Distribution Operations East (USDOE); SHELLNH_SOV_04959 at -959: SOP US / Motiva SD&CM – New Haven, Connecticut Terminal Groundwater Monitoring Plan (May 20, 2010) ("Plan provides for early detection of potential new releases and preventing offsite migration of constituents consistent with Shell Oil Products US and Motiva Enterprises LLC HSE Standard 325 Revised 12/02 (standard 325)").

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

compliance requirements that make sure that that the New Haven Terminal followed Shell environmental and climate policies.[67]

44.    Second, when Equilon entered into contracts with third parties, it required that those third-party contractors comply with Shell HSSE & SP protocols, undergo Shell HSSE training, comply with Shell contractor safety protocols, manage assets at the Terminal in accordance with Shell protocols, and store and maintain records in accordance with Shell policy.[68] These protocols prescribe processes for evaluating and monitoring environmental impacts, and they specifically require that third-party contractors go through HSSE training and otherwise meet Shell safety and environmental standards.[69] When entering into contracts for work on the New Haven Terminal, Equilon made sure vendors and contractors were selected from a list of vendors maintained by Shell T&S.[70] In that way, Equilon made sure that each individual contractor adopted Shell environmental and climate policies.

---

[67] SOPUS_NHVN00022030 (providing names and titles of Shell employees responsible for making sure Shell HSSE protocols were followed); SOPUS_NHVN00021791: HSSE & SP CF Gap Assessment Master Copy (assessing gaps in HSSE compliance and describing remediation strategy); SOPUS_NHVN00018508 at -517 ("In T&S the HSSE & SP Control Framework as well as a number of T&S specific standards as referred to in this manual provide the mandatory requirements for managing HSSE & SP risks to ALARP. The relevant HSSE GM within T&S, where appropriate, may create additional standards and requirements that manage HSSE risks specific to their operations."); at -510 ("This document covers the activities of the T&S Leadership Team (EVP & VP's), Regional and Global T&S GM's as well as T&S staff who provide services, advice, and guidance to the T&S business' on the management of HSSE activities.").

[68] SOPUS_NHVN00010116: Contractor Safety Management System (Dec. 2014); SOPUS_NHVN00162554: HSSE Terminal Operations Manual (Jun. 2011) ("The handling of product is an HSSE-critical activity that needs to be properly planned, monitored, and controlled. The product handling operations are administered and controlled by the Terminal with close contact with the Supply function. Although the planning and arrangement of replenishments is usually undertaken by the Supply, the Terminal shall monitor stock levels of all grades to ensure there is sufficient stock to cover estimated off takes until the replenishment date."); SOPUS_NHVN00242567 at -582: Shell Oil Products US and Motiva Enterprises LLC, Records Management Program Manual (Mar. 31, 2003) ("All records are classified according to the approved Company classification system.").

[69] This is done through the Contractor Safety Management System, HSSE 8.0, which creates "minimum overall standards" when selecting contractors. Its Purpose is to "meet the requirements of the Shell Group Control Framework Contractor HSSE Management Manual."

[70] Shell subsidiaries are technically allowed to select a different vendor if they receive approval from the T&S procurement and engineering groups. However, this process further emphasizes the degree of control Shell exercised over the New Haven Terminal, since to contract with a vendor not listed in the centrally-maintained vendor list, entities had to specifically petition for an exception from T&S and receive approval from executives at Shell T&S. SOPUS_NHVN00013370: Application Form Exception to Group HSSE & SP Control Framework Requirement (Nov.

18

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

45.     Third, Shell, acting through Equilon, ensured that the New Haven Terminal followed Shell design standards for hydrocarbon storage facilities. Shell Global Solutions International maintains Design and Engineering Practice (DEPs) Manuals for Shell facilities. The DEPs are the design basis for any construction or maintenance that occurs at any asset. These manuals state that "the effects of climate change SHALL be included in metocean and hydrological design and operating criteria." Both before and after 2017, Equilon maintained spreadsheets documenting how Motiva, including the New Haven Terminal, complied with DEP design standards. Equilon also followed Shell's Distribution Global Asset Management Excellence (D-GAME), which is specifically intended to ensure that "the design and construction of New Assets and Modifications to existing Assets are in accordance with the Shell Design and Engineering Manuals."[71] Among other things, D-GAME ensures that each site follows Shell's HEMP (Hazards and Effects Management Process) and site Reliability and Integrity plan; uses Shell's "Asset Information Management (AIM) system, a central repository of information that establishes a storage and retrieval process for information related to Shell facilities;"[72] and stipulates governance processes such that there is a clear designation of a decisionmaker for assets and technical standards that pose safety or environmental risks.

46.     Fourth, when Motiva terminals actually experienced emergencies, they relied on Shell emergency management personnel and followed Shell HSSE & SP protocols to help manage and coordinate the response. For example, during Hurricane Sandy in 2012, Motiva Emergency Management notified the Shell communications and emergency management team of tank

---

7, 2017) (showing how James K. Yeates, US East Regional Engineering Manager requested exception from Design and Engineering Manual by asking Claudio Covini, GM of T&S Operations).

[71] SOPUS_NHVN00030239 at -249: Global Trading and Supply Operation Asset Management System Manual (Feb. 2017).

[72] *Id*. at 253-54.

19

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

damage. In an email sent October 30, 2012, Sabrina Carpenter, HSSE Director for Motiva Enterprises, emailed individuals with SHLOIL and SOPUS email codes, including Martin Padilla, to inform them about damage to storage tanks at the Sewaren Terminal.[73] Martin Padilla then informed Marvin Odum, Chairman and President of Shell Oil Company in 2012, about the damage to the Sewaren. Martin Padilla explained that he took the step of informing Marvin Odum about damage to the Sewaren Terminal to ensure compliance with the HSSE & SP Control Framework.[74] As this exchange makes clear, Shell and Motiva employees understood that Motiva was required to follow Shell's HSSE control framework requirements, and Motiva, Equilon, and other Shell employees worked as an integrated team to make sure that Shell HSSE requirements were actually followed during emergencies.

47.     Fifth, employees from other Shell entities have been given direct responsibility for making sure that the New Haven Terminal met Shell HSSE & SP standards,[75] and in the case of the New Haven Terminal specifically, Equilon and Triton have relied on personnel from a variety of different Shell entities to establish compliance with HSSE & SP standards.[76] For example, the Complex Manager for the New Haven Terminal, Michael Sullivan, was in charge of the Terminal when Motiva owned it and continued in the same role after the Terminal was transferred to Triton. In addition, employees listed under Shell Trading & Supply organizational

---

[73] SOPUS_NHVN01086145 at -145: Email Thread between Cox, Sabrina and Padilla, Martin RE: Motiva Damage Assessment from Hurricane Sandy (Oct. 2012) ("For your awareness, Motiva terminal assets in the NY harbor areas have been impacted from significant flooding and storm surge as a result of Hurricane Sandy… [W]e have known asset damage at our Sewaren, NJ terminal facility. One of the diked storage tank areas at Sewaren has been breached. Storage tanks within the diked area were moved due to force of water and were damaged resulting in diesel release.").

[74] SOPUS_NHVN01085446 at -446: Email Thread between Padilla, Martin and Cox, Sabrina RE: SANDY……Product Release …Sewaren Terminal …Holding Statement Request (Oct. 2012) ("Are you aware of the issues at Sewaren? Also need to discuss the Crisis Management CF [Control Framework]. I would be good to have Bob send a quick note to Marvin, this would ensure that we meet the new framework.").

[75] SOPUS_NHVN000021791: New Haven HSSE & SP CF Gap Assessment Master Copy.

[76] SOPUS_NHVN00066611: "Onboarding" Presentation for Trading & Supply HSSE 2016 Org.

20

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

chart were responsible for Shell HSSE & SP compliance at the New Haven Terminal.[77] These include Jennifer Bothwell, who was responsible for supporting Terminal's efforts to comply with state and federal environmental law; Kenn Stark, HSSE Representative for the Terminal as well as other Shell Terminals; CQ Huang, who worked as another HSSE advisor; and Mary Zhou, an HSSE advisor responsible for identifying and remediating gaps in the Terminal's HSSE & SP compliance.[78] In that capacity, Zhou was responsible for assessing safety gaps at the New Haven Terminal and developing a remediation plan. These individuals played central roles in managing environmental compliance at the New Haven Terminal. For example, Jennifer Bothwell and Kenn Stark were responsible for Performance Monitoring and Reporting. In addition, Jennifer Bothwell was also responsible for greenhouse gas and energy management, flaring and venting, soil and groundwater contamination; ozone depleting substances, and other environmental risks.[79] CQ Huang was responsible for Incident Investigation and Learning.[80] Heidi Nelson was responsible for Spill Preparedness and Response Specification as well as Joint Venture HSSE & SP Management.[81] Brian Evans was the Regional Manager for Northeast.[82] In that capacity, he reviewed existing hazard risk assessments and oversaw the HEMP for each .[83] Claudio Covini, who in 2016 was listed as head of TSO Engineering in Shell's T&S Operations HSSE Organizational Chart 2016,[84] was directly responsible for reviewing contracts and approving exceptions to design standards at Motiva Terminals.[85] They were directly responsible for

---

[77] SOPUS_NHVN00022030.
[78] *See id.*
[79] *See id.*
[80] *See* SOPUS_NHVN00021791.
[81] *See id.*
[82] SOPUS_NHVN00033612: USDOE Updates and Highlights (Jun. 14, 2017).
[83] SOPUS_NHVN00026002: USDOE HSSE & SP Control Framework Integration Project.
[84] SOPUS_NHVN00033612.
[85] SOPUS_NHVN00013370; SOPUS_NHVN00038332: James K. Yeates, US East Regional Engineering Manager Requests that Claudio Covini Approve Exception from Shell Design and Engineering Manual; GM T&S Operations,

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

overseeing, managing, and supervising all dimensions of safety and environmental compliance functions at the Terminal, and, more specifically, for making sure the New Haven Terminal complied with Shell's HSSE & SP risk management and reporting processes. In addition to the jobs they performed for Equilon and Triton, these individuals are also listed in the Shell T&S Organizational Chart. Their involvement in the New Terminal demonstrates an unusually high level of integration between Triton, Equilon, and other Shell entities in making sure that the New Haven Terminal complied with Shell environmental and safety policies.[86]

48.     In sum, Shell, often acting through Equilon or Shell T&S, carefully monitored and controlled processes at the New Haven Terminal in order to make sure that the facility complied with Shell environmental and safety protocols. Shell's control over these processes goes well beyond oversight and supervisory activities common of parent companies whose subsidiaries operate potential environmental hazards. Not only did Shell make sure that the New Haven Terminal followed Shell environmental compliance and reporting procedures, but it made sure that Shell, not Triton, individuals were responsible for managing day-to-day environmental compliance and reporting.

**C. Opinion 3: Shell Has a Healthy Balance Sheet and Is Capable of Paying a Large Fine.**

49.     The Shell corporate group, of which Shell plc is the ultimate parent company, is one of the largest and most profitable energy companies in the world. For the most recent year for which Shell has reported financial results, Shell reports revenue of $284.3 billion, income before taxation of $29.9 billion, and income after taxation of $16.5 billion.[87]  For 2023, Shell reported

---

Email from Karen Stammer to Brian Evans, Kent Yeates, and James Ledbetter, cc'ing Michael Sullivan, Paul Fatum, Mary Zhou, & Ashwin Rao (Jun. 7, 2018) ("As a follow-up to our meeting (4/9/2018) for the New Haven HEMP Handshakes, please review the attached HEMP Safety Critical Equipment, Critical Activities and HEMP Remedial Action Plans. The HEMP and associated Remedial Action Plans need your approval as part of the TSO HEMP Standard.").

[86] SOPUS_NHVN00038332.

[87] Shell plc, 2024 Annual Report and Accounts and Form 20-F for the year ended December 31, 2024, at 241.

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

revenue of $323.6 billion, income before taxation of $32.6 billion, and income after taxation of $19.6 billion.[88] For 2022, Shell reported revenue of $321.4 billion, income before taxation of $64.8 billion, and income after taxation of $19.6 billion.[89] While Shell's revenues and profitability, like that of other large energy companies, depend in large part on prevailing energy prices, Shell has returned an annual profit nearly continuously for more than a century. As of 2022, Shell USA, Shell's US subsidiary, had $83.7 billion in total revenue and shareholder equity of $52.6 billion.[90]

50.      Shell has vast assets and ability to raise funds. It reported Current Assets, as of December 31, 2024, of more than $118 billion, including $39 billion in cash and cash equivalents. In 2024, Shell paid $8.7 billion in dividends to shareholders and returned another $13.9 billion to shareholders through repurchasing its own shares.[91] In 2023, Shell paid $8.4 billion in dividends to shareholders and spent $14.6 billion on share repurchases.[92] Investors have rewarded the company's extraordinary performance. Shell's stock trades on the NASDAQ in the United States and, as of this writing, is valued at more than $196 billion, having increased by more than 100% over the past five years.[93] Shell plc's credit rating is also exceptional, with S&P giving the company an A-1 short-term credit rating (the highest category) and an A+ long-term credit

---

[88] *Id.*

[89] *Id.*

[90] SOPUS_NHVN02159944. Shell plc also reports revenue and assets for its USA segment in its Annual Report. It reported USA revenue of $65.1 billion for 2024, $70.3 billion for 2023, and $87.1 billion for 2022, as well as USA assets of $55.2 billion as of December 31, 2024. *See* Shell plc, 2024 Annual Report and Accounts and Form 20-F for the year ended December 31, 2024, at 272.

[91] Shell plc, 2024 Annual Report and Accounts and Form 20-F for the year ended December 31, 2024, at 241.

[92] *Id.*

[93] The Wall Street Journal, "Shell PLC ADR (SHEL)," https://www.wsj.com/market-data/quotes/SHEL (visited May 1, 2025).

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

rating, indicating high-quality bonds.[94] Moody's has given Shell plc a P-1 rating for short-term debt and an Aa2 rating for long-terms debt, which also indicates financial strength.[95]

51.    A penalty of nearly any size would merely be absorbed by Shell's profits and would have no impact on the company's continued operations.

## V. CONCLUSION

52.    In conclusion, it is my opinion, based on my research, professional experience, and teaching, as well as my review of documents produced in this litigation and available publicly, that Motiva, Triton, and Equilon have jointly operated the New Haven Terminal. The relevant issue is whether these entities either owned or operated the New Haven Terminal. Of course, parent companies often provide advice and assistance to their subsidiaries, and they often rely on other corporate entities to provide specific support for specialized tasks such as environmental compliance. In this case, however, Equilon and Shell went well beyond ordinary course of business and directly participated in and controlled processes designed to mitigate environmental harms associated with the New Haven Terminal.

---

[94] *See* Shell, Credit Ratings, https://www.shell.com/investors/debt-information/credit-ratings.html.
[95] *See id.*

24

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability. My opinions are stated to a reasonable degree of certainty and consistent with prevailing and scientific standards of practice.

*Submitted* on this 8th day of May, 2025.


*Joshua Macey*

_____

Joshua Macey

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**VI. EXHIBIT A**: Joshua Macey Curriculum Vitae

**JOSHUA C. MACEY**

Associate Professor, Yale Law School

127 Wall St., New Haven, CT 06511 • (203) 687-6827 • Joshua.macey@yale.edu

## TEACHING EXPERIENCE

Yale Law School
  *Associate Professor of Law*, July 2024-present

The University of Chicago Law School
 *Assistant Professor of Law*, 2020-2024

Cornell Law School
 *Visiting Assistant Professor of Law*, 2019-2020
 *Post-Doctoral Associate*, 2018-2019

## BOOK

ENERGY, ECONOMICS, AND THE ENVIRONMENT, 6th Ed. (West) (with Joel B. Eisen, Emily Hammond, Jim Rossi, David B. Spence, and Hannah J. Wiseman)

## SCHOLARSHIP

Purdue Pharma and the New Bankruptcy Exceptionalism, 2024 Supreme Court Review (forthcoming 2025) (with Tony Casey)

Structural Indeterminacy and the Separation of Powers, 113 California Law Review (forthcoming 2025) (with Brian Richardson)

Does ESG Crowd Out Support for Government Regulation?, 25 American Law and Economics Review (accepted for publication 2025) (with Hajin Kim and Kristen Underhill)

Private Profit and Public Business, 103 Texas Law Review 711 (2025) (with Aneil Kovvali)
  * Winner of Berkeley Center for Law and Business Best Paper Award (junior category)

i

The Public Law of Public Utilities, 42 Yale Journal on Regulation 179 (2025) (with Brian Richardson)

The Law and Economics of Transmission Planning and Cost Allocation, 45 Energy Law Journal 209 (2024) (with Jacob Mays)

Outsourcing Electricity Market Design, 91 University of Chicago Law Review 1243 (2024)

Bankruptcy by Another Name, 133 Yale Law Journal Online (2024) (with Tony Casey)

Grid Reliability in the Electric Era, 41 Yale Journal on Regulation 164 (2024) (with Hannah Wiseman and Shelley Welton)

Hidden Value Transfers in Public Utilities, 171 University of Pennsylvania Law Review 2129 2023) (with Aneil Kovvali)

In Defense of Chapter 11 in Mass Torts Cases, 90 University of Chicago Law Review (2023) (with Tony Casey)

The Corporate Governance of Public Utilities, 40 Yale Journal on Regulation 569 (2023) (with Aneil Kovvali)

Against Political Theory in Constitutional Interpretation, 76 Vanderbilt Law Review 899 (2023) (with Chris Havasy and Brian Richardson)

Open Access, Interoperability, and DTCC's Path to Monopoly, 132 Yale Law Journal 96 (2023) (with Dan Awrey)

What Are Networks, Platforms, and Utilities, and What Should We Do with Them?, Yale Journal On Regulation Notice & Comment (2023) (with Genevieve Lakier)

The Bankruptcy Tribunal, 96 American Bankruptcy Law Journal 749 (2022) (with Tony Casey)

Checks, Not Balances, 101 Texas Law Review 89 (2022) (with Brian Richardson)

Clean Energy Through Grid Reliability, 74 Stanford Law Review 969 (2022) (with Alexandra Klass, Shelley Welton, and Hannah Wiseman) (2022)

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- Winner of the 2022 Morrison Prize for most impactful environmental law article of the year
- Featured in the 2022 Environmental Law and Policy Annual Review as one of the twenty best environmental law articles of the previous year

The Promise and Perils of Open Finance, 40 Yale Journal on Regulation 1 (with Dan Awrey) (2022)

Private Risk and Social Resilience in Liberalized Electricity Markets, 5 Joule 369 (2022) (with Jacob Mays, Michael Craig, L. Lynne Kiesling, Blake Shaffer, and Han Shu)

Bankruptcy Shopping: Domestic Venue Races and Global Forum Wars, 37 Emory Bankruptcy Developments Journal 462 (2021) (invited) (with Tony Casey)

Claim Durability and Bankruptcy's Tort Problem, 38 Yale Journal on Regulation 766 (2021) (with Vince Buccola)

Long Live the Federal Power Act's Bright Line, 134 Harvard Law Review 1360 (2021) (with Matthew Christiansen)
- Winner of the 2021 Morrison Prize for most impactful environmental law article of the year
- Featured in the 2021 Environmental Law and Policy Annual Review as one of the twenty best environmental law articles of the previous year

MOPR Madness, 42 Energy Law Journal 67 (2021) (with Robert Ward)

Utility Mergers and the Modern (and Future) Power Grid, 42 Energy Law Journal 237 (2021) (Review)

Rate Regulation Redux, 168 University of Pennsylvania Law Review 1181 (2020) (with Jackson Salovaara)

Zombie Energy Laws, 73 Vanderbilt Law Review 1077 (2020)
- Winner of the 2020 Morrison Prize for most impactful environmental law article of the year
- Selected for inclusion in the 2020 Environmental Law and Policy Annual Review as one of the top four environmental law articles of the previous year

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

The Hertz Maneuver (and the Limits of Bankruptcy Law, The University Of Chicago Law Review Online (2020) (with Tony Casey)

Bankruptcy as Bailout: Coal Company Insolvency and the Erosion of Federal Law, 71 Stanford Law Review 879 (2019) (with Jackson Salovaara)
- • Selected for inclusion in the 2020 Environmental Law and Policy Annual Review as one of the top twenty environmental law articles of the previous year

What Corporate Veil?, 117 Michigan Law Review 1195 (2019) (Review)

Dodd-Frank is a Pigouvian Regulation, 126 Yale Law Journal 1336 (2018) (with Aaron Levine) (Note)

The Costs of Administrative Aggregation, 70 Stanford Law Review Online (2018) (with Shannon Grammel)

Playing Nicely: How Judges Can Improve Dodd-Frank and Foster Interagency Collaboration, 126 Yale Law Journal 806 (2017) (Note)

## EDUCATION

**Yale Law School**, J.D., 2017

*The Yale Law Journal*, Editor
Coker Fellow (Teaching Assistant, Constitutional Law), Professor Paul Kahn

**The London School of Economics and Political Science**, M.Sc in Political Theory, 2013

**Yale University**, B.A. in English Literature, 2012

## CLERKSHIP
Hon. J. Harvie Wilkinson III, U.S. Court of Appeals for the Fourth
Circuit *Law Clerk*, 2017-2018

## SELECTED PRESENTATIONS

**2023**
- • Queens University Climate Institutions Conference, "Outsourcing Energy Market Design"

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- American Law and Economics Association Annual Meeting, "Outsourcing Energy Market Design"
- University of Texas Advanced Civil Procedure Seminar, "In Defense of Chapter 11 for Mass Torts"
- American Law and Economics Association Annual Meeting, "Does ESG Crowd Out Government Support for Regulation" (presented by Kristen Underhill)
- Berkeley Law, Economics, and Administration Workshop, "Private Risk and Public Business"
- Notre Dame Faculty Workshop Series, "The Public Law of Public Utilities"
- Notre Dame Law and Economics Workshop Series, "Private Risk and Public Business"
- National Conference of Constitutional Law Scholars, "The Public Law of Public Utilities"
- Duke Law and Economics Workshop, "The Corporate Law of Public Utilities"
- Duke Faculty Workshop, "The Public Law of Public Utilities"
- Vanderbilt Networks, Platforms, and Utilities Conference, "The Corporate Law of Public Utilities"
- Environmental Law and Economics Annual Conference, "Outsourcing Energy Market Design"
- Berkeley / Penn Energy Law Conference, "Outsourcing Energy Market Design"

**2022**
- FERC Technical Conference on Transmission Planning and Cost Management, Panel on Local and Regional Reliability Transmission Planning Criteria and Cost Management
- National Association of Regulatory Utility Commissioners Annual Conference, Committee on Electricity, "It's All About the Connection (Transmission)"
- Berkeley POWER Conference, "Private Risk and Social Resilience in Liberalized Electricity Markets"
- Morrison Prize Keynote Lecture, "Long Live the Federal Power Act's Bright Line"
- University of Virginia Law School Faculty Workshop, "The Regulatory Compact"
- University of Texas Law School Faculty Workshop, "Incomplete Energy Markets"
- Yale Law, Economics, and Organization Faculty Workshop, "Incomplete Energy Markets"
- Columbia Law School Faculty Workshop, "Incomplete Energy Markets"
- American Law and Economics Association Annual Meeting, "The Payments Trilemma"
- American Law and Economics Association Annual Meeting, "The Promise and Perils of Open Finance" (presented by Dan Awrey)
- Yale Law Journal Workshop Series, "Open Access, Interoperability, and DTCC's Path to Monopoly"
- Environmental Law and Economics Annual Conference, "Private Risk and Social Resilience in Liberalized Electricity Markets"

v

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- Junior Administrative Law Scholars Conference, "Checks, Not Balances" (presented by Brian Richardson)

**2021**

- American Law and Economics Association Annual Meeting, "MOPR Madness,
- American Law and Economics Association Annual Meeting, "Too Small To Succeed" (presented by Dan Awrey)
- Wharton Financial Regulation Workshop, "Too Small To Succeed"
- Vanderbilt Financial Regulation Workshop, "Too Small To Succeed"
- Morrison Prize Keynote Lecture, "Zombie Energy Laws"
- Environmental Law and Policy Review Annual Meeting, "Zombie Energy Laws"

**2020**

- Vanderbilt Business Law Workshop, "Claim Durability and Bankruptcy's Tort Problem"
- University of Texas Austin Electricity Conference, "Capacity Markets"
- BYU New Deals Conference, "The Regulatory Compact"
- AALS New Voices in Administrative Law and Legislation, "The Regulatory Compact"
- Yale Seminar on Private Law, "The Regulatory Compact"

**2019**

- Northern Plains Resource Council Annual Meeting, "Bankruptcy as Bailout: Coal Company Insolvency and the Erosion of Federal Law"
- Energy Law and Policy in the Rockies, "Bankruptcy as Bailout: Coal Company Insolvency and the Erosion of Federal Law"
- Emerging Energy Law Scholars Conference, "Rate Regulation Redux"
- National Business Law Scholars Conference (NBLSC), "The Lost History of the National Securities Clearing Corporation"
- Richmond Junior Faculty Forum, "Rate Regulation Redux"
- American Law and Economics Association Annual Conference (ALEA), Annual Meeting, "Rate Regulation Redux"
- BYU New Deals Conference, "The Lost History of the National Securities Clearing Corporation"

**2018**

- Young Bankruptcy Law Scholars Conference, "It's Not Moral Hazard, It's the Market: Natural Monopoly and the Misregulation of Financial Market Utilities"
- Canadian Law and Economics Annual Conference (CLEA), "Bankruptcy as Bailout: Coal Company Insolvency and the Erosion of Federal Law"

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

- Midwestern Law and Economics Association Annual Conference (MLEA), "It's Not Moral Hazard, It's the Market: Natural Monopoly and the Misregulation of Financial Market Utilities"

## TEACHING EXPERIENCE

*The University of Chicago Law School*: Bankruptcy; Climate Change Law; Legislation; Energy Law

*Cornell Law School*: Administrative Law (Fall 2019), Energy Law (Fall 2018, Spring 2020), Environmental Law (Spring 2019)

*Yale Law School*: Constitutional Law, Coker Fellow (teaching assistant, Fall 2016)

## SERVICE

University of Chicago Law School: Faculty Appointments Committee, 2022-2023; Journal Committee, 2021-present; Faculty Advisory, The University of Chicago Business Law Review, 2021-present

Cornell Law School: Clerkship Committee, 2019-2020; PhD Committee for student in Natural Resources Department

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**VII. EXHIBIT B**: Materials Considered

**Public Documents**

Ayotte, Kenneth, *Subsidiary Legal Entities and Innovation*, REV. CORP. FIN. STUD. 39 (2017)

Contractor, Farok J., *Tax Avoidance by Multinational Companies: Methods, Policies, and Ethics*, 1 RUTGERS BUS. REV. 27 (2016)

Du, Yan, Marc Deloof, and Ann Jorissen, *The Roles of Subsidiary Boards in Multinational Enterprises*, J. INT'L MGMT. 169 (2015)

Easterbrook, Frank H. and Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. CHI. L. REV. 89 (1985)

Ghoshal, Sumantra & D. Eleanor Westney, *Organization Theory and The Multinational Corporation* 2nd ed. (Palgrave Macmillan, 2005)

Kogut, Bruce, *Joint Ventures: Theoretical and Empirical Perspectives*, 9 STRAT. MGMT. J. 319 (1988)

Landers, Jonathan M., *A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy*, 42 U. CHI. L. REV. 589 (1975)

Lindemann, Jan, *The Financial Value of Brands*, in BRANDS AND MARKETING 26, ed. Rita Clifton & John Simmons (the Economist Series) (2004)

Manne, Henry G., *Our Two Corporation Systems: Law and Economics*, 53(2) VA. L. REV. 259 (March 1, 1967)

Perry, Martin K., "Vertical Integration: Determinants and Effects" (Chapter 4) in *Handbook of Industrial Organization* 183, ed. Richard L. Schmalensee (1989)

"Powering Progress: Annual Report and Accounts," Royal Dutch Shell PLC (Dec. 31, 2020)

Rajan, Raghuram & Luigi Zingales, *The Firm as a Dedicated Hierarchy: A Theory of the Origin and Growth of Firms* (Nat'l Bureau of Econ. Research, Working Paper No. 7546, 1998)

Sanga, Sarath, *A Theory of Corporate Joint Ventures*, 106 CAL. L. REV. 1437, 1461 (2018)

Shell, Credit Ratings, https://www.shell.com/investors/debt-information/credit-ratings.html

Shell plc, 2024 Annual Report and Accounts and Form 20-F for the year ended December 31, 2024

"Sustainability Report 2019," Royal Dutch Shell PLC,

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

https://www.shell.com/sustainability/reporting-centre/reporting-centre-archive.html#tab-2019

The Wall Street Journal, "Shell PLC ADR (SHEL)," https://www.wsj.com/market-data/quotes/SHEL (visited May 1, 2025)

**Caselaw**

Rechtbank Den Haag (The Hague Dist. Ct.), 26 Mei 2021, C/09/571932 (Vereniging Milieudefensie, et al. / Royal Dutch Shell PLC), § 2.2.2 (Neth.)

*United States v. Bestfoods*, 524 U.S. 51 (1998)

**Litigation Documents**

SHELLNH_SOV_04959: SOP US / Motiva SD&CM – New Haven, Connecticut Terminal Groundwater Monitoring Plan (May 20, 2010)

SHELLNH_SOV_09114: Letter from W. Scott Burrus, Sovereign Consulting Co., to Craig Bobrowiecki, CT Department of Energy and Environmental Protection (Apr. 30, 2020)

SOPUS_NHVN00001029: Permit Transfer Application (May 1, 2017)

SOPUS_NHVN000021791: New Haven HSSE & SP CF Gap Assessment Master Copy

SOPUS_NHVN00010116: Contractor Safety Management System (Dec. 2014)

SOPUS_NHVN00013370: Application Form Exception to Group HSSE & SP Control Framework Requirement (Nov. 7, 2017)

SOPUS_NHVN00018508: Trading & Supply Health, Safety, Security, Environment and Social Performance Management System (HSSE & SP MS) Manual (2013)

SOPUS_NHVN00021791: HSSE & SP CF Gap Assessment Master Copy

SOPUS_NHVN00022030: Playbook: HSSE & SP Control Framework Integration Process for United States Distribution Operations East (USDOE)

SOPUS_NHVN00026002: USDOE HSSE & SP Control Framework Integration Project

SOPUS_NHVN00026287: Selection of DEPs & DEM1 Checklist Tool (Rev. 4.1), Based on DEPs v35 & DEM1 Version 8 (Exhibit 1014 to Deposition of James Kent Yeates (Shell Pipeline Company US), December 22, 2022).

SOPUS_NHVN00030239: Global Trading and Supply Operation Asset Management System Manual (Feb. 2017)

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

SOPUS_NHVN00033612: USDOE Updates and Highlights (Jun. 14, 2017)

SOPUS_NHVN00038332: Email Thread between Stammer, Karen and Yeates, Kent RE: 2018 HEMP – New Haven (June 2018)

SOPUS_NHVN00066611: "Onboarding" Presentation for Trading & Supply HSSE 2016 Org

SOPUS_NHVN00075895: Property Transfer Application (June 2017)

SOPUS_NHVN00075899: Permit Assignment and Assumption Agreement, Among Motiva Enterprises LLC and Equilon Enterprises LLC

SOPUS_NHVN00120890: Email from Bothwell, Jennifer to Estes, Adam RE: Shell Trading & Supply (East Coast) Tier II Reporting (Nov. 17, 2017)

SOPUS_NHVN00162554: HSSE Terminal Operations Manual (Jun. 2011)

SOPUS_NHVN00217769: Purchase Contract for the Oil Spill and Hazardous Material Response, Pipeline Response, Safety Supplies, Tank Cleaning and Decontamination between Equilon Enterprises, LLC and OMI Environmental Solutions

SOPUS_NHVN0023617: Contract Documents for Maintenance Dredging, Dewatering and Transportation, Motiva Terminal Facility New Haven, CT (Jan. 2012) to CLE Engineering

SOPUS_NHVN00242567: Shell Oil Products US and Motiva Enterprises LLC, Records Management Program Manual (Mar. 31, 2003)

SOPUS_NHVN00405260: Purchase Contract for Purchases of Goods and Services Between Equilon Enterprises LLC and DFI Construction, Inc. (Nov. 29, 2021)

SOPUS_NHVN00405406: Purchase Contract Between Equilon Enterprises LLC and JJ White Incorporated (Nov. 29, 2021)

SOPUS_NHVN00816878: Second Amendment to Operating Agreement SLPC-SOPUS, Among Equilon Enterprises LLC and Shell Pipeline Company LP (Feb. 1, 2020)

SOPUS_NHVN00891135: Purchase Contract Between Equilon Enterprises LLC and IPF Electric, LLC (Jan. 27, 2022)

SOPUS_NHVN01085446: Email Thread between Padilla, Martin and Cox, Sabrina RE: SANDY……Product Release …Sewaren Terminal …Holding Statement Request (Oct. 2012)

SOPUS_NHVN01086145: Email Thread between Cox, Sabrina and Padilla, Martin RE: Motiva Damage Assessment from Hurricane Sandy (Oct. 2012)

x

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

SOPUS_NHVN01091503: Change Order #3 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement

SOPUS_NHVN01091509: Change Order #1 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement

SOPUS_NHVN01091520: Motiva Service Level Agreement re Environmental and Emergency Management Services between Equilon/SOPUS and Motiva (Jan. 1, 2011)

SOPUS_NHVN01186017: Purchase Contract Between Equilon Enterprises LLC and Mix Bros. Tank Services, Inc. (Apr. 3, 2019)

SOPUS_NHVN01361121: First Amendment to Operating Agreement SPLC-SOPUS (Dec. 12, 2017)

SOPUS_NHVN02159944: Shell USA, Inc. (formerly Shell Oil Company) 2022 Consolidated Financial Statements

SOPUS_NHVN02365078: Letter re Application for Permit Transfer of Salt Caverns & Salt Water Disposal Well Operated by Motive Enterprises LLC (Mar. 27, 2017)

SOPUS_NHVN02448801: Meteorological and Oceanographic Design and Operating Considerations Offshore, Coastal and Onshore (Amendments/Supplement to ISO 19901-1:2015) (Feb. 2021)

SOPUS_NHVN02449103: Separation Agreement by and Among SOPC Holdings LLC, Saudi Refining, Inc., & Aramco Financial Services Relating to the distribution of Certain Assets of Motiva Enterprises LLC and Related Transactions (Feb. 17, 2017)

SOPUS_NHVN02449351: Motiva LLC Amended and Restated Limited Liability Company Agreement, Among SOPC Holdings East LLC, Texaco Refining and Marketing (East), Inc., and Saudi Refining, Inc. (Feb. 13, 2002)

SOPUS_NHVN02458905: Change Order #2 (i.e., amendment) to Jan. 2011 Motiva Service Level Agreement

**Litigation Testimony**

30(b)(6) Deposition of Shell Oil Co. (Brian Evans), February 12, 2025