# Exhibit B

# Filed Under Seal

*Conservation Law Foundation*

*v.*

*Shell New Haven Terminal*

Case No. 3:21-CV-00933-VDO

## EXPERT REBUTTAL REPORT OF JOSHUA C. MACEY

July 22, 2025

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   REBUTTAL OPINIONS ....................................................................................... 1

   A.   Defendant's strong balance sheet indicates that Defendants enjoyed a larger economic benefit from environmental violations. ............................................... 1

   B.   The Connecticut Civil Penalty Policy is not relevant. ......................................... 4

   C.   Shell's balance sheet is relevant in determining whether to adjust the penalty downwards. ............................................................................................................ 6

III.  EXHIBIT A. Materials Considered ............................................................... EXH-I

## I.    INTRODUCTION

1.      I previously submitted an initial report in this matter on May 8, 2025, which includes my qualifications and compensation ("Macey Report"). Counsel for Conservation Law Foundation has asked me to review and respond to the opinions of Eric Kovich, David Uhlman, and Susan Parker Bodine.  In particular, I would like to respond to Ms. Bodine's statement that "deep pockets are not a consideration" in determining civil penalties,[1] and to Mr. Kovich's similar claim, based on his view that Connecticut's Civil Penalty Policy should guide any penalty determination in this case. I make three points:

i.   **Opinion 1:** Defendant's strong balance sheet is relevant in establishing any civil penalty because it relates to the "economic impact of the penalty" and to the "economic benefit" the Defendant obtained as a result of any environmental violations, both of which are listed in the text of the CWA and RCRA as factors in establishing civil penalties.[2]

ii.  **Opinion 2:** The Connecticut Civil Penalty Policy (CPP) does not limit the amount that can be pursued in litigation. It is a guidance document that is intended for use by the Connecticut Department of Energy and Environmental Protection (DEEP). It establishes the "range within which the Department will either settle or recommend that the Attorney General seek in litigation."[3] Civil penalties for citizen suits are governed by federal environmental statutes and EPA regulations, and the CPP itself authorizes DEEP to "assess penalties that are at variance with the policies or procedures contained in this document if appropriate in a specific case, and may change this policy at any time without public notice."[4]

iii. **Opinion 3:** At the very least, Shell's deep pockets are evidence that any penalty levied should not be adjusted downwards based on financial hardship.

## II.    REBUTTAL OPINIONS

### A.  Defendant's strong balance sheet indicates that Defendants enjoyed a larger economic benefit from environmental violations.

---

[1] Expert Report of Susan Parker Bodine, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO, ¶ 49.

[2] 33 U.S.C. § 1319(d).

[3] Department of Environmental Protection, *Civil Penalty Policy*, State of Connecticut (Feb. 1, 2001) https://portal.ct.gov/-/media/deep/enforcement/policies/civilpenaltypolicypdf.pdf?rev=ecb862f9ac76477888fe1fab22f99455&hash=E046241572E44369758B5F4AA5AA599D.

[4] *Id*.

1

2.      To understand why Shell's balance sheet is relevant in this case, it is first necessary to understand how civil penalties are calculated under the environmental statutes. Though there are slight differences between statutes, most of the federal environmental statutes follow the approach taken by the CWA, which provides factors for assessing penalties that can be adjusted in accordance with EPA's regulations.[5] Currently, statutory civil monetary penalties are $68,445 per day for each violation.[6]

3.      EPA statutes and regulations list several factors that should be consulted when assessing civil monetary penalties in civil judicial and administrative proceedings.[7] The relevant factors are: (1) the seriousness of the violation or violations, (2) the economic benefit (if any) resulting from the violation, (3) any history of such violations, (4) any good-faith efforts to comply with the applicable requirements, (5) the economic impact of the penalty on the violator, and (6) such other matters as justice may require."[8]

4.      The CWA gives courts discretion in calculating civil penalties. Courts "may begin either with the violator's estimated economic benefit from noncompliance (known as the "bottom-up" method) or with the statutory maximum allowable penalty (known as the "top-down" method)."[9] These figures can then be adjusted in light of the six factors enumerated in Section 309(d) of the CWA, which include (1) the seriousness of the violations; (2) the economic benefit resulting from the violation; (3) any history of violations; (4) good-faith efforts to comply with applicable requirements; (5) the economic impact of the penalty on the violator; and (6) other matters as justice may require."

---

[5] 33 USC § 1319(d).
[6] 40 C.F.R. § 19.4, Table 1 (column 3, row 9).
[7] 40 C.F.R. § 19.1.
[8] 33 USC § 1319(d).
[9] *Catskill Mountains Chapter of Trout Unlimited v. City of New York*, 451 F.3d 77, 87 (2d Cir. 2006) (citations omitted).

5.      To provide some context, in this case, if the Court were to go back five years, the top-down method in which the court starts with the statutory maximum could result in approximately $229 million in civil penalties per violation.[10]

6.      Shell's strong balance sheet is relevant for a few reasons. First, it indicates that a large penalty is needed to serve the statute's deterrent goal, since only a large penalty would have a significant economic impact on the company. Courts have observed that "[t]he main purpose of the penalty is to deter the violator and others from committing future violations."[11] To that end, courts have adjusted penalties upwards when doing so would provide a stronger and more appropriate deterrent for future CWA and RCRA violations.[12] Civil penalties, in other words, are not calculated as a precise science that is limited to the economic benefit a defendant derived from noncompliance. If they were, the federal environmental statutes would not deter environmental violations, since violators would be no worse off than if they had not complied with the law.

---

[10] The CWA does not have its own statute of limitations, so the court would likely use the federal catchall statute of limitations at 28 U.S.C. § 2462, which expires five years from the date when the claim first accrued. Courts often use section 2462 instead of state law when determining the statute of limitations for the CWA. *See Conn. Fund for Environ. v. Job Plating Co.*, 623 F. Supp. 207, 212-13 (D. Conn. 1985) (concluding that "the five-year statute of limitations period of Section 2462 ought to be applied in citizen suits brought pursuant to Section 1365"). The Second Circuit has also found that fines for a continuing violation can be calculated by looking five years before the complaint was filed. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 88 & n.14 (2d Cir. 2006) ("Catskills filed its complaint on March 31, 2000. Because the CWA has a five-year statute of limitations, 28 U.S.C. § 2462, that is tolled sixty days before the filing of a complaint") (internal citations omitted).

In this case, the complaint was filed on July 7, 2021. That puts the start date on May 8, 2016. The court would add sixty days for the tolling period, and it would add however much time passed between the filing and the liability hearing. Right now, approximately four years have passed since the filing. Thus, if the Court used the top-down approach, it would calculate penalties as follows: $68,445 x (365 x (5+ 4) + 60). That results in a penalty of $228,948,525. That is the figure for each violation. If Plaintiffs win on all surviving claims, that leaves twelve violations.

[11] *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 352 (E.D. Va. 1997); see also *Tull v. United States*, 481 U.S. 412, 422-23 (1987) (observing that restoration of the status quo is not the only basis on which penalties should be awarded under the CWA, and that penalties should punish violators for noncompliance and promote deterrence).

[12] *Id.*

7.      Even looking exclusively at direct economic benefits, Defendants' strong balance sheet is relevant in determining the appropriate size of a penalty. Defendants could clearly have afforded to invest in CWA and RCRA compliance. Financially distressed firms, of course, often struggle to invest in environmental compliance, whereas well-capitalized firms can afford to allocate significant funds to environmental compliance. In assessing Defendant's avoided costs, it is worth considering how much money they could have spent on CWA and RCRA compliance. Shell's strong balance sheet is directly relevant to that question.

8.      Defendants' financial resources also provide a basis for estimating the costs they could have contributed towards climate mitigation and adaptation. Companies, like Defendants, with aggressive climate adaptation and mitigation policies can be expected to meet those commitments only if they have the resources to do so. Defendants have publicly committed to aggressive and ambitious adaptation and mitigation strategies.[13] Their strong financial position indicates that they had the financial resources to meet those goals. Put simply, Defendants' climate policy suggests that the companies' adaptation and mitigation costs should be larger than those of a company that has not committed to reduce its emissions and adapt to climate change, and their strong balance sheet shows that it had the resources to do so.

9.      Finally, it is worth noting that Defendants have long promoted their net-zero goals. Doing so has presumably provided reputational benefits that made the company more profitable. When determining the size of economic benefits due to environmental violations, it would be appropriate here to consider whether the company's attempts to greenwash its climate mitigation and adaptation campaign contributed to its strong financial performance.

### B.  The Connecticut Civil Penalty Policy is not relevant.

---

[13] *See, e.g.* Exhibit 1237 of the Deposition of Brian Evans (Shell), February 12, 2025 (Shell "A Better Life With a Healthy Planet: Pathways to Net-Zero Emissions," Foreword from the CEO, May 2016).

10.     When the EPA or the Connecticut DEEP initiates their own proceedings, they rely on their own penalty policies. Those policies are designed to ensure consistency of enforcement and are used to calculate reasonable settlement amounts. Despite those policies, state governments and the EPA reserve the right to seek different penalties in judicial proceedings.

11.     Policies like the CPP provide standard calculations that help environmental regulators apply the statutory penalty factors. These policies provide guidance when regulators pursue settlement, but Courts do not use them in judicial proceedings except as guidance. In other words, in the context of litigation, state and federal environmental regulators can appeal to their penalty policies to argue that the court should levy a certain penalty, but Courts consistently note that these are guidance documents that apply to agency employees and do not carry the force of law.[14]

12.     This is also evident from the CT DEEP Penalty Policy itself, which states:

> "The policy is intended solely for the guidance of Department employees. It is not intended to, nor does it, constitute Department rulemaking, and it does not create a right or a benefit, substantive or procedural, enforceable at law or in equity, for any person. The Department may assess penalties that are at variance with the policies or procedures contained in this document if appropriate in a specific case, and may change this policy at any time without public notice."[15]

---

[14] *See U.S. v. Municipal Auth. Of Union Township*, 150 F.3d 259, 267 (3d Cir. 1998) ("Appellant and the amici argue that the use of the "wrongful profits" method to calculate economic benefit contravenes EPA policy. They base this argument on the EPA's interim Clean Water Act Settlement Penalty Policy Guide published in 1995 . . . But the EPA policy is not applicable here because, by its own express terms, it is *not* 'intended for use by EPA, violators, courts or administrative judges in determining penalties at a hearing or trial.' App. at 243. *See also Laidlaw I,* 956 F. Supp. at 601 ('the policy expressly states that it is not to be used by a court in determining a penalty at a trial .... [therefore] it will not be considered in arriving at an appropriate penalty amount').").

[15] *Civil Penalty Policy, supra* note 3.

13.     EPA's Civil Penalty Policy works similarly.[16] The Policy specifically says that it "is not intended for use by EPA, violators, courts, or administrative judges in determining penalties at a hearing or trial."[17]

14.     Note, though, that even under these Policy documents, Defendant's financial position would be relevant, since the "[p]olicy is drafted so that violators whose actions, or inactions, resulted in a significant economic benefit and/or harmed or threatened public health or the environment will pay the highest penalties."[18]

### C. Shell's balance sheet is relevant in determining whether to adjust the penalty downwards.

15.     Both courts and state guidance sometimes adjust civil penalties downwards if the Defendant is unable to pay. Because the upward bound of penalties in this case are significant— approximately $240 million in civil penalties per violation—Shell's balance sheet is relevant in establishing that there should not be a downward adjustment in this case: Shell is in a position to pay a significant civil penalty.

---

[16] *Water Enforcement Policy, Guidance and Publications*, United States Environmental Protection Agency, https://www.epa.gov/enforcement/water-enforcement-policy-guidance-and-publications#penalty.
[17] *Id*. at 3.
[18] *Id*.

I certify under penalty of perjury that the opinions expressed in this expert rebuttal report are true and correct to the best of my knowledge and ability. My opinions are stated to a reasonable degree of certainty and consistent with prevailing and scientific standards of practice.

*Submitted* on this 22nd day of July, 2025.

*Joshua Macey*

_____

Joshua Macey

7

**III. EXHIBIT A. Materials Considered**

**Joshua Macey,**
**Expert Rebuttal Report in *Conservation Law Foundation v. Shell Oil Company, et al.*,**
**No. 3:21-cv-00933**

In addition to the materials specifically cited in my expert rebuttal report and any attachments thereto, served on July 22, 2025, I have reviewed and considered the following materials in connection with my expert rebuttal report and reserve the right to rely on any of the documents or materials included herein.

**Public Documents**

Department of Environmental Protection, Civil Penalty Policy, State of Connecticut (Feb. 1, 2001), https://portal.ct.gov/-/media/deep/enforcement/policies/ civilpenaltypolicypdf.pdf? rev=ecb862f9ac76477888fe1fab22f99455&hash=E046241572E44369758B5F4AA5AA599D.

Water Enforcement Policy, Guidance and Publications, United States Environmental Protection Agency, https://www.epa.gov/enforcement/water-enforcement-policy-guidance-and-publications#penalty.

**Regulations**

28 United States Code § 2462 – Time for Commencing Proceedings.

33 United States Code § 1319 – Enforcement.

40 Code of Federal Regulations § 19.1 – Applicability.

40 Code of Federal Regulations § 19.4 – Statutory Civil Monetary Penalties, as adjust for inflation, and Tables.

**Caselaw**

*Catskill Mountains Chapter of Trout Unlimited v. City of New York*, 451 F.3d 77 (2d Cir. 2006).

*Conn. Fund for Environ. v. Job Plating Co.*, 623 F. Supp. 207 (D. Conn. 1985).

*Tull v. United States*, 481 U.S. 412 (1987).

*United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338 (E.D. Va. 1997).

*U.S. v. Municipal Auth. Of Union Township*, 150 F.3d 259 (3d Cir. 1998).

**Litigation Documents**

Exhibit 1237 of the Deposition of Brian Evans (Shell), February 12, 2025 (Shell "A Better Life With a Healthy Planet: Pathways to Net-Zero Emissions," Foreword from the CEO, May 2016).

Expert Report of Susan Parker Bodine, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO

Expert Report of Eric Kovich, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO

Expert Report of David Uhlmann, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO

EXH-II