# Exhibit C

## Filed Under Seal

Page 1

                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT


        ---------------------------x
        CONSERVATION LAW                    :
        FOUNDATION, INC.,                   :
                                            :
                Plaintiff                   :
                                            :CASE NO.
            -versus-                        :3:21-CV-00933-VDO
                                            :
        EQUILON ENTERPRISES LLC             :
        d/b/a SHELL OIL PRODUCTS            :
        US, TRITON TERMINALING LLC          :
        and MOTIVE ENTERPRISES LLC,:
                                            :
                Defendants                  :
        ---------------------------x




Videotaped Deposition of JOSHUA MACEY, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure, held at the law offices of WIGGIN AND
DANA, LLP, One Century Tower, 265 Church Street,
New Haven, Connecticut, before Julia Flynn
Cashman, RPR, CSR and Notary Public in and for the
State of Connecticut, on Tuesday, September 2,
2025, at 9:00 a.m.

Page 2

A P P E A R A N C E S:

ATTORNEY FOR PLAINTIFF:
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, Connecticut  06103
BY:  MICHAEL J. PENDELL,    ESQUIRE
Mpendell@motleyrice.com


ATTORNEY FOR DEFENDANTS:

KING & SPALDING
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309-3521
BY:  RYAN T. KEARNEY, ESQUIRE
Rkearney@kslaw.com


ALSO PRESENT:    Joe'l Mafrige, Esquire
                 Senior Legal Counsel
                 Global Litigation
                 Shell USA
                 Houston, Texas
                 (Remotely)


                 Daniel Lohaus,
                    Videographer
                    (In person)

Page 3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all technicalities as to proof of the official character before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the reading and signing of the deposition by the deponent are not waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

* * * * *

Page 6

understand what I mean when I say "CLF"?

A. Yes, I do.

Q. That case was brought in 2021 regarding allegations related to defendants at the New Haven fuel storage terminal.  Do you understand that you've been disclosed as an expert witness to testify on behalf of the plaintiff in this case?

A. Yes, I do.

Q. And do you also understand that -- strike that.

Are you an attorney of record for CLF in this case?

A. I am not.

Q. Do you understand the difference between attorney of record and expert witness?

A. I do.

Q. And an expert witness may not be able advocate in the same way that attorney of record would be?

A. Correct.

Q. Have you appeared for a deposition before today?

A. I have not.

Q. So I'll go over some brief rules for how this will go.

Page 11

Liscow, who is a law professor at Yale Law School.

Q. Can you spell those last names for the record, please?

A. L-I --

Q. I think you said Klass?

A. K-L-A-S-S.

Q. And Liscow?

A. L-I-S-C-O-W.  I actually don't remember the name of the CLF person.

Q. You also said -- let me ask you first, actually.  Do you recall the name of that lecture or seminar, title?

A. It was something generic like Future or New Directions of Environmental Law.  The Yale Environmental Law Society or student group puts on a conference once a year, and it was in that capacity.

Q. Were you contacted to speak at that seminar by CLF, by Yale, or by someone else?

A. The Yale student group.

Q. You also mentioned that you've sent some of your students to intern at CLF over the years, correct?

A. So I'm actually not certain about that.  It is possible.  I teach Energy and Environmental Law

Page 13

Q. Have you been disclosed as an expert witness for CLF in any other case?

A. No.

Q. Have you been disclosed as an expert witness in any other case with outside counsel Motley Rice?

A. No.

Q. What do you understand your expert role to be in this case?

A. So I -- one of the things I study is corporate governance, corporate structure and corporate law, especially the relationship between corporate governance and corporate structure and environmental remediation.

My understanding of my role here is to examine the record about the relationship between different Shell affiliates and subsidiaries and their role in operating the New Haven terminal.

Q. Is it fair to say that some of your opinions in this case are a pure legal nature?

A. No.

MR. PENDELL:  Objection.

Q. No?

MR. PENDELL:  Go ahead.

A. I don't think -- I do not think I have made

Page 14

any purely legal conclusions or descriptions in this case.

When the experts retained by Shell wrote about the penalty under the Clean Water Act, I summarized that statute.  But that is the only purely legal question I think I have considered in this case.

Q. You are offering some opinions about what the law requires, correct?

MR. PENDELL:  Objection to form.

A. I don't think so.  No, I do not.

Q. Are you offering some opinions regarding what certain case law opinions have said?

A. I certainly describe the Bestfoods case in for the purpose of explaining why the relationship -- you know, it was my understanding that the relationship between Equilon, Motiva, Triton and other Shell subsidiaries was going to be read for the purposes of owner/operator liability.

I used Bestfoods to provide context for those factual descriptions, but I was not opining. I was, I think, describing, you know, one of the things one teaches on the second or third day of a corporate law class, but not providing an opinion

Page 15

about the law.

Q. Do you intend to testify at trial in this case?

A. If there's a trial and I am asked to testify, I'm happy to do so.  I wouldn't say I have an intention either way or another, I don't know if -- what else is really going on.

Q. What would the purpose of your trial testimony be in a case like this?

MR. PENDELL:  Objection to form.

A. The purpose -- should I answer that?

MR. PENDELL:  Yes, go ahead.

A. The purpose of my trial testimony would be to, again, explain how the documents I reviewed provide context for understanding the relationship between various Shell entities, especially with their oversight and control and operational responsibility of the New Haven Terminal.

Q. Is there any other purpose why you've completed an expert report in this case, other than to provide trial testimony?

A. Not that I can think of.

Q. So you understand that this case is about the Equilon New Haven Terminal, correct?

A. Yes.

Page 18

the case, past the statute of limitations.

Q. Let me ask you, then, as of 2021, who was the owner of the New Haven Terminal?

A. As of 2021, I believe Shell was the owner of the New Haven Terminal.  Well, as of the 2021, Triton was the owner of the New Haven Terminal.

Q. Let me try to clean that up.  Do you have any reason to dispute that Triton Terminal Inc. LLC was the owner of the New Haven Terminal as of 2021?

A. No, I do not have reason to dispute that Triton was the owner as of 2021.

Q. And do you have any reason to dispute that Triton is still the owner of the New Haven Terminal --

A. No.

Q. -- as we sit here today?

A. No.

Q. Who -- and I'll start this with the 2021 timeframe, as you identified.  Who was the operator of the New Haven Terminal as of 2021?

A. So I want to sort of -- I don't mean to be overly academic with that question, but "operator," there can be one or many operators. And, you know, under the definition of an operator

Page 21

A. So, again, I have -- I have no reason to dispute that, but the documents I reviewed stopped in 2021.

Q. Do you understand that the defendant Motiva is no longer engaged in the ownership or operation of the terminal?

A. I do.

Q. Do you know when defendant Motiva ceased any ownership or operational role of the New Haven Terminal?

A. I do.

Q. And when was that?

A. 2017.

Q. May 1st, 2017, to be precise?

A. I would need to, once again, review the various documents, but that is my understanding.

Q. So do you understand that other than the three companies that we just discussed, which were Triton, Equilon, and Motiva, that there are no additional defendants in this case?

A. I believe so.

Q. So do you understand, for example, that Shell USA Incorporated is not a defendant in the case?

A. I do.

Page 25

wanted to mark it for the record.

I just wanted to ask you about some of the other items in the Requests For Production to find out if you have any of that material or not.

Was there any data or calculations that you relied on in forming your expert report and opinions in this case?

A. No.

Q. Are there any exhibits or perhaps demonstratives that you already prepared that you would intend to use at trial if you were to testify?

A. No.

Q. Have you given all documents that you believe are responsive to this Notice to plaintiff's attorneys in this case?

A. So you asked for all of my published articles, all of which are in the public domain. I brought many today.  Some are in storage.  So I had intended -- I had intended to go yesterday and print them out, but I didn't remember it was a holiday so I didn't have enough paper to print them out.  So if you had like I can print them out and find a way to get those to you.

But there were about 17 Bar Review articles

Page 29

A. No, I did not.

Q. -- in preparation for today?

A. No.  I'll let you finish.

Q. We're doing okay.  You'll get in more trouble with the court reporter than you will with me.

So you are a law professor, correct?

A. Correct.

Q. At Yale University School of Law?

A. Correct.

Q. Are you actually a practicing attorney as well?

A. I am not.

Q. Are you admitted to the bar in any state?

A. I am not.

Q. Have you ever sought admission to the bar in any state?

A. I have not.

Q. It probably goes without saying, but you're not a professional engineer, correct?

A. I'm not a professional engineer.

Q. And you're not an engineer of any kind?

A. No.

Q. Other than a law license, or a JD, we'll say, do you have any other professional degrees or

Page 30

certifications or licenses of any kind?

A. I have a Master's from the London School of Economics in Political Theory.  I do not have other professional certifications.

Q. To put it cleaner, other than educational degrees, you don't have any professional certifications or licenses?

A. Correct.

Q. You're not a economist?

A. Depends on your definition of economist.  I do not have a PhD in economics.  I don't identify as a economist.  I have papers in economics journals, or submitted to economics journals, coauthored with economists.

Q. You've never held yourself out as a economist, fair?

A. You know, it's a matter of degree.  I don't think of myself as an economist.  I have been introduced as an economist.

Q. You don't have any degree in Economics?

A. I do not.

Q. You don't have any degree in Accounting at any level, do you?

A. Nope.

Q. And you don't have any degree in Finance at

Page 31

any level?

A. No degree.

Q. You're not a certified public accountant?

A. No.

Q. You're not a meteorologist?

A. No.

Q. This may sound silly.

A. I'm happy to answer.

Q. Just for the record.  You're not a toxicologist, correct?

A. Correct.

Q. And you're not a climate scientist?

A. Correct.

Q. You're not an expert on climate change attribution, correct?

A. Correct.

Q. You're not an expert on adaptation to climate change?

A. I mean, I'm not an expert on climate change adaptation, to go back to your previous question. Much of my writing and research is about how legal systems are relevant to climate adaptation and mitigation.  So I -- again, I think it would depend a little bit on what you mean by that.  But there are people who would think of me as an

Page 32

expert about that.

Q. Let me ask you a little more specifically. You don't have any expertise from a technical perspective on climate change adaptation efforts?

A. Can you --

MR. PENDELL:  Objection to form.  Go ahead.

A. Can you explain what you mean by "technical perspective"?

Q. An engineering, perhaps, perspective?

A. I do not have an engineering perspective about that.

Q. Actions that one would take to adapt to climate change.

A. From an engineering perspective?

Q. From an engineering perspective.

A. No.

Q. How about any technical perspective?

A. I have to understand what you mean by "technical."

Q. It seems like you have a hang-up there.  Is there anything that you believe you do have that expertise in, as far as technical perspective for climate adaptation?

A. Sure, I don't need to get us hung up too

Page 33

much on this question. But I have written about insurance for climate change; about financial products relevant to basically underwriting things like counterparty credit risk for extreme events, all of which are relevant to climate adaptation and mitigation. But if the focus is on engineering, then no.

Q. Is it fair to say that any background you may have on climate change adaptation would be either insurance or legal perspective?

A. It would legal corporate governance, corporate structure insurance.

Q. Have you ever prepared or certified a SWPPP?

A. No.

Q. Do you know what SWPPP is?

A. It is extremely familiar, but would you mind reminding me.

Q. I'll state for the record that is a SWPPP is a Stormwater --

A. Oh, yeah, yeah, yeah.

Q. -- Pollution Prevention Plan.

A. Yes, yeah, yeah, yeah.

Q. When you say "yeah," I want to make sure you're not saying something I don't think you're saying.

Page 34

You have never prepared or certified --

A. I have never prepared or certified one.

Q. Have you ever prepared or certified an SPCC?

A. No.

Q. Do you know what a SPCC is?

A. Would you remind me.

Q. SPCC is a Spill Prevention and Countermeasures --

A. I have never.

Q. -- Control Plan.

Have you ever been directly employed by a bulk storage facility?

A. No, I have not.

Q. Have you ever been directly employed by a manufacturing facility of any kind?

A. No.

Q. Have you ever been directly employed by a chemical facility of any kind?

A. No.

Q. Prior to this case, have you ever worked on any projects or studies regarding bulk fuel storage facilities?

A. No, I have not.

Q. Have you ever worked directly with the Connecticut Department of Energy and Environmental

Page 36

Dykes about industrial stormwater permits in the state of Connecticut?

A. I have not.

Q. Let's talk about the other individual you referenced, Josh, whose last name you're unfamiliar with.  What did you speak with Josh at CT DEEP about?

A. Again, nothing to do with this case, nothing to do with stormwater permits, nothing to do with Shell.  Again, matters I would prefer not to talk about.

Q. Personal relationship?

A. It's a personal relationship.  We have spoken about electricity and the grid.  Nothing to do with Shell.

Q. Have you ever worked directly with the Environmental Protection Agency?

A. I have not.

Q. If I say "EPA," I assume you understand what I mean by that?

A. I will.

Q. Have you ever spoke when I anyone -- with EPA about industrial stormwater permits?

A. I have not.

Q. Have you ever spoken with anyone at EPA

Page 37

regarding anything to do with this case?

A. I have not.

Q. You have never worked as an inspector for any government agency, correct?

A. I have not.

Q. You don't have any background in regulatory enforcement with a government agency?

A. Nope.

Q. Safe to say you're not a member of the American Petroleum Institute?

A. I am not.

MR. KEARNEY:  Next exhibit will be Macey Exhibit 4.

(DEFENDANT'S EXHIBIT 4 FOR IDENTIFICATION Received and Marked.)

Q. I'll ask you, Professor Macey, have you ever seen this document before?

A. This all looks familiar.  Oh, is this my LinkedIn page?

Q. I'll say for the record it's a printout of your LinkedIn profile.  I'll respond this way because when you print them out, they don't look perhaps like they might if you access the page on your phone or computer.  But do you recognize this document to be an essentially a copy of the

Page 38

information that's on your LinkedIn profile?

A. It looks like it. I have not gone on my LinkedIn recently, but this -- I would expect this to be my LinkedIn, given that I never printed it out or...

MR. PENDELL: Actually, it's much nicer printed out.

MR. KEARNEY: No pictures, right?

Q. You're LinkedIn profile states you attended Yale University for your Bachelor's degree, correct?

A. Correct.

Q. And you earned a Bachelor's degree in English Language and Literature in 2012?

A. Correct.

Q. You then obtained a Master's degree in Political Theory from London School of Economics and Political Science in 2013?

A. Correct.

Q. And finally, you obtained a law degree from Yale Law School in 2017, correct?

A. Correct.

Q. So it's just eight years ago, right?

A. Yeah.

Q. And you have never held any position as a

Page 39

practicing attorney?

A. I have not.

Q. After law school, you worked as a law clerk for Judge Harvie Wilkinson in Virginia?

A. Correct.

Q. While you clerked for Judge Wilkinson, did you work on any Clean Water Act or Resource Conservation Recovery Act cases?

A. I don't believe so, but I don't think I'm supposed to talk about what I worked on while clerking. I mean, I did not, like -- I can say I did not work on any Clean Water Act or any EPA act. But I am supposed to not talk about what I worked on while clerking.

Q. Is there some rule of confidentiality that protects a clerk working for a judge?

A. I don't -- I mean, I actually don't know if there is. But he's pretty emphatic that he wants us to be discreet about that.

Q. I'll just state, I may ask you some questions about it today, but we can mark it at confidential at your request.

So we talked, you did not work on any CWA or RCRA cases with Judge Wilkinson?

A. Not that I can remember. Again, I'm not

Page 45

your bio page on the Yale Law School website;
correct?

A. Correct.

Q. Your bio states that you're currently on
leave from Yale Law School for the fall of 2025,
correct?

A. Correct.

Q. Why are you currently on leave?

A. I have a six-week-old girl.

Q. Congratulations.

A. Thank you.

Q. Your bio also states that while you've been
at Yale, you've taught courses, and a list of few
of them, I'll just ask you to confirm.  Advanced
State and Federal Electricity Law, --

A. Yes.

Q. -- correct?  Energy Law and Electricity?

A. Yes.

Q. Just so we're on the same page, was that a
course focused on electrical utility companies?

A. It's a course on public utilities, the
regulation of the grid, the natural gas system,
pipeline companies; how we regulate oil, gas and
electricity.

Q. So was part of that course regarding the

Page 46

regulation of bulk fuel storage facilities?

A. No.

Q. Is it fair to say that no aspect of your Energy Law and Electricity course at Yale covered a bulk fuel storage facility like the New Haven Terminal?

A. My course at Yale Law School did not cover bulk fuel storage facilities.  The reason I clarify that is I taught energy four times at Chicago, and there was in their -- under the -- I think under the Trump's first administration, there was an interesting FERC case involving an export facility for liquified natural gas, which I taught one year at the University of Chicago.

Q. For the record when you say "FERC," can you explain what that is?

A. The federal Energy Regulatory Commission.

Q. I think you said that that regarded liquified natural gas storage?

A. It regarded -- the interesting question is whether FERC has jurisdiction to regulate liquified natural gas export facilities.  Because there's an interesting question in the Federal Natural Gas Act about does it have to be coming into the US or in the US.

Page 47

Q. So other than the jurisdictional ability to regulate a liquified natural gas facility, under the case you mentioned, was there any other aspect of that course that discussed bulk fuel storage facilities?

A. No.  The course -- the gas portion of the class is focused on FERC's major restructuring -- (inaudible).

(The reporter asked for clarification)

A. FERC's major restructuring order.  So FERC's authority to regulate the transportation of gas in domestic markets.

Q. Have you ever taught any course regarding industrial stormwater permits of any kind?

A. No.

Q. You also taught a course at Yale Law School called Public Utility Law (Energy), correct?

A. So I'm interested -- I will be teaching -- oh, I did so, okay.  It's interesting.  I have taught Public Utility Law.  Advanced State and Federal Electricity Law, I'm scheduled to teach in the spring.  But --

Q. What was that?

A. Advanced State and Federal Electricity Law, I will be teaching in the spring of 2026.  So the

Page 49

Yale.

Q. You have not taught any courses as a professor at any law school on the subject of Ethics, correct?

A. I have not taught any courses on Ethics.

Q. You have not taught any courses on Civil Procedure?

A. Oh, no.

Q. You have not taught any course, then, on Evidence?

A. No.

MR. KEARNEY:  This will be Macey Exhibit 6.

(DEFENDANT'S EXHIBIT 6 FOR
IDENTIFICATION Received and Marked.)

Q. Professor Macey, have you ever seen this document before?

A. Yes, I have.

Q. What do you recognize it to be?

A. This is my CV.

Q. This is, for the record, a copy of your curriculum vitae that was provided with your initial expert report in this case.  And I'll ask you, does this CV, is it current, is it up to date?

Page 61

in preparing your expert opinions?

A. Correct.

Q. So looking at these lists, it appears you have not reviewed any of the permits or permit documents for the New Haven Terminal.

A. Correct.

Q. You have not reviewed the EPA Multisector General Permit.

A. Correct.

Q. Do you know what that is?

A. No, I do not.

Q. You agree that your list of materials considered for this case, this case, does not contain the 2018 permit that was in effect for the New Haven Terminal at that time, correct?

A. Correct.

Q. Or the 2021 permit, which is the current permit in place for the terminal, correct?

A. Correct.

Q. You have not reviewed the draft permit that CT DEEP has published in 2024 and 2025, correct?

A. Correct.

Q. You have not reviewed the SWPPP in place for the New Haven Terminal?

A. Correct.

Page 62

MR. KEARNEY:  For the record, SWPPP is S-W-P-P-P.

Q. You have not reviewed the SPCC that is in place for the New Haven Terminal, correct?

A. What does "SPCC" stand for?

Q. We talked about that earlier, Spill Prevention Control Countermeasures.

A. Correct.

Q. You have not reviewed that?

A. I have not.

Q. And you're not offering any opinion about those documents we discussed in this case, correct?

A. I would -- I assume it depends what you mean by "opinion about those documents."  I don't -- but if you could clarify, I think I understand.

Q. So with the premise that you have not reviewed those documents, you're not offering any opinion in this case about what those documents say or don't say, correct?

A. So I did review documents in which individuals -- and I'd want to go back and look at them -- mentioned in emails, for example, about who was listed as the owner or operator on the permit.  And so I, based on my review of those

Page 63

documents, do have an opinion about that specific question.

Q. Having not reviewed the permits themselves, you're not going to offer an opinion in this case that defendants are currently in violation of any of the provisions of those permits, correct?

A. My -- that seems like, again, a legal conclusion.  And so my -- the way that I understand my role here is not to provide a legal conclusion about whether the defendants are in fact in violation of the permits.

Q. Whether or not it's a legal conclusion, it's not an opinion that you're offering, correct?

A. I do not have an opinion about that.

Q. So you're not offering an opinion that defendants are currently in violation of the Clean Water Act?

A. I am not offering an opinion about that. Sorry.

Q. Sure.

A. I'm not offering an opinion about whether the defendants are in violation of the Clean Water Act.  Because my initial report prompted a response about the role of Shell's financial resources, if asked, I would be willing to provide

Page 64

an opinion about how Clean Water Act penalties are calculated, which is not, to be very nitpicky and precise, an opinion about whether there was in fact a violation.

Q. Pretty sure we're talking about the same thing here.  Let's just put it very generally, right?  There's a side of the case that might be considered liability and side of the case that might be considered damages, right?

A. Yep.

Q. If anything, --

A. Yep.

Q. -- your opinion would be about penalties under the damages phase of the case.

A. Correct.

Q. You're not offering any opinion about the liability phase of the case.

A. Correct.

Q. The only deposition that you've considered in forming your opinions in this case is the February 6, 2025 rule 30(b)(6) deposition of Brian Evans, correct?

A. I'd have to review what I cited in my report, which I'm happy to do now.  But I take your word for that.

Page 66

MR. KEARNEY:  For the record, that's J-A-R-A-M-I-L-L-O.

Q. And you have not reviewed any of the deposition testimony, Professor Macey, of Paul Verlaan?

A. I -- no.

MR. KEARNEY:  And for the record, that's V-E-R-L-A-A-N.

Q. Professor Macey, you've also not reviewed the deposition testimony of James Kent Yeates?

A. No.

MR. KEARNEY:  And for the record, that's Y-E-A-T-E-S.

Q. And Professor Macey, you've not reviewed the rule 30(b)(6) deposition testimony of the plaintiff in this case, Conservation Law Foundation, correct?

A. Correct.

Q. You have not reviewed any Declaration of an employee within the Shell group of companies that was submitted in this case either, correct?

A. Correct.

Q. Did you ask for any additional information or materials that were not provided to you in your review of the materials for this case?

Joshua Macey                          September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 67

A. I did.

Q. What documents, if any, did you ask for that you were not able to obtain?

A. I was -- well, I asked -- I did not ask for specific documents.  I told the attorneys from Motley Rice that these are the kinds of documents that would be useful for my report.  They then sent me a list of a bunch of documents.  After reviewing those documents, I sent description of other types of documents that would be useful. They sent me those documents.  I reviewed those. I think that happened one more time.  And on the basis of the documents they furnished in response to my description of the kinds of documents that would be useful, I prepared my report.

Q. So what I'm getting at, is there any document that you believe is out there that you haven't seen that you think would impact your ultimate opinions in this case?

MR. PENDELL:  Objection to form.  Go ahead.

A. I submitted a request for all of the kinds of documents that would be useful to me in understanding the types of relationships between various Shell subsidiaries and affiliates.  On the

Page 72

express an opinion in the report I authored about that question.

Q. So maybe a more straightforward question on this.  You're not offering an opinion in this case that any party, other than the defendants that are in the case, owned, operated, participated -- or participated in or controlled the New Haven Terminal?

A. That is correct.

Q. And you agree that Motiva no longer owns or operates the New Haven Terminal, correct?

A. Correct.

Q. And they have not done so since May 1st of 2017?

A. Again, I am pretty sure I trust you on the May 1st question.  When I reviewed the documents that were -- the transition took a few months, but, correct, --

Q. Certainly --

A. -- preceding that.

Q. Certainly you agree that at least 2017 would be the correct date?

A. 2017 would be the correct year.  I'm sorry, slow down, don't interrupt.

Q. I'll slow down as well.  I'm sure that will

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 73

make the court reporter very happy with both of us.

This may go without saying, but you're not offering any opinion that Motiva still participates in any way in the operation of the New Haven Terminal today, are you?

A. I don't -- I do not -- did not express an opinion that Motiva continues to participate in the operation of the terminal today.

Q. And are you not offering that opinion in this case?

A. Correct.

Q. You're not offering an opinion in this case that Motiva still controls the New Haven Terminal today, correct?

A. Correct.

Q. You're not offering any opinion that Shell USA Incorporated owned or operated the New Haven terminal at any time, correct?

A. Given who the named defendants are in this case, I'm not offering that opinion.

Q. You're not offering any opinion that Shell PLC owned or operated the New Haven Terminal at any time either?

A. Again, same answer as previously.

Page 87

inherently wrong with those benefits of a vertically integrated company?

A. Well-managed vertical integration is something we should celebrate.

Q. In fact, those benefits are generally good things that are provided to a company and its shareholders?

A. Good for the company, shareholders and the world economy.

Q. Is it also common for a parent company to install a board of directors to manage its subsidiaries?

A. Yes.

Q. Nothing inherently wrong with that, right?

A. Nothing inherently wrong about that.

Q. In fact, do you recognize the parent company's management of subsidiaries in this fashion is often a good thing?

A. Absolutely.

Q. This type of corporate structure allows the parent company to ensure that its companywide policies are adhered to?

A. So adhere --

Q. Still talking about in general.

A. Talking about in general, this is how

Page 93

Q. Motive no longer shares any parent or subsidiary with any company within the Shell group of companies, does it?

A. No.  I trust that after the period I reviewed, nothing happened; but yeah.

Q. You also talk about joint ventures in your initial expert report.

A. Yes, I did.

Q. A joint venture is when two separate companies collaborate to invest in a business in which they agree to share certain portions of the profit and losses of that company, correct?

A. Correct.

Q. Joint ventures are also very common in your experience?

A. Correct.

Q. And very common across all industries?

A. Correct.  Well, all -- across many and -- yeah, correct.

Q. Sure.  Do joint ventures provide for many of the same benefits that we just discussed in the context of parents and subsidiaries?

A. They do.

Q. And there's nothing inherently wrong with two or more companies working together in a joint

Page 95

It is possible that Motiva continued to exist in some capacity.  And so I -- that particular opinion, I would be happy to look back at.

Q. So to the extent that Motiva was dissolved pursuant to the agreement that you reference, that would only have been to the extent that it no longer persisted as that joint venture; fair?

A. Yeah, the opinion that I provided is that Motiva was no longer involved in the administration or operational control of the New Haven Terminal after a period in 2017.

Q. Do you understand that Motiva is still an active company today, correct?

A. I am getting that impression.  I think that I trust you.

Q. So to the extent that your expert reports imply that Motiva was wholly dissolved as a company and no longer exists, that would be incorrect, right?

A. Motiva, yes, that would be incorrect.

MR. KEARNEY:  I think this is a good time to take a break, if that's okay.

THE VIDEOGRAPHER:  We are now going off the record.  The time is 10:53 a.m.

(R E C E S S)

Page 98

veil, correct?

A. Correct.

Q. You agree that holding a parent liable for the actions or losses of its subsidiary is the exception, not the rule, correct?

A. As a default rule, parents are not held liable for the actions of subsidiary. Absolutely.

Q. That is because the limited liability role for this type of corporate structure is an important protection that's provided to shareholders of a parent company.

A. It's because limited liability is one of the greatest inventions of western civilization; and absolutely, yeah.

Q. And it's an important protection that shareholders have?

A. Yes, there are many economic arguments suggesting that growth, huge economic growth, beginning in the 19th Century, is tied to the invention of limited liability.

Q. And it takes a court to find that the typical role of limited liability should not be applied in a particular case, correct?

A. That, in a particular case, that question is a legal question. That is, yes, absolutely.

Joshua Macey                                 September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 99

Q. And it would take the court to decide that legal question, right?

A. Yes.

Q. And that is something that a judge would have to decide, fair?

A. Fair.

Q. You're not advocating to the court to actually toss aside the limited liability protections of Shell's holders in this case, are you?

A. I do not have -- my opinion is about the relationship between a series of Shell entities and Motiva. And I am not advocating in any way about what the judge should find.

Q. Are you rooting for CLF to win its case against the defendants?

A. I'm not -- I'm not -- my opinion is based -- I was asked to review evidence. This is a topic that interests me. And so I reviewed the documents I was provided and expressed a series of, you know, opinions about the corporate structure. I'm not rooting for anyone.

Q. I just want to make sure we're on the same page. You're not offering an opinion that Shell USA Incorporated or Shell PLC, for that matter,

Joshua Macey                                     September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 100

should be held liability as a direct operator of the New Haven Terminal, are you?

A. In my report, I do not express an opinion -- you said Shell PLC and what was the other entity?

Q. Or Shell USA Incorporated.

A. Correct.

Q. Correct, you are not offering that opinion?

A. I am not offering that opinion.

Q. That would be an example of what we've been referring to previously as advocacy, wouldn't it?

A. That would.

Q. And you're aware that plaintiff has already voluntarily dismissed its claims against all defendants except Triton, Equilon and Motiva?

A. Correct.

Q. So plaintiff has already voluntarily dismissed its claims against Shell USA Incorporated with prejudice in this case, correct?

A. Correct.

Q. And plaintiff has already dismissed its claims against Shell Petroleum Incorporated with prejudice in this case.

A. Correct.

Q. Now, each of the remaining defendants, Triton, Equilon, and Motiva, have actually served

Page 120

documents, I think, list the specific terminals. That didn't appear to be relevant.  It wouldn't have influenced my opinion one way or another. But I -- I'm not sure that's right.

Q. The only documents that you cite in this section -- I'm talking about pages 10 through 14 of your initial expert report -- that is from before 2011, reports -- purports to reflect Equilon's oversight of a 2001 consent degree regarding other facilities, --

A. Yes.

Q. -- is that correct?  It's from 2001.

A. Yes.

Q. The actual footnote that you have in your report goes to a different document, which is a service level agreement from 2011 -- for the record, that's SOPUS, Bates number SOPUS_NHVN01091520, which is cited elsewhere in your report.  Do you agree that that is not the 2001 --

A. That's not the 2001.

Q. Is that a typo?

A. Yes.

Q. In any event, you concede in your report that even that consent decree did not cover New

Page 121

Haven Terminal.

A. The consent decree that I was intending to cite to was not about the New Haven Terminal.

Q. That consent degree applies to various refineries, correct?

A. Correct.

Q. Do you agree New Haven Terminal is not a refinery?

A. Correct.

Q. It's not bulk fuel storage?

A. Yes.

Q. Otherwise, your support for the proposition that Equilon shared operational authority for New Haven Terminal during the period of Motiva's ownership from 1998 to 2017 is limited to various service level agreements, correct?

A. Service level agreements were very important in my conclusion.  They were not the only materials that determined that.  Other documents I consulted and cited included emails between Equilon, Motiva, and Triton entities to environmental regulators.

The service level agreements incorporated things like HSSE & SP, which is Health, Safety, Security, Environmental and Social Policy,

Page 140

Q. I just want to direct -- before I do that, let me ask you, this document does not make a single reference to the New Haven Terminal either, does it?

A. I believe you.

Q. I just want to direct your attention quickly to what's marked as Bates 1191525 at the bottom, assuming it has Bates on it.  Let's see if I can find the page number.

Yes, okay, go to page 6.

A. Okay.

Q. I'll say for the record, this is a document that is ordinarily Bates stamped SOPUS_NHVN01091520.  Your version doesn't have the Bates stamp, but I'll represent the document is that one.

So turn to page 6.  You see the chart up top?

A. I do.

Q. And which includes certain facilities by name?

A. Yes.

Q. The New Haven Terminal is not listed there, correct?

A. Correct.

Page 146

possible someone at Shell has also reviewed it. But I reviewed a significant number of documents with that particular question in mind, such that a comparative assessment would involve -- we'd have to have a test or something.

Q. Okay, I want to look at some documents that discuss this.  And this will be Macey Exhibit 14.

(DEFENDANT'S EXHIBIT 14 FOR IDENTIFICATION, Received and Marked.)

Q. We discussed earlier in the deposition that you did not review any Declaration submitted by the defendants in this case, right?

A. Correct.

Q. I'll represent for the record that this is a Declaration of James Kent Yeates submitted in this action pending in the District of Connecticut, signed September 9, 2022.

And I'll just ask you, you haven't seen this document before, correct?

A. No, I have not.

Q. Do you see, on the very first page, the first paragraph -- actually, let me back up for a moment before I do this.

You're an attorney.  Do you understand what a Declaration is in this context?

Page 147

A. I do.  I'm not an attorney, but I --

Q. That's correct, you have a JD.

A. I have a JD.

Q. Do you understand what a Declaration is in this context?

A. Yes.

Q. In another context, perhaps it might be referred to as an affidavit.

A. Yep.

Q. It's something someone submits under penalty of perjury, testifying everything they include is accurate to the best of their knowledge; correct?

A. Correct.

Q. Similar to what you're doing here today in the deposition.

A. Correct.

Q. So let's turn back to what this document says in the very first page.

It says "My name is James Kent Yeates.  I am the lead facility engineer for the east coast Equilon terminals, which includes the bulk petroleum distribution and storage terminal located in New Haven, Connecticut that is owned by Triton Terminaling LLC and operated by Equilon Enterprises LLC."

Page 151

Equilon entities or operational control may be -- in which I would quibble with that.

Q. Do you agree that defendants have multiple facilities located in different areas of the country that do different business activities, generally speaking?

A. I agree with that.

Q. And do those facilities have unique operational risks, for example, based on the location at which they operate?

A. I haven't reviewed the other ones.  It would not be surprising to me if, for example, hurricane risk is different.

Q. For example, there may be site specific factors to operating a facility that operates with one business purpose versus a different facility that has a different business purpose; fair enough?

A. So that's a little outside my area of expertise.  And I don't really have a view.  I mean, speaking in the abstract, I can imagine that that is true.  But I haven't reviewed the other terminals, nor am I an expert on things like hurricane mitigation risk.

Q. Do you agree that regulations may be

Page 168

Triton -- employed by Motiva, Equilon or Triton, which does not suggest that there is some gap between my understanding, at least at the New Haven terminal, and that of Mr. Yeates.

Q. Let's look to paragraph 27, please. I'll read it for the record, at least the beginning of this long paragraph, which states "Even for liquid fuel terminals on the east coast, there is no one-size-fits-all set of practices for stormwater management. For example, the terminals located in Long Island, Providence and New Haven all require different management practices for drainage of stormwater based on site specific conditions and permit requirements."

Did I read that correctly?

A. You did.

Q. Do you have any reason to dispute that there are different management practices at the different facilities?

A. So here, this is -- this is getting -- I enjoyed the beginning of our conversation where I was reminded that I'm not an engineer. And this is starting to get at the engineering/lawyer/ corporate structure difference.

I am not an expert in things like drainage

Page 169

of stormwater specifically.  I have no knowledge that would lead me to dispute the claim that drain water -- drainage of stormwater requirements differ at these terminals.

My reading of the New Haven Terminal's processes was that everyone who is marching to the beat of the HSSE and SP framework with little discretion, that may or may not be different at other terminals.  Whether or not it is different would still -- if I were to review how HSSE and SP control framework was implemented at those terminals, I would still want to see who is making the decision in order to reach a conclusion about who is the operator, about what operator, who is the operator there.

Q. So not being an engineer, you're not offering any opinion to dispute Mr. Yeates' statement here that there's no one-size-fits-all set of practices for stormwater management; correct?

MR. PENDELL:  Objection to form.

A. I have no opinion on that.

Q. Okay.  I'll read the remainder of the paragraph which begins with the sentence starting with "There is."

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 194

A. I have not.

Q. Would that have been relevant to your points in this case?

MR. PENDELL:  Objection to form.

A. Again, I would need to look at the deposition.

Q. And this document, again, states that the Shell group of companies is not dictating what any of its subsidiaries must do at particular facilities with regard to risk management; correct?

A. This particular documents we're looking at?

Q. Correct.

A. I haven't reviewed the whole document.  I actually don't -- because I'm just skimming it, and the next paragraph says "The Hurricane Action Plan has been incorporated into a Business Continuity Plan."  And I don't have -- I haven't looked at any of these things, so I really would have to look at more, both about document and then about things like the Business Continuity Plan, which I also believe I haven't reviewed.

Q. And you haven't reviewed the SEAM standards either?

A. I have not.

Page 195

Q. So your expert reports obviously do not offer any opinions regarding SEAM standards, Hurricane Action Plan or the Business Continuity Plan, right?  Because you haven't reviewed them?

A. I don't think I reviewed this Hurricane Action Plan.  I reviewed some hurricane stuff, but I don't think this is the one.  But we'd have to look back.

Q. In any event, my question still stands: You're not offering any opinions about those documents in this case?

A. Correct.

Q. Do you agree that's a good thing for individual facilities in different locations to be managing their own site specific risks?

A. Oh, man, we have to look at -- that's a very abstract question.  As we discussed, sometimes vertical integration is important because there will be expertise that can be consolidated in a single entity.  Sometimes there may be reasons to deviate based on idiosyncratic features at a specific site.  And I would want to know much more information about all of that.  The answer is it depends, it could certainly be the case.

Q. Put this document aside.

Page 213

the terminals he worked on, whether DEPs applied or not.  And he absolutely mentioned the New Haven terminal.

Given what I take to be the possibility of an inconsistency here, it just seems know that I would want to understand what he is testifying about, what his responsibility was for Shell, and how it compares to the second testimony that we just looked at.  But I don't think we're disagreeing, really, here.

Q. And to be sure, you are and never been employed by any company within the Shell group of companies; correct?

A. Correct.

Q. And these DEPs are internal documents created within the Shell group of companies; correct?

A. Correct.

Q. In other words, they're not external regulations created by any government agency like the EPA or CT DEEP?

A. Correct.

Q. Or Congress, --

A. Correct.

Q. -- right?  So we agree that employees within

Page 232

MR. PENDELL:  I'm sorry, can you -- I didn't hear that question.

MR. KEARNEY:  Sure.  For the record, we're just going to get the door.

Q. So my question is, do you agree that Shell PLC's balance sheet has nothing to do with whether the defendants are in compliance with the permit requirements that are in place at the New Haven Terminal?

A. You're asking about liability, not damages, right?

Q. That's right.

A. Then correct.

Q. Same questions for, for example, Shell PLC's income before taxation.  Does that have anything to would with whether or not defendants are in compliance with the permit requirements?

A. No, I don't think so.

Q. How about Shell PLC's profitability in general?

A. The question of is Shell complying with the Clean Water Act and RCRA -- not is Shell.  Is Motiva or Equilon or Triton complying with the Clean Water Act or RCRA.  Shell's balance sheet is not relevant to the question of liability.

Page 242

that.  I don't mean that.

Did you endeavor to take, after looking at the corporate documents in this case to understand the corporate structure, did you then endeavor to take that analysis and apply the Bestfoods standard to make a determination as to whether or not it met the Bestfoods standard?

MR. KEARNEY:  Objection to form.

A. I did not make -- I described the facts as I would think that someone would find them to be relevant or useful, but I did not apply the Bestfoods standard to these facts.

Q. Counsel asked you some questions way back in the beginning of the deposition about the percentage of your income that was from being an expert witness in this litigation versus Yale. And I think you said around 20 percent, correct?

A. Yep.

Q. That's 20 percent just for this year, true?

A. True.

Q. Because prior to this year, you had never done this before, right?

A. I have never received consulting income before, yes.

Q. Do you have any other case as we sit here

Page 256

about operation control?

A. So that's consistent with the documents I read, which formally outline the fact that decision -- compliance above certain dollar amounts had to be approved by different entities, including Shell T&S. It, again, suggests to me other entities are heavily involved in the operational decisions of the terminal.

MR. PENDELL:  I have nothing further.

MR. KEARNEY:  A little bit of a ping-pong going back and forth here.

MR. PENDELL:  I'm going to have to have the last word, so --

MR. KEARNEY:  You may, you may.

FURTHER REDIRECT EXAMINATION

BY MR. KEARNEY:

Q. The rule that was referenced about certain individuals having certain spending authority at the terminal that was just referenced, do you agree that it is common among all kinds of companies that certain individuals have a certain spending authority that is assigned to them to make improvements at any facility?

A. Again, it is common to exercise supervision. It is common to be able to oversee and possibly

Page 257

approve or veto certain spending decisions.  And so the question of whether those other entities exercise operational control gets to does this get at the day-to-day things, is it the major issues. So again, it's a case specific inquiry that we've been getting at.

Q. So what I'm getting at, I guess, is it would not be unusual for a certain individual, a certain individual at any company, to have spending authority of let's say a million dollars, and then if you want to spend between a million and some other number, you got to go to somebody else. That's not unusual, is it?

A. That fact is not unusual and for the question of operator, is someone and operator, it's going to depend on the specifics of the case, yes.

MR. KEARNEY:  Those are all the questions I have.  If Mr. Pendell would like the last word, it may be his.

FURTHER RECROSS-EXAMINATION

BY MR. PENDELL:

Q. Let me just ask you this question to summarize.  Is it fair to say no one data point is determinative as to the analysis of who had