# Exhibit A

## Filed Under Seal

Jacqueline Michel , PhD          August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION,

INC.,

          Plaintiff,              Case No.

          vs.                     3:21-cv-00933-VDO

EQUILON ENTERPRISES LLC d/b/a

SHELL OIL PRODUCTS US, TRITON

TERMINALING LLC, and MOTIVA

ENTERPRISES LLC,

          Defendants.

VIDEOTAPED

DEPOSITION OF:  JACQUELINE MICHEL, PhD

DATE:           August 22, 2025

TIME:           9:11 AM

LOCATION:       Nelson Mullins Riley &

                Scarborough, LLP

                1320 Main Street, 17th Floor

                Columbia, SC

REPORTED BY:    Sandra K. Bjerke, RDR, CRR, CBC

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

APPEARANCES OF COUNSEL:
         ATTORNEYS FOR THE PLAINTIFF:
                 MOTLEY RICE, LLC
                 BY:  SHALOM D. JACKS
                 28 Bridgeside Boulevard
                 Mt. Pleasant, SC  29464
                 843-216-9000
                 sjacks@motleyrice.com


         ATTORNEYS FOR THE DEFENDANTS:

                 KING & SPALDING, LLP
                 BY:  RYAN T. KEARNEY
                 1180 Peachtree Street NE
                 Atlanta, GA  30309
                 (404) 572-4600
                 rkearney@kslaw.com

         ALSO PRESENT:
                 Bob Kiel, Videographer

                 (INDEX AT REAR OF TRANSCRIPT)

Page 7

take a break about once every hour, but if you need a break at any other time, just let me know and that's fine.  The only thing I'll ask is if there's a question pending, that we just go ahead and answer that question and then we take the break.

Does that make sense?

A.   Yes.

Q.   Okay.  Dr. Michel, is there anything that would prevent you from giving complete and accurate testimony today?

A.   No.

Q.   And you've sworn to tell the truth in response to all of my questions; correct?

A.   Yes.

Q.   Did you bring any documents or materials with you to your deposition today?

A.   No.

Q.   Okay.  When were you first contacted to serve as an expert witness in this case?

A.   About a year and a half ago.

Q.   Did you have any prior relationship with CLF before you were asked to be an expert in this case?

A.   No.

Q.   Have you been disclosed by CLF as an

Page 9

in that case?

A.    I do not.

Q.    Dr. Michel, what do you understand your expert role to be in this case?

A.    My role is to look at the potential environmental effects of a release from the terminal under extreme weather events and make the determination where there's an environmental endangerment.

Q.    I promise, we're going to get into this in more detail in a minute, but can you please summarize for the record what issues you've been asked -- excuse me, microphone fell -- what issues you've been asked to testify about, if they're any different than what you just told me about, your expert role in the case.

A.    I was also asked to write a rebuttal to the -- three of the expert witnesses.  Expert -- yeah, expert witnesses retained by the defendant.

Q.    Those witnesses that you were asked to rebut were Etkin, McCay, and Morrison; correct?

A.    Correct.

Q.    Do you understand that this case is about the Equilon New Haven Terminal?

A.    Yes.

Page 16

(EXHIBIT 3, Additional Materials Considered, marked for identification.)

MR. KEARNEY:  I'll state for the record this is an additional document we received from plaintiff's counsel on August 20th with the title Additional Materials Considered.

BY MR. KEARNEY:

Q.   Dr. Michel, have you seen this document before?

A.   Yes.

Q.   And what do you understand this to be?

A.    The materials that I reviewed following the additional materials in connection with my report.

Q.   Thank you.

We're going to come back to this in a few minutes as well.  I just wanted to ask you a couple of other questions about documents you may or may not have.

Do you have any set of data and calculations that you relied on in forming your opinions in the case?

A.   No.

Q.   Do you have any exhibits or demonstratives that you've already prepared that

Page 26

A.    It's listed there.

Q.    I assume that refers to responding to oil spills after they've occurred; is that fair?

A.    Yes.

Q.    And the next item under that is HAZWOPER, H-A-Z-W-O-P-E-R.  And does that stand for hazardous waste operations and emergency response?

A.    Yes.

Q.    So is that also a field that deals with responding to oil spills after they've occurred?

A.    Yes.

Q.    So on the top now to the right of that on this page under Summary, do you see that section?

A.    Yes.

Q.    And this section discusses that much of your experience is based on emergency response to oil and chemical spills.

A.    Yes.

Q.    You also specifically list response strategies and shoreline cleanup in that expertise; correct?

A.    Correct.

Q.    And in the next section marked Specialties, you state that you specialize in spill

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 27

planning, response, and damage assessment; correct?

A.    Yes.

Q.    Is it still correct here that with all these references, you're still generally referring to the planning and responding to an oil spill after it's occurred?

A.    Yes.  And hazardous materials.

Q.    Yes.  Your LinkedIn profile provides that you're currently employed as the president of Research Planning, Incorporated.

A.    Yes.

Q.    And you've worked at Research Planning, Incorporated since 1977.

A.    Yes.

Q.    This -- your CV, which we'll talk about in a minute, states that you've served as the president of -- can I call it RPI?

A.    RPI, yes.

Q.    Of RPI since 2000; is that right?

A.    Yes.

Q.    And you were actually one of the founders of that company?

A.    Yes.

Q.    It's actually a company that you helped found while you were still studying for your PhD.

Page 36

know, not a specific spill, but spills in general.

Q.   Is that generally just the kind of research you do to be ready to work on a project if you were hired for an oil spill kind of thing?

A.   It's more that we get hired to do research to inform the spill response community. Not just my company, but responders in general and planners and agencies and industry folks who are involved in oil spill planning and response.

Q.   We just discussed this, but you're not an engineer of any kind; right?

A.   No.

Q.   So this may seem a little silly, but I just have to ask you some follow-up questions I assume I know the answers to, but let me just get through this list, and bear with me, please.

You're not a structural engineer, for example.

A.   No.

Q.   You're not an industrial engineer?

A.   No.

Q.   Or a chemical engineer.

A.   No.

Q.   You're not a mechanical engineer?

A.   No.

Jacqueline Michel , PhD                        August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 37

Q.    And you're not a tank engineer either;
correct?

A.    No.

Q.    You're not a meteorologist?

A.    No.

Q.    You're not a metocean engineer?

A.    No.

Q.    You're not a toxicologist?

A.    Not by training.

Q.    Would you defer to a toxicologist to
evaluate the toxicity of potential contaminants?

A.    I work with toxicologists to make that
assessment.

Q.    So if you're on a project that requires
a toxicological assessment, you would retain a
toxicologist to help you with that; fair?

MS. JACKS:    Objection; speculation.

THE WITNESS:    Under certain conditions,
yes.

BY MR. KEARNEY:

Q.    You're not a climate scientist;
correct?

A.    Correct.

Q.    And you're not an expert on climate
change attribution.

Page 38

A.   No.

Q.   No, you're not an expert.

A.   I'm not an expert, yes.

Q.   Have you ever prepared a stormwater pollution and prevention plan?

A.   No.

Q.   Do you understand that if I refer to that as a SWPPP, that's what I'm talking about?

A.   Yes.

Q.   Have you ever certified a SWPPP?

A.   No.

Q.   Are you familiar with the regulatory requirements relating to the preparation of a SWPPP?

A.   No.

Q.   Have you ever prepared for a spill prevention and countermeasures -- spill prevention, control, and countermeasures plan?

A.   No.

Q.   Do you understand if I refer to that as SPCC, that that's what I'm talking about?

A.   Yes.

Q.   Are you familiar with the regulatory requirements relating to the preparation of an SPCC?

Page 39

A.   Only generally.

Q.   What's your understanding of generally?

A.   There's a certain worst case discharge number that they have to be able to show that they have sufficient containment.

Q.   Generally speaking, it would be someone -- up to someone other than you to look at those regulations and then to prepare the SPCC, though; correct?

A.   Correct.

Q.   Have you ever been directly employed by a bulk fuel storage facility?

A.   No.

Q.   Have you ever designed a bulk fuel storage facility?

A.   No.

Q.   Have you ever designed secondary containment berms for a bulk fuel storage facility?

A.   No.

Q.   Prior to this case, have you ever worked on any projects regarding industrial facilities in the state of Connecticut?

A.   No.

Q.   Have you ever worked directly with the Connecticut Department of Energy and Environmental

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 40

Protection?

A.    No.

Q.    If I refer to that as CT DEEP, would you understand what I mean by that?

A.    Yes.

Q.    Have you ever worked directly with the Environmental Protection Agency?

A.    I have not personally.

Q.    And same thing.  I may refer to that as EPA.  I assume --

A.    Yes.

Q.    -- you understand what I'm talking about.

A.    Yes.

Q.    You've never worked as an inspector for a government agency, have you?

A.    No, I have not.

Q.    Have you ever even spoken with anyone from CT DEEP regarding its stormwater regulations?

A.    No.

Q.    Have you ever spoken with EPA regarding stormwater regulations?

A.    No.

Q.    Are you a member of the American Petroleum Institute?

Page 41

A.    No.

Q.    Okay.  So we talked earlier a bit about how you often lead multidisciplinary teams on projects; right?

A.    Yes.

Q.    In the multidisciplinary projects that you work on where you bring in other people to help with you, you're not typically personally responsible for the calculation of spill volumes; correct?

A.    Correct.

Q.    That's someone that -- that's something that you would bring in someone else to help you with.

A.    Yes.

Q.    If a project required calculating spill volume calculations, you -- strike that.

On the projects that you -- that involve calculating spill volume calculations where you've brought in someone else to help you with that, someone that you brought in on several occasions is Dr. Dagmar Etkin; correct?

A.    Yes.

Q.    Do you agree that Dr. Etkin is a reliable authority in the field of spill volume

Page 42

calculations?

A.   Yes.

Q.   Do you agree that Dr. Etkin has a high degree of competence in the field of spill volume calculation?

A.   Yes.

Q.   Do you believe that Dr. Etkin has provided accurate spill volume calculations in the projects that you have worked together on?

A.   Yes.

MS. JACKS:  Objection; vague.

THE WITNESS:  I'm sorry.  Yes.

BY MR. KEARNEY:

Q.   Is there any reason why you would not hire Dr. Etkin to perform spill volume calculations for you on a future project?

A.   No.

Q.   Okay.  And in the projects you work on, these multidisciplinary teams, when you hire other people to help you with aspects of them, you're not typically personally responsible for creating a spill model either; correct?

A.   Correct.

Q.   If a project required work like that, that is something that you would typically retain

Page 43

an expert in spill modeling to help you on that team; right?

A.    Yes.

Q.    And one of the spill modeling experts that you have asked to serve on multidisciplinary teams to help you with spill modeling is Dr. Deborah McCay; correct?

A.    Deborah French-McCay.

Q.    It's Deborah French-McCay now, and at one point it was Deborah French; right?

A.    Right.

Q.    And you've hired Dr. French-McCay to perform spill modeling for you on several occasions; correct?

A.    Yes.  Her company, yes.

Q.    Do you agree that Dr. McCay -- Dr. French-McCay is a reliable authority in the field of spill modeling?

A.    Yes.

Q.    Do you agree that Dr. French-McCay has a high degree of competence in the field of spill modeling?

A.    Yes.

Q.    Do you believe that Dr. French-McCay has provided accurate spill modeling work in the

Page 44

projects that you have worked together on?

A.    Yes.

Q.    Is there any reason why you would not hire Dr. French-McCay to perform spill modeling work for you on a future project?

A.    No.

Q.    In fact, your CV also lists several publications that you have co-authored with Dr. Etkin and/or Dr. McCay; fair?

A.    Yes.

Q.    Okay.  Switching gears here, obviously you've prepared a rebuttal expert report in this case; right?

A.    Yes.

Q.    And that's what you have in front of you as Exhibit 5; right?

A.    Yes.

Q.    Does this appear to be an accurate and complete copy of the rebuttal expert report that you served in this case?  Feel free to flip through it.

A.    Yes.

Q.    And if you look on page 17, that's your signature; right?

A.    Yes.

Page 47

on it in preparing your opinions; right?

A.   Yes.

Q.   So I take it from reviewing these lists that you have not reviewed any of the permits or permit documents for the Equilon New Haven terminal; is that fair?

A.   Yes.

Q.   Or the EPA MSGP.  Do you know what the MSGP is?

A.   No.

Q.   The EPA Multi-Sector General Permit.

A.   I have not seen those.

Q.   Not something that you relied on in this case.

A.   No.

Q.   Have you reviewed the 2024 or 2025 draft permits from the State of Connecticut that would apply to the terminal if they are finalized?

A.   No.

Q.   I take it you've also not reviewed the terminal's SWPPP.

A.   I have not.

Q.   Or the terminal's SPCC.

A.   I have not.

Q.   And you're not offering opinions

Page 48

regarding those permit documents in your role in this case; is that fair?

A.   Yes.

Q.   You're not offering opinions regarding the provisions of the SWPPP or the SPCC in this case either; correct?

A.   Correct.

Q.   You have not reviewed any deposition testimony in this case, have you?

A.   No.

Q.   Were there any documents or additional information that you would have liked to see but were not provided to you?

A.   No.

Q.   So in your list of materials considered you list the defendants' emergency response plan; correct?

A.   Yes.

Q.   As far as I can tell in your expert report, the only actual citation to that document is a statement regarding employees exiting the terminal in the event of an emergency to the extent it's permitted by time; is that fair?

A.   Yes.

Q.   Is there any other portion of the

Page 49

emergency response plan that you intend to offer testimony regarding?

A.   No.

Q.   And is that true for both the 2021 and the 2024 versions of that plan?

A.   Yes.

Q.   You're not offering any opinion in this case that defendants' emergency response plan is deficient in any way, are you?

A.   No.

Q.   You also list in your additional materials considered list that you reviewed defendants' business continuity plan for the New Haven Terminal; correct?

A.   Yes.

Q.   And the versions of the business continuity plan that you reference in that list are from March 2020 and January 2023; correct?

A.   Yes.

Q.   So have you not reviewed the most recent version of that business continuity plan, which is from April 2024?

A.   I have not.

Q.   So you don't know what, if anything, may have changed from the versions that you

Page 50

reviewed and to the most recent version in 2024;
correct?

A.    I do not, yes.

Q.    I'll just note that your actual written
report does not contain any opinions regarding the
business continuity plan.

Is there any opinion that you are
intending to offer regarding that plan?  Just
please let me know if that's the case.

A.    No.

Q.    So you're not going to offer an opinion
in this case that defendants' business continuity
plan is deficient in any way; right?

MS. JACKS:  Objection; calls for
speculation.

THE WITNESS:  No.

BY MR. KEARNEY:

Q.    I just want to make sure we're on the
same page about that.

A.    Yeah.

Q.    So your rebuttal expert report provides
a summary of the topics you were asked to opine on
in the case; right?

A.    Yes; the three reports.

Q.    And as we discussed, those three

Page 53

THE WITNESS:  No.

BY MR. KEARNEY:

Q.   You haven't reviewed the permits, so you're not offering an opinion that one of those provisions would violate it, essentially.

A.   Yes.  Correct.

Q.   Do you understand that this is a citizens' suit seeking to enforce alleged violations of the Clean Water Act and the Resource Conservation and Recovery Act?

A.   Yes.

Q.   Do you understand that this case asserts allegations that defendants violated the terms of the Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity?

A.   Not the details.

Q.   Okay.  You're not offering any opinions regarding, quote, best management practices, end quote, for the operation of a bulk fuel storage facility like this one, are you?

A.   No.

Q.   You're not offering any opinions regarding best industry practices for the operation of a terminal like this either.

Page 54

A.   No.

Q.   And you're not offering any opinions regarding good engineering practices for the operation of a bulk fuel storage facility either.

A.   No.

Q.   And just so we're on the same page for the record, for those questions "no" means you're not offering those opinions; right?

A.   That's correct.

Q.   And you're not offering any opinion that defendants are currently in violation of the Clean Water Act, are you?

MS. JACKS:  Objection; calls for a legal conclusion, beyond the scope.

THE WITNESS:  No.

BY MR. KEARNEY:

Q.   You're also not offering any opinions that defendants are currently in violation of RCRA.

MS. JACKS:  Objection; calls for a legal conclusion, beyond the scope.

THE WITNESS:  No.

BY MR. KEARNEY:

Q.   So you're not offering any opinion that the tanks at the terminal would actually fail during any particular storm event in this case, are

Page 55

you?

MS. JACKS:  Objection; scope.

THE WITNESS:  No.

BY MR. KEARNEY:

Q.   That's not part of your expert role in the case; fair?

A.   Correct.

Q.   Would you defer to a tank engineer to offer that kind of opinion?

MS. JACKS:  Objection.

THE WITNESS:  Possibly.

BY MR. KEARNEY:

Q.   What do you mean by "possibly"?

A.   I guess it would depend on what the -- that person was using as their input and, you know, factors they were considering.

Q.   Okay.  Regardless of the actual individual person that's offering those opinions, is it fair that, generally speaking, you would defer to someone who is a tank engineer to make that kind of determination?

MS. JACKS:  Objection; calls for speculation, vague.

THE WITNESS:  I guess so.

BY MR. KEARNEY:

Page 56

Q.   So, in essence, you're really just -- you're rebutting the three experts we've talked about that you note in your report.  That's your role in the case; correct?

A.   Correct.  And to make the endangerment -- you know, my final statement in my expert report.

Q.   You're not offering any opinions regarding the frequency or extent of storms that may occur at the New Haven Terminal in the future, are you?

A.   No.

Q.   You're not offering any opinion regarding the extent of flooding or storm surge that may occur at the terminal in the future; correct?

A.   I am not.

Q.   And you're not offering any opinion in support of a specific spill model that would occur in the event of a tank failure, are you?

A.   No.

Q.   Your report does not propose a particular spill model, for example; correct?

A.   That's correct.

Q.   You're not offering any opinion in this

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 58

specific opinions in your rebuttal report.  If you can turn to page 2 of your report, which you should have in front of you there, there's a heading up top in bold where it says Rebuttal to the Dagmar Etkin Expert Report; correct?

A.   Yes.

Q.   And the first opinion in your rebuttal report critiques the worst case discharge volume that's used by Dr. Etkin in preparing her report in the case; correct?

A.   Her credible worst case discharge volume.

Q.   And your opinion as contained in your report is that Dr. Etkin's worst case discharge opinions were faulty because they only considered a potential discard -- discharge from one of the largest tanks in the terminal; correct?

A.   Yes.

Q.   Are you familiar with the federal regulations regarding oil pollution prevention at bulk fuel storage facilities?

A.   Do you mean like SPCC?

Q.   I mean like the CFR, Code of Federal Regulations.

A.   No.

Page 72

experience at actual spills and at facilities, you know, during extreme storm events, that more than one tank is -- the oil from more than one tank is released.  So it's the state of the practice.  The regulations are for SPCC plans.

Q.   So this regulation directs a calculation of worst case discharges to equal that of the capacity of the largest single aboveground storage tank at the facility, and that is what Dr. Etkin did in her report; correct?

MS. JACKS:  Objection to the extent that this calls for a legal conclusion and is speculative.

THE WITNESS:  That is one way to do a worst case discharge.

BY MR. KEARNEY:

Q.   And that is what Dr. Etkin did in her report; right?

A.   No.  She did not do the entire volume. She only looked at the certain percent of -- you know, that the tanks would not be filled.

Q.   Okay.  But in terms of looking at a single tank, this regulation directs an owner/operator to look at a single tank in a facility and to calculate the worst case discharge

Case 3:21-cv-00933-VDO   Document 765   Filed 10/04/25   Page 28 of 40

Jacqueline Michel , PhD                    August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 73

volume based on a single tank; correct?

MS. JACKS:  Objection to the extent it calls for a legal conclusion.  It's outside the scope.

THE WITNESS:  For purposes with -- for their, you know, SPCC plans it does, but for -- you know, again, in my experience, I have -- and I cite many of the cases I've worked on where that was not an adequate, you know, estimate of the worst case discharge.

BY MR. KEARNEY:

Q.  In fact, it's not just for the SPCC plans.  This regulation is specifically directing that calculation in developing the worst case discharge volume; correct?

MS. JACKS:  Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Under that regulation, yes.

BY MR. KEARNEY:

Q.  So according to this regulation, it would have been proper for Dr. Etkin to perform her calculations by looking at the largest tank at the facility.

MS. JACKS:  Objection to the extent it

Page 74

calls for a legal conclusion.

THE WITNESS:  In that case she didn't even use the largest volume.  So I would say her calculation is still incorrect.

BY MR. KEARNEY:

Q.  But in terms of just looking at a one single tank --

A.  Yeah.

Q.  -- she did it correctly as far as the regulation says you're supposed to do it; right?

MS. JACKS:  Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Again, I only can say that my personal experience is that that's not a sufficient worst case scenario.

BY MR. KEARNEY:

Q.  I understand your opinion.

A.  Yeah, yeah.

Q.  I'm just trying to ask to get a question [sic] to my question, which is, at least according to this regulation, which specifies to look at the largest tank at the secondary containment area and one single tank, that Dr. Etkin did do that in her report; correct?

A.  She did that in her report.

Page 75

Q.   Thank you.  Another critique that you have of Dr. Etkin and her report is the failure to include certain past storm events that you reference in your report; correct?

A.   Yes.

Q.   For example, you spend a significant portion of your report discussing spill response efforts following Hurricane Katrina and Hurricane Rita.

A.   Yes.

Q.   And both of those hurricanes made landfall in the state of Louisiana; correct?

A.   Yes.

Q.   Do you concede that the Gulf Coast of Louisiana has certain environmental characteristics that are not present in New Haven, Connecticut?

MS. JACKS:  Objection to the extent it calls for speculation.

THE WITNESS:  In some ways, yes.

BY MR. KEARNEY:

Q.   For example, the facilities that you reference in the state of Louisiana in your report are located in wetland areas; right?

A.   No.  They're on -- they're on, you know, not wetland areas.  They're on, you know,

Page 83

speculation, vague.

THE WITNESS:  That's my general understanding.

BY MR. KEARNEY:

Q.   And, in fact, there is a historical record of hurricane wind strength decreasing once storms have made landfall in the Long Island area; correct?

MS. JACKS:  Objection; calls for speculation.

THE WITNESS:  I have no knowledge of that analysis.

BY MR. KEARNEY:

Q.   Have you conducted any studies regarding Tropical Storm Hanna in 2008?

A.   No.

Q.   Do you have any reason to dispute that Tropical Storm Hanna decreased in severity once it made landfall in the Long Island peninsula?

MS. JACKS:  Objection; calls for speculation.

THE WITNESS:  Yeah.  I have no knowledge of that, so I have no opinion.

BY MR. KEARNEY:

Q.   Have you done any research into

Page 84

Hurricane Gloria in 1985?

A.   No.

Q.   Do you have any reason to dispute that Hurricane Gloria in 1985 decreased in severity once it made landfall on the Long Island peninsula?

MS. JACKS:  Objection; calls for speculation, outside the scope.

THE WITNESS:  Yeah.  I have no knowledge of that.

BY MR. KEARNEY:

Q.   Have you done any research into the Great New England Hurricane of 1938?

A.   I have not.

Q.   Okay.  Do you have any reason to dispute that the Great New England Hurricane of 1938 also decreased in severity upon making landfall on the Long Island peninsula?

MS. JACKS:  Objection; calls for speculation, vague, outside the scope.

THE WITNESS:  I have no -- I'm not familiar with any of that information.

BY MR. KEARNEY:

Q.   Is it fair to say, generally speaking, that hurricanes that may be experienced in one region may be substantially different than

Page 85

hurricanes experienced in a different region?

MS. JACKS:  Objection; calls for speculation.

THE WITNESS:  Yes.

BY MR. KEARNEY:

Q.   For example, we talked about hurricanes in the Gulf of Mexico historically have been of a higher frequency and a higher intensity than elsewhere.

MS. JACKS:  Objection; calls for speculation.

BY MR. KEARNEY:

Q.   At least within the United States.

A.   Yeah, I'm trying to think.  A lot of them come across and hit, you know, the lower Mid-Atlantic, so -- but yes, generally.

Q.   And if storms experienced in the Gulf of Mexico versus, for example, New Haven, Connecticut would be different, would you expect that the associated oil spill would be different as well?

MS. JACKS:  Objection; calls for speculation, vague.

THE WITNESS:  You know, one of my favorite sayings is I've never been to the same

Page 86

spill twice.  So every one is a unique combination of events.

BY MR. KEARNEY:

Q.   I was certainly going to ask you about that.

A.   Yeah.

Q.   Okay.  That you've never been to the same spill twice is a quote that you are sort of attributed to; correct?

A.   That's correct.

Q.   It's one of your favorite quotes in this area of study; correct?

A.   Yes.

Q.   Do you agree that the Gulf of Mexico experiences the highest rate of hurricanes in the Western Hemisphere?

MS. JACKS:  Objection; calls for speculation, vague.

THE WITNESS:  I have -- I haven't researched that, but...

BY MR. KEARNEY:

Q.   Do you have any reason to dispute that?

A.   No.

Q.   Relatedly, the Gulf of Mexico is also the region within the United States that

Page 101

experienced in the Northeastern Seaboard of the United States?

A.   Which one?

Q.   Hurricane Katrina.

MS. JACKS:  Objection; calls for speculation and vague.

THE WITNESS:  You know, it was a category 3 when it came ashore and there's been larger ones.  So, you know, it depends on what your definition is.

BY MR. KEARNEY:

Q.   Do you agree that Hurricane Katrina was classified as it -- in the upper echelons of what would be considered category 3 when it made landfall?

A.   Yes.

Q.   Do you have any reason to dispute that the wind speeds experienced in Hurricane Katrina were much stronger than have ever been recorded in the Northeastern Seaboard in the United States?

A.   I haven't looked at the data for that, but, you know, that -- those are past.  You know, in the future, you know, every -- every storm -- you know, I've never been the same -- you know, I've never seen the same hurricane twice either.

Page 102

So, you know, they're all different as well, and the future ones seem to be more different.

Q.   I just want to get -- make sure we get it for the record.  You said you haven't looked at the data.

A.   Yeah.

Q.   But do you have any reason to dispute that that's accurate, what I said, that Hurricane Katrina had stronger wind speeds than -- in a -- in that hurricane than have ever been recorded in a hurricane that happened in the Northeastern Seaboard of the United States?

MS. JACKS:  Objection; calls for speculation.

THE WITNESS:  Yeah.  I have no knowledge to make that -- you know, to object to that.

BY MR. KEARNEY:

Q.   You state on page 8 of your rebuttal report -- it's the last full sentence.  You state that obviously -- I'm sorry.  I'll wait until you get to that page.  Let me know when you're ready.

A.   Yes.

Q.   It's the last sentence on that -- on the page.  Not the footnote, but in the paragraph,

Page 120

less soluble.

A.  I would even -- say no, because the ones that are more soluble have higher concentrations, and so they -- it takes longer for all those processes to occur.

Q.  Okay.  I want to move on and ask you a couple questions about your next opinion regarding Dr. French-McCay.  It starts on page 12 of your rebuttal report.

A.  Yeah.

Q.  I should say it is entirely contained on page 12.  It's that underlined subheading at the top which reads:

Dr. French-McCay's oil spill model for oil fate under the conditions run for the New Haven Terminal has not been validated.

Do you see that?

A.  Yes.

Q.  That's one of the opinions that you're offering in this case; right?

A.  Yes.

Q.  Do you agree that SIMAP has been validated?

A.  Dr. French-McCay has validated the fate and behavior parts of SIMAP for multiple spills,

Page 121

and she has validated the biological effects modeled for the North Cape spill, but, you know, she's the only one that's done the validations.

Q.    Do you dispute that they've been validated?

A.    For those spill conditions, yes.  No, I don't dispute that.

Q.    Okay.  Are your critiques of that -- of the validation of that model related to the hydrodynamic model portion of it?

A.    Yes, under the -- you know, the extreme storm surge, flooding and hurricane-force winds, those are hydrodynamic, metocean processes, yes.

Q.    Do you agree that Dr. French-McCay stated in her report that the hydrodynamic model that was used was the Delft3D Flexible Mesh modeling suite?

A.    I don't recall the details, but I'm sure that's what she did, yes.

Q.    Are you familiar with that modeling suite?

A.    In general, yes.

Q.    Okay.  Do you agree that the Delft3D Flexible Mesh modeling suite is the state-of-the-art hydrodynamic and environmental

Page 130

opinion, because regardless of the regulations, you know, what I see as a spill responder is these tanks, multiple tanks fail and, you know, the entire contents of the tank can be released.  And that's just my experience as a responder.

And I know that even when companies, operators, you know, are prepared for hurricanes, you know, spills still happen.  You know, they don't do it on purpose.  They want to keep it.  But it's unique -- you know, these extreme storm events can be -- you know, can have unforeseen consequences.

Q.   And even if the -- let's take what is said in this expert report and through the questioning today.

Even if one tank fails and the entire contents spill at the New Haven Terminal, would that change your opinion with regard to -- that any such spill would present substantial endangerment?

MR. KEARNEY:  Objection; speculation.

THE WITNESS:  Yeah.

MR. KEARNEY:  Also to the hypothetical.

THE WITNESS:  So --

BY MS. JACKS:

Q.   You can answer.

Jacqueline Michel , PhD                              August 22, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 131

A.    Yeah, yeah.  No, it would not.  You know, those oils, you know, they're light refined products.  That much oil in an estuary area environment like the New Haven Harbor and the rivers there, we know from experience when you mix those kind of oils, you know, in large volumes in the water column like we saw at the North Cape spill where there were large -- very large damages, you know, and mortalities.  Under those conditions, I would, you know -- I would expect even if one tank was to release its volume, it would still be a significant endangerment.

Q.    Okay.  You've established through your testimony today that you are not a oil modeler like Dr. French-McCay, for example; is that right?

A.    Yes.

Q.    In the course of your work, do you have experience evaluating and interpreting spill models?

A.    Yes.  On almost every spill that I get notified about I work closely with the modelers, most of the time with the National Oceanic and Atmospheric Administration.  And we work together to, you know, look at the model results, understand how -- what might be, you know -- how they could be