# Exhibit E

Filed Under Seal



*Ecological and Biological Sciences*

**Expert Report of
Dr. Ann Michelle Morrison**

**In the Matter of:**
*Conservation Law Foundation v. Equilon
Enterprises LLC, Triton Terminaling
LLC, and Motiva Enterprises LLC*

**Case 3:21-cv-00933-VDO
In the United States District Court
Of Connecticut**

*Ecological and Biological Sciences*

# E*x*ponent®

**Expert Report of
Dr. Ann Michelle Morrison**

**In the Matter of:**
*Conservation Law Foundation v. Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC*

**Case 3:21-cv-00933-VDO
In the United States District Court
Of Connecticut**

**Prepared For:
King & Spalding**

*Prepared By:*

**Ann Michelle Morrison, Sc.D.
Exponent
1075 Worcester Street
Natick, MA 01760**

**June 23, 2025**

**© Exponent, Inc.**

2109100.000 - 2143

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**June 23, 2025**

# Contents

List of Figures      iv

List of Tables      vi

Acronyms and Abbreviations      vii

Limitations      viii

1     Overview      1

2     Assignment and Retention      5

3     Qualifications and Compensation      6

4     Opinion 1: The nature and magnitude of ecological effects from a petroleum product release are determined by the location of the release, the type of product released, and the environmental conditions at the time of release.      7

     4.1     The physical and chemical properties of petroleum products affect their environmental fate and transport and any ecological impacts.      7

     4.2     Ecological natural resources of New Haven Harbor and surrounding areas coexist with industrial and urban activities that affect habitat quality.      12

     4.3     The nature and magnitude of ecological effects from a petroleum product release are specific to the release conditions.      21

         4.3.1     *North Cape* Oil Spill      21

         4.3.2     *Bouchard Barge 120* Oil Spill      23

         4.3.3     Motiva Sewaren Oil Spill      25

     4.4     Summary      26

5     Opinion 2: Defendants' New Haven Terminal is unlikely to present an imminent and substantial endangerment to ecological resources in the area.      27

     5.1     Defendants' New Haven Terminal stormwater discharge is not currently causing risk to ecological resources in New Haven Harbor.      28

     5.2     Site-specific modeling demonstrates that potential impacts to terrestrial resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are spatially limited.      29

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

5.3    Site-specific modeling demonstrates that potential impacts to water column aquatic resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are spatially and temporally limited. 32

5.4    Site-specific modeling demonstrates that potential impacts to sediment resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are unlikely. 35

5.5    Summary 38

**6    Material Relied Upon    40**

6.1    References 40

6.2    Material Considered 43

**Appendix A    *Curriculum vitae* of Ann Michelle Morrison, Sc.D.**
**Appendix B    Diesel Exposure Scenarios – Dissolved**
**Appendix C    No. 2 Fuel Oil Exposure Scenarios – Dissolved**
**Appendix D    Jet Fuel Exposure Scenarios – Dissolved**
**Appendix E    Sediment Calculations**

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



# List of Figures

**Page**

Figure 4-1.  Comparison of the typical hydrocarbon chain lengths found in different petroleum products. Products in the yellow highlighted categories are stored at Defendants' New Haven Terminal. Modified from API (2008).                                                                                9

Figure 4-2.  Visual representation of petroleum products. Reproduced from ITOPF (2014b).     10

Figure 4-3.  Graphical illustration of the percent volume of oil remaining at the surface (either as bulk oil or water-in-oil emulsion) after a marine spill for representative petroleum products within the four API Gravity Petroleum "Groups". Products at Defendants' New Haven Terminal are all "Group 1" substances. Reproduced ITOPF 2014a.     10

Figure 4-4.  Map of New Haven Harbor and Defendants' New Haven Terminal.                     13

Figure 4-5.  Defendants' New Haven Terminal. Photos taken on August 14, 2024.               14

Figure 4-6.  Environmental sensitivity index (ESI) classification of shorelines near Defendants' New Haven Terminal.                                                                           15

Figure 4-7.  Managed shellfish beds and aquaculture operations located near Defendants' New Haven Terminal.                                                                           19

Figure 4-8.  The grounding of the *North Cape* barge and *Scandia* tugboat on Moonstone Beach within the Trustom Pond National Wildlife Refuge in Rhode Island resulted in the release of 828,000 gallons of No. 2 fuel oil from the *North Cape*. Image reproduced from NOAA.                                                                                22

Figure 4-9.  Ram Island during the *Bouchard B-120* Oil Spill. Photo Credit: Massachusetts Department of Environmental Protection. Reproduced from MassDEP.                     24

Figure 5-1.  Representative worst-case discharge of diesel after an assumed breach of Containment 2 berm over dry land and release of the Maximum Credible Discharge from Tank 22. Modified Figure 12-20 from Appendix G, French-McCay (2025).     30

Figure 5-2.  Example scenario of diesel distribution over flooded land during a 100-year storm after an assumed breach of the Containment 2 berm and release of the Maximum Credible Discharge from Tank 22. Modified Figure 13-4 from Appendix H, French-McCay (2025).                                                                           31

Figure 5-3.  Sensitivity distribution of genus-specific CTLBBs, which are also called Genus Mean Acute Values. The Final Acute Value (FAV) is the CTLBB for the 5th percentile sensitive species. Reproduced from US EPA (2003).                     33

Figure 5-4.  Comparison of modeled maximum total hydrocarbon concentrations for each scenario modeled by Dr. French-McCay (French-McCay 2025) to NOAA's Effects Range Low (ERL) and Effects Range Median (ERM) toxicity screening benchmarks for TPAH (not total hydrocarbon concentration). Box plots represent the 25th – 75th percentile concentrations of the data within the colored box. The line in each colored box represents the median concentration, and the whiskers represent 1.5x the

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

interquartile range concentrations. Concentrations above this range are shown as circles. 36

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

2109100.000 - 2413



**June 23, 2025**

# List of Tables

**Page**

Table 4-1.    Classification of petroleum products stored at Defendants' New Haven Terminal according to EPA Emergency Response and API High Production Volume (HPV) categories.    8

Table 4-2.    Maximum and average concentrations of chemicals measured in sediments of New Haven Harbor in 2017 and 2018 in comparison to NOAA sediment thresholds. Data from AECOM (2017) and AECOM (2019). Orange shaded values exceed NOAA's effects range low (ERL) threshold, and red shaded cells exceed NOAA's effects range median (ERM) threshold.    16

Table 5-12.   Analysis of total maximum hydrocarbon concentrations (µg/kg) from Dr. French-McCay's 500-year storm petroleum product release scenarios above NOAA's TPAH ERL and ERM screening benchmarks.    37

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# Acronyms and Abbreviations

| | |
|---|---|
| API | American Petroleum Institute |
| CT DEEP | Connecticut Department of Energy and Environmental Protection |
| CTLBB | critical target lipid body burden |
| COD | chemical oxygen demand |
| DDD | dichloro-diphenyl-dichloroethane |
| DDE | dichloro-diphenyl-dichloroethylene |
| DDT | dichloro-diphenyl-trichloroethane |
| EPA | U.S. Environmental Protection Agency |
| ERA | ecological risk assessment |
| ERL | effects range low |
| ERM | effects range median |
| ESI | environmental sensitivity index |
| FAV | final acute value |
| HMW | high molecular weight |
| HPV | high production volume |
| ITOPF | International Tanker Owners Pollution Federation Limited |
| JP-8 | jet propellant 8 |
| LMW | low molecular weight |
| MassDEP | Massachusetts Department of Environmental Protection |
| MCD | maximum credible discharges |
| NJ DEP | New Jersey Department of Environmental Protection |
| NOAA | National Oceanic and Atmospheric Administration |
| NRDA | natural resource damage assessment |
| PAH | polycyclic aromatic hydrocarbon |
| PCB | polychlorinated biphenyls |
| SCAT | Shoreline Cleanup Assessment Technique |
| SIMAP | Spill Impact Model Application Package |
| Sum TU | sum toxic unit |
| SQuiRTs | Screening Quick Reference Tables |
| SWPPP | stormwater pollution prevention plan |
| TKN | total organic nitrogen + ammonia |
| TP | total phosphorus |
| TPAH | total polycyclic aromatic hydrocarbon |
| TSS | total suspended solids |
| TU | toxic unit |

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# Limitations

This report describes the work performed to date and presents the findings and opinions resulting from that work. The findings presented in this report are made to a reasonable degree of scientific certainty. I reserve the right to supplement this report and to expand or modify my opinions based on review of additional material as it becomes available through ongoing discovery or through any additional work or review of additional work performed or opinions offered by others.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# 1  Overview

In their expert reports submitted in this case, Plaintiff's experts allege that Defendants' New Haven Terminal poses an imminent and substantial endangerment[1] and that the Terminal poses a "credible risk of catastrophic release of toxic and hazardous pollutants" to the environment around the Terminal because the spill containment infrastructure at the Terminal and the Terminal's stormwater pollution prevention plan (SWPPP) are insufficient during extreme weather events associated with climate change[2] (CLF 2022, Horner 2025, Nairn 2025, Goldsmith 2025).

In this report, I review these claims and evaluate the potential risk to ecological natural resources posed by extreme weather events resulting in a hypothetical, accidental release of petroleum product from the Terminal. Applying ecological risk assessment (ERA) methods (US EPA 1997), I evaluate modeled exposure conditions generated by Defendants' expert, Dr. Deborah French-McCay, for hypothetical petroleum releases at Defendants' New Haven Terminal under simulated 100-year and 500-year storms (French-McCay 2025). I examine the chemical and toxicological properties of the products stored at Defendants' New Haven Terminal; identify the ecological natural resources of New Haven Harbor and the surrounding areas, including the Mill River, Quinnipiac River, and West River tributaries to the harbor and Long Island Sound; describe the potential pathways for exposure to these ecological natural resources if a petroleum release were to occur; and evaluate the extent of expected harm in the event of such a hypothetical release, consistent with the components of an endangerment assessment, as outlined by U.S. Environmental Protection Agency (EPA) (1985). Plaintiff's experts have not performed such an analysis.

In addition, I examine three historical oil spills that have affected terrestrial and aquatic ecological natural resources in the northeastern United States to assess the potential for similar ecological impacts from a hypothetical petroleum release to New Haven Harbor from Defendants' New Haven Terminal.

From these analyses, I generated two opinions.[3]

---

[1] The U.S. Environmental Protection Agency (EPA) defines an endangerment assessment as "a determination of the magnitude and probability of actual or potential harm to public health or welfare or the environment by threatened or actual release of a hazardous substance…"; EPA further outlines that an endangerment assessment should identify and characterize (1) hazardous substances in all relevant environmental media, (2) environmental fate and transport mechanisms within potentially affected environmental media, (3) toxicological properties or human health standards for the hazardous substance, (4) exposure pathways and the extent of potential exposure, (5) populations at risk, and (6) the extent of expected harm (US EPA 1985).

[2] https://www.climate.gov/news-features/climate-qa/what-extreme-event-there-evidence-global-warming-has-caused-or-contributed

[3] The analyses supporting these opinions are provided in Sections 4 and 5 of my report.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

**Opinion 1: The nature and magnitude of ecological effects from a petroleum product release are determined by the location of the release, the type of product released, and the environmental conditions at the time of release.**

Any allegation of imminent and substantial endangerment to ecological natural resources from a hypothetical, accidental petroleum product release from Defendants' New Haven Terminal needs to consider the chemical composition of the hypothetically released product, the fate and transport of the individual chemical components of the product in the environment, the environmental conditions at the time of the release, and the ecological resources potentially exposed. The petroleum products stored at Defendants' New Haven Terminal are low-viscosity, volatile, highly dispersible substances, which are unlikely to result in physical smothering or covering of aquatic organisms if a hypothetical, accidental product release were to occur, particularly during a storm event where high dilution and turbulent mixing of surface water is likely. Acute toxicity to aquatic organisms from a hypothetical release of a petroleum product is possible, but the nature and extent of any effects to ecological natural resources would depend on the specific chemicals in the petroleum product, their concentrations, and the duration of exposure.

I identified three oil spills that have affected the northeastern United States and evaluated the nature and extent of ecological impacts resulting from the releases. The most extensive injuries to ecological resources occurred when a petroleum product was released in shallow water under high wind mixing conditions in areas with sensitive shorelines that are important to shellfish and wildlife (i.e., *North Cape* Oil Spill and *Bouchard B-120*). In contrast, the Motiva Sewaren oil spill affected shorelines in a more urban and industrial area and resulted in more limited ecological injuries to exposed shorelines and wildlife. While the Motiva Sewaren oil spill is the most similar to the hypothetical, accidental release Plaintiff's experts have analogized for Defendants' New Haven Terminal (Nairn 2025, Goldsmith 2025), I conclude, to a reasonable degree of scientific certainty, that the effects from a hypothetical, accidental release of petroleum product from Defendants' New Haven Terminal would likely be less than those observed following the Motiva Sewaren oil spill because any hypothetical release would happen in a larger body of water with greater water exchange, which would result in more rapid weathering and dispersion of the product. As noted in other reports (Jones 2025, Bayles and Pace 2025, Etkin 2025, French-McCay 2025), Defendants have implemented various procedures (e.g., ballasting of tanks) and practices (e.g., spill response) that have been developed to minimize risk at the Terminal.

**Opinion 2: Defendants' New Haven Terminal is unlikely to present an imminent and substantial endangerment to ecological resources in the area.**

Plaintiff and its experts have alleged that Defendants' New Haven Terminal presents an imminent and substantial endangerment to the ecological environment from an accidental "catastrophic" release of petroleum product during an extreme weather event. Though unlikely (Bayles and Pace 2025), my analysis and the analyses I rely on assume a petroleum product

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



release might occur during such an event to identify and characterize potential environmental exposure and risks to ecological natural resources.

To evaluate possible exposure and ecological effects, Dr. French-McCay modeled different exposure scenarios under simulated 100-year and 500-year storm intensities.[4] I reviewed the results of Dr. French-McCay's models and concluded there is no imminent and substantial endangerment to shorelines and the resources they support (e.g., shorebirds) in New Haven Harbor, the Quinnipiac River, the Mill River, the West River, or Long Island Sound because no shoreline or water surface oiling resulted from any of Dr. French-McCay's modeled scenarios. Therefore, no petroleum product would affect the Mill River Greenway, which Dr. Wendi Goldsmith discussed in her expert report (Goldsmith 2025), and the absence of any shoreline oiling dismisses Dr. Goldsmith's concern for the "diverse riparian plant community spanning mature trees and native marsh plants adapted to brackish water" along the Mill River (Goldsmith 2025).

Similarly, there is no imminent and substantial endangerment to organisms living in and on the sediment of New Haven Harbor, the Quinnipiac River, the Mill River, the West River, or Long Island Sound because 98% or more of the modeled sediment concentrations of maximum total hydrocarbons from Dr. French-McCay's modeled release scenarios do not exceed a lower screening benchmark indicative of toxicity from total polycyclic aromatic hydrocarbons (TPAH), which is a conservative benchmark for comparison because only a fraction of the chemicals included in Dr. French-McCay's maximum total hydrocarbon concentrations are polycyclic aromatic hydrocarbons (PAHs).

While some aquatic organisms like zooplankton and early life stage fish and shellfish would likely experience toxicity in the unlikely event of a tank failure during an extreme weather event (e.g., 500-year storm intensity), the limited spatial area of exposure and rapid weathering of the released product combined with the resilient life cycles of these organisms indicate that any mortality is unlikely to result in population level effects. For this reason, it is my opinion that a hypothetical release from Defendants' New Haven Terminal during an extreme weather event is not an imminent and substantial endangerment to aquatic organisms.

There is a small area containing some wetland terrestrial habitat south of Defendants' New Haven Terminal that would likely be adversely affected under all scenarios (including all 100-year storm and gasoline release model scenarios). However, based on the small spatial area impacted, the type of habitat impacted, and the isolated nature of the habitat, the overall effect to terrestrial ecological resources in the area from any hypothetical release is low and not an imminent and substantial endangerment.

---

[4]    Dr. French-McCay modeled hypothetical releases of diesel, No. 2 fuel oil, jet fuel, and gasoline under two storm intensities—100-year and 500-year; however, under no scenario did gasoline reach New Haven Harbor. Similarly, under no scenario did a 100-year storm intensity result in any product appreciably reaching New Haven Harbor (French-McCay 2025).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

In summary, I did not identify any evidence that would support Plaintiff's claim that the Terminal poses an imminent and substantial endangerment to ecological resources in the area near the Terminal.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

## 2  Assignment and Retention

I have been retained by King & Spalding, LLP, Atlanta, Georgia, on behalf of Defendants[5], to review opinions offered by Plaintiff's experts regarding imminent and substantial endangerment to ecological natural resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal during an extreme weather event. As part of this effort, I have reviewed Plaintiff's expert reports and documents and data related to the natural ecological resources on and near Defendants' New Haven Terminal. I have reviewed fate and transport models prepared by Defendants' experts, and I visited Defendants' New Haven Terminal on August 14, 2024. Materials I relied upon are provided in Section 6.

---

[5] Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# 3  Qualifications and Compensation

I am a principal scientist in the Ecological and Biological Sciences Practice at Exponent, a scientific and engineering consulting firm. I received my Doctor of Science degree in Environmental Health from the Harvard University School of Public Health. My dissertation research was conducted at the Woods Hole Oceanographic Institution and concerned characterizing the effect of exposure to environmental contaminants on the activity of a highly conserved enzyme in fish. I also have earned a Master of Science degree in Environmental Health from the Harvard University School of Public Health and a Bachelor of Science degree in Biology from Rhodes College.

For more than 28 years, I have studied the effects of human activities on environmental health. I have studied a variety of ecological habitats, with an emphasis on measuring the effects of anthropogenic stressors, including persistent organic chemicals, metals, oil, waste disposal, hot water effluent, sewage releases, water consumption, shoreline construction, and shipping traffic on these environments and the resources that rely on them. At Exponent, much of my work has involved interdisciplinary scientific investigations evaluating the environmental impacts of oil and hazardous chemicals as part of natural resource damage assessments, environmental causal analyses, net environmental benefit analysis, and risk evaluations.

My background includes the study of manmade and natural stressors that can impact natural resources at different levels of organization, from impacts to enzymes and individual animals to impacts to habitats and populations. This expertise is important when discerning potential effects due to natural and anthropogenic causes, especially when the available data, reports, and published literature have implications across numerous levels of biological organization.

I have been involved in a number of environmental damage cases encompassing diverse ecological regions, including temperate, subtropical, and tropical terrestrial, marine, and freshwater environments. I have served as an expert for both plaintiffs and defendants. A list of my publications, presentations, and project experience, including cases for which I have provided an expert report, declaration, affidavit, deposition, or trial testimony is provided in my curriculum vitae, included as Appendix A.

Exponent is being compensated at my standard 2025 billing rate of $425 per hour. I have directed Exponent staff members to perform certain tasks for this report, and they are compensated based on their standard billing rates.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# 4  Opinion 1: The nature and magnitude of ecological effects from a petroleum product release are determined by the location of the release, the type of product released, and the environmental conditions at the time of release.

Petroleum products are complex substances, each composed of many individual chemical constituents, and the nature and magnitude of ecological effects from an accidental petroleum product release are determined by the type of product released, the location of the release, the environmental conditions at the time of release, and the ecological resources that are exposed. Therefore, to understand the potential for ecological risk from a hypothetical, accidental release at Defendants' New Haven Terminal, I applied ERA methods (US EPA 1997), which are consistent with the components of an endangerment assessment, as outlined by US EPA (1985). I reviewed the types of products stored at the Terminal, their chemical and physical properties, the ecological natural resources near the Terminal, and the potential pathways for injury to these resources from exposure to petroleum products. To contextualize the potential risk to ecological natural resources in New Haven Harbor, the Miller River, the Quinnipiac River, the West River, and Long Island Sound, I examined the ecological impacts of three historical releases of petroleum products in the northeast United States, which demonstrated that the nature and magnitude of ecological effects from a petroleum product release are specific to the release conditions.

## 4.1  The physical and chemical properties of petroleum products affect their environmental fate and transport and any ecological impacts.

Three general categories of petroleum products are stored in large aboveground storage tanks at Defendants' New Haven Terminal: (1) Gasoline Blending Streams (Naphtha and Gasoline), (2) Kerosene/Jet Fuel, and (3) Gas Oils (No. 2 Fuel Oil, Low-Sulfur Diesel, Ultra-Low-Sulfur Diesel, and B50 Biodiesel).[6] Table 4-1 summarizes the classification of these products according to EPA Emergency Response categories[7] and American Petroleum Institute (API) High Production Volume (HPV) categories.[8]

---

[6]  Additional non-petroleum products in aboveground storage tanks at the New Haven Terminal include ethanol and fuel additives (Motiva Enterprises LLC 2025, SOPUS 2017, SOPUS 2019).

[7]  https://www.epa.gov/emergency-response/types-refined-petroleum-products

[8]  https://www.petroleumhpv.org/petroleum-substances-and-categories

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

Table 4-1.    Classification of petroleum products stored at Defendants' New Haven Terminal according to EPA Emergency Response and API High Production Volume (HPV) categories.

| EPA Emergency Response Category | EPA Emergency Response Description | API HPV Category(ies) | Terminal Product(s) |
|---|---|---|---|
| Gasoline | "A lightweight material that flows easily, spreads quickly, and may evaporate completely in a few hours under temperate conditions. It poses a risk of fire and explosion because of its high volatility and flammability and is more toxic than crude oil. Gasoline is amenable to biodegradation, but the use of dispersants is not appropriate unless the vapors pose a significant human health or safety hazard." | Gasoline Blending Streams | Gasoline, Naphtha |
| Kerosene | "A lightweight material that flows easily, spreads rapidly, and evaporates quickly. Kerosene is easily dispersed but is also relatively persistent in the environment." | Kerosene/Jet Fuel | Jet A, JP-8 |
| No. 2 Fuel Oil | "A lightweight material that flows easily, spreads quickly, and is easily dispersed. This fuel oil is neither volatile nor likely to form emulsions and is relatively non-persistent in the environment." | Gas Oils | No. 2 Fuel Oil, B50 Biodiesel, Low-Sulfur Diesel, Ultra-Low-Sulfur Diesel |

Each petroleum product held at Defendants' New Haven Terminal is composed of a complex mixture of hydrocarbons and other chemicals. Figure 4-1 illustrates, for example, how hydrocarbon chain lengths vary among different product categories. These differences in chemical composition result in differences in the fate and transport of the product in the environment if it is accidentally released.[9] Differences in fate and transport mechanisms further result in differences in exposure characteristics, including differences in exposure composition and concentration over space and time, which affect whether and to what extent exposure to a petroleum product will result in adverse effects to ecological natural resources.

---

[9]    https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/oil-types.html

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**



Figure 4-1.    Comparison of the typical hydrocarbon chain lengths found in different petroleum products. Products in the yellow highlighted categories are stored at Defendants' New Haven Terminal. Modified from API (2008).

Ecological impacts from the accidental release of petroleum products occur through two primary pathways—physical fouling (i.e. physical smothering or covering) and toxicity (ITOPF 2014b). In general, heavy oils, like crude oil, present the greatest risk for physical fouling or smothering (Figure 4-2) because the products have a low viscosity and do not evaporate, dissolve, degrade, and disperse as readily as lighter oils, generally resulting in longer persistence in the environment and the potential for both acute and chronic toxicity. Lighter oils, on the other hand, have a higher proportion of hydrocarbons that both readily volatize and dissolve, resulting in low persistence in the environment but with the potential for short-term, acute aquatic toxicity, depending on the release (Table 4-1; ITOPF 2014b).

The petroleum products stored at Defendants' New Haven Terminal are low-viscosity, volatile, highly dispersible substances, which are unlikely to result in physical smothering or covering of aquatic organisms if a hypothetical, accidental product release were to occur, particularly during a storm event where high dilution and turbulent mixing of surface water is likely (Figure 4-3). This is aligned with EPA's Emergency Response descriptions of these substances (Table 4-1).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**



Figure 4-2.    Visual representation of petroleum products. Reproduced from ITOPF (2014b).



Figure 4-3.    Graphical illustration of the percent volume of oil remaining at the surface (either as bulk oil or water-in-oil emulsion) after a marine spill for representative petroleum products within the four API Gravity Petroleum "Groups". Products at Defendants' New Haven Terminal are all "Group 1" substances. Reproduced ITOPF 2014a.

Hydrocarbons in gasoline and naphtha tend to have lower boiling points and higher vapor pressures, causing gasoline released into the environment to volatize relatively quickly and then degrade in the atmosphere (API 2008). As described by the National Oceanic and Atmospheric Administration (NOAA), Group 1 Non-Persistent Light Oils like gasoline are highly volatile—

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

evaporating shortly after release—and do not leave a residue after evaporation.[10] Operating through lipid membrane narcosis, gasoline is generally considered acutely, but not chronically, toxic in the aquatic environment, as the rapid volatilization of the light fractions of gasoline significantly reduces the amount of the most acutely toxic hydrocarbon constituents in the environment (McGrath et al. 2005, Di Toro et al. 2007, McGrath and Di Toro 2009).

Kerosene and jet fuels have boiling points slightly higher than gasoline, though lower vapor pressures compared to gasoline, and experience substantial volatilization after release into the environment, with relatively short atmospheric residence times (API 2010). NOAA classifies kerosene and jet fuel as "light refined products" composed of light hydrocarbons (see Figure 4-1) that quickly form a thin layer on the surface of water and are unlikely to build up on shoreline surfaces (NOAA 2019). The combination of rapid evaporation and biodegradation by naturally occurring microorganisms results in reduced exposure to aquatic organisms and limited likelihood of fish kills in open water releases (NOAA 2019). Kerosene and jet fuels also exhibit narcosis toxicity in the aquatic environment (Di Toro et al. 2007, McGrath and Di Toro 2009), though they are considered relatively less toxic than gas oils due to the higher rates of evaporation (NOAA 2019).

Gas oils, like the various forms of diesel and No. 2 fuel oil stored at Defendants' New Haven Terminal, are more variable in chemical composition than gasoline and kerosene/jet fuel (see Figure 4-1). NOAA classifies gas oils as "Persistent Light Oils" and notes that they are "moderately volatile" and will leave a residue after a few days, potentially affecting intertidal resources through smothering or affecting aquatic resources because of moderate concentrations of potentially toxic constituents.[11] Like kerosene/jet fuel, diesel is readily degraded by naturally occurring microorganisms in the environment; however, diesel can be acutely toxic. Gas oils, like gasoline/naphtha and kerosene/jet fuels, also exert toxicity through a narcosis mode of action (Di Toro et al. 2007, McGrath and Di Toro 2009).

In summary, the potential for physical fouling or substantial acute toxicity of aquatic or shoreline organisms from a hypothetical, accidental release of a petroleum product from Defendants' New Haven Terminal during an extreme weather event like a hurricane or nor'easter are limited due to the expected rapid evaporation, dispersal, and dissolution of the product under such extreme conditions. As explained above, the potential for exposure and toxicity from a hypothetical, accidental petroleum product release requires consideration of the individual constituents within the released product since they possess unique chemical-physical properties that dictate their environmental fate and ecotoxicity. Specific tools for estimating the toxicity of petroleum products (e.g., target lipid model [McGrath and Di Toro 2009]; PetroTox and PetroRisk

---

[10]  https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/oil-types.html

[11]  https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/oil-types.html

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

[CONCAWE][12]) have been developed for this purpose and are accepted by EPA for estimating toxicity or ecological risk (US EPA 2003).

## 4.2  Ecological natural resources of New Haven Harbor and surrounding areas coexist with industrial and urban activities that affect habitat quality.

When considering the potential ecological risk from a hypothetical, accidental release of a petroleum product, it is necessary to consider the ecological resources that could be potentially exposed.

Defendants' New Haven Terminal lies within an industrial area along New Haven Harbor's east side and abuts a residential community (Figure 4-4). The storage tank farm is set back about 470 meters (1,542 feet) from the shoreline. Based on my observations during my August 14, 2024 site visit, stormwater management areas with standing water on site contain some emergent vegetation, but the site offers too little habitat to support avian and mammalian wildlife. Some wildlife may occasionally visit the terminal, such as those adapted to human disturbance like raccoon (*Procyon lotor*) and killdeer (*Charadrius vociferus*)—the latter of which I observed during my site visit (Figure 4-5). However, Defendants' New Haven Terminal provides poor natural habitat for ecological resources (Figure 4-5). As such, I did not evaluate chemical concentrations measured in soils at the Terminal because there is no pathway for ecological risk to terrestrial receptors.

A small, vegetated area lies to the south of the Terminal and includes three small, isolated wetland areas comprising a total of approximately 2 acres (Figure 4-4). These isolated wetland habitats are characterized by deciduous forest and emergent vegetation[13] and are unlikely to support fish because they are only seasonally flooded. When flooded, the wetlands likely support amphibians and reptiles that rely on shallow, vernal pools for their reproductive cycle. Composed of trees, shrubs, and mowed lawn, this area south of the Terminal likely supports urban-adapted wildlife, including songbirds, racoons, and rodents (e.g., squirrels, chipmunks, mice, moles, voles, and shrews).[14]

---

[12]   https://www.concawe.eu/

[13]   https://fwsprimary.wim.usgs.gov/wetlands/apps/wetlands-mapper/

[14]   I was unable to identify any survey data or publications describing wildlife that utilize this specific area.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**



Figure 4-4.    Map of New Haven Harbor and Defendants' New Haven Terminal.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**June 23, 2025**



Figure 4-5.    Defendants' New Haven Terminal. Photos taken on August 14, 2024.

New Haven Harbor is an estuary that connects the Mill, Quinnipiac, and West Rivers to Long Island Sound (CT DEEP 2015b). The area immediately surrounding New Haven Harbor is highly developed, and the harbor itself is heavily used by boat traffic, as it is the second busiest port in New England, after Boston Harbor (New Haven Port Authority 2019). NOAA's Environmental Sensitivity Index (ESI) characterizes the shorelines near Defendants' New Haven Terminal as exposed shorelines, riprap, and boulder rubble (Figure 4-6).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



**June 23, 2025**



Figure 4-6.    Environmental sensitivity index (ESI) classification of shorelines near Defendants' New Haven Terminal.[15]

---

[15]    National Shoreline ESI Line geographic information system (GIS) layers (2017) available from the NOAA's Office of Response and Restoration (https://response.restoration.noaa.gov/esi_download).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

June 23, 2025

New Haven Harbor is affected by widespread human activities, including man-made shorelines, coastal development, periodic channel dredging, and multiple industrial facilities along the shoreline. According to the Coastal and Estuarine Land Conservation Program, shoreline development, erosion control projects (e.g., riprap), channel dredging, and wetland alterations threaten coastal species and resources in New Haven Harbor (CT DEEP 2015a, CT DEEP 2015b), and the State of Connecticut has designated New Haven Harbor and the mouths of the Quinnipiac and Mill Rivers impaired according to 303(d) criteria for "Habitat for Marine Fish, Other Aquatic Life, and Wildlife" due to low dissolved oxygen levels, excessive nutrients, polychlorinated biphenyls (PCBs), and oil and grease (CT DEEP 2022).

Consistent with an urban-influenced waterbody, the surface sediments of New Haven Harbor have average concentrations of metals, PAHs, PCBs, and dichloro-diphenyl-trichloroethane (DDT) and its metabolites that exceed NOAA's effects range low (ERL) thresholds (Table 4-2).

Table 4-2.    Maximum and average concentrations of chemicals measured in sediments of New Haven Harbor in 2017 and 2018 in comparison to NOAA sediment thresholds. Data from AECOM (2017) and AECOM (2019). Orange shaded values exceed NOAA's effects range low (ERL) threshold, and red shaded cells exceed NOAA's effects range median (ERM) threshold.

| Analyte | Units | ERL | ERM | Max | Mean |
|---|---|---|---|---|---|
| Arsenic, Total | mg/kg | 8.2 | 70 | 13.8 | 9.10 |
| Cadmium, Total | mg/kg | 1.2 | 9.6 | 5.34 | 1.24 |
| Chromium, Total | mg/kg | 81 | 370 | 143 | 71.1 |
| Copper, Total | mg/kg | 34 | 270 | 275 | 112 |
| Lead, Total | mg/kg | 46.7 | 218 | 211 | 66.6 |
| Mercury, Total | mg/kg | 0.15 | 0.71 | 1.12 | 0.381 |
| Nickel, Total | mg/kg | 20.9 | 51.6 | 40.3 | 23.6 |
| Zinc, Total | mg/kg | 150 | 410 | 390 | 185 |
| Naphthalene | µg/kg | 160 | 2100 | 947 | 141 |
| Acenaphthylene | µg/kg | 44 | 640 | 275 | 65.6 |
| Acenaphthene | µg/kg | 16 | 500 | 327 | 45.7 |
| Fluorene | µg/kg | 19 | 540 | 335 | 49.0 |
| Phenanthrene | µg/kg | 240 | 1500 | 1270 | 237 |
| Anthracene | µg/kg | 85.3 | 1100 | 449 | 87.7 |
| Fluoranthene | µg/kg | 600 | 5100 | 3360 | 709 |
| Pyrene | µg/kg | 665 | 2600 | 2550 | 609 |
| Benz(a)anthracene | µg/kg | 261 | 1600 | 1400 | 324 |
| Chrysene | µg/kg | 384 | 2800 | 1240 | 345 |
| Benzo(a)pyrene | µg/kg | 430 | 1600 | 1030 | 324 |
| Dibenz(a,h)anthracene | µg/kg | 63.4 | 260 | 207 | 63.7 |
| Total LMW PAHs | µg/kg | 552 | 3160 | 2964 | 612 |
| Total HMW PAHs | µg/kg | 1700 | 9600 | 13503 | 3591 |
| Total PAHs | µg/kg | 4022 | 44792 | 16467 | 4203 |
| cis-Chlordane | µg/kg | 0.5 | 6 | 6.99 | 1.13 |
| Dieldrin | µg/kg | 0.02 | 8 | 5.52 | 1.21 |

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



June 23, 2025

| Analyte | Units | ERL | ERM | Max | Mean |
|---------|-------|-----|-----|-----|------|
| 4,4'-DDD | µg/kg | 2 | 20 | 5.56 | 1.24 |
| 4,4'-DDE | µg/kg | 2.2 | 27 | 11.1 | 3.16 |
| 4,4'-DDT | µg/kg | 1 | 7 | 20.3 | 3.08 |
| Total DDT | µg/kg | 1.58 | 46.1 | 37.0 | 7.46 |
| Total PCBs | µg/kg | 22.7 | 180 | 1658 | 148 |

LMW – low molecular weight
HMW – high molecular weight

Despite anthropogenic impacts, however, New Haven Harbor supports a diversity of fish and wildlife. Within New Haven Harbor, a variety of waterfowl species overwinter or use the harbor during migration (CT DEEP 2015b). Harbor seal (*Phoca vitulina*) and harbor porpoise (*Phocoena phocoena*) are known to occasionally use Connecticut's estuarine aquatic habitats (CT DEEP 2015a), and individuals have been sporadically reported in New Haven Harbor.[16]

On the west side of the harbor, Long Wharf, City Point, and Sandy Point Beach host a wide variety of migrating shorebirds and waterfowl, including federally endangered species, such as roseate terns (*Sterna dougallii*), piping plovers (*Charadrius melodus*), and turnstones (*Arenaria sp.*) (CT DEEP 2015b). The Sandy Point Beach and Bird Sanctuary, a designated "Important Bird Area" by Audubon Connecticut, provides barrier beach, marsh, and tidal creek habitats that migrating shorebirds utilize.[17]

North of New Haven Harbor, the Quinnipiac River Marsh Wildlife Management Area and State Park is located within the Quinnipiac River Tidal Marsh (Figure 4-6) and comprises predominately tidal salt marshes and tidal creeks (CT DEEP 2024).[18] Identified by the Audubon Society as a globally Important Bird Area,[19] several threatened, endangered, and special concern bird and reptile species utilize the marsh.[20]

Four species of federally listed sea turtles, including loggerhead turtle (*Caretta caretta*), Kemp's Ridley (*Lepidochelys kempi*), green turtle (*Chelonia mydas*) and leatherback (*Dermochelys coriaea*), may seasonally use coastal waters off Connecticut in Long Island Sound, but leatherback are unlikely to be in New Haven Harbor as they prefer deep waters (US ACE 2020).

New Haven Harbor provides "essential fish habitat" for eight species: pollock (*Pollachius virens*), windowpane flounder (*Scopthalmus aquosus*), winter flounder (*Pseudoplueuronectes americanus*), silver hake (*Merluccius bilinearis*), red hake (*Urophysis chuss*), little skate

---

[16]   Chappy, a harbor seal pup, made headlines after being found in downtown New Haven in February 2025.
https://www.npr.org/2025/03/04/nx-s1-5317461/chappy-seal-dies-new-haven-connecticut

[17]   https://longislandsoundstudy.net/2012/09/sandy-point/

[18]   https://longislandsoundstudy.net/2012/10/quinnipiac-river

[19]   https://www.audubon.org/connecticut/projects/important-bird-areas-ibas-ct

[20]   https://longislandsoundstudy.net/2012/10/quinnipiac-river
https://portal.ct.gov/deep/endangered-species/endangered-species-listings/endangered-threatened--special-concern-birds
https://portal.ct.gov/deep/endangered-species/endangered-species-listings/endangered-threatened--special-concern-reptiles

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



**June 23, 2025**

(*Leucoraja erinacea*), winter skate (*L. ocellata*), and Atlantic sea herring (*Clupea harengus*) (US ACE 2020). In addition, New Haven Harbor and Long Island Sound support hard and soft clam and oyster shellfishing beds (Figure 4-7).

New Haven Harbor opens into Long Island Sound, a tidal estuary that forms the southern boundary of the State of Connecticut. A diversity of plants and animals are found in Long Island Sound, including commercially and recreationally important fish and shellfish, sea turtles, and seals (Wahle 1990).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**



Figure 4-7.    Managed shellfish beds and aquaculture operations located near Defendants' New Haven Terminal.[21]

---

[21]  Geographic information system (GIS) layers available from the CT DEEP and New York State Dept. of State. https://opdgig.dos.ny.gov/datasets/NYSDOS::commercial-aquaculture-locations/about?layer=0; https://opdgig.dos.ny.gov/datasets/NYSDOS::commercial-aquaculture-locations/about?layer=7; https://opdgig.dos.ny.gov/datasets/NYSDOS::commercial-aquaculture-locations/about?layer=8; https://opdgig.dos.ny.gov/datasets/NYSDOS::commercial-aquaculture-locations/about?layer=5; https://geodata.ct.gov/datasets/CTDEEP::shellfish-beds-managed-set/about?layer=1; https://deepmaps.ct.gov/datasets/CTDEEP::shellfish/about).

Additional information on aquaculture operations including species and operation type were obtained from the University of Connecticut's Aquaculture Mapping Atlas (https://cteco.uconn.edu/viewer/index.html?viewer=aquaculture).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

If a petroleum product were hypothetically released from Defendants' New Haven Terminal, various species of birds, fish, shellfish, and other marine life could potentially be exposed depending on the product released, the environmental conditions during the release, and the resultant fate and transport of the released product. The most sensitive ecological habitats—vegetated shorelines and marshes—are primarily found along the banks of the West River, Mill River, and Quinnipiac River, which are 2.14, 1.61 and 1.07 miles from the New Haven Terminal, respectively. The potential for an imminent risk to these areas is entirely dependent on the specific chemical composition of the product; the fate and transport of the hypothetical product released; the volume of the hypothetical release; and the environmental conditions at the time of the hypothetical release.

Notably, none of Plaintiff's experts conduct an endangerment assessment, as outlined by EPA (US EPA 1985), to support their claim that Defendants' New Haven Terminal poses an imminent and substantial endangerment to the natural environment. Plaintiff's experts do not identify and characterize (1) hazardous substances in all relevant environmental media, (2) environmental fate and transport mechanisms within potentially affected environmental media, (3) toxicological properties or human health standards for the hazardous substance, (4) exposure pathways and the extent of potential exposure, (5) populations at risk, and (6) the extent of expected harm (US EPA 1985). Dr. Wendi Goldsmith includes a photograph of informational signage for "a New Haven Urban Oasis", which she describes as "[t]he Mill River Greenway Outreach Sign" (Goldsmith 2025). The trailside sign briefly describes a few species of plants and wildlife that visitors may encounter, but Dr. Goldsmith does not describe how a hypothetical petroleum product release from Defendants' New Haven Terminal could affect these ecological natural resources (Goldsmith 2025). Dr. Goldsmith states that "petrochemical odors were common, especially following rain events" when she contributed to the Mill River Greenway project in 2016, demonstrating that low-level petroleum releases are a widespread problem in the region. However, Dr. Goldsmith does not connect the "petrochemical odors" or low-level releases she experienced to any adverse ecological effects or to Defendants' New Haven Terminal (Goldsmith 2025). As discussed in Section 5.1 of this report and Dr. Joyce Tsuji's report (Tsuji 2025), monitoring data for stormwater discharges from the Terminal contain levels of oil and grease that were below the levels of method detection and below the permit benchmark.

Dr. Goldsmith invokes Hurricanes Katrina, Rita, and Harvey as evidence of the vulnerability of fossil fuel facilities to severe weather. However, she provides no evidence that risks to ecological natural resources from terminals along the Gulf Coast are comparable to risks to ecological natural resources in New Haven Harbor and neighboring waters, which is particularly important since the facilities occur in different ecoregions[22] that experience different climates and support different ecological habitats and natural resources.

---

[22]  https://www.epa.gov/eco-research/ecoregions-north-america

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



## 4.3 The nature and magnitude of ecological effects from a petroleum product release are specific to the release conditions.

Plaintiff and its experts contend that extreme weather events caused by climate change will result in "catastrophic" releases from the Terminal and pose an imminent and substantial endangerment to the environment (CLF 2022, Nairn 2025, Goldsmith 2025). To place this claim in context, I examined three historical oil spills in the Northeast—the *North Cape* oil spill, the *Bouchard Barge B-120* oil spill, and the Motiva Sewaren oil spill. The following summarizes the nature of the release, the type of product released, and the reported ecological impacts from the release, which I contrast to Plaintiff's allegations of harm from a hypothetical accidental release from Defendants' New Haven Terminal. Notably, the Motiva Sewaren oil spill, in which an above ground storage tank released low-sulfur diesel fuel, is the most comparable to Plaintiff's alleged claim and caused the least ecological impact of the three events I reviewed.

### 4.3.1 *North Cape* Oil Spill

The *North Cape* oil spill occurred at Moonstone Beach within the Trustom Pond National Wildlife Refuge in Rhode Island, a part of Block Island Sound, on January 19, 1996 when the tank barge *North Cape* and the tugboat *Scandia* ran aground in high winds (Figure 4-8) (Michel et al. 1997). As a result, 828,000 gallons of No. 2 fuel oil spilled from the *North Cape*, causing the closure of 250 square miles to fishing and affecting seven salt ponds along the Rhode Island coast that are "important spawning and rearing areas for fish and shellfish" (Michel et al. 1997).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**



Figure 4-8.    The grounding of the *North Cape* barge and *Scandia* tugboat on Moonstone Beach within the Trustom Pond National Wildlife Refuge in Rhode Island resulted in the release of 828,000 gallons of No. 2 fuel oil from the *North Cape.* Image reproduced from NOAA.[23]

Trustom Pond National Wildlife Refuge is a federally protected, undeveloped stretch of coastline that hosts a variety of ecologically sensitive habitats within 787 acres.[24] As such, the petroleum release from the *North Cape* injured a variety of ecological natural resources (French McCay 2003). According to the *North Cape* Restoration Plan prepared by the Natural Resource Damage Assessment (NRDA) Trustees, the *North Cape* release led to the death of approximately 19.4 million surf clams, 4.9 billion worms and amphipods, 7.6 million rock and hermit crabs, and 4.2 million fish (RI DEM 1999).[25] Additionally, an estimated 9 million lobsters were killed (Cobb et al. 1999), and lobster harvesting along the Block Island Sound was closed for five months following the spill (RI DEM 1999). Losses within the coastal salt ponds were estimated by the Trustees to be approximately 500,000 fish, 6.5 million worms, and over a million crabs, shrimp, clams, and oysters.[26] Bird losses were assumed by the Trustees at 2,292 birds, including loons, eiders, and grebes (RI DEM 1999). Ten piping plovers (*Charadrius melodus*) were also assumed

---

[23]    https://darrp.noaa.gov/oil-spills/north-cape

[24]    https://www.fws.gov/refuge/trustom-pond/about-us

[25]    These numbers were assumed based on studies published in the scientific literature (e.g., French 1998, Cobb and Clancy 1998, Cobb et al. 1999).

[26]    https://darrp.noaa.gov/oil-spills/north-cape

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

killed.[27] No marine mammals or sea turtles were injured (Michel et al. 1997). Most of the natural resource damage affected benthic marine species (e.g., lobsters, crabs, clams, and oysters), and "no shoreline cleanup was necessary" (Michel et al. 1997).

The extent of natural resource injury from the *North Cape* oil spill was a consequence of the very shallow environment in which the fuel oil was released and high wind conditions that mixed the oil into the water column and drove it into the shallow salt ponds (Michel et al. 1997). A hypothetical, accidental release from Defendants' New Haven Terminal would not occur in such shallow waters and would not be expected to impact sensitive salt ponds.

### 4.3.2  *Bouchard Barge 120* Oil Spill

The *Bouchard Barge 120* (*Bouchard B-120*) ran aground on a shoal on April 27, 2003 in Buzzards Bay, Massachusetts, rupturing the ship's hull and releasing No. 6 fuel oil (heavy fuel oil, see Table 4-1) into the bay (MA EOEA et al. 2005). At the direction of the Coast Guard, the barge, leaking oil, continued travelling for another hour (over 10 miles) before anchoring, which likely contributed to the spread of oil throughout Buzzards Bay (MA EOEA et al. 2005). Wind and waves pushed the oil ashore, impacting more than 100 miles of shoreline across Massachusetts and Rhode Island, with 101.8 acres of shoreline described as "adversely affected" in Massachusetts and Rhode Island (US FWS et al. 2024). Coarse substrates, sand beaches, and tidal salt marshes were affected by the release, including Ram Island, which together with Bird Island, "serve as the nesting areas for about 50% of the North American [tern] breeding population" (Figure 4-9) (US FWS et al. 2024).

---

[27]  https://darrp.noaa.gov/oil-spills/north-cape

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**





Figure 4-9.    Ram Island during the *Bouchard B-120* Oil Spill. Photo Credit: Massachusetts Department of Environmental Protection. Reproduced from MassDEP.[28]

Injuries occurred primarily to birds. An estimated 1,174 birds died as a result of the petroleum release (US FWS et al. 2024). Adult tern species on Ram, Bird, and Penikese Islands suffered a decrease in productivity after the oil spill, and Ram Island continued to show injuries from the oil spill at least two years later (US FWS et al. 2024). Shellfish beds within Buzzards Bay and near the Elizabeth Islands were closed to recreational shellfishing for up to six months, and four dead marine mammals (3 harbor seals and 1 gray seal) showed signs of oiling (MA EOEA et al. 2005).

The decision to have the *Bouchard B-120* travel through Buzzards Bay while leaking No. 6 fuel and the sensitive natural shorelines that support critical bird breeding areas contributed to the nature and extent of ecological injuries from this oil spill. Notably, No. 6 fuel oil is classified as a "Heavy Fuel Oil" (Table 4-1), which NOAA describes as having "little or no evaporation or dissolution" and likely resulting in heavy contamination of intertidal areas, severe impacts to wildlife, slow environmental degradation (weathering), and difficult shoreline cleanup.[29] None of the petroleum

---

[28]    https://www.flickr.com/photos/massdep/albums/72157622549096578/with/3995072989

[29]    https://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/oil-types.html

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



products stored at Defendants' New Haven Terminal are classified as Heavy Fuel Oils. As such, the nature and extent of ecological effects from the *Bouchard B-120* would be unlikely following a hypothetical, accidental release from Defendants' New Haven Terminal because the Terminal does not store the type of petroleum product that resulted in this type of damage.

### 4.3.3  Motiva Sewaren Oil Spill

In the morning hours of October 30, 2012, following landfall and storm surge from Hurricane Sandy ("Superstorm Sandy"),[30] an aboveground petroleum storage tank at the Motiva Terminal in Sewaren, New Jersey was dislodged and released its contents of low-sulfur diesel fuel (NOAA and NJ DEP 2013).[31] Approximately 255,180 gallons escaped the containment area at the terminal and entered Woodbridge Creek (NOAA and NJ DEP 2013). Oil spread into Arthur Kill as far north as Tufts Bay and Smith Creek and south towards Raritan Bay (NOAA and NJ DEP 2013). According to NOAA and NJ DEP (2013), "Low sulfur diesel impacts were generally limited to these areas." The extent of oil sheens was determined via aerial overflight photography and on the ground observations via Shoreline Cleanup Assessment Technique (SCAT) surveys and photographs.

Under the Oil Pollution Act, NOAA, the United States Fish and Wildlife Service, and the environmental protection agencies of New York and New Jersey, as NRDA Trustees, assessed natural resource injuries following the spill (NOAA and NJ DEP 2013). The Trustees focused on shoreline habitats and did not attempt to quantify injury to surface water resources or wildlife, as reports indicated that the release resulted in minimal damage to wildlife—only fourteen birds were oiled, half of which died.[32] There were no reports of fish kills or other wildlife injuries following the release. NRDA damages assessed for the release included 1.23 acres of wetland restoration and continued wetland monitoring (NOAA and NJ DEP 2013).

The Motiva Sewaren oil spill is the most similar to the hypothetical, accidental release Plaintiff's experts have alleged for Defendants' New Haven Terminal (Nairn 2025, Horner 2025). Like New Haven Harbor, the Arthur Kill is affected by urban and industrial development, particularly along the New Jersey shoreline; however, unlike the Sewaren Terminal, Defendants' New Haven Terminal is located on a larger, more open waterbody with greater water exchange compared to Woodbridge Creek, and any hypothetical release would rapidly disperse, weather, and degrade. For these reasons, it is my opinion that any ecological effects from a hypothetical, accidental release of petroleum product from Defendants' New Haven Terminal would likely be less than that observed following the Motiva Sewaren oil spill.

---

[30]  Post-tropical cyclone Sandy made landfall over Brigantine, New Jersey on October 29, 2012 (NJ DEP 2015).

[31]  https://www.nj.gov/dep/newsrel/2012/12_0144.htm

[32]  https://www.nj.gov/dep/newsrel/2012/12_0144.htm

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

## 4.4 Summary

Any allegation of imminent and substantial endangerment to ecological natural resources from a hypothetical accidental petroleum product release from Defendants' New Haven Terminal needs to consider the chemical composition of the hypothetically released product, the fate and transport of the individual chemical components of the product in the environment, the environmental conditions at the time of the release, and the ecological resources potentially exposed. Based on the chemical and physical characteristics of the products stored at Defendants' New Haven Terminal, physical fouling of shorelines and wildlife is an unlikely adverse impact from a hypothetical release of these petroleum products. Acute toxicity to aquatic organisms from a hypothetical release is possible, but the nature and extent of any effects to ecological natural resources depend on the specific chemicals in the petroleum product that was released, their exposure concentrations, and the duration of exposure.

I identified three oil spills that have affected the northeastern United States and evaluated the nature and extent of ecological impacts resulting from the releases. The most extensive injuries to ecological resources occurred when a petroleum product was released in shallow water under high wind mixing conditions in areas with sensitive shorelines that are important to shellfish and wildlife (i.e., *North Cape* Oil Spill and *Bouchard B-120*). In contrast, the Motiva Sewaren oil spill affected shorelines in a more urban and industrial area and resulted in more limited ecological injuries to exposed shorelines and wildlife. While the Motiva Sewaren oil spill is the most similar to the hypothetical, accidental release Plaintiff's experts have envisioned for Defendants' New Haven Terminal (Nairn 2025, Horner 2025), I conclude, to a reasonable degree of scientific certainty, that, were a spill to occur, the effects from a hypothetical, accidental release of petroleum product from Defendants' New Haven Terminal would likely be less than those observed following the Motiva Sewaren oil spill because any hypothetical release would happen in a larger body of water with greater water exchange, which would result in more rapid weathering and dispersion of the product.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

# 5  Opinion 2: Defendants' New Haven Terminal is unlikely to present an imminent and substantial endangerment to ecological resources in the area.

In the unlikely event that petroleum product was released from Defendants' New Haven Terminal during an extreme weather event (Bayles and Pace 2025, Jones 2025, Etkin 2025, French-McCay 2025), potential impacts to ecological resources would be a function of the type of product released, the fate and transport of the individual chemical components of the product, the environmental conditions at the time and location of the release, and the concentration and duration of specific chemical exposures (see Section 4). Oil spill fate and transport and potential toxicity under different scenarios can be modeled by considering the various factors that affect the distribution and fate of petroleum products in the environment.

The Spill Impact Model Application Package (SIMAP), developed by Dr. Deborah French-McCay, can simulate a hypothetical release, accounting for the specific fate and transport processes expected to affect the released product (French-McCay 2025). In her expert report in this matter, Dr. French-McCay modeled releases of gasoline, diesel, No. 2 fuel oil, and jet fuel from Defendants' New Haven Terminal under storm conditions characteristic of a 100-year and a 500-year storm.[33] She modeled the fate and transport of each product in each storm scenario over both dry and flooded land to identify the storm conditions in which a product could potentially enter New Haven Harbor; Dr. French-McCay then selected a release location that resulted in product reaching New Haven Harbor and modeled the fate and transport of the product in New Haven Harbor and surrounding waterbodies, assuming eight different tide stages at the time of release (French-McCay 2025).

I reviewed Dr. French-McCay's model output and evaluated the potential nature and extent of any ecological impacts resulting from the hypothetical, accidental release scenarios modeled. Based on my analysis applying ERA methods, I conclude, to a reasonable degree of scientific certainty, that any ecological impacts from release of a petroleum product stored at Defendants' New Haven Terminal under a 100-year or 500-year storm scenario would be negligible (100-year storm) to minimal (500-year storm). According to Dr. French-McCay's models (French-McCay 2025), no product is projected to reach New Haven Harbor in any 100-year storm scenario, and under 500-year storm scenarios of diesel, No. 2 fuel oil, and jet fuel releases,[34] no oil would be floating on the water surface, no shorelines would be oiled, subsurface exposures to potentially toxic dissolved oil concentrations would occur in relatively small volumes for short durations, and deposition of hydrocarbons to the sediment would be consistent with existing

---

[33]  Dr. Craig Jones (Jones 2025) provided Dr. French-McCay with hydrodynamic model results under simulated 100-year and 500-year storm intensities, which Dr. French-McCay integrated with other products to model the fate, transport, and potential toxicity of a hypothetical release of product from Defendants' New Haven Terminal.

[34]  Under none of the scenarios modeled by Dr. French-McCay did gasoline released from Defendants' New Haven Terminal reach New Haven Harbor (French-McCay 2025)

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

urban background concentrations in New Haven Harbor and would be unlikely to cause toxicity to sediment resources.

A small, low-lying, vegetated area containing some wetlands south of Defendants' New Haven Terminal (see inset in Figure 4-4) is likely to be adversely affected under any scenario in which the containment berms are breached by a storm surge and product leaves the Terminal; however, the ecological impact from this exposure would be primarily limited to habitat injury (i.e., deciduous forest and emergent vegetation) and any non-mobile organisms that are unable to leave the area as the stormwaters flooded the habitat. Given the small spatial area impacted, the type of habitat impacted (see Section 4.2), and the isolated nature of the habitat, the overall impact from any hypothetical release to terrestrial ecological resources is low.

Dr. French-McCay's models use multiple worst-case assumptions that make the likelihood of adverse effects to ecological natural resources even less probable in the unlikely event a storage tank ruptures during an extreme weather event. For example, Dr. French-McCay models only the largest Maximum Credible Discharges (MCDs) for the largest tanks holding each product with instantaneous releases from a breached berm, which, according to Dr. French-McCay, are unrealistic scenarios since the full volume of a ruptured tank would likely take time to release its contents (French-McCay 2025). A protracted release would increase the dissolution, evaporation, and dispersion of the product in the floodwaters and decrease the exposure of ecological natural resources.

The following describes my analyses to arrive at these conclusions.

## 5.1 Defendants' New Haven Terminal stormwater discharge is not currently causing risk to ecological resources in New Haven Harbor.

There is at present no condition at Defendant's New Haven Terminal that can be characterized as an imminent danger to ecological species or habitats. Defendants are in compliance with the 2018 Connecticut Department of Energy and Environmental Protection (CT DEEP) general permit for stormwater discharge associated with industrial activity (CT DEEP 2018), which was in effect when the Plaintiff's filed their complaint against Defendants. Between 2011 and 2018, Defendants monitored their stormwater discharge for several parameters, including pH, oil and grease, chemical oxygen demand, total suspended solids, total phosphorus, total Kjeldahl nitrogen (organic nitrogen and ammonia), nitrate, total copper, total lead and total zinc, twice annually, except where they obtained sampling exemptions.[35] Defendants also complied with the general permit for industrial stormwater by monitoring for aquatic toxicity.

---

[35] After collection of four semiannual samples, if the average of the four monitoring values for any parameter does not exceed the benchmark, the monitoring requirements for that parameter have been fulfilled for the permit term (CT DEEP 2018).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

The Terminal has been exempt from collecting and reporting results for semiannual samples and conducting aquatic toxicity testing since 2018 because previous monitoring results were below benchmarks outlined in the general stormwater permit (see Table 2 in Tsuji 2025). Prior to 2017, nitrate concentrations in stormwater discharge samples exceeded the benchmark (Tsuji 2025); however, all of the nitrate concentrations were below 20 mg/L, a concentration considered safe for marine animals (Camargo et al. 2005).

## 5.2 Site-specific modeling demonstrates that potential impacts to terrestrial resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are spatially limited.

According to Dr. French-McCay's models, if a tank within the Containment 2 berm were to fail and product was released from a breach in the berm (both of which are unlikely (Bayles and Pace 2025),  under dry conditions petroleum product would flow over land into the small, low-lying vegetated area with isolated wetlands south of Defendants' New Haven Terminal (Figure 5-1) (French-McCay 2025). As described in Section 4.2, this area includes three small, isolated wetland areas comprising a total of approximately 2 acres (Figure 4-4). The isolated wetland habitats are characterized by deciduous forest and emergent vegetation and are unlikely to support fish because they are only seasonally flooded. The area likely supports urban-adapted wildlife, including songbirds, racoons, and rodents year-round as well as amphibians and reptiles when the wetlands are flooded.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**Near Instantaneous Release of 165,376 bbls of Diesel from Outside the Secondary Containment**



Figure 5-1.    Representative worst-case discharge of diesel after an assumed breach of Containment 2 berm over dry land and release of the Maximum Credible Discharge from Tank 22. Modified Figure 12-20 from Appendix G, French-McCay (2025).

Under all modeled storm scenarios (i.e., 100-year and 500-year) that assume that the Containment 2 berm is breached from storm surge and product is released from the largest tank holding the product, Dr. French-McCay's model shows that product flows with stormwater into the low-lying, wetland area south of Defendants' New Haven Terminal (Figure 5-2) (French-McCay 2025). Such exposure would likely have adverse fouling and toxicity effects to terrestrial plants and any non-mobile organisms that cannot escape the floodwaters. However, given the small spatial area impacted, the type of habitat impacted, and the isolated nature of the habitat, the overall effect to terrestrial resources from any hypothetical release is low.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



Figure 5-2.    Example scenario of diesel distribution over flooded land during a 100-year storm after an assumed breach of the Containment 2 berm and release of the Maximum Credible Discharge from Tank 22. Modified Figure 13-4 from Appendix H, French-McCay (2025).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**June 23, 2025**

## 5.3  Site-specific modeling demonstrates that potential impacts to water column aquatic resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are spatially and temporally limited.

As noted above, none of Dr. French-McCay's 100-year storm scenarios resulted in petroleum product release to New Haven Harbor (French-McCay 2025).  Likewise, no scenario, regardless of storm strength or product type, resulted in any floating surface oil or shoreline oiling,[36] and no scenario, regardless of storm strength, resulted in gasoline reaching New Haven Harbor (French-McCay 2025). Therefore, I evaluated the potential for ecological impacts to aquatic resources from a hypothetical, accidental release of diesel, No. 2 fuel oil, and jet fuel from Defendant's New Haven Terminal under a simulated 500-year storm. I reviewed model output reported in Dr. French-McCay's Appendix I (Diesel), Appendix J (No. 2 Fuel Oil), and Appendix K (Jet Fuel) and evaluated the likelihood of toxicity to aquatic resources from exposure to dissolved concentrations of petroleum hydrocarbons in the water column.

Exposure to oil-related chemicals alone does not mean that toxicity will necessarily result. Toxicity depends on various factors, such as the sensitivity of the species at issue, the amount and type of oil-related chemicals present, and the duration of exposure (Rand et al. 1995). Exposure of aquatic resources to petroleum products typically focuses on exposure to the dissolved constituents in the water column, as research has demonstrated that exposure to entrained oil droplets does not appreciably contribute to toxicity (Redman et al. 2017, Carls et al. 2008). Constituents in droplets, however, can dissolve over time, and this weathering process is captured in Dr. French-McCay's model (French-McCay 2025).

A commonly used approach to characterize the toxicity of dissolved petroleum constituents is the target lipid model (McGrath and Di Toro 2009, McGrath et al. 2018), which calculates toxic units (TUs), or ratios, of the exposure concentrations of nonionic organic chemicals, like PAHs, divided by a target lipid concentration that causes 50% mortality in acute (96 hours or less) laboratory exposures (Di Toro et al. 2000). These lipid concentrations are called critical target lipid body burdens (CTLBBs) and vary for each species depending on sensitivity, which is illustrated in Figure 5-3. As EPA guidance indicates that water quality criteria should be protective of 95% of species (US EPA 2003), the CTLBB used to compute TUs is based on the 5th percentile most sensitive species and is therefore a conservative (more protective) assessment of risk (see Figure 5-3).

Narcosis toxicity of nonionic chemicals is additive, which means that estimating the potential toxicity of a water column exposure is done by summing individual TUs calculated for each

---

[36]  Because Dr. French-McCay's models did not produce any shoreline and water surface oiling, there is no pathway for risk to aquatic and shoreline birds. As such, these resources, though abundant in the area, are not at risk because there is no pathway for exposure.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



petroleum constituent. If a Sum TU is less than 1, then the estimated concentration of hydrocarbons in an aquatic organism is less than the CTLBB and unlikely to pose a risk to aquatic organisms. If a Sum TU is greater than 1, there is a potential for toxicity to aquatic organisms from exposure.



Figure 5-3.   Sensitivity distribution of genus-specific CTLBBs, which are also called Genus Mean Acute Values. The Final Acute Value (FAV) is the CTLBB for the 5th percentile sensitive species. Reproduced from US EPA (2003).

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**June 23, 2025**

Dr. French-McCay documented exposure to dissolved petroleum in the water column using three metrics (French-McCay 2025):

1. Volume of water with dissolved concentrations of petroleum chemical constituents greater than 10 µg/L
2. Maximum dissolved concentrations of individual hydrocarbon pseudo-components and total hydrocarbons over time
3. Maximum TUs of individual and total aromatic hydrocarbon pseudo-components over time.

The results of her analyses are presented in Appendices I, J, and K of her expert report (French-McCay 2025). I extracted Dr. French-McCay's figures and compiled the information on single pages for each scenario so that I could evaluate the relationship between the volume of water over time with dissolved hydrocarbon concentrations >10 µg/L and Sum TU >1 (see Appendices B, C, and D).

Dr. French-McCay's model results show that the spatial distribution of elevated concentrations of petroleum chemicals differs by product and by tide stage. In general, a hypothetical release of jet fuel during an extreme weather event results in lower volumes of potentially toxic water (dissolved hydrocarbon concentrations >10 µg/L and Sum TU > 1) than a hypothetical release of No. 2 fuel oil or diesel, which is expected based on the physical-chemical properties of the chemical components of each product. Tide phase has a notable impact on the distribution of the maximum concentration of total dissolved hydrocarbons and the timing of maximum Sum TU concentrations.

Based on Dr. French-McCay's model results, it is likely that some water column resources like zooplankton and early life stages (e.g., eggs and larvae) of fish and shellfish, if present at the time of a hypothetical release, would experience toxicity over a period of hours to days in locations where petroleum concentrations exceed a Sum TU of 1; however, dilution of the released product combined with the life cycles of these organisms indicates that any mortality is unlikely to result in population level effects.

Most small species, including many fish, shellfish, and plankton, have characteristics of what ecologists call "r-selected" species; such species reach maturity early, have high reproduction rates, short generation times, and wide offspring dispersion (Pianka 1970). These general reproductive strategies allow species to produce large amounts of offspring in a short period in the face of variable, and often harsh, conditions. In fact, most of the offspring of "r-selected" species perish naturally due to harsh conditions and predation. For example, Houde (1987) estimated that only 0.006% of bay anchovy (*Anchoa mitchilli*) survive from fertilized egg to the first year of life, while he reported the highest rate of survival among the fish species he considered at 0.06% for striped bass (*Morone saxatilis*). With greater than 99% expected mortality in the early life stages, most r-selected species spawn repeatedly during the year, often with spawning periods lasting several months, during which they release large numbers

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



June 23, 2025

(thousands to millions) of gametes into the environment. This reproductive strategy supports populations during periodic disturbances, whether natural or anthropogenic.

Therefore, while mortality of some water column organisms would be expected if a hypothetical, accidental release of petroleum product from Defendants' New Haven Terminal occurred, it is unlikely that exposures at the levels modeled by Dr. French-McCay would result in impacts to populations given the relatively short duration and limited footprint of exposure.

## 5.4  Site-specific modeling demonstrates that potential impacts to sediment resources from a hypothetical release of petroleum product from Defendants' New Haven Terminal are unlikely.

During an oil spill, entrained oil droplets can adsorb to suspended particulate matter and deposit to the sediment. Dr. French-McCay modeled this fate in each of the scenarios she considered, producing spatially defined estimates of total maximum hydrocarbon concentrations (French-McCay 2025). In order to compare the concentrations of hydrocarbons deposited during the hypothetical oil spill scenarios modeled by Dr. French-McCay to sediment toxicity benchmarks, I converted the data, which were produced by Dr. French-McCay's model as maximum concentrations of total hydrocarbons in grams per square meter ($g/m^2$), to micrograms of maximum total hydrocarbons per kilogram of sediment (µg/kg) (Appendix E). I assumed that the hydrocarbons transported to the sediment during the simulated spill events deposited in the top 1 cm, which is a conservative assumption given that sediment disturbance would likely accompany a 500-year storm and mix any deposited hydrocarbons deeper into the sediment.

ERA of sediment chemical concentrations typically involves screening measured concentrations against published thresholds, a process EPA calls a "Screening-level Risk Assessment" (US EPA 1997). Following this method, I conducted a screening-level risk assessment with the modeled maximum total hydrocarbon concentrations converted to µg/kg using total PAH (TPAH) benchmarks (Effects Range Low [ERL] and Effects Range Median [ERM])[37] published in the NOAA Screening Quick Reference Tables (SQuiRTs). While PAHs are varying fractions of the maximum total hydrocarbon sediment concentrations produced by Dr. French-McCay's model (French-McCay 2025), comparing maximum total hydrocarbon concentrations to TPAH thresholds will overestimate any risk because the thresholds are based on a smaller group of chemicals than those included in Dr. French-McCay's model estimates. However, TPAH is a relevant chemical in New Haven Harbor (see Table 4-2), and the screening level assessment I

---

[37] The ERL represents the TPAH concentration associated with the lower 10th percentile of effects evaluated by Long and Morgan (1990); while the ERM represents the TPAH concentration associated with the median (50th percentile) of effects evaluated by Long and Morgan (1990). According to EPA, ERL is defined as "The concentration of a contaminant above which harmful effects may be expected to occur", and ERM is defined as "The concentration of a contaminant above which harmful effects always or almost always occur" (https://sor.epa.gov/sor_internet/registry/termreg/searchandretrieve/glossariesandkeywordlists/search.do?details=&glossaryName=Eco%20Risk%20Assessment%20Glossary).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



conducted is instructive to understand whether there is likely any risk to sediment organisms from the simulated hypothetical petroleum product releases. The results of my analysis are presented in Figure 5-4 and Table 5-12.



Figure 5-4.    Comparison of modeled maximum total hydrocarbon concentrations for each scenario modeled by Dr. French-McCay (French-McCay 2025) to NOAA's Effects Range Low (ERL) and Effects Range Median (ERM) toxicity screening benchmarks for TPAH (not total hydrocarbon concentration). Box plots represent the 25th – 75th percentile concentrations of the data within the colored box. The line in each colored box represents the median concentration, and the whiskers represent 1.5x the interquartile range concentrations. Concentrations above this range are shown as circles.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

Table 5-12.    Analysis of total maximum hydrocarbon concentrations (µg/kg) from Dr. French-McCay's 500-year storm petroleum product release scenarios above NOAA's TPAH ERL and ERM screening benchmarks.

| Tide Stage | Product | Count Over Zero | Count Over ERL | % Over ERL | Count Over ERM | % Over ERM |
|---|---|---|---|---|---|---|
| Neap Ebb | Diesel | 103,981 | 2073 | 1.99% | 14 | 0.0135% |
| Neap Ebb | Jet | 96,909 | 604 | 0.62% | 4 | 0.0041% |
| Neap Ebb | No2 | 100,889 | 1624 | 1.61% | 14 | 0.0139% |
| Neap Flood | Diesel | 106,641 | 2132 | 2.00% | 8 | 0.0075% |
| Neap Flood | Jet | 96,794 | 808 | 0.83% | 7 | 0.0072% |
| Neap Flood | No2 | 102,125 | 1072 | 1.05% | 40 | 0.0392% |
| Neap High | Diesel | 109,908 | 2050 | 1.87% | 4 | 0.0036% |
| Neap High | Jet | 100,933 | 708 | 0.70% | 4 | 0.0040% |
| Neap High | No2 | 107,051 | 1754 | 1.64% | 24 | 0.0224% |
| Neap Low | Diesel | 102,451 | 2011 | 1.96% | 8 | 0.0078% |
| Neap Low | Jet | 95,764 | 1405 | 1.47% | 4 | 0.0042% |
| Neap Low | No2 | 101,533 | 1952 | 1.92% | 18 | 0.0177% |
| Spring Ebb | Diesel | 127,339 | 388 | 0.30% | 0 | 0.0000% |
| Spring Ebb | Jet | 107,303 | 445 | 0.41% | 1 | 0.0009% |
| Spring Ebb | No2 | 116,398 | 1125 | 0.97% | 0 | 0.0000% |
| Spring Flood | Diesel | 128,670 | 822 | 0.64% | 2 | 0.0016% |
| Spring Flood | Jet | 112,003 | 316 | 0.28% | 2 | 0.0018% |
| Spring Flood | No2 | 118,245 | 603 | 0.51% | 1 | 0.0008% |
| Spring High | Diesel | 126,618 | 506 | 0.40% | 1 | 0.0008% |
| Spring High | Jet | 111,044 | 200 | 0.18% | 13 | 0.0117% |
| Spring High | No2 | 118,769 | 920 | 0.77% | 4 | 0.0034% |
| Spring Low | Diesel | 130,667 | 317 | 0.24% | 0 | 0.0000% |
| Spring Low | Jet | 110,051 | 594 | 0.54% | 3 | 0.0027% |
| Spring Low | No2 | 120,184 | 698 | 0.58% | 3 | 0.0025% |

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



Approximately 98% or more of all maximum total hydrocarbon sediment concentrations generated by Dr. French-McCay's 500-year storm models are below NOAA's TPAH ERL, and a negligible percentage of modeled maximum total hydrocarbon sediment concentrations exceed NOAA's TPAH ERM. This indicates a very low likelihood of toxicity effects to benthic organisms from exposure to hydrocarbons from the simulated releases, and such hypothetical releases do not pose an imminent and substantial endangerment to benthic organisms near the New Haven Terminal.

## 5.5  Summary

In this case, Plaintiff and its experts have alleged that Defendants' New Haven Terminal presents an imminent and substantial endangerment to the ecological environment from an accidental release of petroleum product during an extreme weather event. Dr. French-McCay modeled different scenarios for the marine environment under a simulated 500-year storm intensity to assess the nature and extent of exposure that could result from a hypothetical, accidental release. I reviewed the results of her models and concluded there is no imminent and substantial endangerment to shorelines and the resources they support (e.g., shorebirds) in New Haven Harbor, the Quinnipiac River, the Mill River, the West River, or Long Island Sound because no shoreline or water surface oiling resulted from any of Dr. French-McCay's modeled scenarios. Therefore, no petroleum product would affect the Mill River Greenway, which Dr. Wendi Goldsmith discussed in her expert report (Goldsmith 2025), and the absence of any shoreline oiling dismisses Dr. Goldsmith's concern for the "diverse riparian plant community spanning mature trees and native marsh plants adapted to brackish water" along the Mill River (Goldsmith 2025).

Similarly, there is no imminent and substantial endangerment to organisms living in and on the sediment of New Haven Harbor, the Quinnipiac River, the Mill River, the West River, or Long Island Sound because the modeled sediment concentrations of maximum total hydrocarbons from Dr. French-McCay's release scenarios do not exceed screening benchmarks indicative of toxicity to TPAH, which are a fraction of the chemicals included in Dr. French-McCay's maximum total hydrocarbon concentrations.

While some aquatic organisms like zooplankton and early life stage fish and shellfish would likely experience toxicity in the unlikely event of a tank failure during an extreme weather event (e.g., 500-year storm intensity), the limited spatial area of exposure and rapid weathering of the released product combined with the resilient life cycles of these organisms indicates that any mortality is unlikely to result in population level effects. Thus, it is my opinion that a hypothetical release from Defendants' New Haven Terminal during an extreme weather event is not an imminent and substantial endangerment to aquatic organisms.

There is a small, vegetated area containing wetland terrestrial habitat south of Defendants' New Haven Terminal that would likely be adversely affected under all scenarios (including all 100-year storm and gasoline release model scenarios that did not result in product reaching New

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



**June 23, 2025**

Haven Harbor). However, based on the small spatial area impacted, the type of habitat impacted, and the isolated nature of the habitat, the overall effect to terrestrial resources from any hypothetical release is low and not an imminent and substantial endangerment.

In summary, a diversity of fish and wildlife utilize New Haven Harbor and the surrounding waters, coexisting with industrial and urban operations, including Defendants' New Haven Terminal that has been in operation since the 1950s. The Terminal has historically weathered adverse weather events without disturbing the ecology in the area, and, based on the hypothetical release scenarios examined by Dr. French-McCay during simulated extreme weather events, there is no imminent and substantial endangerment to ecological resources in the area. Based on the analyses described in this report, I identify no quantitative data or other information that suggests the New Haven Terminal presents a catastrophic risk to the environment and biota in the area of the Terminal.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



June 23, 2025

# 6  Material Relied Upon

## 6.1  References

AECOM.  2017.  New Haven Harbor, Connecticut, Navigation Improvement Project, Integrated Feasibility Report and Environmental Impact Statement, Supporting Technical Document #1, AECOM Sediment Evaluation, December 19.  AECOM, United States Army Corps of Engineers.  Chelmsford, Massachusetts.  4236 pp.

AECOM.  2019.  New Haven Harbor, Connecticut, Navigation Improvement Project, Integrated Feasibility Report and Environmental Impact Statement, Supporting Technical Document #3, AECOM Supplemental Sediment Evaluation, June 2019.  AECOM, United States Army Corps of Engineers.  Chelmsford, Massachusetts.  3160 pp.

API.  2008.  Gasoline Blending Streams Category Assessment Document, Consortium Registration #1100997, August 21.  88 pp.

API.  2010.  Kerosene/Jet Fuel Category Assessment Document, Consortium Registration # 1100997, September 21.  American Petroleum Institute, Petroleum HPV Testing Group. 47 pp.

Bayles, D., and A. Pace.  2025.  Expert Report.

Camargo, J. A., A. Alonso, and A. Salamanca.  2005.  Nitrate toxicity to aquatic animals: a review with new data for freshwater invertebrates.  Chemosphere 58(9):1255-1267.

Carls, M. G., L. Holland, M. Larsen, T. K. Collier, N. L. Scholz, and J. P. Incardona.  2008.  Fish Embryos Are Damaged By Dissolved PAHs, Not Oil Particles.  Aquatic Toxicology 88:121-127.

CLF.  2022.  3:21-cv-00933-SALM, Conservation Law Foundation, Inc. v Shell Oil Company, Equilon Enterprises LLC D/B/A Shell Oil Products US, Shell Petroleum, Inc., Triton Terminaling LLC, and Motiva Enterprises LLC, Amended Complaint and Jury Demand, February 11.

Cobb, J. S., and M. Clancy.  1998.  *North Cape* Oil Spill: Assessing Impact on Lobster Populations. January 5.

Cobb, J. S., M. Clancy, and R. A. Wahle.  1999.  Habitat-Based Assessment of Lobster Abundance: A Case Study of an Oil Spill.  pp. 285-298.  In: American Fisheries Society Symposium.

CT DEEP.  2015a.  Conservation Actions for Connecticut's Key Habitats and Species of Greatest Conservation Need, Chapter 4, Wildlife Action Plan.  Connecticut Department of Energy and Environmental Protection.  110 pp.

CT DEEP.  2015b.  Connecticut Coastal and Estuarine Land Conservation Program Plan, October 2015.  Hartford, CT.  149 pp.

CT DEEP.  2018.  General Permit for the Discharge of Stormwater Associated with Industrial Activity. DEEP-WPED-GP-014. October 1.  Connecticut Department of Energy and Environmental Protection, Bureau of Materials Mangement and Complicance Assurance.

CT DEEP.  2022.  Appendix B-1. List of Impaired Waters for Connecticut (EPA Category 5). Connecticut Department of Energy and Environmental Protection.

CT DEEP.  2024.  Quinnipiac River Marsh Wildlife Management Area.  p. 1.  Connecticut Department of Energy and Environmental Protection.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



Di Toro, D. M., J. A. McGrath, and D. J. Hansen.  2000.  Technical basis for narcotic chemicals and polycyclic aromatic hydrocarbon criteria. I. Water and Tissue.  Environmental Toxicology & Chemistry 19(8):1951-1970.

Di Toro, D. M., J. A. McGrath, and W. A. Stubblefield.  2007.  Predicting the Toxicity of Neat and Weathered Crude OIl: Toxic Potential and the Toxicity of Saturated Mixtures.  Environmental Toxicology and Chemistry 26(1):24 - 36.

Etkin, D.  2025.  Expert Report.

French-McCay, D.  2025.  Expert Report.

French, D. P.  1998.  Updated Estimate of Injuries to Marine Communities Resulting from the *North Cape* Oil Spill Based on Modeling of Fates and Effects. Report to NOAA Damage Assessment Center. September.  Silver Spring, MD.

French McCay, D.  2003.  Development and application of damage assessment modeling: example assessment for the North Cape oil spill.  Marine Pollution Bulletin 47:34-359.

Goldsmith, W.  2025.  Expert Report of Wendi Goldsmith, May 8, 2025, Conservation Law Foundation v. Shell New Haven Terminal, Case No. 3:21-CV-00933-VDO.  72 pp.

Horner, R. R.  2025.  Report of Richard R. Horner, Ph.D. May 1, 2025, Conservation Law Foundation v. Shell New Haven Terminal, Case No. 3:21-CV-00933-VDO.  104 pp.

Houde, E. D.  1987.  Fish Early Life Dynamics and Recruitment Variability.  pp. 17-29.  In: American Fisheries Society Symposium.

ITOPF.  2014a.  Fate of Marine Oil Spills, Technical Information Paper.  London, United Kingdom.  12 pp.

ITOPF.  2014b.  Effects of Oil Pollution on the Marine Environment, Technical Information Paper.  London, United Kingdom.  12 pp.

Jones, C.  2025.  Expert Report.

Long, E. R., and L. G. Morgan.  1990.  The Potential for Biological Effects of Sediment-Sorbed Containimants Tested in the National Status and Trends Program. August.  National Oceanic and Atmospheric Adminstration, National Ocean Service, Office of Oceanography and Marine Assessment, Ocean Assessment Division, Coast and Estuarine Assessment Branch.  Seattle, Washington.  233 pp.

MA EOEA, US FWS, NOAA, RI DEM, and Entrix Inc.  2005.  Bouchard Barge No. 120 Oil Spill, Buzzards Bay, Massachusetts, Pre-Assessment Data Report, June.  Massachusetts Executive Office of Environmental Affairs, US Fish and Wildlife Service, National Oceanic and Atmospheric Administration, Rhode Island Department of Environmental Management, Entrix Inc.

McGrath, J. A., and D. M. Di Toro.  2009.  Validation of the Target Lipid Model for Toxicity Assessment of Residual Petroleum Constituents: Moncyclic and Polycyclic Aromatic Hydrocarbons.  Environmental Toxicology and Chemistry 28(6):1130 - 1148.

McGrath, J. A., C. J. Fanelli, D. M. Di Toro, T. F. Parkerton, A. D. Redman, M. L. Paumen, M. Comber, C. V. Eadsforth, and K. den Haan.  2018.  Re-evaluation of Target Lipid Model-Derived HC5 Predictions for Hydrocarbons.  Environmental Toxicology 37(6):1579-1593.

McGrath, J. A., T. F. Parkerton, F. L. Hellweger, and D. M. Di Toro.  2005.  Validation of the Narcosis Target Lipid Model for Petroleum Products: Gasoline as a Case Study.  Environmental Toxicology and Chemistry 24(9):2382 - 2394.

Michel, J., F. Csulack, D. French, and M. Sperduto.  1997.  Natural Resource Impacts from the North Cape Oil Spill.  In: International Oil Spill Conference.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

2109100.000 - 2413



June 23, 2025

Motiva Enterprises LLC.  2025.  New Haven Terminal Monthly Inspection Report.  18 pp.

Nairn, R.  2025.  Nairn 2025 Expert Report on the Shell Oil Terminal Flood Risk, Shell Oil Terminal - New Haven, Connecticut April 30, 2025.  Baird.  113 pp.

New Haven Port Authority.  2019.  Annual Report, February 7, 2019.  3 pp.

NJ DEP.  2015.  Final Report, Damage Assessment Report on the Effects of Hurricane Sandy on the State of New Jersey's Natural Resources, May.  New Jersey Department of Environmental Protection, Office of Science.  72 pp.

NOAA.  2019.  Kerosene and Jet Fuel Spills, August.  National Oceanic and Atmospheric Administration.

NOAA, and NJ DEP.  2013. Final report to NOAA and NJDEP, prepared by Industrial Economics, Inc. and Research Planning, Inc. for Motiva Trustees, July 19, 2013. National Oceanic and Atmospheric Administration, New Jersey Department of Environmental Protection.  44 pp.

Pianka, E. R.  1970.  On r- and K-Selection.  The American Naturalist 102:592-597.

Pribyl, D. W.  2010.  A Critical Review of the Conventional SOC to SOM Conversion Factor. Geoderma 156:75-83.

Rand, G. M., W. P.G., and M. L.S.  1995.  Chapter 1: Introduction to aquatic toxicology. pp. 3-67.  In: Fundamentals of Aquatic Toxicology: Effects, Environmental Fate and Risk Assessment. Second edition.  G. M. Rand, editor.  Taylor & Francis, Washington, DC.

Redman, A. D., J. D. Butler, D. J. Letinski, and T. F. Parkerton.  2017.  Investigating the Role of Dissolved and Droplet Oil In Aquatic Toxicity Using Dispersed and Passive Dosing Systems.  Environmental Toxicology and Chemistry 36(4):1020-1028.

RI DEM.  1999.  Revised Draft North Cape Restoration Plan/Environmental Assessment.  Rhode Island Department of Environmental Management.

Schjønning, P., R. A. McBride, T. Keller, and P. B. Obour.  2017.  Predicting Soild Particle Density From Clay and Soil Organic Matter Contents.  Geoderma 286:83-87.

SOPUS.  2017.  Shell Oil Product, 2017 Actual Emissions.

SOPUS.  2019.  Shell Oil Product US, Tank Variation Log, New Haven Terminal.

Tsuji, J.  2025.  Expert Report.

US ACE.  2020.  Final Integrated Feasibility Report and Environmental Impact Statement, New Haven Harbor, Navicgation Improvement Project, Connecticut, February.  US Army Corps of Engineers.  213 pp.

US EPA.  1985.  Endangerment Assesment Guidance, Oswer Directive 9850.0-1.  United States Environmental Protection Agency, Office of Solid Waste and Emergency Response, Washington, D.C.

US EPA.  1997.  Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments, Interim Final.  EPA 540-R-97-006.  US Environmental Protection Agency, Solid Waste and Emergency Response.  Edison, New Jersey.  239 pp.

US EPA.  2003.  Procedures for the Derivation of Equilibrium Partitioning Sediment Benchmarks (ESBs) for the Protection of Benthic Organisms: PAH Mixtures, EPA/600/R-02/013, November.  United States Environmental Protection Agency, Office of Research and Development, National Health and Environmental Effects Research Laboratory.  175 pp.

US FWS, NOAA, and MA EOEA.  2024.  Final Restoration Plan and Environmental Assessment for Roseate Tern (*Sterna dougallii*), Common Tern (*Sterna hirundo*), and Shoreline and

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Salt Marsh Resources on Ram Island Impacted by the Bouchard Barge 120 (B-120) Oil Spill, Buzzards Bay, Massachusetts and Rhode Island, Finding of No Significant Impact, February.  US Fish and Wildlife Service, National Oceanic and Atmospheric Administration, Massachusetts Executive Office of Energy and Environmental Affairs. 88 pp.

Wahle, L.  1990.  Plants and Animals of Long Island Sound, Connecticut Sea Grant College Program. Groton, CT.

## 6.2  Material Considered

API.  2012.  Gas Oils Category Analysis Document and Hazard Characterization, Consortium Registration #1100997, October 24.  152 pp.

Arevalo, E., H. N. Cabral, B. Villeneuve, C. Possémé, and M. Lepage.  2023.  Fish larvae dynamics in temperate estuaries: A review on processes, patterns and factors that determine recruitment.  Fish and Fisheries 24:466-487.

Barlow, M.  2025.  Expert Report Prepared for the Conservation Law Foundation, The Impact of Climate Change on Storms and Extreme Precipitation, Relevant to the Shell Terminal in New Haven, Connecticut, May 1, 2025.  47 pp.

French McCay, D. P., C. A. Manen, M. Gibson, and J. Catena.  2001.  Quantifying the scale of restoration required to compensate for the impacts of the *North Cape* Oil Spill on fish and invertebrates.  pp. 661-666.  In: International Oil Spill Conference.

Goldsmith, W.  2017.  The Resilience Gap: How Can Designers, Owners, and Stakeholders Better Address Future Vulnerability? Center for Urban Watershed Renewal, January 23. 31 pp.

Goldsmith, W.  2024.  Declaration of Wendi Goldsmith, May 7.

Ho, K., L. Patton, J. S. Latimer, R. J. Pruell, M. Pelletier, R. McKinney, and S. Jayaraman. 1999.  The Chemistry and Toxicity of Sediment Affected by Oil from the *North Cape* Spilled into Rhode Island Sound.  Marine Pollution Bulletin 38(4):314-323.

IARC, editor.  1989.  IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Occupational Exposures in Petroleum Refining; Crude Oil and Major Petroleum Fuels. World Health Organization, International Agency for Research on Cancer, United Kingdom.  Volume 45, 331 pp.

McGrath, J., G. Getzinger, A.D. Redman, M. Edwards, A.M. Aparicio, and E. Vaiopoulou. 2021.  Application of the Target Lipid Model to Assess Toxicity of Heterocyclic Aromatic Compounds to Aquatic Organisms.  Environmental Toxicology and Chemistry 40(11):3000-3009.

NOAA.  2019.  Biodiesel Spills, August.  National Oceanic and Atmospheric Administration.

NOAA.  2019.  Denatured Ethanol Spills, August.  National Oceanic and Atmospheric Administration.

NOAA.  2019.  Heavy Fuel Oil Spills, August.  National Oceanic and Atmospheric Administration.

NOAA.  2019.  Weathering Processes Affecting Spills, July 26.  National Oceanic and Atmospheric Administration.

NOAA.  2021.  How Oil Harms Animals and Plants in Marine Environments, May 4.  National Oceanic and Atmospheric Administration.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



June 23, 2025

NOAA.  2021.  How Oil Spills Affect Fish and Whales, May 4.  National Oceanic and Atmospheric Administration.

NOAA.  2022.  The Toxicity of Oil: What's the Big Deal? November 8.  National Oceanic and Atmospheric Administration.

NOAA.  2023.  How Toxic Is Oil? June 5.  National Oceanic and Atmospheric Administration.

O'Donnell, J.  2025.  Expert Report of James O'Donnell, May 1, 2025.  33 pp.

SOPUS.  2017.  Stormwater Pollution Prevention Plan, Shell Oil Products US, New Haven, July.  137 pp.

Shell Oil Company, Equilon Enterprises LLC D/B/A Shell Oil Products US, Shell Petroleum, Inc., Triton Terminaling LLC, and Motiva Enterprises LLC.  2022.  3:21-cv-00933-JAM, Conservation Law Foundation, Inc. v Shell Oil Company, Equilon Enterprises LLC D/B/A Shell Oil Products US, Shell Petroleum, Inc., Triton Terminaling LLC, and Motiva Enterprises LLC, Answer to Amended Complaint, October 7.

Shell Supply and Distribution.  2021.  Emergency Response Action Plan, New Haven Terminal, March.  405 pp.

Shell Supply and Distribution.  2023.  Emergency Response Action Plan, New Haven Terminal, December.  496 pp.

Shell Supply and Distribution. 2024. Emergency Response Action Plan, New Haven Terminal, June.  500 pp.

SOPUS.  2022.  Facility and TRI Chemical Master List, Shell New Haven Terminal.

SOPUS.  2022.  TRI Reporting Form R Release Summary and Sections 8.1 – 8.8 Comparison, Shell New Haven Terminal.

NRT.  2010.  NRT Quick Reference Guide: Fuel Grade Ethanol Spills (Including E85).  National Response Team.

US EPA.  1992.  Framework for Ecological Risk Assessment.  EPA/630/R-92/001.  United States Environmental Protection Agency.  Washington, DC.  57 pp.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

2109100.000 - 2413



# Appendix A

## *Curriculum vitae* of Ann Michelle Morrison, Sc.D.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



# E<sup>x</sup>ponent®
Engineering & Scientific Consulting

## Ann Michelle Morrison, Sc.D.

Principal Scientist | Ecological and Biological Sciences
Natick
+1-978-461-4613 amorrison@exponent.com

## Professional Profile

Dr. Morrison has over 28 years of experience evaluating the relationship between anthropogenic activities and health effects to natural resources and humans. Dr. Morrison specializes in natural resource damage assessment (NRDA), environmental causal analysis, risk evaluations, net environmental benefit analysis, and assessments of water quality conditions.

Dr. Morrison has provided scientific consultation regarding the design of field studies for NRDA, and she has worked closely with legal counsel during scientific assessments and settlement negotiations with state and federal parties. Dr. Morrison has performed detailed technical assessments of risk and injuries to natural resources, including vegetation, benthic infauna, fishes, shellfishes, corals, birds, and wildlife. She has also developed site-specific sediment toxicity thresholds based on the empirical relationships of chemical concentrations to biological effects and evaluated the impacts of climate change events to ecological populations. Dr. Morrison has provided scientific consultation on carbon offset credit projects, carbon sequestration in natural working lands, and on life cycle assessment inputs for industrial processes. She has offered expert testimony concerning potential injury to natural resources, environmental impacts associated with development projects, net environmental benefits of remediation alternatives, and biofouling of marine assets.

Projects Dr. Morrison has been involved with have concerned oil spills, sewage releases, heavy metal contamination, polychlorinated biphenyls, coal ash, phosphate mining, harmful algal blooms, water rights, carbon footprints, and various industrial and municipal facilities that have generated complex releases to the environment. Dr. Morrison uses her broad knowledge of biology, ecology, toxicology, chemistry, statistics, and human health to assess risk and injury, evaluate sustainability, weigh net environmental benefits, analyze causation, evaluate climate impacts, and support decision making.

## Academic Credentials & Professional Honors

Sc.D., Environmental Health, Harvard University, 2004

M.S., Environmental Health, Harvard University, 2001

B.S., Biology, Rhodes College, 1997

© 2025 Exponent, Inc. All Rights Reserved   •   www.exponent.com   •   888.656.EXPO   •   Page 1

## Prior Experience

Senior Scientist, Sole Proprietor, Morrison Environmental Data Services, 2004-2007

Data Analyst, ETI Professionals, 2005

Scientist, NIH Toxicology Training Grant, Harvard School of Public Health, 2000-2004

Guest Student, Woods Hole Oceanographic Institution, Stegeman Lab, 2001-2004

Science Intern, Massachusetts Water Resources Authority, 03–05/2000, 10/2000–10/2001

Research technician, Bermuda Biological Station for Research, Inc., Benthic Ecology Research Program (BERP), Bermuda, 01/1998–09/1999, 06–08/2000

Research Intern, Bermuda Biological Station for Research, Inc., Benthic Ecology Research Program (BERP), Bermuda, 05/1997–12/1997

NSF Research Experience for Undergraduates Fellowship, Bermuda Biological Station for Research, Inc., Benthic Ecology Research Program (BERP), Bermuda, 08–11/1996

## Professional Affiliations

American Chemical Society—ACS

Society for Risk Analysis—SRA

Society of Environmental Toxicology and Chemistry—SETAC North Atlantic Chapter of SETAC

American Society for Testing and Materials—ASTM

## Publications

Wechsung A, Buehler C, James J, Morrison AM, Stern M. 2022. Carbonomics: Introduction to Carbon Pricing, Regulations, and Frameworks. American Institute of Chemical Engineers. CEP. September 2022.

Mearns AJ, Morrison AM, Arthur C, Rutherford N, Bissell M, Rempel-Hester MA. Effects of pollution on marine organisms. Water Environment Research 2020; 92(10): 1510-1532.

Mearns AJ, Bissell M, Morrison AM, Rempel-Hester MA, Arthur C, Rutherford N. Effects of pollution on marine organisms. Water Environment Research 2019; 91(10):1229-1252.

Mearns AJ, Reish, DJ, Oshida PS, Morrison AM, Rempel-Hester MA, Arthur C, Rutherford N, Pryor R. Effects of pollution on marine organisms. Water Environment Research 2017; 89(10):1704-1798.

Morrison AM, Edwards M, Buonagurio J, Cook L, Murray K, Boehm P. Assessing the representativeness and sufficiency of water samples collected during an oil spill. Proceedings, 2017 International Oil Spill Conference, Vol 2017, No 1.

Mearns AJ, Reish DJ, Oshida PS, Morrison AM, Rempel-Hester MA, Arthur C, Rutherford N, Pryor R. Effects of pollution on marine organisms. Water Environment Research 2016; 88(10), pp.1693-1807.

Morrison AMS, Goldstone JV, Lamb DC, Kubota A, Lemaire B, Stegeman JJ. Identification, modeling and ligand affinity of early deuterostome CYP51s, and functional characterization of recombinant zebrafish sterol 14α-demethylase. Biochimica et Biophysica Acta, 2014; 1840:1825-1836.

Menzie C, Kane Driscoll SB, Kierski M, Morrison AM. Advances in risk assessment in support of sediment risk management. In: Processes, Assessment and Remediation of Contaminated Sediments. Reible DD (ed), SERDP ESTCP Environmental Remediation Technology, Vol. 6, pp. 107-130, 2014.

Goldstone JV, Goldstone HMH, Morrison AM, Tarrant AM, Kern SE, Woodin BR, Stegeman JJ. Cytochrome P450 1 genes in early deuterostomes (tunicates and sea urchins) and vertebrates (chicken and frog): Origin and diversification of the CYP1 gene family. Molecular Biology and Evolution; 24(12): 2619-2631, 2007.

Morrison AM. Receiver Operating Characteristic (ROC) Curve Analysis of Antecedent Rainfall and the Alewife/Mystic River Receiving Waters. Boston: Massachusetts Water Resources Authority. Report ENQUAD 2005-04, 2005. 26 p.

Morrison AM, Coughlin K. Results of Intensive Monitoring at Boston Harbor Beaches, 1996-2004. Boston, Massachusetts Water Resources Authority, Report ENQUAD 2005-05, 76 pp., 2004.

Morrison AM, Coughlin K, Shine JP, Coull BA, Rex AC. Receiver operating characteristic curve analysis of beach water quality indicator variables. Applied and Environmental Microbiology, 2003; 69:6405-6411.

Coughlin K, Stanley AM. Boston Harbor beach study suggests a change in beach management. Coastlines, 2001; Issue 11.6.

Coughlin K, Stanley AM. Water quality at four Boston Harbor beaches: Results of intensive monitoring 1996-2000. Boston, Massachusetts Water Resources Authority, Report ENQUAD 2001-18, 46 pp., 2001.

**Published Abstracts**

Stegeman J, Handley-Goldstone H, Goldstone J, Tarrant A, Morrison AM, Wilson J, Kern S. Pantomic studies in environmental toxicology answers, questions and extrapolation. Journal of Experimental Zoology Part A-Comparative Experimental Biology, 2006; 305A:181.

Goldstone JV, Goldstone HMH, Morrison AM, Tarrant A, Kern SE, Woodin BR, Stegeman JJ. Functional evolution of the cytochrome P450I gene family: Evidence of a pre-vertebrate origin. Marine Environmental Research, 2006; 62:S47-S47.

Handley HH, Goldstone JV, Morrison AM, Tarrant, Wilson JY, Godard CA, Woodin BR, Stegeman JJ. Abstracts from the 12th International Symposium on Pollutant Responses in Marine Organisms (PRIMO 12)—Receptors and Regulation of Cytochrome P450. Marine Environmental Research, 2004; 58:131+.

Morrison AM, Stegeman JJ. Abstracts from the Twelfth International Symposium on Pollutant Responses in Marine Organisms (PRIMO 12)—Cloning, Expression and Characterization of Cytochrome P450 51: An investigation of CYP51 azole sensitivity in aquatic animals. Marine Environmental Research, 2004; 58:131+.

Morrison AM, Stegeman JJ. CYP51 azole sensitivity in lower vertebrates and invertebrate. Drug Metabolism Reviews: Biotransformation and Disposition of Xenobiotics, 2003; 35(2):179.

**Presentations**

Menzie C, Morrison AM, Kleven M, Deines A, Yu Q, Duncan B. 2024. One Health: Cumulative impact assessment and actions in the context of environmental justice. One Health: A Joint SETAC/ACES Session on the Interface of Ecosystem Toxicology and Services, Austin, TX. December 11, 2024.

Menzie C, Morrison AM, Kleven M, Deines A, Yu Q, Duncan B, Ryan S. 2023. An Integrated Approach to Cumulative Impact Assessment in Support of Projects and Actions within Delineated Environmental Justice Areas. Society of Environmental Toxicology and Chemistry (SETAC) North America 44th Annual Meeting, Louisville, KY. November 12-16, 2023.

© 2025 Exponent, Inc. All Rights Reserved    •    www.exponent.com    •    888.656.EXPO    •    Page 3

Mendoza S, Stern M, Marston B, and Morrison AM. 2021. What to Do With Your Used EV Batteries – Opportunities to Reuse and Recycle. Exponent Live. December 2, 2021.

Stern M, Morrison AM, Barry DA, and Ehrich DR. 2021. Your Emissions are Going Public! How New Publicly Available Technologies and Tools Could Impact Corporate Risk from Emissions. Exponent Live in partnership with The Product Liability Advisory Council. September 16, 2021.

Cruden J, Helminiak R, and Morrison AM. 2021. Environmental Law & Policy Under the Biden Administration: From Climate Change to Environmental Justice. DRI. April 27, 2021.

Lewis E and Morrison AM. 2021. Environmental Law in the Biden Administration. PLAC. April 15, 2021.

Palmquist KR, Ma J, Kierski M, Morrison AM. Proactive Assessment of Relative Ecological Risk in Wildfire Prone Areas. EPRI Environmental Aspects of Transmission and Distribution International Workshop. London, England. March 12–13, 2019.

Morrison AM, Ma J, Gard N, Palmquist K, Lin C, Deines A. Ecosystem services accounting in support of corporate environmental stewardship in a changing climate. Society of Environmental Toxicology and Chemistry (SETAC) North America 39th Annual Meeting, Sacramento, CA. November 5–8, 2018.

Pietari J, Morrison AM, Kashuba R, Boehm PD. Incorporating a framework for risk assessment, risk management, and risk mitigation of extreme weather events at Superfund sites. Society of Environmental Toxicology and Chemistry (SETAC) North America 39th Annual Meeting, Sacramento, CA. November 5–8, 2018.

Deines AM, Palmquist K, Morrison AM. Global Status and Risk of Non-Native Fish Aquaculture. 148th Annual Meeting of the American Fisheries Society, Atlantic City, NJ. August 19–23, 2018.

Morrison AM, Palmquist K, Kashuba R. Baseline in the Open-Access and "Big Data" Era. Law Seminars International. Washington, D.C. March 1, 2018.

Palmquist K, Morrison AM, Edwards ME. Addressing white hat bias: Lessons from environmental litigation. Society of Environmental Toxicology and Chemistry (SETAC) North America 38th Annual Meeting, Minneapolis, MN. November 12–16, 2017.

Palmquist KR, Ginn TC, Morrison AM, Boehm PD. Addressing Spatial Data Gaps in Deep-sea Benthic Sediment Sampling Following a Large-Scale Oil Spill. Battelle Sediment Conference in New Orleans, LA.

Deines AM, Morrison AM, Menzie CA. Environmental Flows: Evaluating Long-Term Baselines for Hydrological Regime Change in the Southern United States. American Geophysical Union Fall Meeting, San Francisco, CA. December 12-16, 2016.

Kashuba R, Morrison A, Palmquist K. Framework for environmental causal analysis that accounts for uncertainty in data quality. Presented at the Session: Integrated Risk Assessment and Emerging Lines of Evidence to Address Uncertainty, at the Society for Risk Analysis (SRA) 2016 Annual Meeting, San Diego, CA, December 12, 2016.

Yozzo KL, Hauri J, Kane Driscoll S, McArdle ME, Morrison AM. Review of current literature of cardiotoxicity of oil to early life stages of fish for use in natural resource damage assessments. 37th Annual Society of Environmental Toxicology and Chemistry (SETAC) North America Meeting, Orlando FL, November 6-10, 2016.

Kane Driscoll SB, Hauri J, Kulaki K, Morrison AM, McArdle ME, Schierz P, Yozzo KL, Edwards ME. The influence of mixing energy on the concentration and composition of oil in laboratory toxicity tests. 37th Annual Society of Environmental Toxicology and Chemistry (SETAC) North America Meeting, Orlando FL, November 6-10, 2016.

Morrison AM. The Science. Natural Resource Damages 101. Law Seminars International. Washington, D.C. March 9, 2016.

Morrison AM, Murray KJ, Cook LC, Boehm PD. Spatial and Temporal Extent of PAHs Associated with Surface Oil Distributions (Anomalies). Gulf of Mexico Research Initiative Conference. Tampa, FL. February 1–4, 2016.

Boehm PD, Morrison AM. The Interplay of Data Needs and Data Analysis Frameworks to Optimize the Collection and Use of Data from Oil Spills. Gulf of Mexico Research Initiative Conference. Tampa, FL. February 1–4, 2016.

Whaley JE, Morrison AM, Savery LC. Using the Causal Analysis Framework to Investigate Marine Mammal Unusual Mortality Events (poster), Society of Marine Mammalogy Biennial Conference, San Francisco, CA. December 2015.

Kashuba R, Morrison AM, Menzie C. The Application and Misapplication of Directed Acyclic Graphs for Causal Inference in Ecology. Society of Environmental Toxicology and Chemistry (SETAC) North America 36th Annual Meeting, Salt Lake City, UT. November 1–5, 2015.

Kierski M, Morrison AM, Kane Driscoll S, Menzie C. A Refined Multi-Site Model to Estimate the Toxicity of PAH-Contaminated Sediments at MGP Sites. Society of Environmental Toxicology and Chemistry (SETAC) North America 36th Annual Meeting, Salt Lake City, UT. November 1–5, 2015.

Morrison AM, McArdle M, Menzie C. A Tiered Approach to Causal Analysis in Natural Resource Damage Assessment. 35th Annual Society of Environmental Toxicology and Chemistry (SETAC) Meeting, Vancouver, BC, Canada. November 9–13, 2014.

Morrison AM, Kane Driscoll S, McArdle M, Menzie C. Integrated environmental benefit analysis of sediment remediation thresholds. 32nd Annual Society of Environmental Toxicology and Chemistry (SETAC) Meeting, Boston, MA. November 14–17, 2011.

Kierski M, Morrison AM, Kane Driscoll S, Menzie C. A multi-site model to estimate the toxicity of PAH contaminated sediments at MGP sites. 32nd Annual Society of Environmental Toxicology and Chemistry (SETAC) Meeting, Boston, MA. November 14–17, 2011.

Kierski M, Morrison AM, Kane Driscoll S, Menzie C. Use of receiver operating characteristic curve analysis to estimate ecological risk zones as part of an ecological risk assessment. 31st Annual Society of Environmental Toxicology and Chemistry (SETAC) Meeting, Portland, OR. November 7–11, 2010.

Morrison AM, Coughlin K, Rex A. Bayesian network predictions of Enterococcus exceedances at four Boston Harbor beaches. Water Resources Conference 2008, Amherst, MA. April 8, 2008.

Stegeman J, Handley-Goldstone H, Goldstone J, Tarrant A, Morrison AM, Wilson J, Kern S. Pantomic studies in environmental toxicology answers, questions and extrapolation. 15th International Congress of Comparative Endocrinology, Boston, MA. 2005.

Goldstone JV, Goldstone HMH, Morrison AM, Tarrant A, Kern SE, Woodin BR, Stegeman JJ. Functional evolution of the cytochrome P450I gene family: Evidence of a pre-vertebrate origin. 13th International Symposium on Pollutant Responses in Marine Organisms (PRIMO 13), Alessandria, Italy, June 2005.

Morrison AM, Stegeman JJ. CYP51 azole sensitivity in lower vertebrates and invertebrate. 12th North American Meeting of the International Society for the Study of Xenobiotics, Providence, RI. October 12–16, 2003.

Morrison AM, Stegeman JJ. Cloning, expression and characterization of Cytochrome P450 51: An investigation of CYP51 azole sensitivity in aquatic animals. 12th International Symposium, Pollutant Responses in Marine Organisms, Tampa, FL. May 2003.

Handley HH, Goldstone JV, Morrison AM, Tarrant AM, Wilson JY, Godard CA, Woodin BR, Stegeman JJ. 12th International Symposium, Pollutant Responses in Marine Organisms, Tampa, FL. May 2003.

Morrison AM, Coughlin KA, Shine JP, Coull BA, Rex AC. Receiver operating characteristic curve analysis of beach water quality indicator variables. Pathogens, Bacterial Indicators, and Watersheds: Treatment, Analysis, Source Tracking, and Phase II Stormwater Issues. New England Watershed Association, Milford, MA. May 14, 2003.

Stanley AM, Coughlin KA, Shine JP, Coull BA, Rex AC. Receiver operating characteristic analysis is a simple and effective tool for using rainfall data to predict bathing beach bacterial water quality. 102nd General Meeting, American Society for Microbiology, Salt Lake City, UT. May 2002.

Coughlin K, Stanley AM. Five years of intensive monitoring at Boston harbor beaches: Overview of beach water quality and use of the Enterococcus standard to predict water quality. Massachusetts Coastal Zone Marine Monitoring Symposium, Boston, MA. May 2001.

Smith SR, Grayston LM, Stanley AM, Webster G, McKenna SA. CARICOMP coral reef monitoring: A comparison of continuous intercept chain and video transect techniques. Scientific Aspects of Coral Reef Assessment, Monitoring and Management, National Coral Reef Institute (NCRI), Nova Southeastern University, Ft. Lauderdale, FL. 1999.

**Thought Leadership**

Kytömaa H, Dyson, C, Morrison, AM, Parker, S, Wechsung A, James, J, and A Filie. IMO Sets New Emissions Targets for Global Shipping Industry. May 7, 2025.

Kytömaa H, Hilbert B, Wechsung A, Morrison AM, and Saba T. EPA Finalizes Rules to Reduce Power Plant Emissions. May 8, 2024.

Robrock K, Goodfellow W, Jr., Saba T, Morrison AM, Rackl S, Paulsen S, and Pitts B. EPA Designates Two PFAS as CERCLA Hazardous Substances. Exponent. April 24, 2024.

Deines A, Lilly L, Morrison, AM, Gard N, and Wang C. Navigating Shifts in Marine Biodiversity. Exponent. March 6, 2024.

Wechsung A and Morrison AM. EPA Proposes New Power Plant GHG Rules. Exponent. June 14, 2023

Wechsung A, Morrison AM, and Vargas J. EPA Proposes New Air Pollution Rules. Exponent. May 11, 2023.

Jaffé R, Gard N, Moore P, Morrison AM, Castillo Nelis L. Are mining companies ready to assess and manage biodiversity-related risks? April 27, 2023.

Jaffé R, Morrison AM and Gard N. Nearly 200 Countries Adopt a New Global Framework to Preserve Biodiversity. Exponent. January 2, 2023.

Wechsung A., Buehler C, James J., Morrison AM, and Stern M. Carbonomics: Introduction to Carbon Pricing, Regulations & Frameworks. Exponent. November 1, 2022.

Stern M, Morrison AM, Gard N, Jaffé R, and Ryan S. Takeaways from the IPCC Working Group III Report. The available carbon budget to avoid 1.5°C is quickly closing, but certain mitigation measures are gaining traction. Exponent. April 18, 2022.

Desautels C, Stern M, and Morrison AM. Expanding Fenceline Monitoring Challenges and opportunities in the expanded use of fenceline monitoring for hazardous air pollutants at industrial facilities. Exponent. April 7, 2022.

Folcik AM, Steele AN, Petrovich M, and Morrison AM. New York State Proposes ESG Requirements for the Fashion Industry. The "Fashion Sustainability and Social Accountability Act" would require fashion companies to disclose environmental, social, and governance measures. Exponent. April 5, 2022. Morrison AM and Stern M. Are Your Sustainability Goals SMART? Part 6. Time-based sustainability goals identify a target date for completion that is both attainable and relevant. March 18, 2022.

Pape P, Ryan SF, and Morrison AM. New Public Geospatial Data Tools Promote Focus on Environmental Justice EJSCREEN 2.0 and CEJST support geographical evaluation of environmental and climate burdens. Exponent. March 17, 2022.

Morrison AM and Menzie CA. EPA Examining Cumulative Impact Assessments. Recent white paper identifies data gaps and recommends research to support use of cumulative impact assessment in regulatory decisions. Exponent. March 15, 2022.

Stern M, James J, and Morrison AM. Life Cycle Assessments Do Have Limitations. A candid look at the limitations of life cycle assessments for improving efficiency and sustainability operations. Exponent. January 6, 2022.

Jaffé R, Gard N, Deines A, and Morrison AM. New Guidelines Issued on Nature-Based Solutions for Flood Risk Management. U.S. Army of Corps of Engineers and international partners identify critical components of successful projects. Exponent. November 1, 2021.

Morrison AM, Palmquist K, James J, and Stern M. Are Your Forest Carbon Offsets Going Up in Smoke? Re-evaluating forest carbon offsets in the face of growing wildfire risks due to climate change. Exponent. October 21, 2021.

Stern M, Morrison AM, Wechsung A. Buyer Beware! Sustainability Technologies Are Still Evolving. Life cycle assessments are providing conflicting results for some technologies based on differing assumptions. Exponent. October 7, 2021.

Jaffé R, Gard N, and Morrison AM. Biodiversity Disclosures May Be Coming. Is your business prepared to measure and report material impacts to biodiversity? Exponent. October 7, 2021.

Morrison AM and Stern M. Are Your Sustainability Goals SMART? Part 5. Relevant sustainability goals use innovative strategies and technologies to achieve multiple business objectives simultaneously. Exponent. October 5, 2021.

Stern M and Morrison AM. SEC Issues Warning Letters on Climate Disclosures. Letters identify specific areas of interest to the Securities and Exchange Commission. Exponent. October 4, 2021.

Morrison AM, Menzie CA, Goodfellow W, and Reiss R. EPA Re-developing Guidance for Cumulative Risk Assessments. Updates to address environmental justice, multiple chemical exposures, and multiple exposure pathways. Exponent. September 27, 2021.

Stern M and Morrison AM. Newly Released GHG Emissions Database Goes Public. Climate TRACE aims to hold governments and private industries accountable for emissions. Exponent. September 24, 2021.

Morrison AM and Stern AM. Regulatory and Investor Scrutiny is Challenging Company Sustainability Commitments. A wide range of food and consumer product companies are being challenged to demonstrate their offerings meet their sustainability claims. Exponent. August 19, 2021.

Stern M and Morrison AM. The 2021 UN Climate Report: Takeaways for Sustainability Directors and Corporate Counsel. IPCC report strengthens attribution of fires, extreme weather, and climate change to GHG emissions and urges immediate reductions. Exponent. August 12, 2021.

Morrison AM and Stern M. Are Your Sustainability Goals SMART? Part 4. Attainable sustainability goals include actions that you have sufficient control, resources, and technology to perform. Exponent. August 9, 2021.

Morrison AM and Stern M. Are Your Sustainability Goals SMART? Part 3. Measurable sustainability goals define the scope of the target, produce valid and credible data, include industry-specific metrics, and anticipate future data requirements. Exponent. June 1, 2021.

Morrison AM and Stern M. Are Your Sustainability Goals SMART? Part 2. Specific sustainability goals focus on business objectives, use quantitative targets, identify opportunities, and account for uncertainties. Exponent. May 4, 2021.

Stern M, Gilman L, Morrison AM, Ryan SF, Desautels C, Popovic J. Smile! You're on Carbon Camera! How satellites are making carbon and methane emissions public and what companies need to know. Exponent. April 26, 2021.

Morrison AM and Stern M. Are Your Sustainability Goals SMART? Add capital value and reduce risk through Specific, Measurable, Attainable, Relevant, Time-based sustainability goals. Exponent. April 21, 2021.

Morrison AM, Gard N, and Boehm P. Department of Justice Withdraws Restrictions on Supplemental Environmental Projects. Recent executive orders create opportunities for industry to favorably resolve environmental violations and mitigate climate impacts. Exponent. February 19, 2021.

Morrison AM, Kashuba R, Menzie CA. Evaluating alternative causes of environmental change. Environmental Perspectives 2016; 1.

Boehm PD, Morrison AM, Semenova S, Kashuba R, Ahnell A, Monti C. Comprehensive oil spill liability estimation. Environmental Perspectives 2016; 1.

Boehm PD, Morrison AM. Oil spill liability modeling: helping to manage existential risks. Oil & Gas Insight, 2016; 4.

Morrison AM. EPA Continues to Tighten Environmental Regulations for Coal-Fired Power Plants. Exponent. October 12, 2015.

Mudge S, Morrison AM. Tracking sources of sewage in the environment. Environmental Forensic Notes, 2010; 9.

Pietari J, Bigham G, Morrison AM. Source tracking for identification of microbial pollution sources. Environmental Forensic Notes, 2009; 6.

## Project Experience

Dr. Morrison has been involved in numerous complex projects relating to environmental contamination, causation, and potential risk to humans and biological resources in the affected environment.

**Risk Assessment, Natural Resource Assessment, and Environmental Causal Analysis**

Expert witness concerning natural resource injury at a chemical manufacturing site in New Jersey. New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, and the Administrator of the New Jersey Spill Compensation Fund v. E.I. du Pont de Nemours and Company, the Chemours Company, the Chemours Company FC, LLC., The 3M Company, DuPont Specialty Products USA, LLC, Corteva, Inc., DuPont de Nemours, Inc., et al. Case No. 1:19-cv-14766-RMB-JS. In the United States District Court District of New Jersey. Testified at deposition.

Expert witness concerning age of marine organisms on underwater debris. Leeman v. Indian Creek Village, Indian Creek Country Club, Inc., Miami-Dade County, Southeast Marine Construction, Inc., Florida Dept. of Financial Services, Florida Fish and Wildlife Conservation Commission, U.S. Army Corp of Engineers and Florida Inland Navigation District. Case No. 1:2023cv24887. In the U.S. District Court for the Southern District of Florida. Submitted expert report. Case settled.

Expert witness concerning natural resource injury in the Cape Fear watershed. State of North Carolina v. E.I. du Pont de Nemours and Company, the Chemours Company, the Chemours Company FC, LLC., Corteva, Inc., DuPont de Nemours, Inc., et al. Case No. 2020CVS5612. In the General Court of Justice Superior Court Division. Submitted expert report.

Expert witness concerning natural resources in East St. Louis, Illinois. City of East St. Louis v. Monsanto Company, Solutia Inc., Pharmacia LLC. No. 3:21-cv-00232-DWD in the United States District Court Southern District of Illinois. Testified at deposition.

Expert witness concerning natural resource injury in the Upper Columbia River, Washington. Joseph A. Pakootas, Donald R. Michel, the Confederated Tribes of the Colville Reservation, and the State of Washington v. Teck Cominco Metals Ltd. No. 2:04-CV-00256-SAB In United States District Court Eastern District of Washington. Testified at deposition.

Expert witness concerning PCB exposure of natural resources in the St. Lawrence River area. Back et al. v. Bayer Crop Science, LP, Monsanto Company, Solutia, Inc., Pharmacia, LLC, Pfizer, Inc. In Missouri Circuit Court Twenty-first Judicial Circuit, Saint Louis County. Cause No.: 18SL-CC03530. Testified at deposition.

Expert witness concerning likely causes of marine biofouling. Wicked Salty I, LLC v. Great American Insurance Company. In the United States District Court for the Southern District of Florida. Case No. 9:20-CV-82033-RQR. Submitted expert report. Case settled.

Expert witness concerning net environmental benefits from coal ash closure alternatives at two coal ash plants in North Carolina. Roanoke River Basin Association v. Duke Energy Progress, LLC, United States District Court, Middle District of North Carolina, Case No. 1:16-cv-607 and Roanoke River Basin Association v. Duke Energy Progress, LLC, United States District Court, Middle District of North Carolina, Case No. No. 1:17-cv-452. Testified at deposition.

Expert witness concerning potential damages to terrestrial and aquatic resources, including coral reefs, endangered sea turtles, fish and shellfish, and seagrass beds, resulting from a coastal development project on the Caribbean Island of Nevis. Anne Hendricks Bass vs. Director of Physical Planning, Development Advisory Committee, and Caribbean Development Consultant Limited. Eastern Caribbean Supreme Court, in the High Court of Justice Saint Christopher and Nevis, Nevis Circuit, Civil Case No. NEVHCV2016/0014. Testified at trial.

Expert witness concerning potential impacts to California fishery populations from the Refugio oil spill. Andrews et al. v. Plains All American Pipeline, L.P. et al. United States District Court, Central District of California, Western Division, Case No. 2:15-cv-04113-PSG-JEM. Testified at deposition

Expert witness for natural resource damage assessment concerning alleged injuries to aquatic resources from disposal of bauxite ore processing wastes for the case Commissioner of the Department of Planning and Natural Resources, Alicia V. Barnes, et al. v. Virgin Islands Alumina Company et al. District Court of the Virgin Islands, Division of St. Croix, Civil Case No. 2005-0062. Testified at deposition.

Conducted environmental causal analyses of alleged injury to ecological populations in relation to the presence of per- and polyfluoroalkyl substances (PFAS) in water, sediment, and soil.

Conducted environmental causal analyses of alleged injury to ecological populations in relation to the presence of chlorinated hydrocarbons in rivers, bays, and harbors affected by decades to a century of complex anthropogenic activities, including historical engineering changes to the waterbodies, municipal sewage releases, and industrial discharges.
Developed natural resource damage claim for toxicity injury to aquatic resources from a fuel oil spill in the Indian Ocean.

Provided scientific technical review and public comments on Trustee developed work plans for the Lower Passaic River natural resource damage assessment.

Provided scientific support for assessing remediation alternatives and potential natural resource damage claims following a sediment contamination event in a freshwater cave in Guam.

Examined the potential for impacts to aquatic resources, including sea turtle populations, from deep sea mineral extraction.

Provided scientific support for natural resource damage assessment of injuries to wildlife, forest, and wetlands associated with a fuel oil release in the White Mountains National Forest.

Provided scientific support for natural resource damage assessment of injuries to water column resources and marine mammals in the Gulf of Mexico following release of oil from a subsea pipeline.

Evaluated the likelihood of municipal sewage discharges contributing to red tide occurrences in coastal Florida.

Provided scientific support for natural resource damage assessment of injuries to benthic and aquatic resources in coastal Louisiana affected by industrial chemical exposure.
Provided scientific support for natural resource damage assessment of injuries to aquatic resources in a Massachusetts river following sulfuric acid release.

Provided analysis and technical support in Florida v. Georgia United States Supreme Court water rights case that considered questions of causation relative to alleged adverse ecological changes in downstream river and bay populations.

Provided scientific support and mediation testimony for natural resource damage assessment of injuries to fish, benthic invertebrates, wetlands, and upland habitats in New Jersey.

Conducted a comprehensive review of an environmental impact assessment of potential impacts to coral reefs from a proposed dairy farm development in Hawaii.

Provided scientific support for the natural resource damage assessment following the Deepwater Horizon oil spill in the Gulf of Mexico.

Developed a cooperative natural resource damage assessment field study in the offshore waters of the Gulf of Mexico to collect sediment samples for analysis of chemistry, toxicology, and benthic infauna.

Developed decision management products for beach water quality stakeholders using statistical data analysis tools such as receiver operating characteristic (ROC) curves and Bayesian networks to improve public beach advisories related to elevated fecal bacteria.

Developed net environmental benefit analysis (NEBA) for a lead contaminated river. This analysis used site-specific data to evaluate the costs and benefits of two different remediation options that were being considered. The NEBA was successfully used by the client to negotiate a higher remediation goal than originally proposed by the state's department of environmental protection.

© 2025 Exponent, Inc. All Rights Reserved    •    www.exponent.com    •    888.656.EXPO    •    Page 10

Performed ROC curve analyses of site-specific polycyclic aromatic hydrocarbon (PAH) toxicity data to assess the relationship between PAH concentration and toxicity at three ecological risk assessment projects in Wisconsin. The curves were used to identify site-specific toxicity thresholds for PAH concentrations in sediment that indicated various zones of toxicity (no toxicity, low toxicity, and high toxicity), with very limited misidentification of sediments.

Provided research support to calculate site-specific no-observed-adverse-effect level (NOAEL) and lowest-observed-adverse-effect level (LOAEL) concentrations for mammals and birds for use in a baseline ecological risk assessment in Wisconsin.

Performed ROC curve analysis of national mercury toxicity data to assess the relationship between mercury concentration and toxicity. The curves were also used to identify a threshold mercury concentration for sediment that indicates likely toxicity, with limited misidentification of sediments that are not toxic.

Assembled and analyzed data and reviewed remedial investigations to conduct a screening-level ecological risk assessment for sediment, surface water, and groundwater for a site in Connecticut. The chemicals considered were total petroleum hydrocarbons (TPH), metals, and PAHs.

Reviewed species lists and created summary descriptions of organisms that could be potentially impacted by dam construction on a high-altitude river in the Caribbean. This information was used to develop the risk assessment for dam construction.

Researched the toxicity of malathion to fish to support a technical review of the National Marine Fisheries biological opinion for the registration of pesticides containing malathion.

**Ecological and Toxicity Studies**

Conducted surveys to assess the health of coral reefs, seagrass beds, and mangrove swamps in the nearshore environment of Bermuda. Projects included area-wide habitat surveys as well as surveys of targeted sites potentially impacted by a heavy metals dump, hot water effluent from an incinerator, sedimentation from cruise ship traffic, and chronic release of raw sewage. Water quality was assessed through measurements of trace metals in water, sediment, and coral tissue.

Surveyed juvenile coral recruitment in the Florida Keys to evaluate whether marine protected areas (MPAs) provide a benefit to coral recruitment.

Studied cytochrome P450 family enzymes, including CYP51 and CYP1, examining their sensitivity to environmental chemicals and their evolution through molecular biology and biochemistry approaches.

**Environmental Forensics Projects**

Performed document review, information management, and technical writing for numerous complex projects that dealt with historical petroleum contamination and multiple site owners in several types of environmental media.

Reviewed documents, assembled data, and researched metal concentrations associated with crude oil and railroads in support of a Superfund project in Oklahoma.

Examined the correlation of multiple contaminants (PAHs, metals) with PCB congeners at a historically contaminated site in Alabama to identify the likely origins of the PCB contamination.

Performed statistical analysis to determine source contribution in a chemical fingerprinting case at a Superfund site in Washington that involved hydrocarbons in water, sediment, and groundwater.

**Human Health Projects**

Organized, managed, and simplified a complex database of field sampling reports for a litigation case in Louisiana regarding human air exposure to PAHs.

Performed data analysis and document review for a Superfund site in Oklahoma

Researched and compiled screening-level human health inhalation toxicity values for refinery- related gases for an overseas project.

Developed a questionnaire and related database for industrial hygiene surveys to support regulatory compliance for a highly specialized industry.

**Sustainability and Environmental, Social, and Governance (ESG)**

Examined carbon sequestration in natural and working lands, including changes in carbon sequestration over time and following wildfire

Supported review of life cycle assessment inputs for pig iron manufacturing process

Supported review of comparative life cycle assessment for nylon precursor products

Advised on carbon offset market issues

© 2025 Exponent, Inc. All Rights Reserved    •    www.exponent.com    •    888.656.EXPO    •    Page 12

# Appendix B

## Diesel Exposure Scenarios – Dissolved

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Figure 14-9: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 14-17: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 14-25: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

Figure 14-41: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring High Tide**



Figure 14-10: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.



Figure 14-18: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.



Figure 14-26: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

Figure 14-42: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Ebb Tide**



Figure 14-11: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 14-19: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 14-27: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

Figure 14-43: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Low Tide**



Figure 14-12: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 14-20: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 14-28: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

Figure 14-44: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Flood Tide**



Figure 14-13: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 14-21: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 14-29: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

Figure 14-45: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Neap High Tide**



Figure 14-14: Water volume where dissolved concentrations exceed 10 μg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.



Figure 14-22: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.



Figure 14-30: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

Figure 14-46: Maximum total dissolved concentrations (μg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap Ebb Tide



Figure 14-15: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 14-23: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 14-31: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 14-47: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Neap Low Tide**



Figure 14-16: Water volume where dissolved concentrations exceed 10 µg/L over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 14-24: Maximum dissolved concentrations at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 14-32: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 14-48: Maximum total dissolved concentrations (µg/L) at any time for diesel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.

Reproduced from French McCay (2025, Appendix I)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Neap Flood Tide**

# Appendix C

## No. 2 Fuel Oil Exposure Scenarios – Dissolved

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Figure 15-9: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 15-17: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 15-25: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

Reproduced from French McCay (2025, Appendix J)



Figure 15-41: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring High Tide**



Figure 15-10: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.



Figure 15-18: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.



Figure 15-26: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

Figure 15-42: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

Reproduced from French McCay (2025, Appendix J)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Ebb Tide**



Figure 15-11: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 15-19: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 15-27: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

Figure 15-43: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

Reproduced from French McCay (2025, Appendix J)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Low Tide**



Figure 15-12: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 15-20: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 15-28: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

Reproduced from French McCay (2025, Appendix J)

Figure 15-44: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Spring Flood Tide**



Figure 15-13: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 15-21: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 15-29: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

Reproduced from French McCay (2025, Appendix J)



Figure 15-45: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap High Tide



Figure 15-14: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.



Figure 15-22: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500 year storm and entering the harbor beginning at ebb during neap tide.



Figure 15-30: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

Reproduced from French McCay (2025, Appendix J)

Figure 15-46: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap Ebb Tide



Figure 15-15: Water volume where dissolved concentrations exceed 10 μg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 15-23: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500 year storm and entering the harbor beginning at low tide during neap tide.



Figure 15-31: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.

Reproduced from French McCay (2025, Appendix J)

Figure 15-47: Maximum total dissolved concentrations (μg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap Low Tide



Figure 15-16: Water volume where dissolved concentrations exceed 10 µg/L over time for No. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 15-24: Maximum dissolved concentrations at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 15-32: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.

Reproduced from French McCay (2025, Appendix J)

Figure 15-48: Maximum total dissolved concentrations (µg/L) at any time for no. 2 fuel oil spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap Flood Tide

## Appendix D

## Jet Fuel Exposure Scenarios – Dissolved



CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Figure 16-9: Water volume where dissolved concentrations exceed 10 μg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 16-17: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.



Figure 16-25: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

Reproduced from French McCay (2025, Appendix K)



Figure 16-41: Maximum total dissolved concentrations (μg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Spring High Tide



Figure 16-10: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.



Figure 16-18: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500 year storm and entering the harbor beginning at ebb during spring tide.



Figure 16-26: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-42: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Spring Ebb Tide



Figure 16-11: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 16-19: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.



Figure 16-27: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-43: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Spring Low Tide



Figure 16-12: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 16-20: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.



Figure 16-28: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-44: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during spring tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Spring Flood Tide



Figure 16-13: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 16-21: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.



Figure 16-29: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-45: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at high tide during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap High Tide



Figure 16-14: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.



Figure 16-22: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.



Figure 16-30: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-46: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at ebb during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

500 Year Storm – Neap Ebb Tide



Figure 16-15: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 16-23: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.



Figure 16-31: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.

Reproduced from French McCay (2025, Appendix K)

Figure 16-47: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at low tide during neap tide.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Neap Low Tide**



Figure 16-16: Water volume where dissolved concentrations exceed 10 µg/L over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 16-24: Maximum dissolved concentrations at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.



Figure 16-32: Maximum Toxic Units from dissolved concentrations of each of the 9 pseudo-components (AR1-AR9) at any location over time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.

Figure 16-48: Maximum total dissolved concentrations (µg/L) at any time for aviation fuel spilled during the 500-year storm and entering the harbor beginning at flood during neap tide.

Reproduced from French McCay (2025, Appendix K)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**500 Year Storm – Neap Flood Tide**

# Appendix E

## Sediment Calculations

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**June 23, 2025**

# Sediment Calculations

Model output for the maximum total hydrocarbon mass deposited to the sediment surface ($g/m^2$) were provided as raster grids (pixel size of 9.4 m × 12.5 m = 117 $m^2$ resolution) for each combination of tidal conditions (neap and spring), tidal phase (ebb, flood, high tide, and low tide), storm intensity (500-year), and product type (diesel, jet fuel, and No.2 fuel oil) (French-McCay 2025). I extracted all non-zero values for grid cells and developed a conversion from the deposited mass ($g/m^2$) to a sediment concentration (µg/kg) conservatively assuming that the hydrocarbons were mixed into the top 1 cm depth of sediment only. The mass of sediment ($M_{sed}$) occupying 1 cm (0.01 m) depth in a unit 1 $m^2$ area was calculated as:

$$M_{sed} = V \times Dp \times \% \, solids$$

where $V$ is a unit volume for a 1-cm thick sediment layer over a unit 1 $m^2$ area (0.01 $m^3$), $Dp$ is the particle density ($kg/m^3$), and $\%\,solids$ is the percentage of sediment volume occupied by solid particles (organic and mineral). To characterize % solids, I calculated an average of 45.1% solids across 29 surface sediment samples from the AECOM Environmental Impact Assessment (EIA) Supplemental Data (AECOM 2017, Table 16). $Dp$ was calculated following the model of Schjønning et al. (2017), which predicts $Dp$ as a function of organic matter ($OM$, kg/kg) and clay content (% $clay$, kg/kg) of a soil or sediment:

$$Dp = \left[ \frac{OM}{(a + b \times OM)} + \frac{(1 - OM)}{(c + d \times \% \, clay)} \right]^{-1}$$

where $a$, $b$, $c$, and $d$ are constants with values of 1.127, 0.373, 2.648, and 0.209, respectively (Schjønning et al. 2017). $OM$ was calculated by multiplying the surface sediment total organic carbon (%) by a factor of 2, assuming that 50% of organic matter is carbon (Pribyl 2010). $Dp$ was calculated for each surface sediment sample from the AECOM EIA Supplemental Data (AECOM 2017, Tables 15 and 16), and the average value of 2,518 $kg/m^3$ across 29 surface sediment samples was used to calculate a representative sediment mass of 11.36 kg dry weight per unit volume. Finally, maximum total hydrocarbon concentration ($TPH_{c,max}$) for each grid cell was calculated as:

$$TPH_{c,max} \left( \frac{\mu g}{kg} \right) = TPH_{d,max} \left( \frac{g}{m^2} \right) \times Area \, (m^2) \times 10^6 \left( \frac{\mu g}{g} \right) \div M_{sed} \, (kg)$$

where $TPH_{d,max}$ is the maximum total hydrocarbon mass deposited for each scenario in each raster grid cell, $Area$ is the unit area (1 $m^2$), $10^6$ is a unit conversion factor from grams to micrograms, and $M_{sed}$ is the representative sediment mass per unit volume (11.36 kg).

References in this appendix are cited in full in Section 6.1.

   CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

