# Exhibit B

## Filed Under Seal



# Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk

Shell Oil Terminal - New Haven, Connecticut

July 22, 2025   |   13611.303.R2.Rev0



Innovation Engineered.

baird.com

# Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk

## Shell Oil Terminal - New Haven, Connecticut

| Prepared for: | Prepared by: |
|---|---|





Mr. Christopher Kilian, Vice President for Strategic Litigation | Conservation Law Foundation

15 East State St., Suite 4
Montpelier, VT 05602

W.F. Baird & Associates Coastal Engineers Ltd

For further information, please contact
Rob Nairn, Ph.D., P.Eng. at +1 905 845 5385
rnairn@baird.com
www.baird.com

## 13611.303.R2.Rev0

Z:\Shared With Me\QMS\2025\Reports_2025\13611.303.R2.Rev0_NairnExpertReport_Rebuttal.docx

| Revision | Date | Status | Comments | Prepared | Reviewed | Approved |
|---|---|---|---|---|---|---|
| Rev0 | July 22, 2025 | Final | | RBN | RBN | RBN |

© 2025 W.F. Baird & Associates Coastal Engineers Ltd (Baird) All Rights Reserved.  Copyright in the whole and every part of this document, including any data sets or outputs that accompany this report, belongs to Baird and may not be used, sold, transferred, copied or reproduced in whole or in part in any manner or form or in or on any media to any person without the prior written consent of Baird.

This document was prepared by W.F. Baird & Associates Coastal Engineers Ltd for Mr. Christopher Kilian, Vice President for Strategic Litigation | Conservation Law Foundation.  The outputs from this document are designated only for application to the intended purpose, as specified in the document, and should not be used for any other site or project.  The material in it reflects the judgment of Baird in light of the information available to them at the time of preparation.  Any use that a Third Party makes of this document, or any reliance on decisions to be made based on it, are the responsibility of such Third Parties.  Baird accepts no responsibility for damages, if any, suffered by any Third Party as a result of decisions made or actions based on this document.



Innovation Engineered.

# Table of Contents

**1.   Introduction and Background** ...................................................................................**1**

1.1   Introduction and Report Outline                                         1

1.2   Biographical Information on Dr. Nairn's Experience and Qualifications      1

**2.   Summary of Common Rebuttal Themes** ...................................................................**3**

2.1   Theme 1 – The Secondary Containment Berms of the North and South Yards and the Retention Pond at Shell, New Haven are Inadequate to Provide Flood Protection During a 100-year Flood (Storm Surge) Event                                    3

2.2   Theme 2 – Operational Measures Do Not Replace Secondary Containment Berm Function                                                                 10

2.3   Theme 3 – Flood Protection and Containment are Effectively Synonymous      11

2.4   Theme 4 – The Best 100-year Flood Estimate for New Haven is the US Army Corps of Engineers North Atlantic Comprehensive Coastal Study (NACCS) 90% Confidence Interval Value                                                              11

2.5   Theme 5 – As the Containment Berms as They Currently Exist are Insufficient to Serve Their Function, Substantial Improvements are Required and the Appropriate Guideline for Design is ASCE24 Which Dictates a 500-year or 1,000-year Level of Protection for Fuel Storage Facilities and a 50-year Allowance for Sea Level Rise          14

2.6   Theme 6 – The Containment Berms are Susceptible to Erosion from Wave Attack and Overflow Due to Surge and Waves                                         16

**3.   Rebuttal of Jones (2025)** ..................................................................................... **18**

3.1   Rebuttals to Opinions in the Jones Report                                18

3.2   Jones' Flood Results                                                     23

**4.   Rebuttal of Kovich (2025)** ................................................................................... **24**

**5.   Rebuttal of Bayles & Pace (2025)** ....................................................................... **25**

**6.   Rebuttal of French-McCay (2025)** ....................................................................... **26**

**7.   Materials Considered** .......................................................................................... **28**

**Appendix A       Additional Rebuttal Comments to Defendant's Experts Reports**
**                  A.1 – Jones (2025)**
**                  A.2 – Kovich (2025)**
**                  A.3 – Bayles and Pace (2025)**
**                  A.4 – French McCay (2025)**

**Appendix B       Historical Satellite Images of the Site**

Innovation Engineered.

# Figures

Figure 2.1: Relative sea level trend at NOAA station 8467150 in Bridgeport, Connecticut (NOAA, 2025). ...5

Figure 2.2: Change in the 100-year 90% CI return period water level by decade due to SLR in comparison to the containment berms crest elevation shown as the grey bar. ........................................................................5

Figure 2.3: French-McCay Appendix C Figure 8-5. Flooding extent in the Integral/Jones storm models: 100-year (green) versus 500-year (purple). Gray areas are dry and are shown at the model mesh resolution which decreases away from the site (French-McCay, 2025). .......................................................................7

Figure 2.4: French-McCay Appendix C Figure 8-8. Water depth over ground (Top; ft) and Water Level (Bottom; ft NAVD88) at the end of the Integral/Jones 100-year storm (French-McCay, 2025)......................................8

Figure 2.5: French-McCay Appendix C Figure 8-6. Simulated time series of water level (top panel, above NAVD88) and depth over ground (lower panel) at stations within the three containment zones shown in Figure 8-3, and at NACCS Save Point 271 in New Haven Harbor, during the 1% AEP ("100-year") Integral/Jones storm. The NACCS-estimated 1% AEP water level at SP271 is indicated with a black dashed line. The 10.5ft NAVD88 contour bounding the tertiary containment zone west of the Terminal is indicated with a blue dashed line (French-McCay, 2025)..............................................................................................................................9

Figure 2.6: French-McCay Appendix C Figure 8-7. Simulated time series of water level (top panel, above NAVD88) and depth over ground (lower panel) at stations within the three containment zones shown in Figure 8-3, and at NACCS Save Point 271 in New Haven Harbor, during the 0.2% AEP ("500-year") Integral/Jones storm. The NACCS-estimated 0.2% AEP water level at SP271 is indicated with a black dashed line. The 10.5ft NAVD88 contour bounding the tertiary containment zone west of the Terminal is indicated with a blue dashed line (French-McCay, 2025)................................................................................................................ 10

Innovation Engineered.

# 1.    Introduction and Background

## 1.1    Introduction and Report Outline

This rebuttal report addresses the opinions represented in the Defendants expert reports of Jones (2025), Kovich (2025), Bayles & Pace (2025), and French-McCay (2025) as far as they relate to opinions presented in my Nairn (2025) expert report.

The remainder of this report is divided into the following sections:

Section 1.2 provides a brief biographical sketch of my qualifications and experience as they relate to the opinion presented in this report and those in my expert report. Further detail is presented in my CV in Appendix A of my expert report.

Section 2 provides a rebuttal to the key themes that run through the four Defendant's expert reports that I reviewed. Although there are a multitude of comments made by the Defendant's experts that I disagree with, they can be summarized in a limited number of key themes.

Sections 3 through 6 provide a response to the summary opinions presented in the four individual Defendant expert reports I reviewed. Detailed responses to each of the four Defendant expert reports that I reviewed are presented in four subsections for Appendix A to this report.

## 1.2    Biographical Information on Dr. Nairn's Experience and Qualifications

I, Dr. Robert B. Nairn, P.Eng., have more than 40 years experience as a coastal engineer and have been a Principal for W.F. Baird & Associates Coastal Engineers for more than 30 years. I am the global lead for Baird's Risk and Resilience Sector addressing erosion and flooding issues around the world from Baird's offices in Canada (2 offices), US (8 offices), Australia (2 offices), Chile, and Barbados.

I graduated from Queen's University with a BSc in Civil Engineering in 1982, winning the Gold Medal. I completed my MSc at Queen's University in Coastal Engineering in 1984. I became a Professional Engineer in Ontario in 1985. My PhD was completed in Coastal Processes and Engineering at Imperial College in London, England in 1990, and featured the development of a numerical model to predict hydrodynamics, sediment transport and erosion processes.

My primary area of expertise relates to flooding and erosion including the development of solutions for erosion/flood mitigation. My focus for the last 15 to 20 years has been on coastal flood risk reduction projects in the United States. I am or was the Principal in charge of most of Baird's Coastal Storm Risk Reduction (or flood risk reduction) projects including the $76 billion New York New Jersey Harbors and Tributaries (HATS) project in New York, the $45 million Passaic Tidal project to protect the City of Newark, NJ from flooding and the $350 million project to protect three communities on Jamaica Bay from flooding, on all of these Baird are prime consultant for the US Army Corps of Engineers (USACE), New York District. Under my direction Baird are also taking a lead role on numerical modeling of flooding processes to develop design for the $2.6 billion project to protect Orange County in east Texas from flooding. Baird are taking a lead role in evaluating compound flooding for the $2 billion Lake Pontchartrain Barrier Project in New Orleans, again with me leading Baird's technical work. Based on these USACE projects in New York, New Jersey, Louisiana and Texas among others, I have a detailed understanding of the Coastal Hazard System database of historic and synthetic storms including the North Atlantic Comprehensive Coastal Study (NACCS) and the methods to predict storms



surge. I have also been Baird's technical lead for the evaluation of many coastal flood risk evaluation and protection projects in the private sector, particularly related to marine terminals. Dr. Nairn was also the Principal in Charge and lead technical reviewer for FEMA's recent flood study of Palm Beach County and led the application of ADCIRC and TELEMAC models to evaluate FEMA's results from their synthetic hurricane data set. Dr. Nairn is also the Principal in Charge for Baird on their role in evaluating compound flood (pluvial-fluvial-surge) potential and model development for the entire Texas coast for the General Land Office in Texas. Dr. Nairn also recently led for Baird a first of its kind comprehensive evaluation of flood vulnerability of the Patuxent Naval Air Station on Chesapeake Bay. For this pilot study for the US Navy, Baird developed a historic data set of extratropical storms and a synthetic data set of hurricanes, both including wind, atmospheric pressure and rainfall. Baird then applied the TELEMAC model to model waves, storms surge, fluvial and pluvial flooding for over 20,000 storms including existing conditions and mid and late century climate change conditions using CMIP6 output from four GCMs.

I am also a leading expert in erosion processes and erosion protection. From 1982 to 1984 I worked on the Port Burwell shore erosion litigation on behalf of the Government of Canada. It was upon this project that the understanding of cohesive shore erosion was first developed in detail (the secondary containment berms of the Shell facility at New Haven would feature cohesive sediment). Subsequently, in 1992 I was retained by the International Joint Commission for the St. Lawrence River and the Great Lakes to evaluate past and future erosion processes for all the Great Lakes shores under varying historic and future water levels considering cohesive and sandy shore conditions. Through the late 1990s I was retained by the US Army Corps of Engineers (USACE) to complete some pioneering work on erosion processes for a section of cohesive and sandy shore on Lake Michigan. Ultimately, that work led to the USACE retaining me over the period 1997 to 1998 to write a chapter for the Coastal Engineering Manual (the primary coastal engineering manual in North America to this day) on the erosion of cohesive shores. Subsequently, I have worked on many shore erosion projects featuring sandy and cohesive shores throughout the US and Canada and around the world developing mitigation measures to flooding and erosion at many of those locations.

I have over 120 publications with many related to flood and erosion processes and development of associated mitigation measures.

# 2.    Summary of Common Rebuttal Themes

In my review of Defendant's expert reports by Jones (2025), Kovich (2025), Bayles & Pace (2025), and French-McCay (2025), I found several common themes in their critiques and misunderstandings and/or misrepresentations of my expert report opinions. Therefore, this section of my report responds to those common themes and numbers them to provide a cross-reference to the multitude of times they are raised, particularly in Jones (2025). This avoids a detail repetition of my responses to the main repeated claims of Defendant's experts in their reports.

## 2.1    Theme 1 – The Secondary Containment Berms of the North and South Yards and the Retention Pond at Shell, New Haven are Inadequate to Provide Flood Protection During a 100-year Flood (Storm Surge) Event

In many parts of their reports, the Defendant's experts suggest that I have evaluated the potential performance of the secondary containment berms for the North Yard, South Yard, and Retention Pond of the Shell Fuel Storage facility (the Site) based on extreme storms greater than the 100-year event and including future climate change[1]. Those assertions are incorrect. I evaluated the performance of the secondary containment berms using the present-day 100-year return period flood condition to determine whether the containment berms prevent the mixing of harbor/flood waters and containment area waters during this event[2].

Jones (2025) also suggests that the 100-year flood condition is the appropriate standard for evaluating performance of the containment structures – see below eight places in his report where he makes this statement (non exhaustive list). In some of these cases he does suggest that this standard does not apply to the Shell facility according to his interpretation of the permit requirements – something I have not opined on.

1. Opinion 18 on page 5 of his expert report, Jones (2025) states:

   "*The 100-year event is the accepted regulatory benchmark for flood protection under Federal Emergency Management Agency (FEMA) standards, EPA's SPCC and MSGP.*"

2. In the last bullet point of page 29 of his expert report, Jones (2025) states:

   "*2024 FRP Rule (EPA 2024c): This rule reaffirms that the 100-year flood event remains the governing standard, which is consistent with FEMA and longstanding EPA practice.*"

3. Section 8.1.1 titled "Regulatory Foundations for the 100-Year Flood Design Standard" on page 43 and 44 of his expert report, Jones (2025) provides several arguments as to why "…*the 100-year event (with a 1 percent annual chance of occurrence) serves as the widely accepted design benchmark for environmental infrastructure under both federal and state programs*".

4. In the first paragraph of page 58 of his expert report, Jones (2025) states:

   "*…the 100-year flood event—namely, the regulatory benchmark for stormwater permitting and aboveground storage tank resilience—the containment berms and key infrastructure at the New Haven Terminal…*"

5. In the second paragraph of page 69 of his expert report, Jones (2025) states in reference to the Multi-Sector General Permit (MSGP):

---

[1] Hereafter I will refer to the containment berms of North and South Yard, and Retention Pond as "containment berms or areas" or "secondary containment berms or areas"

[2] Hereafter, the function or purpose I refer to for the secondary containment berms is their ability to contain the water and any associated pollutants inside the containment areas and isolate it from the harbor/flood waters.

"…the 100-year flood event remains the established regulatory benchmark under the EPA's MSGP for industrial stormwater management…"

6.  In the first paragraph (first bullet) of page 90 of his expert report, Jones (2025) states in reference to the 2018 Connecticut MSGP:

"…EPA recently released a draft of its 2026 MGSP, which still uses the 100-year event as the applicable standard for permittee consideration."

7.  In the second main paragraph on page 97 of his expert report, Jones (2025) states:

"The best industry practice for evaluation of flood risk uses the mean or median water level for the 100-year event…".

I disagree that the use of the mean or median water level is the best industry practice as explained under Theme 4 below.

8.  In the second paragraph of Section 11.6 on p. 102 of his expert report, Jones (2025) states:

"…the New Haven Terminal operates in compliance with the regulatory standards set by EPA and CT DEEP, both of which rely on the 100-year flood as the governing design threshold…"

I have evaluated the potential flooding of the containment areas and have found through detailed numerical modeling and reliance on the US Army Corps of Engineers NACCS data base, which represents the de facto design data base for any coastal flood risk reduction or protection project in the North Atlantic (see Theme 4 below for further explanation) that these areas are completely inundated during the 100-year flood event such that water would flow freely between the containment areas and the harbor waters outside the containment areas. In fact, since I found that the containment areas are fully inundated during the 100-year event, they would also be inundated during more frequent events (i.e., with return periods less than 100 years), as I did not determine the minimum return period that causes flooding.

It is worth noting that sea level rise (SLR) associated with climate change up to 2021 has inherently been considered in my assessment. I completed a review of historical aerial images to determine approximately when the secondary containment berms were constructed and whether any modifications were made (see Appendix B providing those images and annotations on any changes). For most of the length of the containment berms, they were constructed in the early 1950s. It is likely that any SLR between the early 1950s and 2021 has not been addressed through raising the crest of the containment berms at the Site. NOAA provides a tool to evaluate historical SLR and trends (NOAA, 2025). The nearest station to New Haven with a relatively long record extending back to 1964 is Bridgeport, CT – see the historical SLR in Figure 2.1 below. From 1964 to 2021 the mean sea level increases from -0.29 ft to +0.35 ft, for a total rise of 0.64 ft. Given the berms were constructed in the early 1950s and have remained unchanged in most areas, the SLR since construction of the berms to 2021 is in the order of 0.8 ft (assuming the same rate of SLR of 3.44 mm/yr and going back to 1950). That effective 0.8 ft of relative loss of berm crest elevation to water levels due to SLR makes a big difference in terms of vulnerability to flooding during the 100-year water level event.



**Figure 2.1: Relative sea level trend at NOAA station 8467150 in Bridgeport, Connecticut (NOAA, 2025).**

Figure 2.2 provides an example of how the 100-year return period water level has changed over time due to SLR. Using the current NACCS 100-year return period water level as the value to represent the decade from 2010 to 2019, I then subtracted the average SLR rate of 3.44 mm/year as defined by NOAA (2025) to estimate what the 100-year return period would have been for the previous 6 decades, dating back to 1950. This figure illustrates how the 100-year return period water level in 1950 when the secondary containment was being constructed was not as threatening as it is today.



**Figure 2.2: Change in the 100-year 90% CI return period water level by decade due to SLR in comparison to the containment berms crest elevation shown as the grey bar.**

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



Innovation Engineered.

Lastly, Integral/Jones' own Delft3D model of the 100-year return period water level event resulted in complete inundation of the Site, as shown in Appendix C of the French-McCay (2025) report and copied below in Figure 2.3 to Figure 2.6.

- Figure 2.3 shows the extent of flooding for the 100-year and 500-year water level, which includes all the containment areas for both storms.

- Figure 2.4 shows the water depth (top) and water level (bottom) at the end of the 100-year flood event. The water level in the containment areas is the same as that outside of the berms, showing the areas were fully inundated and water could freely flow in and out of the containment areas.

- Figure 2.5 and Figure 2.6 present the timeseries of water level and water depth in the New Haven harbor and in the containment areas for the 100-year and 500-year flood events respectively. They show that for both the 100-year and 500-year flood events the water level in the containment areas peaks above the containment berms and then slowly recedes to the minimum berm elevation at which point the water is then contained.

In addition, Table 8-3 and 8-4 of the French-McCay (2025) report provide additional evidence that all the containment areas are fully inundated for during the 100-year event (in addition to the 500-year return period event). Table 8-3 presents the volume of water remaining in the containment areas at the end of the storm model simulations. The volume of water is nearly equal for the 100-year and 500-year events, as they both were fully inundated and then drained as the storm surge receded until the water elevation matched the minimum berm crest elevation. Table 8-4 similarly presents the volume of water in the containment areas; however, it includes the volumes at the peak of the storm. The volume of water in the containment areas at the peak of the storm are greater than what was remaining at the end of the simulation, meaning the water level rose above the berm elevations at the peak of the storm, completely inundated the site, and then receded as the storm surge receded to leave only what the secondary containment areas can hold at the end of the simulation. As I have noted, when the containment areas are fully inundated the containment berms have failed to serve their function of keeping the harbor/flood waters separate and isolated from the containment area waters.

The Integral/Jones Delft3D model setup is described in Appendix B of the French-McCay (2025) report.  Here they note that the Delft3D model used the same topography data source as I had used in my model. They also note that the model did not include any wind forcing or wave effects, which means the model provides an underestimate on the flooding of the site as including wind and waves generated from a hurricane would increase the amount of overflow over the containment berms.  Therefore, based on the results of Integral/Jones in Appendix C of French-McCay, the containment berms at this facility would fail to keep the harbor/flood waters separate and isolated from the containment area waters for a more frequent event than the 100-year storm.



Innovation Engineered.



**Figure 2.3: French-McCay Appendix C Figure 8-5. Flooding extent in the Integral/Jones storm models: 100-year (green) versus 500-year (purple). Gray areas are dry and are shown at the model mesh resolution which decreases away from the site (French-McCay, 2025).**

Innovation Engineered.



**Figure 2.4: French-McCay Appendix C Figure 8-8. Water depth over ground (Top; ft) and Water Level (Bottom; ft NAVD88) at the end of the Integral/Jones 100-year storm (French-McCay, 2025).**

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut





**Figure 2.5: French-McCay Appendix C Figure 8-6. Simulated time series of water level (top panel, above NAVD88) and depth over ground (lower panel) at stations within the three containment zones shown in Figure 8-3, and at NACCS Save Point 271 in New Haven Harbor, during the 1% AEP ("100-year") Integral/Jones storm. The NACCS-estimated 1% AEP water level at SP271 is indicated with a black dashed line. The 10.5ft NAVD88 contour bounding the tertiary containment zone west of the Terminal is indicated with a blue dashed line (French-McCay, 2025).**



Time Series for Integral 500yr storm

**Figure 2.6: French-McCay Appendix C Figure 8-7. Simulated time series of water level (top panel, above NAVD88) and depth over ground (lower panel) at stations within the three containment zones shown in Figure 8-3, and at NACCS Save Point 271 in New Haven Harbor, during the 0.2% AEP ("500-year") Integral/Jones storm. The NACCS-estimated 0.2% AEP water level at SP271 is indicated with a black dashed line. The 10.5ft NAVD88 contour bounding the tertiary containment zone west of the Terminal is indicated with a blue dashed line (French-McCay, 2025).**

## 2.2    Theme 2 – Operational Measures Do Not Replace Secondary Containment Berm Function

The Defendant's experts often refer to the operational preparedness of the Shell facility (e.g., the ballasting measures that could be undertaken to avoid flotation of tanks) as if on their own these measures would be sufficient to address the risks of damage and associated spills. The secondary containment berms are required to contain or isolate any liquid within the areas contained by the berms such that it may be inspected and treated before discharging to the harbor waters or the City storm sewer. When the risk of damage to the above ground fuel storage tanks and related infrastructure (and associated spills) is very high (i.e. during extreme



hurricane events such as the 100-year or more severe surge event with strong winds and waves in addition to surge) I have found that the containment berms at the Shell facility are wholly inadequate as the containment areas are completely inundated and water flows freely between the containment areas and the harbor waters without any inspection or opportunity for treatment. Therefore, operational measures do not replace the need for the secondary containment berms to be effective in isolating the water within the containment areas such that it may be inspected and treated before discharge to the harbor, something that will not be achieved during water level events less severe than the 100-year storm surge event (see Section 2.1 which explains that the containment areas are expected to be flooded for return period water level events lower than the 100-year return period), and during any events of greater magnitude.

## 2.3    Theme 3 – Flood Protection and Containment are Effectively Synonymous

Defendants' experts state that secondary containment berms were not intended to serve a flood protection function. I disagree with this view. Given that the purpose of the containment berms is to contain any liquid inside the berms so that it may be inspected and treated before discharge to the harbor or the City sewers, the berms must act to keep the harbor water separate from the water inside the berms. To achieve this purpose the containment berms, need to effectively act as flood protection preventing complete inundation of the containment areas – a circumstance that would allow water to flow freely between the containment areas and the harbor waters. In other words, without achieving flood protection during the 100-year or more frequent event (i.e. preventing complete inundation of the containment areas), there will be unregulated mixing of water between the areas inside and outside of the berms. Therefore, the containment berms are effectively a form of flood protection in the fulfilment of their purpose.

## 2.4    Theme 4 – The Best 100-year Flood Estimate for New Haven is the US Army Corps of Engineers North Atlantic Comprehensive Coastal Study (NACCS) 90% Confidence Interval Value

It is apparent from my expert report and the reports of the Defendants' experts that there is more than one estimate of the 100-year storm surge event, in other words, the event associated with a 1% chance of flooding in any given year (or a 63% chance of occurring in a 100-year period or an 18% chance of occurring in a 20-year period).

Ever since Hurricane Katrina devastated Louisiana, the coastal engineering community has recognized that the historical record of measured water levels is insufficient to provide robust statistics on the 100-year storm surge event generated during hurricanes (Bloemendaal, 2020, James and Mason, 2005, Nadal-Caraballo et al., 2015, and Nadal-Caraballo et al., 2019). Therefore, almost 20 years ago an approach was developed and has been applied throughout the country to define extreme water levels for the purposes of planning and design to address flooding. This approach consists of the development of a "synthetic" hurricane data set to represent several thousand years of conditions. The synthetic set is developed based on the characteristics of the historical record, which, using probabilistic techniques allows the generation of much longer data sets and robust estimates of extreme water levels generated by storm surge, including the 100-year, 500-year and 1,000-year events.

On p. 55 in paragraph 1 of his expert report, Jones (2025) notes the importance of relying on a synthetic hurricane set for design in reference to the NACCS methodology:

> "*This approach ensured that both common and extreme storm conditions were statistically well represented, allowing for a more robust understanding of flood hazards along the North Atlantic*



> *coast. This balance ensures representation of both fast-moving tropical cyclones and slower, broader extratropical systems common to the northeastern United States.*"

The Defendant's experts seem to agree that NACCS is the most appropriate dataset to use to establish the return period water levels for New Haven. Jones (2025) states in Opinion 22:

> *"The use of mean water levels from the North Atlantic Coast Comprehensive Study (NACCS) in the New Haven Terminal's flood risk assessment is consistent with FEMA and EPA guidance. It also provides a scientifically valid basis for risk evaluation".*

In addition, Integral/Jones also used the NACCS return period water levels in his report, and in Appendix C contribution to the French-McCay (2025) report, as the Integral/Jones numerical models were set up to generate peak water levels in the New Haven Harbor that matched the NACCS return period water levels (Jones, 2025). French-McCay (2025) heavily relied on these Integral/Jones modeling results in her report, suggesting her acceptance of the NACCS return period water levels as the appropriate values to use too.

Both FEMA for flood hazard planning purposes and the US Army Corps of Engineers with their publicly available Coastal Hazard System (CHS - https://chs.erdc.dren.mil/) for planning and design purposes rely almost solely on this probabilistic and synthetic hurricane data approach for defining extreme conditions such as the 100-year water level. The one area of the Gulf and Atlantic coasts of the US where FEMA has not yet developed a synthetic data set and therefore relies on the historical record of measured water levels to develop extremes is New England, including New Haven. For New Haven, the FEMA BFE is derived from a statistical analysis of regional tide gauges through 2007, meaning it did not include the impacts of Hurricane Irene and Sandy, which are recent storms with impact on the project area (FEMA, 2017a). However, the USACE NACCS does rely on a synthetic data set (generated from the historical record using probabilistic methods). Therefore, for New Haven, the most appropriate data set to use for evaluation of flood hazards and design of flood protection under hurricanes is the NACCS data set and associated extreme value estimates for water levels, and not the FEMA estimates.

Once it is established that the USACE NACCS extreme value estimates for hurricane storm surge are more robust and reliable than the FEMA values in New England (and at New Haven), the next decision is which confidence interval (CI) or confidence limit (CL)[3] to apply. As I explain on p. 41 of my expert report, the mean or 50% CI that Jones (2025) relies on has a 50% chance of being exceeded. As a designer of flood protection, this risk is too high to be considered a reliable choice for a design water level, particularly for critical infrastructure where the consequences of performance failure are high. In other words, if the secondary containment berms are found to perform their function under the mean value of the 100-yr storm event but fail to perform their function under the 84% or 90% confidence interval, it is appropriate to rely on the higher confidence intervals due to the severe consequences of berm function failure. Therefore, the 90% CI (which has a 10% chance of being exceeded) is an appropriate choice of design water level.

In addition, in the USACE Coastal Storm Risk Management (CSRM) study for the Long Wharf District (USACE, 2020), they noted the inherent epistemic uncertainty in the water level estimates provided by the NACCS methodology. The annual exceedance probability water levels at higher confidence limits show the range of uncertainty in estimating a potential exceedance probability. As noted in the CSRM, "In accordance with ER 1105-2-101, Risk Assessment for Flood Risk Management Studies… the 90-percent confidence limit values have been used to communicate project performance". ER-1105-2-101, titled Risk Assessment for Flood Risk Management Studies, defines performance as "The system's reaction to a hazard… performance refers to the system features and the capability to accommodate the flood hazard as a single event or load." In

---

[3] Confidence interval and confidence limit can be used interchangeably.

this regulation, this would be termed "system performance." Performance also refers to the metric that describes the capability of the system to accommodate a single event (Assurance; also, Conditional Non-exceedance Probability, CNP) and the full range of events: Annual Exceedance Probability (AEP) and Long-Term Exceedance Probability (LTEP)." This concept is important to understand, as the inherent uncertainty in the levels indicates that to have a system or site-specific protection that performs to a 100-year level, it must have the ability to manage the flood hazard for the full range of possible events. ER-1105-2-101 provides an example: "Given irreducible uncertainties inherent in flood frequency analysis, the NED (National Economic Development) Plan will pass the 2% event with 90% assurance." The regulation goes on to say, "This is consistent with standard engineering practice and with the risk expectations of the public." (USACE, 2019). In summary, the USACE study and the USACE Engineering Regulation 1105-2-101 state that using a higher confidence interval (90% for the Long Wharf CSRM) is the standard engineering practice.

Nadal-Caraballo et al. (2019) provides a detailed report on the uncertainties associated with the USACE NACCS joint probability method with optimal sampling (JPM-OS) that is the basis for synthetic hurricane data sets. They state in their conclusions on p. 74, paragraph 2 that (where CRLs are Coastal Reference Locations):

> "Based on the evaluation of 15 CRLs, in general, the U.S. coast north of Virginia exhibited the largest uncertainties. The lowest uncertainties were observed in CRLs in North Carolina, Florida, Mississippi, and Louisiana. This is consistent with the expected negative correlation between uncertainty and TC activity. In other words, areas with higher TC recurrence rates produce larger sample sizes that, in general, exhibit lower uncertainties relative to areas with lower recurrence rates. Sampling uncertainty was the main contributor to total uncertainty followed by kernel size. Observational uncertainty was the lowest contributor to total SRR uncertainty".

On p. 50, paragraph 2 of their report, Nadal-Caraballo et al (2019) specifically mention New England (including New Haven) as an area of high uncertainty. The greater uncertainty with determining 100-year estimates of water level is reflected in the greater increase in estimates between the mean and higher Confidence Interval (CI) estimates (such as the 84% and 90% values). Therefore, it is appropriate at such locations to apply a higher Confidence Interval than the mean or 50% value.

Therefore, for a variety of reasons, it is my opinion the 90% CI estimate of the 100-year (or other return periods) water level published by the USACE as part of the CHS/NACCS is appropriate to apply for evaluation of the flood hazard associated with critical infrastructure (following the ASCE24 definition) such as the Shell secondary containment system surrounding the fuel storage facilities.

Jones (2025) suggests several times that the extreme water levels published for the USACE Coastal Hazard System (including the NACCS) are only meant for informing planning of USACE flood risk reduction projects. This is wholly untrue. The CHS (and or FEMA synthetic hurricane data sets where available) are widely used within the coastal engineering community as a basis for determining design conditions such as the 100-year or 500-year storm surge or wave condition. The NACCS Main Report mentions that its findings are intended to support engineering analyses and coastal project design, stating: "These data will be available for engineering analyses and project design for coastal projects from Maine to Virginia for a spatially complete model domain for the entire North Atlantic coastline" (USACE, 2015). It would be impractical and ineffective to repeat the level of effort of creating and simulating with numerical models 1,000 or more storms for every site where design information is required for flood protection. Jones (2025) also suggests that the CHS may be appropriate for informing design to protect from flood or reduce risks from floods for communities but somehow it does not apply to industrial facilities. The approach that is used by CHS to generate the extreme values for water levels



Innovation Engineered.

during hurricanes is equally applicable to any facility or infrastructure along the coast whether public or private sector.

I found that the South Yard and the Retention Pond are completely inundated during the 100-year 84% CI storm event, and the North Yard is fully flooded at the 90% CI, thus rendering the secondary containment system wholly inadequate to achieve its purpose in that condition. Jones never mentions or includes in any of his figures my 84% and 90% CI estimates of the 100-year water level, though he mentions numerous times the 50% and 95% CI estimates. Therefore, it would seem Jones (2025) has avoided directly addressing my finding that the containment areas entirely flood during the 84% CI (South Yard and Retention Pond) and 90% CI (North Yard) 100-year flood level.

## 2.5    Theme 5 – As the Containment Berms as They Currently Exist are Insufficient to Serve Their Function, Substantial Improvements are Required and the Appropriate Guideline for Design is ASCE24 Which Dictates a 500-year or 1,000-year Level of Protection for Fuel Storage Facilities and a 50-year Allowance for Sea Level Rise

Once I determined that the crest elevation of the containment berms was insufficient to prevent complete inundation during the 100-year flood event (and thus prevent release of water and any associated pollutants from the secondary containment areas at the time when risk of damage and spills is high and they will be most needed), I moved on to investigating the required crest elevation to provide adequate protection to this critical facility.

The American Society of Civil Engineers (ASCE) publishes codes and standards to guide engineers in the design of civil engineering infrastructure. For example, Bayles (2025) refers to ASCE7 on wind loads for designing above ground fuel storage tanks. Flood Resistant Design and Construction presented in ASCE24-14 (2014 Edition) and ASCE24-24 (2024 Edition published in early 2025 not too long before the time of submission of my expert report) is the industry standard guidance for flood protection design in the civil, marine and coastal engineering communities of the United States. ASCE24 lists four Flood Design Classes which have different requirements in terms of design criteria (including the appropriate return period water level to select for design).  ASCE24-24 on page 8 and number 13 under Class 3 infrastructure states:

> "*Buildings and other structures not included in Flood Design Class 4 (including but not limited to facilities that manufacture, process, handle, store, use, or dispose of such substances as hazardous fuels, hazardous chemicals, hazardous waste, or explosives) containing toxic or explosive substances where the quantity of the material exceeds a release threshold quantity established by the community and is sufficient to pose a threat to the public if released*".

Point 9 under Class 4 infrastructure on p. 8 of ASCE24-24 states:

> "*Buildings and other structures (including but not limited to facilities that manufacture, process, handle, store, use, or dispose of such substances as hazardous fuels, hazardous chemicals, or hazardous waste) containing sufficient quantities of highly toxic substances where the quantity of the material exceeds a threshold quantity established by the community and is sufficient to pose a threat to the public if released*".

The text to describe Flood Design Class 3 and 4 is nearly identical in ASCE24-14.

Innovation Engineered.

Therefore, the Shell facility falls under Flood Design Class 3 or Class 4 infrastructure under both ASCE24-14 and ASCE24-24. These standards apply for the design of new facilities or substantial improvements. As noted above, I have shown that the current secondary containment berms are inadequate to serve their purpose and that substantial improvements are therefore required, and specifically, raising the crest elevation of the berms. Based on ASCE24-14, if the facility is considered Class 3, the water level to use for design is the BFE[4] + 1 ft, or DFE[5], whichever is higher. For this case, that would be the NACCS 100-year return period water level to represent the BFE, plus 1 ft of freeboard. If the facility is considered Class 4, the water level to use for design is the BFE + 2 ft, or DFE, or the 500-year flood elevation, whichever is higher. For this case, that would be the NACCS 500-year return period water level.

The most recent version of this standard, ASCE24-24, increases the design criteria for Class 3 and 4 infrastructure to a 750-year design water level for Class 3 infrastructure, and 1,000-year design water level for Class 4 infrastructure. The standard also stipulates an allowance for 50 years of sea level rise in determination of the required crest elevation of the protection (berm in this case).

In my expert report I developed an estimate of the required design crest elevation of the containment berms, based on the facility being in the Class 4 Flood Design Class, and using the ASCE24-14 standard (as ASCE24-24 was published not long before the submission of my expert report). The estimated required design crest elevation was +19.9 ft NAVD88, which is the 500-year return period water level at the 95% confidence interval to account for freeboard, plus 1.64 ft of SLR, which would require raising the existing berm crest by at least 5.5 to 8.5 ft. This increase in crest elevation for the containment berms is significant and represents a substantial improvement in my opinion.  ASCE24-24 would dictate an even higher berm crest elevation than indicated in my expert report.

Contrary to the statement of several of the Defendants' experts at many locations in their reports, I did not evaluate the adequacy of the current state of the containment berms considering return periods greater than 100-year and including climate change effects. Instead, I relied on the guidance of ASCE24 for an initial estimate of the design water level to be used for substantial improvements to the currently inadequate containment berms, and this requires using either the 500-year (ASCE24-14) or 1,000-year (ASCE24-24) water levels, and as per the latest guidance, including an allowance for 50 years of sea level rise.

In my report I discussed the flood protection selected for the CSRM study across the harbor from the Shell facility as an example of a USACE designed flood protection under similar design conditions. In his report, Jones states that the "CSRM study was designed to evaluate community-scale flood control for mixed-use urban districts - not site-specific risk management for petroleum terminals...  The alternative was not designed for, and does not establish, technical standards for aboveground storage tank facilities."  This is agreed.  In fact, site-specific risk management for petroleum terminals, as critical facilities, and regulated under the City of New Haven floodplain ordinances have a minimum standard reflecting their criticality.

New Haven is a participating community of the FEMA Community Rating System (CRS)[6] and has its own flood ordinances. New Haven's Flood Damage Prevention Ordinance (City of New Haven, 2023) document states that for above-ground storage tanks:

---

[4] Base Flood Elevation (BFE) - Elevation of flooding, including wave height, having a 1% chance of being equaled or exceeded in any given year.

[5] Design Flood Elevation (DFE) - Elevation of the design flood, including wave height, relative to the datum specified on the community's flood hazard map.

[6] The Community Rating System (CRS) is a voluntary incentive program that recognizes and encourages community floodplain management practices that exceed the minimum requirements of the National Flood Insurance Program (NFIP). Over 1,500 communities participate nationwide.



Innovation Engineered.

*"New and expanded underground storage tanks are not permitted in the area of special flood hazard. Aboveground tanks shall be installed at or above base flood elevation plus two feet and shall be anchored to prevent flotation, collapse, and lateral movement. Anchored tanks must have the top of the fill pipe located at least two feet above the BFE and have a screw fill cap that does not allow for the infiltration of flood water."*

With regard to hazardous materials, the City of New Haven (2023) states:

*"All new development or substantial improvements with hazardous materials must follow the requirements and limits outlined in the current Connecticut State Building Code. The development or expansion of the following uses are prohibited in the Special Flood Hazard Area.*

*Oil, fuel, or gas refining or storage".*

Lastly, according to the CRS manual the Shell facility is classified as a critical facility due to it being a hazardous materials facility (FEMA, 2017b). Regarding critical facilities, The City of New Haven (2023) states *"New critical facilities, with the exception of wastewater and stormwater management devices and facilities and any other publicly regulated utility, are not permitted in the area of special flood hazard[7] (SFHA)."* Although this is in regard to new critical facilities, it shows that the City of New Haven understands the risk of having these types of facilities in the SFHA, and that the risk should be avoided when possible. To add to that point, in the CRS Manual (FEMA, 2017b), credit is awarded when critical facilities are prohibited from the 500-year floodplain, or where new critical facilities are protected to at least one foot above the 500-year flood level.

Jones cites that "design criteria for newly constructed and substantial modifications for storage tank terminals are appropriately based on the 100-year flood event." He also asserts that "the steel aboveground storage tanks at the terminal are not susceptible to such harm." However, as laid out above, both FEMA and local city ordinances recognize the potential risk of such tanks and infrastructure and specifically indicate that risk mitigation is necessary for critical facilities to a greater than 100-year flood level.

## 2.6     Theme 6 – The Containment Berms are Susceptible to Erosion from Wave Attack and Overflow Due to Surge and Waves

To serve their purpose of containment, the berms must be sufficiently protected to avoid failure (from breaching) during design storm events. Breaching could occur through two possible mechanisms (or a combination of both): due to wave attack on the outside slope or due to overtopping and overflow on the inside slope as water rushes into the containment areas (as I have found it will do during the 100-year flood event). Section 4.2 of my expert report provides industry standard calculations to support the inadequacy of the inner and outer slope, and crest protection of the containment berms to withstand the 100-year flood event conditions. None of the Defendant's experts provide alternative calculations to show that the protection on the berm slopes and crest is sufficient to withstand the 100-year conditions, nor do they critique the methods I applied. Instead, they counter to say the slopes are not all bare soil and/or that breaching is not seen as a failure of the system. With respect to the latter point, if a breach occurs the containment berms will certainly no longer serve their purpose of isolating the water in the containment areas to allow for treatment before discharge to the harbor waters. With respect to the first point, nowhere do I state that the berms are bare soil everywhere, but I do provide photographic evidence of bare or exposed soils in some areas (see Figure 4.20 of

---

[7] Area of special flood hazard - the area within a community subject to one percent or greater chance of flooding in any given year (City of New Haven, 2023).



my expert report) and many areas with little or insufficient stone cover. Also, I note, based on calculations that Defendants' experts do not refute, that the 4-to-6-inch stone that protect some (but not all) areas is only marginally sufficient to protect the slopes and does not provide any factor of safety against failure.

Another important observation is that the crest elevation of the containment areas is not consistent and varies considerably around the perimeter of the berms in a range of 2 to 3 ft (see Figures 3.4 to 3.6 of my expert report). An uneven crest elevation is highly unusual and not recommended in the design of flood protection. The low areas will begin to overflow first and concentrate locally the flow over the berms into the containment area. This will give rise to even greater potential for breaching and failure of the berms. In any case, even if a breach did not occur during the 100-year or more frequent event, I have shown that all three containment areas fully flood during the 100-year or more frequent event (and Integral/Jones in Appendix C of McCay-French (2025) reached the same conclusion) rendering them wholly ineffective at containing waters inside the berms when this containment is most needed (i.e. when winds, waves and surge are highest and thus risk of infrastructure damage and spill potential is highest).

Innovation Engineered.

# 3.   Rebuttal of Jones (2025)

In Section 3.1 I provide my comments on Jones' opinions as stated in his expert report that I disagree with, and in Section 3.2 I discuss the Integral/Jones Delft3D numerical model results. These sections provide an overview of my detailed comments provided on the entire Jones (2025) report that are included in Appendix A of this report.

Jones did not mention the Delft3D model in his report, however it was presented in the Appendices of the French-McCay (2025) report as the Integral model. I refer to this model as the Integral/Jones model, as Jones is a Managing Principal at Integral, and the model output files as shared with me from the Defendant's included the name 'Jones' in the filename.

I received the Integral/Jones Delft3D numerical model output files, but the Defendant's did not share the model input files. This prevents me from being able to properly assess the Integral/Jones numerical model results as the input files contain the configuration details such as boundary conditions, grid setup, bathymetry and model parameters that define how the model was constructed and run. In addition, no calibration or validation of the model was presented in the Jones or French-McCay report, which further reduces my ability to assess the model results[8]. Nevertheless, the Integral/Jones Delft3D results presented in Appendix C of French-McCay (2025) agree with my findings that all three containment areas are completely inundated during a 100-yr or more frequent flood event.

## 3.1   Rebuttals to Opinions in the Jones Report

**Opinion 1:** *From my perspective as an ocean and environmental engineer, the New Haven Terminal was in full compliance with all applicable requirements of the 2018 Connecticut Multi-Sector General Permit (MSGP) for industrial stormwater at the time CLF submitted its notice of intent (NOI). The 2018, or 2021, Connecticut MGSPs for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events.*

**RBN Response:** As noted, both me and Integral/Jones (in Appendix C of French-McCay) find that the containment areas fail to function under the present-day 100-year storm event as they are fully flooded (this evaluation only considered sea level rise to 2021 and not in the future). In other words, in the evaluation of the performance of the facility's containment berms by Integral/Jones and I under the 100-year storm event and present day risks the containment areas are fully inundated, without the consideration of future climate change.

**Opinion 2:** *The allegations raised in CLF's NOI are based on aspirational standards, future climate modeling, and nonbinding guidance documents that were not incorporated into the 2018 or 2021 Connecticut MSGP and do not establish enforceable compliance obligations.*

**RBN Response:** This is not true for my report. Both Integral/Jones (in Appendix C of French-McCay) and I found the performance of the containment berms to fail in containing water under the present-day estimate of the 100-year storm condition. Based on that finding, substantial improvements are required to the containment berms at this facility and ASCE24 indicates the design of those improvements consider sea level rise over a minimum 50-year service life.

---

[8] I am accepting the Integral/Jones Delft3D numerical model results as given without endorsement because I was not provided the input files to the model and therefore could not verify or fully review the work.

Innovation Engineered.

*Opinion 3: The best management practices (BMPs) implemented at the New Haven Terminal were fully compliant with all regulatory requirements at the time CLF submitted its NOI. The terminal's stormwater pollution prevention plan (SWPPP) was current, complete, and properly executed in accordance with the 2018 Connecticut MSGP—including all monitoring, inspection, and documentation obligations—and does not require the terminal to incorporate climate scenario modeling or long-term oceanographic projections.*

**RBN Response:** This is an incorrect representation. Both Integral/Jones (Appendix C of French-McCay) and I have shown that the secondary containment berms fail to serve their function during the present-day 100-year or more frequent storm event, and the 100-year storm is a not a climate change (CC) scenario or "long-term" projection. CC is considered for substantial improvement design which is at least required for all three containment areas. As such, according to ASCE24, substantial improvements are required and ASCE24 dictates consideration of sea level rise as part of that design process.

*Opinion 4: The assertion that "best industry practices" impose a higher compliance standard for many water-based standard than the MSGP is unfounded and unsupported by any authority. This term has no formal definition within Connecticut's MSGP or the U.S. Environmental Protection Agency's (EPA's) MSGPs from 2015 or 2021, and the term has not been adopted as a binding compliance benchmark.*

**RBN Response:** In his report, Jones states that Best Industry Practice includes evaluation of the performance of facilities under the 100-year event conditions.

*Opinion 6: EPA's climate resilience guidance provides nonbinding recommendations and does not create enforceable design or permitting obligations. The New Haven Terminal remains fully compliant with EPA's (2024a) core goal:* "Facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment."

**RBN Response**: Jones notes in several parts of his report that facilities should be designed to achieve these stated goals under the 100-year storm condition. In this case, that would mean isolating water within the containment area during the 100-year event. My expert report shows that this facility does not contain water in its secondary containment areas during the 100-year storm surge event. Integral/Jones results in Appendix C of French-McCay (2025) also show that all three containment areas are fully flooded during the 100-year event.

*Opinion 7: ASCE guidance documents, including ASCE 7 and ASCE 24-14, offer design criteria for new construction and substantial modification. These standards are not retroactive and do not require modifications to existing facilities, such as the New Haven Terminal.*

**RBN Response:** We have shown that this facility will be ineffective at isolating waters within their secondary containment areas during the 100-year storm surge. Therefore, the facility requires substantial improvement to its secondary containment berms to provide this level of industry standard protection. ASCE24-14 on Flood Resistant Design and Protection is the standard for designing flood protection and spells out the requirements. ASCE24-24 recently replaced ASCE24-14 and has more stringent requirements.

*Opinion 9: Flood risk guidance from the U.S. Army Corps of Engineers (USACE), including ER 1105-2-101 and its supporting manuals, provides planning frameworks for future federal infrastructure projects and does not impose design or retrofit requirements for existing private storage facilities like the New Haven Terminal.*

**RBN Response**: This is not true. The USACE engineering manuals and the USACE North Atlantic Comprehensive Coastal Study (NACCS) data base of design wave and water level conditions are both widely applied in the public and private sector as the industry standard for coastal engineering including flood

protection projects. I note Integral/Jones also relied on USACE NACCS to define the 100-year storm surge condition in Appendix C of Defendant's expert French-McCay's (2025) report.

*Opinion 15: The New Haven Terminal's containment berms are constructed, maintained, and inspected in full compliance with EPA's SPCC and the 2018 and 2021 MSGP. Assertions that these earthen berms are noncompliant or structurally deficient are factually unsupported.*

**RBN Response:** I disagree. I presented industry standard calculations to show that the berms are deficient in their design and construction, Jones does not provide any evidence or calculations to the contrary, nor did he critique the methods I applied.

*Opinion 16: The 2018 Connecticut MSGP does not require containment berms to be designed for "wave attack," whatever the definition. CLF provides no credible basis for its claims of berm instability, as Nairn's analysis lacks site-specific data on berm composition, cover, and structural design.*

**RBN Response:** The function of the containment berms at this facility is to contain water and isolate it from the harbor waters for conditions up to the 100-year storm event. I have shown that the berms would fail to serve that function in their current state at the 100-year or more frequent event, both structurally (through breaching) and functionally (through overflow). I rely on photographic evidence and apply industry standard methods to calculate that the berm protection is inadequate. Regarding the breaching potential, Jones does not critique the methods I applied or provide alternative calculations to refute my findings. And regarding overflow, Integral/Jones (in Appendix C of French-McCay) reach the same conclusion as me that all three containment areas completely flood in the 100-yr storm.

*Opinion 18: The 100-year event is the accepted regulatory benchmark for flood protection under Federal Emergency Management Agency (FEMA) standards, EPA's SPCC and MSGP programs, and Connecticut's industrial stormwater permitting framework. It provides a risk informed basis for infrastructure resilience that protects human health and the environment without requiring speculative or nonbinding design thresholds like the 500-year event.*

**RBN Response:** I agree that the performance of the existing secondary containment berms at the site should be designed to withstand complete inundation of the containment areas during the 100-year storm event. Based on the findings of Integral/Jones (Appendix C of French-McCay) and I, the secondary containment berms at the site fail to prevent complete inundation of the and the uncontrolled release of liquid from the containment areas into the harbor/flood waters during the present-day (i.e. including only historic sea level rise up to 2021) 100-year or more frequent storm event.

Given both Integral/Jones and I found that the containment berms at the site fail to achieve their function under the 100-year or more frequent storm event, substantial improvements to the berms are required. ASCE24-14 requires that substantial improvements be designed to withstand the 500-year storm event for this type of facility (Flood Design Class 4). ASCE24-14 has recently been replaced by ASCE24-24 which requires flood protection withstand the 1,000-year event.

*Opinion 19: Design criteria for newly constructed and substantial modifications for storage tank terminals are appropriately based on the 100-year flood event. Higher thresholds, like the 500-year event, are not required for existing terminals under current law or standards.*

**RBN Response**: It is established based on my analysis and that of Integral/Jones (Appendix C of French-McCay) that the existing secondary containment berms are inadequate under the 100-year storm or more frequent condition and therefore substantial improvements are required. ASCE24-14 requires that substantial improvements be designed to withstand the 500-year storm event for this type of facility (Flood Design Class

Innovation Engineered.

4). ASCE24-14 has recently been replaced by ASCE24-24 which requires flood protection withstand the 1,000-year event.

***Opinion 20:*** *Contrary to the suggestion of CLF, Category 3 hurricanes are rare near New Haven, and no Category 4 or 5 hurricanes have been recorded within 150 miles. The New Haven Terminal's infrastructure and preparedness measures—including tank ballasting and emergency planning—appropriately reflect the region's storm history.*

**RBN Response:** The historic record is not long enough to develop robust statistics on the 100-year and less frequent events (500-year and 1,000-year). Instead, industry practice dictates the use of synthetic storm data sets which represent 1,000s of years (I note Integral/Jones also relied on NACCS and its synthetic data set to define the 100-year storm surge condition in Appendix C of Defendant's expert French-McCay's (2025) report).

***Opinion 21:*** *The sea level rise assumptions proposed by O'Donnell (2025) are not incorporated into any regulatory standard governing the New Haven Terminal.*

**RBN Response:** In my evaluation I found that the containment berms of the facilities failed to contain waters within the containment area under the 100-year or more frequent storm event. In this evaluation I considered the sea level rise (SLR) that has occurred to 2021, but not future SLR. A consideration of future SLR is required under ASCE24-24 for design of substantial improvements, which are required here due to the insufficiency of the secondary containment berms to contain water during the 100-year or more frequent storm event. In addition, the inclusion of SLR has been the standard in coastal engineering projects throughout the country for many years. As mentioned in my expert report, the consideration of sea level rise in the development of design for flood risk reduction projects has been standard practice for the USACE, who are responsible for most of the largest coastal storm risk reduction projects in the country since at least 2000 with the initial publication of the design guidance document ER-1105-2-100 (USACE, 2000). Further documentation from USACE includes EC-1164-2-212 (USACE, 2011) and ER 1100-2-8162 (USACE, 2013). Lastly, the National Research Council issued a report regarding engineering implications due to changes in sea level in 1987 (National Research Council, 1987).

***Opinion 22:*** *The use of mean water levels from the North Atlantic Coast Comprehensive Study (NACCS) in the New Haven Terminal's flood risk assessment is consistent with FEMA and EPA guidance. It also provides a scientifically valid basis for risk evaluation. The 95th percentile NACCS water levels represent an upper-bound uncertainty estimate and are not appropriate for use as flood protection benchmarks.*

**RBN Response:** I agree with Jones that he NAACCS is the appropriate source of information to define the 100-year storm surge level. I have shown that the secondary containment berms at the site fail to contain water during the 100-year storm event at the 84% Confidence Interval (CI) for the South Yard and the Stormwater Area and at the 90% CI for the North Yard. In Appendix C of French-McCay (2025), Integral/Jones' own modeling shows that the facility fully floods under the NACCS 100-year storm at the 50% CI, which would result in the uncontrolled release of water from the containment areas into the harbor/flood waters.

***Opinion 23:*** *The New Haven Terminal's application of tank ballasting, consistent with EPA (2016) guidance and operational standards, effectively mitigates failure risk during coastal flood events and supports compliance with accepted engineering practice and environmental protection objectives.*

**RBN Response:** I disagree. I found that during the 100-year storm event the secondary containment areas fully flood with water. In other words, the containment berms fail to contain and isolate the water inside the containment areas from the harbor waters outside. Integral/Jones in Appendix C of French-McCay also found that the containment areas were fully flooded in the 100-year storm event. In the circumstances of the greatest risk to fuel storage tank and related infrastructure damage during the 100-year or less frequent hurricane event

Innovation Engineered.

(with the associated severe winds and waves), the berms fail to achieve containment. In addition, there are several examples where tank ballasting was insufficient, and failures occurred leading to releases of stored fuel during flood events.

*Opinion 24: Probabilistic modeling confirms the New Haven Terminal's aboveground storage tanks are not at structural risk during 100- and 500-year flood and storm events when adequately ballasted. The berms are not required to protect the tanks against floods.*

**RBN Response:** These berms fail to prevent mixing between liquid inside the containment area and the harbor/flood water outside the berms during the 100-year flood or more frequent event according to the results of Integral/Jones (Appendix C of French-MCay) and myself.

*Opinion 25: Projected sea level rise over the next 5 years does not pose a structural risk to the terminal's aboveground storage tanks. The 2024 Connecticut Stormwater Quality Manual, for the first time, mentions that sea level will rise 20 inches by 2050, but it still does not prescribe that permittees take action to address any specific impacts.*

**RBN Response:** Both me and Integral/Jones (Appendix C of French-McCay) have shown that the containment berms fail to prevent mixing between liquid inside the containment area and the harbor/flood water outside the berms during the 100-year or more frequent storm event. Therefore, substantial improvements are required and the current design guidance for these improvements (ASCE24) requires a consideration of sea level rise over a 50-year service life.

*Opinion 26: Historical storms—including Hurricane Sandy—did not result in flooding of the New Haven Terminal.*

**RBN Response:** As noted under my response to Opinion 20 above, both Jones and I agree that the relevant design water level for the 100-year storm event is provided by the USACE NACCS data base which relies on synthetic storms to complete the statistical analysis to define the 100-year level. The water level during Hurricane Sandy at this site was significantly less than the 100-year water level.

*Opinion 27: Modeling results—including those under the most conservative and extreme conditions—demonstrate that the adequately ballasted tanks exhibit negligible probabilities of failure across all modeled hazards, confirming the robustness of the terminal's design, maintenance, and operational protocols under extreme but plausible conditions.*

**RBN Response:** Both me and Integral/Jones (Appendix C of French-McCay) have shown that the containment berms fail to prevent mixing between liquid inside the containment area and the harbor/flood water outside the berms during the 100-year or more frequent storm event.

*Opinion 28: Critical infrastructure in the region—including Union Station, power substations, and hospital access corridors—are more exposed to disruption or structural failure risk during a 100-year flood event than the New Haven Terminal, underscoring the terminal's relative resilience.*

**RBN Response:** No quantitative proof is provided to substantiate this statement. Also, whether or not other facilities may be susceptible to failure during the 100-year flood has no bearing on the fact that the required function of the secondary containment is not achieved during a 100-year or more frequent flood event at the Shell site, which both Integral/Jones (Appendix C of French-McCay) and I have found.



## 3.2   Jones' Flood Results

Jones presents maps of flood depths for the NACCS mean 100-year flood event, mean 500-year flood event, and the upper 95th confidence limit 500-year flood event combined with 1.64 ft of sea level rise by 2050 in Figure 14, 15 and 16 respectively. Figure 14 showing the NACCS 100-year flood event does not show any flooding of the containment areas. However, Jones fails to explain exactly how these flood depths were developed. It appears that he followed a bathtub approach where the NACCS return period water level is compared to the land elevation to evaluate flood depths. Another reason I believe that Jones presented results from a bathtub approach is that in the following section of his report Jones describes the NACCS model results as such:

> *"While the NACCS-based coastal hazards assessment employs a static, or "bathtub," approach—assuming instantaneous equilibrium of water levels across New Haven Harbor and the terminal—it is important to recognize that real-world flooding during rare storm events is dynamic and time limited."*

As Jones stated above, this static approach is not as accurate as actually simulating a storm as I have done. Importantly, Integral/Jones did create and run a Delft3D numerical model to simulate flooding from a hurricane storm surge at the Site. The results are presented in Appendix C of the French-McCay (2025) report, and they show complete flooding of all containment areas for the NACCS mean 100-year flood event, contradicting what is shown in Figure 14 of Jones (2025). Jones, who is a Managing Principal at the company Integral, does not mention the Delft3D numerical model (presented in the French-McCay report) once in his own expert report.

French-McCay (2025) explains in Appendix B of her report that she completed a comparison of the Integral/Jones Delft3D results with a bathtub approach as a check and to support confidence in the model results. However, she notes that "the Delft3D FM model provides a more physically representative simulation of flood dynamics, accounting for temporal variations and flow routing that are not captured in the static analysis." I agree with French-McCay that the Delft3D numerical model results that Integral/Jones present in Appendix C of French-McCay (2025) are a more accurate representation of the flooding at the site for the NACCS mean 100-year flood event (and show complete inundation of all three containment areas).

The Integral/Jones Delft3D FM model results as provided by French-McCay in Appendix C are discussed in Section 2.1.

Innovation Engineered.

# 4.    Rebuttal of Kovich (2025)

In this section I provide my comments on Kovich's summary opinions as stated in his expert report with which I disagree. For all of my comments on Kovich (2025), see Appendix A.

*Pg.1, # 2 - Based on my extensive experience in environmental compliance and my review of the Terminal and related practices, plans and procedures, <u>Defendants implement industry best practices at the New Haven Terminal which go above and beyond the regulatory requirements for bulk petroleum storage terminals related to operations, waste management, stormwater management, and hurricane and extreme weather preparedness.</u>*

**RBN Response:** My opinion is based on evaluating the effectiveness of the containment berms to contain water during the 100-year or more frequent storm (which Jones notes is the correct regulatory standard in many instances in his report – see Section 2.1 above). Both Integral/Jones (Appendix C of French-McCay) and I determined that the secondary containment berms are ineffective in separating containment area waters from harbor/flood waters outside the containment during the 100-year or more frequent flood event. As a result, I developed a preliminary 500-year (or greater) design including a sea level rise allowance over 50 yrs for substantial improvement to the containment berms following guidance of ASCE24.

*Pg.1, # 4 - The alleged "Best Industry Practices" proposed by Goldsmith and Nairn are not industry practices, and they would not have been, and should not have been, implemented at the New Haven Terminal.*

**RBN Response:** Best Industry Practices are utilized for evaluation of the performance of the containment berms under the 100-year event and to provide guidance on the required substantial improvements to the secondary containment berms. It is noted that the containment berms serve a flood protection function during events such as the 100-year condition as their purpose is to prevent flood waters from fully inundating the containment areas to isolate the containment area waters from harbor/flood waters. There are no other flood protection measures in place at the Site, and so the containment berms are the only defense to storm surge flooding. Therefore, the best industry practices would relate to the discipline of flood protection and coastal engineering which is my area of expertise.

*Pg.1, # 5 - Contrary to the opinions of CLF expert Richard Horner, the secondary containment system at the Shell New Haven Terminal is engineered in accordance with industry best practices.*

**RBN Response:** Again, the slope and crest protection requirements for the secondary containment berms at the site should be designed in accordance with coastal engineering best practices to ensure they are adequate to provide the necessary protection from wave and overflow erosion during the 100-year flood event. I have applied industry standard calculation methods to make this evaluation and found that the protection of the berms was inadequate against wave erosion and breaching. Kovich provides no criticism of the industry standard methods that apply or alternative methods to support his statement here.

*Pg.2, Sub bullet #3 - Required Level of Protection (regarding protection of Terminal at 500-year flood)*

**RBN Response:** This is predicated on the fact that containment berms are insufficient to protect the containment areas from complete inundation and prevent mixing between liquid inside the containment area and the harbor/flood water outside the berms during the 100-year event. This is supported by my own analysis and that of Integral/Jones (Appendix C of French-McCay). As such, substantial improvements are required to the containment berms of this facility, and this activates the ASCE24 500-year design level requirement (which in fact is now a 1,000-year protection level based on ASCE24-24 recently replacing ASCE24-14).

Innovation Engineered.

# 5.   Rebuttal of Bayles & Pace (2025)

In this section I provide my comments on Bayles & Pace's opinions as stated in their expert report with which I disagree. This section provides an overview of my detailed comments provided on the entire Bayles & Pace (2025) report that are included in Appendix A of this report.

*Pg. 2, Par. 4 - As for the claims or inferences the tanks will fail if the Terminal experiences an extreme weather event, we show the tanks are designed to withstand the very types of storms that CLF's experts describe.*

**RBN Response:** This is not what I have claimed - I have not investigated tank stability. Instead, my point is that if the containment areas fully fill with water there will be no "containment", the waters inside and outside will freely mingle during the 100-year or more frequent storm event and thus the containment system fails to serve its purpose (based on the findings of Integral/Jones in Appendix C of French-McCay (2025) and myself).

*Pg. 2, Par. 5 - Because the Terminal will have advanced notice of extreme weather events, and Defendants will have time to prepare the Terminal tanks for ballasting, either with product or with water from a high service main, for which we understand that Defendants have immediate access to when needed. From a tank safety perspective, the average product level in tanks at the Terminal is more than what is required to ballast all tanks.*

**RBN Response:** I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year or more frequent flood event that Jones and I cite as the standard. In addition, no proof is presented that the pre-storm preparations of moving product from tank to tank or adding water into tanks are physically possible in the time available.

Innovation Engineered.

# 6.   Rebuttal of French-McCay (2025)

In this section I provide my comments on French-McCay's opinions as stated in her expert report with which I disagree. This section provides an overview of my detailed comments provided on the entire French-McCay (2025) report that are included in Appendix A of this report.

*Pg.4, Summary of Basis of Opinions, Par. 1 - I performed oil spill modeling assuming a maximum credible discharge (MCD, 179-342 thousand gallons of oil) of oil would potentially occur at the New Haven Terminal during an extreme storm surge. However, such events would be extremely improbable because the storm's intensity at New Haven would need to be extreme enough such that a surge would reach the tanks at the Terminal, the tanks at the facility are designed to withstand storm surge conditions and extreme winds, the facility's storm preparation plans call for balancing the volumes of oil in the tanks to reduce likelihood of leakage or failure when a severe storm is predicted, and the failure of the tank would need to be catastrophic for a MCD volume to be released.*

**RBN Response**: Based on my findings and those of Integral/Jones in Appendix C of this report, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Therefore, the containment berms would not function to contain any leaks and resultant spills during the 100-year or less event. In other words, the surge and associated waves do reach the tanks at this site during the 100-year event. French-McCay provides no evidence to counter my findings.

*Pg.5, Opinions, Par. 1 - While I performed oil spill modeling for maximum credible discharges (MCDs) of oil at the New Haven Terminal during extreme storm surges, these events would be extremely improbable because the tanks at the facility are designed to withstand storm surge conditions and extreme winds, the facility's storm preparation plans call for balancing the volumes of oil in the tanks to reduce likelihood of leakage or failure when a severe storm is predicted, and the storm's intensity at New Haven would need to be extreme enough such that a surge would reach the tanks at the Terminal (with a likelihood of occurring less than 1% in any given year). In addition, the modeled instantaneous spill at the height of the surge is not a realistic scenario. Oil could not actually spill catastrophically when water is surrounding the tanks. Thus, these*

**RBN Response**: I disagree with the comment that the likelihood is less than 1% in any given year. Both Integral/Jones (Appendix C of this report) and I found that the containment areas would be completely inundated in a 100-year or more frequent event, thus there is a more (not less as French-McCay suggests) than 1% chance in any given year.

*Pg.5, Opinions, Par. 2 - Given the very low probabilities of a spill, the probable sizes of spills (MCD being of very low likelihood), and the uncertainty in timing of a spill (i.e., a MCD happening instantaneously at the peak of the surge), the likelihood of spilled oil reaching New Haven Harbor is extremely low. If there were a discharge during dry conditions, there is no pathway to the harbor. During an extreme storm surge (i.e., with a likelihood of ≤0.2% in a given year), the spill would need to be catastrophic and instantaneous at the time the surge reaches the tanks in the Terminal for there to be any possibility of oil entering the harbor.*

**RBN Response**: In both the 100-year (based on my results and those of Integral/Jones in Appendix C of this report) and 500-year conditions, the surge and associated waves would reach the tanks around the peak of the storm when winds and waves are greatest.



I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability as a coastal engineer. My opinions are stated to a reasonable degree of certainty and consistent with prevailing and scientific standards of practice.

*Submitted on this 22nd day of July 2025.*

**Robert B. Nairn**
**W.F. Baird & Associates Ltd.**

Innovation Engineered.

# 7.    Materials Considered

American Society of Civil Engineers. (2015). Flood resistant design and construction. http://dx.doi.org/10.1061/9780784413791

ASCE/SEI. (2025). Flood resistant design and construction. In ASCE STANDARD. American Society of Civil Engineers. https://ascelibrary.org

Bayles, D., Pace. A. (2025). Expert Report for Conservation Law Foundation v. Equilon Enterprises LLC, et al., No. 3:21-cv-00933 (D. Ct.). Issued June 22, 2025.

Bloemendaal, N., Haigh, I.D., de Moel, H. *et al.* (2020). Generation of a global synthetic tropical cyclone hazard dataset using STORM. *Sci Data* **7**, 40. https://doi.org/10.1038/s41597-020-0381-2

City of New Haven (2023) - Flood Damage Prevention Ordinance City of New Haven, Connecticut

FEMA (2017a). Flood Insurance Study - New Haven County, Connecticut. Volume 1-2 of 10

FEMA (2017b). National Flood Insurance Program Community Rating System. Coordinator's Manual. FIA-15/2017.

French-McCay, D., et al., (2025). Expert Report for the Conservation Law Foundation x. Shell Oil Company, et al., No. 3:21-cv-00933. Issued June 23, 2025.

James, M. K., and Mason, L. B. (2005). Synthetic tropical cyclone database. *Journal of waterway, port, coastal, and ocean engineering*, *131*(4), 181-192.

Jones, C. (2025). Expert Report for the Conservation Law Foundation x. Shell Oil Company, et al., No. 3:21-cv-00933. Issued June 23, 2025.

Kovich, E. (2025). Expert Report for Conservation Law Foundation v. Equilon Enterprises LLC, et al., No. 3:21-cv-00933-VDO. Issued June 23, 2025.

Nadal-Caraballo, N. C., J. A. Melby, V. M. Gonzalez, and A. T. Cox. (2015). North Atlantic Coastal Comprehensive Study–Coastal Storm Hazards from Virginia to Maine. ERDC/CHL TR-15-5. Vicksburg, MS: US Army Engineer Research and Development Center.

Nadal-Caraballo, N. C., V. M. Gonzalez, and L. Chouinard. (2019). Storm Recurrence Rate Models for Tropical Cyclones–Report 1 of a series on the Quantification of Uncertainties in Probabilistic Storm Surge Models. ERDC/CHL TR-19-4. Vicksburg, MS: US Army Engineer Research and Development Center.

Nairn, R.B. (2025). Nairn 2025 Expert Report on the Shell Oil Terminal Flood Risk. Prepared for Conservation Law Foundation. Issued May 6, 2025.

NOAA (2025). Sea Level Trends - Station 8467150: New London, CT. NOAA Tides & Currents. Retrieved July 15, 2025, from https://tidesandcurrents.noaa.gov/sltrends/sltrends_station.shtml?id=8467150

USACE (2015). North Atlantic Coast Comprehensive Study: Resilient adaptation to increasing risk – Main report. U.S. Army Corps of Engineers. Available at: https://usace.contentdm.oclc.org/digital/collection/p266001coll1/id/2793/



Innovation Engineered.

USACE (2019). Engineering Regulation 1105-2-101, Risk Assessment for Flood Risk Management Studies. July 15, 2019.

USACE (2020). Fairfield and New Haven Counties, Connecticut Coastal Storm Risk Management Feasibility Study. October 2020.



# Appendix A

Additional Rebuttal Comments to Defendant's Expert

Reports

Innovation Engineered.

The four subsections of this appendix provide my detailed comments on the Defendant expert reports of Jones (2025), Kovich (2025), Bayles & Pace (2025) and French-McCay (2025).

## A.1   Detailed Rebuttal Comments to Jones (2025)

*Pg. 12, Par. 1 - The aboveground storage tanks are situated within large, interconnected containment basins that incorporate engineered berms, containment walls, and gravity-fed drainage to a closed loop system. Containment elevations at the berms surrounding the tank fields range from approximately <u>12 to 14 ft NAVD88</u>, which exceeds both normal tidal elevations and the FEMA base flood elevation (BFE) of 12 ft NAVD88 for this zone.*

**RBN Response:** Referring to Figures 3.4 to 3.6 of my expert report, there are sections of the containment berms that are lower than +12 ft NAVD88 and even some areas that are at or lower than +11.5 ft NAVD88. The variability of crest elevation in a berm crest is unusual and not a recommended approach for design of flood protection or containment berms. As the water level rises the low spots in the berms will begin to overflow first, focusing flow into the containment areas at those locations. This focused flow can lead to erosion of the inner slopes of the berms and potential breaching which would in turn allow much more water to flow into the containment areas.

*Pg. 12, Par. 1 - The aboveground storage tanks are situated within large, interconnected containment basins that incorporate engineered berms, containment walls, and gravity-fed drainage to a closed loop system. Containment elevations at the berms surrounding the tank fields range from approximately 12 to 14 ft NAVD88, which exceeds both normal tidal elevations and the <u>FEMA base flood elevation (BFE) of 12 ft NAVD88 for this zone.</u>*

**RBN Response:** The FEMA BFE is based directly on the historic record and not based on a synthetic storm data set in this region (such as the USACE NACCS data set) that has become the industry standard. The USACE NACCS 100-yr to 500-yr water levels are the best available information at this location. In Appendix C of French-McCay, Integral/Jones acknowledge this by relying on the NACCS 100-yr water level.

*Pg. 12, Par. 2 - The containment system is designed to provide secondary containment as required by the terminal's stormwater permit. In the event of a spill, stormwater valves in each basin remain closed until visual inspections confirm that no contamination is present. Once verified, the stormwater is either discharged under Connecticut's MSGP or handled appropriately in accordance with the terminal's SWPPP.*

**RBN Response:** During the 100-yr storm event (and more frequent events) the secondary containment areas are fully flooded and therefore, water freely flows between the containment areas and the harbor waters with no chance to inspect and verify that the water is not contaminated before discharge as the MSGP and SWPPP require as noted here by Jones.

*Pg. 13, Par. 1 - …The MSGP establishes specific standards and practices to ensure effective stormwater management and environmental protection. In addition, the stormwater system is documented and maintained as part of the New Haven Terminal's SWPPP, which includes site maps, flow diagrams, inspection records, and employee training procedures (Triton 2017). <u>The system is designed to manage existing site runoff and is not required.</u> In addition, the state had not provided guidance to accommodate projected future flood levels or intensified precipitation scenarios.*

**RBN Response:** Incomplete sentence, thought - what is not required?

Innovation Engineered.

*Pg. 14, Figure 4 – MSGP, SWPPP, and BMPs Interaction for a Regulated Industrial Facility.*

**RBN Response**: Containment berms (construction, protection and crest elevation) are informed by BMPs included in industry guidelines. During the 100-yr flood event, the containment berms effectively act as flood protection because to serve their purpose they must prevent harbor/flood water from rising above the berm crest and freely mixing with the water in the containment areas. Evaluation and design of flood protection falls under the discipline of coastal engineering and therefore best industry practices related to flood protection and coastal engineering will be most appropriate.

*Pg. 16, Par. 4 - … Defendants maintained complete records of these inspections and submitted annual reports to CT DEEP, including documentation of employee training in stormwater procedures. The terminal also operated a fully engineered containment system with berm elevations between 12 and 14 ft NAVD88, designed to retain the volume of the largest tank in each containment area…*

**RBN Response:** Referring to Figures 3.4 to 3.6 of my expert report, sections of the containment berms around the north and south yards and the stormwater treatment facility are lower than +12 ft NAVD88 and as low or lower than +11.5 ft NAVD88 in some locations (Jones' provides no information to prove that +12 ft is the lowest elevation). My modeling (and that of Integral/Jones in Appendix C of French-McCay) shows that the berms are insufficient to prevent complete inundation of the secondary containment areas and the stormwater containment area of this facility during the 100-yr or more frequent storm event.

*Pg. 17, Par. 1 – …As shown, the 2018 Connecticut MSGP—the only legally enforceable permit in effect when CLF filed its NOI—did not reference climate change, sea level rise, or long-range flood modeling in any form…*

**RBN Response:** Both myself and Integral/Jones (in Appendix C of French-McCay) have shown that the containment areas fail to serve their purpose during a present-day 100-yr or more frequent flood event (without any consideration of future sea level rise or climate change - in other words, only considering existing conditions which include sea level rise to 2021).

*Pg. 17, Par. 1 – The structure and content of these permits make clear that the terminal's obligations at the time of the CLF NOI were limited to managing present-day stormwater risks through the implementation of BMPs, not speculative future scenarios.*

**RBN Response:** Both myself and Integral/Jones (in Appendix C of French-McCay) find that the containment areas fail to serve their function under the present-day 100-yr or more frequent storm event as they are completely inundated (this evaluation only considered sea level rise to 2021 and not in the future). In other words, in my evaluation of the performance of the facility's containment berms under the 100-yr storm event and present-day risks, I did not consider future climate change.

*Pg. 17, Table 1 - Climate Resilience Content Column - Does not refer to climate change, sea level rise, or extreme weather; focuses on present-day stormwater BMPs, routine inspections, visual monitoring, and recordkeeping*

**RBN Response:** As noted, both myself and Integral/Jones (in Appendix C of French-McCay) find that the containment areas fail to function under the present-day 100-yr storm event as they are completely inundated (this evaluation only considered sea level rise to 2021 and not in the future). In other words, in my evaluation of the performance of the facility's containment berms under the 100-yr storm event and present-day risks, I did not consider future climate change.

*Pg. 18, 1st Sentence - … While these experts raise concerns rooted in climate change adaptation and resilience science, none of their critiques are grounded in permitting frameworks that govern the terminal.*

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut

Baird.

Innovation Engineered.

**RBN Response:** As noted, both myself and Integral/Jones (in Appendix C of French-McCay) find that the containment areas fail to function under the present-day 100-yr or more frequent storm event as they are completely inundated (this evaluation only considered sea level rise to 2021 and not in the future). In other words in my evaluation of the performance of the facility's containment berms under the 100-yr storm event and present-day risks, I did not consider future climate change.

*Pg. 18, Par. 5 – Nairn (2025) cites FEMA (2007) and USACE (1996) planning guidance to support his assertion that the New Haven Terminal should have undertaken probabilistic flood modeling and structural retrofits. However, both the FEMA and USACE flood risk management documents are designed primarily for the planning and design of new construction or substantial modification*

**RBN Response:** Agreed, and these are references that apply to substantial improvements (defined in ASCE24) that are required for the containment berms of this facility that fail to provide containment during the 100-yr storm event as shown by myself and Integral/Jones (in Appendix C of French-McCay).

*Pg. 19, Par. 1 – However, both the FEMA and USACE flood risk management documents are designed primarily for the planning and design of new construction or substantial modification for federally funded or critical public infrastructure—such as hospitals, emergency facilities, and public utilities—and are not intended for private industrial stormwater facilities regulated under the Connecticut MSGP.*

**RBN Response:** I disagree, there is wide use in the private sector of FEMA and USACE guidelines and data sets to support flood protection design. Integral/Jones (in Appendix C of French-McCay) relies on the USACE NACCS data set to define the 100-yr flood level.  Again, fully flooded containment areas result in unregulated mixing of water between the harbor/flood waters and the containment area waters. This a critical facility (Classes III and IV definition include fuel storage facilities) under ASA24-14/24.

*Pg. 19, Par. 1 – As such, Nairn's analysis imposes an inappropriate standard by applying federal infrastructure planning frameworks to a private-sector facility governed by a distinct regulatory regime.*

**RBN Response:** The federal design requirements and guidance (not simply "planning frameworks") set the industry standard in both the public and private sector. Integral/Jones acknowledges this through use of the USACE NACCS data set to define the 100-yr flood level in Appendix C of French-McCay.

*Pg. 19, Par. 2 – Taken together, these expert opinions reflect a forward-looking orientation grounded in evolving resilience thinking, but they do not align with the regulatory standards that were actually in place at the New Haven Terminal when CLF served its NOI or filed its complaint in 2021.*

**RBN Response:** This is not true for my report. Similar to Integral/Jones (in Appendix C of French-McCay), I found the performance of the containment berms to fail in their function of containing water under the present-day estimate of the 100-yr storm condition. Based on that finding, substantial improvements are required to the containment berms for this facility and ASCE24 indicates the design of those improvements consider sea level rise over a minimum 50-yr service life.

*Pg. 21, Bullet #2 - Best Industry Practices, which constitute an informal and evolving concept that reflects widely adopted practices by a particular industry with no formally enforceable standard*

**RBN Response:** A good example here is the use of the USACE NACCS data set to identify the 100-yr (and other) storm conditions - an approach that both Integral/Jones (in Appendix C of French-McCay) and I followed.



*Innovation Engineered.*

*Pg. 21, Bullet #3 - Technical Standards and Guidance, which may inform BMP development and "best industry practices" but are not binding unless formally incorporated into permit requirements or design codes.*

**RBN Response:** Both Integral/Jones and I showed that the containment berms of the facility are not effective at containing water during the 100-yr storm event. Therefore, substantial improvements are required to those berms and the technical standard ASCE24 is most appropriate to guide the design of those improvements (at least in terms of the required crest elevation).

*Pg. 22, Table 2 – Examples Column - API 650 (tank design), ASCE 7 and 24 (flood loads), ISO 14001 (environmental management)*

**RBN Response:** As noted above, these inform the design of substantial improvements that are required to the containment berms at this facility.

*Pg. 23, Par. 1 - Examples typically include secondary containment systems that capture spills, impervious paving to reduce infiltration of contaminants, dedicated spill prevention plans, regular inspections of storm drains, and employee training protocols. These practices are not optional; they are prescribed by the MSGP and must be documented*

**RBN Response:** Fundamentally the containment berms function to contain water for inspection and treatment before release to the harbor waters. Both Integral/Jones (Appendix C of French-McCay) and I have shown that the containment berms of this facility fail to serve that function during the 100-yr storm event.

*Pg. 24, Par. 3 - For example, neither the 2018 version (or the 2021 version) of the Connecticut MSGP nor the EPA MSGP required facilities to model sea level rise, prepare for 500-year flood events, or integrate climate change scenarios into stormwater design.*

**RBN Response:** Given that both Integral/Jones (Appendix C of French-McCay) and I have shown that the containment berms fail to contain the water inside the berms during the 100-yr storm event, there is a need for substantial improvements to the berms (i.e. to increase their crest elevation, in addition to improving the protection of the slopes and crest). ASCE24-14 requires that the crest be raised to prevent flooding during the 500-yr storm event. ASCE24-24 which recently replaced ASCE24-14 requires flood protection design for the 1,000-yr event and that the crest elevation feature an allowance of 50 years of sea level rise.

*Pg. 24, Par. 4 - CLF's experts—in particular Goldsmith, Nairn, O'Donnell, Horner, and Barlow—base their opinions on speculative or nonbinding standards and guidance that extend beyond the scope of the Connecticut MSGP.*

**RBN Response:** This is an incorrect representation of my opinions. Similar to Integral/Jones (in Appendix C of French-McCay) I rely on the USACE NACCS 100-yr present-day storm condition to evaluate the sufficiency of the performance of the containment berms. Both Integral/Jones and I find the containment areas are fully flooded during the 100-yr storm condition, and therefore the berms fail to keep the water inside the containment area separate and isolated from the harbor/flood waters. Based on this finding the facility requires substantial improvements and specifically a higher crest elevation for the containment berms (in addition to improved slope and crest protection). The design of the substantial improvements should be guided by ASCE24 and the most recent version of that document requires design to protection from a 1,000-yr storm condition and a sea level rise allowance for a minimum 50-yr service live.

*Pg. 25, Par. 1 - In their reports, Goldsmith (2025) and Nairn (2025) cite numerous federal engineering manuals, technical bulletins, and consensus standards that are either not applicable to private sector*

Innovation Engineered.

*stormwater management under Connecticut's MSGP or intended for use exclusively by federal agencies or in the design of critical or coastal defense infrastructure.*

**RBN Response:** I disagree with this statement. The NACCS and FEMA synthetic hurricanes data sets are the only ones available from a public agency and represent the de facto design information for marine and coastal engineering projects in the public and private sector. Integral/Jones acknowledges this by relying on the NACCS 100-yr storm water level in Appendix C of French-McCay.

*Pg. 25, Par. 2 – For example, the EPA's MSGP and the 2018 and 2021 versions of Connecticut's MSGP do not require terminals to evaluate or design for 500-year (or even 100-year) flood conditions.*

**RBN Response:** As noted above, it has been shown by both Integral/Jones and I that the existing containment berms will be insufficient to contain water during the present day 100-yr event, and therefore, substantial improvement is required. ASCE24-14 dictates that substantial improvement of the flood protection for a facility of this type be designed to the 500-yr level. ASCE24-24 recently replaced ASCE24-14 and requires flood protection to the 1,000-yr storm water level for this type of facility.

*Pg. 25, Bullet #1 - FEMA Risk MAP Program: This is a planning initiative that provides communities with updated flood hazard mapping, risk assessment tools, and planning support to inform local mitigation efforts. While it encourages broad stakeholder participation, it is not a regulatory program and does not impose facility-specific obligations on private terminals (FEMA 2025).*

**RBN Response:** This is incorrect. As participating in the National Flood Insurance Program (NFIP), New Haven is subject to minimum standards per 44 CFR 60.3. In addition, New Haven is a Community Rating System (CRS) participating community and has it own flood ordinances. This includes regulatory standards to which this facility is held. At this site and for this facility, that would require protection to the 500-yr level.

*Pg. 25, Bullet #2 – While this methodology is technically robust, it is intended for federal planning and is not incorporated into industrial stormwater permitting under the CWA (USACE 2019).*

**RBN Response:** This is not correct. the USACE Engineering Regulations (ERs) and Engineer Manuals (EMs) are crucial resources for design and planning within the US Army Corps of Engineers. These documents are widely applied in the public and private sector to support design of flood risk reduction projects.

*Pg. 25, Bullet #3 – USACE Engineer Manual EM 1110-2-1619 (Hydrologic Engineering): This manual is a design and planning resource developed for federal agencies undertaking coastal engineering projects…*

**RBN Response:** We agree this document is widely applied for coastal engineering projects. The secondary containment berms at this site effectively act as flood protection to serve their function of separating containment waters from harbor/flood waters. Therefore, the coastal engineering industry standards are most appropriate for evaluating the performance of the secondary containment berms.

*Pg. 26, Table 3 - Applicability to New Haven Terminal Column - Nonbinding; informational support for local planners; not incorporated into MSGP or SPCC programs*

**RBN Response:** This is incorrect. As participating in the National Flood Insurance Program (NFIP), New Haven is subject to minimum standards per 44 CFR 60.3. In addition, New Haven is a Community Rating System (CRS) participating community and has it own flood ordinances. This includes regulatory standards to which this facility is held. At this site and for this facility, that would require protection to the 500-yr level.



Innovation Engineered.

*Pg. 26, Table 3 - Applicability to New Haven Terminal Column – Not applicable; targets U.S. Army Corps projects and federally designed structures.*

**RBN Response:** This is incorrect, the federal government guidance is widely used as design standards within both the public and private sector. As an example, Integral/Jones (Appendix C of French-McCay) rely on the USACE NACCS information for defining the 100-yr storm surge level.

*Pg. 28, Par. 1 - However, as outlined in the preceding sections, these forward-looking publications do not constitute legally binding requirements, and they do not necessarily establish "best industry practice." Most importantly, they do not override enforceable permitting obligations such as those found in the 2018, or 2021, Connecticut MSGP.*

**RBN Response:** These documents provide guidance for evaluation of performance of existing flood protection infrastructure (which is effectively the purpose of the containment berms) and guidance for design of substantial improvements to flood protection infrastructure.

*Pg. 28, Par. 2 – Additionally, whatever materials these agencies published do not contemplate the extent of climate resilience that CLF contemplates—for example, the consideration of a 500-year flood condition.*

**RBN Response:** The 500-yr level of protection or greater is recommended by ASCE24 for fuel storage infrastructure such as this facility where substantial improvements are required (and we show that these improvements are required at this site).

*Pg. 28, Par. 3 – CLF has cited various technical standards—such as ASCE's flood load criteria, FEMA's risk projections, and USACE's modeling frameworks—to support the argument that the New Haven Terminal should have adopted additional climate-based controls.*

**RBN Response:** The secondary containment berms at the Shell site fail to serve their purpose of containing water during the present-day 100-yr or more frequent flood event (according to Integral/Jones ((Appendix C of French-McCay) and I). Therefore, substantial improvements are required and ASCE24 dictates that the design of these improvements (specifically the increase in the berm crest elevation) should be completed to the 1,000-yr flood level with an allowance for 50 yrs of sea level rise.

*Pg. 29, Bullet #5 - This rule reaffirms that the 100-year flood event remains the governing standard, which is consistent with FEMA and longstanding EPA practice. There is no shift toward requiring 500-year flood event modeling under any EPA permit or design program.*

**RBN Response:** The secondary containment berms at the Shell site fail to serve their purpose of containing water during the present-day 100-yr or more frequent flood event (according to Integral/Jones ((Appendix C of French-McCay) and I). Therefore, substantial improvements are required and ASCE24 dictates that the design of these improvements (specifically the increase in the berm crest elevation) should be completed to the 1,000-yr flood level with an allowance for 50 yrs of sea level rise.

*Pg. 30, Par. 2 - The terminal is, in fact, compliant with all binding EPA frameworks—namely, the 2018 Connecticut MSGP, SPCC regulations under 40 CFR Part 112, and the FRP program. It incorporates secondary containment, visual inspection protocols, site-specific BMPs, and spill prevention infrastructure, all consistent with EPA's (2024a) statement that "facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment."*



Innovation Engineered.

**RBN Response:** Visual inspection protocols will neither be possible during the 100-yr flood event (the site will be inaccessible for a significant period of time during the 100-yr flood event) nor effective even if they were possible (as water will be flowing freely between the containment area and harbor waters).

*Pg. 30, Par. 5 - Further, facilities such as the New Haven Terminal are typically classified as Risk Category II, for which ASCE 7 designates the 100-year flood (with a 1 percent annual chance event) as the applicable protection threshold.*

**RBN Response:** Based on the analysis of Integral/Jones (Appendix C of French-McCay) and I, the containment berms at the site fail to serve their purpose during the present day 100-yr or more frequent storm event.

*Pg. 30, Par. 5 - The 500-year flood standard is reserved for Risk Category III and IV structures (e.g., hospitals, emergency operations centers), which are functionally distinct from storage terminals.*

**RBN Response:** Substantial improvements are required to the containment berms at this site as they fail to serve their purpose during the 100-yr flood. ASCE24 includes fuel storage facilities in the definition of Class III and IV infrastructure, and this requires that improvements are designed to the 1,000-yr level (ASCE24-24 which recently replaced ASCE24-14 and the 500-yr requirement).

*Pg. 31, Par. 1 - It does not mandate upgrades to existing facilities unless triggered by major reconstruction. Goldsmith's (2025) reliance on ASCE 24 as though it applies retroactively to the New Haven Terminal lacks basis.*

**RBN Response:** ASCE24 is triggered by substantial improvements which are required for the containment berms at this site as explained above.

*Pg. 31, Par. 1 - It does not mandate upgrades to existing facilities unless triggered by major reconstruction. Goldsmith's (2025) reliance on ASCE 24 as though it applies retroactively to the New Haven Terminal lacks basis.*

**RBN Response:** As noted, ASCE24 applies because the secondary containment berms at the site fail to serve their purpose under the 100-yr storm event, and therefore, substantial improvements to the berms are required.

*Pg. 31, Par. 3 – By relying on ASCE and ISO guidance documents that are explicitly nonbinding, Goldsmith (2025) and Nairn (2025) blur and redraw the line between best industry practice and enforceable permit compliance (i.e., BMPs).*

**RBN Response:** I rely on this for design guidance on substantial improvements which are required.

*Pg. 31, Par. 4– Its SWPPP is based on historical precipitation risks, pollutant discharge controls, and physical containment features—not on speculative climate modeling or advisory engineering concepts.*

**RBN Response:** Based on the analysis of Integral/Jones (Appendix C of French-McCay) and I, the containment berms at the site fail to serve their purpose during the present day 100-yr or more frequent storm event.

*Pg. 32, Par. 2 - However, each of these documents is intended for federal agencies conducting planning-level analyses of new public infrastructure projects—not for enforcement against private-sector industrial facilities under the CWA or MSGP frameworks:*

---

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut

**Baird.**

Innovation Engineered.

**RBN Response:** This is not correct. the USACE Engineering Regulations (ERs) and Engineer Manuals (EMs) are crucial resources for design and planning within the US Army Corps of Engineers. These documents are widely applied in the public and private sector.

*Pg. 32, Bullet #1– ER 1105-2-101 (USACE 2019) provides a structured approach for evaluating future flood risks using probabilistic modeling. It is aimed at informing USACE project feasibility and investment decisions.*

**RBN Response:** I disagree, see the note above, the USACE ERs are widely used for design guidance in the public and private sector.

*Pg. 32, Bullet #2 – EM 1110-2-1619 (USACE 1996) provides methodologies for coastal structure design, including breakwaters, levees, and revetments. These are primarily for engineers working on federal navigation and shore protection projects, not bulk petroleum storage terminals governed by stormwater discharge permits.*

**RBN Response:** This is incorrect. Secondary containment berms effectively serve a flood protection function by preventing mixing of harbor/flood waters with containment waters. Coastal flood protection design is central to coastal engineering industry practice and therefore, these USACE documents are fully applicable.

*Pg. 32, Par. 3 - By invoking these planning and research tools, Nairn implies the New Haven Terminal had a duty to design and retrofit its aboveground storage tank systems using standards never adopted into EPA's MSGP, SPCC, or FRP rules.*

**RBN Response:** This is not correct. the USACE Engineering Regulations (ERs) and Engineer Manuals (EMs) are crucial resources for design and planning within the US Army Corps of Engineers. These documents are widely applied in the public and private sector as standard industry practice.

*Pg. 32, Par. 3 – This implication is a fundamental mischaracterization. Neither EPA nor CT DEEP has incorporated USACE's technical planning documents into its permitting regimes, and these documents do not apply retroactively to facilities developed under earlier regulatory codes.*

**RBN Response:** Jones misunderstands here, the containment berms effectively serve a flood protection function to achieve their purpose during the 100-yr flood event.

*Pg. 33, Par. 1 - Again, these claims fundamentally mischaracterize both the role of industry standards and the obligations imposed by existing regulatory frameworks.*

**RBN Response:** I have implemented a two-step process in my expert report. First I evaluate the performance of the secondary containment berms and find that they fail to serve their function under the present-day (i.e., only including historic sea level rise to 2021) 100-yr or more frequent storm condition (the analysis of Integral/Jones in Appendix C of French-McCay supports the same conclusion that the berms fail to serve their purpose). Therefore, given that the berms fail to achieve their purpose, as a second step I develop a design for substantial improvements to the containment berms following the industry practice guidance of ASCE24 that requires a 1,000-yr storm level of design and an allowance for 50 yrs of sea level rise.

*Pg. 33, Par. 3 – Goldsmith (2025) relies on nonbinding guidance from IOGP to argue that the New Haven Terminal's SWPPP was deficient, but the guidance does not impose enforceable requirements, and it does not override the terminal's successful implementation of required BMPs. Horner (2025) and Nairn (2025) make similar errors in treating discretionary industry guidance as mandatory standards of care.*

**RBN Response:** This is not an error, see my explanation in the comment directly above.

---

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



Innovation Engineered.

*Pg. 34, Par. 3 - Intentionally or mistakenly, CLF's experts repeatedly conflate "best industry practices" with enforceable design mandates. In fact, best industry practices are voluntary measures that enhance safety and resilience beyond minimum requirements.*

**RBN Response:** The secondary containment berms at this facility fail to serve their purpose during a present-day 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).

*Pg. 36, Par. 1 - Contrary to claims by CLF experts—including Wendi Goldsmith (2025) and Robert Nairn (2025)—the New Haven Terminal actively addresses storm, flood, and operational risks through a suite of established risk management plans.*

**RBN Response:** The secondary containment berms at this facility fail to serve their purpose during a present-day 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).

*Pg. 36, Par. 2 – Similarly, Nairn (2025) advocates for retrofits based on federal planning documents that do not apply to private terminals regulated under EPA's industrial stormwater framework.*

**RBN Response:** I evaluated the performance of the secondary containment system at the site using the industry standard 100-yr protection level. The system fails to meet that standard and I applied the industry standard ASCE24 document to guide the design of the required substantial improvements.

*Pg. 36, Par. 2 – These critiques ignore the structured and proactive measures already in place to manage site-specific risk, ensure containment, and maintain operational readiness during extreme weather events.*

**RBN Response:** When the risk to damage of the above ground fuel storage tanks and associated infrastructure is very high (i.e. during a 100-yr hurricane flood event) the secondary containment berms are most needed to keep the water inside the containment area separate and isolated from the harbor/flood waters, and both Integral/Jones and I have found they will not.

*Pg. 36, Bullet #2 – The terminal complies with the SPCC Rule through redundant secondary containment systems, sealed stormwater basins, and pollution prevention controls consistent with EPA expectations.*

**RBN Response:** The secondary containment berms at this facility fail to serve their  purpose during a present-day 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).

*Pg. 36, Last Paragraph - CLF expert reports claim the terminal has not adequately addressed risks from flooding and sea level rise.*

**RBN Response:** The secondary containment berms at this facility fail to serve their purpose during a present-day (i.e., only including historic sea level rise to 2021) 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).

*Pg. 37, Bullet #2 - Secondary Containment: Each tank is surrounded by engineered containment berms with capacities exceeding SPCC minimums, thereby preventing spills, even during compound flooding.*

**RBN Response:** The secondary containment berms at this facility fail to serve their purpose during a present-day 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).



Innovation Engineered.

*Pg. 37, Par. 1 - These measures directly rebut CLF's assertion that the terminal is failing to manage flood and climate risks. They demonstrate that the facility considers physical threats and implements technically sound solutions, including voluntary safeguards, to reduce the likelihood of failure under extreme conditions.*

**RBN Response:** The secondary containment berms at this facility fail to serve their purpose during a present-day 100-yr or more frequent storm condition, according to both my results and those of Integral/Jones (Appendix C of French-McCay).

*Pg. 38, Par. 2 - As the Terminal plans for extreme weather events, these forecast windows provide ample time for Defendants to implement safety procedures, secure infrastructure, ballast tanks, and deploy containment resources prior to storm arrival. Real-time ingress and egress during peak storm conditions are not required under EPA regulations and are not necessary for effective risk mitigation.*

**RBN Response:** Presence at the site is required to inspect waters in the containment area before release. However, it will not be possible to get into the site during a 100-yr storm. In any event, there would be no way of preventing unregulated release of water from the containment areas due to free mixing of flood/harbor water and containment area waters during the 100-yr flood event.

*Pg. 39, Par. 1 - Nairn (2025) asserts that the New Haven Terminal's containment berms, described as "bare soil," are structurally vulnerable and prone to erosion during flood events, particularly under scenarios involving wave attack.*

**RBN Response:** In my report I indicate that sections of the berm consist of bare soil.

*Pg. 39, Par. 1 - Based on my site inspection, and my knowledge of site inspections completed by several very experienced environmental and tank engineers, this characterization is inaccurate and inconsistent with the facility's actual design and maintenance practices.*

**RBN Response:** Berm protection design (to prevent failure from wave erosion during storm surge events) falls under the discipline of coastal engineering and not tank engineering.

*Pg. 39, Par. 1 - As detailed in the 2017 SWPPP, the berms are constructed from compacted engineered fill and are surfaced with crushed stone or stabilized vegetation, which significantly increases erosion resistance under storm conditions.*

**RBN Response:** I have shown based on my observations and application of industry standard procedures that the existing protection is insufficient to prevent breaching from occurring during a 100-yr flood event. Jones provides no critique or alternative methods to show the berm protection would be stable during this event.

*Pg. 39, Par. 2 - There is no federal or state requirement mandating the use of impermeable liners or concrete armoring for containment berms at existing petroleum terminals.*

**RBN Response:** To serve their purpose the secondary containment berms must be sufficiently armored to resist wave erosion and breaching during a 100-yr or more frequent event.

*Pg. 39, Par. 3 - Nairn (2025) relies primarily on photographic evidence (Figure 5, originally Figure 4.20 in the Nairn report) as the basis for his assessment.*

**RBN Response:** Photographic evidence is sufficient to identify areas of bare soil and to make a conservative (favoring Defendants) estimate of "armor" size. I also apply industry standard methods to calculate stability of



the berms to wave erosion. Jones does not critique these methodologies or apply alternative methodologies to demonstrate stability.

*Pg. 39, Par. 3 – A standalone image without accompanying field data, subsurface characterization, or engineering assessment is wholly inadequate for evaluating berm stability under flood conditions.*

**RBN Response:** I also apply industry standard methods to calculate stability of the berms to wave erosion and show that they are inadequately protected. Jones does not critique these methodologies or apply alternative methodologies to demonstrate stability. I would also add that the crest elevation of the three containment areas is unusually uneven with significant low spots, and this condition leads to focusing of overflow into the containment areas during flood events, and this focusing will increase the potential for breaching through erosion of the berms.

*Pg. 39, Par. 4 - Nairn's analysis does not account for the actual construction of the berms, including the composition of the core, type and thickness of surface armoring (e.g., crushed stone), vegetation cover, or compaction characteristics—all of which critically affect erosion resistance.*

**RBN Response:** I do indeed account for the construction of the berms based on my photographic evidence and a conservative assumption (favoring Defendants) that the berms would consist of clay core to ensure impermeability when I applied the industry standard methods to evaluate erosion potential.

*Pg. 39, Par. 5 – Nairn applies generalized assumptions about berm geometry and material properties without access to as-built drawings, subsurface investigations, or maintenance records for the terminal; as such, his conclusions regarding erosion susceptibility are not grounded in verifiable geotechnical data or actual site conditions.*

**RBN Response:** These were requested from the Defendant and not provided, but there is sufficient information to reach a conclusion that protection is inadequate.

*Pg. 39, Par. 5 – While Nairn calculates wave energy based on assumed fetch distances, he does not calibrate these estimates against historical storm surge behavior within New Haven Harbor or wave attenuation effects from surrounding infrastructure and bathymetry.*

**RBN Response:** This is incorrect. We in fact did consider wind and wave conditions during the 100-yr storm event. We also considered wave attenuation effects.

*Pg. 40, Par. 1 - In contrast, peer-reviewed research on hurricane impacts at petroleum terminals consistently finds that failure modes, such as tank flotation, sliding, or shell buckling—not berm erosion— are the dominant mechanisms of concern (Godoy 2007; Khakzad and Gelder 2018). More recent probabilistic modeling (Mia and Kameshwar 2024) reinforces this conclusion, showing that the erosion of containment berms does not represent a credible or controlling risk under even extreme flood scenarios.*

**RBN Response:** For the secondary containment berms to serve their function they must prevent free exchange of water between the harbor/flood waters, and the containment area waters during the 100-yr 0r more frequent event.

*Pg. 40, Par. 2 – Accordingly, there is no substantiated evidence the berms are "bare soil" or structurally inadequate.*

**RBN Response:** The images that Jones includes in his Figure 5 copied from Figure 4.20 of my report clearly show areas of bare soil and inadequate stone cover. I provide calculations using industry standard methods to

show the berm protection is inadequate. Jones neither critiques these methods nor provides alternative calculations.

*Pg. 40, Par. 2 - The claims of erosion vulnerability advanced by Nairn are unsupported by site specific evidence, inconsistent with federal regulation, and not grounded in accepted engineering judgment.*

**RBN Response:** As note directly above, I apply industry standard methods to evaluate the erosion vulnerability and found the berms to be inadequately protected. Jones does not critique those methods or provide an evaluation with alternative methods.

*Pg. 41, Par. 3 - Nairn's claim that the terminal's berms are "bare soil" and prone to erosion is incorrect. As described in the 2017 SWPPP, the berms are built from compacted fill and protected with stone or stabilized vegetation.*

**RBN Response:** I indicate that there is bare soil in some locations. These, together with the low spots I mentioned earlier there are weak spots in the berm protection and the berms are therefore susceptible to wave erosion and breaching. Jones has not offered countering evidence. There are bare soil areas and the stone protection, where it exists, is not sized sufficiently.

*Pg. 41, Par. 3 – Literature confirms that tank flotation or shell buckling—not berm erosion—are the dominant flood failure modes (Godoy 2007; Khakzad and Gelder 2018; Mia and Kameshwar 2024). The terminal's flood response plans, supported by NOAA lead times, ensure proactive measures are implemented before storm impacts occur.*

**RBN Response:** Containment berms cannot breach if they are to serve their purpose.

*Pg. 42, Par. 2 - CLF and its experts—including Barlow (2025), Goldsmith (2025), and Nairn (2025)—assert the New Haven Terminal is vulnerable to future climate hazards such as storm surge, extreme rainfall, and sea level rise. They also assert that Defendants have not adequately accounted for these risks in the terminal's planning or infrastructure. Specifically, CLF alleges the terminal lacks sufficient elevation, flood protection, and climate resilience measures to withstand increasingly severe weather events. Unfortunately, these claims are largely based on long term climate projections rather than applicable regulatory requirements or site-specific engineering evaluations that are relevant over the time frame of permits (i.e., 5 years).*

**RBN Response:** Based on the findings of Integral/Jones (Appendix C of French-McCay) and I, the secondary containment berms at the site fail to serve their purpose during the present-day (i.e. including only historic sea level rise) 100-yr or more frequent storm event. Therefore, substantial improvements are required to the secondary containment berms (specifically to increase the crest elevation) following industry standard guidance of ASCE24.

*Pg. 42, Par. 4 – Flooding at the New Haven Terminal can result from tidal influences, storm surge, and sea level rise. Given the elevation of the terminal and its containment berms, the risk of flooding at the terminal due to tidal influences is low. In addition, the historic storms documented in New Haven Harbor's water level data record (1999–present) have not been a significant risk to flooding at the terminal (Figure 6).*

**RBN Response:** The industry standard practice is not to rely on direct statistical analysis of historic storms to define return period level storms (such as the 100-yr storm), but instead to rely on synthetic hurricane data sets. Both Integral/Jones (Appendix C of French-McCay) and I rely on the USACE NACCS data set to define the 100-yr storm surge level and NACCS is based on a synthetic hurricane data set.



*Pg. 42, Par. 5 – While precipitation-driven flooding during major storm events is a recognized potential risk at coastal facilities, the New Haven Terminal's stormwater management systems—including bermed secondary containment, graded surfaces, and drainage infrastructure—are designed to capture and manage stormwater runoff effectively. Site-specific drainage features minimize the risk of rainfall accumulation that could lead to flooding within the terminal.*

**RBN Response:** Based on the findings of Integral/Jones (Appendix C of French-McCay) and I, the secondary containment berms at the site fail to serve their purpose during the present-day (i.e. including only historic sea level rise) 100-yr or more frequent storm event.

*Pg. 43, Figure 6 - Maximum Water Levels for Recorded Extreme Storm Events – New Haven, Connecticut*

**RBN Response:** Based on industry practice, return periods for storm surge design conditions are determined through reliance on synthetic hurricane data sets such as the USACE NACCS (that both Integral/Jones in Appendix C of French-McCay and I rely on to define the 100-yr event). The storms shown in this figure have storm surge levels significantly less than the 100-yr level.

*Pg. 43, Par. 3 - In practice, the 100-year event (with a 1 percent annual chance of occurrence) serves as the widely accepted design benchmark for environmental infrastructure under both federal and state programs.*

**RBN Response:** We agree on the use of the 100-yr storm to evaluate the performance of the containment system. Based on the findings of Integral/Jones (Appendix C of French-McCay) and I, the secondary containment berms at the site fail to serve their purpose during the present-day (i.e. including only historic sea level rise) 100-yr or more frequent storm event.

*Pg. 44, Table 4 - Regulatory and Planning Programs Using the 100-Year Flood Standard as the Design Benchmark for Industrial and Stormwater Infrastructure*

**RBN Response:** We agree on the use of the 100-yr storm to evaluate the performance of the containment system.

*Pg. 44, Par.2 - These examples show that the 100-year return period is consistently adopted by regulators as the technical and legal standard for infrastructure and stormwater resilience. CLF's suggestion that anything short of a 500-year design benchmark constitutes a failure to meet best industry practice is not supported by any federal or state program applicable to the New Haven Terminal.*

**RBN Response:** We agree on the use of the 100-yr storm to evaluate the performance of the containment system. Based on the findings of Integral/Jones (Appendix C of French-McCay) and I, the secondary containment berms at the site fail to serve their purpose during the present-day (i.e. including only historic sea level rise) 100-yr or more frequent storm event.

Given the secondary containment system fails its purpose during the 100-yr or more frequent storm event, substantial improvement is required. I developed the design of these improvements to the secondary containment berms (specifically to increase the crest elevation) following industry standard guidance of ASCE24 that now requires design to the 1,000-yr level.

*Pg. 45, Par. 1 - The FEMA AE zones indicate areas subject to a 1 percent annual chance of flooding, which is equivalent to the 100-year flood event, with BFEs established through detailed hydraulic and hydrologic analyses. The FEMA BFEs are applied for defining insurance rates rather than guiding industrial facility design, as they do not offer site-specific risk assessments. The BFE signifies the expected water level during such an event; however, the topography used for its evaluation is a bare earth digital elevation model that has all*

Innovation Engineered.

*structures removed, thereby giving the impression of the flood depth overtopping all the structures within the AE flood zone (Figure 7).*

**RBN Response:** The FEMA 100-yr flood level is not appropriate for design as it is based directly on the historical record (one of the few places in the country that FEMA still relies solely on the historic record) .In contrast, the USACE NACCS design water levels are based on a synthetic hurricane set (as FEMA does on almost all other hurricane prone areas of the country). Both Integral/Jones (Appendix C of French-McCay) and I rely on the NACCS data set to define the 100-yr and less frequent storm surge levels.

Also, as participating in the National Flood Insurance Program (NFIP), New Haven is subject to minimum standards per 44 CFR 60.3. In addition, New Haven is a Community Rating System (CRS) participating community and has it own flood ordinances. This includes regulatory standards to which this facility is held. At this site and for this facility, that would require protection to the 500-yr level.

*Pg. 45, Par. 2 - Nairn (2025) asserts that the New Haven Terminal may experience risk from extreme storm events, including high-category hurricanes and associated storm surge. His analysis relies on worst-case scenario assumptions—such as Category 4 or 5 hurricanes and associated flood depths—but these claims are inconsistent with both regional storm history and accepted flood planning methodologies.*

**RBN Response:** As explained above, in coastal engineering practice it is well known that synthetic hurricane data sets provide the most reliable estimate of design storm conditions (such as the 100-yr storm and greater). Jones acknowledges this in his use of the USACE NACCS 100-yr and greater storm surge levels (as do I). NACCS is based on synthetic hurricane data set. Therefore, the return period storms that Jones and I use are not "worst case" but instead the industry standard approach.

*Pg. 46, Par. 2 - This historical frequency provides an essential context for realistic risk assessment. Nairn's modeling, which treats such extreme events as likely design conditions, is not supported by the climatological record. Regulatory agencies, including EPA, FEMA, and CT DEEP, continue to define the 100-year flood event—not the 500-year event—as the standard for permitting and planning at industrial facilities. Unfortunately, the reliance on historically improbable storms in Nairn's analysis leads to artificially inflated projections that are not aligned with accepted floodplain management practice.*

**RBN Response:** Jones is incorrect here in two respects. First, as directly noted above the industry standard of practice to rely on synthetic hurricane data sets such as the USACE NACCS (which in fact are based on the climatological record) to define design conditions such as the 100-yr storm surge and greater. Integral/Jones relies on the NACCS 100-yr water level in Appendix C of French-McCay.

Second, I evaluated the performance of the secondary containment system against the 100-yr flood condition and found that it failed to perform its function. Therefore, I applied ASCE24 to design the required substantial improvements and that guidance required application of the 500-yr level (ASCE24-14) and now 1,000-yr level in the recently released ASCE24-24).

*Pg. 46, Par. 3 - Further, the geographic positioning of Long Island to the south of New Haven provides a natural storm barrier, moderating storm surge and dampening wave energy in the northern Long Island Sound. This protective topography significantly reduces the terminal's exposure to the type of direct surge impacts typically associated with open-coast hurricanes.*

**RBN Response:** These factors are all fully considered in the models used for NACCS and in the TELEMAC modeling that I applied.



Innovation Engineered.

*Pg. 48, Par. 1 - Most storms in the region do not generate the high-energy coastal impacts associated with major hurricanes, and the geographic positioning of Long Island serves as a natural barrier that moderates storm surge and wave energy, particularly along the northern coast of Long Island Sound (USACE 2015).*

**RBN Response:** All of these factors are considered in the modeling that is the basis for the NACCS data set. Integral/Jones relies on the NACCS data set to define the 100-yr storm surge level in Appendix C of French-MCay.

*Pg. 48, Par. 2 - Flood risk analyses that disregard these historical, geographic, and engineering factors—as Nairn's (2025) analysis appears to do—result in exaggerated and implausible risk projections.*

**RBN Response:** All of these factors are adequately considered in the NACCS database (which Jones relies on) and in my TELEMAC modeling of the site and surrounding area.

*Pg. 48, Par. 2 - By assuming extreme, low-probability hurricane scenarios without regard for regional storm climatology or realistic recurrence intervals, such analyses undermine the value of risk-based infrastructure planning.*

**RBN Response:** Jones is incorrect here, both the analysis associated with the USACE NACCS and my TELEMAC modeling follow industry practice to evaluate the performance of the containment berms during the industry accepted 100-yr storm condition for evaluating existing facilities.

*Pg. 49, 8.1.4 Hurricane Sandy*

**RBN Response:** Hurricane Sandy was significantly less than a 100-yr storm in terms of surge level at this site.

*Pg. 50, Par. 2 - The CSRM study was designed to evaluate community-scale flood control for mixed-use urban districts—not site-specific risk management for petroleum terminals. Its preferred alternative—which includes 5,800 ft of floodwall, 475 ft of deployable gates, and a pump station (with a pumping rate of 900 cubic feet per second) at +15 ft NAVD88—was developed based on public infrastructure needs, land use constraints, and a community-wide cost-benefit analysis.*

**RBN Response:** Given that fuel storage facilities are clearly included in the definition of Class III and IV infrastructure in ASCE24, fuel spills are considered as important to avoid as flooding of communities.

*Pg. 50, Par. 3 – The alternative was not designed for, and does not establish, technical standards for aboveground storage tank facilities. Notably, the CSRM acknowledged that, even with this infrastructure, residual flood risk would remain (with annual exceedance probabilities between 0.8 and 3.5 percent by 2074), meaning it would not meet the protection thresholds for a 500-year flood event that are typically applied to FEMA-designated critical facilities.*

**RBN Response:** The Long Wharf CSRM demonstrates the need to achieve at least a 100-yr level of flood protection for the secondary containment facility.

Also, as participating in the National Flood Insurance Program (NFIP), New Haven is subject to minimum standards per 44 CFR 60.3. In addition, New Haven is a Community Rating System (CRS) participating community and has its own flood ordinances. This includes regulatory standards to which this facility is held. At this site and for this facility, that would require flood protection to the 500-yr level.

*Pg. 51, Par. 2 - These standards focus on facility-specific containment and emergency response; they do not require the construction of regional flood infrastructure like the Long Wharf floodwall system. Applying regional*

---

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



13611.303.R2.Rev0                    Commercial in Confidence                    Appendix A

Innovation Engineered.

*urban flood protection planning criteria to a petroleum terminal—as Nairn (2025) does—misrepresents both the applicable regulatory framework and the physical responsibilities of the facility operator.*

**RBN Response:** Jones is incorrect. As participating in the National Flood Insurance Program (NFIP), New Haven is subject to minimum standards per 44 CFR 60.3. In addition, New Haven is a Community Rating System (CRS) participating community and has its own flood ordinances. This includes regulatory standards to which this facility is held. At this site and for this facility, that would require flood protection to the 500-yr level.

*Pg. 51, Par. 5 - While the Long Wharf study evaluated 500-year flood conditions, the USACE design basis for the proposed floodwall remains the 100-year flood event, which is consistent with the current and proposed requirements for industrial stormwater permitting in Connecticut.*

**RBN Response:** Based on the analysis of Integral/Jones (Appendix C of French-McCay) and I the secondary containment berms of the Shell facility fail to achieve their purpose under the 100-yr or more frequent flood condition.

*Pg. 51, Par. 5 – In summary, CLF's reliance on the Long Wharf CSRM study (USACE and CT DEEP 2020) — whether through Nairn (2025) or Goldsmith (2025)—misrepresents the study's relevance to the New Haven Terminal.*

**RBN Response:** The relevance is that the USACE CSRM Long Wharf study is designing to a 100-year level of protection (at the 90% confidence interval), the Shell facility secondary containment berms fail to keep the water inside the containment area separate and isolated from the harbor/flood waters under the 100-yr event.

*Pg. 52, Par. 1 - Stormwater at the terminal flows away from storage tanks via engineered grading and vegetated swales, ultimately discharging into the harbor. Unlike Gulf Coast locations (e.g., Houston or New Orleans), the Quinnipiac River near the terminal is tidal and relatively small, and it has no upstream reservoirs or tributaries capable of generating significant riverine backwater surges during storm events. Consequently, the physical conditions for compound flooding—simultaneous surge and river inflow—are absent.*

**RBN Response:** Jones misunderstands that compound flood can include the rainfall (pluvial) plus surge condition (vs. the fluvial plus surge condition).

*Pg. 52, Par. 2 – Additionally, the historical storm record undermines claims that compound flooding is a credible design basis for this facility. For example, Hurricane Sandy (in 2012) produced record storm surge in New Haven but very little rain, while Hurricane Irene (in 2011) brought heavy inland precipitation without corresponding coastal surge at the terminal. This historical decoupling of surge and rainfall in southern Connecticut storms highlights the fact that compound flooding is not the dominant risk for the terminal.*

**RBN Response:** As explained previously the historical record on its own does not provide robust statistical information on design conditions such as the 100-yr surge level or greater. Synthetic data sets are required to evaluate surge (and rainfall) statistics.

*Pg. 52, Par. 3 – In addition, and again contrary to Goldsmith's (2024) and Nairn's (2025) suggestion, flooding does not equate to damage. That false premises drives their main recommendations. While an area may flood, damage does not necessarily transpire from flooding. This fact is why stormwater industrial permits exist—they allow for permittees to plan to avoid discharging pollutants in the event of flooding.*

**RBN Response:** Flooding of the containment area to the extent water flows freely from one side to the other without control represents a failure of the secondary containment system. Therefore, Shell would be unable to avoid discharge of any pollutants during the 100-yr storm event.



Innovation Engineered.

*Pg. 52, Par. 4 – Industrial stormwater permits are designed for just this reason—permitting discharge during storms and the conditions that follow—in an environmentally protective way that considers technological and economic factors. Again, flooding does not equate damage—facilities have been flooded across the country over hundreds of adverse weather events while not sustaining damage.*

**RBN Response:** I disagree, the containment berm system at this site fails under less than the 100-yr event because it is fully inundated and water from the containment area is freely discharged to the harbor waters without treatment or inspection.

*Pg. 53, Par. 1 – Along the Connecticut coastline, the best available observational record—NOAA's Bridgeport tide gauge from Station 8467150—shows a sea level rise trend of approximately 0.1 in. per year, or 0.5 in. over the next 5 years (NOAA 2025). NOAA's station provides more than 60 years of continuous data and is the primary basis for state and federal infrastructure planning in southern Connecticut, including planning by NOAA, USACE, and CT DEEP. T*

**RBN Response:** From my perspective, historic sea level rise to 2021 is important as it influences current inadequacy of the crest elevation of the berms; for the future we looked at a mid-range estimate to 2075 following ASCE24 guidance.

*Pg. 53, Par. 2 – To account for future uncertainty, USACE (2013) established three sea level rise planning curves—low (0.1 in./yr), intermediate (0.2 in./yr), and high (0.6 in./yr)—none of which would result in more than 3.0 in. of rise by 2030. Even CT DEEP's conservative scenario, which projects 1.64 ft of sea level rise by 2050 (approximately 0.66 in./yr) (Figure 11), does not justify infrastructure modifications within the current 5-year permit cycle under the MSGP, SPCC, or FRP frameworks.*

**RBN Response:** I have shown that the secondary containment berms do not serve their function under the 100-yr storm event and therefore require substantial improvement under the current ASCE24 guidance including consideration of a sea level rise allowance for a 50-yr service life.

*Pg. 54, Par. 2 – While agencies like NOAA and USACE continue to refine long-term projections, they have not adopted these projections as enforceable standards for retrofitting or redesigning petroleum terminals. No regulatory or engineering framework applicable to the New Haven Terminal requires structural modification based on O'Donnell's proposed projections.*

**RBN Response:** ASCE24 recommends including SLR allowance in design of substantial improvements to the secondary containment berms which have shown to be required at this site and ASCE24 represents best industry practice.

*Pg. 54, Par.5 – It integrates state-of-the-art hydrodynamic and atmospheric modeling techniques to generate high-resolution flood risk assessments and inform risk mitigation strategies. However, NACCS was not designed to evaluate compliance with federal regulations, such as the EPA's SPCC Rule, or the design criteria for individual industrial facilities.*

**RBN Response:** I disagree. For the New England region, the NACCS data set represents the best available information on design water levels (such as the 100-yr level). Integral/Jones (Appendix C of French-McCay) acknowledges this in his use of NACCS to define the 100-yr and greater water levels.

*Pg. 55, Table 5 – NACCS Calculated Water Levels – New Haven, Connecticut (Save Point 271)*

**RBN Response:** Integral/Jones rely on the mean (50% Confidence Interval) NACCS 100-yr and 500-yr levels for his analysis in Appendix C of French McCay. In that Appendix Integral/Jones find that the containment

areas fully flood and fail to perform under the mean 100-yr level. It is my opinion that the 90% Confidence Interval estimate of the 100-yr water level should be used (vs. the mean level).

*Pg. 55, Table 5 – Note: The mean water level per FEMA's BFE is 12.0 ft NAVD88.*

**RBN Response:** As noted in this region the FEMA 100-yr water level (BFE) is based on the historic record and not a synthetic hurricane set (as is standard practice in coastal engineering) and therefore is less reliable than the NACCS return period levels which rely on a synthetic hurricane data set.

*Pg. 56 Par. 1 – The NACCS modeling outputs include both mean water levels and upper 95th percentile confidence limits for each return-period scenario. The mean water level, also referred to as the expected value, represents the central estimate that is most consistent with FEMA's BFE approach, which is widely used across federal, state, and local floodplain management and permitting frameworks. This value serves as the appropriate standard for design and compliance assessments, including for stormwater permitting under the MSGP.*

**RBN Response:** It is commonly understood that epistemic uncertainties associated with definition of the return period events derived using statistical methods (such as the methods used to develop the NACCS synthetic hurricane data set) should be considered through an evaluation of the confidence intervals (see ER-1105-2-101 on a risk-based approach to evaluating flood protection (or risk reduction) performance and design). In the context of the evaluation of the secondary containment berm system at the Shell facility, if the berms are found to perform their function under the mean value of the 100-yr storm event (there is a 50% chance the mean value will be exceeded), but fail to perform their function under the 84% or 90% Confidence Interval, it is appropriate to rely on the higher confidence intervals given the severity of the consequences of failure of the berms to perform their function and the higher uncertainty associated with the CHS/NACCS estimates in the New England area (see Nadal-Caraballo et al., 2019). Nevertheless, as explained previously, the NACCS return period values are more reliable at this location since they are based on a synthetic hurricane data set and FEMA is not.

*Pg. 56 Par. 2 – By contrast, the upper 95th percentile water levels represent conservative bounds used to characterize statistical uncertainty, not to define baseline or required flood protection levels. These values reflect the outer edge of confidence intervals—rare, upper-end estimates—rather than expected conditions. As such, they are used for sensitivity analysis or risk communication in large-scale coastal planning, not as a regulatory standard for industrial facility design. Facilities are not required to be designed to withstand 95th percentile storm surge scenarios, and doing so would impose disproportionate costs with minimal additional risk reduction in most cases.*

**RBN Response:** I found that the secondary containment berms fail to serve their function at less that the 100-yr 90% Confidence Interval water level. Integral/Jones (in Appendix C of French-McCay) find they fail to achieve their function at less than the mean estimate of the 100-yr level.

The secondary containment berms fail to serve their function at less that the 100-yr 90% Confidence Interval water level. Integral/Jones find they fail to serve their purpose at less than the mean estimate of the 100-yr level.

*Pg. 56 Par. 3 – CLF expert Nairn (2025) cites the 95th percentile NACCS surge levels while arguing that the New Haven Terminal's infrastructure is improperly designed for coastal hazards. Again, this citation misrepresents the intended use of NACCS outputs. Selecting only the most extreme upper-bound estimates, without accounting for the statistical distribution or the mean design standard, results in an inflated and unrepresentative view of site-specific flood risk. Federal agencies, including FEMA, EPA, and USACE, consistently use mean return-period water levels— such as the 100-year flood elevation—to establish*



*Innovation Engineered.*

*compliance thresholds and design expectations. Even the Long Wharf CSRM study (USACE and CT DEEP 2020) uses the 100-year mean water level as its design reference. In short, while the 95th percentile values are important for understanding the range of uncertainty, they*

**RBN Response:** The secondary containment berms fail to serve their function at less that the 100-yr 90% Confidence Interval water level. Integral/Jones find they fail to serve their purpose at less than the mean estimate of the 100-yr level. These are not upper bound estimates, they are the estimates (84% and 90% Confidence Intervals) used within industry practice. As explained previously, it is appropriate to review performance of a flood risk reduction system for the range for confidence intervals to evaluate the epistemic uncertainty and consider it in selection of the most appropriate Confidence Interval estimate of the 100-yr flood level (see USACE ER-1105-2-101 on a risk-based flood protection or risk reduction approach). Nadal-Caraballo et al. (2019) note that uncertainties of NACCS results are greatest in the New England area, justifying the need to select higher Confidence Interval results. Also, I note that the USACE Long Wharf CSRM suggests the use of the 90% Confidence Interval estimate of the 100-yr level. In any case, Integral/Jones (Appendix C of French-McCay) finds that the secondary containment berms fail to serve their purpose under less than the mean (50% CI) 100-yr flood level from NACCS.

I found that the berms fail at 84% or 90% Confidence Interval (the latter in the case of the North Yard) of the 100-yr storm or less, Integral/Jones found that they fail at less than the mean (50% CI) 100-yr level.

*Pg. 57, Par. 3 – By utilizing NACCS predictions, flood hazard maps were generated based on a range of modeled storm conditions (Figure 13). Of these, the 100-year flood event's mean water level represents the accepted regulatory benchmark used by EPA, FEMA, and CT DEEP for stormwater permitting, floodplain management, and tank infrastructure design. This value reflects the most probable severe event and is the standard applied in the Connecticut MSGP and related federal programs. Contrary to Nairn's use, the proper use of NACCS predictions is consistent with national engineering and regulatory practice, where mean return-period flood elevations are employed as the basis for design—not upper-bound or compounded extremes.*

**RBN Response:** As outline in ER-1105-2-101 on risk-based design of flood protection measures, it is appropriate to evaluate the performance of a system under the range of confidence intervals and to determine the most appropriate confidence interval to apply. Nevertheless, Integral/Jones finds that the containment berms fail to serve their purpose under the mean (50% CI) 100-yr flood level from NACCS in Appendix C of French-McCay.

*Pg. 58, Figure 13 – Maximum Water Levels per NACCS Mean and 95th Percentile Confidence Interval Storm Surge Water Levels for New Haven, Connecticut, and Connecticut's Sea Level Rise for Save Point 271*

**RBN Response:** Jones does not show the 84% or 90% Confidence Intervals (CIs) result that I rely on.

*Pg. 58, Par. 1 – The probabilistic flood hazard mapping developed from NACCS predictions demonstrates that, under the 100-year flood event—namely, the regulatory benchmark for stormwater permitting and aboveground storage tank resilience—the containment berms and key infrastructure at the New Haven Terminal are not expected to experience inundation (Figure 14).*

**RBN Response:** I found that the berms fail to serve their purpose at the 84% (south yard and stormwater area) and 90% (north yard) Confidence Intervals of the 100-yr storm or less, Integral/Integral/Jones found that they fail at less than the mean (50% CI) estimate of the NACCS 100-yr level.

*Pg. 59, Last Paragraph – An additional worst-case scenario was modeled to incorporate the upper 95th percentile confidence limit of the 500-year flood event's water level and CT DEEP's 1.64-ft sea level rise projection for 2050 (Figure 16). This hypothetical extreme, which resembles the assumptions promoted by CLF*



Innovation Engineered.

*experts, does not have an associated recurrence interval and exceeds all regulatory design standards. Contrary to the suggestion by CLF's experts, there is no federal or state mandate requiring industrial facilities to design for the 95th percentile of a 500-year flood event, and there is no such mandate for compounded flood scenarios extending to 2050. Its inclusion here is illustrative, not prescriptive.*

**RBN Response:** ASCE24 requires this for fuel storage facilities. I found that the berms fail to serve their purpose at the 84% (South Yard and Stormwater area) and 90% (North Yard) Confidence Intervals of the 100-yr storm or less, Integral/Jones found that they fail at less than the mean (50% CI) estimate of the 100-yr level. Given substantial improvements to the containment berm are required and the industry standard guidance of ASCE24 applies requiring design to a 500-yr level or greater.

*Pg. 60, Figure 14 – Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean 100-Year Flood Event*

**RBN Response:** Jones fails to explain how he developed the flood depths presented in Figure 14, 15 and 16. Because he did not explain or allude to the application of a numerical model throughout the entire report, I can only assume that instead he followed a bathtub approach (which is also mentioned in the following section), where the NACCS return period water level is compared to the land elevation to evaluate flood depths. This static approach is not as accurate as simulating a storm as I have done. Importantly, numerical model results from Integral/Jones are presented in Appendix C of the French-McCay report, do show complete flooding of the containment areas for the NACCS mean 100-year flood event, contradicting what is shown in Figure 14.

French-McCay explains in Appendix B of her report that she completed a comparison of the Integral Delft3D results with a bathtub approach as a check and to support confidence in the model results. However, she notes that "the Delft3D FM model provides a more physically representative simulation of flood dynamics, accounting for temporal variations and flow routing that are not captured in the static analysis."

*Pg. 62, Last Paragraph – While the NACCS-based coastal hazards assessment employs a static, or "bathtub," approach—assuming instantaneous equilibrium of water levels across New Haven Harbor and the terminal—it is important to recognize that real-world flooding during rare storm events is dynamic and time limited. CLF's experts, including Nairn (2025) and O'Donnell (2025), imply that extreme water levels result in persistent flooding that threatens tank stability and environmental safety. However, this interpretation fails to consider the transient*

**RBN Response:** This is incorrect. The NACCS output which was used as input to the dynamic TELEMAC model considered time series and changing surge levels. The TELEMAC model considers transient or dynamic nature of flooding by considering the time series of the storm event.

*Pg. 63, Par. 2 – In this case, the terminal's inland position—approximately 1,800 ft from the harbor—and the intervening built environment reduce both the magnitude and duration of potential inundation. As storm surge moves inland, it loses energy due to surface friction, vegetation, and topography, resulting in attenuated and delayed flood arrival compared to direct shoreline exposure. This moderating effect is not considered in CLF's generalized risk framing but is essential to understanding localized flooding behavior. None of these facts are mentioned by Goldsmith, Nairn or other CLF experts.*

**RBN Response:** Jones is incorrect, the TELEMAC model considered all of these factors.

*Pg. 63, Par. 3 – Following the storm's peak, floodwater at the terminal would drain rapidly. The site is positively graded, equipped with engineered drainage systems, and adjacent to open tidal waters, all of which support the rapid recession of surface water as surge subsides. Under typical hydrodynamic conditions, the duration of*

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



Innovation Engineered.

*peak inundation at the site would be 6–12 hours, with full drainage occurring within 24 hours. These durations do not pose a sustained threat to tank stability.*

**RBN Response:** The fact is that the secondary containment berms fail to serve their purpose at the 84% (South Yard and stormwater area) and 90% (North Yard) Confidence Intervals of the 100-yr storm or less, Integral/Jones found that they fail at less than the mean (50% CI) estimate of the 100-yr level. Therefore, regardless of how fast the containment areas may be drained, they fail to serve their purpose of isolating the containment area waters from the harbor/flood waters for a significant period of time.

*Pg. 63, Par. 4 – In contrast to the long-term, catastrophic risks cited by CLF's experts, the realistic hydrodynamic profile at the New Haven Terminal is short-term and manageable. The terminal's established ballasting protocols and emergency response plans are all specifically designed to accommodate these short-duration flooding conditions, consistent with EPA's SPCC Rule and API's inspection and structural integrity frameworks.*

**RBN Response:** Jones offers no proof of this statement. Integral/Jones own model results in Appendix C of French-McCay show that the secondary containment berms fail to serve their purpose during the present-day 100-yr storm event.

*Pg. 65, Par. 1 – Despite the claims made by CLF experts—especially Nairn (2025), who suggests that any flooding in proximity to aboveground storage tanks is inherently unacceptable and implies a failure of compliance—the presence of floodwaters near tanks does not equate to structural failure, engineering deficiency, or environmental hazard.*

**RBN Response:** Both Integral/Jones (Appendix C of French-McCay) and I found that the secondary containment berms fail to serve their purpose during the 100-yr or more frequent storm**.**

*Pg. 68, Last Paragraph – CLF's experts—namely, Nairn (2025), Horner (2025), and Goldsmith (2025)—fail to account for the protective value of ballasting. Their assertions of imminent tank failure ignore the technical literature and operational safeguards in place. Their analyses do not refute the efficacy of ballasting or provide an alternative failure pathway supported by quantitative data.*

**RBN Response:** In the circumstances of greatest risk to storage tank damage during the 100-yr storm event , the berms fail to be effective at their purpose of containment.

*Pg. 69, Par. 5 – While extreme events like the 500-year flood event (with a 0.2 percent annual probability of occurrence) began to appear in academic literature following Hurricane Katrina, their application has been limited to critical infrastructure—specifically, Risk Category III and IV structures under ASCE 7 and ASCE 24-14 (e.g., hospitals, emergency command centers, nuclear plants). Fuel storage terminals do not fall into these categories. No standard from API, ASCE, EPA, FEMA, or USACE requires existing storage tanks to be retrofitted for a 500-year event. Assertions by CLF experts that the New Haven Terminal must meet such standards mischaracterize both the state of practice and the permit requirements.*

**RBN Response:** Both Integral/Jones (Appendix C of French-McCay) and I found that the secondary containment berms fail to serve their purpose during the 100-yr or more frequent storm.

I disagree that fuel storage facilities are not critical infrastructure, fuel storage facilities are specifically mentioned in the definition of critical infrastructure included in Categories III and IV of ASCE24 and thus require 500-yr or greater design for the substantial improvements that are required to the containment berms at this site.



***Pg. 70, Last Paragraph*** *– In summary, the New Haven Terminal is designed and operated to meet or exceed the standard of a 100-year flood event as it governs industrial facility resilience. CLF experts' reliance on speculative, non-consensus scenarios—such as the 500-year flood event or compound worst-case events— does not align with federal permitting requirements or established engineering standards. No credible regulatory or technical justification supports the conclusion that additional modifications are necessary based on these extreme hypotheticals.*

**RBN Response:** Both Integral/Jones (Appendix C of French-McCay) and I found that the secondary containment berms fail to serve their purpose during the 100-yr or more frequent storm.

***Pg. 71, Par. 1*** *– CLF experts, including Nairn (2025) and Goldsmith (2025), claim the New Haven Terminal is vulnerable to failure during extreme flood events beyond the 100-year return period. These assertions rely on speculative scenarios and nonbinding guidance that exceed applicable regulations. But they provide zero evidence for their analysis.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr or more frequent storm.

***Pg. 71, Par. 2*** *– In reality, the 100-year event remains the accepted benchmark per EPA's MSGP and its SPCC Rule as well as FEMA's NFIP standards. Flooding alone does not imply a failure; risks such as flotation or buckling are mitigated through established practices like tank ballasting and structural inspection (EPA 2016). The analysis in this section details the quantitative evaluation of tank ballasting.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr or more frequent storm.

***Pg. 71, Par. 3*** *– Figure 14 shows that, during a modeled 100-year flood event, limited inundation may occur within the containment berms. To provide a comprehensive evaluation—well beyond what is required by any federal or state permitting standard—the analysis in the following sections also includes a 500-year event to assess potential risks under increasingly extreme and unlikely flood conditions.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr or more frequent storm.

***Pg. 71, Par. 4*** *– Even under these extreme conditions, tank resilience is preserved due to proper fill levels, anchoring through ballast, and robust containment structures. These engineering controls are designed to prevent flotation, maintain stability, and ensure environmental protection. The analyses that follow demonstrate that, even under modeled conditions exceeding the standard of a 100-year flood event, the terminal continues to meet its design intent and regulatory obligations.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr or more frequent storm.

***Pg. 76, Par. 2*** *– CLF's experts, including Goldsmith, Nairn, and O'Donnell, suggest that the New Haven Terminal's infrastructure should be evaluated or potentially modified based on a 500-year flood event.*



Innovation Engineered.

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less. Therefore, substantial improvements are required and ASCE24 dictates design to a 500-yr level or greater.

*Pg. 76, Par. 3 – The 500-year flood event is included here solely to demonstrate conservatism and resilience well beyond what is required. These rare-event scenarios serve planning purposes in limited contexts, such as new construction of critical infrastructure (ASCE Risk Category III or IV), but do not apply to existing petroleum terminals like the New Haven Terminal. Neither EPA nor Connecticut DEEP mandates a design or retrofit based on these extreme events. Nonetheless, the following assessments show that, even under these scenarios, the New Haven Terminal's tanks remain structurally sound and environmentally secure. Table 6 summarizes the NACCS modeled mean and 95th percentile confidence limit flood elevations for 100- and 500- year return periods. The 95th percentile represents the upper bound of model uncertainty, not a regulatory or design standard.*

**RBN Response:** I disagree, ASCE24-14 (or ASCE24-24) clearly include fuel storage facilities under Class III or IV requiring design of substantial improvements (needed at this facility) to at least the 500-yr level of design. Also, Jones fails to highlight the 84% and 90% Confidence Interval results that I rely on for the 100-yr event.

*Pg. 85, Par. 1 – Contrary to the claims made in CLF's NOI and the assertions of its experts—including Goldsmith (2025), Nairn (2025), and O'Donnell (2025)—the presence of floodwaters near aboveground storage tanks does not constitute a failure of design, compliance, or environmental stewardship.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr or more frequent storm.

*Pg. 85, Bullet #1 – CLF's experts misrepresent the regulatory design basis for aboveground storage tanks by invoking a 500-year flood event, which is not required by EPA, CT DEEP, or API design standards.*

**RBN Response:** As the secondary containment area is completely ineffective at 100-yr flood level or less, substantial improvement is required and ASCE24 dictates design should be for 500-yr or 1,000-yr flood level.

*Pg. 85, Bullet #3 – There is no requirement to retrofit existing infrastructure based solely on climate projections that have not been incorporated into enforceable regulatory requirements or design standards.*

**RBN Response:** Given the secondary containment berms are inadequate for their purpose under the present-day 100-yr or more frequent flood condition, substantial improvements are required according to ASCE24.

*Pg. 85, Bullet #4 – Peer-reviewed literature and EPA guidance support the conclusion that flooding in proximity to tanks is not inherently hazardous and that ballasting provides a reliable and proven means of ensuring tank stability.*

**RBN Response:** The secondary containment system is rendered ineffective in less than a 100-yr event according to the results of Integral/Jones (Appendix C of French-McCay) and myself.

*Pg. 88, Par. 1 – These examples underscore that other critical infrastructure—ranging from transportation to healthcare and power systems—is more likely to face significant functional or structural risk during 100-year flood events than the New Haven Terminal. The terminal's combination of elevated siting, structural ballasting, and regulatory compliance positions it as comparatively resilient under these rare but modeled scenarios.*



Innovation Engineered.

**RBN Response:** Both Integral/Jones (Appendix C of French and McCay) and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less**.**

***Pg. 90, Bullet #1 & #2 –*** *EPA recently released a draft of its 2026 MGSP, which still uses the 100-year event as the applicable standard for permittee consideration. CT DEEP's 2024 MSGP, yet to be issued, also uses the 100-year flood event as the applicable standard for permittee consideration.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less.

***Pg. 90, Par. 2 –*** *CLF's demands conflate nonbinding climate resilience guidance with enforceable regulatory obligations, seeking to impose retroactive design standards that are not supported by any current state or federal permitting framework.*

**RBN Response:** ASCE24 requires allowance for SLR for substantial improvements which are required here due to the inadequacy of the secondary containment area berms to prevent complete inundation during the 100-yr flood event.

***Pg. 91, Table 11 –*** *CLF Demand Column - Conduct storm surge and wave modeling, including for 500-year storm scenarios*

**RBN Response:** This is required under ASCE24 for substantial improvement to Class III and IV infrastructure (that includes fuel storage facilities) as this upgrade is required as the containment berms must be raised to prevent complete inundation of the containment areas.

***Pg. 91, Table 11 –*** *CLF Demand Column – Update the SWPPP to reflect climate risk analyses*

**RBN Response:** ASCE24 provides guidance for design of substantial improvements which are shown to be required here for the secondary containment berms. ASCE24 requires an allowance for 50 years of sea level rise in the berm crest elevation design.

***Pg. 91, Table 11 –*** *CLF Demand Column – Modify infrastructure to withstand a 500-year storm and sea level rise through 2050 and beyond*

**RBN Response:** This is required under ASCE24 for design of substantial improvements which are needed here.

***Pg. 97, Par. 2 –*** *The flood assessment relies on the assumption that storm surge will reach the upper bound of its statistical distribution—specifically, the 95th percentile confidence level for water elevation. This approach effectively treats a low-probability, high-impact scenario as the default design condition rather than accounting for the full range of possible outcomes. Statistically, a 95th percentile value is expected to be exceeded in only 1 out of 20 modeled events for that recurrence interval (e.g., a 100-year storm event). The best industry practice for evaluation of flood risk uses the mean or median water level for the 100-year event (Table 4). Furthermore, the Nairn (2025) evaluation omits consideration of existing facility flood protections, such as tank ballasting and adaptive measures guided by site-specific risk assessments. Ignoring these factors overstates residual risk and diverges from recommended practice for federal facilities outlined by USACE (2019). While not even applicable to the New Haven Terminal, the USACE guidance promotes balanced, risk-informed design rather than reliance on extreme case scenarios alone.*



**RBN Response:** My opinion is based on the 84% and 90% confidence interval (CI) estimates of the 100-yr flood event, not the 95% CI. Also, Integral/Jones (Appendix C of French-McCay) found that the containment areas completely flooded failing their purpose during less than the mean (50%) CI estimate of the 100-yr flood event. The 84% and 90% CIs are the correct CI to use (given the consequence of failure of secondary containment berms to function and the greater uncertainty of NACCS water level in New England according to Nadal-Caraballo et al., 2019), and at this CI with less than the 100-yr flood the secondary containment area is completely flooded and water moves freely between the containment area and harbor waters.

*Pg. 97, Par. 3 – The water level modeling and tank failure risk analysis in Section 10.3 shows that, while overtopping of the containment berms may occur in low-probability scenarios, the resulting water levels are insufficient to float or fail ballasted aboveground storage tanks, even in the most extreme cases. Additionally, the Defendants use robust spill containment and response protocols as discussed in Section 7. In evaluation of Nairn's opinions on berms, despite potential overtopping during the flood scenarios, the risk of failure for adequately ballasted aboveground storage tank remains negligible.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less.

*Pg. 98, Par. 1 – In response to Nairn's comments on ingress and egress during storm events, the Defendants' emergency response plan accounts for the fact that major coastal storms are typically forecast with several days of advance notice, as documented in Section 7.3. This lead time allows for proactive, staged implementation of onsite safety measures. Emergency protocols prioritize pre-storm containment, personnel safety, and spill prevention using onsite resources, consistent with API and EPA guidance for risk-based planning.*

**RBN Response:** Nevertheless, both Integral/Jones (Appendix C of French-McCay) and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less.

*Pg. 98, Par. 2 – Nairn's assertion regarding potential berm failure is speculative and not based on any quantitative evaluation of the containment berms at the terminal. There is no evidence that the berms are "bare soil" or structurally inadequate (see Section 7.4). The terminal was inspected for its SPCC compliance in 2022, and the terminal was found to comply the applicable SPCC regulations. The claims of erosion vulnerability advanced by Nairn and Horner are unsupported by site-specific evidence, inconsistent with federal regulation, and not grounded in accepted engineering judgment. The berms and containment systems are designed per EPA requirements and have not shown any indication of structural inadequacy.*

**RBN Response:** I relied on photographic evidence and industry standard calculation methods to determine the protection of the berms against wave erosion is inadequate. Jones provides no criticism of the methodologies I applied or alternative methods to prove they are adequate. Photographic evidence clearly shows areas of bare soil and areas of inadequate stone cover. Jones provides no calculations to refute the industry standard calculations I made to show the berms are susceptible to wave erosion and breaching during a 100-yr event or less. The uneven crest elevation of the containment berms makes them prone to focused overflow and breaching. Whether the berms have survived to date provides no evidence that they will survive a 100-yr flood condition with waves.

*Pg. 98, Par. 3 – Nairn also bases his opinions on documents that are not "best industry practice" of existing bulk fuel storage terminals (Section 5). Nairn cites the ASCE 24-14 standard, which is specifically for new construction or major improvements to existing structures. Nairn also cites the Association of Floodplain*

*Managers standards, which state that they apply to local governments to redefine flood ordinances; they are not for industries to adopt. Nairn further cites the FEMA design standards, which are also for new construction standards (and reconstruction). None of these standards are related to existing bulk fuel storage terminals, as summarized in Table 3.*

**RBN Response:** Substantial improvements is the correct terminology from ASCE24 and these improvements are required here due to the failure of the containment berms to serve their purpose during the 100-yr event or more frequent. The substantial improvements shown to be required for the secondary containment berms at this facility ASCE24 calls for 500-yr or 1,000-yr design level together with an allowance for SLR over 50 yrs (ASCE24-24).

*Pg. 98, Par. 4 – By applying the standards for new structures, Nairn is rewriting the permit's requirements. The standard for BMPs specifically addresses cost and "best industry practice." It is not "best industry practice" for bulk fuel storage terminals (or any industry) to tear down existing structures and rebuild them to meet the new standards, yet this premise is a central assumption in Nairn's analysis.*

**RBN Response:** Jones misunderstands that I evaluated the performance of the secondary containment berms under the 100-yr flood condition (that Jones cites as a standard to evaluate performance several times in this report) and found them to fail to serve their purpose (as Integral/Jones did in Appendix C of French-McCay). Given the berms fail to serve their function in a 100-yr or more frequent event, substantial improvements are required and ASCE24 provides guidance to design those improvements.

*Pg. 98, Par. 5 – Overall, Nairn presents an incomplete and overstated view of flood risk at the New Haven Terminal by focusing on statistically extreme water levels—such as 95th percentile storm surge scenarios— and berm overtopping without considering the actual risk to the aboveground storage tanks. This approach neglects key components of a risk-based assessment, including the terminal's compliance with EPA and API standards, existing containment and ballasting measures, and the multiple days of advance notice typically available for major storm events. Nairn's reliance on nonstandard water level projections and federal infrastructure benchmarks—while informative—exceeds the scope of applicable regulatory requirements. The terminal is designed and operated in compliance with the 2018 MSGP, SPCC, and FRP standards, which do not mandate the 500-year flood protection thresholds or wave overtopping criteria cited by Nairn.*

**RBN Response:** My results are based on the 84% (South Yard and stormwater area) and 90% (North Yard) confidence intervals not the 95% CI. The containment berms fail to contain waters in the containment area in the 100-yr flood event (according to both Integral/Jones and I). Therefore, substantial improvement is required and ASCE24 dictates 500-yr flood event design condition or greater.

*Pg. 102, Par. 2 – CLF's experts propose a set of loosely defined, evolving, and subjective criteria for evaluating industrial facility resilience that depart substantially from established regulatory frameworks and best industry practice.*

**RBN Response:** The containment areas fail to perform as required during 100-yr event, therefore substantial improvement is required under ASCE24 to the 500 to 1,000-yr flood level with an allowance of 50 years of sea level rise.

*Pg. 102, Par. 3 – In contrast, the New Haven Terminal operates in compliance with the regulatory standards set by EPA and CT DEEP, both of which rely on the 100-year flood as the governing design threshold. These agencies have access to the same climate data cited by CLF and have chosen not to codify the 500-year flood or sea level rise adjustments in enforceable stormwater or spill prevention regulations.*



Innovation Engineered.

**RBN Response:** This facility fails to contain waters in the secondary containment area during the present-day 100-yr or more frequent flood event. A 500-yr or greater design level with a 50-yr sea level rise allowance are required for the substantial improvements needed at this site as dictated by ASCE24.

*Pg. 102, Par. 5 – Importantly, there is no evidence that CLF's experts conducted any facility-specific quantitative assessment of tank vulnerability, structural integrity, or containment performance at the New Haven Terminal. Their assertions regarding catastrophic flood damage and necessary rebuilds are speculative and not grounded in fragility modeling or structural reliability analysis. In contrast, the probabilistic modeling and review presented here confirms that the terminal's tanks are resilient across all modeled scenarios and that flood conditions—even with added sea level rise—do not lead to structural failures or product release.*

**RBN Response:** I have made calculations on berm stability against wave attack and found the that the protection is inadequate under the 100-yr condition. Jones has not criticized the industry standard calculation approaches I applied, nor has he provided alternative calculations to support his claims. Also, both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the present-day 100-yr storm or less.

*Pg. 103, Last Paragraph – Finally, CLF's experts' attempt to hold the New Haven Terminal to a higher standard than other adjacent critical infrastructure—such as substations and public roads—reveals the inconsistency and impracticality of their recommendations. These expert opinions, largely divorced from operational experience and regulatory precedent, do not reflect industry consensus or enforceable standards, and they should not be used as a basis for evaluating facility compliance or liability.*

**RBN Response:** Both Integral/Jones and I found that the secondary containment berms fail to serve their purpose of containing water inside the areas from mixing freely with the harbor waters at the 100-yr storm or less. The facility fails to provide the necessary protection under the 100-yr flood.



Innovation Engineered.

## A.2    Detailed Rebuttal Comments to Kovich (2025)

*Pg.4, Par. 3 -* *The Terminal is located approximately 1,500 feet from New Haven Harbor. <u>The elevation at the Site ranges from 4.7 ft within the tank storage berm to 12.8 ft at the lowest point of the berm based on the topographic survey provided by Godfrey Hoffman Hodge, LLC.4 A separate survey prepared in 2023 shows the lowest point of the north tank field berm at 12.07 ft and the lowest point of the south tank field berm at 11.78 ft.5 The Base Flood Elevation (BFE) (i.e., elevation of the 100-year flood) for the Terminal is indicated at 12 feet.6</u>*

**RBN Response:** A vertical reference datum is not given; therefore, it is difficult to consider/interpret Kovich's statement. It is clear from my analysis (and corroborated in the findings of Integral/Jones in Appendix C of French-McCay (2025)) that during the 100-year or more frequent storm condition the water level exceeds the berm crest elevation over most of the length of the three containment areas - see Figures 3.4 to 3.6 of my expert report. It is inappropriate to use the FEMA BFE elevation as New England is one of the only places in the country where the 100-year event is based on the historic record vs. a synthetic hurricane data base that is the industry standard approach. The NACCS data base which both Jones and I rely on to define the 100-year design condition is based on a synthetic hurricane approach and therefore is appropriate to use (vs. the BFE). Although we are confident in the LiDAR data we used to define the berm crest elevation, we note that the Godfrey Hoffman Hodge LLC topographic survey of the berm crest was not shared with us as part of Kovich's report.

*Pg. 8, Par. 1 -* *To rebut several of the CLF expert opinions, mainly those from Goldsmith, <u>Nairn</u>, and Horner, I prepared this opinion to provide industry best practices for bulk petroleum storage terminal facilities based on my professional experience gained while working directly for a midstream oil and gas company and professional experience as an environmental consultant supporting terminal operators with their operations. I have focused on environmental management, beginning broadly with an overview of environmental management systems, followed by more specific discussions related to four focus areas relevant to this Matter: oil discharge preparedness and response, waste management, stormwater management, and hurricane preparedness.*

**RBN Response:** For my report the most important best practice relates to selecting the appropriate 100-year level: the FEMA values from historic measurements of water level or USACE NACCS based on a synthetic hurricane set  - the latter is the best practice. Also, I relied on ASCE24 for guidance on flood protection design for the substantial improvements that are required to the secondary containment berms at this site since they allow for inundation under the 100-year or more frequent storm condition. The secondary containment berms effectively serve a flood protection function during the 100-year event as they are meant to keep the water inside the containment area separate and isolated from the harbor/flood waters.

*Pg. 11, Par. 1 -* *The guidance document ultimately concludes that "the certifying PE (or owner/operator, in the case of qualified facilities) determines what volume constitutes sufficient freeboard for precipitation for secondary containment and should document in the Plan how the determination was made." <u>For this reason, the SPCC regulations do not require facilities to plan for a 100-year or 500-year flood as suggested by CLF experts Goldsmith and Nairn.</u>*

**RBN Response:** Jones at several places in his report acknowledges a requirement for the secondary containment berms to serve their function of keeping the water inside the containment area separate and isolated from the harbor/flood waters during a 100-year flood condition. Both Integral/Jones (Appendix C of French-McCay) and I found that the secondary containment berms fail at this purpose during the 100-year

Innovation Engineered.

storm. As such, substantial improvements are required to raise the crest elevation of the berms, and the design of these improvements is guided by ASCE24 which requires 500-year (ASCE24-14) to 1,000-year (recently released ASCE24-24 which supersedes ASCE24-14) design levels for Class III and IV infrastructure which includes fuel storage facilities in their definition.

*Pg. 17, Par. 2 - Furthermore, this fact sheet, which defines industry best practices as a guidance document for the bulk petroleum storage terminal industry nation-wide, does not identify any climate change or extreme weather-related risks for implementing BMPs that should be considered as an industry best practice as incorrectly suggested by Goldsmith. I also note that fact sheet does not include any considerations for flood events when designing and operating bulk petroleum storage terminal facilities which is in direct disagreement with the recommendations provided by Nairn that the New Haven Terminal should protected at either the 100-year or 500-year flood.*

**RBN Response:** Again, the 100-year storm condition which Jones cites as a requirement several times fully floods the containment areas (both based on Integral/Jones analysis in Appendix C of French McCay and my own analysis) thus resulting in uncontrolled releases of containment area waters and mixing with harbor/flood waters. This failure of the containment berms to serve their purpose during the 100-year or more frequent flood condition leads to a requirement for substantial improvements to the containment berms based on 500-year (or 1,000-year in latest ASCE24 version) design levels.

*Pg. 18, Par. 5 - This is where I disagree with CLF's view of environmental best practices for "industry." When CLF subjectively picks a few documents to support its one-off interpretation of best industry practices, it is not using an established or recognized "practice," and it is not using a practice that has been adopted or regularly used by the relevant "industry"—in this case, the petroleum bulk storage terminal industry.*

**RBN Response:** I cite Best Industry Practices related to flood protection relied on by coastal engineers, which are the appropriate practices for this application as referenced in the ASCE standards themselves. The secondary containment berms should effectively serve as flood protection (both Integral/Jones and I show they do not) during the 100-year storm condition by preventing the release of secondary containment area waters via overflow into the surrounding environment. In other words, the containment system cannot contain water during the 100-year condition without preventing flooding. Therefore, the best industry practices that apply to coastal flood prediction and protection are related to coastal engineering.

*Pg. 18, Heading 1.7 Hurricane Preparedness*

**RBN Response:** I am mostly not commenting on this section because my point is that the secondary containment area should be functional under the 100-year storm condition, whether cited by me or Jones - this is when risks of damage and spills to the facility are high regardless of the preparedness, and thus when containment berms are most needed.

*Pg. 21, Par. 4 - As the above information shows, the industry best practices of bulk petroleum storage terminals in the Northeast do not reflect the subject standard developed by Goldsmith, Nairn and other CLF experts. In my opinion, the Terminal meets best industry practice because it considers risks related to extreme weather, specifically by implementing appropriate measures to address short-, near- and longer term risks on the Terminal operations and stormwater management.*

**RBN Response**: The secondary containment berm must function adequately in events up to the 100-year flood according to both me and Jones, and they do not at this facility as the containment areas fully flood under that condition, failing to achieve their purpose.



Innovation Engineered.

*Pg. 22, Heading #2 - Defendants Implement Industry Best Practices At The New Haven Terminal Which Go Above And Beyond The Regulatory Requirements For Bulk Petroleum Storage Terminals Related To Environmental Management Systems, Oil Discharge Preparedness And Responses, Waste Management, Stormwater Management, And Hurricane And Extreme Weather Preparedness.*

**RBN Response:** Based on my analysis and that of Integral/Jones (Appendix C of French-McCay the secondary containment berms are inadequate for the 100-year storm and less in terms of containing water in those areas and separating and isolating that water from the harbor/flood waters. Therefore, the containment berms fail in their purpose.

*Pg. 23, Bullet #1 - an operating stormwater collection system and pumping system is present that sends stormwater to a two-stage holding pond prior to discharge to the municipal stormwater system through the permitted facility outfall;*

**RBN Response:** The berms and any stormwater management system are wholly inadequate for their purpose during a 100-year flood event or less as the containment areas become fully flooded based on the analysis of Integral/Jones (Appendix C of French-McCay) and myself.

*Pg. 27, Par. 2 - Contrary to claims developed by Goldsmith and other CLF experts, the Terminal monitors weather and other meteorological conditions in real-time, assesses the potential credible risks associate with those weather conditions, and has implemented oil discharge preparedness and response planning in accordance with industry best practices. Reading the Goldsmith and Nairn reports would suggest the Terminal is completely unprepared for a storm of any size, and that is just not accurate factually and provides a misleading view of the Terminal's preparedness to handle major storms, hurricanes, sea level rise or other physical conditions.*

**RBN Response**: Whether prepared or not, the secondary containment berms for the facility are inadequate during the 100-year storm standard cited by Jones several times in his expert report (my finding of complete flooding of the containment areas during the 100-year storm event is corroborated by the results of Integral/Jones (Appendix C of French-McCay)).

*Pg. 28, Par. 4 - As noted above, the Terminal has developed and implemented an FRP (most recently updated in June 2024 with previous revisions in December 2023) to prepare Terminal personnel to quickly and safely respond to an oil discharge incident at the Terminal. Again, Goldsmith and Nairn suggests the Terminal is not prepared to identify, manage and respond to any spills or releases at the Terminal during an extreme weather event or events. The facts of the Terminal's compliance plans, procedures, training and mock exercises show the mistakes in Goldsmith's opinions about the Terminal.*

**RBN Response**: As in several places, this misrepresents my opinions. As I have noted, whether prepared or not, the secondary containment berms for the facility are inadequate to achieve their purpose during the 100-year storm standard cited by Jones several times in his expert report (my finding of complete flooding of the containment areas during the 100-year storm event is corroborated by the results of Integral/Jones (Appendix C of French-McCay)).

*Pg. 29, Par. 5 - For Goldsmith and Nairn to suggest the Terminal is unprepared for a "potential catastrophic release" at the Terminal, the USEPA disagrees, and the facts show the misleading nature of that statement. The actual facts show otherwise—this is a well-run Terminal that implements best management practices that is prepared to properly handle petroleum spills or releases if they were to occur.*

**RBN Response:** My professional opinion is that the secondary containment berms are inadequate to serve their function under the 100-year (or less) flood event that both Jones and I cite as the standard.

---



Innovation Engineered.

*Pg. 31, Par. 2 - The Goldsmith and Nairn descriptions of the Terminal's lack of preparedness to handle potential spills, incidents or extreme weather are factually inaccurate.*

**RBN Response**: I disagree. The secondary containment berms fail to serve their purpose under the 100-year flood condition or less as they become completely inundated and therefore do not keep the water inside the containment area separate and isolated from the harbor/flood waters. This finding is based on my analysis and corroborated by the analysis of Integral/Jones in Appendix C to French-MCay. Kovich provides no analysis to counter these findings of Integral/Jones and myself.

*Pg. 34, Top of page - …industry best practices as evidenced by: (i) preparation of a SWPPP, (ii) documentation within the SWPPP, (ii) conducting annual training, and (iii) conducting required inspections.*

**RBN Response**: I disagree, the secondary containment berms fail to serve their purpose during the 100-year flood event or less (that both Jones and I cite as the standard).

*Pg. 35, Par. 1- Despite claims made by Goldsmith and other CLF experts, the Terminal has implemented certain resiliency measures to minimize the potential impacts from stormwater discharges from major storm events.*

**RBN Response**: I disagree, both Integral/Jones (Appendix C of French-McCay) and I have shown that the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Kovich provides no evidence to counter the finding of Integral/Jones and I on this failure of the containment berms to serve their purpose under the 100-year or more frequent storm event.

*Pg. 36, Par. 1 - In other words, the Terminal is already implementing new practices proposed by CT DEEP in the upcoming permit that includes specific "climate resilience" provision. By definition, this is a "best industry practice"—to comply with newly proposed climate provisions before the agency finalizes those provisions.*

**RBN Response**: I disagree, both Integral/Jones (Appendix C of French-McCay) and I provide analysis showing that the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Kovich provides no quantitative evidence to counter this finding.

*Pg. 36, 2.6, Par. 1 - The Terminal's preparation for major storm events such as hurricanes is in accordance with industry best practices. In fact, the Terminal has had a Hurricane Action Plan since at least 2012, now almost 15 years ago.[81] From my perspective, that is the best example of a facility implementing a best practice to prevent any adverse events, spills or incidents from an extreme weather event.*

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 36, Last paragraph - The Hurricane Action Plan indicates that the Terminal will maintain appropriate safe product inventory levels in the tanks during shutdown operations in preparation for a hurricane or severe…*

**RBN Response**: I disagree, based on the analysis of both Integral/Jones (Appendix C of French-McCay) and me, the secondary containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Therefore, when containment is most needed due to high risks associated with flooding during hurricanes, the secondary containment berms will be entirely ineffective at serving their purpose.

*Pg. 38, Last paragraph - Considering the environmental management systems in place at the Terminal, including the plans, practices and best management practices, the Terminal has implemented an effective*



Innovation Engineered.

*decision-making process and* <u>*implement effective internal procedures that ensure effective management of*</u> <u>*stormwater at the Terminal.*</u>

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 39, Par. 1 - The potential impacts from climate change such as increased storm frequency, increased storm intensity, and sea level rise were not required to be considered when evaluating BMPs to comply with the 2018 CT DEEP General Permit for the Discharge of Stormwater Associated with Industrial Activity (effective 1 October 2018; herein referred to as 2018 General Permit).[90]*

**RBN Response**: Effectively the sea level rise from the time of construction of the containment berms in the early to mid-1950s up to 2021 has contributed to the fact that the secondary containment berms at this facility will not serve their purpose under a 100-year flood event. Future sea level rise is only considered in my calculations for the development of preliminary berm crest elevation as part of implementing the required substantial improvements following the guidance of ASCE24.

*Pg. 40, Par. 3 - However, the Goldsmith Report claims that the Defendants are required to "consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards."[92]*

**RBN Response**: As noted above, given the secondary containment berms fail to serve their purpose during a 100-year flood or less, substantial improvements are required (raising the crest elevation of the berms) and these improvements are guided by ASCE24 that requires a sea level rise allowance over a 50-year service life.

*Pg. 40, Par. 3 - The Goldsmith Report references reports of several trade groups (e.g.,* <u>*American Society of*</u> <u>*Civil Engineers*</u>*), government agencies (e.g., U.S. Army Corps of Engineers), papers, and documents prepared by Shell generally related to protecting critical infrastructure and risks from rising sea levels, flooding or storm surge, and major storm events such as hurricanes.*

**RBN Response**: ASCE sets standards for flood protection in the coastal engineering industry which is most applicable to evaluating coastal flood protection (or risk reduction) performance and designing flood protection (or risk reduction) measures. As explained above, during the 100-year condition the secondary containment berms should prevent complete flooding of the containment areas to serve their function - they do not according to the analyses of Integral/Jones in Appendix C to French-MCay or myself.

*Pg. 41, Par. 4 - In my opinion, it is not practical or required for an existing terminal facility to change its design solely based on the evolving research and guidance published by various third-party associations and organizations.*

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard - this is a well-known standard in coastal engineering and not "evolving research." Therefore, substantial improvements are required and those are guided by ASCE24 which for many years has been a widely accepted design document for flood protection - which is the effective function of the secondary containment berms during the 100-year flood event.

*Pg. 41, Par. 4 - Still, the Terminal has implemented "best industry practice" through its Business Continuity Plan, SPCC, FRP, and other operational plans to adequately manage risks due to climate change.*



Innovation Engineered.

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 43, Par. 1* - *The Goldsmith Report indicates that "Best industry practice for critical infrastructure facilities like the Terminal requires addressing risk from the 500-year flood." In my opinion, this is an unreasonable assumption to imply that industry best practice requires a facility to address risk from the 500-year flood and I am not aware of any regulatory requirement to do so.*

**RBN Response**: This is what ASCE24-14 requires. In the latest update ASCE24-24 (which replaces ASCE24-14) requires 1,000-year level of protection for Class III and IV infrastructure that includes fuel storage facilities in their definition.

*Pg. 43, Par. 3* - *Goldsmith's justification for this "requirement" is based on "recommendations" from the American Society of Civil Engineers (ASCE), Federal Emergency Management Agency (FEMA), and The Association of State Floodplain Managers (ASFPM) as indicated in the Expert Report by Robert Nairn (Nairn Report).*

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones cites several times in his report as the appropriate standard. Therefore, substantial improvements are required and those are guided by ASCE24.

*Pg. 43, Par. 4* - *Even more relevant to this lawsuit, the ASCE document indicates: "This standard applies to the following: (1) New construction, including subsequent work to such structures, and (2) work classified as substantial improvement of existing structures that are not historic structures."[96] It is my understanding that new construction or work classified as substantial improvement as defined in this ASCE document is not planned or applicable for the Facility.*

**RBN Response**: I disagree, given that the secondary containment berms fail to serve their purpose during the 100-year or more frequent storm event (based on the analysis of Integral/Jones in Appendix C of French-McCay and myself), substantial improvements are required in terms of raising the crest elevation of the berms and these improvements are guided by the coastal engineering standard of practice, ASCE24.

*Pg. 43, Par. 6* - *Again, none of these "practices" cited by Goldsmith and Nairn make any reference to petroleum bulk storage facilities, and none of these even reference the oil and gas industry. Ironically, at least two say they should not be used as "standards."*

**RBN Response**: ASCE24 directly references fuel storage infrastructure as following in Class III and IV infrastructure, requiring 500-year (ASCE24-14) and more recently 1000-year (ASCE24-24) flood protection for substantial improvements which are required at this site.

*Pg. 44, Par. 1* - *Without a clear permit or regulatory requirement and only based on the recommendations indicated in the Goldsmith Report, the installation of a flood protection device for a 500-year flood is not an economically practicable control measure for the Facility.*

**RBN Response**: Kovich does not provide an estimate of the cost of raising the secondary berm crests to the 500-year level and therefore cannot comment on whether these measures are economically practicable or not.

*Pg. 45, Par. 1* - *Contrary to the opinions in the Goldsmith Report, the Nairn Report, and the Horner Report, it is my opinion that the Facility's secondary containment system is engineered in accordance with industry best practice. Goldsmith indicates "Engineering improvements include raising the berm heights (or similar flood*

Innovation Engineered.

*protection) and addressing structural integrity deficiencies in existing secondary containment berms as discussed in the Nairn Report."[98]*

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

***Pg. 45, Par. 2*** - *Goldsmith, Nairn and Horner suggest the secondary containment system is (or should be) a flood protection measure. As noted elsewhere in this report, an important point of clarification is that the purpose of the secondary containment berms associated with the bulk storage tank operations at a terminal is not flood protection, but rather for containment of product in the event of an oil discharge. With respect to the berms themselves, I did not visually identify structural integrity deficiencies in the secondary containment berms during my site inspection.*

**RBN Response**: Given the purpose of the secondary containment berms is to isolate the water surrounding the above ground fuel storage tanks in the containment areas from the harbor/flood waters outside the containment areas up to the 100-year flood levels, the berms effectively are flood protection.

***Pg. 45, Par. 3*** - *Although the purpose of the secondary containment berms is not for flood protection, the Facility generally meets the engineering standard for hazardous waste treatment, disposal, and storage facilities (TSDF) which requires that facilities located within a 100-year floodplain are to be designed constructed, operated, and maintained to prevent a washout by a 100-year flood.[99] The elevation of the secondary containment berms is approximately at or above the 100-year flood elevation of 12 feet.[100]*

**RBN Response**: Here Kovich acknowledges the requirement for a 100-year level of protection (agreeing with Jones and myself) which both Integral/Jones (in Appendix C of French-McCay) and I find the secondary containment berms at this site fail to meet. As noted earlier the NACCS 100-year flood level of +14.1 ft NAVD88 should be used as it is based on the industry standard synthetic hurricane data set approach and the FEMA BFE is not for this region. Nevertheless, even a flood level of +12 ft exceeds the berm crest elevation in many locations and would lead to extensive flooding of the containment areas (and potential breaching of the low areas).

***Pg. 45, Par. 4*** - *Additionally, Goldsmith indicates "The Terminal's secondary containment area is not able to contain a large spill contemplated by the permit."[101] The Goldsmith Report relies on the opinions formed by other experts to claim that the Facility is not engineered or operated pursuant to best industry practices. This opinion is based on the unrealistic and incorrect assumptions and inconclusive data made in the Horner Report regarding the adequacy of the secondary containment volume and whether the containment is sufficiently impervious.*

**RBN Response**: I disagree, based on the findings of both Integral/Jones (Appendix C of the French-McCay report) and myself, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

***Pg. 46, Par. 2*** - *The Facility and professional engineer who certified the SPCC plan have the flexibility to determine how best to design the Facility to prevent a discharge to navigable waters. That allows for a certification that the containment is sufficiently impervious not based on permeability, hydraulic conductivity, or retention time performance criteria but instead on ensuring that secondary containment structure is able to contain the spill until it is cleaned up thereby preventing a discharge to navigable waters as indicated in the SPCC Guidance for Regional Inspectors.[102]*

**RBN Response**: Based on the analysis of Integral/Jones (Appendix C of French-McCay) and me, the containment berms of the terminal in fact fail to serve their purpose of containing water under the 100-year



flood event that Jones cites at several locations in his report as the standard. Kovich nor any other Defendant expert provide quantitative evidence to counter this finding of Integral/Jones and me.

*Pg. 49, Par. 2* - *Based on my evaluation and opinions in the Goldsmith and Horner Reports which I have established are incorrect, the Facility's secondary containment system is engineered in accordance with industry best practices. Specifically, based on my analysis, the berms at the Terminal comply with the SPCC requirements, and based on my site inspection, the berms appear stable, well maintained, and appropriate for the operation of the Terminal.*

**RBN Response**: I disagree, based on the analyses of Integral/Jones (Appendix C of French McCay) and myself, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Kovich provides no quantitative evidence or calculations to refute the above findings by Integral/Jones and myself.

## A.3  Detailed Rebuttal Comments to Bayles and Pace (2025)

*Pg. 13, Par. 4* - It is my professional opinion that increased wind speeds, sea level rise, flooding, or storm surge that CLF claims are due to climate change will have minimal to no impact on the tanks, and the tanks have been well maintained to avoid catastrophic failures that lead to large spill events.

**RBN Response:** During the 100-year or less frequent storm event the risk of damage to the tanks and associated spills are high and most likely to occur, and it is under this condition that the secondary containment berms are fully flooded and therefore will not keep the water from inside the containment areas isolated from the harbor/floodwater.

*Pg. 13, Par. 5* – For the highest wind speeds in this region, 134 MPH for a Category IV wind, if the tanks were full, there would be minimal to no damage. The tanks are only susceptible to buckling if they are empty. Buckling of the shell is not a catastrophic event, which is what the Baird Report and Goldsmith report would lead you to believe.

**RBN Response:** I make no statements on buckling.

*Pg. 17, Par. 1* - The upper elevation of the containment dike is approximately 8 feet above existing grade, thus making the top of the dike approximately 14 feet above sea level.

**RBN Response:** No vertical datum is provided by Bayles when discussing these elevations, therefore it is not possible to interpret the accuracy of his claims. The minimum crest elevation for the berms is as low as +11.3 ft NAVD88 and in many locations at or below +12 ft NAVD88 compared to the NACCS 100-year flood level at the 90% CI of +14.1 ft NAVD88 (see Figures 3.4 to 3.6 of my expert report).

*Pg. 17, Par. 1* - Rising waters from a hurricane would need to overflow the containment dikes to even introduce flooding in the containment areas.

**RBN Response:** This is precisely what happens during the present-day estimate of the 100-year and less frequent flood conditions according to the analysis of Integral/Jones (see Appendix C of the French McCay expert report) and me.

*Pg. 18, Par. 1* - This type of flooding would only be created/generated by a 500-year storm, which would allow the Defendants time to plan for and complete ballasting of their tanks.

**RBN Response:** There is no basis provided by Bayles for this assertion. I, and Integral/Jones (see Appendix C of the French-McCay expert report), provide proof that the 100 yr event results in complete flooding of the containment areas, rendering them fully ineffective at containing water, thus failing at their purpose.

*Pg. 18, Par. 2* - Figure 8 shows a typical containment wall around the New Haven Terminal. Like the hundreds of other facilities that we have personally visited, containment walls at the Terminal appear to be very similar to those other facilities and are in line with Best Industry Practices being utilized around the world. The CLF expert reports would make you want to think that these walls (berms) are degraded and are made up of loose soils that are completely eroded, when in fact if you walk around the entire facility, the containment walls are all comprised of very sound, rounded, and compacted soil and are visually in excellent shape.

**RBN Response:** I am not stating that the containment berms are necessarily degraded. Rather I am stating that they are not sufficiently protected. Bayles and Pace seem to suggest they are compacted (bare) soil and



Innovation Engineered.

not rock protected on the slopes. This aligns with my observations in some areas. In addition, Bayles and Pace state that the containment berms "appear to be very similar to those other facilities". This statement has no relevance as each location experiences different driving forces consisting of waves and water levels. I have show. using industry standard calculations that the protection of the berm slopes and crest at this location are inadequate to prevent wave erosion and breaching during the 100-year or more frequent event. Bayles and Pace provide no criticism of the industry standard methods I used, nor do they provide alternative methods.

*Pg. 18, Par. 2 - In our opinion, any damage to the berm during a so-called "wave attack" or flood would be temporary and fixable and would not result in an off-site release of product.*

**RBN Response:** The complete inundation of the containment areas which both Integral/Jones (Appendix C of French-MCay) and I predict under the 100-year or more frequent storm event results in uncontrolled release of water from the containment areas into the harbor/flood waters. Furthermore, due to the uneven nature of the crest elevation for the three containment areas, overflow that will occur under the 100-year flood event or less will lead to focused flows at the low spots that would give rise to erosion of the inside slopes of the berms further creating potential for breaches. Once breached the containment purpose is lost and repairs after the fact do not reverse that outcome of failing to serve their purpose.

*Pg. 20, Par. 4 - Based upon the location of the New Haven Terminal, it is understood that flooding can take place, but an event of this magnitude could be foreseen and proper planning would prevent catastrophic events.*

**RBN Response**: My professional opinion is that the containment berms fail to prevent full flooding of the containment areas and therefore do not serve their purpose during a 100-year or more frequent flood event.

*Pg. 20, Par. 4 - The rise in sea level will be at such a slow rate that Defendants would have ample time to update and maintain their Terminal prior to the sea level getting even close to the Terminal itself, let alone over and above the containment area if this ever became a requirement by the permitting authority.*

**RBN Response:** Given that the secondary containment berms are inadequate in terms of serving their purpose during the 100-year flood event, substantial improvement is required and ASCE24 dictates a future sea level rise allowance (50 years of sea level rise) for design of the improved berm crest elevation.

*Pg. 21, Par. 1 - Additionally, the Baird report discusses flooding as if flooding were an issue/violation that cannot occur. The very purpose of API standards and their rigorous requirements are to protect against external forces such as flooding. It is important to note the Baird report provides no analysis on tank failure probability. The tanks' exposure to flooding and peak water levels is not problematic. The tanks are designed to be able to withstand flood events. Contrary to Plaintiff's experts' opinions, flooding does not equate to tank damage, imminent risk to tank damage, or spills or release of product.*

**RBN Response:** I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. Both Integral/Jones (Appendix C of French-McCay) and I find that the containment areas are fully flooded under the 100-year or more frequent storm condition and therefore waters inside the containment areas are not contained or isolated and freely mix with harbor/flood waters.

*Pg. 23, Par. 1 -Due to the distance from water, the height above sea level, and the height of the berm, flooding events would be considered static events and hydrodynamic forces can be ignored.*

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut

**Baird.**

Innovation Engineered.

**RBN Response:** This is not necessarily a valid assumption as there will be rise and fall of water level resulting in currents, and waves that will be able to pass over the flooded secondary containment berms for a significant period of time during the 100-yr storm.

*Pg. 26, Par. 3 – Based on the 500-year flood values provided, the following minimums shown in Figure 11 would be moved into each tank by Defendants before the hurricane/flood event took place. As discussed above, the EPA and 19 other agencies recommend adding products to a level of 3-6 feet above the expected flood/storm surge height as the best practice, and this level is shown as $H_{EPA}$ in Figure 14.*

**RBN Response**: No proof is presented that the pre-storm preparations of moving product from tank to tank or adding water into tanks are physically possible or likely to occur in the time available without human error.

*Pg. 43, Final Summary, Bullet 2 - The Terminal is located 1500 feet from the nearest shoreline and is surrounded by a secondary containment dike wall. The flooding would need to crest extremely high relative to sea level, just to crest or topple the top of the secondary containment dike.*

**RBN Response:** This is not an industry standard approach to evaluating vulnerability to damage during floods. Both Integral/Jones (Appendix C of French-McCay) and I find the containment areas are fully flooded during the 100-year or more frequent flood event because the peak flood level exceeded the crest elevation for most of the length of the containment berms by up to about 2.5 ft.

*Pg. 43, Final Summary, Bullet 3 - The amount of time that it would take for water to rise to these levels would provide ample time for the New Haven Terminal Management to prepare the tanks for flood control, in the form of ballasting and or opening of tanks to allow water to enter the tank to prevent buoyant conditions. Ballasting is the single biggest controlling factor to safeguard against a failure caused by flooding or a hurricane event, which is something EPA and 19 other agencies agree upon. Flooding and hurricane events are predictable and have plenty of time to ballast the tanks properly for.*

**RBN Response**: No proof is presented that the pre-storm preparations of moving product from tank to tank or adding water into tanks are physically possible or likely to occur in the time available without human error. Also, hurricane tracks can change in the last couple of hours before landfall. In addition, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 43, Final Summary, Bullet 5 - Due to the location from the shoreline, any projectile that may be directed towards this Terminal would have to pass by many other obstacles. In addition, the objects would be required to pass over the secondary containment dike, which is very unlikely.*

**RBN Response:** If the containment berms are underwater, which is the case in the 100-year flood event according to Integral/Jones (Appendix C of French-McCay) and myself, an object would be able to pass over the secondary containment berm.

*Pg. 43, Final Summary, Bullet 6 - Since the Management Team regularly keeps the tanks filled to an average of 70% capacity and will have proper notice of an incoming storm to give them time to ballast all of the tanks, sliding or dislodging the tanks which may damage connected piping is very unlikely based on our engineering analysis, since proper ballasting can take place.*

**RBN Response:** No proof is presented that this is the case. Also, hurricane tracks can change in the last couple of hours before landfall. And the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



Innovation Engineered.

*Pg. 43, Final Summary, Bullet 11 - The berms appear in good shape and are properly maintained based on our professional inspection of the tanks. The berms appear as most other berms do across the country—they meet Best Industry Practices. The berms appear structurally sound.*

**RBN Response**: Bayles and Pace provide no analysis to support this opinion in terms of the adequacy of the berm protection to avoid breaching during the 100-year or more frequent event. They also do not criticize my analysis using industry standard approaches that showed the berms are not sufficiently protected. Also, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 44, Final Summary, Bullet 1 - Significant Environmental Releases are highly unlikely at this facility based upon location, hurricane preparedness procedures, and proper inspection and maintenance that have been performed on the tanks within this Terminal.*

**RBN Response**: There is no evidence presented on this. In contrast I have provided evidence (that is corroborated by Integral's/Jones' analysis in Appendix C of French-McCay) that the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg. 44, Final Summary, Bullet 1 - There is no requirement to protect the tanks from a 500-year flood in any regulation or standard, but these tanks can withstand a 500-year despite not being required to.*

**RBN Response:** Given the containment berms will not serve their function during the 100-year flood event or less (due to complete inundation of the containment areas and no separation of water between these areas and the harbor waters), substantial improvements are warranted and the ASCE24 guidance for these improvements require design to the 500-year (ASCE24-14) or 1000-year (ASCE24-24) flood level in addition to an allowance for 50 years of sea level rise.

*Pg. 44, Final Summary, Bullet 2 - The tanks, when properly ballasted, can withstand a 100-year and a 500-year flood with nearly a zero-sum change of a spill.*

**RBN Response:** Secondary containment berms exist for a reason and, based on my analysis and that of Integral/Jones (see Appendix C of French-McCay) the containment berms of this terminal fail to serve their purpose under the 100-year or more frequent flood event that Jones and I cite as the standard.

## A.4   Detailed Rebuttal Comments to French-McCay (2025)

*Pg.12, Objectives, Par. 2 - Other experts have been asked to address the likelihood of an oil spill. The tanks are designed to withstand storm surge conditions and extreme winds (Bayles and Pace, 2025). The facility plans call for balancing the volumes of oil in the tanks to reduce likelihood of leakage or failure when a severe storm is predicted (Shell Trading & Supply Distribution Operations, 2024), and these protocols were followed for Superstorm Sandy (Sullivan, 2025). Jones (2025) has evaluated the likelihood of an oil spill during a storm surge associated with an extreme event, finding negligible chance of spillage, not only because of the tanks' integrity but because of the nature of the storm surge water's movements and water depths around the containment areas and tanks*

**RBN Response**: I disagree, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard.

*Pg.14, Modeling Oil Transport, Fate and Exposure, Par. 1 - The SIMAP model has been validated with data from >20 large oil spills, including the Exxon Valdez, North Cape and Deepwater Horizon (DWH) oil spills (French and Rines 1997; French-McCay 2003, 2004; French-McCay and Rowe 2004; French-McCay et al. 2018b,c; French-McCay et al. 2021a,b,c), as well as test spills designed to verify the model (French et al. 1997, French-McCay et al. 2007). These studies showed that oil trajectories depended primarily on the current and wind data input to the model.*

**RBN Response**: It is our understanding that French-McCay used the water levels associated with a 100-year storm event but used the wind speeds associated with Hurricane Sandy. If that is the case, then French-McCay significantly under-estimated the wind speeds that would exist during a 100-year event as Hurricane Sandy was much less than a 100-year event at this site (as evidenced by the need to scale up the water levels from Sandy to represent a 100-year event). The winds should have been scaled up as well (if they were not).

*Pg.17, Figure 2.1 - Extents of the Integral model grid and the storm surge for each of the modeled storms.*

**RBN Response**: Despite our requests, we have not received the model input files for the Integral/Jones storm surge modeling that is relied on here and summarized in Appendices B and C. *Pg.18, Table 2.1 – Summary of maximum elevations (from Mean Sea Level) from hydrodynamic datasets.*

| Model | Storm | Time (at Max Elevation at the NOAA Tide Station) | Elevation (m) |
|---|---|---|---|
| FVCOM | Superstorm Sandy | October 30, 2012 03:00 | 2.54 |
| Integral | 100-year | May 7, 2024 00:00 | 3.64 |
| | 500-year | May 7, 2024 00:00 | 4.69 |

**RBN Response**: French-McCay uses the 50% Confidence Interval levels here. It is my professional opinion that the 90% CI levels should be used.

*Pg.18, Par. 2 - …Nairn found that the modeled surge waters for the selected 50%-CL 100-year storm (NACCS Storm 369) did not significantly flood the New Haven Terminal containment areas. However, the modeled 500-year storm (Storm 0367 representing the 500-year 50% confidence level return period water level) did flood the*



Innovation Engineered.

*New Haven Terminal Containment areas. Thus, the model output data for this "Baird 500-year storm" was requested via KSLaw and became available to me on 14 June 2025, after I had performed the analyses utilizing the Integral storms as input to the SIMAP oil spill model. While, I and my ROS team reviewed these data, there was not sufficient time to extract needed information and perform oil spill modeling with these data before completing this report.*

**RBN Response**: French-McCay fails to note that I found that the 100-year 84% Confidence Interval (CI) event fully floods the South Yard and Retention Pond, and the 100-year 90% CI fully floods all containment areas at the site. Appendix French-McCay finds that all the containment areas are fully flooded with the 50% CI (or mean) estimate of the 100-yr flood level.

*Pg.19, Par. 2 - The flooded areas of the Baird 500-year storm are very similar to those of the Integral 500-year storm. While the Baird 500-year model simulates the storm surge until 12.5 hours after the peak water level at the New Haven (NOAA) tidal station, for the 100-year and even 500-year AEP water levels considered here, the containment of surge water (described in Appendix C, section 8.1) is complete in the first few hours post water level peak. This containment is due to the topography surrounding the New Haven Terminal, such that considerable volumes of surge water would be retained after an extreme storm. (See Section 2.3.2 for further discussion of the topography.)*

**RBN Response**: Nevertheless, the important point is that based on my findings and those of Integral/Jones in Appendix C of this report, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. The containment berms would not function to contain any leaks and resultant spills during the 100-year or less event. In other words, the surge and associated waves do reach the tanks at this site during the 100-year event.

*Appendix B, Pg.7, Model Assumptions and Limitations, Par. 3 - Boundary conditions were defined using a synthetic water level time series representative of the NACCS 100- and 500-year mean water levels, assuming this forcing represents the extreme event conditions for New Haven Harbor, based on the NACCS data. No wind forcing or wave effects were included. Upstream inflows were estimated and applied as steady discharges, without accounting for temporal variability or watershed hydrology.*

**RBN Response**: Given these were not included in the Delft3D storm surge model, if anything the extent of inundation predicted will be under-estimated. In other words, while Integral/Jones found that the containment areas were fully flooded in a 100-year event it is likely that the containment areas would be fully flooded in a more frequent event (i.e. had winds and waves been included).

*Appendix C, Pg.5, Table 8.2 -Contained area and volume analysis at maximum capacity calculated by ROS, excluding volume occupied by tanks in each containment zone.*

| Containment Zone (Figure 8-3) | Minimum berm elevation or containing contour, ft (m) NAVD88 | Area, $m^2$ ($ft^2$) | Contained volume at max capacity, $m^3$ ($ft^3$) |
|---|---|---|---|
| Containment Area 1 | 11.8 (3.60) | 9,534 (102,620) | 11,957 (422,250) |
| Containment Areas 2 and 3 | 12.1 (3.69) | 53,726 (578,300) | 71,172 (2,513,420) |
| Tertiary Topographic Containment | 10.5 (3.20) | 103,390 (1,112,880) | 68,795 (2,429,460) |
| Total Depressions | | 166,650 (1,793,800) | 151,924 (5,365,130) |

**Nairn 2025 Rebuttal Report on the Shell Oil Terminal Flood Risk**
Shell Oil Terminal - New Haven, Connecticut



Innovation Engineered.

**RBN Response**: I have found that the minimum berm elevation is 11.4 ft for Containment 1 (South Yard), and 11.3 ft for Containment 2 and 3 (North Yard) – see Figures 3.4 to 3.6 of my expert report.

*Appendix C, Pg.9, Figure 8.6 - Simulated time series of water level (top panel, above NAVD88) and depth over ground (lower panel) at stations within the three containment zones shown in Figure 8-3, and at NACCS Save Point 271 in New Haven Harbor, during the 1% AEP ("100-year") Integral storm. The NACCS-estimated 1% AEP water level at SP271 is indicated with a black dashed line. The 10.5ft NAVD88 contour bounding the tertiary containment zone west of the Terminal is indicated with a blue dashed line.*



**RBN Response**: The Integral/Jones model results in complete flooding of all three containment areas during the 100-year storm event using the mean or 50% confidence interval estimate.

*Appendix C, Pg.11, Table 8.3 – Surge water volumes remaining in containment at the end of each Integral storm model stimulation.*

| Metric | Storm | Containment Area 1 | Containment Areas 2 and 3 | Tertiary Containment Zone | Total |
|---|---|---|---|---|---|
| Wetted Area (m²) | 100-year | 9,379.7 | 53,555.4 | 103,445.0 | 166,380.1 |
| | 500-year | 9,420.6 | 54,467.0 | 103,581.1 | 167,468.7 |
| Water Volume (m³) | 100-year | 9,640.2 | 53,141.3 | 84,057.7 | 146,839.2 |
| | 500-year | 9,653.1 | 53,219.0 | 84,202.5 | 147,074.7 |

**RBN Response**: A comparison of the water volumes in Tables 8-3 and 8-4 demonstrates that all of the containment areas are fully inundated during the 100-year event. Therefore, the function of the containment



Innovation Engineered.

berms, of preventing harbor/flood waters from mixing with containment area waters is not achieved. Given that the areas are fully flooded, and that Integral/Jones did not consider winds and waves in their model, the complete flooding would have occurred in an event more frequently than a 100-year event. In other words, according to the results of Integral/Jones the containment berms fail to serve their function in the 100-year or more frequent storm event.

*Appendix C, Pg.14, Par. 3 -* *The extents of flooding in these storm surge simulations modeled by Baird (Nairn 2025) for the area around the New Haven Terminal are shown in Figure 8-10. The 100-year storm simulated by Baird did not flood the secondary containment areas. The 500-year storm flooded the property's secondary containment areas at its peak. Both storm models shown were targeted at the respective 50% confidence level of their NACCS AEP at SP 271 in New Haven Harbor, as also analyzed for the Integral storms.*

**RBN Response**: I found that flooding occurred for the 84% confidence interval (CI) for the south yard and the stormwater area and the north yard for less than the 90% CI.

*Appendix C, Pg.15, Par. 1 -* *The simulations, especially the 100-year storm, are short and include only part of the subsequent tidal cycle. The peak water levels (storm tides) align closely with the corresponding target indicated by a horizontal black line in the top panel: the NACCS-designated AEP levels at SP271. The figures illustrate the simulated sequence of inundation for each storm: the initially dry tertiary containment zone outside the site floods first (and solely, in the 100-year storm; Figure 8-11) , followed by Containment Area 1 ("South Yard") and Containment Areas 2 and 3 in the 500-year storm (Figure 8-12). For the latter storm, floodwaters in the secondary containment zones start falling soon after harbor water levels begin to recede post-peak.*

**RBN Response**: As noted, the south yard and stormwater areas fully flood during the 84% confidence interval 100-year storm result and the north yard floods for less than 90% confidence interval of the 100-year storm.

*Appendix C, Pg.18, Par. 2 -* *Finally, the 100-year simulated storm comes close but does not impact the site: Table 8-6 shows only small wet areas (<250 m2) with insignificant (~0) water depth even at the worst of that storm, that is not visible at the scale of the map in Figure 8-13. Figure 8-13 shows water depth remaining over ground at the end of the Baird 100-year and 500-year storm simulations, as well as the coincident water level. As with the Integral 500-year storm, water is seen left behind and deepest in the containment zones in the Baird 500-year storm (top panel), but at distinct water elevations due to the better resolved individual containment zone's berms (bottom panel). At the end of these simulated storms, more of the floodplain remains wet for the 500-year storm.*

**RBN Response:** As noted, the south yard and storm water areas fully flood during the 84% confidence interval 100-year storm result and the north yard floods for less than 90% confidence interval of the 100-year storm.

*Appendix C, Pg.20, Par. 2 -* *Both Baird and Integral simulated 100-year and 500-year storms. The strategy for creating representative 100-year and 500-year flood events with each of the two models had a similar basis: Both Baird and Integral targeted matching the respective 1% and 0.2% AEP peak water level calculated by NACCS at Save Point 271 at its 50% confidence limit (Figure 8-14). All simulations considered here matched the respective AEP peak water levels within a few cm at that station.*

**RBN Response:** This is incorrect. I also considered higher confidence intervals including 84% and 90% for the 100-year storm.

*Appendix C, Pg.21, Item 2) -* *For the 100-year and even 500-year AEP water levels considered here, the containment of surge water described in (1) is complete in the first few hours post water level peak.*



Innovation Engineered.

**RBN Response:** Nevertheless, the important point is that based on the findings of Integral/Jones presented here, the containment berms of the terminal fail to serve their purpose under the 100-year flood event that Jones and I cite as the standard. The containment berms would not function to contain any leaks and resultant spills during the 100-year or more frequent event.

# Appendix B

Historical Satellite Images of the Site

Innovation Engineered.

## B.1   Historical Satellite Images of the Site

Figure B.1 to Figure B.5 present satellite images of the Site dating from 1951 to 2023, with annotations pointing out the observed significant changes to the secondary containment of the North Yard, South Yard and Retention Pond. Note that the years of the images selected are not based on when the changes occurred, but rather the availability of images.

Innovation Engineered.



**Figure B.1: Satellite images of the Site from 1951 to 1970 and annotations of observed changes to the secondary containment berms.**

Innovation Engineered.



**Figure B.2: Satellite images of the Site from 1974 to 1990 and annotations of observed changes to the secondary containment berms.**

Innovation Engineered.



**Figure B.3: Satellite images of the Site from 1995 to 2004 and annotations of observed changes to the secondary containment berms.**

Innovation Engineered.



**Figure B.4: Satellite images of the Site from 2006 to 2010 and annotations of observed changes to the secondary containment berms.**

Innovation Engineered.

**Figure B.5: Satellite images of the Site from 2012 to 2023 and annotations of observed changes to the secondary containment berms.**

