# Exhibit B

Filed Under Seal

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION,       )
INC.,                              )
                                   )
        Plaintiff,                 )Case No:
                                   )3:21-cv-
                                   )00933-VDO
vs.                                )
                                   )
EQUILON ENTERPRISES LLC D/B/A      )
SHELL OIL PRODUCTS US,             )
TRITON TERMINALING LLC, and        )
MOTIVA ENTERPRISES LLC,            )
                                   )
        Defendants.                )
_____

VIDEOTAPED DEPOSITION OF
JAMES O'DONNELL, Ph.D.

DATE:            September 12, 2025
TIME:            8:52 a.m.
HELD AT:         Wiggin and Dana LLP
                 20 Church Street
                 16th Floor
                 Hartford, Connecticut

   By:           Sarah J. Miner, RPR, LSR #238

Page 2

A P P E A R A N C E S:

For the Plaintiff:

Vincent L. Greene, IV, Esq.
MotleyRice, LLC
40 Westminster Street
5th Floor
Providence, Rhode Island  02903
vgreene@motleyrice.com

For the Defendants:

James O. Craven, Esq.
Wiggin and Dana LLP
One Century Towr
265 Church Street
New Haven, Connecticut  06510
jcraven@wiggin.com

-and-

Marissa Grabowski, Esq.
King & Spalding LLC
1100 Louisiana Street
Suite 4100
Houston, Texas  77002
mgrabowski@kslaw.com

Also Present:

Joe'l Marfrige
Rocco Mercurio, Videographer

Page 3

                          I N D E X

WITNESS:

JAMES O'DONNELL, Ph.D.

Direct Examination by Mr. Craven                6

Cross-Examination by Mr. Greene            189

Redirect Examination by Mr. Craven         201

Recross-Examination by Mr. Greene          206

Further Redirect Examination by Mr. Craven  209

                    E X H I B I T

O'Donnell
Deposition
Exhibits        Description                    Marked

Exhibit 1       Defendant's Notice of            9
                Deposition of James O'Donnell,
                Ph.D. and Request for
                Production of Documents

Exhibit 2       Letter to Devin William          9
                from James O'Donnell, Ph.D.
                6/5/25 JODONNELL_000001-2

Exhibit 3       Curriculum Vitae                 9

Exhibit 4       Standing Protective Order       36

Exhibit 5       Aerial photograph               37

Exhibit 6       "New Haven continues flood      52
                mitigation efforts despite
                FEMA cuts"

Exhibit 7       U.S. Environmental Protection   64
                Agency SPCC Field Inspection
                and Plan Review Checklist
                SOPUS_NHVN00527912-24

Exhibit 8       Resilient Fair Haven            79
                Final Report 12/23

Exhibit 9       Connecticut Sea Level Rise      89
                and Storm Surge Viewer

Exhibit 10      Connecticut Sea Level Rise     108
                and Storm Surge Viewer

Exhibit 11      Connecticut Shoreline 100      112
                Year Event

Exhibit 12      City of Groton Community       126
                Resilience Plan May 2022

Exhibit 13      Modeling nearshore dynamics    134
                of extreme storms in complex
                environments of Connecticut

Exhibit 14      Aerial photograph              151

Page 4

O'Donnell
Deposition

| Exhibits | Description | Marked |
|---|---|---|
| Exhibit 15 | Guidance Document for Preparing a Stormwater Pollution Prevention Plan March 2011 | 166 |
| Exhibit 16 | General Permit for the Discharge of Stormwater Associated with Industrial Activity 10/1/18 | 168 |
| Exhibit 17 | General Permit for the Discharge of Stormwater Associated with Industrial Activity 10/1/21 | 169 |
| Exhibit 18 | General Permit No.:CTR050000 | 169 |
| Exhibit 19 | General Permit Registration for the Discharge of Stormwater Associated with Industrial Activity 10/1/11 | 173 |
| Exhibit 20 | 2004 Connecticut Stormwater Quality Manual | 175 |
| Exhibit 21 | Connecticut Stormwater Quality Manual 3/10/24 | 178 |
| Exhibit 22 | Curriculum Vitae | 188 |

(Exhibits 15 - 18 cover pages only)

(The exhibits were included with the original transcript.)

Page 33

listed on your materials considered portion of your report?

A    No, not that I am aware.

Q    Do you have an awareness that there were a lot of reports prepared by a number of experts in this case?

A    I am not sure if they were all reports. The materials that I received and reported on January 28th line were numerous and detailed and I didn't absorb them all.  So I was more -- I triaged those to see if there was anything that was relevant to the question that I was asked to provide an opinion on and decided that there weren't and it wasn't worth me charging them for time required to absorb them all.

And I think the Barlow report and the Nairn report were things that were the most relevant and so I spent some time on those, but they were not relevant to the opinions that I focused on in my report.

Q    Do you have an awareness that after you prepared your report in this case that the defendants disclosed a number of experts with reports?

A    No.

Page 34

Q    You are not aware of that?

A    No.

Q    You haven't reviewed any of the expert reports prepared by experts retained by the defendants in this case?

A    Not that I recall, no.

Q    Did you review any testimony in connection with your assignment in this case?

A    I am sure I didn't do that.

Q    Do you have an awareness that other experts have provided testimony in this case prior to today?

A    I am aware that that is the process, but only one specific one, I think.

Q    So you have a general awareness in the litigation process based on your prior case and talking to colleagues and other people about how the process worked, that other people may have given testimony in this case but the only specific awareness relates to one individual providing testimony?

A    Correct.

Q    And with regards to the one person that provided testimony that you are specifically aware of, you didn't ask to review that person's

Page 35

testimony?

A    No.  Sorry.  That was inconsistent.  You asked me if I asked to review and I said no when I should have said yes.  I did not ask to review that so it was a double negative.  I don't want to be misinterpreted.

MR. GREENE:  Good catch.

BY MR. CRAVEN:

Q    Thank you, Dr. O'Donnell, for clarifying. Just to be clear, you did not review any testimony in case and you did not ask to review any testimony in this case?

A    That is correct.

Q    Did you conduct any sort of site inspection of the facility that is at issue in this case?

A    No.

Q    Did you conduct any site inspection of the Gulf facility that you prepared an expert report for?

A    No.  Pardon me.  My report is not about a particular site.  It is about the case.  There is a Gulf case.  So it is not -- I want to be clear that I didn't -- I don't address the details of any site in my report.

Page 36

Q   To be clear, in connection with the work you conducted in this case, you did not go and do any sort of site inspection of the Equilon facility?

A   Correct.

Q   Similarly in connection with the work that you were doing for CLF in the other litigation involving a different terminal, you also did not go and do a site inspection?

A   That is correct.

Q   Outside of the litigation process, have you actually gone to any of the New Haven Port terminal bulk storage facilities?

A   I have driven past them.  I played soccer down there one time in a field nearby and I have seen them from the highway many times.

Q   Would it be fair to say that prior to today you haven't been on-site --

A   Yes.

Q   -- of any of the terminal facilities in the Port of New Haven?

A   That is correct.

            (Exhibit No. 4 marked for
            identification.)

BY MR. CRAVEN:

Page 48

head from the breakwater in towards I-95.  Okay?

A    Got it.

Q    And to the extent that I am referring to terminal facilities that are either on the other side of Interstate 95 in the picture that has been marked as an exhibit or on the city side of New Haven Harbor, I will specifically refer to those. Okay?

A    By the city side, you mean to the west?

Q    Yes, sir.

A    Got it.

Q    You can see on exhibit -- is that Exhibit --

A    Five.

Q    -- 5.   That in addition to bulk storage terminal facilities on the east side of the New Haven Harbor there are some facilities that are on the west side.  True?

A    Correct.

Q    To be clear when I asked you earlier to identify specific terminal facilities, you circled an area on the east side of the New Haven Harbor. True?

A    Correct.

Q    Are you able to identify which terminal

Page 49

facility is on the west side of New Haven Harbor?

A   I don't know the name.

Q   Okay.  To the extent that I asked you questions whether or not you visited any terminal facilities in the Port of New Haven given that we have now defined the word Port of New Haven, would it be fair to say that you haven't been on-site on any terminal facility near the harbor of New Haven?

A   That is correct.

Q   And does New Haven have seawalls on the edge of the New Haven Harbor?

A   Yes.

Q   How many seawalls does it have?

A   New Haven Harbor has a lot of seawalls, but I am precisely sure of what fraction, but that is true of all of the Connecticut shoreline.

Q   Does New Haven Harbor have breakwaters?

A   Yes.

Q   How many breakwaters does it have?

A   I think probably three.  At least two.

Q   And what is the purpose of breakwaters, as you understand it?

A   To reduce the amplitude of waves, high frequency waves that propagate from Long Island Sound into New Haven Harbor.

Page 61

the dark and dashed lines that appear in Table 5 and 6.  Table 5, Table --

Q    Figure 6 has a solid black line that appears to run from 2024 or 2025 out to -- past 2090.  True?

A    Yes.

Q    And that solid black line is not meant to necessarily refer to the solid black line that is in the box that says New Haven above.  The colored box on Figure 6 that has Bridgeport as red and New London as dark blue, Montauk Point, Willets Point, those colors relate to the portion of the line going across up until 2024 or 2025?

A    Yeah, those are data and --

Q    And when you looked at the year 2030, you were giving the range from the small dotted points to the -- that range or were you giving the range from the dashed lines on Figure 6?

A    My first answer I think was based on me trying to read what those numbers meant from the graph.  I then realized that I had put them on the table, Table 5, so I jumped there and I read the third column on the second line down, it says 2030. Right.  And that is the lower bound of the dashed interval.  .9 is upper bound of the dashed

Page 64

A    I hope so.  That is was my intent, was to reflect these graphics on this table.

Q    Doctor, I want to make sure it is clear. I can go through and ask you these dates, but the date is on here.  Right?

A    Yes.  Yeah.

Q    Okay.

(Exhibit No. 7 marked for identification.)

MR. GREENE:  This is 7?

THE COURT REPORTER:  Correct.

MR. GREENE:  Thank you.

BY MR. CRAVEN:

Q    Dr. O'Donnell, I am showing you what has been marked as Exhibit 7, which at the top says it is a U.S. Environmental Protection Agency SPCC Field Inspection and Plan Review Checklist.

Do you see that?

A    I see it, yes.

Q    And you see at the -- if you turn to page 2, you see near the bottom of the page 2 there is a grayed out area that says, Inspection Plan Review Information?

A    Yes, I see that.

Q    And you see below that it says, Plan

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 65

review date December 18, 2022?

A    Yes.

Q    And do you see directly below that it says, Inspection date December 21st, 2022?

A    I see it, yes.

Q    And do you see that there is below that a section that says, Lead Inspector?

A    Yes.

Q    And there is a name there?

A    Yes.

Q    Then below that, there is an section that says, Other Inspectors?

A    Yes.

Q    And there are two names there?

A    Yes.

Q    Based on your review of that, would it be your impression that there were three inspectors involved in some fashion in preparing this report?

A    That would be my inference.

Q    If you turn to page 3, bottom of the page it has a section that says, Comments?

A    Yes.

Q    Do you see it says -- the second sentence of this, it says, This inspection is part of an FRP and SPCC inspection?

Page 66

A    Yes.

Q    Do you know what an FRP is?

A    No.

Q    Do you know what an SPCC is?

A    I think I could probably guess, but no.

Q    So if you turn back to the first page of Exhibit 7.

A    Yes.

Q    The top paragraph where it says, Overview of the checklist.

Do you see that?

A    Yes, I see that.

Q    And the second sentence says -- starts with the words, Facilities compliance with.

Do you see that?

A    In the first paragraph?

Q    Yeah, second sentence.

A    It is a required to --

Q    No.  Sorry.  The second line.  I apologize.

A    Facilities compliance with the Spill Prevention Control and Countermeasures.

Q    Parentheses SPCC, do you see that?

A    I see that.

Q    So based upon that, do you have an

Page 67

understanding that SPCC stands for the Spill Prevention Control and Countermeasure?

A   I understand, yes.

Q   If you turn to page 4.  Do you see the section that says 112.3, parentheses D?

A   Yes.

Q   Midway down?

A   Got it, yes.

Q   And there are bullets on that?

A   I see, yes.

Q   You see the third bullet there, it says, Plan is prepared in accordance with good engineering practice, including consideration of applicable industry standards and the requirements of 40 CFR, part 112.

Do you see that?

A   I see that.

Q   And is there a box to the right of that?

A   Yes.

Q   What is that?

A   There is a tick in the "yes" box.

Q   Does that indicate to you that at least as of the date that this inspection was conducted by the individuals conducting this inspection, that they determined that the plan was prepared in

Page 68

accordance with good engineering practice, including consideration of applicable industry standards?

MR. GREENE:  Object to the form. Beyond the scope of his role and expertise in this case.

You can answer.

THE WITNESS:  All I can say is that this document says there is a yes in that box.  I have never seen a form like this before.

BY MR. CRAVEN:

Q   Can you turn to page 6 of this document. You see the top of page 5 it says, General SPCC requirements?

A   I see that, yes.

Q   And the second column, the second row, it starts with the word, Plan follows.

Do you see that?

A   Yes.

Q   Does that say, Plan follows sequence of the rule or is an equivalent plan meaning all applicable rule requirements and includes a cross-reference of provisions?

A   Yes.  There is a tick in the "yes" box.

Page 110

question and I will first make a statement about Exhibit 10.

Dr. O'Donnell, there is a section on your website that has a sea level rise storm surge viewer. True?

A    That is correct.

Q    And if you looking on the link related to that, it brings you to what is contained on Exhibit 10. So the way it is printed out here is four pages.

A    Yes.

Q    But on the website it would be a single sort of page. It has a little background. It has an interactive map, and then it also has a description of the data. True?

A    Yes.

Q    And on the page of Exhibit 10 it describes data and description usage. Can you read what the third paragraph says starting with the words, It is important to note?

A    It is important to note that the 100-year flood event layer in this tool is different from FEMA's 100-year flood map boundary for a few reasons, and then there are three bullets.

Q    And what is the first bullet?

Page 111

A    The model data is calculated for Long Island Sound to capture the complexity of Connecticut geology and landscapes and improve accuracy for effective flood risk design.

Q    And the second bullet says what?

A    The FVCOM model has high accuracy in predicting storm surge levels.  The FVCOM level -- do you want the third one?

Q    Can you read the third bullet.

A    The FVCOM model data only displays storm surge while FEMA maps incorporate both storm surge and waves.

Q    And the next paragraph, can you read that.

A    Sure.  Wave-related splashover along Connecticut shoreline requires smaller scale resolution modeling.  CIRCA continues to work in developing total water flood maps to include wave data for the Connecticut coast and will update tools as new information becomes available.

Q    So would it be fair to say that at least with the sea level rise and storm surge viewer, CIRCA views their viewer more reliable in some aspects but it doesn't include in the viewer wave action?

A    The -- it doesn't include wave action.

Page 112

And it is more reliable than some other tools that are available.  And it does allow consideration of sea level rise.  Those are the motivations.

Q   And would you agree that it is model data calibrated for Long Island Sound?

MR. GREENE:  Object to the form.

You can answer.

THE WITNESS:  Yeah, this term model data I hate, but it is model results that are calibrated using data from areas of Long Island Sound.

BY MR. CRAVEN:

Q   And the -- well, you agree, first of all, that the language here says model data?

A   Yeah, yeah, that is what it says.

Q   This is on CIRCA's website.  True?

A   That is correct.

Q   It has been on CIRCA's website for years.  True?

A   Yes.

(Exhibit No. 11 marked for identification.)

BY MR. CRAVEN:

Q   Dr. O'Donnell, I will show you what is marked as Exhibit 11, a series of printouts for sea

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 113

level rise and storm surge viewer.  And do you see that the printouts cover the area that we have been referring to as the Port of New Haven?

A   Yes.

Q   And do you see that there are various layer lists that you can activate for the storm surge viewer?

A   Yes.

Q   And do you see that the first page of Exhibit 11 has activated a mean higher high water in the 10-year flood event?

A   Yes.

Q   Would you agree that based on using those layers, there are some areas of the New Haven port that show the effects of storm surge and sea level rise but other areas of the port do not?

A   That is correct.

Q   And if you turn to the second page of Exhibit 11.  Do you see that using the CIRCA sea level rise storm surge viewer and activating the layers for mean higher high water 10-year flood event and the 10-year flood event plus 20 inches SLR image shows results?

A   Yes.

Q   Can you see that the results of using

Page 114

those layers shows sea level rise and storm surge impacting portions of the New Haven port area but not all of the terminals?

A    That is correct.

Q    Page 3 of Exhibit 11 has the mean higher high water layer and the 100-year flood event indicated.  Yes?

A    Yes.

Q    And does that show the effects of sea level rise and storm surge from the CIRCA viewer impacting portions of the New Haven port but not all of the terminals located in New Haven?

A    Yes.

Q    Can you turn to the next page of Exhibit 11, Dr. O'Donnell.

A    Yes.

Q    And you see that the next page is a printout showing layer lists where the mean high or high water is indicated in a 100-year flood event plus 20 inches SLR is indicated?

Do you see that?

A    Yes.

Q    And does that show the effects of storm surge and sea level rise from the CIRCA viewer on certain areas of the New Haven port?

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 115

A    Yes.

Q    And does it show that certain areas of the New Haven port are not affected by the 100-year flood event plus 20 inches sea level are?

A    Yes, that is what it shows.

Q    Can you turn to the next page, Dr. O'Donnell.  And do you see that this shows a layer for mean high or high water in a 500-year flood event?

A    Yes.

Q    Do you see that that shows the impact from a 500-year flood event on the terminals located in the Port of New Haven?

A    Yes.

Q    And do you see that the -- there are areas in the Port of New Haven that are not impacted by the 500-year flood event layer for the Connecticut sea level rise and storm surge viewer?

A    Yes.

Q    Can you turn to the next page, Dr. O'Donnell.

A    Yes.

Q    Do you see that this shows the impact under the Connecticut sea level rise storm surge viewer for the sea level rise for mean high or high

Page 116

water in a 500-year flood event plus 20 inches of sea level rise?

A   Yes.

Q   And does this show areas in the Port of New Haven that are not impacted by storm surge or sea level rise?

A   Yes.

Q   Have you looked at images from the sea level rise storm surge viewer showing the Port of New Haven in connection with this case?

A   Yes.

Q   Was that something that you did to prepare for your deposition today?

A   Not today, but as part of the report, you know, when I first was asked to look at the sea level availability in this area, I used this tool to look to see where these tanks were.

Q   And did you at that time notice that some of the tanks potentially had impacts from sea level rise and storm surge while others did not?

A   Yes.

Q   And is there a reason why -- strike that.

Now, you have also been involved in a paper that was peer-reviewed related to wave action in New Haven harbor.  True?

Page 119

argue are valuable.

Q   I guess I don't quite understand that question [sic] so I am going to follow up.

Have you reviewed the defendants' business continuity plan otherwise known as a BCP?

A   No.

Q   Have you reviewed the defendants' HAP?

A   What is that?

Q   Do you know what HAP is?

A   No.

Q   Have you reviewed defendants' hurricane action plan?

A   No.

Q   Have you reviewed defendants' FRP?

A   No.

Q   Do you intend to offer any opinions about the -- any of those documents I just mentioned?

A   No.

Q   Have you spoken with any of the individuals that are responsible for the facility operations?

A   No.

Q   Have you reviewed the testimony of the facility manager?

A   No.

James O'Donnell , Ph.D.                    September 12, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 120

Q   Have you reviewed any of the operational policies and procedures applicable to the Equilon terminal?

A   No.

Q   Dr. O'Donnell, have you reviewed any of the operational documents related to any of the other bulk oil storage terminal facilities in the New Haven port or near the New Haven harbor?

A   No.

Q   Have you reviewed any operational documents for any bulk oil terminal facility ever?

A   No.

Q   So do you intend to offer any opinions in this case whether or not any of the defendants' policies and procedures regarding the operation of the facility are deficient?

A   No.

Q   Do you intend to offer any opinions in this case that the structure of the defendants' facility is any way deficient?

A   No.

Q   You haven't reviewed, for example, the structural aspects of the storage tanks located at the defendants' facility.  True?

A   I think I saw a drawing of the berm

Page 122

A    No.

Q    Are you familiar with the abbreviation RCRA?

A    No.

Q    Some people refer to R-C-R-A as the RCRA?

A    No.

Q    You don't intend to offer any opinions about RCRA in this case?

A    I am not sure what RCRA is, but if it was explained to me I might be able to answer more clearly.

Q    I think I asked you earlier if your spouse was a registered engineer, and you told me she was not.  True?

A    That is correct.

Q    Would this be also true that you are not a registered engineer?

A    That is correct.

Q    And you do not intend to offer any opinions in regards to the practice of engineering in this case?

A    That is correct.

Q    Similarly, you may be aware that Connecticut has some certifications for people that handle hazardous materials.

Page 123

A   I am aware that there are regulations.  I didn't know Connecticut was separate from federal ones.

Q   In any event, you don't have any of those certifications or licenses.  Correct?

A   No, I do not.

Q   Are you aware of who the defendants are in this case?

A   I think so.

Q   Are you aware that the defendants are Equilon Enterprises, Triton Terminaling and Motiva?

A   No.

Q   Are you aware that Motiva sold its interest in the facility in 2017?

A   No.

Q   Do you have any opinions in any sense that Motiva did anything wrong prior to its selling of the terminal in 2017?

MR. GREENE:  Object to the form.

You can answer.

THE WITNESS:  No.

BY MR. CRAVEN:

Q   It seems like from reading your report that the majority or maybe all of the opinions that you are offering have to do with considering future

Page 131

glad that it jogged your memory.

A    Yeah.

Q    So to be clear, you see that Exhibit 12 contains information showing that as part of the City of Groton's resilience plan, at least the individuals performing their resiliency work, they were relying upon CIRCA's viewer?

MR. GREENE:  Object to the form.

You can answer.

THE WITNESS:  Yeah, I agree they used it.  To the extent they relied it, I don't know.  I wasn't part of it.

BY MR. CRAVEN:

Q    Well, part of the reason CIRCA has a viewer on its website is so that people can go to it and look at it and rely upon it.  True?

MR. GREENE:  Objection to form.

You can answer.

THE WITNESS:  Yeah, that is -- the motivation is to be useful to provide guidance on the effects of sea level rise on the patterns of flooding.  But, you know, it does say these low-lying areas need further evaluation due to the hydrologic complexity created by flood

Page 132

control structures, bridges and culverts. That is part of the caveat associated with the map viewer that is on the website.

So the Town uses, you know -- typically, I don't really know what the City of Groton did in this case. I might have seen this. I think I did know about it. But the -- there are FEMA maps people use. They use our maps. And there are requirements, for example, for projects that FEMA would fund that their federally-certified stuff is used as part of the planning documents. So however, they are not adequate for everything. They don't include sea level rise effects.

And so towns and private companies, and individuals I am sure too, use our information and then as well as other sources. And then their plans that they develop I am sure are based on a balance of all of that information.

So I only am extending my comments on this because I wasn't -- I don't want to leave the impression that the reliance is solely on what we provide. We provide

Page 133

stuff and it is used, but other things are used as well.

BY MR. CRAVEN:

Q   You are also not trying to suggest that it is not something that should be relied upon, too. Right?  It is a reliable useful piece of information that CIRCA puts out?

MR. GREENE:  Objection.

THE WITNESS:  Absolutely.  Sorry.

BY MR. CRAVEN:

Q   Dr. O'Donnell, back to page 5 of your resume.  You referenced an article, Number 8.

Do you recall that?

A   Yes.

Q   And is that a peer-review publication?

A   Yes.

Q   What does that mean when you say peer review?

A   In the case of that paper, it means that we submit a manuscript to an editor.  The editor seeks out two or at least reviewers who are anonymous who comment on the value and accuracy of the material in the manuscript and provide advice on whether or not it should be published.

And sometimes there is a cycle of revision

Page 167

Q   Dr. O'Donnell, showing you Exhibit 15.

Have you seen this document before?

A   No.

Q   You are not going to offer opinions about this document in this case?

A   Not without knowing what it is, no.

Q   Well, reading the exhibit it says, Guidance document for preparing a stormwater pollution prevention plan March 2011.

Do you see that?

A   Yes, that is the title.  Go ahead.

Q   And this document isn't something that is referenced in your report as something you considered for your opinions.  True?

A   That is correct.

Q   Okay.  And have you ever been involved in preparing a stormwater pollution prevention plan?

A   No.

Q   So would it be fair to say that you are not going to offer any opinions in this case on how to prepare a stormwater pollution prevention plan. True?

A   No, I would not specifically make recommendations on this in this case.

(Exhibit No. 16 marked for

Page 168

identification.)

BY MR. CRAVEN:

Q   Dr. O'Donnell, I am showing you what has been marked as Exhibit 16, which is entitled, General Permit for the Discharge of Stormwater Associated with Industrial Activity, effective October 1st, 2018.

Do you see that document?

A   Yes.

Q   Have you reviewed this document prior to today?

A   No.

Q   Have you cited this document as something you considered in connection with your opinions in this case?

A   No.

Q   Would it be fair to say you are not going to offer any opinions about the contents of the General Permit for the Discharge of Stormwater Associated with Industrial Activity, dated October 1st, 2018?

A   No.  Well --

Q   That is fair to say?

A   It is fair to say that I am not going to offer any opinions on this document in this case.

Page 169

(Exhibit No. 17 marked for identification.)

BY MR. CRAVEN:

Q    Dr. O'Donnell, showing you what has been marked as Exhibit 17, which is the General Permit for the Discharge of Stormwater Associated with Industrial Activity dated, October 1st, 2021.

Do you see that?

A    Yes.

Q    Have you seen this document before today?

A    No.

Q    Is this document cited as something you considered as part of your opinions in this case?

A    No.

Q    Would it be fair to say you are not going to offer any opinions about the contents of this document?

A    No.  It is fair to say that I will not.

(Exhibit No. 18 marked for identification.)

MR.  CRAVEN:  What I would like to do with counsel's permission, you can consider it, Attorney Greene, but perhaps at the end of the deposition we can for purposes of copies, just use the cover

Page 172

Q   Okay.  Dr. O'Donnell, in connection with the permitting process and the draft permit, Connecticut DEEP provides a number of fact sheets related to proposed changes in the permit.

Have you seen any of those fact sheets?

A   No.

Q   Would it be fair to say that you are not going to offer any opinions about the contents of any fact sheets prepared by Connecticut DEEP related to the General Permit for the Discharge of Stormwater Associated with Industrial Activity?

A   In this case, I don't anticipate that, but I could foresee the possibility that DEEP will ask my opinion about what they should include in their, you know, permit modifications associated with climate change and, in particular, sea level rise. They might ask for that.

Q   At least as of today, you have not been involved in the drafting of the permit that we are talking about.  True?

A   That is correct.

Q   And you don't intend to offer any opinions about the contents of the draft permit or the other permits I showed you in this case.  True?

A   That is correct.

Page 174

Do you see that?

A    Yes.

Q    Do you see below that it says, Pollution prevention plan column notes are defined as, colon, open for plan request, colon, within 15 days of the initial registration posting date members of the public can request a copy of a nonelectronic plan.

Did I read that correctly?

A    Yes.

Q    And then the very next sentence says, Requesters have 30 days from receipt of a plan to submit comments to DEEP.

Do you see that?

A    Yes.

Q    In connection with your opinions in this case, have you reviewed any pollution prevention plans prepared by the defendants in this case?

A    No.

Q    Have you submitted any comments on any pollution prevention plan prepared by the defendants in this case?

A    No.

Q    Have you seen any comments prepared for  a pollution prevention plan prepared by CLF in this case?

Page 185

going to offer opinions related to this issue.

True?

    A    If this case is continued for another

year, there may be papers published in which our

results we are working on now are made public.

    Q    Understanding that in the future there may

be studies that come out that you will review or

you will be part of, but it is not a study that you

have relied upon for purposes of your report or

that you are disclosed in this case to testify

about.  True?

    A    That is correct.

    Q    Okay.  Dr. O'Donnell, I want to make sure

it is clear.  You have done no evaluation of the

specific Equilon terminal in this case.  True?

    A    That is correct.

    Q    And you are not going to offer any

opinions about the potential effects any sea level

rise may or may not have on the Equilon terminal in

this case?

    A    That is correct.

    Q    As you sit here today, you are not aware

whether the Equilon facility has ever experienced

any damage or any damage related to any storm in

the past.  True?

Page 186

A    I don't know of any.

Q    You haven't done any sort of assessment of the Port of New Haven in connection with potential flooding or past flooding related to storms?

A    I have not studied that site.

Q    And so to the extent that your report refers to risk of flooding, you are not offering any opinions that any specific site at the port will flood under any given scenario.  True?

A    That is correct.

Q    You are intending to offer opinions that sea level rise will occur in the future in accordance with the charts that you have provided in your report, but you are not intended to offer the opinion that given those sea level rises it will have any impact on a specific facility in the Port of New Haven?

A    That is correct.  The details of what happens at a site are very sensitive to the geometry, the elevations and that we do require much more intensive look at the geometry of the site for me to do that, so no, I am not.

Q    You haven't done any analysis of the specific site?

A    No.