**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-JAM |
| v. | |
| EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 3, 2025 |
| Defendants. | |

<u>**MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE THE EXPERT TESTIMONY OF NAOMI ORESKES, PH.D., UNDER RULES 702 AND 403**</u>

Defendants Equilon Enterprises LLC (d/b/a Shell Oil Products US), Triton Terminaling LLC, and Motiva Enterprises LLC ("Defendants") attach the following Memorandum of Law and Facts in support of their Motion to Preclude the Expert Testimony of Naomi Oreskes, Ph.D., under Fed. R. Evid. 702 and 403.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

    I.     Overview of Prof. Oreskes and Her Opinions .......................................... 2

    II.    Prof. Oreskes's Opinions Should Be Excluded Under Federal Rules of
            Evidence 702 and 403 ............................................................................... 3

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

    I.     PROF. ORESKES'S AFFIRMATIVE OPINIONS PROFFERED IN HER
            INITIAL REPORT SHOULD BE EXCLUDED IN THEIR ENTIRETY ............. 7

          A.    Prof. Oreskes Is Not Qualified to Testify Regarding Any Topic at
               Issue in This Case ....................................................................... 7

          B.    Prof. Oreskes's "Methodologies" Are Unreliable ..................................... 9

              1.    Prof. Oreskes's "Methodology" of "Reading and
                   Interpreting Documents" Is No Methodology at All ...................... 9

                   a.    Courts Consistently Hold that Reviewing Documents the
                        Experts Has No First-Hand Knowledge of and Making
                        Their Own Conclusions from that Review Is Not a Reliable
                        Methodology ....................................................................... 9

                   b.    By Her Own Admission, Prof. Oreskes Merely Reads and
                        Interprets Documents ....................................................... 10

               2.    Prof. Oreskes's Reliance on Non-Peer Reviewed Secondary
                   Sources Without Verification Is Not Reliable .............................. 13

               3.    Prof. Oreskes's Use of AI to Identify Documents to Read
                   and Interpret Is Not Reliable ....................................................... 15

          C.    The Opinions Prof. Oreskes Proffers in Her Initial Report Are
               Irrelevant and Do Not Help the Jury ........................................................ 17

              1.    Prof. Oreskes's Affirmative Opinions Are Not Relevant to
                   Any Fact at Issue in the Case ...................................................... 18

                     a.    Prof. Oreskes's opinions do not help the jury to determine
                        whether Defendants operated within the scope of the
                        2018/2021 Permit ............................................................. 18

                   b.    Even by CLF's own flawed interpretation of the 2018/2021
                        Permit, Prof. Oreskes's opinions are not relevant ............. 19

                   c.    Prof. Oreskes does not know who the Defendants are and
                        has done no analysis specific to them .............................. 20

                   d.    Prof. Oreskes's opinions do not help the jury determine
                        whether Defendants' conduct will cause "imminent and

substantial endangerment to human health or the environment"...................................................................... 21

    2.    Prof. Oreskes's Constructed Factual Narrative Based on "Reading and Interpreting" Documents Does Not Help the Jury............................................................................................ 22

        a.    Clear Second Circuit precedent establishes that expert testimony consisting merely of reading and interpreting documents is not helpful to the jury................................. 23

        b.    Prof. Oreskes merely reads and interprets documents and creates a subjective "factual" narrative that cannot help the jury ................................................................................. 24

II.    PROF. ORESKES'S REBUTTAL OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY ........................................................................... 26

    A.    Prof. Oreskes Is Not Qualified to Offer Opinions Regarding Mr. Uhlmann's Alleged "Bias," His Ethical Obligations, Nor the Propriety or Reasonability of Attorney Rates ........................................... 27

    B.    Prof. Oreskes Does Not Use Any Methodology to Opine that Mr. Uhlmann is Biased or Violating His Ethical Obligations ......................... 30

        1.    Prof. Oreskes Fails to Use a Reliable Methodology to Assert that Mr. Uhlmann is Biased ............................................... 31

    c.    Prof. Oreskes Fails to Use a Reliable Methodology to Assert that Mr. Uhlmann's Rate Is Excessive ...................................................................... 31

    d.    Prof. Oreskes's "Evidence" of Mr. Uhlmann's Alleged Bias Belies the Subjectivity of Her "Methodology"................................................................. 33

        2.    Prof. Oreskes Has No Methodology for Asserting that Mr. Uhlmann Has Violated His Ethical Obligations ........................... 34

    C.    Prof. Oreskes's *Ad Hominem* Attacks Against Mr. Uhlmann Do Not Help the Jury Decide Any Issue in this Case .................................... 35

    D.    Prof. Oreskes's Rebuttal Opinions Should be Excluded under Rule 403................................................................................................ 36

CONCLUSION.......................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Amorgianos v. Amtrak,*
303 F.3d 256 (2d Cir.2002)................................................................................................33

*Bermejo v. Amsterdam & 76th Assocs.,*
Index No. 23985/09 (N.Y. Supreme Ct. July 1, 2013) .......................................................32

*City & Cnty. of San Francisco, California v. Env't Prot. Agency,*
604 U.S. 334 (2025)...........................................................................................................20

*Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
No. 19-CV-839 (JBA), 2021 WL 4170757 (D. Conn. Sept. 14, 2021) ..................................10

*Coward v. Owens-Corning Fiberglass Corp.,*
729 A.2d 614 (Sup. Ct. Pa. 1999) ......................................................................................32

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993).................................................................................................. *passim*

*Highland Cap. Mgmt., L.P. v. Schneider,*
379 F. Supp. 2d 461 (S.D.N.Y.)...........................................................................................10

*J.G. v. N.Y.C. Dep't of Educ.,*
719 F. Supp. 3d 293 (Feb. 22, 2024) ..................................................................................15

*Keystone Trans. Solutions, LLC v. Nw. Hardwoods, Inc.,*
2019 WL 1756292, (W.D. Va. Apr. 19, 2019) ........................................................................32

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999).............................................................................................................14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
299 F. Supp. 3d 430 (S.D.N.Y. 2018)...............................................................................12, 13

*Luck v. McMahon,*
No. 3:20-CV-00516 (VAB, 2022 WL 5500934 (D. Conn. Feb. 11, 2022) ............................23

*Mann v. National Review, Inc., et al.,*
2012 CA 008263 B (D.C. Super. Ct July 26, 2021) ......................................................4, 11, 13

*Mann v. National Review, Inc., et al.,*
2012 CA 008263 B (D.C. Super. Ct. Jan. 25, 2022)............................................................12

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013).............................................................................23, 25, 35

*Max Zach v. Marker 17 Marine*,
   No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024)
   (Oliver, J.) .........................................................................................................................12

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
   No. 95 CIV. 3901 (PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999)...................................23

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   593 F. Supp. 2d 549 (S.D.N.Y. 2008)...................................................................................14

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)...................................................................................34

*NAACP, Inc. v. City of Niagara Falls, NY*,
   65 F.3d 1002 (2d Cir. 1995).................................................................................................25

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)..................................................................................... *passim*

*Parsi v. Daioleslam*,
   852 F. Supp. 2d 82 (D.D.C. 2012) .......................................................................................34

*Pugliano v. United States*,
   315 F. Supp. 2d 197 (D. Conn 2004)...................................................................................17

*In re Reserve Fund Sec. and Derivative Litig.*,
   No. 09 CIV. 4346 PGG, 2012 WL 12356742 (S.D.N.Y. Sept. 10, 2012)................................25

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................................24, 34

*Rice v. Williams*,
   No. 7:16-cv-00396, 2017 WL 3197242 (W.D. Va. July 26, 2017) ......................................32

*Ruggiero v. Warner–Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005).................................................................................................17

*Scentsational Techs., LLC v. Pepsi, Inc.*,
   No. 13 Civ. 8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ..........................10, 23

*TMI Tr. Co. v. WMC Mortg., LLC*,
   No. 3:12-CV-1538 (CSH), 2017 WL 6617050 (D. Conn. Dec. 28, 2017)...............................6

*United States v. Cruz*,
   363 F.3d 187 (2d Cir. 2004)...................................................................................................8

*United States v. Jones*,
  965 F.3d 149 (2d Cir. 2020)...................................................................................................7

*United States v. Roldan-Zapata*,
  916 F.2d 795 (2d Cir. 1990)..................................................................................................7

*Wang v. Omni Hotels Mgmt. Corp.*,
  No. 3:18-cv-2000 (CDO), 2025 WL 1782264........................................................................6

**Other Authorities**

Fed. R. Evid. 403 ................................................................................................................36

Fed. R. Evid. 702 ........................................................................................................ *passim*

**INTRODUCTION**

In this case, Plaintiff Conservation Law Foundation ("CLF") alleges that the 2018/2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity (the "2018/2021 Permit"),[1] issued under the Clean Water Act ("CWA") by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"), required Equilon Enterprises LLC (d/b/a Shell Oil Products US), Triton Terminaling LLC, and Motiva Enterprises LLC ("Defendants") to consider various factors like sea level rise, increased precipitation, and increased storm levels (alleged "Climate Change Factors") in developing and implementing the Stormwater Pollution Prevention Plan ("SWPPP") for the New Haven bulk storage terminal (the "Terminal"). *See, e.g.*, Am. Compl. (ECF 47) at ¶ 394. Yet nothing in the 2018/2021 Permit—nor any other statute, regulation, or guidance—states such a requirement. Instead, CLF asserts that this requirement is implied by references to "best industry practice." CLF also asserts that these same alleged failures violate the Resource Conservation and Recovery Act ("RCRA") by allegedly creating an "imminent and substantial endangerment to human health or the environment." *Id*. at ¶¶ 494-98, 500-02.

As a matter of law, the only issues in this case for the Court or the jury to decide (and for experts to weigh in on) are: (1) whether the 2018/2021 Permit includes a requirement to consider Climate Change Factors; and (2) whether failure to consider Climate Change Factors exactly as CLF and its experts believe they should be considered constitutes a violation of the 2018/2021 Permit and represents an "imminent and substantial endangerment to human health or the environment."

---

[1] At the time this lawsuit was filed, the applicable permit was the 2018 General Permit. In 2021, CT DEEP renewed the 2018/2021 Permit without any substantive changes.

In support of its case, CLF offers the opinions of Professor Naomi Oreskes.

## I.    Overview of Prof. Oreskes and Her Opinions

A professor of "the History of Science" at Harvard University, Prof. Oreskes is also a prominent advocate against oil and gas companies, as demonstrated by her books, including *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warning*, which she references throughout her initial Report.

On behalf of CLF, Prof. Oreskes has issued two reports in this case. *See* May 1, 2025 Expert Report of Prof. Oreskes ("Rep."), attached as Ex. A,; July 22, 2025 Rebuttal Report of Prof. Oreskes ("Reb. Rep."), attached as Ex. B. In her initial Report, Prof. Oreskes offers three primary opinions:

- "Opinion One: Scientific consensus confirms that climate change is occurring and has caused, and will continue to cause, a rise in sea levels, more severe weather, increased precipitation, flooding, fires, and other serious consequences." Rep. at 20;

- "Opinion Two: Shell knows and has admitted the reality of climate change." Rep. at 94; and

- "Opinion Three: Despite what it knew and should have known, Shell supported third party organizations that disparaged the credible scientific evidence of climate change and worked to block the meaningful policy that Shell publicly claimed to support." Rep. at 115.

Notably, she admitted to having **never read** the relevant 2018/2021 Permit, Sept. 9, 2025 Dep. of Prof. Oreskes ("Oreskes Dep."), attached as Ex. C, at 65:17-23, and to having no opinion regarding what constitutes "best industry practice," "best management practices," the design of the Terminal, or what is the "state of the art" for facilities like the Terminal, for energy companies more broadly, or for evaluating climate risks. *Id.* at 311:17-21, 311:23-312:4, 107:4-9, 191:15-19, 191:20-24, and 192-11:16.

In her Rebuttal Report, Prof. Oreskes does not respond to or rebut the opinions of any of Defendants' experts—nor could she, since she has no experience as a regulator, engineer, or

scientist. Instead, she makes personal attacks on Defendants' expert David Uhlmann, who served as Assistant Administrator of the Office of Enforcement and Compliance Assurance of the U.S. Environmental Protection Agency ("EPA") in the Biden Administration. *See* Curriculum Vitae of D. Uhlmann, attached as Ex. D, at 1.

Prof. Oreskes asserts that: (1) Mr. Uhlmann has a "conflict of interest" which puts him at odds with his ethical obligations because he is a former regulator now testifying on behalf of Defendants; (2) she "believe[s] that a distinction can be drawn between compensation for expert testimony being provided by highly qualified technical experts who are providing testimony within their disciplines," including, conveniently, her own (non-technical) discipline, and "a former regulator who is now being paid enormous sums by the (still) regulated party"; and (3) "[e]xcessive compensation creates a potential conflict of interest" according to "courts" and, in her view, his involvement in this case and opinions about CLF's interpretation of the 2018/2021 Permit is inconsistent with her interpretation of prior general statements he has made about the importance of citizen suits. Reb. Rep. at 3.

Prof. Oreskes's opinions stated in both reports should be excluded under well-settled law.

## II.    Prof. Oreskes's Opinions Should Be Excluded Under Federal Rules of Evidence 702 and 403

The opinions offered in Prof. Oreskes's initial Report suffer from multiple fatal defects:

*First,* Prof. Oreskes is not qualified to offer opinions regarding any issues relevant to this case, i.e., the meaning of the 2018/2021 Permit and the best practices required to design and operate a facility such as the Terminal as she is not an engineer or a lawyer, and she explicitly disclaims any expertise in permitting and enforcement. *See* Oreskes Dep. at 109:9-13, 263:8-10, 303:21-304:1.

3

*Second*, Dr. Oreskes's report does not "reflect[] a reliable application of the principles and methods to the facts of the case"—as required by the 2023 amendments to Rule 702. Far from applying a reliable methodology, Dr. Oreskes merely "read and interpreted" various documents. Furthermore, much of Dr. Oreskes' report relies on citations to documents that are not primary sources but instead are newspaper articles and blog posts that are expressly intended for a general audience. The District of Columbia Superior Court excluded Dr. Oreskes's proposed opinions that were the product of the same "methodologies," described by her in that case as "reading and thinking," because they were "not the types of 'reliable methodologies typical of an expert witness."[2] This conclusion applies squarely here as well. Moreover, she used artificial intelligence ("AI") to select and identify which documents she ultimately reviewed, but failed to provide any information regarding how that AI engine was trained or what prompts were given to the AI engine.

*Third*, Prof. Oreskes's opinions are irrelevant to any issue in this case, based on the claims alleged in the Amended Complaint and listed in CLF's Notice of Intent. By her own admission, Prof. Oreskes has no opinions regarding the 2018/2021 Permit or the best practices involved in running facilities like the Terminal. Instead, her opinions relate solely to climate change and her belief that Shell plc (who is not a defendant in this case) has long known about the validity of climate change science and has engaged in conduct that she believes is meant to mislead the public about climate change. However, the validity of climate change, Shell's knowledge of climate change, and any alleged misleading statements or actions by Shell regarding climate change are not relevant to either the meaning of the 2018/2021 Permit terms or

---

[2]    Order on Expert Motions in Limine, *Mann v. National Review, Inc., et al.*, 2012 CA 008263 B (D.C. Super. Ct July 26, 2021) ("*Mann* Order"), attached as Ex. E, at 25.

to any of CLF's claims. Moreover, Prof. Oreskes offers no opinions regarding any Defendant; instead, she offers opinions exclusively regarding Shell plc, an entity against which CLF has not asserted any claims. *See* ECF 47; ECF 529. Any opinions regarding non-defendant Shell plc's conduct, policies, or alleged operational control are wholly irrelevant to the liability or penalty determinations that must be made with respect to the actual Defendants.

Therefore, as a matter of evidence law under Rule 702, none of Prof. Oreskes's opinions can assist the jury in deciding any issue in this case. In addition, because Prof. Oreskes is simply, by her explanation, "reading and interpreting" documents discussing events and actions of which she has no first-hand knowledge, her "opinions" do not at all help the jury, who are perfectly capable of "reading and interpreting" these documents themselves if presented to them at trial.

The opinions stated in her Rebuttal Report similarly suffer from multiple fatal defects:

*First*, Prof. Oreskes is not qualified to offer any opinions regarding bias or objectivity generally (let alone Mr. Uhlmann's "bias" specifically), Mr. Uhlmann's ethical obligations, or whether Mr. Uhlmann's hourly rate is "excessive."

*Second*, Prof. Oreskes fails to offer any recognized or objective methodology in support of her rebuttal opinions, instead relying entirely on her subjective opinions that Mr. Uhlmann's rates are too high and that he is not acting in line with Prof. Oreskes's view of what his ethical obligations should be.

*Third*, Prof. Oreskes's testimony blatantly invades the jury's exclusive right to determine whether a witness is biased or credible.

*Fourth*, her rebuttal opinions are inadmissible under Rule 403 because to the extent these opinions have any relevance at all—they do not—any such minimal relevance is outweighed by the danger of undue prejudice and confusion of the jury.

For all these reasons, Defendants respectfully request that the Court exclude the expert testimony of Prof. Oreskes in its entirety.

## **LEGAL STANDARD**

District courts play a "'gatekeeping' function' under Rule 702 and 'are charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-cv-2000 (CDO), 2025 WL 1782264, at *2 (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020)). The importance of the gatekeeping function "cannot be overstated" because expert testimony "can be both powerful and quite misleading because of [a jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal quotations omitted); *see also TMI Tr. Co. v. WMC Mortg., LLC,* No. 3:12-CV-1538 (CSH), 2017 WL 6617050, at *4 (D. Conn. Dec. 28, 2017) ("The principal target of *Daubert* and Rule 702 is the professional expert witness—well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors.").

Federal Rule of Evidence 702 prohibits a witness who is qualified as an expert from testifying unless: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Accordingly, a Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). The party proffering

the expert—here, CLF—bears the burden of establishing Rule 702's requirements by a preponderance of the evidence. *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely,* 414 F.3d at 397 (quoting Fed. R. Evid. 403).

## ARGUMENT

Prof. Oreskes is an advocate who has not proffered any admissible opinions. She has no experience or training in engineering, regulatory, or permitting issues. Further, her methodology is nothing but a review of documents that invades the province of the jury, while her opinions do not "fit" the claims at issue in this case or help the jury. Finally, the opinions she expressed in her Rebuttal Report are mere *ad hominem* attacks on Mr. Uhlmann that are unduly prejudicial and inadmissible.

**I.    PROF. ORESKES'S AFFIRMATIVE OPINIONS PROFFERED IN HER INITIAL REPORT SHOULD BE EXCLUDED IN THEIR ENTIRETY**

**A.    Prof. Oreskes Is Not Qualified to Testify Regarding Any Topic at Issue in This Case**

Rule 702 requires that an expert witness first be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Even so, "[a]n expert may be qualified to testify on certain matters and not others." *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) (citation omitted) (affirming the district court's exclusion of a drug expert's testimony about recordkeeping procedures, for which his expertise was not established); *see also Nimely*, 414 F.3d at 399 n. 13 (Even if an expert witness is qualified in "certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). Accordingly, "district courts, in their role as gatekeepers, must be ever vigilant

7

against expert testimony that could stray from the scope of a witness' expertise." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (holding that the district court "failed to satisfy its obligations as a gatekeeper" by allowing an expert to "stray from the scope of his expertise.").

Prof. Oreskes, by her own clear admissions, is not qualified to offer opinions on any issue relevant to this case. Under CLF's claims, the only question in this case is whether the 2018/2021 Permit, specifically language discussing "best industry practices" and "best management practices," can be interpreted to require Defendants to consider Climate Change Factors when developing and implementing its SWPPPs. As Prof. Oreskes explains in her report, she is a "professional historian of science" who studies "the development of scientific knowledge." Rep. at 10. She is not a lawyer or regulator and claims no expertise in interpreting the requirements of the CWA, RCRA, analogous state laws, or permits issued under any of those laws. Nor is she an engineer or other relevant industry professional claiming expertise regarding "best industry practice" or "best management practices."

Indeed, she readily admitted repeatedly throughout her deposition that she has no relevant expertise to interpret the meaning of Defendants' 2018/2021 Permit. She admitted that she is not an expert in:

- the operation of energy and oil and gas facilities, Oreskes Dep. at 53:14-16 ("Q. Are you an expert in day-to-day operations at oil and gas facilities? **A. No.**");

- permitting or enforcement, *id*. at 303:25-304:1 ("**I have no specific expertise about permitting or enforcement**.") (emphasis added); or

- industrial stormwater permits, *id.* at 60:7-10 ("Q. Do you know what an industrial stormwater permit is? **A. Well, again, this is way outside the scope of my expertise**.").

Further, Prof. Oreskes testified that she has no opinion regarding:

- what is "best industry practice" under any relevant permit, *id*. at 311:17-21 ("[Q.] You're not offering any opinion about what best industry practice is under any of these industrial stormwater permits, correct? **A. Correct.**");

8

- what are "best management practices," *id*. at 311:23-312:4 ("Q. And you're not offering opinions on best management practices under these industrial stormwater permits, or even generally in this case, you're not offering opinions on best management practices, correct? . . . . **A. Correct.**");

- the design of the terminal, *id*. at 107:4-9 ("[Q.] You're not offering any opinions the terminal was poorly designed in any way. . . . **A. I'm not offering any opinions on the design of the terminal.**");

- the "state of the art" for facilities such as the Terminal, *id.* at 191:15-19 ("Q. And you use that term [state of the art] in your report, but I don't believe any of your opinions relate to what was state of the art at a petroleum bulk storage terminal, correct? **A. No.**");

- the "state of the art" for any energy companies in any context, *id.* at 191:20-24 ("Q. And you're not offering any state of the art opinions about any activity by energy companies in your report, are you? . . . . **A. No**. . . ."); or

- the "state of the art" for evaluating climate risk, *id*. at 192-11:16 ("Q. And so you're not offering any opinion on what is the state of art for evaluating climate risk in your report, are you? . . . . **A. No. I'm not.**").

Accordingly, by her own admission, Prof. Oreskes is not qualified to offer opinions on any relevant issue in this case.

  **B.**  **Prof. Oreskes's "Methodologies" Are Unreliable**

    **1.**  **Prof. Oreskes's "Methodology" of "Reading and Interpreting Documents" Is No Methodology at All**

      ***a.***  ***Courts Consistently Hold that Reviewing Documents the Experts Has No First-Hand Knowledge of and Making Their Own Conclusions from that Review Is Not a Reliable Methodology***

Under Rule 702, a judge must determine whether proffered expert testimony is "based on sufficient facts or data," "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). As the Supreme Court explained in *Daubert*, "[m]any considerations will bear on the inquiry, including whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the

existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." *Daubert*, 509 U.S. at 580.

Courts are clear that merely reading documents and reaching conclusions based on one's own interpretation of what one has read does not meet the criteria set out under Rule 702 or under *Daubert*. *See Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 19-CV-839 (JBA), 2021 WL 4170757, at *19 (D. Conn. Sept. 14, 2021) ("Rule 702 demands more than the exercise of an expert's subjective judgment for his or her testimony to be 'reliable' under the Federal Rules, including an explanation of how the expert's subjective judgment is applied to the facts."), *on reconsideration*, No. 19-CV-839 (JBA), 2021 WL 5039035 (D. Conn. Oct. 29, 2021); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y.) (holding it would be improper for an expert to testify "solely for the purpose of constructing a factual narrative based upon record evidence"); *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645 (KBF), 2018 WL 1889763, at *3-4 (S.D.N.Y. Apr. 18, 2018) (holding that an expert may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story.") (citation omitted).

### b.    *By Her Own Admission, Prof. Oreskes Merely Reads and Interprets Documents*

Here, Prof. Oreskes asserts that she "rel[ies] on the explicit and specific methodologies of my profession." Rep. at 10. In her own words, this methodology boils down to "the ***critical reading and interpretation*** of original documents, referred to as 'primary sources.'" Rep. at 11 (emphasis added); Oreskes Dep. at 220:21-24 ("The use of documentary evidence I would say is the dominant historical method, so you could say that I used the dominant or primary historical method."). She later reiterates "[t]he job of the historian is to locate relevant historical

documents, ***to judge their credibility***, and to ***interpret their meaning*** by understanding the context in which they were produced." Rep. at 13 (emphasis added).

Prof. Oreskes's methodology is unreliable by definition. Indeed, Prof. Oreskes has been excluded on these grounds before. In *Mann v. National Review, Inc.*, plaintiff Prof. Mann sued various individuals and entities for making allegedly defamatory statements in blog posts that criticized a model he created purporting to show rising global temperatures. *Mann* Order at 2. There, Prof. Oreskes was disclosed to testify regarding the reliability of scientific research, particularly with regards to climate change, and to opine that entities like one of the defendants in the case "ignore, misrepresent, or reject principled scientific thought on environmental and climate issues." *Id.* at 23.

There, the court held that Prof. Oreskes's "methodologies," described by her in that case as "reading and thinking," were "not the types of 'reliable methodologies typical of an expert witness, which leaves the Court unable to distinguish why Prof. Oreskes is more capable than the average juror, who can also read and think about documents." *Mann* Order at 25 (citing *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (holding that while "reading defendant's works was a necessary component of evaluating them, . . . that does not mean that 'reading,' standing alone, is an acceptable methodology")). The court also went on to explain that her "'reading and thinking' have not been peer-reviewed, have no known success rate, and cannot be replicated by others." *Id*. Moreover, the court found that her "opinion is not derived from the scientific method and is more aptly described as a historical narrative or research compilation than scientific testimony." *Id*. (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (finding that identifying scientific testimony "forces the court to focus on principles and methodology, not

on the conclusions they generate, and thus demands a grounding in the methods and procedures of science, rather than subjective belief or unsupported speculation")).[3]

Perhaps recognizing her methodology at its core cannot survive the rigors of Rule 702, Prof. Oreskes attempts to assert that her interpretation of documents is better than that of a jury's by expounding at length that she and other historians apply their expertise to make these interpretations. Rep. at 10-19. However, Second Circuit precedent is clear that "[i]n the absence of some recognizable, describable methodology," such "appeals to [] qualifications" simply render an expert's opinions "'the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion' that is properly excluded." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 502 (S.D.N.Y. 2018) (quoting *Nimely*, 414 F.3d at 399).

When confronted with an expert who "review[ed] various trader communications" and concluded such communications demonstrated "trader-based manipulation" based on his "vast experience and knowledge gained through his work in the dealing rooms of financial institutions," the Southern District of New York held "[s]uch a vague methodology is not a methodology at all, and it is certainly not a methodology that can or has been tested or one with a known or potential error rate." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 502; *see also Max Zach v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *4 (D. Conn. Oct. 30, 2024) (Oliver, J.) (finding expert opinion unreliable when it was impossible to discern the exact methodology used).

---

[3] The court in *Mann* subsequently allowed Prof. Oreskes to testify on the more limited grounds of "the importance of scientific expertise and the significance of the scientific method and peer review process in scientific debate." *See Mann v. National Review, Inc., et al*, 2012 CA 008263 B, (D.C. Super. Ct. Jan. 25, 2022), attached as Ex. F, at 20. Prof. Oreskes does not offer those opinions here, nor are such opinions relevant to this case.

Indeed, Prof. Oreskes has tried this argument before and failed. In *Mann*, the court explained that while "there are instances where an expert's opinion can be based substantially on her experience, [] in those instances the expert must explain 'how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts.'" *Mann* Order at 25-26 (quoting *Arias v. DynCorp.*, 928 F. Supp. 2d 10, 15-16 (D.D.C. 2013)). The court then concluded, "Prof. Oreskes' opinion is not derived from her personal experience, but rather, it is derived from her review of documents and reports created by third-parties." *Id.* at 26.

Just as the at-issue expert did *In re LIBOR* and as Prof. Oreskes did in *Mann*, Prof. Oreskes here fails to state any objective, testable methodology and instead expects the Court to simply defer to her expertise. When asked at her deposition whether 100 historians reviewing the same materials she did would come to the same conclusions, she asserted without basis that "**if a historian of science with expertise, particularly one who knew something about earth science, would read the same volume of documents, I think all of them, unless they were grotesquely biased, would have come to broadly similar conclusions.**" Oreskes Dep. at 222:25-223:5. Further, when challenged with the idea that her method appeared subjective, she stated simply and without further explanation, "**Well, that's your opinion. I disagree.**" *Id*. at 224:5-8.

Thus, given the above, and as other courts have agreed, Prof. Oreskes's methodology of "reading and interpreting" documents is unreliable as a matter of clear Second Circuit law.

### 2. Prof. Oreskes's Reliance on Non-Peer Reviewed Secondary Sources Without Verification Is Not Reliable

Prof. Oreskes's uncritical use of secondary sources does not comport with the methods used by those in her profession outside of litigation, even by her own admission.

13

Another well-established hallmark of reliability is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 564 (S.D.N.Y. 2008) (excluding expert testimony for failing to rise to intellectual rigors of his field).

Here, Prof. Oreskes relies heavily on non-peer reviewed secondary sources like the New York Times, the Guardian, the LA Times, and CNN throughout her report. *See generally* Rep. As noted above, Prof. Oreskes describes her methodology as "the critical reading and interpretation of ***original documents, referred to as 'primary sources.'***" Rep. at 11 (emphasis added). The American Historical Association ("AHA"), which "provides leadership for the discipline" and has "the largest membership association of historians in the world,"[4] explains in its Statement on Standards of Professional Conduct that the "distinction between primary and secondary sources is among the most fundamental that historians make" and that "the professional practice of history means respecting the integrity of primary and secondary sources ***while subjecting them to critical scrutiny*** and contributing in a fairminded way to ongoing scholarly and public debates over what those sources tell us about the past and also what they fail to illuminate." AHA, *Statement on Standards of Professional Conduct* (2023) (emphasis added), attached as Ex. G, at 2.

However, Prof. Oreskes fails entirely to "critically scrutinize" the secondary sources she cites. Indeed, she admitted that she did not verify the statements these sources made at all. *See, e.g.*, Oreskes Dep. at 156:23-157:10 ("Q. Do you even know which entity owned that North Sea Platform? . . . . **A. Well, the New York Times is generally considered to be a reliable source.**

---

[4] *See* AHA, *About Us* (last accessed Oct. 2, 2025) (available at https://www.historians.org/about/).

**So if they described it as a Shell installation, they say – they refer to it as platforms. The**

**'engineers who build natural gas platforms at Shell Oil do not want to take a chance.' The**

**New York Times is discussing these platforms as ones that are Shell platforms.**"). Accordingly, her failure to apply the same rigor to her work in this litigation as is expected of historians outside of litigation renders her methodology unreliable.

### 3. Prof. Oreskes's Use of AI to Identify Documents to Read and Interpret Is Not Reliable

Finally, Prof. Oreskes's (largely undisclosed and unexplained) use of AI to form her opinions is also unreliable.

As the Supreme Court has recognized, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593. Courts in the Second Circuit demonstrate a high degree of wariness with the use of AI in litigation. *See, e.g., J.G. v. N.Y.C. Dep't of Educ.*, 719 F. Supp. 3d 293, 308 (Feb. 22, 2024) (noting ChatGPT's tendency to fabricate citations and striking evidence generated by ChatGPT in part because proponent did "not identify the inputs on which ChatGPT relied").

Here, Prof. Oreskes "directed the use of AI to examine Shell's relations with a set of think tanks which have been involved in activities that scientific organizations, such as the Royal Society, have identified as being anti-scientific, that have disparaged scientists and/or scientific findings, or that have actively lobbied against climate policies." Rep. at 92. However, she did not disclose in her report which AI engine she used, how it was trained, or what prompts she used to identify relevant documents. At the request of Defendants' counsel for additional information regarding her use of AI (as required by Rule 26), Prof. Oreskes disclosed only that she used ChatGPT. However, upon further discussion in her deposition, she revealed that she did not use

15

the publicly available ChatGPT and instead used a private version, which she could provide very little detail about. Oreskes Dep. at 234:13-21 ("Q. What programs was [the member of Prof. Oreskes's staff who performed the AI searches] using to search? **A. We use ChatGPT on a secure server. And this information has already been supplied.** Q. I know. What is that secure server? **A. I'm getting tired. So I have to go back and check my notes, but I know it's in a document that we supplied to you.**").

While CLF recently disclosed the search terms Prof. Oreskes contends her assistant ran to identify documents, this document still fails to detail how this AI was trained and whether it had access to the broader web or only the documents provided to it. Moreover, most AI engines, including traditional ChatGPT, are not "search term" based; instead, they use prompts, similar to instructing a human on how to do a task. *See* OpenAI, *How do I create a good prompt for an AI model?*, attached as Ex. H (last accessed Oct. 2, 2023) ("When thinking about prompt engineering and prompting large language models, it is important to keep in mind how these models work. They are trained on large corpuses of text which includes many examples of how humans interact via text. **Because of this, the models often perform best when interacted with as if you are sending another human a request.**") (emphasis added). To the extent Prof. Oreskes's team was able to simply run search terms, they either must have provided their version of ChatGPT with at least some prompts instructing ChatGPT how to run the search terms or they had access to a specialized version of ChatGPT that allowed for term-based searching across a database of documents rather than requiring prompts. In either scenario, CLF and Prof. Oreskes have failed to disclose crucial information required for her work to be reproducible.

Here, it is impossible for Defendants' experts to perform the same review as Prof. Oreskes to verify her work and evaluate her methodology. Defendants do not have access to the

16

same ChatGPT as Prof. Oreskes, do not know how the ChatGPT she was using was trained, and do not know what prompts were run against the documents in order to pull the documents she ultimately reviewed. Indeed, it is not clear that even Prof. Oreskes knows any of this, as it was not her, but a member of her staff who performed the AI "searches." *Id*. at 226:3-7 (explaining that a member of her staff "ran the analysis").[5] Accordingly, as no one, including Defendants, could use the information made available by CLF or Prof. Oreskes to precisely repeat her analysis, her methodology is rendered even more unreliable.

***

In short, Prof. Oreskes's AI-assisted "reading and interpreting" of documents is not a reliable methodology under Rule 702 and, instead, is the exact kind of subjective narration Rule 702 was designed to exclude.

### C.    The Opinions Prof. Oreskes Proffers in Her Initial Report Are Irrelevant and Do Not Help the Jury

Rule 702 requires that "an expert's opinion reflects a reliable application of the principles and methods to the facts of the case," i.e., the so-called 'fit' requirement." *Pugliano v. United States*, 315 F. Supp. 2d 197, 202 (D. Conn 2004). An expert must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 255 (2d Cir. 2005); *Pugliano*, 315 F. Supp. 2d at 202.

In addition, expert testimony that usurps the role of the jury is, as a matter of settled law, not helpful to the jury. *Nimely*, 414 F.3d at 397 ("We have consistently held, in that respect, that

---

[5] Counsel for Defendants and CLF's counsel conferred on October 2nd regarding Prof. Oreskes's continued failure to disclose materials and information relating to her AI review. The parties have agreed that they are at an impasse with regards to this issue and intend to raise it with the Court shortly.

expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus 'attempts to substitute the expert's judgment for the jury's.'") (internal marks and cites omitted).

As Prof. Oreskes's opinions are not relevant to any fact at issue in this case and also invades the role of the jury, her affirmative opinions should be excluded under the "fit" prong of Rule 702.

> **1.      Prof. Oreskes's Affirmative Opinions Are Not Relevant to Any Fact at Issue in the Case**
>
> > *a.      Prof. Oreskes's opinions do not help the jury to determine whether Defendants operated within the scope of the 2018/2021 Permit*

The central issue to be decided in this case is whether the 2018/2021 Permit required Defendants to perform "climate change assessments" to be incorporated in the SWPPP. The case does not concern the cause of climate change, international treaties on climate change, or the conduct and/or knowledge of non-defendant Shell entities. Prof. Oreskes's three opinions relate to scientific "consensus" regarding climate change and related consequences, non-defendant Shell plc's alleged knowledge of climate change, and her belief that non-defendant Shell plc has engaged in efforts to deceive the public regarding climate change and its own efforts to combat it. Not one of these opinions even attempts to broach the requirements stated by the 2018/2021 Permit.

Indeed, in her deposition, Prof. Oreskes readily admitted that she had *never even seen* any of the Terminal's permits and that she is offering no opinion on what any of the 2018/2021 Permits here require. Oreskes Dep. at 65:17-23 ("Q. Have you reviewed any permit in this

18

lawsuit? **A. No, I have not.** Q. And you're not offering any opinions on what a permit requires or does not require in this lawsuit, correct? **A. Correct.**").

In her deposition, Prof. Oreskes argued that her opinions were relevant to the claims in the case because "broadly my understanding of the complaint is that, as part of the requirements of the 2018/2021 Permit under which Shell and its subsidiaries operate the installations in question, Shell is required to reveal all known risks, and Shell is required to update its understanding of those risks in light of new information that may come to light," and, per Prof. Oreskes, her "expertise is relevant to the matter of what risks Shell did or did not disclose in relation to the operation of this installation." Oreskes Dep. at 37:3-10, 37:22-24.

But Prof. Oreskes admitted that she has never seen the 2018/2021 Permit and, indeed, her understanding of what the 2018/2021 Permit requires is based entirely on CLF's counsel's interpretation of the 2018/2021 Permit. *Id*. at 95:6-96:4 (explaining that "**[c]ounsel [for CLF] directed my attention to the portion of the complaint that begins on page 85, Count VIII**" and discusses the alleged "**permit requirement to supply information relevant to risks**" to CT DEEP). In other words, CLF's counsel asked Prof. Oreskes to assume that its allegations regarding *the ultimate issue in the case that the jury must decide* is true. Accordingly, Prof. Oreskes's opinions necessarily cannot help the jury to decide this issue.

### b.    *Even by CLF's own flawed interpretation of the 2018/2021 Permit, Prof. Oreskes's opinions are not relevant*

Even if the 2018/2021 Permit imposed a requirement upon Defendants to inform CT DEEP of risks at the Terminal related to Climate Change Factors (it does not), the validity of climate change science, non-defendant Shell plc' knowledge of climate change, and any allegedly deceitful conduct regarding climate change are not relevant to whether or not Defendants violated the terms of the 2018/2021 Permit.

Under the CWA, permit violations are a matter of strict liability; either a party has violated a permit or it has not. *City & Cnty. of San Francisco, California v. Env't Prot. Agency*, 604 U.S. 334, 350 (2025) ("The CWA imposes a regime of strict civil liability[.]"). The causes of action brought by CLF do not lie in negligence and, accordingly, the historical state of knowledge regarding climate change, non-defendant Shell plc's alleged knowledge of climate change, and whether or not non-defendant Shell plc sought to deceive the public regarding climate change are not relevant. Indeed, CLF's 30(b)(6) representative admitted as such. *See* Excerpts from June 4, 2025 Deposition of S. Mahoney, attached as <u>Ex. I</u>, at 64:9-17 ("Q. No fraud counts – claims? . . . . **A. I'm not aware of any fraud claims.**"), 61:10-22 ("Q. . . . . [J]ust so we're clear, CLF is not making any claims that are not in the complaint; correct? . . . . **A. The complaint speaks for itself**. Those are the claim that CLF has brought. Q. So if it's not in the complaint, they're not bringing a claim for it? . . . **A. Not as I sit here today.**").

c.    ***Prof. Oreskes does not know who the Defendants are and has done no analysis specific to them***

Indeed, even if a defendant's knowledge of or conduct pertaining to climate change discussions *were* relevant to CLF's claims, Prof. Oreskes offers no opinions relevant to any Defendant in this case. Prof. Oreskes fails to mention Defendants Equilon Enterprises, LLC and Triton Terminaling, LLC anywhere in her report. Oreskes Dep. at 118:8-14 ("[Q.] Your report, your expert report, dated May 1, 2025, actually never mentions Triton Terminaling, LLC, does it? **A. No, it does not.** Q. And your report does not mention Equilon Enterprises, LLC, either, does it? **A. No, it does not.**"). Prof. Oreskes mentions Defendant Motiva Enterprises, LLC only once in her report, and only in reference to another facility not at issue in this case. *Id.* at 118:15-18 ("Q. And there is only one reference to the Defendant Motiva in your report, correct? **A. I'd have to double-check, but that sounds right to me.**"), 119:2-24 (Prof. Oreskes admitting that

20

she doesn't know if the "Motiva oil tank facility" discussed in an email included in her report is referencing the Terminal).

Further, she admitted that when identifying relevant documents to build her opinions, she made no effort to identify documents relating to Defendants. *Id*. at 238:6-19. ("Q. Did you do any searches that involved Triton Terminaling with AI? **A. I'd have to double-check, but my recollection is no.** Q. Did you use AI to identify or interpret any documents from Equilon Enterprises, LLC? **A. I'd have to double-check, but my recollection is no.** Q. How about Motiva Enterprises, LLC, did you use AI to identify or analyze or evaluate documents on the terminal. **A. I'd have to check my notes, but my recollection is no.**"). She also admits to offering no opinions regarding whether any Defendant denies the existence of climate change. *Id*. at 130:7-23.

Instead, Prof. Oreskes's opinions focus on the conduct of non-defendant Shell plc (referred to in her report simply as "Shell")— the ultimate parent company of Triton and Equilon, both of which are separately incorporated companies, and an entity that has never been a named Defendant—rather than the conduct of any Defendant in this case. However, by her own admission, she is "not an expert on corporate structure" and, thus, unable to opine on the relationships between any Defendant and the entities she actually discusses in her report. *Id*. at 99:19-20 ("**I don't know. I'm not an expert on corporate structure.**").

Thus, as Prof. Oreskes's opinions do not actually relate to any Defendant, her opinions are not relevant and should be excluded.

> **d.**     ***Prof. Oreskes's opinions do not help the jury determine whether Defendants' conduct will cause "imminent and substantial endangerment to human health or the environment"***

Just as with CLF's CWA claims relating to the 2018/2021 Permit, Prof. Oreskes makes no mention of RCRA anywhere in her report. In her deposition, she admitted to having no opinions

relating to RCRA. Oreskes Dep. at 67:10-12 ("[Q.] Are you offering any opinions about RCRA? **A. No, I am not.**").

In addition, the same conduct that CLF alleges as the basis of its CWA claim forms the basis of its RCRA claim. Am. Comp. at ¶¶ 493-98, 500-01, 506, 509-10, 513 (alleging that failure to consider Climate Change Factors violated RCRA). Accordingly, as Prof. Oreskes disclaims any opinions regarding the design or operation of facilities like the Terminal or the regulation of stormwater, her opinions are not relevant to CLF's RCRA claims. Oreskes Dep. at 312:5-8 ("Q. You're not offering opinions on good engineering practice, either, are you? . . . . **A. Correct.**"), 191:20-24 ("Q. And you're not offering any state of the art opinions about any activity by energy companies in your report, are you? . . . . **A. No.** . . ."), 192-11:16 ("Q. And so you're not offering any opinion on what is the state of art for evaluating climate risk in your report, are you? . . . . **A. No. I'm not.**"), 60:18-21 ("Q. And you're not offering any opinions about the regulation of stormwater in the United States? **A. No.**"), 107:4-9 ("[Q.] You're not offering any opinions the terminal was poorly designed in any way. . . . **A. I'm not offering any opinions on the design of the terminal.**").

***

Accordingly, as Prof. Oreskes's opinions in her affirmative report do not "fit" the issues to be resolved by the jury in this case, they should be excluded.

### 2.    Prof. Oreskes's Constructed Factual Narrative Based on "Reading and Interpreting" Documents Does Not Help the Jury

Even if the existence of climate change and/or Defendants' knowledge of climate change were at all relevant to the case (which, as discussed above, they are not), Prof. Oreskes's "opinions" consist wholly of creating a factual narrative based on her review of documents, including case materials, testimony, etc., in a manner that invades the province of the jury.

22

#### *a.*      *Clear Second Circuit precedent establishes that expert testimony consisting merely of reading and interpreting documents is not helpful to the jury*

"It is well-settled that 'expert testimony is excluded under Rule 702 if it is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" *See Luck v. McMahon*, No. 3:20-CV-00516 (VAB), 2022 WL 5500934, at *7 (D. Conn. Feb. 11, 2022) (quoting *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 2010 WL 2978289, at *2-6 (D. Conn. Apr. 9, 2010)). As a matter of clear law in the Second Circuit, expert testimony that consists merely of reviewing documents of which the witness has no first-hand knowledge and creating factual narratives based on those documents—in addition to being unreliable, as discussed above—is unhelpful to the jury, as the expert is no better positioned to read these documents and come to conclusions about them than the jury. As the Second Circuit has held, while experts are permitted to rely on hearsay, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony" and, instead, "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 558, 666 (S.D.N.Y.2007) (affirming exclusion of historian expert testimony regarding business practices of Marvel); *see also Scentsational Techs., LLC*, 2018 WL 1889763, at *4 ("Most typically, and certainly here, experts are not percipient witnesses. They are witnesses who, by virtue of specialized expertise, are able to provide opinions or information beyond the ken of the layperson. It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'"); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 CIV. 3901 (PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (excluding expert "testimony

[that] is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties").

In a pharmaceutical product liability case, the plaintiffs proffered an expert to testify about the "history" of the drug Rezulin by providing "a narrative reciting selected regulatory events concerning Rezulin, including Advisory Committee meetings, labeling changes, 'Dear Doctor' letters, and approval and withdrawal decisions by regulators in the United States and abroad." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004). But the Southern District of New York found that the expert's testimony consisted merely of "a narrative of the case which a juror is equally capable of constructing," noting that "the material [cited by the expert], to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence." *Id*. The court ultimately excluded the expert, concluding that he would do "no more than counsel for plaintiff will do in argument, i.e., propound a particular interpretation of [defendant's] conduct." *Id*. (citing *GST Telecomm., Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000) ("In short, the Court should not shift to [expert] witnesses the responsibility to give conclusory opinions and characterizations of the business conduct portrayed[.]")).

> b.    ***Prof. Oreskes merely reads and interprets documents and creates a subjective "factual" narrative that cannot help the jury***

As discussed above, Prof. Oreskes's methodology consists of "the critical reading and interpretation" of documents, including "judg[ing] their credibility" and "interpret[ing] their meaning." Rep. at 11, 13. Accordingly, in line with well-established Second Circuit precedent discussed above, her testimony is unhelpful to the jury, who are perfectly capable of reading, interpreting, and judging the credibility of these documents themselves.

24

However, in an attempt to "prebut" this very argument, Prof. Oreskes cites to several cases or articles describing cases that, by her interpretation, stand for the idea that historian testimony such as hers is, as a matter of law, helpful and admissible. Rep. at 17, n. 29. But these cases do not stand for this assertion. Instead, these are all cases where historical meanings of terms and historical practices were all at issue. For example, she references *NAACP, Inc. v. City of Niagara Falls, NY*, 65 F.3d 1002, 1020 (2d Cir. 1995), where the Second Circuit noted that part of the plaintiffs' burden to prove their Voting Rights Act claim was to demonstrate "a history of official discrimination that has touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." By contrast, here, such "historical narratives" are not relevant to any issue in the case. Again, the sole issue is whether Defendants complied with the 2018/2021 Permit.

The Second Circuit recognizes that a historian may help a jury in "some cases," such as in cases where, without such interpretation, historical "evidence [] would otherwise elude, mislead, or remain opaque to a layperson," where the expert "might helpfully synthesize dense or voluminous historical texts," or "offer background knowledge or context that illuminates or places in perspective past events." *Marvel Characters, Inc.*, 726 F.3d at 135-36.

But this case is not one of those limited instances. Prof. Oreskes does not demonstrate that the materials she reads and interprets are so complex or so far back in time as to require expert interpretation for the jury to understand. Indeed, as noted above, throughout her reports, she cites frequently to articles from sources like the New York Times, NBC News, and the Guardian, all of which are aimed at an audience of laypeople. *See In re Reserve Fund Sec. and Derivative Litig.*, No. 09 CIV. 4346 PGG, 2012 WL 12356742, at *3 (S.D.N.Y. Sept. 10, 2012) (holding that expert opinion meant to provide "historical context" about 2008 financial crash

25

based in large part on quotes and cites from newspaper articles involved "no specialized knowledge that might assist the jury" and, instead, merely served to make the expert "no more than a mouthpiece for hearsay"). In addition, the events she discusses in her report date to no more than a century ago, with the bulk of her report focusing on the last 50 years.

Thus, as the jury is just as capable of reading and understanding the documents Prof. Oreskes relies upon, her opinions are not helpful to the jury and her testimony should be excluded.

## II.    PROF. ORESKES'S REBUTTAL OPINIONS SHOULD BE EXCLUDED IN THEIR ENTIRETY

In her Rebuttal Report, rather than challenging the substance of any expert disclosed by Defendants, Prof. Oreskes asserts that she is an expert on bias and credibility of witnesses. Oreskes Dep. at 293:17-20. She focuses exclusively on Mr. Uhlmann, an environmental lawyer and former regulator with deep experience regarding the interpretation, implementation, and enforcement of the CWA and RCRA. Rep. at 1. She claims that, based on her own subjective "methodology," she can conclude that Mr. Uhlmann has a conflict of interest and is biased. She argues this is so primarily because, in her view, his hourly rate is too high. Rep. Rep. at 3. She also objects to his role as an expert for Defendants, because of his prior work enforcing environmental regulations and defending the importance of citizen suits generally. *Id.*

In his report, Mr. Uhlmann asserts that Defendants' practices were in line with the stormwater pollution prevention requirements in the 2018/2021 Permit, that Defendants did not "create an imminent and substantial endangerment" under RCRA, and that Defendants' corporate parents did not actively control operations at the Terminal. June 23, 2025 Expert Rep. of D. Uhlmann ("Uhlmann Rep."), attached as Ex. J, at 2-3. Prof. Oreskes, however, does not address the substance of any of these opinions in her Rebuttal Report. Oreskes Dep. at 256:25-257:12

26

("Q. You're not offering any opinions that Mr. Uhlmann's technical opinions in his expert report are wrong in any way, are you? **A. That's correct.** . . . Q. In fact, his opinions may very well be correct. You don't have any opinion; is that true? **A. I don't have an opinion one way or the other.**"). Instead, she attacks Mr. Uhlmann himself, implying repeatedly that he is a "**hired gun.**" Reb. Rep. at 3, 4.

> **A.    Prof. Oreskes Is Not Qualified to Offer Opinions Regarding Mr. Uhlmann's Alleged "Bias," His Ethical Obligations, Nor the Propriety or Reasonability of Attorney Rates**

Prof. Oreskes concludes that Mr. Uhlmann is biased and violated his ethical obligations based almost entirely on her assertion that his hourly rate is too high. But Prof. Oreskes is not qualified to testify as to any of these topics.

*First,* while Prof. Oreskes brazenly testified that she is "**claiming expertise about objectivity and the questions of what kinds of factors can compromise a person's objectivity**," Oreskes Dep. at 293:17-20, as a matter of well-settled law, "bias" is not a topic on which experts are qualified to testify. In no way is Prof. Oreskes an expert on "bias." Instead, as courts in the Second Circuit and across the country have long held, the ability to decide whether a witness testifying at trial is "biased" or not belongs solely to the fact-finder. *Nimely*, 414 F.3d at 398 (citing *U.S. v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

*Second*, Prof. Oreskes is not qualified to discuss Mr. Uhlmann's "ethical obligations." Prof. Oreskes asserts that "there are ethical issues related to exceptional levels of compensation" and that, in Mr. Uhlmann's case, this creates a "potential conflict of interest associated with an 'expert' who is being paid very large sums of money to defend an entity that, only a few years or even months before, was the subject of regulation by the agency for which he or she worked." Reb. Rep. at 3. However, she states no concrete grounds for asserting what these "ethical obligations" are or what her qualifications to proffer such opinions are. Instead, she refers

27

vaguely to her expertise in the history of science, asserting, without support, that her work involves assessing "ethical questions about objectivity, impartiality, and bias" and referencing her own book *Merchants of Doubt*, where she made several claims about various entities' and individuals' bias. *Id*. at 2.

Prof. Oreskes admitted she is not an expert in the ethical obligations of lawyers (Mr. Uhlmann's profession) or on the Rules of Professional Responsibility. Oreskes Dep. at 258:19-25 ("Q. Do you know what the Rules of Professional Responsibility are for lawyers? . . . . **A. I mean, I have a general idea. I'm sure I've seen reference to it, but I'm certainly not an expert on that.**"). Instead, she falls back on her assertion that she is "**an expert is scientific objectivity**" (a self-professed area of expertise for which she cites no establishing criteria other than apparently her own say-so). *Id*. at 256:16-20 ("Q. Are you an expert in legal ethics? **A. No. But I'm an expert in scientific objectivity, and that was the basis for the main discussion in this Rebuttal Report.**"). Prof. Oreskes could not, however, provide any authority to support her opinions about "scientific objectivity," other than her own say-so.

Moreover, Mr. Uhlmann is not a scientist and is not offering scientific opinions. Instead, as noted, his opinions all relate to his experience as a regulator enforcing the CWA and RCRA, which Prof. Oreskes admits she has no expertise in. *Id*. at 256:21-24 ("Q. I think you previously testified you did not have any expertise in the Clean Water Act or RCRA; is that correct? **A. Correct.**").

Further, despite claiming to be an expert on bias and objectivity, Prof. Oreskes herself is clearly biased. Outside of this litigation, Prof. Oreskes has primarily made a name for herself as a climate advocate focused on holding oil and gas companies "accountable" for climate change. For example, in 2012, Prof. Oreskes "conceived" of and co-led a "workshop" titled "Establishing

28

Accountability for Climate Change Damages: Lessons from Tobacco Control," where participants "sought to compare the evolution of public attitudes and legal strategies related to tobacco control with those related to anthropogenic climate change," including the "most promising and mutually reinforcing intellectual, legal, and/or public strategies for moving forward." Climate Accountability Institute & Union of Concerned Scientists, *Establishing Accountability for Climate Change Damages: Lessons from Tobacco Control*, *Summary of the Workshop on Climate Accountability, Public Opinion, and Legal Strategies* (Oct. 2012), attached as Ex. K, at 2-4.

Participants, including Prof. Oreskes, noted that "[a] key breakthrough in the public and legal case for tobacco control came when internal documents came to light showing the tobacco industry had knowingly misled the public" and that "**[s]imilar documents may well exist in the vaults of fossil fuel industry and their trade associations and front groups**, and there are **many possible approaches to unearthing them.**" *Id*. at 4 (emphasis added). The workshop specifically highlighted the use of litigation as a way to unearth and publicize these internal documents for the purpose of furthering advocacy efforts, with one participant noting, "**that bringing documents to light must be established as an objective independent of the litigation, or else the most valuable documents are not likely to be made public.**" *Id*. at 9. In short, this publication casts doubt on the true nature of Prof. Oreskes participation in this litigation—is she here as a neutral expert seeking to provide specialized expertise in order to educate and assist the jury, or is she an advocate seeking only to misuse the access she has now been granted to Defendants' confidential internal documents with the goal of furthering her

29

advocacy efforts outside of litigation? Given the facially obvious lack of relevance her opinions have to this litigation, it appears the latter is the case.[6]

*Third*, Prof. Oreskes is not an expert in assessing whether or not any professional's rates, let alone a lawyer's hourly rates, are excessive or unreasonable. Her report fails to state any grounds for such expertise. Indeed, Prof. Oreskes admitted without hesitation that she is not an expert in the compensation of expert witnesses. *Id*. at 293:7-9 ("[Q.] Are you an expert in the compensation of expert witnesses? **A. No, I'm not.**").

***

Accordingly, as Prof. Oreskes lacks expertise on bias, Mr. Uhlmann's ethical obligations, or on the reasonability of expert fees, she is not qualified to offer the opinions she asserts in her Rebuttal Report.

### B.      Prof. Oreskes Does Not Use Any Methodology to Opine that Mr. Uhlmann is Biased or Violating His Ethical Obligations

One of the core requirements under Rule 702 is that an expert witness's opinions must be "based on sufficient facts or data," "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Courts assess a number of factors to determine reliability, such as "whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." *Daubert*, 509 U.S. at 580. Here, Prof. Oreskes fails to identify

---

[6] Counsel for Defendants have already raised serious concerns with CLF regarding Prof. Oreskes's use of AI and what steps, if any, were used to ensure that Defendants' confidential documents were not exposed to the public. CLF's counsel responded that they would speak with Prof. Oreskes and follow up with Defendants' counsel.

any reliable methodology to support her opinions that Mr. Uhlmann's rates are excessive or that

he has somehow run afoul of any ethical obligation.

1.  **Prof. Oreskes Fails to Use a Reliable Methodology to Assert that Mr. Uhlmann is Biased**

a.  ***Prof. Oreskes Fails to Use a Reliable Methodology to Assert that Mr. Uhlmann's Rate Is Excessive***

While Prof. Oreskes offers the opinion that Mr. Uhlmann's hourly rate is "excessive,"

Reb. Rep. at 3, she failed to perform any objective, recognized methodology to make that call.

For example, Prof. Oreskes did not perform a survey of hourly rates across the legal industry.

Oreskes Dep. at 290:19-21. Nor did she look at hourly rates for lawyers in Washington, D.C.,

where Mr. Uhlmann practices. *Id*. at 291:7-13. Nor did she do any analysis of expert witness

rates in other cases, including federal cases, in the State of Connecticut. *Id*. at 292:3-7.

Instead, as Prof. Oreskes explains, her method for assessing that Mr. Uhlmann is biased is

based primarily on her observation that his hourly rate is higher than the hourly rates of the other

experts disclosed by Defendants, the majority of which are not lawyers but geologists and

engineers. Oreskes Dep. at 286:17-23 ("Q. So it's purely hourly rate that you were focused on?

**A. Because we have information about his, and other experts' hourly rate, and his hourly**

**rate is fully four or five times as great in some cases, almost ten times as great as some of**

**the other experts.**"). She gave no consideration to the roles or professions of the various experts

when assessing their respective rates. *Id*. at 287-24-288:2 ("**You know, we don't have limitless**

**time, and I feel like you can accept that I have not looked into the details of their**

**backgrounds.**"). She did not even look at the rates of CLF experts, merely because CLF's

counsel did not instruct her to do so. *Id*. at 289:4-8 ("Q. Did you look at the rates that CLF

experts were charging? **A. No, I did not.** Q. Why not? **A. I wasn't asked to review that.**").

31

Indeed, by her own method, because Prof. Oreskes's rate of $600 per hour is higher than the rate of any of the other experts she lists, her rates are also not reasonable.

Prof. Oreskes alternatively turns to her interpretation of case law from various jurisdictions discussing expert compensation, all of which she asserts supports her conclusion that Mr. Uhlmann's "excessive" fees make him per se biased. Reb. Rep. at 4-6. However, not only is she not a lawyer and not qualified to interpret case law, a simple reading of these cases makes clear that they in fact do not stand for the assertion that Mr. Uhlmann is biased:

- In *Rice v. Williams*, the court held that an expert's past compensation by the defendants as a consulting expert in other matters was relevant and admissible "for the narrow purpose of assessing the issue of bias or prejudice" for consideration by the jury. No. 7:16-cv-00396, 2017 WL 3197242, at *4-5 (W.D. Va. July 26, 2017). This case does not stand for the position that an expert witness can offer opinions on another expert's compensation or bias.

- In *Coward v. Owens-Corning Fiberglass Corp.*, the court affirmed a trial court's decision that cross-examination regarding an expert's past compensation in other similar litigation did not establish grounds for a mistrial. 729 A.2d 614, 626 (Sup. Ct. Pa. 1999). Again, the court did not assert an expert was biased and certainly did not allow another expert to testify with regards to the expert's compensation or bias.

- With regards to *Bermejo v. Amsterdam*, Defendants were unable to identify an order; Prof. Oreskes cites to a blog post and a New York Law Journal article discussing the decision. *See* Reb. Rep. at 5 n. 14; *see also* Transcript, *Bermejo v. Amsterdam & 76th Assocs.*, Index No. 23985/09 (N.Y. Supreme Ct. July 1, 2013).[7] There, the court focused on the fact that the expert in question lied on the stand about what he did for the case, which the court deemed particularly problematic because the expert was "making millions of dollars doing IME's decides that he is going to lie." *Id*. Again, the court does not assert that the expert's compensation made him per se biased, nor that any other expert in the case could testify about his bias or compensation.

- In *Keystone Trans. Solutions, LLC v. Nw. Hardwoods, Inc.*, the court took issue not with the structure, not the amount, of the expert's compensation because he was compensated based on the outcome of the case, giving him a "clear, substantial, and direct financial stake in this litigation." 2019 WL 1756292, at *3, *6 (W.D. Va. Apr. 19, 2019). In the present case, Mr. Uhlmann's compensation is not tied to the outcome of the litigation; his pay will not change, regardless of whether Defendants win or lose. Finally, *Keystone* does not stand for the idea that a certain amount of

---

[7] (available at https://newyorkpersonalinjuryattorneyblog.com/wp-content/uploads/2013/07/July-1-Transcript.pdf).

compensation makes an expert per se biased or that another expert may testify with regards to another expert's compensation or bias.

Ultimately, by her own admission, her belief that Mr. Uhlmann's rate is excessive is "**obviously . . . a judgment call.**" Oreskes Dep. at 290:11-12. She goes on to explain that "**[p]eople have different opinions about what constitutes excessive.**" *Id.* at 290:12-13. This kind of subjective speculation is improper and inadmissible *ipse dixit*. *See Amorgianos v. Amtrak,* 303 F.3d 256, 266 (2d Cir.2002) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

### b.    *Prof. Oreskes's "Evidence" of Mr. Uhlmann's Alleged Bias Belies the Subjectivity of Her "Methodology"*

Prof. Oreskes further demonstrates her subjectivity in developing her opinions regarding Mr. Uhlmann by comparing his report to his past public statements. Specifically, she asserts that opinions expressed in his report are not consistent with statements he made while in government. However, Prof. Oreskes's deposition testimony makes clear that she does not base her opinion on any specific, concrete discrepancies between positions Mr. Uhlmann has taken in the past and his positions in this case. For example, she appears to assert that if he truly supports the use of citizen suits as a means of enforcement of environmental policy, a position he has taken in the past, then he should automatically find this specific citizen suit valid without consideration of any of the factual circumstances of the case. Oreskes Dep. at 306:6-23 ("Q. Does [Mr. Uhlmann's stance that a citizen suit cannot be brought on the bases asserted in this case under the terms of the 2018/2021 Permits] suggest that Mr. Uhlmann is not in favor of citizen suits**? A. It's not clear, but it suggests that he's not in favor of this particular citizen suit, which struck**

33

**me as surprising, given the expansive view of citizen suits that he had expressed in the webinar only a few months before.**").

### 2. Prof. Oreskes Has No Methodology for Asserting that Mr. Uhlmann Has Violated His Ethical Obligations

While Prof. Oreskes asserts that Mr. Uhlmann has perhaps violated his ethical obligations, she can identify no methodology for coming to this conclusion either, other than her own belief that his compensation is too high.

As courts in the Second Circuit and other jurisdictions have made clear, "opinions concerning purported ethical standards" that are "based on [an expert's] personal, subjective views . . . do not meet the core requirement of Rule 702 that expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation'" and, accordingly, "[s]uch speculative testimony . . . cannot serve as the predicate for any purported industry ethical standard." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. at 543 (excluding expert testimony regarding ethical obligations of defendant); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 486–87 (S.D.N.Y. 2016) ("She is not qualified to opine on—nor does she purport to use—FDA or any other objective standards, and we are left with a vague notion that in her personal opinion Bayer's conduct was inadequate. This is impermissible expert testimony."); *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (finding that while identifying applicable professional standards and assessing defendant's conduct in light of those standards is clearly "an acceptable area for expert testimony," . . . . [a]n expert proposing to testify about professional standards must, however, identify specific and objective standards, not rely on his personal opinions about what professional standards should be.").

As stated above, Prof. Oreskes admits that she is not qualified to opine on a lawyer's ethical obligations and lacks knowledge of the Rules governing those obligations. *See* Oreskes

34

Dep. at 258:19-25 ("Q. Do you know what the Rules of Professional Responsibility are for lawyers? . . . . **A. I mean, I have a general idea. I'm sure I've seen reference to it, but I'm certainly not an expert on that.**"), 256:16-20 ("Q. Are you an expert in legal ethics? **A. No. But I'm an expert in scientific objectivity, and that was the basis for the main discussion in this Rebuttal Report.**"). Accordingly, Prof. Oreskes's testimony regarding Mr. Uhlmann's bias and ethical obligations are based on pure *ipse dixit* rather than any recognized methodology or standard and, accordingly, should be excluded.

> C.      **Prof. Oreskes's *Ad Hominem* Attacks Against Mr. Uhlmann Do Not Help the Jury Decide Any Issue in this Case**

As discussed above, the final consideration under Rule 702 is that an expert's testimony must help the jury decide a fact at issue. *See* Fed. R. 702. As a matter of clear law, Prof. Oreskes cannot offer testimony regarding the credibility of any expert in the case, Mr. Uhlmann included, as such assessments are solely within the province of the jury.

Under well-settled law Second Circuit law, "expert opinions that constitute evaluations of witness credibility . . . are inadmissible." *Nimely*, 414 F.3d at 398 (citing *U.S. v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)); *Marvel Characters, Inc.*, 726 F.3d at 136 ("And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder.").

As noted, Prof. Oreskes holds herself out as an expert on "**objectivity and the questions of what kinds of factors can compromise a person's objectivity.**" Oreskes Dep. at 293:17-20. While she later agreed that bias is a question for the jury to decide, she re-asserted that it is her role as "**an expert about bias, to raise the question so that it can be put in front of a jury.**" *Id*. at 307:19-21. On its face, this position is contrary to law. Indeed, even if Prof. Oreskes had applied a reliable, objective, and recognized methodology to make her assertion (which she did

35

not), Second Circuit law is clear that expert opinion about credibility is inadmissible "even when such evaluations are rooted in scientific or technical expertise," *Nimely*, 414 F.3d at 398, which, as stated hers are not.

### D.        Prof. Oreskes's Rebuttal Opinions Should be Excluded under Rule 403

Finally, to allow Prof. Oreskes to offer testimony asserting that Mr. Uhlmann is biased runs afoul of Federal Rule of Evidence 403.

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Second Circuit and Supreme Court recognize "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595). The Supreme Court further emphasizes that because expert testimony has a greater chance of misleading the jury, a court evaluating potential prejudice under Rule 403 "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. Specifically, with regard to proposed expert testimony regarding bias and credibility, the Second Circuit previously held in *Nimely* that "it was an abuse of the district court's substantial discretion in such matters to determine that [an expert] vouching for [other witnesses'] veracity—even were it otherwise admissible—was not prejudicial, confusing, and misleading to the jury within the meaning of Rule 403." *Nimely*, 414 F.3d at 398.

Here, Prof. Oreskes seeks to proffer opinions about bias and credibility, relying exclusively on her self-proclaimed expertise. Allowing her to impugn Mr. Uhlmann's objectivity and credibility based only on her own subjective views—while offering zero evidence regarding any fact actually at issue—would be the very definition of "unfair prejudice."

36

Accordingly, Prof. Oreskes's rebuttal opinions should also be excluded under Rule 403.

## CONCLUSION

Given the above, Defendants respectfully request that the Court grant their Motion to

Preclude the Expert Testimony of Naomi Oreskes under Federal Rules of Evidence 702 and 403.

Dated: October 3, 2025                     Respectfully submitted,

*/s/ Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)

37

WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

38

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will affect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

1