# Exhibit C

# Filed Under Seal

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


----------------------------x

CONSERVATION LAW FOUNDATION, INC.,

          Plaintiff,                    Case No.

   vs.                            3:21-cv-00933-VDO

EQUILON ENTERPRISES LLC d/b/a

SHELL OIL PRODUCTS US, TRITON

TERMINALING LLC, and MOTIVA

ENTERPRISES LLC,

          Defendants.

----------------------------x




          VIDEOTAPED DEPOSITION OF

            NAOMI ORESKES, PH.D.

        Tuesday, September 9, 2025

              9:13 a.m.




Reported by: MaryJo O'Connor, RDR, RMR

Job No. 7576948

Naomi Oreskes , Ph.D.                    September 9, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 2

Tuesday, September 9, 2025

9:13 a.m. EST

VIDEOTAPED DEPOSITION of NAOMI ORESKES, PH.D., held at Beveridge & Diamond, 155 Federal Street, Suite 1600, Boston, Massachusetts, pursuant to notice, before MaryJo O'Connor, Registered Diplomat Reporter, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts.

Page 3

A P P E A R A N C E S:


ATTORNEYS FOR PLAINTIFF:

   (Attending remotely)

   MOTLEY RICE, LLC

   28 Bridgeside Boulevard

   Mt. Pleasant, South Carolina 29464

   (843) 216-9000

   BY:    SHALOM D. JACKS, ESQ.

          sjacks@motleyrice.com


          - and -


   CONSERVATION LAW FOUNDATION

   62 Summer Street

   Boston, Massachusetts 02110

   (617) 850-1744

   BY:    JAMES MEINERT, ESQ.

          jmeinert@clf.org

Page 4

A P P E A R A N C E S (Continued):


ATTORNEYS FOR DEFENDANTS:

    KING & SPALDING, LLP

    1180 Peachtree Street NE, Suite 600

    Atlanta, Georgia 30309

    (404) 572-4600

    BY:     DOUGLAS A. HENDERSON, ESQ.

            dhenderson@kslaw.com

            CRISTINA AZCOITIA, ESQ. (Via Text)

            cazcoitia@kslaw.com




 ALSO PRESENT:   Shawn Budd, Videographer

                 Joel Mafrige, Esq.

Naomi Oreskes , Ph.D.                    September 9, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 5

                        I N D E X

Deposition of:                                  Page

NAOMI ORESKES, PH.D.

    By Mr. Henderson                         11,359

    By Ms. Jacks                                355


            I N S T R U C T I O N S

    Page   Line

     47        14


              E X H I B I T S

No.                                             Page

Exhibit 1   Document entitled                        9
            "Defendants' Notice of
            Deposition of Naomi Oreskes,
            Ph.D., and Request for
            Production of Documents"
Exhibit 2   Document entitled "Amended           9
            Complaint and Jury Demand"
Exhibit 3   Document entitled "Expert            9
            Rebuttal Report of Naomi
            Oreskes"
Exhibit 4   Document entitled "Expert            9
            Report of Naomi Oreskes"

Page 6

E X H I B I T S, (Continued)

No.                                              Page

Exhibit 5    Work Log and Invoice, Bates      9
             NORESKES_000005 to
             NORESKES_000005

Exhibit 6    Work Log and Invoice, Bates      9
             NORESKES_000001 to
             NORESKES_000004

Exhibit 7    Document entitled "Additional    9
             Materials Considered"

Exhibit 8    Document entitled "Expert        9
             Witness Report of David M.
             Uhlmann"

Exhibit 9    Document entitled              270
             "Memorandum Opinion"

Exhibit 10   Westlaw, Keystone             277
             Transportation Solutions,
             LLC v. Northwest Hardwoods,
             Inc.

Exhibit 11   Westlaw, Walter J. Coward v.  279
             Owens-Corning Fiberglas
             Corporation, et al.

Exhibit 12   Article entitled "Scientists' 328
             warning on fossil fuels"

Page 7

E X H I B I T S, (Continued)

No.                                                          Page

Exhibit 13   Article entitled "How             329
             scientists' collective climate
             advocacy affects public trust
             in scientists and voting
             behavior"

Exhibit 14   Article entitled "Extreme         329
             weather event attribution
             predicts climate policy
             support across the world"

Exhibit 15   Article entitled "Trust in        329
             climate science and climate
             scientists: A narrative review"

Exhibit 16   Article entitled "Why             329
             Misinformation Must Not Be
             Ignored"

Exhibit 17   Article entitled "The 2024        329
             state of the climate report:
             Perilous times on planet Earth"

Exhibit 18   Article entitled "Climate         329
             Change and the Clean Air Act
             of 1970 Part I: the Scientific
             Basis"

Page 8

E  X  H  I  B  I  T  S,  (Continued)

No.                                                      Page

Exhibit 19   Document entitled "Science      343
             Journals/AAAS Authorship Form
             & Statement of Conflicts of
             Interest"

Exhibit 20   Article entitled "Outside      343
             interests."

Exhibit 21   Document entitled "Science      347
             Journals/AAAS Authorship Form
             and Statement of Conflicts of
             Interest"

Page 37

MS. JACKS:  Objection to the form.

A.    Well, "relationship" is a broad word, but I would say broadly my understanding of the complaint is that, as part of the requirements of the permit under which Shell and its subsidiaries operate the installations in question, Shell is required to reveal all known risks, and Shell is required to update its understanding of those risks in light of new information that may come to light.

As a person who's spent more than 20 years studying climate science and scientific findings regarding climate risks, including risks related to sea level rise and storm surge, and increased extreme weather events, that knowledge is relevant to the question of the risks.  And so my expert report is about that knowledge, the history of the development of that knowledge, and the history of Shell's involvement with and knowledge of that knowledge.

So my expertise is relevant to the matter of what risks Shell did or did not disclose in relation to the operation of this installation.

Page 53

can't remember.  But I feel like in graduate school when I studied sedimentary basins with Professor Steve Graham, who had worked for many years for Chevron, I feel like we had a field trip where we visited a facility in California, but I couldn't swear to it.  But I think we did.

Q.     Have you ever been to an offshore platform?

A.     No, no.  No.  I have a lot of friends who have worked on offshore platforms, but I haven't personally had the privilege. They don't usually allow visitors.

Q.     Are you an expert in day-to-day operations at oil and gas facilities?

A.     No.

Q.     How about interviews, Dr. Oreskes? How big a part is your job as a historian of science are interviews, interviews with company employees?  Who -- have you ever interviewed any employees at fossil fuel companies?

A.     Okay.  You just asked two different questions, and I'd like to ask you to unpack that.

Q.     Have you ever interviewed any

Page 60

A.        Correct.  I am not.

MS. JACKS:  Objection to the form.

Q.        Now, in this case, are you aware that the allegations address an industrial stormwater permit?

A.        Yes.  I'm aware of that.

Q.        Do you know what an industrial stormwater permit is?

A.        Well, again, this is way outside the scope of my expertise.  But I understand that facilities operate under permits, and those permits address a variety of issues, which also can include stormwater discharges.

Q.        Do you have any experience with the regulation of stormwater in the United States?

A.        No.

Q.        And you're not offering any opinions about the regulation of stormwater in the United States?

A.        No.

Q.        And you're not offering any opinions on any features of the terminal, like secondary containment, or equipment, or anything like that?

Page 61

A.      No.

MS. JACKS:   Objection.  Outside the scope.

Q.      Do you know what an SWPPP is?

A.      I feel like I've seen that abbreviation, probably in the complaint, but offhand I can't remember what it stands for.

Q.      You're not offering any expert opinion on what an SWPPP is or contains, correct?

MS. JACKS:   Objection to the scope.  Outside the scope.

A.      Correct.

Q.      Correct, you're not providing --

A.      Correct, I'm not -- I was waiting. I'm trying really hard to count to three.

So, correct.  I'm answering "correct" in response to your question.

Q.      And you're not offering -- do you know what an SPCC is?

A.      Again, I'm fairly sure I've seen that acronym somewhere, but I do not know what it stands for, and I'm not offering an opinion about it.

Q.      That's all I'm just trying to get.

Page 64

those risks.

Q.    But the comment that the permit requires disclosure of risk, you did not confirm that by your reading of the permit --

A.    No.  By my --

MS. JACKS:  Objection to form.

THE WITNESS:  Sorry.

MR. HENDERSON:  Shalom, can you please for the record, I'm asking you professionally again, can you just let me get through with my question and then you can object?

MS. JACKS:  I'm trying to do that, and object before an answer has begun. So if we could just give me a little bit more time to get an objection lodged, please.

THE WITNESS:  Okay.  I've been counting to three.  I'll count to five. I think there is a lag.

MR. HENDERSON:  Can you read --

THE WITNESS:  There is a lag within Zoom.  I think that's part of the problem.

MR. HENDERSON:  Can you reread the

Page 65

question, MaryJo.

(Record read as requested.)

Q.      -- that the permit actually required the disclosure of risk.

A.      I read the complaint, and I read the amended complaint.  It's up to lawyers to read and interpret the permit.

Q.      Do you know what permit applies to this lawsuit?

A.      You mean like the number, the specific?

Q.      Yeah.

A.      No, no.

Q.      What year are the --

A.      Again, that would be outside of my scope.

Q.      Have you reviewed any permit in this lawsuit?

A.      No, I have not.

Q.      And you're not offering any opinions on what a permit requires or does not require in this lawsuit, correct?

A.      Correct.

Q.      How about experience with the Clean Water Act, Dr. Oreskes?  Is this your

Page 67

A.      You know what?  I know I can still answer.  So you actually don't have to do that. I'm just trying to respect everyone by pausing, so my pausing doesn't mean I'm not answering.

Now I've lost the train.  I'm sorry.  Could you read it, MaryJo?

(Record read as requested.)

A.      No, I did not.

Q.      How about what we call RCRA [RECK-ruh], R-C-R-A?  Are you offering any opinions about RCRA?

A.      No, I am not.

Q.      Do you have any familiarity with RCRA?

A.      A little bit --

MS. JACKS:  Objection.  Beyond the scope.

A.      In my courses I teach the history of environmental science and environmentalism in America.  And as part of that, we sometimes discuss statutes.  Most of my teaching and research related to statutes involves the Clean Air Act, but I certainly know a little bit about the Clean Water Act and other important environmental statutes.

Page 95

attended to, which is relevant to my report, is about the requirement to disclose risks.

I think that answers the question. I'm not making claims about other possible permit violations.

Q. And that's based on what your lawyer told you the permit required?

MS. JACKS: Objection to the form.

A. Again, it's not my lawyer. Counsel doesn't represent me. But --

Q. It's based upon what counsel for --

A. Can I finish?

Q. Yeah, sure.

A. Take a deep breath.

Counsel directed my attention to the portion of the complaint that begins on page 85, Count VIII:

"Violation of the Clean Water Act - failure to submit required facts or information to Connecticut Department of Energy and Environmental Protection."

That's DEEP, who we've been talking about. This section of the complaint discusses the permit requirement

Page 96

to supply information relevant to risks.  My report deals with this section of the complaint, and, as far as I know, not any other section.

Q.    Right.  But in your expert report, you do not say that any activity by Defendants violated that section of the permit, do you?

A.    Well, I think --

Q.    No, just what is stated in your expert report, it does not state, "And this failure of, whatever it is you believe, violates this section of the permit," correct?

A.    Correct.

Q.    So why -- let's look at your expert report, which I think is Exhibit O3.

A.    No, O4.

Q.    O4.

What's the title of your report?

A.    Well, the title is "Expert Report of Naomi Oreskes."

Q.    And what's below that?

A.    What's below that is the date.

Q.    You have "Conversation Law Foundation v. Shell New Haven Terminal," correct?

Page 99

A. Yes. I'm going to call your attention to Exhibit O2, the "Amended Complaint and Jury Demand" dated February 11, 2022, which says:

"Conservation Law Foundation, Inc., Plaintiff, v. Shell Oil Company, Equilon Enterprises LLC d/b/a Shell Oil Products US, Shell Petroleum, Inc., Triton Terminaling LLC, Motiva Enterprises LLC."

So, in fact, Shell Oil Company is a named Defendant in this case, as is Equilon Enterprises, which is part of the Shell Oil Products group, and Triton Terminaling, which is also part of the Shell group.

Q. Which Shell group? What company is it part of?

A. I don't know. I'm not an expert on corporate structure.

Q. Did any of the CLF lawyers tell you that on February of this year Shell Oil Company and Shell Petroleum were dismissed from this litigation?

A. Well, no, they didn't tell me that

Page 107

A.      I know.  It's a funny name.  It's not your fault.

Q.      So, just going through what you are testifying on and what you're not.  You're not offering any opinions the terminal was poorly designed in any way.

MS. JACKS:  Objection to the form.

A.      I'm not offering any opinions on the design of the terminal.

Q.      You're not offering any opinions that the terminal should be renovated in any way.

MS. JACKS:  Objection to the form.

A.      I'm not offering any opinions on the design of the terminal.

Q.      And you're not offering any opinions that the terminal should not flood, are you?

MS. JACKS:  Objection to the form.

A.      Personally, I don't think the terminal should flood, but it's not part of my formal opinion.

Q.      And you're not offering any opinions about the safety of the terminal.

MS. JACKS:  Objection to the form.

Page 109

A.      No, I am not.

Q.      And, Dr. Oreskes, I think we can go through this pretty quick.  You're not a licensed engineer, are you?

A.      No, I'm not.

Q.      Have you ever been?

A.      A licensed engineer?  No, I've never been a licensed engineer.

Q.      From the CV, was your training more as a geologist or an engineer?

A.      I wouldn't say I have any formal training as an engineer.  I'm trained as a scientist and a historian of science.

Q.      Was your degree actually in history of science?

A.      Well, which degree I have?

Q.      Your doctorate.

A.      My doctorate was a joint degree in geology and history of science, but Stanford University had a rule that joint degrees couldn't have the name of a department in it, so we agreed on geological practice and history of science.  And that was something that my professors all signed off on.

Q.      Do you consider yourself a climate

Page 118

Q.      And you've proofread your report?

A.      Yes.  But obviously, sometimes small errors slip by.

Q.      And in terms of your report, Dr. Oreskes --

A.      Yes.  Thank you.

Q.      Close my eyes, I get it right.

Your report, your expert report, dated May 1, 2025, actually never mentions Triton Terminaling, LLC, does it?

A.      No, it does not.

Q.      And your report does not mention Equilon Enterprises, LLC, either, does it?

A.      No, it does not.

Q.      And there is only one reference to the Defendant Motiva in your report, correct?

A.      I'd have to double-check, but that sounds right to me.

Q.      And that was on page 109, just -- I believe that's the only reference you have to Motiva.

A.      So, where is the reference to Motiva?

Q.      I think it's on page 109.

A.      It seems like your pagination

Page 119

isn't quite the same as mine.

Q.      I just want to make sure.  I think 109 at the top where it says "Motiva oil tank facility," like the third sentence from the top.

A.      Oh, yeah, yeah.  I see it.  Yeah, the e-mail detailed a spill, yeah.

Q.      But, Dr. Oreskes, that's the only reference you have to Motiva?

A.      That sounds probably correct to me.

Q.      And do you even know the name of that other facility that you were referencing?

MS. JACKS:  Objection to the form.

A.      I don't understand your question.

Q.      What facility did the spill happen in 2012?

A.      You mean which specific Motiva oil tank facility?

Q.      Yes.

A.      I don't know.

Q.      It wasn't the New Haven Terminal, was it?

A.      I don't know.

Q.      Okay.  And I think we've answered

Page 130

confirms that climate change is occurring and has caused, and will continue to cause, a rise in sea levels, more severe weather, increased precipitation, flooding, fires, and other serious consequences."

Q.      And, Dr. Oreskes, in your report, you're not offering any opinion that Equilon Enterprises is denying climate change is occurring, are you?

MS. JACKS:  Objection to the form.

A.      No, I am not.

Q.      And you're not offering any opinion that Triton Terminaling, LLC, is denying that climate change is occurring, are you?

A.      No, I'm not.

Q.      And you haven't offered any opinion that Motiva Enterprises is denying that climate change is occurring, have you?

MS. JACKS:  Objection to the form.

A.      No, I have not offered an opinion to that effect.

Q.      And I think we went over it, but as of today, you did not know that Shell is not

Page 156

it probably is that New York Times article. But, again, if you would like, we can double-check that and let you know.

Q.    All right.  But on pages 95 and 96, you talk about a New York Times article in 1989.

A.    Correct.

Q.    And it says on the top of page 96, Dr. Oreskes, you have a statement that said, "'The engineers are designing a huge platform that anticipates rising water in the North Sea.'"

Do you see that at the top of page 96 in the quote?

A.    Yes, I see it.

Q.    So all of your information comes from The New York Times article?

MS. JACKS:  Objection to the form.

A.    Well, everything we used is in the citations in the report.  There could be other things in other citations.  But everything that we relied on is in the footnotes of the report.

Q.    Do you even know which entity owned that North Sea platform?

MS. JACKS:  Objection to the form.

Page 157

A.      Well, The New York Times is generally considered to be a reliable source. So if they described it as a Shell installation, they say -- they refer to it as platforms.  The '"engineers who build natural gas platforms at Shell Oil do not want to take a chance.'"

The New York Times is discussing these platforms as ones that are Shell platforms.

Q.      Do you have any primary documentation, internal Shell documents, or other documents, to show that the platform was ever built?

MS. JACKS:  Objection to the form.

A.      No, I do not.

Q.      So you don't know whether or not this change was actually made to the facility?

A.      No.  But the import of this discussion here is about awareness.  The point I'm trying to make is here is that this is further evidence that Shell is aware of the risk of sea level rise from climate change and is having a conversation about steps that maybe need to be taken as a result.  And that's as

Page 191

at that moment in time doing?

So, for example, if you asked me, well, was that a good scientific method?  I can't answer that question without a date, or time and place, because scientific methods change over time.  And so a method that might have been considered valid or sufficient in, let's say, 1890, might not be considered valid or sufficient in 1990.

So "state of the art" refers to what would be the best methods, the best knowledge, the best information that was available to a scientific community at the time of discussion.

Q.     And you use that term in your report, but I don't believe any of your opinions relate to what was state of the art at a petroleum bulk storage terminal, correct?

A.     No.

Q.     And you're not offering any state-of-the-art opinions about any activity by energy companies in your report, are you?

MS. JACKS:  Objection to the form.

A.     No.  This section of the report is about historical methodology.  Because it's my

Page 192

understanding that as an expert witness I have an obligation to explain to the judge what it is that I do, what my method is, and how that method is part of an established methodology that is accepted by my discipline.

So this is part of that conversation. It's not meant to imply that I'm going to be making judgments about what is the state of the art in maintaining a petroleum storage facility.

Q. And so you're not offering any opinion on what is the state of art for evaluating climate risk in your report, are you?

MS. JACKS: Objection to the form.

A. No. I'm not.

Q. Now, you also use the word "consensus view," Dr. Oreskes. Can you explain what you mean by that? Is that just part of your discussion of method?

A. It's not so much -- well, it's part of my discussion of method, because I'm describing what it is that historians of science do. So one of the important things that historians of science do is to try to

Page 219

risk that you say Shell was aware of?

MS. JACKS:  Objection to the form. Calls for speculation.

A.    Well, again, I can't speak for the EPA, but I think it would be a reasonable conclusion to say that they were.  Or they should have been if they weren't, and I would they were derelict in their duty as regulators.

Q.    So why didn't EPA change the permit and require permitees to take more action on climate change?

MS. JACKS:  Objection to the form. Calls for speculation.

A.    Yeah, I really can't speak to that.

Q.    And you're not offering any opinions on that?

A.    I can't speak to what EPA did or didn't do on any particular thing.

Q.    What would you call your method for reaching your opinions?

A.    I call it history.

Q.    You wouldn't call it the historical method?

A.    Well, you could.  But I don't

Naomi Oreskes , Ph.D.                    September 9, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 220

usually like the word -- I don't use -- I don't like the singular, "the historical method," because that implies there is only one method that historians use.  Just like I not only don't like, but have explicitly written about, why we shouldn't talk about "the scientific method."  Even though people use that term all the time, it's very misleading because there isn't one unique scientific method that all scientists use.  There are many methods.

Q.    How would anyone know which method to use if there is multiple methods?

A.    Well, that's part of your training and expertise.  So we talked before about interviews.  When historians are trained, when we teach our students, we talk about interviews, and we talk about situations in which you might decide to use interviews.  So that would be oral history is a method.  It's appropriate in some cases.

The use of documentary evidence I would say is the dominant historical method.  So, if you want, you could say I used the dominant or primary historical method.  But part of being an expert is making judgments not

Page 222

would submit it to peer review.  But because of the constraints of confidentiality, that method isn't available to experts doing expert witnessing, whether they're scientific or historical.

Q.    So if you were to hand the materials you were provided by CLF in this case and gave it to 100 historians of science, how many would you estimate would come up with similar opinions that you have in this --

MS. JACKS:  Objection.

Q.    -- in your expert report?

MS. JACKS:  Objection to the form. Calls for speculation.

A.    Well, first of all, I'm going to object to the "provided by CLF."  Actually, the documents were provided by the Defendant.  And my staff and I went through the documents independently to find the documents we considered to be relevant to the questions.

So I would not agree with the characterization that these were provided by CLF.  They were provided by Shell.  Or we found them on our own, if they were public domain.

But if a historian of science with

Page 223

expertise, particularly one who knew something about earth science, would read the same volume of documents, I think all of them, unless they were grotesquely biased, would have come to broadly similar conclusions.

Q.     How many would make errors and not find the opinions you had?

MS. JACKS:  Objection to the form. Calls for speculation.

A.     Well, again, two different questions there.  How many would make errors? They all would.  We're human beings.  We all make mistakes.

Again, one of the reasons we have assistants, peer review, send papers to colleagues, is that we rely on each other as part of a practice of finding error, because it's extremely difficult to find the errors in your own work, even as much as you may try.

I mean, one of the things I do is I try to anticipate objections that you might raise.  I try to think about if someone disagreed with me, what objections might they raise.  So that's part of my own practice of objectivity.

Page 224

But we all make mistakes.  So if 100 historians looked at this material, they'd probably all make some mistakes.  That's just human nature.  That's life.

Q.     Your method appears to be very subjective.

A.     Well, that's your opinion.  I disagree.

Q.     Are you biased in which documents you look at?

A.     No, absolutely not.  I mean, in fact, one of the things I take pride in is the work I've done and the techniques I've developed to try to address the potential complaint that a person is biased in the documents they look at, or that an expert could be biased because the lawyers would only give you certain documents that supported their side of the case.

So, in every case I work on, I insist that I have full access to the full documentary record, so I'm never just being spoon-fed documents by counsel.  And in this case, I used a methodology that you already asked about.  But it's important to addressing

Page 226

Q.      So who actually ran the AI searches, prompts, for you?

A.      Well, this was discussed in the document we provided.  Sasha and I sat down together to discuss what the prompts would be.

Sasha ran the analysis, and then I reviewed all the documents.

Q.      All right.  So, Dr. Oreskes, we never received any of the materials, what prompts, or what searches you actually ran.

A.      I thought --

MS. JACKS:  Objection.  We did respond to the Notice of Deposition.  We did respond to inquiries concerning AI prior to that with this information.

MR. HENDERSON:  Ms. Jacks, you didn't provide any of the searches.  And if you did, you can resend them to me.  But you did not.  You responded back and said that you used ChatGPT.  But in terms of the actual searches --

A.      Okay.  I think I can clarify that.

MR. HENDERSON:   -- because that's what we were looking for.

A.      Okay.  We were under the

Page 227

impression that when you said "searches," you meant, like, hard copy, paper copies.  But that doesn't exist.

We don't have searches.  We used the ChatGPT to identify the documents.  Then there is a body of documents that I look at.  Every document that I deem to be relevant and relied on in this report is cited in the report and has been provided to you.  So there isn't anything else.  There isn't any other documentation.

Q.    There would have been a prompt, which is what most platforms use --

A.    You mean like a search term?

Q.    They don't use a search term. They like a prompt now, because it's different than a searching, because a prompt implies there is some analysis, generative analysis.

A.    We don't do that.

Q.    So what was your search to look for?  That's what we're trying to find.

A.    So we don't give AI prompts, because that can be viewed as biasing.  So we're not giving them prompts.  We're just giving search terms.  So the primary search

Page 228

term was "sea level rise."  I think we might have also just searched on "sea level."  I'd have to go back and check my notes.  Maybe "sea level change."  You know, we had a set of terms to get at this issue.

Q.    The another thing that we have not received, and we will continue to ask, is which documents did you search on?

So, for example, you said every document that was provided by CLF to you or every document that was provided by CLF plus your own set of documents?  What did you actually search for?

A.    Okay.  You keep saying it was provided by CLF, but what I'm saying is that's an incorrect characterization.  There were a body of documents that were provided by the Defendants as part of the discovery in this case.  We did not rely on CLF to provide us with the relevant documents.  We searched the database using what we considered to be the fairest, least biased search terms that we could decide on mostly related to sea level rise.

Q.    But we still don't even know what

Page 234

his expertise.  So he has a particular toolkit that I think has made it possible for us to look at documents in this extremely efficient manner.  But at the end of the day, it still goes back to reading each document by hand and citing in the expert report every document upon which my opinion rests.

Q.    Was he using any Harvard AI programs --

A.    No.

Q.    -- to search?

A.    No.

Q.    What programs was he using to search?

A.    We use ChatGPT on a secure server. And this information has already been supplied.

Q.    I hear you.  What is that secure server?

A.    I'm getting tired.  So I have to go back and check my notes, but I know it's in a document that we supplied to you.

Q.    Okay.  But you kept your search terms -- I just want to make sure -- on what you searched?

A.    I'm sure that I can find that or

Page 238

context --

A.    No.

Q.    -- of the use of "rising sea level"?

A.    No.

Q.    Did you do any searches that involved Triton Terminaling with AI?

A.    I'd have to double-check, but my recollection is no.

Q.    Did you use AI to identify or interpret any documents from Equilon Enterprises, LLC?

A.    I'd have to double-check, but my recollection is no.

Q.    How about Motiva Enterprises, LLC, did you use AI to identify or analyze or evaluate documents on the terminal?

A.    I have to check my notes, but my recollection is no.

Q.    And on page 76 of your report, you state that you used AI on IPCC documents.

A.    Yes.

Q.    Which IPCC?

A.    The whole universe of publicly available documents that are online.

Page 256

assurance is?

A.     Well, I've heard the term before. I couldn't give you specifics on it.

Q.     Do you know what his responsibilities were at EPA?

MS. JACKS:  Objection to the extent this calls for speculation.

A.     I mean, I assume there is a common sense meaning of the term "enforcement."  So I assume that that's what he did, but I couldn't speak in detail about what his exact responsibilities were.

Q.     Are you an expert in environmental enforcement?

A.     No, I'm not.

Q.     Are you an expert in legal ethics?

A.     No.  But I'm an expert in scientific objectivity, and that was the basis for the main discussion in this rebuttal report.

Q.     I think you previously testified you did not have any expertise in the Clean Water Act or RCRA; is that correct?

A.     Correct.

Q.     You're not offering any opinions

Page 257

that Mr. Uhlmann's technical opinions in his expert report are wrong in any way, are you?

A.     That's correct.

MS. JACKS:  Objection.

THE WITNESS:  Oh, sorry.

A.     That's correct.

Q.     In fact, his opinions may very well be correct.  You don't have an opinion; is that true?

MS. JACKS:  Objection to the form.

A.     I don't have an opinion one way or the other.

Q.     Okay.  And you're not offering any opinions that Mr. Uhlmann misinterpreted the Clean Water Act, correct?

MS. JACKS:  Objection to the form.

A.     I think I'm raising the question of whether or not his interpretations may be biased.  So you could say that I'm raising the possibility that they might be misinterpretations.

Q.     You're not saying there is a legal problem with Mr. Uhlmann's opinions, are you?

A.     No, I'm not.

Q.     You're not saying that Mr. Uhlmann

Page 258

is offering a fraudulent testimony, are you?

MS. JACKS:  Objection to the form.

A.       No, I am not.

Q.       You're not offering any opinion that Mr. Uhlmann is offering misleading testimony, are you?

MS. JACKS:  Objection to the form.

A.       I think my opinion raises the possibility that it could be misleading based on his conflict of interest.

Q.       And you understand Mr. Uhlmann is a licensed attorney and an officer of the court?

A.       I do understand that.

Q.       You cite the Rules of Professional Responsibility in your opinion; is that correct?

A.       That's correct.

Q.       Do you know what the Rules of Professional Responsibility are for lawyers?

A.       I have a general --

MS. JACKS:  Objection to the form.

A.       I mean, I have a general idea. I'm sure I've seen reference to it, but I'm certainly not an expert on that.

Page 263

me with the search.

Q.    He's the computational --

A.    Right.  The one we've already been discussing.

Q.    -- physicist?  Is that what he is?

A.    Well, computational scientist and astrophysicist originally.

Q.    And I know you already testified you're not a lawyer, correct?

A.    (Nods.)

Q.    Have you ever taken any law courses?

A.    No, I have not.

Q.    Are you trained in legal research?

A.    No.

MS. JACKS:  Objection to the form.

A.    No, but I have done some legal research, and I have used LexisNexis and Westlaw.

Q.    Did you use it here?

A.    No, I did not.

Q.    Have you ever had a course in legal professional responsibility?

A.    No, I have not.

Q.    Are you offering any legal

Page 286

his actions can be determined to be quid pro quo.

What is "quid pro quo" to you? What does that mean?

A.    It means one thing for another thing.

Q.    So what did Mr. Uhlmann get for testifying in this case?

A.    He's getting a very large amount of money.

Q.    Do you know the amount that doctor -- I mean, that Mr. Uhlmann is getting? You cited the hourly rate.  Do you see the total amount?

A.    I do not know what the total amount is.  I'm just aware of the hourly rate.

Q.    So it's purely hourly rate that you were focusing on?

A.    Because we have information about his and other experts' hourly rate, and his hourly rate is fully four or five times as great.  In some cases, almost ten times as great as some of the other experts.

Q.    And aren't all of the other experts non-lawyers?

Page 287

A.      That I couldn't say.

Q.      No, I mean, just looking on the list.

A.      Oh.  Well, the list doesn't say.

Q.      And what page are you on?

A.      Page 10 of my report.

Q.      So if you look at page 10 of your report --

A.      Isn't --

Q.      Who is Mr. Battles?

A.      I don't specify what their expertise is.

But you said about lawyers, isn't -- I believe Susan Bodine is a lawyer, and I mention her fee, which is $750 an hour.

Q.      Well, let's go down the list on page 10.  Mr. Battles, what is his role?

A.      I didn't -- I didn't do research into the specific expertise.  So I can stipulate that I'm not making claims about their areas of expertise.

Q.      So Mr. Battles, he's an engineer, correct?

A.      You know, we don't have limitless time, and I feel like you can accept that I

Page 288

have not looked into the details of their backgrounds.  And if you want, I can even say that, yeah, lawyers get paid a lot of money.  That's well known.  But still --

Q.    Well, you're the ones that use context.  I was just trying to get context for why you chose these people.

A.    I didn't choose them for any reason.  These were the other experts for which Defendants --

Q.    These --

A.    Hold on.  Let me finish.

Defendants provided information about their experts.  As far as I'm aware, this is the full population of experts appearing for Defendants.  If that's not correct, you can correct me.

Q.    Did --

A.    And so I looked at -- if I may finish -- I looked at the fees that these various different experts were being paid, including Susan Bodine, who is a layer, and would seem to have similar expertise as Mr. Uhlmann, also worked in a regulatory capacity, and knows this is a very large

Page 289

discrepancy.  And I'm calling attention to the discrepancy as a possible source of concern.  That's all.  No more and no less.

Q.    Did you look at the rates that CLF experts were charging?

A.    No, I did not.

Q.    Why not?

A.    I wasn't asked to review that.

Q.    Did you ask to see how much Motley Rice lawyers are charging per hour?

A.    No, I did not.

MS. JACKS:  Objection to the form.

A.    But the issue here is not what the lawyers are being paid.  The issue is what the expert witnesses are being paid.  Lawyers --

Q.    Did you --

A.    This is important.  You asked about the federal rules of evidence.  My understanding is that lawyers are expected to be zealous advocates for their clients.  That's different than experts who are expected to be objective and give an objective account of the truth of the factual matters at stake.

And, therefore, what the lawyers are being paid, in my opinion, is a separate

Page 290

and different question not material to the issue that I'm trying to raise in this report.

Q.    Do you know how much the other experts for CLF are charging per hour?

A.    I saw one report in which that information was disclosed.  But I only read one of the other expert reports for Motley Rice, or CLF, so I'm not aware of the others.

Q.    How do you know that Mr. Uhlmann's rate is excessive?

A.    Well, obviously, that's a judgment call.  People can have different opinions about what constitutes excessive.  But I thought a comparison with other experts in the same case seemed like a valid comparison.  It's the same case, the same year, the same state or county, and we see this very large discrepancy between Mr. Uhlmann's rate and the other experts.

Q.    Did you conduct any survey of hourly rates across the legal industry?

A.    No, I did not.

MS. JACKS:  Objection to the form.

A.    No, I did not.

Q.    Do you know what the average hourly rate for lawyers in New York City is?

Page 291

MS. JACKS:  Objection to the form.

A.    No, but I don't see how it's pertinent here.  I'm not talking about the rate that lawyers get.  I'm talking about the rates that expert witnesses get.  Two different questions.

Q.    So do you know what the average hourly rate is for lawyers in the District of Columbia?

MS. JACKS:  Objection to the form.

A.    I'm going to repeat my same answer.  I don't see how that's relevant to my opinion in this case.

Q.    Do you know what the average hourly rate for experts in trials in the District of Columbia are?

MS. JACKS:  Objection to the form.

A.    No, I do not.  But as an expert, I have seen documents in other cases with other experts opining on matters related to science, environmental science, regulation.  And I would say that in my experience, other experts that I've seen get pay rates that are comparable to these ones here.  Things between three and $600 an hour are pretty common.  I've never before

Page 292

seen an expert making anything even close to over $2,000 an hour.

Q.     But you didn't do any analysis on what other experts in other cases, federal cases, in the State of Connecticut are, did you?

A.     No, I did not.

Q.     Okay.  Did you ever define what the market rate was for expert witnesses on the topics that Mr. Uhlmann was handling?

MS. JACKS:  Objection to the form.

A.     Well, I'm not aware that there is a market rate, and I'm not sure how you would even figure that out.  Because usually this is confidential, unless -- you wouldn't be privy to this information unless you were a participant in the case.

Q.     Are you charging more than the market rate for a geologist?

MS. JACKS:  Objection to the form.

A.     Well, I think I've just said I don't know what the market rate would be, but also I'm not testifying as a geologist here.  I'm testifying as a historian of science.

Q.     So historians of science can

Page 293

charge more than geologists?

A.    I'm not in a position to answer that question.

Q.    You're the one that raised the hourly rate.  I'm just trying to figure out what you did to evaluate that.

Are you an expert in the compensation of expert witnesses?

A.    No, I'm not.

MS. JACKS:  Objection to the form.

MR. HENDERSON:  Can we ask that question again?  MaryJo, can you read it because the objection I think confused it.

(Record read as requested.)

MR. HENDERSON:  Thank you.

Q.    Professor Oreskes, do you suggest that Mr. Uhlmann is now taking positions for defendants that were at odds with the ones he held as a professor?  Did you research all of Mr. Uhlmann's opinions on climate change?

A.    I didn't research all of them, but I researched some of them.

Q.    Let's look at page 7 of your report.  You said that Mr. Uhlmann argued for

Page 296

the example where you say, "Mr. Uhlmann downplays the importance of infrastructure improvements," as you note in your expert report?

A.    Well, I read this report, and it was my impression, my interpretation of the report, that he downplays the context of climate resiliency.

So it's not a specific place where he says "I downplay climate resiliency." That's not how downplaying works.  But I did do a search on this report to see how often he discussed infrastructure, and what I found was that the word "infrastructure" does not even appear, except for reference to a speech that he gave.

Q.    And what did you search on?

A.    I just said, the word "infrastructure."

Q.    You mean in his report?

A.    Yes.  In his report.

Q.    So it's just your interpretation that he's downplaying the importance of infrastructure?

A.    Yes.  It's my expert opinion that

Page 303

advance of a lawsuit or something.  And that seems to me as contradictory.  And that's my opinion as a nonlawyer, but as a person who has paid some attention to environmental enforcement, some professional attention.

Q.    Do you know the difference between what permitting is and enforcement?

A.    Well, I think I do.

Q.    Can you explain it?

A.    Well, again, I'm not a lawyer, but my understanding is a permit, as the word suggests, permits a person or an entity to do certain kinds of things.  And enforcement implies that after the fact a regulatory agency, or a state or local government, would have the right to enforce the terms of that permit or any other laws that might apply to those activities.

So, in a sense, one is before, and the other is after.

Q.    But you have no special regulatory expertise on distinguish between permitting or enforcement, correct?

MS. JACKS:  Objection to the form.

A.    I have no specific expertise about

Page 304

permitting or enforcement.

Q.    Now, let's look at your third example.  You talk about Mr. Uhlmann says that he's a big believer in the citizen suits, and now you're saying that he no longer -- he's no longer supportive of citizen suits.

Is that a fair statement of what your opinion is?

A.    Correct.

Q.    So what's the basis for that distinction; that you said now he's changed his tune after writing this report?

A.    Well, when writing the report.

So, again, remember I'm not claiming expertise about permitting or enforcement.  I'm claiming expertise about objectivity and the questions of what kinds of factors can compromise a person's objectivity.

But we could also look for evidence that objectivity was compromised.  And one line of evidence that one might look for would be abrupt or surprising shifts in a person's position at or after they received large amounts of compensation for work.

And when I watched this webinar --

Page 306

action alleging that the failure to perform climate resiliency measures constitutes a violation of 2018/2021 General Permit, a citizen suit cannot be brought on that basis either.'"

Q.      Does that suggest that Mr. Uhlmann is not in favor of citizen suits?

A.      It's not clear, but it suggests that he's not in favor of this particular citizen suit, which struck me as surprising, given the expansive view of citizen suits that he had expressed in the webinar only a few months before.

Q.      Could it have any difference to deal with the actual facts of this case?

MS. JACKS:  Objection to the extent it calls for speculation.

Q.      Did you ask him this question on the webinar?

A.      No, I wasn't at the webinar.  I watched it online.  It was recorded, so there wasn't an opportunity to ask him.  If I had been there, I would certainly have asked that question.  But, of course, no one could ask that question because no one at the webinar

Page 307

would know that only a few months later he would write a report expressing this much more restrictive use of citizen suits.

Q.    In your fourth example, you say, he supports "'fair and robust' enforcement." But you then say, he's now "unconvinced that such relief is now appropriate."

Why is -- are you saying he seems unconvinced that injunctive relief is appropriate.  Is that just your view?

A.    Well, again, this is my interpretation of what seems to be a change in his position.  Because previously, he seems to be supportive of a request for injunctive relief.  But in this particular case, seemingly suddenly he's not.

Q.    Isn't this for the jury to decide if he's biased or not?

A.    Absolutely.  But it's for me, as an expert about bias, to raise the question so that it can put in front of a jury.

Q.    So you're an expert on all forms of bias?

MS. JACKS:  Objection to the form.

Q.    No, I mean, you just said you're

Page 311

stake here, so I did not use them.

MR. HENDERSON:  Can we take a five-minute break.

VIDEO TECHNICIAN:  The time is 4:38.  We're off the record.

(Proceedings recessed at 4:38 p.m., and reconvened at 4:53 p.m.)

VIDEO TECHNICIAN:  We are back on the record.  The time is 4:53.

BY MR. HENDERSON:

Q.    Professor Oreskes, let's continue moving.

A.    Yes.  Good idea.

Q.    I'm going to ask you a few things I think I've already asked you.  I'm just making sure.

You're not offering any opinions about what best industry practice is under any of these industrial stormwater permits, correct?

A.    Correct.

MS. JACKS:  Objection to the form.

Q.    And you're not offering opinions on best management practices under these industrial stormwater permits, or even

Page 312

generally in this case, you're not offering opinions on best management practices, correct?

MS. JACKS:  Objection to the form.

A.       Correct.

Q.       You're not offering opinions on good engineering practice, either, are you?

MS. JACKS:  Objection to the form.

A.       Correct.

Q.       Professor Oreskes, based on your research of the fossil fuel industry or other industries, has the energy industry ever developed a consensus standard on how facilities should evaluate climate risk?

I think you may have answered this, but I just want to make sure.

MS. JACKS:  Objection to the form. Calls for speculation.

A.       Not to my knowledge.

Q.       Do you know of any survey of how industries have evaluated the climate risk on their facilities?

MS. JACKS:  Objection to the form.

A.       I believe the reinsurance industry has collected information on that sort, but I don't really know for sure.