# **Exhibit B**

# Filed Under Seal

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

Conservation Law Foundation

v.

Equilon Enterprises LLC et al.

Case No. 3:21-cv-00933

**EXPERT WITNESS REPORT OF DAVID M. UHLMANN**

**June 23, 2025**

**<u>Introduction</u>**

1.      I was retained by King & Spalding to evaluate claims against their clients, Equilon Enterprises LLC ("Equilon), Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva") (collectively, "Defendants"), brought by the Conservation Law Foundation under the Clean Water Act and the Resource Conservation and Recovery Act ("RCRA") and, if requested to do so, to provide expert testimony on behalf of Defendants. Before agreeing to provide an expert opinion in this matter, I advised King & Spalding that I would make no promises about what my opinions would be regarding the merits and the enforceability of Plaintiff's claims against Defendants. King & Spalding and its clients agreed to retain me with that understanding at the rate of $2,250 per hour.

2.      This expert witness report summarizes my opinions related to several issues raised by the Amended Complaint filed in this case, as well as expert reports submitted by Plaintiff. My review has focused on Plaintiff's claims regarding the General Permit for the Discharge of Stormwater Associated with Industrial Activity issued in 2018 by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") and reissued in 2021 without any relevant substantive changes (the "2018/2021 General Permit"). The 2018/2021General

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 2**

Permit governed stormwater discharges at a bulk storage fuel terminal located at 481 East Shore Parkway, in New Haven, Connecticut (the "New Haven Terminal").

3.      Specifically, I have been asked to opine about Plaintiff's allegations that, at the time the Amended Complaint was filed, Defendants were in violation of a requirement in the General Permit that permittees implement a Stormwater Pollution Prevention Plan ("SWPPP") that includes specific best management practices "to minimize the discharge of pollutants from the permitted facility," where the term "minimize" means "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." In addition, I have been asked to opine whether the Defendants created an imminent and substantial endangerment as that term is defined under RCRA through their operation of the New Haven Terminal. Finally, I was asked to opine whether the parent company of Defendants, Shell USA, operated the New Haven Terminal and was responsible for any violations at the New Haven Terminal and whether Shell USA's assets would be relevant in determining the amount of any penalties imposed against Defendants.

4.      Based on the information I reviewed, it is my expert opinion that Defendants complied with the enforceable stormwater pollution prevention requirements of the General Permit by implementing a hurricane action plan and adopting other emergency response measures at the New Haven Terminal. In my opinion, from an enforcement perspective, the "best management practices" and "best industry practices" incorporated into the 2018/2021 General Permit did not require Defendants to take the additional climate resiliency measures specified in the Amended Complaint and in an expert report submitted by Plaintiff. It may have been advisable to implement additional climate resiliency measures at the New Haven Terminal—and

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 3**

permit revisions in 2024, for the first time, require specific climate resiliency measures. In my opinion, however, from an enforcement perspective, it would not have been possible to treat those specific climate resiliency measures as best industry practices for petroleum bulk storage facilities at the time the Amended Complaint was filed in 2021. To my knowledge, there has never been a Clean Water Act enforcement action for general permit violations, predicated on the best industry practice language, other than this case and three other similar cases filed by Plaintiff against terminal owners or operators in Massachusetts, Rhode Island, and Connecticut.

5.    It is my expert opinion, based on the materials I have reviewed, that Defendants did not create an imminent and substantial endangerment, as that term is defined under RCRA. RCRA creates a cradle-to-grave regulatory scheme for treating, storing, and disposing of hazardous waste. It is my understanding that Defendants were "small quantity generators" of hazardous waste at the New Haven Terminal, based on leaks and spills that occurred occasionally at the facility. But the fuel stored by Defendants at the New Haven Terminal, which is the focus of Plaintiff's imminent and substantial endangerment claims, would only become a solid waste and therefore regulated under RCRA if it were released into the environment. In my opinion, if the legal theory alleged in the Amended Complaint were actionable under RCRA, hundreds if not thousands of facilities across the United States also would be creating imminent and substantial endangerments in violation of RCRA, which is not the intent of the statute.

6.    It is my expert opinion, based on the material I have reviewed, that the corporate parents of Defendants, including Shell USA, did not exercise "active" control over operations at the New Haven Terminal, including over day-to-day operations and decisions relating to compliance with the Clean Water Act. Plaintiff also references "Shell plc" in certain reports, but

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

**Expert Report of David M. Uhlmann**
**Page 4**

my understanding is that Shell plc is not a defendant in this case. In my opinion, the United

States Environmental Protection Agency ("EPA") would not consider the parent companies to be

responsible for any violations of environmental statutes and regulations at the New Haven

Terminal. In addition, while EPA penalty policies allow for the consideration of the assets of

corporate parents when subsidiaries are not adequately capitalized, to my knowledge there is no

issue in this case about whether Defendants possess the ability to pay any penalties, if violations

had occurred at the New Haven Terminal.

7.      All the opinions in this expert witness report are expressed to a reasonable degree

of professional certainty based on (a) my experience, which is described below and in the

curriculum vitae that is attached as Exhibit 1 to this report, and (b) my review of the materials

listed in Exhibit 2.

## Qualifications and Experience

8.      I have spent my entire professional career practicing, researching, teaching, and

writing about environmental law, with a particular focus on environmental enforcement. I

currently am a partner at Marten Law, where my practice focuses on representing state and local

governments in their efforts to address climate change and exposure to PFAS and other emerging

contaminants; renewable energy companies, utilities, and trade associations in the clean energy

space; and corporate clients seeking strategic counsel regarding values-driven solutions to

environmental challenges and enhanced ethics, integrity, and compliance programs. Beginning

on July 1, I also will be serving as a Visiting Professor of Law at the George Washington

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 5**

University Law School and as a Nonresident Senior Fellow in the Governance Studies Program at the Brookings Institution in Washington, D.C.

9. Before joining Marten Law in May 2025, I served from July 2023 until December 2024 as the EPA Assistant Administrator for Enforcement and Compliance Assurance. While awaiting Senate confirmation as EPA Assistant Administrator, I served as the Deputy Assistant Administrator and a Senior Advisor to the Administrator from September 2022 to July 2023. In these roles, I led approximately 2,800 EPA employees nationwide responsible for criminal, civil, and administrative enforcement and compliance assurance under the federal environmental laws, including the Clean Water Act and RCRA.

10. As EPA Assistant Administrator, I approved the National Enforcement and Compliance Assurance Initiatives for 2024–2027, which included an initiative to address climate change,[1] and EPA's Climate Enforcement and Compliance Strategy ("Climate Enforcement Strategy").[2] I also issued policies designed to enhance strategic coordination between the civil and criminal enforcement programs at EPA[3] and to accelerate the timelines for EPA enforcement

---

[1] David. M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: FY 2024 – 2027 National Enforcement and Compliance Initiatives (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[2] David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: EPA's Climate and Enforcement Strategy (Sept. 28, 2023), [hereinafter Climate Enforcement Strategy] https://www.epa.gov/system/files/documents/2024-02/epasclimateenforcmentandcompliancestrategy_1.pdf.

[3] David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: Strategic Civil-Criminal Enforcement Policy (Apr. 17,

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 19**

the climate resiliency measures recommended by Dr. Goldsmith were not enforceable

requirements of the 2018/2021 General Permit is reinforced by the fact that EPA and the States

have never brought an enforcement action alleging similar violations. Indeed, there is no

evidence that comparable facilities implemented climate resiliency measures except when

required to do so by specific permit language or in response to extreme weather events that

caused major operational disruptions at an individual facility. Those occurrences did not amend

the 2018/2021 General Permit or otherwise establish a new enforceable best industry practice.

**Opinion 4: By implementing a hurricane action plan and adopting other emergency
response measures at the New Haven Terminal, Defendants addressed climate risks to the
extent that they would have been enforceable best industry practices under the 2018/2021
General Permit; the additional climate resiliency steps specified in the Amended Complaint
and in the Goldsmith Report were not enforceable terms of the 2018/2021 General Permit.**

38.     Based on the materials that I have reviewed relating to operations at the New

Haven Terminal, Defendants took a number of steps to address the possibility of extreme

weather events at the New Haven Terminal. Defendants instituted a "business continuity plan"

and previously implemented a "hurricane action plan" to ensure that the New Haven Terminal

was prepared for extreme weather events, including training to prepare for such events. For

example, Defendants' Business Continuity and Storm Action Plan ("Business Continuity

Plan")[29] directs the facility manager to "work with the Supply Team to evaluate options for tanks

that could be impacted by a storm surge event due to low product levels."[30] The Business

---

[29] Shell Trading & Supply Distributions US East Business Continuity and Storm Action
Plan (Apr. 2024).

[30] *Id.* at 9.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 20**

Continuity Plan outlines several steps that the facility manager can take to protect storage tanks from storm damage, such as increasing the height of product or adding a water bottom to the tank for ballast. The Business Continuity Plan also directs the terminal manager to confirm that the seals between the concrete foundation and the tanks have been inspected on a monthly basis and that the seals are not "compromised or showing signs of deterioration, holes or otherwise areas that water could penetrate between the tank chime and concrete foundation."[31]

39.    It is my understanding that the measures implemented by Defendants to prepare for the potential of extreme weather events were similar to those recommended by the EPA Region 6 Regional Response Team.[32] In addition, based on an expert report submitted by Defendants, operators of bulk petroleum storage facilities located in coastal areas appear to have implemented ballasting procedures and other storm preparedness measures that are similar to those in Defendants' Business Continuity Plan described above.[33] From an enforcement perspective, the ballasting procedures and storm preparedness measures that Defendants and other operators of coastal fuel terminals implemented to prepare for the possibility of extreme weather events may have been enforceable best industry practices at the time of the Amended Complaint. But the additional measures identified by Dr. Goldsmith, which are focused on designing and hardening facilities for long-term impacts of climate change, do not appear to have

---

[31] *Id.*

[32] *See* Region 6 Regional Response Team, Flood Preparedness: Recommended Best Practices (Jan. 2016).

[33] Expert Report of Eric Kovich P.E. (June 23, 2023).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 21**

been generally accepted or implemented widely enough to be considered enforceable best industry practices.

40.    The State of Connecticut has conducted regular inspections at the New Haven Terminal. The State determined that the New Haven Terminal was in compliance with the 2018/2021 General Permit for nearly a decade.[34] Although also not dispositive, these findings by state regulators militate strongly in favor of the view that specific climate resiliency measures were not required best industry practices prior to the filing of the Amended Complaint.

41.    On that basis, it is my opinion that Plaintiff has not demonstrated that Defendants failed to conduct their operations in accordance with the enforceable best industry practices for minimizing stormwater discharges caused by storm events. From an enforcement perspective, I do not believe that EPA and the State of Connecticut could have proven that Defendants violated the requirements of the 2018/2021 General Permit, including the best industry practices provision, by not including the long-term design and hardening measures promoted by Dr. Goldsmith, as those measures were not generally implemented by industry at that time. My opinion is reinforced by the other opinions expressed in this report: (a) the Clean Water Act does not contain statutory language addressing climate change; EPA has never alleged that the failure

---

[34] *See* Expert Report of Russ Parkman (June 23, 2025). *See also* Equilon Enterprises LLC (Shell Oil Products US) FRS ID 110070687145 Detailed Facility Report (showing, as of June 11, 2025, no informal or formal enforcement actions within the past five years), *and* Motiva Enterprises LLC FRS ID 110000491977 Detailed Facility Report (showing, as of June 11, 2025, one Clean Air Act compliance violation in 2023, one presumably related informal enforcement action that same year, and no other informal or formal enforcement actions within the past five years) (both reports retrieved from EPA's Enforcement And Compliance History Online (ECHO) database, https://echo.epa.gov/).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**Expert Report of David M. Uhlmann**
**Page 22**

to implement climate resiliency measures is a violation of the Clean Water Act; and climate resiliency only has been required by EPA as part of settlement agreements; (b) best industry practices—the only term in the 2018/2021 General Permit that Plaintiff cites to support its claims—are not well-suited to enforcement absent far more compelling evidence than what has been presented by Plaintiff; and (c) Plaintiff's expert report fails to identify climate resiliency measures widely adopted by other coastal fuel storage terminals.

42.     It merits emphasis that, while citizen suits can be brought in situations where EPA and the State fail to act, citizen suits cannot be premised on violations that the government cannot enforce. Stated differently, if EPA and the State of Connecticut cannot bring an enforcement action alleging that the failure to perform climate resiliency measures constitutes a violation of the 2018/2021 General Permit, a citizen suit cannot be brought on that basis either. Citizen suits cannot create new obligations or enforce new requirements that do not appear in the Clean Water Act, regulations under the Clean Water Act, or permits issued by EPA or a State under the Clean Water Act.

**Opinion 5: Defendants have not created "an imminent and substantial endangerment" at the New Haven Terminal, as that term is defined under RCRA, because the storage of petroleum products is not regulated under RCRA, and any quantities of petroleum products released during regular operations at the site are too small to present an imminent and substantial endangerment.**

43.     The storage of petroleum products is not regulated under RCRA because the petroleum products are not "discarded" and therefore not "solid waste" or "hazardous wastes"