# Exhibit C

Filed Under Seal

*Conservation Law Foundation*

*v.*

*Shell New Haven Terminal*

Case No. 3:21-CV-00933-VDO

## <u>EXPERT REBUTTAL REPORT OF BRUNO PIGOTT</u>

July 22, 2025

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PROFESSIONAL BACKGROUND AND METHODOLOGY ....................................... 2

III.  OPINIONS ....................................................................................................... 5

OPINION 1. ALL TERMS AND CONDITIONS OF NPDES PERMITS ARE ENFORCEABLE. ........................ 5

OPINION 2.  NPDES PERMIT EFFLUENT STANDARDS AND LIMITATIONS INCLUDE NPDES PERMITS AND THEIR CONDITIONS, INCLUDING STANDARD CONDITIONS INCLUDED IN ALL PERMITS, AND MAY BE ENFORCED VIA CITIZEN SUIT UNDER THE CWA. ................................................................. 7

OPINION 3.   IN THE CONTEXT OF CITIZEN SUITS AND GOVERNMENT ENFORCEMENT ACTIONS COURTS REGULARLY INTERPRET NPDES PERMIT LANGUAGE. ........................................................ 8

OPINION 4.   REQUIRING COMPLIANCE WITH NARRATIVE REQUIREMENTS SUCH AS "BEST INDUSTRY PRACTICE" OR "GOOD ENGINEERING PRACTICE" PLACES AN AFFIRMATIVE BURDEN ON PERMITTEES TO IDENTIFY RISKS AND UNDERLYING CONDITIONS THAT RELATE TO POLLUTANT DISCHARGES UNDER THE CWA. ................................................................................................ 10

OPINION 5. THE EPA HAS RECOGNIZED THAT UNDER THE INDUSTRIAL STORMWATER PROGRAM "GOOD ENGINEERING PRACTICE" INCLUDES CONSIDERATION OF CLIMATE CHANGE-DRIVEN RISKS SUCH AS EXTREME PRECIPITATION, STORM SURGE, FLOODING, AND SEA LEVEL RISE .................... 11

OPINION 6. THE EPA HAS LONG CONSIDERED CLIMATE CHANGE IN THE CONTEXT OF CWA ENFORCEMENT CASES AND PERMIT INTERPRETATION. ............................................................... 12

OPINION 7.   THE EPA HAS INCLUDED CONSIDERATION OF CLIMATE CHANGE-DRIVEN RISKS IN PERMITS FOR COASTAL FACILITIES AND MUNICIPALITIES AS WITHIN THE SCOPE OF THE CWA INDUSTRIAL STORMWATER PERMITTING PROGRAM. .................................................................... 13

OPINION 8.   THE OPERATIVE PERMIT REQUIRES CONSIDERATION OF CLIMATE CHANGE. ............. 16

OPINION 9.   THE LACK OF EXPRESS REQUIREMENTS RELATING TO CLIMATE CHANGE IN THE CWA DOES NOT MEAN THAT SHELL DOES NOT NEED TO CONSIDER CLIMATE CHANGE UNDER THE PERMIT FRAMEWORK. ........................................................................................................................ 18

OPINION 10.  THE CWA AND ENFORCEMENT MECHANISMS ARE APPROPRIATE TOOLS TO ADDRESS CLIMATE CHANGE. .................................................................................................................. 19

APPENDIX A. BRUNO PIGOTT CURRICULUM VITAE (CV) ....................................... A-1

APPENDIX B. MATERIALS CONSIDERED ................................................................. A-4

**I.        Introduction**

My name is Bruno Pigott. I am 64 years old and competent to testify about National Pollutant Discharge Elimination System ("NPDES") permits and climate change considerations. I submit this Report in support of the Conservation Law Foundation, Inc. ("CLF") in the matter of *Conservation Law Foundation, Inc., v. Shell Oil Company, et al.*, Case No.3:21-cv-00933-SALM (D.Conn.).

I was retained by CLF to serve as an expert witness to provide a rebuttal report in this matter. I was asked to provide my opinions about the Clean Water Act ("CWA"), and more specifically storm water provisions in NPDES permits and whether and how climate change considerations are incorporated in those permits.

I am being compensated at a rate of $550 per hour for my work on this report.  My compensation is not contingent on the outcome of the case. All opinions provided herein are my own and reflect my professional judgment and expertise. I have not testified as an expert witness in the past four years.

This report is broken into two sections as follows:

Section II describes my professional background and explains my qualifications as an expert on these matters. It outlines the methodologies I applied and documents I relied upon to provide a factual basis for my work in this matter.

Section III contains my opinions regarding NPDES permit terms and conditions and climate change.  The opinions are as follows:

Opinion 1.    All terms and conditions of NPDES Permits are enforceable.

Opinion 2.    NPDES Permit effluent standards and limitations include NPDES Permits and their conditions, including standard conditions included in all permits, and may be enforced via citizen suit under the CWA.

1

Opinion 3.    In the context of citizen suits and government enforcement actions, courts regularly interpret NPDES Permit language.

Opinion 4.    Requiring compliance with narrative requirements such as "Best Industry Practice" or "Good Engineering Practice" places an affirmative burden on permittees to identify risks and underlying conditions that relate to pollutant discharges under the CWA.

Opinion 5.    The EPA has recognized that, under the Industrial Stormwater Program, "Good Engineering Practice" includes consideration of climate change-driven risks such as extreme precipitation, storm surge, flooding, and sea level rise.

Opinion 6.    The EPA has long considered climate change in the context of CWA enforcement cases and permit interpretation.

Opinion 7.    The EPA has included consideration of climate change-driven risks in permits for coastal facilities and municipalities as within the scope of the CWA Industrial Stormwater permitting program.

Opinion 8.    The Operative Permit requires consideration of climate change.

Opinion 9.    The lack of express requirements relating to climate change in the CWA and RCRA does not change that Shell should consider climate change under the Permit.

Opinion 10.    The CWA and enforcement mechanisms are appropriate tools to address climate change.

## II.    Professional Background and Methodology

**Professional Background**

I have forty years of environmental experience in government at the local, state, and federal level, particularly concerning the Clean Water Act.

a. From 1985–1990 I worked as a Congressional Staff Member in the US House of Representatives for Congressmen Peter Visclosky (1985–1987) and Congressman Dennis Eckart (1987–1990). I served as a Legislative Assistant attending committee hearings, preparing briefing materials, and meeting with stakeholders on a variety of issues, including environmental issues.

b. From 1990–1993, I served as the President of Environmental Advocates in Iowa City, Iowa. From 1993–1996 I was elected to the Iowa City, Iowa City Council. The biggest

2

issue during my tenure was a vote to build a new drinking water and wastewater treatment plant.

c.  From 2000–2021, I served in several positions at the Indiana Department of Environmental Management (IDEM).

   i.  In 2000–2001, I served as the Chief of the State Revolving Loan Fund at the Department. In that capacity I reviewed and approved loans to municipalities for Wastewater Treatment Plant Improvements, often due to failure to comply with permit terms.

   ii.  From 2001–2003, I served as the Chief of the NPDES Compliance Branch in the IDEM Office of Water Quality. In that role, I managed inspectors, reviewed data submitted by municipal and industrial facilities with NPDES permits, and recommended enforcement actions for facilities out of compliance with NPDES permits.

   iii.  From 2003–2005, I served as Chief of the NPDES Permitting Branch in the IDEM Office of Water Quality. In that capacity, I oversaw agency permitting of municipal and industrial NPDES permits as well as state-issued construction permits and individual and general NPDES stormwater permits. I was involved in discussions over specific NPDES permit provisions with industry members and municipalities. For example, I discussed specific narrative and numeric permit conditions, compliance schedules, and other permit requirements with a wide variety of industry members and municipalities, including but not limited to British Petroleum, Arcelor Mittal, US Steel, the Northern Indiana Public Service Company, Duke Energy, American Water, and cities such as Indianapolis, Fort Wayne, Mishawaka, and Evansville.

   iv.  From 2005–2015, I served as the Assistant Commissioner for Water at IDEM. In that capacity my portfolio expanded from compliance and permitting to enforcement, water quality assessment, funding, and all other water-related regulatory activities, including rulemaking.

   v.  From 2015–2016, I served as the IDEM Deputy Chief of Staff and Assistant Commissioner for Water where I worked on budgetary issues and worked to create a new office within the Agency. In 2016, I served as the Chief of Staff to the Commissioner, working on operational and budgetary issues and programmatic activities.

   vi.  From 2017–2021, I served as the Commissioner of the IDEM. I served on the Cabinet of Indiana Governor Eric Holcomb. In that capacity, I also served as a Commissioner on the Ohio River Valley Water Sanitation Commission. The Commission conducts water quality monitoring on the Ohio River and sets Water Quality Standards that states agree to adopt. In that capacity, I served as the Chairman of the Technical Committee. I also served as a Commissioner on the Great Lakes Commission, where we considered a wide variety of issues affecting Great Lakes Water Quality, including climate impacts, invasive species, and water quality standards.

3

d. From 2021–2025, I joined the U.S. Environmental Protection Agency ("EPA") at its headquarters. The EPA headquarters is the national program manager for the EPA's National Pollutant Discharge Elimination System (NPDES) program. I first served as Deputy Assistant Administrator for Water. As such, I was a member of the EPA senior staff and worked with the Assistant Administrator on all water regulations, funding, and water quality standards activities. In 2024, I became the Acting Assistant Administrator for Water. In that position, I was responsible for the interpretation of all water regulations. I reviewed and presented to the Administrator all the regulatory actions proposed by the Office of Water. Those included Effluent Guidelines (ELGs) for industry, including Steam Electric Power Plant rulemaking and drinking water regulations. Additionally, I was responsible for all NPDES guidance documents.

**Methodology**

My opinion is based on the application of accepted methodology, based on my professional experience, and generally accepted authority in the field of water regulation, enforcement, permits, and rulemakings, which I applied to reach the ten opinions derived after I reviewed Mr. Uhlmann's and Ms. Bodine's reports. Additionally, I reviewed the EPA website for relevant authority. The EPA's guidance is an authoritative source, and it is used by the Agency itself as well as state, municipal, and industrial facilities. Outside of the rules themselves, the Agency's guidance documents and memoranda establish the expectations and Agency position on enforcement standards, guidance, and practice. During my tenure at EPA, I led the development of Agency rules and guidance for the Office of Water and participated in drafting, editing, and approving all Water documents.

In addition to my federal experience drafting and promulgating rules, guidance documents, and memoranda, I have relied on my over 40 years of professional experience at the local, state, and federal level. I relied on my experience in both federal and state governments and my participation in state and federal enforcement actions and consent decrees. I have participated in federal consent decree negotiations for over a dozen communities in Indiana alone while serving as the Assistant Commissioner, and later as Commissioner, of the IDEM. And, in those capacities,

4

I also participated in and led State enforcement actions. As Commissioner, I oversaw the development of rules as well as guidance documents on a wide variety of water issues, including storm water issues. I also conducted research on cases relevant to this case.

### III.    Opinions

I have been asked to review the reports of Mr. Uhlmann and Ms. Bodine and provide my opinions regarding the consideration of climate change and NPDES permits.[1]  Below are my opinions.

### Opinion 1. All Terms and Conditions of NPDES Permits are Enforceable.

During my more than two decades as the Assistant Commissioner of the IDEM, I was involved in the issuance and reissuance of over hundreds of permits. It has been my experience, and is my professional judgment, that the terms and conditions of NPDES permits are enforceable and have been enforced. As Assistant Commissioner and Commissioner, I authorized enforcement actions based on terms and conditions of NPDES permits. The terms and conditions of NPDES permits are authorized and mandated by Section 402 of the CWA. The CWA prohibits the discharge of pollutants from any point source into waters of the United States unless such discharge is authorized by an NPDES permit. When the EPA, or a state with delegated authority, issues an NPDES permit, that permit becomes a legally binding document. The conditions within it—such as effluent limitations, monitoring requirements, reporting obligations, and pollution control measures—are not optional guidelines but enforceable legal standards.

The enforceability of these permit conditions serves several critical purposes. First, it ensures consistent and measurable protection of water quality by holding dischargers accountable

---

[1] I take no position on whether and to what extent the Bodine and Uhlmann reports constitute legal opinions or other matters not properly within the scope of an expert report. I have been asked to review and respond to their reports regardless of and without waiver of any objection to the appropriateness or admissibility of their opinions.

for their environmental impacts. Second, it creates a clear legal framework for regulatory oversight, enabling the EPA and states to monitor compliance and respond to violations. Third, enforceability supports the broader goals of the CWA by deterring illegal discharges and promoting investment in pollution control technologies.

Violations of NPDES permit terms can trigger significant legal consequences, including administrative penalties, civil fines, criminal prosecution, and citizen lawsuits. During my time as Assistant Commissioner and Commissioner of the IDEM, I authorized enforcement actions for a host of municipal and industrial permit holders based not only on the exceedances of numeric NPDES limits, but also on other violations, from the failure to implement best management practices to schedule violations, and violations of other specific permit requirements. For example, IDEM took an enforcement action against Arcelor Mittal in 2019 for a toxic spill that resulted in 3,000 fish killed.[2] IDEM also took enforcement action in several instances against facilities and entities that failed to implement best management practices required by both general stormwater permits and individual NPDES permits.[3]

Permit enforcement also has specifically involved climate change-related considerations, contrary to Mr. Uhlmann's assertions. Several consent decrees serve as examples. Three come to my mind. First, a 2024 Cahokia Heights, Illinois consent decree required the city to employ sound engineering principals in the construction and operation of its sewer system and referred to the EPA's Climate Resilience Evaluation and Awareness Tool. *See U.S., et al. v. City of Cahokia Heights, Ill.¸* No. 3:24-cv-02591 (S.D. Ill. 2024). Second, a 2024 Consent Decree for Guam's Hagåtña WWTP Secondary Treatment facility required Guam to approve a feasibility study for

---

[2] https://www.in.gov/idem/cleanwater/files/fish_kill_20190819_press_release.pdf
[3] Several enforcement actions were taken by IDEM.  Three examples include: AO 14115-W failure to provide construction plan; AO 16788-W failure to implement stormwater pollution prevention plan; AO 18400-W failure to implement erosion and sediment controls.

6

secondary treatment upgrades that would conform with good engineering practice and the Ten States Standards, including practices to improve climate change resiliency of the secondary treatment upgrade. *See U.S. v. Guam Waterworks Authority, et al.¸* No. 1:24-cv-00004 (D. Guam 2024). Third, the City of Holyoke, Massachusetts agreed to the terms of a consent decree that required the city to use sound, generally accepted engineering practices to improve the resilience of the system and included the requirement to use the EPA Climate Resilience Evaluation Tool. *See U.S., et al. v. City of Holyoke, Mass.*, No. 19-cv-10332-MGM (D. Mass. 2023). This enforcement mechanism underscores that compliance with permit conditions is not merely a regulatory formality, but a fundamental obligation tied to protecting public health, aquatic ecosystems, and the integrity of the nation's waters.

**Opinion 2.  NPDES Permit effluent standards and limitations include NPDES Permits and their conditions, including standard conditions included in all permits, and may be enforced via citizen suit under the CWA.**

Under the CWA, the NPDES permits, which contain effluent standards, limits, compliance timeframes, schedules, and other permit conditions, may be enforced by citizen suits.  This authority is explicitly granted under Section 505 of the CWA.  The key provision is 33 U.S.C. § 1365(a):

> "Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
>> (1) against any person… who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

Additionally, 33 U.S.C. § 1365(f) states:

> "…the term 'effluent standard or limitation under this chapter' means (1) an unlawful act under section 1311 of this title, (2) an effluent limitation or other limitation under section 1311 or 1312 of this title, (3) a standard of performance under section 1316 of this title, (4) a prohibition, effluent standard or pretreatment standard under section 1317 of this title, (5) a certification under section 1341 of this title, or (6) a permit or condition thereof issued under section 1342 of this title…"

7

I have read the Expert Report of Mr. David Uhlmann ("Uhlmann Report"), dated June 23, 2025, in which he provides his opinions related to several issues raised by the Amended Complaint filed in this case.   In opinion 2 of the Uhlmann Report, he indicates that the "EPA and the States can enforce the requirements of Clean Water Act general permits, including language regarding best management practices and best industry practices."   He then asserts that "…best industry practices only are enforceable in limited circumstances."   It is my experience that permit conditions are not divided into those that are not enforceable and those that are not fully enforceable.   Thus, contrary to Mr. Uhlmann's assertion that a citizen suit cannot be brought where there is a failure to adequately address climate change, a NPDES permit (issued under Section 402, 33 U.S.C. § 1342), and any conditions of that permit, are explicitly included in what can be enforced by a citizen suit.

Court decisions have supported this interpretation. *See Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc*., 484 US 49 (1987).   In that decision, the Supreme Court confirmed that citizen suits could be brought for a pattern of violations of NPDES permits that are likely to continue.   Additionally, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), the Court reinforced the notion that citizens may step in to enforce permit limits even when government fails to act.   This citizen suit framework empowers the public to ensure that polluters are held accountable when government agencies do not act.

**Opinion 3.     In the context of citizen suits and government enforcement actions courts regularly interpret NPDES Permit language.**

Over my 30 years working on and implementing environmental law and regulation, I have gained a deep understanding of not only the CWA, the rules interpreting the act, and the policies developed by the EPA, but also how agencies implement them and courts interpret them.   And, in

8

the context of citizen suits and government enforcement actions under the CWA, courts regularly interpret NPDES permit language. This is not only a practical necessity but a legal requirement, as the enforceability of NPDES permits—considered the central mechanism of the CWA—depends on judicial interpretation to resolve disputes about compliance.

NPDES permits, issued under 33 U.S.C. § 1342, serve as the primary tool for regulating point source discharges into navigable waters. These permits often contain technical, ambiguous, or broadly worded conditions that require judicial construction in enforcement actions. When government agencies or private citizens bring suit under Sections 1319 or 1365 of the CWA, respectively, courts are tasked with determining whether the permittee has violated the permit's terms. This necessarily involves interpreting the meaning and scope of the language used in the permit.

Federal courts have long acknowledged this role. In *Natural Resources Defense Council v. County of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013), for example, the Ninth Circuit undertook a detailed analysis of NPDES permit terms to determine whether stormwater discharges exceeded permit limits. Similarly, in *Piney Run Preservation Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255 (4th Cir. 2001), the Fourth Circuit interpreted language in a municipal stormwater permit to resolve a citizen suit alleging unauthorized discharges.

Courts do not treat NPDES permits as generic administrative documents but as enforceable contracts between the permittee and the regulatory authority, subject to legal interpretation. As such, interpretation of these permits is a fundamental judicial function in both government enforcement and citizen suit contexts. Judicial engagement with permit language ensures that enforcement actions are grounded in the terms and conditions established through the permitting

9

process, thereby reinforcing the CWA's framework of cooperative federalism and its emphasis on compliance through clearly defined legal obligations.

**Opinion 4.     Requiring compliance with narrative requirements such as "Best Industry Practice" or "Good Engineering Practice" places an affirmative burden on permittees to identify risks and underlying conditions that relate to pollutant discharges under the CWA.**

Compliance with narrative requirements in an NPDES permit—such as adherence to "best industry practice" or "good engineering practices"—places an affirmative legal obligation on the permittee to engage in proactive assessment and risk management. Wendi Goldsmith's Expert Report ("Goldsmith Report") rebuts Susan Bodine's false distinction between flooding and flooding caused by sea level rise.  She notes that Shell conducted evaluated areas of vulnerability and produced its Greenhouse Effects Report.  In her expert report, Ms. Bodine attempts to distinguish between flooding and storms.  Yet, the hurricanes Dr. Goldsmith highlighted show that flooding events are directly caused by intense rain events such as hurricanes.  On the one hand, Ms. Bodine seems to argue that these requirements cannot be imposed for flooding, yet flooding is caused by the increased intensity of rain events that raises sea level and result in discharges of pollutants.  These narrative standards are applicable and enforceable conditions of the permit under the CWA, and are not merely aspirational but impose substantive duties. Unlike numeric effluent limitations, narrative requirements often mandate the implementation of practices designed to prevent or minimize pollutant discharges based on site-specific conditions and industry knowledge. As such, compliance demands that the permittee consider circumstances, identify and evaluate potential sources of pollution, assess site vulnerabilities, and investigate operational or structural deficiencies that could result in discharges to waters that could cause or contribute to exceedances of water quality standards. This affirmative duty to assess and manage risks is consistent with the statutory objectives of the CWA, which emphasize not only the control of

10

existing discharges but also the prevention of foreseeable pollution. Courts interpreting these provisions—such as in *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995)—have upheld the enforceability of narrative conditions and confirmed that they require permittees to take meaningful, site-specific steps to meet the performance expectations embedded in the permit.

**Opinion 5. The EPA has recognized that under the Industrial Stormwater Program "Good Engineering Practice" includes consideration of climate change-driven risks such as extreme precipitation, storm surge, flooding, and sea level rise.**

The EPA has explicitly recognized that under the Industrial Stormwater Program, "good engineering practice" includes consideration of climate change–driven risks such as extreme precipitation, storm surge, flooding, and sea level rise. In the Goldsmith Report, she conducted a literature review of peer reviewed publications and conducted a gap analysis that demonstrates that Good Engineering Practices include consideration of climate-related risks. Additionally, in its 2021 Multi-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity, the EPA emphasized that industrial facilities must account for changing climate conditions when designing and implementing stormwater controls. The accompanying Fact Sheet and Stormwater Pollution Prevention Plan ("SWPPP") Guide highlight that facilities are expected to evaluate how climate-related hazards may affect the performance of their best management practices (BMPs). The EPA noted that "[a]s part of good engineering practices, facilities should assess potential impacts from climate change, such as more intense storm events or increased flooding, to ensure that stormwater control measures remain effective." This guidance reflects the agency's position that climate adaptation is not optional but integral to compliance with NPDES permitting requirements. Therefore, a facility's failure to incorporate climate-related risk into its

11

stormwater management strategy may constitute a violation of the narrative permit conditions requiring implementation of good engineering practices.

**Opinion 6. The EPA has long considered climate change in the context of CWA enforcement cases and permit interpretation.**

The EPA has long considered climate change in the context of CWA enforcement cases, permit interpretation, and in guidance documents, recognizing that climate-related impacts directly affect the effectiveness and scope of pollution control measures. In enforcement, the EPA has produced several documents indicating its intention to consider climate in water actions. For example, in its 2016 Climate Change Adaptation Implementation Plan for the Office of Enforcement and Compliance Assurance, the EPA explicitly committed to integrating climate adaptation considerations into its enforcement and permitting oversight. The plan emphasized that enforcement staff should evaluate whether climate change impacts—such as more frequent extreme weather events, flooding, and sea level rise—may compromise compliance with permit requirements or necessitate enhanced pollution controls. Additionally, in 2021, the EPA's Office of Enforcement and Compliance Assurance produced its Framework for Protecting Public and Private Investment in Clean Water Act Enforcement Remedies. This framework outlined several different circumstances where the changing climate has affected wastewater systems and indicated that the EPA would consider relevant climate risks in appropriate enforcement matters and include, where suitable, injunctive relief that accounts for such risk and include requirements for the facilities to conduct vulnerability assessments. And in 2024, the Acting Director for the Water Enforcement Division, Office of Civil Enforcement, Joseph Theis issued a memorandum to Enforcement and Compliance Division Directors that outlines actions that the enforcement program can take that will apply to all CWA enforcement actions. Specifically, the memorandum

12

states that case teams in enforcement actions are expected to consider climate vulnerability in all cases, with very limited exceptions.

Mr. Uhlmann ignores that the EPA has also incorporated climate in its permit actions. When the EPA issued the 2021 Multi-Sector General Permit (MSGP) for industrial stormwater discharges, the EPA advised facilities to assess how climate-driven risks could undermine the performance of stormwater BMPs, effectively tying climate adaptation to permit compliance. Moreover, the EPA has raised climate-related factors in specific enforcement contexts—such as post-Hurricane Sandy investigations—where infrastructure vulnerability to storm surge and flooding informed compliance expectations. These examples show that the EPA views climate change not as a future or separate concern but as a present, material factor in interpreting NPDES permit obligations and enforcing the CWA's protective standards.

The EPA and other federal agencies have also provided resources to assist communities in addressing climate-related risks. For example, the National Oceanographic and Atmospheric Administration (NOAA) and EPA produced the Climate Action Toolkit. Water sector utilities can use this website to improve people's ability to understand and manage their climate-related risks and opportunities, and to help them make their communities and businesses more resilient to extreme events. The EPA also created the Vulnerability Self-Assessment Tool which provided a blueprint for how systems could conduct a Utility Risk Assessment. These resources are consistent with enforceable requirements in permits, reflect the Agencies' recognition that facilities and communities contain substantive and enforceable conditions, and provide permitted facilities with resources to comply with the permit conditions.

**Opinion 7.    The EPA has included consideration of climate change-driven risks in Permits for Coastal facilities and municipalities as within the scope of the CWA Industrial Stormwater permitting program.**

13

The EPA has affirmed that the scope of the CWA Industrial Stormwater Permitting Program, as implemented under the NPDES, encompasses the evaluation and management of climate change-related risks. For industrial facilities and municipalities located in coastal or climate-vulnerable areas, this includes consideration of foreseeable impacts from sea level rise, increased frequency and intensity of storm events, and changes in precipitation patterns. The EPA guidance and permitting frameworks support the inclusion of these factors in the development of SWPPPs, BMPs, and other permit conditions, consistent with the statutory mandate to control the discharge of pollutants to waters of the United States under 33 U.S.C. § 1342(p). Contrary to Ms. Bodine's opinion that the CWA and the Multi-Sector General Permit do not require modification of facilities due to flooding related to climate change, the inclusion of climate risk considerations is consistent with the CWA's objective to restore and maintain the chemical, physical, and biological integrity of waters at all times, and especially during changing climatic circumstances.

For example, the 2021 Multi-Sector General Permit (MSGP), effective March 1, 2021, requires regulated industrial sites to develop site-specific SWPPPs tailored to actual and foreseeable conditions. While the core fact sheet does not specifically mention the term "climate change," Appendix B & D require operators to assess local hydrology and design control measures—such as containment structures, retention basins, and corrosion-resistant materials— based on anticipated rainfall intensities, flooding events, and coastal exposure. Region-specific guidance (e.g. Appendix J regional fact sheets) further mandates adaptation to coastal flooding and storm surge risks. The EPA's 2026 Draft MSGP (for public review) similarly emphasizes "site-specific vulnerability analysis", directing operators in coastal zones to evaluate sea level rise and changing precipitation in BMP design.[4]

---

[4] https://www.epa.gov/system/files/documents/2024-12/proposed-2026-msgp-fact-sheet.pdf

14

Three permits issued to Massachusetts municipalities City of Westfield, Northampton, and Palmer, contain provisions requiring the permit holder to identify critical assets and those operations that could be vulnerable to a 100-year flood based on historical records. And permittees must assess and select measures that will ensure the operation of the plant. The communities are also required to propose an implementation and maintenance schedule.[5]

Proposed permits also contain requirements to evaluate climate impacts. The 2026 Draft MSGP clarifies that the permittees must consider not only the 100-year flood based on historical records but also based on current conditions using current observed data and available forward-looking projections. The 2026 Draft MSGP also indicates that stormwater control measure must be based on the best available data to ensure that stormwater controls can manage pollutants in stormwater discharges. This contradicts any assertion that stormwater permits do not require a facility to modify its stormwater management practices to protect against flooding due to climate change. Additionally, the requirements included in the MSGP and individual permits issued to the Massachusetts municipalities noted above are not discontinuous with prior permit requirements. In my decades of experience, I have found permit writers and environmental agencies use permit updates to clarify or remove requirements in past permits.

In addition to the MSGP and specific permits, the EPA fact sheets and regional guidance recommend that coastal industrial sites assess vulnerabilities to projected coastal flooding, increased salt exposure, and storm surge when identifying BMPs, sizing retention/detention systems, selecting materials (e.g. corrosion-resistant metals), and planning maintenance frequency in SWPPPs.

---

[5] *See* § C.1.a (Components 1, 2, and 3) of the NPDES Permit No. MA0101800, "Authorization to Discharge Under the National Pollutant Discharge Elimination System" for the City of Westfield, Massachusetts, signed Sep. 28, 2023, available at https://www.epa.gov/system/files/documents/2025-06/finalma0101800permit-2023.pdf.

15

These considerations are also in the EPA's Municipal Permit program. The EPA's MS4 Permit Improvement Guide, for example, recommends that permit writers adjust facility inventories and stormwater measures in response to local industrial and climatic concerns. In coastal MS4 jurisdictions, stormwater control requirements may be conditioned to reflect climate exposure risks, thereby extending NPDES authority to anticipate changing hydrology and pollutant loading patterns.

**Opinion 8.     The Operative Permit requires consideration of climate change.**

Consideration of climate change is critical for several reasons. First, the specific Operative permit must also comply with the Connecticut General Permit. This requires, pursuant to 33 U.S.C. § 1311(b)(1)(C), that the permittee's activities must be consistent with the applicable goals and policies in Section 22a-92 of the Connecticut General Statutes.

Section 22a-92 of the Connecticut General Statutes require facilities to consider the potential impact of a rise in sea level, coastal flooding, and erosional patterns. It also requires facilities to consider the potential impact of the rise in sea level as well as coastal flooding and erosional patterns. The section also requires existing structures be maintained to minimize adverse impacts on coastal resources and minimize the risk of spillage of petroleum products and hazardous substances.

Second, contrary to Ms. Bodine's assertion that climate change need not be considered as a part of best management practice, there is an inherent inconsistency to argue that the CWA does not require a climate assessment, but at the same time requires implementing control measures to protect against discharge. The effectiveness of discharge control measures depends on climate-related factors, especially under changing environmental conditions caused by climate change. It is illogical to argue on the one hand that discharges caused by flooding unrelated to climate change

16

are actionable, but discharges from flooding caused by increased precipitation and flooding due to climate change would not be actionable. It simply lacks any rational basis. In fact, it seems that Shell's own experts cannot agree on this point. In the very first opinion of Mr. Uhlmann's report, he acknowledges that "Climate Change is a global threat that requires urgent mitigation and resiliency efforts."

It is widely understood, including by Mr. Uhlmann, that the changing climate directly influences storm intensity and frequency. More frequent and intense rain events can lead to greater runoff as soils cannot absorb water. Water infrastructure, designed for rain events of less intensity and duration, become overwhelmed, resulting in increased pollutant discharges. If control measures are implemented without considering these changing climate-related variables, they may be inadequate or obsolete, failing the purpose of the CWA. That is why determining what measures are sufficient and appropriate must include an assessment of climate impacts. Otherwise, there's no way to assess whether existing infrastructure will handle projected stormwater volume or ensure compliance with water quality standards. As Mathew Barlow notes in his May 1, 2025 Expert Report ("Barlow Report"), "human-caused climate change has already caused an increase in precipitation, and more frequent and severe storms at the Terminal location in New Haven, CT, and these trends are continuing to increase along with increasing fossil fuel emissions. Because the site is on a low-lying area at the coast by a river, there is a combination of climate-related risks from rising sea levels, surges of ocean water and high waves driven by storms, river flooding, and flooding from heavy rain events." So, claiming that the Act requires effective water pollution controls but does not require a climate assessment sets up a contradiction: How can you ensure effectiveness without considering a major variable (climate) that affects discharge?

17

Opinion 9.    The lack of express requirements relating to climate change in the CWA does not mean that Shell does not need to consider climate change under the Permit **Framework.**

Contrary to Mr. Uhlmann's contention that the lack of express requirements regarding climate change removes any basis for alleging violations for failure to consider climate under the CWA, the absence of express requirements about climate change in an NPDES permit or in the CWA does not mean that permit holders are exempt from considering climate change, for several reasons.

First, the CWA is a performance-based statute. It does not prescribe every action, but establishes broad, outcome-based goals including restoring and maintaining waters, preventing discharges that cause or contribute to water quality violations, and requiring technology and water quality-based limits. To meet these goals, discharges must be controlled through permits that ensure water quality standards, not just based on current conditions, but also as they evolve. If climate affects discharges and discharges cause or contribute to water quality violations, then climate assessments and conditions affect compliance.

Second, the permittee has a duty to prevent discharges that cause or contribute to water quality standard violations. That obligation cannot be fulfilled without understanding the changing environmental context as a control measure that works today could fail if rainfall intensity and duration are not considered.

Third, environmental agencies must rely on the best available science and ignoring known, relevant scientific information could be considered arbitrary and capricious under the Administrative Procedures Act.

Fourth, the NPDES permits are designed to consider several factors including the discharge, the receiving water, and the surrounding environment. Climate change alters these

18

factors and failing to consider it undermines the Permit's core function, even if not explicitly mentioned in the permit.

**Opinion 10.  The CWA and enforcement mechanisms are appropriate tools to address climate change.**

The evolution of science and technology does not make the NPDES permit program inappropriate or enforcement a poor fit.  In fact, it is my opinion that the evolution of our understanding of the changing climate has revealed the importance of the storm water program for meeting Water Quality Standards.  And the evolution of technology has meant that facilities have greater options for complying with permit conditions and enforcement would be appropriate for evidence of noncompliance.

While Mr. Uhlmann argues that the evolution of science makes NPDES enforcement a poor fit, it is directly contradicted in the "EPA's Climate Enforcement and Compliance Strategy," which Mr. Uhlmann issued. It states, on page three, "[c]onsistent with EPA's legal authorities, we must take concrete steps to enhance adaptation and resilience within the regulated community by considering climate change adaptation and resilience concepts in all enforcement and compliance activities."

I certify under penalty of perjury that the opinions expressed in this expert report are true and correct to the best of my knowledge and ability. My opinions are stated to a reasonable degree of certainty and consistent with prevailing standards of practice.

*Submitted* on this 22nd day of July, 2025

*Bruno Pigott*
_____
Bruno Pigott

19

**Appendix A. Bruno Pigott Curriculum Vitae (CV)**

**BRUNO PIGOTT**

1701 Massachusetts Avenue, NW, Washington, DC 20036

317-902-9377 cospigott@gmail.com

# PROFESSIONAL SUMMARY

Results Oriented former Acting Assistant Administrator at EPA seeking an Executive Director role, bringing over 15 years of experience in local, state, and federal government. Formulated national and state environmental regulations, spearheaded stakeholder engagement, and managed complex budgets. Experience with strategic and business planning.

# WORK EXPERIENCE

### Acting Assistant Administrator/Principal Deputy Assistant Administrator

Environmental Protection Agency                                    Washington, DC

December 2021 to January 2025

*Appointed by EPA Administrator Michael Regan, I served as the Administrator's leadership team.*

- Advised the Administrator on water regulatory and infrastructure issues. Drove water policy development, including the Lead and Copper Improvements Rule and the PFAS Drinking Water rule.
- Led the Office of Water's budget and regulatory priority development.
- Testified before the Senate Committee on Energy and Natural Resources, shared critical insights on carbon sequestration, informing legislators about permitting issues.

### Commissioner

Indiana Department of Environmental Management                    Indianapolis, Indiana
January 2017 to January 2021

*Appointed by Governor Eric Holcomb to serve on the Governor's Cabinet and led the Indiana Department of Environmental Management.*

- Developed and implemented the Governor's environmental policies.
- Led a 900-employee state agency, eliminating all permit backlogs.
- Testified before the state legislature.

A-1

### Deputy Chief of Staff/Chief of Staff

Indiana Department of Environmental Management                Indianapolis, Indiana

January 2015 to January 2017

*Appointed by the Governor to manage operational aspects of the department.*

- Formulated $130 million budget and presented it before the State Budget Committee.
- Devised a new office within the Department, titled the Office of Program Support.

### Assistant Commissioner, Office of Water Quality

Indiana Department of Environmental Management                Indianapolis, Indiana

April 2005 to January 2015

*Appointed by the Governor to lead the Office of Water Quality.*

- Set policy direction for water including wetlands, water quality standards, Combined Sewers, permitting and compliance.
- Eliminated extensive permit backlogs, improved wetland permitting coordination among agencies, and improved stakeholder relations.
- Coordinated water office activities with the other offices in the agency.

### Chief, Wastewater Permits Branch, Office of Water Quality

Indiana Department of Environmental Management                Indianapolis, Indiana
March 2002 to April 2005

- Supervised 50 employees in Industrial, Municipal, and Stormwater wastewater permits.
- Implemented a plan to remove the backlog of combined sewer plan reviews.

### Chief, Wastewater Compliance Branch, Office of Water Quality

Indiana Department of Environmental Management                Indianapolis, Indiana
September 2001 to March 2002

- Supervised 40 staff inspectors, data managers, and managed operator certification.
- Lead the move to electronic submission of reports.

### Chief, State Revolving Fund Program

Indiana Department of Environmental Management                Indianapolis, Indiana
January 2000 to September 2001

- Led Indiana's fund to provide low-interest infrastructure loans to municipalities.
- Closed $350 million in loans for over 50 communities and managed $50 million in capitalization grants.

A-2

**Elected City Council Member**

City of Iowa City, Iowa                                               Iowa City, Iowa
July 1993 to January 1996

- Elected to seven-member City Council representing 75,000 citizens.
- Passed funding proposal to fund construction of new water and wastewater

plants.

**Program Manager**

The Stanley Foundation                                               Muscatine, Iowa
January 1990 to January 1996

- Served as rapporteur for foundation programs including preparation for the UN
  Earth Summit.

**Congressional Staffer**

US Representatives Bob Carr, Peter Visclosky, and Dennis Eckart

US House of Representatives                                               Washington, DC
January 1985-January 1990

- Served as a legislative correspondent and assistant. Responded to constituent requests,
  tracked legislation, and briefed the Congressmen.

# Education

### Master of Arts at the School of Public and Environmental Affairs

Indiana University
2000

### Bachelor of Arts, Public Policy, James Madison College

Michigan State University
1983

**Appendix B. Materials Considered**

**Bruno Pigott,**
**Expert Rebuttal Report in *Conservation Law Foundation v. Shell Oil Company, et al.*,**
**No. No. 3:21-cv-00933**

In addition to the materials specifically cited in my expert rebuttal report and any attachments thereto, served on July 22, 2025, I have reviewed and considered the following materials in connection with my expert rebuttal report and reserve the right to rely on any of the documents or materials included herein.

**Public Documents**

NPDES Permit No. MA0101800, "Authorization to Discharge Under the National Pollutant Discharge Elimination System" for the City of Westfield, Massachusetts, signed Sep. 28, 2023, available at https://www.epa.gov/system/files/documents/2025-06/finalma0101800permit-2023.pdf.

**Regulations**

33 United States Code § 1311 – Effluent Limitations.

33 United States Code § 1342 – National Pollutant Discharge Elimination System.

33 United States Code § 1365 – Citizen Suits.

**Caselaw**

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000)

*Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 US 49 (1987)

*Natural Resources Defense Council v. County of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013)

*Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995)

*Piney Run Preservation Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255 (4th Cir. 2001)

*U.S., et al. v. City of Cahokia Heights, Ill.¸* No. 3:24-cv-02591 (S.D. Ill. 2024)

*U.S., et al. v. City of Holyoke, Mass.*, No. 19-cv-10332-MGM (D. Mass. 2023)

*U.S. v. Guam Waterworks Authority, et al.¸* No. 1:24-cv-00004 (D. Guam 2024)

**Litigation Documents**

Expert Report of Susan Parker Bodine, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO

Expert Report of David M. Uhlmann, June 23, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO

Expert Report of Matthew Barlow, May 1, 2025, *Conservation Law Foundation, et al.,* No. 3:21-cv-00933-VDO