# Exhibit D

Filed Under Seal

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - +
                                |
CONSERVATION LAW                |
FOUNDATION, INC.,               |
                                |
            Plaintiff,          |   Case Number:
                                |
   vs.                          |   3:21-cv-00933-VDO
                                |
EQUILON ENTERPRISES, LLC,       |
d/b/a SHELL OIL PRODUCTS         |
US, TRITON TERMINALING, LLC,|
and MOTIVA ENTERPRISES, LLC,|
                                |
            Defendants.          |
                                |
- - - - - - - - - - - - - - - - +


                  Video Deposition of
                     BRUNO PIGOTT
                  Monday, August 25, 2025
                        9:15 a.m.




Veritext 7553347
Reported by:  Laurie Donovan, RPR, CRR, CLR

Page 2

August 25, 2025

9:15 a.m.

Video deposition of BRUNO PIGOTT, held in person, with the witness and all parties participating in person, pursuant to the Rules of the United States District Court for the District of Connecticut, subject to such stipulations as may be recited herein or attached hereto, before Laurie Donovan, a Registered Professional Reporter and notary public of the District of Columbia, who officiated in administering the oath to the witness.

Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

Conservation Law Foundation, Inc.

15 East State Street

Suite 4

Montpelier, Vermont 05602

(802)223-5992

By:  Christopher M. Kilian, Esq.

ckilian@clf.org

Katrina Myers, Esq.

ON BEHALF OF THE DEFENDANTS:

King & Spalding, LLP

1180 Peachtree Street, NE

Suite 1600

Atlanta, Georgia 30309

(404)572-4600

By:  Carmen R. Toledo, Esq.

ctoledo@kslaw.com

ALSO PRESENT:

Robert Leonard, videographer

Bruno Pigott                                       August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 4

EXAMINATION INDEX

                                                          PAGE

EXAMINATION BY MS. TOLEDO . . . . . . . . . . .      7

EXAMINATION BY MR. KILIAN . . . . . . . . . . .    238

FURTHER EXAM BY MS. TOLEDO  . . . . . . . . . .    259

E X H I B I T S

EXHIBIT     DESCRIPTION                             PAGE

Exhibit 1   Notice of Deposition  . . . . . .      13

Exhibit 2   Invoice from Bruno Pigott,

            Bates PIGOTT000001  . . . . . . .      27

Exhibit 3   Expert Rebuttal Report of

            Bruno L. Pigott . . . . . . . . .      30

Exhibit 4   Connecticut General Permit for

            the Discharge of Stormwater

            Associated with Industrial

            Activity, October 1, 2018 . . . .      92

Exhibit 5   US EPA's NPDES Multi-Sector

            General Permit for Stormwater

            Discharges Associated with

            Industrial Activity . . . . . . .      94

Bruno Pigott                                        August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 5

(Exhibits continued)

EXHIBIT        DESCRIPTION                                PAGE

Exhibit 6    Industrial Stormwater Fact
             Sheet Series  . . . . . . . . . .    97

Exhibit 7    Another copy of the
             Connecticut General Permit for
             the Discharge of Stormwater
             Associated with Industrial
             Activity, October 1, 2021 . . . .   107

Exhibit 8    Connecticut DEEP National
             Pollutant Discharge Elimination
             System General Permit for the
             Discharge of Stormwater Associated
             with Industrial Activities  . . .   109

Exhibit 9    Expert Witness Report of
             David M. Uhlmann, June 23, 2025 .   137

Exhibit 10   Developing Your Stormwater
             Pollution Prevention Plan, A
             Guide for Industrial Operators  .   179

Bruno Pigott                              August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 14

have in this case to your counsel for production to defendants?

A    I have provided all my documents for this case, yes.

Q    Is your most recent CV the one that is attached to your report?

A    It has recently changed, as I started a new job on August 11 of this year.  So it's not on my CV, but I'm now the executive director of the WateReuse Association, and that's not in my CV.

Q    I'm sorry.  The Water --

A    -- Reuse Association.

THE REPORTER:  So it's "water reuse"?

THE WITNESS:  Correct, and it's actually one word.  It's capital W-a-t-e, capital R-e-u-s-e, which is the way that they -- anyway, that's the association that I'm the executive director of today.

BY MS. TOLEDO:

Q    And what is the WateReuse Association?

A    The WateReuse Association is an association -- it's a membership association comprised of a number of utilities, businesses, and individuals who are interested in promoting, educating and advocating for water reuse policies around the

Page 15

country.

And so that work involves explaining to people what WateReuse is comprised of.  It involves advocating before Congress and other organizations, state legislators, for rules and laws that would promote water reuse activity.

And when I say what's a water reuse activity, it might include putting together a wastewater treatment plant and a drinking water treatment plant that converts the waste water and then -- and super-cleans it, using membranes, to provide for potable drinking water.  For example, San Diego, California is building such a facility today, and there are a number of others.  So that's a potable reuse.

There's non-potable reuse, which means -- and that's done in Florida, for example, in Tampa, Florida, where the City of Tampa takes wastewater, treats it, and it may not be at drinking water standards, but they use it for the purposes of watering lawns and other things.

It's a, it's a conservation effort to ensure that drinking water is supplied to residents.  You see it in the western U.S., in the southern U.S., and increasingly, as we see data centers built around the

Page 53

to protect against climate.

So I believe the agreed orders that would have been put in place would call for submission of a SWPPP or other things, not specifically indicating climate inclusions, but since it was a part of best engineering practices, it would have been something that would have been required under the permit.

BY MS. TOLEDO:

Q    But the violation was the failure to submit a SWPPP, right?

A    There, there was definitely a violation to -- that I can clearly recall -- submit a SWPPP.

Q    Did the agency ever commence enforcement proceedings against any industrial facility based on its failure to consider adverse weather events made worse by climate change?

MR. KILIAN:  Objection.

THE WITNESS:  I believe -- oh, can you repeat the question again.  I'm just a little bit behind.

THE REPORTER:  Sure.

(Whereupon, reporter reads requested material.)

THE WITNESS:  I believe that the agency took

Page 54

enforcement actions when facilities failed to put in place stormwater pollution prevention plans and other plans that did not include both an analysis of the changing climate, specifically regarding intensity and frequency of rain events, and that those were the ways in which the agency incorporated the issue of climate into enforcement actions.

BY MS. TOLEDO:

Q    Can you give me any examples?

A    I don't off the top of my head have a memory of a specific, but we took several enforcement actions, and so I don't have them off the top of my head.

Q    Would that have been after the EPA's 2021 MSGP went into effect?

A    It was probably not just after, but before as well, because we were aware and believed that best engineering practices were inclusive of considerations of rain events and climate changes, even before the MSGP was out.  I felt like the MSGP, the 2021 MSGP only reinforced the notion that long existed that, you know, you ought to look at the changing nature of rain events in the climate as the cause of that to determine what the best engineering practices are, and

Bruno Pigott                              August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 64

meetings that occurred twice a year.  Another occurring coming up, too.

Q    Have you worked on any projects for companies in Connecticut?

A    Not that I'm aware of, no, ma'am.

Q    Have you worked for the State of Connecticut or for any Connecticut municipality or other governmental entity in the state?

A    No.

Q    Other than your work for CLF in this case, have you done any work for any environmental groups in the state of Connecticut?

A    No.

Q    You do not list any publications in your CV. Have you published any articles in the peer-reviewed literature?

A    No.

Q    Have you published any articles in the popular press?

A    I have published articles in Indiana publications, general environmental articles, yes.

Q    Have you submitted any papers for publication?

A    I have not.

Q    Now, you're not an engineer, right?

Bruno Pigott                                August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 65

A    That's correct.  I'm not an engineer.

Q    And you're not a toxicologist?

A    I'm not a toxicologist.

Q    Or a risk assessor?

A    I'm not a risk assessor.

Q    You're not a lawyer?

A    I'm not a lawyer.

Q    You have never worked at a manufacturing facility?

A    I have not.  Well --

Q    Oh, there's a story there.

A    Well, you know, in high school or college, I worked at a plastics factory for a summer, but I don't think that's what you're asking.

Q    Where was that?

A    In Rochester, Michigan.

Q    Did you work the manufacturing line?

A    Oh, yeah, I did.  I put plastic pellets into an enormous machine that produced accelerator pedals.

Q    You've never been employed at a chemical facility?

A    I have not.

Q    You've never been employed at a bulk petroleum storage terminal?

A    I have not been employed at a bulk petroleum

Page 66

storage terminal, no.

Q    Do you have any experience in environmental compliance management at a petroleum bulk storage terminal?

A    I have plenty of experience about environmental compliance management, not at a -- and from a state perspective, but not at a bulk petroleum storage facility, no.

Q    At what type of facilities?

A    At the State of Indiana, I was in charge of compliance activities, for all NPDES permits, both the evaluation of data and in charge of the inspections that took place around the state.

Q    Is that referring to state-owned facilities or industrial facilities that you regulated?

A    State-owned facilities and industrial facilities that we regulated, as well as municipalities, MS4s.  I was in charge of the inspection units for those activities.

            THE REPORTER:  You said MS4s?

            THE WITNESS:  Correct.

BY MS. TOLEDO:

Q    Have you ever advised the owners or operators of petroleum bulk storage terminals about design or compliance issues?

Page 67

A    I signed inspection reports that went to bulk storage facilities, but I did not personally have -- either did not inspect, nor did I talk to the managers of those facilities or the environmental crew about, about environmental requirements.

Q    And that was in your capacity as a regulator for the State of Indiana?

A    That's correct.

Q    You're not a climate scientist, are you?

A    I'm not a climate scientist.

Q    You're not a tank engineer?

A    I'm not a tank engineer.

Q    Are you familiar with best industry practices relating to above-ground storage tanks?

A    As the head of the Indiana Department of Environmental Management, we were involved in discussions regarding above-ground storage tanks when flooding occurred in Indiana and when the Charleston River had a spill in West Virginia that caused our agency to propose regulations imposing secondary containment requirements for bulk storage facilities around the state of Indiana, in response to the big spill that happened in Charleston that closed the drinking water treatment plant, and so that was my role in, in advocating for secondary containment in

Page 70

The burden is literally on the permittee here, not on me to tell them exactly what to do, and, and that's the way the program was constructed, as it is for much of the NPDES program, really, especially industrial.

We don't tell people what specific technologies to put in place on a whole raft of numerics, much less others. We say "here are your conditions, here are your permit requirements, go meet them," and it's based on whether they do -- whether or not they are in compliance with their permit.

BY MS. TOLEDO:

Q    So it's a site-specific inquiry?

A    And certainly, especially for stormwater issues, site-specific inquiries are vitally important.

(Discussion was held off the record regarding a possible short break.)

BY MS. TOLEDO:

Q    It also depends on the specific industry and type of facility, correct, not just location?

MR. KILIAN:  Objection.

THE WITNESS:  A variety of factors go into determining the appropriate control measures, including the location, including the rain event,

Bruno Pigott                                        August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 76

BY MS. TOLEDO:

Q    BMPs include nonstructural or management practices; do you agree?

MR. KILIAN:  Objection:

THE WITNESS:  BMPs include a variety of structural and nonstructural practices.

BY MS. TOLEDO:

Q    And in fact, the MSGP lists some control measures that are management practices, correct?

A    Yes.

(Reporter clarification.)

BY MS. TOLEDO:

Q    You have no opinion on whether defendant's existing plans and procedures to prepare for severe weather events are sufficiently protective, correct?

MR. KILIAN:  Objection.

THE WITNESS:  I have no opinion.

BY MS. TOLEDO:

Q    I'm sorry.  Can you say that again?

A    I don't have an opinion about whether or not the plans are sufficient.  I have not reviewed them.

Q    You do state, like we talked before, that you did review the Barlow and Goldsmith reports, right?

A    I do -- in fact, I quote from them on one of

Page 77

the pages here.

Q    Did you do anything to verify what Dr. Barlow stated in his report?

A    I noted that Barlow said that "human-caused climate change has already caused an increase in precipitation" at the terminal.  I did not verify or check into that statement.

Q    Did you do anything to verify the opinions of Dr. Goldsmith that you're relying on?

A    I reviewed Dr. Goldsmith's opinions, and I did not verify or further investigate those opinions.

Q    If we go to page 1 of your report, the second paragraph describes your charge in this case, correct?

A    That's correct.

Q    And that was to, you say, "to provide my opinions about the Clean Water Act (CWA), and more specifically stormwater provisions in NPDES permits and whether and how climate change considerations are incorporated in those permits."

Did I read that correctly?

A    You did.

Q    So you're not expressing any opinions regarding RCRA, correct?

A    I'm not.

Bruno Pigott                                      August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 78

Q    Okay, and you don't specialize in solid and hazard waste management, do you?

A    I -- well, I was the head of the Department of Environmental Management.  I oversaw the solid waste program, but I do not specialize in solid waste issues.  I was in charge of all of it.

Q    And as we discussed earlier, at EPA, you were at the Office of Water, and that was the focus of your work, right?

A    Yes, that's correct.

Q    Your report does not address any issues relating to hazardous waste management at the terminal, correct?

A    My report does not deal with hazardous waste as material, no.

Q    You are not offering any opinions as to whether the terminal is or is not complying with SPCC regulations, are you?

A    I did not --

MR. KILIAN:  Objection.

THE WITNESS:  I did not offer an opinion about that.

BY MS. TOLEDO:

Q    Are you offering an opinion as to whether the terminal is complying with the applicable

Bruno Pigott                                         August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 82

BY MS. TOLEDO:

Q    Are you stating any opinions relating to any violations of defendants specifically relating to this case?

A    I am not citing any opinions about any violations in this case.

Q    You have reviewed the complaint in the case, right?

A    Yes.

Q    And so you're aware that the claims that are being asserted are based on alleged violations of the Clean Water Act and RCRA, right?

A    Yes.

Q    There are no claims alleging deceit, correct?

A    Not that I'm aware of.

MR. KILIAN:  Objection.

BY MS. TOLEDO:

Q    And there are no claims based on fraud, as best you're aware, correct?

MR. KILIAN:  Objection.

THE WITNESS:  I'm not aware.

BY MS. TOLEDO:

Q    Let's go to page 4 of your report, please, where you discuss your methodology, and I believe you

Page 83

say that you, in reaching your opinions, you rely on your professional experience, you reviewed Mr. Uhlmann's and Ms. Bodine's reports, and you "reviewed the EPA website for relevant authority."

Is that right?

A    Correct.

Q    Did you do anything else in terms of your methodology to reach your opinions?

A    This is the prime methodology I used.

Q    Did you conduct any research to identify what constitutes best industry practice in connection with industrial stormwater permits for petroleum bulk storage terminals?

A    I did not -- well, I recognize that best industry practice has a broad connotation that affects both individual kind of industries, but also a broader sense of industrial activity, so I did not focus on industrial bulk storage facility practices alone.

Q    Now, you say that you "reviewed the EPA website for relevant authority," and what specific EPA documents and guidance did you identify and rely on?

A    In my report, I mention that best -- and I'm going to -- best engineering practices often include the use of climate tools, and I reviewed the, uh, creating resilient water utilities tool, as well as

Bruno Pigott                                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 88

remember, look at cases that I was aware of during my time, and Cohokia Heights being in Illinois, right next to Indiana, was obviously a natural for me, being a midwesterner; and looking at Holyoke, it's a, if I remember correctly, a CSO community, I worked on CSO issues for 20 some odd years; and the Guam case, I believe I had discussions with counsel about the Guam case.

So those were just -- the reason I picked them was because I was aware of them through my discussions at EPA.

Q    You did not conduct any research for these cases before you prepared your report?

A    I read the cases when I reviewed the report. That's the extent of my research on those cases.

Q    You cite some published cases with the complete citation.  Did you have copies of these cases other than just being generally aware of them?

A    I was generally aware, and then I looked them up, and then I found the citations, and I thought it would be important to indicate that it just wasn't something I made up, but here is the citation to it.

Q    Where did you look them up?

A    I did a Google search, quite frankly, and could find them.

Page 92

issues at the same time that you're supposed to put together a permit that reduces or prevents discharges of pollutants to waters that this permit is supposed to get at.

Q    Move to strike as nonresponsive.

Mr. Pigott, we have a lot of ground to cover --

A    Okay.

Q    -- so I'm going to ask you please to answer my questions, and, you know, your counsel will have the opportunity to follow up; okay?

A    Okay.  Yep.

MS. TOLEDO:  Now, the general permit -- I'm going to go ahead and mark the October 1, 2018 Connecticut general permit, and that will be Exhibit 4, I think.

(Exhibit 4 was marked for identification.)

BY MS. TOLEDO:

Q    I'll represent to you that this is the permit that was in effect at the time CLF filed its lawsuit in this case; okay?

Have you reviewed this permit?

A    I have not reviewed this permit.

Q    Is it your understanding that this 2018

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 94

Q    So in, in your opinions that you express in your report, when you're talking about permit requirements, you generally are talking about the EPA 2021 MSGP, correct?

MR. KILIAN:  Objection.

THE WITNESS:  I am talking about the MSGP, and I'm using my experience in Indiana as the department head and my experience with the use of industrial stormwater permits in Indiana as my basis.

BY MS. TOLEDO:

Q    EPA, as we talked about before, classifies different industries by sector, correct?

A    That's correct.

Q    And what sector does the terminal fall under?  Do you know off the top of your head?

A    I do not know.  I'm looking through the permit now to see if there's a sector specific to bulk petroleum loading facilities.

MS. TOLEDO:  Well, let me do something that might help us move this along.

I'm going to mark as Exhibit 5 and 6 the --
actually, let's just do 5.

(Exhibit 5 was marked for
identification.)

Page 101

prevention plans.

BY MS. TOLEDO:

Q    Mr. Pigott, if the permit does not have the express requirement and there is no EPA guidance setting out the express requirements, how are permittees supposed to know that they have to do that?

MR. KILIAN:  Objection.

THE WITNESS:  NPDES permits do not lay out what technologies must be used or what best management practices need to be used.  They depend on -- and the program, the whole NPDES program for industrial individual permits as well as general permits, relies on the engineer's evaluation of a situation and coming up with here's what we're going to do to meet the terms of the permit.

And so I think it's inherent in the, in the process whether or not the language of, of climate change considerations is listed specifically in the permit.

BY MS. TOLEDO:

Q    Do you agree that the section in the 2021 MSGP -- strike that.

Do you agree that Section 2.1.1.8 on page 19 of the 2021 MSGP is a new section that was

Page 110

permit, to the definitions.

Are you there?

A    I am there.  Thank you.

Q    And we can see that the draft permit now references a 100-year flood.

Do you see that?

A    I do see that.

Q    It does not reference a 500-year flood; do you agree?

A    I do not see "500-year flood" defined here.

Q    To your knowledge, is the 100-year flood definition something new that was added to this permit when compared to the 2018 permit?

MR. KILIAN:  Objection.

THE WITNESS:  I -- my experience is "100-year flood" was a common definition in permits, including stormwater permits.  I am not aware whether or not this was included in the definitions in the other past permits.

BY MS. TOLEDO:

Q    If we turn to Section 7(c)(2).

MR. KILIAN:  Do we have a page for that?

BY MS. TOLEDO:

Q    I'm looking.  Sorry.  I neglected to write it down.

Page 119

BY MS. TOLEDO:

Q    And I understand that's your opinion and that's what you've testified to, but my question was a little different.

My question was whether the IDEM NPDES general permit for industrial stormwater incorporated the resilience measure section from the 2021 MSGP at the time that you left the agency.

A    I don't recall, to be quite honest.  As the head of the agency, I didn't always review each of the permits that we issued, even though it was a general permit, and I had responsibilities over air, land and water enforcement, and so I can't answer that honestly, because I, I don't know.

Q    During the course of your experience at IDEM, either at the Office of Water Quality or as commissioner, [did you] commence enforcement proceedings asserting that a facility had failed to consider climate change in its SWPPP?

MR. KILIAN:  Objection.

THE WITNESS:  Enforcement was -- whether or not we took enforcement action on the incorporation of climate in the SWPPP is something I don't know that I can answer, as usually enforcement actions involved a variety of

Page 120

specific violations.

So I can't answer specifically whether a particular enforcement action included a provision saying that they didn't consider climate.

BY MS. TOLEDO:

Q   Do you remember any such enforcement action while you were at the Office of Water Quality?

A   I can remember generally enforcement actions, but don't have a specific recollection of an enforcement action in this regard.  I saw the failure to submit SWPPPs, the failure to put together the climate plans, but I, I cannot, in all honesty, tell you whether or not that was something that I saw as the head of the Office of Water Quality.

Q   Now, you state in this opinion that all NPDES terms are enforceable, right?

A   Yes, I do say that.

Q   Would an NPDES permit term be enforceable if it violated the due process clause?

MR. KILIAN:  Objection.

THE WITNESS:  I, I'm not able to answer that question.  I just don't have the answer.

BY MS. TOLEDO:

Q   Do you know what the due process clause is?

Page 129

process.

Q    Have you ever been involved in the drafting of a complaint that resulted in a consent decree?

A    Not, not involved in a drafting, but in negotiations on consent decrees, yes.

Q    Were you involved in negotiations relating to any of the three consent decrees that you cited in your report?

A    No.

Q    Did any of the three consent decrees that you cited involve a Clean Water Act enforcement action brought for failure to implement a climate-change-related measure?

A    The three -- two of the three were regarding sanitary sewer overflows, and the third was a CSO. Holyoke was a CSO issue.  Combined sewer overflow. Sorry.

Q    I appreciate that.

Did you review the Cohokia Heights complaint?

A    I reviewed the agreed -- I mean consent decree.

Q    Do you know whether the complaint involved any claims based on the failure to implement climate resilience measures?

Page 130

A    I am not aware of whether the complaint points out failure to abide by climate resilience measures.

Q    Did Cohokia Heights hold a discharge permit for its sanitary sewer system --

A    It had a --

Q    -- when it, when it -- when the complaint was filed?

A    I believe it did.

Q    And the permit at issue in the Cohokia Heights consent decree; was, was that the 2021 MSGP?

A    No.  This was about the NPDES individual permit for Cohokia Heights.

Q    Has the Cohokia Heights consent decree, to your knowledge, been approved and finalized, to your knowledge?

A    I -- to my knowledge, I actually don't know the answer to that.  I think it has been, but I, I can't precisely answer or accurately answer.

Q    Guam water works consent decree -- strike that.

For the Guam waterworks matter, did you review that complaint?

A    I reviewed the consent decree itself.

Q    So do you have any knowledge about whether

Page 132

A     I'm unaware of that.

Q     Isn't it true that the Holyoke consent decree does not require climate resilience measures to be implemented, but rather it cites EPS -- strike that -- EPA's climate resilience evaluation and awareness tool as one of five potential practices to be considered when performing construction, management and maintenance?

A     The Holyoke consent decree required the city to use the generally accepted engineering practices, and then explicitly mentioned the climate resilience evaluation tool, the point of which is to say that the generally accepted engineering practices include an evaluation of climate conditions.

Q     Would it be fair to say that none of these cases involved climate-change-related claims?

A     I don't -- so I think that the cases involve sanitary sewer overflows as well as combined sewer overflows.  Some of those overflows may be related to changing climate conditions and overloading of a sewer system.

As a result, one of the -- in two of the consent decrees, the SSO issues required the community to analyze what was the cause of these SSO events, and then to put together a plan including these

Page 134

facilities.

Q    Were this -- was that not mentioned in the consent decrees?

A    My reading of the consent decrees did not mention -- I don't recall reading any mention of bulk storage facilities in the consent decrees, merely that there were SSO events and, and Holyoke CSO events.

Q    Are you aware of any such enforcement actions in the state of Connecticut?

MR. KILIAN:  Objection.

THE WITNESS:  Can you be -- can I ask you to be more specific in terms of the awareness of -- do you mean consent decrees like SSO event consent decrees or specific enforcement matters, or --

BY MS. TOLEDO:

Q    I'll clarify.

A    Okay.  Thank you.

Q    You cite to these three consent decrees as examples of enforcement proceedings that involve climate-change-related considerations, correct?

A    That's correct.

Q    My question is:  Are you aware of any enforcement actions in the state of Connecticut that involved climate-change-related considerations?

Bruno Pigott                                          August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 135

A    I am not aware of specific enforcement activities in Connecticut regarding SSO overflows or CSOs or climate considerations.  I don't have a great understanding of any of the specific enforcement activities in Connecticut.

Q    And that would include consent decrees; you're not aware of any?

A    I'm not aware of the consent decrees, which may or may not contain specific requirements to conduct climate analysis or even imply them.

Q    Are you aware of any enforcement proceedings that involved climate-change-related considerations that occurred before 2023?

A    I believe that the climate considerations are to be taken into account in these enforcement actions; anytime there's a mention of using generally -- the generally accepted engineering practices, that inherent in that is the requirement to evaluate weather patterns and determine whether or not storm events of a magnitude that would be concerning should be considered in developing plans to resolve enforcement cases.

Q    Move to strike as nonresponsive.

My question is whether you can name for me any enforcement proceedings, like the three you cite

Page 136

here in your rebuttal report at pages 6 to 7, that involved climate-change-related considerations before 2023?

A    I do not have a list and cannot cite specific enforcement actions in Connecticut, period.

Q    No, not my question.

Before 2023 anywhere.  The ones you cite are 2023, 2024, 2024.

A    Yes.  In Connecticut, I just don't know.

Q    In, in any state or jurisdiction?

A    I, again, believe that the use of the term's general, except in engineering practices, includes climate considerations, so any enforcement action before 2023 that includes that would require an entity that signs a consent decree to consider the effects of storm events and climate change in their plans to resolve their enforcement cases.

Q    Can you name for me any enforcement proceeding before 2023 that was filed based on an alleged violation of good engineering practice?

A    I cannot name a, an enforcement proceeding that was alleged based on a failure to put in place good engineering practices.

Q    Now, these -- like we were talking about before -- were consent orders that resulted from

Page 148

whether -- and design a system that will help mitigate the, the potential discharges from a facility, and that's based on the fact that they're engineers and they have an awareness of this, and they conduct an evaluation of what's happening in industry generally and then in their area specifically, and in their geographic location.

Q   As we sit here today, can you identify for me a single enforcement case that the EPA has brought against a permittee under the industrial stormwater permit based on a violation of a best industry practice?

MR. KILIAN:  Objection.

THE WITNESS:  I, I'm not aware of the different enforcement actions that have been taken across the board at EPA for a variety of areas, but including the industrial stormwater area, you know.

BY MS. TOLEDO:

Q   Same question for Connecticut DEEP.  You --

A   I'm not aware of the --

MR. KILIAN:  Objection.

THE REPORTER:  You guys were all three talking at the same time.

THE WITNESS:  Sorry.

Page 160

A    I may be mixing it up with an NRDC vs. LA. I'm forgetting, quite frankly.

Q    Let's turn then to Opinion 4, and there you say, "Requiring compliance with narrative requirements such as 'Best Industry Practice' or 'Good Engineering Practice' places an affirmative burden on permittees to identify risks and underlying conditions that relate to pollutant discharges under the CWA."

Did I read that correctly?

A    You did.  Thank you.

Q    Are you aware that the Connecticut general permit does not include the term "good engineering practice"?

A    I am not precisely aware of the language of the Connecticut general permit.

Q    If that is the case, would you agree that permittees subject to the Connecticut general permit are not subject to the term "good engineering practice"?

MR. KILIAN:  Objection.

THE WITNESS:  I tend to think of the best industry practices when I think about these permits and that they would be subject to ensuring that they have best industry practices. It's my understanding that's the whole real

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 161

fundamental basis of the stormwater permits is an understanding that, you know, the SWPPPs and the permits rely on the permitted entities to come up with and analyze current conditions, determine those, how those conditions would affect what they put in place for stormwater, stormwater practices to minimize discharges to waters.

BY MS. TOLEDO:

Q    So this morning you have been talking repeatedly about good engineering practice.  Are you saying now that, that that is not the term you intended to use in your earlier testimony today?

A    I -- no, I think that different, different NPDES permits -- and this paragraph specifically talks about NPDES permits, and therefore, there are different terms that are used.

Good engineering practice may not be used in one permit, but certainly best industry practices are and where they are.  The point is that those practices should include the evaluation of climate conditions before coming up with their stormwater pollution prevention plans.

Q    So in this opinion, you really are again focusing on the MSGP permit terms rather than Connecticut's; is that true?

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 162

MR. KILIAN: Objection.

THE WITNESS: I'm focusing on NPDES permits overall, but certainly MSGP as well.

BY MS. TOLEDO:

Q    What does it mean to have an "affirmative burden . . . to identify risks and underlying conditions that relate to pollutant discharges"?

A    Well, in my experience with the NPDES permit programs, there are both numeric -- and generally in permits, numeric permit conditions, and then there are general standard conditions, and the stormwater program is unique, because it really relies on inputs -- the onus on the facility to conduct an analysis.

It recognizes, A, that the stormwater pollution prevention plan should reflect conditions at a facility, and then B, that you have to take into account a variety of factors when designing a stormwater pollution prevention plan, and if you were to design a plan for a system, whether it's an industry that's a big warehouse or something else, and it was in an upland area away from any water sources, you might put in place different, different best management practices to deal with the stormwater requirements of a multi-sector general permit than you

Page 165

the permit?

MR. KILIAN:  Objection.

THE WITNESS:  I think that permittees know about the outcomes and purposes of the permit itself.  You're to minimize discharges to waters, and what it does, just like the individual NPDES permit program, is allow them to determine what technologies work the best.

In the NPDES permit program, I do not tell an industrial steelmaker what -- I do tell them what numeric limits they need to meet, but I don't tell them what technologies to use to do that.  Here, it's the same kind of thing. It's -- I'm not telling you exactly how you have to build your treatment capacity.  What I'm telling you is here is the outcome I want. That's a standard for the NPDES program.

So I feel like it, it is clear, and that in the NPDES program writ large, there is clarity that there needs to be an analysis to determine how best to meet the outcome requirements of the, of the permits.

BY MS. TOLEDO:

Q    Are you aware that the terminal is in compliance with its limits?

Page 166

A    I --

MR. KILIAN:  Objection.

THE WITNESS:  I made no position about whether they are in compliance.  I don't know them -- I don't know whether that refers to numeric limits or standard conditions, so I can't really say that I am aware of that, no.

BY MS. TOLEDO:

Q    Well, you just said that your focus is on the outcome --

A    That's correct.

Q    -- and meeting the limitations, right?

A    It is meeting limits and the standard conditions in the permit.

Q    If the objective is to meet the limitations, and a terminal is meeting the limitations, then how is a permittee to determine that practices or procedures or other circumstances at the terminal are violations?

A    The stormwater program, and perhaps all of the NPDES programs are interesting, because water is not a static thing.  It's not just whether you're meeting them today, the permit terms, but what are you going to do in the future, and how can you meet them.

And therefore, an analysis needs to be made by the facility at the point in time when they have

Page 167

the permit to determine what are the challenges today and what are the likely future challenges, and then design a system that meets those terms.

Q    And permits have five-year terms, right?

A    That's correct.

Q    Now, every five years, the agency can change the permit requirements, correct?

A    That's correct.

Q    So for this planning for, for future challenges that you were talking about, what time period are you considering?

A    Well, again, the burden to determine the timeframe for the stormwater activities and what should -- is something that is determined by the facility.  They have the requirement to conduct that analysis, and therefore, they need to explain in the stormwater pollution prevention plan what timeframes did they use to consider what future challenges.  Is it a 100-year storm event?  Is it a 500-year storm event?

That analysis is required, and therefore, I don't think that the permits dictate the timeframes that people look for; rather -- and the reason that a five-year term is there is because things change over time, and when they do, it requires both the agency

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 168

and a facility to reevaluate things.

So certainly they should look within that time, that five-year timeframe, but beyond that, to determine what are the likely impacts to our facility, and it's really hard to, given storm events, predict whether a 100-year storm event, a 500-year, how frequently they will happen, but what they can do is evaluate, well, okay, how many times are we seeing these different storm events, and what can we expect in the future.

So it's an analysis.  It certainly is, and the agency does not say that you must do a minimum of X, Y and Z, but requires that facility -- and frankly, the folks that are under these permits advocated to have these kinds of flexibilities in their permits to say, look, let us design this.  We know what's going on at our facility, and we know the stormwater issues there.  I mean who better?  Because we're right there. We know whether XYZ will work.  I think there is a trust element in that to determine what should be put in place.

Q    Well, the Connecticut general permit does set out what is required to be included in the SWPPPs?

A    Correct.

Q    And the 2018 general permit had no

Page 169

requirement that the SWPPP discuss these plans or analyses; do you agree with that?

MR. KILIAN:  Objection.

THE WITNESS:  I believe that as a part of the good -- whether it's good engineering principles or best industry practices, they're incorporated into what an engineering entity that's putting together these stormwater pollution prevention plans need to do.

So you're right that the conditions in the, the permit, the multi-sector general permit may have changed, but the real requirements to conduct that analysis have been in place far longer than the explicit language that you find in 2.1.1.8 and other places.

BY MS. TOLEDO:

Q    As we sit here today, can you name for me any examples where a failure to meet such an affirmative burden, as you're discussing in Opinion 4, was the basis for a Clean Water Act enforcement action?

MR. KILIAN:  Objection.

THE WITNESS:  I can say that while I know enforcement actions have been taken, I can't say whether -- and certainly, while some entities

Page 170

have not submitted SWPPPs at all, that's a failure of their affirmative action to, to conduct this analysis and put in place a plan.

So there have been enforcement cases.  I can't say whether or not the enforcement cases were directly related to failure to consider these in the SWPPP.  I can't answer that.

BY MS. TOLEDO:

Q   Well, the permit has an explicit and express requirement that the facilities prepare SWPPPs, right?

A   Correct.

Q   But there is no such express requirement for this affirmative burden to identify risks and underlying conditions that relate to pollutant discharges; would you agree?

MR. KILIAN:  Objection.

THE WITNESS:  No, I don't agree.  I think there is inherent in that process a burden on the facility to come up with an analysis of the risks and the conditions at the site that necessarily includes the changing nature of rain events and, therefore one could easily argue that those events are, are the components of a climate analysis, especially a water climate analysis.

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 178

Q    So following up on your response, if a facility considers climate considerations, is it meeting its obligations?

A    Well, I suppose that question is what -- I mean what it raises in me is the question of what is -- how do you define climate considerations, and I -- when I look at a stormwater permit, I think:  Has the facility looked at rain events in the area and possible storm surges, possible -- and changes in those things?

When I was in Indiana, for example, we dealt with a consent decree for Indianapolis and their long-term control plan, and we looked at what's changed over time in terms of the flows and rain events in what parts of the city, to determine what controls would be best to put in place to ensure that there were not combined sewer overflows.

My expectation is that that kind of analysis -- you call it "climate change" or "climate considerations," but that kind of analysis is key to designing the right kind of pollution prevention plan. That's what I think.

Q    And again, you haven't looked at any of the documents from the facility that talk about what analyses the facility --

Page 179

A    I did --

Q    -- has done?

A    I did not.  I looked at, rather, the reports that were provided to me, and looked to determine and answer the question of whether good engineering practices actually include climate-change-driven risk and climate risks in the changing climates that we're in the midst of today.

Q    You cite on page 11 the EPA's 2021 Stormwater Pollution Prevention Plan Guide, correct?

A    Yes.

Q    So let's get that --

A    It's a fact sheet and guide, correct.

MS. TOLEDO:  Let's go ahead and mark that as the next exhibit.  It will be Exhibit 10.

(Exhibit 10 was marked for identification.)

BY MS. TOLEDO:

Q    Is this a document that you referenced in your report?

A    Yes.

Q    Can you please turn to page 1, Section 1, Introduction.

A    I have, yes.  Thank you.

Q    And in the first paragraph, it states, "This

Page 184

MR. KILIAN:  Objection.

THE WITNESS:  I disagree.  I said "the EPA has recognized."  I did not have a date associated with it, although later I did talk about the 2021 multi-sector general permit.  I didn't limit these comments to the multi-sector general permit alone.

It's my position that good engineering practice does include consideration of climate, whether it is listed in the 2021 or other multi-sector general permits.

BY MS. TOLEDO:

Q    And again, the Connecticut permit does not incorporate the term "good engineering practice" --

MR. KILIAN:  Objection.

BY MS. TOLEDO:

Q    -- right?

A    I, I would have to go through it.  I can't answer that question.

Q    Let's turn to Opinion 6, and that opinion states, "The EPA has long considered climate change in the context of CWA enforcement cases and permit interpretation."

Did I read that correctly?

A    You did, yes.

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 185

Q    And here again you rely on EPA and the MSGP, right?

A    I relied on the Office of Enforcement Compliance Assurance framework for protecting public and private investment and clean water enforcement remedies, as well as the climate change adaptation plan.

Q    Fair -- fair enough.

MR. KILIAN:  And I would just note for the record that going back to the beginning of the day or earlier testimony, the dates were corrected there.

THE WITNESS:  Yes.

MS. TOLEDO:  Yes.

MR. KILIAN:  Okay.

MS. TOLEDO:  Yes.  I've been marking my copy.

MR. KILIAN:  Okay.  I just didn't want us to get all confused as a result of that.

THE WITNESS:  Also referred to and based it on the acting director for water enforcement, Joseph Theis.

THE REPORTER:  Joseph what?

THE WITNESS:  Theis, T-H-E-I-S, memorandum to enforcement and compliance division directors.

Bruno Pigott                         August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 186

BY MS. TOLEDO:

Q    Got it, but you do not rely on any permit from Connecticut, correct?

A    No.  This statement is indicative of EPA's long consideration of climate.

Q    Okay, and specifically you say that "EPA has long considered climate change in the context of CWA enforcement cases, permit interpretation, and in guidance documents," right?  The first sentence of the opinion.

A    Oh, yes.

Q    So you say "has long considered," and my question is:  Since when?

A    It's my understanding that given the fact that I believe that the best industry practices or best engineering practices both concern and include a requirement to analyze climate issues, that it's long before the 2021 multi-sector general permit and indicated that when I looked at things, the 2016 framework indicated this as well, so for over, or over ten years, the agency has evaluated climate change in the context of the Clean Water Act.

Q    Okay.  So you're looking at the 2016 Office of Enforcement and Compliance Assurance framework for protecting public and private investment in Clean

Page 187

Water Act enforcement remedies; is that right?

A     Yes.

Q     Can you identify for me what CWA enforcement cases you are referencing in the first sentence of Opinion 6?

A     Well, I am referencing the consent decrees that I mentioned in the beginning of the report, specifically the Cohokia Heights, the Hawaii -- Guam, I should say.  Decision in Holyoke as well.

Q     And again, those were all from 2023 and 2024, right?

A     Those dates I think are accurate.

Q     What do you mean in that first sentence of Opinion 6 where you say that EPA has long considered climate change in the context of permit interpretation?

A     Well, what I mean is that permits that use terminology such as "best industry practice" or "best engineering practices" include the evaluation of, of climate in the consideration of being in compliance with the permit, as part of the conditions of a permit.

Q     In your opinion, what is the date when that became an implied term of the permit?

          MR. KILIAN:  Objection.

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 188

THE WITNESS:  I do not have a date that that was the -- but I have indicators that it was long before 2021 that EPA considered climate change in its different frameworks, and therefore, I believe that the, just the use of the term "best industry practices" or "best engineering practices" covered the -- which occurred long before and are foundational in terms of these permits, and necessarily require an evaluation of climate issues, specifically water climate issues.

BY MS. TOLEDO:

Q   When did the term "best industry practice" first appear in a permit?

MR. KILIAN:  Objection.

THE WITNESS:  I can't answer that question.

BY MS. TOLEDO:

Q   And at what point in time would a permittee be able to deduce that best industry practice includes consideration of climate change factors?

MR. KILIAN:  Objection.

THE WITNESS:  I think as long as I've worked in water, permittees could conclude that best industry practices would include factors such as the storm events, such as the intensity of those

Page 189

storm events and frequency of the storm events, as a part of their analysis, so -- and I've worked in the area for 25 years now.

And whether it's the 2021 multi-sector general permit or the MS4 permits, each of those required communities to conduct an analysis to determine what kind of SWPPPs and then what kind of BMPs to use.  If you don't, how can you put together a SWPPP?  How can you put together the appropriate BMPs?  It seems -- you have to consider rain events, you have to consider what is changing, and those I think are considered climate change analyses as well.

BY MS. TOLEDO:

Q    So are you saying that, in your opinion, that has been a requirement for the entire 25 years that you've been doing this?

A    I think that industries and MS4s have been required to put together these SWPPPs and these things for a long period of time, including most of the time that I've been -- and I can't give you a specific date, but long before 2021, to put together SWPPPs.

If you've got a construction -- so we haven't talked about construction stormwater permitting.  You have to put in place best management

Bruno Pigott                                    August 25, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 195

        five.  Back on the record at 4:20 p.m. Eastern

        Time.  You may begin.

BY MS. TOLEDO:

        Q    Are you ready to go forward, Mr. Pigott?

        A    Yes, ma'am.

        Q    Okay.  So let us turn now to Opinion 7 in

your report, and you there state that "The EPA has

included consideration of climate-change-driven risks

in permits for coastal facilities and municipalities

as within the scope of the CWA Industrial Stormwater

permitting program."

             Did I read that correctly?

        A    Yes, you did.

        Q    And again, in this opinion, you discuss the

MSGP and not the Connecticut DEEP permit, correct?

        A    I talk about the Clean Water Act Industrial

Stormwater permitting program writ large, generally.

        Q    But to the extent that you talk about any

permit, you talk about the --

        A    The MSGP later in the second paragraph,

you're correct.  Thank you.

        Q    Okay, and you talk about the requirements in

the 2021 MSGP and the draft 2026 MSGP, correct?

        A    Yes.  Correct.

        Q    Okay.

Page 205

that section is "Consideration of climate change is critical for several reasons.  First, the specific operative permit must also comply with the Connecticut General Permit."

Now, what is your understanding of what the specific operative permit is?

A    It's the permit that is in regard to this specific facility.

Q    Is it your understanding that the facility has an individual permit?

A    It -- I understand that it has the Connecticut general permit, it's got coverage under the general permit.  I do not know whether it has an additional individual permit.

Q    Well, I'll represent to you that the facility is governed by the Connecticut general permit, okay?  So in that sense, that sentence would not be entirely accurate, would you agree, if I'm telling you the truth that it's governed by the general permit?

A    If it's governed by the Connecticut general permit, then it must comply with the general permit, yes.  I see your point.

Q    You cite then to Section 22a-92 of the general statutes, which you have mentioned previously

Page 235

A    Yes.

Q    Can you point to me anywhere in this guide where it instructs industrial operators to conduct an analysis of climate change or resilience factors in developing their SWPPP?

A    I do not see a mention of, of that in my short glance at it currently.

Q    Okay.

You testified earlier about the implicit requirement to consider climate change effects on weather, and that that requirement can be found in the phrases "best engineering" -- "good engineering practice" and "best industry practice," correct?

A    Yes, ma'am.

MR. KILIAN:  Objection.

BY MS. TOLEDO:

Q    And you've explained that several times during the course of your deposition.  To be clear, though, you can't point to any source that supports that opinion before the March 2021 MSGP --

MR. KILIAN:  Objection.

BY MS. TOLEDO:

Q    -- correct?

A    I -- so just for clarification, you're saying that I can't cite a location where it talks

Page 236

about using the terms "best industry practice" or "best engineering practices" to include considerations of climate change before 2021; is that essentially --

Q    That's essentially --

A    -- the question?

Q    -- what I'm asking.  Can you cite to any document, regulation, permit that supports your statement that, that that has been an implicit requirement of the permit for 25 years?

A    I do not have a specific citation for that, but I would ask whether -- how can a person put together the stormwater pollution prevention plan, aside from some of the minimum requirements, including a map, including the design of the facility, without conducting an analysis of the rain events and storm events that are likely to occur, so that's why I consider it a best industry practice.

Q    And -- but you cannot, as you sit here today, identify any specific document that supports that opinion?

MR. KILIAN:  Objection.

THE WITNESS:  I believe that in the process, it's very clear to consultants and engineering companies that put together these, that that process -- that is part of the process.  I do not

Page 261

THE WITNESS:  That's correct, yes.

MR. KILIAN:  That Uhlmann cites and Thies also states --

THE WITNESS:  Thies, I think Thies --

MR. KILIAN:  -- also cites --

THE WITNESS:  -- shows a thread --

MR. KILIAN:  -- as the basis for his memo update, so what we discovered as we were working through it yesterday was that the dates were reversed.

THE WITNESS:  Yeah, I had transposed them. I'm sorry.

BY MS. TOLEDO:

Q    Okay.  All right.  I just want to confirm a couple of things.

Counsel asked you about whether -- if the terminal didn't have a SWPPP, that would be a violation.

Remember that?

A    I do remember that, yes.

Q    Did you ask to review the SWPPP or any of the terminal documents?

A    I did not.

Q    And, and you didn't do so?

A    That's correct.