**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>          Plaintiff,<br><br>    v.<br><br>EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,<br><br>          Defendants. | Case No: 3:21-cv-00933-VDO<br><br><br>October 21, 2025 |

**DRAFT STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Under Local Rule Civil 56(a) and this Court's Order [ECF 797], Defendants Equilon

Enterprises ("Equilon") and Triton Terminaling LLC ("Triton") (collectively, "Defendants"),

respectfully submit this DRAFT[1] Statement of Undisputed Facts.[2]

1.      This case concerns stormwater permit compliance at an onshore petroleum bulk

storage and distribution terminal located at 481 East Shore Parkway, New Haven, Connecticut

(the "Terminal").  ECF 47, Plaintiff's Amended Complaint ("Am. Compl.") at ¶ 2.

2.      Triton owns and Equilon operates the Terminal under the General Permit for

Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut

Department of Energy and Environmental Protection ("CT DEEP").  *Id*. at ¶¶ 29-32.  At the time

---

[1]  Defendants serve this Draft Statement in connection with the Court's Order requiring same.  *See* ECF 797 and Judge Oliver's Pretrial Preferences.

[2] To avoid duplication, Defendants incorporate by reference the statements and supporting record citations contained in the Statements of Undisputed Facts filed by Motiva Enterprises, LLC.  Further, Defendants reserve the right to file additional Statements of Undisputed Facts upon filing Defendants' Motion for Summary Judgment.

Plaintiff filed this action in July 2021, the permit at issue was the 2018 General Permit No. GSI002800.  The 2018 Permit was extended in October 2021 without any substantive changes (hereafter collectively, "the Permit").  *Id*. at ¶ 176.

3.      The Permit regulated stormwater discharges from industrial facilities engaged in certain identified activities.  *See* Ex. A, Permit, at 1.

4.      The Permit did not reference or require consideration of "climate change," "storm surge," "sea level rise," "increased precipitation," a "100-year" or "500-year" flood standard, or use of secondary containment berms as flood barriers.  *See generally id.*

5.      The Permit imposed obligations, including "Control Measures" such as the creation of a Stormwater Pollution Prevention Plan ("SWPPP").  *Id*. at 17-71.

6.      Section 5(b) of the Permit defines "Control Measures" as "best management practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility; and defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice," and sets forth 13 explicit BMPs. *Id*. at 17-22.

7.      Section 5(e)(1)(B)(v) of the Permit provides a procedure for addressing exceedances at the Terminal if the exceedance of a benchmark is attributable to the presence of a pollutant in the natural background or in "run-on" entering from "off-site."  *Id*. at 34.

8.      On October 1, 2025, CT DEEP issued a new General Permit to update and replace the Permit (the "2025 Permit").  Ex. B, 2025 Permit.

9.      On March 11, 2024, in its draft of the new General Permit, CT DEEP described what it referred to as "significant changes" to the Permit and invited public comment.  *See* Ex. C,

November 2024 Fact Sheet at 5.

10.    On May 10, 2024, Plaintiff submitted written comments to CT DEEP stating that "[t]he increase in the minimum acceptable volume requirement for secondary containment areas is a positive change that should remain in the 2025 Permit, and the Undersigned appreciate DEEP's acknowledgement that the minimum volume requirement in the Current Permit is insufficient to guarantee that no overtopping will occur during extreme storm events."  Ex. D, Pl.'s Cmts. at 11.

11.    Plaintiff also proposed "additional changes to the new permit to further protect Connecticut's waters and members of the public" in its comments, which CT DEEP considered and did not adopt in the 2025 Permit.  Ex. D, Pl.'s Cmts. at 13-18; Ex. B, 2025 Permit.

12.    The 2025 Permit becomes effective on November 1, 2025 and expires on September 30, 2030.  *See* Ex. B, 2025 Permit at 1.

13.    The 2025 Permit for the first time requires that permittees consider certain climate "Resilience Measures" that CT DEEP characterizes as a "**new** component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes."  *See e.g.*, Ex. B, 2025 Permit, at 39-40; Ex. E, November 2024 Fact Sheet at 12; Ex. F, December 2024 Supplemental Fact at 3; Ex. G, March 2024 Fact Sheet at 10; Ex. H, April 2024 Supplemental Fact Sheet at 3. (emphasis added).

14.    The new "Resilience Measures" provisions in the 2025 Permit require permittees to consider prevention and mitigation measures to account for "hurricanes, storm surge, extreme/heavy precipitation, and flood events."  *See* Ex. B, 2025 Permit at 39-40.

15.    CLF acknowledged that CT DEEP's guidance states the "Resilience Measures" are a "new component of the SWPPP," and that "DEEP believes [the climate resilience factors

3

are] a new component." Ex. I, June 4, 2025 CLF 30(b)(6) Dep. ("CLF Dep.") at 175: 12-20 and

175:21-176:1.

16.     Neither the Permit nor the 2025 Permit requires secondary containment berms to

serve as flood protection barriers. Ex. A, Permit; Ex. B, 2025 Permit.

17.     The 2025 Permit incorporates by reference the 2024 Stormwater Quality

Manual's ("SQM") "structural control measures [to] help improve the resiliency of industrial

facilities to climate stressors, including changing precipitation patterns and extreme weather

events." *See* Ex. J, 2025 Permit Fact Sheet (dated October 2025) at 13.

18.     The 2025 Permit emphasizes structural control measures from the updated SQM

to improve resilience, but the Manual does not mandate any specific responses to any projected

sea level rise. *See* Ex. K, 2024 Connecticut SQM at 52 and 555.  The SQM was not in effect

before 2023 and was not incorporated into the Permit.

19.     The 2004 SQM is the prior version of the 2024 SQM, and it did not require any

consideration of climate change in connection with its guidance.  Ex. L, 2004 SQM.

20.     CT DEEP has provided permittees with existing authorization interim permit

coverage for 180 days from the date of issuance of the 2025 Permit to submit a new registration.

*See* Ex. J, October 2025 Fact Sheet, at 10.  This means that permittees have 180 days to come

into compliance with the 2025 Permit's requirements.

21.     Plaintiff asserts twelve causes of action,[3] nine of which (Counts I-IX) are based

on Plaintiff's argument that Defendants violated the Permit by failing to account for certain

factors related to "climate change."  ECF 47, Am. Compl. at ¶¶ 78-448.

---

[3] Plaintiff's Amended Complaint asserted fourteen causes of action.  ECF 47.  However, two of Plaintiff's claims were dismissed by Order dated September 16, 2022 [ECF 111].  The Court dismissed all but Count XIII against Defendant Motiva. *Id.*

22.    Under these nine causes of action, Plaintiff seeks the following relief:

a.    "[D]escribe or ensure implementation of BMPs that will be used to ensure that non-stormwater pollutant discharges resulting from the factors discussed in Section IV.A *supra*, including storm surge flooding, do not occur in the future and are eliminated." *Id.* at ¶ 394.

b.    "[I]mplementation of control measures that will be used to ensure that pollutant discharges resulting from the [climate change] factors. . . do not occur." *Id.* at ¶ 399.

c.    Defendants must "disclose and consider the [climate change] factors. . . and the substantial risks of pollutant discharges associated with these factors." *Id.* at ¶ 413.

d.    Defendants must "identify sources of pollutants resulting from the ["climate change"] factors. . .." *Id.* at ¶ 417.

e.    The SWPPP must "refer to the potential for flooding at the Terminal from storm surge[s] and increased rainfall despite past incidences of storm surge flooding. . . [and] include control measures or BMPs to minimize this potential unpermitted discharge." *Id.* at ¶ 424.

f.    The SWPPP must "describe or ensure implementation of BMPs that will be used to address run-on to avoid areas that may contribute pollutants, despite previous flooding and the ["climate change"] factors. . . including storm surge flooding. . . ." *Id.* at ¶ 430.

g.    The SWPPP must "describe or ensure implementation of BMPs that will be used to minimize the potential for leaks and spills resulting from the ["climate change"] factors. . .." *Id.* at ¶ 435.

h.    Defendants must "submit relevant facts. . . regarding the risks of climate-change discussed above, and the substantial risks of pollutant discharges and/or releases associated with these factors, in its SWPPP and reports to CT DEEP." *Id.* at ¶ 438.

i.    Defendants must "amend[] or update[] its SWPPP based on information known to it regarding the ["climate change"] factors. . .." *Id.* at ¶ 445.

23.    Because the term "climate change" is not included in the Permit, Plaintiff contends that the Permit *implied* a requirement to consider "climate change" in the general requirement that the Terminal implement best management practices that are "technologically available and economically practicable and achievable in light of best industry practice." *See generally* Oct. 19, 2023 Hearing Transcript Before Honorable Jeffery Alker Myer.

5

24.     A party intending to file a citizen suit under the CWA must specify in its Notice of

Intent to Sue ("NOI") the "specific standard, limitation or order alleged to have been violated,

the activity alleged to constitute a violation, the person or persons responsible for the alleged

violation, the location of the alleged violation, the date or dates of such violation, and the full

name, address, and telephone number of the person giving notice." 40 C.F.R. at § 135(a).

25.     On July 28, 2020, CLF served an NOI on Defendants.  ECF 47-1, Exhibit A to

CLF's Am. Compl.  Plaintiff has twice supplemented its NOI without asserting any new claims,

first on February 17, 2021 and again on November 21, 2024.[4]  ECF 47-2, Ex. B to CLF's Am.

Compl.; Ex. M, 2d Supp. NOI.

26.     These three substantively identical NOIs identified only 11 discrete alleged

violations of the CWA, which are as follows: (i) Failure to Eliminate Non-Stormwater

Discharges; (ii) Activity Inconsistent with the Coastal Management Act and Causing Adverse

Impacts to Coastal Resources; (iii); Unlawful Certification; (iv) Failure to Identify Sources of

Pollution Reasonably Expected to Affect the Quality of Stormwater Discharges; (v) Failure to

Describe and Implement Practices to Reduce Pollutants and Assure Permit Compliance; (vi)

Failure to Implement Measures to Manage Runoff; (vii) Failure to Minimize the Potential for

Leaks and Spills; (viii) Failure to Submit Required Facts or Information to CT DEEP; (ix)

Failure to Amend or Update the SWPPP; (x) Failure to Identify Discharges to Impaired Waters in

SWPPP; (xi) Failure to Conduct Monitoring for Discharges to Impaired Waters.  ECF 47-1, Ex.

A to CLF's Am. Compl. at 9-13; ECF 47-2, Ex. B to CLF's Am. Compl. at 9-14; Ex. M, 2d Supp.

NOI at 9-14.

27.     In their Expert Reports and in deposition, Plaintiff's experts asserted violations of

---

[4]  Plaintiff never pursued filing an amended complaint in accordance with its November 2024 NOI.

the Permit for the following reasons: (i) Inadequate Capacity of the Secondary Containment; (i) Permeability of Secondary Containment Areas; (iii) Low Points in Secondary Containment Areas; (iv) Structural Integrity of Secondary Containment Berms; (v) Wave Attacks on Secondary Containment Berms; (vi) Bare Soil on Secondary Containment Berms; (vii) Failure to Report on Secondary Containment Deficiencies; (viii) Groundwater Infiltration; (ix) Lack of Stormwater Pond Liner; (x) Insufficient Stormwater Treatment Basin; (xi) Inadequate Emergency Vehicle Access for Ingress and Egress; (xii) Failure to Implement Corrective Action Plan; (xiii) Failure to Apply Best Industry Practice in Defendants' Risk Management Program; (xiv) Tank Spacing Violates National Fire Protection Association Guidance. *See e.g.*, Ex. N, Horner Report at 4-5, 18, 21, and 26; Ex. O, Goldsmith Report at 40-41, 43-47, 49-52, and 54; Ex. P, Nairn Report at v, 5, 10, 50, and 65.

28.    Plaintiff also served NOIs against other entities operating bulk storage facilities in New Haven at the same time.  *See* Gulf NOI, ECF 1-2, *Conservation Law Found. v. Pike Fuels Ltd. Pship*, No. 3:21-cv-00932-SVN (D.Conn.) ("Gulf NOI"); *see also*, Ex. Q, Buckeye NOI.

29.    Unlike Plaintiff's NOIs to Defendants, Plaintiff's NOIs to Gulf and Buckeye included alleged CWA permit violations for (1) "Illegal Infiltration of Stormwater"; and (2) "failure to maintain an impervious containment area." *See* Gulf NOI at 13; Ex. Q, Buckeye NOI at 14.

30.    In this case, Plaintiff's NOIs were the only notice provided to the Environmental Protection Agency ("EPA") and CT DEEP of the alleged violations.  Ex. R, Mahoney Dep. at 51:23-52:3 and 93:14-94:2.

31.    Plaintiff's NOIs contained "the basis for all of the claims that CLF brought in the complaint." *Id*. at 46:22-47:2.

32.     Plaintiff's NOIs do not include specific references to various claims and opinions set forth by its expert witnesses.  *See e.g.*, *Id*. at 71:11-72:6; *id.* at 75:10-76:6 (permeability); *id*. at 80: 15-81 :3 (inadequate secondary containment); *id*. at 84:6-86:8 (stormwater pond liners); *id*. at 90:8-91:4 (inadequate stormwater treatment); *id*. at 95:7- 96:15 (groundwater allegations); *id*. at 96:16-97:23 (failure to implement a corrective action plan); *id.* at 98:5-21 (inadequate ingress and egress); *id*. at 104:15-105:1 (compound flood condition); *id*. at 207: 17-25 (inadequate Spill Prevention Control & Countermeasures Plan ("SPCC")).

33.     Plaintiff did not provide EPA and the CT DEEP notice of the alleged violations contained in Plaintiff's expert reports.  *Id*., at 87:3-24.

34.     Plaintiff's experts also admitted that they were unaware of whether certain alleged violations they claimed at the Terminal were asserted in the statutorily required pre-suit NOI. *See e.g.*, Ex. S, Goldsmith Dep. at 88:4-17; Ex. T, Nairn Dep. at 106:18-107:5; Ex. U, Horner Dep. at 33:10-16; 166:1-5; 166:10-25.

35.     The Terminal's SWPPP outlines procedures for preventing stormwater discharges, including detailed descriptions of site inspections, Control Measures, and monitoring protocols. The SWPPP emphasizes routine inspections, good housekeeping, spill response, and the implementation of structural and non-structural Control Measures to ensure environmental compliance and effective stormwater management.  Ex. V, SWPPP (July 10, 2017).

36.     The Terminal's SPCC Plan details the procedures for spill prevention, response, and regulatory compliance.  It also includes facility operations, storage capacities, and security measures, emphasizing personnel training, inspections, and preventive documentation to minimize oil discharge risks. Ex. W, SPCC Plan (rev. March 2024).

37.     The Terminal's Emergency Response Action Plan ("ERAP"), revised in June

2024, outlines detailed procedures for managing various incidents such as natural disasters, medical emergencies, chemical releases, and spill containment, for a comprehensive emergency response.  Ex. X, ERAP (rev. June 2024).

38.     The Terminal's Facility Response Plan ("FRP") is designed to help personnel prepare for and respond efficiently and effectively to incidents at the Terminal, ensuring compliance with federal, state, and local regulatory requirements and maintaining consistency with the National Contingency Plan and Area Contingency Plans.  Ex. Y, FRP (rev. June 2024).

39.     The Terminal adopted its Business Continuity and Storm Action Plan ("BCP")[5], which details procedures for various operational disruptions and defining roles, responsibilities, and communication protocols.  It also outlines phased steps for storm identification, Terminal shutdown, staff evacuation, employee communications, Terminal assessment and start-up, post-hurricane operations, and public relations.  Ex. Z, BCP (rev. Dec. 2024).

40.     The Terminal's Risk Management Plan ("RMP") was prepared in accordance with the EPA's Accidental Release Prevention Provisions (40 C.F.R. Part 68).  The RMP identifies potential accidental hazardous substance release scenarios and evaluates the potential impacts on public health and the environment.  The RMP also includes safety measures and maintenance, monitoring, and employee training to prevent accidental releases.  Ex. AA, RMP.

41.     EPA issues a Multi-Sector General Permit ("MSGP") for Stormwater Discharges from Industrial Activities that serves as the general permit for jurisdictions that do not issue their own permits under the CWA National Pollutant Discharge Elimination System ("NPDES") program.[6]

---

[5] The BCP incorporated and expanded upon the Terminal's prior Hurricane Action Plan.
[6] *See* https://www.epa.gov/npdes/stormwater-discharges-industrial-activities#:~:text=warehousing%20and%20storage)-,Authorized%20States,Sector%20General%20Permit%20(MSGP).

42.     During the notice and comment period for its most recent MSGP (issued in 2021),

EPA confirmed that the "requirement that operators consider implementing mitigation measures

to minimize impacts from major storm events" was "a **new**. . .condition over the previous permit.

. . ." *See* Ex. BB, EPA Response to Cmts. (Jan. 15, 2021), at 397-98.  (emphasis added).

43.     EPA further stated that "[t]he 2021 MSGP includes this provision. . . **for the first**

**time as the 2015 MSGP did not include a similar provision**." *Id*.  (emphasis added).

44.     The Terminal does not discharge into an impaired waterbody.  ECF 47, Am.

Compl. at ¶ 452.

45.     The Permit requires permittees to identify discharges to an impaired water and

monitor the discharge for "indicator pollutants" only if the permittee discharges directly to an

impaired water.  Ex. A, Permit at 5(c)(2)(D)(i)(7) and (e)(1)(D)(ii).

46.     Paul Simonetta, a professional engineer licensed in the State of Connecticut,

testified that CT DEEP confirmed that unless specifically notified, a permittee discharging to an

MS4 has no obligation to monitor.  *See* Ex. CC, Simonetta Dep. at 96:10–99:13.

47.     Neither CT DEEP nor EPA has ever stated that "best management practices" or

"best industry practice" require a climate change or resilience assessment for the Terminal.  Ex.

R, Mahoney Dep. at 270:6-24.

48.     Plaintiff has never asked CT DEEP for its interpretation of the "best management

practices" or "best industry practices" language, nor has Plaintiff made any inquiries to obtain

any SWPPPs to assess the relevant industry interpretation of that language.  *Id*. at 144:5-14 and

228:25-229:16.

49.     There is no evidence that any company in the petroleum bulk storage industry (or

any other industry) considered "climate change" in developing a SWPPP under the Permit, and

Plaintiff has never performed any independent research to support its interpretation of the Permit.

50.     CT DEEP has never treated failure to plan for either sea level rise or a 100-year or 500-year return period in a SWPPP as a violation of the Permit.  *Id*. at 200:19-25

51.     CT DEEP has taken no enforcement action for failure to conduct a climate change vulnerability assessment and has not cited any permittee for climate-based stormwater violations under the Permit.  Ex. S, Goldsmith Dep. at 116:3–16.

52.     There is no Connecticut law requiring climate change risk assessments, nor is there any Connecticut SWPPP that includes such an assessment.  *See* Ex. R, Mahoney Dep. at 187:13-188:15 and 215:7-21; Ex. S, Goldsmith Dep. at 55:16–24 and 55:22-56:3.

53.     Publicly available Connecticut SWPPPs under the Permit do not document climate change, storm surge, sea level rise, or extreme precipitation analyses, and CT DEEP is not aware of any such SWPPPs or related enforcement.  Ex. DD, Bourdeau Report, at 4.

54.     Plaintiff and its experts did not conduct a survey or other analysis of bulk storage facilities' climate risk practices, and they are unaware of any objective standard requiring climate considerations in facility stormwater operations.  *See, e.g.,* Ex. R, Mahoney Dep. 228:25-229:16; Ex. S, Goldsmith Dep. at 235:19-236:3; 236:19-237:24; 238:6-19; Ex. U, Horner Dep. at 206:9-207:5.

55.     Plaintiff cannot identify a single SWPPP under the Permit that would meet the climate-related permit terms it seeks to enforce.  Ex. R, Mahoney Dep. at 188:7-15; *see also* See Ex. EE, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 1-9.

56.     Plaintiff admitted that neither EPA nor CT DEEP has stated Defendants violated the Permit.  Ex. R, Mahoney Dep. at 268:4-269:14.

57.     In December 2022, EPA inspected the Terminal and confirmed it complies with

the SPCC regulations and the CWA.  Ex. FF, U.S. EPA SPCC Field Inspection and Pan Review

Checklist – SOPUS_NHVN00527912.

58.    The Terminal has not exceeded its water quality benchmark thresholds. *See* Ex.

GG, Parkman Report, at 46.

59.    The Permit, the 2025 Permit, and the 2021 MSGP did not incorporate or adopt

ASCE24-14 or ASCE24-24 or their "critical infrastructure" definitions.  Ex. S, Goldsmith Dep.

at 166:15-167:4; 167:4-9.

60.    There is no evidence that Defendants are in any continuing violation of the CWA.

61.    Connecticut has not defined or required specific permeability (hydraulic

conductivity) standards and has not required stormwater pond liners in secondary containment.

*See* Ex. EE, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 14-15.

62.    CT DEEP has never issued a Notice of Violation to the Terminal.

63.    Plaintiff and several of its experts attended three site visits at the Terminal during

the litigation and did not take any samples or conduct any testing at the Terminal.

64.    University of Connecticut's CIRCA program Sea Level Rise and Storm Surge

Viewer shows that under various scenarios the Terminal is not at risk during any of the modelled

storms on the site.  *See* Ex. T, Nairn Dep. Ex. 19, 20.

65.    There is no evidence of any alleged RCRA violation related to the Terminal.  *See*

42 U.S.C. § 6903; 42 U.S.C. § 6972(a)(1)(B); "Characterization of Remediation Waste"

Presentation (Oct. 17, 2017)[7].

---

[7] https://portal.ct.gov/-/media/deep/ waste_management_and_disposal/hazardous_waste/
characterizationofremediationwastepdf.pdf?rev=f5e69d4274b240fa8848d774d49be444&hash=C2DE548FFF026D4
96AB103DC952531FE.

Dated: October 21, 2025

Respectfully submitted,

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com
CToledo@kslaw.com

Antonio E. Lewis (phv03069)
KING & SPALDING LLP
300 S Tryon Street Suite 1700
Charlotte, North Carolina 28202
T: (704) 503-2600
alewis@kslaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower 265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

Rose J. Jones (phv208026)
Hilgers Graben PLLC
1372 Peachtree Street, N.E. 19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2025 a copy of the foregoing was filed through the Court's electronic filing system ("ECF"), by which means the document is available for viewing and downloading from the ECF system and a copy of the filing will be sent electronically to all parties registered with the ECF system.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com