# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| *Plaintiff*, | Civil Action No. 3:21-cv-00933-VDO |
| v. | |
| SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | October 21, 2025 |
| *Defendants*. | |

## PLAINTIFF CONSERVATION LAW FOUNDATION'S PRELIMINARY LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS ................................................................................................ ii

I.    Introduction ............................................................................................................ 1

II.   Defendants Are Liable For Violations of The Permit at the New Haven Terminal ............... 1

III.  Defendants Have Not Lawfully Certified The Terminal's SWPPP As Required By General Permit Sections 5(c)(2)(F), 5(c)(4), and 5(c)(7)........................................ 3

IV.   The Terminals' Secondary Containment Area Is Not Impermeable As Required By General Permit Section 5(b)(9). ............................................................................ 8

    A.  The New Haven Terminal is Constructed on Highly Permeable Soil. ............................. 9

    B.  The New Haven Terminal's secondary containment area is unlined and permeable ....... 10

    C.  The SWPPP .................................................................................................... 11

V.    The Terminal's Secondary Containment Area Was Insufficient In Volume And Upon Undertaking A Corrective Construction Project Defendants Did Not Notify CT DEEP Or Amend Their SWPPP. .................................................................... 13

VI.   It Is Best Industry Practice to Evaluate and Implement Changes to Stormwater Management Practices Based On the Increased Risks from Climate Change. ..................... 15

## I.    INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") respectfully files this Preliminary Statement of Undisputed Material Facts in support of its Letter Brief Requesting a Pre-Filing Conference Regarding Motions for Partial Summary Judgment pursuant to Judge Oliver's Pre-Trial Instructions and Federal Rule of Civil Procedure 56 and Local Civil Rule 56(a)(1). CLF reserves its rights to amend, add to, and otherwise change its statement of facts when filing any authorized motions. Depending on the Court's grant of motions for summary judgement, CLF may need to request leave to exceed twelve pages for this statement pursuant to Local Civil Rule 56(a)(1).

## II.    DEFENDANTS ARE LIABLE FOR VIOLATIONS OF THE PERMIT AT THE NEW HAVEN TERMINAL

1.  Defendant Equilon Enterprises LLC is the current permit holder of the Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity ("General Permit") and its associated Stormwater Pollution Prevention Plan ("SWPPP") for the New Haven Terminal. Defendants' Answer to the Amended Complaint, ECF 120 ¶¶ 28 & 29.

2.  Equilon Enterprises LLC is the current operator of the New Haven Terminal.  *Id.*  ¶ 29.

3.  Defendant Triton Terminaling LLC is the current owner of the New Haven Terminal. *Id.* ¶¶ 31 & 107–08.

4.  Defendant Motiva Enterprises LLC was the owner of the New Haven Terminal from 2000 to 2017. *Id.* ¶ 34.

5.  Defendant Motiva Enterprises LLC was the operator of the New Haven Terminal from 2000 to 2017. *Id.* ¶ 34.

6.  Defendant Motiva Enterprises LLC was a joint venture 50% owned by Shell Petroleum Inc., from 2000 to 2017. *Id.* ¶ 34.

7. Motiva as a joint venture was dissolved in 2017. *Id.* ¶ 34.

8. The dissolution of the Motiva Joint Venture included a "Permit Assignment and Assumption Agreement." Permit Assignment and Assumption Agreement (Feb. 17, 2017) (SOPUS_NHVN00075899) (ECF 191-7).

9.  . *Id.*

10. The Permit Assignment and Assumption Agreement states:



    *Id.*

11. Shell plc, formerly known as Royal Dutch Shell plc, is a holding company registered in England and Wales that serves as the ultimate parent of numerous subsidiaries engaged in various sectors of the global energy industry. Defendants' Answer to the Amended Complaint, ECF 120 ¶ 17.

12. Shell Petroleum, Inc. is a wholly owned subsidiary of Shell plc. *Id.* ¶ 18.

13. Shell Petroleum, Inc. serves as the principal United States based parent company of **Shell** group[1] entities engaged in exploration and production, trading, refining and retail operations throughout the United States. *Id.* ¶¶ 19, 20, & 41.

14. Shell Oil Company is wholly owned by Shell Petroleum, Inc. and is an indirect subsidiary of Shell plc. *Id.* ¶ 23.

---

[1] "Shell group" refers to the subsidiaries of Shell plc.

15. Defendant Equilon Enterprises LLC ("Equilon") is an indirect subsidiary of Shell Oil Company and Shell plc. *Id.* ¶ 26.

16. Defendant Triton Terminaling LLC ("Triton") is an indirect subsidiary of Shell Oil Company and Shell plc. *Id.* ¶ 30.

17. Shell plc sets some policies that are binding on all companies in the Shell group. *Id.* ¶ 41; Defendants Supplemental Responses to CLF's Interrogatories 9 & 14 (Oct. 11, 2024).

18. Some of the Shell plc policies that are binding on all companies in the Shell group relate to climate change. Defendants' Answer to the Amended Complaint, ECF 120 ¶¶ 41 & 42; Defendants Supplemental Responses to CLF's Interrogatories 9 & 14 (Oct. 11, 2024).

## III.  DEFENDANTS HAVE NOT LAWFULLY CERTIFIED THE TERMINAL'S SWPPP AS REQUIRED BY GENERAL PERMIT SECTIONS 5(C)(2)(F), 5(C)(4), AND 5(C)(7).

19. The New Haven Terminal is subject to the requirements of a General Permit for the Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"), Effective Date: October 1, 2011 (Exhibit 1168), at pages 25-28.

20. The General Permit requires three separate certifications in sections 5(c)(2)(F), 5(c)(4), and 5(c)(7).  Connecticut Department of Environmental Protection, General Permit for the Discharge of Stormwater Associated with Industrial Activity, Effective Date: October 1, 2011 (Exhibit 1168), at 25-28.

21. CT DEEP extended the 2011 General Permit in 2016, 2018, 2019, and reissued it in 2021, stating each time that it was doing so without modification.  *See* Defs' Statement of Undisputed Material Facts (June 13, 2023) ECF 248-02 ¶ 3.

22. The certification in General Permit section 5(c)(2)(F) states in full:

(F) Non-Stormwater Discharge Certification

3

The Plan shall include the following certification, signed by a professional engineer licensed to practice in the State of Connecticut or a Certified Hazardous Materials Manager:

"I certify that in my professional judgment, the stormwater discharge from the site consists only of stormwater, or of stormwater combined with wastewater authorized by an effective permit issued under section 22a-430 or section 22a-430b of the Connecticut General Statutes, including the provisions of this general permit, or of stormwater combined with any of the following discharges provided they do not contribute to a violation of water quality standards:

landscape irrigation or lawn watering;

uncontaminated groundwater discharges such as pumped groundwater, foundation drains, water from crawl space pumps and footing drains;

discharges of uncontaminated air conditioner or refrigeration condensate;

water sprayed for dust control or at a truck load wet-down station;

naturally occurring discharges such as rising groundwaters, uncontaminated groundwater infiltration (as defined at 40 CFR 35.2005(20)), springs, and flows from riparian habitats and wetlands.

This certification is based on testing and/or evaluation of the stormwater discharge from the site. I further certify that all potential sources of non-stormwater at the site, a description of the results of any test and/or evaluation for the presence of non-stormwater discharges, the evaluation criteria or testing method used, the date of any testing and/or evaluation, and the on-site drainage points that were directly observed during the test have been described in detail in the Stormwater Pollution Prevention Plan prepared for the site. I further certify that no interior building floor drains exist unless such floor drain connection has been approved and permitted by the commissioner or otherwise authorized by a local authority for discharge as domestic sewage to sanitary sewer. I am aware that there may be significant penalties for false statements in this certification, including the possibility of fine and imprisonment for knowingly making false statements."

CT DEEP, General Permit (Exhibit 1168), at 25.

23. The certification in CT General Permit section 5(c)(4) states in full:

(4) Signature and Plan Review

(A) The Plan shall be signed as follows:

(i) for a corporation, by a responsible corporate officer or a duly authorized representative thereof, as those terms are defined in section 22a-430-3(b)(2) of the Regulations of Connecticut State Agencies;

(ii) for a municipality, state, federal, or other public agency, by either a principal executive officer or a ranking elected official, as those terms are defined in section 22a-430-3(b)(2) of the Regulations of Connecticut State Agencies;

(iii) for a partnership or a sole proprietorship, by a general partner or the proprietor, respectively.

When a Plan is signed by a duly authorized representative, a statement of authorization shall be included in the Plan. The Plan shall also be certified, in

accordance with "Plan Certification" (Section 5(c)(7)) of this general permit, by a professional engineer licensed in the State of Connecticut or a Certified Hazardous Materials Manager.

The Plan shall be retained on site at the facility that generates the stormwater discharge.

(B) The permittee shall make a copy of the Plan available to the following immediately upon request:

(i) the commissioner at his/her own request or as the result of a request from a member of the public pursuant to "Availability of Registration and Plan" (Section 4(d));

(ii) in the case of a stormwater discharge associated with industrial activity which discharges through a municipal separate storm sewer system, to the operator of the municipal system;

(iii) in the case of a stormwater discharge associated with industrial activity which discharges to a water supply watershed, to the public water supply company.

For all sites submitting a Plan to the Commissioner at the Commissioner's sole request (not a request from the public), a plan review fee of $500 established by section 22a-430-6 of the Regulations of Connecticut State Agencies shall be submitted with the Plan. The plan review fee for municipalities shall be half ($250).

(C) The Commissioner may notify the permittee at any time that the Plan does not meet one or more of the requirements of this section. Within 120 days of such notification unless otherwise specified by the commissioner in writing, the permittee shall revise the Plan, perform all actions required by the revised Plan, and shall inform the commissioner in writing that the requested changes have been made and implemented, and such other information as the commissioner requires.

CT DEEP, General Permit (Exhibit 1168), at 26-27.

24. The certification in CT General Permit section 5(c)(7) states in full:

(7) Plan Certification

The Plan shall contain the following certification, signed by a professional engineer licensed to practice in the State of Connecticut or a Certified Hazardous Materials Manager:

"I certify that I have thoroughly and completely reviewed the Stormwater Pollution Prevention Plan prepared for this site. I further certify, based on such review and site visit by myself or my agent, and on my professional judgment, that the Stormwater Pollution Prevention Plan meets the criteria set forth in the General Permit for the Discharge of Stormwater Associated with Industrial Activity effective on October 1, 2021. I am aware that there are significant penalties for false statements in this certification, including the possibility of fine and imprisonment for knowingly making false statements."

CT DEEP, General Permit (Exhibit 1168), at 28.

5

25. The 2011 Guidance published by CT DEEP regarding compliance with the General Permit repeats that the Plan Certification and corporate officer certifications are separate certifications and are both mandatory and need to be signed pursuant to their respective sections. The Guidance states the same for the Non-Stormwater Discharge Certification and specifies certification must use "the exact wording in Section 5(c)(2)(F)." CT DEEP, Guidance Document for Preparing a SWPPP (Mar. 2011), ECF 248-13 at 6.

26. Jennifer Bothwell, the environmental coordinator for the New Haven Terminal, testified in her deposition that before the 2017 SWPPP the only SWPPP was in the Integrated Contingency Plan ("ICP"). Deposition Transcript of Jennifer Bothwell, Volume I (Dec. 6, 2023), 75:11-77:6.

27. A 2009 Integrated Contingency Plan ("ICP") was produced by Defendants across multiple documents after being scanned from the New Haven Terminal file room as it was kept in that location and did not withhold any parts of the document and stated if there are any missing pages Defendants do not have the missing pages. 2024-04-29 Emails A_Papetti and J_Meinert re file path, ICP, and joint discovery status report.

28. The Integrated Contingency Plan ("ICP") produced by Defendants was introduced in Defendants' 30(b)(6) deposition as exhibit 1216, which the witness testified ███████████ ████████████████████████████. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 248:16 – 249:9; Deposition Exhibit 1216.

29. The Exhibit 1216 ICP contains ███████████████████████████████ ████████████████. Exhibit 1216, at SOPUS_NHVN02143144-46. The Exhibit 1216 ICP contains on pages 339 and 340, bates numbered pages SOPUS_NHVN02143145 and SOPUS_NHVN02143146, ██████████████████████████████████

████████████████████████████████████████████████████████

███████████ required by General Permit section 5(c)(7). Exhibit 1216 at pages 339-40 (bates numbered pages SOPUS_NHVN02143145 and SOPUS_NHVN02143146, which are also labeled ██████████████████ ).

30. Defendants admit in their Response to Request for Admission 8 that the ICP does not contain the Plan Certification language. Defendants' Responses to CLF's First Set of RFAs at 37 (Oct. 16, 2025) ("Defendants admit that the Integrated Contingency Plan identified as Deposition Exhibit 1216 does not contain the verbatim language quoted in the Request . . . .").

31. In 2017 Defendants ████████████████████████████████. 2017-04-03 Emails between Jennifer Bothwell and Triton Environmental, Inc., SHELLNH_TRI_00294-95 (Deposition Exhibit 1154); Bothwell Depo Tr., Volume I, 74:9-75:10.

32. The 2017 SWPPP contains certifications in Appendix A. Triton Environmental, Stormwater Pollution Prevention Plan Shell Oil Products US 481 East Shore Parkway New Haven, Connecticut (July 2017) (SOPUS_NHVN00314028) ("2017 SWPPP") at SOPUS_NHVN003149073 to 76.

33. The 2017 SWPPP contains limitations on the Appendix A certification in Appendices D and G. 2017 SWPPP at SOPUS_NHVN00314081 to 82 and 86 to 87.

34. The 2017 SWPPP contains limitations on the Appendix A certification in Appendix G, stating:

> In preparing this Stormwater Pollution Prevention Plan (SWP3), Triton was directed to rely on the Professional Engineering Certification, engineering reviews, and studies prepared by others which verified the adequacy of secondary containment (RPMS Consulting Engineers April 13, 2013 and Witt O'Brien April 2017). Triton has not performed field measurements, calculations, or other studies to verify secondary containment. As such, Triton has relied completely on these documents and associated conclusions/certification in order to provide certification of this SWP3. The certification as included in Appendix A is based on this reliance.

2017 SWPPP at SOPUS_NHVN00314087.

7

35. Triton's certification in Appendix A ███████████████████████████

███████████████████████████████████████████████████

████████████. 2017-04-03 Emails between Jennifer Bothwell and Triton Environmental,

Inc., SHELLNH_TRI_00289.

36. Triton's certification in Appendix A ███████████████████████████

███████████████████████████████████████████████████

████████████. 2017-04-03 Emails between Jennifer Bothwell and Triton Environmental,

Inc., SHELLNH_TRI_00289.

## IV.    THE TERMINALS' SECONDARY CONTAINMENT AREA IS NOT IMPERMEABLE AS REQUIRED BY GENERAL PERMIT SECTION 5(B)(9).

35. The General Permit requires that the New Haven Terminal's secondary containment "minimize[s] the potential for leaks and spills." General Permit § 5(b)(9).

36. The General Permit provides two options for compliance: the Terminal's storage tanks must be either "double-walled" or the Terminal must have "an impermeable secondary containment area." General Permit 5(b)(9)(A)(i).

37. Spill Prevention, Control, and Countermeasure ("SPCC") Guidance states that the "entire secondary containment system, including walls and floor, must be constructed so that *any* discharge... will not escape containment before cleanup occurs." SPCC Guidance for Regional Inspectors, prepared by EPA Office of Emergency Management, Dec. 16, 2013 ("SPCC Guidance") at 4-29 (citing 40 CFR § 112.7(c)).

38. SPCC Guidance states diked secondary containment areas must be "sufficiently impervious to contain discharged oil." SPCC Guidance at 4-58 (citing 40 CFR §§ 112.8(c)(2), 112.12(c)(2)).

39. SPCC Guidance states: "Floor and walls constructed of sandy material, for example, may not

be appropriate to hold refined products such as gasoline. If earthen material is used, then it

should have a high clay content and be properly compacted, not simply formed into a mound.

" SPCC Guidance at 4-32

### A. The New Haven Terminal is Constructed on Highly Permeable Soil.

40. The New Haven Terminal is located 500 meters from the New Haven Harbor and near the Mill

and Quinnipiac Rivers in the City of New Haven, New Haven County, Connecticut.

Defendants' Answer to the Amended Complaint, ECF 120 ¶¶ 74, 75.

41. A 1979 Soil Survey for New Haven County indicates that the New Haven Terminal is in an

urban zone, but the ground right next to it is comprised of sand and gravel. *See* U.S. Dep't of

Agric., Soil Conservation Serv., *Soil Survey of New Haven County, Connecticut* 38 (1979),

https://archive.org/details/usda-newhavenCT1979/page/n11/mode/2up (accessed October 7,

2025) ("Soil Survey of New Haven County").

42. In October 2003 Sovereign Consulting, Inc. ████████████████████████████

████████████████████████ *See* Letter from W. Scott Burns, Sovereign Consulting,

Inc., to Jennifer Bothwell, Shell Oil Products US (Dec. 8, 2003) ("2003 Sovereign Letter")

(SOPUS_NHVN00001480).

43. Sovereign Consulting concluded ████████████████████████████. 2003

Sovereign Letter at 2.

44. The 2003 Sovereign Consulting ████████████████████████████████

████████████████████████████████████████████.

2003 Sovereign Letter at 2.

45. Sovereign Consulting ████████████████████████████████████

████████████. *See* Sovereign Consulting, Inc., Completion of Investigation Report.

Prepared for Shell Oil Products US, Carson, California (2022) ("2022 Sovereign Report")

9

(SHELLNH_SOV_04289 - SHELLNH_SOV_04473).

46. The 2022 Sovereign Report ████████████████████████████████████

████████████████████████████████. *See* Electronic Transmittal Form for

DEEP Remediation and LUST Secure File Transfer, for the Shell New Haven Terminal, dated

June 28, 2022 (SHELLNH_SOV_04276).

47. In 2023, ████████████████████████████████████████████

████████████████████. *See* Sovereign Consulting, Inc. Remedial Action Plan Shell New

Haven Terminal. Prepared for Shell Oil Products US (Dec. 18, 2023) ("2023 Remedial Action

Plan") (SOPUS_NHVN00247004).

48. The 2023 Remedial Action Plan █████████████████████████████████

████████████████. 2023 Remedial Action Plan, at 4.

49. On April 10, 2025, CLF's expert, Dr. Richard R. Horner, went to the New Haven Terminal to

analyze Defendants' operations at the Shell New Haven Terminal. *See* Expert Report of

Richard R. Horner, Ph.D. (May 1, 2025) at 3 ("Horner Rep.").

50. In his expert report, Dr. Horner concluded ███████████████████████████

██████████████████████████████████████ *See* Horner Rep. at 17.

51. Dr. Horner further stated that ████████████████████████████████████

████████████████████████████. *See* Horner Rep. at 19.

**B. The New Haven Terminal's secondary containment area is unlined and permeable**

52. Motiva and Shell's 30(b)(6) witness testified that the secondary containment area is not

completely impermeable. Deposition Transcript of Defendants' 30(b)(6) Witness Michael

Sullivan (Feb. 6, 2025) at 234:9 – 237:5.

53. Dr. Horner ███████████████████████████████████████████████

████████████████ Horner Rep. at 19.

54. To contain potential oil spills, the Terminal's containment areas are built below ground level and are partially surrounded by rammed-earth walls (berms). *See* Defendants' Answer to the Amended Complaint, ECF 120 ¶ 125.

55. The 2017 SWPPP states that "[t]he containment area floors and berms are constructed of compacted earth floors and crushed stone." 2017 SWPPP at 2.

56. ██████████████████████████████████████████████████████████
    ██████████████. Horner Rep. at 23.

57. The investigation conducted by Sovereign Consulting ██████████████████████
    ████████████████████████████████████████████████████████████
    ████████████████████████████████████████. 2022 Sovereign Report, at 5–6
    (Electronic Transmittal Form for the Report).

   **C. The SWPPP**

58. ██████████████████████████████████████████████████████████
    ████████████

    ████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████████

    Scope of Work Letter from Triton Environmental to Michael Sullivan, Motiva Enterprises, re: Proposal – Development of Stormwater Pollution Prevention Plan (SWP3) (Apr. 7, 2017) (Deposition Ex. 1064) (SHELLNH_TRI_00622).

11

59. 

*Id.* at SHELLNH_TRI_00623-24.

60. ████████████████████████████, Triton Environmental drafted a SWPPP that included a purported Engineer Certification dated July 10, 2017 by Stephen Benben of Triton Environmental. 2017 SWPPP at SOPUS_NHVN00314075.

61. The Certification provided by Mr. Benben purports to certify that "based on [a thorough and complete] review and site visit by myself or my agent, and on my professional judgment, that the Stormwater Pollution Prevention Plan meets the criteria set forth in the General Permit for the Discharge of Stormwater Associated with Industrial Activity effective on October 1, 2011." *Id.*

62. The Terminal's SWPPP does not confirm that the containment areas are impermeable. Triton Environmental 30(b)(6) Deposition at 95:11-15 (Feb. 16, 2023) ("Triton Env. Dep."); Triton Environmental Dep. Ex. 1065 (Appendix D to Facility SWPPP).

63. Triton Environmental's 30(b)(6) witness, Mr. Paul Simonetta, testified that the permeability evaluation for the site was based on the SPCC certification. Triton Env. Dep. at 95:16-17;

64. Mr. Simonetta acknowledged that Triton offered to assess the impermeability of the secondary containment areas, but Shell declined that service. Triton Env. Dep. at 95:22-25 – 96:1-4.

65. Mr. Simonetta further acknowledged that Mr. Benben did not conclude that the secondary containment areas were impermeable by explaining, "[t]hat was not part of our work." Triton Env. Dep. at 95:18-21.

66. Mr. Simonetta affirmed that Triton Environmental did not "do its own surveys or analyses to determine whether the secondary containment areas' impermeability was adequate." Triton Env. Dep. at 93:18-22.

67. Mr. Simonetta confirmed that it is best industry practice to perform impermeability studies when reviewing the impermeability of secondary containment areas.  Triton Env. Dep. at 94:2-5.

68. Mr. Simonetta testified that although Triton could have withheld certification for failure to conduct impermeability studies or "any number of reasons," it chose not to do so.  Triton Env. Dep. at 96:5-9.

## V.  THE TERMINAL'S SECONDARY CONTAINMENT AREA WAS INSUFFICIENT IN VOLUME AND UPON UNDERTAKING A CORRECTIVE CONSTRUCTION PROJECT DEFENDANTS DID NOT NOTIFY CT DEEP OR AMEND THEIR SWPPP.

69. The General Permit requires the New Haven Terminal to have double-walled tanks or "an impermeable secondary containment area which will hold at least 100% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow from such secondary containment area . . . ." General Permit § 5(b)(9)(A)(i).

70. Triton Environmental 

Email from Paul Simonetta to Michael Sullivan (Feb. 10, 2021) (SOPUS_NHN02445405)

13



71. [REDACTED] Email from Paul Simonetta to Michael Sullivan (Feb. 10, 2021) (SOPUS_NHN02445405) ("[REDACTED]").

72. [REDACTED]

Letter from Triton Envtl. to Michael Sullivan (July 28, 2021) (SOPUS_NHVN00190740)

73. [REDACTED]. Letter from Robert Perla, RPMS, to Michael Sullivan (Dec. 22, 2022) (SOPUS_NHVN00227849).

74. RPMS December 2022 letter describing [REDACTED]



Letter from Robert Perla, RPMS, to Michael Sullivan (Dec. 22, 2022) (SOPUS_NHVN00227849).

75. The RPMS December 2022 letter ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ Letter from Robert Perla, RPMS, to Michael Sullivan (Dec. 22, 2022) (SOPUS_NHVN00227849).

76. ██████████████████████████████████████████████. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan at 241:2 – 242:4.

## VI.    IT IS BEST INDUSTRY PRACTICE TO EVALUATE AND IMPLEMENT CHANGES TO STORMWATER MANAGEMENT PRACTICES BASED ON THE INCREASED RISKS FROM CLIMATE CHANGE.

77. In 1981, Shell commissioned a study about the greenhouse gas effect by the Climate Research Institute in the United Kingdom. Royal Dutch Shell, "The Greenhouse Effect" (1988) (SOPUS_NHVN02463861).

78. That study concluded that greenhouse gas emissions had already caused the planet to warm 0.5º C and that it would likely continue to experience a rise in temperature greater than any change since the last ice age. *Id.* at SOPUS_NHVN02463948.

79. In that study, Shell's "Greenhouse Effect Working Group" wrote that:

> Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth . . . Mathematical models of earth's climate indicate that if this warming occurs then it could create significant changes in sea level, ocean currents,

precipitation patterns, regional temperature and weather. These changes could be larger than any that have occurred over the last 12,000 years . . . With fossil fuel combustion being the major source of CO2 in the atmosphere, a forward looking approach by the energy industry is clearly desirable, seeking to play its part with governments and others in the development of appropriate measures to tackle the problem.

*Id.* at SOPUS_NHVN02463863.

80. The report further warned that "Direct operational consequences can be expected from a rising sea level, impacting offshore installations, coastal facilities and operations (e.g. platforms, harbours, refineries, depots) . . ." *Id.* at SOPUS_NHVN02463889.

81. The report suggests possible responses, including "Adaptation to sea level rise through . . . construction of (higher) dikes." *Id.* at SOPUS_NHVN02463893.

82. The study was so comprehensive, it quantified that Shell's own fossil fuel products were responsible for 4% of the total global carbon emissions in 1984. *Id.* at SOPUS_NHVN02463891.

83. In 1989, in furtherance of its efforts to predict and model different climate change scenarios, Defendants forecasted scenarios that ranged from a "sustainable world," wherein greenhouse gas emissions were reduced drastically after the year 2000 resulting in less severe climatic consequences, to scenarios where emissions continued to rise resulting in "more violent weather—more storms, more droughts, more deluges" and sea level rise of at least 30 cm. *See* Royal Dutch Shell, Scenarios: 1989–2010; Challenge and Response (London: Shell Confidential Group Planning, Oct. 1989).

84. Also in 1989, The New York Times reported on Shell's climate change modeling in an article entitled "Greenhouse Effect: Shell Anticipates a Sea Change." In the article, The New York Times reported that Shell was adapting assets in the North Sea specifically to withstand the sea level rise Shell knew was being caused by climate change. *See* Peter Passell, "Greenhouse

16

Effect: Shell Anticipates a Sea Change," The New York Times, December 20, 1989.

85. In 1991, Shell produced a documentary film detailing the effects of climate change on the world entitled "Climate of Concern."  Climate of Concern - Royal Dutch Shell, 1991, https://www.youtube.com/watch?v=0VOWi8oVXmo.

86. The documentary contains dire warnings about the effects of climate change, particularly for coastal areas – including that "warmer seas could make . . . destructive [storm] surges more frequent and even more ferocious." *Id.*  The narrator highlights the "coincidence of high tides and severe storms" that devastated Holland in 1953 and contrasts the fact that Holland's climate adaptation efforts after the storm allow it to "lie safe behind its elaborate and expensive defenses" while in countries that have not implemented climate adaptations "land and people remain at risk." *Id*.

87. In 1994, Shell employee Peter Langcake authored an internal report entitled "The Enhanced Greenhouse Effect," which agrees with the scientific consensus that man-made climate change was "the environmental concern with by far the greatest significance for the fossil fuel industry, having major business implications." P. Langcake, Royal Dutch Shell, "The Enhanced Greenhouse Effect," at 2 (SOPUS_NHVN02463950).

88. In 1995, a Shell management brief titled "Climate Change" reiterated the company's assessment that greenhouse gases are causing global warming with major business implications for the fossil fuel industry:

> The possibility of climate change brought about by global warming via man-made increases in gases such as carbon dioxide (CO2) and methane—the enhanced greenhouse effect—is probably the most prominent global environmental issue of today and could have major business implications for the fossil fuel industry. . . . Man's activities have contributed to emissions of these gases from the use of fossil fuels . . .The increase in concentrations of greenhouse gases has caused concern that this will give rise to an enhanced greenhouse effect resulting in global warming.

Shell International Petroleum Company, "Climate Change" Internal Management Brief (Feb. 1995) at 1–2.

89. In 1997 a presentation by a managing director of Royal Dutch Shell Group continued to reiterate the company's assessments on greenhouse gasses and global warming: "Burning [fossil] fuels creates emissions . . . [a]nd, in recent years, we have begun to appreciate the potential impact on the earth's climate system of the carbon dioxide emitted to the atmosphere when we burn them." John Jennings, Royal Dutch Shell Group, "Sustainable Development – the Challenge for Energy," (1997).

90. In 1998, while continuing to acknowledge that "the burning of fossil fuels such as coal, oil and natural gas . . . releases greenhouses gases, especially carbon dioxide (CO2) into the air," 1998 Shell Report "Climate Change: What does Shell Think and Do About It?," Ex. __ at 2, Shell's President Cor Herkströter addressed climate change risks in a speech to the World Economic Forum, proclaiming that Shell had "a responsibility to take prudent precautionary action." Cor Herkströter. "Reflections on Kyoto." Speech presented at the World Economic Forum, Davos, Switzerland, February 2, 1998.   In accepting that responsibility, Shell committed to "move fast in the commercial development of renewables" and to "increase energy efficiency . . . to reduce emissions of greenhouse gases." *Id.* at 1.

91. In 2002, Shell's understanding and discussion of the coming climate catastrophe began to reach a larger public audience when it started warning investors about climate change risks in its annual shareholder reports. The Shell Report 2002, ("The emission of carbon dioxide (CO2), mainly from burning fossil fuels, and other greenhouse gases (GHGs) could be changing the global climate . . . We believe action is needed now to eventually stabilize GHG levels in the atmosphere.").

92. Shell has continued to reiterate this risk disclosure that the effects of climate change are risks for Shell's operations and facilities: "physical effects of climate change such as, but not limited to, rise in temperature, sea-level rise and fluctuations in water levels could adversely impact both our operations and supply chains." Shell plc, 2018 Annual Report.

93. In 2024, the most recent year for which an annual report is available, Shell went even further, telling shareholders that:

> The impact of physical risks comes from both acute and chronic climate hazards. Acute hazards, such as flooding and droughts, wildfires and more severe tropical storms, and chronic hazards, such as rising temperatures and rising sea levels, could potentially impact some of our facilities, operations and supply chains . . . Mitigation of physical risks, whether or not related to climate change, is considered and embedded in the design and construction of our projects, and/or operation of our assets to help minimize the risk of adverse incidents to our employees and contractors, the communities where we operate, and our equipment.

Shell plc, 2024 Annual Report.

94. 

95. Defendants have a centralized engineering and science team that evaluates hazards and creates engineering requirements for all entities and contractors across the Shell Group as to how facilities must be designed, constructed, operated, and maintained.  See, Defs.' Penny Decl. (May 23, 2023) (ECF 234-1), at 3–5.

96. These requirements are published in Shell DEP documents, which are comprised of a "Specification" document that lays out requirements and an accompanying "Informative" document that explains the background and context requirements in the Specification. *Id.*

97. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████. Shell Global

Sols. Int'l B.V., DEP Informative Metocean Design and Operating Considerations

(Endorsement of ISO 19901-1:2005) (Feb. 2011) ("2011 DEP Informative").

98.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

99.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ *Id.* at 9.

100.   ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ *Id.* at 8–9.

101.   Dr. Paul Verlaan, a Senior Metocean Engineer who has been with Shell since 2002,

testified ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Dep. Tr. of P. Verlaan, (Mar. 20, 2025), at 49:21–50:6.

102.

2011 DEP Informative; Dep. Tr. of P. Verlaan (Mar. 20, 2025), at 49:21–50:6.

103.    Shell DEPs

Dep. Tr. of P. Verlaan at 152:7–22; *see id.* at 48:1-51:20.

104.

Shell Global Sols. Int'l B.V., DEP Informative Metocean Design and Operating Considerations for Offshore and Onshore Structures – Adaption to Climate Change (Feb. 2015) (hereinafter "2015 Adaptation DEP").

*Id.* at 6.

105.

*Id.* at 8.

106. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ *Id.* at 9.

107. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *Id.* at 12.

108. ████████████████████████████████████████

████████████████████████████ *Id.* at 16

109. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████



Shell Global Sols. Int'l B.V., DEP Informative Metocean Design and Operating
Considerations for Offshore and Onshore Structures – Adaption to Climate Change at 16 (Feb.
2015.

110. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



■■■■■■■■■ *Id.*

111. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. Shell Global Sols. Int'l B.V., Meteorological and Oceanographic Design and Operating Considerations Offshore, Costal and Onshore (Amendments/Supplements to ISO 19901-1:2015) (Feb. 2017).

112. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. *Id.* at 5.

113. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Verlaan Tr., at 52:1–64:5 (confirming the contents and use within Shell of the 2015 and 2017 DEP Informatives).

114. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. *See id.* at 234:1–259:20 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

23



).

115. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Reducing

the Impact of Weather and Climate Hazards on Operations – Guideline 1 (ECF 612) and 2

(ECF 613) (hereinafter, "Shell Climate Guideline" 1 and 2).

116. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████. ECF 612 at 4.

117. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ ECF 612 at 4; ECF 613 at 5.

118. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

ECF 612 at 5.

119. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

ECF 612 at 18.

120. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████. ECF 612 at 29, 31.

121. ████████████████████████████████████████████

████████████████████████████████████████ ECF 612 at

31.

122. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. ECF 612 at

53.

123. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. ECF 612 at 31.

124. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████. ECF 612 at 54.

125. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████    Shell Global Sols., Metocean Design and Operating Considerations – Guideline

for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaption (Aug.

2017), ECF 614 at 11 ("2017 Adaptation Guideline").

126. ████████████████████████████████████████████



ECF 614 at 14.

127. ███████████████████████████████████

███████████████████████████. ECF 614 at 14.

128. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████.

ECF 614 at 14.

129. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████." ECF 615 at 41.

130. Defendants have applied these required Shell-wide practices when analyzing some of their other facilities in the United States, and they have concluded that some of their facilities will be under water due to sea level rise before the end of the facilities' lives. Jaramillo, et al., *Extreme Coastal Inundation Under Different Climate Scenarios: Fourchon Junction Case Study* (2021) (ECF 309-12).

131. Defendants have moved some of their facilities to higher ground, including elevating facilities in order to protect them from sea level rise and increased precipitation and storm surge. *Id.*

132. Defendants' 2021 disclosures in SEC filings related to their Port Fourchon facility where

climate risks were assessed and the facility's tanks and building were moved and elevated to adapt to sea level rise concerns. Shell plc, SEC 20-F Annual Report (ECF 309-11).

133.  . Equilon Enterprises LLC dba Shell Oil Products US, Mormon Island Terminal, Climate Change Effects Vulnerability Assessment and Mitigation Plan (July 31, 2024) (SOPUS_NHVN02454432).

134.  Michael Sullivan testified ██████████████████████████ ████████████████████ Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 250:21-23 ("████████████ ████████████████████████").

135.  Mr. Sullivan further testified ██████████████████████ ████████████████. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 252:21-253:2 ("████████ ████████████████████████ ████████████████████████ ████████").

136.  CLF's Interrogatory No. 1 asked Defendants to describe all analyses they had conducted regarding past and current conditions or potential changes in storm frequency precipitation or flooding risk at the New Haven Terminal. Plaintiff's First Set of Interrogatories (Apr. 13, 2022) at 6.

137.  In their Second Supplemental Response to CLF's Interrogatories, Defendants stated that "they do not undertake the complex meteorological predictions and analyses described in Interrogatory No. 1." Defendants Second Supplemental Response to Plaintiff's Interrogatories

(Oct. 11, 2024) at 1-3.

138.    CLF's Interrogatory No. 15 asked Defendants to describe the responsibilities and activities

of Shell's Metocean Team in support of any Shell Business Units, including Shell Downstream

and Shell Trading and Supply, as well as any work performed for their U.S.-based facilities.

Plaintiff's Second Set of Interrogatories (Oct. 3, 2022) at 7.

139.    In response to CLF's Interrogatory No. 15, Defendants stated that the Metocean team has

not been asked to, nor otherwise undertaken, an evaluation of the New Haven Terminal.

Defendants' Responses to Plaintiff's Second Set of Interrogatories (Nov. 2, 2022) at 10.

Dated: October 21, 2025                          Respectfully submitted,

                                                 CONSERVATION LAW
                                                 FOUNDATION, Inc., by its attorneys

                                                 /s/ James Y. Meinert
                                                 James Y. Meinert (ct31637)
                                                 Conservation Law Foundation, Inc.
                                                 62 Summer St
                                                 Boston, MA 02110
                                                 Tel: (617) 850-1744
                                                 E-mail: jmeinert@clf.org

                                                 Christopher M. Kilian (ct31122)
                                                 Kenneth J. Rumelt (phv207130)*
                                                 Anna Tadio (phv208827)*
                                                 Conservation Law Foundation, Inc.
                                                 15 East State Street, Suite 4
                                                 Montpelier, VT 05602
                                                 Tel: (802) 223-5992
                                                 Tel: (802) 622-3020
                                                 Tel: (802) 622-3009
                                                 E-mail: ckilian@clf.org
                                                 E-mail: krumelt@clf.org
                                                 E-mail: atadio@clf.org

                                                 Ana McMonigle (ct31370)
                                                 Andrea Leshak (phv208945)*
                                                 Conservation Law Foundation, Inc.
                                                 195 Church Street

Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
Tel: (203) 902-2157
E-mail: amcmonigle@clf.org
E-mail: aleshak@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Mimi Liu (phv208839)*
Devin Williams (phv208833)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
Tel: (202) 386-9625
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: mliu@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722

29

E-mail: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Shalom Jacks (phv208834)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
Tel: (843) 216-9013
E-mail: rmazingo@motleyrice.com
E-mail: sjacks@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

*Attorneys for Plaintiff*
*Conservation Law Foundation, Inc.*
*Admitted as Visiting Attorney*