## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>EQUILON ENTERPRISES LLC, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,<br><br>Defendants. | Case No: 3:21-cv-00933-VDO<br><br><br>November 3, 2025 |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE THE EXPERT TESTIMONY OF RENEE BOURDEAU, P.E.

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") hereby submit this response in opposition to Plaintiff's Motion to Preclude the Expert Testimony of Renee Bourdeau P.E.  As explained below, as a professional engineer with a master's degree in environmental engineering and several decades of experience in environmental permitting, Ms. Bourdeau is well qualified to offer expert opinions on industrial stormwater permitting, all of which meet the requirements of Federal Rule of Civil Procedure 702.  Plaintiff's motion should be denied.

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................ 4

   A.  Ms. Bourdeau's Qualifications ................................................................5

   B.  Ms. Bourdeau's Opinions and Methodology ........................................7

III.    LEGAL STANDARD ........................................................................................ 9

IV.    ARGUMENT .................................................................................................. 10

   A.  Ms. Bourdeau is qualified to opine on industry engineering practices ...........................11

   B.  Ms. Bourdeau's opinions on industrial stormwater permitting by CT DEEP are helpful and the proper subject of expert testimony .........................................................15

   C.  Ms. Bourdeau's methodology is reliable ..............................................21

V.    CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)......................................................................24

*Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled
  Humidity, 1982*,
  No. 20-CV-04669 (GBD) (VF), 2024 WL 1116083 (S.D.N.Y. Mar. 14, 2024) ...................25

*Cent. Buffalo Project Corp. v. FDIC*,
  975 F. Supp. 226 (W.D.N.Y. 1997) ...........................................................14, 16, 20

*Garthwait v. Eversource Energy Co.*,
  No. 3:20-CV-00902 (JCH), 2022 WL 3019633 (D. Conn. July 29, 2022) ...............22, 23, 24

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
  No. 18 CIV. 05290 (CM), 2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023).............................25

*Gen. Elec. Cap. Corp. v. Nichols*,
  No. 3:09-CV-758, 2011 WL 1638048 (D. Conn. Apr. 29, 2011)...........................................13

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...........................................................................23, 24

*Kovaco v. Rockbestos-Surprenant Cable Corp.*,
  No. 3:11CV377 WWE, 2014 WL 657720 (D. Conn. Feb. 20, 2014).....................................13

*Liberty Mut. Ins. Co. v. Day to Day Imports Inc.*,
  No. 22-CV-02181 (AT) (RFT), 2025 WL 2117897 (S.D.N.Y. July 29, 2025)................17, 19

*Max Zach Corp. v. Marker 17 Marine*,
  No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024)............................9

*In re Mirena IUD Prod. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016)..............................................................15, 16

*Post Univ. Inc. v. Learneo, Inc.*,
  No. 3:21-CV-01242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025)
  ....................................................................................9, 10, 11, 12

*Red Hawk, LLC v. Colorforms Brand LLC*,
  638 F. Supp. 3d 375 (S.D.N.Y. 2022).....................................................................16

*Riad v. Porsche Cars N. Am., Inc.*,
  No. 18 Civ. 5175, 2024 WL 3606315 (E.D. Pa. July 30, 2024)..............................................19

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)............................................................13, 14, 23

*United States v. Boissoneault*,
    926 F.2d 230 (2d Cir. 1991)......................................................................13

*United States v. Donald*,
    No. 3:21-cr-8 (VAB), 2023 WL 6958797 (D. Conn. Oct. 20, 2023) ....................10

*United States v. Faison*,
    393 Fed. Appx. 754 (2d Cir. 2010)..............................................................14

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015).................................................................22, 24

*United States v. Schohn*,
    602 F. Supp. 3d 447 (W.D.N.Y. 2022) ..........................................................14

*Wang v. Omni Hotels Mgmt. Corp.*,
    No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ..............10

**Statutes**

Clean Water Act, 33 U.S.C. §1251 et seq.........................................................6

**Rules**

Fed. R. Evid. 401 ....................................................................................10

Fed. R. Evid. 403 ...............................................................................10, 15

Fed. R. Evid. 702 ............................................................................ *passim*

I.    **INTRODUCTION**

At issue in this case is whether the General Permit for the Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") to the New Haven petroleum bulk storage terminal (the "Terminal") includes an implied requirement that a permittee is required to conduct a "climate change vulnerability risk assessment" and modify its facility to account for "extreme weather." No one disputes the Permit itself does not mention or reference climate change, climate resilience or other specific language. But Plaintiff Conservation Law Foundation ("CLF") claims one phrase defining "minimize"—"achievable in light of best industry practice"—*implies* an obligation to conduct a climate change vulnerability risk assessment. In its recently reissued Permit, CT DEEP included a "new" section to address certain "climate change," which it calls "adverse weather events."

In support of its case, Defendants introduced **Renee L. Bourdeau**, a licensed professional engineer with an M.S. in environmental engineering and decades of experience with stormwater permitting in Connecticut, Rhode Island, and other Northeast States. To clarify how CT DEEP interprets the Permits, especially whether the CT DEEP has ever required a climate change analysis under the Permit, Ms. Bourdeau looked at hundreds of actual Permit and related stormwater plans, and she identified none in the State of Connecticut.

Plaintiff's motion to exclude the testimony of Ms. Bourdeau should be denied. Ms. Bourdeau's opinions squarely meet the standard for admissibility set forth in Rule 702.

*First*, Ms. Bourdeau is eminently qualified to offer these opinions. She earned a Master of Science in Civil and Environmental Engineering, is a licensed Professional Engineer, and offers nearly twenty years of practical experience designing stormwater systems, preparing Stormwater Pollution Prevention Plans ("SWPPPs"), modeling hydrology and hydraulics with

industry-standard tools, and guiding compliance with National Pollutant Discharge Elimination System ("NPDES") and related regulatory programs.

As part of her practice, Ms. Bourdeau has drafted, implemented, reviewed, and overseen SWPPPs and stormwater Best Management Practices ("BMPs") in the field, bridging design, permitting, construction, and maintenance. That background gives her superior knowledge and skill to evaluate what engineers and permittees actually do in SWPPPs, as well as to explain the technical content of those documents for the jury. Plaintiff's suggestion that her opinions require only "the ability to read" misapprehends the expertise required to assess the technical significance of SWPPP provisions and to determine whether they reflect climate-related risk assessment or hardening. Nor is there any merit to Plaintiff's quibbles about the timing of an earlier deposition or her initial fact-designation; what matters is that, as timely disclosed, she applies specialized engineering knowledge to data and documents that reveal industry custom and practice.

**Second**, Ms. Bourdeau's testimony is highly relevant and will help the trier of fact. Plaintiff's unsupported interpretation of "best industry practice" makes the existence and contours of "industry practice" a core issue. Ms. Bourdeau reviewed and analyzed the very documents that reflect industry practice—the SWPPPs prepared by Professional Engineers for permittees subject to the Permit,[1] as well as SWPPP guidance issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). She then applied her technical expertise to evaluate and interpret those plans and to determine whether they

---

[1] The Permit at issue in this case is the 2018 Connecticut Industrial Stormwater General Permit (the "Permit"). The Permit requires that a SWPPP be certified by a professional engineer licensed in the State of Connecticut or a Certified Hazardous Materials Manager. *See* Permit Section 5(c)(7).

demonstrate consideration of "climate change factors" such as extreme precipitation, sea level rise, and severe storms.

The jury will not be able to glean these technical implications by reviewing SWPPPs unaided.  Ms. Bourdeau applied her specialized ability to read the engineering language and to identify what practices were actually implemented by members of the industry.  Accordingly, she can explain whether climate considerations are part of industry practice.  This testimony will materially assist the finder of fact.  Ms. Bourdeau's conclusion—that the SWPPPs she reviewed do not reflect a practice of incorporating climate change considerations, and that based on her research and experience CT DEEP has not instituted enforcement proceedings against permittees on that basis—directly bears on Plaintiff's unsupported interpretation of the Permit.  Without question, Ms. Bourdeau provides exactly the type of expert opinion on the very meaning of "in light of best industry practice" in dispute in this case.

*Third*, Ms. Bourdeau's methodology is reliable.  She pursued the best and most probative data available for assessing industry practice: publicly available Connecticut SWPPPs under the applicable Permit, CT DEEP's SWPPP guidance, relevant enforcement records, and consultation with a knowledgeable CT DEEP official.  She systematically collected 152 SWPPPs available through CT DEEP's website and records room, read them holistically rather than relying on mere keyword searches, and examined whether their technical content demonstrates consideration of climate-related factors.  Her conclusion that none of the plans reviewed reflected climate change considerations, coupled with the absence of CT DEEP enforcement proceedings premised on such omissions, as well as the statements from CT DEEP officials, is a reasonable and well-supported inference about industry practice based on her experience and expertise.

Plaintiff's criticisms—principally that she did not review every SWPPP in existence, that not all were coastal, or that some predated the Permit—do not undermine the reliability of using a large body of directly relevant plans and regulatory materials, particularly where not all SWPPPs are publicly available.[2]  Rule 702 does not demand perfection or omniscience; it requires a reliable application of expertise to sufficient facts and data.  That is exactly what Ms. Bourdeau did.  Notably, Plaintiff has not come forward with a single SWPPP for any facility in Connecticut (or indeed, anywhere) that supports its interpretation of the Permit, and none of Plaintiff's experts dispute the contents of Ms. Bourdeau's analysis of the SWPPPs reviewed nor her substantive opinions on industry practice regarding SWPPPs.

Ms. Bourdeau's specialized engineering expertise, applied through a transparent and methodical review of the best available SWPPP and enforcement data, will meaningfully assist the jury in resolving the question central to Plaintiff's theory—what "best industry practice" actually means and what is required for SWPPPs prepared pursuant to the Permit.  Ms. Bourdeau's opinions are relevant, reliable, and well within her qualifications, education, experience, and expertise.  The motion to preclude her testimony should be denied.

## II.    BACKGROUND

Renee L. Bourdeau, P.E., is a Principal Water Resources Engineer at Geosyntec Consultants, Inc., with more than nineteen years of experience in water resources engineering, stormwater management, and regulatory compliance.  Ms. Bourdeau's education, professional

---

[2] Notably, CLF did not review any other SWPPPs or talk with CT DEEP officials about its view that violations of the Permit are occurring.  *See* Ex. 1, CLF 30(b)(6) (Sean Mahoney) Deposition at 199:4-11 ("Q. Did CLF go to Connecticut DEEP and actually look at SWPPPs? A. I don't know the answer to that. Q. Has anybody ever provided you copies of other SWPPPs from Connecticut? A. Beyond the SWPPP for the Gulf terminal? Q. Yes. A. I don't know the answer to that."), 200:19-25 ("Q. Has CLF ever identified any notice of violation or notice of potential violation that CT DEEP has issued to any facility in Connecticut that relates to climate change in any way? [Objection omitted] A. I -- I don't know.").

credentials, extensive project experience, and thorough methodology in reviewing the best available information are more than sufficient to qualify her to reliably opine on what "best industry practice" means in the context of the Permit requirement that permittees "minimize" stormwater pollution discharges. *See* Permit § 5(b). Unlike Plaintiff's experts, Ms. Bourdeau actually reviewed all available information on "best industry practice" by analyzing all publicly available SWPPPs.

### A.     Ms. Bourdeau's Qualifications

Ms. Bourdeau is educated and licensed to practice in all technical fields relevant to this dispute. Ms. Bourdeau holds a Bachelor of Science in Environmental Science from SUNY Plattsburgh and a Master of Science in Civil and Environmental Engineering from the University of New Hampshire. She is a licensed Professional Engineer in the State of New Hampshire, specializing in Civil and Environmental Engineering. *See* Ex. 2, Expert Report of Renee Bourdeau ("Rpt.") at 1-2.

A Professional Engineer must meet rigorous requirements to earn her license. As the National Society of Professional Engineers explains, "[t]o become licensed, engineers must complete a four-year college degree, work under a Professional Engineer for at least four years, pass two intensive competency exams and receive a license from their state's licensure board. Then, to retain their licenses, PEs must continually maintain and improve their skills throughout their careers."[3]

---

[3] *See* National Society of Professional Engineers, *What is PE Licensing, and Why Does it Matter*. Available at: https://www.nspe.org/about/about-professional-engineering/what-pe (last visited on Oct. 24, 2025). Ms. Bourdeau is not the sole Professional Engineer Defendants have retained. Defendants' experts who are licensed Professional Engineers include not only Ms. Bourdeau but also Thomas Battles, Doug Bayles, Eric Kovich, Austin Pace, and Russell Parkman. In contrast, not a single one of Plaintiff's designated experts is a licensed Professional Engineer.

Ms. Bourdeau's career has frequently involved the application and interpretation of the NPDES regulations, compliance, and permitting, as she has provided engineering guidance in those fields relating to watershed and water quality modeling, stormwater management, land use permitting, and best management practice (BMP) design. *Id.* at 1-2; Ex. 3, 2025 Deposition of Renee Bourdeau ("2025 Dep.") at 35:4-36:23, 44:2-45:4. Ms. Bourdeau has worked closely with municipalities, watershed groups, and private clients to identify sources of water pollution and develop strategies to reduce pollution and improve water quality. Ex. 2, Rpt. at 1-2.

Ms. Bourdeau's technical expertise includes the design and implementation of stormwater BMPs to reduce flooding and meet water quality goals. Indeed, she has specialized in nature-based solutions and green infrastructure practices, which are recognized as best engineering practices for sustainable stormwater management and climate resilience. *See* Ex. 3, 2025 Dep. at 36:4-23, 48:3-49:6. As part of this work, Ms. Bourdeau has developed Stormwater Management Plans ("SWMPs") and SWPPPs for Clean Water Act compliance under the NPDES program, including construction, municipal, and industrial sectors.[4] *Id.*; Ex. 2, Rpt. at 1-2. She likewise routinely develops hydrologic and hydraulic models using industry-standard software such as HydroCAD, HEC-HMS, HEC-RAS, and EPA SWMMM to analyze stormwater management systems and optimize design solutions. Ex. 2, Rpt. at 1-2. These modeling efforts are integral to understanding site-specific risks and implementing effective mitigation strategies, including those related to climate change. *Id.*

Ms. Bourdeau's practice has also resulted in her involvement in several oversight and leadership roles. Such responsibilities span the entire project lifecycle, from identifying client

---

[4] Again, Ms. Bourdeau's experience stands in sharp contrast with Plaintiff's experts, none of whom has ever written a SWPPP. *See, e.g.*, Ex. 4, Deposition of Plaintiff's Expert Richard Horner, at 41:9-13;

and regulatory needs, developing models and designs, preparing construction bid documents, selecting contractors, overseeing construction, and conducting post-construction inspection and long-term maintenance of stormwater BMPs.  Ex. 2, Rpt. at 1-2; Ex. 3, 2025 Dep. at 36:9-17, 48:3-49:22.  This comprehensive approach ensures that best engineering practices are applied from initial planning through ongoing operation and rehabilitation.  In connection with her extensive experience, she also understands how to discuss issues with regulators as well.

From any perspective, Ms. Bourdeau's education, licensure, technical expertise, and extensive experience in both the design and regulatory review of stormwater management systems establish her as a highly qualified expert to define and explain "best industry practice" for industrial stormwater management and climate change adaptation.  Her opinions are grounded in nearly two decades of practical experience, rigorous technical analysis, and a comprehensive understanding of regulatory frameworks and industry standards.

### B.    Ms. Bourdeau's Opinions and Methodology

Despite Plaintiff's complaints that Ms. Bourdeau failed to access data that neither they nor any other party has access to, Ms. Bourdeau's methodology for evaluating "best industry practice" in the context of whether a specific Connecticut Permit includes Climate Change Factors and industrial stormwater management was systematic, transparent, and consistent with generally accepted standards in the field.

Ms. Bourdeau was asked to evaluate what "best industry practice" entails in relation to SWPPPs, with specific reference to whether consideration of Climate Change Factors and climate hardening of facilities was required under the Permit.  To answer this question, Ms. Bourdeau sought the most relevant information: current industry practice with regard to SWPPPs and information from CT DEEP directly.  While the Permit required a permittee to have a SWPPP, it did not require a permittee to publish that plan or submit it to the agency.  Rather,

7

permittees were required to have their current SWPPPs on site and available for review and inspection by CT DEEP.  Thus, the first step of Ms. Bourdeau's methodology consisted of using her engineering experience to identify, assess and evaluate ***every publicly available*** SWPPP prepared pursuant to the Permit, as well as the 2011 CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan.  *See* Ex. 3, 2025 Dep. at 68:6-19; Ex. 2, Rpt. at 3-4.

Ms. Bourdeau clearly and consistently described her thorough process for collecting each and every possible SWPPP she could find in both her report and at depositions.  First, she obtained SWPPPs posted on the Connecticut DEEP website.  See Ex. 3, 2025 Dep. at 55:19-56:21; Ex. 2, Rpt. at 3-4.  Second, she visited CT DEEP's records room to review all SWPPPs contained in agency files.  *Id.*  She confirmed that she reviewed every publicly available SWPPP she could identify that was prepared under the Permit, ultimately analyzing 152 plans, and noted that although she attempted outreach to additional facilities—primarily oil and gas facilities—those efforts did not yield additional documents.  See Ex. 3, 2025 Dep. at 57:4-6, 57:11-14; Ex. 2, Rpt. at 4.

The next step of Ms. Bourdeau's methodology was to analyze the data she had collected. In explaining her analytical approach, Ms. Bourdeau testified that she read each SWPPP to determine whether the permittees and their engineers considered Climate Change Factors—such as extreme precipitation, sea-level rise, changing weather patterns, adverse weather, severe storms, and similar terms—when preparing the plans.  *See* Ex. 3, 2025 Dep. at 58:8-60:5.  She emphasized that her review was not driven by keyword searches alone but by a holistic reading of the text to assess whether the documents reflected consideration of climate change.  *Id.*

She also consulted with Karen Abbott of CT DEEP during her records-room review and asked whether, in Ms. Abbott's experience during facility inspections or SWPPP reviews,

permittees were considering Climate Change Factors.  Ms. Abbott confirmed that they were not and also stated that it was not required by the Permit.  *See* Ex. 3, 2025 Dep. at 60:11-22.

Finally, Ms. Bourdeau supplemented her document review with an examination of enforcement files, explaining that one of her opinions was based on notices of violation in CT DEEP's records and her conversations with Ms. Abbott.  *See* Ex. 3, 2025 Dep. at 70:17-71:2; Ex. 2, Rpt. at 4-5.  Ms. Bourdeau testified that the notices of violation she identified and reviewed did not concern SWPPPs being deficient for lacking Climate Change Factors-related language. *See* Ex. 3, 2025 Dep. at 63:5-64:1.  In sum, she testified that she reviewed all publicly available SWPPPs to determine whether permittees considered Climate Change Factors in their preparation and she confirmed that the underlying records were publicly accessible to anyone who schedules time in the records room.  *See* Ex. 3, 2025 Dep. at 75:2-7, 77:23-78:1.

## III.    LEGAL STANDARD

As this Court has recognized, an expert may offer opinion testimony at trial based on scientific, technical, or other specialized knowledge if the witness is qualified in the relevant subject matter, and the opinion testimony is reliable and "relevant, *i.e.*, whether it will help the trier of fact."  *Post Univ. Inc. v. Learneo, Inc.*, No. 3:21-CV-01242 (VDO), 2025 WL 2709370, at *2-3 (D. Conn. Sept. 23, 2025) (applying Fed. R. Evid. 702) (citations omitted).  A witness is qualified as an expert where she has "superior knowledge, education, experience, or skill" in the relevant subject matter, and *"may be classified as an expert based upon personal experience alone," if the proffered opinion will assist the trier of fact.  Post Univ. Inc.*, 2025 WL 2709370, at *2-3 (citation modified).

If an expert satisfies the qualification requirement, the Court must determine whether the testimony is reliable, *id.* at *2, which is a "flexible" inquiry, *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *2 (D. Conn. Oct. 30, 2024).  In

assessing reliability, the Court "examine[s] not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case." *United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *17 (D. Conn. Oct. 20, 2023) (citation omitted).

A reliable opinion from a qualified expert must also be relevant and admissible under Rule 403. *Post Univ. Inc.*, 2025 WL 2709370, at *3 (applying Fed. R. Evid. 401, 403, 702). "Even if the jury *could* resolve these issues without [the expert's] testimony," the opinion is admissible where it "is *likely to help* [] reach their determinations," because the jury "would necessarily be limited by its own experiences; [and] an expert can assist a jury in understanding considerations that they may not have contemplated." *See Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *3 (D. Conn. June 27, 2025) (emphasis added) (denying motion to exclude opinions when expert "employed technical methods that are likelier than not to assist the jury and . . . utilized sufficiently reliable methods and data").

If the expert's opinion satisfies each threshold requirement, the testimony is admissible, and "any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Post Univ. Inc.*, 2025 WL 2709370, at *3 (citations omitted).

## IV.    ARGUMENT

Plaintiff does not challenge Ms. Bourdeau's qualifications or experience as an engineer in general.  Nor could it, as Ms. Bourdeau's illustrious career in ensuring both the technical and strategic components of industrial stormwater permittees speaks for itself.  Instead, Plaintiff makes half-hearted arguments regarding the helpfulness of Ms. Bourdeau's ability to interpret SWPPPs, her qualifications to opine on the contents of SWPPPs, and the reliability of her methodology for assessing "best industry practice."  Yet, even a surface-level review of Ms.

Bourdeau's report demonstrates that Plaintiff's arguments miss the mark. Ms. Bourdeau's ability to comprehend the technical aspects and end goals of practices and processes included in a SWPPP obviously will be helpful to a finder of fact who would otherwise be lost to the meaning of their many technicalities; she is undoubtedly qualified to assess and interpret the contents of those SWPPPs, and she reliably applied her analysis of the relevant data at issue in generating her opinions regarding what "best industry practice" in fact is – and what it is not. Ms. Bourdeau's opinions should be admitted in full.

A.    **Ms. Bourdeau is qualified to opine on industry engineering practices**

Ms. Bourdeau offers the education, experience, and expertise necessary to perform the analysis of SWPPPs described in her report. "A witness is qualified where he or she has 'superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Post Univ. Inc.*, 2025 WL 2709370, at *2. Accordingly, "[i]f an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Id.*

Ms. Bourdeau more than meets the requirements of Rule 702. She is highly qualified by both education and experience to perform her analysis of SWPPPs and enforcement actions, and to consult with other experts in her field. As explained above, she holds a Master of Science in Civil and Environmental Engineering and is a licensed Professional Engineer, specializing in Civil and Environmental Engineering. *See* Ex. 2, Rpt. at 1-2. She has worked in engineering relating to SWPPPs and managing compliance with environmental regulatory requirements for almost twenty years. *Id.* In that time, she has participated in drafting, assessing, and implementing numerous SWPPPs, with a particular emphasis on engineering guidance in those fields relating to watershed and water quality modeling, stormwater management, land use

permitting, and Best Management Practice (BMP) design.  *Id.* at 2; Ex. 3, 2025 Dep. at 36:4-23, 48:3-49:6.  Put simply, and as described above, Ms. Bourdeau is exceptionally qualified to opine on industry practice in general and, in particular, to assess and interpret the contents of SWPPPs and explain their meaning and function to a jury, including what they say about "industry practice."  *See id.*; *see also Post Univ. Inc.*, 2025 WL 2709370, at *2 ("A witness is qualified where he or she has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.") (citation and quotations omitted).

Given her exceptional qualifications, Plaintiff's argument regarding Ms. Bourdeau's lack of relevant qualifications falls flat.  Plaintiff complains that Ms. Bourdeau did not use her expertise in developing her opinions and that they fall outside the scope of her expertise.  In support, they cite a portion of her earlier deposition *before she had prepared her expert report* where she stated:

> Q.  I think you testified earlier that the permittees are not required to consider climate change in their SWPPP's.  Did you use your professional experience to come to that conclusion?
>
> **A.  There is just no language within the Multi-Sector General Permit or the SWPPP guidance that says that needs to be done.**
>
> Q.  Okay. And you're familiar with that based on your work as an engineer?
>
> **A.  I reviewed the Multi-Sector General Permits and the Connecticut SWPPP guidance that is part of the scope of work.**

Ex. 5, 2023 Deposition of Renee Bourdeau ("2023 Dep.") at 74:18-75:6.

Plaintiff's claims are impossible to square with the relevant case law.  Plaintiff appears to draw from this short exchange in 2023 the impression that Ms. Bourdeau was suggesting she did not use her expertise (or that her expertise was not needed) to review and interpret the SWPPPs.  *See* Plaintiff's Motion to Exclude Ms. Renee Bourdeau [ECF 737-1] at 4-7.  But Ms. Bourdeau never made any such suggestion.  Instead, she merely answered Plaintiff's counsel's direct question regarding the ultimate issue of the case the way any good scientist in her field would:

by referencing the evidence instead of her own *ipse dixit* or qualifications. *See Gen. Elec. Cap. Corp. v. Nichols,* No. 3:09-CV-758, 2011 WL 1638048, at *6 (D. Conn. Apr. 29, 2011) (allowing sales and marketing veteran in the concrete pumps industry to testify as an expert regarding valuation, despite not being a certified appraiser, with the understanding that the expert "sufficiently demonstrated that his analysis in this case is derived from his experiences in the [relevant] industry.").

Instead, Ms. Bourdeau testified that her conclusion resulted from her "review [of] the Multi-Sector General Permits and the Connecticut SWPPP guidance that is part of the scope of [her] work," and referenced the essential language within the materials she reviewed that proved that issue. Ex. 5, 2023 Dep. at 74:18-75:6. Nowhere did she suggest that understanding those documents and plans to comprehend their aims and meanings did not require expertise. Indeed, as discussed in more detail below, it obviously did, for a non-engineer would be ill-equipped to understand many of the technicalities and language used in SWPPPs in assessing the aim and purpose of those plans. *See* Ex. 6, Defendant's SWPPP at 26 ("Structural control measures in use at the facility include catch basins, lift stations, drainage lines, containment berms (walls and floors), valves, and retention basins."); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts."); *Kovaco v. Rockbestos-Surprenant Cable Corp.*, No. 3:11CV377 (WWE), 2014 WL 657720 (D. Conn. Feb. 20, 2014) ("Mr. McNamara's experience in human resources qualifies him to explain, inter alia, what 'progressive discipline' is, what a 'zero tolerance policy' is, and how employers typically engage in the process of accommodating disabled employees. This testimony could assist the trier of fact insofar as it would help to make sense of certain concepts that would likely be foreign to a jury.") (citation omitted); *United States v. Boissoneault*, 926 F.2d 230, 232 (2d

Cir. 1991) (holding that despite general familiarity with English of a jury, the testimony of "experienced narcotics agents" was permissible to explain the meaning of otherwise innocuous words used as "codes and jargon" in the drug trade.).

In another argument, Plaintiff claims that Ms. Bourdeau was initially designated as a fact witness, which somehow, it suggests, means she did not use her expertise when evaluating the SWPPPs. Plaintiff cites no law for this proposition. *See* ECF 737-1 at 1, 5. Nor could it, for so long as an expert was timely disclosed (which Plaintiff does not contest here), Second Circuit precedent clearly confirms that this is entirely unproblematic, as even "so-called dual testimony, testifying as both an expert and as a fact witness, is not objectionable in principle." *United States v. Schohn*, 602 F. Supp. 3d 447, 464 (W.D.N.Y. 2022) (quoting *United States v. Faison*, 393 Fed. Appx. 754, 758 (2d Cir. 2010)) (allowing an investigator in the case to testify as both a fact witness and an expert witness based on his experience in similar cases).[5]

While Plaintiff may dislike the facts and the record evidence that Ms. Bourdeau considered to reach her opinions—and that its experts completely ignored—that does not mean that Ms. Bourdeau is not qualified to use her expertise to assist the jury in understanding and interpreting SWPPPs and their broader implications to understand what constitutes "industry practice." Ms. Bourdeau is fully qualified to testify and use her expertise in forming the contents of her opinion. *See Bilzerian*, 926 F.2d at 1294 ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts."); *Cent. Buffalo Project Corp.*, 975 F. Supp. at 230 ("The standard for admissibility of expert testimony is helpfulness, not necessity.") (citation omitted). As a licensed professional engineer with years of experience with industrial stormwater permits,

---

[5] Similarly, that Ms. Bourdeau testified without reference to her methodology and qualifications before her report on this issue had been finalized says nothing about her qualifications (or alleged lack of them) and does not in any way suggest that she is speaking outside of her area of expertise. Instead, it speaks only to the stage of litigation at which her original deposition was taken.

Ms. Bourdeau is exactly the kind of expert necessary to make sense of the CLF's interpretation that a duty to "minimize" stormwater includes an obligation to conduct a climate change risk assessment when CT DEEP said the old permit did not have that requirement.

**B.    Ms. Bourdeau's opinions on industrial stormwater permitting by CT DEEP are helpful and the proper subject of expert testimony**

Because of her directly relevant experience and expertise with stormwater permitting, Ms. Bourdeau's opinions will assist the finder of fact in this case as required by Rules 702 and 403. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016) ("[E]xpert testimony is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'") (quoting Fed. R. Evid. 403).

At the heart of this dispute is what the Permit phrase "available in light of best industry practice" means, and what it requires in developing and implementing SWPPPs under the Permit. Obviously, "best industry practice" cannot exceed what industry members actually do at their facilities in the State of Connecticut—the term is not aspirational but is rather rooted in what is actually done.[6] And it is this question that Ms. Bourdeau has answered by reviewing *every publicly available* SWPPP prepared pursuant to the Permit, as well as the 2011 CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan. *See* Ex. 3, 2025 Dep. at 68:4-19; Ex. 2, Rpt. at 3-4. By definition, this is critical evidence in this dispute over Permit terms.

---

[6] CT DEEP has not defined "best industry practice" in the Permit, in regulations, or in guidance documents. The common definition of "practice," however, acknowledges that it means "to do or perform *often, customarily, or habitually*." *See* Merriam Webster's Online Dictionary, *Practice*. Available at: https://www.merriam-webster.com/dictionary/practice (emphasis added).

With her expertise in designing, implementing, and analyzing such plans, Ms. Bourdeau is able to evaluate the technically dense language of SWPPPs to determine whether or not those plans indicate any "practice" of consideration of climate change factors or hardening of facilities in response to climate change considerations. *See, e.g.*, Ex. 2, Rpt. at 3-4; Ex. 6, Defendant's SWPPP (containing plans and phrases which would be unfamiliar in purpose and function to a lay individual); *see id.* at 26 ("Structural control measures in use at the facility include catch basins, lift stations, drainage lines, containment berms (walls and floors), valves, and retention basins.").

The ability to interpret these documents is exceptionally helpful to a jury, who would otherwise lack the expertise necessary to understand their meaning or import, and might otherwise be confused into believing that "climate change" considerations could be hiding inside technical plans or language they were capable of understanding. *See id.*; *see also Red Hawk, LLC v. Colorforms Brand LLC,* 638 F. Supp. 3d 375, 380 (S.D.N.Y. 2022) ("Ultimately, the threshold question is whether the "proffered expert testimony is relevant … [the] opinion is relevant if it will help the trier of fact to understand the evidence or to determine a fact in issue.") (citations and quotations omitted); *In re Mirena*, 169 F. Supp. 3d at 413 ("[E]xpert testimony is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'") (quoting Fed. R. Evid. 403); *Cent. Buffalo Project Corp. v. FDIC*, 975 F. Supp. 226, 230 (W.D.N.Y. 1997) ("The standard for admissibility of expert testimony is helpfulness, not necessity") (citation omitted).

So too with Ms. Bourdeau's ultimate conclusions based on her analysis. In relevant part, she opines that:

- "None of the SWPPPs reviewed contained considerations for 'climate change' or similar terms."

- "DEEP has not taken or issued an enforcement action for a permittee not including considerations for 'climate change' when preparing the SWPPP."

- "Based on my research, and as of the date of this report, I see no evidence of an 'industry practice' or a 'best industry practice' in the State of Connecticut for facilities regulated under the DEEP program to conduct a 'climate change vulnerability' risk assessment."

Ex. 2, Rpt. at 4.  Every fact finder would want assistance in knowing and understanding this information given CLF's "implied" interpretation of "achievable in light of best industry practice."

   Ms. Bourdeau's opinions are proper expert testimony and essential to helping the jury understand what "best industry practice" encompasses, and what it does not, a classic role of expert testimony.  *See Liberty Mut. Ins. Co. v. Day to Day Imports Inc*., 2025 WL 2117897, at *13 (S.D.N.Y. July 29, 2025).  Indeed, as other courts in this circuit have found, where industry practice under similar binding documents is relevant to determining the meaning of that document, expert testimony is admissible and helpful to describe those practices.  *See id.* ("[The expert's] opinions about industry custom and practice, including but not limited to industry practice … could be helpful to the factfinders if the Court finds that the Policy is ambiguous"). For example, where a dispute regarding the meaning of an insurance Policy involved complex terms that may have been ambiguous, the courts have allowed expert testimony on industry custom in similar circumstances. *See id.* at *14 ("As to [the expert's] opinion on whether Plaintiff's claims hand[l]ing comported with industry custom and practice, and in particular

17

whether it was customary for a claims adjuster to hire an investigator to investigate the claim, that opinion is an appropriate subject for expert testimony.").  So too here.  Given this case centers around the meaning of the term "best industry practice," Ms. Bourdeau's testimony regarding what industry practice is as it relates to complex practices described in SWPPPs will be invaluable to the jury.

To be clear, Ms. Bourdeau does not intend to offer expert opinions on what the law requires Defendants to do under the Permit.  As Defendants have consistently argued, no expert should be permitted to offer legal opinions.  *See* Defendants' Motions to Exclude the Opinions of Oreskes, Levine, and Macey.  But the factual question of what constitutes "industry practice" is undeniably relevant to what obligations are—and are not—"implied" by the term "best industry practice."  Any suggestion to the contrary by Plaintiff ignores the relevant issues of the case and controlling law regarding proper expert testimony.

It is perhaps unsurprising then that Plaintiff's arguments on these grounds are limited to a single hypothetical footnote and the occasional offhand comment that "[s]imply reviewing the Permits, Guidance, and SWPPPs for the term 'climate change' or language associated with climate change does not require or reflect any particular or specialized knowledge or expertise, other than the ability to read."  *See* Plaintiff's Motion to Exclude Ms. Renee Bourdeau [ECF 737-1] at 6.  Indeed, Plaintiff's primary complaint regarding the helpfulness and appropriateness of Ms. Bourdeau's expert opinion comes in that single footnote, stating: "[t]o the extent the opinion Ms. Bourdeau plans to offer is simply that she 'see[s] no evidence of an industry practice to include climate change considerations' … her opinion should be excluded for the additional reason that it is a factual conclusion … not an expert opinion … such an 'opinion,' based on the inadequate work discussed herein, is not relevant as it is not 'helpful to the trier of fact.'"  *Id.*

18

CLF's argument is difficult to understand, other than Plaintiff's general frustration that there is no evidence—in the record or elsewhere—that any Connecticut industrial facility ever considered "climate change factors" in response to Permit requirements.  If no one is doing it, how can it be "industry practice"?  It isn't.

Indeed, contrary to Plaintiff's argument, all expert opinions are necessarily ***factual***; any other opinion would constitute an impermissible legal opinion or improper speculation.  A doctor's testimony that a car crash caused a victim's injuries is a "factual conclusion," but it is nonetheless proper expert testimony because a jury would be ill-equipped to assess the complicated medical records and issues involved without expert assistance.  *See Riad v. Porsche Cars N. Am., Inc.,* No. 18 Civ. 5175, 2024 WL 3606315, at *3 (E.D. Pa. July 30, 2024) (explaining that courts generally require expert medical evidence in personal injury actions). Likewise, whether "industry practice" aligns with a party's interpretation of a contractual term is a "factual conclusion," and it is the proper subject of expert testimony.  *See Liberty Mut. Ins.*, 2025 WL 2117897 at *13 ("As to [the expert's] opinion on whether Plaintiff's claims handling comported with industry custom and practice, and in particular whether it was customary for a claims adjuster to hire an investigator to investigate the claim, that opinion is an appropriate subject for expert testimony.").  So too here: Ms. Bourdeau's opinion is both helpful to the jury and an appropriate expert opinion, even if it centers around the factual question of what constitutes best industry practice with regard to Climate Change and SWPPPs.

Plaintiff's remaining argument regarding the lack of helpfulness and appropriateness of the opinion fares no better.  As previously explained, Ms. Bourdeau is equipped to interpret the complex technical language found in SWPPPs to determine whether those documents reflect any industry practice of planning for or addressing "climate change factors."  *See, e.g.*, Ex. 2, Rpt. at

3-4; Ex. 6, Defendant's SWPPP at 26 ("Structural control measures in use at the facility include catch basins, lift stations, drainage lines, containment berms (walls and floors), valves, and retention basins."). Ms. Bourdeau's analysis involved far more than simply searching for the term "climate change" or reading the SWPPPs as a layperson would; however, as with any analysis of studies or written data, her analysis "was primarily through reading." *See* Ex. 3, 2025 Dep. at 59:15-60:22. As she testified in her deposition:

> A. I didn't necessarily do keyword searches per se. When I was reviewing the text ***I was generally trying to determine if the permittees and engineers who were writing the SWPPPs were including language which suggests that they were considering climate change*** such as sea level rise, extreme precipitation patterns, terms like that associated with climate change.

*Id.* (emphasis added). Her ability to analyze the technical language to determine what engineers were considering, and thus to explain these documents, will be extremely valuable to a jury. Without her expertise, a jury would lack the necessary understanding to grasp their significance and might mistakenly assume that climate change practices are embedded in technical terms they do not comprehend. *See id.* at 59:15-60:22; *see also Cent. Buffalo Project Corp.*, 975 F. Supp. at 230. ("The standard for admissibility of expert testimony is helpfulness, not necessity") (citation omitted).

Instead, Plaintiff would invite the fact-finder to consider unsupported opinions and speculation by their experts. None of Plaintiff's experts is an engineer or has any experience with SWPPPs, none makes any attempt to evaluate other SWPPPs, and none even talked with CT DEEP to ascertain whether the agency agrees with Plaintiff's interpretation of the Permit.[7]

---

[7] Indeed, as discussed above, no one at CLF reviewed any other SWPPPs or talked with CT DEEP officials about their view that violations of the Permits are occurring. *See* Ex. 1, CLF 30(b)(6) (Sean Mahoney) Deposition at 199:4-11 ("Q. Did CLF go to Connecticut DEEP and actually look at SWPPPs? A. I don't know the answer to that. Q. Has anybody ever provided you copies of other SWPPPs from Connecticut? A. Beyond the SWPPP for the Gulf terminal? Q. Yes. A. I don't know the answer to that."), 200:19-25 ("Q. Has CLF ever identified any notice of

This lack of effort stands in stark contrast to Ms. Bourdeau's investigation and review.  Not surprisingly, none of Plaintiff's experts could dispute Ms. Bourdeau's findings and opinions.

Ms. Bourdeau's testimony is the proper subject of expert testimony and is exceptionally helpful to the finder of fact in determining what "best industry practices" actually are.  Her opinions should be admitted in full.

### C.    Ms. Bourdeau's methodology is reliable

Contrary to CLF's claims, Ms. Bourdeau's testimony "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application" of those principles, as required by Rule 702.  *See* Fed. R. Evid. 702.  In order to develop her opinions regarding "industry practice" and the industry's understanding of Permit requirements, Ms. Bourdeau sought the best and most relevant "facts or data": actual industry practice with regard to SWPPPs.  Because the Permit required a permittee to prepare a SWPPP but did not require a permittee to publish that plan, not all SWPPPs are publicly available.  Nevertheless, Ms. Bourdeau assessed and evaluated *every publicly available* SWPPP, both online and in CT DEEP's record room.  She reviewed the 2011 CT DEEP Guidance Document for Preparing a SWPPP.[8]  *See* Ex. 2, 2025 Dep. at 68:4-19; Ex. 2, Rpt. at 3-4.  She also consulted with Karen Abbott of CT DEEP during her records-room work and asked whether, in Ms. Abbott's experience during facility inspections or SWPPP reviews, permittees were considering Climate Change Factors.  *Id.*  Ms. Abbott responded that they were not.  See Ex. 2, 2025 Dep. at 60:6-22.  And finally, Ms. Bourdeau also sought to supplement her understanding of industry practice with

---

violation or notice of potential violation that CT DEEP has issued to any facility in Connecticut that relates to climate change in any way? [Objection omitted] A. I -- I don''t know.").

[8] The CT DEEP 2011 Guidance Document for Preparing a SWPPP is available at: https://portal.ct.gov/-/media/DEEP/Permits_and_Licenses/Water_Discharge_General_Permits/swpppguidpdf.pdf.

regard to SWPPPs by examining CT DEEP's enforcement files, explaining that one of her opinions was based on notices of violation in CT DEEP's records and her conversations with Ms. Abbott. *See* Ex. 2, 2025 Dep. at 70:23-71:2; Ex. 2, Rpt. at 4-5. Again, her investigation confirmed that CT DEEP never began enforcement proceedings under the Permit based on a permittee's failure to consider "climate change factors" in its SWPPP.

In sum, Ms. Bourdeau sought to inform her opinion on industry practice by consulting with other knowledgeable individuals and reviewing the best available data on what industry practice in fact was with regard to SWPPPs prepared pursuant to the Permit. She then used her experience and expertise as an engineer to evaluate and analyze those documents. Further, her ultimate conclusion on the basis of those documents, *i.e.*, that no SWPPP prepared pursuant to the Permit reveals an "industry practice" of considering or hardening against "climate change factors," remains unrebutted by Plaintiff. Neither Plaintiff nor any of its experts has ever produced a SWPPP documenting consideration of "climate change factors," and indeed, Plaintiff's experts ***entirely ignore this most relevant source of data regarding what "industry practice"*** consists of.

From an evidentiary perspective, Ms. Bourdeau's methodology and the opinions drawn from her methodology are entirely reliable based on her use of the best available data to address a unique question of what constitutes "industry practice." *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ("in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert."). Where full data sets are not available, reliance on publicly available data and drawing opinions from that data is permissible and indeed laudable expert practice. *See Garthwait v. Eversource Energy Co.*, No. 3:20-CV-00902 (JCH), 2022 WL 3019633, at *16 (D. Conn. July 29, 2022). For example, in *Garthwait*, an expert was asked to

opine on the "reasonableness of fees charged to retirement plans." *Id.* Because the expert was not a Plan Administrator, he did not have access to the exact data used by such Administrators. Nevertheless, the court still found the expert's opinion reliable "on a particular issue[]" because "he [was] relying on the "best proxy" [publicly available data] available to an individual who is not a plan administrator . . . [and] applied his 'particular expertise' as a retirement plan consultant with over a decade of experience." Here, too, Ms. Bourdeau used her expertise and experience to consult with other knowledgeable persons and reviewed the best data available; her opinion that no available SWPPP indicates any consideration of "climate change factors" is reliable. *See id.*; *see also Bilzerian*, 926 F.2d at 1294 (holding that "expert testimony may help a jury understand unfamiliar terms and concepts.").

Plaintiff makes a single challenge to Ms. Bourdeau's methodology, namely, that Ms. Bourdeau's methodology of reviewing publicly available SWPPPs and consulting with other knowledgeable experts requires "too great an analytical gap between the data and the opinion proffered." *See* ECF 737-1 at 7-9, citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). According to Plaintiff, Ms. Bourdeau reviewed only 152 of the 1,647 SWPPPs for facilities governed by the Permit and that she did not establish how many of the SWPPPs were for coastal facilities. *See* ECF 737-1 at 7. Plaintiff complains that many of the SWPPPs were dated from before the issuance of the Permit.

The problem for Plaintiff is that none of these complaints demonstrates why Ms. Bourdeau's opinions regarding best industry practices on climate change risk assessments in actual industrial stormwater permits in Connecticut in general are unreliable, nor does Plaintiff identify a superior methodology for determining industry practice with regard to SWPPPs. Given Ms. Bourdeau's opinions address SWPPPs in general (an opinion that is obviously

relevant to what "best industry practices" are), it is entirely reasonable for her to rely on ***all available*** information regarding what industry practice is, regardless of when that "practice" was initiated or under what Permit.  *See generally* Ex. 2, Rpt.  And indeed, Ms. Bourdeau is not opining on the likely contents of the remaining SWPPPs; instead, Ms. Bourdeau is opining on the "best industry practice" that can be inferred from the available data.  *See id.; see also United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ("in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert."); *Garthwait v. Eversource Energy Co.*, 2022 WL 3019633, at *17  ("[the expert] opines on a particular issues—the reasonableness of fees charged to retirement plans—for which, he testifies, he is relying on the "best proxy" available to an individual who is not a plan administrator … [and] applied his 'particular expertise' as a retirement plan consultant with over a decade of experience.").

Here, there is no analytical gap.  Ms. Bourdeau did not pick and choose data, nor did she speculate about what she thought "best industry practice" is or should be.  She did not ignore the available evidence (as Plaintiff's experts have done) and instead reached opinions based on the best available evidence.  There was no "speculation" or "jump" from one unrelated data set to another, as in *Joiner*, 522 U.S. at 143-144, nor any deliberate ignorance of obviously relevant variables, as in *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-269 (2d. Cir. 2002).  Ms. Bourdeau reviewed all available directly relevant data (in fact, the most relevant data) on industry practice with regard to SWPPPs, ignored none of it, and came to her reasonable conclusion on the basis of that data.  *See Garthwait v. Eversource Energy Co.*, 2022 WL 3019633, at *16 (where expert was unable to replicate the competitive bidding process himself, reliance on "publicly available data" to provide the foundation for his analysis was reliable given

he could not himself engage in the competitive bidding process and "detail[] his methodology and the data upon which he relied").

To the extent Plaintiff believes Ms. Bourdeau should have considered more information (although Plaintiff has not identified what that additional information might be), that is properly the subject of cross-examination. *Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982*, No. 20-CV-04669 (GBD) (VF), 2024 WL 1116083, at *5 (S.D.N.Y. Mar. 14, 2024) ("Athena's objection that Plummer failed to consider these documents goes to the weight, not the admissibility, of his testimony."); *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18 CIV. 05290 (CM), 2023 WL 6614486, at *21 (S.D.N.Y. Sept. 20, 2023) ("To the extent Lutron believes the opinions Perkins offers are incomplete because she fails to consider certain evidence or fails to address certain issues … those gaps or inconsistencies in the reasoning leading to [the expert's] opinion" go only to the weight of her testimony") (quotations omitted).

Ms. Bourdeau's thorough analysis of actual CT DEEP industrial stormwater permits provided a reliable (and unrebutted) foundation for her testimony. *See* Fed. R. Evid. 702. Her opinions go directly to the central issue in this case—whether CT DEEP's 2018 industrial stormwater permit included an "implied" requirement to assess climate change at all State of Connecticut facilities, even when CT DEEP stated in 2024 that its "new" industrial stormwater permit addressed "climate change."

## V.    CONCLUSION

Ms. Bourdeau is well qualified to offer her opinions regarding industry practices, which are reliable and helpful to the jury. Her opinions are admissible under Rule 702.

Dated: November 3, 2025                         Respectfully submitted,

                                                */s/ Douglas A. Henderson*
                                                Douglas A. Henderson (phv05547)
                                                Carmen R. Toledo (phv20194)
                                                King & Spalding, LLP
                                                1180 Peachtree Street, N.E.
                                                Atlanta, GA 30309
                                                T: (404) 572-2769
                                                dhenderson@kslaw.com
                                                ctoledo@kslaw.com

                                                Antonio E. Lewis (phv03069)
                                                King & Spalding, LLP
                                                300 S Tryon Street
                                                Suite 1700
                                                Charlotte, NC 28202
                                                (704) 503-2551
                                                alewis@kslaw.com

                                                Rose H. Jones
                                                Hilgers Graben PLLC
                                                1372 Peachtree Street, N.E.
                                                19th Floor
                                                Atlanta, GA 30309
                                                T: (678) 229-1983
                                                rjones@hilgersgraben.com

                                                Anthony G. Papetti (phv206982)
                                                Beveridge & Diamond, P.C.
                                                825 Third Ave., 16th Floor
                                                New York, NY 10022
                                                T: (212) 702-5400
                                                F: (212) 702-5442
                                                apapetti@bdlaw.com

                                                James O. Craven (ct18790)
                                                WIGGIN AND DANA LLP
                                                One Century Tower
                                                265 Church Street
                                                P.O. Box 1832
                                                New Haven, CT 06508-1832
                                                T: (203) 498-4400
                                                F: (203) 782-2889
                                                jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

**Counsel for Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

28