**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | November 3, 2025 |
| Defendants. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE THE EXPERT TESTIMONY OF MR. DAVID UHLMANN**

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") hereby submit this Response in Opposition to Plaintiff's Motion to Preclude the Expert Testimony of Mr. David Uhlmann. As explained below, as a former Assistant Administrator of the U.S. Environmental Protection Agency ("EPA") under President Biden responsible for enforcing all aspects of Clean Water Act ("CWA"), Resource Conservation and Recovery Act ("RCRA"), and other environmental regulations and permits, Mr. Uhlmann is well qualified to offer relevant opinions on the highly technical requirements of industrial stormwater permits and EPA's interpretation and history of enforcement of "best industry standards." Mr. Uhlmann reliably bases these opinions on his experience with and knowledge of environmental enforcement standards and practices under the CWA and RCRA. These opinions are not only relevant, but critical in assisting this Court or a Jury on the issues in this case.  Mr. Uhlmann's testimony meets the requirements of Fed. R. Evid. 702.

**ORAL ARGUMENT REQUESTED**

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ON DAVID UHLMANN ..................................................... 1

        A.      Mr. Uhlmann's Credentials and Opinions............................................. 2

                1.      Mr. Uhlmann Possesses Over 35 Years of Exceptional Experience
                        in the Field of Environmental Enforcement................................ 2

                2.      Mr. Uhlmann's Opinions............................................................. 5

        B.      Mr. Uhlmann's Testimony is Admissible .............................................. 6

III.    LEGAL STANDARD ..................................................................................... 7

IV.     ARGUMENT .................................................................................................. 8

        A.      Mr. Uhlmann Is Highly Qualified to Offer his Opinions...................... 8

                1.      Well-settled case law allows an expert qualified by experience
                        working as a regulator to testify regarding those regulatory regimes......... 8

                2.      Mr. Uhlmann's extensive experience qualifies him to offer
                        opinions regarding the meaning of "Best Industry Practice" within
                        the context of the Permit ........................................................... 11

        B.      Mr. Uhlmann's Opinions are Based on Reliable Methods................... 15

                1.      Mr. Uhlmann reliably bases his opinions regarding the scope of
                        "best industry practice" on his specialized training, knowledge, and
                        experience enforcing the CWA ................................................. 15

                2.      Mr. Uhlmann's opinions 1, 2, 5, and 6 are also reliable .......................... 20

        C.      Mr. Uhlmann's Opinions are Helpful to the Fact-Finder .................... 25

                1.      Well-settled law in this District and Circuit permits the admission
                        of testimony regarding the application of technical regulatory
                        standards ................................................................................... 26

                2.      Mr. Uhlmann's opinions deal with the on-the-ground application of
                        the technical regulatory provisions undergirding most of CLF's
                        claims ........................................................................................ 30

V.      CONCLUSION.............................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Assur. Co. v. Merck & Co.*,
  386 F. Supp. 2d 501 (S.D.N.Y. 2005) ...................................................................9

*Am. Home Assur. Co. v. Merck & Co.*,
  462 F. Supp. 2d 435 (S.D.N.Y. 2006) .............................................................9, 10

*Becerra v. Schultz*,
  499 F. Supp. 3d 1142 (D. Wyo. 2020) ................................................................24

*Bethel v. Berkshire Hathaway Homestate Ins. Co.*,
  596 F. Supp. 3d 1260 (D. Colo. 2022) ................................................................24

*Cary Oil Co. v. MG Refin. & Mktg., Inc.*,
  No. 99 Civ. 1725(VM), 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) ........................ *passim*

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*,
  846 F.3d 492 (2d Cir. 2017) .................................................................................25

*Connecticut Fund for Env't, Inc. v. Upjohn Co.*,
  660 F. Supp. 1397 (D. Conn. 1987) .....................................................................13

*Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Boston Corp.*,
  2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ....................................................6, 37

*Dague v. City of Burlington*,
  935 F.2d 1343 (2d Cir. 1991), *rev'd in part on other grounds,* 505 U.S. 557
  (1992) ...................................................................................................................38

*DeGregorio v. Metro-N. R. Co.*,
  No. 3:05-CV-533 JGM, 2006 WL 3462554 (D. Conn. Nov. 1, 2006) ...................24

*Fiataruolo v. United States*,
  8 F.3d 930 (2d Cir. 1993) ....................................................................................28

*Forman v. Novartis Pharms. Corp.*,
  794 F. Supp. 2d 382 (E.D.N.Y. 2011) .......................................................... *passim*

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ........................................................... *passim*

*In re Golden*,
  No. 16-40809-ESS, 2022 WL 362913 (Bankr. E.D.N.Y. Feb. 4, 2022) ...............26

*Holman v. Illinois Dep't of Corr.*,
  No. 18-CV-1323, 2024 WL 5131945 (C.D. Ill. Dec. 16, 2024) ...........................................24

*Interfaith Comm. Org. v. Honeywell Int'l, Inc.*,
  399 F.3d 248 (3d Cir. 2005)...........................................................................................38

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................................................................16

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
  589 F. Supp. 3d 302 (S.D.N.Y. 2022).............................................................................8, 9

*Max Zach Corp. v. Marker 17 Marine*,
  No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024)............................7

*In re Mirena IUD Prods. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...............................................................................26

*MPM Silicones, LLC v. Union Carbide Corp.*,
  No. 1:11-CV-1542(BKS/ATB), 2016 WL 11604974 (N.D.N.Y. July 7, 2016)....................29

*Murray Energy Corp. v. McCarthy*,
  No. 5:14-cv-39, 2016 WL 3390517, at *4-5 (N.D. W. Va. June 17, 2016) ...............10, 11, 27

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018)................................................................................26

*Old Gate Partners, LLC v. Paddock Enter., LLC*,
  No. 3:18-cv-01657 (JCH), 2024 WL 3520168 (D. Conn. May 30, 2024)............33, 34, 36, 37

*Post Univ. Inc., v. Learneo, Inc.*,
  No. 3:21-CV-01242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025) ...........................7

*Reichmann v. Whirlpool Corp.*,
  No. CV 16-5151 (AYS), 2021 WL 12102128 (E.D.N.Y. Mar. 9, 2021) ...............................28

*Reynolds v. Arnone*,
  645 F. Supp. 3d 17 (D. Conn. 2022)...................................................................................16

*Saline River Properties, LLC v. Johnson Controls, Inc.*,
  No. 10-cv-10507, 2011 WL 6031943, at *2-4 (E.D. Mich. Dec. 5, 2011).......................11, 28

*Sierra Club v. Chevron U.S.A., Inc.*,
  834 F.2d 1517 (9th Cir. 1987) ..........................................................................................13

*SLSJ, LLC v. Kleban*,
  277 F. Supp. 3d 258 (D. Conn. 2017).................................................................34, 36, 37, 39

*United States v. Bedford,*
    536 F.3d 1148 (10th Cir. 2008) ...........................................................................24

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991)...........................................................33, 34, 36, 37

*United States v. Donald,*
    No. 3:21-cr-8 (VAB), 2023 WL 6958797 (D. Conn. Oct. 20, 2023) .......................7

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015)...............................................................................16

*Wang v. Omni Hotels Mgmt. Corp.,*
    No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ...............8

**Statutes**

Clean Air Act .........................................................................................................10, 27

Clean Water Act............................................................................................... *passim*

Comprehensive Environmental Response, Compensation, and Liability Act..............29

**Rules**

Fed. R. Evid. 401 .......................................................................................................7

Fed. R. Evid. 403 .......................................................................................................7

Fed. R. Evid. 702 .............................................................................................. *passim*

Fed. R. Evid. 704 ...................................................................................................28, 38

## I.    INTRODUCTION

At issue in this case is whether the General Permit for the Discharge of Stormwater Associated with Industrial Activity (the "2018/2021 Permit") issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") to the New Haven petroleum bulk storage terminal (the "Terminal") includes an implied requirement that a permittee is required to conduct a "climate change vulnerability risk assessment" and modify its facility to account for "extreme weather." No one disputes the 2018/2021 Permit itself does not mention or reference climate change, climate resilience or other specific language.  But Plaintiff Conservation Law Foundation ("CLF") claims one phrase—"best industry practice"—*implies* an obligation to conduct a climate change vulnerability risk assessment.  In its recently reissued Permit, CT DEEP included a "new" section to address certain "climate change," which it calls "adverse weather events."

In support of its case, Defendants introduced **David Uhlmann**, a former Assistant Administrator of the U.S. Environmental Protection Agency under President Biden who was responsible for interpreting and enforcing environmental permits in the United States. To explain the technical meaning of the arcane, complex industrial stormwater permitting requirements, Mr. Uhlmann provides opinions on how EPA—from an enforcement perspective—interpreted the very issues in this case, and how from an enforcement perspective "climate change" was regulated under the industrial stormwater permitting program. Mr. Uhlmann's opinions—based on his knowledge and experience as EPA's former top compliance and enforcement official and 35 years of specialized training, experience in practice and academia, and leadership roles addressing complex environmental enforcement issues—are undoubtedly relevant and will help the fact-finder answer those questions.

## II.    BACKGROUND ON DAVID UHLMANN

In its motion attempting to strike Mr. Uhlmann, CLF pointedly omits the bulk of Mr. Uhlmann's experience, instead choosing to frame him as "merely" an environmental lawyer. As a factual matter, when the structure of any EPA regulatory framework is in dispute, as a former head of all civil and criminal Enforcement under EPA, Mr. Uhlmann offers unmatched expertise and experience in identifying and explaining the technical requirements of environmental enforcement.

A.     **Mr. Uhlmann's Credentials and Opinions**

1.     **Mr. Uhlmann Possesses Over 35 Years of Exceptional Experience in the Field of Environmental Enforcement**

As Mr. Uhlmann explains in his expert report, he has "████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Ex. 1, June 23, 2025 Expert Report of D. Uhlmann ("Uhlmann Rpt.") at ¶ 8. He works currently as ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*

Mr. Uhlmann also has an extensive history of relevant research and advocacy efforts. ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████

[redacted] *Id*. at ¶ 11. His research includes over 40 publications and dozens of presentations on topics including environmental enforcement as well as the use of environmental enforcement to address climate change. *Id*., Ex. 1 (Uhlmann CV) at 3-6. Mr. Uhlmann has [redacted]." *Id*. at ¶ 11. His opinions and views relating to [redacted] *Id*.

In this case, however, most crucial to Mr. Uhlmann's opinions is his extensive experience in government and, in particular, environmental enforcement. From 1990 to 2007, he prosecuted environmental crime cases for the Department of Justice Environmental Crimes Section, progressing from Trial Attorney to Section Chief. Ex. 1, Uhlmann CV at 2-3. As Environmental Crimes Section Chief, a position he held for seven years, he was "[redacted] Uhlmann Rpt. at ¶ 13. In these roles, he developed enforcement strategy, obtained indictments, and prosecuted cases under the nation's environmental laws, including the CWA and RCRA.

President Biden nominated Mr. Uhlmann to serve as the EPA Assistant Administrator for Enforcement and Compliance Assurance, the nation's top environmental compliance and enforcement officer. Mr. Uhlmann was subsequently confirmed by the U.S. Senate with bi-

partisan support.[1] Ex. 1, Uhlmann Rpt. at ¶ 9; Uhlmann CV at 1. ████████████

████████████████████████████████████████████

████████████ Ex. 1, Uhlmann Rpt. at ¶ 9. In his EPA roles, Mr. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ *Id*. Mr. Uhlman was the top agency enforcement official over industrial stormwater

permitting.

    During his time at EPA, Mr. Uhlmann developed policies on issues directly relevant to

this case. While he served as ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ *Id*. at ¶ 10. He ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*Id*.

    Mr. Uhlmann is intimately familiar, from a regulatory, enforcement, and compliance

perspective, and well qualified based on decades of experience at the most senior levels of the

---

[1] CLF was among the many supporters of Mr. Uhlmann's nomination to be Head of EPA's compliance and enforcement office. *See* Ex. 2, 05/04/2022 Letter of Support for David M. Uhlmann, at 2-3 (CLF listed among the 55 National, State, and Community-Based Environmental Organizations supporting Mr. Uhlmann's nomination, describing Mr. Uhlmann as a "highly qualified nominee," and referencing the "enthusiastic[]" support of the environmental community). *See* https://environmentalintegrity.org/news/55-environmental-groups-and-144-epa-alumni-urge-senate-to-confirm-long-delayed-biden-pick-for-epa-enforcement-chief/ and letter at: Uhlmann-suppport-letter-5.4-CORRECTED-version.pdf.

EPA and Justice Department environmental enforcement programs, to opine about what

constitutes an enforceable violation of the CWA and RCRA. CLF does not seriously dispute Mr.

Uhlmann's qualifications.

      **2.**      **Mr. Uhlmann's Opinions**

     In this case, Mr. Uhlmann offers six primary opinions, each of which are directly relevant

to issues that jury will need to consider to resolve this matter:





### B.    Mr. Uhlmann's Testimony is Admissible

CLF does not challenge: (1) Mr. Uhlmann's qualifications with regards to Opinions 1, 2, 5, and 6; (2) the reliability of his Opinions 1, 2, 5, and 6; or (3) the relevance of his Opinions 3 and 4.

Instead, CLF offers two primary arguments with regards to Mr. Uhlmann's opinions: (1) that "Mr. Uhlmann's Opinions 1, 2, 5, and 6 Are Legal Conclusions that Infringe on the Court's Authority and the Jury's Province"; and (2) that "Mr. Uhlmann Lacks the Expertise to Offer Opinions on 'Best Industry Practices.'" ECF 730-1 at 3, 7. In addition, CLF also challenges cursorily the reliability of Mr. Uhlmann's Opinion 4. All of these arguments fail.

*First*, Mr. Uhlmann is amply qualified to offer all the opinions he states in his report. Mr. Uhlmann has over 35 years of environmental regulatory enforcement experience, along with a long history of scholarly works and advocacy related to environmental regulatory enforcement and climate enforcement specifically. While CLF completely ignores this experience, courts regularly find that former agency employees are qualified to testify regarding topics related to the statutes and regulations they worked under and enforced. Here, Mr. Uhlmann's experience enforcing the CWA and developing climate enforcement policies for EPA qualify him to testify regarding what does and does not constitute "best industry practice."

*Second*, Mr. Uhlmann properly relies on his own substantial experience to form his opinions about the enforceability of the complex statutory, regulatory, and permitting requirements of the Clean Water Act and RCRA, without infringing upon the Court's role by offering legal opinions. Courts in the Second Circuit are clear that experience may reliably form the basis of an expert opinion, particularly with regard to non-scientific opinions, and that they may do so in the context of complex statutory, regulatory, and permitting schemes like those at

issue in this case.

  ***Third***, as courts in the Second Circuit consistently hold, Mr. Uhlmann's opinions, based on his extensive experience enforcing the very statutes, regulations, and permit provisions that the jury will have to grapple with when making its determination, will provide crucial, relevant, and helpful context that will assist the jury in understanding how EPA historically has interpreted "best industry practice" and similar terms.

  Accordingly, Defendants respectfully request that the Court deny CLF's motion.

## III. LEGAL STANDARD

  As this Court has recognized, an expert may offer opinion testimony at trial based on scientific, technical, or other specialized knowledge if the witness is qualified in the relevant subject matter, and the opinion testimony is reliable and "relevant, *i.e.*, whether it will help the trier of fact." *Post Univ. Inc., v. Learneo, Inc.*, No. 3:21-CV-01242 (VDO), 2025 WL 2709370, at *2-3 (D. Conn. Sept. 23, 2025) (applying Fed. R. Evid. 702) (citations omitted). A witness is qualified as an expert where he has "superior knowledge, education, experience, or skill" in the relevant subject matter, and *"*may be classified as an expert based upon personal experience alone," if the proffered opinion will assist the trier of fact. *Id.* at *3.

  If an expert satisfies the qualification requirement, the Court must determine whether the testimony is reliable, *id.* at *2, which is a "flexible" inquiry, *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *2 (D. Conn. Oct. 30, 2024). In assessing reliability, the Court "examine[s] not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case." *United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *17 (D. Conn. Oct. 20, 2023) (citation omitted).

  A reliable opinion from a qualified expert must also be relevant and admissible under

Rule 403. *Post Univ. Inc.*, 2025 WL 2709370, at *3 (applying Fed. R. Evid. 401, 403, 702).

"Even if the jury *could* resolve these issues without [the expert's] testimony," the opinion is

admissible where it "is *likely to help* [] reach their determinations," because the jury "would

necessarily be limited by its own experiences; [and] an expert can assist a jury in understanding

considerations that they may not have contemplated." *See Wang v. Omni Hotels Mgmt. Corp.*,

No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *3 (D. Conn. June 27, 2025) (denying motion to

exclude opinions when expert "employed technical methods that are likelier than not to assist the

jury and … utilized sufficiently reliable methods and data") (emphasis added).

## IV.    ARGUMENT

For a case where the central question is whether EPA meant to require all facilities in

Connecticut to complete a "climate change vulnerability risk assessment," Mr. Uhlmann—as the

chief EPA regulatory enforcement official under President Biden—provides admissible, reliable,

and relevant expert opinions on the EPA (and, by extension, CT DEEP) technical regulatory

requirements under the CWA and RCRA.  Under well-established federal case law in

Connecticut and elsewhere, expert testimony on the meaning of technical regulatory

requirements is regularly accepted, especially where it would assist a Jury and this Court.  For

the issues in this case, there's no better expert to explain why "climate change vulnerability risk

assessments" cannot be "implied" to be a requirement under the industrial stormwater permit.

### A.    Mr. Uhlmann Is Highly Qualified to Offer his Opinions

#### 1.    Well-settled case law allows an expert qualified by experience working as a regulator to testify regarding those regulatory regimes

"Courts within the Second Circuit 'have liberally construed expert qualification

requirements' when determining if a witness can be considered an expert." *Lickteig v. Cerberus*

*Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022) (quoting *Cary Oil Co. v. MG Refin.*

*& Mktg., Inc.*, No. 99 Civ. 1725(VM), 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003)). Under Second Circuit precedent, an expert's experience alone may qualify him to testify. *Lickteig*, 589 F. Supp. 3d at 302 ("Any **one** of the qualities listed in Rule 702—knowledge, skill, **experience**, training, or education—may be sufficient to qualify a witness as an expert.") (quoting *Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Boston Corp.*, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013)) (emphasis added).

Moreover, courts regularly find that an expert proffered to testify on the meaning and application of a particular regulatory scheme is amply qualified by his or her own past experience ***as an agency employee working to enforce that scheme***. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190 (S.D.N.Y. 2009) ("The Court finds that Dr. Parisian is qualified based upon her experience as a Medical Officer at the FDA to offer testimony about regulatory requirements relating to the development, testing, marketing, and surveillance of prescription drugs.").

For example, in *American Home Assurance Company v. Merck & Company, Inc.*, defendant Merck sought insurance coverage for a shipment of vaccine prototype which had frozen during shipment which, Merck alleged, meant that it could no longer sell those vaccines per FDA regulations. 386 F. Supp. 2d 501, 507-08 (S.D.N.Y. 2005). Merck disclosed Thomas Bozzo to testify "regarding the FDA's regulations as they relate to Merck's determination that [certain vaccines] were unfit for use." *Am. Home Assur. Co. v. Merck & Co.,* 462 F. Supp. 2d 435, 451 (S.D.N.Y. 2006). The plaintiff insurance company asserted that Mr. Bozzo was not qualified to testify in the case because, according to the plaintiff, he had "insufficient experience in evaluating temperature excursions specifically for vaccine shipments to provide the necessary 'reliable basis' for his opinions." *Id*. However, the Southern District of New York found that Mr.

"Bozzo ha[d] approximately 40 years [of] experience in the regulation of biological products and spent almost thirty years as a compliance officer at the Center for Biologics Evaluation and Research ('CEBR') and its predecessor, the FDA division that regulated biological products including vaccines"; that he "was CEBR's Director of Compliance"; and that it was "undisputed that Bozzo is intimately familiar with FDA regulations relevant to the Vaccines." *Id*. Ultimately, the court held that "Bozzo's testimony concerns the proper interpretation of generally applicable biological licensing regulations, as well as drug product salvaging regulations," and thus was "persuaded that Bozzo's testimony on these complex regulatory provisions will assist the trier of fact." *Id*.

In a case involving the meaning of a petroleum supply contract within the scope of regulations issued by the Commodity Futures Trading Commission ("CFTC"), the Southern District of New York found that an expert was qualified because he "teaches graduate level courses in derivatives, has authored articles discussing derivatives hedging and valuation, and was Chief Economist and Director of the Division of Economic Analysis for the CFTC, where he led a team that examined contracts similar to the one at issue here." *Cary Oil*, 2003 WL 1878246, at *4. Ultimately, the court held that his testimony was "important if Plaintiffs are to explain to the jury the background issues involved in this complex contractual dispute centered in an intricate regulatory scheme." *Id*.

Courts outside of this district have found former EPA employees qualified to testify regarding federal environmental statutes. For example, in *Murray Energy Corp. v. McCarthy*, the Northern District of West Virginia held that former EPA assistant administrator Jeffrey Holmstead was qualified to testify regarding the Clean Air Act, explaining:

> The EPA also argues that Mr. Holmstead should not be permitted to provide
> expert testimony because he has no "scientific, technical or other specialized

knowledge" as required by Rule 702 of the Federal Rules of Evidence. Frankly, this argument is ridiculous! . . . . Mr. Holmstead's testimony is not scientific in the traditional sense, but it is specialized knowledge. Few if any others have worked on CAA matters for more than 25 years in so many different capacities—a White House staffer, an attorney and lobbyist in private practice, and an EPA official—as Mr. Holmstead has done.

No. 5:14-cv-39, 2016 WL 3390517, at *4-5 (N.D. W. Va. June 17, 2016).

In *Saline River Properties, LLC v. Johnson Controls, Inc.*—a citizen suit under RCRA seeking to enforce an administrative order on consent ("AOC") issued against defendant Johnson Controls, Inc. ("JCI") by EPA—the court held that the former Chief of RCRA Enforcement in EPA was qualified by his experience to testify that (1) "the AOC did not require JCI to submit written quarterly progress reports to the EPA;" (2) "JCI's work at the site progressed in a timely manner and that JCI followed EPA's standard practices;" and (3) "an award of monetary penalties requested by Saline is unprecedented." No. 10-cv-10507, 2011 WL 6031943, at *2-4 (E.D. Mich. Dec. 5, 2011); *see also* Johnson Controls, Inc.'s Resp. to Pl. Mot. to Exclude Opinions of William Muno, No. 10-cv-10507, ECF 74 (E.D. Mich. June 16, 2011), attached as Ex. 3, at 3 (describing Mr. Muno's credentials).

These authorities confirm that Mr. Uhlmann's extensive agency and regulatory experience amply qualifies him to offer expert opinions on the meaning and application of the technical regulatory requirements at issue in this case.

### 2.    Mr. Uhlmann's extensive experience qualifies him to offer opinions regarding the meaning of "Best Industry Practice" within the context of the Permit

CLF does not challenge Mr. Uhlmann's extensive qualifications to offer opinions

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Instead, ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ CLF specifically

argues that Mr. Uhlmann's "professional experience as a lawyer does not provide him the necessary qualifications to offer expert opinions on best industry practices[.]" ECF 730-1. at 7.

Mr. Uhlmann is more than just "a lawyer," as CLF misleadingly suggests. Throughout its motion, CLF ignores the full breadth of Mr. Uhlmann's qualifications, including (but, as discussed above, certainly not limited to) his time serving as EPA Assistant Administrator for Enforcement and Compliance Assurance, when he "led approximately 2,800 EPA employees nationwide responsible for criminal, civil, and administrative enforcement and compliance assurance under the federal environmental laws, including the Clean Water Act and RCRA." Uhlmann Rpt. at ¶ 9.

Without citing case law in support, CLF asserts that Mr. Uhlmann cannot be qualified to testify on the meaning of "best industry practice" because he is not an "engineer, hydrologist, environmental modeling professional, hydrogeologist, toxicologist, or stormwater profession [sic]," lacks scientific training, and lacks "expertise on the movement of pollutants in the environment." ECF 730-1 at 8-9. But as it has done throughout this litigation, CLF ignores that the term "best industry practice" does not exist in a vacuum and, instead, arises from the terms of the Permit, which is rooted firmly in the CWA. As Mr. Uhlmann explains, his opinion is ultimately that "*from an enforcement perspective*, it would not have been possible to treat those specific climate resiliency measures [that CLF advocates for] as best industry practices for

12

petroleum bulk storage facilities at the time the Amended Complaint was filed in 2021." Uhlmann Rpt. at ¶ 4 (emphasis added).

Rather, Mr. Uhlmann will provide the jury insight about whether EPA enforcement professionals, such as himself, who implement and enforce these provisions would interpret "best industry practices" to include the measures CLF claims are "implied" in the 2018/2021 Permit. This distinction is key because CLF does not bring common law tort claims subject to vaguely-defined "standards of care," but instead brings a citizen suit under the CWA and RCRA and, thus, "stand[s] in the shoes" of EPA with regard to the enforcement of the Permit. *See, e.g., Connecticut Fund for Env't, Inc. v. Upjohn Co.*, 660 F. Supp. 1397, 1411 n.22 (D. Conn. 1987) ("Plaintiffs in this citizen suit stand in the shoes of the government with respect to this matter."); *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) ("Citizen enforcement actions greatly resemble government enforcement and qui tam actions … citizen plaintiffs … effectively stand in the shoes of the EPA.").

With relevance to this case, Mr. Uhlmann wore the very shoes CLF now attempts to step in and was the one responsible for interpreting the technical industrial stormwater regulations concerning "best industry practices." And as Mr. Uhlmann explained in his deposition:



Ex. 4, Deposition of David Uhlmann ("Uhlmann Dep."), at 390:22-391:17 (emphasis added); *see also id.* at 391:24-393:2 ("Q: In terms of – in terms of climate change requirements, why is that

13

important the difference between permitting and enforcement? **A. . . . So EPA or the state has the ability to include climate [change-related provisions] in a permit, but as an enforcement official, I can't bring an enforcement case based on climate change out of thin air. I can't just say climate change matters, so I'm going to argue that your failure to account for climate change is an enforceable violation of a statute that I can seek penalties for. I can't do that unless there is either a statute or permit that sets for the fact that that is a required activity for the regulated community.**").

Mr. Uhlmann is undoubtedly qualified to offer opinions regarding what would or would not be considered "best industry practices" within the scope of the CWA. Just like the experts in *American Home Assurance* and *Cary Oil*, Mr. Uhlmann is using his extensive agency experience to offer the fact-finder helpful insights about the on-the-ground application of the CWA, including how EPA determines the scope of and how it enforces permits rooted in the CWA and its regulations, like the Permit at issue in this case. As Mr. Uhlmann explained in his expert report, ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ Uhlmann Rpt. at ¶ 34. Mr. Uhlmann's explanation would be highly relevant and helpful to the jury in determining the factual question of what constitutes a best industry practice in this case—and despite the unsupported insistence of CLF to the contrary, his analysis does not constitute a legal opinion.

Accordingly, as a matter of well-established Second Circuit law, Mr. Uhlmann is

qualified to offer opinions regarding the meaning of "best industry practice" within the context of the Permit.

**B.    Mr. Uhlmann's Opinions are Based on Reliable Methods**

CLF asserts that "Mr. Uhlmann's [Opinions 3 and 4][2] do not satisfy the reliability factors enumerated in *Daubert*" and argue that his opinions are "not empirically testable," cite "[n]o methodological standards," and are "premised on his personal judgment, not peer-reviewed scientific or technical articles, and not on generally accepted scientific or technical practices or methods." ECF 730-1 at 9-10. CLF additionally asserts that Mr. Uhlmann's reference to the lack of any prior "EPA or state enforcement actions targeting climate-resiliency best-industry practices" rendered his Opinion 3 "baseless[]," "wholly unsupported," and "logically unsound." *Id*. at 8 fn.3.

Moreover, while CLF does not explicitly challenge the reliability of Mr. Uhlmann's remaining opinions, they imply that his reference to and partial reliance on statutes, regulations, and case law render his opinions per se improper. ECF 730-1 at 3-7. However, as a matter of clear Second Circuit law, Mr. Uhlmann's opinions are based on reliable methods.

**1.    Mr. Uhlmann reliably bases his opinions regarding the scope of "best industry practice" on his specialized training, knowledge, and experience enforcing the CWA**

**a.    Well-established Second Circuit law allows experts to rely on their own specialized training, knowledge, and experience**

As a matter of well-established law in the Second Circuit, "expert testimony does not [have to] rest on traditional scientific methods" and, accordingly, "district courts must be mindful that 'the *Daubert* factors do not all necessarily apply even in every instance in which reliability

---

[2] It is unclear from Plaintiff's motion whether this criticism, which fails again to cite to any specific statements CLF finds objectionable, applies exclusively to Mr. Uhlmann's Opinion 4 or to both Opinion 3 and 4. Either way, the argument is mistaken.

of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert.'" *United States v. Litvak*, 808 F.3d 160 n. 25 (2d Cir. 2015) (quoting *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999) ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from … specialized experience.'"); *Reynolds v. Arnone*, 645 F. Supp. 3d 17, 25-26 (D. Conn. 2022) (holding that expert's "correctional best practices" opinions were "reliable in light of his extensive, specialized experience," including his "substantial practical experience in corrections, particularly in developing correctional policies") (quoting *E.E.O.C. v. Beauty Enterprises, Inc.*, 361 F. Supp. 2d 11, 19 (D. Conn. 2005)). In other words, "[a]n expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience." *Forman v. Novartis Pharms. Corp.*, 794 F. Supp. 2d 382, 384 (E.D.N.Y. 2011).

### b.    Opinions 3 and 4 are based on Mr. Uhlmann's specialized training, knowledge, and experience and are admissible

Here, again, CLF chooses to blatantly ignore any reference to Mr. Uhlmann's extensive training, knowledge, and experience regarding the enforcement of the enforcement of the environmental laws, including CWA.

As a matter of well-established Second Circuit law, as discussed above, there is nothing inherently objectionable with Mr. Uhlmann's reliance on his own extensive expertise in environmental enforcement and CWA enforcement to form his opinions regarding how EPA or similarly-situated state agencies typically enforce terms like the one in the 2018/2021 Permit. For example, in *Forman*, the Eastern District of New York held that a former FDA employee's opinions regarding the reasonableness of defendant NPC's conduct pursuant to various FDA regulations were based on a reliable methodology when "the information underlying her

16

conclusions were drawn from her review of certain NPC regulatory filings, internal NPC documents, and medical literature" and she ultimately took this information and "app[ied] the relevant FDA regulations and procedures," and "the same methodology that she applied while working at the FDA." *Id*. Accordingly, the court ultimately held that the expert was "permitted to render opinions on 'the reasonableness of [NPC's] conduct in its interaction with the FDA and compliance with FDA regulations, including [NPC's] interactions with FDA with respect to labels and warnings, and FDA regulations and interactions with companies regarding clinical trials.'" *Id*.

Indeed, just like the expert in *Forman* and the other cases cited above, Mr. Uhlmann's expertise forms the basis of his "best industry practice" opinions:





Notably, when asked whether he saw anything suggesting that climate change vulnerability risk assessment were required of any permittee under industrial stormwater permits while he was working as EPA Assistant Administrator for Enforcement and Compliance Assurance, Mr. Uhlmann responded that he directed EPA's enforcement staff, all possessing a "tremendous amount of technical experience"—including "not just lawyers," but also "engineers," "hydrologists," and "toxicologists"—that:

> **[W]e were to bring … climate enforcement cases wherever we could. So if there was … a violation of an environmental law, not to do a climate risk assessment or not to do a climate vulnerability assessment, I want to bring that case. … [But] [w]e didn't believe that we had that authority. What we did believe we had the authority do, which I also said we needed to do, was to include climate resiliency in our settlements, which is very different from bringing a case alleging that something is a violation. … We never [pursued climate resiliency as a violation] because we didn't think we had the authority to do it. We didn't think it was a proper use of our authorities.**

Uhlmann Dep. at 395:5-397:14.

Similarly, CLF argues that paragraph 32 in Mr. Uhlmann's report, which states that EPA and the States have not brought enforcement actions based on the general permit "best industry practice" language at issue in this case, is "baseless." But as Mr. Uhlmann explains, that statement, too, is properly based on his own experience prosecuting environmental crimes, teaching environmental law, and leading EPA's enforcement program, and is buttressed by his extensive experience assessing the enforceability of various permit provisions:



Uhlmann Dep. at 141:11-142:12.

Thus, just like the expert in *Forman*, Mr. Uhlmann uses his own extensive experience to offer opinions on how EPA regulates and enforces the CWA and its "interactions with companies" regarding climate resiliency. Just like the expert in *Forman*, Mr. Uhlmann made clear that he used the same methodologies in developing his opinions here as he would have when working in an enforcement capacity at EPA, explaining that if his team had "suggested to me in any way, shape, or forms that climate assessments or all these different mitigation measures were required by the Clean Water Act or required by Clean Water Act general permits," then



*Id.* at 386:2-15.

For these reasons, Mr. Uhlmann's opinions ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████

### 2. Mr. Uhlmann's opinions 1, 2, 5, and 6 are also reliable

#### a. Mr. Uhlmann's opinions 1, 2, 5, and 6 are based on his own experience and are reliable

CLF incorrectly asserts repeatedly that Mr. Uhlmann supports his opinions exclusively based on his interpretations of statutes, regulations, case law, and case pleadings. This characterization is simply untrue. Instead, as Mr. Uhlmann explained in his report and deposition, his opinions are based primarily on his specialized training, knowledge, and experience enforcing the statutes and regulations underlying CLF's claims under. For example:



The opinion is based on Mr. Uhlmann's specialized knowledge and leadership experience at EPA seeking methods to promote climate

change mitigation and resiliency. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

███████████   In each of these ways, Mr. Uhlmann's expert opinion is based on factual

observations based on his unique and highly specialized experience, not legal opinions in any

respect as CLF erroneously and baselessly insists.

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████   As he explained in his

deposition, in his experience "prosecuting companies for violations of the Clean Water Act, I

would look first and foremost for either a clear statutory violation or a clear permit violation, or I guess in between a clear regulatory violation. So it's game over if I can't identify a clear legal obligation." Uhlmann Dep. at 274:14-22. He further explained that with regards to permits including "best industry practice" language such as the Permit, he would "need to look: Is it defined in the statute? Is it defined in the regulations? Is it defined in some guidance?" *Id.* at 276:3-7. In other words, Mr. Uhlmann forms this opinion by using the same methods he would have used during his time at EPA.

---

[3] This is consistent with the language in the 2018/2021 Permit, which provides that permittees "must implement" Best Management Practices "to minimize the discharge of pollutants from the permitted facility. The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." 2018/2021 Permit Section 5(b). It is undisputed that CT DEEP has not defined "best industry practice" in the Permit or in applicable regulations.



***

Accordingly, Mr. Uhlmann offers reliable bases from his own professional experience as

a regulatory and compliance professional to support Opinions 1, 2, 5, and 6.

>    **b.**    **Mr. Uhlmann references to and reliance on statutes, regulations, and case law is proper**

CLF contends that Mr. Uhlmann's opinions are inadmissible because he relies on statutes, regulations, and case law. As a matter of law, however, expert witnesses are permitted to rely on and reference statutes, regulations, or case law in support of his opinions. *DeGregorio v. Metro-N. R. Co.*, No. 3:05-CV-533 JGM, 2006 WL 3462554, at *4 (D. Conn. Nov. 1, 2006) (holding expert could "testify, based upon his twenty-five years of railroad experience, regarding the similarity, or dissimilarity, between the Shuttlewagon at issue here and the railroad equipment addressed in the various court decisions listed in his expert report, if he has professional knowledge of same" and ultimately, could rely on regulations and case law in addition to his experience) (citing *Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 295 (N.D. Ill. 2005) ("If [the expert's] testimony is based on certain regulations in addition to his industry experience, he may reference those regulations."); *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) ("An 'expert may not state legal conclusions drawn by applying the law to the facts,' but '[a]n expert may ... refer to the law in expressing his or her opinion.'") (quoting *A.E. ex rel Evans v. Indep. Sch. Dist. No. 25 of Adair Cnty., Oklahoma*, 936 F.2d 472, 476 (10th Cir. 1991)); *Bethel v. Berkshire Hathaway Homestate Ins. Co.*, 596 F. Supp. 3d 1260, 1268 (D. Colo. 2022) ("[R]eferencing industry standards—some of which are derived from case law—does not constitute improper legal-conclusion testimony. An expert witness 'may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.'") (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)); *Becerra v. Schultz*, 499 F. Supp. 3d 1142, 1151 (D. Wyo. 2020) ("An expert is also generally permitted to refer to the law in expressing his opinion."); *Holman v. Illinois Dep't of Corr.*, No. 18-CV-1323, 2024 WL 5131945, at *5 (C.D.

24

Ill. Dec. 16, 2024) (appeal dismissed) ("Ms. Stanosheck testified about conducting an extensive investigation of the evidence regarding Plaintiff's disability, the conditions at Pontiac, and the ADA requirements upon which her opinions were based. . . . The Court finds there was no error in allowing Ms. Stanosheck to opine on these issues. '[T]here is a difference between opining on a legal issue and simply relying on legal standards to produce a proper, admissible expert opinion.'" (quoting *Boston Sci. Corp. v. Cook Med. LC*, No. 1:17-cv-03448-JRS-MJD, 2023 WL 1476573, at *5 (S.D. Ind. Feb. 2, 2023)).

From a common sense perspective, that Mr. Uhlmann references to statutes and regulations in his report (a report issued in a case about alleged statutory violations) does not render his opinions unreliable or otherwise inadmissible. Indeed, that is what he was tasked with doing as the top enforcement official in the EPA.

## C.    Mr. Uhlmann's Opinions are Helpful to the Fact-Finder

The bulk of Plaintiff's motion is dedicated to asserting that Mr. Uhlmann's Opinions 1, 2, 5, and 6 are improper legal conclusions rather than expert opinions that can help the fact-finder decide an issue of fact in this case without invading on the Court's exclusive authority to decide the law. ECF 730-1 at 3-7. In doing so, CLF dramatically misstates Mr. Uhlmann's opinions and ignores entirely his very relevant and extensive agency experience, which courts in the Second Circuit routinely find can help the fact-finder understand complex regulatory regimes, such as the one at issue in this case. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency,* 846 F.3d 492, 514 (2d Cir. 2017) ("the Clean Water Act is 'among the most complex' of federal statutes, and it 'balances a welter of consistent and inconsistent goals,' establishing a complicated scheme of federal regulation employing both federal and state implementation and supplemental state regulation") (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 494 (2d Cir. 2001)).

      1.      **Well-settled law in this District and Circuit permits the admission of testimony regarding the application of technical regulatory standards**

Under well-settled Second Circuit law, the testimony of qualified experts can help juries better understand complex statutory and legal regimes. *See Forman*, 794 F. Supp. 2d at 384 (holding former FDA employee's testimony regarding "the reasonableness of Novartis' conduct in its interactions with the FDA and compliance with FDA regulations" was relevant and helpful); *In re Golden*, No. 16-40809-ESS, 2022 WL 362913, at *14 (Bankr. E.D.N.Y. Feb. 4, 2022) ("[W]here an expert testifies, based on his or her experience and expertise, as to matters that may assist the court, but does not offer legal opinions, that testimony may be considered. And this does not change merely because the expert's opinion relates to a topic or subject matter where laws and regulations also play a role."); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 184 (S.D.N.Y. 2018) ("In his report, Professor Thomas explains the procedures under the complex law governing approvals of generic drugs, which is subject matter that is foreign to the average person. He does not provide 'legal conclusions' or opine on whether Defendants violated the Act, but simply explains the mechanics of drug approval, which provides context that is likely to 'assist the trier of fact.'") (quoting Fed. R. Evid. 702); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y. 2016) ("Admitting expert testimony in this context makes sense given the complicated nature of FDA regulations, and it would be helpful to the jury to have an expert explain this complex regulatory process."); *Cary Oil*, 2003 WL 1878246, at *4 (holding that "having an expert witness such as Gay—who teaches graduate level courses in derivatives, has authored articles discussing derivatives hedging and valuation, and was Chief Economist and Director of the Division of Economic Analysis for the CFTC, where he led a team that examined contracts similar to one at issue here—is important if Plaintiffs are to explain to the jury the background issues involved in this complex contractual

dispute centered in an intricate regulatory scheme"); *In re Fosamax*, 645 F. Supp. 2d at 191

(holding that "[a] lay jury cannot be expected to understand the complex regulatory framework

that informs the standard of care in the pharmaceutical industry" and held that the former FDA

expert's "assessment of the reasonableness of Merck's conduct in light of her experience and her

understanding of FDA regulations will be helpful to the jury").[4]

Outside of this Circuit, courts have held that the testimony of former EPA employees

would help the jury understand various environmental statutes and EPA's standard practices

under those statutes. For example, the Northern District of West Virginia determined that former

EPA assistant administrator Jeffrey Holmstead could testify regarding the Clean Air Act and

EPA's practices under that statute. *Murray Energy Corp.*, 2016 WL 3390517, at *6. The court

dismissed assertions that Mr. Holmstead's testimony consisted of "legal conclusions," including

statements such as "I am not aware that EPA has made a meaningful effort during this time to

disclose or even evaluate actual or potential job losses or shifts in employment resulting from the

administration and enforcement of the CAA." and "As far as I know, EPA has never made any

effort to conduct continuing evaluations of the job losses or shifts in employment that result from

CAA regulations." *See id*. at *4 ("This Court does not agree that the statements which the EPA

contends are legal conclusions are in fact such."); *see also* Pl. Mem. in Opp. to Def. Mot. to

Disqualify or Exclude Jeffrey Holmstead, No. 5:14-cv-39, ECF 228 (N.D. W. Va. June 2, 2016),

attached as Ex. 5, at 24 (quoting Holmstead report).

In *Saline River*, the plaintiff asserted "that [the expert's] opinion that [defendant] JCI

---

[4] The *Fosamax* court did ultimately exclude some of Dr. Parisian's opinions as "too conclusory or insufficiently based on expertise or analysis to be admitted," for example, where she asserted that the defendant "failed to adequately disclose to physicians its use of ghostwriters to generate articles favorable to Merck," but "could not name any standard that prohibits such a practice, as long as the information is accurate." *Fosamax*, 645 F. Supp. 2d at 191. However, Mr. Uhlmann's opinions here are distinguishable as he does offer detailed and fulsome explanations for the bases underlying his opinions.

responded timely to EPA's requests and that JCI followed EPA's standards practices . . .

constitutes a legal conclusion[.]" 2011 WL 6031943, at *3. The court rejected this argument,

instead agreeing that the expert's "vast knowledge and experience," including his time leading

the RCRA Enforcement Branch, meant that his "testimony relating to EPA customs and

standards in these types of administrative consent orders would be relevant and helpful to the

jury." *Id*. (citing *Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Co.*, No. 3:04-

cv-7621, 2008 WL 668242, at *3, n.2 (N.D. Ohio Mar. 4, 2008) (finding "[e]vidence of custom

and usage is relevant to the interpretation of ambiguous language in a contract;" "[e]xpert

testimony is admissible to show custom and usage in an industry even if that testimony embraces

the ultimate issue to be decided by the trier of fact.")).

Furthermore, "the Second Circuit has held that '[e]xperts may testify on … mixed

questions of fact and law.'" *Cary Oil*, 2003 WL 1878246, at *5–6 (quoting *Fiataruolo v. United

States*, 8 F.3d 930, 941 (2d Cir. 1993). Moreover, "[t]his sort of testimony is not objectionable

merely 'because it embraces an ultimate issue to be decided by the trier of fact.'" *Fiataruolo*, 8 F.

3d at 941 (quoting Fed. R. Evid. 704). As the Advisory Committee to the Federal Rules

explained:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all
> opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact,
> and Rule 403 provides for exclusion of evidence which wastes time. These
> provisions afford ample assurances against the admission of opinions which
> would merely tell the jury what result to reach, somewhat in the manner of the
> oath-helpers of an earlier day. They also stand ready to exclude opinions phrased
> in terms of inadequately explored legal criteria. Thus the question, "Did T have
> capacity to make a will?" would be excluded, while the question, "Did T have
> sufficient mental capacity to know the nature and extent of his property and the
> natural objects of his bounty and to formulate a rational scheme of distribution?"
> would be allowed.

Fed. R. Evid. 704, Advisory Committee Notes (1972); *Reichmann v. Whirlpool Corp.*, No. CV

16-5151 (AYS), 2021 WL 12102128, at *1 (E.D.N.Y. Mar. 9, 2021) ("For example, this means

that an expert in an antitrust case cannot testify to whether a party's conduct was 'anticompetitive' or 'unlawful' under the Sherman Act, but can, for example, testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand.").

For example, in a private party response action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the central question the parties sought to answer was whether "the costs … incurred in responding to contamination were 'consistent with the National Contingency Plan' ('NCP')." *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542(BKS/ATB), 2016 WL 11604974, at *1 (N.D.N.Y. July 7, 2016) (quoting 42 U.S.C. § 9607(a)(4)(B)). CERCLA states that a response action is "consistent with the NCP" if the action "'is in substantial compliance' with various NCP provisions[.]" *Id*. at *2 (quoting 40 C.F.R. § 300.700(c)(3)(i)). There, "[t]he parties agree[d] that substantial compliance with the NCP is a mixed question of law and fact," but disagreed as to whether experts could properly opine on compliance with the NCP. *Id*. The court held that "[e]xpert testimony as to NCP compliance is appropriate given the NCP's complex regulatory framework" and ultimately found "that an expert's factual analysis of MPM's actions, preliminary investigations of hazardous waste contamination, and whether MPM's actions were consistent with the NCP would be helpful to the Court in resolving the issues regarding the NCP." *Id*. at *3.

Similarly, in *Fosamax*, the Southern District of New York held that the former FDA employee expert could "testify[] about general FDA regulatory requirements and procedures" and "Merck's compliance therewith," explaining that experts "may offer testimony embracing an ultimate issue of fact that the jury will decide." 645 F. Supp. 2d at 191. And, again, in *Cary Oil*, the Southern District of New York held that the expert could "explain general corporate

governance principles and the concept of veil-piercing to the jury," finding that the expert's "analysis of the evidence in this case—and his identification of how such evidence may indicate that the relation between the Defendants exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing—does not cross the boundaries into an opinion that would tell the jury what decision to reach, but rather mirrors" the example used by the Federal Rules Advisory Committee[.]"2003 WL 1878246, at *5–6.

In other words, while no expert in this case may offer the opinion "Defendants did/did not violate the CWA or RCRA," experts are more than welcome to look to the evidence and opine on what "best industry practice" requires, whether Defendants did or did not implement practices and technologies consistent with "best industry practice," and whether the Terminal did or did not present an imminent and substantial endangerment to human health or the environment.

> **2.      Mr. Uhlmann's opinions deal with the on-the-ground application of the technical regulatory provisions undergirding most of CLF's claims**

>> **a.      Mr. Uhlmann's opinions are proper regulatory opinions, not legal conclusions**

The question at the core of Plaintiff's theory in this case is the meaning of the term "Best Industry Practice" in the Permit and whether it includes an "implied" requirement that permittees consider Climate Change Factors. *See, e.g.,* Order Denying Motion for Partial Summary Judgment, ECF 302 (Oct. 19, 2023) (holding that whether the term "best industry practice" as used in the Permit "**is a factual question that the Court cannot resolve at this time and on which it expresses no view**") (emphasis added). CLF asserts (without once actually quoting Mr. Uhlmann's own words) that Mr. Uhlmann's opinions amount to no more than "his statutory interpretation of certain provisions of the CWA and RCRA and his legal conclusions or legal opinions on the requirements of those two federal statutes." ECF 730-1 at 3. Ultimately, CLF

never explains why or demonstrates how Mr. Uhlmann's opinions are "purely legal interpretation" or "conclusory," choosing instead (and ironically) to merely say it is so. Indeed, CLF appears to imply that the mere fact that Mr. Uhlmann references and relies on statutory and regulatory language renders his opinions inadmissible legal conclusions; as discussed above, however, this argument is simply wrong under well-established precedent.

As CLF has opted to paraphrase and, in the process, misstate Mr. Uhlmann's opinions and their bases, Defendants will walk through those opinions here:

██████████████████████        ████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████

██████████████  CLF references (but does not quote) paragraphs 22-24 and 39-41 (the latter three of which are not included in Opinion 1) as "rel[ying] on his interpretation of the CWA and RCRA, implementing regulations and EPA policy documents to opine on the question of whether the EPA would have a basis to allege CWA or RCRA violations related to a lack of climate change planning, in the absence of express permit requirements to that effect," and calls this opinion "merely a legal argument." ECF 730-1 at 4.

Contrary to CLF's assertion, this opinion is not based on simple statutory or regulatory interpretation, but rather on Mr. Uhlmann's experience at EPA attempting to develop ways to build climate change enforcement into EPA's policy. That EPA does not regulate "climate change" under any existing environmental regulatory framework is a central fact in this case. Specifically, Mr. Uhlmann explains that:

████████████████████████████████████████████████████████████



Uhlmann Rpt. at ¶ 21. Mr. Uhlmann states further:



*Id*. at ¶ 22. In addition, following the issuance of the Climate Enforcement strategy,



*Id*. at ¶ 23. As Mr. Uhlmann explains, these documents

*Id*. at ¶ 24 (emphasis added).



*Id*.

None of these opinions are improper legal conclusions. Not once does Mr. Uhlmann delve into a textual analysis of the meaning any particular statutory or regulatory provision within the CWA or RCRA. Nor does he ever assert that the fact-finder *must* find a certain way. Instead, like the experts in *Forman*, *Fosamax*, and other cases cited above, Mr. Uhlmann is providing helpful context on the structure of these complex statutory and regulatory regimes that will allow the fact-finder to better understand the Permit and enforcement of its terms. *See Fosamax*, 645 F. Supp. 2d at 190 (holding expert's "testimony about regulatory requirements relating to the development, testing, marketing, and surveillance of prescription drugs" was admissible); *Forman*, 794 F. Supp. 2d at 383 (holding that expert's "specialized knowledge in the interplay between the FDA and pharmaceutical companies in obtaining drug approval, developing and approving labels and warnings, and in conducting and monitoring clinical trials would be helpful to the trier of fact in providing a opinion on the actions by Novartis from a regulatory perspective").

The law cited by CLF does not change this outcome. To the contrary, they largely support it. While in *Bilzerian*, the Second Circuit affirmed the trial court's decision to preclude an expert's opinion "as to whether [the defendant's] actions violated the securities laws," the court allowed the expert to testify as to "general background on federal securities regulation and the filing requirements of Schedule 13D," stating that "in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991). Similarly, CLF relies on *Old Gate Partners, LLC v. Paddock Enter., LLC*, No. 3:18-cv-01657 (JCH), 2024 WL 3520168, at *7 (D. Conn. May 30, 2024), for the unremarkable general proposition that experts may not offer legal conclusions. But in that case, this Court held that the expert did not offer an "impermissible legal

opinion[]" because he did "not impermissibly 'communicat[e] a legal standard'" and instead properly "explain[ed] the relevant certifications that [an affiliate to the defendant] filed with DEEP, and opine[d] that [the affiliate] did not adhere to the requirements of these certifications." *Id.* at *15. His opinions, like the opinions of Mr. Uhlmann here, were admissible.

Regarding *SLSJ*, CLF cites again to generic statements that experts may not testify on ultimate legal conclusions and discussions of case law specific to corporate governance testimony. *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 269 (D. Conn. 2017). But that Court clarified that experts are permitted to testify "on factual conclusions that may embrace an ultimate issue" so long as they do not testify "on ultimate legal conclusions." *Id*. at 268. When discussing this distinction with regard to a corporate governance expert, the court explained that the expert could "explain the terms 'freeze out' or 'squeeze out' as they relate to the legal principles of a limited liability entity" but could not testify as to the ultimate legal question of whether or not the defendant breached its fiduciary duties. *Id*. at 283-84.

In Opinion 1 regarding climate change enforcement under the CWA, Mr. Uhlmann, unlike the expert in *SLSJ*, is not offering legal conclusions or analysis or attempting to tell the fact-finder how it should decide the case, *i.e.*, whether Defendants violated the CWA and RCRA. Instead, like the experts in *Bilzerian* and *Old Gate*, Mr. Uhlmann uses his own first-hand experience developing and enforcing EPA climate change policy to provide the fact-finder helpful context to decide what are and are not the relevant "best industry practices" in this case— as well as the practical limitations faced by EPA, states, and groups like CLF who seek to enforce elastic permit requirements like best industry practice.

34



Uhlmann Rpt. at 12.

Plaintiff specifically asserts (without providing case support or even quoting the relevant report sections) that paragraphs 26, 27, 29, and 30 of Mr. Uhlmann's expert report offer "legal analysis of the purposes of general and individual permits under the CWA, the use of best industry practice standards, and the enforceability of those practices." ECF 730-1 at 5. However, once more, Mr. Uhlmann is not instructing the jury on the law or on what verdict they must make. Instead, Mr. Uhlmann simply explains to the jury:

CLF fails to cite any case stating that general discussions of complex regulatory and permitting regimes constitute legal analysis. That cannot be the law—if it were, there were never

be experts on regulatory requirements, and cases in this District and Circuit make it clear experts can offer opinions on regulatory compliance.

Rather than citing to any case on point, CLF cites to the same three cases discussed above without offering any explanation as to their application here. Again, consistent with what the courts in *Bilzerian*, *Old Gate*, and *SLSJ* found permissible, Mr. Uhlmann does not seek to tell the jury whether or not Defendants violated the CWA and instead provides relevant background regarding the CWA permitting regime from which the Permit stems, which courts find helpful to the jury. *See, e.g., Cary Oil*, 2003 WL 1878246, at *4 (holding that expert's opinions "serve[d] the reasonable purpose of offering a general overview of derivative instruments [such as those at interest in the case], the CFTC, its regulation of futures trading and other such general economic background to a laymen jury which will have to confront complex questions involving the motivation of petroleum marketing companies in entering into the Contracts" at issue in the case); *Bilzerian*, 926 F.2d at 1294 (holding expert could provide "general background on federal securities regulation and the filing requirements of Schedule 13D").

To the extent Plaintiff takes issue with the fact that Mr. Uhlmann cites to or quotes statutory and regulatory provisions and case law, as discussed above, experts may permissibly reference relevant statutes, regulations, case law, and other legal sources in their opinions. *See supra* Section IV.B.2.b (collecting cases discussing propriety of experts' reference to and reliance on legal sources).

Thus, like the experts in the cases discussed above, Mr. Uhlmann is properly using his experience to provide additional context regarding the statutory and regulatory schemes within which these permits, including the Permit, reside.

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

████████████████ Uhlmann Rpt. at 22. Widely regarded as one of the more arcane environmental regulatory frameworks, Mr. Uhlmann offers expert opinions that are directly relevant to the issues involved in this case.

CLF argues that Opinion 5 consists of "legal analysis involving the interpretation of legal pleadings, statutory language, and case law to determine the scope of liability" along with giving an "ultimate legal conclusion[]." ECF 730-1 at 6. CLF specifically flags paragraphs 43 and 46 as problematic and, again, citing again only to *Bilzerian*, *SLSJ*, and *Old Gate* with no discussion of the applicability of those cases to Mr. Uhlmann's actual opinions.

*First*, Mr. Uhlmann does not "provide[] his interpretation of the definition of terms such as 'solid waste,' 'hazardous waste,' and 'discarded,'" ECF 730-1 at 5; he merely references these terms, Uhlmann Rpt. at ¶ 43 ███████████████████████ ███████████████████████████████████████ As explained multiple times now, experts may reference and rely on statutes, regulations, and case law. *See supra* Section IV.B.2.b. CLF cites nothing to the contrary.

Even more to the point, Mr. Uhlmann does not base his opinion on mere statutory or regulatory interpretation. ███████████████████████████████████ ███████████████. *See* Uhlmann Rpt. at ¶ 43 █████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████

██████████████████████████████████████████████

*Second*, whether conduct is considered an "imminent and substantial endangerment" within RCRA is a question of fact. *See Interfaith Comm. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 253-54 (3d Cir. 2005) ("Other courts of appeals consider [the RCRA endangerment determination] a question of fact.") (collecting cases, including *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991), *rev'd in part on other grounds,* 505 U.S. 557 (1992)). In addition, as explained above, the Federal Rules of Evidence permit experts to offer testimony that "embraces an ultimate issue" to be decided by the trier of fact. Fed. R. Evid. 704. Mr. Uhlmann's testimony here is like the example established by the Advisory Committee: Mr. Uhlmann does not testify that Defendants did not violate RCRA (i.e., that "T [had] capacity to make a will") but instead offers the opinion that, based on his experience enforcing RCRA, Defendants' conduct did not present an imminent or substantial endangerment (*i.e.*, that "T [had] sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution"). *Id.*

████████████████████████████████
██████████████

Finally, CLF asserts that in his Opinion 6, Mr. Uhlmann "seeks to offer his legal opinions regarding corporate parent liability," stating that "[h]is opinions are premised on his legal interpretation of the Supreme Court's decision in *Bestfoods* in light of the facts provided to him" and that his "opinion as to whether Shell plc, Shell Petroleum, Inc., and Shell Oil Company exercised the level of control required to trigger liability under *Bestfoods*, and his further opinions regarding the limits of any corporate parent liability under the applicable law or EPA penalty policy are clearly legal conclusions." ECF 730-1 at 6. CLF conveniently omits noting to this Court that it was CLF's expert, Joshua Macey, that offered legal opinions on the *Bestfoods*

case, and Mr. Uhlmann was explaining why the "parent" corporation of a regulated entity would not be considered under EPA's penalty policy.

Again, Mr. Uhlmann's Opinion █████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████ Uhlmann Rpt. at ¶¶ 49 & 51. As discussed above, experts are permitted to reference the law in their opinions. *See supra* Section IV.B.2.b.

Mr. Uhlmann, who offers extensive experience with issues related to corporate responsibility under environmental regulations in his capacity as the head of enforcement for EPA, merely provides countervailing evidence to Professor Macey's own unsupported assertions. For example, while Professor Macey asserts in his report that various manuals and policies issued by "Shell" demonstrated that "Defendants All Exerted Operational Control Over the Terminal in Furtherance of Shell Environment and Climate Policy," ECF 761, Sealed May 8, 2025 Expert Report of J. Macey, at 15-19, ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ Uhlmann Rpt. at ¶ 51. Again, unlike Mr. Macey, who has never participated in an environmental enforcement action, Mr. Uhlmann was the chief EPA regulatory enforcer, and Mr. Uhlmann was rebutting the incorrect regulatory statements offered by Mr. Macey.

CLF's reliance on *SLSJ* is unavailing. Mr. Uhlmann never makes the assertion in his report that any other "Shell" entity is not liable. Instead, Mr. Uhlmann's testimony is more akin to that of the veil-piercing expert in *Cary Oil*. There, the court found that the expert's "analysis of the evidence in this case—and his identification of how such evidence may indicate that the

relation between the Defendants exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing—does not cross the boundaries into an opinion that would tell the jury what decision to reach, but rather mirrors [the] example offered by the Advisory Committee to the Federal Rules[.]" *Cary Oil*, 2003 WL 1878246, at *5. Like that expert, Mr. Uhlmann "is being asked to opine on questions of fact concerning the relationship between" Defendants and "Shell." *Id*. at *6.

<div align="center">***</div>

Given the above, Mr. Uhlmann's opinions are helpful to the jury and, thus, admissible.

## V.     CONCLUSION

For the unique regulatory issues presented in this case, including the meaning of "best industry practice" for climate change vulnerability risk assessments under the Clean Water Act, Mr. Uhlmann's opinions are not only helpful to the jury and, thus, admissible, but they are based on years of experience interpreting and enforcing environmental permits.


Dated: November 3, 2025                              Respectfully submitted,

                                                     */s/ Douglas A. Henderson*
                                                     Douglas A. Henderson (phv05547)
                                                     Carmen R. Toledo (phv20194)
                                                     King & Spalding, LLP
                                                     1180 Peachtree Street, N.E.
                                                     Atlanta, GA 30309
                                                     T: (404) 572-2769
                                                     dhenderson@kslaw.com
                                                     ctoledo@kslaw.com

                                                     Antonio E. Lewis (phv03069)
                                                     King & Spalding, LLP
                                                     300 S Tryon Street
                                                     Suite 1700
                                                     Charlotte, NC 28202
                                                     (704) 503-2551
                                                     alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)

Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

1