# EXHIBIT 4

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3     ----------------------------

4     CONSERVATION LAW FOUNDATION,

5     INC.,

6                    Plaintiff,

7     V.                              Civil Action No.

8     SHELL OIL COMPANY, EQUILON     3:21-cv-00933-VDO

9     ENTERPRISES LLC D/B/A SHELL

10    OIL PRODUCTS US, SHELL

11    PETROLEUM, INC., TRITON

12    TERMINALING LLC, and MOTIVA

13    ENTERPRISES LLC,

14                    Defendants.

15    ----------------------------

16

17

18       REMOTE VIDEO-RECORDED EXPERT DEPOSITION OF

19                   DAVID M. UHLMANN

20             Friday, September 12, 2025

21                    9:15 PM EST

22

23    Job No. MDLG7585638

24    Reported by:  Denise Dobner Vickery, CRR, RMR



Golkow Technologies,
A Veritext Division



Page 142

1

24          Q.       If EPA had brought an enforcement

1           without reference -- without having a

2           chance to review the reports that I'm

3           relying upon.

4    BY MR. KILIAN:

5           Q.      As a trial lawyer who has tried even

6    criminal cases under the Clean Water Act, you

7    would agree with me that the place you look for

8    compliance activities is in the actual compliance

9    activities of the terminal, correct?

10                    MR. HENDERSON:  Objection to

11          form of the question.  Foundation of the

12          question.  And objection to the extent it

13          requires a legal conclusion.

14                    THE WITNESS:   So I would, you

15          know, in prosecuting companies for

16          violations of the Clean Water Act, I

17          would look first and foremost for either

18          a clear statutory violation or a clear

19          permit violation, or I guess in between a

20          clear regulatory violation.  So it's game

21          over if I can't identify a clear legal

22          obligation.

23                    If I'm trying to determine --

24          if I've identified a clear legal

Page 276

1            But I still have up on the screen
2     language you want to talk about.
3            For me to give out what a best
4     industry practice is, which is the language at
5     issue here, I need to look:  Is it defined in the
6     statute?  Is it defined in the regulations?  Is it
7     defined in some guidance?
8            And if it's not defined in any of
9     those places, which is true of this language here,
10    now I'm stuck going to those experts you were just
11    referring to in one of your earlier questions
12    because I don't -- I don't know on the face of
13    this permit what a best industry practice is.
14        Q.     But just to clarify on that, it's
15    your opinion that that burden is on you as a
16    prosecutor, not on the permittee when they're
17    complying with this permit language?  They don't
18    have the duty to do it?
19                    MR. HENDERSON:  Objection.
20    BY MR. KILIAN:
21        Q.     That's your opinion?
22                    MR. HENDERSON:  Objection to
23          the form of the question.  Foundation of
24          the question.  Also object to the extent

Page 386



1

6

15

22                Mr. Kilian is laughing.

23                That was the central feature,

24   Mr. Kilian -- or, Mr. Henderson, central feature

1      A.     I do.  He asked me a number of

2  questions about my -- my view on citizen suits,

3  and Dr. Oreskes has also said -- actually she

4  referred to it as being gobsmacked.

5      Q.     That's right.

6      A.     It's a word I don't -- you don't

7  hear it very often.  He said the same thing.

8      Q.     Mr. Kilian raised the same issue

9  today in this deposition?

10      A.     Yes, he did.

11      Q.     In any way in your expert report

12  have you changed your opinion on citizen suits?

13  ██    ██    ████████████████

██████████████████████████

████████████████████████████

██████████████████████

          ████████████████████

████████████████████

████████████████████████

██████████████████████████

████████████████████

          ████████████████

████████████████████

████████████████████



Page 391

```
18        Q.        And, Mr. Uhlmann, earlier in your
19   testimony you made a distinction between
20   enforcement and permitting.
21                  Why is that distinction so important
22   in this case?
23        A.        Well --
24        Q.        In terms of -- in terms of climate
```

Page 392

1    change requirements, why is that important the

2    difference between permitting and enforcement?

3          A.      Well, EPA or a state has the

4    authority or the ability, if the statutes

5    authorize them to do so, to write climate change

6    requirements or require climate change

7    considerations.  They have the ability to include

8    that in permits.

9                   And, in fact, the State of

10   Connecticut did that in this case -- or not in

11   this case, but the stormwater permit that's the

12   focal point of this case, the State of Connecticut

13   added climate change to the permit in 2024.  Three

14   years after this lawsuit was filed.

15                  So EPA or the state has the ability

16   to include climate in a permit, but as an

17   enforcement official, I can't bring an enforcement

18   case based on climate change out of thin air.  I

19   can't just say climate change matters, so I'm

20   going to argue that your failure to account for

21   climate change is an enforceable violation of a

22   statute that I can seek civil penalties for.

23                  I can't do that unless there is

24   either a statute or a permit that sets forth the

Page 393

1    fact that that is required activity for the

2    regulated community.

3            Q.        And, Mr. Uhlmann, I believe you

4    testified you were the Assistant Administrator of

5    Enforcement at EPA; is that correct?

6            A.        That is correct.

7            Q.        And that included all civil

8    enforcement?

9            A.        All civil enforcement, all criminal

10   enforcement, all administrative enforcement.

11           Q.        And you have spent your life

12   reviewing these technical regulations related to

13   enforcement?

14           A.        I'll happily.  Just my professional

15   career, but I've been doing this since 1990.  35

16   years.

17           Q.        So based on your technical

18   understanding, could -- let me switch gears,

19   Mr. Uhlmann, a little bit.

20                     Are you familiar with the OECA

21   climate enforcement policies?

22                     I think you discussed in your

23   testimony in response to Mr. Kilian's questions;

24   is that correct?

Page 395

1    enforcement program.  Making sure that we were

2    doing everything we could to mitigate climate

3    change and also to promote climate resilience

4    measures.

5         Q.       Have you seen any written document,

6    any e-mail, any report while you were Assistant

7    Administrator for all enforcement at EPA that

8    suggested, stated, or inferred that climate change

9    vulnerability risk assessment was required of a

10   permittee under the industrial stormwater permit?

11        A.       No, sir.

12                  MR. KILIAN:  Objection.

13                  THE WITNESS:   I was never

14          told that and, in fact, I mentioned the

15          climate change strategy.  In the climate

16          change strategy, I directed the entire

17          enforcement program.

18                  All 2800 people that I

19          referenced in response to Mr. Kilian's

20          testimony -- Mr. Kilian's question, who

21          have tremendous amount of expertise,

22          tremendous amount of technical

23          experience.  They're not just lawyers.

24          They're also engineers.  They're also

1    hydrologists.  They're also

2    toxicologists.

3               I directed them that we were

4    to bring climate action -- climate

5    enforcement cases wherever we could.  So

6    if there was -- if it was -- if it was a

7    violation of an environmental law, not to

8    do a climate risk assessment or not to do

9    a climate vulnerability assessment, I

10   wanted to bring that case.

11              And, Mr. Kilian, if you're

12   talking to me, interrupt talking away,

13   you're on mute.  So I guess I'll keep

14   going.

15              We didn't -- we didn't believe

16   that we had that authority.

17             What we did believe we had the

18   authority to do, which I also said we

19   needed to do, was to include climate

20   resiliency in our settlements, which is

21   very different from bringing a case

22   alleging that something is a violation.

23             So in our settlements, we

24   tried to make sure that whenever possible

Page 397

1          we were including climate resiliency, but
2          I can't stress this enough.
3                    There is a world of difference
4          between saying that climate resiliency --
5          saying that -- saying that climate
6          resiliency is required and therefore that
7          the failure to do it is a violation that
8          subjects a facility to civil penalties,
9          and saying that climate resiliency is a
10         proper term of a settlement.
11                   We never did the former
12         because we didn't think we had the
13         authority to do it.  We didn't think it
14         was a proper use of our authorities.
15                   We did the latter every
16         opportunity we could.  That wasn't just
17         my judgment.  That was -- that was the
18         judgment of the entire enforcement
19         program at EPA.
20     BY MR. HENDERSON:
21         Q.     Mr. Uhlmann, thank you very much.
22         A.     You're welcome.
23         Q.     I think --
24         A.     You're still on mute.

```
                                           Page 411
  1                  CERTIFICATE OF REPORTER
  2    DISTRICT OF COLUMBIA      )
  3                 I, Denise Dobner Vickery, a
  4    Registered Court Reporter and Notary Public of
  5    the District of Columbia, do hereby certify that
  6    the witness was first remotely duly sworn by me.
  7                 I do further certify that the
  8    foregoing is a verbatim transcript of the
  9    testimony as taken stenographically by me at the
 10    time, place and on the date herein set forth, to
 11    the best of my ability.
 12                 I do further certify that I am
 13    neither a relative nor employee nor counsel of
 14    any of the parties to this action, and that I am
 15    neither a relative nor employee of such counsel,
 16    and that I am not financially interested in the
 17    outcome of this action.
 18
 19                      Denise D. Vickery
 20
 21                 DENISE DOBNER VICKERY, CRR,RMR
                    Notary Public in and for the
 22                 District of Columbia
 23
 24    My Commission expires:  March 14, 2028
```