# **<u>EXHIBIT 5</u>**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA
### Wheeling

**MURRAY ENERGY CORPORATION**, et al.,

        Plaintiffs,

        v.                                  Civil Action No. 5:14-cv-39

                                               JUDGE BAILEY

**GINA McCARTHY**, Administrator,
United States Environmental Protection Agency,
in her official capacity,

        Defendant.

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
### MOTION TO DISQUALIFY OR EXCLUDE JEFFREY HOLMSTEAD

        Plaintiffs Murray Energy Corporation; Murray American Energy, Inc.; The American Coal Company; American Energy Corporation; The Harrison County Coal Company; KenAmerican Resources, Inc.; The Marion County Coal Company; The Marshall County Coal Company; The Monongalia County Coal Company; OhioAmerican Energy, Inc.; The Ohio County Coal Company; and UtahAmerican Energy, Inc. (collectively "Plaintiffs"), by their undersigned counsel, respectfully request that the Court deny Defendant's Motion to Disqualify or Exclude Jeffrey Holmstead's expert testimony (hereinafter, "Motion to Disqualify") [Doc. 206, 207]. Because Defendant has failed to meet its burden of showing why Mr. Holmstead should be disqualified under any test for determining whether a conflict of interest exists, having ignored the federal government's own regulations on conflicts of interest for former government employees, and because Mr. Holmstead's expert testimony is not improper legal testimony simply because he happens to be a lawyer, the Court should deny Defendant's Motion to Disqualify.

**INTRODUCTION**

With its Motion to Disqualify, the United States – on behalf of Defendant Gina McCarthy, Administrator of the United States Environmental Protection Agency ("EPA") – is once again attempting to block testimony directly relevant to the core issues in this case: whether EPA has failed to perform the mandatory duty prescribed under Section 321(a) of the Clean Air Act ("CAA") and, if so, what manner of remedy is necessary to redress the ongoing injuries to Plaintiffs and to ensure that EPA can no longer evade its statutory duty. This time, Defendant is attempting to disqualify a former EPA official from testifying based on alleged "conflicts of interest" and "side switching" -- even though he left EPA more than 10 years ago (more than 8 years before this case was filed) and was never privy to any internal communications about Section 321(a) during his time at EPA. While Defendant asserts in its Memorandum in Support of the Motion to Disqualify that "Mr. Holmstead actually based portions of his expert report on privileged and confidential information that he received while at EPA" and that "privileged and confidential communications . . . form the basis of his report," Memo. in Support at 8, 11 [Doc. 207], Defendant does not identify *any* part of his report that is based on confidential or privileged information – because there is none. Defendant has not and cannot point to any "privileged communications" that have anything to do with Mr. Holmstead's report – because there is none. Defendant effectively argues that, because Mr. Holmstead once worked at EPA, he should be disqualified from serving as an expert witness in any case adverse to EPA.

**A.      Mr. Holmstead's Background and His Time at EPA**

Mr. Jeffrey R. Holmstead is one of the United States' leading experts on the CAA and the regulatory process at EPA. He has spent most of his professional career working on issues related to the CAA in both the public and private sectors. Expert Report of Jeffrey R. Holmstead,

April 25, 2016 ("Holmstead Report") at 1. From 1989 to 1993, he served on the White House Staff for President George H.W. Bush, assisting in the modernization of the CAA and passage of the 1990 Amendments. *Id*. Mr. Holmstead was one of two White House staffers assigned to work directly with EPA in order to implement the 1990 Amendments. Following his service at the White House, he worked as a partner in the Environmental Group of the law firm Latham & Watkins, advocating on behalf of clients seeking to comply with, reform, or challenge CAA regulations. *Id*. Twelve years into his CAA career, Mr. Holmstead was appointed as the EPA Assistant Administrator for the Office of Air and Radiation, a position he occupied from 2001 to 2005. *Id*. After four years at EPA, he went back to the private sector to head the Environmental Strategies Group at Bracewell LLP. He has been in this position since he left EPA more than ten years ago. Although Mr. Holmstead's time at EPA was obviously important, it makes up only a small portion of his twenty-seven year professional career working on CAA issues.

**B.      Mr. Holmstead's Testimony in this Matter**

Mr. Holmstead's testimony in this case provides insight on "the process by which CAA regulations are developed and implemented, the types of analysis that EPA conducts as part of the regulatory process, and the roles played by EPA and state environmental agencies under the CAA." *Id*. His testimony is not based solely on his time at EPA. As someone who has worked on CAA issues for more than 25 years in both the public and private sectors, he understands the types of analysis EPA conducts—through notice and comment rulemakings, through the review of publicly available Regulatory Impact Statements ("RIA"), and through the guidance EPA publishes. Accordingly, in this litigation, Mr. Holmstead provides testimony on "the type of advocacy that can influence regulatory decisions and how credible studies and analysis can affect such decisions." *Id*.

- 3 -

Mr. Holmstead's report does not ignore his time at EPA, noting that "[d]uring [his] tenure at EPA, the EPA career officials who worked in the Air Office were very much aware of the burdens that EPA actions could place on the regulated community . . ." *Id.* However, this statement speaks to EPA's practices, methodologies, and processes much in the same way that Albert McGartland, who Defendant submitted as both a fact witness and an expert witness, speaks to EPA's current practices and methodologies. *See* Expert Report of Albert M. McGartland, May 25, 2016 at 2 ("EPA is already conducting robust evaluations of the potential employment impacts . . ."). Despite the similar topics upon which Albert McGartland opines, Defendant claims Mr. Holmstead's statement and others like it might divulge privileged information. However, Defendant does not identify any privileged information that is revealed in Mr. Holmstead's report or that forms the basis for it. Defendant does point to Mr. Holmstead's observation that "[w]hen I started my job at EPA, one of the things that most impressed me was the sophistication of the regulatory analysis done by the Air Office." Memo. in Support at 4 [Doc. 207]. This complimentary statement (and one Plaintiffs would not think Defendant intends to dispute) does not divulge privileged or confidential information. Rather, it serves as mere observation on EPA's practices.

Notably, Defendant has failed to specifically identify *any* privileged document regarding Section 321(a) received by Mr. Holmstead during his time at EPA. To the contrary, Defendant seems particularly upset about Mr. Holmstead's statement that he cannot recall "anyone ever brief[ing] [him] on Section 321 . . ." Memo. in Support at 4 [Doc. 207]. This fact might be embarrassing to EPA, but the fact that no one communicated with him about Section 321 is hardly a "privileged communication." Moreover, out of the hundreds of thousands of documents produced in this litigation (and the over 64,000 privileged documents logged), Defendant can

- 4 -

only cite the Bates numbers of a handful of vaguely-described documents such as "draft email attachment[s] [that] reflects internal pre-decisional deliberations regarding development of state/regional impact report concerning Clear Skies Initiative." *Id*. at 12. This document says nothing about Section 321(a). Additionally, Defendant claims generally that there are "more than 50 privileged communications and documents that appear on the United States' privilege logs provided to Plaintiffs in this matter . . ." *Id*. at 5. Again, Defendant does not cite a single document mentioning Section 321 and Mr. Holmstead. Asserting that Mr. Holmstead was privy to some privileged documents concerning various rulemakings or enforcement initiatives is not enough to conclude that such documents – if they are indeed privileged – are relevant to EPA's failure to evaluate job losses and shifts of employment or that they played any role whatsoever in Mr. Holmstead's expert report. Defendant also complains that it cannot cross examine or impeach Mr. Holmstead without revealing privileged information. This is an odd complaint, since it implies that EPA is in possession of something that might conflict with his report, yet they have not identified anything on their privilege log refuting Mr. Holmstead's statement that he was never briefed on Section 321(a).

Independent of its disqualification argument based on conflict of interest, Defendant also attempts to exclude Mr. Holmstead's testimony (choosing not to depose him in order to learn the full extent of his testimony) by characterizing his expert testimony as being limited to legal conclusions largely because he happens to be an attorney. Defendant claims that an expert on the CAA "is not a field of technical or specialized knowledge . . ." *Id*. at 15. Yet it is hard to imagine anyone with more specialized knowledge about the issues in this case than Mr. Holmstead. He has had almost twenty-seven years' experience directly with the CAA, in nearly every capacity – as a policy maker at the White House and EPA, as an advocate on behalf of

private sector clients, as a long-time observer of the types of advocacy and analysis that can affect regulatory decisions, and the type of analysis that EPA does and is capable of doing. The CAA is highly technical and applies to highly technical operations. To say that Mr. Holmstead's expertise on the CAA in his various capacities is *not* technical or specialized is absurd. None of the purported examples of legal conclusions offered by Defendant are, in fact, legal conclusions. Overall, Defendant has no reason to disqualify Mr. Holmstead or to exclude his expert testimony.  The Motion to Disqualify is simply another tactic to oppose discovery and Plaintiffs' presentation of their case to this Court.

## ARGUMENT

### I.    Mr. Holmstead's Testimony as an Expert Poses No Conflict of Interest Warranting Disqualification.

Although "[c]ourts have the inherent authority to disqualify witnesses for conflicts of interest," Memo. in Support  at 8 [Doc. 207], they are "generally reluctant to disqualify expert witnesses [because they] possess useful specialized knowledge." *Grant Thornton LLP v. FDIC*, 297 F. Supp. 2d 880, 882 (S.D. W. Va. 2004). As a result, the party seeking disqualification of an expert "bears a 'high standard of proof' to show that disqualification is warranted" and "[c]ases granting disqualification [of an expert witness] are rare." *Rhodes v. E.I. Du Pont de Nemours & Co.*, 558 F. Supp. 2d 660, 664 (S.D. W.Va. 2008) (quoting *Tessier v. Plastic Surgery Specialists, Inc*., 731 F. Supp. 724, 729 (E.D. Va. 1990)); *see also Koch Refin. Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996).

Defendant is trying to create a conflict of interest where none exists. Mr. Holmstead is a CAA expert whose report seeks to show "the extent to which EPA has sought to comply with [Section 321(a)] over the years." Holmstead Report at 2. Neither his opinion nor the bases for his opinion are restricted to his four years at EPA as the Assistant Administrator for the Office of

Air and Radiation. And while that four year period is not excluded from his expert report (nor need it be), he is not "switching sides" with respect to a particular matter involving the same parties. Defendant has not met the high standard of proof required to warrant disqualification, under any test.

### A. Mr. Holmstead's Testimony Poses No Conflict of Interest Under Defendant's Bright-Line Rule.

Defendant first argues that Mr. Holmstead should be disqualified under a "bright-line rule." Memo. in Support at 8-9 [Doc. 207]. at 8-9. But even Defendant must acknowledge that Mr. Holmstead has never been "previously employed or retained by [the United States] in the same or similar *litigation*." *Id*. at 8 (emphasis added). Plaintiffs initiated this lawsuit on March 24, 2014 [Doc. 001], long after Mr. Holmstead left EPA in 2005, and Defendant has not alleged any earlier similar litigation regarding EPA's duties under Section 321(a) (because there is none). The "bright-line rule" posited by Defendant requires disqualification only in the blatant "side-switching" situation where an expert was employed by one side in a case and then seeks to serve as an expert for the other side in the same (or similar) case. *See Koch Refining, 85 F.3d at 1181*. Defendant correctly cites *In re C.R. Bard,* 2014 WL 6960396, at *7, in which a medical doctor retained as an expert by defendant medical device manufacturer subsequently sought to be qualified as an expert for plaintiffs, as support for a "bright-line rule."

That is clearly not the situation here, so Defendant attempts to recast the 'bright-line rule' as one requiring disqualification if an expert "could be called as a witness for either party." Memo. in Support at 8 [Doc. 207]. In *United States v. NHC Health Care Corp.*, 150 F. Supp. 2d 1013 (W.D. Mo. 2001), the only case cited by Defendant for this proposition, the proposed expert was employed by the government agency that pursued investigation and sanctions *against* NHC Health Care at the time of that investigation and then sought to serve as an expert *for* NHC

Health Care in the resulting fraud charges brought by the United States. *NHC Health Care,* 150 F. Supp. 2d at 1015. While the district court observed that the proposed expert could be called by either party as a fact witness, that observation was clearly secondary to the proposed expert's specific involvement both for and against NHC Health Care. Moreover, Defendant's suggestion that "EPA could undoubtedly call Mr. Holmstead as a witness to testify," Memo. in Support at 9 [Doc. 207], is a red herring. Defendant has never identified Mr. Holmstead as an individual with knowledge of relevant facts pursuant to Rule 26 initial disclosure obligations, much less as a potential fact witness in this case.

### B. Defendant's Reliance on *Wang Labs* is Misplaced and Ignores Expressly Applicable Federal Regulations Addressing Conflicts of Interests.

Defendant next argues that Mr. Holmstead should be disqualified based upon a two-part test used in *Wang Labs. Inc. v. Toshiba Corp.*, 762 F. Supp. 1246 (E.D. Va. 1991); *see* Memo. in Support at 8-9 [Doc. 207]. In relying on *Wang Labs*, Defendant ignores conflict of interest standards expressly applicable to Mr. Holmstead as a former government employee, and even suggests that those standards have no bearing on whether a conflict of interest exists. Moreover, even under *Wang Labs*, disqualification of Mr. Holmstead is not warranted on the facts of this case. The unbounded view of conflicts of interest espoused by Defendant would lead to the unintended and clearly undesirable result of prohibiting a former EPA official from ever testifying on behalf of the private sector after he or she leaves government employment, about virtually anything.

### 1. As a Former Government Employee, Mr. Holmstead is Subject to the Conflict of Interest Standards of 5 C.F.R. Part 2641 and 18 U.S.C. § 207.

The legal standard regarding conflicts of interests affecting Mr. Holmstead's participation as an expert witness in this case is spelled out in detailed regulations applicable to former

government employees promulgated by the Office of Government Ethics in order to implement 18 U.S.C. § 207. *See* 5 C.F.R. Part 2641; *see generally Gulf Group Gen. Enters. Co. W.L.L. v. United States*, 98 Fed. Cl. 639, 645 (2011) ("There is an existing, elaborate government construct to control future employment and activities of government personnel who leave government service."). Pursuant to 5 C.F.R. 2641.202:

> For two years after his Government service terminates, no former employee shall knowingly, with the intent to influence, make any communication to or appearance before an employee of the United States on behalf of any other person in connection with a ***particular matter*** involving a ***specific party*** or parties, in which the United States is a party or has a direct and substantial interest, and which such person knows or reasonably should know was actually pending under his official responsibility within the one-year period prior to the termination of his Government service.

5 C.F.R. 2641.202 (emphasis added).[1]

As explained by Judge Easterbrook of the Seventh Circuit, Congress enacted 18 U.S.C. §§ 201-09 in 1962 to replace a "hodgepodge of statutes" that "dealt with conflicts of interest in different agencies." *United States v. Medico Industries, Inc.*, 784 F.2d 840, 842 (7th Cir. 1986). With regard to Section 207(a), which prohibits former government employees from serving as agent or attorney for anyone other than the United States in connection with a "particular matter involving a specific party," Judge Easterbrook notes: "Many employees of the government are experts in particular fields. A broad construction of "particular matter" might make it very difficult for these people … to leave the government for a private employer that deals extensively with the government. The 'revolving door' – the movement from private employment to the government and back – has benefits for the government as well as drawbacks." *Id.* at 843; *see also United States v. Rosen*, 599 F. Supp. 2d 290, 701 (E.D. Va. 2009) (finding that "to hold that § 207(a)(1) bars [a former government employee's] involvement

---

[1] As a senior employee, Mr. Holmstead is also subject to Section 2641.204, which establishes a shorter one year limit following Government service. 5 C.F.R. 2641.204.

in this case – would empower the government to disable former government employees from serving as expert witnesses against the government by the simple expedient of meeting briefly with these former employees and discussing only general matters . . ..").  Accordingly, Section 207(a) was drafted so as to disqualify a former employee "only if the contract or other particular matter involves the same 'specific party or parties.'" *Id.* Judge Easterbrook offers some instructive examples based upon the balance struck by Congress in Section 207(a), including that a former official who drafts weapon specifications may represent people who later submit bids to make the weapon, because "specifications (or regulations) do not have 'specific parties.'" *Id.* "The parties, facts, and subject matter must coincide to trigger the prohibition of § 207(a)." *Id.*

The Office of Government Ethics promulgated regulations implementing the 1962 legislation and, in so doing, addressed certain situations not explicitly addressed in the statute. Thus, 5 C.F.R. Part 2641 was issued in order to "explain[] the scope and content of 18 U.S.C. § 207 as it applies to former employees of the executive branch or of certain independent agencies . . ." 5 CFR 2641.101(a). The Office of Government Ethics clearly contemplated the provision of expert testimony by a former government employee, as the regulation cites a nearly identical situation as Mr. Holmstead's in § 2641.301:

> A former senior employee of the Environmental Protection Agency (EPA) is a recognized expert concerning compliance with Clean Air Act requirements. Within one year after terminating Government service, she is retained by a utility company that is the defendant in a lawsuit filed against it by the EPA. While the matter had been pending while she was with the agency, she had not worked on the matter. After the court rules that she is qualified to testify as an expert, the former senior employee may offer her sworn opinion that the utility company's practices are in compliance with Clean Air Act requirements. She may do so although she would otherwise have been barred by [§ 207(c)] . . .

- 10 -

5 C.F.R. 2641.301(f); *See also Gulf Group*, 98 Fed. Cl. at 645. 5 C.F.R. Part 2641 thus captures the situation set out in Defendant's motion, yet Defendants claim it only applies criminally and is irrelevant because Defendant is not alleging that Mr. Holmstead has violated 18 U.S.C. § 207."

However, on its face, Part 2641 is not limited to criminal matters and explicitly provides for civil penalties. 5 C.F.R. 2641.103. Moreover, multiple cases apply the regulation (or statute) to potential conflicts of interest for government employees. *See Gulf Group*, 98 Fed. Cl. 639; *Van Ee*, 202 F.3d 296; *Goodeagle v. United States*, 2010 U.S. Dist. LEXIS 79731 (W.D. Ok 2010); *Matter of VSE Corp.*, 2011 U.S. Comp. Gen. LEXIS 200 (Comp. Gen. 2011); *United States v. Medico Indus., Inc.*, 784 F.2d 840 (7th Cir. 1986); *United States v. Rosen*, 599 F. Supp. 2d 690 (E.D. Va. 2009); *Adams v. United States*, 2008 U.S. Dist. LEXIS 105460; *EEOC v. Exxon Corp*, 202 F.3d 755 (5th Cir. 2000); *United States v. Obendorf*, No. 1:15-cr-00254-BLW, 2016 U.S. Dist. LEXIS 53741 (D. Idaho Apr. 20, 2016).

### 2. Mr. Holmstead's Expert Testimony Poses No Conflict of Interest under the Applicable Conflict of Interest Rules

As a former government employee, there is no question that the federal conflict of interest rules apply to Mr. Holmstead. The question is whether Mr. Holmstead "change[d] . . . sides on the same 'particular matter.' … with specific parties…" *Medico*, 784 F.2d at 843. He did not. In *Medico*, Judge Easterbrook explained that "[t]he parties, facts, and subject matter must coincide to trigger the prohibition of 207(a) (citations omitted). . . . if the matter was just within his job description, but he did not work on it himself, the officer would be free to represent a private party after leaving the government." *Medico*, 784 F.2d at 844. Ultimately, the court found that the expert had helped negotiate the Army contract in question himself; therefore he was substantially involved in the particular matter and with the same specific parties. *See also Gulf Group*, 98 Fed. Cl. at 640 (same particular matter: former Army employee had reviewed the

government contracts in question and offered his opinion on their preparation, and the court

applied 5 C.F.R. 2641 to disqualify him.); *Goodeagle*, 2010 U.S. Dist. LEXIS 79731 at *7-8

(same specific party: former Indian Health Service doctor who had treated the patient was hired

as expert witness, and the court applied 5 C.F.R. 2641 to disqualify him).

     Unlike the cases cited above, Defendant cannot point to anything Mr. Holmstead did with

respect to Section 321(a) when he was with EPA.  Nor was there any litigation over Section

321(a) during the time Mr. Holmstead was at EPA. Defendant claims Mr. Holmstead's opinions

are "inextricably intertwined with the privileged and confidential communications that form the

basis of his report." Memo. in Support  at 7-8 [Doc. 207]. Defendant further asserts that "Mr.

Holmstead was privy to privileged communications concerning the capabilities and limits of

models and other tools that EPA . . . has available for analyzing the costs and benefits, including

the potential employment impacts . . ." *Id*. at 6.  However, Defendant does not point to any

"communications" – privileged or otherwise – during his time at EPA that form the basis of

anything said in Mr. Holmstead's report.  Additionally, if there were a relevant "communication"

to which "Mr. Holmstead was privy," it would presumably appear on EPA's privilege log.  Yet

Defendant points to no such document.

     In contrast, in his Declaration, Mr. Holmstead states that he has no recollection of ever

receiving privileged information about any EPA model or other tool that might be used to

analyze employment impacts – and that capabilities and limits of the model that EPA uses to

analyze regulatory actions involving coal-fired power plants – the Integrated Planning Model

(IPM) – are very well documented and publicly available. (attached hereto as Exhibit 1

"Holmstead Declaration" at 3:17-4:19).  He is not aware of any information regarding its

capabilities or limits that is not already public. *Id*. Additionally, there is nothing in Mr.

Holmstead's report regarding the capabilities and limits any particular model or analytical tool. Indeed, he does not mention any such model or tool. He simply states that "EPA employs a number of economists . . . [who] are very capable and have developed sophisticated tools for analyzing the effects of regulation." (Holmstead Report at 3). EPA has not disputed this opinion, and importantly, the capabilities and limits of a particular model or tool are not at issue in this case.

Defendants also argue that Mr. Holmstead should be disqualified because they "cannot depose or cross examine Mr. Holmstead about the basis for his recollections and the scope of his opinions without delving even further into already privileged communications that Mr. Holmstead is not authorized to divulge," referencing the portion of the report which says Mr. Holmstead was never briefed on Section 321(a). Memo. in Support at 13 [Doc. 207]. However, if Defendant had evidence that Mr. Holmstead had been given such a briefing, it could use this evidence to impeach him without waiving privilege. The specific communications in such a briefing or any written materials presented to him might be privileged and confidential, but Defendant would not need any of this to impeach Mr. Holmstead. Defendant could easily point to evidence that the particular meeting occurred without waiving privilege. Also, if it had written materials from such a briefing, it must be disclosed on their privilege log. It is not. EPA's position is this: If EPA lawyers can hypothetically dream up some type of privileged and confidential information that might be used to impeach Mr. Holmstead, then Mr. Holmstead should be disqualified even if it does not exist. EPA does not cite any support for this position, which would allow EPA to disqualify anyone who ever worked at the Agency.

    **3.**    ***Wang Labs* Does Not Provide the Proper Test for Determining Whether Mr. Holmstead's Testimony Presents a Conflict of Interest.**

Despite the indisputable applicability of the conflict of interest rules to former government employees who seek to testify as an expert witness against the United States, Defendant dismisses these rules as irrelevant because "the United States has not alleged that Mr. Holmstead has violated 18 U.S.C. § 207(a)." Memo. in Support at 14 [Doc. 207]. Defendant fails to explain how the presence or absence of a conflict of interest, as that concept has been expressly addressed both by Congress and by the Office of Government Ethics in the context of former government employees, depends on whether the United States chooses to allege a violation. Defendant also wrongly states that cases applying the conflict of interest rules, with one exception, "do not generally involve the issue of disqualification for disclosure of confidential or privileged information." *Id.* This assertion completely misses one of the express purposes behind Congress' passage of the conflict of interest laws and the Office of Government Ethics' implementing regulations. See Section I. B. 1., *supra*.

Instead, Defendant insists that this Court should look only[2] to a test created in a district court case dealing with a non-government expert who had reviewed confidential information on both sides of a patent infringement case. *See* Mot. to Disqualify at 14 [Doc. 207], citing *Wang Laboratories v. Toshiba Corp.*, 762 F. Supp. 1246 (E.D. Va. 1991). However, the *Wang Labs* test was designed to address potential conflicts of interest when an expert witness was intimately involved with one party that provided him with confidential information and then sought to testify on behalf of the opposing party in a particular matter involving that same information. Moreover, in *Wang Labs*, plaintiffs sought to disqualify an expert who had reviewed confidential documents belonging to plaintiffs, and then, after determining that plaintiff's patents were not valid, was retained by defendants. *Id.* at 1246-1247. This is nothing like the matter at hand—Mr.

---

[2] Oddly, Defendant asks the Court to use *Wang Labs* as part of its "inherent power" – i.e., discretion – while at the same time arguing that federal conflict of interest rules expressly applicable to former government employees seeking to serve as expert witnesses should be ignored.

- 14 -

Holmstead was not involved in this litigation on behalf of the Defendant, and there is no

evidence that he has reviewed any privileged documents regarding Section 321 from Defendant.[3]

The overwhelming number of cases applying *Wang Labs* deal with the private sector and

clear side-switching where the expert had been personally and substantially involved on both

sides of a particular matter. This is true for each of the three cases cited by Defendant as

applying the *Wang Labs* two-part test. Mot. to Disqualify at 13 [Doc. 207]. The first, *In re Bard*,

is the epitome of a blatant "side-switching," with a doctor first serving as an expert on behalf of

the defendant early in a series of toxic tort cases all alleging harm due to a particular medical

device manufactured by the defendant, and then seeking to serve as an expert on behalf of

plaintiffs for the later cases. See Section I.A, *supra*. Similarly, in *Rhodes v. E.I. Du Pont de

Nemours & Co.*, the court held that a prior massive tort action in which the experts had served on

the opposite side was "so intertwined . . . they functionally constitute[d] the same case." *Rhodes,*

558 F. Supp. 2d at 670. Lastly, in *Alien Tech. Corp. v. Intermec, Inc*., 2007 U.S. Dist. LEXIS

89635 (D.N.D 2007), the court concluded that a former Chief Technology Officer could not

serve as an expert against his former employer in a patent case on a project which he had worked

substantially. *See also Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 2003 U.S. Dist. LEXIS 23260

at *15 (W.D.N.Y. 2003) (former employee who worked substantially on T-Grain emulsion could

not serve as an expert against his former employer in a patent case involving T-Grain emulsion)

Further, not all courts agree with *Wang Labs* or use it as the principal standard for

disqualifying experts. *See, e.g., In re Mentor Corp. Obtape Transobturator Sling Prod. Liab.

Lit.*, No. 4:08-MD-2004, 2010 WL 1416548, at *1, 4 (M.D. Ga. April 2010) (finding the *Wang

Labs* test "dubious and unpersuasive" to the extent it purports to authorize an "amorphous

---

[3] Defendant's privilege log will show no privileged documents with Mr. Holmstead's name on them specifically regarding Section 321(a). See also Mot. to Disqualify at 12-13 [Doc. 207].

'judge-made' privilege"). Defendant principally relies on an unpublished, non-reported order issued from the bench in *United States v. Ameren Missouri*. As an initial matter, Defendant is forced to cite only to a transcript, which clearly can have no precedential value. Indeed, the judge himself noted that his decision, which contained no analysis regarding 5 C.F.R. § 2641.207, was not intended to provide guidance for any other court – even in the same district: "[O]bviously no one District Court decision binds any other. There isn't even a rule of the building here . . . Judge Perry is free to reach different conclusions than I am." *Ameren,* Tr. at 72.

Moreover, although the district court's order provides little background information, Mr. Holmstead's Declaration shows that this case is very different from *Ameren*. In that case, Mr. Holmstead was offered as an expert witness on behalf of the defendant in an enforcement action that EPA had brought against a coal-fired power plant owned by Ameren. (Holmstead Declaration at 2:10-3:15). Mr. Holmstead left EPA long before the case was filed, but EPA argued that he had been personally and substantially involved in prior cases against other coal-fired plants that were substantially similar to the case against Ameren and that one of Mr. Holmstead's law firm colleagues had worked on the actual investigation of Ameren when he was at the EPA enforcement office. They also pointed to a declaration that Mr. Holmstead had signed to claim that certain documents were protected by the deliberative process privilege in a prior enforcement case against a coal-fired power plant and had also been used to protect the same documents in the case against Ameren. Although Mr. Holmstead and his colleague disputed that they had been involved in any way in the *Ameren* case, the court concluded that, because they had been privy to privileged documents that were relevant to issues in that case, Mr. Holmstead should be disqualified from serving as an expert witness based on *Wang Labs.*[4]

---

[4] Even so, the judge went out of his way to say that there was no conflict of interest and that Mr. Holmstead had not violated any rule of professional conduct in in agreeing to serve as an expert witness in a case that had been initiated

In the matter before this Court, there was no litigation regarding Section 321 that was pending when Mr. Holmstead was at EPA, nor was there any other case that might be viewed as substantially similar to this one. Defendant cannot point to any Section 321(a) document Mr. Holmstead was in receipt of or copied on during his time at EPA. Defendant relies upon *Ameren* mainly because it involved Mr. Holmstead. However, there is little if any precedential value or similarity to the situation here.

Defendant also cites *Return Mail, Inc. v. United States*, 107 Fed. Cl. 459 (Fed. Cl. 2012), for the proposition that an expert can be disqualified under either *Wang Labs* or 18 U.S.C. § 207. In *Return Mail*, the court applied 18 U.S.C. § 207 and a two-part inquiry (not clearly *Wang Labs*) which asks, first, if the expert and the government entity "have a confidential relationship" and, second, if the government entity "disclose[d] any privileged or confidential information relevant to the instant proceeding" to the expert. *Return Mail Inc.*, 107 Fed. Cl. at 461. The court concluded that an USPS executive *could* testify in a patent infringement case against USPS, and that "Defendant's burden [has not been] met with generalities." The court found that the Defendant did "not identify any specific 'invention description' or IP Board 'discussion' to which [the expert] was privy and does not refer to confidential or privileged information related to the aspects of . . . the claims at issue." *Id*. at 465. Because the defendant cited only "[c]onclusory statements that there were confidential disclosures of invention technical minutia of matter that 'related' to the alleged infringement by the USPS service" it was "not enough" for the court to disqualify the former USPS employee. *Id*. at 466. Similarly, Defendant here has made only conclusory statements and refers to vague documents which neither mention Section

---

many years after he left EPA. *Ameren,* Tr. at 76:19-21 ("I don't want there to be any confusion at a later date that my ruling today should somehow be used to preclude him from testifying substantively.").

321(a) nor show a clear relationship between Mr. Holmstead and this lawsuit. Doc. 207 at 12-13. *Return Mail* supports Plaintiffs, not Defendant.

Under Defendant's expansive view of the test for disqualification, so as long as a former employee had a confidential relationship and could have been "potentially" exposed to a cursory matter vaguely related to the lawsuit, he could be disqualified. *Every* former government employee would be disqualified from testifying as an expert. This argument is an unworkable slippery slope, with or without *Wang Labs* or the statute and regulation. *See Young v. United States*, 181 F.R.D. 344, 347 (W.D. Tx 1997) ("the Code of Federal Regulations probably does not provide a privilege to the Defendants [the United States] sufficient to stop one of its employees from testifying as an expert."). No matter what conflict of interest test Defendant uses, there is no basis to disqualify Mr. Holmstead.

## II.     Mr. Holmstead's Testimony Should Not Be Excluded.

Without deposing him, Defendant also claims that Mr. Holmstead makes "inadmissible legal conclusions" in his report. Memo. in Support at 14 [Doc. 207]. While Mr. Holmstead is a lawyer, this fact does not mean that his testimony is offered as a legal opinion, nor does it mean he carries no technical or specialized knowledge in a particular field outside of law. Mr. Holmstead's position at EPA did not require a law degree and he did not act as a lawyer for EPA.[5] (Holmstead Declaration at 2:9). Also, none of the statements Defendant cites from Mr. Holmstead's report are actually legal conclusions. While the CAA is a federal statute, testifying as to whether EPA did an evaluation of job losses and shifts is not a legal conclusion, but rather an underlying factual opinion Mr. Holmstead maintains based on his expertise in helping to implement the 1990 Amendments as a White House staffer, his years working on CAA issues in

---

[5] Gina McCarthy, a listed Defendant in this litigation, current Administrator of EPA, and former head of the Office of Air and Radiation (the same position that Mr. Holmstead held for more than four years), is not a lawyer.

the private sector, and his years at EPA.  Mr. Holmstead not only has specialized knowledge regarding the CAA, but also on a number of issues covered in his report, including the regulatory process at EPA, the types of analysis that EPA has done since 1990 to support its regulatory decisions, and the ways in which different types of analysis can influence regulatory actions and congressional oversight.

### A. Expertise on the Clean Air Act Constitutes "Specialized Knowledge" under *Daubert* and Fed. R. of Evid. 702.

Rule 702 was "intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gisiaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999). Defendant seeks to exclude Mr. Holmstead's testimony, without even deposing him, under *Daubert* and Fed. R. of Evid. 702. The Fourth Circuit's test was established from *Daubert v. Merrell Dow Pharms.*in *Westberry*, where an expert's testimony is admitted "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry,*178 F.3d 257; *see also Landis v. Hearthmark, LLC*, C.A. No. 2:11-CV-101, 2014 U.S. Dist. LEXIS 5576, at *5-6 (N.D.W.Va., Jan. 16, 2014), quoting *Daubert*, 509 U.S. 579, 592 (1993). Mr. Holmstead's testimony is not scientific in the traditional sense, but it is specialized knowledge. Few if any others have worked on CAA matters for more than 25 years in so many different capacities – a White House staffer, an attorney and lobbyist in private practice, and an EPA official – as Mr. Holmstead has done.

Furthermore, there are a multitude of cases which involve CAA experts or experts on statutes. *See United States v. Ohio Edison Co*., 276 F.Supp.2d 829 (S.D.Ohio 2003) (expert on the CAA and implementation of regulations); *United States v. Am. Elec. Power Serv. Corp*., 2005 U.S. Dist. LEXIS 46249 (S.D. Ohio 2005) (expert on NSR and PSD through the CAA); *United States v. Ala. Power Co*., 372 F.Supp.2d 1283, 1315 (N.D.Ala.2005) (expert on PSD

regulations under the CAA proffered by EPA); *United States v. ConAgra Grocery Products Co.*, LLC, 4 F. Supp. 3d 243 (D. Me. 2014) (expert on CERCLA and the soil contamination analysis required); *Adams v. United States*, 2008 U.S. Dist. LEXIS 105460 (2008) (expert on EPA's pesticide program implemented through a number of environmental statutes). Experts on statutes or regulations are recognized as having specialized knowledge. Mr. Holmstead has the requisite credentials for serving as an expert on the CAA. He helped implement the CAA Amendments with EPA, he participated in the regulatory process pursuant to the CAA on behalf of clients, and he has lobbied on CAA issues. This particular knowledge gives him a true understanding of how EPA works within the statute and within its regulatory authority.

The second part of the analysis in determining whether to exclude expert testimony is whether the expert testimony will aid the jury or trier of fact relevant to the litigation.[6] This litigation concerns the EPA's analysis of its regulations pursuant to the CAA. It will be helpful to the trier of fact here to have an expert to explain the nuance of EPA's process for rulemakings, regulatory analysis, and its effect on entities attempting to comply with the CAA. This is similar to the testimony offered in *Adams v. United States*. There, a former EPA employee who had worked in EPA's Office of Pesticide Programs (OPP) rendered an opinion that "EPA has sufficient information in 1995 to know about the concerns of sulfometuron methyl when it approved the revised labeling amendment for Oust." 2008 U.S. Dist. LEXIS 105460 at *10-11. Like Mr. Holmstead who stated that "one of the things that most impressed me was the sophistication of the regulatory analysis done by the Air Office. . . . EPA experts have developed very robust models . . .", the expert originally from the OPP sought to offer an opinion related OPP's capabilities which is covered by a variety of federal statutes. Mr. Holmstead's testimony will serve a similar function in helping the trier of fact understand EPA's process or capabilities.

---

[6] Defendant does not even address this step. Mot. to Disqualify at 14-18 [Doc. 207].

Defendant claims that Mr. Holmstead makes statements in his report which are "devoid of any discernible scientific or technical analysis or methodology . . ." Mot. to Disqualify at 17 [Doc. 207]. Defendant cites the following examples:

- "[B]ased on my experience with the power sector, I believe that the majority of these units would not have shut down had it not been for the regulatory burden imposed by EPA's recent actions." *Id*.

Again, an expert witness does not have to offer scientific or technical expertise. So long as his opinion is helpful to the jury and he has specialized knowledge, the opinion is admissible. Although Mr. Holmstead is not an economist, he has specialized knowledge of the power sector based on his representation of the regulated community. Opining that many of those units would not have shut down had it not been for EPA's regulations is information helpful to the jury or trier of fact in understanding how regulations affect the power sector and industry.

Defendant also makes the same claim regarding the following example:

- "There is no question that EPA has the expertise and resources to investigate actual and potential plant and mine closures, job losses, and shifts in employment that result from CAA regulatory and enforcement actions." *Id*.

Knowing the above information is again helpful to the jury or trier of fact because it gives insight into EPA's capabilities on carrying out an evaluation of job losses and shifts in employment, and it would take someone with specialized knowledge of EPA (on whichever side of the fence) to be able to form an opinion on that. Mr. Holmstead might have observed this during his time outside of EPA, monitoring the analyses EPA produces, or inside EPA without confidential knowledge pertaining to anything about this litigation.

## B. Mr. Holmstead Does Not Make Any Inadmissible Legal Conclusions.

Rule 702 and the Fourth Circuit do not permit an expert to make conclusions of law. *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006). Mr. Holmstead's expert report

does not contain legal conclusions, and there is a distinction between testifying to "issues that are legal in nature" and admissible expert testimony. *Am. Elec. Power Serv. Corp.*, 2005 U.S. Dist. LEXIS 46249 at *17. Although "[t]he line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern[,]" the court will "identify improper legal conclusions by determining whether 'the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *McIver*, 470 F.3d at 562, citing *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002).[7] For example, in *American Electric*, an environmental consultant was retained to speak on the application of New Source Review. *Am. Elec. Power Serv. Corp.*, 2005 U.S. Dist. LEXIS 46249 at *16-17. The expert was to "offer a description on NSR/PSD; a description of SIPs for states . . . a description of attainment or nonattainment status . . . and a description of the type of emission calculations [the defendant company] should have performed." *Id.* To the extent it was not legal in nature, the court allowed this expert testimony on the requirements of the CAA, whether the defendants met those requirements, and what the company was capable of calculating. Mr. Holmstead does just that in his expert report in regards to Section 321(a).

Examples the Fourth Circuit has cited as inadmissible legal testimony include when the expert testified that "a defendant's actions constituted 'extortion,' *McIver* at 550, citing *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005); that a dog bite constituted 'deadly force,' *Miller v. Clark County*, 340 F.3d 959, 963 n. 7 (9th Cir. 2003); that defendants held a 'fiduciary' relationship to plaintiffs, *Christiansen v. Nat'l Sav. & Trust Co.*, 221 U.S. App. D.C. 179, 683 F.2d 520, 529 (D.C. Cir. 1982); and that a product was 'unreasonably dangerous,' *Strong v. E.I.*

---

[7] For clarification, Defendant claims that "Mr. Holmstead provides a conclusion of law on the ultimate issue," but pursuant to Fed. R. of Evid. 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." *See also United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006) ("Rule 704(a) allows the admission of expert testimony that "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a).).

*DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981)." *McIver*, 470 F.3d at 562; *see also United States v. Melvin*, 508 F. App'x 209, 211 (4th Cir. 2013), citing *United States v. Perkins*, 470 F.3d 150, 159-60 (4th Cir. 2006) ("This question will often turn on . . .the extent to which this wording 'framed the term in its traditional legal context.'"). In this matter, Mr. Holmstead offers testimony similar to the testimony in *American Electric* and nothing framed in a traditional legal context. He speaks to whether EPA evaluated job losses and shifts in employment, whether such an evaluation of plant and mine closures and job losses would be credible, and whether EPA has authority to collect information for such an evaluation. Mr. Holmstead does not conclude that Section 321(a) is a mandatory duty, nor does he claim that EPA has never complied with Section 321(a), which is for the tier of fact to determine. He instead opines that "EPA has essentially ignored section 321(a) . . . since at least 1989." (Holmstead Report at 3). "[E]ssentially ignor[ing]" is not the same as making the ultimate legal conclusion that indeed, EPA has failed to comply with Section 321(a) as a mandatory duty.

Notably, there are differences between interpretation of law and underlying facts to formulate an opinion. *See McIver*, 470 F.3d 550 at 561 (finding that "questions of fact that are committed to resolution by the jury are the proper subject of opinion testimony"). For example, in *Ohio Edison Co*., the court permitted the expert's testimony "for purposes of considering the application of the CAA and the implementation of the regulations." *Am. Elec. Power*, 2005 U.S. Dist. LEXIS 46249 at *17. Mr. Holmstead does something similar in regards to EPA's evaluations of job losses and shifts in employment stemming from its regulations. In light of the legal doctrine surrounding expert testimony, none of the statements by Mr. Holmstead highlighted by Defendant are legal conclusions. Taking each of Defendant's examples, Plaintiffs show why:

- "This is probably why EPA has refused to conduct this type of analysis notwithstanding the requirements of Section 321(a)." Mot. to Disqualify at 16 [Doc. 207].

This statement speaks to EPA's capabilities and motivations. It is an underlying fact to reach an opinion on why EPA is not doing something. This is not an interpretation of the CAA. Mr. Holmstead does not say that EPA has not complied with Section 321(a). He instead states that it has refused to conduct a particular type of analysis, with or without Section 321(a).

- "EPA has essentially ignored section 321(a) of the Clean Air Act since at least 1989." *Id*.

As mentioned earlier, "essentially ignoring" is not a legal term. Ignoring carries no traditional legal implications.

- "I am not aware that EPA has made a meaningful effort during this time to disclose or even evaluate actual or potential job losses or shifts in employment resulting from the administration and enforcement of the CAA." *Id*.

As with "essentially ignoring," making a "meaningful effort" is not a legal conclusion traditionally, and the question of whether EPA has complied with Section 321(a) is still left to be determined, as the agency can comply without making effort to do so.

- "As far as I know, EPA has never made any effort to conduct continuing evaluations of the job losses or shifts in employment that result from CAA regulations." *Id*.

Once again, "making an effort" is not a legal term and it is not the ultimate issue in this case.

- "If EPA were to evaluate plant and mine closures . . ., and this evaluation found that many workers had lost their jobs . . . because of EPA regulations, such an evaluation would be highly credible because it would be viewed as an 'admission against interest.'" *Id*. at 17.

Defendant claims that the statement above attempts to show that Plaintiffs' injury is redressible. However, Mr. Holmstead does not use any traditional legal terminology, nor does the statement assert anything about the Plaintiffs in this case. His opinion speaks to usefulness and is far from a legal conclusion by any stretch of the imagination.

- "Such studies would be used in congressional oversight and regulatory advocacy and, if they show significant job losses, they would likely force EPA to scale back some it its regulatory actions." *Id*. at 17.

Using his knowledge of the regulatory process, it is Mr. Holmstead's opinion that the studies might force EPA to reconsider its actions. This opinion, however, does not say the court should issue a stay. He instead asserts an opinion on what a regulation which produces significant job losses might cause EPA to do based on his observations of the regulatory process.

- "To the extent they need more information for such an evaluation, EPA has authority to collect such information. *Id*.

This information is particularly helpful for the jury or trier of fact to know—that EPA has certain authority to collect information for a job loss evaluation. However, just because he states that EPA has the authority to collect certain information does not mean it is a legal conclusion. Mr. Holmstead does not opine that the EPA has not used its authority or that they should. Instead, he says that EPA has a legal mechanism in place to obtain certain information.

- "To the extent EPA needs to gather information, it also has authority under section 114 of the CAA to request virtually any information its analysts might need from the regulated community." *Id*.

Mr. Holmstead does not opine that EPA must use section 114 to comply with Section 321(a). Rather, he states that a good place to start to collect particular information on job losses or shifts in employment might be under a certain statute available in the CAA. How a section 114 request might work in conjunction with evaluating job losses and shifts in employment would certainly be helpful for a jury or trier of fact to know, and it does not speak to the ultimate issue in this litigation either.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask that this Court deny Defendant's motion to disqualify Mr. Holmstead and or to exclude Mr. Holmstead's testimony.

Dated: June 2, 2016

Respectfully submitted,

/s/ John D. Lazzaretti_____
J. Van Carson (Ohio Bar # 0001324)
Geoffrey K. Barnes (Ohio Bar # 0005767)
John D. Lazzaretti (Ohio Bar # 0080780)
Robert D. Cheren (Ohio Bar # 0091227)
Danelle M. Gagliardi (Ohio Bar # 0093893)
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
Tel: 216.479.8500
Fax: 216.479.8780
Geoffrey.Barnes@squirepb.com
Van.Carson@squirepb.com
John.Lazzaretti@squirepb.com
Bobby.Cheren@squirepb.com
Danelle.Gagliardi@squirepb.com

John E. Jevicky (Ohio Bar # 0012702)
Dinsmore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio 45202
Tel: 513.977.8301
John.Jevicky@dinsmore.com

Jacob A. Manning (West Virginia Bar # 9694)
Dinsmore & Shohl LLP
2100 Market St.
Wheeling, West Virginia 26003
Tel: 304.230.1604
Jacob.Manning@dinsmore.com