## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONSERVATION LAW FOUNDATION, INC.,

                Plaintiff,

    v.

SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,

                Defendants.

Case No: 3:21-cv-00933-VDO

November 3, 2025

## PLAINTIFF CONSERVATION LAW FOUNDATION'S
## OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
## THE TESTIMONY OF RICHARD HORNER, PH.D.

## <u>TABLE OF CONTENTS</u>

I.    **INTRODUCTION**................................................................................................ 1

II.   **BACKGROUND** ............................................................................................... 2

   A.   Dr. Horner's Qualifications and Experience .................................................... 2

   B.   Dr. Horner's Opinions...................................................................................... 4

III.  **LEGAL STANDARD** ........................................................................................ 5

IV.  **ARGUMENT** .................................................................................................... 7

   A.   Dr. Horner is Qualified to Give Opinions on Industrial Stormwater Management
       Systems ............................................................................................................ 7

   B.   Dr. Horner's Opinions Are Reliable................................................................11

       1.   Dr. Horner's opinions on the New Haven Terminal's Soils Are Reliable....................11

       2.   Dr. Horner's Opinions on Best Industry Practice Are Reliable ................................... 13

       3.   Dr. Horner Does Not Have to Assess Alternate Sources of Contamination ................ 15

       4.   The 2023 Storm Water Quality Manual is Supplementary to and Not Dispositive of Dr.
           Horner's Opinions Concerning a Liner Requirement .................................................... 16

   C.   The Violations of the Permit that are Alleged in Dr. Horner's Expert and Rebuttal Reports
       are Sufficiently Pled in the Complaint and Noticed in the Notice of Intent, and the Issue
       is Improperly Raised In this Motion ............................................................... 17

   D.   Dr. Horner's Opinions will not Unfairly Prejudice Defendants........................ 20

V.    **CONCLUSION** ............................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*,
754 F. Supp. 3d 456 (S.D.N.Y. 2024) ................................................................. 6, 9

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996) ................................................................................. 20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ....................................................................... 7, 11, 20

*Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*,
568 F. Supp. 3d 205 (N.D.N.Y. 2021) .................................................................... 20

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................... *passim*

*E.E.O.C. v. Morgan Stanley & Co.*,
324 F. Supp. 2d 451 (S.D.N.Y. 2004) ..................................................................... 20

*Hilaire v. DeWalt Indus. Tool Co.*,
54 F. Supp. 3d 223 (E.D.N.Y. 2014) ......................................................................... 6

*In re E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation*,
345 F.Supp.3d 897 (S.D.Ohio 2015) ......................................................................... 6

*In re Mirena IUD*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................ 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ................................................................................. 6, 7, 12, 13

*Manzo v. Stanley Black & Decker, Inc.*,
No. 13-CV-3963 (MKB), 2024 WL 5319230 (E.D.N.Y. Mar. 20, 2024) .............. 6, 9

*Melini v. 71st Lexington Corp.*,
No. 07-CV-701, 2009 WL 413608 (S.D.N.Y. Feb., 3, 2009) .................................. 20

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ...................................................................................... 5

*Pagliaroni v. Mastic Home Exteriors, Inc.*,
No. CV 12-10164-DJC, 2015 WL 5568624 (D. Mass. Sept. 22, 2015) ............ 15, 16

*Paolino v. JF Realty, LLC*,
710 F.3d 31 (1st Cir. 2013) ...................................................................................... 18

*Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.*,
208 F. Supp. 2d 423 (S.D.N.Y. 2002) ..................................................................... 20

*Stilwell v. Smith & Nephew, Inc.*,
482 F.3d 1187 (9th Cir. 2007) ................................................................................. 19

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
   878 F.2d 791 (4th Cir. 1989) ............................................................................... 10

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213
   (S.D.N.Y. 2004) ....................................................................................................... 20

**Rules**

Federal Rule of Evidence 104(a) ............................................................................... 5

Federal Rule of Evidence 401 .................................................................................... 7

Federal Rule of Evidence 702 ............................................................................. 5, 20

Federal Rule of Evidence 702(b) ............................................................................. 15

## **EXHIBIT LIST**

Exhibit A          Excerpts of the Richard Horner August 2025 Deposition Transcript

## I.     INTRODUCTION

Plaintiff Conservation Law Foundation ("CLF") brought this civil suit under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 6901, et seq. ("Clean Water Act"), and the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq. ("Resource Conservation and Recovery Act" or "RCRA") alleging violations of federal law by Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton Terminaling, LLC, and Motiva Enterprises, LLC (hereinafter, collectively, "Defendants" or "Shell[1]") at their bulk petroleum storage terminal in the Port of New Haven. *See, e.g.* Am. Compl. (ECF 47) at ¶ 1. CLF's central claim is "that the now-governing Permit required the Defendants to consider the effects of climate change in developing and implementing the Stormwater Pollution Prevention Plan ("SWPPP") for Defendants' New Haven bulk fuel storage terminal, and that the Defendants failed to comply with this requirement." ECF 641[2] at 2.  Dr. Horner, an expert on stormwater management, offers the opinion is that Defendants' stormwater management system is inconsistent with the purpose of the 2011 and 2021 Connecticut General Permit for the Discharge of Stormwater Associated with Industrial Activity (the Stormwater Permits[3]) on several grounds to be discussed further below.

---

[1] Dr. Horner's references to "Shell" are not improper because Shell PLC is the ultimate parent company of the Defendants in this case. *See* ECF 752 at fn1, see also Macey Rpt., ECF 761, at 9. Moreover, the fact Shell PLC is not a party to the case does not mean that its policies, procedures, and relationships to the Defendants are irrelevant. Information about Shell PLC is relevant and necessary to explain why, among other things, the named Defendants utilized and employed the same employees and also explains why the named Defendants worked cooperatively to operate the facility in accordance with Shell PLC's policies and procedures.

[2] Omnibus Ruling Denying Motion to Stay, Denying Motion to Strike, Vacating Ruling on Motion for Rule 37 Sanctions, and Referring Motions to Seal and to Strike.

[3] Connecticut Department of Energy & Environmental Protection (CT DEEP); General Permit for the Discharge of Stormwater Associated with Industrial Activity; Bureau of Materials Management & Compliance Assurance; Water Permitting & Enforcement Division; effective October 1, 2021, available at 20210614-gsi_reissuancenotice-websitesigned.pdf (accessed April 24, 2025) ("SWPPP 2021"). The 2021 permit was a reissuance of the 2011 permit without modifications.

Foundational to Dr. Horner's opinions are the violations in the Complaint pertaining to the discharge of industrial stormwater, best management practices, control measures, record keeping and reporting. ECF 47 at ¶ 78–84.

In their *Daubert* Motion (ECF 752), Defendants assert three unpersuasive and unsupported arguments in support of precluding Dr. Horner's opinions, namely: "(1) he is unqualified to offer them, (2) his opinions are irrelevant because the alleged violations he intends to testify about were not included in the NOI or complaint, and (3) his opinions are unreliable because they are demonstrably false or based on unsound or nonexistent methodology and principles."  Each of these assertions are false. Dr. Horner is qualified by training and experience to opine on stormwater management at the New Haven Terminal. His opinions are relevant and pertain to violations of the Permit which governs the New Haven Terminal. The violations he intends to testify about were properly alleged in the Complaint and Notices of Intent. *See* ECF No. 47-2.  Furthermore, Dr. Horner's opinions are based on his review of litigation documents produced in this case by the Defendants, his site visit, and his decades-long experience in stormwater management concerning a diverse range of industrial sites. Notably, over the several decades during which Dr. Horner has worked in stormwater management, he has borne witness to the evolution of related industry standards. He is therefore eminently qualified to opine on what Best Management Practices are for stormwater management at the New Haven Terminal. Likewise, his opinions will assist the trier of fact.

## II.     BACKGROUND

### A.  Dr. Horner's Qualifications and Experience

Dr. Horner brings 58 years of professional experience, including 43 years of teaching and conducting research at the college and university level, and 47 years focused on stormwater runoff

and surface water management. Horner Rpt., ECF 753, at 6. He holds a Ph.D. in Civil and Environmental Engineering from the University of Washington (1978) and two Mechanical Engineering degrees from the University of Pennsylvania. *Id.* Dr. Horner served as a full-time research professor at the University of Washington's Department of Civil and Environmental Engineering from 1981 to 1993. *Id. at 6.* His work has encompassed "aspects of stormwater management, including determination of pollutant sources; their transport and fate in the environment; physical, chemical, and ecological impacts; and solutions to these problems through better structural and non-structural management practices." *Id. at 7.* He has been principal or co-principal investigator on over 40 research studies, has published three books, approximately 30 peer-reviewed papers, and over 20 reviewed conference proceedings papers, and has authored or co-authored more than 100 scientific or technical reports. *Id.*

Dr. Horner participated as one of four principals in an EPA-sponsored assessment of 32 stormwater management programs across 14 states. *Id. at 8.* He was appointed to the National Academy of Sciences-National Research Council (NAS-NRC) panel on Reducing Stormwater Discharge Contributions to Water Pollution, tasked with making policy recommendations to the EPA regarding stormwater permitting. *Id.*

Dr. Horner has extensive experience with industrial stormwater permits and pollution prevention plans, including providing expert testimony in two appeals involving Washington State's Industrial Stormwater General Permits. *Id. at 9.* He has inspected numerous industrial sites, including four petroleum distribution facilities near marine waters, analyzing "sources of stormwater contamination, probable negative effects on receiving waters, stormwater pollution prevention plants, existing and potential best management practices, adherence to industrial stormwater general and industrial permit terms, and stormwater monitoring procedures and

3

results." *Id.* He served on a panel that developed an industry-specific stormwater permit for metal recyclers in California, which became a model for other Regional Water Quality Control Boards. *Id.* at 9-10. Dr. Horner has served as an expert consultant in approximately 80 legal cases. *Id.* at 9.

**B.  Dr. Horner's Opinions**

Dr. Horner's training and experience qualifies him to give opinions on the stormwater management system at the New Haven Terminal. Those opinions are that (Horner Rpt., ECF 753, at 4–6):



4



*Id*. at 4–6.

As explained more fully below, the Court should not exclude Dr. Horner's opinions because Dr. Horner's opinions meet the *Daubert* standard for admissibility set forth under the Federal Rules of Evidence and applicable precedent. See Fed. R. Evid. 104(a), 702 (advisory committee's note to 2023 amendment).

## III.    LEGAL STANDARD

District courts perform a "gatekeeping" function in deciding whether an expert's testimony is admissible under Rule 702. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993). In doing so, courts operate within the "liberal standard of admissibility" embodied by the Rule. *See Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). In defining the gatekeeping role of the Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. *Id*. at 396–97.

5

With regard to qualifications, "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc*., 754 F. Supp. 3d 456, 464 (S.D.N.Y. 2024). Furthermore, "an expert should not be required to satisfy an overly narrow test of his own qualifications, and the court's focus should be on whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id.*  In addition, "[a]n expert need not be precluded from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Manzo v. Stanley Black & Decker, Inc*., No. 13-CV-3963 (MKB), 2024 WL 5319230 (E.D.N.Y. Mar. 20, 2024) ( quoting *Hilaire v. DeWalt Indus. Tool Co*., 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014)). Extensive practical experience applied to the facts and circumstances of a case is a sufficient basis to allow a person to testify as an expert. Experience-based testimony satisfies the Rule 702 admissibility requirements. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150–51 (1999); *In re E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation*, 345 F.Supp.3d 897, 902–907 (S.D.Ohio 2015) (A state of the art or state of the knowledge expert who intends to provide experience-based testimony or an experience-based opinion may well assist the trier of fact in understanding the evidence and/or in determining a fact in issue).

If an expert meets the threshold requirement of qualification, the Court then must determine whether the expert's testimony itself is reliable. The Supreme Court has identified several factors that may be considered in assessing reliability: (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer

review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593-94) (internal quotation marks and citations omitted). These factors, however, do not constitute a "definitive checklist or test." *Kumho Tire Co.,* 526 U.S. at 150. Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of [his] testimony." *Id*.

After determining reliability, expert testimony must also be relevant—it must "help the trier of fact" (*In re Mirena IUD*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016)). Like other evidence, expert testimony is relevant if it makes any consequential fact "more probable or less probable than it would be without the evidence" (Fed. R. Evid. 401).

## IV.    ARGUMENT

### A.  Dr. Horner is Qualified to Give Opinions on Industrial Stormwater Management Systems

As noted in his expert report and discussed above, over the last 47 years Dr. Horner has been researching, teaching and consulting in the area of stormwater runoff and surface water management. Horner Rpt., ECF 753, at 6. All of his teaching, research, and consulting concern

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id*. at 7.

Dr. Horner was appointed as a member of the National Academy of Sciences-National Research Council (NAS-NRC) on Reducing Stormwater Discharge Contributions to Water Pollution. *See id*. at 8. This panel was formed of experts qualified to make findings on stormwater

7

discharges, impacts to water resources, the science of stormwater management and provide their findings to make policy recommendations to the U.S. Environmental Protection Agency, relative to municipal, industrial and construction stormwater permitting to the federal government. *Id*. As a result of its findings, a final report was issued to the public in October of 2008. *Id*.

Dr. Horner also has experience pertaining specifically to industrial stormwater permits[4] and stormwater pollution prevention plans. *Id*. at 9.  For example, he performed analyses and provided expert testimony in two appeals of the state of Washington's Industrial Stormwater General Permits. *Id*. at 9. He has inspected numerous industries of various sizes to ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████  *Id*. As in this case, he has also inspected four other industrial sites that receive and distribute petroleum products by land and are located in proximity to marine waters. *Id*. He, likewise, ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id*. While he does have substantial experience as an expert consultant in some 80 legal cases, he is also recognized for his objective expertise and extensive practical experience. Notably, Dr. Horner helped draft an industry-specific industrial stormwater permit (for metal recyclers) under the

---

[4] Dr. Horner's Industrial Stormwater Management experience in industrial cases is listed in Attachment C of his CV and includes: Girard Resources & Recycling LLC 2023; Pacific Pile & Marine LP 2023; UFP Washington LLC 2023; Pick-Your-Part Auto Wrecking 2022; Corona Clay 2019, 2022-2023; Willis Enterprises, Inc. 2022; Watkins Manufacturing 2019; Fruhling Sand and Topsoil, Inc. 2019; Port of Olympia 2019; Trojan Battery Company 2018; Seattle Iron and Metals 2018; Rainier Petroleum Corporation 2015; Whitley Manufacturing Company, Inc. 2015; Seattle Iron & Metals 2014; Levin Enterprises, Inc. 2014; BNSF Railroad Company 2011; Kramer Metals, Inc. 2008; International Metals, Ltd. 2008. *See* Horner Tr., Ex. A at 226–228.

jurisdiction of California's Santa Ana Regional Water Quality Control Board. *Id*. at 9. The resulting permit was in effect for about six years and then it was reissued and is a model for storm water permits in other California Regional Water Quality Control Boards.  *Id*. at 9–10. Dr. Horner also was appointed as a special master by Judge Christina A. Snyder of the Federal Court for the Central District of California to offer advice on bringing a Los Angeles automobile recycling yard into compliance with the terms of a consent decree entered into with a citizen environmental group regarding an industrial stormwater permit *Id*. at 9.

Accordingly, far from "no experience,"[5] Dr. Horner has both educational and experiential qualifications in drafting, reviewing and evaluating stormwater permits, even if not specifically for bulk petroleum facilities in Connecticut. He also, as stated above, has experience evaluating stormwater programs around the country, including in the Northeast. Such qualifications are "in a general field closely related to the subject matter in question." *Am. Empire Surplus Lines Ins. Co.,* 754 F. Supp. 3d at 464; *see also Manzo,* 2024 WL 5319230 at *8 ("An expert need not be precluded from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.").  Dr. Horner is not required to satisfy an overly narrow test of his qualifications.  His knowledge of stormwater management and his vast experience in the field is such that his opinion will likely assist the trier of fact in arriving at the truth. *See Am. Empire Surplus Lines Ins. Co.,* 754 F. Supp. 3d at 464.

---

[5] Defendants argue: "[a]s its main witness for Plaintiff's "permitting" allegations at the New Haven Terminal, instead of offering a witness with directly relevant experience for the issues in this lawsuit, Plaintiff put up Dr. Horner, from Seattle, Washington, who has **no** experience with the CT DEEP industrial stormwater permit, **no** experience with petroleum bulk storage facilities, **no** experience with SWPPPs (the document that Plaintiff alleges should have included the "climate change" requirement), and **no** experience with designing secondary containment for stormwater permits. Nor has Dr. Horner ever been a licensed engineer in any state, much less the State of Connecticut, although the Permit itself requires any engineer offering opinions on the Permit to be licensed in Connecticut." ECF No. 752 at 10.

Furthermore, Dr. Horner's experience is not "stale" as Defendants argue. *See* ECF No. 752 at 18. In support of this argument, Defendants cite a 4th circuit case from 1989 regarding an expert witness who offered testimony on whether a shift in credit practices was unjustified credit discrimination and price discrimination under § 13(a) of the Robinson–Patman Act. *Thomas J. Kline, Inc. v. Lorillard, Inc*., 878 F.2d 791, 799 (4th Cir. 1989). In *Lorillard*, the expert's "highest level of education" was a master's degree in business administration, obtained about seven years prior to the trial. *Id*. During her entire career she had published only one article, a piece which had nothing to do with price discrimination, credit, or antitrust generally. *Id*. Furthermore, her work experience was limited largely to analyses of companies' financial health, and her employer devoted most of its efforts to providing expert testimony in trials of complex business cases. *Id*. The expert admitted that she had no personal experience in making credit decisions. *Id*. The court held that not one of these factors on its own was disqualifying, but, taken together, the minimal requirements of Rule 702 were not met. *Id*. at 800.

The *Lorillard* case is not analogous here. Dr. Horner has spent his 58-year career evaluating stormwater management systems in the context of teaching, litigation, consulting, and research. His experience includes work on very recent industrial stormwater permits across a wide variety of industries. *See supra* fn 2. In addition, Dr. Horner testified that only about forty-percent of his income is derived from his litigation-consulting work. Horner Tr., ECF 754, at 34:10–13. The remaining sixty-percent is from non-litigation consulting work. *Id*. at 14–16. Far from "stale," his experience in this relevant field grows year over year as a variety of clients hire him to evaluate their stormwater management systems.

For all the above reasons, Dr. Horner is eminently qualified by his education, training and experience to give opinions on the New Haven Terminal's stormwater management system and Defendants' lack of compliance with the Permits.

**B. Dr. Horner's Opinions Are Reliable**

In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See Daubert*, 509 U.S. at 590, 595, 113 S.Ct. 2786; *see also Amorgianos*, 137 F.Supp.2d at 162. In formulating his opinions, Dr. Horner relied extensively on discovery materials produced in the course of this litigation. *See generally* Horner Rpt., ECF 753. Specifically, his opinions are primarily based on his review of Defendants' Stormwater Pollution Prevention Plan dated July 2017 (2017 SWPPP) and the Spill Prevention and Controls Countermeasure Plan ("SPCC") Guidance for Regional Inspectors[6]. Horner Rpt., ECF 753, at 10, 15. His opinions are also based on his observations during his April 10, 2025 site visit[7] where he investigated New Haven Terminal's stormwater management system including its storm water drainage system, containment areas, bypass pipe, above-ground storage tanks ("ASTs"), and soils. *See id.* at 10–14.

**1. Dr. Horner's opinions on the New Haven Terminal's Soils Are Reliable**

To evaluate the soils at the New Haven Terminal, Dr. Horner primarily relied on litigation documents from Sovereign Consulting, Inc. who reported on an investigation of the Terminal's

---

[6] SPCC Guidance for Regional Inspectors; Prepared by Regulation and Policy Development Division of the APA Office of Emergency Management; December 16, 2013 ("SPCC Guidance").

[7] Defendants criticize Dr. Horner for only visiting the site for a few hours and for not independently testing the soils at the site. However, it should be noted that CLF had to file a motion with this Court to obtain any site visit at all for Dr. Horner. *See* ECF No. 548.

soils and hydrogeologic environment in 2022 and issued a remediation plan in 2023. Horner Rpt., ECF 753, at 16. Sovereign's 2022 report █████████████████████████████████████████

████████  ███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ He also personally inspected the surface soil in his site visit[8] in April 2025. Thus, his methodology in evaluating the soil type is not "simply a subjective, conclusory approach that cannot reasonably be assessed for reliability."  *See Daubert*, 509 U.S. at 593–94.

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Dr. Horner

---

[8] Dr. Horner testified that his site visits were "three or four hours" at each of the four other industrial sites that he investigated which were similar to the New Haven Terminal in that they receive and distribute petroleum products by land and are located on or near marine waters. *See* Horner Tr., ECF 754, at 36:4–37:1. Thus, Dr. Horner's opinions are based on "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co.*, 526 U.S. 137, 152 (1999).

applied the controlling language of the General Permit and the SPCC, in accordance with his knowledge and expertise, to the facts originating from Defendants' own investigations and provided opinions that, more likely than not, the Terminal's secondary containment is not currently as impermeable as it is required to be to prevent the illegal discharge of pollutants, in violation of the Clean Water Act. This is not an *ipse dixit* conclusion nor is it "basic reading comprehension" as the Defendants would like this Court to believe. *See* ECF No. 752 at 14, 19, 26. He applied the same intellectual rigor in formulating these opinions that he would have at any site he investigates. *See Kumho Tire Co.*, 526 U.S. at 152 (A significant objection of the Rule 702 *Daubert/Kumho Tire* analysis is to ensure that "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

### 2. Dr. Horner's Opinions on Best Industry Practice Are Reliable

Next, Defendants contend that Dr. Horner is not qualified to opine on "best industry practices," alleging that he did not do any research in support of his opinions on what constitutes the same. However, as Dr. Horner explained during his deposition in discussing his impermeability opinion: "The permit requirement is crystal clear. The containment must be able to hold 100 percent of the contents of the largest tank." Horner Tr., Ex. A, at 205:16–21. Dr. Horner investigated the impermeability issue in the context of the 100% impermeability requirement in the permit and the related language in the SPCC. He then evaluated and proposed solutions to the issue, helpfully providing context to what the Stormwater Permit requires when it states that the permittee must "implement[] stormwater controls that are technologically available and economically practicable and achievable at the level of best industry practice." *Id.* at 30. Dr. Horner also addressed best industry practice in his deposition stating:

Well, for example, for the stormwater system we quite extensively discussed the investigation that I conducted. You know, first, I'm very familiar with treatment systems that perform better than a pond. Secondly, I investigated how many are in service to determine for myself, is this, you know, at the best level of industry practice?

*Id.* at 206:1–8.

On the question of whether best industry practice must take into account the specific industry, Dr. Horner agreed but distinguished the issue as follows:

Q. And BIPs [Best Industry Practices] are generally accepted practices in a given industry and it may not be applicable to others, right?
A. I interpret it more broadly. It is not industry-by-industry, but industry that discharged stormwater, in my field. And this is the way it is definitely used in Washington and California. And I believe the intention is the same in Connecticut. It is not specific to industry-by-industry, but those under the industrial stormwater permit have a obligation to use the best practices that the market provides.
Q. Is it your testimony that those best industry practices apply based on your experience and knowledge of stormwater management, rather than specific industry practice?
A. The SPCC and the permit have very clear language. It's unexceptional. That is what it's based on. I understand what impermeable means. I understand what sufficient volume of containment means, to be cleaned up before it has a chance to escape. That's what it is based on.

*Id.* at 61:6–22; 91:22–25; 92:1–12.

Relatedly, Dr. Horner opined in his Expert Report that, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ *See* Horner Rpt., ECF 753, at 5–6. Dr. Horner also testified that climate change

considerations should be more integral to the management and procedures at the Terminal.  Horner

Tr., ECF 754, at 202: 4–25; 203:1–9. He said, "larger and more storms are predicted and that

affects the operation of the stormwater pond and of the collection within the secondary

containments. And I haven't seen the evidence that that's been taken into account." *Id.* at 203:11–

20. ████████████████████████████████████████████████████████

14

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ Dr. Horner's expert opinions are tethered to the

facts of this case and the unambiguous Permit requirements regarding impermeability and meet

the reliability prerequisite of *Daubert*.

### 3. Dr. Horner Does Not Have to Assess Alternate Sources of Contamination

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ There is no

requirement that experts consider every conceivable cause – here, every conceivable source of

pollution - in developing their opinions. *Pagliaroni v. Mastic Home Exteriors, Inc*., No. CV 12-

10164-DJC, 2015 WL 5568624 at *7 (D. Mass. Sept. 22, 2015) ("[a]s long as the expert opinion

meets the requirements of Rule 702, there is no additional requirement that an expert eliminate all

alternative possible causes in offering a differential diagnosis."). The *Daubert s*tandard requires

"sufficient facts or data" not *all* potentially applicable facts and data. *See* Fed. R. of Evid. 702(b).

"As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'

it should be tested by the adversary process—competing expert testimony and active cross-

examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Pagliaroni,* 2015 WL 5568624 at 7. (citing *Daubert*, 509 U.S. at 590). Defendants can attempt to present evidence of alternate sources of contamination as part of their case, to the extent such evidence exists, and can seek to cross-examine Dr. Horner on such evidence. Dr. Horner is not required to include such information as part of his expert analysis, as it is not relevant to the question of whether stormwater from Defendants' Terminal can contaminate New Haven Harbor due to Defendants' violations of the Permit.

Defendants claim that Dr. Horner failed to analyze water quality data from New Haven Harbor. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Regardless of New Haven Harbor's water quality status and other potential sources of contamination, Defendants remain obligated to meet permit requirements for minimizing pollutant discharge.

**4. The 2023 Storm Water Quality Manual is Supplementary to and Not Dispositive of Dr. Horner's Opinions Concerning a Liner Requirement**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

16

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

given its effective date, also has provisions concerning liners that inform Dr. Horner's opinions as detailed at length in his deposition testimony. *See* Horner Tr., Ex. A, at 212:16–25; 213–220. Defendants are free to test the sources Dr. Horner relied on related to a liner requirement, but this is a matter for cross-examination rather than a basis for excluding his expert testimony.

### C. The Violations of the Permit that are Alleged in Dr. Horner's Expert and Rebuttal Reports are Sufficiently Pled in the Complaint and Noticed in the Notice of Intent, and the Issue is Improperly Raised In this Motion

Defendants argue that Dr. Horner's opinions are not relevant because they include issues that are not addressed in the Amended Complaint or the NOI.  ECF No. 752 at 20–22.  As an initial matter, the question of whether CLF's notices of intent to sue provided adequate notice—they did—is a disputed issue, is potentially dispositive of certain claims, and is therefore improper for resolution under Rule 702 and its focus on admissibility of expert testimony.  Defendants fail to cite any cases resolving the adequacy of citizen suit notice through Rule 702 motions and are also now proposing to (again) address this issue in a motion for summary judgment.  *See* ECF 806 (letter brief filed by Defendants Equilon Enterprises, LLC and Triton Terminaling LLC).

As this Court already explained after Defendants raised the notice issue in a seven-page letter brief, "the Court should not resolve this dispute on the basis of a table listing allegedly

17

improper opinions and the notice of intent to sue along alongside a few lines of briefing from either party. The underdeveloped nature of this exchange demonstrates why a motion to resolve these theories or claims as a matter of law is required.  If the Defendants seek to raise this and their other theories, they remain free to do so, but not outside of the process contemplated by the Federal Rules of Civil Procedure."   ECF 641 at 10. Defendants ignored this Court's instruction and included in their Rule 702 motion another table alongside *fewer* lines of briefing than before. *Compare* Defs.' Letter Brief Motion to Strike Improper Expert Opinions (ECF No. 601) with their instant motion (ECF No 734-1 ) at 20-24 without providing any support that Rule 702 motion is appropriate for resolving the adequacy of citizen suit notice as a matter of law, this Court should strike Defendants' argument.

To the extent the Court decides to address the Defendants' NOI argument in the context of Defendants' Rule 702 motion, the argument fails.  In assessing whether expert testimony is "relevant to the task at hand" under Rule 702, the court considers whether the proffered testimony "logically advances a material aspect of *the proposing party's case*."  *Daubert,* 43 F.3d at 1315 (emphasis added).  That test is met here.  In fact, Dr. Horner's opinions exemplify *Paolino's* principle that "investigating one aspect of an alleged violation" necessarily brings "other aspects...under scrutiny." *Paolino v. JF Realty, LLC*, 710 F.3d 31, 38 (1st Cir. 2013). Accordingly, all of the violations Dr. Horner identifies are interconnected and properly within the scope of CLF's NOI. Defendants' *Daubert* motion should be denied.

Defendants assert that Dr. Horner, in reviewing the NOI during his deposition, "admitted" that they did not contain any allegation or claim that: the Terminal had "inadequate capacity of secondary containment," the "soil failed to meet a 'permeability' requirement," the secondary areas should include a liner," and the "bypass was inadequate." ECF No. 752 at 23. This is a

mischaracterization of his testimony. He explained that a particular word or phrase does not have to be included to understand the nature of the violation.  For example he said:

> A. Now, if you are asking me if I see the word "bypass." At the bottom of page 10 [NOI] I've not seen the word "bypass." However, I do see that the requirement—the permit requires that the SWPPP shall map and describe potential sources of pollutants that may reasonably be expected to affect stormwater quality at the site or that may result in the discharge of pollutants during dry weather from the site. That could include the bypass (Horner Tr., ECF 754 at 165:17-25). Followed by:

> A. I did not see the words "inadequacy of secondary containment." However, I still maintain the general statement that I read to you earlier is a requirement to consider all specific sources of contamination, and that would be one

Horner Tr., ECF 754, at 166:4–8.

Dr. Horner testified that his findings reveal fundamental secondary containment failures including inadequate capacity (Horner Tr., ECF 754, at 165:2–166:8), soil permeability failures (166:9–166:11), need for liners (166:12–166:19), and an inadequate bypass system (166:21–25). Critically, for these opinions, Dr. Horner relies on what Defendants knew of these deficiencies three years before the NOI, when Triton Environmental informed Defendants of deficiencies in the secondary containment that Defendants subsequently failed to correct. (Horner Rpt., ECF 753, at 18–19).  Dr. Horner describes the installation of the 12-inch bypass pipe between containment areas as a "grossly insufficient" workaround (*Id*. at 30–32).

Defendants' argument that Dr. Horner's opinions are not relevant because they include issues that are not addressed in the Amended Complaint or the NOI is simply wrong.  Because there is "a link between the expert's testimony and the matter to be proved[,]" S*tilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (citation omitted), the relevance test is met for purposes of Rule 702 and Dr. Horner's testimony is admissible.

Finally, to the extent Defendants' motion to exclude Dr. Horner's testimony is premised on the outcome of their anticipated motion for summary judgment, their motion is premature and should be denied at this time.

### D.  Dr. Horner's Opinions will not Unfairly Prejudice Defendants

As established above, Dr. Horner's qualifications are exemplary, his opinions are relevant to the key issues of this case, and his methodology is articulated and highly reliable. Moreover, the probative value of Dr. Horner's testimony is very high and will help the trier of fact. Defendants have failed to articulate any material issues in the relevancy or reliability of Dr. Horner's opinions. "Any purported weakness in [Dr. Horner's] methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 133–35 (D.C. Cir. 1996)). As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205 (N.D.N.Y. 2021), quoting Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.' " *Melini v. 71st Lexington Corp.*, No. 07-CV-701, 2009 WL 413608, *5 (S.D.N.Y. Feb., 3, 2009) (quoting *Amorgianos*, 303 F.3d at 267).

Dr. Horner easily meets the *Daubert s*tandard of admissibility and his testimony and his opinions should be admitted in this case.

### V.    CONCLUSION

For the foregoing reasons, CLF respectfully requests that the Court deny the *Daubert* motion to preclude the testimony of Dr. Horner.

Dated: November 3, 2025

Respectfully submitted,

CONSERVATION LAW FOUNDATION, Inc., by its attorneys

*/s/ Shalom Jacks*

Shalom Jacks (phv208834)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9013
E-mail: sjacks@motleyrice.com

James Y. Meinert (ct31637)
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110
Tel: (617) 850-1744
E-mail: jmeinert@clf.org

Christopher M. Kilian (ct31122)
Kenneth J. Rumelt (phv207130)*
Anna Tadio (phv208827)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3020
Tel: (802) 622-3009
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org
E-mail: atadio@clf.org

Ana McMonigle (ct31370)
Conservation Law Foundation, Inc.
195 Church Street, Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
E-mail: amcmonigle@clf.org

James Crowley (ct31319)

21

Conservation Law Foundation, Inc.
235 Promenade Street, Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street, Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Devin Williams (phv208833)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
E-mail: rmazingo@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC

22

40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

*Attorneys for Plaintiff
Conservation Law Foundation, Inc.*

*\*Admitted as Visiting Attorney*

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 3, 2025, the foregoing motion was filed through the Court's electronic filing system ("ECF"), through which the document is available for viewing and downloading from the ECF system, and a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Shalom Jacks*_____
Shalom Jacks