# EXHIBIT A

**to Plaintiff Conservation Law Foundation's Opposition to Defendants' Motion to Exclude the Testimony of Richard Horner**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF CONNECTICUT
    _____
 3
    CONSERVATION LAW FOUNDATION,      )
 4  INC.,                             )
                 Plaintiff,           )
 5                                    )
          vs.                         )
 6                                    ) Case No.
    EQUILON ENTERPRISES LLC D/B/A     ) 3:21-cv-00933-VDO
 7  SHELL OIL PRODUCTS US, TRITON     )
    TERMINALING LLC, and MOTIVA       )
 8  ENTERPRISES LLC,                  )
                                      )
 9              Defendants.           )
    _____
10
     VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF
11
                  RICHARD R. HORNER, Ph.D.
12  _____
13
14              MONDAY, AUGUST 11, 2025
15                  9:05 A.M. PST
16
17              Veritext - Seattle, WA
18           1200 Sixth Avenue, Suite 610
19               Seattle, WA 98101
20
21
22
23
24  JOB No. ATL 7530788
25  REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322
```

Richard R. Horner , Ph.D.                August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

```
 1                    A P P E A R A N C E S
 2     FOR THE PLAINTIFF:
 3           MOTLEY RICE LLC
             Elizabeth Smith
 4           401 9th St. NW
             Suite 1001
 5           Washington, DC 20004
             (401) 457-7700
 6            Esmith@motleyrice.com
 7           MOTLEY RICE LLC
             Shalom D. Jacks
 8           28 Bridgeside Boulevard
             Mount Pleasant, SC 29464
 9           (866) 604-2715
             Sjacks@motleyrice.com
10
11     FOR THE DEFENDANTS:
12           KING & SPALDING LLP
             Carmen R. Toledo
13           1180 Peachtree Street NE
             Suite 1600
14           Atlanta, GA 30309
             (404) 572-3438
15           Ctoledo@kslaw.com
16
17
18
       ALSO PRESENT:  ADAM SWEETS, VIDEOGRAPHER
19
20
21
22
23
24
25
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 3

```
1                          I N D E X
2     EXAMINATION BY:                           PAGE(S)
      MR. TOLEDO                                5,229
3     MS. SMITH                                   208
4
5
6     EXHIBITS FOR IDENTIFICATION                  PAGE
      Exhibit 1     Notice of Deposition Richard      10
7                   Horner
      Exhibit 2     Richard Horner Original Report    15
8     Exhibit 3     Richard Horner Rebuttal Report    15
      Exhibit 4     Robert Horner Invoices            20
9     Exhibit 5     NOI                               33
      Exhibit 6     NOI                               33
10    Exhibit 7     Connecticut DEEP guidance document 40
                    for preparing a SWPPP
11    Exhibit 8     2009 Report Urban Stormwater      54
                    Management in the United States
12    Exhibit 9     Aerial photograph of New Haven    70
                    Terminal and nearby facilities
13    Exhibit 10    Flood Preparedness Fact Sheet by  106
                    Region 6 Regional Response Team
14                  Executive Committee
      Exhibit 11    EPA Inspection Document           115
15    Exhibit 12    Connecticut Stormwater Quality    119
                    Manual
16    Exhibit 13    RPMS Document                     127
      Exhibit 14    Survey Drawings Bates page ending 132
17                  56
      Exhibit 15    2018 Connecticut General Permit   138
18    Exhibit 16    Table 4.2 from Stormwater Manual  171
      Exhibit 17    Notes of Connecticut DEEP meeting 180
19    Exhibit 18    Richard Horner Calculations       185
      Exhibit 19    Letter Report from Sovereign      189
20                  Consulting to Jennifer Bothwell
      Exhibit 20    Meteorological and Oceanographic  199
21                  Design and Operating
                    Considerations Offshore, Coastal,
22                  and Onshore from February2017
      Exhibit 21    Excerpts from the 2004 Connecticut 213
23                  Stormwater Quality Manual
      Exhibit 22    Excerpts from 2004 Stormwater     229
24                  Quality Manual
25
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 205

1          I wanted to ask you finally about the

2    methodology that you used in reaching your opinions.

3          Can you describe for me the methodology that

4    you employed in reaching your opinions about these

5    various violations that you claim the terminal has

6    relating to stormwater?

7          A.   Well, to really answer your question properly,

8    I think we need to go violation by violation.  And I

9    think I laid it out in my report, for example, that

10   ██████████████████████████████████████████████

11   ███████████████████████████████████████████████

12   ███████████████████████████████████████████████

13   ████████████████████████████████████████████

14   █████████████████████████████████████████████████

15   ████████████   That's my basis.

16         Q.   Did you perform any independent research about

17   what the permit requirements are before reaching these

18   opinions?

19         A.   The permit requirement is crystal clear.  The

20   containment must be able to hold 100 percent of the

21   contents of the largest tank.

22         Q.   What about your opinions about best industry

23   practice?   Did you conduct any research or industry

24   survey, however you define industry, of what

25   constitutes best industry practice?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 206

1      A.   Well, for example, for the stormwater system

2   we quite extensively discussed the investigation that I

3   conducted.

4          You know, first, I'm very familiar with

5   treatment systems that perform better than a pond.  And

6   secondly, I investigated how many are in service to

7   determine for myself, is this, you know, at the best

8   level of industry practice?

9      Q.   And I believe we established that you had no

10  communications and conducted no research concerning

11  best industry practices if we define the industry as

12  bulk petroleum storage terminals?

13     A.   No --

14             MS. SMITH:  Objection to form.

15          Go ahead.

16             THE WITNESS:  Because permits, the three

17  that I'm familiar with at least, do not distinguish in

18  that way.  They may have some special requirements for

19  different industrial categories, SIC codes, you know,

20  for example, S-I-C, standard industrial classification.

21  But the terms overall of the permits apply to

22  industries in general.

23   BY MS. TOLEDO:

24     Q.   So the answer is, no, you did not conduct any

25  research specifically as to practices performed by the

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 207

1    bulk petroleum storage terminal industry?

2                    MS. SMITH:  Objection to form.  Asked

3    and answered.  And outside of the scope of his report.

4                    THE WITNESS:  I didn't, nor did I have

5    to.

6     BY MS. TOLEDO:

7         Q.  Do you agree that a scientifically reliable

8    methodology is required to reach reliable expert

9    opinions?

10                   MS. SMITH:  Object to the form.  It

11   calls for a legal conclusion.

12                   THE WITNESS:  When one's opinion is, for

13   example, whether a secondary containment is able to

14   hold 100 percent of the contents of the largest tank,

15   the scientific exercise is to perform a calculation,

16   which I did.

17    BY MS. TOLEDO:

18        Q.  Okay.  So let me see if I understand it

19   correctly.

20            You reviewed the permit and the permit

21   requirements, and then you performed the calculations;

22   is that correct?

23        A.  That's correct.

24                   MS. SMITH:  Objection to form.

25    BY MS. TOLEDO:

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 208

1      Q.   And that is basically the same methodology you
2  followed for the other opinions; for example
3  permeability.  Is that right?  You reviewed the -- the
4  permit and then you evaluated conditions at the site?
5      A.   I relied on the available information that I
6  had at hand; that is, information that is derived from,
7  you might say, a scientific process of taking
8  measurements.  And somebody took measurements, and I
9  relied on those measurements.
10     Q.   But you took no samples, correct?
11     A.   I took personally took no samples.
12               MS. TOLEDO:  Okay.  That is all I have
13  for the moment.  I will pass the witness and reserve
14  the rest of my time.
15               MS. SMITH:  Okay.  Great.
16                    CROSS-EXAMINATION
17  BY MS. SMITH:
18     Q.   So we'll go ahead and get started.  We may
19  have to stop because we're waiting on a document.
20          But starting with the issue you just discussed
21  with counsel, is your methodology described in your
22  report with regard to what you evaluated and what you
23  did to reach each of your conclusions?
24     A.   Yes.  I think I was fairly quite complete in
25  laying out my methodology.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 209

1      Q.  You were previously asked some questions about

2  the business continuity plan and the hurricane

3  preparation plan.

4          Do you recall that?

5      A.  Yes.

6      Q.  In your -- in evaluating the sufficiency of

7  secondary containment, do you need to review the

8  hurricane preparation plan?

9      A.  No.

10      Q.  Do you need to review the business continuity

11  plan to determine whether the secondary --

12              (Reporter clarification.)

13   BY MS. SMITH:

14      Q.  Do you need to review the business continuity

15  plan in order to analyze the discreet issue of whether

16  the secondary containment is sufficient?

17              MS. TOLEDO:  Object to form.

18              THE WITNESS:  I do not have to.  I

19  merely have to make a calculation to determine if it is

20  able to accept 100 percent of the contents.

21   BY MS. SMITH:

22      Q.  In order to determine whether the soils are

23  impermeable, do you need to review the hurricane

24  preparation plan?

25              MS. TOLEDO:  Object to form.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 210

1            THE WITNESS:  No.

2    BY MS. SMITH:

3        Q.  Do you need to review the business continuity

4    plan in order to determine whether the soils at the

5    terminal are impermeable?

6            MS. TOLEDO:  Object to form.

7            THE WITNESS:  I don't.

8    BY MS. SMITH:

9        Q.  In assessing whether the bypass pipe is

10   sufficient, do you need to review the business

11   continuity plan for the terminal?

12           MS. TOLEDO:  Object to form.

13           THE WITNESS:  No.

14   BY MS. SMITH:

15       Q.  Do you need to review the hurricane

16   preparation plan in order to determine whether the

17   bypass pipe is sufficient and complies with the permit?

18           MS. TOLEDO:  Object to form.

19           THE WITNESS:  I do not.

20   BY MS. SMITH:

21       Q.  Do you normally review a facility's hurricane

22   preparation plan when you are evaluating a SWPPP?

23       A.  We don't have hurricanes on the West Coast.

24       Q.  Tsunami preparation plan.  No, strike that.

25           Do you normally review a business continuity

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 211

1    plan when you are assessing whether or not the facility

2    complies with a SWPPP?

3          A.   I have never run into a business continuity

4    plan.

5          Q.   You were asked some questions about soil

6    samples.

7               Do you recall that?

8          A.   Yes.

9          Q.   And whether or not the soil contained fill.

10              Do you recall that?

11         A.   Yes.

12         Q.   If the soil contained fill, would that be

13   reflected in the soil samples that are taken from the

14   site?

15              MS. TOLEDO:  Object to form.  Calls for

16   speculation.

17              THE WITNESS:  Yes.  The boring would

18   proceed through the soil, whatever it is.  So it would

19   come up and be analyzed regardless of the origin of

20   that soil, imported or native.

21    BY MS. SMITH:

22         Q.   And you reviewed, and I believe discussed in

23   your report, a document ██████████████████████

     ███████████████████████; is that right?

25              MS. TOLEDO:  Object to form.  Leading.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 212

1    BY MS. SMITH:

2        Q.  Let me rephrase that.

3            Did you review a document ████████████

█    ██████████████████████████████

5        A.  ████████████████████████

6    █████████████████████████████████████████

7    ████████████

8        Q.  And would you expect a sample from 2024 to

9    have -- well, strike that.

10           Would you expect that samples from 2024 would

11   be different of from the samples from 2022?

12       A.  I certainly do not.

13       Q.  Let's turn to your report to Page 20,

14   subsection F.  Let me know when you're there.

15       A.  Yes.

16       Q.  So the first sentence of this subsection

17   states, ██████████████████████████████████████

█    ████████████████████████████████████████████

█    ██████████████████████████████████████████

█    ██████████████████████████████████████████

█    ███████████████████████████████████

█    ██████████████████████

23           Did I read that correctly?

24       A.  Yes.

25       Q.  And you and counsel for defendants have had

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 213

```
 1   some discussion about the 2023 Stormwater Quality
 2   Manual versus the 2024 manual, correct?
 3                  MS. TOLEDO:  Object to form.
 4    BY MS. SMITH:
 5        Q.  I messed that up.
 6        A.  I believe you mean the 2004 --
 7        Q.  Right.
 8        A.  -- compared to the 2024.
 9        Q.  Thank you.  Compared to the 2024, yes.
10        A.  Yes.
11        Q.  And the next sentence in this section you
12   state, ███████████████████████████████████████
     ██████████████████████████████████████████████
     ██████████████████████████████████████████████
     ██████████████████████████████████████████████
     ███████████
17             Did I read that correctly?
18        A.  Yes.
19        Q.  I'm going to mark as an exhibit some excerpts
20   from the 2004 Connecticut Stormwater Quality Manual.
21                  (Exhibit 21 marked for identification.)
22    BY MS. SMITH:
23        Q.  And if you'll turn to the first excerpted page
24   after the cover page and look at the bottom left-hand
25   paragraph.
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 214

1          This 2004 manual discusses land uses or

2     activities with potential for higher pollutant loads as

3     well, correct?

4          A.   Correct.

5          Q.   And in the next sentence of your report you

6     state, ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██   ████████████████████████████

11          Do you see that in your report?

12          A.   Yes.

13          Q.   And if you'll turn to the second page of this

14    2004 Stormwater Quality Manual, you'll see Table --

15    here's Table 7-5, Land Uses for Activities with

16    Potential for Higher Pollutant Loads.

17          Do you see that?

18          A.   Yes.

19          Q.   And the first bullet under that talks about

20    industrial -- does it talk about industrial facilities?

21          A.   Yes, it does.

22          Q.   Can you read that first bullet for us, please?

23          A.   "Industrial facilities subject to the DEP

24    Industrial Stormwater General Permit or the U.S. EPA

25    National Pollutant Discharge Elimination System, NPDES,

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 215

1    stormwater permit program."

2         Q.  So under this 2004 manual, is the terminal

3    also considered land use or activity with potential for

4    higher pollutant load?

5         A.  Yes.

6              MS. TOLEDO:  Object to form.

7              THE WITNESS:  It's identical in its

8    classification with both manuals.

9     BY MS. SMITH:

10        Q.  Now, in the next sentence of your report, you

11   discuss -- you state -- correct me if I'm reading this

12   correct -- please let me know if I'm reading this

13   correctly.

14                ████████████████████████████████████

     ██ ████████████████████████████████████████████████

     ██ ████████████████████████████████████████████████

     ██ █████████████████████████████████████████████████

     ██ ███████████████████████████████████████████

     ██ ████████████████████████████████████████

     ██ ████████████████████████████████████████████████

     ██ █████████

22              Do you see that?

23        A.  Yes.

24        Q.  And if you'll look at the 2004 permit, does

25   this also talk about infiltration of stormwater

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 216

```
 1   contaminating public and private groundwater supplies
 2   potentially?
 3                MS. TOLEDO:  Object to form.
 4                THE WITNESS:  On Page 8-5 it discusses
 5   infiltration capacity.
 6    BY MS. SMITH:
 7        Q.  And on Page 7-7, do you see on the bottom
 8   left-hand corner where we were reading before where it
 9   states, "Infiltration of stormwater from these land
10   uses or activities, also referred to as stormwater hot
11   spots, can contaminate public and private groundwater
12   supplies."
13                Did I read that correctly?
14        A.  Yes.
15        Q.  And is this language in the 2004 manual
16   consistent with the language ███████████████████████
17   █████████████████████████?
18        A.  Yes.
19                MS. TOLEDO:  Object to form.
20                THE WITNESS:  It's, again, consistent,
21   yes.
22    BY MS. SMITH:
23        Q.  In your report, you discuss ████████████████
     ██ ███████████████████████████████████████████████████
     ██ ███████████████████████████████████████████████████
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 217

1    ███████████████████████████████████████

2    ███████████████████████████████████████

3          Do you see that?

4       A.  Yes.

5       Q.  And if you look at the 2004 manual, it also

6    discusses that infiltration of storm -- or does it --

7    let me strike that and say, does it discuss that

8    infiltration of stormwater from these land uses or

9    activities may be allowed?

10      A.  Yes.

11               MS. TOLEDO:  Object to form.

12               THE WITNESS:  ███████████████████

13   █████████████████████

14    BY MS. SMITH:

15      Q.  Now, in the 2004 manual it goes on to state,

16   "Pretreatment could consist of one or a combination of

17   the primary or secondary treatment practices described

18   in this manual, provided that the treatment practice is

19   designed to remove the stormwater contaminants of

20   concern."

21               Did I read that correctly?

22      A.  Yes.

23      Q.  My question is, does the terminal engage in

24   the pretreatment discussed here?

25      A.  ████████████████████████████████████

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 218

```
 1      Q.  ██████████████████████████████s
 2   ████████████████████████
 3              MS. TOLEDO:  Object to form.  New
 4   opinion, not disclosed.
 5    BY MS. SMITH:
 6      Q.  Go ahead.
 7      A.  ████████
 8      Q.  Now, if you'll move in your report to the last
 9   sentence on Page 21, where you say, ███████████████
██   ██████████████████████████████████████
██   ███████████████████████████████████
██   ████████████████████████
13              Do you see that?
14      A.  Yes.
15      Q.  And if you'll turn to Page 8-5.  In the right
16   column do you see there's a discussion of a water
17   table?
18      A.  Yes.
19      Q.  And it's discussing -- and is it discussing
20   elevated water table?
21      A.  Yes, it is.
22      Q.  And does elevated water table exist at the
23   terminal?
24      A.  Yes.
25      Q.  And you see in the last sentence, in the
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 219

1   second paragraph, it states, "The potential for

2   groundwater pollution due to stormwater infiltration is

3   an important consideration in the design of stormwater

4   treatment practices.  Engineering controls, such as

5   impermeable liners, may be required in these

6   circumstances."

7           Did I read that correctly?

8       A.  You did.

9               MS. TOLEDO:  Object to form.

10  BY MS. SMITH:

11      Q.  And is it your opinion -- well, does this

12  support your opinion ███████████████████████████████████

13  ██████████████████████████████████████████████

14  ██████████████████

15              MS. TOLEDO:  Object to form.

16              THE WITNESS:  ████████████████

17  BY MS. SMITH:

18      Q.  And are there other ways to make the

19  ██████████████████████████████████████████████

20      A.  ███████████████████████████████████████████████

█   ███████████████████████████████████████████████

█   █████████████   ██████████████████████████████

█   ███████████████████   █████████████████████████

█   ████████████████

█           ██████████████████████████████████████████

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 220

1        ████████████████████████████████████

        ███████████████████████████████

        ███████████

4        Q.   Okay.  You can put that down for now.

5             You were asked some questions about what

6   control measures you allege the terminal violated.

7             Do you recall those questions?

8        A.   Yes.

9        Q.   Let's turn to page -- if you can go to

10  Exhibit 15, we're going to just go back to those pages

11  of the permit.  And if you'll turn to the permit,

12  Page 17 is where the control measure section starts, 17

13  of 70.

14       A.   17?

15       Q.   Uh-huh.

16       A.   Okay.

17       Q.   And you talked about some of these control

18  measures that you believe that the terminal was in

19  violation of.  And I have a question about No. 11,

20  non-stormwater discharges.

21            Is it your opinion that the terminal is or

22  potentially is in violation of a non-stormwater

23  discharge control measure as well?

24                 MS. TOLEDO:  Objection.  Asked and

25  answered.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 221

```
 1                THE WITNESS:  ████  ████████████
 2      ████████████████████████████████████████████
█       ████████████████████████████████████████
█       █████████████████████████████
 5   BY MS. SMITH:
 6        Q.  I'm sorry I'm jumping around.  Lots of
 7   different topics.
 8        A.  No problem.
 9        Q.  And counsel for defendants discussed the
10   ████████████████████████
11            Do you remember those questions?
12        A.  Yes.
13        Q.  And I believe you testified that ████████████
14   ████████████████████████; is that correct?
15        A.  Yes.
16        Q.  Is that your testimony?
17                MS. TOLEDO:  Object to form.  Leading.
18   BY MS. SMITH:
19        Q.  Is it -- what is your opinion with regard to
20   ████████████████████████████████████████████████
21   ██████████████████?
22                MS. TOLEDO:  Object to form.  Asked and
23   answered.
24                THE WITNESS:  ████████████████████████
25   ████████████████████████████████████████
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 222



1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮

4    BY MS. SMITH:

5            Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮

8                    MS. TOLEDO:  Object to form.

9                    THE WITNESS:  ▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮

12   BY MS. SMITH:

13           Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮

16                   MS. TOLEDO:  Object to form.

17                   THE WITNESS:  ▮▮▮  ▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 223

1  ██████████████████████████████████████

2  ██████████████████████████████████

3   BY MS. SMITH:

4       Q.  But neither of those things were done; is that

5  correct?

6       A.  Neither were done.

7           MS. TOLEDO:  Object to form.  Leading.

8   BY MS. SMITH:

9       Q.  Were either of those things done by the

10  terminal?

11      A.  They were not.

12      Q.  On Page 34 -- well, strike that.

13          Let me start with, you and counsel for

14  defendants discussed your opinions with regard to the

15  treatment system.

16          Do you recall those questions?

17      A.  Yes.

18      Q.  And if you'll turn to Page 34 of your report,

19  in the last sentence of the first paragraph, you state,

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ██████████████████████████

23          And my question is just, is that still your

24  opinion?

25      A.  Yes.

Page 224

```
 1        Q.  You were asked some questions about the
 2   definition of impermeable.
 3             Do you recall that?
 4        A.  Yes.
 5        Q.  And can you say what your definition of
 6   impermeable is?
 7                  MS. TOLEDO:  Objection.  Asked and
 8   answered.
 9                  THE WITNESS:  Impermeable, to me, means
10   that it's impenetrable by any substance.
11    BY MS. SMITH:
12        Q.  And is there any question in your mind that
13   that is -- in your experience, and in your opinion, is
14   that the definition of impermeable in your field,
15   stormwater management?
16        A.  Yes.
17                  MS. TOLEDO:  Object to form.
18                  THE WITNESS:  It definitely is.
19    BY MS. SMITH:
20        Q.  And is impermeability a requirement under the
21   general permit?
22                  MS. TOLEDO:  Object to form.
23                  THE WITNESS:  Yes, in plain words.
24    BY MS. SMITH:
25        Q.  You were asked some questions about your work
```

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 225

1  that you've done in stormwater management field towards

2  the beginning of the deposition.

3          Do you recall that?

4      A.  Yes.

5      Q.  And have you been active in work with regard

6  to industrial stormwater management -- industrial

7  stormwater management?

8      A.  Yes.

9              MS. TOLEDO:  Object to form.  Asked and

10  answered.

11              THE WITNESS:  I certainly have.

12   BY MS. SMITH:

13      Q.  And let's start talking about non-litigation

14  cases.

15          Can you describe the work that you've been

16  involved in with regard to industrial stormwater

17  management and cases that are not in litigation?

18      A.  I mentioned the San Diego Airport in which I

19  gave advice about their stormwater treatment and did

20  staff training.  I worked with a group called Salmon

21  Safe that certifies sites and properties for good

22  practices.

23          You might think of LEED, for example, that

24  certifies buildings for good practices.  It's set up in

25  a different way, but it's a certification for positive

Page 226

1    environmental actions.

2            And there are -- there have been three

3    airports that have been certified.  I consider those to

4    be industrial locations.  One is Seattle Tacoma

5    Airport.  One is Vancouver Airport.  One is Snohomish

6    County Airport, which, actually, is no longer

7    certified, but, nevertheless, went through the

8    certification process and requires the evaluation of a

9    variety of things that they do.

10           I serve on a team, a certification team, and I

11   represent mainly the stormwater aspects of the

12   certification, and is it adequate in relation to the

13   needs of salmon and their habitat in the streams.

14           And so those are several examples of

15   industrial stormwater cases that I -- situations that I

16   was involved in that have nothing whatsoever to do with

17   litigation.  In fact, quite the opposite, giving

18   positive reenforcement.

19       Q.  And with regard to case -- litigation cases

20   you've been involved in, and I say "litigation,"

21   meaning there's a case that's brought and you've either

22   been involved in writing a report or giving testimony,

23   deposition and trial.

24           Are there litigation cases where you have been

25   involved in industrial stormwater management issues?

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 227

1          MS. TOLEDO:  Object to form.  Compound.

2          THE WITNESS:  Yeah, I need to find the

3    attachment in my report that has -- yes, Attachment C.

4          There are a number of these cases in which it

5    did not proceed to, say, an active stage of litigation,

6    to the point where I wrote an expert report, did a

7    deposition, went to trial, or all three.

8          And they are -- well, I wrote an expert

9    report, but it didn't go to -- it didn't go all the way

10   to trial.  Okay?  So they're listed here.

11         There are others, and quite a number of others

12   in which it didn't even go to this stage.  But let's go

13   down this list to identify those that are industrial.

14    BY MS. SMITH:

15    Q.  Yes.  Can you identify the cases that are on

16   this list that were -- involved industrial stormwater

17   issues?

18    A.  Right.  And it's most of them.

19         The first one Girard.  The second one, Pacific

20   Pile and Marine.  The third one, UFP.  The fourth one,

21   Pick-Your-Part Auto Wrecking.  Next one, Corona Clay.

22   The one after that, Willis Enterprises.  The one after

23   that, a different Willis Enterprises location.  Then

24   Watkins Manufacturing, Fruhling Sand and Topsoil.  Port

25   of Olympia is under stormwater permit, so it's

Page 228

1    industrial, an industrial permit.  Trojan Battery

2    Company.

3          Really, all of those -- I'm pretty sure all of

4    them, except for those at the Pollution Control Hearing

5    Board.  SSA Marine, Seattle Iron & Metal, Coast

6    Seafoods.  Astro Auto Wrecking, that's one that went to

7    trial, talked about this morning.  Louis Dreyfus, that

8    is a grain terminal on the waterfront here.  Cruise

9    Terminals of America, that's maybe a little bit

10   amorphous as to whether that's industrial or not.

11         Rainier Petroleum, we talked about two

12   different sites there.  Whitley Manufacturing, the one

13   in Louisiana, the bulk terminals.  Another situation

14   with Seattle Iron & Metals.  Magic Mountain, it's an

15   amusement park, that would not be industrial.  Levin

16   Enterprises, petroleum coke exporting terminal, that's

17   industrial.

18         And then we have an earlier case against

19   Willis.  Sierra Pacific, wood products firm.  City of

20   Malibu, obviously not industrial.  BNSF Railroad,

21   industrial.  Los Angeles County, no.  Kramer Metals,

22   yes.  International Metals, industrial.

23         And -- and many others that did not require

24   going to the stage of an expert report or farther.

25                   MS. SMITH:  If we could go off the