# EXHIBIT A

**to Plaintiff Conservation Law Foundation's Opposition to Defendants' Motion to Exclude the Testimony of Naomi Oreskes**

Page 14

Q. Now, number 17, "All DOCUMENTS in your possession, custody, or control that RELATE TO the TERMINAL."
Have you provided all of those documents to counsel?
A. I have no documents in my possession related to the terminal.
Q. Okay. Great. Thank you.
So, Dr. Oreskes, I know we discussed earlier that you have been deposed before, but have you ever been a party in a lawsuit?
A. You mean like I was the Plaintiff or the Defendant?
Q. Correct.
A. No.
Q. Have you ever been an amicus [a-ME-kee] party, or amicus [a-ME-kuhs] party, in a lawsuit?
A. Yes. I've signed on to numerous amicus briefs.
Q. How many?
A. I'd have to check my CV. I believe we've supplied that information to you because I -- well, I think it would be best to

Page 15

consult my CV, but something in the order of half a dozen.
Q. But less than ten?
A. Again, I'm under oath. I don't want to swear to something without checking it. But it's on my CV, and my CV has been provided to you.
Q. We'll get that.
What is the most recent case you've signed on as an amicus, signed on to an amicus brief?
A. I don't remember offhand. I'd have to consult my CV.
Q. Do you remember the first time you signed on to an amicus brief?
A. No. I'd have to consult my CV.
Q. Have you ever been paid to sign on to an amicus brief?
A. No.
Q. Have you ever received money of any kind for participating in an amicus brief?
A. No.
Q. Have you ever been a juror?
A. Yes.
Q. In what kind of case?

Page 16

A. I was a juror on a case in San Diego County involving alleged violations of food safety laws.
Q. How did the case end up? Was it resolved by a verdict or was it settled?
A. There were quite a few charges. If I recall correctly, there were eight charges total. The prosecution dropped two of the charges. The jury settled on six of the charges with a not guilty verdict. It was a Friday afternoon, very late in the day, we could not resolve the remaining two, and the prosecution agreed to drop the remaining two charges.
Q. So were found liable on two charges?
A. No. Those two charges were dropped. They were found not guilty on six charges, and the remaining charges were dropped.
Q. Okay. So there was no verdict against the Defendant.
A. Correct.
Q. Okay. How many times have you been deposed?

Page 17

A. I believe this is the fifth time, but let me just think for a second.
Yes, this will be my fifth deposition.
Q. Do you remember the five depositions you had?
A. Yes, I do. Back in, it would either be 2012 or 2013, I was involved in a case involving scientific evidence related to testing protocols for endocrine-disrupting chemicals. I was deposed in that case, and I appeared in court as an expert witness.
Q. That was the first one?
A. Yes.
Q. What was the second?
A. The second one was the case of Mike -- a climate scientist, Michael Mann, brought a defamation complaint against parties who he believed had defamed him related to his work as a climate scientist.
I was deposed in that case and appeared as an expert witness testifying on questions related to scientific practices and, particularly, the role of peer review in scientific practice.

Q. And who did you appear for?
A. On behalf of Professor Mann.
Q. And how did that case resolve?
A. Professor Mann won his case.
Q. What did he win?
A. Well, the jury found he had been defamed and granted a financial settlement.
Q. What was the third case where you were deposed?
A. So I'm involved in two ongoing cases right now. So the third and the fourth both involve cases in the State of Louisiana, personal injury cases related to the legacy effects, or alleged legacy effects, of the BP Horizon oil spill.
Q. And what are the two case names?
A. One is Boggs versus BP, et cetera, and the other is Gremillion versus BP, et cetera.
Q. Can you spell that?
A. Gremillion?
Q. (Nods.)
A. G-r-e-m-i-l-l -- yeah, sorry I'm just trying to think for a second. G-r-e-m-i-l-l-o-n [sic], Gremillion.



Q. And what nature of your testimony in the Boggs v. BP case?
MS. JACKS: Objection to this line of questioning to the extent it calls for testimony that's privileged and work product beyond this case.
MR. HENDERSON: Subject to that, you can answer.
A. I agree with counsel. I think I'm not at liberty to discuss that because it's confidential privileged work product and has not yet been made public.
Q. Have any of your documents been filed of public record in that case?
A. I believe that my expert reports have been filed, but I would have to check on that.
Q. So what was the general nature of your testimony in that case?
A. I think I can speak to the general nature. It's similar to things I've done before. I have expertise in history of science, but also in the practice of science in the contemporary period, and that involves considerable work I've done on the question of



what makes scientific evidence reliable and what kinds of factors could contribute to scientific evidence being not reliable.
So my expert reports have to do with scientific evidence that's being invoked in this case. And my expertise, my expert reports, speak to matters related to the reliability of that evidence.
Q. What is your definition of "reliability"?
A. Well, that's a good question. I would say my definition would be the definition that most scientists would take, which would be that you could count on it; that it would hold up under scrutiny.
Q. So it's not a legal definition of "reliability."
A. No, I'm not a lawyer. I'm a historian of science. So it's based on my understanding of scientific practices, in the way the term would be used and understood by scientists.
Q. What factors make scientific testimony unreliable?
A. Okay. Well, now we've just



shifted from scientific data to scientific testimony. Those are two different things. You asked about my testimony in the Boggs and Gremillion cases. The testimony is about scientific data.
Q. You can answer my question.
A. Okay. Could you repeat the question, please?
MR. HENDERSON: MaryJo, do you want to read the question.
(Record read as requested.)
A. Okay, testimony. Well, there are many things that could contribute, and it's not a "yes" or "no." It's not an on-or-off, zero-one situation. Testimony could be more or less reliable. There are many factors that can contribute to bias or prejudice.
Do you want me to say more?
Q. Oh, please. Please go ahead.
A. Okay.
Q. I mean, part of this is I learn from the deposition.
A. Okay.
Q. So I want to hear what your definition of "reliability" is and what is

agreement, which we can put on the record or read for the record, if we need to.

MR. HENDERSON: I'm just asking questions at this deposition, Ms. Jacks. And if you have to -- if you desire to place an objection, please do. But my questions are pretty straightforward.

Q. So did you consult with any historians at all as you prepared your expert report in this case?

A. No.

Q. Did you consult with any environmental lawyers?

A. No. Well, apart from the conversations I had with counsel in this case.

Q. Did you ever -- have you ever been by the terminal in New Haven, Connecticut?

A. It's a good question. I've been to New Haven many times. It's possible I've driven past it, but I couldn't really say for sure.

Q. So you don't know where it's actually located on the New Haven Harbor?

A. Well, in a general way of



location.

Q. Do you know how far away the terminal is from the harbor?

A. No.

Q. Have you ever provided any opinions of the petroleum bulk storage facilities?

A. No.

Q. Are you currently retained by other law firms to address climate change issues?

MS. JACKS: Objection to the extent that this line of questioning calls for attorney-client privilege or work product information related to consulting work outside of this case.

Q. I think publicly you've testified that you have been retained by Sher Edling.

A. In the past, but I'm not currently under retainer to Sher Edling.

Q. And when did that end?

A. A few years ago. I'd have to consult my notes, but quite a few years ago.

Q. Are you retained by any other law firms at this time, besides in this case?



A. I feel like I'm confused, actually, over the technical meaning of the term "retained."

So, in the past, I did have a retainer agreement with Sher Edling. I do not have a retainer agreement with any other law firm, or with them at this point in time, either.

Q. Okay. Have you ever been to an oil and gas facility?

A. Yeah, I have.

Q. Which ones? Tell me.

A. Well, that's a good question. A number of years ago, I served on a committee in Canada about fracking. We visited an oil and gas facility in Alberta. I don't remember the name of it, but we definitely visited.

When I worked in Australia as a mining geologist, my company had oil and gas -- had an oil and gas division. We once had a field trip to one of those facilities. I don't remember the details. It's 40 years ago. But, yes, I have visited oil and gas facilities.

Q. How about in the United States?

A. Let's see. You know, honestly, I



can't remember. But I feel like in graduate school when I studied sedimentary basins with Professor Steve Graham, who had worked for many years for Chevron, I feel like we had a field trip where we visited a facility in California, but I couldn't swear to it. But I think we did.

Q. Have you ever been to an offshore platform?

A. No, no. No. I have a lot of friends who have worked on offshore platforms, but I haven't personally had the privilege. They don't usually allow visitors.

Q. Are you an expert in day-to-day operations at oil and gas facilities?

A. No.

Q. How about interviews, Dr. Oreskes? How big a part is your job as a historian of science are interviews, interviews with company employees? Who -- have you ever interviewed any employees at fossil fuel companies?

A. Okay. You just asked two different questions, and I'd like to ask you to unpack that.

Q. Have you ever interviewed any

Page 54

current employees at fossil fuel companies?
MS. JACKS: Objection to the form.
A. If you mean formal interviews, like on the record, no. But informally, yes, I've spoken to many people in the oil and gas industry. I've been on panels -- for example, the World Economic Forum -- with people in the oil and gas industry. I've chatted with them informally afterwards.
So I've had many interactions with people in the oil and gas industry. I've not done formal historical interviews.
Q. It was the latter I was trying to get a handle on. Have you conducted formal interviews with current employees of energy companies?
A. No. My work has never called for that.
Q. Have you ever interviewed past employees of energy companies?
A. Again, formally?
Q. (Nods.)
A. No.
Q. Have you ever conducted interviews as part of your profession?

Page 55

A. Yes, sometimes.
Q. How many times?
A. Oh, I don't know. I'd have to go back and look. But from my book, Science on a Mission, I did some interviews with some scientists. And we can go into the details of how I decide when interviews are appropriate or not. But that's, again, a kind of a long story.
But I did -- the most significant set of formal interviews I ever did was some years ago. The Office of Naval Research was celebrating its anniversary. I don't remember what anniversary it was, but I actually received a grant from the Office of Naval Research to do formal interviews with oceanographers who had worked with the Office of Naval Research, and those formal interviews were all videotaped, and they're all on repository at the Scripps Institution of Oceanography.
(Court reporter clarification.)
A. Sorry. They're all deposited at the Scripps Institution of Oceanography archives.

Page 56

Q. Have you ever interviewed any past or present employees of any Shell entity?
MS. JACKS: Objection to the form.
A. Not formally.
Q. How about informally?
A. I think --
MS. JACKS: Objection to the form.
A. I think on occasions I've had conversations with past or present Shell employees.
Q. Who are they?
A. I couldn't tell you offhand. I'd have to...
Q. Did you keep notes of those?
A. No.
MS. JACKS: Objection to the form.
Q. How about interviews with past or present employees of other energy companies: BP, Exxon, Marathon, any other energy companies?
A. Again, formal interviews? No.
Q. How about informal?
A. Yes, I've had informal conversations.
Q. Do you keep notes of those

Page 57

conversations?
A. Not normally.
Q. Do you have any notes of prior interviews or conversations with past or present employees at energy companies?
MS. JACKS: Objection to the form. Objection based on any confidentiality that the witness may or may not be waiving related to any documentation of any interviews that may or may not have happened.
Q. You may answer.
A. I have had conversations with some former Exxon employees. I do not believe that I kept formal or written records of that. I could check my notes. I don't see it as relevant to this case, but I certainly have had conversations with people who have been employed by ExxonMobil.
And I already said this, I appeared a few years ago on a panel at the World Economic Forum with someone from BP. And I served on a committee some years ago at the Lawrence Livermore National Laboratory with Steve Koonin, who was a former -- I believe he



Page 62

This is just my time to ask you questions.
A. I know. And I'm not troubled.
Q. I get it.
In fact, based on my read, and you can correct me if I'm wrong, you're not offering any opinions on compliance with any laws or regulations at the terminal, correct?
A. I'm going to have to slightly disagree with that. I think my report is
Q.
A.
Q.
MS. JACKS: Objection. Outside the scope.
A. I'm sorry. Could you read back

Page 63

the question?
(Record read as requested.)
A. So my response is I'm not a lawyer, so I'm not offering
Q. And that was because you were told by the lawyers it was relevant? I mean -- so that's a question.
A. No, I wouldn't put it that way. I mean, obviously, in our initial consultation, there was a conversation about how and why my expertise -- how and why they were seeking my expertise.
They believe, and the complaint says, that they believe there has been

Page 64

Q. But the comment that --
A. --
MS. JACKS: Objection to form.
THE WITNESS: Sorry.
MR. HENDERSON: Shalom, can you please for the record, I'm asking you professionally again, can you just let me get through with my question and then you can object?
MS. JACKS: I'm trying to do that, and object before an answer has begun. So if we could just give me a little bit more time to get an objection lodged, please.
THE WITNESS: Okay. I've been counting to three. I'll count to five. I think there is a lag.
MR. HENDERSON: Can you read --
THE WITNESS: There is a lag within Zoom. I think that's part of the problem.
MR. HENDERSON: Can you reread the

Page 65

question, MaryJo.
(Record read as requested.)
Q. -- .
A. I read the complaint, and I read the amended complaint. It's up to lawyers to read and interpret the permit.
Q. Do you know what permit applies to this lawsuit?
A. You mean like the number, the specific?
Q. Yeah.
A. No, no.
Q. What year are the --
A. Again, that would be outside of my scope.
Q. Have you reviewed any permit in this lawsuit?
A. No, I have not.
Q. And you're not offering any opinions on what a permit requires or does not require in this lawsuit, correct?
A. Correct.
Q. How about experience with the Clean Water Act, Dr. Oreskes? Is this your



Page 198

A. Correct.
Q. Do you ever have any intent to widen your sphere and look at how private entities are supposed to make decisions about climate change?
MS. JACKS: Objection to the form.
A. I think that would be a great research topic if I collaborated with someone at the Harvard Business School, but I don't have any immediate plans to do that.
Q. And that's -- you're not offering any opinions about one company should do this, and another company should do that, when it comes to climate change?
MS. JACKS: Objection to the form.
A. Well, I believe that all companies should take into account climate risk in their operations, but that's beyond the scope of my report.
Q. Do you know of any industry statement about a consensus, any issue on the consensus, involving climate change?
MS. JACKS: Objection.
Q. Do you know if -- is there a consensus by any industry group on any specific

Page 199

aspect of climate change?
MS. JACKS: Objection to the form.
A. That's way beyond the scope of my report and not anything I would testify to in court. But it's my understanding that actually the insurance industry has issued some statements related to climate risk.
I know the reinsurance industry a few years ago was working on this topic. But what exactly they did or didn't say in the end, I'm not sure. And again, it would be beyond the scope of my report and would not be something that I would testify about.
Q. In your report, page 1, 11, 12, at the beginning, going back to the beginning here [redacted] ?
A. [redacted]

Page 200

[redacted]

Page 201

[redacted]
Q. In your expert report, you [redacted] ?
A. [redacted] -
Q. And you've cited those where you thought they were relevant in your expert report?



Page 202

A. Well, everything that I relied on is cited.
Q. Did you -- were you provided documents that you did not cite in your report?
A. [redacted]
Q. [redacted]?
A. [redacted]

Page 203

[redacted].
Q. [redacted]?
A. [redacted].
MS. JACKS: Better?
THE WITNESS: I'm sorry?
MR. HENDERSON: Sorry?
MS. JACKS: You all are freezing up. Yes, the connection froze up about twice where I couldn't hear what was being said. So, could we check that?
MR. HENDERSON: Sure. Actually, why don't we take a five-minute break. It's 2:10. How about at 2:20?
THE WITNESS: Sounds good.
VIDEO TECHNICIAN: The time is 2:05. We're off the record.
(Proceedings recessed at 2:05 p.m., and reconvened at 2:12 p.m.)
VIDEO TECHNICIAN: We are back on the record. The time is 2:12.

Page 204

BY MR. HENDERSON:
Q. So, Dr. Oreskes, let's keep going with primary sources.
A. Sure.
Q. On page 12 of your report, you state:
[redacted]?
MS. JACKS: Objection to the form.
A. [redacted]

Page 205

[redacted].
Q. Like e-mails or other documents that could explain what something meant?
A. Yeah. I mean, in this case, that would be beyond the scope of what I was asked to review. But yes, I would certainly -- if I were asked to review a question like that, then I would certainly want to look at those documents if they were available.
Q. So in your article in Ecology Law Quarterly about the Clean Air Act, did you address how permits are reissued every five years? Did you address that?
A. No, we did not.
Q. Wouldn't that be relevant to understand how things change over time? If EPA had a Clean Air Act permit that was issued in 2000, and they issued a new permit in 2005 that

Page 222

would submit it to peer review. But because of the constraints of confidentiality, that method isn't available to experts doing expert witnessing, whether they're scientific or historical.

Q. So if you were to hand the materials you were provided by CLF in this case and gave it to 100 historians of science, how many would you estimate would come up with similar opinions that you have in this --

MS. JACKS: Objection.

Q. -- in your expert report?

MS. JACKS: Objection to the form. Calls for speculation.

A. Well, first of all, I'm going to object to the "provided by CLF." Actually, the documents were provided by the Defendant. And my staff and I went through the documents independently to find the documents we considered to be relevant to the questions.

So I would not agree with the characterization that these were provided by CLF. They were provided by Shell. Or we found them on our own, if they were public domain.

But if a historian of science with

Page 223

expertise, particularly one who knew something about earth science, would read the same volume of documents, I think all of them, unless they were grotesquely biased, would have come to broadly similar conclusions.

Q. How many would make errors and not find the opinions you had?

MS. JACKS: Objection to the form. Calls for speculation.

A. Well, again, two different questions there. How many would make errors? They all would. We're human beings. We all make mistakes.

Again, one of the reasons we have assistants, peer review, send papers to colleagues, is that we rely on each other as part of a practice of finding error, because it's extremely difficult to find the errors in your own work, even as much as you may try.

I mean, one of the things I do is I try to anticipate objections that you might raise. I try to think about if someone disagreed with me, what objections might they raise. So that's part of my own practice of objectivity.

Page 224

But we all make mistakes. So if 100 historians looked at this material, they'd probably all make some mistakes. That's just human nature. That's life.

Q. Your method appears to be very subjective.

A. Well, that's your opinion. I disagree.

Q. Are you biased in which documents you look at?

A. No, absolutely not. I mean, in fact, one of the things I take pride in is the work I've done and the techniques I've developed to try to address the potential complaint that a person is biased in the documents they look at, or that an expert could be biased because the lawyers would only give you certain documents that supported their side of the case.

So, in every case I work on, I insist that I have full access to the full documentary record, so I'm never just being spoon-fed documents by counsel. And in this case, I used a methodology that you already asked about. But it's important to addressing

Page 225

this question of bias.

So this is a methodology I've been developing with my post-doc, Alexander Kaurov, who we've already mentioned, who as already mentioned, is a computational scientist.

A couple of years ago, we were talking about could we use AI to try to ensure that we are looking at all the relevant documents in a particular instance or case. So we developed a strategy, and it's not anything particularly fancy. We simply use AI as a sieve to identify all the documents that could be relevant to a particular question. And we explain this to you in our response to interrogation about this issue.

So we used AI in this case to go through all of the documents provided by the Defendant [REDACTED].

So there is no bias whatsoever in the documents that we look at, because we use AI, which is as neutral as any mechanism can be, to identify documents capaciously in an unbiased manner.

Q. So who actually ran the AI searches, prompts, for you?
A. Well, this was discussed in the document we provided. Sasha and I sat down together to discuss what the prompts would be.
Sasha ran the analysis, and then I reviewed all the documents.
Q. All right. So, Dr. Oreskes, we never received any of the materials, what prompts, or what searches you actually ran.
A. I thought --
MS. JACKS: Objection. We did respond to the Notice of Deposition. We did respond to inquiries concerning AI prior to that with this information.
MR. HENDERSON: Ms. Jacks, you didn't provide any of the searches. And if you did, you can resend them to me. But you did not. You responded back and said that you used ChatGPT. But in terms of the actual searches --
A. Okay. I think I can clarify that.
MR. HENDERSON: -- because that's what we were looking for.
A. Okay. We were under the



impression that when you said "searches," you meant, like, hard copy, paper copies. But that doesn't exist.
We don't have searches. We used the ChatGPT to identify the documents. Then there is a body of documents that I look at. Every document that I deem to be relevant and relied on in this report is cited in the report and has been provided to you. So there isn't anything else. There isn't any other documentation.
Q. There would have been a prompt, which is what most platforms use --
A. You mean like a search term?
Q. They don't use a search term. They like a prompt now, because it's different than a searching, because a prompt implies there is some analysis, generative analysis.
A. We don't do that.
Q. So what was your search to look for? That's what we're trying to find.
A. So we don't give AI prompts, because that can be viewed as biasing. So we're not giving them prompts. We're just giving search terms. So the primary search



[REDACTED]
Q. The another thing that we have not received, and we will continue to ask, is which documents did you search on?
So, for example, you said every document that was provided by CLF to you or every document that was provided by CLF plus your own set of documents? What did you actually search for?
A. Okay. You keep saying it was provided by CLF, but what I'm saying is that's an incorrect characterization. There were a body of documents that were provided by the Defendants as part of the discovery in this case. We did not rely on CLF to provide us with the relevant documents. We searched the database using what we considered to be the fairest, least biased search terms that we could decide on mostly related to [REDACTED]
Q. But we still don't even know what



that is.
A. Can I finish? Can I finish?
Q. Sure. Sure.
A. A body of documents are then identified. I then look at those documents, many of them turn out not to be particularly informative, relevant, significant. Some of them are [REDACTED]
So out of that, there is some subset of documents that I relied on, and every one of those documents is cited in this report and has been provided to you.
Q. I'm looking for the universe of documents that you actually searched. How do we know what that is?
A. Because you provided it, or your client provided it.
Q. But we don't know that. You didn't receive it from us. We know what we would provide. We received it from them. We don't know what documents it was. See, that's what I'm trying to get at.
A. Well, then you have to take it up with counsel. Everything I looked at was a body of documents that I was told had been

Page 230

provided by Defendants as part of the discovery process. If you have some reason to think that that's not the documents you provided, then you have to take that up with opposing counsel.
Q. Okay. The problem is that's what we've asked. We don't know what you were provided.
A. But I don't see --
MS. JACKS: I am going to object to this line of questioning. We lodged our responses to the Notice of Deposition distinguishing where the request for documentation exceed the requirements under the federal rules, in addition to any requirements listed or limits listed in the parties' stipulation, their non-discoverability agreement.
Any documents have been cited within the report that were relied upon for this opinion. That is all that is required under the Federal Rules of Civil Procedure.
MR. HENDERSON: Ms. Jacks, we just disagree with you on that.

Page 231

Q. But in terms of the documents, so do you have a list of the documents that you were provided that you actually did AI on? That's what we're trying to get a handle on.
MR. MEINERT: Doug, you've asked this question five or six times.
MR. HENDERSON: I know, but you guys have never answered it.
MR. MEINERT: The written response says "full set of documents shall be provided in litigation." If you didn't read that part, you can go reread it. I don't think that continuing to ask the deponent the exact same question over and over --
MR. HENDERSON: But I don't --
MR. MEINERT: -- there is a line where it's harassing.
MR. HENDERSON: Okay.
MR. MEINERT: I don't know that we've crossed it.
MR. HENDERSON: Well, Mr. Meinert, again, we have not even received the search terms that they used for those documents.

Page 232

MR. MEINERT: We can look at the record. I think you just did.
A. I thought we had supplied them. If we haven't, I'm happy to supply the search terms. That's no big deal.
But let me just maybe say one more thing to help clarify this for the record. Imagine a box. And every document provided by your client, the Defendant, is in that box. I now have access to that box, and I search that box. In the old days, I would search it by printing all the papers and read them, but that takes a heck of a long time.
The great thing that AI does for us is it accelerates that process. It doesn't do anything we couldn't do by hand, but it does it a whole heck of a lot faster. Which, in a situation like this where time is limited and there is a deadline, a court-imposed deadline, it's very helpful to be able to use this new, good tool to identify documents that use the words "[REDACTED]." That's all it does. And then I look at those documents.
But every one of those documents was supplied, as far as to the best of my

Page 233

knowledge, was supplied by the Defendants as part of the discovery process. So, therefore, you do know what's in that box because it's your clients who supplied it.
Q. Again, we'll go back and take it up with the Court --
A. Okay.
Q. -- on this particular issue, just because we don't even know what set of documents you've actually looked at. I know that they told you that, but we know of no AI program that would look at the volume and the amount of documents that we've produced.
A. Well, again, it's not --
Q. We deal with AI all the time, so we understand.
A. Well, I beg to differ. I mean, one of the reasons I hired Sasha is he's kind of a genius, and he's keeping up with this space in a way that, in my experience, most law firms are not, which is part of the reason we thought we had a toolkit that was above and beyond what some other people maybe had.
And if I could just finish. He's a computational scientist by training. That's

his expertise. So he has a particular toolkit that I think has made it possible for us to look at documents in this extremely efficient manner. But at the end of the day, it still goes back to reading each document by hand and citing in the expert report every document upon which my opinion rests.

Q. Was he using any Harvard AI programs --

A. No.

Q. -- to search?

A. No.

Q. What programs was he using to search?

A. We use ChatGPT on a secure server. And this information has already been supplied.

Q. I hear you. What is that secure server?

A. I'm getting tired. So I have to go back and check my notes, but I know it's in a document that we supplied to you.

Q. Okay. But you kept your search terms -- I just want to make sure -- on what you searched?

A. I'm sure that I can find that or



that Sasha can give it to me.

Q. That's all. I'm just trying to...

Have you ever used AI before in any of your prior briefs or expert reports?

A. Again, within the constraints of confidential work product, none of my prior reports -- we hadn't done this before. This is something we've developed in the last year or so.

Q. So what did you specifically develop about AI that's new?

A. Well, it isn't really new. We didn't invent anything new. We just had the idea that we could use AI to facilitate search and do it in a faster and more comprehensive, in a way a more reliable way, than people have done in the past.

So it's nothing radically different. We just think we're doing it better.

Q. So when you looked at the number of times "[REDACTED]" was used in these documents, did you look at the context of how they were used?

A. Yes.



Q. How many documents did you read with --

MS. JACKS: So I'm going to --

Q. You can go ahead and answer.

A. I'm going to allow --

MS. JACKS: There is a lag here. There is a lag. I'm going to reiterate that.

I'm going to object to this line of questioning to the extent that it's overbroad, to the extent that the parties have responded to the Notice of Deposition, the parties have provided the materials considered that undergird this report, which is all that is required according to the federal rules.

Additionally to that, we do have a non-discoverability agreement that limits any findings or informal discussions that have occurred between the experts and between any other consultants, the party-related entities, as you well know, Mr. Henderson. You held off on that stipulation. So we need to stay within the confines of what



we are obligated to disclose.

MR. HENDERSON: MaryJo, do you just want to read back my question.

(Record read as requested.)

Q. Dr. Oreskes, just roughly, how many documents did you read that dealt with [REDACTED], for example, that you identified?

A. Well, we identified thousands. I think I've already said this. In some cases, it's just a passing reference. It's nothing substantive. Some of them were [REDACTED] [REDACTED], so most of those we just discarded as not necessarily germane to the question of what Shell and its subsidiaries knew.

So we now pulled to something on the order of, I don't know, hundreds maybe. And as I've already now said multiple times, every document on which I relied for my opinion is cited in the report.

Q. How did you determine the context of those? Was it through your reading?

A. Yeah. Basically.

Q. Did you use AI to determine the