**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | November 3, 2025 |
| Defendants. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE THE EXPERT TESTIMONY OF DR. CRAIG JONES**

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") hereby oppose Plaintiff's Motion to Preclude the Expert Testimony of Dr. Craig Jones [ECF 722]. As explained below, a Ph.D. coastal engineer and hydrodynamic modeler with decades of experience assessing the effects of storm surges, rising sea level, and floods, Dr. Jones is well qualified to opine that the Terminal would not be damaged by adverse weather given the tank protection, ballasting, and other protective measures implemented. These opinions all meet the reliability and relevancy requirements of Federal Rule of Civil Procedure 702. Specifically, Dr. Jones used EPA-approved hydrology models to evaluate how storm surges, floods, and other weather events might affect the Terminal. For these reasons, Plaintiff's motion should be denied.

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT.................................................................................... 1

II.     BACKGROUND ON DR. CRAIG JONES, PH.D.................................................... 3

        A.      Background and Qualifications...................................................................3

        B.      Dr. Jones' Opinions...................................................................................4

III.    LEGAL STANDARD ................................................................................................ 5

IV.     ARGUMENT............................................................................................................. 7

        A.      Dr. Jones' Opinions Are Based on His Engineering and Technical
                Expertise and Are Not Legal Opinions .....................................................8

                1.      Dr. Jones Is Qualified to Offer All of His Opinions .................................. 9

                2.      Dr. Jones' Opinions on Complex, Technical Regulatory
                        Requirements Applicable to the Terminal Are Both Proper and
                        Admissible ................................................................................................ 12

                3.      Dr. Jones' Opinions on the Terminal's Compliance with Various
                        Industry and Regulatory Mandates Are Admissible ................................ 18

        B.      The Delft3D FM Model Has Been Appropriately Disclosed and Is
                Otherwise Admissible ..............................................................................26

                1.      The Delft3D Model Is the Industry Standard and Was Adequately
                        Disclosed.................................................................................................. 27

                2.      Any Challenge to the Data Underlying the Delft3D Model Goes to
                        Weight, Not Admissibility ....................................................................... 32

V.      CONCLUSION.......................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Assur. Co. v. Merck & Co., Inc.*,
  462 F. Supp. 2d 435 (S.D.N.Y. 2006)...............................................................................15, 21

*Antrim Pharma. LLC v. Bio-Pharm, Inc.*,
  950 F.3d 423 (7th Cir. 2020) .......................................................................................16

*Caraballo v. Home Depot U.S.A., Inc.*,
  No. 3:21-CV-252, 2025 WL 1639694 (D. Conn. Jun. 10, 2025) ...........................................32

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*,
  846 F.3d 492 (2d Cir. 2017)..........................................................................................18

*DeGregorio v. Metro-North R.R. Co.*,
  No. 3:05CV533 JGM, 2006 WL 3462554 (D. Conn. Nov. 1, 2006).......................................20

*Fiataruolo v. United States*,
  8 F.3d 930 (2d Cir. 1993) ............................................................................................15

*Forman v. Novartis Pharms. Corp.*,
  794 F. Supp. 2d 382 (E.D.N.Y. 2011) ...................................................................... *passim*

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164(S.D.N.Y. 2009)..............................................................................15

*Gussack Realty Co. v. Xerox Corp.*,
  224 F.3d 85 (2d Cir. 2000).............................................................................................31

*Holman v. Illinois Dep't of Corrections*,
  No. 18-CV-1323, 2024 WL 5131945 (C.D. Ill. Dec. 16, 2024) (appeal
  dismissed), *appeal filed, Holman v. Hughes*, No. 25-1053(7th Cir. Jan. 13,
  2025) .................................................................................................................19, 25

*Johnson v. Monsanto Co.*,
  333 Or. App. 678 (Or. Ct. App. 2024), *petition for cert. filed* (U.S. Apr. 22,
  2025) ....................................................................................................................16

*Max Zach Corp. v. Marker 17 Marine*,
  No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024).............................6

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995)...........................................................................................32

*In re Mirena IUD Prods. Liability Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016)................................................................15, 26

*MPM Silicones, LLC v. Union Carbide Corp.*,
No. 1:11-CV-1542, 2016 WL 11604974 (N.D.N.Y. Jul. 7, 2016) ....................15, 16

*Nat'l Audubon Society v. U.S. Army Corps of Eng'rs*,
991 F.3d 577 (4th Cir. 2021) .....................................................................28, 29, 32

*Old Gate Partners, LLC v. Paddock Enters., LLC*,
Civil Case No. 3:18-CV-01657, 2024 WL 3520168 (D. Conn. May 30, 2024)..................9, 11

*Post Univ. Inc., v. Learneo, Inc.*,
No. 3:21-CV-01242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025) ........................5, 6

*Reynolds v. Arnone*,
645 F. Supp. 3d 17 (D. Conn. 2022)........................................................................25

*Saline River Prop., LLC v. Johnson Controls, Inc.*,
No. 10-cv-10507, 2011 WL 6031943 (E.D. Mich. Dec. 5, 2011) .........................21, 23, 24, 25

*Tardif v. City of New York*,
344 F. Supp. 3d 579 (S.D.N.Y. 2018).....................................................................11

*United States v. Cristobal*,
No. 23-6107, 2024 WL 1506750 (2d Cir. Apr. 8, 2024) .......................................7, 19

*United States v. Donald*,
No. 3:21-cr-8 (VAB), 2023 WL 6958797 (D. Conn. Oct. 20, 2023) .........................6

*United States v. EES Coke Battery, LLC*,
No. 22-11191, 2025 WL 1621296 (E.D. Mich. Jun. 9, 2025), *objections
overruled by* 2025 WL 1983451 (E.D. Mich July 17, 2025)....................................16

*United States v. Romano*,
794 F.3d 317 (2d Cir. 2015)....................................................................................32

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004).....................................................................................10

*Wang v. Omni Hotels Mgmt. Corp.*,
No. 3:18-CV-2000, 2023 WL 4304875 (D. Conn. Jun. 30, 2023) .........................31

*Wang v. Omni Hotels Mgmt. Corp.*,
No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ....................6, 24, 25

*Wasilewski v. Abel Womack, Inc.*,
No. 3:10-CV-1857, 2016 WL 183471 (D. Conn. Jan. 14, 2016)............................31

iv

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
  571 F.3d 206 (2d Cir. 2009)........................................................................32

**Statutes**

Clean Water Act, 33 U.S.C. §§ 1251 et seq.........................................1, 17, 18

CERCLA, 42 U.S.C. §§ 9601 et seq. .................................................................16

CONN. GEN. STAT. §§ 22a-426-1 - 22a-426-9.....................................................18

Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601 et seq. ...........1

**Other Authorities**

40 C.F.R. Parts 118, 122-23, 125, 130-31 .........................................................18

Fed. R. Evid. 401 ..................................................................................................6

Fed. R. Evid. 403 ..................................................................................................6

Fed. R. Evid. 702 ........................................................................................ *passim*

Fed. R. Evid. 703 ................................................................................................32

Fed. R. Evid. 704(a) ...........................................................................................18

Federal Rule of Civil Procedure 26(a)(2) .......................................................29

## I.    PRELIMINARY STATEMENT

In this lawsuit, Plaintiff Conservation Law Foundation ("Plaintiff" or "CLF") alleges the New Haven Terminal is not prepared for adverse weather events, including sea-level rise, storm surges, and certain floods.  The picture CLF paints is extreme, suggesting the petroleum storage tanks at the Terminal—which are inspected daily and maintained on a strict schedule—will break apart, float away, and pollute the New Haven Harbor.  Assuming weather conditions that have never been identified in the New Haven area, CLF alleges that Defendants violated the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA") at the New Haven Terminal (the "Terminal").  ECF 47, Amd. Cmp.  For example, Plaintiff alleges "the Terminal is likely to discharge and/or release pollutants into surrounding surface waters, groundwater, the community, and the air because it has not been designed to withstand flooding associated with storm events and storm surge, tides, sea level rise, and increasing sea surface temperatures."  *Id.* at ¶ 14.  At bottom, Plaintiff claims that the 2018/2021 Industrial Stormwater Permit[1] contains an "implied" term that requires permittees, including the Terminal, to consider severe weather events caused by climate change—even though the 2018/2021 Permit does not contain any such express requirement.  Plaintiff's experts offer general opinions to support these claims; however, none of Plaintiff's experts come forward with any opinions about the likelihood of tank failures or of releases of petroleum products to New Haven Harbor.

CLF presented no expert on the structural stability of the tanks at the Terminal at all, and no expert that modeled the risk of tank failure at the Terminal.

---

[1] The permit at issue at the time this lawsuit was filed (the "2018/2021 Permit") was the Connecticut Department of Energy and Environmental Protection 2018 General Permit for the Discharge of Stormwater Associated with Industrial Activity.  In 2021, Connecticut Department of Energy and Environmental Protection renewed the Permit without any substantive changes.

In response to CLF's claims and wholly unsupported speculation, Defendants designated Dr. Craig Jones, a Ph.D. coastal engineer with 20-plus years of experience, widely known for integrating state-of-the-art field measurements with advanced modeling tools to evaluate long-term environmental risks and inform climate-adaptive management. Ex. 1, Expert Report of Craig Jones, Ph.D. ("Jones Rpt.") at 121. A member of the American Society of Environmental Engineers who regularly consults with the U.S. Department of Defense on coastal impacts to facilities across the United States, Dr. Jones is recognized for his leadership in infrastructure planning, restoration, and regulatory compliance, particularly in coastal assessment and management. *Id.*

In this case, Dr. Jones analyzed the Connecticut Department of Energy and Environmental Protection's ("CT DEEP") 2018/2021 Permit framework in connection with the Terminal's practices; described the status and applicability of external guidance; and modeled and evaluated the impact of adverse weather events on the Terminal and the resilience of its tanks to severe weather impacts. Dr. Jones concluded the Terminal implemented practices compliant with the 2018/2021 Permit and that the Terminal and its tanks are resilient to adverse weather events, even though the 2018/2021 Permit itself does not require such extensive analysis.

Plaintiff now attacks Dr. Jones, his modeling, and his opinions. ***First***, Plaintiff argues Dr. Jones provides "legal opinions" by interpreting the 2018/2021 Permit, even though his assessment addresses compliance from an engineering perspective. ***Second***, Plaintiff contends Dr. Jones' model was not adequately disclosed such that it should be excluded in its entirety. As explained more fully below, both arguments are ill-devised end-runs around testimony and data

that undermine CLF's case. Dr. Jones' opinions are both reliable and admissible.  Plaintiff's

motion to exclude Dr. Jones should therefore be denied.

## II.    BACKGROUND ON DR. CRAIG JONES, PH.D.

Dr. Jones has spent the majority of his career identifying and assessing the effects of

coastal environmental conditions, including floods, sea level rise, and storm surges, on counties,

cities, industrial facilities, and governmental facilities like U.S. Department of Defense military

facilities.

### A.    Background and Qualifications

Dr. Jones earned a B.S. in coastal engineering from Texas A&M University-Galveston, a

master's in fluid mechanics from the University of California, Santa Barbara, and a doctorate in

mechanical and environmental engineering from the University of California, Santa Barbara.

Ex. 1, Jones Rpt. at 121; Ex. 2, Deposition of Craig Jones, Ph.D. ("Jones Dep.") at 51:19-52:4.

He is the managing principal of Integral Consulting's Marine, Coastal, Climate, and Technology

Services group.  Ex. 1, Jones Rpt. at 121.  Dr. Jones leads engineering and science-based projects

focused on coastal and estuarine hazards, sediment dynamics, and climate resilience for both

government agencies and private sector clients.  *Id.*  The scope of his work spans from

infrastructure planning to regulatory compliance.  *Id.*  Dr. Jones also contributes to national and

international standards development through leadership roles.  *Id.* at 121-122.  For example, he is

Vice President of the American Society of Civil Engineer's ("ASCE") Coasts, Oceans, Ports, and

Rivers Institute ("COPRI") Board, and he serves as the U.S. delegate and standards contributor

to the International Electrotechnical Commission ("IEC") Technical Committee 14, which

develops international technical standards for marine energy systems including wave, tidal, and

other water current converters.  *Id.*

Dr. Jones also has a wide breadth of relevant experience.  For example, Dr. Jones regularly advises clients on coastal risk assessments and long-term coastal management.  *Id.* at 122.  He was the technical lead on a comprehensive coastal hazards and sea level rise vulnerability assessment and adaptation planning effort for southern San Mateo County, California.  *Id.*  The project evaluated risks to public trust lands and critical infrastructure from climate-driven coastal flooding and erosion.  He also authored a U.S. Navy guidance document for the Department of Defense to improve the effectiveness and cost-efficiency of sediment investigations and remedial actions on Department of Defense managed coastal lands.  *Id.*  Dr. Jones served as the technical lead on a project called Coastal Protect Africa: Climate-Resilient Shoreline Management Concept, a conceptual shoreline management and climate resilience initiative.  *Id.* at 122-123.  The World Bank selected this project as one of the top five global design concepts for coastal adaptation.  *Id.*  These examples are just a few of dozens of projects Dr. Jones has worked on during his more than 20-year career.  *Id.* at 121-130.  Dr. Jones has also published over 50 scientific articles, most peer-reviewed; presented at dozens of conferences; and been invited to speak on multiple expert panels involving a variety of topics focused on coastal management.  *Id.* at 130-138.

### B.    Dr. Jones' Opinions

Dr. Jones offers multiple opinions in his expert report, 29 in total.  Ex. 1, Jones Rpt. at 4-7.  The gravamen of Dr. Jones' expert report is that the Terminal complies with all binding regulatory requirements and that nonbinding climate guidance and higher planning standards cited by CLF do not apply retroactively to an existing terminal.  But with respect to the calamities speculated by CLF, Dr. Jones completed a detailed environmental engineering and probabilistic modeling to demonstrate the Terminal's tanks' resilience under 100-year—and even 500-year—flood scenarios, despite the fact the 2018/2021 Permit did not require the Terminal to

4

demonstrate such resilience.  Dr. Jones explains the current accepted benchmark for stormwater permitting is the 100-year event, and near-term sea level rise and precipitation updates do not alter those compliance conclusions.[2]

Dr. Jones' opinions fall into five major categories (1) technical regulatory framework and compliance—opinions 1-5, 17-19; (2) status and applicability of external guidance from the Environmental Protection Agency ("EPA"), ASCE, International Organization for Standardization ("ISO"), U.S. Army Corps of Engineers ("USACE"), American Petroleum Institute ("API"), International Association of Oil and Gas Producers ("IOGP")—opinions 6-12; (3) practices implemented at the Terminal—opinions 13-16; (4) climate and flood hazard context and benchmarks—opinions 20-22, 28-29; and (5) engineering analyses of tank resilience and performance—opinions 23-27.  Dr. Jones' opinions permissibly demonstrate the Terminal's compliance with the 2018/2021 Permit from an engineering and technical perspective and its resilience to adverse weather events even beyond what is contemplated by the 2018/2021 Permit.

## III.    LEGAL STANDARD

As this Court has recognized, an expert may offer opinion testimony at trial based on scientific, technical, or other specialized knowledge if the witness is qualified in the relevant subject matter, and the opinion testimony is reliable and "relevant, i.e., whether it will help the trier of fact." *Post Univ. Inc., v. Learneo, Inc.*, No. 3:21-CV-01242 (VDO), 2025 WL 2709370, at *2-3 (D. Conn. Sept. 23, 2025) (applying Fed. R. Evid. 702) (citations omitted).  A witness is qualified as an expert where he "has superior knowledge, education, experience, or skill" in the

---

[2] CT DEEP's 2025 Permit, issued on October 1, 2025, confirms Dr. Jones' opinion that the accepted benchmark for industrial stormwater permitting is the 100-year event, and near-term sea level rise and precipitation updates do not alter that benchmark.  *See* 2025 Permit at 39-40, available at: 2025-industrial-stormwater-general-permit-part-1--2erc.pdf.  Note, at time the complaint, ECF 1, was filed, there was no explicit requirement in the 2018/2021 Permit to incorporate consideration of the 100-year event.

relevant subject matter, and "may be classified as an expert based upon personal experience alone," if the proffered opinion will assist the trier of fact. *Post Univ. Inc.*, 2025 WL 2709370, at *2-3 (citation modified; emphasis added).

If an expert satisfies the qualification requirement, the Court must determine whether the testimony is reliable, *id.* at *2, which is a "flexible" inquiry. *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *2 (D. Conn. Oct. 30, 2024). In assessing reliability, the Court "examine[s] not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case." *United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *17 (D. Conn. Oct. 20, 2023) (citation omitted).

A reliable opinion from a qualified expert must also be relevant and admissible under Rule 403. *Post Univ. Inc.*, 2025 WL 2709370, at *3 (applying Fed. R. Evid. 401, 403, 702). "Even if the jury could resolve these issues without [the expert's] testimony," the opinion is admissible where it "is likely to help [] reach their determinations," because the jury "would necessarily be limited by its own experiences; [and] an expert can assist a jury in understanding considerations that they may not have contemplated." *Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *3 (D. Conn. June 27, 2025) (denying motion to exclude opinions when expert "employed technical methods that are likelier than not to assist the jury and … utilized sufficiently reliable methods and data.").

If the expert's opinion satisfies each threshold requirement, the testimony is admissible, and "any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Post Univ. Inc.*, 2025 WL 2709370, at *3 (citations omitted).

6

## IV.    ARGUMENT

In its motion, CLF seeks to exclude portions of Dr. Jones' expert opinions under two separate theories.  First, CLF accuses Dr. Jones of offering impermissible legal opinions interpreting both federal and municipal law.  ECF 722-1, at 1, 6-8.  Contrary to well established case law in this District and Circuit, CLF contends that Dr. Jones' experience as an engineer disqualifies him from opining on the applicability of, and compliance with, the very technical regulatory regimes governing the Terminal.  Second, CLF argues that Dr. Jones must be precluded from offering testimony on the "**Delft3D FM Model**"—a well-accepted, commonly used modeling program that even Plaintiff's own expert engineering firm utilizes—that Dr. Jones and his team at Integral prepared to be used as an input in the oil spill model developed by Defendants' expert Dr. Deborah French-McCay, who modeled the theoretical effects of a tank failure on conditions in New Haven Harbor.

Throughout its motion, CLF misapprehends both the law and facts to manufacture an admissibility dispute.  As it relates to his so-called "legal opinions," Dr. Jones permissibly works within the scope of his engineering expertise and experience in coastal resilience and management.  Given the complex regimes that regulate structures like the Terminal, courts in this Circuit routinely allow experts to opine on the governing frameworks and industry practices to aid the jury in assessing defendants' conduct.  *See, e.g.*, *United States v. Cristobal*, No. 23-6107, 2024 WL 1506750, at *3 (2d Cir. Apr. 8, 2024) (allowing an expert to testify to "[whether] practitioners acting in the usual course of professional practice conduct physical examinations before prescribing oxycodone, and [allowed the expert's] cit[ation] to a New York state regulatory requirement," to justify practices used in the usual course of professional practice).

And as for Dr. Jones' testimony regarding the Delft3D FM Model, the model and its use in this case were explicitly and timely disclosed to CLF, as were the related model runs and

spreadsheets.  There is no evidence that CLF has experienced any unfair disadvantage from this alleged "failure."[3]  Dr. French-McCay disclosed her use of the model in her report and included a description of the model as an Appendix to her report.  Defendants produced all Delft3D-FM-related documents.  And Dr. Jones' own deposition testimony evidenced his role in running that model.  CLF' failure to follow up on these disclosures to request additional information about the model or an additional deposition from other members of Dr. Jones' team does not merit exclusion of valid, proper, and reliable expert testimony and opinions.  Of note, none of Plaintiff's experts disputed the inputs or methodology of the Delft3D-FM Model, or otherwise called into question its reliability.

For these and the reasons explained more fully below, Defendants request that this Court deny Plaintiff's motion to preclude Dr. Jones in its entirety.

### A. Dr. Jones' Opinions Are Based on His Engineering and Technical Expertise and Are Not Legal Opinions

Despite identifying 20 opinions that CLF contends usurp the Court's adjudicatory function in this matter, Plaintiff only expends two pages and identifies *three* case citations in its effort to exclude Dr. Jones from testifying on the lion's share of his opinions.  CLF contends that of the 29 opinions offered in Dr. Jones' expert report, Opinions 1-4, 6-19, 25, and 29[4] should be withheld from the fact-finder because Dr. Jones allegedly offers a "legal conclusion" about what federal law and the 2018/2021 Permit require.  *See* ECF 722-1, at 7.  CLF further argues that a

---

[3] CLF has also tried to preclude Dr. McCay's opinions.  *See* ECF 714.  However, Plaintiff's own experts have retained Dr. McCay to provide analysis they say should now be excluded in this case.  Ex. 3, Deposition of Edwin Levine ("Levin Dep.") at 51:7-51:21, 52:1-52-11, 52:25-53:8, 53:22-54:1; Ex. 4, Deposition of Jacqueline Michel, Ph.D. ("Michel Dep.") at 43:4-44:10.

[4] As noted, Dr. Jones' opinions may be broken down into five major categories (1) technical regulatory framework and compliance—opinions 1-5, 17-19; (2) status and applicability of external guidance from EPA, ASCE, ISO, USACE, API, IOGP—opinions 6-12; (3) practices implemented at the Terminal—opinions 13-16; (4) climate and flood hazard context and benchmarks—opinions 20-22, 28-29; and (5) engineering analyses of tank resilience and performance—opinions 23-27.

subset of 8 of Dr. Jones' opinions—Opinions 1-4, 14-15, 17, and 19—should be excluded because Dr. Jones supposedly determined whether the Terminal complied with federal, state, or municipal law, or some combination thereof. *See id.* at 8. As CLF sees it, both categories of Dr. Jones' opinions are impermissible legal opinions that invade the province of this Court.

CLF also contends that Dr. Jones is not adequately qualified to offer opinions on the Terminal's adherence to the governing legal and regulatory regime. For example, CLF describes Dr. Jones as just "an engineer who primarily deals with distribution of contaminated sediments in the environment." ECF 722-1 at 1.

That claim is easily dismissed when Dr. Jones' expertise is reviewed. Setting aside the fact that Plaintiff grossly mischaracterizes the scope of Dr. Jones' experience and expertise, its argument that he is somehow unqualified to opine on the Terminal's resilience against flooding and extreme weather is flatly unfounded. Dr. Jones is an ocean and environmental engineer with over 20 years of experience, including in the assessment of estuarine hazards and the projected impacts of climate change. There is simply no basis to exclude Dr. Jones as an unqualified testifier. For these and the reasons discussed further below, Defendants respectfully request that the Court deny Plaintiff's motion to exclude 20 of Dr. Jones' opinions.

### 1.    Dr. Jones Is Qualified to Offer All of His Opinions

CLF gives its qualifications argument short shrift. "Whether [a] witness is 'qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert' is a 'threshold matter' that courts consider before analyzing the relevance and reliability of the testimony itself." *Old Gate Partners, LLC v. Paddock Enters., LLC*, Civil Case No. 3:18-CV-01657, 2024 WL 3520168, at \*6 (D. Conn. May 30, 2024) (quoting *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016)). An expert is sufficiently qualified where he has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."

*United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  As outlined above in Section II.A,

it is a virtually foregone conclusion that Dr. Jones has the requisite qualifications to testify on the

Terminal's resilience in the face of potential flooding and climate-related risks.

As both his report and deposition testimony make clear, Dr. Jones is a highly-credentialed

coastal and environmental engineer.  He received a B.S. in coastal engineering, a M.S. in fluid

mechanics with minors in ocean engineering and environmental engineering, and a Ph.D. in

mechanical and environmental engineering.  Ex. 1, Jones Rpt. at 121; Ex. 2, Jones Dep. at 51:19-

52:4.  And, as noted above, he is the current Vice-President of the CORPI Board, an institute within

the ASCE, and he is a member of a U.S. technical advisory group to the IEC, which serves marine

energy trade groups.  Ex. 2, Jones Dep. at 66:8-67:12.  Dr. Jones also authored guidance for the

U.S. Department of Defense to improve its effectiveness and cost-efficiency of sediment

investigations and remedial actions on coastal lands.  Ex. 1, Jones Rpt. at 122.

In his work at Integral, Dr. Jones specializes in marine, coastal, climate, and technology

services.  Ex. 2, Jones Dep. at 59:3-15.  One of his previous projects includes work with San

Mateo County, California, to conduct a vulnerability assessment and adaptation plan for the outer

coast of the county.  *Id.* at 67:13-68:2.  Dr. Jones also led technical investigations for Arctic

Coastal Erosion and Climate Risk Assessment in Alaska.  *Id.* at 68:9-15.  He also served as the

technical lead as part of Integral's role in Coastal Protect Africa, a climate resilient shoreline

management concept in West Africa.  *Id.* at 68:16-22.

CLF's self-serving characterization of Dr. Jones as "an engineer who primarily deals with

distribution of contaminated sediments in the environment," *see* ECF 722-1, at 1, is derived from

its own biased interpretation of Dr. Jones' publication history, *see* Ex. 2, Jones Dep. at 102:21-25

("Q: So for over 25 years you've written over 50 publications, and the majority of them are on

10

the sediments and marine energy; correct?  A: They cover a wide range of topics, so I don't know if I would bucket them that - that narrowly . . .").  In reality, Dr. Jones has authored 51 publications over the course of his career, most of them peer reviewed, including on climate change; sea level rise; environmental permitting, licensing, and compliance; and hydrodynamic modeling.  Ex. 1, Jones Rpt. at 130-134.

Dr. Jones' professional experience also directly correlates to issues pertinent to this litigation.  He has worked on a stormwater monitoring project in San Francisco Bay, and other stormwater monitoring and compliance for multiple entities.  Ex. 2, Jones Dep. at 105:5-21, 106:5-107:3.  He has contributed to Stormwater Pollution Prevention Plans ("SWPPPs"), including contributions to sections on monitoring requirements consistent with local regulations. *Id.* at 116:11-117:2.

CLF's last-ditch argument that Dr. Jones lacks knowledge or experience on all fours with the facts of this case is belied both by Dr. Jones' testimony and Second Circuit case law.  "[A]n expert's knowledge need not be perfectly tailored to the facts of the case."  *Old Gate Partners*, 2024 WL 3520168, at *6 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81-82 (2d Cir. 1997)); *see also Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018) ("If an expert has educational and experiential qualification in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").  Dr. Jones similarly testified that issues of climate change and flooding are important components of his work, even though his CV does not specifically list them as specialties.  *See, e.g.*, Ex. 2, Jones Dep. at 115:4-10; 116:4-10; 117:3-9.

11

It should go without saying that Dr. Jones is more than qualified to offer expert testimony on the Terminal's ability to withstand adverse weather events and whether the Terminal complies with the applicable regulatory framework. As discussed below and in Table 1, specialized engineers like Dr. Jones routinely coordinate with entities, including municipalities, to ensure that structures like the Terminal meet the applicable complex and technical regulations that govern them. CLF's implied criticism that Dr. Jones' lack of a law degree disqualifies his testimony is a misapprehension of the law, a mischaracterization of his experience and expertise, and a misstatement of the nature and scope of his opinions. *See* Sections IV.A.2-3. As demonstrated by his curriculum vitae, education, work history, and accolades, Dr. Jones is well within his field of expertise to offer the testimony CLF now challenges.[5]

### 2. Dr. Jones' Opinions on Complex, Technical Regulatory Requirements Applicable to the Terminal Are Both Proper and Admissible

For the broader set of 20 opinions CLF has challenged, CLF argues that Dr. Jones has shirked Rule 702's guardrails and invaded this Court's province to offer interpretations of what the law requires. Not so. As Dr. Jones explains at the start of his report, he "conducted an analysis to determine whether Defendants' current practices for the [T]erminal align with industry expectations and regulatory requirements. Additionally, [he] assessed the validity of CLF's claims regarding the need for additional climate resilience measures." Ex. 1, Jones Rpt. at 3. Dr. Jones does not opine about what the law requires. The case law is clear that qualified

---

[5] *See also* Dr. Jones' publications: (1) Barr, Z.W., B. Best, W.J. Peplinski, C. Jones, J.D. Roberts, and S, Kramer. 2022. Novel marine energy environmental compliance reporting application summarizes disparate content by tags and location. C. Wyatt and J. Denegre (eds.), Offshore Technology Conference, Houston, TX. doi: 10.4043/31946-MS; (2) Barr, Z.W., J. Roberts, W. Peplinski, S. Kramer, and C. Jones. 2021. The permitting, licensing and environmental compliance process: Lessons and experiences within U.S. marine renewable energy. *Energies*. 14(16): 5048; (3) W.J. Peplinski, J. Roberts, G. Klise, S. Kramer, Z. Barr, A. West, and C. Jones. 2021. Marine energy environmental permitting and compliance costs. *Energies*. 14(16): 4719; (4) Kramer, S., C. Jones, G. Klise, J. Roberts, A. West, and Z. Barr. 2020. Environmental permitting and compliance cost reduction strategies for the MHK industry: Lessons learned from other industries. *J. Mar. Sci. Engr.* 8:554. doi:10.3990/jmse8080554.

experts can offer opinions on the meaning of regulations, their development, and how they are applied within a complex regulatory regime.  That is precisely what Dr. Jones does here.  Dr. Jones's report focuses on applicable regulatory requirements, scenarios that go beyond applicable requirements, and then models the impacts of adverse weather events under different scenarios to determine how the Terminal would respond (see figures below from Dr. Jones' report illustrating the scope of his opinions).



Figure 13.  Maximum Water Levels per NACCS Mean and 95th Percentile Confidence Interval Storm Surge Water Levels for New Haven, Connecticut, and Connecticut's Sea Level Rise for Save Point 271

13



Figure 15.   Flood Depths at the New Haven Terminal and Surrounding Areas for an NACCS Mean
500-Year Flood Event

Note: The callout boxes show local terminal water depths.



Figure 22.   New Haven Terminal's Tank 24, Properly Ballasted, under 500-Year Flood Conditions

14

In this Circuit, "[e]xpert testimony is admissible [] where it addresses an issue of fact and will 'help the trier of fact to understand the evidence or to determine a fact in issue.'"[6] *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542, 2016 WL 11604974, at *2 (N.D.N.Y. Jul. 7, 2016) (quoting Fed. R. Evid. 702(a)).  Courts in the Second Circuit have repeatedly held that, where specialized industries are involved, expert testimony on complex regulatory regimes are ultimately helpful to the trier of fact.  *See, e.g.*, *id.* at *3 (permitting "expert testimony on substantial compliance with" CERCLA regulations given the "complex regulatory framework"); *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y. 2016) ("given the complicated nature of FDA regulations, [] it would be helpful to the jury to have an expert explain this complex regulatory process."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190-91(S.D.N.Y. 2009) (allowing expert testimony on compliance with FDA regulations where the expert's "assessment of the reasonableness of [the defendant's] conduct in light of her experience and her understanding of FDA regulations [would] be helpful to the jury"); *Am. Home Assur. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 451 (S.D.N.Y. 2006) (admitting expert testimony on FDA regulations where the court was "persuaded that [the expert's] testimony on these complex regulatory provisions [would] assist the trier of fact"). This is especially true where questions of compliance implicate both fact and law.  *See Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) ("Experts may testify on … mixed questions of fact and law.").  Few experts in this case—for Plaintiff or Defendants—are more directly experienced to evaluate climate change effects than Dr. Jones.

---

[6] By discussing in this Opposition the proper scope of expert testimony under Rule 702, Defendants are not conceding that there are true issues of disputed facts in this case or that this case should proceed to trial.  To the contrary, Defendants believe that they are entitled to summary judgment on all claims, as stated in their Letter Briefs and as will be fully discussed in their upcoming Motions for Summary Judgment.  *See* ECF 804, 806, Defendants' Letter Briefs.

On this point, the court's analysis in *MPM Silicones* is instructive. There, the district court was tasked with determining whether an engineer serving as an environmental project manager could testify on liability under CERCLA, 42 U.S.C. §§ 9601 *et seq.*, based on its National Contingency Plan ("NCP") provisions. *See* 2016 WL 11604974, at *1. The court acknowledged that it "had broad latitude over the admission of evidence," particularly "where the court has to determine if the expert testimony will be helpful to the fact finder." *Id.* at *3 (internal quotation omitted). Given the complexity of CERCLA's regulatory regime, the court found that testimony on "whether MPM's actions were consistent with the NCP would be helpful to the court in resolving the issues regarding the NCP." *Id.* at *3.[7] This analysis "permit[ing] regulatory experts to testify on complex statutory or regulatory frameworks when that testimony assists the jury in understanding a party's actions within that broader framework," has been repeatedly endorsed by other courts. *Antrim Pharma. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 430-31 (7th Cir. 2020); *United States v. EES Coke Battery, LLC*, No. 22-11191, 2025 WL 1621296, at *8 (E.D. Mich. Jun. 9, 2025), *objections overruled by* 2025 WL 1983451 (E.D. Mich July 17, 2025) (finding an environmental expert focusing on air quality enforcement cases to have sufficient qualification to "help the Court in assessing or weighing the evidence."); *Johnson v. Monsanto Co.*, 333 Or. App. 678, 689 (Or. Ct. App. 2024), *petition for cert. filed,* (U.S. Apr. 22, 2025)(No. 24-1098) ("we disagree with defendant that testimony explaining a relevant and complex regulatory scheme [FIFRA] in a case such as this is an intrusion on the trial court's domain").

---

[7] The fact that *MPM Silicones*' admission of expert testimony on CERCLA's regulatory regime occurred within the context of a bench trial does not alter its applicability here. *See* 2016 WL 11604974, at *3. As the court acknowledged, "[i]t is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different." *Id.* (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

What's more, this Court invited expert testimony to prove up the parties' positions on best industry practices and complicated regulatory regimes.  During its hearing on Defendants' Motion for Partial Summary Judgment, the Court found that "whether best industry practice is to consider climate change factors is simply a question of fact that's not suitable for resolution at this stage where the parties have yet to complete discovery."  ECF 305 at 85:13-16.  The Court explicitly observed that the parties "[a]re going to have to get, I presume probably expert testimony … to say this is what best industry practice is."  *Id.* at 62:11-17.[8]

Relying on the Court's assessment, Defendants retained experts, including Dr. Jones, to address the question the Court posed in October 2023, namely, what the best industry practices are for operation and management of structures like the Terminal.[9]  Put differently, the Court's 2023 analysis confirms that Dr. Jones' testimony would be helpful to the trier of fact, and is therefore admissible.

Dr. Jones' testimony is plainly admissible under these standards.  The CWA, its National Pollutant Discharge Elimination System ("NPDES") enforcement mechanism, and the authority that EPA delegated to Connecticut to implement a NPDES permitting program through CT DEEP, are complex regulatory regimes.  In fact, the Second Circuit has expressly recognized that "the Clean Water Act is 'among the most complex' of federal statutes, and it 'balances a welter of consistent and inconsistent goals,' establishing a complicated scheme of federal regulation

---

[8] Defendants respectfully disagree with the Court's prior ruling, and continue to maintain that CLF's interpretation of the Permit is unsupported and that CLF's claims should not go to trial.  However, Defendants retained experts and have produced expert reports as required by the Court's orders, without waiving their right to seek summary judgment.

[9] After the Court's ruling, CT DEEP issued its 2025 Industrial Stormwater General Permit and related guidance which have made clear that 2018/2021 Permit did *not* require permittees to consider Climate Change Factors to comply with the Permit.  *See e.g.,* Ex. 5, 2025 CT DEEP Industrial Stormwater General Permit; Ex. 6, CT DEEP Nov. 2024 Fact Sheet; Ex. 7, CT DEEP Dec. 2024 Suppl. Fact Sheet.

17

employing both federal and state implementation and supplemental state regulation." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency,* 846 F.3d 492, 514 (2d Cir. 2017) (citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 482, 494 (2d Cir. 2001), *adhered to on reconsideration by* 451 F.3d 77 (N.Y. 2006) ("*Catskill I*")). *See generally* 33 U.S.C. § 1251 et seq., 40 C.F.R. Parts 118, 122-23, 125, 130-31; CONN. GEN. STAT. §§ 22a-426-1 - 22a-426-9. The various technical requirements required to comply with these regimes are far beyond the ken of a lay juror. Dr. Jones' testimony would undoubtedly assist the trier of fact determine whether the Terminal complied with relevant statutory regimes and best industry practices. As such, CLF's motion to exclude Dr. Jones' identified opinions should be denied.

### 3.    Dr. Jones' Opinions on the Terminal's Compliance with Various Industry and Regulatory Mandates Are Admissible

Despite moving to exclude 20 of Dr. Jones' opinions, Plaintiff cherry picks three to purportedly illustrate the alleged deficiencies in Dr. Jones' report. ECF 722-1, at 1-2 (discussing Opinions 1, 3, and 15). Specifically, Plaintiff complains that Dr. Jones goes beyond merely describing the relevant 2018/2021 Permit and that he instead offers opinions about the scope of the 2018/2021 Permit's requirements and whether the Terminal complies. *See id.* Plaintiff's argument misses the mark.

As a preliminary matter, expert "opinion is not objectionable just because it embraces an ultimate issue." That point is clearly established in Fed. R. Evid. 704(a). And as explained above, courts regularly permit experts to testify on complex regulatory regimes that go beyond common juror knowledge. Section IV.A.2, *supra*. At bottom, and especially in this case involving multiple technical permit interpretations, experts are allowed "to testify on relevant regulations and industry standards as a basis to evaluate a defendant's conduct and intent."

18

*Cristobal*, 2024 WL 1506750, at \*3 (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), *aff'd,* 123 F.3d 843 (2d Cir. 1997), *judgment aff'd by* 127 F3d 237 (2d Cir. 1997)).

As detailed below in Table 1, each of Dr. Jones' opinions that CLF challenges are admissible and tailored to assist the trier of fact in assessing Defendants' conduct without impermissibly opining on the law.  Notably, unlike most of CLF's experts, Dr. Jones inspected the Terminal, knows where it is located, and actually reviewed the Permit documents.

**Table 1: Dr. Jones' Opinions which CLF Claims are Legal Opinions and Defendants' Opposition to CLF's Assertions.**

| Challenged Opinion No. | Dr. Jones' Opinion | Why Dr. Jones' Opinion is Not a Legal Opinion |
|---|---|---|
| 1 | "From my perspective as an ocean and environmental engineer, the New Haven Terminal was in full compliance with all applicable requirements of the 2018 Connecticut Multi-Sector General Permit (MSGP) for industrial stormwater at the time CLF submitted its notice of intent (NOI).  The 2018, or 2021, Connecticut MGSPs for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events." Ex. 1, Jones Rept. at 4. | Dr. Jones offers this assessment based on his expertise as a Ph.D. in coastal engineering and his review of the 2018/2021 Permit from an engineering perspective.  Engineers regularly advise permittees under stormwater industrial permits on how to comply with the permit, as engineers write, certify, and stamp SWPPPs.  Because of this responsibility, engineers must understand the standards that apply to the permittee at issue.  *See Forman v. Novartis Pharms. Corp.*, 794 F. Supp. 2d 382, 384 (E.D.N.Y. 2011) ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience."); *Holman v. Illinois Dep't of Corrections*, No. 18-CV-1323, 2024 WL 5131945, at \*5 (C.D. Ill. Dec. 16, 2024) (appeal dismissed), *appeal filed, Holman v. Hughes*, No. 25-1053(7th Cir. Jan. 13, 2025) ("Ms. Stanosheck testified about conducting an extensive investigation of the evidence regarding Plaintiff's disability, the conditions at Pontiac, and the ADA requirements upon which her opinions were based. . . . The Court finds there was no error in allowing Ms. Stanosheck to opine on these issues. '[T]here is a difference between opining on a legal issue and simply relying on legal standards to produce a proper, admissible expert opinion.'" (quoting *Bos. Sci. Corp. v. Cook Med. LLC*, No. 117-cv-03448- |

19

| | | |
|---|---|---|
| | | JRS-MJD, 2023 WL 1476573, at *5 (S.D. Ind. Feb. 2, 2023)). |
| 2 | "The allegations raised in CLF's NOI are based on aspirational standards, future climate modeling, and nonbinding guidance documents that were not incorporated into the 2018 or 2021 Connecticut MSGP and do not establish enforceable compliance obligations." Ex. 1, Jones Rept. at 4. | Dr. Jones offers this assessment based on his expertise as a Ph.D. in coastal engineering and his review of the 2018/2021 Permit from an engineering perspective. As an engineer, Dr. Jones understands the standards that apply to a permittee. Additionally, as the Vice President of the ASCE's COPRI Board, Dr. Jones is uniquely positioned to understand the engineering standards that apply at a facility like the Terminal. In that capacity, Dr. Jones is qualified to determine whether or not CLF's allegations present the true standard or are aspirational because he plays a leading role on the CORPI Board that contributes to advancing best practices and policy guidance. *See DeGregorio v. Metro-North R.R. Co.*, No. 3:05CV533 JGM, 2006 WL 3462554, at *4 (D. Conn. Nov. 1, 2006) (citing *Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 295 (N.D. Ill. 2005) ("If [the expert's] testimony is based on certain regulations in addition to his industry experience, he may reference those regulations."). |
| 3 | "The best management practices (BMPs) implemented at the New Haven Terminal were fully compliant with all regulatory requirements at the time CLF submitted its NOI. The terminal's stormwater pollution prevention plan (SWPPP) was current, complete, and properly executed in accordance with the 2018 Connecticut MSGP—including all monitoring, inspection, and documentation obligations—and does not require the terminal to incorporate climate scenario modeling or long-term oceanographic projections." Ex. 1, Jones Rept. at 4. | Given Dr. Jones' experience as an engineer for more than two decades, Dr. Jones is well positioned to read CLF's NOI alleging technical violations and interpret what is contained within those allegations. The NOI is one of the most technical statements in this case, and critical to what Plaintiff can and cannot provide evidence on. Specifically, Dr. Jones is well qualified to determine whether the Terminal's SWPPP complied with the engineering requirements of the 2018/2021 Permit. Again, engineers advise permittees on how to comply with the industrial stormwater permit. Engineers write, certify, and stamp SWPPPs. Dr. Jones' professional experience makes him qualified to determine whether, from an engineering and scientific perspective, the permit required the Terminal to incorporate climate scenario modeling or long-term oceanographic projections. Dr. Jones has also contributed to SWPPPs. Ex. 2, Jones Dep. at 116:11-117:2. *See Forman*, 794 F. Supp. 2d 384 ("An expert is permitted to draw a conclusion from |

| | | a set of observations based on extensive and specialized experience."); *Am. Home Assur. Co.*, 462 F. Supp. 2d 451(admitting expert testimony on FDA regulations where the court was "persuaded that [the expert's] testimony on these complex regulatory provisions [would] assist the trier of fact"). |
|---|---|---|
| 4 | "The assertion that 'best industry practices' impose a higher compliance standard for many water-based standard than the MSGP is unfounded and unsupported by any authority.  This term has no formal definition within Connecticut's MSGP or the U.S. Environmental Protection Agency's (EPA's) MSGPs from 2015 or 2021, and the term has not been adopted as a binding compliance benchmark."  Ex. 1, Jones Rept. at 4. | Dr. Jones has unique experience, as both Vice President of the American Society of Civil Engineers' CORPI Board, and as the U.S. delegate and standards contributor to the IEC, Technical Committee 14.  Few are regularly present in the room where engineering standards are discussed, debated, and decided.  Dr. Jones has the ideal experience to be able to speak to what "best industry practices" are given that he is one of the engineers that makes those types of determinations collaboratively with his peers.  *Saline River Prop., LLC v. Johnson Controls, Inc.*, No. 10-cv-10507, 2011 WL 6031943, at *3 (E.D. Mich. Dec. 5, 2011) (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."). |
| 6 | "EPA's climate resilience guidance provides nonbinding recommendations and does not create enforceable design or permitting obligations. The New Haven Terminal remains fully compliant with EPA's (2024a) core goal: 'Facilities must be designed, constructed, maintained, and operated to minimize the possibility of a release of hazardous waste or hazardous waste constituents that could threaten human health and the environment.'"  Ex. 1, Jones Rept. at 4. | Dr. Jones works collaboratively with his peers to determine what engineering standards must be met.  Dr. Jones' role as Vice President of the ASCE's CORPI Board includes duties such as "strategic planning, cross-sector collaboration with federal agencies (e.g., USACE, NOAA), facilitating conference sessions, and supporting the advancement of technical knowledge and professional development within the civil and coastal engineering communities."  Ex. 1, Jones Rpt. at 121.  Dr. Jones regularly interfaces with federal agencies and understands the standards they set, as the organization he is a part of, ASCE, releases standards and guidance collaboratively and in line with federal agencies. *Saline River Prop.*, 2011 WL 6031943, at *3 (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."). |
| 7 | "ASCE guidance documents, including ASCE 7 and ASCE 24-14, | As Vice President of the ASCE's CORPI Board, Dr. Jones is uniquely positioned to understand |

21

| | | |
|---|---|---|
| | offer design criteria for new construction and substantial modification. These standards are not retroactive and do not require modifications to existing facilities, such as the New Haven Terminal." Ex. 1, Jones Rept. at 4. | what ASCE guidance documents require. Dr. Jones writes and contributes to these guidance documents, and thus is in a prime position to speak to the meaning of these standards. *See Forman*, 794 F. Supp. 2d 384 ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience."). |
| 8 | "Standards from the International Organization for Standardization (ISO), such as ISO 14090, are voluntary guidance documents intended to support long-term planning. They do not impose binding regulatory obligations on petroleum terminals or alter existing permitting requirements under the MSGP or spill prevention, control, and countermeasure (SPCC) frameworks Ex. 1, Jones Rept. at 4-5. | Dr. Jones is uniquely positioned, both as Vice President of the ASCE's CORPI Board and as the U.S. delegate and standards contributor to the IEC Technical Committee 14 to speak to and interpret what standards setting organizations publish. ASCE regularly reviews other standards setting organizations, so Dr. Jones is well versed in the latest developments from other organizations and how those standards are used by industry. Dr. Jones understands the role of standards setting organizations versus those of a regulatory agency. Also, as USACE project manager for the Hamilton |
| 9 | "Flood risk guidance from the U.S. Army Corps of Engineers (USACE), including ER 1105-2-101 and its supporting manuals, provides planning frameworks for future federal infrastructure projects and does not impose design or retrofit requirements for existing private storage facilities like the New Haven Terminal." Ex. 1, Jones Rept. at 5. | Wetland Restoration project in California, Dr. Jones developed the experience and expertise to be able to opine as to the requirements imposed by USACE. *Saline River Prop.,* 2011 WL 6031943, at *3 (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."); *Forman*, 794 F. Supp. 2d 384 ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience."). |
| 10 | "The American Petroleum Institute (API) and International Association of Oil and Gas Producers (IOGP) provide technical recommendations to support operational resilience, but they do not impose mandatory climate adaptation standards or retrofits for existing aboveground storage tanks." Ex. 1, Jones Rept. at 5. | |
| 11 | "IOGP does not impose binding design or operational standards for addressing climate change risks at | |

| | | |
|---|---|---|
| | existing industrial facilities." Ex. 1, Jones Rept. at 5. | |
| 12 | "API Standards 650 and 653 do not require retroactive climate-specific upgrades. The New Haven Terminal is fully aligned with these core industry expectations."  Ex. 1, Jones Rept. at 5. | |
| 13 | "The New Haven Terminal employs best industry practices not required under the MSGP or other enforceable regulatory standards— such as tank ballasting during storm events—to enhance the structural resilience of its aboveground storage tanks."  Ex. 1, Jones Rept. at 5. | Through his practical experience designing and implementing dozens of engineering projects for more than 20 years, Dr. Jones understands what "best industry practices" requires.  He is also aware based on his experience as Vice President of the ASCE's CORPI Board, and as the U.S. delegate and standards contributor to the IEC, Technical Committee 14 (1) what are "enforceable regulatory standards" and what goes beyond those standards to enhance a facilities' resilience beyond what is required by regulation; and (2) what the difference is between "required" and "discretionary" practices, as he is one who often drafts and collaborates to determine such practices. *Saline River Prop.*, 2011 WL 6031943, at *3 (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."); *Forman*, 794 F. Supp. 2d 384 ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience."). |
| 14 | "The New Haven Terminal meets or exceeds both the enforceable BMP requirements of the MSGP and the discretionary best practices recognized by the petroleum industry." Ex. 1, Jones Rept. at 5. | |
| 15 | "The New Haven Terminal's containment berms are constructed, maintained, and inspected in full compliance with EPA's SPCC and the 2018 and 2021 MSGP. Assertions that these earthen berms are noncompliant or structurally deficient are factually unsupported." Ex. 1, Jones Rept. at 5. | Dr. Jones offers this assessment based on his expertise as a Ph.D. in engineering and his assessment of the Terminal through modeling and his on-site visit.  Dr. Jones used the NACCS modeling framework which incorporates advanced numerical models to simulate the interactions of coastal storms with local topography, bathymetry, and hydrodynamic forces to understand the impact of adverse weather events on the Terminal. Ex. 1, Jones Rpt. at 55.  Based on his site visit and inspection, Dr. Jones observed that the berms were "built from compacted fill and protected with stone."  Ex. 1, Jones Rpt. at 41.  *See Wang*, 2025 WL 1782264, at *3 (denying motion to exclude opinions when expert "employed technical |
| 16 | "The 2018 Connecticut MSGP does not require containment berms to be designed for 'wave attack,' whatever the definition. CLF provides no credible basis for its claims of berm | |

| | | |
|---|---|---|
| | instability, as Nairn's analysis lacks site-specific data on berm composition, cover, and structural design." Ex. 1, Jones Rept. at 5. | methods that are likelier than not to assist the jury and … utilized sufficiently reliable methods and data"). |
| 17 | "The New Haven Terminal's business continuity plan (BCP), facility response plan (FRP), and hazard assessment protocol (HAP) collectively demonstrate compliance with applicable EPA regulations and API standards for inspection and containment. They also incorporate BMPs and best industry practices that address adverse weather risks. These plans reflect a proactive, standards-based approach to environmental and operational resilience." Ex. 1, Jones Rept. at 5. | Through his practical experience designing and implementing dozens of engineering projects over more than 20 years, Dr. Jones understands what "best industry practices" and "BMPs" entail. He is also aware based on his experience as Vice President of the ASCE's CORPI Board, and as the U.S. delegate and standards contributor to the IEC Technical Committee 14 what "compliance" means versus "proactive" management. Further, Dr. Jones can determine whether plans a facility implements would improve its resilience, as these are the types of plans and projects he has developed during his tenure. *Saline*, 2011 WL 6031943, at *3 (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."). |
| 18 | "The 100-year event is the accepted regulatory benchmark for flood protection under Federal Emergency Management Agency (FEMA) standards, EPA's SPCC and MSGP programs, and Connecticut's industrial stormwater permitting framework. It provides a risk-informed basis for infrastructure resilience that protects human health and the environment without requiring speculative or nonbinding design thresholds like the 500-year event." Ex. 1, Jones Rept. at 5-6. | Dr. Jones works collaboratively with his peers to determine what engineering standards must be met. Dr. Jones' role as Vice President of the ASCE's CORPI Board includes duties such as "strategic planning, cross-sector collaboration with federal agencies (e.g., USACE, NOAA), facilitating conference sessions, and supporting the advancement of technical knowledge and professional development within the civil and coastal engineering communities." Ex. 1, Jones Rpt. at 121. Dr. Jones regularly interfaces with federal agencies and understands the standards they set, as the organization he is a part of, ASCE, also releases standards and guidance collaboratively and in line with federal |
| 19 | "Design criteria for newly constructed and substantial modifications for storage tank terminals are appropriately based on the 100-year flood event. Higher thresholds, like the 500-year event, are not required for existing terminals under current law or standards or for best industry practice." Ex. 1, Jones Rept. at 6. | agencies. Given his experience in implementing dozens of coastal adaptation and management projects, Dr. Jones has expertise in the design thresholds required, and is well aware of the vailing standard for hydrologic design in the United States. *Saline River Prop.*, 2011 WL 6031943, at *3 (holding "[e]xpert testimony is admissible to show custom and usage in an industry even if that testimony embraces the ultimate issue to be decided by the trier of fact."); |

24

| 29 | "NOAA Atlas 14 is the prevailing standard for hydrologic design in the United States. NOAA Atlas 15 has not been adopted by EPA or the Connecticut Department of Energy and Environmental Protection (CT DEEP)."  Ex. 1, Jones Rept. at 7. | *Forman*, 794 F. Supp. 2d 384 ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience."). |
|---|---|---|
| 25 | "Projected sea level rise over the next 5 years does not pose a structural risk to the terminal's aboveground storage tanks.  The 2024 Connecticut Stormwater Quality Manual, for the first time, mentions that sea level will rise 20 inches by 2050, but it still does not prescribe that permittees take action to address any specific impacts." Ex. 1, Jones Rept. at 6. | Dr. Jones offers this assessment based on his expertise as a Ph.D. in engineering and his review of the 2018/2021 Permit from an engineer's perspective. As an engineer who designs coastal adaptation and management strategies, Dr. Jones understands the structural risk posed by sea level rise, and whether the 2018/2021 Permit requires such risk assessment.  *Holman*, 2024 WL 5131945, at *5 (appeal dismissed) ("Ms. Stanosheck testified about conducting an extensive investigation of the evidence regarding Plaintiff's disability, the conditions at Pontiac, and the ADA requirements upon which her opinions were based. . . . The Court finds there was no error in allowing Ms. Stanosheck to opine on these issues. '[T]here is a difference between opining on a legal issue and simply relying on legal standards to produce a proper, admissible expert opinion.'" (quoting *Bos. Sci. Corp. v. Cook Med. LLC*, 2023 WL 1476573, at *5). |

CLF's perfunctory criticism misrepresents both the scope of Dr. Jones' opinions and settled precedent in the Second Circuit that permits his testimony.  *See, e.g., Wang*, 2025 WL 1782264, at *3 (denying motion to exclude opinions when expert "employed technical methods that are likelier than not to assist the jury and … utilized sufficiently reliable methods and data"); *Reynolds v. Arnone*, 645 F. Supp. 3d 17, 25-26 (D. Conn. 2022) (holding that expert's "correctional best practices" opinions were "reliable in light of his extensive, specialized experience," including his "substantial practical experience in corrections, particularly in developing correctional policies") (quoting *E.E.O.C. v. Beauty Enters., Inc.*, 361 F. Supp. 2d 11,

19 (D. Conn. 2005)).  In each of the 20 opinions detailed above, Dr. Jones diligently assesses the applicable regulatory frameworks as well as industry benchmarks to evaluate Defendants' conduct against the broad-sweeping condemnation of CLF's claims.  Such testimony is clearly admissible and would be helpful to the jury.  *See, e.g.*, *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d at 467-68 (permitting a doctor to testify on a pharmaceutical label's compliance with FDA regulations given the "complex," "intricate and technical" nature of the governing regulatory framework and industry practices).  Indeed, Plaintiff does not criticize Dr. Jones' methodology, but rather attacks his conclusions, claiming they are legal opinions.  Just because CLF does not agree with Dr. Jones' conclusions does not make them impermissible legal opinions.  On the contrary, to the extent CLF disagrees with Dr. Jones' analysis, it can test his credibility on cross examination.  Defendants respectfully request this Court deny CLF's motion to exclude Dr. Jones' testimony.

> **B.    The Delft3D FM Model Has Been Appropriately Disclosed and Is Otherwise Admissible**

In a confusing argument, CLF also moves to preclude Dr. Jones from offering any opinions regarding the Delft3D FM Model ("Delft3D") that his team prepared for the Terminal. ECF 722-1 at 9.  For simplicity, Delft3D is one of the most frequently used hydrodynamic modeling programs, used by EPA and other agencies around the world. In short, CLF contends that Defendants' oil fate and transport expert, Dr. Deborah French-McCay, cannot rely on the Delft3D model, which Dr. Jones and his team prepared, because Dr. Jones did not discuss the model in his own expert report.  Because Dr. French-McCay used the Delft3D model as an input for her own oil spill model ("SIMAP"), and because Dr. Jones generated but did not explicitly opine on the Delft3D model in his report, CLF contends that neither expert should be allowed to testify about or rely on the Delft3D model.  *See id.* at 8-12.  As explained above, CLF cannot

indiscriminately purge contrary evidence to bolster its own claims.  Dr. Jones is allowed testify to the inputs and operation of the Delft3D model upon which Dr. French-McCay relied.  As such, Defendants respectfully request that the Court deny CLF's motion to exclude Dr. Jones' testimony on Delft3D.

### 1.    The Delft3D Model Is the Industry Standard and Was Adequately Disclosed

Deltares, a technology institute based in The Netherlands, developed a software to "simulate storm surges, hurricanes, tsunamis, detailed flows and water levels, waves, sediment transport and morphology, water quality and ecology" under the name Delft3D-FM.[10]  Far from being an obscure tool known to few, Delft3D is the industry standard for hydrodynamic models.  It is widely used across both public and private sectors to create hydrodynamic models to support numerous projects and initiatives.  Delft3D's user base includes the EPA, U.S. Geological Survey, the U.S. Army Corps of Engineers, the National Oceanic and Atmospheric Administration ("NOAA"), and the U.S. Navy.[11]  ***Plaintiff's own expert modeler, Robert Nairn,***

---

[10] *See* Deltares, *Delft3D FM Suite 2D3D*, https://www.deltares.nl/en/software-and-data/products/delft3d-flexible-mesh-suite (last accessed Oct. 29, 2025).

[11] *See, e.g.,* EPA, *Crisfield Nature-Based Strategies Research—Technical Working Group 4*, https://assessments.epa.gov/risk/document/&deid%3D365530 (last accessed Oct. 29, 2025); M.W. Brand, *et al.*, *Multi-Decadal Simulation of Marsh Topography Under Sea Level Rise and Episodic Sediment Loads*, Journal of Geophysical Research: Earth Surface, 127, e2021JF006526 (2022), available at: https://doi.org/10.1029/2021JF006526 (USGS, NOAA); R.C. Martyr-Koller, et al., *Application of an unstructured 3D finite volume numerical model to flows and salinity dynamics in the San Francisco Bay-Delta*, Estuarine, Coastal & Shelf Science, 192:86-107 (2017), available at: https://www.sciencedirect.com/science/article/pii/S0272771416307120; US Army Corps of Engineers, GIWW Coastal Resiliency Study, Texas, Review Plan (2020), available at: https://www.swg.usace.army.mil/Portals/26/docs/Planning/Review%20Plans/GIWW%20CRS%20FS/GIWW%20CRS%20Feasibility%20Study%20Updated%20Review%20Plan%20(Oct%202020)R4_Redacted.pdf?ver=dV12YbO2DP_npsdzDaAd7w%3D%3D; J. Veeramony, *et al.*, *Validation of Delft3D as a Coastal Surge and Inundation Prediction System*, Naval Research Lab (Apr. 7, 2016), https://apps.dtic.mil/sti/html/tr/ADA631769/; L. Zhu, *et al.*, *Numerical Modeling of Circulation and Wave Dynamics Along the Shoreline of Shinnecock Indian Nation in Long Island, New York*, USGS (Aug. 20, 2024), https://www.usgs.gov/publications/numerical-modeling-circulation-and-wave-dynamics-along-shoreline-shinnecock-indian.

***as well as his employer, the consulting firm Baird & Associates, have used the Delft3D***

***hydrodynamic model in its projects***.[12]

Delft3D has been employed in multiple peer-reviewed studies assessing flood vulnerability and resilience planning in U.S. coastal environments.[13]  One study applied Delft3D to simulate flooding impacts during Hurricane Michael in the northeastern Gulf of Mexico, demonstrating the model's capability to handle coupled tide-wave-surge dynamics under extreme conditions.[14]  These peer-reviewed studies support Delft3D as a technically robust and credible modeling platform for coastal flood assessments.  Plaintiff has made no statement to the contrary, nor has Plaintiff argued that Delft3D is not reliable.

Federal courts have recognized that Delft3D is a reliable and generally accepted hydrodynamic model.  In fact, the Fourth Circuit Court of Appeals stated "[t]he Delft3D model is a sophisticated simulation tool capable of taking into account water and sediment flows in the context of water level, tides, currents, waves, and winds." *Nat'l Audubon Society v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 582 (4th Cir. 2021) (*affirming Nat'l Audubon Society v. U.S. Army Corps of Eng'rs*, 420 F. Supp. 3d 409 (E.D. S.C. 2019)).  In *National Audobon*, the Fourth Circuit explained how the Army Corps of Engineers had used the Delft3D model to measure the

---

[12] *See, e.g.*, Baird, *Mardi Project: Hydrodynamic Modelling Report* (Mar. 12, 2020), https://www.epa.wa.gov.au/sites/default/files/PER_documentation2/A06-1_Hydrodynamic_Modelling_Report.pdf; R. Nairn, *et al.*, *Examination of the Physical and Biological Implications of Using Buried Channel Deposits and Other Non-Topographic Offshore Features as Beach Nourishment Material*, U.S. Dep't of the Interior Minerals Mgm't Serv. (Oct. 2007), https://espis.boem.gov/final%20reports/4274.pdf.

[13] W. Lee, *et al.*, *Hindcasting compound pluvial, fluvial and coastal flooding during Hurricane Harvey (2017) using Delft3D-FM, Natural Hazards*, 120(1), 851-880 (2024); D.F. Muñoz, *et al., Inter-model comparison of Delft3D-FM and 2D HEC-RAS for total water level prediction in coastal to inland transition zones*, JAWRA Journal of the American Water Resources Association, 58(1), 34-49 (2022); S. Han, S., *et al., Variability in surge levels in communities adjacent to the Houston Ship Channel industrial Corridor to changes in Hurricane characteristics*, Coastal Engineering Journal, 66(2), 270-293 (2024).

[14] A.E. Elkut, *et al.*, *Performance of Parametric, Physics-Based, and Blended Approaches for Hurricane Atmospheric Forcing in Coastal Modelling* (2025), available at SSRN: https://ssrn.com/abstract=5401575 or http://dx.doi.org/10.2139/ssrn.5401575.

28

environmental effects of different erosion rates, and affirming the trial court's order rejecting the plaintiff's challenge to the Corps' modeling and conclusions.  991 F.3d at 582.

In this case, Dr. Jones' team at Integral ran the Delft3D model to evaluate water levels and their associated water depths over inland areas.  *See* Ex. 9, Expert Report of Deborah French-McCay, Ph.D. ("French-McCay Rpt."), Appx. B – Integral Memo Describing Storm Model Preparation.  Dr. Jones completed the modeling analysis to demonstrate the fundamental problems with CLF's speculations.  Instead of merely speculating how adverse weather conditions might affect the Terminal, Dr. Jones used appropriate scientific methods to identify, model, and analyze the impacts of these events could hypothetically have on the Terminal.

Far from concealing his use of the modeling tool—as CLF implies—Dr. Jones clearly testified during his deposition that he relied in part on Delft3D in connection with his retention in this case.  *See, e.g.*, Ex. 2, Jones Dep. at 135:18-23 ("Q: What is the name of the model that you are relying on?  A: The key models [I am] relying on [are] FEMA flood plain maps that are informed by models that FEMA commissions; the NACCS model, which I reference in the report, the Delft Flexible Mesh model which I use.").  Dr. Jones plainly testified to CLF that the Delft FM model was conducted by him and another member of his team at his direction, *id.* 136:23-24, and he twice affirmed that his "opinions are informed by the Integral [*i.e.,* Delft3D] modeling." *See id.* 137:5-138:2.  Importantly, Dr. Jones also noted that he reviewed other models, such as the CIRCA model; flood plain maps generated by FEMA models; and the NACCS model as well, yet Plaintiffs assert no complaints with this reliance.  Ex. 1, Jones Rpt. at 58; Ex. 2, Jones Dep. at 135:18-23.

Defendants agree that Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that a retained expert issue a report that contains "a complete statement of all opinions the witness will

29

express and the basis and reasons for them." Dr. Jones has done so. Despite CLF's apparent misapprehension of Dr. Jones' deposition testimony, and, quite possibly his report, Dr. Jones does not offer any opinion *about* Delft3D. Nonetheless, as he repeatedly informed Plaintiff, Delft3D was one of multiple models that informed his opinions about the Terminal. *See* Ex. 2, Jones Dep. at 135:18-23; 138:13-139:2. Dr. French-McCay subsequently utilized the Delft3D model as an input for her oil spill modeling, and she not only disclosed that reliance in her report, but attached the description of the Integral Delft3D model as an Appendix to her report. *See* Ex. 8, French-McCay Rpt. at Appx. B at 7; *see also* Ex. 2, Jones Dep. at 138:20-139:2 ("Q. Dr. Jones, have you completed modelling for the New Haven Terminal? A. Yes. Q. Which modelling? A. The Delft FM model that is included as an appendix in the French McCay report and the tank modelling -- the tank risk modelling that is included in my report."). Defendants also produced all model runs and spreadsheets Dr. Jones and his team generated with the Delft3D model.

Contrary to everything in this case, CLF alleges "Integral has not been designated as an expert consultant, its opinion was not disclosed, and it was not available for cross-examination," is simply unfounded. *See* ECF 722-1, at 4. That is simply not backed up by any fact whatsoever. A principal at Integral and a worldwide leader in coastal analysis, Dr. Jones and his team worked on his report, on the Delft3D model, and on other models described in his report.

Again contrary to CLF's unsupported statements, Dr. Jones is a designated expert who was timely disclosed, whose opinions were properly and fully described in his report, and who was made available for deposition by CLF. And during his deposition, Dr. Jones clearly and repeatedly told Plaintiff that he helped run the Delft3D model. *See* Ex. 2, Jones Dep. at 135:18-23; 138:13-139:2. In fact, CLF admits that it knew Dr. Jones participated in the model because

30

Defendants produced the Delft3D model run files, which included "Jones" in the filename. ECF 722-1, at 10. Moreover, some versions of Delft3D are "open source" software so, CLF had the ability to use, explore, and evaluate Delft3D. At his deposition, CLF had abundant opportunity to cross-examine Dr. Jones about Delft3D during his deposition, including when he explicitly disclosed his involvement. But CLF asked no questions about the model or the modeling Dr. Jones completed.

Just because CLF passed up the opportunity to ask Dr. Jones "how the Delft3D FM model was run or the inputs that were used," does not mean that "there is not a testifying expert in this litigation on the Delft3D FM model." *See* ECF 722-1, at 11. That witness is Dr. Jones.[15] "The point of expert disclosure is to provide one's opponent with sufficient detail to permit preparation of its defense." *Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-CV-2000, 2023 WL 4304875, at *7 (D. Conn. Jun. 30, 2023) (cleaned up). CLF had ample opportunity to prepare its case; its failure to examine Dr. Jones about his use of the Delft3D model does not therefore render his testimony about it inadmissible.

---

[15] CLF was put on timely notice that another member of Dr. Jones' Integral team helped run the Delft3D model. Ex. 2, Jones Dep. at 136:23-24; *see also* Ex. 10, Deposition of Deborah French-McCay, Ph.D., at 46:2-49:24 (explaining that Integral ran the Delft3D model that she used as input for her SIMAP model). CLF easily could have requested more information or sought the deposition of the Integral team member to testify about the model. What's more, it is both a common and permissible practice for a party's experts to rely on each other and third-party experts when preparing their reports. *See, e.g.*, *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) ("The Federal Rules of Evidence specifically provide that an expert may rely on facts or data perceived by *or* made known to the expert at or before the hearing.") (internal quotation omitted) (emphasis in original); *Wasilewski v. Abel Womack, Inc.*, No. 3:10-CV-1857, 2016 WL 183471, at *9 (D. Conn. Jan. 14, 2016) ("An expert may also rely on data from other cases or studies that he did not collect himself."). CLF's expert, Dr. Wendi Goldsmith, for example, routinely cited other CLF experts in forming her opinions, including Drs. Barlow, Horner, O'Donnell, and Nairn. *See generally* ECF 751, Sealed Ex. F, Goldsmith Rpt. at 29. Further, both Defendants' and CLF's experts rely on NACCS models in their analyses, even though neither party disclosed NACCS as an expert. *See, e.g.*, Ex. 2, Jones Dep. at 135:18–23; ECF 770, Sealed Ex. A, Nairn Rpt. ii n.5, 16-17.

### 2.    Any Challenge to the Data Underlying the Delft3D Model Goes to Weight, Not Admissibility

Plaintiff comes forward with no evidence or even a bare-bones argument that the Delft3D model is unreliable or erroneous in any way.  Nor does Plaintiff address or discuss any of the methodology or findings of the model, which are explained and described fully in Appendix B of the report of Dr. French-McCay.  Ex. 8, French-McCay Rpt. Appx. B.  Instead, in a throw-away sentence, CLF complains that "[t]here was no calibration or validation of the data presented in either Dr. Jones' report or the French-McCay report."  ECF 722-1, at 10.  To the extent this constitutes another argument against the admissibility of Delft3D, this Court should reject it.  As explained above, Delft3D is a generally accepted and widely used hydrodynamic model that has been found to be reliable and admissible in federal court.  *Nat'l Audubon*, 991 F.3d 577; *Nat'l Audubon*, 420 F. Supp. 3d 409.

Where the proponent of expert testimony has proven its reliability, other "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009), *subsequent determination*, 882 F. Supp.2d 496 (S.D.N.Y., 2012), *judgment aff'd,* 513 Fed. App'x 30 (2nd Cir. 2013); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve"); *Caraballo v. Home Depot U.S.A., Inc.*, No. 3:21-CV-252, 2025 WL 1639694, at *7 (D. Conn. Jun. 10, 2025).  "[C]riticisms" that go "to the weight of the evidence" are "matters for cross-examination and argument to the jury." *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015).

As made clear by Federal Rule of Evidence 703, "facts or data in the particular case upon which an expert bases an opinion or inference" "need not be admissible in evidence" "[i]f

32

experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." One of CLF's own expert has used Delft3D in published reports, *see* fn. 12 above, while another concedes that Delft3D is a reliable hydrodynamic model. Dr. Jacqueline Michel testified that Delft3D is "generally accepted as" a "state-of-the-art hydrodynamic and modeling framework," produced by "a leading Dutch research institute specializing in water and subsurface systems" and "widely used in regulatory, academic, and engineering contexts for flood risk assessment" and "environmental impact analysis." Ex. 4, Michel Dep. 121:23-122:16. At best, then, CLF's complaints about the Delft3D model, such as they are, go to its weight, not its admissibility. To the extent Plaintiff wishes to challenge the inputs to the model, it may cross-examine Dr. Jones on those issues at trial.

## V.     CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's *Daubert* Motion to Preclude the Expert Testimony of Dr. Craig Jones [ECF 722].

Dated: November 3, 2025

Respectfully submitted,

*/s/ Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
KING & SPALDING LLP
1180 Peachtree Street, N.E., Suite 1600
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
KING & SPALDING LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
HILGERS GRABEN PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
BEVERIDGE & DIAMOND, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
T: (203) 498-4400

34

F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
BEVERIDGE & DIAMOND, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

***Counsel for Defendants***

35

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

36