**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| EQUILON ENTERPRISES LLC, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | November 3, 2025 |
| Defendants. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE THE EXPERT TESTIMONY OF DEBORAH FRENCH-McCAY, Ph.D.

Defendants Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") hereby submit this response in opposition to Plaintiff's Motion to Preclude the Expert Testimony of Deborah French-McCay, Ph.D. [ECF 714]. As explained below, Dr. French-McCay is an internationally recognized University of Rhode Island Ph.D. oceanographer and oil spill modeler, who for over forty years has worked on hundreds of oil spills, including the Deepwater Horizon spill, for which she conducted modeling on behalf of the federal government. In this case, to dispel the unsupported claims the Terminal is a future disaster, Dr. French-McCay prepared modeling for the Terminal, assuming the highly unlikely event that a spill and release from the Terminal would occur. Based on her modeling, Dr. French-McCay concludes that even in a Worst Case Discharge scenario, releases from the Terminal would not reach New Haven Harbor. Because Dr. French-McCay is well qualified to offer her opinions, and her modeling and opinions meet the reliability and relevance

**ORAL ARGUMENT REQUESTED**

requirements of Federal Rule of Civil Procedure 702, Plaintiff's motion should be denied in its

entirety.

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT.................................................................................. 1

II. BACKGROUND ON DEBORAH FRENCH-MCCAY, PH.D. ........................................ 3

  A. Background and Qualifications............................................................... 3

  B. Dr. French-McCay's Modeling and Opinions........................................... 6

  C. The Delft3D-FM Hydrodynamic Model................................................... 9

III. LEGAL STANDARD ....................................................................................... 12

IV. ARGUMENT..................................................................................................... 13

  A. Dr. French-McCay Is Eminently Qualified and an Undisputed Leader in her Field ................................................................................................... 14

  B. The Delft3D-FM Model Is a Reliable and Validated Model that Is the Industry Standard, and Plaintiff Was Well Aware of its Provenance ................... 18

    1. Dr. French-McCay's Use of Hydrodynamic Model Inputs Into Her SIMAP Model Is Routine and Comports with Well-Accepted Methods.................................................................................... 18

    2. Dr. French-McCay's Use Of The Delft3D FM Model As An Input Into Her SIMAP Was Properly and Timely Disclosed............................. 24

  C. Dr. French-McCay's SIMAP Has Been Validated to Reliably Model Oil Spills in a Variety of Conditions, including Hurricanes ..................................... 27

V. CONCLUSION..................................................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
   9 F.4th 768 (8th Cir. 2021) ...................................................................................................19

*Caraballo v. Home Depot U.S.A., Inc.*,
   No. 3:21-CV-252, 2025 WL 1639694 (D. Conn. Jun. 10, 2025) ...........................................28

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir.), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133
   L.Ed.2d 126 (1995) ..............................................................................................13, 19, 20, 24

*Gussack Realty Co. v. Xerox Corp.*,
   224 F.3d 85 (2d Cir. 2000)....................................................................................................25

*Johnson v. Manitowoc Boom Trucks, Inc.*,
   484 F.3d 426 (6th Cir. 2007) ................................................................................................19

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
   772 F.3d 1352 (11th Cir. 2014) ............................................................................................19

*Max Zach Corp. v. Marker 17 Marine*,
   No. 3:23-CV-01088 (VDO), 2024 WL 4614487 (D. Conn. Oct. 30, 2024)...........................12

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995)..................................................................................................28

*Nat'l Audobon Society v. U.S. Army Corps of Eng'rs.*,
   991 F.3d 577 (4th Cir. 2021) ................................................................................................23

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)....................................................................................................20

*Perkins v. Origin Medsystems, Inc.*,
   299 F. Supp. 2d 45 (D. Conn. 2004).....................................................................................20

*Post Univ. Inc., v. Learneo, Inc.*,
   No. 3:21-CV-01242 (VDO), 2025 WL 2709370 (D. Conn. Sept. 23, 2025) ....................12, 13

*Reynolds v. Arnone*,
   645 F. Supp. 3d 17 (D. Conn. 2022)......................................................................................19

*United States v. Donald*,
   No. 3:21-cr-8 (VAB), 2023 WL 6958797 (D. Conn. Oct. 20, 2023) ....................................12

*United States v. Romano,*
794 F.3d 317 (2d Cir. 2015)............................................................................................28

*United States v. Tin Yat Chin,*
371 F.3d 31 (2d Cir. 2004)..............................................................................................15

*Vellali v. Yale Univ.,*
No. 3:16-CV-1345(AWT), 2022 WL 968555 (D. Conn. Mar. 30, 2022) ..............................25

*Wang v. Omni Hotels Mgmt. Corp.,*
No. 3:18-CV-2000, 2023 WL 4304875 (D. Conn. Jun. 30, 2023) .........................................27

*Wang v. Omni Hotels Mgmt. Corporation,*
No. 3:18-cv-2000 (VDO), 2025 WL 1782264 (D. Conn. June 27, 2025) ..............................13

*Wasilewski v. Abel Womack, Inc,*
No. 3:10-CV-1857 (VAB), 2016 WL 183471 (D. Conn. Jan. 14, 2016) ...............................25

*In re Wright Med. Technology Inc. Conserve Hip Implant Prods. Liab. Litig.,*
127 F. Supp. 3d 1306 (N.D. Ga. 2015) ...............................................................................14

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.,*
LLC, 571 F.3d 206 (2d Cir. 2009) .....................................................................................28

**Statutes**

Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*........................................................................1

Comprehensive Response, Compensation and Liability Act,
42 U.S.C. §§ 9601 *et seq.* ("CERCLA")...........................................................................5

Resource Conservation and Recovery Act,
42 U.S.C. §§ 6901 *et seq.* ("RCRA") ................................................................................1

**Other Authorities**

Fed. R. Evid. 401 ...............................................................................................................12

Rule 403 ............................................................................................................................12

Fed. R. Evid. 702 ..........................................................................................................12, 13

Fed. R. Evid. 703 ..........................................................................................................25, 28

Federal Rule of Civil Procedure 26(a)(2)(B) ..................................................................24, 26

## I.    PRELIMINARY STATEMENT

In this lawsuit, Plaintiff Conservation Law Foundation ("Plaintiff" or "CLF") alleges the New Haven Terminal is not prepared for adverse weather events, including sea level rise, storm surges, and floods.  The picture CLF paints is extreme, suggesting the petroleum storage tanks at the Terminal—which are inspected daily and maintained on a strict schedule—will break apart, float away, and pollute the New Haven Harbor.  Assuming extreme weather conditions that never have been identified in the New Haven area, CLF alleges that Defendants violated the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"), and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq*. ("RCRA"), at their New Haven Terminal (the "Terminal").  Amd. Cmp. [ECF 47].  For example, Plaintiff alleged that "the Terminal is likely to discharge and/or release pollutants into surrounding surface waters, groundwater, the community, and the air because it has not been designed to withstand flooding associated with storm events and storm surge, tides, sea level rise, and increasing sea surface temperatures." *Id.* at ¶ 14.  Throughout its Amended Complaint, Plaintiff claims the 2018/2021 Permit[1] contains an "implied" term that requires permittees, including the Terminal, to consider severe weather events caused by climate change—even though the 2018/2021 Permit does not contain any such express requirement. Plaintiff's experts offered general opinions to support these claims; however, none of Plaintiff's experts came forward with any opinions about the likelihood of tank failures or of releases of petroleum products to New Haven Harbor.

---

[1] The permit at issue at the time this lawsuit was filed (the "2018/2021 Permit") was the Connecticut Department of Energy and Environmental Protection ("CT DEEP") 2018 General Permit for the Discharge of Stormwater Associated with Industrial Activity.  In 2021, CT DEEP renewed the Permit without any substantive changes.

CLF presented no expert on the structural stability of the tanks at the Terminal and no expert that modeled the potential for release of products from the Terminal to New Haven Harbor.

In response to CLF's claims and speculative expert opinions, Defendants designated Deborah French-McCay, Ph.D., an internationally recognized expert in oil and chemical spill fate and effects modeling. Ex. 1, Expert Report of Deborah French-McCay, Ph.D. ("French-McCay Rpt."). A distinguished graduate of the University of Rhode Island Oceanography doctoral program, she has worked on numerous high-profile projects for state, federal, and international governments, as well as private clients, over the course of 40+ years. In fact, for decades she has worked with *two of Plaintiff's rebuttal experts*, Jacqueline Michel and Edwin Levine, both of whom *candidly admit that they hold Dr. French-McCay in high regard*, and would work with her again, without hesitation. Ex. 2, Deposition of Jacqueline Michel, Ph.D. ("Michel Dep.") at 43:4-44:10; Ex. 3, Deposition of Edwin Levine ("Levine Dep.") at 51:7-51:21, 52:1-52-11, 52:25-53:8, 53:22-54:1.

In this case, Dr. French-McCay developed and ran a computerized oil spill transport model that considered site-specific information from the Terminal and New Haven Harbor, including a hydrodynamic model prepared by Defendants' expert Dr. Craig Jones and his team at Integral Consulting. Ex. 1, French-McCay Rpt. at 16 &Appx. B. Dr. French-McCay concluded that it is highly unlikely that a release from the Terminal would ever occur; but that even if a release were to occur, products released from the Terminal would not reach the Harbor. In her comprehensive report, Dr. French-McCay explained the methodology she used; in her deposition, she further explained that it is the same methodology she uses in her work outside of litigation. Ex. 4, Deposition of Deborah French-McCay, Ph.D. ("McCay Dep.") at 92-93.

Plaintiff now attacks every aspect of Dr. French-McCay, her modeling, and her opinions. *First*, Plaintiff argues that Dr. French-McCay is not qualified to offer opinions about a hydrodynamic model (the "Delft3D-FM Model") that she used as input for her own oil spill model, and that the Delft3D-FM Model was generated by an "undisclosed expert."  *Second*, Plaintiff argues that Dr. French-McCay's proprietary Spill Impact Model Application Package ("SIMAP") model has not been properly validated and is therefore unreliable.  As will be explained fully below, both arguments are incorrect and mischaracterize the evidence.  Notably, at no point does Plaintiff present any evidence or even attorney argument that the methodology of either the Delft3D-FM Model or the SIMAP model is unreliable or incorrect, that the inputs used in either model are incorrect or unreliable, or that the results of either model are unreliable or incorrect.  To the contrary, *Plaintiff's own expert*, Dr. Jacqueline Michel, acknowledges that the Delft3D-FM Model is the industry standard and generally accepted in the industry. Plaintiff's motion to preclude Dr. French-McCay should be denied.  Her opinions are reliable and admissible under any standard.

## II.    BACKGROUND ON DEBORAH FRENCH-McCAY, Ph.D.

### A.  Background and Qualifications

Deborah French-McCay is an internationally recognized authority in oil and chemical spill fate and effects modeling for response planning, risk assessments and impact evaluations. Ex. 1, French-McCay Rpt. at 8 & Appx. L (CV).  Dr. French-McCay earned a Ph.D. in Oceanography from the University of Rhode Island.  *Id.* at Appx. L.  During her career, she developed a three-dimensional oil spill transport and fate model called **SIMAP** which has been

used to evaluate and study hundreds of spills of petroleum products around the world.  *Id.* at 13.[2]

As Dr. French-McCay explained in her Report, "[t]he SIMAP model has been validated with

data from >20 large oil spills, including the *Exxon Valdez*, *North Cape*, and Deepwater Horizon

(DWH) oil spills."  *Id.* (citations omitted).

Besides her direct modeling experience, Dr. French-McCay has published about 90

articles in peer-reviewed publications as well as over 30 publicly available technical reports in

which she describes her model and the results of her work on numerous oil spills.  *Id.*  She has

made scores of presentations at conferences and has taught courses relating to spill modeling in

conjunction with scientists from the U.S. National Oceanic and Atmospheric Administration

("NOAA").[3]  *Id.*

For more than 40 years, Dr. French-McCay has worked with numerous government

organizations and private clients to evaluate transport, fate, exposure and effects of pollutants.

*Id.*  She has worked on hundreds of projects modeling spills in U.S. waters and around the world,

including in Rhode Island, Delaware, Texas, Louisiana, California, Alaska, Washington State,

and Florida.  Some of her more notable projects include:

- **Deepwater Horizon oil spill**.  In 2010, the Deepwater Horizon oil rig explosion

  killed 11 people, injured 17, and released 134 million gallons of oil into the Gulf of

  Mexico.[4]  It was the largest marine oil spill in U.S. history and the largest accidental

---

[2] *See also* https://www.rpsgroup.com/services/oceans-and-coastal/modelling/simap/; D. French-McCay, *et al.*, *Oil fate and mass balance for the Deepwater Horizon oil spill*, Marine Pollution Bulletin 171 (2021) 112681, available at https://www.sciencedirect.com/science/article/pii/S0025326X21007153.

[3] *See, e.g.*, *OR&R Prepares for 2024 International Oil Spill Conference*, available at https://response.restoration.noaa.gov/orr-prepares-2024-international-oil-spill-conference.  The International Oil Spill Conference "is part of a triennial series of events including Interspill in Europe and Spillcon in Asia.  The rotating conferences provide a platform for the sharing of oil spill preparedness and response expertise and ideas from around the globe."  https://www.iosc.org/.  The last conference, in which Dr. French-McCay was part of the faculty, took place in 2024.  The next conference is scheduled for May 2027 in Savannah, Georgia.  *Id.*

[4] *See* https://www.fisheries.noaa.gov/news/deepwater-horizon-10-years-later-10-questions.

oil spill in the world.[5]  Working for NOAA for six years, Dr. French-McCay performed and managed oil spill modeling with her SIMAP model and developed supporting spill data, both "for the purposes of evaluating transport, fate, exposure, and injuries to water column resources."  Ex. 1, French-McCay Rpt. at 8; Appx. L at 4.  Her work on this project is discussed in over a dozen separate peer-reviewed publications and additional technical reports, all of which are listed in her References (Ex. 1, French-McCay Rpt. at 38-39) and Curriculum Vitae (Ex. 1, French-McCay Rpt. Appx. L at 6-8, 11-13).

- **North Cape oil spill**.  In 1996, on behalf of NOAA, Dr. French-McCay performed a Natural Resource Damage Assessment after the barge North Cape ran aground in the south coast of Rhode Island, spilling approximately 828,000 gallons of home heating oil.  Ex. 1, French-McCay Rpt. at 5, 13.  Dr. French-McCay performed computer modeling of oil fates and acute toxic effects with her SIMAP model.  Model results were validated against observational data taken after the spill, including water concentrations and numbers of lobsters killed.  *Id.*  This project also resulted in several articles published in the peer-reviewed literature.  *Id.,* Appx. L at 9-10.

- **Department of Interior Natural Resource Damage Assessment model under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA").**  Early in her career, Dr. French-McCay developed two models, in 1987 and 1996, to compute the fate and biological effects of a wide variety of substances that might be spilled in the marine environment.  The final Natural Resource Damage Assessment Model for Coastal and Marine

---

[5] *Id.*

Environments (NRDAM/CME) model, which was adopted by DOI as a final rule, can be run for 429 chemicals and 33 oils in all coastal waters of the U.S., including Hawai'i, Alaska, and U.S. protectorates in the Pacific and Caribbean. Ex. 1, French-McCay Rpt. at 23, 27.

Some things in law are close calls, but there can be no doubt that Dr. French-McCay is eminently qualified to perform the oil spill modeling that she did for this case.

## B. Dr. French-McCay's Modeling and Opinions

To dispel the unsupported misinformed suggestions the Terminal is a disaster waiting to happen, Dr. French-McCay offers her opinion on the potential trajectory, fate, and adverse environmental impacts of a hypothetical oil spill at the New Haven Terminal. From an evidentiary perspective, Dr. French-McCay modeled a spill under the assumption that a maximum credible discharge ("MCD") of oil would be released during an extreme storm surge. Dr. French-McCay found that such an event would be extremely improbable because of the Terminal's storm preparation plans, its strong record of tank maintenance and inspection history, and the fact that the tanks are designed to withstand storm conditions, even the "catastrophic" severe weather conditions that Plaintiff claims could happen in the future. Specifically, Dr. French-McCay explained in her Report that:

> While I performed oil spill modeling for maximum credible discharges (MCDs) of oil at the New Haven Terminal during extreme storm surges, *these events would be extremely improbable* because the tanks at the facility are designed to withstand storm surge conditions and extreme winds, the facility's storm preparation plans call for balancing the volumes of oil in the tanks to reduce likelihood of leakage or failure when a severe storm is predicted, and the storm's intensity at New Haven would need to be extreme enough such that a surge would reach the tanks at the Terminal (with a likelihood of occurring less than 1% in any given year). In addition, the modeled instantaneous spill at the height of the surge is not a realistic scenario. Oil could not actually spill catastrophically when water is surrounding the tanks. *Thus, these results are hypothetical and highly conservative such that the risk of such a situation occurring is extremely low*.

6

Ex. 1, French-McCay Rpt. at 5 (emphasis added).  None of Plaintiff's experts performed an oil spill model to dispute Dr. French-McCay's modeled results or opinions.

Even though a spill would be highly unlikely, Dr. French-McCay still modeled a hypothetical oil spill at the Terminal using her SIMAP model, a model she has used and developed over the past four decades of her career and that has been used to assess the risk of hundreds of oil spills.  Ex. 1, French-McCay Rpt. at 4.  SIMAP allows the use of site-specific geographical, chemical, toxicological, and biological data, and she followed the same methodology in preparing this model as she has done outside of litigation.

Using the SIMAP model, Dr. French-McCay found that the likelihood of any release actually reaching the Harbor was nil:

> Given the very low probabilities of a spill, the probable sizes of spills (MCD being of very low likelihood), and the uncertainty in timing of a spill (i.e., a MCD happening instantaneously at the peak of the surge), the likelihood of spilled oil reaching New Haven Harbor is extremely low.  If there were a discharge during dry conditions, ***there is no pathway to the harbor***.  During an extreme storm surge (*i.e.*, with a likelihood of ≤0.2% in a given year), the spill would need to be catastrophic and instantaneous at the time the surge reaches the tanks in the Terminal for there to be any possibility of oil entering the harbor.

Ex. 1, French-McCay Rpt. at 5 (emphasis added).  The figure below shows the modeled results for a hypothetical worst-case discharge, demonstrating that even in the unlikely event of a release from the Terminal's secondary containment area, the release "was predicted to flow south along East Shore Parkway and then flow into the forested area south of the New Haven Terminal.  No oil was predicted to reach the harbor from these sites."  Ex. 1, French-McCay Rpt. at 27.  Again, Plaintiff does not challenge in its motion the reliability of the model or its results.



Figure 3-1: Map of oil trajectory and thickness for representative worst-case discharge of diesel from outside secondary containment.

Finally, to be sure the Terminal would not create a mess, Dr. French-McCay further assumed that catastrophic conditions would occur and result in the highly unlikely release of product to the harbor, and she modeled the fate and transport of that hypothetical spill and what risk it posed to aquatic life. Dr. French-McCay found the percentage of product released under a MCD discharge scenario that could reach New Haven Harbor was: <6% for diesel and No. 2 fuel oil, <2% of aviation fuel, and <0.004% of gasoline. Ex. 1, French-McCay Rpt. at 4. Dr. French-McCay shows that, even assuming a spill occurred, only a very small percentage of the oil mass that could enter New Haven Harbor would be acutely toxic to sensitive aquatic organisms such as fish eggs and larvae. Moreover, these hypothetical concentrations dispersed in a matter of a few days. Ex. 1, French-McCay Rpt. at 5. Dr. French-McCay also found that the Terminal's oil spill response plan includes provisions for oil cleanup operations that would further reduce the likelihood of a release and would further attenuate the spill's magnitude and potential to cause

8

any acute toxicity.  Ex. 1, French-McCay Rpt. at 5.  Dr. French-McCay ultimately concluded that "the volumes of the oils handled at the New Haven Terminal do not represent an imminent and substantial endangerment to the environment."  Ex. 1, French-McCay Rpt. at 6.

### C.  The Delft3D-FM Hydrodynamic Model

Like all models, Dr. French-McCay's SIMAP model, which she used to model a hypothetical oil spill at the Terminal, requires inputs of data and information.  Ex. 1, French-McCay Rpt. at App. B; Ex. 4, French-McCay Dep. at 46:6-23.  The inputs into SIMAP for this case included a separate hydrodynamic model (the Delft3D-FM Model) run by Dr. Craig Jones and his team at Integral Consulting.

Deltares, a technology institute based in the Netherlands, developed a software to "simulate storm surges, hurricanes, tsunamis, detailed flows and water levels, waves, sediment transport and morphology, water quality and ecology" under the name Delft3D-FM Model.[6]  Far from being an obscure tool known to few, Delft3D-FM is the industry standard for hydrodynamic models.  It is widely used across both public and private sectors to create hydrodynamic models to support numerous projects and initiatives.  Delft3D-FM's user base includes the EPA, the U.S. Geological Survey, the U.S. Army Corps of Engineers, the National Oceanic and Atmospheric Administration ("NOAA"), and the U.S. Navy.[7]  ***Plaintiff's own***

---

[6] *See* Deltares, *Delft3D FM Suite 2D3D*, https://www.deltares.nl/en/software-and-data/products/delft3d-flexible-mesh-suite (last accessed Oct. 29, 2025).

[7] *See, e.g.,* EPA, *Crisfield Nature-Based Strategies Research—Technical Working Group 4*, https://assessments.epa.gov/risk/document/&deid%3D365530 (last accessed Oct. 29, 2025); M.W. Brand, *et al.*, *Multi-Decadal Simulation of Marsh Topography Under Sea Level Rise and Episodic Sediment Loads*, Journal of Geophysical Research: Earth Surface, 127, e2021JF006526 (2022), available at: https://doi.org/10.1029/2021JF006526 (USGS, NOAA); R.C. Martyr-Koller, et al., *Application of an unstructured 3D finite volume numerical model to flows and salinity dynamics in the San Francisco Bay-Delta*, Estuarine, Coastal & Shelf Science, 192:86-107 (2017), available at: https://www.sciencedirect.com/science/article/pii/S0272771416307120; US Army Corps of Engineers, GIWW Coastal Resiliency Study, Texas, Review Plan (2020), available at: https://www.swg.usace.army.mil/Portals/26/docs/Planning/Review%20Plans/GIWW%20CRS%20FS/GIWW%20CRS%20Feasibility%20Study%20Updated%20Review%20Plan%20(Oct%202020)R4_Redacted.pdf?ver=dV12YbO

*expert modeler, Robert Nairn, as well as his employer, the consulting firm Baird & Associates, have used the Delft3D-FM hydrodynamic model in numerous projects*.[8]

CLF's own expert, Dr. Jacqueline Michel, admitted in her deposition that the Delft3D-FM Model is "generally accepted as" the "state-of-the-art hydrodynamic and modeling framework," and that it is produced by "a leading Dutch research institute specializing in water and subsurface systems." Ex. 2, Michel Dep. at 121:23-122:6. Dr. Michel also admitted that the Delft3D-FM Model "is widely used in regulatory, academic, and engineering contexts for flood risk assessment," as well as "for environmental impact analysis." *Id*. at 122:7-16. The Delft3D-FM Model is a generally accepted, widely used, and robust model.

While Dr. French-McCay did not run the Delft3D-FM Model herself, she explained in her Report that she had used the Integral Delft3D-FM Model as an input in her SIMAP model, and attached to her report full and complete descriptions of the Integral Delft3D-FM Model and the assumptions Integral used in preparing the Delft3D-FM Model. Ex. 1, French-McCay Rpt. at 16-17, Appx. A, Appx. B. Dr. French-McCay explained in her report that:

> Integral used the Delft3D Mesh Suite (Delft3D FM) software product from Deltares (2025). **Delft hydrodynamic models from Deltares have been developed over decades and are well published and validated.** The Delft FM model was applied to New Haven Harbor, using a model grid that has a boundary near the 20-foot depth contour around the entrance to New Haven Harbor (Figure 2-1). Appendix A contains descriptions of these Integral storm surge (hydrodynamic)

---

2DP_npsdzDaAd7w%3D%3D; J. Veeramony, *et al.*, *Validation of Delft3D as a Coastal Surge and Inundation Prediction System*, Naval Research Lab (Apr. 7, 2016), https://apps.dtic.mil/sti/html/tr/ADA631769/; L. Zhu, *et al.*, *Numerical Modeling of Circulation and Wave Dynamics Along the Shoreline of Shinnecock Indian Nation in Long Island, New York*, USGS (Aug. 20, 2024), https://www.usgs.gov/publications/numerical-modeling-circulation-and-wave-dynamics-along-shoreline-shinnecock-indian.

[8] *See, e.g.*, Baird, *Mardi Project: Hydrodynamic Modelling Report* (Mar. 12, 2020), https://www.epa.wa.gov.au/sites/default/files/PER_documentation2/A06-1_Hydrodynamic_Modelling_Report.pdf; R. Nairn, *et al.*, *Examination of the Physical and Biological Implications of Using Buried Channel Deposits and Other Non-Topographic Offshore Features as Beach Nourishment Material*, U.S. Dep't of the Interior Minerals Mgm't Serv. (Oct. 2007), https://espis.boem.gov/final%20reports/4274.pdf.

model data sets, including maps and time series data of bathymetry, current speeds, directions, and water levels.



Figure 2-1: Extents of the Integral model grid and the storm surge for each of the modeled storms.

Ex. 1, French-McCay Rpt. at 16-17; *see also id.* at Appx. A, p.6, Appx. B.  In addition, Defendants produced to CLF all spreadsheets and model runs for the Delft3D-FM Model and the SIMAP model prepared by both Integral and Dr. French-McCay on July 1 and 3, well before Dr. Jones and Dr. French-McCay were deposed. *See* Ex. 5, July 1, 2025, Production Upload Transmittal Letter to CLF; Ex. 6, July 3,2025 Production Upload Transmittal Letter to CLF.

Dr. French-McCay performed the same type of modeling, using the same generally-accepted and validated methodology, that is the industry standard in oil spill modeling.  She is not only well qualified to offer her opinions, she is the professional modeler that has worked for federal, state, and international governments to perform such modeling.  Plaintiff's own experts, Dr. Michel and Mr. Levine, have worked with or hired her to perform the same type of modeling she did here.  Plaintiff has not made any showing that there are any errors in her inputs,

methodology, conclusions, or opinions.  Dr. French-McCay's opinions permissibly demonstrate that a release from the Terminal is highly unlikely, and that even if such a rare release were to occur, the hypothetical spill would not reach the harbor.  Her opinions are reliable, relevant, and admissible

### III.    LEGAL STANDARD

As this Court has recognized, an expert may offer opinion testimony at trial based on scientific, technical, or other specialized knowledge if the witness is qualified in the relevant subject matter, and the opinion testimony is reliable and "relevant, *i.e.*, whether it will help the trier of fact."  *Post Univ. Inc., v. Learneo, Inc.*, No. 3:21-CV-01242 (VDO), 2025 WL 2709370, at *2-3 (D. Conn. Sept. 23, 2025) (applying Fed. R. Evid. 702) (citations omitted).  A witness is qualified as an expert where she "has superior knowledge, education, experience, or skill" in the relevant subject matter, and ***"may be classified as an expert based upon personal experience alone," if the proffered opinion will assist the trier of fact***.  *Post Univ. Inc.*, 2025 WL 2709370, at *3 (citation modified; emphasis added).

If an expert satisfies the qualification requirement, the Court must determine whether the testimony is reliable, *id.* at *2, which is a "flexible" inquiry.  *Max Zach Corp. v. Marker 17 Marine*, No. 3:23-CV-01088 (VDO), 2024 WL 4614487, at *2 (D. Conn. Oct. 30, 2024).  In assessing reliability, the Court "examine[s] not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case."  *United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *17 (D. Conn. Oct. 20, 2023) (citation omitted).

A reliable opinion from a qualified expert must also be relevant and admissible under Rule 403.  *Post Univ. Inc.*, 2025 WL 2709370, at *3 (applying Fed. R. Evid. 401, 403, 702).  "Even if the jury *could* resolve these issues without [the expert's] testimony," the opinion is

12

admissible where it "is *likely to help* [] reach their determinations," because the jury "would necessarily be limited by its own experiences; [and] an expert can assist a jury in understanding considerations that they may not have contemplated." *See Wang v. Omni Hotels Mgmt. Corporation*, No. 3:18-cv-2000 (VDO), 2025 WL 1782264, at *3 (D. Conn. June 27, 2025) (denying motion to exclude opinions when expert "employed technical methods that are likelier than not to assist the jury and … utilized sufficiently reliable methods and data").

If the expert's opinion satisfies each threshold requirement, the testimony is admissible, and "any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Post Univ. Inc.*, 2025 WL 2709370, at *3 (citations omitted).

## IV.    ARGUMENT

In its motion, CLF makes two arguments. ***First***, CLF argues that Dr. French-McCay is not qualified to testify about the Delft3D-FM Model, and that the "Integral consultant" was "functionally undisclosed." ECF 714. The Delft3D-FM Model was timely and properly disclosed, as were the model runs and spreadsheets. Ironically, Plaintiff deposed both Dr. Jones and Dr. French-McCay and could have asked whatever questions it had about the model during those depositions. Nor was the expert "undisclosed." The Delft3D-FM Model was prepared by Dr. Jones and his team and under his direction and supervision. And Dr. McCay properly relied and identified the Delft3D-FM Model in her Report and testimony. The law is clear that an expert may under Rule 702 rely on data and information regularly relied on by the expert outside of litigation and that is relied on by experts in the field—both of which are true here. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir.) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they

13

have developed their opinions expressly for purposes of testifying."), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)); *see also In re Wright Med. Technology Inc. Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1319 (N.D. Ga. 2015) (experts may rely on opinions and findings of other experts if other experts in the particular field would reasonably rely on those facts or data in forming an opinion).

***Second***, CLF argues that Dr. French-McCay's SIMAP model has not been properly validated. ECF 714. That statement is simply untrue—it is a mischaracterization of the record, the science, and the evidence. Plaintiff apparently does not appreciate that the SIMAP model has been repeatedly validated with data from more than 20 large oil spills, all of which has been described fully in several peer-reviewed articles. Ex. 1, French-McCay Rpt. at 13; Ex. 4, French-McCay Dep. at 36:18-20 ("Q. Both the SIMAP physical fates and biological models have been validated, correct? A. Yes.").

Because CLF's motion mischaracterizes the record, applicable science, and the law, it should be denied in its entirety.

### A. Dr. French-McCay Is Eminently Qualified and an Undisputed Leader in her Field

Dr. French-McCay is a well-recognized leader in the field of oil spill fate and effects modeling. As described above, Dr. French-McCay has a Ph.D. in oceanography and has been performing oil spill modeling—the same modeling she performed for the Terminal in this case—for over 40 years. She has worked on the most important and significant spills in the United States, including the Deepwater Horizon spill and the North Cape spill in nearby Rhode Island. In both those projects, she was retained by NOAA. She also performed modeling on behalf of the State of Louisiana after Hurricanes Katrina and Rita. As Plaintiff notes in its motion, ECF 714-1 at 6, a witness is qualified when she possesses "superior knowledge, education,

experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). There can be no doubt that Dr. French-McCay meets (and exceeds) those qualifications.

Dr. French-McCay is not a professional witness; she testified in her deposition that "[m]uch less than 1%" of her income is earned from expert testimony, and that her primary income is earned from her salary as an "environmental consultant," where she provides "environmental risk assessments using modeling and scientific analyses." Ex. 4, French-McCay Dep. at 19:17-20:1. Across more than four decades, she has led the development of the models, methods, and evidentiary standards that government trustees, courts, regulators, and industry rely on to understand how oil moves and weathers, how organisms are exposed, and what harm may result. Ex. 1, French-McCay Rpt. at 8. Her body of work spans model development, rigorous validation against real-world spills, leadership in the largest natural resource damage assessment in U.S. history, and repeated recognition by courts and federal agencies seeking objective, quantitative expertise. *Id.* Dr. French-McCay is a leading authority in her discipline.

As Senior Principal Scientist at the RPS Ocean Science office within Tetra Tech, she manages ongoing model research and development and supervises complex, multi-disciplinary projects applying these tools across diverse environments. Ex. 1, French-McCay Rpt. at 8. Early in her career, she served as principal investigator for the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration to develop natural resource damage assessments. Ex. 1, French-McCay Rpt. at Appx. L p. 2. Dr. French-McCay has been principal investigator and primary author of more than one hundred reports and published papers evaluating oil trajectory and fate, exposure, effects, and ecological risks. Ex. 1, French-McCay Rpt. at 8.

15

As an expert witness, Dr. French-McCay has provided expert evidence to the High Court of England and Wales concerning the Bonga oil spill off the Nigerian coast, to the Federal Court of Australia in the Montara class action, and in multiple U.S. administrative and judicial proceedings.  Ex. 1, French-McCay Rpt. at 8.  Her opinions are consistently admitted and credited.  Dr. French-McCay confirmed during her deposition that her testimony has not been limited or excluded, and that she has served as an expert for government trustees and courts on the most complex and consequential spill matters.  Ex. 4, French-McCay Dep. at 82:19-21.  Notably, she has also testified before the U.S. Senate Committee on Commerce, Science, and Transportation regarding impacts from the Deepwater Horizon spill—further public recognition of her standing as a national authority. Ex. 4, French-McCay Dep. at 81:15-83:7.

Indeed, Plaintiff's "rebuttal" experts agree.  **Mr. Levine**, for example, candidly expressed his respect for Dr. French-McCay's expertise:

Q.  Do you know Dr. French-McCay?

**A.  Yes.**

Q.  Have you worked with Dr. French-McCay?

**A.  Yes.**

Q.  On what types of things have worked [with] Dr. French-McCay on?

**A.  Oil spills.**

Q.  Have you, in fact, engaged Dr. French-McCay to assist you on various matters?

**A.  I have not; NOAA has.**

* * *

Q.  Do you believe that Dr. French-McCay is well qualified?

**A.  Yes.**

Q.  Do you rely upon her expertise or have you relied upon her expertise in other matters?

**A.  Yes.**

Q.  Okay.  Do you believe that the methodology she employs in doing what she does is generally reliable?

16

**A. Yes.**

&ast; &ast; &ast;

Q. Would you say that Dr. French-McCay and Dr. Etkin [Defendants' spill probability expert] are experts in their field?

**A. Yes.**

Q. Would it be fair to say that they're actually some of the top experts in the world in what they do?

**A. Probably.**

&ast; &ast; &ast;

Q. But you would agree, at least within the United States, Dr. French-McCay and Dr. Etkin are some of the top experts in their field?

**A. Yes.**

&ast; &ast; &ast;

Q. In your experience with both Dr. French-McCay and Dr. Etkin, have you relied upon their expertise in the areas that they're experts in?

**A. Yes.**

Ex. 3, Levine Dep. at 51:7-51:21, 52:1-52-11, 52:25-53:8, 53:22-54:1 (objections omitted).

Another of CLF's experts, Dr. Jacqueline Michel, testified similarly:

Q. And one of the spill modeling experts that you have asked to serve on multidisciplinary teams to help you with spill modeling is Dr. Deborah McCay, correct?

**A. Deborah French-McCay.**

&ast; &ast; &ast;

Q. And you've hired Dr. French-McCay to perform spill modeling for you on several occasions; correct?

**A. Yes.  Her company, yes.**

Q. Do you agree that Dr. McCay -- Dr. French-McCay is a reliable authority in the field of spill modeling?

**A. Yes.**

Q. Do you agree that Dr. French-McCay has a high degree of competence in the field of spill modeling?

**A. Yes.**

Q. Do you believe that Dr. French-McCay has provided accurate spill modeling work in the projects that you have worked together on?

17

A. Yes.

Q. Is there any reason why you would not hire Dr. French-McCay to perform spill modeling work for you on a future project?

A. No.

Ex. 2, Michel Dep. at 43:4-44:10.

For some reason, Plaintiff goes against the opinions of its own experts to argue that Dr. French-McCay should be disqualified because she offers opinions "beyond the scope of [her] expertise" with regard to the Delft3D-FM Model. ECF 714-1 at 8-10. Plaintiff is mistaken.

As both Dr. French-McCay and Dr. Jones have explained, Dr. Jones and his team at Integral performed the Delft3D-FM Model that Dr. French-McCay used as an input in her SIMAP model. Ex. 4, French-McCay Dep. at 46:6-23; Ex. 7, Deposition of Craig Jones, Ph.D. ("Jones Dep.") at 138:13-139:2. Dr. French-McCay testified that she regularly uses hydrodynamic models such as the Delft3D-FM Model to perform her own analyses, that she is very familiar with hydrodynamic models, and that she found the Delft3D-FM Model prepared by Dr. Jones and his team to be of a similar quality to hydrodynamic models she regularly relies on during the course of her non-litigation work. The notion that Dr. French-McCay should be disqualified for using a hydrodynamic model as an input for the SIMAP model she developed, is non-sensical—as will be discussed further below.

**B. The Delft3D-FM Model Is a Reliable and Validated Model that Is the Industry Standard, and Plaintiff Was Well Aware of its Provenance**

**1. Dr. French-McCay's Use of Hydrodynamic Model Inputs Into Her SIMAP Model Is Routine and Comports with Well-Accepted Methods**

In its motion, CLF contends that Dr. French-McCay relied on Delft3D FM Model data to reach "her opinion … that the spill would need to be catastrophic and instantaneous at the time the surge reaches the tanks in the Terminal for there to be any possibility of oil entering the harbor." ECF 714-1 at 10. CLF argues that Dr. French-McCay is "not qualified as a flood

expert" and "is not offering any testimony about how the Delft3D FM Model was constructed, calibrated, or run," and that her testimony is therefore unreliable and should be excluded.  *Id.* at 8-10.  However, Dr. French-McCay's testimony with respect to oil spill fate and effects modeling is reliable, and CLF's attack on Dr. French-McCay's upstream use of the Delft3D-FM Model data, *as an input* into her SIMAP model, is fundamentally misguided.  Dr. French-McCay routinely uses similar modeling data to reach conclusions with respect to spill fate and effects modeling, and there is little doubt that the Delft3D-FM Model is reliable.  Ex. 4, French-McCay Dep. at 92:20-93:1.

In determining the admissibility of expert testimony, "[a] gatekeeping court must ensure that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Reynolds v. Arnone*, 645 F. Supp. 3d 17, 21 (D. Conn. 2022) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)); *see also Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) (excluding an expert where the "expert's opinions were conceived, executed, and invented solely in the context of [the] litigation."); *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) (in part excluding expert testimony when it "was developed for litigation); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (excluding expert Dr. Mack because "Dr. Mack did not 'propos[e] to testify about matters growing naturally and directly out of research [he had]

19

conducted independent of the litigation.'"); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994) (affirming the court was "satisfied that where Drs. DiGregorio or Sherman based their conclusion as to a plaintiff's symptoms solely on the plaintiff's self-report of illness in preparation for litigation, [that] the district court acted within its discretion in excluding the testimony as based on an unreliable source of information."); *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 58 (D. Conn. 2004) (finding a factor "favoring admissibility [of an expert was] the fact that [their] opinions were not developed for purposes of litigation."). Indeed, courts "may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office," and an expert's testimony "***based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science***." *Daubert*, 43 F.3d at 1317 (emphasis added). Dr. French-McCay's expertise has been developed outside of litigation over the course of over 40 years, and has been tested in peer-reviewed publications and through federal and state oversight.

When questioned about her use of the Delft3D-FM Model data, Dr. French-McCay testified that her "normal practice is to refer to a flood expert for flood modeling," Ex. 4, French-McCay Dep. at 89:4-6, and that she "routinely … use[s] similar … hydrodynamic models … for input" in her spill fate and effects modeling, *id.* at 92:20-93:1. In fact, Dr. French-McCay has used hydrodynamic models for input in her spill fate and effects modeling "over the last 40 years," and she found the Delft3D-FM Model "to be of a similar quality" to the hydrodynamic models that she has used in the past. *Id.* at 93:2-5. In her deposition, Dr. French-McCay explained her SIMAP model and discussed her reliance on the Delft3D-FM Model. While she does not run Delft3D-FM models herself, others in her company (Nickitas Georgas, Emily Day, and Mahmud Monim) regularly use the Delft3D-FM Model. Ex. 4, French-McCay Dep. at 46-

20

47. She also testified that she independently reviewed and evaluated the Delft3D-FM Model from Dr. Jones and his team at Integral:

Q. Did you independently review the data that Integral used as input?

A. **Yes.**

Q. How did you do that?

A. **I asked for Nikita [*sic*] Georgas['] help and also Emily Day to plot up what the data was.  First I asked [for] the files and I received[,] the same files you received[,] these binary files, computer files.  So I needed help in reading all that data and making figures, so I asked for help to plot it all up, to look at the results, to look at the inputs.  And we did a review of all the inputs and the outputs.**

Ex. 4, French-McCay Dep. at 49-50; *see also id.* at 86-87 ("A. I reviewed the results and I reviewed how they [Integral] set it up so that I understood what they had done, what their inputs were, what the results were. …  I reviewed it so that I could evaluate whether or not it was reasonable and therefore reliable.").

Dr. French-McCay also confirmed that she regularly relies on similar hydrodynamic models as inputs for SIMAP:

Q. Now, you talked with Ms. Jacks about reviewing the Integral model.  Do you review and rely on similar models in your career and in your professional work that is detailed in your CV?

A. **Yes, I routinely do use similar models, hydrodynamic models, for input from my modeling.**

Q. Do you find the Integral model to be of a similar quality as what you have used in your career over the last 40 years?

A. **Yes.**

Ex. 4, French-McCay Dep. at 92:20-93:5; *see also id.* at 89:10-13 (explaining that she regularly uses hydrodynamic models, "[s]o I'm familiar with how they do it.").

To the extent that CLF suggests that the Delft3D-FM Model is unreliable, ***CLF's own expert***, Dr. Jacqueline Michel***, admitted in her deposition that the Delft3D-FM Model is "generally accepted as" the "state-of-the-art hydrodynamic and modeling framework,"*** and

21

that it is produced by "a leading Dutch research institute specializing in water and subsurface systems." Michel Dep. at 121:23-122:6.  Dr. Michel also admitted that the Delft3D-FM Model "is widely used in regulatory, academic, and engineering contexts for flood risk assessment," as well as "for environmental impact analysis."  *Id*. at 122:7-16.

As previously described, the Delft3D-FM Model is one of the most frequently used hydrodynamic modeling programs, widely used across both public and private sectors to create hydrodynamic models to support numerous projects and initiatives.  The Delft3D Model is used by federal agencies including the EPA, the U.S. Geological Survey, the Army Corps of Engineers, and the U.S. Navy.[9]  Even Plaintiff's own expert Dr. Robert Nairn, and his employer, the consulting firm Baird have used the Delft3D-FM Model in publicly available reports and projects.[10]  The Delft3D-FM model has been employed in multiple peer-reviewed studies assessing flood vulnerability and resilience planning in U.S. coastal environments.[11]  One study applied the Delft3D-FM Model to simulate flooding impacts during Hurricane Michael in the northeastern Gulf of Mexico, demonstrating the model's capability to handle coupled tide-wave-surge dynamics under extreme conditions.[12]  These peer-reviewed studies support Delft3D-FM as a technically robust and credible modeling platform for coastal flood assessments.  Plaintiff

---

[9] *See* fn. 7, supra.

[10] *See* fn. 8, supra.

[11] W. Lee, *et al*., *Hindcasting compound pluvial, fluvial and coastal flooding during Hurricane Harvey (2017) using Delft3D-FM, Natural Hazards*, 120(1), 851-880 (2024); D.F. Muñoz, *et al., Inter-model comparison of Delft3D-FM and 2D HEC-RAS for total water level prediction in coastal to inland transition zones*, JAWRA Journal of the American Water Resources Association, 58(1), 34-49 (2022); S. Han, S., *et al., Variability in surge levels in communities adjacent to the Houston Ship Channel industrial Corridor to changes in Hurricane characteristics*, Coastal Engineering Journal, 66(2), 270-293 (2024).

[12] A.E. Elkut, *et al*., *Performance of Parametric, Physics-Based, and Blended Approaches for Hurricane Atmospheric Forcing in Coastal Modelling* (2025), available at SSRN: https://ssrn.com/abstract=5401575 or http://dx.doi.org/10.2139/ssrn.5401575.

has made no statement to the contrary, nor has Plaintiff or its experts argued that the Delft3D-FM Model is not reliable.

Federal courts recognized the Delft3D-FM Model is a reliable and generally accepted hydrodynamic model.  In fact, the Fourth Circuit Court of Appeals has stated that "[t]he Delft3D model is a sophisticated simulation tool capable of taking into account water and sediment flows in the context of water level, tides, currents, waves, and wind." *Nat'l Audobon Society v. U.S. Army Corps of Eng'rs.*, 991 F.3d 577, 582 (4th Cir. 2021) (affirming *Nat'l Audobon Society v. U.S. Army Corps of Eng'rs.*, 420 F. Supp. 3d 409 (E.D. S.C. 2019) (finding "[U]sing the Delft3D model for different purposes was not arbitrary and capricious, where [] defendant USACE consistently applied the model across alternatives and disclosed the model's limitations.")).  In *National Audobon*, the court explained how the Army Corps of Engineers used the Delft3D model properly to measure and compare the environmental effects of different erosion rates, and rejected the plaintiff's challenge the Corps' modeling and conclusions.  *Id.*

In this case, Dr. Jones' team at Integral ran the Delft3D model to evaluate water levels and their associated water depths over inland areas.  *See* Ex. 1, Integral Memo Describing Storm Model Preparation, Appx. B to French-McCay Rpt.  Dr. Jones completed this analysis to demonstrate the fundamental problems with CLF's speculations.  Instead of just speculating how adverse weather conditions might affect the Terminal, Dr. Jones used appropriate scientific methods to identify, model and analyze the actual potential impacts on the Terminal.  Dr. French-McCay, in turn, properly used that model as an input for her oil spill model.  There was no mystery on what occurred—it was typical of coordinating experts completing scientific analyses. Plaintiff has made no showing whatsoever that either model is unreliable or incorrect.

To the contrary, there is no doubt that the Delft3D-FM Model is reliable and that Dr. French-McCay properly relied on it to prepare her own SIMAP modeling. Plaintiff cannot credibly argue otherwise. Dr. French-McCay's routine use of hydrodynamic models such as Delft3D-FM in her work outside of litigation as an input into her spill fate and effects modeling is "objective proof" that her use of Delft3D-FM Modeling data in this case "comports with the dictates of good science." *Daubert*, 43 F.3d at 1317.

### 2. Dr. French-McCay's Use Of The Delft3D FM Model As An Input Into Her SIMAP Was Properly and Timely Disclosed

CLF also contends that Defendants failed to identify the individual at Integral who "prepared the Delft3D FM hydrodynamic datasets" and "the technical summary describing the Delft3D FM model preparation" constitutes a violation of Federal Rule of Civil Procedure 26(a)(2)(B)(ii). ECF 714-1 at 3-4. CLF argues that Dr. French McCay's testimony should be excluded "in full" because the Delft3D-FM Modeling data used by Dr. French-McCay was prepared by a "functionally undisclosed" expert. *Id.* Plaintiff's argument misinterprets the law and the record evidence.

Federal Rule of Civil Procedure 26(a)(2)(B)(ii) provides that an expert report "must contain … the facts or data considered by the witness in forming" all of her opinions. Dr. French-McCay did submit to CLF a report containing "all of the facts or data" that she considered in forming her opinions, in accordance with Federal Rule of Civil Procedure 26(a)(2)(B)(ii). Indeed, CLF admits that Appendix B of Dr. French-McCay's expert report "provided verbatim the technical summary describing the Delft3D-FM model preparation," in addition to the fact that it was produced by "someone at" Integral. ECF 714-1 at 3. The Federal Rules of Evidence permit an expert "to base an opinion" on the reports of other experts—even when such reports are "inadmissible evidence"— "so long as 'experts in the particular field

would reasonably rely on those kinds of facts or data in forming an opinion on the subject.' An expert may also rely on data from other cases or studies that he did not collect himself." *Wasilewski v. Abel Womack, Inc*, No. 3:10-CV-1857 (VAB), 2016 WL 183471, at *9 (D. Conn. Jan. 14, 2016) (quoting Fed. R. Evid. 703); *see also Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 968555, at *5 (D. Conn. Mar. 30, 2022) (allowing one expert to rely on the other's data where "experts in [this] field reasonably rely on such data in forming an opinion."); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) ("The Federal Rules of Evidence specifically provide that an expert may rely on facts or data perceived by *or* made known to the expert at or before the hearing.") (internal quotation omitted) (emphasis in original); *Wasilewski v. Abel Womack, Inc.*, No. 3:10-CV-1857, 2016 WL 183471, at *9 (D. Conn. Jan. 14, 2016) ("An expert may also rely on data from other cases or studies that he did not collect himself.").[13]

Far from concealing her reliance on the Delft3D-FM Model, Dr. French-McCay extensively discussed the use of the model in her report; described the model's methodology, inputs, and data; produced the spreadsheets and model runs of the Delft3D-FM Model that she used as inputs in her SIMAP model; and testified about her reliance on the Delft3D-FM Model in her deposition. Similarly, Dr. Jones testified during his deposition that he worked on the Delft3D-FM Model with his team at Integral and relied on it in connection with his retention in this case. *See, e.g.*, Ex. 7, Jones Dep. at 135:18-23 ("Q: What is the name of the model that you are relying on? A: The key models [I am] relying on [are] FEMA flood plain maps that are

---

[13] CLF's expert, Dr. Wendi Goldsmith, for example, routinely cited other CLF experts in forming her opinions, including Drs. Barlow, Horner, O'Donnell, and Nairn. *See generally* ECF 751, Sealed Ex. F, Goldsmith Rpt. at 29. Further, both Defendants' and CLF's experts rely on NACCS models in their analyses, even though neither party disclosed NACCS as an expert. *See, e.g.*, Ex. 7, Jones Dep. at 135:18–23; ECF 770, Sealed Ex. A, Nairn Rpt. ii n.5, 16-17.

informed by models that FEMA commissions; the NACCS model, which I reference in the report, the Delft Flexible Mesh model which I use."). He clearly and unequivocally testified that the Delft FM model was conducted by himself and another member of his team at his direction." Ex. 7, Jones Dep. at 136:23-24, 137:5-138:3.

Defendants agree that Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that a retained expert issue a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." Dr. French-McCay has done so. Despite CLF's apparent misapprehension of the deposition testimony of both Dr. French-McCay and Dr. Jones, both experts disclosed the use of the Delft3D-FM model, answered questions about it during their depositions, and produced all model runs and spreadsheets generated by the Delft3D-FM Model and relied on by Dr. French-McCay. *See* Ex. 1, French-McCay Rpt. at Appx. B, 7; *see also* Ex. 7, Jones Dep. at 138:13-139:2; Ex. 5, July 1, 2025, Production Upload Transmittal Letter to CLF; Ex. 6, July 3, 2025, Production Upload Transmittal Letter to CLF.

Plaintiff received Dr. French-McCay's and Dr. Jones' reports on June 23, 2025, and the Delft3D-FM Model runs and spreadsheets on July 1 and July 3. Plaintiff had all the necessary information about the Delft3D-FM model well before the expert deposition deadline of September 12. Plaintiff deposed both Dr. French-McCay and Dr. Jones, asked questions about the Delft3D-FM Model, and had every opportunity to ask more questions. At no point did CLF ever request additional discovery relating to the model or ask that Defendants make available any other witness for deposition.

Contrary to CLF's unsupported statements that the Delft3D-FM Model was prepared by an "undisclosed expert," Dr. Jones clearly and repeatedly testified that he helped run the Delft3D-FM Model. *See* Ex. 7, Jones Dep. at 135:18-23; 138:13-139:2. In fact, CLF admits that

26

it knew Dr. Jones participated in the model because Defendants produced the Delft3D model run files, which included "Jones" in the filename.  ECF 722-1, at 10.  CLF had abundant opportunity to cross-examine Dr. Jones about the Delft3D-FM Model during his deposition, including when he explicitly disclosed his involvement.  Just because CLF forfeited its opportunity to ask Dr. Jones "how the Delft3D FM model was run or the inputs that were used," does not mean that "there is not a testifying expert in this litigation on the Delft3D FM model."  *See* ECF 722-1, at 11.  That witness is Dr. Jones.  "The point of expert disclosure is to provide one's opponent with sufficient detail to permit preparation of its defense."  *Wang v. Omni Hotels Mgmt. Corp.*, No. 3:18-CV-2000, 2023 WL 4304875, at *7 (D. Conn. Jun. 30, 2023) (cleaned up).  Defendants and their experts have met their disclosure obligations here.  CLF had ample opportunity to prepare its case; its failure to cross-examine Dr. Jones about the Delft3D-FM Model does not therefore render Dr. French-McCay's (or Dr. Jones') testimony inadmissible.

### C. Dr. French-McCay's SIMAP Has Been Validated to Reliably Model Oil Spills in a Variety of Conditions, including Hurricanes

CLF complains that "SIMAP is not known to be peer reviewed and validated under storm surge conditions." ECF 714-1, at 11.  In doing so, CLF ignores all the evidence regarding validation of the SIMAP model, including Dr. French-McCay's report, her testimony, and her extensive publications confirming that SIMAP has been repeatedly validated.  To the extent this constitutes an argument against the admissibility of Dr. French-McCay's model and opinions, this Court should reject it.

First, neither the Federal Rules of Evidence nor Second Circuit precedent require that underlying data presented in an expert report be calibrated or otherwise validated.  Where the proponent of expert testimony has proven its reliability, as Defendants and Dr. French-McCay have done here, other "contentions that the assumptions are unfounded go to the weight, not the

admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 213-14 (2d Cir. 2009); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve"); *Caraballo v. Home Depot U.S.A., Inc.*, No. 3:21-CV-252, 2025 WL 1639694, at *7 (D. Conn. Jun. 10, 2025). "[C]riticisms" that go "to the weight of the evidence" are "matters for cross-examination and argument to the jury." *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015).

As made clear by Federal Rule of Evidence 703, "facts or data in the particular case upon which an expert bases an opinion or inference" "need not be admissible" in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The SIMAP model more than meets that standard.

Importantly, Plaintiff's argument that the SIMAP model has not been adequately validated mischaracterizes the record. As Dr. French-McCay described in her expert report,

> The SIMAP model has been validated with data from >20 large oil spills, including the *Exxon Valdez*, *North Cape* and Deepwater Horizon (DWH) oil spills (French and Rines 1997; French-McCay 2003, 2004; French-McCay and Rowe 2004; French-McCay et al. 2018b,c; French-McCay et al. 2021a,b,c), as well as test spills designed to verify the model (French et al. 1997, French-McCay et al. 2007). These studies showed that oil trajectories depended primarily on the current and wind data input to the model.

Ex. 1, French-McCay Rpt. at 4.

Dr. French-McCay's SIMAP model has been validated on numerous occasions and under diverse circumstances. As Dr. French-McCay confirmed:

> Q. You would agree with me that for a model like SIMAP to be useful [it] must be developed, tested and validated. Correct?
>
> **A. I would agree that it's important to validate models. Spent my career working on that. Actually.**
>
> Q. Both the SIMAP physical fates and biological models have been validated, correct?

A. **Yes.**

Q. Can you describe what validated means?

A. **Validated means to run a model for some analysis and then compare it to data that's independent of the input data. So it's a check that it actually is accurate. So I've done that with a number of different cases to check the model is working appropriately.**

Ex. 4, French-McCay Dep. at 36:12-37:2 (objection omitted).

At Dr. French-McCay's deposition, Plaintiff questioned Dr. French-McCay about SIMAP validation based on her article "Validation and Use of Spill Impact Modeling for Impact Assessments" at her deposition discussing the validation of SIMAP. Ex. 4, French-McCay Dep. at 39:22-42:3.

Q. And this article is about the validation of SIMAP, is that right? On page 830, the page numbers in the top left-hand corner, there's a table call table one and it's titled Spills Evaluated for Validation of the Model. Is that right?

A. **Yes.**

Q. *The table lists multiple spills, their location, date, oil type and amount, correct?*

A. **That's correct.**

* * *

Q. Okay. And can you describe in general how you validated SIMAP related to those spills?

A. **What we did was collected whatever data was available for the spills, observational information about where the oil moved, primarily in what concentration, where, at what times. And we ran the model and then made a comparison with the data.**

Q. How did you collect the data?

A. **By reviewing public documents that were available, literature, technical reports.**

Q. Were there. Would that have involved flights over the spill to look at?

A. **In some cases, yes.**

Ex. 4, French-McCay Dep. at 41:2-10, 42:4-16 (emphasis added).

At her deposition, Dr. French-McCay gave an example of the accuracy of her model:

29

Q. Right. Because SIMAP was also used to model the oil fate and behavior for the North Cape spill. Correct.  How precise was SIMAP's modeling of the North Cape spill?

**A. Well, I quantified that and described it in my 2003 publication, the Marine Pollution Bulletin. I was an expert for NOAA, the government trustee. I have a technical. I wrote a technical report at the time and then I published that paper that described it. So I compared the model results to measurements of PAH's in the water column, and I also compared it to the bird counts, dead bird counts that were quantified for that spill, and to the lobster quantification that was done based on field data.**

Q. And so it was -- how precise was it doing this?

**A. Off the top of my head, I think. For example, the lobster estimate from the field Data was about 9 million lobsters killed, and my model prediction was 8.3 million.  I believe that was the number.  I don't remember the exact numbers for the birds, but it was in the right range. I also compared from the physical fate and exposure part of the modeling, I compared to the measurements in the water column, which were, I think about the sixth day after the spill. And I compared my predicted concentrations in the water to concentrations measured in a lab then and for about 10 days after the spill. And I also compared concentrations I predicted in the sediments to the measurements that were taken from the sediments. Okay.**

Ex. 4, French-McCay Dep. at 44:1-45:5.  Neither Plaintiff nor its experts have any response to this incontrovertible data.

While it is clear SIMAP has been repeatedly validated, Plaintiff hones in on the idea that SIMAP has not been validated under "storm surge conditions"—but even that is not true specifically.  ECF 714-1, at 11.  When asked again about her 1997 "Validation and Use of Spill Impact Modeling for Impact Assessments" article, and whether "any of these spills" validated in the article "occur[ed] during a hurricane," Dr. French-McCay explained, "The Argo Merchant occurred in the Northeaster, so that was a huge storm."  Ex. 4, French-McCay Dep. at 41:11-14. Dr. French-McCay was further questioned about the article and whether "any [spills] occurred due to flooding or storm surge."  Ex. 4, French-McCay Dep. at 41:17-18.  Dr. McCay testified that the Exxon Bayway spill involved a storm or at least some flooding, the Mega Borg spill

30

occurred during a storm in the Gulf of Mexico, and the Shell Oil complex in Martinez occurred during flooding in San Francisco Bay.  Ex. 4, French-McCay Dep. at 41:19-42:3.  In addition, Dr. French-McCay testified that she used SIMAP to model spills caused by Hurricanes Katrina and Rita:

> Q.  Have you ever used SIMAP to model oil fate under hurricane conditions?
>
> **A.  Besides this project?**
>
> Q.  Besides this project.
>
> **A.  Yes.  As part of environmental risk assessments, where the question has been what would occur if there were a spill at any time?  And also specifically, I had a big project that I did with the state of Louisiana to evaluate the potential impacts and injury quantification for spills that occurred under Rita and Katrina, both hurricanes.  So I spent quite a few years working on that.**

Ex. 4, French-McCay Dep. at 45:6-17.  Although the information relating to that project is confidential, *id.* at 45:23-46:1, the record is clear that Dr. French-McCay has in fact validated SIMAP for hurricane and storm conditions.

CLF's attempt to discredit Dr. French-McCay's SIMAP model is completely unfounded.  At best, CLF's complaint about the SIMAP data goes to its weight, not its admissibility.  To the extent Plaintiff wishes to challenge that data, that is a proper question for cross-examination.  Dr. French-McCay's model is reliable and relevant.  Plaintiff's motion should be denied.

## V.     CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's Motion to Preclude the Expert Testimony of Dr. Deborah French-McCay [ECF 714].

Dated: November 3, 2025     Respectfully submitted,

*/s/ Douglas A. Henderson*
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 572-2769
dhenderson@kslaw.com
ctoledo@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding, LLP
300 S Tryon Street
Suite 1700
Charlotte, NC 28202
(704) 503-2551
alewis@kslaw.com

Rose H. Jones
Hilgers Graben PLLC
1372 Peachtree Street, N.E.
19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

Anthony G. Papetti (phv206982)
Beveridge & Diamond, P.C.
825 Third Ave., 16th Floor
New York, NY 10022
T: (212) 702-5400
F: (212) 702-5442
apapetti@bdlaw.com

James O. Craven (ct18790)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832

32

T: (203) 498-4400
F: (203) 782-2889
jcraven@wiggin.com

John S. Guttmann (ct25359)
BEVERIDGE & DIAMOND, P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036
T: (202) 789-6020
F: (202) 789-6190
jguttmann@bdlaw.com

Bina R. Reddy (phv20420)*
BEVERIDGE &DIAMOND, P.C.
400 West 15th Street
Suite 1410
Austin, TX 78701-1648
T: (512) 391-8000
F: (202) 789-6190
breddy@bdlaw.com

Megan L. Marzec Morgan (phv20623)
Roy D. Prather III (phv206800)
Beveridge & Diamond, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
T: (410) 230-1305
F: (410) 230-1389
mmorgan@bdlaw.com
rprather@bdlaw.com

*Counsel for Defendants*

33

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court through the Court's CM/ECF system, which will effect service on all counsel of record by sending a Notice of Electronic Filing.

/s/ *Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com

34