# **<u>EXHIBIT 4</u>**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

----------------------------

CONSERVATION LAW FOUNDATION,

INC.,

            Plaintiff,

V.                                    Civil Action No.

SHELL OIL COMPANY, EQUILON      3:21-cv-00933-VDO

ENTERPRISES LLC D/B/A SHELL

OIL PRODUCTS US, SHELL

PETROLEUM, INC., TRITON

TERMINALING LLC, and MOTIVA

ENTERPRISES LLC,

            Defendants.

----------------------------

REMOTE VIDEO-RECORDED EXPERT DEPOSITION OF

DAVID M. UHLMANN

Friday, September 12, 2025

9:15 PM EST

Job No. MDLG7585638

Reported by:  Denise Dobner Vickery, CRR, RMR

Q.    Can you explain what you meant in the prior answer where you referred to your report saying it's not dispositive?

A.    Sure.  I think -- I mean, maybe -- should I refer to that paragraph in the report?

Q.    No, you can just answer from your recollection.

A.    Well, I mean, I give a more complete answer if I had the opportunity to look at the paragraph of my report.

But it's -- it's my view, based on my experience for decades with enforcement under the Clean Water Act and with the enforcement of permit conditions under the Clean Water Act, that the concept of best industry practices is a quite vague concept.

Now, from an enforcement perspective, I want to try to find a way to give it some content, some way that I can give it meaning that would be enforceable.

Most of my background is enforcing. So I actually looked at this topic and this question with that in mind.  What is the enforcement context here?  What is -- what is the

Page 142

enforceability of that term?

I just think it's, to my knowledge, EPA and the State of Connecticut have never brought an action based on that term and I, you know, that is, in my opinion, because it is so vague and so difficult to enforce, and there's a very narrow lane in which that would be an enforceable concept.

So when I say it's highly significant to me but not dispositive, what I mean is that that term has very limited purchase, if you will, very limited value for enforcement.

Doesn't mean no one can think of a way to try and do it.  Doesn't mean it's legally precluded, but I'm not testifying about the law. The law is up to the judge and, in fact, I think the judge has said it's legally permissible.  It's possible.

But the fact that EPA and the State have never done it, it speaks volume about whether it's -- it's something that can be done consistent with the requirements in the due process clause of the Constitution.

Q.    If EPA had brought an enforcement

Page 274

without reference -- without having a chance to review the reports that I'm relying upon.

BY MR. KILIAN:

Q.    As a trial lawyer who has tried even criminal cases under the Clean Water Act, you would agree with me that the place you look for compliance activities is in the actual compliance activities of the terminal, correct?

MR. HENDERSON:  Objection to form of the question.  Foundation of the question.  And objection to the extent it requires a legal conclusion.

THE WITNESS:   So I would, you know, in prosecuting companies for violations of the Clean Water Act, I would look first and foremost for either a clear statutory violation or a clear permit violation, or I guess in between a clear regulatory violation.  So it's game over if I can't identify a clear legal obligation.

If I'm trying to determine -- if I've identified a clear legal

But I still have up on the screen language you want to talk about.

For me to give out what a best industry practice is, which is the language at issue here, I need to look:  Is it defined in the statute?  Is it defined in the regulations?  Is it defined in some guidance?

And if it's not defined in any of those places, which is true of this language here, now I'm stuck going to those experts you were just referring to in one of your earlier questions because I don't -- I don't know on the face of this permit what a best industry practice is.

Q.     But just to clarify on that, it's your opinion that that burden is on you as a prosecutor, not on the permittee when they're complying with this permit language?  They don't have the duty to do it?

MR. HENDERSON:  Objection.

BY MR. KILIAN:

Q.     That's your opinion?

MR. HENDERSON:  Objection to the form of the question.  Foundation of the question.  Also object to the extent

were not going to do.

My team never brought to me this question.  They never me -- never suggested to me in any way, shape, or forms that climate assessments or all these different mitigation measures were required by the Clean Water Act or required by Clean Water Act general permits.

And if they had come to me with that, I would have asked all the same questions, I mean, had all the same concerns that we're talking about today.  And I would have been looking for some indication, some way that we could establish that the regulated industry was effectively on notice about what those practices were, and that's just critically and essentially important.

I talked almost every -- every day and certainly every week about the importance of a fair and robust enforcement program at EPA, and robust for me meant going hard on climate change on all the issues that we've been talking about today.

Mr. Kilian is laughing.

That was the central feature, Mr. Kilian -- or, Mr. Henderson, central feature

A.    I do.  He asked me a number of questions about my -- my view on citizen suits, and Dr. Oreskes has also said -- actually she referred to it as being gobsmacked.

Q.    That's right.

A.    It's a word I don't -- you don't hear it very often.  He said the same thing.

Q.    Mr. Kilian raised the same issue today in this deposition?

A.    Yes, he did.

Q.    In any way in your expert report have you changed your opinion on citizen suits?

A.    No.  My expert report reflects exactly what I've always thought about citizen suits, which they play a critically important role in our environmental enforcement system.

They're actually one of the things that I've said in the past, and continue to believe to be true, is that they're one of the uniquely American features of our system and are extremely important and play a valuable role.

But I also said, and have always said, and my report reflects the fact that citizens can't bring a suit if the government

Page 391

couldn't bring a suit.

And the suit that was brought in this case is one that the Justice Department and EPA would have not been able to bring based on the law, based on the facts, and based on the proper exercise of enforcement discretion.

Q.    And that's your opinions as a technical expert on environmental enforcement?

A.    It's my opinion as someone who spent more than 30 years both working on enforcement issues, criminal, civil, and administrative, and somebody who's taught about enforcement issues for nearly two decades, and someone who's been an expert report -- has done expert witness work on enforcement issues and provided other consulting services for the last 15 years about enforcement issues.

Q.    And, Mr. Uhlmann, earlier in your testimony you made a distinction between enforcement and permitting.

Why is that distinction so important in this case?

A.    Well --

Q.    In terms of -- in terms of climate

Page 392

change requirements, why is that important the difference between permitting and enforcement?

A.      Well, EPA or a state has the authority or the ability, if the statutes authorize them to do so, to write climate change requirements or require climate change considerations.  They have the ability to include that in permits.

And, in fact, the State of Connecticut did that in this case -- or not in this case, but the stormwater permit that's the focal point of this case, the State of Connecticut added climate change to the permit in 2024.  Three years after this lawsuit was filed.

So EPA or the state has the ability to include climate in a permit, but as an enforcement official, I can't bring an enforcement case based on climate change out of thin air.  I can't just say climate change matters, so I'm going to argue that your failure to account for climate change is an enforceable violation of a statute that I can seek civil penalties for.

I can't do that unless there is either a statute or a permit that sets forth the

Page 393

fact that that is required activity for the regulated community.

Q.    And, Mr. Uhlmann, I believe you testified you were the Assistant Administrator of Enforcement at EPA; is that correct?

A.    That is correct.

Q.    And that included all civil enforcement?

A.    All civil enforcement, all criminal enforcement, all administrative enforcement.

Q.    And you have spent your life reviewing these technical regulations related to enforcement?

A.    I'll happily.  Just my professional career, but I've been doing this since 1990.  35 years.

Q.    So based on your technical understanding, could -- let me switch gears, Mr. Uhlmann, a little bit.

Are you familiar with the OECA climate enforcement policies?

I think you discussed in your testimony in response to Mr. Kilian's questions; is that correct?

Page 395

enforcement program.  Making sure that we were doing everything we could to mitigate climate change and also to promote climate resilience measures.

Q.    Have you seen any written document, any e-mail, any report while you were Assistant Administrator for all enforcement at EPA that suggested, stated, or inferred that climate change vulnerability risk assessment was required of a permittee under the industrial stormwater permit?

A.    No, sir.

MR. KILIAN:  Objection.

THE WITNESS:   I was never told that and, in fact, I mentioned the climate change strategy.  In the climate change strategy, I directed the entire enforcement program.

All 2800 people that I referenced in response to Mr. Kilian's testimony -- Mr. Kilian's question, who have tremendous amount of expertise, tremendous amount of technical experience.  They're not just lawyers. They're also engineers.  They're also

Page 396

hydrologists.  They're also toxicologists.

I directed them that we were to bring climate action -- climate enforcement cases wherever we could.  So if there was -- if it was -- if it was a violation of an environmental law, not to do a climate risk assessment or not to do a climate vulnerability assessment, I wanted to bring that case.

And, Mr. Kilian, if you're talking to me, interrupt talking away, you're on mute.  So I guess I'll keep going.

We didn't -- we didn't believe that we had that authority.

What we did believe we had the authority to do, which I also said we needed to do, was to include climate resiliency in our settlements, which is very different from bringing a case alleging that something is a violation.

So in our settlements, we tried to make sure that whenever possible

we were including climate resiliency, but I can't stress this enough.

There is a world of difference between saying that climate resiliency -- saying that -- saying that climate resiliency is required and therefore that the failure to do it is a violation that subjects a facility to civil penalties, and saying that climate resiliency is a proper term of a settlement.

We never did the former because we didn't think we had the authority to do it.  We didn't think it was a proper use of our authorities.

We did the latter every opportunity we could.  That wasn't just my judgment.  That was -- that was the judgment of the entire enforcement program at EPA.

BY MR. HENDERSON:

Q.     Mr. Uhlmann, thank you very much.

A.     You're welcome.

Q.     I think --

A.     You're still on mute.

Page 411

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA      )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first remotely duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028