# EXHIBIT 2

## EXPERT REPORT OF SUSAN PARKER BODINE

1. I am Susan Parker Bodine. I am a partner in the law firm Earth & Water Law in Washington, D.C. I have expertise in the scope of the regulatory authority of the Clean Water Act, 33 U.S.C. 1251 *et seq.* and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq*. My business address is 1455 Pennsylvania Ave., N.W., Suite 400, Washington, D.C. 20004.

### Assignment

2. I have been retained by King & Spalding LLP to provide an expert opinion regarding whether the facts alleged by Conservation Law Foundation in *Conservation Law Foundation v. Shell Oil Company, et al,* No. 3:21-cv-00933 (D. Ct.) are relevant to the technical requirements of the Clean Water Act (CWA) or the Resource Conservation and Recovery Act (RCRA). My role as an expert is to provide background and technical context regarding the regulatory frameworks, statutory authority, and practical implementation of the CWA and RCRA, based on my extensive experience and expertise in the technical requirements of these statutes. I do not offer legal conclusions or opinions as to the ultimate legal issues in this case, nor do I intend to instruct the Court or jury on the law. My opinions are limited to the technical requirements and regulatory practices under these statutes as they are generally understood and applied by regulatory agencies. I am being compensated at my hourly rate of $750/hr. My compensation is not dependent on the outcome of the litigation.

### Summary of Opinions

3. The following reflects my technical and regulatory opinions, based on my extensive experience in the enforcement and administration of the CWA and RCRA. My opinions are intended to assist the Court and the parties in understanding the regulatory context and technical requirements of these statutes and are not offered as legal conclusions or as instructions on the law.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER                    1

4. Based on my decades of technical experience with the CWA, it is my opinion that the duties that Conservation Law Foundation (CLF) seeks to find in the CWA and the Connecticut Department of Energy & Environmental Protection's (DEEP's) 2018 and 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity are not related to meeting CWA obligations. Specifically, a "climate assessment" and proposed measures to adapt to increased flood risks that may result from climate change do not meet the CWA definition of effluent limits or standards and are not limitations on a discharge, which are central to establishing the practical scope of CWA authority. Further, even if climate assessment and adaptation measures fell within the scope of CWA authority, they do not represent best industry practices so the applicable DEEP permit includes no requirement to implement them.

5. Based on my decades of experience with RCRA technical requirements, it also is my opinion that the petroleum product stored in aboveground storage tanks at the Terminal is not a solid or hazardous waste regulated under RCRA. Specifically, the petroleum product inside of the tanks at Defendants' New Haven Terminal, located at 481 East Shore Parkway, New Haven, Connecticut ("the Terminal") has not been discarded. Therefore, there is no authority under RCRA to regulate the storage of petroleum product at the Terminal.

6. These opinions are based on my extensive experience with the technical requirements of the CWA and RCRA and my understanding of how the CWA and RCRA are interpreted by EPA and implemented in practice and by applying my knowledge of these statutes to the facts presented in this matter. I gained this understanding as a regulator tasked with enforcing these statutes and related regulations, as a regulator tasked with implementing these statutes and revising related regulations, as a congressional staffer tasked with overseeing agency implementation of these statutes and drafting legislation to amend these statutes, and as an attorney in private practice tasked with advising clients on compliance with these statutes.

7. I explain the bases for these opinions below.

**Qualifications**

8.  I am an environmental law, regulatory compliance, and waste and water policy expert with a J.D. from the University of Pennsylvania (1988). I am a member in good standing of the bar of the District of Columbia.

9.  In my 37-year career I have gained significant expertise in the CWA and RCRA. In particular:

    a.  From August 1988 through December 1994, I was an associate in the law firm Covington & Burling, where, among other things, I worked on Clean Water Act permits and compliance as well as RCRA regulations and compliance.

    b.  From January 1995 through December 2005, I served as a senior counsel and then as staff director of the Subcommittee on Water Resources and Environment of the House Transportation and Infrastructure Committee. That subcommittee has jurisdiction over oil and other pollution of navigable water, including inland, coastal, and ocean waters (which includes jurisdiction over the Clean Water Act). The subcommittee also has jurisdiction over flood control and improvement of rivers and harbors (which includes jurisdiction over the civil works program of the U.S. Army Corps of Engineers).

    c.  As a member of the subcommittee staff, I worked on legislation pertaining to and oversight over implementation of the Clean Water Act and the Corps' flood control mission.

    d.  The Transportation and Infrastructure Committee also has jurisdiction over federal management of emergencies and natural disasters (which includes jurisdiction over the Federal Emergency Management Agency (FEMA)). Jurisdiction over FEMA now resides within the Subcommittee on Economic Development, Public Buildings, and Emergency Management although in the 104th Congress (1995-96) the FEMA jurisdiction resided within my subcommittee.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**          3

e.  From January 2006 through January 2009, I served as the Assistant Administrator for the Office of Solid Waste and Emergency Response (OSWER) (now the Office of Land and Emergency Management) of the U.S. Environmental Protection Agency (EPA). That EPA headquarters office is the National Program Manager for EPA's RCRA hazardous waste program and EPA's Spill Prevention, Control, and Countermeasure (SPCC) program. My position required Senate confirmation. In my role as the Assistant Administrator of OSWER, I was responsible for the interpretation and revision of technical regulations.

f.  As the Assistant Administrator for OSWER, I was extensively involved in the October 2008 EPA rulemaking to conform the RCRA Definition of Solid Waste to various decisions of the federal Court of Appeals for the District of Columbia Circuit. That rulemaking focused on identifying when hazardous secondary material has been discarded, which determines when RCRA regulatory authority comes into effect, an issue that is an issue in this litigation. In 2015, a subsequent administration made changes to the October 2008 Definition of Solid Waste regulation. However, after judicial review, the D.C. Circuit vacated many provisions of the 2015 rule for failure to recognize the limits of EPA's statutory authority and restored the October 2008 provisions.

g.  As the Assistant Administrator for OSWER, I also was extensively involved in the December 2008 EPA rulemaking to add flexibilities to EPA's CWA Spill Prevention, Control, and Countermeasure Rule regulations.

h.  From March 2009 through December 2014, I was a partner at the law firm Barnes & Thornburg in Washington, D.C. During that time, on behalf of clients, I was extensively involved in EPA's development and implementation of CWA regulations on behalf of both the agricultural community and the homebuilding community. This work focused on the limits of EPA's authority under the CWA to control runoff.

i.  During my tenure at Barnes & Thornburg, I also worked on EPA's regulations pertaining to non-hazardous secondary materials. The purpose of those regulations is to determine when a non-hazardous secondary material is a waste when combusted. If the secondary material is a waste, it can only be combusted in

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER          4

a unit that meets the Clean Air Act standards for commercial and industrial solid waste incinerators. I also was involved in the D.C. Circuit litigation challenging those regulations. Like the October 2008 definition of solid waste rulemaking, the non-hazardous secondary material rulemaking focused on identifying when a secondary material has been discarded.

j.  From January 2015 to September 2017, I served as the Chief Counsel for the Senate Committee on Environment and Public Works. This committee has jurisdiction over all federal environmental laws, including the CWA and RCRA. As a member of the committee staff, I oversaw agency implementation of the CWA and RCRA and drafted legislation relating to both statutes.

k.  From December 2017 to January 2021, I served as the Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance (OECA). I was confirmed by the Senate for this position. Under my direction, this office monitored compliance with all federal environmental laws and enforced against violations of those laws, including the Clean Water Act and RCRA. In my role as the Assistant Administrator of OECA, I was responsible for ensuring the regulated community complied with technical regulations.

l.  Since March 2021, I have been a partner at Earth & Water Law, LLC.

m.  From these experiences, I have developed specialized knowledge of, and a unique perspective on, the technical provisions of the CWA and RCRA and their implementing regulations, which will aid the fact finder in understanding this complicated, technical body of compliance obligations.

10. Over the course of my career, I have analyzed the CWA and RCRA regulatory requirements on hundreds of occasions, researched the technical requirements of the CWA and RCRA regulations, drafted CWA and RCRA regulations, drafted amendments to the CWA and RCRA, and worked on the implementation and enforcement of the CWA and RCRA regulations in numerous matters across a wide range of industries.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

11. I have testified before Congress eight times as an independent outside expert and twelve times on behalf of EPA as an assistant administrator.  I have never been deposed or testified in court.

12. My writings include the following:

   a. *Maui: A Discernible, Confined, and Discrete Path Forward,* Texas Environmental Law Journal, Vol. 52, No. 2, Winter 2022-23, at 1.

   b. "Examining the Term 'Waters of The United States' in Its Historical Context." Policy Brief, C. Boyden Gray Center for the Study of the Administrative State at George Mason University - Antonin Scalia Law School, Jan. 19, 2022, *cited by* the Supreme Court in *Sackett v. EPA,* 598 U.S. 651, 703 n.8 (Justice Thomas, concurring).

   c. "EPA issues final revisions to Non-Hazardous Secondary Material Rule, but questions remain," American Bar Association, Section on Energy, Environment, and Resources, TRENDS, March/April 2013.

   d. "Nutrient Trading and Water Quality," The Water Report, Water Rights, Water Quality, and Water Solutions in the West, issue #113 (2013).

   e. Numerous legal briefs including two Supreme Court *amicus* briefs for a Member of Congress, a Sixth Circuit *amicus* brief for Members of Congress, a D.C. Circuit *amicus* brief for Members of Congress, and other appellate briefs on behalf of petitioners, intervenors, plaintiffs, and *amici*.

   f. More than 30 sets of comments filed under the Administrative Procedure Act on proposed Environmental Protection Agency rulemakings.

   g. Numerous congressional committee reports.

**Materials Considered**

13. I have reviewed the following documents:

   a. The February 11, 2022, Amended Complaint in Conservation Law Foundation, Inc., v. Shell Oil Company, et al. June 28, 2022, D. Ct. (3:21-cv-00933).

   b. EPA's CWA permit regulations, found at 40 CFR Part 122.

c.  The May 2025 Reports prepared for this litigation by James O'Donnell, Naomi Oreskes, Joshua Macey, Matthew Barlow, Richard Horner, Robert Nairn, and Wendi Goldsmith.

d.  EPA's March 2021 guidance document entitled "Developing Your Stormwater Pollution Prevention Plan, A Guide for Industrial Operators" (EPA 833-B-09-002).

e.  The Court's ruling in *Conservation Law Foundation v. Shell Oil Co. et al.*, D. Ct. Mar. 24, 2024. (2024 WL 1341116).

f.  The Court's Order Denying Motion For Partial Summary Judgment, *Conservation Law Foundation v. Shell Oil Co. et al.*, D. Ct. Oct. 19, 2023.

g.  This Court's Ruling on Motion to Dismiss, *Conservation Law Foundation v. Shell Oil Co. et al.*, D. Ct. Sept. 16, 2022.

h.  EPA's 2021 Multi-Sector General Permit for Industrial Facilities.

i.  Connecticut Department of Energy & Environmental Protection's 2018 General Permit for the Discharge of Stormwater Associated with Industrial Activity.

j.  Connecticut Department of Energy & Environmental Protection's 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity.

k.  EPA's Response to Comments on the 2021 Multi-Sector General Permit for the Discharge of Stormwater Associated with Industrial Activity.

l.  EPA's Proposed 2026 Multi-Sector General Permit for the Discharge of Stormwater Associated with Industrial Activity.

m.  Connecticut Department of Energy & Environmental Protection's Proposed General Permit for the Discharge of Stormwater Associated with Industrial Activity.

n.  CLF's Comments on Connecticut's Proposed General Permit for the Discharge of Stormwater Associated with Industrial Activity, dated May 10, 2024.

o.  Oil Pollution Prevention; Spill Prevention, Control, and Countermeasure Rule Requirements – Amendments, 73 Fed. Reg. 74236 (Dec. 5, 2008).

p.  40 CFR Part 122.

q.  *NRDC v. EPA,* 859 F.2d 156, 169-70 (D.C. Cir. 1988).

r.  *City and County of San Francisco v. EPA,* 145 S. Ct. 704, 715 (U.S. 2025).

s.  *NRDC v. EPA,* 808 F.3d 556, 578 *(2nd Cir. 2015).*

t.  Order Denying Motion to Reopen Case, *U.S. et al v. Miami-Dade County, FL,* S.D. Fl., 12-24400, May 8, 2014.

**Background**

14. I understand that CLF is alleging that the owners and operators of the Terminal violated the CWA by failing to perform an assessment of flooding and sea level rise that may occur as a result of climate change and failing to modify the Terminal in light of such an assessment. This allegation appears to be based on an assumption that best industry practices to minimize stormwater discharges require consideration of climate change and therefore climate assessment and adaptation were required by the 2018 and 2021 Connecticut Multi-Sector General Permit for Industrial Facilities.

15. I understand that CLF also is alleging that the owners and operators of the Terminal violated RCRA and are creating an imminent and substantial endangerment under RCRA by storing petroleum project at the terminal. The argument that stored product is a waste appears to be based on the premise that the terminal has not been designed to sufficiently withstand flooding and sea level rise that may occur as a result of climate change and therefore the Terminal intends to discard that product.

**Bases for my opinion that the CWA and the Multi-Sector General Permit for Industrial Activity do not require Defendants[1] to modify their facility to address potential flooding resulting from climate change.**

---

[1] Defendants in this action are Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton Terminaling LLC, and Motiva Enterprises LLC.

16. In the course of my 37 years working on environmental law and policy, I have gained a deep understanding of the scope of authority granted by Congress to EPA under the CWA.

17. The regulatory authority of the CWA over stormwater discharges is based on section 301, which prohibits the discharge of a pollutant unless the discharge is in compliance with effluent limits and standards as prescribed in a permit issued under the Act. 33 U.S.C. 1311.

    a. "Discharge of a pollutant" is a defined term.  It means the addition of any pollutant to navigable waters from any point source. 33 U.S.C. 1362(12).
    b. "Point source" is a defined term. It means any discernible, confined and discrete conveyance.  33 U.S.C. 1362(14).
    c. "Pollutant" is a defined term. It means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. 1362(6).
    d. "Effluent limitation" is a defined term. It means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters. 33 U.S.C. 1362(11).

18. In accordance with the statute, regulatory authority under the CWA applies only to the discharge. Section 301 of the CWA does not give EPA authority to regulate the source of a discharge.

> "EPA can properly take only those actions authorized by the CWA -- allowing, prohibiting, or conditioning the pollutant discharge.  And, contrary to EPA's assumption, the CWA does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants.  Thus, just as EPA lacks authority to ban construction of new sources pending permit issuance, so the agency is powerless

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

*to impose permit conditions unrelated to the discharge itself." NRDC v. EPA, 859 F.2d 156, 169-70 (D.C. Cir. 1988).*

19. Further, a CWA permit standard or limitation must set forth specific rules applicable to the discharge.

    a. *"As used in the relevant context, a limitation is a 'restriction or restraint imposed from without (as by law[]).* [Citation omitted] *A provision that tells a permittee that it must do certain specific things plainly qualifies as a limitation. Such a provision imposes a restriction 'from without.' But when a provision simply tells a permittee that a particular end result must be achieved and that it is up to the permittee to figure out what it should do, the direct source of restriction or restraint is the plan that the permittee imposes on itself for the purpose of avoiding future liability. In other words, the direct source of the restriction comes from within, not 'from without.'" City and County of San Francisco v. EPA, 145 S. Ct. 704, 715 (U.S. 2025).*

    b. *"In sum we hold that [section 301 of the CWA] does not authorize EPA to include 'end-result' provisions in NPDES permits." 145 S. Ct. at 720.*

    c. *"This narrative standard is insufficient to give a shipowner guidance as to what is expected or to allow any permitting authority to determine whether a shipowner is violating water quality standards. By requiring shipowners to control discharges 'as necessary to meet applicable water quality standards' without giving specific guidance on the discharge limits, EPA fails to fulfill its duty to 'regulat[e] in fact, not only in principle.'" NRDC v. EPA, 808 F.3d 556, 578 (2nd Cir. 2015)* (citing *Waterkeeper Alliance v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005)).

20. As a technical matter, the Supreme Court's ruling in *City and County of San Francisco* does not preclude the adoption of technology-based effluent limitations that are set forth as descriptive narrative requirements, such as best management practices. 145 S. Ct. at 710, 720. However, those narrative requirements must be specific so that they are imposed from without, not from within. And those requirements must be a limitation on or a standard applicable to a discharge, not to the facility itself.

21. In my experience overseeing enforcement and implementation of the CWA, the technical requirements have never been used, and have never been contemplated to be used, as a flood control statute. The only references to flood or flooding in the CWA are found in non-regulatory provisions (studies in collaboration with other federal agencies under section 104(n), eligible uses of funds in the Oil Spill Liability Trust Fund for Gulf Coast

restoration and recovery under section 311(t), and eligible purposes of competitive awards provided under section 320(g)(4)). Notably, there is no suggestion in section 301 that effluent limitations and standards include any aspect of flood control or flood damage reduction.

22. My observation is based in part on my experience as a member of the staff of two Congressional committees of jurisdiction. Members of the public and regulated community frequently bring matters to the attention of Congressional committee staff, particularly if they believe a federal agency has overstepped its authority. Based on my experience during my tenure as a member of the staff of both House and Senate committees with jurisdiction over the CWA, I have not been made aware of any individual or general CWA stormwater permit that requires a facility to modify its structures to protect against flooding that may result from climate change or any statement by a state or federal regulatory official taking that position.

23. My observation also is based in part on my experience representing members of the regulated community when in private practice. I have not been made aware of any EPA or state CWA enforcement action alleging a violation based on a facility's failure to assess climate change and modify its structures to protect against flooding that may result from climate change.

   a. I am aware of a 2012 CWA enforcement action brought by EPA and the State of Florida against Miami-Dade County in the Southern District of Florida regarding the County's sanitary sewer overflows.

   b. The Biscayne Bay Waterkeeper intervened in that action in 2013 seeking to include in the settlement a requirement that Miami-Dade County consider climate change impacts including sea level rise.

   c. The proposed Consent Decree did not include any such requirements and the Biscayne Bay Waterkeeper opposed entry of the decree.

   d. The court entered the Consent Decree in 2014 without any climate change provisions and denied a motion by Biscayne Bay Waterkeeper to reopen the case

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**    11

holding that the Consent Decree resolves the *CWA violations* raised in the litigation.

24. My observation also is based on my experience as a regulator enforcing the CWA. During my tenure as the assistant administrator leading EPA's enforcement office, no member of the public, environmental non-governmental organization, or EPA staff suggested to me that EPA should take a CWA enforcement action alleging a violation based on a facility's failure to assess climate change or modify its structures to protect against flooding that may result from climate change. To my knowledge, based on my experiences at EPA, the Senate, the House, and in private practice, EPA has never initiated an enforcement action under the CWA based on a facility's failure to assess climate change or to adapt its facility taking into consideration the impacts of climate change.

25. The Connecticut Department of Energy & Environmental Protection's 2018 and 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity is consistent with the scope of CWA statutory authority that I have observed in my various capacities.

    a. The Permit defines "stormwater" as waters consisting of rainfall runoff, including snow or ice melt during a rain event. Notably, this definition does not include water flowing onto a facility from a river or the ocean, *i.e.,* flooding resulting from sea level rise.

    b. The Permit requires elimination of non-stormwater discharges unless authorized under a separate permit or as authorized in a "Non-Stormwater Discharge Certification" under the permit. The Permit authorizes a stormwater discharge that is a mixture of stormwater and naturally occurring discharges. Accordingly, contrary to the allegation in the Complaint, storm surge flooding of river and ocean water, even if mixed with stormwater at the facility, is not prohibited by the Permit.

    c. The Permit includes "Control Measures" that are defined as Best Management Practices that the permittee must implement to minimize the discharge of pollutants. The term "minimize" is defined as "reduce and/or eliminate to the

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**      12

extent achievable using control measures that are technologically available and economically practicable in light of best industry practice."

d.  Consistent with the scope of authority under the CWA, the Permit's definition of control measures is limited to controls on a discharge. None of the control measures identified in the Permit are measures that relate in any way to the prevention of the possibility of a discharge that is not yet occurring.

e.  The term "best industry practice" as used in the Permit's definition of control measures can only refer to an industry practice related to controlling the discharge of pollutants.

f.  Accordingly, it is my opinion as a CWA regulatory and compliance expert that nothing in the Permit requires a climate assessment or modification of a facility to address potential sea level rise.

26. The requirement in the DEEP permit for consistency with the applicable goals and policies in section 22a-92 of the Connecticut General Statutes does not expand the scope of regulatory authority being implemented by the Permit. That requirement applies to "such activity." The activity referred to is stormwater discharge associated with industrial activity, which the permit defines at "the discharge from any conveyance which is used for collecting and conveying stormwater and which is directly related to manufacturing, processing, or material storage areas at an industrial activity." Notwithstanding any reference to the state's Coastal Management Act, the Permit only regulates discharges of pollutants to navigable waters. Thus, a stormwater discharge into a coastal resource, such as an oyster bed, may be prohibited by the Permit. However, the reference to the Coastal Management Act does not expand regulation under the Permit to include facility siting or flood control.

27. Even if climate change assessment and adaptation measures did fall within the scope of the Permit's definition of control measure none of the information I have reviewed indicates that any such "best industry practice" exists at this time, as EPA uses that term in the regulatory context.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**         13

28. For example, when identifying the maximum achievable control technology (MACT) to be applied to existing major sources of hazardous air pollutants under the section 112(d) of the Clean Air Act, EPA surveys the relevant industry sector and sets standards based on the best performing 12 percent of such sources.

29. Absent a formal survey, like that used to set Clean Air Act MACT standards, in my experience EPA relies on standards set by third parties using a consensus process when identifying applicable industry practices.

30. For example, EPA's SPCC regulations require consideration of applicable and sound industry practices, as certified by a professional engineer, or self-certified (for smaller facilities) when designing measures to prevent oil spills. (Notably, EPA's SPCC program authority comes from section 311(j)(1)(C) of the CWA, which is broader than section 311 in that it authorizes spill prevention measures rather than just controls on an existing discharge.)

31. When working on revisions to EPA's SPCC regulations in 2008 as the Assistant Administrator for OSWER, I asked the EPA staff what constitutes applicable industry practices, as that term is used in the regulations. My concern was notice to the regulated community of their obligations. The staff assured me that reliance on applicable industry practices was intended to add flexibility and that only practices developed by third party experts would be considered to be "industry practices."

32. This definition is included in the preamble to the 2008 rule:

> "Industry standards are technical guidelines created by experts in a particular industry for use throughout that industry. These guidelines assist in establishing common levels of safety and common practices for manufacture, maintenance, and repair. Created by standard-setting organizations using a consensus process, the standards establish the minimum accepted industry practice." 73 Fed. Reg. at 74,265.

33. Similarly, regulations implementing section 112(r) of the Clean Air Act rely on industry practices. That regulation establishes a general duty to design and maintain a safe facility. According to EPA, to meet that requirement a facility should "[a]dopt or follow any

relevant industry codes, practices or consensus standards." The General Duty Clause, Office of Land and Emergency Management, EPA 550-F-20-002 (Apr. 2020).

34. I am not aware of any EPA survey of industry climate change practices relevant to CWA compliance. I also am not aware of any consensus technical guidelines for complying with a CWA stormwater permit created by experts in a particular industry for use throughout that industry that includes assessment of climate change or modification of structures to protect against flooding that may result from climate change.

35. As a result, it is my opinion as an expert in CWA regulatory compliance, that control measures in the Connecticut 2018 and 2021 Multi-Sector General Permit for Industrial Facilities do not include climate change and adaptation measures.

**Bases for my opinion that the petroleum product stored at the Terminal is not a waste under RCRA.**

36. RCRA and its implementing regulations set forth detailed requirements for the treatment, storage, and disposal of hazardous waste.  However, RCRA does not regulate material that is not a waste, whether hazardous or not, and does not give EPA any authority to prevent a product from becoming a waste.

37. The Complaint alleges a RCRA violation based on a perceived "intent to discard" petroleum products stored at the Terminal. However, "intent to discard" is not an activity that is regulated under RCRA. RCRA applies only after a material has been discarded. *American Mining Congress v. EPA*, 824 F.2d 1177, 1190 (D.C. Cir. 1987) ("Congress clearly and unambiguously expressed its intent that 'solid waste' (and therefore EPA's regulatory authority) be limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away.").

38. RCRA regulations require a fact-based determination of whether or not a material is discarded.

39. Under RCRA, a material is considered discarded if it is abandoned by being disposed of, burned or incinerated, accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated. 40 CFR 261.2(b).

40. EPA's 2008 Definition of Solid Waste rulemaking, in which I was extensively involved as Assistant Administrator for OSWER, establishes criteria for identifying when a hazardous secondary material is discarded. 73 Fed. Reg. 64,668, 64,673 (Oct. 30, 2008).

41. EPA's 2008 regulations require a generator or a recycler of a hazardous secondary material to manage the secondary material in the same manner as an analogous raw material.  If there is no analogous raw material, the regulations required the hazardous secondary material to be contained.  In 2015, EPA added a definition of the term "contained" to its regulations to provide guidance to generators and recyclers of hazardous secondary materials. This definition comes into play only if there is no analogous raw material. The 2015 amendments did not change the fact that if there is an analogous raw material, a hazardous secondary material is not discarded if it is managed in a manner that is consistent with the management of the raw material. 40 CFR 260.43(a)(3).

42. Based on this understanding of EPA's RCRA authority, petroleum product stored at the Terminal cannot be considered discarded. Further, an "intent to discard" does not establish RCRA authority. Accordingly, the owners and operators of the Terminal cannot be considered to be in violation of RCRA based on the storage of petroleum product even if located in a flood plain and even if there is a possibility of a release.

**Evaluation of Plaintiff's Expert Reports**

43. Nothing in the expert reports served by the plaintiff in this litigation changes the opinions expressed above.

44. Dr. James O'Donnell provides his opinion that sea level rise will occur in the New Haven Harbor and that Defendants are aware of the potential for sea level rise.  As discussed

above, the risk that a discharge to navigable waters may occur in the future or that a product may be released to the environment in the future are not matters that can be addressed using CWA authority (which applies to an actual discharge, not a source) or RCRA authority (which applies to material that is already discarded). Additionally, Dr. O'Donnell provides new analyses on the exacerbation of climate change and suggests Defendants incorporate his analysis into their SWPPP. Dr. O'Donnell's analyses are not industry standards and no SWPPP permittee has an obligation to follow them.

45. Dr. Mathew Barlow provides his opinion that climate change will result in sea level rise, increased precipitation, and more frequent and severe storms in New Haven. As discussed above, the risk that a discharge to navigable waters may occur in the future or that a product may be released to the environment in the future are not matters that can be addressed using CWA authority (which applies to an actual discharge, not a source) or RCRA authority (which applies only to material that is already discarded).

46. Dr. Naomi Oreskes provides her opinion that climate change is happening and will cause increased precipitation and flooding and that Defendants are aware of these facts. Defendants are not disputing whether climate change is occurring. As discussed above, the risk that a discharge to navigable waters may occur in the future or that a product may be released to the environment in the future are not matters that can be addressed using CWA authority (which applies to an actual discharge, not a source) or RCRA's regulatory or imminent and substantial endangerment authorities (which apply only to materials that are solid or hazardous wastes, not stored product) and thus are irrelevant to the claims set forth in the amended Complaint.

47. Dr. Richard Horner provides his opinion that it is best industry practice for a stormwater pollution prevention plan to consider potential future increases in precipitation as a result of climate change. As discussed above, to be relevant to CWA compliance a best industry practice must be a control measure and a control measure must be a specific measure designed to address a discharge. Requiring a facility to eliminate the risk that a discharge to navigable waters may occur in the future would be the regulation of the source, not the discharge, and therefore would not be authorized under the CWA. Further, Dr. Horner has

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

provided no examples of practices related to climate assessment and adaptation measures that are technical guidelines created by experts in a particular industry for use throughout that industry using a consensus process.

48. Dr. Robert Nairn provides his opinion on the adequacy of flood protection at the Terminal and cites to guidelines issued by the American Society of Civil Engineers and the Association of Floodplain Managers. As discussed above, neither the CWA nor RCRA give an agency the authority to require flood protection.

49. Mr. Joshua Macey, Esq. provides his opinion that "Shell" and Motiva exerted control over the Terminal and that "Shell" can afford to pay a large fine. Based on my experience as head of enforcement at EPA, I am aware of the factors considered in setting penalties for violations of the CWA and RCRA. EPA will consider inability to pay to justify lowering a penalty. However, deep pockets are not a consideration.

50. Dr. Wendi Goldsmith references the other expert reports and provides her opinion that best industry practice requires the Terminal to apply recommendations applicable to critical infrastructure as a matter of compliance with the CWA and RCRA. As discussed above, CWA authority does not attach until a discharge occurs and RCRA authority does not attach until a material is discarded. Thus, compliance with facility hardening recommendations do not fall within the scope of CWA and RCRA authority over the Terminal.

**Conclusion**

51. Based on my understanding of how the CWA and RCRA are authorized and implemented in practice and by applying my knowledge of these statutes to the facts presented in this matter it is my opinion that the regulatory frameworks of these two statutes do not provide the authority to compel the climate related adaptation measures being sought by CLF in this case.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Dated: June 23, 2025

_____
Susan Parker Bodine

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**   19