**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, <br><br> Defendants. | Case No: 3:21-cv-00933-VDO <br><br><br> November 3, 2025 <br><br><br> **FILED UNDER SEAL** |

**[REDACTED] PLAINTIFF CONSERVATION LAW FOUNDATION'S OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT
<u>WENDI GOLDSMITH'S OPINIONS AND TESTIMONY</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................... ii

I.   INTRODUCTION .........................................................................................................1

II.  BACKGROUND ...........................................................................................................2

     A.  Plaintiff's Claims .................................................................................................2

     B.  Dr. Goldsmith's Qualifications............................................................................4

     C.  Dr. Goldsmith's Opinions....................................................................................5

III. LEGAL STANDARD FOR EXPERT TESTIMONY ............................................................6

IV. ARGUMENT.................................................................................................................8

     A.  Dr. Goldsmith is Well Qualified to Offer Expert Testimony in this Case. .........8

         1.  Rule 702 Does Not Require the Particularized Educational and Experiential
             Background that Defendants Demand. ..........................................................9

     B.  Defendants' Arguments Regarding Dr. Goldsmith's Methodology are Meritless............12

         1.  Dr. Goldsmith's Opinions are Reliable. ......................................................12

         2.  Arguments About the Sufficiency of Information on Which Dr. Goldsmith Based
             Her Opinions Go to the Weight of Her Opinions, Not their Admissibility.................16

         3.  Defendants Improperly Conflate Dr. Goldsmith's Opinions with a Legal Opinion to
             Reargue Their View of what the Permit Requires.......................................16

     C.  This Court Should Disregard Defendants' Attempt to Raise Previously Rejected
         Dispositive Arguments under the guise of a Rule 702 Motion to Preclude Expert
         Testimony. ..........................................................................................................18

     D.  Defendants' Motion Ignores CLF's RCRA Claims and Cannot Exclude Dr. Goldsmith's
         Testimony on That Basis. ...................................................................................21

     E.  Dr. Goldsmith's Testimony Will Assist the Jury Without Misleading or Confusing the
         Jury, or Unfairly Prejudicing Defendants..........................................................22

V.   CONCLUSION ...........................................................................................................23

**TABLE OF AUTHORITIES**

*Cases*

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*,
    754 F. Supp. 3d 456 (S.D.N.Y. 2024) ...................................................................................9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ..............................................................................................7

*CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*,
    815 F. Supp. 2d 673 (S.D.N.Y. 2011) ...............................................................................16

*Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933 (SALM),
    2022 WL 4292183 (D. Conn. Sept. 16, 2022) ....................................................................3

*Cortes-Irizarry v. Corporacion Insular De Seguros*,
    111 F.3d 184 (1st Cir. 1997) .............................................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................................................................7

*Grdinich v. Bradlees*,
    187 F.R.D. 77 (S.D.N.Y. 1999) .........................................................................................14

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................................7,12

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................................7

*McBeth v. Porges*, No. 15-CV-2742 (JMF),
    2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018) .............................................................10, 13

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) ...........................................................................................9, 13

*Meineker v. Hoyts Cinemas Corp.*,
    154 F.Supp.2d 379 (N.D.N.Y) ......................................................................................15, 16

*Munn v. Hotchkiss Sch.*,
    24 F. Supp. 3d 155 (D. Conn. 2014) .............................................................................14, 15

*Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH),
    2024 WL 3520168 (D. Conn. May 30, 2024) ..................................................................6, 7

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ...............................................................................16

*Riegel v. Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006), aff'd, 552 U.S. 312 (2008) ....................................................13

*SLSJ, LLC v. Kleban*,
    277 F. Supp. 3d 258 (D. Conn. 2017) ..........................................................................6, 7, 8

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) ......................................................................................10

*TMI Tr. Co. v. WMC Mortg., LLC*, No. 3:12-CV-1538 (CSH),
    2017 WL 6617050 (D. Conn. Dec. 28, 2017) .....................................................................22

*United States v. Angelilli*,
    660 F.2d 23 (2d Cir. 1981) .........................................................................................6

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004) .........................................................................................6

*Williamson v. Amica Mut. Ins. Co.*, No. 3:23-CV-01203 (JCH),
    2025 WL 1796324 (D. Conn. June 30, 2025) ..................................................................12

*Woelfle v. Black & Decker (U.S.) Inc.*, No. 18-CV-486,
    2023 WL 4407577 (W.D.N.Y. July 7, 2023) ....................................................................10

*Washington v. Kellwood Co.*,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015) ..............................................................................6

**Statutes**

42 U.S.C. § 6972(a)(1)(B).............................................................................................21

**Rules**

Fed. R. Civ. P. 56........................................................................................................20

Fed. R. Evid. 702...................................................................................................passim

Fed. R. Evid. 403 ..............................................................................................7, 22, 23

## I.    INTRODUCTION

Defendants' arguments disregard Judge Meyer's rejection of their Motion for Partial Summary Judgment and attempt to relitigate the same issues about the "best industry practice" permit requirement in their motion to exclude Dr. Wendi Goldsmith's testimony. In that ruling, Judge Meyer held, "The very purpose of a best industry practice requirement . . . is to require industry to conform to best practices even if the content of such best practices are not spelled out word for word in the permit itself, in no small part because of the common sense reality that best practices may evolve over time." Tr. of Mot. Hr'g, ECF No. 305 at 83:5–11. He further held that, "If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that I cannot resolve at this time." *Id.* at 86:8–16. This issue is settled, and Defendants' effort to relitigate through Rule 702 should be rejected.[1]

Dr. Goldsmith's opinions directly address Judge Meyer's holding—namely, "as a factual matter, whether best industry practice requires consideration of climate change for a facility like the Shell facility that sits adjacent to the New Haven Harbor." *Id.* at 84:17–22. Her expert analysis is specifically focused on evaluating the standards and practices used in industry—including the oil and gas industry and the Shell Group of companies—which is central to resolving the Court's inquiry. Dr. Goldsmith's nearly 60-page report describes her extensive qualifications and

---

[1] Judge Meyer also rejected Defendants' reassertion that EPA rejected the argument that the terms of the general federal Clean Water Act permit require considerations of climate change. *Compare* Mem. at 4 *with* Hearing Tr. at ECF 305 at 86:3–7 ("I'm convinced, for the reasons pointed out by CLF, that the record is not so clear that the EPA's alleged interpretation is necessarily conclusive in this case involving a state permit."). CLF notes that Defendants have signaled their intent to re-raise their theories regarding the "best industry practices" requirement of the permits for the New Haven Terminal in another round of pre-trial summary judgment briefing.  ECF 806.  No briefing schedule has been set based on the parties' short letter briefs.

1

experience, methodology, and the basis for each of her opinions, including personal observations of conditions at the New Haven Terminal and internal Shell engineering practices and guidelines. Her testimony does not "essentially redefine" a permit term.

CLF opposes Defendants' motion to exclude Dr. Goldsmith's testimony, as her expert analysis is directly responsive to the factual issues Judge Meyer identified and is grounded in her extensive background and experience. Dr. Goldsmith's opinions are both relevant and reliable, addressing best industry practices at coastal facilities with vulnerable million-plus gallon petroleum storage tanks. Excluding her testimony would deprive the Court of testimony necessary to resolve the central questions in this case.

## II.    BACKGROUND

### A.    Plaintiff's Claims

 CLF filed this action to halt Defendants' longstanding and ongoing violations of the CWA and RCRA at their bulk petroleum fuel storage terminal in the Port of New Haven (the "Terminal"). In short, CLF alleges that Defendants have failed to evaluate and address the reasonably foreseeable risks to the Terminal posed by severe weather, including risks associated with climate change, which threaten to flood the Terminal and release millions of gallons of oil and other pollutants into nearby New Haven Harbor, Quinnipiac River, and Mill River.

Defendants are all directly liable as owners or operators of the Terminal for violating the terms of the CWA permit ("the Permit"), including the obligations to satisfy "best industry practice" (Counts I, V, VI, VII) and inform state regulators about risks to the Terminal from severe weather and climate change (Counts III, VIII, IX, and XIII), as well as for presenting an imminent and substantial endangerment to human health and the environment under RCRA (Count XIII). Am. Compl. ECF No. 47. The appropriate civil penalties for these violations depend in part on CLF's allegations that Defendants have knowingly failed to address these risks at the Terminal for

2

decades. CLF filed an Amended Complaint on February 11, 2022, and Defendants moved to dismiss certain of CLF's claims. ECF No.'s 47, 50. This Court largely denied Defendants' motion, holding that CLF's CWA claims could proceed against Defendants Shell USA, Shell Petroleum, Equilon, and Triton, and that one of CLF's RCRA claims (Count XIII) could proceed against all Defendants. *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933(SALM), 2022 WL 4292183 (D. Conn. Sept. 16, 2022).[2] Central to this Court's decisions were allegations regarding "whether Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change," *id.* at *21 (citation omitted), and "that the infrastructure at the Terminal is at risk of experiencing the same infirmities as those alleged to have occurred at Shell's Houston and Deer Park Facilities, among others," *Id.* at *17.

Well before discovery ended, Defendants moved for partial summary judgment regarding the meaning of the permit term "best industry practice," arguing that it does not require consideration of climate change factors. Defs.' Mot. for Partial Summ. J., ECF No. 248-1. The late Judge Jeffrey A. Meyer denied Defendants' motion, explaining from the bench that the term "best industry practice" is not ambiguous but, "[i]nstead, the parties seem to dispute, as a factual matter, whether best industry practice requires consideration of climate change for a facility like the Shell facility that sits adjacent to the New Haven Harbor." Tr. Mot. Hr'g, ECF No. 305 at 34:18–22. In his Order denying Defendants' Motion for Partial Summary Judgment, he held:

> If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that the Court cannot resolve at this time and on which it expresses no view.

---

[2] CLF stipulated to the voluntary dismissal of Defendants Shell USA, Inc. (f/k/a Shell Oil Company) and Shell Petroleum Inc.  ECF 527, 529.

Order Denying Mot. for Partial Summ. J. at 1, ECF No. 302. The Court's numerous decisions establish the scope of issues in this matter.

### B. Dr. Goldsmith's Qualifications

Dr. Goldsmith received a Bachelor of Arts in Earth Planetary Sciences, Environmental Studies from Yale University, a Master of Arts in Landscape Design from Conway School, a Master of Science in Plant and Soil Science from the University of Massachusetts Amherst, and a PhD in Business and Social Science from Aarhus University in Denmark. Goldsmith Expert R. ECF No. 751 at App. A pg. ii. She is a Licensed Professional Geologist in New Hampshire and Louisiana, and holds professional certifications in Geology, Erosion and Sediment Control, and Storm Water Quality. *Id.*

Dr. Goldsmith is a recipient of numerous awards including the Bronze Order of the de Fleury Medal for leadership to the Engineer Regiment of the US Army in recognition of 20 years of environmental stewardship and engineering innovation for climate change resilient infrastructure for the greater New Orleans Hurricane and Storm Damage Risk Reduction System; the Outstanding Civil Engineering Achievement Award from the American Society of Civil Engineers; the National Engineering Excellence Award from the American Consulting Engineers Council; and the Grand Conceptor Award for Engineering Excellence from the American Council of Engineering Companies. *Id.* at App. A pg. iv. She has authored articles regarding "lessons Learned from Katrina" in The Military Engineer, and "Engineering Infrastructure for the Post-Katrina Future" in the PIANC (World Association for Waterborne Transport) Yearbook. *Id.* at App. A, pg. v. She is also a Fellow of the Society of American Military Engineers, a member of the Society for Risk Analysis, PIANC, the Soil and Water Conservation Society, and the Soil Science Society of America. *Id.* at App. A, pg. vii.

4

Her work for the U.S. Army Corps of Engineers after hurricanes Katrina and Rita included refining and applying federal policies and procedures for climate resilient planning and engineering of infrastructure for flood risk management. *Id.* at 3. She founded Bioengineering Group and served as CEO until its sale in 2014. There, she led the planning, permitting and design of large-scale infrastructure projects including industrial stormwater management systems, flood control facilities, and worked on contaminated properties regulated under RCRA and Superfund. *Id.* at 3.

After Hurricanes Katrina and Rita devastated New Orleans and neighboring parishes, she led an international team providing planning and engineering services to improve flood infrastructure. *Id.* at 4. Her firm, Bioengineering Group, was awarded $200 million in contracts to provide services for planning, design, and program management to address the inadequate flood controls made apparent by Hurricane Katrina. *Id.* at 5. Her experience over the last twenty years includes many other infrastructure projects dealing with weather-related impacts. *See id.* at 5–7.

### C.      Dr. Goldsmith's Opinions

The following list sets forth Dr. Goldsmith's primary opinions verbatim:

1. Best Industry Practice Requires Shell to Consider and Protect Against Reasonably Foreseeable Risks, Including Risks Due to Climate Change.

2. More Severe Weather, Precipitation, Storm Surge, and Sea Level Rise Have Created Reasonably Foreseeable and Significant Risks to the New Haven Oil Terminal that Shell has not Addressed.

3. Past Storms Put Shell on Notice of the Increased Risks to Coastal Facilities from Severe Weather, Storm Surges, Precipitation, and Sea Level Rise.

4. The New Haven Oil Terminal is Not Engineered or Operated Pursuant to Best Industry Practice.

5. The New Haven Terminal's Stormwater Management System is Not Sufficient to Mitigate the Risks of Potential Flood Hazards and Severe Storms.

5

6.  The New Haven Oil Terminal's Berms and Containment Areas are Insufficient to Contain the Petroleum in the Event of Oil Spill.

7.  The New Haven Oil Terminal is Not Engineered or Operated to Prevent the Discharge of Pollutants.

8.  Adequate Decision Support Frameworks Currently Exist to Guide Engineering of Infrastructure Measures to Effectively Manage Flood Risk at the New Haven Oil Terminal.

9.  Shell Fails to Apply Best Industry Practice in Its Risk Management Program.

10. A Severe Storm Poses a Threat of Potential Pollution in the Surrounding Community and Environment Given the Current Condition of the Shell New Haven Terminal.

## III.   LEGAL STANDARD FOR EXPERT TESTIMONY

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 264 (D. Conn. 2017) (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015)). "A witness is qualified where he or she has 'superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH), 2024 WL 3520168, at *6 (D. Conn. May 30, 2024) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). "One may become qualified as an expert based on practical experience, so that professional education is not a prerequisite." *SLSJ, LLC*, 277 F. Supp. at 266 (citing *United States v. Angelilli*, 660 F.2d 23, 39–40 (2d Cir.1981)). "Alternatively, formal education may also suffice to qualify a witness as an expert in a particular field, and the lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying." *Id.* (internal quotation and citation omitted). "When considering an expert's 'practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is

6

whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *Id.* (citing *Valentin v. New York City*, No. 94-CV-3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

"If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable." *Old Gate Partners, LLC*, 2024 WL 3520168, at *6. In *Daubert*, the Supreme Court identified four factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation' " and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. 579, 493–94 (internal quotations and citations omitted). However, these factors are not a "definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.*

"In addition to ensuring that expert testimony is reliable, the court must decide whether the expert's testimony is relevant, i.e., whether it will 'help the trier of fact.'" *Old Gate Partners, LLC*, 2024 WL 3520168, at *7 (quoting *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016). "[E]xpert testimony is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting Fed. R. Evid. 403). "Furthermore, doubts

about the usefulness of an expert's testimony, should be resolved in favor of admissibility." *SLSJ, LLC*, 277 F. Supp. 3d at 264.

## IV.    ARGUMENT

### A.    Dr. Goldsmith is Well Qualified to Offer Expert Testimony in this Case.

As described in Section II.B., above, Dr. Goldsmith possesses over thirty-five years of experience in flood management infrastructure, disaster resilience, and sustainable planning with significant work focused on critical infrastructure. *Id.* at 3. Her experience includes direct consulting for the U.S. Army Corps of Engineers, including direct involvement in refining and applying federal policies and procedures for climate resilient planning and engineering of infrastructure for flood risk management. *Id.* She consults and advises nationally and internationally on established and emerging procedures and standards related to critical infrastructure systems and components, including petrochemical storage and handling facilities. *Id.* She has led the planning, permitting and design of large-scale infrastructure projects such as renewable energy generation, highways, municipal and industrial stormwater management systems, and flood control facilities. *Id.*

She has advised on vulnerability assessments, risk mitigation, and practices for flood protection at facilities storing hazardous materials, applying internationally recognized standards and protocols to address foreseeable risks from severe weather, storm surge, and sea level rise. *Id.* at 6–7. Her background encompasses both the technical aspects of flood risk analysis and practical implementation of resilient infrastructure measures, making her uniquely qualified to opine on best industry practices. *See id.* at 6–7.

This work required integrating climate science, risk management, and engineering practice to address the very types of hazards—severe weather, storm surge, and sea level rise—that threaten coastal petrochemical storage facilities such as the Shell New Haven Terminal. Dr. Goldsmith's

8

expertise is not limited to theoretical analysis; she has led resilience programs and has been recognized for her ability to translate scientific consensus and regulatory requirements into actionable strategies for infrastructure adaptation and disaster risk reduction. *Id.* at App. A pg. i

Her qualifications are further demonstrated by her leadership in projects ranging from urban flood management to stormwater systems and coastal defenses, both in the United States and internationally. *Id.* at 6–7. These projects required the same knowledge, training, and experience applicable to the opinions Dr. Goldsmith has offered in this case. Dr. Goldsmith's work has consistently involved assessing vulnerabilities, identifying failure modes, and proposing solutions for facilities including those handling hazardous materials. By drawing from her leadership on resilience programs and her work with recognized standards, Dr. Goldsmith offers insights that are suited to address the issues at the heart of this case, thereby providing substantial value to the trier of fact.

### 1. Rule 702 Does Not Require the Particularized Educational and Experiential Background that Defendants Demand.

Defendants' complaints about Dr. Goldsmith's lack of an engineering degree and direct experience with bulk fuel storage terminals do not render her unqualified. Mem. at 4, 11–16. District courts in this circuit have frequently rejected claims that a witness who lacks "particular educational or other experiential background" precisely at issue in a case is unqualified to give expert testimony, holding that those issues go to weight, not admissibility. *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 754 F. Supp. 3d 456, 464 (S.D.N.Y. 2024) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)). Education and experience in a "general field closely related to the subject matter in question" is sufficient. *Id.* Courts will not disqualify a witness solely because they lack expertise in the "specialized areas that are directly pertinent" to the case. *Id.* Experts should not be subject to an "overly narrow" test

9

of their qualifications. *Id.* The court should instead focus on whether the witness will likely assist the trier of fact. *Id.* at 464.

An expert may offer an opinion using their education and professional qualifications to "analyze a given set of circumstances . . . through reading, calculations, and reasoning from known scientific principles" even though those circumstances are new. *Woelfle v. Black & Decker (U.S.) Inc.*, No. 18-CV-486, 2023 WL 4407577, at \*5 (W.D.N.Y. July 7, 2023) (admitting expert testimony in products liability case where expert had no direct experience in manufacture of product). Indeed, "well-trained people with somewhat more general qualifications' are *better* suited to testify to industry practices and customs than are experts qualified with a high 'degree of specificity,' but who may have an insular perspective." *McBeth v. Porges*, No. 15-CV-2742 (JMF), 2018 WL 5997918, at \*6 (S.D.N.Y. Nov. 15, 2018) (citing *Stagl v. Delta Air Lines, Inc.* 117 F.3d 76, 82 (2d Cir. 1997)).

EPA has determined that an engineering degree is not required to prepare Stormwater Pollution Prevention Plans under its multi-sector general permit for stormwater associated with industrial activities, which undercuts Defendants' argument that Dr. Goldsmith must hold an engineering degree or professional engineer's license to offer opinions in this case. EPA Response to Public Comments, EPA NPDES 2015 Multi-Sector General Permit (MSGP), Docket ID #: EPA-HQ-OW-2012-0803 (June 4, 2015) at 265.[3] EPA recognized that a person "knowledgeable in the principles and practices of industrial stormwater controls and pollution prevention, and possesses the education and ability to assess both facility conditions at the industrial facility that could impact stormwater quality, and the education and ability to assess the effectiveness of stormwater controls selected and installed to meet the requirements of the permit" is qualified. *Id.*

---

[3] https://downloads.regulations.gov/EPA-HQ-OW-2012-0803-0135/content.pdf.

10

Dr. Goldsmith's knowledge of the principles and practices of industrial stormwater controls and pollution prevention is demonstrated throughout her expert report by her education, credentials, and extensive practical experience. As a professional geologist, she has the knowledge and training to analyze subsurface conditions, hydrology, and contaminant pathways to assess how facility conditions affect stormwater quality and to assess the effectiveness of stormwater controls. Indeed, she is a Certified Professional in Stormwater Quality and a Certified Professional in Erosion and Sediment Control. Moreover, Dr. Goldsmith's leadership on projects involving the planning, design, and evaluation of stormwater management systems directly demonstrates her ability to assess the effectiveness of stormwater controls, especially regarding the control of surface water flow. By overseeing municipal and industrial stormwater projects, conducting technical reviews for the U.S. Army Corps of Engineers, and advising on risk mitigation for critical infrastructure, she is well-versed in evaluating how well stormwater controls manage runoff, reduce flooding, identify weaknesses in surface water flow management, and recommend improvements tailored to critical infrastructure facilities.

Defendants fail to articulate any rationale for why direct, hands-on experience with a petroleum bulk fuel storage terminal is necessary to render opinions in this case. Their objection baldly asserts that Dr. Goldsmith lacks such experience, without demonstrating how this specific background is required under Rule 702 or relevant authority. Indeed, the focus of Rule 702 is on whether the expert's knowledge, skill, training, or experience enables her to assist the trier of fact—not whether she has worked at the precise type of facility at issue. The absence of direct experience at a bulk fuel storage terminal does not undermine Dr. Goldsmith's ability to assess the Terminal's stormwater management, practices, and risk mitigation measures, especially given her extensive background. Without any showing that such direct experience is a prerequisite to opine

11

on best industry practice, Defendants' criticism amounts to a challenge to weight, not admissibility, which they can explore on cross examination.

**B.    Defendants' Arguments Regarding Dr. Goldsmith's Methodology are Meritless.**

**1.    Dr. Goldsmith's Opinions are Reliable.**

An expert may base their opinions on a review of published studies, industry documents, and other authoritative sources, and need not personally conduct original studies to reach reliable conclusions. *See, e.g.*, *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016). Defendants' criticisms of Dr. Goldsmith's methodology closely follow the defendant's arguments in *Williamson v. Amica Mut. Ins. Co.*, No. 3:23-CV-01203 (JCH), 2025 WL 1796324 (D. Conn. June 30, 2025). There, the defendant asked the District of Connecticut to exclude testimony because in their view it "consist[ed] of subjective beliefs and unsupported speculation." *Id.* at *4. The court rejected this argument, finding that the expert conducted on-site visual inspections and applied his own expertise and analysis to information gleaned from other expert reports, a review of an alternative work practice, and an asbestos sampling report to reach his conclusions. *Id.* Defendants' arguments about Dr. Goldsmith's opinions are no different and are equally misplaced.

Dr. Goldsmith's methodology is anchored in a systematic gap analysis, which involves a detailed comparison between the existing conditions and practices at the New Haven Terminal and information set forth in recognized engineering standards and guidance. *See, e.g.*, Goldsmith Rep. at 9–10. This process includes a review of facility documentation, site assessments, and the identification of vulnerabilities relative to existing and reasonably foreseeable risks. *See id.* Dr. Goldsmith also examined and cited reports from respected climate change, coastal engineering, and civil engineering experts retained by CLF. *See, e.g.*, *id.* at 29. She relied on established

12

guidelines from organizations such as the American Society of Civil Engineers (ASCE), the Association of State Floodplain Managers (ASFPM), EPA, and the U.S. Army Corps of Engineers. *See, e.g.*, *id.* at 15, 17, and 41. This approach ensured her conclusions were based on reliable and authoritative sources.

In response to Defendants' criticisms regarding the alleged subjectivity of her methodology and the selection of sources, Dr. Goldsmith's reliance on published standards and guidance documents provides a transparent framework for her analysis. Her selection of sources is not arbitrary; it is dictated by her decades of experience and based on their acceptance within the professional community. By referencing the information described above in her report, Dr. Goldsmith demonstrates that her methodology is both objective and consistent with the expectations of experts in the field. Her lengthy report offers far more than "some explanation" as to how she reached her opinions, which the Second Circuit has held suffice even when the there is a "lack of textual authority" supporting an opinion. *McBeth*, 2018 WL 5997918, at *6 (citing *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008) and *McCullock*, 61 F.3d at 1044).

In asserting that Dr. Goldsmith "points to no objective standard" in her analysis, Mem. at 16, Defendants omit that Dr. Goldsmith's opinions are based in part on Shell's own internal documents. These documents establish a clear framework for best industry practice in addressing climate and weather-related risks at petroleum bulk storage facilities. Rep. at 18–25. For example, Dr. Goldsmith cites Shell "Design Engineering Practices" (DEPs), which represent Shell's interpretation of good engineering practices and other guidelines, including DEPs that require explicit consideration of climate change impacts—like sea level rise and increased rainfall—over a facility's anticipated service life. *Id.* at 20–28. Additionally, Dr. Goldsmith references an internal

Shell guideline for "Metocean[4] Design and Operating Considerations - Guideline for Inclusion of Climate Change Criteria in Metocean Criteria and Associated Adaptation," which provides standardized approaches for incorporating climate risk into engineering design and operational criteria for Shell facilities, including coastal bulk storage terminals. *Id.* at 28. Collectively, these Shell-authored materials reflect and codify Shell's vision of best industry practice by mandating forward-looking, risk-based assessments and adaptive measures to ensure facility resilience against foreseeable climate hazards.  Dr. Goldsmith's opinions are based on a myriad of objective information, including information produced by Defendants.

Defendants reference to selected language from a handful of cases are unpersuasive. *Grdinich v. Bradlees*, 187 F.R.D. 77 (S.D.N.Y. 1999) is inapposite. Mem. at 21–22. As explained in *Sec & Exch. Comm'n v. Frost*, No. 819CV01559JLSJDE, 2021 WL 6103551, at *6 (C.D. Cal. Nov. 15, 2021), *Grdinich* involved claims about safety standards for displaying ironing boards at a department store, and the "court arrived at the logical conclusion that no expert was needed." *Id.* In contrast, *Frost* involved "an industry where multiple millions of dollars are invested. . . ." *Id. Frost* further held that "the fact that [the expert did] not cite to codified industry standards, and codified industry standards do not exist, is not fatal to his testimony; he may testify regarding standard practices based on his experience working in the same industry." *Id.* Thus, even if Dr. Goldsmith did not reference any codified industry standards, her testimony would still be admissible.

*Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155 (D. Conn 2014), has absolutely no bearing on this case. Mem. at 22. Defendants selectively omit ***the key facts*** that led the court to find the expert's testimony was false and misleading.  In that case, the court qualified the putative expert

---

[4] The term "metocean" means meteorological and oceanographic.

to testify regarding standard practices schools take for protecting against insect-borne diseases based on his representations that he had reviewed the results of two surveys "and that those surveys, in addition to his personal experience . . . formed the basis from which he drew his conclusions and opinions." 24 F. Supp. 3d at 201. However, as the expert continued to testify "it became clear that [the expert] *did not base his opinion on survey results* or other reliable facts or data of a type reasonably relied upon by other experts in the field; instead, he gave personal lay opinions disguised as industry standards." *Id.* (emphasis added). The court went on to explain that the expert "had no data" to support his claims beyond "his conversation with one other school" and the survey on which he claimed to rely "asked no questions" related to preventing insect-borne diseases.  *Id.* at 205. Thus, the court concluded the expert "*had no basis whatsoever* to offer an opinion regarding standard practices of schools regarding protections against insect-borne diseases. *Id*. (emphasis added). The court struck the expert's testimony because it was not based on sufficient facts or data as required by Rule 702 and because "he did not testify truthfully." *Id.* at 207. It is inappropriate for Defendants to baselessly suggest to this Court "[t]hat is exactly what Dr. Goldsmith did in this dispute." Mem. at 22.

Defendants' reliance on *Meineker v. Hoyts Cinemas Corp.* is also misplaced. In *Meineker*, the expert's opinion was excluded because it relied solely on the expert's subjective determination of what constituted "best" and "worst" seating, without reference to any objective industry standards or established methodology. 154 F. Supp. 2d 376, 380 (N.D.N.Y. 2001). The court found that the expert formulated his own standards, which inhibited objective testing and lacked a reliable foundation, rendering the opinion inadmissible under Rule 702. *Id.*

In contrast, Dr. Goldsmith does not rest on subjective personal preference or unsupported subjective criteria. Rather, she reviewed relevant literature, agency guidance, and established

standards, including those from the ASCE, EPA, and ASFPM. In addition, she cites Shell's internal policies and guidelines. She applied a gap analysis to the available information regarding the New Haven Terminal. Dr. Goldsmith's analysis is thus rooted in objective facts, not mere personal opinion, and is distinguishable from the unreliable, subjective approach that led to exclusion in *Meineker*.

### 2.    Arguments About the Sufficiency of Information on Which Dr. Goldsmith Based Her Opinions Go to the Weight of Her Opinions, Not their Admissibility.

Defendants also claim that Dr. Goldsmith did not consider certain information they believe she should have, Mem. at 21–24, that she relied on information they assert is irrelevant under their legal theory of what the permit requires, Mem. at 24–28, and that she did not label other references in her report as "best industry practice," Mem. at 28–29. Each of these arguments raise "[q]uestions about the . . . sufficiency of the evidence upon which the expert relied" and therefore "are for cross-examination." *CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.,* 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011); *see also Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (contention that expert's report omitted important facts do not affect admissibility and may be explored on cross-examination). They do not render Dr. Goldsmith's opinions unreliable or inadmissible.

### 3.    Defendants Improperly Conflate Dr. Goldsmith's Opinions with a Legal Opinion to Reargue Their View of what the Permit Requires.

Defendants open their attack on Dr. Goldsmith's methodology by conflating her expert opinions with a legal argument, asserting incorrectly that "CT DEEP has rejected her interpretation [of the permit]" based on its issuance of a draft permit and related fact sheet, and rehashing an argument Judge Meyer rejected that "the listed control measures in the 2018/2021 Permit are cabined by 'best industry practice.'" Mem. at 16–17. None of these arguments address the

16

admissibility of Dr. Goldsmith's opinions under Rule 702; instead, they represent the same legal arguments Defendants have serially raised in motions practice throughout this litigation.

First, Dr. Goldsmith is not offering a legal opinion on how to interpret the permit. Her expert report and testimony will help the trier of fact determine the factual question Judge Meyer held needed resolution: "[w]hether best industry practice is to consider climate change factors." Tr. of Hr'g at 36:14–15, ECF 305.  Defendants, however, recast Dr. Goldsmith's report as offering a legal opinion. *See* Mem. at 17 (Dr. Goldsmith "hing[es] her entire analysis" on the permit requiring that "permittees assess for and protect against Climate Change Risk."). As discussed below in section IV.C., Defendants' legal arguments are not appropriate for a Rule 702 motion to exclude expert testimony.

Second, CT DEEP did not "reject" Dr. Goldsmith's "interpretation" of the permit. Again, Dr. Goldsmith is not offering a legal interpretation of the permit. In May, Defendants argued that the same draft permit and fact sheet they rely on here warranted a stay of the case. *See* Defs. Mem. In Supp. Of Mot. to Stay Disc., 2–3, ECF No. 585. There, they argued the CT DEEP "*is* poised" to resolve the meaning of "best industry practice." *Id.* at 2 (emphasis added). Now Defendants argue that the CT DEEP *has* rejected that interpretation. Mem. at 16. It cannot be both.  Either way, in denying Defendants' Motion to Stay, this Court held that, "Agencies are afforded no veto power over citizen suits. Instead, the citizen suit provision is perhaps at its most force when an agency disagrees with the suit's theory of recovery." Omnibus Ruling Den. Mot. to Stay, 6 ECF No. 641. Thus, CT DEEP's alleged "rejection" of Dr. Goldsmith's "interpretation" is not dispositive.

Third, Judge Meyer expressly rejected Defendants' narrow legal interpretation of the 2018/2021 Permit that only the "listed control measures" in the permit are required. *Compare*

Mem. at 17 ("the listed control measures . . . are cabined by 'best industry practice'") with ECF 248-1 at 9–11 (arguing the only control measures required are those expressly enumerated in the permit). As this Court noted in its Order Denying Defendants' Motion to Stay, Judge Meyer held over Defendants' argument to the contrary, that the term "best industry practice in fact adduced additional requirements." ECF No. 641 at 4.

In sum, significant aspects of Defendants' criticism of Dr. Goldsmith's methodology is simply a repackaging of legal arguments that this Court has already considered and rejected, rather than a genuine challenge to the admissibility of her expert testimony. Their assertions focus on the interpretation of the permit and the requirements it imposes—questions of law that fall outside the scope of Rule 702's evidentiary inquiry. Accordingly, their arguments should be disregarded in the context of this evidentiary motion.

> **C.     This Court Should Disregard Defendants' Attempt to Raise Previously Rejected Dispositive Arguments under the guise of a Rule 702 Motion to Preclude Expert Testimony.**

Defendants' Motion to Preclude Dr. Goldsmith's testimony is an improper vehicle for seeking dispositive relief. They argue that Dr. Goldsmith's testimony is relevant to issues that were not properly noticed; and that her opinions are not relevant by way of their contention that the 2018/2021 permits for the New Haven Terminal do not require Defendants to consider the effects of climate change. Mem. at 30–36. They raise the latter contention to claim Dr. Goldsmith's opinions are therefore irrelevant and will not help the trier of fact. *Id.* at 34–36. However, because the adequacy of CLF's notice of intent to sue and issues of what the 2018/2021 permits require are contested issues in this case, the assertion that Dr. Goldsmith's expert opinions do not "fit" Defendants' legal theories does not provide a basis for excluding them opinions under Fed. R. Evid. 702 and *Daubert*. Instead, in assessing whether an expert opinion testimony is "relevant to the task at hand" under Rule 702, the court considers whether the proffered testimony "logically

advances a material aspect of *the proposing party's case.*" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (emphasis added). That test is met here, and Defendants' motion should be denied.

First, the question of whether CLF's notices of intent to sue provided adequate notice—they did—is a disputed issue, is potentially dispositive of certain claims, and is therefore improper for resolution under Rule 702 and its focus on admissibility of expert testimony. Defendants fail to cite any cases resolving the adequacy of citizen suit notice through Rule 702 motions and are also now proposing to (again) address this issue in a motion for summary judgment. *See* Defs.' Equilon Enterprises LLC and Triton Terminaling LLC Letter Mot. for Part. Summ. J. ECF No. 806.

As this Court already explained after Defendants raised the notice issue in a seven-page letter brief, "the Court should not resolve this dispute on the basis of a table listing allegedly improper opinions and the notice of intent to sue alongside a few lines of briefing from either party. The underdeveloped nature of this exchange demonstrates why a motion to resolve these theories or claims as a matter of law is required. If the Defendants seek to raise this and their other theories, they remain free to do so, but not outside of the process contemplated by the Federal Rules of Civil Procedure." ECF No. 641 at 10. Defendants ignored this Court's instruction and included in their Rule 702 motion another table alongside *fewer* lines of briefing than before. *Compare* Defs.' Letter Br. Mot. to Strike Improper Expert Opinions (ECF No. 601) with their instant motion (ECF No. 743-1) at 31–34. Without providing any support that Rule 702 motion is appropriate for resolving the adequacy of citizen suit notice as a matter of law, this Court should reject Defendants' argument at this time and in this context.

19

Second, the question of whether the permits for the New Haven terminal require Defendants to consider the effects of climate change is a core issue in this case. In 2023, Judge Meyer denied Defendants' motion for partial summary judgment, which was premised on the argument that the current permit for the terminal did not require consideration of climate change, either explicitly or as a best industry practice. Order Denying Mot. for Partial Summ. J., ECF No. 304. In so doing, Judge Meyer "held that whether consideration of climate change was an 'industry best practice' remained an issue of material fact *that could not be resolved as a matter of law*." ECF No. 641 at 4 (emphasis added). In a more recent Order denying Defendants' motion to stay, the Court described Plaintiff's "central claim in this action" as "[t]hat the now-governing General Permit required the Defendants to consider the effects of climate change in developing and implementing the Stormwater Pollution Prevention Plan ("SWPPP") for Defendants' New Haven bulk fuel storage terminal, and that the Defendants' failed to comply with this requirement." ECF No. 641 at 2. Defendants are now proposing to (again) address this central claim in a motion for summary judgment. *See* ECF No. 806 (letter brief filed by Defendants Equilon Enterprises, LLC and Triton Terminaling LLC). Briefing on the parties' anticipated cross-motions for summary judgment has not yet been set.

Third, a *Daubert* motion is an evidentiary motion, not a dispositive motion. The standard for determining questions of law at summary judgment under Fed. R. Civ. P. 56 is different from the evidentiary standard that governs the admissibility of expert testimony under Rule 702 and *Daubert*. For that reason, courts are instructed to "exercise caution" when issues that must be addressed at summary judgment intersect with *Daubert* motions. *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). The Court should not, for example, decide the validity of a party's claim in the context of ruling on an evidentiary issue. *E.g., Kirksey v.*

*Schindler Elevator Corp.*, No. CV 15-0115-WS-N, 2016 WL 5213928, at *11 (S.D. Ala. Sept. 21, 2016).  As applied here, the Court should reject Defendants' invitation to either accept the validity of their legal position on the interpretation of the permits or, alternatively, to decide that contested issue in the context of a *Daubert* motion without affording the parties an opportunity to fully brief that issue (and others) on cross-motions for summary judgment under Rule 56.  Instead, because there is "a link between the expert's testimony and the matter *to be proved[,]*" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (citation omitted), the relevance test is met for purposes of Rule 702 and Dr. Goldsmith's testimony is admissible.

Finally, to the extent Defendants' motion to exclude Dr. Goldsmith's testimony is premised on the outcome of their anticipated motion for summary judgment, their motion is premature and should be denied at this time.

### D.    Defendants' Motion Ignores CLF's RCRA Claims and Cannot Exclude Dr. Goldsmith's Testimony on That Basis.

CLF's claims in this case do not rise or fall on Defendants' permit construction alone. CLF also asserts independent imminent and substantial endangerment claim under RCRA based on Defendants' longstanding failure to evaluate and address reasonably foreseeable flood and storm surge risks that threaten releases of petroleum products and other pollutants into surrounding waters. Am. Compl. ECF No. 47 (Count XIII). Defendants' CWA-only lens therefore leaves their brief silent as to RCRA's distinct standards and the facts that bear on them.

Under RCRA, the questions are whether conditions at the Terminal may present an imminent and substantial endangerment to health or the environment and what measures are necessary to abate that risk—not how Defendants would construe their stormwater permit. 42 U.S.C. § 6972(a)(1)(B). Dr. Goldsmith's analysis directly informs that inquiry as well as the CWA claims.

Dr. Goldsmith's report concludes that Defendants have failed to evaluate and address known and reasonably foreseeable flood and storm surge risks at the New Haven Terminal, resulting in ongoing threats of catastrophic releases of petroleum products and other pollutants into surrounding waters. She specifically finds that the Terminal's berms and containment areas are insufficient to contain spills during severe weather events, and that existing site conditions create a substantial risk of imminent harm to the environment and nearby community, directly supporting CLF's RCRA imminent and substantial endangerment claim.

Those opinions go to the heart of the RCRA claims and are relevant and admissible regardless of Defendants' CWA permit gloss. Defendants' failure to engage independently of their CWA theory means their motion does not carry their burden to exclude testimony that clearly "helps the trier of fact" on the RCRA claim.

### E.      Dr. Goldsmith's Testimony Will Assist the Jury Without Misleading or Confusing the Jury, or Unfairly Prejudicing Defendants.

Expert testimony "may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the Jury. Fed. R. Evid. 403. As the District of Connecticut has remarked:

> The principal target of *Daubert* and Rule 702 is the professional expert witness—well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors. The gatekeeper judge endeavors to keep that renegade sheep on the far side of the stile, unable to mislead the flock of jurors, safely grazing in the protected pasture of the courtroom.
>
> *TMI Tr. Co. v. WMC Mortg., LLC*, No. 3:12-CV-1538 (CSH), 2017 WL 6617050, at *4

(D. Conn. Dec. 28, 2017). None of those factors exist here. The only prejudice Defendants actually identify relate to legal questions about the scope and interpretation of the permit—issues they have already raised and intend to raise at summary judgment—and the adequacy of CLF's

22

citizen suit notice. Rule 403 is not the proper vehicle for resolving such legal disputes, which are for the Court to decide on the merits, not for exclusion of expert testimony.

## V.    CONCLUSION

For the foregoing reasons, CLF respectfully requests that the Court deny Defendants' Motion.

Dated: November 3, 2025                    Respectfully submitted,

CONSERVATION LAW FOUNDATION,
Inc., by its attorneys

*Kenneth J. Rumelt*
Christopher M. Kilian, Esq.*
Kenneth J. Rumelt, Esq.*
Anna Tadio*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3020
Tel: (802) 622-3009
krumelt@clf.org
ckilian@clf.org
atadio@clf.org

James Y. Meinert (ct31637)
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110
Tel: (617) 850-1744
E-mail: jmeinert@clf.org

Ana McMonigle (ct31370)
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
E-mail: amcmonigle@clf.org

23

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Mimi Liu
Devin Williams (phv208833)**
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
Tel: (202) 386-9625
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: mliu@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Vincent Greene*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

24

Shalom Jacks (phv208834)*
Ridge Mazingo (phv208402)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9013
Tel: (843) 216-9620
E-mail: sjacks@motleyrice.com
E-mail: rmazingo@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, CT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com


*Attorneys for Plaintiff*
*Admitted Pro Hac Vice*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2025 the foregoing Opposition to Defendants' Motion to Exclude Plaintiff's Expert Wendi Goldsmith's Opinions and Testimony was filed through the Court's electronic filing system ("ECF"), through which the document is available for viewing and downloading from the ECF system, and a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Kenneth J. Rumelt*

Kenneth J. Rumelt

26