# EXHIBIT A

**to Plaintiff Conservation Law Foundation's Opposition to
Defendants' Motion to Exclude the Testimony of Richard Horner**

**Filed Under Seal**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

CONSERVATION LAW FOUNDATION,      )
INC.,                             )
                Plaintiff,        )
                                  )
     vs.                          )
                                  ) Case No.
EQUILON ENTERPRISES LLC D/B/A     ) 3:21-cv-00933-VDO
SHELL OIL PRODUCTS US, TRITON     )
TERMINALING LLC, and MOTIVA       )
ENTERPRISES LLC,                  )
                                  )
                Defendants.       )

_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

RICHARD R. HORNER, Ph.D.

_____

MONDAY, AUGUST 11, 2025
9:05 A.M. PST

Veritext - Seattle, WA
1200 Sixth Avenue, Suite 610
Seattle, WA 98101

JOB No. ATL 7530788
REPORTED BY:  JUDY BONICELLI, RPR, CSR 9091, CCR 2322

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 2

                    A P P E A R A N C E S
FOR THE PLAINTIFF:
        MOTLEY RICE LLC
        Elizabeth Smith
        401 9th St. NW
        Suite 1001
        Washington, DC 20004
        (401) 457-7700
         Esmith@motleyrice.com
        MOTLEY RICE LLC
        Shalom D. Jacks
        28 Bridgeside Boulevard
        Mount Pleasant, SC 29464
        (866) 604-2715
        Sjacks@motleyrice.com

FOR THE DEFENDANTS:
        KING & SPALDING LLP
        Carmen R. Toledo
        1180 Peachtree Street NE
        Suite 1600
        Atlanta, GA 30309
        (404) 572-3438
        Ctoledo@kslaw.com


ALSO PRESENT:   ADAM SWEETS, VIDEOGRAPHER

Case 3:21-cv-00933-VDO   Document 855   Filed 11/03/25   Page 4 of 28

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 3

I N D E X

EXAMINATION BY:                                    PAGE(S)
MR. TOLEDO                                         5,229
MS. SMITH                                          208


EXHIBITS FOR IDENTIFICATION                         PAGE
Exhibit 1    Notice of Deposition Richard            10
             Horner
Exhibit 2    Richard Horner Original Report          15
Exhibit 3    Richard Horner Rebuttal Report          15
Exhibit 4    Robert Horner Invoices                  20
Exhibit 5    NOI                                     33
Exhibit 6    NOI                                     33
Exhibit 7    Connecticut DEEP guidance document      40
             for preparing a SWPPP
Exhibit 8    2009 Report Urban Stormwater            54
             Management in the United States
Exhibit 9    Aerial photograph of New Haven          70
             Terminal and nearby facilities
Exhibit 10   Flood Preparedness Fact Sheet by       106
             Region 6 Regional Response Team
             Executive Committee
Exhibit 11   EPA Inspection Document                115
Exhibit 12   Connecticut Stormwater Quality         119
             Manual
Exhibit 13   RPMS Document                          127
Exhibit 14   Survey Drawings Bates page ending      132
             56
Exhibit 15   2018 Connecticut General Permit        138
Exhibit 16   Table 4.2 from Stormwater Manual       171
Exhibit 17   Notes of Connecticut DEEP meeting      180
Exhibit 18   Richard Horner Calculations           185
Exhibit 19   Letter Report from Sovereign          189
             Consulting to Jennifer Bothwell
Exhibit 20   Meteorological and Oceanographic      199
             Design and Operating
             Considerations Offshore, Coastal,
             and Onshore from February2017
Exhibit 21   Excerpts from the 2004 Connecticut    213
             Stormwater Quality Manual
Exhibit 22   Excerpts from 2004 Stormwater         229
             Quality Manual

Page 205

I wanted to ask you finally about the methodology that you used in reaching your opinions.

Can you describe for me the methodology that you employed in reaching your opinions about these various violations that you claim the terminal has relating to stormwater?

A.   Well, to really answer your question properly, I think we need to go violation by violation.  And I think I laid it out in my report, for example, that this secondary containment is inadequate with the addition of the bypass pipe because my calculations show that, with a conceivable breach of a tank, it would not transfer the contents to the backup containment area rapidly enough to avoid overflowing the berm.  That's my basis.

Q.   Did you perform any independent research about what the permit requirements are before reaching these opinions?

A.   The permit requirement is crystal clear.  The containment must be able to hold 100 percent of the contents of the largest tank.

Q.   What about your opinions about best industry practice?   Did you conduct any research or industry survey, however you define industry, of what constitutes best industry practice?

Page 206

A.  Well, for example, for the stormwater system we quite extensively discussed the investigation that I conducted.

You know, first, I'm very familiar with treatment systems that perform better than a pond.  And secondly, I investigated how many are in service to determine for myself, is this, you know, at the best level of industry practice?

Q.  And I believe we established that you had no communications and conducted no research concerning best industry practices if we define the industry as bulk petroleum storage terminals?

A.  No --

MS. SMITH:  Objection to form.

Go ahead.

THE WITNESS:  Because permits, the three that I'm familiar with at least, do not distinguish in that way.  They may have some special requirements for different industrial categories, SIC codes, you know, for example, S-I-C, standard industrial classification.  But the terms overall of the permits apply to industries in general.

BY MS. TOLEDO:

Q.  So the answer is, no, you did not conduct any research specifically as to practices performed by the

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 207

bulk petroleum storage terminal industry?

MS. SMITH:  Objection to form.  Asked and answered.  And outside of the scope of his report.

THE WITNESS:  I didn't, nor did I have to.

BY MS. TOLEDO:

Q.  Do you agree that a scientifically reliable methodology is required to reach reliable expert opinions?

MS. SMITH:  Object to the form.  It calls for a legal conclusion.

THE WITNESS:  When one's opinion is, for example, whether a secondary containment is able to hold 100 percent of the contents of the largest tank, the scientific exercise is to perform a calculation, which I did.

BY MS. TOLEDO:

Q.  Okay.  So let me see if I understand it correctly.

You reviewed the permit and the permit requirements, and then you performed the calculations; is that correct?

A.  That's correct.

MS. SMITH:  Objection to form.

BY MS. TOLEDO:

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 208

Q.  And that is basically the same methodology you followed for the other opinions; for example permeability.  Is that right?   You reviewed the -- the permit and then you evaluated conditions at the site?

A.  I relied on the available information that I had at hand; that is, information that is derived from, you might say, a scientific process of taking measurements.  And somebody took measurements, and I relied on those measurements.

Q.  But you took no samples, correct?

A.  I took personally took no samples.

MS. TOLEDO:  Okay.  That is all I have for the moment.  I will pass the witness and reserve the rest of my time.

MS. SMITH:  Okay.  Great.

CROSS-EXAMINATION

BY MS. SMITH:

Q.  So we'll go ahead and get started.  We may have to stop because we're waiting on a document.

But starting with the issue you just discussed with counsel, is your methodology described in your report with regard to what you evaluated and what you did to reach each of your conclusions?

A.  Yes.  I think I was fairly quite complete in laying out my methodology.

Page 209

Q.   You were previously asked some questions about the business continuity plan and the hurricane preparation plan.

Do you recall that?

A.   Yes.

Q.   In your -- in evaluating the sufficiency of secondary containment, do you need to review the hurricane preparation plan?

A.   No.

Q.   Do you need to review the business continuity plan to determine whether the secondary --

(Reporter clarification.)

BY MS. SMITH:

Q.   Do you need to review the business continuity plan in order to analyze the discreet issue of whether the secondary containment is sufficient?

MS. TOLEDO:  Object to form.

THE WITNESS:  I do not have to.  I merely have to make a calculation to determine if it is able to accept 100 percent of the contents.

BY MS. SMITH:

Q.   In order to determine whether the soils are impermeable, do you need to review the hurricane preparation plan?

MS. TOLEDO:  Object to form.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 210

THE WITNESS:  No.

BY MS. SMITH:

Q.  Do you need to review the business continuity plan in order to determine whether the soils at the terminal are impermeable?

MS. TOLEDO:  Object to form.

THE WITNESS:  I don't.

BY MS. SMITH:

Q.  In assessing whether the bypass pipe is sufficient, do you need to review the business continuity plan for the terminal?

MS. TOLEDO:  Object to form.

THE WITNESS:  No.

BY MS. SMITH:

Q.  Do you need to review the hurricane preparation plan in order to determine whether the bypass pipe is sufficient and complies with the permit?

MS. TOLEDO:  Object to form.

THE WITNESS:  I do not.

BY MS. SMITH:

Q.  Do you normally review a facility's hurricane preparation plan when you are evaluating a SWPPP?

A.  We don't have hurricanes on the West Coast.

Q.  Tsunami preparation plan.  No, strike that.

Do you normally review a business continuity

Page 211

plan when you are assessing whether or not the facility complies with a SWPPP?

A.   I have never run into a business continuity plan.

Q.   You were asked some questions about soil samples.

Do you recall that?

A.   Yes.

Q.   And whether or not the soil contained fill.

Do you recall that?

A.   Yes.

Q.   If the soil contained fill, would that be reflected in the soil samples that are taken from the site?

MS. TOLEDO:  Object to form.  Calls for speculation.

THE WITNESS:  Yes.  The boring would proceed through the soil, whatever it is.  So it would come up and be analyzed regardless of the origin of that soil, imported or native.

BY MS. SMITH:

Q.   And you reviewed, and I believe discussed in your report, a document from 2022 showing that soil samples were predominantly sand; is that right?

MS. TOLEDO:  Object to form.  Leading.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 212

BY MS. SMITH:

Q.   Let me rephrase that.

Did you review a document from 2022 that indicated whether the soil was sand?

A.   Yes, which supplemented the Sovereign information and the soil survey information said the same thing.

Q.   And would you expect a sample from 2024 to have -- well, strike that.

Would you expect that samples from 2024 would be different of from the samples from 2022?

A.   I certainly do not.

Q.   Let's turn to your report to Page 20, subsection F.  Let me know when you're there.

A.   Yes.

Q.   So the first sentence of this subsection states, "The stormwater permits require compliance with the Connecticut Stormwater Quality Manual, stating that with regard to management of runoff" -- "the permittee shall ensure that such measures are properly designed, implemented, and maintained in accordance with the Stormwater Quality Manual."

Did I read that correctly?

A.   Yes.

Q.   And you and counsel for defendants have had

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 213

some discussion about the 2023 Stormwater Quality

Manual versus the 2024 manual, correct?

          MS. TOLEDO:  Object to form.

 BY MS. SMITH:

     Q.  I messed that up.

     A.  I believe you mean the 2004 --

     Q.  Right.

     A.  -- compared to the 2024.

     Q.  Thank you.  Compared to the 2024, yes.

     A.  Yes.

     Q.  And the next sentence in this section you

state, "The Connecticut Stormwater Quality Manual

specifies the management of stormwater infiltration

from land uses or activities with higher potential from

land uses or activities with higher potential pollutant

loads."

          Did I read that correctly?

     A.  Yes.

     Q.  I'm going to mark as an exhibit some excerpts

from the 2004 Connecticut Stormwater Quality Manual.

          (Exhibit 21 marked for identification.)

 BY MS. SMITH:

     Q.  And if you'll turn to the first excerpted page

after the cover page and look at the bottom left-hand

paragraph.

Page 214

This 2004 manual discusses land uses or activities with potential for higher pollutant loads as well, correct?

A.   Correct.

Q.   And in the next sentence of your report you state, "As an industrial facility subject to the Connecticut general permit for the discharge of stormwater associated with industrial activity, the Shell terminal is a LUHPPL" L-U-H-P-P-L, "as designated by the stormwater manual's Table 10-4."

Do you see that in your report?

A.   Yes.

Q.   And if you'll turn to the second page of this 2004 Stormwater Quality Manual, you'll see Table -- here's Table 7-5, Land Uses for Activities with Potential for Higher Pollutant Loads.

Do you see that?

A.   Yes.

Q.   And the first bullet under that talks about industrial -- does it talk about industrial facilities?

A.   Yes, it does.

Q.   Can you read that first bullet for us, please?

A.   "Industrial facilities subject to the DEP Industrial Stormwater General Permit or the U.S. EPA National Pollutant Discharge Elimination System, NPDES,

Richard R. Horner , Ph.D.    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 215

stormwater permit program."

Q. So under this 2004 manual, is the terminal also considered land use or activity with potential for higher pollutant load?

A. Yes.

MS. TOLEDO: Object to form.

THE WITNESS: It's identical in its classification with both manuals.

BY MS. SMITH:

Q. Now, in the next sentence of your report, you discuss -- you state -- correct me if I'm reading this correct -- please let me know if I'm reading this correctly.

"Both the stormwater manual and the Connecticut National Pollutant Discharge Elimination System General Permit for the discharge of stormwater from small municipal separate storm sewer systems, the MS4 permit, observe that infiltration of LUHPPL stormwater can contaminate public and private groundwater supplies and surface waters via groundwater flow."

Do you see that?

A. Yes.

Q. And if you'll look at the 2004 permit, does this also talk about infiltration of stormwater

Page 216

contaminating public and private groundwater supplies potentially?

MS. TOLEDO:  Object to form.

THE WITNESS:  On Page 8-5 it discusses infiltration capacity.

BY MS. SMITH:

Q.  And on Page 7-7, do you see on the bottom left-hand corner where we were reading before where it states, "Infiltration of stormwater from these land uses or activities, also referred to as stormwater hot spots, can contaminate public and private groundwater supplies."

Did I read that correctly?

A.  Yes.

Q.  And is this language in the 2004 manual consistent with the language that you discussed in your report in the 2023 manual?

A.  Yes.

MS. TOLEDO:  Object to form.

THE WITNESS:  It's, again, consistent, yes.

BY MS. SMITH:

Q.  In your report, you discuss the stormwater manual stating, "According to the stormwater manual, infiltration of stormwater from certain LUHPPLs is not

Page 217

allowed, while, in other cases, it may be allowed by the review authority under the following conditions."

Do you see that?

A.   Yes.

Q.   And if you look at the 2004 manual, it also discusses that infiltration of storm -- or does it -- let me strike that and say, does it discuss that infiltration of stormwater from these land uses or activities may be allowed?

A.   Yes.

MS. TOLEDO:  Object to form.

THE WITNESS:  It uses very similar, if not identical language.

BY MS. SMITH:

Q.   Now, in the 2004 manual it goes on to state, "Pretreatment could consist of one or a combination of the primary or secondary treatment practices described in this manual, provided that the treatment practice is designed to remove the stormwater contaminants of concern."

Did I read that correctly?

A.   Yes.

Q.   My question is, does the terminal engage in the pretreatment discussed here?

A.   There is no pretreatment installed at all, no.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 218

Q.   And so that violates this requirement that's discussed in the manual, correct?

MS. TOLEDO:   Object to form.  New opinion, not disclosed.

BY MS. SMITH:

Q.   Go ahead.

A.   Correct.

Q.   Now, if you'll move in your report to the last sentence on Page 21, where you say, "Furthermore, the manual at Page 356 states that a liner is required for stormwater ponds that receive runoff from land uses with higher potential pollutant loads."

Do you see that?

A.   Yes.

Q.   And if you'll turn to Page 8-5.  In the right column do you see there's a discussion of a water table?

A.   Yes.

Q.   And it's discussing -- and is it discussing elevated water table?

A.   Yes, it is.

Q.   And does elevated water table exist at the terminal?

A.   Yes.

Q.   And you see in the last sentence, in the

Page 219

second paragraph, it states, "The potential for groundwater pollution due to stormwater infiltration is an important consideration in the design of stormwater treatment practices.  Engineering controls, such as impermeable liners, may be required in these circumstances."

Did I read that correctly?

A.  You did.

MS. TOLEDO:  Object to form.

BY MS. SMITH:

Q.  And is it your opinion -- well, does this support your opinion that an impermeable liner should be installed at the terminal in the secondary containment?

MS. TOLEDO:  Object to form.

THE WITNESS:  Yes, it does.

BY MS. SMITH:

Q.  And are there other ways to make the containment area impermeable besides a liner?

A.  When you use the term "liner," I assume you're referring to a synthetic geotextile, and there are other ways.  And we touched on this a little -- some time ago today.  They include, like, bentonite clay, for example.

But I also said at that time that a synthetic

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 220

liner would be the most convenient, probably most cost-effective way for the terminal to achieve impermeability.

Q. Okay. You can put that down for now.

You were asked some questions about what control measures you allege the terminal violated.

Do you recall those questions?

A. Yes.

Q. Let's turn to page -- if you can go to Exhibit 15, we're going to just go back to those pages of the permit. And if you'll turn to the permit, Page 17 is where the control measure section starts, 17 of 70.

A. 17?

Q. Uh-huh.

A. Okay.

Q. And you talked about some of these control measures that you believe that the terminal was in violation of. And I have a question about No. 11, non-stormwater discharges.

Is it your opinion that the terminal is or potentially is in violation of a non-stormwater discharge control measure as well?

MS. TOLEDO: Objection. Asked and answered.

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 221

THE WITNESS:  Yes.  If gasoline is released due to the inadequate secondary containment, that would be a non-stormwater discharge to a conveyance to receiving water.

BY MS. SMITH:

Q.  I'm sorry I'm jumping around.  Lots of different topics.

A.  No problem.

Q.  And counsel for defendants discussed the height of the bypass pipe.

Do you remember those questions?

A.  Yes.

Q.  And I believe you testified that if it was not at 11.5, it was close to that; is that correct?

A.  Yes.

Q.  Is that your testimony?

MS. TOLEDO:  Object to form.  Leading.

BY MS. SMITH:

Q.  Is it -- what is your opinion with regard to the height of the bypass pipe in terms of how close the height is to 11.5?

MS. TOLEDO:  Object to form.  Asked and answered.

THE WITNESS:  I believe it's very close.  And even without doing calculations, I'm sure that I

Richard R. Horner , Ph.D.                    August 11, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 222

would conclude that there's still a potential for release in the event of a tank failure is definitely there.

BY MS. SMITH:

Q.  If the height was at 11, let's say, do you believe that there would still be release from a tank failure?

MS. TOLEDO:  Object to form.

THE WITNESS:  I -- I believe, yes, even without doing the calculations, with that little change there would be.

BY MS. SMITH:

Q.  Besides the bypass pipe, are there other things that the terminal could have done to make secondary containment fully adequate?

MS. TOLEDO:  Object to form.

THE WITNESS:  Yes.  It is unfortunate that the calculation that I did apparently nobody did at the time the pipe was designed and installed.  If it had been done, it would have been shown to be inadequate, as I did.

The options would be enlarge the pipe, of course.  But perhaps better options would be either to raise the berm, therefore, to create more storage capacity, or extend the berms to create more surface

Page 223

area to pond the released gasoline, or both, either to replace the pipe or to supplement the pipe.

BY MS. SMITH:

Q.   But neither of those things were done; is that correct?

A.   Neither were done.

MS. TOLEDO:  Object to form.  Leading.

BY MS. SMITH:

Q.   Were either of those things done by the terminal?

A.   They were not.

Q.   On Page 34 -- well, strike that.

Let me start with, you and counsel for defendants discussed your opinions with regard to the treatment system.

Do you recall those questions?

A.   Yes.

Q.   And if you'll turn to Page 34 of your report, in the last sentence of the first paragraph, you state, "I believe that Shell should move toward replacement of its treatment basins with one of the forms of advance treatment I describe here."

And my question is just, is that still your opinion?

A.   Yes.

Page 224

Q.   You were asked some questions about the definition of impermeable.

Do you recall that?

A.   Yes.

Q.   And can you say what your definition of impermeable is?

MS. TOLEDO:  Objection.  Asked and answered.

THE WITNESS:  Impermeable, to me, means that it's impenetrable by any substance.

BY MS. SMITH:

Q.   And is there any question in your mind that that is -- in your experience, and in your opinion, is that the definition of impermeable in your field, stormwater management?

A.   Yes.

MS. TOLEDO:  Object to form.

THE WITNESS:  It definitely is.

BY MS. SMITH:

Q.   And is impermeability a requirement under the general permit?

MS. TOLEDO:  Object to form.

THE WITNESS:  Yes, in plain words.

BY MS. SMITH:

Q.   You were asked some questions about your work

Page 225

that you've done in stormwater management field towards the beginning of the deposition.

Do you recall that?

A.   Yes.

Q.   And have you been active in work with regard to industrial stormwater management -- industrial stormwater management?

A.   Yes.

MS. TOLEDO:  Object to form.  Asked and answered.

THE WITNESS:  I certainly have.

BY MS. SMITH:

Q.   And let's start talking about non-litigation cases.

Can you describe the work that you've been involved in with regard to industrial stormwater management and cases that are not in litigation?

A.   I mentioned the San Diego Airport in which I gave advice about their stormwater treatment and did staff training.  I worked with a group called Salmon Safe that certifies sites and properties for good practices.

You might think of LEED, for example, that certifies buildings for good practices.  It's set up in a different way, but it's a certification for positive

Page 226

environmental actions.

And there are -- there have been three airports that have been certified.  I consider those to be industrial locations.  One is Seattle Tacoma Airport.  One is Vancouver Airport.  One is Snohomish County Airport, which, actually, is no longer certified, but, nevertheless, went through the certification process and requires the evaluation of a variety of things that they do.

I serve on a team, a certification team, and I represent mainly the stormwater aspects of the certification, and is it adequate in relation to the needs of salmon and their habitat in the streams.

And so those are several examples of industrial stormwater cases that I -- situations that I was involved in that have nothing whatsoever to do with litigation.  In fact, quite the opposite, giving positive reenforcement.

Q.  And with regard to case -- litigation cases you've been involved in, and I say "litigation," meaning there's a case that's brought and you've either been involved in writing a report or giving testimony, deposition and trial.

Are there litigation cases where you have been involved in industrial stormwater management issues?

Page 227

MS. TOLEDO:  Object to form.  Compound.

THE WITNESS:  Yeah, I need to find the attachment in my report that has -- yes, Attachment C.

There are a number of these cases in which it did not proceed to, say, an active stage of litigation, to the point where I wrote an expert report, did a deposition, went to trial, or all three.

And they are -- well, I wrote an expert report, but it didn't go to -- it didn't go all the way to trial.  Okay?  So they're listed here.

There are others, and quite a number of others in which it didn't even go to this stage.  But let's go down this list to identify those that are industrial.

BY MS. SMITH:

Q.  Yes.  Can you identify the cases that are on this list that were -- involved industrial stormwater issues?

A.  Right.  And it's most of them.

The first one Girard.  The second one, Pacific Pile and Marine.  The third one, UFP.  The fourth one, Pick-Your-Part Auto Wrecking.  Next one, Corona Clay.  The one after that, Willis Enterprises.  The one after that, a different Willis Enterprises location.  Then Watkins Manufacturing, Fruhling Sand and Topsoil.  Port of Olympia is under stormwater permit, so it's

Page 228

industrial, an industrial permit.  Trojan Battery Company.

Really, all of those -- I'm pretty sure all of them, except for those at the Pollution Control Hearing Board.  SSA Marine, Seattle Iron & Metal, Coast Seafoods.  Astro Auto Wrecking, that's one that went to trial, talked about this morning.  Louis Dreyfus, that is a grain terminal on the waterfront here.  Cruise Terminals of America, that's maybe a little bit amorphous as to whether that's industrial or not.

Rainier Petroleum, we talked about two different sites there.  Whitley Manufacturing, the one in Louisiana, the bulk terminals.  Another situation with Seattle Iron & Metals.  Magic Mountain, it's an amusement park, that would not be industrial.  Levin Enterprises, petroleum coke exporting terminal, that's industrial.

And then we have an earlier case against Willis.  Sierra Pacific, wood products firm.  City of Malibu, obviously not industrial.  BNSF Railroad, industrial.  Los Angeles County, no.  Kramer Metals, yes.  International Metals, industrial.

And -- and many others that did not require going to the stage of an expert report or farther.

MS. SMITH:  If we could go off the