## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| Plaintiff, | Case No: 3:21-cv-00933-VDO |
| v. | |
| SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | November 3, 2025 |
| Defendants. | **FILED UNDER SEAL** |

**[UNREDACTED] PLAINTIFF CONSERVATION LAW FOUNDATION'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT <u>ROBERT NAIRN'S OPINIONS AND TESTIMONY</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES.................................................................................................. ii

LIST OF EXHIBITS ...........................................................................................................iv

I.   INTRODUCTION ........................................................................................................1

II.  BACKGROUND ..........................................................................................................2

   A.  Plaintiff's Claims ................................................................................................2

   B.  Summary of Dr. Nairn's Qualifications, Opinions, and Methodology. .............4

   C.  Summary of Dr. Nairn's Primary Opinions and Methodology. ........................6

III. LEGAL STANDARD ..................................................................................................7

IV.  ARGUMENT................................................................................................................9

   A.  This Court Should Disregard Defendants' Attempt to Relitigate Their 2023 Motion for Partial Summary Judgment Under the Guise of a Rule 702 Motion to Preclude Expert Testimony. ....................................................................................................9

   B.  Dr. Nairn's Opinions are Reliable .................................................................12

      1.  Defendants' Attack on Dr. Nairn's Methodology Relies on Their Own Interpretation of the Permit Requirements That This Court Previously Rejected. ...........................12

      2.  Dr. Nairn's Analysis of Flood Risks at the Terminal is Directly Relevant to the Issues in this Case....................................................................................................14

      3.  Defendants' Attack on the Government and Professional Standards Dr. Nairn Cites Also Stem from Their Incorrect Interpretation of the Permit....................................14

      4.  Dr. Nairn's Conclusions Are Not "Pure Opinion Testimony," They Are Grounded in Established Scientific and Engineering Principles. ....................................................16

   C.  Defendants' Motion Ignores CLF's RCRA Claims and Cannot Exclude Dr. Nairn's Testimony on That Basis. ........................................................................................18

   D.  Dr. Nairn's Testimony Will Help the Jury Without Misleading or Confusing the Jury, or Unfairly Prejudicing Defendants. ........................................................................19

V.   CONCLUSION ...........................................................................................................20

## TABLE OF AUTHORITIES

*Cases*

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...............................................................................8

*Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933 (SALM),
2022 WL 4292183 (D. Conn. Sept. 16, 2022) ..........................................3

*Cortes-Irizarry v. Corporacion Insular De Seguros*,
111 F.3d 184 (1st Cir. 1997) .............................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ...........................................................................................7

*Kirksey v. Schindler Elevator Corp.*, No. CV 15-0115-WS-N,
2016 WL 5213928 (S.D. Ala. Sept. 21, 2016) ...............................11–12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...........................................................................................8

*McBeth v. Porges*, No. 15-CF-2742 (JMF),
2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018) ..........................................16

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) .............................................................................16

*Munn v. Hotchkiss Sch.*,
24 F. Supp. 3d 155 (D. Conn. 2014) ..........................................................17, 18

*Natural Res. Def. Council v. U.S. E.P.A.*,
808 F.3d 556 (2d Cir. 2015) .............................................................................14

*Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH),
2024 WL 3520168 (D. Conn. May 30, 2024) ..........................................7, 8

*On Davis v. The Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) .............................................................................17

*SLSJ, LLC v. Kleban*,
277 F. Supp. 3d 258 (D. Conn. 2017) ..........................................................7, 8, 9

*Stilwell v. Smith & Nephew, Inc.*,
    482 F.3d 1187 (9th Cir. 2007) ...................................................................12

*TMI Tr. Co. v. WMC Mortg., LLC*, No. 3:12-CV-1538 (CSH),
    2017 WL 6617050 (D. Conn. Dec. 28, 2017) .......................................19

*United States v. Angelilli*,
    660 F.2d 23 (2d Cir. 1981) ........................................................................7

*United States v. Tin Yat Chin*, 3
    71 F.3d 31 (2d Cir. 2004) ..........................................................................7

*Valentin v. New York City*, No. 94-CV-3911 (CLP),
    1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997) ........................................8

*Washington v. Kellwood Co.*,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015) ......................................................7

**Statutes**

33 U.S.C. § 1365(a)(1) ...................................................................................13

33 U.S.C. § 1365(f) .......................................................................................13

42 U.S.C. § 6972(a)(1)(B) .............................................................................18

**Rules**

Fed. R. Evid. 403 ......................................................................................9, 19

Fed. R. Evid. 702 ...................................................................................passim

Fed. R. Civ. P. 56 ..........................................................................................12

## LIST OF EXHIBITS

Exhibit A.   Curriculum Vitae of Dr. Robert Nairn

Exhibit B.   Deposition of Defendants Triton Terminaling LLC, Equilon Enterprises LLC, and Motiva Enterprises LLC (Rule 30(b)(6) Representative) (Feb. 6, 2025) (Excerpts)*

\* Denotes documents either redacted or filed under seal in compliance with this Court's Protective Order (ECF 7)

## I.    INTRODUCTION

Defendants' Motion to Exclude Dr. Robert Nairn's testimony and opinions is a misguided attempt to reargue legal claims about the phrase "best industry practice" in Defendants' 2018/2021 permits that this Court already rejected. To accomplish this, Defendants attempt to convert Dr. Nairn's report and testimony into legal opinions about the 2018/2021 permits' meaning. Mem. at 1 (Dr. Nairn "contends that his own self-made obligations are 'implied' by the 2018/2021 Permit's reference to 'best industry practice.'"). However, Dr. Nairn is not offering any opinions about the legal meaning of the permit. Rather, he offers objective expert analysis regarding Defendants' New Haven, Connecticut Terminal: the vulnerability of fuel storage yards and the retention pond to flooding, the stability and erosion susceptibility of containment berms during extreme weather events, and limitations on the ingress and egress routes during storm surges.

Defendants' arguments in support of their motion derive exclusively from two of their legal theories: (1) that the 2018/2021 permits do not, and cannot, require consideration of climate change; and (2) certain aspects of CLF's citizen suit notice of intent to sue were inadequate. Mem. at 6.  However, regarding their first theory, the late Judge Jeffrey A. Meyer held, "The very purpose of a best industry practice requirement . . . is to require industry to conform to best practices even if the content of such best practices are not spelled out word for word in the permit itself, in no small part because of the common sense reality that best practices may evolve over time."  Tr. of Mot. Hr'g, ECF 305 at 83:5–11. He further held that, "If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question . . . ." *Id.* at 86:8–16.

That ruling established that this is a factual issue that will need to be addressed and resolved at trial. Defendants' effort to relitigate through Rule 702 should be rejected.[1]

Regarding their second theory, a Rule 702 motion to exclude expert testimony is an improper procedure for resolving what could be a dispositive issue. As this Court held in response to Defendants' letter motion to strike expert testimony, whether CLF's citizen suit notice was sufficient "should not resolve this dispute on the basis of a table listing allegedly improper opinions and the notice of intent to sue alongside a few lines of briefing from either party." ECF 641 at 10. Defendants' Rule 702 motion offers even fewer lines of briefing than their letter brief.

CLF opposes Defendants' motion to exclude Dr. Nairn's testimony, as his expert analysis is directly responsive to the factual issues Judge Meyer identified and is grounded in his extensive background and experience. Dr. Nairn's opinions are both relevant and reliable, offering this Court expert testimony on weather-related risks at the New Haven Terminal based on industry standard analyses, and identifying measures necessary for mitigating those risks.

## II.    BACKGROUND

### A.    Plaintiff's Claims

CLF filed this action to halt Defendants' longstanding and ongoing violations of the Clean Water Act (CWA) and Resource Conservation and Recovery Act (RCRA) at their bulk petroleum fuel storage terminal in the Port of New Haven (the "Terminal"). In short, CLF alleges that Defendants have failed to evaluate and address the reasonably foreseeable risks to the

---

[1] Judge Meyer also rejected Defendants' reassertion that EPA rejected the argument that the terms of the general federal Clean Water Act permit require considerations of climate change. *Compare* Br. at 4 *with* Hearing Tr. at ECF 305 at 86:3–7 ("I'm convinced, for the reasons pointed out by CLF, that the record is not so clear that the EPA's alleged interpretation is necessarily conclusive in this case involving a state permit."). CLF notes that Defendants have signaled their intent to re-raise their theories regarding the "best industry practices" requirement of the permits for the New Haven Terminal in another round of pre-trial summary judgment briefing. ECF 806. No briefing schedule has been set based on the parties' short letter briefs.

Terminal posed by severe weather, including risks associated with climate change, which threaten to flood the Terminal and release millions of gallons of oil and other pollutants into nearby New Haven Harbor, Quinnipiac River, and Mill River.

Defendants are all directly liable as owners or operators of the Terminal for violating the terms of the CWA permit ("the Permit"), including the obligations to satisfy "best industry practice" (Counts I, V, VI, VII) and inform state regulators about risks to the Terminal from severe weather and climate change (Counts III, VIII, IX, and XIII), as well as for presenting an imminent and substantial endangerment to human health and the environment under RCRA (Count XIII). The appropriate civil penalties for these violations depend in part on CLF's allegations that Defendants have knowingly failed to address these risks at the Terminal for decades. CLF filed an Amended Complaint on February 11, 2022, and Defendants moved to dismiss certain of CLF's claims. ECFs 47, 50. This Court largely denied Defendants' motion, holding that CLF's CWA claims could proceed against Defendants Shell USA, Shell Petroleum, Equilon, and Triton, and that one of CLF's RCRA claims (Count XIII) could proceed against all Defendants. *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21CV00933(SALM), 2022 WL 4292183 (D. Conn. Sept. 16, 2022).[2] Central to this Court's decisions were allegations regarding "whether Best Management Practices requires defendants to prepare the Terminal for the immediate effects of climate change," *id.* at *21 (citation omitted), and "that the infrastructure at the Terminal is at risk of experiencing the same infirmities as those alleged to have occurred at Shell's Houston and Deer Park Facilities, among others," *id.* at *17.

---

[2] CLF stipulated to the voluntary dismissal of Defendants Shell USA, Inc. (f/k/a Shell Oil Company) and Shell Petroleum Inc. ECF 527, 529.

Well before discovery ended, Defendants moved for partial summary judgment regarding the meaning of the permit term "best industry practice," arguing that it does not require consideration of climate change factors.  Defs.' Mem. for Part. Sum. J., ECF 248-1. The late Judge Jeffrey A. Meyer denied Defendants' motion, explaining from the bench that the term "best industry practice" is not ambiguous but, "[i]nstead, the parties seem to dispute, as a factual matter, whether best industry practice requires consideration of climate change for a facility like the Shell facility that sits adjacent to the New Haven Harbor." Tr. Mot. Hr'g, ECF No. 305 at 34:18–22.  In his Order denying Defendants' MPSJ, he held:

> If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that the Court cannot resolve at this time and on which it expresses no view.

Order Denying Mem. for Partial Summ. J. at 1, ECF 302.  The Court's numerous decisions establish the scope of issues in this matter.

### B.       Summary of Dr. Nairn's Qualifications, Opinions, and Methodology.

Dr. Robert B. Nairn of Baird & Associates is a world-recognized expert in river and coastal engineering, with more than 40 years of experience in hydrodynamics, sediment transport, and scour processes across watersheds, rivers, estuaries, lakes, coasts, and oceans.  Ex. A, Robert Nairn, Curriculum Vitae at 1. He currently leads Baird's Hazards, Risk and Resilience Sector, overseeing a wide range of coastal zone planning, management, and engineering studies, including numerical and physical modeling and design projects.  *Id.* Dr. Nairn holds a Ph.D. in Coastal Processes and Engineering, an M.Sc. (Research) in Coastal Engineering, and a B.Sc. First Class Honors in Civil Engineering. *Id.* He is affiliated with several professional organizations including Professional Engineers Ontario (PEO), Canadian Society for Civil Engineering (CSCE), Ontario Society of Professional Engineers (OSPE), Central Dredging Association (CEDA), American

Shore & Beach Preservation Association (ASBPA), and Canadian Coastal Science and Engineering Association (CCSEA). *Id.*

Dr. Nairn's experience encompasses significant work for government and oil and gas industry clients. He has served as a principal investigator and technical lead on projects for the U.S. Navy and the Office of Naval Research, developing methodologies to assess coastal flood risk and climate change impacts at military installations such as the Patuxent River Naval Air Station. *Id* at 2. In these assignments, he has applied advanced hydrodynamic modeling to evaluate compound flooding scenarios and inform resilience strategies for critical infrastructure. *Id.* at 1. His experience includes significant work for private industry clients, including serving as Baird's technical lead to evaluate the proposed 500-year flood protection for a liquified natural gas facility on the lower Mississippi River. *See generally id.* His work has included advanced hydrodynamic, sediment transport, and contaminant modeling for major oil and gas terminals, providing expert analysis to support facility design, and regulatory compliance. *Id.*

In this matter, Dr. Nairn was engaged by CLF to provide expert analysis regarding the adequacy of flood protection measures at the Shell Oil Terminal in New Haven, Connecticut. Expert Report of Dr. Robert Nairn at ii, ECF 771. His scope of work included quantifying the flood risk to the facility under industry-standard design events (100-year and 500-year return periods), both under current conditions and projected future sea level rise. *See id.* at ii–iii. Dr. Nairn assessed the vulnerability of fuel storage yards and the retention pond to flooding, evaluated the stability and erosion susceptibility of containment berms during extreme events, and examined ingress and egress routes during storm surges. *Id.* His methodology relied on advanced numerical modeling (TELEMAC), validated with historic storm data, and incorporated published

5

government datasets and industry guidance to deliver a comprehensive, scientifically grounded evaluation. *Id.*

### C.    Summary of Dr. Nairn's Primary Opinions and Methodology

Dr. Robert Nairn's expert analysis, as presented in his 2025 report, delivers a comprehensive evaluation of the flood risk and adequacy of flood protection measures at the Terminal. His primary opinions are grounded in industry standards and supported by robust scientific and engineering methodologies. *Id.* at iii–vi. Dr. Nairn concludes that the Shell facility is highly vulnerable to flooding during both 100-year and 500-year storm surge events, under current conditions and with projected future sea level rise. *Id.* Specifically, he finds that the fuel storage yards and retention pond are at risk of complete inundation during extreme storm events, and the existing containment berms are susceptible to erosion and breaching, particularly in areas with bare earth or minimal protection. *Id.* at iv–v.  He further opines that the facility does not meet flood protection standards established by leading authorities[3] stipulate protection up to the 500-year flood elevation plus freeboard for critical infrastructure such as fuel storage facilities. *Id.* at iv–v. In addition, Dr. Nairn finds that ingress and egress routes are impassable for extended periods during major storm surges, posing significant safety and operational risks. *Id.* at v.

To reach these opinions, Dr. Nairn employed a rigorous methodology centered on advanced numerical modeling using the TELEMAC model, which is widely accepted in the coastal engineering community for simulating hydrodynamic and flood scenarios. *Id.* at iii. His modeling incorporated high-resolution topographic and bathymetric data, *id.* at 23, historical and synthetic storms, *id.* at 16–17, and government datasets (notably the USACE North Atlantic Coast

---

[3] Dr. Nairn references the American Society of Civil Engineers (ASCE), the U.S. Army Corps of Engineers (USACE), the Federal Emergency Management Agency (FEMA), and the Association of State Flood Plain Managers (ASFPM). *See, e.g.*, Nairn Report at 10, 15–16, ECF 771.

Comprehensive Study (NACCS)), *id.* Validation of model results was performed using observed data from significant events, including Hurricane Sandy. *Id.* at 36. The analysis considered multiple flood scenarios: rainfall events, compound flooding (river flows plus storm surge), and future sea level rise projections based on state and federal guidance. *See, e.g.*, *id.* at 41–44. Dr. Nairn's approach also included evaluation of berm stability under hydraulic and wave forces, referencing established engineering manuals and design criteria. *Id.* at 64–69.

In summary, Dr. Nairn's opinions are supported by validated, industry-standard modeling and authoritative data sources, and his methodology reflects prevailing engineering practice. His findings directly address the adequacy of flood protection, the vulnerability of critical infrastructure, and the need for significant upgrades to meet regulatory and safety requirements at the New Haven Terminal.

## III.    LEGAL STANDARD

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 264 (D. Conn. 2017) (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015)). "A witness is qualified where he or she has 'superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Old Gate Partners, LLC v. Paddock Enters., LLC*, No. 3:18-CV-01657 (JCH), 2024 WL 3520168, at *6 (D. Conn. May 30, 2024) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). "One may become qualified as an expert based on practical experience, so that professional education is not a prerequisite." *SLSJ, LLC*, 277 F. Supp. at 266 (citing *United States v. Angelilli*, 660 F.2d 23, 39–40 (2d Cir.1981)). "Alternatively, formal education may also suffice to qualify a witness as an expert in a particular field, and the lack of extensive practical experience

7

directly on point does not necessarily preclude the expert from testifying." *Id.* (internal quotation and citation omitted). "When considering an expert's 'practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *Id.* (citing *Valentin v. New York City*, No. 94-CV-3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

"If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable." *Old Gate Partners, LLC*, 2024 WL 3520168, at *6. In *Daubert*, the Supreme Court identified four factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation' " and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. 579, 593–94 (1993) (internal quotations and citations omitted). However, these factors are not a "definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.*

"In addition to ensuring that expert testimony is reliable, the court must decide whether the expert's testimony is relevant, i.e., whether it will 'help the trier of fact.'" *Old Gate Partners, LLC*, 2024 WL 3520168, at *7 (quoting *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016). "[E]xpert testimony is relevant if it has 'any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting Fed. R. Evid. 403).

"Furthermore, doubts about the usefulness of an expert's testimony, should be resolved in favor of admissibility." *SLSJ, LLC*, 277 F. Supp. 3d at 264.

## IV.    ARGUMENT

Defendants' motion rests on a single premise: that the only legal framework that matters is their reading of the 2018/2021 industrial stormwater permit under the Clean Water Act. On that premise, they attempt to slide previously rejected summary judgment theories about what the permit does or does not require into a Rule 702 framework. As shown below, Defendants' repackaged and previously rejected summary judgment arguments are not a basis for excluding the expert testimony of Dr. Nairn, whose qualifications are not challenged, and who will present opinions that are both relevant and reliable.

> **A.    This Court Should Disregard Defendants' Attempt to Relitigate Their 2023 Motion for Partial Summary Judgment Under the Guise of a Rule 702 Motion to Preclude Expert Testimony.**

Defendants' Motion to Preclude Dr. Nairn's testimony is an improper vehicle for seeking dispositive relief.  They argue that Dr. Nairn's testimony is relevant to issues that were not properly noticed; and that his opinions are not relevant by way of their contention that the 2018/2021 permits for the New Haven Terminal do not require Defendants to consider the effects of climate change.  Mem. at 6–13. They raise the latter contention to claim Dr. Nairn's opinions are therefore irrelevant and will not help the trier of fact.  *Id.*  at 11–13.  However, because the adequacy of CLF's notice of intent to sue and issues of what the 2018/2021 permits require are contested issues in this case, the fact that Dr. Nairn's expert opinions do not "fit" Defendants' legal theories does not provide a basis for excluding them under Fed. R. Evid. 702 and *Daubert*.  Instead, in assessing whether an expert opinion testimony is "relevant to the task at hand" under Rule 702, the court

considers whether the proffered testimony "logically advances a material aspect of *the proposing party's case*." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (emphasis added). That test is met here, and Defendants' motion should be denied.

First, the question of whether CLF's notices of intent to sue provided adequate notice—which they did—is a disputed issue, is potentially dispositive of certain claims, and is therefore improper for resolution under Rule 702 and its focus on admissibility of expert testimony. Defendants fail to cite any cases resolving the adequacy of citizen suit notice through Rule 702 motions and are also now proposing to (again) address this issue in a motion for summary judgment. *See* ECF 806 (letter brief filed by Defendants Equilon Enterprises, LLC and Triton Terminaling LLC).

As this Court already explained after Defendants raised the notice issue in a seven-page letter brief, "the Court should not resolve this dispute on the basis of a table listing allegedly improper opinions and the notice of intent to sue alongside a few lines of briefing from either party. The underdeveloped nature of this exchange demonstrates why a motion to resolve these theories or claims as a matter of law is required. If the Defendants seek to raise this and their other theories, they remain free to do so, but not outside of the process contemplated by the Federal Rules of Civil Procedure." ECF 641 at 10. Defendants ignored this Court's instruction and included in their Rule 702 motion another table alongside *fewer* lines of briefing than before. *Compare* Defs.' *Compare* Defs.' Letter Br. Mot. to Strike Improper Expert Opinions (ECF 601) with their instant motion (ECF 770) at 7–11. Without providing any support that Rule 702 motion is appropriate for resolving the adequacy of citizen suit notice as a matter of law, this Court should reject Defendants' argument at this time and in this context.

10

Second, the question of whether the permits for the New Haven Terminal require Defendants to consider the effects of climate change is a core issue in this case. In 2023, Judge Meyer denied Defendants' motion for partial summary judgment, which was premised on the argument that the current permit for the terminal did not require consideration of climate change, either explicitly or as a best industry practice. Order Denying Mem. for Partial Sum. J., ECF 304. In so doing, Judge Meyer "held that whether consideration of climate change was an 'industry best practice' remained an issue of material fact *that could not be resolved as a matter of law*." ECF 641 at 4 (emphasis added). In a more recent Order denying Defendants' motion to stay, the Court described Plaintiff's "central claim in this action" as "[t]hat the now-governing General Permit required the Defendants to consider the effects of climate change in developing and implementing the Stormwater Pollution Prevention Plan ("SWPPP") for Defendants' New Haven bulk fuel storage terminal, and that the Defendants' failed to comply with this requirement." ECF 641 at 2. Defendants are now proposing to (again) address this central claim in a motion for summary judgment. *See* ECF 806 (letter brief filed by Defendants Equilon Enterprises, LLC and Triton Terminaling LLC). Briefing on the parties' anticipated cross-motions for summary judgment has not yet been set.

Third, a *Daubert* motion is an evidentiary motion, not a dispositive motion. The standard for determining questions of law at summary judgment under Fed. R. Civ. P. 56 is different from the evidentiary standard that governs the admissibility of expert testimony under Rule 702 and *Daubert*. For that reason, courts are instructed to "exercise caution" when issues that must be addressed at summary judgment intersect with *Daubert* motions. *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). The court should not, for example, decide the validity of a party's claim in the context of ruling on an evidentiary issue. *E.g., Kirksey v.*

11

*Schindler Elevator Corp.*, No. CV 15-0115-WS-N, 2016 WL 5213928, at \*11 (S.D. Ala. Sept. 21, 2016).  As applied here, the Court should reject Defendants' invitation to either accept the validity of their legal position on the interpretation of the permits or, alternatively, to decide that contested issue in the context of a *Daubert* motion without affording the parties an opportunity to fully brief that issue (and others) on cross-motions for summary judgment under Rule 56.  Instead, because there is "a link between the expert's testimony and the matter *to be proved[,]*" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (citation omitted), the relevance test is met for purposes of Rule 702 and Dr. Nairn's testimony is admissible.

Finally, to the extent Defendants' motion to exclude Dr. Nairn's testimony is premised on the outcome of their anticipated motion for summary judgment, their motion is premature and should be denied at this time.

### B. Dr. Nairn's Opinions are Reliable.

#### 1. Defendants' Attack on Dr. Nairn's Methodology Relies on Their Own Interpretation of the Permit Requirements That This Court Previously Rejected.

Defendants' argument about Dr. Nairn's methodology is fundamentally flawed because it is premised on their own interpretation of what the 2018/2021 permit requires, rather than as determined by the Court. Mem. at 13–21. Judge Meyer held that what constitutes "industry best practice" is a material fact that cannot be resolved as a matter of law. ECF 641 at 4. By assuming their construction of the permit is correct, Defendants attempt to sidestep the Court's prior ruling and improperly frame Dr. Nairn's opinions as methodologically flawed and irrelevant. This approach ignores the actual legal standard Judge Meyer established, which recognizes that the scope and requirements of the permit—including the relevance of best industry practices—remain contested factual issues for the trier of fact to resolve. By anchoring their argument to their own interpretation of what the permit requires and transforming Dr. Nairn's opinions into a strawman

12

about the meaning of the permit's terms, they fail to raise any real concerns about the methodology Dr. Nairn followed to reach his conclusions.

Dr. Nairn's report describes his methodology at length, which involves the application of industry-standard computer models and data to predict flood impacts at the New Haven Terminal from foreseeable storm events. Defendants do not address any of this methodology. Mem. at 13–19 (Sections B). Instead, they focus on Dr. Nairn's legal and regulatory acumen and knowledge of the permit, none of which underpin his scientific analysis of flood risks, and therefore irrelevant factors for attacking his methodology under Rule 702. Mem. at 15–19. Dr. Nairn is not offering opinions "about the terms of the Permit," Mem. at 16, so Defendants' arguments are pure misguided.

Defendants take their strawman argument and misrepresentations to the extreme. Based on Dr. Nairn's innocuous testimony that he does not "know what [he] will do at trial" due to a lack of "instruction" from CLF, Defendants claim he is going to "speculate about the terms of the Permit based on his instructions from CLF," and cite two irrelevant cases where courts rejected expert testimony as pure advocacy. Mem. at 16. Dr. Nairn simply stated he could not speculate about what he will do at trial. *See id.* An expert's statement that they have not had discussions with counsel about what his role will be at trial clearly does not render that expert's opinions unreliable. Defendants' entire argument is pure fiction.[4]

---

[4] This Court should also disregard Defendants' assertion, which they make in bold lettering, that the Terminal is in compliance with the permit. Mem. at 15. Whether Defendants are complying with their permit is the very subject of this litigation and must be resolved by the Court. Defendants also attempt to rewrite the law to suggest that the violation of a permit condition is not a violation of the Clean Water Act. *See id.* (arguing "the Terminal is attaining the point of the 2018/2021 permit."). Whether Defendants believe they are attaining the "point" of the permit is irrelevant. Under the Clean Water Act, CLF may bring a citizen suit against Defendants for violating an "effluent standard or limitation" contained in their permit. 33 U.S.C. § 1365(a)(1). An "effluent standard or limitation" includes a "permit or condition of a permit." *Id.* § 1365(f). Thus, the violation of a permit condition is a violation of the law.

### 2. Dr. Nairn's Analysis of Flood Risks at the Terminal is Directly Relevant to the Issues in this Case.

Defendants' claim that protecting against flood events and ensuring berms are structurally sound are irrelevant are similarly based on their rejected interpretation of the permit. Mem. at 15, 23 (characterizing Dr. Nairn's opinions as regarding "flood management"). The case Defendants cite in support of their argument highlights exactly why they are wrong. Mem. at 15. In *Natural Res. Def. Council v. U.S. E.P.A.*, the court noted that best management practices "typically involve requirements like . . . devices such as berms to channel water away from pollutant sources." 808 F.3d 556, 579 (2d Cir. 2015). Defendants fail to recognize that flood management is integral to industrial stormwater management and containment. *See*. Mem. at 23 (noting the Permit governs the Terminal's practices regarding containment). They are two sides of the same coin. The thrust of Dr. Nairn's analysis is that the New Haven Terminal's berms *do not* channel water away from pollutant sources because (1) they are not high enough to withstand reasonably foreseeable flood events; and (2) they are susceptible to erosion and failure.  His expert analysis provides evidence for the trier of fact to conclude that Defendants have not employed best industry practices at the Terminal in violation of the permit.

### 3. Defendants' Attack on the Government and Professional Standards Dr. Nairn Cites Also Stem from Their Incorrect Interpretation of the Permit.

Defendants extend their rejected legal theory of the case to attack the published government and professional standards Dr. Nairn cites as supporting authority in his report. Mem. at 23–30. They argue that Dr. Nairn's opinions are unreliable because he references standards that are not "identified or referenced in the Permit" or linked specifically to "the industrial stormwater permit at issue in this lawsuit." Mem. at 22. But again, the premise of their argument directly conflicts with Judge Meyer's ruling on Defendants' 2023 Motion for Partial Summary Judgment: "The very

14

purpose of a best industry practice requirement . . . is to require industry to conform to best practices even if the content of such best practices are not spelled out word for word in the permit itself . . . ." ECF 305 at 83:5–9. And "[n]o one suggests that it is CT DEEP that conclusively decides as an initial matter what is best industry practice." *Id.* at 83:1–3. Notably, Defendants themselves, through the deposition testimony of their Rule 30(b)(6) designee Michael Sullivan, expressed the same understanding of the Terminal's permits:

- "Q. And [the permit] doesn't allow you to rely on Connecticut DEEP to select the best management practices that will reduce or eliminate stormwater pollution to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices; right? [Objection omitted].  A. That is correct. They leave it to the individual facilities because of individual circumstances." (Sullivan Dep. 52:9-19)

- "Q. Okay. And the Connecticut general permit does not allow you to wait for Connecticut DEEP to tell you exactly what you need to do to reduce and eliminate stormwater pollution. True? A. That is correct. There are benchmarks that" (Sullivan Dep. 52:20-24)

- "Q. Okay. And the State of Connecticut relies on you, the defendants, to design control measures for significant storms; correct? [Objection omitted]. A. They rely on us to comply with the permit they put upon us. Q. Including during significant storms; correct? A. All stormwater management. Q. All the time. A. All the time. Q. 24/7, 365; correct? A. That's right." (Sullivan Dep. 53:2-14)

- "Q. You agree with me that the Connecticut DEEP is not a part of the oil and gas industry, is it? A. State agency. No, they're not. Q. Okay. They -- to your knowledge, they don't own or operate any coastal petroleum facilities. MR. [Objection omitted]. A. I don't think they do. Q. Okay. You have access to engineers; is that right? A. Yes, we do. Q. How about scientists? Do you have scientists that you have access to? A. If there were a need, I believe we would. Q. Okay. A. But we do hire consultants, who happen to be scientists. Q. And the defendants in this case, you have access to engineering guidelines from across the Shell family of companies? A. Yes, we do. They're called the DEPs, and they're in my line of business called trading and supplying. Q. And do you agree with me that the word "best" doesn't mean the absolute minimum? [Objection omitted]. A. I do agree with you." (Sullivan Dep. 53:18-54:21)

Ex. B, Dep. of Defs. Triton Terminaling LLC, Equilon Enterprices LLC, and Motiva Enterprises LLC (Rule 30(b)(6) Representative) (Feb. 6, 2025) (Excerpts).

Stripped of their legal argument that the general permit or a regulatory agency dictates the specific selection and design of stormwater controls at their terminal, Defendants' attack on Dr. Nairn loses all footing. Even if their legal argument was well grounded—it is not—Defendants' criticism over the standards Dr. Nairn applied[5] is not an issue of admissibility based on the law in this circuit. Any alleged "lack of textual authority" for an expert's opinion goes to the weight of the expert's testimony, not its admissibility. *McBeth v. Porges*, No. 15-CF-2742 (JMF), 2018 WL 5997918, at *6 (S.D.N.Y Nov. 15, 2018) (citing *McCullock*, 61 F.3d at 1044). Thus, Defendants' arguments about the applicability of Dr. Nairn's textual support, or lack thereof (*see* Mem. at 32–36) for his opinions can be addressed through cross examination.[6]

### 4. Dr. Nairn's Conclusions Are Not "Pure Opinion Testimony," They Are Grounded in Established Scientific and Engineering Principles.

Defendants assert that Dr. Nairn's opinions are not reliable because they are "pure opinion testimony." Mem. at 30–32. However, their brief is very confusing. First, they claim he "failed to provide support for his opinion that his preferred practices are generally accepted" in the field, Mem. at 30, yet they neither cite his opinions nor specify which "practices" they mean. *Id.* Then

---

[5] Dr. Nairn references publications including: the American Society of Civil Engineers (ASCE) Standard 24-14, "Flood Resistant Design and Construction"; the Association of State Floodplain Managers' (ASFPM) "A Guide for Higher Standards in Floodplain Management"; Federal Emergency Management Agency's (FEMA) Design Guide for Improving Critical Facility Safety from Flooding and High Winds: providing protection to people and buildings"; and several U.S. Army Corps of Engineers publications. *See, e.g.*, ECF 771 at ii–v.

[6] For example, Defendants assert that the ASCE standard 24-14 does not apply to the Terminal because it is not a new facility. Mem. at 28. However, they omit Dr. Nairn's testimony explaining that "those documents provide guidelines where if you are the owner/operator of a facility, you want to know whether it achieves the requirements from time to time." ECF 773 at 174:13–175:1. Moreover, the ASCE Standard also states that, "ASCE does not intend, nor should anyone interpret, ASCE's standards to replace the sound judgment of a competent professional, having knowledge and experience in the appropriate field(s) of practice, nor to substitute for the standard of care required of such professionals in interpreting and applying the contents of this standard." ECF 710-10 at ECF Header Page 4 of 93.

Defendants assert several other arguments that are indecipherable making it impossible for CLF to respond. *See* Mem. at 23–24 (regarding alleged "unsupported assurances that [Dr. Nairn's] standards are accepted an [sic] unspecified industry, as applied 'within the context of his opinions.'"; *id.* at 24 (suggesting Dr. Nairn did not point to "objective criteria for industry standards" even though Defendants later criticize the objective standards referenced in Dr. Nairn's report).

they argue "in other words" that his "failure to explain how his conclusions are 'reasonably related' to the facts of this case renders his opinions irrelevant and inadmissible." *Id.* They attribute the "reasonably related" requirement that Dr. Nairn allegedly violated to a case involving copyright infringement that has nothing to do with Rule 702, *Daubert*, or expert witnesses. *Id.* (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001)). The Court should reject whatever argument Defendants intended to make here.

Next, Defendants argue "Dr. Nairn's endorsement of his own expertise to define 'best industry standards' hardly qualifies as reliable support for his conclusions." Mem. at 30. But again, their argument is difficult to decipher. At best, they criticize a statement in Dr. Nairn's rebuttal report that best industry practices that apply to flood protection at the terminal relate to his areas of expertise (flood protection and coastal engineering). ECF 772 at 24. There is nothing remarkable about this statement given the topic and Dr. Nairn's decades of experience in the field.

Defendants next argue that there is a "lack of data for [Dr. Nairn's] definition of 'best industry practices' [which] is reason to strike his speculative opinions." Mem. at 31. Again, Defendants fail to identify with particularity what "definition of 'best industry practice'" they mean. *See id.* Dr. Nairn is not opining on the legal meaning of permit terms. Defendants also claim that Dr. Nairn's report reflects "unsupported personal lay opinions disguised as industry standards," which is frankly nonsensical. *See id.* (quoting *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 201–03 (D. Conn. 2014)). *Munn* has absolutely no bearing on this case. In that case, the court qualified the putative expert to testify regarding standard practices schools take for protecting against insect-borne diseases based his representations that he had reviewed the results of two surveys "and that those surveys, in addition to his personal experience . . . formed the basis from which he drew his conclusions and opinions." 24 F. Supp. 3d at 201.  As the expert continued to

17

testify, however, "it became clear that [the expert] *did not base his opinion on survey results* or other reliable facts or data of a type reasonably relied upon by other experts in the field; instead, he gave personal lay opinions disguised as industry standards." *Id.* (emphasis added). The court went on to explain that the expert "had no data" to support his claims beyond "his conversation with one other school" and the survey on which he claimed to rely "asked no questions" related to preventing insect-borne diseases. *Id.* at 205. Thus, the court concluded the expert "*had no basis whatsoever* to offer an opinion regarding standard practices of schools regarding protections against insect-borne diseases. *Id*. (emphasis added). The court struck the expert's testimony because it was not based on sufficient facts or data as required by Rule 702 and because "he did not testify truthfully." *Id.* at 207. Comparing Dr. Nairn's work in this case with the disqualified expert in *Munn* is a gross mischaracterization. The other *ipse dixit* cases Defendants cite similarly have no bearing on Dr. Nairn's opinions.  Mem. at 31–32.

### C.    Defendants' Motion Ignores CLF's RCRA Claims and Cannot Exclude Dr. Nairn's Testimony on That Basis.

CLF's claims in this case do not rise or fall on Defendants' permit construction alone. CLF also asserts an independent imminent and substantial endangerment claim under RCRA based on Defendants' longstanding failure to evaluate and address reasonably foreseeable flood and storm surge risks that threaten releases of petroleum products and other pollutants into surrounding waters. ECF 47 (Count XIII). Defendants' CWA-only lens therefore leaves their brief silent as to RCRA's distinct standards and the facts that bear on them.

Under RCRA, the questions are whether conditions at the Terminal may present an imminent and substantial endangerment to health or the environment and what measures are necessary to abate that risk—not how Defendants would construe their stormwater permit. 42 U.S.C. § 6972(a)(1)(B). Dr. Nairn's analysis directly informs that inquiry as well as the CWA

18

claims. He concludes, based on industry-standard modeling and authoritative datasets, that the Terminal is highly vulnerable to inundation during 100- and 500-year events (made worse with sea-level rise), that containment berms are susceptible to erosion and breaching, and that ingress/egress routes become impassable during these events—conditions that materially increase the likelihood and magnitude of uncontrolled pollutant releases. *See* ECF 771 at ii–vi. Those opinions go to the heart of the RCRA claims and are relevant and admissible regardless of Defendants' CWA permit gloss. Defendants' failure to engage independently of their CWA theory means their motion does not carry their burden to exclude testimony that clearly "helps the trier of fact" on the RCRA claim.

### D. Dr. Nairn's Testimony Will Assist the Jury Without Misleading or Confusing the Jury, or Unfairly Prejudicing Defendants.

Expert testimony "may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the Jury. Fed. R. Evid. 403. As the District of Connecticut has remarked:

> The principal target of *Daubert* and Rule 702 is the professional expert witness— well educated, impeccably dressed, highly articulate—who dispenses cleverly packaged junk scientific or other specialized opinions to lay jurors. The gatekeeper judge endeavors to keep that renegade sheep on the far side of the stile, unable to mislead the flock of jurors, safely grazing in the protected pasture of the courtroom.

*TMI Tr. Co. v. WMC Mortg., LLC*, No. 3:12-CV-1538 (CSH), 2017 WL 6617050, at *4 (D. Conn. Dec. 28, 2017). None of those factors exist here. The only prejudice Defendants actually identify relates to legal questions about the scope and interpretation of the permit— issues they have already raised and intend to raise at summary judgment—and the adequacy of CLF's citizen suit notice; Rule 403 is not the proper vehicle for resolving such legal disputes, which are for the Court to decide on the merits, not for exclusion of expert testimony.

19

## V.    CONCLUSION

For the foregoing reasons, CLF respectfully requests that the Court deny Defendants'

Motion to Exclude Plaintiff's Expert Robert Nairn's Opinions and Testimony.


Dated: November 3, 2025                    Respectfully submitted,

                                           CONSERVATION LAW FOUNDATION,
                                           Inc., by its attorneys

                                           *Kenneth J. Rumelt*
                                           Christopher M. Kilian, Esq.*
                                           Kenneth J. Rumelt, Esq.*
                                           Anna Tadio*
                                           Conservation Law Foundation, Inc.
                                           15 East State Street, Suite 4
                                           Montpelier, VT 05602
                                           Tel: (802) 223-5992
                                           Tel: (802) 622-3020
                                           Tel: (802) 622-3009
                                           krumelt@clf.org
                                           ckilian@clf.org
                                           atadio@clf.org

                                           James Y. Meinert (ct31637)
                                           Conservation Law Foundation, Inc.
                                           62 Summer St
                                           Boston, MA 02110
                                           Tel: (617) 850-1744
                                           E-mail: jmeinert@clf.org

                                           Ana McMonigle (ct31370)
                                           Conservation Law Foundation, Inc.
                                           195 Church Street
                                           Mezzanine Level, Suite B
                                           New Haven, CT 06510
                                           Tel: (203) 298-7692
                                           E-mail: amcmonigle@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Mimi Liu
Devin Williams (phv208833)**
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
Tel: (202) 386-9625
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: mliu@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Vincent Greene*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

21

Shalom Jacks (phv208834)*
Ridge Mazingo (phv208402)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9013
Tel: (843) 216-9620
E-mail: sjacks@motleyrice.com
E-mail: rmazingo@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, CT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com


*Attorneys for Plaintiff*
*Conservation Law Foundation, Inc.*
*\*Admitted Pro Hac Vice*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2025, the foregoing Opposition to Defendants' Motion to Exclude Plaintiff's Expert Robert Nairn's Opinions and Testimony was filed through the Court's electronic filing system ("ECF"), through which the document is available for viewing and downloading from the ECF system, and a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Kenneth J. Rumelt*

Kenneth J. Rumelt

23