Page 1

Volume I  Pages 1-348

Exhibits 1202-1233

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

——————————————————————————

CONSERVATION LAW FOUNDATION, INC.

    Plaintiff                        C.A. No.

V.                              3:21-cv-00933-JAM

SHELL OIL COMPANY, EQUILON ENTERPRISES

LLC D/B/A SHELL OIL PRODUCTS US, et al.

    Defendants

——————————————————————————

(Full caption on following page)


RULE 30(b)(6) VIDEOTAPED

VIDEOCONFERENCE DEPOSITION OF

TRITON TERMINALING LLC, EQUILON ENTERPRISES LLC,

and MOTIVA ENTERPRISES LLC

by and through its designee

MICHAEL SULLIVAN LLC

Thursday, February 6, 2025, 9:11 a.m.

MOTLEY RICE

40 Westminster Street, 5th Floor

Providence, Rhode Island  02903

-----REPORTER:  Sonya Lopes, RPR, CSR-----

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

CONSERVATION LAW FOUNDATION, INC.

   Plaintiff          C.A. No.

V.              3:21-cv-00933-JAM

SHELL OIL COMPANY, EQUILON
ENTERPRISES LLC D/B/A SHELL
OIL PRODUCTS US, SHELL
PETROLEUM INC., TRITON
TERMINALING LLC, and
MOTIVA ENTERPRISES LLC

   Defendants

_____

Page 4

APPEARANCES:

Also present:

   Kenneth Rumelt
   Katrina Myers
   Joe'l Mafrige, Esq.
   James Meinert (via Zoom)
   Sarah Shahabi (via Zoom)
   Vincent Greene (via Zoom)
   Chance Raymond (via Zoom)
   Stephanie Yu (via Zoom)
   Anna Tadio (via Zoom)
   Meenakshi Jani (via Zoom)

Videographer:  Jacob Before

Page 3

APPEARANCES:

Motley Rice LLC
   Michael J. Pendell, Esq.
   Ridge Mazingo, Esq.
   One Corporate Center
   20 Church Street, 17th Floor
   Hartford, Connecticut  06103
   860.218.2722
   mpendell@motleyrice.com
   rmazingo@motleyrice.com
   for Plaintiff

King & Spalding
   Antonio E. Lewis, Esq.
   Ryan T. Kearney, Esq.
   300 South Tyron Street
   Charlotte, North Carolina  28202
   704.503.2551
   alewis@kslaw.com
   rkearney@kslaw.com
   for Defendants

Page 5

I N D E X

WITNESS:     MICHAEL SULLIVAN

EXAMINATION BY:         PAGE
Mr. Pendell         11
Mr. Lewis         337

EXHIBIT         PAGE
Exhibit 1202  corporate Website printout..69
Exhibit 1203  code of conduct policy......72
Exhibit 1204  deposition notice...........93
Exhibit 1205  responses to plaintiff's
    first request for
    admissions..................96
Exhibit 1206  December 26, 2018 letter
    from Connecticut DEEP......106
Exhibit 1207  document Bates-labeled
    SOPUS_NHVN00236121 with
    attachment Bates-labeled
    SOPUS_NHVN00236123 to
    6124......................113
Exhibit 1208  document Bates-labeled
    SOPUS_NHVN01270906 to
    0907.....................125

2 (Pages 2 - 5)

Page 6

I N D E X

EXHIBIT                    PAGE

Exhibit 1209  document Bates-labeled
        SOPUS_NHVN01271023 to
        1025......................132

Exhibit 1210  Shell PLC sustainability
        report 2023................135

Exhibit 1211  document Bates-labeled
        SOPUS_NHVN01096683 to
        6689......................174

Exhibit 1212  document Bates-labeled
        SHELLNH_RPMS_02013 to
        02029....................191

Exhibit 1213  document Bates-labeled
        PSCT016061 to 16140.......197

Exhibit 1214  document Bates-labeled
        SOPUS_NHVN00314915........241

Exhibit 1215  document Bates-labeled
        SOPUS_NHVN02144575 to
        44736....................246

Exhibit 1216  document Bates-labeled
        SOPUS_NHVN02142807 to
        3348......................248

Page 7

I N D E X

EXHIBIT                    PAGE

Exhibit 1217  document Bates-labeled
        SOPUS_NHVN00000582 to 659..253

Exhibit 1218  document Bates-labeled
        SOPUS_NHVN02367937 to
        8038......................259

Exhibit 1219  document Bates-labeled
        SOPUS_NHVN00000113 to 517..260

Exhibit 1220  document Bates-labeled
        SOPUS_NHVN00038398........278

Exhibit 1221  document Bates-labeled
        SOPUS_NHVN02449475........279

Exhibit 1222  document Bates-labeled
        SOPUS_NHVN00049773 to
        49775....................284

Exhibit 1223 document Bates-labeled
        SOPUS_NHVN00234673 to
        234698...................286

Exhibit 1224  documents Bates-labeled
        SOPUS_NHVN00312383 to
        12413....................290

Page 8

I N D E X

EXHIBIT                    PAGE

Exhibit 1225  document Bates-labeled
        SOPUS_NHVN00326984 to
        27014....................296

Exhibit 1226  document Bates-labeled
        SOPUS-NHVN00190734 to
        747......................303

Exhibit 1227  Document Bates-labeled
        SOPUS_NHVN00256533..........310

Exhibit 1228  documents Bates-labeled
        SOPUS_NHVN00245055 to 5252..312

Exhibit 1229  document Bates-labeled
        SOPUS_NHVN00247004 to 7241..314

Exhibit 1230  document Bates-labeled
        SOPUS_NHVN02485749 to
        85846....................321

Exhibit 1231  document starting with Bates
        No. SOPUS_NHVN00313126......323

Exhibit 1232  document Bates-labeled
        SOPUS_NHVN02267852 to 8013..332

Page 9

I N D E X

EXHIBIT                    PAGE

Exhibit 1233  Document Bates-labeled
        SHELLNH_RPMS_00030 to
        00047....................335

*Exhibits returned to Mr. Pendell, with copies to
 Mr. Lewis

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

Page 50

industrial stormwater isn't managed sufficiently, it could be discharged from a location that is not covered by the permit, in other words, a place it shouldn't be discharged from?

MR. LEWIS: Object to form.

A. That's why there are outfalls in the permit. So I think you are imagining a scenario where something would not go through the intended outfall. I've not experienced that.

Q. Have you ever heard of that happening?

A. In my business, in my remit, no.

Q. What do you mean by your remit?

A. My remit is Providence and New Haven.

Q. Have you ever heard of that happening anywhere in the industry?

A. Yes, I have.

Q. Okay.

A. There were -- I don't know specifically where. But there were Rita and Katrina. Those could be examples.

Q. To your knowledge -- are you -- strike that.

Are you aware of it ever happening to a terminal owned by Shell or one of its subsidiaries?

MR. LEWIS: Objection. Outside the

Page 51

scope. You can answer, if you know.

A. Well, my recollection and not direct experience was that there was a 12-foot storm surge at Sewaren. And water came in, breached the dike.

Q. The Connecticut general permit makes the permittee -- so not DEEP but the person who is obtaining the permit -- responsible for figuring out all the stuff we've been talking about. Is that fair?

MR. LEWIS: Object to form.

A. Does give guidelines on best management practices, storm conveyance system -- I think keeping in mind because every facility is constructed differently, there are unique circumstances at each facility.

Q. But the responsibility falls on the permittee, ultimately; correct?

A. Yes, it does.

MR. LEWIS: Object to form.

Q. Okay. And do you know much of anything about Connecticut DEEP?

MR. LEWIS: Object to form.

A. The agency?

Q. Yes.

A. I don't know -- I know some people there

Page 52

who are inspectors or people who would visit, you know, from the air bureau or the storage tank license people.

Q. The Connecticut general permit doesn't allow you to rely on Connecticut DEEP to design your SWPPP for you; is that correct?

MR. LEWIS: Object to form.

A. That's correct.

Q. And it doesn't allow you to rely on Connecticut DEEP to select the best management practices that will reduce or eliminate stormwater pollution to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices; right?

MR. LEWIS: Object to form.

A. That is correct. They leave it to the individual facilities because of individual circumstances.

Q. Okay. And the Connecticut general permit does not allow you to wait for Connecticut DEEP to tell you exactly what you need to do to reduce and eliminate stormwater pollution. True?

A. That is correct. There are benchmarks that we need to be under, and it is up to the facility to

Page 53

achieve those objectives.

Q. Okay. And the State of Connecticut relies on you, the defendants, to design control measures for significant storms; correct?

MR. LEWIS: Object to form.

A. They rely on us to comply with the permit they put upon us.

Q. Including during significant storms; correct?

A. All stormwater management.

Q. All the time.

A. All the time.

Q. 24/7, 365; correct?

A. That's right.

Q. Okay. No two-week vacations.

A. I wish. No.

Q. Me too.

You agree with me that the Connecticut DEEP is not a part of the oil and gas industry, is it?

A. State agency. No, they're not.

Q. Okay. They -- to your knowledge, they don't own or operate any coastal petroleum facilities.

MR. LEWIS: Object to form. Outside the scope.

14 (Pages 50 - 53)

Page 54

A. I don't think they do.

Q. Okay. You have access to engineers; is that right?

A. Yes, we do.

Q. How about scientists? Do you have scientists that you have access to?

A. If there were a need, I believe we would.

Q. Okay.

A. But we do hire consultants, who happen to be scientists.

Q. And the defendants in this case, you have access to engineering guidelines from across the Shell family of companies?

A. Yes, we do. They're called the DEPs, and they're in my line of business called trading and supplying.

Q. And do you agree with me that the word "best" doesn't mean the absolute minimum?

MR. LEWIS: Object to form. Outside the scope.

A. I do agree with you.

Q. And I'm going to talk about the general permit, and I promise I'm going to give it to you when we talk about it some more.

But you understand, as the facility manager

Page 55

for the New Haven terminal, am I correct that you certified under penalty of law that you read and understood all the conditions of the general permit? Do you remember doing that?

A. Yes.

Q. Okay. And was your certification that you read and understood all the conditions of that general permit true at the time you read it?

A. Yes.

Q. Okay. And as the facility manager, you also certified that all terms and conditions of the general permit were being met for all discharges. Do you remember doing that?

A. Yes.

Q. And that includes for significant storm events. True?

MR. LEWIS: Object to form.

A. 24/7, yes.

Q. And you stand by that certification, sitting here today?

A. I do.

Q. And as the facility manager, you also certified that a system was in place to ensure that all terms and conditions of this general permit would continue to be met for all discharges

Page 56

authorized by this general permit at this site. Do you remember making that certification?

MR. LEWIS: Objection. The document speaks for itself. Can you put the document in front of him so he can --

MR. PENDELL: Well, I'm asking for his memory, which I'm allowed to do. So you can object to the form of the question, but I'd like you to stop instructing this witness.

MR. LEWIS: I did not instruct the witness.

Q. Did you understand the question, sir?

A. I did.

Q. Okay. Can you answer, or do you need me to repeat it?

A. I certified one time for all the conditions of the permit.

Q. Okay. Do you think it's okay for the owner-operator of a petroleum terminal in the State of Connecticut to lie to Connecticut DEEP?

MR. LEWIS: Object to form.

A. We would never intentionally lie to a regulatory agency.

Q. So you don't think it's okay; correct?

A. I do not think that's okay.

Page 57

Q. And that includes the EPA as well?

A. That does include EPA.

MR. LEWIS: Object to form.

Q. And that includes the Coast Guard?

MR. LEWIS: Object to form.

A. Yes.

Q. What if it's a small lie? Are small lies okay?

MR. LEWIS: Object to form.

A. Being truthful and complying with a permit is the objective.

Q. You think it's okay for the owner or operator of a petroleum terminal in the State of Connecticut to stretch the truth in representations that it makes to a regulatory agency?

MR. LEWIS: Object to form.

A. There's no difference.

Q. I agree with you. I agree with that.

Do you think it's okay to withhold information from a regulatory agency?

A. No, I don't.

Q. Okay. When did you first learn that you were going to be giving sworn testimony in this case?

A. Several months ago, I think.

15 (Pages 54 - 57)