## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, <br><br> *Defendants*. | Civil Action No. 3:21-cv-00933-VDO <br><br><br> November 3, 2025 |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S**
**OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE**
**THE TESTIMONY OF NAOMI ORESKES, PH.D.**

# TABLE OF CONTENTS

I.    INTRODUCTION..............................................................................................................1

II.   DR. ORESKES' EXPERIENCE AND OPINIONS .........................................................2

III.  LEGAL STANDARD ......................................................................................................3

IV.   ARGUMENT ...................................................................................................................5

   A.   Dr. Oreskes is Qualified to Testify......................................................................5

   B.   Dr. Oreskes' Methodology is Reliable .................................................................7

      1.   Dr. Oreskes' use of secondary sources is appropriate.....................................8

      2.   Dr. Oreskes' use of AI as a search engine was appropriate ...........................9

      3.   Dr. Oreskes' opinions in this case are distinguishable from her opinions in the *Mann* case.........................................................................................................................11

      4.   Dr. Oreskes' Testimony Is Not Unfairly Prejudicial.....................................11

   C.   Dr. Oreskes' Expert Testimony is Based on Reliable Methodology and Will Assist the Trier of Fact in Determining Whether 'Best Industry Practice' Includes Consideration of Climate Change.....................................................................................................12

V.    DR. ORESKES' REBUTTAL TESTIMONY SHOULD BE ALLOWED .....................13

VI.   CONCLUSION...............................................................................................................14

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Eagle Outfitters, Inc. v. Walmart, Inc.*,
2023 U.S. Dist. LEXIS 21641 (W.D. Pa. Feb. 6, 2023) ........................................................ 7

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996)................................................................................................. 5

*Amorgianos v. National R.R. Passenger Corp.*,
137 F.Supp.2d 147 (E.D.N.Y. 2001) ................................................................................... 4, 5

*Conservation L. Found., Inc. v. Shell Oil Co.*,
No. 3:21-CV-00933 (JAM), 2023 WL 5434760 (D. Conn. Aug. 22, 2023) ........................... 12

*Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*,
568 F. Supp. 3d 205 (N.D.N.Y. 2021)............................................................................. 3, 4, 12

*Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, Inc.*,
2014 U.S. Dist. LEXIS 21829 (N.D. Okla. Feb. 21, 2014) ...................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993)...................................................................................................... 3, 4, 5, 9

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ................................................................................................... 4

*E.E.O.C. v. Morgan Stanley & Co.*,
324 F. Supp. 2d 451 (S.D.N.Y. 2004) ............................................................................... 3, 12

*Ferlito v. Harbor Freight Tools USA*, Inc.,
2025 WL 1181699 (E.D.N.Y. Apr. 23, 2025).......................................................................... 9

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ..................................................................................... 5

*Jacobson v. R.J. Reynolds Tobacco Co.*,
2013 U.S. Dist. LEXIS 197101 (S.D. Cal. Sept. 20, 2013) ...................................................... 7

*Kohls v. Ellison*,
No. 24-CV-3754 (LMP)(DLM), 2025 WL 66514 (D. Minn. Jan. 10, 2025)............................ 9

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................................... 1, 4, 5

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2nd Cir. 2013) ................................................................................................. 7

*Melini v. 71st Lexington Corp.*,
No. 07-CV-701, 2009 WL 413608 (S.D.N.Y. Feb. 3, 2009)..................................................... 5

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011)..................................................................................................... 4

*Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.*,
  208 F. Supp. 2d 423 (S.D.N.Y. 2002) ........................................................................ 5

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213
  (S.D.N.Y. 2004) ........................................................................................................ 3

*U.S. v. Abu–Jihaad*,
  630 F.3d 102 (2d Cir.2010) ...................................................................................... 12

*Walden v. City of Chi.*,
  755 F. Supp. 2d 942 (N.D. Ill. 2010) ......................................................................... 7

**Other Authorities**

Martha C. Howell & Walter Prevenier, From Reliable Sources: An Introduction to Historical
  Methods 2 (2001) ....................................................................................................... 7

Maxine D. Goodman, Slipping Through the Gate, 60 Baylor L. Rev. 824 (2008) ........................ 7

**Rules**

Federal Rule of Evidence 401 .................................................................................. 5, 13

Federal Rule of Evidence 702 -  Advisory Committee's Note .................................................. 3, 12

## <u>EXHIBIT LIST</u>

Exhibit A          Excerpts of the Naomi Oreskes September 2025 Deposition Transcript

## I.    INTRODUCTION

In their efforts to exclude Dr. Oreskes, Defendants fundamentally misunderstand, or purposefully misconstrue, her education, experience, training, and methodology. As a result, each of their arguments fail.

First, Dr. Oreskes is eminently qualified. She is the Charles Henry Lea Professor of the History of Science and Affiliated Professor of Earth and Planetary Sciences at Harvard University in Cambridge, Massachusetts. Oreskes Rpt., ECF No. 778, at 3. She holds a Ph.D. from Standford University in Geological Research and the History of Science. *Id*. Her scholarship has focused on the development of scientific methods and knowledge, and particularly climate science. *Id*. Relatedly, she has studied resistance to scientific findings and "attempts by interested parties to downplay, disparage, and even rejected entirely that science." *Id.* It is irrelevant that Dr. Oreskes is not an engineer or a lawyer, or that she does not have any expertise in permitting and enforcement. Dr. Oreskes does not need these qualifications to provide a chronological scientific history of the knowledge of climate science development in the fossil fuel industry generally, and Shell specifically.

Second, Dr. Oreskes employs a reliable methodology. She uses the historical method, which is the same method she uses to write her books or numerous peer-reviewed articles. This methodology includes a review of primary and secondary sources and the litigation materials produced in this case. This methodology has been accepted by courts nationwide. Dr. Oreskes also employs the same level of intellectual rigor in this case as she does in her professional work as a historian, another key indicator of reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Third, Dr. Oreskes' opinions about what the fossil fuel industry and Shell specifically knew about climate change are appropriate subjects of expert testimony. As a historian, Dr. Oreskes synthesizes and explains the scientific history related to climate change, providing helpful context about what information Defendants had about climate change and when they had it. This neither invades the role of the jury, nor does it amount to parroting the plain language of documents. Whether the Permit requires Defendants to consider and address the impact of climate change as a "best industry practice" is the core issue in the case. *See* Defendants' Motion for Partial Summary Judgement (ECF No. 248) and their Motion to Stay (ECF No. 584). See ECF No. 641 at 9; Tr. Of Oral Arg. On Mot. for Partial Sum. J. at 75–90. Dr. Oreskes' testimony is relevant to this issue because establishing best industry practice for climate change response depends fundamentally on knowledge of the relevant science and risks.

Dr. Oreskes' rebuttal opinions about how the fossil fuel industry has coopted and corrupted the science related to climate change and the regulators who regulate them are also appropriate. They are an inherent part of her knowledge and opinions concerning the resistance to scientific findings and "attempts by interested parties to downplay, disparage, and even rejected entirely that science." Oreskes Rpt., ECF No. 778, at 3. Her opinions on this topic are based on her decades of studying and writing about how the fossil fuel industry has shaped scientific discourse and policy.

## II.   DR. ORESKES' EXPERIENCE AND OPINIONS

Dr. Oreskes has been studying the history of climate change science since the early 2000s. *Id*. Her research spans the evolution of climate change science, beginning in 1843 until today. *See Id*. at 21. As a Historian of Science, Dr. Oreskes studies the development of scientific knowledge. *Id*. at 10. The history of science is a specialized branch of history which focuses on science. *Id*. at 15. Doctors of the history of science are trained to understand, research, teach, publish, and opine

2

on scientific matters as they are reported on in the historical record, be it in corporate documents, newspapers, or some other medium.  Applying her reliable and generally accepted methodology, Dr. Oreskes provides three key opinions in this case:

- Scientific consensus confirms that climate change is occurring and has caused and will continue to cause a rise in sea levels, more severe weather, increased precipitation, flooding, fires, and other serious consequences.
  *Id*. at 20.

- Shell knows and has admitted the reality of climate change.
  *Id*. at 94.

- Despite what it knew and should have known, Shell supported third party organizations that disparaged the credible scientific evidence of climate change and worked to block the meaningful policy that Shell publicly claimed to support.
  *Id*. at 115.

## III.    LEGAL STANDARD

Under Federal Rule of Evidence § 702 and the *Daubert* standard, the Court's gatekeeping obligation is to ensure that proffered expert testimony is relevant and based on reliable methods. *See Daubert v. Merrell Dow Pharm., Inc*. 509 U.S. 579, 589 (1993). A key goal of the adoption of the Daubert standard was to relax traditional barriers to admission of expert opinion testimony. *Daubert*, 509 U.S. at 588. Courts are thus in agreement that Rule 702 mandates a liberal standard of admissibility. As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." *Cooper Crouse-Hinds, LLC v. City of Syracuse, New York*, 568 F. Supp. 3d 205 (N.D.N.Y. 2021) (quoting Fed. R. Evid. 702, Advisory Committee's Note); *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F.Supp.2d 213, 226 (S.D.N.Y. 2004). The Second Circuit distilled Rule 702's requirements into three broad criteria: (1)

3

qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. *Cooper Crouse-Hinds*, 568 F. Supp. at 396–97.

In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See Daubert*, 509 U.S. at 590, 595, 113 S.Ct. 2786; *see also Amorgianos v. National R.R. Passenger Corp*., 137 F.Supp.2d 147, 162 (E.D.N.Y. 2001). In other words, it is not the Court's task to decide whether an expert's conclusions are correct. *See Daubert v. Merrell Dow Pharm.*, *Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) (*Daubert* II) ("[T]he *Daubert* test "is not the correctness of the expert's conclusions but the soundness of his methodology."). Nor is the Court empowered "to determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Prods. Grp., Inc*., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citations omitted). Instead, the party submitting expert testimony must demonstrate that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*.

In service of relaxing the admission of expert evidence, the Supreme Court has provided a list of non-exclusive factors that a court may consider, including: "whether the theory or technique…can be (and has been) tested;" whether "the theory or technique has been subject to peer review and publication;" whether, "in the case of a particular scientific technique," there is a high "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593–94. However, this is a "flexible" test, and the factors set forth in *Daubert* do not constitute a "definitive checklist." *See Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Whether the

*Daubert* factors are pertinent to assessing reliability in a particular case depends on "the nature of the issue, the expert's particular expertise, and the subject of his testimony," and "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. In short, "the gatekeeping inquiry must be 'tied to the facts' of a particular case," *Id*. (quoting *Daubert* 509 U.S. at 591, 113 S.Ct. 2786), and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152, 119 S.Ct. 1167.

In addition to ensuring that expert testimony is reliable, the Court must decide whether the expert's testimony is relevant, i.e., whether it will "help the trier of fact." *In re Mirena IUD Prods. Liab. Litig*., 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016). Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility. *Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc*., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 133–35 (D.C. Cir. 1996)). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini v. 71st Lexington Corp.*, No. 07-CV-701, 2009 WL 413608 at \*5 (S.D.N.Y. Feb. 3, 2009) (quoting *Amorgianos*, 303 F.3d at 267).

## IV.    ARGUMENT

### A.  Dr. Oreskes is Qualified to Testify

5

As a historian of science who has extensively studied the history of climate science and knowledge about that science by the fossil fuel industry, Dr. Oreskes is uniquely qualified to provide opinions on what information about climate change was known by or available to the Defendants and when that occurred.  In addition to studying the topic for several decades, she has published eight scholarly books and dozens of articles concerning the history of climate change science within peer-reviewed journals. *See* Oreskes Rpt., ECF 778, at Appendix 1.  Dr. Oreskes also has practical, wide-ranging, decades-long history of first-hand experience on the subject, including, but not limited to, her work as a mining geologist in Australia; on panels in the World Economic Forum with fossil fuel industry representatives; and formal interviews with oceanographers for the Office of Naval Research. *See* Oreskes Dep., Ex. A, at 52–55. Dr. Oreskes' research and opinions, including those cited in her Report, have been widely published and subject to peer-review, and recognized through numerous awards and fellowships. *See id*. at 9.

Defendants' insistence that Dr. Oreskes is not a regulator, lawyer, or engineer misses the mark.  None of that expertise is relevant to or required for any of the opinions she offers in this case. Dr. Oreskes' core opinions reflect her education, training, and experience: 1) climate change is real, and 2) Defendants as well as the fossil fuel industry in general have known about it and studied it for decades. *See* Oreskes Rpt., ECF 778, at 78–93.

Defendants' accusation that Dr. Oreskes is an advocate is disingenuous. Her opinions are based upon an objective analysis of science and evidence that were largely developed based on a review of that science and evidence long before she was ever engaged to be an expert witness in this case. The fact that Defendants disagree with and have a financial interest in refuting her opinions does not somehow make her testimony inappropriate advocacy nor does it magically erase her education, training, experience and copious volumes of reliance materials.

### B. Dr. Oreskes' Methodology is Reliable

In formulating her opinions, Dr. Oreskes employed a reliable and well accepted methodology to synthesize voluminous litigation materials produced in this case, and to understand their historical context through analysis of other primary and secondary sources. *See* Oreskes Dep., Ex. A, at 201:17–22; *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–136 (2nd Cir. 2013); *see generally* Maxine D. Goodman, Slipping Through the Gate, 60 Baylor L. Rev. 824, 857 (2008) (commenting that a historian's task is "to choose reliable sources, to read them reliably, and to put them together in ways that provide reliable narratives about the past") (quoting Martha C. Howell & Walter Prevenier, From Reliable Sources: An Introduction to Historical Methods 2 (2001)).

Dr. Oreskes' methodology has been deemed reliable and accepted by courts in numerous cases where specialized knowledge is needed to interpret historical records and place them in proper context. *Id*; *see, e.g., Jacobson v. R.J. Reynolds Tobacco Co*., 2013 U.S. Dist. LEXIS 197101, at *3 (S.D. Cal. Sept. 20, 2013) (permitting historian Dr. Proctor to opine on epidemiologic studies "from a historic perspective" to describe "the impact that they had on . . . the tobacco industry"); *Am. Eagle Outfitters, Inc. v. Walmart, Inc*., 2023 U.S. Dist. LEXIS 21641, at *7 (W.D. Pa. Feb. 6, 2023) (finding archivist qualified to opine on particular brand strength due to general study in field); *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, Inc*., 2014 U.S. Dist. LEXIS 21829, at *23–24 (N.D. Okla. Feb. 21, 2014) (holding trained economist qualified to opine on history of economics); *Walden v. City of Chi*., 755 F. Supp. 2d 942, 950 (N.D. Ill. 2010) (allowing historian to opine on policies and practices of Chicago Police Department).  Unlike the *Marvel* historians Defendants cite to (who merely parroted speculative statements of motivations and intentions of freelance artists), Dr. Oreskes' used her training and specialized knowledge

7

developed over decades to synthesize and interpret a large body of diverse but reliable source material in furtherance of developing her opinions in this case.

Defendants claim that Dr. Oreskes has no knowledge of the Defendants or litigation issues in this case is wrong. Dr. Oreskes reviewed and considered, among other things, the Amended Complaint, General Permit, the Stormwater Pollution Prevention Plan ("SWPPP"), and even details about the Defendants' corporate structure. *See* Oreskes Rpt., ECF 778, at 19.  Moreover, the fact that climate change is occurring and that Defendants, and the fossil fuel industry, have been aware of it for decades are litigation issues in this case. It is those issues that Dr. Oreskes was proffered to address.  As Dr. Oreskes explained in her deposition:

> The complaint says, that they believe there has been a permit violation related to disclosure of risks. That leads to the question what risks? And my report is pertinent to the question of those risks, both what risks are factually in terms of our best scientific understanding, our best available science, and in terms of what the historical records shows that Shell Corporation knew or should have known about those risks.

 *See* Oreskes Dep. Ex. A at 63:16–64:1.

### 1. Dr. Oreskes' use of secondary sources is appropriate

Dr. Oreskes' use of secondary sources as part of her comprehensive analysis is appropriate. *See* Oreskes Rpt., ECF 778, at 12–19, 107–111; *see also* Oreskes Dep. Ex. A at 202:19–23. Historians routinely incorporate reputable journalistic and other secondhand sources when they report contemporaneous events relevant to historical analysis. *See* Oreskes Rpt., ECF 778, at 12; *see also* AHA, Statement on Standards of Professional Conduct (2023) ("We honor the historical record, but understand that its interpretation constantly evolves as historians analyze primary documents in light of the ever-expanding body of secondary literature that places those documents in a larger context."). Moreover, the secondary sources Dr. Oreskes' considered are not the sole basis for her opinions but compliment and provide nuance to her analysis of primary documents,

scientific literature, and industry materials. *See* Oreskes Dep. Ex. A at 202:3–23; 203:1–7. This is entirely consistent with the accepted methodology of historians who analyze multiple sources to establish historical facts and patterns, particularly when analyzing recent history where journalistic accounts provide important contemporaneous documentation. *See* Oreskes Rpt., ECF 778, at 12.

### 2. Dr. Oreskes' use of AI as a search engine was appropriate

Defendants' complaints that Dr. Oreskes used artificial intelligence (AI) as a search engine to help sift through thousands of documents are not well taken. First, contrary to Defendants' assertions otherwise, Dr. Oreskes disclosed her use of AI as a search engine to help her sift through thousands of documents in her Expert Report. *See* Oreskes Rpt., ECF 778, at 76–77 ("In preparing this report, I directed the use of artificial intelligence as an additional means to observe how often the words sea level, sea level rise, or related term (such as coastal flood, coastal erosion, and extreme weather) appeared in IPCC and Shell documents.") In addition, she provided fulsome testimony about how AI was used to help her identify pertinent documents at her deposition. *See* Oreskes Dep., Ex. A, at 227–230. Her use of AI in this way is not novel or controversial. *See*, *e.g.*, *Ferlito v. Harbor Freight Tools USA*, Inc., 2025 WL 1181699 at *4. (E.D.N.Y. Apr. 23, 2025) (quoting *Kohls v. Ellison*, No. 24-CV-3754 (LMP)(DLM), 2025 WL 66514 at *4 (D. Minn. Jan. 10, 2025) ("To be clear, the Court does not fault Professor Hancock for using AI for research purposes. AI, in many ways, has the potential to revolutionize legal practice for the better. *See* Damien Riehl, AI + MSBA: Building Minnesota's Legal Future, 81-Oct. Bench & Bar of Minn. 26, 30–31 (2024) (describing the Minnesota State Bar Association's efforts to explore how AI can improve access to justice and the quality of legal representation)."). *Daubert* issues arise only "when attorneys and experts abdicate their independent judgment and critical thinking skills in favor of ready-made AI-generated answers." *Ferlito,* 2025 WL 1181699 at *4. Here, Dr. Oreskes

9

did not use AI to provide any answers to the questions she was asked to answer but instead used it as a tool to help her sort through thousands of documents to find the ones that contained information about the issues she was asked to discuss. *See* Oreskes Dep., Ex. A, at 227:4–9 ("We used [] ChatGPT to identify [existing] documents. Then there is a body of documents that I look at every document that I deem to be relevant and relied on in this report is cited in the report and has been provided to [Defendants]."). *See* Oreskes Dep., Ex. A, 228:14–24; 229:4–12; 234:4–7. Oreskes Rpt., ECF 778, at 76.

Defendants' insistence that Dr. Oreskes uses AI to generate documents or citations or to train an AI engine is also utterly in error and without factual basis. Dr. Oreskes merely used AI to help identify documents that contained references to certain things like "sea level rise" and variations thereof. As opposed to a generative AI, what Dr. Oreskes employed was essentially a glorified search engine. Once documents containing those types of phrases were identified, she personally reviewed each of those documents to assess their relevance to this case. *See* Oreskes Dep. Ex. A 225: 16–20; 227:22–25; 228:1–5.

The fact that Defendants do not have this particular AI tool is a red herring. *See* Def. Mot., ECF 777 at 16. First, the tool she used is available on the open market.[1] Second, Defendants have the list of documents that make up the universe of Defendant specific materials Dr. Oreskes was working from. They also have the search terms she provided to the AI tool and the list of documents that it identified based on the search terms and phrases she provided to it. Thus, Defendants have everything they need to understand how Dr. Oreskes narrowed the universe of thousands of documents to find the ones that were most relevant to her analysis. There are numerous litigation

---

[1] *See* https://azure.microsoft.com/en-us/pricing/details/cognitive-services/openai-service/

platforms used by experts and attorneys in litigation that run key word searches to help locate and sift through potentially relevant documents.  The AI tool Dr. Oreskes utilized did the same thing here.

### 3. Dr. Oreskes' opinions in this case are distinguishable from her opinions in the *Mann* case

Although Defendants are correct that Dr. Oreskes' opinions were precluded by the Court in *Mann*, their assertion that this decision has any bearing here is incorrect.  *Mann* was a defamation action arising out of two blog posts that denounced the plaintiff's work as fraudulent. *See* ECF 741-6 at 2, Ex. E; *see also* Oreskes Dep., Ex. A, at 17:16–20. Dr. Oreskes was disclosed as an expert witness to testify on questions concerning climate change, scientific practices, and the role of peer review in scientific practice. ECF 741-6 at 21–25. The Court limited Dr. Oreskes' testimony only to contextual information about what makes scientific research reliable because the concept of "climate reconstruction" was not relevant to that case. *See* ECF No. 741-7, Ex. F, at 23–24. Here, Dr. Oreskes is not providing any opinions that are irrelevant to this case.

In addition, unlike her articulation of her methodology in the *Mann* case, Dr. Oreskes' articulated methodology here is comprehensive, robust, and well accepted in our jurisprudence. *See* Oreskes Rpt., ECF 778, at 10–19; *see also* Oreskes Dep. Ex. A at 224–244.

### 4. Dr. Oreskes' Testimony Is Not Unfairly Prejudicial

Defendants completely failed to articulate how Dr. Oreskes' testimony results in unfair prejudice to them.  Under Rule 403, "unfair prejudice" is not merely evidence that is damaging to the opposing party, but evidence that has an "undue tendency to suggest a decision on an improper basis," such as anger or emotion.  Testimony about climate change and industry knowledge about climate change is not inherently prejudicial.  Furthermore, even if Defendants could articulate any risk of unfair prejudice (which they have not done here), any such risk could be mitigated through

the Court's limiting instructions. *See U.S. v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir.2010). As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." *Cooper Crouse-Hinds*, 568 F. Supp. 3d 205 (N.D.N.Y. 2021) (quoting Fed. R. Evid. 702, Advisory Committee's Note); *see also E.E.O.C.*, 324 F. Supp. 2d at 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc.*, 313 F.Supp.2d at 226.

**C. Dr. Oreskes' Expert Testimony is Based on Reliable Methodology and Will Assist the Trier of Fact in Determining Whether 'Best Industry Practice' Includes Consideration of Climate Change**

This case centers on whether the Permit's requirement that permittees apply "best industry practice" to their New Haven Terminal necessarily includes consideration of known climate risks. ECF 641 at 2. Defendants' and industry knowledge of climate change directly bears on what constitutes "best industry practice." *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-CV-00933 (JAM), 2023 WL 5434760 at 1 (D. Conn. Aug. 22, 2023) ("The Defendants' policies and procedures governing the Terminal, and their knowledge of certain climate change risks, are relevant in the Rule 26(b)(1) sense to claims asserted in CLF's Amended Complaint"). Such knowledge informs Defendants' legal obligations under the Permit to notify regulators about climate change risks and harden their New Haven Terminal to prevent an "imminent and substantial endangerment to human health or the environment." *See, e.g.*, Am. Compl. (ECF 47) at 494–98, 500–02.

This Court already held that industry-wide practices are relevant to the determination of best industry practices. *See Conservation L. Found., Inc. v. Shell Oil Co., No*. 3:21-CV-00933 (JAM), 2024 WL 1341116 at 4 (D. Conn. Mar. 29, 2024). Dr. Oreskes' analysis of litigation materials, publicly available documents, and archival records provides a strong foundation for her conclusions as to both Defendants' knowledge and the industry-wide knowledge of climate risks.

12

*See* Oreskes Rpt., ECF 778, at 10–19.   Her opinions are directly relevant to whether it is more likely than not that best industry practices include consideration of climate change. *Id*.; *see* ECF 641 at 2. Her testimony sheds light on the risks that climate poses "in terms of our best scientific understanding, our best available science, and in terms of what the historical record shows that [Defendants] knew or should have known about those risks." *See* Oreskes Dep. Ex. A at 63:19–25; 64:1. The fact that Shell PLC is not a party to the case does not mean that its policies, procedures, and relationships to the Defendants are irrelevant. Dr. Oreskes does not offer an opinion as to Shell's corporate structure. The historical and scientific consensus regarding climate change was known and knowable not only to Shell PLC, but to all Shell entities, including Defendants, and the industry generally.  Her testimony is therefore admissible because it will help the jury understand the evidence and it has "[a] tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Fed. R. Evid. 401.

For all these reasons, CLF respectfully requests that the Court deny the Defendants' Motion to preclude the expert testimony of Dr. Oreskes.

## V.    DR. ORESKES' REBUTTAL TESTIMONY SHOULD BE ALLOWED

Defendants erroneously argue that Dr. Oreskes is not qualified to rebut opinions being offered by Defense expert Attorney Uhlmann.[2] Given Attorney Uhlmann's significant background as an attorney working for the EPA  and his  public positions and statements in that role that contradict his proffered testimony in this case, Dr. Oreskes opines that Attorney Uhlmann's about-

---

[2] Dr. Oreskes' rebuttal testimony is only being offered to rebut Attorney Ulmann's improper legal conclusions about what the CWA, RCRA, and permits require.  If Attorney Uhlmann is not permitted to testify, Dr. Oreskes does not intend to offer her rebuttal opinions.

13

face in this case is consistent with  that of a "hired ally" and the improprieties of such a relationship between Defendants and experts.  Oreskes Reb. Rpt., ECF 779, at 3.

As part of her decades' long study of the history of climate change, Dr. Oreskes has investigated the fossil fuel industry's efforts to corrupt the science surrounding climate change and the regulators who enforce environmental law. Dr. Oreskes' research has given her a unique expertise in identifying industry efforts to corrupt climate science and the regulators who are charged with protecting our environment, particularly in light of significant evidence accepted by legitimate scientists about the realities of climate change and its causes. Dr. Oreskes' opinions that Defendants' retention of a former EPA Attorney who was once responsible for regulating the fossil fuel industry and paying him $2,200 an hour to testify on their behalf is consistent with those efforts is appropriate. Her critique of Attorney Uhlmann and his $2,200 an hour retainer is consistent with her academic research on the reliability of scientific and expert knowledge that has been tainted by industry. Oreskes Rpt., ECF 778, at 1–2. If Attorney Uhlman is permitted to provide legal opinions that are contrary to positions he has taken previously when he worked for EPA, then Dr. Oreskes should be permitted to explain how his being paid $2,200 an hour by Defendants is consistent with the industry's historical efforts to corrupt the science related to climate change and the people responsible for regulating them.

Dr. Oreskes' rebuttal report provides important context about the fossil fuel industry's efforts to corrupt the science and the regulators who regulate their industry.  Dr. Oreskes explains how Defendants, consistent with industry practice, bias purported independent experts. As such, her rebuttal testimony should be allowed.

## VI.    CONCLUSION

14

For the foregoing reasons, CLF respectfully requests that the Court deny the motion to preclude the testimony of Dr. Oreskes.

Dated: November 3, 2025

Respectfully submitted,

CONSERVATION LAW FOUNDATION, Inc., by its attorneys

*/s/ Shalom Jacks*

Shalom Jacks (phv208834)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9013
E-mail: sjacks@motleyrice.com

James Y. Meinert (ct31637)
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110
Tel: (617) 850-1744
E-mail: jmeinert@clf.org

Christopher M. Kilian (ct31122)
Kenneth J. Rumelt (phv207130)*
Anna Tadio (phv208827)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3020
Tel: (802) 622-3009
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org
E-mail: atadio@clf.org

Ana McMonigle (ct31370)
Conservation Law Foundation, Inc.
195 Church Street, Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
E-mail: amcmonigle@clf.org

James Crowley (ct31319)

15

Conservation Law Foundation, Inc.
235 Promenade Street, Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street, Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Devin Williams (phv208833)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
E-mail: rmazingo@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC

16

40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

*Attorneys for Plaintiff
Conservation Law Foundation, Inc.*

*\*Admitted as Visiting Attorney*

17

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 3, 2025, the foregoing motion was filed through the Court's electronic filing system ("ECF"), through which the document is available for viewing and downloading from the ECF system, and a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Shalom Jacks*
Shalom Jacks
