# EXHIBIT A

**to Plaintiff Conservation Law Foundation's Opposition to Defendants' Motion to Exclude the Testimony of Phillip Pasteris, M.S.**

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Equilon Enterprises LLC et al.

Case No. 3:21-CV-00933-VDO

# EXPERT REPORT OF ERIC KOVICH, P.E.

Prepared by:

Eric Kovich, P.E. (PA & VA)
Geosyntec Consultants, Inc.

June 23, 2025

Prepared for:

King & Spalding LLP
1180 Peachtree Street N.E. Ste. 1600
Atlanta, GA 30309-3521

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

Retention and Case Reference .....................................................................................1

Qualifications...............................................................................................................2

Previous Expert Testimony..........................................................................................3

Statement of Compensation .........................................................................................3

BACKGROUND ...........................................................................................................4

Terminal Location .......................................................................................................4

Terminal History..........................................................................................................4

Terminal Layout and Operations .................................................................................5

1.  BULK PETROLEUM STORAGE TERMINAL INDUSTRY BEST PRACTICES
    INCLUDE ENVIRONMENTAL MANAGEMENT SYSTEMS, OIL DISCHARGE
    PREPAREDNESS AND RESPONSE, WASTE MANAGEMENT, STORMWATER
    MANAGEMENT, AND HURRICANE PREPAREDNESS ...............................................7

    1.1  Environmental Management Systems ....................................................................8

    1.2  Oil Discharge Preparedness & Response .............................................................9

        1.2.1  Spill Prevention Control and Countermeasures .............................................10

        1.2.2  Facility Response Plan ...................................................................................11

    1.3  Waste Management ..............................................................................................13

    1.4  Dock Operations Manual......................................................................................15

    1.5  Risk Management Program ...................................................................................16

    1.6  Stormwater Management ......................................................................................17

    1.7  Hurricane Preparedness .......................................................................................18

2.  DEFENDANTS IMPLEMENT INDUSTRY BEST PRACTICES AT THE NEW HAVEN
    TERMINAL WHICH GO ABOVE AND BEYOND THE REGULATORY
    REQUIREMENTS FOR BULK PETROLEUM STORAGE TERMINALS RELATED TO
    ENVIRONMENTAL MANAGEMENT SYSTEMS, OIL DISCHARGE PREPAREDNESS
    AND RESPONSES, WASTE MANAGEMENT, STORMWATER MANAGEMENT, AND
    HURRICANE AND EXTREME WEATHER PREPAREDNESS...................................22

    2.1  Environmental Management System and Operational Standards ............................23

    2.2  Oil Discharge Preparedness and Response ..........................................................27

        2.2.1  Spill Prevention Control and Countermeasures Plan ....................................27

        2.2.2  Facility Response Plan ...................................................................................28

    2.3  Risk Management Program ...................................................................................30

    2.4  Waste Management ..............................................................................................31

    2.5  Terminal's Management of Stormwater and Compliance with Permit.....................33

    2.6  Hurricane and Extreme Weather Preparedness .....................................................36

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

3.    THE REGULATORY REQUIREMENTS ON AND BEFORE JULY 2021, WHEN THE CLF LAWSUIT WAS FILED, DID NOT REQUIRE THE DEFENDANTS TO CONSIDER IMPACTS FROM CLIMATE CHANGE WHEN OPERATING THE SHELL NEW HAVEN TERMINAL...................................................................................................39

4.    THE ALLEGED "BEST INDUSTRY PRACTICES" PROPOSED BY GOLDSMITH AND NAIRN ARE NOT INDUSTRY PRACTICES, AND THEY WOULD NOT HAVE BEEN, AND SHOULD NOT HAVE BEEN, IMPLEMENTED AT THE NEW HAVEN TERMINAL...................................................................................................41

5.    THE SECONDARY CONTAINMENT SYSTEM AT THE SHELL NEW HAVEN TERMINAL IS ENGINEERED IN ACCORDANCE WITH INDUSTRY BEST PRACTICES..................................................................................................45

6.    THE CONCLUSION PRESENTED IN OPINION 3 OF THE MACEY REPORT IS UNFOUNDED AND DOES NOT CONSIDER THE CURRENT CT DEEP CIVIL PENALTY POLICY.............................................................................................50

REFERENCES ..............................................................................................52

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## INTRODUCTION

## Retention and Case Reference

I have been retained by Equilon Enterprises LLC, Triton Terminaling LLC, and Motiva Enterprises LLC ("Defendants") in Conservation Law Foundation, Inc. (CLF), v. Equilon Enterprises LLC et al., Case 3:21-cv-00933-VDO ("Matter").

In this lawsuit, CLF alleges the New Haven Terminal ("Terminal") violates certain sections of the Resource Conservation and Recovery Act (RCRA) and Clean Water Act (CWA). According to CLF, the CWA requires Defendants to assess the impacts of climate change on stormwater practices at the Terminal. Expert reports from CLF experts provide opinions on a wide range of issues, as described below.

Given the CLF allegations, I have developed the following opinions regarding this Matter.

1. Bulk petroleum storage terminal industry best practices include environmental management systems, oil discharge preparedness and response, waste management, stormwater management, and hurricane preparedness practices.

2. Based on my extensive experience in environmental compliance and my review of the Terminal and related practices, plans and procedures, Defendants implement industry best practices at the New Haven Terminal which go above and beyond the regulatory requirements for bulk petroleum storage terminals related to operations, waste management, stormwater management, and hurricane and extreme weather preparedness.

3. From a regulatory compliance perspective, the applicable regulatory requirements applicable to the Terminal on and before July 2021, when the CLF lawsuit was filed, did not require Defendants to consider impacts from climate change when operating the Shell New Haven Terminal.

4. The alleged "Best Industry Practices" proposed by Goldsmith and Nairn are not industry practices, and they would not have been, and should not have been, implemented at the New Haven Terminal.

5. Contrary to the opinions of CLF expert Richard Horner, the secondary containment system at the Shell New Haven Terminal is engineered in accordance with industry best practices.

6. The conclusion presented in Opinion 3 of the Macey report is unfounded and does not consider the current CT DEEP Civil Penalty Policy.

My opinions contradict the opinions of CLF experts generally including:

- Wendi Goldsmith Opinions
  - Best industry practice requires Shell to consider and protect against reasonable foreseeable risks, including risks from climate change.
  - The New Haven Oil Terminal is not engineered or operated pursuant to best industry practices.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- o The New Haven Oil Terminal's berms and containment areas are insufficient to contain the petroleum in the event of oil spill.
- Richard Horner Opinions:
  - o Assessment of the Containment Area 1 Bypass (regarding the South Tank Farm area containment).[1]
- Robert Nairn Opinions
  - o Required Level of Protection (regarding protection of Terminal at 500-year flood).[2]
- Joshua Macey Opinions:
  - o Shell has a healthy balance sheet and is capable of paying a large fine.

In developing my opinions, I reviewed the produced materials and referenced applicable documents in this report. I also conducted a site and facility inspection of the Terminal, interviewed Terminal personnel, and reviewed the reports of other Plaintiff's Experts.

My opinions related to this matter and the basis for my opinions are presented in this report. My opinions are consistent with generally accepted principles of environmental regulatory compliance and are stated with a reasonable degree of scientific certainty. My opinions are based on my education, knowledge, and experience working directly in the oil and gas industry where I managed environmental compliance for petroleum pipeline and bulk storage terminal facilities; my consideration of the site conditions as discussed above; my consideration of the documents referenced in this report and listed in the Appendices of this report; information obtained from the site visit; discussions with operators of the Terminal; and my discussions and work with other experts in the environmental field. I reserve the right to supplement or revise these opinions based on any new information related to this matter that I receive in the future.

In the following sections of this report, I provide:

- a summary of my professional experience and qualifications;
- information related to the New Haven Terminal location, history, layout and operations;
- my opinions on this Matter; and
- references cited in this report.

## Qualifications

I am a Senior Principal Engineer at Geosyntec Consultants, Inc. where I also serve as the Branch Manager of the Gulf Coast and Energy Branch within the Southern Region. The branch I manage has approximately 80 scientists and/or engineering professionals and provides consulting services to public and private clients and governmental organizations primarily in solid waste, energy, and water resources entities.

I have more than 28 years of professional experience supporting clients in the oil and gas, petrochemical, chemical, and manufacturing industries with a focus on mergers and acquisitions, capital projects planning/permitting/execution, regulatory compliance programs, operational risk management, auditing, compliance management systems, emergency preparedness/response, and

---

[1] Expert Report of Richard Horner. Page 30.
[2] Expert Report of Robert Nairn. Page iii.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

environmental liability management. I have previously served as a Senior Director of the Corporate Health, Safety, Security & Environmental (HSSE) programs for a leading midstream oil and gas company where I supported operations, engineering, and asset integrity management programs for pipeline and bulk storage terminal assets.

I am a licensed professional engineer in the States of Pennsylvania (PE071015) and Virgina (0402038038).

I earned my Bachelor of Science degree in Environmental Engineering technology from Temple University.

My project experience and qualifications are further described in Attachment 1.

## Previous Expert Testimony

I have not testified in trial or in deposition in the past four years.

## Statement of Compensation

Geosyntec is being compensated at a rate of $425 per hour for my consulting services, deposition, and trial testimony.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## BACKGROUND

Bulk petroleum storage terminal ("terminal") facilities play a critical role in energy logistics, serving as a final storage location prior to distribution of petroleum products to service stations or other end users. Overall, bulk petroleum storage terminal facilities are a relatively simple operation when compared to other types of facilities within the energy supply chain (e.g., refineries). A terminal essentially operates as a liquid petroleum storage "warehouse" where the products are received into bulk storage containers and subsequently loaded into tanker trucks, and in some instances rail cars, marine vessels or pipelines, for distribution to petroleum service stations or direct to other end users (e.g., commercial or industrial facility). During product loading, certain additives may be mixed with the petroleum product to meet customer specifications or other regulatory requirements (e.g., the use of red dye to designate diesel fuel intended for off-road use), but there is no complex chemical processing activity taking place at a terminal.

## Terminal Location

The Shell New Haven Terminal ("Terminal") is located at 481 East Shore Parkway, New Haven, Connecticut (the "Site"). The Site is identified as 37.74-acre parcel with the identification number of 2889 (PID number as listed in New Haven, CT Online Assessment[3]). The Site is currently surrounded by an industrial facility owned by United Illuminating Company to the north, residential properties to the east, a wastewater treatment plant (East Shore Water Pollution Abatement Facility) to the south, and a power plant operated by Public Service Enterprise Group to the west.

The Terminal is located approximately 1,500 feet from New Haven Harbor.  The elevation at the Site ranges from 4.7 ft within the tank storage berm to 12.8 ft at the lowest point of the berm based on the topographic survey provided by Godfrey Hoffman Hodge, LLC.[4]  A separate survey prepared in 2023 shows the lowest point of the north tank field berm at 12.07 ft and the lowest point of the south tank field berm at 11.78 ft.[5] The Base Flood Elevation (BFE) (i.e., elevation of the 100-year flood) for the Terminal is indicated at 12 feet.[6]

## Terminal History

The Terminal has specifically been listed as an oil storage facility since at least 1957 when operated by ESSO Standard Oil Bulk Plant. Since 1957, the Terminal has continued to operate as an oil storage facility transferring ownership through multiple entities. Most recently, the Terminal transferred ownership from Motiva Enterprises, LLC (Motiva) to Triton Terminaling,

---

[3] https://gis.vgsi.com/newhavenct/
[4] SOPUS_NHVN02089181: 2021 - NHVN topography map.pdf
[5] SOPUS_NHVN00242892: July 2023 - NHVN - Oil Storage Containment Calculations.pdf
[6] Flood Insurance Rate Map 09009C0442J, effective on 7/8/2013 available at https://msc.fema.gov/portal/search?AddressQuery=481%20east%20shore%20parkway%2C%20new%20haven%2C%20ct

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

LLC which remains the current owner. Equilon Enterprises LLC d/b/a/ Shell Oil Products US (SOPUS) currently operates the Terminal.[7]

## Terminal Layout and Operations

The Terminal is an active petroleum bulk storage and distribution terminal.  The Terminal operations principally consist of the receipt, storage, and truck loading of petroleum products and additives. Products are received at the terminal via product transfer lines at the dock and via trucks. Products are primarily distributed to customers from the truck loading rack. Product is also shipped via pipeline.

The Terminal consists of 21 large capacity aboveground storage tanks (ASTs) for bulk storage of petroleum products, several smaller capacity ASTs, approximately 10 product additive storage tanks, and three butane ASTs. The ASTs and other containers range in size from 50 to 9,267,762 gallons.[8]

Office, warehouse, and maintenance garage buildings are located along the western edge of the Terminal, as well as a truck loading rack with nine loading bays. Two stormwater retention ponds are located near the southwestern perimeter of the Terminal.[9]

---

[7] Completion of Investigation Report prepared by Sovereign Consulting Inc. dated June 2022
[8] SOPUS_NHVN02367994: SPCC 2024 New Haven Produced.pdf
[9] SHELLNH_TRI_00422: Current 2017 July Shell New Haven Terminal SWPPP with Appendices.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



*Figure 1. New Haven Terminal*

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

1. **BULK PETROLEUM STORAGE TERMINAL INDUSTRY BEST PRACTICES INCLUDE ENVIRONMENTAL MANAGEMENT SYSTEMS, OIL DISCHARGE PREPAREDNESS AND RESPONSE, WASTE MANAGEMENT, STORMWATER MANAGEMENT, AND HURRICANE PREPAREDNESS**

When considering the CLF expert allegations, it is important to describe the industry best practices implemented at petroleum bulk storage terminals. As would be expected, the petroleum bulk storage terminal industry is subject to extensive regulations at the federal, state, and local levels.

The environmental rulemaking process in the United States is designed to ensure that regulations are developed in a transparent and effective manner. When a regulatory agency identifies a need for a new rule or an amendment to an existing rule, they will draft a proposed rule, which includes both the regulatory text and a preamble explaining the purpose, legal authority, and rationale behind the rule.  The proposed rule gets published in the Federal Register, with a comment period established to allow interested stakeholders time to review and provide written comments on the proposed rule.  Once the comment period closes, the agency will review and consider all comments received during the public comment period, make any revisions to the proposed rule based on the feedback and develop the final rule along with a preamble that addresses the comments received and explains any changes made to the proposed rule. The final rule is published in the Federal Register with a specified effective date and can often contain an established compliance timeline for entities that are subject to the new rule (e.g., compliance immediately upon the effective date is not necessarily the requirement). The agency may also issue guidance documents to help regulated entities comply with the new rule.  Over time, the agency may review the effectiveness of the rule and make revisions, which can involve additional rulemaking processes as described above to update or amend the regulation.

The terminal industry works closely with various trade associations and other organizations to provide review and public comment on proposed regulatory changes, ensure a clear understanding of obligations under the various regulatory programs, and to share knowledge regarding approaches to managing their business to maintain compliance with regulatory requirements. Third party associations and organizations (i.e., other than regulatory governing bodies) often make recommendations as best practices, but there is no single authoritative source which defines best practices for the bulk petroleum storage terminal industry. These industry best practices should not be confused with best management practices (BMPs) which are implemented on a site-specific basis and are clearly defined through 40 CFR Part 122 Subpart A as

> *schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of "waters of the United States." BMPs also include treatment requirements, operating procedures,*

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

*and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.*[10]

To rebut several of the CLF expert opinions, mainly those from Goldsmith, Nairn, and Horner, I prepared this opinion to provide industry best practices for bulk petroleum storage terminal facilities based on my professional experience gained while working directly for a midstream oil and gas company and professional experience as an environmental consultant supporting terminal operators with their operations. I have focused on environmental management, beginning broadly with an overview of environmental management systems, followed by more specific discussions related to four focus areas relevant to this Matter: oil discharge preparedness and response, waste management, stormwater management, and hurricane preparedness.

## 1.1    Environmental Management Systems

In general, organizations establish and leverage an Environmental Management System (EMS) to ensure environmentally-focused regulatory requirements are identified, understood, and addressed in a systematic and cost-effective manner. Most EMS are built on the Plan, Do, Check, Act (PDCA) model, which is commonly associated with the work of W. Edwards Deming.  By following the PDCA model, a feedback and continual improvement process is created to support achieving an end goal (e.g., compliance with an environmental regulatory requirement).  A basic summary of the PDCA steps is described below.

- **Plan**: this step of the process is where an organization establishes the objectives and processes necessary to achieve the desired outcome or results.

- **Do**: this step of the process is where an organization implements the processes identified in the Plan step.

- **Check**: during this step of the process, the organization will evaluate results gathered from the Do step and compare to the desired outcome.

- **Act**: this step of the process, which is also sometimes referred to as "Adjust", focuses on continual improvement and the information gathered from the prior steps is reviewed to identify any adjustments that may be needed to improve, which are subsequently applied during the next implementation of the particular task or activity.

A widely-recognized EMS in use today is the International Organization for Standardization (ISO) 14001 standard.[11]  ISO is a non-governmental international organization that has developed more than 25,000 standards and other deliverables covering a broad spectrum of topics including quality management, environmental management (including sustainability and climate change), health 7 safety, energy management, food safety and IT security.  Specific to environmental management, ISO 14001 consists of various elements that collectively form the foundation of an effective EMS. These elements are designed to ensure that an organization can

---

[10] https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-122/subpart-A/section-122.2
[11] https://www.nsf.org/management-systems/environmental-health-safety-management-systems/iso-14001

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

effectively manage its environmental responsibilities and support a continual improvement process.

The primary components of ISO 14001 EMS are described below.

- **Environmental Policy**: this is a statement of an organization's commitment to operating its business in a manner that is protective of the environment.

- **Planning**: this step identifies the environmental aspects of the business, potential impacts, compliance requirements and performance targets.

- **Implementation**: this step involves establishing responsibilities, developing operational and emergency preparedness/response procedures, allocating resources, training, communication, and documentation.

- **Corrective Action**: this step involves evaluating performance against established objectives and implementing actions to drive continual improvement.

- **Management Review**: this step involves conducting a periodic evaluation of the EMS at the organization's Management level to identify improvement opportunities.

Many companies will develop an EMS to align with the elements of the ISO 14001 standard without pursuing full ISO certification as certification is not a mandatory component of the standard.

## 1.2   Oil Discharge Preparedness & Response

The United States Environmental Protection Agency (USEPA or EPA) issued the Oil Pollution Prevention (OPP) regulations[12] under the CWA as amended in the Oil Pollution Act[13] to establish requirements for prevention, preparedness, and response to oil discharges at certain non-transportation-related facilities which could reasonably be expected to discharge oil in quantities that may be harmful to human health and/or the environment. The OPP regulations require these facilities to develop and implement Spill Prevention, Control and Countermeasure (SPCC) plans focused on containing discharges of oil and preventing its discharge to navigable waters and/or adjoining shorelines. SPCC plans provide facilities with the framework to achieve the goal of preventing oil discharges, preparing for oil discharges, and responding to oil discharges.  The regulation also requires a subset of facilities to develop and implement a Facility Response Plan (FRP).

Overall petroleum bulk storage terminal industry best practice related to oil discharge preparedness is to develop and implement SPCC and FRP (if applicable).  Further information regarding SPCC and FRP requirements is provided in sections 1.2.1 and 1.2.2.

---

[12] 40 CFR Part 112
[13] 33 U.S.C. §2701 et seq. (1990)

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

### 1.2.1   Spill Prevention Control and Countermeasures

Subparts A, B, and C of 40 CFR 112 are commonly referred to as the "SPCC Rule", which has specific requirements for covered facilities related to containment, controls, and countermeasures for oil discharges. Generally, the SPCC Rule applies to facilities that are non-transportation related, have an aboveground oil storage capacity of greater than 1,320 gallons, and could reasonably be expected to discharge oil to navigable waters or adjoining shorelines in quantities that could be harmful. The general components in SPCC plans include:

- management review and approval of the SPCC plan;

- review and certification of the SPCC plan by a licensed Professional Engineer;

- contact list for notification and managing spills and emergency conditions;

- employee training;

- spill prevention measures;

- response and cleanup measures;

- security requirements; and

- inspections and recordkeeping.

The SPCC Rule provides requirements for containment structures to be sized to contain the volume of the largest tank at a facility plus "sufficient freeboard" to contain precipitation.  In its SPCC Guidance for Regional Inspectors, [14] USEPA discusses the topic of "sufficient freeboard" on pages 4-19 and 4-20. This document discusses the 1991 proposed amendment to the SPCC rule, which recommended the use of 25-year storm events to determine the appropriate freeboard volume.  The Agency received numerous comments on the 1991 proposed amendment, which were addressed in the preamble to the 2002 amendments to the SPCC Rule, which stated:

> *We believe that the proper standard of "sufficient freeboard to contain precipitation is that amount necessary to contain precipitation from a 25-year, 24-hour storm event. That standard allows flexibility for varying climatic conditions. It is also the standard required for certain tank systems storing or treating hazardous waste. (67 FR 47117, July 17, 2002)*

The inspector guidance further explains that the SPCC Rule did not set the 25-year, 24-hour storm event as a requirement for freeboard capacity and therefore, the use of 25-year, 24-hour storm event precipitation data is "…not enforceable as a standard for containment freeboard." The 2002 preamble stated:

> *While we believe that the 25-year, 24-hour storm event standard is appropriate for most facilities and protective of the environment, we are not making it a rule*

---

[14] https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

*standard because of the difficulty and expense for some facilities of securing recent information concerning such storm events at this time. (67 FR 47117, July 17, 2002)*

The guidance document ultimately concludes that "the certifying PE (or owner/operator, in the case of qualified facilities) determines what volume constitutes sufficient freeboard for precipitation for secondary containment and should document in the Plan how the determination was made." For this reason, the SPCC regulations do not require facilities to plan for a 100-year or 500-year flood as suggested by CLF experts Goldsmith and Nairn.

In addition, the SPCC Rule indicates that diked areas must be "sufficiently impervious to contain oil."[15] The purpose of secondary containment is to prevent a discharge to navigable waters or adjoining shorelines. For this reason, secondary containment structures must be able to contain oil until a cleanup occurs. The SPCC Guidance for Regional Inspectors[16] further indicates that

*The rule does not specify permeability, hydraulic conductivity, or retention time performance criteria for these provisions (i.e., "sufficiently impervious" does not necessarily mean indefinitely impervious). Instead, the owner/operator and/or the certifying PE have the flexibility to determine how best to design the containment system to prevent a discharge to navigable waters or adjoining shorelines.*

### 1.2.2    Facility Response Plan

Subpart D of 40 CFR 112 also established requirements for development of a Facility Response Plan (FRP) for facilities that meet one or more of the substantial harm screening criteria.[17] Generally, these substantial harm criteria are based on the oil storage capacity at a facility (e.g., either greater than 42,000 gallons or 1 million gallons) and if the facility transfers oil over water or is located at a distance which would impact fish, wildlife, and sensitive environments and/or shut down a public drinking water intake. The FRP provides detailed documentation on the facility's preparedness and response measures associated with a specific discharge scenarios. These requirements are often referred to as the "FRP Rule" and apply only to a subset of SPCC-regulated facilities, as specified in 40 CFR Part 112.20. The key elements that must be included in an FRP as defined in 40 CRF 112.20(h) are:

- Emergency Response Action Plan (ERAP) which generally provides a summary of internal and external emergency response contacts, responsibilities, and emergency response procedures;

- facility information;

- information about emergency response;

- hazard evaluation;

---

[15] 40 CFR Part 112.12(c)(2)
[16] https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf
[17] https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/facility-response-plan-frp-applicability

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- response planning levels which may include

  - a small discharge of 2,100 gallons or less;

  - a medium discharge of greater than 2,100 gallons but less than 36,000 gallons or 10% of the capacity of the larges tank (whichever is less); and

  - a worst-case discharge (WCD) of typically the capacity of the largest single aboveground storage tank including consideration of adverse weather conditions;

- discharge detection systems;

- plan implementation;

- inspection, drills / exercises, and training;

- diagrams;

- security systems; and

- response plan cover sheet.

In accordance with 40 CFR 112.2, adverse weather

> *means weather conditions that make it difficult for response equipment and personnel to clean up or remove spilled oil, and that must be considered when identifying response systems and equipment in a response plan for the applicable operating environment. Factors to consider include significant wave height as specified in appendix E to this part (as appropriate), ice conditions, temperatures, weather-related visibility, and currents within the area in which the systems or equipment is intended to function.*[18]

Of relevance to this case, USEPA defined adverse weather to include accounting for climate change in the definition for Clean Water Act hazardous substance FRPs under 40 CFR 118.2, but did not update the definition of adverse weather for petroleum facilities under 40 CFR 112.2.

FRPs are required to be submitted to the appropriate USEPA regional office. If the USEPA Regional Administrator (RA) determines the facility could cause "significant and substantial harm", the FRP must be approved by the RA. In addition, FRPs must be updated to reflect changes at the facility, and revised portions of the plan must be submitted to USEPA within 60 days of any change that may materially affect the facility's response to a WCD scenario.

In short, the Terminal is required to design and implement a SPCC and a FRP, which it has as discussed below.

---

[18] 40 CFR Part 112.2

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## 1.3 Waste Management

To most appropriately describe the terminal industry best practices regarding waste management under RCRA, the definitions of solid waste and hazardous waste as understood by the industry are needed to appropriately manage wastes.

As defined in Title 42 of United States Code, "the term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33 , or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended ( 68 Stat. 923 ) [42 U.S.C. 2011 et seq.]."[19] The definition of solid waste is also provided in 40 CFR 261.2(a) and subsequent paragraphs as

"(1) A solid waste is any discarded material that is not excluded under § 261.4(a) or that is not excluded by a variance granted under §§ 260.30 and 260.31 or that is not excluded by a non-waste determination under §§ 260.30 and 260.34.

(2) (i) A discarded material is any material which is:
(A) Abandoned, as explained in paragraph (b) of this section; or
(B) Recycled, as explained in paragraph (c) of this section; or
(C) Considered inherently waste-like, as explained in paragraph (d) of this section; or
(D) A military munition identified as a solid waste in § 266.202."

As defined in Title 42 of United States Code, "the term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."[20] The definition of hazardous waste is also provided in 40 CFR 261.3 and discussed further below.

Specific industry best practices regarding hazardous waste management depend on generator status. The quantity of hazardous waste generated determines the generator status and applicable regulations. Large quantity generators are classified as generating greater than or equal to 1,000 kilograms (kg) of hazardous waste per month, greater than 1 kg of acute hazardous waste per month, or greater than 100 kg of impacted soil from the cleanup of an acute hazardous waste spill. Large quantity generators must follow the requirements in 40 CFR Part 262. Small quantity generators are classified as generating hazardous waste between 100 to 1,000 kg per month. Small quantity generators are subject to select portions of 40 CFR Part 262.

---

[19] 42 U.S.C. §6903
[20] 42 U.S.C. §6903

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

The USEPA developed regulations for the management of hazardous waste under RCRA Subtitle C. These regulations ensure that hazardous waste is appropriately identified and handled safely to protect human health and the environment. Industry best practices have been developed around these regulations and include:

- hazardous waste (HW) determination;

- defining generator status;

- tracking waste generation volumes;

- storage and handling;

- transportation requirements including manifesting of wastes; and

- reporting and recordkeeping.

In my experience, bulk petroleum storage terminals do not generate hazardous waste on a routine basis but rather may generate waste from episodic events, such as maintenance activities CT DEEP Waste Engineering & Enforcement Division has prepared the Characterization of Remediation Waste presentation dated October 17, 2017 to provide an overview of key concepts related to waste generated from remediation activities.[21] This document provides waste characterization concepts such as point of generation, characteristic vs. listed wastes, and Connecticut's RCRA "Contained-In" policy for impacted environmental media among others.

As a general rule, point of generation indicates "a waste that is placed into storage or disposal prior to the effective date of RCRA is not a waste until it is removed from storage or disposal. As a result, environmental media that was blended with hazardous waste before the effective date of RCRA is not hazardous waste as long as it is in the ground. Once it is removed from the ground (e.g., dug up or pumped out), it is "generated" and becomes a waste – and potentially a hazardous waste." This presentation notes that the effective date of RCRA is November 19, 1980 for most wastes.

"Characteristic hazardous wastes" are solid wastes that exhibit one or more of the following characteristics:

- Ignitability (D001): liquids with a flash point < 140, ignitable solids, ignitable compressed gases, DOT oxidizers.

- Corrosivity(D002): pH ≤ 2.0 or ≥ 12.5.

- Reactivity (D003): react with water, explosives, some cyanide and sulfide bearing wastes.

- Toxicity (D004 –D043): fail TCLP test for one or more constituents.

---

[21]https://portal.ct.gov/-/media/deep/waste_management_and_disposal/hazardous_waste/characterizationofremediationwastepdf.pdf?rev=f5e69d4274b240fa8848d774d49be444&hash=C2DE548FFF026D496AB103DC952531FE

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Listed hazardous wastes generally include listed spent solvents, metal finishing wastes, and spill and container residues of commercial chemical products.

The Connecticut RCRA "Contained In" policy as described in this presentation indicates "contaminated environmental media containing these wastes is only hazardous if it exhibits a characteristic (after the point of generation)" or "contaminated environmental media that contains listed HW [meaning hazardous waste] is itself a listed hazardous waste (after the point of generation).

In my experience as an industry best practice, bulk petroleum storage terminals manage petroleum-containing materials (e.g., tank bottoms, product/water mixtures) using approved off-site third-party reclamation facilities as a means to minimize waste materials generated under the exclusion of 40 CFR 261.4(a)(12)(ii).

## 1.4  Dock Operations Manual

The United States Coast Guard (USCG) regulates the operation of the dock facilities at a marine terminal facility.  Specifically, 33 CFR Part 154 applies to all facilities capable of transferring oil or hazardous material, in bulk, to or from a vessel, where the vessel has a total capacity, from a combination of all products carried, of 250 barrels (10,500 gallons) or more. A regulated facility must have an Operations Manual (commonly referred to as a "Dock Operations Manual" or "DOM") that contains sufficient detail to guide someone who is generally qualified in oil or hazardous material transfer operations in performing their duties at the facility in an environmentally safe manner.

General requirements for Operations Manuals are identified at 33 CFR 154.300 and include the following:

- basic facility information: location, physical description, hours of operation.

- vessel information: sizes, types, and number of vessels that the facility can transfer oil or hazardous material to or from.

- product information: for each product transferred at the facility, the DOM must include the chemical name, appearance and odor description, hazards associated with handling the material and safe handling instructions, spill response procedures including firefighting procedures and effective extinguishing agents.

- personnel requirements: the minimum number of persons on duty during transfer operations and their duties as well as the duties of watchmen for unmanned vessels moored at the facility.

- emergency contacts: The name and telephone number of the facility's qualified individual (QI) and the contact information for Coast Guard, State, local, and other emergency personnel.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- emergency shutdown systems: A description and location of each emergency shutdown system.

Ultimately, the DOM is designed to provide comprehensive guidance for safe and efficient operations, emergency response, and regulatory compliance at marine oil terminals.  A facility must submit their DOM to the Captain of the Port (COTP) of the zone in which the facility is located at least 60 days prior to any transfer operation.

## 1.5   Risk Management Program

More than 40 years ago, USEPA developed the Risk Management Program (RMP) Rule to address Section 112(r) of the 1990 Clean Air Act amendments by publishing regulations focused on preventing chemical accidents at facilities that use certain regulated hazardous substances above a certain amount (aka, the "threshold quantity").  By definition, the RMP Rule is primarily focused on **minimizing the risk of chemical accidents and enhancing community safety**.  Typically, a terminal will only be subject to the RMP Rule if they are storing and using butane (used for blending into gasoline during Fall & Winter months), which is a regulated substance under the RMP Rule, at a quantity greater than 10,000 pounds.

The key elements of a Risk Management Program (RMP) under Section 112(r) of the Clean Air Act include:

- **Hazard Assessment**: involves identifying potential accidental hazardous substance release scenarios and evaluating the potential impacts on public health and the environment (offsite consequence analysis).

- **Prevention Program**: includes safety measures and maintenance, monitoring, and employee training to prevent accidental releases.

- **Emergency Response Program**: ensures that facilities are prepared to respond effectively to accidental releases, including coordination with local emergency responders.

- **Risk Management Plan**: facilities subject to the Rule must develop and implement a Risk Management Plan, which includes the above key elements.  This Plan must be reviewed, updated as needed and submitted to USEPA every five years.

Over the past 10 years or so, USEPA has been working to update the RMP Rule.  The RMP Amendments Final Rule was published in 2017; however, many of the requirements from the 2017 update were modified or rescinded in the 2019 RMP Reconsideration Final Rule.  The proposed Safer Communities by Chemical Accident Prevention (SCCAP) Rule was published in 2022.  The USEPA issued a final SSCAP Rule effective May 10, 2024, which updated the RMP regulations providing new requirements for hazard analysis including obligations related to considering risks posed by climate change.  In March 2025, USEPA announced that the agency is reconsidering the 2024 RMP SSCAP final rule.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## 1.6  Stormwater Management

The industry best practice for stormwater management is the development and implementation of a Stormwater Pollution Prevention Plan (SWPPP) that complies with the Terminal's National Pollutant Discharge Elimination System (NPDES) (or equivalent) industrial stormwater permit.

Stormwater management for the bulk petroleum storage industry is typically regulated under the NPDES General Permit for the Discharge of Stormwater Associated with Industrial Activities or equivalent permits by authorized state agencies pursuant to delegation from the USEPA. The USEPA defines Petroleum Bulk Oil Stations and Terminals (SIC Code 5171) under Sector P of the Multi-Sector General Permit (MSGP) under the NPDES permit. The USEPA issued a fact sheet dated February 2021[22] which describes: i) the types of facilities that are required to obtain a permit, ii) requirements of the industrial stormwater permit, iii) pollutants associated with activities at the facility, and iv) best management practices that are required to be implemented. Best management practices (BMPs) as listed in this fact sheet and in the MSGP include:

- good housekeeping practices;

- minimizing exposure;

- erosion and sediment control;

- management of runoff;

- preventative maintenance and recordkeeping;

- facility inspections;

- spill prevention and response; and

- employee training.

Furthermore, this fact sheet, which defines industry best practices as a guidance document for the bulk petroleum storage terminal industry nation-wide, does not identify any climate change or extreme weather-related risks for implementing BMPs that should be considered as an industry best practice as incorrectly suggested by Goldsmith. I also note that fact sheet does not include any considerations for flood events when designing and operating bulk petroleum storage terminal facilities which is in direct disagreement with the recommendations provided by Nairn that the New Haven Terminal should protected at either the 100-year or 500-year flood.

Connecticut has delegated authority to issue its own stormwater permit(s) under the Memorandum of Agreement between EPA and Connecticut.[23] In the October 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activities ("Current General Permit") issued by Connecticut Department of Energy & Environmental Protection (CT DEEP),

---

[22] https://www.epa.gov/sites/default/files/2015-10/documents/sector_p_transportationfacilities.pdf
[23] https://www.epa.gov/sites/default/files/2013-09/documents/ct-moa-npdes.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

additional stormwater control measures defined as Best Management Practices (BMPs) include those listed above in addition to:

- vehicle or equipment washing;

- floor drains;

- roof areas; and

- non-stormwater discharges.

In accordance with the Current General Permit, these BMPs must be implemented to minimize the discharge of pollutants from permitted facilities. The Current General Permit defines the term "minimize" as: "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."

As explained below, the Terminal has complied with the CT DEEP industrial stormwater permit for decades after the general permit became effective in the State of Connecticut.

The Current General Permit does not define what is both economically practicable and achievable given best industry practice for permitted facilities to evaluate how to minimize the discharge of pollutants from the permitted facility. As a practical matter, a permitted facility must make its own determination of what is economically practicable and achievable given best industry practice for implementing control measures to minimize the discharge of pollutants. For example, a permitted facility may not find a control measure is economically practicable to be implemented if the cost is orders of magnitude greater to implement than the anticipated benefit.

From my perspective, industry best practices mean the standard practice related to a topic that is generally broadly followed by companies and implemented at facilities within a given industry. Working through the elements, there must be a "practice," which means some identifiable "practice" that a majority of industry is following. If there is no established practice, there will be no "best industry practice." Related to this, a practice must be tied to the specific industry that is being permitted. In other words, a best practice for a local government to prepare flood maps would not be a best industry practice for petroleum bulk storage terminals. Similarly, a new guidance document from the ASCE or AIChE to build structures in a floodplain would not be a best industry practice for the petroleum bulk storage terminal industry.

This is where I disagree with CLF's view of environmental best practices for "industry." When CLF subjectively picks a few documents to support its one-off interpretation of best industry practices, it is not using an established or recognized "practice," and it is not using a practice that has been adopted or regularly used by the relevant "industry"—in this case, the petroleum bulk storage terminal industry.

## 1.7  Hurricane Preparedness

Hazards to aboveground storage tanks at bulk petroleum storage terminals due to hurricanes have been well documented to include wind-induced failures, storm surge failures, wave-induced

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

failures, and extreme precipitation induced failures.[24] As a practical matter, major storm events such as hurricanes require additional planning for bulk petroleum storage terminals located in coastal regions.  In my experience, terminal facilities located in coastal areas will coordinate closely with the local United States Coast Guard (USCG) Captain of the Port (COTP) regarding issuance of Port Condition advisories. The USCG assigns specific port condition terms based on severe weather events and these are used by terminal companies and the ship or vessel companies to guide operations and response to a severe weather event. The port condition terms utilized are:

- **Whiskey**: used to describe conditions when gale force winds, defined as 50-102 kilometers per hour (kph) or 31-63 miles per hour (mph), are anticipated at the port location within the next 72 hours. The port will typically remain open to commercial traffic at this stage; however, ships and vessels must report their intentions to remain in the port or depart the port.

- **X-Ray**: used when gale force winds are expected within the next 48 hours. Similar requirements to "Whiskey" port condition.

- **Yankee**: used when gale force winds are expected within 24 hours. Vessels planning to depart the Port must arrange for immediate departure. Certain port operations will cease as sustained winds begin to pick up.

- **Zulu**: used when gale force winds are anticipated within the next 12 hours. The port is closed at this level.

A Hurricane Preparedness Plan or Hurricane Action plan or similar document is commonly developed to address actions needed to be undertaken by the terminal facility before, during, and after the major storm event. Hurricane Preparedness Plans typically include:

- roles and responsibilities of company personnel along with contact information for key company personnel as well as various local, state, and federal response agencies;

- communications plan (internal employee and external public relations);

- storm monitoring and tracking process;

- terminal shutdown and staff evacuation planning and implementation procedures;

- operating procedures before and through the duration of a major storm event;

- post-storm facility assessment and start-up procedures; and

---

[24] Kameshwar, 2023. Chapter 4 - Hurricane performance and assessment models. Above Ground Storage Tank Oil Spill. Gulf Professional Publishing Pages 133 to 158. Available at https://doi.org/10.1016/B978-0-323-85728-4.00010-3.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- mitigation of storage tank potential failure modes during or after major storm event by, most commonly, ballasting the storage tank if able.

Managing tank inventories to ensure adequate fill levels (i.e., ballasting) is a critical consideration for bulk petroleum storage terminals during hurricane planning and preparation for a storm event. In my opinion, this is the most important precaution that a terminal can undertake to prevent damage to equipment and facilities during extreme weather events.

The USEPA Region 6 Regional Response Team (RRT) prepared flood preparedness recommended best practices to share lessons learned on how to best safeguard cylinders, containers, and other tanks against hurricanes.[25] The Region 6 RRT includes representatives from the states of Arkansas, Louisiana, New Mexico, Oklahoma, and Texas and 16 federal departments and agencies such as USEPA, USCG, NOAA, and FEMA.

Given the broad support by relevant governmental agencies, this is one of the true industry consensus best practices for petroleum bulk storage terminals in the United States.  From my perspective, the EPA Region 6 RRT best practice document is central to understanding how petroleum bulk storage terminals operate before, during and after extreme weather events, whether hurricanes, rising sea level, or storm surges.  The recommended best practices were developed after reviewing lessons learned from Hurricanes Katrina and Rita.

The review identified three primary causes of tank damage or failure during these hurricane events: exposure to storm surge, exposure to flooding, and impact from debris.  The review also noted that bulk storage tanks that were not adversely impacted by exposure to the three primary causes during these hurricane events contained a liquid level in the tank that was greater than the height of storm surge of floodwater levels outside of the tank and/or the tank was securely anchored to its foundation. The industry best practice for protecting bulk storage tanks during major storm events is to provide a ballast for the tank by ensuring product or water levels are above the expected level of water outside the tank to provide stability for the structure and decrease uplifting potential due to flooding or storm surge.

Others addressing the petroleum bulk storage industry sector likewise adopt similar practices to those in the EPA Region 6 RRT best practice document.  For example, the New York State Energy Research and Development Authority (NYSERDA), in its report titled New York State Petroleum Terminal Resiliency Assessment Final Report (March 2014) as prepared by ICF International,[26] completed an assessment of bulk petroleum storage terminals, with a focus of how bulk petroleum storage terminals have implemented resiliency measures to prepare for future storm events. The NYSERDA assessment was based on a survey of 55 terminals across New York State and site visits to 19 of those terminals.

---

[25] https://www.deq.louisiana.gov/assets/docs/FloodPrepFactSheetDRAFT.pdf

[26]https://www.google.com/url?sa=i&url=https%3A%2F%2Fwww.nyserda.ny.gov%2F-%2Fmedia%2FProject%2FNyserda%2FFiles%2FEDPPP%2FEnergy-Prices%2FEnergy-Statistics%2FNYS-terminal-resiliency-assessment-final-report.pdf&psig=AOvVaw3COET0XMSHUel8Ieq6h-LP&ust=1750364325430000&source=images&cd=vfe&opi=89978449&ved=0CAYQrpoMahcKEwiQ2LGw5fuNAxUAAAAAHQAAAAAQBA

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

In its review, NSERDA noted that petroleum storage terminals undertake extensive pre-storm activities designed to protect vulnerable parts of their facilities. Specifically, the NYSERDA survey noted "filling or pumping water or product between tanks to ensure adequate weight in each tank to prevent floating, closing isolation values at tanks to prevent unintended product releases, checking roof drain valves for stormwater, adjusting value configurations for storm water drains, pre-positioning backup generators," and other measures.  The NYSERDA also noted that "nearly all" terminals reported having emergency plans.  According to NYSERDA, "most terminals reported that their emergency plans were sufficient to cover the types of issues experienced during Superstorm Sandy." As for other issues, "flooding was cited as affecting operations only by 22% of the terminals." At a broader perspective, the NYSERDA survey noted "there is no specific level of hardening that applies to all terminals."

As noted above, the survey identified ballasting of products in tanks at petroleum bulk storage terminals as a major best practice throughout industry.  In its report, NYSERDA noted that, based on its extensive survey, 49% of the terminals in New York State filled their tanks with water or product prior to major storms (p. 33). As for other practices, 27% pumped product between tanks to prevent any spills during adverse weather events (p. 33).

According to the NYSERDA, "ensuring that tanks have adequate volume helps protect the structural integrity of the tanks and can help to stabilize them." The report noted: "an empty tank that encounters external pressure from floodwater could be shifted or could be lifted from its base and float away with the floodwater. This could lead to significant damage to the tank and/or nearby assets, and could result in a release of products. No NYS terminals reported experiencing any tank movement during Superstorm Sandy and Hurricane Irene." (p. 34-35). Of the 28 terminals surveyed which are located near water, only two terminals reported installing enhanced berms, levees, or floodwalls along their waterfronts to protect onshore equipment following recent events.

As the above information shows, the industry best practices of bulk petroleum storage terminals in the Northeast do not reflect the subject standard developed by Goldsmith, Nairn and other CLF experts.  In my opinion, the Terminal meets best industry practice because it considers risks related to extreme weather, specifically by implementing appropriate measures to address short-, near- and longer term risks on the Terminal operations and stormwater management.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**2. DEFENDANTS IMPLEMENT INDUSTRY BEST PRACTICES AT THE NEW HAVEN TERMINAL WHICH GO ABOVE AND BEYOND THE REGULATORY REQUIREMENTS FOR BULK PETROLEUM STORAGE TERMINALS RELATED TO ENVIRONMENTAL MANAGEMENT SYSTEMS, OIL DISCHARGE PREPAREDNESS AND RESPONSES, WASTE MANAGEMENT, STORMWATER MANAGEMENT, AND HURRICANE AND EXTREME WEATHER PREPAREDNESS.**

Based on my experience over the last 30 years in the oil and gas industry, and my direct experience in the petroleum bulk storage industry, Defendants implementation of industry best practices at the Terminal go above and beyond the regulatory requirements described above.

Based on my experience and expertise and contrary to the opinions expressed in the Expert Report of Wendi Goldsmith, industry best practices related to operations, maintenance, environmental and risk management are implemented at the Terminal. As part of a much larger integrated oil company, the terminal benefits from access to industry-leading expertise and programs/processes within the company's organization which provide a more robust framework and resources than what is typical of many other independent terminal operating companies within the bulk petroleum storage terminal industry.

I visited the Terminal on April 10, 2025 and was provided access to the Terminal and provided information on the day-to-day environmental compliance practices and procedures led by Michael Sullivan, Facilities Manager. Prior to commencing the walking tour of the Terminal, Mr. Sullivan provided a site orientation and overview of the Terminal and operations referencing an aerial photograph in the Terminal's conference room.

My key observations and findings from the site orientation overview presentation, walking tour, and discussions with Mr. Sullivan include the following:

- good general housekeeping conditions are present at the Terminal;

- industry standard tanker truck loading operations were ongoing during the site visit;

- an adequately-sized canopy is present at the truck loading rack to limit stormwater contact;

- a strip drain system at the truck loading rack is tied into an oil water separator for managing any stormwater and to provide secondary containment in the event of an oil discharge from a tanker truck;

- earthen secondary containment for the bulk storage tanks is present with discharge valves maintained in the normally-closed position except during pumping activities;

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- an operating stormwater collection system and pumping system is present that sends stormwater to a two-stage holding pond prior to discharge to the municipal stormwater system through the permitted facility outfall;

- a well-maintained waste storage area is located within the warehouse building preventing exposure to stormwater; and

- the Terminal interacts with the local fire and emergency officials to ensure their understanding of the terminal operations and to maximize effectiveness of a coordinated response effort in the event of an oil discharge.

Contrary to the claim made in the Expert Report of Wendi Goldsmith (Goldsmith Report) regarding the Terminal's infrastructure,[27] I observed infrastructure which is kept up to date and in a generally well-maintained condition, consistent with the hundreds of terminals I have visited over my career. The facility implements an asset integrity management program following prescribed standards for inspection and maintenance of facility infrastructure (e.g., API 653 program for bulk storage tanks) and maintains an annual maintenance program budget to address repairs needed from the integrity management inspection program. I understand other experts in this case will describe the tank design, maintenance and inspections for the Terminal.

I have further described the Defendants' implementation of industry best practices at the Terminal in the following sections which include (ii) environmental management systems, (iii) oil discharge preparedness and response, (iv) waste management, (v) stormwater management, and (vi) hurricane preparedness.

Based on my observations and discussions with Mr. Sullivan during the visit to the Terminal on April 10, 2025, it is my opinion that the Terminal is implementing general industry environmental management best practices in the operation of a bulk petroleum storage terminal. From my experience, the Terminal goes beyond what most terminals are implementing. The Terminal recognizes the importance of weather-related risks, and the environmental management systems implemented at the Terminal are designed and implemented to address any significant risks which may develop.

## 2.1 Environmental Management System and Operational Standards

As referenced above, I believe the Terminal benefits from being part of the Shell organization in terms of access to the risk management processes and subject matter expertise of the broader integrated oil company organization. For example, the Shell Commitment and Policy on Health, Safety, Security, Environment and Social Performance (HSSE & SP), originally published in 1997 and most recently updated in 2023, establishes core principles focused on ensuring worker health and safety, minimizing environmental impact, and operating in a safe manner as responsible member of the local community.[28] The Shell Commitment and Policy on HSSE &

---

[27] Goldsmith Report, Page 40.
[28]    group-hsse-sp-commitment-and-policy.pdf    available    at    https://www.shell.com/sustainability/our-approach/commitments-policies-and-

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

SP is implemented through five standards that are referred to as the Safety, Environment and Asset Management (SEAM) Standards.[29] The SEAM Standards cover the following areas: 1) HSSE & SP and Asset Management Foundations; 2) Carbon, Environment, Social Performance, Product Stewardship and Quality; 3) Workplace Health, Safety, and Security; 4) Process Safety and Asset Management; and, 5) Transport Safety. SEAM Standards require Shell's businesses, projects. and operated assets to identify and manage impacts, risks and opportunities so their activities can be carried out in a safe and environmentally-responsible manner. The SEAM Standards align with industry standards where practicable and Shell's businesses are instructed to follow the more stringent of either the SEAM Standards or applicable regulations for a particular business/project/operating asset.

With respect to design and engineering standards for addressing adverse weather conditions, Shell has developed Design and Engineering Practices, known as DEPs, for new projects, mainly off-shore platforms and similar projects.[30] The DEPs provide practices and procedures for developing and constructing off-shore structures given the construction challenges, harsh weather conditions, and jurisdictional uncertainties. For existing operations, the facilities rely on local laws, regulations and ordinances to determine what weather related precautions the facility would be required follow on an emergency or day-to-day basis, besides complying with the SPCC plan, the FRP plan, the RMP and the Terminal Operations Manual.

For example, when the California Regional Water Quality Control Board, Los Angeles Region, issued Water Quality Order R4-2023-0293 in 2003, Section 3.5.1 required the facility to complete a Climate Change Effects Vulnerability Assessment and Management Plan (Climate Change Plant) and submit that to the Los Angeles Water Board.[31] That local requirement required the Morman Island Terminal to assess climate vulnerabilities at the facility, including rising sea level, storm surges and back-to-back severe storms, and, depending on the results of that assessment, implement certain "control measures" such as emergency procedures, alarm/notification systems, backup power and consider potential mitigation plans.

Recently the Los Angeles Water Board approved the Climate Change Effects Vulnerability Assessment and Mitigation Plan submitted by the Morman Island Terminal.[32] At the New Haven Terminal, the facility would comply with the same process of deferring to the applicable governmental authority and with the industrial stormwater requirements set by the CT DEEP and

---

standards/_jcr_content/root/main/section_621037715/text_663851422.multi.stream/1742569750258/53ba55277342 6d6a596fc723156d61a4d21cc2fc/group-hsse-sp-commitment-and-policy.pdf

[29] Commitments, policies and standards | Shell Global available at https://www.shell.com/sustainability/our-approach/commitments-policies-and-standards.html#:~:text=Commitment%20and%20Policy%20on%20HSSE%20%26%20SP&text=is%20a%20set%20of%20core,and%20contribute%20to%20sustainable%20development.

[30] Mar. 20, 2025 Deposition of Paul Verlaan, at 277:18-278:1 ("The difference between a project and an asset is that an asset is already a facility that has been built, and the project is what we call the whole process you go through to build that facility, for instance, if the outcome is a facility."); May 28, 2025 Deposition of Sergio Jaramillo, at 183:12-23 (testifying that DEPs are applied to "new projects and new facilities" and, in his experience, are not applied to "existing Shell facilities")

[31] California Regional Water Quality Control Board Los Angeles Region. Water Quality Order R4-2023-0293

[32] Climate Change Effects Vulnerability Assessment and Mitigation Plan (September 4, 2024) for Shell Oil Products US Mormon Island Terminal.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

the local county. Recently, the CT DEEP indicated it would issue a new General Permit for industrial stormwater that would include "climate resilience" provision identical to those in the EPA 2021 MSGP industrial stormwater permit.  In short, there are no DEPs that would govern existing facility operations because local laws and regulations would provide the standards to address extreme weather precautions. Shell's Hazards and Effects Management Process (HEMP) is used to systematically identify and manage HSSE hazards at Shell facilities. Shell defines HEMP as "a systematic method of identifying hazards, assessing risk, putting controls in place to guard against those risks and defining recovery measures should an incident happen."[33] HEMP utilizes a Risk Assessment Matrix (RAM) to rank hazards as high, medium, or low based on consequence (categories for "People", "Assets", "Community", and "Environment"), severity (six  levels considered by consequence type) and likelihood of occurrence ("Never heard of in the Industry", "Heard of in the Industry", "Has happened in the Organisation or more than once per year in the Industry", "Has happened at the Location or more than once per year in the Organisation", and "Has happened more than once per year in the Location").  Identified hazards undergo further analysis to document controls and identify any actions needed to mitigate identified risks.  The HEMP process is reviewed and revalidated on a scheduled basis to ensure a continual feedback and improvement loop consistent with the PDCA process discussed earlier in my report.

Based on my direct experiencing working for over 20 years with a variety of terminal operating companies to support their operational and environmental compliance, I can confidently state that the SEAM Standards and HEMP process extend beyond the basic regulatory requirements applicable to a terminal company, are more robust than many risk management frameworks implemented by independent terminal operating companies, and go above and beyond what I consider industry best practice. In other words, I disagree with Goldsmith's unsupported opinion on risk management implemented at the Terminal.

In addition to the SEAM Standards, Defendants maintain a repository of documents at the Terminal and on-line documents that describe policies and procedures for the operations of their facilities which satisfy or go above and beyond regulatory requirements. For example, these documents include:

- A Risk Management Plan for the Butane Blending Process.[34]
- Process Safety & Asset Management Standard.[35]
- Health, Safety, Security, Environment, Social Performance & Asset Management (SEAM) Standards Governance.[36]
- HSSE & SP and Asset Management Foundations Standard.[37]
- Emergency & Spill Response Plans and Exercises.[38]

---

[33] HSSE & Social Performance Commitment and Policy | Shell Global available at https://www.shell.com/business-customers/marine/commitment-and-policy-on-hsse-social-performance.html
[34] SOPUS_NHVN02173938: RMP 2024.pdf
[35] SOPUS_NHVN02450062: Process Safety & Assest Management Standard – SEAM.pdf
[36] SOPUS_NHVN02450159: HSSE SEAM.pdf
[37] SOPUS_NHVN02449764: HSSE & SP Asset Management SEAM.pdf
[38] SOPUS_NHVN02450514: Emergency & Spill Response SEAM.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- Accidental Release Prevention and Emergency Release Polices.[39]
- Water in the Environment Manual.[40]
- Hazards & Effects Management Process (HEMP).[41]
- Shell New Haven Terminal Information Book v9 – Oct 2023.[42]
- Dock Operations Manual Marine Transfers.[43]

The reason these are important is because these are all examples of industry best practices focused on environmental regulatory compliance and operational risk management that the Terminal has developed and implements in its day to day operations. The documents clearly confirm the Terminal has identified key environmental and operational risks, has developed procedures directly relevant to managing these risks in the day-to-day operations, and requires compliance with these procedures. In my experience, implementing procedures like these prevents accidents, spills and and other operational incidents. It is surprising that neither Goldsmith nor Nairn referenced any of the day-to-day practices implemented at the Terminal.

The Terminal also utilizes a Terminal Operations Manual (TOM) for tank operations.[44] Of critical relevance to the issues in this lawsuit, the TOM provides policies and procedures implemented at the Terminal for operating and maintaining the aboveground storage tanks. In addition, this document identifies several risks that may exist during general operation of the aboveground storage tanks and identifies safeguards to be taken to ensure safe operations. For example, this manual discusses establishing various fill levels (e.g., low level, normal fill level, high level, high-high level, and overfill level) and utilizing level sensors and alarms to support operating personnel and prevent overfills.[45] In my opinion, the information provided by this document to provide a set of guidelines to ensure safe operation of a terminal facility is another example of the Defendants' use of industry best practice.

On April 30, 2025, I interviewed Ms. Theresa Geijer via telephone to review the Defendants' approach to managing environmental regulatory compliance for the New Haven Terminal. Ms. Geijer is the Environmental Advisor for several of Defendants' terminal facilities, including the New Haven Terminal. Ms. Geijer confirmed that Defendants have a system to identify applicable environmental regulatory obligations and to establish and assign appropriate tasks/actions to meet these requirements. We also generally discussed various policies and procedures focused on maintaining environmental compliance. Ms. Geijer also reported that appraisals and audits of compliance are periodically conducted to assess the Terminal's performance and identify any corrective actions that may be necessary and/or appropriate, thus providing a continual feedback loop consistent with the PDCA process discussed previously in this report. This discussion with Ms. Geijer confirmed similar information provided by Mr. Sullivan during the site visit.

---

[39] SOPUS_NHVN02174024: Accidental Release prevention.pdf
[40] SOPUS_PVD00071805: 2016 Shell HSSE SP Water in the Environment Manual (SOPUS_PVD00071805)l.pdf
[41] 02. New Haven HEMP_v1_2018.xlsx
[42] SOPUS_NHVN01843720: SOPUS_NHVN01843720.pdf
[43] SOPUS_NHVN01345893: SOPUS_NHVN01345893.pdf
[44] SOPUS_NHVN00188123: Terminal Operations Manual.pdf
[45] SOPUS_NHVN00188130: Terminal Operations Manual.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Based on this information, it is my opinion that the Terminal has implemented the major elements of an Environmental Management System, consistent with industry best practice and to adequately manage risk.

## 2.2   Oil Discharge Preparedness and Response

Contrary to claims developed by Goldsmith and other CLF experts, the Terminal monitors weather and other meteorological conditions in real-time, assesses the potential credible risks associate with those weather conditions, and has implemented oil discharge preparedness and response planning in accordance with industry best practices.  Reading the Goldsmith and Nairn reports would suggest the Terminal is completely unprepared for a storm of any size, and that is just not accurate factually and provides a misleading view of the Terminal's preparedness to handle major storms, hurricanes, sea level rise or other physical conditions.

In fact, the Terminal implements a robust preparedness and response program consistent with relevant regulatory requirements and internal company standards.  Major components of the Terminal's oil discharge preparedness and response program are described further in Sections 2.2.1 and 2.2.2.

### 2.2.1   Spill Prevention Control and Countermeasures Plan

Based on my review, the Terminal's SPCC plan meets the requirements of the federal regulations (40 CFR Part 112) and has been certified by a licensed professional engineer. Furthermore, the Terminal implements the SPCC plan as evidenced by the documentation of: (i) annual training, (ii) monthly inspections, (iii) a five-year review of the SPCC plan, and (iv) maintaining tank integrity testing requirements.

These findings are discussed in further detail below.

- Annual training documentation from 2016 through 2018 was noted in the June 11, 2019, response to CT DEEP regarding the SWPPP documentation.[46] Based on common industry practices, the SWPPP and SPCC annual training are conducted concurrently.

- The Terminal maintained a record of monthly inspection forms for the SPCC from 2014 through 2023 (10-year period).[47]

- The Terminal conducted a five-year review of the SPCC plan dated April 21, 2022.[48]

- The Terminal maintained tank integrity testing requirements.[49]

Even the USEPA believes the Terminal's SPCC complies with the Clean Water Act.  For example, the USEPA conducted a review of the October 2022 revision of the SPCC Plan for the Terminal on December 18, 2022, and conducted a site inspection on December 21, 2022.[50]  To

---

[46] 2019-06-11_New Haven_ SWPPP Documentation Ltr.pdf
[47] SOPUS_NHVN00313611 – SOPUS_NHVN00316510: New Haven Terminal Monthly Inspection Reports
[48] SOPUS_NHVN02367940: SPCC 2024 New Haven Produced.pdf
[49] See, e.g., 20250401 NHVN DJA Inspection.xlsx
[50] SOPUS_NHVN00527913: SHE00154327.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

do this, the USEPA utilizes a SPCC Field Inspection and Plan Review checklist which "is designed to assist EPA inspectors in conducting a thorough and nationally consistent inspection of a facility's compliance" with the SPCC Rule.[51] The inspector who completes the checklist conducts an evaluation of whether each requirement of the SPCC Rule has been addressed adequately or inadequately in the SPCC Plan and in the field.

Based on my review of this checklist, the USEPA SPCC Plan Reviewer and Inspector did not note any violations, non-compliance, failures of best management practices or other issues at the New Haven Terminal with the SPCC plan or the Terminal in the December 2022 review and inspection.  Contrary to the opinions of Goldsmith and Horner regarding the Terminal's secondary containment, the EPA Inspector indicated "Yes" that the Terminal has constructed "all bulk storage tank installation with secondary containment to hold the capacity of largest container and sufficient freeboard for precipitation" and "Yes" that "diked areas sufficiently impervious to contain discharged oil."[52]  Again, I found no support for the opinions of Goldsmith and Horner when it comes to the Terminal's preparedness and implementation of best management practices to address extreme weather conditions.  Based on this analysis, the Terminal appears appropriately engineered to prevent the discharge of stormwater and reduce the discharge of stormwater.

I have provided a further evaluation of the engineering of the Terminal as it relates to the requirements for implementing an SPCC plan in accordance with industry best practices in Opinion 5 of this report.

### 2.2.2   Facility Response Plan

As noted above, the Terminal has developed and implemented an FRP (most recently updated in June 2024[53] with previous revisions in December 2023) to prepare Terminal personnel to quickly and safely respond to an oil discharge incident at the Terminal. Again, Goldsmith and Nairn suggests the Terminal is not prepared to identify, manage and respond to any spills or releases at the Terminal during an extreme weather event or events.  The facts of the Terminal's compliance plans, procedures, training and mock exercises show the mistakes in Goldsmith's opinions about the Terminal.

The FRP includes:

- identification of two Qualified Individuals (QI) and one alternative QI who have been granted full authority to implement the FRP and respond to incidents by;

    o   obtaining support from Oil Spill Response Organizations (OSRO);

    o   interacting with Federal responders; and

    o   initiating response activities;

---

[51] SOPUS_NHVN00527912: SHE00154327.pdf
[52] SOPUS_NHVN00527922: SHE00154327.pdf
[53] SOPUS_NHVN02451144: FRP-ERP – June 2024.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- a listing of internal and external notification contacts;

- small, medium, and worst case discharge (WCD) scenarios for the facility and specific response measures;

- OSRO contracts to provide resources which are capable of responding to and recovering a WCD from the facility; and

- procedures for spill response drills and exercises and personnel training.

Again, as professional engineer that specializes in environmental compliance at petroleum bulk storage facilities, the Terminal's FRP meets or exceeds the requirements of the federal regulations (40 CFR Parts 112.20 and 112.21). Based on my observations and interviews with Mr. Sullivan and review of the FRP, the Terminal is well prepared to handle oil discharges based on:

- routinely conducting drills or exercises on spill response;

- having contracts set up with OSRO to provide appropriate response resources;

- coordinating and maintaining strong relationships with local first responders; and

- having considered small, medium, and worst-case discharge scenarios including taking into account adverse weather.

If the Terminal experienced a release of petroleum during an extreme weather event, from a hurricane or sea level rise, the New Haven Terminal would be well prepared.

As an added precaution, the Terminal conducts the regulatory-required tabletop and worst-case discharge drills/exercises. Under Mr. Sullivan's leadership, the Terminal goes above and beyond to engage with local responders and regulatory agencies for participation in the Terminal oil discharge drill and exercise programs.   In addition, Mr. Sullivan indicated the Terminal has been subject to and successfully completed Government-Initiated Unannounced Exercises, which are agency-initiated unannounced spill drills designed to test a facility's ability to implement the elements of its FRP.

As was required when the FRPs were implemented at the Terminal, USEPA has reviewed the FRP dated August 2013 and provided approval on September 26, 2013.[54]  In other words, the Terminal meets or exceeds the FRP requirements regarding potential oil spills from adverse weather events, and the USEPA has reviewed, inspected and approved the FRP for the New Haven Terminal.

Based on my review of the planning and implementation of the SPCC plan and FRP at the Terminal, it is my opinion that the Terminal is well prepared to respond to an oil discharge incident and is operating in accordance with industry best practices with respect to its oil discharge preparedness program. For Goldsmith and Nairn to suggest the Terminal is unprepared for a "potential catastrophic release" at the Terminal, the USEPA disagrees, and the facts show the

---

[54] SOPUS_NHVN00317780: SOPUS_NHVN00317780.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

misleading nature of that statement.  The actual facts show otherwise—this is a well-run Terminal that implements best management practices that is prepared to properly handle petroleum spills or releases if they were to occur.

## 2.3    Risk Management Program

The Terminal has developed and implemented a "risk management plan" for the facility's butane storage and blending infrastructure, consistent with industry best practice as discussed in Section 1.5 of this report.  The Risk Management Plan implemented at the Terminal is focused on **minimizing the risk of chemical accidents and enhancing community safety**.  The Terminal's Risk Management Plan submittal clearly documents that extreme weather events (e.g., hurricane, tornado, flooding) were identified and considered during the hazard assessment process and development of the worst-case and alternate release endpoint scenarios documented in the Plan. The offsite consequence analysis completed for both worst case (catastrophic system failure; deemed as "highly unlikely") and alternate release (10-minute butane release from a shear of the 3-inch truck offloading line) endpoint scenarios indicates a 0.5-mile endpoint radius for the worst-case release scenario and a 0.2-mile endpoint radius for the alternate release scenario.  The plan also discusses the Terminal's release prevention program related to the butane operation, including operations and maintenance of the equipment, and lists various process controls in use to mitigate the risk of an incident, including relief valves, check valves, manual and automatic shutoffs, operating procedures, alarms, and interlocks. The plan also discusses emergency response, noting the butane process complies with National Fire Protection Association (NFPA) Liquefied Petroleum Gas (LPG) Code (NFPA-58), and referencing the emergency response program (described in Section 2.2.2 of this report).

As discussed previously, the RMP Rule was updated in May 2024 when USEPA issued the final SSCAP Rule. During the SSCAP rulemaking process, the U.S. Government Accountability Office (GAO) completed a review of climate change risk (flooding, storm surge, sea level rise) for more than 10,400 facilities subject to the RMP requirements and published their findings in GAO-22-104494, dated February 2022.[55]  The report identifies that approximately 31 percent of the facilities reviewed are located in areas that may be impacted by flooding, storm surge, wildfire or sea level rise.

Of particular relevance to this lawsuit, the GAO review included the Terminal in its analysis. Findings presented for the Terminal are as follows:

- Flooding: the Terminal is located in an area with a 1% or higher annual chance of flooding.

- Storm surge: the Terminal is located in an area potentially impacted by storm surge from a Category 1 or higher hurricane.

- Sea Level Rise: the Terminal is not located in an area potentially inundated under 0-foot, 1-foot and 3-foot sea level rise scenarios.

---

[55] https://www.gao.gov/products/gao-22-104494

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- Wildfire: the Terminal is not located in an area of high or very high wildfire hazard potential.

The Terminal initially prepared and submitted a Risk Management Plan for the butane blending process in 2019 and completed its five-year revalidation including an updated off-site consequence analysis, which was documented in an updated Risk Management Plan submitted to USEPA in May 2024.[56] The Plan indicates that there has been no chemical accident history for the butane blending process.  The Plan considers the elements of flood risk and major storm events as part of the overall hazard assessment (Appendix D Flood Plain Data and Appendix G NOAA Major Storm and Hurricane/Tornado Data) and disputes the erroneous statements and inferences in the Goldsmith and Nairn reports that the Terminal is unprepared to address extreme weather events.  The Terminal has implemented a "Risk Management Plan" to minimize a wide range of potential accidents and events.  As noted above, the USEPA specifically considered the New Haven Terminal and specifically concluded the Terminal was not at risk from sea level rise scenarios.  So when Goldsmith claims the Terminal is at "catastrophic" risk from sea level rise, the USEPA disagrees, as noted above.

With respect to Goldsmith's suggestion the Terminal is ignoring the "surrounding community" near the Terminal, that is again factually inaccurate and misleading.  As noted above, the RMP is specifically designed to provide information to the "community' on the Terminal's operations and with respect to any accidents, explosions or other incidents.  The Goldsmith and Nairn descriptions of the Terminal's lack of preparedness to handle potential spills, incidents or extreme weather are factually inaccurate.

## 2.4   Waste Management

The Terminal also has implemented an extensive environmental management system to identify, collect, manage and dispose of "hazardous waste," to the extent it generates hazardous waste at the Terminal.

From my perspective as a professional engineering who specializes in environmental compliance, waste management at the Terminal is in accordance with industry best practices.  The Terminal is currently listed as a Small Quantity Generator with a list of waste codes and descriptions including: D001 (ignitable waste), D008 (lead), and D018 (benzene).[57] Based on my observations as indicated in Opinion 2.2, the Terminal maintains a well-kept waste storage area within the warehouse to minimize exposure to stormwater.

I have also reviewed the most recent biennial facility summary report through EPA's Biennial Report database from 2017 which shows two tons of waste classified as with the D018 (benzene) which was generated and shipped to Michigan Disposal, Inc. in Belleville, Michigan.[58] Furthermore, the Terminal has a procedure for implementing hazardous waste determinations[59],

---

[56] SOPUS_NHVN02173939: RMP 2024.pdf
[57] https://enviro.epa.gov/envirofacts/rcrainfo/facility?handlerId=CTD064827942
[58] https://enviro.epa.gov/envirofacts/br/report?handlerId=CTD064827942&reportingYear=2017
[59] SOPUS_PVD00452866: SOPUS_PVD00242852.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

tracks the generation of hazardous waste[60], updates generator status[61], prepares manifests (or bills of lading) for transportation[62], and maintains recordkeeping requirements as indicated in the Residuals Management Plan.[63]

The Residuals Management Plan goes into great detail regarding waste management at the Defendant's facilities often going above and beyond the regulatory requirements. For example, the Defendants have preemptively defined a Waste Minimization Program,[64] which identifies requirements for both Small Quantity Generators and Large Quantity Generators[65]. In addition, the Residual Management Plan identifies multiple types of residuals such as hazardous waste, non-hazardous waste, universal waste, used oil and others which require special attention by Terminal personnel.[66] Specifically, the Residual Management Plan notes that once a residual is classified as non-hazardous the federal 90-day requirement for removal stops, however, it is the Defendants policy to continue the "90-day clock" for removal of the residual.[67]

Furthermore, the Residuals Management Plan also includes:

- defined roles and responsibilities for managing residuals (i.e., wastes);
- lists criteria for identifying the characteristics of hazardous wastes;
- describes the requirements for onsite storage of residual materials;
- indicates sampling and analytical requirements;
- provides for procedures for tracking and handling wastes; and
- documents recordkeeping and training requirements.

Defendants rely on a third-party consultant (e.g., GHD) to support their waste management program.[68] The third-party consultant implements hazardous waste determinations (i.e., residual characterization and profiling), coordinates disposal of residuals, and provides recordkeeping and reporting assistance to the Defendants.

The third-party consultant may determine that some residuals are "recoverable materials". The Residual Management Plan indicates

> *Hydrocarbons and fractions thereof, such as gasoline and water mixture, may qualify as recoverable materials if processed via reclamation or recycling in most states based on the federal regulations. To qualify as a recoverable material certain conditions must be met. State regulations that apply to exemptions associated with recoverable materials can vary from state to state. GHD is knowledgeable of federal and state regulations which affect the status of a recoverable material;*

---

[60] SOPUS_NHVN00242808, SOPUS_NHVN02184620, SOPUS_NHVN02184715
[61] SOPUS_PVD00283392: SOPUS_PVD00283340.pdf
[62] See SOPUS_NHVN00322288 and SOPUS_NHVN00385979 as examples
[63] SOPUS_PVD00446601: SOPUS_PVD00446572.pdf
[64] SOPUS_PVD00446604: SOPUS_PVD00446572.pdf
[65] 40 CFR Part 262.27
[66] SOPUS_PVD00446576: SOPUS_PVD00446572.pdf
[67] SOPUS_PVD00446591: SOPUS_PVD00446572.pdf
[68] SOPUS_PVD00446585: SOPUS_PVD00446572.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

> *therefore, please confer with GHD prior to labelling any residual as a recoverable material. Recoverable materials are not waste materials and are not subject to the 90-day storage requirement.[69]*

I rely on the expertise of the Defendants' selected third-party consultant to identify the applicable regulations to make this determination; however, I do note previously in Opinion 1.3 that broadly, this approach related to recoverable materials is a terminal industry best practice.,

Finally, I reviewed the Remedial Action Plan dated December 18, 2023 prepared by Sovereign Consulting, Inc.[70] with the context of the Terminal to potentially generate wastes from remedial activities. This Remedial Action Plan recommended soil remediation by excavation and offsite disposal for one Area of Concern at the Terminal.  For the remaining portion of the Terminal, this Remedial Action Plan indicates

> *Due to the presence of the large ASTs, piping, equipment, and other appurtenances, soil remediation activities in these areas are considered impracticable and hazardous. Upon closure of the terminal and decommissioning of the site structures, activities to address residual soil above I/C DEC will be implemented, including the placement of an EUR to restrict residential activity and to render the soil inaccessible, along with soil excavation and/or clean fill placement in order to meet RSR requirements.[71]*

I understand this to indicate that potentially impacted soil at the Terminal will stay in place until the Terminal is closed because of safety and practicality concerns associated with performing excavations at an active bulk petroleum storage terminal.

Goldsmith in particular suggests the Terminal is not managing its solid and hazardous wastes in accordance with best management practices.[72] In my opinion, the Terminal is operating in accordance with industry best practices regarding waste management based on the findings discussed above.

## 2.5   Terminal's Management of Stormwater and Compliance with Permit

The Terminal's management of stormwater and compliance with the Current General Permit is in general accordance with industry best practices. As indicated in Opinion 1.4, the industry best practice for management of stormwater is development and implementation of a SWPPP which complies with applicable NPDES (or equivalent) permit. I understand that a full evaluation of the Terminal's compliance with its stormwater permit and SWPPP for compliance with the Current General Permit was conducted by other experts. My review of the SWPPP and resulting opinion presented herein is focused on the implementation of the Terminal's SWPPP in regard to industry best practices. The Terminal implements stormwater management in accordance with

---

[69] SOPUS_PVD00446592: SOPUS_PVD00446572.pdf
[70] Remedial Action Plan (2023) by Sovereign Consulting, Inc.
[71] Remedial Action Plan (2023) Page 27.
[72] Goldsmith Report, Page 12.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

industry best practices as evidenced by: (i) preparation of a SWPPP, (ii) documentation within the SWPPP, (ii) conducting annual training, and (iii) conducting required inspections.

The most recent approved revision of the Terminal's SWPPP (dated July 2017) prepared by Triton Environmental, Inc.[73] indicates the Terminal is implementing the following permit required BMPs.

- Good Housekeeping
- Vehicle or Equipment Washing
- Floor Drains
- Roof Areas
- Minimizing Exposure
- Sediment and Erosion Control
- Management of Runoff
- Preventative Maintenance
- Spill Prevention and Response
- Employee Training
- Non-Stormwater Discharges
- Solid De-Icing Materials Storage
- Consistency with Other Plans and Permits
- Future Construction

I reviewed annual training documentation from 2016 through 2018, a SWPPP refresher training from October 2020,[74] Quarterly Visual Monitoring Reports from 2016 through March 2019, and Semi-annual Comprehensive Site Compliance Evaluation Reports from 2016 through April 2019.[75] In addition, the Terminal has maintained a record of monthly inspection forms from 2014 through 2023 (10-year period).[76] My review of these records confirms that the Terminal was appropriately implementing the elements of its SWPPP during this time period.

Contrary to the opinions made by Goldsmith[77], it is my opinion that:

1. The Terminal's SWPPP lists potential sources of pollutants. The list of potential sources of pollutants does not increase with additional precipitation or flooding.
2. The Terminal's SWPPP lists the BMPs which are specified in the Current General Permit. I rely on other Defendants' Experts to define the appropriateness, priorities, and how these controls are protective of human health and the environment.
3. The Current General Permit indicates that "where feasible" the Terminal shall divert uncontaminated stormwater run-on away from potential pollutant sources.
4. The Terminal's SPCC Plan provides procedures and inspections for minimizing the potential for leaks and spills.

---

[73] SHELLNH_TRI_0408: - Current 2017 July Shell New Haven Terminal SWPPP with Appendices.pdf
[74] SOPUS_NHVN02169370: SWPPP Training.pdf
[75] 2019-06-11_New Haven_ SWPPP Documentation Ltr.pdf
[76] SOPUS_NHVN00313611 to SOPUS_NHVN00316510
[77] See Page 26 Lines 6 to 10 of Goldsmith Report regarding weather-related risks and requirements for the SWPPP

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Despite claims made by Goldsmith and other CLF experts, the Terminal has implemented certain resiliency measures to minimize the potential impacts from stormwater discharges from major storm events. The State of Connecticut has drafted a revised stormwater general permit that, for the first time, incorporates a requirement for permitted facilities consider resiliency measures to prepare for and mitigate impacts from extreme weather events. Resiliency measures listed in the draft CT DEEP General Permit for the Discharge of Stormwater Associated with Industrial Activity dated November 2024 (Draft 2024 General Permit)[78] include:

- Reinforce materials storage structures to withstand flooding and additional exertion of force.
- Prevent floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with non-corrosive device.
- When a delivery of exposed materials is expected, and a storm is anticipated within 72 hours (3 days), delay delivery until after the storm or store materials as appropriate (refer to emergency procedures).
- Temporarily store materials and waste above the BFE level.
- Temporarily reduce or eliminate outdoor storage.
- Temporarily relocate any mobile vehicles and equipment to higher ground.
- Develop scenario-based emergency procedures for major storms that are complementary to regular stormwater pollution prevention planning and identify emergency contacts for staff and contractors.
- Conduct staff training for implementing the permittee's emergency procedures at regular intervals.

The Draft 2024 General Permit indicates that resilience measures must be *considered* when selecting and designing stormwater control measures but does not require nor prescribe specific stormwater control measures to be implemented. As of the date of this report, CT DEEP has not issued the final version of the Draft 2024 General Permit, nor has it indicated when it will be effective.

These resilience measures are based Section 2.1.1.8 in the 2021 USEPA MSGP.[79] I note that the draft 2026 USEPA MSGP also references these resilience measures without major revisions from the 2021 USEPA MSGP.[80]

Based on my observations and interviews with Terminal personnel during a site visit in April 2025, review of facility design documents, and reports of other Experts, the Terminal has implemented the following resilience measures:

- When preparing for a severe weather event, reinforcing tanks using ballast water or product at sufficient elevations to withstand flooding;

---

[78]  https://portal.ct.gov/-/media/deep/water_regulating_and_discharges/stormwater/industrial/2024-industrial-sw-gp-reissuance---public-notice-docs/december-2024-public-notice/2024-11-25_draft-2024-stormwater-igp-permit_ahd.pdf?rev=af1c80877444485a9c7de092bdbb25e6&hash=165C40AF003DF4AFF17705F60EC1436B
[79] https://www.epa.gov/sites/default/files/2021-01/documents/2021_msgp_-_permit_parts_1-7.pdf
[80] https://www.epa.gov/system/files/documents/2024-12/proposed-2026-msgp-permit-parts-1-7.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- generally stores materials or wastes indoors to minimize exposure;
- requires good housekeeping to be implemented which eliminates outdoor storage of miscellaneous materials to both minimize exposure and the risk of damage from storm debris;
- developed scenario-based emergency procedures for major storms and has identified emergency contacts for staff and contractors; and
- conducts staff training for implementing emergency procedures at regular intervals.

In other words, the Terminal is already implementing new practices proposed by CT DEEP in the upcoming permit that includes specific "climate resilience" provision.  By definition, this is a "best industry practice"—to comply with newly proposed climate provisions before the agency finalizes those provisions.

Finally, based on my direct experience managing the HSSE programs for bulk petroleum storage terminals, the Terminal has implemented control measures which are technologically available and economically practicable and achievable given best industry practices.

## 2.6  Hurricane and Extreme Weather Preparedness

The Terminal's preparation for major storm events such as hurricanes is in accordance with industry best practices. In fact, the Terminal has had a Hurricane Action Plan since at least 2012, now almost 15 years ago.[81]  From my perspective, that is the best example of a facility implementing a best practice to prevent any adverse events, spills or incidents from an extreme weather event.

In the Terminal's Hurricane Action Plan dated June 2018[82], the Terminal has documented procedures to prepare and respond to hurricanes which may threaten operations at the Terminal. The Hurricane Action Plan includes:

- roles and responsibilities for assigned individuals to lead the response to a hurricane;

- storm tracking and monitoring procedures with specific actions based on timeframe from predicted arrival of storm conditions (e.g., 72-hours, 48-hours, 24-hours from arrival);

- coordination with the local USCG COTP;

- procedures for shutdown of the Terminal;

- communicating with employees and the public; and

- inspections and start-up procedures following the hurricane.

The Hurricane Action Plan indicates that the Terminal will maintain appropriate safe product inventory levels in the tanks during shutdown operations in preparation for a hurricane or severe

---

[81] SOPUS_NHVN00110254: August 2012 HAP.pdf
[82] SOPUS_NHVN00155559: Jun. 2018 Hurr. Action Plan - SOPUS_NHVN00155559.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

weather event. Elements of the 2018 Hurricane Action Plan were adopted into the Business Continuity and Storm Action Plan dated April 2024.[83]

The 2024 Business Continuity and Storm Action Plan identifies multiple phases for actions to be taken when responding to hurricanes or other severe weather. These phases include:

- Storm Identification and Staff Stand-by:[84] where appropriate personnel are identified and potential storms which may impact operations at the Terminal are tracked;

- Terminal Shutdown and Staff Evacuation plans:[85] which provides planning steps to be implemented as a storm approaches the Terminal such as managing tank inventory "based on business needs and acceptable risk level";

- Terminal Shutdown and Staff Evacuation Implementation:[86] which indicates the facility manager will issue a shutdown and/or evacuation order where safe product inventory levels in the tanks will be maintained and critical control equipment will be secured.

With respect to the issues in this lawsuit, the 2024 Business Continuity and Storm Action Plan further defined appropriate safe product inventory levels and provided a plan to address storage tanks that could be impacted by storm surge due to low product levels. Planned actions include:

- identifying storage tanks with a product level less than 10 feet or empty and out of service, and

- evaluating the need to either increase product height or empty the tank and/or add water to the tank.

The Facility Manager, Michael Sullivan, re-affirmed the actions taken as described in the Business Continuity and Storm Action plan when preparing for Superstorm Sandy.[87] Mr. Sullivan indicated that the Terminal prepared for this major storm event by evaluating tank levels to ensure "sufficient inventory to ballast tanks."

In addition, Mr. Sullivan indicated that the "severity of the storm does not matter" as the Terminal utilizes "a practice that we internally call prudently overreacting".[88] Finally, Mr. Sullivan indicated that the Terminal has "systems in place based on local conditions to make a decision to stop normal operation" and he provided an example for a high winds scenario to "stop moving product".[89] This clearly indicates the Terminal is operated in a manner which has considered the risks for extreme weather contrary to Goldsmith's claims.

Claims by CLF experts that the Terminal does not prepare for adverse weather conditions are simply incorrect. As described herein, the Terminal adheres to industry best practices related to

---

[83] SOPUS_NHVN00269166: Apr. 2024 BCP and SAP - SOPUS_NHVN00269158.pdf
[84] SOPUS_NHVN00269166: Apr. 2024 BCP and SAP - SOPUS_NHVN00269158.pdf
[85] SOPUS_NHVN00269167: Apr. 2024 BCP and SAP - SOPUS_NHVN00269158.pdf
[86] SOPUS_NHVN00269168: Apr. 2024 BCP and SAP - SOPUS_NHVN00269158.pdf
[87] Deposition of Michael Sullivan dated February 6, 2025, Page 22 Line 22 to Page 24 Line 5
[88] Deposition of Michael Sullivan dated February 6, 2025, Page 27 Line 6 to Line 8
[89] Deposition of Michael Sullivan dated February 6, 2025, Page 41 Line 17 to Page 42 Line 2

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

planning and preparing for potential impact from severe weather events to minimize risk of discharge and to ensure safe and timely return to operations to provide critical energy services to responders and the impacted community.

Considering the environmental management systems in place at the Terminal, including the plans, practices and best management practices, the Terminal has implemented an effective decision-making process and implement effective internal procedures that ensure effective management of stormwater at the Terminal.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

**3.  THE REGULATORY REQUIREMENTS ON AND BEFORE JULY 2021, WHEN THE CLF LAWSUIT WAS FILED, DID NOT REQUIRE THE DEFENDANTS TO CONSIDER IMPACTS FROM CLIMATE CHANGE WHEN OPERATING THE SHELL NEW HAVEN TERMINAL.**

The potential impacts from climate change such as increased storm frequency, increased storm intensity, and sea level rise were not required to be considered when evaluating BMPs to comply with the 2018 CT DEEP General Permit for the Discharge of Stormwater Associated with Industrial Activity (effective 1 October 2018; herein referred to as 2018 General Permit).[90] The 2018 General Permit listed control measures and SWPPP requirements in Section 5(b) and Section 5(c), respectively. Additional requirements for certain sectors are listed in Section 5(f); however, the bulk petroleum storage terminal industry (SIC code 5171, Sector P) is not listed in this section. The 2018 General Permit was the operative permit for the Terminal when the CLF complaint was filed and is still the Terminal's permit as of the date of this report.

Based on my review of the 2018 General Permit, there are no specific references to the impacts from climate change in the 2018 General Permit to be considered when selecting stormwater controls (i.e., BMPs) to be included in the SWPPP. I note that the 2018 General Permit indicates the permittee shall amend the SWPPP whenever there is a change at the site which affects the potential to cause pollution of the surface waters of the state. This statement does not imply modifying the SWPPP based on changes at the site due to the potential impacts from climate change. Instead, this statement refers more specifically to infrastructure or process changes at the site such as the addition or modification of above-ground storage tanks or potential pollutant sources, layout of secondary containment structures, etc.

The Goldsmith Report indicates that "Shell is required to employ Best Industry Practice (BIP) under its Permit…"[91] The justification for this opinion is an incorrect and incomplete interpretation of the defined term "minimize" which is provided in the Current General Permit. "Minimize," as defined in the Current General Permit, means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice. This definition indicates control measures must be: i) available to be implemented based on current technologies, ii) economically practicable to be implemented, and iii) achievable given consideration of best industry practice. This definition is not a clearly stated requirement to implement best industry practice nor is it a requirement to protect against risks due to climate change for maintaining compliance with the permit.

The Goldsmith Report example of considering the increased risks from major storm events and flood events in the Chelsea Terminal SWPPP in the State of Massachusetts is not applicable to the Terminal. The 2021 USEPA Multi-Sector General Permit, which is applicable to the State of Massachusetts, requires facilities to implement this as a regulatory requirement, but that

---

[90] 2018 CT Stormwater General Permit at Time of Lawsuit.pdf
[91] See Page 15 of Goldsmith Report

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

requirement does not extend to the State of Connecticut. Therefore, the Terminal is not obligated to protect against risks due to climate change. However, the Defendants have considered and implemented multiple resilience measures above and beyond the regulatory requirements of the Current General Permit, as described in Opinion 2.5 above.

The Goldsmith Report references the Coastal Management Act which is included in the Current General Permit related specifically to the authorization of the discharge of stormwater associated with industrial activity. The Current General Permit generally requires that discharge of stormwater "must be consistent with all applicable goals and policies" of the Coastal Management Act for authorization under the permit.

CT DEEP has authorized the Terminal under the Current General Permit demonstrating compliance with this provision. However, the Goldsmith Report claims that the Defendants are required to "consider in the planning process the potential impact of a rise in sea level, coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and minimize the necessity of public expenditure and shoreline armoring to protect future new development from such hazards."[92]

This quotation of the Coastal Management Act is not applicable to the Terminal. Specifically, the language of the Act discusses the "planning process" in order "to protect future new development". The Terminal is an existing facility that is currently in the operations phase as opposed to the "planning process" and has been since the 1950s. The "planning process" refers to new facilities that are being planned and have yet to enter into the engineering design phase which is followed by the construction phase and ultimately the operations phase. Each of those prior phases (i.e., planning, design, and construction) have already been completed for the Terminal. This is further clarified by the Coastal Management Act when it specifically mentions "future new development", which again is not applicable to the Terminal. The Coastal Management Act is specifically defined as "general goals and policies" and is only applicable in relation to the Current General Permit in order to obtain authorization.

---

[92] Section 22a-92(5) of the Connecticut General Statutes

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## 4.  THE ALLEGED "BEST INDUSTRY PRACTICES" PROPOSED BY GOLDSMITH AND NAIRN ARE NOT INDUSTRY PRACTICES, AND THEY WOULD NOT HAVE BEEN, AND SHOULD NOT HAVE BEEN, IMPLEMENTED AT THE NEW HAVEN TERMINAL.

I have reviewed the Goldsmith Report regarding industry best practices and operations at the Terminal. I believe that several industry best practices as defined in the Goldsmith Report, which Dr. Goldsmith claims are required to be implemented, are based on information which is not directly applicable to the bulk petroleum storage terminal industry or specific to the State of Connecticut. In my opinion, the Goldsmith Report applies unrealistic, inconclusive, and/or hypothetical data and assumptions when defining industry best practice for the Facility.  Even more troubling, Dr. Goldsmith's interpretation of the requirement to implement industry best practices is categorically incorrect based only on recommendations by national organizations and with no clear permit or regulatory requirements.

I have identified the industry best practices for the bulk petroleum storage terminal industry related to environmental management in this report. The purpose of implementing industry best practices is to enable a facility to maintain compliance with applicable permits and regulations while operating their facility in a safe and environmentally-responsible manner. For example, I define the preparation and implementation of a SWPPP as the industry best practice for maintaining compliance with a stormwater discharge permit. This is an example of an industry best practice that is required by a permit.

The Goldsmith Report references reports of several trade groups (e.g., American Society of Civil Engineers), government agencies (e.g., U.S. Army Corps of Engineers), papers, and documents prepared by Shell generally related to protecting critical infrastructure and risks from rising sea levels, flooding or storm surge, and major storm events such as hurricanes. The Goldsmith Report indicates that these documents form the basis of "best industry practice" that are a requirement for the Defendants to consider and implement into the design and operation of the Facility to "minimize the future risk of pollutant discharges triggered by these reasonably foreseeable risks". In general, I agree with Dr. Goldsmith that risks should be addressed, evaluated, and mitigated by engineered solutions. However, Dr. Goldsmith and I disagree on some of the referenced documents which are provided as industry best practices and the requirement to implement certain industry best practices.

In my opinion, it is not practical or required for an existing terminal facility to change its design solely based on the evolving research and guidance published by various third-party associations and organizations. The New Haven terminal was designed and constructed to the relevant standards in effect at that time. The Facility's integrity management program is implemented in accordance with established regulatory requirements and is amended accordingly as relevant modifications to existing regulations or new regulations are published, which ensures that assets are maintained in accordance with the most current standards. Still, the Terminal has implemented "best industry practice" through its Business Continuity Plan, SPCC, FRP, and other operational plans to adequately manage risks due to climate change. The Terminal has

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

proactively addressed risks from severe weather, precipitation, storm surge, and sea level rise, again through its Business Continuity Plan, SPCC, FRP, and other operational plans.

While Goldsmith claims the Terminal has been "on notice" of increased risk to "coastal facilities from severe weather, storm surges, precipitation, and sea level rise" the 2018 CT Stormwater General Permit and Current Permit do not provide any notice to the Terminal that it should assess such alleged risk. The Draft 2024 General Permit would be the first time the Terminal had notice from a regulatory agency. Regardless, the Terminal still assessed the risks associated with coastal facilities from severe weather, storm surges, precipitation, and sea level rise through the aforementioned plans.

Additionally, the Facility is operated in compliance with its operating permits, which typically have three-to-five year effective periods.  If changes to regulations associated with a Facility operating permit are published during the effective period of a current permit, an operating company does not immediately make a change without required modifications to its current permit from the regulatory agency.  Rather, the updated requirements would be incorporated into their next permit renewal with specific compliance timelines typically included when the new or amended regulation was published or written into the new permit issued by the regulatory agency.

The references in Opinion 1 of the Goldsmith Report are claimed as industry best practices for the previous 35 years. However, the findings, recommendations, and implications for not implementing the claimed industry best practices have not currently been translated into specific permit requirements or regulations applicable to the bulk petroleum storage terminal industry throughout all coastal regions and specifically in the State of Connecticut. I am aware that other States and the EPA have recently (i.e., within the previous five years) identified the need to consider the implementation of "resiliency measures" to minimize the effects of extreme storms and flood events.

For instance, the Chelsea Terminal in the State of Massachusetts has considered the increased risks from major storm and flood events as documented in its SWPPP.[93] Dr. Goldsmith references this SWPPP as an example of a facility which addresses climate change "to better mitigate future risks proportionate with foreseeable severe storms." The Chelsea Terminal SWPPP indicates that in response to the increased risks identified for this facility additional control measures are "recommended"[94] but I point out that this SWPPP does not indicate that these additional control measures are "required." In addition, the 2021 USEPA Multi-Sector General Permit, which is applicable to the State of Massachusetts, requires facilities to implement this as a regulatory requirement, but that requirement does not extend to the State of Connecticut. However, the Defendants have considered and implemented multiple resilience measures above and beyond the regulatory requirements of the Current General Permit, as described in Opinion 2.5 above.

---

[93] SOPUS_NHVN02367313: SOPUS_NHVN02367286 (Chelsea Terminal SWPPP).pdf
[94] SOPUS_NHVN02367314: SOPUS_NHVN02367286 (Chelsea Terminal SWPPP).pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

The Goldsmith Report indicates that "Best industry practice for critical infrastructure facilities like the Terminal requires addressing risk from the 500-year flood." In my opinion, this is an unreasonable assumption to imply that industry best practice requires a facility to address risk from the 500-year flood and I am not aware of any regulatory requirement to do so. For example, the CT DEEP Draft 2024 General Permit and draft EPA 2026 MSGP, refer to the Base Flood Elevation (i.e., 100-year flood) as the level to consider when implementing structural improvements to minimize impacts from stormwater discharges from major storm and flood events.

In addition, the Maine Department of Environmental Protection (MDEP) assessed various bulk petroleum storage terminals in Maine, specifically to evaluate how the terminals should assess adverse weather conditions under a new Maine Statute.  For example, in the December 2024 *Natural Hazard Risk Assessment for Marine Oil Terminals*,[95] MDEP noted "the best practices are designed to facilitate addressing the risk of a 100-year (1% annual chance) flood for present-day seal level and sea level 30 years in the future … for infrastructure resilience planning."

Goldsmith's justification for this "requirement" is based on "recommendations" from the American Society of Civil Engineers (ASCE), Federal Emergency Management Agency (FEMA), and The Association of State Floodplain Managers (ASFPM) as indicated in the Expert Report by Robert Nairn (Nairn Report).

The ASCE document indicates: "ASCE has no authority to enforce compliance with its standards and does not undertake to certify products for compliance or to render any professional services to any person or entity."  Even more relevant to this lawsuit, the ASCE document indicates: "This standard applies to the following: (1) New construction, including subsequent work to such structures, and (2) work classified as substantial improvement of existing structures that are not historic structures."[96] It is my understanding that new construction or work classified as substantial improvement as defined in this ASCE document is not planned or applicable for the Facility.

Similarly, the FEMA document indicates: "in general, essential building systems should be elevated to at least the 0.2-percent annual chance [i.e., 500-year] flood elevation and higher if it is practical to do so. The stated purpose of this document is to provide "recommendations" for reducing the effects of flooding on critical infrastructure.[97]  In other words, it is not directed at the oil and gas industry—rather, the FEMA document is directed to FEMA "partners," the local governments trying to set floodplain standards.  By its own terms, the ASFPM document indicates: "the guide is not a substitute for a set of community floodplain regulations, nor is it a model floodplain ordinance."

Again, none of these "practices" cited by Goldsmith and Nairn make any reference to petroleum bulk storage facilities, and none of these even reference the oil and gas industry.  Ironically, at least two say they should not be used as "standards."  That Goldsmith and Nairn suggest these

---

[95]https://www.maine.gov/dep/waste/abovegroundtanks/documents/NHRA%20Guidance%20for%20Marine%20Oil%20Terminals%20December%202024.pdf

[96] https://www.asce.org/publications-and-news/codes-and-standards/asce-sei-24-24

[97] https://www.fema.gov/sites/default/files/2020-08/midwest_floods_ras_2009.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

documents define and set "best industry practices" for petroleum bulk storage terminals in New Haven, Connecticut is not only not accurate, but misleading.

From a day-to-day environmental compliance perspective, the implementation of the "best industry practices" proposed by Goldsmith, Nairn and others contradicts established regulatory requirements and imposes new requirements on the Terminal that have never been disclosed to industrial stormwater permittees.  In my several decades of experience working in and with terminal companies, I have not seen these documents referenced or utilized as appropriate guidance for hurricane and adverse weather preparedness.  I am not aware of a permit or regulatory requirement which would drive the industry best practice to implement flood mitigation measures at the 500-year flood level. Without a clear permit or regulatory requirement and only based on the recommendations indicated in the Goldsmith Report, the installation of a flood protection device for a 500-year flood is not an economically practicable control measure for the Facility.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## 5.    THE SECONDARY CONTAINMENT SYSTEM AT THE SHELL NEW HAVEN TERMINAL IS ENGINEERED IN ACCORDANCE WITH INDUSTRY BEST PRACTICES.

Contrary to the opinions in the Goldsmith Report, the Nairn Report, and the Horner Report, it is my opinion that the Facility's secondary containment system is engineered in accordance with industry best practice. Goldsmith indicates "Engineering improvements include raising the berm heights (or similar flood protection) and addressing structural integrity deficiencies in existing secondary containment berms as discussed in the Nairn Report."[98]

Goldsmith, Nairn and Horner suggest the secondary containment system is (or should be) a flood protection measure.  As noted elsewhere in this report, an important point of clarification is that the purpose of the secondary containment berms associated with the bulk storage tank operations at a terminal is <u>not</u> flood protection, but rather for containment of product in the event of an oil discharge. With respect to the berms themselves, I did not visually identify structural integrity deficiencies in the secondary containment berms during my site inspection.

Although the purpose of the secondary containment berms is not for flood protection, the Facility generally meets the engineering standard for hazardous waste treatment, disposal, and storage facilities (TSDF) which requires that facilities located within a 100-year floodplain are to be designed constructed, operated, and maintained to prevent a washout by a 100-year flood.[99] The elevation of the secondary containment berms is approximately at or above the 100-year flood elevation of 12 feet.[100] I note that the Facility is not a TSDF and is not required to meet this standard, but I provide this as an example of a current more-protective regulation that the Facility is meeting.  Put differently, the Terminal meets the RCRA standard to site a hazardous waste facility in the United States, but Goldsmith and Nairn suggest that some other standard is required.

Additionally, Goldsmith indicates "The Terminal's secondary containment area is not able to contain a large spill contemplated by the permit."[101] The Goldsmith Report relies on the opinions formed by other experts to claim that the Facility is not engineered or operated pursuant to best industry practices. This opinion is based on the unrealistic and incorrect assumptions and inconclusive data made in the Horner Report regarding the adequacy of the secondary containment volume and whether the containment is sufficiently impervious.

The Current General Permit indicates that secondary containment must be impermeable, but the CT DEEP does not provide a definition or clarification on the extent of impermeability. The Horner Report indicates that the secondary containment is not impermeable but relies on soil texture classifications from soil borings advanced throughout the Facility, general hydraulic conductivity in the vicinity of the Facility, and deposition testimony. The Horner Report does not

---

[98] See Page 39 of the Goldsmith Report
[99] 40 CFR Part 264.18(b)
[100] SOPUS_NHVN02089181: 2021 – NHVN topography map.pdf
[101] See Page 40 of the Goldsmith Report

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

document actual hydraulic conductivity testing results of the soils within the containment structure to prove the containment is not impermeable.

Since the definition of "impermeable" is not included in the Current General Permit, the State of Connecticut does not have regulations that define permeability for the industrial stormwater permitting program, and there is no hydraulic conductivity testing results of soils within the secondary containment, the Facility relied on the certification of the SPCC plan which implies that the secondary containment is sufficiently impervious to contain a spill.

The Facility and professional engineer who certified the SPCC plan have the flexibility to determine how best to design the Facility to prevent a discharge to navigable waters. That allows for a certification that the containment is sufficiently impervious not based on permeability, hydraulic conductivity, or retention time performance criteria but instead on ensuring that secondary containment structure is able to contain the spill until it is cleaned up thereby preventing a discharge to navigable waters as indicated in the SPCC Guidance for Regional Inspectors.[102]

Regarding secondary containment volume capacity, the Horner Report does not address the more than adequate available volume of the secondary containment to contain the volume from the largest tank (i.e., Tank 23) plus sufficient freeboard to contain precipitation. Instead, the Horner Report focuses on the flow capacity of a pipe for transferring product from the South Tank Farm containment area to the Middle Tank Farm containment area.

From an engineering perspective, the simple calculation used in the Horner Report makes several unrealistic assumptions and does not fully account for appropriate variables which impact flow characteristics. For example, the calculation in the Horner Report assumes the entire volume of one of the storage tanks will be completely discharged within one hour. A basis for this assumption was not provided and in my opinion is an overly conservative assumption of the flow rate during a spill event. Worse still, Horner's calculation does not take into account Shell's stated practices and procedures for managing the volume of product to be stored in the tanks during major storm events.

Given my concern with the Horner speculative statements, I reviewed the quantitative evaluation presented in the Horner Report related to the consequences of a rupture emptying Tank T-1 (i.e., tank J-1) with a capacity of 4,087,554 gal. That tank is located in the South Tank Field which has a bypass pipe installed in August 2022 to hydraulically connect the South Tank Field with the Middle Tank Field (i.e., Containment Area 2) to provide sufficiently sized containment for the Facility.

Horner suggests this "solution has a serious flaw" because the bypass pipe is not "capable of transferring the flow during a spill incident rapidly enough to prevent overtopping the dike and releasing contaminated water" beyond the secondary containment area. I disagree with this claim based on unreasonable and unrealistic assumptions and not properly accounting for actual real-world conditions expected.

---

[102] https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Horner assumes the entire tank volume of 4,087,554 gal is released in a 60-minute period and assumes an average flow rate of 68,126 gallons per minute (gpm).  While it remains unclear what Horner actual did, Horner accounts for infiltration at an estimated 9,188 gpm (20.47 cfs) based on an infiltration rate of 6.0 inch/hour resulting in an approximate "buildup" rate of 58,938 gpm (131.3 cfs). Horner then suggests that the bypass pipe has a capacity of 2,962 gpm (6.6 cfs) based on several assumptions. Because the estimated "buildup" rate is greater than the bypass pipe capacity, Horner assumes that the release will overtop the dike and discharge beyond the secondary containment area.

Horner's assumptions in this evaluation are unreasonable and not representative of reality. Horner's assumptions do not take into consideration the following: i) the size of a hole in the tank that would be required to release all the contents in a 60-minute period is unrealistically large, ii) the discharge from the tank will have a variable flow rate due to the liquid level in the tank, and iii) additional head acting on the bypass pipe will improve the efficiency of its capacity. My analysis below addresses the implications of each of these items in a more realistic model while still making several conservative assumptions.

I developed a simple model using the EPA SWMM software to simulate a tank with a 120 ft diameter (area of 11,310 ft$^2$) and height of 48 ft (total volume of 542,867 ft$^3$ or 4,087,554 gal) at elevation 9.04 ft. The model simulates an orifice with a discharge coefficient of 0.65 located in the side wall at the bottom of the tank. This simulation was used to estimate the size of the orifice (or hole) needed to achieve a 60-minute drawdown time for the tank assuming free discharge (i.e., no submersion due to accumulated liquid in the secondary containment area) as suggested by the Horner Report.

To achieve a 60-minute drawdown, a hole in the side of the tank with a diameter of approximately 3.9 ft would be required to drain 99% of the tank contents. Planning for such a large diameter hole in a tank for secondary containment requirements is unreasonable and unrealistic. A hole of this diameter in the tank is extremely unlikely to occur and would not be reasonably expected. The model developed can be used to demonstrate that the size of the hole significantly influences the drawdown time and the discharge rate. I simulated several orifice sizes to develop a relationship between orifice diameter and drawdown time as shown in the figure below. A much smaller hole resulting in a much longer drawdown time, and therefore lower discharge rate, is more reasonable and realistic for planning purposes.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



To evaluate the performance of the bypass pipe and the likelihood of the dike being overtopped, I simulated the secondary containment volume based on the South Tank Containment Area calculations provided in the calculations prepared by RPMS Consulting Engineers.[103] These calculations only report a containment volume up to elevation 8.9 ft. For this reason, I made a conservative assumption of no additional increased storage volume due to area changes above this elevation while also taking into consideration the presence of the other two tanks at elevations 7.15 ft and 8.13 ft, respectively.

Additionally, I simulated the bypass pipe at invert elevation 8.9 ft with a Manning's roughness coefficient of 0.012 for steel pipe and a slope of 3.0% consistent with the assumptions listed in the Horner Report. Finally, I simulated an overflow weir at the dike elevation of 11.78 ft. These model results indicate that a hole in the tank with a diameter of 0.974 ft or less will not result in overtopping of the dike. This sized hole will result in a drawdown time of approximately 15 hours.

I understand that the tanks are typically operated at 75% capacity. I conducted the same analysis under the typical operating conditions which indicate that a hole in the tank with a diameter of 1.61 ft or less will not result in overtopping of the dike. This sized hole will result in a drawdown time of approximately 8.75 hours.

An analysis of this model demonstrates that the capacity of the bypass pipe is closer to 8.5 cfs instead of the 6.6 cfs suggested by the Horner Report, which is nearly a 30% increase in capacity. The reason for this increased capacity is that my model accounts for the additional headwater of nearly 2 ft on the top of the pipe as the containment area fills, which creates pressure that forces more liquid through the pipe than Horner assumed.

---

[103] SOPUS_NHV00242890

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

My model does not account for the significant infiltration rate included in Horner Report nor does it account for the additional storage volumes at elevations greater than 8.9 ft resulting from the slope of the containment berms and is therefore a conservative model. If infiltration and the additional storage volumes are accounted for, the bypass pipe and likelihood of overtopping the dike will only decrease meaning that the hole in the tank can actually be larger than the values reported above before the dike is overtopped. Similarly, my model does not account for the operation of any pumps to drain the liquid during this unlikely tank rupture event nor does it account for personnel response and implementation of mitigation measures that would occur in the event of a rupture. From these calculations, the likelihood of the dike being overtopped is significantly overstated in the Horner Report and the bypass pipe installed by Shell to address SPCC containment deficiencies is reasonable and appropriate.

Based on my evaluation and opinions in the Goldsmith and Horner Reports which I have established are incorrect, the Facility's secondary containment system is engineered in accordance with industry best practices. Specifically, based on my analysis, the berms at the Terminal comply with the SPCC requirements, and, based on my site inspection, the berms appear stable, well maintained, and appropriate for the operation of the Terminal.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

## 6. THE CONCLUSION PRESENTED IN OPINION 3 OF THE MACEY REPORT IS UNFOUNDED AND DOES NOT CONSIDER THE CURRENT CT DEEP CIVIL PENALTY POLICY.

Based on my experience with environmental compliance over the past 30 years, Opinion 3 in the Expert Report of Professor Joshua C. Macey and is unfounded, misleading and fails to consider the current and relevant agency civil penalty process as defined in Civil Penalty Policy, CT DEEP.[104] Professor Macey's Opinion 3 presents information derived from financial statements of Shell plc and Shell USA and concludes that "a penalty of nearly any size would merely be absorbed by Shell's profits and would have no impact on the company's continued operations."[105]

However, Professor Macey fails to take into account the fact that the Civil Penalty Policy (CPP) is used to assess civil penalties for violations of environmental laws.  The Facility has not received a notice of violation or non-compliance from a regulatory authority with respect to its stormwater permit or other regulatory compliance documents relevant to this case (e.g., SPCC Plan, Facility Response Plan).  As the Penalty Policy is predicated on the existence of a current violation of an environmental law, there is no basis to assert that a fine or penalty is applicable to the Facility.

As described in the opening paragraph above, Professor Macey asserts that the amount of a potential penalty can be correlated (adjusted upward) to Shell's financial balance sheet.  The CPP's stated purpose is

> *...to assure that penalties for violations of the Department's programs are assessed in a fair and consistent manner; that economic incentives for noncompliance are eliminated; that penalties are appropriate to the gravity of the violation committed; that no one gains a competitive advantage by violating environmental requirements; and that penalties are sufficient to deter persons from committing violations.*[106]

The CPP also details a prescribed approach to calculating a civil penalty which accounts for several factors including, almost all of which Macey ignores:

- **Economic Benefit**: in general the civil penalty must be equal or greater than the economic benefit of non-compliance.
- **Basic Gravity-Based Component**: comprised of two factors; the "Extent of Deviation" from the relevant legal requirement and the "Potential for Harm" to the environment, public health and to the Department's ability to ensure against actual or potential harm to the environment or public health posed by the violation.

---

[104] https://portal.ct.gov/-/media/DEEP/enforcement/policies/civilpenaltypolicypdf.pdf
[105] Macey Report, Page 24.
[106] Civil Penalty Policy, Pages 1 and 2

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

- **Continuing Violation Gravity-Based Component**: a time-based component to account for the duration of a violation if it continued for more than one day.  CT DEEP may seek up to the maximum statutory penalty for each day a violation existed.

The CPP also considers adjustments to the Gravity-based Component of the penalty and is clear on the factors that are considered for an adjustment which include good faith efforts (or lack thereof) to comply prior to the discovery of the violation (downward or upward adjustment), degree of willfulness and/or negligence (upward adjustment), compliance (or noncompliance) history (upward adjustment), ability to pay (downward adjustment), and other unique factors such as risk and cost of litigation (upward or downward adjustment).

These criteria substantiate my opinion that the financial balance sheet of a company, referenced as "ability to pay" in the CPP is only taken into consideration to evaluate a potential downward adjustment to a final penalty payment.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

# REFERENCES

American Society of Civil Engineers. (2025). ASCE/SEI 24-24 Flood Resistant Design and Construction.

Connecticut Department of Energy & Environmental Protection. (2018). General Permit for the Discharge of Stormwater Associated with Industrial Activity Effective Date: October 1, 2018.

Connecticut Department of Energy & Environmental Protection. (2021). General Permit for the Discharge of Stormwater Associated with Industrial Activity Effective Date: October 1, 2021.

Connecticut Department of Energy & Environmental Protection. (2024). General Permit for the Discharge of Stormwater Associated with Industrial Activity Draft.

Intertek. (2025) ISO 14001 Environmental Management Systems. Available at https://www.intertek.com/assurance/iso-14001/

NSF. (2025). ISO 14001 Environmental Management System (EMS) Standard. Available at https://www.nsf.org/management-systems/environmental-health-safety-management-systems/iso-14001

Sovereign Consulting, Inc. (2022). Completion of Investigation Report Shell New Haven Terminal.

USEPA. (1983). 40 CFR 122.2. Available at https://www.ecfr.gov/current/title-40/part-122/section-122.2.

USEPA. (1992). Memorandum of Agreement between EPA and Connecticut. Available at https://www.epa.gov/sites/default/files/2013-09/documents/ct-moa-npdes.pdf.

USEPA. (2013). SPCC Guidance for Regional Inspectors. Available at https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf.

USEPA. (2016). Flood Preparedness Recommended Best Practices. Available at https://www.deq.louisiana.gov/assets/docs/FloodPrepFactSheetDRAFT.pdf.

USEPA. (2020). 40 CFR 112. Available at https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-112?toc=1.

USEPA. (2021). Industrial Stormwater Fact Sheet Series Sector P: Motor Freight Transportation Facilities, Passenger Transportation Facilities, Petroleum Bulk Oil Stations and Terminals, Rail Transportation Facilities, and United States Postal Service Transportation Facilities. Available at https://www.epa.gov/sites/default/files/2015-10/documents/sector_p_transportationfacilities.pdf.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

USEPA. (2025). BR Facility Summary Report. Available at
https://enviro.epa.gov/envirofacts/br/report?handlerId=CTD064827942&reportingYear=
2017.

USEPA. (2025). RCRAInfo Facility. Available at
https://enviro.epa.gov/envirofacts/rcrainfo/facility?handlerId=CTD064827942.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

# ATTACHMENT 1

CONFIDENTIAL - PRODUCED PURSUANT TO PROTECTIVE ORDER

**Geosyntec**▷
consultants

**Eric M. Kovich, PE** (PA & VA)

**Mergers & Acquisitions**
**Environmental Planning and Management**
**Regulatory Compliance Management**
**Emergency Preparedness & Response**
**Site Assessment & Remediation**

## EDUCATION

B.S., Environmental Engineering Technology, Temple University, Philadelphia, PA, 1996

## REGISTRATIONS AND CERTIFICATIONS

Professional Engineer, Pennsylvania, P.E.071015
Professional Engineer, Virginia, #0402038038

## CAREER SUMMARY

Mr. Kovich has more than 25 years of professional experience supporting clients in the oil and gas, petrochemical, chemical, and manufacturing industries with a focus on mergers and acquisitions (M&A), capital projects planning/permitting/execution, regulatory compliance programs, operational risk management, auditing, management systems, emergency preparedness/response, and environmental liability management. Mr. Kovich spent 11 years of his career outside of the consulting industry. During this time, he directed the Corporate Health, Safety, Security & Environmental (HSSE) programs for a leading midstream oil and gas company and leverages this experience to quickly understand his client's business drivers and deliver value-added, strategic consulting services.

### Mergers & Acquisitions

Mr. Kovich's experience includes leading HSSE-related efforts on M&A activities for over $8 billion in assets within the U.S. and international locations, ranging from large single industrial facility locations to 30+ location asset portfolios. Responsibilities for these projects included detailed due diligence, environmental liability valuation, OPEX/MCAP/RCAP budget development, transactional support, transition planning, environmental permitting, and asset integration services. Mr. Kovich has been recognized for his ability to identify business risks, negotiate favorable transaction terms to mitigate those risks, and implement effective risk management strategies to facilitate completion of multiple high profile and competitive M&A projects. Representative project experience includes the following:

***Integrated Midstream Oil & Gas Logistics Assets Acquisition,*** *Multiple Locations, TX.* Senior Director HSSE for $860 Million acquisition of three gathering facilities, a processing facility, and a marine terminal in Texas. Worked closely with operations and engineering personnel post-acquisition to successfully complete processing facility construction and commissioning efforts, with a focus on multi-media environmental compliance as well as process safety program development and compliance.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 2



**Marine Terminal Asset Portfolio Acquisition,** *Multiple Locations, US East Coast and Caribbean.* Senior Director HSSE for $850 Million acquisition of 19 facilities located throughout the US East Coast and one facility located in the Caribbean. Worked closely with Seller to successfully complete segregation and demolition of the former refinery infrastructure while maintaining terminal facility operations.

**Former Refinery Acquisition,** *New Jersey.* Senior Director HSSE for $260 Million acquisition of a former refinery facility in the NJ/NY metropolitan area. Worked closely with the deal team to negotiate complex environmental indemnity terms related to ongoing RCRA Corrective Action obligations being maintained by the Seller.

**Former Refinery Acquisition,** *Non-U.S. Caribbean location.* Senior Director HSSE for $1.2 Billion acquisition of a former refinery facility located in the Caribbean. Completed detailed environmental liability valuation (ELV) analysis related to historical subsurface LNAPL plume to support financial reserve requirements.

**Marine Terminal Acquisition,** *U.S. Caribbean location.* Senior Director HSSE for $36 Million acquisition of a marine terminal located in the Caribbean. Worked closely with the deal team to negotiate complex environmental indemnity terms related to Seller-retained obligations.

**Pipeline & Terminal Asset Portfolio Acquisition,** *Multiple Locations, Midwest, Southeast & Western U.S.* Senior Director HSSE for $250 Million acquisition of 33 inland terminal facilities and approximately 1,000 miles of active refined products pipeline assets. Successfully managed a large volume of regulatory compliance transition items under a compressed timeline.

**Environmental Planning & Management**

Mr. Kovich supports client's maintenance and growth capital project portfolios in the areas of planning, permitting, public/government/media relations, construction, waste management, project commissioning, and compliance obligation management. He has worked with organizations to develop and implement risk-based evaluation criteria and processes to prioritize allocation of annual maintenance capital expenditures. Representative experience includes the following:

**Industrial Oily Water & Storm Water Management Infrastructure Improvement,** *Former Refinery Facility, Non-U.S. Caribbean location.* Project Director for $5 Million maintenance capital project involving design and implementation of upgrades to oily water and storm water conveyance and treatment equipment throughout the facility. A key component of this project was to segregate oily water and storm water streams at the facility. Oily water was collected and conveyed to a dedicated treatment system for processing and recovery of oil for re-use at the facility. Storm water was conveyed through an upgraded conveyance and detention system prior to subsea discharge. Challenges related to high-intensity storm events coupled with a shallow water table and presence of a substantial historical LNAPL plume were incorporated into the overall final design to ensure storm water discharge met requirements of the facility's license with the local regulatory authority.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 3



**Marine Terminal Expansion Project,** *Perth Amboy, NJ.* Project Director for environmental and land use permitting for a $300+ Million project to increase storage capacity, optimize operations and provide additional pipeline connectivity for the facility. Projects included reactivation of the truck loading rack, storage tank refurbishment and construction, dock refurbishment and expansion, significant piping and pipe manifold construction, unit train rail facility installation and installation if a ~7-mile pipeline to connect to a nearby pipeline supply location. The project required complex permitting in multiple phases to achieve desired business milestones and included LAER determination for the project's air permit.

**Air Pollution Control Equipment Program Management,** *Multiple Locations, U.S., and Caribbean.* Program Manager for air pollution control equipment portfolio at 120+ operating locations; responsible for all aspects of the program including engineering standards and specifications, capital projects (RCAP), equipment maintenance (capital and expense programs), operational performance (uptime and control efficiency), compliance management, employee training, program staff management, KPIs and progress reporting. Implemented $8 Million project to refurbish vapor recovery unit (VRU) equipment at 50 facilities. Established standardized maintenance inspection program, spare parts inventory, preventive maintenance program and VRU carbon management process.

**Refinery Catalyst Management,** *Non-U.S. Caribbean location.* Project Director for $1.3 Million project to dispose of catalyst from former refinery operations. Material properties (uranium radioactive component) and age, coupled with complex rules related to management of this material, limited the disposal options. Successfully gained regulatory approvals and managed effort to safely load material onto ocean-going vessel for return to country of origin for proper disposal.

**Storm Water Engineering Evaluation,** *Corpus Christi, TX.* Project Director for engineering evaluation of storm water management infrastructure and BMPs at an active refinery facility. Developed a model to simulate storm water flow conditions under various storm events and discharge scenarios. Completed evaluation of adequacy of current site storm water management infrastructure and practices. Developed recommendations to improve storm water BMP's and upgrade storm water management infrastructure to meet requirements of the facility's discharge permit.

## Regulatory Compliance Programs

Mr. Kovich has effectively developed and implemented regulatory compliance programs to meet a variety of health & safety, process safety, security, and environmental regulatory requirements. Representative experience includes the following:

**Environmental Audits & Compliance Assurance,** *Multiple U.S. Locations.* Extensive auditing and compliance assurance experience across all Environmental media for Energy Sector clients. Adept at identifying appropriate corrective actions to address gaps identified during an audit process and working within a client's organization to develop and implement continuous improvement initiatives within Environmental Programs to achieve improved performance.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 4



**Waste Management Program and TSDF Audits,** *Multiple U.S. Locations.* Project Director supporting a Midstream energy sector client with program development and auditing support to manage RCRA compliance obligations and minimize long-term liability associated with waste disposal across the client's operations. Project components included updating the client's existing Waste-related program documents, developing, and implementing a new process for managing waste across routine operations and on projects, establishing and implementing a TDSF vetting process, and conducting audits of TSDF locations.

**HSSE Information Management System Implementation,** *Multiple U.S. Locations.* Project Director for development and implementation of an HSSE Information Management System to standardize incident and compliance management processes at a corporate level for a midstream oil & gas company. Leveraged the system to develop key performance indicator (KPI) Dashboard used by executive-level staff to measure performance. Resulted in greater organizational awareness of performance and 21% reduction in number of noncompliance events.

**Safety Culture Transformation,** *Multiple U.S. Locations.* As Project Director, led a multi-year Safety Culture transformation process for a 1,200-employee organization to establish individual accountability for Safety excellence and a focus on leading indicators. Resulted in a 53% reduction in OSHA TRIR and a 50% reduction in motor vehicle incident rate.

**Air Compliance Data Acquisition & Management,** *Multiple U.S. Locations.* Project Director for designing and implementing a standardized approach to data acquisition and management for operational information and pollution control device performance data for a midstream oil & gas company. Developed standard specification for data acquisition equipment and completed upgrades at all facilities. Enhanced exiting compliance data management system to provide a standardized compliance report for each operating location and an "early warning" notification system to enable action to be taken to avoid non-compliance events. Resulted in a 73% reduction in number of potential non-compliance events.

**Regulatory Agency Negotiations,** *Multiple Locations.* Extensive experience leading negotiations with multiple federal and state-level agencies related to emergency response activities, long-term environmental remediation liability management and HSSE compliance-related enforcement actions. Have led multiple post-enforcement compliance programs to ensure required obligations are completed in full compliance with consent agreement requirements.

**Emergency Preparedness & Response**

Mr. Kovich is trained in the National Incident Management System (NIMS) Incident Command System (ICS) and has served in multiple ICS positions throughout his career in support of hazardous liquid spill response management. While leading the Corporate HSSE function for a U.S. based midstream oil and gas company, he was responsible for managing the company's Emergency Planning and Preparedness activities as well as serving on the Crisis Management Team during incident response efforts. Representative experience includes the following:

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 5



Geosyntec▷
consultants

***Corporate Crisis Management Plan Development,*** *Multiple U.S. & Caribbean Locations.* Led development and implementation of corporate-level Crisis Management Plan (CMP) to define roles & responsibilities of Crisis Management Team (CMT) and identify the process of interaction between the CMT and the local response team during the incident response phase. Implemented a CMT member training program and conducted an annual drill to evaluate implementation of the CMP under a variety of potential incident scenarios.

***Facility Emergency Preparedness Plan Development,*** *Multiple U.S. & Caribbean Locations.* Prepared, certified (as appropriate based on Plan type and facility location) and updated/maintained emergency preparedness-focused Plans for a 6,000-mile onshore petroleum products pipeline system, more than 100 inland terminal facilities, and more than 30 marine terminal facilities. Worked with local facility personnel to ensure Plans accurately reflect operating conditions, develop location-specific emergency response tactics, establish/maintain relationships with local responders, and contract with OSROs, Trained personnel on Plan contents as well as notification and response procedures.

***Emergency Preparedness Plan Management System Implementation,*** *Multiple U.S. & Caribbean Locations.* Implemented a standardized online Plan management system to provide a corporate-wide consistent format and single repository for more than 400 regulatory-required Plans (ERP, FRP, SPCC, etc.). This system streamlined management of change processes related to updating information that affected multiple plans and/or locations. The system also served as the central document repository for these plans to ensure that each covered facility has immediate access to both company-level and site-specific Plan documents in event of an emergency event or a regulatory agency inspection.

***Emergency Preparedness Drills & Exercises,*** *Multiple U.S. & Caribbean Locations.* Participated in more than 50 spill response exercises ranging from tabletop exercises, worst-case discharge (WCD) drills including response equipment deployment (announced and unannounced), and joint public/private exercises with various government agencies (e.g., State Environmental, USEPA, USCG, PHMSA).

***Emergency Response Management for Petroleum Pipeline & Terminal Facility Incidents,*** *Multiple Locations.* Served in various ICS positions in support of emergency response activities for petroleum release incidents at pipeline right of way, pipeline breakout station, inland terminal and marine terminal locations throughout the U.S. and Caribbean. Responsibilities included environmental assessment and recovery/remediation efforts, regulatory agency interaction, community/public relations, claims support, logistics management, response personnel management, and resource planning.

***Catastrophic Gasoline Release Emergency Response Management,*** *Eastern Pennsylvania.* Served as Environmental Unit Leader during emergency response activities surrounding a 40,000-gallon gasoline release at a pipeline facility located in karst geology. Directed subsurface assessment, product recovery, remediation planning, community well sampling, regulatory agency interactions and community relations activities. Ensured safety of on-site occupied buildings and adjacent residential properties through comprehensive sampling program. Led

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 6



Geosyntec▷
consultants

technical discussions during multiple public meetings to communicate status of response efforts and planned activities.

**Site Assessment & Remediation**

Mr. Kovich has considerable experience related to site assessment and remediation of a variety of contaminants at sites located throughout the U.S. and the Caribbean. He is also well-versed in environmental remediation portfolio management in support of financial reserve requirements for publicly traded companies. Representative experience includes the following:

***Remediation Project Portfolio Management,*** *Multiple Locations.* Managed a remediation project portfolio of over 140 projects throughout the U.S. and the Caribbean, including site assessment and remediation implementation, interactions/negotiations with regulatory agencies, insurance carrier claims management, and development of environmental reserve in support of company's financial audit process.

***Environmental Reserve Process Optimization,*** *Multiple Locations.* Led a multi-year project to implement process improvements related to environmental reserve management for a publicly traded company. Developed a standard process and document template for detailing the assumptions utilized in establishing the environmental reserve for each project in the portfolio. Defined a series of controls to be audited against as part of the company's internal and external financial audit process. Efforts recognized by company Board of Director's Audit Committee.

***Former Manufacturing Facility,*** *Long Island City, NY.* Project Manager for subsurface assessment of chlorinated solvent impacts associated with historical degreasing activities. Urban setting and requirement to delineate source zone located beneath the manufacturing building presented additional challenges related to drill rig access. Mr. Kovich supported design and implementation of a TCE dense non-aqueous phase liquid (DNAPL) source zone and dissolved-phase plume remediation strategy that included SVE, air sparging, ozone sparging, and potassium permanganate injection.

***Former Polystyrene Manufacturing Facility,*** *Windsor, NJ.* Project Manager for assessment and remediation of LNAPL and dissolved plume under NJDEP's ISRA program. Utilized UV fluorescence and hydrophobic dye screening methodologies to aid in subsurface delineation activities. Established Ground Water Classification Exception Area (CEA) per NJDEP requirements. Designed and implemented pilot-scale and full-scale ISCO program coupled with select source area excavation activities.

**PROFESSIONAL EXPERIENCE**

Geosyntec Consultants, Inc., Tampa, FL, 2017 – present
Buckeye Partners, L.P., Breinigsville, PA, 2006 – 2017
Groundwater & Environmental Services, Inc, Richmond, VA & Exton, PA, 2000 – 2006
Environmental Resources Management, Inc., Richmond, VA, 1998 – 2000
RT Environmental Services, Inc., King of Prussia, PA, 1997 – 1998

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Eric M. Kovich, PE (PA & VA)
Page 7



Geosyntec▷
consultants

## AFFILIATIONS

American Petroleum Institute (API) Pipeline Environmental, Health & Safety Group – 2006 through 2016

International Liquid Terminals Association (ILTA) Environmental, Health, Safety and Security Committee – 2009 through 2016

# Materials Considered

1. 2025.05.01 Expert Report of Richard Horner
2. 2025.05.01 Expert Report of Robert Nairn
3. 2025.05.08 Expert Report of Joshua Macey
4. 2025.05.08 Expert Report of Wendi Goldsmith
5. 2018 CT Stormwater General Permit at Time of Lawsuit
6. 2019-06-11_New Haven_ SWPPP Documentation Ltr
7. 2021 - NHVN topography map
8. 2021_msgp_-_permit_parts_1-7
9. Apr. 2024 BCP and SAP - SOPUS_NHVN00269158
10. CURRENT 2017 July Shell New Haven Terminal SWPPP with Appendices
11. FRP - New Haven Dec 2023 - produced
12. FRP-ERP - June 2024
13. July 2023 - NHVN - Oil Storage Containment Calculations
14. Jun. 2018 Hurr. Action Plan - SOPUS_NHVN00155559
15. SPCC 2024 New Haven Produced
16. Metocean DEP 37.00.10.10-Gen_Spec_Feb 2021_SOPUS_NHVN02448878
17. 2014 NYS Petroleum Terminal Resiliency Assessment ICF
18. 2022 EPA RMP Climate Change Report gao-22-104494
19. 2024 Maine DEP Guidance for Marine Oil Terminals December 2024
20. Copy of GAO-22-104494 New Haven
21. proposed-2026-msgp-permit-parts-1-7
22. Terminal Operations Manual
23. SOPUS_NHVN00317780
24. Michael Sullivan , 30b6 - 02-06-2025_Condensed
25. August 2012 HAP
26. June 2018 HAP
27. chelsea-swppp-march-2023

28. 02. New Haven HEMP_v1_2018

29. 2016 Shell HSSE SP Water in the Environment Manual (SOPUS_PVD00071805)l

30. Accidental release prevention

31. Emergency & Spill Reponse SEAM

32. HSSE & SP Asset Managment SEAM

33. HSSE SEAM

34. Process Safety & Assest Managment Standard - SEAM

35. RMP 2024

36. SOPUS_NHVN01345893

37. SOPUS_NHVN01843720

38. SWPPP Training

39. Flood-Prepare-fact_sheet

40. SHE00154327

41. 2014-01 Monthly Inspection

42. 2014-02 Monthly Inspection

43. 2014-03 Annual Site Inspection

44. 2014-03 Monthly Inspection

45. 2014-04 Monthly Inspection

46. 2014-05 Monthly Inspection

47. 2014-06 Monthly Inspection

48. 2014-07 Monthly Inspection

49. 2014-08 Monthly Inspection

50. 2014-09 Monthly Inspection

51. 2014-10 Monthly Inspection

52. 2014-11 Monthly Inspection

53. 2014-12 Monthly Inspection

54. 2015-01 Monthly Inspection

55. 2015-02 Monthly Inspection

56. 2015-03 Monthly Inspection

57. 2015-04 Monthly Inspection

58. 2015-05 Monthly Inspection

59. 2015-06 Monthly Inspection

60. 2015-07 Monthly Inspection

61. 2015-08 Monthly Inspection

62. 2015-09 Monthly Inspection

63. 2015-10 Monthly Inspection

64. 2015-11 Monthly Inspection

65. 2015-12 Monthly Inspection

66. 2016-01 Monthly Inspection

67. 2016-02 Monthly Inspection

68. 2016-03 Monthly Inspection

69. 2016-04 Monthly Inspection

70. 2016-05 Monthly Inspection

71. 2016-06 Monthly Inspection

72. 2016-07 Monthly Inspection

73. 2016-08 Monthly Inspection

74. 2016-09 Monthly Inspection

75. 2016-10 Monthly Inspection

76. 2016-11 Monthly Inspection

77. 2016-12 Monthly Inspection

78. 2017-01 Monthly Inspection

79. 2017-02 Monthly Inspection

80. 2017-03 Monthly Inspection

81. 2017-04 Monthly Inspection

82. 2017-05 Monthly Inspection

83. 2017-06 Monthly Inspection

84. 2017-07 Monthly Inspection

85. 2017-08 Monthly Inspection

86. 2017-09 Monthly Inspection

87. 2017-10 Monthly Inspection

88. 2017-11 Monthly Inspection

89. 2017-12 Monthly Inspection

90. 2018-01 Monthly Inspection

91. 2018-02 Monthly Inspection

92. 2018-03 Monthly Inspection

93. 2018-04 Monthly Inspection

94. 2018-05 Monthly Inspection

95. 2018-06 Monthly Inspection

96. 2018-07 Monthly Inspection

97. 2018-08 Monthly Inspection

98. 2018-09 Monthly Inspection

99. 2018-10 Monthly Inspection

100.    2018-11 Monthly Inspection

101.    2018-12 Monthly Inspection

102.    2019-01 Monthly Inspection

103.    2019-02 Monthly Inspection

104.    2019-03 Monthly Inspection

105.    2019-04 Monthly Inspection

106.    2019-05 Monthly Inspection

107.    2019-06 Monthly Inspection

108.    2019-09 Monthly Inspection

109.    2019-10 Monthly Inspection

110.    2019-11 Monthly Inspection

111.    2019-12 Monthly Inspection

112.    2020-01 Monthly Inspection

113.    2020-02 Monthly Inspection

114.    2020-03 Monthly Inspection

115.    2020-04 Monthly Inspection

116.    2020-05 Monthly Inspection

117.    2020-06 Monthly Inspection

118.    2020-07 Monthly Inspection

119.    2020-08 Monthly Inspection

120.    2020-09 Monthly Inspection

121.    2020-10 Monthly Inspection

122.    2020-11 Monthly Inspection

123.    2020-12 Monthly Inspection

124.    2021-01 Monthly Inspection

125.    2021-02 Monthly Inspection

126.    2021-03 Monthly Inspection

127.    2021-04 Monthly Inspection

128.    2021-05 Monthly Inspection

129.    2021-06 Monthly Inspection

130.    2021-07 Monthly Inspection

131.    2021-08 Monthly Inspection

132.    2021-09 Monthly Inspection

133.    2021-10 Monthly Inspection

134.    2021-11 Monthly Inspection

135.    2021-12 Monthly Inspection

136.    2022-01 Monthly Inspection

137.    2022-02 Monthly Inspection

138.    2022-03 Monthly Inspection

139.    2022-04 Monthly Inspection

140.    2022-05 Monthly Inspection

141.    2022-06 Monthly Inspection

142.    2022-07 Monthly Inspection

143.    2022-08 Monthly Inspection

144.    2022-09 Monthly Inspection

145.    2022-10 Monthly Inspection

146.    2022-11 Monthly Inspection

147.    2022-12 Monthly Inspection

148.    2023-01 Monthly Inspection

149.    2023-02 Monthly Inspection

150.    2023-03 Monthly Inspection

151.    2023-04 Monthly Inspection

152.    2023-05 Monthly Inspection

153.    2023-06 Monthly Inspection

154.    2023-07 Monthly Inspection

155.    2023-08 Monthly Inspection

156.    2023-09 Monthly Inspection

157.    2023-10 Monthly Inspection

158.    2023-11 Monthly Inspection

159.    2023-12 Monthly Inspection

160.    https://gis.vgsi.com/newhavenct/

161.    Flood Insurance Rate Map 09009C0442J, effective on 7/8/2013 available at https://msc.fema.gov/portal/search?AddressQuery=481%20east%20shore%20parkway%2C%20new%20haven%2C%20ct

162.    2022_06_Completion of Investigation Report_Final

163.    https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-122/subpart-A/section-122.2

164.    https://www.nsf.org/management-systems/environmental-health-safety-management-systems/iso-14001

165.    40 CFR Part 112

166.    33 U.S.C. §2701 et seq. (1990)

167.    https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014

168.    40 CFR Part 112.12(c)(2)

169.    https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014

170.    https://www.epa.gov/oil-spills-prevention-and-preparedness-regulations/facility-response-plan-frp-applicability

171.    40 CFR Part 112.2

172.    42 U.S.C. §6903

173.    https://portal.ct.gov/-media/deep/waste_management_and_disposal/hazardous_waste/characterizationofremediationwastepdf?rev=f5e69d4274b240fa8848d774d49be444&hash=C2DE548FFF026D496AB103DC952531FE

174.    https://www.epa.gov/sites/default/files/2015-10/documents/sector_p_transportationfacilities

175.    https://www.epa.gov/sites/default/files/2013-09/documents/ct-moa-npdes

176.    Kameshwar, 2023. Chapter 4 - Hurricane performance and assessment models. Above Ground Storage Tank Oil Spill. Gulf Professional Publishing Pages 133 to 158. Available at https://doi.org/10.1016/B978-0-323-85728-4.00010-3.

177.    group-hsse-sp-commitment-and-policy available at https://www.shell.com/sustainability/our-approach/commitments-policies-and-standards/_jcr_content/root/main/section_621037715/text_663851422.multi.stream/1742569750258/53ba552773426d6a596fc723156d61a4d21cc2fc/group-hsse-sp-commitment-and-policy

178.    Commitments, policies and standards | Shell Global available at https://www.shell.com/sustainability/our-approach/commitments-policies-and-standards.html#:~:text=Commitment%20and%20Policy%20on%20HSSE%20%26%20SP&text=is%20a%20set%20of%20core,and%20contribute%20to%20sustainable%20development

179.    HSSE & Social Performance Commitment and Policy | Shell Global available at https://www.shell.com/business-customers/marine/commitment-and-policy-on-hsse-social-performance.html

180.    20250401 NHVN DJA Inspection

181.    https://enviro.epa.gov/envirofacts/rcrainfo/facility?handlerId=CTD064827942

182.    https://enviro.epa.gov/envirofacts/br/report?handlerId=CTD064827942&reportingYear=2017

183.    40 CFR Part 262.27

184.    Remedial Action Plan (2023) by Sovereign Consulting, Inc.

185.    Section 22a-92(5) of the Connecticut General Statutes

186.    https://www.asce.org/publications-and-news/codes-and-standards/asce-sei-24-24

187.    https://www.fema.gov/sites/default/files/2020-08/midwest_floods_ras_2009

188.    40 CFR Part 264.18(b)

189.      https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014

190.      https://portal.ct.gov/-/media/DEEP/enforcement/policies/civilpenaltypolicypdf

191.      SOPUS_PVD00242852

192.      SOPUS_NHVN00242808

193.      SOPUS_NHVN02184620

194.      SOPUS_NHVN02184715

195.      SOPUS_PVD00283340

196.      SOPUS_NHVN00322288

197.      SOPUS_NHVN00385979

198.      SOPUS_PVD00446572