# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| *Plaintiff*, | Civil Action No. 3:21-cv-00933-VDO |
| v. | |
| SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, | November 14, 2025 |
| *Defendants*. | |

## PLAINTIFF CONSERVATION LAW FOUNDATION'S PRELIMINARY LOCAL RULE 56(a)(2) STATEMENT OF FACTS IN OPPOSITION TO EQUILON ENTERPRISES AND TRITON TERMINALING, LLC'S <u>MOTION FOR SUMMARY JUDGMENT</u>

# I.   TABLE OF CONTENTS

I.     TABLE OF CONTENTS.................................................................................................. ii

I.     Introduction.................................................................................................................. 1

II.    Plaintiff's Responses to Equilon and Triton's Rule 56(a)(1) Statement................................. 1

III.   Plaintiff's Statement of Additional Material Facts ............................................................ 33

## I.    INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") respectfully files this Preliminary Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment, to Defendants Equilon Enterprises ("Equilon") and Triton Terminaling LLC ("Triton") (collectively, "Defendants") Preliminary Statement of Undisputed Material Facts (ECF 807)[1] pursuant to Judge Oliver's Pre-Trial Instructions and Federal Rule of Civil Procedure 56. CLF reserves its rights to amend, add to, and otherwise change its statement of facts in opposition when filing any authorized motions. Depending on the Court's grant of motions for summary judgment, CLF may need to request leave to exceed pages for this opposition statement pursuant to Local Civil Rule 56(a)(2).

## II.    PLAINTIFF'S RESPONSES TO EQUILON AND TRITON'S RULE 56(A)(1) STATEMENT

1.    This case concerns stormwater permit compliance at an onshore petroleum bulk storage and distribution terminal located at 481 East Shore Parkway, New Haven, Connecticut (the "Terminal"). ECF 47, Plaintiff's Amended Complaint ("Am. Compl.") at ¶ 2.

**Response:** Plaintiff objects to this fact because Defendants failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.* 2 F. R. D. 305, 306 (S.D. N.Y. 1942) ("The pleadings are not evidence."). Subject to and without waiving these objections, Plaintiff admits.

2.    Triton owns and Equilon operates the Terminal under the General Permit for Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of

---

[1] Defendants purport to incorporate by reference the statements and supporting record citations contained in the Statements of Undisputed Facts filed by Motiva Enterprises, LLC. To the extent such incorporation is permissible, Plaintiff also incorporates by reference its responses in opposition to Defendants statements and supported record citations contained in the Statement of Undisputed Facts filed by Motiva Enterprises, LLC.

Energy and Environmental Protection ("CT DEEP"). *Id*. at ¶¶ 29-32. At the time Plaintiff filed this action in July 2021, the permit at issue was the 2018 General Permit No. GSI002800. The 2018 Permit was extended in October 2021 without any substantive changes (hereafter collectively, "the Permit"). *Id*. at ¶ 176.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Defendants failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.* 2 F.R. D. 305, 306 (S.D. N.Y. 1942) ("The pleadings are not evidence."). Subject to and without waiving these objections, Plaintiff admits.

3.      The Permit regulated stormwater discharges from industrial facilities engaged in certain identified activities. *See* Ex. A, Permit, at 1.

**Response:** Plaintiff admits.

4.      The Permit did not reference or require consideration of "climate change," "storm surge," "sea level rise," "increased precipitation," a "100-year" or "500-year" flood standard, or use of secondary containment berms as flood barriers. *See generally id.*

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff denies. Whether the Permit requires consideration of "climate change" "storm surge," "sea level rise," "increased precipitation," a "100-year" or "500-year" flood standard, or use of secondary containment berms as flood barriers are included in the 2018 or 2021 Permit is a question of fact. The Permit contains a number of requirements tied to 100-year metrics. Judge Meyer has already ruled that the Best Industry Practice requirement of the permit includes

2

consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16.

5.      The Permit imposed obligations, including "Control Measures" such as the creation of a Stormwater Pollution Prevention Plan ("SWPPP"). *Id*. at 17-71.

   **Response**:  Plaintiff objects that "including 'Control Measures'" is vague and not sufficiently specific. *See* Fed. R. Civ. P. 56(c)(1)(A). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff admits that the Permit sets forth requirements including implementation of control measures applicable to all facilities.  Plaintiff denies the SWPPP is an example of a control measure. *Compare* Permit § 5(b) *with* § 5(c).

6.      Section 5(b) of the Permit defines "Control Measures" as "best management practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility; and defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice," and sets forth 13 explicit BMPs. Id. at 17-22.

   **Response:** Plaintiff admits that the language from the Permit is quoted correctly although with mistakes in the use of quotation marks.

7.      Section 5(e)(1)(B)(v) of the Permit provides a procedure for addressing exceedances at the Terminal if the exceedance of a benchmark is attributable to the presence of a pollutant in the natural background or in "run-on" entering from "off-site." *Id*. at 34.

   **Response**: Plaintiff admits in part and denies in part. Plaintiff admits the 2021 Permit provides procedures for addressing exceedances at the Terminal. Plaintiff denies the remaining fact as misrepresenting the language in the Permit. The Permit states:

> Following the first semiannual samples of benchmark monitoring (or sooner if the exceedance is triggered by less than 4 monitoring events), if the average

concentration of a pollutant exceeds a benchmark value, and the permittee determines that exceedance of the benchmark is attributable solely to the presence of that pollutant in the natural background or in 'run on' entering from off-site, the permittee is not required to perform corrective action or additional benchmark monitoring provided all of the following conditions are met: [listing 5 conditions]. Natural background pollutants include those substances that are naturally occurring in rainfall, soils or groundwater. Natural background pollutants do not include legacy pollutants from earlier activity on the site.

Permit § 5(e)(1)(B)(v).

8.     On October 1, 2025, CT DEEP issued a new General Permit to update and replace the Permit (the "2025 Permit"). Ex. B, 2025 Permit.

     **Response**: Plaintiff admits.

9.     On March 11, 2024, in its draft of the new General Permit, CT DEEP described what it referred to as "significant changes" to the Permit and invited public comment. *See* Ex. C, November 2024 Fact Sheet at 5.

     **Response:** Plaintiff objects it is not clear if this fact  refers to a March 2024 draft of the New Permit or a November 2024 Fact Sheet. Assuming the fact refers to page 5 of the November 2024 Fact Sheet, Plaintiff admits that CT DEEP stated that "There are significant changes to the draft IGP including its format and transition to electronic reporting." Plaintiff admits that CT DEEP invited public comment. Plaintiff denies that these statements were made "[o]n March 11, 2024, in its draft of the new General Permit."

10.     On May 10, 2024, Plaintiff submitted written comments to CT DEEP stating that "[t]he increase in the minimum acceptable volume requirement for secondary containment areas is a positive change that should remain in the 2025 Permit, and the Undersigned appreciate DEEP's acknowledgement that the minimum volume requirement in the Current Permit is insufficient to guarantee that no overtopping will occur during extreme storm events." Ex. D, Pl.'s Cmts. at 11.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies. The quote provided is not identical to any passage in CLF's May 10, 2024 comments.

11.    Plaintiff also proposed "additional changes to the new permit to further protect Connecticut's waters and members of the public" in its comments, which CT DEEP considered and did not adopt in the 2025 Permit. Ex. D, Pl.'s Cmts. at 13-18; Ex. B, 2025 Permit.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits the quote that CLF proposed additional changes, Plaintiff denies the statement that CT DEEP considered and did not adopt those changes. CT DEEP adopted many of CLF's proposed changes.

12.    The 2025 Permit becomes effective on November 1, 2025 and expires on September 30, 2030. *See* Ex. B, 2025 Permit at 1.

**Response:** Plaintiff admits.

13.    The 2025 Permit for the first time requires that permittees consider certain climate "Resilience Measures" that CT DEEP characterizes as a "**new** component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes." *See e.g.*, Ex. B, 2025 Permit, at 39-40; Ex. E, November 2024 Fact Sheet at 12; Ex. F, December 2024 Supplemental Fact at 3; Ex. G, March 2024 Fact Sheet at 10; Ex. H, April 2024 Supplemental Fact Sheet at 3. (emphasis added).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection,

Plaintiff admits in part and denies in part. Plaintiff admits that the 2025 Permit includes a section titled "Resilience Measures." Plaintiff denies that the 2025 Permit contains the quote provided by Defendants. Plaintiff denies that the 2025 Permit was the "first time" permittees were required to consider certain climate resilience measures. Whether permittees were required to consider certain climate resilience measures in the 2018 and/or 2021 Permits is a question of **fact**. Judge Meyer has already ruled on that the Best Industry Practice requirement of the permit includes consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16.

14.     The new "Resilience Measures" provisions in the 2025 Permit require permittees to consider prevention and mitigation measures to account for "hurricanes, storm surge, extreme/heavy precipitation, and flood events." *See* Ex. B, 2025 Permit at 39-40.

**Response:** Plaintiff denies that the "Resilience Measures" are "new." Whether such resilience measures were in the 2018 and/or 2021 Permits is a question of fact. Judge Meyer has already ruled that the Best Industry Practice requirement of the permit includes consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16. Plaintiff admits that page 39-40 of the 2025 Permit states:

> Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events. If such SCMs are already in place due to existing requirements mandated by other state, local or federal agencies, the permittee should document in their SWPPP a brief description of the controls and a reference to the existing requirement(s).

15.     CLF acknowledged that CT DEEP's guidance states the "Resilience Measures" are a "new component of the SWPPP," and that "DEEP believes [the climate resilience factors are] a new component." Ex. I, June 4, 2025 CLF 30(b)(6) Dep. ("CLF Dep.") at 175:12-20 and 175:21-176:1.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that the referenced deposition testimony as to what CT DEEP believes is a fact rather than speculation. Subject to and without waiving these objections, Plaintiff admits that its 30(b)(6) witnessed acknowledged that there was a draft interim fact sheet that states "The resilience measures element is a new component of the SWPPP." Plaintiff denies any draft interim fact sheets are "CT DEEP's guidance."

16. Neither the Permit nor the 2025 Permit requires secondary containment berms to serve as flood protection barriers. Ex. A, Permit; Ex. B, 2025 Permit.

**Response:** Plaintiff objects that this is a legal conclusion, not a fact. Subject to and without waiving this objection, Plaintiff denies. Whether the Permit or the 2025 Permit requires secondary containment berms to serve as flood protection barriers is a question of fact.

17. The 2025 Permit incorporates by reference the 2024 Stormwater Quality Manual's ("SQM") "structural control measures [to] help improve the resiliency of industrial facilities to climate stressors, including changing precipitation patterns and extreme weather events." *See* Ex. J, 2025 Permit Fact Sheet (dated October 2025) at 13.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits the modified quote is found in the cited Fact Sheet. Plaintiff denies the references to the date of the SQM, which is different in the Fact Sheet and not specified in the 2025 Permit.

18. The 2025 Permit emphasizes structural control measures from the updated SQM to improve resilience, but the Manual does not mandate any specific responses to any projected sea level rise. *See* Ex. K, 2024 Connecticut SQM at 52 and 555. The SQM was not in effect before 2023 and was not incorporated into the Permit.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph,

in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits the 2025 Permit refers to the SQM to improve resilience. Plaintiff denies the SQM does not include specific information regarding sea level rise as it includes extensive discussion on appropriate site design parameters for a variety of contexts including at times inclusion of 50-year planning horizons for some BMPs. Plaintiff denies the SQM not being in effect before 2023 and not incorporated into the Permit. The 2021 Permit included numerous references to the 2004 SQM.

19.    The 2004 SQM is the prior version of the 2024 SQM, and it did not require any consideration of climate change in connection with its guidance. Ex. L, 2004 SQM.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits that the 2004 SQM does not contain express descriptions of climate change evaluations. Plaintiff denies whether the 2004 SQM "did not require" "any consideration of climate change" "in connection with its guidance," as the 2004 SQM clearly states it is "guidance and are intended to augment, rather than replace, professional judgment," 2004 SQM at 1-2.

20.    CT DEEP has provided permittees with existing authorization interim permit coverage for 180 days from the date of issuance of the 2025 Permit to submit a new registration. *See* Ex. J, October 2025 Fact Sheet, at 10. This means that permittees have 180 days to come into compliance with the 2025 Permit's requirements.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits as to the provision of 180 days of

interim permit coverage. Plaintiff denies as to the phrase "to come into compliance with the 2025 Permit's requirements" to the extent this implies any safe harbor for ongoing violations.

21.  Plaintiff asserts twelve causes of action,[2] nine of which (Counts I-IX) are based on Plaintiff's argument that Defendants violated the Permit by failing to account for certain factors related to "climate change." ECF 47, Am. Compl. at ¶¶ 78-448.

**Response:** Plaintiff objects to this "fact" because Defendants' paraphrased description of CLF's claims are inadmissible and failed to support this fact with citation to admissible evidence. See Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.* 2 F. R. D. 305, 306 (S.D. N.Y. 1942) ("The pleadings are not evidence."). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits the number of causes of actions. Plaintiff denies the summary of 371 paragraphs of the Amended Complaint, which speaks for itself and is not fully summarized by the statement "failing to account for certain factors related to 'climate change.'"

22.  Under these nine causes of action, Plaintiff seeks the following relief:

a.  "[D]escribe or ensure implementation of BMPs that will be used to ensure that non-stormwater pollutant discharges resulting from the factors discussed in Section IV.A *supra*, including storm surge flooding, do not occur in the future and are eliminated." *Id*. at ¶ 394.
b.  "[I]mplementation of control measures that will be used to ensure that pollutant discharges resulting from the [climate change] factors. . . do not occur." *Id*. at ¶ 399.
c.  Defendants must "disclose and consider the [climate change] factors. . . and the substantial risks of pollutant discharges associated with these factors." *Id*. at ¶ 413.
d.  Defendants must "identify sources of pollutants resulting from the ["climate change"] factors ......." *Id*. at ¶ 417.
e.  The SWPPP must "refer to the potential for flooding at the Terminal from storm surge[s] and increased rainfall despite past incidences of storm surge flooding [and] include control measures or BMPs to minimize this potential unpermitted discharge." *Id*. at ¶ 424.

---

[2] Plaintiff's Amended Complaint asserted fourteen causes of action. ECF 47. However, two of Plaintiff's claims were dismissed by Order dated September 16, 2022 [ECF 111]. The Court dismissed all but Count XIII against Defendant Motiva. *Id*.

f.   The SWPPP must "describe or ensure implementation of BMPs that will be used to address run-on to avoid areas that may contribute pollutants, despite previous flooding and the ["climate change"] factors. . . including storm surge flooding. . . ." *Id*. at ¶ 430.

g.   The SWPPP must "describe or ensure implementation of BMPs that will be used to minimize the potential for leaks and spills resulting from the ["climate change"] factors. .. ." *Id*. at ¶ 435.

h.   Defendants must "submit relevant facts........ regarding the risks of climate-change discussed above, and the substantial risks of pollutant discharges and/or releases associated with these factors, in its SWPPP and reports to CT DEEP." *Id*. at ¶ 438.

i.   Defendants must "amend[] or update[] its SWPPP based on information known to it regarding the ["climate change"] factors. . .." *Id*. at ¶ 445.

**Response:** Plaintiff objects to this "fact" because Defendants' paraphrased description of CLF's claims are inadmissible and failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.* 2 F.R. D. 305, 306 (S.D. N.Y. 1942) ("The pleadings are not evidence."). Subject to and without waiving this objection, Plaintiff admits that the above are portions of Plaintiff's claims for relief.

23.    Because the term "climate change" is not included in the Permit, Plaintiff contends that the Permit *implied* a requirement to consider "climate change" in the general requirement that the Terminal implement best management practices that are "technologically available and economically practicable and achievable in light of best industry practice." *See generally* Oct. 19, 2023 Hearing Transcript Before Honorable Jeffery Alker Myer.

**Response:** Plaintiff objects because this is Defendants' summary of Plaintiff's legal contentions and argument before this Court, not a statement or contention of material fact. To the extent Defendants seek to elicit facts from the statement of counsel at a hearing, Defendants are still required to provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). They have not done so here. Subject to these objections, Plaintiff denies that Plaintiff used the term "implied," the only usage of "implied" at the October 19, 2023, MPSJ

hearing was by Defendants' counsel. The full quote from the hearing on whether climate change

is included in the Permit was the following ruling by Judge Meyer:

> So I do conclude that the permit unambiguously imposes a minimization duty that, in turn, references and incorporates best industry practice. If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that I cannot resolve at this time.

Hearing Tr., ECF 305 (Oct. 19, 2023), at 86:8–16. Plaintiff denies that "'climate change' is not

included in the Permit." Whether "climate change" is included in the Permit is a question of fact.

Plaintiff denies as this is a conclusion of law, not fact.

24.     A party intending to file a citizen suit under the CWA must specify in its Notice of Intent

to Sue ("NOI") the "specific standard, limitation or order alleged to have been violated, the

activity alleged to constitute a violation, the person or persons responsible for the alleged

violation, the location of the alleged violation, the date or dates of such violation, and the full

name, address, and telephone number of the person giving notice." 40 C.F.R. at § 135(a).

**Response:** Plaintiff objects that this is a conclusion of law, not a fact. Subject to this

objection, Plaintiff admits the fact accurately quotes a portion of 40 C.F.R. § 135(a).

25.     On July 28, 2020, CLF served an NOI on Defendants. ECF 47-1, Exhibit A to CLF's Am.

Compl. Plaintiff has twice supplemented its NOI without asserting any new claims, first on

February 17, 2021 and again on November 21, 2024.[3] ECF 47-2, Ex. B to CLF's Am. Compl.;

Ex. M, 2d Supp. NOI.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph,

in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving objections, Plaintiff

---

[3] Plaintiff never pursued filing an amended complaint in accordance with its November 2024 NOI.

admits.

26.     These three substantively identical NOIs identified only 11 discrete alleged violations of the CWA, which are as follows: (i) Failure to Eliminate Non-Stormwater Discharges; (ii) Activity Inconsistent with the Coastal Management Act and Causing Adverse Impacts to Coastal Resources; (iii); Unlawful Certification; (iv) Failure to Identify Sources of Pollution Reasonably Expected to Affect the Quality of Stormwater Discharges; (v) Failure to Describe and Implement Practices to Reduce Pollutants and Assure Permit Compliance; (vi) Failure to Implement Measures to Manage Runoff; (vii) Failure to Minimize the Potential for Leaks and Spills; (viii) Failure to Submit Required Facts or Information to CT DEEP; (ix) Failure to Amend or Update the SWPPP; (x) Failure to Identify Discharges to Impaired Waters in SWPPP; (xi) Failure to Conduct Monitoring for Discharges to Impaired Waters. ECF 47-1, Ex. A to CLF's Am. Compl. at 9-13; ECF 47-2, Ex. B to CLF's Am. Compl. at 9-14; Ex. M, 2d Supp. NOI at 9-14.

     **Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits the list of 11 alleged violations reflect the sub-headers at the cited pages of the NOIs. Plaintiff denies that the references to these 11 sub-headers fully summarize the contents of the alleged violations.

27.     In their Expert Reports and in deposition, Plaintiff's experts asserted violations of the Permit for the following reasons: (i) Inadequate Capacity of the Secondary Containment; (i) Permeability of Secondary Containment Areas; (iii) Low Points in Secondary Containment Areas; (iv) Structural Integrity of Secondary Containment Berms; (v) Wave Attacks on Secondary Containment Berms; (vi) Bare Soil on Secondary Containment Berms; (vii) Failure to Report on Secondary Containment Deficiencies; (viii) Groundwater Infiltration; (ix) Lack of Stormwater

Pond Liner; (x) Insufficient Stormwater Treatment Basin; (xi) Inadequate Emergency Vehicle Access for Ingress and Egress; (xii) Failure to Implement Corrective Action Plan; (xiii) Failure to Apply Best Industry Practice in Defendants' Risk Management Program; (xiv) Tank Spacing Violates National Fire Protection Association Guidance. *See e.g.*, Ex. N, Horner Report at 4-5, 18, 21, and 26; Ex. O, Goldsmith Report at 40-41, 43-47, 49-52, and 54; Ex. P, Nairn Report at v, 5, 10, 50, and 65.

**Response:** Plaintiff objects in that the opinion testimony of experts retained by Plaintiff or Defendants in this case are not "material facts" within the meaning of Fed. R. Civ. P. 56 or D. Conn. L. R. Civ. P. 56(a)(1). To the extent that Defendants are seeking to identify the content of Plaintiff's expert reports as "fact," Plaintiff objects to Defendants' inclusion of several such "facts" in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that the above list includes some of the violations Plaintiff's experts identified. Plaintiff denies that the references to this list fully summarizes the contents of the alleged violations substantiated in CLF's expert reports, or otherwise established by the evidence in this case.

28.     Plaintiff also served NOIs against other entities operating bulk storage facilities in New Haven at the same time. *See* Gulf NOI, ECF 1-2, *Conservation Law Found. v. Pike Fuels Ltd. Pship*, No. 3:21-cv-00932-SVN (D. Conn.) ("Gulf NOI"); *see also*, Ex. Q, Buckeye NOI.

**Response:** Plaintiff objects this fact is immaterial to any issue in this litigation. Subject to and without waiving this objection, Plaintiff admits in part, and Plaintiff denies in part. Plaintiff admits that Plaintiff served NOIs to other entities operating bulk storage facilities in New Haven. Plaintiff denies that such NOIs were issued "at the same time." The NOI issued to Gulf was dated July 18, 2020. The NOI issued to Buckeye was dated July 28, 2020.

29.     Unlike Plaintiff's NOIs to Defendants, Plaintiff's NOIs to Gulf and Buckeye included alleged CWA permit violations for (1) "Illegal Infiltration of Stormwater"; and (2) "failure to maintain an impervious containment area." *See* Gulf NOI at 13; Ex. Q, Buckeye NOI at 14.

**Response:** Plaintiff objects this fact is immaterial to any issue in this litigation. Subject to and without waiving this objection, Plaintiff admits the Gulf NOI and Buckeye NOI included headings titled "Illegal Infiltration of Stormwater" and "failure to maintain an impervious containment area." Plaintiff admits that the NOIs to Defendants do not contain these headings.

30.     In this case, Plaintiff's NOIs were the only notice provided to the Environmental Protection Agency ("EPA") and CT DEEP of the alleged violations. Ex. R, Mahoney Dep. at 51:23-52:3 and 93:14-94:2.

**Response:** Plaintiff admits that Mr. Mahoney testified that the only notices *that CLF* provided to EPA and Connecticut DEEP are Exhibits 3, 4, and 5 of the deposition. Mahoney Dep. at 93:12-13. The cited deposition testimony does not support the statement that CLF's NOIs were the only notices EPA or CT DEEP has ever received of permit violations at the Terminal. Plaintiff objects that this is a legal conclusion, not a fact and mischaracterizes Mr. Mahoney's testimony. After an objection for legal conclusion, Mr. Mahoney testified that the purpose of the notice of intent letter is "to provide notice an intent to file suit under a statute, here the Clean Water Act and the Resource Conservation Recovery Act, to provide notice to the party alleged to be in violation of these acts." *Id.* at 51:18– 52:3.

31.     Plaintiff's NOIs contained "the basis for all of the claims that CLF brought in the complaint." *Id.* at 46:22-47:2.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits that the quoted language from the deposition is accurate. Plaintiff denies as to "Plaintiff's NOIs contained", as

this portion of the deposition focused on one of CLF's Notice of Intent to File Suit letters, dated July 28, 2020, not all of "Plaintiff's NOIs": "Q. Okay.  Now – and you have read through this Notice of Intent to Sue identified as Mahoney No. 3?" *Id.* at 46:1-3.

32.    Plaintiff's NOIs do not include specific references to various claims and opinions set forth by its expert witnesses. *See e.g.*, *Id*. at 71:11-72:6; *id.* at 75:10-76:6 (permeability); *id*. at 80: 15-81 :3 (inadequate secondary containment); *id*. at 84:6-86:8 (stormwater pond liners); *id*. at 90:8-91:4 (inadequate stormwater treatment); *id*. at 95:7- 96:15 (groundwater allegations); *id*. at 96:16-97:23 (failure to implement a corrective action plan); *id.* at 98:5-21 (inadequate ingress and egress); *id*. at 104:15-105:1 (compound flood condition); *id*. at 207:17-25 (inadequate Spill Prevention Control & Countermeasures Plan ("SPCC")).

        **Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that "Plaintiff's NOIs do not include specific references to various claims and opinions set forth by its expert witnesses" because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects that this fact mischaracterizes the NOI documents. Plaintiff objects that the line of questioning during the deposition regarding the above terms were objected to during the deposition as the questions were beyond the scope of the deposition and because the NOI speaks for itself. Subject to and without waiving these objections, Plaintiff denies. The NOIs clearly describe and cite and quote requirements in the Permit related to the above paraphrases of violations at the Terminal. Whether the NOI contains specific references to various claims is a legal contention not a fact.  In addition, the NOI speaks for itself.

33.     Plaintiff did not provide EPA and the CT DEEP notice of the alleged violations contained in Plaintiff's expert reports. *Id*., at 87:3-24.

**Response:** Plaintiff objects to this contention because it is a statement of Defendants' legal position in this case, not a contention of fact. Subject to this objection, Plaintiff denies. The descriptions of the alleged violations in the NOIs clearly describe and cite and quote requirements in the Permit related to the paraphrases of violations at the Terminal set forth in paragraph 31. This contention misrepresents the cited deposition testimony. When asked if CLF ever notified CT DEEP or EPA about Dr. Horner's alleged violation that there was no liner in the stormwater pond, Mr. Mahoney answered: "I don't know if Doctor Horner's expert report has been shared with EPA or Connecticut DEEP, or quite frankly, any other third party other than your clients." *Id.* at 87:3–15.

34.     Plaintiff's experts also admitted that they were unaware of whether certain alleged violations they claimed at the Terminal were asserted in the statutorily required pre-suit NOI. *See e.g.*, Ex. S, Goldsmith Dep. at 88:4-17; Ex. T, Nairn Dep. at 106:18-107:5; Ex. U, Horner Dep. at 33:10-16; 166:1-5; 166:10-25.

**Response:** Plaintiff objects to this contention because it is not a statement of material fact relevant to any claim in this case.  Whether the NOIs provided adequate notice of the CLF's claims in this case is a contested question in this case, the resolution of which does not turn on the "awareness" of any expert regarding the content of the NOIs or this Court's interpretation of the NOIs.  Plaintiff objects that "Plaintiff's experts also Plaintiff admits that they were unaware" because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). To the extent this contention is treated as one of fact, Plaintiff

16

objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits the cited deposition sections include testimony regarding the expert's recall of the contents of the NOIs. Plaintiff denies as to this "fact's" failure to address the valid objections lodged on these questions and responses.

35.     The Terminal's SWPPP outlines procedures for preventing stormwater discharges, including detailed descriptions of site inspections, Control Measures, and monitoring protocols. The SWPPP emphasizes routine inspections, good housekeeping, spill response, and the implementation of structural and non-structural Control Measures to ensure environmental compliance and effective stormwater management. Ex. V, SWPPP (July 10, 2017).

     **Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

36.     The Terminal's SPCC Plan details the procedures for spill prevention, response, and regulatory compliance. It also includes facility operations, storage capacities, and security measures, emphasizing personnel training, inspections, and preventive documentation to minimize oil discharge risks. Ex. W, SPCC Plan (rev. March 2024).

     **Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

37.     The Terminal's Emergency Response Action Plan ("ERAP"), revised in June 2024, outlines detailed procedures for managing various incidents such as natural disasters, medical

emergencies, chemical releases, and spill containment, for a comprehensive emergency response. Ex. X, ERAP (rev. June 2024).

**Response**: Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

38.    The Terminal's Facility Response Plan ("FRP") is designed to help personnel prepare for and respond efficiently and effectively to incidents at the Terminal, ensuring compliance with federal, state, and local regulatory requirements and maintaining consistency with the National Contingency Plan and Area Contingency Plans. Ex. Y, FRP (rev. June 2024).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits as to the general contents of the Terminal's FRP. Plaintiff denies as to the characterization that the FRP "ensuring compliance with federal, state, and local regulatory requirements" as the Terminal's compliance status is a matter of interpretation of those unnamed laws and not a fact.

39.    The Terminal adopted its Business Continuity and Storm Action Plan ("BCP")[4], which details procedures for various operational disruptions and defining roles, responsibilities, and communication protocols. It also outlines phased steps for storm identification, Terminal shutdown, staff evacuation, employee communications, Terminal assessment and start-up, post-hurricane operations, and public relations. Ex. Z, BCP (rev. Dec. 2024).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection,

---

[4] The BCP incorporated and expanded upon the Terminal's prior Hurricane Action Plan.

Plaintiff admits

40.     The Terminal's Risk Management Plan (RMP") was prepared in accordance with the EPA's Accidental Release Prevention Provisions (40 C.F.R. Part 68). The RMP identifies potential accidental hazardous substance release scenarios and evaluates the potential impacts on public health and the environment. The RMP also includes safety measures and maintenance, monitoring, and employee training to prevent accidental releases. Ex. AA, RMP.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies as to the first sentence as it is a legal conclusion not fact, Plaintiff admits to the second and third sentences.

41.     EPA issues a Multi-Sector General Permit ("MSGP") for Stormwater Discharges from Industrial Activities that serves as the general permit for jurisdictions that do not issue their own permits under the CWA National Pollutant Discharge Elimination System ("NPDES") program.[5]

**Response:** Plaintiff objects that this fact contains legal conclusions. Subject to and without waiving this objection, Plaintiff denies the legal conclusions regarding the reasons for and where the MSGP applies, Plaintiff admits as to the fact that EPA issues a MSGP that can serve as the general permit for stormwater discharges from industrial activities in states.

42.     During the notice and comment period for its most recent MSGP (issued in 2021), EPA confirmed that the "requirement that operators consider implementing mitigation measures to minimize impacts from major storm events" was "a **new**. . .condition over the previous permit.

---

[5] *See* https://www.epa.gov/npdes/stormwater-discharges-
industrial- activities#:~:text=warehousing%20and%20storage)-
,Authorized%20States,Sector%20General%20Permit%20(MSGP).

. . ." *See* Ex. BB, EPA Response to Cmts. (Jan. 15, 2021), at 397-98. (emphasis added).

**Response:** Plaintiff denies as stated. Defendants' contention only partially quotes the response to a comment. Plaintiff admits the complete quote was the following: "EPA disagrees that the requirement that operators consider implementing mitigation measures to minimize impacts from major storm events constitutes backsliding. This is a new effluent limitation or condition over the previous permit, and as such not 'effluent limitations which are less stringent' as specified in section 402(o) of the Act or the regulations at 40 CFR 122.44(l)."

43.     EPA further stated that "[t]he 2021 MSGP includes this provision. . . **for the first time as the 2015 MSGP did not include a similar provision**." *Id.* (emphasis added).

**Response:** Plaintiff denies as stated. Defendants' contention only partially quotes the response to a comment. Plaintiff admits that the complete quote was the following: "The 2021 MSGP includes this provision to consider implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures for the first time as the 2015 MSGP did not include a similar provision."

44.     The Terminal does not discharge into an impaired waterbody. ECF 47, Am. Compl. at ¶ 452.

**Response:** Plaintiff objects to this fact because Defendants failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.* 2 F.R. D. 305, 306 (S.D. N.Y. 1942) ("The pleadings are not evidence."). Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. The cited paragraph in the amended complaint states in full that "[t]he

Terminal discharges to New Haven Harbor via the City of New Haven's Municipal Separate Storm Sewer System ("MS4")."

New Haven Harbor is listed under section 303(d) of the Clean Water Act as impaired for polychlorinated biphenyls (PCBs), oil and grease, nutrients, and dissolved oxygen, which negatively affect the beneficial use Habitat for Marine Fish, Other Aquatic Life and Wildlife; for enterococcus impeding the beneficial use Recreation; and for fecal coliform impacting the beneficial use Commercial Shellfish Harvesting. CT DEEP, 2022 Integrated Water Quality Report, at Appendix B-1 (Sept. 15, 2022) https://portal.ct.gov/deep/water/water-quality/water-quality-305b-report-to-congress. Total Maximum Daily Loads ("TMDLs") have been issued for fecal coliform, dissolved oxygen, total nitrogen, and nutrient/eutrophication biological indicators. *Id.* at Appendix B-2 (Waterbodies with Adopted TMDLs (EPA Category 4a)).

The City of New Haven municipal separate storm sewer system maps trace the course of stormwater after its exit from the Terminal. These maps show the pipe in East Shore Parkway where the stormwater basin outfall 001 discharges. There is a tide gate after a turn toward the northwest, beyond which the flow is on the surface. The channel turns toward the west at once and then flows through a discharge structure into New Haven Harbor.

45.     The Permit requires permittees to identify discharges to an impaired water and monitor the discharge for "indicator pollutants" only if the permittee discharges directly to an impaired water. Ex. A, Permit at 5(c)(2)(D)(i)(7) and (e)(1)(D)(ii).

**Response:** Plaintiff objects because what the Permit "requires" is a disputed question of fact, not a contention of fact. To the extent the contention in paragraph 45 includes contentions of fact, Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to these objections, Plaintiff denies. The cited permit

sections do not contain exemptions for identifying or monitoring discharges where a discharge is not "directly to an impaired water."

46.    Paul Simonetta, a professional engineer licensed in the State of Connecticut, testified that CT DEEP confirmed that unless specifically notified, a permittee discharging to an MS4 has no obligation to monitor. *See* Ex. CC, Simonetta Dep. at 96:10–99:13.

**Response:** Plaintiff objects that this is a legal conclusion not a fact. Subject to and without waiving this objection, EPA has rejected the notion that a permittee does not need to monitor a discharge into an MS4.

> Finally, EPA received comments and evaluated the proposal under which operators of regulated small, medium, and large MS4s would be responsible for controlling discharges from industrial and other facilities into their systems in lieu of requiring NPDES permit coverage for such facilities. EPA did not adopt this framework due to concerns with administrative and technical burden on the MS4 operators, as well as concerns about such an intergovernmental mandate.

64 Fed Reg 68722, 68782 (12/8/1999). Plaintiff further objects that Mr. Simonetta's statement is hearsay as to what CT DEEP has or has not confirmed. Fed. Rules Evid. 801(c). In addition, Mr. Simonetta could not recall how he received this guidance.

> Q: Do you know whether that guidance was over email or phone?
> A: I don't recall.
> Q: Do you know whether that guidance was provided in another case and then you applied it in this case?
> A: It's likely. I mean, the issue is that we've been working with this permit for 11 years now, maybe 12; and I don't know that it's going to be easy to find a communication or a document that specifically details that.
> Q: So you weren't basing that statement about discharges into impaired water on any general permit guidelines; instead, you were basing it off communications several years ago with CT DEEP; right?
> A: Correct.

Simonetta Dep. at 98:25–99:13.

47.    Neither CT DEEP nor EPA has ever stated that "best management practices" or "best industry practice" require a climate change or resilience assessment for the Terminal. Ex. R, Mahoney Dep. at 270:6-24.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff denies. This fact misrepresents the deposition testimony. Mr. Mahoney stated that he was not aware of any documents from EPA or CT DEEP that made reference to climate change in connection with BMPs. *Id.* at 270:6 – 24. In addition, the cited transcript does not mention "resilience assessment" at all.

48.     Plaintiff has never asked CT DEEP for its interpretation of the "best management practices" or "best industry practices" language, nor has Plaintiff made any inquiries to obtain any SWPPPs to assess the relevant industry interpretation of that language. *Id.* at 144:5-14 and 228:25-229:16.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1).  Plaintiff also objects in that this is not a statement of material fact relevant to any issue Defendants propose to brief at summary judgment. Subject to this and the below objections, Plaintiff admits that when asked if CLF ever asked CT DEEP does the term "best industry practice" include an obligation to complete a climate change assessment of a facility permitted under an industrial stormwater permit in Connecticut, Mr. Mahoney testified: "I don't believe CLF has ever asked Connecticut DEEP that question." *Id.* at 144:5–14. Plaintiff objects to the rest of the fact as it is a misrepresentation of the deposition testimony. Plaintiff denies this fact as to testimony regarding inquiries made, as Mr. Mahoney testified that he did not know if CLF had attempted to identify SWPPPs for other facilities along the coast in Connecticut. *Id.* at 228:25–229:16.

49.     There is no evidence that any company in the petroleum bulk storage industry (or any other industry) considered "climate change" in developing a SWPPP under the Permit, and Plaintiff has never performed any independent research to support its interpretation of the Permit.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff denies. Whether "climate change" is considered in developing a SWPPP under the permit is a question of fact. Plaintiff denies, as this fact is not supported by any evidence.

50.     CT DEEP has never treated failure to plan for either sea level rise or a 100-year or 500-year return period in a SWPPP as a violation of the Permit. *Id*. at 200:19-25.

**Response:** Plaintiff denies. This fact mispresents the cited testimony. The question asked was "Has CLF ever identified any notice of violation or notice of potential violation that CT DEEP has issued to any facility in Connecticut that relates to climate change in any way?" Mr. Mahoney's response was: "I don't know." *Id.* Further, whether there is a violation of the Permit is a question of fact. The Permit contains a number of requirements tied to 100-year metrics.

51.     CT DEEP has taken no enforcement action for failure to conduct a climate change vulnerability assessment and has not cited any permittee for climate-based stormwater violations under the Permit. Ex. S, Goldsmith Dep. at 116:3–16.

**Response:** Plaintiff denies. This fact misrepresents the cited deposition testimony of one expert witness, and is not supported by any other citation to admissible evidence regarding CT DEEP's enforcement actions. When asked about CT DEEP enforcement action against any

24

permittee under the permit for failure to complete a climate change vulnerability risk assessment, Ms. Goldsmith responded: "I'm not aware of any --- I don't know very much about Connecticut DEEP's enforcement actions from one cause [sic] or another." *Id.*

52.     There is no Connecticut law requiring climate change risk assessments, nor is there any Connecticut SWPPP that includes such an assessment. *See* Ex. R, Mahoney Dep. at 187:13-188:15 and 215:7-21; Ex. S, Goldsmith Dep. at 55:16–24 and 55:22-56:3.

**Response:** Plaintiff objects to this contention as it is a conclusion of law, not fact. To the extent the contentions in paragraph 52 includes contentions of fact, Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that this fact is speculative as to whether there are any Connecticut SWPPPs that include climate change risk assessments. Subject to and without waiving these objections, Plaintiff denies. The Permit requires climate change risk assessments as an application of duty to minimize pollutants to the best industry practice. This fact misrepresents the deposition testimony. As to CT DEEP and climate change vulnerability analysis, Ms. Goldsmith testified that "I don't believe that Connecticut DEEP made mention of that in any emails or other correspondence I reviewed." Goldsmith Dep. at 55:16 – 24. Ms. Goldsmith also testified that "she was not aware" if Connecticut DEEP ever asked the Terminal to change any of its practices or procedures involving stormwater at the Terminal. *Id.* at 55:22–56:3. Mr. Mahoney testified he was "not aware of any" and did not think there was a SWPPP in Connecticut that includes requirements to conduct a climate change vulnerability analysis under and industrial stormwater permit. Mahoney Dep. 187:13–22; 188:7–11. Mr. Mahoney testified that he could "not recollect" if there are other states that have such a condition in a SWPPP. Mahoney Dep. 188:12-15.

53.    Publicly available Connecticut SWPPPs under the Permit do not document climate change, storm surge, sea level rise, or extreme precipitation analyses, and CT DEEP is not aware of any such SWPPPs or related enforcement. Ex. DD, Bourdeau Report, at 4.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies that Ms. Bourdeau's conclusion about publicly available Connecticut SWPPPs is not accurate, reliable, or admissible, as Defendants have not cited any evidence supporting such determinations. Plaintiff denies as hearsay "CT DEEP is not aware of any such SWPPPs or related enforcement." Plaintiff denies that the documents Ms. Bourdeau reviewed did not contain the listed information, as Ms. Bourdeau's characterization of the contents of those documents is hearsay. Plaintiff denies that the testimony is material to Defendants' motion, as Ms. Bourdeau's testimony is irrelevant to the intent of the permitting authority in promulgating the Permit.

54.    Plaintiff and its experts did not conduct a survey or other analysis of bulk storage facilities' climate risk practices, and they are unaware of any objective standard requiring climate considerations in facility stormwater operations. *See, e.g.,* Ex. R, Mahoney Dep. 228:25-229:16; Ex. S, Goldsmith Dep. at 235:19-236:3; 236:19-237:24; 238:6-19; Ex. U, Horner Dep. at 206:9-207:5.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1).  Plaintiff admits that Ms. Goldsmith did not conduct a survey of industry practices in the bulk petroleum storage or any industry, she did not conduct a survey of all petroleum bulk storage facilities in Connecticut, and did not interview or contact other petroleum bulk storage terminals. Goldsmith Dep. 235:19–236:3; 236:12–20; 238:6–19. Plaintiff objects that this contention mispresents the deposition testimony. Mr. Mahoney stated

26

that he did not know if CLF identified SWPPPs for other facilities along the coast and in Connecticut. Mahoney Dep. 228:25–229:16.

55.     Plaintiff cannot identify a single SWPPP under the Permit that would meet the climate related permit terms it seeks to enforce. Ex. R, Mahoney Dep. at 188:7-15; *see also* See Ex. EE, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 1-9.

> **Response:** Plaintiff objects that this is a legal conclusion, not a fact. Subject to and without waiving this objection, Plaintiff denies. CLF's RFA Responses do not admit the stated fact. Whether a SWPPP under the Permit "would meet the climate related permit terms" is a question of permit interpretation. This fact also misrepresents the deposition testimony. Mr. Mahoney testified that he did not think there was an example of a SWPPP that CLF believes would comply with its interpretation of climate change assessment. Mahoney Dep. at 188:7-15.

56.     Plaintiff admitted that neither EPA nor CT DEEP has stated Defendants violated the Permit. Ex. R, Mahoney Dep. at 268:4-269:14.

> **Response:** Plaintiff objects that this is a legal conclusion, not a fact. Plaintiff objects that this is hearsay as to what EPA or CT DEEP has stated. Subject to and without waiving these objections, Plaintiff denies. This contention mispresents the testimony. Mr. Mahoeny testified that he did not believe "EPA or Connecticut DEEP has communicated to CLF that the Defendants are not operating the facility in – – in compliance with the permit." Mahoeny Dep. at 268:4–16. Mr. Mahoney did not know if either "EPA or [CT] DEEP has ever indicated to defendants that defendants are not acting in accordance with best management practices." *Id.* at 268:17–22.

57.     In December 2022, EPA inspected the Terminal and confirmed it complies with the SPCC regulations and the CWA. Ex. FF, U.S. EPA SPCC Field Inspection and Pan Review Checklist – SOPUS_NHVN00527912.

**Response:** Plaintiff objects as this is a legal conclusion, not a fact. Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that EPA performed an inspection of the Terminal in December 2022, but Plaintiff denies that the citation to the evidence confirms that Terminal "complies with the SPCC regulations and the CWA."

58.      The Terminal has not exceeded its water quality benchmark thresholds. *See* Ex. GG, Parkman Report, at 46.

**Response:** Plaintiff objects as this is a legal conclusion, not a fact. Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits as to the set of monitoring reports evaluated in the Parkman Report at 46, which states: "The discharge pollutant concentrations monitored and reported to the CT DEEP according to their permit requirements through Discharge Monitoring Reports (Exhibit 11) have all been below permit benchmark concentrations since implementation of the 2017 SWPPP." Plaintiff denies as to a fact that the Terminal "has not exceeded" in any monitoring at any time. Defendants have exceeded benchmark water quality standards in sampling for nitrogen. *E.g.*, ECF 47-9.

59.      The Permit, the 2025 Permit, and the 2021 MSGP did not incorporate or adopt ASCE24-14 or ASCE24-24 or their "critical infrastructure" definitions. Ex. S, Goldsmith Dep. at 166:15-167:4; 167:4-9.

**Response:** Plaintiff objects that this is a legal conclusion of law, not a fact. Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that "have not incorporated" is vague. Subject to and without waiving these objections, Plaintiff denies. This fact misrepresents the deposition testimony. Ms. Goldsmith stated that she was "not aware" as to whether EPA has adopted the ASCE Policy 360 as an example of best industry practice." Goldsmith Dep. at 166:4–17. The cited evidence of deposition testimony also does not refer ASCE24-14, ASCE-24, or "critical infrastructure" definitions, the Permit, the 2025 Permit, or the 2021 MSGP. Therefore, as to these terms, this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3).

60.     There is no evidence that Defendants are in any continuing violation of the CWA.

**Response**: Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Defendants are in continuing violation of a variety of provisions of the Permit. For example, Defendants have never had a full engineers' certification of their SWPPP, which is a continuing violation of Permit section 5(c)(7). The evidence of Defendants' continuing violation is at least the SWPPP Appendix G limitation on the SWPPP Appendix A certification.

61.     Connecticut has not defined or required specific permeability (hydraulic conductivity) standards and has not required stormwater pond liners in secondary containment. *See* Ex. EE, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 14-15.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that this is a legal conclusion, not a fact. Subject to and without waiving these objections, Plaintiff denies. Connecticut's permeability requirement is stated in the Permit, that standard requires an "impermeable secondary containment area."

62.    CT DEEP has never issued a Notice of Violation to the Terminal.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. CT DEEP issued Notices of Violation to the Terminal on at least April 23, 2001, July 28, 2006, and May 16, 2023.

63.    Plaintiff and several of its experts attended three site visits at the Terminal during the litigation and did not take any samples or conduct any testing at the Terminal.

**Response:** Plaintiff objects because this fact is vague regarding "samples" "testing" and does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff denies as this fact does not provide any supporting evidence or define "take any samples or conduct any testing." Experts conducted visual assessments and physical measurements of site features and stormwater infrastructure. Plaintiff admits that several of its experts attended site visits at the Terminal during the litigation and did not take physical water samples to conduct subsequent laboratory testing for pollutants.

64.    University of Connecticut's CIRCA program Sea Level Rise and Storm Surge Viewer shows that under various scenarios the Terminal is not at risk during any of the modelled storms on the site. *See* Ex. T, Nairn Dep. Ex. 19, 20.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects that there is no foundation as to how the CIRCA program Sea Level Rise and Storm Surge Viewer for how these maps were developed or any expert report on these maps. Subject to and without waiving these objections, Plaintiff denies. When Dr. Nairn was shown screenshots from the CIRCA Mapping Tool (Exhibits 19-1 to 19 -9), he testified that he had "no idea how it [CIRCA Mapping Tool] was developed, what confidence interval they used, what data they used, et cetera, et cetera, so whether they used a model at all." Nairn Dep. 258:1–259:4. Further, Dr. Nairn testified that when he saw the CIRCA maps it was "unfathomable" as to what the maps indicated "given the elevations and the elevation of that storm." *Id*. at 262:4–15. As to Exhibit 20, the CIRCA, Connecticut Sea Level Rise and Storm Surge Viewer, Dr. Nairn testified that this tool uses an historical record to determine return periods, and that this is not common practice within the coastal engineering community. *Id.* at 268:3–269:18. Dr. Nairn testified that using NACCS,

> [T]he area of the base of the berms around this facility ranges from plus 6 to plus 9 feet in the same datum, NAVD88. So they would be under water the 100-year event, let alone the 100-year plus another 1.64 feet, and then the 500-year with 1.64 feet. So there is something seriously wrong with this [CIRCA MAP] in terms of how it has been developed, and it would be that it is just more of a regional model and it is not site-specific.

*Id.* 269:19–270:22. In addition, Exhibit 20 contained a "data disclaimer", which stated "[t]his information is provided with the understanding that it is not guaranteed to be correct or complete

31

and the conclusions drawn from such information are the sole responsibility of the user." *Id.* at 273:17 – 274:9, Exhibit 20.

65.     There is no evidence of any alleged RCRA violation related to the Terminal. *See* 42 U.S.C. § 6903; 42 U.S.C. § 6972(a)(1)(B); "Characterization of Remediation Waste" Presentation (Oct. 17, 2017)[6].

   **Response:** Plaintiff objects that this is a legal contention, not a contention of fact. Plaintiff objects to this contention because Defendants failed to support it with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Plaintiff objects because this contention does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Defendants are allegedly in violation of RCRA at the Terminal for causing and contributing to an imminent and substantial endangerment for discarding hazardous substances into the Terminal's soil and groundwater and failing to contain and design the site to account for risks from climate change. NOI, ECF 47-2.

---

[6] https://portal.ct.gov/-/media/deep/ waste_management_and_disposal/hazardous_waste/ characterizationofremediationwastepdf.pdf?rev=f5e69d4274b240fa8848d774d49be444&hash=C2DE548FFF026D4 96AB103DC952531FE.

### III.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

66.    The 2018/2021 General Permit has the same requirement to implement Best Management Practices to the Best Industry Practice as the New Permit. 2021 Permit § 2 & 5(b); 2025 Permit § 4.2 & 7.

67.    The February 17, 2021 NOI cites to violation of the 2018 Permit § 5(b)(9), which requires "an impermeable secondary containment area." NOI, ECF 47-2 at 12; 2018 Permit § 5(b)(9)(A)(i)(2).

68.    The NOI cites to violation of the 2018 Permit § 5(b)(9), which requires secondary containment volume of "at least 100% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow from such secondary containment area." NOI, ECF 47-2 at 12; 2018 Permit § 5(b)(9)(A)(i)(2).

69.    The NOI describes the Terminal's containment areas, stating in part:

> The Terminal's bulk storage tanks are located in three "Containment Areas," which lie below the surrounding ground level and have rammed earth berms at certain locations around the periphery of the Containment Areas. The containment berms do not surround the entirety of the Containment Areas and have openings in several places. Stormwater from the Terminal flows through a series of catch-basins and pumps into a set of two retention basins. The stormwater from the basins is then manually pumped into the New Haven Municipal Separate Storm Sewer System ("MS4"). The stormwater from the tank farm is not treated before it is pumped into the retention basins. Stormwater from the truck loading rack flows through an oil/water separator before it is pumped into the retention basins. The stormwater from the retention basins is not treated before it is pumped to the New Haven MS4. The stormwater flows from the New Haven MS4 directly into New Haven Harbor.

NOI, ECF 47-2 at 3.

33

70. Triton and Equilon's 30(b)(6) witness testified that the secondary containment area is not completely impermeable. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 234:9–237:5.

71. The Terminal's SWPPP does not confirm that the containment areas are impermeable. Triton Environmental 30(b)(6) Deposition at 95:11–15 (Feb. 16, 2023); Triton Environmental Dep. Ex. 1065 (Appendix D to Facility SWPPP).

72. Section 3(b)(2) of the Permit, Coastal Management Act, which falls under requirements for authorization under the Permit section, states: "Such activity must be consistent with all applicable goals and policies in section 22a-92 of the Connecticut General Statutes, and must not cause adverse impacts to coastal resources as defined in section 22a-93(15) of the Connecticut General Statutes." Permit, ECF 248-5 at 10.

73. The Terminal discharges to the New Haven Harbor. Until 2015, the Terminal's stormwater monitoring reports to CT DEEP identified it as discharging to an impaired waterbody (New Haven Harbor) and included the required additional monitoring. *E.g.*, Stormwater Monitoring Report (Oct. 19, 2011), ECF 47-9 at 3–4.

74. The New Haven Harbor is impaired. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 31:2–15.

75. Triton and Equilon admit they generate hazardous waste at the Terminal. Answer, ECF 120 ⁋ 143, 144.

76. Triton and Equilon admit they store hazardous waste at the Terminal. Answer, ECF 120 ⁋ 145.

77. The Terminal's Remedial Action Plan divides the Terminal site into nine AOCs designated: 1, 2, 3, 4/5, 6, 7, 8, 9, 10. Sovereign Consulting, Inc. Remedial Action Plan

Shell New Haven Terminal. Prepared for Shell Oil Products US at 7, 64 Fig. 3 (Dec. 18, 2023) ("2023 Remedial Action Plan") (SOPUS_NHVN00247004).

78. Pollutants in soil and groundwater are above remediation thresholds in each AOC. 2023 Remedial Action Plan at 9–13, 15–18.

79. The Terminal's Remedial Action Plan proposes removing contaminated soil in AOC 1 and 2. 2023 Remedial Action Plan at 28–29.

80. The Terminal's Remedial Action Plan proposes to not remove contaminated soil in AOCs 3-10, but instead hold removal "in abeyance until the terminal is decommissioned and all equipment is removed." 2023 Remedial Action Plan at 27–31.

81. The Terminal is abutted by residential backyards containing children's playsets. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 191:1–16.

Dated: November 14, 2025

Respectfully submitted,

CONSERVATION LAW
FOUNDATION, Inc., by its attorneys

/s/ James Y. Meinert
James Y. Meinert (ct31637)
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110
Tel: (617) 850-1744
E-mail: jmeinert@clf.org

Christopher M. Kilian (ct31122)
Kenneth J. Rumelt (phv207130)*
Anna Tadio (phv208827)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3020

Tel: (802) 622-3009
E-mail: ckilian@clf.org
E-mail: krumelt@clf.org
E-mail: atadio@clf.org

Ana McMonigle (ct31370)
Andrea Leshak (phv208945)*
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
Tel: (203) 902-2157
E-mail: amcmonigle@clf.org
E-mail: aleshak@clf.org

James Crowley (ct31319)
Conservation Law Foundation, Inc.
235 Promenade Street
Suite 560, Mailbox 28
Providence, RI 02908
Tel: (401) 228-1905
Email: jcrowley@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Mimi Liu (phv208839)*
Devin Williams (phv208833)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004
Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
Tel: (202) 386-9625
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: mliu@motleyrice.com

36

E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Shalom Jacks (phv208834)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
Tel: (843) 216-9013
E-mail: rmazingo@motleyrice.com
E-mail: sjacks@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

*Attorneys for Plaintiff*
*Conservation Law Foundation, Inc.*
**Plaintiff admits as Visiting Attorney*