# **<u>EXHIBIT 1</u>**

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 2 of 9

Wendi Goldsmith , Ph.D., PG                         August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 1

```
 1                           Volume I
                          Pages 1 to 291
 2                        Exhibits See Index
 3            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
 4
     - - - - - - - - - - - - - - - - -x
 5                                     :
     CONSERVATION LAW FOUNDATION,      :
 6   INC.,                             :
                  Plaintiff,           :
 7                                     :  Civil Action
             vs.                       :  No.
 8                                     :  3:21-cv-00933-
     EQUILON ENTERPRISES LLC D/B/A     :  VDO
 9   SHELL OIL PRODUCTS US, TRITON     :
     TERMINALING LLC, and MOTIVA       :
10   ENTERPRISES LLC,                  :
                  Defendants.          :
11                                     :
     - - - - - - - - - - - - - - - - -x
12
             VIDEOTAPED DEPOSITION OF WENDI GOLDSMITH,
13   Ph.D., PG, a witness called by counsel for the
     Defendants, taken pursuant to the Federal Rules of
14   Civil Procedure, before Jane M. Werner, Registered
     Merit Reporter and Notary Public in and for the
15   Commonwealth of Massachusetts, appearing at the
     Offices of Conservation Law Foundation, Inc., 62
16   Summer Street, Boston, Massachusetts, on Wednesday,
     August 20, 2025, commencing at 10:02 a.m.
17
     PRESENT:
18
        Conservation Law Foundation
19           (by Christopher M. Kilian, Esq.)
             15 East State Street, Suite 4, Montpelier,
20           VT 05602, for the Plaintiff.
             ckilian@clf.org
21           802.223.5992
22
23
24
```

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 3 of 9

Wendi Goldsmith , Ph.D., PG                          August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 140

1                  (Document marked as
2                  Exhibit G34 for identification)
3      BY MR. HENDERSON:
4      Q.   Just for the record, this is an
5   introductory section of this report by the National
6   Academy Press, by the National Academy of
7   Sciences -- actually, the National Research council,
8   called, "Responding to Changes in Sea Level."
9           And you've referred to this as a best
10  industry practice, correct?
11     A.   I don't think I did, no.
12     Q.   The document identified as Exhibit G34, is
13  this a best industry practice?
14     A.   I don't think so.
15     Q.   Why did you cite this?
16     A.   This was a very early formalized
17  publication stating the linkage between changes in
18  sea level and the engineering implications.
19     Q.   Does this set any best industry practice
20  whatsoever?
21     A.   First of all, I believe the Corps of
22  Engineers had a more sophisticated -- it might even
23  be referenced in this; I forget.  But I'm familiar
24  with the Corps of Engineers having had sea level

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 4 of 9

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 141

1  rise -- sea level rise due to post-glacial rebound
2  has been understood by geologists for, you know, at
3  least a century, I'd say.  And the Corps of
4  Engineers had been dealing with that on project
5  sites, so I know that they had awareness, if not at
6  the time of this report, possibly preceding it, I
7  think, to my recollection.
8      Q.   So this is or is not a best industry
9  practice?
10     A.   It certainly isn't a best industry practice
11 today, because this is something that is rather
12 stale and outdated.  And also, this particular
13 document really was trying to catalogue what was the
14 then current understanding of sea level -- what
15 contributes to sea level rise, why is it different
16 in different areas and so forth, what are some of
17 the extremes of sea level rise experienced locally.
18 But it didn't really get into factoring in future
19 forecasts.  In 1987, it was -- people were using a
20 calculator to do a lot of computations, but they
21 didn't have multi-parameter modeling of future
22 climate conditions and their effects on sea level
23 rise.
24     Q.   But just to be clear, this does not include

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 5 of 9

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 164

1   practicing engineers, project stakeholders,
2   policy-makers, and decision-makers --
3        Q.   But this is not -- sorry, go ahead.
4        A.   -- informing practicing engineers, project
5   stakeholders --
6             THE COURT REPORTER:  Hold on.  That's
7   really loud.
8             MR. HENDERSON:  Sorry.
9        Q.   Okay, go ahead.
10       A.   -- identifying critical infrastructure that
11  is most threatened by changing climate and so on.
12            Anyway, this statement is a policy
13  statement, but it frames how the science, the
14  policy, the role of engineers, and the significance
15  of critical infrastructure are reflected.
16       Q.   So is this a best industry practice for
17  petroleum bulk storage facilities?
18       A.   It's not a best industry practice.  It's a
19  policy statement that references some practices.
20       Q.   Just making sure it's not a best industry
21  practice.
22       A.   It speaks to what is and what's involved in
23  a best industry practice.  And it also definitely
24  speaks about critical infrastructure as well.

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 6 of 9

Wendi Goldsmith , Ph.D., PG                    August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 177

1   page here, it talks about how this is related to the
2   National Flood Insurance Program and the Flood
3   Insurance Rate Map process, right?
4       Q.   Is this document a best industry practice
5   for permitees under the Industrial Stormwater Permit
6   in the State of Connecticut?
7       A.   No.
8       Q.   So it's "No."  Why is it not?
9       A.   The FEMA firm development process is
10  intended for setting insurance rates.  It's an
11  excellent screening tool.  A lot of people rely on
12  it as the only tool that exists covering their
13  certain area.
14           I have presented -- and I attempted to be
15  clear about it -- that the NACCS study provided much
16  more detailed analysis at a much higher resolution
17  and degree of accuracy that included future climate
18  change effects related to flooding and storm
19  intensity.
20           And so I wish to differentiate that use of
21  FEMA maps for screening purposes is a good starting
22  point.  But for the -- the publicly available
23  resource that far exceeded that in terms of quality
24  would be the NACCS study.  And last but not least,

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 7 of 9

Wendi Goldsmith , Ph.D., PG               August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 203

1    MR. HENDERSON:  It's the Table of Contents.
2    MR. KILIAN:  And one introduction page?
3    MR. HENDERSON:  That's all it is.
4    MR. KILIAN:  Okay.
5    MR. HENDERSON:  So we have a picture of it
6  to see if Dr. Goldsmith believes this is evidence of
7  best industry practice for permitees under the
8  Industrial Stormwater Permitting program in the
9  State of Connecticut.
10      A.   So I think just from the date on it, I
11  don't believe it's actually what would currently be
12  a best practice, because it's nearly 20 years old.
13  But it would have been in the evolutionary sequence
14  of best practices.
15      Q.   So you're not offering an opinion that this
16  is a current best industry practice?
17      A.   It's -- let's see.  Can you point me to
18  where in my report I actually --
19      Q.   It's in a footnote.  I don't have that.
20      A.   I think it is this -- it's related to the
21  debris impact loads.  That probably is a best
22  industry practice to this date, because I don't
23  believe in that respect that I cited it for, I don't
24  believe there's been any new material advancement.

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 8 of 9

Wendi Goldsmith , Ph.D., PG                August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 204

1   And it's not really a best practice.  It's just
2   relevant information that should be used within best
3   practices.
4       Q.   If you look at Page Romanette i of this
5   document, which is identified as Exhibit G34.
6            MR. KILIAN:  35, I think.
7            MR. HENDERSON:  It is 35, sorry.
8       A.   I'm looking at that, yeah.
9       Q.   G35.  It says, "This manual recommends
10  incorporating hazard mitigation measures at all
11  stages for all levels for new construction and the
12  reconstruction rehabilitation of existing
13  facilities."
14      A.   Uh-hum.
15      Q.   So New Haven terminal is not new, correct,
16  and it's not being reconstructed or rehabilitated?
17           MR. KILIAN:  Objection.

[redacted]

Case 3:21-cv-00933-VDO   Document 893-1   Filed 11/17/25   Page 9 of 9

Wendi Goldsmith , Ph.D., PG   August 20, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, Et Al.

Page 291

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.                  )
3      I, Jane M. Werner, RMR and Notary Public in and
4  for the Commonwealth of Massachusetts, do hereby
5  certify that there came before me on the 20th day of
6  August, 2025, at 10:02 a.m., the person hereinbefore
7  named, who was by me duly sworn to testify to the
8  truth and nothing but the truth of her knowledge
9  touching and concerning the matters in controversy
10 in this cause; that she was thereupon examined upon
11 her oath, and her examination reduced to typewriting
12 under my direction; and that the deposition is a
13 true record of the testimony given by the witness.
14     I further certify that I am neither attorney or
15 counsel for, nor related to or employed by, any
16 attorney or counsel employed by the parties hereto
17 or financially interested in the action.
18     In witness whereof, I have hereunto set my hand
19 and affixed my notarial seal this 31st day of
20 August, 2025.
21
22 *[signature: Jane M Werner]*
23 Jane M. Werner
   Notary Public
24 Commission expires 1/27/2028