# EXHIBIT 1

Page 1

Volume I
Pages 1 to 291
Exhibits See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -x
                                    :
CONSERVATION LAW FOUNDATION,        :
INC.,                               :
              Plaintiff,            :
                                    :   Civil Action
        vs.                         :   No.
                                    :   3:21-cv-00933-
EQUILON ENTERPRISES LLC D/B/A       :   VDO
SHELL OIL PRODUCTS US, TRITON       :
TERMINALING LLC, and MOTIVA         :
ENTERPRISES LLC,                    :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - - - -x

        VIDEOTAPED DEPOSITION OF WENDI GOLDSMITH,
Ph.D., PG, a witness called by counsel for the
Defendants, taken pursuant to the Federal Rules of
Civil Procedure, before Jane M. Werner, Registered
Merit Reporter and Notary Public in and for the
Commonwealth of Massachusetts, appearing at the
Offices of Conservation Law Foundation, Inc., 62
Summer Street, Boston, Massachusetts, on Wednesday,
August 20, 2025, commencing at 10:02 a.m.

PRESENT:

    Conservation Law Foundation
        (by Christopher M. Kilian, Esq.)
        15 East State Street, Suite 4, Montpelier,
        VT 05602, for the Plaintiff.
        ckilian@clf.org
        802.223.5992

Page 140

(Document marked as

Exhibit G34 for identification)

BY MR. HENDERSON:

Q.   Just for the record, this is an introductory section of this report by the National Academy Press, by the National Academy of Sciences -- actually, the National Research council, called, "Responding to Changes in Sea Level."

And you've referred to this as a best industry practice, correct?

A.   I don't think I did, no.

Q.   The document identified as Exhibit G34, is this a best industry practice?

A.   I don't think so.

Q.   Why did you cite this?

A.   This was a very early formalized publication stating the linkage between changes in sea level and the engineering implications.

Q.   Does this set any best industry practice whatsoever?

A.   First of all, I believe the Corps of Engineers had a more sophisticated -- it might even be referenced in this; I forget.  But I'm familiar with the Corps of Engineers having had sea level

Page 141

rise -- sea level rise due to post-glacial rebound has been understood by geologists for, you know, at least a century, I'd say.  And the Corps of Engineers had been dealing with that on project sites, so I know that they had awareness, if not at the time of this report, possibly preceding it, I think, to my recollection.

Q.    So this is or is not a best industry practice?

A.    It certainly isn't a best industry practice today, because this is something that is rather stale and outdated.  And also, this particular document really was trying to catalogue what was the then current understanding of sea level -- what contributes to sea level rise, why is it different in different areas and so forth, what are some of the extremes of sea level rise experienced locally. But it didn't really get into factoring in future forecasts.  In 1987, it was -- people were using a calculator to do a lot of computations, but they didn't have multi-parameter modeling of future climate conditions and their effects on sea level rise.

Q.    But just to be clear, this does not include

Page 164

practicing engineers, project stakeholders,

policy-makers, and decision-makers --

Q.   But this is not -- sorry, go ahead.

A.   -- informing practicing engineers, project

stakeholders --

THE COURT REPORTER:  Hold on.  That's

really loud.

MR. HENDERSON:  Sorry.

Q.   Okay, go ahead.

A.   -- identifying critical infrastructure that

is most threatened by changing climate and so on.

Anyway, this statement is a policy

statement, but it frames how the science, the

policy, the role of engineers, and the significance

of critical infrastructure are reflected.

Q.   So is this a best industry practice for

petroleum bulk storage facilities?

A.   It's not a best industry practice.  It's a

policy statement that references some practices.

Q.   Just making sure it's not a best industry

practice.

A.   It speaks to what is and what's involved in

a best industry practice.  And it also definitely

speaks about critical infrastructure as well.

Page 177

page here, it talks about how this is related to the National Flood Insurance Program and the Flood Insurance Rate Map process, right?

Q.   Is this document a best industry practice for permitees under the Industrial Stormwater Permit in the State of Connecticut?

A.   No.

Q.   So it's "No."  Why is it not?

A.   The FEMA firm development process is intended for setting insurance rates.  It's an excellent screening tool.  A lot of people rely on it as the only tool that exists covering their certain area.

I have presented -- and I attempted to be clear about it -- that the NACCS study provided much more detailed analysis at a much higher resolution and degree of accuracy that included future climate change effects related to flooding and storm intensity.

And so I wish to differentiate that use of FEMA maps for screening purposes is a good starting point.  But for the -- the publicly available resource that far exceeded that in terms of quality would be the NACCS study.  And last but not least,

Page 203

MR. HENDERSON:  It's the Table of Contents.

MR. KILIAN:  And one introduction page?

MR. HENDERSON:  That's all it is.

MR. KILIAN:  Okay.

MR. HENDERSON:  So we have a picture of it to see if Dr. Goldsmith believes this is evidence of best industry practice for permitees under the Industrial Stormwater Permitting program in the State of Connecticut.

A.   So I think just from the date on it, I don't believe it's actually what would currently be a best practice, because it's nearly 20 years old. But it would have been in the evolutionary sequence of best practices.

Q.   So you're not offering an opinion that this is a current best industry practice?

A.   It's -- let's see.  Can you point me to where in my report I actually --

Q.   It's in a footnote.  I don't have that.

A.   I think it is this -- it's related to the debris impact loads.  That probably is a best industry practice to this date, because I don't believe in that respect that I cited it for, I don't believe there's been any new material advancement.

Page 204

And it's not really a best practice.  It's just relevant information that should be used within best practices.

Q.   If you look at Page Romanette i of this document, which is identified as Exhibit G34.

MR. KILIAN:  35, I think.

MR. HENDERSON:  It is 35, sorry.

A.   I'm looking at that, yeah.

Q.   G35.  It says, "This manual recommends incorporating hazard mitigation measures at all stages for all levels for new construction and the reconstruction rehabilitation of existing facilities."

A.   Uh-hum.

Q.   So New Haven terminal is not new, correct, and it's not being reconstructed or rehabilitated?

MR. KILIAN:  Objection.

A.   I have seen corrective actions prepared -- I've seen a corrective action plan prepared by Shell at the terminal.  So to say that it is -- it's definitely been in existence since on or around 1950, but it's also subject to various upgrades and modifications over the years.  And it has had at least one set of modifications proposed relatively

Page 291

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                   )

I, Jane M. Werner, RMR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 20th day of August, 2025, at 10:02 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 31st day of August, 2025.

Jane M. Werner

Notary Public

Commission expires 1/27/2028