# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


----------------------------x
CONSERVATION LAW                    :
FOUNDATION, INC.,                   :
                                    :
          Plaintiff                 :
                                    :CASE NO.
     -versus-                       :3:21-CV-00933-VDO
                                    :
EQUILON ENTERPRISES LLC             :
d/b/a SHELL OIL PRODUCTS            :
US, TRITON TERMINALING LLC :
and MOTIVE ENTERPRISES LLC,:
                                    :
          Defendants                :
----------------------------x




Videotaped Deposition of JOSHUA MACEY, taken
pursuant to Rule 30 of the Federal Rules of Civil
Procedure, held at the law offices of WIGGIN AND
DANA, LLP, One Century Tower, 265 Church Street,
New Haven, Connecticut, before Julia Flynn
Cashman, RPR, CSR and Notary Public in and for the
State of Connecticut, on Tuesday, September 2,
2025, at 9:00 a.m.

Page 102

ahead.

A. So, yeah, this is a great question.  And it's pretty interesting, I think.  I'll slow down. So and I -- here, I am not expressing an opinion on the legal conclusion, but simply why this would matter for the -- either the judge or the jury charged with reaching a legal conclusion.

So Motiva could be held liable and regardless of whether Equilon indemnifies it, if Equilon is held liable separately, that could affect the -- it could certainly affect a variety of reasons why, as a legal conclusion, there are then multiple defendants who could pay liability, the financial solvency, you know, in terms of assessing damages.

If Equilon is a -- in short, if Equilon is the operator in that period, it could be held liable in its own right, separately from Motiva.

Q. Are you aware of any defendant in this case asserting a defense based on financial insolvency?

A. I am not.

Q. Do you have any reason to believe that defendants would not be able to pay damages awarded in this case?

A. So one -- okay, so two things.  One, based

Page 103

on the evidence I reviewed, I'm not aware that they could not pay damages.

That being said, the -- there are other reasons, based on how Clean Water Act damages are calculated, why solvency could be relevant in assessing damages.

Q. Would that be true only if a party was claiming insolvency?

A. No.

Q. Why is that?

A. So under the Clean Water Act, one of the prongs in determining damages is the economic benefit to the firm.  Various Shell entities, and including the CEO, have discussed their environmental stewardship and the measures they're taking to adapt to climate change and to mitigate climate harm in things likes advertising, et cetera.

One would expect that a firm that does that makes, invests in, you know -- speaking, one might think that a firm that does that is going to invest in mitigation measures to meet the measures they've publicly professed that they are trying to do.

And so in terms of an economic benefit, a

Page 119

period, --

A. Yes.

Q. -- 1998 to 2017.

A. Yes.

Q. Now, almost all the support for the opinion in Opinion Number One in your expert report comes from documents authored in 2011 or later.  Is it fair to say?  You can look at --

A. I think so.  I thought there were a few beforehand, but most that I'm recollecting from that time period.

Q. And I'm referring to pages 10 through 14 of your report which cite various documents.

A. Yes.

Q. None of the documents that you cite in your report specifically refer to the New Haven Terminal, do they?

A. That is -- I think some of them do.  I don't discuss it -- so, many of the documents that I reviewed were contracts between Equilon and Motiva about management of Motiva terminals.  And my recollection -- but this is not something I have looked at in some time -- is that some of the documents list out the -- many of the documents -- actually, many of those documents -- some of the

Page 120

documents, I think, list the specific terminals. That didn't appear to be relevant.  It wouldn't have influenced my opinion one way or another. But I -- I'm not sure that's right.

Q. The only documents that you cite in this section -- I'm talking about pages 10 through 14 of your initial expert report -- that is from before 2011, reports -- purports to reflect Equilon's oversight of a 2001 consent degree regarding other facilities, --

A. Yes.

Q. -- is that correct?  It's from 2001.

A. Yes.

Q. The actual footnote that you have in your report goes to a different document, which is a service level agreement from 2011 -- for the record, that's SOPUS, Bates number SOPUS_NHVN01091520, which is cited elsewhere in your report.  Do you agree that that is not the 2001 --

A. That's not the 2001.

Q. Is that a typo?

A. Yes.

Q. In any event, you concede in your report that even that consent decree did not cover New

Page 132

Q. Obviously, 2020 would have been after Motiva transferred ownership of the New Haven Terminal to Triton.

A. Correct.

Q. What does this agreement have to do with your opinions regarding the ownership and operation of the terminal during the period of Motiva's ownership?

A. Yeah, so Equilon and Motiva -- Motiva, as we discussed, was established as a joint venture among -- between Equilon and Saudi Aramco.  They had a series of joint investments, and one of the things I was trying to ascertain was how they managed and operated those entities.  And so this document, to me, shows the extent to which Equilon was empowered to directly contract for services related to operational control.

You are correct that the New Haven Terminal is not listed as one of the facilities here.  But in terms of understanding the relationship that Equilon had with various Motiva terminals, this is -- this is a document that informed my opinion.

Q. You have not seen any document during the period of Motiva ownership and operation of the New Haven Terminal that refers to Equilon as the

Page 133

operator, correct?

A. I would need to go back.  I'm not recalling this, right now.

Q. In fact, you have not seen any document, you don't cite any in your expert report, during the period of Motiva ownership and operation that specifically reference the New Haven Terminal in any way?

A. I don't recall.

Q. There's another document that you cite in your expert report.  This, we'll mark as Macey Exhibit 11.

(DEFENDANT'S EXHIBIT 11 FOR
IDENTIFICATION Received and Marked.)

Q. Have you seen this document before?

A. Yes, I have.

Q. This is one of the documents that you relied on in performing --

A. It is.

Q. -- preparing your expert opinions?

A. It is.

Q. I'll note that this is a -- in its native format, a spreadsheet.  And this appears to be a printout of that spreadsheet, fair?

A. Yes.

Page 134

Q. This spreadsheet is undated, correct?

A. It is undated.  There are dates in the third column.  I'm just trying to -- I mean, that's not the date of the document.  But the document itself is undated.

Q. So for the record, there is a column here that shows revision dates of the document, correct?

A. Yes.

Q. But there's no date on this document that will tell you when the document itself or the spreadsheet itself was created; fair?

A. I would need to review the document carefully again, but I am not aware of any.

Q. Are there any references in this document to the New Haven Terminal whatsoever?

A. I do not believe that there are, but I would -- am happy to look through it.

Q. So again, what does this document have to do with anything regarding the New Haven Terminal during the period we've been discussing from 1998 to 2017?

A. So, again, as with the service level agreements that discuss facilities that are owned by Motiva, but not mention the New Haven Terminal,

Page 135

this indicates how Equilon maintained exhaustive and excruciatingly close scrutiny of various Motiva facilities, though it does not mention the New Haven Terminal.

Q. Now, talking -- moving towards the period of transition from the Motiva ownership and operation of the terminal, to the time period when it's become owned by Triton and operated by Equilon.

A. Yes.

Q. Just want to orient you to the time period we're going to talk about.

We already discussed your opinion that Motiva did not actually dissolve its entire company, correct?

A. Correct.

Q. And there's actually a separation agreement that you have relied upon and cited in your initial report, correct?

A. Correct.

Q. And it's on page 10 of your report, Footnote 35.

A. Correct.

MR. KEARNEY:  This will be Macey Exhibit 12.

(DEFENDANT'S EXHIBIT 12 FOR

Page 184

A. Correct.

Q. And do you know that when a party submits Answers to Interrogatories, that those answers are served under oath?

A. Yes.

Q. That means that the person signing the answers has to certify that they are telling the truth under penalty of perjury, correct?

A. Correct.

Q. Just like you've sworn to tell the truth in your testimony today?

A. Correct.

Q. I'm going to hand you a copy of your Interrogatory answers in this case.  Bear with me.

You could put aside the Yeates Declaration. So this next exhibit will be Macey Exhibit 15.

(DEFENDANT'S EXHIBIT 15 FOR IDENTIFICATION Received and Marked.)

MR. KEARNEY:  For the record, I'll state this is a copy of "Defendant's Second Supplemental Response to Plaintiff Conservation Law Foundation Interrogatories to All Defendants" with this case is captioned up top.  And if you go to the back, it was served on October 11, 2024.

Q. Professor Macey, I assume you've not seen

Page 185

this document before today?

A. No, I have not.

Q. If you turn your direction to page 8, you can see it's a part of a response to Interrogatory Number 9.  Is that correct, if you look from page 6, it flows forward and then we're on page 8.

A. Okay.

Q. Direct your attention to the first paragraph on the page, which starts with, reading, "Additionally, severe weather and other risks are addressed through the terminal's asset integrity process.  This process helps to ensure -- helps to both ensure compliance with permit requirements, and evaluate and address physical risks to the terminal.  In doing so, the terminal utilizes site-specific engineering practices in maintaining its preparation for severe weather effects.  There are no universally applicable engineering practices and such practices are highly site-specific."

Did I read that correctly?

A. You did.

Q. Do you have any reason to dispute the language in this statement that the terminal's asset integrity process directs the terminal to

Page 193

were, as this paragraph says, responsible for ensuring environmental compliance.  Many of them have been employed by a series of Shell entities, and they were directly responsible for environmental compliance at the terminal.

When I looked at what they did at the New Haven Terminal, they checked the box of the HSSE control framework.  And so the paragraph says the same thing as the other paragraphs we've gone over.  But I really feel, given just looking at these other parts of the document, that what we have to get at is how much did these other individuals do.

And it actually is starting to look to me like parts of -- even this Interrogatory, support my position because they mention the important role that these other individuals played at the site.

Q. Okay.  You referred to the preceding paragraph which talks about deposition testimony of Michael Sullivan, James Kent Yeates, Jennifer Bothwell and James Ledbetter; correct?

A. Correct.

Q. You haven't reviewed any of their deposition testimony, have you?

Page 194

A. I have not.

Q. Would that have been relevant to your points in this case?

MR. PENDELL:   Objection to form.

A. Again, I would need to look at the deposition.

Q. And this document, again, states that the Shell group of companies is not dictating what any of its subsidiaries must do at particular facilities with regard to risk management; correct?

A. This particular documents we're looking at?

Q. Correct.

A. I haven't reviewed the whole document.  I actually don't -- because I'm just skimming it, and the next paragraph says "The Hurricane Action Plan has been incorporated into a Business Continuity Plan."  And I don't have -- I haven't looked at any of these things, so I really would have to look at more, both about document and then about things like the Business Continuity Plan, which I also believe I haven't reviewed.

Q. And you haven't reviewed the SEAM standards either?

A. I have not.

Page 196

MR. KEARNEY: I'll mark this as Macey Exhibit 16 and say for the record it's a copy of the February 12, 2025, 30(b)(6) videotaped deposition of Brian Evans.

(DEFENDANT'S EXHIBIT 16 FOR IDENTIFICATION Received and Marked.)

Q. So Professor Macey, we were just discussing the Yeates Declaration and then the Interrogatory answer which you had not reviewed.  But this deposition transcript is on your list of materials considered, correct?

A. Yes.

Q. And it's your understanding that Mr. Evans was sitting for a deposition on this date, February 12, 2025, just like you're sitting here today, correct?

A. Correct.

Q. In fact, he was actually a Rule 30(b)(6) deposition deponent.  Do you understand what that means?

A. I believe so.  As we discussed, my civil procedure is not ideal.  If you wouldn't mind reminding me, I'd be grateful.

Q. Do you understand that Mr. Evans was designated to testify on behalf of defendants for

Joshua Macey                                September 2, 2025
Conservation Law Foundation, Inc. v. Shell Oil Com

Page 265

                    C E R T I F I C A T E

        I hereby certify that I am a Notary Public
in and for the State of Connecticut duly
commissioned and qualified to administer oaths.
I further certify that the deponent named in the
foregoing deposition was by me duly sworn and
thereupon testified as appears in the foregoing
deposition; that said deposition was taken by me
stenographically in the presence of counsel and
transcribed by means of computer-aided
transcription by the undersigned, and the
foregoing is a true and accurate transcript of the
testimony.
I further certify that I am neither of counsel nor
attorney to either of the parties to said suit,
nor of either counsel in said suit, nor related to
or employed by any of the parties or counsel to
said suit, nor am I interested in the outcome of
said cause.
Witness my hand and seal as Notary Public this
28th day of September, 2025.

        NOTARY PUBLIC

        My commission expires:  11/30/2027