# Exhibit B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,<br><br>               Defendants. | Case No: 3:21-cv-00933-VDO<br><br>October 16, 2025 |

## DEFENDANTS' RESPONSES TO PLAINTIFF CONSERVATION LAW FOUNDATION'S FIRST SET OF REQUESTS FOR ADMISSION

Defendants Equilon Enterprises LLC d/b/a Shell Oil Products US, Triton Terminaling LLC, and Motiva Enterprises LLC (collectively, "Defendants") provide below their responses ("Responses") to Plaintiff's September 16, 2025 First Set of Requests for Admission ("Requests").

## PRELIMINARY STATEMENT

Defendants' good-faith response to each Request is based on information presently known to the respective responding Defendant. The Responses are made without prejudice to Defendants' right to supplement their Responses if further responsive information and documents become known to Defendants hereafter. Defendants serve their responses to Plaintiff's requests for admission for the sole purpose of this case only.

Non-party Shell plc, Defendants Equilon Enterprises LLC d/b/a Shell Oil Products US, and Triton Terminaling LLC, and other companies ultimately and/or indirectly owned by Shell plc have observed and continue to observe the requirements to operate as separate entities and maintain corporate distinctions. Defendants deny that the activities of one another, and those of any other separately formed entity, can be imputed to them.

Motiva Enterprises LLC ("Motiva") does not currently own, operate, or control the bulk storage and fuel terminal located at 481 East Shore Parkway, New Haven, Connecticut ("Terminal" or "New Haven Terminal") that is the subject of this litigation; its ownership interest and operational control was limited to the period from July 1, 1998 to May 1, 2017. Motiva is not and has never been a subsidiary of Shell plc, does not share a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group."[1]

Because each Defendant is a separate legal entity, the use of collective terms (e.g., "Defendants") and/or common objections and Responses is solely for the purpose of streamlining Defendants' Responses to Plaintiff's Requests for Admission and should not be construed to have any other effect.

## GENERAL OBJECTIONS

In accordance with Fed. R. Civ. P. 36 and applicable case law, Defendants state as follows:

1.      Defendants object to Plaintiff's First Set of Requests for Admission to the extent that they were served to frustrate and harass Defendants regarding issues that bear no connection

---

[1] Defendants use the term "Shell Group" to refer to a global group of separate companies that are ultimate and/or indirect subsidiaries of Shell plc. Defendants incorporate this definition of "Shell Group" for each instance as used by Defendants herein.

to the parties' claims or defenses and are not relevant or proportional to the needs of this case. These Requests for Admission represent the latest effort from Plaintiff to conduct a fishing expedition into irrelevant matters, at an enormous cost to Defendants. Many of Plaintiff's Requests seek admissions regarding issues such as "climate change", "sea level rise" and hypothetical weather events that are not defined in the Requests for Admissions nor sufficiently related to the controlling regulatory framework applicable to the Terminal. For these reasons, Defendants maintain that these Requests, and Defendants' responses, are irrelevant and object to their introduction in this or any other action, for any purpose.

2.      Defendants object to the Requests to the extent they seek admissions that involve privileged or confidential information, including but not limited to information encompassed by the attorney-client privilege, the attorney work-product doctrine, the deliberative process privilege, the First Amendment, or any other applicable privilege or immunity. Defendants' Responses are not intended to and cannot be construed as a waiver or relinquishment of any applicable privilege or immunity. To the extent privileged or protected information is disclosed, such disclosure shall not constitute a waiver of any privilege or protection, and Defendants reserve the right pursuant to Fed. R. Civ. P. 26(b)(5)(B) to claw back any information or documents over which they assert a privilege or protection that is disclosed without waiving any privilege or protection.

3.      Defendants object to the Requests to the extent they seek the disclosure of proprietary, confidential, financial, trade secret, or commercially sensitive information of any Defendant or of other entities that could harm the Shell Group of companies' competitive or business positions or result in a breach of any obligation to maintain the confidentiality of such

information.  Defendants will provide such responsive information as permitted by law and pursuant to the terms of the protective order entered in this case.

4.      Defendants object to the Requests to the extent they require admissions for issues and statements based on review of information not in the possession, custody, or control of the Defendants.

5.      Defendants object to the Requests as unduly burdensome to the extent they seek admissions on facts and situations that cannot be confirmed after a reasonable search of their records reasonably believed most likely to contain the information necessary to determine whether they can admit or deny the Requests.

6.      Defendants object to the Requests to the extent that they call for admissions beyond the scope of discovery permitted under the Federal Rules of Civil Procedure and applicable case law.  For example, Defendants object to Requests that seek admissions or denials that are not relevant to the claims or defenses in this litigation or proportional to the reasonable needs of the case.  *See* Fed. R. Civ. P. 26(b).  Numerous Requests seek admissions or denial for issues not relevant to the claims in this matter (e.g., entirely unrelated to the Terminal, issues beyond the Clean Water Act ("CWA") or Resource Conservation and Recovery Act ("RCRA") claims, broad global warming/climate change issues, or the time-period at issue, etc.), and/or the relief sought by Plaintiff.  For these same reasons, Defendants also object to these Requests as overbroad and unduly burdensome.

7.      Defendants object to the Requests as unduly burdensome to the extent they seek information or documents in a format other than as the information is kept in the usual course of business.

8.      Defendants object to the Requests to the extent that they seek responses relating to information that is publicly available and equally available to Plaintiff.

9.      The information that Defendants provide in the Responses, if any, is being provided solely for the purpose of this action, pursuant to the protective order in place in this action.  Should any party seek to admit the information contained in these Responses in motion or trial of this or any other action, such information is subject to all objections regarding relevance, authenticity, materiality, propriety, and admissibility, and any other objections that would require exclusion of such information from evidence.  All such objections are expressly reserved and may be raised at the time of motion or trial of this or any other action.

10.     Defendants reserve the right to raise additional objections that may become apparent during the course of responding to discovery requests.

11.     Defendants reserve the right to object to other discovery directed to the subject matter of the Requests.  Defendants' decision to provide information notwithstanding the objectionable nature of any Request should not be construed as a stipulation or admission that the information provided is relevant or admissible, a waiver of any objection, or an agreement that requests for similar discovery will be treated in a similar manner.

12.     To the extent Defendants reference documents as responsive or potentially relevant to the Requests, except as set forth in the Responses and except for the obligation to respond by the Fed. R. Civ. P. 36 and applicable case law, those references do not constitute an admission that Defendants agree with any characterization, disputed facts or other information contained in the Response.

13.     Defendants object to the Requests for Admission to the extent they seek proprietary or confidential business information, or information that is otherwise sensitive in

nature (such as security related information).  Defendants maintain any information included in these responses is being furnished, and will remain controlled by, the operative standing protective order.  *See* ECF No.7, July 7, 2021 Standing Protective Order.

14.    Defendants object to Requests numbered greater than 20 (i.e., RFAs Nos. 21 through 40) because they exceed the limit set by the Court's original Scheduling Order in this case, which limits each party to 20 Requests for Admission.  *See* ECF No. 52, Scheduling Order and Case Management Plan, March 1, 2022.  In reliance on the limitations set by the aforementioned scheduling order, Defendants will not respond to RFAs Nos. 21 through 40.  To the extent Plaintiff may ultimately obtain leave of Court to exceed the Court's explicit limit on the number of Requests for Admission, Defendants reserve the right to assert any and all available objections to the Requests that may be afforded by law, together with any supplemental response(s) to same.

These General Objections are incorporated by reference into each of the individual Responses below.  The following Responses are made subject to the foregoing Preliminary Statement, these General Objections, the Objections to Definitions and Instructions, and the specific objections provided for each respective Request for Admission.  Defendants do not waive any General Objections or Objections to Definitions and Instructions in response to any specific Request for Admission propounded, and any specific objection made by Defendants in no respect limits or modifies the General Objections or Objections to Definitions and Instructions stated herein.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

In accordance with Fed. R. Civ. P. 36 and applicable case law, Defendants further state as follows:

6

1.       Defendants object to **Instruction 3** and **Instruction 5** because they contradict the specific requirements of Fed. R. Civ. P. 36.

2.       Defendants object to **Instruction 7**, which requests that each defendant submit individual responses to each of Plaintiff's Requests.

3.       Defendants object to **Instruction 9**, which establishes the applicable timeframe for the Responses as "2008 to present."  For many of these Requests this timeframe is not relevant to Plaintiff's claims, which allege current or ongoing violations of the CWA and/or RCRA, and is overbroad, unduly burdensome, and not proportional in relation to the reasonable needs of this case, as noted in the specific objections below.  Defendants further object to the extent Plaintiff's instructed timeline exceeds the scope of relevant discovery ordered by the Court in this case.

4.       Defendants object to Plaintiff's **Definition 7** of "**Defendants**" and **Definition 19** of "**You/Your**" as overbroad and unduly burdensome, including to the extent the definition groups together each of the named Defendants in this action, each of which is a separate legal entity, and because the term is defined to include numerous non-parties.  Plaintiff cannot seek discovery of information about or from non-parties to this litigation.  These responses are made solely on behalf of the named entities and all references to Defendants are limited to those entities.

5.       Defendants object to Plaintiff's **Definition 15** of "**Shell Group**" as overbroad and unduly burdensome, including to the extent the definition groups together each of the named Defendants in this action (including Motiva), each of which is a separate legal entity, and because the term is defined to include numerous non-parties.  Plaintiff cannot use the party discovery process as an end-run to seek discovery of information from Defendants about or from

entities that are not parties to this litigation and have no obligation to respond. Defendants further object to Plaintiff's definition to the extent it includes other separate companies and defies the basic principles of corporate separateness. When Defendants use the term "Shell Group" in this document, Defendants incorporate the definition set forth in Footnote 1, supra.

6.      Defendants object to Plaintiff's **Definition 9** of "**General Permit**" to the extent that it includes prior versions of the permit that were in effect prior to October 1, 2011. Further, Defendants object to the extent that this definition will include versions of the permit that become effective after October 1, 2021, as the Connecticut Department Connecticut Department of Energy and Environmental Protection ("CT DEEP") intends to substantially amend its permit for the Discharge of Stormwater Associated with Industrial Activity. CT DEEP's permits for the Discharge of Stormwater Associated with Industrial Activity issued in 2011, 2018, and 2021 are substantially similar, whereas the newest permit issued on October 1, 2025 is substantially different, and must be defined separately.

7.      Defendants object to Plaintiff's **Definition 18** of "**Terminal Site**" as overbroad because the inclusion of "all locations to which hazardous waste has traveled" encompasses offsite disposal locations that are beyond the scope of this litigation.

These Objections to Definitions and Instructions are incorporated by reference into each of the individual Responses below. The following Responses are made subject to the foregoing Preliminary Statement, the General Objections, these Objections to Definitions and Instructions, and the specific objections provided for each respective Request for Admission. Defendants do not waive any General Objections or Objections to Definitions and Instructions in response to any specific Request for Admission propounded, and any specific objection made by Defendants

in no respect limits or modifies the General Objections or Objections to Definitions and Instructions stated herein.

## RESPONSES TO REQUESTS FOR ADMISSION

## REQUEST FOR ADMISSION NO. 1:

Admit that the information submitted to CT DEEP in or with the 2017 SWPPP for the Terminal was not gathered and evaluated utilizing a system designed to assure that qualified personnel considered the reasonably foreseeable risks of pollutant discharges associated with climate change.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "information submitted to CT DEEP in or with the 2017 SWPPP for the Terminal" and "a system designed to assure that qualified personnel considered . . . risks . . . associated with climate change." which could include a diverse range of topics and issues not at issue in this case, calling for speculation as to Plaintiff's intended meaning. From the Request, it remains unclear whether "system" means written policies and procedures, an electronic system, employee work tasks, or some other process means. It is also unclear from the Request whether the concept of "climate change risks" is meant to include changes in temperature in the atmosphere, surface or sea, precipitation, or wind, or a range of other meteorological or physical changes or conditions not an issue in this case, or some other meaning anticipated by Plaintiff in this case. It is also unclear whether "risks . . . associated with climate change risks" is meant to include potential "risks" relating to specific climate change impacts, such as drought, heat, rising sea level, or a range of other meteorological or physical impacts not an issue in this case, or some other meaning anticipated by Plaintiff in

this case, as well as any physical, economic, financial or a wide range of other types of "risk" anticipated by Plaintiff in this case.  Without a definition of these terms, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Further, Defendant Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Defendant Motiva no longer had any involvement with the Terminal.

Under the General Permit, Defendants were not required to re-submit the SWPPP or any information related to the SWPPP.  *See* 2018 General Permit, Section 3(g) ("For all permittees authorized under the previous general permit (effective October 1, 2011, modified October 1, 2019.)  Authorization is effective on the effective date of this general permit. No new registration is required.").  Facilities not previously authorized by the prior 2011 General Permit were required to register, and subsequently were required to submit a SWPPP under Section 4(c)(2)(H) only if the SWPPP did not contain confidential business information. *See* 2018 General Permit, Section (4)(d)(3).  Thus, the premise that information should have been submitted to "CT DEEP in or with the 2017 SWPPP" is flawed.

Defendants also retained Triton Environmental, Inc., an environmental and engineering consulting firm, to develop a SWPPP in accordance with Connecticut regulations.  Triton Environmental, Inc. subsequently developed and certified, with a professional engineer stamp, that the 2017 SWPPP was "thoroughly and completely reviewed," and based on their "professional judgment" the SWPPP met the criteria "set forth in the General Permit."  *See* 2017 SWPPP at 49.

Finally, Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the

General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit.  The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit—does not define, reference, or use the word or concept of "climate change" in any way, and no requirements under the General Permit require a permittee or operator to consider the concept of "climate change" with respect to any specific substances or pollutants regulated under the General Permit.

Nor do any regulations or guidance documents by the U.S. Environmental Protection Agency ("EPA") or CT DEEP issued prior to the filing of this lawsuit require a permittee or operator to consider the concept of "climate change" in complying with stormwater discharges or the preparation of a stormwater pollution prevention plan. Rather, the General Permit requires a permittee or operator to "minimize" the discharge of pollutants from New Haven Terminal in accordance with the very specific technical requirements identified in the General Permit.  The General Permit does not require the collection of "risks . . . associated with climate change" or the submission of any such information "with the 2017 SWPPP."

CT DEEP recently revised its regulatory framework for industrial stormwater—and in doing so, rejected Plaintiff's crafted interpretation of the prior permit as described in its Amended Complaint.  On October 1, 2025, CT DEEP issued a General Permit for the Discharge of Stormwater Associated with Industrial Activities, Permit No. CTR050000, which will become effective on November 1, 2025 (the "2025 General Permit").  *See* 2025 General Permit Section 4.3.2.8 ("Resilience Measures"), available at: https://portal.ct.gov/-/media/deep/water_regulating_and_discharges/stormwater/industrial/2025-permit-documents/2025-industrial-stormwater-general-permit-part-1--2erc.pdf?rev=e07e4c0e8e9942cfb424954fe5bc89e5&hash=CFF6E87399495EA4981CB0C8949

F43CD.  Section 8.16 of the 2025 General Permit covers petroleum bulk stations and terminals, including petroleum bulk terminals like the New Haven Terminal. *See* 2025 General Permit, Section 8.16 ("Sector P").

For the first time, the 2025 General Permit introduced the idea that: "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events."  2025 General Permit Section 4.3.2.8.  This language was not included or required in the 2017 General Permit.

Along with focusing on "Major Storm Events," CT DEEP also provided a list of "stormwater control measures" available to permittees, including "[r]einforc[ing] materials storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the BFE." *Id.*

CT DEEP's definitions differ fundamentally from what Plaintiff assumes in its Requests and alleges in its Amended Complaint.  With respect to the Major Storm Events or Base Flood Elevation, or BFE, is defined as "The flood having a 1-percent chance of being equaled or exceeded in any given year; also known as the 100-year flood. The base flood, which is the standard used by most Federal and state agencies, is used by the National Flood Insurance Program (NFIP) as the standard for floodplain management and to determine the need for flood insurance. A structure located within a special flood hazard area shown on an NFIP map has a 26 percent chance of suffering flood damage during the term of a 30-year mortgage." [2]  In other

_____

[2] FEMA Glossary, last access October 8, 2025, https://floodmaps.fema.gov/tutorials/check-ras/0.3_glossary.shtml#:~:text=Base%20Flood:,of%20a%2030%2Dyear%20mortgage.

words, CT DEEP now defines what storms it requires permittees to consider in managing industrial stormwater at facilities in Connecticut.

Of relevance to this case and these Requests, CT DEEP does not frame its industrial stormwater requirements using the concept of "climate change."  Section 4.3 of the 2025 General Permit explains the SWPPP requirements.  CT DEEP defines "Best Management Practices (BMPs)," as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of the waters of the state. BMPs also include treatment requirements, operating procedures, and practices to control plant site run-off, spillage or leaks, sludge or waste disposal, or drainage from raw material storage."  2025 General Permit, Section 4.2. This section of the 2025 General Permit is largely unchanged from the respective section of prior permits applicable to the Terminal, and does not incorporate any "climate change" considerations into the requirements for BMPs, as wished for by Plaintiff.

Of direct relevance to this lawsuit and this Request, CT DEEP has not in the past, and does not today, require permittees to complete "climate change" assessments, does not require any specific "climate change" expertise for employees or consultants, does not use the term "handle" in the context of "climate change."  In addition, the 2025 General Permit does not require the collection of data and/ or information, or an assessment of "risks . . . associated with climate change" or the submission of any such information "with the 2017 SWPPP."

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants deny that the 2017 SWPPP required Defendants to assess or report

information to CT DEEP regarding "risks . . . associated with climate change," but nevertheless state that Defendants considered, planned and prepared for all credible risks that may adversely impact the Terminal, regardless of cause, including severe weather events that may or may not be associated with "climate change." Responding further, the Request is otherwise denied as stated and for the reasons provided above.

## REQUEST FOR ADMISSION NO. 2:

Admit that the 2017 SWPPP for the Terminal contains no consideration of the impact of sea level rise, coastal flooding, or erosion patterns on coastal development.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "sea level rise," "coastal flooding," and "erosion patterns" used in the Request, which could include a diverse range of irrelevant topics and issues.

With respect to "sea level rise" "coastal flooding," and "erosion patterns" the lack of time frame for this Request makes it impossible to admit or deny.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit. The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit—does not define, reference, or use the words or concept

14

of "sea level rise," "coastal flooding" or "erosion patterns" in any way, and no requirements under the General Permit require a permittee or operator to consider these concepts with respect to any specific substances or pollutants regulated under the General Permit.

Nor do any regulations or guidance documents by the U.S. Environmental Protection Agency ("EPA") or CT DEEP issued prior to the filing of this lawsuit require a permittee or operator to consider the concept of "sea level rise," "coastal flooding" or "erosion patterns" in complying with stormwater discharges or the preparation of a stormwater pollution prevention plan. Rather, the General Permit requires a permittee or operator to "minimize" the discharge of pollutants from New Haven Terminal in accordance with the very specific technical requirements identified in the General Permit.

CT DEEP recently revised its regulatory framework for industrial stormwater—and rejected Plaintiff's crafted interpretation described in its Amended Complaint. On October 1, 2025, CT DEEP issued a General Permit for the Discharge of Stormwater Associated with Industrial Activities, Permit No. CTR050000, which will become effective on November 1, 2025 (the "2025 General Permit"). *See* 2025 General Permit Section 4.3.2.8 ("Resilience Measures"), available at: https://portal.ct.gov/-/media/deep/water_regulating_and_discharges/stormwater/industrial/2025-permit-documents/2025-industrial-stormwater-general-permit-part-1--2erc.pdf?rev=e07e4c0e8e9942cfb424954fe5bc89e5&hash=CFF6E87399495EA4981CB0C8949F43CD. Section 8.16 of the 2025 General Permit covers petroleum bulk stations and terminals, including petroleum bulk terminals like the New Haven Terminal. *See* 2025 General Permit, Section 8.16 ("Sector P").

For the first time, the 2025 General Permit introduced the idea that: "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events." 2025 General Permit Section 4.3.2.8. This language was not included or required in the 2017 General Permit.

Along with focusing on "Major Storm Events," CT DEEP also provided a list of "stormwater control measures" available to permittees, including "[r]einforc[ing] materials storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the BFE." *Id.*

CT DEEP's definitions differ fundamentally from what Plaintiff assumes in its Requests and alleges in its Amended Complaint. With respect to the Major Storm Events or Base Flood Elevation, or BFE, is defined as "The flood having a 1-percent chance of being equaled or exceeded in any given year; also known as the 100-year flood. The base flood, which is the standard used by most Federal and state agencies, is used by the National Flood Insurance Program (NFIP) as the standard for floodplain management and to determine the need for flood insurance. A structure located within a special flood hazard area shown on an NFIP map has a 26 percent chance of suffering flood damage during the term of a 30-year mortgage." [3] In other words, CT DEEP now defines what storms it requires permittees to consider in managing industrial stormwater at facilities in Connecticut.

---

[3] FEMA Glossary, last access October 8, 2025, https://floodmaps.fema.gov/tutorials/check-ras/0.3_glossary.shtml#:~:text=Base%20Flood:,of%20a%2030%2Dyear%20mortgage.

Of relevance to this case and these Requests, CT DEEP does not frame its industrial stormwater requirements using the concepts of "sea level rise," "coastal flooding" or "erosion patterns." Section 4.3 of the 2025 General Permit explains the SWPPP requirements. CT DEEP defines "Best Management Practices (BMPs)," as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of the waters of the state. BMPs also include treatment requirements, operating procedures, and practices to control plant site run-off, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." 2025 General Permit, Section 4.2. This section of the 2025 General Permit is largely unchanged from the respective section of prior permits applicable to the Terminal, and does not incorporate any "sea level rise," "coastal flooding" or "erosion pattern" considerations into the requirements for BMPs, as wished for by Plaintiff.

Of direct relevance to this lawsuit and this Request, CT DEEP has not in the past, and does not today, require permittees to complete "sea level rise," "coastal flooding," or "erosion pattern" assessments. Nor does CT DEEP require any specific "sea level rise," "coastal flooding," or "erosion pattern" expertise for employees or consultants, does not use those terms in the context of "climate change." In addition, the 2025 General Permit does not require the collection of data and/or information regarding "sea level rise," "coastal flooding," or "erosion patterna" or the inclusion of any such information in the 2017 SWPPP.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants interpret the meaning of the vague and undefined term "sea level

17

rise," in the context of Plaintiff's Request for Admission, to contemplate an undefined increase in the localized height of coastal sea level for an undefined period of time. Defendants also interpret the meaning of the vague and undefined term "coastal flooding," in the context of Plaintiff's Request for Admission, to contemplate flooding experienced in a physical location nearby and/or adjacent to a natural coastline for an undefined period of time. Defendants also interpret the meaning of the vague and undefined term "erosion patterns," in the context of Plaintiff's Request for Admission, to contemplate trends in the physical erosion of coastal soil, earthen materials, and/or landscape in a localized area over an undefined period of time.

Subject to those interpretations, and without waiving any objections to this Request, Defendants deny that the 2017 General Permit required Defendants to assess, or include in its SWPPP, risks related to "sea level rise," "coastal flooding," or "erosion patterns." Defendants state that the 2017 SWPPP contains various control measures that are in place at the Terminal to address various risks. Sections 9 and 10 of the 2017 SWPPP detail the structural and non-structural control measures at the Terminal. For example, the Terminal implements good housekeeping, vehicle/equipment washing, sediment and erosion control, preventative maintenance, employee training, and other practices to minimize the discharge of pollutants. *See* 2017 SWPPP at 26-32.

Additionally, Defendants state that they consider, plan and prepare for all credible risks that may reasonably and adversely impact the Terminal, regardless of cause, including severe weather events and/or environmental conditions that may or may not be associated or experienced with "sea level rise," "coastal flooding," or "erosion patterns." Defendants state they do and have collected weather and storm information to ensure the Terminal takes appropriate steps to protect the Terminal against adverse weather events, including floods,

18

hurricanes, and other weather-related events.  For example, Defendants state the Terminal has developed and implemented policies including, but not limited to, a Facility Response Plan and Business Continuity Plan which provide additional controls, aiding to minimize the discharge of pollutants.

Responding further, the Request is otherwise denied as stated and for the reasons provided above.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the 2017 SWPPP for the Terminal does not include control measures that minimize the risk of pollutant discharges from storm surge flooding.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "storm surge flooding" used in the Request, which could include a diverse range of irrelevant topics and issues.  With respect to "storm surge flooding," without knowing the type of storm (e.g., 25-year v. 50-year), it impossible to estimate storm surge, and accordingly it is impossible to admit or deny this Request as stated.  Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny this Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this

lawsuit. The effective permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's 2017 General Permit—does not define, reference, or use the word or concept of "storm surge flooding" in any way, and no requirements under the General Permit require a permittee or operator to consider the concept of "storm surge flooding" with respect to any specific substances or pollutants regulated under the General Permit.

Nor do any regulations or guidance documents by the U.S. Environmental Protection Agency ("EPA") or CT DEEP issued prior to the filing of this lawsuit require a permittee or operator to consider the concept of "storm surge flooding" in complying with stormwater discharges or the preparation of a stormwater pollution prevention plan. Rather, the General Permit requires a permittee or operator to "minimize" the discharge of pollutants from New Haven Terminal in accordance with the very specific technical requirements identified in the General Permit. The General Permit does not require the collection of data and/or information regarding "storm surge floodin" or the submission of any such information "with the 2017 SWPPP."

CT DEEP recently revised its regulatory framework for industrial stormwater—and rejected Plaintiff's crafted interpretation described in its Amended Complaint. On October 1, 2025, CT DEEP issued a General Permit for the Discharge of Stormwater Associated with Industrial Activities, Permit No. CTR050000, which will become effective on November 1, 2025 (the "2025 General Permit"). *See* 2025 General Permit Section 4.3.2.8 ("Resilience Measures"), available at: https://portal.ct.gov/-/media/deep/water_regulating_and_discharges/stormwater/industrial/2025-permit-documents/2025-industrial-stormwater-general-permit-part-1--2erc.pdf?rev=e07e4c0e8e9942cfb424954fe5bc89e5&hash=CFF6E87399495EA4981CB0C8949

F43CD.  Section 8.16 of the 2025 General Permit covers petroleum bulk stations and terminals, including petroleum bulk terminals like the New Haven Terminal. *See* 2025 General Permit, Section 8.16 ("Sector P").

For the first time, the 2025 General Permit introduced the idea that: "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events."  2025 General Permit Section 4.3.2.8.  This language was not included or required in the 2017 General Permit.

Along with focusing on "Major Storm Events," CT DEEP also provided a list of "stormwater control measures" available to permittees, including "[r]einforc[ing] materials storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the BFE." *Id.* This language was likewise not included or required in the 2017 General Permit.

CT DEEP's definitions differ fundamentally from what Plaintiff assumes in its Requests and alleges in its Amended Complaint.  With respect to the Major Storm Events or Base Flood Elevation, or BFE, is defined as "The flood having a 1-percent chance of being equaled or exceeded in any given year; also known as the 100-year flood. The base flood, which is the standard used by most Federal and state agencies, is used by the National Flood Insurance Program (NFIP) as the standard for floodplain management and to determine the need for flood insurance. A structure located within a special flood hazard area shown on an NFIP map has a 26 percent chance of suffering flood damage during the term of a 30-year mortgage." [4]  In other

___

[4] FEMA Glossary, last access October 8, 2025, https://floodmaps.fema.gov/tutorials/check-ras/0.3_glossary.shtml#:~:text=Base%20Flood:,of%20a%2030%2Dyear%20mortgage.

words, CT DEEP now defines what storms it requires permittees to consider in managing industrial stormwater at facilities in Connecticut.

Of relevance to this case and these Requests, the 2017 General Permit does not frame its industrial stormwater requirements using the concept of "storm surge flooding." Section 4.3 of the 2025 General Permit explains the SWPPP requirements. CT DEEP defines "Best Management Practices (BMPs)," as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of the waters of the state. BMPs also include treatment requirements, operating procedures, and practices to control plant site run-off, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." 2025 General Permit, Section 4.2. CT DEEP does not require "climate change" risk assessments or other concepts wished for by Plaintiff.

Of direct relevance to this lawsuit and this Request, the 2017 General Permit did not require permittees to complete "storm surge flooding" assessments, does not require "100-year 'storm event,' 500-year 'storm event,' or '1000-year 'storm event' assessments, does not mandate "erecting storm barriers", or any of the other wish list of items preferred and crafted by Plaintiff. Nor did the 2017 Permit require any specific "storm surge flooding" expertise for employees or consultants, does not use the term "handle" in the context of "climate change." In addition, the 2017 General Permit did not require the collection of data and/or information regarding "storm surge flooding" or the submission or inclusion of any such information in the 2017 SWPPP.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**<u>Response:</u>**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants interpret the meaning of the vague and undefined term "storm surge flooding," in the context of Plaintiff's Request for Admission, to contemplate flooding at the coast generated by a storm event that temporarily pushes an undefined amount of ocean water inland at some quantitative measure of force, for an undefined period of time.

Subject to those interpretations, and without waiving any objections to this Request, Defendants deny that the 2017 General Permit required Defendants to assess, or include in its SWPPP, risks related to "storm surge flooding." Defendants state that the 2017 SWPPP contains various control measures that are in place at the Terminal to address various risks. Sections 9 and 10 of the 2017 SWPPP detail the structural and non-structural control measures at the Terminal. For example, the Terminal implements good housekeeping, vehicle/equipment washing, sediment and erosion control, preventative maintenance, employee training, and other practices to minimize the discharge of pollutants. *See* 2017 SWPPP at 26-32.

Additionally, Defendants state that they consider, plan and prepare for all credible risks that may reasonably and adversely impact the Terminal, regardless of cause, including severe weather events and/or environmental conditions that may or may not be associated or experienced with "storm surge flooding." Defendants state they do and have collected weather and storm information to ensure the Terminal takes appropriate steps to protect the Terminal against adverse weather events, including floods, hurricanes, and other weather-related events. For example, Defendants state the Terminal has developed and implemented policies including, but not limited to, a Facility Response Plan and Business Continuity Plan which provide additional controls, aiding to minimize the discharge of pollutants.

Responding further, the Request is otherwise denied as stated and for the reasons provided above.

**REQUEST FOR ADMISSION NO. 4:**

Admit that the 2017 SWPPP for the Terminal does not include control measures that minimize the risk of pollutant discharges from storm surge flooding as worsened by sea level rise and increased frequency and severity of storms.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "storm surge flooding," and "worsened by sea level rise and increased frequency and severity of storms," used in the Request, both of which could include a diverse range of irrelevant topics and issues.

With respect to "storm surge flooding," without knowing the type of storm (e.g., 25-year v. 50-year), it impossible to estimate storm surge, and accordingly it is impossible to admit or deny this Request as stated. With respect to "sea level rise," the lack of time frame for this Request makes it impossible to admit or deny. With respect to "storm surge" and "increased frequency and severity of storms," without knowing the type of storm (e.g., 25-year v. 50-year), it impossible to estimate storm surge, and accordingly it is impossible to admit or deny this Request as stated. As for "worsened," without knowing the timeframes involved—e.g., within a year or within the decade, it is impossible to admit or deny this Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.

24

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit. The 2017 General Permit does not define, reference, or use the words or concepts of "storm surge flooding," "sea level rise," or "increased frequency and severity of storms" in any way, and no requirements under the 2017 General Permit require a permittee or operator to consider the concepts of "storm surge flooding," "sea level rise," or "increased frequency and severity of storms" with respect to any specific substances or pollutants regulated under the General Permit.

Nor do any regulations or guidance documents by the U.S. Environmental Protection Agency ("EPA") or CT DEEP issued prior to the filing of this lawsuit require a permittee or operator to consider the concepts of "storm surge flooding," "sea level rise," or "increased frequency and severity of storms" in complying with stormwater discharges or the preparation of a stormwater pollution prevention plan. Rather, the General Permit requires a permittee or operator to "minimize" the discharge of pollutants from New Haven Terminal in accordance with the very specific technical requirements identified in the General Permit. The General Permit does not require the collection of "climate change risks" or the submission of any such information "with the 2017 SWPPP."

CT DEEP recently revised its regulatory framework for industrial stormwater—and rejected Plaintiff's crafted interpretation described in its Amended Complaint. On October 1, 2025, CT DEEP issued a General Permit for the Discharge of Stormwater Associated with Industrial Activities, Permit No. CTR050000, which will become effective on November 1, 2025 (the "2025 General Permit"). *See* 2025 General Permit Section 4.3.2.8 ("Resilience Measures"),

available at: https://portal.ct.gov/-
/media/deep/water_regulating_and_discharges/stormwater/industrial/2025-permit-
documents/2025-industrial-stormwater-general-permit-part-1--
2erc.pdf?rev=e07e4c0e8e9942cfb424954fe5bc89e5&hash=CFF6E87399495EA4981CB0C8949
F43CD.  Section 8.16 of the 2025 General Permit covers petroleum bulk stations and terminals,

including petroleum bulk terminals like the New Haven Terminal. *See* 2025 General Permit,

Section 8.16 ("Sector P").

    For the first time, the 2025 General Permit introduced the idea that: "Implementing

structural improvements, enhanced/resilient pollution prevention measures, and other mitigation

measures can help to minimize impacts from stormwater discharges from major storm events

such as hurricanes, storm surge, extreme/heavy precipitation, and flood events."  2025 General

Permit Section 4.3.2.8.  This language was not included or required in the 2017 General Permit.

    Along with focusing on "Major Storm Events," CT DEEP also provided a list of

"stormwater control measures" available to permittees, including "[r]einforc[ing] materials

storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating

of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing

with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the

BFE." *Id.*

    CT DEEP's definitions differ fundamentally from what Plaintiff assumes in its Requests

and alleges in its Amended Complaint.  With respect to the Major Storm Events or Base Flood

Elevation, or BFE, is defined as "The flood having a 1-percent chance of being equaled or

exceeded in any given year; also known as the 100-year flood. The base flood, which is the

standard used by most Federal and state agencies, is used by the National Flood Insurance

Program (NFIP) as the standard for floodplain management and to determine the need for flood

insurance. A structure located within a special flood hazard area shown on an NFIP map has a 26

percent chance of suffering flood damage during the term of a 30-year mortgage." [5]  In other

words, CT DEEP now defines what storms it requires permittees to consider in managing

industrial stormwater at facilities in Connecticut.

 Of relevance to this case and these Requests, CT DEEP does not frame its industrial

stormwater requirements using the concept of "climate change."  Section 4.3 of the 2025 General

Permit explains the SWPPP requirements.  CT DEEP defines "Best Management Practices

(BMPs)," as "schedules of activities, prohibitions of practices, maintenance procedures, and

other management practices to prevent or reduce the pollution of the waters of the state. BMPs

also include treatment requirements, operating procedures, and practices to control plant site run-

off, spillage or leaks, sludge or waste disposal, or drainage from raw material storage."  2025

General Permit, Section 4.2. CT DEEP does not require "climate change" risk assessments or

other concepts wished for by Plaintiff.

 Of direct relevance to this lawsuit, CT DEEP has not in the past, and does not today,

require permittees to complete "climate change" assessments, does not require "100-year 'storm

event,' 500-year 'storm event,' or '1000-year 'storm event' assessments, does not mandate

"erecting storm barriers", or any of the other wish list of items preferred and crafted by Plaintiff.

Nor does CT DEEP require any specific "climate change" expertise for employees or

consultants, does not use the term "handle" in the context of "climate change," and does not set

standards for "secondary containment" (since those standards are addressed by other provisions

---

[5] FEMA Glossary, last access October 8, 2025, https://floodmaps.fema.gov/tutorials/check-ras/0.3_glossary.shtml#:~:text=Base%20Flood:,of%20a%2030%2Dyear%20mortgage.

of the Clean Water Act).  In addition, the 2025 General Permit does not require the collection of

"climate change risks" or the submission of any such information "with the 2017 SWPPP."

Accordingly, the Request is legally, factually and technically irrelevant, vague, and

ambiguous as stated.

**<u>Response:</u>**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R.

Civ. P. 36(a)(4), Defendants interpret the meaning of the vague and undefined term "storm surge

flooding," in the context of Plaintiff's Request for Admission, to contemplate flooding at the

coast generated by a storm event that temporarily pushes an undefined amount of ocean water

inland at some quantitative measure of force, for an undefined period of time.  Defendants

interpret the meaning of the vague and undefined term "sea level rise," in the context of

Plaintiff's Request for Admission, to contemplate an undefined increase in the localized height

of coastal sea level for an undefined period of time.  Defendants also interpret the meaning of the

vague and undefined term "increased frequency and severity of storms," in the context of

Plaintiff's Request for Admission, to contemplate storms that are stronger and/or occur more

frequently than currently experienced at the Terminal today.  And Defendants interpret the

meaning of the vague and undefined term "worsened," in the context of Plaintiff's Request for

Admission, to contemplate a more significant storm surge event taking place during an undefined

storm event at some undefined point in the near future, in light of the Permit term.

Subject to those interpretations, and without waiving any objections to this Request,

Defendants deny that the 2017 General Permit required Defendants to assess, or include in its

SWPPP, risks related to "storm surge flooding," including as may or may not be "worsened by

sea level rise and increased frequency and severity of storms."  Defendants state that the 2017

SWPPP contains various control measures that are in place at the Terminal to address various risks. Sections 9 and 10 of the 2017 SWPPP detail the structural and non-structural control measures at the Terminal. For example, the Terminal implements good housekeeping, vehicle/equipment washing, sediment and erosion control, preventative maintenance, employee training, and other practices to minimize the discharge of pollutants. *See* 2017 SWPPP at 26-32.

Additionally, Defendants state that they consider, plan and prepare for all credible risks that may reasonably and adversely impact the Terminal, regardless of cause, including severe weather events and/or environmental conditions that may or may not be associated or experienced with "storm surge flooding," including as may or may not be "worsened by sea level rise and increased frequency and severity of storms." Defendants state they do and have collected weather and storm information to ensure the Terminal takes appropriate steps to protect the Terminal against adverse weather events, including floods, hurricanes, and other weather-related events. For example, Defendants state the Terminal has developed and implemented policies including, but not limited to, a Facility Response Plan and Business Continuity Plan which provide additional controls, aiding to minimize the discharge of pollutants.

Responding further, the Request is otherwise denied as stated and for the reasons provided above.

## REQUEST FOR ADMISSION NO. 5:

Admit that the 2017 SWPPP for the Terminal does not address the potential for leaks and spills due to the Terminal's permeable secondary containment area.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "leaks and spills," and "permeable," used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of vague and ambiguous terms "leaks and spills" and "permeable" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From a regulatory perspective, the 2017 General Permit does not define, reference, or provide any measurable standard for the term "permeable." Further, it remains unclear whether "leaks and spills" means every molecule of product or some other definition or interpretation. Without a definition of these terms, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

The term "permeable" in this context, as that term is not defined in the 2017 General Permit and has never been defined in any regulatory document issued by CT DEEP. Indeed, CT DEEP has never adopted any standard of permeability as measured by hydraulic conductivity in centimeters per second. Any attempt by Defendants to define a term that has never been defined or subjected to a measurable standard by the applicable regulatory body would be mere speculation that is an improper subject of written discovery. As such, Defendants object to Plaintiff's characterization of the Terminal's secondary containment area as "permeable." In this regard, Plaintiff's Request if based on a faulty premise.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R.

Civ. P. 36(a)(3) and (5), Defendants further object to the extent that the "permeability" or

"impermeability" of the Terminal's secondary containment area—a term that remains undefined

in the State of Connecticut and therefore does not permit Defendants with the ability to

respond—is irrelevant to any claim or defense in this action.  Indeed, Plaintiff failed to notify

Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the

alleged permeability of the Terminal's secondary containment area, and such claim is not

encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before

initiating this lawsuit.  There are likewise no allegations regarding the alleged permeability of the

Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in

this action.  As such, there is no cause of action related to the alleged permeability of

Defendants' secondary containment area that is currently pending in this lawsuit, and this

Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 6:**

Admit that industrial stormwater has infiltrated into the ground within the Terminal's

secondary containment areas.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails

to provide a clear and unambiguous technical definition of "infiltrated into the ground" used in

the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "infiltrated into the ground" creates technical and regulatory

ambiguities with respect to the actual regulatory requirements at issue in this case and the legal

relevance of the Request.  Defendants object to the term "infiltrated" because it does not distinguish between periodic flooding or wetness and continuous wetness.  The lack of a definition of "infiltrated" similarly creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From a regulatory perspective, the operable CT DEEP Permit does not define the term "infiltration" anywhere in the Permit.  Without a definition of these terms, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Defendants also object to this Request because it attempts to create and introduce new regulatory, standards, concepts, and requirements not contained in the General Permit.  The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit—does not prohibit "infiltration" of stormwater in totality. Section 5(b)(7) of the General Permit states "The permittee shall *investigate* the need for stormwater management or treatment practices that shall be used to divert, *infiltrate*, reuse, or treat stormwater runoff in a manner that minimizes pollutants in stormwater discharges from the site . . . *infiltration* practices, care must be taken to avoid ground water contamination in accordance with *Appendix C*." (emphasis added). Appendix C applies to "aquifer protection areas and other groundwater drinking supply areas." *See* General Permit, at Appendix C. However, the Terminal is *not* in an aquifer protection area or other groundwater drinking supply area. *See* Connecticut Aquifer

Protection Area Map below, showing the New Haven Terminal is *not* in such area.[6]



Accordingly, the Request is legally, factually, and technically irrelevant, and based on a faulty premise.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the "infiltration" of stormwater into the ground is irrelevant to any claim or defense in this action.  Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged "infiltration" of stormwater into the ground within the Terminal's secondary containment area, including any claim or implication that such infiltration may have occurred due to alleged "permeability" of the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this

---

[6] Connecticut Aquifer Protection Areas, CT DEEP, last accessed October 8, 2025, https://ctdeep.maps.arcgis.com/apps/webappviewer/index.html?id=6b33fc05fcce4c5286fafae1b2cccbfb

lawsuit.  There are likewise no allegations regarding the alleged infiltration of stormwater into the ground within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action.  As such, there is no cause of action related to alleged infiltration of stormwater into the ground within Defendants' secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 7:**

Admit that You did not receive approval from CT DEEP to infiltrate industrial stormwater into the ground within the Terminal's secondary containment areas.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "infiltrate into the ground" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "infiltrated into the ground" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request.  Defendants object to the term "infiltrated" because it does not distinguish between periodic flooding or wetness and continuous wetness.  The lack of a definition of "infiltrated" similarly creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. Without a definition of these terms, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Defendants object to this Request because it attempts to create and introduce new regulatory, standards, concepts, and requirements not contained in the General Permit.  The only

environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's

General Permit—does not prohibit infiltration of stormwater in totality nor does it require

*approval from CT DEEP* to infiltrate industrial stormwater into the ground. Section 5(b)(7) of the

General Permit states "The permittee shall *investigate* the need for stormwater management or

treatment practices that shall be used to divert, *infiltrate*, reuse, or treat stormwater runoff in a

manner that minimizes pollutants in stormwater discharges from the site . . . *infiltration*

practices, care must be taken to avoid ground water contamination in accordance with *Appendix*

*C.*" (emphasis added). Appendix C applies to "aquifer protection areas and other groundwater

drinking supply areas." *See* General Permit, at Appendix C. However, the Terminal is *not* in an

aquifer protection area or other groundwater drinking supply area. *See* Connecticut Aquifer

Protection Area Map below, showing the New Haven Terminal is *not* in such area.[7]



[7] Connecticut Aquifer Protection Areas, CT DEEP, last accessed October 8, 2025,
https://ctdeep.maps.arcgis.com/apps/webappviewer/index.html?id=6b33fc05fcce4c5286fafae1b2cccbfb

Accordingly, the Request is legally, factually, and technically irrelevant, and based on a faulty premise.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the "infiltration" of stormwater into the ground is irrelevant to any claim or defense in this action. Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged "infiltration" of stormwater into the ground within the Terminal's secondary containment area, including any claim or implication that such infiltration may have occurred due to alleged "permeability" of the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit. There are likewise no allegations regarding the alleged infiltration of stormwater into the ground within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action. As such, there is no cause of action related to alleged infiltration of stormwater into the ground within Defendants' secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Integrated Contingency Plan (Deposition Exhibit 1216) does not contain the following engineering certification:

> I certify that I have thoroughly and completely reviewed the Stormwater Pollution Prevention Plan prepared for this site. I further certify, based on such review and site visit by myself or my agent, and on my professional judgment, that the Stormwater Pollution Prevention Plan meets the criteria set forth in the General Permit for the Discharge of Stormwater Associated with Industrial Activity effective on October 1, 2011. I am aware that there

are significant penalties for false statements in this certification, including the possibility of fine and imprisonment for knowingly making false statements.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request to the extent it assumes facts not established in the record concerning the scope and applicability of the quoted certification language.

Defendants also object to this Request as compound insofar as it purports to require an admission regarding both the contents of a single identified document and compliance with regulatory criteria referenced therein.

Defendants also object to this Request as irrelevant and not proportional to the needs of the case to the extent it concerns the Integrated Contingency Plan, which is not required by, incorporated into, or otherwise mandated by the applicable CT DEEP permit. The Integrated Contingency Plan reflects additional control measures employed at the Terminal beyond any permit obligations, and the claims asserted by CLF in this action are related to the CT DEEP permit, which is not implicated by the Integrated Contingency Plan.

Defendants also retained Triton Environmental, Inc., and environmental and engineering consulting firm, to develop a SWPPP in accordance with Connecticut regulations. Triton Environmental, Inc. subsequently developed and certified, with a professional engineer stamp, the 2017 SWPPP, certifying the SWPPP was "thoroughly and completely reviewed" and based on *their* "professional judgment" the SWPPP met the criteria "set forth in the General Permit." *See* 2017 SWPPP at 49.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants state that the document speaks for itself. Defendants admit that the Integrated Contingency Plan identified as Deposition Exhibit 1216 does not contain the verbatim language quoted in the Request, but deny the implication that the Integrated Contingency Plan does not contain an engineering certification with substantially similar language as included in the Request. Indeed, the Integrated Contingency Plan, marked as Deposition Exhibit 1216, includes the following engineering certification signed by a registered professional engineer:

> "I have personally examined and am familiar with the information submitted in this document and all attachments thereto, and I certify that based on reasonable investigation, including my inquiry of those individuals responsible for obtaining the information, the submitted information is true, accurate and complete to the best of my knowledge and belief. I understand that a false statement made in the submitted information may be punishable as a criminal offense, in accordance with section 53a-157b of the General Statutes, and in accordance with any other applicable statute."
>
> *See* SOPUS_NHVN02143146.

Except as expressly admitted herein, the Request is otherwise denied.

## REQUEST FOR ADMISSION NO. 9:

Admit that on July 28, 2021, You received a letter from Paul Simonetta and Stephen Benben, Triton Environmental, Inc. (SOPUS_NHVN00190740), and on that date You were aware that the secondary containment area volumes for Tanks 1, 2, and 3 at the Terminal did not provide sufficient containment volume as required by the 2019 General Permit.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "sufficient containment volume" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "sufficient containment volume" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From the Request, it remain unclear whether "sufficient containment volume" requires that all stormwater is diverted to holding tanks, that no flooding or wetness is ever permitted or allowed to occur at the Terminal or other facilities in the State of Connecticut, that flooding can only be temporary, that only "stormwater controls" specifically required by the 2019 General Permit are required, or that some other action is required or recommended. Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**<u>Response:</u>**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action. Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the

Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit. There

are likewise no allegations regarding the alleged sufficiency or insufficiency of secondary

containment volume within the Terminal's secondary containment area contained anywhere in

any of Plaintiff's complaints in this action. As such, there is no cause of action related to alleged

sufficiency or insufficiency of secondary containment volume within the Terminal's secondary

containment area that is currently pending in this lawsuit, and this Request is not relevant or

proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 10:**

Admit that You did not inform CT DEEP that the secondary containment area volumes

for Tanks 1, 2, and 3 at the Terminal did not provide sufficient containment volume as required

by the 2019 General Permit within fifteen days of receiving the July 28, 2021 letter from Triton

Environmental, Inc. (SOPUS_NHVN00190740).

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails

to provide a clear and unambiguous technical definition of "sufficient containment volume" used

in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "sufficient containment volume" creates technical and

regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and

the legal relevance of the Request. From the Request, it remain unclear whether "sufficient

containment volume" requires that all stormwater is diverted to holding tanks, that no flooding or

wetness is ever permitted or allowed to occur at the Terminal or other facilities in the State of

Connecticut, that flooding can only be temporary, that only "stormwater controls" specifically

required by the 2019 General Permit are required, or that some other action is required or

recommended. Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.  Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action.  Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit.  There are likewise no allegations regarding the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action.  As such, there is no cause of action related to alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

41

**REQUEST FOR ADMISSION NO. 11:**

Admit that You have never informed CT DEEP that the secondary containment area volumes for Tanks 1, 2, and 3 at the Terminal did not provide sufficient containment volume as required by the General Permit after receiving the July 28, 2021 letter from Triton Environmental, Inc. (SOPUS_NHVN00190740).

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "sufficient containment volume" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "sufficient containment volume" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From the Request, it remain unclear whether "sufficient containment volume" requires that all stormwater is diverted to holding tanks, that no flooding or wetness is ever permitted or allowed to occur at the Terminal or other facilities in the State of Connecticut, that flooding can only be temporary, that only "stormwater controls" specifically required by the 2019 General Permit are required, or that some other action is required or recommended. Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined

term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls

for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R.

Civ. P. 36(a)(3) and (5), Defendants object to the extent that the sufficiency of secondary

containment volume at the Terminal is irrelevant to any claim or defense in this action.  Indeed,

Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of

action related to the alleged sufficiency or insufficiency of secondary containment volume within

the Terminal's secondary containment area. Such claim is not encompassed within any of the

Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit.  There

are likewise no allegations regarding the alleged sufficiency or insufficiency of secondary

containment volume within the Terminal's secondary containment area contained anywhere in

any of Plaintiff's complaints in this action.  As such, there is no cause of action related to alleged

sufficiency or insufficiency of secondary containment volume within the Terminal's secondary

containment area that is currently pending in this lawsuit, and this Request is not relevant or

proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the secondary containment area volumes for Tanks 1, 2, and 3 at the Terminal

did not provide sufficient containment volumes from October 1, 2011 to August 29, 2022 as

required by the General Permit.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "sufficient containment volume" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "sufficient containment volume" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From the Request, it remain unclear whether "sufficient containment volume" requires that all stormwater is diverted to holding tanks, that no flooding or wetness is ever permitted or allowed to occur at the Terminal or other facilities in the State of Connecticut, that flooding can only be temporary, that only "stormwater controls" specifically required by the 2019 General Permit are required, or that some other action is required or recommended. Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**<u>Response:</u>**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action. Indeed,

Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit.  There are likewise no allegations regarding the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action.  As such, there is no cause of action related to alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

## REQUEST FOR ADMISSION NO. 13:

Admit that on August 30, 2022, You installed a bypass pipe between the secondary containment area for Tanks 1, 2, and 3 and the Tank 24 diked area.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "bypass" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "bypass" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request.  From the Request, it remain unclear what Plaintiff means by "bypass." Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny the Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**<u>Response:</u>**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the installation of a bypass pipe between the secondary containment areas at the Terminal, including any allegation or implication that installation was conducted to address the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action. Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the installation of a bypass pipe in the secondary containment area of the Terminal, including the implication that such installation was conducted to address alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit. There are likewise no allegations regarding the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action. As such, there is no cause of action related to the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment

volume within the Terminal's secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 14:**

Admit that You did not inform CT DEEP about Your plan to install a bypass pipe to increase the secondary containment area volume for the Tank 1, 2, and 3 containment area prior to August 30, 2022.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "bypass" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "bypass" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From the Request, it remain unclear what Plaintiff means by "bypass." Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny the Request as stated.

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit. The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit—does not in any way require a permittee or operator to inform CT DEEP about "upcoming" plans or projects with respect to any specific substances or pollutants regulated under the General Permit. Plaintiff attempts to create a non-existent requirement in the General Permit.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated, and based on a faulty premise.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.  Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the installation of a bypass pipe between the secondary containment areas at the Terminal, including any allegation or implication that installation was conducted to address the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action.  Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the installation of a bypass pipe in the secondary containment area of the Terminal, including the implication that such installation was conducted to address alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit.  There are likewise no allegations regarding the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area contained anywhere in

any of Plaintiff's complaints in this action.  As such, there is no cause of action related to the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

### REQUEST FOR ADMISSION NO. 15:

Admit that You have not amended or updated the SWPPP for the Terminal with information about the bypass pipe that You installed to increase the secondary containment area volume for the Tank 1, 2, and 3 containment area.

### Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "bypass" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "bypass" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request.  From the Request, it remain unclear what Plaintiff means by "bypass." Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny the Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal.  Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined

term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls

for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R.

Civ. P. 36(a)(3) and (5), Defendants object to the extent that the installation of a bypass pipe

between the secondary containment areas at the Terminal, including any allegation or

implication that installation was conducted to address the sufficiency of secondary containment

volume at the Terminal is irrelevant to any claim or defense in this action.  Indeed, Plaintiff

failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action

related to the installation of a bypass pipe in the secondary containment area of the Terminal,

including the implication that such installation was conducted to address alleged sufficiency or

insufficiency of secondary containment volume within the Terminal's secondary containment

area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff

served in this action before initiating this lawsuit.  There are likewise no allegations regarding

the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary

containment volume within the Terminal's secondary containment area contained anywhere in

any of Plaintiff's complaints in this action.  As such, there is no cause of action related to the

installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment

volume within the Terminal's secondary containment area that is currently pending in this

lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 16:**

Admit that You did not recertify the Terminal's SWPPP pursuant to Section 5(c)(5) of the General Permit after installing the bypass pipe to increase the secondary containment area volume for the Tank 1, 2, and 3 containment area.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "bypass" used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition of "bypass" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From the Request, it remain unclear what Plaintiff means by "bypass." Without a definition of these key terms in the Request, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny the Request as stated.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(3) and (5), Defendants object to the extent that the installation of a bypass pipe between the secondary containment areas at the Terminal, including any allegation or

implication that installation was conducted to address the sufficiency of secondary containment volume at the Terminal is irrelevant to any claim or defense in this action. Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the installation of a bypass pipe in the secondary containment area of the Terminal, including the implication that such installation was conducted to address alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area. Such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit. There are likewise no allegations regarding the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action. As such, there is no cause of action related to the installation of a bypass pipe, or the alleged sufficiency or insufficiency of secondary containment volume within the Terminal's secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 17:**

Admit that You did not perform an evaluation of the permeability of the earthen materials that comprise the floor and berms of the secondary containment areas at the Terminal in response to Triton Environmental, Inc's July 28, 2021 letter recommending an "evaluation of the permeability of the earthen materials that comprise the floor and berms of the secondary containment areas." (Ex. 1226 at SOPUS_NHVN00190740 – SOPUS_NHVN00190747).

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "permeable," used in the Request, which could include a diverse range of irrelevant topics and issues.

The lack of definition for "permeable" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. From a regulatory perspective, the 2017 General Permit does not define, reference, or provide any measurable standard for the term "permeable." Without a definition of these terms, in accordance with Fed. R. Civ. P. 36, Defendants are unable to admit or deny Request as stated.

The term "permeability" in this context, as that term is not defined in the 2017 General Permit and has never been defined in any regulatory document issued by CT DEEP. Indeed, CT DEEP has never adopted any standard of permeability as measured by hydraulic conductivity in centimeters per second. Any attempt by Defendants to define a term that has never been defined or subjected to a measurable standard by the applicable regulatory body would be mere speculation that is an improper subject of written discovery. As such, Defendants object to any implication that the Terminal's secondary containment area is "permeable." In this regard, Plaintiff's Request if based on a faulty premise.

Further, Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit. The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit.

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants object to the extent that the "permeability" or "impermeability" of the Terminal's secondary containment area—a term that remains undefined in the State of Connecticut and therefore does not permit Defendants with the ability to respond—is irrelevant to any claim or defense in this action. Indeed, Plaintiff failed to notify Defendants, or any applicable regulator, of its intent to pursue a cause of action related to the alleged permeability of the Terminal's secondary containment area, and such claim is not encompassed within any of the Notices of Intent to Sue that Plaintiff served in this action before initiating this lawsuit. There are likewise no allegations regarding the alleged permeability of the Terminal's secondary containment area contained anywhere in any of Plaintiff's complaints in this action. As such, there is no cause of action related to the alleged permeability of Defendants' secondary containment area that is currently pending in this lawsuit, and this Request is not relevant or proportional to the needs of this case.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the Feb. 2021 DEP 37.00.10.10-Gen (SOPUS_NHVN02448801) applies to the design of new facilities and operation of existing facilities that are coastal and onshore facilities within the Shell Group.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit.  The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit.  The contents of any standards, policies, procedures, control measures, and/or design and engineering practices within the internal documents of the Shell group of companies—especially entities that are not parties to this litigation—are beyond the scope of what the General Permit contemplates, and cannot create additional legal requirements for Defendants to meet in order to avoid liability for violating the terms of CT DEEP's General Permits.  Nor do any such internal documents establish what may or may not constitute "best management practices" or "best industry practices" in the industry at large.  Further, the internal design and engineering practice cited in the Request does not apply "existing facilities" like the New Haven Terminal in question, as Defendants have repeatedly and consistently explained to Plaintiff throughout this litigation, including deposition testimony, prior responses to written discovery and declarations submitted to Court. *See e.g.*, Sergio Jaramillo Depo. (dated May 28, 2025) at 188:3-189:18; Paul Verlaan Depo. (dated March 20, 2025) at 277:15-279:11.  The contents of such design and engineering practices are simply unrelated to any claim or defense in this action, and any further discovery regarding same is irrelevant and disproportionate to the needs of this case.

Defendants further object that Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants object that the document speaks for itself.  By its terms, Defendants admit the limited portion of the Request that the Feb. 2021 DEP 37.00.10.10-Gen (SOPUS_NHVN02448801) is a design and engineering design practice ("DEP") within the Shell group of companies that applies to the design and execution of new capital projects and facilities within the Shell group of companies' project engineering organizations (including coastal and onshore facility design), but deny that the referenced design and engineering practice applies to any existing, in-service asset such as the New Haven Terminal at issue in this lawsuit. Defendants further deny that the design and engineering practices govern or require any retroactive redesign or modification of existing facilities such as the New Haven Terminal.  In this regard, Defendants further deny any implication or assertion that the design and engineering practices impose any standards applicable to existing facilities, or that Defendants were required by the design and engineering practices to undertake specific design changes at existing terminals.  Defendants further deny that the referenced DEP can be considered within the scope of what the General Permit contemplates, and deny any implication that the referenced DEP

document could possibly create additional legal requirements for Defendants to meet in order to avoid liability for violating the terms of CT DEEP's General Permits. Defendants further deny that any such internal documents establish what may or may not constitute "best management practices" or "best industry practices" in the industry at large, such that they may be admissible in this action.

Except as expressly admitted herein, the Request is otherwise denied.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the document produced at SOPUS_NHVN00249686 is an ALARP Determination for the Hazard "H-08.1 Weather – High Winds, Flooding" for a June 2016 "New Haven Terminal HSE Case", that determined that "Construct flood walls around facilities that are located in low lying areas" is a "credible/practicable" measure for the Terminal but was not implemented because "disproportionate resources required to implement."

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this lawsuit. The only environmental permit at issue in this lawsuit involving the New Haven Terminal—CT DEEP's General Permit. The contents of any standards, policies, procedures, control measures, and/or ALARP documents within the internal documents of the Shell group of companies are beyond the scope of what the General Permit contemplates, and cannot create additional legal requirements for Defendants to meet in order to avoid liability for violating the terms of CT DEEP's General Permits. Nor do any such internal documents establish what may or may not constitute "best management practices" or

"best industry practices" in the industry at large. More specifically, neither the General Permit nor any applicable guidance requires or even discusses "construction of flood walls." Further, the General Permit is clear that any "control measure" implemented to "minimize" the discharge of pollutants must be "technologically available and economically practicable and achievable in light of best industry practice."

Even if Defendants were to consider the 2025 General Permit, which still cabins any "control measure" to be "technologically available and economically practicable and achievable," the 2025 General Permit *still* does not contemplate the idea of flood walls. As mentioned, Section 4.3.2.8 of the General Permit asks permittees to consider actions like: "[r]einforc[ing] materials storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the BFE." *Id.*

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated, and based on a faulty premise.

Defendants further object that Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

**Response:**

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants object that the document speaks for itself.  Defendants admit the limited portion of the Request that SOPUS_NHVN00249686 contains a section entitled, "Additional Risk Reduction Measure for Consideration" ("ALARP"), which lists as a consideration for discussion whether to "[c]onstruct flood walls around facilities that are located in low lying areas."  Defendants further admit the limited portion of the Request that the document includes a chart that states "Yes" in response to the question whether "the measure is credible/practicable," and states "No" "disproportionate resources [are] required to implement" this proposed measure in response to whether the proposed measure would require "disproportionate resources . . . to implement."  However, Defendants deny that the referenced ALARP document can be considered within the scope of what the General Permit contemplates, and deny any implication that the referenced ALARP document could possibly create additional legal requirements for Defendants to meet in order to avoid liability for violating the terms of CT DEEP's General Permits.  Defendants further deny that any such internal documents establish what may or may not constitute "best management practices" or "best industry practices" in the industry at large, such that they may be admissible in this action.

Except as expressly admitted herein, the Request is otherwise denied.

## REQUEST FOR ADMISSION NO. 20:

Admit that the risk of a loss of primary containment at the Terminal due to storm surge flooding is worsened by sea level rise and increased frequency and severity of storms.

## Specific Objections:

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "risk of a loss of primary

containment," "storm surge flooding," and "worsened by sea level rise and increased frequency and severity of storms," used in the Request, all of which could include a diverse range of irrelevant topics and issues.

The lack of definition of "risk of a loss of primary containment" creates technical and regulatory ambiguities with respect to the actual regulatory requirements at issue in this case and the legal relevance of the Request. With respect to "storm surge flooding," without knowing the type of storm (e.g., 25-year v. 50-year), it impossible to estimate storm surge, and accordingly it is impossible to admit or deny this Request as stated. With respect to "sea level rise," the lack of time frame for this Request makes it impossible to admit or deny. With respect to "increased frequency and severity of storms," without knowing the type of storm (e.g., 25-year v. 50-year), it impossible to estimate storm surge, and accordingly it is impossible to admit or deny this Request as stated. As for "worsened," without knowing the timeframes involved—e.g., within a year or within the decade, it is impossible to admit or deny this Request as stated.

Defendants further object that Motiva has not had any ownership interest or operational control at the Terminal since May 2017 and objects to this Request to the extent it seeks information concerning a time when Motiva no longer had any involvement with the Terminal. Defendants also object that Motiva is not and has never been a subsidiary of Shell plc, does not now and has never shared a parent company of any other Defendant, and is improperly incorporated into Plaintiff's defined term "Shell Group." Motiva is therefore unable to respond to this Request to the extent it calls for admissions regarding the referenced non-Motiva document.

Defendants also object to this Request because it attempts to create and introduce new regulatory and legal terms, standards, concepts, and requirements not contained in the General Permit and not contained in any state or federal statutes, regulations, or agency guidance in this

lawsuit.  The only environmental permit at issue in this lawsuit involving the New Haven

Terminal—CT DEEP's General Permit—does not define, reference, or use the word or concept

of "climate change" in any way, and no requirements under the General Permit require a

permittee or operator to consider the concept of "climate change" with respect to any specific

substances or pollutants regulated under the General Permit.

Nor do any regulations or guidance documents by the U.S. Environmental Protection

Agency ("EPA") or CT DEEP issued prior to the filing of this lawsuit require a permittee or

operator to consider the concept of "climate change" in complying with stormwater discharges or

the preparation of a stormwater pollution prevention plan.  Rather, the General Permit requires a

permittee or operator to "minimize" the discharge of pollutants from New Haven Terminal in

accordance with the very specific technical requirements identified in the General Permit.  The

General Permit does not require the collection of "climate change risks" or the submission of any

such information "with the 2017 SWPPP."

CT DEEP recently revised its regulatory framework for industrial stormwater—and

rejected Plaintiff's crafted interpretation described in its Amended Complaint.  On October 1,

2025, CT DEEP issued a General Permit for the Discharge of Stormwater Associated with

Industrial Activities, Permit No. CTR050000, which will become effective on November 1, 2025

(the "2025 General Permit").  *See* 2025 General Permit Section 4.3.2.8 ("Resilience Measures"),

available at: https://portal.ct.gov/-

/media/deep/water_regulating_and_discharges/stormwater/industrial/2025-permit-

documents/2025-industrial-stormwater-general-permit-part-1--

2erc.pdf?rev=e07e4c0e8e9942cfb424954fe5bc89e5&hash=CFF6E87399495EA4981CB0C8949

F43CD.  Section 8.16 of the 2025 General Permit covers petroleum bulk stations and terminals,

including petroleum bulk terminals like the New Haven Terminal. *See* 2025 General Permit, Section 8.16 ("Sector P").

For the first time, the 2025 General Permit introduced the idea that: "Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events."  2025 General Permit Section 4.3.2.8.

Along with focusing on "Major Storm Events," CT DEEP also provided a list of "stormwater control measures" available to permittees, including "[r]einforc[ing] materials storage structures to withstand flooding and additional exertion of force; [p]revent[ing] floating of semi-stationary structures by elevating to the Base Flood Elevation (BFE) level or securing with a non-corrosive device;… [and] [t]emporarily stor[ing] materials and waste above the BFE." *Id.*

CT DEEP's definitions differ fundamentally from what Plaintiff assumes in its Requests and alleges in its Amended Complaint.  With respect to the Major Storm Events or Base Flood Elevation, or BFE, is defined as "The flood having a 1-percent chance of being equaled or exceeded in any given year; also known as the 100-year flood. The base flood, which is the standard used by most Federal and state agencies, is used by the National Flood Insurance Program (NFIP) as the standard for floodplain management and to determine the need for flood insurance. A structure located within a special flood hazard area shown on an NFIP map has a 26 percent chance of suffering flood damage during the term of a 30-year mortgage." [8]  In other

_____

FEMA Glossary, last access October 8, 2025, https://floodmaps.fema.gov/tutorials/check-ras/0.3_glossary.shtml#:~:text=Base%20Flood:,of%20a%2030%2Dyear%20mortgage.

words, CT DEEP now defines what storms it requires permittees to consider in managing industrial stormwater at facilities in Connecticut.

Of relevance to this case and these Requests, CT DEEP does not frame its industrial stormwater requirements using the concept of "climate change." Section 4.3 of the 2025 General Permit explains the SWPPP requirements. CT DEEP defines "Best Management Practices (BMPs)," as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of the waters of the state. BMPs also include treatment requirements, operating procedures, and practices to control plant site run-off, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." 2025 General Permit, Section 4.2. CT DEEP does not require "climate change" risk assessments or other concepts wished for by Plaintiff.

Of direct relevance to this lawsuit, CT DEEP has not in the past, and does not today, require permittees to complete "climate change" assessments, does not require "100-year 'storm event,' 500-year 'storm event,' or '1000-year 'storm event' assessments, does not mandate "erecting storm barriers", or any of the other wish list of items preferred and crafted by Plaintiff. Nor does CT DEEP require any specific "climate change" expertise for employees or consultants, does not use the term "handle" in the context of "climate change," and does not set standards for "secondary containment" (since those standards are addressed by other provisions of the Clean Water Act). In addition, the 2025 General Permit does not require the collection of "climate change risks" or the submission of any such information "with the 2017 SWPPP."

Accordingly, the Request is legally, factually and technically irrelevant, vague, and ambiguous as stated.

**Response:**

63

Subject to and without waiving the Specific Objections, and in accordance with Fed. R. Civ. P. 36(a)(4), Defendants interpret the meaning of the vague and undefined term "storm surge flooding," in the context of Plaintiff's Request for Admission, to contemplate coastal flooding generated by a storm event that temporarily pushes an undefined amount of ocean water inland at some quantitative measure of force, for an undefined period of time.  Defendants also interpret the meaning of the vague and undefined term "sea level rise," in the context of Plaintiff's Request for Admission, to contemplate an undefined increase in the localized height of coastal sea level for an undefined period of time.  Defendants also interpret the meaning of the vague and undefined term "increased frequency and severity of storms," in the context of Plaintiff's Request for Admission, to contemplate storms that are stronger and/or occur more frequently than currently experienced at the Terminal today.  And Defendants interpret the meaning of the vague and undefined term "worsened," in the context of Plaintiff's Request for Admission, to contemplate that a given event should be reasonably expected to occur at the Terminal at some undefined point in the near future, in light of the Permit term.

Subject to those interpretations, and without waiving any objections to this Request, the Request is denied in all respects.

**REQUEST FOR ADMISSION NO. 21:**

Admit that there is a risk of a loss of primary containment at the Terminal due to storm surge flooding.

**Specific Objections:**

In addition to the General Objections, Defendants object to this Request because it fails to provide a clear and unambiguous technical definition of "storm surge flooding," used in the Request, which could include a diverse range of irrelevant topics and issues. With respect to