# EXHIBIT B

Page 1

PAGES:    1-331

EXHIBITS:  1-15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

NO. 3:21-cv-00933-JAM

_____

CONSERVATION LAW FOUNDATION, INC.,  )

                Plaintiff,          )

                vs.                 )

SHELL OIL COMPANY, EQUILON          )

ENTERPRISES LLC D/B/A SHELL OIL     )

PRODUCTS US, SHELL PETROLEUM INC.,  )

TRITON TERMINALING LLC, and MOTIVA  )

ENTERPRISES, LLC,                   )

                Defendants.         )

_____)

VIDEOTAPED DEPOSITION OF

CONSERVATION LAW FOUNDATION, INC. BY SEAN M.

MAHONEY, called as a witness by and on behalf of

the Defendants, pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

Rule 30(b)(6) before P. Jodi Ohnemus, RPR, RMR,

CRR, CA-CSR #13192, NH-LSR #91, MA-CSR #123193, and

Notary Public, within and for the Commonwealth of

Massachusetts, at Conservation Law Foundation, 62

Summer Street, Boston, Massachusetts, on Wednesday,

June 4, 2025, commencing at 8:06 a.m.

Page 46

Q.   Okay.  Now -- and you have read through this Notice of Intent to Sue identified as Mahoney No. 3?

A.   I reviewed it, yes.

Q.   And this included all of its claims under the RCRA, the R-C-R-A, the Resource Conversation [sic] and Recovery Act?

MR. GREENE:  Objection.  Form of the question.

You can answer.

A.   On page 7 and 8 it provides notice of claims under the RCRA.

Q.   And this notice of intent includes all of CLF's claims under the Clean Water Act as well?

MR. GREENE:  Objection to the form of the question.

You can answer.

A.   On pages --

Q.   What pages are those?

A.   Pages -- pages -- pages 8 through 13 provide notice of Clean Water Act violations.

Q.   And that's included all of the ones that CLF were bringing?

MR. GREENE:  Objection.  Form of the question.

A.    It provides notice as the basis for all of the claims that CLF brought in the complaint.

Q.    Okay.  I'm going to hand you, Mr. Mahoney, what will be marked Mahoney 4.

(Exhibit Mahoney 4, letter, 2/17/2021, Supplemental Notice of Intent to File Suit, 15-page document.)

Q.    Mr. Mahoney, just to move this along, for the record, this is another notice of intent filed in this case, dated February 17, 2021.

Have you seen this Notice of Intent to Sue?

A.    I have.

Q.    And what's the difference between this notice and the prior notice?

A.    My understanding is stated on page 2 of the document.  (As read):

"This letter supplements and does not supersede CLF's July 28, 2020, Notice of Intent to File Suit for Violations of RCRA and the CWA."

That was sent to parties.  (As read):

"This letter puts additional parties on notice of the RCRA and CWA violations alleged herein."

And as I understand it, this notice added

Page 51

notice letters comply with the code of federal regulation requirements for a notice letter under the Clean Water Act?

MR. GREENE:  Objection.  Calls for a legal conclusion.

It's not his role as a 30(b)(6) witness.

Q.   You can still answer.

A.   I'm confident that these notices of intent comply with all applicable regulations.

Q.   But here today you did not check to see if it were -- if they did meet the code of federal regulations?

MR. GREENE:  Objection.  Calls for a legal conclusion.

It's not his role as a 30(b)(6) witness.

Q.   You can still answer.

A.   I did not.

Q.   Okay.  So what is the purpose of a notice of intent letter?

MR. GREENE:  Objection.  Calls for a legal conclusion.

You can answer if you're able.

Q.   Do you know?

A.   It's to provide notice of an intent to file suit under a statute, here the Clean Water Act

Page 52

and the Resource Conservation Recovery Act, to provide notice to the party alleged to be in violation of those acts --

Q.   Is it --

A.   -- and to provide the parties with an opportunity to cure the violations or to provide the appropriate state or federal agencies charged with enforcing the law to bring an action.

Q.   And what is the purpose of the 60-day waiting notice?  Do you know?

MR. GREENE:  Objection.  Calls for a legal conclusion.

You can answer if you're able.

A.   Yes, it is to provide that period of time for those parties to correct the alleged violations.

Q.   Doesn't it also give notice to the agency of what specific violations are alleged?

MR. GREENE:  Objection.  Calls for a legal conclusion.

You can answer.

A.   It gives notice to both the agencies and the parties of the basis for the violations alleged.

Q.   So that's -- the theory is -- so if the

Page 71

know --

MR. GREENE:  Well, if he's going to review it, it's going to be on the record.

Go ahead.

Q.   -- if the notice of intent mentions the word permeability or impermeable.

MR. GREENE:  Same objections.

A.   Okay.  So my answer is the document speaks for itself.  If you'd like, I would review this and see if I find that word in there.

Q.   Mr. Mahoney, I'm not trying to be difficult.  I'm just trying to get in here and to say this document does not include the word permeability or impermeable or impervious.  Any of those words and concepts are not mentioned in here --

MR. GREENE:  Objection.

Q.   -- is that correct?

MR. GREENE:  Objection.  The document speaks for itself.

Q.   Or --

MR. GREENE:  Mischaracterizes the document.  Beyond the scope of the deposition.

Q.   -- if -- if the words are not in this document, the words are not in this document.

Page 72

Is that a fair statement?

A.    That is -- that is -- that is a fair statement.

Q.    Okay.

A.    If the words aren't in a document, they are not in the document, yes.

Q.    Okay.  Great.

But you did not look today to review to see if the words permeability or impermeability were in the notice of intent?

A.    I did not.

MR. GREENE:  Objection.  Beyond the scope of the notice and beyond the role of the witness.

But go ahead.

Q.    Again, we're just here trying to ask questions about what we're being sued over, and this is the notice of intent, and you're the only person that I have the right to ask these questions.  So that's all I'm trying to do.

MR. GREENE:  And, again -- no.  So I just want to be clear for the record, what you're trying to do is go beyond the scope of the notice to pad a record for a motion that you have pending.  That's what you --

MR. HENDERSON:  It's topic No. 4,

Page 75

A.    -- "and increased magnitude and frequency of storm surges do not occur in the future and are eliminated."

Doctor Horner's opinion talks about some of the best management practices and best industry practices associated with controlling stormwater.

Q.    Did --

A.    And in that context he talks about permeable and impermeable.

Q.    But does he reference -- does CLF identify of any specific violations related to permeability or impermeability in the notice of intent letter?

MR. GREENE:  Objection.  Asked and answered.  Document speaks for itself.  Beyond the scope of the notice.

Q.    If -- do you agree the words permeability or impermeability or porosity or any word like that is ident- -- included in this notice of intent letter?

MR. GREENE:  Objection.  The form of the question.  The document speaks for itself.  Beyond the scope of the notice.

If you can answer, you can go ahead.

A.    I -- I -- I -- we've asked and answered this a number of times.  I --

Page 76

Q.    So you -- you --

A.    The -- the document speaks for itself.  As you said earlier, if a document -- if a word is not in a document, it's not in the document.

Q.    Okay.

A.    I would agree with that.

Q.    Okay.  That's helpful.

Is there any count, any sentence, any word in the complaint or the amended complaint that it -- includes permeability or impermeability?

MR. GREENE:  Objection.  The document speaks for itself.  It's beyond the scope of the notice.  Beyond the role of the witness.

If you are able to answer, you can answer.

A.    It would -- it would be the same answer as I just gave.

Q.    Okay.  So the words -- if the words are not there, then you did not include that in the amended complaint?

MR. GREENE:  Hold -- mischaracterizes his testimony.  Objection to the form of the question.

Simply because the complaint doesn't use a specific word you are asking about does not mean that the violations are not included.

So with that, you can answer.

Page 80

MR. GREENE:  Objection.

Go ahead.

A.   Best management practices include -- so there's -- there's not a -- there's not in this document.

Q.   So there's no citation.  The only -- the only citation here is to "eliminate nonstormwater discharges"?

MR. GREENE:  Objection.  The form of the question.

Q.   Does that --

A.   And BMPs, yes.

Q.   That is --

A.   That's one section of this, yes.

Q.   Does the notice of intent deal with secondary containment?  Does it provide any notice of any violation of secondary containment?

MR. GREENE:  Objection.  The form of the question.  Document speaks for itself.  Beyond the scope of the notice.

You can answer.

Q.   Mr. Mahoney --

A.   The document speaks for itself.

Q.   Okay.  So -- and I'm -- I understand your -- your testimony.  You're saying if it's not

Sean M. Mahoney                    June 4, 2025
Conservation Law Foundation, Inc.  Vs. Shell Oil Company

Page 81

there, it's not there; if it is there, it is there; is that correct?

A.   That's correct.

Q.   Okay.  Well, that should save us some time here.

So, to your knowledge, has EPA ever cited any of the defendants for a violation of any section of the Connecticut stormwater permit ever at any time?

A.   For this terminal, for the New Haven terminal?

Q.   Yes.

A.   I'm not aware of any.

Q.   Okay.  Has the US EPA ever cited the defendants for this terminal for any violation of any environmental law?

MR. GREENE:  Objection.  The form of the question.  Calls for a legal conclusion.

You can answer.

A.   Not that I'm aware of.

And what topic are we on?

Q.   Topic 4 and other topics.

A.   Okay.  Thank you.

Q.   So has the Connecticut DEEP ever inspected this terminal and identified any problem with the

Page 84

Q.   Yes.

A.   Would speak for itself; but, again, I would agree -- and we can do this if you'd like -- if the word is not in there, it's not in there.

Q.   Okay.  Thank you.

Are you -- do you remember where Doctor Horner talked about no liner in the stormwater pond?  Does that sound familiar?

MR. GREENE:  I'm just going to object.

If you want to ask him specific questions about the expert reports, he should have the expert reports in front of him.

A.   I recall that there was discussion about the base of the retention pond.

Q.   Is there any allegation in the notice of intent that -- that it's a violation of the stormwater permit that there's no liner in the stormwater pond?  Is there anything that remotely resembles that in the notice of intent?

MR. GREENE:  Just going to object to the form of the question.  The document speaks for itself.  Calls for a legal conclusion.  Beyond the scope of the notice.

Go ahead.

A.   Yeah, I -- you know, the same answers that

Page 85

we've had.

Q.   So just so we're -- there's no confusion here, all of your claims against the defendants is in the Notice of Intent to Sue?

MR. GREENE:  Objection.  Asked and answered.  Repeatedly --

MR. HENDERSON:  No.  No.  No.

MR. GREENE:  -- repeatedly, repeatedly he's testified to that.

MR. HENDERSON:  If we can agree that that's it, then we can move on.

MR. GREENE:  No.  No.  No.  No.  Just 'cause you're not getting the answer that you want doesn't mean you get to keep asking over and over.

MR. HENDERSON:  No, I'm -- I'm getting the answers that I think he's being truthful about.

MR. GREENE:  No, no.  I said you're not getting the answers that you want --

MR. HENDERSON:  No.  No.  You don't --

MR. GREENE:  -- so you keep asking that question.

MR. HENDERSON:  Mr. Greene, why do you think you know what's in my head.  I'm just curious.

MR. GREENE:  'Cause I can tell from your

Page 86

questions.  It's obvious.

Q.   So if it's not in the letter, it's not in the letter?

MR. GREENE:  Objection.  Mischaracterizes his testimony.

Q.   So are --

A.   If a word is not in the letter, it is not in the letter.

Q.   Okay.

A.   That was not your question.

Q.   I just asked that question.

MR. GREENE:  No, it's not the same question.

Q.   Okay.  Are you familiar with the Connecticut -- are you familiar with the Connecticut Stormwater Quality Manual?

A.   Yes.

Q.   Okay.  Are you alleging any violations of the Connecticut Stormwater Quality Manual in this case?

MR. GREENE:  Objection.  Calls for a legal conclusion.  Beyond the scope of the notice.

Q.   You can answer.

A.   I'm aware of the -- the guidance manual which provides guidance to permit holders.  I'm not

Page 87

sure one could be in violation of the guidance document.

Q.   Okay.  Did CLF ever notify Connecticut DEEP or EPA about its -- about Doctor Horner's alleged violation there was no liner in the stormwater pond?

MR. GREENE:  I'm just going to object.

I -- well, that's -- that's, again, well beyond the scope of this notice.

Q.   I'm just -- okay.  Subject to that, you can answer.

A.   I don't know if Doctor Horner's expert report has been shared with EPA or Connecticut DEEP or, quite frankly, any other third party other than your clients.

Q.   How would -- to the extent you know, how would the Connecticut DEEP know that there was an alleged violation of the liner -- of no liner in the stormwater pond?

MR. GREENE:  Objection.  Calls for speculation.  Beyond the scope of the notice.

Go ahead.

A.   They could read Doctor Horner's report. They could -- they could go to the site themselves.

Q.   Okay.

Page 90

A.   Yeah.

Q.   Are you saying Doctor Horner's report didn't allege any violations?

A.   Doctor Horner's report is his expert opinion as to the appropriate stormwater control measures -- in part appropriate stormwater control measures that should be applied at the site.

Q.   If you go back to Mahoney Exhibit No. 3, is there any allegation of inadequate stormwater treatment in the Notice of Intent to Sue?

MR. GREENE:  Once again, I'm going to object --

THE WITNESS:  Yeah.

MR. GREENE:  -- to the extent the document speaks for itself.

A.   It would be the same answer as before.

Q.   So if it's -- if it doesn't mention inadequate stormwater treatment in the NS -- NOI, then that is not a claim that CLF is making?

MR. GREENE:  Objection.  Mischaracterizes testimony and the document.

But you can go ahead.

THE WITNESS:  Yeah.

A.   If it -- if the words aren't in the document, the words aren't in the document.  It

Page 91

doesn't have to do with the relationship between the notice and the claim.

Q.   Okay.

A.   And the complaint.

Q.   Does -- did CLF ever notify EPA or DEEP about alleged violations of inadequate secondary containment in the notice of intent?

A.   Again --

MR. GREENE:  Just going to object again. The document speaks for itself.  Beyond the scope of the notice.

You can answer.

THE WITNESS:  Yeah.

Q.   I'm -- I'm just asking questions.

A.   These -- these are the documents --

MR. GREENE:  Again, just because you keep saying that now I have to say you're not just asking questions.  You're asking -- for the fifth time, you're asking questions beyond the scope of the notice, mischaracterizing documents, mischaracterizing testimony all to pad the record of a motion that you have pending, which is well beyond the scope of the notice which was negotiated and litigated.

MR. HENDERSON:  It's the -- topic No. 4,

Page 93

MR. GREENE:  Simply saying that doesn't make it true.

MR. HENDERSON:  If we can just keep -- Mr. Greene, you have a right to file whatever notice on the record you want.  So...

MR. GREENE:  And I'm going to keep doing that because you continue to mischaracterize the documents, the testimony, the regulatory process, and you're well off the notice.  You're well beyond the scope of topic 4.  So I will continue to object.

MR. HENDERSON:  So --

MR. GREENE:  You can go ahead.

Q.   Did CLF ever provide notice to EPA or DEEP that there was inadequate secondary containment at the terminal in New Haven?

MR. GREENE:  I'm going to object.  Form of the question.  Calls for a legal conclusion. Mischaracterizes the NOI.  Beyond the scope of the notice.

You can answer, Mr. Mahoney.

A.   The only notices that CLF provided to EPA and Connecticut DEEP are Exhibits 3, 4, and 5.

Q.   Okay.  And if they're not -- if the alleged violations are not in Exhibit 3, 4, or 5,

Page 94

then they're not in this case; right?

A.   No.

MR. GREENE:  Objection.  Mischaracterizes the documents and the testimony.

Q.   So how would the agency know about these inadequate secondary containment allegations that CLF is making?

MR. GREENE:  Objection.  Calls for speculation.  Beyond the scope of the notice. Mischaracterizes the document.

You can go ahead, Mr. Mahoney.

A.   Again, the notices of intent provide your clients and also the agencies with notice of the basis for alleged violations.  What your clients or EPA or Connecticut DEEP do with that notice is up to them.

Q.   So --

A.   The Exhibits 3, 4, and 5 clearly provide notice of alleged violations of the Clean Water Act and the Resource Conservation Recovery Act to all those parties.

Q.   And I think you previously testified you don't know if they meet the requirements for the code of federal regulations on notice?

MR. GREENE:  Objection.  Mischaracterizes

Page 95

the testimony.

Go ahead.

A.    I said I'm not intimately familiar to know, but I would presume that the notice letter was appropriately prepared and meets all legal requirements.

Q.    Did Doctor Horner raise any groundwater allegations, or did he make any claims that there were violation of groundwater laws and regulations in the Notice of Intent to Sue letter?

MR. GREENE:  I'm just going to object that it mischaracterizes the nature of the expert report which does not address claims or allegations, but also Mr. Mahoney repeatedly said if you're going to ask him questions about Doctor Horner's report, he would like to have it in front of him.

But with that objection, you can go ahead.

A.    The question's a little confusing.  Doctor Horner's report is provided well after the notices and -- and the complaint.  So it has -- it doesn't relate back to those.

Q.    So that's our point.

A.    Yeah.

Q.    So Doctor Horner raised alleged violations in his report that were not in the Notice of Intent

Page 96

to Sue?

A.   No, you --

MR. GREENE:  Objection.  Mischaracterizes his testimony.  Mischaracterizes the report. Mischaracterizes the NOI.

You can answer.

A.   You -- you asked me if Mr. Horner's claims -- they're not claims, but if his opinion was -- was in the NOI.  I took that to mean did Doctor Horner contribute to the NOIs when they were drafted and sent in July of 2020 and -- sorry -- February of '21 and November of '24.

And my answer to that is, no, he did not because his expert report was prepared after those documents.

Q.   Was -- does the Notice of Intent to Sue or the complaint include any allegation that the defendants violated the permit for a failure to implement a corrective action plan?

MR. GREENE:  Objection to the form of the question.  And the documents speaks for themselves. Beyond the scope of the notice.

But you can answer if you're able.

A.   Again, same answer:  If the words "corrective action plant -- plan" aren't in the

Page 97

notice, they're not in the notice.  I'd have to take a look at the complaint.  But same thing:  The document would speak for itself.

Q.   So no notice of a failure to implement a corrective action plan was ever provided by CLF to the EPA or the Connecticut DEEP?

MR. GREENE:  Objection.  Mischaracterizes his testimony.  Mischaracterizes the document.  Beyond the scope of the deposition.

Q.   So no notice was provided to CL -- by CLF to the Connecticut DEEP and the EPA about an alleged violation of a failure to implement a corrective action plan?

MR. GREENE:  Objection.  Mischaracterizes the document.  Mischaracterizes -- documents.  Mischaracterizes his testimony.  Beyond the scope of the deposition notice.

A.   Again, same thing.

Q.   Okay.

A.   Notice was provided for the basis of the allegations of alleged violations, and if the words aren't in the document, they're not in the document.

(Counsel confer.)

Q.   So, Mr. Mahoney, just continuing to move

Page 98

forward here about the notice of intent, which is identified as Mahoney Exhibit 3.

Does -- I'm going to ask the same question just so we have it on the transcript.

Does the notice of intent make any allegation that the defendants violated any part of the permit related to ingress and egress to the terminal site?

MR. GREENE:  Objection.  The document speaks for itself.  Beyond the scope of the deposition.

You can answer.

A.   And I assume by "permit" you're talking about the Connecticut DEEP permit?

Q.   The Connecticut DEEP permit.

A.   Connecticut permit?

Q.   Yes, sir.

A.   Same -- same answer.

Q.   Okay.

A.   If the words aren't in the document, they're not in the document.

Q.   Mr. Mahoney, to your knowledge, has the claim by CLF that the defendants violated the -- some law related to ingress/egress, has that been made at any time before May 8th, 2025?

Page 104

mischaracterizes his testimony --

MR. HENDERSON:  That's just a question --

MR. GREENE:  -- where he has said --

MR. HENDERSON:  It's just a question.

MR. GREENE:  -- whether or not words --

No.  No.  No.  No.  Because you're misconstruing his testimony with the intent of getting testimony to help your motion.  He said whether or not words are in the document, they may or may not be in the document.  That does not mean if words -- specific words you've asked for are not in the document that that claim is not brought, and he's said that over and over again.  And you continue to mischaracterize his testimony.

Q.  So has CLF ever provided notice to EPA or the Connecticut DEEP of a compound flood condition at the terminal in New Haven?

MR. GREENE:  Object.  Document speaks for itself.  Beyond the scope of the notice.

Go ahead.

A.  It's the same answer.  The notice -- the only notice of intent concerning this terminal provided to EPA and Connecticut DEEP are Exhibits 3, 4, and 5.

Q.  Okay.

Page 105

A.    And they speak for themselves.

Q.    Okay.  Did -- did CLF ever provide notice to EPA or the Connecticut DP -- DEEP of bare soil on berms at the terminal?

A.    Same --

MR. GREENE:  Object to the form of the question.

You can answer.

A.    Same answer.

Q.    Okay.  Did -- did it ever provide oral notice to Connecticut DEEP of any violation at the terminal?

MR. GREENE:  Just going to object.  Beyond the scope of the notice.

Go ahead.

A.    I don't -- I don't know the answer to that.  I don't know if there was any conversation concerning receipt of the notices of intent.

Q.    Has CLF ever had any conversation with Connecticut DEEP about any alleged violations at the terminal in New Haven?

A.    Yes, in connection with FOIA requests that were made.

Q.    What were those conversations?

A.    Following up on the status of the response

Page 106

to those FOIA requests.

Q.   Has --

(Environmental sounds.)

VIDEO OPERATOR:  Just to be clear, that's going to be in the video, if you want to pause for just a second.

MR. HENDERSON:  We can take a five-minute break if you want.

MR. GREENE:  Why don't we just pause for a minute.  It's going to go by.

THE WITNESS:  He gave the thumb's up.

MR. HENDERSON:  Huh?  Okay.

Q.   Has CLF ever had -- has CLF ever notified the Connecticut DEEP or EPA orally that there were violations at the terminal in New Haven?

MR. GREENE:  Object to the form of the question.

You can go ahead.

A.   I don't believe so.  They may have, but I don't -- I don't believe so.

Q.   Okay.  Has CLF -- does it lobby in Connecticut?

MR. GREENE:  I'm just going to object as beyond the scope of the notice.

You can go ahead.

Page 117

correct?

MR. HENDERSON:  Yes.  Yes, sir.

Q.   The definitions -- this permit does not include a definition for climate change, does it?

MR. GREENE:  Object to the form of the question.

Go ahead.

A.   (Witness reviews document.)  It does not.

Q.   Okay.  Does it mention the word "climate adaptation"?

MR. GREENE:  Objection.  Document speaks for itself.

You can answer.

A.   There's no definition for climate adaptation, if that's what you're asking.

Q.   Is there a definition of climate resilience, r-e-s-i-l-i-e-n-s-c-e [verbatim]?

MR. GREENE:  Objection.  Document speaks for itself.

You can answer.

A.   There's no definition of resilience in this document.

Q.   Does it use the word "climate change," "climate adaptation," or "climate resilience" anywhere in the permit?

Page 118

A.   You know, the document speaks for itself. I haven't done that close of a review to say it does or it doesn't.

Q.   Okay.  But if those words don't appear in here, then the word -- the permit does not include the words; correct?

MR. GREENE:  Object to the form of the question.

You can answer.

A.   Right.  If the -- if the words aren't in here, the words aren't in here.

Q.   Okay.  Did -- can you point out anywhere in this permit where it requires the defendants to complete a climate change risk assessment?

MR. GREENE:  Object.  First of all, if the witness wants to take the time to review the document, he should take whatever time he wants.

Secondly, the document speaks for itself.

But go ahead.

A.   You asked about climate risk assessment?

Q.   Yes.

A.   I don't see that defined in -- in the definitions, section 2, of this document.  And as I said earlier, I haven't reviewed the -- the permit closely enough to give you an answer either way as

Page 119

to whether it appears elsewhere in the document.

Q.   Is CLF alleging that the defendants failed to consider climate change impacts on the terminal?

MR. GREENE:   Object to the extent that the NOI and complaint speak for themselves.

But you can answer.

A.   CLF's allegations are that --

(Counsel confer.)

A.   -- that the --

Q.   Go ahead.

A.   CLF's allegations are that your clients have failed to meet the requirements of the permit and that that failure is set forth in the complaint and -- and in the opinions of the experts that CLF has retained to support its claims.

Q.   Thank you.  I would -- I'm just trying to identify where in the permit, what provision have the defendants violated in -- when CLF claims they did not complete a climate change assessment of the terminal?

MR. GREENE:   Object to the form of the question.  And the document speaks for itself, as do the NOI and the complaint -- complaints, excuse me.

But you can answer.

Page 143

interpretation that the general permit of 2021 for industrial stormwater section 5, the best industry practice, requires a climate change assessment?

MR. GREENE:  Object to the form of the question.

You can answer.

A.    I'm not aware of any such guidance or directive issued by Connecticut DEEP.

Q.    Does CLF have any information that any other laws in the state of Connecticut require a permittee, under industrial stormwater permit, to complete a climate change assessment of the permitted facility?

MR. GREENE:  Object to the extent that it calls for a legal conclusion and beyond the scope of the notice.

But you can answer.

A.    I'm not aware of any such laws.

Q.    Do you know of any state in the United States that requires a permittee, under any general permit, to complete a climate change assessment of the permitted facility?

MR. GREENE:  Objection to the extent it calls for a legal conclusion.  Beyond the scope of the notice.

Page 144

A.   I haven't done an analysis --

Q.   Okay.

A.   -- of any states with respect to that question.

Q.   Does -- has CLF ever asked the Connecticut DEEP does the term "best industry practice" include an obligation to complete a climate change assessment of a facility permitted under an industrial stormwater permit in Connecticut?

MR. GREENE:  Object to the form of the question.

You can answer.

A.   I don't believe CLF has ever asked Connecticut DEEP that question.

Q.   Okay.  Why not?

MR. GREENE:  Objection.  Beyond the scope of the notice.  Calls for potentially privileged information.

But you can answer.

A.   I -- I don't know.

(Counsel confer.)

(Exhibit Mahoney 8, Guidance Document For Preparing a Stormwater Pollution Prevention Plan, March 2011.)

Q.   Mr. Mahoney, you've been provided what's

Page 165

scope of -- of the deposition.

Q. Can you identify any?

A. I mean, I think that the -- the expert report of Professor Oreskes lays out -- O-r-e-s-k-e-s, I believe.

MR. GREENE: Yeah.

A. -- documents a lot of the science that was -- that has been conducted and would support that, including science conducted and engaged in by employees of Shell.

Q. So does CLF agree this proposed permit, this is the first time that Connecticut DEEP has ever required any assessment of adverse weather events, hurricanes, in preparing a solid waste pollution prevent -- I mean a Stormwater Pollution Prevention Plan?

MR. GREENE: Objection. Form of the question and to the extent that it mischaracterizes the documents that are marked here and are part of the question.

But you can answer.

(Court Reporter comment.)

THE WITNESS: Sorry. Sorry.

(Question read back.)

A. This may well be the first time that the

Page 166

term -- the phrase hurricane is used in the -- in the permit.  I'm -- again, I would say if it -- if the word's not in the 2021 permit, it's -- it's not in there.

Q.  Okay.  Mr. Mahoney, I'm going to hand you what will be marked Mahoney 11, and we'll just go ahead and enter them all.  Save us some time.

(Exhibit Mahoney 11, National Pollutant Discharge Elimination System General Permit For the Discharge of Stormwater Associated With Industrial Activity, Fact Sheet, March 2024.)

(Exhibit Mahoney 12, Supplemental Fact Sheet Draft NPDES Permit For the Discharge of Stormwater Associated With Industrial Activities, March 2024.)

(Exhibit Mahoney 13, National Pollutant Discharge Elimination System General Permit For the Discharge of Stormwater Associated With Industrial Activity Fact Sheet, General Permit No:  CTR 050000.)

MR. KEARNEY:  Off the record for a moment.

VIDEO OPERATOR:  The time is now 11:40. We are off the record.

(Discussion off the record.)

Page 175

opinion.  Beyond the scope of the deposition notice.

You can answer.

A.   Yeah, again, I have no opinion as to whether or not we would -- CLF considers this to be a new component of the SWPPP.

Q.   So you're offering no opinion on that?

A.   I'm --

MR. GREENE:  Objection.

You can answer.

A.   -- absolutely offering no opinion on that.

Q.   Do you think factually this is a new addition to the industrial stormwater permit in the state of Connecticut?

MR. GREENE:  Objection.  Asked and answered.

But you -- you can answer.

A.   I think the specific resilience measures term is new and Connecticut DEEP believes it's a new component of the SWPPP.

Q.   And DEEP believes they're new?

MR. GREENE:  Objection.  Calls for speculation.

You can answer.

A.   The DEEP fact sheet states "The resilience

Page 176

measures element is a new component of the SWPPP."

Q.   Is it CLF's view that the prior permit required considering clim- -- required consideration of climate resilience in the industrial stormwater permit?

MR. GREENE:  Objection.  Calls for a legal conclusion.  Beyond the scope of the notice.

But you can answer.

THE WITNESS:  Could you read the question again.

(Question read back.)

A.   Yes, to the extent that best management practices and best industry practices called for measures to safely and -- and properly manage stormwater from those facilities.

Q.   And does CLF have in its possession any statements by US EPA that the federal agency agrees with CLF's interpretation of the prior permit?

MR. GREENE:  Objection.  Asked and answered.

Go ahead.

VIDEO OPERATOR:  Can I ask the witness to move your microphone up.

THE WITNESS:  Sorry.

VIDEO OPERATOR:  You keep crossing your

Page 178

2021 EPA MSGP."

Do you see that?

A.    Yes.

Q.    Does that mean -- what all did the 2021 MSGP include?  Did -- do you -- did it include climate and resilience provisions?

A.    I'd have to take a look at that -- at that permit.

Q.    If you look at -- then going on down in that paragraph where it talks about -- it has the new permit -- or the new proposed permit will have a corrective action section.

Do you see that?

A.    I do.

Q.    So is it CLF's position that that did not exist in the prior permit?

MR. GREENE:  Object to the extent the documents speak for themselves, don't require an opinion, and to the extent that it calls for a legal conclusion about the documents.

But you can go ahead.

A.    Yeah, I don't recall.  I could look back on the 2021 permit if you'd like.

Q.    Okay.  Sure.

A.    (Witness reviews document.)  I'm just

Page 179

looking at the table of contents --

Q.   Right.

A.   -- in the sections, and I don't see a section titled "Corrective Action" --

Q.   So --

A.   -- here.

Q.   -- Connecticut DEEP believes that's a new section; right?

MR. GREENE:  Objection to the extent that it calls for speculation.

But you can --

A.   Yes, they -- they use the adjective "new."

Q.   Right.  And if you could turn to page 3 of this document, which is marked Mahoney 14, section identified as 1.4; and, again, this is a fact sheet for the proposed Connecticut DEEP industrial stormwater permit for the state of Connecticut; correct?  This fact sheet?

A.   This fact sheet.

Q.   In this section right here it points to "New resiliency measure element in the SWPPP."

Is this the new climate resiliency measure that Connecticut DEEP is proposing to include in the new permit?

MR. GREENE:  Object to the form of the

Page 187

pollution and -- and -- under a stormwater permit.
So to the extent steps can be taken to -- to
minimize pollution from flooding events and they're
not taken, then that could be cause for violation
of a permit.

Q.   Okay.  Is that any flooding or only
flooding from a 100-year return period storm or...

MR. GREENE:  Same objection again.

A.   Yeah, I think it's very fact dependent
on -- on what -- what you're talking about, what
kind of flooding and what kind of impacts result
from the flooding.

Q.   So, Mr. Mahoney, turning to some other
topics here.  Does CLF know of any SWPPP --
S-W-P-P-P -- know of any SWPPP in the state of
Connecticut that includes requirements to conduct a
climate change vulnerability analysis under
industrial stormwater permit?

MR. GREENE:  Object to the extent it's
outside the scope of the notice.

But you can answer.

A.   I'm -- I'm not aware of any.

Q.   Okay.  Has CLF actually looked to see if
it could identify an existing SWPPP at a facility
in state of Connecticut that includes requirements,

Page 188

procedures, to evaluate climate change and to make changes at a facility?

MR. GREENE:  Same objection.

A.  I don't know the -- the answer to that. There aren't that many facilities such as your client's in -- in the state.

Q.  But CLF does not -- does it have an example of a SWPPP that CLF believes would comply with its interpretation of climate change assessment?

A.  I don't think there's one in Connecticut.

Q.  How about other states?

A.  Can't recollect right now if there are other states that have such a condition in a SWPPP, S-W-P-P-P.

Q.  Has CLF developed a model SWPPP that it believes would meet all the requirements that CLF believes are needed to address climate change in a SWPPP under state of Connecticut law?

MR. GREENE:  Just going to object to the extent that that's beyond the scope of the notice.

But you can answer.

A.  No.  CLF has provided comments in the state of Connecticut on the draft 2024 permit.

Q.  Uh-huh.

Page 189

A.   But we have not developed a SWPPP -- we don't have an industrial facility that requires the --

Q.   I didn't know if you were trying to do it for industry so they knew what CLF expected industry to do.

MR. GREENE:  Object to the form of the question.

You can answer to the extent that there's a question there.

A.   We have not developed a SWPPP for Shell or other industrial facilities.

Q.   Does the existing -- the 2021 industrial stormwater permit -- or does it require a permit to you to assess sea level rise?

MR. GREENE:  Object that it calls for an expert opinion or legal conclusion.

But you can answer.

A.   I don't think that the 2021 permit has a specific requirement concerning sea level rise.

Q.   How about storm surge?  Does the 2021 permit include any requirement to assess storm surges for industrial permit in the state of Connecticut?

MR. GREENE:  Same objection.

Page 190

THE WITNESS:  Yeah.

A.   I -- I don't believe that the permit has a specific provision concerning storm surges.  As I've said before, the permit does have provisions requiring best management practices and best industry practices, and so the -- the question or the issue there would be whether or not those practices -- what those practices required.

Q.   How about does the 2021 general permit for industrial stormwater in the state of Connecticut include an obligation to -- for a permittee to assess the effects of drought on industrial stormwater at a facility?

MR. GREENE:  So I object to the extent it calls for a legal conclusion or expert opinion.

But you can answer.

A.   It would -- it would be the same answer that I -- that I just gave --

Q.   Okay.

A.   -- with respect to storm surge.

Q.   Does CLF -- has CLF identified any SWPPPs that include provisions addressing climate change impacts under an industrial stormwater permit?

A.   I think that there might have been such a permit out of California, but I can't recall

Page 200

A.   Yeah, I think the SPCC is a condition of the -- of the permit, and I think that is an issue that CLF has identified.

Q.   What -- what is the problem with the SWPPP?

MR. GREENE:  Object to form of the question.

Q.   Or what is the violation of the SWPPP that CLF alleges?

A.   You mean the SPCC or the --

Q.   The SPCC, yeah.

A.   I'd want to look at the complaint to -- to do any --

Q.   But you don't remember anything --

A.   I don't.

Q.   -- off --

A.   Not off -- as I sit here today.  As you know, there were a lot of things to look at.

Q.   Has CLF ever identified any notice of violation or notice of potential violation that CT DEEP has issued to any facility in Connecticut that relates to climate change in any way?

MR. GREENE:  Object.  Asked and answered and beyond the scope of the deposition.

A.   I -- I don't know.

Page 207

language, but I think that it would -- it could very well fall, for the reasons I noted, under best management practices or best -- best industry practices.

Q. Okay. Has or is CLF alleging that the New Haven terminal has failed to have a spill prevention or a leak procedure implemented at the terminal?

MR. GREENE: I'm just going to object to the extent that allegations are contained within the NOIs, the complaint, and the plaintiff's expert reports.

But you can answer.

A. No, I believe that the contention isn't that there's not an SPCC but the adequacy of that SPCC.

Q. Does the notice of intent make a specific allegation that the terminals have violated the stormwater permit by not having an adequate SPCC?

A. I think we've kind of gone over before the notice piece. So the notice doesn't specifically state the violation is the failure to have an adequate SPCC. Just provides notice that the stormwater management control measures are -- are not sufficient.

Page 215

the US EPA recommends to have tank storage facilities secure the facility during hurricanes and other adverse weather events?

MR. GREENE:  Object to the form.

Go ahead.

A.   I -- we may be.  They -- CLF staff may be.

Q.   Yeah.  Okay.

Does the US EPA have any specific procedures or requirements for terminals to secure their facilities to withstand hurricanes?

MR. GREENE:  Object to the extent that it calls for a legal conclusion.

You can answer.

A.   I -- I don't know the answer to that.

Q.   Does Connecticut DEEP have any written procedures, policies, or regulations that a fuel storage terminal should implement in the event of adverse weather events at the terminal?

MR. GREENE:  Same objection.

A.   Yeah, I'm -- I'm not aware of any specifics.

Q.   Does CLF have any documents, reports, other evidence that the tank -- I mean the valves or other equipment at the terminal are faulty or substandard?

Page 228

A.   Right.  And I think -- I go back to the answer that we've -- you've had from me a couple of times, which is, you know, the document speaks for itself.

Q.   Okay.

A.   If there's no specific language requiring climate --

Q.   Right.

A.   -- assessment, it's not in there.  Those words aren't in there.

Q.   Do you believe that Connecticut DEEP should have added additional provisions to the new draft proposed permit?

MR. GREENE:  Just going to object to the extent that it's outside the scope of the deposition.  It calls for legal and expert conclusion.

But you can answer.

A.   I know that -- that CLF has made suggestions for additional measures or provisions for the draft permit in the two comment letters that we submitted and presume that those comments are still under consideration by Connecticut DEEP, as they have yet to issue a final permit.

Q.   Has CLF attempted to identify SWPPPs for

Page 229

other facilities along the coast in the state of Connecticut to evaluate whether they address climate change in any way?

MR. GREENE:  Just going to object to the extent that I think that was asked and answered. Beyond the scope of the deposition notice.

But you can answer.

A.    What facilities do you -- are you referencing?

Q.    Oh, just along the coast or on the coast.

A.    Industrial facilities?

Q.    Industrial facilities.  Facilities subject to the industrial stormwater permit.

A.    Oh.  I don't know if -- if others at CLF have inquired about that.  Have made those inquiries.

Q.    If none of the SWPPPs for facilities along the coast of Connecticut have any provisions that require climate change assessment of those facilities, does that indicate anything about what industry is doing in the state of Connecticut?

MR. GREENE:  I'm going to object. Incomplete hypothetical.  Assumes facts not in evidence.  Beyond the scope of the deposition. Calls for a legal conclusion.  Calls for an expert

Page 237

Connecticut and inquired about how they are handling climate change impacts in their industrial stormwater permits?

MR. GREENE:  Object as to beyond the scope of topic 12.  It's not specified as to what industry.  It's overbroad.

But go ahead.

A.   I don't know.

Q.   Has anyone ever provided you any information that they're -- that anyone at CLF had ever contacted industry to see what the best industry practice is in the state of Connecticut?

MR. GREENE:  Once again, I'm going to object as to overbroad and beyond the scope of the topic which is limited to the permit for industrial stormwater permit compliance.

But you can go ahead.

A.   By industry do you just mean anybody subject to the industrial stormwater permit?

Q.   Yes, sir.

A.   I think the only -- the only information we've received has been from your clients as to what they consider best management practice and best industry practice.

Q.   So has CLF interviewed, spoken with any

Page 239

attorney-client privilege, but with those caveats, you can answer.

A.   I'm not aware of anybody at CLF who has.

Q.   Do you know if anyone at CLF has actually looked at the SWPPP for any other facility that's located on the New Haven Harbor?

MR. GREENE:  Same objections as to work product and privilege.

But with those caveats, you can answer.

A.   I believe that somebody has -- somebody at CLF has reviewed the SWPPP for the Gulf Pike facility.

Q.   Other than the Gulf Pike facility?

MR. GREENE:  Same objections.

A.   I'm not aware of -- of anybody having reviewed any other facility that might be on New Haven Harbor and subject to the industrial stormwater permit.

Q.   Did CLF ever conduct a review of SWPPPs for facilities along the entire coast of Connecticut to see how those facilities were handling climate change impact analysis at those facilities?

A.   I think you already asked that question, and the answer is I'm not aware of anything other

Page 240

than your client's facility in New Haven and the Gulf Pike facility.

Q.   How has CLF determined what the best industry practices are for compliance with SWPPPs in the state of Connecticut?

MR. GREENE:  Just going to object to the extent that it calls for a legal conclusion, attorney work product, attorney-client communications.

But if you're able to answer with those caveats, go ahead.

A.   Based on a reading of the general permit, the facility SWPPP, and the reports prepared by our expert witnesses.

Q.   So -- so did the -- how does CLF define best industry practices?

MR. GREENE:  Just going to object to the extent that it calls for a legal conclusion, expert testimony, and particularly given that defendant is in possession of the discovery in this matter as well as the plaintiff's expert reports, is very aware of the plaintiff's position in that.

With that, you can answer.

A.   I think it gives the plain meaning of best industry practice as -- and it's defined by those

Page 257

industry itself, including your client Shell and its associated companies.

Q. Do you know of any national consensus standard on how a company should evaluate climate change impacts to its facility regulated under an industrial stormwater permit?

A. I don't -- sitting here right now, I couldn't tell you if there's a national standard.

I would think that there is -- because every facility is different, there's going to have to be individual site-specific approaches taken in light of the nature of risk surrounding environmental features, habitat features, size of facility, type of activity going on.

As you know, the general permit covers a variety of sectors. So those sectors have different issues. Some have tanks storing hazardous materials. Some don't. Some are -- are producing materials. Others are storing and transferring them. It's a -- you know. So it depends on -- on the -- on the industry.

But -- I'll stop there.

Q. Would the EPA MSGP, would that provide guidance to companies on how to consider climate change impacts of their facilities under an

Page 268

A.   Of the sectors, which go to sector J, there are -- there is not a sector for a bulk -- bulk oil storage terminals.

Q.   Okay.  Okay.  So in terms of, like, the allegations of CLF that the defendants did not follow BMPs and BIPs, or best industry practices, has EPA or Connecticut DEEP ever said that defendants are not acting in accordance with best management practices at the New Haven Terminal?

MR. GREENE:  Object to the form of the question.

You can answer.

A.   I don't believe EPA or Connecticut DEEP has communicated to CLF that the defendants are not operating the facility in -- in compliance with the permit.

Q.   Do you know -- does CLF know that EPA -- that neither EPA nor Connecticut DEEP has ever indicated to defendants that defendants are not acting in accordance with best management practices?

A.   No.

MR. GREENE:  Object to the form of the question.

A.   I have no knowledge as to what Connecticut

Page 269

DEEP or EPA may have said or not said to defendants.

Q. But CLF does not have any documents that suggest that or indicate that?

MR. GREENE: I believe it's been asked and answered.

But go ahead, with that objection.

A. CLF does not have any documents.

Q. Same thing: CLF does not have any documents that indicate that EPA or CT DEEP that defendants are not acting in accordance with best industry practices either.

A. CLF is not aware of any documents from EPA or Connecticut DEEP saying that.

Q. So the term "good engineering practices," is that used in the 2021 stormwater permit for the state of Connecticut?

MR. GREENE: What exhibit is that, Sean?

THE WITNESS: I'm looking at Exhibit 7.

MR. HENDERSON: It's Mahoney 7.

MR. GREENE: Just wanted to make sure I have the right one.

A. It's not a defined term; and, as we've talked about earlier, I don't know the permit well enough to say whether or not the term is -- is in

Page 270

the 70 pages that is the permit, but I would also say that, as we've said before, that if the term is not -- if the three words are not in the document, the three words are not in the document.  The document speaks for itself.

Q.   Are you aware of any documents from EPA that say best industry practices requires consideration of climate change factors in -- for an industrial stormwater permit?

A.   I'm not aware of -- of such a document, sitting here today.

Q.   Okay.  Is CLF aware of any document from EPA or CT DEEP that best management practices requires consideration of climate change factors in operating facilities regulated by the industrial stormwater permit?

A.   Well, I'm familiar that the draft Connecticut permit talks about resilience measures in climate change, and we've talked about that.

Q.   Right.

A.   I'm unaware of specific documents where EPA or Connecticut DEEP may reference climate change in connection with best management practices.

Q.   Is CLF aware of any climate change risk

Page 304

impacts; but, you know, the effects of climate change is absolutely something that should be done to comply, and I think that the expert reports we have submitted make that clear.

Q. I'm just looking at what you -- CLF, how it interprets the new permit. Okay?

A. That's how we interpret it. That's how I interpret this new permit.

Q. So under the new permit the climate resilience measures are left up to the permittee?

MR. GREENE: Objection. Mischaracterizes testimony.

THE WITNESS: Yeah.

A. I would disagree with that. I think the -- the permittee must consider section 7(b), stormwater control measures, among other things, in determining its resilience -- in determining resilience measures.

Q. So is it CLF's view that under this permit every permittee would have to complete a climate change vulnerability analysis to see how climate change may be affecting their facility?

A. Yeah. Again, it's not clear to me what you mean by a climate change vulnerability analysis, but it would be that, in determining

Page 303

Q.   Right.

A.   So those are two different actions required under the --

Q.   Just confirming --

A.   Okay.

Q.   -- okay --

A.   Right.

Q.   -- that understanding.

A.   Okay.

Q.   And that is CLF's understanding?

A.   That -- that is -- that is my understanding of -- of this draft permit.  I haven't discussed that understanding with others at CLF.

Q.   Okay.

Is it CLF's view that section 7(b) that you were just reading, page 23 of 54, that it includes a requirement to complete a climate change vulnerability analysis under that section 7(b)?

A.   I would say that if this draft permit were to actually be finalized, that it is setting forth a requirement that best management practices have to be met to minimize pollution and that, as part of that consideration, factoring in the risks posed to a facility from what you call climate assessment