# EXHIBIT

# C

Case: 3:21-cv-00933-VDO

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -

CONSERVATION LAW FOUNDATION,     No.: 3:21-cv-00933-VDO
INC.,

Plaintiff

v.

SHELL OIL COMPANY, EQUILON
ENTERPRISES LLC D/B/A SHELL OIL
PRODUCTS US, SHELL PETROLEUM,
INC., TRITON TERMINALING LLC,
AND MOTIVA ENTERPRISES LLC,

Hartford, Connecticut

Defendants    MAY 14, 2026

- - - - - - - - - - - - - - - - -

FINAL DISCOVERY HEARING

B E F O R E:

THE HONORABLE THOMAS O. FARRISH, U.S.M.J.

Alicia A. Cayode Kyles, RMR
Official Court Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFF:

CONSERVATION LAW FOUNDATION
62 Summer Street
Boston, MA 02110
BY:  JAMES YUAN MEINERT, ESQUIRE

MOTLEY RICE LLC
40 Westminster Street, 5th Floor
Providence, RI 02903
BY:  VINCENT LEO GREENE, IV, ESQUIRE


FOR THE DEFENDANTS:

KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
BY:  DREW BELL, ESQUIRE

HILGERS PLLC
Peachtree Street, N.E. 19th Floor
Atlanta, GA 30309
BY:  ROSE J. JONES, ESQUIRE

SHOOK HARDY & BACON, LLP
185 Asylum Street, Suite 3071
Hartford, CT 06103
BY:  JAMES O. CRAVEN, ESQUIRE

(Call to Order of the Court, 2:58 p.m.)

THE COURT:  Good afternoon everybody.  Please, be seated.

We're here in the matter of *Conservation Law Foundation vs. Shell Oil Company*.  It's Case No. 21-cv-933.  It's assigned for trial to Judge Oliver.  I am Judge Farrish.

And the appearances, please, beginning with the plaintiff?

MR. MEINERT:  Your Honor, James Meinert for the plaintiff Conservation Law Foundation.

THE COURT:  Good afternoon, Mr. Meinert.

MR. GREENE:  And good afternoon, Your Honor.  Vincent Greene from Motley Rice firm on behalf of CLF.

THE COURT:  Good afternoon, Mr. Greene.

And for the defendants?

MR. BELL:  Good afternoon, Your Honor.  Drew Bell for the defendants.

THE COURT:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Rose Jones from Hilgers law firm.

THE COURT:  Good afternoon.

MR. CRAVEN:  Good afternoon, Your Honor.  Jim Craven from Shook, Hardy & Bacon also for the defendants.

THE COURT:  Good afternoon, Mr. Craven.

Okay.  So, we're here to take up our remaining and hopefully last discovery issues.  I thought we might begin by seeing how many issues we have.  So, let's talk first about the dispute over the defendants' confidentiality designation.

So, where do we stand on that?  The motion for reconsideration in Rhode Island, I gather, has been resolved.  You guys were thinking, I think, that you might have a agreed order to present to me once that was resolved but, Mr. Meinert, why don't I turn to you and you can tell me where we stand.

MR. MEINERT:  Certainly, Your Honor.  The resolution that the parties reported in the original joint status report is the same as where we're at today.

We did exchange a draft of the proposed order yesterday but didn't get it to complete resolution, so we are prepared to provide a proposed order to the Court that would resolve CLF's former challenges to de-designations as well as provide a party [sic] that both parties agree to going forward for confidentiality disputes over exhibits in the dispositive phase.

THE COURT:  Okay.  So, what do you think?  Are we down to the fine drafting here and you're likely to report an agreement to me and just put something up on the docket that I can sign or are you guys still in Stalingrad over

it?

MR. MEINERT:  I believe we still do have a dispute over the one paragraph that was at issue in the CLF's motion for re-clarification and then objection for reconsideration.

THE COURT:  Okay.  Can I ask you how important this is because I read the resolution out in Rhode Island and it seems to me like, you know, you're allowed to use documents in particular ways in the Rhode Island litigation, right?  I mean, if I did something here, different here, would it have any practical effect?

MR. MEINERT:  We believe that the Court here should not entertain having the same use restriction that the Rhode Island court put in place and then withdrew, but the defendants would like that the use restriction that was put in place and withdrawn to be now entered in the first instance here --

THE COURT:  Oh, okay, so maybe that question goes to the defendants.

So, I don't know if this is -- sounds like it's a Ms. Jones question.

MS. JONES:  Yes, Your Honor.

THE COURT:  So, if I recall correctly, you know, we basically have an agreement to use documents between the two litigations here.  Let's imagine that I was to

accept that position that I should include the use restriction that was ordered in Rhode Island and then withdrawn.  Would it make any practical difference given that they've got this over in Rhode Island?

MS. JONES:  So, Your Honor, thank you for that. Our position is that we are going to be objecting to the Rhode Island order and so, at this point, we think it's very important that we keep that language in this order as well until that gets resolved.

THE COURT:  Ah, I see.  So, you know, there was kind of this odd posturing in Rhode Island, right.  There was an objection under Rule 72 that, in this district, isn't referred back to a magistrate judge, but I guess they did that in Rhode Island, so I gather you still have an opportunity to take it up with a district judge?

MS. JONES:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So, should we just watch that play out in Rhode Island or what's the plan here?

MS. JONES:  That works with defendants.

THE COURT:  Okay.  All right.  Mr. Meinert, any reason why I need to act on this before things get done in Rhode Island?

MR. MEINERT:  CLF believes that because the language is no longer in the Rhode Island order and that

court has withdrawn it, it would be appropriate to move forward with the proposed draft -- proposed order without that language here.

If defendants need to -- us to put in what would ostensibly be a motion to modify the protective order in this case, to conform it to language that they later receive who knows when, that would be on them to put that motion forward in this case.  CLF believes -- has no idea how long that would take or what the eventual resolution would be.

And so, for the sake of finality it makes sense to just put in the order with the language that the parties have already agreed to, that the Rhode Island court has found at this juncture works for their process.

THE COURT:  Well, hasn't finally found, right?  So --

MS. JONES:  That's right, Your Honor.  And also, we do have significant concerns about the use of our documents, whether they are de-designated under a confidentiality challenge or under a motion to unseal, that the documents will be used in the public domain.  And if these documents are used in that manner, it allows our competitors to have access to documents that they would normally not have access to and it's very much harmful to defendants and so we do -- this is something very

important to the defendants and so we respectfully request that the Court withhold issuing an order that does not have that language until we can get it resolved in the Rhode Island court.

THE COURT:  Okay.  Well, my inclination here is just not to do anything on this particular issue today. It sounds like you guys are going to put it in front of the district judge in Rhode Island and we'll let that happen.  You know, if the district judge were to affirm the last action of the magistrate judge on this I don't know that it would make much practical effect what I did here, right?  So, perhaps since they're out in front of us we ought to let that process play out.

All right.  Mr. Meinert, I know you probably rather that I did differently here, but it seems to make sense practically.

MR. MEINERT:  Sounds reasonable, Your Honor.

THE COURT:  Okay.  All right.  So, let's do that. I'm not going to take any action on the defendants' confidentiality designations at this point.

All right.  So, let's talk about what you've labeled in your status report as, quote, CLF's use of AI to review defendants' document productions, unquote.

So, I don't know if this is a Mr. Meinert issue or Mr. Greene issue.

MR. GREENE:  Mr. Greene issue, Your Honor.

THE COURT:  Okay, Mr. Greene.  So, I've read every word that was put before me.  My law clerk has too, but I'm still not sure I understand what information exists and what has been produced.  So, I observe three distinct terms being used here and what's been put before me.

So, first, Dr. Oreskes talked about, quote, search terms, unquote, but then Dr. Kaurov talked about prompts and queries.  So, for each of the three here I'm just going to ask you straight up, does it still exist and has it been produced.

So, search terms, do they exist and have they been produced?

MR. GREENE:  Your Honor, they don't exist.  There's nothing to pull.

THE COURT:  Okay.  Is that true with respect to search terms?  Because I thought you told me in your brief that the search terms had been produced and I thought the question I was going to ask you is if you produced all of them.

MR. GREENE:  My understanding is we've advised what the search terms were, but not that there's any kind of report to pull down from the system.

THE COURT:  Okay.  Well, let's drill into that a

little bit here.  So, you've asked Dr. -- so there is nothing by which Dr. Oreskes could reproduce her search term, but you've nevertheless talked to her and you've given them a statement, is that what I'm hearing?

MR. GREENE:  We've advised them what the search terms were, yes; and she testified to this as well, Your Honor.  This was all part of her testimony.

And if I may, Your Honor, just go off book just for 30 seconds?

THE COURT:  Okay.

MR. GREENE:  Because I'm hoping maybe I can just nip this in the bud by a simple explanation --

THE COURT:  All right.

MR. GREENE:  -- which comes from her testimony.

What we're dealing with here, if we say "AI" it conjures up all kinds of, you know, concerns or confusion. The reality here is that what Dr. Oreskes did was no different than having someone in her, if she had someone in her office who she gave a bunch of documents to and said tell me how many times this term shows up in these documents and pull and cull them and that person goes and does that.  And then that person comes and back and says the search term shows up this many times and here's those documents.  And then she says well, now, tell me how many documents have this search term and this search term, and

then that person goes and does that.

That is, in essence, what we're talking about here, Your Honor.

THE COURT: Well, but, I have an affi- -- I have a declaration from Dr. Kaurov, don't I, that talks about prompts and then I have this kind of parsing term of experimental prompts and so on. Isn't more going on here than just tell me, show me the documents that include the word "cheeseburger"?

MR. GREENE: Realistically no, Your Honor, because all that's happening is no different than the scenario I just described, which is if you are going back and forth about what's found and then what's the next cull you want to do on those documents.

Dr. Oreskes, in her deposition, uses those terms interchangeably. Counsel asked her about prompts and she said, We don't use prompts. We use search terms.

THE COURT: But then Dr. Kaurov said, We use prompts.

MR. GREENE: All I can speak to is what this expert did and what's her understanding --

THE COURT: He gave it to Dr. Kaurov who said he used prompts, right?

MR. GREENE: But they're using the terms interchange- -- she is using the term interchangeably,

Your Honor.  And so, the point there is none of that is any different than the scenario I just laid out, which is if you're going back and refining your search, the only difference is that there's a machine doing it instead of a person doing it, and there's no recorded record of doing that nor is there required to be, Your Honor.

And so, if we look at -- and I know you've read everything, so I don't want to repeat what if I've done.  But if we look at the scope of discovery and the scope of the stipulation in this case from the Rule 29, none of this would be discoverable if it was a person going back and forth.  If the two individuals were having a conversation about what to look for and then what's found, there's no requirement that that be written down and there's no ability to produce that.

THE COURT:  Well, I would grant you that that might be true if all we were talking about were a genuine, Hey, McDonald's, show me every document that includes the word "cheeseburger," but if, instead, what we've got is a curated body of documents that have been curated by somebody else's prompts and, you know, haircutting and so on and so forth.  That would be a different story, wouldn't it?

MR. GREENE:  But they're not somebody else's prompts.  They begin with the search terms.  Dr. Oreskes

testified that she provides the search terms, so they're her prompts, they're her search terms.  And so, it's not as if she went into a generative AI and asked it to produce something and produce thoughts.  All this is doing is culling documents the same way if you asked a person to cull documents.  That's all this is.

THE COURT:  All right.  Well, let me tell you how it's striking my ear.  It's striking my ear that you don't dispute that they should -- well, you know, maybe you dispute that they should have this, but you agreed to share the search terms with them and that you've already given them the search terms.  What we have here is a dispute over whether that production is complete, right?

MR. GREENE:  I think we also have a dispute over whether what has been asked and asked in a variety of different ways is even discoverable.  As I mentioned, Your Honor, I don't think it's within the bounds of discovery. I don't think it's within the bounds of the Rule 29 stipulation, but more importantly, if I had more to give I would give it.

We've been arguing over this for almost a year. Her report was issued a year ago last week, Your Honor.

THE COURT:  All right.  Well, this is well-trod ground, what to do when somebody -- when we've basically got an agreement, you know, subject to objections, of

course, but an agreement that will produce information to somebody and they think the production is not complete, right?  This is pretty well trod-down ground.

MR. GREENE:  It is, Your Honor.  Again, if I thought there was more to give, if there had been some report generated, we would turn that over at this point just to make the issue, frankly, go away despite whether I believe it's discoverable or not.  The point here is there's no recorded record.  There's no printout to provide.

THE COURT:  Okay.

MR. GREENE:  That's my issue.

THE COURT:  But the cases on this situation tell us, don't they, in fact I've written a couple of them. The cases tell us that if there's a, you know, decent reason to believe, backed by more than just suspicion, that there might be something unproduced the thing I should do here is place you under an order to produce it, and if, after I place you under an order, you guys want to still fold your arms and say I don't have anything else to produce then great, but if they find out that there is more then you'd be subject to Rule 37(b) sanctions, right?

MR. GREENE:  Well, Your Honor, I understand what the Court's saying, but my issue is there's nothing more to produce, so I think an order in that regard is

inappropriate and not called for.

And again, to go back to this isn't discoverable. It's not within the bounds of the stipulation and we've been over this and over this and over this -- sorry.

THE COURT: Okay. Well, let me ask you a question. If I were to say that it sounds to me like there's a reason on the other side, more than just suspicion, more than just, you know, distrust because you guys have been throwing bombs at each other for years, but there's a reason that they can put their finger on, a suspect that there might be something unproduced, and that reason is Dr. Kaurov saying that there were prompts, not just search terms but prompts in the AI and, therefore, you know, I should place you under an order.

And if you want to say then that there's still nothing to produce, you know, nevertheless you're under an order. You know what, I'd be legally wrong, leave aside factually here for a moment.

MR. GREENE: I think you'd be legally wrong because I still don't think it's discoverable, Your Honor. It's not within the bounds of Rule 26. It's not within the bounds of the stipulation. So, again, we're fighting over things that don't exist, that aren't discoverable.

So whether Your Honor is leaning one way or the other on whether something more exists, my point is even

if there's something more exists, it's not discoverable.

But just if I can, Your Honor, Dr. Oreskes' testimony is we don't give AI prompts because that can be viewed as biasing. So, we're not giving them prompts, we're just giving them search terms, so the primary search term was "sea-level rise." That's her testimony.

And again, this is a culling. It's not a generative AI. It's not a learning AI. It's a culling. And so, again, we are down this road almost a year over using machine to cull documents versus a person to cull documents. That's what we're talking about, Your Honor.

THE COURT: Okay. And so, if there's nothing more, you know, what would be the affirmative harm from this order other than the principle?

MR. GREENE: I understand about principle, Your Honor. Again --

THE COURT: I get it.

MR. GREENE: -- there's nothing discoverable even though it doesn't exist, Your Honor.

THE COURT: Okay. Tell me more about this thing about the Rule 29 stipulation. So, of course, you know I have held, in this very case, that they are enforceable when they're super clear. So, tell me what's the exact language you would call to my attention to put this out of bounds.

MR. GREENE:  The exact language, Your Honor, was in our letter.  It is "non-discoverability:  Drafts of expert reports and communications between experts, employees and consultants, a party-related entities on expert opinions or settlement-related issues, including emails, notes, other correspondence shall not be subject to discovery.  This includes any preliminary findings or informal discussions that have occurred between experts, employees, and consultants, the party-related entities."

I would submit if these exist they fall within that, Your Honor.

THE COURT:  Okay.  So what -- I know you think that Dr. Kaurov is using the word "prompts" as just a synonym for what Dr. Oreskes called "search terms" but put your finger on the exact word in that discovery agreement that you would think that "search terms" falls under.

MR. GREENE:  I would think this falls in part under drafts of expert reports, what she used as part of this search and what followed we would -- part of a draft of her expert report.  I mean, it's essentially notes. It's just -- it's in a computer and not, you know, written down on a pad, Your Honor.

THE COURT:  Okay.  And you think if you were to place it in front of 10 litigators that, hey, we had an agreement whereby we weren't going to share our draft

expert reports for each other, you know, all 10 would say, well, search terms are the same thing?

MR. GREENE:  I think that falls under notes as well, Your Honor, yes.

THE COURT:  Okay.  All right.  Well, all right. Let me turn to Shell here.

So, you know, I hear them telling me that there isn't anything here.  Why are we -- why are we all fighting?  Why did everybody fly up for this?

MR. BELL:  Okay.  Well, seeing how I probably came the farthest, I'm from Austin.

THE COURT:  Okay.

MR. BELL:  So, I get to handle this one.

And look, there was a lot there.  To address the Rule 29 agreement first, I think it's a real stretch, the language of that agreement, to think that any of this falls under that agreement.  That's meant to protect things like emails and memos and so forth that might go between the expert and her assistant.  This is not that. And you know, this is inputs into an AI machine.  And any of us who have used ChatGPT, which is the AI mechanism that was used here, know that you just don't enter search terms, you wouldn't just enter "sea-level rise."  The machine wouldn't know what to do with that.

THE COURT:  Well, I mean, you could, right?

MR. BELL:  You have to tell it what to do.

THE COURT:  You could say I've given you these documents, identify the ones that contain the term "sea-level rise."

MR. BELL:  That is what we're entitled to know and that did exist at one point, almost certainly because that's the only way this would work and ChatGPT can keep a record of those things and should have in this situation. And so, maybe it doesn't exist, maybe it does, but it existed at one time and it should exist now.

The fact that Mr. Greene -- and I take him at his word -- says that it doesn't exist, okay, but it should and it's their obligation to try to produce it.

We would like an order compelling its production and if they're not able to comply with that order, then we'll take it from there, but I think we are entitled to that.

Dr. Oreskes, in her deposition, specifically said that this process is part of her methodology.  It's right around the part that Mr. Greene read from.  This is part of her methodology.  These are facts and data underlying her methodology and we are unable to explore that unless this discovery is produced.  It's really as simple as that.

If a medical -- if this were a medical doctor and

they said, I did a review of the medical literature, but I'm not going to tell you which database I looked.  I'm not going to tell you what I put in to look through it. Nobody would accept that and that's really no different in this situation.

It's discover- -- simple expert discovery that allows us to verify what Dr. Oreskes did, right?  It's kind of a trust but verify situation.  We need to be able to check her work so that we can probe those opinions and we're unable to do that at this point, that's the problem.

And I don't think it was a mistake in Dr. Kaurov's declaration when he used the word "prompts" because that's how these AI systems work.  You have to give them prompts, you can't just put in search terms.

THE COURT:  So what I think I hear Mr. Greene saying is that hey, look, you know, maybe they should have talked amongst each other and settled on a single word to use here, but they basically got the same idea. Dr. Oreskes -- whether you call it a "prompt" or a "search term" all they did was ask the machine to identify documents that had a particular term in it.

And what would be your Exhibit A for the proposition that, no, they did more than that?

MR. BELL:  Well, that's what they say they did and we're entitled to know whether that's true.

I want to make it clear for Your Honor exactly what we have and don't have.  What we really want -- there are two primary categories of things that we want and we don't have, okay.

The first is we want a list of the documents that were searched, okay.  We do not have that.  Dr. Oreskes said that she searched -- initially, at her deposition, when she was asked, she said she searched all of the documents that were produced by the defendants.

Well, first of all, she has no way of knowing that, right?  Those were the documents that were provided to her to look through.  She has no idea whether those were all the documents that were produced and I'd like to know whether that was true.

And then, also, when she was pressed on the infeasibility of that, because there have been millions of pages of documents produced in this litigation and it's really not very feasible for even advanced AI models to search through that much in this way.  She said well there's a -- Dr. Kaurov has a particular toolkit that he uses to do this.  Well, what does that mean?  Does that mean that it was a subset of the documents?  We don't know.  But it should be simple enough to provide us with a list of all the Bates numbers of all the documents that were searched.  We've asked for it many times, still do

not have it today.

What we were given was a list of the documents, after the search in process was completed and that Dr. Oreskes actually reviewed herself for her report, but we already knew about that because it's in our report, so it's not very helpful.

The second thing is what we've mostly been talking about, right?  We want to know all of the inputs, not just an example of search terms.  We've been given, as an -- I think three examples saying search terms included "sea-level rise", "SLR" and maybe "sea level."  It doesn't say that's all the search terms, and it doesn't have anything about what other prompts, instructions, guidance, feedback was given to the ChatGPT model that was used for this case.

And, you know, the fact that it's AI really doesn't make any difference.  I mean, this is -- all this is is expert discovery into facts and data underlying her methodology.  It's something we're clearly entitled to and I'd ask the Court to order it.

THE COURT:  Okay.  So, on the first part on the list of documents search and the Bates numbers, you had me there for a second, but I think I lost you for a little bit, so -- so, there's the list of how many documents go into the engine in the first place, and then Dr. Kaurov

does whatever he does to cull things down and then there's a smaller body of documents that goes to Dr. Oreskes and, presumably, you know, there's some left on the cutting room floor, she never sees them, right?

MR. BELL:  That's what we've been told.

THE COURT:  Okay.  And you have the Bates numbers as to second smaller body of documents, right?

MR. BELL:  Yes, sir.  Yes, sir.

THE COURT:  Okay.  So tell me a little bit more about why you need the Bates numbers that were left on the cutting room floor if they didn't reach the expert?

MR. BELL:  Well, because we need to know -- it's a bias issue, right, and she made a big deal in her deposition about how their process eliminates bias and how they put in all of the documents, not just a subset of the documents so that we can eliminate bias in the methodology, okay?

She doesn't know, though, whether those are all the documents.  If that's all the documents, great; but I'd like to know that.  I'd like to verify that.

THE COURT:  All right.  Well, let me ask you a question.  Let's say, and bear with me here, this is going to be kind of tortured.  But let's say there were 2 million pages produced, you know Bates No. 1 through 2 million.  And let's say that for whatever reason

because, you know, CLF's attorneys didn't provide it to Dr. Oreskes' office at all.  Bates Nos. 1 million through 2 million never even reach anybody, Dr. Kaurov, Dr. Oreskes, right, they didn't even give them to them.

And then Bates Nos. 100,000 through 1 million, Dr. Kaurov culls out and it's only Bates Nos. 1 through 100,000 that reach Dr.Oreskes.

Are you with me so far?

MR. BELL:  I think so, yes.

THE COURT:  Okay.  What I'm trying to figure out here is why does it matter to you whether, you know, Document No. 800,000 reached Dr. Oreskes as opposed to Document No. 1.3 million that didn't?

MR. BELL:  Because -- well, two reasons.  Okay.

If there are documents in Bates Nos. 1 million to 2 million that contain things that are directly opposite of the opinion she's offering and she didn't even consider them, she didn't even give herself the chance to consider them because they're not in the set, that is a pretty potent argument for our Rule 702 motion and, failing that, it is a really powerful argument for the jury.  And right now I have no way of making that argument because I can't substantiate it.

THE COURT:  Oh, okay.  So, basically, the idea here is, you know, yeah, maybe they ran the word "sea

level" across documents one through a million, but if they didn't run it across through documents 1,000,0001 to 2 million that might have biased the sample itself?

MR. BELL:  Exactly.  And actually Dr. Oreskes suggests as much when she talks about how important it is to have all the documents.  She, herself, acknowledges that this is an important way of eliminating bias.

And look, it's -- she very well may have had the whole set.  I don't know, but that's what expert discovery is all about.

THE COURT:  Okay.  All right.  Well, let me turn back to Mr. Greene here and I'm just going to offer a few observations and then have you react to it.

So, first, you know, I do think that they're entitled to take discovery into the expert's methodology. I think Mr. Bell is making a persuasive case for the proposition that search terms, prompts, whatever you want to call them, is part of the methodology here.

I would add, while we're talking about Rule 26, that you guys had been very significant beneficiaries of the principle that when there's any doubt here there's always the thumb on the scale of the side of discovery not not discovery.

And as to Rule 29, I don't know that it's so obvious that what we're talking about, that the search

terms here and the prompts, whatever you want to call them, qualify as draft expert reports that I can really invoke the Rule 29 agreement against them here.

I'm kind of inclined to think that they're entitled to what they're asking for, but I wanted to give you another chance here to tell me why not.

MR. GREENE:  Well, first of all, Your Honor, let me just clarify.  We've represented on multiple occasions that the universe of documents sent to Dr. Oreskes was the entire universe of documents produced by the defendants, so they know -- they already know what she had and what she reviewed and so, if they think that they need to know --

THE COURT:  Do they have that in something signed under Rule 33 or Rule 34?

MR. GREENE:  My understanding is that's been provided both -- that's been stated in our pleadings and in our letters.  I'm happy to clarify that and if that's not the case, I'm happy to put that in writing and confirm that.

THE COURT:  Okay.

MR. GREENE:  So, I don't think there's anything to provide or produce in that regard.  It is not -- counsel said that they can't then verify what she did and didn't do.  They know what her search terms were.  They

know what the universe of documents is.  This product, this AI is available to them.  They can re-run her search.

I'm a little unclear as to how, if there are more documents that say "sea-level rise" and "climate change" that's going to help them, but that's their right.  They can do that.  That's issue number one.

Issue number two is at the close of his argument counsel said, it's discovery, it's expert discovery.  Expert discovery, in this context, is limited to the materials that the expert relied upon.  They know what the expert relied upon.  We've already clarified that.  They have the search terms and they have the Bates numbers of the documents.  They have everything that, under discovery that they're entitled to, so there's nothing more for them to obtain in that regard.  There's nothing else that the rule provides.

With respect to what should, should exist within this AI program, we have counsel here saying what the AI program should have retained.  There is no expert affidavit here.  There's no documentation from the AI computer system.  We have counsel saying this is what should exist and I have Dr. Oreskes saying I don't have what they're asking me for.  So, again, we're back to where we started which is whatever else they think they want, and whatever else they think they're entitled to

just doesn't exist.  There's nothing else to provide them.

Lastly, Your Honor, under your point of Rule 29, it's not just correspondence.  And again, I think you have to analogize this to talking to a person in an office and how you cull these documents.  I don't think it's any different than talking to a colleague than it is just having the machine cull these documents, but I think this would also go to notes.

If we are, if we think that there are search terms and counsel contends that something should have been retained by the system, those are still notes and they're still under Rule 29, so they're still not discoverable.  Again, that's not available.  I can't provide it, but even if it was, it falls under notes because it's part of the process of her working through these documents.  And under the Rule 29 stipulation and under Rule 26, that's not discoverable no matter how often they say they want it.

Lastly, Your Honor, they cross-examined her on this.  They cross-examined her on this in September of last year.  Her report in May laid out what she used and how she used it and -- so, we are beating this drum over nothing, still, Your Honor.

And if there are anymore questions, Your Honor, I'm happy to answer.

THE COURT:  Okay.  Well, normally I would have

let you have the last word here, but let me get Mr. Bell to respond to the point.

So, in my example here of Bates Nos. 1 through 2 million, they're telling me that they have told you that they gave all 2 million to Dr. Oreskes -- they right about that?

MR. BELL:  I am not aware of that in a format that we can use in the way that I was talking about, but perhaps they can fix that.  I'm not opposed to that necessarily.

What we have in response to our motion was a response filed by CLF that listed the post-process documents, right.  And we have, what we have is the witness under oath saying that, that all the documents went in the system, but as I explained that doesn't necessarily do it either.

If they are willing to provide something that we can use to verify that then, okay, maybe that resolves that issue.

I think as far as the prompts go, we still have a problem, right, because we know how ChatGPT works, right? If I take her search term, if I take SLR and I type S-L-R into ChatGPT it might give me a bunch of cameras, right, single-lens reflex cameras that -- it's just -- you have to give it some context.  You have to give it some

guidance and I want to know what that guidance was.  And I think Dr. Kaurov gave it guidance.  In fact, he suggested as much as in his declaration.

So, you know, this was part of an ongoing litigation.  She, herself, calls it part of her methodology.  She's very proud that it's part of her methodology.  She uses it to bolster the reliability of her methodology.  We need to be able to discover that stuff.

THE COURT:  Okay.  Well, all right.  One last question to Mr. Greene and then I think I know my mind on this.

But, Mr. Greene, is there a place on the docket where it's in my record that they have something signed under Rule 33 or Rule 34 that tells them that the entire document production, every page of it, went to Dr. Oreskes?

MR. GREENE:  Your Honor, as I stand here today I cannot certify that for you, but I am happy to provide for them, in writing, a detail of exactly what was provided to Dr. Oreskes, or let me amend that.  I'm happy to explain in writing, in an appropriate format what was produced, the universe of what was produced.

I'm amending my response because I don't want to get in a back and forth about every single Bates number or

something like that.  But, my understanding is it was everything they produced and I'm happy to certify that, and that's not a problem.

I do want to go back to one other -- I realize you didn't ask me this, Your Honor, but I just -- I need to respond to just what was said.

THE COURT:  All right.

MR. GREENE:  Here's the problem.  The comment was made about if I type in S-L-R I'll get cameras.  Yes, on an open source AI.  This is not an open source AI.  This is a specific license program that uses ChatGPT and the universe of what was being searched was the documents.  So that's the problem here, Your Honor, is we have counsel representing how this program works and we don't have an expert here.  We don't have an affidavit here.  And you're being told that this is what should exist and this is why I need this.

This is a closed source licensed product.  It uses ChatGPT, but it's a closed universe that was, what was searched were the documents and so there is nothing more here for them to get.

THE COURT:  Okay.  All right.  Well, thank you, Mr. Greene.

So, what I'm going to do here is I'm going to give you kind of my first draft of the ruling from the

bench here and then I'm going to go back to my chambers. I thought I was going to do it this afternoon but we actually have a significant criminal matter coming in here in a minute, but sometime over the next 48 working hours we'll put something on the docket about this here and if I put something up on the docket that's different from what I'm about to say, it'll be the docket that will prevail, not my oral comments here, but I think I'm going to substantially grant the defendants' motion here.

So, with respect to whether or not it's within the scope of discovery under Rule 26 I do think that they're entitled to take discovery into an expert's methodology and I think there's at least a strong enough argument here that search terms or prompts are a component of her methodology that it's sufficient to permit discovery on this.

On Rule 29, I think I am the author of probably two thirds of the decisions in this district about enforcing agreements under Rule 29 and I will tell you that I've always contemplated something much clearer than this before I can tell them that they can't get otherwise discoverable information under Rule 26 because they had an agreement.

And then with respect to the contention that, hey, Judge, we've already told them, the production is

complete; you know, we're just basically disagreeing over a principle here.  I have decisions on that as well.  The one that comes to mind is *Lewis v. Doe*.

So, the question presented when that happens -- Hey, Judge, the production is complete.  The question is whether or not I nevertheless put the producing party under an order and that question is determined by whether or not the requesting party has come up with something beyond just mere suspicion, beyond just I don't like the other guy and I don't trust him.  And I think they have come forward with enough on that point, by pointing me to Dr. Kaurov's declaration which does say that there were prompts rather than search terms.

Mr. Greene, I hear you loud and clear that, you know, hey, maybe it's just two people using a term differently here.  Maybe that's true.  Maybe it turns out that there's nothing more to produce here, but I think it's enough to tip the balance of, you know, do I put CLF under an order to produce.

So, as I say, I'm going to go back to my chambers.  We'll get something out to you, you know, no later than Monday and whatever I put on the docket will prevail over what I've said here, but I think we'll put CLF under an order to produce the search terms, prompts, or queries whatever the relevant term is.

All right.  So with that, let's turn to the dispute over CLF's sixth and seventh privilege logs and I don't know if this is a Mr. Bell issue, a Ms. Jones issue or Mr. Craven issue.

So we had talked about this at considerable length and, actually, why don't I begin by just telling you why I've let this pend so long.

MR. BELL:  Yes, thank you.

THE COURT:  So, before I think anybody in this room was involved in this case, except perhaps Mr. Craven and maybe Mr. Meinert, we had a long conversation about this, and this goes back to Mr. Prather, I think.  And one thing that was really clear was that Mr. Prather was just 1,000 percent convinced he was getting this case dismissed on a Rule 12 motion and that this discovery was actually more than anything kind of pointed toward the vexatious litigation claim that he was sure that he was going to be able to make.  And he really wanted to get into, you know, what CLF was telling its members here.  And I've let this pend for a long time because, you know, you guys have tried a Rule 12 motion and it failed.  Now, you've tried a Rule 56 motion and it prevailed.  I don't think there's really a vexatious litigation claim in the offing here.

So, that's all kind of long-winded windup to saying to you all, you know, why is this important?

MR. BELL: And I appreciate the question, Judge. And, as you know, it's the first time I'm meeting you. I wasn't here in those days. I don't want to foreclose any motion that my clients may want to make. That being said, it's more than just about whether this is vexatious litigation.

THE COURT: Well, so, tell me more about this. So, now I have held already, you read the transcript at ECF No. 469. You know that the information is relevant, you know, in a Rule 26(b)(1) sense. But, you know, I have to also consider whether or not your interest in this information outweighs whatever invasion there is into their ability to talk with their people here. So, beyond relevance, tell me why it's important.

MR. BELL: Sure. So, obviously, we don't know what's in all of these materials, but part of our theory of the case, our defense -- our theory of the defense is that this entire interpretation of the permit language that's central for most of the claims in this case, this entire approach to interpreting a permit with implied requirements as opposed to request requirements is really kind of like avant-garde, you know, new stuff, right, pushing the envelope which, hey, look, that's what an organization like CLF, maybe that's what they should be doing. Okay. I'm not casting aspersions. I'm just

saying that part of our theory here is that this is not the way permits are interpreted and have been interpreted basically forever.

If there are statements, by the plaintiff, going out to third parties or even its own members talking about how, hey, we are, you know, pursuing a new frontier in environmental litigation, we are, you know, pushing the limits on what can be done to protect New England, that would support that theory of the case, that actually this interpretation of the -- that's consistent with our interpretation of the permit and how it should be enforced.

That's just an example and I'm speculating because I don't know what's in these communications, but that's not about them being a vexatious litigant, that's just about the way that the permit should be interpreted, and so that's one example of something that could be in there.

But, if you look at the privilege logs, most of them say, you know, they're facially responsive -- facially responsive, right, and they will go on to say something like fundraising documents circulated to donors that mentions this case and includes the attorney characterization of the case and recent developments. That could include any number of relevant statements by

the plaintiff that would come in as party admissions. There's -- there are any number of things that could be said in these documents that could potentially be relevant and we just don't know until we see them.

THE COURT:  Okay.

MR. BELL:  And I just want to -- on the other side of the coin, the First Amendment infringement is really pretty minimal if we accept what we've already offered, which is we don't -- we're not interested in the identities of any of the people here.  We can redact all of them.

THE COURT:  Yes, thank you.  That's one thing I wanted to confirm with you all.  It's actually in my notes here, so we've got an agreement here that whatever happens you don't need the list of recipients?

MR. BELL:  No.  We're not interested in that.

THE COURT:  Okay.  Okay.  Well, while you're still standing up, Mr. Bell --

MR. BELL:  Yes, sir.

THE COURT:  -- I didn't catch you before you sat down.

So, as you know from the motion practice here, they kind of conceive of these documents in four different classes.  When you talk about the degree of First Amendment invasion here, would you see any distinction

between any of the classes?

MR. BELL:  Not really.  I mean, I think, you know -- I think the redaction of the identities of the people kind of blurs all those lines together because it eliminates all of the chilling effect of these documents, in my view.

I mean, to me, the problems with all of them are the facts that you might have people concerned that they would be dragged into litigation somehow by virtue of these documents identifying them and that sort of thing and that seems to be the primary concern, but that concern is really eliminated whether these -- you know, regardless of who the people are.  So, I'm happy to answer another question about that.

THE COURT:  Yeah, well, actually I was going to turn to these guys, but before I do, let me ask you the photographic negative of the question that I was going to ask them.

MR. BELL:  Okay.

THE COURT:  So, they've got this Category 3 of documents, which is documents where they're chatting with their standing witnesses and also with other concerned environmentalists.  And, you know, there's a case out there that tells us that, you know, people in that position maybe really can't have an expectation that

they're going to participate in a litigation without, you know, being asked questions about it.

So, I was going to ask these guys if there isn't a lesser First Amendment interest in Category 3, but, you know, Category 1, 2 and 4, where they're just chatting amongst their own membership, you know, not specific to litigation, but, you know, just about issues generally and one in particular, and this is a distinction between this situation and the first time the associational privilege was raised -- raised in this case.

You know, they point out to me that the last time they did an advocacy against an oil company that got a hacking campaign against them.

I'm sorry.  That was kind of a walkabout, but the question I'm headed to is, you know, wouldn't you have to recognize some distinction between the four classes of documents for First Amendment purposes?

MR. BELL:  I think that's -- I think that's fair, Judge, and I didn't -- what I was really getting at was that if we can eliminate the concern about, you know, people's identities being revealed then I think that eliminates the concern for everybody.

I agree with Your Honor that if you are a standing plaintiff you certainly have a lower expectation of a First Amendment privilege in this context.

But, I do think that if we can eliminate the potential chilling effect, which I think we can very easily, then I think all of these are discoverable. I don't think that they're privileged.

THE COURT: Okay. So, basically to test my understanding of what you're saying about trying to give it back to you in my own words, Judge, if there's a 1 to 100 scale of First Amendment interest, once we take all the names off the recipient list, Categories 1, 2 and 4 might have two points and Category 1 has one point.

MR. BELL: There may be a distinction, but it may be a distinction without a difference.

THE COURT: Okay. All right. Well, let me turn to CLF here. I don't know if this is a Mr. Meinert issue or a Mr. Greene issue.

Mr. Meinert?

MR. MEINERT: Yes, Your Honor.

THE COURT: Okay. All right. So, let me pose the same question to you. So, you know, would you observe a distinction in the level of First Amendment interest in the four categories that you've got here? In particular, give me the best argument that you've got for the proposition that even Category 3 doesn't go over to them.

MR. MEINERT: Certainly, Your Honor.

Of the three -- so, CLF's position would be that

on all of the categories there is a significant First Amendment harm by having to produce these documents and communications.

We would potentially take a position that there could be differences between certain types of communications. I don't know that across these three categories, however, there's a meaningful distinction to be put there. And I'm -- I must say that, what we heard from Attorney Bell is that they do not have a claim or defense that these documents are related to. They are fishing for a hypothetical concept that some member --

THE COURT: Mr. Meinert, I'm going to stop you right there because you guys have been such enormous beneficiaries of the principle that the concept of relevance is construed broadly at the discovery stage. I mean, you got two million documents relying principally on that principle and here, I don't know, it would be strange for --

MR. MEINERT: Certainly, Your Honor. Then, skipping forward to the balancing analysis that would have to be done when considering the harm to CLF's injury. The defendants here would have to put forward that they have a compelling interest in having this discovery because that interest is crucial to their party's case, and it goes to the heart of the claims or defenses.

What we heard from Attorney Bell was not that this goes to the heart, but that it's a peripheral thing that maybe it would be nice if they could get a few statements that sound a little --

THE COURT:  I didn't hear it that way at all.  I heard him say it's actually at the heart of the thing.  Now, the degree of confidence that he has, that the documents will touch on that is a different thing; but, you know, let's imagine, for a moment, that one of these documents is y'all saying to your membership, hey, we just thought up this new theory that nobody's ever thought of before, that there's an implied condition in a permit.

You know, that would be central to the defense that they've been mounting for five years now, wouldn't it?

MR. MEINERT:  Well, what I would -- Your Honor, what I would say to that is that the second balancing factor here is the available alternatives of the speech they are seeking.  And they have CLF's forcefully placed advocacy campaigns about what we're doing, about the need to do it, and the statements we are making.  Those are regularly cited in their briefs.  They've been produced in this litigation.

The nonpublic communications are a different issue and CLF should be free to have conversations with

its members, both upon their reaching out to us to ask about the progress of litigation or aspects about it, as well as to give updates to our members and donors about what is going on at the organization.

As a non-profit that is funded off of membership donations, we need to be able to communicate with our members.  If there are distinctions between these categories were forcing CLF to send these updates, maybe in one-on-one emails, the obvious extension would be we'd have to treat these as only provided orally at some point maybe on a call, and carefully limit who can attend those, or even directly placing one-on-one calls, which may be a method that CLF would need take certainly with its communications for certain donors, but the idea that the defendant has free license to look at all of our communications regarding the litigation, I mean that is the RFP, as you know, and have referenced.  They're seeking all communications and all documents between CLF and its members related to --

THE COURT:  Well, they're seeking the documents on your privilege log, right?  They're not -- I mean, the breadth of their -- the breadth of the request that led to this is not really our issue here, is it?

MR. MEINERT:  Well, we would point to -- yes, at issue here is the items on the sixth and seventh privilege

log.  But that doesn't change the fact that CLF, it's injury is fundamentally about its freedom to speak.

THE COURT:  Yeah, and I guess this is what I wanted to get back to, Mr. Meinert.  So you would observe the same injury and the same degree of injury across the four categories of documents including the third category which is, you know, you guys chatting with your standing witnesses and other concerned environmentalists?

MR. MEINERT:  Your Honor, what I would say is that the Category 3 communications, there is a band of these communications that are already provided and not logged and those --

THE COURT:  Okay.

MR. MEINERT:  -- you know, go out when there is no issue.  So, these are particular 2R First Amendment claims here.

THE COURT:  Okay.  All right.  I think that might answer a different question, right?  I think what I hear you telling me here is, Well, Judge, they have some documents related to that topic and they should be satisfied with the some, right?

That is a -- that's another principle that you guys have been an immense beneficiary of, right?

MR. MEINERT:  And, Your Honor, what I would say is that the standing witnesses agree to engage with CLF in

this manner.  This is part of how they want to donate their time and be involved with our work and we let them know that as part of that, certain elements of their documents or communications would put at issue.  The communications we have with them around, you know, their participation, those get produced.

These are other questions about, tell me about the litigation.  It's more akin to our -- not akin, it is in the same category as our communications with other members who are not standing witnesses.  It just so happens that these are the standing witnesses and so we do take regular collections from them.  We focus on those.  And because of that relationship that's been built up, there just are more communications from them and so we have drawn lines to produce documents and these are the ones that we view as --

THE COURT:  Okay.  On that point, how would you distinguish the *National Organization of Women* case which tells us, doesn't it, that an organization's members can't reasonably expect to participate in a litigation in a risk-free atmosphere, you know, the risk being that their communications with the organization might have to go over?

MR. MEINERT:  Certainly, Your Honor, and we fully understand that when the standing witnesses participate in

this way, that their both relationship to CLF and their activity certainly in the area around the terminal or whatever the subject for litigation is, that those will be probed and we know it, they know it.  And so I do -- you know, we fully are in line with -- we believe that our position in this brief is consistent with that instruction from the *New York NOW* case.

THE COURT:  Okay.  Tell me how though.

MR. MEINERT:  If you'd indulge me, Your Honor --

THE COURT:  Take your time.

MR. MEINERT:  -- to pull up the privilege log again.

(Pause)

MR. MEINERT:  Your Honor, so the communications that are logged at 18, 19 and 22, so the -- most of the Category 3 documents that are mentioned there, these are the ones that have the subject header RE:  CTD, E-Alert, Availability of Public Notice.

What we would put forward here is that these communications are about a standing witness seeing something in the news, that they are curious how it relates to the case, where they're curious of what CLF's position will be on a matter of news kind of either related to the litigation or something like that.  That communication to CLF's attorneys, the counsel of record

there, is not about their participation in the litigation. It's their queries about what CLF's activities are and we've tried to parse that between what's on the log and what is just produced as our acknowledgment that the standing witnesses' communications, the declarations, some of that information does get produced.

THE COURT:  Okay.  I think I get it.

All right.  Mr. Bell, any last words you want to say on this motion that I've let pend for two years?

MR. BELL:  Yes.  I think it's more than ripe, so -- so, so I'll be --

THE COURT:  Kindly put, thank you.

MR. BELL:  I'll be short.  So, I do feel a little bit, and Your Honor has pointed out, I do feel a little bit like I'm reading some of the arguments when I go back in time and I look at this file and I see the arguments that were made about, like, say the 15 other terminals on the eastern seaboard and so forth.  I mean, it sort of feels like the shoe's on the other foot a little bit here. I mean, Mr. Meinert, you know, doesn't want --

THE COURT:  With that said though, if you don't mind my interjecting.

MR. BELL:  Sure.

THE COURT:  You know, your objection -- you know, when he said the scope of discovery, the scope of the --

afforded the concept of relevance at the discovery stage is broad.  What you guys said in opposition to that was, well, it's a burden and you didn't give me a very good affidavit and that's why you guys ended up producing two million documents.  But here he's not saying burden, here he's saying the First Amendment.

MR. BELL:  Yeah, understood, Judge, understood.

All I was saying is that Rule 26, the scope of discovery in this case has been broad and I think it, you know, obviously it should be broad for both sides.  I think it -- I think that's how it's going to apply.

Mr. Meinert complained that we would have free license to look into all of their communications.  Well, you know, they've certainly had a lot of our communications, that's kind of my point.

I did want to make one point that Ms. Jones reminded me that I forgot to make which is that there's another level of protection here, not just the redactions that I mentioned.  But there's also the fact that these documents will be subject to the confidentiality order in this case.

So, you know, that's another -- that's another layer of protection against any potential chilling effect anyone could be concerned about.  I don't see, with those two things on top of each other, how there can be any

chilling affect whatsoever here.

So, the final point I just want to make is, you know, the facts that we have some things of this type really doesn't preclude us from discovering other things. It doesn't mean we're not entitled to them. We think we're entitled to these. I do not think that the associational privilege applies, especially when we have the safeguards in place that we both offered and of the confidentiality order.

So with that, I'll leave it to you, Judge.

THE COURT: Okay. Thank you, Mr. Bell.

All right. So, I did promise you guys that I was going to rule from the bench --

MR. MEINERT: Your Honor, if I might provide one just additional piece?

THE COURT: Okay.

MR. MEINERT: After the briefing for the sixth and the seventh log, the defendants filed motions of extension for the later logs down the line.

THE COURT: Mm-hmm.

MR. MEINERT: And CLF opposed the motion for extension on the eighth log. Just to point out to the Court that the documents or the things at issue on the eighth log were not substantially similar to the four categories in the sixth and seventh log.

THE COURT:  Well, I'm nevertheless going to assume that if I rule on this motion here I'm going to give you guys enough guidance that you can probably resolve any dispute over the eighth log yourself.  Would I be wrong about that or is it completely in a different solar system?

MR. MEINERT:  I hope the parties can work with that.

THE COURT:  Okay.  All right.  Well, I know I promised you that I would give you as many rulings from the bench as I could give you, but I'm actually not even going to give you the first oral draft on this one here today even though it's been pending very long because a couple weeks ago I read everything again, including the one at Number 200 that you asked me to incorporate into your pleadings, but I didn't read 200 again before coming back out here, so I want to do that before I shoot my mouth off, but I do recognize that the motion has been pending for a couple of years now.

It's never been at the top of my triage pile in this case, so I don't feel too guilty about that, but it's been pending long enough I might as well take another 48 hours to make sure I got it right, so we'll get something up on the docket.

MR. BELL:  What's a couple more days --

THE COURT:  I'm sorry?

MR. BELL:  What's a couple more days at this point?

THE COURT:  Indeed.  Indeed.

All right.  So, finally, CLF, I guess you want to talk to me about sanctions, right?  I don't know if that's a Mr. Greene issue or Mr. Meinert issue.

MR. MEINERT:  Certainly, Your Honor, that is me, Attorney Meinert.

So, there's -- would you like a presentation on either of the motions referenced?

THE COURT:  I will hear you on the issue of sanctions as broadly or as narrowly as you want to argue it.

MR. MEINERT:  Okay.  Certainly, Your Honor.

So the pending portions of sanctions from the discovery orders from CLF were the motion to compel responses to the revised RFPs.  That was at ECF 326-1. The heart of that motion, as the Court knows, because there's a very substantial ruling on the RFPs, was that the defendants did not conduct a single additional search for documents before responding to CLF's written requests for production.

CLF served the revised RFPs in line with ECF 277. The Court's initial ruling on the RFPs provided guidance

on relevance.  The parties then negotiated for two and a half months the scope of the RFPs and whether or not there was any formulation of the other facilities' RFPs that could reduce the burden of defendants.

The defendants negotiated, negotiated and promised that there would be a formulation coming where they could provide us something.  CLF adjusted its position a number of times looking for formulations that somehow resolve the burden.

At the end of the day, on the eve of our deadline to file that motion to compel, defense came forward and said that to provide documents on a single additional facility would pose an undue burden.  They would not do it.

So, by the time CLF filed its motion, the defendants' written discovery responses were that they would not produce a single extra document in response to the revised RFPs, so CLF undertook that effort as authorized by the Court and the defendant stood basically on their original objections to the original RFPs.

Now, because of that CLF put in its motion that this seems to fly in the face of the requirement in Rule 26(g), that before a party certifies a discovery response, the signer does so because they, to the best of that person's knowledge, the discovery response is correct

and they've only provided that certification after a reasonable inquiry.

CLF's position is there was no reasonable inquiry that was conducted. And, as you know from the later motion practice, CLF continued to pursue questions about what documents had been searched and had been produced and whether there was still a formulation that the parties could come to agree to to resolve the motion.

What we learned and right before the order came down, CLF filed a motion for discovery conference saying we had new information to strike and I would -- I would advise the emails attached to that motion have the defendant saying that actually they've now come to understand, not only do they not have the search terms they used to collect documents originally, but that they collected documents from multiple primary custodians in whole without search terms.

And so, the whole basis of their burden argument, which was that they originally collected 1.7 million documents, that was not a reflection of the burden or language associated with CLF's RFPs which CLF appreciates that on their face the Court gave initial ruling on, but the revised RFPs they never conducted any inquiry into whether or not there was a substantial burden there. They just looked at this database that had 1.7 million

documents and said that's good enough burden.

Because CLF came in with this information, we believe we had grounds to strike language or at least raise the issue about which parts of those affidavits were truthful or relevant to the motions.  As, you know, you addressed this in a footnote in your ruling saying that you weren't relying on the affidavits, but CLF would just point out that this fully underscores the idea and I think is strong evidence that the defendants did not conduct a reasonable inquiry before certifying that discovery response.

And if I could just put one more point on that.

Once the Court ordered compliance with the other facilities' RFPs and created a process whereby defendants would give a list of here's our coastal facilities that hit the orange/red RAM, CLF would then get to pick 15.

When that happened, there was a dispute between the parties and at that first discovery conference, because they came up, they went back and looked for the list.  What they had said in motion practice, there's hundreds globally, it's too burdensome to even look.  And then they came back and at first said, actually, there's not even 15 coastal facility in the Americas -- sorry, in the United States and so they only -- I believe it was 12 and had that to pick from.

We then went back, had some discussions because that 12 also included facilities that had long been closed and so what discovery would there be on those?

The point is from these three items that it very much seemed that there was not a reasonable inquiry and so all CLF asked for in its motion through the 26(g), inclusion of 26(g) in that motion was that the cost and preparation of preparing that motion was, was unnecessary. The parties could have found ground to negotiate something if the defendants had conducted a reasonable inquiry, if the parties had been able to meet and confer over the revised requests.

I'll put that forward as our presentation on the 26(g) issue.

THE COURT:  Okay.  I have two questions for you about that, Mr. Meinert.

So, first, we haven't gotten to the level of you submitting, you know, hours and rates and all that, and I'm not saying we're ever going to get there, but hum me a few bars of what that would look like if you did.

You know, do you contend that, you know, and, therefore, they should pay us $12,000 or do you contend and, therefore, they should pay us four million?

MR. MEINERT:  Certainly, Your Honor.

So, CLF undertook the meet and confer process

that the parties engaged in before this hearing seriously and provided actually an accounting of what the cost and fees would be for both the motions that had a sanctions element.  CLF provided that broken out, both here's the total for that motion and said here's the part that's meeting and conferring and revising the RFPs.  Here's the part that's preparing the motion.  Here's the part that's the motion to seal practice.  Here's the part that's the reply.  Heres the part that's -- provided all that to foster discussion.  We even offered that these could be resolved potentially without an admission of sanctionable conduct.

The defendants did not, did not select any of those options nor provide any counteroffers.  All that to say that information does exist and it's been provided to the defendants.  The all in, as we calculated it for the motion, the revised RFPs, motion to compel was 153,000.

THE COURT:  Okay.

MR. MEINERT:  And that's three months of meet and confers over the revised RFPs, that's preparing a very substantial motion, that's the practice -- the meet and confer practice around the motions to seal which there was secondary practice where we've resolved that and then filed a new motion to kind of jointly pull back one of the motions to seal, and then preparing for the oral argument.

THE COURT: Okay. And then the second question I have for you so, if I were to conclude that, A, they did something that reaches the level of sanctionable under Rule under 26(g); but also, B, CLF did some things that are potentially sanctionable over the course of discovery as well, what should I do? Should I give them an opportunity to make a sanctions motion before ruling on yours?

MR. MEINERT: Your Honor, I don't believe that the defendants have these types of allegations pending in the record and so I -- without knowing what the allegation would be, I don't know what CLF's position would be and, certainly, if there was a misunderstanding between the parties over a representation that was made, I --

THE COURT: Well, just to give one example, my memory is they were pretty frosted about some instructions not to answer at depositions and I have to say I read some transcripts that I thought were pretty troubling but they've held off with any kind of sanctions practice over it. I think, in part, because of the comments that I made in that transcript at ECF No. 469, right. I don't know if you remember that.

MR. MEINERT: Certainly, I do remember it, Your Honor. And I would point out that CLF has also withheld bringing forward issues like this, these are two that are

pending, and I appreciate that.  But, as you may recall, part of your 277 order, was that the defendant -- that CLF would get to select 50 documents --

THE COURT:  Mm-hmm.

MR. MEINERT:  -- that there had been relevance redactions made to and we would get them -- then they would have seven days or something to provide those to us in unredacted form and then we could evaluate them and come to you to say if something more was needed or if that was just what we got from that issue.

As you may recall, they did not produce the 50 documents in unredacted form.  They took issue with phrasing in your order to say that actually you can only select documents where the redaction substantially, you know, occluded the context of the unredacted portion which we believe was an impossible test for us to come up with documents where the portion that was unredacted and then make argument about how that's related to the part that is redacted when they are the ones holding those redactions.

So, I would put forward that we have taken your instructions seriously at multiple hearings, that you are not adjusting fees on a motion by motion basis and you believe that gives improper incentives to the parties and CLF has endeavored to not bring forward every, you know, tit and tattle in a sanctions context and only sought

discovery or sought amendments to calendars when we thought there was real good cause and for whatever reason the parties were at loggerheads either because of that particular issue or because some other thing that was happening in the litigation where, you know, someone hadn't bent the week earlier and so now we're not bending today.

And some of that has come before you, but I don't think that there is a comparable issue from their side and so I could --

THE COURT:  Well, I expect they probably disagree, but more importantly what I wanted your reaction to is let's imagine that they do and that they've got this long list of things that they want to move for sanctions on, that they're holding their fire on because at the end of 469 I said I didn't want a sanctions motion with every discovery motion.

Now, how should I do it logistically?

MR. MEINERT:  So, Your Honor, a second point I would make is that on both of these motions where we added a sanctions component, within those motions we were seeking a discovery-based sanction, a belief that because there has been, what we viewed as improper withholding, there should be some additional discovery provided.  CLF was not seeking, kind of in a classic -- in the 362-1

revised RFPs motion we weren't ending it with and, therefore, we get all our fees because we prevail on this motion.

It was simply a request that because they made this certification without a reasonable inquiry they should -- there should be a consequence so this does not become the practice within this litigation nor within the district.

THE COURT:  Okay.  All right.  Mr. Meinert, is there anything else you want to tell me for the proposition that they owe you money or some other sanction under Rule 37 or 26(g)?

MR. MEINERT:  The only other thing I'd like to raise is the other sanction's aspect of a discovery motion, and I'll keep that presentation shorter, but the gist of it, which was the emergency motion to amend the schedule and for sanctions over the late produced all four documents.

So, in that motion we had two different grounds for sanctions.  One was the classic 37(b)(2)(A) and then the other one was related to the duty to supplement under 26(e).

THE COURT:  Okay.

MR. MEINERT:  If I could just focus on the second part.  The second part the Rule 26(e) issue, you know, as

we presented in that motion, the documents that had not been produced were climate change risk evaluations of the New Haven terminal.  That is, essentially, a core feature of many of the claims in this case and of this litigation whether -- first of all, whether or not a climate change risk assessment had ever been done for the New Haven terminal and then what that risk assessment would tell the terminal to do to create resiliency measures to protect against those risks.

And so, there was a number of discovery requests. I mean a vast majority of CLF's discovery requests were charging this exact information and defendants repeatedly said in deposition and otherwise and in ROG responses that no such analysis had ever been conducted nor did they enured to be because the permit says X, Y, Z.

So, CLF was surprised to find that an analysis had been conducted and indeed had been conducted months ago before CLF took the 30(b)(6) depositions and was only being produced because CLF asked for supplementation because of a few emails that appeared to show that they had hired a consultant to look into this and then not gone forward further, but it had now been a year and a half so maybe they re-engaged because there had been a draft permit from the State of Connecticut that came out that had a resiliency measures, we thought maybe they did

sometime in the last six months hire this company again and it turns out they had.

And not only had they, but the 30(b)(6) witness who sat for their 30(b)(6) deposition was the person who had engaged this outside consultant. And so, the idea that they were not in the position to know, under the duty to supplement in Rule 26, just did not seem plausible to CLF and so we put that forward --

THE COURT: Sure.

MR. MEINERT: -- as a ground for sanctions.

THE COURT: And what would you have me do about it today?

MR. MEINERT: So, on that one I would say that we had asked originally for discovery-based sanction.

THE COURT: And you wanted some additional time with a 30(b)(6) witness but hopefully that's resolved, right? Because --

MR. MEINERT: Well, Your Honor, since that time, in the Rhode Island litigation, CLF since then put a subpoena on the consultant and was able to do a 30(b)(6) deposition of that consultant there.

THE COURT: Okay.

MR. MEINERT: We did not get Shell's representative testimony on it, but I don't know that that would be necessary and so we were just left with --

THE COURT:  Okay.  So, we still have that -- technically on the docket somewhere we have that thing hanging out there about the additional two hours' worth of deposition time with CLF's 30(b)(6) witness that, you know, Judge Oliver had a different view than I had --

MR. MEINERT:  Correct.

THE COURT:  -- but that's substantially resolved, right, by having talked to this guy from all four in the Rhode Island case?

MR. MEINERT:  I would put forward that the case has advanced now to a point where that would be a march backwards.

THE COURT:  Okay.  Good because if that were still out there I would have hoped that would have been reported to me in the status report as a pending discovery issue, not a sanctions issue.

So, as to sanctions on that point, what would you want me to do this about that today?

MR. MEINERT:  CLF's position has been that the appropriate resolution would just be an apportionment fees back and forth.

THE COURT:  Okay.

MR. MEINERT:  So, we provided the number to them. We split it out and it did not -- that was our good-faith effort to resolve the motion and it didn't resolve and so

we came here.  There were also other attempts to horse trade between we have two motions, you have two motions, but those did not resolve.

THE COURT:  Okay.  All right.  I don't know if this is a Mr. Bell or Ms. Jones, but you --

Mr. Wood, I'm sorry, what time do we have?  My o'clock is wrong here.

THE CLERK:  It's 4:18.

THE COURT:  Okay.  So we've got some time.

So, Ms. Jones.

MS. JONES:  Thank you, Your Honor.

So, first, I would like to state that, as you know I entered my appearance right after this order was issued so forgive me if I don't have all of the facts, you know, and the behind-the-scenes details, but I have read all of the briefing.  And I also wanted to note on --

So, let's first talk about ECF 326 and that motion to compel and the requested sanctions.

So, first of all, I'm not sure that we got an accounting, per se.  We did get the 153,000 offer.

THE COURT:  Well, let's not worry about the number because --

MS. JONES:  Okay.

THE COURT:  -- all I needed to know is what the zip code was.

MS. JONES: Okay. I do want to point out that that meet and confer process, based on my reading of the record, was a result of a prior order from Your Honor basically stating that the original RFPs were overly broad, so that three-month process was a court-ordered obligation, right? So we had to go back and we had to meet and confer, and so to think that everything that was done within that time frame should be reimbursed to plaintiffs is beyond what I believe necessary under the rules and also under Your Honor's order.

Additionally, I have worked with these defendants, my client for nearly two years now on this matter and I can state that they take their discovery obligations incredibly seriously. They do significant analysis and take incredible time and detail to determine how we're going to be able to respond to the various requests.

And so I want to take that experience that I have had to basically say that it's hard for me to believe that they did not take any steps to identify what was necessary to be able to comply with the very broad RFPs.

And I do understand that you have concerns about the affidavits or the declarations. I acknowledge that, Your Honor, but I do want to point out that they actually -- they bore out. We did spend nearly four and a

half million dollars to respond to that discovery request. We had to collect 3.5 million documents. We hired 414 contract reviewers. We also had 65 reviewers from my firm at that time assisting with that review.

So, regardless of whether or not the actual affidavit accurately or clearly stated what was going to take, it actually did take what the affidavit stated that it would, so we were nearly $5 million to get that done. And so our foundational legal objection to the massive burden actually did play out, Your Honor.

And so, even if the Court previously found fault with those affidavits, we do believe that we have -- we had a justified reasoning. It was not unsubstantiated.

I also wanted to point out that CLF has raised their sanctions motion under 37(a)(5)(A). And under 37(a)(5)(A), if a motion to compel is granted then reasonable attorneys fees obviously can be awarded. However, Your Honor, did not grant the entire motion.

THE COURT: Right.

MS. JONES: And so, therefore, in any instance, they should not be able to receive all of their fees, but maybe a reasonable proportionment but, again, we don't believe that that is necessary because, Your Honor, we successfully defeated two of the RFPs, one subsection of another RFP. But then also, Your Honor actually stated in

your order that without CLF's late concessions on the 15 facilities you would have still found that they were overly broad.

So, the meet and confer process was necessary and, again, it wasn't until that late concession that we even got to the 15 facilities.

I also wanted to raise your question about the sanctions and to Your Honor's point because of ECF 469 we have not brought to this Court additional sanctions requests.

THE COURT:  Yeah, so that's really my only question to you is to sing me a few bars of what that would sound like if I said, you know what, let's put all of everybody's sanction briefs on the table.

MS. JONES:  So, to your point, we have the issue with the depositions.  Now, we believe that we will have, pending your order, a potential sanctions for spoliation of data by not preserving the prompts and the outputs.

We also have --

THE COURT:  That's essentially before Judge Oliver right now, right?

MS. JONES:  Yes, Your Honor.

We also have -- I believe that the all four order or their motion to compel violated this Court's protocol at ECF 473 because you required that going forward all

discovery disputes should be brought to the Court's attention and go through the seven-page letter briefing process, which was not done.

We did not meet and confer on this motion to compel before plaintiffs filed their motion.  They actually reached out to us at 9:00 p.m. on a Sunday evening.  We had a call the next afternoon and CLF refused to -- our repeated requests to identify specific documents or deposition testimony they claimed warranted sanctions, they basically said you'll see it in our motion when it's filed.

THE COURT:  Okay.  I think I get the flavor.

MS. JONES:  Okay.  There are a few others, but that's the gist of those.

THE COURT:  All right.  Well, let me tell you what I think we should do on sanctions.  So, Mr. Meinert, I realize that that's been pending for a while here but, you know, as you guys know I really didn't want to receive a sanctions motion with every discovery motion.  We've had almost a thousand docket entries in this case and if I had allowed that, we probably would have had 1500.  So it was always in my contemplation that if you guys didn't settle this thing by the time discovery was done and Daubert motions were done, we would come in here and we would have a big gathering of the tribes and try and figure out who's

a net debtor to whom.

So, not saying here that I haven't listened to you carefully today, but I am going to say that I am not going to rule on it today one way or the other. So, I think that's what we'll do on sanctions is I'm going to go ahead and I'm going to give you my ruling on the two motions that we talked about earlier. We'll get that up on the docket, you know, by Monday or so and then we'll just put sanctions in abeyance for awhile.

I'll watch how things work with the Daubert motions and whatnot and if you guys still haven't resolved it with Judge Vatti by then we'll call you all in and we'll will talk about it some more.

MR. GREENE: Thank you, Your Honor.

MS. JONES: Thank you, Your Honor.

MR. MEINERT: Thank you, Your Honor.

THE COURT: Okay. With that -- so, I've got this criminal matter I got to do here and, actually, I don't know when y'all's planes are, but I might invite you if you have time to sit around and watch the next matter that's coming in because it actually might give you some perspective here. You know, we've been fighting in here about, you know, search term this and, you know, Sunday night that and whatnot. This next case that will come in will give you some perspective.

But, with that said, is there anything else anybody wants to raise with me before we recess?

MR. GREENE:  Your Honor, just one very quick clarifying point.  I realize I've lost on the principle of the issue, but on the practicality of the issue, as we chatted earlier, the plaintiffs don't believe there is anything more to provide the defendants.  I'm only raising that because I appreciate Your Honor saying we'll get an order in 48 hours.  I'm just hoping there might be some guidance on that point only because I don't want to be in a position where we get your order and I look at it and I said totally understand the Court's ruling except I don't know what to do next.  That's my only concern.

THE COURT:  Well, what you do next then if you don't have any documents is you send them -- you send them response under Rule 34 that says we don't have any documents to produce.

MR. GREENE:  That's correct.

THE COURT:  If that turns out not to be true somewhere, then they come back to me for Rule 37(b) sanctions.

MR. GREENE:  That's the only reason I wanted to clarify that, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  Mr. Bell, anything else the defendants want to raise?

MR. BELL:  No, sir.  Thank you.

THE COURT:  All right.  Well, thank you to Mr. Wood.  Thank you, Attorney Larue-Zitkat.

We will take a brief recess while I talk to probation for the next matter.

(Court recessed at 4:27 p.m.)

(* * * * *)

                    C E R T I F I C A T E


          I, Alicia A. Cayode Kyles, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.


/s/ _____

ALICIA A. CAYODE KYLES, RMR
Official Court Reporter
United States District Court
450 Main Street, Room 320
Hartford, Connecticut 06103
(860) 509-8743


Dated:  5/18/26