# Exhibit C

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


----------------------------

CONSERVATION LAW FOUNDATION,)

INC.,                       )

            Plaintiff,    )

        v.                  )

                            ) Case No:

EQUILON ENTERPRISES LLC     ) 3:21-CV-00933-VDO

D/B/A SHELL OIL PRODUCTS US,)

TRITON TERMINALING LLC, and )

MOTIVA ENTERPRISES LLC,     )

            Defendants.  )

----------------------------)


--- VIDEOTAPED DEPOSITION of ROBERT NAIRN Ph.D.,

held at the offices of Veritext Legal Solutions,

located at 77 King Street West, Suite 2020,

Toronto, Ontario, on the 13th day of August, 2025.


            --------

Reported By:  Deana Santedicola, CSR (Ont.), RPR,

            CRR

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 2

A P P E A R A N C E S:


FOR THE PLAINTIFF:

CONSERVATION LAW FOUNDATION

PER:   Ken Rumelt, Esq.,

       62 Summer Street

       Boston, MA 02110-1016

       krumelt@clf.org


        - and -


TARRANT, GILLIES, SHEMS LLP

PER:   David K. Mears, Esq.

       44 East State Street

       Montpelier, VT 05602

       david@tarrantgillies.com


FOR THE DEFENDANTS:

KING & SPALDING

PER:   Ryan T. Kearney, Esq.,

       1180 Peachtree Street, N.E.

       Atlanta, GA 30309

       rkearney@kslaw.com


Also Present:  P. Rodney Barnes, Videographer

Robert Nairn , Ph.D.                         August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 3

INDEX   OF   PROCEEDINGS


WITNESS:   ROBERT NAIRN

                                                       PAGES

EXAMINATION BY MR. KEARNEY............... 11 - 329

EXAMINATION BY MR. RUMELT................ 329 - 331

Veritext Legal Solutions
800.808.4958                                      770.343.9696

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 22

And, Dr. Nairn, I am going to instruct you not to answer the question.

BY MR. KEARNEY:

Q.   Well, Dr. Nairn, in this case, for example, you have been disclosed as an expert on coastal engineering, flooding and erosion at the New Haven Terminal; is that correct?

A.   Those are some of the areas.

Q.   My question is only limited to that.  I am not trying to get into opinions or testimony on Pike Fuels.  Generally speaking, is that the same area of testimony that you will be offering in the Pike Fuels case?

MR. RUMELT:  And I have the same objection.  That is work product that is protected, and I am going to instruct Dr. Nairn not to answer that question.

BY MR. KEARNEY:

Q.   Okay.  Dr. Nairn, what do you understand your expert role to be in this case?

A.   If I could have my report, I could read you the charge that I have for this case.

Q.   Right.  I am just asking, generally speaking, what do you understand your role to be in this case?

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 23

A.    So you are asking me to remember what my charge is, so --

Q.    Can you not remember what you are talking about in this case without viewing your expert report?

A.    I just want to make sure --

MR. RUMELT:  I --

THE WITNESS:  -- I don't miss anything.

MR. RUMELT:  Dr. Nairn, if you could give me a moment after he asks the question so I'm able to raise an objection if I need to.

BY MR. KEARNEY:

Q.    Yeah, we are going to get into more detail as to your opinions in this case certainly.  I am just asking you if you can give us a very basic summary as to the opinions you have been asked to offer in this case.

A.    At a high level and not exclusively, it was to look at whether the containment areas of the facility flooded or could flood, and then the stability of the berms during flood events.

And then - see, I'm trying to remember my report now - the evaluation of what it would require to provide sufficient flood risk reduction

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 24

for the facility.

Q.   Okay.  Dr. Nairn, we are obviously going to spend a lot of time today talking about the Equilon Terminal in New Haven, Connecticut.

I just want to say at times I may refer to that simply as "the terminal" or the "Equilon Terminal", perhaps the "New Haven Terminal". Unless I say otherwise, can we agree that if I use those terms, I am talking about the Equilon Terminal in New Haven, Connecticut?

A.   Yes.

Q.   What is your understanding of the claims that CLF is making in this case?

MR. RUMELT:  Rob, I am just going to object to the extent it is outside the scope of your report.

But you can answer.

THE WITNESS:  It has been a long time since I read the claim, so I wouldn't be best to answer that question.

BY MR. KEARNEY:

Q.   Have you read the Complaint in this case?

A.   At one point in time.

Q.   Have you read the Notices of

Page 25

Intent that were served prior to the Complaint being served?

A.   I don't recall.

Q.   Do you have an understanding as to who the Defendants are in this case?

A.   Yes.

Q.   And who are they?

A.   I would assume the owner/operators of the facility.  I don't know much more than that.

Q.   And so, for example, who is the owner of the Equilon Terminal in New Haven?

A.   I don't know the ownership structure.  I know Shell is somehow involved, but...

Q.   Do you know who the operator is of the Equilon Terminal in New Haven?

A.   No.

Q.   Do you understand that one of the Defendants, Motiva Enterprises, is no longer the owner or operator of the New Haven Terminal as we sit here today?

MR. RUMELT:  Ryan, I am going to object to the line of questioning to the extent that it seeks a legal opinion about what entity is an operator based on the operator liability claims

Page 26

that we have in this case.

Subject to that, you can answer.

THE WITNESS:  I read something about Motiva, but I don't remember the timing or exactly what happened.

BY MR. KEARNEY:

Q.  Do you have any reason to dispute that Motiva ceased any ownership or operation of the terminal as of May 1st, 2017?

MR. RUMELT:  Objection to the extent it is outside the scope of your report, Dr. Nairn.

THE WITNESS:  I don't recall the dates.

BY MR. KEARNEY:

Q.  I'll represent to you that the three Defendants in this case are Equilon Enterprises LLC, Triton Terminaling LLC and Motiva Enterprises LLC, and that there are no additional Defendants in this case.  Is that your understanding?

A.  As I said, I didn't really understand who the Defendants were.

Q.  Well, let me ask you a different question.  Do you understand that, for example, Shell USA is not a Defendant in this case?

A.  I wasn't aware of the -- of who

Page 27

the Defendants were.

Q.   Well, the same question I would have for Shell PLC.  Do you have any reason to dispute that they are not a Defendant in this case?

A.   I am not aware of who is a Defendant exactly.

Q.   I take it you have reviewed the Notice of Deposition for your appearance today?

A.   I don't think I have seen that.

Q.   Okay.  Let's mark it as an exhibit.

EXHIBIT NO. 2:  Notice of Deposition for the appearance of Dr. Robert Nairn.

BY MR. KEARNEY:

Q.   For the record, this will be Nairn Exhibit 2.

So, Dr. Nairn, why don't you take a second to just flip through that, and let me know when you are ready.

MR. RUMELT:  Ryan, if I can ask if you intend to also introduce the Objections?

MR. KEARNEY:  I don't have a printout. If you have it, you are more than welcome to introduce it as an exhibit.

MR. RUMELT:  Okay.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 49

applies to.

Q.   You have a Ph.D. in coastal engineering, right?

A.   Coastal engineering and coastal processes I believe is the name of the Ph.D., but it also included river engineering courses or river engineering studies.

Q.   I'll mark as the next exhibit -- we are up to 7 now; is that correct?

COURT REPORTER:  Yes.

MR. KEARNEY:  So Nairn Exhibit 7, for the record, is a printout of your LinkedIn bio.  I apologize.  It is a part of the job, but --

[Court Reporter intervenes for

clarification.]

MR. KEARNEY:  Oh, I'm sorry, yes.

EXHIBIT NO. 7:  Printout of the

LinkedIn biography of Dr. Robert Nairn.

BY MR. KEARNEY:

Q.   I'll keep this one.  Thank you.

So, Dr. Nairn, is this a copy of your LinkedIn bio?

A.   It could be.  I don't think I have looked at this in a long time.

Q.   The reason I asked you the

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 53

A.   Some of the projects.

Q.   Okay.  You stated earlier that perhaps it doesn't include all of the projects that you worked on, but generally speaking, it summarizes various projects that you have worked on that are included?

A.   It summarizes the ones I show here.

Q.   Your CV demonstrates that you have been involved in a significant number of projects in the Gulf of Mexico; correct?

A.   Correct.

Q.   I count 20 in total, if my math is correct, on this CV.  Do you have any reason to dispute that number?

A.   I haven't counted them.

Q.   That includes ten projects in Louisiana alone, approximately?

A.   I haven't counted them.

Q.   Five other projects on the Gulf Coast of Texas?

A.   Was that a question, sorry?

Q.   Yes.

A.   I haven't counted them.

Q.   Do you have any reason to dispute

Page 55

projects in your CV relate to the Gulf of Mexico;
correct?

A.    Correct.

Q.    In addition to what we have
discussed, you have also worked on other projects
at locations within the Caribbean Sea; correct?

A.    Correct.

Q.    Some in Barbados and some in the
Bahamas, for example?

A.    Certainly Barbados.  Possibly
Bahamas too.

Q.    And if my math is correct, when I
add up your work in the Gulf of Mexico and the
Caribbean Sea, that comes to 24 projects in that
region alone?

A.    I haven't counted them.

Q.    Okay.  Throughout your career,
have you ever provided any consulting services for
an oil and gas company?

A.    Yes.

Q.    Which companies?

A.    I can recall project names, but I
am not -- I don't remember the structure of the
contracts and whether we worked directly for
companies, oil and gas companies.

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 59

Q.   So you have stated that your primary expertise is in the areas of coastal engineering, flooding and erosion; correct?

A.   I think you asked that earlier, and I said coastal and river engineering.

Q.   So your primary expertise is in the area of coastal and river engineering, as well as flooding and erosion?

MR. RUMELT:  Object to form.

BY MR. KEARNEY:

Q.   Is that correct?

A.   Flooding erosion formed part of coastal and river engineering.

Q.   You are not a structural engineer, are you?

A.   I'm not a registered structural engineer.

Q.   You are not an industrial engineer?

MR. RUMELT:  Object to form, vague.

BY MR. KEARNEY:

Q.   You can answer.

A.   I would have to understand the definition of "industrial engineering".

Q.   Are you a registered industrial

Robert Nairn , Ph.D.                                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 60

engineer?

A.   No.

Q.   Are you a registered chemical engineer?

A.   No.

Q.   Are you a registered mechanical engineer?

A.   No.

Q.   Are you a registered tank engineer?

A.   No.

Q.   Have you ever published an article regarding the potential for failure of above-ground oil storage tanks?

A.   No.

Q.   And that is not within your area of expertise, is it?

A.   What?

Q.   The failure of above-ground fuel storage tanks.

A.   Not directly, no.

Q.   You are not a meteorologist?

A.   I have a good understanding of meteorology.

Q.   Would you say you are an expert in

Page 61

meteorology?

A.   I have sufficient understanding of meteorology to inform the opinions I developed here.

Q.   In this case?

A.   In this case, and in many of the projects we do.

Q.   And you are speaking as to opinions that may be included in your expert reports that we have received in this case?

A.   Correct.

Q.   You are not a metocean engineer; correct?

A.   Yeah, I do practice metocean engineering.

Q.   Okay.  Do you belong to any metocean engineering professional organizations?

A.   Not that I can think of right now right here.  It is really at the heart of what we do.

[Court Reporter intervenes for clarification.]

THE WITNESS:  It is at the heart of what we do, metocean.

BY MR. KEARNEY:

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 62

Q.   You are not a toxicologist; we can agree on that?

A.   That's correct.

Q.   You would defer to a toxicologist to evaluate toxicity of potential contaminants?

A.   Correct.

Q.   You are not a risk assessor, are you?

A.   We assess -- I assess risk in almost all of my projects.

Q.   Referring to the general field of work of someone might have a title "Risk Assessor", that is not you; correct?

MR. RUMELT:  Object to form.

THE WITNESS:  I don't know what that title would entail, but as I say, most of our projects involve risk assessment.

BY MR. KEARNEY:

Q.   You are not an expert on climate change attribution, are you?

MR. RUMELT:  Object to form.

THE WITNESS:  I would say I'm an expert on more than climate change attribution.

BY MR. KEARNEY:

Q.   What do you mean by that?

Page 63

A.   Evaluating the impact of climate change on meteorological conditions and then those -- how those conditions relate to rainfall and storm surge.

Q.   Do you understand what I mean when I say "attribution"?  I am talking about causing, the causes of climate change.

MR. RUMELT:  Object to form.

THE WITNESS:  Yes, I do.

BY MR. KEARNEY:

Q.   Okay.  And your answer was a little bit different than that, so I'll re-ask the question.

Are you an expert on climate change attribution?

MR. RUMELT:  Object to form.

THE WITNESS:  I think I answered yes and beyond that.  So in other words, attribution typically refers to a single storm.

BY MR. KEARNEY:

Q.   Do you believe you are an expert on the causes of climate change; in other words, what is causing climate change to happen?

MR. RUMELT:  Object to form.

THE WITNESS:  No.

Page 82

either list or in your report and ask you whether you have reviewed them.

Am I correct that you have not reviewed any of the actual permits for the Equilon New Haven Terminal?

A.  I might -- I may have reviewed permits, but it was some time ago.

Q.  Do you know for sure?

A.  No, I don't know for sure.

Q.  In any event, you did not cite any of the permit documents in your expert reports; correct?

A.  Not that I am aware of.

Q.  And --

A.  I made -- yeah, I guess I made reference to the implications of those within the SPCC, but I don't directly cite.

Q.  So you do cite the SPCC in your expert reports; correct?

A.  I believe so.

Q.  And it is on your list of your materials considered?

A.  I believe so.

Q.  So I'm asking you -- that is why I'm asking you about the permit, because I see

Robert Nairn , Ph.D.                              August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 83

certain documents on the list and I see certain documents that I know of that are not on the list, so that is what I am asking you about it.

Am I correct that you have not reviewed the EPA MSGP?

A.   I don't recall if I have or have not.

Q.   Do you know what that is?

A.   Multi-Sector General Permit.

Q.   Am I correct that you are not offering any opinions in this case that Defendants actually violated a particular permit provision?

A.   I have provided -- I addressed the charge that CLF gave me, and I would -- so I don't know legally what they are going to do with it.

Q.   At least in your role, you are not offering any opinions that Defendants violated a specific permit provision?

A.   I may -- the information I am provided may have gone to that end or may go to that end.  I don't know.

Q.   In other words, you are not drawing a conclusion, at least in your role, that a certain permit provision was violated; is that fair?

Page 84

A.   I -- no, I don't think that is fair.

Q.   Well, tell me then.

A.   Tell you what?

Q.   Are you offering any opinions in this case that Defendants violated a specific permit provision?

A.   I think I answered that I am providing information that would be the basis for determining whether a permit has been violated, but from a permitting and legal standpoint, I don't know.

MR. RUMELT:  And, Ryan, on this kind of line of questioning, I would object that there -- to the extent they call for legal conclusions about what a violation is or isn't.

BY MR. KEARNEY:

Q.   I'm just asking you because, you know, I have -- obviously I have read your reports. I don't see a conclusion in your reports that say, Defendants violated provision 'X' in the 2018 or 2021 permit.  Am I correct about that?

MR. RUMELT:  And, again, I'll object to the extent you are asking the witness about a legal conclusion.

Page 85

MR. KEARNEY:  I'm asking about his report.

THE WITNESS:  I don't specifically cite permit violations, but the information I provide I believe goes to evaluating whether the permits have been --

BY MR. KEARNEY:

Q.   And that would be for somebody else to decide; correct?

A.   Certainly not for me.  I'm not a Judge.

[Court Reporter intervenes for clarification.]

THE WITNESS:  A Judge.

BY MR. KEARNEY:

Q.   Am I correct that you have not reviewed any of the EPA or CT DEEP guidance materials for how one should go about preparing a SWPPP?

MR. RUMELT:  Object to form, vague.

THE WITNESS:  I may have reviewed those at some point in time, either in this case or at least with respect to EPA and other times, but I don't recall.

BY MR. KEARNEY:

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 86

Q.    So it sounds like you can't be sure, as you sit here today, whether you reviewed those materials for purposes of your testimony in this case?

A.    Correct.

Q.    The same question for how one should go about preparing an SPCC.  Have you reviewed for the purposes of this case any EPA or CT DEEP guidance materials for doing that?

A.    I --

MR. RUMELT:  One second.  Object to form, vague and compound.

THE WITNESS:  Could you repeat the question?

BY MR. KEARNEY:

Q.    Sure.  Similar to the last question I asked you about guidance materials about preparing a SWPPP, but this time we are talking about SPCCs, right.

So my question to you is, have you reviewed any of the EPA or CT DEEP guidance materials for how one should go about preparing an SPCC --

MR. RUMELT:  The same objection.

BY MR. KEARNEY:

Page 87

Q.   -- for purposes of your testimony in this case?

MR. RUMELT:  Sorry, the same objection.

THE WITNESS:  I think I might have, but it has been awhile since I looked at them.

BY MR. KEARNEY:

Q.   I ask you because it is not included in your list of materials considered, so it sounds like, like with the SWPPP question, you are not sure whether you have done that for purposes of this case?

MR. RUMELT:  Object to form, vague.

THE WITNESS:  I am just trying to recall two or three years ago whether I read those documents or not.  And I appreciate they may not be on the list, but as I said, that list is not necessarily exhaustive.  It is the best we could do in everything we looked at.

BY MR. KEARNEY:

Q.   It is what I have from --

A.   Yes.

Q.   Okay.  Am I correct that you have not reviewed the Connecticut Stormwater Quality Manual?

A.   Actually, I think I did look at

Robert Nairn , Ph.D.                      August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 105

citizen suits like this one before; correct?

A.   I am not sure.

Q.   Do you know what a citizen suit is?

A.   Not specifically.

Q.   I'll represent to you that a citizen suit is when a particular law or statute authorizes someone who is not the government themselves to bring a cause of action to enforce that statute.  That is what we call a citizen suit.

Have you worked on those kinds of cases before?  I think you have said you have worked on a Clean Water Act case, for example.

A.   To be honest, I don't know whether the cases I have worked on fit under that description or not.

Q.   Are you familiar with what is referred to as a Notice of Intent to Sue that is served in a case like this by the Plaintiff?

A.   Not really.

Q.   Okay.  Did you work with CLF in the preparation of any of its Notices of Intent to Sue that were served in this case?

MR. RUMELT:  Objection, work product. I'll instruct you not to answer that question.

Page 106

BY MR. KEARNEY:

Q.    Are you aware of the requirement that in order to bring a certain cause of action in a citizen suit case, you have to first include that in the pre-suit Notice of Intent?

A.    I don't have an awareness of any of that legal stuff.

Q.    Okay.  Have you actually reviewed the Notices of Intent that Plaintiffs served in this action?

A.    I may have.

Q.    And not on your list of materials considered.

A.    Yeah, I don't recall doing it, and --

Q.    One way or the other?

A.    As I said, I may have.

Q.    Okay.  Do you know whether or not the opinions you express in your expert reports were actually included in the Notices of Intent that Plaintiffs served?

MR. RUMELT:  Objection.  This is beyond the scope of Dr. Nairn's work in this case.

MR. KEARNEY:  That is exactly what I am asking him, whether it is or it isn't.

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 107

MR. RUMELT:  You can ask your question.

BY MR. KEARNEY:

Q.   I have.

A.   I -- not that I am aware of, but I can't answer that yes or no.

Q.   Okay.  Would you have any reason to dispute that your opinions regarding ingress and egress routes at the terminal are not included in the Notices of Intent that Plaintiff served in this case?

MR. RUMELT:  Objection.  The document speaks to itself, and it also -- I believe the question calls for a legal opinion about the contents of the Notice of Intent.

[Court Reporter intervenes to request counsel speak more loudly.]

THE WITNESS:  I am not aware one way or the other.

BY MR. KEARNEY:

Q.   Do you have any reason to dispute that your opinions regarding the presence of bare soil on berm faces appears anywhere in Plaintiff's Notices of Intent in this case?

MR. RUMELT:  The same --

THE WITNESS:  I am not aware.

Page 108

MR. RUMELT:  The same objection as before.

THE WITNESS:  I am not aware one way or the other.

BY MR. KEARNEY:

Q.  I think I asked a bad question there.

The question was supposed to be, do you have any reason to dispute that those opinions regarding bare soil on berm faces or any facts about bare soil on berm faces are not included in the Notice of Intent?

MR. RUMELT:  The same objection.

THE WITNESS:  I am not aware one way or the other.

BY MR. KEARNEY:

Q.  Do you have any reason to dispute that your opinions regarding inadequate berm height are not factually represented in the Notices of Intent that Plaintiffs served in this case?

MR. RUMELT:  The same objection.

THE WITNESS:  I'm not aware one way or the other.

BY MR. KEARNEY:

Q.  At the time that this lawsuit was

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 109

filed in 2021, the applicable permit for the

Equilon New Haven Terminal was the 2018 General

Permit; correct?

        A.    I don't recall.

        Q.    Okay, and I am going to mark that

as an exhibit.  Are we on 10?

        COURT REPORTER:  11.

        MR. KEARNEY:  11.  That is the hardest

part of my job.

        So I'm going to mark this as Nairn

Exhibit 11.

        EXHIBIT NO. 11:  General Permit for the

        Discharge of Stormwater Associated with

        Industrial Activity, issued by CT DEEP,

        effective date of October 1, 2018.

        BY MR. KEARNEY:

        Q.    Dr. Nairn, I'll represent to you

that this is the 2018 General Permit for the

Discharge of Stormwater Associated with Industrial

Activity that was issued by CT DEEP.

        You'll recall that we had some

discussion earlier today about whether you reviewed

the permits or not.  Having looked at this document

in your hands now, is this something that you

reviewed in preparing your opinions in this case;

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 110

yes or no?

A.    Yeah, I believe I might have reviewed this one, yeah.

Q.    A long time ago, it sounds like?

A.    Probably, again, in relationship to the Jones report rebuttal.

Q.    Do you understand that this permit was later updated and that we now have a new version of the General Permit that is in place today?

A.    I recall something to that effect.

Q.    All right, we'll mark that as well.

This will be Nairn Exhibit 12.

EXHIBIT NO. 12:  General Permit for the Discharge of Stormwater Associated with Industrial Activity, issued by CT DEEP, effective date of October 1, 2021.

BY MR. KEARNEY:

Q.    And, Dr. Nairn, I'll represent to you that this is the 2021 version of the General Permit for the Discharge of Stormwater Associated with Industrial Activity, again, issued by CT DEEP.

The same question.  Have you reviewed this document in preparation for your opinions in

Page 112

the requirements in these permits and the SPCC in particular cannot be achieved in a hundred-year storm.

BY MR. KEARNEY:

Q.   Let me ask you a really specific question.

If we go to a trial in this case, you are not going to sit on the witness stand and hold up a copy of the permit and say, I looked at page 50 and this is the provision that Defendants violated?  That is not something that you intend to do?

A.   I don't know what I will do at trial.  I haven't been instructed by CLF.

Q.   That is not something that you --

[Court Reporter intervenes for clarification.]

THE WITNESS:  I have not been instructed by CLF.

BY MR. KEARNEY:

Q.   And that is not something that you have offered in your expert reports in this case to that specific extent, correct, that there is some specific provision in either permit that Defendants have violated?

Page 114

just look for "visual" and I could get there really quick, but it might take awhile to get there here.

It is in here somewhere about visual monitoring before discharge.

Q.    Is it safe to say at least that you are not an expert in what is specifically spelled out in this permit and what is not?

MR. RUMELT:  Objection, calls for a legal conclusion or a legal opinion.

THE WITNESS:  From a legal perspective, no, but I am aware of that requirement on visual monitoring before discharge, and that it is in here.  And if I could search the document in Word or in PDF, I could get you to it quickly.

BY MR. KEARNEY:

Q.    Do you have any reason to dispute that this permit does not speak to ingress or egress routes at the -- at industrial facilities?

MR. RUMELT:  Object to form.

THE WITNESS:  It may not speak to ingress or egress, but the implications of what must be done under the permit would require ingress and egress.

BY MR. KEARNEY:

Q.    What is your basis for saying that

Robert Nairn , Ph.D.                          August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 115

the permit requires consideration of ingress and egress routes?

A.    For example, if you -- you need to be physically present at the facility to visually monitor discharge before you discharge out of the secondary containment areas or the detention ponds.

And physical presence would be impossible if you can't get in or get out, and I don't think you are going to be there in the middle of the storm.

Q.    But you are not offering the opinion that this permit tells you that ingress and egress routes must be considered in order to comply with the permit itself?

A.    I just answered that question.

Q.    Do you dispute that this permit does not include the word "ingress"?

A.    I would have to search it, but -- sorry.

MR. RUMELT:  Yeah, give me a moment --

THE WITNESS:  Sorry.

MR. RUMELT:  -- to raise an objection.

I'll just object in that, you know, the document speaks for itself to the extent that it has a word or not.

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 116

BY MR. KEARNEY:

Q.   Did you dispute that this permit does not include the word "egress"?

A.   I would have to search the document.

Q.   As you sit here today, could you tell me what page it is on?

A.   No, because I would have to search the document.

Q.   Do you have any reason to dispute what I am representing for the record, that the permit does not include those words?

A.   Well, not unless I was able to search the document.

Q.   Do you agree at least in the abstract that if the words are not included in the permit, then the permit doesn't include those words; correct?

A.   That much I can say yes to.

Q.   Right.  Do you have any reason to dispute that this permit does not cite regulations from the National Highway Traffic and Safety Administration?

A.   I don't know if it does or doesn't.

Page 119

serve as secondary containment of the product
stored in the tanks should there be a release from
the tank?

            MR. RUMELT:  Object to form.

            THE WITNESS:  I think there might be
other reasons.

            BY MR. KEARNEY:

            Q.   You concede that that is the
primary reason?

            MR. RUMELT:  Object to form.

            THE WITNESS:  I don't know whether I
would rank it primary or secondary.  It is one of
the reasons.

            BY MR. KEARNEY:

            Q.   Do you agree that the permit
itself is completely silent on what materials
should be used to construct secondary containment
berms?

            MR. RUMELT:  Object to form.  Also
object to the extent it calls for a legal opinion
about what the permit requires or does not require.

            THE WITNESS:  I would expect the permit
anticipates that the berms are made of something
that would resist a storm condition.  Otherwise,
why would you build it?

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 120

BY MR. KEARNEY:

Q.   Just for a more specific question then, does the permit direct an owner and operator of a bulk fuel storage facility as to what they must use to construct secondary containment berms?

MR. RUMELT:  Object to form.  Also object to the extent it calls for a legal conclusion about what the permit requires or does not require.

THE WITNESS:  I can't answer that question.

BY MR. KEARNEY:

Q.   Do you have any reason to dispute that the permit does not specifically state how tall a secondary containment berm must be?

MR. RUMELT:  Object to form.  Also object to the extent it calls for a legal opinion about what the permit requires or does not require.

THE WITNESS:  I think the crest elevation obviously is one of the most important things in terms of the secondary containment berm to contain.

BY MR. KEARNEY:

Q.   Does the permit factually state how tall a secondary containment berm must be?

Robert Nairn , Ph.D.                                August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 121

MR. RUMELT:  The same objection.

THE WITNESS:  I am not aware, and I don't think it is up to the permit to do that.

BY MR. KEARNEY:

Q.  Do you agree that the permit states that the berms must be designed in order to contain certain volumes of product in the event of a leak or spill?

MR. RUMELT:  Object to form.  Also object to the extent it calls for a legal conclusion about what the permit requires or does not require.

THE WITNESS:  My understanding is one of the functions of the secondary containment areas are to contain spilled material.

BY MR. KEARNEY:

Q.  Right.  And that is actually spelled out in the permit, isn't it?

MR. RUMELT:  Object to form.

THE WITNESS:  I believe so.  I would have to look at the specific location.

BY MR. KEARNEY:

Q.  But you reviewed certain calculations prepared by RPMS in this case about the secondary containment volume at the New Haven

Robert Nairn , Ph.D.                              August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 122

Terminal; correct?

A. Yes.

Q. And those calculations are based on a certain requirement of a certain volume that needs to be contained; is that right?

MR. RUMELT: Object to form. Also object to the extent it calls for a legal conclusion or opinion about what the permit requires or does not require.

THE WITNESS: RPMS provides some estimates of containment volume.

BY MR. KEARNEY:

Q. And their estimates of actual containment volume at the site are included in those documents in comparison to what is required under the permit; correct?

MR. RUMELT: Object to form. And also object to the extent it mischaracterizes documents that RPMS authored.

THE WITNESS: RPMS considered different aspects of the functionality than I did.

BY MR. KEARNEY:

Q. It is actually one of the opinions in one of your expert reports that the total containment volume of the secondary containment

Robert Nairn , Ph.D.         August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 155

prepared for Triton Terminaling LLC with a Bates No. SOPUS_NHVN02367937.

Dr. Nairn, I want to ask you about return periods of storm events. And in your expert reports, you have endorsed using, in some cases, a 100-year storm event return period and a 500-year storm event return period. Is that fair, generally speaking?

MR. RUMELT: I'll object to the extent that it mischaracterizes Dr. Nairn's report.

BY MR. KEARNEY:

Q. It is just foundation.

A. I have evaluated conditions at the facility under those two return periods.

Q. So you now have the benefit of having three, the permit for the New Haven Terminal, the SWPPP for the New Haven Terminal and the SPCC for the New Haven Terminal in front of you. Can you tell me where in any of those three documents there are specific endorsements of using any particular return period in conducting a risk assessment of the terminal?

MR. RUMELT: Object to form and object to the extent the question calls for a legal opinion about what any of those documents require

Page 156

or do not require.

And, Ryan, I would ask for a standing objection on those grounds to the extent you are asking about requirements in the SPCC.

BY MR. KEARNEY:

Q.   You may have a standing objection. I'll restate that I am just asking about what is factually stated in those three documents and what is not.

MR. RUMELT:  And I will object again and disagree that the question is limited to what is in factually these documents or not.

THE WITNESS:  So I need to point you to a clause in here that then will allow me to answer your question.

BY MR. KEARNEY:

Q.   Fair enough.

A.   So the second paragraph on page 4-2, section 4.1.

Q.   Which document are you referring to?

A.   The SPCC, Exhibit 15.

Q.   Okay.  What paragraph are you referring to?

A.   The second paragraph on that page,

Robert Nairn , Ph.D.                                      August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 157

which reads:

                    "Stormwater in the diked areas
          that does not evaporate/percolate is
          visually inspected to verify that
          contamination is not present and
          then pumped to the retention basin,
          from where it is inspected and then
          discharged to Outfall 001 and the
          City storm sewer on East Shore
          Parkway."
          So my evaluation was to look at
different return periods where -- where you could
achieve that and where you could not achieve that.
          So you have to put the return period on
a storm to define it and quantify it and say, under
these conditions, the facility can achieve what
they say they are going to do here.
          Q.    Okay.  Is there anywhere in this
document that says that a certain return period
should be used by the permittee in conducting its
operations?
          A.    Not that I am aware of.
          Q.    Is there any statement in the
SWPPP that specifies which return period should be
looked at in conducting risk management in the

Page 158

operations of the terminal?

MR. RUMELT:  Again, object to form, and you know, again, continuing the standing objection.

THE WITNESS:  I don't recall whether it is mentioned in the SWPPP either.

BY MR. KEARNEY:

Q.   How about the General Permit?  Is there anywhere in the General Permit that specifies which return period storm events should be considered for risk management purposes in operating the terminal?

MR. RUMELT:  The same objections.

THE WITNESS:  I am not aware of that. I am trying to remember, because Jones did reference the hundred-year in relation to one of the permits, or maybe it was the EPA basis for the permits, the hundred-year, several times in his report.

BY MR. KEARNEY:

Q.   So those three documents that we have been discussing, so the permit, the SWPPP and the SPCC, would you agree that those are the three permitting documents that Defendants must comply with in operating the New Haven Terminal?

MR. RUMELT:  Object to form, and also

Page 159

standing objection.

THE WITNESS: That is beyond my opinion.

BY MR. KEARNEY:

Q. Do you have an opinion as to that?

MR. RUMELT: The same objection.

THE WITNESS: Beyond my opinion. I have read to you the parts of this report that relate to my opinion.

BY MR. KEARNEY:

Q. Do you agree that the New Haven Terminal is subject to the 2021 Connecticut General Permit for Industrial Stormwater Discharge?

MR. RUMELT: Object to the extent it calls for a legal opinion, but you can answer.

THE WITNESS: Again, I am not -- I am not opining on, you know, which permits apply when and where.

BY MR. KEARNEY:

Q. These are the documents, again, these three documents I have been referring to issued by CT DEEP, that specify what Defendants must do to comply with their permitting obligations for the terminal; correct?

A. That may be. I don't know whether

Page 160

it is the entirety.

Q.   I want to introduce another exhibit.  We have talked about it a little bit, but we haven't put it in front of you yet.

And this will be Nairn Exhibit 16, I believe.  It is a large document.  And I'll state for the record this is the 2004 Connecticut Stormwater Quality Manual.

EXHIBIT NO. 16:  Document titled "2004 Connecticut Stormwater Quality Manual".

BY MR. KEARNEY:

Q.   Dr. Nairn, I think we had talked about this before earlier today.  This is a document that you have seen before at some point; correct?

A.   Correct.

Q.   And this is a document that permittees may look to as a manual for how to conduct their stormwater operations in the State of Connecticut?

MR. RUMELT:  Object to the extent it calls for speculation.

THE WITNESS:  When I looked through this, my recollection was that I didn't see how it directly -- it applies in a general sense to the

Robert Nairn , Ph.D.                     August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 170

the expert who is familiar with these types of

situations of flooding and the risk involved in

them.

But I can't answer the question of what

is in here and what is not without doing a search

on the document.

BY MR. KEARNEY:

Q.   Your reports cite to various

documents, including from, for example, FEMA and

the Army Corps of Engineers and the American

Society of Civil Engineers, correct, generally

speaking?

A.   I cite three of those -- those

three, yes.

Q.   Do any of those standards that you

cite to actually apply to the New Haven Terminal in

terms of requirements for them to follow them?

MR. RUMELT:  Object to form, and object

to the extent that your question calls for a legal

opinion.

THE WITNESS:  I believe all three of

them -- well, at least all three of FEMA, ASCE and

the Association of Floodplain Managers or the

American Society of Floodplain Managers mention

above-ground storage tanks as critical facilities

Page 171

with then a designated return period.

BY MR. KEARNEY:

Q.   Are any of those regulations that the New Haven Terminal is required by law to follow?

MR. RUMELT:  Object to form, and object to the extent the question calls for Dr. Nairn to offer a legal opinion about what is or isn't required at the terminal.

THE WITNESS:  I am not a lawyer.  I can't answer that question.

BY MR. KEARNEY:

Q.   Do you agree that there is a difference between a regulatory requirement and a recommendation in a guidance document from an organization like the American Society of Floodplain Managers?

MR. RUMELT:  Object to form, and object to the extent it calls for a legal opinion.

THE WITNESS:  Yeah, I can't answer that in terms of their relationship with the legality.

BY MR. KEARNEY:

Q.   Those documents we are talking about, for example, the American Society of Floodplain Managers, FEMA, American Society of

Page 172

Civil Engineers, are design recommendations;
correct?

MR. RUMELT:  Object to form, and object
to the extent it calls for Dr. Nairn to make a --
give a legal opinion.

THE WITNESS:  As an expert within the
field, I use them as guidance in developing design.

BY MR. KEARNEY:

Q.  And that is primarily for the
design of new facilities; correct?

A.  No.

Q.  Explain.

A.  It is for both facilities -- new
facilities and for facilities that require a
substantial improvement.

Q.  Right.  So those documents -
again, we are talking about the American Society of
Floodplain Managers, FEMA, American Society of
Civil Engineers - provide design recommendations to
be used for either the new build of a new facility
or the substantial modification of an existing
facility; correct?

MR. RUMELT:  Object to form, and object
to the extent the opinion -- or the question calls
for a legal opinion.  Also object to the extent it

Page 173

mischaracterizes the requirements of one or more of the documents that you referenced in your question.

THE WITNESS:  I think you better ask that question again, if you could.

MR. KEARNEY:  Could you just read it back, if you don't mind?

Thank you.  It's the first time I've had to ask.

COURT REPORTER:  The question was:

"Right.  So those documents - again, we are talking about the American Society of Floodplain Managers, FEMA, American Society of Civil Engineers - provide design recommendations to be used for either the new build of a new facility or the substantial modification of an existing facility; correct?"

MR. RUMELT:  The same objections.

THE WITNESS:  If you are referring to the ASCE 24 and the AS -- well, I don't know the date on the ASPM that I referenced in my report, and the FEMA 2007, they apply to new facilities and substantial improvement of existing facilities.

Page 174

BY MR. KEARNEY:

Q. So in other words, they do not apply to an existing facility unless it is undergoing a substantial modification?

MR. RUMELT: Object to form, and object to the extent it calls for Dr. Nairn to give a legal opinion.

THE WITNESS: My interpretation is that - and I think it would be an expert's interpretation - would be that, in the field, that if a facility is shown to require substantial improvement, then these guidelines would apply.

BY MR. KEARNEY:

Q. If an existing facility is not either undergoing a substantial improvement or, using your words, shown to require that, it was just an existing facility, there is nothing in those documents that would suggest those facilities should just affirmatively start looking at return periods that are cited in the documents; correct?

MR. RUMELT: Object to form.

THE WITNESS: No, I think I would disagree, because I think those documents provide guidelines where if you are the owner/operator of a facility, you want to know whether it achieves the

Page 175

requirements from time to time.

BY MR. KEARNEY:

Q.   I mean, the requirements are set forth in the permit; correct?

MR. RUMELT:  Object to form.

THE WITNESS:  As I said, I don't make -- I can't make the legal opinion on whether -- the relationship between guidelines and the requirements of the permit.

MR. KEARNEY:  So I am going to mark an exhibit.

Is this 18?

COURT REPORTER:  It's 17.

MR. KEARNEY:  17.  I thought it was 18.

EXHIBIT NO. 17:  Excerpt of the 2024 Connecticut Stormwater Quality Manual with the Publication Date of September 30, 2023 and Latest Revision Date of March 26, 2024.

BY MR. KEARNEY:

Q.   I will state for the record that this is an excerpt, because it is a very large document, but this is an excerpt of the 2024 Connecticut Stormwater Quality Manual that we were just discussing a moment ago when we were talking

Page 198

MR. RUMELT:  Object.  Object to form.

THE WITNESS:  It was a hybrid storm.
That is where the name originated.

BY MR. KEARNEY:

Q.   All right.  I want to talk about
the General Permit and its discussion of best
management practices and best industry practices.
Are you familiar with the language in the General
Permit that discusses those terms?

A.   Not something I looked at in
detail.

MR. RUMELT:  And, Ryan, again, to the
extent you are going to be questioning Dr. Nairn
about the content of the permit and the meaning of
the permit, I would like a standing objection, that
is, object to the extent it calls for a legal
opinion about what the permit requires or does not
require.

And, further, I would object to the
scope of the questions as being outside the scope
of Dr. Nairn's report.

BY MR. KEARNEY:

Q.   In the context of best industry
practices, what do you believe is the relevant
industry to look to when assessing what practices

Page 199

should be implemented at a bulk fuel storage facility?

MR. RUMELT:  So, Ryan, just again, the standing objection, and you didn't confirm on the record whether you would accept the standing objection.

MR. KEARNEY:  Sure.  Let's have a party.

[Court Reporter intervenes for clarification.]

MR. KEARNEY:  Sure.

MR. RUMELT:  Sure, yes, you'll accept the standing objection?

MR. KEARNEY:  Yes.

MR. RUMELT:  Okay.

THE WITNESS:  In the context of the opinions that I have offered, which relate to the inability of the containment areas to serve their function under a hundred-year storm surge, the relevant guidance is the guidance that I have referenced in my report.

BY MR. KEARNEY:

Q.   And what is that?

A.   The ASCE 24, in particular, FEMA 2007 are probably the main ones.  Then the American

Robert Nairn , Ph.D.                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 200

Society of Floodplain Managers.

Q.    In preparing your opinions in this case, did you review any SWPPPs or SPCCs for other industrial facilities in the State of Connecticut whatsoever?

MR. RUMELT:  Object to form, and also object to the extent it is outside the scope of Dr. Nairn's report and what he was asked to do.

THE WITNESS:  As we went through in the beginning of my report, that was not part of my scope.

BY MR. KEARNEY:

Q.    Do you have any evidence that any other private sector bulk fuel storage facility is actually looking at a 500-year return period storm event in conducting its risk assessment operations?

MR. RUMELT:  The same objection.

THE WITNESS:  I can think of two.

BY MR. KEARNEY:

Q.    What are those?

A.    Well, I'm not sure the second is bulk storage, but the first is the Venture Global site on the Mississippi River, the Plaquemines site that I referred to.

Q.    But my question was regarding the

Page 205

that, yeah.

A.    Yes.

Q.    Do you believe it is a violation of any requirement if the terminal would be flooded in any way?

MR. RUMELT:  Object to form, and object to the extent it calls for Dr. Nairn to offer a legal opinion, and object to the extent it is beyond the scope of his expert report and opinions he includes in his report.

THE WITNESS:  I can't opine on whether it is a violation or not.  I can only opine on what happens in the conditions that I looked at.

BY MR. KEARNEY:

Q.    So the mere fact of a flood at a terminal is not a violation of any regulatory requirement that you are aware of?

MR. RUMELT:  Object to form, and object to the extent it calls for Dr. Nairn to offer a legal opinion and is beyond the scope of the opinions that he has offered in his report.

THE WITNESS:  Yeah, I guess I can't offer that in terms of -- I guess you used the word "violation" again, I believe, in that question, and that requires me to provide a legal opinion.

Page 215

Q.   Okay.  Do you have any reason to believe that the words "storm surge" are referenced anywhere in the permit, the SPCC or the SWPPP?

A.   I am not aware one way or the other.

Q.   Do you have any reason to dispute my representation to you that those words do not appear in any of those documents?

A.   Not without sitting here and searching the word.

Q.   Okay.  I am going to go to the next exhibit, and this should be 18, I believe, Nairn Exhibit 18.

EXHIBIT NO. 18:  CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan dated March 2011.

BY MR. KEARNEY:

Q.   I'll represent for the record that this is the CT DEEP Guidance Document for Preparing a Stormwater Pollution Prevention Plan dated March 2011.

I'll wait for you to get a copy, Dr. Nairn.

And let me just first ask you,

Page 216

Dr. Nairn, have you ever seen this document before?

A.   Not recently.  I can't say whether I have looked through this one or not.

Q.   Okay.  So you are not sure one way or the other whether you have reviewed this document before today?

A.   Correct.

Q.   Okay.

A.   I think I might have, now as I go through it, but it has been awhile.

Q.   So if you could turn to page 2. And these are double-sided, so it is just the reverse page of the front page there.  And if you look down to the third paragraph, it reads:

"This guidance document outlines the major elements required in a Plan and provides templates for certain elements of the Plan."

Did I read that correctly?

A.   Yes.

Q.   And the document further up towards the top states that:

"[The] guidance document [was] prepared by the Department of Environmental Protection [...] to

Page 217

assist you in complying with the

requirements of the General Permit

[...]"

Did I read that correctly?

A.   Yes, you did.

MR. RUMELT:  I'll just note that, Ryan,

you did not complete the sentence.

BY MR. KEARNEY:

Q.   Sure, and I will clear that up in

my next question.

So you see in this document it makes

reference to a General Permit that was effective in

2011; correct?

A.   Yes.

Q.   I'll represent to you that there

has been no revision of this document in the time

since 2011, and do you have any reason to dispute

that representation to you?

MR. RUMELT:  Ryan, just for clarity,

are you talking about Exhibit 18 or the permit --

MR. KEARNEY:  18, the Guidance Document

for Preparing a Stormwater Pollution Prevention

Plan.

MR. RUMELT:  Okay.

BY MR. KEARNEY:

Robert Nairn , Ph.D.                     August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 218

Q.   In other words, do you have any reason to believe that this 2011 Guidance Document is not still the most recent Guidance Document from CT DEEP on this issue?

A.   I don't know one way or the other.

Q.   Okay.  If you can flip to page 15, and you see up at the top where it says "Stormwater Control Measures"?

A.   Yes.

Q.   Okay.  This Guidance Document provides some specific guidance on what is --

A.   Oh, wait.  Where are you reading from?

Q.   This is not quote.

A.   Oh.

Q.   Yeah, so -- but do you have any reason to dispute that this Guidance Document provides some guidance on what is meant by the terms "control measures" and "best management practices" as those terms are seen in the permit itself?

MR. RUMELT:  Objection.  The document speaks for itself, and in addition, object to the extent your question calls for Dr. Nairn to give a legal opinion.

Robert Nairn , Ph.D.                                    August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 219

THE WITNESS:  I would have to take another look at this to see whether your characterization is correct or not.

BY MR. KEARNEY:

Q.   So you see right under that header at the top of the page, it says:

"Control measures are the best management practices (BMPs) or other structural or non-structural practices that are used to prevent or minimize the discharge of pollutants in stormwater."

Did I read that correctly?

A.   Yes.

Q.   And is this document explaining what those terms mean in the permit itself?

MR. RUMELT:  Objection.  Dr. Nairn has already said that he would need to review this document to answer questions about it.

THE WITNESS:  Yeah, I haven't seen this document in awhile, and you are asking me to relate it to the permit, what the permit says.  I would have to look at both and spend some time with them to answer that question properly.

BY MR. KEARNEY:

Page 221

site-specific?

MR. RUMELT:  Object to the extent it calls for a legal opinion and is beyond the scope of Dr. Nairn's report.

THE WITNESS:  Yeah, I don't think I have looked at any of these specifically, these bullet points.  It is outside my scope.

BY MR. KEARNEY:

Q.  Yeah, I am getting to the point here.  If you flip then to page 18.  And by the way, in the preceding pages you will see, right, these are the control measures.  The 13 control measures that are outlined in the permit are shown here, and then there is some text about those control measures; is that fair to say?

A.  Well, gee, I don't know.

MR. RUMELT:  Well, I'll just object to the extent the document and the permit, whichever permit you are referencing, speaks for themselves.

BY MR. KEARNEY:

Q.  So just to make that clearer, on page 15 there is that header that says "Control Measure Elements", and then there are a number of sections that follow that have these bolded headers; correct?

Page 222

A.    That is what the report has, yes.

Q.    I can show you in the permit if you like, but I'll represent to you that these headers are the control measures that are specified in the permit.  The same words show up in the permit as are shown here.

MR. RUMELT:  Object to the extent you are indicating what you believe the permit requires or does not require as far as best management practices, and also the documents speak for themselves.

THE WITNESS:  You'll have to repeat the question.

BY MR. KEARNEY:

Q.    Give me a moment, please.

All right, you still have the permit in front of you, right?  I just want to show you why this comparison is being drawn.

So if you could pull up the permit, which I think was 12, right.

Oh, no, it is number -- yeah, it is number 12, Exhibit 12, the 2021 permit.

And if you go to page 23, which is at the bottom of the document.

MR. RUMELT:  Ryan, you are at what page

Page 223

of -- was it Exhibit 12?

MR. KEARNEY:  Yeah, page 23.

MR. RUMELT:  Okay.

BY MR. KEARNEY:

Q.   Which talks about the stormwater control measures.

Do you see below that where it starts with 7(b)(1) and continues through those pages? The first one referenced is as "Good Housekeeping".

A.   Sorry, this is page 23 of 70 on Exhibit 12?

Q.   Am I in the --

MR. RUMELT:  Ryan, I am not seeing that language in mine.

BY MR. KEARNEY:

Q.   Oh, I'm sorry, I had the wrong -- okay, it is tab -- I had a different number on my system.  I'll get the right page number for you.

Okay, so it is page 18 of 70.  My apologies.

So on page 18 of 70, do you see where it says "(b) Control Measures"?

A.   Yes.

Q.   And then there are numbered subsections below that, the first one being "Good

Page 224

Housekeeping", the second one being "Vehicle or

Equipment Washing", and so on?

          A.   Yes.

          Q.   And if you start comparing that

with the 2011, how to prepare a SWPPP guidance,

right, on page 15 the first one is "Good

Housekeeping".  If you flip to page 16, you see

"Vehicle or Equipment Washing", and so on and so

forth, right, and it tracks those control measures

that are shown in the General Permit are then

discussed in this Guidance Document.  Does that

appear to be the case?

          A.   It appears to be the case, but I

am sort of looking at it and doing this comparison

for the first time.

          Q.   Well, I want to direct your

attention to a specific one, but I just wanted to

get that point in first, right.

          So these sections in the Guidance

Document are talking -- are giving guidance as to

what these control measures that are talked about

in the permit in shorter text mean and how

permittees should approach them.  Is that fair?

          MR. RUMELT:  Object to form, and object

to the extent you are offering your own opinion

Robert Nairn , Ph.D.                                  August 13, 2025
Conservation Law Foundation, Inc. v. Shell Oil Company, et al.

Page 292

be significant changes from the old permit regime under the 2021 permit?

MR. RUMELT:  Objection, calls for speculation and calls for Dr. Nairn to offer a legal opinion, and also calls for an opinion outside the scope of his report authored in this case.

THE WITNESS:  I don't think I could really answer that question.  I would just say that, you know, "significant changes" could mean that there is other changes versus them being significant in comparison.

So who knows what it means.  I certainly don't.

BY MR. KEARNEY:

Q.   Well, we looked previously at the current permit which did not include some of the phrases like "storm surge", like "climate change", like "return period events", and to the extent that they would then be included in a new permit, would you agree that those are significant changes?

MR. RUMELT:  Objection, calls for Dr. Nairn to offer a legal opinion that is also beyond the scope of his expert report and what he has been asked to do in this case.

Page 293

THE WITNESS:  I can't answer that question.

BY MR. KEARNEY:

Q.   Why not?

A.   Because I don't -- I don't know enough about the comparison of the two permits, the meaning of "significant", whether the meaning here of "significant" is the meaning I think you are taking versus saying there are other changes that are not as significant.

So I really don't -- I can't answer that question.

Q.   Are you aware of any permit that currently exists in the State of Connecticut that requires permittees to consider storm surge events in operating their facilities?

MR. RUMELT:  Objection, calls for Dr. Nairn to render a legal opinion, including about permits that are beyond the scope of this case.

THE WITNESS:  I'm not aware one way or the other.

BY MR. KEARNEY:

Q.   Can you point to any statement from EPA or CT DEEP that would support the position