**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,<br><br>Defendants. | Case No: 3:21-cv-00933-VDO<br><br>August 25, 2026 |

**AMENDED DRAFT STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Under Local Rule Civil 56(a) and this Court's Order [ECF 989], Defendants Equilon Enterprises ("Equilon") and Triton Terminaling LLC ("Triton") (collectively, "Defendants"), respectfully submit this Amended Draft[1] Statement of Undisputed Facts.[2]

1. This case primarily concerns stormwater permit compliance at an onshore petroleum bulk storage and distribution terminal located at 481 East Shore Parkway, New Haven, Connecticut (the "Terminal"). ECF 47, Plaintiff's Amended Complaint ("Am. Compl.") at ¶ 2. Plaintiff also brings claims under the Resource Conservation and Recovery Act.

2. The Terminal consists of 21 above-ground storage tanks of various sizes located within diked containment areas. Ex. D, Bayles & Pace Report at 6. All 21 tanks are on a regular

[1] Defendants serve this Draft Statement in connection with the Court's Order requiring same. *See* ECF 989 and Judge Oliver's Pretrial Preferences.

[2] To avoid duplication, Defendants incorporate by reference the statements and supporting record citations contained in the Statements of Undisputed Facts filed by Motiva Enterprises, LLC. Further, Defendants reserve the right to file additional Statements of Undisputed Facts upon filing Defendants' Motion for Summary Judgment.

inspection and maintenance program that meets or exceeds the requirements of the American Petroleum Institute's standard 653. *Id*. at 9.

3. The Terminal is located approximately 1,500 feet from the nearest shoreline. Ex. D, Bayles & Pace Report at 19.

4. Since 2017, Triton has owned and Equilon has operated the Terminal under numerous permits including a General Permit for Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). *Id*. at ¶¶ 29-32.

5. CT DEEP has issued various General Permits for the Discharge of Stormwater Associated with Industrial Activity since October 1, 2011. Ex. A. At the time Plaintiff filed this action in July 2021, the operative stormwater permit was the 2019 General Permit (the "2019 Permit"). ECF 1-2, Exhibit A to Plaintiff's Complaint at 8.

6. The 2019 Permit expired on September 30, 2021, and was replaced in October 2021 with a new General Permit (the "2021 Permit"). The 2021 Permit was in effect from October 1, 2021 until October 31, 2025. Ex. Q, CT DEEP, 2021 Permit; Ex. R, CT DEEP, 2025 Permit.

7. Plaintiff did not submit any comments to CT DEEP and did not administratively challenge the 2019 Permit or the 2021 Permit. *See* Ex. G, S. Mahoney Dep. at 153:19-154:4. Plaintiff did not submit any comments to CT DEEP and did not administratively challenge any of the Defendants' registrations and submissions in connection with any permit. *See* Pl.'s Written Discovery Resps.

8. Defendants were also registered and covered under the 2021 Permit. After the 2021 Permit took effect, the 2019 Permit ceased to govern the terminal. *See* Ex. G, June 4, 2025

S. Mahoney Dep. at 111:21-112:6 (stating "the 2021 permit is the permit that is governing today . . ." and "there was little change" between the 2021 Permit and pervious permits); Ex. O, 2011 Permit, Ex. P, 2019 Permit, Ex. Q, 2021 Permit.

9. The 2019 Permit regulated stormwater discharges from industrial facilities engaged in certain identified activities. *See* Ex. P, 2019 Permit, at 1. The 2019 Permit imposed various regulatory restrictions on those facilities, including control measures, the creation of a SWPPP, and monitoring and recordkeeping tasks, among others. Ex. P, 2019 Permit, at 2.

10. The 2019 Permit did not expressly reference or require consideration of "climate change," "storm surge," "resiliency," "resilience," "adaption," "sea level rise," "increased precipitation," or similar terms suggesting that a permittee was required to conduct some kind of climate change risk analysis. *See generally id.* Similarly, the 2019 Permit does not expressly require a 100-year or a 500-year flood analysis, or use of secondary containment berms as flood barriers. Nor does the 2019 Permit mention sea level rise, storm surge, flooding, hurricanes, increasing frequency or severity of storm events, or other adverse weather events, let alone a purported requirement to conduct a climate change risk assessment. *See* Ex. P, 2019 Permit.

11. The 2019 Permit imposed obligations, including "Control Measures" such as the creation of a Stormwater Pollution Prevention Plan ("SWPPP"). *Id.* at 17-71. The purpose of the SWPPP is to describe the necessary control measures at the Terminal to reduce the stormwater runoff pollutants discharged into the environment. *See id.* at 22-29

12. Section 5(b) of the 2019 Permit defines "Control Measures" as "best management practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility; and defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically

practicable and achievable in light of best industry practice," and sets forth 13 explicit BMPs. *Id*. at 17-22. For example, BMPs in the 2019 Permit include "good housekeeping" requiring permittees to "maintain a clean, orderly facility (e.g. sweeping at regular intervals, appropriate storage practices, proper garbage and waste management, dust control measures, etc.) in all areas that are exposed to rainfall and are potential sources of pollutants," "vehicle or equipment washing" requiring permittees to "provide, at a minimum, that no washing or rinsing of equipment, buildings or vehicles shall be allowed at the site which would allow wash or rinse waters to enter any storm drainage system or surface waters of the State without a permit. . . ", and "sediment and erosion control," requiring permittees to "ensure that all employees whose activities may affect stormwater quality receive training within ninety (90) days of employment and at least once a year thereafter to make them familiar with the components and goals of these control measures and the Plan. Training shall address topics such as emergency equipment location, spill response management, control measures, inspection requirements, good housekeeping and materials management practices . . . ." *Id.*

13. Section 5(e)(1)(B)(v) of the 2019 Permit provides a procedure for addressing exceedances at the Terminal if the exceedance of a benchmark is attributable to the presence of a pollutant in the natural background or in "run-on" entering from "off-site." *Id*. at 34.

14. Defendants prepared SWPPPs for the Terminal with the assistance of Triton Environmental Inc. ("Triton Environmental"). Ex. S, SWPPP.

15. Triton Environmental is an environmental and engineering services consulting company. Ex. M. Triton Environmental has provided stormwater management and other environmental consulting services to various Connecticut regulated entities, including at coastal bulk fuel oil terminals such as the Pike terminal in New Haven. Ex. V, *Conservation Law*

*Foundation, Inc. v. Pike Fuels Limited Partnership*, No. 21-cv-00932 (D. Conn) ECF 356-8 at 2-4. Triton Environmental's services include the preparation of SWPPPs and it employs individuals who can certify SWPPPs for its clients. Ex. K, Simonetta Dep. at 18:8-11, 135:10-23.

16. As of 2023, Triton had developed approximately one hundred SWPPPs in Connecticut and advised companies about how to comply with the 2019 Permit. Ex. K, Simonetta Dep. at 135:17-23. Triton did not understand the 2019 Permit to require consideration of climate change. Ex. K, Simonetta Dep. at 136:8-140:3.

17. Triton Environmental had previously communicated with CT DEEP, and in those conversations, CT DEEP never indicated that the 2019 Permit required consideration of climate change. Ex. K, Simonetta Dep. at 139:4-13.

18. Defendants disclosed a number of expert witnesses in this case, three of whom are certified professional engineers ("P.E.")—Russell Parkman, Renee Bourdeau, and Thomas Battles. Specifically, Mr. Parkman and Mr. Battles are P.E.s, licensed in the State of Connecticut.

19. Defendants' Connecticut P.E.s experts are the only disclosed experts in this case for either party to have prepared and certified SWPPPs under the 2019 Permit. Ex. J, Parkman Report at 73; Ex. W, Battles Report at 1.

20. Defendants' expert witnesses testified similarly to Triton Environmental—based on their experience with stormwater permits, the 2019 Permit did not require permittees to consider climate change and implement changes at the Terminal as a result. Ex. J, Parkman Report at 16, 56; Ex. J, Parkman Dep. at 62:3-19; Ex. T, Bourdeau Report at 2-4. Ex. W, Battles Report at 5-6.

21. For example, Ms. Bourdeau's opinions were derived (in part) through her direct communications with CT DEEP regarding the issues in this matter. Ex. X, Bourdeau Dep. 2023 at 23:24-24:7.

22. In 2022 and 2023, P.E. Renee Bourdeau spoke to CT DEEP environmental analyst, Karen Abbott. Ms. Abbot informed Ms. Bourdeau that over the approximately 15 years that she worked for CT DEEP, she was not aware of any SWPPP containing language regarding, or of any permittees considering, the impacts of climate change in the SWPPPs. Ex. X, Bourdeau Dep. 2023 at 23:24-24:7. Ms. Abbott also indicated that she had never prepared a Notice of Violation for any permittees for failure to contain language with respect to climate change in their SWPPPs. Ex. X, Bourdeau Dep. 2023 at 24:8-13.

23. The United States Environmental Protection Agency ("EPA") also issues a Multi-Sector General Permit ("MSGP") for Stormwater Discharges from Industrial Activities that serves as the general permit for jurisdictions that do not issue their own permits under the CWA National Pollutant Discharge Elimination System ("NPDES") program. *See* EPA, Stormwater Discharges from Industrial Activities, *available at* https://www.epa.gov/npdes/stormwater-discharges-industrial-activities.

24. During the notice and comment period for EPA's most recent MSGP in 2021, Plaintiff submitted comments to EPA, including comments on the draft MSGP's "climate change" measures, which, like the requirements in CT DEEP's 2025 Permit, require permittees to consider implementing measures to minimize impacts from major storm events. Ex. Y, EPA, MSGP. Plaintiff claimed that the new requirements constituted "prohibited backsliding" because they supposedly narrowed the scope of the 2015 MSGP—arguing that the 2015 MSGP already

required consideration of such factors. Ex. Z, 2021 EPA MSGP Response to Comments at 397-398.

25. EPA confirmed that the "requirement that operators consider implementing mitigation measures to minimize impacts from major storm events" was "a **new**. . .condition over the previous permit. . . ." *See* Ex. AA, EPA Response to Cmts. (Jan. 15, 2021), at 397-98. (emphasis added). EPA further stated that "[t]he 2021 MSGP includes this provision. . . **for the first time as the 2015 MSGP did not include a similar provision**." *Id*. (emphasis added).

26. Other states have recently updated or are updating their NPDES permits to require some consideration of climate change, but these do not apply to the Terminal. Ex. J, Parkman Report at 16-19**.** For example, the 2023 NY MSGP expressly states that climate change must be considered when designing best management practices to minimize pollutant discharges. Ex. J, Parkman Report at 28**.** As another example, Rhode Island's 2019 MSGP had no provisions addressing "major storm events," but the 2024 version now does. *Compare* Ex. BB, RIDEM 2019 *with* Ex. CC, RIDEM 2024 at 17-18, Appendix E. Additionally, the Los Angeles Region of the California Regional Water Quality Control Board's 2024 individual NPDES permits include clear requirements for preparing site-specific climate action plans whereas previous ones did not. Ex. J, Parkman Report at 28, 34-35**.**

27. On October 1, 2025, CT DEEP issued a new General Permit to update and replace the 2019 Permit. The 2025 Permit became effective on November 1, 2025. Ex. R, 2025 Permit. Regulated entities had 180 days to bring their facilities into compliance with the new permit's requirements. *See* CT DEEP, Industrial Stormwater General Permit, https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/commercial-stormwater.

28. On March 11, 2024, in its draft of the new General Permit, CT DEEP described what it referred to as "significant changes" to the 2019 Permit and invited public comment. *See* Ex. EE, November 2024 Fact Sheet at 5. The 2021 Permit was set to expire on September 30, 2024, but the permit was administratively continued until the new 2025 Permit went into effect. Ex. R, 2025 Permit.

29. Following publication of the draft permit in 2024, Plaintiff submitted comments to CT DEEP. On May 10, 2024, Plaintiff submitted written comments to CT DEEP stating that "[t]he increase in the minimum acceptable volume requirement for secondary containment areas is a positive change that should remain in the 2025 Permit, and the Undersigned appreciate DEEP's acknowledgement that the minimum volume requirement in the Current Permit is insufficient to guarantee that no overtopping will occur during extreme storm events." Ex. DD, Pl.'s Cmts. at 11.

30. Plaintiff also proposed "additional changes to the new permit to further protect Connecticut's waters and members of the public" in its comments, which CT DEEP considered and did not adopt in the 2025 Permit. Ex. DD, Pl.'s Cmts. at 13-18; Ex. R, 2025 Permit. For example, Plaintiff requested that CT DEEP require the use of precipitation data to design SWPPPs and stormwater control measures to specifically account for "climate change," recognizing that CT DEEP's draft permit did not require that. Ex. GG, CLF Comments to CT DEEP re: Draft Permit at 514-15. Plaintiff also specifically requested that CT DEEP require consideration of retreat of facilities entirely from the coastline. *Id.* at 15-16. Plaintiff requested the enlargement of the secondary containment areas surrounding storage areas, tanks, and containers. *Id.* at 15.

31. CT DEEP reissued the draft permit on December 30, 2024 without making any of Plaintiff's suggested changes. *See* Ex. B, CT DEEP, Draft General Permit for the Discharge of Stormwater Associated with Industrial Activities. The notice and comment period lasted from May 13 to May 20, 2025. *See* Ex. F, CT DEEP, Public Notice, General Permit for the Discharge of Stormwater Associated with Industrial Activities, https://portal.ct.gov/deep/public-notices/public-notices-proposed-actions---opportunity-for-comment/proposed-general-permits/proposed-general-permits-archive---pre-2025/general-permit-for-the-discharge-of-stormwater-assoc-with-industrial-activities.

32. In accordance with the new requirements of the 2025 Permit, permittees were required to submit a SWPPP to CT DEEP by April 1, 2026. Ex. R, 2025 Permit at 5.

33. The 2025 Permit for the first time requires that permittees consider "Resilience Measures" that CT DEEP characterizes as a "**new** component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes." *See e.g.*, Ex. R, 2025 Permit, at 39-40; Ex. EE, November 2024 Fact Sheet at 12; Ex. HH, December 2024 Supplemental Fact at 3; Ex. FF, March 2024 Fact Sheet at 10; Ex. II, April 2024 Supplemental Fact Sheet at 3. (emphasis added).

34. The new "Resilience Measures" provisions in the 2025 Permit require permittees to consider prevention and mitigation measures to account for "hurricanes, storm surge, extreme/heavy precipitation, and flood events." *See* Ex. R, 2025 Permit at 39-40.

35. CLF acknowledged that CT DEEP's guidance states the "Resilience Measures" are a "new component of the SWPPP," and that "DEEP believes [the climate resilience factors are] a new component." Ex. G, June 4, 2025 Mahoney Dep. ("CLF Dep.") at 175: 12-20 and 175:21-176:1.

36. The 2025 Permit states that if a particular facility already has such measures in place "due to existing requirements mandated by other state, local or federal agencies," then the permittees should document this in their updated SWPPP. *See* Ex. R, 2025 Permit at 39-40.

37. Neither the 2019 Permit nor the 2025 Permit requires secondary containment berms to serve as flood protection barriers. Ex. P, Permit; Ex. R, 2025 Permit.

38. The 2025 Permit incorporates by reference the 2024 Stormwater Quality Manual's ("SQM") "structural control measures [to] help improve the resiliency of industrial facilities to climate stressors, including changing precipitation patterns and extreme weather events." *See* Ex. R, 2025 Permit Fact Sheet (dated October 2025) at 13.

39. The 2025 Permit emphasizes structural control measures from the updated SQM to improve resilience, but the Manual does not mandate any specific responses to any projected sea level rise. *See* Ex. U, 2024 Connecticut SQM at 52 and 555. The SQM was not in effect before 2023 and was not incorporated into the 2019 Permit.

40. The 2004 SQM is the prior version of the 2024 SQM, and it did not require any consideration of climate change in connection with its guidance. Ex. JJ, 2004 SQM.

41. The 2024 SQM has an Appendix G – Climate Change Considerations. Table G-1 includes Connecticut's Design Storm Precipitation Approach. *See* Ex. U, 2024 Connecticut SQM at 548.

42. As part of its Resilience Measures, the 2025 Permit states, "If the facility may be exposed to or has previously experienced such major storm events, additional SCMs that may be considered include, but are not limited to" various enumerated measures that should be considered. *See* Ex. R, 2025 Permit at 39-40.

43. One of these Resilience Measures is: "The permittee must document in their SWPPP the considerations made to select and design control measures [with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events] at their facility to minimize pollutants discharged via stormwater." *Id.* at 40.

44. The 2025 Permit also requires that "The SWPPP must be representative of current site conditions and must address, at a minimum the following elements . . . ." Ex. R, 2025 Permit Fact Sheet Section 7.6.

45. In accordance with the 2025 Permit requirements, Defendants submitted their new SWPPP which includes a "Resiliency Measures" section. *See* Ex. KK, 2026 SWPPP at 46-54.

46. Plaintiff did not submit any comments or administratively challenge Defendants' 2025 Permit submission.

47. Not a single weather event or storm during the period of the Permits has damaged the Terminal. Ex. L, Feb. 6, 2025 M. Sullivan Dep. at 322:20-323:12. Nor has Plaintiff identified any weather event or storm that has caused an improper discharge under the CWA.

48. Neither Plaintiff nor its experts have presented evidence that the Terminal tanks are likely to fail under any particular weather event or identified a mechanism of failure. Indeed, Defendants' experts have shown that due to their ballasting practices (in accordance with EPA BMPs), no tank at the Terminal will fail even if Plaintiff's hypothetical weather events occur. Ex. D, Bayles & Pace Report at 3, 12, 16; Ex. E, Jones Report at 6 stating ("The New Haven Terminal's application of tank ballasting, consistent with EPA (2016) guidance and operational standards, effectively mitigates failure risk during coastal flood events and supports compliance with accepted engineering practice and environmental protection objectives."); Ex. LL, EPA's Region 6 RRT (2016).

49. In an effort to rebut Plaintiff's chief complaints that Terminal has failed to account for certain factors related to "climate change," Defendants retained expert witness, Craig Jones, Ph.D., a coastal, ocean, and environmental engineer. Ex. E, Jones Report at Appendix A.

50. Dr. Jones modeled several storms, to determine whether potential flooding at the Terminal would overtop the berms, which are at or above 12 feet from the relative datum. During previous storms, including the 2022 Nor'easter, Hurricane Irene, and Hurricane Sandy, the water levels at the Terminal were well below the 12-foot berm height. Ex. E, Jones Report at 43.

51. Dr. Jones modeled a hypothetical 100-year storm, again, the potential flooding levels at the Terminal did not surpass the 12-foot berm height. Ex. E, Jones Report at 58-60. This means potential flooding at the Terminal would not reach the tanks, and therefore, would be unable to have any physical force on the tanks. Ex. E, Jones Report at 60.

52. CLF's expert, Robert Nairn, agreed with this assessment when he also modeled a hypothetical 100-year storm, finding "peak water levels" at the Terminal would be below the height of the berms that surround the tanks at the Terminal. Ex. MM. Narin at 42.

53. Regardless of these models, the 2019 Permit had no specifically identified requirements regarding flood preparedness. *See generally* Ex. P, 2019 Permit.

54. Because the term "climate change" is not included in the 2019 Permit, Plaintiff contends that the 2019 Permit *implied* a requirement to consider "climate change" in the general requirement that the Terminal implement best management practices that are "technologically available and economically practicable and achievable in light of best industry practice." *See* Ex. G, June 4, 2025 S. Mahoney Dep. at 136:7-21, 140:14-141:14, 148:10-149:25, 176:2-15, 189:21-190:8.

55. Both Defendants' expert and Plaintiff's expert models show that berms at or above 12 feet are sufficient to address any risks posed by the effects of "climate change." Ex. E, Jones Report at 43, 60; Ex. MM. Nairn at 42.

56. A party intending to file a citizen suit under the CWA must specify in its Notice of Intent to Sue ("NOI") the "specific standard, limitation or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. at § 135(a).

57. On July 28, 2020, CLF served an NOI on Defendants. ECF 47-1, Exhibit A to Am. Compl. Plaintiff has twice supplemented its NOI without asserting any new claims, first on February 17, 2021, and again on November 21, 2024. ECF 47-2, Ex. B to Am. Compl.; Ex. M, 2d Supp. NOI.

58. These three substantively identical NOIs identified only 11 discrete alleged violations of the CWA, which are as follows: (i) Failure to Eliminate Non-Stormwater Discharges; (ii) Activity Inconsistent with the Coastal Management Act and Causing Adverse Impacts to Coastal Resources; (iii); Unlawful Certification; (iv) Failure to Identify Sources of Pollution Reasonably Expected to Affect the Quality of Stormwater Discharges; (v) Failure to Describe and Implement Practices to Reduce Pollutants and Assure Permit Compliance; (vi) Failure to Implement Measures to Manage Runoff; (vii) Failure to Minimize the Potential for Leaks and Spills; (viii) Failure to Submit Required Facts or Information to CT DEEP; (ix) Failure to Amend or Update the SWPPP; (x) Failure to Identify Discharges to Impaired Waters in SWPPP; (xi) Failure to Conduct Monitoring for Discharges to Impaired Waters. ECF 47-1, Ex. A to Am. Compl. at 9-13; ECF 47-2, Ex. B to Am. Compl. at 9-14; Ex. M, 2d Supp. NOI at 9-14.

59. The only claims properly in the case are those in the NOI. The NOI does not allege permit violations based on:

a. Inadequate capacity of secondary containment
b. Permeability of secondary containment areas
c. Low points in secondary containment areas
d. Structural integrity of secondary containment berms
e. Wave attacks on secondary containment berms
f. Bare soil on secondary containment berms
g. Failure to report on secondary containment deficiencies
h. Groundwater infiltration
i. Stormwater pond liner
j. Insufficient stormwater treatment basin
k. Emergency vehicle access for ingress and egress
l. Failure to implement a corrective action plan
m. Failure to apply best industry practice in Defendants' Risk Management Program, or
n. Tank spacing.

ECF 47-1, Ex. A to Am. Compl. at 9-13; ECF 47-2, Ex. B to Am. Compl. at 9-14; Ex. M, 2d Supp. NOI at 9-14.

60. In their Expert Reports and in deposition, Plaintiff's experts asserted various opinions that went beyond the violations Plaintiff alleged in its NOIs, including based on the areas listed above in Paragraph 63. As Defendants have explained, these opinions are inadmissible. *See* ECF 734-1 at 20-24; ECF 743-1 at 31-34; ECF 744-1 at 7-11.

61. Plaintiff also served NOIs against other entities operating bulk storage facilities in New Haven at the same time. *See* Ex. V, ECF 1-2, *Conservation Law Found. v. Pike Fuels Ltd. Pship*, No. 3:21-cv-00932-SVN (D. Conn.) ("Gulf NOI"); *see also*, Ex. OO, Buckeye NOI.

62. Unlike Plaintiff's NOIs to Defendants, Plaintiff's NOIs to Gulf and Buckeye included alleged CWA permit violations for (1) "Illegal Infiltration of Stormwater"; and (2) "failure to maintain an impervious containment area." *See* Gulf NOI at 13; Ex. OO, Buckeye NOI at 14.

63. In this case, Plaintiff's NOIs were the only notice provided to EPA and CT DEEP of the alleged violations. Ex. G, Mahoney Dep. at 51:23-52:3 and 93:14-94:2.

64. Plaintiff's NOIs contained "the basis for all of the claims that CLF brought in the complaint." *Id*. at 46:22-47:2.

65. The Terminal's SWPPP outlines procedures for preventing stormwater discharges, including detailed descriptions of site inspections, Control Measures, and monitoring protocols. The SWPPP emphasizes routine inspections, good housekeeping, spill response, and the implementation of structural and non-structural Control Measures to ensure environmental compliance and effective stormwater management. Ex. S, SWPPP (July 10, 2017).

66. The Terminal's Spill Prevention, Control, and Countermeasure ("SPCC") Plan details the procedures for spill prevention, response, and regulatory compliance. It also includes facility operations, storage capacities, and security measures, emphasizing personnel training, inspections, and preventive documentation to minimize oil discharge risks. Ex. PP, SPCC Plan (rev. March 2024).

67. The Terminal's Emergency Response Action Plan ("ERAP"), revised in June 2024, outlines detailed procedures for managing various incidents such as natural disasters, medical emergencies, chemical releases, and spill containment, for a comprehensive emergency response. Ex. RR, ERAP (rev. June 2024).

68. The Terminal's Facility Response Plan ("FRP") is designed to help personnel prepare for and respond efficiently and effectively to incidents at the Terminal, ensuring compliance with federal, state, and local regulatory requirements and maintaining consistency with the National Contingency Plan and Area Contingency Plans. Ex. QQ, FRP (rev. June 2024).

69. The Terminal adopted its Business Continuity and Storm Action Plan ("BCP"), which details procedures for various operational disruptions and defining roles, responsibilities, and communication protocols. It also outlines phased steps for storm identification, Terminal shutdown, staff evacuation, employee communications, Terminal assessment and start-up, post-hurricane operations, and public relations. Ex. SS, BCP (rev. Dec. 2024).

70. The Terminal's Risk Management Plan ("RMP") was prepared in accordance with the EPA's Accidental Release Prevention Provisions (40 C.F.R. Part 68). The RMP identifies potential accidental hazardous substance release scenarios and evaluates the potential impacts on public health and the environment. The RMP also includes safety measures and maintenance, monitoring, and employee training to prevent accidental releases. Ex. TT, RMP.

71. The Terminal does not discharge directly into an impaired waterbody. *See* Ex. L, Feb. 6, 2025 M. Sullivan Dep. at Ex.at 32:2-11 (the Terminal discharges into the storm system, not directly into an impaired waterway); Ex. K, Simonetta Dep. at 98:9-14.

72. Paul Simonetta, a professional engineer licensed in the State of Connecticut, testified that CT DEEP has confirmed that unless specifically notified by CT DEEP, a permittee discharging to an MS4 is not covered by the impaired water monitoring requirements. *See* Ex. K, Simonetta Dep. at 96:10–99:13.

73. Neither CT DEEP nor EPA has ever stated that "best management practices" or "best industry practice" under the 2019 Permit required a climate change or resilience assessment for any Connecticut Terminal. Ex. G, Mahoney Dep. at 270:6-24; Ex. X, Bourdeau Dep. 2023 at 23:24-24:13; Ex. P, 2019 Permit; Ex. Q, 2021 Permit; EPA, National Menu of Best Management Practices BMPs) for Stormwater, https://www.epa.gov/npdes/national-menu-best-management-practices-bmps-stormwater.

74. Plaintiff has never asked CT DEEP for its interpretation of the "best management practices" or "best industry practices" language, nor has Plaintiff found any CT SWPPPs that support its interpretation of that language. Ex. G, Mahoney Dep. At 144:5-14 and 228:25-229:16.

75. Neither Plaintiff nor its experts has never performed any independent industry research to support its interpretation of the 2019 Permit. There is no evidence that any company in the petroleum bulk storage industry (or any other industry) considered "climate change" in developing a SWPPP under the 2019 Permit or modified its facility based on any climate resiliency analysis. *See* Ex. G, June 4, 2025 Mahoney Dep. at 187:13-22.

76. Plaintiff has never conducted a review of SWPPPs for facilities along the coast of Connecticut to review how those facilities analyze the impacts of climate change. *See* Ex. G, June 4, 2025 Mahoney Dep. at 239:19-240:2.

77. None of the SWPPPs that CLF collected from Connecticut Facilities or from CT DEEP pertaining to the 2019 Permit contain climate change or resilience assessments. *See* Ex. G, June 4, 2025 Mahoney Dep. at 190:21-192:8.

78. CT DEEP has never treated failure to plan for sea level rise in a SWPPP as a violation of the 2019 Permit. *Id*. at 200:19-25

79. CT DEEP has taken no enforcement action for failure to conduct a climate change vulnerability assessment and has not cited any permittee for alleged climate-based stormwater violations under the 2019 Permit. Ex. I, Goldsmith Dep. at 116:3–16.

80. Plaintiff has no evidence that any SWPPP in Connecticut has ever included a climate change risk assessment. *See* Ex. G, Mahoney Dep. at 187:13-188:15 and 215:7-21; Ex. I, Goldsmith Dep. at 55:16–24 and 55:22-56:3.

81. Publicly available Connecticut SWPPPs under the 2011, 2019, and 2021 Permit do not document climate change, storm surge, sea level rise, or extreme precipitation analyses, and CT DEEP is not aware of any such SWPPPs or related enforcement. Ex. T, Bourdeau Report*,* at 4; Ex. X, Bourdeau Dep. 2023 at 23:24-24:13.

82. Plaintiff and its experts did not conduct a survey or other analysis of bulk storage facilities' climate risk practices, and they are unaware of any objective standard requiring climate considerations in facility stormwater operations. *See, e.g.,* Ex. G, Mahoney Dep. 228:25-229:16; Ex. I, Goldsmith Dep. at 235:19-236:3; 236:19-237:24; 238:6-19; Ex. C, Horner Dep. at 206:9-207:5.

83. Plaintiff cannot identify a single SWPPP under the 2019 Permit that would meet the climate-related permit terms it seeks to enforce. Ex. G, Mahoney Dep. at 188:7-15; *see also* See Ex. UU, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 1-9.

84. The adjacent Pike terminal, also did not consider climate change in its SWPPP. Ex. V, *Conservation Law Foundation, Inc. v. Pike Fuels Limited Partnership*, No. 21-cv-00932 (D. Conn) (ECF 356-2).

85. One of the experts in the *Pike* case prepared dozens of Connecticut SWPPPs under the permit and had never included "consideration of climate change factors." *See* Ex. ZZ, Dep. of C. Escedy at 46:18-47:21; 126:15-129:12, *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.,* No. 3:21-cv-00932-SVN (D. Conn.); Ex. VV, Escedy Report at 2, 4-7*, Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.,* No. 3:21-cv-00932-SVN (D. Conn.).

86. Plaintiff admitted that neither EPA nor CT DEEP, to Plaintiff's knowledge, has stated Defendants violated the 2019 Permit. Ex. G, Mahoney Dep. at 268:4-269:14.

87. In December 2022, two inspectors from the EPA inspected the Terminal and confirmed it complies with the SPCC regulations and the CWA. Ex. WW, U.S. EPA SPCC Field Inspection and Pan Review Checklist – SOPUS_NHVN00527912.

88. During the term of the permits, the Terminal has not exceeded its water quality benchmark thresholds. *See* Ex. J, Parkman Report, at 46.

89. Although CLF's expert Wendi Goldsmith took samples and tested a stormwater outflow from the Gulf facility in the Port of New Haven in the *Pike* litigation, she did not take any samples or conduct any testing at the Defendants' Terminal. Ex. I, Goldsmith Dep. at 37:7-21; Ex. H, *Pike* Goldsmith Dep. at 27:9-14, 34:14-25 *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.,* No. 3:21-cv-00932-SVN (D. Conn.).

90. Plaintiff and several of its experts conducted three site visits to the Defendants' Terminal, and they did not take any samples or conduct any testing of stormwater outflows.

91. The stormwater testing conducted at the Terminal pursuant to its monitoring obligations under the 2025 Permit shows its stormwater discharges are still in compliance. Ex. XX, June 2026 Analytical Report; Ex. YY, July 15, 2026 Semi-Annual Benchmark Discharge Monitoring Report.

92. The 2019 Permit, the 2025 Permit, and the 2021 MSGP did not incorporate or adopt ASCE24-14 or ASCE24-24 or their "critical infrastructure" definitions. Ex. I, Goldsmith Dep. at 166:15-167:4; 167:4-9.

93. There is no evidence that Defendants are in any continuing violation of the CWA. *See* EPA, Detailed Facility Report, https://echo.epa.gov/detailed-facility-report?fid=110000491977.

94. CT DEEP has not issued a Notice of Violation to the Terminal during the term of the 2019, 2021, or 2025 Permits. *See* EPA, Detailed Facility Report, https://echo.epa.gov/detailed-facility-report?fid=110000491977.

95. CT DEEP conducts training, notices, workshops, and hundreds of inspections per year. *See, e.g.,* CT DEEP, Professional Development Workshops, https://portal.ct.gov/deep/education/environmental-education-workshops; CT DEEP, Industrial Wastewater Compliance Assistance, https://portal.ct.gov/deep/water-regulating-and-discharges/industrial-wastewater/compliance-assistance/what-to-expect-from-an-inspection.

96. The University of Connecticut's CIRCA program Sea Level Rise and Storm Surge Viewer shows that under various scenarios the Terminal is not at risk during any of the modelled storms on the site. *See* Ex. NN, Nairn Dep. Ex. at 19, 20; Ex. N, O'Donnell Dep. at 112:24-118:3; Ex. N, O'Donnell Dep. Ex. 11.

97. CIRCA published an article in a peer review journal called Coastal Engineering in June of 2021 that showed modeling for extreme storms in Connecticut that included the New Haven Harbor. The article showed no impact on the Terminal using the model they used. *See* Liu, et al., "Modeling nearshore dynamics of extreme storms in complex environments of Connecticut," *Coastal Eng'g* (Sept. 2021). CLF's expert James O'Donnell, Ph.D. is a co-author of the article.

98. There is no evidence of any alleged RCRA violation related to the Terminal. *See* 42 U.S.C. § 6903; 42 U.S.C. § 6972(a)(1)(B). Product placed into storage is not waste. *See* 40 C.F.R. § 261.2 (defining "solid waste" as "any discarded material . . . "); EPA Frequent Questions Related to Hazardous Waste Recycling, the Definition of Solid Waste and Other Exemptions and Exclusions ("Under RCRA, unused products do not become 'waste' until they

become 'discarded material.' EPA believes that an unused product becomes 'discarded' when an intent to discard the material is demonstrated."), *available at* https://www.epa.gov/hw/frequent-questions-related-hazardous-waste-recycling-definition-solid-waste-and-other-exemptions.

99. The product shipped to and stored at the Terminal is product that will be distributed to customers. For example, the Terminal stores gasoline, diesel fuel, biofuel, and ethanol. *See* Ex. L, Feb. 6, 2025 M. Sullivan Dep. at 12:21-13:21. The Terminal is a storage facility for these products, where they are safely stored and then distributed to customers and end users. *Id.* at 62:15-25.

100. Plaintiff has not put forward sufficient evidence showing that Defendants failed to use control measures that are technologically available and economically practicable and achievable in light of best industry practice. In other words, Plaintiff has not presented sufficient evidence of what allegedly unimplemented control measures were (1) technologically available, (2) economically practicable, and (3) achievable in light of best industry practice. *See* Ex. P, 2019 Permit, Section 5(b).

101. There is no evidence that any of Plaintiff's members have been harmed by Defendants' alleged failure to "consider" climate change in their operation of the Terminal. Plaintiff has not submitted any evidence demonstrating that Defendants' purported failure to consider climate change or make climate-change related disclosures in its SWPPPs caused any property or environmental damage or any other tangible consequences.

Dated: August 25, 2026

Respectfully submitted,

<u>*/s/ Douglas A. Henderson*</u>
Douglas A. Henderson (phv05547)
Carmen R. Toledo (phv20194)
King & Spalding LLP

1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com
ctoledo@kslaw.com

Drew Bell (phv208721)
King & Spalding LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
T: (512) 457-2036
dbell@kslaw.com

Antonio E. Lewis (phv03069)
King & Spalding LLP
300 S Tryon Street, Suite 1700
Charlotte, North Carolina 28202
T: (704) 503-2600
alewis@kslaw.com

James O. Craven (ct18790)
Shook, Hardy, & Bacon
City Place 1
185 Asylum Street, Suite 3701
Hartford, CT 06103
T: (860) 515-8901
jcraven@shb.com

Rose J. Jones (phv208026)
Hilgers PLLC
1372 Peachtree Street, N.E., 19th Floor
Atlanta, GA 30309
T: (678) 229-1983
rjones@hilgersgraben.com

***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2026 a copy of the foregoing was filed through the Court's electronic filing system ("ECF"), by which means the document is available for viewing and downloading from the ECF system and a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Douglas A. Henderson*
Douglas A. Henderson (phv05547)
KING & SPALDING LLP
1180 Peachtree Street, NE Suite 1600
Atlanta, GA 30309
T: (404) 572-4600
dhenderson@kslaw.com